C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,<br><br>               Plaintiffs,<br><br>      v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,<br><br>             Defendants. | Case No:  17-cv-1017-BEN-JLB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     June 13, 2017<br>Time:    10:00 a.m.<br>Dept:    5A<br>Judge:  Hon. Roger T. Benitez |

# TABLE OF CONTENTS

**Page**

Table of Contents ...................................................................................................i

Table of Authorities .............................................................................................ii

Introduction ..........................................................................................................1

Factual Background ..............................................................................................2

I.  The Prohibited Magazines Are in Common Use for Lawful Purposes....................2

II.  The History of Magazine Capacity Restrictions ........................................4

III.  California's Magazine Possession Ban and Its Impact on Plaintiffs.........................5

Legal Standard ......................................................................................................6

Argument...............................................................................................................6

I.  Plaintiffs Are Likely to Succeed on the Merits ........................................6

    A.  Section 32310(c) Violates the Second Amendment ........................6

        1.  Section 32310(c) burdens Second Amendment conduct by banning magazines in "common use" for lawful purposes. ...........................7

        2.  Section 32310(c) cannot withstand heightened scrutiny. ....................8

            a.  Section 32310(c) is not "substantially related" to the state's public safety interests. ...............................10

            b.  Section 32310(c) is not "closely drawn" to an interest in preventing criminal misuse.................................14

    B.  Section 32310(c) Is an Unconstitutional Taking..........................16

    C.  Section 32310(d) Violates the Due Process Clause ....................21

II.  The Remaining Preliminary Injunction Factors Warrant Relief ...........................23

    A.  Plaintiffs Will Suffer Irreparable Harm if the Court Denies Relief.............23

    B.  Granting Preliminary Injunctive Relief Is in the Public Interest ................24

    C.  The Balance of Equities Tips Sharply in Plaintiffs' Favor ..........................24

Conclusion ...........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Alliance for the Wild Rockies v. Cottrell*,
632 F.3d 1127 (9th Cir. 2011) ...........................................................24

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ............................................................6

*Amen v. City of Dearborn*,
718 F.2d 789 (6th Cir. 1983). .........................................................19

*Andrus v. Allard*,
444 U.S. 51 (1979)...........................................................................17

*Buckley v. Valeo*,
424 U.S. 1 (1976)...............................................................................9

*Caetano v. Massachusetts*,
136 S. Ct. 1027 (2016).......................................................................7

*Carson Harbor Vill., Ltd. v. City of Carson*,
353 F.3d 824 (9th Cir. 2004) .......................................................20, 21

*Casitas Mun. Water Dist. v. United States*,
543 F.3d 1276 (Fed. Cir. 2008) .......................................................18

*Chalk v. U.S. Dist. Ct. Cal.* (*Orange Cty. Superin. of Schs.*),
840 F.2d 701 (9th Cir. 1998) .............................................................6

*DISH Network Corp. v. FCC*,
653 F.3d 771 (9th Cir. 2011) ...........................................................10

*District of Columbia v. Heller*,
554 U.S. 570 (2008)...................................................................*passim*

*E. Enters. v. Apfel*,
524 U.S. 498 (1998).......................................................................21, 22

*Edenfield v. Fane*,
507 U.S. 761 (1993)...........................................................................9

*Elrod v. Burns*,
427 U.S. 347 (1976)..........................................................................23

*Ezell v. Chicago*,
651 F.3d 684 (7th Cir. 2011) ...........................................................23

*First English Evangel. Luth. Church v. Los Angeles Cty.*,
482 U.S. 304 (1987)..........................................................................21

*Friedman v. City of Highland Park*,
　　784 F.3d 406 (7th Cir. 2015) ............................................................ 7

*Fyock v. City of Sunnyvale*,
　　25 F. Supp. 3d 1267 (N.D. Cal. 2014) ........................................ 9, 10

*Fyock v. City of Sunnyvale*,
　　779 F.3d 991 (9th Cir. 2015) ...................................... 7, 8, 10, 14

*Heller v. District of Columbia* (*Heller II*),
　　670 F.3d 1244 (D.C. Cir. 2011) .............................................. 7, 8

*Horne v. Dep't of Agric.*,
　　135 S. Ct. 2419 (2015) ................................................... *passim*

*Int'l Paper Co. v. United States*,
　　282 U.S. 399 (1931) ......................................................... 18

*Jackson v. City & Cty. of San Francisco*,
　　746 F.3d 953 (9th Cir. 2014) ............................... 7, 9, 14, 20

*Jacob Ruppert, Inc. v. Caffey*,
　　251 U.S. 264 (1920) ......................................................... 17

*James Everard's Breweries v. Day*,
　　265 U.S. 545 (1924) ......................................................... 17

*Kelo v. City of New London*,
　　545 U.S. 469 (2005) ..................................................... 18, 22

*Keystone Bituminous Coal Ass'n v. DeBenedictis*,
　　480 U.S. 470 (1987) ......................................................... 19

*Klein v. City of San Clemente*,
　　584 F.3d 1196 (9th Cir. 2009) ........................................... 24

*Kolbe v. Hogan*,
　　849 F.3d 160 (4th Cir. 2017) ............................................. 10

*Lingle v. Chevron U.S.A. Inc.*,
　　544 U.S. 528 (2005) ............................................. 16, 20, 21

*Loretto v. Teleprompter Manhattan CATV Corp.*,
　　458 U.S. 419 (1982) ..................................................... 17, 19

*Lucas v. S.C. Coastal Council*,
　　505 U.S. 1003 (1992) ....................................................... 16

*Madsen v. Women's Health Ctr., Inc.*,
　　512 U.S. 753 (1994) ......................................................... 9

*McCutcheon v. FEC*,
　　134 S. Ct. 1434 (2014) ................................................... 9, 14

*McDonald v. Chicago*,
  561 U.S. 742 (2010)..................................................................23

*Melendres v. Arpaio*,
  695 F.3d 990 (9th Cir. 2012) ...................................................23

*Monterey Mech. Co. v. Wilson*,
  125 F.3d 702 (9th Cir. 1997) ...................................................23

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
  804 F.3d 242 (2d Cir. 2015) ...............................................7, 10

*Nat'l Socialist Party of Am. v. Vill. of Skokie*,
  432 U.S. 43 (1977)...................................................................15

*Nixon v. United States*,
  978 F.2d 1269 (D.C. Cir. 1992) .........................................17, 19

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
  460 U.S. 37 (1983).....................................................................9

*Preminger v. Principi*,
  422 F.3d 815 (9th Cir. 2005) ...................................................24

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992)...................................................................8

*Richmond Elks Hall Ass'n v. Richmond Redevel. Agency*,
  561 F.2d 1327 (9th Cir. 1977) ...........................................18, 19

*Rodde v. Bonta*,
  357 F.3d 988 (9th Cir. 2004) ...................................................25

*Rodriguez v. Robbins*,
  715 F.3d 1127 (9th Cir. 2013) .................................................25

*Schad v. Borough of Mount Ephraim*,
  452 U.S. 61 (1981)...................................................................20

*Se. Promotions, Ltd. v. Conrad*,
  420 U.S. 546 (1975)..................................................................15

*Southview Assocs., Ltd. v. Bongartz*,
  980 F.2d 84 (2d Cir. 1992) .......................................................17

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*,
  535 U.S. 302 (2002)..............................................16, 17, 19, 20

*Taylor v. Westly*,
  488 F.3d 1197 (9th Cir. 2007) .................................................23

*Tucson Woman's Clinic v. Eden*,
  379 F.3d 531 (9th Cir. 2004) .....................................................8

*Turner Broad. Sys., Inc. v. FCC,*
   520 U.S. 180 (1997)............................................................................14

*United States v. 50 Acres of Land,*
   469 U.S. 24 (1984)............................................................................21

*United States v. Chester,*
   628 F.3d 673 (4th Cir. 2010)..........................................................8

