C. D. Michel - SBN 144258
Sean A. Brady - SBN 262007
Anna M. Barvir - SBN 268728
Matthew D. Cubeiro - SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation, | Case No: 17-cv-1017-BEN-JLB |
| | **DECLARATION OF MASSAD AYOOB IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; EXHIBITS A-C** |
| Plaintiffs | |
| v. | Date:     June 13, 2017 |
| | Time:     10:00 a.m. |
| XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10, | Dept:     5A |
| | Judge:    Hon. Roger T. Benitez |
| Defendants. | |

1

## DECLARATION OF MASSAD AYOOB

1.   I, Massad Ayoob, am not a party in the above-titled action. I am over the age of 18, have personal knowledge of the facts and events referred to in this Declaration, and am competent to testify to the matters stated below.

2.   I have been a competitive handgun shooter since the late 1960s, a published writer in the field of defensive firearms since 1971, and a firearms instructor since 1972. My resume is attached as **Exhibit A**. I have served for more than thirty years each as handgun editor for Guns magazine and law enforcement editor for American Handgunner magazine. I served for 19 years as chair of the Firearms and Deadly Force Training Committee for the American Society of Law Enforcement Trainers, and have served for 14 years on the advisory board of the International Law Enforcement Educators and Trainers Association. I have served as an expert witness on firearms, firearms training standards, deadly force training standards, dynamics of violent encounters, and related subject matter areas since 1979. I have also been an instructor in disarming and firearm retention (i.e., the countering of a disarming attempt) since 1980 and became a trainer of other instructors in those disciplines in 1990.

3.   In my role as a self-defense and weapons expert, including as an expert witness, I have researched incidents of defensive gun uses by law-abiding citizens, including by both private citizens and law enforcement officers. My opinions about defensive guns uses provided herein are based, in part, on the information I have learned during such research.

4.   A true and correct copy of a excerpt from my book, *The Complete Book of Handguns* 87, 89-90 (2013) is attached as **Exhibit B**.

**Ten Round Magazine Limit: Disparate Impact on Law-Abiding Citizens**

5.   Limiting the law-abiding citizen to a magazine of ten rounds or less will clearly limit their ability to protect themselves from violent criminals in certain situations. Such limits on magazine capacity are likely to impair the ability of

2

citizens to engage in lawful self-defense in those crime incidents necessitating that the victim fire many rounds in order to stop the aggressive actions of offenders.

6.    An illustrative, real-world example is the case of Susan Gonzalez. She and her husband were attacked by two intruders within their home one night. The attackers shot both of them multiple times, but she was able to escape to their bedroom where she located her husband's semi-automatic pistol, while her husband bravely physically fought the attackers off into the front room. She entered the room where the attackers were struggling with her husband, and, not wanting to shoot her husband, discharged three warning shots in the air, hoping the attackers would flee. They did not.

7.    One attacker charged toward her, causing her to flee back to the bedroom. From an opening in the bedroom she could see the attacker lying in wait for her in the kitchen. So she used her knowledge of the house to exit the bedroom and approach the attacker from behind via another door leading to the kitchen. She pointed the pistol at the attacker and discharged seven rounds in his direction, gravely wounding him, but not immediately killing him.

8.    The wounded attacker was still able to exit the house aided by his accomplice. The other attacker reentered the house and demanded Mr. Gonzalez give him keys to an automobile to escape. During his search for keys in the bedroom he located Mrs. Gonzalez who was out of ammunition. He put the gun to her temple and demanded the keys, which she gave him.

9.    Fortunately, the attacker decided to spare Mrs. Gonzalez's life, but he could have just as easily pulled the trigger. Had she had more rounds in her magazine, maybe she would not have had to leave her fate to chance. It is impossible to say how many more cases where victims lost (or almost lost, as in Mrs. Gonzalez's case), due to having an insufficient amount of ammunition readily

DECLARATION OF MASSAD AYOOB                    17-cv-1017-BEN-JLB

available in a self-defense firearm.[1]

10.    The published account of this shooting has Mrs. Gonzalez firing three shots into the ceiling, then seven at the homicidal intruder, and then running dry. This would indicate only ten cartridges at her disposal. The gunfight occurred during the ten-year period when the Federal "high capacity magazine ban" was in force. The Ruger 9mm pistol she used, designed to hold fifteen cartridges in the magazine and one more in the firing chamber, was sold during the ten year period of that ban with magazines which could only hold ten rounds. In such a situation, five more shots can make the difference between neutralizing the murderous threat, and being rendered helpless with an empty gun at the hands of a law-breaking, homicidal, armed felon.

11.    It is difficult to say exactly how many private citizens have actually fired more than ten rounds in a self-defense shooting, because the amount of rounds fired in self-defense shoots, from my experience in researching such incidents, is very often an omitted fact in written accounts of such defensive gun uses. Oftentimes the accounts just say "multiple shots fired." That could mean more or less than ten, it just cannot be known. This does not seem to be the case, however, with shootings involving police officers, for which, generally the number of shots that were fired is documented. In my experience researching such shootings, officers often fire more than ten rounds. And, cases where an individual officer fired less than 10 rounds, but there were multiple officers shooting, can be fairly characterized as involving more than ten rounds, if the multiple officers involved fired over ten rounds in aggregate.

12.    Officer-involved shootings are relevant in evaluating private citizen shootings, for the simple reason that private citizens arm themselves for protection

---

[1]  Robert A. Waters, *Guns Save Lives: True Stories of Americans Defending Their Lives with Firearms* 149-59 (2002).

DECLARATION OF MASSAD AYOOB                          17-cv-1017-BEN-JLB

against the exact same criminals the police are armed to deal with. Tim Gramins of the Skokie, Illinois police department was in a shootout with an armed robber whose car he had pulled over. The gunman came out shooting. The gunman was armed with two semiautomatic pistols, one on his person and one snatched from his car, both of which he fired during the gun battle. He also had in his possession a semiautomatic rifle in his car, which he did not deploy. Gramins fired 33 rounds before the gunman, now fatally wounded, stopped firing.  The suspect had absorbed 14 hits by the time he was neutralized, and the officer had been forced to reload twice. The officer was armed with a Glock Model 21 .45 caliber pistol, loaded with a magazine containing 12 rounds and a thirteenth in the firing chamber. He also had two additional magazines containing 12 rounds each. The officer was down to the last few cartridges in his last magazine at the time he finally won the gunfight. Gramins was wounded in the shooting. As a result of this incident, he now carries a higher-capacity handgun with more spare magazines.[2]

13.    While, as mentioned, the number of rounds fired in a self-defense shoot involving a private citizen is usually not documented, there are nevertheless a number of confirmed accounts of private citizens discharging more than ten rounds during a criminal attack. For example, a Baltimore man discharged sixteen rounds from a handgun he was licensed to carry when he was physically attacked by three men, one of whom allegedly had a gun, while in his car carrying thousands of dollars in cash to the bank. One of the assailants died, while the other two fled, one of whom was arrested at a nearby hospital with a bullet wound in the hand.[3] In a

---

[2]  Charles Remsberg, *Why One Cop Carries 145 Rounds of Ammo on the Job*, PoliceOne (Apr. 17, 2013), http://www.policeone.com/patrol-issues/articles/6199620-Why-one-cop- carries-145-rounds-of-ammo-on-the-job/. (last updated Apr. 17, 2013) (Barvir Decl., Ex. VV).

[3]  Gus G. Sentementes & Julie Bykowicz, *Documents Detail Cross Keys Shooting* (Mar. 21, 2006), http://articles.baltimoresun.com/2006-03-21/news/ 0603210220_1_beckwith- police-documents-robbery (Barvir Decl., Ex. WW).

DECLARATION OF MASSAD AYOOB                    17-cv-1017-BEN-JLB

similar situation, a South Carolina gun store owner who lived in the rear of his shop was awoken by three men, at least one of them armed, crashing a van into his store. When going to investigate, one of the robbers yelled to another to kill him, so the owner opened fire, discharging thirty rounds, hitting all three attackers, mortally wounding one and causing the rest to flee.[4]

14.    There is also the account of Travis Dean Neel. While sitting in a traffic jam behind an officer with a car pulled over, an occupant emerged from the detained vehicle and opened fire on the officer. Neel responded by retrieving his pistol with three magazines from his backseat and opened fire on the assailant, which resulted in him being fired upon and an ensuing gunfight, during the course of which he prevented the assailants from "finishing off" the officer and (with assistance from an off-duty police officer who joined him in the gunfight with his own handgun) from car-jacking a woman to get away, which may have saved that woman's life. Despite Neel using all three of his fifteen-round magazines, and the several shots fired by the off-duty officer, the assailants were still able to flee, but could just as easily have decided to continue their attack and overcome Neel.[5]

15.    Ronald Honeycutt was delivering pizzas when approached by a man with a gun from behind. He turned and fired when he saw a gun in the man's hand, discharging all of his magazine's fifteen rounds, which still did not immediately stop the threat, as the attacker remained upright with the gun pointed at him. But the attacker eventually succumbed to his wounds before being able to rack a round into

---

[4] *Gun Shop Owner Shoots, Kills Man During Attempted Robbery*, WIS TV (Aug. 9, 2012), http://www.wistv.com/story/19236842/gun-shop-owner-shoots-kills-man-during-attempted-robbery (last updated Aug. 19, 2012, 8:22 AM) (Barvir Decl., Ex. XX).

