C. D. Michel - SBN 144258
Sean A. Brady - SBN 262007
Anna M. Barvir - SBN 268728
Matthew D. Cubeiro - SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,<br><br>　　　　　　　Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California, and DOES 1-10,<br><br>　　　　　　　Defendants. | Case No: 17-cv-1017-BEN-JLB<br><br>**DECLARATION OF STEPHEN HELSLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　　June 13, 2017<br>Time:　　10:00 a.m.<br>Dept:　　5A<br>Judge:　　Hon. Roger T. Benitez |

## DECLARATION OF STEPHEN HELSLEY

1. I am a retired peace officer from the California Department of Justice (DOJ). The bulk of that career was in drug enforcement. The last three positions I held were Chief of the Bureau of Narcotic Enforcement, Chief of the Bureau of Forensic Services and finally Assistant Director of the Division of Law Enforcement. As Assistant Director, I was responsible for the department's criminal, civil and controlled substance investigations as well as law enforcement training, intelligence gathering and our forensic laboratory system. In my executive level positions, I had occasion to review special agent-involved shootings and a wide range of homicides involving firearms. I have qualified as an expert in both criminal and civil matters. I was the department's principal firearms instructor for many years and am an FBI certified range master. I also participated in the firearm training that was part of the FBI National Academy Program in Quantico, Virginia. Additionally, I am a member of the American Academy of Forensic Sciences and a technical advisor to the Association of Firearm and Tool Mark Examiners. I have co-authored five books on firearms and have authored or co-authored more than fifty firearm-related articles for US and Russian journals. For the past twenty years, I was first a state liaison and, then later, a consultant to the National Rifle Association. Throughout my adult life I have been an active participant in handgun, rifle and shotgun competitions. I have also been a firearm collector and ammunition reloader since the early 1960s. Finally, I am a collector of firearm related books – of which I have approximately three thousand. Included in my book collection are approximately 50 different issues of *Gun Digest*, the earliest of which is from 1944 and includes the 2016 issue. It is a standard resource that is widely used by gun dealers and buyers alike. *Gun Digest* has traditionally provided a comprehensive overview of the firearms and related items available to retail buyers.

2. The combination of my consulting work, writing and free time activities puts me in constant contact with gun stores, shooting ranges, gun shows and gun

owners. I am also in frequent contact with retirees from DOJ and other law enforcement agencies. It is clear to me from my collective experiences that magazines having a capacity of more than 10-rounds are a common choice for self-protection in both rifles and handguns.

3. The standard magazine for a given firearm is one that was originally designed for use with that firearm, regardless of whether its capacity is six, ten, fifteen, or twenty rounds. Various popular handgun models originally came from the manufacturer standard, free from artificial influences like laws restricting capacity, with magazines exceeding ten rounds. Examples include, but are in no way limited to, the Browning High Power (13 rounds) c.1954, MAB PA-15 (15 rounds) c.1966, Beretta Models 81/84 (12/13 rounds) c.1977, S&W Model 59 (14 rounds) c.1971, L.E.S P-18 (18 rounds) c.1980 aka Steyr GB, Beretta Model 92 (15 rounds) c.1980s, and Glock 17 (17 rounds) c.1986. I know there to be many more examples not listed here.

4. Firearms with a capacity exceeding 10-rounds date to the 'dawn of firearms.' In the late-15th Century, Leonardo Da Vinci designed a 33-shot weapon. In the late 17th Century, Michele Lorenzoni designed a practical repeating flintlock rifle. A modified 18th Century version of Lorenzoni's design, with a 12-shot capacity, is displayed at the NRA's National Firearms Museum. Perhaps the most famous rifle in American history is the one used by Lewis and Clark on their 'Corps of Discovery" expedition between 1803 and 1806 -- the magazine for which held twenty-two .46 caliber balls.

5. Rifles with fixed magazines holding 15-rounds were widely used in the American Civil War. During that same period, revolvers with a capacity of 20-rounds were available but enjoyed limited popularity because they were so ungainly.

6. In 1879, Remington introduced the first 'modern' detachable rifle magazine. In the 1890s, semiautomatic pistols with detachable magazines followed.

