XAVIER BECERRA
Attorney General of California
TAMAR PACHTER
Supervising Deputy Attorney General
NELSON R. RICHARDS
ANTHONY P. O'BRIEN
Deputy Attorneys General
ALEXANDRA ROBERT GORDON
Deputy Attorney General
State Bar No. 207650
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone: (415) 703-5509
 Fax: (415) 703-5480
 E-mail:  Alexandra.RobertGordon@doj.ca.gov
*Attorneys for Defendant*
*Attorney General Xavier Becerra*

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VIRGINIA DUNCAN, et al.,**<br><br>Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of the State of California; et al.,**<br><br>Defendants. | 17-cv-1017-BEN-JLB<br><br>**ATTORNEY GENERAL'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:  June 13, 2017<br>Time:  10:00 a.m.<br>Dept:  5A<br>Judge: Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................1

BACKGROUND .......................................................................................................2

    I.    Federal and State Regulation of LCMs ................................................2

    II.   California State Prohibitions on the Possession of LCMs...................4

ARGUMENT.............................................................................................................6

    I.    Legal Standard ......................................................................................6

    II.   Plaintiffs Have Not Demonstrated a Likelihood of Success on
the Merits of any of Their Claims.........................................................6

        A.    Plaintiffs' Second Amendment Claim Fails. ...........................7

            1.    The Second Amendment Does Not Protect Large-
Capacity Magazines. .....................................................9

                a.    Large-Capacity Magazines Are Dangerous
and Unusual..........................................................10

                b.    Large-Capacity Magazines Are Not
"Typically Possessed by Law-Abiding
Citizens for Lawful Purposes" Such as Self-
Defense.................................................................13

            2.    Even Assuming that It Implicates the Second
Amendment, Section 32310 is Constitutional................16

                a.    Intermediate Scrutiny is the Appropriate
Standard. ..............................................................16

                b.    Section 32310 Advances the State's
Compelling Interests. ...........................................17

        B.    Plaintiffs' Takings Claim Fails.............................................21

        C.    Plaintiffs' Due Process Claim Fails......................................24

    III.  Plaintiffs Have Failed to Demonstrate Either Irreparable Injury
or that the Balance of Harms and the Public Interest Weigh in
Favor of an Injunction........................................................................25

CONCLUSION…………………………………………………………………26

i

# TABLE OF AUTHORITIES

**Page**

CASES

*Akins v. United States*
82 Fed. Cl. 619 (2008)....................................................................................22, 23

*Alliance for the Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ...................................................................................6

*Andrus v. Allard*
444 U.S. 51 (1979) ...................................................................................................22

*Bauer v. Becerra*
No. 15-15428, 2017 WL 2367988 (9th Cir. June 1, 2017) ................................20

*Berjikian v. Franchise Tax Bd.*
No. CV 13-06301, 2013 WL 4677772 (C.D. Cal. Aug. 30, 2013) ....................25

*Chang v. United States*
327 F.3d 911 (9th Cir. 2003) ...................................................................................24

*Chemical Specialties Mfrs. Ass'n, Inc. v. Allenby*
958 F.2d 941 (9th Cir. 1992) .....................................................................................7

*Chevron USA, Inc. v. Cayetano*
224 F.3d 1030 (9th Cir. 2000)............................................................................22, 24

*Chicago, B. & Q. R. Co. v. Illinois*
200 U.S. 561 (1906) .................................................................................................22

*City of Los Angeles v. Alameda Books, Inc.*
535 U.S. 425 (2002) (plurality opinion)..............................................................19

*Colorado Outfitters Ass'n v. Hickenlooper*
24 F. Supp. 3d 1050 (D. Colo. 2014) ................................................8, 14, 15, 19

*Ctr. for Competitive Politics v. Harris*
784 F.3d 1307 (9th Cir.) .............................................................................................6

*Ctr. for Fair Pub. Policy v. Maricopa County*
336 F.3d 1153 (9th Cir. 2003) ...............................................................................19

*District of Columbia v. Heller*
554 U.S. 570 (2008) ........................................................... 8, 9, 10

*Drake v. Filko*
724 F.3d 426 (3d Cir. 2013) ................................................. 19

*Eastern Enterprises v. Apfel*
524 U.S. 498 (1998) ............................................................. 24

*Everard's Breweries v. Day*
265 U.S. 545 (1924) ............................................................. 22

*Fed. Trade Comm'n v. Affordable Media, LLC*
179 F.3d 1228 (9th Cir. 1999) ............................................. 25

*Fesjian v. Jefferson*
399 A.2d 861 (D.C. Ct. App. 1979) ..................................... 23

*Fla. Bar v. Went for It, Inc.*
515 U.S. 618 (1995) ............................................................. 19

*Friedman v. City of Highland Park*
784 F.3d 406 (7th Cir.) ..................................................... 8, 16

*Fyock v. City of Sunnyvale*
25 F. Supp. 3d 1267 (N.D. Cal. 2014) ........................... *passim*

*Goldie's Bookstore, Inc. v. Superior Ct.*
739 F.2d 466 (9th Cir. 1984) ............................................... 25

*Gun South, Inc. v. Brady*
877 F.2d 858 (11th Cir. 1989) ............................................. 23

*Heller v. District of Columbia*
670 F.3d 1244 (D.C. Cir. 2011) (*Heller II*) .................... *passim*

*Heller v. District of Columbia*
698 F.Supp.2d 179 (D.D.C. 2010) ....................................... 15

*Hightower v. City of Boston*
693 F.3d 61 (1st Cir. 2012) .......................................... 10, 14

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Holt v. Morgan*
128 Cal.App.2d 113 (Cal. Ct. App. 1st Dist. 1954) ........................................... 24

*Horne v. Dept. of Agriculture*
135 S. Ct. 2419 (2015) ....................................................................................... 23

*Jackson v. City and County of San Francisco*
746 F.3d 953 (9th Cir. 2014) ................................................................... 9, 16, 17

*Kashalsky v. County of Westchester*
701 F.3d 81 (2d Cir. 2012) ................................................................................ 21

*Kolbe v. Hogan*
849 F.3d 114 (4th Cir. 2017) (en banc) ............................................. 7, 10, 11, 16

*Kolbe v. O'Malley*
42 F. Supp. 3d 768 (D. Md. 2014) ............................................................... 19, 20

*Lingle v. Chevron U.S.A., Inc.*
544 U.S. 528 (2005) ..................................................................... 16, 21, 22

*Lucas v. South Carolina Coastal Council*
505 U.S. 1003 (1992) .......................................................................................... 24

*Madsen v. Women's Health Ctr., Inc.*
512 U.S. 753 (1994) ........................................................................................... 17

*Maryland v. King*
133 S. Ct. 1 (2012) ............................................................................................. 25

*McDonald v. City of Chicago*
561 U.S. 742 (2010) ................................................................................... 8, 9, 12

*Mugler v. Kansas*
123 U.S. 623 (1887) ........................................................................................... 22

*Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco & Firearms*
700 F.3d 185 (5th Cir. 2012) ............................................................................... 8

*New York State Rifle & Pistol Ass'n v. Cuomo*
804 F.3d 242 (2d Cir. 2015) .............................................................. 8, 14, 16, 18

iv

*Penn Central Transp. Co. v. City of New York*
    438 U.S. 104 (1978) ....................................................................................... 21

*Pennsylvania Coal Co. v. Mahon*
    260 U.S. 393 (1922) ....................................................................................... 21

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v.*
    *U.S. Dep't of Agriculture*
    499 F.3d 1108 (9th Cir. 2007) ................................................................... 7, 17

*Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*
    561 F.2d 1327 (9th Cir. 1977) ....................................................................... 23

*San Francisco Veteran Police Officers Ass'n v. City of San Francisco*
    18 F. Supp. 3d 997 (N.D. Cal. 2014) ......................................................... 8, 25

*Shew v. Malloy*
    No. 3:13-CV-0739 (D. Conn.) ....................................................................... 20

*Silvester v. Harris*
    843 F.3d 816 (9th Cir. 2016) ........................................................................ 17

*Suitum v. Tahoe Regional Planning Agency*
    520 U.S. 725 (1997) ................................................................................ 22, 23

*Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning*
    *Agency*
    535 U.S. 302 (2002) ....................................................................................... 22

*Tracy Rifle and Pistol LLC v. Harris*
    118 F. Supp. 3d 1182 (E.D. Cal. 2015) ......................................................... 25

*Turner Broad. Sys., Inc. v. FCC*
    512 U.S. 622 (1994) ................................................................................ 17, 21

*Turner Broad. Sys., Inc. v. FCC*
    520 U.S. 180 (1997) ....................................................................................... 17

*United States v. Carter*
    750 F.3d 462 (4th Cir. 2014) ......................................................................... 19

**<u>TABLE OF AUTHORITIES</u>**
**(continued)**

<u>Page</u>

*United States v. Chester*
 628 F.3d 673 (4th Cir. 2010) ................................................................... 9

*United States v. Chovan*
 735 F.3d 1127 ..............................................................................9, 17, 19

*United States v. Salerno*
 481 U.S. 739 (1987) ...........................................................................6, 7

*Washington State Grange v. Washington State Republican Party*
 552 U.S. 442 (2008) ................................................................................ 7

*Williams-Yulee v. Fla. Bar*
 135 S. Ct. 1656 (2015) ......................................................................... 19

*Winter v. Natural Res. Def. Council, Inc.*
 555 U.S. 7 (2008) .................................................................................. 6

STATUTES

Oakland, California Code of Ordinances, § 9.38.030-9.38.040 ................................. 4

California Fish & Game Code
 § 2010(a) ............................................................................................... 13

California Municipal Code
 § 9.44.050 ............................................................................................... 4
 § 46.30 .................................................................................................... 4
 § 55.13 .................................................................................................... 4

California Penal Code
 § 3210 ..................................................................................................... 4
 § 16740 ............................................................................................... 2, 4
 § 32310 .........................................................................................*passim*
 § 32310(a) .............................................................................................. 3
 § 32310(c) .............................................................................................. 5
 § 32310 (c), (d) ................................................................................. 5, 24
 § 32310 (d) ...................................................................................... 5, 24
 § 32390 ................................................................................................... 3

California Political Code Article 9, § 619 ................................................................4

Colorado Revenue Statute §§ 18-12-301, 18-12-302, 18-12-303 .............................4

Conneticutt General Statute §§ 53-202w-202x ........................................................4

D.C. Code § 7-2506.01 .............................................................................................4

Georgia Annotated Code § 27-3-4 ..........................................................................13

Hawaii Revenue Statute § 134-8(c) ..........................................................................3

Illinois Code of Ordinances
    § 29-49 ...............................................................................................................4
    § 3-13G-3 ...........................................................................................................4
    § 54.212 ..............................................................................................................4

Illinois Municipal Code
    §§ 8-20-010, 8-20-085 ......................................................................................4
    § 27-2-1 ..............................................................................................................4

Maryland Code, Criminal Law § 4-305 .....................................................................3

Massachusetts General Laws Annotated Chapter 140
    § 121 ...................................................................................................................3
    § 131M ...............................................................................................................3

New Jersey Statute Annotated §§ 2C:39-1(y), 39-3(j), 39-9(h) ................................3

New York, City Code No. 47-5 ..................................................................................4

New York Penal Law
    § 265.00(23) ......................................................................................................3
    § 265.02(8) .........................................................................................................3
    § 265.10 ..............................................................................................................3
    § 265.11 ..............................................................................................................3
    § 265.20(7-f) ......................................................................................................3
    § 265.36-265.37 .................................................................................................3

Pub. L. 103-322, Sept. 13, 1994, 108 Stat. 1796, 1998-2000 (formerly
    codified at 18 U.S.C. § 922(w)) ........................................................................3

# TABLE OF AUTHORITIES
### (continued)

Page

**OTHER AUTHORITIES**

2 Colorado Code Regulations § 406-3 (303)(b) ........................................................ 13

4 Blackstone, *Commentaries on the Laws of England* 148-49 (1769) ..................... 10

David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. Crim. L. & Criminology 1430 (1997)     21

AG OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (17-cv-1017-BEN-JLB)

# INTRODUCTION

In the wake of escalating mass-shootings and gun violence, the Legislature and the people of California have enacted a ban on the possession of magazines holding more than ten rounds of ammunition. These large-capacity magazines (LCMs) are disproportionately used in crime, and feature prominently in some of the most serious crime, including homicides, mass shootings, and killings of law enforcement officers. When LCMs are used to commit crime, more shots are fired, more victims are wounded, and there are more wounds per victim. This in turn leads to more injuries, more lethal injuries, and higher rates of death than crimes involving firearms with conventional magazines. Because LCMs are so dangerous, federal and state law have restricted their manufacture, importation, and sale for decades. Now, in order to strengthen these restrictions, and close a loophole that allowed for the continued proliferation of LCMs, California Penal Code Section 32310 (Section 32310) prohibits the possession of LCMs by private citizens beginning July 1, 2017.

Plaintiffs seek to enjoin this important public safety legislation claiming that it violates the Second Amendment, as well as the Takings and Due Process Clauses. However, plaintiffs have not demonstrated that any of these constitutional guarantees are even implicated by the challenged legislation, let alone violated by it. Possession of LCMs is not protected by the Second Amendment, and, even if it were, there is a "reasonable fit" between Section 32310 and the State's important interests. Because the statute is an exercise of the State's police power that does not deprive plaintiffs of all economic or beneficial use of their property, plaintiffs cannot prevail on their takings claim. Plaintiffs' skeletal due process claim, which is largely derivative of their other claims, also fails.

Plaintiffs' motion is also unsubstantiated by any cognizable evidence of injury that they would suffer in the absence of injunctive relief. By contrast, the harm to the State's ability to effectively enforce its laws and to the public interest, were a

preliminary injunction to issue, would be considerable. Accordingly, the law, the balance of equities, and the public interest all weigh against issuing a preliminary injunction.

## BACKGROUND

### I. FEDERAL AND STATE REGULATION OF LCMS

California law defines "large-capacity magazine" as any ammunition-feeding device with the capacity to accept more than 10 rounds. Cal. Penal Code § 16740. LCMs allow semiautomatic weapons to fire more than 10 rounds without pausing to reload the weapon. Graham Decl. ¶ 16. Because LCMs enable a shooter to fire repeatedly without pausing to reload, they significantly increase a shooter's ability to kill and injure large numbers of people quickly. *Id.*, ¶ 17. LCMs frequently have been used in mass shootings over the last three decades, including the deadliest shooting in this country's history in Orlando, Florida, where the gunman killed forty-nine and injured fifty-three people. *Id.*, ¶ 19(l). LCMs have also been used in other massacres, such as those taking the lives of 14 people and seriously injuring 22 more in San Bernardino, California, the murder of children and their teachers at Sandy Hook Elementary School in Newtown, Connecticut, and the shooting spree that killed six and wounded 13, among them former Congresswoman Gabrielle Giffords and the Honorable John Roll, in Tucson, Arizona. *Id.*, ¶ 19; Webster Decl. ¶¶ 9-10. In the past two years, LCMs were used in eight of the nine mass shootings with known magazine capacity. Allen Decl. ¶ 13. LCMs have also been used in a number of mass shootings in California. Graham Decl. ¶¶ 18-19.

Because of the devastating and prominent role that LCMs have played in mass shootings, as well as in the killing of law enforcement personnel, LCMs have been extensively regulated in the United States for decades. In 1989, the U.S. Department of Treasury, charged with developing guidelines for which firearms could be imported into the United States, determined that the ability to accept an LCM was a signature characteristic of military firearms, and that detachable LCMs

2

did not serve any sporting purpose.  Declaration of Alexandra Robert Gordon (Gordon Decl.), Exhs. 55 at 6 & 56.

In 1994, Congress passed the Violent Crime Control and Law Enforcement Act (the federal assault weapons ban).  H.R. Rep. 103-489, at 32-33 (1994).  The ban prohibited the possession or transfer of all "large-capacity ammunition feeding devices," defined as those with the capacity to accept more than ten rounds, except those lawfully possessed at the time of the bill's enactment. See Pub. L. 103-322, Sept. 13, 1994, 108 Stat. 1796, 1998-2000 (formerly codified at 18 U.S.C. § 922(w)).  The law, which also prohibited the possession or transfer of assault weapons (except those manufactured before 1994), expired in 2004.  *Id*., 108 Stat. at 2000.

