XAVIER BECERRA
Attorney General of California
TAMAR PACHTER
Supervising Deputy Attorney General
NELSON R. RICHARDS
ANTHONY P. O'BRIEN
Deputy Attorneys General
ALEXANDRA ROBERT GORDON
State Bar No. 207650
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone:  (415) 703-5509
  Fax:  (415) 703-5480
  E-mail:  Alexandra.RobertGordon@doj.ca.gov
*Attorneys for Defendant
Attorney General Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VIRGINIA DUNCAN, et al.,**<br><br>　　　　　　　　Plaintiffs,<br><br>　v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of the State of California; et al.,**<br><br>　　　　　　　　Defendants. | 17-cv-1017-BEN-JLB<br><br>**DECLARATION OF PROFESSOR JOHN J. DONOHUE IN SUPPORT OF DEFENDANT XAVIER BECERRA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　　　June 13, 2017<br>Time:　　　10:00 a.m.<br>Dept:　　　5A<br>Judge:　　　Hon. Roger T. Benitez<br>Action Filed: May 17, 2017 |

# DECLARATION OF PROFESSOR JOHN J. DONOHUE
## BACKGROUND AND QUALIFICATIONS

1. I, John J. Donohue, am the C. Wendell and Edith M. Carlsmith Professor of Law at Stanford Law School. After earning a law degree from Harvard and a Ph.D. in economics from Yale, I have been a member of the legal academy since 1986. I have previously held tenured positions as a chaired professor at both Yale Law School and Northwestern Law School. I have also been a visiting professor at a number of prominent law schools, including Harvard, Yale, the University of Chicago, Cornell, the University of Virginia, Oxford, Toin University (Tokyo), St. Gallens (Switzerland), and Renmin University (Beijing).

2. For a number of years, I have been teaching at Stanford a course on empirical law and economics issues involving crime and criminal justice, and I have previously taught similar courses at Yale Law School, Tel Aviv University Law School, the Gerzensee Study Center in Switzerland, and St. Gallen University School of Law in Switzerland. I have consistently taught courses on law and statistics for two decades.

3. I am a Research Associate of the National Bureau of Economic Research, and a member of the American Academy of Arts and Sciences. I was a Fellow at the Center for Advanced Studies in Behavioral Sciences in 2000-01, and served as the co-editor (handling empirical articles) of the *American Law and Economics Review* for six years. I have also served as the President of the American Law and Economics Association and as Co-President of the Society of Empirical Legal Studies.

4. I am also a member of the Committee on Law and Justice of the National Research Council ("NRC"), which "reviews, synthesizes, and proposes research related to crime, law enforcement, and the administration of justice, and provides an intellectual resource for federal agencies and private groups." (See

1

Decl. of Prof. Donohue ISO Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (17-cv-1017-BEN-JLB)

http://www7.national-academies.org/claj/ online for more information about the NRC.)

5. I filed an expert declaration in each of two cases involving a National Rifle Association ("NRA") challenge to city restrictions on the possession of large-capacity magazines: *Fyock v. City of Sunnyvale*, United States District Court (N.D. Cal.), January 2014; *Herrera v. San Francisco*, United States District Court (N.D. Cal.), January 2014.

6. I also filed an expert declaration in a case involving a challenge by NRA to Maryland's restrictions on assault weapons and large-capacity magazines: *Tardy v. O'Malley*, United States District Court (District of Maryland), February 2014.

7. In all these cases, the relevant gun regulations have (ultimately) been sustained in the relevant federal appellate courts.

8. I also just filed (June 1, 2017) an expert declaration in a case involving a challenge by NRA to California's restrictions on carrying of weapons in public: *Flanagan v. Becerra*, United States District Court (C.D. Cal.), Case No. 2:16-cv-06164-JAK-AS.

## SUMMARY OF CONCLUSIONS

9. It is a sound, evidenced-based, and longstanding harm-reducing strategy for governments to place constraints on the harm that weapons can inflict. Restrictions on the size of large-capacity magazines (LCMs) sit comfortably in this appropriate regulatory approach, and can be expected to reduce deaths and injury from gun violence.

10. The LCM ban is well-tailored to limit the behavior of criminals engaging in the most dangerous forms of violent criminal behavior, and at the same time is likely to have little or no impact on the defensive capabilities of law-abiding citizens.

