1  Anthony Schoenberg (State Bar No. 203714)
   Farella Braun + Martel LLP
2  Rebecca H. Stephens (State Bar No. 299234)
   rstephens@fbm.com
3  235 Montgomery Street, 17th Floor
   San Francisco, California 94104
4  Telephone: (415) 954-4400
   Facsimile: (415) 954-4480
5

6  Attorneys for *Amicus Curiae*
   Law Center to Prevent Gun Violence
7

8

9                    UNITED STATES DISTRICT COURT

10                SOUTHERN DISTRICT OF CALIFORNIA

11

12 | VIRGINIA DUNCAN, RICHARD | Case No. 17-CV-10017 -BEN-JLB
   | LEWIS, PATRICK LOVETTE, |
13 | DAVID MARGUGLIO, | **BRIEF OF AMICUS CURIAE LAW**
   | CHRISTOPHER WADDELL, | **CENTER TO PREVENT GUN**
14 | CALIFORNIA RIFLE & PISTOL | **VIOLENCE IN SUPPORT OF**
   | ASS'N, INC., a California corporation, | **DEFENDANT'S OPPOSITION TO**
15 | | **PLAINTIFFS' MOTION FOR A**
   | Plaintiffs, | **PRELIMINARY INJUNCTION**
16 |
   | vs. | Date:   June 13, 2017
17 | | Time:   10:00 A.M.
   | | Place:  5A
18 | XAVIER BECERRA, in his official |
   | capacity as Attorney General of the | The Hon. Roger T. Benitez
19 | State of California; and DOES 1-10, |
20 | |
   | Defendants. |
21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

34582\6004201.1

1

2

# **TABLE OF CONTENTS**

3
**Page**

4
INTEREST OF *AMICUS CURIAE* ...................................................................... 1

5
SUMMARY OF ARGUMENT ............................................................................. 2

6
ARGUMENT .......................................................................................................... 5

7
I.    The Challenged Amendments to California's Large-Capacity Magazine

8
       Restrictions Close a Dangerous Loophole in Existing Law .......................... 5

9
       A.    California's LCM Laws and the "Grandfathering" Loophole ............. 5

10
       B.    The Need for Proposition 63 ................................................................ 7

11
       C.    Enactment of California's LCM Possession Ban ............................... 10

12
II.    The LCM Possession Ban is Constitutional Because It Regulates
       Activity Outside the Scope of the Second Amendment's Protections .......... 11

13
       A.    LCMs Are Not Second Amendment-Protected "Arms" .................... 12

14
       B.    Even If LCMs Are Arms, They Are Unprotected by the Second
           Amendment Because They Are "Dangerous and Unusual" .............. 14

15
           1.    LCMs Are Dangerous ................................................................ 14

16
           2.    LCMs are "Unusual," in California and Nationwide ............... 15

17
       C.    LCMs Are Unprotected by the Second Amendment Because They
           Are Most Suitable for Military Use .................................................... 17

18
       D.    LCM Restrictions Are "Longstanding" and Outside the Scope of the
           Second Amendment .......................................................................... 18

19
III.    CONCLUSION ............................................................................................. 21

20

21

22

23

24

25

26

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

i

34582\6004201.1

1

## TABLE OF AUTHORITIES

2

**Page**

3

### Federal Court Cases

4

*District of Columbia v. Heller,*
   554 U.S. 570 (2008) ..................................................................passim

5

6

*Friedman v. City of Highland Park,*
   784 F.3d 406 (7th Cir. 2015) ......................................................11, 15

7

*Fyock v. City of Sunnyvale,*
   779 F.3d 991 (9th Cir. 2015) .....................................................passim

8

9

*Hightower v. City of Boston,*
   693 F.3d 61 (1st Cir. 2012) ...............................................................18

10

11

*Jackson v. San Francisco,*
   746 F.3d 953 (9th Cir. 2014) ............................................................13

12

*Kolbe v. Hogan,*
   849 F.3d 114 (4th Cir. Feb. 21, 2017)...........................................passim

13

14

*Kolbe v. O'Malley,*
   42 F. Supp. 3d 768 (D. Md. Aug. 12, 2014).....................................18

15

16

*McDonald v. City of Chicago,*
   561 U.S. 742 (2010) ...........................................................................1

17

*Miller v. California,*
   413 U.S. 15 (1973) .....................................................................15, 20

18

19

*New York State Rifle & Pistol Association v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015) .............................................................11

20

21

*Peruta v. San Diego,*
   824 F.3d 919 (9th Cir. 2016) ..............................................................1

22

*San Francisco Veteran Police Officers Ass'n et al. v. San Francisco,*
   No. 13-cv-05351-WHA (N.D. Cal. Jan. 16, 2014) ...........................10

23

24

*Second Amendment. In District of Columbia v. Heller,*
   554 U.S. 570 (2008) ...........................................................................4

25

26

*Silvester v. Harris,*
   843 F.3d 816 (9th Cir. 2016)........................................................5, 21

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

ii

34582\6004201.1

**Regulations**

14 Cal. Code Reg. §353(d) ........................................................................16

**Legislative Materials**

159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013) ........................................2

**Additional Authorities**

Bill Analysis for 2013 Cal. SB 396 (quoting L.A. County Sheriff's Department).....6

Brian Freskos, Baltimore Police Are Recovering More Guns Loaded With High-
     Capacity Magazines, Despite Ban on Sales, THE TRACE, Mar. 27, 2017,
     https://www.thetrace.org/2017/03/high-capacity-magazine-ban-baltimore-police/.
     ........................................................................................................6

John Wilkens, *Construction Workers Felt They 'Had To Do Something*, San Diego
     Union-Tribune, Oct. 11, 2010, http://www.sandiegouniontribune.com/sdut-
     hailed-as-heroes-construction-workers-who-stopped-2010oct11-htmlstory.html. 3

Joanna Molloy, Ex-NYPD Top Cop Bill Bratton Pushing for Overdue Ban on
     Assault-Weapons Ammo Clips, N.Y. DAILY NEWS, May 19, 2011,
     http://www.nydailynews.com/news/crime/ex-nypd-top-bill-bratton-pushing-
     overdue-ban-assault-weapons-ammo-clips-article-1.142101. ...........................4

*Large Capacity Magazines*,
     http://www.nycrimecommission.org/pdfs/CrimeCmsnNYCLACouncils.pdf.
     (Mar. 2, 2011) ..............................................................................7, 19

Louis Klarevas, *Rampage Nation: Securing America From
     Mass Shootings* (2016) ........................................................................8

Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* ,
     http://libcloud.s3.amazonaws.com/9/56/4/1242/1/analysis-of-recent-mass-
     shootings.pdf. (Jan. 2013) ...................................................................7

