1  XAVIER BECERRA
   Attorney General of California
2  TAMAR PACHTER
   Supervising Deputy Attorney General
3  NELSON R. RICHARDS
   ANTHONY P. O'BRIEN
4  Deputy Attorneys General
   ALEXANDRA ROBERT GORDON
5  Deputy Attorney General
   State Bar No. 207650
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone: (415) 703-5509
     Fax: (415) 703-5480
8    E-mail:
     Alexandra.RobertGordon@doj.ca.gov
9  *Attorneys for Defendant*
   *Attorney General of California*
10

11             IN THE UNITED STATES DISTRICT COURT

12           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **VIRGINIA DUNCAN, et al.**          17-cv-1017-BEN-JLB

                            Plaintiffs,
17
        v.                              **EXHIBITS 16-24 TO THE
18                                      DECLARATION OF ALEXANDRA
                                        ROBERT GORDON IN SUPPORT
19  **XAVIER BECERRA, in his official   OF DEFENDANT ATTORNEY
    capacity as Attorney General of the GENERAL XAVIER BECERRA'S
20  State of California; et al.,**       OPPOSITION TO PLAINTIFFS'
                                        MOTION FOR PRELIMINARY
21                          Defendants. INJUNCTION**

22                                      Date:      June 13, 2017
                                        Time:      10:00 a.m.
23                                      Dept:      5A
                                        Judge:     Hon. Roger T. Benitez
24                                      Action Filed:    May 17, 2017

25

26

27

28

# Exhibit 16

Kamala D. Harris, Attorney General

| California Department of Justice<br>DIVISION OF LAW ENFORCEMENT<br>Larry J. Wallace, Director  | *INFORMATION BULLETIN* | |
|---|---|---|
| Subject:<br>**New and Amended Firearms/Weapons Laws** | No:<br>2016-BOF-02 | **Bureau of Firearms**<br>(916) 227-7527 |
| | Date:<br>01/10/2017 | |

**TO: All California Criminal Justice and Law Enforcement Agencies, Centralized List of Firearms Dealers, Manufacturers, and Exempted Federal Firearms Licensees**

This bulletin provides a brief summary of California firearms/weapons bills that were signed into law by Governor Brown in July and September, 2016, that took effect January 1, 2017, unless otherwise noted. You can access the full text of the bills at http://leginfo.legislature.ca.gov/.

## AB 857 (Stats. 2016, ch. 60) – Identifying Information on Firearms

- Commencing July 1, 2018, and subject to exceptions, requires a person who manufactures or assembles a firearm to first apply to the Department of Justice ("department") for a unique serial number or other identifying mark, as provided. (Pen. Code, § 29180.)

- Requires any person who, as of July 1, 2018, owns a firearm that does not bear a serial number to likewise apply to the department for a unique serial number or other mark of identification by January 1, 2019. Except as provided, the sale or transfer of a firearm manufactured or assembled pursuant to these provisions is prohibited. A person who is prohibited from possessing a firearm is prohibited from aiding in the manufacture or assembly of a firearm. A violation of these provisions is a misdemeanor. (Pen. Code, § 29180.)

- Requires the department to issue a serial number or other identifying mark to an applicant meeting specified criteria and allows the department to charge a fee to recover its costs associated with assigning the distinguishing number or mark. (Pen. Code, §§ 23910, 29180, 29182, 29183.)

- The department will soon be drafting regulations that specify the acceptable procedures for obtaining a serial number for a firearm that does not possess one.

## AB 1135 (Stats. 2016, ch. 40) and SB 880 (Stats. 2016, ch. 48) – Assault Weapons

- Revises the Penal Code section 30515 definition of "assault weapon" to mean a semiautomatic centerfire rifle or a semiautomatic pistol that does not have a fixed magazine but has any one of several specified attributes. Defines "fixed magazine" to mean an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action. (Pen. Code, § 30515.)

- Requires any person who, from January 1, 2001, to December 31, 2016, inclusive, lawfully possessed an assault weapon that does not have a fixed magazine, as defined, and including those weapons with an ammunition feeding device that can be removed readily from the firearm with the use of a tool, to register the firearm with the department before January 1, 2018, but not before the

Information Bulletin 2016-BOF-02
New and Amended Firearms/Weapons Laws
Page 2

effective date of specified regulations. Registrations must be submitted electronically via the Internet utilizing a public-facing application to be made available by the department. The registration fee is $15 per person. (Pen. Code, § 30900.)

- Requires the department to adopt regulations for the purpose of implementing these provisions. The regulations adopted by the department are exempt from the Administrative Procedure Act. (Pen. Code, § 30900.)

- The department is currently drafting regulations that specify the acceptable methods of registering an assault weapon.

## AB 1511 (Stats. 2016, ch. 41) – Lending Firearms

- Limits the exemption from conducting the loan of a firearm through a licensed firearms dealer, to the loan of a firearm to a spouse or registered domestic partner, or to a parent, child, sibling, grandparent, or grandchild, related as specified. If the firearm being loaned is a handgun, it must be registered to the person loaning the handgun. (Pen. Code, § 27880.)

## AB 1695 (Stats. 2016, ch. 47) – False Reports of Stolen Firearms

- Makes it a misdemeanor to report to certain individuals and peace officers as specified, that a firearm has been lost or stolen, knowing the report to be false. Makes it a misdemeanor for a person convicted of violating this provision to own, purchase, or possess a firearm within 10 years of the conviction. (Pen. Code, §§ 148.5, 29805.)

## AB 1999 (Stats. 2016, ch. 638) – Initial Review of Prohibited Armed Persons File

- Requires the department to complete an initial review of a match, as defined, in the daily queue of the Armed and Prohibited Persons system within 7 days of the match being placed in the queue.

- Requires periodic reassessment of whether the department can complete said reviews more efficiently.

## AB 2165 (Stats. 2016, ch. 640) – Firearms Prohibitions Exemptions

- Exempts specified entities and sworn members who have to complete a firearms portion of a training course prescribed by the Commission on Peace Officer Standards and Training from limitations on the sale or purchase of a handgun.

- Exempt individuals pursuant to this provision would be prohibited from the sale or transfer of ownership of a handgun to an individual who is not exempt.

- Requires exempt individuals to lock an unsafe handgun, as described, in their vehicle's trunk, or in a locked container out of sight when leaving their vehicle unattended.

Information Bulletin 2016-BOF-02
New and Amended Firearms/Weapons Laws
Page 3

## AB 2510 (Stats. 2016, ch. 645) – Uniform License to Carry Concealed Weapons

- This bill would require the Attorney General to develop a uniform license that may be used as indicia of proof of licensure throughout the state.

- The Attorney General is required to approve the use of licenses issued by local agencies that contain specified information, including a recent photograph of the applicant.

- The Attorney General is required to retain exemplars of approved licenses and maintain a list of agencies issuing local licenses.

- This bill would create a committee comprised of representatives from the California State Sheriffs' Association, California Police Chiefs Association, and the Department of Justice to review and revise the uniform licenses, as specified.

## SB 1235 (Stats. 2016, ch. 55) – Ammunition

- Commencing July 1, 2019, with specified exceptions, ammunition can be sold only to a person whose information matches an entry in the Automated Firearms System and who is eligible to possess ammunition, to a person who has a current certificate of eligibility issued by the department, or to a person who purchases or transfers the ammunition in a single ammunition transaction, as specified. Ammunition purchasers and transferees would be charged a per transaction fee not to exceed $1.

- Commencing July 1, 2019, an ammunition vendor shall electronically submit to the department information regarding ammunition sales and transfers. The department shall retain this information in a database to be known as the Ammunition Purchase Records File. This information shall remain confidential and may be used by the department and those entities specified in, and pursuant to, subdivision (b) or (c) of Penal Code section 11105, through the California Law Enforcement Telecommunications System, only for law enforcement purposes. The ammunition vendor shall not use, sell, disclose, or share the information for any other purpose other than the submission required by this subdivision without the express written consent of the purchaser or transferee.

- The other provisions of this bill will not become operative, as Proposition 63 was passed by voters.

- The department is currently drafting regulations that specify the acceptable methods for ammunition sales.

## SB 1446 (Stats. 2016, ch. 58) – Magazine Capacity

- Commencing July 1, 2017, makes it an infraction punishable by a fine not to exceed $100 for the first offense, by a fine not to exceed $250 for the 2nd offense, and by a fine not to exceed $500 for the 3rd or subsequent offense, for a person to possess any large-capacity magazine, regardless of the date the magazine was acquired. A person who, prior to July 1, 2017, legally possesses a large-capacity magazine shall dispose of that magazine by any of the following means:

Information Bulletin 2016-BOF-02
New and Amended Firearms/Weapons Laws
Page 4

(1) Remove the large-capacity magazine from the state.

(2) Prior to July 1, 2017, sell the large-capacity magazine to a licensed firearms dealer.

(3) Destroy the large-capacity magazine.

(4) Surrender the large-capacity magazine to a law enforcement agency. (Pen. Code, § 32310.)

Pursuant to Penal Code section 16740, the definition of a large capacity magazine does not include an ammunition feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds. The department is currently drafting regulations that specify the acceptable methods of permanent alteration.

## SB 869 (Stats. 2016, ch. 651) – Securing Handguns in Vehicles

- Requires a person, when leaving a handgun in an unattended vehicle, to secure the handgun by locking it in the trunk of the vehicle or locking it in a locked container and placing the container out of plain view, or locking the handgun in a container that is permanently affixed to the vehicle's interior and not in plain view.

If you have any questions regarding this Information Bulletin, please contact the Department of Justice, Bureau of Firearms at (916) 227-7527.

Sincerely,

MARTHA SUPERNOR, Interim Chief
Bureau of Firearms

For KATHLEEN A. KENEALY
Acting Attorney General

# Exhibit 17



# CALIFORNIA DEPARTMENT OF JUSTICE
## BUREAU OF FIREARMS
### Large-Capacity Magazine Permit
### Application



## Instructions:

Any firearms dealership licensed pursuant to Penal Code section 26700 may apply for a Department of Justice (DOJ) Large-Capacity Magazine Permit to engage in the lawful importation and exportation of large-capacity magazines and the activities associated thereto as specified in Penal Code sections 32310 through 32450.

All licensees of the dealership must complete and sign this form before a permit will be issued to the dealership. Use the reverse side of this form for additional signatures if necessary.

To apply for a DOJ Large-Capacity Magazine Permit, complete this application and mail to the Department of Justice, Firearms Licensing and Permits Section - Centralized List, P.O. Box 160367, Sacramento, CA 95816-0367. You are encouraged to return this application in the same envelope as your Application for Centralized List of Firearms Dealers (BOF 4080), or with your Centralized List of Firearms Dealers Renewal Transmittal.

## Dealership Information:

California Firearms Dealership (CFD) Number     Dealership Name

Mailing Address                                 City                    Zip Code

## Good Cause for Issuance of Permit:

California Code of Regulations, title 11, section 5480, subdivision (b), states that no permit shall be issued to any person who fails to establish "good cause" for issuance of the permit and that the permit would not endanger public safety. California Code of Regulations, title 11, section 5480, subdivision (b)(1) requires a statement from the applicant that a large-capacity magazine marketplace exists for their dealership. Please attach a good cause statement that establishes the specific reasons that a large-capacity magazine marketplace exists for your dealership and that the permit would not endanger public safety.

**(Attach good cause statement)**

I (we) certify the information contained in the attached good cause statement is true and correct. I (we) agree to abide by the statutes and regulations governing the importation, exportation, keeping for sale, exposing or offering for sale, and sale of large-capacity magazines. I (we) understand the DOJ Large-Capacity Magazine Permit must be renewed annually prior to December 31 of each calendar year in order to maintain uninterrupted status as a large-capacity magazine permittee. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

_Dealership Licensee Printed Name_          _Dealership Licensee Signature_          _Date_

_Dealership Licensee Printed Name_          _Dealership Licensee Signature_          _Date_

_Dealership Licensee Printed Name_          _Dealership Licensee Signature_          _Date_

_Dealership Licensee Printed Name_          _Dealership Licensee Signature_          _Date_




# CALIFORNIA DEPARTMENT OF JUSTICE
# BUREAU OF FIREARMS
# NOTICE

The manufacture, importation, sale, or transfer of any large-capacity magazine, except to specifically designated parties and under specified conditions (including law enforcement use, loans for service/repair, et al.) is prohibited by law. A large-capacity magazine is defined as any ammunition feeding device with the capacity to accept more than 10 rounds but shall not include any .22 caliber tube ammunition feeding device, or a magazine that has been permanently altered so that it cannot accommodate more than ten rounds.

A permit is not required for the lawful sale of large-capacity magazines within the state to persons authorized to obtain them under Penal Code sections 32400 through 32450, such as law enforcement agencies, peace officers, other licensed firearms dealers, armored car companies, museums, and theatrical companies. Record keeping requirements include the maintenance of records of sales for all transactions, including a copy of the photo identification of the peace officer or licensed firearms dealer, a copy of the official invoice of the law enforcement agency, or an authorization letter on the letterhead of the company to which the sale is being made. The records must be maintained at the dealership location for three years and, upon request, be made available to law enforcement.

A permit is required for the import or export of large-capacity magazines. Large-Capacity Magazine Permits will be issued, upon request, to licensed firearms dealers on the DOJ Centralized List of Firearms Dealers whose businesses have a bona fide marketplace for the import or export of large-capacity magazines. Pursuant to Penal Code section 32315, you must have a permit issued by the DOJ to engage in the import or export of large-capacity magazines. Large-capacity magazine permittees will be required to maintain acquisition and disposition records for all large-capacity magazines they purchase, import or export. The records must be maintained at the dealership location for three years and upon request, be made available to law enforcement.

Whenever dealerships have multiple licensees, all licensees must sign this application form. There is no additional fee for the permit. However, maintenance of active status on the DOJ Centralized List of Firearms Dealers is required. The permit is valid for the calendar year term, provided the permittee abides by the conditions and limitations of the permit, and must be renewed annually with the Centralized List of Firearms Dealers Renewal Transmittal.

If you have any questions, please contact the Firearms Licensing and Permits Section at (916) 227-2153.

Mail completed application, along with the required good cause statement to:

Department of Justice
Firearms Licensing and Permits Section - Centralized List
P.O. Box 160367
Sacramento, CA 95816-0367

## Additional Signatures: *(if necessary)*

| | | |
|---|---|---|
| _____ | _____ | _____ |
| *Dealership Licensee Printed Name* | *Dealership Licensee Signature* | *Date* |
| | | |
| _____ | _____ | _____ |
| *Dealership Licensee Printed Name* | *Dealership Licensee Signature* | *Date* |



# Exhibit 18

# Finding of Emergency

The Department of Justice (Department or DOJ) finds that an emergency exists, and that the immediate adoption of sections within Chapter 39, of Division 5, of Title 11 is necessary to avoid serious harm to the public peace, health, safety, or general welfare.

## Specific Facts Demonstrating the Need for Immediate Action

Proposition 63, a measure banning the possession of large-capacity magazines, was approved by the voters on November 8, 2016 and took effect November 9, 2016. In anticipation of its passages, the Legislature pre-amended Proposition 63 with the passage of Senate Bill 1446 (Chapter 48, Statutes of 2016). The clarifying amendments take effect on January 1, 2017.

Pursuant to Proposition 63, as amended, beginning July 1, 2017, it will be an infraction punishable by a fine for a person to possess any large-capacity magazine, regardless of the date the magazine was acquired. (Penal Code, § 32310, subdivision (b).) The new law requires a person in lawful possession of a large-capacity magazine prior to July 1, 2017 to dispose of the magazine. Some persons are exempt from the ban, including active and retired law enforcement, armored car entities, and licensed gun dealers. (Penal Code, §§ 32400, 32405, 32406, 32410, 32430, 32435, 32450.) Starting July 1, 2017, anyone who violates the ban is subject to a year in jail, and a $100 fine for a first offence, $250 fine for a second offense, and a $500 fine for a third offense. (Penal Code § 32310, subdivision (b).)

These emergency regulations are necessary for the implementation and on-going enforcement of the ban on large-capacity magazines. The proposed regulations provide guidance to California residents on how to comply with the ban. These regulations need to be established as soon as possible so the Department has time to notify gun owners and gun owners have time to make the necessary changes to comply with the ban.

There are likely hundreds of thousands of large-capacity magazines in California at this time. In recent years, there has been an increase in these types of firearms on the market. The Department therefore expects many gun owners to be affected by the new ban. Under the new law, gun owners have six months to dispose of or permanently alter their large-capacity magazines. Pursuant to Penal Code section 32310, subdivision (c), a person who legally possesses a large-capacity magazine shall dispose of that magazine by any of the following means prior to July 1, 2017: (1) remove the large-capacity magazine from the state; (2) sell the large-capacity magazine to a licensed firearms dealer; (3) destroy the large-capacity magazine; or (4) surrender the large-capacity magazine to a law enforcement agency for destruction.

Alternatively, gun owners may permanently alter large-capacity magazines by reducing their ammunition capacity so that it no longer meets the definition of a "large-capacity magazine." Penal Code section 16740 defines "large-capacity magazine" to mean any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include a feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds. If a gun owner chooses to permanently reduce the capacity of their large-capacity

magazines, these emergency regulations provide guidance for doing so with what the Department has determined to be the acceptable minimum level of permanence.

By providing this information to the public in a timely manner, through the emergency process, the Department will avert serious harm to public peace, health, safety, or general welfare.

## Technical, Theoretical, and Empirical Study, Report, or Similar Document, if any, Upon Which the Department Relied

In addition to existing regulations forming the basis of these proposed regulations, the following documents were used:

UTAS MAKINE LTD., UTS-15 owners manual, attached for reference
KEL TEC, KSG owners manual, Rev 042814, attached for reference
Standard MFG. DP-12 shotgun owners manual, attached for reference

## Authority and Reference Citations

Authority:    Penal Code sections 26905, 26910, 32310, 32311, 32315.

Reference:    Penal Code sections 16740, 32310, 32311, 32315, 32400, 32405, 32406, 32410, 32415, 32425, 32430, 32435, 32440, 32445, 32450.

Repealed:    Penal Code section 32420 was removed from the authority of section 5480 because SB 1446 repealed that section.

## Informative Digest/Policy Statement Overview

Existing law prohibits the sale, gift, and loan of a large-capacity magazine. A violation of this prohibition is punishable as a misdemeanor with specified penalties, or as a felony. The new law goes further and provides that possession of large-capacity magazines by a non exempt person is an infraction punishable by a fine not to exceed $100 for the first offense, by a fine not to exceed $250 for the second offense, and by a fine not to exceed $500 for the third or subsequent offense, regardless of the date the magazine was acquired. The law requires a person in lawful possession of a large-capacity magazine prior to July 1, 2017, to dispose of the magazine as provided. By creating a new crime, this law imposes a state-mandated local program.

Existing law creates various exceptions to the prohibition on the sale, gift or loan of a large-capacity magazine including, but not limited to, the sale of, giving of, lending of, importation into this state, or purchase of, any large-capacity magazine to, or by the holder, of a special weapons permit for use as a prop for a motion picture or any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties, whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties. The new law makes conforming changes to those exceptions by including possession of a large-capacity magazine in those provisions and would establish additional exceptions, including exceptions to allow

licensed gunsmiths and honorably retired sworn peace officers to possess large-capacity magazines.

The objective of the proposed regulations is to inform California gun owners of their options for complying with new California laws while maintaining public safety.

Article 4. Large-Capacity Magazine Permits

§ 5480. Requirements for Large-Capacity Magazine Permits Pursuant to Penal Code Section 32315.
This section is amended to state that a separate Large-Capacity Magazine Permit is needed for each licensed location. The permit will automatically transfer with an existing California Firearms Dealer if their physical store moves and they notify the Department prior to moving. Large-Capacity Magazine Permit applications can only be submitted online.

§ 5483. Large-Capacity Magazine Permit Record Keeping.
This section is amended to include instructions on how permittees shall document the Large-Capacity Magazine Permit records, which form to use, any additional documentation to be kept with the form, and timeframe for completing the documentation.

§ 5484. Large-Capacity Magazine Permit Revocations.
This section is amended to include the grounds for revocation of a Large-Capacity Magazine Permit, and the factors surrounding the revocation.

Article 5. Large-Capacity Magazines and Large-Capacity Magazine Conversion Kits

§ 5490. Large-Capacity Magazine; manufacturing
This section has been added to inform gun owners who legally possess a large-capacity magazine that they may disassemble and clean the magazine without triggering the ban.

§ 5491. Large-Capacity Magazine; capacity
This section has been added to inform gun owners of the legal definition of a large-capacity magazine and provide guidance on reducing the capacity on their large-capacity magazines.

§ 5492. Large-Capacity Magazine Conversion Kits.
This section has been added to clarify the definition of large-capacity magazine conversion kits.

**Government Code Section 11346.5(a)(3)(D) Evaluation**

The proposed regulations are not inconsistent or incompatible with existing state regulations.

**Mandate on Local Agencies or School Districts**

The Department has determined the proposed emergency regulations do impose a state-mandated local program or a mandate requiring reimbursement by the State pursuant to Chapter 58, Statutes of 2016, because it creates a new crime. However, SB 1446 states that no reimbursement

is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction.

## Other Matters Prescribed by Statute Applicable to the Agency or to Any Specific Regulation or Class of Regulations

None.

## Nonduplication of State Statutes as Necessary To Satisfy Government Code Section 11349.1(a)(6)

To satisfy the requirements of Government Code section 11349.1(a)(6), the text of the proposed regulations are nonduplicative.

## Forms Incorporated by Reference

Large-Capacity Magazine Permit Application, BOF 050 (Rev. 12/2016)
Large Capacity Magazine Report, BOF 1002 (Rev. 12/2016)

## Cost Estimates

The Department has assessed the potential for significant adverse impact that might result from the proposed emergency action and has determined:
- There will be no non-discretionary costs or savings to local agencies
- There will be no costs to school districts
- There will be no costs or savings in federal funding to the State

As detailed on the attachment to the Economic and Fiscal Impact Statement (STD. 399), the Department estimates its costs (state agency) directly related to the large-capacity magazine permit and enforcement of the large-capacity magazine laws and regulations will be insignificant.

## Finding of Emergency

Government Code section 11346.1(a)(2) requires that, at least five working days prior to submission of the proposed emergency action to the Office of Administrative Law, the adopting agency provide a notice of the proposed emergency action to every person who has filed a request for notice of regulatory action with the agency. After submission of the proposed emergency to the Office of Administrative Law, the Office of Administrative Law shall allow interested persons five calendar days to submit comments on the proposed emergency regulations as set forth in Government Code section 11349.6.

**Explanation of Failure to Adopt Nonemergency Regulations**

The Department is unable to develop regulations in the standard manner because of the short timeframes provided in the legislation.  The legislation was signed into law on July 1, 2016, and the ban commences on July 1, 2017.  It is the Department's intention to provide guidance to California's gun owners so that by July 1, 2017, they will be in compliance with the law.  The proposed regulations provide options for disposal of large-capacity magazines, as well as instructions for reducing the capacity of a large-capacity magazine, and need to be formalized and provided to California residents as soon as possible.

# OWNER'S MANUAL

*Instruction Book for UTS-15 Shotgun*

www.utas-usa.com

1

UTS 15



www.utas-usa.com

2

UTS15

# OWNER'S MANUAL

*Instruction Book for UTS-15 Shotgun*

Introduction ........................................................................... 4-5

Ten commandments of safety ................................................ 6-12

Important Parts & Mechanism ............................................. 13-15

Loading and Firing ............................................................... 16-23

Unloading .............................................................................. 24

Cleaning ................................................................................ 25-28

Complete Disassembly .......................................................... 29-51

Exploded View & Part List ................................................... 52-54

Parts and Service .................................................................. 57

3

UTS 15

# *Introduction*

Congratulations on your purchase of the UTS-15 Shotgun. This shotgun is on the cutting edge of modern shotgun design and materials utilization. Developed by UTAS MAKINE LTD and manufactured in the United States and Turkey, the UTS-15 is sure to change the way sportsmen as well as military and law enforcement personnel view a shotgun and its capabilities.

