1  Xavier Becerra
   Attorney General of California
2  Tamar Pachter
   Supervising Deputy Attorney General
3  Nelson R. Richards
   Anthony P. O'Brien
4  Deputy Attorneys General
   Alexandra Robert Gordon
5  Deputy Attorney General
   State Bar No. 207650
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone: (415) 703-5509
     Fax: (415) 703-5480
8    E-mail:
     Alexandra.RobertGordon@doj.ca.gov
9  *Attorneys for Defendant*
   *Attorney General of California*

10

11                 IN THE UNITED STATES DISTRICT COURT

12            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| 15 **VIRGINIA DUNCAN, et al.** | 17-cv-1017-BEN-JLB |
| 16                            Plaintiffs, | |
| 17        **v.** | **EXHIBITS 57-62 TO THE DECLARATION OF ALEXANDRA ROBERT GORDON IN SUPPORT OF DEFENDANT ATTORNEY GENERAL XAVIER BECERRA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 18 **XAVIER BECERRA, in his official capacity as Attorney General of the State of California; et al.,** | |
| 19 | |
| 20 | |
| 21                            Defendants. | |
| 22 | Date:        June 13, 2017 |
| 23 | Time:        10:00 a.m. |
| | Dept:        5A |
| 24 | Judge:       Hon. Roger T. Benitez |
| | Action Filed:    May 17, 2017 |

25

26

27

28

# Exhibit 57

H.R. REP. 103-489, H.R. Rep. No. 489, 103RD Cong., 2ND Sess.
1994, 1994 WL 168883, 1994 U.S.C.C.A.N. 1820 (Leg.Hist.)
, VIOLENT CRIME CONTROL AND LAW ENFORCEMENT ACT OF 1994

PUBLIC SAFETY AND RECREATIONAL FIREARMS USE PROTECTION ACT

DATES OF CONSIDERATION AND PASSAGE

House: November 3, 1993; March 23, April 14, 19, 20, 21, May 5, August 19, 21, 1994
Senate: November 3, 4, 5, 8, 9, 10, 11, 16, 17, 18, 19, 1993; May 19, August 22, 23, 24, 25, 1994
Cong. Record Vol. 139 (1993)
Cong. Record Vol. 140 (1994)
House Report (Judiciary Committee) No. 103–324,
Nov. 3, 1993 (To accompany H.R. 3355)
House Report (Judiciary Committee) No. 103–489,
May 2, 1994 (To accompany H.R. 4296)
House Conference Report No. 103–694,
Aug. 10, 1994 (To accompany H.R. 3355)
House Conference Report No. 103–711,
Aug. 21, 1994 (To accompany H.R. 3355)

RELATED REPORTS

House Report (Judiciary Committee) No. 103–45,
Mar. 29, 1993 (To accompany H.R. 829)
House Report (Judiciary Committee) No. 103–245,
Sept. 21, 1993 (To accompany H.R. 1385)
House Report (Judiciary Committee) No. 103–320,
Nov. 3, 1993 (To accompany H.R. 3350)
House Report (Judiciary Committee) No. 103–321,
Nov. 3, 1993 (To accompany H.R. 3351)
House Report (Judiciary Committee) No. 103–322,
Nov. 3, 1993 (To accompany H.R. 3353)
House Report (Judiciary Committee) No. 103–323,
Nov. 3, 1993 (To accompany H.R. 3354)
House Report (Judiciary Committee) No. 103–389,
Nov. 20, 1993 (To accompany H.R. 3098)
House Report (Judiciary Committee) No. 103–392,
Nov. 20, 1993 (To accompany H.R. 324)
House Report (Judiciary Committee) No. 103–395,
Nov. 20, 1993 (To accompany H.R. 1130)
House Report (Natural Resources Committee) No. 103-444,
Mar. 21, 1994 (To accompany H.R. 4034)
House Report (Judiciary Committee) No. 103–459,
Mar. 24, 1994 (To accompany H.R. 4033)
House Report (Judiciary Committee) No. 103–460,
Mar. 24, 1994 (To accompany H.R. 3979)
House Report (Judiciary Committee) No. 103–461,

Mar. 25, 1994 (To accompany H.R. 1120)
House Report (Judiciary Committee) No. 103–462,
Mar. 25, 1994 (To accompany H.R. 3968)
House Report (Judiciary Committee) No. 103–463,
Mar. 25, 1994 (To accompany H.R. 3981)
House Report (Judiciary Committee) No. 103–464,
Mar. 25, 1994 (To accompany H.R. 4030)
House Report (Judiciary Committee) No. 103–465,
Mar. 25, 1994 (To accompany H.R. 4031)
House Report (Judiciary Committee) No. 103–466,
Mar. 25, 1994 (To accompany H.R. 4032)
House Report (Judiciary Committee) No. 103–468,
Mar. 25, 1994 (To accompany H.R. 665)
House Report (Judiciary Committee) No. 103–469,
Mar. 25, 1994 (To accompany H.R. 3993)
House Report (Judiciary Committee) No. 103–489,
May 2, 1994 (To accompany H.R. 4296)
House Report (Judiciary Committee) No. 103–138,
Sept. 10, 1994 (To accompany S. 11)

HOUSE REPORT NO. 103–489

May 2, 1994
[To accompany H.R. 4296]

The Committee on the Judiciary, to whom was referred the bill (H.R. 4296) to make unlawful the transfer or possession of assault weapons, having considered the same, report favorably thereon with an amendment and recommend that the bill as amended do pass.

The amendment is as follows:

Strike out all after the enacting clause and insert in lieu thereof the following:

## SECTION 1. SHORT TITLE.

This Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

## SEC. 2. RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS.

(a) Restriction.–Section 922 of title 18, United States Code, is amended by adding at the end the following:

"(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

"(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.

"(3) Paragraph (1) shall not apply to–

"(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

"(B) any firearm that–

"(i) is manually operated by bolt, pump, lever, or slide action;

"(ii) has been rendered permanently inoperable; or

"(iii) is an antique firearm;

"(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

"(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.

The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.

"(4) Paragraph (1) shall not apply to–

"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

"(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

(b) Definition of Semiautomatic Assault Weapon.–Section 921(a) of such title is amended by adding at the end the following:

"(30) The term 'semiautomatic assault weapon' means–

"(A) any of the firearms, or copies or duplicates of the firearms, known as–

"(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

"(ii) Action Arms Israeli Military Industries UZI and Galil;

"(iii) Beretta Ar70 (SC–70);

"(iv) Colt AR–15;

"(v) Fabrique National FN/FAL, FN/LAR, and FNC;

"(vi) SWD M–10, M–11, M–11/9, and M–12;

"(vii) Steyr AUG;

"(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and

"(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

"(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of–

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a bayonet mount;

"(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

"(v) a grenade launcher;

"(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of–

"(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

"(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

"(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

"(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

"(v) a semiautomatic version of an automatic firearm; and

"(D) a semiautomatic shotgun that has at least 2 of–

"(i) a folding or telescoping stock;

"(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

"(iii) a fixed magazine capacity in excess of 5 rounds; and

"(iv) an ability to accept a detachable magazine.".

(c) Penalties.–

(1) Violation of section 922(v).–Section 924(a)(1)(B) of such title is amended by striking "or (q) of section 922" and inserting "(r), or (v) of section 922".

(2) Use or possession during crime of violence or drug trafficking crime.–Section 924(c)(1) of such title is amended in the first sentence by inserting ", or semiautomatic assault weapon," after "short-barreled shotgun,".

(d) Identification Markings for Semiautomatic Assault Weapons.–Section 923(i) of such title is amended by adding at the end the following: "The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured.".

## SEC. 3. RECORDKEEPING REQUIREMENTS FOR TRANSFERS OF GRANDFATHERED FIREARMS.

(a) Offense.–Section 922 of title 18, United States Code, as amended by section 2(a) of this Act, is amended by adding at the end the following:

"(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

"(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

"(3) If a person receives a semiautomatic assault weapon from anyone other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.

"(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.

"(5) As used in this subsection, the term 'form 4473' means–

"(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or

"(B) any other form which–

"(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and

"(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).".

(b) Penalty.–Section 924(a) of such title is amended by adding at the end the following:

"(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.".

## SEC. 4. BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES.

(a) Prohibition.–Section 922 of title 18, United States Code, as amended by sections 2 and 3 of this Act, is amended by adding at the end the following:

"(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

"(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.

"(3) This subsection shall not apply to–

"(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

"(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;

"(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or

"(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.".

(b) Definition of Large Capacity Ammunition Feeding Device.–Section 921(a) of such title, as amended by section 2(b) of this Act, is amended by adding at the end the following:

"(31) The term 'large capacity ammunition feeding device'–

"(A) means–

"(i) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and

"(ii) any combination of parts from which a device described in clause (i) can be assembled; but

"(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.".

(c) Large Capacity Ammunition Feeding Devices Treated as Firearms.–Section 921(a)(3) of such title is amended in the first sentence by striking "or (D) any destructive device." and inserting "(D) any destructive device; or (E) any large capacity ammunition feeding device.".

(d) Penalty.–Section 924(a)(1)(B) of such title, as amended by section 2(c) of this Act, is amended by striking "or (v)" and inserting "(v), or (x)".

(e) Identification Markings for Large Capacity Ammunition Feeding Devices.–Section 923(i) of such title, as amended by section 2(d) of this Act, is amended by adding at the end the following: "A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that

clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.".

## SEC. 5. STUDY BY ATTORNEY GENERAL.

(a) Study.–The Attorney General shall investigate and study the effect of this Act and the amendments made by this Act, and in particular shall determine their impact, if any, on violent and drug trafficking crime. The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment of this Act.

(b) Report.–Not later than 30 months after the date of enactment of this Act, the Attorney General shall prepare and submit to the Congress a report setting forth in detail the findings and determinations made in the study under subsection (a).

## SEC. 6. EFFECTIVE DATE.

This Act and the amendments made by this Act–

(1) shall take effect on the date of the enactment of this Act; and

(2) are repealed effective as of the date that is 10 years after that date.

## SEC. 7. APPENDIX A TO SECTION 922 OF TITLE 18.

Section 922 of title 18, United States Code, is amended by adding at the end the following appendix:

## "APPENDIX A

### Centerfire Rifles–Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle

Browning BAR Mark II Safari Magnum Rifle

Browning High-Power Rifle

Heckler & Koch Model 300 Rifle

Iver Johnson M-1 Carbine

Iver Johnson 50th Anniversary M-1 Carbine

Marlin Model 9 Camp Carbine

Marlin Model 45 Carbine

Remington Nylon 66 Auto-Loading Rifle

Remington Model 7400 Auto Rifle

Remington Model 7400 Rifle

Remington Model 7400 Special Purpose Auto Rifle

Ruger Mini-14 Autoloading Rifle (w/o folding stock)

Ruger Mini Thirty Rifle

**Centerfire Rifles–Lever & Slide**

Browning Model 81 BLR Lever-Action Rifle

Browning Model 81 Long Action BLR

Browning Model 1886 Lever-Action Carbine

Browning Model 1886 High Grade Carbine

Cimarron 1860 Henry Replica

Cimarron 1866 Winchester Replicas

Cimarron 1873 Short Rifle

Cimarron 1873 Sporting Rifle

Cimarron 1873 30" Express Rifle

Dixie Engraved 1873 Rifle

E.M.F. 1866 Yellowboy Lever Actions

E.M.F. 1860 Henry Rifle

E.M.F. Model 73 Lever-Actions Rifle

Marlin Model 336CS Lever-Action Carbine

Marlin Model 30AS Lever-Action Carbine

Marlin Model 444SS Lever-Action Sporter

Marlin Model 1894S Lever-Action Carbine

Marlin Model 1894CS Carbine

Marlin Model 1894CL Classic

Marlin Model 1895SS Lever-Action Rifle

Mitchell 1858 Henry Replica

Mitchell 1866 Winchester Replica

Mitchell 1873 Winchester Replica

Navy Arms Military Henry Rifle

Navy Arms Henry Trapper

Navy Arms Iron Frame Henry

Navy Arms Henry Carbine

Navy Arms 1866 Yellowboy Rifle

Navy Arms 1873 Winchester-Style Rifle

Navy Arms 1873 Sporting Rifle

Remington 7600 Slide Action

Remington Model 7600 Special-Purpose Slide Action

Rossi M92 SRC Saddle-Ring Carbine

Rossi M92 SRS Short Carbine

Savage 99C Leber-Action Rifle

Uberti Henry Rifle

Uberti 1866 Sporting Rifle

Uberti 1873 Sporting Rifle

Winchester Model 94 Side Eject Lever-Action Rifle

Winchester Model 94 Trapper Side Eject

Winchester Model 94 Big Bore Side Eject

Winchester Model 94 Ranger Side Eject Lever-Action Rifle

Winchester Model 94 Wrangler Side Eject

**Centerfire Rifles–Bolt Action**

Alpine Bolt-Action Rifle

A-Square Caesar Bolt-Action Rifle

A-Square Hannibal Bolt-Action Rifle

Anschutz 1700D Classic Rifles

Anschutz 1700D Custom Rifles

Anschutz 1700D Bavarian Bolt-Action Rifle

Anschutz 1733D Mannlicher Rifle

Barret Model 90 Bolt-Action Rifle

Beeman/HW 60J Bolt-Action Rifle

Blaser R84 Bolt-Action Rifle

BRNO 537 Sporter Bolt-Action Rifle

BRNO ZKB 527 Fox Bolt-Action Rifle

BRNO ZKK 600, 601, 602 Bolt-Action Rifles

Browning A-Bolt Rifle

Browning A-Bolt Stainless Stalker

Browning A-Bolt Left Hand

Browning A-Bolt Short Action

Browning Euro-Bolt Rifle

Browning A-Bolt Gold Medallion

Browning A-Bolt Micro Medallion

Century Centurion 14 Sporter

Century Enfield Sporter #4

Century Swedish Sporter #38

Century Mauser 98 Sporter

Cooper Model 38 Centerfire Sporter

Dakota 22 Sporter Bolt-Action Rifle

Dakota 76 Classic Bolt-Action Rifle

Dakota 76 Short Action Rifles

Dakota 76 Safari Bolt-Action Rifle

Dakota 416 Rigby African

E.A.A./Sabatti Rover 870 Bolt-Action Rifle

Auguste Francotte Bolt-Action Rifles

Carl Gustaf 2000 Bolt-Action Rifle

Heym Magnum Express Series Rifle

Howa Lightning Bolt-Action Rifle

Howa Realtree Camo Rifle

Interarms Mark X Viscount Bolt-Action Rifle

Interarms Mini-Mark X Rifle

Interarms Mark X Whitworth Bolt-Action Rifle

Interarms Whitworth Express Rifle

Iver Johnson Model 5100A1 Long-Range Rifle

KDF K15 American Bolt-Action Rifle

Krico Model 600 Bolt-Action Rifle

Krico Model 700 Bolt-Action Rifle

Mauser Model 66 Bolt-Action Rifle

Mauser Model 99 Bolt-Action Rifle

McMillan Signature Classic Sporter

McMillan Signature Super Varminter

McMillan Signature Alaskan

McMillan Signature Titanium Mountain Rifle

McMillan Classic Stainless Sporter

McMillan Talon Safari Rifle

McMillan Talon Sporter Rifle

Midland 1500S Survivor Rifle

Navy Arms TU-33/40 Carbine

Parker-Hale Model 81 Classic Rifle

Parker-Hale Model 81 Classic African Rifle

Parker-Hale Model 1000 Rifle

Parker-Hale Model 1000M African Rifle

Parker-Hale Model 1100 Lightweight Rifle

Parker-Hale Model 1200 Super Rifle

Parker-Hale Model 1200 Super Clip Rifle

Parker-Hale Model 1300C Scout Rifle

Parker-Hale Model 2100 Midland Rifle

Parker-Hale Model 2700 Lightweight Rifle

Parker-Hale Model 2800 Midland Rifle

Remington Model Seven Bolt-Action Rifle

Remington Model Seven Youth Rifle

Remington Model Seven Custom KS

Remington Model Seven Custom MS Rifle

Remington 700 ADL Bolt-Action Rifle

Remington 700 BDL Bolt-Action Rifle

Remington 700 BDL Varmint Special

Remington 700 BDL European Bolt-Action Rifle

Remington 700 Varmint Synthetic Rifle

Remington 700 BDL SS Rifle

Remington 700 Stainless Synthetic Rifle

Remington 700 MTRSS Rifle

Remington 700 BDL Left Hand

Remington 700 Camo Synthetic Rifle

Remington 700 Safari

Remington 700 Mountain Rifle

Remington 700 Custom KS Mountain Rifle

Remington 700 Classic Rifle

Ruger M77 Mark II Rifle

Ruger M77 Mark II Magnum Rifle

Ruger M77RL Ultra Light

Ruger M77 Mark II All-Weather Stainless Rifle

Ruger M77 RSI International Carbine

Ruger M77 Mark II Express Rifle

Ruger M77VT Target Rifle

Sako Hunter Rifle

Sako Fiberclass Sporter

Sako Hunter Left-Hand Rifle

Sako Classic Bolt Action

Sako Hunter LS Rifle

Sako Deluxe Lighweight

Sako Super Deluxe Sporter

Sako Mannlicher-Style Carbine

Sako Varmint Heavy Barrel

Sako TRG-S Bolt-Action Rifle

Sauer 90 Bolt-Action Rifle

Savage 110G Bolt-Action Rifle

Savage 110CY Youth/Ladies Rifle

Savage 110WLE One of One Thousand Limited Edition Rifle

Savage 110GXP3 Bolt-Action Rifle

Savage 110F Bolt-Action Rifle

Savage 110FXP3 Bolt-Action Rifle

Savage 110GV Varmint Rifle

Savage 110FV Varmint Rifle

Savage Model 110FVS Varmint Rifle

Savage Model 112BV Heavy Barrel Varmint Rifle

Savage 116FSS Bolt-Action Rifle

Savage Model 116SK Kodiak Rifle

Savage 110FP Polic Rifle

Steyr-Mannlicher Sporter Models SL, L, M, S, S/T

Steyr-Mannlicher Luxus Model L, M, S

Steyr-Mannlicher Model M Professional Rifle

Tikka Bolt-Action Rifle

Tikka Premium Grade Rifle

Tikka Varmint/Continental Rifle

Tikka Whitetail/Battue Rifle

Ultra Light Arms Model 20 Rifle

Ultra Light Arms Model 28, Model 40 Rifles

Voere VEC 91 Lightning Bolt-Action Rifle

Voere Model 2166 Bolt-Action Rifle

Voere Model 2155, 2150 Bolt-Action Rifles

Weatherby Mark V Deluxe Bolt-Action Rifle

Weatherby Lasermark V Rifle

Weatherby Mark V Crown Custom Rifles

Weatherby Mark V Safari Grade Custom Rifle

Weatherby Mark V Sporter Rifle

Weatherby Mark V Safari Grade Custom Rifles

Weatherby Weathermark Rifle

Weatherby Weathermark Alaskan Rifle

Weatherby Classicmark No. 1 Rifle

Weatherby Weatherguard Alaskan Rifle

Weatherby Vanguard VGX Deluxe Rifle

Weatherby Vanguard Classic Rifle

Weatherby Vanguard Classic No. 1 Rifle

Weatherby Vanguard Weathermark Rifle

Wichita Classis Rifle

Wichita Varmint Rifle

Winchester Model 70 Sporter

Winchester Model 70 Sporter WinTuff

Winchester Model 70 SM Sporter

Winchester Model 70 Stainless Rifle

Winchester Model 70 Varmint

Winchester Model 70 Synthetic Heavy Varmint Rifle

Winchester Model 70 DBM Rifle

Winchester Model 70 DBM-S Rifle

Winchester Model 70 Featherweight

Winchester Model 70 Featherweight WinTuff

Winchester Model 70 Featherweight Classic

Winchester Model 70 Lightweight Rifle

Winchester Ranger Rifle

Winchester Model 70 Super Express Magnum

Winchester Model 70 Super Grade

Winchester Model 70 Custom Sharpshooter

Winchester Model 70 Custom Sporting Sharpshooter Rifle

**Centerfire Rifles–Single Shot**

Armsport 1866 Sharps Rifle, Carbine

Brown Model One Single Shot Rifle

Browning Model 1885 Single Shot Rifle

Dakota Single Shot Rifle

Desert Industries G-90 Single Shot Rifle

Harrington & Richardson Ultra Varmint Rifle

Model 1885 High Wall Rifle

Navy Arms Rolling Block Buffalo Rifle

Navy Arms #2 Creedmoor Rifle

Navy Arms Sharps Cavalry Carbine

Navy Arms Sharps Plains Rifle

New Enlgand Firearms Handi-Rifle

Red Willow Armory Ballard No. 5 Pacific

Red Willow Armory Ballard No. 1.5 Hunting Rifle

Red Willow Armory Ballard No. 8 Union Hill Rifle

Red Willow Armory Ballard No. 4.5 Target Rifle

Remington-Style Rolling Block Carbine

Ruger No. 1B Single Shot

Ruger No. 1A Light Sporter

Ruger No. 1H Tropical Rifle

Ruger No. 1S Medium Sporter

Ruger No. 1 RSI International

Ruger No. 1V Special Varminter

C. Sharps Arms New Model 1874 Old Reliable

C. Sharps Arms New Model 1875 Rifle

C. Sharps Arms 1875 Classic Sharps

C. Sharps Arms New Model 1875 Target & Long Range

Shiloh Sharps 1874 Long Range Express

Shiloh Sharps 1874 Montana Roughrider

Shiloh Sharps 1874 Military Carbine

Shiloh Sharps 1874 Business Rifle

Shiloh Sharps 1874 Military Rifle

Sharps 1874 Old Reliable

Thompson/Center Contender Carbine

Thompson/Center Stainless Contender Carbine

Thompson/Center Contender Carbine Survival System

Thompson/Center Contender Carbine Youth Model

Thompson/Center TCR '87 Single Shot Rifle

Uberti Rolling Block Baby Carbine

**Drillings, Combination Guns, Double Rifles**

Baretta Express SSO O/U Double Rifles

Baretta 455 SxS Express Rifle

Chapuis RGExpress Double Rifle

Auguste Francotte Sidelock Double Rifles

Auguste Francotte Boxlock Double Rifle

Heym Model 55B O/U Double Rifle

Heym Model 55FW O/U Combo Gun

Heym Model 88b Side-by-Side Double Rifle

Kodiak Mk. IV Double Rifle

Kreighoff Teck O/U Combination Gun

Kreighoff Trumpf Drilling

Merkel Over/Under Combination Guns

Merkel Drillings

Merkel Model 160 Side-by-Side Double Rifles

Merkel Over/Under Double Rifles

Savage 24F O/U Combination Gun

Savage 24F-12T Turkey Gun

Springfield Inc. M6 Scout Rifle/Shotgun

Tikka Model 412s Combination Gun

Tikka Model 412S Double Fire

A. Zoli Rifle-Shotgun O/U Combo

**Rimfire Rifles–Autoloaders**

AMT Lightning 25/22 Rifle

AMT Lightning Small-Game Hunting Rifle II

AMT Mannum Hunter Auto Rifle

Anschutz 525 Deluxe Auto

Armscor Model 20P Auto Rifle

Browning Auto-22 Rifle

Browning Auto-22 Grade VI

Krico Model 260 Auto Rifle

Lakefield Arms Model 64B Auto Rifle

Marlin Model 60 Self-Loading Rifle

Marlin Model 60ss Self-Loading Rifle

Marlin Model 70 HC Auto

Marlin Model 990*l* Self-Loading Rifle

Marlin Model 70P Papoose

Marlin Model 922 Magnum Self-Loading Rifle

Marlin Model 995 Self-Loading Rifle

Norinco Model 22 ATD Rifle

Remington Model 522 Viper Autoloading Rifle

Remington 522BDL Speedmaster Rifle

Ruger 10/22 Autoloading Carbine (w/o folding stock)

Survival Arms AR-7 Explorer Rifle

Texas Remington Revolving Carbine

Voere Model 2115 Auto Rifle

**Rimfire Rifles–Lever & Slide Action**

Browning BL-22 Lever-Action Rifle

Marlin 39TDS Carbine

Marlin Model 39AS Golden Lever-Action Rifle

Remington 572BDL Fieldmaster Pump Rifle

Norinco EM-321 Pump Rifle

Rossi Model 62 SA Pump Rifle

Rossi Model 62 SAC Carbile

Winchester Model 9422 Lever-Action Rifle

Winchester Model 9422 Magnum Lever-Action Rifle

**Rimfire Rifles–Bolt Actions & Single Shots**

Anschutz Achiever Bolt-Action Rifle

Anschutz 1416D/1516D Classic Rifles

Anschutz 1418D/1518D Mannlicher Rifles

Anschutz 1700D Classic Rifles

Anschutz 1700D Custom Rifles

Anschutz 1700 FWT Bolt-Action Rifle

Anschutz 1700D Graphite Custom Rifle

Anschutz 1700D Bavarian Bolt-Action Rifle

Armscor Model 14P Bolt-Action Rifle

Armscor Model 1500 Rifle

BRNO ZKM-452 Deluxe Bolt-Action Rifle

BRNO ZKM 452 Deluxe

Beeman/HW 60-J-ST Bolt-Action Rifle

Browning A-Bolt 22 Bolt-Action Rifle

Browning A-Bolt Gold Medallion

Cabanas Phaser Rifle

Cabanas Master Bolt-Action Rifle

Cabanas Espronceda IV Bolt-Action Rifle

Cabanas Leyre Bolt-Action Rifle

Chipmunk Single Shot Rifle

Cooper Arms Model 36S Sporter Rifle

Dakota 22 Sporter Bolt-Action Rifle

Krico Model 300 Bolt-Action Rifles

Lakefield Arms Mark II Bolt-Action Rifle

Lakefield Arms Mark I Bolt-Action Rifle

Magtech Model MT-22C Bolt-Action Rifle

Marlin Model 880 Bolt-Action Rifle

Marlin Model 881 Bolt-Action Rifle

Marlin Model 882 Bolt-Action Rifle

Marlin Model 883 Bolt-Action Rifle

Marlin Model 883SS Bolt-Action Rifle

Marlin Model 25MN Bolt-Action Rifle

Marlin Model 25N Bolt-Action Repeater

Marlin Model 15YN "Little Buckaroo"

Mauser Model 107 Bolt-Action Rifle

Mauser Model 201 Bolt-Action Rifle

Navy Arms TU-KKW Training Rifle

Navy Arms TU-30/40 Carbine

Navy Arms TU-KKW Sniper Trainer

Norinco JW-27 Bolt-Action Rifle

Norinco JW-15 Bolt-Action Rifle

Remington 541-T

Remington 40-XR Rimfire Custom Sporter

Remington 541-T HB Bolt-Action Rifle

Remington 581-S Sportsman Rifle

Ruger 77/22 Rimfire Bolt-Action Rifle

Ruger K77/22 Varmint Rifle

Ultra Light Arms Model 20 RF Bolt-Action Rifle

Winchester Model 52B Sporting Rifle

**Competition Rifles–Centerfire & Rimfire**

Anschutz 64-MS Left Silhouette

Anschutz 1808D RT Super Match 54 Target

Anschutz 1827B Biathlon Rifle

Anschutz 1903D Match Rifle

Anschutz 1803D Intermediate Match

Anschutz 1911 Match Rifle

Anschutz 54.18MS REP Deluxe Silhouette Rifle

Anschutz 1913 Super Match Rifle

Anschutz 1907 Match Rifle

Anschutz 1910 Super Match II

Anschutz 54.18MS Silhouette Rifle

Anschutz Super Match 54 Targe Model 2013

Anschutz Super Match 54 Targe Model 2007

Beeman/Feinwerkbau 2600 Target Rifle

Cooper Arms Model TRP-1 ISU Standard Rifle

E.A.A./Weihrauch HW 60 Target Rifle

E.A.A./HW 60 Match Rifle

Finnish Lion Standard Target Rifle

Krico Model 360 S2 Biathlon Rifle

Krico Model 400 Match Rifle

Krico Model 360S Biathlon Rifle

Krico Model 500 Kricotronic Match Rifle

Krico Model 600 Sniper Rifle

Krico Model 600 Match Rifle

Lakefield Arms Model 90B Target Rifle

Lakefield Arms Model 91T Target Rifle

Lakefield Arms Model 92S Silhouette Rifle

Marlin Model 2000 Target Rifle

Mauser Model 86-SR Specialty Rifle

McMillan M-86 Sniper Rifle

McMillan Combo M-87/M-88 50-Caliber Rifle

McMillan 300 Phoenix Long-Range Rifle

McMillan M-89 Sniper Rifle

McMillan National Match Rifle

McMillan Long-Range Rifle

Parker-Hale M-87 Target Rifle

Parker-Hale M-85 Sniper Rifle

Remington 40-XB Rangemaster Target Centerfire

Remington 40-XR KS Rimfire Position Rifle

Remington 40-XBBR KS

Remington 40-XC KS National Match Course Rifle

Sako TRG-21 Bolt-Action Rifle

Steyr-Mannlicher Match SPG-UIT Rifle

Steyr-Mannlicher SSG P-I Rifle

Steyr-Mannlicher SSG P-III Rifle

Steyr-Mannlicher SSG P-IV Rifle

Tanner Standard UIT Rifle

Tanner 50 Meter Free Rifle

Tanner 300 Meter Free Rifle

Wichita Silhouette Rifle

**Shotguns–Autoloaders**

American Arms/Franchi Black Magic 48/AL

Benelli Super Black Eagle Shotgun

Benelli Super Black Eagle Slug Gun

Benelli M1 Super 90 Field Auto Shotgun

Benelli Montefeltro Super 90 20-Gauge Shotgun

Benelli Montefeltro Super 90 Shotgun

Benelli M1 Sporting Special Auto Shotgun

Benelli Black Eagle Competition Auto Shotgun

Beretta A-303 Auto Shotgun

Beretta 390 Field Auto Shotgun

Beretta 390 Super Trap, Super Skeet Shotguns

Beretta Vittoria Auto Shotgun

Beretta Model 1201F Auto Shotgun

Browning BSA 10 Auto Shotgun

Browning Bsa 10 Stalker Auto Shotgun

Browning A-500R Auto Shotgun

Browning A-500G Auto Shotgun

Browning A-500G Sporting Clays

Browning Auto-5 Light 12 and 20

Browning Auto-5 Stalker

Browning Auto-5 Magnum 20

Browning Auto-5 Magnum 12

Churchill Turkey Automatic Shotgun

Cosmi Automatic Shotgun

Maverick Model 60 Auto Shotgun

Mossberg Model 5500 Shotgun

Mossberg Model 9200 Regal Semi-Auto Shotgun

Mossberg Model 9200 USST Auto Shotgun

Mossberg Model 9200 Camo Shotgun

Mossberg Model 6000 Auto Shotgun

Remington Model 1100 Shotgun

Remington 11-87 Premier shotgun

Remington 11-87 Sporting Clays

Remington 11-87 Premier Skeet

Remington 11-87 Premier Trap

Remington 11-87 Special Purpose Magnum

Remington 11-87 SPS-T Camo Auto Shotgun

Remington 11-87 Special Purpose Deer Gun

Remington 11-87 SPS-BG-Camo Deer/Turkey Shotgun

Remington 11-87 SPS-Deer Shotgun

Remington 11-87 Special Purpose Synthetic Camo

Remington SP-10 Magnum-Camo Auto Shotgun

Remington SP-10 Magnum Auto Shotgun

Remington SP-10 Magnum Turkey Combo

Remington 1100 LT-20 Auto

Remington 1100 Special Field

Remington 1100 20-Gauge Deer Gun

Remington 1100 LT-20 Tournament Skeet

Winchester Model 1400 Semi-Auto Shotgun

**Shotguns–Slide Actions**

Browning Model 42 Pump Shotgun

Browning BPS Pump Shotgun

Browning BPS Stalker Pump Shotgun

Browning BPS Pigeon Grade Pump Shotgun

Browning BPS Pump Shotgun (Ladies and Youth Model)

Browning BPS Game Gun Turkey Special

Browning BPS Game Gun Deer Special

Ithaca Model 87 Supreme Pump Shotgun

Ithaca Model 87 Deerslayer Shotgun

Ithaca Deerslayer II Rifled Shotgun

Ithaca Model 87 Turkey Gun

Ithaca Model 87 Deluxe Pump Shotgun

Magtech Model 586-VR Pump Shotgun

Maverick Models 88, 91 Pump Shotguns

Mossberg Model 500 Sporting Pump

Mossberg Model 500 Camo Pump

Mossberg Model 500 Muzzleloader Combo

Mossberg Model 500 Trophy Slugger

Mossberg Turkey Model 500 Pump

Mossberg Model 500 Bantam Pump

Mossberg Field Grade Model 835 Pump Shotgun

Mossberg Model 835 Regal Ulti-Mag Pump

Remington 870 Wingmaster

Remington 870 Special Purpose Deer Gun

Remington 870 SPS-BG-Camo Deer/Turkey Shotgun

Remington 870 SPS-Deer Shotgun

Remington 870 Marine Magnum

Remington 870 TC Trap

Remington 870 Special Purpose Synthetic Camo

Remington 870 Wingmaster Small Gauges

Remington 870 Express Rifle Sighted Deer Gun

Remington 879 SPS Special Purpose Magnum

Remington 870 SPS-T Camo Pump Shotgun

Remington 870 Special Field

Remington 870 Express Turkey

Remington 870 High Grades

Remington 870 Express

Remington Model 870 Express Youth Gun

Winchester Model 12 Pump Shotgun

Winchester Model 42 High Grade Shotgun

Winchester Model 1300 Walnut Pump

Winchester Model 1300 Slug Hunter Deer Gun

Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun

Winchester Model 1300 Turkey Gun

Winchester Model 1300 Ranger Pump Gun

**Shotguns–Over/Unders**

American Arms/Franchi Falconet 2000 O/U

American Arms Silver I O/U

American Arms Silver II Shotgun

American Arms Silver Skeet O/U

American Arms/Franchi Sporting 2000 O/U

American Arms Silver Sporting O/U

American Arms Silver Trap O/U

American Arms WS/OU 12, TS/OU 12 Shotguns

American Arms WT/OU 10 Shotgun

Armsport 2700 O/U Goose Gun

Armsport 2700 Series O/U

Armsport 2900 Tri-Barrel Shotgun

Baby Bretton Over/Under Shotgun

Beretta Model 686 Ultralight O/U

Beretta ASE 90 Competition O/U Shotgun

Beretta Over/Under Field Shotguns

Beretta Onyx Hunder Sport O/U Shotgun

Beretta Model SO5, SO6, SO9 Shotguns

Beretta Sporting Clay Shotguns

Beretta 687EL Sporting O/U

Beretta 682 Super Sporting O/U

Beretta Series 682 Competition Over/Unders

Browning Citori O/U Shotgun

Browning Superlight Citori Over/Under

Browning Lightning Sporting Clays

Browning Micro Citori Lightning

Browning Citori Plus Trap Combo

Browning Citori Plus Trap Gun

Browning Citori O/U Skeet Models

Browning Citori O/U Trap Models

Browning Special Sporting Clays

Browning Citori GTI Sporting Clays

Browning 325 Sporting Clays

Centurion Over/Under Shotgun

Chapuis Over/Under Shotgun

Connecticut Valley Classics Classic Sporter O/U

Connecticut Valley Classics Classic Field Waterfowler

Charles Daly Field Grade O/U

Charles Daly Lux O/U

E.A.A./Sabatti Sporting Clays Pro-Gold O/U

E.A.A./Sabatti Falcon-Mon Over/Under

Kassnar Grade I O/U Shotgun

Krieghoff K-80 Sporting Clays O/U

Krieghoff K-80 Skeet Shotgun

Krieghoff K-80 International Skeet

Krieghoff K-80 Four-Barrel Skeet Set

Krieghoff K-80/RT Shotguns

Krieghoff K-80 O/U Trap Shotgun

Laurona Silhouette 300 Sporting Clays

Laurona Silhouette 300 Trap

Laurona Super Model Over/Unders

Ljutic LM-6 Deluxe O/U Shotgun

Marocchi Conquista Over/Under Shotgun

Marocchi Avanza O/U Shotgun

Merkel Model 200E O/U Shotgun

Merkel Model 200E Skeet, Trap Over/Unders

Merkel Model 203E, 303E Over/Under Shotguns

Perazzi Mirage Special Sporting O/U

Perazzi Mirage Special Four-Gauge Skeet

Perazzi Sporting Classic O/U

Perazzi MX7 Over/Under Shotguns

Perazzi Mirage Special Skeet Over/Under

Perazzi MX8/MX8 Special Trap, Skeet

Perazzi MX8/20 Over/Under Shotgun

Perazzi MX9 Single Over/Under Shotguns

Perazzi MX12 Hunting Over/Under

Perazzi MX28, MX410 Game O/U Shotfuns

Perazzi MX20 Hunting Over/Under

Piotti Boss Over/Under Shotgun

Remington Peerless Over/Under Shotgun

Ruger Red Label O/U Shotgun

Ruger Sporting Clays O/U Shotgun

San Marco 12-Ga. Wildflower Shotgun

San Marco Field Special O/U Shotgun

San Marco 10-Ga. O/U Shotgun

SKB Model 505 Deluxe Over/Under Shotgun

SKB Model 685 Over/Under Shotgun

SKB Model 885 Over/Under Trap, Skeet, Sporting Clays

Stoeger/IGA Condor I O/U Shotgun

Stoeger/IGA ERA 2000 Over/Under Shotgun

Techni-Mec Model 610 Over/Under

Tikka Model 412S Field Grade Over/Under

Weatherby Athena Grade IV O/U Shotguns

Weatherby Athena Grade V Classic Field O/U

Weatherby Orion O/U Shotguns

Weatherby II, III Classic Field O/Us

Weatherby Orion II Classic Sporting Clays O/U

Weatherby Orion II Sporting Clays O/U

Winchester Model 1001 O/U Shotgun

Winchester Model 1001 Sporting Clays O/U

Pietro Zanoletti Model 2000 Field O/U

**Shotguns–Side by Sides**

American Arms Brittany Shotgun

American Arms Gentry Double Shotgun

American Arms Derby Side-by-Side

American Arms Grulla #2 Double Shotgun

American Arms WS/SS 10

American Arms TS/SS 10 Double Shotgun

American Arms TS/SS 12 Side-by-Side

Arrieta Sidelock Double Shotguns

Armsport 1050 Series Double Shotguns

Arizaga Model 31 Double Shotgun

AYA Boxlock Shotguns

AYA Sidelock Double Shotguns

Beretta Model 452 Sidelock Shotgun

Beretta Side-by-Side Field Shotguns

Crucelegui Hermanos Model 150 Double

Chapuis Side-by-Side Shotgun

E.A.A./Sabatti Sabe-Mon Double Shotgun

Charles Daly Model Dss Double

Ferlib Model F VII Double Shotgun

Auguste Francotte Boxlock Shotgun

Auguste Francotte Sidelock Shotgun

Garbi Model 100 Double

Garbi Model 100 Side-by-Side

Garbi Model 103A, B Side-by-Side

Garbi Model 200 Side-by-Side

Bill Hanus Birdgun Doubles

Hatfield Uplander Shotgun

Merkell Model 8, 47E Side-by-Side Shotguns

Merkel Model 47LSC Sporting Clays Double

Merkel Model 47S, 147S Side-by-Sides

Parker Reproductions Side-by-Side

Piotti King No. 1 Side-by-Side

Piotti Lunik Side-by-Side

Piotti King Extra Side-by-Side

Piotti Piuma Side-by-Side

Precision Sports Model 600 Series Doubles

Rizzini Boxlock Side-by-Side

Rizzini Sidelock Side-by-Side

Stoeger/IGA Side-by-Side Shotgun

Ugartechea 10-Ga. Magnum Shotgun

**Shotguns–Bolt Actions & Single Shots**

Armsport Single Barrel Shotgun

Browning BT-99 Competition Trap Special

Browning BT-99 Plus Trap Gun

Browning BT-99 Plus Micro

Browning Recoilless Trap Shotgun

Browning Micro Recoilless Trap Shotgun

Desert Industries Big Twenty Shotgun

Harrington & Richardson Topper Model 098

Harrington & Richardson Topper Classic Youth Shotgun

Harrington & Richardson N.W.T.F. Turkey Mag

Harrington & Richardson Topper Deluxe Model 098

Krieghoff KS-5 Trap Gun

Krieghoff KS-5 Special

Krieghoff KS-80 Single Barrel Trap Gun

Ljutic Mono Gun Single Barrel

Ljutic LTX Super Deluxe Mono Gun

Ljutic Recoilless Space Gun Shotgun

Marlin Model 55 Goose Gun Bolt Action

New England Firearms Turkey and Goose Gun

New England Firearms N.W.T.F. Shotgun

New England Firearms Tracker Slug Gun

New England Firearms Standard Pardner

New England Firearms Survival Gun

Perazzi TM1 Special Single Trap

Remington 90-T Super Single Shotgun

Snake Charmer II Shotgun

Stoeger/IGA Reuna Single Barrel Shotgun

Thompson/Center TCR '87 Hunter Shotgun.".

## SUMMARY AND PURPOSE

The purpose of this bill is to create criminal penalties for the manufacture, transfer, or possession of certain firearms within the category of firearms known as "semiautomatic assault weapons." It also creates such penalties for certain ammunition feeding devices, as well as any combination of parts from which such a device can be assembled.

In reporting legislation banning certain assault weapons last Congress, the Committee on the Judiciary said:

The threat posed by criminals and mentally deranged individuals armed with semi-automatic assault weapons has been tragically widespread. [1]

Since then, the use of semiautomatic assault weapons by criminal gangs, drug-traffickers, and mentally deranged persons continues to grow. [2]

H.R. 4296 will restrict the availability of such weapons in the future. The bill protects the rights of persons who lawfully own such weapons on its date of enactment by a universal "grandfathering" clause and specifically exempts certain firearms traditionally used for hunting and other legitimate support. It contains no confiscation or registration provisions; however, it does establish record-keeping requirements for transfers involving grandfathered semiautomatic assault weapons. Such record-keeping is not required for transfers of grandfathered ammunition feeding devices (or their component parts.) H.R. 4296 expires ("sunsets") on its own terms after 10 years.

## BACKGROUND

A series of hearings over the last five years on the subject of semiautomatic assault weapons has demonstrated that they are a growing menace to our society of proportion to their numbers: [3] As this Committee said in its report to the last Congress:

The carnage inflicted on the American people be criminals and mentally deranged people armed with Rambo-style, semi-automatic assault weapons has been overwhelming and continuing. Police and law enforcement groups all

over the nation have joined together to support legislation that would help keep these weapons out of the hands of criminals. [4]

Since then, evidence continues to mount that these semiautomatic assault weapons are the weapons of choice among drug dealers, criminal gangs, hate groups, and mentally deranged persons bent on mass murder.

Use in Crimes. On April 25, 1994, the Director of the Federal Bureau of Alcohol, Tobacco and Firearms testified that the percentage of semiautomatic assault weapons among guns traced because of their use in crime is increasing:

In 1990, 5.9 percent of firearms traced were assault weapons. In 1993, that percentage rose to 8.1 percent. Since Justice Department studies have shown that assault weapons make up only about 1 percent of the firearms in circulation, these percentages strongly suggest that they are proportionately more often used in crimes. [5]

Law enforcement officials confirm this statistical evidence in accounts of the rising level of lethality they face from assault weapons on the street. For example, the representative of a national police officers' organization testified:

In the past, we used to face criminals armed with a cheap Saturday Night Special that could fire off six rounds before loading. Now it is not at all unusual for a cop to look down the barrel of a TEC–9 with a 32 round clip. The ready availability of and easy access to assault weapons by criminals has increased so dramatically that police forces across the country are being required to upgrade their service weapons merely as a matter of self-defense and preservation. The six-shot .38 caliber service revolver, standard law enforcement issue for years, it just no match against a criminal armed with a semi-automatic assault weapon. [6]

A representative of federal law enforcement officers testified that semiautomatic assault weapons "dramatically escalate the firepower or the user" and "have become the weapon of choice for drug runners, hate groups and the mentally unstable." [7]

The TEC–9 assault pistol is the undisputed favorite of drug traffickers, gang members and violent criminals. Cities across the country confiscate more TEC–9s than any other assault pistol. The prototype for the TEC–9 was originally designed as a submachine gun for the South African government. Now it comes standard with an ammunition magazine holding 36 rounds of 9 mm cartridges. It also has a threaded barrel to accept a silencer, and a barrel shroud to cool the barrel during rapid fire. To any real sportsman or collector, this firearm is a piece of junk, yet is very popular among criminals. [8]

The Secretary of Housing and Urban Development testified that criminal gangs in Chicago routinely use semiautomatic assault weapons to intimidate not only residents but also security guards, forcing the latter to remove metal detectors installed to detect weapons. [9]

Use in Mass Killings and Killings of Law Enforcement Officers. Public concern about semiautomatic assault weapons has grown because of shootings in which large numbers of innocent people have been killed and wounded, and in which law enforcement officers have been murdered.

On April 25, 1994, the Subcommittee on Crime and Criminal Justice heard testimony about several incidents representative of such killings.

On February 22, 1994, Los Angeles (CA) Police Department rookie officer Christy Lynn Hamilton was ambushed and killed by a drug-abusing teenager using a Colt AR–15. The round that killed Officer Hamilton penetrated a car door, skirted the armhole of her protective vest, and lodged in her chest. The teenager also killed his father, who had given him

the gun, and took his own life as well. Officer Hamilton had been voted the most inspirational officer in her graduating class only weeks before her murder. Officer Hamilton's surviving brother testified about the impact of this murder. [10]

On December 7, 1993, a deranged gunman walked through a Long Island Railroad commuter train, shooting commuters. Six died and 19 were wounded. The gunman used a Ruger semiautomatic postol. Although the pistol itself would not be classified as an assault weapon under this bill, its 15 round ammunition magazine ("clip") would be banned. The gunman had several of these high capacity 15 round magazines and reloaded several times, firing between 30 to 50 rounds before he was overpowered while trying to reload yet again. The parents of one of the murdered victims, Amy Locicero Federici, testified about the impact of this murder. [11]

On February 28, 1993, 4 special agents of the Bureau of Alcohol, Tobacco and Firearms were killed and 15 were wounded while trying to serve federal search and arrest warrants at the Branch Davidian compound in Waco, Texas. The Branch Davidian arsenal included hundreds of assault weapons, including AR–15s, AK–47s, Street Sweepers, MAC10s and MAC–11s, along with extremely high capacity magazines (up to 260 rounds). [12]

Finally, on July 1, 1993, gunman Gian Luigi Ferri Killed 8 people and wounded 6 others in a San Francisco high rise office building. Ferri–who took his own life–used two TEC DC9 assault pistols with 50 round magazines, purchased from a gun dealer in Las Vegas, Nevada. Two witnesses, both of whom lost spouses in the slaughter, and one of whom was herself seriously injured, testified about this incident. [13]

Numerous other notorious incidents involving semiautomatic assault weapons have occurred. They include the January 25, 1993, slaying of 2 CIA employees and wounding of 3 others at McLean, VA, (AK–47), and the January 17, 1989 murder in a Stockton, CA, schoolyard of 5 small children, and wounding of 29 others (AK–47 and 75 round magazine, firing 106 rounds in less than 2 minutes).

Several witnesses who were victims themselves during such incidents testified in opposition to H.R. 4296/H.R. 3527, and in opposition to the banning of any semiautomatic assault weapons or ammunition feeding devices.

Dr. Suzanna Gratia witnessed the brutal murder, in Luby's cafeteria located in Killeen, Texas, of both of her parents who had just celebrated their 47 weeding anniversary. Just a few days before, she had removed her gun from her purse and left it in her car to comply with a Texas law which does not allow concealed carrying of a firearm. Dr. Gratia testified:

I am mad at my legislators for legislating me out of a right to protect myself and my family. I would much rather be sitting in jail with a felony offense on my head and have my parents alive. As far as these so-called assault weapons, you say that they don't have any defense use. You tell that to the guy that I saw on a videotape of the Los Angeles riots standing on his rooftop protecting his property and his life from an entire mob with one of these so-called assault weapons. Tell me that he didn't have a legitimate self-defense use. [14]

Ms. Jacquie Miller was shot several times with a semiautomatic assault weapon and left for dead at her place of employment with the Standard Gravure Printing Company in Louisville, Kentucky, when a fellow employee went on a killing spree. Now permanently disabled, Ms. Miller testified:

It completely enrages me that my tragedy is being used against me to deny me and all the law abiding citizens of this country to the right of the firearm of our choosing. I refuse in return to use my tragedy for retribution against innocent people just to make myself feel better for having this misfortune. Enforce the laws against criminals already on the books. After all, there are already over 20,000 of them. [15] More won't do a thing for crime control *** You cannot ban everything in the world that could be used as a weapon because you fear it, don't understand it, or don't agree with it.

This is America, not Lithuania or China. Our most cherished possession is our Constitution and Bill of Rights. Let's not sell those down the river or we could one day find ourselves in a boat without a paddle against the criminals who think we are easy pickings. [16]

Mr. Phillip Murphy used his lawfully-possessed Colt AR–15 H-BAR Sporter semiautomatic rifle–a gun which would be specifically banned by H.R. 4296–to capture one of Tucson, Arizona's most wanted criminals who was attempting to burglarize the home of Mr. Murphy's parents. The 19-year old criminal he captured was a three-time loser with 34 prior convictions who was violating his third adult State parole for a knife assault. Mr. Murphy testified:

I respectfully urge this Committee and the Congress of the United States to restrain themselves from forcing tens of millions of law-abiding Americans like me to choose between the law and their lives. [17]

The Characteristics of Military-Style Semiautomatic Assault Weapons. The question of what constitutes an assault weapon has been studied by the Congress and the executive branch as the role of these guns in criminal violence has grown.

A Bureau of Alcohol, Tobacco and Firearms working group formed under the Bush administration to consider banning foreign imports of such semiautomatic assault weapons conducted the most recent comprehensive study of military assault weapons and the civilian firearms that are modelled after them. [18] The working group formulated a definition of the civilian version, and a list of the assault weapon characteristics that distinguish them from sporting guns. That technical work has to a large extent been incorporated into H.R. 4296. [19]

The working group settled on the term "semiautomatic assault" for the civilian firearms at issue. That term distinguishes the civilian firearms from the fully automatic military weapons (machineguns) [20] after which they are modelled and often simply adapted by eliminating the automatic fire feature. The group determined that "semiautomatic assault rifles *** represent a distinctive type of rifle distinguished by certain general characteristics which are common to the modern military assault rifle." [21]

The group elaborated on the nature of those characteristics as follows:

The modern military assault rifle, such as the U.S. M16, German G3, Belgian FN/FAL, and Soviet AK–47, is a weapon designed for killing or disabling the enemy and *** has characteristics designed to accomplish this purpose.

We found that the modern military assault rifle contains a variety of physical features and characteristics designed for military applications which distinguishes it from traditional sporting rifles. These military features and characteristics (other than selective fire) are carried over to the semiautomatic versions of the original military rifle. [22]

The "selective fire" feature to which the working group referred is the ability of the military versions to switch from fully automatic to semiautomatic fire at the option of the user. Since Congress has already banned certain civilian transfer or possession of machineguns, [23] the civilian models of these guns are produced with semiautomatic fire capability only. However, testimony was received by the Subcommittee on Crime and Criminal Justice that it is a relatively simple task to convert [24] a semiautomatic weapon to automatic fire [25] and that semiautomatic weapons can be fired at rates of 300 to 500 rounds per minute, making them virtually indistinguishable in practical effect from machineguns. [26]

The 1989 Report's analysis of assault characteristics which distinguish such firearms from sporting guns was further explained by an AFT representative at a 1991 hearing before the Subcommittee on Crime and Criminal Justice:

We found that the banned rifles represented a distinctive type of rifle characterized by certain military features which differentiated them from the traditional sporting rifles. These include the ability to accept large capacity detachable magazines, bayonets, folding or telescoping stocks, pistol grips, flash suppressors, bipods, grenade launchers and night sights, and the fact that they are semiautomatic versions of military machineguns. [27]

Proponents of these military style semiautomatic assault weapons often dismiss these combat-designed features as merely "cosmetic." The Subcommittee received testimony that, even if these characteristics were merely "cosmetic" in effect, it is precisely those cosmetics that contribute to their usefulness as tools of intimidation by criminals. [28]

However, the expert evidence is that the features that characterize a semiautomatic weapon as an assault weapon are not merely cosmetic, but do serve specific, combat-functional ends. By facilitating the deadly "spray fire" of the weapon or enhancing its portability–a useful attribute in combat but one which serves to enhance the ability to conceal the gun in civilian life. [29]

High-capability magazine, for example, make it possible to fire a large number of rounds without re-loading, then to reload quickly when those rounds are spent. [30] Most of the weapons covered by the proposed legislation come equipped with magazines that hold 30 rounds. Even these magazines, however, can be replaced with magazines that hold 50 or even 100 rounds. Furthermore, expended magazines can be quickly replaced, so that a single person with a single assault weapon can easily fire literally hundreds of rounds within minutes. As noted above, tests demonstrate that semiautomatic guns can be fired at very high rates of fire. In contrast, hunting rifles and shotguns typically have much smaller magazine capabilities–from 3 to 5.

Because of the greater enhanced lethality–numbers of rounds that can be fired quickly without reloading–H.R. 4296 also contains a ban on ammunition magazines which hold more than 10 rounds, as well as any combination of parts from which such a magazine can be assembled.

Barrel shrouds also serve a combat-functional purpose. [31] Gun barrels become very hot when multiple rounds are fired through them quickly. The barrel shroud cools the barrel so that it will not overheat, and provides the shooter with a convenient grip especially suitable for spray-firing.

Similar military combat purposes are served by flash suppressors (designed to help conceal the point of fire in night combat), bayonet mounts, grenade launchers, and pistol grips engrafted on long guns. [32]

The net effect of these military combat features is a capability for lethality–more wounds, more serious, in more victims–far beyond that of other firearms in general, including other semiautomatic guns. [33]

### BRIEF EXPLANATION OF H.R. 4296

H.R. 4296 combines two approaches which have been followed in the past in legislation proposed to control semiautomatic assault weapons–the so-called "list" approach and the "characteristics" approach.

The bill does not ban any semiautomatic assault weapons nor large capacity ammunition feeding device (or component parts) otherwise lawfully possessed on the date of enactment. However, records must be kept by both the transferor and the transferee involved in any transfer of these weapons, but not of the feeding devices (or combination of parts).

The bill explicitly exempts all guns with other than semiautomatic actions–i.e., bolt, slide, pump, and lever actions. In addition, it specifically exempts by make and model 661 long guns most commonly used in hunting and recreational sports, [34] making clear that these semiautomatic assault weapons are not and cannot be subject to any ban.

Section 2(z) of the bill lists 19 specific semiautomatic assault weapons–such as the AK–47, M–10, TEC–9, Uzi, etc.– that are banned. [35] It also defines other assault weapons by specifically enumerating combat style characteristics and bans those semiautomatic assault weapons that have 2 or more of those characteristics. [36]

The bill makes clear that the list of exempted guns is not exclusive. The fact that a gun is not on the exempted list may not be construed to mean that it is banned. Thus, a gun that is not on the list of guns specifically banned by name would only be banned if it met the specific characteristics set out in the characteristics test. No gun may be removed from the exempted list.

H.R. 4296 also bans large capacity ammunition feeding devices–clips that accept more than 10 rounds of ammunition– as well as any combination of parts from which such a device can be assembled.

The bill exempts all semiautomatic assault weapons and large capacity ammunition feeding devices (as well as any combination of parts) that are lawfully possessed on date of enactment. Owners of such semiautomatic assault weapons need do nothing under the bill unless they wish to transfer the semiautomatic assault weapon.

H.R. 4296 differs significantly from previously-proposed legislation–it is designed to be more tightly focused and more carefully crafted to clearly exempt legitimate sporting guns. Most significantly, the ban in the 1991 proposed bill gave the Bureau of Alcohol, Tobacco, and Firearms authority to ban any weapon which "embodies the same configuration" as the named list of guns. The current bill, H.R. 4296 does not contain any such general authority. Instead, it contains a set of specific characteristics that must be present in order to ban any additional semiautomatic assault weapons.

### 102d Congress

The Subcommittee on Crime and Criminal Justice held hearings on semiautomatic assault weapons on June 12 and July 25, 1991. A ban on certain semiautomatic assault weapons was included as Subtitle A of Title XX in H.R. 3371, the Omnibus Crime Control Act of 1991. A ban on large capacity ammunition feeding devices was included in the same bill. The bill was reported out of the Judiciary Committee on October 7, 1991. The provisions dealing with semiautomatic assault weapons and large capacity ammunition feeding devices were struck by the House of Representatives by a vote of 247–177 on October 17, 1991.

### 103d Congress

The Subcommittee on Crime and Criminal Justice held hearings on H.R. 4296 and its predecessor, H.R. 3527, which ban semiautomatic assault weapons, on April 25, 1994. The Subcommittee reported favorably on an amendment in the nature of a substitute to H.R. 4296 on April 26, 1994, by a recorded vote of 8–5.

### COMMITTEE ACTION

The Committee on the Judiciary met on April 28, 1994 to consider H.R. 4296, as amended. Two amendments were adopted during the Committee's consideration.

An amendment was offered to provide that the absence of a firearm from the list of guns specifically exempted from the ban may not be construed as evidence that the semiautomatic assault weapon is banned, and that no gun may be removed from the exempt list so long as the Act is in effect. This amendment was adopted by voice vote.

An amendment was offered to delete a provision that barred from owning any firearms those persons convicted of violating the recordkeeping requirements relating to grandfathered weapons. This amendment was adopted by voice vote.

A reporting quorum being present, the Committee on the Judiciary, by a roll call vote of 20 to 15, ordered H.R. 4296, as amended, favorably reported to the House.

## SECTION-BY-SECTION ANALYSIS

### SECTION 1–SHORT TITLE

This section provides that the Act may be cited as the "Public Safety and Recreational Firearms Use Protection Act".

### SECTION 2–RESTRICTION ON MANUFACTURE, TRANSFER, AND POSSESSION OF CERTAIN SEMIAUTOMATIC ASSAULT WEAPONS

Subsection 2(a) makes it unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon (including any "copies or duplicates.")

The ban on transfer and possession does not apply to (1) weapons otherwise lawfully possessed on the date of enactment; (2) any of the firearms (or their replicas or duplicates) listed in Appendix A; (3) any manually operated (bolt, pump, slide, lever action), permanently inoperable, or antique firearms; (4) semiautomatic rifles that cannot accept a detachable magazine that holds more than 5 rounds; or, a semiautomatic shotgun that cannot hold more than 5 rounds in a fixed or detachable magazine.

The fact that a gun is not listed in Appendix A may not be construed to mean that it is banned. No gun listed in Appendix A may be removed from that exempted list so long as the Act is in effect.

Federal departments and agencies and those of States and their subdivisions are exempted. Law enforcement officers authorized to purchase firearms for official use are exempted, as are such officers presented with covered weapons upon retirement who are not otherwise prohibited from receiving such a weapon. Finally, weapons made, transferred, possessed, or imported for the purposes of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 2(b) defines semiautomatic assault weapons, both by name and by characteristics. It lists by name specific firearms, including "copies or duplicates" of such firearms. [37] Characteristics of covered semiautomatic rifles, pistols, and shotguns are defined by separate subsections applicable to each. In the case of rifles and pistols, in addition to being semiautomatic, a gun must be able to accept a detachable magazine and have at least 2 listed characteristics.

In the case of rifles, those characteristics are: (1) folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a bayonet mount; (4) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (5) a grenade launcher.

In the case of pistols, the characteristics are: (1) a magazine that attaches to the pistol outside of the pistol grip; (2) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer; (3) a barrel shroud that permits the shooter to hold the firearm without being burned; (4) an unloaded manufactured weight of 50 ounces or more; and (5) a semiautomatic version of an automatic firearm.

In the case of shotguns, covered weapons must have at least 2 of the following four features: (1) a folding or telescoping stock; (2) a pistol grip that protrudes conspicuously beneath the action of the weapon; (3) a fixed magazine capacity in excess of 5 rounds; and (4) an ability to accept a detachable magazine.

The section provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban on manufacture, transfer and possession. It also adds use of a semiautomatic assault weapon to the crimes covered by the mandatory minimum of 5 years under 18 USC Section 924(c)(1) for use in a federal crime of violence or drug trafficking crime.

Finally, the section requires that semiautomatic assault weapons manufactured after the date of enactment must clearly show the date on which the weapon was manufactured.

## SECTION 3–RECORDKEEPING REQUIREMENTS
## FOR TRANSFERS OF GRANDFATHERED FIREARMS

This section makes it unlawful to transfer a grandfathered semiautomatic assault weapon unless both the transferor and the transferee complete and retain a copy of federal form 4473 (or its successor). Within 90 days of enactment, the Secretary of the Treasury must issue regulations ensuring the availability of the form to owners of semiautomatic assault weapons. The Committee expects the Secretary to make such forms easily and readily available to such gun owners. The Committee further expects the Secretary to maintain the confidentiality of the requester and to ensure the destruction of any and all information pertaining to any request for such forms immediately upon complying with the request. The Committee does not expect the Secretary to release any such information to any other Department of the Federal, State or local Governments or to use the information in any way other than to comply with the requests for the form. The Committee would consider failure to comply with these expectations a very serious breach.

A person who knowingly violates the recordkeeping requirement shall be fined not more than $1,000, imprisoned for not more than 6 months or both.

## SECTION 4–BAN OF LARGE CAPACITY AMMUNITION FEEDING DEVICES

Subsection 4(a) makes it unlawful for a person to transfer or possess a large capacity ammunition feeding device (which is defined to include any combination of parts from which such a device can be assembled.)

The ban on transfer and possession does not apply to (1) devices (or component parts) otherwise lawfully possessed on the date of enactment; (2) Federal departments and agencies and those of States and their subdivisions; (3) law enforcement officers authorized to purchase ammunition feeding devices for official use; devices transferred to such officers upon retirement who are not otherwise prohibited from receiving them; and (3) devices (or combination of parts) made, transferred, possessed, or imported for the purpose of testing or experiments authorized by the Secretary of the Treasury are exempted.

Subsection 4(b) defines large capacity ammunition feeding device to mean a magazine, belt, drum, feed strip, or similar device that has a capacity of more than 10 rounds, or can be readily restored or converted to accept more than 10 rounds.

It includes any combination of parts from which such a device can be assembled. It exempts an attached tubular device designed to accept and capable of operating only with .22 caliber rimfire ammunition.

Subsection 4(c) adds large capacity ammunition feeding devices to the definition of "firearm" under 18 US Code section 921(a)(3).

Subsection 4(d) provides a fine of not more than $5,000, imprisonment for not more than 5 years, or both, for knowingly violating the ban.

Subsection 4(e) requires that large capacity ammunition feeding devices manufactured after the date of enactment be identified by a serial number that clearly shows the device was manufactured after the date or imported after the date of enactment, and such other identification as the Secretary of the Treasury may by regulation prescribe.

## SECTION 5–STUDY BY ATTORNEY GENERAL

This section requries the Attorney General to study and report to the Congress no later than 30 months after its enactment the effects of the Act, particularly with regard to its impact–if any–on violent and drug-trafficking crime.

The study shall be conducted over a period of 18 months, commencing 12 months after the date of enactment.

## SECTION 6–EFFECTIVE DATE

The Act and the amendment made by the Act take effect on the date of enactment and are repealed effective as of the date that is 10 years after that date.

## SECTION 7–APPENDIX A TO SECTION 922 OF TITLE 18

This section adds, as Appendix A, a list of firearms that are specifically exempted from the ban on semiautomatic assault weapons.

## COMMITTEE OVERSIGHT FINDINGS

In compliance with clause 2(l)(3)(A) of rule XI of the Rules of the House of Representatives, the Committee reports that the findings and recommendations of the Committee, based on oversight activities under clause 2(b)(1) of rule X of the Rules of the House of Representatives, are incorporated in the descriptive portions of this report.

## COMMITTEE ON GOVERNMENT OPERATIONS OVERSIGHT FINDINGS

No findings or recommendations of the Committee on Government Operations were received as referred to in clause 2(l)(3)(D) of rule XI of the Rules of the House of Representatives.

## NEW BUDGET AUTHORITY AND TAX EXPENDITURES

Clause 2(l)(3)(B) of House Rule XI is inapplicable because this legislation does not provide new budgetary authority or increased tax expenditures.

## INFLATIONARY IMPACT STATEMENT

Pursuant to clause 2(l)(4) of rule XI of the Rules of the House of Representatives, the Committee estimates that H.R. 4296 will have no significant inflationary impact on prices and costs in the national economy.

## CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

In compliance with clause 2(l)(3)(C) of rule XI of the Rules of the House of Representatives, the Committee sets forth, with respect to the bill H.R. 4296, the following estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of the Congressional Budget Act of 1974:

U.S. Congress,
Congressional Budget Office.
Washington, DC, May 2, 1994.

Hon. Jack Brooks,
Chairman, Committee on the Judiciary,
House of Representatives, Washington, DC.

Dear Mr. Chairman: The Congressional Budget Office has reviewed H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, as ordered reported by the House Committee on the Judiciary on April 28, 1994. We estimate that enactment of the bill would result in costs to the federal government over the 1995–1999 period of less than $500,000 from appropriated amounts. In addition, we estimate that enactment of H.R. 4296 would lead to increases in receipts of less than $10 million a year from new criminal fines. Such receipts would be deposited in the Crime Victims Fund and spent in the following year. Because the bill could affect direct spending and receipts, pay-as-you-go procedures would apply. The bill would not affect the budgets of state or local governments.

H.R. 4296 would ban the manufacture, transfer, and possession of certain semiautomatic assault weapons not lawfully possessed as of the date of the bill's enactment. The bill also would ban the transfer and possession of certain large-capacity ammunition feeding devices not lawfully possessed as of the date of enactment. In addition, H.R. 4296 would establish recordkeeping requirements for transfers of grandfathered weapons and would direct the Attorney General to conduct a study of the bill's impact. Finally, the bill would create new federal crimes and associated penalties–prison sentences and criminal fines–for violation of its provisions.

The new recordkeeping requirements and the impact study would increase costs to the Department of the Treasury and the Department of Justice, respectively, but we estimate that these costs would be less than $500,000 over the next several years from appropriated amounts. The imposition of new criminal fines in H.R. 4296 could cause governmental receipts to increase through greater penalty collections. We estimate that any such increase would be less than $10 million annually. Criminal fines would be deposited in the Crime Victims Fund and would be spent in the following year. Thus, direct spending from the fund would match the increase in revenues with a one-year lag.

If you wish further details on this estimate, we will be pleased to provide them.

Sincerely,

Robert D. Reischauer, Director.

## CHANGES IN EXISTING LAW MADE BY THE BILL, AS REPORTED

In compliance with clause 3 of rule XIII of the Rules of the House of Representatives, changes in existing law made by the bill, as reported, are shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

CHAPTER 44 OF TITLE 18, UNITED STATES CODE

* * * * * * *

CHAPTER 44–FIREARMS

S 921. Definitions

(a) As used in this chapter–

(1)***

* * * * * * *

(3) The term "firearm" means (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of any such weapon; (C) any firearm muffler or firearm silencer; [or (D) any destructive device.] (D) any destructive device; or (E) any large capacity ammunition feeding device. Such term does not include an antique firearm.

* * * * * * *

(30) The term "semiautomatic assault weapon" means–

(A) any of the firearms, or copies or duplicates of the firearms, known as–

(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models);

(ii) Action Arms Israeli Military Industries UZI and Galil;

(iii) Beretta Ar70 (SC–70);

(iv) Colt AR–15;

(v) Fabrique National FN/FAL, FN/LAR, and FNC;

(vi) SWD M–10, M–11, M–11/9, and M–12;

(vii) Steyr AUG;

(viii) INTRATEC TEC–9, TEC–DC9 and TEC–22; and

(ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12;

(B) a semiautomatic rifle that has an ability to accept a detachable magazine and has at least 2 of–

(i) a folding or telescoping stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a bayonet mount;

(iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and

(v) a grenade launcher;

(C) a semiautomatic pistol that has an ability to accept a detachable magazine and has at least 2 of–

(i) an ammunition magazine that attaches to the pistol outside of the pistol grip;

(ii) a threaded barrel capable of accepting a barrel extender, flash suppressor, forward handgrip, or silencer;

(iii) a shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to hold the firearm with the nontrigger hand without being burned;

(iv) a manufactured weight of 50 ounces or more when the pistol is unloaded; and

(v) a semiautomatic version of an automatic firearm; and

(D) a semiautomatic shotgun that has at least 2 of–

(i) a folding or telescoping stock;

(ii) a pistol grip that protrudes conspicuously beneath the action of the weapon;

(iii) a fixed magazine capacity in excess of 5 rounds; and

(iv) an ability to accept a detachable magazine.

(31) The term "large capacity ammunition feeding device"–

(A) means–

(i) a magazine, belt, drum, feed strip, or similar device that has a capacity of, or that can be readily restored or converted to accept, more than 10 rounds of ammunition; and

(ii) any combination of parts from which a device described in clause (i) can be assembled; but

(B) does not include an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

S 922. Unlawful acts

(a) It shall be unlawful–

* * * * * * *

(v)(1) It shall be unlawful for a person to manufacture, transfer, or possess a semiautomatic assault weapon.

(2) Paragraph (1) shall not apply to the possession or transfer of any semiautomatic assault weapon otherwise lawfully possessed on the date of the enactment of this subsection.

(3) Paragraph (1) shall not apply to–

(A) any of the firearms, or replicas or duplicates of the firearms, specified in Appendix A to this section, as such firearms were manufactured on October 1, 1993;

(B) any firearm that–

(i) is manually operated by bolt, pump, lever, or slide action;

(ii) has been rendered permanently inoperable; or

(iii) is an antique firearm;

(C) any semiautomatic rifle that cannot accept a detachable magazine that holds more than 5 rounds of ammunition; or

(D) any semiautomatic shotgun that cannot hold more than 5 rounds of ammunition in a fixed or detachable magazine.

The fact that a firearm is not listed in Appendix A shall not be construed to mean that paragraph (1) applies to such firearm. No firearm exempted by this subsection may be deleted from Appendix A so long as this Act is in effect.

(4) Paragraph (1) shall not apply to–

(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

(B) the transfer of a semiautomatic assault weapon by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase firearms for official use;

(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving a firearm, of a semiautomatic assault weapon transferred to the individual by the agency upon such retirement; or

(D) the manufacture, transfer, or possession of a semiautomatic assault weapon by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.

(w)(1) It shall be unlawful for a person to sell, ship, or deliver a semiautomatic assault weapon to a person who has not completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

(2) It shall be unlawful for a person to receive a semiautomatic assault weapon unless the person has completed a form 4473 in connection with the transfer of the semiautomatic assault weapon.

(3) If a person receives a semiautomatic assault weapon from anyone other than a licensed dealer, both the person and the transferor shall retain a copy of the form 4473 completed in connection with the transfer.

(4) Within 90 days after the date of the enactment of this subsection, the Secretary shall prescribe regulations ensuring the availability of form 4473 to owners of semiautomatic assault weapons.

(5) As used in this subsection, the term "form 4473" means–

(A) the form which, as of the date of the enactment of this subsection, is designated by the Secretary as form 4473; or

(B) any other form which–

(i) is required by the Secretary, in lieu of the form described in subparagraph (A), to be completed in connection with the transfer of a semiautomatic assault weapon; and

(ii) when completed, contains, at a minimum, the information that, as of the date of the enactment of this subsection, is required to be provided on the form described in subparagraph (A).

(x)(1) Except as provided in paragraph (2), it shall be unlawful for a person to transfer or possess a large capacity ammunition feeding device.

(2) Paragraph (1) shall not apply to the possession or transfer of any large capacity ammunition feeding device otherwise lawfully possessed on the date of the enactment of this subsection.

(3) This subsection shall not apply to–

(A) the United States or a department or agency of the United States or a State or a department, agency, or political subdivision of a State;

(B) the transfer of a large capacity ammunition feeding device by a licensed manufacturer, licensed importer, or licensed dealer to an entity referred to in subparagraph (A) or to a law enforcement officer authorized by such an entity to purchase large capacity ammunition feeding devices for official use;

(C) the possession, by an individual who is retired from service with a law enforcement agency and is not otherwise prohibited from receiving ammunition, of a large capacity ammunition feeding device transferred to the individual by the agency upon such retirement; or

(D) the manufacture, transfer, or possession of any large capacity ammunition feeding device by a licensed manufacturer or licensed importer for the purposes of testing or experimentation authorized by the Secretary.

## APPENDIX A

### Centerfire Rifles–Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle

Browning BAR Mark II Safari Magnum Rifle

Browning High-Power Rifle

Heckler & Koch Model 300 Rifle

Iver Johnson M-1 Carbine

Iver Johnson 50th Anniversary M-1 Carbine

Marlin Model 9 Camp Carbine

Marlin Model 45 Carbine

Remington Nylon 66 Auto-Loading Rifle

Remington Model 7400 Auto Rifle

Remington Model 7400 Rifle

Remington Model 7400 Special Purpose Auto Rifle

Ruger Mini-14 Autoloading Rifle (w/o folding stock)

Ruger Mini Thirty Rifle

**Centerfire Rifles–Lever & Slide**

Browning Model 81 BLR Lever-Action Rifle

Browning Model 81 Long Action BLR

Browning Model 1886 Lever-Action Carbine

Browning Model 1886 High Grade Carbine

Cimarron 1860 Henry Replica

Cimarron 1866 Winchester Replicas

Cimarron 1873 Short Rifle

Cimarron 1873 Sporting Rifle

Cimarron 1873 30" Express Rifle

Dixie Engraved 1873 Rifle

E.M.F. 1866 Yellowboy Lever Actions

E.M.F. 1860 Henry Rifle

E.M.F. Model 73 Lever-Actions Rifle

Marlin Model 336CS Lever-Action Carbine

Marlin Model 30AS Lever-Action Carbine

Marlin Model 444SS Lever-Action Sporter

Marlin Model 1894S Lever-Action Carbine

Marlin Model 1894CS Carbine

Marlin Model 1894CL Classic

Marlin Model 1895SS Lever-Action Rifle

Mitchell 1858 Henry Replica

Mitchell 1866 Winchester Replica

Mitchell 1873 Winchester Replica

Navy Arms Military Henry Rifle

Navy Arms Henry Trapper

Navy Arms Iron Frame Henry

Navy Arms Henry Carbine

Navy Arms 1866 Yellowboy Rifle

Navy Arms 1873 Winchester-Style Rifle

Navy Arms 1873 Sporting Rifle

Remington 7600 Slide Action

Remington Model 7600 Special-Purpose Slide Action

Rossi M92 SRC Saddle-Ring Carbine

Rossi M92 SRS Short Carbine

Savage 99C Leber-Action Rifle

Uberti Henry Rifle

Uberti 1866 Sporting Rifle

Uberti 1873 Sporting Rifle

Winchester Model 94 Side Eject Lever-Action Rifle

Winchester Model 94 Trapper Side Eject

Winchester Model 94 Big Bore Side Eject

Winchester Model 94 Ranger Side Eject Lever-Action Rifle

Winchester Model 94 Wrangler Side Eject

**Centerfire Rifles–Bolt Action**

Alpine Bolt-Action Rifle

A-Square Caesar Bolt-Action Rifle

A-Square Hannibal Bolt-Action Rifle

Anschutz 1700D Classic Rifles

Anschutz 1700D Custom Rifles

Anschutz 1700D Bavarian Bolt-Action Rifle

Anschutz 1733D Mannlicher Rifle

Barret Model 90 Bolt-Action Rifle

Beeman/HW 60J Bolt-Action Rifle

Blaser R84 Bolt-Action Rifle

BRNO 537 Sporter Bolt-Action Rifle

BRNO ZKB 527 Fox Bolt-Action Rifle

BRNO ZKK 600, 601, 602 Bolt-Action Rifles

Browning A-Bolt Rifle

Browning A-Bolt Stainless Stalker

Browning A-Bolt Left Hand

Browning A-Bolt Short Action

Browning Euro-Bolt Rifle

Browning A-Bolt Gold Medallion

Browning A-Bolt Micro Medallion

Century Centurion 14 Sporter

Century Enfield Sporter #4

Century Swedish Sporter #38

Century Mauser 98 Sporter

Cooper Model 38 Centerfire Sporter

Dakota 22 Sporter Bolt-Action Rifle

Dakota 76 Classic Bolt-Action Rifle

Dakota 76 Short Action Rifles

Dakota 76 Safari Bolt-Action Rifle

Dakota 416 Rigby African

E.A.A./Sabatti Rover 870 Bolt-Action Rifle

Auguste Francotte Bolt-Action Rifles

Carl Gustaf 2000 Bolt-Action Rifle

Heym Magnum Express Series Rifle

Howa Lightning Bolt-Action Rifle

Howa Realtree Camo Rifle

Interarms Mark X Viscount Bolt-Action Rifle

Interarms Mini-Mark X Rifle

Interarms Mark X Whitworth Bolt-Action Rifle

Interarms Whitworth Express Rifle

Iver Johnson Model 5100A1 Long-Range Rifle

KDF K15 American Bolt-Action Rifle

Krico Model 600 Bolt-Action Rifle

Krico Model 700 Bolt-Action Rifle

Mauser Model 66 Bolt-Action Rifle

Mauser Model 99 Bolt-Action Rifle

McMillan Signature Classic Sporter

McMillan Signature Super Varminter

McMillan Signature Alaskan

McMillan Signature Titanium Mountain Rifle

McMillan Classic Stainless Sporter

McMillan Talon Safari Rifle

McMillan Talon Sporter Rifle

Midland 1500S Survivor Rifle

Navy Arms TU-33/40 Carbine

Parker-Hale Model 81 Classic Rifle

Parker-Hale Model 81 Classic African Rifle

Parker-Hale Model 1000 Rifle

Parker-Hale Model 1000M African Rifle

Parker-Hale Model 1100 Lightweight Rifle

Parker-Hale Model 1200 Super Rifle

Parker-Hale Model 1200 Super Clip Rifle

Parker-Hale Model 1300C Scout Rifle

Parker-Hale Model 2100 Midland Rifle

Parker-Hale Model 2700 Lightweight Rifle

Parker-Hale Model 2800 Midland Rifle

Remington Model Seven Bolt-Action Rifle

Remington Model Seven Youth Rifle

Remington Model Seven Custom KS

Remington Model Seven Custom MS Rifle

Remington 700 ADL Bolt-Action Rifle

Remington 700 BDL Bolt-Action Rifle

Remington 700 BDL Varmint Special

Remington 700 BDL European Bolt-Action Rifle

Remington 700 Varmint Synthetic Rifle

Remington 700 BDL SS Rifle

Remington 700 Stainless Synthetic Rifle

Remington 700 MTRSS Rifle

Remington 700 BDL Left Hand

Remington 700 Camo Synthetic Rifle

Remington 700 Safari

Remington 700 Mountain Rifle

Remington 700 Custom KS Mountain Rifle

Remington 700 Classic Rifle

Ruger M77 Mark II Rifle

Ruger M77 Mark II Magnum Rifle

Ruger M77RL Ultra Light

Ruger M77 Mark II All-Weather Stainless Rifle

Ruger M77 RSI International Carbine

Ruger M77 Mark II Express Rifle

Ruger M77VT Target Rifle

Sako Hunter Rifle

Sako Fiberclass Sporter

Sako Hunter Left-Hand Rifle

Sako Classic Bolt Action

Sako Hunter LS Rifle

Sako Deluxe Lighweight

Sako Super Deluxe Sporter

Sako Mannlicher-Style Carbine

Sako Varmint Heavy Barrel

Sako TRG-S Bolt-Action Rifle

Sauer 90 Bolt-Action Rifle

Savage 110G Bolt-Action Rifle

Savage 110CY Youth/Ladies Rifle

Savage 110WLE One of One Thousand Limited Edition Rifle

Savage 110GXP3 Bolt-Action Rifle

Savage 110F Bolt-Action Rifle

Savage 110FXP3 Bolt-Action Rifle

Savage 110GV Varmint Rifle

Savage 110FV Varmint Rifle

Savage Model 110FVS Varmint Rifle

Savage Model 112BV Heavy Barrel Varmint Rifle

Savage 116FSS Bolt-Action Rifle

Savage Model 116SK Kodiak Rifle

Savage 110FP Polic Rifle

Steyr-Mannlicher Sporter Models SL, L, M, S, S/T

Steyr-Mannlicher Luxus Model L, M, S

Steyr-Mannlicher Model M Professional Rifle

Tikka Bolt-Action Rifle

Tikka Premium Grade Rifle

Tikka Varmint/Continental Rifle

Tikka Whitetail/Battue Rifle

Ultra Light Arms Model 20 Rifle

Ultra Light Arms Model 28, Model 40 Rifles

Voere VEC 91 Lightning Bolt-Action Rifle

Voere Model 2166 Bolt-Action Rifle

Voere Model 2155, 2150 Bolt-Action Rifles

Weatherby Mark V Deluxe Bolt-Action Rifle

Weatherby Lasermark V Rifle

Weatherby Mark V Crown Custom Rifles

Weatherby Mark V Safari Grade Custom Rifle

Weatherby Mark V Sporter Rifle

Weatherby Mark V Safari Grade Custom Rifles

Weatherby Weathermark Rifle

Weatherby Weathermark Alaskan Rifle

Weatherby Classicmark No. 1 Rifle

Weatherby Weatherguard Alaskan Rifle

Weatherby Vanguard VGX Deluxe Rifle

Weatherby Vanguard Classic Rifle

Weatherby Vanguard Classic No. 1 Rifle

Weatherby Vanguard Weathermark Rifle

Wichita Classis Rifle

Wichita Varmint Rifle

Winchester Model 70 Sporter

Winchester Model 70 Sporter WinTuff

Winchester Model 70 SM Sporter

Winchester Model 70 Stainless Rifle

Winchester Model 70 Varmint

Winchester Model 70 Synthetic Heavy Varmint Rifle

Winchester Model 70 DBM Rifle

Winchester Model 70 DBM-S Rifle

Winchester Model 70 Featherweight

Winchester Model 70 Featherweight WinTuff

Winchester Model 70 Featherweight Classic

Winchester Model 70 Lightweight Rifle

Winchester Ranger Rifle

Winchester Model 70 Super Express Magnum

Winchester Model 70 Super Grade

Winchester Model 70 Custom Sharpshooter

Winchester Model 70 Custom Sporting Sharpshooter Rifle

**Centerfire Rifles–Single Shot**

Armsport 1866 Sharps Rifle, Carbine

Brown Model One Single Shot Rifle

Browning Model 1885 Single Shot Rifle

Dakota Single Shot Rifle

Desert Industries G-90 Single Shot Rifle

Harrington & Richardson Ultra Varmint Rifle

Model 1885 High Wall Rifle

Navy Arms Rolling Block Buffalo Rifle

Navy Arms #2 Creedmoor Rifle

Navy Arms Sharps Cavalry Carbine

Navy Arms Sharps Plains Rifle

New Enlgand Firearms Handi-Rifle

Red Willow Armory Ballard No. 5 Pacific

Red Willow Armory Ballard No. 1.5 Hunting Rifle

Red Willow Armory Ballard No. 8 Union Hill Rifle

Red Willow Armory Ballard No. 4.5 Target Rifle

Remington-Style Rolling Block Carbine

Ruger No. 1B Single Shot

Ruger No. 1A Light Sporter

Ruger No. 1H Tropical Rifle

Ruger No. 1S Medium Sporter

Ruger No. 1 RSI International

Ruger No. 1V Special Varminter

C. Sharps Arms New Model 1874 Old Reliable

C. Sharps Arms New Model 1875 Rifle

C. Sharps Arms 1875 Classic Sharps

C. Sharps Arms New Model 1875 Target & Long Range

Shiloh Sharps 1874 Long Range Express

Shiloh Sharps 1874 Montana Roughrider

Shiloh Sharps 1874 Military Carbine

Shiloh Sharps 1874 Business Rifle

Shiloh Sharps 1874 Military Rifle

Sharps 1874 Old Reliable

Thompson/Center Contender Carbine

Thompson/Center Stainless Contender Carbine

Thompson/Center Contender Carbine Survival System

Thompson/Center Contender Carbine Youth Model

Thompson/Center TCR '87 Single Shot Rifle

Uberti Rolling Block Baby Carbine

**Drillings, Combination Guns, Double Rifles**

Baretta Express SSO O/U Double Rifles

Baretta 455 SxS Express Rifle

Chapuis RGExpress Double Rifle

Auguste Francotte Sidelock Double Rifles

Auguste Francotte Boxlock Double Rifle

Heym Model 55B O/U Double Rifle

Heym Model 55FW O/U Combo Gun

Heym Model 88b Side-by-Side Double Rifle

Kodiak Mk. IV Double Rifle

Kreighoff Teck O/U Combination Gun

Kreighoff Trumpf Drilling

Merkel Over/Under Combination Guns

Merkel Drillings

Merkel Model 160 Side-by-Side Double Rifles

Merkel Over/Under Double Rifles

Savage 24F O/U Combination Gun

Savage 24F-12T Turkey Gun

Springfield Inc. M6 Scout Rifle/Shotgun

Tikka Model 412s Combination Gun

Tikka Model 412S Double Fire

A. Zoli Rifle-Shotgun O/U Combo

**Rimfire Rifles–Autoloaders**

AMT Lightning 25/22 Rifle

AMT Lightning Small-Game Hunting Rifle II

AMT Mannum Hunter Auto Rifle

Anschutz 525 Deluxe Auto

Armscor Model 20P Auto Rifle

Browning Auto-22 Rifle

Browning Auto-22 Grade VI

Krico Model 260 Auto Rifle

Lakefield Arms Model 64B Auto Rifle

Marlin Model 60 Self-Loading Rifle

Marlin Model 60ss Self-Loading Rifle

Marlin Model 70 HC Auto

Marlin Model 990*l* Self-Loading Rifle

Marlin Model 70P Papoose

Marlin Model 922 Magnum Self-Loading Rifle

Marlin Model 995 Self-Loading Rifle

Norinco Model 22 ATD Rifle

Remington Model 522 Viper Autoloading Rifle

Remington 522BDL Speedmaster Rifle

Ruger 10/22 Autoloading Carbine (w/o folding stock)

Survival Arms AR-7 Explorer Rifle

Texas Remington Revolving Carbine

Voere Model 2115 Auto Rifle

**Rimfire Rifles–Lever & Slide Action**

Browning BL-22 Lever-Action Rifle

Marlin 39TDS Carbine

Marlin Model 39AS Golden Lever-Action Rifle

Remington 572BDL Fieldmaster Pump Rifle

Norinco EM-321 Pump Rifle

Rossi Model 62 SA Pump Rifle

Rossi Model 62 SAC Carbile

Winchester Model 9422 Lever-Action Rifle

Winchester Model 9422 Magnum Lever-Action Rifle

**Rimfire Rifles–Bolt Actions & Single Shots**

Anschutz Achiever Bolt-Action Rifle

Anschutz 1416D/1516D Classic Rifles

Anschutz 1418D/1518D Mannlicher Rifles

Anschutz 1700D Classic Rifles

Anschutz 1700D Custom Rifles

Anschutz 1700 FWT Bolt-Action Rifle

Anschutz 1700D Graphite Custom Rifle

Anschutz 1700D Bavarian Bolt-Action Rifle

Armscor Model 14P Bolt-Action Rifle

Armscor Model 1500 Rifle

BRNO ZKM-452 Deluxe Bolt-Action Rifle

BRNO ZKM 452 Deluxe

Beeman/HW 60-J-ST Bolt-Action Rifle

Browning A-Bolt 22 Bolt-Action Rifle

Browning A-Bolt Gold Medallion

Cabanas Phaser Rifle

Cabanas Master Bolt-Action Rifle

Cabanas Espronceda IV Bolt-Action Rifle

Cabanas Leyre Bolt-Action Rifle

Chipmunk Single Shot Rifle

Cooper Arms Model 36S Sporter Rifle

Dakota 22 Sporter Bolt-Action Rifle

Krico Model 300 Bolt-Action Rifles

Lakefield Arms Mark II Bolt-Action Rifle

Lakefield Arms Mark I Bolt-Action Rifle

Magtech Model MT-22C Bolt-Action Rifle

Marlin Model 880 Bolt-Action Rifle

Marlin Model 881 Bolt-Action Rifle

Marlin Model 882 Bolt-Action Rifle

Marlin Model 883 Bolt-Action Rifle

Marlin Model 883SS Bolt-Action Rifle

Marlin Model 25MN Bolt-Action Rifle

Marlin Model 25N Bolt-Action Repeater

Marlin Model 15YN "Little Buckaroo"

Mauser Model 107 Bolt-Action Rifle

Mauser Model 201 Bolt-Action Rifle

Navy Arms TU-KKW Training Rifle

Navy Arms TU-30/40 Carbine

Navy Arms TU-KKW Sniper Trainer

Norinco JW-27 Bolt-Action Rifle

Norinco JW-15 Bolt-Action Rifle

Remington 541-T

Remington 40-XR Rimfire Custom Sporter

Remington 541-T HB Bolt-Action Rifle

Remington 581-S Sportsman Rifle

Ruger 77/22 Rimfire Bolt-Action Rifle

Ruger K77/22 Varmint Rifle

Ultra Light Arms Model 20 RF Bolt-Action Rifle

Winchester Model 52B Sporting Rifle

**Competition Rifles–Centerfire & Rimfire**

Anschutz 64-MS Left Silhouette

Anschutz 1808D RT Super Match 54 Target

Anschutz 1827B Biathlon Rifle

Anschutz 1903D Match Rifle

Anschutz 1803D Intermediate Match

Anschutz 1911 Match Rifle

Anschutz 54.18MS REP Deluxe Silhouette Rifle

Anschutz 1913 Super Match Rifle

Anschutz 1907 Match Rifle

Anschutz 1910 Super Match II

Anschutz 54.18MS Silhouette Rifle

Anschutz Super Match 54 Targe Model 2013

Anschutz Super Match 54 Targe Model 2007

Beeman/Feinwerkbau 2600 Target Rifle

Cooper Arms Model TRP-1 ISU Standard Rifle

E.A.A./Weihrauch HW 60 Target Rifle

E.A.A./HW 60 Match Rifle

Finnish Lion Standard Target Rifle

Krico Model 360 S2 Biathlon Rifle

Krico Model 400 Match Rifle

Krico Model 360S Biathlon Rifle

Krico Model 500 Kricotronic Match Rifle

Krico Model 600 Sniper Rifle

Krico Model 600 Match Rifle

Lakefield Arms Model 90B Target Rifle

Lakefield Arms Model 91T Target Rifle

Lakefield Arms Model 92S Silhouette Rifle

Marlin Model 2000 Target Rifle

Mauser Model 86-SR Specialty Rifle

McMillan M-86 Sniper Rifle

McMillan Combo M-87/M-88 50-Caliber Rifle

McMillan 300 Phoenix Long-Range Rifle

McMillan M-89 Sniper Rifle

McMillan National Match Rifle

McMillan Long-Range Rifle

Parker-Hale M-87 Target Rifle

Parker-Hale M-85 Sniper Rifle

Remington 40-XB Rangemaster Target Centerfire

Remington 40-XR KS Rimfire Position Rifle

Remington 40-XBBR KS

Remington 40-XC KS National Match Course Rifle

Sako TRG-21 Bolt-Action Rifle

Steyr-Mannlicher Match SPG-UIT Rifle

Steyr-Mannlicher SSG P-I Rifle

Steyr-Mannlicher SSG P-III Rifle

Steyr-Mannlicher SSG P-IV Rifle

Tanner Standard UIT Rifle

Tanner 50 Meter Free Rifle

Tanner 300 Meter Free Rifle

Wichita Silhouette Rifle

**Shotguns–Autoloaders**

American Arms/Franchi Black Magic 48/AL

Benelli Super Black Eagle Shotgun

Benelli Super Black Eagle Slug Gun

Benelli M1 Super 90 Field Auto Shotgun

Benelli Montefeltro Super 90 20-Gauge Shotgun

Benelli Montefeltro Super 90 Shotgun

Benelli M1 Sporting Special Auto Shotgun

Benelli Black Eagle Competition Auto Shotgun

Beretta A-303 Auto Shotgun

Beretta 390 Field Auto Shotgun

Beretta 390 Super Trap, Super Skeet Shotguns

Beretta Vittoria Auto Shotgun

Beretta Model 1201F Auto Shotgun

Browning BSA 10 Auto Shotgun

Browning Bsa 10 Stalker Auto Shotgun

Browning A-500R Auto Shotgun

Browning A-500G Auto Shotgun

Browning A-500G Sporting Clays

Browning Auto-5 Light 12 and 20

Browning Auto-5 Stalker

Browning Auto-5 Magnum 20

Browning Auto-5 Magnum 12

Churchill Turkey Automatic Shotgun

Cosmi Automatic Shotgun

Maverick Model 60 Auto Shotgun

Mossberg Model 5500 Shotgun

Mossberg Model 9200 Regal Semi-Auto Shotgun

Mossberg Model 9200 USST Auto Shotgun

Mossberg Model 9200 Camo Shotgun

Mossberg Model 6000 Auto Shotgun

Remington Model 1100 Shotgun

Remington 11-87 Premier shotgun

Remington 11-87 Sporting Clays

Remington 11-87 Premier Skeet

Remington 11-87 Premier Trap

Remington 11-87 Special Purpose Magnum

Remington 11-87 SPS-T Camo Auto Shotgun

Remington 11-87 Special Purpose Deer Gun

Remington 11-87 SPS-BG-Camo Deer/Turkey Shotgun

Remington 11-87 SPS-Deer Shotgun

Remington 11-87 Special Purpose Synthetic Camo

Remington SP-10 Magnum-Camo Auto Shotgun

Remington SP-10 Magnum Auto Shotgun

Remington SP-10 Magnum Turkey Combo

Remington 1100 LT-20 Auto

Remington 1100 Special Field

Remington 1100 20-Gauge Deer Gun

Remington 1100 LT-20 Tournament Skeet

Winchester Model 1400 Semi-Auto Shotgun

**Shotguns–Slide Actions**

Browning Model 42 Pump Shotgun

Browning BPS Pump Shotgun

Browning BPS Stalker Pump Shotgun

Browning BPS Pigeon Grade Pump Shotgun

Browning BPS Pump Shotgun (Ladies and Youth Model)

Browning BPS Game Gun Turkey Special

Browning BPS Game Gun Deer Special

Ithaca Model 87 Supreme Pump Shotgun

Ithaca Model 87 Deerslayer Shotgun

Ithaca Deerslayer II Rifled Shotgun

Ithaca Model 87 Turkey Gun

Ithaca Model 87 Deluxe Pump Shotgun

Magtech Model 586-VR Pump Shotgun

Maverick Models 88, 91 Pump Shotguns

Mossberg Model 500 Sporting Pump

Mossberg Model 500 Camo Pump

Mossberg Model 500 Muzzleloader Combo

Mossberg Model 500 Trophy Slugger

Mossberg Turkey Model 500 Pump

Mossberg Model 500 Bantam Pump

Mossberg Field Grade Model 835 Pump Shotgun

Mossberg Model 835 Regal Ulti-Mag Pump

Remington 870 Wingmaster

Remington 870 Special Purpose Deer Gun

Remington 870 SPS-BG-Camo Deer/Turkey Shotgun

Remington 870 SPS-Deer Shotgun

Remington 870 Marine Magnum

Remington 870 TC Trap

Remington 870 Special Purpose Synthetic Camo

Remington 870 Wingmaster Small Gauges

Remington 870 Express Rifle Sighted Deer Gun

Remington 879 SPS Special Purpose Magnum

Remington 870 SPS-T Camo Pump Shotgun

Remington 870 Special Field

Remington 870 Express Turkey

Remington 870 High Grades

Remington 870 Express

Remington Model 870 Express Youth Gun

Winchester Model 12 Pump Shotgun

Winchester Model 42 High Grade Shotgun

Winchester Model 1300 Walnut Pump

Winchester Model 1300 Slug Hunter Deer Gun

Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun

Winchester Model 1300 Turkey Gun

Winchester Model 1300 Ranger Pump Gun

**Shotguns–Over/Unders**

American Arms/Franchi Falconet 2000 O/U

American Arms Silver I O/U

American Arms Silver II Shotgun

American Arms Silver Skeet O/U

American Arms/Franchi Sporting 2000 O/U

American Arms Silver Sporting O/U

American Arms Silver Trap O/U

American Arms WS/OU 12, TS/OU 12 Shotguns

American Arms WT/OU 10 Shotgun

Armsport 2700 O/U Goose Gun

Armsport 2700 Series O/U

Armsport 2900 Tri-Barrel Shotgun

Baby Bretton Over/Under Shotgun

Beretta Model 686 Ultralight O/U

Beretta ASE 90 Competition O/U Shotgun

Beretta Over/Under Field Shotguns

Beretta Onyx Hunder Sport O/U Shotgun

Beretta Model SO5, SO6, SO9 Shotguns

Beretta Sporting Clay Shotguns

Beretta 687EL Sporting O/U

Beretta 682 Super Sporting O/U

Beretta Series 682 Competition Over/Unders

Browning Citori O/U Shotgun

Browning Superlight Citori Over/Under

Browning Lightning Sporting Clays

Browning Micro Citori Lightning

Browning Citori Plus Trap Combo

Browning Citori Plus Trap Gun

Browning Citori O/U Skeet Models

Browning Citori O/U Trap Models

Browning Special Sporting Clays

Browning Citori GTI Sporting Clays

Browning 325 Sporting Clays

Centurion Over/Under Shotgun

Chapuis Over/Under Shotgun

Connecticut Valley Classics Classic Sporter O/U

Connecticut Valley Classics Classic Field Waterfowler

Charles Daly Field Grade O/U

Charles Daly Lux O/U

E.A.A./Sabatti Sporting Clays Pro-Gold O/U

E.A.A./Sabatti Falcon-Mon Over/Under

Kassnar Grade I O/U Shotgun

Krieghoff K-80 Sporting Clays O/U

Krieghoff K-80 Skeet Shotgun

Krieghoff K-80 International Skeet

Krieghoff K-80 Four-Barrel Skeet Set

Krieghoff K-80/RT Shotguns

Krieghoff K-80 O/U Trap Shotgun

Laurona Silhouette 300 Sporting Clays

Laurona Silhouette 300 Trap

Laurona Super Model Over/Unders

Ljutic LM-6 Deluxe O/U Shotgun

Marocchi Conquista Over/Under Shotgun

Marocchi Avanza O/U Shotgun

Merkel Model 200E O/U Shotgun

Merkel Model 200E Skeet, Trap Over/Unders

Merkel Model 203E, 303E Over/Under Shotguns

Perazzi Mirage Special Sporting O/U

Perazzi Mirage Special Four-Gauge Skeet

Perazzi Sporting Classic O/U

Perazzi MX7 Over/Under Shotguns

Perazzi Mirage Special Skeet Over/Under

Perazzi MX8/MX8 Special Trap, Skeet

Perazzi MX8/20 Over/Under Shotgun

Perazzi MX9 Single Over/Under Shotguns

Perazzi MX12 Hunting Over/Under

Perazzi MX28, MX410 Game O/U Shotfuns

Perazzi MX20 Hunting Over/Under

Piotti Boss Over/Under Shotgun

Remington Peerless Over/Under Shotgun

Ruger Red Label O/U Shotgun

Ruger Sporting Clays O/U Shotgun

San Marco 12-Ga. Wildflower Shotgun

San Marco Field Special O/U Shotgun

San Marco 10-Ga. O/U Shotgun

SKB Model 505 Deluxe Over/Under Shotgun

SKB Model 685 Over/Under Shotgun

SKB Model 885 Over/Under Trap, Skeet, Sporting Clays

Stoeger/IGA Condor I O/U Shotgun

Stoeger/IGA ERA 2000 Over/Under Shotgun

Techni-Mec Model 610 Over/Under

Tikka Model 412S Field Grade Over/Under

Weatherby Athena Grade IV O/U Shotguns

Weatherby Athena Grade V Classic Field O/U

Weatherby Orion O/U Shotguns

Weatherby II, III Classic Field O/Us

Weatherby Orion II Classic Sporting Clays O/U

Weatherby Orion II Sporting Clays O/U

Winchester Model 1001 O/U Shotgun

Winchester Model 1001 Sporting Clays O/U

Pietro Zanoletti Model 2000 Field O/U

**Shotguns–Side by Sides**

American Arms Brittany Shotgun

American Arms Gentry Double Shotgun

American Arms Derby Side-by-Side

American Arms Grulla #2 Double Shotgun

American Arms WS/SS 10

American Arms TS/SS 10 Double Shotgun

American Arms TS/SS 12 Side-by-Side

Arrieta Sidelock Double Shotguns

Armsport 1050 Series Double Shotguns

Arizaga Model 31 Double Shotgun

AYA Boxlock Shotguns

AYA Sidelock Double Shotguns

Beretta Model 452 Sidelock Shotgun

Beretta Side-by-Side Field Shotguns

Crucelegui Hermanos Model 150 Double

Chapuis Side-by-Side Shotgun

E.A.A./Sabatti Sabe-Mon Double Shotgun

Charles Daly Model Dss Double

Ferlib Model F VII Double Shotgun

Auguste Francotte Boxlock Shotgun

Auguste Francotte Sidelock Shotgun

Garbi Model 100 Double

Garbi Model 100 Side-by-Side

Garbi Model 103A, B Side-by-Side

Garbi Model 200 Side-by-Side

Bill Hanus Birdgun Doubles

Hatfield Uplander Shotgun

Merkell Model 8, 47E Side-by-Side Shotguns

Merkel Model 47LSC Sporting Clays Double

Merkel Model 47S, 147S Side-by-Sides

Parker Reproductions Side-by-Side

Piotti King No. 1 Side-by-Side

Piotti Lunik Side-by-Side

Piotti King Extra Side-by-Side

Piotti Piuma Side-by-Side

Precision Sports Model 600 Series Doubles

Rizzini Boxlock Side-by-Side

Rizzini Sidelock Side-by-Side

Stoeger/IGA Side-by-Side Shotgun

Ugartechea 10-Ga. Magnum Shotgun

**Shotguns–Bolt Actions & Single Shots**

Armsport Single Barrel Shotgun

Browning BT-99 Competition Trap Special

Browning BT-99 Plus Trap Gun

Browning BT-99 Plus Micro

Browning Recoilless Trap Shotgun

Browning Micro Recoilless Trap Shotgun

Desert Industries Big Twenty Shotgun

Harrington & Richardson Topper Model 098

Harrington & Richardson Topper Classic Youth Shotgun

Harrington & Richardson N.W.T.F. Turkey Mag

Harrington & Richardson Topper Deluxe Model 098

Krieghoff KS-5 Trap Gun

Krieghoff KS-5 Special

Krieghoff KS-80 Single Barrel Trap Gun

Ljutic Mono Gun Single Barrel

Ljutic LTX Super Deluxe Mono Gun

Ljutic Recoilless Space Gun Shotgun

Marlin Model 55 Goose Gun Bolt Action

New England Firearms Turkey and Goose Gun

New England Firearms N.W.T.F. Shotgun

New England Firearms Tracker Slug Gun

New England Firearms Standard Pardner

New England Firearms Survival Gun

Perazzi TM1 Special Single Trap

Remington 90-T Super Single Shotgun

Snake Charmer II Shotgun

Stoeger/IGA Reuna Single Barrel Shotgun

Thompson/Center TCR '87 Hunter Shotgun.

S 923. Licensing

(a)***

* * * * * * *

(i) Licensed importers and licensed manufacturers shall identify by means of a serial number engraved or cast on the receiver or frame of the weapon, in such manner as the Secretary shall by regulations prescribe, each firearm imported or manufactured by such importer or manufacturer. The serial number of any semiautomatic assault weapon manufactured after the date of the enactment of this sentence shall clearly show the date on which the weapon was manufactured. A large capacity ammunition feeding device manufactured after the date of the enactment of this sentence shall be identified by a serial number that clearly shows that the device was manufactured or imported after the effective date of this subsection, and such other identification as the Secretary may by regulation prescribe.

S 924. Penalties

(a)(1) Except as otherwise provided in this subsection, subsection (b), (c), or (f) of this section, or in section 929, whoever–

(A) knowingly makes any false statement or representation with respect to the information required by this chapter to be kept in the records of a person licensed under this chapter or in applying for any license or exemption or relief from disability under the provisions of this chapter;

(B) knowingly violates subsection (a)(4), (a)(6), (f), (k), [or (q) of section 922] (r), (v), or (x) of section 922;

\* \* \* \* \* \* \*

(6) A person who knowingly violates section 922(w) shall be fined not more than $1,000, imprisoned not more than 6 months, or both. Section 3571 shall not apply to any offense under this paragraph.

\* \* \* \* \* \* \*

(c)(1) Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years, and if the firearm is a short-barreled rifle, short-barreled shotgun, or semiautomatic assault weapon, to imprisonment for ten years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to imprisonment for thirty years. In the case of his second or subsequent conviction under this subsection, such person shall be sentenced to imprisonment for twenty years, and if the firearm is a machinegun, or a destructive device, or is equipped with a firearm silencer or firearm muffler, to life imprisonment without release. Notwithstanding any other provision of law, the court shall not place on probation or suspend the sentence of any person convicted of a violation of this subsection, nor shall the term of imprisonment imposed under this subsection run concurrently with any other term of imprisonment including that imposed for the crime of violence or drug trafficking crime in which the firearm was used or carried. No person sentenced under this subsection shall be eligible for parole during the term of imprisonment imposed herein.

\* \* \* \* \* \* \*

## SUPPLEMENTAL VIEWS OF HON. DAN GLICKMAN

I supported this bill because it is a narrowly crafted bill focused on specific weapons that have no business being on our streets. It is aimed at rapid fire weapons that have the sole purpose of killing people, and it is aimed at weapons that are more suited for the battlefield than the target range.

I believe that violence in our nation is getting out of hand. It is devastating to read that a student killed a student with a semi-automatic weapon. But it is equally devastating to hear of students killing students with anyone. What we really need to focus on is why students are engaging in violence in the first place. For this reason, I think this legislation must be viewed as part of the effort to reduce crime–in conjunction with the comprehensive crime bill that increases penalties, calls for tougher sentencing, provides for more jails and police officers, and provides for prevention programs.

But we must not abrogate the Second Amendment rights that are provided for in the Constitution. We must be extremely careful that in this legislation and in any legislation in the future, that we are not taking away guns that truly are used for sports, hunting, or self-defense.

I don't believe that this bill is the first step in a long road to banning guns. However, some of my constituents have expressed their fear that the Congress is moving slowly toward banning all guns for all people. We must be absolutely clear that this narrowly crafted legislation is not that first step and is not just a precursor to further, broader federal gun control and federal gun bans. Sport shooters and hunters tell me that they don't want assault weapons on the streets and in the hands of gang members any more than anyone else. But what they don't want is for Congress to take the short step to saying that the hunting rifles are being used on the streets, and should be taken away. And then the handguns are being used on the streets and should be taken away.

I want to make sure that what we are doing has a purpose–that it gets at the weapons that are being used by gang members and others in killing sprees or other random violence. I want to be able to assure the hunters, sport shooters

and folks who want to be prepared for self-defense that we're not going to turn around and tell these gun owners that their sporting guns are illegal. This is a good bill, but let's tread very carefully before going any further.

Finally, because I want to make sure that there is no mistake about which guns are banned and which are exempt, especially guns that will be developed in the future, I offered an amendment during Committee markup that was accepted by the Committee. This amendment clarifies that simply because a gun is not on the list of specifically exempted guns, does not mean that that firearm is banned. A firearm must meet the specific criteria set out in the bill, or be specifically named as a banned gun before it can be banned. In other words, the exempted gun list is not exhaustive.

Furthermore, my amendment makes clear that no gun may be taken off the list of specifically exempted guns as long as the act is in effect. In this way, it is absolutely clear that the intent of Congress is that exempted guns remain exempted.

### DISSENTING VIEWS OF HON. F. JAMES SENSENBRENNER, JR., HON. GEORGE GEKAS, HON. LAMAR S. SMITH, HON. BILL McCOLLUM, HON. HOWARD COBLE, HON. STEVE SCHIFF, AND HON. BOB GOODLATTE

We strongly oppose H.R. 4296 which would ban a variety of guns. The primary problem with this bill is that it targets law abiding citizens. If this bill passes, simply possessing a shotgun or rifle could land you in jail. You don't have to shoot anybody. You don't have to threaten anyone, just leaving it in the hall closet is enough to land you in jail. Even if you use the gun for self-defense, you can go to jail.

It is already a federal crime for convicted criminals to possess these weapons, or any other gun for that matter. The laws aimed at these criminals should be fully enforced before we start going into the homes of law-abiding citizens and arresting them.

Another problem with this legislation is that simple, cosmetic changes to certain guns would turn those guns from being illegal to, all of a sudden being legal. For example, simply by removing a pistol grip, or a bayonet mount from a rifle saves the owner from going to jail, but leaves the gun's performance unaffected.

Finally, the problem of these guns has been greatly exaggerated. Although semiautomatic weapons are used in the most high profile killings that make it on the nightly news, in fact, more than 99 percent of killers eschew assault rifles and use more prosaic devices. According to statistics from the Justice Department and reports from local law enforcement, five times as many people are kicked or beaten to death than are killed with assault rifles.

Passing this legislation is an excuse to avoid the real issues of violent crime, and threatens the rights of law-abiding citizens. Therefore, we oppose H.R. 4296.

> F. James Sensenbrenner, Jr.
> George W. Gekas.
> Lamar Smith.
> Bill McCollum.
> Howard Coble.
> Steve Schiff.
> Bob Goodlatte.

### DISSENTING VIEWS OF HON. JACK BROOKS

I am strongly opposed to H.R. 4296, the Public Safety and Recreational Firearms Use Protection Act, because it misidentifies the causes of violent crime in the United States; diverts national priorities away from meaningful solutions

to the problem of violent crime; punishes honest American gun owners who buy and use firearms for legitimate, lawful purposes such as, but not necessarily limited to, self-defense, target shooting, hunting, and firearms collection; fails to focus the punitive powers of government upon criminals. Most fundamentally, a prohibition on firearms violates the right of individual Americans to keep and bear arms, protected by the Second Amendment to the Constitution of the United States–a stark fact of constitutional life that the proponents of H.R. 4296 conveniently overlook in their zeal to abridge the rights of law-abiding citizens.

Reasons claimed to justify a prohibition on the firearms that would be affected by H.R. 4296 include the assertion that those particular firearms are used often in the commission of violent crimes. Data on the use of the firearms H.R. 4296 labels as "assault weapons" is not comprehensive, but such data as do exist consistently show that "assault weapons" are involved in a small percentage of violent crimes.

Most of the firearms labelled as "assault weapons" in H.R. 4296 are rifles–yet rifles are the general category of firearms used least often in the commission of violent crimes. The FBI Uniform Crime Reports, 1992, the most recent comprehensive data available, shows that rifles of any description are used in 3.1 percent of homicides, for example, while knives are used in 14.5 percent, fists and feet are used in 5 percent, and blunt objects are used in another 5 percent.

Professor Gary Kleck, of Florida State University, the 1993 recipient of the American Society of Criminology's Hindelang Award, estimates that one-half of 1 percent of violent crimes are committed with "assault weapons." University of Texas criminologist Sheldon Ekland-Olson estimates that one-quarter of rifle-related homicides may involve rifles chambered for military cartridges, which would include not only so-called "assault" type semi-automatic rifles, but non-semiautomatic rifles as well.

Since 1980, rifle-related homicides have declined by more than a third. According to the Metropolitan Police of Washington, D.C., the city which has the highest per capita rate of homicides of any major city in the United States, between 1980–1993 there occurred only 4 rifle-related homicides out of a total of more than 4,200 homicides in the period. The last rifle homicide during the period was recorded in 1984. Other data from D.C. police show that rifles are used in about one-tenth of 1 percent of robberies and assaults.

The California Department of Justice surveyed law enforcement agencies in the state in 1990, as the state's legislature addressed "assault weapon" ban legislation there. The California Department of Justice found that only 3.7 percent of the firearms that are used in homicides and assaults were "assault weapons," defined there to include even more firearms than are defined as "assault weapons" in H.R. 4296.

Connecticut State Police report that less than 2 percent of firearms seized by police in the state are "assault weapons"; the Massachusetts State Police report that "assault" type rifles were used in one-half of 1 percent of homicides between 19851991.

I believe the proponents of H.R. 4296 are in error in claiming that the Bureau of Alcohol, Tobacco and Firearms (BATF) has traced a large number of "assault weapons" to crime. This claim has been effectively contradicted by both the BATF itself and the Congressional Research Service's (CRS) report on the BATF firearms tracing system. The BATF has stated that it "does not always know if a firearm being traced has been used in a crime." For instance, sometimes a firearm is traced simply to determine the rightful owner after it is found by a law enforcement officer.

Each year, the BATF traces about 50,000 firearms, yet only about 1 percent of these traces relate to "assault weapons" that have been seized by police in the course of investigations of violent crimes. Most "assault weapons" traced relate not to violent crime but to property violations, such as stolen guns being traced so that they may be returned to their lawful owners, violations of the Gun Control Act, and other non-violent circumstances.

As noted by BATF and by CRS in its report to Congress entitled "Assault Weapons: Military-Style Semiautomatic Firearms Facts and Issues" (1992) that firearms traces are not intended to "trace guns to crime," that few "assault weapons" traced relative to violent crime investigations, and that available state and local law enforcement agency data shows relatively little use of "assault weapons" are used frequently in violent crimes.

"Assault weapons" function in the same manner as any other semi-automatic firearm. They fire once with each pull of the trigger, like most firearms. They use the same ammunition as other firearms, both semi-automatic and not. Therefore, "assault weapons" are useful for target shooting, self-defense, hunting, and other legitimate purposes, just as other firearms are.

H.R. 4296 would prohibit rifles that are commonly used for competitive shooting, such as the Springfield A and the Colt "AR–15."

Accessories found on some models of "assault weapons," such as folding stocks, flash suppressors, pistol grips, bayonet lugs, and detachable magazines may look menacing to persons unfamiliar with firearms, but there is absolutely no evidence that any of these accessories provide any advantage to a criminal. As has been demonstrated on many occasions, firearms which H.R. 4296 specifically exempts from its prohibition, firearms not equipped with those accessories, can be fired at the same rate, with the same accuracy, and with the same power as "assault weapons."

Time and again, supporters of H.R. 4296 have claimed that "assault weapons" can be "spray-fired from the hip"; but this is simply not true. The firearms targeted in H.R. 4296 are not machineguns. Machineguns are restricted under the National Firearms Act of 1934. H.R. 4296's guns are semi-automatic, and fire only one shot at a time.

H.R. 4296's limitation on the capacity of ammunition feeding devices would do nothing to reduce the number of rounds available to a criminal. It has been demonstrated frequently that such devices can be switched in less than a second, so a criminal determined to have available a number of rounds greater than H.R. 4296 would permit in a single magazine would need only to possess additional smaller magazines. However, police have reportedly consistently that when criminals fire shots, they rarely discharge more than 2–5 rounds, well below the number of rounds H.R. 4296 would permit in a single magazine.

Most fundamentally, to impinge upon the constitutionally-protected rights of honest, law-abiding Americans on the basis of myth, misinformation, and newspaper headlines is a crime in and of itself. To protect against such a mockery of our Constitution and the infliction of such harm upon our citizens, I intend to oppose H.R. 4296 vigorously on the House floor in the hope that careful reflection will permit cooler heads and the light of reason to prevail.

1 "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong, 1st Sess., Rept. 102 –242, October 7, 1991, at 202.

2 See, e.g., Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 Firearms; Chief Sylvester Daughtry, President, International Association of Chiefs of Police; Mr. John Pitta, National Executive Director, Federal Law Enforcement Officers Association).

3 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994; Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991; Hearing on Semiautomatic Assault Weapons, Part II, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, July 25, 1991; Hearing on H.R. 1190,

Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5 and 6, 1989.

4 "Omnibus Crime Control Act of 1991," Report of the Committee on the Judiciary, House of Representatives, on H.R. 3371, 102d Cong, 1st Sess., Rept. 102–242, October 7, 1991, at 203.

5 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. John Magaw, Director, Bureau of Alcohol, Tobacco and Firearms).

6 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Tony Loizzo, executive vice president, National Association of Police Organizations). See also, Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal Order of Police) (assault weapons "pose a grave and immediate threat to the lives of those sworn to uphold our laws"); Hearing on H.R. 1190, Semiautomatic Assault Weapons Act of 1989, and related bills, House of Representatives, Committee on the Judiciary, Subcommittee on Crime, April 5, 1989 (Testimony of Daniel M. Hartnett, associate director, law enforcement, Bureau of Alcohol, Tobacco and Firearms) ("Fifteen years ago, police rarely encountered armed drug dealers. Today, firearms, especially certain types of semiautomatic weapons, are status symbols and tools of the trade for this country's most vicious criminals.")

7 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

8 Hearing on H.R. 4296 and H.R. 3527, Public Safety and recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

9 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Hon. Henry Cisneros, Secretary, Department of Housing and Urban Development).

10 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ken Brondell, Jr.).

11 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Jacob Locicero and Arlene Locicero).

12 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of John Pitta, executive vice president, Federal Law Enforcement Officers Association).

13 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Michelle Scully and Steve Sposato).

14 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on crime and Criminal Justice, April 25, 1994 (State of Dr. Suzanna Gratia, Copperas Cove, Texas)

15 The Committee notes that, under the Gun Control Act of 1968 as amended in 1986, it is a Federal felony for a convicted felon to be in possession of any firearm, including an assault weapon, under 18 U.S.C. 922(g)(1). Violations carry up to five years imprisonment and a $250,000 fine. If a criminal–whether previously convicted or not–is carrying an assault weapon and is involved in a drug trafficking crime, that criminal is subject to a mandatory minimum of 5 years imprisonment and a $250,000 fine under 18 U.S.C. 924(c)(1). Any criminal who has three prior violent felony and/ or serious drug offenses convictions and is in possession of a firearm is subject to a mandatory minimum of 15 years imprisonment and a $250,000 fine under 18 U.S.C. 924(e)(1).

16 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Ms. Jacquie Miller, Louisville, Kentucky).

17 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement of Mr. Phillip Murphy, Tucson, Arizona).

18 U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989.

19 The ultimate question of law upon which the working group was advising the Secretary of the Treasury was whether these import firearms met a "sporting purpose" test under 18 U.S.C. Code section 925(d). He held that they did not. Although that legal question is not directly posed by this bill, the working group's research and analysis on assault weapons is relevant on the questions of the purposes underlying the design of assault weapons, the characteristics that distinguish them from sporting guns, and the reasons underlying each of the distinguishing features.

20 An automatic gun fires a continuous stream as long as the trigger is held down, until it has fired all of the cartridges ("rounds" or "bullets") in its magazine (or "clip"). Automatic firearms are also known as machineguns. A semi-automatic gun fires one round, then loads a new round, each time the trigger is pulled until its magazine is exhausted. Manually operated guns require the shooter to manually operate a bolt, slide, pump, or lever action to extract the fired round and load a new round before pulling the trigger.

21 U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

22 U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

23 18 U.S. Code, section 922(o).

24 The Committee notes that such conversion is a Federal felony that carries penalties of up to 10 years imprisonment and a $250,000 fine under 26 U.S.C. 5861.

25 Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal order of Police).

26 Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Dewey R. Stokes, National President, Fraternal order of police).

27 Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard Cook, Chief, Firearms Divisions, Bureau of Alcohol, Tobacco and Firearms) at 268.

28 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms, Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements of Hon. Henry Cisneros, Secretary, Department of Housing and Urban Development and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Paul J. McNulty, Principal Deputy Director, Office of Policy development, Department of Justice) at 288.

29 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); Hearing on Semiautomatic Assault Weapons, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, June 12, 1991 (Statement of Richard Cook, Chief, Firearms Division, Bureau of Alcohol, Tobacco and Firearms); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

30 U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

31 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

32 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statements and testimony of John McGaw, Director, Bureau of Alcohol, Tobacco and Firearms, and John Pitta, National Executive Vice President, Federal Law Enforcement Officers Association); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

33 Hearing on H.R. 4296 and H.R. 3527, Public Safety and Recreational Firearms Use Protection Act, House of Representatives, Committee on the Judiciary, Subcommittee on Crime and Criminal Justice, April 25, 1994 (Statement and testimony of Dr. David Milzman, Associate Director, Trauma Services, Georgetown University Medical Center, Washington, DC); U.S. Department of the Treasury, Bureau of Alcohol, Tobacco and Firearms, "Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles," July, 1989, p. 6.

34 See H.R. 4296, Appendix A, for the list.

WESTLAW   © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 58



# Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012

## OFFICE OF THE STATE'S ATTORNEY
## JUDICIAL DISTRICT OF DANBURY
### Stephen J. Sedensky III, State's Attorney

### November 25, 2013

TABLE OF CONTENTS

EXECUTIVE SUMMARY ...................................................................................1

INTRODUCTION  .............................................................................................5

PURPOSE AND SCOPE OF REPORT ...............................................................6

SANDY HOOK ELEMENTARY SCHOOL - INCIDENT AND RESPONSE ............................9

SANDY HOOK ELEMENTARY SCHOOL – SCENE INVESTIGATION ...............................16

SANDY HOOK ELEMENTARY SCHOOL - AUTOPSY INFORMATION ............................23

36 YOGANANDA STREET, NEWTOWN, CT – INCIDENT AND RESPONSE ....................24

36 YOGANANDA STREET, NEWTOWN, CT – SCENE INVESTIGATION ........................24

36 YOGANANDA STREET, NEWTOWN, CT – AUTOPSY INFORMATION ......................27

SHOOTER – AUTOPSY INFORMATION...............................................................27

INVESTIGATION TO DETERMINE ACCESSORIES AND/OR CO-CONSPIRATORS ........27

EVENTS AND BACKGROUND INFORMATION LEADING UP TO DEC. 14, 2012 ...........28

EVIDENCE EXAMINATION .............................................................................35

MISCELLANEOUS INVESTIGATIVE LEADS ......................................................38

DETERMINATIONS OF CRIMES COMMITTED ...................................................40

CONCLUSION................................................................................................43

ACKNOWLEDGEMENTS..................................................................................44

## APPENDIX[1]

Search Warrants

Honda Civic – 12/14/2012 ...................................................................................A1

36 Yogananda Street - 12/14/2012 at 5:29 p.m ...............................................A10

36 Yogananda Street - 12/14/2012 at 7:25 p.m ...............................................A21

36 Yogananda Street - 12/15/2012 at 3:03 p.m ...............................................A31

36 Yogananda Street - 12/16/2012 at 4:31 p.m ...............................................A38

ATT telephone – 4/10/2013 at 10:43 a.m. ......................................................A47

ATT telephone – 4/10/2013 at 10:47 a.m. ......................................................A54

Verizon telephone – 4/10/2013 at 10:51 a.m. .................................................A61

Combat Arms – Nexon – 08/27/2013 at 9:46 a.m. ..........................................A68

World of Warcraft – Blizzard - 8/27/2013 at 9:50 a.m. ..................................A76

Time Line .......................................................................................................A84

SHES Floor Plan ..........................................................................................A116

SHES and Parking Lot Map .........................................................................A117

SHES Ballistics Diagram .............................................................................A118

SHES Exterior Description ...........................................................................A119

SHES Lobby, Hallway, Room 9 and Ballistics Description..........................A125

SHES Classroom 8 Ballistics Description ....................................................A134

SHES Classroom 10 Ballistics and Shooter Description ...............................A136

SHES Weight – Guns and Ammunition ........................................................A141

---

[1] Because of its volume, the Appendix to this report is published as a separate document.  Some of the search warrants and reports contained in the Appendix have been redacted to meet court orders, exceptions to the Freedom of Information Act, protect the identity of witnesses, protect records of child abuse or personal identification information.

SHES Newtown Emergency Response Plan ................................................................ A144

SHES Photographs ................................................................................................ A165

Yogananda Scene Description ................................................................................ A180

Yogananda Digital Image Report .......................................................................... A188

Yogananda Photographs ........................................................................................ A193

Yogananda Review of Electronic Evidence .......................................................... A211

Yogananda - Book of Granny ................................................................................ A220

Yogananda GPS Routes ........................................................................................ A223

Lanza, Adam – Toxicology .................................................................................... A231

# EXECUTIVE SUMMARY

The purpose of this report is to identify the person or persons criminally responsible for the twenty-seven homicides that occurred in Newtown, Connecticut, on the morning of December 14, 2012, to determine what crimes were committed, and to indicate if there will be any state prosecutions as a result of the incident.

The State's Attorney for the Judicial District of Danbury is charged, pursuant to Article IV, Section 27 of the Constitution of the State of Connecticut and Connecticut General Statutes (C.G.S.) Sec. 51-276  *et seq.*, with the investigation and prosecution of all criminal offenses occurring within the Judicial District of Danbury. The Connecticut State Police have the responsibility to prevent and detect violations of the law and this State's Attorney has worked with and relied upon the Connecticut State Police since the incident occurred.

Since December 14, 2012, the Connecticut State Police and the State's Attorney's Office have worked with the federal authorities sharing responsibilities for various aspects of this investigation. Numerous other municipal, state and federal agencies assisted in the investigation. The investigation materials reflect thousands of law enforcement and prosecutor hours. Apart from physical evidence, the materials consist of more than seven-hundred individual files that include reports, statements, interviews, videos, laboratory tests and results, photographs, diagrams, search warrants and returns, as well as evaluations of those items.

In the course of the investigation, both state and federal law enforcement personnel received a large number of contacts purporting to provide information on the shootings and the shooter. Although many times these "leads" would go nowhere, each one was evaluated and often required substantial law enforcement time to pursue. An abundance of caution was used during the investigation to ensure that all leads were looked into, despite the fact that more than 40 such "leads" proved, after investigation, to be unsubstantiated. Information that was substantiated and relevant was made part of the investigation.

It is not the intent of this report to convey every piece of information contained in the voluminous investigation materials developed by the Connecticut State Police and other law enforcement agencies, but to provide information relevant to the purposes of this report. While no report is statutorily required of the State's Attorney once an investigation is complete, it has been the practice of State's Attorneys to issue reports on criminal investigations where there is no arrest and prosecution if the State's Attorney determines that some type of public statement is necessary. Given the gravity of the crimes committed on December 14, 2012, a report is in order.

On the morning of December 14, 2012, the shooter, age 20, heavily armed, went to Sandy Hook Elementary School (SHES) in Newtown, where he shot his way into the locked school building with a Bushmaster Model XM15-E2S rifle. He then shot and killed the principal and school psychologist as they were in the north hallway of the school responding to the noise of the shooter coming into the school. The shooter also shot and injured two other staff members who were also in the hallway.

The shooter then went into the main office, apparently did not see the staff who were hiding there, and returned to the hallway.

After leaving the main office, the shooter then went down the same hallway in which he had just killed two people and entered first grade classrooms 8 and 10, the order in which is unknown. While in those rooms he killed the two adults in each room, fifteen children in classroom 8 and five in classroom 10.  All of the killings were done with the Bushmaster rifle.

He then took his own life with a single shot from a Glock 20, 10 mm pistol in classroom 10.

Prior to going to the school, the shooter used a .22 caliber Savage Mark II rifle to shoot and kill his mother in her bed at the home where they lived at 36 Yogananda Street in Newtown.

The response to these crimes began unfolding at 9:35:39 a.m. when the first 911 call was received by the Newtown Police Department. With the receipt of that call, the dispatching and the arrival of the police, the law enforcement response to the shootings began. It was fewer than four minutes from the time the first 911 call was received until the first police officer arrived at the school. It was fewer than five minutes from the first 911 call, and one minute after the arrival of the first officer, that the shooter killed himself. It was fewer than six minutes from the time the first police officer arrived on SHES property to the time the first police officer entered the school building. In fewer than 11 minutes twenty first-grade pupils and six adults had lost their lives.

The following weapons were recovered in the course of this investigation: (1) a Bushmaster Model XM15-E2S semi-automatic rifle, found in the same classroom as the shooter's body. All of the 5.56 mm shell casings from the school that were tested were found to have been fired from this rifle. (2) a Glock 20, 10 mm semi-automatic pistol found near the shooter's body and determined to have been the source of the self-inflicted gunshot wound by which he took his own life. (3) a Sig Sauer P226, 9 mm semi-automatic pistol found on the shooter's person. There is no evidence this weapon had been fired. (4)  a Izhmash Saiga-12, 12 gauge semi-automatic shotgun found in the shooter's car in the parking lot outside the school, and which was secured in the vehicle's trunk by police responding to the scene. There is no evidence this weapon had been fired. (5) a Savage Mark II rifle found at 36 Yogananda Street on the floor of the master bedroom near the bed where the body of the shooter's mother was found. This rifle also was found to have fired the four bullets recovered during the autopsy of the shooter's mother.

All of the firearms were legally purchased by the shooter's mother. Additionally, ammunition of the types found had been purchased by the mother in the past, and there is no evidence that the ammunition was purchased by anyone else, including the shooter.

At the date of this writing, there is no evidence to suggest that anyone other than the shooter was aware of or involved in the planning and execution of the crimes that were committed on December 14, 2012, at Sandy Hook Elementary School and 36 Yogananda Street. From the time an unknown male was encountered by the Newtown police outside of the school during the initial response, until well after the staff and children had been evacuated, the thought that there may have been more than one shooter was a condition all responding law enforcement worked under as they cleared the school. Individuals located in the wooded areas surrounding the school

as the searches and evacuations were taking place were initially treated as suspect and handled accordingly (including being handcuffed) until their identity could be determined. The circumstances surrounding all of these individuals were fully investigated and revealed no additional shooters. DNA testing of evidence recovered from both the school and 36 Yogananda Street also revealed no potential accessories or co-conspirators.

It is the conclusion of this State's Attorney that the shooter acted alone and was solely criminally responsible for his actions of that day. Moreover, none of the evidence developed to date demonstrates probable cause to believe that any other person conspired with the shooter to commit these crimes or aided and abetted him in doing so.

Unless additional – and at this time unanticipated – evidence is developed, there will be no state criminal prosecution as result of these crimes. With the issuance of this report, the investigation is closed. Should additional reliable information related to the existence of accessories or co-conspirators come to the attention of the investigators, the investigation will be reopened.[2]

In the course of his rampage the shooter committed a number of crimes in violation of our Connecticut Penal Code.  The most significant are those where lives were taken and people were physically injured. In Sandy Hook Elementary School, the crime of Murder under Special Circumstances, in violation of C.G.S. Sec. 53a-54b, was committed twenty-six times and Attempted Murder under Special Circumstances in violation of C.G.S. Secs. 53a-49 and 53a-54b was committed twice as it relates to the two individuals who were shot by the shooter and survived. The crime of Murder in violation of C.G.S. Sec. 53a-54 was committed by the shooter in killing his mother.

The obvious question that remains is: "Why did the shooter murder twenty-seven people, including twenty children?" Unfortunately, that question may never be answered conclusively, despite the collection of extensive background information on the shooter through a multitude of interviews and other sources. The evidence clearly shows that the shooter planned his actions, including the taking of his own life, but there is no clear indication why he did so, or why he targeted Sandy Hook Elementary School.

It is known that the shooter had significant mental health issues that affected his ability to live a normal life and to interact with others, even those to whom he should have been close. As an adult he did not recognize or help himself deal with those issues. What contribution this made to the shootings, if any, is unknown as those mental health professionals who saw him did not see anything that would have predicted his future behavior. He had a familiarity with and access to firearms and ammunition and an obsession with mass murders, in particular the April 1999 shootings at Columbine High School in Colorado. Investigators however, have not discovered any evidence that the shooter voiced or gave any indication to others that he intended to commit such a crime himself.

---

[2] It should be noted that potentially important evidence, i.e., a computer hard drive recovered from the shooter's home, as of this date remains unreadable. Additional insight could be gained should efforts to recover data from the hard drive ever prove successful, which at this time appears highly improbable. It is because of this improbability, coupled with the current determination of no accessories or co-conspirators that the case is being closed.

This State's Attorney expresses his sincere sympathy and condolences to the victims of the incident of December 14, 2012, and to their families. He also expresses his appreciation for their continued patience and understanding during the course of the investigation and preparation of this report. He acknowledges and thanks law enforcement, which responded to Sandy Hook Elementary School in minutes and entered the building believing someone could be there ready to take *their* lives as well. He also acknowledges and thanks the staff of the Sandy Hook Elementary School who acted heroically.  The combination saved many children's lives.

This report would not have been possible if not for the assistance and cooperation of numerous agencies at the state, local and federal levels of government. The State's Attorney expresses his sincere gratitude and appreciation to all of these agencies and to all of the men and women who contributed so much to this investigation. The assistance of federal authorities has been invaluable. Particularly worthy of special note are the men and women of the Connecticut State Police, and in particular, the Western District Major Crime Squad.  The thoroughness and sensitivity with which they conducted their investigation is unmatched in my experience.

## INTRODUCTION

On the morning of December 14, 2012, Adam Lanza, the shooter,[3] age 20, went to Sandy Hook Elementary School (also SHES) in Newtown, Connecticut, where he shot his way into the building and killed twenty children and six adults and wounded two other adults, all with a Bushmaster Model XM15-E2S rifle. The shooter then took his own life with a single shot from a Glock 20, 10 mm handgun. From the time the doors of the school were locked at 9:30 a.m. until the time it is believed the shooter killed himself at 9:40:03, fewer than 11 minutes had elapsed.

Prior to going to the school, the shooter used a .22 caliber Savage Mark II rifle to shoot and kill his mother in her bed. This occurred at the home where they lived at 36 Yogananda Street, also in Newtown.

With these unprecedented horrific crimes came a responsibility for an investigation to determine what crimes were committed and, more importantly, if the shooter acted alone. Any person who aided and abetted the shooter or who conspired with him had to be held accountable.

Beginning on December 14, 2012, the Connecticut State Police and the State's Attorney's Office worked in cooperation with the federal authorities sharing responsibilities for various aspects of the case. The federal involvement has been invaluable. Though some evidence is still being examined, there is no indication in the investigation by either state or federal authorities to date that the shooter acted with anyone on December 14, 2012, or had co-conspirators or accessories who could be prosecuted.

In addition to physical evidence,[4] the investigation materials contain over seven-hundred individual files that include reports, statements, interviews, videos, laboratory tests and results, photographs, diagrams, search warrants and search warrant returns as well as evaluations of those items. Investigators interviewed individuals who were present at SHES on December 14, 2012, and witnessed the incident, among them students, staff members, parents of students and neighbors. Special attention and consideration was given to the interviewing of child witnesses, given their traumatic experience. Also interviewed were police officers and other first responders who were present at SHES during the course of the incident itself and in the course of the subsequent search, evacuation of the school and processing of the scenes.

Investigators attempted to obtain as much information about the shooter's life as possible in an effort to determine the reasons or motives for his actions on December 14, 2012. Interviews were conducted with members of the shooter's family, those who knew the shooter or his family throughout his life, as well as teachers and school personnel who had been involved with him and his family over his time in Newtown.

Efforts were made within the limits of privacy laws to gather information on medical consultations and/or treatments the shooter was involved with over the course of his years in Newtown. In doing so, investigators found no evidence to suggest the shooter had taken any

---

[3] Throughout the remainder of this report Adam Lanza will be referred to as "the shooter."

[4] Over 270 evidence designations were used, many grouping related items as one number.

medication that would affect his behavior or by any means to explain his actions on December 14, 2012.

An investigation of this magnitude requires careful planning and review. The interviews took substantial time, first to identify which individuals should be interviewed and then to conduct the actual interviews. Physical evidence had to be examined and forensically reviewed. This included ballistics, fingerprint and DNA analysis. Additionally, all of the information collected had to be reviewed and summarized in written statements that have since become a part of the investigation, reflecting thousands of dedicated law enforcement and prosecutor hours.

I had been working closely with the Connecticut State Police, who conducted the state investigation, and federal law enforcement officers since December 2012. Once the investigation was delivered for my review, I took the time to read, digest, evaluate and summarize the material, mindful of the privacy interests involved and the approaching December 14, 2012, anniversary.

The federal authorities have stated that under federal law many of their reports and materials cannot become part of the public record due to rules regarding the dissemination of information obtained pursuant to grand jury subpoenas, sealed search warrants, and federal Freedom of Information law. Therefore, information obtained by federal authorities will not, for the most part, be incorporated into the Connecticut State Police criminal investigation file.

While the reports and materials will not be part of the state investigation record, such materials have been examined and considered by state law enforcement authorities. Based upon a review of all of the documentation, both state and federal, we are left confident at this time that the evidence developed to date does not reveal co-conspirators or accessories. Accordingly, as a result of the investigation to date, there will be no state criminal prosecution of anyone.

## PURPOSE AND SCOPE OF REPORT

The State's Attorney's Office for the Judicial District of Danbury is charged, pursuant to Article IV, Sec. 27 of the Connecticut State Constitution[5] and Connecticut General Statutes (C.G.S.) Sec. 51-276[6] *et seq*., with the investigation and prosecution of all criminal offenses occurring within the Judicial District of Danbury. The Connecticut State Police have the responsibility to prevent and detect violations of the law and this State's Attorney has worked with and relied upon the Connecticut State Police since the incident occurred. The investigation has been

---

[5] Connecticut Constitution Article 4, Sec. 27.  There shall be established within the executive department a division of criminal justice *which shall be in charge of the investigation and prosecution of all criminal matters.* Said division shall include the chief state's attorney, who shall be its administrative head, and the state's attorneys for each judicial district, which districts shall be established by law. The prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district.

[6] Sec. 51-276. Division established. There is hereby established the Division of Criminal Justice within the Executive Department, which shall be in charge of the investigation and prosecution of all criminal matters in the Superior Court. The Division of Criminal Justice shall be an agency within the Executive Department with all management rights except appointment of all state's attorneys.

tirelessly conducted by the Connecticut State Police (also CSP) with the assistance of multiple local, state and federal agencies, both in and out of Connecticut.

While no report is statutorily required of the State's Attorney once the investigation is complete, it has been the practice of state's attorneys to issue reports on criminal investigations where there is no arrest and prosecution if the state's attorney determines that some type of public statement is necessary.[7] Given the gravity of the crimes committed on December 14, 2012, a report is in order.

The purpose of this report is to identify the person or persons criminally responsible for the twenty-seven homicides that occurred in Newtown, Connecticut,[8] on the morning of December 14, 2012, to determine what crimes were committed, and to indicate if there will be any state prosecutions as a result of the incident.

Many witnesses to this case have expressed great concern that their identities will be disclosed publicly and make them susceptible to threats or intimidation as a result of their cooperation or connection with the investigation.[9] This cooperation has been essential and greatly appreciated. As a result of the witnesses' concerns, this report will not identify lay witnesses, except where necessary.

Consistent with Public Act 13-311,[10] exceptions to the state Freedom of Information Act[11] and C.G.S. Sec. 17a-101k(a) [12] this report will not list the names of the twenty children killed in

---

[7] See for example: Statement of David I. Cohen, State's Attorney for the Judicial District of Stamford/Norwalk, in reference to the February 16, 2009, attack on Charla Nash by the Chimpanzee Named Travis, Issued December 7, 2009;  Statement of the State's Attorney for the Judicial District of Stamford-Norwalk Concerning the Fatal Fire on December 25, 2011, at 2267 Shippan Avenue, Stamford, Issued June 8, 2012; and Report of the State's Attorney for the Judicial District of Ansonia-Milford on the Murder of Shangyl Rasim on January 17, 2010, Issued May 24, 2010.

[8] Newtown, Connecticut is within the Judicial District of Danbury.

[9] In fact, some witnesses have had that occur to them.

[10] An Act Limiting the Disclosure of Certain Records of Law Enforcement Agencies and Establishing a Task Force Concerning Victim Privacy Under the Freedom of Information Act.

[11] See C.G.S. Sec. 1-210.

[12] Sec. 17a-101k. Registry of findings of abuse or neglect of children maintained by Commissioner of Children and Families. Notice of finding of abuse or neglect of child. Appeal of finding. Hearing procedure. Appeal after hearing. Confidentiality. Regulations. (a) The Commissioner of Children and Families shall maintain a registry of the commissioner's findings of abuse or neglect of children pursuant to section 17a-101g that conforms to the requirements of this section. The regulations adopted pursuant to subsection (i) of this section shall provide for the use of the registry on a twenty-four-hour daily basis to prevent or discover abuse of children and the establishment of a hearing process for any appeal by a person of the commissioner's determination that such person is responsible for the abuse or neglect of a child pursuant to subsection (b) of section 17a-101g. The information contained in the registry and any other information relative to child abuse, wherever located, shall be confidential, subject to such statutes and regulations governing their use and access as shall conform to the requirements of federal law or regulations. Any violation of this section or the regulations adopted by the commissioner under this section shall be punishable by a fine of not more than one thousand dollars or imprisonment for not more than one year.

Sandy Hook Elementary School, nor will it recite 911 calls made from within the school on that morning or describe information provided by witnesses who were in the classrooms or heard what was occurring in the classrooms.

It is not the intent of this report to convey every piece of information contained in the voluminous investigation materials developed by the Connecticut State Police and other law enforcement agencies, but to provide information relevant to the purposes of this report.

---

To conclude that *all* such information, including the basic facts of the incident itself is confidential would prohibit even the disclosure of the children being killed. Such an interpretation would be unworkable and is not taken here. It is concluded though that the C.G.S. Sec. 17a-101k(a) is applicable in the present case and will be applied in the manner described.

## SANDY HOOK ELEMENTARY SCHOOL - INCIDENT AND RESPONSE

### Incident

On the morning of December 14, 2012, the shooter parked his 2010 Honda Civic next to a "No Parking" zone outside of Sandy Hook Elementary School in Newtown, Connecticut.[13] Shortly after 9:30 a.m. he approached the front entrance to the school.[14]   He was armed with a Bushmaster Model XM15-E2S rifle (also Bushmaster rifle), a Glock 20, 10 mm pistol and a Sig Sauer P226, 9 mm pistol and a large supply of ammunition.

The doors to the school were locked, as they customarily were at this time, the school day having already begun. The shooter proceeded to shoot his way into the school building through the plate glass window to the right of the front lobby doors.

The main office staff reported hearing noises and glass breaking at approximately 9:35 a.m. and saw the shooter, a white male with a hat and sunglasses, come into the school building with a rifle type gun. The shooter walked normally, did not say anything and appeared to be breathing normally. He was seen shooting the rifle down the hallway.

Just down the hallway from the main office, in the direction that the shooter was to be seen firing, a 9:30 a.m. Planning and Placement Team (PPT) meeting was being held in room 9, a conference room. It was attended by Principal Dawn Hochsprung and School Psychologist Mary Sherlach, together with a parent and other school staff. Shortly after the meeting started, the attendees heard loud banging. The principal and school psychologist then left the room followed shortly after by a staff member. After leaving the room, Mrs. Hochsprung yelled "Stay put!"

As the staff member left the room, the staff member heard gunshots and saw Mrs. Hochsprung and Mrs. Sherlach fall down in front of the staff member. The staff member felt a gunshot hit the staff member's leg. Once down, the staff member was struck again by additional gunfire, but laid still in the hallway. Not seeing anyone in the hallway, the staff member crawled back into room 9 and held the door shut. A call to 911 was made and in the ensuing moments the telephone in room 9 was also used to turn on the school wide intercom system. This appears to have been done inadvertently, but provided notice to other portions of the building.[15]

---

[13] On December 13, 2012, the student enrollment was 489.  Official attendance had not yet been recorded as of 9:30 a.m. on December 14, 2012. The staff for the school is 91, but on December 14, 2012, there were nine staff members absent.  The staffing was at 82 for the day.

[14] A more complete description of the school building and the front entrance starts on page A119 of the Appendix. For the purposes of this report, the front of SHES faces north.

[15] Intercom system could be accessed from nine phones located in seven rooms.  These telephones and rooms were three phones in the main office, the principal's office, the nurse's office (room 57), room 9 conference room, room 29, room 32 and room 60. The "All Call" which opens the intercom to the entire school was accessed by pressing "#0" from the telephones mentioned. The All Call-except quiet rooms was accessed by pressing "#1."

At the same time the shooter was firing in the hallway, another staff member was at the far east end of the hallway near classroom 1. The staff member was struck by a bullet in the foot and retreated into a classroom.

Both Dawn Hochsprung, age 47, and Mary Sherlach, age 56, died as a result of being shot. Both wounded staff members shot in the hallway were later evacuated to the hospital and survived.

After shooting and killing the two adults and wounding the two others, the shooter entered the main office. The office staff had taken shelter in the office. They heard sounds of the office door opening, footsteps walking inside the office and then back toward the office door. Staff members heard the door open a second time and then heard more gunfire from outside the office. They called 911.

Where the shooter specifically went next is unclear. The evidence and witness statements establish the shooter went down the hallway in an easterly direction ultimately entering first grade classrooms 8 and 10. The order is not definitively known. While in classrooms 8 and 10, the shooter shot and killed four adults and twenty children with the Bushmaster rifle. Twelve children survived, one from classroom 8 and eleven from classroom 10.

The shooter finally killed himself in classroom 10 with one gunshot to his head from a Glock 20, 10 mm pistol. This is believed to have occurred at 9:40:03.[16]

Classroom 8's substitute teacher was Lauren Rousseau, age 30, who was assisted by Rachel D'Avino, age 29, a behavioral therapist. Fifteen children were found by police. Fourteen who were deceased and one who was transported to Danbury Hospital and later pronounced dead. The two adults were found deceased close to the children. In all, seventeen people were killed in classroom 8. A sixteenth child survived and exited classroom 8 after the police arrived.

Classroom 10's teacher was Victoria Soto, age 27. Working with her was Anne Marie Murphy, age 52, a behavioral therapist. Five children were found, with Mrs. Murphy partially covering one child. Four of the five children were deceased. One of the five children was transported to the hospital and pronounced dead. Miss Soto was found deceased in the room near the north wall with a set of keys nearby. Nine children had run out of the room and survived. A police officer found two uninjured children in the class restroom.

In all, eighteen children and six adult school staff members were found deceased within the school. Two more children were pronounced dead at Danbury Hospital. Two other adult school staff members were injured and were treated at nearby hospitals and survived.

The two classrooms on either side of 8 and 10 were numbered 6 and 12. Classroom 6 was on the eastern side of classroom 8 and classroom 12 was on the western side of classroom 10. Staff and students hid in the class restrooms, locking the restroom doors from the inside.

---

[16] See the time line in the Appendix starting at page A84.

Throughout the rest of the school, staff and students hid themselves wherever they happened to be at the time they became aware of gunfire. The staff used various ways to keep the children calm, from reading to having them color or draw pictures. Those hiding in rooms closest to the shooter kept silent. Some people were able to escape out of the building prior to the police arrival and went to Sandy Hook center, nearby residences, or received rides from parents going to the school or from passersby.

One staff member heard a loud crashing noise and ran toward the front lobby. As the staff member got closer, bullet holes could be seen and gun powder smelled. Realizing what was going on, the staff member immediately called 911, turned and went back down the hall from where the staff member had come. During the incident, while staying on the line with the 911 operator, this staff member sent other staff to their rooms or had them stay in their rooms and this staff member went about locking doors. The staff member remained in the hallway on the telephone with the 911 operator until the police arrived.

**Response**

Upon the receipt of the first 911 call, law enforcement was immediately dispatched to the school. It was fewer than four minutes from the time the first 911 call was received until the first police officer arrived at SHES. It was fewer than five minutes from the time the first 911 call was received until the shooter killed himself. It was fewer than six minutes from the time the first police officer arrived on SHES property to the time the first police officer entered the school building.

Below is an abbreviated time line from the first 911 call received to the time the police entered the school building.[17]

9:35:39 -  First 911 call to Newtown Police Department is received.

9:36:06 -  Newtown Police Department dispatcher broadcasts that there is a shooting at Sandy Hook Elementary School.

9:37:38 -  Connecticut State Police are dispatched to SHES for active shooter.

9:38:50 -  CSP are informed that SHES is in lockdown.

9:39:00 -  First Newtown police officer arrives behind SHES on Crestwood Rd.

9:39:13 -  Two more Newtown officers arrive at SHES and park on the driveway near the ball field. Gunshots are heard in the background.

---

[17] See page A84 of the Appendix for full time line put together by the Connecticut State Police Western District Major Crime Squad. This time line was compiled from 911 calls, witness statements, police car cameras, police radio and police dispatch transmissions.

9:39:34 -   Newtown officer encounters unknown male running along the east side of SHES with something in his hand.

9:40:03 -   Last gunshot is heard. This is believed to be the final suicide shot from the shooter in classroom 10.

9:41:07 -   Information is relayed as to the location of the last known gunshots heard within SHES, the front of the building.

9:41:24 -   Newtown officer has unknown male prone on ground, starting information relay regarding possibly more than one shooter.

9:42:39 -   Newtown officer calls out the license plate of the shooter's car.

9:44:47 -   Newtown officers enter SHES.

9:46:23 -   CSP arrive at SHES.

9:46:48 -   CSP enter SHES.

As the gravity of the situation became known, local, state and federal agencies responded to the scene to assist.

From the time the unknown male was encountered by the Newtown police outside of SHES until after the staff and children were evacuated, all responding law enforcement operated under the belief that there may have been more than one shooter and acted accordingly.[18]

For example, K-9 units were brought in to search the area and officers were posted to act as lookouts to ensure the safety of those evacuating the school building. Some people were located in the areas surrounding the school as the searches and evacuations were taking place. Some of those individuals were treated initially as suspects and handled accordingly, including being handcuffed, until their identities and reason for being there could be determined.

Some of these detentions included:

1. The initial unknown male who turned out to be a parent with a cell telephone in his hand;
2. Two reporters located in the woods around SHES, who were held at gun point by Department of Energy and Environmental Protection (DEEP) police officers until their identities could be determined; and
3. A man from New York who was working in a nearby town and went to SHES after an application on his cell telephone alerted him to the situation at the school. He drove to the firehouse and went up to the school on foot. He was taken from the scene

---

[18] In fact, the possibility that there was more than one shooter remained a consideration beyond December 14, 2012. It was only after potential leads were investigated that investigators became confident that the shooter was not aided in any way by others and that no one knew of the shooter's plan prior to December 14, 2012.

of the school in handcuffs and later to Newtown Police Department. It was later determined that he did not have a connection to the shooting and had gone to SHES to see what was going on.

As noted above, on December 14, 2012, there was a concern that there may have been more than one shooter.  This was based upon a number of factors:

1. The initial police encounter with the unknown male outside SHES;[19]
2. Reports by school personnel during the shooting on a 911 call of seeing someone running outside the school while the shooting was ongoing;
3. The location of two black zip up sweat jackets on the ground outside of the shooter's car;
4. The discovery of an Izhmash Saiga-12, 12 gauge shotgun and ammunition in the passenger compartment of the shooter's car. A police officer moved this shotgun and ammunition to the car's trunk for safety purposes;
5. Shell casings that were located outside of the school; and
6. The apparent sound of gunfire coming from outside of the school;

The subsequent investigation revealed there were no additional shooters based upon:

1. Searches of the area and examinations of local business security surveillance videos;
2. Persons detained revealed they were not connected to the shootings. In the case of the initial unknown male, he was identified as the parent of a student and had a cell telephone, rather than a weapon, in his hand;
3. Witness interviews which indicated that no witness saw anyone other than the shooter, with a firearm;
4. Witness interviews in which it was determined that a number of SHES staff had escaped from the school through a window and had been running outside the school building during the shootings;
5. The shotgun located in the shooter's car had been purchased by the shooter's mother previously;
6. The two sweat jackets were both C-Sport brand black zip up hooded sweat jackets with no size listed and were located immediately outside the shooter's car;[20] Both are believed to have been brought there by the shooter;[21]
7. The live shotgun shells (other than the one found on the shooter and the ones found in the shooter's car) that were located inside and outside of the school were in locations where first responders had been. Additionally, there were first responders who

---

[19] The man was later determined to be the parent of one of the school's children and the item in his hand was a cell telephone.

[20] See the Appendix at page A174.

[21] A parent who arrived at SHES as the shooting was taking place saw the shooter's car parked in front of the school with the passenger side door open and the two sweat jackets on the ground near the car.  To the parent, the jackets looked like two black blankets on the ground.

reported missing live shotgun rounds. Moreover, the shells were found in locations where there had not been reported sightings of any non-law enforcement individuals;

8. There were no expended shotgun shells found in the actual crime scene nor were any expended 12 gauge shotgun pellets or slugs recovered;

9. The only expended casings located outside of the school building were 5.56 mm casings located just outside the school's front entrance, consistent with the shooter's entry into the school; and

10. The officer who heard what he believed to be outside gunfire was in a position to have heard the shooter's gunfire coming from window openings in the classroom in which the shooter was firing.

Stopping the active shooter was the first priority. Once that occurred, the location and treatment of the victims, the search for additional shooters, and the safe evacuation of the school were of primary importance.[22] The collection of evidence and the preservation and documentation of the crime scene, while important, came second.

Two command centers were set up, one at the firehouse on Riverside Road and the other at Newtown's Emergency Operations Center, located on the Newtown Fairfield Hills Campus.  In the week immediately after the shootings, services to victims' families and victims, as well as support to the investigators in the school were handled out of the firehouse. All other aspects of the investigation not related to the school itself were run out of the Emergency Operations Center.

Investigation responsibilities were handled as follows:[23]

**Connecticut State Police (CSP)**

> **CSP-Western District Major Crime (WDMC)** squad was the lead CSP unit for the entire investigation and acted as the coordinating law enforcement agency for other agencies and units of the CSP.[24] The van unit processed the interior of SHES.

> **CSP-Central District Major Crime (CDMC)** squad van unit processed the exterior of SHES, including the shooter's car, and established the temporary morgue[25] with the

---

[22] One of the difficulties encountered was the inability of state police radios to operate within SHES.

[23] This report does not include a listing of all of the law-enforcement and non-law enforcement service providers and their actions. In the days and weeks that followed the tragedy, local, state and federal agencies provided help to the Town of Newtown and its families through counseling, funeral protection, traffic control, handling bomb threats as well as many other services. Additionally, the CSP set up an invaluable law enforcement liaison program with the families of the deceased victims in which a state or local police officer was specifically assigned to the family of a deceased victim to provide communication and protection in the days and weeks that followed December 14th.

[24] WDMC Squad and Van, as the lead CSP unit, over the course of the week that followed was there for seven days processing the interior scene, the shooter and victims' personal effects, including assisting with the packing and removal of furniture from the immediate scene.

[25] The Department of Public Health provided and set up the portable tent used for the temporary morgue.

OCME to identify and document the decedents prior to their being moved to the OCME in Farmington.[26] CDMC also attended the autopsies at the OCME and did a secondary search of 36 Yogananda Street, as well as photographing doors and locks in SHES.

**Eastern District Major Crime (EDMC)** squad processed the scene at 36 Yogananda Street and were the investigators for the shooting of Nancy Lanza, the shooter's mother.

**CSP-Emergency Services Unit (ESU), Tactical Teams**, were assigned to both SHES and 36 Yogananda Street to handle the clearing of the scenes and rendering them safe.[27]

**CSP – Troop A, Southbury and CSP from other troops and units,** in addition to being first responders, worked to secure the scene and worked with WDMC and the OCME.

**Computer Crimes and Electronic Evidence Unit** handled the seizure and examination of additional electronic evidence from 36 Yogananda Street together with EDMC, CDMC and WDMC.

**CSP - Collision, Analysis and Reconstruction Squad (CARS)** was assigned to produce the sketch maps for both the interior and exterior of the school.

**CSP -** On December 14, 2012, virtually every aspect of the CSP was engaged in the response to SHES and 36 Yogananda Street. For example, included in the first responders were troopers and detectives, not only from Troop A in Southbury, but other troops and units as well, including the Statewide Narcotics Task Force.

**Department of Energy and Environmental Protection (DEEP)** provided first responders at SHES.

**Forensic Science Laboratory, Division of Scientific Services, Department of Emergency Services and Public Protection (DESPP)** examined items seized and collected from SHES and 36 Yogananda Street.

**Office of the Chief Medical Examiner (OCME)** was responsible for investigating the cause and manner of the deaths involved in this case and worked with the CSP in setting up the temporary morgue at SHES that was used to identify and document the deceased prior to their being moved to Farmington.

**Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)** in addition to responding to both scenes, worked on the firearms aspect of the investigation.

---

[26] WDMC and CDMC personnel were also assigned and paired with the FBI to conduct interviews and neighborhood canvasses as well as assist with the identification of victims, investigate a report of another shooter at a hospital, as well as prepare search warrants and attend autopsies.

[27] There were numerous law enforcement agencies that worked on the clearing of SHES and the protection of those who were doing the clearing.

**Federal Bureau of Investigation (FBI)**  – in addition to responding to the scenes, handled interviewing of witnesses and investigation both at a local level and on a national level. The Tactical Team assisted with the clearing of the school. The Behavioral Analysis Unit (BAU), as part of the search warrant execution for 36 Yoganonda Street, was provided with materials for review. They provided their expertise in the preparation of witness interviews. The Victim Assistance Unit worked with victims' families, victims and witnesses.

**United States Attorney's Office** was stationed at the Emergency Operations Center overseeing the investigation into the possible commission of federal crimes and the issuance of federal legal process, as well as coordinating the various federal agencies involved in assisting with the state investigation.

**United States Marshals Service, Technical Operations Group** provided technical and investigation assistance.

**United States Postal Service** looked for mail that may have been relevant to the investigation.

**Municipal Police Departments** from around the state assisted throughout the Town of Newtown, including being first responders at SHES, handling calls in town and the tremendous inflow of media and visitors to the Town in the weeks after December 14, 2012.

**Newtown Police Department** in addition to being first responders, worked to secure the scene and assisted WDMC.

**Office of the State's Attorney, Judicial District of Danbury (SAO)** – oversaw the state investigation, working with the Connecticut State Police.  Together with the assistance of the Office of the Chief State's Attorney, the SAO was stationed at the Emergency Operations Center starting December 14, 2012, and oversaw the legal issues and state aspect of the investigation including search warrant review, child witness issues, working with the federal authorities, etc.


## SANDY HOOK ELEMENTARY SCHOOL – SCENE INVESTIGATION

On the afternoon of December 14, 2012, the WDMC and CDMC van units began documenting the crime scene and collecting evidence. The units could not begin this process until the scene was declared safe. The scene processing took seven days.

The scene was thoroughly processed, with the WDMC van unit handling the interior of SHES and the CDMC van unit covering the exterior. This processing included extensive written documentation as well as taking videos and thousands of photographs and measurements. In addition to the recovery of evidence, bullet trajectories were analyzed and documented.

My description of the scene processing starts with the front entrance and moves into the school building itself. This does not necessarily reflect the actual order in which the crime scene was processed. Many descriptions come directly from the investigation reports but are not in quotation marks to ease reading.

The conditions of windows and doors were documented, but some may have been disturbed by police and emergency personnel during the emergency response and protective sweep of the building. Similarly, other items of evidence, such as shell casings, may not have been found in their original positions because, as mentioned previously, the first priority was to locate and neutralize any active shooter, followed by the location and treatment of the victims, the search for additional shooters and the safe evacuation of the school. Only then could evidence collection begin.

**Interior**

Sandy Hook Elementary School was[28] a one story brick public school building of approximately 66,000 square feet, built in 1954. The building was on Dickinson Drive off of Riverside Road in the Sandy Hook section of Newtown. The front of the building sat in a magnetic northeast direction, but will be considered north for the purposes of this report. See the diagram at page 19.

SHES was rectangular in shape with four hallways in the main building and portable classrooms attached to the rear (south) side which were accessed from the south side of the main building. Classrooms on the exterior walls had even numbers and interior classrooms had odd numbers.

- **Main entrance**

The main entrance to the school was located next to the large glass window that the shooter shot out to enter the school. A patio area was just before the entrance doors. The entrance to the lobby consisted of two sets of locked full glass doors that opened outwardly using a pull handle. They were separated by a small vestibule. The doors were secured with an electronic locking mechanism. The doors could be opened from the inside with a horizontal push bar across the middle of the door.

The broken area of the window that the shooter shot out measured approximately 35.33 inches wide and 42.5 inches high.[29]

The exterior of the main entrance door way had a call box, buzzer system with a video camera. The call box was installed in 2005. The video camera did not record, but the video could be viewed live on three monitoring systems on the secretaries' desks in the main office, with no recording capabilities. The electronic unlocking of the front doors was done by using a "key button" on any of the three monitoring systems.

Glass shards were located just before and to the side of the outside entrance doors on the patio and plantings in the area and also on the floor in the lobby.[30] Eight expended brass colored 5.56

---

[28] SHES was demolished in October and November 2013.

[29] See the Appendix starting at page A168.

[30] See the Appendix at page A169 and A171.

mm bullet casings stamped with "S&B 60 5.56x45"[31] were located in the area outside the broken window and front entrance doors. These were seized.

The front entrance led into the school's lobby. The lobby measured approximately 28 feet north to south and 36 feet east to west.  The southeast corner of the lobby allowed open access to the north hallway of the school. Sixteen brass colored expended 5.56 mm bullet casings were located on the floor within the lobby area and were seized. Furniture in the lobby area had holes consistent with having been struck by a bullet. There were eleven damaged areas consistent with bullet strikes in the lobby.

-   **North Hallway**

The hallway on the north side of the building, where the shootings occurred, ran east to west and contained the lobby and main office, inside of which was the nurse's office. The hallway also contained rooms numbered 1-10, 11A-5 and 12. The bulk of the scene processing occurred in this area. See the diagram on page 19.

The ceiling as in the lobby was 8 feet high.  And the width of the hall was 8.5 feet. The even numbered rooms were on the north side of the hallway with classroom 12 being the western most classroom and classroom 2 being the eastern most. The odd numbered rooms were on the south side of the hallway with the main office being the western most room and classroom 1 being the eastern most. East of the main office was a closet labeled "11A-5 storage" and the east of the closet was a conference room identified as Room 9.

The doors in the hallway all locked from the outside with a key. The interior door handles had no locking mechanism. All of the doors opened outwardly toward the hallway. All doors were solid wood with a circular window in the upper half of the door.[32]

All classrooms in the north hallway had a restroom and a closet. The restrooms were uniformly designed, approximately 4 feet 7 inches by 3 feet 6 inches with a solid wood door. The door of each restroom opened inward and away from the toilet. Each restroom door had a knob push button lock on the inside handle and a key lock on the outside handle.[33] The conference room did not have a restroom.

Classrooms in the north hallway 12 and 10, 8 and 6, 6 and 4, and 3 and 5 respectively had an interior door that was shared by the two classrooms.

---

[31] The ammunition used by the shooter in the Bushmaster rifle has been described as .223 caliber, 5.56 mm NATO and 5.56 X 45.  All of these descriptions are for similar bullets (cartridges) that can be fired from the Bushmaster rifle. The ammunition that the shooter used in this case for the Bushmaster bore the stamp "S&B 60  5.56 X 45" on the base of the cartridges and will be referred to as a 5.56 mm round.  The distinction between a .223 cal. and a 5.56 mm is not relevant to this report.

[32] See the Appendix at page A178 for an example of classroom door locks.

[33] See the Appendix at page A177 for an example of restroom door locks.



The bodies of Mrs. Hochsprung and Mrs. Sherlach were located in the western-most area of the north hallway, near the lobby. One brass colored expended 5.56 mm casing was located and seized from the floor in the area of Mrs. Hochsprung and Mrs. Sherlach.[34] In addition to the 5.56 mm ballistics, one 10 mm shell casing was found in the north hallway and was later identified as having been fired from the Glock 20, 10 mm pistol found near the shooter.

-   **Conference Room (Room 9)**

Conference room 9 was on the south side of the north hallway on the opposite side of the hallway and approximately 16 feet east of the door for classroom 12. The room had a telephone mounted in the center of the west wall.

-   **Classroom 12**

Classroom 12 was located on the north side of the north hallway and was the first classroom east of the front lobby. The classroom door was located 23 feet east of the lobby. The window to the door was covered on the hallway side with dark colored paper that was there from a previous lockdown drill.

-   **Classroom 10**

Classroom 10 was located on the north side of the north hallway and was the second classroom east of the front lobby. The hallway door was approximately 27 feet east of classroom 12. The window was not completely covered, but did have a decoration over part of the inside of the window.

The room measured 27 feet east to west and 30 feet north to south with carpeted floors and painted cinder block walls. There were large windows across the north wall, which provided a view into the front (north) parking lot. Fluorescent ceiling lights turned on automatically when the room was entered. As mentioned previously, there was a restroom in the room and a closet. This closet door had no lock. The door that provided access to classroom 12 was on the center of the west wall. This had a key lock on both sides and the door was unlocked. There was a telephone mounted on the south side of the east wall north of the closet. An Emergency Response Packet Plan was hanging on the south wall. The packet was above a map depicting the emergency evacuation route for this classroom.

The classroom door that opened into the north hallway could only be locked with a key from the outside (hallway side).  The door was unlocked with no signs of forced entry.

In the window area for classroom 10 there were no less than nine holes consistent with being bullet holes. Investigators conducted a trajectory analysis of the shots that went through the window area of classroom 10. No determination could be made as to whether the shots through the window area were intended for the outside of the building. In other words, it could not be determined whether the shooter, while in classroom 10, had intentionally fired at something or

---

[34] See the Appendix starting at page A130 for a description of the ballistics evidence from the north hallway.

someone outside of the building. There was no indication that any shots through the window area of classroom 10 came from outside of the school. All of the evidence indicates that shots went out of the window area of classroom 10 and into the parking area north of the school.

Classroom 10 evidence is further described below.

- **Classroom 8**

Classroom 8 was located on the north side of the north hallway and was the third classroom east of the front lobby, with its entrance door approximately 27 feet east of classroom 10. As with the others, its classroom door opened out into the hallway and could only be locked from the hallway side with a key. The window was not covered. The classroom door to the hallway was unlocked with no signs of forced entry.

The room dimensions and construction were similar to those of classrooms 10 and 12. There was also a restroom in this classroom. The closet door in classroom 8 had no locking device. There were also large glass windows across the north wall providing a view into the front (north) parking lot of the school. There was a wall telephone in the room on the south side of the east wall, north of the closet. An "Emergency Response Plan" packet was hanging on the south wall adjacent to the east side of the entrance door. This packet was above a map depicting the emergency evacuation route for the classroom.

The door that connected into classroom 6 was on the north side of the east wall, had key locks on both sides of the door.  The door was unlocked.

Ballistic evidence located in classroom 8 is described in the Appendix at page A134, which includes a total of twenty-four rounds of 5.56 mm ammunition found, of which ten rounds were in one PMAG 30 magazine, thirteen rounds were in another such magazine and one live round was on the floor. There was a third empty PMAG 30 magazine seized. There were a total of eighty expended 5.56 mm casings seized from classroom 8.

- **Classrooms 6 and 4**

Located on the floor of classroom 6 was one live round "Federal Tactical" 12 gauge shotgun slug shell (Exhibit 49). This shotgun shell was made of clear-like plastic and was different in color from the shotgun shell that was seized on the shooter's person. On the floor of classroom 4 was a blue colored 12 gauge slug shotgun shell with the word "Federal Premium Tactical Rifled slug" stamped on the side and "12 GA Made in USA stamped on the head of the shell (Exhibit 99). This shotgun shell was made of a blue colored plastic and also was different in color from the shotgun gun shell that was seized from the shooter's person.

As mentioned previously, the loose shotgun shells not found on the shooter were in locations where first responders had been and had reported missing shotgun shells. Additionally, there were no witness reports of any persons being seen with firearms other than first responders in those locations, there were no expended shotgun shell casings or projectiles recovered at the scene and the live shotgun shell on the shooter's person and those recovered from his car did not

match any of those recovered from the three locations.  No shotgun was recovered from the school. It is believed that these live shells were dropped by first responders.

- **Shooter**

Responding police officers found the shooter in classroom 10 northwest of the hallway entrance dead from a self-inflicted gunshot wound to the head.  He was wearing a pale green pocket vest over a black polo style short sleeve shirt over a black t-shirt. He had yellow colored earplugs in each ear. He was wearing black cargo pocket pants, black socks, black sneakers, a black canvas belt and black fingerless gloves on each hand. He had an empty camouflage drop holster that was affixed to his right thigh.

After all of the victims were removed from the school, the shooter's body was removed once all firearms and ballistic evidence were recovered from his person. The body was moved to the OCME on December 15, 2012.

- **Weapons on Shooter and Ammunition in Classroom 10**

The weapons on the shooter together with a description of items seized related to the shooting are contained in the Appendix starting at page A136. On the shooter's person was a loaded semi-automatic Sig Sauer P226, 9 mm pistol and additional ammunition. Located near the shooter was a partially loaded Glock 20, 10 mm semi-automatic pistol that appeared to be jammed.

A Bushmaster Model XM15-E2S rifle was located some distance away from the shooter. The rifle's shoulder strap was attached in the front but disconnected at the butt of the rifle. The disconnected rear portion was the result of a failed nut attachment. It is unknown if the nut failed while the rifle was being used or as the result of being dropped or thrown to the floor.

The Bushmaster rifle was found with the safety in the "fire" position. There was one live 5.56 mm round in the chamber and one PMAG 30 magazine in the magazine well. The magazine contained fourteen live 5.56 mm rounds of ammunition. The rifle did not appear to have malfunctioned when observed by the WDMC van unit, but a CSP-ESU report described the weapon as appearing to have jammed.  When tested later, the rifle functioned properly.

Two empty PMAG 30 magazines that were duct-taped together in a tactical configuration and one live 5.56 mm round were found near the rifle.

Officers found two-hundred-fifty-three live rounds on the shooter's body: one-hundred-sixteen 9 mm rounds, seventy-five rounds of 10 mm, sixty-one rounds of 5.56 mm and one 12 gauge shotgun shell. Officers also seized forty-six 5.56 mm live rounds. This consisted of fifteen from the rifle, one from the floor and thirty from the magazine under the body of the shooter, as well as thirteen 10 mm live rounds (nine from the Glock and four from the floor).  There were forty-nine expended 5.56 mm casings seized and one 10 mm casing from classroom 10. Total live rounds seized were three-hundred-twelve and total expended casings seized from classroom 10 were fifty.

**Exterior**

CDMC processed the exterior of SHES.

-   **Shooter's Car**

The shooter's car was found parked in front of the school, west of the front entrance, next to a "No Parking" zone. It was a black 2010 Honda Civic with Connecticut registration 872YEO. The car was registered to his mother, Nancy Lanza, but had been purchased for him.

Recovered from the car was an Izhmash Saiga-12, 12 gauge shotgun with two magazines containing a total of twenty rounds of ammunition.[35] The shotgun and ammunition were originally seen in the passenger compartment of the car and were moved by police to the car's trunk for safekeeping during the initial response and evacuation.

-   **Parking Lot**

There were a number of cars parked in the north parking lot of SHES. Three of these cars were struck by gunfire. None of the cars struck belonged to law enforcement. A total of five strikes to those three cars were identified as having come from classroom 10. It could not be determined whether these shots were intended to go outside of the classroom.

Also found in the north parking lot, was a shotgun shell that was dropped by a first responder.


**<u>SANDY HOOK ELEMENTARY SCHOOL – AUTOPSY INFORMATION</u>**

Deceased victims were removed from the school building to a large military-style tent located in the north parking lot, near the front of the school. The Office of the Chief Medical Examiner sought to make positive identification of the victims through photos, school records and personal and clothing descriptions.

On Saturday, December 15, 2012, all of the victims were transported to the OCME in Farmington for autopsies; autopsies were performed the same day. The cause of death for all of the victims was determined to have been gunshot wounds; the manner of death was determined to have been homicide.[36]

Evidence collected during the autopsies was turned over to CDMC and forwarded to the Division of Scientific Services for examination. The Evidence Examination section of this report contains a summary of the results.

---

[35] A search warrant was obtained for the car. The search warrant return originally reported the amount of ammunition as seventy rounds.  This was corrected to twenty rounds and the search warrant return was amended.

[36] Our law defines homicide as the killing of one human being by another human being.

## 36 YOGANANDA STREET, NEWTOWN, CT – INCIDENT AND RESPONSE

**Incident**

Sometime on the morning of December 14, 2012, before 9:30 a.m., the shooter shot and killed his mother, Nancy Lanza, in her bed at 36 Yogananda Street, Newtown. The weapon used was a .22 caliber Savage Mark II rifle. Someone in the area reported hearing "two or three" gunshots in the neighborhood between 8:00 a.m. and 9:00 a.m. That person thought them to be from hunters, though the person indicated the shots did "sound unusually close."

Between 9:30 a.m. and 10:00 a.m. there was a delivery made to the house. The delivery driver saw no one, did not see any vehicles in the driveway and the garage door was closed. A delivery slip was left and the driver continued on.

The mother was found by police dead in her bed when they entered the house. The rifle was found on the floor next to the bed.

**Response**

Once it was determined that the shooter's car was registered to his mother at 36 Yogananda Street, Newtown, Connecticut, the Newtown police went to the house and evacuated the surrounding homes. The CSP-ESU came to the scene to clear the residence of potential hazards, such as booby traps or trip wires.

## 36 YOGANANDA STREET, NEWTOWN, CT – SCENE INVESTIGATION

After the body of the shooter's mother was found and the scene declared safe, the process of obtaining search warrants for the house began, with the first warrant being reviewed and signed by a judge of the Superior Court at 5:29 p.m. on December 14, 2012, at the Emergency Operations Center.[37]

Additional search warrants were approved and issued as the search disclosed additional evidence. The investigation of the shooter's mother's killing and the scene processing was done by EDMC and the search for evidence at 36 Yogananda Street related to the shootings at SHES was investigated by both CDMC and WDMC. A list of the items seized from the home is contained in the search warrant returns in the Appendix, with some descriptions in the "Digital Image Report," starting at page A188 in the Appendix.[38]

---

[37] The Judicial Branch and the Honorable John F. Blawie are to be commended for their response to the SHES shootings. Judge Blawie was available at the Emergency Operations Center to review search warrants.

[38] A description of the home is also in the Appendix starting at page A181.

The weapon used to kill Nancy Lanza, the .22 cal. Savage Mark II rifle, was found near her bed and seized. In the chamber of the rifle was a spent .22 cal. shell casing and three live rounds were in the magazine. Three other spent .22 cal. shell casings were found in the room and seized.

The shooter's second floor bedroom windows were taped over with black trash bags. The second floor computer room also had its windows covered. There, investigators found a computer hard drive that appeared to have been intentionally damaged. To date, because of the extensive damage, forensic experts have not yet been able to recover any information from that hard drive.

In a typical criminal case, the investigation would remain open when potentially important evidence was still being examined. Given the improbability of any information being recovered from the damaged hard drive, this outstanding piece of evidence is not preventing the closure of this case now. Should any relevant information related to the existence of any accessory or co-conspirator be obtained from the hard drive, the case will be reopened.

Investigators found a large number of firearms and related items in the home. All firearms involved in these incidents were legally purchased by the shooter's mother over the years. The home also contained many edged weapons, knives, swords, spears, etc. A prescription bottle in the shooter's name for acetaminophen with codeine was found in the mother's bathroom, which was part of the master bedroom.

During the search of 36 Yogananda Street, a global positioning system (GPS) device was located in the shooter's room with various routes in the memory from April 25, 2012, through December 13, 2012. Investigation revealed that the GPS was purchased for the shooter.

The routes taken indicate a number of trips from 36 Yogananda Street to the area of a local theater where a commercial version of the game "Dance Dance Revolution" is located. Over that time period, trips were made that took the driver in the vicinity of some schools in Newtown, including SHES. On December 13, 2012, a trip was recorded from 2:09 p.m. to 2:32 p.m. starting and ending on Yogananda Street and driving in Sandy Hook, which is in the area of SHES, though the route does not indicate the shooter drove up to the school.

Numerous video games were located in the basement computer/gaming area. The list of video games includes, but is not limited to:

| | |
|---|---|
| -"Left for Dead" | -"Grand Theft Auto" |
| -"Metal Gear Solid" | -"Shin Megami Tensei" |
| -"Dead Rising" | -"Dynasty Warriors" |
| -"Half Life" | -"Vice City" |
| -"Battlefield" | -"Team Fortress" |
| -"Call of Duty" | -"Doom" |

Other items found and noted for this report are:

- A Christmas check from the mother to the shooter to purchase a CZ 83 firearm;[39]
- A New York Times article from February 18, 2008, regarding the school shooting at Northern Illinois University;
- Three photographs of what appear to be a dead human, covered in blood and wrapped in plastic;
- The book *Amish Grace: How Forgiveness Transcended Tragedy*, Jossey-Bass, 2007, by Donald B. Kraybill, Steven Nolt and David Weaver-Zercher;[40] and
- Photocopied newspaper articles from 1891 pertaining to the shooting of school children

While the vast majority of persons interviewed had no explanation for the shooter's actions, a review of electronic evidence or digital media that appeared to belong to the shooter, revealed that the shooter had a preoccupation with mass shootings, in particular the Columbine shootings[41] and a strong interest in firearms. For example, there was a spreadsheet with mass murders over the years listing information about each shooting.

The review of the electronic evidence also found many things that are on a typical hard drive or memory card that would probably have no relevance to the investigation either because of creation date or subject matter.  That being said, the following selected topics or items were found within the digital evidence seized:

- Bookmarks pertaining to firearms, military, politics, mass murder, video games, music, books, Army Ranger, computers and programs, ammunition, candy, economic books
- Web page design folders
- Two videos showing suicide by gunshot
- Commercial movies depicting mass shootings
- The computer game titled "School Shooting" where the player controls a character who enters a school and shoots at students
- Screen shots (172) of the online game "Combat Arms"
- "Dance Dance Revolution" (DDR) game screen shots
- Videos of shooter playing DDR
- Images of the shooter holding a handgun to his head
- Images of the shooter holding a rifle to his head
- Five-second video (dramatization) depicting children being shot
- Images of shooter with a rifle, shotgun and numerous magazines in his pockets
- Documents on weapons and magazine capacity

---

[39] The return for the December 16, 2012, search warrant indicates that Exhibit #612 was a check for a "C183."  A closer inspection of the check makes it clear that "CZ83" is written.  A CZ 83 is a type of pistol.
The check reads "Christmas Day" in the check's date section.

[40] In October 2006 a gunman entered a one-room Amish school in Pennsylvania, killed five children and leaving others wounded.

[41] The Columbine High School shootings occurred in April 1999 at Columbine High School in Colorado.  Two shooters, in a planned attack, killed a number of students and a teacher and injured others.

- A document written showing the prerequisites for a mass murder spreadsheet
- A spreadsheet listing mass murders by name and information about the incident
- Materials regarding the topic of pedophilia and advocating for rights for pedophiles (not child pornography)[42]
- Large amount of materials relating to Columbine shootings and documents on mass murders
- Large amount of materials on firearms
- Comedy videos
- Music
- Images of hamsters
- Images of Lego creations

## 36 YOGANANDA STREET, NEWTOWN, CT – AUTOPSY INFORMATION

The OCME performed an autopsy on the body of Nancy Lanza, age 52, on December 16, 2012, at the OCME. The cause of death was determined to be multiple gunshots to the head.  The manner of death was homicide.

## SHOOTER - AUTOPSY INFORMATION

The autopsy of the shooter was conducted on December 16, 2012, at the OCME.  The shooter, age 20, was 72 inches tall and weighed 112 pounds.  No drugs were found in the shooter's system. The cause of death was determined to be a gunshot wound to the head.  The manner of death was suicide.

## INVESTIGATION TO DETERMINE ACCESSORIES AND/OR CO-CONSPIRATORS

The investigation sought to determine if the shooter was aided by or had conspired with anyone to commit these crimes. As detailed above, none of the persons found in the vicinity of SHES on December 14, 2012, played any role in the shootings. Most were attempting to escape the area; others were responding to the school after learning of the shootings. None had any association with the shooter.

Investigators then sought to determine if anyone had conspired with or aided the shooter before the shootings. To that end, investigators examined social contacts, writings, e-mails, internet blogs, telephone records and his general internet presence. One of the internet blogs on which the shooter posted focused on mass shootings and in particular the Columbine shootings. The shooter also exchanged e-mails with others who were interested in the topic of mass shootings. None of these communications, however, related to SHES or in any way suggested that the shooter intended to commit a mass shooting. Thus, the evidence as developed to date, does not demonstrate that any of those with whom he communicated conspired with the shooter or criminally aided and abetted him in committing the murders on December 14, 2012.

---

[42] No child pornography was seen on any of the digital media.

**EVENTS AND BACKGROUND INFORMATION LEADING UP TO DECEMBER 14, 2012**

**Recent Background Information**

As of December 14, 2012, the shooter and his mother lived at 36 Yogananda Street. This had been the family home for years, although only the shooter and his mother had resided in the house for an extended time.

Both the shooter's and his mother's bedrooms were on the second floor; the mother occupied the master bedroom.

In November 2012, the mother sought to buy the shooter another computer or parts for a computer for the shooter to build one himself.  She was concerned about him and said that he hadn't gone anywhere in three months and would only communicate with her by e-mail, though they were living in the same house. The mother never expressed fear of the shooter, for her own safety or that of anyone else.

The mother said that she had plans to sell her home in Newtown and move to either Washington state or North Carolina.  She reportedly had told the shooter of this plan and he apparently stated that he wanted to move to Washington. The intention was for the shooter to go to a special school in Washington or get a computer job in North Carolina. In order to effectuate the move, the mother planned to purchase a recreational vehicle (RV) to facilitate the showing and sale of the house and the eventual move to another state. The RV would provide the shooter with a place to sleep as he would not sleep in a hotel.  In fact, during Hurricane Sandy in October 2012, with no power in the house, the shooter refused to leave the home and go to a hotel.

The mother wanted to buy the shooter a CZ 83 pistol for Christmas and had prepared a check for that purchase to give the shooter.

On December 10, 2012, the mother indicated to a friend that the shooter had bumped his head badly, there was some bleeding, but he was okay. This appeared to have occurred at 5:30 a.m. She then prepared for her trip to New Hampshire and cooked for the shooter before she left, leaving him his favorites.

During the week of December 10, 2012, the shooter's mother was out of town in New Hampshire.  She arrived home Thursday evening December 13, 2012, at approximately 10:00 p.m.

As mentioned above, the GPS found in the home, revealed that on Thursday, December 13, 2012, the device was used. It recorded a trip from and back to 36 Yogananda Street with a route in the Sandy Hook area of Newtown between 2:09 p.m. and 2:32 p.m.  The GPS did not report that the driver drove up to SHES. Presumably this was the shooter driving the black Honda Civic as this would have been the only car available to the shooter and it was reportedly his, having been purchased for him.

28

**General Background Information**

Investigators conducted many interviews with persons who knew the shooter and members of his family. As explained above, they did so principally to determine if anyone had conspired with the shooter or aided his crimes. But they also sought to ascertain what might have motivated him to murder children and their teachers and his mother.

The first question was whether the shooter had a reason specifically to target SHES or any student, teacher, or employee. No evidence suggests that he did. In fact, as best as can be determined, the shooter had no prior contact with anyone in the school that day. And, apart from having attended the school as a child, he appears to have had no continuing involvement with SHES.

More generally, those who knew the shooter describe him in contradictory ways. He was undoubtedly afflicted with mental health problems; yet despite a fascination with mass shootings and firearms, he displayed no aggressive or threatening tendencies. In some contexts he was viewed as having above-average intelligence; in others below-average. Some recalled that the shooter had been bullied; but others – including many teachers – saw nothing of the sort. With some people he could talk with them and be humorous; but many others saw the shooter as unemotional, distant, and remote.

What follows are some observations that investigators developed in attempting to determine the shooter's motive.

**Parents**

The shooter's mother and father Peter Lanza had been married to each other. They moved from New Hampshire to the Sandy Hook section of Newtown in 1998.  In addition to the shooter, they had another son Ryan Lanza, who was four years older than the shooter.[43]  In 2001 the shooter's parents separated. The children continued to reside with the mother.  The parents subsequently divorced. The father remarried in 2011; the mother never remarried.

After college, the brother moved out of state. He reached out to the shooter a few times but the shooter did not respond. As of December 14, 2012, the older brother had not had contact with the shooter since 2010. The brother believed that the shooter and his mother had a close relationship. After his older brother left for college, the shooter reportedly became interested in firearms and at one point considered joining the military.

Both the shooter's mother and father indicated that the shooter was bullied growing up. The father indicated that it was not excessive and concerned his social awkwardness and physical gait. As expanded upon in the Education and Mental Health section below, other witnesses did not recall the shooter being overtly bullied. Nonetheless, the shooter appears to have had few friends growing up.

---

[43] Both the shooter's father and brother cooperated fully with the investigation.

The shooter's father saw him regularly until he turned 18. They would go hiking, play video games and other activities. They went shooting twice. The shooter had a cell phone but never used it. Calls all went to voice mail. His father would just e-mail him when he wanted to reach him.

The shooter's relationship with his father deteriorated in the last quarter of 2010 and the father last saw the shooter in that year. After that the father would reach out to the shooter by mail or through e-mails regularly, asking him to join him at various places for different activities. The shooter stopped responding at some point prior to December 2012.

One witness who knew the shooter in 2011 and 2012 said that he rarely mentioned his father or his brother; though he would mention briefly something he did with his father or brother in the past.

While it appears that the shooter's mother did volunteer at SHES, it was when the shooter was a student.  There is no indication that she volunteered there in recent years.

The mother took care of all of the shooter's needs. The mother indicated that she did not work because of her son's condition. She worried about what would happen to the shooter if anything happened to her.

One witness indicated that the shooter did not have an emotional connection to his mother. Recently when his mother asked him if he would feel bad if anything happened to her, he replied, "No."  Others, however, have indicated that they thought the shooter was close to his mother and she was the only person to whom the shooter would talk.

A person who knew the shooter in 2011 and 2012 said the shooter described his relationship with his mother as strained because the shooter said her behavior was not rational.

The shooter was particular about the food that he ate and its arrangement on a plate in relation to other foods on the plate. Certain types of dishware could not be used for particular foods. The mother would shop for him and cook to the shooter's specifications, though sometimes he would cook for himself. Reportedly the shooter did not drink alcohol, take drugs, prescription or otherwise, and hated the thought of doing any of those things.

The mother did the shooter's laundry on a daily basis as the shooter often changed clothing during the day.  She was not allowed in the shooter's room, however, even to clean. No one was allowed in his room.

The shooter disliked birthdays, Christmas and holidays. He would not allow his mother to put up a Christmas tree. The mother explained it by saying that shooter had no emotions or feelings. The mother also got rid of a cat because the shooter did not want it in the house.

**People Outside the Family**

When the shooter had his hair cut, he did not like to be touched and did not like the sound of clippers, so they were not used much. He would sit with his hands in his lap and always look down, giving one word answers if the cutter tried to engage him in conversation.

Those who worked on the property at 36 Yogananda Street never entered the home. They spoke with the mother outside in the yard or at the bottom of driveway. They were instructed never to ring the doorbell and to make prior arrangements before using power equipment as her son had issues with loud noises. The shooter was observed at times coming and going from the residence.

There were a number of people who knew the mother over the years, some fairly well, who had never met the shooter – although were aware of his existence – and had never been inside her residence.

**Shooter's Interests**

Over the years his hobbies included building computers,[44] writing poetry and hiking. The shooter worked briefly at a computer repair shop.  When he was younger he played the saxophone. The shooter had a cell phone but never used it.

Shooting was a pastime in which the family engaged. Over the years the shooter enjoyed target shooting and would go to a range with his brother and mother. The mother had grown up with firearms and had a pistol permit. The shooter did not. Both the mother and the shooter took National Rifle Association (NRA) safety courses. The mother thought it was good to learn responsibility for guns. Both would shoot pistols and rifles at a local range and the shooter was described as quiet and polite.

He played video games often, both solo at home and online. They could be described as both violent and non-violent. One person described the shooter as spending the majority of his time playing non-violent video games all day, with his favorite at one point being "Super Mario Brothers."

Another said he used the computer to play games online and communicate. Sometimes the shooter would not respond to e-mails and be unavailable for a couple of weeks.  The shooter explained that he was "moping around." The shooter frequently formatted the hard drive of his computer as a way of "staying off the grid" and minimizing his internet trace.

Initially the shooter did not drive but he eventually got a driver's license and the Honda was purchased for him.  The shooter was issued a driver's license in July 2010.

The shooter liked to play a game called "Dance Dance Revolution" (DDR), which is a music video game in which the player stands on a platform, watches a video screen and moves his feet

---

[44] By all accounts the shooter was extremely computer savvy.

as directed by the video. A home version of this was seen and photographed in the shooter's home.[45] Several videos of him playing DDR were found on digital media taken from the home.

The GPS found in the home and reportedly belonging to the shooter indicated that he regularly went to the area of a theater that had a commercial version of the DDR game in the lobby. In 2011 and up until a month before December 14, 2012, the shooter went to the theater and played the game. He went most every Friday through Sunday and played the game for four to ten hours.

The shooter was specific about the clothes he wore. He typically wore the same clothing when at the theater: a grey hoodie and slacks. After a snowstorm in 2011 the shooter was not seen at the theater until about February 2012. At that time he seemed more anti-social and no longer played DDR with others.

An acquaintance of the shooter from 2011 to June 2012 said that the shooter and the acquaintance played DDR quite a bit. They would play the game and occasionally see a movie. They did not play first person shooter games at the theater.[46] The shooter had stamina for DDR and never appeared winded unless really exhausted.

The acquaintance said the shooter seemed to enjoy nature and mentioned the possibility of going hiking more than once. The shooter was capable of laughing, smiling and making jokes, though always in a dry fashion. The shooter never mentioned being bullied while growing up. Topics of conversation included world and current events, and included chimpanzee society and how they interacted.

In the course of their conversations, the shooter indicated that he had an interest in mass murders and serial killing. They never spent a lot of time discussing them, but it would be a topic of conversation.[47] There were no conversations about weapons or shooting at a gun range.

**Shooter – Education and Mental Health**

The following background information is compiled from a variety of sources and may at times appear to be inconsistent. This is a function of the differing perspectives of those interviewed. The information also varied based upon the time period during which the witness knew or associated with the shooter or his family.

The shooter went through the Newtown public school system, though part of seventh grade and part of eighth grade were done at St. Rose of Lima School in Newtown.

---

[45] See the Appendix at page A197.

[46] Online first person shooter games that the shooter did play as determined by a search of the digital media in the home, "Combat Arms" and "World of Warcraft" were played on the computer using a keyboard to control the player.

[47] The shooter also wrote about all of these topics.  Other topics of discussion included human nature, perception, judgment, morality, lack of control, prejudice, empathy, suicide, mental illness, existential crisis, urban exploration of abandoned areas, hiking and cookies.

While the shooter did attend SHES from 1998 to 2003, the first through fifth grade, he was never assigned to the classrooms where the shootings occurred. The shooter went for walks with his family around and near SHES after he had gotten out of the school. The shooter indicated that he loved the school and liked to go there.

According to some, the shooter was more social when he first moved to Connecticut and was younger. He would attend play groups and parties. The early school years have him portrayed as a nice kid, though sort of withdrawn. He loved music and played saxophone.

As he got older his condition seemed to worsen, he became more of a loner. As the shooter got into the higher grades of middle school, he did not like noise and confusion and began to have issues when he had to walk to different classes. As a result, in high school, the shooter was home schooled for a period of time. Though not in a mainstream setting, he could sit through a quiet lecture. The mother drove the shooter where he needed to go.  He did not want to go to events with crowds.

He attended Newtown High School (NHS) with a combination of home schooling, tutoring and classes at NHS and Western Connecticut State University (WCSU). At NHS he was considered a special education student. Having enough credits, the shooter graduated from NHS in 2009. He continued to take classes at WCSU after high school graduation.

Various witnesses made the following observations about the shooter through his school years:

1. In the 2002-2003 school year, when the shooter was in the fifth grade, he was quiet, reluctant, very bright and had good ideas regarding creative writing. He wouldn't necessarily engage in conversation, but wouldn't ignore one. There was no recollection of him being bullied or teased.
2. The fifth grade was also the year that, related to a class project, the shooter produced the "Big Book of Granny" in which the main character has a gun in her cane and shoots people. The story includes violence against children. There is no indication this was ever handed in to the school.[48]
3. In the fifth grade the shooter indicated that he did not like sports, did not think highly of himself and believed that everyone else in the world deserved more than he did.
4. In intermediate school from 2002-2004 he was a quiet shy boy who participated in class and listened. He did not show enthusiasm, extreme happiness or extreme sadness. He was neutral.
5. In the fifth and sixth grades from 2003 to 2004 the shooter participated in concerts at school. He was not remembered by the teacher as having been bullied and the shooter had at least one friend.
6. A sixth grade teacher described the shooter as an average student with A's and B's; homework was never an issue. The shooter never made trouble or distracted others. He had friends and was friendly to others. He was a normal child with no oddities and there were no reports of bullying or teasing.

---

[48] See the Appendix starting at page A220.

7. In 2004 while at the intermediate school he was described as respectful and cooperated with others.

8. One person who remembered him from the middle school never saw the shooter bullied.

9. In seventh grade, a teacher described the shooter as intelligent but not normal, with anti-social issues. He was quiet, barely spoke and did not want to participate in anything. His writing assignments obsessed about battles, destruction and war, far more than others his age. The level of violence in the writing was disturbing. At the same time, when asked to write a poem, he was able to write a beautiful one and presented it in public.

10. In the ninth and tenth grades the shooter was reclusive, shutting himself in the bedroom and playing video games all day. In the upper classes the shooter compiled a journal instead of attending physical education.

11. In high school the shooter did not have good social skills. He did not show any signs of violence.

12. In high school the shooter would have "episodes"[49] and his mother would be called to the school. The episodes would last about fifteen minutes each. There were no signs of violence during any of these episodes and the shooter was more likely to be victimized than to act in violence against another.

13. In high school the shooter was not willing to talk much, hard to communicate with and had poor social skills. He often became withdrawn in a social environment. The shooter would have both inclusive class time and leave the class for specialized sessions.

14. At NHS the shooter was in the "Tech Club" in 2007–2008. He was remembered in a variety of ways including as a quiet person who was smart. He wore the same clothing repeatedly and might not speak to you, even if you were talking to him. He was not remembered to have been bullied or to have spoken about violence. The advisor looked out for him and tried to have him included wherever possible. He was also remembered for pulling his sleeves over his hand to touch something. He was not known to be a violent kid at all and never spoke of violence.

15. The shooter had a LAN party[50] at his home in 2008 with Tech Club members; no firearms were seen at the shooter's home.

16. In terms of video games, the shooter liked to play "Phantasy Star Online" (a role playing game), "Paper Mario," "Luigi's Mansion" and "Pikmin." He also liked Japanese animated films and television.

Over the years from the late 1990s and into the 2000s, the shooter had evaluations of various types, some of which were available to the investigators. In the late 1990s he was described as having speech and language needs. At that time he was also being followed medically for seizure activities. In preschool his conduct included repetitive behaviors, temper tantrums, smelling things that were not there, excessive hand washing and eating idiosyncrasies.

In 2005, the shooter was diagnosed with Asperger's Disorder and was described as presenting with significant social impairments and extreme anxiety. It was also noted that he lacked empathy and had very rigid thought processes. He had a literal interpretation of written and

---

[49] What these episodes were was unclear.

[50] This is a party where attendees eat pizza and play video games.

34

verbal material. In the school setting, the shooter had extreme anxiety and discomfort with changes, noise, and physical contact with others.

In 2006 the shooter had an overall IQ in the average range. He had no learning disability. Depending on the psychological test taken he could be average, below average or above average. Testing that required the touching of objects could not be done. It was reported that his school issues related to his identified emotional and/or Pervasive Developmental Disorder (PDD) spectrum behaviors. His high level of anxiety, Asperger's characteristics, Obsessive Compulsive Disorder (OCD) concerns and sensory issues all impacted his performance to a significant degree, limiting his participation in a general education curriculum. Tutoring, desensitization and medication were recommended. It was suggested that he would benefit by continuing to be eased into more regular classroom time and increasing exposure to routine events at school.

The shooter refused to take suggested medication and did not engage in suggested behavior therapies.

Over the years his mother consistently described the shooter as having Asperger's syndrome. She had a number of books in the home on the topic. She also described the shooter as being unable to make eye contact, sensitive to light and couldn't stand to be touched. Over time he had multiple daily rituals, an inability to touch door knobs,[51] repeated hand washing and obsessive clothes changing, to the point that his mother was frequently doing laundry.

In 2006, the shooter's mother noted that there were marked changes to the shooter's behavior around the seventh grade. Prior to that, he would ride his bike and do adventurous things such as climbing trees or climbing a mountain. He had stopped playing the saxophone. He had been in a school band but dropped out. He had withdrawn from playing soccer or baseball which he said he did not enjoy.

It is important to note that it is unknown, what contribution, if any, the shooter's mental health issues made to his attack on SHES. Those mental health professionals who saw him did not see anything that would have predicted his future behavior.

## EVIDENCE EXAMINATION

### Electronics

Examinations of the following seized items were done by the WDMC squad and the Computer Crimes and Electronic Evidence Laboratory of the Department of Emergency Services and Public Protection (DESPP).

Sony PlayStation 2: An older games history was found. Games located included "Dynasty Tactics," "Kingdom Hearts," "Kingdom Hearts 2," "Onimusha," "Dynasty Warriors," and "The Two Towers." The PlayStation 2 games could not be played with others over the internet.

---

[51] This included not opening doors for himself because he did not like touching the door handle or other metal objects, often going through a box of tissues a day to avoid the contact.

Xbox: A game history for the console and an indication of an Xbox Live user account were found.  Games found in the gaming history included "Call of Duty 2: Big Red One," "Call of Duty: Finest Hour," "Dead or Alive 3," "Halo," "Halo 2," "Lego Star Wars," "MechAssault," "Mercenaries," "MGS2 Substance," "Panzer Dragoon ORTA," "PSO," "Shenmue II," "Spiderman," "Splinter Cell 2," "Splinter Cell-CT," "Star Wars Battlefront," "Star Wars Republic Commando," "Tenchu: Return from Darkness," "The Return of the King," and "Worms Forts Under Seige."

It was noted on both of the above items that the gaming history found may not be the complete history of those actually played.  No evidence regarding the existence of any accessories or co-co-conspirators was found.

Xbox 360: Found to be damaged and inoperable.

**Firearms and Related Evidence**

Of the firearms seized in this case, five are directly involved, four from SHES and one from 36 Yogananda Street.

- **History**

All of the firearms below and involved in these cases were legally purchased by the shooter's mother. Additionally, ammunition of the type used in these cases had been purchased by the shooter's mother in the past. There is no reason to believe the ammunition used here was purchased by anyone else. The evidence does not show any ammunition purchases by the shooter.

The shooter did not have a permit to carry a pistol, nor had he ever had one. His mother had a valid pistol permit.

A pistol is defined as "… any firearm having a barrel less than twelve inches."[52]  Both the Glock 20, 10 mm and the Sig Sauer P226, 9 mm qualify as pistols. They are firearms and their barrel lengths were less than 12 inches.

- **Firearms, Recovered Bullets and Fragments**

Recovered from Shooter's Honda Civic Outside of SHES

Izhmash Saiga-12, 12 gauge, semiautomatic shotgun: The Izhmash Saiga-12 was found in the shooter's Honda Civic that was parked outside SHES. It was tested and found to be operable without malfunction. There was no physical evidence indicating this weapon had been fired at SHES, i.e., the bullets, bullet fragments and expended shell casings recovered at the scene and from the OCME could not have been fired from this weapon.

---

[52] C.G.S. Sec. 53a-3(18).

Recovered from Classroom 10, SHES

Bushmaster Model XM15-E2S semiautomatic rifle: The Bushmaster rifle was found in classroom 10. The Bushmaster was tested and found to be operable without malfunction. All of the 5.56 mm shell casings from SHES that were tested were found to have been fired from this rifle. All of the bullets and fragments, recovered from SHES and the OCME that were tested, with the exception of those mentioned immediately below, are consistent with having been fired from the Bushmaster rifle.[53] They could not have been fired from the Saiga-12, the Glock 20 or the Sig Sauer P226.

Glock 20, 10 mm, semiautomatic pistol: The Glock 20 was found in classroom 10 near the shooter's body. The Glock 20 was tested and found to be operable without malfunction. It was found to have fired both of the 10 mm shell casings recovered at SHES. It was consistent with having fired the bullet that was recovered from the ceiling of classroom 8 in a location along the trajectory of the suicide shot of the shooter in classroom 10. It could have fired the three bullet fragments recovered from classroom 10. The three fragments together weigh less than one bullet and are presumed to have been parts of the same one bullet. Though all lacked sufficient striate for a positive identification, all had polygonal rifling consistent with the Glock 20. They could not have been fired from the Saiga-12, the Bushmaster or the Sig Sauer P226.

Sig Sauer P226, 9 mm, semiautomatic pistol: The Sig Sauer P226 was found in classroom 10 on the shooter's person. The Sig Sauer P226 was tested and found to be operable without malfunction. There was no physical evidence found indicating that this weapon had been fired at SHES, i.e. casings, bullets and bullet fragments recovered at the scene and from the OCME could not have been fired from this weapon.

The total weight of the guns and ammunition from the shooter at SHES was 30.47 lbs.[54]

Recovered from 36 Yogananda Street, Newtown, CT

Savage Mark II, .22 cal. Long Rifle, bolt action: The Savage Mark II rifle was found on the floor of the master bedroom near the bed where the body of the shooter's mother was found. The rifle was found to be operable without malfunction. The rifle was found to have fired the .22 cal. casing recovered from the rifle's chamber and the three .22 cal. casings found in the master bedroom. The rifle also was found to have fired the four bullets recovered during the autopsy of the shooter's mother.

---

[53] "No positive identification could be made to any of the bullet evidence submissions noted … … in 5.56 mm caliber.  The physical condition of the bullet jacket surfaces were severely damaged and corroded. They all lacked individual striated marks of sufficient agreement for the identification process.  The test fires also exhibited a lack of individual striated marks on the bullet surface for comparison purposes. This condition can be caused by fouling in the barrel of the rifle and the ammunition itself.  The Bushmaster rifle cannot be eliminated as having fired the 5.56 caliber bullet evidence examined," quoting from the 6/19/13 Forensic Science Laboratory report.

[54] See the Appendix at page A141.

**Other Testing**

In the course of the investigation swabbings to test for DNA were taken from various pieces of evidence in the case, both at Sandy Hook Elementary School and 36 Yogananda Street. The purpose was to determine if anyone else had actively been involved in the planning or carrying out of the shootings. These swabbings were tested and compared to known samples in the case and no potential accessories or co-conspirators were revealed by the testing.[55]

## MISCELLANEOUS INVESTIGATIVE LEADS

In the course of the investigation, law enforcement personnel received a large number of contacts purporting to provide information on the shootings and the shooter.  This applied to both state and federal law enforcement.  Information that was substantiated and relevant was made part of the investigation.  Other information, after investigation was not substantiated.

Typically someone would call the CSP and leave a message that they had information relevant to the shootings at Sandy Hook Elementary School.  In an abundance of caution, a detective was assigned to follow up on every "lead," regardless of its presumed validity.

Some of the more than forty unsubstantiated leads and information are described below because of their nature or mention in investigation documents.

1.  In the December 14, 2012, 7:25 p.m. search warrant for 36 Yogananda Street, paragraphs 8 and 9 read as follows:

    8.  That investigators determined that on 12/12/12, an individual logged onto a website called 4Chan.com and anonymously posted "I'm going to kill myself on Friday and it will make the news. be watching at 9:00 am."  That another anonymous individual asked "Where at?"  The first individual responded "I live in Connecticut, that's as much as I'll say."

    9.  That additionally on 12/14/12, a concerned individual in Texas contacted the Hartford Police Department and reported that her son was playing a video game named 'Call of Duty' approximately 20 hours ago.  She continued that a gamer with the screen name [RaWr]i<3EmoGirls (hereinafter "User") stated; "next week or very soon there maybe a shooting at my school and other schools so if i die remember me plz if I don't get on for 3-5 not including weeks that means i died and im being 100 percent serious."  The User then stated: "something might go bad tomorrow this could possibly be my last moments alive.-." Finally, User stated, "as far as I know theres a list of ppl that are gunna get shot-. I hope I aint on it."

---

[55] Two of the items examined from outside the building of SHES, one from the shotgun in the shooter's car and a second from 36 Yogananda Street yielded DNA profiles consistent with the DNA profiles of two victims killed in SHES, one in each.  It is strongly believed that this resulted from an accidental transference as a result of the unique circumstances of this case.  There is no reason to believe that either victim would ever have come in contact with these items. The DESPP is conducting a separate protocol inquiry in an attempt to determine the reason that the DNA appears on the items.

Both of these leads were immediately investigated by federal law enforcement and found to have no validity and no relation to Newtown.[56]

2.  A December 14, 2012, search of the Stamford residence of Peter Lanza, the father of the shooter, was conducted with the FBI. Some illegal fireworks were seized and secured. After consultation with David I. Cohen, the State's Attorney for the Judicial District of Stamford/Norwalk, and based on all of the circumstances involved, this state's attorney has decided to exercise his discretion and not prosecute Mr. Lanza for possession of the fireworks, which are in no way related to the events of December 14, 2012.

3.  Dick's Sporting Goods – Police received a lead that the shooter had tried to buy ammunition at a Dick's Sporting Goods store. Store security surveillance videos were recovered and reviewed. None of the individuals depicted in the videos appear to be the shooter or connected to shooter.

4.  A person called the police indicating that the shooter had tried to rent a room from her and indicated he was having problems with his mother. This proved to be unsubstantiated after an investigation.

5.  Some callers indicated that they chatted with the shooter online in postings.  These postings were determined to be false.

6.  Numerous citizens in Newtown received calls on their telephones with messages left saying "I am [the shooter's name] and I am going to kill you." It was determined that these calls were made from out of state and the investigation is ongoing. Preliminary investigation results establish that the callers were not associated with the shooter.

7.  CSP investigated a lead that the shooter went to Newtown High School before going to SHES.  In the course of this investigation one parent refused to let her high school child be interviewed by police and related that a friend of the child had told the child they saw the shooter in the parking lot before the shooting. A review of Newtown High School video did not substantiate this claim.

8.  There were reports of the shooter being at SHES on December 12, 2012, that were investigated and found not to be substantiated.

9.  A report that a man claimed that while in Oklahoma a woman told him about the planned shooting before the shooting occurred.  Federal law enforcement investigated this and found that it could not be true.

---

[56] These search warrants were applied for with information that was available at the time.  Some of the information was later determined to be inaccurate.

## DETERMINATIONS OF CRIMES COMMITTED

In the course of his rampage the shooter committed a number of state crimes. The most significant are those where lives were taken and people were specifically injured.

At Sandy Hook Elementary School, the crime of Murder under Special Circumstances[57] in violation of C.G.S. Sec. 53a-54b was committed twenty-six times. Attempted Murder under Special Circumstances[58] in violation of C.G.S. Secs. 53a-49 and 53a-54b was committed twice as it relates to the two individuals who were shot and survived. These crimes reflect the killings of the children and adults, as well as those physically injured.[59]   The crime of Murder in violation of C.G.S. Sec. 53a-54a was committed by the shooter in killing his mother at 36 Yogananda Street.[60]

Also listed are other major crimes committed by the shooter on December 14, 2012.[61]

The major felonies[62] committed by the shooter in this case are:

- Murder with Special Circumstances
- Attempted Murder with Special Circumstances
- Assault in the First Degree[63]

---

[57] Sec. 53a-54b. Murder with special circumstances. A person is guilty of murder with special circumstances who is convicted of any of the following: (1)… … (7) murder of two or more persons at the same time or in the course of a single transaction; or (8) murder of a person under sixteen years of age.

[58] Sec. 53a-49. Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: … … (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

[59] Though state law as to who is a "victim" in a criminal case is very broad, only those victims mentioned above will be discussed. Connecticut defines a "victim of crime" as an individual who suffers direct or threatened physical, emotional or financial harm as a result of a crime and includes immediate family members of a minor, incompetent individual or homicide victim and a person designated by a homicide victim in accordance with section 1-56r.  See C.G.S. Sec. 1-1k.

[60] Sec. 53a-54a. Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

[61] The investigation has not discovered any evidence that Nancy Lanza was in any way aware of her son's plans.

[62] In any given situation, the facts giving rise to the commission of one crime will suffice to meet the elements of additional crimes.  Here the focus will be on the major crimes committed and not go into every possible felony justified by the evidence.

- Burglary in the First Degree[64]
- Risk of Injury to a Minor[65]
- Possession of a Weapon on School Grounds[66]
- Carrying a Pistol Without a Permit,[67]

The crimes listed above all require some type of mental state whether it is a specific intent, knowledge or a general intent to do the prohibited act.

The intent to kill for the crime of murder can be seen in the circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wounds inflicted and the events leading to and immediately following the deaths, as well as with the shooter intending the natural consequences of his voluntary acts.[68]

Here the intent is clear from the evidence that the shooter intentionally armed himself heavily, drove to SHES, parked in a manner out of direct sight of the front door, shot his way into the building and immediately killed those who confronted him as well as those in classrooms 8 and 10. The evidence found at his home on the digital media further support his intentions to kill, both at the school and with his mother. Further the manner in which he killed his mother reflects the shooter's intent to kill her.

---

[63] Sec. 53a-59. Assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument;… … or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm.

[64] Sec. 53a-101. Burglary in the first degree: Class B felony. (a) A person is guilty of burglary in the first degree when (1) such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with explosives or a deadly weapon or dangerous instrument, or (2) such person enters or remains unlawfully in a building with intent to commit a crime therein and, in the course of committing the offense, intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone, or …..

[65] Sec. 53-21. Injury or risk of injury to, or impairing morals of, children. Sale of children. (a) Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or … …, shall be guilty of a class C felony for a violation of subdivision (1) ….

[66] Sec. 53a-217b. Possession of a weapon on school grounds: Class D felony. (a) A person is guilty of possession of a weapon on school grounds when, knowing that such person is not licensed or privileged to do so, such person possesses a firearm or deadly weapon, as defined in section 53a-3, (1) in or on the real property comprising a public or private elementary or secondary school, or ….

[67] Sec. 29-35. Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28.

[68] State v. Otto, 305 Conn. 51, 66-67 (2012).

Murder with Special Circumstances is met both in the killing of the children and in the killing of more than one person at the same time.

In this case the shooter's mental status is no defense to his conduct as the evidence shows he knew his conduct to be against the law. He had the ability to control his behavior to obtain the results he wanted, including his own death. This evidence includes his possession of materials related to mass murders, his removal of the GPS from his car, his utilization of ear plugs, the damaging of the hard drive and waiting for his mother's return from New Hampshire.[69]

The existence of an extreme emotional disturbance for which there is a reasonable explanation or excuse is also not present in this case.[70]  It is clear that the shooter planned his crimes in advance and was under no extreme emotional disturbance for which there was a reasonable explanation or excuse.

---

[69] Sec. 53a-13. Lack of capacity due to mental disease or defect as affirmative defense. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

[70] Sec. 53a-54a. Murder. (a) A person is guilty of murder when, … …with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

## CONCLUSION

With the issuance of this report, the investigation is closed.[71] If additional reliable information, related to the existence of others' involvement in the case, comes to the attention of the investigators, it is subject to being reopened. I do not anticipate that occurring. As of now, there will be no state prosecution of anyone as an accessory or co-conspirator.

Many people have asked why the shooter did what he did on December 14, 2012. Or, in the vernacular of the criminal justice system, "Did he have a motive to do what he did?" This investigation, with the substantial information available, does not establish a conclusive motive.

What we do know is that the shooter had significant mental health issues that, while not affecting the criminality of the shooter's mental state for the crimes or his criminal responsibility for them, did affect his ability to live a normal life and to interact with others, even those to whom he should have been close. Whether this contributed in any way is unknown. The shooter did not recognize or help himself deal with those issues. He had a familiarity with and access to firearms and ammunition and an obsession with mass murders, in particular the Columbine shootings.

There is no clear indication why Sandy Hook Elementary School was selected, other than perhaps its close proximity to the shooter's home.

What is clear is that on the morning of December 14, 2012, the shooter intentionally committed horrendous crimes, murdering 20 children and 6 adults in a matter of moments, with the ability and intention of killing even more. He committed these heinous acts after killing his own mother. The evidence indicates the shooter planned his actions, including the taking of his own life.

It is equally clear that law enforcement arrived at Sandy Hook Elementary School within minutes of the first shots being fired. They went into the school to save those inside with the knowledge that someone might be waiting to take *their* lives. It is also clear that the staff of Sandy Hook Elementary School acted heroically in trying to protect the children. The combination saved many children's lives.

November 25, 2013

Stephen J. Sedensky III
State's Attorney
Judicial District of Danbury

---

[71] There remain some outstanding reports, returns and an evidence examination evaluation to be filed.

43

## ACKNOWLEDGEMENTS

Over the course of the last eleven months many agencies, governmental and private, have come together to assist the victims' families, victims, first responders, others affected by the crimes, the Connecticut State Police and the State's Attorney's Office for the Judicial District of Danbury.

I wish to thank the below agencies, listed alphabetically, for their investigative work, cooperation and assistance in this investigation. Though I have tried to list all of the agencies that provided assistance to the investigation, I suspect some will be inadvertently left out.  For this I apologize.

- Connecticut State Police and in particular Western District Major Crime Squad[72]*
- Connecticut Intelligence Center (CTIC)
- Bureau of Alcohol, Tobacco, Firearms and Explosives
- Department of Emergency Services and Public Protection Forensic Science Laboratory
- Faculty of Finding Words-Connecticut, A ChildFirst State[73]
- Family & Children's Aid of Danbury[74]
- Federal Bureau of Investigation,[75] including Victim Services and Behavior Analysis units
- Gundersen Health System's National Child Protection Training Center
- Hoboken, New Jersey, Police Department
- Homeland Security
- Municipal police departments in Connecticut
- Newtown Police Department
- Office of the Chief Medical Examiner
- Office of the Chief State's Attorney[76]*
- State of Connecticut Judicial Branch
- United States Attorney's Office for the District of Connecticut*
- United States Drug Enforcement Agency
- United States Marshals Service

I would also like to thank the members of the Danbury State's Attorney's Office, in particular, Supervisory Assistant State's Attorney Warren Murray and Inspectors Donald Brown and John Mahoney for their assistance and support.

---

[72] The Western District Major Crime Squad under the leadership of Lt. David Delvecchia investigated this case with a thoroughness and sensitivity that is unmatched in my experience.

[73] Connecticut is a ChildFirst state whose one week program Finding Words Connecticut, Interviewing Children and Preparing for Court is funded by the Governor's Task Force on Justice for Abused Children.

[74] Family & Children's Aid of Danbury hosts the Multidisciplinary Investigation Team.

[75] This includes FBI agents across the country who sought out evidence and interviewed witnesses in many states.

[76] Chief State's Attorney Kevin T. Kane's counsel and assistance has been an invaluable asset to me and this case, together with the assistance of those in his office who worked on the case.

* I am grateful for the suggestions, editing and reviews of the drafts of this report provided by these organizations. Any errors that remain are mine.

# Exhibit 59



September 2013

MAYORS AGAINST ILLEGAL GUNS

**Analysis of Recent**

# MASS SHOOTINGS


# ANALYSIS OF RECENT MASS SHOOTINGS

Mayors Against Illegal Guns conducted a comprehensive analysis of every mass shooting between January 2009 and September 2013 that was identifiable through FBI data and media reports. This report describes the **93 MASS SHOOTINGS — ALMOST TWO PER MONTH — THAT OCCURRED IN 35 STATES** in the nearly five-year period. Each description includes the location of the shooting, number of people killed and/or injured, and information on the shooter, gun(s), ammunition, and gun purchase, where available.

The FBI defines "mass shooting" as any incident where at least four people were murdered with a gun. Mayors Against Illegal Guns reviewed mass shootings in the FBI's Supplementary Homicide Reports from 2009-2011, the most recent data available, and searched the media for further details about these incidents as well as for mass shootings that occurred in 2012 and 2013.

This survey includes every shooting we identified in which at least four people were murdered with a gun. And the findings reveal a different portrait of mass shootings in America than conventional wisdom might suggest:



**Analysis of Recent MASS SHOOTINGS**                                    **3**



TOTAL U.S. FIREARM HOMICIDES

## Mass shootings

represent a small share of total U.S. firearm homicides. Less than one percent of gun murder victims recorded by the FBI in 2010 were killed in incidents with four or more victims.

**151% MORE SHOT**

**63% MORE KILLED**

## Assault weapons or high-capacity magazines

were used in at least 14 of the incidents (15%). These incidents resulted in an average of 14.4 total people shot — 151% more people shot than in other incidents (5.7) — and 7.8 deaths — 63% more deaths than in other incidents (4.8).

**4**    Analysis of **Recent** MASS SHOOTINGS





## Domestic or family violence

There was a noteworthy connection between mass shooting incidents and domestic or family violence. In at least 53 of the cases (57%), the shooter killed a current or former spouse or intimate partner or other family member, and in at least 17 incidents the shooter had a prior domestic violence charge.



## Mental health

We did not find evidence that any of the shooters were prohibited from possessing guns by federal law because they had been adjudicated mentally ill or involuntarily committed for treatment. In 10 of the 93 incidents (11%), we found evidence that concerns about the mental health of the shooter had been brought to the attention of a medical practitioner, school official or legal authority prior to the shooting.



## Role of prohibited possessors

Certain categories of people, including felons, certain domestic abusers, and people adjudicated mentally ill are prohibited by federal law from possessing guns. We had sufficient evidence to judge whether the shooter was a prohibited gun possessor in 75 of the 93 incidents (81%). Of those 75 incidents, 32 (43%) involved a prohibited possessor, and 43 (57%) did not.

## "Gun-free" zones

Sixty-two of the 93 incidents (67%) took place wholly in private residences. Of the 31 incidents in public spaces, at least 17 took place wholly or in part where concealed guns could be lawfully carried. All told, no more than 14 of the shootings (15%) took place entirely in public spaces that were so-called "gun-free zones."

**NOT "GUN-FREE" ZONES**

**"GUN-FREE" ZONES**

## Suicide

In 40 of the 93 incidents (43%), the shooter committed suicide during the incident.

**SUICIDE**

## Law enforcement

In 13 of the 93 shootings (14%), law enforcement or military officers were targeted in the shooting or killed or injured responding to it.

**LAW ENFORCEMENT**

## Workplace and school shootings

Four of the 93 shootings (4%) occurred at the shooter's current or former workplace. Four of the 93 shooting incidents (4%) took place in schools, including primary, secondary, and college campuses.

**WORKPLACE**

**SCHOOL**



# MASS SHOOTING INCIDENTS
# JANUARY 2009–SEPTEMBER 2013
## (in reverse chronological order)

**Washington, D.C., 9/16/2013:** The alleged shooter, who was a civilian contractor and former non-combat military, killed twelve and wounded three more in an attack on Building 197 at the Navy Yard.

- **SHOOTER NAME:** Aaron Alexis, 34
- **GUN DETAILS:** The shooter arrived with a shotgun and also obtained a handgun from one a security guard that he killed.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Two days before the incident the shooter passed a National Instant Criminal Background Check System (NICS) at the licensed gun dealer Sharpshooters in Lorton, VA, and purchased the shotgun.
- **PROHIBITING CRITERIA:** The shooter had been arrested at least three times including: in September 2010 in Fort Worth, Texas for shooting a firearm into a neighbor's apartment; in August 2008 in Dekalb County, Georgia for disorderly conduct; and in 2004 in Seattle, Washington for shooting out the tires of another man's vehicle. But court records do not indicate he was convicted in any of these cases, and this record did not prohibit him from buying guns. He had also received treatment for mental health conditions at two VA hospitals beginning in August, 2013 following an incident where he called Newport Rhode Island Police to report hearing voices. But these incidents did not rise to the level of prohibiting from buying guns. And during his military service he was reportedly cited on at least eight occasions for misconduct ranging from traffic tickets and showing up late for work to insubordination, extended absences from work, and disorderly conduct. On account of this the Navy sought to offer him a "general discharge" but he was ultimately honorably discharged through the early-enlisted transition program in January 2011.
- **NOT A GUN-FREE ZONE:** There were armed guards at the Washington Navy Yard, and the shooter was familiar with the premises, so he did not select it as a target on the presumption he would not faced armed resistance. In fact, the shooter reportedly used a gun that he took from a guard after killing him.

**Crab Orchard, TN, 9/11/2013:** Bennett and his girlfriend Moser killed a woman and three teenagers, apparently during an attempted robbery during a marijuana exchange. The victims' bodies were discovered in a car parked along the side of the road in the Renegade Mountain resort community near Crossville.

- **SHOOTER NAME:** Jacob Allen Bennett, 26 and Brittany Lina Yvonn Moser, 25
- **GUN DETAILS:** Handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Bennett was prohibited from possessing firearms. In 2010 he received a 6-year prison sentence for charges of theft, forgery, and possession of a handgun during a felony, but was paroled on March 4, 2013. The Cumberland County sheriff's office estimated they had previously arrested Bennett

five times.

- **NOT A GUN-FREE ZONE:** We could find no evidence that permit holders were prohibited from carrying guns in this area. In Tennessee, concealed weapons would be prohibited only if the county or municipality declared itself a gun-free zone.

## Oklahoma City, OK, 8/14/13: The shooter killed four of his relatives including an infant inside of their family home.

- **SHOOTER NAME:** Daniel Green, 40
- **GUN DETAILS:** .380 semiautomatic handgun
- **AMMO DETAILS:** A box of .380 handgun ammunition was found in the vehicle when the shooter was arrested.
- **GUN ACQUIRED:** One of the victims owned a .380 semiautomatic handgun and kept it hidden in the attic.
- **PROHIBITING CRITERIA:** Green's father told police in an affidavit that his son was schizophrenic, but there is no evidence that Green had been adjudicated mentally ill or had a criminal history that would prohibit gun ownership.

## Dallas, TX, 08/07/2013: The gunman shot and killed his girlfriend and her daughter, and injured two others; and then in a separate attack shot and killed his estranged wife and her daughter, and injured another two people. He also detonated an explosive but it did not harm anyone.

- **SHOOTER NAME:** Erbie Lee Bowser, 44
- **GUN DETAILS:** .380 pistol
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter's estranged wife had obtained a protective order against Bowser in February 2011, citing family violence, and he was later arrested for violating the order. The order seems to have expired in February 2012, but would likely have been prohibiting while it was in place. A criminal conviction for domestic violence, which would also likely have been prohibiting, was expunged from his record after he completed a court program for veterans in the summer of 2012. Bowser was a veteran, but he had not served in combat — making him ineligible to enter the program. He apparently lied about his military history in order to enter the program.

## Clarksburg, WV, 07/26/2013: According to a criminal complaint, the shooter was trying to collect $10,000 two men owed him for drugs when one of them aimed a handgun at him. He stripped the man of the weapon and used it to kill them both; he then shot and killed a father-son newspaper delivery team that happened to be outside the house.

- **SHOOTER NAME:** Sidney Muller, 27
- **GUN DETAILS:** 9mm Beretta
- **AMMO DETAILS:** Unknown



- **GUN ACQUIRED:** Gun apparently belonged to one of the victims
- **PROHIBITING CRITERIA:** The shooter had been convicted previously for driving under the influence and had been arrested for driving with a suspended license, but was not criminally prohibited from possessing a gun. The shooter was also a veteran of the U.S. Marine Corps and his lawyers indicated he had scored four out of five in Post-Traumatic Stress Disorder testing and had been diagnosed as bipolar. He was reportedly in treatment at the local VA hospital. But there is no evidence his mental illness rose to the level of prohibiting him from possessing guns.

---

## Hialeah, FL, 7/16/13: The shooter killed the two managers of his building, a bystander across the street, and three more occupants before police killed him in a standoff.

- **SHOOTER NAME:** Pedro Alberto Vargas, 42
- **GUN DETAILS:** Glock 17 9mm semiautomatic pistol
- **AMMO DETAILS:** Hundreds of additional rounds were found in Vargas' apartment following the incident.
- **GUN ACQUIRED:** Vargas obtained a concealed weapons permit after completing a two-hour training and four-hour safety course in the fall of 2010 at the Florida Gun Center in Hialeah. In October 2010 he passed a background check and purchased a Glock 17, which was used in the shootings.
- **PROHIBITING CRITERIA:** The shooter had developed a pattern of anonymously harassing his former co-workers online, and was confronted about it three days before the shooting. But there is no evidence Vargas was prohibited from owning a gun.

---

## Santa Monica, CA, 6/7/13: The shooter killed his father and brother, burned down their house, and shot and wounded a passing driver who tried to intervene. He then carjacked another vehicle and made the driver transport him to Santa Monica College, firing at a city bus and police cruiser along the way, injuring three. Once on the college's campus, he shot and killed three people outside and fired 70 rounds at students in the library before he was shot and killed by police.

- **SHOOTER NAME:** John Zawahri, 23
- **GUN DETAILS:** The shooter was armed with a .223 caliber AR-15 assault rifle that did not have a serial number; this type of rifle is prohibited in California. A .44 caliber "black powder" revolver that had been converted to fire .45 caliber rounds and three 'Zip Guns,' which are illegal to possess, were also recovered.
- **AMMO DETAILS:** The shooter was carrying a duffel bag containing approximately 1,300 rounds of ammunition. He was armed with approximately forty 30-round .223 magazines, which are illegal to purchase, sell, or transfer in the state of California.
- **GUN ACQUIRED:** The assault rifle, high-capacity magazines, and several components to modify the firearms may have been shipped from outside California. The firearms were not registered to the shooter or to his family members.
- **PROHIBITING CRITERIA:** The shooter had a history of mental health issues and had previously been held for a short-term psychiatric evaluation, which would have prohibited him from accessing or possessing a firearm for five years, but the prohibition expired in 2011. The shooter had attempted to buy a firearm in 2011, but a letter from the Department of Justice discovered in his bedroom after the shooting indicated that he had not been eligible to purchase it at that time, likely because of this hospitalization.

**MAYORS AGAINST ILLEGAL GUNS**   **Analysis of Recent MASS SHOOTINGS**                                            **9**

**Fernley, NV, 05/13/2013:** On May 10th, the shooter killed a couple in their home and stole $3,500 in cash and jewelry. Three days later, he killed two more people and stole a firearm and their vehicle, and then shot and killed another person later that day.

- **SHOOTER NAME:** Jeremiah Bean, 25
- **GUN DETAILS:** NEF Co. Model R92 .22 caliber handgun. The shooter also stole a Smith & Wesson from one of his victims.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter had been previously convicted for felony charges of burglary and grand larceny, and finished his parole in December 2012. This criminal record likely prohibited him from possessing firearms.

**Waynesville, IN, 5/11/13:** The alleged shooter killed four people in a home where methamphetamine was subsequently discovered, leading police to believe the crime was drug-related.

- **SHOOTER NAME:** Samuel Earl Sallee, 55
- **GUN DETAILS:** A Ruger 10/22 .22 caliber rifle was recovered.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The alleged shooter, who had been at the location of the homicides just hours before the bodies were discovered, was taken into custody two days after the shooting. He was prohibited from possessing firearms due to several prior felony convictions including for intimidation, drunk driving (on multiple occasions), receipt of stolen property, and battery. Although authorities delayed in charging the shooter with a crime while they tried to determine a motive for the homicides, they charged him with illegal firearm possession.

**Ottawa, KS, 04/28/2013:** The shooter raped and killed a woman, as well as killing her 18-month old daughter and two men who were with her at a farm in eastern Kansas.

- **SHOOTER NAME:** Kyle Flack, 27
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In 2005 the shooter was convicted of attempted murder in the 2nd degree, having shot a man five times with a pistol, but he only served two years of a five-year sentence and was paroled in July 2009. He was required to register as a violent offender until 2024 and was prohibited from buying guns. His mother also sought mental health treatment on his behalf; her concerns were dismissed, but Flack ultimately submitted to a mental health evaluation.

**Manchester, IL, 4/24/13:** The shooter broke into a home and killed the grandmother of his child and four of her family members including two young children, apparently related to a cus-

**Analysis of Recent MASS SHOOTINGS**



tody dispute over his 3-year-old daughter. The shooter was subsequently killed in a gunfight with law enforcement.

- **SHOOTER NAME:** Rick Odell Smith, 43
- **GUN DETAILS:** All of the victims were killed with a Winchester 20-gauge pump-action shotgun. A .270 Bolt Action Winchester rifle and Ruger carbine rifle were also recovered.
- **PROHIBITING CRITERIA:** The shooter had been previously convicted for felony reckless homicide, which would likely have prohibited from possessing guns, along with drug possession and writing bad checks.

## Federal Way, WA, 4/21/13: The shooter killed his girlfriend inside the apartment they shared and then fatally shot two men in a nearby parking lot. When a neighbor called 911, the shooter broke down the man's door with a shotgun and killed him. He was subsequently shot and killed by police.

- **SHOOTER NAME:** Dennis Clark III, 27
- **GUN DETAILS:** .40 caliber semi-automatic handgun and a pistol grip Mossberg 500 pump shotgun. Federal Way Police report that Clark had a permit to carry a concealed weapon and was the registered owner of at least two firearms, including the handgun he used in the shooting.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Clark had no criminal convictions but in 2002 had used a BB gun to shoot a girl in the buttocks and back after she broke up with him, resulting in a fourth-degree assault charge that was dismissed. He was charged with misdemeanor criminal trespass in 2003. And in March 2009 he was charged with harming a police dog but the case was dismissed.

## Akron, OH, 4/18/13: The shooters killed four people inside a townhouse; the initial motive for the crime was reportedly robbery.

- **SHOOTER NAME:** Derrick Brantley, 21 and Deshanon Haywood, 21
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** One shooter, Brantley, was free on bond awaiting trial on felony charges of heroin trafficking. The other, Haywood, was paroled from prison in February 2012 after serving part of a two-year sentence for cocaine trafficking and heroin possession. He immediately violated his parole and was sentenced to 45 days of house arrest. Both were likely prohibited from possessing firearms by their criminal histories.

## Herkimer, NY, 04/13/2013: The shooter killed two people and critically wounded one at John's Barber Shop and then killed two more people at Gaffey's Fast Lube, a car care facility. He was killed by responding officers.



**Analysis of Recent MASS SHOOTINGS**                                    **11**

- **SHOOTER NAME:** Kurt Myers, 64
- **GUN DETAILS:** According to the police superintendent, Myers used a shotgun. Additional guns and ammunition were found by emergency crews after Myers set fire to the apartment.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no reason to believe Myers was prohibited him from possessing a gun. He was arrested in 1973 for drunk driving
- **NOT A GUN-FREE ZONE:** Gaffey's Fast Lube does not have a specific policy prohibiting guns  and allows permit holders to carry concealed weapons on the premises. John's Barbershop did not reopen following the shooting but the owner of a neighboring business did not recall the barbershop having any explicit firearm policy or ban, which would have been required to prohibit customers from carrying guns on the premises.

---

## Albuquerque, NM, 1/19/13: The shooter killed his parents and three siblings in their home. He then loaded a van with guns and ammunition with the intent to kill his girlfriend's family and die in a shootout at Wal-Mart, according to court documents. Instead, he spent the next day with his girlfriend and her family and went to a church he regularly attended, where he was arrested for murder after speaking with the pastor.

- **SHOOTER NAME:** Nehemiah Griego, 15
- **GUN DETAILS:** AR-15 assault rifle, .22 rifle, and two shotguns
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The guns had been legally purchased by his parents.
- **PROHIBITING CRITERIA:** As a juvenile, the shooter was prohibited from purchasing firearms, but it was lawful for him to possess long guns like those used in the incident.

---

## Tulsa, OK, 1/7/13: During a robbery the shooters bound the hands of four women in an apartment at the Fairmont Terrace complex and shot each one in the head. The 3-year-old son of one of the victims was in the apartment at the time of the incident but was unharmed.

- **SHOOTER NAME:** Cedric Dwayne Poore, 39 and James Stanford Poore, 32
- **GUN DETAILS:** .40 caliber pistol
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Both shooters had extensive criminal histories: Cedric Poore received a 35-year prison sentences in 1995 for armed robbery and James Poore received a 12-year sentence in 2000 for armed robbery with a firearm. Both were released in 2011, but likely remained prohibited from possessing firearms.

---

## Newtown, CT (Sandy Hook Elementary School), 12/14/12: The shooter killed his



mother in her home and then traveled to a nearby elementary school where he shot twenty-eight people, killing twenty-six of them, including twenty children, before killing himself.

- **SHOOTER NAME:** Adam Peter Lanza, 20
- **GUN DETAILS:** A Bushmaster .223 assault-style rifle was used in the attack at the elementary school. A 10mm Glock handgun, a 9mm SIG Sauer handgun, and a shotgun were also recovered at the crime scene.
- **AMMO DETAILS:** Lanza was carrying multiple high-capacity clips, reportedly enough ammunition to kill nearly every student at school.
- **GUN ACQUIRED:** The guns were legally registered to Lanza's mother, who he shot and killed earlier in the day and with whom he lived.
- **PROHIBITING CRITERIA:** Under Connecticut law, Lanza would have been prohibited from possessing handguns because he had not reached the legal age, 21. However, he would not have been prohibited from possessing a long gun like the Bushmaster rifle used in the shooting. Lanza's mental health was also scrutinized after the shooting, and while his social isolation had been noted, we did not find evidence that concerns had been brought to the attention of a public authority.

## Tule River Reservation, CA, 12/8/2012: The shooter killed his mother and two uncles in the travel trailer where they lived and injured his young son; he then shot his two daughters, one fatally, while fleeing with them from the police. The gunman died after a shootout with police in which he also shot himself in the head.

- **SHOOTER NAME:** Hector Celaya, 31
- **GUN DETAILS:** .38 caliber revolver
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Celaya had been imprisoned in 2008 for an assault and battery charge and was prohibited from having weapons as a condition of three years' probation. It is likely that this criminal record prohibited him from possessing firearms. He was subsequently arrested multiple times for driving while intoxicated, and was due in court in January 2013 to face a misdemeanor drug possession charge.

## Detroit, MI, 12/4/2012: Three adults and one minor were shot to death in a house on the east side of the city before a fire broke out, apparently set by the shooter. There are no reports of arrests or suspects.

- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The assailants are unknown.

## Northridge, CA, 12/02/2012: The shooter arrived at an unlicensed boarding house on Devonshire street, reportedly in search of his girlfriend, and after a dispute shot and killed four people

outside.

- **SHOOTER NAME:** Ka Pasasouk, 31
- **GUN DETAILS:** semiautomatic handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was prohibited from possessing guns, having been convicted for car theft and felony robbery. While on probation in September 2012, he was arrested again for possession of methamphetamine. According to the district attorney, a prosecutor then released him on probation over the objection of probation officials, who believed he posed a threat to the safety of the community.
- **NOT A GUN-FREE ZONE:** Permit holders were not prohibited from carrying guns in this area.

## New Town, ND, 11/18/2012: The shooter murdered a woman and her three grandchildren in their home on Fort Berthold Indian Reservation. When confronted by police he stabbed himself in the neck and died of his injuries.

- **SHOOTER NAME:** Kalcie Eagle, 21
- **GUN DETAILS:** .25-06 hunting rifle
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The rifle did not belong to the shooter; police speculated that it may have belonged to a family member.
- **PROHIBITING CRITERIA:** In March 2012, Eagle was arrested in a stolen pickup truck after a high-speed chase with police. He pled guilty to felony unauthorized use of a vehicle, and was sentenced to a year in jail, with more than three years of supervised probation and more than $45,000 in fines and restitution. Because of this offense, he was likely prohibited from possessing a firearm.

## Minneapolis, MN, 9/27/12: The shooter killed six people and injured two at a signage business, from which he was fired earlier in the day, before killing himself.

- **SHOOTER NAME:** Andrew John Engeldinger, 36
- **GUN DETAILS:** Glock 9mm semiautomatic handgun
- **AMMO DETAILS:** Engeldinger fired at least 46 bullets during the shooting. At his home, police recovered packaging for 10,000 rounds of ammunition.
- **GUN ACQUIRED:** Engeldinger purchased the gun used in the shooting one year before at KGS Guns and Ammo in Minneapolis after passing a background check and obtaining a permit-to-purchase. Around the same time, Engeldinger purchased another, similar handgun that police recovered when searching his home.
- **PROHIBITING CRITERIA:** Engeldinger had a concealed carry permit and was not prohibited from possessing a gun. But his family suspected he had paranoid schizophrenia and two years before the shooting they reached out on his behalf to the National Alliance on Mental Illness. Engeldinger did not pursue treatment.
- **ONLINE CONNECTION:** According to Minneapolis Police, Engeldinger may have purchased some or all of his stockpiled ammunition online from out-of-state dealers.

**Analysis of Recent MASS SHOOTINGS**    

---

## Oak Creek, WI, 8/5/12: The shooter killed six people at a Sikh temple and injured three others, including a responding police officer, before killing himself.

- **SHOOTER NAME:** Wade Michael Page, 40
- **GUN DETAILS:** 9mm semiautomatic handgun
- **AMMO DETAILS:** Page reportedly bought three 19-round magazines when he purchased the gun.
- **GUN ACQUIRED:** Page acquired the gun at a local gun shop a week before the shooting.
- **PROHIBITING CRITERIA:** Page was involved with the white supremacist movement but he does not appear to have been prohibited from purchasing a gun. He received a discharge from the army "under other than honorable conditions" and was demoted from sergeant to specialist, but this did not affect his access to firearms. Federal officials investigated Page's ties to supremacist groups more than once prior to the shooting, but did not collect enough evidence to open an investigation.
- **NOT A GUN-FREE ZONE:** Nothing restricted the possession of a firearm on the property. Wisconsin state law permits people to carry their guns in temples and other places of worship unless there is a sign or they have been personally notified that carrying firearms is prohibited by the property owner or occupant. Amardeep Kaleka, whose father founded the temple and was killed during the attack, confirmed that there was no such sign on the property.

---

## Aurora, Co, 7/20/12: The shooter killed twelve and wounded fifty-eight in an attack on a suburban movie theater during a midnight screening of Batman.

- **SHOOTER NAME:** James Holmes, 24
- **GUN DETAILS:** Smith & Wesson AR-15 assault-style rifle, Remington 870 12-gauge shotgun, and two Glock .40 caliber handguns.
- **AMMO DETAILS:** Holmes had a 100-round drum magazine for the AR-15 and reportedly only ceased firing with it when it jammed.
- **GUN ACQUIRED:** Holmes acquired the guns at local gun shops.
- **PROHIBITING CRITERIA:** While a student at the University of Colorado, Holmes was treated by the school psychiatrist, who expressed concern about his behavior and referred him to the university Behavioral Evaluation and Threat Assessment (BETA) team. They took no further action and he was never adjudicated mentally ill.
- **ONLINE CONNECTION:** Holmes purchased over 6,000 rounds of ammunition online.

---

## Newton Falls, OH, 7/6/12: The shooter killed his girlfriend, another couple, and their son in two separate shootings, before being cornered by the police and killing himself.

- **SHOOTER NAME:** Robert Brazzon, 55
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Brazzon had previously pled guilty to felony drug trafficking after police seized 47 guns from his home in 1999 (the guns were later returned to Brazzon's brother and son following a

court petition). But due to Ohio laws that provide for the restoration of felons' firearm rights, it is unclear whether Brazzon was prohibited from possessing firearms at the time of the shooting.

## Tempe, AZ, 6/2/2012:
The shooter killed his wife and three children inside of their home, then drove the bodies to a location in the Vekol Valley desert, where he lit the car on fire and shot himself. His wife had filed for a divorce earlier in the year but he had not vacated their shared residence. He was also reportedly undergoing treatment for a brain tumor.

- **SHOOTER NAME:** James Butwin, 47
- **GUN DETAILS:** Two guns were recovered in the vehicle, and the caliber of the shells for one matched those found in the house where the murders took place.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that Butwin was prohibited from owning a gun.

## Seattle, WA, 5/20/12:
The shooter killed five people in a string of neighborhood shootings that began in a coffee shop, and later killed himself.

- **SHOOTER NAME:** Ian Lee Stawicki, 40
- **GUN DETAILS:** At least one Para-Ordnance .45 caliber handgun – some reports say he carried two.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Stawicki legally purchased the weapon used in the shooting in addition to two others.
- **PROHIBITING CRITERIA:** The shooter was a concealed carry permit holder but had a history of mental illness and arrests. He was twice charged with misdemeanor assault but both cases were dismissed when the victims — his girlfriend and brother — refused to testify. Before the shooting, Stawicki's family attempted to have his concealed carry permit revoked. Stawicki's family had become concerned that his mental health had worsened. However, his family was rebuffed by authorities, who said they had no legal basis to revoke Stawicki's permit on claims about Stawicki's behavior alone.

## Leivasy, WV, 5/19/2012:
The shooter killed a man after a dispute over a debt for drugs, as well as his girlfriend and their two children.

- **SHOOTER NAME:** James Roy Belknap, 27
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In 2007, Belknap pled guilty on charges of conspiracy to deliver cocaine and was sentenced to 5 years in prison. In exchange, prosecutors dismissed a grand jury indictment charging him with murder. He was therefore prohibited from possessing a gun.



## Port St. John, FL, 5/15/12: The shooter attacked her four children — ages 12 to 17 — in her home, killing them before shooting and killing herself. An autopsy indicated that she had a blood alcohol level of .16 at the time of the shooting — twice the legal limit.

- **SHOOTER NAME:** Tonya Thomas, 33
- **GUN DETAILS:** Taurus .38 caliber revolver
- **AMMO DETAILS:** She fired 18-hollow-point rounds during the incident, reloading the gun three times.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence she was prohibited from possessing a gun. The shooter was charged with misdemeanor battery in 2002 for striking the father of her children but it was later dropped.

## Gilbert, AZ, 5/2/12: The shooter, formerly a member of the U.S. Marine Corps and a founder and leader of a border militia group, shot and killed four people including his girlfriend, before killing himself. At the time of the incident he was running for the office of Pinal County Sheriff.

- **SHOOTER NAME:** Jason Todd ("J.T.") Ready, 39
- **GUN DETAILS:** At least two handguns and a shotgun were recovered from the scene. Six-armor piercing grenades, which may not legally be possessed by civilians, were also recovered.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that the shooter was prohibited from owning guns, even though he had a record of dangerous behavior. In 1992, he was arrested for damage to property and aggravated assault with a weapon and pled guilty to simple assault, a misdemeanor. He was court-martialed twice during his military service, the second resulting in a bad conduct discharge in 1996. In 2009, a woman filed an order of protection against him, but it was not active at the time of the shooting. Officers had also responded to multiple domestic violence calls from Ready's home. Indeed, his girlfriend went to police headquarters on February 28, 2012 to make a complaint and report two domestic violence incidents, but she did not go to court to file for an order of protection.

## Oakland, CA (Oikos University), 4/2/12: The shooter killed seven people at a Korean Christian college, where he had formerly been a student.

- **SHOOTER NAME:** One L. Goh, 43
- **GUN DETAILS:** .45 caliber handgun
- **AMMO DETAILS:** Goh was armed with four magazines of ammunition, holding 10 rounds each.
- **GUN ACQUIRED:** The gun was purchased legally in California two months before the shooting.
- **PROHIBITING CRITERIA:** None apparent, though Goh was expelled from the school for disciplinary problems.

## Norcross, GA, 2/20/12: The shooter returned to a Korean spa from which he'd been kicked out after an altercation, where he shot and killed two of his sisters and their husbands before commit-

ting suicide.

- **SHOOTER NAME:** Jeong Soo Paek, 59
- **GUN DETAILS:** .45 caliber handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Police reported that he acquired the gun legally.
- **PROHIBITING CRITERIA:** Paek does not appear to have been prohibited, although he had allegedly served two months in jail for assaulting his sister six years earlier. In 2006 she applied for a temporary protection order and described his intention to harm himself or others with guns.
- **NOT A GUN-FREE ZONE:** We could find no indication that the property owner forbade possession of a firearm on their property.

## Villa Park, IL, 1/17/2012: The shooter killed his girlfriend, her two sons, and her niece while they slept. After leaving the scene of the crime he shot himself and died of his injuries.

- **SHOOTER NAME:** Cedric Anderson, 42
- **GUN DETAILS:** .357 Magnum handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Anderson has several drug-related offenses dating back to 1990, and in 2008 received probation for possessing a firearm without the required license. On December 29, 2011 was convicted of felony heroin possession, and was awaiting sentencing at the time of the massacre. He was therefore prohibited from possessing a gun.

## Grapevine, TX, 12/25/11: The shooter killed his estranged wife, two children, and three other family members as they opened their Christmas presents, before killing himself. The shooter's wife had filed for bankruptcy in August 2010 and reportedly separated from him during the proceedings, moving to the apartment complex where the shooting took place.

- **SHOOTER NAME:** Aziz Yazdanpanah, 56
- **GUN DETAILS:** 9mm and .40 caliber handguns
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The 9mm was purchased in 1996 and registered to the shooter.
- **PROHIBITING CRITERIA:** In 1996, the shooter pled guilty to one count of subscribing to a false income tax return, and was fined $1000 and placed on three years' probation. But police said the 9mm was legally registered to the shooter and there is no evidence that he was otherwise prohibited from purchasing a gun.

## Emington, IL, 12/16/2011: The shooter killed her boyfriend and her three children before taking her own life in the backyard of their home.

- **SHOOTER NAME:** Sara McMeen, 30



- **GUN DETAILS:** Semi-automatic pistol
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from owning a gun. But she reportedly suffered from bipolar disorder and postpartum depression, and did not take any medication. She also had a family history of mental illness and violence. In 1971, McMeen's father shot and killed his wife with a 12-gauge shotgun. He was found not guilty by reason of insanity, and diagnosed with schizophrenia with suicidal and homicidal tendencies.

---

## Gargatha, VA, 12/15/11: The shooter killed two of his children, their mother, and the man she was living with before killing himself. The shooter was reportedly involved in a custody dispute with the woman at the time of her death.

- **SHOOTER NAME:** Esteban Quintero-Gonzales, 37
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

---

## Bay City, TX, 11/30/11: The shooter and his wife argued in their mobile home, and when she exited he shot her three times in the front yard, injuring her, before killing his four children aged 2 to 5 and then killing himself.

- **SHOOTER NAME:** Jose Avila-Alva, 24
- **GUN DETAILS:** .22 caliber revolver
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The handgun was reported stolen in 2010.
- **PROHIBITING CRITERIA:** The shooter was not a legal resident of the U.S., and had been deported to Mexico in 2006 for unlawful entry, which would have prohibited him from purchasing a gun. One week earlier, on November 22, 2011, the shooter's wife filed an assault report against him and was taken to a crisis center by police, but she did not press charges.

---

## Greensboro, NC, 11/20/2011: The shooter shot and injured a married man she had been having an affair with since 2008, injuring him. At some point that morning she also shot four children in her house, including her older son, a niece, a nephew, and a friend, and they all died of their injuries. She then picked up her son from a sleepover, shot and killed him, and turned the gun on herself.

- **SHOOTER NAME:** Mary Ann Holder
- **GUN DETAILS:** .38 caliber handgun



**Analysis of Recent MASS SHOOTINGS**                                        **19**

- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun. The wife of the man the shooter was having an affair with sought a restraining order against her earlier in 2011; the shooter responded by requesting a restraining order against the man and his wife. Both orders had expired.

---

## Liberty, SC, 10/14/11: The shooter killed her ex-husband, two sons, and their step-grandmother. When investigators arrived, she told them one of her sons had committed the homicides and then killed himself, but this story was inconsistent with forensic evidence. Nine days after the shooting she was taken into custody and charged with four counts of homicide. She had reportedly taken out a $700,000 life insurance policy for her family members with herself named as the beneficiary.

- **SHOOTER NAME:** Susan Diane Hendricks, 48
- **GUN DETAILS:** .380 caliber handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In April 2006, Susan Hendricks shot and killed Doyle "O'Brian" Teaguein in her home after he had allegedly entered uninvited and threatened her. No charges were filed against Hendricks at the time, and the case was never closed. There is no evidence that she was prohibited from possessing a gun in 2011.

---

## Seal Beach, CA, 10/12/11: The shooter injured one and killed eight at a hair salon, including his ex-wife, before being taken into police custody.

- **SHOOTER NAME:** Scott Evans Dekraai, 41
- **GUN DETAILS:** Dekraai carried 3 handguns – a 9 mm Springfield, a Heckler & Koch .45, and a Smith & Wesson .44 Magnum – and used at least two in the shooting.
- **AMMO DETAILS:** News articles say Dekraai was carrying "extra ammunition" when the shooting began.
- **GUN ACQUIRED:** All three guns were purchased legally and registered in accordance with California law.
- **PROHIBITING CRITERIA:** Dekraai was subject to a restraining order that specifically prohibited him from possessing guns, but the order expired in 2008. Dekraai had been diagnosed with Post Traumatic Stress Disorder, and during a custody suit his ex-wife had filed court papers claiming that he was mentally unstable and had threatened to kill himself or someone else at least once.

---

## Laurel, IN, 9/26/11: The shooter killed a man, the man's estranged wife, their two children, and a neighbor. The male victim reportedly had sold the addictive pain-reliever Oxycontin to the shooter, and on the day of the murders they had argued over the price.

- **SHOOTER NAME:** David E. Ison, 46



- **GUN DETAILS:** A .380 caliber handgun was used in the slayings. Another stolen .380 handgun and an AK-47 were recovered during the investigation.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter had a lengthy criminal record, including a conviction for armed robbery, which would have prohibited him from possessing a gun, and at the time of the murders was on probation for 10 counts of burglary.

## Monongalia County, WV, 9/6/2011: The shooter killed five people and injured one before fleeing from the police and then killing himself.

- **SHOOTER NAME:** Shayne Riggleman, 22
- **GUN DETAILS:** A .30-.30 rifle was used. A second rifle and a .22 caliber pistol were also recovered.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In 2008, Riggleman was sentenced to 14 months in prison for armed robbery, an offense that would prohibit him from possessing firearms, though it is possible his rights were restored under West Virginia law. He had also been diagnosed with bipolar disorder and schizophrenia at Chestnut Ridge Hospital and his family had him committed on several occasions.

## Carson City, NV (IHOP Shooting), 9/6/2011: The shooter killed four people at an IHOP restaurant, including three National Guard members, before killing himself.

- **SHOOTER NAME:** Eduardo Sencion, 32
- **GUN DETAILS:** A Norinco Mak 90 assault rifle that had been illegally modified into a fully automatic machine gun. A Romarm/Cugir AK-47 type assault rifle and a Glock 26 semiautomatic handgun were also recovered.
- **AMMO DETAILS:** Police recovered 450 rounds of AK-47 ammunition from Sencion's van and "box upon box" of additional ammunition at his home.
- **GUN ACQUIRED:** Five years earlier, the gun had been sold by a private party in California to an unknown buyer.
- **PROHIBITING CRITERIA:** Sencion was taken into protective custody during a mental health commitment in April 2000 but no court order was involved and it remains unclear if a record of the incident was reported to the NICS database.
- **NOT A GUN-FREE ZONE:** IHOP allows individual franchises to determine their own firearm policies, and this franchise allows concealed carrying of firearms on the premises.

## Marion County, FL, 8/5/11: The shooter killed the mother of his child in her mother's home, his own 6-year-old sister, and two other acquaintances before setting the building on fire. Court records indicated he had smoked synthetic marijuana laced with cocaine prior to the murders. The gun was not immediately recovered.

- **SHOOTER NAME:** James Edward Bannister, 31
- **GUN DETAILS:** Believed to be a .38 caliber revolver
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that he had a prohibiting criminal record.

---

## Wheatland, WY, 7/30/11: The shooter killed his three sons and his brother and shot and injured his wife before surrendering to police. His wife later reported he had become upset because he wanted to keep the curtains of their home drawn to prevent the neighbors from looking inside.

- **SHOOTER NAME:** Everett E. Conant III
- **GUN DETAILS:** Two semiautomatic handguns were used in the shooting. A shotgun and a rifle were also recovered.
- **AMMO DETAILS:** Police testified that about 50 rounds were fired during the incident.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The police reported that the shooter did not have a criminal record. There is no evidence to indicate he was prohibited from possessing a gun.

---

## Wagener, SC, 7/3/2011: The shooter apparently went on a murder-suicide rampage, killing his wife, her twin sister, his mother-in-law, and his ex-girlfriend in two different residences before he was confronted by law enforcement and shot himself.

- **SHOOTER NAME:** Kenneth Myers, 47
- **GUN DETAILS:** A 20-gauge shotgun was used in the massacre. Myers owned numerous weapons including an SKS, AK-47, two 9 mm handguns, a .22 caliber revolver, and a .38 caliber snub-nose pistol.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that the shooter was prohibited from owning a gun. However, he reportedly had a history of violence, having threatened his mother-in-law with a rifle. In a suicide note, he blamed his wife's family for contributing to her drug problem.

---

## Grand Prairie, TX, 6/23/11: The shooter killed his wife and four of her family members at his daughter's birthday party before killing himself.

- **SHOOTER NAME:** Tan Do, 35
- **GUN DETAILS:** Reported to be a handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Tan Do had a history of domestic violence. His wife had obtained a protective order against him but had withdrawn it earlier that year against the advice of a prosecutor.



## Medford, NY, 6/9/11: The shooter killed four people at a pharmacy, Haven Drugs, and stole thousands of hydrocodone pills before fleeing in a vehicle. During the trial he acknowledged that he and his wife were addicted to prescription medication.

- **SHOOTER NAME:** David Laffer
- **GUN DETAILS:** A .45 caliber handgun was used in the shooting. Several other legally registered guns were also recovered from the shooter's home.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The gun was legally registered to the shooter, and there is no evidence he was prohibited from possessing a gun. But five months before the shooting, Suffolk County Detective Kenneth Ripp investigated an identity theft claim made by the shooter's mother, who said the shooter had stolen her debit card. After questioning the shooter and his mother, Ripp advised the Suffolk County Pistol License Bureau that the shooter was dangerous and that his guns should be confiscated. Despite Ripp's report, the guns were not removed.
- **GUN-FREE ZONE:** We could find no evidence that Haven Drugs posted a sign or had a policy prohibiting the carrying of firearms. Current employees declined to comment.

## Yuma, AZ, 6/2/11: In a series of separate shootings over a five-hour period, a gunman shot and killed his ex-wife, three of her friends, and her attorney, before killing himself.

- **SHOOTER NAME:** Carey H. Dyess, 73
- **GUN DETAILS:** Handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Dyess's ex-wife alleged there had been domestic abuse and a judge had issued an order of protection against him in 2006, but there is no evidence that he was a prohibited from possessing firearms at the time of the shooting.

## Ammon, ID, 5/11/11: The shooter killed his two infant children, their mother, and her sister before setting fire to the house and shooting himself. He had separated from the victim several months before the incident, and in the week before the shooting he had sent her harassing text messages.

- **SHOOTER NAME:** Gaylin Leirmoe
- **GUN DETAILS:** .45 caliber handgun
- **AMMO DETAILS:** Eight shots were fired during the shooting.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In October 2009, the shooter was charged with misdemeanor battery for domestic violence with no traumatic injury after hitting his girlfriend — the woman he would ultimately kill — at her birthday celebration. The charges were later dismissed. There is no evidence that he was prohibited from possessing a gun.

## Oak Harbor, Ohio, 4/16/11: The shooter killed his wife and three children, age 1 to 4, before killing himself.

- SHOOTER NAME: Alan Atwater
- GUN DETAILS: .22 caliber rifle, shotgun
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: The shooter and his wife separately reported to friends that in the past he had held her against a wall and choked her. But there is no evidence he was prohibited from possessing a gun.

## Willowbrook, CA, 2/11/11: Two brothers, their uncle, and their cousin were shot and killed by an unknown assailant on the patio of their home.

- SHOOTER NAME: Unknown
- GUN DETAILS: Unknown
- AMMO DETAILS: Witnesses reported that the shooting was loud and continuous. Police believe a semiautomatic weapon was used.
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: The assailant is unknown.

## Minot, ND 1/28/11: The shooter, a Somali national, killed the mother of his child at her home — and then her brother, her mother, and her mother's boyfriend at a nearby home. The murder weapon was never recovered.

- SHOOTER NAME: Omar Mohamed Kalmio, 28
- GUN DETAILS: Believed to be a handgun.
- AMMO DETAILS: Unknown
- GUN ACQUIRED: Unknown
- PROHIBITING CRITERIA: In 2006, Kalmio was convicted of second-degree assault with a dangerous weapon and sentenced to a year in prison, which offense prohibited him from legally possessing a firearm.

## Tucson, AZ, 1/8/11: The shooter attacked a constituent event hosted by Congresswoman Gabrielle Giffords, killing six and wounding fourteen, including Giffords, before he was subdued.

- SHOOTER NAME: Jared Loughner, 22
- GUN DETAILS: 9mm Glock 19 semiautomatic handgun
- AMMO DETAILS: 33-round magazine
- GUN ACQUIRED: Loughner passed a background check and purchased the Glock handgun at Sportsman's Warehouse in Tucson two months before the attack. Loughner also purchased a Harrington & Richardson shotgun in 2009; this gun was not used in the attack.



- **PROHIBITING CRITERIA:** Loughner had a history of mental illness and drug use. He was rejected from Army enlistment in 2008 after failing a drug test and admitting to drug use on his U.S. Army medical history application form, which should have prohibited Loughner from buying a gun for at least one year. However, Loughner successfully purchased a Harrington & Richardson shotgun in 2009, within a year of his Army rejection. Loughner's purchase of the Glock 19 handgun in 2010 violated the plain intent of federal law, which prohibits someone considered an/to be "unlawful user of or addicted to any controlled substance" from purchasing a gun, but the purchase was still allowed under current enforcement practices. Loughner was also suspended from Pima Community College in 2010 for erratic behavior, and exhibited other signs of mental instability in posts to websites.
- **NOT A GUN-FREE ZONE:** It was lawful to carry a firearm in the area of the shooting. An armed bystander, Joe Zamudio, mistook someone else as the shooter and prepared to fire on him before he was stopped by other bystanders.

## Boston, MA, 09/28/10: The shooter killed four and wounded one during a drug-related robbery.

- **SHOOTER NAME:** Edward Washington, 33, and Dwayne Moore, 35, were both charged in the killings. Washington was acquitted. In Moore's first trial, the jury deadlocked 11-1 in favor of his guilt, but he was later convicted in a retrial.
- **GUN DETAILS:** .40 caliber Iberia handgun and 9mm Cobray semiautomatic. The Cobray has not been recovered, but the weapon was identified based on recovered bullets and shell casings.
- **AMMO DETAILS:** 14 rounds fired
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooters were prohibited from possessing guns.
- **NOT A GUN-FREE ZONE:** Any person holding the appropriate license could lawfully carry a firearm in this area. As of 2012 there were an estimated 250,000 concealed weapons permit holders in Massachusetts, and neither state or local law prohibits them from carrying in the city of Boston.

## Riviera Beach, FL 9/27/10: The shooter killed his estranged wife and four of his stepchildren in their home, injured one other, and then shot and killed himself.

- **SHOOTER NAME:** Patrick Dell, 41
- **GUN DETAILS:** Handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** In May 2010, the shooter's wife obtained a restraining order, which was active at the time of the shooting and would have prohibited him from owning a gun. In December 2009, Dell has also been arrested on felony aggravated assault, and had been convicted of misdemeanor improper exhibition of a dangerous firearm. Police had responded to 34 calls from the household in the four years preceding the shooting. In April 2008, the shooter's wife had taken out another restraining order against Dell for abusive behavior.

## Jackson, KY, 9/10/10: The shooter, reportedly enraged at how his wife prepared his eggs, fatally

shot her, his stepdaughter, and three neighbors. He killed himself when the police arrived.

- **SHOOTER NAME:** Stanley Neace, 47
- **GUN DETAILS:** Shotgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

## Chicago, IL, 9/2/10: The shooter murdered four individuals execution-style in a garage on South Kildare Avenue. Officials believe he was part of a drug-trafficking crew that had been involved in at least 10 other killings.

- **SHOOTER NAME:** Raul Segura-Rodriguez, 36
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** While the shooter was reportedly an experienced criminal, there is no evidence of convictions that would have prohibited him from possessing a gun.

## Lake Havasu City, AZ, 8/29/10: The shooter killed his ex-girlfriend, her boyfriend, and three others while they were celebrating her boyfriend's birthday and took his own life later that night.

- **SHOOTER NAME:** Brian Diez, 26
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The gunman's girlfriend had taken out a restraining order against him earlier that year, which would likely prohibit him from purchasing or possessing a gun.

## Buffalo, NY, 8/14/10: The shooter opened fire on a group of people outside a bar, killing four and wounding four others.

- **SHOOTER NAME:** Riccardo McCray, 24
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** McCray had been arrested earlier that year on felony drug charges and the previous year for having a loaded rifle in his car. If he was found guilty of either crime, he would have been prohibited from possessing firearms.
- **NOT A GUN-FREE ZONE:** We could find no indication that it was unlawful to carry a firearm in the area.



There are an estimated 100,000 concealed weapon permit holders in New York and other than limiting a person's ability to carry when he is under the influence of drugs or alcohol, Buffalo does not add any additional requirements to state law.

## Lanham, MD, 8/6/10: The shooter killed two children, their mother, and their paternal aunt in the home where they resided. Police said the shooter was involved in drug trafficking and the victims owed him money.

- **SHOOTER NAME:** Darrell Lynn Bellard
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that he was prohibited from possessing a gun.

## Manchester, CT, 8/3/10: The shooter killed eight coworkers at a beer distributor and wounded two others before killing himself.

- **SHOOTER NAME:** Omar Thornton, 34
- **GUN DETAILS:** Two Ruger SR9 9mm handguns
- **AMMO DETAILS:** The shooter allegedly carried two extra magazines and two extra boxes of ammunition with him to the attack.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no indication that he was prohibited from possessing firearms and the guns he used were registered to him.

## Hialeah, FL, 6/6/10: The shooter killed four women, including his wife — who had just separated from him. He injured three others before shooting and killing himself. The shooting occurred in Yoyito-Cafe Restaurant, where the shooter's wife was employed as a waitress, and in the parking lot immediately outside.

- **SHOOTER NAME:** Gerardo Regalado, 38
- **GUN DETAILS:** .45 caliber handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The shooter had a concealed weapons permit.
- **PROHIBITING CRITERIA:** There is no evidence that the shooter was prohibited from owning a gun. However, relatives said the shooter had abused and terrorized women in the past, and had been imprisoned in Cuba for a particularly violent incident, but he did not have a criminal record in the United States.
- **NOT A GUN-FREE ZONE:** We could find no indication that guns were prohibited in this area. Guns are prohibited in Florida restaurants only in areas primarily devoted to the serving of alcohol.

## Chicago, IL, 4/14/10: The shooter who had converted to Islam in prison killed his family for not going along with his conversion, fatally shooting his mother, pregnant wife, infant son, and two nieces, and injuring one other.

- **SHOOTER NAME:** James A. Larry, 33
- **GUN DETAILS:** Shotgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Larry was almost certainly prohibited from purchasing a gun, having recently served a prison term for a weapons charge. He had also recently pled no contest to misdemeanor battery against his wife.

## Los Angeles, CA, 4/3/10: The shooter killed four and injured two at a San Fernando Valley restaurant after a dispute with other patrons. He was indicted in a separate investigation for engaging in the business of dealing firearms without a license and possession of a firearm with an obliterated serial number, having sold firearms to an informant working for federal agents the previous year.

- **SHOOTER NAME:** Nerses Arthur Galstyan, 28
- **GUN DETAILS:** Unspecified handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

## Washington, DC, 03/30/10: Three gunmen killed four and wounded five in retaliation for another murder.

- **SHOOTER NAME:** Nathaniel D. Simms, 26; Orlando Carter, 20, and unnamed 14-year-old juvenile.
- **GUN DETAILS:** An AK-47 assault rifle and 9mm and .45-caliber handguns
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The adults were reported to have lengthy criminal histories, which prohibited them from purchasing guns, and the 14-year-old was too young to purchase or own a gun.
- 

## New Orleans, LA, 3/26/10: The shooter killed his ex-girlfriend, her sister, and two children.

- **SHOOTER NAME:** Damian Jordan, 22
- **GUN DETAILS:** Handgun
- **AMMO DETAILS:** Unknown



- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Jordan was likely prohibited from possessing a gun due to a lengthy history of domestic abuse, though he had repeatedly pled down the crimes to simple battery.

## Appomattox, VA, 1/19/10: The shooter killed eight family-members and acquaintances and fired at responding police officers – even forcing a helicopter to make an emergency landing – before surrendering. He wore a bulletproof vest during the attack.

- **SHOOTER NAME:** Christopher Speight, 39
- **GUN DETAILS:** High-powered rifle
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was a concealed carry permit holder and was not prohibited from possessing a gun.

## Bellville, TX, 1/16/10: The shooter, angered after a household argument, fatally shot his mother, stepfather, sister, brother and niece.

- **SHOOTER NAME:** Maron Thomas, 20
- **GUN DETAILS:** Handgun and shotgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

## Madison, WI, 12/3/2009: The shooter killed two women with whom he was involved in paternity cases, along with their daughters, before shooting himself in his car.

- **SHOOTER NAME:** Tyrone Adair, 38
- **GUN DETAILS:** Two handguns were found inside the vehicle where Adair died, one of which matched the caliber of the ammunition used in the murders.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Police report that Adair bought a 9mm gun that was advertised on Craigslist. This gun was likely transferred in a private sale.
- **PROHIBITING CRITERIA:** The shooter was prohibiting from possessing firearms due to an active restraining order involving a third woman. He had also been arrested in March 2009 after a domestic incident, but charges were not filed in that case.

## Lakewood, WA, 11/29/09: The shooter killed four police officers in a Tacoma Coffee shop, eluding police for two days before being killed as he fled.



**Analysis of Recent MASS SHOOTINGS**                                   **29**

- **SHOOTER NAME:** Maurice Clemmons, 37
- **GUN DETAILS:** When he was killed, he was in possession of the handgun of one of the officers he had killed.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was prohibited from purchasing a firearm, having been charged with at least 13 felonies across two states. He had posted bail for raping a child just six days before the attack.
- **NOT A GUN-FREE ZONE:** The police officers were armed at the time of the shooting.

## Osage, KS, 11/28/09: The shooter killed his estranged wife, her grandmother, and his two daughters in their home.

- **SHOOTER NAME:** James Kahler, 46
- **GUN DETAILS:** Assault rifle
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Kahler was charged with a misdemeanor domestic violence assault in March 2009. If convicted, he would have been prohibited from purchasing a firearm.

## Jupiter, FL, 11/26/09: The shooter killed his two twin sisters, his aunt, and his cousin's daughter, and injured two other family members, during a Thanksgiving celebration. He eluded capture for over a month before authorities apprehended him.

- **SHOOTER NAME:** Paul Merhige, 40
- **GUN DETAILS:** He used at least two handguns during the shooting.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Purchased at least six guns (including a .22 caliber handgun and a .40 caliber semi-automatic handgun), a high-powered rifle with a scope, and ammunition from two gun stores in South Florida.
- **PROHIBITING CRITERIA:** The shooter was involuntarily committed to mental health facilities at least three times in the decade before the killing, which prohibited him under federal law from possessing guns. But his records were not submitted to the NICS database. His parents reportedly knew he had ceased taking prescribed psychotropic medication in the weeks leading up the shooting. In addition, his sister Carla Merhige had requested a restraining order against him in 2006, but later withdrew the request. The shooter was able to obtain a concealed weapons permit.

## Pearcy, AR, 11/12/09: Three shooters killed five people in their mobile homes and stole wheel rims, televisions, a handgun, and a vehicle. One of the shooters injured a police officer while he was being apprehended several days later.

- **SHOOTER NAME:** Samuel Conway, Marvin Lamar Stringer, and Jeremy Pickney
- **GUN DETAILS:** .22 and .25 caliber handguns

**Analysis of Recent MASS SHOOTINGS**



- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that the shooters were prohibited from possessing guns.

## Oklahoma City, OK, 11/9/2009: The shooter or shooters killed four people in a house before setting the building on fire. Two of the victims were pregnant. The crime was premeditated by two conspirators, and related to drugs they sold for one of the victims. It is unclear whether just one or both of the conspirators were present for the shooting, but both were charged with six counts of murder. Tyner surrendered to authorities a week after the killings. Phillips was arrested in Tulsa in April 2010 after allegedly attempting to sell two guns stolen from a police sergeant's home.

- **SHOOTERS:** David Allen Tyner (pled guilty), 31 and Denny Edward Phillips (pled not guilty), 34
- **GUN DETAILS:** Handgun
- **AMMO DETAILS:** Two types of bullet cases were recovered at the crime scene.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Phillips was prohibited due to a lengthy criminal history including multiple felony convictions. Phillips was convicted in 1996 for assault with a deadly weapon, and other crimes including a jail escape. He was also convicted in 2010 for possession of a firearm by a felon. He was also convicted of aggravated assault and battery. There is no indication that Tyner was prohibited, though he was reportedly a member of a prison gang.

## Fort Hood, TX, 11/5/09: The shooter killed thirteen and wounded thirty soldiers during an attack at the Fort Hood army base.

- **SHOOTER NAME:** Nidal Malik Hasan, 39
- **GUN DETAILS:** A FN Five-seven handgun was used in the attack. A Smith and Wesson .357 revolver also recovered.
- **AMMO DETAILS:** Hasan fired at least 220 rounds of ammunition and had 200 rounds in his pocket when he was detained.
- **GUN ACQUIRED:** Purchased legally at a local gun shop, Guns Galore.
- **PROHIBITING CRITERIA:** The shooter had links with terrorist organizations, but being placed on a terror watch list does not prohibit purchase or possession of firearms under current law.

## Mount Airy, NC, 11/01/09: The shooter killed four people outside a television store before eventually surrendering to the police.

- **SHOOTER NAME:** Marcos Chavez Gonzalez, 29
- **GUN DETAILS:** Assault rifle.
- **AMMO DETAILS:** Unknown

- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was a prohibited purchaser, having been convicted of kidnapping a minor in 2002.
- **NOT A GUN-FREE ZONE:** It was lawful to carry a firearm in the area of the shooting.

## Lawrenceville, GA, 08/27/09: The shooter killed his girlfriend, his daughter, and two others in a domestic dispute.

- **SHOOTER NAME:** Richard Ringold, 44
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

## Kansas City, KS, 6/22/09: The shooter killed a woman with whom he had been romantically linked and three others at the house where she was staying. He had argued with the woman and followed her to the house.

- **SHOOTER NAME:** Adrian Burks
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter was prohibited from possessing firearms. He had served 10 years in Kansas prisons for robbery, aggravated assault, and burglary. He also fatally shot a man in March 2009, but he was not charged in the incident, which his cousin later described as "self defense." In April 2009, he was charged with battery and a criminal threat against the sister of the man he killed and was ordered not to possess firearms.

## Middletown, MD, 04/19/09: The shooter killed his wife and three children in their home before committing suicide.

- **SHOOTER NAME:** Christopher Alan Wood, 34
- **GUN DETAILS:** .25-caliber handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.
- **GREEN HILL, AL, 4/7/2009:** The shooter killed his estranged wife, their teenage daughter, and two other relatives one day before his divorce proceedings were scheduled to take place. He then lit the house on fire and shot himself.
- **SHOOTER NAME:** Kevin Garner, 45

**Analysis of Recent MASS SHOOTINGS**



- **GUN DETAILS:** handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from owning a gun. In divorce documents, however, his wife cited physical and emotional abuse.

## Graham, WA, 4/4/2009:
After a dispute with his wife in which she told him she was ending their relationship, the shooter returned home and killed his five children. Police believe he then made an unsuccessful attempt to find his wife again and then killed himself in his car.

- **SHOOTER NAME:** James Harrison
- **GUN DETAILS:** Unspecified rifle
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence Harrison was prohibited from possessing a gun. Since 2001 the state had received five complaints about the shooter, including one for abuse in 2007 that stemmed from a slapping incident with one of his children. None of the complaints resulted in a domestic violence conviction. After the shooting, his wife said that she and her children had sustained years of abuse.

## Binghamton, NY, 4/3/09:
The shooter killed fourteen and wounded four at the American Civic Association where he had been taking English classes before killing himself. He wore a bullet-proof vest during the attack.

- **SHOOTER NAME:** Jiverly A. Wong, 42
- **GUN DETAILS:** 9mm and .45 caliber Beretta handguns.
- **AMMO DETAILS:** Allegedly fired 98 rounds during the attack. At least one magazine with a 30-round capacity was recovered at the scene.
- **GUN ACQUIRED:** The guns were registered to his New York State pistol license.
- **PROHIBITING CRITERIA:** Wong was not prohibited from possessing a gun, and had a New York State concealed carry permit. People who knew Wong said he exhibited no outward signs of mental instability, although a letter he wrote that was delivered to a newspaper after the shooting indicated he was paranoid and suffering from mental illness.

## Carthage, NC, 3/29/09:
The shooter opened fire at a nursing home where his estranged wife worked, killing eight and injuring three before he was shot and arrested by a police officer.

- **SHOOTER NAME:** Robert Stewart, 45
- **GUN DETAILS:** .357 Magnum handgun and Winchester 1300 shotgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** The guns were acquired legally from a local sporting good store.

**MAYORS AGAINST ILLEGAL GUNS**   **Analysis of Recent MASS SHOOTINGS**   33

- **PROHIBITING CRITERIA:** There is no indication the Stewart was prohibited from possessing a gun.

## Santa Clara, CA, 3/29/09: The gunman killed five family members and wounded two in an apparent murder-suicide.

- **SHOOTER NAME:** Devan Kalathat, 45
- **GUN DETAILS:** Two .45 caliber pistols
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Purchased legally weeks before the incident.
- **PROHIBITING CRITERIA:** There is no indication that Kalathat was prohibited from possessing a gun.

## East Oakland, CA, 3/21/09: The shooter used a semiautomatic handgun to kill two police officers after they stopped his car and then fled on foot to an apartment where he killed two SWAT officers with an assault weapon and injured a third before being killed by police.

- **SHOOTER NAME:** Lovelle Mixon
- **GUN DETAILS:** 9mm semiautomatic handgun and SKS assault-style rifle
- **AMMO DETAILS:** Police said the assault weapon had a high-capacity magazine.
- **GUN ACQUIRED:** The shooter took part in a home invasion robbery in Modesto, CA, on February 21 2009 in which a rifle was reported stolen. Police did not comment on whether the stolen rifle was the one used in the shooting.
- **PROHIBITING CRITERIA:** The shooter had a lengthy criminal history, including a conviction for armed battery, which would have prohibited him from possessing a gun, and he was on parole for assault with a deadly weapon at the time of the shootings.
- **GUN-FREE ZONE:** Two of the victims were shot on a public roadway — the 7400 block of Macarthur Boulevard in East Oakland — where no state law would have prohibited a citizen with the appropriate permit to carry a gun. All of the police officers killed in the incident were armed.

## Raytown, MO, 3/16/09: The gunman shot and stabbed his former girlfriend, her boyfriend, and her two nephews, killing all four.

- **SHOOTER NAME:** Gevante Anderson, 26
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

## Miami, FL, 3/15/09: At a birthday party, the shooter killed his estranged wife, her daughter, her daughter's boyfriend, and the boyfriend's grandmother. He then returned to his house where he set the building on fire and shot and killed himself.

 

- **SHOOTER NAME:** Guillermo Lopez, 48
- **GUN DETAILS:** Semi-automatic handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

## Catawba, NC, 3/12/09: The gunman shot and stabbed a woman and her three children in their home. He later killed himself and his girlfriend after a police chase in Utah.

- **SHOOTER NAME:** Chiew Chan Saevang, 38
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence the shooter was prohibited from possessing a gun.

## Geneva County, AL, 3/10/09: The shooter killed ten, including four members of his family, before killing himself.

- **SHOOTER NAME:** Michael Kenneth McLendon, 28
- **GUN DETAILS:** Bushmaster AR-15, SKS rifle, shotgun, and .38 pistol
- **AMMO DETAILS:** Police recovered additional ammunition from his vehicle after the shooting.
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter had no criminal record and there is no indication he was prohibited from possessing a gun.
- **NOT A GUN-FREE ZONE:** It was lawful to carry a firearm in the public intersection and gas station where two of the individuals were shot.

## Cleveland, OH, 3/05/09: The shooter killed his new wife and four of her relatives before committing suicide.

- **SHOOTER NAME:** Davon Crawford, 33
- **GUN DETAILS:** At least one semiautomatic handgun.
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** Crawford was likely prohibited from possessing a gun. He was convicted of manslaughter in 1995 and pled guilty to felonious assault with a firearm in 2005, though Ohio enables felons to restore their gun rights so it is possible he was no longer prohibited.

## Brockport, NY, 02/14/2009: The shooter killed a nurse in the Lakeside Memorial Hospital

parking lot and a motorist who intervened, and wounded the motorist's girlfriend. The shooter had been fired from the hospital after the nurse filed a sexual harassment complaint against him. He then drove 50 miles and killed another nurse — who had filed a similar complaint against the shooter — and her husband in their home.

- **SHOOTER NAME:** Frank Garcia, 34
- **GUN DETAILS:** .40 caliber Glock handgun
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** There is no evidence that the shooter was prohibited from owning a gun. However, he had applied for concealed carry permits and been denied three times. In his 1995 application, he omitted information about his criminal record — including arrests for criminal possession of a weapon, assault, and harassment. In 2001 and 2006 he made further omissions, and was evaluated as lacking moral character. But in 2007 a judge reversed the denial and granted Garcia a concealed weapon permit.
- **GUN FREE ZONE:** We found no indication that permit holders were prohibited from carrying guns in this area at the time of the incident.

## Wilmington, CA, 1/27/09: The shooter killed his wife and their five children before killing himself.

- **SHOOTER NAME:** Ervin Lupoe, 40
- **GUN DETAILS:** Unknown
- **AMMO DETAILS:** Unknown
- **GUN ACQUIRED:** Unknown
- **PROHIBITING CRITERIA:** The shooter did not have a criminal record and there is no indication he was prohibited from possessing a gun.

# Exhibit 60



# Mass Shootings
# at Virginia Tech

**April 16, 2007**

# Report of the Review Panel

**Presented to**

# Governor Kaine
# Commonwealth of Virginia



**AUGUST 2007**

# Chapter III
# TIMELINE OF EVENTS

The following timeline provides an overview of the events leading up to the tragedy on April 16, and then the actions taken on April 16. The time scale switches from years to months to days and even to minutes as appropriate. This information is a reference source to use as one reads the chapters.

The information here was drawn from numerous interviews and written sources. The Cho family and Seung Hui Cho's school administrators, counselors, teachers, and medical and school records are the prime sources for his history prior to attending Virginia Tech.

Information obtained on his university years before the shootings came from interviews with faculty, counselors, administrators, police, courts, psychological evaluators, suitemates, and others. The panel also had access to many university, medical, and court records and to e-mails and other written materials involving Cho.

The timeline for the events of April 16 relied primarily on state and campus police reports and interviews, supplemented by interviews with survivors, university officials, emergency medical responders, hospitals and others.

The information on the aftermath drew on medical examiner records, interviews with families, and other sources.

Each aspect of the timeline is discussed further in the following chapters, with an evaluation as well as narration of events.

## PRE-INCIDENTS:  CHO'S HISTORY

| 1986–2000 |
|---|

**1984**          Seung Hui Cho is born to a family living in a small two-room apartment in Seoul, South Korea. He is an inordinately shy, quiet child, but no problem to his family. He has serious health problems from 9 months to 3 years old, is frail, and after unpleasant medical procedures does not want to be touched.

**1992**          Cho's family emigrates to Maryland when he is 8 years old.

**1993**          The Cho family moves to Fairfax County, Virginia, when he is 9 years old. They work long hours in a dry-cleaning business.

**1997**          Seung Hui in the 6th grade continues to be very withdrawn. Teachers meet with his parents about this behavior. In the summer before he enters 7th grade, he begins receiving counseling at the Center for Multi-cultural Human Services to address his shy, introverted nature, which is diagnosed as "selective mutism." Parents try to socialize him more by encouraging extracurricular activities and friends, but he stays withdrawn.

**1999**          During the 8th grade, suicidal and homicidal ideations are identified by Cho's middle school teachers in his writing. It is connected to the Columbine shootings this year. (He references Columbine in school writings.) The school requests that his parents ask a counselor to intervene, which leads to a psychiatric evaluation at the Multicultural Center for Human Services. He is prescribed antidepressant medication. He responds well and is taken off the medication approximately one year later.

| 2000–2003 (High School) |
|---|

**Fall 2000**     Cho starts Westfield High School in Fairfax County as a sophomore, after attending another high school at Centreville for a year. After review by the "local screening committee," he is enrolled in an

Individual Educational Program (IEP) to deal with his shyness and lack of responsiveness in a classroom setting. Therapy continues with the Multicultural Center for Human Services through his junior year. He has no behavior problems, keeps his appointments, and makes no threats. He gets good grades and adjusts reasonably to the school environment. Both the guidance office in school and the therapist feel he was successful.

**June 2003**    Cho graduates from Westfield High School with a 3.5 GPA in the Honors Program. He decides to attend Virginia Tech against the advice of his parents and counselors, who think that it is too large a school for him and that he will not receive adequate individual attention. He is given the name of a contact at the high school if he needs help in college, but never avails himself of it.

## 2003–2004 (Virginia Tech)

**August 2003**    Cho enters Virginia Tech as a business information systems major. Little attention is drawn to him during his freshman year. He has a difficult time with his roommate over neatness issues and changes rooms. His parents make weekly trips to visit him. His grades are good. He does not see a counselor at school or home. He is excited about college.

**Fall 2004**    Cho begins his sophomore year. Cho moves off campus to room with a senior who is rarely at home. Cho complains of mites in the apartment, but doctors tell him it is acne and prescribe minocycline. He becomes interested in writing and decides to switch his major to English beginning his junior year. He submits the paperwork late that sophomore year. His sister notes a growing passion for writing over the summer break, though he is secretive about its content. Cho submits a book idea to a publishing house.

## 2005 (Virginia Tech)

**Spring 2005**    Cho requests a change of major to English. The idea for a book sent to a New York publishing house is rejected. This seems to depress him, according to his family. He still sees no counselor at school or home, and exhibits no behavioral problems other than his quietness.

**Fall 2005**    Cho starts junior year and moves back into the dorms. Serious problems begin to surface. His sister notes that he is writing less at home, is less enthusiastic, and wonders if the publisher's rejection letter curbed his enthusiasm for writing and reversed his improving attitude. At school, Cho is taken to some parties by his suitemates at the start of the fall semester. He stabs at the carpet in a girl's room with a knife in the presence of his suitemates.

Professor Nikki Giovanni, Cho's poetry professor, is concerned about violence in his writing. She also asks him to stop taking pictures of classmates from a camera held under the desk. She offers to get him into another class and writes a letter to English Department Chair Lucinda Roy to create a record that could lead to removing Cho from her class.

Dr. Roy removes Cho from Professor Giovanni's class and tutors him one-on-one with assistance from Professor Frederick D'Aguiar. When Cho refuses to go to counseling, Dr. Roy notifies the Division of Student Affairs, the Cook Counseling Center, the Schiffert Health Center, the Virginia Tech police, and the College of Liberal Arts and Human Sciences. Cho's problems are discussed with the university's Care Team that reviews students with problems.

**November 27**    A female resident of WAJ files a report with the Virginia Tech Police Department (VTPD) indicating that Cho had made "annoying" contact with her on the Internet, by phone, and in person. The

CHAPTER III. TIMELINE OF EVENTS

VTPD interviews Cho, but the female student declines to press charges. The investigating officer refers Cho to the school's disciplinary system, the Office of Judicial Affairs.

**November 30**   Cho calls Cook Counseling Center and is triaged (i.e., given a preliminary screening) by phone at following his interaction with VTPD police.

**December 6**   E-mails among resident advisors (RAs) reflect complaints by a female resident in Cochrane residence hall regarding instant messages (IMs) from Cho sent under various strange aliases. E-mails also report that he went in disguise to a female student's room (the event of November 27).

**December 12**   A female student from Campbell Hall files a report with the VTPD complaining of "disturbing" IMs from Cho. She requests that Cho have no further contact with her.

Cho does not keep a 2:00 p.m. appointment at Cook Counseling Center but is triaged by them again by phone that afternoon.

**December 13**   VTPD notifies Cho that he is to have no further contact with the second female student who complained. After campus police leave, Cho's suitemate receives an IM from Cho stating, "I might as well kill myself now." The suitemate alerts VTPD. The police take Cho to the VTPD where a prescreener from the New River Valley Community Services Board evaluates him as "an imminent danger to self or others." A magistrate issues a temporary detaining order, and Cho is transported to Carilion St. Albans Psychiatric Hospital for an overnight stay and mental evaluation.

**December 14**

**7 a.m.**   The person assigned as an independent evaluator, psychologist Roy Crouse, evaluates Cho and concludes that he does not present an imminent danger to himself.

**Before 11 a.m.**   A staff psychiatrist at Carilion evaluates Cho, concludes he is not a danger to himself or others, and recommends outpatient counseling. He gathers no collateral information.

**11-11:30 a.m.**   Special Justice Paul M. Barnett conducts Cho's commitment hearing and rules in accordance with the independent evaluator, but orders follow-up treatment as an outpatient. Cho then makes and keeps an appointment with the campus Cook Counseling Center.

**Noon**   The staff psychiatrist dictates in his evaluation summary that "there is no indication of psychosis, delusions, suicidal or homicidal ideation." The psychiatrist finds that "his insight and judgment are normal....Followup and aftercare to be arranged with the counseling center at Virginia Tech; medications, none." Cho is released.

**3:00 p.m.**   Cho is triaged in person at the Cook Counseling Center for the third time in 15 days.

## 2006

**January**   The Cook Counseling Center receives a psychiatric summary from St. Albans. No action is taken by Cook Counseling Center or the Care Team to follow up on Cho.

**April 17**   Cho's technical writing professor, Carl Bean, suggests that Cho drop his class after repeated efforts to address shortcomings in class and inappropriate choice of writing assignments. Cho follows the professor to his office, raises his voice angrily, and is asked to leave. Bean does not report this incident to university officials.

**Spring**   Cho writes a paper for Professor Hicok's creative writing class concerning a young man who hates the students at his school and plans to kill them and himself. The writing contains a number of parallels

to the events of April 16, 2007 and the recorded messages later sent to NBC.

**September 6–12** Professor Lisa Norris, another of Cho's writing professors, alerts the Associate Dean of Liberal Arts and Human Sciences, Mary Ann Lewis, about him, but the dean finds "no mention of mental health issues or police reports" on Cho. Professor Norris encourages Cho to go to counseling with her, but he declines.

**Fall** Professor Falco, another of Cho's writing instructors, confers with Professors Roy and Norris, who tell him that Dr. Roy in Fall 2005 and Professor Norris in 2006 alerted the Associate Dean of Students, Mary Ann Lewis, about Cho.

| 2007 |
| --- |

**February 2** Cho orders a .22 caliber Walther P22 handgun online from TGSCOM, Inc.

**February 9** Cho picks up the handgun from J-N-D Pawnbrokers in Blacksburg, across the street from the university.

**March 12** Cho rents a van from Enterprise Rent-A-Car at the Roanoke Regional Airport, which he keeps for almost a month. (Cho videotapes some of his subsequently released diatribe in the van.)

**March 13** Cho purchases a 9mm Glock 19 handgun and a box of 50 9mm full metal jacket practice rounds at Roanoke Firearms. He has waited the 30 days between gun purchases as required in Virginia. The store initiates the required background check by police, who find no record of mental health issues.

**March 22** Cho goes to PSS Range and Training, an indoor pistol range, and spends an hour practicing.

**March 22** Cho purchases two 10-round magazines for the Walther P22 on eBay.

**March 23** Cho purchases three additional 10-round magazines from another eBay seller.

**March 31** Cho purchases additional ammunition magazines, ammunition, and a hunting knife from Wal-Mart and Dick's Sporting Goods. He buys chains from Home Depot.

**April 7** Cho purchases more ammunition.

**April 8** Cho spends the night at the Hampton Inn in Christiansburg, Virginia, videotaping segments for his manifesto-like diatribe. He also buys more ammunition.

**April 13** Bomb threats are made to Torgersen, Durham, and Whittemore halls, in the form of an anonymous note. The threats are assessed by the VTPD; and the buildings evacuated. There is no lockdown or cancellation of classes elsewhere on campus. In retrospect, no evidence is found linking these threats to Cho's later bomb threat in Norris Hall, based in part on handwriting analysis.

**April 14** An Asian male wearing a hooded garment is seen by a faculty member in Norris Hall. She later (after April 16) tells police that one of her students had told her the doors were chained. This may have been Cho practicing. Cho buys yet more ammunition.

**April 15** Cho places his weekly Sunday night call to his family in Fairfax County. They report the conversation as normal and that Cho said nothing that caused them concern.

## THE INCIDENTS

| April 16, 2007 |
| --- |

**5:00 a.m.** In Cho's suite in Harper Hall (2121), one of Cho's suitemates notices Cho is awake and at his computer.

CHAPTER III. TIMELINE OF EVENTS

**About 5:30 a.m.** One of Cho's other suitemates notices Cho clad in boxer shorts and a shirt brushing his teeth and applying acne cream. Cho returns from the bathroom, gets dressed, and leaves.

**6:47 a.m.** Cho is spotted by a student waiting outside the West Ambler Johnston (WAJ) residential hall entrance, where he has his mailbox.

**7:02 a.m.** Emily Hilscher enters the dorm after being dropped off by her boyfriend (the time is based on her swipe card record).

**About 7:15 a.m.** Cho shoots Hilscher in her room (4040) at WAJ. He also shoots Ryan Christopher Clark, an RA. Clark, it is thought, most likely came to investigate noises in Hilscher's room, which is next door to his. Both of the victims' wounds prove to be fatal.

**7:17 a.m.** Cho's access card is swiped at Harper Hall (his residence hall). He goes to his room to change out of his bloody clothes.

**7:20 a.m.** The VTPD receives a call on their administrative telephone line advising that a female student in room 4040 of WAJ had possibly fallen from her loft bed. The caller was given this information by another WAJ resident near room 4040 who heard the noise.

**7:21 a.m.** The VTPD dispatcher notifies the Virginia Tech Rescue Squad that a female student had possibly fallen from her loft bed in WAJ. A VTPD officer is dispatched to room 4040 at WAJ to accompany the Virginia Tech Rescue Squad, which is also dispatched (per standard protocol).

**7:24 a.m.** The VTPD officer arrives at WAJ room 4040, finds two people shot inside the room, and immediately requests additional VTPD resources.

**7:25 a.m.** Cho accesses his university e-mail account (based on computer records). He erases his files and the account.

**7:26 a.m.** VT Rescue Squad 3 arrives on-scene outside WAJ.

**7:29 a.m.** VT Rescue Squad 3 arrives at room 4040.

**7:30 a.m.** Additional VTPD officers begin arriving at room 4040. They secure the crime scene and start preliminary investigation. Interviews of residents find them unable to provide a suspect description. No one on Hilscher's floor in WAJ saw anyone leave room 4040 after the initial noise was heard.

**7:30–8:00 a.m.** A friend of Hilscher's arrives at WAJ to join her for the walk to chemistry class. She is questioned by detectives and explains that on Monday mornings Hilscher's boyfriend would drop her off and go back to Radford University where he was a student. She tells police that the boyfriend is an avid gun user and practices using the gun. This leads the police to seek him as a "person of interest" and potential suspect.

**7:40 a.m.** VTPD Chief Flinchum is notified by phone of the WAJ shootings.

**7:51 a.m.** Chief Flinchum contacts the Blacksburg Police Department (BPD) and requests a BPD evidence technician and BPD detective to assist with the investigation.

**7:57 a.m.** Chief Flinchum notifies the Virginia Tech Office of the Executive Vice President of the shootings. This triggers a meeting of the university's Policy Group.

**8:00 a.m.** Classes begin. Chief Flinchum arrives at WAJ and finds VTPD and BPD detectives on the scene and the investigation underway. A local special agent of the state police has been contacted and is responding to the scene.

**8:10 –9:25 a.m.** Chief Flinchum provides updated information via phone to the Virginia Tech Policy Group regarding progress made in

the investigation. He informs them of a possible suspect, who is probably off campus.

**8:11 a.m.**　　BPD Chief Kim Crannis arrives on scene.

**8:13 a.m.**　　Chief Flinchum requests additional VTPD and BPD officers to assist with securing WAJ entrances and with the investigation.

**8:15 a.m.**　　Chief Flinchum requests the VTPD Emergency Response Team (ERT) to respond to the scene and then to stage in Blacksburg in the event an arrest is needed or a search warrant is to be executed.

**8:16–9:24 a.m.**　　Officers search for Hilscher's boyfriend. His vehicle is not found in campus parking lots, and officers become more confident that he has left the campus. VTPD and BPD officers are sent to his home; he is not found. A BOLO (be on the lookout) report is issued to BPD and the Montgomery County Sheriff's Office for his vehicle. Meanwhile, officers continue canvassing WAJ for possible witnesses. VTPD, BPD, and the Virginia State Police (VSP) continue processing the room 4040 crime scene and gathering evidence. Investigators secure identification of the victims.

**8:19 a.m.**　　Chief Crannis requests BPD ERT to respond for the same reason as the VTPD ERT.

**8:20 a.m.**　　A person fitting Cho's description is seen near the Duck Pond on campus.

**8:25 a.m.**　　The Virginia Tech Policy Group meets to plan on how to notify students of the homicides.

**8:52 a.m.**　　Blacksburg public schools lock their outer doors upon hearing of the incident at WAJ from their security chief, who had heard of the incident on police radio.

**9:00 a.m.**　　The Policy Group is briefed on the latest events in the ongoing dormitory homicide investigation by the VTPD.

**9:01 a.m.**　　Cho mails a package from the Blacksburg post office to NBC News in New York that contains pictures of himself holding weapons, an 1,800-word rambling diatribe, and video clips in which he expresses rage, resentment, and a desire to get even with oppressors. He alludes to a coming massacre. Cho prepared this material in the previous weeks. The videos are a performance of the enclosed writings. Cho also mails a letter to the English Department attacking Professor Carl Bean, with whom he previously argued.

**9:05 a.m.**　　Classes begin for the second period in Norris Hall.

**9:15 a.m.**　　Both police ERTs are staged at the BPD in anticipation of executing search warrants or making an arrest.

**9:15–9:30 a.m.**　　Cho is seen outside and then inside Norris Hall, an engineering building. He chains the doors shut on the three main entrances from the inside. No one reports seeing him do this.

**9:24 a.m.**　　A Montgomery County, Virginia deputy sheriff initiates a traffic stop of Hilsher's boyfriend off campus in his pickup truck. Detectives are sent to assist with the questioning.

**9:25 a.m.**　　A VTPD police captain joins the Virginia Tech Policy Group as police liaison and provides updates as information becomes available.

**9:26 a.m.**　　Virginia Tech administration sends e-mail to campus staff, faculty, and students informing them of the dormitory shooting.

**9:31–9:48 a.m.**　　A VSP trooper arrives at the traffic stop of the boyfriend and helps question him. A gunpowder residue field test is performed on him and the result is negative.

CHAPTER III. TIMELINE OF EVENTS

**About 9:40 a.m.[1] until about 9:51 a.m.** Cho begins shooting in room 206 in Norris Hall, where a graduate engineering class in Advanced Hydrology is underway. Cho kills Professor G. V. Loganathan and other students in the class, killing 9 and wounding 3 of the 13 students.

Cho goes across the hall from room 206 and enters room 207, an Elementary German class. He shoots teacher Christopher James Bishop, then students near the front of the classroom and starts down the aisle shooting others. Cho leaves the classroom to go back into the hall.

Students in room 205, attending Haiyan Cheng's class on Issues in Scientific Computing, hear Cho's gunshots. (Cheng was a graduate assistant substituting for the professor that day.) The students barricade the door and prevent Cho's entry despite his firing at them through the door.

Meanwhile, in room 211 Madame Jocelyne Couture-Nowak is teaching French. She and her class hear the shots, and she asks student Colin Goddard to call 9-1-1. A student tells the teacher to put the desk in front of the door, which is done but it is nudged open by Cho. Cho walks down the rows of desks shooting people. Goddard is shot in the leg. Student Emily Haas picks up the cell phone Goddard dropped. She begs the police to hurry. Cho hears Haas and shoots her, grazing her twice in the head. She falls and plays dead, though keeping the phone cradled under her head and the line open. Cho says nothing on entering the room or during the shooting. (Three students who pretend to be dead survive.)

**9:41 a.m.** A BPD dispatcher receives a call regarding the shooting in Norris Hall. The dispatcher initially has difficulty understanding the location of the shooting. Once identified as being on campus, the call is transferred to VTPD.

**9:42 a.m.** The first 9-1-1 call reporting shots fired reaches the VTPD. A message is sent to all county EMS units to staff and respond.

**9:45 a.m.** The first police officers arrive at Norris Hall, a three-minute response time from their receipt of the call. Hearing shots, they pause briefly to check whether they are being fired upon, then rush to one entrance, then another, and then a third but find all three chained shut. Attempts to shoot open the locks fail.

**About 9:45 a.m.** The police inform the administration that there has been another shooting. University President Steger hears sounds like gunshots, and sees police running toward Norris Hall.

Back in room 207, the German class, two uninjured students and two injured students go to the door and hold it shut with their feet and hands, keeping their bodies away. Within 2 minutes, Cho returns. He beats on the door and opens it an inch and fires shots around the door handle, then gives up trying to get in.

Cho returns to room 211, the French class, and goes up one aisle and down another, shooting people again. Cho shoots Goddard again twice more.

A janitor sees Cho in the hall on the second floor loading his gun; he flees downstairs.

Cho tries to enter room 204 where engineering professor Liviu Librescu is teaching Mechanics. Librescu braces his body against the door yelling for students to head for the window. He is shot through the door. Students push out screens and jump or drop to grass or bushes below the window. Ten students escape this way. The next two students trying to escape are shot. Cho

---

[1]The panel estimates that the shooting began at this time based on the time it took for the students and faculty in the room next door to recognize that the sounds being heard were gunshots, and then make the call to 9-1-1.

27

returns again to room 206 and shoots more students.

**9:50 a.m.**      Using a shotgun, police shoot open the ordinary key lock of a fourth entrance to Norris Hall that goes to a machine shop and that could not be chained. The police hear gunshots as they enter the building. They immediately follow the sounds to the second floor.

Triage and rescue of victims begin.

A second e-mail is sent by the administration to all Virginia Tech e-mail addresses announcing that "A gunman is loose on campus. Stay in buildings until further notice. Stay away from all windows." Four loudspeakers out of doors on poles broadcast a similar message.

Virginia Tech and Blacksburg police ERTs arrive at Norris Hall, including one paramedic with each team.

**9:51 a.m.**      Cho shoots himself in the head just as police reach the second floor. Investigators believe that the police shotgun blast alerted Cho to the arrival of the police. Cho's shooting spree in Norris Hall lasted about 11 minutes. He fired 174 rounds, and killed 30 people in Norris Hall plus himself, and wounded 17.

While the shootings at Norris Hall were occurring, police were taking the following actions in connection with the shootings at WAJ:

- Officers canvass WAJ for possible witnesses.

- VTPD, BPD, and VSP process the room 4040 crime scene and gather evidence.

- Officers search interior and exterior waste containers and surrounding areas near WAJ for evidence.

- Officers canvass rescue squad personnel for additional evidence or information.

- Police officials assign the additional responding law enforcement personnel.

At Norris Hall, the first team of officers begins—

- Securing the second floor.

- Triaging the 48 gunshot victims and aiding survivors in multiple classrooms.

- Coordinating rescue efforts to remove survivors from Norris Hall.

- Gathering preliminary suspect or gunman descriptions.

- Determining if additional gunmen exist.

**9:52 a.m.**      The police clear the second floor of Norris Hall. Two tactical medics attached to the ERTs, one medic from Virginia Tech Rescue and one from Blacksburg Rescue, are allowed to enter to start their initial triage.

**9:53 a.m.**      The 9:42 a.m. request for all EMS units is repeated.

**10:08 a.m.**      A deceased male student is discovered by police team and suspected to be the gunman:

- No identification is found on the body.

- He appears to have a self-inflicted gunshot wound to the head.

- He is found among his victims in classroom 211, the French class.

- Two weapons are found near the body.

**10:17 a.m.**      A third e-mail from Virginia Tech administration cancels classes and advises people to stay where they are.

**10:51 a.m.**      All patients from Norris Hall have been transported to a hospital or moved to a minor treatment unit.

**10:52 a.m.**      A fourth e-mail from Virginia Tech administration warns of "a multiple shooting with multiple victims in Norris

Hall," saying the shooter has been arrested and that police are hunting for a possible second shooter.

**10:57 a.m.**      A report of shots fired at the tennis courts near Cassell Coliseum proves false.

**12:42 p.m.**      University President Charles Steger announces that police are releasing people from buildings and that counseling centers are being established.

**1:35 p.m.**      A report of a possible gunshot near Duck Pond proves to be another false alarm.

**4:01 p.m.**      President George W. Bush speaks to the Nation from the White House regarding the shooting.

**5:00 p.m.**      The first deceased victim is transported to the medical examiner's office.

**8:45 p.m.**      The last deceased victim is transported to the medical examiner's office.

**Evening**      A search warrant is served for the residence of the first victim's boyfriend. Investigators continue investigating whether he is linked to the first crime; the two crimes are not yet connected for certain.

## POST-INCIDENT

| April 17, 2007 |
|---|

**9:15 a.m.**      VTPD releases the name of the shooter as Cho Seung Hui and confirms 33 fatalities between the two incidents.

**9:30 a.m.**      VT announces classes will be cancelled "for the remainder of the week to allow students the time they need to grieve and seek assistance as needed."

**11:00 a.m.**      A family assistance center is established at The Inn at Virginia Tech.

**2:00 p.m.**      A convocation ceremony is held for the university community at the Cassell Coliseum. Speakers include President George W. Bush, Virginia Governor Tim Kaine (who had returned from Japan), Virginia Tech President Charles Steger, Virginia Tech Vice President for Student Affairs Zenobia L. Hikes, local religious leaders (representing the Muslim, Buddhist, Jewish, and Christian communities), Provost Dr. Mark G. McNamee, Dean of Students Tom Brown, Counselor Dr. Christopher Flynn, and poet and Professor Nikki Giovanni.

**8:00 p.m.**      A candlelight vigil is held on the Virginia Tech drill field.

**11:30 p.m.**      The first autopsy is completed.

| April 18, 2007 |
|---|

**8:25 a.m.**      A SWAT team enters Burruss Hall, a campus building next to Norris Hall, responding to a "suspicious event"; this proved to be a false alarm.

**4:37 p.m.**      Local police announce that NBC News in New York received by mail this day a package containing images of Cho holding weapons, his writings, and his video recordings. NBC immediately submitted this information to the FBI. A fragment of the video and pictures are widely broadcast.

| April 19, 2007 |
|---|

VT announces that all students who were killed will be granted posthumous degrees in the fields in which they were studying. (The degrees are subsequently awarded to the families at the regular commencement exercises.)

Virginia Governor Kaine selects an independent Virginia Tech Review Panel to detail the April 16 shootings.

Autopsies on all victims are completed by the medical examiner. The autopsy of Cho found no gross brain function abnormalities

and no toxic substances, drugs, or alcohol that could explain the rampage.

### April 20, 2007

Governor Kaine declares a statewide day of mourning.

# Exhibit 61



# Assault Weapons
# "Mass Produced Mayhem"

**Brady Center to Prevent Gun Violence**
**October 2008**

# Assault Weapons:
# "Mass  Produced  Mayhem"

**Brady Center to Prevent Gun Violence**
**October 2008**



## October 2008

### ACKNOWLEDGEMENTS

The Brady Center to Prevent Gun Violence is a national non-profit organization working to reduce the tragic toll of gun violence in America through education, research, and legal advocacy.  Through its project, *Gun Industry Watch*, the Brady Center works to monitor and publicly expose gun industry practices that contribute to gun violence, with the goal of bringing about life-saving industry reform.  The programs of the Brady Center complement the legislative and grassroots mobilization efforts of its sister organization, the Brady Campaign to Prevent Gun Violence and its network of Million Mom March Chapters.

*Assault Weapons: "Mass Produced Mayhem"* was written by Brian J. Siebel. Thanks go to Robyn Steinlauf, Sarah McLemore, Molly Warren, Lindsay Brooker, Talesia Simon, Natalie Durham, and Elizabeth Haile for their assistance in preparing this report.  If you have questions about any part of this report, or would like a copy, please write to *Gun Industry Watch*, Brady Center to Prevent Gun Violence, 1225 Eye Street, N.W., Suite 1100, Washington D.C. 20005.  The report and other Gun Industry Watch reports are also available at www.bradycenter.org/gunindustrywatch and www.gunlawsuits.org.

---

**A Note About the Title**

The phrase "mass produced mayhem" is taken from the federal Bureau of Alcohol, Tobacco, Firearms and Explosive's description of assault weapons in its "Assault Weapons Profile" (April 1994).

---

Copyright © 2008 by Brady Center to Prevent Gun Violence
No part of this publication may be reproduced without prior permission.

ii



# Table of Contents

**Executive Summary** ................................................................................ iv

**Assault Weapons Are Designed to Slaughter People** ................................ 1

**Assault Weapons Threaten Law Enforcement and Terrorize Civilians** ................... 3

    **Police Outgunned** ............................................................................ 3

    **Civilians Massacred** ......................................................................... 7

    **Crime Use Disproportionate** ........................................................... 10

    **Terrorists Armed** ........................................................................... 10

**Assault Weapons Have No Sporting or Self-Defense Purpose** ................ 14

**"Dangerous and Unusual" Weapons Are Not Protected by the Second Amendment** ......................................................................................... 18

**A Strong Federal Assault Weapons Ban Should Be Enacted** ................... 19

    **Effect of 1994 Federal Ban** ............................................................ 19

    **Support by Law Enforcement, the Public, and Presidents** ............ 20

**Conclusion** .......................................................................................... 22

**Appendix: Examples of Assault Weapons Violence Reported Since Federal Ban Expired** ........................................................................ 23

**Endnotes** ............................................................................................. 50



# Executive Summary

Assault weapons are military-style weapons of war, made for offensive military assaults. It is no accident that when a madman, Gian Luigi Ferri, decided to assault the law offices at 101 California Street in San Francisco, he armed himself with two TEC-9 assault weapons with 50-round magazines, which enabled him to kill eight people and wound six others.[1] Or that the Columbine high school shooters, who killed 12 students and a teacher, included a TEC-9 assault pistol in their arsenal.[2] Or that the Branch-Davidians at Waco, Texas, accumulated an arsenal of assault weapons to prepare for battle against the federal government, including 123 AR-15s, 44 AK-47s, two Barrett .50 calibers, two Street Sweepers, an unknown number of MAC-10 and MAC-11s, 20 100-round drum magazines, and 260 large-capacity banana clips.[3] Or that James Huberty used an UZI assault pistol and a shotgun to kill 21 people and wound 19 others at a McDonald's in San Ysidro, California.[4] Or that Patrick Purdy used an AK-47 assault rifle to kill five children and wound 29 others and a teacher at an elementary school in Stockton, California. Equipped with a 75-round "drum" magazine, Purdy was able to shoot 106 rounds in less than two minutes.[5] The list of horrific attacks goes on.[6]

The federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) has called assault weapons "mass produced mayhem."[7] They have been weapons of choice for gangs, drug dealers, and mass killers. They have been used to slaughter innocents in numerous high-profile shootings, and have been used to outgun police officers on the streets. They are of no use for hunters and are counterproductive for lawful defense of one's home. Law enforcement throughout the nation has called for them to be banned. Presidents Gerald Ford, Jimmy Carter, Ronald Reagan, Bill Clinton, and George W. Bush did not agree on much, but they all supported an assault weapons ban.

For ten years, from 1994-2004, federal law banned these weapons of war. Although this now-expired law was limited in scope, and was circumvented by many gun manufacturers, it reduced the use of assault weapons in crime. The experience suggests that a stronger, more comprehensive law would enhance public safety even more.

In the four years since the federal ban expired, hundreds of people have been killed in this country with military-style assault weapons. This report lists incidents in which at least 163 people have been killed and 185 wounded in with assault weapons, including at least 38 police officers killed or wounded by them. Moreover, as these incidents are only those that we could find reported in the press, the actual tally of fatalities and injuries is almost certainly much higher.

Since the federal assault weapon expired in 2004, politicians from President George W. Bush to Senator John Warner have called for its renewal. But on this issue, the two major presidential candidates offer two starkly opposing views: Senator Barack



iv

Obama has stated as recently as his convention acceptance speech that it is imperative that criminals be denied the use of assault weapons.  Senator John McCain, who has opposed the NRA on gun shows and other issues, has been firm in his opposition to assault weapon bans.  The question should be asked of the candidates, "Senator, why should civilians be allowed to wield these weapons of war?"

This report provides the factual basis for answering that question, and makes the evidentiary case for an assault weapons ban.  The report also outlines how the availability of assault weapons to criminals has altered the balance of power on urban streets between police and criminals, placing police officers in grave risk of harm.

SWD M-10, M-11, M-11/9, and M-12 Assault Pistol



AK-47 Assault Rifle (Many variants)





v

# Assault Weapons Are Designed to Slaughter People

Assault weapons are semiautomatic versions of fully automatic guns designed for military use.  These guns unleash extraordinary firepower.  When San Jose, California, police test-fired an UZI, a 30-round magazine was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semiautomatic.[8]

As the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has explained:

> Assault weapons were designed for rapid fire, close quarter shooting at human beings.  That is why they were put together the way they were.  You will not find these guns in a duck blind or at the Olympics.  **They are mass produced mayhem.**[9]

ATF has also described semiautomatic assault weapons as "large capacity, semi-automatic firearms designed and configured for rapid fire, combat use….  Most are patterned after machine guns used by military forces."[10]  In short, as a Montgomery County, Alabama Sheriff has said: **"[T]here's only one reason for owning a gun like that – killing people.  There's no other use other than to kill people.  That's all they're made for."**[11]

Assault weapons have distinct features that separate them from sporting firearms.[12]  While semiautomatic hunting rifles are designed to be fired from the shoulder and depend upon the accuracy of a precisely aimed projectile, the military features of semiautomatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly.  Assault weapons are equipped with large-capacity ammunition magazines that allow the shooter to fire 20, 50, or even more than 100 rounds without having to reload.  Pistol grips on assault rifles and shotguns help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position.  Barrel shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession.  Far from being simply "cosmetic," these features all contribute to the unique function of any assault weapon to deliver extraordinary firepower.  They are uniquely military features, with no sporting purpose whatsoever.[13]

Accordingly, ATF has concluded that assault weapons "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes" and instead "are attractive to certain criminals."[14]  An ATF survey of 735 hunting guides, conducted during the administration of President George H.W. Bush, found that sportsmen do not use assault weapons.[15]  These findings were confirmed in a second study performed by ATF under the Clinton Administration.[16]



1

A researcher hired by the Department of Justice to analyze the effect of the 1994 federal ban on assault weapons confirmed that the firepower of assault weapons gives them greater destructive potential.  His analysis found that:

> attacks with semiautomatics – including assault weapons and other semiautomatics equipped with large capacity magazines – result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms.[17]

This contradicts the National Rifle Association's ("NRA") assertion that there are only "cosmetic" differences between the guns affected by the assault weapon ban and other firearms.

### TEC-9, TEC-DC-9, and TEC-22 Assault Pistol



### Steyr AUG Assault Rifle





2

# Assault Weapons Threaten Law Enforcement and Terrorize Civilians

Since the federal assault weapons ban expired in September 2004, assault weapons have again flooded our streets, causing mayhem.  Law enforcement agencies throughout the United States have reported an upward trend in assault weapons violence, forcing many police departments to invest in expensive assault weapons to keep from being outgunned by criminals.  However, even with greater firepower and the availability of bulletproof vests, many officers have lost their lives to assault weapon attacks.  Hundreds of civilians have also been victimized by assault weapons, many of them in multiple-victim attacks.  In an appendix to this report, we list more than 200 assault weapons shootings and attacks that have occurred since the federal ban expired – and the list does not purport to be comprehensive.  Assault weapons may not be used in the majority of crimes – handguns are – but they are disproportionately used in crime compared to their numbers in circulation.  Moreover, assault weapons have special appeal to terrorists.  They have no place in a civilized society.

## Police Outgunned

Law enforcement has reported that assault weapons are the "weapons of choice" for drug traffickers, gangs, terrorists, and paramilitary extremist groups.  As Los Angeles Police Chief William Bratton said:

> There is a reason that these weapons are so appealing to criminals. They are designed to be easily concealed and kill as many people as possible as quickly as possible. Congress must act and act now to protect the American public and our police officers from these deadly weapons. This is about public safety and law enforcement.[18]

Law enforcement officers are at particular risk from these weapons because of their high firepower, which often leaves them outgunned by criminals.  A researcher for the Department of Justice found that:

> [A]ssault weapons account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.[19]

Indeed, numerous law enforcement officers have been killed with high-firepower assault weapons.[20]  In black sidebars on the following pages, we list ten cases of officers down since the federal assault weapons ban expired in September 2004. Unfortunately, there have been many more.[21]



3

## OFFICERS DOWN

**San Antonio, Texas.  September 8, 2008.**
A man shot two police officers with an assault rifle when the police attempted to arrest him.  A standoff between the suspect and police followed, ending hours later when the suspect shot and killed himself.[22]

**Tucson, Arizona.  June 1, 2008.**
A man shot at several houses with an assault rifle, then lead police in pursuit across Tucson for more than an hour.  During the chase, the gunman shot at police multiple times, fatally shooting one officer and injuring two Sheriff's deputies.[23]

**Philadelphia, Pennsylvania.  May 3, 2008**.
Officer Stephen Liczbinski was shot and killed by an assault rifle as he was responding to a robbery at a Bank of America branch.  Three men robbed the bank and were fleeing when Officer Liczbinski stopped their car and exited his patrol car.  At that time, one of the bank robbers opened fire with an SKS assault rifle, striking Liczbinski numerous times.  One suspect was eventually shot and killed by police and the other two were arrested and charged with murder.[24]

**Miami, Florida.  September 13, 2007**.
Police spotted a vehicle driving erratically and followed it until it stopped in a residential complex.  The suspect got out and hopped a fence to the rear of the home; the officers exited their patrol car and went to the front of the home and were granted permission to search by a female resident.  The suspect grabbed a high-powered, military-style assault rifle and fired at the police officers through a window, killing Officer Jose Somohano.  The suspect then exited the house and shot three other officers as he escaped.  The shooter was caught later that day but would not relinquish his assault rifle so he was shot and killed by police officers.[25]

**Floyd County, Indiana.  June 18, 2007.**
Two officers responded to a domestic disturbance call between a mother and her son.  The officers were speaking with the mother on the driveway when the 15-year-old son ambushed both officers from an upstairs window and shot at them with a high-powered assault rifle.  One officer was killed and the other was seriously wounded.[26]

In addition, police departments have found that the ban's expiration has led to increased criminal access to assault weapons and levels of violent crime, forcing many to outfit their officers with assault rifles of their own.[27]  An informal survey of about 20 police departments conducted by the International Association of Chiefs of Police revealed that since 2004, all of the agencies have either added assault weapons to patrol units or replaced existing weapons with military-style assault weapons.[28]

"We're in an arms race," said Police Chief Scott Knight, chairman of the firearms committee of the International Association of Chiefs of Police.[29]  Indeed, data collected from ATF found that, since 2005, the first full year after the federal ban on assault weapons expired, ATF recorded an 11% increase in crime gun tracings of AK-47-type assault weapons.[30]

The Chicago Police Department reported a 10% increase in the number of assault weapons seized.  Superintendent Phil Cline said, "[t]hese are guns that can shoot up to 30 rounds with a couple pulls of the trigger.  And it puts our police in grave danger out there.  So, we'd like still to see some kind of ban, either by the state or federally."[31]

In 2006, law enforcement in Miami noted the effect of the expiration of the assault weapons ban on the rash of crimes used with these now-legal weapons.



4

County state attorney Katherine Fernandez-Rundle stated that the AK-47 is the "favorite weapon" of dangerous gangs gaining influence in Miami.[32]  Miami-Dade Police Director Robert Parker stated "there was nothing positively gained by the lifting of the ban on assault weapons by the government."[33]

Just over a year later, Miami police said that the amount of assault weapons they recovered, and homicides using assault weapons, had continued to increase.   While just four percent of homicides in Miami in 2004 were committed with assault weapons, in 2007, it was one in five.[34] "It's almost like we have water pistols going up against these high-powered rifles," said John Rivera, president of the Dade County Police Benevolent Association. "Our weaponry and our bulletproof vests don't match up to any of those types of weapons."[35]

The death of Miami police officer Sgt. Jose Somohano - killed by a shooter wielding a MAK-90 three years to the day after the federal ban expired - prompted Miami Police Chief John Timoney for the first time to authorize officers to start carrying assault weapons.  The Chief blamed the expiration of the federal ban for the current "arms race" between police and drug gangs using assault weapons:

> This is really a failure of leadership at the national level.  We are absolutely going in the wrong direction here.  The whole thing is a friggin disgrace.[36]

He added:

> Two or three years ago, we had the lowest homicide rate since 1967 in Miami.  Then the homicides skyrocketed with the availability of AK-47s.  And it went from 3% of all homicides being committed with AKs, up to 9% two years ago, then 18% last year, and this year it is around 20%.  And it's going up…. We're being flooded with these AK-47s."[37]

Shootings involving assault weapons were among the reasons U.S. Attorney R. Alexander Acosta set up an anti-gang task force of federal, state, and local law enforcement officials in Florida in 2007.  Fifteen federal prosecutors were assigned to the effort. Said Acosta of assault weapons:

> These bullets are very powerful: they go through walls, they go through cars, and if you just spray the general vicinity you're going to get innocent bystanders.  A shooting that might have been an injury previously is now a death.[38]

Pittsburgh law enforcement also has noticed an increase in criminal use of assault weapons since the expiration of the ban.  Firearms like the AK-47 and Soviet SKS Carbine have become the weapons of choice for street criminals. Pittsburgh's Assistant Chief of Police William Mullen blamed the expiration of the ban for this



## OFFICERS  DOWN

**Biloxi, Mississippi.  June 5, 2007.**  A gunman with an AK-47 ambushed police officers in a shootout, killing one, then shooting himself. The gunman lured police by firing shots in the neighborhood and waiting.  After shooting one officer, the gunman unloaded an additional round into the patrol car.  The gunman had a cache of backup guns and ammunition waiting inside his home.[39]

**Chantilly, Virginia.  May 8, 2006.**  A teenager with an AK-47 and 5 handguns engaged in a firefight at a police station in suburban Virginia, killing Detective Vicky Armel immediately and wounding two other officers, one of whom, Officer Michael Garbarino, died nine days later from his injuries.[40]

**Las Vegas, Nevada.  February 1, 2006.**  A 22-year-old fired at least 50 rounds from an assault rifle, shooting two Las Vegas police officers and killing one, before being shot and killed by the surviving officer.[41]

**Livingston County, Kentucky.  June 2, 2005.**  A deputy was shot when he responded to a domestic disturbance call placed by a couple's 18-year-old daughter.  When the officer entered the home, a male fired at least 8 rounds from an assault rifle at him, hitting him four times and killing him. The officer was able to fire one round which killed the gunman.[42]

**Ceres, California. January 9, 2005.**  A 19-year-old Marine armed with an SKS assault rifle shot two police officers, killing one, in a gun battle outside a liquor store.[43]

increase and noted, "[t]here's a lot more assault weapons in the area in districts now than ever before."[44]

In Houston, where homicides were up significantly in 2006, Police Chief Harold Hurtt said the AK-47 assault rifle had become "a weapon of choice" among warring gangs.[45]

Palm Beach County police have noted an alarming trend of AK-47 use in violent crimes. Sheriff's Lieutenant Mike Wallace said: "It seems to be the weapon of choice right now.  It's a weapon of war, and the function is to kill and maim.  When somebody gets hit with that, it causes horrendous damage."[46]  Sergeant Laurie Pfiel of the same office said: "[Criminals] don't have .38s anymore.  They have AK-47s."[47]

Martin County Sheriff's Office Captain Ed Kirkpatrick of Florida details the effect of criminal possession of assault weapons on effective law enforcement: "Everyone is taking more precautions.  When you stop a car in the middle of the night, you [didn't] think about it.  Now you do.  These are very powerful weapons."[48]

Franklin County, North Carolina Sheriff Pat Green said: "I've been in this business 25 years, and it's just getting worse," referring to a report that they have been finding more and more assault weapons at crime scenes in the state.[49]  In South Carolina, Lieutenant Ira Parnell, head of the State Law Enforcement Division's firearms lab, noted that investigators are seeing an increase in criminal use of AK-47 and SKS assault rifles.[50]

Fort Wayne, Indiana police reported a significant spike in seizures of assault weapons since the ban expired, from two in 2003, to nine in 2004, eight in 2005, 29 in 2006, and 20 in 2007.  "[W]e're certainly seeing them more and more," said Police Chief Rusty York.[51]  Similarly, Omaha, Nebraska police seized 39 assault rifles in 2007, up from nine in 2006.[52]



6

In San Francisco, Police Officers Association President Gary Delanges said: "Just about every crook you run into out there [who] is a drug dealer or a gang banger's got one of these weapons.  And it's putting our officers' lives at risk."[53]  Deputy Chief Morris Tabak displayed some of the seized assault weapons, including a .22 caliber gun modified to hold 100 rounds.  "These are what could be described only as anti-personnel weapons," he said.[54]


Israeli Military Industries Action Arms UZI Assault Rifle



Civilians Massacred

Assault weapons have been used to perpetrate some of the most horrific crimes, including mass murders, ever committed in the United States.  Some of the most infamous ones are cited in the Executive Summary of this report.  Unfortunately, this gruesome death toll has grown since the expiration of the 10-year federal ban on assault weapons.

As can be seen from the following examples, assault weapons have been used to kill civilians engaged in common activities of life, in all types of circumstances and places.  The Appendix lists more than 200 examples from just the last four years.

- **Teens slaughtered at a swimming hole in Wisconsin**

On July 31, 2008, a man used an assault rifle to massacre a group of teenagers, killing three and injuring a fourth near Niagara, Wisconsin.  The teens were gathered along a river to go swimming when the gunman emerged from surrounding woods and began shooting.[55]



7

- **Apartment employees shot by a disgruntled tenant in Virginia**

On March 19, 2008, in Virginia Beach, Virginia, a man shot five people, killing two, with an AK-47 assault rifle and .9mm handgun before killing himself.  The man was about to be evicted from his apartment and targeted the apartment complex's employees in his attack.[56]

- **Churchgoers gunned down in Colorado**

On December 9, 2007, a man armed with an assault rifle attacked a missionary training center in Arvada and a church in Colorado Springs.  He killed two people and injured two others in Arvada, and killed two and injured three others, including two teenage sisters, in Colorado Springs.  He was injured by a security guard and then shot himself.[57]

- **Mall shoppers massacred in Nebraska, Washington, and New York**

On December 5, 2007, nine people were shot to death and five others were injured after a 20-year-old shooter, armed with a military-style assault rifle, attacked shoppers in a department store in an Omaha, Nebraska mall**.**[58]

On November 20, 2005, a 20-year-old male opened fire in a Tacoma, Washington mall, wounding six.  The shooter took four hostages, all of whom were released unharmed.[59]

On February 13, 2005, a gunman fired more than 60 shots from an AK-47 assault rifle in the Hudson Valley Shopping Mall in Ulster, New York, wounding two and causing tens of thousands of dollars of damage before being apprehended.  A few hours earlier, the shooter had purchased armor-piercing ammunition from a nearby Wal-Mart.[60]

- **Birthday party celebrants spray-fired in Louisiana**

On September 15, 2007, at least 28 bullets were fired from an AK-47 at an outdoor birthday party for five-year-old twins in the courtyard of a housing complex in Kenner, Louisiana.  A 19-year-old was killed and three children were wounded, ages 7, 8 and 13.[61]

- **Pregnant woman and child shot while sleeping in Illinois**

On June 25, 2006, in Calumet City, Illinois, a 22-year old pregnant woman and her three-year old son were shot and killed while they were sleeping when an unknown gunman fired 30 rounds from an AK-47 into their home at 1:15 a.m.[62]



8

- **Family massacred in a home robbery in Indiana**

On June 2, 2006, in Indianapolis, Indiana, seven family members, four adults and three children, were shot and killed in their home by a robber armed with an assault rifle.  Nearly 30 shell casings were found.[63]

- **Two young girls shot in their homes in Illinois**

On March 11, 2006, 10-year-old Siretha White was killed by a shot to her head as she was celebrating her birthday in her living room. A spray of bullets from an assault weapon peppered the house from a nearby fight.[64]

Just over a week earlier, on March 3, 2006, a stray bullet from an assault rifle struck a 14-year-old honor student as she was looking out the window of her home, killing her instantly.[65]

- **College students murdered while camping in Florida**

On January 7, 2006, two college students camping in the Ocala National Forest in Florida were randomly targeted by a man who shot and killed them with a stolen AK-47.[66]

- **Domestic violence leads to mass shootout on courthouse steps in Texas and triple-slaying in Ohio**

On February 25, 2005, in Tyler, Texas, a gunman who was reportedly fighting with his ex-wife over child support for their two youngest children, shot over 50 rounds from an SKS assault rifle on the steps of his local courthouse, killing his ex-wife and a bystander.  The shooter's 23-year-old son and three law enforcement officers were wounded in a shootout.[67]

Just a day earlier in Akron, Ohio, a man shot and killed his girlfriend and her seven-year-old son using an AR-15 assault weapon, then fired more than 100 rounds at a dozen law enforcement officers as he fled the murder scene.  The gunman was arrested the next morning inside the apartment of a Kent State University student, who he also murdered with the AR-15 assault weapon.  Police subsequently seized 21 weapons kept by the suspect, including an Uzi and an AK-47.[68]

- **Hunters gunned down in the woods in Wisconsin**

On November 21, 2004, near Hayward, Wisconsin, a 36-year-old man opened fire with an SKS semiautomatic rifle, killing six members of a hunting party and wounding two after being asked to leave another hunter's property.[69]



9

## Crime Use Disproportionate

The firepower of assault weapons makes them especially desired by violent criminals and especially lethal in their hands.  Prior to the Act, although assault weapons constituted less than 1% of the guns in circulation,[70] they were a far higher percentage of the guns used in crime.   ATF's analysis of guns traced to crime showed that assault weapons "are preferred by criminals over law abiding citizens eight to one…. Access to them shifts the balance of power to the lawless."[71]

In arguing against assault weapon bans, the NRA and its supporters have cited Justice Department studies based on surveys of state and federal prisoners to claim that assault weapons are used in only 2% of crimes nationally.  These studies, however, actually confirm the disproportionate use of assault weapons in crime.  More than 80% of these prisoners used *no firearm* in the commission of their crime.  Within the category of inmates who used guns to commit crimes, semiautomatic assault weapons were actually used in 6.8% of state prosecutions and 9.3% of federal prosecutions.[72]  Both percentages are much higher than the estimated 1% of guns in circulation that are assault weapons.[73]

In addition, research by Dr. Garen Wintemute of the University of California at Davis has found that gun buyers with criminal histories were more likely to buy assault weapons than buyers without such histories.  Wintemute further found that the more serious the offender's crimes, the more likely he is to buy assault weapons.  Assault weapon buyers also are more likely to be arrested after their purchases than other gun purchasers.[74]

## Fabrique Nationale FN/FAL, FN/LAR, and FNC Assault Rifle



## Terrorists Armed

As our nation wages a war on terrorism – at home and abroad – one salient fact is especially unassailable:  terrorists and assault weapons go together.  The assault weapon's capacity to mass-murder within a matter of seconds makes it an ideal weapon for domestic and foreign terrorists alike.  The oft-seen file footage of Osama Bin Laden,



aiming his AK-47 at an unknown target, is now a familiar reminder of the incontrovertible connection between terrorism and assault weapons.

After America's bombing of terrorist camps in Afghanistan after 9/11, the *Chicago Tribune* reported that, among the mounds of rubble found at a training facility in Kabul for a radical Pakistan-based Islamic terrorist organization, was a manual entitled "How Can I Train Myself for Jihad" containing an entire section on "Firearms Training."[75] Tellingly, the manual singles out the United States for its easy availability of firearms and advises al-Qaeda members living in the United States to "obtain an assault weapon legally, preferably AK-47 or variations."  Further, the manual sets forth guidelines for how would-be terrorists should conduct themselves in order to avoid arousing suspicion as they amass and transport firearms.

As the following examples indicate, terrorists have sought and obtained assault weapons in the U.S.

- **Conspirators armed to attack within the United States**

On May 7, 2007, five New Jersey men were indicted for conspiring to attack the United States Army base at Fort Dix, NJ.  Over several months, the conspirators managed to stockpile numerous assault weapons, along with shotguns and various other small arms, and used these weapons in tactical training for their attack.  The men had also arranged to purchase five fully automatic AK-47s and several M-16s at the time of their arrest.[76]

On March 16, 2005, in New York, Artur Solomonyan, an Armenian, and Christian Dewet Spies, of South Africa, were indicted for smuggling a small arsenal of assault weapons into the U.S. from Russia and Eastern Europe.  The two men, who had entered the U.S. illegally, stored these weapons in storage lockers in New York, Los Angeles, and Fort Lauderdale.  When approached by an FBI informant with ties to terrorist organizations, Solomonyan and Spies offered to sell him AK-47s and machine guns, along with RPG-launchers, mines, and other military-grade ordnance.[77]

In late April 2004, Michael J. Breit of Rockford, Illinois, was arrested after firing his AK-47 in his apartment. Federal agents recovered seven guns, more than 1,300 rounds of ammunition, pipe bomb making components and other explosives, a list of government officials and political and public figures with the word "marked" written next to them, and a written plan for 15 heavily armed men to kill 1,500 people at a Democratic presidential event.  Breit's library included *The Turner Diaries*, the anti-government cult novel that inspired Timothy McVeigh, and *Guns, Freedom and Terrorism*, the book authored by NRA CEO Wayne LaPierre, investigators said.[78]

In September 2001, Ben Benu, Vincente Pierre and his wife were arrested in Virginia for illegally buying assault weapons and other guns. The arrests were part of the post-September 11th sweep of terrorism suspects.  They were alleged to be part of a militant group called Muslims of America (also linked to a terrorist group called Al



11

Fuqra).  They bought guns including an SKS assault rifle, a 9mm pistol, and AK-47 ammunition.[79]

### Street Sweeper/Striker 12 Assault Shotgun



- **Arming terrorists and criminals abroad with assault weapons bought here**

On May 6, 2008, Phoenix gun dealer George Iknadosian and two associates were arrested after receiving a shipment of weapons intended for sale to a Mexican drug cartel.  An undercover investigation by ATF indicated that Iknadosian sold at least 650 AK-47 assault rifles for trafficking to Mexico but that the actual number might have been be closer to 1,000.  Such weapons feed the on-going conflict between drug traffickers and Mexican authorities, a conflict which resulted in more than 2,000 law enforcement deaths in an 18-month period.[80]

Over several months in 2006, Adan Rodriguez purchased more than 100 assault rifles, along with many other weapons, from Dallas area gun shops on behalf of Mexican drug traffickers who paid him in cash and marijuana.  Rodriguez's arrest was one of several key arrests in a five-year crack-down on weapons smuggling to Mexico. AK-47's, AR-15's, and other high-powered assault weapons, obtained either at gun shows or through straw purchasers, fuel an on-going war between major Mexican cartels and police and military officials. Over 4,000 people were killed in this drug-related violence during an 18-month period in 2007-2008.[81]

On September 10, 2001, Ali Boumelhem was convicted on a variety of weapons charges plus conspiracy to ship weapons to the terrorist organization Hezbollah in Lebanon. He and his brother had purchased an arsenal of shotguns, hundreds of rounds of ammunition, flash suppressors and assault weapons components at Michigan gun shows. Had it not been for a police informant, these purchases would have eluded any scrutiny.[82]

Stephen Jorgensen purchased hundreds of firearms, including AK-47 clones called MAK-90s, with plans to ship them overseas from Tampa, Florida. Jorgensen bought 800 MAK-90s, loading them on to small planes. US customs officials say the guns were headed to the FARK guerilla movement in Colombia, a group on the U.S. terrorism watch list. Jorgensen was caught because he illegally exported the guns.[83]



In June 2001 federal agents arrested Keith Glaude when he tried to purchase 60 AK-47 assault rifles and 10 machine guns in Florida.  He told authorities that he intended to ship the guns to an Islamic extremist group in his native Trinidad. Previously, that group had acquired over 100 assault weapons in Florida that it used in a 1990 attempt to overthrow the government of Trinidad and Tobago.[84]

- **Using assault weapons in terrorist attacks**

Over a period of weeks in 2002, John Mohammed, a convicted felon, and his juvenile cohort, Lee Boyd Malvo, terrorized the entire metropolitan Washington, D.C. area by engaging in a series of sniper attacks on randomly-selected victims.  In all, they shot 16 victims with a Bushmaster XM-15 E2S .223 caliber semiautomatic assault rifle that one of the snipers allegedly shoplifted from a Tacoma, Washington gun store. Each of the victims was randomly gunned down while going about simple activities of daily living, like closing up a store after work,[85] filling a car with gas at a service station,[86] mowing a lawn,[87] or loading one's car in a mall parking lot.[88]    Both shooters have been convicted of their offenses.

On March 1, 1994, terrorist Rashid Baz opened fire on a van of Hasidic students crossing the Brooklyn Bridge, killing one student and wounding another. Baz used a Cobray M-11 assault pistol in the crime.  He assembled it from a mail-order kit.[89]

On January 25, 1993, Pakistani national Mir Aimal Kasi killed 2 CIA employees and wounded 3 others outside the entrance to CIA headquarters in Langley, Virginia. Kasi used a Chinese-made semiautomatic AK-47 assault rifle equipped with a 30-round magazine purchased from a Northern Virginia gun store.[90]   After fleeing the country, he was arrested in Pakistan in June 1997 and convicted by a Virginia jury in November of that year.[91]



Colt AR-15 Assault Rifle





13

# Assault Weapons Have No Sporting or Self-Defense Purpose

Prior to passage of the federal assault weapons ban, the importation of certain types of assault weapons from overseas was banned during the Reagan and George H.W. Bush Administrations.  These import bans were ordered by ATF under the 1968 Gun Control Act, which bars the importation of guns that are not "particularly suitable for or readily adaptable to sporting purposes."[92]

Under the Reagan Administration, ATF blocked the importation of certain models of shotguns that were not suitable for sporting purposes.  In 1989, during the George H.W. Bush Administration, ATF expanded this list to permanently ban the importation of 43 types of semiautomatic assault rifles that were also determined not to have a sporting purpose.  Later, in 1998, President Clinton banned the importation of 58 additional foreign-made "copycat" assault weapons in order to close a loophole in the existing import ban.[93]

Assault weapons, as opposed to hunting rifles, are commonly equipped with some or all of the following combat features that have no sporting value:

- **A high-capacity ammunition magazine** enabling the shooter to continuously fire dozens of rounds without reloading. Standard hunting rifles are usually equipped with no more than three or four-shot magazines.

- **A folding or telescoping stock**, which sacrifices accuracy for concealability and for mobility in close combat.

- **A pistol grip or thumbhole stock**, which facilitates firing from the hip, allowing the shooter to spray-fire the weapon. A pistol grip also helps the shooter stabilize the firearm during rapid fire.

- **A barrel shroud**, which allows the shooter to grasp the barrel area to stabilize the weapon, without incurring serious burns, during rapid fire.

- **A flash suppressor**, which allows the shooter to remain concealed when shooting at night, an advantage in combat but unnecessary for hunting or sporting purposes. In addition, the flash suppressor is useful for providing stability during rapid fire, helping the shooter maintain control of the firearm.

- **A threaded barrel designed to accommodate a flash suppressor or silencer**.  A silencer is useful to assassins but clearly has no purpose for sportsmen.  Silencers are also illegal.

- **A barrel mount designed to accommodate a bayonet**, which obviously serves no sporting purpose.



# Combat Hardware Commonly Found on Assault Weapons

Assault weapons generally include features that are useful for offensive assaults on people, but have no sporting or self-defense function. Some of these are shown below.



**Flash Suppressor**
Reduces the flash from the barrel of the weapon, allowing the shooter to remain concealed when shooting at night. Also helps stabilize the weapon during rapid fire.

**Barrel Mount**
Designed to accomodate a bayonet.

**AK - 47**

**Barrel Length**
Shorter barrels sacrifice accuracy and range for mobility in close combat.

**Folding Stock**
Sacrifices accuracy for concealablity and mobility in combat situations.

**High Capacity Detachable Magazine**
Permits shooter to fire dozens of rounds of ammunition without reloading.

**Pistol Grip**
Allows weapon to be "spray fired" from the hip. Also helps stabilize the weapon during rapid fire.

**Threaded Barrel**
Designed to accomodate a sliencer.

**Barrel Shroud**
Allows the shooter to grasp the barrel area during rapid fire without incurring serious burns from an over-heated barrel.

**Tec 9**

**High Capacity Magazine Outside Pistol Grip**
Permits a shooter to fire dozens of rounds of ammunition without reloading.



15

- **A grenade launcher or flare launcher**, neither of which could have any sporting or self-defense purpose.

- **A shortened barrel** designed to reduce the length of an assault rifle to make it more concealable.  This reduces accuracy and range.[94]

In addition to utilizing military features useful in combat, but which have no legitimate civilian purpose, assault weapons are exceedingly dangerous if used in self defense, because the bullets many of the weapons fire are designed to penetrate humans and will penetrate structures, and therefore pose a heightened risk of hitting innocent bystanders.  As Jim Pasco, executive director of the Fraternal Order of Police has explained: **"An AK-47 fires a military round.  In a conventional home with dry-wall walls, I wouldn't be surprised if it went through six of them."** [95]  A bullet fired in self-defense that penetrated a home's walls, could strike bystanders in neighboring rooms, apartments, or houses.

High capacity magazines containing more than 10 rounds, which were also banned as part of the Federal Assault Weapons Act, are also not useful for self-defense, as former Baltimore County Police Department Colonel Leonard J. Supenski has testified:

> The typical self-defense scenario in a home does not require more ammunition than is available in a standard 6-shot revolver or 6-10 round semiautomatic pistol.  In fact, because of potential harm to others in the household, passersby, and bystanders, too much firepower is a hazard.  Indeed, in most self-defense scenarios, the tendency is for defenders to keep firing until all bullets have been expended.[96]

Assault weapons were designed for military use.  They have no legitimate use as self-defense weapons.



16

### Sportsman Jim Zumbo Speaks Out
### "Assault" Rifles are "Terrorist" Rifles

A long-standing writer for *Outdoor Life* magazine, Jim Zumbo, created a huge controversy within the gun lobby when he admitted in an online blog that assault rifles have no place as hunting weapons.  Zumbo wrote:

*"I must be living in a vacuum.  The guides on our hunt tell me that the use of AR and AK rifles have a rapidly growing following among hunters, especially prairie dog hunters.  I had no clue.  Only once in my life have I ever seen anyone using one of these firearms.*

*I call them 'assault' rifles, which may upset some people.  Excuse me, maybe I'm a traditionalist, but I see no place for these weapons among our hunting fraternity.  I'll go so far as to call them 'terrorist' rifles.  They tell me that some companies are producing assault rifles that are 'tackdrivers.'*

*Sorry, folks, in my humble opinion, these things have no place in hunting.  We don't need to be lumped into the group of people who terrorize the world with them, which is an obvious concern.  I've always been comfortable with the statement that hunters don't use assault rifles.  We've always been proud of our "sporting firearms.*

*This really has me concerned.  As hunters, we don't need the image of walking around the woods carrying one of these weapons.  To most of the public, an assault rifle is a terrifying thing.  Let's divorce ourselves from them.  I say game departments should ban them from the prairies and woods."[97]*

**Israel Military Industries Action Arms Galil** Assault Rifle





17

# "Dangerous and Unusual Weapons" Are Not Protected by the Second Amendment

The Second Amendment does not provide constitutional protection for military-style assault weapons.  In *District of Columbia v. Heller,*[98] the Supreme Court recently ruled that the Second Amendment protects an individual right to keep and bear arms for self-defense in the home.[99]  However, the Court also went out of its way to indicate that the right is limited in a number of ways.  One limitation, the Court held, is that not all "arms" are protected.

> We also recognize another important limitation on the right to keep and carry arms.  [*U.S. v.*] *Miller* said, as we have explained, that the sorts of weapons protected were those **"in common use at the time."**  We think that limitation is fairly supported by the historical tradition of prohibiting carrying of **"dangerous and unusual weapons."**[100]

Assault weapons are certainly "dangerous and unusual weapons" according to any reasonable analysis of that phrase.  They are military-style offensive weapons designed to slaughter human beings.[101]  This differentiates them from all hunting rifles and shotguns, as well as common handguns, which are often used in crime but have also been used in self-defense.

Moreover, assault weapons have never been "in common use" at ***any*** time.  As semi-automatic versions of machine guns developed for use during the World Wars of the 20th Century, they are a relatively recent invention.  In addition to being banned by the federal government for 10 years, they have been banned in several states.[102]  Plus, ATF has twice concluded, after thorough analyses in 1989 and 1998, that assault weapons have no "sporting purpose."[103]  This conclusion has blocked them from being imported into the United States.

Another factor suggesting that the Second Amendment does not protect assault weapons is that state supreme courts have consistently upheld the constitutionality of assault weapon bans as reasonable regulations designed to protect public safety under broadly-worded right-to-bear-arms provisions in state constitutions.[104]  The *Heller* Court relied on these state constitutional provisions, many of which were adopted in the 18th and 19th centuries, to support its interpretation that the Second Amendment protects an individual right to bear arms.  Courts construing the Second Amendment, post-*Heller,* can be expected to apply a similar standard of review, and uphold a federal assault weapons ban.



# A Strong Federal Assault Weapons Ban Should Be Enacted

In response to mass shootings and mounting public pressure, Congress finally passed a nationwide ban on assault weapons in 1994.  In hearings on the bills, the Senate Judiciary Committee explained the need to:

> address the carnage wrought by deadly military-style assault weapons on innocent citizens and the law enforcement officers who seek to protect us all.  Recent events illustrate again, and with chilling vividness, the tragedy that results from the wide and easy availability of guns with fire power that overwhelm our police, of weapons that have no place in hunting or sport and whose only real function is to kill human beings at a ferocious pace.[105]

Those factors are just as prevalent today.  Indeed, after 9/11, the need may be greater.

Unfortunately, the 1994 statute's scope and effectiveness were limited in several important ways.  First, the law included a 10-year sunset provision allowing it to lapse when it was not re-enacted in 2004.  Second, the law contained a list of assault weapons banned by make and model, but this list was not comprehensive.  Third, the statute also banned guns by reference to their military features, but required guns to have **two** of these features (in addition to being semiautomatic firearms capable of accepting a detachable, high-capacity ammunition magazine) in order to be banned.  The requirement of two military features created a loophole that allowed gun makers to continue manufacturing and selling stripped-down assault weapons.[106]

The result was a piece of legislation that was valuable at keeping many of the most dangerous assault weapons out of criminals' hands, but one that also had an opening for gun manufacturers to evade the ban.  Some manufacturers evaded the ban by developing guns, like the Bushmaster XM-15, Intratec's AB ("After Ban")-10, and Olympic Arms PCR ("Politically Correct Rifle"), with only minor changes in features to banned weapons.

### Effect of the 1994 Ban

According to a study published by the Brady Center in 2004 entitled *On Target: The Impact of the 1994 Federal Assault Weapons Act*, the federal assault weapons ban reduced the incidence of assault weapons use in crime.  In the five-year period (1990-1994) before enactment of the ban, assault weapons named in the Act constituted 4.82% of the crime gun traces ATF conducted nationwide.  In the post-ban period after 1995,[107] these assault weapons made up only 1.61% of the guns ATF has traced to crime – a drop of 66% from the pre-ban rate.[108]  Moreover, ATF trace data showed a steady year-by-year decline in the percentage of assault weapons traced, suggesting that the longer the statute was in effect, the less available these guns became for



19

criminal misuse.  Indeed, the absolute number of banned assault weapons traced also declined.  An initial report issued by the Department of Justice supported these findings.[109]  These findings were further supported in a later report by one of the same researchers.[110]

This analysis was based on crime gun trace data compiled by ATF of more than 1.4 million crime guns recovered across the United States between 1990 and 2001.[111] If the ban had not been enacted, and had the banned assault weapons continued to make up the same percentage of crime gun traces as before the Act's passage,  it was estimated that approximately 60,000 more of the banned assault weapons would have been traced to crime in the 10 years the law was in effect.  Former ATF officials at Crime Gun Solutions, LLC, including the former Special Agent in Charge of ATF's National Tracing Center, analyzed the data for the Brady Center.

*On Target* also looked at the problem of "copycat" assault weapons developed by the gun industry to enable the continued sale of high-firepower weapons.  The study found that industry efforts to evade the federal ban through the sale of these "copycat" weapons was able to diminish, but not eliminate, the 1994 Act's beneficial effects.  Even including copycats of the federally banned guns, there was still a 45% decline between the pre-ban period (1990-1994) and the post-ban period (1995 and after) in the percentage of ATF crime gun traces involving assault weapons and copycat models.

The lesson to be drawn from this study is that a new assault weapons ban should be passed to reduce criminal use of these dangerous weapons, but it should be stronger and more comprehensive than the original federal ban to reduce indirect evasion through the manufacture of "copycat" weapons.  One model for a strong assault weapons ban is the law California enacted in 2000 that bans military-style weapons capable of accepting high-capacity ammunition magazines that have even a single combat feature.[112]  Representative Carolyn McCarthy has introduced similar strong assault weapons legislation in the U.S. House of Representatives.[113]

### Support by Law Enforcement, the Public, and Presidents

The law enforcement community has long supported strong assault weapons bans.  Every major national law enforcement organization in the country supported the Federal Assault Weapons Act and urged its renewal, including the Law Enforcement Steering Committee, Fraternal Order of Police, National Sheriffs' Association, International Association of Chiefs of Police, Major City Chiefs Association, International Brotherhood of Police Officers, National Association of Police Organizations, Hispanic American Police Command Officers Association, National Black Police Association, National Organization of Black Law Enforcement Executives, Police Executive Research Forum, and Police Foundation.

In poll after poll, the American people, regardless of party affiliation, have consistently supported a federal ban on assault weapons.  In an ABC/Washington Post poll conducted in August-September 1999, 77% of adults supported a nationwide ban



20

on the sale of assault weapons.[114]  That same percentage held firm through the end of 2003 when an NBC News/Wall Street Journal poll found that 78% of adults nationwide expressed support for renewing the federal ban.[115]  In September 2004, just after the assault weapons ban expired, a Harris poll found that a substantial majority of Americans, 71%, favored reinstatement of the ban.[116]  As more time has passed without a federal assault weapons ban in effect, support for a ban has grown.  For example, a 2007 poll from Illinois found that 80% of voters favored banning semiautomatic assault weapons.[117]  Newspaper editorial boards have also continued their strong support for getting assault weapons off our nation's streets.[118]

Presidents across the political spectrum have supported an assault weapons ban.  Former Presidents Ford, Carter, and Reagan wrote Congress in support of the 1994 ban to "urge you to listen to the American public and to the law enforcement community and support a ban on the further manufacture of these weapons."[119]  In 2004, Presidents Ford, Carter, and Clinton wrote to urge re-authorization of the ban.[120]  President George W. Bush also stated that he supported the ban and would sign its reauthorization if it passed Congress.

- **Senator Obama Opposes Assault Weapons for Civilians, While Senator  McCain Supports Them**

Of the Presidential candidates, Senator Barack Obama supports banning assault weapons.  He also addressed the issue in his acceptance speech to the 2008 Democratic Convention, saying, "The reality of gun ownership may be different for hunters in rural Ohio than they are for those plagued by gang violence in Cleveland, but don't tell me we can't uphold the Second Amendment while keeping AK-47s out of the hands of criminals."

Senator John McCain has consistently opposed an assault weapon ban, saying it "represented an arbitrary restriction on the constitutional rights of law-abiding citizens."



## Conclusion

Assault weapons are weapons of war that are sought after and used by street gangs, drug dealers, and terrorists, but are of no use to law-abiding persons who own guns for sporting purposes and self-defense.  Law enforcement and an overwhelming majority of the American public realize that these guns have no place in civilian hands, and should be banned.  For 10 years, America attempted to limit the mayhem caused by assault weapons and the high-capacity ammunition magazines that they utilize.  Although the gun industry worked hard to evade the federal ban by marketing assault weapons stripped of enough features to get by, gun makers were not wholly effective at neutralizing the federal ban's effect.  Even accounting for the industry's evasive efforts, the use of assault weapons in crime declined substantially.  Unfortunately, President Bush and the 108th Congress allowed it to lapse.

We need to enact a new, stronger federal assault weapons ban to keep these dangerous guns off the streets – a law that will ban all military-style weapons and with no sunset provision.

The lives of our law enforcement officers and our citizens hang in the balance.

### Beretta AR 70 Assault Rifle





# APPENDIX: Examples of Assault Weapon Violence Since Federal Ban Expired

- **North Tulsa, Oklahoma.  October 6, 2008.**  A man accidentally shot his roommate with an SKS assault rifle.  The victim and shooter were arguing with the victim's estranged wife and another man when the shooter fired warning shots, hitting his roommate inadvertently.[1]

- **Madison, Illinois.  October 6, 2008.**  A 12-year-old boy died after getting caught in the middle of a gunfight. More than 40 shots were fired as a man with an assault rifle exchanged fire with gunmen in cars.[2]

- **Springfield, Missouri.  October 4, 2008.**  A 21-year-old shot two men with an AR-15 Assault Rifle during an argument at a nightclub.[3]

- **Kansas City, Missouri.  October 2, 2008.**  Two men, one armed with an assault rifle, shot at two undercover police officers.  The officers returned fire, injuring the two assailants.[4]

- **Brownsville, Texas.  September 30, 2008.**  Two men armed with an AK-47 Assault Rifle and .38 revolver shot multiple rounds at a group of men gathered outside a home twice in one night.  There was a long-standing argument between the shooters and one of the victims.  Nobody was hurt in either incident.[5]

- **Battle Creek, Michigan.  September 28, 2008.**  A felon with an assault weapon shot two teenagers in retaliation for a shooting several weeks prior.[6]

- **Jackson, Mississippi.  September 26, 2008.**  Two men armed with an assault rifle shot repeatedly at a house, hitting a woman and a one year old boy inside.[7]

- **Lenoir, North Carolina.  September 21, 2008.**  A former police officer and army veteran, who was armed with an assault rifle, shot two sheriff's deputies, killing one of them.[8]

- **San Antonio, Texas.  September 18, 2008.**  A gunman with an AK-47 assault rifle fired more than 15 rounds at a home, hitting a woman sleeping inside twice.[9]

---

[1] *Man accidentally shot by roommate*, KJRH- TV 2, Tulsa, Oklahoma, Oct. 6, 2008.
[2] *12 Year Old Shot Dead In Madison, Illinois Overnight,* ASSOCIATED PRESS, Oct. 7, 2008.
[3] Dirk Vanderhart, *Shooting prompted by conflict over woman, hat*, SPRINGFIELD NEWS-LEADER, Oct. 7, 2008.
[4] *KCMO Officers Fired on with Assault Rifle*, WDAF-TV 4, Kansas City, Missouri, Oct. 2, 2008.
[5] *Police: 10-year grudge prompts downtown shooting*, BROWNSVILLE HERALD, Oct. 3, 2008.
[6] Trace Christenson, *B.C. man faces attempted murder charge*, BATTLE CREEK ENQUIRER, Oct. 2, 2008.
[7] *2 men charged in shooting denied bond*, ASSOCIATED PRESS, Oct. 2, 2008.
[8] Dee Henry, *Armed and dangerous*, HICKORY DAILY HERALD, Sept.  22, 2008.



23

- **Charlotte, North Carolina.  September 15, 2008.**  Two people were sitting in a car outside an apartment building when a man shot at them with an assault rifle.  One person in the car was hit twice and the other individual was injured by shattered glass.[10]

- **Houston, Texas.  September 9, 2008.**  One person died and two were injured in an overnight shooting.  The assailants were carrying several weapons, including an assault rifle.[11]

- **San Antonio, Texas.  September 8, 2008.**  A man shot two police officers with an assault rifle when the police attempted to arrest him.  A standoff between the suspect and police followed, ending hours later when the suspect shot and killed himself. [12]

> **Tulsa, Oklahoma.  September 7, 2008.**  A gunman with an assault weapon opened fire on a car carrying five teenagers home from church.  Four of the five passengers were hit:  Donivan Crutcher died from his wounds, Adrion Crutcher sustained damage to his spinal cord, Jeremy Williams lost the sight in his left eye, and Jahmal Bryant was in the intensive care unit.  Four days later, a suspect was arrested in connection with the shooting.[13]

- **Birmingham, Alabama.  September 5, 2008.**  A man shot and killed his landlord with an SKS assault rifle after the two argued over stolen property.[14]

- **Dayton, Ohio.  August 26, 2008.**  A 31-year-old man sustained severe leg injuries when he was shot multiple times with an assault rifle.[15]

- **Hope Mills, North Carolina.  August 25, 2008.**  An 18-year-old shot a man in the head with an assault rifle.  The victim was leaving the shooter's house by car, along with a woman and baby, when the incident occurred.[16]

- **Miami, Florida.  August 23, 2008.**  An intoxicated customer was shot with an AK-47 assault rifle after being kicked out of a strip club.  The shooter was then shot by another man, who was also carrying an assault rifle.[17]

---

[9] *Shooter Opens Fire On Home, Sleeping Woman Hit Twice*, WOAI – TV 4 San Antonio, Sept. 18, 2008.
[10] *Apartment Complex Evacuated After Double Shooting*, WSOC-TV 9, Sept. 16, 2008.
[11] *Suspects in Triple Shooting Had Assault Rifle, Multiple Weapons*, FOX 26 TV Houston, Sept. 10, 2008.
[12] *SAPD Details Monday Shooting Investigation*, KSAT12-TV, San Antonio, Texas, Sept. 10, 2008.
[13] *Arrest made in deadly drive-by*, Tulsa World, Sept. 12, 2008.
[14] *Landlord Killed After Argument Over Stolen Copper*, NBC13-TV, Birmingham, Alabama, Sept. 8, 2008.
[15] *Man Targeted By Shooter With Assault Rifle*, WHIOTV, Dayton, Ohio, Aug. 27, 2008.
[16] *Three charged in Hope Mills shooting*, The Fayetteville Observer, Aug. 28, 2008.
[17] *2 Dead in Shootout At Strip Club*, NBC6-TV, Miami, Florida, Aug. 23, 2008.



- **Youngsville, North Carolina.  August 22, 2008.**  A 12-year-old boy accidentally shot an 11-year-old neighbor with an AK-47 assault rifle.[18]

- **San Antonio, Texas.  August 20, 2008.**  A man was chased by a group of young men outside an apartment complex and was shot twice with an assault rifle.[19]

- **West Valley City, Utah.  August 15, 2008.**  Three men in an SUV shot at another car with an assault rifle and then led police on a high-speed chase. The police recovered drugs, alcohol, live casings, and an assault rifle from the car.[20]

---

**Newark, New Jersey.  August 14, 2008.** 15-year-old Bukhari Washington was killed after a bullet fired from a Chinese-made Norinco SKS assault rifle struck his bed while he slept.  The gun was fired accidentally when its owner, 19-year-old Terrance Perry, was "fiddling" with it in the apartment below.  Washington was a student at Christ the King Preparatory School and interned at a nursing home for people with HIV and AIDS.[21]

---

- **Birmingham, Alabama.  August 11, 2008.**  A 17-year-old girl was in a car that was sprayed by bullets from an AK-47.  The girl exited the car and tried to run home when she was shot twice, once in the chest and again in her left hand, severing it. She died moments later from her injuries.[22]

- **New Orleans, Louisiana.  August 10, 2008.**  One man was injured and another man died after being shot with an AK-47 assault rifle.[23]

- **New Orleans, Louisiana.  August 8, 2008.**  A gunman carrying an assault rifle shot two people.[24]

- **Niagara, Wisconsin.  July 31, 2008.**  A man with an assault rifle massacred a group of teenagers, killing three and injuring a fourth.  The group was gathered along a river to go swimming when the gunman emerged from surrounding woods and began shooting.[25]

---

[18] *Sheriff says boy, 11, shot with AK-47,* THE NEWS & OBSERVER, Aug. 24, 2008.

[19] *Man Chased Down and Shot to Death,* WOAI-TV, San Antonio, Texas, Aug. 21, 2008.

[20] *Shooting triggers high-speed chase,* THE SALT LAKE TRIBUNE, Aug. 15, 2008.

[21] Jonathan Schuppe, *Senseless Shot, Random Death:  Respected teen is slain in bed, to Newark's grief,* THE STAR-LEDGER, Aug. 15, 2008.

[22] Dan Barry, *Gunshot, then silence:  And the sorrow spreads,* NEW YORK TIMES, Aug. 17, 2008.

[23] Nicole Dungca & Ramon Antonio Vargas, *Two die Sunday in separate slayings,* THE TIMES-PICAYUNE, Aug. 11, 2008.

[24] Leslie Williams, *Mob scene follows double shooting,* THE TIMES-PICAYUNE, Aug. 9, 2008.

[25] *Niagara, Wisconsin shooting suspect caught,* THE CHICAGO TRIBUNE, Aug. 1, 2008.



- **Pittsburgh, Pennsylvania.  July 31, 2008**.  Two men with an assault rifle shot and killed two cousins as they talked outside a home.[26]

- **Orlando, Florida.  July 30, 2008**.  A man with an assault rifle shot and killed two teenagers and another man over stolen property.[27]

- **Dallas, Texas.  July 29, 2008**.  A Dallas Morning News deliveryman was shot multiple times with an assault rifle while delivering papers early in the morning.  His 14-year-old son was with him, but was not injured.[28]

- **Kansas City, Missouri.  July 28, 2008**.  Three men broke into a home and held up the occupants at 1:30 in the morning.  The men were armed with an assault rifle with a bayonet attached.[29]

- **Detroit, Michigan.  July 27, 2008**.  Three people died, including a 17-year-old girl, after being shot with an assault rifle while leaving a bar.[30]

- **Salt Lake City, Utah.  July 26, 2008**.  A 19-year-old airman shot a 22-year-old with an assault rifle after the two argued at a nightclub.  The airman shot another person several months earlier.[31]

- **Chattanooga, Tennessee.  July 24, 2008**. Two men armed with an SKS assault rifle shot a 28-year-old man in the head and back.[32]

> **Oakland, California.  July 23, 2008.**  23-year-old Amanda Hunter was killed when she was accidentally shot in the head with an assault rifle.  Hunter was attempting to remove the weapon from her home when it fell to the ground and fired.  Her boyfriend, the owner of the weapon and a convicted felon, was arrested for weapons related charges including being a felon in possession of a firearm.[33]

- **New Orleans, Louisiana.  July 15, 2008**.  A man died after being shot repeatedly with an AK-47 while asleep in his trailer.[34]

---

[26] Jill King Greenwood, *72 killings set bloody pace in city, county*, PITTSBURGH TRIBUNE-REVIEW, Aug. 2, 2008.

[27] Vincent Bradshaw & Willoughby Mariano, *Flurry of bullets near Orlando playground kills three*, THE ORLANDO SENTINEL, July 31, 2008.

[28] Scott Goldstein, *Father, son survive shooting during News delivery*, THE DALLAS MORNING NEWS, Aug. 7, 2008.

[29] Mike Rice, *Home invasion robbery reported in Gladstone*, KANSAS CITY STAR, July 28, 2008.

[30] Candice Williams, *Girl, 17, two men fatally shot outside Detroit bar*, THE DETROIT NEWS, July 27, 2008.

[31] *Airman's arrest for shooting not his first*, STANDARD-EXAMINER, July 29, 2008

[32] Jacqueline Koch, *Police investigate assault-rifle shooting*, CHATTANOOGA TIMES FREE PRESS, July 25, 2008.

[33] *Oakland woman killed when assault rifle accidentally fires*, July 24, 2008, *available at*: http://www.insidebayarea.com/ci_9977524 (last visited Sept. 26, 2008).

[34] Ramon Antonio Vargas, *AK-47 fire kills sleeping former rapper*, THE TIMES PICAYUNE, July 16, 2008.



- **Daytona Beach, Florida.  July 13, 2008.**  A distraught man fired 30 rounds into the side of an occupied building with an AK-47 assault rifle.[35]

- **Eatonville, Florida.  July 8, 2008.**  A father and son were shot during a robbery with an AK-47 assault rifle.[36]

- **Youngstown, Ohio.  July 8, 2008**.  A man beat up and attempted to shoot his girlfriend with an assault weapon.[37]

- **Edwardsville, Illinois.  July 7, 2008.**  Two 19-year-olds repeatedly shot at a sheriff's deputy with an assault weapon as he pursued them during a car chase.[38]

- **Van Buren, Michigan.  July 6, 2008.**  Two 19-year-olds with an assault rifle shot and killed a man they had argued with earlier.[39]

- **Beaumont, Texas.  July 5, 2008**.  One person was injured when a man shot an assault rifle into a crowd standing outside a nightclub.[40]

- **Dallas, Texas.  July 4, 2008.**  A gunman shot at an apartment building with an AK-47 assault rifle, killing a 17-year-old girl inside. The gunman had been arguing with the girl's stepfather outside.[41]

- **Buena Vista, Michigan.  July 3, 2008**.  A gunman shot an AK-47 multiple times into a car carrying two teenage girls, hitting one in the leg.[42]

---

[35] Julie Murphy, *Outlaws clubhouse shot up.  Police: man fires 30 rounds, accuses members of rape*, DAYTONA BEACH NEWS JOURNAL, July 17, 2008.

[36] *Shooting may be linked to Orlando Incident*, WESH.COM, Orlando, FL, July 8, 2008, *available at:* http://www.wesh.com/print/16817435/detail.html (last visited Sept. 26, 2008).

[37] *Man charged with assault over domestic dispute*, VINDY.COM, July 9, 2008, *available at*: http://www.vindy.com/news/2008/jul/09/man-charged-with-assault-over-domestic-dispute/ (last visited Sept. 26, 2008).

[38] Sandord J. Schmidt, *Two accused of shooting at deputy*, THE TELEGRAPH.COM, July 8, 2008, *available at*:  http://www.thetelegraph.com/news/county_15966___article.html/madison_accused.html (last visited Sept. 26, 2008).

[39] Susan L. Oppat, *2 Van Buren teens charged in slaying*, THE ANN ARBOR NEWS, July, 10, 2008.

[40] Heather Nolan, *Beaumont police seek help in investigating shooting at night club,* BEAUMONTENTERPRISE.COM,  July 7, 2008, *available at*: http://www.beaumontenterprise.com/news/local/beaumont_police_seek_public_s_help_in_investigaton_0 7-07-2008_10_43_01.html (last visited Sept. 26, 2008).

[41] Seema Mathur, *Teen hit by stray bullet at dallas apartment*, CBS11TV.COM, July 6, 2008, *available at*: http://cbs11tv.com/local/dallas.teen.shot.2.764557.html (last visited Sept. 26, 2008).

[42] *Buena Vista gunman fires AK-47, strikes girl*, WNEM.COM, July 8, 2009, *available at*: http://www.wnem.com/print/16821122/detail.html (last visited Sept. 26, 2008).



27

> **Warsaw, North Carolina.  July 2, 2008.**  18-year-old high school football star Derrick Barden was killed after being shot with an AK-47.  Three teenagers  were charged with his death, which occurred as a group of people played with an AK-47 outside of an apartment complex.[43]

- **Adairsville, Georgia.  June 29, 2008.**  A man carrying an AK-47 assault rifle shot a woman twice in the chest during a robbery attempt.[44]

- **Overtown, Florida.  June 28, 2008.**  A 15-year-old died after he was shot with an assault weapon during a drive-by shooting.[45]

- **Mobile, Alabama.  June 27, 2008.**  A 6-year-old boy was shot three times and a man twice when a group of men fired AK-47 and SKS assault weapons at the two cars they were riding in.[46]

- **Powhatan, Virginia.  June 25, 2008.**  A 17-year-old with an assault weapon shot and killed an 18 year old after the two argued.[47]

- **Powhatan County, Virginia.  June 24, 2008.**  An 18-year-old high school student was shot and killed with an assault rifle following an altercation at a gas station.  A juvenile was also wounded in the shooting.[48]

- **Anderson, South Carolina.  June 22, 2008.**  A man fired more than 30 rounds from an assault rifle at a group of people, killing a 16-year-old who was hit three times and wounding a man.[49]

- **Opa Locka, Florida.  June 22, 2008.**  A man shot an AK-47 assault rifle at a business, injuring three people inside.[50]

---

[43] Steve Herring, *Three teens charged in player's shooting*, GOLDSBORO NEWS-ARGUS, July 9, 2008.

[44] Hayden Jennings, *Suspect arrested in Adairsville shooting*, ROMENEWSWIRE.COM, June 30, 2008, *available at*:  http://www.romenewswire.com/index.php/2008/06/30/suspect-arrested-in-adairsville-shooting/ (last visited Sept. 26, 2008).

[45] David Ovalle, *2 deaths raise 2008 homicides to 136*, THE MIAMI HERALD, July 2, 2008

[46] Ron Colquitt, *Four suspects denied bail*, THE  PRESS-RESGISTER, June 28, 2008.

[47] *Authorities:  Powhatan teen's killer was 17-year-old*, INRICH.COM, June 30, 2008, *available at*:  http://www.inrich.com/cva/ric/news.PrintView.-content-articles-RTD-2008-06-30-0195.html (last visited Sept. 26, 2008).

[48] Linda Dunham & Reed Williams, *Suspects in fatal shooting surrender:  Sheriff:  Trio wanted in Powhatan teen's death face murder charges; suspected weapon found*, RICHMOND TIMES-DISPATCH, June 29, 2008.

[49] Craig Stanley, *Westside student, shooting victim, is remembered*, INDEPENDENTMAIL.COM, June 27, 2008, *available at*:  http://www.independentmail.com/news/2008/jun/27/westside-student-shooting-victim-remembered/ (last visited Sept. 26, 2008).

[50] *3 shot in Opa Locka*, NBC6.NET, June 22, 2008, *available at*:  http://www.independentmail.com/news/2008/jun/27/westside-student-shooting-victim-remembered/ (last visited Sept. 26, 2008).

- **Little Rock, Mississippi. June 21, 2008.**  A man died after being shot in the head with an AK-47 assault rifle.  The gunman and victim had argued over a dice game.[51]

- **Elyria, Ohio. June 14, 2008.**  A woman died after being shot with an AK-47 assault rifle during a robbery.[52]

- **Miami, Florida.  June 13, 2008.**  A man shot six people at a graduation party with an assault rifle.  One of the victims died.[53]

- **Lavaca County, Texas.  June 11, 2008.**  A 14-year-old boy died after being accidentally shot by his grandfather with an AK-47 assault rifle.[54]

- **Longview, Texas.  June 10, 2008.**  A man opened fire with an AK-47 assault rifle after arguing with his girlfriend, injuring three people, including a 7-year-old girl.[55]

- **Wilkes, North Carolina.  June 6, 2008.**  A 17-year-old was seriously injured after being shot with an AK-47 assault rifle.  Several teenagers were playing with the gun when it was fired.[56]

- **Shreveport, Louisiana.  June 1, 2008.**  A 25-year-old man was seriously injured after being shot multiple times with an assault rifle while in his car.[57]

- **Tucson, Arizona.  June 1, 2008.**  A man shot at several houses with an assault rifle, then lead police in pursuit across Tucson for more than an hour.  During the chase, the gunman shot at police multiple times, fatally shooting one officer and injuring two Sheriff's deputies.[58]

---

[51] Tim Doherty, *Foxworth man held in slaying* THE HATTIESBURG AMERICAN, June 24, 2008.

[52] Matt Suman, *AK-47 used in deadly Gas USA robbery*, THEMORNINGJOURNAL.COM, June 25, 2008 *available at*:
http://www.zwire.com/site/news.cfm?newsid=19801129&BRD=1699&PAG=461&dept_id=46371&rfi=6 (last visited Sept. 26, 2008).

[53] *Teen shot and killed while leaving graduation party*, WSVN.COM, Miami Gardens, FL, *available at:* http://www.wsvn.com/news/articles/local/MI88522/ (last visited Sept. 26, 2008).

[54] *Teen shot, killed in hunting accident*, KSAT.COM, June 12, 2008, *available at*:
http://www.zwire.com/site/news.cfm?newsid=19801129&BRD=1699&PAG=461&dept_id=46371&rfi=6 (last visited Sept. 26, 2008).

[55] *3 wounded in Longview gunfire*, THE DALLS MORNING NEWS, June 10, 2008.

[56] *Wilkes teens play with rifle, one shot*, GOBLUERIDGE.NET, June 9, 2008, *available at*: http://www.goblueridge.net/index.php?option=com_content&task=view&id=3821&Itemid=1 (last visited Sept. 26, 2008).

[57] Katrina Webber, *Violent weekend in Shreveport leaves 3 with gunshot wounds,* KSLA NEWS 12, June 2, 2008, *available at*:  http://www.ksla.com/Global/story.asp?S=8410023&nav=0RY5RQCK (last visited Sept. 26, 2008).

[58] Brady McCombs & Alexis Huicochea, *Officer on life support after crosstown pursuit,* ARIZONA DAILY STAR, June 2, 2008.

- **New Orleans, Louisiana.  May 26, 2008.**  Two people were injured when a gunman carrying an AK-47 assault rifle fired more than twenty rounds at them.[59]

- **Jackson, Mississippi.  May 26, 2008**.  Five people were shot, one fatally, at a Memorial Day barbecue. A man left the party after an argument and returned with an assault rifle and fired indiscriminately into the crowd.[60]

- **Shreveport, Louisiana.  May 19, 2008**.  A 15-year-old shot a 14-year-old with an assault weapon.[61]

- **Brooklyn, Connecticut.  May 14, 2008**.  A 16-year-old boy with Asperger syndrome shot an assault rifle near a group of people playing basketball in a park who he had argued with earlier.[62]

- **Miami, Florida.  May 14, 2008**.  A man was shot multiple times after his car was sprayed with bullets from an assault weapon.[63]

- **San Jacinto, California.  May 12, 2008**.  A SWAT team was called in after a man and woman armed with assault rifles shot at security guards and then Sheriff's deputies.  The two were killed in the resulting shootout.[64]

- **Raceland, Louisiana.  May 12, 2008.**  Three men attacked three other men in their car, killing all three.  Each victim was shot multiple times with an AK-47 assault rifle.[65]

> **Calabash, North Carolina.  May 8, 2008.**  James Murdock, 25, was killed in a drive-by shooting.  Murdock was sitting in a car  when a dark SUV pulled up and fired at him with an assault rifle.  He died at the scene.  Two men were charged with the murder.[66]

- **San Jacinto, California.  May 8, 2008**.  A 26-year-old man shot at Sheriff's deputies with an assault rifle.  The man was killed when the policemen returned fire.[67]

---

[59] *Pair gunned down by AK-47*, WDSU.COM, May 27, 2008, *available at*: http://www.wdsu.com/news/16401761/detail.html (last visited Sept. 26, 2008).

[60] Kathleen Baydala, *Man arrested in fatal holiday party shooting*, THE CLARION LEDGER, May 28, 2008.

[61] *Arrest made in shooting of 14 year old boy*, KSLA NEWS 12, May 20, 2008, *available at*: http://www.ksla.com/Global/story.asp?S=8350809&nav=menu50_11_16_4 (last visited Sept. 26, 2008).

[62] Dustin Racioppi & Don Bond, *Conn. teen with autism held in assault rifle shooting,* THE METRO WEST DAILY NEWS, May 15, 2008, *available at*: http://www.metrowestdailynews.com/archive/x2118739287/Conn-teen-with-autism-held-in-assault-rifle-shooting (last visited Sept. 26, 2008).

[63] *Man shot with high-powered assault weapon*, LOCAL 10 NEWS, May 14, 2008, *available at:* http:www.local10.com/print/16261614/detail.html (last visited Sept. 29, 2008).

[64] Gillian Flaccus, *Deputies kill 2 in gun battle on Calif. Reservation*, ASSOCIATED PRESS ARCHIVE, May 14, 2008.

[65] Raymond Legendre, *Grand jury to consider Raceland triple-slaying case*, THE COURIER, August 11, 2008.

[66] Shannan Bowen, *Two charged in Calabash murder*, STAR-NEWS, May 20, 2008.



- **Ripon, Wisconsin.  May 6, 2008.**  A 19-year-old accidentally shot and killed an 18-year-old friend with an assault rifle while the two were at a friend's house.[68]

---

**Stafford, Virginia.  May 5, 2008.**  Aaron Poseidon Jackson shot his children, 1-year-old Aaron and 2-year-old Nicole, with a .38 caliber handgun,  then shot their mother, Latasha Thomas, with an AK-47.  When police arrived at the home, Jackson, wearing a bulletproof vest and surrounded by guns and ammunition, was found dead from a self inflicted gunshot wound.[69]

---

- **Burien, Washington.  May 4, 2008.**  A man died when he was shot in the head with an assault rifle after arguing with the shooter in a bar.  The shooter left after the initial incident but returned with the gun.[70]

- **Chicago, Illinois. May 4, 2008.**  A college student died after being shot with an assault rifle when she was caught in crossfire from a gang while in a car.[71]

- **Cordova, New Mexico.  May 4, 2008**.  A man killed his 17-month-old son by shooting him in the chest with an assault rifle.[72]

- **Philadelphia, Pennsylvania.  May 3, 2008**.  A police officer was shot and killed by an assault rifle as he was responding to a bank robbery.  Three men robbed the bank and were fleeing when the officer stopped their car and exited his patrol car.  At that time, one of the bank robbers opened fire with an SKS assault rifle, striking the officer numerous times.  One suspect was eventually shot and killed by police and the other two were arrested and charged with murder.[73]

- **San Antonio, Texas.  May 2, 2008.**  Two teens armed with an assault rifle shot at a man after he tried to stop a fight between groups of teenagers.[74]

---

[67] Jose Arballo Jr., Steve Fetbrandt & Michelle DeArmond, *Soboba member killed in gun battle with deputies*, THE PRESS-ENTERPRISE, May 8, 2008.

[68] *Teen charged with negligent homicide in Ripon shooting posts bond*, NBC 15 NEWS, Feb. 29, 2008, *available at: http://www.nbc15.com/home/headlines/15839617.html* last visited (Sept. 29, 2008).

[69] Keith Epps & Ellen Biltz, *Gunman heavily armed*, FREDERICKSBURG.COM, May 7, 2008, *available at*: http://fredericksburg.com/News/FLS/2008/052008/05072008/377460 (last visited Sept. 26, 2008).

[70] Casey McNerthney, *Man shot after Burien bar fight dies,* SEATTLE POST-INTELLIGENCER, May 5, 2008.

[71] Annie Sweeney & Stefano Esposito, *We had so many plans*, THE CHICAGO SUN-TIMES, May 6, 2008.

[72] Isaac Paul Vasquez, *Police allege father killed son*, KFOXTV.COM, May 4, 2008, *available at*: http://www.kfoxtv.com/news/16157794/detail.html (last visited Sept. 26, 2008).

[73] Joseph A. Gambardello, *Liczbinski suspect's girlfriend to stand trial*, PHILADELPHIA INQUIRER, July 17, 2008; *Officer shot, killed after bank robbery*, NBC 10.COM, May 3, 2008; *See* Sergeant Stephen Liczbinski, www.odmp.org, *available at*:  http://www.odmp.org/officer/19359-sergeant-stephen-liczbinski (last visited Sept. 30, 2008).

[74] *Man shot at after breaking up fight*, KSAT TV 12, May 2, 2008, *available at*: http://www.ksat.com/news/16136482/detail.html (last visited Sept. 26, 2008).



- **Compton, California.  April 29, 2008**. A 19-year-old with an assault rifle exchanged fire with Sheriff's deputies.  No one was injured in the incident.[75]

- **Chicago, Illinois.  April 21, 2008.**  The owner of a plumbing company was shot in the stomach by an employee using an AK-47 and died as a result.  The employee also shot at three police officers later in the evening.[76]

- **York, Pennsylvania.  April 11, 2008.**  A man died after he was shot multiple times with an assault rifle.  The victim and shooter had argued earlier.[77]

- **Miami, Florida.  April 5, 2008**.  A 16-year-old boy died and his mother was injured when they were shot with an assault rifle outside of their home by people they had previously argued with.[78]

- **Sharonville, Ohio.  April 3, 2008.**  A 14-year-old girl was shot in the leg when a man fired an assault weapon randomly into the street.  The bullet went through a car door and hit the victim.[79]

- **Miami, Florida.  April 3, 2008.**  A 20-year-old with over thirteen firearms, including four AK-47s, and more than 5,000 rounds of ammunition, was arrested after threatening over the internet that he was going to carry-out a Virginia Tech style massacre.[80]

- **Tarpon Springs, Florida. March 30, 2008.**  A man fired several rounds from an assault weapon toward another man who was exiting his car.[81]

- **Donaldsonville, Louisiana.  March 22, 2008.**  A five-year-old boy and a man were injured after being shot with an assault rifle on the street.[82]

- **Virginia Beach, Virginia.  March 19, 2008.**  A man shot five people, killing two, with an AK-47 assault rifle and .9 mm handgun before killing himself.  The man was

[75] *Suspect arrested in connection to Compton shootout*, CBS2.COM, May 1, 2008, *available at*: http://cbs2.com/local/Compton.Shooting.Arrest.2.713125.html (last visited Sept. 26, 2008).

[76] Lisa Donovan et. al., *SWAT will go on patrol*, CHICAGO SUN TIMES, Apr. 22, 2008.

[77] Kristin Thorne, *York man killed in shooting involving assault rifle*, ABC27 NEWS, Apr. 11, 2008, *available at:* http://cfc.whtm.com/printstory.cfm?id=510600 (last visited Sept. 29, 2008).

[78] *Teen killed, mother injured in shooting*, NBC6.NET, Apr. 6, 2008, *available at*: http://www.nbc6.net/news/15806302/detail.html (last visited Sept. 26, 2008).

[79] *Teenage girl accidentally shot in Sharonville*, WCPO 9 NEWS, Apr. 3, 2008, *available at:* http://www.wcpo.com/news/local/story.aspx?content_id=c473d379-e54d-4b46-a24d-397f12369149 (last visited on Sept. 29, 2008).

[80] *Police:  Man threatened to re-enact Virginia Tech-style killings*, ASSOCIATED PRESS, Apr. 4, 2008.

[81] *Tarpon Springs man arrested in assault rifle attack*, TBO.COM, Mar. 31, 2008, *available at*: http://suncoastpasco.tbo.com/content/2008/mar/31/tarpon-springs-man-arrested-assault-rifle-attack/ (last visited Sept. 26, 2008).

[82] Samuel Irvin, *Sheriff promises to boost patrols*, THE ADVOCATE, Mar. 27, 2008 *available at*: http://www.2theadvocate.com/news/17040851.html (last visited Sept. 26, 2008).



about to be evicted from his apartment and targeted the apartment complex's employees in his attack.[83]

- **Chattanooga, Tennessee.  March 15, 2008**.  A man fired more than 20 rounds from an assault rifle at another man outside of an apartment building.  The victim was not hit.[84]

- **Baton Rouge, Louisiana.  March 7, 2008.**  A 16-year-old male shot his father in the arm with an AK-47 and was placed in juvenile detention on one count of attempted murder.[85]

- **Kansas City, Missouri.  March 5, 6, 7, 2008**.  One man was killed and three injured during a drive-by shooting of a tire store.  The shooters used two .223-caliber assault rifles, one of which had two large drum magazines and could fire 100 bullets without reloading.  Police pursued the shooters, who were eventually apprehended, and were shot at with the same assault rifles.  The following day, three retaliatory shootings occurred; the day after, one retaliatory shooting occurred in which a woman was shot seven times in the chest and torso.[86]

- **Roanoke, Virginia.  February 29, 2008.**  A car chase ended when the driver pulled over and began shooting at police with an SKS assault rifle.  The police shot and seriously wounded the driver.  None of the police were seriously injured.[87]

**Gainesville, Georgia.  February 19, 2008.**  52-year old Mary Bailey was killed after being shot with an AK-47.  Bailey was sleeping on the sofa when her 19-year old son, Derrick Bailey, cleaned his assault weapon and it fired.  Derrick claims he did not know the weapon was loaded.[88]

- **Marrero, Louisiana.  February 16, 2008.**  An 18-year-old was killed and a 16-year-old wounded after being shot with an AK-47 multiple times.  The shooter fired more than 20 rounds at the two victims.[89]

- **Pulaski, Kentucky.  February 9, 2008**.  A man fired more than 50 rounds from his assault rifle into a mobile home and garage after arguing with the owner.  The homeowner received only minor injuries in the incident.[90]

---

[83] *Gunman in mass shooting identified*, WVEC 13 NEWS, Mar. 20, 2008, *available at:* http://www.wvec.com/news/vabeach/stories/wvec_local_031908_vb_shooting.79dfc43.html (last visited Sept. 29, 2008).

[84] Amy Katcher, *East Lake shootout caught on tape*, WDEF NEWS 12, Mar. 26, 2008, *available at*: http://wdef.com/news/east_lake_shootout_caught_on_tape/03/2008 (last visited Sept. 26, 2008).

[85] *Police and fire briefs*, BATON ROUGE ADVOCATE, Mar. 8, 2008.

[86] Christine Vendel, *Heavy firepower in KC:  Officers outgunned by suspects*, KANSAS CITY STAR, Mar. 8, 2007.

[87] Jessica Marcy, *Shots end U.S. 220 chase in Roanoke County*, WWW.ROANOKE.COM, Mar. 1, 2008, *available at*:  http://www.roanoke.com/news/roanoke/wb/152736 (last visited Sept. 26, 2008).

[88] *Gainesville teen:  'I shot my mother'*, WSBTV.COM, Feb. 19, 2008, *available at*: http://www.wsbtv.com/news/15345707/detail.html (last visited Sept. 26, 2008).

[89] *Harvey teen booked with murder*, THE TIMES PICAYUNE, Feb. 19, 2008.

- **Phoenix, Arizona.  February 9, 2008**.  A 17-year-old died and a 23-year-old was injured after being shot with an assault rifle during an attack by four men.[91]

- **Indianapolis, Indiana.  February 8, 2008.**  An 8-year-old girl died after being shot in the head when someone sprayed her house with bullets from an assault weapon.[92]

- **Macon, Georgia.  February 4, 2008.**  A man fired over 70 rounds from an assault rifle into the front of a house, killing the woman at the door.  The man was looking for the woman's son but shot her after learning he was not at home.[93]

- **Cleveland, Tennessee.  February 2, 2008.**  A 20-year-old man died after being shot several times with an assault rifle as he exited a car.  The gunman shot at the other people in the car and at a nearby house as well.[94]

- **Pittsburgh, Pennsylvania.  January 28, 2008**.  A 12-year-old girl was killed and her mother badly injured after they were shot with an AK-47 assault rifle.  The two were visiting a family member when an assailant sprayed the house with dozens of bullets.[95]

- **Camp Hill, Alabama.  January 22, 2008**.  A 19-year-old shot a 17-year-old in the face with an assault rifle after the two argued over the stolen weapon.[96]

- **Miami, Florida.  January 20, 2008.**  Three cousins were injured when dozens of rounds were fired from an assault rifle into their car.  One of the cousins was left brain-dead.[97]

- **Carmichael, California.  January 16, 2008.**  A 24-year-old man was shot with an assault rifle in a drive-by shooting and died.[98]

---

[90] *Eubank man jailed following hail of bullets fired into residence*, WKYT.COM, Feb. 9, 2008, *available at*: http://www.wkyt.com/home/headlines/15476381.html (last visited Sept. 26, 2008).

[91] David Biscobing, *Teen gunned down in Phoenix with rifle*, EAST VALLEY TRIBUNE, Feb. 9, 2008.

[92] *Community mourns eight-year-old's shooting death*, WTHR 13 NEWS, Feb. 26, 2008, *available at*: http://www.wthr.com/Global/story.asp?S=7853369 (last visited Sept. 29, 2008); *Man charged in 8-year-old's shooting death,* WTHR 13 NEWS, Feb. 27. 2008, *available at*: http://www.wthr.com/Global/story.asp?s=7865668  (last visited Sept. 29, 2008).

[93] Ashley Tusan Joyner, *Woman died after man sprays home with bullets*, THE MACON TELEGRAPH, Feb. 6, 2008.

[94] Ryan Harris, *Bradley murder victim identified*, CHATTANOOGA TIMES FREE PRESS, Feb. 5, 2008.

[95] Michael Hasch, *Girl, 12, killed as 40 shots blast into North Side home*, THE PITTSBURGH TRIBUNE-REVIEW, Jan. 29, 2008.

[96] *Teen shot in face by assault rifle*, WTVM.COM, Jan. 22, 2008, *available at*: http://www.wtvm.com/Global/story.asp?S=7757100&nav=menu91_2 (last visited Sept. 26, 2008).

[97] David Ovalle, *Little Haiti: Gun violence tears family*, THE MIAMI HERALD, January 24, 2008.

[98] *Two Carmichael killings may be connected*, KCRA.COM, Jan. 16, 2008, *available at*: http://www.kcra.com/news/15067608/detail.html (last visited Sept. 26, 2008).



34

- **Louisville, Kentucky.  January 14, 2008**.  A man carrying an assault rifle fired several rounds at a police officer during a traffic stop.  The officer was not injured.[99]

- **North Miami Beach, Florida.  January 8, 2008.**  An off-duty Miami police detective was killed by a man who shot him with an AK-47 assault rifle as he sat in his car.[100]

- **Merrillville, Indiana.  December 31, 2007.**  A 25-year-old man shot a 20-year-old man with an assault rifle. The shooter asked the victim and another man to leave his apartment after they argued, then followed them outside and shot the victim multiple times.[101]

> **Little Rock, Arkansas.  December 29, 2007.**  6-year-old Kamya Weathersby was shot at least 7 times by gunmen outside her home as she was lying in bed.  Police believe  at least one assault rifle was used to fire 50 or more rounds at her home. The following day,  Kamya died when her family made the decision to take her off life support. [102]

- **Ozark, Alabama.  December 29, 2007.**  An 18-year-old man repeatedly shot a 22-year-old man using a SKS assault rifle after the two argued. The 22-year-old died from his injuries.[103]

- **Southington, Connecticut.  December 24, 2007.**  One man shot another in the head with an assault rifle, killing him, after the two argued.[104]

- **Arvada & Colorado Springs, Colorado.  December 9, 2007**.  One man with an assault rifle attacked a missionary training center in Arvada and a church in Colorado Springs.  He killed two people and injured two others in Arvada, and killed two and injured three others in Colorado Springs.  He died after being shot by a security guard and then shooting himself.[105]

---

[99] *4th arrest made in SWAT case*, WLKY.com, Jan. 14, 2008, *available at*: http://www.wlky.com/news/15048297/detail.html (last visited Sept. 26, 2008).
[100] David Quinones, *Dispute boils over mourning of detective*, MIAMI HERALD, Jan. 19, 2008; *See* Detective James Walker, www.odmp.org, *available at*:  http://www.odmp.org/officer/19128-detective-james-walker (last visited Sept. 30, 2008).
[101] *M'ville man charged in shooting*, THETIMESONLINE.COM, Jan. 4, 2008, *available at*: http://www.thetimesonline.com/articles/2008/01/04/news/lake_county/doc88e35a05299f4540862573c600061f09.txt
(last visited Sept. 26, 2008).
[102] *Girl, 6, dies after being shot 7 times – Ark. police search for suspects, motive,* MEMPHIS COMMERCIAL APPEAL, Jan. 1, 2008.
[103] *Ozark shooting suspect surrenders*, PRESS-REGISTER, Jan. 1, 2008.
[104] Chris Velardi, *$2million bond for Southington murder suspect*, WTNH.COM, Jan. 2, 2008, *available at:* http://www.wtnh.com/global/story.asp?s=7566985 (last visited on Sept. 29, 2008).
[105] Erin Emery, *Report details church shooting, the document chronicles the days leading up to the Dec. 9 deaths of four young people*, DENVER POST, Mar. 13, 2008.



- **Omaha, Nebraska.  December 5, 2007**.  Nine people were shot to death and five others were injured after a 20-year-old shooter, armed with a military-style assault rifle, attacked shoppers in a department store in a Nebraska mall.[106]

- **Arden, South Carolina. December 4, 2007**.  One man was injured when he was shot at close range in the leg and foot with an AK-47 assault rifle.[107]

- **Memphis, Tennessee.  November 13, 2007.**  One man was killed and another injured after an unidentified man opened fire on a grocery store parking lot with an AK-47 assault rifle.[108]

- **Vallejo, California. November 4, 2007**.  One man died after being shot several times with an assault rifle while arguing with two other men. Witnesses of the shooting pursued the shooters by car and were also shot at, although none were injured.[109]

- **Crandon, Wisconsin.  October 7, 2007.**  An off-duty Sheriff's deputy killed six and wounded a seventh person when he burst into a pizza party and started shooting with an assault weapon.  The shooter later killed himself as the police closed in.[110]

- **West Palm Beach, Florida.  September 18, 2007**.  Two men were killed and another injured when they were attacked in their car by two men carrying a handgun and an assault rifle.  The suspects shot at the police as they escaped.[111]

- **New Orleans, Louisiana.  September 15, 2007**.  At least 28 bullets were fired from an AK-47 at an outdoor birthday party for 5-year-old twins in the courtyard of a public housing complex.  A 19-year-old was killed and three children were wounded, ages 7, 8 and 13.[112]

- **Miami, Florida.  September 13, 2007**.  Police spotted a vehicle driving erratically and followed it until it stopped in a residential complex.  The driver got out and hopped a fence to the rear of the home; the officers exited their patrol car and went to the front of the home where they were granted permission to search by a female resident.  The suspect grabbed a high-powered, military-grade rifle and fired at the police officers through a window, killing one officer, then exited the house and shot

---

[106] *The American Way*, Register-Guard, Dec. 17, 2007.

[107] Clarke Morrison, *Arden man gets 12 years for assault rifle shooting*, The Citizen-Times, Aug. 8, 2008.

[108] Chris Conley & Jody Callahan, *Drive-by shooting kills 1—police search for two gunmen in B-52 Market incident*, Memphis Commercial Appeal, Nov. 13, 2007.

[109] Henry K. Lee, *Two suspects sought in Vallejo homicide*, SFGate.com, Nov. 10, 2007, *available at*: http://www.sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/11/10/BAUJT9HSA.DTL (last visited Sept. 26, 2008).

[110] Todd Richmond, *Crandon mass murder-suicide:  Questions linger in killing of seven, officials tight-lipped despite suspect's death*, St. Paul Pioneer Press, Dec. 4, 2007.

[111] *2 killed in West Palm shootings, suspects escape on foot after one fires at police officer pursuing them*, South Florida Sun-Sentinel, Sept. 19, 2007.

[112] Mary Sparacello, *Housing Authority reining in parties, Kenner shooting leads to regulations,* The Times Picayune, Oct. 11, 2007.

three other officers as he escaped.  The shooter was caught later that day but would not relinquish his assault rifle so he was shot and killed by police officers.[113]

- **Aiken, South Carolina. September 12, 2007.**  A 20-year-old man died after being shot multiple times with an assault rifle by a 19-year-old when they were having an argument.[114]

- **Rome, Georgia.  August 26, 2007.**  One man was killed and a woman seriously injured inside their home.  The shooter was found with an AK-47, from which several clips of ammunition had been emptied, and a 12-gauge shotgun when police arrived at the scene.[115]

- **Treme, Louisiana.  August 13, 2007.**  Two men were killed and another was seriously wounded as a shooter sprayed the crowd with an AK-47 assault rifle at a recreational league basketball game.[116]

- **Dallas, Texas.  August 12, 2007.**  One person was killed and three others wounded in a shooting outside a poetry/coffee shop.  The gunman, who used an assault rifle, fled the scene.[117]

**Hialeah, Florida.  August 5, 2007.**  Eric Lopez, 38, was fatally shot in his home, and his wife, Olga, was shot in the leg.  The incident began around noon when gunmen entered their home and began firing with a military-style semi-automatic weapon.  Police arrested four people in connection with the shooting.[118]

- **Oakland, California.  August 4, 2007.**  A gunman with an assault rifle unleashed a barrage of bullets at a van parked on a North Oakland street, killing one man who lived nearby and wounding his brother and their friend. The gunman then fled.[119]

- **Orangeburg, South Carolina. July 19, 2007.**  A man brandishing an assault rifle shot a woman once in the leg.  The man was charged with assault and battery with intent to kill.[120]

---

[113] David Ovalle et al., *The murder and the manhunt started in a South Miami-Dade townhouse, zigzagged…,* MIAMI HERALD, Sept. 15, 2007.

[114] Michelle Guffey, *Police seek murder suspects*, THE AUGUSTA CHRONICLE, Sept. 19, 2007.

[115] *Man goes on shooting rampage, kills one, severely injures another*, ROMENEWSWIFE.COM, *available at:* http://www.romenewswire.com/index.php/2007/08/26/police-on-scene-of-possible-murder-in-west-rome/ (last visited Sept. 29, 2008).

[116] Richard A. Webster, *Soaring murder rate in New Orleans undermines recovery strides*, NEW ORLEANS CITY BUSINESS, Aug. 20, 2007.

[117] Marissa Alanis, *Peacekeeper is killed outside club, police say:  Dallas 3 others injured as gunman fires assault rifle into crowd*, DALLAS MORNING NEWS, Aug. 13, 2007.

[118] Laura Figueroa, *Hialeah:  4 charged in 'crime of passion'*, MIAMI HERALD, Aug. 7, 2007.

[119] *Two more slain in Oakland weekend violence*, THE OAKLAND TRIBUNE, Aug. 5, 2007.

[120] Richard Walker, *Woman recovering after being shot with AK-47*, THE TIMES AND DEMOCRAT, July 20, 2007.

- **North Augusta, South Carolina.  July 15, 2007.**  Twenty-one bullets were shot from an assault rifle into a home, hitting a 14-year-old boy sleeping inside.  The bullets reportedly came from a car outside, tore through a foosball table, couch, and the wall to a back bedroom, where they pierced furniture, blasted a TV to the floor, and hit the boy.[121]

- **Floyd County, Indiana.  June 18, 2007.**  Two officers responded to a domestic disturbance call between a mother and her son.  The officers were speaking with the mother on the driveway when the 15-year-old son ambushed both officers from an upstairs window and shot at them with a high powered assault rifle.  One officer was killed and the other was seriously wounded.[122]

- **Biloxi, Mississippi.  June 5, 2007.**  A gunman with an AK-47 ambushed police officers in a shootout, killing one, then shooting himself. The gunman lured police by firing shots in the neighborhood and waiting.  After shooting one officer, the gunman unloaded an additional round into the patrol car.  The gunman had a cache of backup guns and ammunition waiting inside his home.[123]

- **Dallas, Texas.  March 23, 2007.**  A Dallas police officer was killed when he was struck in the neck and chest by an assault weapon as he approached a suspect's car.[124]

- **Metairie, Louisiana.  February 27, 2007.**  Two AK-47s were among several guns fired into a Metairie apartment that resulted in four men being shot, one fatally and another critically.[125]

- **Philadelphia, Pennsylvania. February 13, 2007.**  A gunman used an assault weapon to kill 3 and wound another before killing himself.[126]

- **Palm Beach County, Florida**.  January 1, 2007.  An 8-month-old baby boy was shot in his car seat after his mom parked in front of a drug house and rivals opened fire with assault rifles.[127]

- **New Bedford, Massachusetts.  December 12, 2006.**  Three people were killed and two police officers were injured when a gunman opened fire at the Foxy Lady strip

---

[121] Meredith Anderson, *North Augusta 14-year-old shot*, WRDW 12 NEWS, July 16, 2007, *available at:* http://www.wrdw.com/home/headlines/8526357.html (last visited on Sept. 29, 2008).

[122] *See* Officer Frank Charles Denzinger, odmp.org, *available at:* http://www.odmp.org/officer/18926-officer-frank-charles-denzinger (last visited Sept. 30, 2008).

[123] Ryan LaFontaine, *Gunman had a large arsenal, Police say Asher used AK-47*, SUN HERALD, June 9, 2007.

[124] Tanya Eiserer et al., *Dallas officer dies after shootout*, THE DALLAS MORNING NEWS, Mar. 24, 2007.

[125] Michelle Hunter, *Cops say victim not innocent bystander,* THE TIMES PICAYUNE, Feb. 28, 2007.

[126] Larry King & Joseph A. Gambardello, *Investor rage, lethal trap*, PHILADELPHIA INQUIRER, Feb. 14, 2007.

[127] Rochelle E.B. Gilken, *County has most homicides since '89*, PALM BEACH POST, Jan. 6, 2008.



club; the shooter was fatally shot. One of the weapons used was described as an AR-15.[128]

- **Westboro, Massachusetts.  December 2, 2006.**  Police seized a semiautomatic assault rifle from the bedroom closet of a young Shrewsbury man who posted threatening internet messages and who claimed to admire one of the Columbine High School killers.[129]

- **Newport, Kentucky.  November 19, 2006.**  A fight at a nightclub led to four people being shot that evening.  A 23-year-old was shot several times and left for dead on a bridge.  An hour later, police found a 20-year-old man shot dead in his vehicle.  Two other people were taken to the hospital with gunshot wounds and police recovered casings from an assault weapon.[130]

- **Chicago, Illinois.  October 30, 2006.**  Members of the New Breed Street gang shot at Chicago police officers with an AK-47 from their car, injuring one officer.  One gang member was killed and another critically wounded in the shoot-out.[131]

- **Palm Beach County, Florida.  August 15, 2006.**  A 50-year-old landscaper was shot at least 15 times as he walked toward a house to collect money for completed yard work.  The shooters used assault weapons in the drive-by and police say the shooters mistook the victim for a gang member.  [132]

- **Chapel Hill, North Carolina, July 29, 2006.**  A gunman with an assault rifle shot a man multiple times outside a nightclub, killing him.  The shooter fled in a getaway car and later turned himself in.[133]

---

[128] Jessica Heslam, *Strip club gunman at 'crossroads', killer bid farewell in cell phone messages*, BOSTON HERALD, Dec. 14, 2006.

[129] Kevin Keenan, *State police seize weapons,* WORCESTER TELEGRAM & GAZETTE, Dec. 2, 2006.

[130] *A fight at a Northern Kentucky nightclub lead to a wild shooting spree*, WLEX TV 18, Lexington, KY, Nov. 19, 2006, *available at*:  http://www.lex18.com/Global/story.asp?S=5704257&nav=EQ1p (last visited Oct. 2, 2008).

[131] Lisa Donovan et al., *Shoot-out 'looked like a movie':  Cops kill 2 men they say were about to execute gang rivals*, CHICAGO SUN TIMES, Oct. 31, 2006.

[132] Tim Collie, *Two members offer a look inside a South Florida gang*, SOUTH FLORIDA SUN-SENTINEL; July 22, 2007; Jerome Burdi, *'Innocent victim' killing unsolved, family awaits arrest in 2006 Boynton drive-by shooting*, SOUTH FLORIDA SUN-SENTINEL, Aug. 20, 2007.

[133] *Chapel Hill nightclub under review after fatal shooting*, WRAL.COM, July 31, 2006, *available at:* http://www.wral.com/news/local/story/1056918/ (last visited Sept. 29, 2008).



> **St. John the Baptist Parish, Louisiana.  June 27, 2006.**  25-year-old Kelvin Thomas Jr. died after being shot in the abdomen with an assault rifle.  Alonzo Bolden, 20, was arrested and booked with second-degree murder in connection with the shooting.  Police believe the two men were engaged in an argument that was part of a long-running feud and ended with Bolden firing multiple shots at Thomas at close range.  Thomas had three young children.[134]

- **Calumet City, Illinois. June 25, 2006.**  A 22-year-old pregnant woman and her 3-year-old son were shot and killed while they were sleeping when an unknown gunman fired 30 rounds from an AK-47 into their home at 1:15 a.m.[135]

- **St. John the Baptist Parish, Louisiana.  June 20, 2006.**  A man who had killed a deputy police officer and injured another during a crime spree broke into the house of an 81-year-old man and held him hostage with an AK-47 until he eventually gave himself up and released the hostage.[136]

- **Metairie, Louisiana.  June 15, 2006.**  Police attempted to serve a man with an emergency committal order but the man barricaded himself in his home and engaged in a 12-hour standoff with police.  Seven hours into the standoff, the man shot and wounded two Sheriff's deputies with an assault rifle.[137]

- **Reno, Nevada.  June 12, 2006.**  An owner of a gun shop, with a license to carry concealed weapons and access to a cache of guns, stabbed his wife to death and then shot the family court judge presiding over his divorce with a Bushmaster .223 high-powered assault rifle with sniper capabilities.  The judge survived.[138]

- **Howard County, Maryland. June 8, 2006.**  County police officers were shot at by a man wielding an assault rifle whom they were attempting to serve a warrant on.[139]

- **Norman, Oklahoma.  June 7, 2006.**  Two men opened fire on a Native American gathering of over 300 with an SKS assault rifle, killing one man and injuring another.[140]

---

[134] Allen Powell II, *Garyville man held in fatal shooting, Deputies suspect long-running feud*, THE TIMES PICAYUNE, June 27, 2006.

[135] Tom Rybarczyk, *Calumet City reels after spray of bullets*, CHICAGO TRIBUNE, June 26, 2006.

[136] Allen Powell II, *Mourners salute slain St. John deputy*, NEW ORLEANS TIMES PICAYUNE, June 21, 2006.

[137] Michelle Hunter & Walt Philbin, *2 deputies wounded in Metairie standoff*, THE TIMES PICAYUNE, June 16, 2006.

[138] FOX NEWS, June 24, 2006.

[139] Tyrone Richardson, *Man found guilty of murder attempt*, BALTIMORE SUN, Oct. 29, 2006.

[140] Tom Blakely, *Pair arraigned in Sunday crowd shooting*, THE NORMAN TRANSCRIPT, June 7, 2006.



- **Miami, Florida.  June 6, 2006.**  Three men were killed and another injured when the van they were riding in was shot numerous times by assault weapons.  About 50 rounds were fired into the van.[141]

- **Indianapolis, Indiana.  June 2, 2006.**  Seven family members, four adults and three children, were shot and killed in their home by a robber armed with an assault rifle. Nearly 30 shell casings were found.[142]

- **San Diego, California.  June 2, 2006.**  A 17-year-old was wounded in an accidental workplace shooting when the teen's co-worker brought an AK-47 to work and was unaware that there was a live round inside the rifle's chamber.[143]

- **New Milford Township, Pennsylvania.  May 27, 2006.**  Two brothers were camping with their wives and children when they were awakened by gunshots coming from a neighbor's property at 3:00 a.m.  The brothers knew the neighbor so they went to his house to ask him to stop shooting. The neighbor, armed with a shotgun, told the two brothers to leave and then told his stepson to pick up an AR-15 rifle.  The brothers were both shot in the stomach and wounded severely.[144]

- **West Palm Beach, Florida.  May 17, 2006**.  Two men carrying AK-47 assault rifles ordered a man out of his car at gun-point, mugged him, and ripped off his pants.[145]

- **Kingston, Tennessee.  May 14, 2006.**  A deputy sheriff and another individual were shot and killed by high-powered assault rifles.  The deputy had 33 gunshot wounds.[146]

- **Port Salerno, Florida.  May 12, 2006.**  A deputy sheriff was shot and wounded with an AK-47 assault rifle.[147]

---

[141] David Ovalle, *Ambush takes lives of 3 men*, MIAMI HERALD, June 6, 2006.

[142] Ashley M. Heher, *Suspect in slaying of 7 family members surrenders / Indianapolis police say he had nowhere else to go*, HOUSTON CHRONICLE, June 4, 2006.

[143] Debbi Farr Baker, *Man accidentally shoots co-worker*, SAN DIEGO UNION-TRIBUNE, June 3, 2006.

[144] Nyier Abdou, *Somerville brothers still hospitalized after shooting:  Pa. Man charged with assaulting rescue squad members during family camping trip,* THE STAR-LEDGER, May 31, 2006.

[145] *Digest*, SOUTH FLORIDA SUN-SENTINEL, May 17, 2006.

[146] Duncan Mansfield, '*Anti-government' man sought in ambush of Tennessee deputy*, CHARLESTON GAZETTE, May 13, 2006.

[147] Leon Fooksman, *Police fearful of violent crime trend:  AK-47 shootings*, SOUTH FLORIDA SUN-SENTINEL, May 13, 2006.

**Fort Worth, Texas.  May 9, 2006.**  16-year-old Derick Giles, an innocent bystander, was killed after being shot in the abdomen in the crossfire of a gang shooting outside a convenience store.  Five minutes later, one man was shot in the leg and another in the foot during a second drive-by shooting.  One hour and half later, a 50-year-old woman was shot in the shoulder by gunfire from a high-powered assault weapon as she stood in her kitchen.[148]

- **Chantilly, Virginia.  May 8, 2006.**  A teenager with an AK-47 and 5 handguns engaged in a firefight at a police station, killing a female detective immediately and wounding two other officers, one of whom died nine days later from his injuries.[149]

- **Los Angeles, California.  May 8, 2006.**  Police arrested a man and found over 20 assault weapons in his home after the man fired multiple rounds in the air while driving through his neighborhood with a semiautomatic pistol.  The man had his young son in the car with him.[150]

- **Oskaloosa, Iowa.   May 5, 2006**.  A 17-year-old shot his 13-year-old friend in the chest with a military-style rifle and then shot himself.[151]

- **West Palm Beach, Florida.  April 28, 2006.**  Shots were fired into an apartment at 6:00 in the morning, hitting one man in the right leg and left knee.  Seventeen shell casings from an AK-47 were found at the scene.[152]

**West Palm Beach, Florida.  April 27, 2006.**  An AK-47 was used to shoot 24-year-old David Paulk and his 16-year-old sister.  Mr. Paulk was critically injured and died four days later.  The next day, the alleged gunman, Brandon Williams, was shot in the back with an assault rifle and taken to the hospital, where he was treated and left before police  were able to find cause to arrest him.[153]  However, he was arrested soon after.[154]

---

[148] Deanna Boyd, *Teen killed in shooting at convenience store,* FORT WORTH STAR-TELEGRAM, May 9, 2006.

[149] Ian Urbina, *Fatal police station attach shocks tranquil community,* NEW YORK TIMES, May 10, 2006; *Officer Killed,* BOSTON GLOBE, May 18, 2006.

[150] *Man said to be on 'edge of Armageddon',* LONG BEACH PRESS-TELEGRAM, May 9, 2006.

[151] AP-News Agenda, Broadcast News, May 5, 2006.

[152] *Police Blotter,* PALM BEACH POST, Apr. 29, 2006; Jerome Burdi, *Rash of shootings hits city in 2 days,* SOUTH FLORIDA SUN-SENTINEL, Apr. 29, 2006.

[153] Jerome Burdi, *Rash of shootings hits city in 2 days,* SOUTH FLORIDA SUN-SENTINEL, Apr. 29, 2006; Jerome Burdi, *New task force seeks man suspected in 2 shootings*, SOUTH FLORIDA SUN-SENTINEL, Apr. 30, 2006; *Police Blotter,* PALM BEACH POST, Apr. 30, 2006.

[154] Nirvi Shah, *West Palm slaying suspect jailed after Pensacola stop,* PALM BEACH POST, May 8, 2006.



- **Oakland, California.  March 19, 2006.**  A gunman with an AK-47 opened fire on an apartment building, filling it with bullets and killing a 49-year-old man.[155]

- **Lake Worth, Florida.   March 17, 2006.**  A man angry over an argument with a woman, shot the woman and her roommate with an AK-47 and left the victims in the doorway of their home.[156]

- **Chicago, Illinois.  March 11, 2006.**  A 10-year-old girl was killed by a shot to her head as she was celebrating her birthday in her living room. A spray of bullets from an assault weapon peppered the house from a nearby fight.[157]

- **Chicago, Illinois.  March 3, 2006.**  A stray bullet from an assault rifle struck a 14-year-old honor student as she was looking out the window of her home, killing her instantly.[158]

- **Las Vegas, Nevada.  February 1, 2006.**  A 22-year-old fired at least 50 rounds from an  assault rifle, shooting two Las Vegas police officers and killing one, before being shot and killed by the surviving officer.[159]

- **Brooklyn, New York.  January 20, 2006.**  A man was arrested after firing at least two rounds from an Uzi at two members of the New York Police Department.[160]

- **Ocala, Florida.  January 7, 2006.**  Two college students who were camping in the Ocala National Forest were randomly targeted by a man who shot and killed them with a stolen AK-47.[161]

- **Indianapolis, Indiana.  January 2, 2006.**  A man dubbed the "Tec-9 Robber" was arrested after being wanted in connection with as many as 23 robberies in four months of fast food restaurants, convenience stores, and gas stations.[162]

- **Caddo Parish, Louisiana.  January 1, 2006.**  A 19-year-old was arrested after he was found hiding in an alley with an assault weapon.  He faces two counts of aggravated assault on a police officer and potential charges for riddling a house with bullets, injuring a man.[163]

---

[155] Henry K. Lee, *Oakland:  Two new slayings brings homicide total to 30*, SAN FRANCISCO CHRONICLE, Mar. 21, 2006.

[156] Kevin Deutsch, *Man arrested in assault-rifle shooting*, PALM BEACH POST, Mar. 17, 2006.

[157] *Gov. Blagojevich, victims' families, advocates urge lawmakers in Springfield to pass statewide assault weapons ban*, US STATE NEWS, Mar. 23, 2006.

[158] Charles Sheehan, *Neighborhood buries another child*, CHICAGO TRIBUNE, Mar. 19, 2006.

[159] Omar Sofradzija, *Processions to honor Prendes*, LAS VEGAS REVIEW-JOURNAL, Feb. 7, 2006.

[160] Veronika Belenkaya et al., *Uzi maniac shot by cops.  Tied to 3 attacks on city's finest*, NEW YORK DAILY NEWS, Jan. 22, 2006.

[161] Stephen Kudak & Sarah Lundy, Cops:  *Suspect admits killing 2 campers in Ocala forest*, ORLANDO SENTINEL, Jan. 28, 2006.

[162] CBS 8 WISH, Indianapolis, IN, Jan. 5, 2006.

[163] CBS 12 KSLA, Shreveport, LA, Jan. 2, 2006.



43

- **Harper Woods, Michigan.  December 31, 2005.**  A 40-year-old man was shot sixteen times with an assault weapon while standing on his front porch around 3:15 p.m. and died from his injuries.  His wife and daughters were in the house at the time of the shooting.  His murder, occurring on the last day of the year, was the first murder of 2005 in his town.[164]

- **Miami, Florida.  December 28, 2005.**  A man dressed in all black used an assault weapon to fire multiple rounds into a house killing a 20-year-old man and injuring another man who was hit in the leg.[165]

- **Fortville, Indiana.  December 13, 2005.**  A man slapped a female relative and fired a round from an assault weapon into his driveway then barricaded himself in his house and threatened to shoot anyone who came to the door.  When the 8-hour standoff ended, police found more than 10 weapons in the home.[166]

- **Tacoma, Washington.  November 20, 2005**.  A 20-year-old male opened fire in a Tacoma mall, wounding six.  The shooter took four hostages, all of whom were released unharmed.[167]

> **San Francisco, California.  October 14, 2005.**  22-year- old Dernae Wysinger and his two-year-old son, Naemon, were killed when a man opened fire on their car with an assault weapon.  The toddler's mother, Jazmanika Ridout, was shot in the foot and survived.  The family was leaving the home of the toddler's great aunt, who had been babysitting Naemon so that Wysinger and Ridout could go on a date.[168]

- **North Braddock, Pennsylvania. August 12, 2005.**  A man was found dead, shot in the back and head.  Police found assault rifle bullet casings near the body.[169]

- **Denton County, Texas. August 9, 2005.** In a night-long standoff at his home, a man fired his SKS assault rifle at police to avoid being arrested.  After shooting an officer in the leg and refusing to negotiate, police shot and killed the suspect.[170]

- **New Orleans, Louisiana. August 8, 2005**. While driving, a man was shot and killed when an occupant of another car opened fire with an AK-47 assault rifle.[171]

---

[164] NBC 51 WDIV, Detroit, MI, Jan. 4, 2006.

[165] *Man killed in early morning shooting*, MIAMI HERALD, Dec. 28, 2005.

[166] *Eight-hour standoff ends peacefully*, THEINDYCHANNEL.COM, Dec. 13, 2005 *available at*: http://www.theindychannel.com/news/5524484/detail.html (last visited Sept. 29, 2008).

[167] *Suspect:  'follow screams', Man opens fire at mall in Tacoma; 6 wounded*, AKRON BEACON JOURNAL, Nov. 22, 2005.

[168] Christopher Heredia, *San Francisco police ask public for help in finding shooting suspect,* SAN FRANCISCO CHRONICLE, Oct. 16, 2005.

[169] Michael Hasch, *Shooting victim was teen suspect's uncle*, PITTSBURGH TRIBUNE REVIEW, Aug. 17, 2005.

[170] Domingo Ramirez Jr., *Trooper is shot; suspect is killed*, FORT WORTH STAR-TELEGRAM, Aug. 9, 2005.



- **West Palm Beach, Florida. June 25, 2005.** A man was killed and his 9-year-old daughter severely wounded when a man fired into their parked car with an assault weapon that police believe had been converted to fully automatic. [172]

- **Cincinnati, Ohio. June 22, 2005.** Assailants armed with SKS-type assault rifles sprayed over forty armor-piercing bullets in twenty seconds, hitting two women leaving a grocery store.[173]

- **Livingston County, Kentucky.  June 2, 2005.**  A deputy was shot when he responded to a domestic disturbance call placed by a couple's 18-year-old daughter. When the officer entered the home, a male fired at least 8 rounds from an assault rifle at him, hitting him four times and killing him.  The officer was able to fire one round which killed the gunman.[174]

- **Fresno, California. May 31, 2005.**  A man fired at least eight shots from an assault rifle at two veteran police officers sitting in their patrol car outside the police K-9 facility. The police later found a partially loaded 30 round magazine in the assailant's car.[175]

- **Kansas City, Missouri. May 29, 2005.**  After being pulled over for a routine traffic stop, a recently fired elementary school janitor shot a Highway Patrol trooper nine times with a 9 mm assault rifle.[176]

- **Tulsa, Oklahoma. May 29, 2005.**  A gunman fired more than 20 shots from an assault rifle at an apartment building security guard, wounding the guard and hitting his car and surrounding buildings.[177]

- **Camden, New Jersey. May 21, 2005.**  A mother of three young children was killed by a stray bullet fired from an AK-47 during a shoot-out.[178]

- **Jackson, Mississippi. May 18, 2005.** A man fired at least 17 shots from an SKS assault rifle and 9 mm pistol at police during a traffic stop.[179]

---

[171] Walt Philbin, *Three men killed in seven hours:  All are shot to death on New Orleans streets*, NEW ORLEANS TIMES PICAYUNE, Aug. 9, 2005.

[172] *Gun owners trade in arms, W. Palm Beach shootings spark city buyback*, SOUTH FLORIDA SUN-SENTINEL, July 10, 2005.

[173] *Two wounded in West End*, CINCINNATI POST, June 24, 2005.

[174] *Livingston County Kentucky Deputy Sheriff killed in gunfight*, LMPD.com, June 3, 2005, *available at*: http://www.lmpd.com/index.php?name=News&file=article&sid=291&theme=AutoPrint (last visited Sept. 30, 2008).

[175] *Two held in assault-rifle attack on two officers*, FRESNO BEE, June 1, 2005.

[176] *Accused man tells trooper he's sorry*, KANSAS CITY STAR , May 30, 2005.

[177] *Security guard at apartment is shot*, TULSA WORLD, May 29, 2005.

[178] *Two more men arraigned in fatal street shoot-out*, THE PHILADELPHIA INQUIRER, June 1, 2005.

[179] *Bond denied for man in shootout*, SUN HERALD, July 20, 2005.



**Clayton County, Georgia.  April 23, 2005.**  High school senior Larry Bishop Jr. was killed, and three other teens were wounded, when a gunman opened fire on a group of partygoers.  18-year old Artavious Rashad Abercrombie was arrested in connection with the crime.[180]

- **Miami, Florida. April 10, 2005.**  Three men were injured during a dispute in a strip club parking lot when a fourth man fired an AK-47 at them.[181]

- **Canton, Texas. April 8, 2005.**  A man shot his son's football coach in the chest with an AK-47 after a dispute.[182]

- **Houston, Texas. April 8, 2005.**  Two robbers armed with AK-47s fired nearly twenty rounds at police during a shoot-out outside a pawnshop. [183]

- **New Orleans, Louisiana. March 27, 2005.**  A woman was shot in the chest outside her apartment with an AK-47 when she refused to give her purse to two armed robbers.[184]

**Pittsburgh, Pennsylvania.  March 16, 2005.**  16-year- old Keith Watts was killed, and two other students were injured, when a shooter fired at least eight rounds from an AK-47 into their parked vehicle.[185]

- **Dallas, Texas. March 15, 2005**.  Three people were killed after a man fired an assault rifle at them through the sunroof of his car.[186]

- **Schertz, Texas. March 3, 2005.**  After being pulled over, a man fired more than 30 bullets from a handgun and AK-47 at a state police officer.[187]

- **Tyler, Texas. February 25, 2005.**  A gunman with a history of domestic violence and a felony conviction, who was reportedly fighting with his ex-wife over child support for their two youngest children, shot over 50 rounds from an SKS assault rifle on the steps of his local courthouse when his ex-wife exited the building.  His ex-wife was killed along with a bystander who tried to shoot the gunman.  The shooter's 23-year-old son and three law enforcement officers were wounded during the shooting, including a 28-year-old deputy who was in grave condition.  The

---

[180] *Teen faces murder charge*, THE ATLANTA JOURNAL-CONSTITUTION, May 28, 2005.

[181] *Pair of early-morning shootings leave six hurt*, MIAMI HERALD, April 11, 2005.

[182] *Gunman attacks coach at school*, FORT WORTH STAR-TELEGRAM, April 8, 2005.

[183] *Pawnshop heist ends in bloody shootout*, HOUSTON CHRONICLE, April 7, 2005.

[184] *Jeff woman shot in struggle with thief*, THE TIMES-PICAYUNE, March 29, 2005.

[185] *Schools need permission to shield kids from threats*, PITTSBURGH POST-GAZETTE, March 18, 2005.

[186] *Police say revenge went awry for slaying suspects*, DALLAS MORNING NEWS, March 18, 2005.

[187] *Man indicted in Schertz shootout*, SAN ANTONIO EXPRESS-NEWS, March 24, 2005.



gunman fled the scene but was pursued and shot by police when he exited his car and shot toward officers. [188]

- **Los Angeles, California. February 24, 2005.**  A disgruntled Los Angeles municipal employee opened fire with an AK-47 after being reprimanded at work, killing his supervisor and another employee.[189]

> **Akron, Ohio. February 24, 2005.**  A man shot and killed his girlfriend and her seven year old son using an AR-15 assault rifle, then fired more than one-hundred rounds at a dozen law enforcement officers as he fled the murder scene.  The gunman was arrested the next morning inside the apartment of a Kent State University student, who he also murdered with the AR-15 assault rifle.  Police subsequently seized 21 weapons kept by the suspect, including an Uzi and an AK-47.[190]

- **Las Vegas, Nevada. February 15, 2005.**  A suspected murderer fled from police as his girlfriend fired an assault rifle with a 100 round magazine at pursuing police vehicles.  The man was wanted in connection with a drug related murder and for a nonfatal shooting.  The man also had convictions for attempted manslaughter and armed robbery, and was suspected of shooting at a Louisiana police officer five months earlier.[191]

- **Ulster, New York. February 13, 2005.**  A gunman fired more than 60 shots from an AK-47 assault rifle in the Hudson Valley Shopping Mall, wounding two and causing tens of thousands of dollars of damage before being apprehended.  A few hours earlier, the shooter had purchased armor-piercing ammunition from a nearby Wal-Mart.[192]

- **Lebanon, Tennessee.  February 10, 2005.**  A second grade student found a Tec-9 inside a closet and brought it to school in his backpack, where it was confiscated by police.   The gun was not fired but sixteen bullets were discovered in the magazine.[193]

- **Dayton, Ohio. January 31, 2005.**  Three teens were shot with a Russian-made assault rifle following an argument at a grocery store.[194]

---

[188] Bill Hanna & Jack Douglas Jr., *Rampage in Tyler leaves three dead, four wounded*, FORT WORTH STAR-TELEGRAM, Feb. 25, 2005; Jack Douglas Jr. & Bill Hanna, *Police order emergency trace on weapon used in shootings*, FORT WORTH STAR-TELEGRAM, FEB. 26, 2005.

[189] *2 Are Shot to Death at Maintenance Yard*, LOS ANGELES TIMES, Feb. 25, 2005.

[190] Ed Meyer, *Police eye semiautomatic rifles, Brimfield officials want to be prepared after recent shooting rampage that killed 3 people*, AKRON BEACON JOURNAL, Feb. 24, 2005.

[191] Brian Haynes, *Wild chase ends in arrests*, LAS VEGAS REVIEW-JOURNAL, Feb. 19, 2005.

[192] *Mall Gunman Had Columbine Fixation, an Official Says*, THE NEW YORK TIMES, Feb. 15, 2005.

[193] WKRN TV NEWS 2, Nashville, TN, Feb. 10, 2005.

[194] Kelli Wynn, *Assault weapon used in shooting, police say*, DAYTON DAILY NEWS, Feb. 2, 2005.



- **Ravena, Ohio. January 21, 2005.** Three people were killed, including a mother and her seven year old son, when a man fired at least 18 bullets from an assault rifle.[195]

> **Jackson, Tennessee.  January, 11, 2005.**  Donna Renee Jordan, 31, David Gordon, 41, and Jerry Hopper, 61, were killed when Jordan's estranged husband, David Jordan, opened fire in a Tennessee Department of Transportation maintenance garage.  Two other employees, Larry Taylor and James Goff, were shot and wounded.  When David Jordan was arrested shortly after the shootings, police found an SKS assault rifle, a 12-gauge shotgun, and two pistols in his truck.  Jordan's wife, whom he shot four times, left behind two children and two stepchildren.

- **Ceres, California.  January 9, 2005**.  A 19-year-old Marine armed with an SKS assault rifle shot two police officers, killing one, in a gun battle outside a liquor store.[196]

- **Newington, Connecticut. December 31, 2004.**  A former correction officer used a fully automatic M-16 to fatally shoot a Newington policeman after the officer responded to a domestic disturbance call.[197]

- **New Orleans, Louisiana.  December 23, 2004.** A mentally challenged 19-year-old was chased through the streets with a high-powered assault rifle before being gunned down outside his former elementary school.[198]

- **Hayward, Wisconsin. November 21, 2004.**  After being asked to leave another hunter's property, a 36-year-old man opened fire with an SKS semiautomatic rifle, killing six members of a hunting party and wounding two.[199]

- **Oak Creek, Wisconsin. November 5, 2004.**  A man wearing body armor and armed with a machine gun fled the hotel room where he murdered his girlfriend, firing 30 to 40 rounds down the hotel hallway, killing one man and injuring two others. [200]

- **Portland, Oregon.  October 28, 2004.**  A 31-year-old aimed two machine guns out his front window to guard the marijuana growing operation run from his home, which was less than 400 feet from an elementary school.  Police seized 29 guns from his home, including several AK-47s and Uzis, a MAC-10 submachine gun and a .50

---

[195] Stephen Dyer, *Murder suspect pleads insanity*, AKRON BEACON JOURNAL, Feb. 8, 2005.

[196] *Cop, gunman dead:  Marine killed after shooting officers*, THE MODESTO BEE, Jan. 11, 2005.

[197] *Officer shot, held hostage*, HARTFORD COURANT, Dec. 31, 2004.

[198] *Barbarity beyond belief*, THE TIMES-PICAYUNE, Dec. 23, 2004.

[199] *Wisconsin Shooting Rampage*, ST. PAUL PIONEER PRESS, Nov. 23, 2004.

[200] *2 dead, 2 wounded in hotel shootings*, MILWAUKEE JOURNAL SENTINAL, Nov. 6, 2004.



caliber anti-aircraft gun.  He was later sentenced to more than eight years in prison.[201]

- **Minneapolis, Minnesota. October 21, 2004.**  A store clerk died after being shot in the chest with an assault rifle during a botched robbery attempt.[202]

- **Oakland, California.  September 22, 2004.**  A 16-year-old honor student was killed on the sidewalk near her home after being struck by errant assault rifle fire.[203]

---

[201] Local news – Washington County, THE OREGONIAN, May 4, 2006.

[202] *3 teens charged with clerk's slaying*, ST. PAUL PIONEER PRESS, Nov. 2, 2004.

[203] *Girl, 16, gunned down in Oakland drive-by*, THE OAKLAND TRIBUNE, Sept. 24, 2004.



# Endnotes

[1] *Ferri Used Guns That California Ban Does Not Forbid*, SAN FRANCISCO EXAMINER, July 4, 1993.

[2] Michael Janofsky, *Columbine killers thank gun suppliers taped comments revealed in hearing*, CLEVELAND PLAIN DEALER, Nov. 13, 1999.

[3] *Cult's Massive Weapons Purchases Stir Up a Furor Over Federal Regulation*, FORT WORTH STAR-TELEGRAM, May 2, 1993.

[4] *Satellite College Campus Helps to Heal the Scars at San Ysidro Massacre*, LOS ANGELES TIMES, Mar. 30, 1989; *A 77-Minute Moment in History That Will Never Be Forgotten*, LOS ANGELES TIMES, July 16, 1989.

[5] *The Kinds of Guns School Killer Used*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989; Michael Taylor & Leslie Guevarra, *Myterious Scrawlings and Slogans, School Killer's Last Days, Toy Army in his Room*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989.

[6] In an appendix of this report, we have included 27 pages of assault weapons shootings that have occurred in just the last four years.  Moreover, this list is not comprehensive.  It is merely representative examples.

[7] ATF, *Assault Weapons Profile* 19 (1994)

[8] Judith Bonderman, *In Search of Justice: Compensation for Victims of Assault Weapon Violence*, 20 PRODUCT SAFETY & LIABILITY REP. 25 (June 26, 1992).  There are numerous examples of test-firing that display the firepower of semi-automatic assault weapons on YouTube.  *See, e.g.*, http://www.youtube.com/watch?v=nCMEqCPCvV4; http://www.youtube.com/watch?v=cYRsPzUYMM4; and http://www.youtube.com/watch?v=A75O0-QolJI.

[9] ATF, *Assault Weapons Profile, supra* note 7, at 19 (emphasis added).

[10] *Id.*

[11] *Assault rifles concern police*, MONTGOMERY ADVERTISER, May 25, 2006.

[12] ATF, *Assault Weapons Profile, supra* note 7, at 20.

[13] *See infra* p. 15.

[14] Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 38 (1998).

[15] ATF, *Report and Recommendations of the ATF Working Group on the Importability of Certain Semi-Automatic Rifles* (July 6, 1989)

[16] Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, *supra* note 14.

[17] Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, U. PA. JERRY LEE CENTER OF CRIMINOLOGY 3 (June 2004). [Quotation in report spells out 'assault weapons' & 'large capacity magazines' while the actual quotation uses the abbreviations 'AWs' & 'LCMs'].

[18] Press Release, Mayor Hahn, Chief Bratton Unite With Leaders Across Country To Demand Renewal Of Assault Weapons Ban (Apr. 27, 2004) (available at www.lacity.org).

[19] Christopher S. Koper, Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003, *supra* note 17, at 87. [Quotation in report spells out 'assault weapons' while the actual quotation uses the abbreviation 'AWs'].



[20]  *See* International Association of Chiefs of Police, *Taking a Stand: Reducing Gun Violence in Our Communities: Report and Recommendations from the IACP Great Lakes Summit on Gun Violence* 26 (2007) (noting that FBI data indicated that 41 of the 211 law enforcement officers slain in the line of duty between January 1, 1998 and December 31, 2001, were killed with assault weapons. *See also*, H.R. Rep. No. 103-489 (1994) at 14-15 (citing testimony about several assault weapons shootings); *Cops Under Fire: Law Enforcement Officers Killed With Assault Weapons or Guns With High Capacity Magazines*, Handgun Control, Inc. (now the Brady Center to Prevent Gun Violence) (1995).

[21] The Officer Down Memorial Page, Inc. collects information on officers killed in the line of duty.  *See* http://www.odmp.org/.

[22] *SAPD Details Monday Shooting Investigation*, KSAT12-TV, San Antonio, Texas, Sept. 10, 2008.

[23] Brady McCombs & Alexis Huicochea, *Officer on life support after crosstown pursuit*, ARIZONA DAILY STAR, June 2, 2008.

[24] Joseph A. Gambardello, *Liczbinski suspect's girlfriend to stand trial*, PHILADELPHIA INQUIRER, July 17, 2008; *Officer shot, killed after bank robbery*, NBC 10.COM, May 3, 2008; *See* Sergeant Stephen Liczbinski, www.odmp.org, *available at*: http://www.odmp.org/officer/19359-sergeant-stephen-liczbinski (last visited Sept. 30, 2008).

[25] David Ovalle et. al., *The murder and the manhunt started in a South Miami-Dade townhouse, zigzagged…*, MIAMI HERALD, Sept. 15, 2007.

[26] *See* Officer Frank Charles Denzinger, odmp.org, *available at*: http://www.odmp.org/officer/18926-officer-frank-charles-denzinger (last visited Sept. 30, 2008).

[27] *See, e.g.*, Brittany Wallman, *Fort Lauderdale police to carry assault rifles in cars*, SOUTH FLORIDA SUN-SENTINEL, June 4, 2008; Ronnie Garrett, *Long guns on patrol: Officers find it takes more than a handgun, a badge and handcuffs to protect the public and themselves*, OFFICER.COM, May 20, 2008; David C. Lipscomb, *D.C. to arm police with assault rifles*, WASHINGTON TIMES, May 8, 2008, '*Arms race' has police carrying deadlier guns: Officers armed with increasingly powerful tools*, ASSOCIATED PRESS, Mar. 22, 2008; Katie Fretland, *Sheriff's office upgrades to counter criminals*, ORLANDO SENTINEL, Oct. 4, 2007,

[28] Kevin Johnson, *Police needing heavier weapons: Chiefs cite spread of assault rifles*, USA TODAY, Feb. 20, 2007.

[29] Matt Sedensky, *AK-47s are turning up more in U.S.*, ASSOCIATED PRESS, Mar. 27, 2008; Lise Fisher, *Phasing in firepower*, GAINSVILLE SUN, Dec. 17, 2007; Jeffrey Kofman, *Increasing Assault Weapons in Criminal Hands*, ABC NEWS, Nov. 27, 2007

[30] Matt Sedensky, *AK-47s are turning up more in U.S.*, *supra* note 29.

[31] *See* Mike Flannery, *More Assault Weapons Found in Chicago Since Ban Expired*, CBS 2 CHICAGO, June 7, 2005, *available at* http://cbs2chicago.com/topstories/local_story_158180945.html.

[32] *State Attorney: Problems Posed by Haitian Gangs Growing*, NBC6, June 7, 2006 *available at*: http://www.nbc6.net/news/9337747/detail.html.

[33] *Murder Also Stalks Black Men in Their 20s*, MIAMI HERALD, June 25, 2006.

[34] Jack Dolan, *Miami Police get OK for more firepower*, MIAMI HERALD, Sept. 16, 2007.

[35] Matt Sedensky, *Assault-weapon attacks on rise in Miami area where officer slain*, ASSOCIATED PRESS, Sept. 14, 2007.

[36] Jack Dolan, *Miami Police get OK for more firepower*, *supra* note 34.

[37] Bruce Falconer, *How Not to Buy an AK-47*, MOTHER JONES, July 16, 2008.

[38] Matt Sedensky, *Assault-weapon attacks on rise in Miami area where officer slain*, *supra* note 35.

[39] Ryan LaFontaine, *Gunman had a large arsenal, Police say Asher used AK-47*, SUN HERALD, June 9, 2007.

[40] Ian Urbina, *Fatal police station attack shocks tranquil community*, NEW YORK TIMES, May 10, 2006; *Officer Killed*, BOSTON GLOBE, May 18, 2006.

[41] Omar Sofradzija, *Processions to honor Prendes*, LAS VEGAS REVIEW-JOURNAL, Feb. 7, 2006.

[42] *Livingston County Kentucky Deputy Sheriff killed in gunfight*, LMPD.COM, June 3, 2005, *available at:* http://www.lmpd.com/index.php?name=News&file=article&sid=291&theme=AutoPrint (last visited Sept. 30, 2008).

[43] *Cop, gunman dead: Marine killed after shooting officers*, THE MODESTO BEE, Jan. 11, 2005

[44] *Assault Weapons Putting Safety in Crosshairs?*, KDKA CBS 2, July 12, 2005, *available at* http://kdka.com/local/local_story_193165007.html.

[45] Kevin Johnson, *Police needing heavier weapons: Chiefs cite spread of assault rifles*, USA TODAY, Feb. 20, 2007.

[46] Michael Laforgia, *Assault rifles escalate violence*, PALM BEACH POST, Jan. 28, 2007.

[47] Susan Candiotti, *Cops find themselves in arms race with criminals*, CNN.COM, Nov. 6, 2007.

[48] Len Fooksman, *Police Fearful of Violent Crime Trend: AK-47 Shootings*, SOUTH FLORIDA SUN-SENTINEL, May 13, 2006.

[49] *Authorities seeing increase in use of assault weapons*, WRAL-TV, Aug. 28, 2008.

[50] Glenn Smith, *Police can't get handle on supply*, POST AND COURIER, Oct. 1, 2006.

[51] Evan Goodenow, *AK-47-type weapons in city, police reporting: Seizures are up nationally since assault-rifle ban expired in 2004*, FORT WAYNE NEWS SENTINEL, June 24, 2008.

[52] Lynn Safranek, *Assault rifles becoming more common in Midlands*, OMAHA WORLD-HERALD, Jan. 27, 2008.

[53] Vic Lee, *SF cops say they're outgunned*, KGO TV 7 NEWS, Aug. 24, 2006.

[54] *Id.*

[55] *Niagara, Wisconsin shooting suspect caught*, THE CHICAGO TRIBUNE, Aug. 1, 2008.

[56] *Gunman in mass shooting identified*, WVEC 13 NEWS, Mar. 20, 2008, *available at:* http://www.wvec.com/news/vabeach/stories/wvec_local_031908_vb_shooting.79dfc43.html (last visited Sept. 29, 2008).

[57] Erin Emery, *Report details church shooting, the document chronicles the days leading up to the Dec. 9 deaths of four young people*, DENVER POST, Mar. 13, 2008.

[58] *The American Way*, REGISTER-GUARD, Dec. 17, 2007.

[59] *Suspect: 'follow screams', Man opens fire at mall in Tacoma; 6 wounded*, AKRON BEACON JOURNAL, Nov. 22, 2005.

[60] *Mall Gunman Had Columbine Fixation, an Official Says*, THE NEW YORK TIMES, Feb. 15, 2005.

[61] Mary Sparacello, *Housing Authority reining in parties, Kenner shooting leads to regulations*, NEW ORLEANS TIMES PICAYUNE, Oct. 11, 2007.

[62] Tom Rybarczyk, *Calumet City reels after spray of bullets*, CHICAGO TRIBUNE, June 26, 2006.

[63] Ashley M. Heher, *Suspect in slaying of 7 family members surrenders / Indianapolis police say he had nowhere else to go*, HOUSTON CHRONICLE, June 4, 2006.

[64] *Gov. Blagojevich, victims' families, advocates urge lawmakers in Springfield to pass statewide assault weapons ban*, US STATE NEWS, Mar. 23, 2006.

[65] Charles Sheehan, *Neighborhood buries another child*, CHICAGO TRIBUNE, Mar. 19, 2006.



66 Stephen Kudak & Sarah Lundy, *Cops:  Suspect admits killing 2 campers in Ocala forest*, ORLANDO SENTINEL, Jan. 28, 2006.

67 Bill Hanna & Jack Douglas Jr., *Rampage in Tyler leaves three dead, four wounded*, FORT WORTH STAR-TELEGRAM, Feb. 25, 2005; Jack Douglas Jr. & Bill Hanna, *Police order emergency trace on weapon used in shootings*, FORT WORTH STAR-TELEGRAM, Feb. 26, 2005.

68 Ed Meyer, *Police eye semiautomatic rifles, Brimfield officials want to be prepared after recent shooting rampage that killed 3 people*, AKRON BEACON JOURNAL, Feb. 24, 2005.

69 *Wisconsin Shooting Rampage*, ST. PAUL PIONEER PRESS, Nov. 23, 2004.

70  Marianne Zawitz, *Guns Used in Crime*, U.S. Dep't of Justice, Bureau of Justice Statistics 6 (1995).

71 ATF, *Assault Weapons Profile supra* note 7, at 19-20.

72 NIJ, Firearm Use By Offenders 2-3 (2001).

73 ATF, *Assault Weapons Profile, supra* note 7, at 19.

**74** Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles, supra* note 14, at 17

75 Paul Salopek, *A Chilling Look into Terror's Lair*, CHICAGO TRIBUNE, Nov. 18, 2001.

76 Complaint, United States v. Shnewer, Magistrate No. 07-M-2045 (D.N.J. 2007).

77 *Indictment Details Terror Weapons Smuggling Scheme*, NEW YORK SUN, March 16, 2005.

78 Press Release, U.S. Dep't of Justice, Rockford Man Faces Federal Explosives Charges; Large Cache of Weapons, Ammunition and Explosives Materials Seized (Apr. 21, 2004).

79 *Gun Land – Are guns bought in the U.S. ending up in the hands of terrorists?,* NOW WITH BILL MOYERS, Nov. 15, 2002.

80 *ATF: Phoenix Gun Dealer Supplied Mexican Drug Cartels*, ABC NEWS, May 6, 2008.

81 *U.S. guns arm Mexican drug cartels*, LOS ANGELES TIMES, Aug. 11, 2008.

82 *Man Accused of Shipping Arms, Ammunition to Beirut*, ASSOCIATED PRESS, Nov. 21, 2000.

83 Gun Land – Are guns bought in the U.S. ending up in the hands of terrorists?, NOW WITH BILL MOYERS, *supra* note 79.

84 Elena Cabral, *Attempt to Buy Rifles Linked to Terrorist*, MIAMI HERALD, June 2, 2001.

85 22-year-old Rupinder "Benny" Oberoi was shot in the lower back outside his place of work in Silver Spring, Maryland on September 14th.  52-year-old liquor store manager Claudine Parker was shot and killed as she and a coworker closed the store in Montgomery, Alabama.  45-year-old beauty supply store manager named Hong Im Ballenger was shot and killed outside a store she managed in Baton Rouge, Louisiana on September 23rd.

86 Premkumar A. Walekar of Olney, Maryland, a 54-year-old male cabdriver, was shot and killed with the Bushmaster assault rifle at a Mobil gas station in Aspen Hill, Maryland on October 3rd.

87 James L. "Sonny" Buchanan, Jr. of Abingdon, VA, a 39-year-old landscaper, was shot and killed with the Bushmaster assault rifle while mowing grass at a car dealership in White Flint, Maryland On October 3.

88 Linda Franklin, a 47-year-old FBI employee was shot and killed with the Bushmaster assault rifle while loading packages with her husband in their car in the parking garage of a Home Depot in Seven Corners Shopping Center in Fairfax County, Virginia On October 14.

89 Second Amended Complaint, Halberstam v. S.W. Daniel, Inc., No. 95-C3323 (E.D.N.Y.1998), Nov. 19, 1997.



[90] *CIA Killings Prompt Scrutiny on 2 Fronts; Fairfax Loophole Expedited Gun Purchase*, WASHINGTON POST, Feb. 11, 1993.

[91] Robert O'Harrow, Jr. *Kansi's Shadowy Stay in U.S. Leaves a Hazy Portrait*, WASHINGTON POST, Mar 3, 1993.

[92] On March 21, 1989, ATF announced a temporary suspension of the importation of five assault weapons.  On March 29, 1989, ATF expanded the scope of the suspension to cover all assault weapons "indistinguishable in design, appearance and function to the original five" and established a working group to decide whether to make this import ban permanent.  On March 30, 1989, a gun importer challenged ATF's authority to suspend the importation of these weapons.  The Eleventh Circuit Court of Appeals upheld ATF's authority to issue the import suspensions.  *Gun South, Inc. v. Brady*, 877 F.2d 858 (11th Cir. 1989).  ATF then issued its working group report and, pursuant to 18 U.S.C. § 925(d)(3), made the import ban permanent.  ATF, *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles supra* note 15.

[93] In April 1998, ATF determined that the 1989 ban on the importation of assault rifles remained valid and expanded the import ban to include rifles with the "ability to accept a detachable large capacity military magazine" because those weapons "cannot fairly be characterized as sporting rifles."  ATF, *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles, supra* note 14.

[94] *See* ATF, *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles, supra* note 15, at 5-8 (describing numerous military features of assault weapons).

[95] *Police Fear a Future of Armored Enemies*, USA TODAY, Mar. 3, 1997.

[96] Declaration of Leonard J. Supenski in Support of Plaintiffs' Joint Opposition to Navegar, Inc.'s Motion for Summary Judgment or, in the Alternative, Summary Adjudication at 8, In re 101 California Street Bldg., No. 959316 (Sup. Ct. Cal. 1996).

[97] Jim Zumbo, *Assault Rifles for Hunters?, available at*: http://razoreye.net/mirror/zumbo/zumbo_assault_rifles.html (last visited Oct. 7, 2008).

[98] *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008).

[99] The Court was careful to announce only a limited Second Amendment right that was tied to guns used for self-defense in the home**.**  *Id.* at 2821-22.  **"**[W]hatever else [the Second Amendment] leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home."  *Id.* at 2821.  "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table.  These included the absolute prohibition of handguns held and used for self-defense in the home."  *Id.* at 2822.  "In sum, we hold that the District's ban on handgun possession in the home violates the Second Amendment, as does its prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense."  *Id.* at 2821-22.

[100] *Id.* at 55.

[101] *See infra* p. 1, *Assault Weapons are Designed to Slaughter People*.

[102] Those include California, which passed the nation's first statewide ban in May 1989, as well as New Jersey (1990), Hawaii (1991), Connecticut (1993), Maryland (1994), Massachusetts (1998), and New York (2000).  California expanded its ban in 2000 to include all semiautomatic rifles or pistols that have the ability to accept a detachable magazine and contain any one of a series of military-style features similar to the list found in the federal ban.  CAL. PENAL CODE § 12276.1.

[103] *See infra* p. 14, *Assault Weapons Have No Sporting or Self-Defense Purpose*.

[104] *See, e.g., Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995); *Robertson v. Denver*, 874 P.2d 325 (Colo. 1994); *Arnold v. City of Cleveland*, 616 N.E.2d (Ohio 1993).

[105] Hearings Before the Committee on the Judiciary on S. 639 and S. 653, U.S. Senate, 103d Cong. 1 (Aug. 3, 1993) (statement of Hon. Joseph Biden).



[106] The law was intended to cover "copies or duplicates" of named firearms, 18 U.S.C. § 921(30)(A), but it was never successfully applied to ban any of the copycat weapons that emerged after the ban unless they also violated the two-features test.

[107] The data available at the time of the study went up through the end of 2001.

[108] The conclusions in the On Target study were similar to an analysis of assault weapons traced to crime done for United States Senators Dianne Feinstein and Charles Schumer.  This analysis showed that the proportion of banned assault weapons traced to crime dropped by more than 65% while the ban was in effect, according to ATF crime gun trace data.  *See* report released on Nov.  5, 2003, *available at* http://feinstein.senate.gov/03Releases/r-assaultwepsrate1.htm.

[109] In addition to the Brady Center's study, the U.S. Department of Justice, National Institute of Justice conducted a study, mandated by the Act, of the short-term impact on crime of the assault weapons ban. The study, published in 1999, found that the ban had "clear short-term effects on the gun market," leading to semiautomatic assault weapons "becom[ing] less accessible to criminals because there was at least a short-term decrease in criminal use of the banned weapons."  Jeffrey A. Roth & Christopher S. Koper, *Impacts of the 1994 Assault Weapons Ban: 1994-96* 1, 9 (U.S. Dep't of Justice, National Institute of Justice 1999) (*available at* http://www.ncjrs.org/pdffiles1/173405.pdf).

[110] One of the principal authors of that interim study published a follow-up analysis of the effects of the federal ban in June 2004.  Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, U. PA. JERRY LEE CENTER OF CRIMINOLOGY, *supra* note 17.  That study documented a dramatic reduction in the incidence of assault weapon use in crime while the ban was in effect.  The study found, according to ATF data, that assault weapons, as a percentage of total crime gun traces, fell 70% from 1992-93 to 2001-02.  *Id.* at 44.  Indeed, the study found it "remarkable" that the annual number of assault weapons traced to crime did not increase during the period the ban was in effect, even though, due to far more comprehensive tracing of crime guns by ATF, the number of total guns traced to crime increased almost 200% during that same period.  *Id.* As the study noted, these results were consistent with the findings of the Brady Center in its On Target report, discussed above.  *Id.* at 44, n.43.  Koper's study attributed these declines in the frequency of assault weapon use in crime to the statute itself, in contradiction to the assertions made by some commentators that the decline was due to other factors.  The study found that the decline in frequency of assault weapon traces did not begin until 1994, the year of the ban, and concluded that "the ban prevent[ed] a few thousand crimes with assault weapons annually."  *Id.* at  52, n.61.

[111] The firearms listed in this data are considered by ATF to be "crime guns," which means they have been illegally possessed, used in a crime, or suspected of having been used in a crime.  ATF, *The Youth Crime Gun Interdiction Initiative, Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Market in 27 Communities* 5 (1999).

[112] CAL. PENAL CODE § 12276.1.

[113] H.R. 1022, 110th Cong. (2007).

[114] *See* http://www.pollingreport.com/guns.htm.

[115] *Id.*

[116] Majority of U.S. adults favors continuing ban on sales of assault rifles, according to latest Harris poll, Sept. 24, 2004, *available at*:  http://www.harrisinteractive.com/harris_poll/index.asp?PID=498 (last visited Oct. 3, 2008).

[117] *Survey:  8 out of 10 Illinois voters favor banning assault weapons*, WBBM 780 NEWS, Chicago, IL, Mar. 22, 2007.

[118] Numerous newspaper editorials and columnists are in favor of the reinstatement of an assault weapons ban.  *See, e.g., Our leaders are fighting to bring back the national assault weapons ban*, DAILY PENNSYLVANIAN, May 29, 2008; Brian Scheid, *Rendell:  Reinstate weapons ban*, BUCKS COUNTY COURIER TIMES, May 12, 2008; David Gambacorta, *In wake of Liczbinski slaying, a push for assault-weapon ban*,



PHILADELPHIA DAILY NEWS, May 8, 2008; *Time for action*, BUCKS COUNTY COURIER TIMES, May 7, 2008; *Gun Control: How many more?,* PHILADELPHIA INQUIRER, May 6, 2008; Sam Wood, *Cheap but deadly weapon killed police officer*, PHILADELPHIA INQUIRER, May 6, 2008; *Assault rifles: Cops find themselves outgunned*, SALT LAKE TRIBUNE, Apr. 14, 2008; *Take aim at guns*, CHICAGO TRIBUNE, Mar. 12, 2008; *Gun Crazy*, NEW YORK TIMES, Mar. 1, 2008; *Assault weapon bill is a start, at least*, SOUTH FLORIDA SUN-SENTINEL, Feb. 12, 2008; *Off-Target: Why are chuka sticks illegal, but not AK-47 knockoff?*, SYRACUSE POST-STANDARD, Dec. 27, 2007; *Mass killings demand serious debate on banning some weapons*, RECORDNET.COM, Dec. 20, 2007, *available at:* http://www.recordnet.com/apps/pbcs.dll/article?AID=/20071220/A_OPINION01/712200308/-1/A_OPINION (last visited Oct. 2, 2008); Ralph Fascitelli, *It's time to outlaw military assault weapons*, SEATTLE POST-INTELLIGENCER, Dec. 19, 2007; *Get rid of these guns – now*, TIMES-HERALD, Dec. 19, 2007; *Courage vs. Carnage: What Congress can do to keep the worst weapons out of the wrong hands*, WASHINGTON POST, Dec. 13, 2007; *The Omaha Massacre: Warning Shots*, PHILADELPHIA INQUIRER, Dec. 7, 2007; Charles Rabin, *Dade urges renewing assault-arms ban*, MIAMI HERALD, Nov. 8, 2007; *The other arms race*, BALTIMORE SUN, Nov. 7, 2007; Ana Menendez, *There's no good reason to have an assault rifle*, MIAMI HERALD, Sept. 16, 2007; *Legislature should take aim at assault weapon horrors*, CHICAGO SUN-TIMES, Jan. 10, 2007.

[119] *See* Press Release, Brady Campaign to Prevent Gun Violence, Jim and Sarah Brady "Personally Offended" by Gun Lobby Efforts to Falsify Reagan Record (June 16, 2004) *available at*: http://www.bradycampaign.org/media/release.php?release=565 (quoting letter from President Reagan).

[120] *See* Press Release, Brady Campaign to Prevent Gun Violence, Former Presidents Ford, Carter, Clinton Urge President Bush to Save the Assault Weapons Ban (June 7, 2004) *available at*: http://www.bradycampaign.org/media/release.php?release=569.



# Exhibit 62

JUNE 2011



Violence Policy Center



# The Militarization of the U.S. Civilian Firearms Market

WWW.VPC.ORG

## COPYRIGHT

Copyright © June 2011 Violence Policy Center

The Violence Policy Center (VPC) is a national nonprofit educational organization that conducts research and public education on violence in America and provides information and analysis to policymakers, journalists, advocates, and the general public.

This study was funded in part with the support of the David Bohnett Foundation and The Joyce Foundation.

For a complete list of VPC publications with document links, please visit http://www.vpc.org/publications/.

To learn more about the Violence Policy Center, or to make a tax-deductible contribution to help support our work, please visit www.vpc.org.

## TABLE OF CONTENTS

Key Findings                                                                                     1

"Militarization"—What is It?                                                                     2

Why Has the Gun Industry Militarized Its Market?                                                 7

   Gun Industry Problem: Long-Term Decline                                                       7

   Gun Industry Solution: Generating Demand with New and More Lethal Designs                     9

   Appealing to the Soldier Within                                                              11

How Has the Gun Industry Militarized Its Market?                                                14

   High-Capacity Handguns                                                                       14

      Handgun Militarization—High-Capacity Semiautomatic Pistols                                15

      Handgun Militarization—High-Capacity "Anti-Terrorist" Vest-Busting Pistols                18

   Assault Rifles and Assault Pistols                                                           21

      Imports—AK-47 Variants                                                                    23

      Domestic Production—AR-15 Variants of the M-16                                            25

      The 1994 Assault Weapons "Ban" and the Rise of Bushmaster                                 27

      Assault Pistols—UZI, Ingram, Intratec, and More                                           28

   The Assault Weapons Hype Market                                                              29

      The 1980s Explosion                                                                       29

      The Y2K Exploitation                                                                      30

      Continuing Incitement                                                                     32

      The National Shooting Sports Foundation's Rebranding Campaign                             34

   50 Caliber Anti-Armor Sniper Rifles                                                          36

Taxpayers Subsidize the Gun Industry                                                            38

The Result: Militarized Firearms Define the U.S. Civilian Firearms Market                       40

The Consequences of Militarization                                                              41

   Increasing Attacks on Law Enforcement with Assault Weapons                                   41

   Trafficking of Military-Style Weapons from the United States                                  42

What Can Be Done?                                                                               43

Endnotes                                                                                        44



Firearms accessories manufacturer TangoDown claims on its website that it "…exists for one reason. To design, develop and manufacture the highest quality products for the warriors of the United States Armed Forces." However, many of its products—like the poster reproduced above—and its advertising are aimed at the militarized civilian market.

www.tangodown.com/td_pages/p_about.html



Sgt. Brandon Paudert (left) and Officer Bill Evans (right) of the West Memphis (Arkansas) Police Department were shot to death May 20, 2010, following a traffic stop. The shooter, 16-year-old Joseph Kane, was armed with an AK-47 semiautomatic assault rifle. Kane and his father, Jerry, were killed in a gunfight with police in a nearby Walmart parking lot. The Kanes were reportedly members of the anti-government Sovereign Citizens Movement.

"Brandon and Bill had no chance against an AK-47," [West Memphis Police Chief Bob] Paudert said. "They were completely outgunned. We are dealing with people who rant and rave about killing. They want government officials dead. We had a 16-year-old better armed than the police."

"West Memphis police chief says officers' pistols were no match for heavily armed teenager,"
*The Commercial Appeal* (Memphis, TN), May 25, 2010

"Sovereign Citizens Movement members leave two police officers dead in shootout,"
*NBC News Transcripts*, July 5, 2010

# KEY FINDINGS

**The civilian firearms industry in the United States has been in decline for several decades.** Although the industry has enjoyed periods of temporary resurgence, usually primed by "fear marketing"—encouraging people to buy guns by stoking fear of crime, terrorism, violent immigrants, or government control, for example—the long-term trend for the manufacturers of guns for civilians has been one of steady decline.

**Selling militarized firearms to civilians—i.e., weapons in the military inventory or weapons based on military designs—has been at the point of the industry's civilian design and marketing strategy since the 1980s.** Today, militarized weapons—semiautomatic assault rifles, 50 caliber anti-armor sniper rifles, and armor-piercing handguns—define the U.S. civilian gun market and are far and away the "weapons of choice" of the traffickers supplying violent drug organizations in Mexico.

**The flood of militarized weapons exemplifies the firearms industry's strategy of marketing enhanced lethality, or killing power, to stimulate sales.** The resulting widespread increase in killing power is reflected in the toll of gun death and injury in the United States—a relentless count that every year takes 10 times the number of lives as the terrorist attacks of September 11, 2001.[1]

**Militarization has baleful consequences beyond the "routine" toll of murders, suicides, and unintentional deaths.** Military-style weapons are a favored tool of organized criminals such as gangs and drug traffickers, and violent extremists. Semiautomatic assault weapons—especially inexpensive AK-47 type imports—are increasingly used in attacks against law enforcement officers in the United States.

**The pernicious effects of the militarized U.S. civilian gun market extend well beyond the borders of the United States.** Lax regulation and easy access to these relatively inexpensive military-style weapons has resulted in their being smuggled on a large scale from the U.S. to criminals throughout the Western Hemisphere—including Mexico, Canada, Central America, the Caribbean, and parts of South America—as well as to points as far away as Afghanistan, the Balkans, and Africa.

This study surveys the rise of the militarized civilian gun market, examines its impact on public health, safety, and crime in the United States and the world, and refutes the gun lobby's recent attempt to "rebrand" semiautomatic assault weapons as "modern sporting rifles."

# "MILITARIZATION"—WHAT IS IT?

The verb "militarize" means "to give a military character to" something.[2] The gun industry has given a "military character" to guns in the U.S. civilian market by—

■ **Selling on the civilian market guns that are identical to guns used by the armed forces of the United States and other countries.** These firearms include such sophisticated weapons as the Barrett 50 caliber anti-armor sniper rifle and the FN Herstal Five-seveN 5.7mm pistol.





The Barrett Firearms 50 caliber anti-armor sniper rifle used in combat (above) is sold without meaningful regulation in the U.S. civilian gun market.



This ad from *Guns & Ammo* (March 2008) explicitly plays on the military's use of FN's Five-seveN 5.7mm armor-piercing handgun.

- **Designing and manufacturing, or importing, civilian variants of military firearms that would otherwise be illegal to sell on the civilian market.** These are principally semiautomatic versions of military assault weapons. (Military assault rifles are capable of fully automatic fire. They are thus barred, as "machine guns," from sale to civilians in the United States.) They include many variants of the AR-15 (the civilian version of the U.S. military M-16 assault rifle) and numerous semiautomatic versions of the Kalashnikov assault rifle, popularly known as the AK-47.

 

The covers of these books, the left published in 2000, the right in 1992, graphically illustrate the equivalence gun enthusiasts see between the military M-16 and the civilian AR-15.

■ **Heavily promoting military-style products through images, slogans, print, video, and other electronic media that link the features, capabilities, and uses of military weapons with firearms available on the civilian market.** In addition to this direct product promotion, the industry relies heavily on suggestive "patriotic" and "heroic" imagery—both historic and contemporary—to identify ownership of military-style weapons with grand themes of "patriotism" and "homeland defense."

In short, the gun industry designs, manufactures, imports, and sells firearms in the civilian market that are to all intents and purposes the same as military arms. It then bombards its target market with the message that civilian consumers—just like real soldiers—can easily and legally own the firepower of militarized weapons.




These ads from the NRA's *American Rifleman* magazine (May 2010) are typical of how the gun industry implicitly evokes militaristic themes in its marketing.











Colt's Manufacturing's 2010 catalog (cover at top) *American Legends* touches all the bases. Internal pages, clockwise from upper left, glorify: Teddy Roosevelt and his Rough Riders; World War I hero Sgt. Alvin York; Colt's CEO Marine Lt. Gen. William M. Keys; and, U.S. Navy deserter and 1930s bank robber John Dillinger. The brochure's mawkish tone is typical of gun industry advertising and gun lobby propaganda.

## WHY HAS THE GUN INDUSTRY MILITARIZED ITS MARKET?

In spite of the gauzy imagery of its advertising, the gun industry's militarization is simply a business strategy aimed at survival: boosting sales and improving the bottom line. The hard commercial fact is that military-style weapons sell in an increasingly narrowly focused civilian gun market. True sporting guns do not.

Here, for example, is an informed industry assessment of the importance of assault (often euphemistically called "tactical") weapons to the gun industry from October 2008:

> If there is an area of good news, it's still the tactical segment. In the past week, storefront owners and catalog retailers are unequivocally saying that, with the exception of the tactical categories— from AR-style rifles to the polymer pistols increasingly found in the holsters of law enforcement across the country, sales are slow.[3]

Here is another from an article titled, "Industry Hanging Onto [sic] A Single Category"—

> The net of all the numbers is that if you're a company with a strong line of high-capacity pistols and AR-style rifles, you're doing land office business. If you're heavily dependent on hunting, you are hurting.[4]

**Gun Industry Problem: Long-Term Decline.** The civilian firearms industry in the United States has been in decline for several decades. Although it has from time to time enjoyed brief peaks in sales, it has been essentially stagnant. For example, demand for firearms apparently increased beginning in 2008 because of fears that "high unemployment would lead to an increase in crime" and the Obama administration would "clamp down" on gun ownership by regulating assault weapons. But demand fell back as these fears waned.[5] A writer for the online industry publication *Shooting Wire* noted in September 2009:

> ...research tells me what everyone already knows: gun sales are slowing again. It seems the "Barack Boom" has started to go bust. No real reason, other than maybe the fact that everyone already has all the AR-style rifles they can shoot, store or afford, but there is an undeniable slowdown....[6]

In spite of such occasional anomalies, fundamental long-term trends have worked against the gun industry. The nation's largest firearms manufacturer, Freedom Group, Inc., included the following candid disclosure in a document filed recently with the U.S. Securities and Exchange Commission (SEC):

> We believe that a number of trends that currently exist may affect the hunting and shooting sports market:
>
> ■ the development of rural property in many locations has curtailed or eliminated access to private and public lands previously available for hunting;
>
> ■ environmental issues, such as concern about lead in the environment; and
>
> ■ decreases in consumer confidence and levels of consumer discretionary spending.

These trends may have a material adverse effect on our business by impairing industry sales of firearms, ammunition and other shooting-related products.[7]

Other trends include aging consumers—the percent of the U.S. population aged 65 and older has grown from 4.1 percent in 1900 to 12.4 percent in 2000.[8] Gun owners are older and young people are less likely to buy firearms. *The Christian Science Monitor* reported in 2002 that some in the gun industry itself explained that the "fact that the average age of gun owners continues to increase is...more than a statistical quirk tied to aging baby boomers. Rather it's a sign that younger generations see guns differently."[9] The growing proportion of immigrants in U.S. society also has an impact: "America's increasing immigrant population has less of a tradition with firearms...."[10]



Electronic entertainment like Nintendo's Super Mario series of video games threatens the gun industry's crucial "youth market."

Recent studies have shown that alternative recreation has drastically affected so-called "nature recreation"— camping, hunting, fishing, and park visitation—by all Americans. According to these studies, "Most reliable long-term per capita visitation measures of nature recreation peaked between 1981 and 1991. They've declined about 1.2 percent per year since then, and have declined a total of between 18 percent and 25 percent."[11] The authors state the cause is "a social change of values characterized by our increasing pursuit of electronic media entertainment."[12] According to the Entertainment Software Association, U.S. sales of computer and video games grew from $2.6 billion in 1996 to "well over $7.0 billion" in 2007.[13]

As a result, the gun industry has failed to keep up with population growth. Between 1980 and 2000 the U.S. population grew from 226,545,805 to 281,421,906—a 24 percent increase.[14] Over the same period, total domestic small arms production fell from 5,645,117 to 3,763,345—a 33 percent decrease.[15] As America has gotten bigger, the gun industry has gotten smaller.

**Gun Industry Solution: Generating Demand with New and More Lethal Designs.** In order to entice new gun owners into its shrinking pool of customers—and to motivate gun owners already in the pool to buy more guns—the gun industry seeks to create innovative products that offer new features and appeal to consumer trends. The industry itself deliberately creates these consumer trends.

An example lies in the phenomena of: (1) the gun lobby's nationwide campaign, led by the National Rifle Association (NRA), to change state laws to allow the concealed carry of firearms; and, (2) the gun industry's parallel aggressive marketing of concealable, high-powered handguns. In a 1996 interview with *The Wall Street Journal*, the NRA's then-chief lobbyist, Tanya Metaksa, claimed credit for generating new gun sales with the concealed carry campaign: "The gun industry should send me a basket of fruit—our efforts have created a new market."[16]



Colt's Manufacturing evokes the militaristic image of Air Force General Curtis LeMay—"Father of the Strategic Air Command"— to promote its 01970 CY "carry model" semiautomatic pistol.

*Colt American Legends* catalog (2010)

A Freedom Group filing with the SEC contains a more recent description of the process: "We have also shifted our business from a manufacturing-based 'push system' to a customer-focused 'pull system,' *driven by our Chief Sales and Marketing Officers.*" [emphasis added][17] Translated into plain English from the language of financial filings, this admission means that the conglomerate's marketing technique is to *generate* demand ("pull").

The constant generation of "pull" in niche markets is vital to the industry's survival. If a manufacturer's new product generates sufficient "pull," or product demand, imitation by other manufacturers and proliferation of the design follows swiftly.



NRA bumper sticker typical of gun lobby's pseudo-patriotic propaganda.



DSA, Inc. promoted its "Spartan Series" semiautomatic assault rifles with the Greek phrase "*Molon Labe*" ("Come and take them") supposedly uttered by Spartan warriors in 480 BC at the Battle of Thermopylae. "In the United States the English translation is often heard from shooting sports enthusiasts as a defense of the U.S. constitutional right to keep and bear arms," the company's brochure states.

**Appealing to the Soldier Within.** A marketing technique central to the gun industry's militarization campaign is appealing to the soldier within potential buyers who are drawn for emotional—or more sinister practical—reasons to military weaponry.



FN Herstal USA's 2010 catalog touts the SCAR 16S, "the semi-auto only version of the U.S. Special Operations Command's newest service rifle."

Here, for example, is an industry newsletter's description of the appeal of an assault rifle recently introduced by FN Herstal—the FNAR—by reference to a well-known military weapon, the Browning Automatic Rifle (BAR):

> Even as many in the firearms business worry about the potential for another assault on assault rifles…there's yet another entry into the black rifle marketplace.

> FNH USA has announced the availability of their new FNAR 7.62x51mm semiautomatic rifle. If [sic] looks something like a tuner-version of the venerable BAR, but there's probably some reason for that resemblance. FNH, after all, owns Browning—and the Browning Automatic Rifle carries a lot of mystique with law enforcement and military folks.[18]



"Descending from the legendary Browning Automatic Rifle (BAR), the FNAR puts autoloading speed and bolt-action accuracy into one powerful package."

FNUSA description of its FNAR civilian semiautomatic assault rifle, www.fnhusa.com/le/products/firearms/group.asp?gid=FNG022&cid=FNC01





The BAR was a favorite of U.S. Marines in World War II—and of a notorious 1930s outlaw, serial cop-killer Clyde Barrow.

The gun industry's embrace of militarization can be seen in the chart below. Eleven of the top 15 gunmakers manufacture some type of assault weapon.

## ELEVEN OF THE TOP 15 GUN MANUFACTURERS MARKET ASSAULT WEAPONS[19]

| Rank | Manufacturer | Assault Weapons? | Make or Type |
|------|--------------|------------------|--------------|
| 1 | Sturm, Ruger | Yes | Mini-14 and SR-556 assault rifles |
| 2 | Smith & Wesson | Yes | M&P 15 assault rifle |
| 3 | Remington | Yes | R-15 assault rifle |
| 4 | Maverick/Mossberg | Yes | Tactical .22 assault rifle and assorted assault shotguns |
| 5 | Marlin | No | |
| 6 | Sig Sauer | Yes | Assorted assault rifles |
| 7 | Kel-Tec | Yes | Assorted assault rifles |
| 8 | Savage | Yes | 110 BA assault rifle |
| 9 | H&R 1871 | No | |
| 10 | Beemiller | Yes | Hi-Point Carbine assault rifle |
| 11 | Henry Repeating Arms | No | |
| 12 | DPMS | Yes | Assorted assault rifles |
| 13 | Beretta, USA | Yes | Storm assault rifles |
| 14 | Bushmaster | Yes | Assorted assault weapons |
| 15 | Glock | No | |

# HOW HAS THE GUN INDUSTRY MILITARIZED ITS MARKET?

The gun industry has militarized the civilian market with three major types of firearms: high-capacity handguns, assault rifles and pistols, and sniper rifles.

### HIGH-CAPACITY HANDGUNS

Handguns are a basic weapon of the U.S. military. Until 1911, the U.S. armed forces historically favored revolvers. In that year the U.S. Army adopted a semiautomatic pistol for the first time, the iconic Colt M1911 in .45ACP (designated the M1911A1 after modifications were made in 1926).[20]



Colt Model 1911A1

The Colt pistol remained the military's standard sidearm until 1989. Although various models of the Colt pistol were offered in the civilian market, American consumers favored revolvers, which continued to dominate the market until 1989.

In that year, Beretta, U.S.A. Corporation—a subsidiary of an Italian gun manufacturer—won final approval of a contract to replace the venerable M1911A1 with its 9mm semiautomatic pistol. In short order, the U.S. civilian handgun market was revolutionized and militarized, in large part because of a deliberate, well-documented marketing strategy by Beretta's management.

**Handgun Militarization—High-Capacity Semiautomatic Pistols.** Beretta's pistol, designated the M-9, entered service in 1990 as the military's primary sidearm.[21] But Beretta's top executive told the *Baltimore Sun* in 1993 that the military contract was simply "part of a carefully planned strategy dating back to 1980"—

> The plan was to win the military contract and use it to make Beretta a household name in the United States in hopes of tapping into the larger law-enforcement and commercial markets. That's why, [Robert] Bonaventure [head of Beretta U.S.A. Corp.] said, the company has been selling pistols to the military for about $225 each—close to production cost....The biggest market—about twice the size of the police and military business combined—is the commercial market....[22]



Beretta's top U.S. executive told the *Baltimore Sun* in 1993 that the company's strategy was to use the cachet of military sales to reach the larger civilian handgun market. The Beretta M9 also became a favorite of street gangs and drug dealers.



Beretta advertisement from October 1985 issue of *Guns & Ammo* exemplifies the Italian arms maker's use of military cachet in the civilian gun market.

Austrian entrepreneur Gaston Glock had a similar objective when he founded his handgun manufacturing company, won an Austrian army competition in 1982, opened a U.S. subsidiary, and then went after the American law enforcement market. "In marketing terms, we assumed that, by pursuing the law enforcement market, we would then receive the benefits of 'after sales' in the commercial market," Glock told *Advertising Age* in 1995.[23]





Austrian gun manufacturer Glock promotes its firearms by constantly linking them to law enforcement use, a form of domestic militarism.

Boosted by these companies' sophisticated marketing strategies, and an adulatory gun press, high-capacity 9mm semiautomatic pistols reinvigorated the industry in the 1980s. Known as "Wonder Nines," 9mm semiautomatic pistols drove the formerly dominant revolvers out of the handgun market and created a lucrative boom for the industry. The military-style semiautomatic pistols proliferated.

The switch from revolvers to high-capacity pistols dramatically enhanced handgun lethality. As *Jane's Infantry Weapons* observed in the early 1980s, revolvers are "bulky," "generally limited to six rounds," take a "long time to reload," and produce low muzzle velocity. Pistols "can be made flat and unobtrusive," "take up to 13 rounds or more," feature a "simple to replace magazine," and high muzzle velocity.[24]



Gun industry promotional materials, like this DVD distributed at an NRA convention by German gunmaker Walther, frequently emphasize such militaristic terms as "mission," "special operations," and "tactical."





*Sniperworld* (above) sells military-style firearms through the Internet. Here it assigns customers the "mission" of picking their sniper rifle. The dealer displays its membership in the NRA Business Alliance: "The Business of Freedom."

**Handgun Militarization—High-Capacity "Anti-Terrorist" Vest-Busting Pistols.** In the scramble for market, the gun industry has introduced a plethora of high-capacity, high-caliber semiautomatic pistol designs since the mid-1980s. But no product better captures the gun industry's relentless militarization than the Belgian company FN Herstal's introduction into the civilian market of a pistol and cartridge specifically designed to defeat body armor—the FN Model Five-seveN.

FN Herstal originally created the 5.7x28mm cartridge as the ammunition for a new submachine gun, the P90. The gun and round combination was developed in response to NATO's request for design of a weapon that would be effective against body armor—ubiquitous on the modern battlefield. (The P90 is the prime example of a new generation of "high-tech" assault rifles, and a civilian version, the PS90, has become popular in the United States.) In short order, the company also designed a handgun that would chamber the innovative armor-piercing submachine round.



> "Just like the Five-seveN handgun, the P90 submachine gun was developed around the 5.7x28mm ammunition to meet the Armies [sic] requirement in terms of efficiency."
>
> FN Herstal website

FN clearly understood that it was releasing a lethal genie. A spokesman for the company told the *Sunday Times* in 1996 that the pistol was "too potent" for normal police duties and was designed for anti-terrorist and hostage rescue operations.[25] The NRA's *American Rifleman* claimed in 1999 that: "Law enforcement and military markets are the target groups of FN's new FiveseveN pistol," and told its readers, "Don't expect to see this cartridge sold over the counter in the United States. In this incarnation, it is strictly a law enforcement or military round."[26] In 2000, *American Handgunner* magazine assured the public, "For reasons that will become obvious, neither the gun nor the ammunition will ever be sold to civilians or even to individual officers."[27]

In fact, this handgun, described as being for anti-terrorist and hostage rescue operations with its law enforcement and military round were, and are, freely sold to civilians. FN was simply hyping its new product with widespread publicity in the gun press about "restricted" sales to military and police, and then—having whetted the gun buying public's appetite—moved into the much bigger and more profitable civilian market. The Five-seveN is one of the leading firearms smuggled to Mexico from the U.S. civilian gun market.



FN has heavily promoted its armor-piercing handgun in the U.S. civilian market. FN emphasizes its military cachet: "Today FN provides 70% of the small arms used by U.S. Military Forces around the globe. FN is the name you can trust. JUST LIKE THEY DO." [Capitals in original.]

FNH USA 2008 catalog



U.S. Army Major Nidal Malik Hasan, left, used an FN Five-seveN 5.7mm semiautomatic pistol at Ft. Hood, Texas, on November 5, 2009. The major allegedly shot to death 13 people and wounded 32 others. He awaits trial in an Army court martial.



Although aimed at women, this ad's text promotes FN's military connection: "Built for America's Forces. Built for You."

## ASSAULT RIFLES AND ASSAULT PISTOLS

In the mid-1980s, the industry found another niche market—semiautomatic assault weapons.

Semiautomatic assault weapons are civilian versions of automatic military assault rifles (like the AK-47, the M-16, and FN's high-tech P-90) and automatic military assault pistols (like the UZI).[28]

The military weapons "look" the same as the civilian weapons because they are functionally virtually identical. They differ only in one feature: military assault rifles are "machine guns." A machine gun fires continuously as long as its trigger is held back—until it runs out of ammunition. Civilian assault rifles are *semi*-automatic weapons. The trigger of a semiautomatic weapon must be pulled back separately for each round fired.

Because federal law has banned the sale of new machine guns to civilians since 1986,[29] and heavily regulates sales to civilians of pre-1986 machine guns, there is virtually no civilian market for military assault weapons. The gun industry introduced semiautomatic versions of these deadly military assault weapons in order to create and exploit civilian markets.



The next problem arises if you make a semiauto-only model of one of these selective-fire rifles. According to the purists, an assault rifle has to be selective fire. Yet, if you think about it, it's a little hard to accept the idea that firearms with extended magazines, pistol grip stock, etc., cease to be assault rifles by changing a bit of metal.

In his 1986 book pro-gun author Duncan Long dismissed in the quote above the suggestion that semiautomatic civilian assault rifles were different in any substantial way from their military counterparts. The gun lobby has spent three decades trying to "rebrand" civilian assault rifles as mere sporting guns.

The world's armies developed assault weapons to meet specific combat needs. All assault weapons—military and civilian alike—incorporate specific features that were designed for laying down a high volume of fire over a wide killing zone. This is sometimes known as "hosing down" an area. Civilian assault weapons feature the specific military design features that make spray-firing easy and distinguish assault weapons from traditional sporting firearms.

The most important of these design features are—

■   High-capacity detachable ammunition magazines that hold as many as 75 rounds of ammunition.

■   A rear pistol grip (handle), including so-called "thumbhole stocks" and magazines that function like pistol grips.

■   A forward grip or barrel shroud. Forward grips (located under the barrel or the forward stock) give a shooter greater control over a weapon during firing.

A gun industry observer summed up the design in September 2009:

> From the minute you get your first modern, AR-style rifle, the first thing that you notice is the fact that it truly is one of the most ergonomic long guns you'll ever put to your shoulder. Makes sense, it was designed to take young men, many of whom had never fired a gun of any sort before, and quickly make them capable of running the rifle—effectively—in the most extreme duress, armed combat.[30]



130. Firing with the stock pressed to the body is conducted without halting. Press the stock to the right side with the right arm, with the butt of the stock in the armpit or against the front part of the upper arm (Figure 73). If the stock is folded, press the rifle's receiver and pistol grip to the body with the right hand (Figure 56). Hold the rifle with the left hand at the fore end. Point the rifle at the target and, continuing movement, commence firing.

**Figure 73.** Firing on the move:

a - with stock pressed to side (armpit)   b - with stock resting against upper arm

131. When firing on the move, reload the rifle without stopping movement.



Assault rifles are used for sustained fire action at relatively close range (under 100 meters being the norm). Here Russian troops engage targets with their AK-47/AKM assault rifles.



loosed at a 100-yard gong. The arm functioned flawlessly, and the iron plate reverberated with pleasing regularity. Recoil was virtually nil and even the report was not prohibitive. Ejection was positive, with the cases being tossed cavalierly to the *continued on page 76*

*Our test 8mm AR-15 was found to be a natural pointer. Target acquisition was rapid, even in instinctual shooting from waist level.*

AK manual, gun magazine, and rifle book illustrate assault rifle "hosing down" technique.

**Imports—AK-47 Variants.** The Soviet Army's premier assault rifle, the AK-47, went into service in 1947. The AK-47 has been made in many variants since then. It is said to be the most widely-distributed rifle in the world.

China was directly responsible for the AK boom in the United States. The country exported few guns to the United States until 1987, when Chinese rifle imports—mostly semiautomatic versions of the AK-47—surged. The flood of Chinese rifles reached 64 percent of all rifles imported into the United States in 1993.[31]

The executive branch has clear, existing authority under the Gun Control Act of 1968 to completely prohibit the import of any "non-sporting" firearm, such as these military-derived weapons.[32] In 1989, the George H.W. Bush administration blocked the importation of foreign-made semiautomatic assault rifles such as the AK variants. After the gun industry devised ways to skate around this ban with minor design changes, the Clinton administration acted again to cut off the flood of so-called "rule beaters."

The George W. Bush administration, however, completely and surreptitiously abrogated the first Bush and Clinton import rules. The Obama administration has done nothing to reinstate the earlier tough rules. Accordingly, Eastern European gun manufacturers have taken the place of the Chinese gun makers. They are supplying millions of AK-47-type weapons to the U.S. civilian market through licensed importers.



*Guns & Ammo* ad for AK-type rifles from China in December 1985 (lower right). Since George W. Bush's administration opened the assault rifle floodgates again, AK-type rifles have poured in from Eastern Europe, as evidenced by this May 20, 2010, ad for J&G Sales from *Shotgun News*, which is typical of fare in the popular publication.

**Domestic Production—AR-15 Variants of the M-16.** After studying over three million casualty reports from World Wars I and II, and data from the Korean War, the U.S. Army concluded, "Marksmanship was not as important as volume." Accordingly, it decided in the 1960s to replace its M-14 battle rifle with the M-16 assault rifle.[33]

The gun industry quickly churned out civilian versions of the M-16, labeling the semiautomatic model the "AR-15" (the same designation as the prototype military assault rifle). "With the number of companies making those particular black rifles today, it's tough to keep up them [sic]," a gun industry insider wrote in 2009.[34]



The gun industry created a vast market for AR-15 civilian versions of the U.S. military's M-16 assault rifle.

Manufacturers have recently introduced assault rifles in 22 caliber, considerably cheaper than the .223 ammunition of the usual AR-15 semiautomatic assault rifle. The lighter weapons also provide an entry model for later transition to higher-caliber rifles. For example, in August 2009 Smith & Wesson began shipments of its M&P15-22 semiautomatic assault rifle. Here is how one gun writer enthused about the new model:

> ...the M&P15-22 might be the first .22 LR AR platform that actually is appropriate for consumers, law enforcement and military use that can be used to teach AR operations and basic marksmanship skills and know there will be no modifications necessary to transition to the myriad of other AR calibers available.[35]



The industry has lately pushed 22 caliber semiautomatic assault rifles.

**The 1994 Assault Weapons "Ban" and the Rise of Bushmaster.** In 1994, Congress passed a ban on the production of certain semiautomatic assault weapons as well as new high-capacity ammunition magazines that held more than 10 rounds. The law banned specific assault weapons by name and also classified as assault weapons semiautomatic firearms that could accept a detachable ammunition magazine and had two additional assault weapon design characteristics.[36]

Because the law listed merely cosmetic features (like bayonet mounts) and did not address the fundamental design of assault weapons, it was ineffective. The gun industry quickly made slight design changes in "post-ban" guns to evade the law, a tactic gunmakers dubbed "sporterization." One of the most aggressive of the manufacturers of "post-ban" ARs was Bushmaster Firearms. A Bushmaster XM15 M4 A3 assault rifle was used by the Washington, D.C.-area snipers to kill 10 and injure three in October 2002. A poster child for the industry's success at evading the ban, the snipers' Bushmaster was marketed as a "Post-Ban Carbine."

The 1994 law expired ("sunset") on September 13, 2004.




The Washington, D.C.-area "Beltway Snipers" used the Bushmaster semiautomatic assault rifle being shown at left above. Among Bushmaster's latest AR-type assault rifles is the "Adaptive Combat Rifle" featured on the cover of the NRA's May 2010 *American Rifleman*.

**Assault Pistols—UZI, Ingram, Intratec, and More.** A particularly deadly variant in the gun industry's marketing program has been the sale of civilian assault pistols, which are for the most part simply semiautomatic versions of submachine guns. Firearms expert Duncan Long explained the marketing basis of this trend in his book *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families*:

> As the militaries of the world increasingly rely on assault rifles to fill the submachine gun role, making money on a new submachine gun design becomes harder and harder....Citizens purchasing firearms for everything from plinking to self-defense have provided a lucrative market, especially in the United States. Those weapons produced for the civilian market are generally semiauto versions of the automatic weapons, often modified slightly to conform to U.S. firearms laws.[37]

A more recent development has been the introduction of AK-47 type pistols, which combine all the deadly design characteristics of the military-style assault rifle with the greater concealability of the handgun.



Gun dealers offer AK-47 type semiautomatic assault pistols, like the Draco above, through the Internet.

## THE ASSAULT WEAPONS HYPE MARKET

**The 1980s Explosion.** Assault weapons quickly became hot items on the civilian market in the 1980s for a variety of reasons. For manufacturers, assault weapons helped counter the mid-1980s decline in handgun sales. Criminals—especially drug traffickers—were drawn to assault weapons' massive firepower, useful for fighting police and especially competing traffickers. Survivalists—who envisioned themselves fending off a horde of desperate neighbors from within their bomb shelters—loved the combat features of high ammunition capacity and anti-personnel striking power of assault weapons. Right-wing paramilitary extremists, in their ongoing battle against the "Zionist Occupational Government," made these easily purchased firearms their gun of choice. And for gun enthusiast fans of popular entertainment—*Rambo* and *Miami Vice*—semiautomatic assault weapons offered the look and feel of the "real thing."




German manufacturer Heckler & Koch pushed the civilian version of its military assault rifle in a series of ads—like these from *Guns & Ammo* magazine—in the mid-1980s stressing "survivalist" themes.

**The Y2K Exploitation.** The gun industry has ever since poured its efforts into new assault weapons designs and into their heavy marketing. One example of the industry's cynicism was its deliberate exploitation of widespread fears of a "breakdown" in public order at the turn of the millennium ("Y2K").[38]

In the January 1999 issue of *Shooting Sports Retailer*, editor Bob Rogers predicted, "Amidst social turmoil and disintegrating economic underpinnings, you will sell more guns in 1999 than you've ever sold in your life."[39] *Shooting Industry*'s Russ Thurman asked readers, "Are you cashing in on the new millennium?"[40]

The prime danger, the gun industry luridly suggested, was that of rampaging humans: "...since the Have Nots won't hesitate to break in and take from the Haves, plan on close contact. And plan on being outnumbered. High-capacity rifles, pistols and shotguns are obvious choices."[41] But domestic pets could also become a threat to life in the gun industry's bizarre world: "One might also need to quickly stop a dog or dogs who through starvation revert to wild beasts. Dogs take a lot of killing, so a powerful round and good shot placement will be necessary should this distasteful task arise."[42]





Premier gun industry magazine *Shooting Industry* advised dealers in September 1999 (left) that "...taking advantage of the Y2K 'scare' is smart business...." In January 2000 the magazine reported that "...predictions of massive unrest...prompted gunowners to stock-up [sic] on ammunition."

*Gun World*'s Y2K Daisy Chain



*Gun World* magazine not only published its own article in 1999 about how to "survive Y2K"—it also referred its readers to its sister publication *American Survival Guide*, in which appeared another article of survival advice written by *Gun World* editor Jan Libourel.




Typical Y2K gun ads from 1999 are shown above.

**Continuing Incitement.** The gun industry, the NRA, and the gun press have exploited every real and imagined public fear since the 1980s—including the terror attacks of September 2001, Hurricane Katrina, "spillover" of border violence, and concerns about violent "illegal" immigrants. The industry's propaganda added fuel to the militia movement in the 1990s. Lethal confrontations occurred between federal law enforcement and civilians heavily armed with military-style weapons at Waco, Texas, and Ruby Ridge, Idaho. Barack Obama's election, and fears that he would push an anti-gun agenda, ignited growth in the "militia"movement and a disturbing trend of open display of assault weapons near Presidential speaking engagements.[43]



The ad for a Benelli shotgun on the left, from the NRA's 2010 annual meeting brochure, ostensibly speaks to a "revolution" in shotgun design. The ad for the "tactical" shotgun on the right, from the September 2010 *Guns & Ammo* magazine, links "homeland security" to "Iraq, Afghanistan, Your Livingroom."



The NRA pamphlet *Freedom in Peril* warns, "Second Amendment freedom today stands naked...." Laced with ugly stereotypes of the gun lobby's political enemies—a classic technique for dehumanizing "the other"—it suggests "towering waves" of danger from ethnic and racial gangs. "Sometimes," the brochure suggestively states, "any hope of prevailing rests in the hearts and hands of a very urgent few...."



**The National Shooting Sports Foundation's Rebranding Campaign.** In November 2009, the National Shooting Sports Foundation (NSSF) announced that—"due to gun owners' concerns over President-elect Obama and possible legislation regulating the Second Amendment rights of Americans"—it had placed on its website a "media resource...to help clear up much of the confusion and misinformation about so-called 'assault weapons.'"[44]

This was the opening salvo in the industry's meretricious campaign to "rebrand" semiautomatic assault weapons as "modern sporting rifles."[45] The point of the campaign—inspired by the pummeling the industry gets for selling killing machines—is apparently that semiautomatic assault rifles are really just another sporting gun, no different from an older generation of bolt-action and low-capacity rifles.

Unfortunately for the NSSF and the industry, the widely-reported affection for semiautomatic assault rifles by extremists, drug lords, and common criminals gives the lie to this insidious "rebranding" campaign. Even worse, some within the gun industry's own ranks apparently never got the NSSF rebranding memo. They continue to call semiautomatic assault rifles what they are—*assault* rifles—and even write lurid prose promoting the worst features of these guns.





Manufacturers and fan magazines alike called semiautomatic assault weapons "assault weapons" before their deadly killing power became a matter of public debate.

For recent example, the August 2010 edition of *Gun World* magazine headlines "Ruger's Mini-14 Tactical Rifle" as "'Combat Customized' From the Factory."[46] Among other outbursts of naked candor in the enthusiastic article are the following—

■   Ruger's Mini-14 Tactical Rifle is a version of the well-established Mini-14 incorporating many of the assault rifle features that end users have being [sic] applying themselves for decades, this time straight from the factory.

■   **Being seen over the years as a sort of "poor man's assault rifle" the Mini-14 has spawned a huge array of after-market parts that may be applied to make it more "assault rifle-y."** Recently Sturm, Ruger & Co. finally decided to get into the act themselves by producing their Mini-14 Tactical Rifles. [Bold added]

This spasm of candor is typical of the "wink and nod" game that the gun industry plays when it talks to itself and to its hard-core consumers: call them what you will—"black rifles," "tactical rifles," or "modern sporting rifles"—semiautomatic assault weapons are plain and simply military-style assault weapons.



## 50 CALIBER ANTI-ARMOR SNIPER RIFLES

The 50 caliber anti-armor sniper rifle is a case of militarization in which precisely the same weapon is sold on the civilian market as that sold to the world's armed services.

This lucrative weapon was invented in the early 1980s by a Tennessee commercial photographer, Ronnie G. Barrett, who derived the sniper rifle from the Browning 50 caliber machine gun.[47]

Barrett's 1987 patent called his new invention an "anti-armor gun." He described the rifle in his patent claim as a "shoulder-fireable, armor-penetrating gun." Barrett related the novelty of his anti-armor gun as follows:

> The recoil and weight of the Browning M-2 heavy-barrel machine gun (50 cal.), belt-fed, make it unsuitable for firing from the  shoulder. The bolt-fed sniper rifle of smaller weight and caliber will not penetrate armored targets. The bolts of guns of a caliber that will penetrate armored targets are often broken by recoil because of excessive strain on the lock lugs. Thus, there is a need for a light-weight, shoulder-fireable, armor-penetrating gun that can stand up to heavy duty use. After extended investigation I have come up with just such a gun.

Barrett Firearms Manufacturing, Inc. is today the leading supplier of 50 caliber anti-armor sniper rifles to U.S. military forces and many other armies of the world.



Advertising note "From the Desk of Ronnie Barrett," inventor of the 50 caliber anti-armor sniper rifle, boasts that "...each Barrett model of large-caliber rifle is in service with a government somewhere around the globe." In his pitch to "Fellow Fun Enthusiasts," Barrett urges them to "[c]onsider this when you are comparing our rifles to any other

Barrett has also aggressively marketed its anti-armor rifles to civilian buyers in the United States. After Barrett effectively created a new civilian market for his anti-armor rifles, lower-priced competition sprang up from dozens of new manufacturers cashing in on the booming niche. These rifles have become one of the hottest items sold in the civilian market.

In spite of their battlefield pedigree, 50 caliber anti-armor rifles are no more regulated under federal law than a 22 caliber target rifle, and are less regulated than handguns. Under federal law, anyone at least 18 years of age who is not in a category as to whom transfers or possession of firearms is prohibited—such as convicted felons—can legally buy any .50BMG anti-armor sniper rifle sold in America. But it is against the law for a federally licensed dealer to sell a handgun to anyone less than 21 years of age. Unlike other weapons of war—such as 50 caliber fully automatic machine guns—50 caliber anti-armor rifles are exempt from the stringent provisions of the federal National Firearms Act, which requires a photo, fingerprints, local law enforcement approval, record of the transfer, and registration of the weapon with a $200 fee.



The gun industry has saturated the American civilian "gun culture" with 50 caliber anti-armor sniper rifles, like this AR-50.

## TAXPAYERS SUBSIDIZE THE GUN INDUSTRY

In spite of "anti-government" and insurrectionist rhetoric from the National Rifle Association and its ilk, the gun industry and the gun lobby aggressively milk the federal government for taxpayer subsidies. For example, the U.S. Fish & Wildlife Service regularly subsidizes gun industry marketing research in the guise of "conservation" grants, as described in this 2009 industry article:

The Task Force 20/20 group, industry leaders from the hunting and shooting sports, is continuing to work toward its goal of increasing participation in hunting and the shooting sports by 20 percent over the next five years....Task Force 20/20 began in 2008 during the NSSF Summit whose primary focus was discussing research from a three-year study titled *The Future of Hunting and the Shooting Sports—Research-based Recruitment and Retention Strategies*. The report condenses the findings of one of the largest and most comprehensive studies ever conducted on factors related to the hunting and shooting sports industry. Funding for the research came from the U.S. Fish & Wildlife Service in the form of a multi-state conservation grant.[48]



The U.S. armed forces also subsidize industry activity, largely through the ploy of "marksmanship" programs, as this article from an industry newsletter attests:

> Every summer, prior to the National Rifle and Pistol Trophy Matches at Camp Perry, Ohio, Soldiers from the U.S. Army Marksmanship Unit take time out of their own training and preparation to pass their knowledge and superb shooting skills on to the next generation of American shooters at the Small Arms Firing School....

> "It's such a great thing," said Jim Davis, Hamilton, Ind. "This is the best place in the country, maybe the world, to learn about shooting and everything that goes with it."

> Davis took his son and three other children from the Dekalb County 4-H club to the rifle class, stressing to them how valuable the instruction that they are receiving is to them now and down the road.

> "I still remember when I came to this school as a teenager," he said. "I tell my kid that this is something that you'll always remember."[49]

The Army Marksmanship Unit also hosts an annual event for "civilians playing army in combat situations."[50]

> The shooting sport of 3-gun competition, with pistol, rifle, and tactical shotgun is rooted somewhere in the idea of adults playing army. It is simulated combat. And Three Gun can get even more interesting when the Army issues an invitation to bring your guns and join up for three days of competition, with the Army Marksmanship Unit hosting their 3-gun challenge.[51]

The bottom line—ultimately the only thing that matters to the gun industry—is that taxpayers are paying for the means by which a dying industry hangs on by funding market research in the guise of "conservation grants" and introducing new generations of children to the "sport" of shooting military-style weapons in the drag of military marksmanship programs.

## THE RESULT: MILITARIZED FIREARMS DEFINE THE U.S. CIVILIAN FIREARMS MARKET

Military-style weapons today define the U.S. civilian gun market. As noted earlier, *Shooting Wire* summarized the gun industry's situation in December 2008 as follows:

> The net of all the numbers is that if you're a company with a strong line of high-capacity pistols and AR-style rifles, you're doing land office business. If you're heavily dependent on hunting, you are hurting.[52]



Military-style "combat rifles" and lethal firepower dominate U.S. civilian firearms market production and marketing.

## THE CONSEQUENCES OF MILITARIZATION

The widespread availability of militarized firearms—including especially high-capacity semiautomatic pistols and assault weapons—has substantially raised the level of lethality of armed encounters in the United States. Criminal street gangs, drug traffickers, and militant extremists are all drawn to the military-style firepower of these weapons.

Two trends are remarkable.

**Increasing Attacks on Law Enforcement with Assault Weapons.** A recent Violence Policy Center study of reported incidents showed that more than one out of four assault weapons incidents involve police. Moreover, the number of assault weapons incidents involving police grew significantly between the two periods studied (March 1, 2005 to February 28, 2006 and March 1, 2006 to February 28, 2007).[53]

A typical more recent incident is that of Richard Poplawski, who is accused of shooting to death Pittsburgh, Pennsylvania, police officers Paul J. Sciullo II, Stephen J. Mayhle, and Eric G. Kelly on April 4, 2009. Among the guns Poplawski fired at police was an AK-47 semiautomatic assault rifle.[54]



Richard Poplawski and the three police officers who died on April 4, 2009.

**Trafficking of Military-Style Weapons from the United States.** According to both United States and Mexican officials, large numbers of military-style firearms from the U.S. civilian gun market fuel criminal violence in Mexico. Congressional hearings and public policy reports have made clear that the U.S. gun industry is instrumental in making readily available to illegal gun traffickers the types and numbers of weapons that facilitate drug lords' confrontations with the Mexican government and its people. U.S. and Mexican officials report that, based on firearms tracing data from the federal Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), the cartels obtain up to 90 percent of their firearms from the United States.[55]



Military-style firearms smuggled from the United States fuel violence among Mexican drug cartels and criminal confrontations with the Mexican government. Weapons of choice include 50 caliber anti-armor sniper rifles,assault rifles, and cop-killing FN Five-seveN anti-armor handguns.

## WHAT CAN BE DONE?

More than anything else, the news media, public interest groups, and especially policymakers must come to grips with a deadly reality. That reality is that the gun industry is not today—if it ever was—a "sporting" industry. It is a highly militarized and increasingly cynical industry that has cast all restraint aside to generate profit from military-style firearms.

Like an injured predator, the industry is particularly dangerous as it sinks further into its inevitable decline. The gun industry's desperate "marketing" campaigns underwrite mass shootings in the United States, increasingly lethal confrontations with law enforcement, and armed violence abroad.

Most insidiously, the gun lobby's exploitation of fear—racial, ethnic, and political—encourages resort to armed violence among the most impressionable and ill-equipped to function in a complex society.

This is truly an era in which to do nothing is to invite unthinkable violence.

# ENDNOTES

1. Although counts have varied slightly as forensic evidence became available and was more thoroughly examined, the total number of people killed in all of the terrorist attacks on September 11, 2001, is about 2,975. *Associated Press*, "Official 9/11 Death Toll Climbs By One," July 10, 2008, www.cbsnews.com/stories/2008/07/10/national/main4250100.shtml. By comparison, there were a total of 31,224 firearm deaths in the United States in 2007, the latest year for which data are available. Centers for Disease Control and Prevention, "2007, United States Firearm Deaths and Rates per 100,000."

2. See www.merriam-webster.com/dictionary/militarization.

3. "New Products, New Political Twists," *Shooting Wire*, October 15, 2008, www.shootingwire.com/archived/2008-10-15_sw.html.

4. "Industry Hanging Onto A Single Category," *Shooting Wire*, December 17, 2008, www.shootingwire.com/archived/2008-12-17_sw.html.

5. "Gun Sales Go Soft As Economy Improves, Fears Subside," *Daily Finance*, April 14, 2010, www.dailyfinance.com/story/company-news/gun-sales-go-soft-as-economy-improves-fears-subside/19437972/#.

6. "All Quiet—But Why?," September 14, 2009, www.shootingwire.com/archived/2009-09-14_sw.html.

7. Freedom Group, Inc., Form S-1, Registration Statement under the Securities Act of 1933, as filed with the Securities and Exchange Commission on October 20, 2009.

8. U.S. Census Bureau, *Demographic Trends in the 20th Century* (November 2002), Figure 2.7, "Percent of Total Population Age 65 and Over: 1900 to 2000," p. 59.

9. "Gun sales fall despite Sept. 11," *Christian Science Monitor*, April 2, 2002.

10. "Gun sales fall despite Sept. 11," *Christian Science Monitor*, April 2, 2002.

11. "Conservation Science: Do People Still Care About Nature," The Nature Conservancy, www.nature.org/tncscience/misc/art23800.html.

12. Oliver R.W. Pergams and Patricia A. Zaradic, "Is love of nature in the US becoming love of electronic media?," *Journal of Environmental Management*, March 30, 2006, p. 391. The researchers call the population's increasing attention to video games, personal computers, the Internet, and home entertainment systems "videophilia." "Kids just don't get out(doors) much anymore," *Star Tribune* (Minneapolis), February 10, 2008.

13. Stephen E. Siwek, *Video Games in the 21st Century: Economic Contributions of the US Entertainment Software Industry*, Entertainment Software Association, 2007, p. 9.

14. U.S. Census Bureau, *Demographic Trends in the 20th Century* (November 2002), Appendix A, Table 1, "Total Population for the United States, Regions, and States: 1900 to 2000."

15. National Shooting Sports Foundation, *Industry Intelligence Reports*, "Small-Arms Production in the United States," 2007 Edition, p. 2, Table: "25 Years Small-Arms Production (1980-2005)."

16. "Tinier, Deadlier Pocket Pistols Are in Vogue," *The Wall Street Journal*, September 12, 1996.

17. Freedom Group, Inc., Form S-1, Registration Statement under the Securities Act of 1933, as filed with the Securities and Exchange Commission on October 20, 2009 [emphasis added].

18. "Another Entry Into the Tactical/Black Rifle Game," *Shooting Wire*, October 22, 2008, www.shootingwire.com/archived/2008-10-22_sw.html.

19. *Shooting Industry*, "U.S. Firearm Industry Report—EXTENDED," July 2010, http://www.shootingindustry.com/Pages/SpecRep02.html.

20. See, for example, *Jane's Infantry Weapons 1983-1984* (London: Jane's Publishing Company Limited), ".45 Model 1911A1 automatic pistol," p. 66.

21. U.S. Army Fact File, "M-9 Pistol," www.army.mil/factfiles/equipment/individual/m9.html.

22. "Italian Gun Maker Beretta Hits U.S. Market with a Bang," *The Plain Dealer*, August 18, 1993 (reprint of *Baltimore Sun* article).

23. Quoted with citations in Tom Diaz, *Making a Killing: The Business of Guns in America* (The New Press, 1999), p. 77.

24. *Jane's Infantry Weapons 1983-1984* (London: Jane's Publishing Company Limited), "Revolvers and Self-loading Pistols," p. 9.

25. "SAS gets handgun that can shoot through walls," *Sunday Times*, July 7, 1996.

26. Dan Shea, "Military Small Arms Update: FN's FiveseveN System," *American Rifleman*, November/December 1999, p. 51.

27. Charles E. Petty, "FN Five-seveN," *American Handgunner*, January/February 2000, p. 54.

28. For a more detailed discussion of the design features of assault weapons, see Violence Policy Center, *Bullet Hoses—Semiautomatic Assault Weapons: What Are They? What's So Bad About Them?* (May 2003), www.vpc.org/studies/hosecont.htm.

29. See, 18 U.S. Code, Section 922(o).

30. "Widening the Funnel," *Shooting Wire*, September 30, 2009, www.shootingwire.com/archived/2009-09-30_sw.html.

31. For a more detailed discussion of China's marketing of semiautomatic assault rifles, see Tom Diaz, *Making a Killing: The Business of Guns in America* (The New Press, 1999), pp. 71-75.

32. 18 USC § 925(d)(3). The Attorney General also has authority to regulate the import of firearms that qualify as "defense articles" pursuant to the Arms Export Control Act, 22 USC § 2278.

33. See Violence Policy Center, *Bullet Hoses—Semiautomatic Assault Weapons: What Are They? What's So Bad About Them?* (May 2003), www.vpc.org/studies/hosecont.htm.

34. "Gold Star for DoubleStar," *Shooting Wire*, July 15, 2009, www.shootingwire.com/archived/2009-07-15_sw.html.

35. "S&W Showing New and Announced Products," *Shooting Wire*, August 19, 2009, www.shootingwire.com/archived/2009-08-19_sw.html.

36. For a more detailed discussion of the illusory effects of the 1994 ban, see Violence Policy Center, *Illinois—Land of Post-Ban Assault Weapons* (March 2004), www.vpc.org/graphics/IllinoisAWstudy.pdf.

37. Duncan Long, *The Terrifying Three: Uzi, Ingram, and Intratec Weapons Families* (Boulder, CO: Paladin Press, 1989): 3-4.

38. For a detailed discussion of this period, see Violence Policy Center, *Cashing in on the New Millennium* (December 1999), www.vpc.org/studies/y2kcont.htm.

39. Bob Rogers, "Y2Kaos," *Shooting Sports Retailer*, January 1999, p. 22.

40. Russ Thurman, "It's Time to Sell the New Millennium!," *Shooting Industry*, September 1999, p. 64.

41. Barrett Tillman, "B4Y2K," *American Handgunner*, September/October 1999, pp. 33, 34.

42. Leroy Thompson, "Facing Y2K With a Colt Python," *Handguns*, September 1999, pp. 51, 53.

43. For a detailed discussion of historical and current trends, see Violence Policy Center, *Lessons Unlearned—The Gun Lobby and the Siren Song of Anti-Government Rhetoric* (April 2010), www.vpc.org/studies/lessonsunlearned.pdf.

44. "NSSF Announces Media Resource on 'Assault Weapons,'" *Shooting Wire*, November 29, 2009, www.shootingwire.com/archived/2008-11-24_sw.html.

45. "Rebranding is the creation of a new name, term, symbol, design or a combination of them for an established brand with the intention of developing a differentiated (new) position in the mind of stakeholders and competitors." "Rebranding," *Wikipedia*, http://en.wikipedia.org/wiki/Rebranding.

46. "Ruger's Mini-14 Tactical Rifle," *Gun World*, August 2010, p. 58.

47. For a complete discussion of the history and threat of 50 caliber anti-armor rifles, see, Violence Policy Center, *Clear and Present Danger: National Security Experts Warn About the Danger of Unrestricted Sales of 50 Caliber Anti-Armor Sniper Rifles to Civilians* (July 2005), www.vpc.org/studies/50danger.pdf.

48. "Task Force 20/20 Continues Setting Agenda for Five-year Plan," *Shooting Wire*, September 18, 2009, www.shootingwire.com/archived/2009-09 -18_sw.html.

49. "Taking Time To Teach," *Shooting Wire*, August 26, 2009, www.shootingwire.com/archived/2009-08-26_sw.html.

50. "Shooting USA Features The USAMU Three Gun Match," *Shooting Wire*, July 15, 2009, www.shootingwire.com/archived/2009-07-15_sw.html.

51. See www.shootingusa.com/TV_SCHEDULE/SHOW_26-17/show_26-17.html.

52. "Industry Hanging Onto A Single Category," *Shooting Wire*, www.shootingwire.com/archived/2008-12-17_sw.html.

53. For complete details, see Violence Policy Center, *Target: Law Enforcement—Assault Weapons in the News* (February 2010), www.vpc.org/studies/targetle.pdf.

54. "Zappala Will Seek Death Penalty for Poplawski," *Pittsburgh Post-Gazette*, April 21, 2009.

55. For more details, see Violence Policy Center, *Indicted: Types of Firearms and Methods of Gun Trafficking from the United States to Mexico as Revealed in U.S. Court Documents* (April 2009), www.vpc.org/studies/indicted.pdf.

 **Violence Policy Center**

1730 Rhode Island Avenue, NW  Suite 1014

Washington, DC 20036

W W W . V P C . O R G