*United States v. Chovan,*
   735 F.3d 1127 (9th Cir. 2013)....................................................7, 9

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010)............................................................14

*Univ. of Tex. v. Cameisch,*
   451 U.S. 390 (1981)........................................................................23

*Usery v. Turner Elkhorn Mining Co.,*
   428 U.S. 1 (1976)............................................................................22

*Valle del Sol Inc. v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013)......................................................25

*Vincenty v. Bloomberg,*
   476 F.3d 74 (2d Cir. 2007)............................................................15

*Ward v. Rock Against Racism,*
   491 U.S. 781 (1989)........................................................................14

*Whole Woman's Health v. Hellerstedt,*
   136 S. Ct. 2292 (2016)..................................................................20

*Winter v. Nat. Res. Def. Council, Inc.,*
   55 U.S. 7 (2008)..............................................................................6

**Statutes**

Cal. Penal Code § 16740...........................................................................5

Cal. Penal Code § 32310...................................................................*passim*

Colo. Rev. Stat. § 18-12-301.....................................................................4

Colo. Rev. Stat. § 18-12-302.....................................................................4

Conn. Gen. Stat. § 53-202w.......................................................................4

D.C. Code § 7-2506.01...............................................................................4

Haw. Rev. Stat. § 134-8.............................................................................4

Mass. Gen. Laws ch. 140, § 121...............................................................4

Mass. Gen. Laws ch. 140, § 131 ...........................................................................4

Md. Code., Crim. Law § 4-305 ...........................................................................4

N.J. Stat. § 2C:39-1 ...........................................................................................4

N.J. Stat. § 2C:39-9 ...........................................................................................4

N.J. Stat. § 2C-39-3 ...........................................................................................4

N.Y. Penal Law § 265.00 ...................................................................................4

N.Y. Penal Law § 265.36 ...................................................................................4

**Other Authorities**

11A Charles Alan Wright et al.,
    *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) .......................................23

Chad Adams,
    *Complete Guide to 3-Gun Competition* (2012) ......................................................4

Christopher S. Koper, et al.,
    *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (Nat'l Instit. Just. June 2004)...........3, 8, 11

David B. Kopel,
    *The History of Firearm Magazines and Magazine Prohibitions*,
    78 Alb. L. Rev. 849 (2015)...............................................................................*passim*

International Practical Shooting Confederation,
    http://www.ipsc.org .............................................................................................4

Massad Ayoob,
    *The Complete Book of Handguns* (2013) ........................................................3, 7, 8

Official Voter Info. Guide,
    *Prop. 63: Text of Proposed Laws*, *available at*
    voterguide.sos.ca.gov/en/propositions/63 .......................................................9

S. 1446, 2015-2016 Reg. Sess. (Cal. 2016) .......................................................5

S. 23, 1999-2000 Reg. Sess. (Cal. 1999) ..........................................................5

S. Comm. Pub. Safety,
    S. 1446, 2015-2016 Reg. Sess., at 5 (Cal. 2016), *available at*
    https://leginfo.legislature.ca.gov/faces/bill
    AnalysisClient.xhtml?bill_id=201520160SB1446...............................................9

U.S. Dep't of Just., Bur. of Just. Statistics,
    *Criminal Victimization in the United States, 2008 Statistical Tables, National Crime Victimization Survey* table 37 (May 2011) ...................................................13

Uniform Crime Reports,
  *Crime in the United States 2012*, Fed. Bur. Invest., Dep't of Just. (2012),
  http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-
  2012/violent-crime/violent-crime ...........................................................................11

Uniform Crime Reports,
  *Crime in the United States 2012*, Fed. Bur. Invest., Dep't of Just. table 1 *(2012)*,
  https://ucr.fbi.gov/crime-in-the-u.s/2012/crime-in-the-u.s.-
  2012/tables/1tabledatadecoverviewpdf/table_1_crime_
  in_the_united_states_by_volume_and_rate_per_100000_inhabitants_1993-
  2012.xls ..................................................................................................................11

*What Should America Do About Gun Violence?*:
  Hearing Before U.S. S. Comm. on Judiciary, 113th Cong. (2013) ..........................5

# INTRODUCTION

Ammunition magazines that can hold more than 10 rounds are ubiquitous in the United States, coming standard with approximately half of all firearms sold today. Estimates show that well over 100 million such magazines have been lawfully acquired in just the past quarter century; the clear majority of them, by law-abiding citizens who keep them for self-defense. To date, very few states have taken the extraordinary step of banning the possession of these commonly owned arms.

Come July 1, 2017, California will join them. On that date, every Californian (save a special few) who merely possesses a magazine over 10 rounds—even at home—will be a criminal. Plaintiffs' only options to avoid prosecution are to surrender their magazines to the government, transfer them out of state, or sell them to one of a few state-approved purchasers—all without government compensation. California's impending magazine possession ban is an outlier that violates multiple constitutional provisions and should be preliminarily enjoined.

First, a total ban on the possession of magazines "in common use" by law-abiding citizens for self-defense plainly violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 627 (2008). The state can point to no justification—let alone one sufficient to withstand heightened scrutiny—for banning magazines lawfully and safely owned by tens of millions of Americans to defend themselves.

Second, *physically dispossessing* magazine owners of their private property without just compensation from the government violates the Takings Clause. It is no answer that the owner of a soon-to-be-illegal magazine can give it to the government, remove it from the state, or sell it on a state-restricted market. Whatever expectations people may have regarding regulation of their property, they do not expect it to be "occupied or taken away." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015).

Third, because it retroactively criminalizes and deprives owners of lawfully acquired magazines without advancing the government's interest in public safety, the possession ban violates the Due Process Clause. There is simply no reason to believe that

physical dispossession of magazines from those, like Plaintiffs, who have safely and lawfully possessed them since the state banned their acquisition in 2000 is now related to advancing the state's interest in public safety.

Finally, Plaintiffs are not only likely to succeed on the merits but also satisfy the other preliminary injunction requirements. Denial of a constitutional right is the quintessential irreparable injury, and the need for immediate relief is only more evident when the injury involves physical dispossession of property on an imminent date certain. There is no public interest in inflicting a likely constitutional violation, especially when the status quo can be preserved with no demonstrable harm to anyone. To be clear, Plaintiffs seek merely to preliminarily enjoin the provision that takes effect July 1, 2017, criminalizing the *possession* of the targeted magazines. California has gone its entire history without taking these magazine from law-abiding citizens; it should not be allowed to start until the multiple constitutional defects in the new law are adjudicated.

## FACTUAL BACKGROUND

### I.   THE PROHIBITED MAGAZINES ARE IN COMMON USE FOR LAWFUL PURPOSES

Magazines over 10 rounds are commonly possessed by the American public—and they have been for generations. Curcuruto Decl. ¶¶ 4, 13; Helsley Decl. ¶¶ 3, 10; Barvir Decl., Ex. E; David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851-64, 871-72 (2015) (Barvir Decl., Ex. H at 207-08). Such magazines have existed since before the American Revolution. Helsley Decl. ¶ 4; Barvir Decl., Ex. H at 207. They "have been very commonly possessed in the United States since 1862." Barvir Decl., Ex. H at 207; *see also* Helsley Decl. ¶¶ 5-7. And their popularity has steadily increased ever since, especially as technology has improved. Helsley Decl. ¶¶ 5-10; Ex. H at 187-200; *see generally* Barvir Decl., Exs. H-NN.

Although exact numbers are difficult to calculate, a sizable percentage—perhaps a majority—of all firearms sold in the United States today come from the factory with magazines over 10 rounds. Curcuruto Decl. ¶¶ 4-6, 12, Ex. D; *see also* Helsley Decl. ¶ 3, 9-10; Barvir Decl., Exs. E at 497-99, F; Massad Ayoob, *The Complete Book of Handguns*

87, 89-90 (2013) (Ayoob Decl., Ex. B). Indeed, "[i]t is indisputable that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are *standard equipment* for many popular firearms." Barvir Decl., Ex. H at 210 (emphasis added); *see also* Helsley Decl. ¶¶ 3, 9-10. Further, approximately *115 million* magazines over 10 rounds were in circulation in the United States between 1990 and 2015, representing roughly 50 percent of all magazines acquired during that time. Curcuruto Decl. ¶¶ 6-8, 12-13, Ex. D; Barvir Decl., Ex. H at 208; Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* 65 (Nat'l Instit. Just. June 2004) (Barvir Decl., Ex. PP at 453).