[5] Robert A. Waters, *The Best Defense: True Stories of Intended Victims Who Defended Themselves with a Firearm*, 23-40 (1998).

DECLARATION OF MASSAD AYOOB                    17-cv-1017-BEN-JLB

the firing chamber of his pistol, which he had forgotten to do, and is probably why he was pointing the gun at Honeycutt but never discharged a single round.[6]

16.    Additionally, in California, consider the well-documented multiple gunfights with armed robbers experienced by Los Angeles watch shop owner Lance Thomas.[7] More than one of his five shooting incidents required him to fire more shots than Penal Code section 32310 would allow to be in any one handgun. In one of those incidents, reports have Thomas firing approximately nineteen shots before the last of his multiple opponents ceased attempting to murder him.[8]

17.    Thomas's strategy was to stage multiple loaded handguns every few feet in his workspace. He could do this, as a sole proprietor with a small shop, a workspace closed to the public, and with buzz-in entry. A pair of brothers used the same strategy in defending themselves against two violent career criminals robbing their Richmond, Virginia jewelry store. They went through multiple firearms staged throughout the store placed in anticipation for such an event.[9] The strategy of staging multiple firearms employed by these shopkeepers is a unique circumstance,

---

[6] Chris Bird, *Thank God I Had A Gun: True Accounts of Self-Defense* 251-74 (2007).

[7] WIS TV, *supra* n. 4.

[8] *See* Nieson Himmel, *Police Say Watch Shop Owner Kills 4th, 5th Suspects* (Feb. 21, 1992),  http://articles.latimes.com/1992-02-21/local/me-2663_1_watch-shop-owner (Barvir Decl., Ex. YY); Massad Ayoob, *Why Good People Need Semiautomatic Firearms and "High Capacity" Magazines, Part I* (Dec. 29, 2012), http://backwoodshome.com/blogs/MassadAyoob/2012/12/29/why-good-people-need-semiautomatic-firearms-and -high-capacity-magazines-part-I/ (Barvir Decl., Ex. UU); Massad Ayoob, *5 Gunfighting Myths Debunked*, Personal Defense World (Oct. 14, 2014), http://www.personaldefenseworld.com/2014/10/5-gunfighting-myths-debunked-massad-ayoob/#armed-and-ready (Barvir Decl., Ex. SS).

[9] *Jewelry Store Burglarized, Scene of Deadly 1994 Robbery Attempt*, nbc12.com (2012), *available at* http://www.nbc12.com/story/16445849/jewelry-store-burglarized-scene-of-deadly-1994-robbery-attempt (Barvir Decl., Ex. ZZ).

DECLARATION OF MASSAD AYOOB                    17-cv-1017-BEN-JLB

however, it would not be practical or safe for most shopkeepers or for homeowners, due to the danger of unexpected children wandering behind the counter or unexpectedly arriving at the given home. Thus, most private citizens could not be expected to have multiple handguns in multiple locations in their home or on their person in order to engage in a defensive gun use.

18.    The homeowner who keeps a defensive firearm and is awakened in the night by an intruder is most unlikely to have time to gather spare ammunition. The sudden and unpredictable nature of such attacks, and their occurring in relatively confined spaces, generally do not permit gathering multiple firearms or magazines. Ideally, one hand would be occupied with the handgun itself, and the other, with a telephone to call the police. And, assuming they even had time for a magazine change, most people do not sleep wearing clothing that would allow them to stow spare magazines, etc. on their person. They would have only what was in the gun.

19.    Most plainclothes police officers do not find it practical to carry multiple handguns, let alone private citizens. Any suggestion that private citizens simply carry more guns or more ammunition feeding devices would, for the reasons stated above, be impractical.

20.    Criminals bent on causing harm, on the other hand, even assuming they were impeded from obtaining over ten-round magazines by California Penal Code section 32310, could simply arm themselves with multiple weapons, and often do.

21.    Criminals have time to assess and plan shootings, whereas victims do not. Whitman, the Texas Tower mass murderer, literally brought a large box of rifles, handguns, a shotgun and ammunition to his sniper perch.[10] Harris and Klebold had four firearms between them at Columbine.[11] Holmes in Aurora brought

---

[10]  The UT Tower Shooting, Tex. Monthly, *available at* http://www.texasmonthly.com/topics/ut-tower-shooting (Barvir Decl., Ex. AAA).

[11]  Mark Obmascik, Marilyn Robinson & David Olinger, *Columbine - Tragedy and Recovery: Officials Say Girlfriend Bought Guns*, denverpost.com (Apr. 27,

DECLARATION OF MASSAD AYOOB                    17-cv-1017-BEN-JLB

a rifle, shotgun, and pistol into the theater.[12] Hassan was armed with a pistol and a revolver at Fort Hood.[13] Lanza entered the elementary school in Newtown, Connecticut armed with a rifle and two pistols, leaving a shotgun in his car.[14] The mass murderer Cho entered Virginia Tech armed with two pistols and a backpack full of magazines.[15] The Isla Vista attack was perpetrated by a man carrying two knives and three handguns.[16] The Umpqua Community College shooter carried five handguns with him.[17] The San Bernardino terrorists each had a semi-automatic rifle

---

1999), *available at* http://extras.denverpost.com/news/shot0427a.htm (Barvir Decl., Ex. BBB).

   [12] Rong Gong Lin II, *Gunman Kills 12 at 'Dark Knight Rises' Screening in Colorado*, L.A. Times (Jul. 20, 2012), *available at* http://www.latimes.com/news/nation/nationnow/la-na-nn-dark-knight-shooting-20120720,0,2147749.story#axzz2nDkU7CWB (Barvir Decl., Ex. CCC).

   [13] Associated Press, *Ft. Hood shooter Nidal Hasan Used Private, Legally-bought Pistol - Not Military Weapon - In Rampage*, N.Y. Daily News (Nov. 7, 2009), *available at* http://www.nydailynews.com/news/national/ft-hood-shooter-nidal-hasan-private-legally-bought-pistol-military-weapon-rampage-article-1.414799 (Barvir Decl., Ex. DDD).

   [14] Steve Almasy, *Newtown Shooter's Guns: What We Know*, cnn.com (last updated Dec. 19, 2012 10:11 a.m. EST), available at http://www.cnn.com/2012/12/18/us/connecticut-lanza-guns (Barvir Decl., Ex. EEE).

   [15] Virginia Tech Review Panel, *Mass Shootings at Virginia Tech 16, 2007: Report of the Review Panel* 89 (Aug. 2007), available at http://www.governor.virginia.gov/tempcontent/techPanelReport-docs/FullReport.pdf. (Barvir Decl., Ex. GGG).

   [16] *2014 Isla Vista Killings*, Wikipedia (last updated May 25, 2017 to correct typo), *available at* http://www.latimes.com/local/lanow/la-me-ln-isla-vista-document-20140524-story.html; *see also* https://en.wikipedia.org/wiki/2014_Isla_Vista_killings (Barvir Decl., Ex. HHH).

   [17] *Umpqua Community College Shooting*, Wikipedia (last updated May 25, 2017 to undo prior revision), *available at* https://en.wikipedia.org/wiki/Umpqua_Community_College_shooting (Barvir Decl.,

9

DECLARATION OF MASSAD AYOOB                     17-cv-1017-BEN-JLB

and handgun.[18] Mateen likewise brought a semi-automatic rifle and handgun with him to perpetrate the Pulse nightclub massacre in Orlando.[19]

22.   None of these murderers' victims had planned to repel an attack by a perpetrator with multiple firearms.

23.   The likelihood of the mass murderer arriving on scene with multiple firearms also largely negates the theory that with fewer rounds in the gun, the killer could be more easily disarmed and subdued by unarmed citizens when he first ran empty, before he could reload. I have written a piece explaining why this theory is of dubious merit. A true and correct copy is attached as **Exhibit C**. In sum, Hassan, Holmes, Lanza, or Cho simply could have drawn a second (or third) gun that they had on their persons and shot whoever attempted to grab the empty one.