During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced. As those magazines protruded well below the bottom of the pistol's frame, they weren't practical for use with a belt holster – and by extension concealed carry for self-defense.

7. In 1935, Fabrique Nationale introduced the Model P-35 pistol with its fully internal 13-round magazine. It would become one of the most widely used military pistols of all time. During WWII, magazine capacity for shoulder-fired arms was substantially increased while most pistols (excluding the P-35) remained at 10-rounds or less. In the mid-1950s the P-35 was rebranded the High Power and imported to the US.

8. This transition of a firearm from military to civilian use for sport or self-defense is very common. The standards of WWI – the 1903 Springfield rifle and the Colt M1911 pistol are but two of many examples. Civilian sales of both began immediately after the war ended. The Springfield would become the standard for both rifle hunting and target competition. Likewise, the M1911 Colt pistol was a target-shooting standard for a half-century or more and popular for self-defense.

9. Between the two world wars, double-action semiautomatic pistols like the Walther PPK and P-38 were introduced. The double-action feature allowed the first shot to be fired in a manner similar to a revolver. Law enforcement agencies in the United States had traditionally used revolvers. However, in the early 1970s, a confluence of events changed that: training funds became widely available and so did the first double action semiautomatic pistol (the S&W M59) with a 14-round magazine. Soon major agencies were transitioning to the M59 and the legion of other makes that followed – CZ, Colt, HK, Sig-Sauer, Glock, Beretta, Ruger, Smith & Wesson, etc. Pistols with magazine capacities as large as 19-rounds quickly replaced the six-shot revolver.

10. Law enforcement demand for the new generation of semiautomatic pistols helped create an increased demand in the civilian market. Comparing 1986

and 2010 handgun sales, one can see evidence of that change. According to the Bureau of Alcohol Tobacco Firearms and Explosives, in 1986, 663,000 pistols were sold in the United States versus 761,000 revolvers. In 2010, revolver sales had dropped to 559,000 while pistol sales had grown to 2,258,000. *See* United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, Firearms Commerce in the United States, Annual Statistical Update (2012).[1] The result of almost four decades of sales to law enforcement and civilian clients is millions of semiautomatic pistols with a magazine capacity of more than ten rounds and likely multiple millions of magazines for them. My associates who have such pistols also have a significant number of spare magazines for them. In my case, I have one 19-round and eight 17-round magazines for my Glock.

11. The concealed weapon permit holder and the home-owner wants a pistol that can hold significantly more cartridges than a revolver for the same reason a law enforcement office or soldier wants one – to increase his or her chances of staying alive. Gunfights frequently involve a lot of 'missing.' This can be the result of improper aim or impact with barriers such as vehicles or walls. One would be hard pressed to find someone who had been in a gunfight that complained about having too much ammunition.

12. Some believe that anyone defending themselves can just "shoot to wound." Those who grew up in the 1950s likely watched Roy Rogers shoot the gun out of an evildoers hand or–if things got really serious–let loose a grazing wound to the arm to settle matters. Such ideas are a fantasy. Equally as silly is the well-known 'fact' that a bullet from a .45ACP cartridge will knock someone to the ground no matter where it strikes them.

---

[1] Report available at http://www.atf.gov/files/publications/firearms/050412-firearms-commerce-in-the-us-annual-statistical-update-2012.pdf

13. The notion that a bullet can 'knock-down' a person is a largely Hollywood-inspired myth. Most of us learned in school about Sir Isaac Newton's *Third Law of Motion* that states - "For every action, there is an opposite and equal reaction." Put another way: if the recoil of the firearm doesn't knock you down, neither will the impact of the bullet. Bullets can penetrate skin, cut arteries, brake bones or interrupt nerve function to accomplish what is generally described as 'stopping power.' A bullet that severs the spine or strikes a certain area of the brain will almost certainly stop an attacker instantly. Bullet design and/or increased velocity may improve performance but placement is still the most critical factor. A hit, or even multiple hits, to less vital areas of the body may allow an attacker to continue the assault. This phenomenon is extensively documented in the citations for American heroes who were awarded the Congressional Medal of Honor. Many of these men continued to fight after suffering multiple gunshot wounds, being struck by shrapnel or having an arm or leg severed. *See*, e.g., The Congressional Medal of Honor, The Names, The Deeds 28-29, 52-53, 284-85 (Sharp & Dunnigan, 1984). A fighter who has overcome fear and is motivated to continue an attack can be difficult to stop. In the infamous 1986 FBI shoot-out with two Florida bank robbers, one of the suspects, Michael Platt, sustained 12 gunshot wounds before dying. Jamie Frater, Top 10 Most Audacious Shootouts in US History, Listserve (October 14, 2009) http://listverse.com/2009/10/14/top-10-most-audacious-shootouts-in-us-history/.