In 2000, before the federal ban expired, California adopted its own legislation prohibiting the manufacture, import, keeping or offering for sale, giving, or lending of LCMs.  Cal. Stats. 1999, ch. 129, §§ 3, 3.5, presently codified at § 32310.[1]  In 2013, California also enacted a ban on the purchase or receipt of LCMs.  Cal. Stats. 2013, ch. 728 (A.B. 48) § 1 (amending § 32310(a)).  California has also declared LCMs to be a "nuisance."  § 32390.  Thus, though the federal assault weapons ban expired in 2004, LCMs have remained illegal to buy, sell, or import in California.  Combined, both the federal and state law have made LCMs unavailable to the vast majority of Californians for over two decades.

Currently, at least seven other states and 11 local jurisdictions restrict the possession or sale of ammunition magazines on the basis of capacity.[2]

---

[1] All subsequent statutory references are to the California Penal Code, unless otherwise noted.
[2] See Haw. Rev. Stat. § 134-8(c) (prohibiting possession of LCMs capable of use with pistols); Mass. Gen. Laws Ann. ch. 140, §§ 121, 131M (enacted as 1998 Mass. Stats. ch. 180, § 8) (prohibiting sale or possession of LCMs); Md. Code, Crim. Law § 4-305 (prohibiting sale of magazine with capacity of more than 20 rounds); N.J. Stat. Ann. §§ 2C:39-1(y), 39-3(j), 39-9(h) (prohibiting possession of magazines with capacity of more than 15 rounds except magazines grandfathered under 1990 law); N.Y. Penal Law §§ 265.00(23), 265.02(8), 265.10, 265.11, 265.20(7-f), 265.36-265.37 (prohibiting LCMs except those manufactured before
(continued…)

3

## II. CALIFORNIA STATE PROHIBITIONS ON THE POSSESSION OF LCMs.

On July 1, 2016, the State of California enacted Senate Bill No. 1446 (2015-2016 Reg. Sess.), which prohibited the possession of LCMs (defined under Section 16740 as "a feeding device with the capacity to accept more than 10 rounds") beginning on July 1, 2017. Gordon Decl., Exh. 91 (Cal. Stats. 2016, ch. 58 (SB 1446) § 1). SB 1446, which went into effect on January 1, 2017, amended Section 32310 to state that, beginning on July 1, 2017, any person possessing an LCM, with exemptions not relevant here, would be guilty of an infraction punishable by a fine starting at $100 for the first offense. *Id.*, Cal. Stats. 2016, ch. 58 (S.B. 1446) § 1 (amending Section 32310 to add a new subdivision (c).). The law also provided that anyone possessing an LCM may, prior to July 1, 2017, dispose of the magazine by any of the following means: (1) removing it from the state; (1) selling it to a licensed firearms dealer; (3) destroying it; or (4) surrendering it to a law enforcement agency for destruction. *Id.*, Cal. Stats. 2016, ch. 58 (S.B. 1446) § 1 (amending Section 32310 to add a new subdivision (d)). The Senate Bill Analysis noted that the amendments were necessary because the prior version of the law, which did not prohibition possession of LCMs, was "very difficult to enforce." *Id.*, Exh. 92 (Sen. Bill No. 1446, 3d reading Mar. 28, 2016

(…continued)
September 13, 1994); Conn. Gen. Stat. §§ 53-202w-202x (prohibits, with few exceptions, the sales, use, and possession of LCMs); Colo. Rev. Stat. §§ 18-12-301, 18-12-302, 18-12-303; Rochester, N.Y., City Code No. 47-5 (prohibiting possession of pistol magazines containing more than 17 rounds or rifle magazines containing more than five rounds); D.C. Code § 7-2506.01 (prohibiting possession of LCMs); Chicago, Ill. Muni. Code §§ 8-20-010, 8-20-085 (prohibiting possession of magazines with capacity greater than 15 rounds); Sunnyvale, Cal. Muni. Code, § 9.44.050 (prohibiting possession of ammunition magazines holding more than 10 rounds); Los Angeles, Cal. Muni. Code §§ 46.30, 55.13 (sell, transfer, possess); San Francisco, Cal. Pol. Code Art. 9, § 619 (possess); Oakland, Cal. Code of Ordinances, § 9.38.030-9.38.040 (Ord. No. 13352, § 1(D), 1-19-2016) (possess); Cook County, Ill. Code of Ordinances, § 54.212 (Ord. No. 13-O-32, 7-17-2013.) (manufacture, sell, offer, displace, transfer, carry, possess); Aurora, Ill. Code of Ordinances, § 29-49 (sell, offer, displace, acquire, possess); Franklin Park, Ill. Code of Ordinances, § 3-13G-3 (sell, offer, give, lend, acquire, possess, manufacture); Oak Park, Ill. Muni. Code, § 27-2-1 (possess or carry, but they call it an "assault ammunition feeding device").

AG OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (17-cv-1017-BEN-JLB)

(2015-2016 Reg. Sess.) (Cal. 2016)).  Specifically, there was no reliable way for law enforcement to know which LCMs were properly grandfathered and which had been illegally smuggled and sold or were the product of "magazine conversion kits," which enabled people to skirt the law.  *Id.*; Graham Decl., ¶¶ 24-32.

On November 8, 2016, California voters passed Proposition 63, the "Safety for All Act of 2016."  Gordon Decl., Exh. 95 (Prop. 63, § 1, as approved by voters (Gen. Elec. Nov. 8, 2016)).  The measure included several provisions—including amendments to Section 32310—intended to close "loopholes that leave communities throughout the state vulnerable to gun violence and mass shootings." *Id.*, Exh. 96 (Prop. 63, § 2, ¶ 5 (uncodified findings and declarations of the people of California)); *id.* (Prop. 63, § 2, ¶ 11 (finding that LCMs "significantly increase a shooter's ability to kill a lot of people in a short amount of time.  That is why these large-capacity ammunition magazines are common in many of America's most horrific mass shootings, from the killings"))).

The amendments to Section 32310 largely mirror the same amendments made under SB 1446.  Both provisions prohibit the possession of LCMs on or after July 1, 2017, and list options for the disposal of LCMs before that date.  *Id.*, Exh. 95. Prop. 63 also increased the potential consequence for violations of the possession ban, from an infraction to an infraction or a misdemeanor.[3]  *Id.*, (Prop. 63, § 6.1). Because Proposition 63's amendments were enacted after SB 1446, they are the governing provisions.  Therefore, references to Section 32310 in this brief are to the statute as amended by Proposition 63.

---

[3] The other substantive differences between the two laws are minor.  Under Proposition 63, Section 32310(c) states the prohibition on possession of LCMs on or after July 1, 2017, and Section 32310(d) lists the options for disposal of the LCMs.  And unlike SB 1446, the Proposition 63 amendments do not list destruction of the LCM as an option for disposal.  But since the Proposition 63 amendments do not explicitly prohibit destruction of LCMs, such disposal may still be valid.

# ARGUMENT

## I. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as a matter of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). To prevail, "a plaintiff must show (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) that an injunction is in the public interest." *Id*. at 7, 20. Alternatively, "[a] preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011) (internal citation omitted). Plaintiffs must make a showing of all four *Winter* factors even under the alternative sliding scale test. *Id*. at 1132, 1135.

## II. PLAINTIFFS HAVE NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS OF ANY OF THEIR CLAIMS

Plaintiffs[4] bring a facial challenge to Section 32310 on the grounds that it violates the Second Amendment, as well as the Takings and Due Process Clauses of the United States Constitution.[5] *See* Plaintiffs' Memorandum of Points and Authorities, ECF No. 6-1, (Motion) at 6. In order to succeed on a facial challenge, plaintiffs "must establish that no set of circumstances exists under which the [regulation or statute] would be valid." *United States v. Salerno*, 481 U.S. 739, 745

---

[4] The subset of plaintiffs, Lewis and Lovette, who currently possess LCMs have standing to bring this challenge. Accordingly, the Attorney General does not address the standing, or lack there of, of the other individual and associational plaintiffs here. The Attorney General reserves all arguments regarding the standing of these plaintiffs.