11. Over the last few decades, the number of households owning firearms has been declining, currently down to about 31 percent of Americans households. At

2

Decl. of Prof. Donohue ISO Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (17-cv-1017-BEN-JLB)

the same time, the growth in gun purchases reflects the highly concentrated rate of ownership with 20 percent of gunowners now owning 60 percent of the nation's firearms. While there is far less evidence on ownership of large-capacity magazines, one would expect the ownership of such products to be at least as concentrated as gun ownership.

## DISCUSSION

12. A discussion of the social science literature concerning gun ownership rates must begin with the General Social Science Survey (GSS), which is an annual survey conducted by the National Opinion Research Center, headquartered at the University of Chicago. The GSS is widely regarded by social science researchers as the most reliable indicator of national social trends, in part because of its professional implementation of face-to-face interviews using a very large sample size (the latest GSS data comes from 2,867 respondents versus roughly 1000 in a typical telephone survey) with a high response rate (always in excess of 70 percent versus telephone survey responses which have fallen below 10 percent in recent surveys). See Pew Research Center, "Assessing the Representativeness of Public Opinion Surveys," (May 15, 2012); http://www.people-press.org/2012/05/15/assessing-the-representativeness-of-public-opinion-surveys/.

13. GSS data from 2016, the most recent year that data is available, states that 30.8% of American households have at least one gun, and that 20.5% of adults personally own a gun. See Donohue & Rabbani, "Recent Trends in American Gun Prevalence," (attached as Exhibit B). A carefully executed 2015 national survey showed that 34% of households owned guns, and that ownership of private firearms is highly concentrated among a small percentage of gun owners.[1]

---

[1] Azrael et al., "The Stock and Flow of US Firearms: Results from the 2015 National Firearms Survey," Russell Sage Foundation J. Soc. Sci., forthcoming (2017) (attached as Exhibit C).

3

Decl. of Prof. Donohue ISO Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (17-cv-1017-BEN-JLB)

14. This is a considerable drop from the approximately 50% of United States households with one or more guns in the late 1970s, as reflected in GSS surveys. See Donohue & Rabbani, supra. Other national surveys show similar results, such as research by the Pew Research Center and the National Behavioral Risk Factor Surveillance System. These studies consistently find a persistent decline in household gun ownership over the past several decades. A recent report from the Pew Research Center states:

> The Pew Research Center has tracked gun ownership since 1993, and our surveys largely confirm the General Social Survey trend. In our December 1993 survey, 45% reported having a gun in their household; in early 1994, the GSS found 44% saying they had a gun in their home. A January 2013 Pew Research Center survey found 33% saying they had a gun, rifle or pistol in their home, as did 34% in the 2012 wave of the General Social Survey.[2]

15. While the GSS in 2016 put the percentage of American households with guns at less than 31%, the most recent Gallup survey found that 39% of American adults live in a household that contains a gun, and 29% personally own one. There is no consensus about why Gallup's estimates are somewhat higher than those from the above sources, although it should be noted that the Gallup polls are far smaller surveys based on less reliable telephone interviews with dramatically lower response rates than the GSS. Nonetheless, every survey of gun ownership conducted over time—including Gallup—shows that the percentage of household with guns today is lower than it was two decades ago.

16. The evidence that gun ownership is concentrated is strong and uncontradicted. Researchers analyzing the results of a 2015 national survey found that 8% of individual gun owners reported owning ten or more firearms— collectively accounting for 39% of the American gun stock—and that the 20% of

---

[2] [http://www.people-press.org/2013/03/12/section-3-gun-ownership-trends-and-demographics.]

4

gun owners who owned the most guns collectively possessed about 60% of the nation's guns.[3] A decade earlier, researchers found a similar pattern: a 2004 survey indicated that 48% of gun owners possessed four or more guns and that the top 20% of firearms owners possessed 65% of all firearms.[4]

17. The FBI publishes records of the number of background checks requested, and such background checks are often initiated pursuant to a desired purchase of firearms. With only a couple of exceptions, the trend has been for the number of background checks conducted each year to grow every year.[5] Gun industry trade groups cite increased background checks and an increase in collections of the federal excise taxes collected on the sale of firearms and ammunition as reflecting strong demand for firearms.[6]

18. Because reliable social science data shows that the number of households that own guns has likely dropped in recent decades, and certainly has not grown, it seems most likely that robust gun sales can be attributed not to increasingly broad gun ownership but instead largely to purchases of guns by members of households that previously owned guns.

19. I am not aware of any current social science research providing an estimate for the number of American households that own large-capacity magazines or LCMs (defined as an ammunition feeding device with the capacity to hold more than 10 rounds of ammunition) or for the number of LCMs in private hands in America.