Press Release, Citizens Crime Commission of New York City, NYC & LA City
     Councils Introduce Rezo for Federal Ban on Large Capacity Magazines 2 (Mar.
     2, 2011),
     http://www.nycrimecommission.org/pdfs/CrimeCmsnNYCLACouncils.pdf.......6

*Representative Gabrielle Giffords And Others* ,
     http://www.vpc.org/fact_sht/AZbackgrounder.pdf. (Jan. 2011) ...........................6

Rick Jervis, Gun Control Advocates Target High-Capacity Magazines, USA Today
     (Jul. 31, 2012)..................................................................................9

Farella Braun + Martel LLP
235 Montgomery Street, 17ᵗʰ Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

iii

34582\6004201.1

Robert Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 Law & Cont. Probs. 55, 68 (2017), http://lcp.law.duke.edu/article/gun-law-history-in-the-united-states-and-second-amendment-rights-spitzer-vol80-iss2/ (describing Michigan and Rhode Island laws)............................................19

*See* http://palmettostatearmory.com/index.php/accessories.html.............................13

*See* http://www.atlanticfirearms.com/accessories.html....................................passim

Shaila Dewan, *Hatred Said to Motivate Tenn. Shooter*, N.Y. Times, Jul. 28, 2008, http://www.nytimes.com/2008/07/28/us/28shooting.html.....................................3

Steven D. Levitt, Understanding Why Crime Fell in the 1990s—Four Factors that Explain the Decline and Six That Do Not, 18 J. ECON. PERSP. 163, 171, 177-81 (2004)....................................................................................................7

Thomas Watkins, *LA Police Chief Supports Ban on Big Ammo Magazines*, San Diego Union-Tribune, Mar. 2, 2011, http://www.sandiegouniontribune.com/sdut-la-police-chief-supports-ban-on-big-ammo-magazines-2011mar02-story.html....2

Violence Policy Center, Backgrounder on Glock 19 Pistol and Ammunition Magazines Used in Attack on Representative Gabrielle Giffords And Others 1 (Jan. 2011), http://www.vpc.org/fact_sht/AZbackgrounder.pdf...........................5

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

34582\6004201.1

# INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* the Law Center to Prevent Gun Violence ("Law Center") is a national, nonprofit organization dedicated to reducing gun violence. The Law Center was founded in 1993 in the wake of an assault weapon massacre at the downtown San Francisco law firm Pettit & Martin, perpetrated by a shooter who was armed with semiautomatic pistols and large-capacity ammunition magazines. The Law Center's founding attorneys later advised on and supported the enactment of the 1994 federal law restricting assault weapons and large-capacity magazines.

Today, the Law Center provides comprehensive legal expertise in support of effective gun safety regulations. Law Center attorneys track and analyze firearms legislation, evaluate gun violence prevention research and policy proposals, and monitor Second Amendment litigation nationwide.

In 2015, the Law Center advised California's Lieutenant Governor, Gavin Newsom, on dangerous gaps that existed in California's gun laws, including those regulating military-style ammunition magazines. The Law Center then partnered with the Lieutenant Governor to draft Proposition 63, a comprehensive package of gun safety reforms that included a provision prohibiting private possession of large-capacity magazines. As primary drafter and a key proponent of Proposition 63, the Law Center has a special interest in participating as an *amicus curiae* in this constitutional challenge to part of the initiative.

The Law Center has offered informed analysis as an *amicus curiae* in many firearm-related cases, including *District of Columbia v. Heller*, 554 U.S. 570 (2008), *McDonald v. City of Chicago*, 561 U.S. 742 (2010), *Fyock v. City of Sunnyvale*, 779 F.3d 991 (9th Cir. 2015), *Peruta v. San Diego*, 824 F.3d 919 (9th Cir. 2016) (en banc), and *Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc).

---

[1] The Law Center has filed a motion for leave to appear as an *amicus curiae*, but submits its proposed brief to the Court concurrently to facilitate its consideration during the expedited time frame for Plaintiffs' preliminary injunction motion.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

1

34582\6004201.1

## SUMMARY OF ARGUMENT

On January 8, 2011, a man walked into a grocery store parking lot in Tucson where U.S. Congresswoman Gabrielle Giffords was hosting a constituent meeting called "Congress On Your Corner." Carrying a semiautomatic pistol equipped with a 33-round magazine, the man opened fire on Congresswoman Giffords, her staff, and the crowd lined up to meet her. In 15 seconds, he fired 33 rounds and hit 19 victims, killing six, including a nine-year-old girl named Christina-Taylor Green.

Congresswoman Giffords's husband, retired Navy Captain Mark Kelly, later testified before Congress that, in his view, a law banning ammunition magazines with a capacity greater than 10 rounds would have saved the young girl's life:

> The shooter in Tucson showed up with two 33-round magazines, one of which was in his 9 millimeter. He unloaded the contents of that magazine in 15 seconds. Very quickly. It all happened very, very fast. The first bullet went into Gabby's head. Bullet number 13 went into a nine-year-old girl named Christina-Taylor Green, who was very interested in democracy and our Government and really deserved a full life committed to advancing those ideas. If he had a 10-round magazine—well, let me back up. When he tried to reload one 33-round magazine with another 33-round magazine, he dropped it. And a woman named Patricia Maisch grabbed it, and it gave bystanders a time to tackle him. I contend if that same thing happened when he was trying to reload one 10-round magazine with another 10-round magazine, meaning he did not have access to a high-capacity magazine, and the same thing happened, Christina-Taylor Green would be alive today.[2]

Unfortunately, preventable tragedies like the one Captain Kelly describes have become commonplace. Large-capacity magazines ("LCMs") holding more than 10 rounds of ammunition—in some cases up to 100 rounds—allow shooters to inflict mass casualties by continuously firing bullets without pausing to reload. The Los Angeles Police Chief explains that these extended clips change a gun "into a weapon of mass death rather than a home-protection-type device."[3]

---

[2] 159 Cong. Rec. S2743 (daily ed. Apr. 17, 2013) (statement of Sen. Leahy) (quoting Judiciary Committee testimony of Captain Mark Kelly).
[3] Thomas Watkins, *LA Police Chief Supports Ban on Big Ammo Magazines*, SAN

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO   2   34582\6004201.1
PREVENT GUN VIOLENCE
Case No. 17-CV-10017-BEN-JLB

LCMs are the thread linking numerous recent high-fatality gun massacres, including the 2012 Aurora movie theater shooting, where a gunman shot 70 people in ten minutes; the 2012 Sandy Hook Elementary shooting, where a gunman fired 154 rounds, killing 26 children and teachers, in under five minutes; the 2015 San Bernardino shooting, where assailants shot 36 people in four minutes; and the 2016 Orlando nightclub shooting, where a gunman shot over 100 people and killed 49.