UTAS is a company that specializes in firearms design, engineering and OEM manufacturing. Arguably, UTAS is one of the top sporting firearms design companies with their products being voted "Gun of the Year" by the NRA's American Rifleman Magazine in 2006 and again in 2007. Although UTAS continues to win awards for beautiful designs, the heart of the company is innovation as exemplified in the revolutionary new UTS-15.

The UTS-15 is a unique shotgun platform not previously seen by the American shooter. The UTS-15 platform is to the shotgun shooter as the AR platform is to the center fire rifle shooter. The UTS-15 is offered in several hunting configurations as well as a Military and Law Enforcement specification. While the sporting model has twin magazines of 5 round capacities requiring manual magazine selection, the M&P model offers a total magazine capacity of 15 rounds with consecutive automatic magazine selection. The M&P model has additional law enforcement enhancements

4

UTS 15

including a flash suppressor extended choke and an integral laser / spotlight night sight designed for close-quarters combat situations. You will find that the UTS-15 is equally at home in shooting 2 ¾" or 3 inch ammunition. Additionally, the UTS-15 will reliably feed specialty rounds loaded in 2 ½ inch cases. A variety of sporting choke tubes is available from cylinder bore for big game such as wild boar, bear or deer with buckshot or slugs to an extra full turkey choke.

As with any firearm, you are asked to become familiar with the UTS-15 and this operator's manual even before you take it out of the box. It is impossible to be too careful when it comes to firearms safety. Most firearms accidents could be prevented with just a few simple rules such as controlling the direction of the muzzle, proper operation of the safety mechanism and utilization of the proper loads designed for your particular firearm. The UTS-15 is not your father's shotgun. Take your time, use your head, be safe with this new and exciting shotgun and it will provide you with a lifetime of shooting enjoyment.

# *Warning!*

Failure to follow any of these safety precautions and the Ten Commandments of Firearms Safety may cause personal injury including death to the shooter or to bystanders as well as substantial property damage. If you have any questions regarding your UTS-15 or it's safe operation, please call **UTAS-USA at** (+1) 847 768 1011. We will be happy to talk to you.

5

UTS 15

# *The ten commandments of firearm safety*

The following Ten Commandments of Firearm Safety should be committed to memory and kept in mind anytime you are handling firearms whether on the range, in the field or at home for cleaning and storage.  Please give these commandments your full attention and obtain a through understanding of these rules.  Mistakes can be made by even the most experienced shooter.  Make sure that is not you by memorizing and faithfully practicing these Ten Commandments of Firearms Safety.

6

UTS15

## First commandment
### *Always keep the muzzle pointed in a safe direction.*

This commandment is listed first and is number one because it is the most important rule to remember and follow. If your muzzle is always pointed in a safe direction, you can never have an accidental discharge that will cause any injury or damage. Never allow your gun to point in any direction or at anything you do not want to shoot. This rule applies to your firearm whether it is loaded or not and particularly when either loading or unloading your firearm.

## Second commandment
### *Firearms should be unloaded when not actually in use.*

Your firearm should only be loaded when you are at the range or in the field and actually ready to shoot. When you have finished shooting, unload the firearm before putting it in your vehicle, tent or home. Always remember to unload the firearm completely. This means removing all ammunition not only from the chamber but the magazines as well. Anytime you are given a firearm, check to see if it is unloaded. Do this as well when passing a firearm to another person. The mark of a real firearm pro is to always know the loading condition of any firearm you are handling. Always use good common sense. If you are climbing into a tree stand, crossing a fence, stream or other obstruction, unload your firearm. Do not store firearms loaded. Be particularly careful around children who are often fascinated with firearms. Lock your firearms away and secure your ammunition is a separate storage facility

7

UTS15

**Third commandment**
## Do not rely on your firearm's safety.

Your UTS-15 has a safety designed to maximize performance and safety. It is, however, a mechanical device and is subject to failure. Always keep your safety engaged until you are ready to take your shot. Never put your finger on the trigger until you are ready to take your shot. Do not pull the trigger just to "test the safety". Before using your new shotgun, read the owner's manual carefully and be completely familiar with the exact location and operation of your firearm's safety mechanism. Always know that you and your good judgment are the best safety mechanism for your firearm.

**Fourth commandment**
## Be sure of your target and what's beyond it.

Once you have pulled a trigger and released a round, you can never get it back. Know what you are shooting. Never take a "sound shot" or fire at a movement or flash of color. It might well be your hunting buddy. Know what is behind your target in case you miss or experience a ricochet. Bullets and shot charges can carry great distances and with lethal effect.

8

UTS15

**Fifth commandment**

## *Use proper ammunition.*

Your UTS-15 shotgun is designed to be used only with 12 gauge ammunition of no greater case length than three inches. Using the wrong ammunition or using ammunition that has been improperly loaded can cause serious personal injury and even death. It certainly can destroy your firearm. The most common ammunition error in 12 gauge shotgun shooting is called a 12/20 burst. This is when a 20 gauge shell is loaded into a 12 gauge gun by mistake. The 20 gauge shell will slide through the 12 gauge chamber and lodge in the bore. When a 12 gauge shell is then loaded and fired, the burst results. These situations have the potential to be fatal to both the shooter and those around the shooter. Always carefully check the markings on your ammunition to insure that what you are using is intended for your particular firearm. If you are using reloaded ammunition, be particularly careful to know that you are using properly reloaded shells.

9

UTS15

### Sixth commandment
## *If your firearm fails to fire when the trigger is pulled, handle with care.*

Should this happen to you, remember the first commandment and keep your muzzle pointed in a safe direction. It may be a simple misfire where the primer did not ignite the propellant charge. It could also be what is known as a "hang fire" where the powder does not discharge immediately but might do so a second or two after the trigger is pulled. Keep your muzzle pointed in a safe direction, keep your face away from the ejection port, put the safety on and carefully unload the action. Safely dispose of the defective round. Throughout this procedure, always remember that the gun might discharge at any time.

### Seventh commandment
## *Always wear eye and ear protection when shooting.*

Your sight and hearing are always at risk when shooting. This is particularly true in clay target shooting or in confined spaces such as a duck blind or enclosed deer stand. Always use proper eye and ear protection. Most of us only have two eyes and two ears. Take care of them through proper protection when shooting.

10

UTS15

**Eighth commandment**
## Be sure the barrel is clear of obstructions before shooting.

This procedure starts before you load your gun. Open the action and make sure that both the chamber and the magazines are clear. Check the barrel for any obstruction or debris. A very small obstruction such as a cleaning patch, snow, mud or similar object could well be enough to destroy your gun and hazard your life and limb. Never try to clear an obstruction by shooting a round through the barrel. If you notice something not quite right with the recoil or report when you fire your shotgun, stop, unload the gun and check the bore for obstructions.

**Ninth commandment**
## Don't alter or modify your gun and have it serviced regularly.

Your UTS-15 shotgun has been designed to operate within certain factory specifications. If you make any attempt to alter the trigger pull, safety mechanism or any other feature in any way you might jeopardize your safety and the safety of others around you. All mechanical devices are subject to failure through wear, misuse or poor maintenance. Make sure that you periodically have your shotgun serviced and inspected by a competent service facility. The best way to insure continuing serviceability is proper cleaning and lubrication. Before cleaning, always make sure that your firearm is completely unloaded. If possible, clean the bore from the chamber end to the muzzle end.

11

UTS15

**Tenth commandment**

## Learn the mechanics and handling characteristics of your firearm.

You might be a real firearm pro but not all guns are alike in features, operation and performance. This is particularly true of the UTS-15 which represents a new and totally different shotgun platform. Read your instruction manual from cover to cover. Become familiar with all the different component parts and operating features. As an additional note, alcohol and gun powder DO NOT MIX! Always shoot sober. Never consume anything that will impair your judgment when it comes to using firearms. A majority of the firearms accidents in the world every year involve the use of drugs and alcohol. Stay safe! Stay alive! SHOOT SOBER!

12

UTS15

## Safety Mechanism

As indicated in illustration the tip of the safety selector is pointed at S for safety. To fire the switch is rotated clockwise until the tip is pointed at the F for fair.



## Fore-end

This is used to pull the bolt rearward to open the action and to load another round after firing.



13

UTS15

## Action Bar Release (bolt release)

The action bar release is used to unlock and operate the action when the trigger has not been pulled.



## Trigger

Pulling the trigger will discharge the firearm if the chamber has a loaded round in it.  The weight of the trigger is set at the factory.  Do not attempt to adjust the trigger.  To do so might result in an unsafe condition resulting in accidental discharge.



14

UTS15

## *Choke Tubes*



## *Warning*

Unload the firearm completely before attempting to change a choke tube. Leave the action open and the chamber and magazine empty.

To change the choke tube:

• Point the firearm in a safe direction.

• Engage the safety.

• Place the choke tube wrench into the choke tube.

• Turn the wrench counter clockwise to remove the choke tube.

• Screw in the new choke tube with the wrench.

• Tighten the choke tube snugly but DO NOT OVERTIGHTEN. With the action open and the chamber empty, check the choke tube occasionally to make sure the tube has not become loose.

• NOTE: NEVER fire the firearm without a choke tube installed.

15

UTS15

# *UTS-15 Owners Manual Additions*

## *Loading and Firing*

At the range after removing your UTS-15 from it's protective carton or deployment case, check to make sure the safety is in the on safe position (picture 1)



depress the bolt release button (picture 2)



16

UTS 15

and slide the action into the full rear position to
insure the chamber is empty,
then raise the upper stock (picture 3)

to visually confirm that there
are no live shells in either magazine tube
(picture 4).





17

UTS15



With the upper stock raised
you will be able to see
the serial number plate on the
left side of the receiver (picture 5).

It is a good idea to record this
serial number and place it in a safe place
in case your UTS-15 is ever lost or stolen.

After confirming that your UTS-15 is in
fact empty, check again to make sure the
safety is in the safe position, then check
that the extended choke tube, tactical
choke or barrel extension are fully screwed
in and snug (picture 6).

18

UTS15

Open the loading port doors by pressing down on the loading door release latch (7).



The shell follower should then be pushed forward with the end of you thumb until it passes the magazine shell catch (8)



19



which will hold the magazine
follower in the magazine tube,
leaving the monobloc port open
to receive shells (9).



Six 2 ¾" 12 gauge shells or five 3" shells can now be loaded into
each magazine tube; the remaining shell can then be place in the
open monobloc loading port (10).

When the loading port door is
closed the shells held in the
magazine tube will be released,
charging the full seven 2 ¾" or six
3" shells into the ready to load
position, with an audible sound of
the shells moving rearward to the
rear of the monobloc.



20



Visual inspection to confirm that the magazine is full charged can be achieved by viewing the cartridge counter indicator  the viewing ports in the side of the aluminum magazine tube (11)



Now with both magazines fully charged and the action in the full rear position the 15th shell can be placed directly in the chamber of the barrel (12).

21

UTS15



With the UTS-15 pointed down range and the magazine selector in the center position if a full 15 rounds is to be fired (13)

(the magazine selector can be moved to either the full right or full left position to block the corresponding magazine if you choose to fire from only one magazine), check that there is no one in front of the firing line and that there is a sufficient down range back stop to contain the fired projectiles.

22



With the range safe, place the butt of the UTS-15 snuggly to your shoulder (14)

slide the action to the full forward locked position, rotate the safety to the fire position and commence firing.



The action will automatically release when the shell is fired; the action should then be moved fully rearward in a positive manner to expend the spent cartridge and have a new live round loaded onto the shell loading ramp (15).

23

Sliding the action back into the full forward and locked position loads the new round and completes the loading cycle. Be sure the action is fully forward and locked before pulling the trigger. If the trigger is pulled before the action is fully forward and locked the hammer will fall, but the firing pin can not reach the shell's primer, this is a key safety feature of the UTS-15 to insure that a shell can not be fired until the action is fully closed and locked. Inexperienced shooters, in an attempt to load and fire rapidly will often pull the trigger before the gun is locked and then think that either the shell is a dud or something is wrong with the gun. To rapidly fire the UTS-15 takes practice, so go slowly at first making a conscious effort to positively pump the action fully rearward, then forward into the locked position before pulling the trigger. After repeated practice, pumping the UTS-15 can become a motor reflex, but only time and work on the range can develop this skill.



## Unloading

When you have finished firing the UTS-15 if a shell remains in either magazine, place the safety in the safe position, remove the gun from your shoulder and while keeping it pointed down range depress the bolt release button and cycle the remaining shells through the action.

24

UTS15

Once the last live shell has been ejected leave the action open, raise the upper stock and visually confirm that no shells remain in the magazines tubes, then visually confirm that no shell remains in the chamber of the barrel (16).



## *The UTS-15 is now ready for cleaning.*
## *Cleaning*

It is not necessary to fully disassemble the UTS-15 to clean it, but field stripping is advised so that proper lubrication can be applied to keep the action running smoothly.

25

UTS15



To field strip the UTS-15, leave the upper stock in the raised position, unscrew and remove the barrel retaining cap (17).

Then slide the barrel / magazine assembly forward and lift off (18).

26



With the barrel / magazine assembly removed, slide the fore-end and bolt carriage assembly forward and off (19),

while being conscious that the bolt when free of the receiver can be lifted off the bolt carriage (20).

You will now have four parts: the barrel / magazine assembly, lower stock and receiver assembly, bolt carriage / fore-end assembly and bolt. Clean the barrel with gun solvent and finish with a lightly oiled patch. The inside of the receiver can be wiped clean, but oil should not be used. For best operation a small amount of dry graphite powder provides the best lubrication. Wiping the bolt head and shank with a cloth and a drop of gun oil on the bolt head shank is all that is necessary to keep the bolt working smoothly. Further disassembly will be discussed later in this manual, but in most cases this simple cleaning and lubricating procedure is all that is necessary.

27

UTS 15

## *Field Strip Reassembly*

Place the bolt on the bolt carriage making sure it is fully down into the receiving mortises in the bolt carriage. With the upper stock raised, slide the bolt carriage into the receiver with the bolt release button depressed until the fore-end is even with the base of the barrel retaining pipe (21).

Now slide the barrel / magazine assembly into the receiver while making sure that the foot of the shell release slide is between the two bolt carriage extensions (22).

Press down firmly to make sure the barrel is fully mounted into the receiver then replace the barrel retaining cap making sure it is screwed down snuggly. Close the upper stock, slide the action into the forward and locked position, then close the ejection port door.



28   FURTHER DISSASSEMBLY OF THE UTS-15 BY THE USER IS NOT RECOMMENDED

UTS 15

## Complete disassembly

Field strip the UTS-15 (see section on field stripping).
**Bolt –** With a drift punch remove the lateral pin (23) in the lower rear of the bolt while depressing the firing pin forward to keep the firing pin spring captured when the lateral pin is removed.



Remove the firing pin and firing pin spring (24).



29



Lift out the bolt head retaining pin. Slide out the bolt head and bolt head spring (25).

Place the bolt head in a vice or similar type holding fixture and drive out the extractor retaining pin with a drift punch, being conscious of the extractor spring underneath the extractor. The bolt is now completely disassembled into its component parts.



**Receiver –** remove C clips from the receiver retaining pins and upper stock hinge pin (26).

UTS15



Remove receiver and upper stock retaining pins
with a drift punch than lift and remove upper
stock. Remove butt plate retaining pin (27) with
a drift punch and slide butt plate out of the
lower stock assembly.

Rotate receiver out of lower stock (28) and
unhinge trigger linkage from trigger.

31

UTS15



With the receiver now free of the lower stock place the receiver on a surface in such a manner that the rear gearbox retaining pin (29) can be removed with a drift punch.

The front gearbox retaining pin can now be driven from left to right with a drift punch only ¼" (30) to allow the gear box assembly to be dropped out of the bottom of the receiver while still retaining the component parts in the gearbox assembly.



32

UTS 15

The trigger linkage will fall free as the gearbox is removed (31).



The gear box can be further disassembled by removing the remaining gear box retaining pin which will free the hammer, hammer spring & plunger and bolt release (32).



33





The sear / secondary sear assembly can be removed from the gearbox housing by pushing out the sear pivot pin (33)



with a drift punch. The secondary sear can then be removed by driving out the secondary sear pivot pin (34)

while being conscious of the secondary sear spring retained underneath.

34



The loading mechanism of the receiver can now be addressed. First remove the C clips from the mousetrap spring retaining pin (35).



With the receiver held in a vice or similar holding fixture, hold the mousetrap spring down by placing a block of wood or similar material on the spring coils while the mousetrap spring retaining pin is removed with a drift punch. Remove the C clips from the mousetrap spoon pivot and forward pin (36) and remove pins from assembly.

35

UTS15



The mousetrap trigger plate and spring is held in place with a headless screw, with a similar spring bearing screw directly below (37).



Carefully remove these two screws to complete the disassembly of the receiver loading mechanisms. Unscrew the ejector spring retaining screw on the left side of the receiver (38).

36



With the ejector spring retaining screw removed
the ejector spring and pin (39)



may fall free or can be pushed out of
the receiver with a thin screw driver
or wire.  Carefully drive the ejection
port door retaining pin (40) out of
the receiver being conscious of the
ejection port door spring; this com-
pletes the disassembly of the receiver.

37



**Lower stock** – remove the safety spring retaining screw (41)



38                    from the stock and drop out the safety spring and plunger (42).

Rotate the safety a little over 90°
until the machined clearance flat
on the safety is over the trigger bar
and slide safety out of the
stock(43)



Remove the C clips from the
trigger retaining pin, push
out the pin and lift the
trigger out of the stock (43
A).



39

UTS15

If your UTS-15 is equipped with a tactical laser
/ spotlight unit the unit can be completely
removed by unplugging the wiring just forward
of the switch (44).



If the switch needs to be removed
the rotary switch (45) can be unscrewed
and the switch body pulled free.

40





**Barrel / magazine assembly** - Remove the magazine cap (46) by unscrewing the two forward caps screws

41

UTS15

being conscious that the magazine cap retains
the magazine springs.



Remove the magazine springs (47)

42



UTS15

and magazine followers (48).

Remove the three side cover screws on the right side and the two side cover screws and sling swivel screw on the left side (49) and lift off side covers.

43

UTS15

Unscrews the three top
rail screws (50)



and lift off top rail /
magazines, monobloc
subassembly (51)

44



UTS15

the three magazine supports (52) can now be lifted off the barrel.

Remove the two shell release slide screws (53)

45

UTS15

with their washers and
tensions springs and lift
off the shell release slide
(54).



This will also free the top
rail from the monobloc and
allow the magazine tubes to
be removed from the mono-
bloc as well ( 55 A).



46

UTS 15



Remove the shell stop full right or full left position.
Right behind the shell stop there is a retaining screw
which connects the monoblock to the shell stop.
First unscrew the shell stop retaining screw then
unscrew the shell stop screw. (55 B)

being conscious of the spring and
detent bearing housed in the shell
stop(56).

47

UTS 15



Remove the two screws holding the shell
gate cap (57)



and lift cap off of the monobloc being
conscious of the shell gate spring (58).

48





Slide the shell gates (59)

forward and up, removing them from
the monobloc. With a drift punch drive
out the shell catch pivot pin (60) and
remove shell catch and shell catch spring
from the monobloc. Drive the loading
port door hinge pin (61)

out of the monobloc
from front to rear with
a drift punch and lift
loading port doors free.



49



UTS 15

Remove loading port door latch
retaining screw (62)



being conscious of the loading port door
latch spring underneath. Unscrew the
interrupter retaining screw (63) from
the monoblock

50

UTS 15



and slide interrupter (64) out of monoblock.

This completes the entire disassembly of the UTS-15.

**Assembly** – The UTS-15 is simple and robust by design and does not require a skilled gunsmith for correct assembly. However, in some areas special tools and fixtures greatly contribute to the ease of assembly. Professional service personnel should contact UTAS Technical Services for the availability of special tools, fixtures and training videos.