   The magazines are overwhelmingly used for lawful purposes. "Common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds that has existed since the mid-nineteenth century." Barvir Decl., Ex. H at 207. Indeed, renowned firearm historian Stephen Helsley declares that firearms and magazines over 10 rounds were developed for self and home defense. Helsley Decl. ¶¶ 4-11. Manufacturers specifically market them for those purposes. Barvir Decl., Exs. F-G. And civilians overwhelmingly choose them to increase their chances of staying alive in violent confrontations. Ayoob Decl. ¶ 24; Curcuruto Decl. ¶¶ 4, 7-8; Helsley Decl. ¶ 11; Duncan Decl. ¶ 6; Lewis Decl. ¶ 6; Lovette Decl. ¶ 6; Marguglio Decl. ¶ 6; Waddell Decl. ¶ 6; Dember Decl. ¶ 6.[1]

   The reasons a potential victim benefits from having a magazine over 10 rounds for self-defense are clear. The presence of multiple attackers may require far more defensive discharges to eliminate the threat, Ayoob Decl. ¶¶ 5-9, 16-17; Kleck Decl. ¶¶ 18-20; the

---

   [1]  Unsurprisingly, American citizens have historically modeled their choice of defensive firearms on what police carry. Ayoob Decl. ¶ 25; Helsley Decl. ¶¶ 9-10. Take Glock pistols, the most popular handguns among American law enforcement, they are "hugely popular" for home and personal defense. Ayoob Decl., Ex. B. They come standard with 15- to 17-round magazines. *Id.*

stress of a criminal attack greatly reduces the likelihood that shots fired will hit an attacker, Kleck Decl. ¶¶ 19-21; *see also* Ayoob Decl. ¶ 28; and bullet-hits do not necessarily incapacitate a criminal before he can complete his attack, Ayoob Decl. ¶¶ 5-10, 12-14; Helsley Decl. ¶¶ 12-15. Further, because most people do not keep back-up magazines or firearms immediately accessible, victims are often limited to shots available from a single firearm. Ayoob Decl. ¶¶ 17-18, 24, 27-29; Kleck Decl. ¶ 18. For these reasons, discussed below, the banned magazines are commonly preferred by law-abiding Californians, including Plaintiffs, for self-defense. *See infra* Argument, Part I.A.2.a.[2]

## II. THE HISTORY OF MAGAZINE CAPACITY RESTRICTIONS

Though magazines over 10 rounds predate the Second Amendment by over 200 years, there were *no* ammunition capacity restrictions on the law books when the amendment was ratified. Ex. H at 200. In fact, the first such laws—found in just three states and the District of Columbia—appeared "during the prohibition era, nearly a century and half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment." *Id.* Save for D.C.'s law, a version of which remains in effect, all have since been repealed. *Id.* at 200-02. Today, the overwhelming majority of states place *no* restrictions on magazine-capacity, let alone demand that law-abiding citizens surrender them under threat of criminal penalty. The restrictions that are in place are of recent vintage, and they differ as to what capacity is acceptable and for what types of firearms capacity should be restricted.[3]

_____

[2] The banned magazines are also essential in the most popular competitive shooting sports in America. *See* International Practical Shooting Confederation, http://www.ipsc.org; Chad Adams, *Complete Guide to 3-Gun Competition* 89 (2012).

[3] Barvir Decl., Ex. H (for firearm historian David Kopel's exhaustive history of ammunition capacity restrictions in the U.S.); *see also* Colo. Rev. Stat. §§ 18-12-301—302 (15-round limit; adopted 2013); Conn. Gen. Stat. § 53-202w (10-round limit; adopted 2013); D.C. Code § 7-2506.01(b) (12-round limit adopted in 1932; reduced to 10 rounds in 2009); Haw. Rev. Stat. § 134-8(c) (10-round limit for handguns only; adopted in 1992); Md. Code, Crim. Law § 4-305(b) (20-round limit on transfer adopted in 1994; reduced to 10 in 2013); Mass. Gen. Laws ch. 140, §§ 121, 131(a) (10-round limit without Class A permit; adopted 1994); N.J. Stat. § 2C:39-1y, -3j, -9h (15-round limit; adopted 1990); N.Y. Penal Law §§ 265.00, 265.36 (10-round limit; transfer banned in 2000,

In 1994 (before the Supreme Court confirmed that the Second Amendment protects an individual right), Congress adopted the first nationwide magazine-capacity restriction—a federal law banning possession and transfer of "large-capacity magazines" manufactured before 1994. Barvir Decl., Ex. H at 203. But Congress allowed that restriction to expire in 2004 after a Department of Justice-commissioned study on the effectiveness of the federal ban showed no real impact. *What Should America Do About Gun Violence?*: Hearing Before U.S. S. Comm. on Judiciary, 113th Cong. 11 (2013) (Barvir Decl., Ex. OO at 424); Barvir Decl., Ex. H at 20.

## III.   CALIFORNIA'S MAGAZINE POSSESSION BAN AND ITS IMPACT ON PLAINTIFFS

Since January 1, 2000, California has regulated the manufacture, importation, sale, and transfer of any "large-capacity magazine," defined as "any ammunition feeding device with the capacity to accept more than 10 rounds," but not including feeding devices that have been permanently altered to accommodate no more than 10 rounds, any .22 caliber tube ammunition feeding device, and any tubular magazine contained in a lever-action firearm. S. 23, 1999-2000 Reg. Sess. (Cal. 1999) (codified at Cal. Penal Code § 32310); Cal. Penal Code § 16740. California, however, left the *possession* of "large-capacity magazines" lawful.

That changed in July 2016, when the Legislature amended Penal Code section 32310 to prohibit the mere possession of "large-capacity magazines." S. 1446, 2015-2016 Reg. Sess. (Cal. 2016). Then, on November 8, 2016, voters approved Prop. 63, which effectively did the same. *See* Cal. Penal Code § 32310. Under either version, anyone currently in possession of a now-banned magazine has until July 1 to: (1) remove it from the state; (2) sell it to a licensed firearm dealer; or (3) surrender it to law enforcement. Violating section 32310 exposes the possessor to criminal penalties. *Id.*

The individual plaintiffs are responsible and law-abiding residents of San Diego

---

possession banned in 2013).

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR PRELIMINARY INJUNCTION

County, California, who are not prohibited from owning or possessing firearms. Duncan Decl. ¶ 3; Lewis ¶ 3; Lovette ¶ 3; Marguglio ¶ 3; Waddell ¶ 3. They either own and possess a lawfully acquired magazine over 10 rounds, or seek to acquire and possess one. Duncan Decl. ¶ 9; Lewis ¶ 4; Lovette ¶ 4; Marguglio ¶ 9; Waddell ¶ 9. For purposes of this motion, which seeks to enjoin only the part of the law banning *possession* of magazines lawfully obtained before 2000, Plaintiffs Lewis and Lovette declare that, but for the impending enforcement of section 32310(c), they would continue to possess their magazines in the state for self-defense and other lawful purposes. Lewis ¶ 12; Lovette ¶ 12. Plaintiff California Rifle & Pistol Association, Incorporated (CRPA), represents its countless law-abiding members, who lawfully acquired and presently possess magazines over 10 rounds, and who would retain possession of them if this Court enjoins section 32310(c). Dember Decl. ¶ 5; Lewis Decl. ¶ 13; Lovette Decl. ¶ 13.