24.   The virtuous citizen, by contrast, cannot practically be expected to have accessible that many guns or that much ammunition at a moment's notice. The victimized citizen is the one who is, therefore, most deleteriously impacted by the magazine capacity limitation. If he or she must use the gun to protect self and family, they will most likely have only the ammunition in the gun with which to fend off determined, perhaps multiple, attackers.

25.   Virtuous citizens buy their guns to protect themselves from the same criminals police carry guns to protect the citizens, the public, and themselves from. Therefore, armed citizens have historically modeled their choice of firearms on

Ex. III).

[18]  Spencer Kimball, *San Bernardino: Guns, Mass Shootings and Fears of Terrorism*, www.dw.com (Apr. 12, 2015), *available at* http://www.dw.com/en/san-bernardino-guns-mass-shootings-and-fears-of-terrorism/a-18894313 (Barvir Decl., Ex. JJJ).

[19]  Bart Jansen, *Weapons Gunman Used In Orlando Shooting Are High-Capacity, Common*, USA Today (June 14, 216), https://www.usatoday.com/story/news/2016/06/14/guns-used-kill-49-orlando-high-capacity-common-weapons/85887260/ (Barvir Decl., Ex. KKK).

DECLARATION OF MASSAD AYOOB                              17-cv-1017-BEN-JLB

what police carry. The vast majority of California law enforcement officers carry pistols with double-stack magazines whose capacities exceed those permitted under California Penal Code section 32310.

26.    The on-duty, uniformed police officer generally will be armed with a service pistol containing a detachable magazine holding more than ten rounds, and generally two spare magazines holding more than ten rounds on the uniform belt. He or she will normally be wearing body armor, have immediate access to a loaded shotgun and/or loaded patrol rifle with magazines holding more than ten rounds in the patrol car, and will have instant radio access to fellow officers and dispatch if backup help is needed.

27.    The off-duty officer and the law-abiding citizen alike are not likely to have that volume of spare ammunition on their person or elsewhere readily accessible. They are not likely to be wearing body armor, nor to be in reach of a rifle or shotgun. Their only communication to potential backup will be by phone, relayed through Police Dispatch to responding officers. Thus, for them, the ability to have a pistol already loaded with a significant amount of ammunition is all the more important.

28.    It takes even a world champion speed shooter a full second to reload with a fresh magazine. A highly skilled police officer or competitive shooter may be able to accomplish a reload in two seconds. Most people take considerably longer; especially someone who is under the mental duress typically experienced during an attack. Changing a magazine is a fine motor skill, the type of skill which degrades severely in human beings under stress due to vasoconstriction (loss of blood flow to the extremities) and also due to tremors induced by internally-generated adrenaline (epinephrine). This is a well-known physiological reaction that has been defined as the "fight or flight" response in the medical literature and training literature for a century or longer, by Dr. Walter Cannon at Harvard Medical School before World War I.

DECLARATION OF MASSAD AYOOB                    17-cv-1017-BEN-JLB

29.   By contrast, simply pulling the trigger again on a pistol that still has more ammunition in it can be accomplished in a fraction of a second. Based on my experience in self-defense scenarios, fractions of seconds can mean the difference between the victim successfully repelling an attacker and the victim being subdued. Thus, a magazine change for the person being attacked could be the difference between life and death.[20] The same, however, is not generally true for the attacker. The loss of time for a magazine change is generally of little consequence for the attacker. This is because it is the attacker who gets to choose when, where, how, and whom to attack. So the attacker is not burdened by the surprise and shock factor that the victim is, as explained above, generally prepared for the confrontation with large amounts of arms and ammunition. This is demonstrated by the multiple mass shootings where the attacker made magazine changes without being subdued. Perhaps the most illustrative example is the Virginia Tech shooting, where the attacker carried with him seventeen magazines for his two semi-automatic pistols, from which he fired 174 rounds.[21] At least five of those magazines had a capacity of only ten rounds and would be legal under California Penal Code section 32310.[22] While it cannot be said exactly how many magazine changes he made during what was the deadliest mass shooting in the country's history, based on the number of rounds fired and the fact that authorities found seventeen empty magazines at the scene, he had to have made several reloads.[23] Another example is the Orlando Pulse Nightclub shooting, where the attacker

---

[20]  Jacob Sullum, *The Threat Posed by Gun Magazine Limits* (Jan. 13, 2016), *available at* http://reason.com/archives/2013/01/16/the-threat-posed-by-gun-magazine- limits (Barvir Decl., Ex. TT).

[21]  Virginia Tech Review Panel, *supra* n. 15, at 92 (Barvir Decl., Ex. GGG).

[22]  *Id.*

[23]  *Id.*

DECLARATION OF MASSAD AYOOB                    17-cv-1017-BEN-JLB

carried both a Sig Sauer rifle with a 30-round capacity magazine and a Glock 17 pistol with a 17-round capacity magazine.[24] It has been reported that the shooter fired over 202 rounds during his attack.[25] Assuming the attacker used both firearms, and based upon the number of rounds fired, the attacker would have been forced to reload his firearms (and possibly magazines) on at least 5 separate occasions. Despite being in a confined space surrounded by hundreds of men who he was murdering one-by-one, at no point during the attack did anyone in the night club tackle or otherwise subdue the attacker during the several times when he was forced to reload.

30.    Supporters of the magazine capacity limitation will undoubtedly point to some firearm expert who is comfortable with an eight- or nine-shot pistol, or even a five- or six-shot revolver. It should be noted, however, that the operative term there is "expert." The individual who has spent a lifetime training in shooting, and may fire hundreds or even thousands of shots on the range per month, has developed a level of skill and confidence that is not practical to expect from the average police officer, let alone the average law-abiding citizen who keeps a firearm in the home or on his person for protection of self and family.

### Disparate Impact on the Disabled

31.    A particular subset of law-abiding citizens who are disparately, negatively impacted by California Penal Code section 32310 is the physically disabled. This is true of many categories of the physically challenged.

---

[24]    Jansen, *supra* n. 19 (Barvir Decl., Ex. KKK).

[25]    WFTV-Orlando, *Law Enforcement Source: 202 Rounds Fired During Pulse Nightclub Shooting in Orlando*, wscotv.com (Jun. 13, 2016), available at http://www.wsoctv.com/news/trending-now/law-enforcement-source-202-rounds-fired-during-pulse-nightclub-shooting-in-orlando/340948566 (Barvir Decl., Ex. LLL).

DECLARATION OF MASSAD AYOOB                    17-cv-1017-BEN-JLB

32.   Over the last twelve years, we have seen many war veterans joining the amputee community. Those who have lost fingers or a hand will have great difficulty reloading an empty gun if a ten-round magazine does not prove sufficient to defeat an attacker. Work-related injuries such as carpal tunnel syndrome can greatly slow ability to reload. So can many of the infirmities of age: rheumatism, arthritis, bursitis, etc.

33.   The wheelchair-bound individual, and many more mobility-challenged individuals (back issues, ankle issues, knee issues, etc.), cannot run to cover to reload. They will be caught in the open if they have to reload in a fight with one or more armed criminals, and thus will become totally helpless as soon as their California Penal Code section 32310-mandated ten-shot magazine is depleted.

34.   Thus, in conclusion, study of events in the real world indicates that California Penal Code section 32310's restriction on magazine capacity can be expected to have little, if any, effect in reducing casualties due to intentional mass murder. However, law-abiding citizens, certain off-duty and retired criminal justice personnel, families of criminal justice personnel, recipients of death threats, stalking victims, and people working in places of business prone to armed robbery, will be severely disadvantaged by California Penal Code section 32310 in terms of

/ / /

/ / /

DECLARATION OF MASSAD AYOOB                    17-cv-1017-BEN-JLB

their ability to lawfully protect themselves and others. This impact will be particularly severe upon members of such groups who are physically disabled.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on May 19, 2017.

Massad Ayoob

DECLARATION OF MASSAD AYOOB                                    17-cv-1017-BEN-JLB

# EXHIBIT A

EX_A_000001

# *Curriculum Vitae,*  **Massad F. Ayoob**

**Areas of Expertise**

Dynamics of violent encounters, training standards for safe weapons handling (law enforcement/civilian), training standards of firearms and use of force (police/civilian), homicide/use of force investigation, personal and professional security, weapon retention/disarming, law enforcement internal investigation/discipline.

**Teaching Experience**

Director, Massad Ayoob Group, 2009-present.