14. "Knockdown" and "Stopping Power" are things I know from personal experience. During my early years as a narcotic agent with the California Department of Justice, I was conducting an undercover investigation of a significant heroin dealer. After purchasing an ounce and a half of heroin from him and the arrest was initiated, he shot me with a .45 first breaking my left arm and severing an artery (Note: I wasn't 'knocked down.') and then bouncing another round off my spine that exited my right leg. From a prone position I returned fire at

the suspect who was mostly concealed by the trunk of his car. My shots that struck the vehicle failed to penetrate sufficiently to reach him. In the exchange that followed I had another round pass through my right leg, while another entered my left side and lodged in the disc between L3 and L4 - where it remains today. Having emptied the 8 rounds in my pistol, I tried to reload. However, with a broken arm and temporary paralysis from the waist down, I was unable to reach my spare magazine in my left rear pants pocket. Fortunately, at that time the suspect quickly surrendered to my converging surveillance team. Very little pain was initially associated with my wounds and I could have 'fought on' if more ammunition had been available. A total of 18-rounds were fired.

15. Four years later, I was making an undercover cocaine purchase with a new member of my team. I had involved myself to evaluate his performance. The three suspects, two of whom were armed (initially unbeknownst to us) had decided that robbery was a better option than delivering the cocaine. The junior agent was taken hostage and was being held in the state undercover car with a sawed-off rifle to the back of his head and a revolver held against his right side. I was across the street in another undercover car with the money the suspects wanted. I informed the surveillance team that I was going to approach the other vehicle to see what I could do. When I got to the car it was difficult to determine what was happening, as it was a dark, rainy night. I told the agent to exit the vehicle and as he opened the car door and dived out, two shots were fired at him – both missed. I returned fire at the area of the muzzle flash inside the car. Of the eight rounds I fired, the automobile glass defeated most. However, one .45 bullet hit the suspect holding the rifle, causing him serious internal injuries. The suspect with the revolver came out of the passenger door and was struck through the shin with a .45 bullet from a member of the surveillance team who had quietly closed-in on the vehicle. After a short pause the suspects were ordered out of the vehicle. Both of those with gunshot wounds came out fighting. A flashlight to the chin produced the 'stopping power' for the

suspect with the internal wound. The suspect with the leg wound was unaware of his injury until he saw the massive blood loss – whereupon he exclaimed "I'm bleeding" and passed out. Twenty-eight rounds were fired into the vehicle with only two hits. For my actions in this incident I was awarded the department's Medal of Valor. The 'take away' from these incidents is that serious bullet wounds aren't necessarily incapacitating and that gunfights can require lots of ammunition.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on May 18, 2017.

*[signature]*
Stephen Helsley

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,

    Plaintiffs,

v.

XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,

    Defendant.

Case No: 17-cv-1017-BEN-JLB

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 E. Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have cause service of the following documents, described as:

**DECLARATION OF STEPHEN HELSLEY IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on all parties by placing a copy in a separate envelope, with postage fully prepaid, for each address named below and depositing each in the U.S. Mail at Long Beach, CA, on May 26, 2017.

Ms. Alexandra Robert Gordon
Mr. Anthony P. O'Brien
California Department of Justice
1300 I Street, Suite 125
Sacramento, CA 95814

    I declare under penalty of perjury that the foregoing is true and correct. Executed on May 26, 2017, at Long Beach, CA.

*/s/ Laura Palmerin*
Laura Palmerin

PROOF OF SERVICE

17-cv-1017-BEN-JLB