[5] The nature of plaintiffs' challenge, be it facial or as applied, is not entirely clear from the face of the Complaint. However, plaintiffs seek a declaration that Section 32310's ban on LCMs is unconstitutional. The relief they seek would therefore "reach beyond the particular circumstances of these plaintiffs," and thus, they are required to "satisfy [the] standards for a facial challenge to the extent of that reach." *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1314 (9th Cir.), *cert. denied*, 136 S. Ct. 480 (2015).

(1987); *see also Chemical Specialties Mfrs. Ass'n, Inc. v. Allenby*, 958 F.2d 941, 943 (9th Cir. 1992). To support a finding of facial unconstitutionality, voiding a statute or regulation as a whole, plaintiffs cannot prevail by suggesting that in some future hypothetical situation constitutional problems may possibly arise as to the particular *application* of the statute. Rather, they must show that the statute is unconstitutional in *all* of its applications. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008). Where, as here, a statute has a "plainly legitimate sweep," a facial challenge must fail. *Id.* at 449 (citation and internal quotations omitted).

Plaintiffs have not met the "heavy burden" to show that the prohibition on possession of LCMs facially violates the Second Amendment or the Takings and Due Process Clauses. *United States v. Salerno*, 481 U.S at 745. Indeed, plaintiffs do not establish that Section 32310 violates these guarantees under *any* circumstance, let alone *every* circumstance. *See id.*

### A. Plaintiffs' Second Amendment Claim Fails.

Plaintiffs' Second Amendment claim, which has been rejected by the Ninth Circuit as well as every other court to consider it, is without merit and cannot provide the basis for enjoining state law. *See Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1271 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ("No court has yet entered a preliminary injunction against a law criminalizing the possession of magazines having a capacity to accept more than ten rounds, nor has any court yet found that such a law infringes the Second Amendment.");[6] *Kolbe v. Hogan*, 849 F.3d 114, 130-41 (4th Cir. 2017) (en banc);

---

[6] Plaintiffs argue that the Ninth Circuit's decision in *Fyock*, which upheld a municipal ban on the possession of LCMs, is not binding authority because it was decided on appeal from a motion for preliminary injunction. Motion 10. While decisions made during the preliminary injunction phase are not, as a "general rule," controlling, conclusions on pure issues of law, like those in *Fyock*, are binding. *Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am. v. U.S. Dep't of Agriculture*, 499 F.3d 1108, 1114 (9th Cir. 2007).

*New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 263-64 (2d Cir.

2015), *cert denied sub nom*, *Shew v. Malloy*, 136 S. Ct. 2486 (2016) (*NYSRPA*);

*Friedman v. City of Highland Park*, 784 F.3d 406, 411-12 (7th Cir.), *cert. denied*,

136 S. Ct. 447 (2015); *Heller v. District of Columbia*, 670 F.3d 1244, 1260-64 (D.C.

Cir. 2011) (*Heller II*); *San Francisco Veteran Police Officers Ass'n v. City of San

Francisco*, 18 F. Supp. 3d 997, 1002-06 (N.D. Cal. 2014); *Colorado Outfitters

Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1067-74 (D. Colo. 2014), *vacated and

remanded for lack of standing*, 823 F.3d 537 (10th Cir. 2016).

While the Supreme Court held, in *District of Columbia v. Heller*, 554 U.S. 570,

622 (2008), that the Second Amendment confers an individual right to keep and

bear arms, plaintiffs overstate the nature and scope of that right and consequent

restrictions on the government's ability to enact reasonable gun safety regulations.

The Court in *Heller* stated that the Second Amendment has "the core lawful

purpose of self-defense" and "elevates above all other interests the right of law-

abiding, responsible citizens to use arms in defense of hearth and home." *Id.* at 630,

635.[7]  The Court was clear, however, that the Second Amendment does not provide

"a right to keep and carry any weapon whatsoever in any manner whatsoever and

for whatever purpose." *Heller*, 554 U.S. at 626.  Rather, the right to keep and bear

arms, like other constitutional rights, is limited in scope and subject to regulation.

*Id.* at 626-28.  "When the fledgling republic adopted the Second Amendment, an

expectation of sensible gun safety regulation was woven into the tapestry of the

guarantee." *Nat'l Rifle Ass'n v. Bureau of Alcohol, Tobacco & Firearms*, 700 F.3d

185, 200 (5th Cir. 2012).  Thus, the Supreme Court has emphasized that the Second

Amendment "does not imperil every law regulating firearms" and that "state and

local experimentation with reasonable firearms regulation will continue under the

_____

[7] This right is incorporated against the states through the Fourteenth
Amendment. *McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010)
(plurality).

AG OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (17-cv-1017-BEN-JLB)

Second Amendment." *McDonald*, 561 U.S. at 785; *see also Heller*, 554 U.S. at 626-29.

In evaluating whether the Second Amendment permits such state regulation, the Ninth Circuit employs a two-step inquiry. *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013). First, the court "asks whether the challenged law burdens conduct protected by the Second Amendment." *Id.* If not, the challenged law does not implicate the Second Amendment and is valid. *See id.* at 1138; *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010). If a Second Amendment right is implicated, the court then selects an appropriate level of scrutiny. *Chovan*, 735 F.3d at 1136. Here, LCMs are not protected by the Second Amendment, and plaintiffs' claim thus fails at the threshold. *See Jackson v. City and County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014). Moreover, because Section 32310 advances the State's compelling interests in protecting citizens and law enforcement from gun violence, protecting public safety, and preventing crime, it is constitutional.

### 1. The Second Amendment Does Not Protect Large-Capacity Magazines.

Even assuming that LCMs, which are neither a "weapon[] of offence," nor ammunition,[8] can properly be considered "arms," *see Heller*, 554 U.S. at 582, they are not within the scope of the Second Amendment. The Supreme Court has explained that there are "important limitation[s]" on the right conferred by the Second Amendment that leave substantial room for the government to legislate in the public interest. *Id.* at 626-28. As especially relevant here, protection under the Second Amendment "extends only to certain types of weapons." *Id.* at 623. In particular, the Second Amendment does not protect weapons that are recognized as

---

[8] As noted above, Section 32310 does not directly regulate firearms; it regulates only the size of a magazine. The magazine is a container that holds and feeds rounds of ammunition to a firearm. Graham Decl., ¶ 15.

abnormally "dangerous and unusual." *Id.* at 627.[9]  The Court stressed that this includes many weapons that are "most useful in military service." *Id.*  Further, the Second Amendment only protects those weapons that are "'in common use at the time' for lawful purposes like self-defense." *Id.* at 624 (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)).  It "does not protect those weapons not typically possessed by law-abiding citizens" for such purposes.  *Id.* at 625.

Section 32310 prohibits a subset of military-style magazines that are unusually dangerous and that "are designed to enhance their capacity to shoot multiple human targets very rapidly." *Heller v. District of Columbia*, 670 F.3d 1244, 1262 (D.C. Cir. 2011) (*Heller II*).  LCMs have no utility for legitimate self-defense, and are not actually used for such purposes in practice.  *See Hightower v. City of Boston*, 693 F.3d 61, 66, 71 (1st Cir. 2012) (noting that "large capacity weapons" with ability to carry more than ten rounds are not "of the type characteristically used to protect the home").  Consequently, and as the Fourth Circuit recently determined, "whatever their other potential uses," because LCMs are designed to "kill or disable the enemy," they are "clearly most useful in military service" and thus are not within the right secured by the Second Amendment.  *See Kolbe*, 849 F.3d at 137.