---

[3] See Azrael et al., supra.

[4] Hepburn et al., "The US Gun Stock: Results from the 2004 National Firearms Survey," Injury Prevention 2007;13:15–19.

[5] See National Instant Criminal Background Check System (NICS) Firearm Checks: Month/Year 2017, available at https://www.fbi.gov/file-repository/nics_firearm_checks_-_month_year.pdf/view.

[6] See, e.g., NRA-ILA, "The Myth Of "Declining" Gun Ownership," (Jul. 13, 2016), available at http://dailycaller.com/2016/07/13/the-myth-of-declining-gun-ownership/.

5

Decl. of Prof. Donohue ISO Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (17-cv-1017-BEN-JLB)

20. It is reasonable to assume that consumer demand for large-capacity magazines is broadly similar to demand for firearms generally. If anything, one would expect the specialized product of a large-capacity magazine to appeal to only a subset of gun owners. Accordingly, LCM ownership by household is likely to be at least as concentrated, with increased numbers of LCMs held by a declining share of households. This would be consistent with a January 2013 New York Times/CBS News poll of 1,110 adults nationwide showing that nearly two-thirds of Americans favored a ban on large-capacity magazines.[7]

21. A review of the resolution of mass shootings in the U.S. suggests that bans on large capacity magazines can help save lives by forcing mass shooters to pause and reload ammunition. Citizens have frequently taken advantage of a perpetrator stopping to reload his weapon to tackle him or otherwise subdue him in at least 20 separate shootings in the United States since 1991, notably including the December 7th, 1993 shooting of passengers on a Long Island Railroad car,[8] the October 29th, 1994 shooting near the grounds of the White House,[9] and the January 8th, 2011 shooting in Tucson, AZ that targeted U.S. Congresswoman Gabby Giffords.[10] In many other incidents, targeted victims were able to escape while a shooter reloaded. Perhaps the most vivid illustration of this benefit was seen when

---

[7] http://www.nytimes.com/2013/02/19/us/politics/lawmakers-look-at-ban-on-high-capacity-gun-magazines.html?_r=1&.

[8] "DEATH ON THE L.I.R.R.: The Rampage; Gunman in a Train Aisle Passes Out Death," *The New York Times*, December 9, 1993 - http://www.nytimes.com/1993/12/09/nyregion/death-on-the-lirr-the-rampage-gunman-in-a-train-aisle-passes-out-death.html (9-millimeter pistol, 15 round magazine).

[9] "Public Report of the White House Security Review," Department of the Treasury, 1995 - http://www.fas.org/irp/agency/ustreas/usss/t1pubrpt.html (Chinese-made SKS semiautomatic rifle, 30 round magazine).

[10] "Crowd members took gunman down," *Los Angeles Times*, January 9, 2011 - http://articles.latimes.com/2011/jan/09/nation/la-na-arizona-shooting-heroes-20110110 (9mm Glock handgun, 30 round extended magazine).

Decl. of Prof. Donohue ISO Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (17-cv-1017-BEN-JLB)

11 children at Sandy Hook Elementary School were able to escape while Adam Lanza reloaded his 30 round LCM.[11]

22. The complaint in this case makes the following wholly untenable argument against the LCM ban:

> Banning magazines over ten rounds is no more likely to reduce criminal abuse of guns than banning high horsepower engines is likely to reduce criminal abuse of automobiles. To the contrary, the only thing the ban ensures is that a criminal unlawfully carrying a firearm with a magazine over ten rounds will have a (potentially devastating) advantage over his lawabiding victim.

23. This unsupported argument is incorrect for a host of reasons. First, as I just mentioned, Adam Lanza was able to kill more (a total of 20 children and six adults) because he was using lawfully purchased weapons equipped with a 30 round LCM. It may well be that Lanza would have criminally abused the guns that his mother had made available to him even if he had not had an LCM, but there is every reason to believe that he would have killed fewer individuals if he had to persistently reload during his murderous rampage. In other words, the LCM ban is designed precisely to save lives and by raising the costs for killers, the LCM ban would be expected to advance that goal.