These horrific events reflect the fact that LCMs are incredibly lethal in the hands of mass murderers, enabling even untrained shooters to enter crowded spaces and harm many dozens of people in minutes—without the possibility of interruption while they are reloading. It is the latter point that makes LCMs so dangerous. In a mass shooting, the pause when the shooter reloads is when lives get saved. In contrast to the examples above, there are other recent high-profile shootings where LCMs were not used, and shooters were apprehended or thwarted from killing others while they reloaded, resulting in fewer fatalities.[4]

To help prevent the occurrence of high-fatality mass shootings like Aurora, Sandy Hook, and Orlando, and to reduce the bloodshed when such tragedies do occur, in 2016, California outlawed possession of magazines that can hold more

_____

DIEGO UNION-TRIBUNE, Mar. 2, 2011, http://www.sandiegouniontribune.com/sdut-la-police-chief-supports-ban-on-big-ammo-magazines-2011mar02-story.html.

[4] For example, in the 2013 massacre at Washington Navy Yard, a man with a seven-shell shotgun killed twelve people, but while he reloaded, a victim he had cornered was able to crawl to safety. In 2014, a gunman at Seattle Pacific University was tackled while he reloaded his shotgun. Other examples abound. *E.g.*, John Wilkens, *Construction Workers Felt They 'Had To Do Something,'* SAN DIEGO UNION-TRIBUNE, Oct. 11, 2010, http://www.sandiegouniontribune.com/sdut-hailed-as-heroes-construction-workers-who-stopped-2010oct11-htmlstory.html (after gunman wounded two students, "workers chased after him as he stopped to reload, knocked him" down "and held him until police arrived"); *Deer Creek Middle School Shooting: At Least Two Shot in Incident in Littleton, Colorado*, HUFFINGTON POST, Apr. 25, 2010, http://www.huffingtonpost.com/2010/02/23/deer-creek-middle-school_n_473943.html (math teacher "tackled the suspect as he was trying to reload his weapon"); Shaila Dewan, *Hatred Said to Motivate Tenn. Shooter*, N.Y. TIMES, Jul. 28, 2008, http://www.nytimes.com/2008/07/28/us/28shooting.html ("It was when the man paused to reload that several congregants ran to stop him.").

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

3

34582\6004201.1

than ten rounds of ammunition. As fully discussed below, this measure (the "LCM possession ban") was enacted by the Legislature in July 2016, and separately was adopted by voters in a proposition that appeared on the November 2016 ballot.

California's LCM possession ban is a lifesaving gun safety measure that is also fully consistent with the Second Amendment. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court recognized that law-abiding, responsible citizens have a right to keep an operable handgun in the home for self-defense. *Heller* held that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." It is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." 554 U.S. at 626. *Heller* approved the tradition of banning "'dangerous and unusual weapons,'" and confirmed that other "longstanding" types of gun regulations are lawful. *Id.* at 626-27 & n. 26.

California's ban on high-powered magazines that are frequently used in mass shootings does not violate the Second Amendment. Californians remain free to possess a wide variety of guns and ammunition for self-defense. But LCMs are, in the words of another law enforcement official, "designed as weapons of war . . . to kill as many people as possible in the shortest period of time."[5] Restricting these destructive devices is unlike the handgun ban invalidated in *Heller*. Otherwise, *Heller*'s recognition that people are not entitled to "any weapon whatsoever in any manner whatsoever" has no meaning. The Constitution does not guarantee a right to possess an exceedingly dangerous accessory that is designed, and has repeatedly been used, to inflict mass casualties before anyone has time to intervene.

Plaintiffs' Second Amendment challenge fails because California's LCM possession ban does not burden Second Amendment-protected activity. Large-

---

[5] Joanna Molloy, Ex-NYPD Top Cop Bill Bratton Pushing for Overdue Ban on Assault-Weapons Ammo Clips, N.Y. DAILY NEWS, May 19, 2011, http://www.nydailynews.com/news/crime/ex-nypd-top-bill-bratton-pushing-overdue-ban-assault-weapons-ammo-clips-article-1.142101.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

4

34582\6004201.1

capacity magazines are a lethal accessory, not a protected "arm," but either way, the Amendment permits prohibiting them because they are dangerous and unusual, and best suited for military applications rather than self-defense. California's LCM ban also has "longstanding" antecedents and is constitutional for that reason, too. Because Plaintiffs cannot succeed on the merits of their Second Amendment claim, the Court should deny their motion for a preliminary injunction.[6]

## ARGUMENT

I.   THE CHALLENGED AMENDMENTS TO CALIFORNIA'S LARGE-CAPACITY MAGAZINE RESTRICTIONS CLOSE A DANGEROUS LOOPHOLE IN EXISTING LAW

### A.   California's LCM Laws and the "Grandfathering" Loophole

Recognizing the necessity of regulating the exceedingly lethal magazines often deployed by mass shooters, the California Legislature first restricted access to LCMs over seventeen years ago. Starting in January 2000, California prohibited the manufacture, importation, sale, and transfer of magazines accepting more than 10 rounds of ammunition. Contrary to Plaintiffs' incredible suggestion that LCMs were unremarkable in colonial America, in reality, prior to the 1980s the only handgun most American gun owners possessed was a revolver, which typically held six rounds.[7] It was not until the 1980s that the gun industry aggressively produced and promoted pistols that can be equipped with larger magazines.[8] In the 1980s and 1990s, jurisdictions—including California—saw that widespread access to

---

[6] As the State's brief demonstrates, even if the LCM possession ban implicates the Second Amendment's protections, the law easily withstands the applicable standard of intermediate scrutiny. The State's evidence amply shows that the ban is "substantially related to the important government interest of reducing firearm-related deaths and injuries." *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (quotation omitted). Sources cited in this brief support that conclusion, as well.
[7] Violence Policy Center, *Backgrounder on Glock 19 Pistol and Ammunition Magazines Used in Attack on Representative Gabrielle Giffords And Others* 1 (Jan. 2011), http://www.vpc.org/fact_sht/AZbackgrounder.pdf. This means that, before the 1980s, average Americans relied on six round revolvers for self-defense. Plaintiffs point to no evidence that revolvers were believed inadequate then.
[8] *Id.*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

5

34582\6004201.1

extended-capacity magazines posed a significant danger to police and the public, and modern LCM restrictions came into being.