51



*UTS-15 Pump Action Shotgun*

# Parts of the UTS-15

52

# Part Listing For Model: UTS15 Pump-action

UTS15

| VIEW | DESCRIPTION | QTY | VIEW | DESCRIPTION | QTY | VIEW | DESCRIPTION | QTY |
|---|---|---|---|---|---|---|---|---|
| 1 | FRONT MAGAZINE CAP | 1 | 53 | EXTRACTOR PIN | 1 | 105 | REAR GEAR BOX PIN | 1 |
| 2 | FRONT MAGAZINE CAP SCREWS | 2 | 54 | EXTRACTOR SPRING | 1 | 106 | BUTT PLATE | 1 |
| 3 | MAGAZINE FOLLOWER BODY LEFT & RIGHT | 2 | 55 | MAGAZINE CAP | 1 | 107 | RECOIL PAD | 1 |
| 4 | MAGAZINE FOLLOWER PLUNGER | 2 | 56 | MAGAZINE CAP SPRING | 1 | 108 | UPPER RETAINING PIN | 1 |
| 5 | MAGAZINE FOLLOWER SPRING | 2 | 57 | LOWER STOCK | 1 | 109 | UPPER STOCK | 1 |
| 6 | RIGHT MAGAZINE TUBE | 1 | 58 | TRIGGER GUARD | 1 | 110 | UPPER STOCK RETAINING PIN | 1 |
| 7 | LEFT MAGAZINE TUBE | 1 | 59 | LOWER STOCK MAGAZINE TUBE | 1 | 111 | SLING SWIVELS | 2 |
| 8 | MAGAZINE TUBE SPRING | 2 | 60 | TRIGGER | 1 | 112 | FRONT SIGHT | 1 |
| 9 | MONOBLOCK BODY | 1 | 61 | TRIGGER PIN | 1 | 113 | SIGHT PIN | 1 |
| 10 | SHELL RELEASE PLATE | 1 | 62 | SAFETY | 1 | 114 | FRONT SIGHT CLAMP | 1 |
| 11 | SHELL RELEASE PLATE SCREW | 2 | 63 | SAFETY BALL 3 MM | 1 | 115 | FRONT SIGHT CLAMP SCREW | 2 |
| 12 | RIGHT SHELL RELEASE GATE | 1 | 64 | SAFETY SPRING | 1 | 116 | SET SCREW | 1 |
| 13 | LEFT SHELL RELEASE GATE | 1 | 65 | PISTOL GRIP | 1 | 117 | REAR SIGHT | 1 |
| 14 | SHELL RELEASE GATE SPRING | 1 | 66 | PISTOL GRIP SCREW | 1 | 118 | REAR SIGHT SPRING | 1 |
| 15 | SHELL FEED GATE CAP | 1 | 67 | TRIGGER GUARD SCREW | 2 | 119 | REAR SIGHT APERTURE | 1 |
| 16 | SHELL FEED GATE SCREW | 2 | 68 | GEAR BOX BODY | 1 | 120 | WINDAGE SCREW | 1 |
| 17 | INTERRUPTER | 1 | 69 | HAMMER | 1 | 121 | WINDAGE ADJUSTMENT KNOB | 1 |
| 18 | INTERRUPTER SCREW | 1 | 70 | BOLT RELEASE | 1 | 122 | WINDAGE KNOB PIN | 1 |
| 19 | SHELL STOP | 1 | 71 | HAMMER/BOLT RELEASE PIN | 1 | 123 | REAR SIGHT CLAMP SCREW | 2 |
| 20 | SHELL STOP SCREW | 1 | 72 | BOLT RELEASE SPRING | 1 | 124 | REAR SIGHT CLAMP | 1 |
| 21 | SHELL STOP SPRING | 1 | 73 | HAMMER SPRING | 1 | 125 | 7,5" BARREL EXTENSION | 1 |
| 22 | SHELL STOP BALL 4 MM | 1 | 74 | HAMMER SPRING PLUNGER | 1 | 126 | TAKE DOWN TOOL | 1 |
| 23 | RIGHT LOADING PORT DOOR | 1 | 75 | SEAR | 1 | 127 | WINDAGE ADJUSTMENT KNOP SPRING | 1 |
| 24 | LEFT LOADING PORT DOOR | 1 | 76 | SECONDARY SEAR | 1 | 128 | WINDAGE ADJUSTMENT KNOP BALL, 3MM | 1 |
| 25 | LOADING PORT HINGE PIN | 2 | 77 | SEAR PIN | 1 | 129 | LASER / FLASHLIGHT UNIT | 1 |
| 26 | TOP RAIL | 1 | 78 | SECONDARY SEAR PIN | 1 | 130 | FLASHLIGHT LENS | 1 |
| 27 | LOADING PORT DOOR SCREW | 4 | 79 | SECONDARY SEAR RETAINING PIN | 1 | 131 | C CLIPS (3 MM) | 2 |
| 28 | TOP RAIL SCREW | 3 | 80 | SECONDARY SEAR SPRING | 1 | 132 | C CLIPS (4 MM) | 6 |
| 29 | FRONT MAGAZINE SUPPORT | 1 | 81 | TRIGGER LINKAGE | 1 | 133 | C CLIPS (5 MM) | 4 |
| 30 | MIDDLE & REAR MAGAZINE SUPPORT | 2 | 82 | HAMMER SPRING HOUSING | 1 | 134 | O-RING | 1 |
| 31 | RIGHT SIDE COVER | 1 | 83 | TRIGGER LINKAGE SPRING | 1 | 135 | SAFETY SCREW | 1 |
| 32 | LEFT SIDE COVER | 1 | 84 | RECEIVER | 1 | 136 | LEFT &RIGHT MAGAZINE TUBE RIVETS | 4 |
| 33 | SIDE COVER SCREW | 5 | 85 | RECEIVER PLATE | 1 | 137 | SHELL RELEASE PLATE SPRING | 2 |
| 34 | SIDE COVER SCREW WITH HOLE | 1 | 86 | EJECTION PORT DOOR | 1 | 138 | SHELL RELEASE PLATE SCREW FLAT WASHER | 2 |
| 35 | BARREL | 1 | 87 | EJECTION PORT DOOR MAGNET | 1 | 139 | PISTOL GRIP SCREW SERRATED WASHER | 1 |
| 36 | BARREL EXTENSION | 1 | 88 | EJECTION PORT DOOR SPRING | 1 | 140 | TRIGGER GUARD SCREW SERRATED WASHER | 2 |
| 37 | EXTENDED CHOKE TUBE | 1 | 89 | EJECTION PORT HINGE PIN | 1 | 141 | MONOBLOCK BODY EXTRACTOR | 2 |
| 38 | BARREL HANGER | 1 | 90 | MOUSE TRAP PIN | 1 | 142 | MONOBLOCK BODY EXTRACTOR SPRING | 2 |
| 39 | BARREL STUDS | 3 | 91 | MOUSE TRAP SPOON | 1 | 143 | MONOBLOCK BODY EXTRACTOR PIN | 2 |
| 40 | FORE-END | 1 | 92 | MOUSE TRAP FORWARD PIN | 1 | 144 | LOADING PORT DOOR LOCK SLIDE | 2 |
| 41 | FORE-END SCREW | 4 | 93 | MOUSE TRAP SPRING | 1 | 145 | LOADING PORT DOOR LOCK SLIDE SPRING | 2 |
| 42 | BOLT CARRIAGE | 1 | 94 | MOUSE TRAP SPRING RETAINING PIN | 1 | 146 | LOADING PORT DOOR LOCK SLIDE SCREW | 2 |
| 43 | BOLT BODY | 1 | 95 | MOUSE TRAP TRIGGER PLATE | 1 | 148 | EXTENDED CHOKE TUBE CYLINDER SHORT | 1 |
| 44 | BOLT HEAD | 1 | 96 | MOUSE TRAP TRIGGER PLATE PIN | 1 | 149 | LASER / FLASHLIGHT SWITCH COVER | 1 |
| 45 | FIRING PIN | 1 | 97 | MOUSE TRAP TRIGGER PLATE LOWER PIN | 1 | 150 | LOWER RECEIVER MAGAZINE TUBE LASER CAP | 1 |
| 46 | FIRING PIN SPRING | 1 | 98 | MOUSE TRAP TRIGGER PLATE SPRING | 1 | 151 | MAGAZINE CAP PIN | 1 |
| 47 | BOLT HEAD SPRING | 1 | 99 | EJECTOR PIN | 1 | 154 | RED FLASHLIGHT UNIT | 1 |
| 48 | BOLT HEAD PIN | 1 | 100 | EJECTION PORT MAGNET HOUSING | 1 | 155 | GREEN FLASHLIGHT UNIT | 1 |
| 49 | FIRING PIN RETAINING PIN | 1 | 101 | EJECTION SPRING RETAINING SCREW | 1 | 163 | SHELL STOP RETAINING SCREW | 1 |
| 50 | BOLT WHEEL | 1 | 102 | EJECTOR SPRING | 1 | 164 | LASER / FLASHLIGHT SWITCH HOLE PLUG | 2 |
| 51 | BOLT WHEEL SCREW | 1 | 103 | RECEIVER RETAINING PINS | 1 | 165 | LASER / FLASHLIGHT TRIPLE SWITCH COVER | 1 |
| 52 | EXTRACTOR | 1 | 104 | MIDDLE RECEIVER RETAINING PIN | 2 | | | |

53

54

UTS 15

55

UTS15



56



1505 Cox Road
Cocoa FL 32926
Phone: 1-800-515-9983
Fax: 321-631-1169

WWW.KELTECWEAPONS.COM

SAFETY, INSTRUCTION and PAR

⚠ Warning: Read this manual caref

## TABLE OF CONTENTS

| | | |
|---|---|---|
| A. | Safety Information and Warnings | 2 |
| B. | Overview | 5 |
| | Description | 5 |
| | Nomenclature | 5 |
| | Specifications | 5 |
| | Ammunition | 6 |
| | Sling Mounting | 6 |
| C. | Operating Instructions | 7 |
| | Safety | 7 |
| | Loading Magazines | 7 |
| | Chambering from Magazine | 8 |
| | Manual Chamber Loading | 8 |
| | Firing | 8 |
| | Unloading | 10 |
| D. | Disassembly | 10 |
| | Removal of Grip Assembly | 13 |
| | Removal of the Stock | 14 |
| | Separation of the Barrel and Receiver Assemblies | 15 |
| E. | Assembly | 16 |
| | Joining of the Barrel and Receiver Assemblies | 16 |
| | Insertion of the Bolt | 18 |
| | Insertion of the Stock | 19 |
| | Attaching the Grip Assembly | 19 |
| F. | Cleaning and Maintenance | 20 |
| | Maintenance | 20 |
| | Lubrication | 20 |
| | Troubleshooting | 21 |
| G. | Exploded View and Parts List | 11 |
| H. | Service, Repair and Limited Lifetime Warranty | 22 |

REV 042814

## A.   SAFETY INFORMATION AND WARNINGS

**STATEMENT OF LIABILITY**
This firearm may be classified as a dangerous weapon and is surrendered by KEL-TEC
CNC INDUSTRIES INC. with the understanding that the purchaser assumes all liability
resulting from unsafe handling or any action that constitutes a violation of any applicable
laws or regulations. Firearms can cause serious injury and death. **Safety must be the
prime consideration of anyone who handles firearms. Always treat a firearm as
though it were loaded. Always keep the muzzle pointed in a safe direction.** In owning
a firearm, you are responsible for the firearm's safety and security. **Always secure
firearms from children.**

   **READ THESE INSTRUCTIONS AND WARNINGS CAREFULLY, BE SURE YOU
UNDERSTAND THESE INSTRUCTIONS AND WARNINGS BEFORE USING THIS
FIREARM.**

This SAFETY, INSTRUCTION & PARTS MANUAL should always accompany this firearm
and be transferred with it upon change of ownership or when the firearm is loaned or
presented to another person. A copy of the SAFETY, INSTRUCTION & PARTS MANUAL
is available FREE upon request and can also be downloaded from the internet at:
http://www.keltecweapons.com

**READ AND CAREFULLY FOLLOW THESE WARNINGS AND INSTRUCTIONS**
These warnings and instructions are provided to assure the safe functioning of the firearm.
Failure to heed these instructions may result in improper functioning and serious injury.

Kel-Tec firearms are designed to function reliably with proper care and knowledgeable
use. Do not use your firearm unless you fully understand these instructions, and the safe
operation of your firearm.

Only safe gun-handling habits will ensure the safe use of your firearm. This is your
responsibility. Accidents are the result of violating the rules of safe gun handling noted
below and common sense.

Before handling a firearm, understand its operation.

Never accept or pick up a firearm without checking the magazine and the chamber to
assure the weapon is empty. Do not trust the extractor to clear the chamber; always look
and feel.

Always make sure the **muzzle is pointed in a safe direction at all times.** Never point a
firearm at anyone or anything you do not intend to shoot.

Ensure the barrel is free of obstructions prior to firing. Open the action and clear the firearm
of all ammunition before checking the barrel of the **unloaded** firearm.

Keep your firearm unloaded when not in use. Never keep a loaded firearm in the home or
vehicle. Never store a firearm with a cartridge in the chamber. Never store firearms and
ammunition together, keep them locked up and away from children.

Never touch the trigger when working the action.

Never alter any components of your firearm.

2

Never take medications, drugs, or alcohol when handling firearms.

Never load or unload a firearm without assuring the muzzle is pointed in a safe direction.

Never load a firearm except immediately before shooting.

## SAFE GUN HANDLING IS YOUR RESPONSIBILITY

 Discharging firearms in poorly ventilated areas, cleaning firearms, or handling ammunition may result in exposure to lead and other substances known to cause birth defects, reproductive harm, and other serious physical injury. Have adequate ventilation at all times. Wash hands thoroughly after exposure.

**Never discharge a firearm without proper shooting glasses and ear protection.** Never shoot at any water surface or any surface where a ricochet can occur.

Never shoot until you are sure of your backstop and what lies beyond it.

If the gun does not discharge after pulling the trigger, do not change the weapon's direction for at least 30 seconds; the weapon could be having a "hang fire", and the cartridge could go off when you do not expect it. After waiting 30 seconds, remove the magazine and remove the unfired case, while keeping the firearm pointed in a safe direction.

Always be aware of other people so that they cannot accidentally walk into the line of fire. When firing on a target range, be alert and follow the range officer's commands. Never cross obstacles such as fences or streams with a loaded firearm.

**Do not allow a firearm to be used by individuals who do not understand its safe operation and the rules of safe gun handling.**

 **WARNING: After firing several rounds, the exterior metal parts of the firearm get VERY hot and can cause severe burns if touched.**

Be sure all accessories are compatible with the firearm and that the accessories do not interfere with safe operation of the firearm.

When transporting your firearm, be sure your firearm is unloaded and on SAFE.

This weapon passes Industry Standards for drop-test safety; this does not guarantee the weapon may not accidently discharge upon being dropped while loaded.

If you do not understand how to operate any of our products or have any questions about their safe handling, please write, call, or email us at:

**KEL-TEC CNC INDUSTRIES INC**
1505 Cox Road
Cocoa, FL 32926
**Telephone Number:** 321-631-0068
**Toll free:** 1-800-515-9983
**Hours:** M-F 9am-3pm EST (excluding holidays)
**Website:** http://www.keltecweapons.com
**Email:** customerservice@kel-tec-cnc.com

3

## B.   OVERVIEW

### Description

The KSG™ is a dual-magazine select-feed 12-gauge pump action shotgun. The bullpup dual-magazine select-feed design provides the operator with a more compact layout, increased total capacity, and the option to rapidly switch between two magazines of ammunition.

The KSG™ features positive extraction and ejection, allowing it to be reliably fired in any shooting orientation. Loading and ejection are combined into a single port rearward of the grip assembly under the shotgun, enabling the KSG™ to be fired from both the dominant and non-dominant side.

Two integral MIL-STD-1913 Picatinny rails, located above the barrel and on the forend, come standard with the KSG™ for mounting accessories. Unloaded, the KSG™ maintains a center of gravity over the grip assembly to facilitate ease of handling.

### Nomenclature



**Figure B-1: Side-View**

### Specifications

| Design Features | |
| --- | --- |
| Operating System | Pump Action |
| Gauge | 12 |
| Capacity | 6+6+1 dual magazines, 3" shells |
| Chamber | 12-gauge 3.00" (76 mm) |
| Barrel Length | 18.50" (470 mm) |
| Length of Pull | 13.0" (330 mm) |
| Forend Travel | 4.1" (104 mm) |
| Accessory Mount | MIL-STD-1913 Picatinny Rail |

| Dimensions and Weight | |
| --- | --- |
| Total Length | 26.1" (664mm) |
| Total Width | 2.2" (56 mm) |
| Total Height | 8.0" (204 mm) |
| Width of Grip | 1.2" (30 mm) |
| Width of Forend | 2.1" (54 mm) |
| Width of Stock | 2.1" (54 mm) |
| Weight | 6.9 lbs (3.1 kg) |

4

## Ammunition

The KSG™ is chambered for 12-gauge 3" shells and may safely fire both lead and steel shot. Shells 2-3/4" and shorter are also safe to fire, but anything shorter than 2-3/4" should be thoroughly tested for reliable feeding and ejection. For reference, the chamber gauge and length is indicated on the grip of the shotgun.

 **WARNING: ALWAYS USE SHELLS OF THE CORRECT GAUGE AND LENGTH OR SHORTER. DO NOT USE NON-STANDARD AMMUNITION OR SHELLS WITH PRESSURES EXCEEDING SAAMI STANDARDS. FAILURE TO FOLLOW THIS WARNING MAY RESULT IN SERIOUS INJURY OR DEATH AND DAMAGE TO YOUR FIREARM.**

Only use commercially available US-manufactured ammunition that meets SAAMI established standards. Inspect your ammunition to make sure it is clean, dry, and in good condition. Never use non-standard, reloaded or damaged shells. Any other ammunition is considered non-standard and its use may void the warranty on this firearm.

Kel-Tec™ firearms are manufactured from high quality materials. They will provide a lifetime of service if properly maintained. However, all warranties, expressed or implied, are voided and Kel-Tec will not be liable for property damage or personal injury and consequential damages, if faulty, non-standard, or reloaded ammunition is used in any Kel-Tec™ firearm.

## Sling Mounting

The KSG™ comes equipped with forward attachment points on the left and right sides of the barrel assembly as well as a single rear attachment slot in the stock.



**Figure B-2: KSG™ Equipped with Kel-Tec™ Sling**

The different sling attachment points on the KSG™ should be used to mount the included 1¼" wide nylon sling but will also accommodate aftermarket slings of the same width.

5

## C.   OPERATING INSTRUCTIONS

**Safety**

The KSG™ features a cross-bolt safety located behind the trigger on the grip assembly. When the safety is activated, the cross-bolt blocks the sear from releasing and prevents the trigger from being pulled. Please note that the safety will not engage unless the hammer is cocked.

For right-handed users, the safety is generally pressed with the right thumb until a noticeable "click" is heard and the red letter "F" is visible on the safety. The safety is color coded and labeled to enhance visibility and hasten safety assessment.




White "S" for SAFE                              Red "F" for FIRE

 **WARNING: NEVER TOTALLY RELY ON YOUR MECHANICAL SAFETY AS IT CAN FAIL OR UNINTENTIONALLY BE DISENGAGED. YOUR MECHANICAL SAFETY IS NOT A SUBSTITUTE FOR SAFE GUN HANDLING PRACTICES.**

**Loading Magazines**

1.   Ensure your muzzle is pointed in a safe direction before loading.
2.   Engage the safety by ensuring the white "S" is visible.
3.   Ensure the forend is locked forward and not in the rearmost position.
4.   Place magazine selector to the positions shown in *Figure C-1* depending on desired loading configuration. The magazine selector indicates which magazine is selected for loading by "pointing" to the active magazine. For example: if the magazine selector is pointing left, the left magazine is available for loading. The magazine selector may also be placed in the middle position, which blocks both magazine tubes from loading and feeding.





**Figure C-1: Magazine Selector Orientations**

5.   With thumb on the base of the round, insert the round into the loading/ejection port and slide the round into the magazine using your thumb as shown in *Figure C-2*.

6



**Figure C-2: Loading a Shell into the Magazine Tube**

**Chambering from Magazine**

1. Ensure the magazine selector is oriented to feed from the desired magazine tube.
2. Press down on the action bar lock and maintain downward pressure to unlock forend.
3. Cycle the forend fully rearward and then fully forward to chamber a round.

**CAUTION: DO NOT HOLD THE FOREND BEHIND THE PICATINNY RAIL. DOING SO WILL SHORT STROKE THE ACTION AND PINCH YOUR HAND.**

 **Manual Chamber Loading**

The procedure for loading a shell directly into the chamber of the KSG™ is different than most other shotguns because of the combined loading and ejection port. To load a shell into the chamber of the  KSG™, use the following procedure as a guideline.

1. Ensure your muzzle is pointed in a safe direction before loading.
2. Engage the safety by ensuring the white "S" is visible.
3. Press down the action bar lock to unlock forend.
4. Slide the forend so that it is about a 1/2" from the rearmost position to prevent the lifters from elevating and blocking access to the chamber.
5. Place shell in chamber and slide the forend forward to chamber inserted shell.

**Firing**

1. Load a shell into the chamber of the KSG™ manually or from the magazine.
2. Aim at the target, taking notice of the target's backdrop.
3. Disengage the safety, taking notice of the red letter "F" that is visible on the safety.
4. Place trigger finger into trigger guard.
5. When the trigger is pressed, the KSG™ will fire. Cycle the forend to eject the empty case and feed a new round, if a loaded magazine tube is selected.

**Unloading**

1. Ensure your muzzle is pointed in a safe direction before unloading.
2. Ensure the forend is locked in the forward position.
3. Engage the safety by ensuring the white "S" is visible.
4. Press magazine selector to one side (either side).
5. Rotate the KSG-331-CTG OUT down to release one or more shells in the selected magazine tube.  NOTE: Shells will eject with some force from the magazine tube.
6. Magazine is empty when the white magazine follower is visible from the ejection port, as shown previously in *Figure C-1.*
7. Switch the magazine selector to select the other magazine tube for unloading.
8. Repeat steps 5-6.
9. With the forend in its rearmost position, always visually and tactually check the chamber to confirm the firearm is unloaded.

7

## D.  DISASSEMBLY

For regular maintenance of the KSG™, it will be necessary that you become familiar with its disassembly. The following sections should be followed in sequential order and continued as needed depending on desired maintenance.



**Figure D-1: KSG™ General Disassembly**

 **WARNING: ALWAYS ENSURE THE KSG™ IS CLEAR OF ALL AMMUNITION BEFORE ATTEMPTING DISASSEMBLY. IF THE KSG™ HAS BEEN FIRED, WAIT A SUFFICIENT AMOUNT OF TIME FOR THE COMPONENTS TO COOL BEFORE ATTEMPTING DISASSEMBLY.**

**Removal of Grip Assembly**

1. Place magazine selector to the center position.
2. Engage the safety by ensuring the white "S" is visible.
3. Remove the rear assembly pins adjacent to the ejection port located on the grip assembly and place them in the assembly pin retaining holes as shown in *Figure D-2*.

 

**Figure D-2: Place Rear Assembly Pins in Retaining Holes**

4. Remove the grip assembly by lifting the rear of the assembly directly upwards as shown in *Figure D-3*.

8



**Figure D-3: Lift Grip Assembly Directly Upwards**

**Removal of the Stock**

1.  Grip the stock as shown in *Figure D-4* and pull rearward to remove.



**Figure D-4: Pull Stock Rearward**

2.  Move the forend to its rearmost position to gain access to the bolt. The bolt should now be resting in the receiver of the KSG™ and can be easily removed by reaching in and lifting out the bolt as shown in *Figure D-5*.



**Figure D-5: Remove Bolt from Receiver**

9

# Kel-Tec KSG

| | | |
|---|---|---|
| 118 | BARREL | 1 |
| 135 | BARREL EXTENSION | 1 |
| 136 | BARREL NUT | 1 |
| 137 | BARREL RING | 3 |
| 138 | SIGHT BASE | 1 |
| 139 | PUMP BUFFER | 1 |
| 140 | MUZZLE PLATE | 1 |
| 141 | M3-20 SOCKET HEAD | 1 |
| 142 | PICATINNY | 1 |
| 146 | MAG BOLT | 2 |
| 148 | WAVY WASHER | 2 |
| 154 | MAG BOLT RETAINER CLIP | 1 |
| 170 | BOLT | 1 |
| 172 | EXTRACTOR | 1 |
| 173 | HEAT SHIELD | 1 |
| 174 | BOLT LOCK | 1 |
| 175 | FIRING PIN PIN | 1 |
| 176 | FIRING PIN | 1 |
| 177 | EXTRACTOR AXIS | 1 |
| 178 | EXTRACTOR SPRING | 1 |
| 179 | BOLT LOCK PIN | 1 |
| 185 | BOLT CARRIER | 1 |
| 209 | FRAME PIN | 2 |
| 210 | M3-10 SOCKET HEAD | 1 |
| 211 | M3-16 SOCKET HEAD | 17 |
| 212 | M3 NUT | 19 |
| 214 | GRIP RIGHT | 1 |
| 215 | GRIP LEFT | 1 |
| 216 | TRIGGER | 1 |
| 218 | FOREND RIGHT | 1 |
| 219 | FOREND LEFT | 1 |
| 220 | HAMMER | 1 |

| | | |
|---|---|---|
| 221 | HAMMER BAR | 2 |
| 223 | ACTION LOCK | 1 |
| 224 | SEAR BAR | 1 |
| 225 | SEAR | 1 |
| 226R | HAMMER BAR PIN | 2 |
| 227 | SEAR CATCH | 1 |
| 228 | MAG STOP ACTUATOR | 1 |
| 230 | M4-6 BUTTON HEAD | 4 |
| 232 | M4-12 BUTTON HEAD | 2 |
| 234 | HAMMER SPRING | 2 |
| 236 | M3-25 SOCKET HEAD | 1 |
| 237 | M3-35 SOCKET HEAD | 1 |
| 238 | SAFETY | 1 |
| 240 | SAFETY SNAP | 1 |
| 241 | ACTION BAR SPRING | 1 |

| | | |
|---|---|---|
| 242 | TRIGGER SPRING | 1 |
| 243 | SEAR SPRING | 1 |
| 244 | SEAR SPRING GUIDE | 1 |
| 249 | CAPTOR SPRING | 2 |



**NOTE:**
Exploded view of weapon is for reference only.
Design is subject to change without notice.

**Separation of the Barrel and Receiver Assemblies**

The barrel assembly is secured to the receiver assembly via two slotted magazine bolts located on the front of the KSG™. To remove these assemblies, the magazine bolts must be unscrewed using an object with a flat edge such as a quarter or the rim of a spent shell casing.

1.  Using your tool of choice, unscrew the magazine bolts at the same rate alternating between the two bolts a half-turn at a time. This procedure is illustrated in *Figure D-6*.

  

**Figure D-6: Unscrew Magazine Bolts with Alternating 1/2 Turns**

2.  The KSG-334-CTG Stop Actuator must be pressed down for clearance as the barrel and receiver assemblies are separated, as shown in *Figures D-7 & D-8*.

  

**Figure D-7: Press down CTG Stop Actuator and Slide Forend Away**

3.  With the KSG™ upside-down, simultaneously pull the barrel assembly and receiver assembly linearly apart as shown in *Figure D-9*.



**Figure D-9: Pull Barrel Assembly Apart from Receiver Assembly**

CAUTION:   FURTHER DISASSEMBLY SHOULD ONLY BE PERFORMED BY A CERTIFIED GUNSMITH OR KEL-TEC CNC INC. ATTEMPTING FURTHER DISASSEMBLY COULD VOID YOUR WARRANTY.