## LEGAL STANDARD

"The purpose of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits." *Chalk v. U.S. Dist. Ct.* (*Orange Cty. Superin. of Schs.*), 840 F.2d 701, 704 (9th Cir. 1998). To obtain such relief, the moving party must show: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm absent preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 55 U.S. 7, 20 (2008)).

## ARGUMENT

### I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

#### A. Section 32310(c) Violates the Second Amendment

The Supreme Court has described "the right of law-abiding, responsible citizens to use arms in defense of hearth and home" as the Second Amendment interest "surely elevate[d] above all other[s]." *Heller*, 554 U.S. at 635. The Ninth Circuit employs a two-step analytical framework when evaluating Second Amendment claims, asking first

whether the law burdens conduct protected by the Second Amendment, and then whether it survives the appropriate level of heightened scrutiny. *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). Because section 32310(c) prohibits law-abiding citizens from keeping commonly possessed arms within the sanctity of their homes for the core purpose of self-defense, it severely burdens protected conduct and is unconstitutional under any level of scrutiny.

### 1.   Section 32310(c) burdens Second Amendment conduct by banning magazines in "common use" for lawful purposes.

The Second Amendment protects those "arms" that are "typically possessed by law-abiding citizens for lawful purposes." *See Heller*, 554 U.S. at 624-25; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1027-28 (2016). The Second Amendment's protection necessarily includes the ammunition and magazines required for the meaningful exercise of the right to keep and bear arms. *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967-68 (9th Cir. 2014). The Second Amendment thus protects those magazines "in common use" by law-abiding citizens today. *Heller*, 554 U.S. at 627.

Applying that test here is straightforward. Nearly every appellate court that has analyzed this issue has found, or was willing to assume without expressly holding, that bans on magazines over 10 rounds burden conduct protected by the Second Amendment—that is, they ban magazines in common use for lawful purposes. *See, e.g.*, *Fyock*, 779 F.3d at 999 (holding lower court did not abuse its discretion in holding that magazines over 10 rounds are in common use); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015); *Friedman v. City of Highland Park*, 784 F.3d 406, 415 (7th Cir. 2015); *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1261 (D.C. Cir. 2011). And for good reason: It is well-documented that these magazines have long been commonly possessed by law-abiding citizens—especially for the core lawful purpose of self-defense. *See supra* Factual Background, Part I; Ayoob Decl., Ex. B, Curcuruto Decl. ¶¶ 4, 6, 8, 13, Ex. D; Helsley Decl. ¶¶ 3, 5-11; Barvir Decl., Exs. H at

207-08, 810, PP at 1, 65-67; *see generally* Barvir Decl., Exs. E-H, RR-SS.

There is nothing unusual or novel about magazines that can hold more than 10 rounds. Indeed, many of the nation's best-selling firearms—including the Glock pistol, the nation's most popular handgun—have long come *standard* with magazines California now prohibits. Ayoob Decl., Ex. B; Barvir Decl., Ex. H at 210; Curcuruto Decl. ¶¶ 6, 8; Helsley Decl. ¶¶ 2-3, 9-10. Law-abiding citizens safely possess firearms equipped with such magazines in the clear majority of states, which have *no* magazine capacity restrictions at all. *See supra* n.4. The reason for the popularity of these magazines is straightforward: In a confrontation with a violent attacker, having enough ammunition can be the difference between life and death. *See supra* Factual Background, Part I; *see infra* Argument, Part I.A.2.a.

Plaintiffs are thus highly likely to succeed at step one of the two-step Second Amendment framework, because a complete ban on magazines that are in "common use" by millions of Americans plainly burdens the Second Amendment.

### 2. Section 32310(c) cannot withstand heightened scrutiny.

Under heightened scrutiny, a challenged law is *presumed* unconstitutional, and the government bears the burden of justifying it. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (content-based speech regulations are presumptively invalid); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("unless the conduct at issue is not protected by the Second Amendment at all, the government bears the burden of justifying the constitutional validity of the law"). When a court evaluates the constitutionality of a statute under even intermediate scrutiny,[4] the government carries two equally important

---

[4]  Plaintiffs do not concede that intermediate scrutiny is proper for evaluating the constitutionality of section 32310. They do recognize, however, that Ninth Circuit precedent likely compels the Court to apply it here. *Fyock*, 779 F.3d at 999. That said, Plaintiffs preserve their arguments that section 32310 requires no application of the levels-of-scrutiny analysis because it is a categorically invalid ban on protected arms under *Heller*. *See Heller II*, 670 F.3d at 1271-85 (Kavanaugh, J., dissenting). But if a level of means-end review is selected, strict scrutiny must be the test. *See, e.g.*, *id.* at 1284-85; *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 544 (9th Cir. 2004) ("[A] law is subject to strict scrutiny . . . when that law impacts a fundamental right, not when it

burdens. First, it must demonstrate that the law is "substantially related" to an important government interest. *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *see Chovan*, 735 F.3d at 1139-40. Second, it must prove that its chosen means is "closely drawn" to achieve that end without "unnecessary abridgment" of constitutionally protected conduct. *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456-57 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)); *see Jackson*, 746 F.3d at 961 (noting that Second Amendment heightened scrutiny is "guided by First Amendment principles"). The Attorney General can meet neither burden.

In adopting Proposition 63, the People stated their intention behind the law was to prevent a specific category of criminal-misuse of "large-capacity magazines"—i.e., mass shootings. And in passing S.B. 1146, the Legislature sought to make the ban on buying, selling, or acquiring magazines over 10 rounds in section 32310(a) easier to enforce—thereby promoting the public safety interests that those earlier magazine restrictions sought to achieve.[5] While the government has an important interest in promoting public safety and preventing crime, *see, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994), the Attorney General must still prove that the ban is substantially related and closely drawn to advancing those interests before the state may revoke its citizens' constitutional rights. He cannot prove either. Plaintiffs are thus likely to succeed.

Nothing in the Northern District of California's decision in *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014), or the Ninth Circuit's decision affirming it, command a different outcome. There, the district court declined to temporarily enjoin a citywide ban on magazines over 10 rounds because plaintiffs had not established a likelihood of success on the record then before the court. *Id.* at 1282. While

---

infringes it."); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 54 (1983) (similar).

[5] Official Voter Info. Guide, *Prop. 63: Text of Proposed Laws* 164, *available at* voterguide.sos.ca.gov/en/propositions/63; S. Comm. Pub. Safety, S. 1446, 2015-2016 Reg. Sess., at 5 (Cal. 2016), *available at* https://leginfo.legislature.ca.gov/faces/bill AnalysisClient.xhtml?bill_id=201520160SB1446 (select 04/18/16-Senate Public Safety).

the Ninth Circuit affirmed the denial, it ruled simply that "the district court did not *abuse its discretion . . . , on the record before it*." *Fyock*, 779 F.3d at 1001 (emphasis added). It did *not* hold that bans on magazines over 10 rounds necessarily survive intermediate scrutiny. *See id.* Indeed, the court warned readers that "due to the limited scope of our review . . . our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits." *Id.* at 995 (quoting *DISH Network Corp. v. FCC*, 653 F.3d 771, 776 (9th Cir. 2011)). In short, *Fyock* does not preclude this Court from granting the temporary relief Plaintiffs' seek if the Court is satisfied that, on the record *now*, Plaintiffs are likely to succeed on the merits.[6]

### a. Section 32310(c) is not "substantially related" to the state's public safety interests.

For a law to be substantially related to the government's interests, the government must demonstrate that its "restriction will in fact alleviate" its concerns. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). It is not enough for the government to rely on "mere speculation or conjecture." *Id.* But here, neither the Attorney General or anyone else has identified a causal link between violent crime and the banned magazines. Instead, proponents of magazine bans rely almost entirely on "mere speculation" that, given time, such bans *may* reduce gun violence because they have:

> "[T]he potential to (1) reduce the number of crimes committed with [large capacity magazines]; (2) reduce the number of shots fired in gun crimes; (3) reduce the number of gunshot victims in such crimes; (4) reduce the number of wounds per gunshot victim; (5) reduce the lethality of gunshot injuries when they do occur; and (6) reduce the substantial societal costs that flow from shootings."