Director, Lethal Force Institute, 1981-2009.

Chair of firearms committee, American Society of Law Enforcement Trainers (ASLET), 1987-2007.  Also served on Ethics Committee.  Led annual Panel of Experts on firearms/deadly force issues at ASLET's international seminars.

Special Instructor, Chapman Academy of Practical Shooting, 1981-88. Defensive Combat Shooting; Judicious Use of Deadly Force; Advanced Officer Survival Tactics.

International Instructor, PR-24 baton; has lectured several times at annual international seminar. Trains other instructors and trainers of instructors.

Advisory Board member, International Law Enforcement Educators' and Trainers' Association. Have lectured there on investigation and management of police use of force cases at all Annual Meetings since the organization's inception in 2003.

National Instructor, Weapon Retention & Disarming, National Law Enforcement Training Center. Trains other instructors and trainers of instructors. 1990-2009.
Assistant professor teaching weapons and chemical agents, Advanced Police Training Program of New Hampshire, 1974-77.

Co-instructor (w/former world pistol champion Ray Chapman) of Advanced Officer Survival Seminars for the Police Marksman Association.

International Instructor, Persuader Mini-Baton, certified by Joe Truncale.

Instructor, Kubotan self-defense, certified by Soke Takayuki Kubota.

National Instructor, Telescoping baton, certified by CASCO (baton manufacturer).

EX_A_000002

Instructor, straight baton, certified by COPSTK (baton manufacturer).
Has taught for national, international, and regional seminars of

>    FBI. Albuquerque Office. Use of force/Survival. 2012.

>    International Association of Law Enforcement Firearms Instructors. Numerous annual meetings.

>    Regional seminars for CLE credit on defending deadly force cases (NACDL; Mass. CDL Assn.).

>    International Homicide Investigators' Seminar. Investigation of officer-involved shootings and characteristics of self-defense shootings.

>    McGill University School of Medicine. Visiting lecturer on medico-legal aspects of gunshot and knife wounds.

>    Officer survival tactics taught at:  DEA National Academy; Ordnance Expo, Los Angeles; National Tactical Invitational; New England SWAT Seminar; Metro-Dade Police Academy; DEA/Miami.

**Personal Training**

Smith & Wesson Academy:  Advanced Combat Shooting (1st in class), Instructor course; Instructor Update (twice); Officer Survival Course (1st in class); Weapon Retention instructor course; advanced revolver shooting course.

Glock:  Glock Instructor Course; Glock Armorer Course.

Firearms Instructor Courses: National Rifle Association.

Ordnance Expo: Firearms and Ballistic Evidence; Officer Involved Shooting Investigation; Advanced Officer Involved Shooting Investigation; Officer Survival; Management of Barricaded Suspects.

International Police Academy: Defensive Tactics (Unarmed Combat and Restraint) Instructor Course, rated Master Instructor by sensei James Morell.

NYPD: "Hostage Negotiation for Supervisors", "Post Shooting Tactics", "House Clearing Techniques", "Off Duty Confrontation Tactics", "Summary of Violent Encounter Patterns", "Police Shotgun Program."

Advanced Homicide Investigation. By Vern Geberth, NYPD Ret., author of "Practical Homicide Investigation."

EX_A_000003

International Homicide Investigators' Seminar (2 occasions).

Medical/Legal Death Investigation (Dade County Medical Examiner's Office).

Americans for Effective Law Enforcement : "Police Civil Liability Seminar."

American Society of Law Enforcement Trainers. "PPCT: Pressure Point Control Tactics ," taught by Bruce Siddle.

Federal Law Enforcement Training Center: BOSS program including officer survival, intelligence briefings on outlaw bike gangs, booby traps, counter-ambush tactics, arrest techniques.

Escrima (stick- and knife-fighting), Grandmaster Remy Presas.

Knife/Counter-Knife courses: Master Paul Vunak, Hank Renhardt, Sensei Jim Maloney, Michael de Bethencourt.

Has studied personally with world handgun champions Ray Chapman, Rob Leatham, Jerry Miculek, and Frank Garcia in advanced shooting programs.

**Has studied special units and their training on-site, including:**

NYPD Firearms & Tactics Unit, Emergency Services Unit, Armed Robbery Stakeout Unit.

LAPD SWAT, Firearms Training Unit.

FBI Firearms Training Unit.

Metro-Dade Police Firearms/SWAT Training Unit

Illinois State Police Ordnance Section.

NH State Police SWAT, EVOC, Firearms Training.

Kentucky State Police, Firearms Training and SRT Training.

Arizona Highway Patrol Firearms Training.

London, England Metropolitan Police firearms training and special services unit (D.11, PT-17, SO-19).

Has reviewed or audited numerous other law enforcement firearms training programs.

EX_A_000004

**Publication Credits**

***Books:***

"Fundamentals of Modern Police Impact Weapons," Charles C. Thomas, Publishers, 1978.

"In the Gravest Extreme: the Role of the Firearm in Personal Protection," Police Bookshelf, 1979.

"Hit the White Part," Police Bookshelf, 1982.

"The Truth About Self Protection," Bantam, 1983.

"StressFire," Police Bookshelf, 1984.

"StressFire II," Advanced Combat Shotgun," Police Bookshelf, 1992.

"The Semiautomatic Pistol in Police Service and Self Defense," Police Bookshelf, 1988.

"Ayoob Files: the Book," Police Bookshelf, 1995.

"Complete Book of Handguns," Volume 10 (1993) with completely new volume produced annually through 2009, Harris Publications.

"Gun Digest Book of Combat Handgunnery, Fifth Edition," Krause Publications, 2002.

"Gun Digest Book of SIG-Sauer Pistols," Krause Publications, 2004.

"Gun Digest Book of Beretta Pistols," Krause Publications, 2005.

"Gun Digest Book of Combat Handgunnery, Sixth Edition," Krause Publications, 2007.

"Gun Digest Book of Concealed Carry," Krause Publications, 2008.

"Massad Ayoob's Greatest Handguns of the World," Krause Publications, 2010.

"Gun Digest Book of Concealed Carry," Second Edition, Krause,  2012

"Combat Shooting With Massad Ayoob," Krause, 2011

"Complete Book of Handguns," annual editions now through 2013

EX_A_000005

***Monographs:***

"Gunproof Your Children," Police Bookshelf/Potshot Press

"Handgun Primer," Police Bookshelf/Potshot Press.

"The Police View of Gun Control," Second Amendment Foundation.

"Armed and Alive," Second Amendment Foundation.

***Forewords for Authoritative Texts:***

"The Newhall Incident," by Mike Wood

"Armed: The Essential Guide to Concealed Carry," by Dr. Bruce Eimer

"The Gun Digest Book of the Revolver," by Grant Cunningham

"Mu Tau: The Modern Greek Karate" by James Arvanitis

"Realistic Defensive Tactics" by John Peters

"Modern Centerfire Handguns" by Stanley Trzoniec

"You Can't Miss" by John Shaw

"MasterTips" by Jon Winokur

"Effective Defense" by Gila May-Hayes

"In Self Defense" by Michael Izumi

"The Tactical Pistol" by David Lauck

"The Tactical Rifle" by David Lauck

"Personal Defense for Women" by Gila Hayes

"Lessons From Armed America" by Mark Walters and Kathy Jackson

"Armed Response" by Dave Kenik

"Rule the Night/Win the Fight" by Ed Santos

EX_A_000006

***Periodicals:***

Handgun Editor, *Guns* magazine

Law Enforcement Editor, *American Handgunner* magazine

Contributing Editor, *Shooting Industry* magazine

Contributing Editor, *On Target* magazine

Firearms Editor, *Backwoods Home* magazine

Associate Editor, *Combat Handguns* magazine

Associate Editor, *Guns & Weapons for Law Enforcement* magazine

Associate Editor, *Gun Week*

Have published thousands of articles in various professional journals and newsstand periodicals, the overwhelming majority related to law enforcement, weaponry, martial arts and personal defense.  Firearms articles have appeared in *Guns, American Handgunner, Handguns, GUNsport, Handgunner, Home Defense, Glock Annual, Colt Annual, Magnum, Gun World, Combat Handguns,* and others.  Martial arts/unarmed combat articles have appeared in *Black Belt, Official Karate, Inside Kung-fu, Inside Karate, Warriors, Fighting Stars,* and other such publications. Law enforcement articles have been published in *American Police Beat, Law & Order, Police, Police Product News, Sentinel, Trooper, Patrolman, Police Marksman, Guardian, Guns & Weapons for Law Enforcement, Guns & Ammo Law Enforcement Annual,* and other police professional journals and law enforcement related periodicals.  Has also been published in *Car & Driver, Gentlemen's Quarterly, Man's Magazine, Modern Jeweler, New Hampshire Outdoorsman, New Hampshire Times, Prism, Sexology, Sports Afield,* and assorted other general interest publications.