### a. Large-Capacity Magazines Are Dangerous and Unusual.

The LCMs banned by Section 32310 are especially dangerous, and are thus appropriately singled out for greater restriction.  LCMs have obvious utility in offensive assaults by allowing the shooter to fire more rounds without having to reload.  Thus, "magazines capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for military and law

---

[9] In setting forth the limitation on the right to keep and carry arms for "dangerous and unusual weapons," the Court in *Heller* relied upon Blackstone's Commentaries of the Laws of England.  *See* 554 U.S. at 627.  Blackstone referred to the crime of carrying "dangerous *or* unusual weapons."  4 Blackstone, *Commentaries on the Laws of England* 148-49 (1769) (emphasis added).

enforcement applications." Gordon Decl., Exh. 63 at 10 (noting that large-capacity magazines are meant to "provide[] soldiers with a large ammunition supply and the ability to reload rapidly."). LCMs enable a shooter to hit "multiple human targets very rapidly," and "contribute to the unique function of any assault weapon to deliver extraordinary firepower." *Kolbe*, 849 F.3d at 137; Gordon Decl., Exh. 103; Graham Decl., ¶ 17.

The military-style features of LCMs make them particularly attractive to mass shooters and other criminals and pose heightened risks to innocent civilians and law enforcement. *See Kolbe*, 849 F.3d at 139; Donohue Decl., ¶ 25; Webster Decl., ¶¶ 7-12, 15. As noted above, LCMs are used disproportionately in mass killings and in murders of police. In the last thirty years, in instances where the magazine capacity used by a killer could be determined, researchers found that 86 percent of them involved an LCM. Gordon Decl., Exh. 79; *see also* Allen Decl., ¶¶ 11-14; Webster Decl., ¶ 12. While LCMs accounted for only 21 percent of the civilian magazine stock in 1994 (the final year before the 10-year federal ban), they were used in somewhere between 31 to 41 percent of gun murders of police. Webster Decl., ¶ 15; Gordon Decl., Exh. 75 at 160-62.

When LCMs are used in crime, they result in more shots fired, more victims wounded, and more wounds per victim. Allen Decl., ¶ 14-15; Webster Decl., ¶ 12. This in turn leads to more injuries, more lethal injuries, and higher rates of death than crimes involving more conventional firearms. *See NYSRA*, 849 F.3d at 140. In cases where an oversized magazine was used, an average of around four more people were killed in each shooting and nine more people were wounded than in shootings involving standard-capacity magazines. One study has shown an average of 22 fatalities or injuries per mass shooting with an LCM compared to nine without. Allen Decl., ¶ 15. Another study found that the use of LCMs and assault weapons in recent mass shootings was associated with a 151 percent increase in the

number of people shot and a 63 percent increase in deaths. Gordon Decl., Exhs. 59 at 3 & 107 ¶¶ 27-38.[10]

Thus, as the commission that examined the mass shooting at the Sandy Hook Elementary School determined, the lethality and utility of a firearm in crime is directly "correlated to capacity." Gordon Decl., Exh. 70 at 7. While LCMs may be useful and appropriate in a military context, they "pose a distinct threat to safety in private settings as well as places of assembly." *Id.* at 6. The Chief of Police in Los Angeles was even more direct, stating "[t]here is no reason that a peaceful society based on rule of law needs its citizenry armed with 30-round magazines" and that LCMs transform a firearm "into a weapon of mass death rather than a home-protection type device." Gordon Decl., Exh. 44.

Plaintiffs do not meaningfully dispute the evidence that LCMs are unusually dangerous, but rather argue that some of the same attributes that make them so lethal and effective at killing and injuring vast numbers of people can also be useful in self-defense, and that LCMs are marketed for such lawful purposes. Motion 3-4. However, the fact that law-abiding citizens may "prefer" LCMs, for self-defense or any other purpose, does not cast doubt on their dangerousness. *See, e.g.*, *McDonald*, 130 S. Ct. at 3107 (Stevens, J., dissenting) ("Just as [firearms] can help homeowners defend their families and property from intruders, they can help thugs and insurrectionists murder innocent victims."); Gordon Decl., Exh. 98 at 16 (testimony of Laurence Tribe: "I might want a magazine with twice as many bullets as any possible home intruder. I might want a machine gun too. But in the end that can't be the measure of what the Second Amendment says I have a *right* to own or

---

[10] The use of LCMs by private citizens also increases the possibility of injury resulting from missed shots. Plaintiffs acknowledge that private citizens are likely to miss with the vast majority of shots they take. *See* Kleck Decl., ¶¶ 19-21 (noting that the marksmanship of civilians is likely lower than the 37 percent "hit rate" of police officers). Because of the low hit rate, citizens using large-capacity magazines are more likely to hit many more things other than their intended targets, and possibly injure or kill innocent bystanders. Gordon Decl., Exh. 66 at 83.

deploy."). Similarly, however LCMs may be advertised, the fact remains that they are overrepresented in the mass killings of innocent civilians and law enforcement. Webster Decl., ¶¶ 7-12, 15; Gordon Decl., Exh. 66 at 80-91.

### b. Large-Capacity Magazines Are Not "Typically Possessed by Law-Abiding Citizens for Lawful Purposes" Such as Self-Defense.

Even accepting plaintiffs' assertions that LCMs are "commonly possessed,"[11] Motion 2, they have adduced no cognizable evidence that LCMs are typically used for lawful purposes. Although plaintiffs claim that they need military firepower in their homes to defend themselves against possible attackers, there is no proof that magazines holding more rounds are necessary or commonly used for self-defense.[12] *See Heller II*, 670 F.3d at 1262; Gordon Decl., Exh. 98 at 14 (noting that "in the case of high-capacity magazines, significant market presence does not necessarily translate into heavy reliance by American gun owners on those magazines for self-defense."); Webster Decl., ¶ 16. Plaintiffs' expert, Dr. Kleck, has opined elsewhere that most defensive uses of guns result in few if any shots fired. Kleck, *Point Blank: Guns and Violence in America* (1991), at 111 (Gordon Decl., Exh. 7). Other gun rights proponents have testified that 98 percent of the time that firearms are used defensively, it is only necessary to "brandish" a gun, but not fire it. Donohue Decl., ¶¶ 29-30. Mr. Ayoob similarly has commented that "[t]he bottom line is, it's

---

[11] Plaintiffs claim that approximately 115 million magazines over 10 rounds were in circulation in the United States between 1990 and 2015. Curcuruto Decl., ¶¶ 6-8. However, Plaintiff's experts admit that such numbers are based solely on estimates of the number of magazines sold to the general population. *Id.* ¶ 6. Available evidence indicates that gun ownership—and correspondingly, ownership of LCMs—is concentrated. Donohue Decl., ¶¶ 11-20. Plaintiffs do not cite to any current social science research estimating the number of households owning LCMs. However, it is likely that LCM ownership is also likely to be concentrated, with increased numbers of LCMs held by a decreasing number of people. *Id.* ¶ 20.

[12] Plaintiffs' assertions that LCMs are used for hunting is belied by the fact that California law prohibits the use of shotguns "holding more than six cartridges at one time" for hunting purposes. Cal. Fish & Game Code § 2010(a). Many states have similar restrictions. *See, e.g.*, 2 Colo. Code Regs. § 406-3 (303)(b); Ga. Code Ann. § 27-3-4.

---

13

not about 'what gun you have,' so much as 'did you have a gun?'" Gordon Decl.,

Exh. 9.

In fact, numerous studies have shown that law-abiding individuals do not fire

ten or more rounds in their homes, in self-defense or for any other reason. An

analysis of the NRA's own reports of firearm use in self-defense "demonstrated that

in 50 percent of all cases, two or fewer shots were fired, and the average number of

shots fired across the entire data sample was about two." *Id*., Exh. 8. An updated

analysis of the NRA reports for the period January 2011 to May 2017 likewise

indicates that individuals fired on average only 2.2 bullets when using a firearm in

self-defense. Allen Decl., ¶¶ 8-9. Out of 47 incidents in California during this

period, there were no instances in which a defender was reported to have fired more

than 10 bullets. Allen Decl., ¶ 10; *see also* James Decl., ¶ 8.