24. Second, the quoted argument conjures a situation that a law-abiding citizen will be overwhelmed by a criminal who carries a firearm with an LCM. But the federal assault weapons ban – which did not contain a ban on possession of LCM, and thus would be less effective than the more complete California prohibition – led to increases in the price of LCM's. Therefore, California's LCM ban should elevate the cost that a criminal will need to pay to procure an LCM, which means that fewer criminals will be equipped with LCM's (under standard

---

[11] "Legislative Leaders Say Bipartisan Agreement Could Yield Nation's Strongest Gun-Control Bill," *The Hartford Courant*, April 1, 2013. - http://www.courant.com/news/politics/hc-gun-deal-newtown-0413-20130401,0,7341094.story (Bushmaster .223 caliber rifle, high capacity 30 round magazine).

7

economic principles). In other words, fewer law-abiding individuals will be confronted by a criminal with an LCM because of the LCM ban.

25. Third, most mass killings by Americans involve the use of guns, and many of these killers – Adam Lanza (Newtown), James Holmes (the Batman movie killer in Aurora, Colorado killed 12 and injured 70), Jared Loughner (shooting Congresswoman Gabbie Giffords) to name just a few – were drawn to a vision of killing large number of individuals in a certain way that included the use of LCM's. On November 5, 2009, Nidal Hassan killed 13 and injured more than 30 others at Fort Hood, near Killeen, Texas. When Hasan purchased his killing arsenal, he asked for "the most technologically advanced weapon on the market and the one with the highest standard magazine capacity."[12] This is exactly what one would do if one wanted to simply kill as many people as possible in the shortest amount of time. If one is serious about stopping mass killings, a good first step is to deprive such killers of their preferred killing approaches.[13]

26. In this regard, consider what happened in Australia after a crazed gunman killed 35 people in Port Arthur, Tasmania in 1996. The Australian federal government persuaded all states and territories to implement tough new gun control laws. Under the National Firearms Agreement (NFA), firearms legislation was tightened throughout the country, national registration of guns was imposed, and it

---

[12] Scott Huddleston, "Hasan Sought Gun with 'High Magazine Capacity,'" October 21, 2010, http://blog.mysanantonio.com/military/2010/10/hasan-sought-gun-with-high-magazine-capacity/.

[13] Anders Breivik who committed mass murder in Norway was aided in his efforts because of lax rules concerning LCM's in the United States. Breivik was very unhappy that he could not get the large-capacity magazines that he wanted to use since they were banned in Europe. In his manifesto, he wrote about his attempts to legally buy weapons, stating, "I envy our European American brothers as the gun laws in Europe sucks ass in comparison." Under the section titled, "December and January - Rifle/gun accessories purchased," Breivik wrote that he purchased ten 30-round ammunition magazines from a U.S. supplier who mailed the devices to him. Stephanie Condon, "**Norway Massacre Spurs Calls For New U.S. Gun Laws,**" CBS News, July 28, 2011, http://www.cbsnews.com/news/norway-massacre-spurs-calls-for-new-us-gun-laws/.

8

Decl. of Prof. Donohue ISO Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (17-cv-1017-BEN-JLB)

became illegal to hold certain long guns that might be used in mass shootings. The effect was that both while there were 13 mass shootings in Australia during the period 1979–96 (a per capita rate that was higher than in the U.S. at the time), there have been none in the 21 years since (while the problem of mass shootings in the United States is getting worse[14]).

27. The important point of the Australian experience for present purposes is that by depriving disturbed individuals of the vehicle by which they imagined they would unleash their murderous impulses, Australia showed that mass shootings can be dramatically reduced – even if guns are still widely available, as they remain in Australia.

28. In the face of the clear evidence from around the United States and the world, the NRA has provided expert statements that conjure a mythical old or disabled homeowner who is only able to thwart a violent home invasion by having enough bullets to blast enough shots without reloading. In this one-sided analysis, the only effect of the LCM ban is that it prevents a law-abiding citizen from protecting his or her family from criminal attack. The NRA experts opine that criminals rarely need to shoot more than a bullet or two, so there is no real benefit of the ban on LCM's, while the old lady or disabled person quaking with the blasting gun in her shaking hands will protect herself and her loved ones if she can only get off 30 plus shots without re-loading. These unsupported assertions are either irrelevant or have no empirical support.

---

[14] Tristan Bridges and Tara Leigh Tober, "**Mass shootings in the US are on the rise. What makes American men so dangerous?**" *The Society Pages*, December 31, 2015, https://thesocietypages.org/socimages/2015/12/31/mass-shootings-in-the-u-s-what-makes-so-many-american-men-dangerous/; Dan Diamond, "**Mass Shootings Are Rising. Here's How To Stop Them,**" *Forbes*, June 18, 2015, https://www.forbes.com/sites/dandiamond/2015/06/18/charleston-deaths-are-an-american-tragedy-mass-shootings-are-rising/#12bd32ef787b.