Although the state banned the manufacture, sale, and transfer of LCMs in 2000, California initially did not ban *possession* of these LCMs, instead grandfathering in possession of LCMs obtained before 2000. Instead of serving as a limited exception, the grandfathering clause actually made California's LCM restrictions nearly impossible to implement. Because LCMs lack identifying marks to indicate when they were manufactured or sold, grandfathering meant that police officers who came upon LCMs could not determine whether they were legally obtained. The Los Angeles County Sheriff's Department has explained that the state's LCM "law is difficult to enforce since the date of acquisition is nearly impossible to prove," and magazines "acquired before the ban, or illegally purchased in other states since the ban, are usually indistinguishable. A ban on the possession of high capacity magazines will help address this issue."[9]

Reflecting the sheer difficulty of enforcement, the Los Angeles Police Department continued to recover drastically *larger* numbers of crime guns loaded with LCMs in the years after the enactment of the 2000 restrictions, suggesting the law was not having its intended effect. The LAPD's numbers for recovered LCMs rose from 38 in 2003 to anywhere from 151 to 940 in each year between 2004 and 2010, an increase of between 297% and 2,374%.[10] Other states that have prohibited the sale, but not possession, of LCMs have observed a similar trend.[11]

To address the troubling proliferation of LCMs in California despite a ban on their sale or transfer, in 2015, the Law Center drafted—and Lieutenant Governor

---

[9] Bill Analysis for 2013 Cal. SB 396 (quoting L.A. County Sheriff's Department).
[10] Press Release, Citizens Crime Commission of New York City, NYC & LA City Councils Introduce Rezo for Federal Ban on Large Capacity Magazines 2 (Mar. 2, 2011), http://www.nycrimecommission.org/pdfs/CrimeCmsnNYCLACouncils.pdf.
[11] Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-Capacity Magazines, Despite Ban on Sales*, THE TRACE, Mar. 27, 2017, https://www.thetrace.org/2017/03/high-capacity-magazine-ban-baltimore-police/.

Farella Braun + Martel LLP
235 Montgomery Street, 17ᵗʰ Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

6

34582\6004201.1

Gavin Newsom introduced—Proposition 63 (also called the "Safety For All Act of 2016"), a voter initiative that appeared on the November 2016 ballot. The measure encompassed several proposed improvements to California's gun laws, including provisions to generally prohibit possession of large-capacity ammunition magazines by closing the state's grandfathering loophole.

### B.   The Need for Proposition 63

When considering and ultimately approving legislation to prohibit possession of LCMs, California drew on the experiences of other states that have enacted this policy.[12] In each instance, LCM restrictions were adopted in an attempt to protect the public from the devastating use of LCMs in shootings involving multiple victims, including mass shootings in public places and attacks on police officers. When LCMs are used in mass attacks, the outcome is far more lethal. On average, shooters who use LCMs or assault weapons shoot more than twice as many victims (151% more) and kill 63% more victims as compared to other mass shootings.[13]

Plaintiffs rest much on their contention that "magazine capacity limits are ineffective at reducing violence," because "possession of magazines over 10 rounds is not causally related to violent crime." (Pls. Mem. P & A at 11.) This is a straw-man argument that ignores the growing body of credible research that even though overall violent crime *rates* in America have dropped in recent years (*see id.*), LCMs are responsible for substantially increased *fatalities* when they are used in crimes, particularly in mass shootings.

Laws restricting the availability of LCMs are not necessarily likely to reduce violent crime rates overall, because there are many types of violent crime, and many factors have been demonstrated to affect crime rates in America.[14] But the aim of

---

[12] *See id.* (describing magazine capacity limits in eight states and D.C.).

[13] Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* 3 (Jan. 2013), http://libcloud.s3.amazonaws.com/9/56/4/1242/1/analysis-of-recent-mass-shootings.pdf.

[14] *See, e.g.*, Steven D. Levitt, *Understanding Why Crime Fell in the 1990s—Four*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017-BEN-JLB

7

34582\6004201.1

1   laws restricting access to LCMs is to reduce the capacity for firepower, and thus the

2   lethality, of firearms used in *unlawful shootings* in particular.[15] As discussed above,

3   a closely related goal of LCM restrictions is to reduce fatalities in major mass

4   shootings in crowded spaces where, absent enforceable ammunition capacity

5   restrictions, killers are able to murder or injure scores of people without interruption.

6          A recent analysis of major mass shootings clarifies the dangers that LCMs

7   pose, and the efficacy of LCM restrictions. Louis Klarevas surveyed high-fatality

8   mass shootings (where at least 6 people were killed) between 1966 and 2015, and

9   concluded that such massacres have markedly increased in incidence and lethality,

10  reaching "unprecedented levels in the past ten years."[16] Dr. Klarevas found that the

11  sharpest increase in fatalities is driven by access to LCMs that allow shooters to hit

12  more targets without interruption. Analyzing data over nearly five decades, he found

13  that use of magazines holding more than ten rounds is "the factor most associated

14  with high death tolls in gun massacres. . . . If such magazines were completely

15  removed from circulation, the bloodshed would be drastically reduced."[17]

16          In fact, Dr. Klarevas found, reduced bloodshed is exactly what occurred

17  between 1994 and 2004, when federal law restricted sale and possession of LCMs.

18  The federal ban on assault weapons and LCMs did not necessarily impact violent

19  crime as a general category, but Dr. Klarevas found that it achieved dramatic

20  reductions in fatalities resulting from mass shootings.[18] Specifically, he observed:

21

22  *Factors that Explain the Decline and Six That Do Not*, 18 J. ECON. PERSP. 163, 171,
23  177-81 (2004) (finding that policing and incarceration, combined with reduced use
    of crack-cocaine, led to reduced crime rates in the 1990s).
24  [15] It makes no sense to expect LCM laws to reduce violent crime generally, as
    "violent crime" is much broader than gun crime (or crimes committed with LCMs).
25  [16] Louis Klarevas, RAMPAGE NATION: SECURING AMERICA FROM MASS
    SHOOTINGS 215, 78-79 (2016) (Ex. A, at 9). The relevant excerpts from Dr.
26  Klarevas's book have been attached to this brief as Exhibit A.
27  [17] *Id.* at 257 (Ex. A, at 24); *see also id.* 215-25 (Ex. A, at 15-20) (calculating impact
    of LCM use on fatalities).
28  [18] *Id.* at 240-43 (Ex. A, at 22-23) (ban was "extremely successful" in reducing

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO          8          34582\6004201.1
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

> During the ten-year period that the [federal ban] was in effect, the numbers [of fatalities per mass shooting] declined substantially, with only twelve gun massacres, resulting in eighty-nine deaths, for an average of 7.4 fatalities per incident. What's particularly astounding about this time period is that during the first four and a half years of the ban, there wasn't a single gun massacre in the United States. Not one. This is unprecedented in modern American history.[19]

When the federal ban expired in 2004, fatality rates connected to large-scale shootings spiked once more, "further evidenc[ing] the [ban's] effectiveness."[20]

Just as laws restricting access to LCMs can reduce citizen death tolls in mass shootings, such laws also can reduce the lethality of day-to-day shootings. In Maryland, where current LCM restrictions are difficult to enforce because state law has a grandfathering clause, police officers observed that "larger magazines have surged in popularity among criminals because they can squeeze off more shots without reloading."[21] A police spokesman reported that it is "not uncommon for officers to pull up at crime scenes and find the street littered with spent shell casings," and a Baltimore Sun investigation found that in the past ten years, the number of corpses at the state medical examiner's office with 10 or more bullet wounds doubled.[22] This suggests that LCMs are selected for many gun crimes (not just high-profile mass shootings) for their lethal propensities.