### E.   ASSEMBLY

**Joining of the Barrel and Receiver Assemblies**

1.   Ensure the bolt carrier is properly placed into the forend as shown in *Figure E-1*.



**Figure E-1: Ensure Bolt Carrier is Locked into Forend**

2.   Orient the barrel and receiver assemblies as shown in *Figure E-2* and push the two units together, ensuring the magazine bolt screw threads seat into the magazine plug screw threads.



**Figure E-2: Join Barrel Assembly to Receiver Assembly**

3.   When joining the Barrel and Receiver Assemblies, the CTG Stop Actuator may need to be pressed down for clearance under the Mag Stop Actuator. This process is illustrated in *Figure E-3*.

13




**Figure E-3: Slide Forend over CTG Stop Actuator to Secure Assemblies**

4.  Using your tool of choice, screw the magazine bolts into the magazine plugs at the same rate, alternating between the two bolts a half-turn at a time until both bolts firmly resist further tightening. This must be done because the bolts screw into the same piece and will prematurely bind if one bolt is tightened faster than the other.

5.  To ensure the two assemblies are properly joined, visually check that no gap exists between the barrel extension and receiver, as shown in *Figure E-4*. Additionally, attempt to pull the barrel and receiver assemblies apart and press them together, checking for any travel. If there is any travel or gap present, the magazine bolts are not fully tightened and steps 1-2 should be repeated.





Incorrect: Gap Present          Correct: No Gap Present

**Figure E-4: Ensure No Gap Exists Between Assemblies**

14

**Insertion of the Bolt**

1.  Cycle the forend completely rearward before attempting to insert the bolt.

2.  Insert the bolt onto the bolt carrier as shown in *Figure E-5*, first inserting the bolt on its side before rotating 90° to its upright position. The rear lip of the bolt should easily fit into the square cutout of the bolt carrier.



**Figure E-5: Insert Bolt onto Bolt Carrier Sideways and Rotate 90°**

3.  Ensure the bolt is in the proper position by pushing the bolt completely forward. You can confirm this by checking to see if there is a gap between the mating surfaces shown in *Figure E-6*, which is composed of the bolt lip and bolt carrier cutout.

4.  Move the forend completely forward to lock the bolt into place. You should hear a definitive "click" indicating the bolt is properly locking with the barrel extension.



**Figure E-6: Push Bolt Fully Forward on Bolt Carrier**

15

**Insertion of the Stock**

1. Ensure the forend is completely forward before attempting to insert the stock.
2. Insert the stock as shown in *Figure E-7* and ensure the lifter axes are in place. It may be helpful to lift up on the firing pin during assembly.




**Figure E-7: Lift Firing Pin while Inserting Stock**

**Attaching the Grip Assembly**

1. Place magazine selector to the center position.
2. Engage the safety by ensuring the white "S" is visible.
3. As shown in *Figure E-8*, ensure the forward part of the grip assembly is inserted under the grip catch and rotate the grip down.




**Figure E-8: Move Forend Rearward and Insert Grip Assembly**

5. Remove the assembly pins from their pin retaining holes and insert them into the assembly pin holes located on the grip assembly.
6. After the KSG™ is fully assembled, check the firearm for proper functioning by pressing down the action bar lock and cycling the action.

**F.   CLEANING AND MAINTENANCE**

**Maintenance**

Your KSG™ is a precision instrument and will provide a lifetime of faithful service if it is properly cleaned and maintained. It is recommended that you clean your KSG™ after every shooting session or more frequently if needed. Be sure to unload your KSG™ *(see Unloading on pg. 8)* before performing any cleaning or maintenance procedures.

CAUTION:   NEVER USE AUTOMOTIVE BRAKE CLEANER OR ANY SOLVENT NOT DESIGNED FOR POLYMER FIREARMS. DOING SO MAY DAMAGE THE FIREARM AND VOID YOUR WARRANTY.

1.   Disassemble the KSG™ *(see Disassembly on pg. 9)*.
2.   Thoroughly clean all exterior sides of the bolt and receiver with solvent and brush.
3.   Brush the barrel bore and chamber with a good powder removing solvent and bore brush. Wipe the areas clean with patches or a swab.
4.   Using a small brush dipped in solvent, remove all deposits from around the breech of the barrel and barrel extension, as well as all adjacent areas that have been subjected to powder or primer residue.
5.   Clean the magazine tubes with solvent and brush if needed.

**Lubrication**

After cleaning the entire gun, use a cloth to apply a light coating of high quality gun oil to all internal and exterior metal surfaces and wipe clean.

Manually cycle the action back and forth to check the function of the firearm. If any parts are damaged or badly worn or the firearm does not work correctly, the firearm should not be fired and should be returned to Kel-Tec for servicing immediately.

 WARNING: DISCHARGING A FIREARM WITH OIL, GREASE, OR ANY OTHER MATERIAL EVEN PARTIALLY OBSTRUCTING THE BORE COULD RESULT IN SERIOUS INJURY OR DEATH AND SERIOUS DAMAGE TO YOUR FIREARM.

**Troubleshooting**

Proper functioning of your firearm is directly related to proper maintenance and care as well as the quality of ammunition you use. If in the unlikely circumstance your KSG™ malfunctions, we have included a list of several suggested remedies below.

| | |
|---|---|
| If the KSG™ Fails to Fire: | You may be experiencing a misfire and should point the barrel of the KSG™ in a safe direction, engage the safety by ensuring the white "S" is visible, and wait at least 30 seconds before fully cycling the action and ejecting the round. |
| | Otherwise, ensure the action is fully forward. The KSG™ is designed to prohibit firing out of battery to protect the user. |
| Double Feed: | A double feed may occur if there is a failure to extract. Engage the KSG™'s safety and place the magazine selector to the middle non-feed position. |
| | Rotate the KSG™ to expose the ejection port and visually examine the malfunction. Depending on the orientation of the rounds, it is usually easiest to push the double-fed shell back into the magazine and cycle the action to clear the shell. |
| | Otherwise, you must manually reach into the ejection port and remove the interfering shell by rotating it around the lifters as shown below. |



**Figure F-1: Clear Double Feed by Rotating Shell Around Lifters**

| | |
|---|---|
| Magazine Selector Jammed: | The magazine selector will bind if a round is not fully loaded into the magazine tubes. Ensure all shells are completely loaded into the magazines. |

## H.   SERVICE, REPAIR, AND WARRANTY

This warranty is granted by Kel-Tec CNC Industries, Inc. P.O. Box 236009, Cocoa, FL 32923. This lifetime warranty is effective from the date of purchase and applies to the original owner of a Kel-Tec™ firearm.

Kel-Tec™ firearms are warranted to be free from defects in material and workmanship. Any such defects of which Kel-Tec receives written notice by the original owner, will be remedied by Kel-Tec without charge within a reasonable time after such notification and delivery of the product as provided below.

If your Kel-Tec™ firearm should ever require service or repair please perform the following to ensure fast and reliable service:

1) Include a copy of a bill of sale in the owner's name or a copy of ATF Form 4473 indicating date of purchase.
2) Include a written copy of the model and serial number of the firearm and a description of the difficulty experienced and service desired.
3) Include your name, desired return address, and a number where we can reach you.
4) Also include a written list of any accessories in your shipment – Kel-Tec will not be responsible for any item that was not listed and confirmed by Kel-Tec.
5) Be sure the firearm is completely unloaded and the shipping container is free of ammunition. It is against postal and commercial regulations to ship ammunition.
6) Securely package your Kel-Tec™ firearm and ship (transportation charges pre-paid) to:

> Kel-Tec CNC, Inc
> Service Department
> 1505 Cox Road
> Cocoa, FL 32926

It is recommended that shipments be insured by the owner, since Kel-Tec will accept no responsibility for loss or damage in transit.

Transportation and insurance charges for return to owner will be paid by Kel-Tec if the claim is covered by the warranty.

Under no circumstances shall Kel-Tec be responsible for incidental or consequential damages with respect to economic loss or injury or property damage, whether as a result of breach of express or implied warranty, negligence or otherwise. Some States do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.

Kel-Tec will not be responsible for defects resulting from careless handling, unauthorized or unsafe adjustments or modifications, non-standard, defective, or improper ammunition, corrosion, neglect, fire damage, water damage, theft, abuse, ordinary wear and tear, or unreasonable use.



OWNER'S MANUAL

# TABLE OF CONTENTS

**A. Safety Information and Warnings**.................................................. 3

**B. Overview**
Description ............................................................................... 6
Nomenclature ......................................................................... 6
Ammunition ............................................................................ 7
Sling Mounting........................................................................ 7

**C. Operating Instructions**
Safety....................................................................................... 8
Loading Magazines................................................................. 8
Chambering from Magazine.................................................... 9
Manual Chamber Loading....................................................... 9
Firing....................................................................................... 10
Unloading................................................................................ 10

**D. Disassembly**
Loosen Stock Recoil Assembly................................................11
Removal of Grip Assembly.................................................…… 12
Removal of the Bolts............................................................... 13

**E. Assembly**
Insertion of the Bolt................................................................ 15
Lower Grip Attachment ……………….............……………………… 16

**F. Choke Tubes**
Removal and Installation of choke tubes ............................... 17

**G. Cleaning and Maintenance**
Maintenance ........................................................................... 18
Lubrication .............................................................................. 18

**H. Troubleshooting**
Troubleshooting ..................................................................... 19

**I. Service, Repair and Warranty**.................................................20
Parts Schematic ......................................................................22

2       **DO NOT PUT HAND IN FRONT OF MUZZLE**

### A. SAFETY INFORMATION AND WARNINGS
### STATEMENT OF LIABILITY

This firearm may be classified as a dangerous weapon and is surrendered by
Standard Mfg. with the understanding that the purchaser assumes all liability
resulting from unsafe handling or any action that constitutes a violation of any
applicable laws or regulations. Firearms can cause serious injury and death.
Safety must be the prime consideration of anyone who handles firearms.

**READ THESE INSTRUCTIONS AND WARNINGS CAREFULLY, BE
SURE YOU UNDERSTAND THESE INSTRUCTIONS AND WARNINGS
BEFORE USING THIS FIREARM.**

**DO NOT PUT HAND IN FRONT OF MUZZLE.**

This manual should always accompany this firearm and be transferred with it
upon change of ownership or when the firearm is loaned or presented to another
person. A copy of the MANUAL is available FREE upon request and can also be
downloaded from the internet at: http://www.standardmfgllc.com.

Each DP-12 also has a QR
code that can be scanned
with a smart phone to bring
you to an on-line copy of the
manual.



**ALWAYS LEAVE GUN IN OPEN BOLT POSITION**          3

## READ AND CAREFULLY FOLLOW THESE WARNINGS AND INSTRUCTIONS

This Instruction Manual is designed to assist you in learning how to use and care for your **DP-12** properly. Please contact us if you have any questions about it. Failure to follow these instructions may result in improper functioning and serious injury or death.

Only when you are certain you fully understand the Manual and can properly carry out its instructions should you practice loading, etc. with live ammunition. If you have any doubts about your ability to handle or use a particular type of gun safely, then you should seek supervised instruction. Such personalized instruction is often available from gun dealers, gun clubs or police departments. If none of these sources can help you, write to the National Rifle Association, 11250 Waples Mill Road, Fairfax, VA 22030-7400. They will assist you.

The person possessing a gun has a full-time job. You cannot guess; you cannot forget. You must know how to use your firearm safely. Do not use any firearm without having a complete understanding of its particular characteristics and safe use.

Remember: There is no such thing as a foolproof gun.

- Only safe gun-handling habits will ensure the safe use of your firearm. This is your responsibility. Accidents are the result of violating the rules of safe gun handling noted below and common sense.
- Before handling a firearm, understand its operation.
- Never accept or pick up a firearm without checking the magazine and the chambers to assure the weapon is empty. Do not trust the extractor to clear the chambers, always look and feel to insure both chambers are empty.
- Always make sure the muzzle is pointed in a safe direction at all times.
- Never point a firearm at anyone or anything you do not intend to shoot.
- Ensure the barrel is free of obstructions prior to firing. Open the action and clear the firearm of all ammunition before checking the barrel of the unloaded firearm.
- Keep your firearm unloaded when not in use. Never keep a loaded firearm in the home or vehicle. Never store a firearm with a cartridge in the chamber.
- Never store firearms and ammunition together, keep them locked up and away from children. Use locking accessories for prevention.
- Never touch the trigger when working the action.
- Never alter any components of your firearm.
- Never take medications, drugs, or alcohol when handling firearms.
- Never load or unload a firearm without assuring the muzzle is pointed in a safe direction.
- Never load a firearm except immediately before shooting.

4      **DO NOT PUT HAND IN FRONT OF MUZZLE**

**SAFE GUN HANDLING IS YOUR RESPONSIBILITY**

Discharging firearms in poorly ventilated areas, cleaning firearms, or handling ammunition may result in exposure to lead and other substances known to cause birth defects, reproductive harm, and other serious physical injury. Have adequate ventilation at all times. Wash hands thoroughly after exposure.
Never discharge a firearm without proper shooting glasses and ear protection.
Never shoot at any water surface or any surface where a ricochet can occur.
Never shoot until you are sure of your backstop and what lies beyond it.
If the gun does not discharge after pulling the trigger, do not change its direction for at least 30 seconds, you could be having a "hang fire", and the cartridge could go off when you do not expect it. After waiting 30 seconds open the action, remove all ammunition from the magazine and remove the unfired cases from the chambers, while keeping the firearm pointed in a safe direction.
Always be aware of other people so that they cannot accidentally walk into the line of fire.
When firing on a target range, be alert and follow the range officer's commands.
Never cross obstacles such as fences or streams with a loaded firearm.
Do not allow a firearm to be used by individuals who do not understand its safe operation and the rules of safe gun handling.

**WARNING:** After firing several rounds, the exterior metal parts of the firearm and barrels get VERY hot and can cause severe burns if touched.
Be sure all accessories are compatible with the firearm and that the accessories do not interfere with safe operation of the firearm.
When transporting your firearm, be sure your firearm is unloaded and on SAFE.


If you do not understand how to operate your DP-12 or have any questions about their safe handling, please write, call, or email us at:
Standard Mfg.
100 Burritt Street
New Britain, CT 06053

Website: http://standardmfgllc.com
Email: info@standardmfgllc.com


**ALWAYS LEAVE GUN IN OPEN BOLT POSITION**          5

**B. OVERVIEW**

**Description**

The DP-12 is a dual-magazine 12-gauge pump action shotgun. The bullpup dual magazine feed design provides the operator with a more compact layout, increased total capacity, and with no requirement to switch between two magazines of ammunition.

The DP-12 features positive extraction and ejection, allowing it to be reliably fired in any shooting orientation. Loading and ejection are combined into a single port rearward of the grip assembly under the shotgun, enabling the DP-12 to be fired from both the dominant and non-dominant side.

The DP-12 has an integral MIL-STD-1913 Picatinny rail, located above the barrel and on the forend, that come standard with the DP-12 for mounting accessories. Unloaded, the DP-12 maintains a center of gravity over the grip assembly to facilitate ease of handling.

**Nomenclature**



6        **DO NOT PUT HAND IN FRONT OF MUZZLE**

**Ammunition**

The DP-12 is chambered for 12-gauge 3" shells and may safely fire both lead and steel shot. Shells 2-3/4" and shorter are also safe to fire, but anything shorter than 2-3/4" should be thoroughly tested for reliable feeding and ejection. For reference, the chamber gauge and length is indicated on the right side of the receiver of the shotgun.

**WARNING: ALWAYS USE SHELLS OF THE CORRECT GAUGE AND LENGTH OR SHORTER. DO NOT USE NON-STANDARD AMMUNITION OR SHELLS WITH PRESSURES EXCEEDING SAAMI STANDARDS. FAILURE TO FOLLOW THIS WARNING MAY RESULT IN SERIOUS INJURY OR DEATH AND DAMAGE TO YOUR FIREARM. FAILURE TO FOLLOW THIS WILL VOID WARRANTY.**

Only use commercially available US-manufactured ammunition that meets SAAMI established standards. Inspect your ammunition to make sure it is clean, dry, and in good condition. Never use non-standard, reloaded or damaged shells. Any other ammunition is considered non-standard and its use may void the warranty on this firearm. Standard Mfg. firearms are manufactured from high quality materials. They will provide a lifetime of service if properly maintained. However, all warranties, expressed or implied, are voided and Standard Mfg. will not be liable for property damage or personal injury and consequential damages, if faulty, non-standard, or reloaded ammunition is used in any Standard Mfg. firearm.

**Sling Mounting**

The DP-12 comes equipped with forward attachment points on the left and right sides of the barrel assembly as well as multiple rear attachment capabilities in the rear of the receiver.
The different sling attachment points on the DP-12 can be used to mount a 1." wide nylon sling.



**ALWAYS LEAVE GUN IN OPEN BOLT POSITION**          7

## C. OPERATING INSTRUCTIONS
### Safety

The DP-12 features an AR type rotary safety located behind and above the trigger on the grip assembly. When the safety is activated, it blocks the sear from releasing and prevents the trigger from being pulled. Please note that the safety will not engage unless the hammer is cocked. The safety is rotated with the right or left thumb until a click is heard and the pointer selects the desired mode "SAFE" or "FIRE".



**WARNING: NEVER TOTALLY RELY ON YOUR MECHANICAL SAFETY AS IT CAN FAIL OR UNINTENTIONALLY BE DISENGAGED. YOUR MECHANICAL SAFETY IS NOT A SUBSTITUTE FOR SAFE GUN HANDLING PRACTICES.**

### Loading Magazines

1. Ensure your muzzle is pointed in a safe direction before loading.
2. Engage the safety by ensuring the pointer is selecting the "SAFE" position.
3. Ensure the forend is not in the rearmost position. If so, move the forend and slide assembly forward. Slide the action closed with chambers empty so that the bolt sled will aid in locating the ammunition.
4. With fingers on the base of the round, insert the round into the loading/ejection port and slide the round into the magazine using your fingers as shown in Figure C-1. The rounds should slide under and should be held in place by the magazine hooks.
5. The magazine hooks must be pulled up to manually release shells from the magazine tubes.



Figure C-1: Loading Shells into the Magazine Tubes

Magazines can be filled simultaneously by using two fingers while the firearm is stable upside down and pointed in a safe direction.

8          **DO NOT PUT HAND IN FRONT OF MUZZLE**

**Chambering from Magazine**

1. The magazines may be filled to capacity with 7 2 3/4" shotshells in each tube, less rounds may be used, if desired.
2. Pull down the action bar release on the trigger guard and maintain downward pressure to unlock forend. See Figure C-2.
3. Actuate the forend fully rearward and then fully forward to chamber two rounds from the magazine tubes, one in each barrel.
4. The gun is ready to fire with the "SAFETY" on. One round may now be placed into each of the magazine tubes to replace the 2 that have been chambered.

**CAUTION: DO NOT HOLD THE FOREND BEHIND THE PICATINNY RAIL. DOING SO WILL SHORT STROKE THE ACTION AND PINCH YOUR HAND.**



Figure C-2: Action bar release

**Manual Chamber Loading**

The procedure for loading a shell directly into the chamber of the DP-12 is different than most other shotguns because of the combined loading and ejection port. To load a shell into the chamber of the DP-12, use the following procedure as a guideline.

1. Ensure your muzzle is pointed in a safe direction before loading.
2. Engage the safety by ensuring the pointer is selecting "SAFE".
3. Pull down the action bar lock and maintain downward pressure to unlock forend.
4. Actuate the forend so that it is about a 1/2" from the rearmost position. Inspect that the shell lifters are down against the top of the receiver and are not blocking access to the chamber.
5. Place a shell or 2 shells in chamber and cycle the action forward to chamber the inserted shells.

**ALWAYS LEAVE GUN IN OPEN BOLT POSITION**          9

**Firing**

1. Load a shell or two shells into the chamber of the DP-12 manually or from the magazine, as instructed above.
2. Aim at the target, taking notice of the target's backdrop.
3. Disengage the safety, rotating it so the pointer selects "FIRE".
4. Place trigger finger into trigger guard.
5. When the trigger is depressed the DP-12 will fire the right barrel. Release the trigger and depress again to fire the left barrel. Cycle the action to eject the empty cases and feed two new rounds from the loaded magazine tube into the chambers.

**IF YOU DO NOT RELEASE THE TRIGGER AFTER FIRING THE FIRST ROUND THE SECOND SEAR ENGAGEMENT WILL NOT SETUP**

**Unloading**

1. Ensure your muzzle is pointed in a safe direction before unloading.
2. Engage the safety by rotating the pointer to "SAFE".
3. **ENSURE THAT ALL FINGERS ARE CLEAR OF THE TRIGGER.**
4. Pull down the action bar lock and maintain downward pressure to unlock forend.
5. Cycle action back and forth repeatedly using the forend, loading and extracting live ammunition until the magazine followers are visible and the chambers are empty.
6. When the DP-12 is fully unloaded both magazine followers should be visible from the ejection port and the chamber should be visibly empty.
7. With the forend in its rearmost position, always visually and tactually check the chamber to confirm the firearm is unloaded.
8. To keep the firearm safe, keep action open to the rearward position and insert the locking bracket in front of the forend between the barrels and the magazine tubes. Use the supplied padlock to prevent child access.
9. The rounds in the magazine tubes may be removed manually by lifting the magazine tube hooks. This cannot be done with the forend assembly and bolts at their rearward position. Move the forend assembly forward so the lifters fall to the inside top of the receiver. Pull up on the magazine release hooks to release contained rounds. Always return forend assembly to the rearmost position and inspect that the chambers are empty, both visually and tactually.

10      **DO NOT PUT HAND IN FRONT OF MUZZLE**

## D. DISASSEMBLY

For regular maintenance of the DP-12 only cleaning and lubricating will be necessary. In order to remove debris or thoroughly clean and lubricate the action, it will be necessary that you become familiar with its disassembly. The following sections should be followed in sequential order and continued as needed depending on desired maintenance.

**WARNING: ALWAYS ENSURE THE DP-12 IS CLEAR OF ALL AMMUNITION BEFORE ATTEMPTING DISASSEMBLY. IF THE DP-12 HAS BEEN FIRED, WAIT A SUFFICIENT AMOUNT OF TIME FOR THE COMPONENTS TO COOL BEFORE ATTEMPTING DISASSEMBLY.**

### Loosen Stock Recoil Assembly

1. Ensure that the firearm chambers and magazine tubes are completely empty and the muzzle is pointed in a safe direction.
2. Inspect that safety is selecting "SAFE."
3. Access the shoulder screws through the large holes in the recoil pad with an allen wrench and remove the recoil pad assembly with springs. See Figure D-1.



Figure D-1: Removal of recoil pad assembly

4. Loosen the socket head cap screws in the recoil pad shroud at least 1 1/2 turns. See Figure D-2.



Figure D-2: Loosening of socket head cap screws

**ALWAYS LEAVE GUN IN OPEN BOLT POSITION**          11

**Removal of Grip Assembly**

1. Slide forend assembly back to open the action and inspect that chambers and magazines are empty.

2. Inspect pointer is selecting "SAFE" mode.

3. Remove the rear assembly pin located at the rear of the receiver just in front of the recoil pad shroud. See Figure D-3.

4. On each side of the firearm remove the socket screws at the front of the receiver just below the magazine tubes. See Figure D-4.

5. Adjust the position of the forend rearward so that the front socket screw of the lower grip assembly can be accessed through the hole in the forend just in front of the lower 3 slots in the forend. Loosen and remove the screw completely. See Figures D-5 and D-6.


Figure D-3: Removal of rear assembly pin


Figure D-4: Remove socket screws


Figure D-5: Loosen and remove screws


Figure D-6: Remove screws

6. Remove the grip assembly by lifting the rear of the assembly sliding angularly against the back of the receiver as shown in Figure D-7.