*Fyock*, 25 F. Supp. 3d at 1280 (quoting expert declaration of Christopher Koper

---

[6]  Likewise, this Court is not bound by those out-of-circuit decisions upholding bans on magazines over 10 rounds. *Kolbe v. Hogan*, 849 F.3d 160, 149 (4th Cir. 2017); *NYSRPA*, 804 F.3d at 269; *Heller II*, 670 F.3d at 1264. To the extent this Court considers those cases as persuasive precedent, it is clear they were wrongly decided—ignoring clear guidance from *Heller* that removing constitutionally protected arms from the homes of law-abiding Americans lacks the required fit under *any* level of scrutiny. *See supra* Argument, Part I.A.2.

1  supporting citywide magazine ban).

2      The abstract theory simply does not hold up in reality—as Mr. Koper's own

3  research shows. A Department of Justice study commissioned by the Clinton

4  administration to study the effects of the 1994 federal ban on magazines over 10 rounds

5  and "assault weapons" concluded that, ***10 years after the ban was imposed***, "there [had

6  been] no discernible reduction in the lethality and injuriousness of gun violence." Barvir

7  Decl., Ex. PP at 485. Indeed, "[t]here was no evidence that lives were saved [and] no

8  evidence that criminals fired fewer shots during gun fights." *Id.* at Ex. OO at 424; *see*

9  *also* Kleck Decl. ¶ 30-32. Koper's final report declared that the federal ban could not be

10  "clearly credit[ed] . . . with any of the nation's recent drop in gun violence," Barvir Decl.,

11  Ex. PP at 454, and that, "[s]hould [a nationwide ban] be renewed the effects on gun

12  violence are likely to be small at best and perhaps too small for reliable measurement,"

13  *id.* at 455.

14      It is no wonder, then, that Congress allowed the ban to expire in 2004. Ex. OO at

15  42. Since that time, likely *millions* more of the formerly banned magazines have been

16  purchased throughout the United States. Curcuruto Decl. ¶¶ 6-13, Ex. D. But violent

17  crime has steadily and significantly declined.[7] What the 1994 federal experiment proves

18  is that possession of magazines over 10 rounds is not causally related to violent crime.

19      Existing data show why magazine capacity limits are ineffective at reducing

20  violence. First, criminals rarely fire more than a few rounds, making magazine capacity

21  irrelevant for almost all crimes. Kleck Decl. ¶¶ 7-8. High volume of fire is usually limited

22  to rare mass shootings, those involving many victims. Kleck Decl. ¶ 9. But, even in such

23  cases, larger magazines do not increase lethality because the perpetrators almost always

24

25  _____

26      [7] Uniform Crime Reports, *Crime in the United States 2012*, Fed. Bur. Invest. ,
     Dep't of Just. (2012), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-
27  in-the-u.s.-2012/violent-crime/violent-crime; *id.* at table 1, https://ucr.fbi.gov/crime-in-
     the-u.s/2012/crime-in-the-u.s.-2012/tables/1tabledatadecoverviewpdf/table_1_crime_
28  in_the_united_states_by_volume_and_rate_per_100000_inhabitants_1993-2012.xls.

possess multiple firearms or magazines that allow them to sustain the same amount and rate of fire, regardless of magazine size. Kleck Decl. ¶¶ 9-13, 16-17. For these reasons, the notion that lower capacity magazines (assuming the law prevents the mass murderer from obtaining larger ones) will provide victims an opportunity to escape or tackle the shooter during a magazine change required after few shots is, unfortunately, unrealistic. Ayoob Decl., Ex. C; Kleck ¶¶ 14-17. History shows that mass shooters often change magazines without incident throughout their attack. Ayoob Decl. ¶¶ 21, 29; Barvir Decl., Ex. OO at 19; Kleck Decl. ¶¶ 10-14; Kleck, *Targeting Guns*, *supra*, at 125, 144.

In short, no empirical evidence establishes a link between violent crime and the possession of the magazines the state bans. Without that link, the Attorney General cannot establish that section 32310(c) is substantially related to that interest.

Indeed, contrary to proponents' claims that magazine bans promote public safety, such laws instead *decrease* public safety because they restrict the self-defense capabilities of the law-abiding—as the time it takes to change magazines is much more likely to negatively affect crime victims than their attackers. Ayoob Decl. ¶¶ 5, 24, 28-30, 31-34; Kleck Decl. ¶¶ 25-32. Unlike perpetrators of violent crime and mass shootings, victims do not choose when or where an attack will take place. Ayoob Decl. ¶¶ 29. The number of attackers, the location of the attack, the attacker's intentions, and the time of the attack are completely unknown. *Id.* ¶¶ 21-22, 29. For that reason, the prohibited magazines are overwhelmingly preferred by law-abiding Americans for personal and home defense.

The availability of more ammunition in a firearm increases the likelihood of surviving a criminal attack, while limiting the number of rounds available decreases one's chances of survival. A firearm's ammunition capacity is thus directly related to its suitability for self-defense. Evidence of this point is overwhelming. Massad Ayoob, a use-of-force expert and law enforcement defensive-gun-use trainer, describes the suitability of firearms with increased ammunition capacities for self-defense and the impact of magazine restrictions like California's:

[L]imits on magazine capacity are likely to impair the ability of citizens to

engage in lawful self-defense in those crime incidents necessitating that the victim fire many rounds in order to stop the aggressive actions of offenders.

*Id.* ¶ 4; *see also id.* ¶¶ 5-17 (recounting instances where crime victims required more than 10 rounds to fight off their attacker(s)); Kleck Decl. ¶¶ 25-32.

The reasons citizens benefit from having more than 10 rounds immediately available in a self-defense emergency are clear. Given that criminal attacks occur at a moment's notice, taking the victim by surprise, usually at night and in confined spaces, victims rarely have multiple magazines or extra ammunition readily available for reloading. Ayoob Decl. ¶¶ 18-19; Kleck Decl. ¶ 25. Regardless, the victim likely cannot hold a spare magazine as she scrambles for cover. Often both hands will be on the firearm. If they are not, one hand is likely holding the phone to call the police. Ayoob Decl. ¶ 18. And certainly, most people do not keep back-up magazines or firearms strapped to their bodies while they sleep; they must typically make do with a single gun and its ammunition capacity. *Id.* ¶¶ 18-19, 23; Kleck Decl. ¶¶ 18, 25.

Even if additional magazines are available, it is extremely difficult—and potentially deadly—to stop to change magazines when one is under attack, the stress of which severely degrades the fine motor skills necessary for the task. Ayoob Decl. ¶ 28; Kleck Decl. ¶ 25. That same stress also reduces the accuracy of any shots that are fired. Kleck ¶¶ 19-22; *see also* Ayoob Decl. ¶ 28; Helsley Decl. ¶ 11. Even if accurate, it is rare that a single shot will immediately neutralize an attacker. Ayoob Decl. ¶¶ 5-17; Helsley Decl. ¶¶ 12-15. And the presence of multiple attackers[8] may require far more defensive discharges to eliminate the threat. Ayoob Decl. ¶¶ 5-17; Kleck Decl. ¶¶ 19-20. Limited to just 10 rounds by the state's ban, victims are left defenseless should they be unable to incapacitate their attackers with just 10 bullets.

---

[8]  Far from rare, of those violent crimes for which the number of assailants is known, 17.4 percent involved multiple offenders in 2008—*10.5 percent (nearly 800,000 incidents) involved at least three*. U.S. Dep't of Justice, Bur. of Just. Statistics, *Criminal Victimization in the United States, 2008 Statistical Tables, National Crime Victimization Survey* table 37 (May 2011) (Barvir Decl., Ex. RR at 511).