***Training Films***

"Massad Ayoob on Concealed Carry," Panteao Productions, 2013

"Massad Ayoob on Home Defense," Panteao Productions, 2011

"StressFire Handgun," 2002

"StressFire Shotgun," 2002

"StressFire Rifle," 2002

EX_A_000007

"Deadly Force Cases," ALI-ABA, 2001

"Judicious Use of Deadly Force," 1990

"Post Violent Event Trauma," 1990

"LFI Handgun Safety," 1990

"Off Duty Survival," 1993

"Shoot to Live," 1986

"How Close is Too Close," 1986

"Cute Lawyer Tricks," 1986

"Physio-Psychological Aspects of Violent Encounters," 1981

Has appeared in various other training films.

***Quoted as authoritative reference in:***

FBI Journal

"Law Enforcement Handgun Digest" (Grennell)

"Gun Digest Book of Combat Handgunnery, 1st edition (Lewis & Mitchell), 2nd and 3rd editions (Karwan)

"Shooting Schools: An Analysis" (Winter)

"Street Survival: Tactics for Armed Encounters," (Adams, McTernan, Remsberg)

"Tactical Edge: Tactics for High Risk Patrol" (Remsberg)

"Handgun Retention System" (Lindell)

"The Street Smart Gun Book" (Farnam)

"Police Handgun Manual" (Clede)

"Police Shotgun Manual" (Clede)

EX_A_000008

"High Tech SWAT Weapons" (Bane)

"PR-24 Baton Manual" (Starrett)

"Police Officers Guide" (Clede)

Cited as authoritative reference in numerous other publications.

**Career Accomplishments**

Voted Outstanding American Handgunner of the Year, 1998.

Winner of first annual National Tactical Advocate Award, 1995, awarded by American Tactical Shooting Association.

Winner of the Roy Rogers Award for promotion of firearms safety.

Winner of first George C. Nonte Award for excellence in firearms journalism, 1978.

**Firearms Qualifications and Awards**

Combat Master, NRA Police Revolver

First 5-gun Master, International Defensive Pistol Association

Master, Revolver, National Marksman Sports Society

Master, Automatic, National Marksman Sports Society

Class A, International Practical Shooting Confederation

Grand Mastershot, UK Practical Shooting Association

Master Blaster, Second Chance

Expert, NRA Action Shooting

Honorary Distinguished Expert, Federal Law Enforcement Training Center

Several times top shooter in statewide NH police combat matches, 1973-2003

Five times New England Regional champion in various handgun disciplines

EX_A_000009

Co-winner with daughter Justine, National Champion Parent/Child Team, National Junior Handgun Championships, 1998

Has won numerous individual/local combat shooting tournaments, has competed successfully in five countries.

**Law Enforcement Experience**

Hooksett (NH) Police Dept.: 1972-73, auxiliary policeman. 1973-1980, fully sworn Police Officer. Duties under four chiefs included patrol, firearms training, community relations and crime prevention assignments, dept. firearms instructor for most of this period. Served in part time capacity with full police authority.

Deerfield (NH) Police Dept.: 1982-1990.  Fully sworn officer, rank of Sergeant ('82-'84) in charge of all police training, and Lieutenant ('84-'90), in charge of police training and crime prevention activities. Served in part time capacity with full police authority.

Grantham (NH) Police Dept.: 1990-present.   Fully sworn Captain and Police Prosecutor. Training, research, and other administrative functions.  Served in part time capacity with full police authority.

EX_A_000010

**Massad Ayoob case list**

| CASE | LOCALE | ALLEGATION | RETAINED BY |
|------|--------|------------|-------------|
| Littleton v. Belmont County | OH | Wrongful Death | Defendant |
| Florida v. Hecksel | FL | Manslaughter | Defendant |
| Favor v. Walgreen | TX | Wrongful Death | Defendant |
| Texas v. Hubbard | TX | Murder | Defendant |
| Wemouth v. Brunswick | ME | Wrongful Death | Defendant |
| Allen v. Leal | TX | Wrongful Death | Plaintiff |
| California v. Karlson | CA | Murder | Defendant |
| Minick v. County of Sacramento | CA | Wrongful Death | Defendant |
| Jones v. Norwalk | CT | Wrongful Death | Defendant |
| CA v. Matthews | CA | Assault | Defendant |
| Maxim v. Livingstone | FL | Wrongful Shooting Injury | Plaintiff |
| Florida v. Bonenfant | FL | Aggravated Assault | Defendant |
| Cangealose v. Janet Reno & FBI | Wash DC | Wrongful Termination | Plaintiff |
| Null v. Murfreesboro | TN | Wrongful Termination | Plaintiff |
| Missouri v. Beeler | MO | Murder | Defendant |
| Nordlund v. American Armor | NE | Product Liability | Defendant |
| House v. Lawco | UT | Product Liability | Defendant |
| Saldana v. Weitzel | WI | Wrongful Death | Defendant |
| Messing v. Oak Creek | WI | Wrongful Death | Defendant |
| Palmquist v. Selvik | IL | Wrongful Death | Defendant |
| NY v. Gill | NY | Gun Permit Hearing | Defendant |
| Michigan v. Budzyn | MI | Murder | Defendant |
| Wallen v. County of El Dorado | CA | Wrongful Death | Defendant |
| FL v. Jimmy Hecksel | FL | Manslaughter | Defendant |
| Paderez v. Blocker | CA | Product liability | Defendant |
| Blanford v. County of Sacramento | CA | Wrongful Death | Defendant |
| MA v. Robert Tessitore | MA | Manslaughter | Defendant |
| Kulesza v. Marina Bay | MA | Failure to protect | Plaintiff |
| MS v. Patrick Champagne | MS | Manslaughter | Defendant |
| Gorey v. Foley | MI | Wrongful Death | Defendant |
| Tim Alessi v. State of FL | FL | PCR | Appellant |
| TN v. Robert Barnes | TN | Murder | Defendant |
| FL v. Plana | FL | Murder | Defendant |
| Webster & Castle v. Orange County | FL | Wrongful Shooting | Defendant |
| Oxendine v. SRMC | NC | Wrongful Death | Defendant |
| FL v. Ed Michael | FL | Aggravated Assault | Defendant |
| TX v. Terry Graham | TX | Homicide | State |

16

| NM v. Billy Anders | NM | Manslaughter | Defendant |
| MD v. Der and Kifer | MD | Manslaughter | Defendants |
| CO v. Larry Lindsey | CO | Aggravated Assault | Defendant |
| WA v. Jay Olsen | WA | Aggravated Assault | Defendant |
| Chambers v. Graham | TX | Wrongful Death | Defendant |
| FL v. Tim Alessi | FL | Murder (appeal) | Defendant |
| CA v. Thomas Mun & Chad Marshall | CA | Homicide (grand jury level) | State |
| FL v. William Wilkerson | FL | Murder | Defendant |
| FL. V. Ronald Robbins | FL | Manslaughter | Defendant |
| WA v. Jay Olsen | WA | Aggravated Assault | Defendant |
| Chambers v. Graham | TX | Wrongful Death | Defendant |
| Arizona v. Larry Hickey | AZ | Aggravated Assault | Defendant |
| Olevarria v. Couture | VA | Wrongful Death | Defendant |
| Aguilar v. ICE | NY | Excessive Force | Defendant |
| Atkinson v. Tulare County | CA | Wrongful Death | Defendant |
| Gutierrez v. Yolo County | CA | Wrongful Death | Defendant |
| WV v. Jonathan Ferrell | WV | Murder | Defendant |

EX_A_000012

# EXHIBIT B

EX_B_000013



HARRIS OUTDOOR GROUP PRESENTS #129

# THE COMPLETE BOOK OF

2013

# HANDGUNS

™

**BY MASSAD AYOOB**

**HOME DEFENSE**
Castle Doctrine Law Clarified

**Defensive Handgun Drills**

**Split Second TACTICAL RELOADS**

CARACAL
C5 SERIES
vir dian®

**CARACAL F 9X19MM**

**S&W M340 M&P .357MAG**

**AYOOB'S FAVORITE AUTOPISTOLS & REVOLVERS**

Glock 21 Gen4 .45 ACP

Ruger LCR .22 LR

Colt NM Gold Cup .45 ACP

$11.95

29>

7 74470 02063 9

**6 GUNFIGHTING MYTHS** Life & Death LESSONS

**Concealed Carry Tactics**

**J-FRAME SNUBBY GUIDE**

## GUN TESTS
Ruger LCR .22 LR
Springfield XDS .45 ACP
Sig Sauer P229 .357 SIG
Colt NM Gold Cup .45 ACP
Kahr CM9 9x19MM MORE!