There is no credible evidence that a civilian would need more than a ten-round

magazine in his home in order to defend himself. As a former Baltimore Police

Colonel has stated, "the typical self-defense scenario in a home does not require

more ammunition than is available in a standard 6-shot revolver or 6-10 round

semiautomatic pistol. In fact, because of the potential harm to others in the

household, passersby, and bystanders, too much firepower is a hazard." Gordon

Decl., Exh. 61 at 16; *see also Heller II*, 670 F.3d at 1263-63 (noting that "high-

capacity magazines are dangerous in self-defense situations because the tendency is

for defenders to keep firing until all bullets have been expended, which poses grave

risks to others in the household, passersby, and bystanders.") (internal quotation

marks omitted); *Colorado Outfitters*, 24 F. Supp. 3d at 1072 (citing testimony by

Mr. Ayoob that his students "frequently feel the need to 'spray and pray'" that at

least one shot will hit their target).[13] Plaintiffs themselves admit that many of the

---

[13] For these reasons, courts that have examined the civilian use of assault
weapons and large-capacity magazines for home or self-defense have found
evidence of such uses to be lacking. *See NYSRPA*, 804 F.3d at 263; *Hightower*, 693
(continued…)

shots supposedly fired in self-defense do not actually hit their intended targets. Motion 3-4, 8; Kleck Decl., ¶¶ 19-20; Ayoob Decl., ¶ 28.

While plaintiffs note the popularity of LCMs and claim that civilians "overwhelmingly choose [LCMs] to increase their chances of staying alive in violent confrontations," Motion 3, even accepting this preference as true, there is no evidence that civilians need or use LCMs to defend themselves. As noted above, all the evidence is to the contrary. Plaintiffs offer a few anecdotes in which persons apparently fired more than ten rounds in self-defense in their homes or supposedly would have been aided by the ability to do so. *See* Ayoob Decl., ¶¶ 6-10. These isolated incidents do not establish that LCMs are commonly used for self-defense.[14] Plaintiffs' unsupported speculation about scenarios that would necessitate an LCM, such as the presence of multiple violent attackers and individuals who are infirm or disabled and thus may be unable to reload quickly also does not suffice. In contrast to the data indicating that LCMs are used by criminals and increase casualties in mass shootings, there is no study or systematic data to support the argument that LCMs are necessary or commonly used in self-defense. Webster Decl., ¶ 16; *Colorado Outfitters*, 24 F. Supp. 3d at 1070.[15]

Accordingly, and because they are unusually dangerous, LCMs fall outside the scope of Second Amendment protection.

---

(…continued)
F.3d at 66, 71; *Heller II*, 670 F.3d at 1263-64; *Heller v. District of Columbia*, 698 F.Supp.2d 179, 193-94 (D.D.C. 2010).

[14] Plaintiffs' inconsistent and unsupported arguments that while criminals "rarely fire more than a few rounds," more than ten rounds are necessary to defend people in their homes, strains credulity. *See* Donohue Decl., ¶ 27.

[15] There is no evidence that any type of firearm, let alone an LCM, is used in self-defense even a fraction as often as plaintiffs suggest. One study analyzing National Crime Victimization Survey data for the five-year period from 2007 through 2011, shows the total number of self-protective behaviors involving a firearm by victims of attempted or completed violent crimes or property crimes totaled only 338,700. Gordon Decl., Exh. 71 at 9.

### 2. Even Assuming that It Implicates the Second Amendment, Section 32310 is Constitutional.

#### a. Intermediate Scrutiny is the Appropriate Standard.

Even if Section 32310's prohibition on LCMs fell within the scope of Second Amendment protection, the law would survive constitutional scrutiny. In determining the appropriate level of scrutiny to apply to a Second Amendment challenge, the court must consider "(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right." *Jackson*, 746 F.3d at 960-61. At most, Section 32310 regulates the manner in which persons may exercise their Second Amendment rights. *See id.* at 961. It does not impose a complete ban on an entire category of firearms considered to be "the quintessential self-defense weapon," like the law at issue in *Heller*. *See* 544 U.S. at 629. Rather, it bans a particularly dangerous subset of magazines that have been illegal for sale in California for more than twenty years.[16] Section 32310 does not restrict the number of magazines that a person may own, or the number of defensive shots he can fire in the unlikely event that such shots would be necessary. Thus, the "prohibition of … large capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves." *Fyock*, 779 F.3d at 999. Accordingly, in assessing the constitutionality of a municipal ordinance banning possession of LCMs, substantially identical to Section 32310, the Ninth Circuit, like every other court to consider the issue, concluded that intermediate scrutiny was appropriate. *Id.*[17] As

---

[16] For this reason, plaintiffs' contention that if a complete ban on all handguns would not survive intermediate scrutiny, Section 32310 cannot either, Motion 15, is unfounded. Unlike in *Heller*, any burden on the exercise of the core Second Amendment right caused by Section 32310 is not substantial or severe.

[17] *See also Kolbe v. Hogan*, 849 F.3d at 138 (applying intermediate scrutiny); *NYSRPA*, 804 F.3d at 260-61 (same); *Friedman*, 784 F.3d at 410 (same); *Heller II*, 670 F.3d at 1264 (same).

plaintiffs acknowledge, that determination is binding here.[18]  Motion 8; *Ranchers Cattlemen*, 499 F.3d at 1114.

### b. Section 32310 Advances the State's Compelling Interests.

Contrary to plaintiffs' articulation of it, Motion 8-9, in the Ninth Circuit, the intermediate scrutiny test under the Second Amendment requires that (1) the government's stated objective must be significant, substantial, or important; and (2) there must be a "reasonable fit" between the challenged regulation and the asserted objective. *Chovan*, 735 F.3d at 1139.  Intermediate scrutiny does not require the fit between the challenged regulation and the stated objective to be perfect, nor does it require that the regulation be the least restrictive means of serving the interest. *Jackson*, 746 F.3d at 969.  Rather, the government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Id.* at 969-70 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)). In determining whether a law survives intermediate scrutiny, courts "afford substantial deference to the predictive judgments of the legislature." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997).  The courts' narrow role is to "assure that, in formulating its judgments, [the State] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (plurality).  Section 32310 easily passes scrutiny under this framework.

Plaintiffs concede, as they must, that the government has important interests in promoting public safety and preventing crime and gun violence.  Motion 9; *see, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994); *Fyock*, 779 F.3d at 1000; *Chovan*, at 1135.  Section 32310 furthers these interests by eliminating a

[18] Moreover, and contrary to plaintiffs' view, Motion 8 n.4, strict scrutiny is reserved for only those laws that significantly burden the core Second Amendment right to keep and bear arms for self defense in the home. *See Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016); *Jackson*, 746 F.3d at 961, 964-65.  Thus, even if this Court were not bound by *Fyock*, Section 32310 would be subject to intermediate scrutiny.

particularly lethal subset of magazines, LCMs, that are designed to cause greater fatalities and injuries and are disproportionately used in mass shootings and the killing of law enforcement officers. *Fyock*, 779 F.3d at 1000; Gordon Decl., Exh. 66. In addition to common sense, which suggests that the most effective way to eliminate the threat of death, injury, and destruction caused by LCMs is to prohibit their use, the evidence shows that banning possession of LCMs has the greatest potential to "prevent and limit shootings in the state over the long run." *NYSRPA*, 804 F.3d at 264 (quoting testimony of Dr. Koper). A reduction in the number of LCMs in circulation will reduce the number of crimes in which LCMS are used and reduce the lethality and devastation of gun crime when it does occur. Webster Decl., ¶¶ 24-26; Donohue Decl., ¶¶ 9-10, 36; James Decl., ¶¶ 6-9, Exh. A.

The only comprehensive study of the effect of the federal ban on LCMs demonstrates that the ban reduced the use of LCMs in gun crimes and that it would have had an even more substantial impact had it not been allowed to expire in 2004. Webster Decl., ¶¶ 17-24; Gordon Decl., Exh. 14 at ¶¶ 7-50, 66, 74-75. While the use of LCMs initially increased after the federal ban went into effect, due in large part to a massive stock of grandfathered and imported magazines not covered by federal law, LCM use in crime appeared to be decreasing by the early 2000s. Webster Decl., ¶ 19; Gordon Decl., Exh. 107 at ¶¶ 54-63, 78-88. A later investigation by the *Washington Post*, using more current data on the use of LCMs in crime in Virginia, confirmed that between 1994 and 2004, the period the federal ban was in effect, that gun crimes using LCMs declined by roughly 31 to 41 percent. This investigation also determined that once the federal ban expired, crimes with LCMs more than doubled. Gordon Decl., Exhs. 45 & 107 at ¶¶ 57, 74, 81; Webster Decl., ¶¶ 19, 23. Section 32310, which is far more robust than the federal ban, can reasonably be expected to be more effective in reducing LCM use. Webster Decl., ¶ 26; Gordon Decl., Exhs. 14 at ¶¶ 51-57 & 107 at ¶¶ 69-77; James Decl., ¶ 9.