9

Decl. of Prof. Donohue ISO Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (17-cv-1017-BEN-JLB)

29. First, the notion that safety will be enhanced if someone with quaking hands that prevent them from hitting their target in the first ten shots is able to spray additional bullets is ludicrous. Bullets from modern guns with large-capacity magazines can easily penetrate walls, which means that poorly directed shooting will pose a significant threat to other family members and neighbors.

30. Second, it is irrelevant if most times that criminals use guns, they don't fire their guns more than ten times. The LCM ban is designed to address one particularly societally damaging problem – that of mass shootings. By definition, these incidents will involve firing of many bullets, and therefore they are an appropriate target of government concern and regulation.

31. Third, it is worth noting that the vast majority of the time that an individual in the United States is confronted by violent crime, they do not use a gun for self-defense. Specifically, over the period from 2007-2011 when roughly 6 million violent crimes occurred each year, data from the National Crime Victimization Survey shows that the victim was not able to defend with a gun in 99.2 percent of these incidents – this in a country with 300 million guns in civilian hands.

32. Fourth, even if a gun were available for self-defense use, the need for a LCM is slight according to decades of statements by NRA affiliated and pro-gun experts. For example John Lott has repeatedly made the following claims:

- based on "about 15 national survey[s] ... about 98 percent of [defensive gun uses] involve people brandishing a gun and not using them."[15]
- "When victims are attacked, 98 percent of the time merely brandishing a gun is enough to cause the criminal to stop his attack."[16]

---

[15] Statements by John R. Lott, Jr. on Defensive Gun Brandishing Posted by Tim Lambert on October 17, 2002 http://scienceblogs.com/deltoid/2002/10/17/lottbrandish/. Page 41, State of Nebraska, Committee on Judiciary LB465, February 6, 1997, statement of John Lott, Transcript prepared by the Clerk of the Legislature, Transcriber's Office.

[16] John R. Lott, Jr., Packing Protection, Letters, *Chicago Sun-Times*, April
(continued...)

10

Decl. of Prof. Donohue ISO Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (17-cv-1017-BEN-JLB)

- "Considerable evidence supports the notion that permitted handguns deter criminals. …. In 98% of the cases, people simply brandish weapons to stop attacks."[17]

33. As for Gary Kleck, the NRA expert in this case, we hear a similar albeit less precise claim: "More commonly, guns are merely pointed at another person, or perhaps only referred to ("I've got a gun") or displayed, and this is sufficient to accomplish the ends of the user, whether criminal or non- criminal."[18]

34. Gun Owners of America cite published survey results on gun brandishing by Gary Kleck for the following statement about gun brandishing: "Of the … times citizens use their guns to defend themselves every year, the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers."[19]

35. In other words, a gun is used in defense less than 1 percent of the time when someone is attacked in the United States. In the "overwhelming majority" of cases (according to the NRA's expert) in the small percentage of the time that a gun *is* used, brandishing is all that is needed for defense. One would imagine that the vast majority of the times that the gun is fired in this increasingly small subset, it will be fired less than 10 times.

36. Should there be a future case of a law-abiding citizen who 1) has a gun and 2) the need and opportunity to use it in self-defense, and 3) the desire to fire more than 10 rounds, the individual can either re-load the defensive weapon by inserting a new clip or by using a second weapon, which an increasingly large

---

(…continued)
30, 1997, Pg. 52.

[17] John R. Lott Jr., "Unraveling Some Brady Law Falsehoods," *Los Angeles Times*, July 2, 1997.

[18] Guns and Self-Defense by Gary Kleck, Ph.D., http://www.pulpless.com/gunclock/kleck2.html.

[19] Gary Kleck and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun," 86(1) *Journal of Criminal Law and Criminology* 150-187 (Fall 1995). https://pdfs.semanticscholar.org/91da/afbf92d021f06426764e800a4e639a1c1116.pdf.

11

number of gun owners currently possess. This implies that the LCM ban is well-tailored to limit the behavior of criminals engaging in the most dangerous forms of violent criminal behavior, and at the same time is likely to have little or no impact on the defensive capabilities of law-abiding citizens.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on: June 5, 2017

*John J. Donohue III*

JOHN J. DONOHUE III

12

Decl. of Prof. Donohue ISO Def.'s Opp'n to Pls.' Mot. for Prelim. Inj. (17-cv-1017-BEN-JLB)