Finally, LCM restrictions help protect the police officers who are most likely to confront heavily armed criminals and killers. Opining on the commonplace use of LCMs by criminals, the Philadelphia Police Commissioner said simply: "something needs to happen," because "[w]e're outgunned."[23] In a declaration submitted in litigation over San Francisco's LCM ban, Police Captain David Lazar similarly explained that LCMs pose a heightened danger to police officers. Captain Lazar

---

rampage violence).
[19] *Id.* at 243 (Ex. A, at 23).
[20] *Id.*
[21] Freskos, *supra* n. 11.
[22] *Id.*
[23] Rick Jervis, *Gun Control Advocates Target High-Capacity Magazines*, USA TODAY (Jul. 31, 2012) (quoting Police Commissioner Charles Ramsey).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

9

34582\6004201.1

1   cited examples of police officers being targeted by suspects with LCMs or even

2   being outgunned by a shooter with over 100 rounds of ammunition.[24]

3       In sum, the LCM legislation that California considered, and ultimately

4   enacted, is an evidence-based measure aimed at reducing the rising death toll from

5   mass shootings. It was also intended to mitigate documented risks that the

6   proliferation of LCMs poses for citizens and law enforcement officers.

7       **C.    Enactment of California's LCM Possession Ban**

8       Proposition 63's language was finalized in December 2015 and readied for

9   the November 2016 ballot. However, in the months after Proposition 63's text

10  became final, lawmakers galvanized by the recent mass shooting in San Bernardino

11  introduced dozens of new gun safety bills in the California Legislature. Most of

12  those bills sought to implement reforms that were not included in Prop 63, but a few

13  sought to address some of the same loopholes targeted by the earlier-drafted

14  initiative. On July 1, 2016, Governor Brown signed SB 1446, which, like

15  Proposition 63, generally prohibits possession of LCMs in California.

16      In November 2016, California voters approved Proposition 63 and enacted it

17  into law. As plaintiffs acknowledge (Complaint n. 9), both laws they challenge—SB

18  1446 and Proposition 63—prohibit only the possession of magazines capable of

19  holding more than ten rounds. That is because California has prohibited their

20  manufacture, importation, sale, and transfer since the year 2000. Indeed, although

21  Plaintiffs purport to challenge the possession ban set to go into effect July 1, their

22  Complaint actually attacks LCM regulations that have been in place in California for

23  nearly two decades—contradicting Plaintiffs' suggestion that their claims are time-

24  sensitive and related only to the measure scheduled to take effect next month. *See,*

25  *e*.*g*., Complaint ¶ 55 ("Prohibiting law-abiding adults from acquiring, keeping,

26  ───────────────────

27  [24] Decl. of Captain David S. Lazar ISO San Francisco's Opp. To Plaintiffs' Motion
    for Prelim. Inj. at ¶¶ 8-9, *San Francisco Veteran Police Officers Ass'n et al. v. San*

28  *Francisco*, No. 13-cv-05351-WHA (N.D. Cal. Jan. 16, 2014), ECF No. 38.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

10

34582\6004201.1

1  possessing, and/or transferring these commonly owned magazines implicates and
2  violates their Second Amendment rights.").

3      But no matter how it is framed, Plaintiffs' Second Amendment challenge is
4  meritless. California's LCM regulations, including the possession ban, are
5  constitutional in their entirety.

6  **II.   THE LCM POSSESSION BAN IS CONSTITUTIONAL BECAUSE IT REGULATES ACTIVITY OUTSIDE THE SCOPE OF THE SECOND AMENDMENT'S PROTECTIONS**
7

8      California's LCM possession ban is a necessary public safety measure that is
9  fully consistent with the Second Amendment. Indeed, many courts addressing laws
10 like California's have concluded that the Constitution does not protect a right to
11 possess extraordinarily dangerous magazines commonly used by mass shooters to
12 quickly kill and injure large numbers of people.[25]

13     In *Fyock v. City of Sunnyvale*, the Ninth Circuit heard a Second Amendment
14 challenge to a local ordinance prohibiting possession of LCMs, and affirmed the
15 district court's denial of the challengers' motion for a preliminary injunction. 779
16 F.3d 991, 1001 (9th Cir. 2015). The district court had determined that "the
17 Sunnyvale ordinance imposes some burden on Second Amendment rights" (after
18 finding that LCMs are in "common use," and so protected by the Amendment); but
19 then the court concluded that even so, the burden was "slight," and Sunnyvale
20 presented sufficient evidence to show that the law was constitutional under
21 intermediate scrutiny. *Fyock*, 25 F. Supp. 3d 1267, 1281 (N.D. Cal. 2014).

22     In its affirmance, the Ninth Circuit agreed that Sunnyvale's law passes
23 intermediate scrutiny, but expressly did *not* decide whether the Second Amendment
24 protects LCM possession. *E.g.*, *Fyock*, 779 F.3d at 997 ("we need not determine at

25
26 [25] *E.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 135 (4th Cir. Feb. 21, 2017) (en banc);
27 *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 261-64 (2d Cir. 2015); *Heller v.*
28 *District of Columbia ("Heller II")*, 670 F.3d 1244, 1260-64 (D.C. Cir. 2011).

this juncture whether firing-capacity regulations are among the longstanding prohibitions that fall outside of the Second Amendment's scope"). Instead, the Court held only that based on the record below, the district court did not abuse its discretion in finding that LCMs are protected. *See id.* at 998 (evidence "does not necessarily show that large-capacity magazines are in fact commonly possessed by law-abiding citizens," but "we cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, magazines are in common use").

After the district court and Ninth Circuit issued their rulings in *Fyock*, new research on LCM restrictions and their potential to reduce gun violence became available. This important work includes Dr. Klarevas's study of high-fatality mass shootings,[26] investigations showing that LCMs are still being recovered in large numbers in a state with a "grandfathering" loophole,[27] and a survey of historical gun laws demonstrating the ubiquity of early twentieth-century laws prohibiting particularly dangerous weapons.[28] In addition to confirming that California's LCM ban, like Sunnyvale's, passes intermediate scrutiny, this new research also suggests that, in fact, the Second Amendment does *not* protect private possession of LCMs.

In light of this new research and the overall record in this case, California's LCM ban is constitutional because LCMs fall outside the scope of the Second Amendment's protections. There are four independent reasons why this is true.