Figure D-7: Remove grip assembly

12        **DO NOT PUT HAND IN FRONT OF MUZZLE**

7. It is best to slide the forend assembly forward. Begin removing the assembly by rocking the front of the grip assembly away from the magazine tubes slightly. Then slide the grip assembly away at an angle parallel to the rear of the receiver. Return screws and pin to their original locations. See Figure D-7 and D-8.



Figure D-8: Pull rear away from aluminum action.

8. Grip the lower assembly as shown in Figure D-8 and pull front up <u>slightly</u>.

**Removal of the Bolts**

1. With the grip assembly removed the bolt retainer plate may be removed to access the bolt sled and bolts. Remove the flat head socket screws on each side (See Figure D-9) of the receiver to the rear of the irregular "U" shaped notch in the receiver bottom. Slide the black anodized bolt retainer plate approximately 1/4" forward so that its rear corners are free from the notches in the sides of the receiver. Lift directly up and out of the receiver. See Figure D-10.




Figure D-9: Remove socket screws (both sides)

Figure D-10: Slide the retainer plate forward and lift up and out.

2. The bolt and bolt sled should now be resting in the receiver of the DP-12 and can be removed by reaching in and lifting out the bolt sled as shown in Figure D-11.

Figure D-11: The bolt and bolt sled resting in the receiver.



**ALWAYS LEAVE GUN IN OPEN BOLT POSITION**          13

3. With the bolt retainer plate out, slide forend assembly to rear position. Then slide the forend assembly 1/2" to 5/8" forward so that you can see the rear outer corners clear in front of the trigger retainer plate notch. The bolt sled can then be lifted straight up through widest opening in the receiver, See Figure D-12.



Figure D-12: Remove bolt sled

**DO NOT TILT
WHILE LIFTING
BOLT SLED OUT**

4. The 2 separate bolts may then be lifted out of the receiver. To reinstall bolts note that they must be positioned so that the bolt faces are approximately 5/8" forward of the front of the bolt sled at the sled entry and egress locations. The slide arm assembly must also be positioned so the notches engage the bolt sled correctly(See Figure D-11).  See Figure D-13.



Figure D-13: Remove
Exposed Bolt from Receiver
Note that the slidearm
bumps are in their notches
in the bolt sled.

**CAUTION: FURTHER DISASSEMBLY SHOULD ONLY BE
PERFORMED BY A CERTIFIED GUNSMITH OR STANDARD MFG.
ATTEMPTING FURTHER DISASSEMBLY COULD VOID YOUR
WARRANTY.**

14       **DO NOT PUT HAND IN FRONT OF MUZZLE**

**E. ASSEMBLY**
**Insertion of the Bolts**

1. Cycle the forend completely rearward before attempting to insert the bolts.
2. Insert the bolts rounded side down against the inside top of the receiver with the extractor hooks up towards bottom of the receiver and forward towards the barrels. Position the bolts side by side approximately 5/8" forward of their rearward position. The rear of the extractor hooks should be slightly behind the front edge of the cutout in the receiver for installing and extracting the bolt retainer plate and bolt sled. This cutout jog is in the center of the "U" shaped cutouts in the sides of the receiver for the hammer pivot.
2. Align the notch in the outer forend slide bars so the front edge of the notch is even with the rear of the ejector hooks. See Figure D-13. Hold the bolt sled so the lock bumps are down and the 4 thin legs are rearward, the 2 smooth shallow channels facing towards you. Lower the bolt sled down through the receiver cutout; the sled must be held horizontally so that its sides slide against the inner walls of the cutout in the receiver. See Figure E-2. The slide arm assembly might need to be moved slightly back and forth so that the 3/8" cutout in the sides of the bolt sled capture the rear bumps on the outer slide arms. See Figure E-3. The lock bumps of the sled should fall into the bolts and then moving the forend assembly back and forth should move both bolts and sled back and forth for the full travel. Slide the forend assembly forward so that the sled is captured in the side slots of the receiver.



Figure E-1: Align the cutout



Figure E-2: Lower the bolt sled



3/8" Cutout
Bolt Sled

Figure E-3: Move back and forth to capture bumps on the slide arms

**ALWAYS LEAVE GUN IN OPEN BOLT POSITION**          15

3.  Hold the bolt retainer plate so the large rectangular bump with threaded holes are facing you and positioned forward towards the barrels.  Slide the bolt retainer plate down through the cutout in the receiver just behind the "U" shaped cutouts in the receiver sides.  See Figure E-4.

Figure E-4: Slide the bolt retainer plate down through the cutout



Move the bolt retaining plate down and then rearward so that the rear outside corners enter the 1/8" horizontal slots in the receiver sides.  The threaded holes should then align with the counter sink holes in the sides of the receiver.  Install the #5-40 flat head screws in each side.  See Figure E-5



Figure E-5: Install the flat head screws.

**LOWER GRIP ATTACHMENT**
1. The hammers must be pulled rearward and cocked before installing lower grip assembly.  The forend assembly must be forward and bolts closed in breech.
2. Carry out steps 8 through 3 in D. Disassembly: Removal of Lower Grip Assembly.

**DO NOT PUT HAND IN FRONT OF MUZZLE**

**F. CHOKE TUBES**

The DP-12 comes with 2 choke tubes threaded into the muzzle end of each barrel. It is imperative that they be removed and cleaned regularly.

**BEFORE REMOVAL OR INSTALLATION OF CHOKE TUBES, MAKE SURE THE FIREARM IS UNLOADED AND THE MUZZLE IS POINTED IN A SAFE DIRECTION.**

**Removal of Choke Tubes**

1. To change or remove the choke tubes, find the wrench that was supplied.
2. Align either stepped end of the tool with the notches in the choke tube as shown in Figure F-1. Turn counter clockwise.



Figure F-1: Turn counter clockwise to remove choke tubes.

**Installing Choke Tubes**

1. Start new choke tubes into the muzzle with the threaded end entering the barrel first and the 4 notches pointing away from the barrel.
2. Turn clockwise, starting threads by hand.
3. Use supplied tool to tighten.

ALWAYS LEAVE GUN IN OPEN BOLT POSITION          17

### G. CLEANING AND MAINTENANCE
**Maintenance**

Your DP-12 is a precision instrument and will provide a lifetime of faithful service if it is properly cleaned and maintained. It is recommended that you clean your DP-12 after every shooting session or more frequently if needed. Be sure to unload your DP-12 (see Unloading on pg. 10) before performing any cleaning or maintenance procedures.

**CAUTION: NEVER USE AUTOMOTIVE BRAKE CLEANER OR ANY SOLVENT NOT DESIGNED FOR POLYMER FIREARMS. DOING SO MAY DAMAGE THE FIREARM AND VOID YOUR WARRANTY.**

1. Thoroughly clean all exterior sides of the bolt and receiver with solvent and brush.
2. Brush the barrel bore and chamber with a good powder removing solvent and bore brush. Wipe the areas clean with patches or a swab.
3. Using a small brush dipped in solvent, remove all deposits from around the breech of the barrel and barrel extension, as well as all adjacent areas that have been subjected to powder or primer residue.
4. Clean the magazine tubes with solvent and brush if needed.

**Lubrication**

After cleaning the entire gun, use a cloth to apply a light coating of high quality gun oil to all internal and exterior metal surfaces and wipe clean. If the need arises to lubricate the grip assembly, do so through the top of the assembly. Manually cycle the action back and forth to check the function of the firearm. If any parts are damaged or badly worn or the firearm does not work correctly the firearm should not be fired and should be returned to Standard Mfg. for servicing immediately.

**WARNING: DISCHARGING A FIREARM WITH OIL, GREASE, OR ANY OTHER MATERIAL EVEN PARTIALLY OBSTRUCTING THE BORE COULD RESULT IN SERIOUS INJURY OR DEATH AND SERIOUS DAMAGE TO YOUR FIREARM.**

18        **DO NOT PUT HAND IN FRONT OF MUZZLE**

**H. TROUBLESHOOTING**

Proper functioning of your firearm is directly related to proper maintenance and care as well as the quality of ammunition you use. If in the unlikely circumstance your DP-12 malfunctions, we have included a list of several suggested remedies below.

If the DP-12 Fails to Fire: You may be experiencing a misfire and should point the barrel of the DP-12 in a safe direction, engage the safety by ensuring the pointer is selecting "SAFE", and wait at least 30 seconds before fully cycling the action and ejecting the round. Otherwise, ensure the action is fully forward. The DP-12 is designed to prohibit firing out of battery to protect the user.

Double Feed: A double feed may occur if there is a failure to extract.

Rotate the DP-12 to expose the ejection port and visually examine the malfunction. Depending on the orientation of the rounds, it is usually easiest to push the double-fed shell back into the magazine and cycle the action to clear the shell.
Otherwise, you must manually reach into the ejection port and remove the interfering shell by rotating it around the shell lifters as shown below.



Figure F-1: Clear Double Feed by Rotating Shell Around Lifters

Magazine tube shell hooks will not operate with action in its rearward position. Move the forend assembly forward and raise hooks to empty the magazine tubes.

**ALWAYS LEAVE GUN IN OPEN BOLT POSITION**          19

## I. SERVICE, REPAIR, AND WARRANTY

This warranty is granted by Standard Mfg. . This 1 year warranty is effective from the date of purchase and applies to the original owner of a Standard Mfg. firearm. Standard Mfg. firearms are warrantied to be free from defects in material and workmanship. Any such defects of which Standard Mfg. receives written notice by the original owner, will be remedied by Standard Mfg. without charge within a reasonable time after such notification and delivery of the product as provided below. If your Standard Mfg. firearm should ever require service or repair please perform the following to ensure fast and reliable service:

1) Include a copy of a bill of sale in the owner's name or a copy of ATF Form 4473 indicating date of purchase.
2) Include a written copy of the model and serial number of the firearm and a description of the difficulty experienced and service desired.
3) Include your name, desired return address, and a number where we can reach you.
4) Also include a written list of any accessories in your shipment -- Standard Mfg. will not be responsible for any item that was not listed and confirmed by Standard Mfg..
5) Be sure the firearm is completely unloaded and the shipping container is free of ammunition. It is against postal and commercial regulations to ship ammunition.
6) Securely package your Standard Mfg. firearm and ship (transportation charges pre-paid) to:
Standard Mfg.
Service Department
100 Burritt Street
New Britain, CT 06053
It is recommended that shipments be insured by the owner, since Standard Mfg. will accept no responsibility for loss or damage in transit.
Transportation and insurance charges for return to owner will be paid by Standard Mfg. if the claim is covered by the warranty.
Under no circumstances shall Standard Mfg. be responsible for incidental or consequential damages with respect to economic loss or injury or property damage, whether as a result of breach of express or implied warranty, negligence or otherwise. Some States do not allow the exclusion or limitation of incidental or consequential damages, so the above limitation or exclusion may not apply to you.

Standard Mfg. will not be responsible for defects resulting from careless handling, unauthorized or unsafe adjustments or modifications, non-standard, defective, or improper ammunition,  corrosion, neglect, fire damage, water damage, theft, abuse, ordinary wear and tear, or unreasonable use.

20      **DO NOT PUT HAND IN FRONT OF MUZZLE**

ALWAYS LEAVE GUN IN OPEN BOLT POSITION        21

**DO NOT PUT HAND IN FRONT OF MUZZLE**



| | | | |
|---|---|---|---|
| | | | **DOUBLE PUMP ASSY EXPLODED** |
| | | | D  DP 01000 |

**ALWAYS LEAVE GUN IN OPEN BOLT POSITION** 23



**READ THE INSTRUCTIONS AND WARNINGS IN THIS MANUAL CAREFULLY BEFORE USING THIS FIREARM**

**For Product Service on This Model Please Email:**
**service@standardmfgllc.com**

THIS INSTRUCTION MANUAL SHOULD ALWAYS ACCOMPANY THIS
FIREARM AND BE TRANSFERRED WITH IT UPON CHANGE OF
OWNERSHIP, OR WHEN THE FIREARM IS LOANED OR PRESENTED TO
ANOTHER PERSON

# Exhibit 19

December 15, 2016

# Notice of Proposed Emergency Action

Pursuant to the requirements of Government Code section 11346.1, subdivision (a)(1), the Department of Justice (Department) is providing notice of proposed emergency adoption of regulations regarding large-capacity magazines.

## Submission of Comments

Government Code section 11346.1, subdivision (a)(2) requires that, at least five working days prior to submission of the proposed emergency action to the Office of Administrative Law (OAL), the adopting agency provide a notice of the proposed emergency action to every person who has filed a request for notice of regulatory action with the agency. After submission of the proposed emergency to the OAL, the OAL shall allow interested persons five calendar days to submit comments on the proposed emergency regulations as set forth in Government Code section 11349.6.

The text of the proposed emergency regulations, all documents incorporated by reference, and the "Finding of Emergency" are posted on the Department's website at http://oag.ca.gov/firearms.

The Department plans to file the emergency rulemaking package with OAL at least five working days from the date at the top of this notice. If you would like to comment on the proposed emergency regulations or the Finding of Emergency, your comments must be received by both the Department and the OAL within five days of the Department's filing with OAL. Responding to comments is strictly at the Department's discretion. Send comments simultaneously to:

Department of Justice
Bureau of Firearms
Attn:  Jacqueline Dosch
P.O. Box 160487
Sacramento, CA 95816


and


Office of Administrative Law
300 Capitol Mall, Suite 1250
Sacramento, CA 95814

# Exhibit 20

# California Code of Regulations
## Title 11, Division 5

## Chapter 39 Assault Weapons and Large-Capacity Magazines

## Article 4. Large-Capacity Magazine Permits

§ 5480. Requirements for Large-Capacity Magazine Permits Pursuant to Penal Code Section 32315.

(a) This article applies to Penal Code section 32315, which permits for the out-of-state importation and exportation of large-capacity magazines as defined in Penal Code section 16740. Importation and exportation includes the transportation of magazines as necessary to complete a transfer to or from an out-of-state source.

(b) No large-capacity magazine permit shall be issued to any person who fails to establish "good cause" for issuance of the permit, and that the permit would not endanger public safety. "Good cause" shall be established by the following:

    (1) A statement from the applicant that a large-capacity magazine marketplace exists for their dealership; and

    (2) Compliance with The Dangerous Weapons Control Law comprised of the provisions listed in Penal Code section 16580 relative to large-capacity magazines and record keeping requirements specified in section 5483 of these regulations.

(c) Large-capacity magazine permit applications shall be filed on DOJ form Form, BOF 050, Large-Capacity Magazine Permit Application (Rev. 1/2012 12/2016), which is hereby incorporated by reference. This form which requires the following information: California Firearms Dealership (CFD) number; dealership name; dealership mailing address; statement of good cause; dealership licensee's printed name; signature of dealership licensees; and date.

(d) A dealership with multiple locations must obtain a separate large-capacity magazine permit for each location.

(e) A large-capacity magazine permit will automatically transfer when an existing dealer relocates to a different physical store location(s) and notifies the DOJ prior to making the move.

Note: Authority cited: Sections 26905, 26910, and 32315, Penal Code. Reference: Sections 16580, 16740, 32310, 32315, 32400, 32405, 32410, 32415, 32420, 32425, 32430, 32435, 32440, 32445 and 32450, Penal Code.

§ 5483. Large-Capacity Magazine Permit Record Keeping.

(a) Permittees shall maintain acquisition and disposition transaction records of the importation and exportation of large-capacity magazines.  Records shall include transaction date, transaction volume; and the name, address, and Federal Firearms License number (if any) of the out-of-state transferee or transferor.  Records must be maintained at the dealership for three years and be made available to representatives of the DOJ or any other law enforcement agency upon request.

(b) Permittees shall keep record of all large-capacity magazine sales on a form prescribed by DOJ, hereby identified as the Large-Capacity Magazine Report, BOF 1002 (Rev. 12/2016). Information, including but not limited to:  acquisition date, distributor/dealer, quantity, capacity, caliber, disposition date, purchaser's name, purchaser's agency, and salesperson's signature, shall be noted on the BOF 1002. This form shall be evidence of ongoing "good cause" for renewal purposes and shall serve as documentation of lawful sales to exempt parties.

(c) A photocopy of the front and back of the credentials of the purchasing state or local peace officer shall be retained and attached to the DOJ form BOF 1002.

(d) A business card from federal law enforcement purchasing personnel shall be   retained and attached to the DOJ form BOF 1002.  The federal law enforcement purchasing personnel's credentials shall be verified by the Permittee.

(e)  Permittees shall complete the documentation process within 24 hours of the sale.

(f)  Permittees shall keep all large-capacity magazine permit and/or sales records such as completed BOF 1002 forms, in a separate file, and the original form shall not be attached to a related Dealer Record of Sale (DROS) form. A copy of the BOF 1002 form may be attached to the DROS form if the dealer wishes.

Note: Authority cited: Section 32315, Penal Code. Reference: Sections 16740, ~~and~~ 32315, 32405, and 32410, Penal Code.


§ 5484. Large-Capacity Magazine Permit Revocations.

(a) Large-capacity magazine permits shall be subject to revocation for failure to comply with record keeping requirements specified in section 5483 ~~of these regulations~~ or for failure to comply with The Dangerous Weapons Control Law comprised of the provisions listed in Penal Code section 16580 relative to large-capacity magazines.

(b) A Permittee convicted of violating Penal Code section 32310 shall be subject to immediate revocation of the Permittee's large-capacity magazine permit(s).  If a Permittee is convicted of any other firearms prohibiting offense or is otherwise firearms prohibited then the large-capacity magazine permit(s) shall be immediately revoked.

(c) All procedures and hearings related to the revocation of a large-capacity magazine permit, apart from those covered in section (b), shall be conducted in accordance with Government Code sections 11500 et seq.

(d) When revoking a large-capacity magazine permit from a Permittee that holds multiple large-capacity magazine permits for different locations, the DOJ may seek revocation of all permits. Factors the DOJ may consider include, but are not limited to, prior violations, egregiousness of the act(s), the number of violations, the length of time the business has been open, and training received by the store employees and Permittee.

(e) If the Permittee is prohibited under state or federal law from owning, possessing and/or purchasing firearms or ammunition, all of the Permittee's large-capacity magazine permits shall be revoked.

Note: Authority cited: Section 32315, Penal Code. Reference: Sections 16580, 16740, and 32310, 32315, and 32410, Penal Code.

## Article 5. Large-Capacity Magazines and Large-Capacity Magazine Conversion Kits

### § 5490. Large-Capacity Magazines; manufacturing

A person who lawfully possesses and/or owns a large-capacity magazine may disassemble the magazine for cleaning, maintenance, and other lawful purposes, and then reassemble the magazine without violating Penal Code section 32310.

Note: Authority cited: Section 32315, Penal Code. Reference: Sections 32310, 32311, 32315, 32400, 32405, 32406(a), 32410, 32415, 32425, 32430, 32435 and 32440, Penal Code.

### § 5491. Large-Capacity Magazine; capacity

(a) Prior to July 1, 2017, large-capacity magazine permit holders may accept large-capacity magazines, as defined in Penal Code section 16740, from California residents for the purposes of permanently altering the magazine's feeding device so that it reduces the capacity to 10 rounds or less.

(b) Prior to July 1, 2017, an individual may dispose of a large-capacity magazine by permanently altering the magazine's feeding device so that it reduces the capacity to 10 rounds or less.

(1) A large-capacity magazine that is a box type can have its capacity permanently reduced by using both of the following methods:

(A) Inserting a rigid magazine capacity reduction device, also known as a magazine block, into the magazine body and then affixing the floor plate of the magazine to the body of the magazine with permanent epoxy. Metal magazines with metal floor

plates have the option of being either welded closed or permanently epoxied closed once the magazine block(s) have been inserted. Due to magazine manufacturing variations (such as drum magazines or tubular magazines) it may be necessary to insert multiple magazine blocks in order to reduce the capacity to 10 rounds; and

(B) Once the capacity of the magazine has been reduced by inserting a rigid magazine block into the magazine, it shall be riveted in place through either the floor plate or side wall of the magazine body.

(2) A large-capacity magazine that is a drum or tubular style can be permanently reduced by using any of the following methods:

(A) Drum magazines generally come in two styles:  those that are fed from the neck of the magazine (neck fed drum magazines), and those that open from the side and are loaded once a lid or cover is opened up (clam shell drum magazines).

(i)  A neck fed drum magazine needs a specific number of "dummy rounds" inserted into the neck fed magazine drum and then the "dummy rounds" needs to be epoxied in place in an attempt at reducing the capacity of the neck fed drum magazine.  The actual numbers of dummy rounds vary per neck fed drum magazine depending on its original capacity.  For example, a 50 round neck fed drum magazine needs 40 dummy rounds epoxied in placed so that no more than 10 rounds could be loaded.  Once these dummy rounds are permanently epoxied into place the lid shall be closed and also permanently epoxied closed.  Due to the internal moving parts of these magazines, a rivet securing the lid or cover is not possible in most cases. Armatac AR-15 style magazines are one example of this type of magazine.

(ii) Clam shell drum magazines are fed by opening the cover or lid and then loading the magazine. This magazine type cannot be loaded via the neck because of its design. Examples of this type are the AK-47 style  Suomi, PPSH-41 and Thompson "Tommy Gun" drum magazines. If the capacity is reduced down to 10 rounds or less, (as described above), and the cover or lid is epoxied closed, the magazine could never be reloaded once the 10 rounds are fired.  This magazine type is not a good candidate for reduction to 10 rounds or less and shall be disposed by other means if not permanently altered as described in this section.

(B)  A tubular magazine that has more than a 10 round capacity shall have its capacity permanently reduced by insertion of a magazine block and use of permanent epoxy to hold the block in place. Then, a rivet shall secure the block in place by penetrating the tubular magazine and the magazine block.

(C)  Per Penal Code section 16740, tubular magazines in lever action firearms and .22 caliber tubular magazines are not subject to the prohibition in Penal Code section 32310 or the permitting requirements for large-capacity magazines.

(3) Magazine capacity for shotguns shall be based upon shotgun shells that are 2 3/4", which shall be the default standard if the firearm is not marked to indicate another shotgun shell standard. If a particular firearm is marked to indicate another shotgun shell standard, then the magazine capacity for that firearm shall be based upon those markings. Shotgun shells shorter than the default standard may only be used to determine magazine capacity if a firearm is specifically marked to accept this shell exclusively.

(4) One or more magazines, each having a 10 round or less capacity, that are then attached to each other with tape, a plastic or metal coupler, or welded together would not be deemed a large-capacity magazine unless one of the following circumstances exist:

   (A)  The internal magazines of a firearm are part of a design function in which the combined ammunition capacity exceeds 10 rounds, and can be fired by the shooter without manipulating the magazine selector switch. An example of this type of firearm is the Standard Manufacturing DP-12 pump shotgun. If the tubular magazines are permanently altered to reduce their capacity to 10 rounds or less as described in this section, then this firearm would not be deemed a large-capacity magazine.

   (B) The internal magazines of a firearm are part of a design function in which the combined ammunition capacity exceeds 10 rounds and the firearm has a selector switch that allows the shooter to alternatingly use ammunition from more than one tubular magazine without having to manually switch the ammunition feeding process. An example of this type of firearm is the UTAS MAKINE LTD., MODEL: UTS-15, pump shotgun which has two seven-round tubular magazines. If the tubular magazines are permanently altered to reduce their capacity to 10 rounds or less as described in this section then this firearm would not be deemed a large-capacity magazine. Alternatively, if the UTS-15 magazine selector switch was modified so that the shooter had to manually switch the ammunition feed from one tube to another, then this firearm would not be deemed a large-capacity magazine.