In short, section 32310 is not a small burden on self-defense. Forcing law-abiding citizens to change magazines while attempting to defend against a criminal attack could cost them their lives. Because the magazine ban restricts the self-defense capabilities of the law-abiding (with potentially deadly consequences), it cannot be said that the law promotes the government's asserted public safety interests.

### b.   Section 32310(c) is not "closely drawn" to an interest in preventing criminal misuse.

Even assuming the law does advance the state's public safety interests, the government bears the burden of establishing that the law is "closely drawn to avoid unnecessary abridgment" of constitutional rights, *McCutcheon*, 134 S. Ct. at 1456; *see Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989). The government is entitled to *no deference* when assessing the "fit" between its purported interests and the means selected to advance them. *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 214 (1997). Rather, the government must *prove* that those means do not burden the right "substantially more" than "necessary to further [its important] interest." *Id.* Concededly, this does not require the government employ the "least restrictive means," *Fyock*, 779 F.3d at 1000-01, but the fit must be "reasonable," *United States v. Marzzarella*, 614 F.3d 85, 97-98 (3d Cir. 2010).

Here, the state has chosen the opposite of tailoring. It flatly bans Californians— including those who, like Plaintiffs, have lawfully owned the now-banned magazines for over 20 years without incident—from possessing magazines over 10 rounds. *See Jackson*, 746 F.3d at 964 (contrasting "complete ban" with regulations). The state paints with the broadest strokes possible, simply obliterating the right to keep and use these protected magazines for in-home self-defense instead of carefully balancing the state's public safety interests and the People's fundamental rights. This is *not* the sort of "fit" that survives intermediate scrutiny.

To ban certain arms because criminals might misuse them is to tell law-abiding citizens that their own liberties depend not on their own conduct, but on the conduct of

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR PRELIMINARY INJUNCTION

1  the lawless few who abuse those liberties—a perverse message indeed. The notion that

2  the government may flatly ban constitutionally protected activity simply because the

3  activity *could* lead to abuses has been squarely rejected in other contexts, *cf. Nat'l*

4  *Socialist Party of Am. v. Vill. of Skokie*, 432 U.S. 43, 43-44 (1977), and should be

5  rejected here. " '[A] free society prefers to punish the few who abuse [their] rights . . .

6  after they break the law than to throttle them and all others beforehand.' " *Vincenty v.*

7  *Bloomberg*, 476 F.3d 74, 85 (2d Cir. 2007) (quoting *Se. Promotions, Ltd. v. Conrad*, 420

8  U.S. 546, 559 (1975)) (upholding injunction against ban on sale to and possession of

9  spray paint and broad-tipped markers by persons under 21 to combat graffiti).

10       Ultimately, the magazine ban represents a policy choice as to the types of arms the

11  state desires its residents to use. But *Heller* declares such policy choices "off the table" as

12  to constitutionally protected arms—i.e., those in "common use" for lawful purposes. *See*

13  554 U.S. at 636. There, D.C. sought to ban handguns for the same reasons California

14  wishes to ban magazines over 10 rounds. *Id.* at 682, 693 (Breyer, J., dissenting). Despite

15  these compelling public safety interests, *Heller* held that D.C.'s handgun ban would "fail

16  constitutional muster" under "any of the standards of scrutiny" applicable to fundamental

17  rights. *Id.* at 628-29 (majority opinion). If the D.C. handgun ban could not even pass

18  intermediate scrutiny (that is, it was not "closely drawn" to advance the government's

19  public safety interests), it follows that California's magazine ban cannot survive such

20  scrutiny either. For if prohibiting law-abiding citizens from possessing protected arms

21  were a valid method of reducing criminal misuse, *Heller* would have been decided

22  differently. Certainly, the justification for banning *handguns* is at least as strongly related

23  to the government's public safety objectives, for handguns are *overwhelmingly* preferred

24  by criminals—accounting for 81 percent of all firearm homicides from 1993 to 1997. *Id.*

25  at 697-99 (Breyer, J., dissenting). But despite the government's clear interest in keeping

26  concealable firearms out of the hands of criminals, banning the possession of commonly

27  used, protected arms by the law abiding *lacks the required fit under any level of scrutiny*.

28  *Id.* at 628-29 (majority opinion). The same result follows here.

1
2
3

Because the Attorney General cannot establish that section 32310(c)'s possession ban is *both* substantially related and closely drawn to the state's public safety interests, Plaintiffs are likely to succeed on the merits.

4

**B.      Section 32310(c) Is an Unconstitutional Taking**

5
6
7

Plaintiffs Lewis, Lovette, and CRPA are also likely to succeed on their claims that the ban violates the Takings Clause, as it forces them to dispossess themselves of their lawfully acquired property without just compensation. Compl. ¶¶ 69-71.

8
9
10
11
12
13
14
15
16

The Takings Clause applies to two types of governmental action: "physical taking[s]" and "regulatory takings." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015). A physical taking occurs when "the government physically takes possession of an interest in property for some public purpose"—that is, when it "dispossess[es] the owner" of private property to promote the general good. *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 322, 325 n.19 (2002). When the government physically takes property, it "has a categorical duty to compensate the former owner." *Id.* at 322. That duty applies equally to takings of real and "personal property." *Horne*, 135 S. Ct. at 2427.

17
18
19
20
21
22
23
24

By contrast, a regulatory taking is "a restriction on the *use*" of private property. *Id.* (emphasis added). A regulation that deprives an owner of "*all* economically beneficial use of her property" categorically requires government compensation. *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 538 (2005) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)). A regulation of property use also requires compensation if it "goes too far"—an inquiry that requires analysis of several factors, including "the magnitude of a regulation's economic impact and the degree to which it interferes with legitimate property interests." *Id.* at 537-38, 540.

25
26
27
28

California's magazine possession ban is a paradigmatic physical taking that requires government compensation. Section 32310(c) subjects to criminal punishment "any person in this state who possesses any large-capacity magazine" after July 1, 2017, "regardless of the date the magazine was acquired." Cal. Penal Code § 32310(c). By its

MEMORANDUM OF POINTS AND AUTHORITIES ISO MOTION FOR PRELIMINARY INJUNCTION
17-cv-1017-BEN-JLB

1   plain terms, the law is a government mandate that owners of private property physically

2   dispossess themselves of their property—a physical taking that requires government

3   compensation. *See Tahoe-Sierra*, 535 U.S. at 324 n.19 (holding that a physical taking

4   "dispossess[es] the owner" of property); *Nixon v. United States*, 978 F.2d 1269, 1287

5   (D.C. Cir. 1992) (statute that "physically dispossessed" property owner "resulted in" *per*

6   *se* taking). Indeed, physical dispossession of the kind mandated by California's ban is the

7   *sine qua non* of a physical taking; what "distinguish[es]" a physical from a regulatory

8   taking is whether the regulation "absolutely dispossess[es] the owner." *Loretto v.*

9   *Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982); *see Southview*

10  *Assocs., Ltd. v. Bongartz*, 980 F.2d 84, 95 (2d Cir. 1992) (finding "no physical taking"

11  where there was "no absolute dispossession" of property rights).

12       Precisely because section 32310 prohibits *possession* of magazines over 10 rounds,

13  it is readily distinguishable from restrictions on the *use* of personal property that have

14  been upheld against takings challenges. For example, in *Andrus v. Allard*, 444 U.S. 51

15  (1979), the Supreme Court held that a ban on the sale of previously lawful eagle products

16  was not a taking. But *Andrus* emphasized that it was "crucial that [the owners] *retain[ed]*

17  *the rights to possess* and transport their property." *Id.* at 66 (emphasis added). Likewise,

18  in the Prohibition-era cases involving takings challenges to restrictive liquor laws, those

19  challenges were rejected because the statutes restricted only the ability to *sell* lawfully

20  acquired alcohol, not to continue to possess it. *See James Everard's Breweries v. Day*,

21  265 U.S. 545, 560 (1924) (upholding statute "prohibiting traffic in intoxicating malt

22  liquors for medicinal purposes"); *Jacob Ruppert, Inc. v. Caffey*, 251 U.S. 264, 278-79

23  (1920) (upholding statute barring sales of liquor "for beverage purposes").