Display Until April 29, 2013

# FINDING THE RIGHT GLOCK

## Finding the optimum autopistol that will satisfy your needs!

Available in the United States for more than a quarter of a century now, the Glock pistol dominates market here. There are many good reasons why, and one of them is its versatility. Let's look at the broad array of Glocks presently available. One or the other will probably serve your particular needs a bit better than the rest.

### SIZE

The very first Glock, the G17, established itself as a "service pistol" par excellence. That length, in turn, became the "standard size" Glock: a 4.5-inch barrel with slide of commensurate length, and a full-length grip-frame housing a full-length magazine.

That Glock 17, now in its fourth generation of design advancement, is chambered for the 9x19 cartridge, also known as 9mm NATO, 9mm Luger, and 9mm Parabellum. Safe to carry fully loaded with a round in the chamber, it holds 17 more in its standard magazine.

In 1990, the same Glock format was introduced chambered for the then-new .40 S&W cartridge. Known as the Glock 22, this pistol is believed to be in use by more American police departments than any other. Its standard magazine capacity is 15 rounds.

Next, Glock chambered the same gun for the .357 SIG cartridge, and called it the Glock 31. That bottlenecked round shares overall length and case head dimensions with the .40, so by simply interchanging the barrels the shooter can change his Glock .357 to .40, or vice versa. G31 magazines will work with .40, and G22 magazines will work with .357 SIG cartridges.

With one caveat, the Glock 37 pistol in caliber .45 GAP is the same size as the pistols listed above. That one difference is slide thickness: on the G37, the slide is wider, sufficiently so that it comes standard with the oversize slide-stop lever that is merely optional on the other standard size service models. A G37 magazine is designed to hold ten rounds of .45 GAP.

### STANDARD COMPACTS

"Standard compacts" sounds like a contradiction, but is used here intentionally to describe the frame size of the standard models made shorter at muzzle and butt. The first of these, going back to the late 1980s, was the Glock 19. Take the G17, shorten the barrel by half



*The five configurations of standard size Glocks, shown here in 9mm. From top: longslide G17L, Tactical/Practical G34, standard size G17, compact G19, subcompact "baby Glock" G26.*

EX B 000015

the line. The differences are found in size and power level.

While I know many people who carry full size Glocks concealed year round, and my friend and ace instructor Tom Givens wears a 5.3-inch Glock 35 holstered inside his waistband daily, the compacts and subcompacts are the ones generally seen as the "conceal-ment guns." Consider the Glock range of "compacts" described above.

The Glock 19 has won many a match for famed instructor "Super Dave" Harrington of Team Panteao, even though it's not perceived as a "match gun." On the NYPD, where officers have a choice of three different 16-shot 9mm pistols for uniform carry, an estimated 20,000 of the city's estimated 35,000 sworn personnel carry the Glock 19. The lightest of the city-approved duty guns, it is compact enough for plainclothes carry in an investigative assignment or off duty, yet substantial enough for uniform duty wear. Its .40 caliber twin, the Glock 23, is standard issue for FBI agents (who have the option of the service-size G22 if they prefer). The G23 is also standard issue for all divisions of the Boston Police Department, and its versatility in both uniformed and plainclothes roles is one reason why.

Glock's subcompact pistols are famous for being remarkably accurate for their size. It is not uncommon to see one outshoot its full-size counterpart in the same caliber. In addition to the mechanics, there is the matter of ergonomics and overall "shootability." Several times in recent years, at GSSF (Glock Sport Shooting Foundation) matches, the overall top shot has tallied that "Matchmeister" score with a subcompact 9mm Glock 26. Mike Ross and Bryan Dover come to mind.

"Well, heck," some might say. "Those guys are so good they could outshoot everybody else with anything." Um…it's not just that. I'm told that on those days, both men shot those winning scores in the Subcompact division. They were also shooting their bigger 9mm Glocks in the Master Stock division. They beat everyone, including themselves, who was using the bigger guns. That says something pretty impressive, not just about Dover and Ross, but about the little Glock 26 pistol.

That said, it was the longer barreled Glock 34 (his signature pistol) that Bob Vogel used to shoot his way to the World Championship of the International Defensive Pistol Association last year. As noted earlier, that's the single most popular handgun, not just the most





FMK FIREARMS

RETAIL $399

FMK 9C1 Gen II

Pistol, 2 magazines, 7 interchangeable low profile sights, lockable hard plastic case and owner's manual
9mm | 10+Mag | 23.45oz | 6.58"L x 5.09"H 1.14"W | 4"Barrel
Made In USA | Polymer Frame | High Carbon Steel Slide

Available Options:
Dark Earth (above), Pink, or Matte Black.
Slide with or without Bill of Rights Engraving

AMERICAN TACTICAL

800-290-0065
www.AmericanTactical.us
/AmericanTactical

## Finding The Right Glock

popular Glock, at the IDPA Nationals every year. The long sight radius is very forgiving in terms of accuracy, and because the front part of their slides are cut away to make them lighter, the Tactical/Practical Glocks are not clunky or muzzle-heavy in feel. In fact, swinging a Glock 35 is a little like waving a wand compared to some of the old-style all-steel pistols it has superseded.

### CALIBER QUESTION

Caliber will also be a huge part of the answer to the question, "Which Glock should I buy?" The new shooter in particular is well served with a 9mm, due to both its mild recoil and its relatively low cost compared to the other available calibers. With careful ammunition selection, the 9mm is a sound choice today for defensive purposes…and, of course it has room on board for a bit more ammunition, gun size for gun size. The lighter recoil also makes it the caliber of choice for some types of competition. The .45 caliber always inspires confidence in a police or defensive pistol, and its larger diameter tears bigger holes if the bullet's hollow nose plugs on heavy clothing in cold weather environments. Glocks chambered for the standard 45 Auto round give higher capacity than most of the competition in the big G21 or the compact G30, and for those with smaller hands the standard-frame Glocks in .45 GAP deliver essentially the same level of stopping power. .45 ACP won't exceed .45 GAP in power unless you go to a +P load.

If the debate between 9mm and .45 causes as much angst in the shooter as it has in many law enforcement agencies, the shooter can follow the police path and compromise on the .40, which Glock offers in all sizes.

An increasing number of police departments have gone with the powerful .357 SIG cartridge, such as the Tennessee Highway Patrol, which issues the Glock 31. With 125-grain hollow points, this high-velocity round has earned an excellent reputation for "stopping power," and for tactical barricade penetration. Its velocity also gives it a flat trajectory for long shots.

Glock has been known to produce other calibers for markets outside the United States. The Glock in caliber 9x21 is popular in Italy, where private citizens are forbidden to own military caliber guns. One South American nation reportedly permits its citizens to carry only .32 or smaller caliber handguns; a Glock in .30 Luger would be ideal there. Glock produces compact and subcompact



*The Glock Tactical/Practical, here in a 9mm G34 configuration.*

.380s as well, though they're not imported into the U.S.

There are .22 LR conversions units available, affording inexpensive practice with the Glock. The one from Advantage Arms gets uniformly good reviews. This writer would like to see Glock bring out their own rimfire for their next product, which in the logical line of company product numbering, would be the fortieth. If the Glock 22 is a .40, it seems only fair that the Glock 40 should be a .22.

### TRIGGERS

Determined to be "double-action-only" by the Bureau of Alcohol, Tobacco, Firearms and Explosives, Glock's Safe Action trigger is available in multiple formats. The standard is the 5.5-pound with standard trigger return spring, designed to give an overall pull of that weight. The shooter will experience a two-stage pull, rather like an old Springfield or Mauser bolt-action rifle trigger. The first stage is a relatively long, light take-up, followed by a shorter completing movement with more resistance. Glock shooters find it easy to "ride the link," allowing the trigger to return forward from the last shot only until the sear engagement is felt, and then repeating the press.

Some police departments, such as Miami PD and the San Bernardino County Sheriff's Department, have over the years seen fit to install heavier connectors in their issue Glocks. This would be the 8-pound. Butch Barton, who won more Gunny Challenge Glock matches than anyone else, long favored this set-up in his Glocks because he felt it gave him a crisper release. The 8-pound connector has not become widely popular elsewhere, however.