1   Experience also indicates that because shooters limited to ten-round magazines
2   must reload more frequently, the prohibition of LCMs helps create a "critical
3   pause" that has been proven to give potential victims an opportunity to hide, escape,
4   or disable a shooter. *Colorado Outfitters*, 24 F. Supp. 3d at 1072-73; Donohue
5   Decl., ¶ 20. Moreover, the "two or three second pause during which a criminal
6   reloads his firearm can be of critical benefit to law enforcement." *Heller II*, 670
7   F.3d at 1264; Gordon Decl., Exh. 100. For example, eleven children at Sandy
8   Hook Elementary School were able to escape while the shooter reloaded his 30-
9   round LCM. Donohue Decl., ¶ 21; *see id.* (noting that citizens have subdued a
10  perpetrator stopping to reload his weapon in at least 20 different shootings in the
11  United States since 1991). Further, it will limit damage caused by civilians
12  indiscriminately firing more rounds than necessary, thereby endangering
13  themselves and bystanders. *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 795-96 (D. Md.
14  2014); Gordon Decl., Exh. 61 at 16.

15       Accordingly, substantial evidence demonstrates that there is "reasonable fit"
16  between Section 32310 and the State's important interests. *Chovan*, 735 F.3d at
17  1139. Plaintiffs' arguments to the contrary are based upon a misunderstanding of
18  intermediate scrutiny. Plaintiffs assert that without "empirical evidence"
19  establishing a link between possession of LCMs and the prevention of gun violence
20  and crime and the protection of the public, Section 32310 cannot survive
21  constitutional attack. Motion 12. However, while there is a considerable body of
22  empirical evidence demonstrating that prohibiting possession of LCMs advances
23  the government's objectives, such proof is not required under intermediate scrutiny.
24  *See, e.g.*, *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439 (2002)
25  (plurality opinion); *Ctr. for Fair Pub. Policy v. Maricopa County*, 336 F.3d 1153,
26  1168 (9th Cir. 2003). Rather, substantial evidence can take many forms: "history,
27  consensus, and simple common sense," *Fla. Bar v. Went for It, Inc.*, 515 U.S. 618,
28  628 (1995) (quotation marks omitted); *Drake v. Filko*, 724 F.3d 426, 438 (3d Cir.

19

2013); correlational evidence, *see United States v. Carter*, 750 F.3d 462, 469 (4th Cir. 2014); and intuition, *Williams-Yulee v. Fla. Bar*, 135 S. Ct. 1656, 1666 (2015). Plaintiffs' arguments regarding "tailoring" are also unfounded. *See* Motion 14-15. Section 32310 prohibits possession of LCMs while allowing people to have as many magazines containing 10 rounds or fewer as they wish. Even assuming that it "could have been drawn more narrowly, because the burden [is] minimal and intermediate scrutiny does not require the least restrictive means," the law is constitutional. *Bauer v. Becerra*, No. 15-15428, 2017 WL 2367988, at *6 (9th Cir. June 1, 2017) (citing *Jackson*, 746 F.3d at 967).

Most of plaintiffs' remaining assertions are based on mischaracterizations of the State's evidence, supplemented by unfounded and self-serving speculation. For example, plaintiffs contend that the study regarding the impact of the federal ban on LCMs, discussed above, demonstrates that Section 32310 will be unsuccessful. However, plaintiffs distort the findings of that study and take of out context statements of its primary author, Professor Christopher Koper.[19] *See Kolbe*, 42 F. Supp. 3d at 796 ("[Plaintiffs' arguments rely on mischaracterizations of Koper's expert opinions and reports."); Webster Decl., ¶¶ 17-22. Notably, plaintiffs ignore Professor Koper's conclusions that the federal ban on LCMs was effective and that the elimination of numerous exemptions, including one for possession, would have made it more so. Gordon Decl., Exh. 107 ¶¶ 59-63, 81, 84-88. They also ignore the entirety of Professor Koper's opinions on LCMs, including his later and more complete reports and his consistent and well-founded testimony that bans on LCMs, especially those that ban possession, will reduce crimes committed with LCMs, reduce the devastation caused by LCMs when gun crimes occur, and are likely to

---

[19] Professor Koper, who is an expert on issues related to firearms, policing, and federal crime prevention efforts, served as an expert in *Fyock* as well as numerous other cases challenging LCM bans. For the sake of completeness, his declaration in *Fyock* and his affidavit in *Shew v. Malloy*, No. 3:13-CV-0739 (D. Conn.), are attached as Exhibits 14 and 107 to the Gordon Declaration.

advance the government's important interests in protecting both its citizens and state and local law enforcement personnel. *Id.*

Finally, plaintiffs rely on their expert, Dr. Kleck, for the proposition that Section 32310 will not reduce gun violence and crime. Motion 11-12. Dr. Kleck's work on guns and gun violence, which has been widely discredited in other contexts, is similarly unreliable here. *See, e.g.*, David Hemenway, *Survey Research and Self-Defense Gun Use: An Explanation of Extreme Overestimates*, 87 J. Crim. L. & Criminology 1430 (1997); Gordon Decl., Exh. 11 at 12-13. Further, even if any of Dr. Kleck's supposition regarding the behavior of mass-shooters were valid and not contradicted by empirical evidence, *see, e.g.*, Gordon Decl., Exh. 66; Allen Decl., ¶¶ 11-16; Webster Decl., ¶¶ 13-16, some disagreement regarding the efficacy of the ban on LCM possession would not prevent Section 32310 from surviving intermediate scrutiny. *See Turner*, 512 U.S. at 666; *Fyock*, 779 F.3d at 1001-01; *Kashalsky v. County of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012). Accordingly, plaintiffs have not demonstrated a likelihood of success on their Second Amendment claim.

## B. Plaintiffs' Takings Claim Fails.

Plaintiffs' takings claim fares no better. The Takings Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." *Lingle v. Chevron U.S.A., Inc*., 544 U.S. 528, 536 (2005). Its purpose is to prohibit "[g]overnment from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 123 (1978) (internal quotations and citations omitted). Although a taking often occurs when the government physically invades or confiscates property, the Supreme Court has recognized that economic regulation may also effect a taking if it "goes too far." *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). Government

regulation that "completely deprives an owner of all economically beneficial use of her property" is generally deemed to be a taking compensable under the Fifth Amendment. *Lingle*, 544 U.S. at 528. To establish a facial takings claim, a party attacking a statute must demonstrate that its mere enactment constitutes a taking and deprives the owner of all viable use of the property as issue. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 318 (2002). The Supreme Court has stated that facial takings challenges "face an uphill battle since it is difficult to demonstrate that mere enactment of a piece of legislation deprived the owner of economically viable use of his property." *Suitum v. Tahoe Regional Planning Agency*, 520 U.S. 725, 736 n.10 (1997). Plaintiffs have not made this showing.