### A.   LCMs Are Not Second Amendment-Protected "Arms"

First, the right protected under the Second Amendment applies only to "arms." *Heller*, 554 U.S. at 581. The *Heller* Court relied on a 1773 dictionary defining "arms" as "weapons of offence, or armour of defence." 554 U.S. at 581 (citing 1 Dictionary of the English Language 106 (4th ed.) (reprinted 1978)). An

---

[26] Klarevas, *supra* n. 16.
[27] Freskos, *supra* n. 11.
[28] Spitzer, *infra* n. 37.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

12

34582\6004201.1

LCM is not a "weapon of offence" or "armour of defence." Rather, an LCM is an ammunition storage device that enhances a gun's ability to fire without reloading, but is in no way an essential functional part of most lawful firearms.

The gun industry already draws this distinction by offering magazines for sale as "accessories," not firearms or ammunition.[29] Historical sources also support the conclusion that accessories that merely enhance an already functional firearm are not "arms." In his dissent in *Heller*, Justice Stevens cited a Virginia militia law that "ordered that 'every one of the said officers . . . shall constantly keep the aforesaid arms, accoutrements, and ammunition, ready to be produced whenever called for….'" 554 U.S. at 650 (Stevens, J., dissenting) (quoting Act for Regulating and Disciplining the Militia, 1785 Va. Acts ch. 1, § 3, p. 2). This founding-era source clearly distinguished between "arms," "ammunition," and a third category, "accoutrements," analogous to accessories like expanded-capacity magazines.

That is not to say that *ammunition* should never be grouped with "arms" for purposes of the Second Amendment, or that magazines with a maximum capacity of ten rounds are not "arms," either. A magazine that is necessary to provide a constitutionally protected firearm with some number of bullets might be considered part of the "arm" because it is essential to the firearm's core function. *Accord Jackson v. San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose."); *Fyock*, 779 F.3d at 998 (recognizing corollary "but not unfettered" right to ammunition that is "necessary to render [constitutionally protected] firearms operable").

But the argument that some amount of ammunition is "integral" to a gun's

---

[29] For instance, Atlantic Firearms differentiates firearms and "ammo" in its online store, but offers magazines for sale under an entirely separate category: "accessories." *See* http://www.atlanticfirearms.com/accessories.html. Palmetto State Armory also categorizes magazines as "accessories," separate from "firearms" and "ammunition." *See* http://palmettostatearmory.com/index.php/accessories.html.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

13

34582\6004201.1

function has no application to a magazine that enhances ammunition capacity far beyond what would ordinarily be available. Indeed, LCMs serve a totally separate purpose from the ammunition needed to operate protected arms—they drastically enhance ammunition storage for guns equipped with them. This separate function of an LCM supports categorizing it separately from both arms and ammunition.

LCMs are not arms or ammunition, but are non-essential accessories, like scopes or silencers. Such accessories, which are not essential for most guns' core operation, are not "arms" and are not protected by the Second Amendment.

**B.    Even If LCMs Are Arms, They Are Unprotected by the Second Amendment Because They Are "Dangerous and Unusual"**

Even if LCMs are "arms," the Second Amendment does not protect them because they are "dangerous and unusual." *See Fyock*, 779 F.3d at 997.

**1.    LCMs Are Dangerous**

In *Fyock*, the Ninth Circuit stated that LCMs could be prohibited on the grounds that they are "dangerous and unusual" if there is sufficient evidence that LCMs pose an "increased danger" and are "unusual." *See id.* at 998.

Large-capacity magazines, which can fire as many as 100 rounds at once, pose a vastly "increased danger" because they substantially boost the lethality of the firearms using them. The evidence presented in the Summary of Argument and in Section I.B shows that LCMs are catastrophic when employed in a confined area packed with people, because the best, or only, opportunity to stop such shooters is when they reload. Moreover, a recent study (discussed *supra* at pp. 8-9) shows that major mass shootings have increased in frequency, and more lives are being lost— the latter trend attributable to the use of LCMs. Such magazines are also being used more in day-to-day crimes on city streets. In whatever context in which they are used, LCMs are more lethal; they "increase [criminals'] odds of a kill."[30]

---

[30] Freskos, *supra* n. 11.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

14

34582\6004201.1

As the firearm accessory most responsible for driving up murder rates during mass shootings and other gun crimes, LCMs are uniquely dangerous.

### 2.   LCMs are "Unusual," in California and Nationwide

Since the manufacture, importation, sale, and transfer of magazines accepting more than 10 rounds has been prohibited in California since 2000, lawful possession and use of LCMs is rare within the state. Indeed, there can be little question that LCMs are unusual in California because lawful possession is generally limited to people who are covered by the grandfathering clause.

Plaintiffs ask the Court to assess the term "unusual" by examining possession nationwide. But *Heller* did not address or decide whether a statewide firearms law must be assessed with a national frame of reference, and most lower courts have not addressed (and certainly have reached no consensus on) the question whether a national frame of reference is required.[31]

Ample reason exists to adopt a local "common use" standard. Other constitutional rights are reviewed on a local basis to account for diversity among the states. In the First Amendment context, whether material is obscene depends on standards of the relevant community. The Supreme Court has held, "[i]t is neither realistic nor constitutionally sound to read the First Amendment as requiring that the people of Maine or Mississippi accept public depiction of conduct found tolerable in Las Vegas, or New York City," as "[p]eople in different States vary in their tastes and attitudes, and this diversity is not to be strangled by the absolutism of imposed uniformity." *Miller v. California*, 413 U.S. 15, 32-33 (1973); *accord Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (Easterbrook, J.) ("[T]he Constitution establishes a federal republic where local differences are cherished as

---

[31] The district court in *Fyock* considered this issue and found that "common use" should be assessed nationally. But on appeal, the Ninth Circuit held only that this was not an abuse of discretion; its opinion did not mandate a national "common use" test. *Compare Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1281 (N.D. Cal. 2014), *with Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

15

34582\6004201.1

1   elements of liberty, rather than eliminated in a search for national uniformity.").

2        Similarly, it is neither realistic nor sound to read the Second Amendment to

3   thwart California from prohibiting dangerous devices that are already unusual within

4   the state, just because not enough other states have enacted this lifesaving measure.

5   As many have noted, firearms legislation should be tailored to the safety needs of

6   communities. *E.g.*, *Kolbe* v. *Hogan*, 849 F.3d 114, 150 (4th Cir. 2017) (en banc)

7   (Wilkinson, J., concurring). California should be permitted to exercise legislative

8   judgment to ban dangerous devices that are unusual in its borders.