(5) If a firearm with multiple tubular magazines, each having a 10 round or less capacity, must be manually switched from one tube to the other tube to use each group of ammunition, this type of firearm would not be deemed a large-capacity magazine. An example of this type of firearm is the KEL TEC, KSG shotgun which has two seven-round tubular magazines. While the tubes can collectively hold 14 rounds, the shooter must manually switch magazines. Another example of this type of firearm is the SRM-1216 semi automatic shotgun which has four four-round tubular magazines welded together. After firing the first four rounds the shooter must manually rotate the quad magazine clockwise to enable firing of the next group of four rounds. If a version of this firearm was manufactured that mechanically rotated the quad ammunition tubes it would be deemed a large-capacity magazine.

Note:  Authority cited:  Section 32315, Penal Code. Reference:  Sections 16740, 32310, 32315, 32415, 32425, and 32440, Penal Code.

§ 5492. Large-Capacity Magazine:  Conversion Kits.

(a) A "magazine extension" is a device capable of increasing the magazine capacity of a magazine.  These are considered large-capacity magazine conversion kits.  These devices often increase both magazine capacity and finger grip available space.

(b) A disassembled large-capacity magazine that may be readily assembled, which is in the possession of or under the control of the same person is a large-capacity magazine conversion kit.   In the past these were sometimes sold and marketed as large-capacity magazine "repair kits."

(c) A "grip extension" is a device that solely increases grip space on the magazine(s) it is compatible with.  A grip extension is not a large-capacity magazine conversion kit.

(d) A person who lawfully possesses large-capacity magazines may disassemble their magazines for cleaning, maintenance and other lawful purposes and then reassemble the magazine without triggering Penal Code section 32311 regarding rules governing large-capacity magazine conversion kits.

Note:  Authority cited:  Section 32311, Penal Code. Reference:  Sections 32311, 32315, 32415, 32425, and 32440, Penal Code.

# Exhibit 21

**ECONOMIC AND FISCAL IMPACT STATEMENT**
**(REGULATIONS AND ORDERS)**
STATE OF CALIFORNIA – DEPARTMENT OF FINANCE
STD. 399 (REV. 12/2013)

# ECONOMIC IMPACT STATEMENT

| DEPARTMENT NAME | CONTACT PERSON | EMAIL ADDRESS | TELEPHONE NUMBER |
|---|---|---|---|
| Justice | Jacqueline Dosch | jacqueline.dosch@doj.ca.gov | 916-227-5419 |

| DESCRIPTIVE TITLE FROM NOTICE REGISTER OR FORM 400 | NOTICE FILE NUMBER |
|---|---|
| Large-Capacity Magazines | Z |

## A. ESTIMATED PRIVATE SECTOR COST IMPACTS   *Include calculations and assumptions in the rulemaking record.*

1. Check the appropriate box(es) below to indicate whether this regulation:

   [X] a. Impacts business and/or employees
   [ ] b. Impacts small businesses
   [ ] c. Impacts jobs or occupations
   [ ] d. Impacts California competitiveness

   [ ] e. Imposes reporting requirements
   [ ] f. Imposes prescriptive instead of performance
   [X] g. Impacts individuals
   [ ] h. None of the above (Explain below):

*If any box in Items 1 a through g is checked, complete this Economic Impact Statement.*
*If box in Item 1.h. is checked, complete the Fiscal Impact Statement as appropriate.*

2. The ___Justice___ estimates that the economic impact of this regulation (which includes the fiscal impact) is:
   (Agency/Department)

   [X] Below $10 million
   [ ] Between $10 and $25 million
   [ ] Between $25 and $50 million
   [ ] Over $50 million *[If the economic impact is over $50 million, agencies are required to submit a Standardized Regulatory Impact Assessment as specified in Government Code Section 11346.3(c)]*

3. Enter the total number of businesses impacted: ___approx. 2000___

   Describe the types of businesses (Include nonprofits): firearms dealers

   Enter the number or percentage of total
   businesses impacted that are small businesses: ___90%___

4. Enter the number of businesses that will be created: ___None___ eliminated: ___None___

   Explain: The effect on sales volume, if any, will not be significant enough to affect the creation nor elimination of businesses

5. Indicate the geographic extent of impacts: [X] Statewide
   [ ] Local or regional (List areas): _____

6. Enter the number of jobs created: ___None___ and eliminated: ___None___

   Describe the types of jobs or occupations impacted: The effect on sales volume, if any, will not be significant enough to affect the creation nor elimination of jobs.

7. Will the regulation affect the ability of California businesses to compete with
   other states by making it more costly to produce goods or services here?   [ ] YES   [X] NO

   If YES, explain briefly: _____

STATE OF CALIFORNIA - DEPARTMENT OF FINANCE
**ECONOMIC AND FISCAL IMPACT STATEMENT**
**(REGULATIONS AND ORDERS)**
STD. 399 (REV. 12/2013)

## ECONOMIC IMPACT STATEMENT (CONTINUED)

**B. ESTIMATED COSTS**   *Include calculations and assumptions in the rulemaking record.*

1. What are the total statewide dollar costs that businesses and individuals may incur to comply with this regulation over its lifetime?  $ 0

   a. Initial costs for a small business:  $ N/A        Annual ongoing costs: $ N/A        Years: N/A

   b. Initial costs for a typical business: $ N/A        Annual ongoing costs: $ N/A        Years: N/A

   c. Initial costs for an individual:      $40          Annual ongoing costs: $ Undetermined        Years: N/A

   d. Describe other economic costs that may occur:  The costs are approximately $40 per large-capacity magazine owner opts to permanently reduce the magazine's capacity rather than get rid of it.

2. If multiple industries are impacted, enter the share of total costs for each industry: N/A

3. If the regulation imposes reporting requirements, enter the annual costs a typical business may incur to comply with these requirements. *Include the dollar costs to do programming, record keeping, reporting, and other paperwork, whether or not the paperwork must be submitted.*  $ N/A

4. Will this regulation directly impact housing costs?  ☐ YES    ☒ NO

   If YES, enter the annual dollar cost per housing unit:  $

   Number of units:

5. Are there comparable Federal regulations?    ☒ YES    ☐ NO

   Explain the need for State regulation given the existence or absence of Federal regulations:  The state regulations are needed to further clarify the law and provide guidance on how to comply with the new laws.

   Enter any additional costs to businesses and/or individuals that may be due to State - Federal differences:  $ 0

**C. ESTIMATED BENEFITS**   *Estimation of the dollar value of benefits is not specifically required by rulemaking law, but encouraged.*

1. Briefly summarize the benefits of the regulation, which may include among others, the health and welfare of California residents, worker safety and the State's environment:  The proposed regulations will provide guidance to California's residents and help them comply with recently enacted laws.

2. Are the benefits the result of:  ☒ specific statutory requirements, or  ☐ goals developed by the agency based on broad statutory authority?

   Explain: Laws require large-capacity magazines to be disposed of or modified. The regulations provide guidelines for this.

3. What are the total statewide benefits from this regulation over its lifetime?  $ N/A

4. Briefly describe any expansion of businesses currently doing business within the State of California that would result from this regulation:  N/A

**D. ALTERNATIVES TO THE REGULATION**   *Include calculations and assumptions in the rulemaking record. Estimation of the dollar value of benefits is not specifically required by rulemaking law, but encouraged.*

1. List alternatives considered and describe them below. If no alternatives were considered, explain why not:  No alternatives were considered because there are multiple ways in the proposed regulations of how to dispose of or modify a large-capacity magazine.

**ECONOMIC AND FISCAL IMPACT STATEMENT**
**(REGULATIONS AND ORDERS)**
STD. 399 (REV. 12/2013)

## ECONOMIC IMPACT STATEMENT (CONTINUED)

2. Summarize the total statewide costs and benefits from this regulation and each alternative considered:

| | | | |
|---|---|---|---|
| Regulation: | Benefit: $ N/A | Cost: $ | 40 per magazine |
| Alternative 1: | Benefit: $ N/A | Cost: $ N/A | |
| Alternative 2: | Benefit: $ N/A | Cost: $ N/A | |

3. Briefly discuss any quantification issues that are relevant to a comparison of estimated costs and benefits for this regulation or alternatives:    See D1 above.

4. Rulemaking law requires agencies to consider performance standards as an alternative, if a regulation mandates the use of specific technologies or equipment, or prescribes specific actions or procedures. Were performance standards considered to lower compliance costs?    ☐ YES    ☒ NO

Explain: N/A

---

**E. MAJOR REGULATIONS** *Include calculations and assumptions in the rulemaking record.*

*California Environmental Protection Agency (Cal/EPA) boards, offices and departments are required to submit the following (per Health and Safety Code section 57005). Otherwise, skip to E4.*

1. Will the estimated costs of this regulation to California business enterprises **exceed $10 million?** ☐ YES    ☒ NO

*If YES, complete E2. and E3*
*If NO, skip to E4*

2. Briefly describe each alternative, or combination of alternatives, for which a cost-effectiveness analysis was performed:

Alternative 1: _____ N/A _____

Alternative 2: _____ N/A _____

*(Attach additional pages for other alternatives)*

3. For the regulation, and each alternative just described, enter the estimated total cost and overall cost-effectiveness ratio:

| | | |
|---|---|---|
| Regulation:    Total Cost $ N/A | Cost-effectiveness ratio: $ N/A |
| Alternative 1: Total Cost $ N/A | Cost-effectiveness ratio: $ N/A |
| Alternative 2: Total Cost $ N/A | Cost-effectiveness ratio: $ N/A |

4. Will the regulation subject to OAL review have an estimated economic impact to business enterprises and individuals located in or doing business in California exceeding $50 million in any 12-month period between the date the major regulation is estimated to be filed with the Secretary of State through12 months after the major regulation is estimated to be fully implemented?

☐ YES    ☒ NO

*If YES, agencies are required to submit a Standardized Regulatory Impact Assessment (SRIA) as specified in Government Code Section 11346.3(c) and to include the SRIA in the Initial Statement of Reasons.*

5. Briefly describe the following:

The increase or decrease of investment in the State:    N/A

The incentive for innovation in products, materials or processes:    N/A

The benefits of the regulations, including, but not limited to, benefits to the health, safety, and welfare of California residents, worker safety, and the state's environment and quality of life, among any other benefits identified by the agency:    N/A

**ECONOMIC AND FISCAL IMPACT STATEMENT
(REGULATIONS AND ORDERS)**
STD. 399 (REV. 12/2013)

# FISCAL IMPACT STATEMENT

**A. FISCAL EFFECT ON LOCAL GOVERNMENT** *Indicate appropriate boxes 1 through 6 and attach calculations and assumptions of fiscal impact for the current year and two subsequent Fiscal Years.*

☐ 1. Additional expenditures in the current State Fiscal Year which are reimbursable by the State. (Approximate)
(Pursuant to Section 6 of Article XIII B of the California Constitution and Sections 17500 et seq. of the Government Code).

$ _____

☐ a. Funding provided in _____

Budget Act of _____ or Chapter _____ , Statutes of _____

☐ b. Funding will be requested in the Governor's Budget Act of _____

Fiscal Year: _____

☐ 2. Additional expenditures in the current State Fiscal Year which are NOT reimbursable by the State. (Approximate)
(Pursuant to Section 6 of Article XIII B of the California Constitution and Sections 17500 et seq. of the Government Code).

$ _____

*Check reason(s) this regulation is not reimbursable and provide the appropriate information:*

☐ a. Implements the Federal mandate contained in _____

☐ b. Implements the court mandate set forth by the _____ Court.

Case of: _____ vs. _____

☐ c. Implements a mandate of the people of this State expressed in their approval of Proposition No. _____

Date of Election: _____

☐ d. Issued only in response to a specific request from affected local entity(s).

Local entity(s) affected: _____

☐ e. Will be fully financed from the fees, revenue, etc. from: _____

Authorized by Section: _____ of the _____ Code;

☐ f. Provides for savings to each affected unit of local government which will, at a minimum, offset any additional costs to each;

☐ g. Creates, eliminates, or changes the penalty for a new crime or infraction contained in _____

☐ 3. Annual Savings. (approximate)

$ _____

☐ 4. No additional costs or savings. This regulation makes only technical, non-substantive or clarifying changes to current law regulations.

☒ 5. No fiscal impact exists. This regulation does not affect any local entity or program.

☐ 6. Other. Explain _____

STATE OF CALIFORNIA — DEPARTMENT OF FINANCE

Case 2:17-cv-0101-BEN-JLB   Document 18   Filed 06/05/17   PageID.1763   Page 129 of 161

**ECONOMIC AND FISCAL IMPACT STATEMENT**
**(REGULATIONS AND ORDERS)**
STD. 399 (REV. 12/2013)

## FISCAL IMPACT STATEMENT (CONTINUED)

**B. FISCAL EFFECT ON STATE GOVERNMENT** *Indicate appropriate boxes 1 through 4 and attach calculations and assumptions of fiscal impact for the current year and two subsequent Fiscal Years.*

☐ 1. Additional expenditures in the current State Fiscal Year. (Approximate)

$ _____

*It is anticipated that State agencies will:*

☐ a. Absorb these additional costs within their existing budgets and resources.

☐ b. Increase the currently authorized budget level for the _____ Fiscal Year

☐ 2. Savings in the current State Fiscal Year. (Approximate)

$ _____

☐ 3. No fiscal impact exists.  This regulation does not affect any State agency or program.

☒ 4. Other. Explain   DOJ has determined the regulation will not have a significant financial impact on the Bureau's operating costs. Anyone not in compliance with these regulations will be found via the normal course of investigations.

**C. FISCAL EFFECT ON FEDERAL FUNDING OF STATE PROGRAMS** *Indicate appropriate boxes 1 through 4 and attach calculations and assumptions of fiscal impact for the current year and two subsequent Fiscal Years.*

☐ 1. Additional expenditures in the current State Fiscal Year. (Approximate)

$ _____

☐ 2. Savings in the current State Fiscal Year. (Approximate)

$ _____

☒ 3. No fiscal impact exists.  This regulation does not affect any federally funded State agency or program.

☐ 4. Other. Explain _____

_____

| FISCAL OFFICER SIGNATURE | DATE |
|---|---|
| | 11-28-16 |

*The signature attests that the agency has completed the STD. 399 according to the instructions in SAM sections 6601-6616, and understands the  impacts of the proposed rulemaking. State boards, offices, or departments not under an Agency Secretary must have the form signed by the highest  ranking official in the organization.*

| AGENCY SECRETARY | DATE |
|---|---|
| | 12.13.16 |

*Finance approval and signature is required when SAM sections 6601-6616 require completion of Fiscal Impact Statement in the STD. 399.*

| DEPARTMENT OF FINANCE PROGRAM BUDGET MANAGER | DATE |
|---|---|
| | |

# Exhibit 22

# State of California
# Office of Administrative Law

In re:
**Department of Justice**

**AMENDED NOTICE OF WITHDRAWAL**

**Regulatory Action:**

**Government Code Section 11349.3(c)**

**Title 11, California Code of Regulations**

**Adopt sections:**   5490, 5491, 5492
**Amend sections:**   5480, 5483, 5484
**Repeal sections:**

**OAL Matter Number: 2016-1223-02**

**OAL Matter Type: Emergency (E)**

---

This notice confirms that your proposed regulatory action regarding Large-Capacity Magazines was withdrawn from OAL review pursuant to Government Code section 11349.3(c).

OAL will return your rulemaking record promptly.

Date:    December 29, 2016

_____
Mark Storm
Senior Attorney

For:    Debra M. Cornez
Director

Original:   Kamala D. Harris
Copy:    Melan Noble

# Exhibit 23

# California Code of Regulations
## Title 11, Division 5

Chapter 39 Assault Weapons and Large-Capacity Magazines

Article 2. ~~Definitions of Terms Used to Identify Assault Weapons~~ Registration Requirement, What Qualifies for Registration, and Definitions

§ 5469. ~~Definitions.~~ Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Who Must Register.

~~The following definitions apply to terms used in the identification of assault weapons pursuant to Penal Code section 30515:~~

~~(a)   "Detachable magazine" means any ammunition feeding device that can be removed readily from the firearm with neither disassembly of the firearm action nor use of a tool being required. A bullet or ammunition cartridge is considered a tool. Ammunition feeding device includes any belted or linked ammunition, but does not include clips, en bloc clips, or stripper clips that load cartridges into the magazine.~~

~~(b)   "Flash suppressor" means any device designed, intended, or that functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision.~~

~~(c)   "Forward pistol grip" means a grip that allows for a pistol style grasp forward of the trigger.~~

~~(d)   "Pistol grip that protrudes conspicuously beneath the action of the weapon" means a grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed below the top of the exposed portion of the trigger while firing.~~

~~(e)   "Thumbhole stock" means a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing.~~

Any person who, from January 1, 2001, to December 31, 2016, inclusive, lawfully possessed an assault weapon that does not have a fixed magazine, as defined in Penal Code section 30515, including those weapons with an ammunition feeding device that can be readily removed from the firearm with the use of a tool (commonly referred to as a bullet-button weapon) must register the firearm before January 1, 2018.

Note: Authority cited: Section ~~30520~~ 30900, Penal Code. Reference: Sections ~~16170(a), 16350, 16890,~~ 30515, ~~30600, 30605, 30610, 30615, 30620, 30625, 30630, 30635, 30640, 30645, 30650, 30655, 30660, 30665, 30670, 30675,~~ 30900, ~~30905, 30910, 30915, 30920, 30925, 30930, 30935, 30940, 30945, 30950, 30955, 30960 and 30965,~~ Penal Code.

~~Article 3. Assault Weapon Registration~~

§ 5470. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Which Weapons Must be Registered.

(a)     Except as provided in section 5472, an assault weapon that does not have a fixed magazine, as defined by Penal Code section 30515, must be registered with the Department before January 1, 2018.

(b)     A semiautomatic, centerfire or rimfire pistol with an ammunition feeding device that can be readily removed from the firearm with the use of a tool, commonly referred to as a bullet-button weapon, that has one or more specified features identified in Penal Code section 30515 is included in the category of firearms that must be registered.

(c)     A semiautomatic, centerfire rifle with an ammunition feeding device that can be readily removed from the firearm with the use of a tool, commonly referred to as a bullet-button weapon, that has one or more specified features identified in Penal Code section 30515 is included in the category of firearms that must be registered.

(d)     A semiautomatic shotgun with an ammunition feeding device that can be readily removed from the firearm with the use of a tool, commonly referred to as a bullet-button weapon, is included in the category of firearms that must be registered.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

§ 5471. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Explanation of Terms Related to Assault Weapon Designation.

The following definitions apply to terms used in the identification of assault weapons pursuant to Penal Code section 30515, and for purposes of Articles 2 and 3 of this Chapter:

(a)     "Ability to accept a detachable magazine" means with respect to a semiautomatic shotgun, it does not have a fixed magazine.

(b)     "Action" means the working mechanism of a semiautomatic firearm, which is the combination of the receiver or frame and breech bolt together with the other parts of the mechanism by which a firearm is loaded, fired, and unloaded.

(c)     "Barrel" means the tube, usually metal and cylindrical, through which a projectile or shot charge is fired. Barrels may have a rifled or smooth bore.

(d)     "Barrel length" means the length of the barrel measured as follows: Without consideration

of any extensions or protrusions rearward of the closed bolt or breech-face the approved procedure for measuring barrel length is to measure from the closed bolt (or breech-face) to the furthermost end of the barrel or permanently attached muzzle device. Permanent methods of attachment include full-fusion gas or electric steel-seam welding, high-temperature (1100°F) silver soldering, or blind pinning with the pin head welded over. Barrels are measured by inserting a dowel rod into the barrel until the rod stops against the closed bolt or breech-face. The rod is then marked at the furthermost end of the barrel or permanently attached muzzle device, withdrawn from the barrel, and measured.

(e)     "Bullet" means the projectile expelled from a gun. It is not synonymous with a cartridge. Bullets can be of many materials, shapes, weights, and constructions such as solid lead, lead with a jacket of harder metal, round-nosed, flat-nosed, hollow-pointed, et cetera.

(f)     "Bullet-button" means a product requiring a tool to remove an ammunition feeding device or magazine by depressing a recessed button or lever shielded by a magazine lock. A bullet-button equipped fully functional semiautomatic firearm does not meet the fixed magazine definition under Penal Code section 30515(b).

(g)     "Bore" means the interior of a firearm's barrel excluding the chamber.

(h)     "Caliber" means the nominal diameter of a projectile of a rifled firearm or the diameter between lands in a rifled barrel. In the United States, caliber is usually expressed in hundreds of an inch; in Great Britain in thousandths of an inch; in Europe and elsewhere in millimeters.

(i)     "Cartridge" means a complete round of ammunition that consists of a primer, a case, propellant powder and one or more projectiles.

(j)     "Centerfire" means a cartridge with its primer located in the center of the base of the case.

(k)     "Contained in" means that the magazine cannot be released from the firearm while the action is assembled. For AR-15 style firearms this means the magazine cannot be released from the firearm while the upper receiver and lower receiver are joined together.

(l)     "Department" means the California Department of Justice.

(m)     "Detachable magazine" means any ammunition feeding device that can be removed readily from the firearm without disassembly of the firearm action or use of a tool. A bullet or ammunition cartridge is considered a tool. An ammunition feeding device includes any belted or linked ammunition, but does not include clips, en bloc clips, or stripper clips that load cartridges into the magazine.

An AR-15 style firearm that has a bullet-button style magazine release with a magnet left on the bullet-button constitutes a detachable magazine. An AR-15 style firearm lacking a magazine catch assembly (magazine catch, magazine catch spring and magazine release button) constitutes a detachable magazine. An AK-47 style firearm lacking a magazine catch assembly (magazine catch, spring and rivet/pin) constitutes a detachable magazine.

(n)     "Disassembly of the firearm action" means the fire control assembly is detached from the action in such a way that the action has been interrupted and will not function. For example, disassembling the action on a two part receiver, like that on an AR-15 style firearm, would require the rear take down pin to be removed, the upper receiver lifted upwards and away from the lower receiver using the front pivot pin as the fulcrum, before the magazine may be removed.

(o)     "Featureless" means a semiautomatic firearm (rifle, pistol, or shotgun) lacking the characteristics associated with that weapon, as listed in Penal Code section 30515.

(p)     "Fixed magazine" means an ammunition feeding device contained in, or permanently attached to, a firearm in such a manner that the device cannot be removed without disassembly of the firearm action.

(q)     "Flare launcher" means a device used to launch signal flares.

(r)     "Flash suppressor" means any device attached to the end of the barrel, that is designed, intended, or functions to perceptibly reduce or redirect muzzle flash from the shooter's field of vision. A hybrid device that has either advertised flash suppressing properties or functionally has flash suppressing properties would be deemed a flash suppressor. A device labeled or identified by its manufacturer as a flash hider would be deemed a flash suppressor.

(s)     "FMBUS" means a Firearm Manufactured By Unlicensed Subject.

(t)     "Forward pistol grip" means a grip that allows for a pistol style grasp forward of the trigger.

(u)     "Frame" means the receiver of a pistol.

(v)     "Grenade launcher" means a device capable of launching a grenade.

(w)     "Permanently attached to" means the magazine is welded, epoxied, or riveted into the magazine well. A firearm with a magazine housed in a sealed magazine well and then welded, epoxied, or riveted into the sealed magazine well meets the definition of "permanently attached to".

(x)     "Overall length of less than 30 inches" with respect to a centerfire rifle means the rifle has been measured in the shortest possible configuration that the weapon will function/fire and the measurement is less than 30 inches. Folding and telescoping stocks shall be collapsed prior to measurement. The approved method for measuring the length of the rifle is to measure the firearm from the end of the barrel, or permanently attached muzzle device, if so equipped, to that part of the stock that is furthest from the end of the barrel, or

permanently attached muzzle device. (Prior to taking a measurement the owner must also check any muzzle devices for how they are attached to the barrel.)

(y)    "Pistol" means any device designed to be used as a weapon, from which a projectile is expelled by the force of any explosion, or other form of combustion, and that has a barrel less than 16 inches in length. This definition includes AR-15 style pistols with pistol buffer tubes attached. Pistol buffer tubes typically have smooth metal with no guide on the bottom for rifle stocks to be attached, and they sometimes have a foam pad on the end of the tube farthest from the receiver.