24       As the Supreme Court recently explained in distinguishing those cases from a

25  regulation that physically dispossessed farmers of their raisins, there is a fundamental

26  difference between a regulation that restricts only the *use* of private property, and one

27  that requires "physical surrender . . . and transfer of title." *Horne*, 135 S. Ct. at 2429.

28  Because California's ban requires the latter, it is a "*per se taking[]*" that requires

government compensation. *See id.* "Whatever . . . reasonable expectations" people may have "with regard to regulations," they "do not expect their property, real or personal, to be actually occupied or taken away." *Id.* at 2427. That is all the more true when the property in question is expressly protected by the Bill of Rights. *See supra* Argument, Part I.A.1.

To be sure, section 32310 does not necessarily require a magazine owner to surrender her lawfully acquired property to *the government*. In addition to "[s]urrender[ing] the large-capacity magazine to a law enforcement agency for destruction," the owner may also "[s]ell the large-capacity magazine to a licensed firearms dealer" or "[r]emove the large-capacity magazine from the state." Cal. Penal Code § 32310(d). But neither of those alternatives is any less a taking.

As to the first alternative, it is well-established that a physical taking can occur even if the government itself does not "directly appropriate the title, possession or use of the propert[y]." *Richmond Elks Hall Ass'n v. Richmond Redevel. Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977). Rather, "it is sufficient if the action by the government involves a direct interference with or disturbance of property rights." *Id.* For example, there was no dispute that the real property at issue in *Kelo v. City of New London*, 545 U.S. 469 (2005), was physically taken for purposes of the Takings Clause, even though the owner had the option to sell her home to a "private nonprofit entity," *id.* at 473-75.[9]  The Supreme Court has also found that a government-mandated diversion of privately owned water to a third party was a physical taking, even though the government neither performed the diversion nor possessed the water. *Int'l Paper Co. v. United States*, 282 U.S. 399, 404-06 (1931); *see also Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1292-93 (Fed. Cir. 2008). The compelled sale of a magazine to a government-designated party is no less a physical taking than a law that "forced residents to sell their

---

[9]  The dispute in *Kelo* was instead whether the economic redevelopment plan constituted a "public use" under the Takings Clause. *See* 545 U.S. at 472.

homes to the City." *Amen v. City of Dearborn*, 718 F.2d 789, 797 (6th Cir. 1983).

Indeed, selling property to avoid having it taken is an option in almost every takings case, including several in which the Supreme Court has found physical takings. The raisin growers in *Horne* could have sold their farms or grown a different crop rather than surrendering their raisins to the government. *See* 135 S. Ct. at 2430. The apartment building owner in *Loretto* could have sold the complex or exited the landlord business to avoid having the cable box placed on his building. *See* 458 U.S. at 439 n.17. But in both cases, the Court expressly rejected the argument that those possibilities changed the nature of the physical taking. "[P]roperty rights 'cannot be so easily manipulated.' " *Horne*, 135 S. Ct. at 2430 (quoting *Loretto*, 458 U.S. at 439 n.17); *cf. Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 500 (1987) (stating analysis does not "turn on whether state law allowed the separate sale of the segment of property").

Similarly, the possibility of physically moving a prohibited magazine to another state—on pain of criminal prosecution if kept or returned in-state—does not make section 32310 any less a physical taking. Like a mandatory sale to a third party or physical surrender to the government, a mandatory transfer of property out of state "physically dispossesse[s]" a property owner and results in a taking. *Nixon*, 978 F.2d at 1287; *see Tahoe-Sierra*, 535 U.S. at 324 n.19. It "is no answer" that the property owner may maintain title or access the property by traveling outside California; "retention of some access rights by the former owner of property does not preclude the finding of a *per se* taking." *Nixon*, 978 F.2d at 1285-86. By stripping the property owner of his most basic property right—physical possession in the relevant jurisdiction—the magazine ban works a physical taking regardless of whether the government itself "directly appropriate[s] the title, possession or use of the propert[y]." *Richmond Elks*, 561 F.2d at 1330.

Moreover, the option of transferring a magazine out of state exists only if (1) the property owner has some out-of-state location to store the magazine—which is certainly not true in all and maybe not true in most cases, and (2) the transferee state permits possession of the magazine—a policy choice by a different sovereign over which

California has no control. California can no more invoke the permissive firearms laws of other states to defend the constitutionality of its own restrictions on magazines than Texas could invoke the permissive abortion laws of other states to defend the constitutionality of its restrictions on clinics. *See Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292, 2304, 2310-13 (2016); *Jackson*, 746 F.23 at 967 ("That Jackson may easily purchase ammunition elsewhere is irrelevant."). In short, there is no "first mover" exception to the Takings Clause; California may not enact an unconstitutional law simply because other states have not. *Cf. Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 76-77 (1981) ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place.") (internal quotations omitted); *Jackson*, 746 F.23 at 967 (same).[10]

Because the magazine ban works a physical taking of Plaintiffs' property, the state "has a categorical duty to compensate the former owner." *Tahoe-Sierra*, 535 U.S. at 322. The law plainly fails to fulfill that duty. Section 32310 makes no provision for government compensation. Indeed, two of the three "options" that the statute provides for an owner to comply with the physical dispossession mandate—surrendering the magazine to the government or moving it out of state—result in *no* compensation. Cal. Penal Code § 32310(d)(1), (3). Sale to a licensed firearms dealer, *id.* § 32310(d)(2), may result in some compensation, but it is not compensation *from the government*. "Although the Court has wrestled with many issues in its extensive takings jurisprudence . . . it has invariably operated under the assumption that *the government is the entity charged with paying just compensation*." *Carson Harbor Vill., Ltd. v. City of Carson*, 353 F.3d 824, 831 (9th Cir. 2004) (O'Scannlain, J., concurring) (emphasis added) (collecting cases); *see, e.g.*, *First English Evangel. Luth. Church v. Los Angeles Cty.*, 482 U.S. 304, 319

---

[10]  Even if this Court were not to find the compelled physical dispossession requirement of section 32310 to be a physical taking, it is nevertheless "functionally equivalent" to a physical taking and thus requires government compensation under the regulatory takings doctrine. *Lingle*, 544 U.S. at 539.

1    (1987) ("[T]he Just Compensation Clause of the Fifth Amendment requires that the

2    government pay the landowner for the value of the use of the land.").

3         This case underscores the reason for that rule. The Constitution requires not simply

4    *some* compensation for a taking of private property, but "*just* compensation,"—that is,

5    " 'the market value of the property at the time of the taking.' " *Horne*, 135 S. Ct. at 2432

6    (quoting *United States v. 50 Acres of Land*, 469 U.S. 24, 29 (1984)). But nothing in

7    California's magazine ban even suggests, let alone ensures, that the compensation a

8    magazine owner receives for the potential sale of her property to a third party will reflect

9    its fair market value. In fact, by limiting the universe of potential purchasers to licensed

10   firearms dealers, compelling sale by a fixed date, and prohibiting possession by nearly

11   everyone in the state—the law practically ensures that the owner will receive less than

12   fair market value. *See* Cal. Penal Code § 32310(d)(2). Precisely to avoid such a result, the

13   Takings Clause prevents "government attempts to lay the general public's burden of just

14   compensation on third parties." *Carson*, 353 F.3d at 831.

15        **C.    Section 32310(d) Violates the Due Process Clause**

16        For largely the same reasons that it runs afoul of the Takings Clause, the magazine

17   ban also violates the Due Process Clause, as retroactively prohibiting the possession of

18   lawfully acquired magazines does not substantially advance a "legitimate governmental

19   objective." *Lingle*, 544 U.S. at 542.