On the other end of the scale is the 3.5/4.5-pound connector, which debuted with the G17L match pistol. Now known by the 4.5 pound designation, it registers that weight when the trigger is pulled from the center, where most of us place the index finger, and can go down to 3.5

pounds due to leverage when weighed at the bottom, or toe, of the trigger. Very popular among competitive shooters, it is sternly warned against by Glock for "duty pistols" or self-defense guns, unless used in conjunction with a New York style trigger return spring unit.

Twenty-some years ago, at the behest of the New York Police Department, Glock created the New York Trigger, now known as NY-1. This device replaces the standard trigger return spring and gives a firm resistance to the still-two-stage trigger from the very beginning of the pull. When mated with the 5.5-pound connector, the NY-1 brings pull weight up into the 7- to 8-pound range. A Mid-western state police agency pioneered the practice of mating the 3.5-pound connector with the NY-1, which gave a very smooth and uniform pull in the 6-pound weight range. This combination has been Glock approved for duty/defense guns across the board for several years now. For NYPD, Glock also developed a "New York Plus" module, now known as the NY-2, which with the standard 5.5-pound connector brings pull weight up into the 11- to 12-pound range. To my knowledge, it is used only by NYPD and the New York State Parole Board.

This writer recommends following Glock's guidelines and only going with the 3.5/4.5-pound total pull in a competition gun. Some wonder why that system is standard in the Tactical/Practical guns; they need to look at the Glock website (glock.com) and observe that those pistols are listed under the Sport Shooting and Enthusiast categories, and not under Police, Military, or Personal Defense. It is Glock's policy to ship G34s and G35s ordered by police departments with the standard 5.5-pound trigger system, and it is worth noting that when the Kentucky State Police adopted the Glock 35, they ordered them with NY-1 triggers.

### FINAL NOTES

The most popular police handgun in America, the Glock is also hugely popular for action pistol competition and home and personal defense, and in 10mm or .357 SIG can be a very useful outdoorsman's sidearm, too. There's pretty much a Glock for everyone, but it's up to the shooter to identify his or her needs, and then determine which page to mark in the Glock catalog. To learn more, call 770-432-1202 or visit glock.com.

EX_B_000017

# EXHIBIT C

EX_C_000018




# Disarming Mass Murderers

By Massad Ayoob

## Situation:

Some gun grabbers seek magazine capacity limits, citing the theory it'll force mass murderers to reload sooner — allowing them to be disarmed by citizens and thus reducing potential death toll.

## Lesson:

There are faster ways to stop mass murderers; disarming is a risky strategy at best. In most cases, mass murderers and spree killers carry multiple guns — and they're not going to give them up to unarmed citizens.

When legislation is introduced to ban or criminalize so-called "high-capacity magazines," one argument always cited by gun grabbers is it will force mass-murderers to reload sooner — creating a window of opportunity in which some heroic citizen can disarm them and stop the killing. There are, of course, several things wrong with this hypothesis. One is the unrealistic assumption someone who's willing to commit mass murder won't be willing to access and use an illegal magazine.

Tactically, how likely is it there will be someone close enough to jump a gunman caught at slide-lock without the rescuer already (being in such close proximity to the murderer) shot before he could even make the disarming attempt? To find the answer, we have to look deeply into the history of such incidents.

## Disarms During Reloading … or Not?

Two incidents seem to be most often cited by those who demand reduced magazine capacity. One is the capture of Jared Loughner after the murder spree in Tucson in which he killed six people and wounded a dozen more, including US Representative Gabrielle Giffords. The other is the capture of Colin Ferguson, which ended the Long Island Railroad train massacre, which claimed six lives and left 19 more people wounded. In each case, multiple people were able to overpower the killer at a point when his weapon was no longer shootable. It should be noted, however, accounts of how it

EX_C_000019

happened seem to differ among the witnesses. In the case of Loughner, we know Patricia Maisch ended up holding one of his magazines. Some of Ms. Maisch's accounts make it sound as if she ripped it from his hand, while in others, she seems to say he dropped it and she picked it up.

However, Loughner was carrying multiple magazines, and at least one witness insists he had already reloaded a fresh magazine — but had somehow jammed the Glock 19 while attempting to complete the reload. In the Long Island Railroad massacre, Ferguson reloaded at least once and sustained fire. His Ruger P89 had apparently run dry at the time he was rushed and overpowered by unarmed citizens. Accounts differ as to whether Ferguson was attempting to reload a third full magazine at this time, or had shot all his magazines empty and was trying to insert loose cartridges into one of the empty mags.

Thus, it remains possible Loughner was successfully disarmed, not because he was reloading per se, but because he had jammed his already-reloaded gun. If in fact Ferguson had run out of loaded magazines, he was de facto more "out of ammunition" than he was "reloading" at the time he was overpowered and disarmed. Details, details …

There have been successful disarms in public shootings; let's take a look.

## Successful Disarms

In Moses Lake, Wash., 14-year-old Barry Loukaitis opened fire at the middle school he attended. Armed with a .30-30 rifle, .357 Magnum revolver, .25 auto and 78 rounds of ammunition, he killed three victims and wounded a fourth before a gym coach was able to wrestle the rifle away from him and hold him down. Note: the courageous gym teacher didn't let the murderer keep shooting and killing until he ran empty — he got the .30-30 away from the young murderer while it was still loaded. If you're going to attempt a disarm, this strategy would seem likely to save the most lives.

In June 2014, Aaron Ybarra, 26, opened fire at Seattle Pacific University. He killed one and injured three, and was then pepper-sprayed and overpowered by student monitor Jon Meis. According to one report, the killer's weapon was a double-barrel shotgun, in poor repair and capable of firing only one barrel — for all practical intents and purposes, a single-shot weapon. While this in no way detracts from the courage displayed by the heroic Jon Meis, it's not common for mass murderers to use single-shot weapons.

Another young hero to emerge from a mass murder atrocity is Jacob Ryker. Kip Kinkel, 15, murdered his parents and gained control of a Ruger 10/22 rifle, Ruger MK II .22 pistol and 9mm Glock 19. He took them to his school in Springfield, Ore., with an ample supply of ammunition and opened fire. His barrage had killed four people and wounded 25 more when one of those wounded students, young Mr. Ryker, jumped him as the killer reloaded the rifle.

EX_C_000020

However, Kinkel had armed himself with multiple weapons. During the struggle, he drew the 9mm and fired, wounding Ryker again and also another student. Then according to accounts, Ryker, now joined by six other students, was able to finally disarm him and gain physical control. By then, Kinkel had fired a total of 51 rounds, 37 of which struck human targets.

## When It Goes Wrong

Getting a gun away from a killer isn't easy. Good people have died in the attempt. In the Luby's Cafeteria massacre in Killeen, Texas, George Hennard drove his pickup truck through the plate glass window of the restaurant and stepped out with a Ruger P89 and a Glock 17. He shot 43 people, 23 fatally. In the midst of the slaughter, Al Hupp attempted to disarm the madman.

He wasn't successful. Hennard shot him in the chest with one of the pistols, mortally wounding him. As Hupp's wife cradled her dying husband, Hennard shot her dead too. When police arrived and he tasted return fire, Hennard killed himself.

This atrocity occurred before the passage of shall-issue concealed carry in Texas. Suzanna Gratia-Hupp, the murdered couple's daughter, had left her S&W .38 in her parked vehicle according to Texas law. She was certain she could have neutralized Hennard early in the encounter had her gun been within reach. Instead, she endured the horror of watching her parents murdered. Ever since, Suzanna Gratia-Hupp has been one of our most eloquent and poignant spokespersons for armed citizens and lawful concealed carry.

Perhaps the most glaringly conspicuous failure to disarm occurred during the mass murder that most tore at America's heart: Sandy Hook. The first to die was petite school principal Dawn Hochsprung. As quintessential loser Adam Lanza blasted his way through the locked door of the school, she ran at him in what could only be construed as an attempt to disarm and restrain.

She apparently never got within touching distance before he shot her down. Later, with 20 helpless children and six brave but helpless adults dead at his hands, he blew his brains out as soon as police arrived.

In Colebrook, N.H., a bitter old man named Carl Drega went on a murder rampage, assassinating two state troopers and a female judge he hated. As he left the latter murder scene, newspaper editor Dennis Joos attempted to get his rifle away from him. Drega reportedly snarled, "Mind your own f—ing business," threw Joos to the sidewalk, and killed him with multiple gunshots. After a manhunt in which multiple lawmen were wounded, Drega was shot and killed by police.

What about verbally convincing the gunman to just put down the gun? This strategy doesn't have a promising history. In 2013, a 12-year-old boy came to school with a gun in

EX_C_000021

Sparks, Nev. Teacher Michael Landsberry tried to "talk him down." The boy shot and killed the teacher, and then committed suicide.