Plaintiffs argue that because Section 32310 prohibits the possession of LCMs, it is a "paradigmatic physical taking" that requires compensation. Motion 16-21. However, a ban on possession, standing alone, is not a physical taking.[20] Rather, what is dipositive is under what power and for what purpose the government is acting with respect to particular property. In a physical taking, the government exercises its eminent domain power to take private property for "*public use*." S*ee Lingle*, 544 U.S. at 536; *Chevron USA, Inc. v. Cayetano*, 224 F.3d 1030, 1034 (9th Cir. 2000). When the government acts pursuant to its police power to protect the safety, health, and general welfare of the public, a prohibition on possession of property declared to be a public nuisance is not a physical taking. *See Chicago, B. & Q. R. Co. v. Illinois*, 200 U.S. 561, 593-594 (1906); *Akins v. United States*, 82

---

[20] Plaintiffs mistakenly rely on cases such as *Andrus v. Allard*, 444 U.S. 51 (1979), in support of their argument that a prohibition on possession is a per se physical taking. *Andrus* involved the prohibition on commercial transactions of eagle feathers. In determining that the prohibition was not a taking, the Court stated that although the law did prevent the most profitable use of plaintiffs' property, because they could continue to possess the artifacts, they had not been deprived of all economic benefit. 444 U.S. at 66-67. Nothing in *Andrus* suggests that a ban on possession is a per se taking. Further, and as discussed herein, Section 32310 does not deprive plaintiffs of all economic benefit of their LCMs.

Fed. Cl. 619, 622 (2008); *see also Everard's Breweries v. Day*, 265 U.S. 545, 563 (1924); *Mugler v. Kansas*, 123 U.S. 623, 668-69 (1887).  Recognizing this distinction, a number of courts have rejected Takings Clause challenges to laws banning the possession of dangerous weapons.  *See Akins*, 82 Fed. Cl. at 623-24 (restrictions on sale and possession of machine guns not a taking); *Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. App. 1979) (ban on machine guns not a taking); *cf. Gun South, Inc. v. Brady*, 877 F.2d 858, 869 (11th Cir. 1989) (suspension on importation of assault weapons not a taking).

In contrast to the cases cited by plaintiffs, *see* Motion 17-19, Section 32310 is not an exercise of the eminent domain power and does not involve the government acquiring LCMs for public use.  Regardless of the fact that Section 32310 may require the "surrender" of personal property, Motion 16, the purpose of the statute is to remove LCMs from circulation, not to transfer title to the government or an agent of the government for use in service of the public good.  *Compare, e.g.*, *Horne v. Dept. of Agriculture*, 135 S. Ct. 2419, 2427-29 (2015) (physical taking where government required raisin growers to set aside a percentage of their crop so government could sell, allocate, or otherwise dispose of raisins in ways it determined were best suited for maintaining orderly market); *Richmond Elks Hall Ass'n v. Richmond Redevelopment Agency*, 561 F.2d 1327, 1330-32 (9th Cir. 1977) (finding "de facto taking" in "extreme case" where as part of public redevelopment plan, city and its agency "substantially interfered" with property and practically eliminated its value).  Section 32310 is a legitimate exercise of the State's police power to prevent crime and protect the public by eliminating a subset of particularly dangerous magazines.  Accordingly, it is not a physical taking.

To the extent that plaintiffs contend that Section 32310 is a regulatory taking, this argument also fails.  Plaintiffs cannot demonstrate that (the mere enactment of) Section 32310 completely deprives them of all economically beneficial use of their LCMs.  *Suitum*, 520 U.S. at 736 n.10.  As plaintiffs acknowledge, until July 1,

23

2017, they are able to protect or realize the economic value of their LCMs by storing them out-of-state or selling them to a licensed firearms dealer. *See* § 32310(d). It is also possible and relatively easy, as plaintiffs are apparently aware, to modify an LCM so it can only accept a maximum of ten rounds. Gordon Decl., Exh. 24 at 5-6. Accordingly, Section 32310 does not deprive plaintiffs of all economically beneficial uses of their property and thus plaintiffs cannot succeed on a regulatory taking claim. *See Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992); *Chevron USA*, 224 F.3d at 1041-42.

### C. Plaintiffs' Due Process Claim Fails.

Plaintiffs argue that Section 32310 violates the Due Process Clause because it "retroactively prohibit[s] the possession of lawfully acquired magazines" and "does not substantially advance a 'legitimate governmental objective.'" Motion 21. This cause of action is largely derivative of Plaintiffs' claims for violation of the Second Amendment and Takings Clause and fails for the same reasons. Moreover, Plaintiffs' barely elaborated claim of Due Process violation is based on the false premise that Section 32310 is a retroactive law. Motion 21. However, Section 32310 is not retroactive, as it does not punish individuals for the past possession of LCMs. Rather, the law imposes criminal penalties only upon those individuals that possess LCMs *on or after* July 1, 2017. § 32310 (c), (d).[21] The mere fact that plaintiffs Lewis and Lovette may have lawfully possessed the LCMs before July 1, 2017, does not make Section 32310 retroactive. *See Holt v. Morgan*, 128 Cal.App.2d 113, 116-117 (Cal. Ct. App. 1st Dist. 1954). Thus, because Section 32310 does not "alter[] the legal consequences of acts completed before its

---

[21] Plaintiffs cite *Eastern Enterprises v. Apfel*, 524 U.S. 498, 502 (1998), for the contention that "retroactive laws change the legal consequences of transactions long closed." Motion 21. But in that case, the Supreme Court ruled that the law was retroactive because it "created liability for events occurring 35 years ago." 524 U.S. at 502. Section 32310 does not punish individuals for past events.

effective date," *Chang v. United States*, 327 F.3d 911, 920 (9th Cir. 2003),

plaintiffs cannot prevail on their due process claim.

### III. PLAINTIFFS HAVE FAILED TO DEMONSTRATE EITHER IRREPARABLE INJURY OR THAT THE BALANCE OF HARMS AND THE PUBLIC INTEREST WEIGH IN FAVOR OF AN INJUNCTION.

Plaintiffs' claims of injury are based on the alleged denial of their

constitutional rights. Motion 23. Because their constitutional claims fail, plaintiffs

cannot demonstrate that they will be injured, let alone irreparably so, in the absence

of an injunction. *See Goldie's Bookstore, Inc. v. Superior Ct.*, 739 F.2d 466, 472

(9th Cir. 1984); *Fyock*, 25 F. Supp. 3d at 1282. Although plaintiffs will not be able

to possess LCMs (during the pendency of this lawsuit), they have not established

that having to use lower-capacity magazines is irreparable harm. *See San

Francisco*, 18 F. Supp. 3d at 1005.[22] Ultimately, plaintiffs have not established,

and cannot establish, harm sufficient to outweigh the fact that "[a]ny time a State is

enjoined by a court from effectuating statutes enacted by representatives of its

people, it suffers a form of irreparable injury." *Maryland v. King*, 133 S. Ct. 1, 2

(2012) (quotation and citation omitted). Plaintiffs cannot show that having to use

magazines containing ten rounds outweighs the grievous injuries and deaths caused

to innocent civilians and law enforcement by LCMs. Nor can they demonstrate that

it is in the public interest to enjoin a duly-enacted law designed to protect the public

safety and reduce gun violence and gun-related crime. *See Tracy Rifle and Pistol

LLC v. Harris*, 118 F. Supp. 3d 1182, 1193-94 (E.D. Cal. 2015); *see also Fed.

Trade Comm'n v. Affordable Media, LLC*, 179 F.3d 1228, 1236 (9th Cir. 1999)

Accordingly, the law, the balance of harms, and the public interest all weigh

decisively against a preliminary injunction.

---

[22] Plaintiffs' claims of injury are further undermined by the fact that they waited more than ten months after Section 32310 was signed into law and until just weeks before the effective date of Section 32310 to file their lawsuit and move for a preliminary injunction. *See Berjikian v. Franchise Tax Bd.*, No. CV 13-06301, 2013 WL 4677772, at *1 (C.D. Cal. Aug. 30, 2013).

1                           **CONCLUSION**

2           For the foregoing reasons, defendant Attorney General Becerra

3 respectfully requests that the Court deny plaintiffs' request for injunctive relief.

4

5 Dated:  June 5, 2017                     Respectfully Submitted,

6                                XAVIER BECERRA
                               Attorney General of California

7                                TAMAR PACHTER
                               Supervising Deputy Attorney General

8                                NELSON R. RICHARDS
                               ANTHONY P. O'BRIEN

9                                Deputy Attorneys General

10                                */s/ Alexandra Robert Gordon*
                               ALEXANDRA ROBERT GORDON

11                                Deputy Attorney General
                               *Attorneys for Defendant*

12                                *Attorney General Xavier Becerra*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

AG OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION (17-cv-1017-BEN-JLB)