9        Though the Court can and should take a local approach to assess whether

10  LCMs are commonly used for lawful purposes, LCMs are also "unusual"

11  nationwide. Indeed, national polling suggests that a solid majority of Americans

12  have never owned and have no use for LCMs, which alone suggests that LCMs are

13  unusual.[32] Many experts have testified that it is extremely rare to fire more than ten

14  rounds in self-defense,[33] and LCM use in hunting is often banned.[34]

15       Examined in isolation, national LCM sales data might suggest that this is a

16  commonplace accessory in America. However, this may also reflect the popularity

17  of semiautomatic pistols that can accept ammunition magazines (though those are

18  itself a recent phenomenon, as such pistols were uncommon until the 1980s). The

19  popularity of pistols that can *accept* LCMs does not mean LCMs are commonly

20  used for lawful purposes, such as home defense or hunting. Indeed, there is simply

---

[32] CNN/ORC International Poll, *December 17-18 – Gun Rights* 3 (Dec. 2012), at http://i2.cdn.turner.com/cnn/2012/images/12/19/cnnpoll.december19.4p.pdf (in December 2012 national poll, 62% of respondents favored a ban on the "sale and possession" of LCMs allowing guns to shoot more than 10 rounds before a reload).
[33] *See, e.g.*, *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 787 (D. Md. Aug. 12, 2014) (expert found "that it is rare for a self-defender to fire more than ten rounds"; on average, 2.1 bullets were fired), *aff'd*, 849 F.3d 114 (4th Cir. 2017) (en banc); *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1281 (N.D. Cal. Mar. 5, 2014) (fact that "Plaintiffs only present anecdotal examples rather than quantitative studies" suggests it is very rarely "necessary to possess a larger magazine in self-defense").
[34] For instance, California prohibits hunting deer with shotguns holding more than three shells. 14 Cal. Code Reg. §353(d).

1    no evidence that LCMs are "commonly" employed for such lawful purposes. The

2    fact that LCMs were not widely available until relatively recently, are a destructive

3    tool linked to rising fatalities in mass shootings, and are not necessary for self-

4    defense suggests, to the contrary, that they are "unusual."

5        Regardless of how many LCMs may have been sold, self-defense by

6    responsible Americans does not depend on continuously firing tens to hundreds of

7    bullets. LCMs are "dangerous and unusual" accessories and are ill suited for

8    ordinary self-defense. As such, they are unprotected by the Second Amendment.

9      **C.**    **LCMs Are Unprotected by the Second Amendment Because They**
                **Are Most Suitable for Military Use**

10

11        In *Heller*, the Supreme Court recognized the "tradition of prohibiting the

12    carrying of dangerous and unusual weapons." 554 U.S. at 625. The Court also

13    recognized that "weapons that are most useful in military service—M-16 rifles and

14    the like—may be banned" without violating the Second Amendment. *Id*. at 627.

15        In *Kolbe v. Hogan*, the en banc Fourth Circuit ruled that weapons and

16    accessories that are "like" "M-16 rifles" in that they "are most useful in military

17    service" fall outside the scope of the Second Amendment, and may be prohibited.

18    849 F.3d 114, 135 (4th Cir. 2017) (en banc) ("Because the banned assault weapons

19    and large capacity magazines are 'like' 'M-16 rifles'—'weapons that are most

20    useful in military service'—they are among those arms that the Second Amendment

21    does not shield."). The Fourth Circuit treated this as a separate question from

22    whether a weapon or accessory is in common use, because *Heller*'s statement—

23    "weapons that are most useful in military service" may be banned—contained no

24    caveat that such weapons may only be banned if they are uncommon. The *Kolbe*

25    Court held that assault weapons and LCMs fall outside the scope of the Second

26    Amendment because they are similar to M-16s and *most* suitable for military

27

28

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017-BEN-JLB

17

34582\6004201.1

applications, regardless of other "potential uses" in self-defense. *See id.* at 136-37.[35]

The same is true here with respect to LCMs. Whatever LCMs' *potential* application for self-defense, overwhelming evidence (cited elsewhere in this brief) demonstrates that proliferation of LCMs gives civilians military-level firepower that enables them to turn public spaces into battlefields where they can quickly kill and disable many people. As the *Kolbe* Court recognized, magazines that allow firing over ten rounds without reloading are "particularly designed and most suitable for military and law enforcement applications," 849 F.3d at 137, where there is a need to "enhance" a shooter's "capacity to shoot multiple human targets very rapidly." *Id.*

Indeed, LCMs' lethality suits them to military and police use, but this same characteristic makes them popular with criminals who may target the military or police, and also makes them poorly-adapted for civilian defense. *Kolbe*, 849 F.3d at 127 ("[e]ven in the hands of law-abiding citizens, large-capacity magazines are particularly dangerous"; "inadequately trained civilians…tend to fire more rounds than necessary and thus endanger more bystanders"); *see also Hightower v. City of Boston*, 693 F.3d 61, 71 (1st Cir. 2012) (noting that "large capacity weapons" are not "of the type characteristically used to protect the home"). It is for this reason that LCMs are more analogous to M-16s than to any of the protected weaponry recognized in *Heller*, and why LCMs are unprotected by the Second Amendment.

### D. LCM Restrictions Are "Longstanding" and Outside the Scope of the Second Amendment

*Heller* "recognized that the Second Amendment does not preclude certain 'longstanding' provisions . . . which it termed 'presumptively lawful regulatory measures.'" *Silvester*, 843 F.3d at 820 (quoting *Heller*, 554 U.S. at 627 n.26). If a law "resemble[s] prohibitions historically exempted from the Second Amendment,"

---

[35] Note that in *Fyock*, the Ninth Circuit did not address the argument that LCMs are most useful in military service, because it was not before the court. *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 997-98 (9th Cir. 2015).

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017-BEN-JLB                    18                    34582\6004201.1

and its "historical prevalence and significance is properly developed in the record," *Fyock*, 779 F.3d at 997, then the law is constitutional. Because *Heller*'s examples of "longstanding" regulations included laws from the twentieth century, *see Silvester*, 843 F.3d at 831, a similarly modern law "can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue." *Id.* (quotation omitted); *see also Fyock*, 779 F.3d at 997 ("early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation").

Naturally, there are no Founding-era or nineteenth century laws prohibiting LCMs, since it was not until much later that semiautomatic pistols that can accept such magazines attained a high percentage of the American gun market.[36] However, LCM prohibitions do have exact antecedents in several early twentieth century laws prohibiting weapons based on ammunition capacity. In 1932, Congress enacted a D.C. law prohibiting weapons that can fire 12 or more times without reloading; previously in 1927, Michigan and Rhode Island enacted bans with 16- and 12-round caps.[37] There are also close, though not identical, antecedents in laws from the same time period prohibiting other weapons perceived as highly dangerous, including semiautomatic weapons (restricted in as many as 10 states in the 1920s and 1930s) and machine guns (restricted in at least 28 states in about the same period).[38]

In a recent article cataloguing colonial and state firearm laws enacted from 1607 to 1934, Robert Spitzer explains that state laws "identify[ing] certain weapons as dangerous or unusual" began appearing in the early part of the 1900s with greater

---

[36] *See supra* n. 7 ("In the 1980s, a very significant shift in gun design and marketing occurred: high-capacity semiautomatic pistols became the dominant product line").