(z)    "Pistol grip that protrudes conspicuously beneath the action of the weapon" means a grip that allows for a pistol style grasp in which the web of the trigger hand (between the thumb and index finger) can be placed beneath or below the top of the exposed portion of the trigger while firing. This definition includes pistol grips on bullpup firearm designs.

(aa)    "Receiver" means the basic unit of a firearm which houses the firing and breech mechanisms and to which the barrel and stock are assembled.

(bb)    "Receiver, lower" means the lower part of a two part receiver.

(cc)    "Receiver, unfinished" means a precursor part to a firearm that is not yet legally a firearm. Unfinished receivers may be found in various levels of completion. As more finishing work is completed the precursor part gradually becomes a firearm. Some just have the shape of an AR-15 lower receiver for example, but are solid metal. Some have been worked on and the magazine well has been machined open. Firearms Manufactured by Unlicensed Subjects (FMBUS) began as unfinished receivers.

(dd)    "Receiver, upper" means the top portion of a two part receiver.

(ee)    "Rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(ff)    "Rimfire" means a rimmed or flanged cartridge with the priming mixture located in the rim of the case.

(gg)    "Second handgrip" means a grip that allows the shooter to grip the pistol with their non-trigger hand. The second hand grip often has a grip texture to assist the shooter in weapon control.

(hh)    "Semiautomatic" means a firearm functionally able to fire a single cartridge, eject the empty case, and reload the chamber each time the trigger is pulled and released. Further, certain necessary mechanical parts that will allow a firearm to function in a semiautomatic nature must be present for a weapon to be deemed semiautomatic. A weapon clearly designed to be semiautomatic but lacking a firing pin, bolt carrier, gas tube, or some other

crucial part of the firearm is not semiautomatic for purposes of Penal Code sections 30515, 30600, 30605(a), and 30900.

(1) A mechanically whole semiautomatic firearm merely lacking ammunition and a proper magazine is a semiautomatic firearm.

(2) A mechanically whole semiautomatic firearm disabled by a gun lock or other firearm safety device is a semiautomatic firearm. (All necessary parts are present, once the gun lock or firearm safety device is removed, and weapon can be loaded with a magazine and proper ammunition.)

(3) With regards to an AR-15 style firearm, if a complete upper receiver and a complete lower receiver are completely detached from one another, but still in the possession or under the custody or control of the same person, the firearm is not a semiautomatic firearm.

(4) A stripped AR-15 lower receiver, when sold at a California gun store, is not a semiautomatic firearm. (The action type, among other things, is undetermined.)

(ii)    "Shotgun with a revolving cylinder" means a shotgun that holds its ammunition in a cylinder that acts as a chamber much like a revolver. To meet this definition the shotgun's cylinder must mechanically revolve or rotate each time the weapon is fired. A cylinder that must be manually rotated by the shooter does not qualify as a revolving cylinder.

(jj)    "Shroud" means a heat shield that is attached to, or partially or completely encircles the barrel, allowing the shooter to fire the weapon with one hand and grasp the firearm over the barrel with the other hand without burning the shooter's hand. A slide that encloses the barrel is not a shroud.

(kk)   "Spigot" means a muzzle device on some firearms that are intended to fire grenades. The spigot is what the grenade is attached to prior to the launching of a grenade.

(ll)    "Stock" means the part of a rifle, carbine, or shotgun to which the receiver is attached and which provides a means for holding the weapon to the shoulder.  A stock may be fixed, folding, or telescoping.

(mm)  "Stock, fixed" means a stock that does not move, fold, or telescope.

(nn)   "Stock, folding" means a stock which is hinged in some fashion to the receiver to allow the stock to be folded next to the receiver to reduce the overall length of the firearm. This definition includes under folding and over folding stocks.

(oo)   "Stock, telescoping" means a stock which is shortened or lengthened by allowing one section to telescope into another portion. On AR-15 style firearms, the buffer tube or receiver extension acts as the fixed part of the stock on which the telescoping butt stock slides or telescopes.

(pp)   "Those weapons with an ammunition feeding device that can be readily removed from the firearm with the use of a tool" includes functional semiautomatic rifles, pistols, and shotguns with bullet-button style magazine releases. These weapons do not have a fixed magazine.

(qq)   "Thumbhole stock" means a stock with a hole that allows the thumb of the trigger hand to penetrate into or through the stock while firing.

(rr)   "Threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer" means a threaded barrel able to accept a flash suppressor, forward handgrip or silencer, and includes a threaded barrel with any one of those features already mounted on it. Some firearms have "lugs" in lieu of threads on the end of the barrel. These lugs are used to attach some versions of silencers. For purposes of this definition a lugged barrel is the same as a threaded barrel.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

## Article 3. Assault Weapon Registration

§ 5472. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Weapons That Will Not Be Registered as Assault Weapons.

(a)   The Department will not register as an assault weapon a firearm unless it was lawfully possessed on or before December 31, 2016.

(b)   The Department will not register a firearm that was required to be registered under prior assault weapon registration laws in effect before January 1, 2017. These weapons include, but are not limited to, firearms known as "named assault weapons" and are listed in Penal Code section 30510 and sections 5495 and 5499 of Chapter 40.

(c)   The Department will not register a firearm as an assault weapon if the firearm is featureless.

(d)   The Department will not register a firearm as an assault weapon if the firearm has a fixed magazine that holds ten rounds or less.

(e)   The Department will not register a firearm as an assault weapon unless the firearm is fully assembled and fully functional.

(f)     The Department will not register as an assault weapon a firearm manufactured by a federally-licensed manufacturer if the firearm does not have a serial number applied pursuant to federal law.

(g)     The Department will not register as an assault weapon a FMBUS if the firearm does not have a serial number assigned by the Department and applied by the owner or agent pursuant to section 5474.2.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

§ 5473. Voluntary Cancellations

(a)     The DOJ will accept voluntary cancellations for assault weapons that are no longer possessed by the registrant. Cancellations will also be accepted for assault weapons, defined and registered pursuant to Penal Code section 30515, that have been modified or reconfigured to no longer meet the assault weapon definition. Cancellation requests must be signed, dated, and provide the following information:

(1) Registrant's full name, telephone number, and current address; make, model, and serial number of the assault weapon; and the DOJ assault weapon registration number (as indicated on the registration confirmation letter provided to the registrant at the time of registration). If the DOJ assault weapon registration number is unknown, the request must be notarized.

(b)     After confirmation of the information provided on the cancellation request, the DOJ will permanently delete the registration for the specified assault weapon(s). If there are no remaining assault weapons registered to the individual, all personal information regarding the registrant will also be deleted from the assault weapon data base. The DOJ will mail confirmation of the cancellation to the address provided on the request.

Note: Authority cited: Section 30520, Penal Code. Reference: Sections 30900, 30905, 30910, 30915, 30920, 30925, 30930, 30935, 30940, 30945, 30950, 30955, 30960 and 30965, Penal Code.

§ 5473. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); California Firearms Application Reporting System ("CFARS"); Account Requirements.

(a)     Assault weapon registrations must be filed electronically using the Department's California Firearms Application Reporting System (CFARS), at the following website: https://cfars.doj.ca.gov/login.do.

(b)     A CFARS account must be created to use the electronic registration system. To create a CFARS account, assault weapon registrants will be required to agree to the following

conditions of use:

(1) Non-Liability: The Department is not responsible for and will have no liability for any hardware, software, information, or other items or any services provided by any persons other than the Department. Except as may be required by law, in no event shall either party be liable to the other or any third party, under any theory of liability, including, but not limited to, any contract or tort claim for any cause whatsoever, for any indirect, incidental, special, or consequential damages, including loss of revenue or profits, even if aware of the possibility thereof.

(2) Authorization: I am authorized to use CFARS for the purpose of reporting firearm information to the Department in order to comply with California firearm laws and regulations. If I become aware of an unauthorized user obtaining access to my CFARS account, I will notify the Customer Support Center immediately at (916) 227-7527, or via email at: firearms.bureau@doj.ca.gov.

(3) Fees: Notwithstanding such notification, the Department shall not be liable for transaction charges fraudulently incurred. It will be the cardholder's responsibility to pay any charges. The Department will not provide refunds after the submission of a transaction.

(4) True and Accurate Information: All of the information I submit to the Department through CFARS shall be true, accurate, and complete to the best of my knowledge.

(c)    The following information must be provided by registrants in order to create a CFARS account:

(1) Full Name

(2) Email Address

(3) Three Security Questions and Answers

(4) Password

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

§ 5474. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Applicant and Firearms Information.

Once a CFARS account has been created, registrants must provide the following information:

(a)    The registrant's full name, address, telephone number, date of birth, sex, height, weight, eye color, hair color, military identification number (if applicable), California Driver License number or California Identification Card number, U.S. citizenship status, place of birth, country of citizenship, and alien registration number or I-94, if applicable.

(b)    A description of the firearm that identifies it uniquely, including but not limited to: firearm type, make, model, caliber, firearm color, barrel length, serial number, all identification marks, firearm country of origin/manufacturer, the date the firearm was acquired, the name and address of the individual from whom, or business from which, the firearm was acquired.

(c)    Clear digital photos of firearms listed on the application. One photo shall depict the bullet-button style magazine release installed on the firearm. One photo shall depict the firearm from the end of the barrel to the end of the stock if it is a long gun or the point furthest from the end of the barrel if it is a pistol. The other two photos shall show the left side of the receiver/frame and right side of the receiver/frame. These locations are typically where firearms are marked when manufacturing is complete. At the discretion of the Department the last two photos shall be substituted for photos of identification markings at some other locations on the firearm.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

§ 5474.1. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Joint Registration of Assault Weapons.

(a)    If a firearm will be jointly registered, one family member must be identified as the primary registrant. The name and relationship of each joint registrant must be provided. Joint registrants must reside in the same household and share the same address.

(b)    All joint registrants must be 18 years of age by December 31, 2017. Joint registrations are only authorized for the following family relationships:

(1)  Spouses

(2)  Parent to Child

(3)  Child to Parent

(4)  Grandparent to Grandchild

(5)  Grandchild to Grandparent

(6)  Domestic Partners

(7)  Siblings

(c)    Proof of address for each joint registrant shall be provided at the time of electronic submission. Acceptable forms of proof of address are as follows:

(1)  Carry Concealed Weapon (CCW) Permit

(2)  Curio and Relic (C & R) Federal firearm license with name and address

(3)  Utility Bill: Cable, electricity, garbage, gas, pipeline, propane, alarm/security or water bill with purchaser's name on it and dated within three months of application for registration.

(4)   Military permanent duty station orders indicating assignment within California; (active duty military spouse ID is not acceptable).

(5)   Property Deed: Valid deed or trust for the individual's property or a certificate of title

(6)   Resident Hunting License

(7)   Signed and dated rental agreement/contract or residential lease

(8)   Trailer certification of title

(9)   DMV Vehicle Registration

(10) Certificate of Eligibility, as defined in section 4031, subdivision (g) of Chapter 3.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515, 30900 and 30955, Penal Code.


5474.2. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Firearm Manufactured By Unlicensed Subject (FMBUS).

A person seeking assault weapon registration for this type of firearm shall seek a Department issued serial number at: dojserialnumber@doj.ca.gov, prior to initiating the assault weapon registration process.

(a)   A Department-provided serial number shall be issued and applied as follows:

   (1)  The Department shall issue a unique serial number to the applicant. The serial number issuance is a separate process and must be done before the assault weapon application will be accepted by the Department. Applicants seeking a FMBUS related serial number shall complete a New Serial Number Application, Form BOF 1008, (Rev 6/2017) hereby incorporated by reference, and submit it to the Department prior to the initiation of the registration of this type of firearm.

   (2)  Once the applicant has received a Department issued serial number, the applicant may contact a Federal Firearms Licensed Manufacturer (type 07) to have the serial number applied in a manner consistent with this section and federal law. However, a Federal Firearms Licensee is under no obligation to perform this work. Persons who have manufactured their own firearm may also use non-licensed parties to apply the serial number and other required markings; however, the owner of the weapon must not leave the firearm unattended with an unlicensed party in violation of firearms transfer and/or lending laws. Proof of the serial number being applied to the firearm shall be given to the Department in the form of one or more digital photographs of the newly serialized firearm being submitted in accordance with the photo requirement noted in section 5474 (c).

   (3)  An unlicensed manufacturer of firearms must legibly and uniquely identify each firearm manufactured as follows:

      (A)  By engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame or receiver thereof an individual serial number. The serial number must be placed in a manner not susceptible of being readily obliterated, altered, or removed, and must not duplicate any serial number placed by the unlicensed manufacturer on any other firearm. The engraving, casting, or stamping (impressing) of the serial number must be to a minimum depth of .003 inch and in a print size no smaller than 1/16 inch; and

      (B)  By engraving, casting, stamping (impressing), or otherwise conspicuously placing or causing to be engraved, cast, stamped (impressed) or placed on the frame, receiver, or barrel thereof certain additional information. This information must be placed in a manner not susceptible of being readily obliterated, altered, or removed. The additional information must include:

         (i)   The model of the firearm, if such designation has been made;

    (ii)   The caliber or gauge of the firearm;

    (iii)  The manufacturer's first and last name as provided to the Department for registration purposes, when applicable; and

    (iv)  The city and state (or recognized abbreviation thereof) where the manufacturer made the firearm.

(4)   Measurement of height and depth of markings. The depth of all markings required by this section will be measured from the flat surface of the metal and not the peaks or ridges. The height of serial numbers required by paragraph (a)(3)(A) of this section will be measured as the distance between the latitudinal ends of the character impression bottoms (bases).

(5)   The Department shall deny assault weapon registration applications if it determines the above described marking requirements have not been met.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

§ 5475. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Fees.

(a)   The fee to register an assault weapon is $15.00 per person, per transaction. There is no limit to the number of assault weapons a person can register in a single transaction.

(b)   The fee must be paid by debit or credit card at the time the registration is submitted to the Department for processing. If the fee is not paid, the registration will not be processed.

(c)   A $5 fee is required to obtain a copy of the original registration disposition letter.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

§ 5476. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Processing of Applications

(a)   Applications for assault weapon registration must be received between January 1, 2017, and December 31, 2017, and will be processed in the order in which they are received.

(b)   Once the registration has been submitted electronically and fees have been paid, the Department will inform the applicant, via email, that the application: has been received

and accepted for processing; is being returned as incomplete and specify what information is required; or has been rejected.

(c)     If the Department deems an application incomplete and notifies the applicant via email of the incomplete determination, the applicant shall provide the requested information or documentation within 30 days. If the Department does not receive the additional information or documentation within 30 days, the application will be rejected and the application fee will not be refunded.  The applicant may complete a new application before December 31, 2017, subject to a new application fee.

(d)     Once the Department determines that all necessary information has been received and the firearm qualifies for registration, the firearms eligibility check shall commence. The Department will inform the applicant of the results of the check.

(e)     If the firearms eligibility check is successful, the registrant shall receive an assault weapon registration disposition letter via U.S. mail.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515, 30900 and 30950, Penal Code.


§ 5477. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Post-Registration Modification of Registered Assault Weapons, Prohibition.

(a)     The release mechanism for an ammunition feeding device on an assault weapon registered pursuant to Penal Code section 30900, subdivision (b)(1) shall not be changed after the assault weapon is registered.  A weapon's eligibility for registration pursuant to Penal Code section 30900, subdivision (b)(1) depends, in part, on its release mechanism. Any alteration to the release mechanism converts the assault weapon into a different weapon from the one that was registered.

(b)     The prohibition in subdivision (a) does not extend to the repair or like-kind replacement of the mechanism.

(c)     This prohibition in subdivision (a) does not extend to a firearm that is undergoing the deregistration process pursuant to section 5478. Written confirmation from the Department that acknowledges the owner's intent to deregister his or her assault weapon pursuant to section 5478 shall be proof the deregistration process has been initiated.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

§ 5478. Registration of Assault Weapons Pursuant to Penal Code Section 30900(b)(1); Voluntary Deregistration.

(a)   The Department will accept voluntary deregistration requests for assault weapons that are no longer possessed by the registrant, in the form of a completed Form BOF 4546, "Notice of No Longer in Possession," (Rev 6/2017) hereby incorporated by reference. Deregistration requests will also be accepted for assault weapons, as defined in Penal Code section 30515, that have been modified or reconfigured to no longer meet that definition. Deregistration requests must be in writing, signed, dated, and provide the following information:

(1)   Registrant's full name, telephone number, and current address; make, model, and serial number of the assault weapon; and the Department assault weapon registration number (as indicated on the registration confirmation letter provided to the registrant at the time of registration). If the Department assault weapon registration number is unknown, the request must be notarized.

(2)   If the firearm has been modified or reconfigured to no longer meet the definition of assault weapon, one or more photographs clearly depicting the firearm in its current configuration shall be attached to the written deregistration request. Additional information, photographs, or inspection may be requested by the Department before determining eligibility for deregistration.

(3)   If the registrant is no longer in possession of the firearm, proof of sale or transfer of the firearm shall be attached to the written deregistration request. Acceptable proof includes receipts from out-of-state gun stores, or law enforcement reports depicting the seizure and/or destruction of the firearm(s).

(b)   Upon determining eligibility for deregistration, the Department will delete the assault weapon registration for the specified firearm(s), and, if the weapon is still in the possession of the registrant, will convert the information to a BOF 4542A, "Firearm Ownership Report, (Rev. 6/2017), hereby incorporated by reference.

(c)   If the registrant has sold the weapon to a party outside of the State of California or otherwise lawfully disposed of the weapon, or if the weapon was seized by law enforcement, the Department will create a "No Longer In Possession" entry in the Automated Firearms System.

(d)   Upon completion of the assault weapon deregistration, the Department will mail confirmation of deregistration and updated firearm ownership information to the registrant at the address provided on the request.

Note: Authority cited: Section 30900, Penal Code. Reference: Sections 30515 and 30900, Penal Code.

# Exhibit 24

SENIOR PARTNER
C. D. Michel*

MANAGING PARTNER
Joshua Robert Dale

SPECIAL COUNSEL
Eric M. Nakasu
W. Lee Smith

ASSOCIATES
Anna M. Barvir
Sean A. Brady
Matthew D. Cubeiro
Scott M. Franklin
Margaret E. Leidy
Ben A. Machida
Clint B. Monfort
Joseph A. Silvoso, III
Los Angeles, CA

*   Also admitted in Texas and the
    District of Columbia

OF COUNSEL
Matthew M. Horeczko
Los Angeles, CA

## MICHEL & ASSOCIATES, P.C.
### Attorneys at Law

WRITER'S DIRECT CONTACT:
562-216-4444
JSILVOSO@MICHELLAWYERS.COM

December 28, 2016

Office of Administrative Law
ATTN: OAL Reference Attorney
300 Capitol Mall, Suite 1250
Sacramento, CA 95814
staff@oal.ca.gov
**BY MAIL & EMAIL**

Department of Justice
Bureau of Firearms
ATTN: Jacqueline Dosch and Melan Noble
P.O. Box 160487
Sacramento, CA 95816
Regulations@doj.ca.gov
jacqueline.dosch@doj.ca.gov
melan.noble@doj.ca.gov
Fax: (916) 324-5033
**BY MAIL, EMAIL, & FAX**

RE:   **OPPOSITION to the Proposed Emergency Regulations Regarding "Large-Capacity Magazines" and "Large-Capacity Magazine Conversion Kits"**

To Whom It May Concern:

We write on behalf of our clients, the National Rifle Association of America ("NRA") and the California Rifle & Pistol Association, Incorporated ("CRPA"), as well as their respective members throughout California and the United States. We write in opposition to the California Department of Justice's ("DOJ") proposed emergency regulations relating to "large-capacity magazines"[1] (OAL File Nos. 2016-1223-02E Parts 1a and 1b and 2016-1223-02 Part 2).

For the following reasons, the Office of Administrative Law ("OAL") should reject the proposed regulations and require DOJ to follow the standard rulemaking process:

1.      The laws covering "large-capacity magazines " ("LCMs"), affected by the proposed emergency regulations, have been on California's books for 17 years.

2.      The laws restricting "large-capacity magazine conversion kits" ("Conversion Kits")

---

[1] These regulations also, briefly, address "large-capacity magazine conversion kits." Because these regulations predominantly cover "large-capacity magazines," and for the sake of brevity, we will refer to these regulations as covering "large-capacity magazines." But we will address the concerns relating to "large-capacity magazine conversion kits" as well.

went into effect in 2014.

3.  The new laws restricting the possession of LCMs do not go into effect until July 1, 2017. There is no change to the restrictions on conversion kits.

4.  DOJ presented zero evidence that an emergency exists, and there is ample time to address the regulations using the standard rulemaking procedure.

5.  There is no need to clarify the existing or the new laws. DOJ has let the California public and firearm industry dictate the definitions of key terms used in California law without clarification or guidance.

6.  The regulations are not necessary to avoid serious harm to the public. More troubling is the fact that if these regulations go into effect, DOJ will create unwitting felons without adequate notice or giving the public reasonable opportunity to comment.

Both the content of DOJ's proposed regulations and the timing of their submission are suspect. Our clients are gravely concerned about DOJ's attempt to circumvent the notice and hearing requirements of the California Administrative Procedure Act ("APA") during a time that encompasses both a holiday and one of the busiest periods of the year for firearm dealers and manufacturers.

On December 23, 2016, DOJ submitted its proposed regulations to the OAL, seeking an emergency exception to the requirements of the APA. This submission occurred on the Friday before Christmas Eve (Saturday) and Christmas (Sunday). Monday, December 26, is the federally-observed holiday for Christmas this year and taken as a holiday by many other Californians due to its connection to the Christmas weekend. It is also one of the busiest shopping days of the year. The timing of DOJ's submission is dubious at best if not downright deceitful.

As explained below, no actual emergency exists to justify the application of the regulations here. Even if there is an emergency, DOJ's proposed regulations do not address it, as the regulations are not needed to implement or enforce the new ban on LCM possession. And the shortened notice and comment period that DOJ seeks, along with the consequences of certain proposed regulations, will lead to detriment and damages for thousands of Californians.

I.   **BACKGROUND**

A.   **The Current Law for "Large-Capacity Magazines" and "Large-Capacity Magazine Conversion Kits" and How Permanently Altering a "Large-Capacity Magazine" Can Exempt a Device from the Definition and Restrictions for "Large-Capacity Magazines"**

The current restrictions relating to LCMs were part of Senate Bill 23, which passed in 1999. They have been on the books for 17 years and were relatively unchanged for that entire period of time. Meanwhile, the laws defining and restricting "large-capacity magazine conversion kits" went into

December 28, 2016
Page 3 of 17

effect in 2014 and remained unchanged from their original versions.[2]

### 1.    Definition of "Large-Capacity Magazine"

The definition of "large-capacity magazine" has also been relatively unchanged since 2000. Back then, "'large-capacity magazine' mean[t] any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include a feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds nor shall it include any .22 caliber tube ammunition feeding device."[3]

Today, the Penal Code defines "large-capacity magazine" as:

"'[A]ny ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include any of the following:

(a)    *Feeding devices that have been permanently altered so that they cannot accommodate more than 10 rounds.*

(b)    A .22 caliber tube ammunition feeding device.

(c)    A tubular magazine that is contained in a lever-action firearm."[4]

### 2.    Definition of "Large-Capacity Magazine Kit"

A "large-capacity magazine conversion kit" "is a device or combination of parts of a fully functioning large-capacity magazine, including, but not limited to, the body, spring, follower, and floor plate or end plate, capable of converting an ammunition feeding device into a large-capacity magazine."[5]

### 3.    Restrictions on "Large-Capacity Magazine"/"Large-Capacity Magazine Conversion Kit" Activities, Not Possession

The original restrictions on LCMs stated that: "Commencing January 1, 2000, [any person who] manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes

---

[2] *Compare* Enacted Legislation Stats. 2013, c. 728 (A.B. 48) *with* Cal. Penal Code § 32311.