20        Our legal system "for centuries . . . has harbored a singular distrust of retroactive

21   statutes, and that distrust is reflected in th[e Supreme] Court's due process

22   jurisprudence." *E. Enters. v. Apfel*, 524 U.S. 498, 502 (1998) (majority opinion). "If

23   retroactive laws change the legal consequences of transactions long closed, the change

24   can destroy the reasonable certainty and security which are the very objects of property

25   ownership." *Id.* at 548. It therefore "does not follow . . . that what [a legislature] can

26   legislate prospectively it can legislate retrospectively. The retrospective aspects of

27   legislation, as well as the prospective aspects, must meet the test of due process, and the

28   justifications for the latter may not suffice for the former." *Usery v. Turner Elkhorn*

21

*Mining Co.*, 428 U.S. 1, 16-17 (1976). Courts accordingly have "given careful consideration to due process challenges to legislation with retroactive effects," *E. Enters.*, 524 U.S. at 547-48 (Kennedy, J., concurring in part and dissenting in part) (collecting cases), subjecting such laws to "heightened scrutiny," *Kelo*, 545 U.S. at 493 (Kennedy, J., concurring).

As those cases reflect, even assuming the magazine ban furthers a legitimate government interest as to individuals who do not presently lawfully possess a magazine over 10 rounds (a dubious assumption),[11] the state must independently justify its *retroactive* enforcement against magazine owners who lawfully acquired their property before California banned the importation, sale, or transport of magazines over 10 rounds in 1999. That, the state cannot do.

While the state undoubtedly has a legitimate interest in public safety, applying its ban retroactively against magazine owners like Plaintiffs Lewis and Lovette, who have complied with the law since at least 1999, does not further that interest in a meaningful way. There is no reason to think that applying a criminal possession ban—as opposed to some additional form of regulation to address the state's safety concerns—to individuals who have lawfully possessed the now-banned magazines for decades will have any tangible public safety benefit. To the contrary, depriving them of their magazines will have the perverse effect of punishing compliance with the law and may well reduce public safety by preventing individuals from effectively exercising self-defense. The state's effort to "change the legal consequences of transactions long closed," *E. Enters.*, 524 U.S. at 548, cannot "meet the test of due process," *Usery*, 428 U.S. at 17.

/ / /

/ / /

---

[11]   While this motion seeks relief only from the law's impending dispossession command, Plaintiffs reserve their right to argue that the entirety of the magazine ban violates the Due Process Clause.

## II.   THE REMAINING PRELIMINARY INJUNCTION FACTORS WARRANT RELIEF

### A.   Plaintiffs Will Suffer Irreparable Harm if the Court Denies Relief

If this Court concludes that Plaintiffs are likely to succeed on one or more of their alleged constitutional violations, the remaining preliminary injunction factors follow readily. "It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.' " *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)); 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). The Ninth Circuit has imported the First Amendment's "irreparable-if-only-for-a-minute" rule to cases involving other rights and, in doing so, has held a deprivation of these rights irreparable harm per se. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997). The Second Amendment should be treated no differently. *See McDonald v. Chicago*, 561 U.S. 742, 780 (2010) (refusing to treat the Second Amendment as a second-class right subject to different rules); *see also Ezell v. Chicago*, 651 F.3d 684, 700 (7th Cir. 2011) (a deprivation of the right to arms is "irreparable and having no adequate remedy at law").

The constitutional violations alone are enough to satisfy the irreparable harm factor, but the circumstances here make the irreparable harm unmistakable. Because the magazine possession ban is set to take effect on July 1, 2017, the need to "preserve the status quo pending a determination of the action on the merits"—the fundamental purpose of a preliminary injunction—is particularly strong. *Chalk*, 840 F.2d at 704. The need for immediate injunctive relief is even more apparent because the impending harm is a physical taking of property that cannot be remedied easily if at all—a quintessential example of irreparable injury. *See, e.g.*, *Taylor v. Westly*, 488 F.3d 1197, 1202 (9th Cir. 2007) ("[W]ithout a preliminary injunction, plaintiffs run the risk that California will permanently deprive them of their property . . . . Once the property is sold, it may be impossible for plaintiffs to reacquire it, thus creating the requisite 'irreparable harm.' ").

Finally, the property being taken is not just any personal item, but one that is constitutionally protected for the most essential purpose—defense of a person's life against harm. *See Heller*, 554 U.S. at 595. The irreparable harm could hardly be clearer.

## B.   Granting Preliminary Injunctive Relief Is in the Public Interest

For similar reasons, granting preliminary injunctive relief before the magazine possession ban takes effect on July 1, 2017, is plainly in the public interest. When challenging government action that affects the exercise of constitutional rights, "[t]he public interest . . . tip[s] *sharply* in favor of enjoining the" law. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009) (emphasis added). Here, Plaintiffs seek to vindicate their fundamental Second Amendment rights, as well as their rights under the Takings and Due Process Clauses. As the Ninth Circuit has made clear, "*all citizens* have a stake in upholding the Constitution" and have "concerns [that] are implicated when a constitutional right has been violated." *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005) (emphasis added). Thus, not only Plaintiffs' rights are at stake, but so are the rights of all Californians seeking to engage in conduct that is prohibited by the state's magazine ban. The public interest tips sharply in Plaintiffs' favor. *Klein*, 584 F.3d at 1208.

Moreover, the state has no plausible argument that enjoining enforcement of the magazine ban with respect to *current owners* of magazines that can hold more than 10 rounds—which is all the relief Plaintiffs seek here—will endanger public safety. After all, California has banned the purchase, sale, and importation of such magazines *without banning their possession* for the better part of the past two decades. It strains credulity to suggest that simply preserving the status quo for magazine possessors who have complied with the law and not endangered public safety for at least the past 17 years will somehow endanger public safety now.

## C.   The Balance of Equities Tips Sharply in Plaintiffs' Favor

The final factor considers "the balance of hardships between the parties." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1137 (9th Cir. 2011). In contrast to Plaintiffs' many injuries, the state will suffer no harm from a preliminary injunction. The

state "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *see Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("[I]t is clear that it would not be equitable . . . to allow the state . . . to violate the requirements of federal law.") (citations omitted). But even absent the constitutional dimension of this lawsuit, the balance of harms tips in Plaintiffs' favor. As explained above, physically dispossessing magazine owners who have complied with the law and not endangered public safety for the past 17 years cannot plausibly be understood to serve the public interest or increase public safety. To the contrary, the magazine ban makes the public *less* secure by making it more difficult for Plaintiffs to defend themselves.

The balance of equities also favors litigants who seek only "to preserve, rather than alter, the status quo while they litigate the merits of th[eir] action." *Rodde v. Bonta*, 357 F.3d 988, 999 n.14 (9th Cir. 2004). Here, granting the relief Plaintiffs seek now will merely maintain the status quo while the case moves forward on the merits, which further "strengthens their position" in the analysis of the equitable injunction factors. *Id.* The sale of magazines over 10 rounds remains unlawful in the state (and Plaintiffs do not now seek to preliminary enjoin that law), so California cannot be flooded with new magazines if an injunction is granted. On the other hand, enjoining section 32310(c)-(d) will end the ongoing violation of Plaintiffs' rights, ensuring they are free to exercise their rights without fear of prosecution.

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs' Motion for Preliminary Injunction.

Date: May 26, 2017

MICHEL & ASSOCIATES, P.C.

s/ C.D. Michel
C.D. Michel
Email: cmichel@michellawyers.com
*Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,

                   Plaintiffs,

        v.

XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,

                   Defendant.

Case No: 17-cv-1017-BEN-JLB

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 E. Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have cause service of the following documents, described as:

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on all parties by placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at Long Beach, CA, on May 26, 2017.

Ms. Alexandra Robert Gordon
Mr. Anthony P. O'Brien
California Department of Justice
1300 I Street, Suite 125
Sacramento, CA 95814

    I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2017, at Long Beach, CA.

Laura Palmerin