## Physical Mismatches

If you're close enough to grab the offender as soon as he starts shooting — and actually know how to do it — you have a reasonable chance of succeeding. Unfortunately if you're close, you'll very likely be one of the first victims of his criminal gunfire, perhaps before you can act. There is also the matter of relative physical strength. In the Loukaitis incident, an adult male gym teacher was able to overpower a 14-year-old boy who, judging by his photos, was physically unintimidating.

In the Drega murders, Dennis Joos wasn't a physically large or especially strong man, and was up against a rugged, muscular killer who stood over 6' tall and weighed well over 200 pounds. This disparity made Joos all the more a hero in his last moments, but at the end, a dead hero.

And let's not forget, the opponent may have multiple guns; it's going to be awfully hard to disarm him if he's not in surrender mode. Though most accounts of the Drega murders have him killing Joos with the same .223 he used on his first three victims, the Wikipedia story on the case as of this summer states, "During the struggle Drega shot and killed Joos with a second firearm." And we recall Jacob Ryker was wounded in the Kinkel incident when the punk he was disarming drew a second gun and shot him and another boy.

## Multiple Guns

Ron Borsch is a retired career lawman and SWAT cop, whose second career was as head of the Southeast Area Law Enforcement Academy in Bedford, Ohio. A pioneer in the concept of lone-officer response to active mass murder incidents, he's one of the nation's leading authorities on this sort of terrible event. When he and I were both instructing at the International Law Enforcement Educators and Trainers Association (ILEETA) conference earlier this year, I asked him how many of the mass killers he studied had been armed with multiple guns. "Well over half," he answered.

This isn't new. One of the worst mass murderers in American history goes back to Civil War times, "Bloody Bill" Anderson, a senior officer in Quantrill's Raiders. The trademark of these guerrillas was carrying multiple revolvers, usually .36-caliber Navy Colts. When he was killed in a shootout with Union troops, an eyewitness to Anderson's death said, "Bloody Bill had four revolvers buckled around him and two very large ones across the saddle."

In 1966, Charles Whitman ascended the Texas Tower in Austin with so many guns and ammunition he had them in a footlocker, which he rolled into the elevator on a dolly. He murdered 17 people and wounded 32 more from his lofty perch immune to .38-caliber revolver fire and 12-ga. buckshot from police, until rifle fire from armed citizens on the

EX_C_000022

ground pinned him down. Another armed citizen led police to his sniper's nest atop the tower, where they killed him.

The term "going postal" came in large part from Patrick Sherrill's death orgy in the Edmond, Okla., Post Office (14 dead, six wounded, perpetrator took own life). Sherrill was armed with two 1911 .45's he had been issued by the National Guard, and a .22 target pistol of his own.

The list goes on. James Holmes in the Aurora, Colo., theater: AR-15 with high-capacity magazine which jammed early on, 12-ga. Remington 870 and two Glock 22 pistols, one on his person and one in his car. He surrendered as soon as police confronted him. By then, he had shot 82 helpless people in his chosen "Gun-Free Zone," a dozen of them fatally. He, like the other multiple-armed perpetrators discussed here, would have been tough to disarm.

## A Better Strategy

When a monster with a lethal weapon attempts wholesale murder of the innocent, what's a better strategy than expecting untrained potential victims to grapple with them?

Quite simply, have a trained, armed person in place to suppress them.

A few months before the Aurora theater atrocity, another incident happened in the same city, which the national media chose to virtually ignore. On April 22, 2012, Kiarron Parker opened fire outside a church in Aurora, killing the pastor's mother. Instantly, one member of the congregation — an off-duty Denver Police officer named Antonio Milow — drew his own handgun and shot and killed Kiarron before he could wreak any more mayhem.

In 2007, also in Colorado, psycho loser Matthew Murray shot multiple people at one church then went to another, where he opened fire and shot more victims. Then, Jeanne Assam — a former cop, working as volunteer church security — ran at him with a Beretta 92 in her hands, firing as she went. She hit him with bullet after 124-gr. 9mm JHP bullet, and he went down with just enough life force left to shoot himself. The pastor of the church later credited Assam with saving 100 or more lives. A detailed account of this incident can be found in the Ayoob Files archives here at American Handgunner.

Luke Woodham, 16, stabbed and bludgeoned his mother to death to get the keys to his estranged father's gun cabinet, where he took a Marlin .30-30 rifle and headed to his high school in Pearl, Miss. He shot nine of his teenage schoolmates, killing two.

As he drove out of the parking lot — on course to a nearby junior high school, and still armed with the rifle and more ammunition — Woodham was taken at gunpoint by Vice Principal Joel Myrick, who had sprinted to the parking lot to retrieve a Colt .45 auto from his truck. The killer stopped his car, exited and went to the ground in front of the armed teacher squealing, "The world has wronged me, Mr. Myrick!" A detailed account of this event is also in the Ayoob Files archives.

EX_C_000023

## Lessons

Waiting for the gunman to run empty and then jumping him for the gun, no matter how many rounds it was loaded with, is simply not as viable of a strategy as it sounds. History teaches us another strategy works much better.

This strategy is born in reality: In almost every one of these highly-publicized mass murder/killing spree incidents, as soon as the gunman is met with return fire he ceases shooting innocent people and either is killed, kills himself or surrenders soon thereafter. Unarmed, untrained people attempting disarms sometimes actually prevailed, but oftentimes were hurt or killed in the attempt.

Those who would commit the most rigidly prohibited crimes in the history of civilization are certainly not likely to be deterred by a law limiting magazine capacity. The only people who can be realistically expected to obey such laws are, by definition, the law-abiding and not the law-breakers.

When in the wake of the Sandy Hook atrocity, NRA spokesman Wayne LaPierre said the only thing capable of stopping a bad guy with a gun was a good guy with a gun, he was shouted down and excoriated by the mass media. Yet, history and reality combine to show he spoke the absolute truth.

After the Ma'alot Massacre, Israel put armed good guys into their schools; many of them school personnel and student family members who volunteered to be trained for the job by Mishmar Ezrachi, the Israeli civil guard. Terrorist attacks on schoolchildren plummeted.

Here in the US, intended mass school shootings have been short-circuited by armed SRO's, school resource officers from local law enforcement agencies. An increasing number of school systems are, to the horror of the gun grabbers, quietly arming and training volunteer personnel to perform the same function as the Israeli model. Discreet arming of church volunteers for the protection of the congregation seems to have become even more widespread.

We can only wonder what might have happened if the courageous principal of Sandy Hook Elementary School, Dawn Hochsprung, had been armed and capable of dealing with Adam Lanza on that terrible day in December 2012. She died courageously, trying to defend the little children and the adult staff for whom she was responsible. Her empty hands rendered her brave spirit futile, and we all know what happened next.

If instead those empty hands had held Jeanne Assam's Beretta 92 with the same skill. If …

9

EX_C_000024

## Browse

Advertising          American Handgunner Photo Gallery          Archives          Digital Version

CD-Rom Digital Editions          Classic Handgunner Editions          Columns          Contact Us

Exclusive Web Extra          Features          Find Us On Facebook          FMG Publications Videos

Handgunner Merchandise          Service          Special Editions          Store          Subscribe

Visit Us On YouTube          Web Blast          Home

## Publications

American COP          American Handgunner          GUNS Magazine          FMG Publications

FMG Resource Center          Shooting Industry

American Handgunner is an FMG Publication. © 2017 Copyright by Publishers Development Corporation. All rights reserved. American Handgunner is a registered Trademark of Publishers Development Corporation.



EX_C_000025

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF CALIFORNIA**

VIRGINIA DUNCAN, RICHARD
LEWIS, PATRICK LOVETTE, DAVID
MARGUGLIO, CHRISTOPHER
WADDELL, CALIFORNIA RIFLE &
PISTOL ASSOCIATION,
INCORPORATED, a California
corporation,

                         Plaintiffs,

            v.

XAVIER BECERRA, in his official
capacity as Attorney General of the State
of California; and DOES 1-10,

                         Defendant.

Case No:  17-cv-1017-BEN-JLB

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 E. Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have cause service of the following documents, described as:

**DECLARATION OF MASSAD AYOOB IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; EXHIBITS A-C**

on all parties by placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at Long Beach, CA, on May 26, 2017.

Ms. Alexandra Robert Gordon
Mr. Anthony P. O'Brien
California Department of Justice
1300 I Street, Suite 125
Sacramento, CA 95814

    I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2017, at Long Beach, CA.

                                    Laura Palmerin