[37] Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Cont. Probs. 55, 68 (2017), http://lcp.law.duke.edu/article/gun-law-history-in-the-united-states-and-second-amendment-rights-spitzer-vol80-iss2/ (describing Michigan and Rhode Island laws); Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 650, 652 (D.C. law).

[38] *Id.* at 68-69 (describing "successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s"); *id.* at 67 (describing a "concerted national push to regulate … gangster-type weapons").

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

19

34582\6004201.1

frequency.[39] These measures had roots in earlier state laws prohibiting spring-loaded gun "traps" and concealed pistols (the latter type of law was particularly widespread).[40] Starting in about the 1920s, states "moved aggressively to outlaw" a wider range of weapons perceived to be highly dangerous, including machine guns, silencers, sawed-off shotguns, mechanisms that rigged a gun to fire without a trigger pull, and other "pistols, weapons and mechanisms that allowed firearms to be fired a certain number of times rapidly without reloading."[41] These new, more aggressive regulatory efforts included the laws (mentioned above) restricting certain LCMs, semiautomatic weapons, and machine guns. Dr. Spitzer attributes these laws to an increasing awareness that certain weapons preferred by gangsters had started to "spread in the civilian population in the mid-to-late 1920s."[42]

It is true that this wave of laws in the 1920s and 1930s—including the LCM prohibitions mentioned in Michigan, Rhode Island, and the District of Columbia— post-dated the *invention* of LCMs. But that reflects the logical fact that such state "laws were enacted not when these weapons were invented, but when they began to circulate widely in society"; their timing reflects that throughout "gun regulation history . . . new technologies bred new laws when circumstances warranted."[43]

*Fyock* stated that early twentieth century laws could be "longstanding" "if their historical prevalence and significance" is developed. 779 F.3d at 997. The early twentieth century state laws restricting unusually dangerous weapons meet this standard. The laws are prevalent, having been enacted by more than half of states (namely: LCM bans in three jurisdictions, machine gun bans in 28 states, and semiautomatic weapons restrictions in at least seven but up to as many as ten

---

[39] *See id.* at 67.
[40] *See id.* at 67, 63-65.
[41] *Id.* at 67.
[42] *Id.* at 68.
[43] *Id.*

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

20

34582\6004201.1

states).[44] And the laws are historically significant, reflecting a "concerted national push to regulate . . . gangster-type weapons"[45] and others that were perceived as highly dangerous, right when the weapons started spreading to the civilian public.

Though it does not have an exact Founding-era analogue, California's LCM possession ban does fit comfortably within a robust early twentieth century tradition of states prohibiting firearms perceived as highly dangerous—and doing so when new technologies became more widespread. Because this tradition dates from the 1920s and 1930s, it is older or at least as old as some categories of regulations which *Heller* termed "longstanding." *See Silvester*, 843 F.3d at 831. Accordingly, California's LCM possession ban is "longstanding," and constitutional.

## III.   CONCLUSION

Because large-capacity magazine possession falls outside the scope of the Second Amendment's protections, the challenged California law is constitutional. For the foregoing reasons, and the reasons stated in the State's opposition brief, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated:  June 5, 2017                                  FARELLA BRAUN + MARTEL LLP


                                                       By:       /s Anthony Schoenberg
                                                       Anthony Schoenberg
                                                       Email: tschoenberg@fbm.com

                                                       Attorneys for *Amicus Curiae*
                                                       Law Center to Prevent Gun Violence

---

[44] *Id.* at 67-71.
[45] *Id.* at 67.

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

BRIEF OF *AMICUS CURIAE* LAW CENTER TO
PREVENT GUN VIOLENCE
Case No. 17-CV-10017 -BEN-JLB

21

34582\6004201.1

1  Anthony Schoenberg (State Bar No. 203714)
   Farella Braun + Martel LLP
2  Rebecca H. Stephens (State Bar No. 299234)
   rstephens@fbm.com
3  235 Montgomery Street, 17th Floor
   San Francisco, California 94104
4  Telephone: (415) 954-4400
   Facsimile: (415) 954-4480
5

6  Attorneys for *Amicus Curiae*
   Law Center to Prevent Gun Violence
7

8

9                  UNITED STATES DISTRICT COURT

10               SOUTHERN DISTRICT OF CALIFORNIA

11

12  VIRGINIA DUNCAN, RICHARD          Case No. 17-CV-10017 -BEN-JLB
    LEWIS, PATRICK LOVETTE,
13  DAVID MARGUGLIO,                  **CERTIFICATE OF SERVICE**
    CHRISTOPHER WADDELL,
14  CALIFORNIA RIFLE & PISTOL         Date:   June 13, 2017
    ASS'N, INC., a California corporation,   Time:   10:00 A.M.
15                                    Place:  5A
                  Plaintiffs,
16                                    The Hon.  Roger T. Benitez
              vs.
17

18  XAVIER BECERRA, in his official
    capacity as Attorney General of the
19  State of California; and DOES 1-10,
20
                  Defendants.
21

22

23

24       I am a resident of the United States employed in San Francisco County,

25  California.  I am over the age of eighteen years and not a party to the within-entitled

26  action.  My business address is 235 Montgomery Street, 17th Floor, San Francisco,

27  California  94104.  My e-mail address is mbanuelos@fbm.com.

28       On June 5, 2017, I served true copies of the following document described

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

34582\6004269.1

CERTIFICATE OF SERVICE
Case No. 17-CV-10017 -BEN-JLB

as:

**BRIEF OF AMICUS CURIAE LAW CENTER TO PREVENT GUN
VIOLENCE IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

☒    by placing the document(s) listed above in a sealed FEDERAL
EXPRESS envelope and affixing a pre-paid air bill addressed as set forth
below, and deposited such envelope for collection.  I am readily familiar
with the firm's practice for collection and processing of correspondence
for overnight delivery, said practice being that in the ordinary course of
business, the envelope(s) will be timely delivered to a FEDERAL
EXPRESS agent for delivery the next day.

Alexandra Robert Gordon
Anthony P. O'Brien
California Department of Justice
1300 I Street, Suite 125
Sacramento, CA  95814

I declare under penalty of perjury under the laws of the United States of
America that the foregoing is true and correct and that I am employed in the office
of a member of the bar of this Court at whose direction the service was made.

Executed on June 5, 2017 at San Francisco, California.

_____

Mayra Banuelos

Farella Braun + Martel LLP
235 Montgomery Street, 17th Floor
San Francisco, California 94104
(415) 954-4400

CERTIFICATE OF SERVICE -
Case No. 17-CV-10017 -BEN-JLB

34582\6004269.1