[3] *See, e.g.,* Cal. Penal Code § 12020, subd. (c)(25) (2000); *see also* Enacted Legislation Stats. 1999, c. 129 (S.B. 23). Former Penal Code section 12020 was broken up by the general renumbering of the "dangerous weapons" sections of the Penal Code in 2012.

[4] Cal. Penal Code § 16740 (emphasis added). California law does not explain further what an LCM is. However, in its definition of "detachable magazine," California states that an "ammunition feeding device" includes "any belted or linked ammunition" but not "clips, en bloc clips, or stripper clips that load cartridges into the magazine." (Cal. Code Regs. tit. 11, § 5469, subd. (a).)

[5] Cal. Penal Code § 32311.

December 28, 2016
Page 4 of 17

for sale, or who gives, or lends, any large-capacity magazine" will be punished by imprisonment.[6] A violation of these restrictions is punishable as a misdemeanor or a felony.[7] Of note, possession of "large-capacity magazines" was not restricted. So those in possession of "large-capacity magazines" before January 1, 2000 could continue to possess them under California law.

The current restrictions on LCMs state that LCMs are illegal to make, manufacture, import, sell, keep or expose for sale, give, buy, receive, or loan within California.[8] The restrictions on buying and receiving LCMs were added to the code on 2014.[9] Violation of any of these restrictions remains a misdemeanor or felony pursuant to the prosecutor or court's discretion.[10]

Just like LCMs, the *possession* of conversion kits is not a restricted activity that violates the law. "Any person in [California] who knowingly manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives" a conversion kit violates California law.[11] Unlike the punishments for LCMs, a person may only be prosecuted for a misdemeanor for violating the restrictions relating to conversion kits.[12]

### 4.     *Exceptions to the Restrictions*

Penal Code section 12020, the precursor to the current restrictions on LCMs, lumped LCMs with other weapons. Therefore, there were exceptions that applied to that entire group of weapons, including LCMs. Today, those exceptions are located under the exceptions for "generally prohibited weapons," of which LCMs are included.[13] In addition, LCMs were provided their own specific exceptions.[14] Hence, there are two sets of exceptions that apply to LCMs: those for "generally prohibited weapons" and those specific to LCMs. All of the exceptions for LCMs also apply to conversion kits.[15]

---

[6]  Cal. Penal Code § 12020, subd. (a)(2) (2000).

[7]  *See* Cal. Penal Code § 12020, subd. (a) (2000).

[8]  Cal. Penal Code § 32310, subd. (a).

[9]  *See* Enacted Legislation Stats. 2013, c. 728 (A.B. 48) (adding "buys" and "receives" to the list of restricted activities in Penal Code section 32310, subdivision (a)).

[10]  *See* Cal. Penal Code § 32310, subd. (a).

[11]  Cal. Penal Code § 32311, subd. (a).

[12]  *See id.*

[13]  *See* Cal. Penal Code §§ 17700 *et seq.*

[14]  *See* Cal. Penal Code §§ 32400 *et seq.*

[15]  *See* Cal. Penal Code § 32311, subd. (a).

December 28, 2016
Page 5 of 17

     *a.*    *Interplay of the Exceptions and DOJ's "Large-capacity Magazine" Permit*

There are a number of exceptions to the restrictions for LCMs. However, these exceptions have an interesting interplay. For those who want to import LCMs or conversion kits into California, the law is clear that they have to first obtain an LCM Permit from DOJ for the importation.[16] The law is also clear that the restrictions on LCMs and conversion kits "do not apply to the importation into this state of, or sale of, any large-capacity magazine by" such Permit holders, "when those activities are in accordance with the terms and conditions of that permit."[17] But once the LCMs and conversion kits are in California, however, another exception to the general restriction must be used (e.g., sell to law enforcement or the entertainment industry) in order to lawfully transfer the device(s).

     *b.*    *DOJ's Lack of Guidance and Clarification Resulting in (Heretofore Accepted) Industry and Public Modification of "Large-Capacity Magazines" Based on the "Permanent Alteration" Exception*

For 17 years, Californians knew that an ammunition feeding device holding more than 10 rounds would lose its LCM status if someone *permanently alters* it so that it can no longer accept more than 10 rounds.[18] We know of no cases where DOJ and law enforcement ever questioned or challenged any of the many types of alterations people used to modify their LCMs to hold no more than 10 rounds.

When the original restrictions on LCMs passed in 2000, DOJ  attempted to define "permanently altered" in the California Code of Regulations, but it then deleted the definition[19] and never provided further regulations or guidance. Therefore, over the course of so many years, Californians naturally assumed that DOJ did not have its own definition of "permanently altered" and that common sense modifications to LCM would suffice.

For the last 17 years, Californian firearm owners, dealers, and manufacturers made or remade LCMs "California compliant" through "permanent alteration." There are countless articles and videos online on how to modify LCMs to hold 10 rounds. And there are a number of different ways to restrict a magazine so that it cannot hold more than 10 rounds. Yet, to reiterate, there has *never* been a case to our knowledge where DOJ (or any law enforcement/prosecuting agency for that matter) has challenged

---

[16] *See* Cal. Penal Code § 32315.

[17] Cal. Penal Code § 32430.

[18] *See* Cal. Penal Code § 16740, subd. (a).

[19] *See generally Notice of Modification to Text of Proposed Regulations*, California Department of Justice, Office of the Attorney General, http://oag.ca.gov/sites/all/files/agweb/pdfs/firearms/regs/sb23rev.pdf (last visited Dec. 20, 2016).

December 28, 2016
Page 6 of 17

an alteration of a magazine restricting its capacity to 10 rounds or less.

Thus, because of DOJ's silence on this issue, firearm dealers, manufacturers, and members of the public, have, for years, been "permanently altering" LCMs according to make them "California compliant." In its package of materials submitted to the OAL, DOJ does not state (much less cite to factual evidence showing) that this 17-year-old industry standard has in any way harmed public peace, health, safety, or welfare. DOJ's long-lasting silence and apparent support of these modifications support the lack of emergency for the pending regulations.

**B.      The New Ban on the Possession of "Large-Capacity Magazine" Introduced by Senate Bill 1446 and Proposition 63**

*Beginning on July 1, 2017*, the possession of LCMs shall generally be illegal within California.[20] This is due to the passage of Senate Bill ("SB") 1446 on July 1, 2016 and the people's decision to pass Proposition 63 on November 8, 2016.

It is important to note:

1.      There are no appreciable differences between the texts of SB 1446 and Proposition 63.

2.      Aside from expanding the restrictions on LCMs to include possession and making minor changes to the exceptions to those restrictions, SB 1446 and Proposition 63 leave current law relatively unchanged.

3.      The restriction on the possession of LCMs for both SB 1446 and Proposition 63 goes into effect on July 1, 2017.

SB 1446 generally prohibits the possession of LCMs in California, unless the possessor qualifies for an exception (e.g., being a certain kind of museum or historical society).[21] Meanwhile, Proposition 63 is an initiative measure that also bans the possession of LCMs in California. It just eliminates some of the exceptions available under SB 1446 and presents a slightly different punishment[22] – differences that have no bearing on how the possession ban itself is to be implemented or enforced by DOJ's proposed emergency regulations.

Significantly, both SB 1446 and Proposition 63 state that the new ban on LCM possession will not take effect until July 1, 2017, which is a full year after the passage of SB 1446 and more than half a

---

[20]  Cal. Penal Code § 32310, subd. (b) (effective July 1, 2017). Certain local jurisdictions, such as Los Angeles and Sunnyvale, already have restrictions on LCMs.

[21]  *See generally* Stats. 2016, c. 58 (S.B.1446).

[22]  For instance, Proposition 63 states in its Findings and Declaration section that "[n]o one except trained law enforcement should be able to possess [LCMs]." (*See generally* 2016 Cal. Legis. Serv. Prop. 63 (Proposition 63) (West).)

December 28, 2016
Page 7 of 17

year after the passage of Proposition 63.[23] Under both SB 1446 and Proposition 63, firearm owners have until July 1, 2017 to (1) permanently alter or (2) dispose of their LCMs if the magazines are affected by the new law.[24] A person can lawfully dispose of an LCM by any of the following means:

(1)     Remove the LCM from the state;

(2)     Sell the LCM to a licensed firearms dealer;

(3)     Destroy the LCM; or

(4)     Surrender the LCM to a law enforcement agency for destruction.[25]

Neither SB 1446 nor Proposition 63 changed any laws covering conversion kits. The changes in the laws only relate to the possession of LCMs, not conversion kits.

C.     **The Content at Issue in DOJ's Proposed Emergency Regulations**

DOJ says that it is issuing emergency regulations in response to the new ban on LCM *possession* implemented by SB 1446 and Proposition 63. In its most relevant parts, DOJ's set of proposed emergency regulations:

•     Require firearm dealers to get a separate LCM Permit for each licensed location;[26]

•     Require LCM Permit holders to keep records of the sales of LCMs and require this to be done within 24 hours of any sale;[27]

•     Expand the scope of violations constituting LCM Permit revocation;[28]

•     Provide guidance stating that a lawful possessor/owner of an LCM may take it apart and put it back together;[29]

---

[23]   *See generally* Cal. Penal Code § 32310, subd. (b) (effective July 1, 2017).

[24]   *See id.*

[25]   *Id.*

[26]   Cal. Code Regs., tit. 11, § 5480, subd.(d) (proposed).

[27]   *See* Cal. Code Regs., tit. 11, § 5483, subds. (b)-(f) (proposed).

[28]   *See* Cal. Code Regs., tit. 11, § 5484, subds. (b)-(e) (proposed).

[29]   *See* Cal. Code Regs., tit. 11, § 5490 (proposed).

- Clarify that an owner of an LCM may modify the magazine and clarify the ways the LCM can be "permanently altered" for purposes of exempting it from the definition of "LCM"[30] (i.e., DOJ "has determined the acceptable minimum level of permanence"[31]);

- State how magazine capacity for shotguns ought to be measured (i.e., either based on shotgun shells that are 2.75 inches or the shotgun shell standard indicated on the firearm);[32]

- Provide the circumstances under which magazines, each having a 10-round capacity or less, would be deemed "LCMs" when they are attached to each other (e.g., with tape or welded together);[33]

- Designate certain shotguns to have LCMs if they are equipped with more than one magazine tube that can hold (collectively) more than 10 shells, and can either (1) fire all of the shells without the use of a magazine tube selector switch or (2) have a switch that allows the user to utilize the shells from both tubes;[34] and

- Clarify what constitutes a conversion kit and that a person may disassemble his or her lawfully-possessed LCM and reassemble it without violating Penal Code section 32311.[35]

## II.  DOJ's Proposed "Emergency" Regulations Are Not Necessary to Address an Emergency

DOJ cannot utilize the APA's emergency rulemaking process. DOJ had, and still has, time to act via the APA's "standard" (i.e., non-emergency) rulemaking process, and it does not justify its failure (or refusal) to abide by the APA's "standard" rulemaking process. Simply put, there is no emergency based on time frame. Further, there is also no emergency based on the level of harm that is threatening public peace, health, safety, or welfare. It is significant that **DOJ does not present any evidence suggesting an emergency exists.**

Not only is there no harm that needs to be addressed when it comes to the new ban on LCM possession, but there is also no uncertainty that needs to be addressed. Accordingly, DOJ's proposed regulations do not address any unresolved issues arising from the new ban on LCM possession. In the

---

[30] *See* Cal. Code Regs., tit. 11, § 5491, subds. (a)-(b)(2) (proposed).

[31] DOJ, *Finding of Emergency* (submitted with the proposed emergency regulations at issue), page 2 (2016).

[32] Cal. Code Regs., tit. 11, § 5491, subd. (b)(3) (proposed).

[33] Cal. Code Regs., tit. 11, § 5491, subd. (b)(4) (proposed).

[34] Cal. Code Regs., tit. 11, § 5491, subd. (b)(5) (proposed).

[35] Cal. Code Regs., tit. 11, § 5492 (proposed).

end, it appears as if DOJ is yoking the new ban to its proposed regulations as a means to poach a deadline, however artificial it may be, to further its attempt to circumvent the APA's "standard" rulemaking process.

### A.   The Law Governing the Shortened Notice/Comment Period for the APA's Emergency Rulemaking Process and the Requisite Finding of "Emergency"

#### 1.   *The Law re: Shortened Notice and Comment Period for Emergency Regulations, Contrasted with the APA's "Standard" Rulemaking Process*

Emergency regulations are not subject to the regular notice and comment procedures set forth in the APA. The emergency rulemaking process, rather, has specific requirements outlined in section 11346.1 of the Government Code. The section provides a brief notice period,[36] a short public comment period,[37] and limited time for the OAL to approve or deny the emergency regulations based on an adjudication of whether they are necessary to address an emergency.[38] If approved by the OAL, the emergency regulation will be effective upon filing with the Secretary of State and thrust upon the unsuspecting public. Thus, DOJ's "emergency" LCM regulations can become effective and fully applicable to all Californians in just 17 days or so without any further notice.

In contrast, the "standard" APA rulemaking process requires the state agency to: give the public a 45-day opportunity to comment on the proposed regulation (and hold a public hearing if any member of the public requests one within 15 days prior to the close of that 45-day written comment period); consider the public's comments as it decides whether to amend its proposed regulations; (if it does decide to make amendments,) make the amendments available for public comment for at least 15 or 45 days depending on the substantiality of the amendment; summarize and respond on the record to timely public comments that are directed to it; and then submit a rule-making action to the OAL, which then has 30 days to reach a decision on whether to approve or deny the proposed regulations.[39]

Based on simple arithmetic–and even providing additional buffer room for time spent on consideration, research, and everyday delays–common sense dictates that the APA's "standard" rulemaking process can be completed in approximately 4 to 5 months. Moreover, a final regulation just has to be filed between March 1 and May 31, 2017 to become effective on July 1, 2017.[40]

It bears repeating, then, that the laws covering LCMs have been around for *17 years* (including the "permanently altered" exception). And the restrictions for conversion kits were implemented in 2014. DOJ had ample time to implement regulations in a timely fashion, which would have allowed for

---

[36] Cal. Govt. Code, § 11346.1, subd. (a)(2).

[37] Cal. Code Regs., tit. 1, § 55, subd. (b).

[38] *See* Cal. Code Regs., tit. 1, § 56, subd. (a)(1).

[39] *See Guide to Public Participation in the Regulatory Process*, Office of Administrative Law, http://www.oal.ca.gov/files/2016/10/How-2-Participate-102016.pdf (last visited Dec. 20, 2016).

[40] *See id.* at page 18.

public comment and criticism as intended by the APA. As discussed below, DOJ cannot justify its fabricated "emergency."

Furthermore, the timing of its "emergency" regulations, over the holiday season, calls into serious question DOJ's motives and willingness to provide Californians ample notice or opportunity to comply and/or comment on the pending laws.

### 2.   *The Law re: The Requisite Finding of Emergency for the APA's Emergency Rulemaking Process*

Presumably because there is such a marked difference between the notice and comment periods for the APA's "standard" rulemaking process and that of its emergency rulemaking process, California has safeguards in place to ensure that the emergency rulemaking process is not abused and only used when it is truly needed. Hence, California only allows the APA's emergency rulemaking process to be used when "the adoption of a regulation . . . is necessary to address an emergency[.]"[41]

According to state law, "'[e]mergency' means a situation that calls for immediate action to avoid serious harm to the public peace, health, safety, or general welfare."[42] To establish a sufficient "emergency," DOJ "must . . . *describ[e] specific facts supported by substantial evidence* that demonstrate the existence of an emergency and the need for immediate adoption of the proposed regulation," unless the situation is expressly deemed an emergency by statute.[43]

In addition, if the emergency existed and was known by the agency in sufficient time to have been addressed through non-emergency regulations, the finding of emergency shall include facts explaining the failure to address the situation through non-emergency regulations. *A finding of emergency based only upon expediency, convenience, best interest, general public need, or speculation, is not adequate to demonstrate the existence of an emergency.*[44]

---

[41]   *See* Cal. Govt. Code, § 11346.1(b)(1).

[42]   Cal. Govt. Code, § 11342.545.

[43]   *About the Emergency Rulemaking Process*, Office of Administrative Law, http://www.oal.ca.gov/regulations/emergency_regulations/emergency_regulation_process/ (last visited Dec. 20, 2016) (citing Cal. Govt. Code, § 11346.1, subd. (b)(2)) (emphasis added).

[44]   *Id.* (emphasis added).

**B.** **DOJ's "Finding of Emergency" Does Not Sufficiently Demonstrate that the Proposed Regulations Are Necessary to Address an Emergency and to Avoid Serious Public Harm**

*1.* *Assuming Arguendo that the Proposed Emergency Regulations Are Even Needed to Implement/Enforce/Clarify the New Law, There Is No Emergency Based on Time Frame*

DOJ turns a blind eye on the fact that it has had sufficient time to address its claimed "emergency" through non-emergency regulations. In the documents it submitted to the OAL, DOJ willfully overlooks the facts that: (1) the new ban on LCM possession does not go into effect until July 1, 2017, (2) DOJ knew as early as *July 1, 2016* that a ban on LCM possession would occur starting on July 1, 2017, and (3) therefore, DOJ has had ample time–and *still* has time–to issue the regulations it thinks it needs by going through the "standard" APA rulemaking process.

DOJ cannot claim that it was waiting for the November 8, 2016 vote on Proposition 63 to act because the Governor already signed the LCM restrictions in Proposition 63 into law on July 1, 2016 when he passed SB 1446. The differences between Proposition 63 and SB 1446 do not affect the substance of DOJ's proposed regulations (*see* Section I.B above).[45]

What was DOJ doing since July 1, 2016 that prevented it from drafting its proposed regulations–a mere five pages–until just a couple of days ago?

And, more importantly, what is preventing DOJ from proceeding via the APA's "standard" rule making process now, given the facts that the process can be completed in 4 months *and DOJ has until May 31, 2017 to file final regulations for a July 1, 2017 deadline*?

DOJ failed to address these crucial concerns and, therefore, failed to show that an emergency exists to justify the utilization of the APA's emergency rulemaking process. Half-heartedly, DOJ attempts to argue on page 1 of its *Finding of Emergency* that "[t]hese regulations need to be established as soon as possible so [DOJ] has time to notify gun owners and gun owners have time to make the necessary changes to comply with the ban."[46]

The logic of this argument fails on many levels. For one, as shown in Section II.B.3 below, DOJ's proposed emergency regulations are not needed to implement, clarify, or enforce the new law banning the possession of LCMs (i.e., the *only* law that DOJ identified in its *Finding of Emergency* that comes with a deadline). So there is no time pressure to notify gun owners about the proposed regulations if DOJ is truly worried about ensuring people's compliance with the new ban. And the

---

[45] DOJ states on page 1 of its *Finding of Emergency* that "the Legislature pre-amended Proposition 63 with the passage of Senate Bill 1446 . . . The clarifying amendments take effect on January 1, 2017." This is not only confusingly worded, but it also gives the wrong impression that a January 1, 2017 deadline somehow looms on the horizon for DOJ.

[46] DOJ, *Finding of Emergency* (submitted with the proposed emergency regulations at issue), page 1 (2016).

December 28, 2016
Page 12 of 17

proposed regulations relating to permit applications, record keeping, and revocation are certainly not needed in an "emergency" capacity (and DOJ makes absolutely no attempt to connect them with any deadline or temporal urgency).

Second, due to its longer periods for public comment, hearing, and feedback, the APA's "standard" rulemaking process gives Californians more notice of a proposed regulation than the APA's emergency rulemaking procedure. If DOJ is truly worried about lack of notice to gun owners and giving them more time to comply with the law, DOJ should have proceeded via the APA's "standard" rulemaking process. At that point, Californians would have ample opportunity to review, understand, and make suggestions to DOJ's regulations, and, indeed, DOJ would have the ability to not only correct errors and oversights in the current regulations, but also to make corrections so that the regulations are more workable for the public.

As a result, DOJ altogether fails to show why there is a time crunch necessitating the finding of an emergency and the issuance of emergency regulations.

### 2.   *Assuming Arguendo that an Emergency Exists and DOJ Has Run Out of Time to Proceed via the APA's "Standard" Rulemaking Process, DOJ Fails to Justify Its Failure to Meet the Non-Emergency Deadlines*

Because DOJ's alleged "emergency" "existed and was known by [DOJ] in sufficient time to have been addressed through non-emergency regulations," DOJ must meet its burden to justify its "failure to address the situation through non-emergency regulations[.]"[47] DOJ has failed to do so.

Essentially, all DOJ does is state in its *Explanation of Failure to Adopt Nonemergency Regulations* that it:

> is unable to develop regulations in the standard manner because of the short timeframes [sic] provided in the legislation. The legislation was signed into law on July 1, 2016, and the ban commences on July 1, 2017.[48]

It is not sufficient to state the (comfortable) length of time one has to act and then dismiss it with a short, unqualified, and incorrect statement that the length of time to enact non-emergency regulations is too short. As explained above in Section II.B.1, the time frame given to DOJ was not too short. Actually, DOJ could propose, hold public comment, modify, and submit for final approval a number of regulations back-to-back during this timeframe. DOJ does not seem to have any countering explanation as to why a year is too short.

---

[47]  *Id.* at page 2.

[48]  *Id.* at page 1.

December 28, 2016
Page 13 of 17

> **3.** ***DOJ's Proposed Regulations Are Not Necessary to Implement/Enforce/Clarify the New "Large-Capacity Magazine" Possession Ban***

In its *Finding of Emergency*, DOJ disingenuously states that its proposed emergency regulations are

> *necessary* to provide guidance to California's gun owners so that by July 1, 2017, they will be in compliance with the law. The proposed regulations provide options for disposal of large-capacity magazines, as well as instructions for reducing the capacity of a large-capacity magazine[.][49]

Any reasonable person reading the texts of SB 1446 and Proposition 63, and who understands just the general contours of California's LCM laws during the last 17 years and conversion kit laws over the last three, would know that DOJ's assertion rings false.

A reasonable review of the texts reveals that neither SB 1446 nor Proposition 63 introduce any new legal requirements *necessitating new*, clarifying regulations on how an LCM Permit holder should keep records, how "permanent alteration" should be defined, how magazine capacity for shotguns ought to be measured, how magazines attached to one another can be LCMs, how dual-tube shotguns can be LCMs, etc.

The issues addressed by DOJ's proposed emergency regulations arose long before California even contemplated SB 1446 and Proposition 63, and have been on the horizon for quite some time. Accordingly, Californians have asked DOJ numerous times to address these issues. DOJ has generally refused to do so. As a result of years of silence from DOJ, firearm manufacturers, dealers, and owners created their own compliance mechanisms independent of DOJ. All these years, DOJ failed to provide guidance, comment, and even challenges to these mechanisms.

So why do these issues only ***now*** need to be addressed over the holiday season? What possible part of SB 1446 and Proposition 63 changes the status quo and/or landscape of LCM law in a way to make the regulations so necessary? Why didn't DOJ identify such a provision or explain how the status quo was changed in the materials it submitted to the OAL?

DOJ's meaningful silence on this matter and the statutory language itself show that the proposed emergency regulations are not needed to implement, enforce, and/or clarify the new ban on LCM possession. Unlike the case with the new "assault weapon" laws taking effect on January 1, 2017,[50] there is no indication that California gun owners cannot comply with the new laws banning LCM possession in the absence of DOJ's regulations. There is no need for DOJ to be so paternalistic or officious when it comes to grown-up gun owners, saying that the regulations are *necessary* for compliance.

---

[49]   *Id.* at page 5 (emphasis added).

[50]   Cal. Penal Code §§ 30515, 30680, 30900 (effective January 1, 2017).