XAVIER BECERRA
Attorney General of California
TAMAR PACHTER
Supervising Deputy Attorney General
NELSON R. RICHARDS
ANTHONY P. O'BRIEN
Deputy Attorneys General
ALEXANDRA ROBERT GORDON
Deputy Attorney General
State Bar No. 207650
  455 Golden Gate Avenue, Suite 11000
  San Francisco, CA  94102-7004
  Telephone: (415) 703-5509
  Fax: (415) 703-5480
  E-mail:
  Alexandra.RobertGordon@doj.ca.gov
*Attorneys for Defendant*
*Attorney General of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VIRGINIA DUNCAN, et al.**<br><br>Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of the State of California; et al.,**<br><br>Defendants. | 17-cv-1017-BEN-JLB<br><br>**EXHIBITS 63-69 TO THE DECLARATION OF ALEXANDRA ROBERT GORDON IN SUPPORT OF DEFENDANT ATTORNEY GENERAL XAVIER BECERRA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        June 13, 2017<br>Time:        10:00 a.m.<br>Dept:        5A<br>Judge:      Hon. Roger T. Benitez<br>Action Filed:      May 17, 2017 |

Decl. of Alexandra Robert Gordon ISO Def's Opp'n to Pls.' Mot. For Prelim. Inj.
(17-cv-1017-BEN-JLB)

# Exhibit 63

**U.S. Department of Justice**

Bureau of Alcohol, Tobacco, Firearms and Explosives

# ATF
## Study on the Importability of Certain Shotguns



**Firearms and Explosives Industry Division**

**January 2011**

i

## TABLE OF CONTENTS

Page

1. Executive Summary………………………………………….              ii

2. Study on the Importability of Certain Shotguns……………..…..              1

3. Background on Shotguns…………………………………….              1

4. Background on Sporting Suitability………………….…………              1

5. Methodology………………………………………………              5

6. Analysis…………………………………………………...              7

       Scope of Sporting Purpose………………………..…..              7

       Suitability for Sporting Purposes…………………….……              8

7. Conclusion…………………………………………………              13

8. Exhibits

    1. Shotgun Stock Style Comparison

    2. State Laws

    3. Sample Drum Magazine

    4. Integrated Rail System

    5. Bulk Measurements

    6. Forward Pistol Grip

ii

## Study on the Importability of Certain Shotguns

### Executive Summary

The purpose of this study is to establish criteria that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) will use to determine the importability of certain shotguns under the provisions of the Gun Control Act of 1968 (GCA).

The Gun Control Act of 1968 (GCA) generally prohibits the importation of firearms into the United States. [1]  However, pursuant to 18 U.S.C. § 925(d), the GCA creates four narrow categories of firearms that the Attorney General must authorize for importation.  Under one such category, subsection 925(d)(3), the Attorney General shall approve applications for importation when the firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes (the "sporting purposes test").

After passage of the GCA in 1968, a panel was convened to provide input on the sporting suitability standards which resulted in factoring criteria for handgun importations.  Then in 1989, and again in 1998, the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) conducted studies to determine the sporting suitability and importability of certain firearms under section 925(d)(3).  However, these studies focused mainly on a type of firearm described as "semiautomatic assault weapons."  The 1989 study determined that assault rifles contained a variety of physical features that distinguished them from traditional sporting rifles.  The study concluded that there were three characteristics that defined semiautomatic assault rifles. [2]

The 1998 study concurred with the conclusions of the 1989 study, but included a finding that "the ability to accept a detachable large capacity magazine originally designed and produced for a military assault weapon should be added to the list of disqualifying military configuration features identified in 1989." [3]  Further, both studies concluded that the scope of "sporting purposes" did not include all lawful activity, but was limited to traditional sports such as hunting, skeet shooting, and trap shooting.  This effectively narrowed the universe of firearms considered by each study because a larger number of firearms are "particularly suitable for or readily adaptable to a sporting purpose" if plinking [4] and police or military-style practical shooting competitions are also included as a "sporting purpose." [5]

Although these studies provided effective guidelines for determining the sporting purposes of rifles, ATF recognized that no similar studies had been completed to determine the sporting

---

[1] Chapter 44, Title 18, United States Code (U.S.C.), at 18 U.S.C. § 922(l).
[2] These characteristics were:  (a) a military configuration (ability to accept a detachable magazine, folding/telescoping stocks, pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights); (b) a semiautomatic version of a machinegun; and (c) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.  *1989 Report and Recommendation on the Importability of Certain Semiautomatic Rifles (1989 Study)* at 6-9.
[3] *1998 Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Rifles (1998 Study)* at 2.
[4] "Plinking" is shooting at random targets such as bottles and cans.  1989 Report at 10.
[5] *1989 Report* at 8-9; *1998 Study* at 18-19.

suitability of shotguns.  A shotgun study working group (working group) was assigned to perform a shotgun study under the § 925(d)(3) sporting purposes test.  The working group considered the 1989 and 1998 studies, but neither adopted nor entirely accepted findings from those studies as conclusive as to shotguns.

<u>Sporting Purpose</u>

Determination of whether a firearm is generally accepted for use in sporting purposes is the responsibility of the Attorney General (formerly the Secretary of the Treasury).  As in the previous studies, the working group considered the historical context of "sporting purpose" and that Congress originally intended a narrow interpretation of sporting purpose under § 925(d)(3).

While the 1989 and 1998 studies considered all rifles in making their recommendations, these studies first identified firearm features and subsequently identified those activities believed to constitute a legitimate "sporting purpose."  However, in reviewing the previous studies, the working group believes that it is appropriate to first consider the current meaning of "sporting purpose" as this may impact the "sporting" classification of any shotgun or shotgun features.  For example, military shotguns, or shotguns with common military features that are unsuitable for traditional shooting sports, may be considered "particularly suitable for or readily adaptable to sporting purposes" if military shooting competitions are considered a generally recognized sporting purpose.  Therefore, in determining the contemporary meaning of sporting purposes, the working group examined not only the traditional sports of hunting and organized competitive target shooting, but also made an effort to consider other shooting activities.

In particular, the working group examined participation in and popularity of practical shooting events as governed by formal rules, such as those of the United States Practical Shooting Association (USPSA) and International Practical Shooting Confederation (IPSC), to determine whether it was appropriate to consider these events a "sporting purpose" under § 925(d)(3).  While the number of members reported for USPSA is similar to the membership for other shotgun shooting organizations,[6] the working group ultimately determined that it was not appropriate to use this shotgun study to determine whether practical shooting is "sporting" under § 925(d)(3).  A change in ATF's position on practical shooting has potential implications for rifle and handgun classifications as well.  Therefore, the working group believes that a more thorough and complete assessment is necessary before ATF can consider practical shooting as a generally recognized sporting purpose.

The working group agreed with the previous studies in that the activity known as "plinking" is "primarily a pastime" and could not be considered a recognized sport for the purposes of

---

[6] Organization websites report these membership numbers:  for the United States Practical Shooting Association, approx. 19,000; Amateur Trapshooting Association, over 35,000 active members; National Skeet Shooting Association, nearly 20,000 members; National Sporting Clays Association, over 22,000 members; Single Action Shooting Society, over 75,000 members.

importation.[7]  Because almost any firearm can be used in that activity, such a broad reading of "sporting purpose" would be contrary to the congressional intent in enacting section 925(d)(3). For these reasons, the working group recommends that plinking not be considered a sporting purpose.  However, consistent with past court decisions and Congressional intent, the working group recognized hunting and other more generally recognized or formalized competitive events similar to the traditional shooting sports of trap, skeet, and clays.

Firearm Features

In reviewing the shotguns used for those activities classified as sporting purposes, the working group examined State hunting laws, rules, and guidelines for shooting competitions and shooting organizations; industry advertisements and literature; scholarly and historical publications; and statistics on participation in the respective shooting sports.  Following this review, the working group determined that certain shotgun features are <u>not</u> particularly suitable or readily adaptable for sporting purposes.  These features include:

> (1) Folding, telescoping, or collapsible stocks;
> (2) bayonet lugs;
> (3) flash suppressors;
> (4) magazines over 5 rounds, or a drum magazine;
> (5) grenade-launcher mounts;
> (6) integrated rail systems (other than on top of the receiver or barrel);
> (7) light enhancing devices;
> (8) excessive weight (greater than 10 pounds for 12 gauge or smaller);
> (9) excessive bulk (greater than 3 inches in width and/or greater than 4 inches in depth);
> (10) forward pistol grips or other protruding parts designed or used for gripping the shotgun with the shooter's extended hand.

Although the features listed above do not represent an exhaustive list of possible shotgun features, designs or characteristics, the working group determined that shotguns with any one of these features are most appropriate for military or law enforcement use.  Therefore, shotguns containing any of these features are not particularly suitable for nor readily adaptable to generally recognized sporting purposes such as hunting, trap, sporting clay, and skeet shooting. Each of these features and an analysis of each of the determinations are included within the main body of the report.

---

[7] 1989 Study at 10; 1998 Study at 17.

Study on the Importability of Certain Shotguns

The purpose of this study is to establish criteria that the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) will use to determine the importability of certain shotguns under the provisions of the Gun Control Act of 1968 (GCA).

Background on Shotguns

A shotgun is defined by the GCA as "a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of an explosive to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger."[8]

Shotguns are traditional hunting firearms and, in the past, have been referred to as bird guns or "fowling" pieces.  They were designed to propel multiple pellets of shot in a particular pattern that is capable of killing the game that is being hunted.  This design and type of ammunition limits the maximum effective long distance range of shotguns, but increases their effectiveness for small moving targets such as birds in flight at a close range.  Additionally, shotguns have been used to fire slugs.  A shotgun slug is a single metal projectile that is fired from the barrel.  Slugs have been utilized extensively in areas where State laws have restricted the use of rifles for hunting.  Additionally, many States have specific shotgun seasons for deer hunting and, with the reintroduction of wild turkey in many States, shotguns and slugs have found additional sporting application.

Shotguns are measured by *gauge* in the United States.  The gauge number refers to the "number of equal-size balls cast from one pound of lead that would pass through the bore of a specific diameter."[9]  The largest commonly available gauge is 10 gauge (.0775 in. bore diameter).  Therefore, a 10 gauge shotgun will have an inside diameter equal to that of a sphere made from one-tenth of a pound of lead.  By far, the most common gauges are 12 (0.729 in. diameter) and 20 (0.614 in. diameter).  The smallest shotgun that is readily available is known as a ".410," which is the diameter of its bore measured in inches.  Technically, a .410 is a 67 gauge shotgun.

Background on Sporting Suitability

The GCA generally prohibits the importation of firearms into the United States.[10]  However, the statute exempts four narrow categories of firearms that the Attorney General shall authorize for importation.  Originally enacted by Title IV of the Omnibus Crime Control and Safe Streets Act of 1968,[11] and amended by Title I of the GCA[12] enacted that same year, this section provides, in pertinent part:

---

[8] 18 U.S.C. § 921(a)(5).
[9] The Shotgun Encyclopedia at 106.
[10] 18 U.S.C. § 922(l).
[11] Pub. Law 90-351 (June 19, 1968).
[12] Pub. Law 90-618 (October 22, 1968).

the Attorney General shall authorize a firearm . . . to be imported or brought into the United States . . . if the firearm . . . (3) is of a **type** that does not fall within the definition of a firearm as defined in section 5845(a) of the Internal Revenue Code of 1954 and **is generally recognized as particularly suitable for or readily adaptable to sporting purposes**, excluding surplus military firearms, except in any case where the Secretary has not authorized the importation of the firearm pursuant to this paragraph, it shall be unlawful to import any frame, receiver, or barrel of such firearm which would be prohibited if assembled.[13] (Emphasis added)

This section addresses Congress' concern that the United States had become a "dumping ground of the castoff surplus military weapons of other nations,"[14] in that it exempted only firearms with a generally recognized sporting purpose.  In recognizing the difficulty in implementing this section, Congress gave the Secretary of the Treasury (now the Attorney General) the discretion to determine a weapon's suitability for sporting purposes.  This authority was ultimately delegated to what is now ATF.  Immediately after discussing the large role cheap imported .22 caliber revolvers were playing in crime, the Senate Report stated:

> [t]he difficulty of defining weapons characteristics to meet this target without discriminating against sporting quality firearms, was a major reason why the Secretary of the Treasury has been given fairly broad discretion in defining and administering the import prohibition.[15]

Indeed, Congress granted this discretion to the Secretary even though some expressed concern with its breadth:

> [t]he proposed import restrictions of Title IV would give the Secretary of the Treasury unusually broad discretion to decide whether a particular type of firearm is generally recognized as particularly suitable for, or readily adaptable to, sporting purposes.  If this authority means anything, it permits Federal officials to differ with the judgment of sportsmen expressed through consumer preference in the marketplace….[16]

Since that time, ATF has been responsible for determining whether firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes under the statute.

---

[13] 18 U.S.C. § 925(d)(3).  In pertinent part, 26 U.S.C. § 5845(a) includes "a shotgun having a barrel or barrels of less than 18 inches in length."
[14] 90 P.L. 351 (1968).
[15] S. Rep. No. 1501, 90th Cong. 2d Sess. 38 (1968).
[16] S. Rep. No. 1097, 90th Cong. 2d Sess. 2155 (1968) (views of Senators Dirksen, Hruska, Thurmond, and Burdick).  In Gun South, Inc. v. Brady, 877 F.2d 858, 863 (11th Cir. 1989), the court, based on legislative history, found that the GCA gives the Secretary "unusually broad discretion in applying section 925(d)(3)."

- 3 -

On December 10, 1968, the Alcohol and Tobacco Tax Division of the Internal Revenue Service (predecessor to ATF) convened a "Firearm Advisory Panel" to assist with defining "sporting purposes" as utilized in the GCA.   This panel was composed of representatives from the military, law enforcement, and the firearms industry.  The panel generally agreed that firearms designed and intended for hunting and organized competitive target shooting would fall into the sporting purpose criteria.  It was also the consensus that the activity of "plinking" was primarily a pastime and therefore would not qualify.  Additionally, the panel looked at criteria for handguns and briefly discussed rifles.   However, no discussion took place on shotguns given that, at the time, all shotguns were considered inherently sporting because they were utilized for hunting or organized competitive target competitions.

Then, in 1984, ATF organized the first large scale study aimed at analyzing the sporting suitability of certain firearms.  Specifically, ATF addressed the sporting purposes of the Striker-12 and Streetsweeper shotguns.  These particular shotguns were developed in South Africa as law enforcement, security and anti-terrorist weapons.  These firearms are nearly identical 12-gauge shotguns, each with 12-round capacity and spring-driven revolving magazines.  All 12 rounds can be fired from the shotguns within 3 seconds.

In the 1984 study, ATF ruled that the Striker-12 and the Streetsweeper were not eligible for importation under 925(d)(3) because they were not "particularly suitable for sporting purposes." In doing this, ATF reversed an earlier opinion and specifically rejected the proposition that police or combat competitive shooting events were a generally accepted "sporting purpose." This 1984 study adopted a narrow interpretation of organized competitive target shooting competitions to include the traditional target events such as trap and skeet.  ATF ultimately concluded that the size, weight and bulk of the shotguns made them difficult to maneuver in traditional shooting sports and, therefore, these shotguns were not particularly suitable for or readily adaptable to these sporting purposes.  At the same time, however, ATF allowed importation of a SPAS-12 variant shotgun because its size, weight, bulk and *modified* configuration were such that it was particularly suitable for traditional shooting sports.[17]  The Striker-12 and Streetsweeper were later classified as "destructive devices" pursuant to the National Firearms Act.[18]

In 1989, and again in 1998, ATF conducted studies to determine whether certain rifles could be imported under section 925(d)(3).  The respective studies focused primarily on the application of the sporting purposes test to a type of firearm described as a "semiautomatic assault weapon."  In both 1989 and 1998, ATF was concerned that certain semiautomatic assault weapons had been approved for importation even though they did not satisfy the sporting purposes test.

---

[17] Private letter Ruling of August 9, 1989 from Bruce L. Weininger, Chief, Firearms and Explosives Division.
[18] *See* ATF Rulings 94-1 *and* 94-2.

- 4 -

<u>1989 Study</u>

In 1989, ATF announced that it was suspending the importation of several semiautomatic assault rifles pending a decision on whether they satisfied the sporting criteria under section 925(d)(3). The 1989 study determined that assault rifles were a "type" of rifle that contained a variety of physical features that distinguished them from traditional sporting rifles.  The study concluded that there were three characteristics that defined semiautomatic assault rifles:

(1) a military configuration (ability to accept a detachable magazine, folding/telescoping stocks, pistol grips, ability to accept a bayonet, flash suppressors, bipods, grenade launchers, and night sights);
(2) semiautomatic version of a machinegun;
(3) chambered to accept a centerfire cartridge case having a length of 2.25 inches or less.[19]

The 1989 study then examined the scope of "sporting purposes" as used in the statute.[20]  The study noted that "[t]he broadest interpretation could take in virtually any lawful activity or competition which any person or groups of persons might undertake.  Under this interpretation, any rifle could meet the "sporting purposes" test.[21]  The 1989 study concluded that a broad interpretation would render the statute useless.  The study therefore concluded that neither plinking nor "police/combat-type" competitions would be considered sporting activities under the statute.[22]

The 1989 study concluded that semiautomatic assault rifles were "designed and intended to be particularly suitable for combat rather than sporting applications."[23]  With this, the study determined that they were not suitable for sporting purposes and should not be authorized for importation under section 925(d)(3).

<u>1998 Study</u>

The 1998 study was conducted after "members of Congress and others expressed concern that rifles being imported were essentially the same as semiautomatic assault rifles previously determined to be nonimportable" under the 1989 study.[24]  Specifically, many firearms found to be nonimportable under the 1989 study were later modified to meet the standards outlined in the study.  These firearms were then legally imported into the country under section 925(d)(3).  ATF commissioned the 1998 study on the sporting suitability of semiautomatic rifles to address concerns regarding these modified firearms.

---

[19] 1989 Report and Recommendation on the ATF Working Group on the Importability of Certain Semiautomatic Rifles (1989 Study).
[20] Id. at 8.
[21] Id.
[22] *Id.* At 9.
[23] *Id.* At 12.
[24] 1998 Study at 1.

- 5 -

The 1998 study identified the firearms in question and determined that the rifles shared an important feature—the ability to accept a large capacity magazine that was originally designed for military firearms.  The report then referred to such rifles as Large Capacity Military Magazine rifles or "LCMM rifles."[25]

The study noted that after 1989, ATF refused to allow importation of firearms that had any of the identified non-sporting features, but made an exception for firearms that possessed only a detachable magazine.  Relying on the 1994 Assault Weapons Ban, the 1998 study noted that Congress "sent a strong signal that firearms with the ability to expel large amounts of ammunition quickly are not sporting."[26]  The study concluded by adopting the standards set forth in the 1989 study and by reiterating the previous determination that large capacity magazines are a military feature that bar firearms from importation under section 925(d)(3).[27]

Present Study

While ATF conducted the above mentioned studies on the sporting suitability of rifles, to date, no study has been conducted to address the sporting purposes and importability of shotguns.  This study was commissioned for that purpose and to ensure that ATF complies with it statutory mandate under section 925(d)(3).

Methodology

To conduct this study, the working group reviewed current shooting sports and the sporting suitability of common shotguns and shotgun features.  At the outset, the working group recognized the importance of acknowledging the inherent differences between rifles, handguns and shotguns.  These firearms have distinct characteristics that result in specific applications of each weapon.  Therefore, in conducting the study, the working group generally considered shotguns without regard to technical similarities or differences that exist in rifles or handguns.

The 1989 and 1998 studies examined particular features and made sporting suitability determinations based on the generally accepted sporting purposes of *rifles*.  These studies served as useful references because, in recent years, manufacturers have produced shotguns with features traditionally found only on rifles.  These features are typically used by military or law enforcement personnel and provide little or no advantage to sportsmen.

Following a review of the 1989 and 1998 studies, the working group believed that it was necessary to first identify those activities that are considered legitimate "sporting purposes" in the modern era.  While the previous studies determined that only "the traditional sports of hunting and organized competitive target shooting" would be considered "sporting,"[28] the working group recognized that sporting purposes may evolve over time.  The working group felt

---

[25] 1998 Study at 16.
[26] 1998 Study at 3.
[27] The 1994 Assault Weapons Ban expired Sept. 13, 2004, as part of the law's sunset provision.
[28] 1998 Study at 16

that the statutory language supported this because the term "generally recognized" modifies, not only firearms used for shooting activities, but also the shooting activities themselves.  This is to say that an activity is considered "sporting" under section 925(d)(3) if it is generally recognized as such.[29]  Therefore, activities that were "generally recognized" as legitimate "sporting purposes" in previous studies are not necessarily the same as those activities that are "generally recognized" as sporting purposes in the modern era.  As stated above, Congress recognized the difficulty in legislating a fixed meaning and therefore gave the Attorney General the responsibility to make such determinations.  As a result, the working group did not simply accept the proposition that sporting events were limited to hunting and traditional trap and skeet target shooting.  In determining whether an activity is now generally accepted as a sporting purpose, the working group considered a broad range of shooting activities.

Once the working group determined those activities that are generally recognized as a "sporting purpose" under section 925(d)(3), it examined numerous shotguns with diverse features in an effort to determine whether any particular firearm was particularly suitable for or readily adaptable to those sports.  In coming to a determination, the working group recognized that a shotgun cannot be classified as sporting merely because it may be used for a sporting purpose.  During debate on the original bill, there was discussion about the meaning of the term "sporting purposes."  Senator Dodd stated:

> Here again I would have to say that if a military weapon is used in a special sporting event, it does not become a sporting weapon.  It is a military weapon used in a special sporting event . . . . As I said previously the language says no firearms will be admitted into this country unless they are genuine sporting weapons.[30]

In making a determination on any particular feature, the working group considered State hunting laws, currently available products, scholarly and historical publications, industry marketing, and rules and regulations of organization such as the National Skeet Shooting Association, Amateur Trapshooting Association, National Sporting Clays Association, Single Action Shooting Society, International Practical Shooting Confederation (IPSC), and the United States Practical Shooting Association (USPSA).  Analysis of these sources as well as a variety of shotguns led the working group to conclude that certain shotguns were of a type that did not meet the requirements of section 925(d)(3), and therefore, could not lawfully be imported.

---

[29] ATF previously argued this very point in <u>Gilbert Equipment Company , Inc. v. Higgins</u>, 709 F.Supp. 1071, 1075 (S.D. Ala. 1989).  The court agreed, noting, "according to Mr. Drake, the bureau takes the position…that an event has attained general recognition as being a sport before those uses and/or events can be 'sporting purposes' or 'sports' under section 925(d)(3).  *See also* Declaration of William T. Drake, Deputy Director, Bureau of Alcohol, Tobacco and Firearms.
[30] 114 Cong. Rec. 27461-462 (1968).

<u>Analysis</u>

A.  <u>Scope of Sporting Purposes</u>

In conducting the sporting purposes test on behalf of the Attorney General, ATF examines the physical and technical characteristics of a shotgun and determines whether those characteristics meet this statutory requirement.  A shotgun's suitability for a particular sport depends upon the nature and requirements inherent to that sport.  Therefore, determining a "sporting purpose" was the first step in this analysis under section 925(d)(3) and is a critical step of the process.

A broad interpretation of "sporting purposes" may include any lawful activity in which a shooter might participate and could include any organized or individual shooting event or pastime.  A narrow interpretation of "sporting purposes" would clearly result in a more selective standard governing the importation of shotguns.

Consistent with previous ATF decisions and case law, the working group recognized that a sport or event must "have attained general recognition as being a 'sport,' before those uses and/or events can be 'sporting purposes' or 'sports' under Section 925(d)(3)."[31]  The statutory language limits ATF's authority to recognize a particular shooting activity as a "sporting purpose," and therefore requires a narrow interpretation of this term.  As stated however, the working group recognized that sporting purposes may change over time, and that certain shooting activities may become "generally recognized" as such.

At the present time, the working group continues to believe that the activity known as "plinking" is not a generally recognized sporting purpose.  There is nothing in the legislative history of the GCA to indicate that section 925(d)(3) was meant to recognize every conceivable type of activity or competition that might employ a firearm.  Recognition of plinking as a sporting purpose would effectively nullify section 925(d)(3) because it may be argued that *any* shotgun is particularly suitable for or readily adaptable to this activity.

The working group also considered "practical shooting" competitions.  Practical shooting events generally measure a shooter's accuracy and speed in identifying and hitting targets while negotiating obstacle-laden shooting courses.  In these competitions, the targets are generally stationary and the shooter is mobile, as opposed to clay target shooting where the targets are moving at high speeds mimicking birds in flight.  Practical shooting consist of rifle, shotgun and handgun competitions, as well as "3-Gun" competitions utilizing all three types of firearm on one course.  The events are often organized by local or national shooting organizations and attempt to categorize shooters by skill level in order to ensure competitiveness within the respective divisions.  The working group examined participation in and popularity of practical shooting events as governed under formal rules such as those of the United States Practical Shooting Association (USPSA) and International Practical Shooting Confederation (IPSC) to see

---

[31] <u>Gilbert</u> *at 1085.*

if it is appropriate to consider these events a legitimate "sporting purpose" under section 925(d)(3).

The USPSA currently reports approximately 19,000 members that participate in shooting events throughout the United States.[32]   While USPSA's reported membership is within the range of members for some other shotgun shooting organizations,[33] organizations involved in shotgun hunting of particular game such as ducks, pheasants and quail indicate significantly more members than any of the target shooting organizations.[34]   Because a determination on the sporting purpose of practical shooting events should be made only after an in-depth study of those events, the working group determined that it was not appropriate to use this shotgun study to make a definitive conclusion as to whether practical shooting events are "sporting" for purposes of section 925(d)(3).  Any such study must include rifles, shotguns and handguns because practical shooting events use all of these firearms, and a change in position by ATF on practical shooting or "police/combat-type" competitions may have an impact on the sporting suitability of rifles and handguns.  Further, while it is clear that shotguns are used at certain practical shooting events, it is unclear whether shotgun use is so prevalent that it is "generally recognized" as a sporting purpose.  If shotgun use is not sufficiently popular at such events, practical shooting would have no effect on any sporting suitability determination of shotguns.  Therefore, it would be impractical to make a determination based upon one component or aspect of the practical shooting competitions.

As a result, the working group based the following sporting suitability criteria on the traditional sports of hunting, trap and skeet target shooting.

B.  Suitability for Sporting Purposes

The final step in our review involved an evaluation of shotguns to determine a "type" of firearm that is "generally recognized as particularly suitable or readily adaptable to sporting purposes."  Whereas the 1989 and 1998 studies were conducted in response to Congressional interest pertaining to a certain "type" of firearm, the current study did not benefit from a mandate to focus upon and review a particular type of firearm.  Therefore, the current working group determined that it was necessary to consider a broad sampling of shotguns and shotgun features that may constitute a "type."

Whereas rifles vary greatly in size, function, caliber and design, historically, there is less variation in shotgun design.  However, in the past several years, ATF has witnessed increasingly diverse shotgun design.  Much of this is due to the fact that some manufacturers are now applying rifle designs and features to shotguns.  This has resulted in a type of shotgun that has

---

[32] *See* www.uspsa.org.

[33] Organization websites report these membership numbers: for the United States Practical Shooting Association, approx. 19,000; Amateur Trapshooting Association, over 35,000 active members; National Skeet Shooting Association, nearly 20,000 members; National Sporting Clays Association, over 22,000 members; Single Action Shooting Society, over 75,000 members.

[34] Organization websites report these membership numbers:  Ducks Unlimited, U.S adult 604,902 (Jan. 1, 2010); Pheasants/Quail Forever, over 130,000 North American members (2010) http://www.pheasantfest.org/page/1/PressReleaseViewer.jsp?pressReleaseId=12406.

features or characteristics that are based on tactical and military firearms.  Following a review of numerous shotguns, literature, and industry advertisements, the working group determined that the following shotgun features and design characteristics are particularly suitable for the military or law enforcement, and therefore, offer little or no advantage to the sportsman.  Therefore, we recognized that any shotgun with one or more of these features represent a "type" of firearm that is not "generally recognized as particularly suitable or readily adaptable to sporting purposes" and may not be imported under section 925(d)(3).

(1) Folding, telescoping or collapsible stock.

Shotgun stocks vary in style, but sporting stocks have largely resembled the traditional design.[35] Many military firearms incorporate folding or telescoping stocks. The main advantage of this feature is portability, especially for airborne troops.  These stocks allow the firearm to be fired from the folded or retracted position, yet it is difficult to fire as accurately as can be done with an open or fully extended stock.  While a folding stock or telescoping stock makes it easier to carry the firearm, its predominant advantage is for military and tactical purposes.  A folding or telescoping stock is therefore not found on the traditional sporting shotgun.  Note that certain shotguns may utilize adjustable butt plates, adjustable combs, or other designs intended only to allow a shooter to make small custom modifications to a shotgun.  These are not intended to make a shotgun more portable, but are instead meant to improve the overall "fit" of the shotgun to a particular shooter.  These types of adjustable stocks are sporting and are, therefore, acceptable for importation.

(2) Bayonet Lug.

A bayonet lug is generally a metal mount that allows the installation of a bayonet onto the end of a firearm.  While commonly found on rifles, bayonets have a distinct military purpose. Publications have indicated that this may be a feature on military shotguns as well.[36]  It enables soldiers to fight in close quarters with a knife attached to their firearm.  The working group discovered no generally recognized sporting application for a bayonet on a shotgun.

(3) Flash Suppressor.

Flash suppressors are generally used on military firearms to disperse the muzzle flash in order to help conceal the shooter's position, especially at night.  Compensators are used on military and commercial firearms to assist in controlling recoil and the "muzzle climb" of the shotgun. Traditional sporting shotguns do not have flash suppressors or compensators.  However, while compensators have a limited benefit for shooting sports because they allow the shooter to quickly reacquire the target for a second shot, there is no particular benefit in suppressing muzzle flash in

---

[35] Exhibit 1.
[36] *A Collector's Guide to United States Combat Shotguns* at 156.

sporting shotguns.  Therefore, the working group finds that flash suppressors are not a sporting characteristic, while compensators are a sporting feature.  However, compensators that, in the opinion of ATF, actually function as flash suppressors are neither particularly suitable nor readily adaptable to sporting purposes.

(4) <u>Magazine over 5 rounds, or a Drum Magazine</u>.

A magazine is an ammunition storage and feeding device that delivers a round into the chamber of the firearm during automatic or semiautomatic firing.[37]  A magazine is either integral (tube magazine) to the firearm or is removable (box magazine). A drum magazine is a large circular magazine that is generally detachable and is designed to hold a large amount of ammunition.

The 1989 Study recognized that virtually all modern military firearms are designed to accept large, detachable magazines.  The 1989 Study noted that this feature provides soldiers with a large ammunition supply and the ability to reload rapidly.  The 1998 Study concurred with this and found that, for rifles, the ability to accept a detachable large capacity magazine was not a sporting feature.  The majority of shotguns on the market today contain an integral "tube" magazine.  However, certain shotguns utilize removable box magazine like those commonly used for rifles.[38]

In regard to sporting purposes, the working group found no appreciable difference between integral tube magazines and removable box magazines.  Each type allowed for rapid loading, reloading, and firing of ammunition.  For example, "speed loaders" are available for shotguns with tube-type magazines.  These speed loaders are designed to be preloaded with shotgun shells and can reload a shotgun with a tube-type magazine in less time than it takes to change a detachable magazine.

However, the working group determined that magazines capable of holding large amounts of ammunition, regardless of type, are particularly designed and most suitable for military and law enforcement applications.  The majority of state hunting laws restrict shotguns to no more than 5 rounds.[39]  This is justifiable because those engaged in sports shooting events are not engaging in potentially hostile or confrontational situations, and therefore do not require the large amount of immediately available ammunition, as do military service members and police officers.

Finally, drum magazines are substantially wider and have considerably more bulk than standard clip-type magazines.  They are cumbersome and, when attached to the shotgun, make it more difficult for a hunter to engage multiple small moving targets.  Further, drum magazines are generally designed to contain more than 5 rounds.  Some contain as many as 20 or more

---

[37] Steindler's New Firearms Dictionary at 164.
[38] See Collector's Guide to United States Combat Shotguns at 156-7, noting that early combat shotguns were criticized because of their limited magazine capacity and time consuming loading methods.
[39] Exhibit 2.

rounds.[40]  While such magazines may have a military or law enforcement application, the working group determined that they are not useful for any generally recognized sporting purpose. These types of magazines are unlawful to use for hunting in most states, and their possession and manufacture are even prohibited or restricted in some states.[41]

(5) Grenade Launcher Mount.

Grenade launchers are incorporated into military firearms to facilitate the launching of explosive grenades.  Such launchers are generally of two types.  The first type is a flash suppressor designed to function as a grenade launcher.  The second type attaches to the barrel of the firearm either by screws or clamps. Grenade launchers have a particular military application and are not currently used for sporting purposes.

(6) Integrated Rail Systems.[42]

This refers to a mounting rail system for small arms upon which firearm accessories and features may be attached.  This includes scopes, sights, and other features, but may also include accessories or features with no sporting purpose, including flashlights, foregrips, and bipods. Rails on the sides and underside of shotguns—including any accessory mount—facilitate installation of certain features lacking any sporting purpose.  However, receiver rails that are installed on the top of the receiver and barrel are readily adaptable to sporting purposes because this facilitates installation of optical or other sights.

(7) Light Enhancing Devices.

Shotguns are generally configured with either bead sights, iron sights or optical sights, depending on whether a particular sporting purpose requires the shotgun to be pointed or aimed.[43]  Bead sights allow a shooter to "point" at and engage moving targets at a short distance with numerous small projectiles, including birds, trap, skeet and sporting clays.  Iron and optical sights are used when a shooter, firing a slug, must "aim" a shotgun at a target, including deer, bear and turkeys.[44]  Conversely, many military firearms are equipped with sighting devices that utilize available light to facilitate night vision capabilities. Devices or optics that allow illumination of a target in low-light conditions are generally for military and law enforcement purposes and are not typically found on sporting shotguns because it is generally illegal to hunt at night.

---

[40] Exhibit 3.
[41] *See, e.g.,*  Cal Pen Code § 12020**;** N.J. Stat. § 2C:39-9.
[42] Exhibit 4.
[43] NRA Firearms Sourcebook at 178.
[44] Id.

- 12 -

(8) <u>Excessive Weight</u>.[45]

Sporting shotguns, 12 gauge and smaller, are lightweight (generally less than 10 pounds fully assembled),[46] and are balanced and maneuverable. This aids sportsmen by allowing them to carry the firearm over long distances and rapidly engage a target. Unlike sporting shotguns, military firearms are larger, heavier, and generally more rugged. This design allows the shotguns to withstand more abuse in combat situations.

(9) <u>Excessive Bulk</u>.[47]

Sporting shotguns are generally no more than 3 inches in width or more than 4 inches in depth. This size allows sporting shotguns to be sufficiently maneuverable in allowing hunters to rapidly engage targets. Certain combat shotguns may be larger for increased durability or to withstand the stress of automatic fire. The bulk refers to the fully assembled shotgun, but does not include magazines or accessories such as scopes or sights that are used on the shotgun. For both width and depth, shotguns are measured at the widest points of the action or housing on a line that is perpendicular to the center line of the bore. Depth refers to the distance from the top plane of the shotgun to the bottom plane of the shotgun. Width refers to the length of the top or bottom plane of the firearm and measures the distance between the sides of the shotgun. Neither measurement includes the shoulder stock on traditional sporting shotgun designs.

(10) <u>Forward Pistol Grip or Other Protruding Part Designed or Used for Gripping the Shotgun with the Shooter's Extended Hand</u>.[48]

While sporting shotguns differ in the style of shoulder stock, they are remarkably similar in fore-end design.[49] Generally, sporting shotguns have a foregrip with which the shooter's forward hand steadies and aims the shotgun. Recently, however, some shooters have started attaching forward pistol grips to shotguns. These forward pistol grips are often used on tactical firearms and are attached to those firearms using the integrated rail system. The ergonomic design allows for continued accuracy during sustained shooting over long periods of time. This feature offers little advantage to the sportsman. Note, however, that the working group believes that pistol grips for the trigger hand are prevalent on shotguns and are therefore generally recognized as particularly suitable for sporting purposes.[50]

While the features listed above are the most common non-sporting shotgun features, the working group recognizes that other features, designs, or characteristics may exist. Prior to importation, ATF will classify these shotguns based upon the requirements of section 925(d)(3). The working

---

[45] *See generally* <u>Gilbert</u>.
[46] Shotgun Encyclopedia 2001 at 264.
[47] Exhibit 5.
[48] Exhibit 6.
[49] *See* Exhibit 1. *See generally* NRA Firearms Sourcebook at 121-2.
[50] See Exhibit 1.

- 13 -

group expects the continued application of unique features and designs to shotguns that may include features or designs based upon traditional police or military tactical rifles.  However, even if a shotgun does not have one of the features listed above, it may be considered "sporting" only if it meets the statutory requirements under section 925(d)(3).   Further, the simple fact that a military firearm or feature *may* be used for a generally recognized sporting purposes is not sufficient to support a determination that it is sporting under 925(d)(3).  Therefore, as required by section 925(d)(3), in future sporting classifications for shotguns, ATF will classify the shotgun as sporting only if there is evidence that its features or design characteristics are generally recognized as particularly suitable for or readily adaptable to generally recognized sporting purposes.

The fact that a firearm or feature was initially designed for military or tactical applications, including offensive or defensive combat, may indicate that it is not a sporting firearm.  This may be overcome by evidence that the particular shotgun or feature has been so regularly used by sportsmen that it is generally recognized as particularly suitable for or readily adaptable to sporting purposes.  Such evidence may include marketing, industry literature and consumer articles, scholarly and historical publications, military publications, the existence of State and local statutes and regulations limiting use of the shotgun or features for sporting purposes, and the overall use and the popularity of such features or designs for sporting purposes according to hunting guides, shooting magazines, State game commissioners, organized competitive hunting and shooting groups, law enforcement agencies or organizations, industry members and trade associations, and interest and information groups.  Conversely, a determination that the shotgun or feature was originally designed as an improvement or innovation to an existing sporting shotgun design or feature will serve as evidence that the shotgun is sporting under section 925(d)(3).  However, any new design or feature must still satisfy the sporting suitability test under section 925(d)(3) as outlined above.

The Attorney General and ATF are not limited to these factors and therefore may consider any other factor determined to be relevant in making this determination.  The working group recognizes the difficulty in applying this standard but acknowledges that Congress specifically intended that the Attorney General perform this function.  Therefore, the working group recommends that sporting determinations for shotguns not specifically addressed by this study be reviewed by a panel pursuant to ATF orders, policies and procedures, as appropriate.

<u>Conclusion</u>

The purpose of section 925(d)(3) is to provide a limited exception to the general prohibition on the importation of firearms without placing "any undue or unnecessary Federal restrictions or burdens on law-abiding citizens with respect to the acquisition, possession, or use of firearms…."[51]  Our determinations will in no way preclude the importation of true sporting shotguns.  While it will certainly prevent the importation of certain shotguns, we believe that

---

[51] 90 P.L. 351 (1968).

- 14 -

those shotguns containing the enumerated features cannot be fairly characterized as "sporting" shotguns under the statute.  Therefore, it is the recommendation of the working group that shotguns with any of the characteristics or features listed above not be authorized for importation.

Shotgun Stock Style Comparison

Exhibit 1

"Straight" or "English" style stock (Ruger Red Label):



"Pistol grip" style stock (Browning Citori):



"Pistol grip" style stock (Mossberg 935 Magnum Turkey):



"Thumbhole" style stock (Remington SP-10):



Stock with Separate Pistol Grip



<u>Hunting Statutes by State</u>                                                                                          Exhibit 2

| State | Gauge | Mag Restriction / plugged with one piece filler requiring disassembly of gun for removal | Attachments | Semi-Auto | Other |
|-------|-------|------------------------------------------------------------------------------------------|-------------|-----------|-------|
| Alabama | 10 gauge or smaller; | (Species specific) 3 shells | | | 1 |
| Alaska | 10 gauge or smaller | | | | |
| Arizona | 10 gauge or smaller | 5 shells | | | |
| Arkansas | ≤ 10 gauge; some zones ≥ .410; ≥ 20 gauge for bear | (Species specific) 3 shells | | | |
| California | ≤ 10 gauge; Up to 12 gauge in some areas | (Species specific) 3 shells | | | |
| Colorado | ≥ 20 gauge; Game Mammals ≤ 10 gauge | 3 shells | | | |
| Connecticut | ≤ 10-gauge | (Species specific) 3 shells | telescopic sights | | |
| Delaware | 20, 16, 12, 10 gauge | 3 shells | Muzzleloaders may be equipped with scopes | | 2 |
| Florida | Muzzleloading firing ≥ 2 balls ≥ 20-gauge; Migratory birds ≤ 10-gauge; opossums - single-shot .41 -gauge shotguns | (Species specific) 3 shells | | | |
| Georgia | ≥ 20-gauge; Waterfowl ≤ 10-gauge | 5 shells | Scopes are legal | | |
| Hawaii | ≤ 10 gauge | (Species specific) 3 shells | | | |
| Idaho | | | some scopes allowed | | 3 |
| Illinois | 20 - 10 gauge; no .410 or 28 gauge allowed | 3 shells | | | |
| Indiana | | (Species specific) 3 shells | Laser sights are legal | | |

Hunting Statutes by State                                                                                   Exhibit 2

| | | | |
|---|---|---|---|
| **Iowa** | 10-, 12-, 16-, and 20-gauge | | |
| **Kansas** | ≥ 20 gauge;  ≤ 10 gauge, | (Species specific) 3 shells | |
| **Kentucky** | up to and including 10-gauge, includes .410- | (Species specific) 3 shells | Telescopic sights (scopes) |
| **Louisiana** | ≤ 10 gauge | 3 shells | Nuisance Animals; infrared, laser sighting devices, or night vision devices |
| **Maine** | 10 - 20 gauge | (Species specific) 3 shells | may have any type of sights, including scopes | Auto-loading illegal if hold more than 6 cartridges |
| **Maryland** | Muzzle loading ≥ 10 gauge ; Shotgun ≤ 10-gauge | (Species specific) 3 shells | may use a telescopic sight on muzzle loading firearm | |
| **Massachusetts** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Michigan** | any gauge | (Species specific) 3 shells | | Illegal: semi-automatic holding > 6 shells in barrel and magazine combined |
| **Minnesota** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Mississippi** | any gauge | (Species specific) 3 shells | Scopes allowed on primitive weapons | |
| **Missouri** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Montana** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Nebraska** | ≥ 20 gauge | (Species specific) 3 shells | | Illegal: semi-automatic holding > 6 shells in barrel and magazine combined |
| **Nevada** | ≤ 10 gauge; ≥ 20 gauge | (Species specific) 3 shells | | |
| **New Hampshire** | 10 - 20 gauge | (Species specific) 3 shells | | |
| **New Jersey** | ≤ 10 gauge; ≥ 20 gauge; or .410 caliber | (Species specific) 3 shells | Require adjustable open iron, peep sight or scope affixed if hunting with slugs.  Telescopic sights Permitted | |
| **New Mexico** | ≥ 28 gauge, ≤ 10 gauge | (Species specific) 3 shells | | |
| **New York** | Big game ≥ 20 gauge | | scopes allowed | No semi-automatic firearm with a capacity to hold more than 6 rounds |

Hunting Statutes by State                                    Exhibit 2

| | | | | |
|---|---|---|---|---|
| **North Carolina** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **North Dakota** | ≥ 410 gauge; no ≤ 10 gauge | 3 shells (repealed for migratory birds) | | |
| **Ohio** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Oklahoma** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Oregon** | ≤ 10 gauge; ≥ 20 gauge | (Species specific) 3 shells | Scopes (permanent and detachable), and sights allowed for visually impaired | |
| **Pennsylvania** | ≤ 10 gauge; ≥ 12 gauge | (Species specific) 3 shells | | |
| **Rhode Island** | 10, 12, 16, or 20-gauge | 5 shells | | |
| **South Carolina** | | (Species specific) 3 shells | | |
| **South Dakota** | (Species specific) ≤ 10 gauge | 5 shells | | No auto-loading firearm holding > 6 cartridges |
| **Tennessee** | Turkey: ≥ 28 gauge | (Species specific) 3 shells | May be equipped with sighting devices | |
| **Texas** | ≤ 10 gauge | (Species specific) 3 shells | scoping or laser sighting devices used by disabled hunters | |
| **Utah** | ≤ 10 gauge; ≥ 20 gauge | (Species specific) 3 shells | | |
| **Vermont** | ≥ 12 gauge | (Species specific) 3 shells | | |
| **Virginia** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **Washington** | ≤ 10 gauge | (Species specific) 3 shells | | |
| **West Virginia** | | | | |
| **Wisconsin** | 10, 12, 16, 20 and 28 gauge; no .410 shotgun for deer/bear | (Species specific) 3 shells | | |
| **Wyoming** | | | | 4 |

| | |
|---|---|
| **1** | Shotgun/rifle combinations (drilling) permitted |
| **2** | large game training course -  Students in optional proficiency qualification bring their own pre-zeroed, ≥ .243 , scoped shotgun |
| **3** | no firearm that, in combination with a scope, sling and/or any attachments, weighs more than 16 pounds |
| **4** | no relevant restrictive laws concerning shotguns |

General Firearm Statutes by State                                                                    Exhibit 2

| State | Source | Semi-Auto Restrictions | Attachments | Prohibited* (in addition to possession of short-barrel or sawed-off shotguns by non-authorized persons, e.g., law enforcment officers for official duty purposes) |
|---|---|---|---|---|
| Alabama | Alabama  Code, title 13: | | | |
| Alaska | Alaska Statutes 11.61.200.(h) | | | |
| Arizona | Arizona Rev. Statutes 13-3101.8. | single shot | silencer prohibited | |
| Arkansas | Arkansas Code Title 5, Chapter 73. | | | |
| California | California Penal Code, Part 4.12276. and San Diego Municipal Code 53.31. | San Diego includes under "assault weapon," any shotgun with a magazine capacity of more than 6 rounds | | "Assault weapons": Franchi SPAS 12 and LAW 12; Striker 12; Streetsweeper type S/S Inc. ; semiautomatic shotguns having both a folding or telescoping stock and a pistol grip protruding conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip; semiautomatic shotguns capable of accepting a detachable magazine; or shotguns with a revolving cylinder. |
| Colorado | 2 CCR 406-203 | | | |
| Connecticut | Connecticut Gen. Statutes 53-202a. | | | "Assault weapons": Steyr AUG; Street Sweeper and Striker 12 revolving cylinder shotguns |
| D.C | 7-2501.01. | | | |

General Firearm Statutes by State                                                        Exhibit 2

| State | | | |
|---|---|---|---|
| **Delaware** | 7.I.§ 711. | | 7.I.§ 711. Hunting with automatic-loading gun prohibited; penalty<br>(a) No person shall hunt for game birds or game animals in this State, except as authorized by state-sanctioned federal depredation/conservation orders for selected waterfowl species, with or by means of any automatic-loading or hand-operated repeating shotgun capable of holding more than 3 shells, the magazine of which has not been cut off or plugged with a filler incapable of removal through the loading end thereof, so as to reduce the capacity of said gun to not more than 3 shells at 1 time, in the magazine and chamber combined.<br>(b) Whoever violates this section shall be guilty of a class C environmental misdemeanor.<br>(c) Having in one's possession, while in the act of hunting game birds or game animals, a gun that will hold more than 3 shells at one time in the magazine and chamber combined, except as authorized in subsection (a) of this section, shall be prima facie evidence of violation of this section. |
| **Florida** | Florida statutes, Title XLVI.790.001. | | |
| **Georgia** | | | |
| **Hawaii** | Hawaii Rev. Statutes, Title 10., 134-8. | silencer prohibited | |
| **Idaho** | Idaho Code, 18-3318. | | |
| **Illinois** | Code of Ordinances, City of Aurora 29-43. | Aurora includes under "assault weapon," any shotgun with a magazine capacity of more than 5 rounds | "Assault weapons": Street Sweeper and Striker 12 revolving cylinder shotguns or semiautomatic shotguns with either a fixed magazine with a capacity over 5 rounds or an ability to accept a detachable magazine and has at least a folding / telescoping stock or a pistol grip that protrudes beneath the action of firearm and which is separate and apart from stock |

<u>General Firearm Statutes by State</u>                                                                                              Exhibit 2

| Indiana | Indiana Code 35-47-1-10. and Municipal Code of the City of South Bend 13-95. | South Bend under "assault weapon" firearms which have threads, lugs, or other characteristics designed for direct attachment of a silencer, bayonet, flash suppressor, or folding stock; as well as any detachable magazine, drum, belt, feed strip, or similar device which can be readily made to accept more than 15. rounds | South Bend includes under "assault weapon," any shotgun with a magazine capacity of more than 9 rounds |
|---|---|---|---|
| Iowa | Iowa Code, Title XVI. 724.1. | | Includes as an offensive weapon, "a firearm which shoots or is designed to shoot more than one shot, without manual reloading, by a single function of the trigger" |
| Kansas | | | |
| Kentucky | Kentucky Revised Statutes- 150.360 | | |
| Louisiana | Louisiana RS 56:116.1 | | |
| Maine | Maine Revised Statutes 12.13.4.915.4.§11214. F. | | |
| Maryland | Maryland Code 5-101. | | "Assault weapons": F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun; Steyr-AUG-SA semi-auto; Holmes model 88 shotgun; Mossberg model 500 Bullpup assault shotgun; Street sweeper assault type shotgun; Striker 12 assault shotgun in all formats;  Daewoo USAS 12 semi-auto shotgun |

General Firearm Statutes by State                                                                Exhibit 2

| | | | |
|---|---|---|---|
| **Massachusetts** | Massachusetts Gen L. 140.121. | under "assault weapon": any shotgun with (fixed or detachable) magazine capacity of more than 5 rounds | "Assault weapons": revolving cylinder shotguns, e.g., Street Sweeper and Striker 12; also "Large capacity weapon" includes any semiautomatic shotgun fixed with large capacity feeding device (or capable of accepting such), that uses a rotating cylinder capable of accepting more than 5 shells |
| **Michigan** | II.2.1. (2) | | |
| **Minnesota** | Minnesota Statutes 624.711 | | "Assault weapons": Street Sweeper and Striker-12 revolving cylinder shotgun types as well as USAS-12 semiautomatic shotgun type |
| **Mississippi** | Mississippi Code 97-37-1. | silencer prohibited | |
| **Missouri** | Code of State Regulations 10-7.410(1)(G) | | |
| **Montana** | | | |
| **Nebraska** | Nebraska Administrative Code Title 163 Chapter 4 001. | | |
| **Nevada** | Nevada Revised Statutes 503.150 1. | | |
| **New Hampshire** | | | |
| **New Jersey** | New Jersey Statutes 23:4-13.  and 23:4-44.  and New Jersey Rev. Statutes 2C39-1.w. | magazine  capacity of no more than 5 rounds | "Assault weapons": any shotgun with a revolving cylinder, e.g. "Street Sweeper" or "Striker 12" Franchi SPAS 12 and LAW 12 shotguns or USAS 12 semi-automatic type shotgun; also any semi-automatic shotgun with either a magazine capacity exceeding 6 rounds, a pistol grip, or a folding stock |
| **New Mexico** | New Mexico Administrative Code 19.31.6.7H., 19.31.11.10N. , 19.31.13.10M.  and 19.31.17.10N. | | |

General Firearm Statutes by State                                                                    Exhibit 2

| New York | New York Consolidated Laws 265.00. 22. and Code of the City of Buffalo 1801B. | magazine capacity of no more than 5 rounds | sighting device making a target visible at night may classify a shotgun as an assault weapon | "Assault weapons": Any semiautomatic shotgun with at least two of the following:folding or telescoping stock;pistol grip that protrudes conspicuously beneath the action of the weapon;fixed magazine capacity in excess of five rounds;an ability to accept a detachable magazine; or any revolving cylinder shotguns, e.g., Street Sweeper and Striker 12; Buffalo 1801B. Assault Weapon:(2) A center-fire rifle or shotgun which employs the force of expanding gases from a discharging cartridge to chamber a fresh round after each single pull of the trigger, and which has:(a) A flash suppressor attached to the weapon reducing muzzle flash;(c) A sighting device making a target visible at night;(d) A barrel jacket surrounding all or a portion of the barrel, to dissipate heat therefrom; or(e) A multi-burst trigger activator.(3) Any stockless pistol grip shotgun. |
|---|---|---|---|---|
| North Carolina | North Carolina Gen. Statutes 14-288.8 | | silencer prohibited | |
| North Dakota | North Dakota Century Code 20.1-01-09. Section 20.1-04-10, SHOTGUN SHELL-HOLDING CAPACITY RESTRICTION, repealed/eliminated | | | |
| Ohio | Ohio Rev. Code 2923.11. and Columbus City Codes 2323.11. | magazine capacity of no more than 5 rounds | | semiautomatic shotgun that was originally designed with or has a fixed magazine or detachable magazine with a capacity of more than five rounds. Columbus includes under "Assault weapon" any semi-automatic shotgun with two or more of the following: pistol grip that protrudes conspicuously beneath the receiver of the weapon; folding, telescoping or thumbhole stock; fixed magazine capacity in excess of 5 standard 2-3/4, or longer, rounds; or ability to accept a detachable magazine; also any shotgun with revolving cylinder |
| Oklahoma | | | | |
| Oregon | Oregon Rev. Statutes 166.272. | | silencer prohibited | |
| Pennsylvania | Title 34 Sec. 2308. (a)(4) and (b)(1) | | | |
| Rhode Island | Rule 7, Part III, 3.3 and 3.4 | | | |
| South Carolina | SECTION 50-11-310. (E) and ARTICLE 3. SUBARTICLE 1. 123 40 | | | |

General Firearm Statutes by State                                                                         Exhibit 2

| State | Statute | Magazine/Capacity | Other |
|---|---|---|---|
| **South Dakota** | South Dakota Codified Laws 22,1,2, (8) | silencer prohibited | |
| **Tennessee** | | | |
| **Texas** | | | |
| **Utah** | Utah Administrative Code R657-5-9. (1), R657-6-6. (1) and R657-9-7. | | |
| **Vermont** | | | |
| **Virginia** | Virginia Code 18.2-308. | magazine capacity no more than 7 rounds (not applicable for hunting or sport shooting) | "Assault weapons": Striker 12's commonly called a "streetsweeper," or any semi-automatic folding stock shotgun of like kind with a spring tension drum magazine capable of holding twelve shotgun shells prohibited |
| **Washington** | Washington Administrative Code 232-12-047 | | |
| **West Virginia** | West Virginia statute 8-12-5a. | | |
| **Wisconsin** | Wisconsin Administrative Code – NR 10.11 and NR 10.12 | | |
| **Wyoming** | Wyoming Statutes, Article 3. Rifles and Shotguns [Repealed] and 23-3-112. | silencer prohibited | |

Drum Magazine

Exhibit 3



Integrated Rail System                                    Exhibit 4

## Sporting



## Sporting



## Non-Sporting                    ## Non-Sporting

          

<u>Bulk Measurements</u>                                            Exhibit 5

Depth refers to the distance from the top plane of the shotgun to the bottom plane of the shotgun. Depth measurement "A" below is INCORRECT; it includes the trigger guard which is not part of the frame or receiver.  Depth measurement "B" below is CORRECT; it measures only the depth of the frame or receiver:



Width refers to the length of the top or bottom pane of the firearm and measures the distance between the sides of the shotgun. Width measurement "A" below is CORRECT; it measures only the width of the frame or receiver.  Width measurement "B" below is INCORRECT; it includes the charging handle which is not part of the frame or receiver:



<u>Forward Pistol Grip</u>                                        Exhibit 6





[PAGE INTENTIONALLY LEFT BLANK]

# Exhibit 64

**Statement of Professors of Constitutional Law: The Second Amendment and the Constitutionality of the Proposed Gun Violence Prevention Legislation**

January 30, 2013

Several proposed reforms to the nation's gun laws, including universal background checks and restrictions on high-capacity ammunition magazines and assault weapons, are now pending before Congress. Concerns have been raised that these measures might violate the Second Amendment. We, the undersigned professors with expertise in constitutional law, write to address those concerns.

In 2008, the U.S. Supreme Court held that the Second Amendment, which provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed," guarantees an individual's right to have a functional firearm in the home for self-defense. The Court's decision in that case, *District of Columbia v. Heller*, struck down a D.C. law that effectively barred the use of any firearm for self-defense. The law is now clear that the government may not completely disarm law-abiding, responsible citizens. The Court also made clear, however, that many gun regulations remain constitutionally permissible. "Like most rights," the Court explained, "the right secured by the Second Amendment is not unlimited." Writing for the Court, Justice Antonin Scalia explained that restrictions on "dangerous and unusual" weapons are constitutional and that "nothing in our opinion should be taken to cast doubt" on laws that prohibit "the possession of firearms by felons or the mentally ill" or laws that impose "conditions and qualifications on the commercial sale of arms."

In this sense, Justice Scalia recognized in *Heller* that, like other constitutional rights, the Second Amendment is not an absolute. The First Amendment, for example, provides that "Congress shall make no law . . . abridging the freedom of speech," but the Supreme Court has long and consistently held that some types of speech – for example, defamation, obscenity and threats – can be regulated; that some people – for example, public employees, members of the military, students and prisoners – are subject to greater restrictions on their speech than others; and that the government can reasonably regulate the time, place and manner of speech. As Justice Scalia explained in *Heller*, the rights guaranteed by the Second Amendment are likewise subject to appropriate regulation in order to enhance public safety.

In acknowledging the presumptive constitutionality of laws designed to prevent gun violence, including restrictions on who has access to firearms and what types of

1

firearms they may have, *Heller* is consistent with the history of the right to keep and bear arms. The founding fathers who wrote and ratified the Second Amendment also had laws to keep guns out of the hands of people thought to be untrustworthy. Such laws were necessary to ensure that the citizen militia referenced in the Second Amendment was "well regulated." In the 1800s, many states restricted the sale or public possession of concealable firearms. In the early twentieth century, the federal government restricted access to unusually dangerous weapons, such as machine guns, and states barred people convicted of certain felonies from possessing firearms. Laws such as these were routinely upheld by the courts, which recognized the legitimacy of legislative efforts to keep the most dangerous weapons out of the hands of the most dangerous people.

While the permissibility of any particular reform depends on its details, the reforms currently being considered by Congress are clearly consistent with the Second Amendment. We express no view on the effectiveness or desirability of the policies reflected in the various proposals, but we all agree that none infringes the core right identified by the Court in *Heller*.

Universal background checks, especially those conducted instantaneously through the National Instant Background Check System, do not impose a significant burden on law-abiding citizens. Yet background checks may provide an important safeguard against easy access to guns by members of criminal street gangs, other felons, and the mentally ill. As with other rights that have eligibility criteria, such as the right to vote, the right to keep and bear arms is not offended by neutral measures designed to ensure that only eligible, law-abiding citizens exercise the right. Moreover, background checks imposed at the point of sale are typical of the "conditions and qualifications on the commercial sale of arms" recognized by the Supreme Court in *Heller*.

Restrictions on the manufacture and sale of high-capacity ammunition magazines and assault weapons are also consistent with the Second Amendment. In a recent opinion authored by Judge Douglas Ginsburg and joined by Judge Karen Henderson, the U.S. Court of Appeals for the District of Columbia Circuit held that such regulations are consistent with the Second Amendment and with the Supreme Court's decision in *Heller*. The court of appeals recognized such weapons and magazines are not necessary for individual self-defense — what *Heller* called the "core lawful purpose" of the Second Amendment. Restrictions on high-capacity magazines and assault weapons, the court of appeals held, do "not effectively disarm individuals or substantially affect their ability to defend themselves." The Second Amendment, like the First Amendment, does not prevent lawmakers from enacting reasonable regulations that do not seriously interfere with the core right guaranteed by the Constitution.

The Supreme Court has clearly held that the Second Amendment preserves the right of law-abiding citizens to have a firearm in the home for self-defense. As both the historical tradition of the right to bear arms and the Court's decision suggest,

2

reasonable and limited measures to enhance public safety that do not unduly burden that right are consistent with the Second Amendment.

Signed,

Bruce Ackerman
Sterling Professor of Law and Political Science, Yale Law School

Albert W. Alschuler
Julius Kreeger Professor Emeritus, The University of Chicago Law School

Mitchell N. Berman
Richard Dale Endowed Chair in Law, The University of Texas School of Law

Ashutosh Bhagwat, Professor of Law
UC Davis School of Law

Joseph Blocher
Associate Professor of Law, Duke Law School

Lee C. Bollinger
President, Columbia University

Rebecca L. Brown
Newton Professor of Constitutional Law, USC Gould School of Law

Alan Brownstein
Professor of Law, Boochever and Bird Chair, UC Davis School of Law

Erwin Chemerinsky
Dean and Distinguished Professor of Law, UC Irvine School of Law

Dan T. Coenen
University Professor and Harmon W. Caldwell Chair, University of Georgia Law

Walter E. Dellinger III
Douglas B. Maggs Emeritus Professor of Law, Duke Law School

Michael C. Dorf
Robert S. Stevens Professor of Law, Cornell University Law School

Lee Epstein
Provost Professor and Rader Family Trustee Chair in Law, USC Gould School of Law

3

Richard A. Epstein
Laurence A. Tisch Professor of Law, New York University School of Law

Daniel A. Farber
Sho Sato Professor of Law, UC Berkeley School of Law

Owen M. Fiss
Sterling Professor Emeritus of Law and Professorial Lecturer in Law, Yale Law School

Charles Fried
Beneficial Professor of Law, Harvard Law School

Barry Friedman
Jacob D. Fuchsberg Professor of Law, New York University School of Law

Risa Goluboff
Justice Thurgood Marshall Professor of Law, The University of Virginia School of Law

Jamal Greene
Professor of Law, Columbia Law School

H. Kent Greenfield
Professor of Law and Law Fund Research Scholar, Boston College Law School

Ariela Gross
John B. and Alice R. Sharp Professor of Law and History, USC Gould School of Law

Roderick M. Hills, Jr.,
William T. Comfort, III Professor of Law, New York University School of Law

Samuel Issacharoff
Bonnie and Richard Reiss Professor, New York University School of Law

John C. Jeffries, Jr.
David and Mary Harrison Distinguished Professor and former Dean, University of Virginia

Dawn Johnsen
Walter W. Foskett Professor of Law, Indiana University Maurer School of Law

Mark R. Killenbeck
Wylie H. Davis Distinguished Professor of Law, University of Arkansas School of Law

Ronald J. Krotoszynski, Jr.
John S. Stone Chair, Professor of Law,  University of Alabama

Carlton F.W. Larson
Professor of Law, UC Davis School of Law

Lawrence Lessig
Roy L. Furman Professor of Law, Harvard Law School

Sanford V. Levinson
W. St. John Garwood and W. St. John Garwood, Jr., Centennial Chair, University of Texas

William P. Marshall
William Rand Kenan, Jr. Distinguished Professor of Law, University of North Carolina

Frank I. Michelman
Robert Walmsley University Professor, Emeritus, Harvard Law School

Darrell Miller
Professor of Law, University of Cincinnati College of Law

Alan B. Morrison
Lerner Family Associate Dean, The George Washington University Law School

Gene R. Nichol
Boyd Tinsley Distinguished Professor of Law, UNC School of Law

Spencer A. Overton
Professor of Law, The George Washington University Law School

Eric Posner
Kirkland & Ellis Distinguished Service Professor, The University of Chicago Law School

Lawrence Rosenthal
Professor of Law, Chapman University School of Law

Theodore Ruger
Professor of Law, University of Pennsylvania Law School

Jane S. Schacter
William Nelson Cromwell Professor of Law, Stanford Law School

Stephen J. Schulhofer
Robert B. McKay Professor of Law, New York University School of Law

5

Neil S. Siegel
Professor of Law and Political Science, Duke Law School

Reva Siegel
Nicholas deB. Katzenbach Professor of Law, Yale Law School

Geoffrey R. Stone
Edward H. Levi Distinguished Service Professor and former Dean, The University of Chicago

David A. Strauss
Gerald Ratner Distinguished Service Professor of Law, The University of Chicago

Laurence H. Tribe
Carl M. Loeb University Professor and Professor of Constitutional Law, Harvard Law School

Mark Tushnet
William Nelson Cromwell Professor of Law, Harvard Law School

Jonathan D. Varat
Professor of Law and former Dean, UCLA School of Law

Keith Wehran
Ashton Phelps Chair of Constitutional Law, Tulane University School of Law

Adam Winkler
Professor of Law, UCLA School of Law

*University affiliation provided for identification purposes only.*

# Exhibit 65

<u>Report on the Importability of Certain Shotguns</u>

July 2, 2012

The Gun Control Act of 1968 (GCA) generally prohibits the importation of firearms into the United States.  However, pursuant to 18 U.S.C. § 925(d), the GCA creates four narrow exceptions under which the Attorney General shall authorize firearms for importation. Under one such category, section 925(d)(3), the Attorney General shall approve applications for importation when the firearms are generally recognized as particularly suitable for or readily adaptable to sporting purposes (the "sporting purposes test").

ATF has long approved the importation of shotguns under section 925(d)(3).  However, although ATF previously provided guidance on the sporting purposes test in regard to rifles and handguns, it had provided no such guidance for the importation of shotguns. Prior to publication of the "ATF Study on the Importability of Certain Shotguns" in January 2011 (the 2011 report), there was no definitive guidance to the firearms industry or to the public regarding the standards for the importation of shotguns under this exception.  Although shotguns were regularly imported, licensees were forced to rely upon private correspondence from ATF or previously approved applications as guidance on whether a particular shotgun would be approved for importation.  Importers could assume that previously approved shotguns satisfied the sporting purposes test, but any changes to the configuration of these shotguns might result in disapproval of an import application. To complicate matters further, although shotguns had retained classic sporting configurations for decades, importers recently sought to import firearms utilizing features typically found on military *rifles*.  ATF recognized this and determined that, commensurate with its responsibilities to enforce the law as written, it was necessary to provide guidance on this topic.  The resulting 2011 report provides the necessary guidance for importers and the public.

Following publication of the 2011 report, from January 31, 2011 through May 1, 2011, ATF accepted comments from the public and members of the firearms industry regarding the determinations made in the report.  ATF has reviewed the comments and, in an effort to provide guidance on the sporting suitability of shotguns, provides the following information to revise the January 2011 report.

## **Public Comments**

ATF received approximately 21,000 individual comments on the 2011 report.  Many of the commenters argued, in effect, that 18 U.S.C. 925(d)(3) was unconstitutional and that the sporting purposes test was invalid, or questioned ATF's interpretation of the sporting purposes test as it was applied to shotguns.  Several commenters argued that although the report stated that certain features were not particularly suitable for or readily adaptable to sporting purposes, the features allowed disabled sporting enthusiasts to use shotguns. Principally, the commenters noted that forward pistol grips are an essential feature for this group of sporting enthusiasts.

2

Approximately 15,000 commenters addressed one or more of three points in opposing the 2011 report.  First, the commenters focused on the impact upon an individual's Second Amendment rights.  Second, the commenters questioned whether some shotguns could be more dangerous than others and argued that all shotguns are appropriate for home defense.  Finally, many commenters questioned the validity of the sporting purposes test as required by the GCA.

ATF understands the concerns expressed in these comments, but notes that Federal law *requires* ATF to make sporting determinations of firearms before they may legally be approved for importation.  This is because section 922(l) of the GCA prohibits the importation of *any* firearms or ammunition, and therefore a firearm may be imported only if it meets one of the exceptions found in the statute, 18 U.S.C. § 925.  One of these exceptions, the sporting purposes test found in section 925(d)(3), currently provides the only avenue by which firearms or ammunition may legally be imported in any quantity for possession and use by private individuals.

Further, the constitutionality of section 925(d)(3) is in little doubt even after *District of Columbia v. Heller* and its progeny. In *Heller*, the Supreme Court noted that, although not unlimited, "[T]here seems to us no doubt, on the basis of both text and history, that the Second Amendment conferred an individual right to keep and bear arms."  Even without this qualifying language, concerns about the constitutionality of section 925(d)(3) or ATF application of this statute are without legal basis.

Specifically, section 925(d)(3) does not limit or pose an undue burden on possession of shotguns.  As stated above, section 925(d)(3) actually permits the importation of firearms and has no impact upon the legal possession of more than 743,000 shotguns that were manufactured in the United States in 2010 alone.  Section 925(d)(3) and the 2011 report impact only those shotguns that are to be imported and, in fact, prohibit only a small number of shotguns that Congress has determined should not be imported.

A number of the commenters expressed various concerns, including possible negative effects on self defense or the increased costs of firearms because of limitations on the importation of shotguns.  However, it should be noted that the sporting purposes test under 18 U.S.C. § 925(d)(3) applies as a limitation only on the *importation* of shotguns.  Accordingly, the 2011 report results in no "ban" on any shotguns, even those with nonsporting features.  In fact, any domestically made shotguns with these features are unaffected by 18 U.S.C. 925(d)(3) or the report.  Therefore, shotguns with these features remain available for self defense.

Second, the 2011 report has not resulted in the denial of any of the most popular shotguns that were previously approved for importation. For example, concerns that the Saiga shotgun would be prohibited from importation based upon the 2011 report are unfounded.  As currently imported, the Saiga contains none of the nonsporting features discussed in the report.

Numerous commenters questioned the scope of sporting purposes, including ATF's long-held interpretation that this includes the traditional shooting sports of hunting, skeet and trap shooting and target shooting.  Specifically, some argued that "three gun" competitions should be

considered to fall within the scope of sporting purposes.  However, as discussed in the 2011 report, the legislative history indicates that this was not meant to include police and military style shooting competitions.  Three gun competitions generally require competitors to use a rifle, a pistol and a shotgun to engage targets in timed events.  Competitors and organizers emphasize tactical deployment of these firearms to properly engage the targets.  These competitions are clearly based upon military or police training and therefore are the type of activity that Congress sought to exclude as "sporting."

Further, statistics suggest that the United States Practical Shooting Association has approximately 19,000 members who participate in "three gun" or similar competitions.  Conversely, the U.S. Fish and Wildlife Service estimates that in 2006, 10.7 million licensed individuals participated in hunting within the U.S.  Using this data, those participating in tactical shooting comprised approximately .18% of those participating in hunting.  For tactical shooting events to affect the type of shotgun that may be considered as "generally recognized as particularly suitable for or readily adaptable to sporting purposes," ATF would have to consider use by .18% of the sporting public as determinative of what is "generally recognized" in the community.  ATF does not believe such an approach is consistent with the congressional intent in enacting this provision.

**Amendments**

The 2011 report set forth 10 features that the agency determined are disqualifying under the sporting purposes test.  These include the forward pistol grip and the integrated rail system, including rails on the side and underside of the firearm.

In discussing the forward pistol grip, the 2011 report noted that the feature allowed for "continued accuracy during sustained shooting over long periods of time."  The report concluded that this was not particularly advantageous for recognized sporting purposes based upon the fact that, in such activities, a few well-aimed shots are paramount.  However, there is a convincing argument that this feature is generally recognized as particularly suitable for or readily adaptable to sporting purposes because it permits accuracy and maneuverability even for activities such as bird hunting or skeet shooting.  The forward pistol grip permits a shooter to grip a shotgun at a more natural angle in that the shooter is not required to rotate the forward hand and cradle the firearm during firing.  This ergonomic design provides for added comfort and more accurate engagement of fast-moving targets.  Therefore, the 2011 report will be amended and this feature removed as a nonsporting feature.

Forward pistol grips are often attached to the underside of firearms through the use of an integrated rail system—another feature that the 2011 report addressed.  As noted in the report, an integrated rail system, which includes rails on the side and bottom planes of the firearm, permits a shooter to add several features to include flashlights, lasers or other items that are not particularly suitable for or readily adaptable to sporting purposes.  However, recognition of the forward pistol grip as sporting would have little effect if integrated rails systems remain a nonsporting feature.  Therefore, because of the use of the forward pistol grip, it necessarily follows that the integrated rail system is generally recognized as particularly suitable for or readily adaptable to sporting purposes.

4

Based upon the above, the criteria in the 2011 report are hereby revised to read as follows:

      (1) Folding, telescoping, or collapsible stocks;
      (2) bayonet lugs;
      (3) flash suppressors;
      (4) magazines over 5 rounds, or a drum magazine;
      (5) grenade-launcher mounts;
      (6) light enhancing devices;
      (7) excessive weight (greater than 10 pounds for 12 gauge or smaller);
      (8) excessive bulk (greater than 3 inches in width and/or greater than 4 inches in depth).

# Exhibit 66

The author(s) shown below used Federal funds provided by the U.S. Department of Justice and prepared the following final report:

| | |
|---|---|
| **Document Title:** | **Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003** |
| **Author(s):** | **Christopher S. Koper** |
| **Document No.:** | **204431** |
| **Date Received:** | **July 2004** |
| **Award Number:** | **98-IJ-CX-0039** |

This report has not been published by the U.S. Department of Justice. To provide better customer service, NCJRS has made this Federally-funded grant final report available electronically in addition to traditional paper copies.

Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# An Updated Assessment of the Federal Assault Weapons Ban:  Impacts on Gun Markets and Gun Violence, 1994-2003

## Report to the National Institute of Justice, United States Department of Justice

By

**Christopher S. Koper**
(Principal Investigator)

With

Daniel J. Woods and Jeffrey A. Roth

**June 2004**

Jerry Lee Center of Criminology
University of Pennsylvania
3814 Walnut Street
Philadelphia, PA 19104



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# TABLE OF CONTENTS

Preface                                                                                                    i
Acknowledgments                                                                                            ii

1. Impacts of the Federal Assault Weapons Ban, 1994-2003: Key Findings and
Conclusions                                                                                                1
2. Provisions of the Assault Weapons Ban                                                                   4
    2.1.  Assault Weapons                                                              4
    2.2.  Large Capacity Magazines                                                     6
    2.3.  Foreign Rifles Capable of Accepting Large Capacity Magazines for
        Military Rifles                                             8
    2.4.  Ban Exemptions                                                               10
    2.5.  Summary                                                                      11
3. Criminal Use of Assault Weapons and Large Capacity Magazines Before the
Ban                                                                                                        14
    3.1.  Criminal Use of Assault Weapons                                              15
    3.2.  Criminal Use of Large Capacity Magazines                                     18
    3.3.  Summary                                                                      19
4. Overview of Study Design, Hypotheses, and Prior Findings                                                20
    4.1.  Logical Framework for Research on the Ban                                     20
    4.2.  Hypothesized Market Effects                                                   21
    4.3.  Prior Research on the Ban's Effects                                           23
5. Market Indicators for Assault Weapons:  Prices and Production                                           25
    5.1.  Price Trends for Assault Weapons and Other Firearms                           25
    5.2.  Production Trends for Assault Weapons and Other Firearms                      33
    5.3.  Summary and Interpretations                                                  36
6. Criminal Use of Assault Weapons After the Ban                                                           39
    6.1.  Measuring Criminal Use of Assault Weapons: A Methodological
        Note                                                       39
    6.2.  National Analysis of Guns Reported By Police to the Federal
        Bureau of Alcohol, Tobacco, and Firearms                   40
    6.3.  Local Analyses of Guns Recovered By Police                                    46
    6.4.  Summary                                                                      51
7. Market Indicators for Large Capacity Magazines:  Prices and Importation                                 61
    7.1.  Price Trends for Large Capacity Magazines                                     61
    7.2.  Post-Ban Importation of Large Capacity Magazines                              65
    7.3.  Summary and Interpretations                                                  65

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**TABLE OF CONTENTS (CONTINUED)**

8. Criminal Use of Large Capacity Magazines After the Ban                68
    8.1.  Baltimore                                                       69
    8.2.  Anchorage                                                       73
    8.3.  Milwaukee                                                       75
    8.4.  Louisville                                                      77
    8.5.  Summary                                                         78
9.  The Consequences of Crimes With Assault Weapons and Large Capacity
Magazines                                                                80
    9.1.  The Spread of Semiautomatic Weaponry and Trends in Lethal and
    Injurious Gun Violence Prior to the Ban                          81
    9.2.  Shots Fired in Gun Attacks and the Effects of Weaponry on Attack
    Outcomes                                                         83
    9.3.  Post-Ban Trends in Lethal and Injurious Gun Violence           91
    9.4.  Summary                                                         96
10.  Looking to the Future: Research Recommendations and Speculation About
the Possible Consequences of Reauthorizing, Modifying, or Lifting the Assault
Weapons Ban                                                              98
    10.1.  Research Recommendations and Data Requirements                98
    10.2.  Potential Consequences of Reauthorizing, Modifying, or Lifting
    the Assault Weapons Ban                                          100
References                                                               102

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

**PREFACE**

Gun violence continues to be one of America's most serious crime problems.  In 2000, over 10,000 persons were murdered with firearms and almost 49,000 more were shot in the course of over 340,000 assaults and robberies with guns (see the Federal Bureau of Investigation's annual *Uniform Crime Reports* and Simon et al., 2002).  The total costs of gun violence in the United States – including medical, criminal justice, and other government and private costs – are on the order of at least $6 to $12 billion per year and, by more controversial estimates, could be as high as $80 billion per year (Cook and Ludwig, 2000).

However, there has been good news in recent years.  Police statistics and national victimization surveys show that since the early 1990s, gun crime has plummeted to some of the lowest levels in decades (see the *Uniform Crime Reports* and Rennison, 2001).  Have gun controls contributed to this decline, and, if so, which ones?

During the last decade, the federal government has undertaken a number of initiatives to suppress gun crime.  These include, among others, the establishment of a national background check system for gun buyers (through the Brady Act), reforms of the licensing system for firearms dealers, a ban on juvenile handgun possession, and Project Safe Neighborhoods, a collaborative effort between U.S. Attorneys and local authorities to attack local gun crime problems and enhance punishment for gun offenders.

Perhaps the most controversial of these federal initiatives was the ban on semiautomatic assault weapons and large capacity ammunition magazines enacted as Title XI, Subtitle A of the *Violent Crime Control and Law Enforcement Act of 1994*.  This law prohibits a relatively small group of weapons considered by ban advocates to be particularly dangerous and attractive for criminal purposes.  In this report, we investigate the ban's impacts on gun crime through the late 1990s and beyond.  This study updates a prior report on the short-term effects of the ban (1994-1996) that members of this research team prepared for the U.S. Department of Justice and the U.S. Congress (Roth and Koper, 1997; 1999).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## ACKNOWLEDGMENTS

This research was supported by National Institute of Justice (U.S. Department of Justice) grants 2003-IJ-CX-1029 to the University of Pennsylvania and 98-IJ-CX-0039 to the Urban Institute.  The Jerry Lee Center of Criminology, University of Pennsylvania provided additional support.  The views expressed are those of the author.  They do not reflect official positions of the United States Department of Justice and should not be attributed to the trustees of the University of Pennsylvania, the Urban Institute, or any of the other persons or organizations listed below.

The author wishes to thank several people and organizations that assisted this effort in numerous ways.  Daniel Woods assisted with data analysis.  Jeffrey Roth, who directed our first study of the assault weapons ban, provided advice and editorial input. Additional research assistance was provided by the following former employees of the Urban Institute:  Gretchen Moore, David Huffer, Erica Dinger, Darin Reedy, Kate Bunting, Katie Gorie, and Michele Waul.  The following persons and organizations provided databases, information, or other resources utilized for this report:  Glenn Pierce (Northeastern University), Pamela Shaw and Edward Koch (Baltimore Police Department), Robert Shem (Alaska State Police), Bill McGill and Mallory O'Brien (currently or formerly of the Firearm Injury Center, Medical College of Wisconsin), Rick Ruddell (California State University, Chico), Scott Doyle (Kentucky State Police), Terrence Austin and Joe Vince (currently or formerly of the Bureau of Alcohol, Tobacco, Firearms, and Explosives), Carlos Alvarez and Alan Lynn (Metro-Dade Police Department), Charles Branas (Firearm and Injury Center, University of Pennsylvania), Caroline Harlow (Bureau of Justice Statistics), and Rebecca Knox (Brady Center to Prevent Handgun Violence).  Robert Burrows (Bureau of Alcohol, Tobacco, Firearms, and Explosives) and Wain Roberts (Wain Roberts Firearms) shared technical expertise on firearms.  Anonymous reviewers for the National Institute of Justice provided thorough and helpful comments on earlier versions of this report, as did Terrence Austin and Robert Burrows of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  Finally, I thank Lois Mock, our National Institute of Justice grant monitor, for her advice and encouragement throughout all of the research that my colleagues and I have conducted on the assault weapons ban.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 1.  IMPACTS OF THE FEDERAL ASSAULT WEAPONS BAN, 1994-2003:  KEY FINDINGS AND CONCLUSIONS

This overview presents key findings and conclusions from a study sponsored by the National Institute of Justice to investigate the effects of the federal assault weapons ban.  This study updates prior reports to the National Institute of Justice and the U.S. Congress on the assault weapons legislation.

### The Ban Attempts to Limit the Use of Guns with Military Style Features and Large Ammunition Capacities

- Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 imposed a 10-year ban on the "manufacture, transfer, and possession" of certain semiautomatic firearms designated as assault weapons (AWs).  The ban is directed at semiautomatic firearms having features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense (examples include flash hiders, folding rifle stocks, and threaded barrels for attaching silencers).  The law bans 18 models and variations by name, as well as revolving cylinder shotguns.  It also has a "features test" provision banning other semiautomatics having two or more military-style features.  In sum, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified 118 models and variations that are prohibited by the law.  A number of the banned guns are foreign semiautomatic rifles that have been banned from importation into the U.S. since 1989.

- The ban also prohibits most ammunition feeding devices holding more than 10 rounds of ammunition (referred to as large capacity magazines, or LCMs).  An LCM is arguably the most functionally important feature of most AWs, many of which have magazines holding 30 or more rounds.  The LCM ban's reach is broader than that of the AW ban because many non-banned semiautomatics accept LCMs.  Approximately 18% of civilian-owned firearms and 21% of civilian-owned handguns were equipped with LCMs as of 1994.

- The ban exempts AWs and LCMs manufactured before September 13, 1994.  At that time, there were upwards of 1.5 million privately owned AWs in the U.S. and nearly 25 million guns equipped with LCMs.  Gun industry sources estimated that there were 25 million pre-ban LCMs available in the U.S. as of 1995.  An additional 4.7 million pre-ban LCMs were imported into the country from 1995 through 2000, with the largest number in 1999.

- Arguably, the AW-LCM ban is intended to reduce gunshot victimizations by limiting the national stock of semiautomatic firearms with large ammunition capacities – which enable shooters to discharge many shots rapidly – and other features conducive to criminal uses.  The AW provision targets a relatively small number of weapons based on features that have little to do with the weapons'

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

1

operation, and removing those features is sufficient to make the weapons legal. The LCM provision limits the ammunition capacity of non-banned firearms.

**The Banned Guns and Magazines Were Used in Up to A Quarter of Gun Crimes Prior to the Ban**

- AWs were used in only a small fraction of gun crimes prior to the ban: about 2% according to most studies and no more than 8%. Most of the AWs used in crime are assault pistols rather than assault rifles.

- LCMs are used in crime much more often than AWs and accounted for 14% to 26% of guns used in crime prior to the ban.

- AWs and other guns equipped with LCMs tend to account for a higher share of guns used in murders of police and mass public shootings, though such incidents are very rare.

**The Ban's Success in Reducing Criminal Use of the Banned Guns and Magazines Has Been Mixed**

- Following implementation of the ban, the share of gun crimes involving AWs declined by 17% to 72% across the localities examined for this study (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), based on data covering all or portions of the 1995-2003 post-ban period. This is consistent with patterns found in national data on guns recovered by police and reported to ATF.

- The decline in the use of AWs has been due primarily to a reduction in the use of assault pistols (APs), which are used in crime more commonly than assault rifles (ARs). There has not been a clear decline in the use of ARs, though assessments are complicated by the rarity of crimes with these weapons and by substitution of post-ban rifles that are very similar to the banned AR models.

- However, the decline in AW use was offset throughout at least the late 1990s by steady or rising use of other guns equipped with LCMs in jurisdictions studied (Baltimore, Milwaukee, Louisville, and Anchorage). The failure to reduce LCM use has likely been due to the immense stock of exempted pre-ban magazines, which has been enhanced by recent imports.

**It is Premature to Make Definitive Assessments of the Ban's Impact on Gun Crime**

- Because the ban has not yet reduced the use of LCMs in crime, we cannot clearly credit the ban with any of the nation's recent drop in gun violence. However, the ban's exemption of millions of pre-ban AWs and LCMs ensured that the effects

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

of the law would occur only gradually.  Those effects are still unfolding and may not be fully felt for several years into the future, particularly if foreign, pre-ban LCMs continue to be imported into the U.S. in large numbers.

**The Ban's Reauthorization or Expiration Could Affect Gunshot Victimizations, But Predictions are Tenuous**

- Should it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement.  AWs were rarely used in gun crimes even before the ban.  LCMs are involved in a more substantial share of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability of offenders to fire more than ten shots (the current magazine capacity limit) without reloading.

- Nonetheless, reducing criminal use of AWs and especially LCMs could have non-trivial effects on gunshot victimizations.  The few available studies suggest that attacks with semiautomatics – including AWs and other semiautomatics equipped with LCMs – result in more shots fired, more persons hit, and more wounds inflicted per victim than do attacks with other firearms.  Further, a study of handgun attacks in one city found that 3% of the gunfire incidents resulted in more than 10 shots fired, and those attacks produced almost 5% of the gunshot victims.

- Restricting the flow of LCMs into the country from abroad may be necessary to achieve desired effects from the ban, particularly in the near future.  Whether mandating further design changes in the outward features of semiautomatic weapons (such as removing all military-style features) will produce measurable benefits beyond those of restricting ammunition capacity is unknown.  Past experience also suggests that Congressional discussion of broadening the AW ban to new models or features would raise prices and production of the weapons under discussion.

- If the ban is lifted, gun and magazine manufacturers may reintroduce AW models and LCMs, perhaps in substantial numbers.  In addition, pre-ban AWs may lose value and novelty, prompting some of their owners to sell them in undocumented secondhand markets where they can more easily reach high-risk users, such as criminals, terrorists, and other potential mass murderers.  Any resulting increase in crimes with AWs and LCMs might increase gunshot victimizations for the reasons noted above, though this effect could be difficult to measure.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 2. PROVISIONS OF THE ASSAULT WEAPONS BAN

### 2.1. Assault Weapons

Enacted on September 13, 1994, Title XI, Subtitle A of the *Violent Crime Control and Law Enforcement Act of 1994* imposes a 10-year ban on the "manufacture, transfer, and possession" of certain semiautomatic firearms designated as assault weapons (AWs).[1]  The AW ban is not a prohibition on all semiautomatics.  Rather, it is directed at semiautomatics having features that appear useful in military and criminal applications but unnecessary in shooting sports or self-defense.  Examples of such features include pistol grips on rifles, flash hiders, folding rifle stocks, threaded barrels for attaching silencers, and the ability to accept ammunition magazines holding large numbers of bullets.[2]  Indeed, several of the banned guns (e.g., the AR-15 and Avtomat Kalashnikov models) are civilian copies of military weapons and accept ammunition magazines made for those military weapons.

As summarized in Table 2-1, the law specifically prohibits nine narrowly defined groups of pistols, rifles, and shotguns.  A number of the weapons are foreign rifles that the federal government has banned from importation into the U.S. since 1989.  Exact copies of the named AWs are also banned, regardless of their manufacturer.  In addition, the ban contains a generic "features test" provision that generally prohibits other semiautomatic firearms having two or more military-style features, as described in Table 2-2.  In sum, the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) has identified 118 model and caliber variations that meet the AW criteria established by the ban.[3]

Figures 2-1 and 2-2 illustrate a few prominent AWs and their features.  Figure 2-1 displays the Intratec TEC-9 assault pistol, the AW most frequently used in crime (e.g., see Roth and Koper 1997, Chapter 2).  Figure 2-2 depicts the AK-47 assault rifle, a weapon of Soviet design.  There are many variations of the AK-47 produced around the world, not all of which have the full complement of features illustrated in Figure 2-2.

---

[1]  A semiautomatic weapon fires one bullet for each squeeze of the trigger.  After each shot, the gun automatically loads the next bullet and cocks itself for the next shot, thereby permitting a somewhat faster rate of fire relative to non-automatic firearms.  Semiautomatics are not to be confused with fully automatic weapons (i.e., machine guns), which fire continuously as long as the trigger is held down.  Fully automatic weapons have been illegal to own in the United States without a federal permit since 1934.
[2]  Ban advocates stress the importance of pistol grips on rifles and heat shrouds or forward handgrips on pistols, which in combination with large ammunition magazines enable shooters to discharge high numbers of bullets rapidly (in a "spray fire" fashion) while maintaining control of the firearm (Violence Policy Center, 2003).  Ban opponents, on the other hand, argue that AW features also serve legitimate purposes for lawful gun users (e.g., see Kopel, 1995).
[3]  This is based on AWs identified by ATF's Firearms Technology Branch as of December 1997.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## Table 2-1.  Firearms Banned by the Federal Assault Weapons Ban

| Firearm | Description | 1993 Blue Book Price | Pre-Ban Federal Legal Status | Examples of Legal Substitutes |
|---|---|---|---|---|
| Avtomat Kalashnikov (AK) (by Norinco, Mitchell, Poly Technologies) | Chinese, Russian, other foreign and domestic: .223 or 7.62x39mm caliber, semiauto. rifle; 5, 10, or 30 shot magazine, may be supplied with bayonet | $550 (generic import); add 10-15% for folding stock models | Imports banned in 1989. | Norinco NHM 90/91 [1] |
| Uzi, Galil | Israeli: 9mm, .41, or .45 caliber semiauto. carbine, mini-carbine, or pistol. Magazine capacity of 16, 20, or 25, depending on model and type (10 or 20 on pistols). | $550-$1050 (Uzi) $875-$1150 (Galil) | Imports banned in 1989 | Uzi Sporter [2] |
| Beretta AR-70 | Italian: .222 or .223 caliber semiauto. paramilitary design rifle; 5, 8, or 30 shot magazine. | $1050 | Imports banned in 1989. | |
| Colt AR-15 | Domestic: primarily .223 caliber  paramilitary rifle or carbine; 5 shot magazines, often comes with two 5-shot detachable magazines.  Exact copies by DPMS, Eagle, Olympic, and others. | $825-$1325 | Legal (civilian version of military M-16) | Colt Sporter, Match H-Bar, Target models |
| Fabrique National FN/FAL, FN/LAR, FNC | Belgian design: .308 caliber semiauto. rifle or .223 combat carbine with 30 shot magazine.  Rifle comes with flash hider, 4 position fire selector on automatic models. Discontinued in 1988. | $1100-$2500 | Imports banned in 1989. | L1A1 Sporter (FN, Century) [2] |
| Steyr AUG | Austrian: .223/5.56mm caliber semiauto. paramilitary design rifle. | $2500 | Imports banned in 1989 | |
| SWD M-10, 11, 11/9, 12 | Domestic: 9mm, .380, or .45 caliber paramilitary design semiauto. pistol; 32 shot magazine.  Also available in semiauto. carbine and fully automatic variations. | $215 (M-11/9) | Legal | Cobray PM11, 12 |
| TEC-9, DC9, 22 | Domestic: 9mm caliber semiauto. paramilitary design pistol, 10 or 32 shot magazine.; .22 caliber semiauto. paramilitary design pistol, 30 shot magazine. | $145-$295 | Legal | TEC-AB |
| Revolving Cylinder Shotguns | Domestic:  12 gauge, 12 shot rotary magazine; paramilitary configuration | $525 (Street Sweeper) | Legal | |

[1] Imports were halted in 1994 under the federal embargo on the importation of firearms from China.
[2] Imports banned  by federal executive order, April 1998.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 2-2.  Features Test of the Federal Assault Weapons Ban**

| Weapon Category | Military-Style Features (Two or more qualify a firearm as an assault weapon) |
|---|---|
| Semiautomatic pistols accepting detachable magazines: | 1) ammunition magazine that attaches outside the pistol grip<br>2) threaded barrel capable of accepting a barrel extender, flash hider, forward handgrip, or silencer<br>3) heat shroud attached to or encircling the barrel<br>4) weight of more than 50 ounces unloaded<br>5) semiautomatic version of a fully automatic weapon |
| Semiautomatic rifles accepting detachable magazines: | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) bayonet mount<br>4) flash hider or threaded barrel designed to accommodate one<br>5) grenade launcher |
| Semiautomatic shotguns: | 1) folding or telescoping stock<br>2) pistol grip that protrudes beneath the firing action<br>3) fixed magazine capacity over 5 rounds<br>4) ability to accept a detachable ammunition magazine |

## 2.2.  Large Capacity Magazines

In addition, the ban prohibits most ammunition feeding devices holding more than 10 rounds of ammunition (referred to hereafter as large capacity magazines, or LCMs).[4]  Most notably, this limits the capacity of detachable ammunition magazines for semiautomatic firearms.  Though often overlooked in media coverage of the law, this provision impacted a larger share of the gun market than did the ban on AWs.  Approximately 40 percent of the semiautomatic handgun models and a majority of the semiautomatic rifle models being manufactured and advertised prior to the ban were sold with LCMs or had a variation that was sold with an LCM (calculated from Murtz et al., 1994).   Still others could accept LCMs made for other firearms and/or by other manufacturers.  A national survey of gun owners found that 18% of all civilian-owned firearms and 21% of civilian-owned handguns were equipped with magazines having 10 or more rounds as of 1994 (Cook and Ludwig, 1996, p. 17).  The AW provision did not affect most LCM-compatible guns, but the LCM provision limited the capacities of their magazines to 10 rounds.

---

[4]  Technically, the ban prohibits any magazine, belt, drum, feed strip, or similar device that has the capacity to accept more than 10 rounds or ammunition, or which can be readily converted or restored to accept more than 10 rounds of ammunition. The ban exempts attached tubular devices capable of operating only with .22 caliber rimfire (i.e., low velocity) ammunition.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 2-1.  Features of Assault Weapons:
The Intratec TEC-9 Assault Pistol**



**Threaded Barrel**
Designed to accommodate a silencer

**Barrel Shroud**
Cools the barrel of the weapon so it will
not overheat during rapid firing.  Allows
the shooter to grasp the barrel area during
rapid fire without incurring serious burns.

**Large Capacity Magazine Outside Pistol Grip**
Characteristic of an assault weapon, not a
sporting handgun.

Adapted from exhibit of the Center to Prevent Handgun Violence.

     As discussed in later chapters, an LCM is perhaps the most functionally important
feature of many AWs.  This point is underscored by the AW ban's exemptions for
semiautomatic rifles that cannot accept a detachable magazine that holds more than five rounds
of ammunition and semiautomatic shotguns that cannot hold more than five rounds in a fixed
or detachable magazine.  As noted by the U.S. House of Representatives, most prohibited AWs
came equipped with magazines holding 30 rounds and could accept magazines holding as
many as 50 or 100 rounds (U.S. Department of the Treasury, 1998, p. 14).  Also, a 1998 federal
executive order (discussed below) banned further importation of foreign semiautomatic rifles
capable of accepting LCMs made for military rifles. Accordingly, the magazine ban plays an
important role in the logic and interpretations of the analyses presented here.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

**Figure 2-2.  Features of Assault Weapons:
The AK-47 Assault Rifle**

**Flash Suppressor**
Reduces the flash from the barrel
of the weapon, allowing the
shooter to remain concealed when
shooting at night.

**Barrel Mount**
Designed to
accommodate a
bayonet, serves no
sporting purpose.

**Folding Stock**
Sacrifices accuracy for
concealability and mobility
in combat situations.

**Large Capacity
Detachable Magazine**
Permits shooter to fire dozens
of rounds of ammunition
without reloading.

**Pistol Grip**
Allows the weapon to be
"spray fired" from the hip.
Also helps stabilize the
weapon during rapid fire.

Adapted from exhibit of the Center to Prevent Handgun Violence.

## 2.3.  Foreign Rifles Accepting Large Capacity Military Magazines

In April of 1998, the Clinton administration broadened the range of the AW ban
by prohibiting importation of an additional 58 foreign semiautomatic rifles that were still
legal under the 1994 law but that can accept LCMs made for military assault rifles like
the AK-47 (U.S. Department of the Treasury, 1998).[5]  Figure 2-3 illustrates a few such
rifles (hereafter, LCMM rifles) patterned after the banned AK-47 pictured in Figure 2-2.
The LCMM rifles in Figure 2-3 do not possess the military-style features incorporated
into the AK-47 (such as pistol grips, flash suppressors, and bayonet mounts), but they
accept LCMs made for AK-47s.[6]

---

[5]  In the civilian context, AWs are semiautomatic firearms.  Many semiautomatic AWs are patterned after
military firearms, but the military versions are capable of semiautomatic and fully automatic fire.
[6]  Importation of some LCMM rifles, including a number of guns patterned after the AK-47, was halted in
1994 due to trade sanctions against China (U.S. Department of the Treasury, 1998).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

**Figure 2-3. Foreign Semiautomatic Rifles Capable of Accepting Large Capacity Military
Magazines: AK47 Copies Banned by Executive Order in 1998**



Taken from U.S. Department of the Treasury (1998)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

9

## 2.4. Ban Exemptions

### 2.4.1. Guns and Magazines Manufactured Prior to the Ban

The ban contains important exemptions.  AWs and LCMs manufactured before the effective date of the ban are "grandfathered" and thus legal to own and transfer. Around 1990, there were an estimated 1 million privately owned AWs in the U.S. (about 0.5% of the estimated civilian gun stock) (Cox Newspapers, 1989, p. 1; American Medical Association Council on Scientific Affairs, 1992), though those counts probably did not correspond exactly to the weapons prohibited by the 1994 ban.  The leading domestic AW producers manufactured approximately half a million AWs from 1989 through 1993, representing roughly 2.5% of all guns manufactured in the U.S. during that time (see Chapter 5).

We are not aware of any precise estimates of the pre-ban stock of LCMs, but gun owners in the U.S. possessed an estimated 25 million guns that were equipped with LCMs or 10-round magazines in 1994 (Cook and Ludwig, 1996, p. 17), and gun industry sources estimated that, including aftermarket items for repairing and extending magazines, there were at least 25 million LCMs available in the United States as of 1995 (Gun Tests, 1995, p. 30).  As discussed in Chapter 7, moreover, an additional 4.8 million pre-ban LCMs were imported into the U.S. from 1994 through 2000 under the grandfathering exemption.

### 2.4.2. Semiautomatics With Fewer or No Military Features

Although the law bans "copies or duplicates" of the named gun makes and models, federal authorities have emphasized exact copies.  Relatively cosmetic changes, such as removing a flash hider or bayonet mount, are sufficient to transform a banned weapon into a legal substitute, and a number of manufacturers now produce modified, legal versions of some of the banned guns (examples are listed in Table 2-1).  In general, the AW ban does not apply to semiautomatics possessing no more than one military-style feature listed under the ban's features test provision.[7]  For instance, prior to going out of business, Intratec, makers of the banned TEC-9 featured in Figure 2-1, manufactured an AB-10 ("after ban") model that does not have a threaded barrel or a barrel shroud but is identical to the TEC-9 in other respects, including the ability to accept an ammunition magazine outside the pistol grip (Figure 2-4).  As shown in the illustration, the AB-10 accepts grandfathered, 32-round magazines made for the TEC-9, but post-ban magazines produced for the AB-10 must be limited to 10 rounds.

---

[7]  Note, however, that firearms imported into the country must still meet the "sporting purposes test" established under the federal Gun Control Act of 1968.  In 1989, ATF determined that foreign semiautomatic rifles having any one of a number of named military features (including those listed in the features test of the 1994 AW ban) fail the sporting purposes test and cannot be imported into the country. In 1998, the ability to accept an LCM made for a military rifle was added to the list of disqualifying features.  Consequently, it is possible for foreign rifles to pass the features test of the federal AW ban but not meet the sporting purposes test for imports (U.S. Department of the Treasury, 1998).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Another example is the Colt Match Target H-Bar rifle (Figure 2-5), which is a legalized version of the banned AR-15 (see Table 2-1).  AR-15 type rifles are civilian weapons patterned after the U.S. military's M-16 rifle and were the assault rifles most commonly used in crime before the ban (Roth and Koper, 1997, Chapter 2).  The post-ban version shown in Figure 2-5 (one of several legalized variations on the AR-15) is essentially identical to pre-ban versions of the AR-15 but does not have accessories like a flash hider, threaded barrel, or bayonet lug.  The one remaining military feature on the post-ban gun is the pistol grip.  This and other post-ban AR-15 type rifles can accept LCMs made for the banned AR15, as well as those made for the U.S. military's M-16.  However, post-ban magazines manufactured for these guns must hold fewer than 11 rounds.

The LCMM rifles discussed above constituted another group of legalized AW-type weapons until 1998, when their importation was prohibited by executive order.  Finally, the ban includes an appendix that exempts by name several hundred models of rifles and shotguns commonly used in hunting and recreation, 86 of which are semiautomatics.  While the exempted semiautomatics generally lack the military-style features common to AWs, many take detachable magazines, and some have the ability to accept LCMs.[8]

## 2.5.  Summary

In the broadest sense, the AW-LCM ban is intended to limit crimes with semiautomatic firearms having large ammunition capacities – which enable shooters to discharge high numbers of shots rapidly – and other features conducive to criminal applications.  The gun ban provision targets a relatively small number of weapons based on outward features or accessories that have little to do with the weapons' operation.  Removing some or all of these features is sufficient to make the weapons legal.  In other respects (e.g., type of firing mechanism, ammunition fired, and the ability to accept a detachable magazine), AWs do not differ from other legal semiautomatic weapons.  The LCM provision of the law limits the ammunition capacity of non-banned firearms.

---

[8] Legislators inserted a number of amendments during the drafting process to broaden the consensus behind the bill (Lennett 1995).  Among changes that occurred during drafting were: dropping a requirement to register post-ban sales of the grandfathered guns, dropping a ban on "substantial substitutes" as well as "exact copies" of the banned weapons, shortening the list of named makes and models covered by the ban, adding the appendix list of exempted weapons, and mandating the first impact study of the ban that is discussed below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.   11

**Figure 2-4. Post-Ban, Modified Versions of Assault Weapons:
The Intratec AB ("After Ban") Model (See Featured Firearm)**



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 2-5. Post-Ban, Modified Versions of Assault Weapons:
The Colt Match Target HBAR Model**



This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**3.  CRIMINAL USE OF ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES BEFORE THE BAN**

During the 1980s and early 1990s, AWs and other semiautomatic firearms equipped with LCMs were involved in a number of highly publicized mass murder incidents that raised public concern about the accessibility of high powered, military-style weaponry and other guns capable of discharging high numbers of bullets in a short period of time (Cox Newspapers, 1989; Kleck, 1997, pp.124-126,144; Lenett, 1995).  In one of the worst mass murders ever committed in the U.S., for example, James Huberty killed 21 persons and wounded 19 others in a San Ysidro, California MacDonald's restaurant on July 18, 1984 using an Uzi carbine, a shotgun, and another semiautomatic handgun.  On September 14, 1989, Joseph Wesbecker, armed with an AK-47 rifle, two MAC-11 handguns, and a number of other firearms, killed 7 persons and wounded 15 others at his former workplace in Louisville, Kentucky before taking his own life.  Another particularly notorious incident that precipitated much of the recent debate over AWs occurred on January 17, 1989 when Patrick Purdy used a civilian version of the AK-47 military rifle to open fire on a schoolyard in Stockton, California, killing 5 children and wounding 29 persons.

There were additional high profile incidents in which offenders using semiautomatic handguns with LCMs killed and wounded large numbers of persons. Armed with two handguns having LCMs (and reportedly a supply of extra LCMs), a rifle, and a shotgun, George Hennard killed 22 people and wounded another 23 in Killeen, Texas in October 1991.  In a December 1993 incident, a gunman named Colin Ferguson, armed with a handgun and LCMs, opened fire on commuters on a Long Island train, killing 5 and wounding 17.

Indeed, AWs or other semiautomatics with LCMs were involved in 6, or 40%, of 15 mass shooting incidents occurring between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded (Kleck, 1997**,** pp.124-126, 144)**.**  Early studies of AWs, though sometimes based on limited and potentially unrepresentative data, also suggested that AWs recovered by police were often associated with drug trafficking and organized crime (Cox Newspapers, 1989; also see Roth and Koper, 1997, Chapter 5), fueling a perception that AWs were guns of choice among drug dealers and other particularly violent groups.  All of this intensified concern over AWs and other semiautomatics with large ammunition capacities and helped spur the passage of AW bans in California, New Jersey, Connecticut, and Hawaii between 1989 and 1993, as well as the 1989 federal import ban on selected semiautomatic rifles.  Maryland also passed AW legislation in 1994, just a few months prior to the passage of the 1994 federal AW ban.[9]

Looking at the nation's gun crime problem more broadly, however, AWs and LCMs were used in only a minority of gun crimes prior to the 1994 federal ban, and AWs were used in a particularly small percentage of gun crimes.

---

[9] A number of localities around the nation also passed AW bans during this period.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### 3.1.  Criminal Use of Assault Weapons

Numerous studies have examined the use of AWs in crime prior to the federal ban.  The definition of AWs varied across the studies and did not always correspond exactly to that of the 1994 law (in part because a number of the studies were done prior to 1994).  In general, however, the studies appeared to focus on various semiautomatics with detachable magazines and military-style features.  According to these accounts, AWs typically accounted for up to 8% of guns used in crime, depending on the specific AW definition and data source used (e.g., see Beck et al., 1993; Hargarten et al., 1996; Hutson et al., 1994; 1995; McGonigal et al., 1993; New York State Division of Criminal Justice Services, 1994; Roth and Koper, 1997, Chapters 2, 5, 6; Zawitz, 1995).  A compilation of 38 sources indicated that AWs accounted for 2% of crime guns on average (Kleck, 1997, pp.112, 141-143).[10]

Similarly, the most common AWs prohibited by the 1994 federal ban accounted for between 1% and 6% of guns used in crime according to most of several national and local data sources examined for this and our prior study (see Chapter 6 and Roth and Koper, 1997, Chapters 5, 6):

- Baltimore (all guns recovered by police, 1992-1993):  2%
- Miami (all guns recovered by police, 1990-1993):  3%
- Milwaukee (guns recovered in murder investigations, 1991-1993):  6%
- Boston (all guns recovered by police, 1991-1993):  2%
- St. Louis (all guns recovered by police, 1991-1993):  1%
- Anchorage, Alaska (guns used in serious crimes, 1987-1993):  4%
- National (guns recovered by police and reported to ATF, 1992-1993):  5%[11]
- National (gun thefts reported to police, 1992-Aug. 1994):  2%
- National (guns used in murders of police, 1992-1994):  7-9%[12]
- National (guns used in mass murders of 4 or more persons, 1992-1994):  4-13%[13]

Although each of the sources cited above has limitations, the estimates consistently show that AWs are used in a small fraction of gun crimes.  Even the highest

---

[10]  The source in question contains a total of 48 estimates, but our focus is on those that examined all AWs (including pistols, rifles, and shotguns) as opposed to just assault rifles.

[11]  For reasons discussed in Chapter 6, the national ATF estimate likely overestimates the use of AWs in crime.  Nonetheless, the ATF estimate lies within the range of other presented estimates.

[12]  The minimum estimate is based on AW cases as a percentage of all gun murders of police.  The maximum estimate is based on AW cases as a percentage of cases for which at least the gun manufacturer was known.  Note that AWs accounted for as many as 16% of gun murders of police in 1994 (Roth and Koper, 1997, Chapter 6; also see Adler et al., 1995).

[13]  These statistics are based on a sample of 28 cases found through newspaper reports (Roth and Koper, 1997, Appendix A).  One case involved an AW, accounting for 3.6% of all cases and 12.5% of cases in which at least the type of gun (including whether the gun was a handgun, rifle, or shotgun and whether the gun was a semiautomatic) was known.  Also see the earlier discussion of AWs and mass shootings at the beginning of this chapter.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

estimates, which correspond to particularly rare events such mass murders and police murders, are no higher than 13%. Note also that the majority of AWs used in crime are assault pistols (APs) rather than assault rifles (ARs). Among AWs reported by police to ATF during 1992 and 1993, for example, APs outnumbered ARs by a ratio of 3 to 1 (see Chapter 6).

The relative rarity of AW use in crime can be attributed to a number of factors. Many AWs are long guns, which are used in crime much less often than handguns. Moreover, a number of the banned AWs are foreign weapons that were banned from importation into the U.S. in 1989. Also, AWs are more expensive (see Table 2-1) and more difficult to conceal than the types of handguns that are used most frequently in crime.

### 3.1.1. A Note on Survey Studies and Assault Weapons

The studies and statistics discussed above were based primarily on police information. Some survey studies have given a different impression, suggesting substantial levels of AW ownership among criminals and otherwise high-risk juvenile and adult populations, particularly urban gang members (Knox et al., 1994; Sheley and Wright, 1993a). A general problem with these studies, however, is that respondents themselves had to define terms like "military-style" and "assault rifle." Consequently, the figures from these studies may lack comparability with those from studies with police data. Further, the figures reported in some studies prompt concerns about exaggeration of AW ownership (perhaps linked to publicity over the AW issue during the early 1990s when a number of these studies were conducted), particularly among juvenile offenders, who have reported ownership levels as high as 35% just for ARs (Sheley and Wright, 1993a).[14]

Even so, most survey evidence on the actual use of AWs suggests that offenders rarely use AWs in crime. In a 1991 national survey of adult state prisoners, for example, 8% of the inmates reported possessing a "military-type" firearm at some point in the past (Beck et al., 1993, p. 19). Yet only 2% of offenders who used a firearm during their conviction offense reported using an AW for that offense (calculated from pp. 18, 33), a figure consistent with the police statistics cited above. Similarly, while 10% of adult inmates and 20% of juvenile inmates in a Virginia survey reported having owned an AR, none of the adult inmates and only 1% of the juvenile inmates reported having carried them at crime scenes (reported in Zawitz, 1995, p. 6). In contrast, 4% to 20% of inmates surveyed in eight jails across rural and urban areas of Illinois and Iowa reported having used an AR in committing crimes (Knox et al., 1994, p. 17). Nevertheless, even assuming the accuracy and honesty of the respondents' reports, it is not clear what

---

[14] As one example of possible exaggeration of AW ownership, a survey of incarcerated juveniles in New Mexico found that 6% reported having used a "military-style rifle" against others and 2.6% reported that someone else used such a rifle against them. However, less than 1% of guns recovered in a sample of juvenile firearms cases were "military" style guns (New Mexico Criminal Justice Statistical Analysis Center, 1998, pp. 17-19; also see Ruddell and Mays, 2003).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

weapons they were counting as ARs, what percentage of their crimes were committed with ARs, or what share of all gun crimes in their respective jurisdictions were linked to their AR uses.  Hence, while some surveys suggest that ownership and, to a lesser extent, use of AWs may be fairly common among certain subsets of offenders, the overwhelming weight of evidence from gun recovery and survey studies indicates that AWs are used in a small percentage of gun crimes overall.

### 3.1.2.  Are Assault Weapons More Attractive to Criminal Users Than Other Gun Users?

Although AWs are used in a small percentage of gun crimes, some have argued that AWs are more likely to be used in crime than other guns, i.e., that AWs are more attractive to criminal than lawful gun users due to the weapons' military-style features and their particularly large ammunition magazines.  Such arguments are based on data implying that AWs are more common among crime guns than among the general stock of civilian firearms.  According to some estimates generated prior to the federal ban, AWs accounted for less than one percent of firearms owned by civilians but up to 11% of guns used in crime, based on firearms reported by police to ATF between 1986 and 1993 (e.g., see Cox Newspapers, 1989; Lennett, 1995).  However, these estimates were problematic in a number of respects.  As discussed in Chapter 6, ATF statistics are not necessarily representative of the types of guns most commonly recovered by police, and ATF statistics from the late 1980s and early 1990s in particular tended to overstate the prevalence of AWs among crime guns.  Further, estimating the percentage of civilian weapons that are AWs is difficult because gun production data are not reported by model, and one must also make assumptions about the rate of attrition among the stock of civilian firearms.

Our own more recent assessment indicates that AWs accounted for about 2.5% of guns produced from 1989 through 1993 (see Chapter 5).  Relative to previous estimates, this may signify that AWs accounted for a growing share of civilian firearms in the years just before the ban, though the previous estimates likely did not correspond to the exact list of weapons banned in 1994 and thus may not be entirely comparable to our estimate.  At any rate, the 2.5% figure is comparable to most of the AW crime gun estimates listed above; hence, it is not clear that AWs are used disproportionately in most crimes, though AWs still seem to account for a somewhat disproportionate share of guns used in murders and other serious crimes.

Perhaps the best evidence of a criminal preference for AWs comes from a study of young adult handgun buyers in California that found buyers with minor criminal histories (i.e., arrests or misdemeanor convictions that did not disqualify them from purchasing firearms) were more than twice as likely to purchase APs than were buyers with no criminal history (4.6% to 2%, respectively) (Wintemute et al., 1998a).  Those with more serious criminal histories were even more likely to purchase APs: 6.6% of those who had been charged with a gun offense bought APs, as did 10% of those who had been charged with two or more serious violent offenses.  AP purchasers were also more likely to be arrested subsequent to their purchases than were other gun purchasers.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Among gun buyers with prior charges for violence, for instance, AP buyers were more than twice as likely as other handgun buyers to be charged with any new offense and three times as likely to be charged with a new violent or gun offense. To our knowledge, there have been no comparable studies contrasting AR buyers with other rifle buyers.

## 3.2.  Criminal Use of Large Capacity Magazines

Relative to the AW issue, criminal use of LCMs has received relatively little attention.  Yet the overall use of guns with LCMs, which is based on the combined use of AWs and non-banned guns with LCMs, is much greater than the use of AWs alone. Based on data examined for this and a few prior studies, guns with LCMs were used in roughly 14% to 26% of most gun crimes prior to the ban (see Chapter 8; Adler et al., 1995; Koper, 2001; New York Division of Criminal Justice Services, 1994).

- Baltimore (all guns recovered by police, 1993):  14%
- Milwaukee (guns recovered in murder investigations, 1991-1993):  21%
- Anchorage, Alaska (handguns used in serious crimes, 1992-1993):  26%
- New York City (guns recovered in murder investigations, 1993): 16-25%[15]
- Washington, DC (guns recovered from juveniles, 1991-1993):  16%[16]
- National (guns used in murders of police, 1994):  31%-41%[17]

Although based on a small number of studies, this range is generally consistent with national survey estimates indicating approximately 18% of all civilian-owned guns and 21% of civilian-owned handguns were equipped with LCMs as of 1994 (Cook and Ludwig, 1996, p. 17).  The exception is that LCMs may have been used disproportionately in murders of police, though such incidents are very rare.

As with AWs and crime guns in general, most crime guns equipped with LCMs are handguns.  Two handgun models manufactured with LCMs prior to the ban (the Glock 17 and Ruger P89) were among the 10 crime gun models most frequently recovered by law enforcement and reported to ATF during 1994 (ATF, 1995).

---

[15]  The minimum estimate is based on cases in which discharged firearms were recovered, while the maximum estimate is based on cases in which recovered firearms were positively linked to the case with ballistics evidence (New York Division of Criminal Justice Services, 1994).

[16] Note that Washington, DC prohibits semiautomatic firearms accepting magazines with more than 12 rounds (and handguns in general).

[17]  The estimates are based on the sum of cases involving AWs or other guns sold with LCMs (Adler et al., 1995, p.4).  The minimum estimate is based on AW-LCM cases as a percentage of all gun murders of police.  The maximum estimate is based on AW-LCM cases as a percentage of cases in which the gun model was known.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### 3.3.  Summary

In sum, AWs and LCMs were used in up to a quarter of gun crimes prior to the 1994 AW-LCM ban.  By most estimates, AWs were used in less than 6% of gun crimes even before the ban.  Some may have perceived their use to be more widespread, however, due to the use of AWs in particularly rare and highly publicized crimes such as mass shootings (and, to a lesser extent, murders of police), survey reports suggesting high levels of AW ownership among some groups of offenders, and evidence that some AWs are more attractive to criminal than lawful gun buyers.

In contrast, guns equipped with LCMs – of which AWs are a subset – are used in roughly 14% to 26% of gun crimes.  Accordingly, the LCM ban has greater potential for affecting gun crime.  However, it is not clear how often the ability to fire more than 10 shots without reloading (the current magazine capacity limit) affects the outcomes of gun attacks (see Chapter 9).  All of this suggests that the ban's impact on gun violence is likely to be small.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 4. OVERVIEW OF STUDY DESIGN, HYPOTHESES, AND PRIOR FINDINGS

Section 110104 of the AW-LCM ban directed the Attorney General of the United States to study the ban's impact and report the results to Congress within 30 months of the ban's enactment, a provision which was presumably motivated by a sunset provision in the legislation (section 110105) that will lift the ban in September 2004 unless Congress renews the ban.  In accordance with the study requirement, the National Institute of Justice (NIJ) awarded a grant to the Urban Institute to study the ban's short-term (i.e., 1994-1996) effects.  The results of that study are available in a number of reports, briefs, and articles written by members of this research team (Koper and Roth, 2001a; 2001b; 2002a; Roth and Koper, 1997; 1999).[18]  In order to understand the ban's longer-term effects, NIJ provided additional funding to extend the AW research.  In 2002, we delivered an interim report to NIJ based on data extending through at least the late 1990s (Koper and Roth, 2002b).  This report is based largely on the 2002 interim report, but with various new and updated analyses extending as far as 2003.  It is thus a compilation of analyses conducted between 1998 and 2003.  The study periods vary somewhat across the analyses, depending on data availability and the time at which the data were collected.

### 4.1.  Logical Framework for Research on the Ban

An important rationale for the AW-LCM ban is that AWs and other guns equipped with LCMs are particularly dangerous weapons because they facilitate the rapid firing of high numbers of shots, thereby potentially increasing injuries and deaths from gun violence.  Although AWs and LCMs were used in only a modest share of gun crimes before the ban, it is conceivable that a decrease in their use might reduce fatal and non-fatal gunshot victimizations, even if it does not reduce the overall rate of gun crime.  (In Chapter 9, we consider in more detail whether forcing offenders to substitute other guns and smaller magazines can reduce gun deaths and injuries.)

It is not clear how quickly such effects might occur, however, because the ban exempted the millions of AWs and LCMs that were manufactured prior to the ban's effective date in September 1994.  This was particularly a concern for our first study, which was based on data extending through mid-1996, a period potentially too short to observe any meaningful effects.  Consequently, investigation of the ban's effects on gun markets – and, most importantly, how they have affected criminal use of AWs and LCMs – has played a central role in this research.  The general logic of our studies, illustrated in Figure 4-1, has been to first assess the law's impact on the availability of AWs and LCMs, examining price and production (or importation) indices in legal markets and relating them to trends in criminal use of AWs and LCMs.  In turn, we can relate these market patterns to trends in the types of gun crimes most likely to be affected by changes in the use of AWs and LCMs.  However, we cannot make definitive assessments of the

---

[18]  The report to Congress was the Roth and Koper  (1997) report.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

ban's impact on gun violence until it is clear that the ban has indeed reduced criminal use of AWs and LCMs.

**Figure 4-1.  Logic Model for Research on the Assault Weapons Ban**



## 4.2.  Hypothesized Market Effects

### 4.2.1.  A General Description of Gun Markets

Firearms are distributed in markets commonly referred to as primary and secondary markets.  Illicit gun transactions occur in both markets.  Primary markets include wholesale and retail transactions by federally-licensed gun dealers, referred to as federal firearm licensees.  Licensed dealers are required to, among things, follow federal and state background procedures to verify the eligibility of purchasers, observe any legally required waiting period prior to making transfers, and maintain records of gun acquisitions and dispositions (though records are not required for sales of ammunition magazines).

Despite these restrictions, survey data suggest that as many as 21% of adult gun offenders obtained guns from licensed dealers in the years prior to the ban (Harlow, 2001, p. 6; also see Wright and Rossi, 1986, pp. 183,185).  In more recent years, this figure has declined to 14% (Harlow, 2001, p. 6), due likely to the Brady Act, which established a national background check system for purchases from licensed dealers, and reforms of the federal firearms licensing system that have greatly reduced the number of licensed gun dealers (see ATF, 2000; Koper, 2002).  Some would-be gun offenders may be legally eligible buyers at the time of their acquisitions, while others may seek out corrupt dealers or use other fraudulent or criminal means to acquire guns from retail dealers (such as recruiting a legally entitled buyer to act as a "straw purchaser" who buys a gun on behalf of a prohibited buyer).

Secondary markets encompass second-hand gun transactions made by non-licensed individuals.[19]  Secondary market participants are prohibited from knowingly transferring guns to ineligible purchasers (e.g., convicted felons and drug abusers).  However, secondary transfers are not subject to the federal record-keeping and background check requirements placed on licensed dealers, thus making the secondary

---

[19]  Persons who make only occasional sales of firearms are not required to obtain a federal firearms license (ATF, 2000, p. 11).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

market almost entirely unregulated and, accordingly, a better source of guns for criminal users.[20]  In the secondary market, ineligible buyers may obtain guns from a wide variety of legitimate or illegitimate gun owners: relatives, friends, fences, drug dealers, drug addicts, persons selling at gun shows, or other strangers (e.g., see Wright and Rossi, 1986; Sheley and Wright, 1993a).  Of course, ineligible purchasers may also steal guns from licensed gun dealers and private gun owners.

Secondary market prices are generally lower than primary market prices (because the products are used), though the former may vary substantially across a range of gun models, places, circumstances, and actors.  For example, street prices of AWs and other guns can be 3 to 6 times higher than legal retail prices in jurisdictions with strict gun controls and lower levels of gun ownership (Cook et al., 1995, p. 72).  Nonetheless, experts note that primary and secondary market prices correspond to one another, in that relatively expensive guns in the primary market are also relatively expensive in the secondary market.  Moreover, in any given locality, trends in secondary market prices can be expected to track those in the primary market because a rise in primary market prices for new weapons will increase demand for used weapons and therefore increase secondary market prices (Cook et al., 1995, p. 71).

### 4.2.2.  *The AW-LCM Ban and Gun Markets*

In the long term, we can expect prices of the banned guns and magazines to gradually rise as supplies dwindle.  As prices rise, more would-be criminal users of AWs and LCMs will be unable or unwilling to pay the higher prices.  Others will be discouraged by the increasing non-monetary costs (i.e., search time) of obtaining the weapons.  In addition, rising legal market prices will undermine the incentive for some persons to sell AWs and LCMs to prohibited buyers for higher premiums, thereby bidding some of the weapons away from the channels through which they would otherwise reach criminal users.  Finally, some would-be AW and LCM users may become less willing to risk confiscation of their AWs and LCMs as the value of the weapons increases.  Therefore, we expect that over time diminishing stocks and rising prices will lead to a reduction in criminal use of AWs and LCMs.[21]

---

[20] Some states require that secondary market participants notify authorities about their transactions.  Even in these states, however, it is not clear how well these laws are enforced.

[21] We would expect these reductions to be apparent shortly after the price increases (an expectation that, as discussed below, was confirmed in our earlier study) because a sizeable share of guns used in crime are used within one to three years of purchase.  Based on analyses of guns recovered by police in 17 cities, ATF (1997, p. 8) estimates that guns less than 3 years old (as measured by the date of first retail sale) comprise between 22% and 43% of guns seized from persons under age 18, between 30% and 54% of guns seized from persons ages 18 to 24, and between 25% and 46% of guns seized from persons over 24.  In addition, guns that are one year old or less comprise the largest share of relatively new crime guns (i.e., crime guns less than three years old) (Pierce et al., 1998, p. 11).  Similar data are not available for secondary market transactions, but such data would shorten the estimated time from acquisition to criminal use.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

However, the expected timing of the market processes is uncertain.  We can anticipate that AW and LCM prices will remain relatively stable for as long as the supply of grandfathered weapons is adequate to meet demand.  If, in anticipation of the ban, gun manufacturers overestimated the demand for AWs and LCMs and produced too many of them, prices might even fall before eventually rising.  Market responses can be complicated further by the continuing production of legal AW substitute models by some gun manufacturers.  If potential AW buyers are content with an adequate supply of legal AW-type weapons having fewer military features, it will take longer for the grandfathered AW supply to constrict and for prices to rise.  Similarly, predicting LCM price trends is complicated by the overhang of military surplus magazines that can fit civilian weapons (e.g., military M-16 rifle magazines that can be used with AR-15 type rifles) and by the market in reconditioned magazines.  The "aftermarket" in gun accessories and magazine extenders that can be used to convert legal guns and magazines into banned ones introduces further complexity to the issue.

### 4.3.  Prior Research on the Ban's Effects

To summarize the findings of our prior study, Congressional debate over the ban triggered pre-ban speculative price increases of upwards of 50% for AWs during 1994, as gun distributors, dealers, and collectors anticipated that the weapons would become valuable collectors' items.  Analysis of national and local data on guns recovered by police showed reductions in criminal use of AWs during 1995 and 1996, suggesting that rising prices made the weapons less accessible to criminal users in the short-term aftermath of the ban.

However, the speculative increase in AW prices also prompted a pre-ban boost in AW production; in 1994, AW manufacturers produced more than twice their average volume for the 1989-1993 period.  The oversupply of grandfathered AWs, the availability of the AW-type legal substitute models mentioned earlier, and the steady supply of other non-banned semiautomatics appeared to have saturated the legal market, causing advertised prices of AWs to fall to nearly pre-speculation levels by late 1995 or early 1996.  This combination of excess supply and reduced prices implied that criminal use of AWs might rise again for some period around 1996, as the large stock of AWs would begin flowing from dealers' and speculators' gun cases to the secondary markets where ineligible purchasers may obtain guns more easily.

We were not able to gather much specific data about market trends for LCMs.  However, available data did reveal speculative, pre-ban price increases for LCMs that were comparable to those for AWs (prices for some LCMs continued to climb into 1996), leading us to speculate – incorrectly, as this study will show (see Chapter 8) – that there was some reduction in LCM use after the ban.[22]

---

[22]  To our knowledge, there have been two other studies of changes in AW and LCM use during the post-ban period.  One study reported a drop in police recoveries of AWs in Baltimore during the first half of 1995 (Weil and Knox, 1995), while the other found no decline in recoveries of AWs or LCMs in Milwaukee homicide cases as of 1996 (Hargarten et al., 2000).  Updated analyses for both of these cities

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Determining whether the reduction in AW use (and perhaps LCM use) following the ban had an impact on gun violence was more difficult.  The gun murder rate dropped more in 1995 (the first year following the ban) than would have been expected based on preexisting trends, but the short post-ban follow-up period available for the analysis precluded a definitive assessment as to whether the reduction was statistically meaningful (see especially Koper and Roth, 2001a).   The reduction was also larger than would be expected from the AW-LCM ban, suggesting that other factors were at work in accelerating the decline.  Using a number of national and local data sources, we also examined trends in measures of victims per gun murder incident and wounds per gunshot victim, based on the hypothesis that these measures might be more sensitive to variations in the use of AWs and LCMs.  These analyses revealed no ban effects, thus failing to show confirming evidence of the mechanism through which the ban was hypothesized to affect the gun murder rate.  However, newly available data presented in subsequent chapters suggest these assessments may have been premature, because any benefits from the decline in AW use were likely offset by steady or rising use of other guns equipped with LCMs, a trend that was not apparent at the time of our earlier study.

We cautioned that the short-term patterns observed in the first study might not provide a reliable guide to longer-term trends and that additional follow-up was warranted.  Two key issues to be addressed were whether there had been a rebound in AW use since the 1995-1996 period and, if so, whether that rebound had yet given way to a long-term reduction in AW use.  Another key issue was to seek more definitive evidence on short and long-term trends in the availability and criminal use of LCMs.  These issues are critical to assessing the effectiveness of the AW-LCM ban, but they also have broader implications for other important policy concerns, namely, the establishment of reasonable timeframes for sunset and evaluation provisions in legislation.   In other words, how long is long enough in evaluating policy and setting policy expiration dates?

---

are presented in Chapters 6 and 8.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# 5.  MARKET INDICATORS FOR ASSAULT WEAPONS:  PRICES AND PRODUCTION

This chapter assesses the ban's impact on the availability of AWs in primary and secondary markets, as measured by trends in AW prices and post-ban production of legal AW substitute models.  Understanding these trends is important because they influence the flow of grandfathered weapons to criminals and the availability of non-banned weapons that are close substitutes for banned ones.  In the next chapter, we assess the impact of these trends on criminal use of AWs, as approximated by statistics on gun seizures by police.  (Subsequent chapters present similar analyses for LCMs.)

Following our previous methods, we compare trends for AWs to trends for various non-banned firearms.  The AW analyses generally focus on the most common AWs formerly produced in the U.S., including Intratec and SWD-type APs and AR-15-type ARs produced by Colt and others.   In addition, we selected a small number of domestic pistol and rifle models made by Calico and Feather Industries that fail the features test provision of the AW legislation and that were relatively common among crime guns reported by law enforcement agencies to ATF prior to the ban (see Roth and Koper, 1997, Chapter 5).  Together, this group of weapons represented over 80% of AWs used in crime and reported to ATF from 1993 through 1996, and the availability of these guns was not affected by legislation or regulations predating the AW-LCM ban.[23]  We also examine substitution of legalized, post-ban versions of these weapons, including the Intratec AB-10 and Sport-22, FMJ's PM models (substitutes for the SWD group), Colt Sporters, Calico Liberty models, and others.  We generally did not conduct comparative analyses of named foreign AWs (the Uzi, Galil, and AK weapons) because the 1989 federal import ban had already limited their availability, and their legal status was essentially unchanged by the 1994 ban.

The exact gun models and time periods covered vary across the analyses (based on data availability and the time at which data were collected).  The details of each analysis are described in the following sections.

## 5.1.  Price Trends for Assault Weapons and Other Firearms

To approximate trends in the prices at which AWs could be purchased throughout the 1990s, we collected annual price data for several APs, ARs, and non-banned comparison firearms from the *Blue Book of Gun Values* (Fjestad, 1990-1999).  The *Blue Book* provides national average prices for an extensive list of new and used firearms based on information collected at gun shows and input provided by networks of dealers

---

[23]  The Intratec group includes weapons made by AA Arms.  The SWD group contains related models made by Military Armaments Corporation/Ingram and RPB Industries.  The AR-15 group contains models made by Colt and copies made by Bushmaster, Olympic Arms, Eagle Arms, SGW Enterprises, Essential Arms, DPMS, and Sendra.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

and collectors.  The *Blue Book* is utilized widely in the gun industry, though prices in any given locality may differ notably from the averages appearing in the *Blue Book*.

To assess time trends in gun prices, we conducted hedonic price analyses (Berndt, 1990) in which the gun prices were regressed upon a series of year and model indicators. The coefficients for the year indicators show annual changes in the prices of the guns relative to 1994 (the year the ban went into effect), controlling for time-stable differences in the prices of various gun models.  Since manufacturers' suggested retail prices (MSRP) were not available for banned AWs during post-ban years, we utilized prices for AWs in 100% condition for all years.[24]  For non-banned firearms, we used MSRP.[25]  For all models, we divided the gun prices by annual values of the gross domestic product price deflator provided in the December 2001 and 2000 issues of *Economic Indicators* and logged these adjusted prices.

Each model presented below is based on data pooled across a number of firearm models and years, so that observation $P_{jt}$ represents the price of gun model j during year t. We weighted each observation, $P_{jt}$, based on cumulative estimates of the production of model j from 1985 or 1986 (depending on data availability) through year t using data provided by gun manufacturers to ATF and published by the Violence Policy Center (1999).[26, 27]

---

[24] Project staff also collected prices of weapons in 80% condition.  However, the levels and annual changes of the 80% prices were very highly correlated (0.86 to 0.99) with those of the 100% condition prices. Therefore, we limited the analysis to the 100% prices.

[25] We utilized prices for the base model of each AW and comparison firearm (in contrast to model variations with special features or accessories).

[26] The regression models are based on equal numbers of observations for each gun model.  Hence, unweighted regressions would give equal weight to each gun model.  This does not seem appropriate, however, because some guns are produced in much larger numbers than are other guns.  Weighting the regression models by production estimates should therefore give us a better sense of what one could "typically" expect to pay for a generic gun in each study category (e.g., a generic assault pistol).

[27] Several of the selected weapons began production in 1985 or later.  In other cases, available production data extended back to only the mid-1980s.  Published production figures for handguns are broken down by type (semiautomatic, revolver) and caliber and thus provide perfect or very good approximations of production for the handgun models examined in this study.  Rifle production data, however, are not disaggregated by gun type, caliber, or model.  For the ARs under study, the production counts should be reasonable approximations of AR production because most of the rifles made by the companies in question prior to the ban were ARs.  The rifles used in the comparison (i.e., non-banned) rifle analysis are made by companies (Sturm Ruger, Remington, and Marlin) that produce numerous semiautomatic and non-semiautomatic rifle models.  However, the overall rifle production counts for these companies should provide some indication of differences in the availability of the comparison rifles relative to one another. Because production data were available through only 1997 at the time this particular analysis was conducted (Violence Policy Center, 1999), we used cumulative production through 1997 to weight the 1998 and 1999 observations for the comparison handgun and comparison rifle models.  This was not a consideration for AWs since their production ceased in 1994 (note that the AW production figures for 1994 may include some post-ban legal substitute models manufactured after September 13, 1994).  Nonetheless, weighting had very little effect on the inferences from either of the comparison gun models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### 5.1.1. Assault Pistol Prices

The analysis of AP prices focuses on the Intratec TEC-9/DC-9, TEC-22, SWD M-11/9, and Calico M950 models.  Regression results are shown in Table 5-1, while Figure 5-1 graphically depicts the annual trend in prices for the period 1990 through 1999.  None of the yearly coefficients in Table 5-1 is statistically significant, thus indicating that average annual AP prices did not change during the 1990s after adjusting for inflation.  Although the model is based on a modest number of observations (n=40) that may limit its statistical power (i.e., its ability to detect real effects), the size of the yearly coefficients confirm that prices changed very little from year to year.   The largest yearly coefficient is for 1990, and it indicates that AP prices were only 4% higher in 1990 than in 1994.[28]

This stands in contrast to our earlier finding (Roth and Koper, 1997, Chapter 4) that prices for SWD APs may have risen by as much as 47% around the time of the ban.  However, the earlier analyses were based on semi-annual or quarterly analyses advertised by gun distributors and were intended to capture short-term fluctuations in price that assumed greater importance in the context of the first AW study, which could examine only short-term ban outcomes.  *Blue Book* editions released close in time to the ban (e.g., 1995) also cautioned that prices for some AWs were volatile at that time.  This study emphasizes longer-term price trends, which appear to have been more stable.[29]

---

[28]  To interpret the coefficient of each indicator variable in terms of a percentage change in the dependent variable, we exponentiate the coefficient, subtract 1 from the exponentiated value, and multiply the difference by 100.

[29]  Although the earlier analysis of AP prices focused on the greatest variations observed in semi-annual prices, the results also provide indications that longer-term trends were more stable.  Prices in 1993, for example, averaged roughly 73% of the peak prices reached at the time the ban was implemented (i.e., late 1994), while prices in early 1994 and late 1995 averaged about 83% and 79% of the peak prices, respectively.  Hence, price variation was much more modest after removing the peak periods around the time of the ban's implementation (i.e., late 1994 and early 1995).   The wider range of APs used in the current study may also be responsible for some of the differences between the results of this analysis and the prior study.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 5-1.  Regression of Assault Pistol and Comparison Handgun Prices on Annual Time Indicators, 1990-1999, Controlling for Gun Model**

|  | Assault Pistols (n=40) | | Comparison Handguns (n=38) | |
|---|---|---|---|---|
|  | Estimate | T Value | Estimate | T Value |
| Constant | 1.56 | 26.94*** | -0.21 | -6.81*** |
| 1990 | 0.04 | 1.07 | 0.12 | 2.07** |
| 1991 | 0.01 | 0.30 | 0.09 | 1.79* |
| 1992 | -0.01 | -0.32 | 0.05 | 1.30 |
| 1993 | -0.03 | -1.09 | 0.02 | 0.48 |
| 1995 | 0.01 | 0.22 | -0.02 | -0.48 |
| 1996 | -0.01 | -0.45 | -0.09 | -2.69*** |
| 1997 | -0.03 | -1.13 | -0.11 | -3.26*** |
| 1998 | 0.00 | -0.10 | -0.07 | -1.99* |
| 1999 | -0.02 | -0.58 | -0.14 | -4.02*** |
| Tec-9 | -0.67 | -11.95*** |  |  |
| Tec-22 | -0.89 | -15.59*** |  |  |
| SWD | -0.64 | -11.49*** |  |  |
| Davis P32 |  |  | 0.09 | 3.63*** |
| Davis P380 |  |  | 0.20 | 8.20*** |
| Lorcin L380 |  |  | 0.29 | 11.35*** |
| F value | 27.79 |  | 16.24 |  |
| (p value) | <.01 |  | <.01 |  |
| Adj. R-square | 0.89 |  | 0.83 |  |

Time indicators are interpreted relative to 1994.  Assault pistol model indicators are interpreted relative to Calico 9mm.  Comparison handgun models are interpreted relative to Lorcin .25 caliber.
* Statistically significant at $p<=.10$.
** Statistically significant at $p<=.05$.
*** Statistically significant at $p<=.01$.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 5-1. Annual Price Trends for Assault Pistols and SNS Handguns, 1990-1999**



Assault pistol prices basd on TEC9, TEC22, SWD M11/9, and Calico M950.  SNS prices based on Davis P32 and P380 and Lorcin L25 and L380.

*5.1.2.  Comparison Handgun Prices*

For comparison, Table 5-1 and Figure 5-1 illustrate price trends for a number of non-banned, cheaply priced, and readily concealable semiautomatic handgun models:  the Davis P32 and P380 and the Lorcin L25 and L380.  Such guns are often referred to as Saturday night specials (SNS).  By a number of accounts, SNS-type guns, and Davis and Lorcin models in particular, are among the guns most frequently used in crime (ATF, 1995; 1997; Kennedy et al., 1996; Wintemute, 1994).  Although the differences between APs and SNS handguns (particularly the fact that most SNS handguns do not have LCMs) suggest they are likely to be used by gun consumers with different levels of firearms experience and sophistication, the SNS guns are arguably a good comparison group for APs because both groups of guns are particularly sensitive to criminal demand. Like AP buyers, SNS buyers are more likely than other gun buyers to have criminal histories and to be charged with new offenses, particularly violent or firearm offenses, subsequent to their purchases (Wintemute et al., 1998b).

Prices of SNS handguns dropped notably throughout the 1990s.  Prices for SNS handguns were 13% higher in 1990 than in 1994.  Prices then dropped another 13% from 1994 to 1999.  This suggests that although AP prices remained generally stable throughout the 1990s, they increased relative to prices of other guns commonly used in crime.  We say more about this below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### *5.1.3. Assault Rifle Prices*

To assess trends in prices of ARs, we examined prices for several Colt and Olympic rifle models in the AR-15 class, as well as Calico models M900 and M951 and Feather models AT9 and AT22.[30]  Because rifle production data are not disaggregated by weapon type (semiautomatic, bolt action, etc.), caliber, or model, the regressions could only be weighted using overall rifle production counts for each company.  For this reason, we calculated the average price of the ARs made by each company for each year and modeled the trends in these average prices over time, weighting by each company's total rifle production.[31]

Results shown in Table 5-2 and Figure 5-2 demonstrate that AR prices rose significantly during 1994 and 1995 before falling back to pre-ban levels in 1996 and remaining there through 1999.  Prices rose 16% from 1993 to 1994 and then increased another 13% in 1995 (representing an increase of nearly one third over the 1993 level).  Yet by 1996, prices had fallen to levels virtually identical to those before 1994.  These patterns are consistent with those we found earlier for the 1992-1996 period (Roth and Koper, 1997, Chapter 4), though the annual price fluctuations shown here were not as dramatic as the quarterly changes shown in the earlier study.

Note, however, that these patterns were not uniform across all of the AR categories.  The results of the model were driven largely by the patterns for Colt rifles, which are much more numerous than the other brands.  Olympic rifles increased in price throughout the time period, while prices for most Calico and Feather rifles tended to fall throughout the 1990s without necessarily exhibiting spikes around the time of the ban.

---

[30]  Specifically, we tracked prices for the Match Target Lightweight (R6530), Target Government Model (R6551), Competition H-Bar (R6700), and Match Target H-Bar (R6601) models by Colt and the Ultramatch, Service Match, Multimatch M1-1, AR15, and CAR15 models by Olympic Arms.  Each of these models has a modified, post-ban version.  We utilized prices for the pre-ban configurations during post-ban years.
[31]  Prices for the different models made by a given manufacturer tended to follow comparable trends, thus strengthening the argument for averaging prices.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 5-2.  Regression of Assault Rifle and Comparison Semiautomatic Rifle Prices on Annual Time Indicators, 1991-1999, Controlling for Gun Make**

|  | Assault Rifles (n=36) | | Comparison Rifles (n=27) | |
|---|---|---|---|---|
|  | Estimate | T value | Estimate | T value |
| Constant | 1.31 | 21.15*** | 1.40 | 76.75*** |
| 1991 | -0.12 | -1.98* | -0.01 | -0.21 |
| 1992 | -0.13 | -2.26** | 0.01 | 0.30 |
| 1993 | -0.15 | -2.78** | 0 | -0.13 |
| 1995 | 0.12 | 2.47** | 0.03 | 1.08 |
| 1996 | -0.11 | -2.27** | 0.04 | 1.69 |
| 1997 | -0.11 | -2.23** | 0.03 | 1.46 |
| 1998 | -0.12 | -2.47** | 0.02 | 0.91 |
| 1999 | -0.14 | -2.71** | 0.03 | 1.21 |
| Colt (AR-15 type) | 1.07 | 19.93*** |  |  |
| Olympic (AR-15 type) | 1.14 | 16.08*** |  |  |
| Calico | 0.43 | 5.53*** |  |  |
| Ruger |  |  | 0.26 | 20.07*** |
| Remington |  |  | 0.29 | 21.69*** |
| F statistic | 50.52 | | 63.62 | |
| (p value) | <.01 | | <.01 | |
| Adj. R-square | 0.94 | | 0.96 | |

Time indicators interpreted relative to 1994.  Assault rifle makes interpreted relative to Feather.
Comparison rifle makes interpreted relative to Marlin.
* Statistically significant at p<=.10.
** Statistically significant at p<=.05.
*** Statistically significant at p<=.01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 5-2. Annual Price Trends for Assault Rifles and
Comparison Semiautomatic Rifles, 1991-1999**



Assault rifle prices based on Colt and Olympic AR-type, Calico, and Feather models.  Comparison rifle prices based on
selected Remington, Marlin, and Sturm Ruger models.

*5.1.4.  Comparison Semiautomatic Rifles.*

The analysis of comparison rifle prices includes the Remington 7400, Marlin Model 9, and Sturm Ruger Mini-14 and Mini-30 models (the Ruger model prices were averaged for each year).  The AW legislation exempted each of these semiautomatic rifles by name, though the exemption does not apply to Mini-14 models with folding stocks (a feature included in the ban's features test).  The Ruger models are of particular interest since they are among only four exempted guns that can accept LCMs made for military rifles (U.S. Department of the Treasury, 1998, p. 23), though Ruger produced LCMs only for the Mini-14 model and substituted a 5-round magazine for this gun in 1989 (Fjestad, 2002, pp. 1361-1362).  The Marlin model was also manufactured with an LCM prior to 1990 (Fjestad, 2002, p. 917).  The Remington model is manufactured with a detachable 4-round magazine.

Prices for these guns remained steady throughout the decade (see Table 5-2 and Figure 5-2).  The largest change was a 4% increase (non-significant) in prices in 1996 relative to prices in 1994.  Therefore, the rifle price spikes in 1994 and 1995 were specific to assault rifles.  However, the steady annual price trends may mask short-term fluctuations that we found

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by
the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official
position or policies of the U.S. Department of Justice.

previously (Roth and Koper, 1997, Chapter 4) for some non-banned semiautomatic rifles (including the Ruger Mini-14) during 1994 and early 1995.[32]

## 5.2.  Production Trends for Assault Weapons and Other Firearms

To more fully assess the ban's effects on gun markets, examination of pre and post-ban trends in production of AWs and legal AW substitutes is a useful complement to studying price trends.  Our earlier work revealed a spike in AW production during 1994 as the ban was being debated.  Post-ban production of legal AW substitutes should reveal additional information about the reaction of gun markets to the ban.  If production of these models has fallen off dramatically, it may suggest that the market for AWs has been temporarily saturated and/or that consumers of AWs favor the original AW models that have more military-style features.  Stable or rising production levels, on the other hand, may indicate substantial consumer demand for AW substitutes, which would suggest that consumers consider the legal substitute models to be as desirable as the banned models.

### 5.2.1.  Production of Assault Pistols and Other Handguns

Figure 5-3 presents production trends for a number of domestic AP manufacturers from 1985 through 2001 (the most recent year available for data on individual manufacturers).[33]  After rising in the early 1990s and surging notably to a peak in 1994, production by these companies dropped off dramatically, falling 80% from 1993-1994 to 1996-1997 and falling another 35% by 1999-2000 (Table 5-3).[34]  Makers of Intratec and SWD-type APs continued manufacturing modified versions of their APs for at least a few years following the ban, but at much lower volumes than that at which they produced APs just prior to the ban.  Companies like AA Arms and Calico produced very few or no AP-type pistols from 1995 onward, and Intratec – producers of the APs most frequently used in crime – went out of business after 1999.

However, the pattern of rising and then falling production was not entirely unique to APs. Table 5-3 shows that production of all handguns and production of SNS-type pistols both declined sharply in the mid to late 1990s following a peak in 1993.  Nonetheless, the trends –

---

[32]  We attributed those short-term fluctuations to pre-ban uncertainty regarding which semiautomatic rifles would be prohibited by the ban.  Also note that the prior findings were based on a different set of comparison semiautomatic rifles that included a number of foreign rifles.  We concentrated on domestically produced rifles for this updated analysis in order to make more explicit links between rifle price and production trends (data for the latter are available only for domestic firearms).

[33]  Production figures for individual manufacturers through 2000 have been compiled by the Violence Policy Center (2002).  Year 2001 data are available from ATF via the Internet (see www.atf.treas.gov).  National gun production totals through 1998 are also available from ATF (2000, p. A-3).

[34]  The assault pistol production figures used here and in the price analysis include 9mm and .22 caliber pistols made by Intratec, 9mm pistols manufactured by AA Arms, all non-.22 caliber pistols manufactured by S.W. Daniels, Wayne Daniels, and Military Armaments Corporation (which together constitute the SWD group), and .22 and 9mm pistols manufactured by Calico.  Intratec produces a few non-AW models in .22 and 9mm calibers, so the Intratec figures will overstate production of assault pistols and their legal substitutes to some degree.  The comparison, SNS production figures are based on all handguns produced by Lorcin Engineering and Davis Industries.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

both peak and decline – were more dramatic for APs than for other handguns.  Production of APs rose 69% from 1990-1991 to 1993-1994, while SNS production and overall handgun production each increased 47%.  From 1993-1994 to 1996-1997, production of AP-type handguns, SNS models, and all handguns declined 80%, 66%, and 47%, respectively.  Further, production of AP-type handguns continued to decline at a faster rate than that of other handguns through the end of the decade.[35]

## Figure 5-3. Assault Pistol Production, 1985-2001



---

[35]  Lorcin, a prominent SNS brand that we examined for the price and production analyses, went out of business after 1998.  Unlike the situation in the AP market (where, to our knowledge, former AP makers have not been replaced on any large scale), the SNS market appears to have compensated somewhat to offset the loss of Lorcin. The SNS change from 1996-1997 to 1999-2000 is based on examination of a larger group of SNS-type makers, including Lorcin, Davis, Bryco, Phoenix Arms, and Hi-Point.  Production among this group declined by 22% from 1996-1997 to 1999-2000, a decline greater than that for total handgun production but less than that for AP-type production.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 5-3.  Production Trends for Assault Weapons and Other Firearms, 1990-2000***

| Firearm Category | % Change 1990/91 to 1993/94 | % Change 1993/94 to 1996/97 | % Change 1996/97 to 1999/2000 |
|---|---|---|---|
| Total Handguns | 47% | -47% | -10% |
| Assault Pistols (or Post-Ban Models) | 69% | -80% | -35% |
| SNS Handguns | 47% | -66% | -22% |
| Total Rifles | 22% | 8% | 18% |
| Assault Rifles (or Post-Ban Models) | 81% | -51% | 156% |
| Comparison Rifles | 15% | 13% | -16% |

* Total handgun and rifle figures include all production by U.S. manufacturers.  Assault pistols include Intratec group, SWD group, and Calico models.  SNS figures are based on Lorcin Engineering and Davis Industries for changes up through 1996-1997.  Because Lorcin went out of business after 1998, the SNS change from 1996-1997 to 1999-2000 is based on a larger group of SNS makers including Lorcin, Davis, Bryco, Phoenix Arms, and Hi-Point.  Assault rifles include AR-15 type models by Colt and others. Comparison rifles include Sturm Ruger, Remington, and Marlin.

*5.2.2.  Production of Assault Rifles and Other Rifles*

As shown in Figure 5-4, production of AR-15 type rifles surged during the early 1990s, reaching a peak in 1994.[36]  AR production during the early 1990s rose almost 4 times faster than total rifle production and over 5 times faster than production of the comparison rifles examined in the price analysis (Table 5-3).  Yet, by 1996 and 1997, production of legalized AR-type rifles had fallen by 51%, as production of other rifles continued increasing.  AR production trends reversed again during the late 1990s, however, rising over 150%.[37]  Total rifle production increased much more modestly during this time (18%), while production of the comparison rifles declined.

---

[36]  Note again that the AR and legalized AR production figures are approximations based on all rifles produced by the companies in question (rifle production data are not available by type, caliber, or model), but it appears that most rifles made by these companies during the study period were AR-type rifles.  Also, the figures for the comparison rifle companies (Ruger, Marlin, and Remington) are based on all rifles produced by these companies (the price analysis focused on selected semiautomatic models).
[37]  There was also a notable shift in market shares among AR makers, as Bushmaster overtook Colt as the leading producer of AR-15 type rifles (Figure 5-4).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 5-4. Assault Rifle Production, 1986-2001 (AR-15 Type)**



Other:  Olympic, Eagle/Armalite, DPMS, Essential Arms, Sendra.


### 5.3. Summary and Interpretations

   Below, we offer some interpretations of the patterns found in the price and production analyses, keeping in mind that these analyses were largely descriptive, so causal inferences must be made cautiously.  As documented in our earlier study, Congressional debate over the AW-LCM ban triggered speculative price increases for AWs in the months leading up to the ban's enactment.   This study's examination of longer-term, annual price trends suggests that this speculative effect was very brief (and perhaps quite variable across jurisdictions) for APs but persisted through 1995 for ARs. This implies that speculators and sophisticated gun collectors (who we suspect played a large role in driving price trends) have more interest in ARs, which tend to be higher in quality and price than APs.

   Responding to the speculative price growth, AW manufacturers boosted their production of AWs in 1994.   Although total handgun and rifle production were increasing during the early 1990s, the rise in AW production was steeper, and there was a production peak unique to AWs in 1994 (production of other handguns peaked in 1993). It seems that this boost in the supply of grandfathered AWs was sufficient to satisfy speculative demand, thereby restoring national average AP prices to pre-ban levels within a year of the ban and doing the same for AR prices by 1996.  AW prices remained stable through the late 1990s, and production of legalized AW-type weapons dropped off

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

substantially, at least through 1998. This suggests that the supply of grandfathered AWs was sufficient to meet demand through the late 1990s.

However, prices of APs rose relative to other handguns commonly used in crime during the 1990s. Handgun prices and production declined in general during the late 1990s, implying a decrease in demand for APs and other handguns that probably stemmed from the nation's declining crime rates.[38] But the AW ban's restriction of the AP supply, combined with the interest of speculators and collectors in these guns, may have prevented AP prices from falling as did prices for other handguns. The market patterns also suggest that consumers of APs are not as easily satisfied by legalized APs with fewer military-style features; despite the increasing value of APs (in relative terms), post-ban production of legalized APs declined faster than did production of other handguns, and some AP makers went out of business.

Prices of ARs, on the other hand, remained steady during the late 1990s (after the speculative price bubble of 1994-1995) both in absolute terms and relative to other rifles. The failure of AR prices to rise in at least relative terms, as occurred for APs, and the temporary drop in production of AR-type rifles after the ban may signify that the AR market was saturated relative to the AP market for a least a number of years following the ban. However, demand for AR-type rifles later rebounded, as evidenced by the resurgence in production of legalized, AR-type rifles in the late 1990s. In fact, more of these guns were produced in 1999 than in 1994. Unlike AP users, therefore, rifle users appear to be readily substituting the legalized AR-type rifles for the banned ARs, which may be another factor that has kept prices of the latter rifles from rising. All of this suggests that rifle owners, who have a lower prevalence of criminal users than do handgun owners, can more easily substitute rifles with fewer or no military features for the hunting and other sporting purposes that predominate among rifle consumers.

Another relevant factor may have been a surge in the supply of foreign semiautomatic rifles that can accept LCMs for military weapons (the LCMM rifles discussed in Chapter 2) during the early 1990s. Examples of LCMM rifles include legalized versions of banned AK-47, FN-FAL, and Uzi rifles. Importation of LCMM rifles rose from 19,147 in 1991 to 191, 341 in 1993, a nine-fold increase (Department of the Treasury, 1998, p. 34). Due to an embargo on the importation of firearms from China (where many legalized AK-type rifles are produced), imports of LCMM rifles dropped

---

[38] It seems likely that the rise and fall of handgun production was linked to the rising crime rates of the late 1980s and early 1990s and the falling crime rates of the mid and late 1990s. Self-defense and fear of crime are important motivations for handgun ownership among the general population (e.g., Cook and Ludwig, 1996; McDowall and Loftin, 1983), and the concealability and price of handguns make them the firearms of choice for criminal offenders. It is likely that the peak in 1993 was also linked to the Congressional debate and passage of the Brady Act, which established a background check system for gun purchases from retail dealers. It is widely recognized in the gun industry that the consideration of new gun control legislation tends to increase gun sales.

The decline in production was more pronounced for SNS handguns, whose sales are likely to be particularly sensitive to crime trends. Criminal offenders make disproportionate use of these guns. We can also speculate that they are prominent among guns purchased by low-income citizens desiring guns for protection. In contrast, the poor quality and reliability of these guns make them less popular among more knowledgeable and affluent gun buyers.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

back down to 21,261 in 1994.  Importation of all foreign LCMM rifles was ended by federal executive order in 1998.

ATF has reported that criminal use of LCMM rifles increased more quickly during the early 1990s than did that of other military-style rifles (U.S. Department of the Treasury, 1998, p. 33; also see Chapter 6).  Accordingly, it is possible that the availability of LCMM rifles also helped to depress the prices of domestic ARs and discourage the production of legalized ARs during the 1990s, particularly if criminal users of rifles place a premium on the ability to accept LCMs.  It is noteworthy, moreover, that the rebound in domestic production of legalized ARs came on the heels of the 1998 ban on LCMM rifles, perhaps suggesting the LCMM ban increased demand for domestic rifles accepting LCMs.

In sum, this examination of the AW ban's impact on gun prices and production suggests that there has likely been a sustained reduction in criminal use of APs since the ban but not necessarily ARs.  Since most AWs used in crime are APs, this should result in an overall decline in AW use.  In the following chapter, we examine the accuracy of this prediction.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 6.  CRIMINAL USE OF ASSAULT WEAPONS AFTER THE BAN

### 6.1.  Measuring Criminal Use of Assault Weapons:  A Methodological Note

In this chapter, we examine trends in the use of AWs using a number of national and local data sources on guns recovered by law enforcement agencies (we focus on the domestic AW models discussed at the beginning of the previous chapter).  Such data provide the best available indicator of changes over time in the types (and especially the specific makes and models) of guns used in violent crime and possessed and/or carried by criminal and otherwise deviant or high-risk persons.  The majority of firearms recovered by police are tied to weapon possession and carrying offenses, while the remainder are linked primarily to violent crimes and narcotics offenses (e.g., see ATF, 1976; 1977; 1997; Brill, 1977).  In general, up to a quarter of guns confiscated by police are associated with violent offenses or shots fired incidents (calculated from ATF, 1977, pp. 96-98; 1997; Brill, 1977, pp. 24,71; Shaw, 1994, pp. 63, 65; also see data presented later in this chapter).  Other confiscated guns may be found by officers, turned in voluntarily by citizens, or seized by officers for temporary safekeeping in situations that have the potential for violence (e.g., domestic disputes).

Because not all recovered guns are linked to violent crime investigations, we present analyses based on all gun recoveries and gun recoveries linked to violent crimes where appropriate (some of the data sources are based exclusively, or nearly so, on guns linked to violent crimes).  However, the fact that a seized gun is not clearly linked to a violent crime does not rule out the possibility that it had been or would have been used in a violent crime.  Many offenders carry firearms on a regular basis for protection and to be prepared for criminal opportunities (Sheley and Wright, 1993a; Wright and Rossi, 1986).  In addition, many confiscated guns are taken from persons involved in drugs, a group involved disproportionately in violence and illegal gun trafficking (National Institute of Justice, 1995; Sheley and Wright, 1993a).  In some instances, criminal users, including those fleeing crime scenes, may have even possessed discarded guns found by patrol officers. For all these reasons, guns recovered by police should serve as a good approximation of the types of guns used in violent crime, even though many are not clearly linked to such crimes.

Two additional caveats should be noted with respect to tracking the use of AWs. First, we can only identify AWs based on banned makes and models.  The databases do not contain information about the specific features of firearms, thus precluding any assessment of non-banned gun models that were altered after purchase in ways making them illegal.  In this respect, our numbers may understate the use of AWs, but we know of no data source with which to evaluate the commonality of such alterations.  Second, one cannot always distinguish pre-ban versions of AWs from post-ban, legalized versions of the same weapons based on weapon make and model information (this occurs when the post-ban version of an AW has the same name as the pre-ban version), a factor which may have caused us to overstate the use of AWs after the ban.  This was more of a problem for our assessment of ARs, as will be discussed below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Finally, we generally emphasize trends in the percentage of crime guns that are AWs in order to control for overall trends in gun violence and gun recoveries. Because gun violence was declining throughout the 1990s, we expected the number of AW recoveries to drop independently of the ban's impact.

## 6.2.  National Analysis of Guns Reported By Police to the Federal Bureau of Alcohol, Tobacco, and Firearms

### 6.2.1.  An Introduction to Gun Tracing Data

In this section, we examine national trends in AW use based on firearm trace requests submitted to ATF by federal, state, and local law enforcement personnel throughout the nation. A gun trace is an investigation that typically tracks a gun from its manufacture to its first point of sale by a licensed dealer. Upon request, ATF traces guns seized by law enforcement as a service to federal, state, and local agencies. In order to initiate a trace on a firearm, the requesting law enforcement agency provides information about the firearm, such as make, model, and serial number.

Although ATF tracing data provide the only available national sample of the types of guns used in crime and otherwise possessed or carried by criminal and high-risk groups, they do have limitations for research purposes. Gun tracing is voluntary, and police in most jurisdictions do not submit trace requests for all, or in some cases any, guns they seize. Crime and tracing data for 1994, for example, suggest that law enforcement agencies requested traces for 27% of gun homicides but only 1% of gun robberies and gun assaults known to police during that year (calculated from ATF, 1995 and Federal Bureau of Investigation, 1995, pp. 13, 18, 26, 29, 31, 32).

The processes by which state and local law enforcement agencies decide to submit guns for tracing are largely unknown, and there are undoubtedly important sources of variation between agencies in different states and localities. For example, agencies may be less likely to submit trace requests in states that maintain their own registers of gun dealers' sales. Knowledge of ATF's tracing capabilities and procedures,[39] as well as participation in federal/state/local law enforcement task forces, are some of the other factors that may affect an agency's tracing practices. Further, these factors are likely to vary over time, a point that is reinforced below.

Therefore, firearms submitted to ATF for tracing may not be representative of the

---

[39] To illustrate, ATF cannot (or does not) trace military surplus weapons, imported guns without the importer name (generally, pre-1968 guns), stolen guns, or guns without a legible serial number (Zawitz 1995). Tracing guns manufactured before 1968 is also difficult because licensed dealers were not required to keep records of their transactions prior to that time. Throughout much of the 1990s, ATF did not generally trace guns older than 5-10 years without special investigative reasons (Kennedy et al., 1996, p. 171). Our data are based on trace requests rather than successful traces, but knowledge of the preceding operational guidelines might have influenced which guns law enforcement agencies chose to trace in some instances.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

types of firearms typically seized by police. In general, not much is known about the nature of potential bias in tracing data. In prior studies, however, AWs tended to be more common in tracing data than in more representative samples of guns confiscated by police (Kleck, 1997, pp. 112, 141). This suggests that police have been more likely historically to initiate traces for seized AWs than for other seized guns. Although comparisons across studies are complicated by varying definitions of AWs used in different analyses, studies of guns confiscated by police or used in particular types of crimes generally suggest that AWs accounted for up to 6% of crime guns and about 2% on average prior to the federal AW ban (see Chapter 3 and Kleck, 1997, p. 141), whereas studies of pre-ban tracing data indicated that 8% of traced guns, and sometimes as many as 11%, were AWs (Cox Newspapers, 1989; Lenett, 1995; Zawitz, 1995).

Changes over time in the tracing practices of law enforcement agencies present additional complexities in analyzing tracing data. Due to improvements in the tracing process, ATF promotional efforts, and special initiatives like the Youth Crime Gun Interdiction Initiative (see ATF, 1997; 1999 and more recent reports available via the Internet at www.atf.treas.gov),[40] the utilization of tracing grew substantially throughout the 1990s in jurisdictions that chose to participate (also see ATF, 2000; Roth and Koper, 1997). To illustrate, trace requests to ATF rose from roughly 42,300 in 1991 to 229,500 in 2002 (see Table 6-1 in the next section), an increase of 443%. This growth reflects changes in tracing practices (i.e., changes in the number of agencies submitting trace requests and/or changes in the percentage of recovered guns for which participating agencies requested traces) rather than changes in gun crime; gun homicides, for example, were falling throughout the 1990s (see Table 6-1 in the next section) and were a third lower in 2002 than in 1991.

Therefore, an increase in trace requests for AWs does not necessarily signal a real increase in the use of AWs. Further, examining trends in the percentage of trace requests associated with AWs is also problematic. Because law enforcement agencies were more likely to request traces for AWs than for other guns in years past, we can expect the growth rate in tracing for non-AWs to exceed the growth rate in traces for AWs as gun tracing becomes more comprehensive. Consequently, AWs are likely to decline over time as a share of trace requests due simply to reporting effects, except perhaps during periods when AWs figure prominently in public discourse on crime.[41]

---

[40] As part of this initiative, police in a few dozen large cities are submitting trace requests to ATF for all guns that they confiscate. The initiative began with 17 cities in 1996 and has since spread to 55 major urban jurisdictions.

[41] To illustrate, assume that a hypothetical police agency recovers 100 guns a year, 2 of which are AWs, and that the agency has a selective tracing policy that results in the submission of trace requests for 20 of the guns, including 1 of the recovered AWs. Under this scenario, the department would be almost three times as likely to request traces for AWs as for other guns. If the department adopted a policy to request traces on all guns (and again recovered 2 AWs and 98 other guns), AW traces would double and traces of other guns would increase by more than 400%. Moreover, AWs would decline from 5% of traced guns to 2% of traced guns due simply to the change in tracing policy.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*6.2.2.  Traces of Assault Weapons, 1990-2002*

Figure 6-1 illustrates the share of all traces that were for AWs from 1990 through 2002.  A more detailed assessment of annual changes in traces for AWs and other guns is presented in Table 6-1.  Changes in gun murders are also shown in Table 6-1 to emphasize the differences in trends for tracing and gun crime.  Below, we summarize key points from the analysis.  Due to the instrumentation problems inherent in tracing data, statistical tests are not presented.[42]

### Figure 6-1. Police Recoveries of Assault Weapons Reported to ATF (National), 1990-2002



As % of Traced Guns (N=1,658,975)

Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

---

[42]  Nearly 30% of the tracing records lack specific gun model designations (the crucial elements for conducting a trace are the gun make and serial number).  For the makes and types of guns likely to be AWs, however, the missing model rate was slightly under 10%.  Further, we were able to identity some of the latter weapons as AWs with reasonable confidence based on the makes, types, and calibers alone. Nevertheless, we conducted a supplemental analysis using only those records for which the gun model was identified.  The results of that analysis were substantively very similar to those presented below.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 6-1.  Annual Percentage Changes in Gun Murders and Police Requests to ATF for Traces of Assault Weapons and Other Firearms, 1991-2002 (Number of Traces in Parentheses)**

| Year | Gun Murders (1) | All Traces (2) | AW Traces* (3) | AP Traces (4) | AR Traces (5) | AW and AW Substitute Traces (6) | Violent Crime Traces (7) | AW Violent Crime Traces (8) | LCMM Rifle Traces** (9) |
|---|---|---|---|---|---|---|---|---|---|
| 1991 | 9% | 14% (42281) | 14% (2378) | 24% (1775) | -6% (603) | 14% (2378) | 19% (6394) | 20% (344) | -- |
| 1992 | -1% | 6% (44992) | 1% (2398) | 4% (1838) | -7% (560) | 1% (2398) | 3% (6558) | 7% (367) | -- |
| 1993 | 5% | 20% (54189) | 25% (2994) | 20% (2199) | 42% (795) | 25% (2994) | 26% (8248) | 41% (516) | 252% (183) |
| 1994 | -4% | 53% (82791) | 11% (3337) | 23% (2706) | -21% (631) | 11% (3337) | 22% (10083) | -18% (424) | 223% (592) |
| 1995 | -10% | -6% (77503) | -19% (2730) | -24% (2051) | 8% (679) | -18% (2747) | 23% (12439) | -15% (362) | -10% (530) |
| 1996 | -9% | 66% (128653) | 12% (3059) | 13% (2309) | 10% (750) | 17% (3214) | 67% (20816) | 27% (459) | 40% (743) |
| 1997 | -7% | 42% (183225) | 31% (4019) | 31% (3017) | 34% (1002) | 36% (4362) | 11% (23147) | 13% (519) | 24% (925) |
| 1998 | -11% | 5% (192115) | 0% (4014) | -9% (2751) | 26% (1263) | 7% (4681) | 3% (23844) | -22% (404) | 33% (1227) |
| 1999 | -8% | -2% (188296) | -11% (3581) | -12% (2414) | -8% (1167) | -6% (4406) | 3% (24663) | 0% (404) | -18% (1003) |
| 2000 | 1% | -3% (182961) | -11% (3196) | -16% (2027) | 0% (1169) | -6% (4143) | -13% (21465) | -25% (305) | -14% (859) |
| 2001 | -1% | 18% (215282) | 1% (3238) | 5% (2138) | -6% (1100) | 3% (4273) | 20% (25822) | 6% (322) | -3% (833) |
| 2002 | 6% | 7% (229525) | 19% (3839) | 4% (2214) | 48% (1625) | 12% (4765) | 20% (30985) | 65% (531) | 4% (865) |

* Based on Intratec group, SWD group, AR-15 group, and Calico and Feather models.
** Foreign semiautomatic rifles accepting large capacity military magazines (banned by executive order in 1998).  (Data are not shown for 1991 and 1992 because very few of these guns were traced in those years.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### 6.2.2.1.  Assault Weapons as a Percentage of Crime Gun Traces

As shown in Figure 6-1, AWs declined from 5.4% of crime gun traces in 1992-1993 to 1.6% in 2001-2002, a decline of 70%.  Although this downward trend could be attributable in large part to changes in tracing practices, it is noteworthy that it did not begin until 1994 (the year of the ban); during the pre-ban years, 1990 to 1993, AWs accounted for a steady share of traces despite a 46% increase in total tracing volume.  It is also remarkable that about 3,200 AWs were traced in both 2000 and 2001, which is virtually identical to the average number traced during 1993 and 1994 (3,166) even though total traces increased more than 190% during the same period (Table 6-1, columns 2 and 3).[43]

### 6.2.2.2.  Annual Changes in Traces for Assault Weapons and Other Guns

Throughout most of the post-ban period (particularly 1995 to 2001), AW traces either increased less or declined more than total traces (Table 6-1, columns 2 and 3), a pattern that is also consistent with a decline in the use of AWs relative to other guns, though it too may be distorted by changes in tracing practices.  This pattern was largely consistent whether analyzing all traces or only traces associated with violent crimes (columns 7 and 8).[44]

The years when total traces declined or were relatively flat are arguably the most informative in the series because they appear to have been less affected by changes in tracing practices.  For example, there was a 6% decline in total trace requests from 1994 to 1995 (the years featured in our earlier study) that coincided with a 10% drop in gun murders (Table 6-1, column 1).  Therefore, it seems tracing practices were relatively stable (or, conversely, reporting effects were relatively small) from 1994 to 1995.  The 19% reduction in AW traces during this same period implies that AW use was declining faster than that of other guns.  Furthermore, there were fewer AW traces in 1995 than in 1993, the year prior to the ban.  The fact that this occurred during a period when the AW issue was very prominent (and hence police might have been expected to trace more of the AWs they recovered) arguably strengthens the causal inference of a ban effect.[45]

Total traces also declined slightly (2%-3%) in 1999 and 2000.  In each of those years, the decline was greater for AWs (11%).  Thus, in years when tracing declined overall, AW traces fell 3 to 6 times faster than did total traces.  Put another way, AWs fell between 9% and 13% as a percentage of all traces in each of these years.

The general pattern of AW traces increasing less or declining more than those of

---

[43]  These general findings are consistent with those of other tracing analyses conducted by ATF (2003 Congressional Q&A memo provided to the author) and the Brady Center to Prevent Gun Violence (2004).

[44]  A caveat is that requests without specific crime type information are often grouped with weapons offenses (ATF, 1999).  Therefore, traces associated with violent crimes are likely understated to some degree.

[45]  This inference is also supported by our earlier finding that trace requests for AWs declined by only 8% in states that had their own AW bans prior to the federal ban (Roth and Koper, 1997, Chapter 5).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

other crime guns was clearly apparent for APs but less consistent for ARs (Table 6-1, columns 4 and 5).  For example, AR traces went up 26% in 1998 while total traces went up only 5% and AP traces declined 9%.  In 2000, total and AP traces fell 3% and 16%, respectively, but AR traces remained flat.  This is consistent with predictions derived from the price and production analyses described above.  But note that the post-ban AR counts could be overstated because the data do not distinguish pre-ban from post-ban versions of some popular AR-15 type rifles like the Colt Sporter and Bushmaster XM-15. (Also note that the percentage of traces for ARs did fall from 1.4% in 1992-1993 to 0.6% in 2001-2002.)

More generally, the use of post-ban AW-type weapons (including both legalized APs and ARs) has not been widespread enough to completely offset the apparent decline in the use of banned AWs.  Combined traces for banned AWs and AW substitutes (Table 6-1, column 6) also followed the pattern of increasing less or declining more than did total traces throughout most of the period, though the differences were not as pronounced as those between AWs and total traces.  In 1999 and 2000, for example, AWs traces dropped 11%, while combined traces for AWs and legal substitutes declined only 6%. Still, the latter figure was greater than the 2%-3% drop for total traces.

Finally, traces of the LCMM rifles banned by executive order in 1998 were generally rising to that point, reaching levels as high as those for AR-15 type rifles (Table 6-1, column 9).  Since 1998, however, the number of traces for LCMM rifles has fallen substantially.  Despite a 4% increase from 2001 to 2002, the number of LCMM traces in 2002 (865) was 30% lower than the peak number traced in 1998 (1,227).  Tentatively, this suggests that the 1998 extension of the ban has been effective in curtailing weapons that offenders may have been substituting for the ARs banned in 1994.

### 6.2.2.3.  *Did Use of Assault Weapons Rebound in 2002?*

In 2002, tracing volume increased 7%, which closely matched the 6% increase in gun murders for that year.  In contrast to the general pattern, AW traces increased by 19%, suggesting a possible rebound in AW use independent of changes in tracing practices, a development that we have predicted elsewhere (Roth and Koper, 1997) based on the boom in AW production leading up to the ban.  The disproportionate growth in AW traces was due to ARs, however, so it could partially reflect increasing use of post-ban AR-type rifles (see the discussion above).

Moreover, this pattern could be illusory.  With data from the most recent years, it was possible to run a supplementary analysis screening out traces of older weapons (not shown).  Focusing on just those guns recovered and traced in the same year for 2000 through 2002 revealed that recoveries of AWs declined in 2001, more so for ARs (16%) than for APs (9%), while total traces increased 1%.[46]  Traces for APs and ARs then

---

[46] The tracing database indicates when guns were recovered and when they were traced.  However, the recovery dates were missing for 30% of the records overall and were particularly problematic for years prior to 1998.  For this reason, the main analysis is based on request dates.  The auxiliary analysis for 2000-

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

increased in 2002 (1% and 6%, respectively) but by less than total traces (8%). Therefore, the disproportionate growth in AR traces in 2002 shown in Table 6-1 may have been due to tracing of older AWs by newly participating police agencies.

### 6.2.2.4.  Summary of the ATF Gun Tracing Analysis

Complexities arising from recent changes in the use of gun tracing by law enforcement warrant caution in the interpretation of ATF gun tracing data. Notwithstanding, the data suggest that use of AWs in crime, though relatively rare from the start, has been declining.  The percentage of gun traces that were for AWs plummeted 70% between 1992-1993 and 2001-2002 (from 5.4% to 1.6%), and this trend did not begin until the year of the AW ban.  On a year-to-year basis, AW traces generally increased less or declined by more than other gun traces.  Moreover, in years when tracing volume declined – that is, years when changes in reporting practices were least likely to distort the data – traces of AWs fell 3 to 6 times faster than gun traces in general. The drop in AW use seemed most apparent for APs and LCMM rifles (banned in 1998). Inferences were less clear for domestic ARs, but assessment of those guns is complicated by the possible substitution of post-ban legal variations.

## 6.3.  Local Analyses of Guns Recovered By Police

Due to concerns over the validity of national ATF tracing data for investigating the types of guns used in crime, we sought to confirm the preceding findings using local data on guns recovered by police.  To this end, we examined data from half a dozen localities and time periods.

- All guns recovered by the Baltimore Police Department from 1992 to 2000 (N=33,933)
- All guns recovered by the Metro-Dade Police Department (Miami and Dade County, Florida) from 1990 to 2000 (N=39,456)
- All guns recovered by the St. Louis Police Department from 1992 to 2003 (N=34,143)
- All guns recovered by the Boston Police Department (as approximated by trace requests submitted by the Department to ATF) from 1991 to 1993 and 2000 to 2002 (N=4,617)[47]

---

2002 focuses on guns both recovered and traced in the same year because it is likely that some guns recovered in 2002 had not yet been traced by the spring of 2003 when this database was created.  Using only guns recovered and traced in the same year should mitigate this bias.

[47] The Boston Police Department has been tracing guns comprehensively since 1991 (Kennedy et al., 1996).  However, we encountered difficulties in identifying Boston Police Department traces for several years in the mid-1990s.  For this reason, we chose to contrast the 1991 to 1993 period with the 2000 to 2002 period.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

- Guns recovered during murder investigations in Milwaukee County from 1991 to 1998 (N=592)[48]
- Guns linked to serious crimes in Anchorage and other parts of Alaska and submitted to state firearm examiners for evidentiary testing from 1987 to 2000 (N=900)[49]

The selection of these particular locations and samples reflects data availability.[50] The locations were not selected randomly, and some of the samples are small for conducting trend analysis of relatively rare events (i.e., AW recoveries).  Accordingly, we must use caution in generalizing the results to other places.  However, the data sources reflect a wide geographic range and cover post-ban periods extending through at least the latter 1990s (and typically through the year 2000 or beyond).  To the extent that the results are similar across these jurisdictions, therefore, we can have more confidence that they reflect national patterns.

In each jurisdiction, we examined pre-post changes in recoveries of AWs (focusing on the domestic AW group defined earlier) and substitution of post-ban AW models for the banned models.  Where possible, we conducted separate analyses of all AW recoveries and those linked specifically to violent crimes.[51]  We also differentiated between AP and AR trends using the larger databases from Baltimore, Miami, and St. Louis.  But since most of these databases do not extend more than two years beyond 1998, we do not present analyses specifically for LCMM rifles.

Key summary results are summarized in Table 6-2, while more detailed results from each site appear at the end of the chapter in Tables 6-3 through 6-6 and Figures 6-2 through 6-6.[52]  The number of AW recoveries declined by 28% to 82% across these

---

[48]  The data are described in reports from the Medical College of Wisconsin (Hargarten et al., 1996; 2000) and include guns used in the murders and other guns recovered at the crime scenes.  Guns are recovered in approximately one-third of Milwaukee homicide cases.

[49]  The data include guns submitted by federal, state, and local agencies throughout the state.  Roughly half come from the Anchorage area.  Guns submitted by police to the state lab are most typically guns that were used in major crimes against persons (e.g. murder, attempted murder, assault, robbery).

[50]  We contacted at least 20 police departments and crime labs in the course of our data search, focusing much of our attention on police departments participating in ATF's Youth Crime Gun Interdiction Initiative (YCGII) (ATF, 1997; 1999).  Departments participating in the YCGII submit data to ATF on all guns that they recover.  Though the YCGII did not begin until 1996 (well after the implementation of the AW ban), we suspected that these departments would be among those most likely to have electronically-stored gun data potentially extending back in time to before the ban.  Unfortunately, most of these departments either did not have their gun data in electronic format or could not provide data for other reasons (e.g., resource constraints).  In the course of our first AW study (Roth and Koper, 1997), we contacted many other police departments that also did not have adequate data for the study.

[51]  All of the Milwaukee and Anchorage analyses were limited to guns involved in murders or other serious crimes.  Despite evidence of a decline, AW recoveries linked to violence were too rare in Boston to conduct valid test statistics.

[52]  We omitted guns recovered in 1994 from both the pre and post-ban counts because the speculative price increases for AWs that occurred in 1994 (see previous section and Roth and Koper, 1997, Chapter 4) raise questions about the precise timing of the ban's impact on AW use during that year, thereby clouding the designation of the intervention point.  This is particularly a concern for the Baltimore analysis due to a

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

locations and time periods, but the discussion below focuses on changes in AWs as a share of crime guns in order to control for general trends in gun crime and gun seizures. Prior to the ban, AWs ranged from about 1% of guns linked to violent crimes in St. Louis to nearly 6% of guns recovered in Milwaukee murder cases.[53]

AWs dropped as share of crime guns in all jurisdictions after the ban. Reductions ranged from a low of 17% in Milwaukee (based on guns linked to homicides) to a high of 72% in Boston (based on all crime guns) but were generally between 32% and 40%.[54, 55] A decline in the use of AWs relative to other guns was generally apparent whether examining all AW recoveries or just those linked to violent crimes.[56] An exception was in St. Louis, where

---

state AP ban that took effect a few months prior to the federal AW ban.

[53] These figures should be treated as approximations of the prevalence of AWs. On the one hand, the numbers may understate the prevalence of AWs to a small degree because they are based on only the domestic AW group defined earlier. Based on analysis of national ATF gun tracing data, we estimated previously that the domestic AW group accounts for 82% of AWs used in crime (Roth and Koper, 1997, Chapter 5). To further test the reliability of this assessment, we investigated the prevalence of all banned AW models among guns recovered in Baltimore using an ATF list of all guns defined as AWs under the 1994 Crime Act criteria (118 model and caliber combinations). We chose the Baltimore database because it provides a complete inventory of guns recovered by police in that city during the study period and, having been maintained by crime lab personnel, is particularly thorough with regard to make and model identifications. Though there was some ambiguity in classifying a small number of AK-type semiautomatic rifles (there are many civilian variations of the AK-47 rifle, some of which were legal under the 1994 legislation), our examination suggested that the domestic AW group accounted for approximately 90% of the AWs recovered in Baltimore. (In addition, including all AWs had virtually no effect on the pre-post changes in AW use in Baltimore.) But as discussed previously, the counts could also overstate AW use to some degree because imprecision in the identification of gun models in some data sources may have resulted in some legalized firearms being counted as banned AWs.

[54] The AW counts for Miami also include Interdynamics KG9 and KG99 models. These models were produced during the early 1980s and were forerunners to the Intratec models (ATF restricted the KG9 during the early 1980s because it could be converted too easily to fully automatic fire). These weapons were very rare or non-existent in most of the local data sources, but they were more common in Miami, where Interdynamics was formerly based. Including these guns increased the AW count in Miami by about 9% but did not affect pre-post changes in AW recoveries.

[55] State AW legislation passed in Maryland and Massachusetts could have had some impact on AW trends in Baltimore and Boston, respectively. Maryland implemented an AP ban, similar in coverage to the federal AW ban, in June 1994 (Maryland has also required background checks for retail sales of a broader list of state-defined AWs since 1989), and Massachusetts implemented additional legislation on federally-defined AWs in late 1998. The timing and scope of these laws make them largely redundant with the federal ban, so they should not unduly complicate inferences from the analysis. However, Maryland forbids additional transfers of grandfathered APs, and Massachusetts has imposed additional requirements for possession and transfer of LCMs and guns accepting LCMs. Both states also have enhanced penalties for certain crimes involving APs, LCMs, and/or guns accepting LCMs. Hence, the ban on AWs was arguably strengthened in Baltimore and Boston, relative to the other jurisdictions under study. This does not appear to have affected trends in AW use in Baltimore, which were very similar to those found in the other study sites. However, use of AWs and combined use of AWs and post-ban AW substitutes declined more in Boston than in any other study site. Although the trends in Boston could reflect ongoing, post-2000 reductions in use of AWs and similar weapons (Boston was one of the only study sites from which we obtained post-2000 data), it is possible that the Massachusetts legislation was also a contributing factor.

[56] There may be some inconsistency across jurisdictions in the identification of guns associated with violent crimes. In Miami, for example, 28% of the guns had an offense code equal to "other/not listed," and this percentage was notably higher for the later years of the data series.

---

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 6-2.  Pre-Post Changes in Assault Weapons As a Share of Recovered Crime Guns For Selected Localities and Time Periods:  Summary Results (Total Number of Assault Weapons for Pre and Post Periods in Parentheses)** [a]

| Locality and Time Period | AWs | AWs (Linked to Violence) | APs | ARs | AWs and Post-Ban Substitutes |
|---|---|---|---|---|---|
| Baltimore (all recoveries) pre=1992-1993, post=1995-2000 | -34%*** (425) | -41%** (75) | -35%*** (383) | -24% (42) | -29%*** (444) |
| Miami-Dade (all recoveries) pre=1990-1993, post=1995-2000 | -32%*** (733) | -39%*** (101) | -40%*** (611) | 37%* (115) | -30%*** (746) |
| St. Louis (all recoveries) pre=1992-1993, post=1995-2003 | -32%*** (306) | 1% (28) | -34%*** (274) | 10% (32) | -24%** (328) |
| Boston (all recoveries) pre=1991-1993, post=2000-2002 | -72%*** (71) | N/A | N/A | N/A | -60%*** (76) |
| Milwaukee (recoveries in murder cases) pre=1991-1993, post=1995-1998 | N/A | -17% (28) | N/A | N/A | 2% (31) |
| Anchorage, AK (recoveries in serious crimes) pre=1987-1993, post=1995-2000 | N/A | -40% (24) | N/A | N/A | -40% (24) |

a.  Based on Intratec group, SWD group, AR-15 group, and Calico and Feather models.  See the text for additional details about each sample and Tables 6-3 through 6-6 for more detailed results from each locality.
* Statistically significant change at chi-square p level < .1
** Statistically significant change at chi-square p level < .05
*** Statistically significant change at chi-square p level < .01

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

AWs declined as share of all guns but not of guns linked to violent crimes, though the latter test was based on rather small samples.

These reductions were not due to any obvious pre-ban trends (see Figures 6-2 through 6-6 at the end of the chapter).  On the contrary, AW recoveries reached a peak in most of these jurisdictions during 1993 or 1994 (Boston, which is not shown in the graphs due to missing years, was an exception).  We tested changes in AW prevalence using simple chi-square tests since there were no observable pre-existing time trends in the data.  Due to the small number of AWs in some of these samples, these changes were not all statistically significant.  Nonetheless, the uniformity of the results is highly suggestive, especially when one considers the consistency of these results with those found in the national ATF tracing analysis.

The changes in Tables 6-2 through 6-6 reflect the average decline in recoveries of AWs during the post-ban period in each locality.  However, some of these figures may understate reductions to date.  In several of the localities, the prevalence of AWs among crime guns was at, or close to, its lowest mark during the most recent year analyzed (see Figures 6-2 through 6-6 at the end of the chapter), suggesting that AW use continues to decline.  In Miami, for example, AWs accounted for 1.7% of crime guns for the whole 1995 to 2000 period but had fallen to 1% by 2000.  Further, the largest AW decline was recorded in Boston, one of two cities for which data extended beyond the year 2000 (however, this was not the case in St. Louis, the other locality with post-2000 data).

Breakouts of APs and ARs in Baltimore, Miami, and St. Louis show that the decline in AW recoveries was due largely to APs, which accounted for the majority of AWs in these and almost all of the other localities (the exception was Anchorage, where crimes with rifles were more common, as a share of gun crimes, than in the other sites).  Pre-post changes in recoveries of the domestic AR group weapons, which accounted for less than 1% of crime guns in Baltimore, Miami, and St. Louis, were inconsistent.  AR recoveries declined after the ban in Baltimore but increased in St. Louis and Miami.  As discussed previously, however, the AR figures may partly reflect the substitution of post-ban, legalized versions of these rifles, thus overstating post-ban use of the banned configurations.  Further, trends for these particular rifles may not be indicative of those for the full range of banned rifles, including the various foreign rifles banned by the 1994 law and the import restrictions of 1989 and 1998 (e.g., see the ATF gun tracing analysis of LCMM rifles).[57]

---

[57]  As discussed in the last chapter, our research design focused on common AWs that were likely to be most affected by the 1994 ban as opposed to earlier regulations (namely, the 1989 import ban) or other events (e.g., company closings or model discontinuations prior to 1994).  However, an auxiliary analysis with the Baltimore data revealed a statistically meaningful drop in recoveries of all ARs covered by the 1994 legislation (not including the LCMM rifles) that was larger than that found for just the domestic group ARs discussed in the text.  Similarly, an expanded AR analysis in Miami showed that total AR recoveries declined after the ban, in contrast to the increase found for the domestic group ARs.  (Even after expanding the analysis, ARs still accounted for no more than 0.64% of crime guns before the ban in both locations.  As with the domestic AR group, there are complexities in identifying banned versus non-banned versions of some of the other ARs, so these numbers are approximations.)  Consequently, a more nuanced view of AR trends may be that AR use is declining overall, but this decline may be due largely to the 1989 import

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Finally, the overall decline in AW use was only partially offset by substitution of the post-ban legalized models. Even if the post-ban models are counted as AWs, the share of crime guns that were AWs still fell 24% to 60% across most jurisdictions. The exception was Milwaukee where recoveries of a few post-ban models negated the drop in banned models in a small sample of guns recovered during murder investigations.[58]

## 6.4. Summary

Consistent with predictions derived from the analysis of market indicators in Chapter 5, analyses of national ATF gun tracing data and local databases on guns recovered by police in several localities have been largely consistent in showing that criminal use of AWs, while accounting for no more than 6% of gun crimes even before the ban, declined after 1994, independently of trends in gun crime. In various places and times from the late 1990s through 2003, AWs typically fell by one-third or more as a share of guns used in crime.[59, 60] Some of the most recent, post-2000 data suggest

---

restrictions that predated the AW ban. It is not yet clear that there has been a decline in the most common ARs prohibited exclusively by the 1994 ban.

[58] This was not true when focusing on just those guns that were used in the incident as opposed to all guns recovered during the investigations. However, the samples of AWs identified as murder weapons were too small for valid statistical tests of pre-post changes.

[59] These findings are also supported by prior research in which we found that reported thefts of AWs declined 7% in absolute terms and 14% as a fraction of stolen guns in the early period following the ban (i.e., late 1994 through early 1996) (Koper and Roth, 2002a, p. 21). We conducted that analysis to account for the possibility that an increase in thefts of AWs might have offset the effect of rising AW prices on the availability of AWs to criminals. Because crimes with AWs appear to have declined after the ban, the theft analysis is not as central to the arguments in this paper.

[60] National surveys of state prisoners conducted by the federal Bureau of Justice Statistics show an increase from 1991 to 1997 in the percentage of prisoners who reported having used an AW (Beck et al., 1993; Harlow, 2001). The 1991 survey (discussed in Chapter 3) found that 2% of violent gun offenders had carried or used an AW in the offense for which they were sentenced (calculated from Beck et al. 1993, pp. 18,33). The comparable figure from the 1997 survey was nearly 7% (Harlow, 2001, pp.3, 7).

Although these figures appear contrary to the patterns shown by gun recovery data, there are ambiguities in the survey findings that warrant caution in such an interpretation. First, the definition of an AW (and most likely the respondents' interpretation of this term) was broader in the 1997 survey. For the 1991 survey, respondents were asked about prior ownership and use of a "…military-type weapon, such as an Uzi, AK-47, AR-15, or M-16" (Beck et al., 1993, p. 18), all of which are ARs or have AR variations. The 1997 survey project defined AWs to "…include the Uzi, TEC-9, and the MAC-10 for handguns, the AR-15 and AK-47 for rifles, and the 'Street Sweeper' for shotguns" (Harlow, 2001, p. 2). (Survey codebooks available from the Inter-University Consortium for Political and Social Research also show that the 1997 survey provided more detail and elaboration about AWs and their features than did the 1991 survey, including separate definitions of APs, ARs, and assault shotguns.)

A second consideration is that many of the respondents in the 1997 survey were probably reporting criminal activity prior to or just around the time of the ban. Violent offenders participating in the survey, for example, had been incarcerated nearly six years on average at the time they were interviewed (Bureau of Justice Statistics, 2000, p. 55). Consequently, the increase in reported AW use may reflect an upward trend in the use of AWs from the 1980s through the early to mid 1990s, as well as a growing recognition of these weapons (and a greater tendency to report owning or using them) stemming from publicity about the AW issue during the early 1990s.

Finally, we might view the 1997 estimate skeptically because it is somewhat higher than that from most other sources. Nevertheless, it is within the range of estimates discussed earlier and could reflect a

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

reductions as high as 70%.[61]  This trend has been driven primarily by a decline in the use of APs, which account for a majority of AWs used in crime.  AR trends have been more varied and complicated by the substitution of post-ban guns that are very similar to some banned ARs.  More generally, however, the substitution of post-ban AW-type models with fewer military features has only partially offset the decline in banned AWs.

These findings raise questions as to the whereabouts of surplus AWs, particularly APs, produced just prior to the ban.  Presumably, many are in the hands of collectors and speculators holding them for their novelty and value.[62]  Even criminal possessors may be more sensitive to the value of their AWs and less likely to use them for risk of losing them to police.

Finally, it is worth noting the ban has not completely eliminated the use of AWs, and, despite large relative reductions, the share of gun crimes involving AWs is similar to that before the ban.  Based on year 2000 or more recent data, the most common AWs continue to be used in up to 1.7% of gun crimes.

---

somewhat higher use of AWs among the subset of offenders who are most active and/or dangerous; recall that the highest estimate of AW use among the sources examined in this chapter came from a sample of guns recovered during murder investigations in Milwaukee (also see the discussion of offender surveys and AWs in Chapter 3).

[61]  Developing a national estimate of the number of AW crimes prevented by the ban is complicated by the range of estimates of AW use and changes therein derived from different data sources.  Tentatively, nonetheless, it appears the ban prevents a few thousand crimes with AWs annually.  For example, using 2% as the best estimate of the share of gun crimes involving AWs prior to the ban (see Chapter 3) and 40% as a reasonable estimate of the post-ban drop in this figure implies that almost 2,900 murders, robberies, and assaults with AWs were prevented in 2002 (this assumes that 1.2% of the roughly 358,000 gun murders, gun robberies, and gun assaults reported to police in 2002 [see the *Uniform Crime Reports*] involved AWs but that 2% would have involved AWs had the ban not been in effect).  Even if this estimate is accurate, however, it does not mean the ban prevented 2,900 gun crimes in 2002; indeed, the preceding calculation assumes that offenders prevented from using AWs committed their crimes using other guns.  Whether forcing such weapon substitution can reduce the number of persons wounded or killed in gun crimes is considered in more detail in Chapter 9.

[62]  The 1997 national survey of state prisoners discussed in footnote 60 found that nearly 49% of AW offenders obtained their gun from a "street" or illegal source, in contrast to 36% to 42% for other gun users (Harlow, 2001, p. 9).  This could be another sign that AWs have become harder to acquire since the ban, but the data cannot be used to make an assessment over time.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 6-3.  Trends in Police Recoveries of Domestic Assault Weapons in Baltimore, 1992-2000 [a]**

|  | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| **A.  All Recoveries** | Jan. 1992-Dec. 1993 | Jan. 1995-Dec. 2000 | |
| | | | |
| Total AWs | 135 | 290 | |
| Annual Mean | 67.5 | 48.33 | -28% |
| AW's as % of Guns | 1.88% | 1.25% | -34%** |
| | | | |
| APs | 123 | 260 | |
| Annual Mean | 61.5 | 43.33 | -30% |
| APs as % of Guns | 1.71% | 1.12% | -35%** |
| | | | |
| ARs | 12 | 30 | |
| Annual Mean | 6 | 5 | -17% |
| ARs as % of Guns | 0.17% | 0.13% | -24% |
| | | | |
| Total AWs and Substitutes | 135 | 309 | |
| Annual Mean | 67.5 | 51.5 | -24% |
| AWs/Subs as % of Guns | 1.88% | 1.33% | -29%** |
| | | | |
| **B.  Recoveries Linked to Violent Crimes [b]** | | | |
| | | | |
| Total AWs | 28 | 47 | |
| Annual Mean | 14 | 7.83 | -44% |
| AWs as % of Violent Crime Guns | 2.1% | 1.24% | -41%* |

a.  Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
b.  Murders, assaults, and robberies
* Chi-square p level < .05 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance).
** Chi-square p level < .01 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 6-2. Police Recoveries of Assault Weapons in Baltimore, 1992-2000**



Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 6-4. Trends in Police Recoveries of Domestic Assault Weapons in Miami (Metro-Dade), 1990-2000 [a]**

|  | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| **A. All Recoveries** | Jan. 1990-Dec. 1993 | Jan. 1995-Dec. 2000 | |
| Total AWs | 403 | 330 | |
| Annual Mean | 100.75 | 55 | -45% |
| AW's as % of Guns | 2.53% | 1.71% | -32%*** |
| APs | 355 | 256 | |
| Annual Mean | 88.75 | 42.67 | -52% |
| APs as % of Guns | 2.23% | 1.33% | -40%*** |
| ARs | 43 | 72 | |
| Annual Mean | 10.75 | 12 | 12% |
| ARs as % of Guns | 0.27% | 0.37% | 37%* |
| Total AWs and Substitutes | 403 | 343 | |
| Annual Mean | 100.75 | 57.17 | -43% |
| AWs/Subs as % of Guns | 2.53% | 1.78% | -30%*** |
| **B. Recoveries Linked to Violent Crimes [b]** | | | |
| Total AWs | 69 | 32 | |
| Annual Mean | 17.25 | 5.33 | -69% |
| AWs as % of Violent Crime Guns | 2.28% | 1.39% | -39%** |

a. Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
b. Murders, assaults, and robberies
* Chi-square p level < .1 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)
** Chi-square p level < .05 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)
*** Chi-square p level <.01 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.



**Figure 6-3. Police Recoveries of Assault Weapons in Miami (Metro-Dade), 1990-2000**

Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 6-5.  Trends in Police Recoveries of Domestic Assault Weapons in St. Louis, 1992-2003 [a]**

|  | **Pre-Ban Period** | **Post-Ban Period** | **Change** |
|---|---|---|---|
| **A.  All Recoveries** | Jan. 1992-Dec. 1993 | Jan. 1995-Dec. 2003 | |
| | | | |
| Total AWs | 94 | 212 | |
| Annual Mean | 47 | 23.56 | -50% |
| AW's as % of Guns | 1.33% | 0.91% | -32%** |
| | | | |
| APs | 87 | 187 | |
| Annual Mean | 43.5 | 20.78 | -52% |
| APs as % of Guns | 1.23% | 0.81% | -34%** |
| | | | |
| ARs | 7 | 25 | |
| Annual Mean | 3.5 | 2.78 | -21% |
| ARs as % of Guns | 0.1% | 0.11% | 10% |
| | | | |
| Total AWs and Substitutes | 94 | 234 | |
| Annual Mean | 47 | 26 | -45% |
| AWs/Subs as % of Guns | 1.33% | 1.01% | -24%* |
| | | | |
| **B.  Recoveries Linked to Violent Crimes [b]** | | | |
| | | | |
| Total AWs | 8 | 20 | |
| Annual Mean | 4 | 2.2 | -45% |
| AWs as % of Violent Crime Guns | 0.8% | 0.81% | 1% |

a.  Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
b.  Murders, assaults, and robberies
* Chi-square p level < .05 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)
** Chi-square p level <.01 (changes in percentages of guns that were AWs/APs/ARs/AW-subs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 6-4. Police Recoveries of Assault Weapons in St. Louis, 1992-2003**



As % of Recovered Guns (N=34,143)

Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 6-6.  Trends in Police Recoveries of Domestic Assault Weapons in Boston, Milwaukee, and Anchorage (Alaska) [a]**

|  | **Pre-Ban Period** | **Post-Ban Period** | **Change** |
|---|---|---|---|
| **Boston** | Jan. 1991-Dec. 1993 | Jan. 2000-Dec. 2002 | |
| (All Gun Traces) | | | |
| AWs | 60 | 11 | |
| Annual Mean | 20 | 3.7 | -82% |
| AWs as % of Guns | 2.16% | 0.6% | -72%* |
| | | | |
| AWs and Substitutes | 60 | 16 | |
| Annual Mean | 20 | 5.3 | -74% |
| AWs/Subs as % of Guns | 2.16% | 0.87% | -60%* |
| | | | |
| **Milwaukee** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 | |
| (Guns Recovered in Murder Cases) | | | |
| AWs | 15 | 13 | |
| Annual Mean | 5 | 3.25 | -35% |
| AWs as % of Guns | 5.91% | 4.91% | -17% |
| | | | |
| AWs and Substitutes | 15 | 16 | |
| Annual Mean | 5 | 4 | -20% |
| AWs/Subs as % of Guns | 5.91% | 6.04% | 2% |
| | | | |
| **Anchorage** | Jan. 1987-Dec. 1993 | Jan. 1995-Dec. 2000 | |
| (Guns Tested for Evidence) | | | |
| AWs | 16 | 8 | |
| Annual Mean | 2.29 | 1.33 | -42% |
| AW's as % of Guns | 3.57% | 2.13% | -40% |
| | | | |
| AWs and Substitutes | N/A | N/A | |

a.  Domestic assault weapons include Intratec group, SWD group, AR-15 group, and Calico and Feather models.
* Chi-square p level < .01 (changes in percentages of guns that were AWs/AW-subs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 6-5. Assault Weapons Recovered in Milwaukee County Murder Cases, 1991-1998**



Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

**Figure 6-6. Police Recoveries of Assault Weapons in Anchorage (Alaska), 1987-2000**



Includes Intratec group, SWD group, AR-15 group, and selected Calico and Feather models.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# 7.  MARKET INDICATORS FOR LARGE CAPACITY MAGAZINES:  PRICES AND IMPORTATION

The previous chapters examined the AW-LCM ban's impact on the availability and criminal use of AWs.  In this chapter and the next, we consider the impact of the ban's much broader prohibition on LCMs made for numerous banned and non-banned firearms.  We begin by studying market indicators.  Our earlier study of LCM prices for a few gun models revealed that prices rose substantially during 1994 and into 1995 (Roth and Koper, 1997, Chapter 4).  Prices of some LCMs remained high into 1996, while others returned to pre-ban levels or oscillated more unpredictably.  The price increases may have reduced LCM use at least temporarily in the short-term aftermath of the ban, but we could not confirm this in our prior investigation.

## 7.1.  Price Trends for Large Capacity Magazines

For this study, we sought to approximate longer term trends in the prices at which users could purchase banned LCMs throughout the country.  To that end, we analyzed quarterly data on the prices of LCMs advertised by eleven gun and magazine distributors in *Shotgun News*, a national gun industry publication, from April 1992 to December 1998.[63]  Those prices are available to any gun dealer, and primary market retailers generally re-sell within 15% of the distributors' prices.[64]  The distributors were chosen during the course of the first AW study (Roth and Koper, 1997) based on the frequency with which they advertised during the April 1992 to June 1996 period.  For each quarterly period, project staff coded prices for one issue from a randomly selected month.  We generally used the first issue of each selected month based on a preliminary, informal assessment suggesting that the selected distributors advertised more frequently in those issues.  In a few instances, first-of-month issues were unavailable to us or provided too few observations, so we substituted other issues.[65]  Also, we were unable to obtain *Shotgun News* issues for the last two quarters of 1996.  However, we aggregated the data annually to study price trends, and the omission of those quarters did not appear to affect the results (this is explained further below).

We ascertained trends in LCM prices by conducting hedonic price analyses,

---

[63]  The *Blue Book of Gun Values*, which served as the data source for the AW price analysis, does not contain ammunition magazine prices.

[64]  According to gun market experts, retail prices track wholesale prices quite closely (Cook et al., 1995, p. 71).  Retail prices to eligible purchasers generally exceed wholesale (or original-purchase) prices by 3% to 5% in the large chain stores, by about 15% in independent dealerships, and by about 10% at gun shows (where overhead costs are lower).

[65]  The decision to focus on first-of-month issues was made prior to data collection for price analysis update.  For the earlier study (Roth and Koper, 1997), project staff coded data for one or more randomly selected issues of every month of the April 1992 to June 1996 period.  For this analysis, we utilized data from only the first-of-month issues selected at random during the prior study.  If multiple first-of-month issues were available for a given quarter, we selected one at random or based on the number of recorded advertisements.  If no first-of-month issue was available for a given quarter, we selected another issue at random from among those coded during the first study.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

similar to those described in the AW price analysis (Chapter 5), in which we regressed inflation-adjusted LCM prices (logged) on several predictors: magazine capacity (logged), gun make (for which the LCM was made), year of the advertisement, and distributor. We cannot account fully for the meaning of significant distributor effects. They may represent unmeasured quality differentials in the merchandise of different distributors, or they may represent other differences in stock volume or selling or service practices between the distributors.[66] We included the distributor indicators when they proved to be significant predictors of advertised price. In addition, we focused on LCMs made for several of the most common LCM-compatible handguns and rifles, rather than try to model the differences in LCM prices between the several hundred miscellaneous makes and models of firearms that were captured in the data. Finally, for both the handgun and rifle models, we created and tested seasonal indicator variables to determine if their incorporation would affect the coefficient for 1996 (the year with winter/spring data only), but they proved to be statistically insignificant and are not shown in the results below.[67]

### 7.1.1. Large Capacity Magazines for Handguns

The handgun LCM analysis tracks the prices of LCMs made for Intratec and Cobray (i.e., SWD) APs and non-banned semiautomatic pistols made by Smith and Wesson, Glock, Sturm Ruger, Sig-Sauer, Taurus, and Beretta (each of the manufacturers in the former group produces numerous models capable of accepting LCMs). In general, LCMs with greater magazine capacities commanded higher prices, and there were significant price differentials between LCMs made for different guns and sold by different distributors (see Table 7-1). Not surprisingly, LCMs made for Glock handguns were most expensive, followed by those made for Beretta and Sig-Sauer firearms.

Turning to the time trend indicators (see Table 7-1 and Figure 7-1), prices for these magazines increased nearly 50% from 1993 to 1994, and they rose another 56% in 1995. Prices declined somewhat, though not steadily, from 1996 to 1998. Nevertheless, prices in 1998 remained 22% higher than prices in 1994 and nearly 80% higher than those in 1993.

---

[66] For example, one possible difference between the distributors may have been the extent to which they sold magazines made of different materials (e.g., steel, aluminum, etc.) or generic magazines manufactured by companies other than the companies manufacturing the firearms for which the magazines were made. For example, there were indications in the data that 3% of the handgun LCMs and 10% of the AR-15 and Mini-14 rifle LCMs used in the analyses (described below) were generic magazines. We did not control for these characteristic, however, because such information was often unclear from the advertisements and was not recorded consistently by coders.

[67] Project staff coded all LCM advertisements by the selected distributors. Therefore, the data are inherently weighted. However, the weights are based on the frequency with which the different LCMs were advertised (i.e., the LCMs that were advertised most frequently have the greatest weight in the models) rather than by production volume.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 7-1.  Regression of Handgun and Rifle Large Capacity Magazine Prices on Annual Time Indicators, 1992-1998, Controlling for Gun Makes/Models and Distributors**

| | Handgun LCMs (n=1,277) | | Rifle LCMs (n=674) | |
|---|---|---|---|---|
| | Estimate | T value | Estimate | T value |
| Constant | -1.79 | -12.74*** | -4.10 | -19.12*** |
| 1992 | -0.19 | -2.11** | -0.48 | -4.20*** |
| 1993 | -0.38 | -6.00*** | -0.55 | -6.14*** |
| 1995 | 0.44 | 6.88*** | -0.25 | -2.64*** |
| 1996 | 0.29 | 4.05*** | -0.12 | -0.93 |
| 1997 | 0.36 | 6.33*** | -0.31 | -3.68*** |
| 1998 | 0.20 | 3.51*** | -0.44 | -5.19*** |
| Rounds (logged) | 0.26 | 5.73*** | 0.84 | 15.08*** |
| Cobray | -0.36 | -4.15*** | | |
| Glock | 0.41 | 8.15*** | | |
| Intratec | -0.40 | -4.18*** | | |
| Ruger | -0.42 | -7.79*** | | |
| Smith&Wesson | -0.08 | -1.71* | | |
| Sig-Sauer | 0 | -0.09 | | |
| Taurus | -0.31 | -6.10*** | | |
| AK-type | | | -0.25 | -3.15*** |
| Colt AR-15 | | | 0.14 | 1.68* |
| Ruger Mini-14 | | | -0.08 | -0.92 |
| Distributor 1 | -0.72 | -16.38*** | -0.35 | -5.15*** |
| Distributor 2 | -0.15 | -0.97 | -0.83 | -5.24*** |
| Distributor 3 | -0.16 | -3.93*** | 0.19 | 2.69*** |
| Distributor 4 | -0.55 | -5.72*** | 0.16 | 0.80 |
| Distributor 5 | -0.07 | -1.79* | -0.18 | -2.65*** |
| Distributor 6 | -0.53 | -1.23 | -0.12 | -0.32 |
| Distributor 7 | -1.59 | -3.70*** | -0.10 | -0.91 |
| Distributor 8 | | | 0.14 | 0.70 |
| Distributor 9 | -0.91 | -12.52*** | -0.48 | -4.00*** |
| F statistic | 58.76 | | 21.22 | |
| (p value) | <.0001 | | <.0001 | |
| Adj. R-square | 0.51 | | 0.38 | |

Year indicators are interpreted relative to 1994, and distributors are interpreted relative to distributor 10.
Handgun makes are relative to Beretta and rifle models are relative to SKS.
* Statistically significant at p<=.10.
** Statistically significant at p<=.05.
*** Statistically significant at p<=.01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## Figure 7-1. Annual Price Trends for Large Capacity Magazines, 1992-1998



Based on 1,277 sampled ads for LCMs fitting models of 8 handgun makers and 674 sampled ads for LCMs fitting 4 rifle model groups.

### 7.1.2.  Large Capacity Magazines for Rifles

We approximated trends in the prices of LCMs for rifles by modeling the prices of LCMs manufactured for AR-15, Mini-14, SKS,[68] and AK-type rifle models (including various non-banned AK-type models).  As in the handgun LCM model, larger LCMs drew higher prices, and there were several significant model and distributor effects.  AR-15 magazines tended to have the highest prices, and magazines for AK-type models had the lowest prices (Table 7-1).

Like their handgun counterparts, prices for rifle LCMs increased over 40% from 1993 to 1994, as the ban was debated and implemented (see Table 7-1 and Figure 7-1).  However, prices declined over 20% in 1995.  Following a rebound in 1996, prices moved downward again during 1997 and 1998.   Prices in 1998 were over one third lower than the peak prices of 1994 and were comparable to pre-ban prices in 1992 and 1993.

---

[68]  The SKS is a very popular imported rifle (there are Russian and Chinese versions) that was not covered by either the 1989 AR import ban or the 1994 AW ban.  However, importation of SKS rifles from China was discontinued in 1994 due to trade restrictions.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 7.2.  Post-Ban Importation of Large Capacity Magazines

ATF does not collect (or at least does not publicize) statistics on production of LCMs.  Therefore, we cannot clearly document pre-ban production trends.  Nevertheless, it seems likely that gun and magazine manufacturers boosted their production of LCMs during the debate over the ban, just as AW makers increased production of AWs.  Regardless, gun industry sources estimated that there were 25 million LCMs available as of 1995 (including aftermarket items for repairing magazines or converting them to LCMs) (Gun Tests, 1995, p. 30).

Moreover, the supply of LCMs continued to grow even after the ban due to importation of foreign LCMs that were manufactured prior to the ban (and thus grandfathered by the LCM legislation), according to ATF importation data.[69]  As shown in Table 7-2, nearly 4.8 million LCMs were imported for commercial sale (as opposed to law enforcement uses) from 1994 through 2000, with the largest number (nearly 3.7 million) arriving in 1999.[70]  During this period, furthermore, importers received permission to import a total of 47.2 million LCMs; consequently, an additional 42 million LCMs may have arrived after 2000 or still be on the way, based on just those approved through 2000.[71, 72]

To put this in perspective, gun owners in the U.S. possessed 25 million firearms that were equipped with magazines holding 10 or more rounds as of 1994 (Cook and Ludwig, 1996, p. 17).  Therefore, the 4.7 million LCMs imported in the U.S. from 1994 through 2000 could conceivably replenish 19% of the LCMs that were owned at the time of the ban.  The 47.2 million approved during this period could supply nearly 2 additional LCMs for all guns that were so equipped as of 1994.

## 7.3.  Summary and Interpretations

Prices of LCMs for handguns rose significantly around the time of the ban and, despite some decline from their peak levels in 1995, remained significantly higher than pre-ban prices through at least 1998.  The increase in LCM prices for rifles proved to be more temporary, with prices returning to roughly pre-ban levels by 1998.[73]

---

[69]  To import LCMs into the country, importers must certify that the magazines were made prior to the ban. (The law requires companies to mark post-ban LCMs with serial numbers.)  As a practical matter, however, it is hard for U.S. authorities to know for certain whether imported LCMs were produced prior to the ban.

[70]  The data do not distinguish between handgun and rifle magazines or the specific models for which the LCMs were made.  But note that roughly two-thirds of the LCMs imported from 1994 through 2000 had capacities between 11 and 19 rounds, a range that covers almost all handgun LCMs as well as many rifle LCMs.  It seems most likely that the remaining LCMs (those with capacities of 20 or more rounds) were primarily for rifles.

[71] The statistics in Table 7-2 do not include belt devices used for machine guns.

[72]  A caveat to the number of approved LCMs is that importers may overstate the number of LCMs they have available to give themselves leeway to import additional LCMs, should they become available.

[73]  A caveat is that we did not examine prices of smaller magazines, so the price trends described here may not have been entirely unique to LCMs.  Yet it seems likely that these trends reflect the unique impact of the ban on the market for LCMs.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 7-2.  Large Capacity Magazines Imported into the United States or Approved For Importation for Commercial Sale, 1994-2000**

| Year | Imported | Approved |
|------|----------|----------|
| 1994 | 67,063 | 77,666 |
| 1995 | 3,776 | 2,066,228 |
| 1996 | 280,425 | 2,795,173 |
| 1997 | 99,972 | 1,889,773 |
| 1998 | 337,172 | 20,814,574 |
| 1999 | 3,663,619 | 13,291,593 |
| 2000 | 346,416 | 6,272,876 |
| *Total* | *4,798,443* | *47,207,883* |

Source:  Firearms and Explosives Imports Branch, Bureau of Alcohol, Tobacco, Firearms, and Explosives. Counts do not include "links" (belt devices) or imports for law enforcement purposes.

The drop in rifle LCM prices between 1994 and 1998 may have due to the simultaneous importation of approximately 788,400 grandfathered LCMs, most of which appear to have been rifle magazines (based on the fact that nearly two-thirds had capacities over 19 rounds), as well as the availability of U.S. military surplus LCMs that fit rifles like the AR-15 and Mini-14.  We can also speculate that demand for LCMs is not as great among rifle consumers, who are less likely to acquire their guns for defensive or criminal purposes.

The pre-ban supply of handgun LCMs may have been more constricted than the supply of rifle LCMs for at least a few years following the ban, based on prices from 1994 to 1998.  Although there were an estimated 25 million LCMs available in the U.S. as of 1995, some major handgun manufacturers (including Ruger, Sig Sauer, and Glock) had or were close to running out of new LCMs by that time (Gun Tests, 1995, p. 30).  Yet the frequency of advertisements for handgun LCMs during 1997 and 1998, as well as the drop in prices from their 1995 peak, suggests that the supply had not become particularly low.  In 1998, for example, the selected distributors posted a combined total of 92 LCM ads per issue (some of which may have been for the same make, model, and capacity combinations) for just the handguns that we incorporated into our model.[74]  Perhaps the

---

[74]  Project staff found substantially more advertisements per issue for 1997 and 1998 than for earlier years. For the LCMs studied in the handgun analysis, staff recorded an average of 412 LCM advertisements per year (103 per issue) during 1997 and 1998.  For 1992-1996, staff recorded an average of about 100 ads per year (25 per issue) for the same LCMs.  A similar but smaller differential existed in the volume of ads for the LCMs used in the rifle analysis.  The increase in LCM ads over time may reflect changes in supply and

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

demand for enhanced firepower among handgun consumers, who are more likely to acquire guns for crime or defense against crime, was also a factor (and perhaps a large one) putting a premium on handgun LCMs.

Although we might hypothesize that high prices depressed use of handguns with LCMs for at least a few years after the ban, a qualification to this prediction is that LCM use may be less sensitive to prices than is use of AWs because LCMs are much less expensive than the firearms they complement and therefore account for a smaller fraction of users' income (e.g., see Friedman, 1962). To illustrate, TEC-9 APs typically cost $260 at retail during 1992 and 1993, while LCMs for the TEC-9, ranging in capacity from 30 to 36 rounds, averaged $16.50 in *Shotgun News* advertisements (and probably $19 or less at retail) during the same period. So, for example, a doubling of both gun and LCM prices would likely have a much greater impact on purchases of TEC-9 pistols than purchases of LCMs for the TEC-9. Users willing and able to pay for a gun that accepts an LCM are most likely willing and able to pay for an LCM to use with the gun.

Moreover, the LCM supply was enhanced considerably by a surge in LCM imports that occurred after the period of our price analysis. During 1999 and 2000, an additional 4 million grandfathered LCMs were imported into the U.S., over two-thirds of which had capacities of 11-19 rounds, a range that covers almost all handgun LCMs (as well as many rifle LCMs). This may have driven prices down further after 1998.

In sum, market indicators yield conflicting signs on the availability of LCMs. It is perhaps too early to expect a reduction in crimes with LCMs, considering that tens of millions of grandfathered LCMs were available at the time of the ban, an additional 4.8 million – enough to replenish one-fifth of those owned by civilians – were imported from 1994 through 2000, and that the elasticity of demand for LCMs may be more limited than that of firearms. And if the additional 42 million foreign LCMs approved for importation become available, there may not be a reduction in crimes with LCMs anytime in the near future.

---

demand for LCMs during the study period, as well as product shifts by distributors and perhaps changes in ad formats (e.g., ads during the early period may have been more likely to list magazines by handgun model without listing the exact capacity of each magazine, in which case coders would have been more likely to miss some LCMs during the early period). Because the data collection effort for the early period was part of a larger effort that involved coding prices in *Shotgun News* for LCMs and numerous banned and non-banned firearms, it is also possible that coders were more likely to miss LCM ads during that period due to random factors like fatigue or time constraints.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 8. CRIMINAL USE OF LARGE CAPACITY MAGAZINES AFTER THE BAN

Assessing trends in criminal use of LCMs is difficult.  There is no national data source on crime guns equipped with LCMs (ATF national tracing data do not include information about magazines recovered with traced firearms), and, based on our contacts with numerous police departments over the course of this study and the first AW study, it seems that even those police departments that maintain electronic databases on recovered firearms do not typically record the capacity of the magazines with which the guns are equipped.[75,76]  Indeed, we were unable to acquire sufficient data to examine LCM use for the first AW study (Roth and Koper, 1997).

For the current study, we obtained four data sources with which to investigate trends in criminal use of LCMs.  Three of the databases utilized in the AW analysis – those from Baltimore, Milwaukee, and Anchorage – contained information about the magazines recovered with the guns (see the descriptions of these databases in Chapter 6). Using updated versions of these databases, we examined all LCM recoveries in Baltimore from 1993 through 2003, recoveries of LCMs in Milwaukee murder cases from 1991 to 2001, and recoveries of LCMs linked to serious crimes in Anchorage (and other parts of Alaska) from 1992 through 2002.[77]  In addition, we studied records of guns and magazines submitted to the Jefferson Regional Forensics Lab in Louisville, Kentucky from 1996 through 2000.  This lab of the Kentucky State Police services law enforcement agencies throughout roughly half of Kentucky, but most guns submitted to the lab are from the Louisville area.  Guns examined at the lab are most typically those associated with serious crimes such as murders, robberies, and assaults.

The LCM analyses and findings were not as uniform across locations as were those for AWs.  Therefore, we discuss each site separately.  As in the AW analysis, we emphasize changes in the percentage of guns equipped with LCMs to control for overall trends in gun crime and gun recoveries.  Because gun crime was falling during the latter 1990s, we anticipated that the number of guns recovered with LCMs might decline independently of the ban's impact.  (Hereafter, we refer to guns equipped with LCMs as LCM guns.)

---

[75]  For the pre-ban period, one can usually infer magazine capacity based on the firearm model.  For post-ban recoveries, this is more problematic because gun models capable of accepting LCMs may have been equipped with grandfathered LCMs or with post-ban magazines designed to fit the same gun but holding fewer rounds.

[76]  As for the AW analysis in Chapter 6, we utilize police data to examine trends in criminal use of LCMs.  The reader is referred to the general discussion of police gun seizure data in Chapter 6.

[77]  Findings presented in our 2002 interim report (Koper and Roth, 2002b) indicated that LCM use had not declined as of the late 1990s.  Therefore, we sought to update the LCM analyses where possible for this version of the report.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### 8.1. Baltimore

In Baltimore, about 14% of guns recovered by police were LCM guns in 1993. This figure remained relatively stable for a few years after the ban but had dropped notably by 2002 and 2003 (Figure 8-1).  For the entire post-ban period (1995-2003), recoveries of LCM guns were down 8% relative to those of guns with smaller magazines (Table 8-1, panel A), a change of borderline statistical significance.  Focusing on the most recent years, however, LCM gun recoveries were 24% lower in 2002 and 2003 than during the year prior to the ban, a difference that was clearly significant (Table 8-1, panel B).[78,79,80]  This change was attributable to a 36% drop in LCM handguns (Table 8-1, panel C).  LCM rifles actually increased 36% as a share of crime guns, although they still accounted for no more than 3% in 2002 and 2003 (Table 8-1, panel D).[81]

Yet there was no decline in recoveries of LCM guns used in violent crimes (i.e., murders, shootings, robberies, and other assaults).  After the ban, the percentage of violent crime guns with LCMs generally oscillated in a range consistent with the pre-ban level (14%) and hit peaks of roughly 16% to 17% in 1996 and 2003 (Figure 8-1).[82]  Whether comparing the pre-ban period to the entire post-ban period (1995-2003) or the most recent years (2002-2003), there was no meaningful decline in LCM recoveries linked to violent crimes (Table 8-2, panels A and B).[83]  Neither violent uses of LCM

---

[78]  Data on handgun magazines were also available for 1992.  An auxiliary analysis of those data did not change the substantive inferences described in the text.

[79]  The Maryland AP ban enacted in June 1994 also prohibited ammunition magazines holding over 20 rounds and did not permit additional sales or transfers of such magazines manufactured prior to the ban.  This ban, as well as the Maryland and federal bans on AWs that account for many of the guns with magazines over 20 rounds, may have contributed to the downward trend in LCMs in Baltimore, but only 2% of the guns recovered in Baltimore from 1993 to 2000 were equipped with such magazines.

[80]  All comparisons of 1993 to 2002-2003 in the Baltimore data are based on information from the months of January through November of each year.  At the time we received these data, information was not yet available for December 2003, and preliminary analysis revealed that guns with LCMs were somewhat less likely to be recovered in December than in other months for years prior to 2003.  Nevertheless, utilizing the December data for 1993 and 2002 did not change the substantive inferences.  We did not remove December data from the comparisons of 1993 and the full post-ban period because those comparisons seemed less likely to be influenced by the absence of one month of data.

[81]  This increase may have been due largely to a general increase in rifle seizures.  LCM rifles actually dropped as a percentage of all rifle recoveries from 1993 to 2002-2003, suggesting that recoveries of LCM rifles were increasing less than recoveries of other rifles.

[82]  For 1996, 45% of all records and 24% of those linked to violent crimes had missing data for magazine capacity (due to temporary changes in operational procedures in the Baltimore crime lab).  For other years, missing data rates were no more than 6%.  Based on those cases for which data were available, the share of guns with LCMs in 1996 was comparable to that in other years, particularly when examining all gun recoveries.  At any rate, the analyses focusing on 1993, 2002, and 2003 reinforce the findings of those that include the 1996 data.

[83]  The ammunition capacity code in the Baltimore data usually reflected the full capacity of the magazine and weapon, but sometimes reflected the capacity of the magazine only.  (For instance, a semiautomatic with a 10-round magazine and the ability to accept one additional round in the chamber might have been coded as having a capacity of 10 or 11.)  Informal assessment suggested that capacity was more likely to reflect the exact capacity of the magazine in the early years of the database and more likely to reflect the full capacity of the gun and magazine in later years.  For the main runs presented in the text and tables, guns were counted as having LCMs if the coded capacity was greater than 11 rounds.  This ensured that LCMs were not overestimated, but it potentially understated LCM prevalence, particularly for the earlier

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

handguns or LCM rifles had declined appreciably by 2002-2003 (Table 8-2, panels C and D).  Hence, the general decline in LCM recoveries may reflect differences in the availability and use of LCMs among less serious offenders, changes in police practices,[84] or other factors.

### Figure 8-1. Police Recoveries of Guns Equipped With Large Capacity Magazines in Baltimore, 1993-2003



As % of Recovered Guns (N=33,403)

———— All guns          ———— Violent crime guns

---

years.  However, coding the guns as LCM weapons based on a threshold of 10 (i.e., a coded capacity over 10 rounds) in 1993 and a threshold of 11 (i.e., a coded capacity over 11 rounds) for 2002-2003 did not change the inferences of the violent crime analysis.  Further, this coding increased the pre-ban prevalence of LCMs by very little (about 4% in relative terms).
[84] During the late 1990s, for example, Baltimore police put greater emphasis on detecting illegal gun carrying (this statement is based on prior research and interviews the author has done in Baltimore as well as the discussion in Center to Prevent Handgun Violence, 1998).  One can hypothesize that this effort reduced the fraction of recovered guns with LCMs because illegal gun carriers are probably more likely to carry smaller, more concealable handguns that are less likely to have LCMs.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 8-1.  Trends in All Police Recoveries of Firearms Equipped With Large Capacity Magazines, Baltimore, 1993-2003**

|  | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| **A.  All LCM Guns** | Jan.-Dec. 1993 | Jan. 1995-Nov. 2003 | |
| Total | 473 | 3703 | |
| Annual Mean | 473 | 445.86 [a] | -6% |
| LCM Guns as % of All Guns | 13.51% | 12.38% | -8%* |
| **B.  All LCM Guns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 430 | 626 | |
| Annual Mean | 430 | 313 | -27% |
| LCM Guns as % of All Guns | 13.47% | 10.3% | -24%*** |
| **C.  LCM Handguns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| Total | 359 | 440 | |
| Annual Mean | 359 | 220 | -39% |
| LCM Handguns as % of All Guns | 11.25% | 7.24% | -36%*** |
| **D.  LCM Rifles** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 | |
| LCM Rifles | 71 | 183 | |
| Annual Mean | 71 | 91.5 | 29% |
| LCM Rifles as % of All Guns | 2.22% | 3.01% | 36%** |

a.  Annual average calculated without 1996 and 2003 (to correct for missing months or missing magazine data).
* Chi-square p level < .10 (changes in percentages of guns equipped with LCMs were tested for statistical significance)
** Chi-square p level <.05 (changes in percentages of guns equipped with LCMs were tested for statistical significance)
** Chi-square p level < .01 (changes in percentages of guns equipped with LCMs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 8-2.  Trends in Police Recoveries of Firearms Equipped With Large Capacity Magazines in Violent Crime Cases, Baltimore, 1993-2003**

|  | Pre-Ban Period | Post-Ban Period | Change [a] |
|---|---|---|---|
| **A.  All LCM Guns** | Jan.-Dec. 1993 | Jan. 1995-Nov. 2003 |  |
| Total | 87 | 711 |  |
| Annual Mean | 87 | 81.86 [b] | -6% |
| LCM Guns as % of All Guns | 14.01% | 14.44% | 3% |
| **B.  All LCM Guns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 |  |
| Total | 79 | 104 |  |
| Annual Mean | 79 | 52 | -34% |
| LCM Guns as % of All Guns | 13.96% | 13.65% | -2% |
| **C.  LCM Handguns** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 |  |
| Total | 62 | 81 |  |
| Annual Mean | 62 | 40.5 | -35% |
| LCM Handguns as % of All Guns | 10.95% | 10.63% | -3% |
| **D.  LCM Rifles** | Jan.-Nov. 1993 | Jan.-Nov. 2002-2003 |  |
| LCM Rifles | 17 | 23 |  |
| Annual Mean | 17 | 11.5 | -32% |
| LCM Rifles as % of All Guns | 3% | 3.02% | 1% |

a.  Changes in the percentages of guns with LCMs were statistically insignificant in chi-square tests.
b.  Annual average calculated without 1996 and 2003 (to correct for missing months or missing magazine data).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

### 8.2. Anchorage

In the Alaska database, magazine capacity was recorded only for guns recovered during the post-ban years, 1995 through 2002.  However, we estimated pre-ban use of LCM handguns by identifying handgun models inspected during 1992 and 1993 that were manufactured with LCMs prior to the ban.[85]  This permitted an assessment of pre-post changes in the use of LCM handguns.

As shown in Figure 8-2 (also see Table 8-3, panel A), LCM guns rose from 14.5% of crime guns in 1995-1996 to 24% in 2000-2001 (we present two-year averages because the sample are relatively small, particularly for the most recent years) and averaged about 20% for the entire post-ban period.  LCM handguns drove much of this trend, but LCM rifles also increased from about 3% of crime guns in 1995-96 to 11% in 2000-2001.

**Figure 8-2. Police Recoveries of Guns Equipped With Large Capacity Magazines in Anchorage (Alaska), 1995-2002**



As % of Guns Submitted for Evidentiary Testing (N=405)

Two year averages.

---

[85]  To make these determinations, we consulted gun catalogs such as the *Blue Book of Gun Values* and *Guns Illustrated*.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 8-3.  Trends in Police Recoveries of Firearms Equipped With Large Capacity Magazines in Violent Crime Cases, Anchorage (Alaska), 1992-2002 [a]**

|  | Pre-Ban Period | Post-Ban Period | Change [b] |
|---|---|---|---|
| **A.  All LCM Guns** | N/A | Jan. 1995-Dec. 2002 | |
| Total | | 80 | |
| Annual Mean | | 10 | N/A |
| LCM Guns as % of All Guns | | 19.75% | N/A |
| **B.  LCM Handguns** | Jan. 1992-Dec. 1993 | Jan. 1995-Dec. 2002 | |
| Total | 17 | 57 | |
| Annual Mean | 8.5 | 7.13 | -16% |
| LCM Handguns as % All Handguns | 26.15% | 22.35% | -15% |
| **C.  LCM Handguns** | Jan. 1992-Dec. 1993 | Jan. 2001-Dec. 2002 | |
| Total | 17 | 10 | |
| Annual Mean | 8.5 | 5 | -41% |
| LCM Handguns as % of All Handguns | 26.15% | 19.23% | -26% |

a.  Based on guns submitted to State Police for evidentiary testing.
b.  Changes in the percentages of guns equipped with LCMs were statistically insignificant in chi-square tests.

Investigation of pre-post changes for handguns revealed an inconsistent pattern (Figure 8-3).  LCM handguns dropped initially after the ban, declining from 26% of handguns in 1992-1993 to 18% in 1995-1996.  However, they rebounded after 1996, reaching a peak of 30% of handguns in 1999-2000 before declining to 19% in 2001-2002.

For the entire post-ban period, the share of handguns with LCMs was about 15% lower than in the pre-ban period (Table 8-3, panel B).  By the two most recent post-ban years (2001-2002), LCM use had dropped 26% from the pre-ban years (Table 8-3, panel C).  These changes were not statistically significant, but the samples of LCM handguns were rather small for rigorous statistical testing.  Even so, it seems premature to conclude

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

that there has been a lasting reduction in LCM use in Alaska.  LCM use in 2001-2002 was somewhat higher than that immediately following the ban in 1995-1996, after which there was a substantial rebound.  Considering the inconsistency of post-ban patterns, further follow-up seems warranted before making definitive conclusions about LCM use in Alaska.

**Figure 8-3. Police Recoveries of Handguns Equipped With Large Capacity Magazines in Anchorage (Alaska), 1992-2002**



As % of Handguns Submitted for Evidentiary Testing (N=319)

Two-year averages.  Data for 1994 excluded.

## 8.3. Milwaukee

LCM guns accounted for 21% of guns recovered in Milwaukee murder investigations from 1991 to 1993 (Table 8-4, panel A).  Following the ban, this figure rose until reaching a plateau of over 36% in 1997 and 1998 (Figure 8-4).  On average, the share of guns with LCMs grew 55% from 1991-1993 to 1995-1998, a trend that was driven by LCM handguns (Table 8-4, panels A and B).[86]  LCM rifles held steady at between 4% and 5% of the guns (Table 8-4, panel C).

We also analyzed a preliminary database on 48 guns used in murders during 2000 and 2001 (unlike the 1991-1998 database, this database did not include information on other guns recovered during the murder investigations).  About 11% of these guns were LCM guns, as compared to 19% of guns used in murders from 1991 to 1993 (analyses not shown).  However, nearly a quarter of the 2000-2001 records were missing information on magazine capacity.[87]  Examination of the types and models of guns with

---

[86]  LCM guns also increased as share of guns that were used in the murders (the full sample results discussed in the text include all guns recovered during the investigations).
[87]  Magazine capacity was missing for less than 4% of the records in earlier years.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

unidentified magazines suggested that as many as 17% of guns used in murders during 2000 and 2001 may have been LCM guns (based on all those that either had LCMs, were models sold with LCMs prior to the ban, or were unidentified semiautomatics).  While this still suggests a drop in LCM use from the peak levels of the late 1990s (26% of guns used in murders from 1995 to 1998 had LCMs), it is not clear that LCM use has declined significantly below pre-ban levels.

**Table 8-4.  Trends in Police Recoveries of Firearms Equipped With Large Capacity Magazines in Murder Cases, Milwaukee County, 1991-1998**

|  | **Pre-Ban Period** | **Post-Ban Period** | **Change** |
|---|---|---|---|
| **A.  All LCM Guns** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 | |
| Total | 51 | 83 | |
| Annual Mean | 17 | 20.75 | 22% |
| LCM Guns as % of All Guns | 20.9% | 32.42% | 55%* |
| **B.  LCM Handguns** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 | |
| Total | 40 | 71 | |
| Annual Mean | 13.33 | 17.75 | 33% |
| LCM Handguns as % of All Guns | 16.39% | 27.73% | 69%* |
| **C.  LCM Rifles** | Jan. 1991-Dec. 1993 | Jan. 1995-Dec. 1998 | |
| Total | 11 | 12 | |
| Annual Mean | 3.67 | 3 | -18% |
| LCM Rifles as % of All Guns | 4.51% | 4.69% | 4% |

*  Chi-square p level < .01 (changes in percentages of guns equipped with LCMs were tested for statistical significance)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 8-4. Recoveries of Guns Equipped With Large Capacity Magazines in Milwaukee County Murder Cases, 1991-1998**



As % of Guns Recovered in Murder Cases (N=571)

## 8.4.  Louisville

The Louisville LCM data are all post-ban (1996-2000), so we cannot make pre-post comparisons.  Nonetheless, the share of crime guns with LCMs in Louisville (24%) was within the range of that observed in the other cities during this period.  And similar to post-ban trends in the other sites, LCM recoveries peaked in 1997 before leveling off and remaining steady through the year 2000 (Figure 8-5).  LCM rifles dropped 21% as a share of crime guns between 1996 and 2000 (analyses not shown), but there were few in the database, and they never accounted for more than 6.2% of guns in any year.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 8-5. Police Recoveries of Guns Equipped With Large Capacity Magazines in Louisville (Kentucky), 1996-2000**



As % of Guns Submitted for Evidentiary Testing (N=681)

Year 2000 data are not for the full year.

## 8.5.  Summary

Despite a doubling of handgun LCM prices between 1993 and 1995 and a 40% increase in rifle LCM prices from 1993 to 1994, criminal use of LCMs was rising or steady through at least the latter 1990s, based on police recovery data from four jurisdictions studied in this chapter.  These findings are also consistent with an earlier study finding no decline in seizures of LCM guns from juveniles in Washington, DC in the year after the ban (Koper, 2001).[88]  Post-2000 data, though more limited and inconsistent, suggest that LCM use may be dropping from peak levels of the late 1990s but provide no definitive evidence of a drop below pre-ban levels.[89]  These trends have been driven primarily by LCM handguns, which are used in crime roughly three times as

---

[88]  From 1991 to 1993, 16.4% of guns recovered from juveniles in Washington, DC had LCMs (14.2% had LCMs in 1993).  In 1995, this percentage increased to 17.1%.  We did not present these findings in this chapter because the data were limited to guns recovered from juveniles, the post-ban data series was very short, and the gun markets supplying DC and Baltimore are likely to have much overlap (Maryland is a leading supplier of guns to DC – see ATF, 1997; 1999).

[89]  We reran selected key analyses with the Baltimore, Milwaukee, and Louisville data after excluding .22 caliber guns, some of which could have been equipped with attached tubular magazines that are exempted from the LCM ban, and obtained results consistent with those reported in the text.  It was possible to identify these exempted magazines in the Anchorage data.  When they were removed from Anchorage's LCM count, the general pattern in use of banned LCMs was similar to that presented in the main 1995-2002 analysis:  guns with banned LCMs rose, reaching a peak of 21% of crime guns in 1999-2000, before declining slightly to 19% in 2001-2002.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

often as LCM rifles.  Nonetheless, there has been no consistent reduction in the use of LCM rifles either.

The observed patterns are likely due to several factors:  a hangover from pre-ban growth in the production and marketing of LCM guns (Cook and Ludwig, 1997, pp. 5-6; Wintemute, 1996);[90] the low cost of LCMs relative to the firearms they complement, which seems to make LCM use less sensitive to prices than is firearm use;[91] the utility that gun users, particularly handgun users, attach to LCMs; a plentiful supply of grandfathered LCMs, likely enhanced by a pre-ban surge in production (though this has not been documented) and the importation of millions of foreign LCMs since the ban;[92] thefts of LCM firearms (see Roth and Koper, 1997, Chapter 4); or some combination of these factors.[93]  However, it is worth noting that our analysis did not reveal an upswing in use of LCM guns following the surge of LCM importation in 1999 (see the previous chapter).  It remains to be seen whether recent imports will have a demonstrable effect on patterns of LCM use.

Finally, we must be cautious in generalizing these results to the nation because they are based on a small number of non-randomly selected jurisdictions.  Nonetheless, the consistent failure to find clear evidence of a pre-post drop in LCM use across these geographically diverse locations strengthens the inference that the findings are indicative of a national pattern.

[90] To illustrate this trend, 38% of handguns acquired by gun owners during 1993 and 1994 were equipped with magazines holding 10 or more rounds, whereas only 14% of handguns acquired before 1993 were so equipped (Cook and Ludwig, 1997, pp. 5-6).
[91] Although elevated post-ban prices did not suppress use of LCMs, a more subtle point is that LCM use rose in most of these locations between 1995 and 1998, as LCM prices were falling from their peak levels of 1994-1995.  Therefore, LCM use may have some sensitivity to price trends.
[92] However, we do not have the necessary data to determine if LCMs used in crime after the ban were acquired before or after the ban.
[93] In light of these considerations, it is conceivable that the ban slowed the rate of growth in LCM use, accelerated it temporarily (due to a pre-ban production boom), or had no effect.  We do not have the data necessary to examine this issue rigorously.  Moreover, the issue might be regarded as somewhat superfluous; the more critical point would seem to be that nearly a decade after the ban, LCM use has still not declined demonstrably below pre-ban levels.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

## 9. THE CONSEQUENCES OF CRIMES WITH ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES

One of the primary considerations motivating passage of the ban on AWs and LCMs was a concern over the perceived dangerousness of these guns and magazines. In principal, semiautomatic weapons with LCMs enable offenders to fire high numbers of shots rapidly, thereby potentially increasing both the number of person wounded per gunfire incident (including both intended targets and innocent bystanders) and the number of gunshot victims suffering multiple wounds, both of which would increase deaths and injuries from gun violence. Ban advocates also argued that the banned AWs possessed additional features conducive to criminal applications.

The findings of the previous chapters suggest that it is premature to make definitive assessments of the ban's impact on gun violence. Although criminal use of AWs has declined since the ban, this reduction was offset through at least the late 1990s by steady or rising use of other guns equipped with LCMs. As argued previously, the LCM ban has greater potential for reducing gun deaths and injuries than does the AW ban. Guns with LCMs – of which AWs are only a subset – were used in up to 25% of gun crimes before the ban, whereas AWs were used in no more than 8% (Chapter 3). Furthermore, an LCM is arguably the most important feature of an AW. Hence, use of guns with LCMs is probably more consequential than use of guns with other military-style features, such as flash hiders, folding rifle stocks, threaded barrels for attaching a silencers, and so on.[94]

This is not to say that reducing use of AWs will have no effect on gun crime; a decline in the use of AWs does imply fewer crimes with guns having particularly large magazines (20 or more rounds) and other military-style features that could facilitate some crimes. However, it seems that any such effects would be outweighed, or at least

---

[94] While it is conceivable that changing features of AWs other than their magazines might prevent some gunshot victimizations, available data provide little if any empirical basis for judging the likely size of such effects. Speculatively, some of the most beneficial weapon redesigns may be the removal of folding stocks and pistol grips from rifles. It is plausible that some offenders who cannot obtain rifles with folding stocks (which make the guns more concealable) might switch to handguns, which are more concealable but generally cause less severe wounds (e.g. see DiMaio, 1985). However, such substitution patterns cannot be predicted with certainty. Police gun databases rarely have information sufficiently detailed to make assessments of changes over time in the use of weapons with specific features like folding stocks. Based on informal assessments, there was no consistent pattern in post-ban use of rifles (as a share of crime guns) in the local databases examined in the prior chapters (also see the specific comments on LCM rifles in the previous chapters).

Pistol grips enhance the ability of shooters to maintain control of a rifle during rapid, "spray and pray" firing (e.g., see Violence Policy Center, 2003). (Heat shrouds and forward handgrips on APs serve the same function.) While this feature may prove useful in military contexts (e.g., firefights among groups at 100 meters or less – see data of the U.S. Army's Operations Research Office as cited in Violence Policy Center, 2003), it is unknown whether civilian attacks with semiautomatic rifles having pistol grips claim more victims per attack than do those with other semiautomatic rifles. At any rate, most post-ban AR-type rifles still have pistol grips. Further, the ban does not count a stock thumbhole grip, which serves the same function as a pistol grip (e.g., see the illustration of LCMM rifles in Chapter 2), as an AR feature.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

obscured, by the wider effects of LCM use, which themselves are likely to be small at best, as we argue below.[95]

Because offenders can substitute non-banned guns and small magazines for banned AWs and LCMs, there is not a clear rationale for expecting the ban to reduce assaults and robberies with guns.[96]  But by forcing AW and LCM offenders to substitute non-AWs with small magazines, the ban might reduce the number of shots fired per gun attack, thereby reducing both victims shot per gunfire incident and gunshot victims sustaining multiple wounds.  In the following sections, we consider the evidence linking high-capacity semiautomatics and AWs to gun violence and briefly examine recent trends in lethal and injurious gun violence.

## 9.1.  The Spread of Semiautomatic Weaponry and Trends in Lethal and Injurious Gun Violence Prior to the Ban

Nationally, semiautomatic handguns grew from 28% of handgun production in 1973 to 80% in 1993 (Zawitz, 1995, p. 3).  Most of this growth occurred from the late 1980s onward, during which time the gun industry also increased marketing and production of semiautomatics with LCMs (Wintemute, 1996).  Likewise, semiautomatics grew as a percentage of crime guns (Koper, 1995; 1997), implying an increase in the average firing rate and ammunition capacity of guns used in crime.[97]

---

[95]  On a related note, a few studies suggest that state-level AW bans have not reduced crime (Koper and Roth, 2001a; Lott, 2003).  This could be construed as evidence that the federal AW ban will not reduce gunshot victimizations without reducing LCM use because the state bans tested in those studies, as written at the time, either lacked LCM bans or had LCM provisions that were less restrictive than that of the federal ban.  (New Jersey's 1990 AW ban prohibited magazines holding more than 15 rounds.  AP bans passed by Maryland and Hawaii prohibited magazines holding more than 20 rounds and pistol magazines holding more than 10 rounds, respectively, but these provisions did not take effect until just a few months prior to the federal ban.)  However, it is hard to draw definitive conclusions from these studies for a number of reasons, perhaps the most salient of which are the following:  there is little evidence on how state AW bans affect the availability and use of AWs (the impact of these laws is likely undermined to some degree by the influx of AWs from other states, a problem that was probably more pronounced prior to the federal ban when the state laws were most relevant); studies have not always examined the effects of these laws on gun homicides and shootings, the crimes that are arguably most likely to be affected by AW bans (see discussion in the main text); and the state AW bans that were passed prior to the federal ban (those in California, New Jersey, Hawaii, Connecticut, and Maryland) were in effect for only three months to five years (two years or less in most cases) before the imposition of the federal ban, after which they became largely redundant with the federal legislation and their effects more difficult to predict and estimate.

[96]  One might hypothesize that the firepower provided by AWs and other semiautomatics with LCMs emboldens some offenders to engage in aggressive behaviors that prompt more shooting incidents.  On the other hand, these weapons might also prevent some acts of violence by intimidating adversaries, thus discouraging attacks or resistance.  We suspect that firepower does influence perceptions, considering that many police departments have upgraded their weaponry in recent years – often adopting semiautomatics with LCMs – because their officers felt outgunned by offenders.  However, hypotheses about gun types and offender behavior are very speculative, and, pending additional research on such issues, it seems prudent to focus on indicators with stronger theoretical and empirical foundations.

[97]  Revolvers, the most common type of non-semiautomatic handgun, typically hold only 5 or 6 rounds (and sometimes up to 9).  Semiautomatic pistols, in contrast, hold ammunition in detachable magazines that, prior to the ban, typically held 5 to 17 bullets and sometimes upwards of 30 (Murtz et al., 1994).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The impact of this trend is debatable.  Although the gun homicide rate rose considerably during the late 1980s and early 1990s (Bureau of Justice Statistics, 1994, p. 13), the percentage of violent gun crimes resulting in death was declining (see Figure 9-1 and the related discussion in section 9.3).  Similarly, the percentage of victims killed or wounded in handgun discharge incidents declined from 27% during the 1979-1987 period to 25% for the 1987-1992 period (calculated from Rand, 1990, p. 5; 1994, p. 2) as semiautomatics were becoming more common crime weapons.[98]  On the other hand, an increasing percentage of gunshot victims died from 1992 to 1995 according to hospital data (Cherry et al., 1998), a trend that could have been caused in part by a higher number of gunshot victims with multiple wounds (also see McGonigal et al., 1993).  Most notably, the case fatality rate for assaultive gunshot cases involving 15 to 24-year-old males rose from 15.9% in late 1993 to 17.5% in early 1995 (p. 56).

### Figure 9-1. Percentage of Violent Gun Crimes Resulting in Death (National), 1982-2002



Based on gun homicides, gun robberies, and gun assaults reported in the Uniform Crime Reports and Supplemental Homicide Reports.

---

[98] A related point is that there was a general upward trend in the average number of shots fired by offenders in gunfights with New York City police from the late 1980s through 1992 (calculated from Goehl, 1993, p. 51).  However, the average was no higher during this time than during many years of the early 1980s and 1970s.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Some researchers have inferred links between the growing use of semiautomatics in crime and the rise of both gun homicides and bystander shootings in a number of cities during the late 1980s and early 1990s (Block and Block, 1993; McGonigal et al., 1993; Sherman et al., 1989; Webster et al., 1992). A study in Washington, DC, for example, reported increases in wounds per gunshot victim and gunshot patient mortality during the 1980s that coincided with a reported increase in the percentage of crime guns that were semiautomatics (Webster et al., 1992).

Nevertheless, changes in offender behavior, coupled with other changes in crime guns (e.g., growing use of large caliber handguns – see Caruso et al., 1999; Koper, 1995; 1997; Wintemute, 1996), may have been key factors driving such trends. Washington, DC, for example, was experiencing an exploding crack epidemic at the time of the aforementioned study, and this may have raised the percentage of gun attacks in which offenders had a clear intention to injure or kill their victims. Moreover, studies that attempted to make more explicit links between the use of semiautomatic firearms and trends in lethal gun violence via time series analysis failed to produce convincing evidence of such links (Koper, 1995; 1997). However, none of the preceding research related specific trends in the use of AWs or LCMs to trends in lethal gun violence.

### 9.2. Shots Fired in Gun Attacks and the Effects of Weaponry on Attack Outcomes

The evidence most directly relevant to the potential of the AW-LCM ban to reduce gun deaths and injuries comes from studies examining shots fired in gun attacks and/or the outcomes of attacks involving different types of guns. Unfortunately, such evidence is very sparse.

As a general point, the faster firing rate and larger ammunition capacities of semiautomatics, especially those equipped with LCMs, have the potential to affect the outcomes of many gun attacks because gun offenders are not particularly good shooters. Offenders wounded their victims in no more than 29% of gunfire incidents according to national, pre-ban estimates (computed from Rand, 1994, p. 2; also see estimates presented later in this chapter). Similarly, a study of handgun assaults in one city revealed a 31% hit rate per shot, based on the sum totals of all shots fired and wounds inflicted (Reedy and Koper, 2003, p. 154). Other studies have yielded hit rates per shot ranging from 8% in gunfights with police (Goehl, 1993, p. 8) to 50% in mass murders (Kleck, 1997, p. 144). Even police officers, who are presumably certified and regularly re-certified as proficient marksman and who are almost certainly better shooters than are average gun offenders, hit their targets with only 22% to 39% of their shots (Kleck, 1991, p. 163; Goehl, 1993). Therefore, the ability to deliver more shots rapidly should raise the likelihood that offenders hit their targets, not to mention innocent bystanders.[99]

---

[99] However, some argue that this capability is offset to some degree by the effects of recoil on shooter aim, the limited number of shots fired in most criminal attacks (see below), and the fact that criminals using non-semiautomatics or semiautomatics with small magazines usually have the time and ability to deliver multiple shots if desired (Kleck, 1991, pp. 78-79).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

A few studies have compared attacks with semiautomatics, sometimes specifically those with LCMs (including AWs), to other gun assaults in terms of shots fired, persons hit, and wounds inflicted (see Tables 9-1 and 9-2).  The most comprehensive of these studies examined police reports of attacks with semiautomatic pistols and revolvers in Jersey City, New Jersey from 1992 through 1996 (Reedy and Koper, 2003), finding that use of pistols resulted in more shots fired and higher numbers of gunshot victims (Table 9-1), though not more gunshot wounds per victim (Table 9-2).[100]  Results implied there would have been 9.4% fewer gunshot victims overall had semiautomatics not been used in any of the attacks.  Similarly, studies of gun murders in Philadelphia (see McGonigal et al., 1993 in Table 9-1) and a number of smaller cities in Pennsylvania, Ohio, and Iowa (see Richmond et al., 2003 in Table 9-2) found that attacks with semiautomatics resulted in more shots fired and gunshot wounds per victim.  An exception is that the differential in shots fired between pistol and revolver cases in Philadelphia during 1990 did not exist for cases that occurred in 1985, when semiautomatics and revolvers had been fired an average of 1.6 and 1.9 times, respectively.  It is not clear whether the increase in shots fired for pistol cases from 1985 to 1990 was due to changes in offender behavior, changes in the design or quality of pistols (especially an increase in the use of models with LCMs – see Wintemute, 1996), the larger sample for 1990, or other factors.

---

[100]  But unlike other studies that have examined wounds per victim (see Table 9-2), this study relied on police reports of wounds inflicted rather than medical reports, which are likely to be more accurate.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 9-1.  Shots Fired and Victims Hit in Gunfire Attacks By Type of Gun and Magazine**

| Data Source | Measure | Outcome |
|---|---|---|
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Shots Fired | Avg. = 3.2 – 3.7 (n=165 pistol cases) *<br><br>Avg. = 2.3 – 2.6 (n=71 revolver cases) * |
| Gun homicides with semiautomatic pistols and revolvers, Philadelphia, 1985 and 1990 [b] | Shots Fired | Avg. = 1.6 (n=21 pistol cases, 1985)<br>Avg. = 1.9 (n=57 revolver cases, 1985)<br><br>Avg. = 2.7 (n=95 pistol cases, 1990)<br>Avg. = 2.1 (n=108 revolver cases, 1990) |
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Victims Hit | Avg. = 1.15 (n=95 pistol cases) *<br><br>Avg. = 1.0 (n=40 revolver cases) * |
| Mass shootings with AWs, semiautomatics having LCMs, or other guns, 6+ dead or 12+ shot, United States, 1984-1993 [c] | Victims Hit | Avg. = 29 (n=6 AW/LCM cases)<br><br>Avg. = 13 (n=9 non-AW/LCM cases) |
| Self-reported gunfire attacks by state prisoners with AWs, other semiautomatics, and non-semiautomatic firearms, United States, 1997 or earlier [d] | % of Attacks With Victims Hit | 19.5% (n=72 AW or machine gun cases)<br><br>22.3% (n=419 non-AW, semiautomatic cases)<br><br>23.3% (n=608 non-AW, non-semiautomatic cases) |

a.  Reedy and Koper (2003)
b.  McGonigal et al. (1993)
c.  Figures calculated by Koper and Roth (2001a) based on data presented by Kleck (1997, p. 144)
d.  Calculated from Harlow (2001, p. 11).  (Sample sizes are based on unpublished information provided by the author of the survey report.)
*  Pistol/revolver differences statistically significant at p<.05 (only Reedy and Koper [2003] and Harlow [2001] tested for statistically significant differences).  The shots fired ranges in Reedy and Koper are based on minimum and maximum estimates.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 9-2.  Gunshot Wounds Per Victim By Type of Gun and Magazine**

| Data Source | Measure | Outcome |
|---|---|---|
| Gun attacks with semiautomatic pistols and revolvers, Jersey City, 1992-1996 [a] | Gunshot Wounds | Avg. = 1.4 (n=107 pistol victims)<br><br>Avg. = 1.5 (n=40 revolver victims) |
| Gun homicides with semiautomatic pistols and revolvers, Iowa City (IA), Youngstown (OH), and Bethlehem (PA), 1994-1998 [b] | Gunshot Wounds | Avg. = 4.5 total (n=212 pistol victims)*<br>Avg. = 2.9 entry<br><br>Avg. = 2.0 total (n=63 revolver victims)*<br>Avg. = 1.5 entry |
| Gun homicides with assault weapons (AWs), guns having large capacity magazines (LCMs), and other firearms, Milwaukee, 1992-1995 [c] | Gunshot Wounds | Avg. = 3.23 (n=30 LCM victims) **<br>Avg. = 3.14 (n=7 AW victims)<br><br>Avg. = 2.08 (n=102 non-AW/LCM victims)** |

a. Reedy and Koper (2003)
b. Richmond et al. (2003)
c. Roth and Koper (1997, Chapter 6)
* Pistol/revolver differences statistically significant at p<.01.
** The basic comparison between LCM victims and non-AW/LCM victims was moderately significant (p<.10) with a one-tailed test.  Regression results (with a slightly modified sample) revealed a difference significant at p=.05 (two-tailed test).  Note that the non-LCM group included a few cases involving non-banned LCMs (.22 caliber attached tubular devices).

Also, a national survey of state prisoners found that, contrary to expectations, offenders who reported firing on victims with AWs and other semiautomatics were no more likely to report having killed or injured victims than were other gun offenders who reported firing on victims (Table 9-1).  However, the measurement of guns used and attack outcomes were arguably less precise in this study, which was based on offender self-reports, than in other studies utilizing police and medical reports.[101]

Attacks with AWs or other guns with LCMs may be particularly lethal and injurious, based on very limited evidence.  In mass shooting incidents (defined as those in which at least 6 persons were killed or at least 12 were wounded) that occurred during the decade preceding the ban, offenders using AWs and other semiautomatics with LCMs (sometimes in addition to other guns) claimed an average of 29 victims in comparison to an average of 13 victims for other cases (Table 9-1).  (But also see the study discussed in the preceding paragraph in regards to victims hit in AW cases.)

Further, a study of Milwaukee homicide victims from 1992 through 1995 revealed that those killed with AWs were shot 3.14 times on average, while those killed with any

---

[101]  See the discussion of self-reports and AW use in Chapter 3.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

gun having an LCM were shot 3.23 times on average (Table 9-2).  In contrast, victims shot with guns having small magazines had only 2.1 wounds on average.  If such a wound differential can be generalized to other gun attacks – if, that is, both fatal and non-fatal LCM gunshot victims are generally hit one or more extra times – then LCM use could have a considerable effect on the number of gunshot victims who die.  To illustrate, the fatality rate among gunshot victims in Jersey City during the 1990s was 63% higher for those shot twice than for those shot once (26% to 16%) (Koper and Roth, 2001a; 2001b).  Likewise, fatality rates are 61% higher for patients with multiple chest wounds than for patients with a single chest wound (49% to 30.5%), based on a Washington, DC study (Webster et al., 1992, p. 696).

Similar conclusions can also be inferred indirectly from the types of crimes involving LCM guns.  To illustrate, handguns associated with gunshot victimizations in Baltimore (see the description of the Baltimore gun and magazine data in the preceding chapter) are 20% to 50% more likely to have LCMs than are handguns associated with other violent crimes, controlling for weapon caliber (Table 9-3).  This difference may be due to higher numbers of shots and hits in crimes committed with LCMs, although it is also possible that offenders using LCMs are more likely to fire on victims.  But controlling for gunfire, guns used in shootings are 17% to 26% more likely to have LCMs than guns used in gunfire cases resulting in no wounded victims (perhaps reflecting higher numbers of shots fired and victims hit in LCM cases), and guns linked to murders are 8% to 17% more likely to have LCMs than guns linked to non-fatal gunshot victimizations (perhaps indicating higher numbers of shots fired and wounds per victim in LCM cases).[102]  These differences are not all statistically significant, but the pattern is consistent.  And as discussed in Chapter 3, AWs account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.

---

[102]  Cases with and without gunfire and gunshot victims were approximated based on offense codes contained in the gun seizure data (some gunfire cases not resulting in wounded victims may not have been identified as such, and it is possible that some homicides were not committed with the guns recovered during the investigations).  In order to control for caliber effects, we focused on 9mm and .38 caliber handguns.  Over 80% of the LCM handguns linked to violent crimes were 9mm handguns.  Since all (or virtually all) 9mm handguns are semiautomatics, we also selected .38 caliber guns, which are close to 9mm in size and consist almost entirely of revolvers and derringers.

The disproportionate involvement of LCM handguns in injury and death cases is greatest in the comparisons including both 9mm and .38 caliber handguns.  This may reflect a greater differential in average ammunition capacity between LCM handguns and revolvers/derringers than between LCM handguns and other semiautomatics.  The differential in fatal and non-fatal gunshot victims may also be due to caliber effects; 9mm is generally a more powerful caliber than .38 based on measures like kinetic energy or relative stopping power (e.g., see DiMaio, 1985, p. 140; Warner 1995, p. 223; Wintemute, 1996, p. 1751).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 9-3.  Probabilities That Handguns Associated With Murders, Non-Fatal Shootings, and Other Violent Crimes Were Equipped With Large Capacity Magazines in Baltimore, 1993-2000**

| Handgun Sample | % With LCM | % Difference (#2 Relative to #1) |
|---|---|---|
| **A.  Handguns Used in Violent Crimes With and Without Gunshot Injury** | | |
| 1) 9mm and .38:  violence, no gunshot victims | 23.21% | |
| 2) 9mm and .38:  violence with gunshot victims | 34.87% | 50%* |
| 1) 9mm:  violence, no gunshot victims | 52.92% | |
| 2) 9mm:  violence with gunshot victims | 63.24% | 20%* |
| **B.  Handguns Used in Gunfire Cases With and Without Gunshot Injury** | | |
| 1) 9mm and .38:  gunfire, no gunshot victims | 27.66% | |
| 2) 9mm and .38:  gunfire with gunshot victims | 34.87% | 26% |
| 1) 9mm:  gunfire, no gunshot victims | 54.17% | |
| 2) 9mm:  gunfire with gunshot victims | 63.24% | 17% |
| **C.  Handguns Used in Fatal Versus Non-Fatal Gunshot Victimizations** | | |
| 1) 9mm and .38:  non-fatal gunshot victims | 32.58% | |
| 2) 9mm and .38:  homicides | 38.18% | 17% |
| 1) 9mm:  non-fatal gunshot victims | 61.14% | |
| 2) 9mm:  homicides | 66.04% | 8% |

* Statistically significant difference at p<.01 (chi-square).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

The findings of the preceding studies are subject to numerous caveats. There were few if any attempts to control for characteristics of the actors or situations that might have influenced weapon choices and/or attack outcomes.[103] Weapons data were typically missing for substantial percentages of cases. Further, many of the comparisons in the tables were not tested for statistical significance (see the notes to Tables 9-1 and 9-2).[104]

Tentatively, nonetheless, the evidence suggests more often than not that attacks with semiautomatics, particularly those equipped with LCMs, result in more shots fired, leading to both more injuries and injuries of greater severity. Perhaps the faster firing rate and larger ammunition capacities afforded by these weapons prompt some offenders to fire more frequently (i.e., encouraging what some police and military persons refer to as a "spray and pray" mentality). But this still begs the question of whether a 10-round limit on magazine capacity will affect the outcomes of enough gun attacks to measurably reduce gun injuries and deaths.

---

[103] In terms of offender characteristics, recall from Chapter 3 that AP buyers are more likely than other gun buyers to have criminal histories and commit subsequent crimes. This does not seem to apply, however, to the broader class of semiautomatic users: handgun buyers with and without criminal histories tend to buy pistols in virtually the same proportions (Wintemute et al., 1998b), and youthful gun offenders using pistols and revolvers have very comparable criminal histories (Sheley and Wright, 1993b, p. 381). Further, semiautomatic users, including many of those using AWs, show no greater propensity to shoot at victims than do other gun offenders (Harlow, 2001, p. 11; Reedy and Koper, 2003). Other potential confounders to the comparisons in Tables 9-1 and 9-2 might include shooter age and skill, the nature of the circumstances (e.g., whether the shooting was an execution-style shooting), the health of the victim(s), the type of location (e.g., indoor or outdoor location), the distance between the shooter and intended victim(s), the presence of multiple persons who could have been shot intentionally or accidentally (as bystanders), and (in the mass shooting incidents) the use of multiple firearms.

[104] Tables 9-1 and 9-2 present the strongest evidence from the available studies. However, there are additional findings from these studies and others that, while weaker, are relevant. Based on gun model information available for a subset of cases in the Jersey City study, there were 12 gunfire cases involving guns manufactured with LCMs before the ban (7 of which resulted in wounded victims) and 94 gunfire cases involving revolvers or semiautomatic models without LCMs. Comparisons of these cases produced results similar to those of the main analysis: shot fired estimates ranged from 2.83 to 3.25 for the LCM cases and 2.22 to 2.6 for the non-LCM cases; 1.14 victims were wounded on average in the LCM gunshot cases and 1.06 in the non-LCM gunshot cases; and LCM gunshot victims had 1.14 wound on average, which, contrary to expectations, was less than the 1.47 average for other gunshot victims.

The compilation of mass shooting incidents cited in Table 9-1 had tentative shots fired estimates for 3 of the AW-LCM cases and 4 of the other cases. The AW-LCM cases averaged 93 shots per incident, a figure two and a half times greater than the 36.5 shot average for the other cases.

Finally, another study of firearm mass murders found that the average number of victims killed (tallies did not include others wounded) was 6 in AW cases and 4.5 in other cases (Roth and Koper, 1997, Appendix A). Only 2 of the 52 cases studied clearly involved AWs (or very similar guns). However, the make and model of the firearm were available for only eight cases, so additional incidents may have involved LCMs; in fact, at least 35% of the cases involved unidentified semiautomatics. (For those cases in which at least the gun type and firing action were known, semiautomatics outnumbered non-semiautomatics by 6 to 1, perhaps suggesting that semiautomatics are used disproportionately in mass murders.)

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

89

### 9.2.1.  Will a 10-Round Magazine Limit Reduce Gunshot Victimizations?

Specific data on shots fired in gun attacks are quite fragmentary and often inferred indirectly, but they suggest that relatively few attacks involve more than 10 shots fired.[105] Based on national data compiled by the FBI, for example, there were only about 19 gun murder incidents a year involving four or more victims from 1976 through 1995 (for a total of 375) (Fox and Levin, 1998, p. 435) and only about one a year involving six or more victims from 1976 through 1992 (for a total of 17) (Kleck, 1997, p. 126).  Similarly, gun murder victims are shot two to three times on average according to a number of sources (see Table 9-2 and Koper and Roth, 2001a), and a study at a Washington, DC trauma center reported that only 8% of all gunshot victims treated from 1988 through 1990 had five or more wounds (Webster et al., 1992, p. 696).

However, counts of victims hit or wounds inflicted provide only a lower bound estimate of the number of shots fired in an attack, which could be considerably higher in light of the low hit rates in gunfire incidents (see above).[106]  The few available studies on shots fired show that assailants fire less than four shots on average (see sources in Table 9-1 and Goehl, 1993), a number well within the 10-round magazine limit imposed by the AW-LCM ban, but these studies have not usually presented the full distribution of shots fired for all cases, so it is usually unclear how many cases, if any, involved more than 10 shots.

An exception is the aforementioned study of handgun murders and assaults in Jersey City (Reedy and Koper, 2003).  Focusing on cases for which at least the type of handgun (semiautomatic, revolver, derringer) could be determined, 2.5% of the gunfire cases involved more than 10 shots.[107]  These incidents – all of which involved pistols – had a 100% injury rate and accounted for 4.7% of all gunshot victims in the sample (see Figure 9-2).  Offenders fired a total of 83 shots in these cases, wounding 7 victims, only 1 of whom was wounded more than once.  Overall, therefore, attackers fired over 8 shots

---

[105]  Although the focus of the discussion is on attacks with more than 10 shots fired, a gun user with a post-ban 10-round magazine can attain a firing capacity of 11 shots with many semiautomatics by loading one bullet into the chamber before loading the magazine.

[106]  As a dramatic example, consider the heavily publicized case of Amadou Diallo, who was shot to death by four New York City police officers just a few years ago.  The officers in this case fired upon Diallo 41 times but hit him with only 19 shots (a 46% hit rate), despite his being confined in a vestibule.  Two of the officers reportedly fired until they had emptied their 16-round magazines, a reaction that may not be uncommon in such high-stress situations.  In official statistics, this case will appear as having only one victim.

[107]  The shots fired estimates were based on reported gunshot injuries, physical evidence (for example, shell casings found at the scene), and the accounts of witnesses and actors.  The 2.5% figure is based on minimum estimates of shots fired.  Using maximum estimates, 3% of the gunfire incidents involved more than 10 shots (Reedy and Koper, 2003, p. 154).

A caveat to these figures is that the federal LCM ban was in effect for much of the study period (which spanned January 1992 to November 1996), and a New Jersey ban on magazines with more than 15 rounds predated the study period.  It is thus conceivable that these laws reduced attacks with LCM guns and attacks with more than 10 shots fired, though it seems unlikely that the federal ban had any such effect (see the analyses of LCM use presented in the previous chapter).  Approximately 1% of the gunfire incidents involved more than 15 shots.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

for every wound inflicted, suggesting that perhaps fewer persons would have been wounded had the offenders not been able to fire as often.[108]

---

### Figure 9-2. Attacks With More Than 10 Shots Fired

### Jersey City Handgun Attacks, 1992-1996

- **2.5% - 3% of gunfire incidents involved 11+ shots**
  - **3.6% - 4.2% of semiauto pistol attacks**
- **100% injury rate**
- **Produced 4.7% of all gunshot wound victims**
- **8.3 shots per gunshot wound**

---

Based on data reported by Reedy and Koper (2003).  Injury statistics based on the 2.5% of cases involving 11+ shots by minimum estimate.

Caution is warranted in generalizing from these results because they are based on a very small number of incidents (6) from one sample in one city.  Further, it is not known if the offenders in these cases had LCMs (gun model and magazine information was very limited); they may have emptied small magazines, reloaded, and continued firing.  But subject to these caveats, the findings suggest that the ability to deliver more than 10 shots without reloading may be instrumental in a small but non-trivial percentage of gunshot victimizations.

On the other hand, the Jersey City study also implies that eliminating AWs and LCMs might only reduce gunshot victimizations by up to 5%.  And even this estimate is probably overly optimistic because the LCM ban cannot be expected to prevent all incidents with more than 10 shots.  Consequently, any effects from the ban (should it be extended) are likely to be smaller and perhaps quite difficult to detect with standard statistical methods (see Koper and Roth, 2001a), especially in the near future, if recent patterns of LCM use continue.

### 9.3.  Post-Ban Trends in Lethal and Injurious Gun Violence

Having established some basis for believing the AW-LCM ban could have at least a small effect on lethal and injurious gun violence, is there any evidence of such an effect to date?  Gun homicides plummeted from approximately 16,300 in 1994 to 10,100 in 1999, a reduction of about 38% (see the Federal Bureau of Investigation's *Uniform Crime*

---

[108]  These figures are based on a supplemental analysis not contained in the published study.  We thank Darin Reedy for this analysis.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

*Reports*).  Likewise, non-fatal, assaultive gunshot injuries treated in hospitals nationwide declined one-third, from about 68,400 to under 46,400, between 1994 and 1998 (Gotsch et al., 2001, pp. 23-24).  Experts believe numerous factors contributed to the recent drop in these and other crimes, including changing drug markets, a strong economy, better policing, and higher incarceration rates, among others (Blumstein and Wallman, 2000).  Attributing the decline in gun murders and shootings to the AW-LCM ban is problematic, however, considering that crimes with LCMs appear to have been steady or rising since the ban.  For this reason, we do not undertake a rigorous investigation of the ban's effects on gun violence.[109]

But a more casual assessment shows that gun crimes since the ban have been no less likely to cause death or injury than those before the ban, contrary to what we might expect if crimes with AWs and LCMs had both declined.  For instance, the percentage of violent gun crimes resulting in death has been very stable since 1990 according to national statistics on crimes reported to police (see Figure 9-1 in section 9.1).[110]  In fact, the percentage of gun crimes resulting in death during 2001 and 2002 (2.94%) was slightly higher than that during 1992 and 1993 (2.9%).

Similarly, neither medical nor criminological data sources have shown any post-ban reduction in the percentage of crime-related gunshot victims who die.  If anything, this percentage has been higher since the ban, a pattern that could be linked in part to more multiple wound victimizations stemming from elevated levels of LCM use.  According to medical examiners' reports and hospitalization estimates, about 20% of gunshot victims died nationwide in 1993 (Gotsch et al., 2001).  This figure rose to 23% in 1996, before declining to 21% in 1998 (Figure 9-3).[111]  Estimates derived from the Uniform Crime Reports and the Bureau of Justice Statistics' annual National Crime Victimization Survey follow a similar pattern from 1992 to 1999 (although the ratio of fatal to non-fatal cases is much higher in these data than that in the medical data) and also show a considerable increase in the percentage of gunshot victims who died in 2000 and 2001 (Figure 9-3).[112]  Of course, changes in offender behavior or other changes in crime

---

[109] In our prior study (Koper and Roth 2001a; Roth and Koper, 1997, Chapter 6), we estimated that gun murders were about 7% lower than expected in 1995 (the first year after the ban), adjusting for pre-existing trends.  However, the very limited post-ban data available for that study precluded a definitive judgment as to whether this drop was statistically meaningful (see especially Koper and Roth, 2001a).  Furthermore, that analysis was based on the assumption that crimes with both AWs and LCMs had dropped in the short-term aftermath of the ban, an assumption called into question by the findings of this study.  It is now more difficult to credit the ban with any of the drop in gun murders in 1995 or anytime since.  We did not update the gun murder analysis because interpreting the results would be unavoidably ambiguous.  Such an investigation will be more productive after demonstrating that the ban has reduced crimes with both AWs and LCMs.

[110] The decline in this figure during the 1980s was likely due in part to changes in police reporting of aggravated assaults in recent decades (Blumstein, 2000).  The ratio of gun murders to gun robberies rose during the 1980s, then declined and remained relatively flat during the 1990s.

[111] Combining homicide data from 1999 with non-fatal gunshot estimates for 2000 suggests that about 20% of gunshot victimizations resulted in death during 1999 and 2000 (Simon et al., 2002).

[112] The SHR/NCVS estimates should be interpreted cautiously because the NCVS appears to undercount non-fatal gunshot wound cases by as much as two-thirds relative to police data, most likely because it fails to represent adequately the types of people most likely to be victims of serious crime (i.e., young urban males who engage in deviant lifestyles) (Cook, 1985).  Indeed, the rate of death among gunshot victims

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

weaponry (such as an increase in shootings with large caliber handguns) may have influenced these trends.  Yet is worth noting that multiple wound shootings were elevated over pre-ban levels during 1995 and 1996 in four of five localities examined during our first AW study, though most of the differences were not statistically significant (Table 9-4, panels B through E).

Another potential indicator of ban effects is the percentage of gunfire incidents resulting in fatal or non-fatal gunshot victimizations.  If attacks with AWs and LCMs result in more shots fired and victims hit than attacks with other guns and magazines, we might expect a decline in crimes with AWs and LCMs to reduce the share of gunfire incidents resulting in victims wounded or killed.  Measured nationally with UCR and NCVS data, this indicator was relatively stable at around 30% from 1992 to 1997, before rising to about 40% from 1998 through 2000 (Figure 9-4).[113]  Along similar lines, multiple victim gun homicides remained at relatively high levels through at least 1998, based on the national average of victims killed per gun murder incident (Table 9-4, panel A).[114]

---

appears much higher in the SHR/NCVS series than in data compiled from medical examiners and hospitals (see the CDC series in Figure 9-3).  But if these biases are relatively consistent over time, the data may still provide useful insights into trends over time.

[113]  The NCVS estimates are based on a compilation of 1992-2002 data recently produced by the Inter-University Consortium for Political and Social Research (ICPSR study 3691).  In 2002, only 9% of non-fatal gunfire incidents resulted in gunshot victimizations.  This implies a hit rate for 2002 that was below pre-ban levels, even after incorporating gun homicide cases into the estimate.  However, the 2002 NCVS estimate deviates quite substantially from earlier years, for which the average hit rate in non-fatal gunfire incidents was 24% (and the estimate for 2001 was 20%).  Therefore, we did not include the 2002 data in our analysis.  We used two-year averages in Figures 9-3 and 9-4 because the annual NCVS estimates are based on very small samples of gunfire incidents.  The 2002 sample was especially small, so it seems prudent to wait for more data to become available before drawing conclusions about hit rates since 2001.
[114]  We thank David Huffer for this analysis.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Figure 9-3. Percentage of Gunshot Victimizations Resulting in Death (National), 1992-2001**



SHR/NCVS series based on two-year averages from the Supplemental Homicide Reports and National Crime Victimization Survey.  CDC series based on homicide and hospitalization data from the Centers for Disease Control (reported by Gotsch et al. 2001).

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

**Table 9-4.  Short-Term, Post-Ban Changes in the Lethality and Injuriousness of Gun Violence:  National and Local Indicators, 1994-1998 [a]**

| Measure and Location | Pre-Ban Period | Post-Ban Period | Change |
|---|---|---|---|
| A.  Victims Per Gun Homicide Incident (National) | Jan. 1986-Sept. 1994 1.05 (N=106,668) | Oct. 1994-Dec. 1998 1.06 (N=47,511) | 1%** |
| B.  Wounds per Gun Homicide Victim:  Milwaukee County | Jan. 1992-Aug. 1994 2.28 (N=282) | Sept. 1994-Dec. 1995 2.52 (N=136) | 11% |
| C.  Wounds Per Gun Homicide Victim: Seattle (King County) | Jan. 1992-Aug. 1994 2.08 (N=184) | Sept. 1994-Jun. 1996 2.46 (N=91) | 18% |
| D.  Wounds Per Gunshot Victim: Jersey City (NJ) | Jan. 1992-Aug. 94 1.42 (N=125) | Sept. 1994-Jun. 1996 1.39 (N=137) | -2% |
| E.  % of Gun Homicide Victims With Multiple Wounds:  San Diego County | Jan. 1992-Aug. 1994 41% (N=445) | Sept. 1994-Jun. 1996 43% (N=223) | 5% |
| F.  % of Non-Fatal Gunshot Victims With Multiple Wounds: Boston | Jan. 1992-Aug. 1994 18% (N=584) | Sept. 1994-Dec. 1995 24% (N=244) | 33%* |

a.  National victims per incident figures based on unpublished update of analysis reported in Roth and Koper (1997, Chapter 5).  Gunshot wound data are taken from Roth and Koper (1997, Chapter 6) and Koper and Roth (2001a).  Wound data are based on medical examiners' reports (Milwaukee, Seattle, San Diego), hospitalization data (Boston), and police reports (Jersey City).
*  Chi-square p level < .1.
**  T-test p level < .01.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

If anything, therefore, gun attacks appear to have been more lethal and injurious since the ban.  Perhaps elevated LCM use has contributed to this pattern.  But if this is true, then the reverse would also be true – a reduction in crimes with LCMs, should the ban be extended, would reduce injuries and deaths from gun violence.

**Figure 9-4. Percentage of Gunfire Cases Resulting in Gunshot Victimizations (National), 1992-2001**



Based on two-year averages from the Supplemental Homicide Reports and National Crime Victimization Survey.

## 9.4.  Summary

Although the ban has been successful in reducing crimes with AWs, any benefits from this reduction are likely to have been outweighed by steady or rising use of non-banned semiautomatics with LCMs, which are used in crime much more frequently than AWs.  Therefore, we cannot clearly credit the ban with any of the nation's recent drop in gun violence.  And, indeed, there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury, as we might have expected had the ban reduced crimes with both AWs and LCMs.

However, the grandfathering provision of the AW-LCM ban guaranteed that the effects of this law would occur only gradually over time.  Those effects are still unfolding and may not be fully felt for several years into the future, particularly if foreign, pre-ban LCMs continue to be imported into the U.S. in large numbers.  It is thus premature to make definitive assessments of the ban's impact on gun violence.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Having said this, the ban's impact on gun violence is likely to be small at best, and perhaps too small for reliable measurement.  AWs were used in no more than 8% of gun crimes even before the ban.  Guns with LCMs are used in up to a quarter of gun crimes, but it is not clear how often the outcomes of gun attacks depend on the ability to fire more than 10 shots (the current limit on magazine capacity) without reloading.

Nonetheless, reducing crimes with AWs and especially LCMs could have non-trivial effects on gunshot victimizations.  As a general matter, hit rates tend to be low in gunfire incidents, so having more shots to fire rapidly can increase the likelihood that offenders hit their targets, and perhaps bystanders as well.  While not entirely consistent, the few available studies contrasting attacks with different types of guns and magazines generally suggest that attacks with semiautomatics – including AWs and other semiautomatics with LCMs – result in more shots fired, persons wounded, and wounds per victim than do other gun attacks.  Further, a study of handgun attacks in one city found that about 3% of gunfire incidents involved more than 10 shots fired, and those cases accounted for nearly 5% of gunshot victims.  However, the evidence on these matters is too limited (both in volume and quality) to make firm projections of the ban's impact, should it be reauthorized.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# 10. LOOKING TO THE FUTURE:  RESEARCH RECOMMENDATIONS AND SPECULATION ABOUT THE CONSEQUENCES OF REAUTHORIZING, MODIFYING, OR LIFTING THE ASSAULT WEAPONS BAN

In this chapter, we discuss future lines of inquiry that would be informative whether or not the AW-LCM ban is renewed in September 2004.  We then offer some brief thoughts about the possible consequences of reauthorizing the ban, modifying it, or allowing it to expire.

## 10.1.  Research Recommendations and Data Requirements

### 10.1.1.  An Agenda for Assault Weapons Research and Recommendations for Data Collection by Law Enforcement

The effects of the AW-LCM ban have yet to be fully realized; therefore, we recommend continued study of trends in the availability and criminal use of AWs and LCMs.  Even if the ban is lifted, longer-term study of crimes with AWs and LCMs will inform future assessment of the consequences of these policy shifts and improve understanding of the responses of gun markets to gun legislation more generally.[115]

Developing better data on crimes with LCMs is especially important.  To this end, we urge police departments and their affiliated crime labs to record information about magazines recovered with crime guns.  Further, we recommend that ATF integrate ammunition magazine data into its national gun tracing system and encourage reporting of magazine data by police departments that trace firearms.

As better data on LCM use become available, more research is warranted on the impacts of AW and LCM trends (which may go up or down depending on the ban's fate) on gun murders and shootings, as well as levels of death and injury per gun crime. Indicators of the latter, such as victims per gunfire incident and wounds per gunshot victim, are useful complementary outcome measures because they reflect the mechanisms through which use of AWs and LCMs is hypothesized to affect gun deaths and injuries.[116]  Other potentially promising lines of inquiry might relate AW and LCM use to mass murders and murders of police, crimes that are very rare but appear more likely to involve AWs (and perhaps LCMs) and to disproportionately affect public perceptions.[117]

---

[115] Establishing time series data on primary and secondary market prices and production or importation of various guns and magazines of policy interest could provide benefits for policy researchers.  Like similar statistical series maintained for illegal drugs, such price and production series would be valuable instruments for monitoring effects of policy changes and other influences on markets for various weapons.

[116] However, more research is needed on the full range of factors that cause variation in these indicators over time and between places.

[117] Studying these crimes poses a number of challenges, including modeling of rare events, establishing the reliability and validity of methods for measuring the frequency and characteristics of mass murders (such as through media searchers; see Duwe, 2000, Roth and Koper, 1997, Appendix A), and controlling for factors like the use of bullet-proof vests by police.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Finally, statistical studies relating AW and LCM use to trends in gun violence should include statistical power analysis to ensure that estimated models have sufficient ability to detect small effects, an issue that has been problematic in some of our prior time series research on the ban (Koper and Roth, 2001a) and is applicable more generally to the study of modest, incremental policy changes.

Research on aggregate trends should be complemented by more incident-based studies that contrast the dynamics and outcomes of attacks with different types of guns and magazines, while controlling for relevant characteristics of the actors and situations. Such studies would refine predictions of the change in gun deaths and injuries that would follow reductions in attacks with AWs and LCMs. For instance, how many homicides and injuries involving AWs and LCMs could be prevented if offenders were forced to substitute other guns and magazines? In what percentage of gun attacks does the ability to fire more than ten rounds without reloading affect the number of wounded victims or determine the difference between a fatal and non-fatal attack? Do other AW features (such as flash hiders and pistol grips on rifles) have demonstrable effects on the outcomes of gun attacks? Studies of gun attacks could draw upon police incident reports, forensic examinations of recovered guns and magazines, and medical and law enforcement data on wounded victims.

### 10.1.2.  *Studying the Implementation and Market Impacts of Gun Control*

More broadly, this study reiterates the importance of examining the implementation of gun policies and the workings of gun markets, considerations that have been largely absent from prior research on gun control. Typical methods of evaluating gun policies involve statistical comparisons of total or gun crime rates between places and/or time periods with and without different gun control provisions. Without complimentary implementation and market measures, such studies have a "black box" quality and may lead to misleading conclusions. For example, a time series study of gun murder rates before and after the AW-LCM ban might find that the ban has not reduced gun murders. Yet the interpretation of such a finding would be ambiguous, absent market or implementation measures. Reducing attacks with AWs and LCMs may in fact have no more than a trivial impact on gun deaths and injuries, but any such impact cannot be realized or adequately assessed until the availability and use of the banned guns and magazines decline appreciably. Additionally, it may take many years for the effects of modest, incremental policy changes to be fully felt, a reality that both researchers and policy makers should heed. Similar implementation concerns apply to the evaluation of various gun control policies, ranging from gun bans to enhanced sentences for gun offenders.

Our studies of the AW ban have shown that the reaction of manufacturers, dealers, and consumers to gun control policies can have substantial effects on demand and supply for affected weapons both before and after a law's implementation. It is important to study these factors because they affect the timing and form of a law's impact

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

on the availability of weapons to criminals and, by extension, the law's impact on gun violence.

## 10.2.  Potential Consequences of Reauthorizing, Modifying, or Lifting the Assault Weapons Ban

### 10.2.1.  Potential Consequences of Reauthorizing the Ban As Is

Should it be renewed, the ban might reduce gunshot victimizations.  This effect is likely to be small at best and possibly too small for reliable measurement.  A 5% reduction in gunshot victimizations is perhaps a reasonable upper bound estimate of the ban's potential impact (based on the only available estimate of gunshot victimizations resulting from attacks in which more than 10 shots were fired), but the actual impact is likely to be smaller and may not be fully realized for many years into the future, particularly if pre-ban LCMs continue to be imported into the U.S. from abroad.  Just as the restrictions imposed by the ban are modest – they are essentially limits on weapon accessories like LCMs, flash hiders, threaded barrels, and the like – so too are the potential benefits.[118]   In time, the ban may be seen as an effective prevention measure that stopped further spread of weaponry considered to be particularly dangerous (in a manner similar to federal restrictions on fully automatic weapons).  But that conclusion will be contingent on further research validating the dangers of AWs and LCMs.

### 10.2.2.  Potential Consequences of Modifying the Ban

We have not examined the specifics of legislative proposals to modify the AW ban.  However, we offer a few general comments about the possible consequences of such efforts, particularly as they relate to expanding the range of the ban as some have advocated (Halstead, 2003, pp. 11-12).

---

[118]   But note that although the ban's impact on gunshot victimizations would be small in percentage terms and unlikely to have much effect on the public's fear of crime, it could conceivably prevent hundreds of gunshot victimizations annually and produce notable cost savings in medical care alone.  To help place this in perspective, there were about 10,200 gun homicides and 48,600 non-fatal, assault-related shootings in 2000 (see the FBI's *Uniform Crime Reports* for the gun homicide estimate and Simon et al. [2002] for the estimate of non-fatal shootings).  Reducing these crimes by 1% would have thus prevented 588 gunshot victimizations in 2000 (we assume the ban did not actually produce such benefits because the reduction in AW use as of 2000 was outweighed by steady or rising levels of LCM use).  This may seem insubstantial compared to the 342,000 murders, assaults, and robberies committed with guns in 2000 (see the *Uniform Crime Reports*).  Yet, gunshot victimizations are particularly costly crimes.  Setting aside the less tangible costs of lost lives and human suffering, the lifetime medical costs of assault-related gunshot injuries (fatal and non-fatal) were estimated to be about $18,600 per injury in 1994 (Cook et al., 1999).  Therefore, the lifetime costs of 588 gun homicides and shootings would be nearly $11 million in 1994 dollars (the net medical costs could be lower for reasons discussed by Cook and Ludwig [2000] but, on the other hand, this estimate does not consider other governmental and private costs that Cook and Ludwig attribute to gun violence).  This implies that small reductions in gunshot victimizations sustained over many years could produce considerable long-term savings for society.  We do not wish to push this point too far, however, considering the uncertainty regarding the ban's potential impact.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Gun markets react strongly merely to debates over gun legislation.  Indeed, debate over the AW ban's original passage triggered spikes upwards of 50% in gun distributors' advertised AW prices (Roth and Koper, 1997, Chapter 4).  In turn, this prompted a surge in AW production in 1994 (Chapter 5).  Therefore, it seems likely that discussion of broadening the AW ban to additional firearms would raise prices and production of the weapons under discussion.  (Such market reactions may already be underway in response to existing proposals to expand the ban, but we have not investigated this issue.)  Heightened production levels could saturate the market for the weapons in question, depressing prices and delaying desired reductions in crimes with the weapons, as appears to have happened with banned ARs.

Mandating further design changes in the outward features of semiautomatic weapons (e.g., banning weapons having any military-style features) may not produce benefits beyond those of the current ban.  As noted throughout this report, the most important feature of military-style weapons may be their ability to accept LCMs, and this feature has been addressed by the LCM ban and the LCMM rifle ban.  Whether changing other features of military-style firearms will produce measurable benefits is unknown.

Finally, curbing importation of pre-ban LCMs should help reduce crimes with LCMs and possibly gunshot victimizations.  Crimes with LCMs may not decline substantially for quite some time if millions of LCMs continue to be imported into the U.S.

### 10.2.3.  Potential Consequences of Lifting the Ban

If the ban is lifted, it is likely that gun and magazine manufacturers will reintroduce AW models and LCMs, perhaps in substantial numbers.[119]  In addition, AWs grandfathered under the 1994 law may lose value and novelty, prompting some of their lawful owners to sell them in secondary markets, where they may reach criminal users.  Any resulting increase in crimes with AWs and LCMs might increase gunshot victimizations, though this effect could be difficult to discern statistically.

It is also possible, and perhaps probable, that new AWs and LCMs will eventually be used to commit mass murder.  Mass murders garner much media attention, particularly when they involve AWs (Duwe, 2000).  The notoriety likely to accompany mass murders if committed with AWs and LCMs, especially after these guns and magazines have been deregulated, could have a considerable negative impact on public perceptions, an effect that would almost certainly be intensified if such crimes were committed by terrorists operating in the U.S.

---

[119]  Note, however, that foreign semiautomatic rifles with military features, including the LCMM rifles and several rifles prohibited by the 1994 ban, would still be restricted by executive orders passed in 1989 and 1998.  Those orders stem from the sporting purposes test of the Gun Control Act of 1968.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# REFERENCES

Adler, W.C., Bielke, F.M., Doi, D.J., and Kennedy, J.F. (1995). *Cops Under Fire: Law Enforcement Officers Killed with Assault Weapons or Guns With High Capacity Magazines*, Handgun Control, Inc., Washington, DC.

American Medical Association Council on Scientific Affairs. (1992). Assault weapons as a public health hazard in the United States. *JAMA* 267:3067-3070.

Berndt, E.R. (1990). *The Practice of Econometrics: Classic and Contemporary*, Addison Wesley, Reading, MA.

Beck, A., Gilliard, D., Greenfeld, L., Harlow, C., Hester, T., Jankowski, L., Snell, T., Stephan, J., and Morton, D. (1993). *Survey of State Prison Inmates, 1991* (NCJ-136949), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Block, C.R. and Block, R. (1993). *Street Gang Crime in Chicago* (NCJ-144782), National Institute of Justice, United States Department of Justice, Washington, DC.

Blumstein, A. (2000). Disaggregating the violence trends. In Blumstein, A. and Wallman, J. (eds.), *The Crime Drop in America*, Cambridge University Press, New York, pp. 13-44.

Blumstein, A. and Wallman, J. (eds.), (2000). *The Crime Drop in America*, Cambridge University Press, New York.

Brady Center to Prevent Gun Violence. (2004). *On Target: The Impact of the 1994 Federal Assault Weapons Act*, Washington, DC.

Brill, S. (1977). *Firearm Abuse: A Research and Policy Report,* Police Foundation, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1976). *Project Identification: A Study of Handguns Used in Crime,* United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1977). *Concentrated Urban Enforcement (CUE),* United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1995). *The National Tracing Center 1994 Yearend Report*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (1997). *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 17 Communities*, United States Department of the Treasury, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Bureau of Alcohol, Tobacco, and Firearms. (1999). *Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Markets in 27 Communities*, United States Department of the Treasury, Washington, DC.

Bureau of Alcohol, Tobacco, and Firearms. (2000). *Commerce in Firearms in the United States*, United States Department of the Treasury, Washington, DC.

Bureau of Justice Statistics. (1994). *Firearms and Crimes of Violence: Selected Findings from National Statistical Series* (NCJ-146844), United States Department of Justice, Washington, DC.

Bureau of Justice Statistics. (2000). *Correctional Populations in the United States, 1997* (NCJ-177613), United States Department of Justice, Washington, DC.

Caruso, R.P., Jara, D.I. and Swan, K.G. (1999). Gunshot wounds: Bullet caliber is increasing. *The Journal of Trauma: Injury, Infection, and Critical Care* 46:462-465.

Center to Prevent Handgun Violence. (1998). *On the Front Line: Making Gun Interdiction Work,* Handgun Control, Inc., Washington, DC.

Cherry, D., Annest, J.L., Mercy, J.A., Kresnow, M., and Pollock, D.A. (1998). Trends in nonfatal and fatal firearm-related injury rates in the United States, 1985-1995. *Annals of Emergency Medicine* 32:51-59.

Cook, P.J. (1985). The case of the missing victims: Gunshot woundings in the National Crime Survey." *Journal of Quantitative Criminology* 1:91-102.

Cook, P.J., Lawrence, B.A., Ludwig, J., and Miller, T.R. (1999). The medical costs of gunshot injuries in the United States. *JAMA* 282:447-454.

Cook, P.J. and Ludwig, J. (1996). *Guns in America: Results of a Comprehensive National Survey on Firearms Ownership and Use*, Police Foundation, Washington, DC.

Cook, P.J. and Ludwig, J. (1997). *Guns in America: National Survey on Private Ownership and Use of Firearms* (NCJ-165476), National Institute of Justice, United States Department of Justice, Washington, DC.

Cook, P.J. and Ludwig, J. (2000). *Gun Violence: The Real Costs*. New York: Oxford University Press.

Cook, P.J., Molliconi, S., and Cole, T.B. (1995). Regulating gun markets. *Journal of Criminal Law and Criminology* 86:59-92.

Cox Newspapers. (1989). *Firepower: Assault Weapons in America*, Cox Enterprises, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

DiMaio, V.J.M. (1985). *Gunshot Wounds: Practical Aspects of Firearms, Ballistics, and Forensic Techniques,* Elsevier, New York.

Duwe, G. (2000). Body-count journalism: The presentation of mass murder in the news media. *Homicide Studies* 4:364-399.

Federal Bureau of Investigation, (1982-2003). *Crime in the United States*, United States Department of Justice, Washington, DC.

Fjestad, S.J. (1990-2002). *Blue Book of Gun Values* (11th-23rd eds.), Blue Book Publications, Minneapolis.

Fox, J.A. and Levin, J. (1998). Multiple homicide: Patterns of serial and mass murder. In Tonry, M. (ed.), *Crime and Justice, Vol. 23*, University of Chicago Press, Chicago, pp. 407-455.

Friedman, M. (1962). *Price Theory: A Provisional Text*, Aldine Publishing Company, Chicago.

Goehl, G. (1993). *1992 Firearms Discharge Assault Report,* Police Academy Firearms and Tactics Section, New York City Police Department, New York.

Gotsch, K.E., Annest, J.L., Mercy, J.A., and Ryan, G.W. (2001). Surveillance for fatal and nonfatal firearm-related injuries – United States, 1993-1998. *Morbidity and Mortality Weekly Report (MMWR) CDC Surveillance Summaries* 50(SS-2):1-34.

Gun Tests. (1995). Magazine rule change unlikely. March.

Halstead, T.J. (2003). *The Assault Weapons Ban: Legal Challenges and Legislative Issues*, Congressional Research Service, Washington, DC (distributed by Penny Hill Press, Derwood, MD).

Hargarten, S.W., Karlson, T.A., O'Brien, M., Hancock, J., and Quebbeman, E. (1996). Characteristics of firearms involved in fatalities. *JAMA* 275:42-45.

Hargarten, S.W., Kuhn, E.M., Nie, C.L., O'Brien, M.E., Withers, R.L., and Wintemute, G.J. (2000). Homicide gun characteristics before and after the 1994 crime bill. In Blackman, P.H., Leggett, V.L., Olson, B.L., and Jarvis, J.P. (eds.), *The Varieties of Homicide and Its Research: Proceedings of the 1999 Meeting of the Homicide Research Working Group*, FBI Academy, Federal Bureau of Investigation, U.S. Department of Justice, Quantico, VA.

Harlow, C.W. (2001). *Firearm Use By Offenders* (NCJ-189369, Revised Feb. 2002), Bureau of Justice Statistics, U.S. Department of Justice, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Hutson, H.R., Anglin, D., and Pratts, M.J., Jr. (1994). Adolescents and children injured or killed in drive-by shootings in Los Angeles. *New England Journal of Medicine* 330:324-327.

Hutson, H.R., Anglin, D., Kyriacou, D.N., Hart, J., and Spears, K. (1995). The epidemic of gang-related homicides in Los Angeles County from 1979 through 1994. *JAMA* 274:1031-1036.

Kennedy, D.M., Piehl, A.M., and Braga, A.A. (1996). Youth violence in Boston: gun markets, serious youth offenders, and a use-reduction strategy. *Law and Contemporary Problems* 59:147-196.

Kleck, G. (1991). *Point Blank: Guns and Violence in America.* Aldine de Gruyter, New York.

Kleck, G. (1997). *Targeting Guns: Firearms and Their Control*. Aldine de Gruyter, New York.

Knox, G.W., Houston, J.G., Laskey, J.A., McCurrie, T.F., Tromanhauser, E.D., Laske, D.L. (1994). *Gangs and Guns: A Task Force Report from the National Gang Crime Research Center*, National Gang Crime Research Center, Chicago

Kopel, D.B. (1995). Assault weapons. In Kopel (ed.), *Guns: Who Should Have Them?* Prometheus Books, Amherst, NY, pp. 159-232.

Koper, C.S. (1995). *Gun Lethality and Homicide: Gun Types Used By Criminals and the Lethality of Gun Violence in Kansas City, Missouri, 1985-1993,* (Ph.D. Dissertation), Department of Criminology and Criminal Justice, University of Maryland, College Park.

Koper, C.S. (1997). *Gun Density Versus Gun Type: Did the Availability of More Guns or More Lethal Guns Drive Up the Dallas Homicide Rate, 1980-1992?* (Report NCJ-187106 to the National Institute of Justice), Crime Control Institute, Philadelphia.

Koper, C.S. (2001). *A Follow-Up Assessment of the 1994 Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence*, Presentation at the annual meeting of the American Society of Criminology, Atlanta.

Koper, C.S. (2002). Federal legislation and gun markets:  How much have recent reforms of the federal firearms licensing system reduce criminal gun suppliers? *Criminology and Public Policy* 1:151-178.

Koper, C.S. and Roth, J.A. (2001a). The impact of the 1994 federal assault weapon ban on gun violence outcomes: an assessment of multiple outcome measures and some lessons for policy evaluation. *Journal of Quantitative Criminology* 17:33-74.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Koper, C.S. and Roth, J.A. (2001b). A priori assertions versus empirical inquiry: A reply to Kleck. *Journal of Quantitative Criminology* 17:81-88.

Koper, C.S. and Roth, J.A. (2002a).  The impact of the 1994 federal assault weapons ban on gun markets: An assessment of short-term primary and secondary market effects. *Journal of Quantitative Criminology* 18:239-266.

Koper, C.S and Roth, J.A. (2002b). *An Updated Assessment of the Federal Assault Weapons Ban:  Impacts on Gun Markets, 1994-2000* (Draft Report to the National Institute of Justice), Jerry Lee Center of Criminology, University of Pennsylvania, Philadelphia and The Urban Institute, Washington, DC.

Lennet, M.G. (1995). Taking a bite out of violent crime. *University of Daytona Law Review*  20:573-617.

Lott, J.R., Jr. (2003). *The Bias Against Guns: Why Almost Everything You've Heard About Gun Control is Wrong*, Regnery Publishing, Washington, DC.

McDowall, D. and Loftin, C. (1983). Collective security and the demand for legal handguns. *American Journal of Sociology* 88:1146-1161.

McGonigal, M.D., Cole, J., Schwab, C.W., Kauder, D.R., Rotondo, M.F., and Angood, P.B. (1993). Urban firearm deaths: a five-year perspective. *The Journal of Trauma*: 35:532-537.

Murtz, H.A. and the Editors of Gun Digest. (1994). *Guns Illustrated 1994*, DBI Books, Northbrook, IL.

National Institute of Justice. (1995). *Arrestees and Guns: Monitoring the Illegal Firearms Market* (NCJ-184205), United States Department of Justice, Washington, DC.

New Mexico Criminal Justice Statistical Analysis Center. (1998). *Controlling New Mexico Juveniles' Possession of Firearms*, Institute for Social Research, University of New Mexico, Albuquerque.

New York State Division of Criminal Justice Services. (1994). *Assault Weapons and Homicide in New York City*, Albany, New York.

Pierce, G.L., Briggs, L.R., and Carlson, D.A. (1998). *National Report on Firearm Trace Analysis for 1996-1997*, Northeastern University, Boston.

Rand, M.R. (1990). *Handgun Crime Victims* (NCJ-123559), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Rand, M.R. (1994). *Guns and Crime* (NCJ-147003), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Reedy, D.C. and Koper, C.S. (2003). Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers. *Injury Prevention* 9:151-155.

Rennison, C.M. (2001). *Criminal Victimization 2000: Changes 1999-2000 With Trends 1993-2000* (NCJ-187007), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

Richmond, T.S, Branas, C.C, Cheney, R.A, and Schwab, C.W. (2004, under review). *The Case for Enhanced Data Collection of Handgun Type*, Firearm and Injury Center at Penn, University of Pennsylvania, Philadelphia.

Roth, J.A. and Koper, C.S. (1997). *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*, The Urban Institute, Washington, DC.

Roth, J.A. and Koper, C.S. (1999). *Impacts of the 1994 Assault Weapons Ban: 1994-96* (NCJ-173405), National Institute of Justice, United States Department of Justice, Washington, DC.

Ruddell, R. and Mays, G.L. (2003). Examining the arsenal of juvenile gunslingers: trends and policy implications. *Crime and Delinquency* 49:231-252.

Shaw, J.W. (1994). *Community Policing Against Crime: Violence and Firearms* (Ph.D. dissertation), Department of Criminology and Criminal Justice, University of Maryland, College Park.

Sheley, J.F. and Wright, J.D. (1993a). *Gun Acquisition and Possession in Selected Juvenile Samples* (NCJ-145326), National Institute of Justice, United States Department of Justice, Washington, DC.

Sheley, J.F. and Wright, J.D. (1993b). Motivations for gun possession and carrying among serious juvenile offenders. *Behavioral Sciences and the Law* 11:375-388.

Sherman, L.W., Steele, L., Laufersweiler, D., Hoffer, N., and Julian, S.A. (1989). Stray bullets and 'mushrooms': Random shootings of bystanders in four cities, 1977-1988. *Journal of Quantitative Criminology* 5:297-316.

Simon, T.R., Saltzman, L.E., Swahn, M.H., Mercy, J.A., Ingram, E.M., and Mahendra, R.R, Annest, J.L., and Holmgreen, P. (2002). Nonfatal physical assault-related injuries treated in hospital emergency departments – United States, 2000. *Morbidity and Mortality Weekly Report* 51:460-463.

United States Department of the Treasury. (1998). *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

Violence Policy Center. (1999). *Firearms Production in America* (1999 Edition), Washington, DC.

Violence Policy Center (2002). *Firearms Production in America* (2002 Edition), Washington, DC.

Violence Policy Center (2003). *Bullet Hoses: Semiautomatic Assault Weapons – What Are They? What's So Bad About Them?* Washington, DC.

Warner, K. (ed.). (1995). *Gun Digest 1995/49th Annual Edition,* DBI Books, Northbrook, IL.

Webster, D.W., Champion, H.R., Gainer, P.S., and Sykes, L. (1992). Epidemiologic changes in gunshot wounds in Washington, DC, 1983-1990. *Archives of Surgery* 127:694-8.

Weil, D.S. and Knox, R. (1995). *Estimating the Impact in Baltimore of the Maryland Ban on the Sale of Assault Pistols and High Capacity Magazines*, The Center to Prevent Handgun Violence, Washington, DC.

Wintemute, G.J. (1994). *Ring of Fire: The Handgun Makers of Southern California*, Violence Prevention Research Program, University of California, Davis.

Wintemute, G.J. (1996). The relationship between firearm design and firearm violence: Handguns in the 1990s." *JAMA* 275:1749-1753.

Wintemute, G.J., Wright, M.A., Parham, C.A., Drake, C.M., Beaumont, J.J. (1998a). Criminal activity and assault-type handguns: A study of young adults. *Annals of Emergency Medicine* 32.

Wintemute, G.J., Parham, C.A., Wright, M.A., Beaumont, J.J., and Drake, C.M. (1998b). Weapons of choice: Previous criminal history, later criminal activity, and firearm preference among legally authorized young adult purchasers of handguns. *The Journal of Trauma: Injury, Infection, and Critical Care* 44:155-160.

Wright, J.D. and Rossi, P.H. (1986). *Armed and Considered Dangerous: A Survey of Felons and Their Firearms*, Aldine de Gruyter, New York.

Zawitz, M.W. (1995). *Guns Used in Crime* (NCJ-148201), Bureau of Justice Statistics, United States Department of Justice, Washington, DC.

This document is a research report submitted to the U.S. Department of Justice. This report has not been published by the Department. Opinions or points of view expressed are those of the author(s) and do not necessarily reflect the official position or policies of the U.S. Department of Justice.

# Exhibit 67

# Man wanted in officer's slaying dies in gunbattle

By RICH McKAY
SENTINEL STAFF WRITER

BEVILLE'S CORNER — A man wanted in the killing of a New Jersey police officer last week was slain during a gunfight Easter morning after a chase b... ... Hernand...

and abdomen, also wounding her partner before fleeing.

Hernando deputies called for backup as they began to pursue Marti and he sped off and shot at them, Bergen County, N.J., prosecutor John L. Molinelli said.

... drove northeast on State ... crossing from Hernando in ... where Sumter depu...

ment, Caruthers said. The chase covered about 20 miles, Hernando sheriff's officials said.

When the car stopped about 9:50 a.m., Marti got out with an AK-47 assault rifle and again shot at the deputies, officials said. He was shot several times by deputies, Caruthers said.

Marti was airlifted to a Lakeland hospital where he was pronounced ...

## Violence Policy Center

# "Officer Down"

## Assault Weapons and the War on Law Enforcement

# Rifle attack called officer's nightmare

B6  The Roanoke Times, Sunday, June 17, 2001

*Suspect brandished 9 mm 'Uzi-style' weapon, authorities say*

## Slain officer wanted shift with most action

ACTION  FROM 1-A

In his application, Cudnik said he wanted to be a police officer because it was "one of the most mentally and physically challenging and emotionally rewarding vocations that I can aspire to."

Cudnik spent his police career ...

wanted to work when all the action was happening."

His personnel file showed no commendations. The only reprimand occurred in February 1995 when he was suspended for 60 days for leaving the scene of a three-car accident while off-duty, then failing to report his involvement ...

Cudnick grew up in the Garfield Heights area and graduated from Parma Senior High School in 1967. He was the divorced father of three sons: Hilary Jr., 23, a Cleveland firefighter; Michael 21, a student at the University of Dayton; and Daniel, 20, with the Coast Guard.

Even though he worked the grueling 8 p.m. to 4 a.m. shift in one of the city's toughest neighborhoods, Cudnik was a frequent presence at the bar, which opened at 6 a.m. to serve bacon and eggs to the no-nonsense working man's crowd at the nearby LTV Steel Co. mill.

"He was always here," said

**The Violence Policy Center (VPC)** is a national non-profit educational organization that conducts research and public education on firearms violence and provides information and analysis to policymakers, journalists, grassroots advocates, and the general public.  The Center examines the role of firearms in America, analyzes trends and patterns in firearms violence, and works to develop policies to reduce gun-related death and injury.

This report was authored by VPC Legislative Director Kristen Rand and VPC Policy Analyst Marty Langley.  It was edited by VPC Publications Coordinator Aimée Stenzel and VPC Executive Director Josh Sugarmann.

This study was funded in part with the support of The David Bohnett Foundation, The California Wellness Foundation, The George Gund Foundation, The Joyce Foundation, The John D. and Catherine T. MacArthur Foundation, and The Streisand Foundation.  Past studies released by the VPC include:

- *Firearms Production in America 2002 Edition—A Listing of Firearm Manufacturers in America with Production Histories Broken Out by Firearm Type and Caliber* (March 2003)
- *"Just Like Bird Hunting"—The Threat to Civil Aviation from 50 Caliber Sniper Rifles* (January 2003)
- *When Men Murder Women:  An Analysis of 2000 Homicide Data* (October 2002)
- *No Deal:  The Drop in Federally Licensed Firearms Dealers in America* (September 2002)
- *Sitting Ducks—The Threat to the Chemical and Refinery Industry from 50 Caliber Sniper Rifles* (August 2002)
- *License to Kill IV:  More Guns, More Crime* (June 2002)
- *American Roulette:  The Untold Story of Murder-Suicide in the United States* (April 2002)
- *The U.S. Gun Industry and Others Unknown—Evidence Debunking the Gun Industry's Claim that Osama bin Laden Got His 50 Caliber Sniper Rifles from the U.S. Afghan-Aid Program* (February 2002)
- *"A .22 for Christmas"—How the Gun Industry Designs and Markets Firearms for Children and Youth* (December 2001)
- *Kids in the Line of Fire:  Children, Handguns, and Homicide* (November 2001)
- *Unintended Consequences: Pro-Handgun Experts Prove That Handguns Are a Dangerous Choice For Self-Defense* (November 2001)
- *Voting from the Rooftops:  How the Gun Industry Armed Osama bin Laden, Other Foreign and Domestic Terrorists, and Common Criminals with 50 Caliber Sniper Rifles* (October 2001)
- *Shot Full of Holes:  Deconstructing John Ashcroft's Second Amendment* (July 2001)
- *Hispanics and Firearms Violence* (May 2001)
- *Where'd They Get Their Guns?—An Analysis of the Firearms Used in High-Profile Shootings, 1963 to 2001* (April 2001)
- *A Deadly Myth:  Women, Handguns, and Self-Defense* (January 2001)
- *Handgun Licensing and Registration:  What it Can and Cannot Do* (September 2000)
- *Pocket Rockets:  The Gun Industry's Sale of Increased Killing Power* (July 2000)
- *Gunland USA:  A State-by-State Ranking of Gun Shows, Gun Retailers, Machine Guns, and Gun Manufacturers* (June 2000)
- *Guns For Felons:  How the NRA Works to Rearm Criminals* (March 2000)
- *One Shot, One Kill:  Civilian Sales of Military Sniper Rifles* (May 1999)
- *Cease Fire:  A Comprehensive Strategy to Reduce Firearms Violence* (Revised, October 1997)

Violence Policy Center
1140 19th Street, NW
Suite 600
Washington, DC  20036

202-822-8200  phone
202-822-8205  fax
www.vpc.org  web

©May 2003
Violence Policy Center

# Introduction

In 1994, Congress passed, and President Clinton signed, a ban on the production of certain semiautomatic assault weapons as well as high-capacity ammunition magazines that hold more than 10 rounds.  The law banned specific assault weapons by name and also classified as assault weapons semiautomatic firearms that could accept a detachable ammunition magazine and had two additional assault weapon design characteristics.  The law is scheduled to end on September 13, 2004.

This study reveals the gun industry's efforts to evade the 1994 ban and documents the significant threat assault weapons still pose to law enforcement.  These facts make clear the need to not only renew, but also *strengthen*, the ban before it expires next year.  Legislation will soon be introduced in the U.S. Congress to accomplish this goal.  Without action this Congress, the 1994 law will expire in 2004.

Both President Bush and Attorney General Ashcroft have expressed support for the assault weapons ban.  President Bush's support for the ban has been longstanding.  In October 2000, Bush campaign spokesperson Ray Sullivan told *Salon* magazine that he would expect then-candidate Bush to reauthorize the ban.[1]  That position was reiterated by Attorney General John Ashcroft during his confirmation hearings on January 17, 2001, when he stated, "It is my understanding that the president-elect of the United States has indicated his clear support for extending the assault weapon ban, and I would be pleased to move forward that position, and to support that as a policy of this president, and as a policy of the Justice Department."[2]  Most recently, in April of this year, White House spokesperson Scott McClellan told Knight Ridder news service, "The President supports the current law, and he supports reauthorization of the current law."[3]

This study contains three sections.  *Section One:  Assault Weapons, the Gun Industry, and Law Enforcement* reveals how the firearms industry has evaded the current ban, and how assault weapons continue to pose a stark threat to America's law enforcement personnel.  *Section Two:  Law Enforcement Officers Killed in the Line of Duty by Assault Weapons, 1998 Through 2001* is a chart listing the known incidents of police officers killed by assault weapons, including year, state, manufacturer, model of assault weapon, and caliber.  *Section Three:  Selected Incidents of Law Enforcement Officers Killed in the Line of Duty by Assault Weapons, 1998 Through*

---

[1]     Jake Tapper, "Gore Shoots Blanks on Guns," *Salon*, October 24, 2000.

[2]     "Day 2, Morning Session of a Hearing of the Senate Judiciary Committee," *Federal News Service*, January 17, 2001.

[3]     Shannon McCaffrey, "In Surprise Move, Bush Backs Renewing Ban on Assault Weapons," *Knight Ridder/Tribune News Services*, April 12, 2003.

*2001* offers expanded narratives for 15 of the law enforcement shootings that occurred during this period.  Each narrative also includes a representative illustration of the model of assault weapon used in the shooting (each weapon shown is representative of the brand or model of assault weapon and may not be identical to the specific weapon used in the shooting detailed in the narrative).

## Section One:  Assault Weapons, the Gun Industry, and Law Enforcement

### Assault Weapons:  A Clear Threat to Law Enforcement

A primary stimulus for the 1994 law was the severe threat that assault weapons pose to law enforcement officers.  Police and other law enforcement personnel were some of the first victims of the assault weapon trend that emerged in the 1980s.  For example, in October 1984, a San Jose, California, police officer was gunned down with an UZI carbine.  In a high-profile shootout in April 1986, two agents from the Federal Bureau of Investigation (FBI) were killed by robbery suspects wielding a Ruger Mini-14 assault rifle.  Five other agents were wounded in the gun battle.  As high-capacity assault weapons became more commonplace, police routinely complained that they were being outgunned by suspects.  As a result, major law enforcement organizations supported passage of the 1994 federal assault weapons ban.

In 1995, the first full year in which the ban was implemented, police continued to be victims of assault weapons. Approximately one in 10 of the 74 law enforcement officers killed in the line of duty in 1995 was slain with a banned assault weapon.[4]

### The Gun Industry Evades the Law

Immediately after the 1994 law was enacted, the gun industry moved quickly to make slight, cosmetic design changes in their "post-ban" guns to evade the law, a tactic the industry dubbed "sporterization."  Of the nine assault weapon brand/types listed by manufacturer in the law,[5] six of the brand/types have been re-marketed in new,

---

[4]     *Cop Killers:  Assault Weapon Attacks on America's Police*, Violence Policy Center, September 1995.

[5]     The law states, "The term `semiautomatic assault weapon' means—(A) any of the firearms, or copies or duplicates of the firearms in any caliber, known as—(i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all models); (ii) Action Arms Israeli Military Industries UZI and Galil; (iii) Beretta Ar70 (SC-70); (iv) Colt AR-15; (v) Fabrique National FN/FAL, FN/LAR, and

2

"sporterized" configurations.[6]   In fact, gunmakers openly boast of their ability to circumvent the assault weapons ban.  Their success is described in an August 2001 *Gun World* magazine article about the new Vepr II assault rifle, a "sporterized" version of the AK-47:

> In spite of assault rifle bans, bans on high capacity magazines, the rantings of the anti-gun media and the rifle's innate political incorrectness, the Kalashnikov [AK-47], in various forms and guises, has flourished.  Today there are probably more models, accessories and parts to choose from than ever before.

Equally blunt was an article in the May 2003 issue of *Gun World* reviewing the LE Tactical Carbine, a post-ban, "sporterized" AR-15 clone:

> Strange as it seems, despite the hit U.S. citizens took with the passage of the onerous crime bill of 1994 [which contained the federal assault weapons ban], ARs are far from dead.  Stunned momentarily, they sprang back with a vengeance and seem better than ever.  Purveyors abound producing post-ban ARs for civilians and pre-ban models for government and law enforcement agencies, and new companies are joining the fray.[7]

Just such a post-ban AR,  the Bushmaster XM15 M4 A3 assault rifle, was used by the Washington, DC-area snipers to kill 10 and injure three in October 2002.   The Bushmaster is the poster child for the industry's success at evading the ban. The snipers' Bushmaster is even marketed as a "Post-Ban Carbine."  [Please see page four for catalog copy.]

The industry's efforts have been aided by the fact that not all assault weapons are covered by the 1994 ban.  For example, assault weapons with more conventional designs, such as the Ruger Mini-14, were not covered by the 1994 law—although gun experts define them as assault weapons.  Furthermore, any gun that was legally possessed as of the date the 1994 law took effect may still be legally possessed and

---

FNC; (vi) SWD —10, M-11/9, and M-12; (vii) Steyr AUG; (viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and (ix) revolving cylinder shotguns, such as (or similar to) the Street Sweeper and Striker 12…."

[6]      Assault weapons that have not been reintroduced are the Beretta AR70, Street Sweeper and Striker 12 assault shotguns (the latter two guns were re-classified by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) as subject to the strict regulations of the National Firearms Act of 1934), and Steyr AUG, although Steyr has begun marketing a new assault weapon—the Vector—that, like the AUG, is of a bullpup design.

[7]      "Rock River's LE Tactical Carbine," *Gun World* (May 2003), p. 50.



**The Bushmaster XM15 used by the Washington, DC-area snipers to kill 10 and wound three in October 2002 is the poster child for the gun industry's cynical efforts to circumvent the federal assault weapons ban. Maine-based Bushmaster even advertises the gun—based on the banned Colt AR-15 assault rifle—as a "Post-Ban Carbine."**

4

transferred without restriction.  With respect to high-capacity ammunition magazines, manufacturers stockpiled thousands, or perhaps hundreds of thousands, of magazines before the ban took effect.  Those magazines—some of which can hold up to 75 rounds of ammunition—are still widely available.

### Still a Threat to Police—One in Five Law Enforcement Officers Slain in the Line of Duty is Killed With an Assault Weapon

The gun industry's evasion of the 1994 ban on assault weapons and high-capacity ammunition magazines continues to put law enforcement officers at extreme risk.  Using data obtained from the Federal Bureau of Investigation, the Violence Policy Center has determined that *at least 41 of the 211 law enforcement officers slain in the line of duty between January 1, 1998, and December 31, 2001, were killed with assault weapons*.[8]  *Using these figures, one in five law enforcement officers slain in the line of duty was killed with an assault weapon*.

While no comprehensive information is yet available for the years 2002 and 2003, it is clear that law enforcement personnel continue to be killed by assault weapons.  For example, on February 20, 2003, in Alexandria, Louisiana, two police officers were killed in an ambush with an AK-47-type assault rifle.  Anthony Molette, age 25, had a long criminal history, including a charge of attempted first-degree murder.  The day before the murders, Molette opened fire on an officer in his patrol car.  The officer was not hurt, but 18 to 20 rounds were fired into the vehicle.  Molette bragged to his friends about the shooting, prompting Alexandria police to search for him.  When officers arrived at Molette's residence to serve a warrant, Molette opened fire, fatally wounding Officers Charles Ezernack, age 26, and Jeremy "Jay" Carruth, age 29. Molette was shot and killed as he charged two other police officers.[9]

The fact that from 1998 through 2001 one in five law enforcement officers slain in the line of duty was killed with an assault weapon indicates that the ban in its current form is inadequate to protect police and the public from the hazards presented by assault weapons.

---

[8]    The Federal Bureau of Investigation data does not identify the firearm used in some instances, in those cases the type of firearm is listed as "unknown."  Therefore, the number of law enforcement officers killed with assault weapons may actually be higher.  (This figure does not include the 72 law enforcement deaths that resulted from the events of September 11, 2001.  The foreword of the FBI's *Law Enforcement Officers Killed and Assaulted, 2001* states, "Because a catastrophe such as the September 11 attacks falls far outside the normal course of police experience, the FBI has not included those fatalities in the 2001 rate, trend, or disposition tables for to do so would skew the data and render analyses meaningless.")  The year 2001 is the most recent year for which complete information is available from the FBI.

[9]    "Police Killings Baffling," *State-Times/Morning Advocate*, February 22, 2003.

5

According to the Urban Institute's 1997 study of the effects of the 1994 ban,[10] "the relatively high use of assault weapons in murders of police suggests that police gun murders should be more sensitive to the effects of the ban than gun murders of civilians."  The stark reality that murders of law enforcement personnel committed with assault weapons have not abated demonstrates the need to not only renew, but significantly strengthen, the current ban.

---

[10]     Roth and Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994 Final Report*, Urban Institute, March 13, 1997.

## Section Two:  Law Enforcement Officers Killed in the Line of Duty by Assault Weapons, 1998 Through 2001

| Year | State | Manufacturer | Model | Caliber |
|------|-------|--------------|-------|---------|
| 1998 | Alaska | Colt | AR-15 | 7.62mm |
| | Georgia | Iver Johnson | M1 Carbine | .30 |
| | Oregon | Norinco | SKS[11] | 7.62mm |
| | New York | Unknown | MAC-11 | 9mm |
| | California | Armalite | M151A | .223 |
| | Mississippi | Colt | AR-15 | .223 |
| | Mississippi | Colt | AR-15 | .223 |
| | Michigan | DPMS, Inc. | AR-15 | .223 |
| | Florida | Unknown | SKS | 7.62mm |
| | Colorado | Unknown | SKS | 7.62mm |
| | Texas | Unknown | AR-15 | .223 |
| | Texas | Unknown | AR-15 | .223 |
| | Missouri | Unknown | MAK 90 | 7.62mm |
| | California | Ruger | Mini-14 | .223 |
| | Indiana | Norinco | SKS | 7.62mm |
| 1999 | California | Ferunion/Hungarian Arms | SA85 | 7.62mm |
| | Indiana | Norinco | SKS | 7.62mm |

---

[11]      The SKS is not banned by name under the 1994 federal assault weapons ban.  Only SKS rifles that were modified to be defined as an assault weapon under Section (B) of the law were affected by the ban.  Section (B) defines a "semiautomatic assault weapon" as "a semiautomatic rifle that has an ability to accept a detachable ammunition magazine and has at least 2 of—(i) a folding or telescoping stock; (ii) a pistol grip that protrudes conspicuously beneath the action of the weapon; (iii) a bayonet mount; (iv) a flash suppressor or threaded barrel designed to accommodate a flash suppressor; and (v) a grenade launcher...."  Legislation to be introduced this Congress would explicitly ban any SKS able to accept a detachable ammunition magazine.  Unless otherwise stated, the exact configuration of SKS weapons used in police shootings cited in this study cannot be determined.

| Year | State | Manufacturer | Model | Caliber |
|------|-------|--------------|-------|---------|
| | New Jersey | Intratec | TEC-9 | 9mm |
| | Arizona | Unknown | AK-47 | 7.62mm |
| | California | Norinco | MAK 90 | 7.62mm |
| | Oklahoma | Colt | AR-15 H-BAR | .223 |
| | Texas | Norinco | MAK 90 Sporter | 7.62mm |
| | Texas | Norinco | MAK 90 | 7.62mm |
| | Texas | Norinco | MAK 90 | 7.62mm |
| | Texas | Norinco | MAK 90 | 7.62mm |
| 2000 | North Carolina | Maadi | ARM | 7.62mm |
| | Georgia | Ruger | AR-15[12] | .223 |
| | California | Colt | CAR-15 | .223 |
| | Texas | Ruger | Mini-14 | .223 |
| | Georgia | Intratec | TEC-9 | 9mm |
| | Maryland | Unknown | M1 Carbine | .30 |
| 2001 | California | Unknown | AR-15 | .223 |
| | Florida | SWD, Inc. | M-11 | 9mm |
| | Indiana | Unknown | AK-47 | 7.62mm |
| | Kentucky | Underwood | M1 Carbine | .30 |
| | Kentucky | Underwood | M1 Carbine | .30 |
| | Michigan | Unknown | SKS | 7.62mm |
| | Tennessee | Maadi | MAK 90 | 7.62mm |
| | Texas | Unknown | M-11 | 9mm |
| | Texas | Norinco | SKS | 7.62mm |
| | Utah | Norinco | SKS | 7.62mm |

---

[12]     Inconsistency between manufacturer and weapon type from FBI data.

8

**Section Three:  Selected Incidents of Law Enforcement Officers Killed in the Line of Duty by Assault Weapons,[13] 1998 Through 2001**

---

[13]      Each weapon shown is representative of the brand or model of assault weapon and is not a picture of the specific weapon used in the shooting described in the narrative.

9

10

**Date:**                  January 27, 1998

**Location:**              Portland, Oregon

**Assault Weapon:**        Norinco SKS 7.62mm rifle

On January 27, 1998, one police officer was killed and two were wounded with a Norinco SKS 7.62mm rifle.  The officers, working on a drug investigation in Portland, entered the home of Steven Douglas Dons and were met with gunfire.  Colleen Waibel, a six-year veteran, was hit with multiple gunshots, becoming the first female officer killed in the line of duty in Portland.  Kim Keist, a 15-year veteran, was wounded in the chest and arm despite wearing a bullet-proof vest.  A third officer was treated for a gunshot wound to the hand.  A neighbor reported that Dons was known to have a large arsenal of weapons and that police had been called to the house weeks before on a complaint of weapons being fired.  Dons committed suicide while awaiting trial.

Lauren Dodge, "Three Portland Officers Ambushed at House; One Dead, Two Wounded," *Associated Press*, January 28, 1998; "Victim, Husband Have Mixed Feelings Over Apparent Suicide of Suspect," *The Columbian*, February 26, 1998.



11

**Date:** April 25, 1998

**Location:** Millbrae, California

**Assault Weapon:** Armalite M151A .223 rifle

On April 25, 1998, one police officer was killed with an Armalite M151A .223 rifle.  Officer David Chetcuti responded to another officer's call for help in a traffic stop on the Millbrae Avenue off-ramp of U.S. 101.  Officer Seann Graham had pulled over Marvin Patrick Sullivan for not having a current registration sticker for his vehicle.  Sullivan, who was heavily armed and had bombs strapped to his body, opened fire, wounding Officer Chetcuti.  Chetcuti returned fire hitting the suspect once in the side before being killed by two shots to the head from close range.  Several of the bullets penetrated Chetcuti's bullet-proof vest, and more than 40 bullet casings were recovered at the scene.  Officer Graham escaped harm by diving into a drainage ditch.  Sullivan was arrested after leading several police cars in a chase across the San Mateo Bridge.  Sullivan has been repeatedly declared incompetent to stand trial, and sent to a California state mental hospital.

Tyche Hendricks and Jim Herron Zamora, "Cop Killing:  No Fremont Tie," *San Francisco Examiner*, April 27, 1998; "Judge: Man isn't competent; Defendant Sent Back to Hospital in Millbrae Cop Slaying Case," *San Jose Mercury News*, July 23, 2002.



**Date:**                        May 29, 1998

**Location:**                   Cortez, Colorado

**Assault Weapon:**          SKS 7.62mm rifle


On May 29, 1998, one police officer was killed and two were wounded with an SKS 7.62mm rifle.  Officer Dale Claxton stopped a truck that had been reported stolen the day before.  As Officer Claxton was checking the stolen truck's license plate, a passenger in the truck fired approximately 40 rounds through the front of Claxton's police cruiser.  Montezuma County Sheriff's Deputy Jason Bishop responded to the radio call of an officer being shot, and was wounded as his cruiser was hit with approximately 40 more rounds from the SKS.  Minutes later, Deputy Todd Martin was wounded in the left arm and right leg.  The three suspects, described by authorities as "anti-government, end-of-the-world-fearing survivalists," escaped into Colorado.  Two of the suspects were later found dead, while the third, Jason Wayne McVean, is still at large.

Greg Burton, "Posse Scours Badlands for 3 Cop Killers," *Salt Lake Tribune*, May 31, 1998; Julie Cart, "Answers Vanished Along With Four Corners Outlaw," *Los Angeles Times*, November 24, 1999.



13

**Date:**                      July 7, 1998

**Location:**                San Benito, Texas

**Assault Weapon:**       AR-15 .223 rifle

On July 7, 1998, two U.S. Border Patrol agents were killed with an AR-15 .223 rifle. Ernie Moore, reportedly enraged over a broken love affair, shot and wounded Dan Morin, who had been dating Moore's former girlfriend, and killed Morin's mother and sister. Two hours later, a shootout ensued between Moore and police officers resulting in the death of two Border Patrol agents before Moore was fatally wounded. In addition to a cocaine habit, Moore had a history of emotional problems and displayed Nazi posters and photos of Adolf Hitler in his bedroom.

James Pinkerton, "Two Border Patrol Agents Are Slain During Rampage," *Houston Chronicle*, July 8, 1998; "Assault Rifle Costs Border Town $35M," *National Law Journal*, March 4, 2002.



**Date:**                           November 29, 1998

**Location:**                       Los Angeles, California

**Assault Weapon:**                 Ruger Mini-14 .223 rifle


On November 29, 1998, Los Angeles Police Department training officer Brian Brown was killed with a Ruger Mini-14 .223 rifle.  Brown and his partner witnessed a drive-by shooting in Culver City and attempted to stop the suspects.  The gunmen fired multiple rounds from the Mini-14, killing Officer Brown.  Police shot and killed one of the suspects near the scene while the other managed to commandeer a taxi, leading police on a five-mile chase before also being fatally wounded.

Anthony Breznican, "Three Dead, Including Police Officer, During Violent Arrest for Drive-By Shooting," *Los Angeles Times*, December 1, 1998.



**Date:**                                    January 10, 1999

**Location:**                                Oakland, California

**Assault Weapon:**                          MAK-90 or SA85 7.62mm rifle


On January 10, 1999, Officer James Williams was killed with a MAK-90 or SA85 7.62mm rifle.  Officer Williams was among a group of officers who were searching for a rifle that had been discarded by the occupants of a vehicle that was involved in a chase with police.  While they were searching for the rifle, a gunman opened fire from a nearby overpass, killing Officer Williams.   Chad Rhodes was arrested and charged with special-circumstances murder, attempted murder, three counts of firing an assault weapon, and possessing an assault weapon.  Rhodes pleaded guilty to second-degree murder and was sentenced to life in prison without parole.


Henry K. Lee, "Arrest in Oakland Sniper Slaying," *San Francisco Chronicle*, January 12, 1999; Henry K. Lee, "Sniper Suspect Enters Plea of Not Guilty," *San Francisco Chronicle*, February 6, 1999; "Man Pleads Guilty in Killing of Oakland Cop," *San Francisco Chronicle*, April 9, 2003.



**Date:**                      April 8, 1999

**Location:**                  Orange, New Jersey

**Assault Weapon:**            TEC-9 9mm pistol


On April 8, 1999, Officer Joyce Carnegie was killed with a TEC-9 9mm pistol.  Condell Woodson pleaded guilty to felony murder in the death of Officer Carnegie.  Woodson claimed that his gun accidentally went off, shooting Carnegie in the head and abdomen as she was attempting to arrest Woodson for armed robbery.  Woodson also pleaded guilty to robbery and weapons offenses.  Carnegie was the second policewoman killed in the line of duty in New Jersey history.

Amy Westfeldt, "Man Pleads Guilty to Policewoman's Murder," *Associated Press*, May 13, 1999.



17

**Date:**                                      June 12, 1999

**Location:**                                  Orange County, California

**Assault Weapon:**                            MAK-90 or SA85 7.62mm rifle

On June 12, 1999, Sheriff's Deputy Brad Riches was killed with a MAK-90 or SA85 7.62mm rifle.  Deputy Riches was sitting in his patrol car outside a 7-Eleven when his police cruiser was riddled with assault weapon fire.  The 7-Eleven clerk said that a customer told him he was carrying an AK-47-style assault rifle to shoot a police officer.  Maurice Steksal was convicted on November 19, 2002 of the first-degree murder of Deputy Riches.

Jack Leonard, "Thousands Pay Last Respects to Slain Deputy," *Los Angeles Times*, June 17, 1999; Greg Hardesty, "Laborer Guilty of Deputy's Murder," *Orange County Register*, November 20, 2002.



**Date:**                                 January 27, 2000

**Location:**                            Lexington, North Carolina

**Assault Weapon:**               Maadi 7.62mm rifle


On January 27, 2000, Sheriff's Deputy Todd Cook was killed with a Maadi 7.62mm rifle. Deputy Cook was serving a warrant at the home of Christopher Lee Cooper who had been accused of trespassing and was also wanted by Lexington police for questioning about a statutory rape.  Deputy Cook was shot at least five times from behind.  After the shooting, Cooper led police on a car chase that ended when he crashed through a roadblock.  Officers found Cooper dead in the car from a self-inflicted gunshot wound.

"Piedmont Community Mourns Loss of Slain Deputy," *Associated Press*, January 29, 2000.



19

**Date:**                    August 3, 2000

**Location:**                San Marcos, Texas

**Assault Weapon:**          Ruger Mini-14 .223 rifle


On August 3, 2000, State Trooper Randall Vetter was killed with a Ruger Mini-14 .223 rifle. Trooper Vetter stopped 72-year-old Melvin Hale for not wearing his seat belt.  Hale got out of his car and aimed his rifle at Vetter because he believed the traffic stop violated his constitutional rights.  Vetter raised his pistol and ordered him to put down his gun.  Hale fired at least twice, hitting Vetter in the head as he sat in his patrol car.  Six months earlier, another San Marcos trooper had written a letter warning Hays County law enforcement officers to exercise caution around Hale.  The trooper said Hale had threatened him with a rifle when he stopped at Hale's ranch to ask about deer hunting on the 125-acre property. Hale pleaded guilty to the shooting and was sentenced to life in prison.

Jason Spencer, "A Somber Salute for a Fallen Officer," *Austin American-Statesman*, August 9, 2000; "Trooper's Shooter Gets Life Sentence; 74-year-old Accepted Surprise Plea Agreement as Jury Selection Began," *Austin American-Statesman*, January 24, 2002.



**Date:**                    March 29, 2001

**Location:**                San Antonio, Texas

**Assault Weapon:**          M-11 assault pistol

On March 29, 2001, San Antonio Police Officer Hector Garza, age 48, was shot and killed while responding to a domestic disturbance report.  Jessica Garcia, age 21, had called police to ask for an officer's protection while she moved out of her home.  When Garcia's husband, Frank, learned of her plans, he drove home and killed both Jessica and Officer Garza—a 25-year police veteran—by shooting them both in the head with an M-11 assault pistol.  Frank Garcia, 28, was arrested at the scene and charged with two counts of capital murder and three counts of attempted murder.  Garcia was convicted of the murders in February 2002.

Bill Hendricks, "Cop's Slaying Stuns City," *San Antonio Express-News*, March 30, 2001; "Garcia Gets Death Penalty; Cop Killer Sentenced," *San Antonio Express-News*, February 12, 2002.



21

**Date:**                          April 4, 2001

**Location:**                      Detroit, Michigan

**Assault Weapon:**               SKS assault rifle

On April 4, 2001, Detroit Police Officer Neil Wells, age 41, was fatally shot during a drug raid at an abandoned apartment house.  While on patrol,  Wells and his partner received a complaint of drug sales at the building.  When the officers arrived, the gunman was waiting in ambush behind a door.  Wells was shot twice at close range with an SKS assault rifle. Lamont Smith, age 21, was charged with murder and felony firearm violations.  Smith was convicted of second degree murder and sentenced to 60 to 90 years in prison.

Norman Sinclair, "Gun Owner Sought in Cop's Killing," *The Detroit News*, April 8, 2001; "Man Given 60-90 Years in Cop Killing," *Detroit Free Press*, January 16, 2002.



**Date:**                            September 6, 2001

**Location:**                        Hamilton County, Tennessee

**Assault Weapon:**                  MAK 90 assault rifle

On September 6, 2001, Hamilton County Sheriff's Deputy Donald Bond, age 35, was shot and killed when he stopped at a fruit and vegetable stand to check on a suspicious vehicle. When Deputy Bond did not respond to a 2:18 AM call from his dispatcher, an alert was sent out to locate him.  A fellow deputy found Bond dead beside his patrol car, shot multiple times with an MAK 90 assault rifle.  Later that morning, acting on a tip, a SWAT team evacuated the suspect's street and waited for a chance to make an arrest.   After observing Marlon Duane Kiser, age 31, throw out a front panel of body armor and Deputy Bond's service weapon, police arrested Kiser and charged him with first-degree murder.  Kiser is awaiting trial in the case.

Mike O'Neal and Gary Tanner, "Suspect Held in Deputy's Death," *Chattanooga Times Free Press*, September 7, 2001; "Law Enforcement Officers Killed and Assaulted, 2001," Federal Bureau of Investigation; "Courts News Digest," *Chattanooga Times Free Press*, February 18, 2003.



23

**Date:**                    September 17, 2001

**Location:**                Indianapolis, Indiana

**Assault Weapon:**          AK-47 assault rifle

On September 17, 2001, Marion County Sheriff's Deputy Jason Baker, age 24, was killed during a car chase and gun battle.  On his way to a report of a domestic dispute, Deputy Baker tried to make a traffic stop.  The driver refused to stop and a chase ensued.  Allen Dumperth, a convicted felon, and Michael Shannon, both age 20, fired at Baker from their fleeing car.  When Baker's fellow officers found him, he was dead from a gunshot wound to the head.  The front and rear windows of his patrol car were shot out.  After crashing his car, Dumperth was shot and killed by members of the police SWAT team.  Shannon later pleaded guilty in court to shooting Deputy Baker.

Vic Ryckaert, "Role in Deputy Death Brings 40 Years; 21-Year-Old Bought the Assault Rifles Used by 2 Men Accused in Slaying of Jason Baker," *Indianapolis Star*, April 11, 2002.



**Date:**                           November 13, 2001

**Location:**                       Nicholasville, Kentucky

**Assault Weapon:**                 M1 Carbine

Jessamine County Sheriff's Deputies Billy Ray Walls, age 28, and Chuck Morgan, age 51, were shot and killed, and another deputy was wounded, when they tried to serve a warrant for misdemeanor terroristic-threatening to Phillip Walker, age 75, on his drydocked houseboat. Walker had threatened to kill a family member with a gun.  While in the houseboat with the deputies, Walker fired 11 shots from a 30-caliber M1 Carbine, killing Deputy Walls and fatally injuring Deputy Morgan.  Walker was killed in the gun battle.

Greg Kocher, "Man Who Killed Deputy Fired 11 Times Police Say," *Lexington Herald Leader*, November 15, 2001.



**About the Violence Policy Center**

The Violence Policy Center (VPC) is a national nonprofit educational organization working to reduce death and injury from firearms. As America's premier think tank on gun policy, the VPC studies current firearms issues and provides information to policymakers, journalists, public health professionals, and grassroots activists.

The virtually unrestricted distribution of firearms is more than a crime problem, it is a national health crisis. Unlike every other consumer product, firearms are exempt from federal health and safety laws. Guns—especially handguns and assault weapons—are inherently dangerous products, and the failure to regulate them like all other products costs thousands of lives and billions of dollars every year. By conducting research on key issues in firearms policy, the VPC counters the gun lobby's distortions and brings hard facts to the debate over firearms death and injury.

**Violence Policy Center        www.vpc.org**

# Exhibit 68

# Assault Weapons Profile



**United States**
**Department of the Treasury**

**Bureau of Alcohol, Tobacco and Firearms**

**April 1994**

# AK's -- Norinco, Mitchell, Poly Technologies

## Background

These assault rifles are semi-automatic copies of machineguns designed in Communist block countries. They are variations of post-World War II military rifles.

## Production

These firearms have been imported as follows: Norinco from China, Mitchell from Yugoslavia, Poly Technologies from China. In 1989, these assault rifles were banned from importation into the United States, because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 100,000 of these firearms have been imported into the U.S., and are still in circulation.

## Ammunition Magazine

These assault rifles come equipped with a 30-round magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 2,061 of the firearms traced for law enforcement officials nationwide. The traces included 329 narcotics investigations and 272 murder cases.

* not all firearms used in crime are traced.

## Examples of Use in Crime

In a Detroit, Michigan suburb, a Norinco AK-47 was recovered in a narcotics-related double homicide. The weapon had an obliterated serial number. The AK-47 was one of the weapons purchased by an individual who was diverting them to drug traffickers.

Federal, State and local officers recently raided the Kentucky Courts public housing complex in Washington, DC, following the fatal shooting of police officer Jason White. The seizure turned up six guns, including an AK-47 assault rifle. The Kentucky Court Crew gang is suspected of doling out guns, including assault weapons, and crack from an apartment within firing range of where Officer White was gunned down.



Shown is Norinco AK-47

1

# M-10, M-11, M-11/9, and M-12

## Background

These semi-automatic assault pistols are manufactured in the United States, and designed as semi-automatic copies of submachine guns. The M-11/9 weighs 3.25 pounds unloaded, 4.25 pounds when fully loaded, some of SWD's M-11/9 models were manufactured as rifles.

## Production

Approximately 100,000 of these firearms have been manufactured.

## Ammunition Magazine

These assault pistols come equipped with a 32-round magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 3,091 of the firearms traced for law enforcement officials nationwide. They were traced for 561 narcotics investigations, 313 murder cases, and 125 instances of assault.

According to ATF's Tracing Center, from 1991 through the present, the M11/9 has been in the top 10 firearms that were traced.

* not all firearms used in crime are traced.

## Examples of Use in Crime

In October 1992, a bank in Sykesville, Maryland was robbed by two gunmen using a MAC firearm that had been purchased in West Virginia. Four tellers were taken hostage and shot. Two of the tellers subsequently died.

In Atlanta, Georgia, 11 individuals were indicted in a gun-trafficking scheme. For 2 years, nearly 1,000 guns were shipped illegally to New York, where many were recovered in crimes in New York City. The men had converted a number of semi-automatic Cobray 9mm pistols (MAC 10) into automatic operation.

A Houston, Texas police officer made a traffic stop and was critically wounded, shot four or five times by the driver. The suspect got away and later, the suspect attempted a robbery. A trooper approached the suspect's car and was met with assault weapon fire. After abandoning his car, the suspect continued shooting at the pursuing officers and a gun battle ensued. The suspect was clutching a MAC 11 when he was killed. A search of his vehicle disclosed an AK-47.



Shown is SWD M11/9

3

# Action Arms UZI and Galil

## Background

These assault rifles and pistols are semi-automatic copies of machineguns designed in Israel. They are variations of post-World War II military rifles.

## Production

In 1989, these assault rifles were banned from importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 10,000 of these firearms were imported into the U.S. prior to the ban and are in circulation today. The UZI assault pistol was banned from importation into the United States in 1993 by President Clinton because it did not meet the sporting purpose criteria under the Gun Control Act. The UZI assault rifle has the same appearance as the submachine gun, and was first imported in 1980. The Galil was introduced into U.S. commerce in 1982.

## Ammunition Magazine

The UZI Carbine chambers 9mm ammunition, and comes equipped with a 25-round magazine.

The Galil is a .308 caliber semi-automatic rifle and comes equipped with a 20-shot magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 755 of the firearms traced for law enforcement officials nationwide. Galils were traced for 9 narcotics investigations, 2 murder cases, and 2 instances of assault. UZIs were traced for 151 narcotics investigations, 47 murder cases, and 30 instances of assault.

* not all firearms used in crime are traced.

## Examples of Use in Crime

A Louisville, Kentucky police officer stopped a suspect in a shooting incident. The officer found, in the suspect's car, a 9mm UZI with an obliterated serial number and loaded with a magazine of 17 rounds.

In Boston, Massachusetts, an undercover agent infiltrated an Asian gang involved in illegal narcotics and gun sales. The undercover agent bought over a kilo of 91% pure heroin (street value of $1 million), and 29 guns. The purchased firearms included an Action Arms UZI, an SWD/Cobray M-11/9 pistol, an Intratec TEC-9 (converted to fire fully automatic), and an AK-47 assault rifle.



Shown is UZI Pistol

5

# Beretta AR-70

## Background

These assault rifles are semi-automatic copies of machineguns designed in Italy. They are variations of post-World War II military rifles.

## Production

In 1989, these assault rifles were banned from importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 1,000 of these firearms were imported into the U.S. prior to the ban, and remain in circulation.

## Ammunition Magazine

This gas-operated semi-automatic 5.56 x 45 mm assault rifle comes equipped with a 30-round ammunition magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 3 of the firearms traced for law enforcement officials nationwide.

* not all firearms used in crime are traced.

## Examples of Use in Crime

In April 1992, ATF agents in Fargo, North Dakota recovered a Beretta AR-70, another long gun, 3 handguns and approximately 8,000 rounds of ammunition from a convicted illegal manufacturer of explosives.

In May 1993, the San Bernardino, California Sheriff's Office recovered a Beretta AR-70 and Intratec TEC 9 mm pistol and two pounds of methamphetamine from a suspected drug dealer. The suspect was convicted under California law of possessing an unregistered assault weapon and is awaiting trial on the drug charges.



Shown is Beretta AR70

7

# Colt AR-15

## Background

These assault rifles are semi-automatic copies of machineguns manufactured in the United States.   Semi-automatic versions of the M-16, they are variations of post-World War II military rifles.

## Production

Approximately 400,000 of these firearms have been manufactured.  In 1989, these assault rifles were banned from re-importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act.

## Ammunition Magazine

The Colt AR-15 comes equipped with a 5-round detachable box magazine.  However, this firearm is typically fitted with a 30-round magazine as shown below.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 1,802 of the firearms traced for law enforcement officials nationwide.  They were traced for 212 narcotics investigations, 106 murder cases, and 39 instances of assault.

* not all firearms used in crime are traced.

## Examples of Use in Crime

In San Fernando Valley, California, a son shot and killed his father using an AR-15.  He then opened fire on the police as they arrived on the scene.  One police officer was killed.

Seven-year old Dantrell Davis and his mother were walking to school in the Chicago, Illinois housing project where they lived.  A sniper armed with an AR-15 fired into the area as part of a violent feud between gangs.  A shot hit the boy in the head and he was killed instantly.



Shown is AR-15

9

# Fabrique Nationale
# FN/FAL, FN/LAR, and FNC

## Background

These assault rifles are semi-automatic copies of machineguns designed in Belgium, and used by various NATO countries. They are variations of post-World War II military rifles.

## Production

In 1989, these assault rifles were banned from importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 30,000 of these firearms had been imported into the U.S., and are in circulation today.

## Ammunition Magazine

These semi-automatic assault rifles come equipped with a 30-round magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 39 of the firearms traced for law enforcement officials nationwide.

* not all firearms used in crime are traced.

## Examples of Use in Crime

Police in Las Vegas, Nevada recovered an FN rifle and silencer, RPB 9mm converted machinegun and 2,268 rounds of ammunition from a convicted burglar.

A suspect was arrested by ATF agents in St. Louis, Missouri for dealing in cocaine. The suspect was arrested at his residence with 30 firearms in his possession, the majority of which were assault weapons, including an FN FNC assault rifle.



Shown is FN FNC

11

# Steyr AUG

## Background

These assault rifles are semi-automatic copies of machineguns designed in Austria. They are used by military forces in Austria, Australia and various NATO countries, and are variations of post-World War II military rifles.

## Production

In 1989, these assault rifles were banned from importation into the United States because they did not meet the sporting purpose criteria under the Gun Control Act. Approximately 10,000 of these firearms were imported into the U.S. prior to the ban, and remain in circulation. They have subsequently been manufactured in the United States in limited quantities.

## Ammunition Magazine

This semi-automatic assault rifle comes equipped with either a 30 or 40-shot magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 18 of the firearms traced for law enforcement officials nationwide.

* not all firearms used in crime are traced.

## Examples of Use in Crime

A self-styled survivalist and weapons expert was arrested by ATF agents in Dallas, Texas for posession of a large quantity of cocaine. Police searched a storage unit owned by the suspect and seized 2 Steyr AUGs and parts to convert them to fully automatic operation (all of the work to convert had been completed on the guns), a grenade launcher on a Colt AR-15 with the parts to convert the firearm to fully automatic, another AR-15 and several other firearms. The suspect later was convicted on Federal firearms charges and received 27 months in prison.



Shown is Steyr AUG

13

# Intratec TEC-9, TEC-DC9, and TEC-22

## Background

The TEC-9 weighs 50 ounces unloaded, and 72 ounces when fully loaded.

## Production

This semi-automatic assault pistol is manufactured domestically by Intratec in Miami. Approximately 200,000 have been manufactured.

## Ammunition Magazine

The TEC-9 chambers 9mm ammunition and comes equipped with a 36-round magazine.

## Numbers Traced *

During the years 1990 to 1993, these firearms accounted for 3,710 of the firearms traced for law enforcement officials nationwide. They were traced for 638 narcotics investigations, 319 murder cases, and 234 instances of assault.

According to ATF's Tracing Center, from 1991 through 1993, the TEC-9 has been in the top 10 firearms that were traced.

* not all firearms used in crime are traced.

## Examples of Use in Crime

An ATF undercover agent in Colorado Springs, Colorado attempted to buy illegally purchased firearms from members of a Los Angeles based street gang (in Colorado). The gang members critically wounded the agent with a TEC-9, 9mm semi-automatic pistol.

In Anchorage, Alaska, the police department investigated an armed robbery in which a TEC-9 semiautomatic assault pistol was used. The suspect was one of 17 defendants in an ATF drug/gun conspiracy investigation.

A convicted felon with gang affiliations was arrested after taking a TEC-22 into the Louisiana State University Medical Center.



Shown is TEC 9 (DC 9)

15

# Street Sweeper/Striker 12
# (also including the USAS 12)

## Background

On March 1, 1994, these assault shotguns were classified as destructive devices under the National Firearms Act. As such, they may still be manufactured, but must be registered with ATF.

## Production

In 1984 and 1988, these shotguns were denied for importation because they did not meet the sporting purpose criteria under the Gun Control Act. They have subsequently been manufactured in the United States. Approximately 18,000 have been manufactured domestically to date.

The Striker was originally designed in Rhodesia and manufactured in South Africa for the purposes of crowd control. The Street Sweeper is a domestic copy of the original Striker 12. The USAS-12 was originally produced in Korea and was based on an automatic version of the weapon used by the military.

## Ammunition Magazine

These shotguns come equipped with magazine capacities of 12 shotgun shell rounds.

## Numbers Traced *

During the years 1991 to 1993, these shotguns accounted for 176 of the firearms traced for law enforcement officials nationwide. They were traced for 42 narcotics investigations, 11 murder cases, and 6 instances of assault.

* not all firearms used in crime are traced.

## Examples of Use in Crime

In New Orleans, Louisiana, a multiple conviction felon, with a conviction for drive-by shootings, was found in possession of a Street Sweeper and TEC-22. He was a known gang member and escaped from custody after an initial arrest. He has been recaptured and is a suspect in several California homicides.

A Street Sweeper was confiscated from a tax protester in Minneapolis, Minnesota during a DWI. The Street Sweeper was decorated with Nazi insignias -- the words "White Power" and swastikas.

A Street Sweeper was confiscated from a suspect who was believed to have participated in the recent Brooklyn Bridge attack on a group of Hasidic Jews in New York City.



Shown is Street Sweeper

17

# Questions and Answers About
# Semi-Automatic Assault Weapons

## What are semi-automatic assault weapons?

As defined in the Senate Crime Bill and in legislation pending in the House of Representatives, assault weapons are large capacity, semi-automatic firearms designed and configured for rapid fire, combat use (the Street Sweeper/Striker 12 shotguns have a wind-up drum). Most are patterned after machine guns used by military forces. They have distinct features which separate them from sporting firearms.

Many are banned from being imported into the United States, but all can be legally manufactured in this country. Passing assault weapons legislation removes these guns from circulation.

## Why ban semi-automatic assault weapons?

Assault weapons make up only 1% of the guns in circulation in the United States. They account for up to 8% of the guns traced by law enforcement officials in the investigation of criminal activity. They are preferred by criminals over law abiding citizens 8 to 1. A number of these guns rank in the top 10 of all guns traced in relation to crime.

The way to show that we are serious about violent crime is to ban assault weapons. We are not being tough on gangsters if we allow open access to gangster weapons. Passing assault weapons legislation puts an end to an arms race on our streets.

## Some people say semi-automatic assault weapons are just different looking versions of sporting firearms?

Some people might try to tell us that a diesel locomotive is like a family sedan because they have internal combustion engines. Assault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics. They are mass produced mayhem.

## Can't conventional sporting firearms be fitted with large magazines?

The legislation now pending in Congress bans ammunition magazines with a capacity greater than 10 rounds.

If someone crafts an illegal magazine, we can prosecute that person. Right now factories legally turn out such magazines and distribute them by the truckload.

19

## Don't some gun owners say that this ban will lead to a ban of their semiautomatic sporting firearms?

The legislation pending in Congress specifically exempts nearly 700 conventional sporting firearms from its provisions. This legislation doesn't threaten the law abiding gun owners; it protects them and protects those who own no guns at all.

## Will banning these firearms have an impact on crime?

Yes, it will. These guns help the criminals who have them to commit their crimes, adding to the carnage. They embolden the crook. Access to them shifts the balance of power to the lawless.

It is also a matter of principle that we ban these semi-automatic assault weapons. For people who say they are serious about addressing violent crime, it is time to vote seriously about the firearms criminals prefer.

## The AR-15 comes equipped with a 5-round magazine. How can you classify this firearm as a rapid fire assault weapon?

Any weapon that takes a detachable magazine will hold a magazine of a larger capacity. Large capacity magazines of up to 150 rounds are available in unknown quantities for all of the firearms identified in this legislation, except the Street Sweeper. However, twenty and fifty-round magazines are readily available for use with these firearms.

# Firearms Exempted in Proposed Legislation as Hunting and Sporting Firearms

### Centerfire Rifles—Autoloaders

Browning BAR Mark II Safari Semi-Auto Rifle
Browning BAR Mark II Safari Magnum Rifle
Browning High-Power Rifle
Heckler & Koch Model 300 Rifle
Iver Johnson M–1 Carbine
Iver Johnson 50th Anniversary M–1 Carbine
Marlin Model 9 Camp Carbine
Marlin Model 45 Carbine
Remington Nylon 66 Auto-Loading Rifle
Remington Model 7400 Auto Rifle
Remington Model 7400 Rifle
Remington Model 7400 Special Purpose Auto Rifle
Ruger Mini-14 Autoloading Rifle (w/o folding stock)
Ruger Mini Thirty Rifle

### Centerfire Rifles—Lever & Slide

Browning Model 81 BLR Lever-Action Rifle
Browning Model 81 Long Action BLR
Browning Model 1886 Lever-Action Carbine
Browning Model 1886 High Grade Carbine
Cimarron 1860 Henry Replica
Cimarron 1866 Winchester Replicas
Cimarron 1873 Short Rifle
Cimarron 1873 Sporting Rifle
Cimarron 1873 30″ Express Rifle
Dixie Engraved 1873 Rifle
E.M.F. 1866 Yellowboy Lever Actions
E.M.F. 1860 Henry Rifle
E.M.F. Model 73 Lever-Action Rifle
Marlin Model 336CS Lever-Action Carbine
Marlin Model 30AS Lever-Action Carbine
Marlin Model 444SS Lever-Action Sporter
Marlin Model 1894S Lever-Action Carbine
Marlin Model 1894CS Carbine
Marlin Model 1894CL Classic
Marlin Model 1895SS Lever-Action Rifle
Mitchell 1858 Henry Replica
Mitchell 1866 Winchester Replica
Mitchell 1873 Winchester Replica
Navy Arms Military Henry Rifle
Navy Arms Henry Trapper
Navy Arms Iron Frame Henry
Navy Arms Henry Carbine
Navy Arms 1866 Yellowboy Rifle
Navy Arms 1873 Winchester-Style Rifle
Navy Arms 1873 Sporting Rifle
Remington 7600 Slide Action
Remington Model 7600 Special Purpose Slide Action

21

Rossi M92 SRC Saddle-Ring Carbine
Rossi M92 SRS Short Carbine
Savage 99C Lever-Action Rifle
Uberti Henry Rifle
Uberti 1866 Sporting Rifle
Uberti 1873 Sporting Rifle
Winchester Model 94 Side Eject Lever-Action Rifle
Winchester Model 94 Trapper Side Eject
Winchester Model 94 Big Bore Side Eject
Winchester Model 94 Ranger Side Eject Lever-Action Rifle
Winchester Model 94 Wrangler Side Eject

## Centerfire Rifles—Bolt Action

Alpine Bolt-Action Rifle
A-Square Caesar Bolt-Action Rifle
A-Square Hannibal Bolt-Action Rifle
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700D Bavarian Bolt-Action Rifle
Anschutz 1733D Mannlicher Rifle
Barret Model 90 Bolt-Action Rifle
Beeman/HW 60J Bolt-Action Rifle
Blaser R84 Bolt-Action Rifle
BRNO 537 Sporter Bolt-Action Rifle
BRNO ZKB 527 Fox Bolt-Action Rifle
BRNO ZKK 600, 601, 602 Bolt-Action Rifles
Browning A-Bolt Rifle
Browning A-Bolt Stainless Stalker
Browning A-Bolt Left Hand
Browning A-Bolt Short Action
Browning Euro-Bolt Rifle
Browning A-Bolt Gold Medallion
Browning A-Bolt Micro Medallion
Century Centurion 14 Sporter
Century Enfield Sporter #4
Century Swedish Sporter #38
Century Mauser 98 Sporter
Cooper Model 38 Centerfire Sporter
Dakota 22 Sporter Bolt-Action Rifle
Dakota 76 Classic Bolt-Action Rifle
Dakota 76 Short Action Rifles
Dakota 76 Safari Bolt-Action Rifle
Dakota 416 Rigby African
E.A.A./Sabatti Rover 870 Bolt-Action Rifle
Auguste Francotte Bolt-Action Rifles
Carl Gustaf 2000 Bolt-Action Rifle
Heym Magnum Express Series Rifle
Howa Lightning Bolt-Action Rifle
Howa Realtree Camo Rifle
Interarms Mark X Viscount Bolt-Action Rifle
Interarms Mini-Mark X Rifle
Interarms Mark X Whitworth Bolt-Action Rifle
Interarms Whitworth Express Rifle
Iver Johnson Model 5100A1 Long-Range Rifle
KDF K15 American Bolt-Action Rifle
Krico Model 600 Bolt-Action Rifle
Krico Model 700 Bolt-Action Rifles

22

Mauser Model 66 Bolt-Action Rifle
Mauser Model 99 Bolt-Action Rifle
McMillan Signature Classic Sporter
McMillan Signature Super Varminter
McMillan Signature Alaskan
McMillan Signature Titanium Mountain Rifle
McMillan Classic Stainless Sporter
McMillan Talon Safari Rifle
McMillan Talon Sporter Rifle
Midland 1500S Survivor Rifle
Navy Arms TU–33/40 Carbine
Parker-Hale Model 81 Classic Rifle
Parker-Hale Model 81 Classic African Rifle
Parker-Hale Model 1000 Rifle
Parker-Hale Model 1100M African Magnum
Parker-Hale Model 1100 Lightweight Rifle
Parker-Hale Model 1200 Super Rifle
Parker-Hale Model 1200 Super Clip Rifle
Parker-Hale Model 1300C Scout Rifle
Parker-Hale Model 2100 Midland Rifle
Parker-Hale Model 2700 Lightweight Rifle
Parker-Hale Model 2800 Midland Rifle
Remington Model Seven Bolt-Action Rifle
Remington Model Seven Youth Rifle
Remington Model Seven Custom KS
Remington Model Seven Custom MS Rifle
Remington 700 ADL Bolt-Action Rifle
Remington 700 BDL Bolt-Action Rifle
Remington 700 BDL Varmint Special
Remington 700 BDL European Bolt-Action Rifle
Remington 700 Varmint Synthetic Rifle
Remington 700 BDL SS Rifle
Remington 700 Stainless Synthetic Rifle
Remington 700 MTRSS Rifle
Remington 700 BDL Left Hand
Remington 700 Camo Synthetic Rifle
Remington 700 Safari
Remington 700 Mountain Rifle
Remington 700 Custom KS Mountain Rifle
Remington 700 Classic Rifle
Ruger M77 Mark II Rifle
Ruger M77 Mark II Magnum Rifle
Ruger M77RL Ultra Light
Ruger M77 Mark II All-Weather Stainless Rifle
Ruger M77 RSI International Carbine
Ruger M77 Mark II Express Rifle
Ruger M77VT Target Rifle
Sako Hunter Rifle
Sako Fiberclass Sporter
Sako Safari Grade Bolt Action
Sako Hunter Left-Hand Rifle
Sako Classic Bolt Action
Sake Hunter LS Rifle
Sako Deluxe Lightweight
Sako Super Deluxe Sporter
Sako Mannlicher-Style Carbine
Sako Varmint Heavy Barrel

23

Sako TRG–S Bolt-Action Rifle
Sauer 90 Bolt-Action Rifle
Savage 110G Bolt-Action Rifle
Savage 110CY Youth/Ladies Rifle
Savage 110WLE One of One Thousand Limited Edition Rifle
Savage 110GXP3 Bolt-Action Rifle
Savage 110F Bolt-Action Rifle
Savage 110FXP3 Bolt-Action Rifle
Savage 110GV Varmint Rifle
Savage 112FV Varmint Rifle
Savage Model 112FVS Varmint Rifle
Savage Model 112BV Heavy Barrel Varmint Rifle
Savage 116FSS Bolt-Action Rifle
Savage model 116FSK Kodiak Rifle
Savage 110FP Police Rifle
Steyr-Mannlicher Sporter Models SL, L, M, S, S/T
Steyr-Mannlicher Luxus Model L, M, S
Steyr-Mannlicher Model M Professional Rifle
Tikka Bolt-Action Rifle
Tikka Premium Grade Rifles
Tikka Varmint/Continental Rifle
Tikka Whitetail/Battue Rifle
Ultra Light Arms Model 20 Rifle
Ultra Light Arms Model 28, Model 40 Rifles
Voere VEC 91 Lightning Bolt-Action Rifle
Voere Model 2165 Bolt-Action Rifle
Voere Model 2155, 2150 Bolt-Action Rifles
Weatherby Mark V Deluxe Bolt-Action Rifle
Weatherby Lasermark V Rifle
Weatherby Mark V Crown Custom Rifles
Weatherby Mark V Sporter Rifle
Weatherby Mark V Safari Grade Custom Rifles
Weatherby Weathermark Rifle
Weatherby Weathermark Alaskan Rifle
Weatherby Classicmark No. 1 Rifle
Weatherby Weatherguard Alaskan Rifle
Weatherby Vanguard VGX Deluxe Rifle
Weatherby Vanguard Classic Rifle
Weatherby Vanguard Classic No. 1 Rifle
Weatherby Vanguard Weatherguard Rifle
Wichita Classic Rifle
Wichita Varmint Rifle
Winchester Model 70 Sporter
Winchester Model 70 Sporter WinTuff
Winchester Model 70 SM Sporter
Winchester Model 70 Stainless Rifle
Winchester Model 70 Varmint
Winchester Model 70 Synthetic Heavy Varmint Rifle
Winchester Model 70 DBM Rifle
Winchester Model 70 DBM–S Rifle
Winchester Model 70 Featherweight
Winchester Model 70 Featherweight WinTuff
Winchester Model 70 Featherweight Classic
Winchester Model 70 Lightweight Rifle
Winchester Ranger Rifle
Winchester Model 70 Super Express Magnum
Winchester Model 70 Super Grade

24

Winchester Model 70 Custom Sharpshooter
Winchester Model 70 Custom Sporting Sharpshooter Rifle

## Centerfire Rifles—Single Shot

Armsport 1866 Sharps Rifle, Carbine
Brown Model One Single Shot Rifle
Browning Model 1885 Single Shot Rifle
Dakota Single Shot Rifle
Desert Industries G–90 Single Shot Rifle
Harrington & Richardson Ultra Varmint Rifle
Model 1885 High Wall Rifle
Navy Arms Rolling Block Buffalo Rifle
Navy Arms #2 Creedmoor Rifle
Navy Arms Sharps Cavalry Carbine
Navy Arms Sharps Plains Rifle
New England Firearms Handi-Rifle
Red Willow Armory Ballard No. 5 Pacific
Red Willow Armory Ballard No. 1.5 Hunting Rifle
Red Willow Armory Ballard No. 8 Union Hill Rifle
Red Willow Armory Ballard No. 4.5 Target Rifle
Remington-Style Rolling Block Carbine
Ruger No. 1B Single Shot
Ruger No. 1A Light Sporter
Ruger No. 1H Tropical Rifle
Ruger No. 1S Medium Sporter
Ruger No. 1 RSI International
Ruger No. 1V Special Varminter
C. Sharps Arms New Model 1874 Old Reliable
C. Sharps Arms New Model 1875 Rifle
C. Sharps Arms 1875 Classic Sharps
C. Sharps Arms New Model 1875 Target & Long Range
Shiloh Sharps 1874 Long Range Express
Shiloh Sharps 1874 Montana Roughrider
Shiloh Sharps 1874 Military Carbine
Shiloh Sharps 1874 Business Rifle
Shiloh Sharps 1874 Military Rifle
Sharps 1874 Old Reliable
Thompson/Center Contender Carbine
Thompson/Center Stainless Contender Carbine
Thompson/Center Contender Carbine Survival System
Thompson/Center Contender Carbine Youth Model
Thompson/Center TCR '87 Single Shot Rifle
Uberti Rolling Block Baby Carbine

## Drillings, Combination Guns, Double Rifles

Baretta Express SSO O/U Double Rifles
Baretta Model 455 SxS Express Rifle
Chapuis RGExpress Double Rifle
Auguste Francotte Sidelock Double Rifles
Auguste Francotte Boxlock Double Rifle
Heym Model 55B O/U Double Rifle
Heym Model 55FW O/U Combo Gun
Heym Model 88b Side-by-Side Double Rifle
Kodiak Mk. IV Double Rifle
Kreighoff Teck O/U Combination Gun
Kreighoff Trumpf Drilling

25

Merkel Over/Under Combination Guns
Merkel Drillings
Merkel Model 160 Side-by-Side Double Rifles
Merkel Over/Under Double Rifles
Savage 24F O/U Combination Gun
Savage 24F–12T Turkey Gun
Springfield Inc. M6 Scout Rifle/Shotgun
Tikka Model 412s Combination Gun
Tikka Model 412S Double Fire
A. Zoli Rifle-Shotgun O/U Combo

### Rimfire Rifles—Autoloaders

AMT Lightning 25/22 Rifle
AMT Lightning Small-Game Hunting Rifle II
AMT Magnum Hunter Auto Rifle
Anschutz 525 Deluxe Auto
Armscor Model 20P Auto Rifle
Browning Auto-22 Rifle
Browning Auto-22 Grade VI
Krico Model 260 Auto Rifle
Lakefield Arms Model 64B Auto Rifle
Marlin Model 60 Self-Loading Rifle
Marlin Model 60ss Self-Loading Rifle
Marlin Model 70 HC Auto
Marlin Model 990l Self-Loading Rifle
Marlin Model 70P Papoose
Marlin Model 922 Magnum Self-Loading Rifle
Marlin Model 995 Self-Loading Rifle
Norinco Model 22 ATD Rifle
Remington Model 522 Viper Autoloading Rifle
Remington 552BDL Speedmaster Rifle
Ruger 10/22 Autoloading Carbine (w/o folding stock)
Survival Arms AR–7 Explorer Rifle
Texas Remington Revolving Carbine
Voere Model 2115 Auto Rifle

### Rimfire Rifles—Lever & Slide Action

Browning BL–22 Lever-Action Rifle
Marlin 39TDS Carbine
Marlin Model 39AS Golden Lever-Action Rifle
Remington 572BDL Fieldmaster Pump Rifle
Norinco EM–321 Pump Rifle
Rossi Model 62 SA Pump Rifle
Rossi Model 62 SAC Carbine
Winchester Model 9422 Lever-Action Rifle
Winchester Model 9422 Magnum Lever-Action Rifle

### Rimfire Rifles—Bolt Actions & Single Shots

Anschutz Achiever Bolt-Action Rifle
Anschutz 1416D/1516D Classic Rifles
Anschutz 1418D/1518D Mannlicher rifles
Anschutz 1700D Classic Rifles
Anschutz 1700D Custom Rifles
Anschutz 1700 FWT Bolt-Action Rifle
Anschutz 1700D Graphite Custom Rifle

26

Anschutz 1700D Bavarian Bolt-Action Rifle
Armscor Model 14P Bolt-Action Rifle
Armscor Model 1500 Rifle
BRNO ZKM–452 Deluxe Bolt-Action Rifle
BRNO ZKM 452 Deluxe
Beeman/HW 60–J–ST Bolt-Action Rifle
Browning A-Bolt 22 Bolt-Action Rifle
Browning A-Bolt Gold Medallion
Cabanas Phaser Rifle
Cabanas Master Bolt-Action Rifle
Cabanas Espronceda IV Bolt-Action Rifle
Cabanas Leyre Bolt-Action Rifle
Chipmunk Single Shot Rifle
Cooper Arms Model 36S Sporter Rifle
Dakota 22 Sporter Bolt-Action Rifle
Krico Model 300 Bolt-Action Rifles
Lakefield Arms Mark II Bolt-Action Rifle
Lakefield Arms Mark I Bolt-Action Rifle
Magtech Model MT–22C Bolt-Action Rifle
Marlin Model 880 Bolt-Action Rifle
Marlin Model 881 Bolt-Action Rifle
Marlin Model 882 Bolt-Action Rifle
Marlin Model 883 Bolt-Action Rifle
Marlin Model 883SS Bolt-Action Rifle
Marlin Model 25MN Bolt-Action Rifle
Marlin Model 25N Bolt-Action Repeater
Marlin Model 15YN "Little Buckaroo"
Mauser Model 107 Bolt-Action Rifle
Mauser Model 201 Bolt-Action Rifle
Navy Arms TU–KKW Training Rifle
Navy Arms TU–33/40 Carbine
Navy Arms TU–KKW Sniper Trainer
Norinco JW–27 Bolt-Action Rifle
Norinco JW–15 Bolt-Action Rifle
Remington 541–T
Remington 40–XR Rimfire Custom sporter
Remington 541–T HB Bolt-Action Rifle
Remington 581–S Sportsman Rifle
Ruger 77/22 Rimfire Bolt-Action Rifle
Ruger K77/22 Varmint Rifle
Ultra Light arms Model 20 RF Bolt-Action Rifle
Winchester Model 52B Sporting Rifle

## Competition Rifles—Centerfire & Rimfire

Anschutz 64–MS Left Silhouette
Anschutz 1808D RT Super Match 54 Target
Anschutz 1827B Biathlon Rifle
Anschutz 1903D Match Rifle
Anschutz 1803D Itermediate Match
Anschutz 1911 Match Rifle
Anschutz 54.18MS REP Deluxe Silhouette Rifle
Anschutz 1913 Super Match Rifle
Anschutz 1907 Match Rifle
Anschutz 1910 Super Match II
Anschutz 54.18MS Silhouette Rifle
Anschutz Super Match 54 Target Model 2013

27

Anschutz Super Match 54 Target Model 2007
Beeman/Feinwerkbau 2600 Target Rifle
Cooper Arms Model TRP–1 ISU Standard Rifle
E.A.A./Weihrauch HW 60 Target Rifle
E.A.A./HW 660 Match Rifle
Finnish Lion Standard Target Rifle
Krico Model 360 S2 Biathlon Rifle
Krico Model 400 Match Rifle
Krico Model 360S Biathlon Rifle
Krico Model 500 Kricotronic Match Rifle
Krico Model 600 Sniper Rifle
Krico Model 600 Match Rifle
Lakefield Arms Model 90B Target Rifle
Lakefield Arms Model 91T Target Rifle
Lakefield Arms Model 92S Silhouette Rifle
Marlin Model 2000 Target Rifle
Mauser Model 86–SR Specialty Rifle
McMillan M–86 Sniper Rifle
McMillan Combo M–87/M–88 50-Caliber Rifle
McMillan 300 Phoenix Long Range Rifle
McMillan M–89 Sniper Rifle
McMillan National Match Rifle
McMillan Long Range Rifle
Parker-Hale M–87 Target Rifle
Parker-Hale M–85 Sniper Rifle
Remington 40–XB Rangemaster Target Centerfire
Remington 40–XR KS Rimfire Position Rifle
Remington 40–XBBR KS
Remington 40–XC KS National Match Course Rifle
Sako TRG–21 Bolt-Action Rifle
Steyr-Mannlicher Match SPG–UIT Rifle
Steyr-Mannlicher SSG P–I Rifle
Steyr-Mannlicher SSG P–III Rifle
Steyr-Mannlicher SSG P–IV Rifle
Tanner Standard UIT Rifle
Tanner 50 Meter Free Rifle
Tanner 300 Meter Free Rifle
Wichita Silhouette Rifle

## Shotguns—Autoloaders

American Arms/Franchi Black Magic 48/AL
Benelli Super Black Eagle Shotgun
Benelli Super Black Eagle Slug Gun
Benelli M1 Super 90 Field Auto Shotgun
Benelli Montefeltro Super 90 20-Gauge Shotgun
Benelli Montefeltro Super 90 Shotgun
Benelli M1 Sporting Special Auto Shotgun
Benelli Black Eagle Competition Auto Shotgun
Beretta A–303 Auto Shotgun
Beretta 390 Field Auto Shotgun
Beretta 390 Super Trap, Super Skeet Shotguns
Beretta Vittoria Auto Shotgun
Beretta Model 1201F Auto Shotgun
Browning BSA 10 Auto Shotgun
Browning BSA 10 Stalker Auto Shotgun
Browning A–500R Auto Shotgun

28

Browning A–500G Auto Shotgun
Browning A–500G Sporting Clays
Browning Auto-5 Light 12 and 20
Browning Auto-5 Stalker
Browning Auto-5 Magnum 20
Browning Auto-5 Magnum 12
Churchill Turkey Automatic Shotgun
Cosmi Automatic Shotgun
Maverick Model 60 Auto Shotgun
Mossberg Model 5500 Shotgun
Mossberg Model 9200 Regal Semi-Auto Shotgun
Mossberg Model 9200 USST Auto Shotgun
Mossberg Model 9200 Camo Shotgun
Mossberg Model 6000 Auto Shotgun
Remington Model 1100 Shotgun
Remington 11–87 Premier Shotgun
Remington 11–87 Sporting Clays
Remington 11–87 Premier Skeet
Remington 11–87 Premier Trap
Remington 11–87 Special Purpose Magnum
Remington 11–87 SPS–T Camo Auto Shotgun
Remington 11–87 Special Purpose Deer Gun
Remington 11–87 SPS–BG-Camo Deer/Turkey Shotgun
Remington 11–87 SPS-Deer Shotgun
Remington 11–87 Special Purpose Synthetic Camo
Remington SP–10 Magnum-Camo Auto Shotgun
Remington SP–10 Magnum Auto Shotgun
Remington SP–10 Magnum Turkey Combo
Remington 1100 LT–20 Auto
Remington 1100 Special Field
Remington 1100 20-Gauge Deer Gun
Remington 1100 LT–20 Tournament Skeet
Winchester Model 1400 Semi-Auto Shotgun

### Shotguns—Slide Actions

Browning Model 42 Pump Shotgun
Browning BPS Pump Shotgun
Browning BPS Stalker Pump Shotgun
Browning BPS Pigeon Grade Pump Shotgun
Browning BPS Pump Shotgun (Ladies and Youth Model)
Browning BPS Game Gun Turkey Special
Browning BPS Game Gun Deer Special
Ithaca Model 87 Supreme Pump Shotgun
Ithaca Model 87 Deerslayer Shotgun
Ithaca Deerslayer II Rifled Shotgun
Ithaca Model 87 Turkey Gun
Ithaca Model 87 Deluxe Pump Shotgun
Magtech Model 586–VR Pump Shotgun
Maverick Models 88, 91 Pump Shotguns
Mossberg Model 500 Sporting Pump
Mossberg Model 500 Camo Pump
Mossberg Model 500 Muzzleloader Combo
Mossberg Model 500 Trophy Slugster
Mossberg Turkey Model 500 Pump
Mossberg Model 500 Bantam Pump
Mossberg Field Grade Model 835 Pump Shotgun

29

Mossberg Model 835 Regal Ulti-Mag Pump
Remington 870 Wingmaster
Remington 870 Special Purpose Deer Gun
Remington 870 SPS–BG-Camo Deer/Turkey Shotgun
Remington 870 SPS-Deer Shotgun
Remington 870 Marine Magnum
Remington 870 TC Trap
Remington 870 Special Purpose Synthetic Camo
Remington 870 Wingmaster Small Gauges
Remington 870 Express Rifle Sighted Deer Gun
Remington 879 SPS Special Purpose Magnum
Remington 870 SPS–T Camo Pump Shotgun
Remington 870 Special Field
Remington 870 Express Turkey
Remington 870 High Grades
Remington 870 Express
Remington Model 870 Express Youth Gun
Winchester Model 12 Pump Shotgun
Winchester Model 42 High Grade Shotgun
Winchester Model 1300 Walnut Pump
Winchester Model 1300 Slug Hunter Deer Gun
Winchester Model 1300 Ranger Pump Gun Combo & Deer Gun
Winchester Model 1300 Turkey Gun
Winchester Model 1300 Ranger Pump Gun

### Shotguns—Over/Unders

American Arms/Franchi Falconet 2000 O/U
American Arms Silver I O/U
American Arms Silver II Shotgun
American Arms Silver Skeet O/U
American Arms/Franchi Sporting 2000 O/U
American Arms Silver Sporting O/U
American Arms Silver Trap O/U
American Arms WS/OU 12, TS/OU 12 Shotguns
American Arms WT/OU 10 Shotgun
Armsport 2700 O/U Goose Gun
Armsport 2700 Series O/U
Armsport 2900 Tri-Barrel Shotgun
Baby Bretton Over/Under Shotgun
Beretta Model 686 Ultralight O/U
Beretta ASE 90 Competition O/U Shotgun
Beretta Over/Under Field Shotguns
Beretta Onyx Hunter Sport O/U Shotgun
Beretta Model SO5, SO6, SO9 Shotguns
Beretta Sporting Clay Shotguns
Beretta 687EL Sporting O/U
Beretta 682 Super Sporting O/U
Beretta Series 682 Competition Over/Unders
Browning Citori O/U Shotgun
Browning Superlight Citori Over/Under
Browning Lightning Sporting Clays
Browning Micro Citori Lightning
Browning Citori Plus Trap Combo
Browning Citori Plus Trap Gun
Browning Citori O/U Skeet Models
Browning Citori O/U Trap Models

30

Browning Special Sporting Clays
Browning Citori GTI Sporting Clays
Browning 325 Sporting Clays
Centurion Over/Under Shotgun
Chapuis Over/Under Shotgun
Connecticut Valley Classics Classic Sporter O/U
Connecticut Valley Classics Classic Field Waterfowler
Charles Daly Field Grade O/U
Charles Daly Lux Over/Under
E.A.A./Sabatti Sporting Clays Pro-Gold O/U
E.A.A./Sabatti Falcon-Mon Over/Under
Kassnar Grade I O/U Shotgun
Krieghoff K-80 Sporting Clays O/U
Krieghoff K-80 Skeet Shotgun
Krieghoff K-80 International Skeet
Krieghoff K-80 Four-Barrel Skeet Set
Krieghoff K-80/RT Shotguns
Krieghoff K-80 O/U Trap Shotgun
Laurona Silhouette 300 Sporting Clays
Laurona Silhouette 300 Trap
Laurona Super Model Over/Unders
Ljutic LM-6 Deluxe O/U Shotgun
Marocchi Conquista Over/Under Shotgun
Marocchi Avanza O/U Shotgun
Merkel Model 200E O/U Shotgun
Merkel Model 200E Skeet, Trap Over/Unders
Merkel Model 203E, 303E Over/Under Shotguns
Perazzi Mirage Special Sporting O/U
Perazzi Mirage Special Four-Gauge Skeet
Perazzi Sporting Classic O/U
Perazzi MX7 Over/Under Shotguns
Perazzi Mirage Special Skeet Over/Under
Perazzi MX8/MX8 Special Trap, Skeet
Perazzi MX8/20 Over/Under Shotgun
Perazzi MX9 Single Over/Under Shotguns
Perazzi MX12 Hunting Over/Under
Perazzi MX28, MX410 Game O/U Shotguns
Perazzi MX20 Hunting Over/Under
Piotti Boss Over/Under Shotgun
Remington Peerless Over/Under Shotgun
Ruger Red Label O/U Shotgun
Ruger Sporting Clays O/U Shotgun
San Marco 12-Ga. Wildflower Shotgun
San Marco Field Special O/U Shotgun
San Marco 10-Ga. O/U Shotgun
SKB Model 505 Deluxe Over/Under Shotgun
SKB Model 685 Over/Under Shotgun
SKB Model 885 Over/Under Trap, Skeet, Sporting Clays
Stoeger/IGA Condor I O/U Shotgun
Stoeger/IGA ERA 2000 Over/Under Shotgun
Techni-Mec Model 610 Over/Under
Tikka Model 412S Field Grade Over/Under
Weatherby Athena Grade IV O/U Shotguns
Weatherby Athena Grade V Classic Field O/U
Weatherby Orion O/U Shotguns
Weatherby II, III Classic Field O/Us
Weatherby Orion II Classic Sporting Clays O/U

31

Weatherby Orion II Sporting Clays O/U
Winchester Model 1001 O/U Shotgun
Winchester Model 1001 Sporting Clays O/U
Pietro Zanoletti Model 2000 Field O/U

### Shotguns—Side by Sides

American Arms Brittany Shotgun
American Arms Gentry Double Shotgun
American Arms Derby Side-by-Side
American Arms Grulla #2 Double Shotgun
American Arms WS/SS 10
American Arms TS/SS 10 Double Shotgun
American Arms TS/SS 12 Side-by-Side
Arrieta Sidelock Double Shotguns
Armsport 1050 Series Double Shotguns
Arizaga Model 31 Double Shotgun
AYA Boxlock Shotguns
AYA Sidelock Double Shotguns
Beretta Model 452 Sidelock Shotgun
Beretta Side-by-Side Field Shotguns
Crucelegui Hermanos Model 150 Double
Chapuis Side-by-Side Shotgun
E.A.A./Sabatti Saba-Mon Double Shotgun
Charles Daly Model Dss Double
Ferlib Model F VII Double Shotgun
Auguste Francotte Boxlock Shotgun
Auguste Francotte Sidelock Shotgun
Garbi Model 100 Double
Garbi Model 101 Side-by-Side
Garbi Model 103A, B Side-by-Side
Garbi Model 200 Side-by-Side
Bill Hanus Birdgun Doubles
Hatfield Uplander Shotgun
Merkell Model 8, 47E Side-by-Side Shotguns
Merkel Model 47LSC Sporting Clays Double
Merkel Model 47S, 147S Side-by-Sides
Parker Reproductions Side-by-Side
Piotti King No. 1 Side-by-Side
Piotti Lunik Side-by-Side
Piotti King Extra Side-by-Side
Piotti Piuma Side-by-Side
Precision Sports Model 600 Series Doubles
Rizzini Boxlock Side-by-Side
Rizzini Sidelock Side-by-Side
Stoeger/IGA Uplander Side-by-Side Shotgun
Ugartechea 10-Ga. Magnum Shotgun

### Shotguns—Bolt Actions & Single Shots

Armsport Single Barrel Shotgun
Browning BT–99 Competition Trap Special
Browning BT–99 Plus Trap Gun
Browning BT–99 Plus Micro
Browning Recoilless Trap Shotgun
Browning Micro Recoilless Trap Shotgun
Desert Industries Big Twenty Shotgun

32

Harrington & Richardson Topper Model 098
Harrington & Richardson Topper Classic Youth Shotgun
Harrington & Richardson N.W.T.F. Turkey Mag
Harrington & Richardson Topper Deluxe Model 098
Krieghoff KS–5 Trap Gun
Krieghoff KS–5 Special
Krieghoff K–80 Single Barrel Trap Gun
Ljutic Mono Gun Single Barrel
Ljutic LTX Super Deluxe Mono Gun
Ljutic Recoilless Space Gun Shotgun
Marlin Model 55 Goose Gun Bolt Action
New England Firearms Turkey and Goose Gun
New England Firearms N.W.T.F. Shotgun
New England Firearms Tracker Slug Gun
New England Firearms Standard Pardner
New England Firearms Survival Gun
Perazzi TM1 Special Single Trap
Remington 90–T Super Single Shotgun
Snake Charmer II Shotgun
Stoeger/IGA Reuna Single Barrel Shotgun
Thompson/Center TCR '87 Hunter Shotgun.''.

# Exhibit 69

# FINAL REPORT
# OF THE
# SANDY HOOK ADVISORY COMMISSION

## Presented to

## Governor Dannel P. Malloy
## State of Connecticut

## March 6, 2015

*"[W]e would often hear people say, I can't imagine what you're going through.  I can't imagine how hard it must be.  I can't imagine losing your child.  And while we appreciated the sentiment, the fact was that they were imagining it.  They were putting themselves into our shoes, for at least a second.  And as hard and as horrible as it sounds, we need people to imagine what it is like.  We need to empathize with each other, to walk a mile in each other's shoes. Without that imagination, we'll never change."*

–Jeremy Richman, father of
Avielle Richman

## DEDICATION

The Sandy Hook Advisory Commission dedicates this report to the twenty-six victims who were killed at Sandy Hook Elementary School in Newtown, Connecticut on December 14, 2012, to their families, the Newtown community, and to all those that have come face-to-face with the devastating effects of violence.

The families of the twenty children and six educators killed have created a website in an effort to honor and remember the lives and legacies of each victim. The Commission could think of no better way to honor these individuals than to direct our readers to this site. Here you will learn more about the memorials created for each child and educator killed.



**www.MySandyHookFamily.org**

\* \* \*

### The Children (name/age)

Charlotte Helen Bacon (6)

Daniel Barden (7)

Olivia Rose Engel (6)

Josephine Gay (7)

Ana Grace Márquez-Greene (6)

i

Dylan Christopher Hockley (6)

Madeleine Hsu (6)

Catherine Hubbard (6)

Chase Michael Anthony Kowalski (7)

Jesse McCord Lewis (6)

James Radley Mattioli (6)

Grace Audrey McDonnell (7)

Emilie Parker (6)

Jack Armistead Pinto (6)

Noah Pozner (6)

Caroline Previdi (6)

Jessica Adrienne Rekos (6)

Avielle Rose Richman (6)

Benjamin Andrew Wheeler (6)

Allison Wyatt (6)

**<u>The Adults</u>**

Rachel D'Avino (29)

Dawn Hochsprung (47)

Anne Marie Murphy (52)

Lauren Gabrielle Rousseau (30)

Mary Sherlach (56)

Victoria Leigh Soto (27)

ii

# TABLE OF CONTENTS

DEDICATION .................................................................................. i

FOREWORD....................................................................................... x

   I.   PREFACE ......................................................................... x

   II.  GOVERNOR DANNEL P. MALLOY'S CHARGE TO THE SANDY HOOK ADVISORY COMMISSION (PRESENTED ON JANUARY 24, 2013) ......... xii

   III. MEMBERSHIP OF THE SANDY HOOK ADVISORY COMMISSION.........xiv

ACKNOWLEDGMENTS................................................................xvi

EXECUTIVE SUMMARY ............................................................... 1

   I.   THE SUBSTANTIVE COMPONENTS OF THE FINAL REPORT ................. 4

     A.  Safe School Design And Operation...................................... 4

     B.  Law Enforcement, Public Safety And Emergency Response ................. 5

     C.  Mental and Behavioral Health.............................................. 7

OVERVIEW OF MASS SHOOTINGS AT SANDY HOOK ELEMENTARY SCHOOL ON DECEMBER 14, 2012................................................ 10

## PART ONE

FINDINGS AND RECOMMENDATIONS OF THE SAFE SCHOOL DESIGN AND OPERATIONS WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION ..................................................................... 14

   I.   PRELIMINARY STATEMENT............................................... 14

     A.  Contents Of Safe School Design And Operations Writing Group Report. ........................................................................ 15

     B.  Who Should Read This Report?....................................... 16

     C.  Why The Commission's Recommendations Should Be Credited......... 17

   II.  GUIDING PRINCIPLES OF SAFE SCHOOL DESIGN AND OPERATION RECOMMENDATIONS. ...................................................... 20

A.   The "All Hazards" Approach To Safe School Design And Operation.... 20

B.   The Commission Based Its Recommendations On Their Perceived Efficacy, Not Their Anticipated Cost. ................................................... 23

C.   Safe School Design and Operation Strategies Can And Should Enhance, Not Diminish, Students' Educational Experience. .............. 24

D.   The Importance Of "Situational Awareness." .................................... 25

E.   The Importance Of Creating A Safe School Climate. .......................... 27

F.   Safe School Design and Operations Strategies Must Be Tailored To The Needs Of Particular Communities And Specific Schools. ............. 29

G.   Safe School Design And Operation Standards Are Not Static.  They Must Be Reviewed And Updated On A Regular Basis. ........................ 31

H.   Successful Implementation Of Safe School Design And Operation Strategies Requires "Local Champions." ........................................... 31

III.  RECOMMENDATIONS ......................................................................... 32

IV.  ENDORSEMENTS AND COMMENTS ................................................... 38

A.   Endorsement of Public Act 13-3 ....................................................... 38

B.   Endorsement of School Safety Infrastructure Council Report and School Security and Safety Plan Standards. ...................................... 40

V.   KEY SAFE SCHOOL INFRASTRUCTURE COUNCIL STANDARDS ......... 45

**PART TWO**

FINDINGS AND RECOMMENDATIONS OF THE LAW ENFORCEMENT WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION ........... 61

I.   INTRODUCTION .................................................................................. 61

II.  INTERIM REPORT RECOMMENDATIONS ........................................... 63

A.   Firearm Permitting And Registration ................................................. 64

B.   High-Capacity Firearms, Magazine Capacity, And Ammunition ......... 65

C.   Assault Weapons ............................................................................... 67

iv

D.   Firearm Storage And Security .......................................................... 67

E.   Additional Recommendations Re: Firearms And Ammunition ............ 68

III.   FINAL REPORT RECOMMENDATIONS .................................................. 69

A.   Firearms/Ammunition ...................................................................... 69

B.   Best Practices/Protocols .................................................................. 71

C.   Gun Violence Reduction Strategies .................................................. 77

**PART THREE**

FINDINGS AND RECOMMENDATIONS OF THE MENTAL HEALTH WRITING
GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION ........... 79

I.   INTRODUCTION ................................................................................... 79

II.   MODELS OF CARE ............................................................................. 85

A.   Analysis: Reforming The System ...................................................... 85

1.   Laying the groundwork for lifelong mental health .......................... 87

2.   Treating the whole person and the whole family ............................. 89

3.   Family-centered care ................................................................... 94

4.   Places of care: schools and communities ....................................... 99

5.   Social isolation ......................................................................... 105

6.   Concluding thoughts ................................................................. 108

B.   Recommendations ........................................................................ 109

III.   BARRIERS TO ACCESS: INSURANCE AND FUNDING ISSUES ........... 113

A.   Analysis: System Fragmentation As A Barrier To Effective Care ....... 113

1.   Improving access to effective services in the public system ........... 116

2.   Elevating reimbursement rates to meet the costs of care .............. 117

3.   Improving access to effective services in the private system .......... 119

4. Expanding an overtaxed workforce ............................................... 124

5. Concluding thoughts: Toward a more integrated system of care ... 126

B. Key Findings And Recommendations ............................................... 127

IV. BARRIERS TO ACCESS: STIGMA AND DISCRIMINATION .................. 130

A. Analysis: Confronting Mental Health Stigma ................................... 130

1. Defining stigma ............................................................................ 131

2. The pervasiveness of stigma ....................................................... 134

3. Stigma deters access to care........................................................ 136

4. Stigma impacts what care is available......................................... 138

5. Internalized stigma....................................................................... 140

6. The media's role in perpetuating stigma...................................... 142

7. Effectively combating stigma....................................................... 143

8. Concluding thoughts .................................................................... 149

B. Key Findings And Recommendations ............................................... 150

V. PRIVACY, CONFIDENTIALITY AND COMMUNITY SAFETY.................. 152

A. Analysis: Privacy In The Service Of Mental Health........................... 152

1. The HIPAA Privacy Rule.............................................................. 154

2. The health information of a minor child....................................... 157

3. Limits on a parent or guardian's access to health information of an adult child........................................................................... 158

4. Communications to health care providers from concerned friends or family members........................................................... 160

5. FERPA........................................................................................... 161

6. Gray areas between FERPA and HIPAA ....................................... 163

7.    Concluding Thoughts: Balancing privacy and safety under both
      HIPAA and FERPA ........................................................................ 164

  B.  Recommendations ........................................................................ 165

VI.  THE ROLE OF MENTAL ILLNESS IN VIOLENT EVENTS .................... 166

  A.  Analysis: Mental Illness And Violence, Misconceptions And
      Realities ...................................................................................... 166

    1.  Identifying risk factors................................................................. 171

    2.  Types of violence ........................................................................ 176

    3.  Protective factors ........................................................................ 176

    4.  Self-harm and victimization......................................................... 178

    5.  Managing the risk of violence...................................................... 179

    6.  The limits of violence prediction.................................................. 180

    7.  From prediction to prevention...................................................... 182

    8.  Mandatory reporting and firearm ownership ................................ 185

    9.  What interventions to take when individuals are at risk for
        violence ...................................................................................... 189

    10.  Concluding thoughts ................................................................. 192

  B.  Key Findings And Recommendations ............................................. 193

VII.  RESPONSE, RECOVERY AND RESILIENCE ..................................... 196

  A.  Analysis: Promoting Resilience Through Response And Recovery
      Efforts .......................................................................................... 196

    1.  Disaster response planning ......................................................... 198

    2.  Training and professional development........................................ 203

    3.  Coordination ............................................................................... 208

    4.  Involvement of victims' families................................................... 209

     5.   Concluding thoughts. .................................................................. 211

  B.  Key Findings And Recommendations .................................................. 211

CLOSING QUOTE............................................................................................. 215

APPENDIX[1]

A.   Consolidated Recommendations of the Sandy Hook Advisory Commission

B.   List of Individuals Who Testified Before the Sandy Hook Advisory Commission

C.   Sandy Hook Advisory Commission Agendas and Meeting Minutes*

D.   Sandy Hook Advisory Commission Interim Report (dated March 18, 2013)*

E.   Sandy Hook Elementary School Floor Plan*

F.   Photographs of weapons used in Sandy Hook Elementary School shootings

G.   Legislation Passed During 2013 General Assembly Session Relating To Sandy Hook:

     Public Act 13-3 ("An Act Concerning Gun Violence Prevention And Children's Safety")*

     Public Act 13-220 ("An Act Concerning Revisions To The Gun Violence Prevention And Children's Safety Act")*

     Public Act 13-178 ("An Act Concerning The Mental, Emotional And Behavioral Health of Youths") and Report on Implementation of PA 13-178*

     Public Act 13-188 ("An Act Concerning School Safety")*

H.   Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newton, Connecticut on December 14, 2012 (dated Nov. 25, 2013), with accompanying Appendix.*

---

[1] Appendix entries denoted by an asterisk (*) are not included in the main report, but are available for download from the Internet via hyperlink.

I.     Report of the Child Advocate, "Shooting at Sandy Hook Elementary School," released on November 21, 2014*

J.     State Police Investigative Files re: Shootings at Sandy Hook Elementary School and 36 Yogananda Street*

K.     Report of the Safe School Infrastructure Council (revised and updated to June 27, 2014)

L.     School Security and Safety Plan Standards (v 1.0) (dated Dec. 30, 2013)*

M.     Capitol Region Chiefs of Police Association "Blue Plan" (dated April 24, 2013) (mutual aid response to incidents within Capitol Region)*

# FOREWORD

## I.   PREFACE

On December 14, 2012, one of the most vicious and incomprehensible domestic attacks in American history occurred at Sandy Hook Elementary School in Newtown, Connecticut.  Within a few hours, the world understood the gravity of the attack.  Lives were lost in two distinct locations: Sandy Hook Elementary School and a private residence in Newtown.  The scope of the tragedy would take on international proportions, and people from around the world would grieve and mourn alongside the families of Newtown.

Lost in the attack were twenty children and six adult staff members: Charlotte Bacon, Daniel Barden, Rachel D'Avino, Olivia Engel, Josephine Gay, Dawn Hochsprung, Dylan Hockley, Madeleine Hsu, Catherine Hubbard, Chase Kowalski, Jesse Lewis, Ana Márquez-Greene, James Mattioli, Grace McDonnell, Anne Marie Murphy, Emilie Parker, Jack Pinto, Noah Pozner, Caroline Previdi, Jessica Rekos, Avielle Richman, Lauren Rousseau, Mary Sherlach, Victoria Soto, Benjamin Wheeler and Allison Wyatt.

Prior to attacking Sandy Hook Elementary School, Adam Lanza ("A.L."), the lone shooter, murdered his mother, Nancy Lanza, in the home they shared.  Then, as law enforcement approached the elementary school after receiving 911 calls concerning the shootings there, A.L. took his own life.

Shortly thereafter, Connecticut Governor Dannel P. Malloy established the Sandy Hook Advisory Commission.  Comprised of sixteen subject matter experts in the fields of mental health and mental wellness, secure facility design and operations, law enforcement training and response, and public policy implementation, the Commission began taking public testimony from a series of outside experts in January 2013.

The Commission was not intended to be an investigatory body.  It was not intended to tell the story of what happened on December 14, 2012 with academic rigor and forensic precision.  The Commission was not endowed with the power of subpoena; it did not enjoy heightened access to law enforcement

x

documents at the local, state, or federal level.  It was not intended to cast a bright light on A.L., and in doing so, make the incomprehensible act somehow comprehensible.  It was not assigned financial resources.  It was endowed only with moral authority as representatives of a state so shaken by this tragedy.

Over a two year period, the panel reviewed laws, policies, and practices in place on December 14, 2012 in order to make recommendations intended to reduce the probability of another tragedy on the scale of what occurred at Sandy Hook Elementary School.  The panel focused its work in three distinct areas: Safe School Design and Operation, Law Enforcement, Public Safety, and Emergency Response, and Mental Health/Mental Wellness.

Although these topic areas are treated as separate sections of this report, mental health/mental wellness support structures, law enforcement training, response, and access, and safe school design and operation weave themselves into a tapestry in which a combination of threads offers the best opportunity for a systematic improvement in the safety of our schools. The Sandy Hook Advisory Commission offers this report as our recommendations for such a tapestry.

The intended audience for this report is broad.  First and foremost, it is for communities that recognize the value of their schools not only as sites for the education of children, but also as neighborhood hubs.  This report is for the boards of education, architects, engineers, and school building committees who design and operate school facilities on a daily basis.  It is for the volunteer and professional providers of guardian services in our towns and cities.  It is for the lawmakers and legislators who weigh issues of public safety.  It is for medical and mental health providers and supporting institutions who understand that the mind and the body are inextricably linked.  It is for the 32% of Americans who, in any given year, will face a mental health challenge and the other 68% who should support them in obtaining the help they need. This report is for all of us.

The Sandy Hook Advisory Commission offers this report as a tribute to those lost and to those families who continue to recover from their connection to this tragedy.

## II.   GOVERNOR DANNEL P. MALLOY'S CHARGE TO THE SANDY HOOK ADVISORY COMMISSION (PRESENTED ON JANUARY 24, 2013)

* * *

I want to thank all of you for the time and effort that you will put forth over the coming weeks and months.  I also want to especially thank the mayor, Scott Jackson, for serving as chair of this commission.  I put a great deal of faith in the mayor, and I think he deserves all of it.  He's done outstanding work in his own community and has served on other commissions that I've established previously, and I was very grateful when he accepted my invitation to lead this important and historic commission.

I know that serving on this commission is taking you away from other obligations, including from your families, but I believe that together, once our work is done, we will have made our children, and indeed, our entire state safer.  That's our goal.

The further away we get from December 14, 2012, the more apparent it is to me that the entire country was shaken to its core by the tragic events that occurred at Sandy Hook Elementary School.  This was brought home to me particularly during the time that I was in Washington this past weekend, where people would stop me on the street and want to talk about this and what could be done to make sure that this sort of thing doesn't happen again.  And rather than losing its impact, I would say, or its immediacy over time, the desire for changing our policies and our laws to prevent another incident like this one I think is increasing on a daily basis, not decreasing. That may be one of the great differences between this mass shooting and others.

We must bring about change through a thoughtful and comprehensive debate, one that looks at not only how we can prevent gun violence, but how also we can fix our mental health system.  We must take a serious look at

xii

public safety, particularly school safety, so that our children can grow up and go to school without the fear of violence in a culture that does, in fact, glorify violence.  We need to have a discussion about stopping that.

The recommendations you will craft over the coming weeks and months will no doubt take us towards the goal, that goal, better mental health, better safety in our schools, and a system that is set up to stop the glorification of violence, but before you get started, there are a few things that I want you to consider.

I believe that responsible, law-abiding citizens of our state have a right to bear arms, but that right cannot come at the expense of public safety.  We need to develop a common sense way to regulate access to guns.  We need to make sure that our mental health professionals have access to the resources and information they need to get treatment to those who need it.  We must make sure the public has better information about what to do when they suspect someone may be battling mental illness.

It's a sad fact that shootings like this are becoming all too common occurrences in our country.  It's also a fact that in almost every one of these cases there were warning signs.  That's why we need to come up with ways that we as friends, as family, as a society or a school system can better respond to those warning signs and hopefully reduce the stigma of mental illness.  I want to say here that reducing that stigma is extremely important.  There is a certain reality about mental illness that is not properly accounted for in the public's mind. There's a reality that many citizens, perhaps a majority of our citizens, at some point will experience as mental illness challenge, but with treatment, almost all of those incidences will be overcome.  A very small portion or a portion won't be resolved, but yet we attach so much stigma to reaching out, to sitting down, to speaking and getting help or medication that will help a person through that battle.  I said in a speech at the U.S. Conference of Mayors last Saturday that we live in a society that has destigmatized violence at the same time that it has refused to destigmatize mental treatment.

xiii

And last, we must make sure that our schools are both safe and welcoming places where our children can reach their full potential, and teachers can practice their craft without fear.

Let me also add that while this tragedy happened in a school, we must take steps to ensure that the next time it doesn't happen in a movie theatre, at a shopping mall, at a ballgame or on a street corner in any of our cities where street crime, including using guns that were purchased under loopholes, have become a constant problem in our society.

This is a monumental task that you take on.  I want to thank you again for the work that you are going to do.  I know how seriously each and every one of you takes it.  I can think of no better way to honor those that we lost in Newtown just a few short weeks ago than for you to do your hard and good work and come forward with the recommendations that will accomplish our common goals.  Thank you very much for allowing me to be with you.

\* \* \*

## III.   MEMBERSHIP OF THE SANDY HOOK ADVISORY COMMISSION

- Scott D. Jackson (Chair): Mayor, Town of Hamden

- Dr. Adrienne L. Bentman; General (Adult) Psychiatry Residency Director, Institute of Living/Hartford Hospital Program; Assistant Professor of Psychiatry, University of Connecticut School of Medicine

- Ron Chivinski: Teacher, Newtown Middle School; Vice President, Connecticut Chapter of the American Federation of Teachers

- Robert Ducibella: Former (retired) Senior and Founding Principal of Ducibella Venter & Santore, Security Consulting Engineers; Senior and Founding Principal, Risk and Protection Consulting Services, LLC

- Terry Edelstein (Vice-Chair): Nonprofit Liaison, Office of Governor Dannel P. Malloy

- Kathleen Flaherty, Esq.: Associate Executive Director, Connecticut Legal Rights Project, Inc.

- Alice M. Forrester, Ph.D.: Executive Director, Clifford W. Beers Guidance Clinic, Inc.

- Ezra H. Griffith, M.D.: Professor Emeritus of and Senior Research Scientist in Psychiatry, Deputy Chair for Diversity and Organizational Ethics, Department of Psychiatry, Yale University

- Patricia Keavney-Maruca: Member, State Board of Education; Former technical high school teacher

- Christopher Lyddy: Chief Operating Officer, Advanced Trauma Solutions, Inc.; Former State Representative, 106th Assembly District of Newtown

- Denis McCarthy: Fire Chief and Emergency Management Director, City of Norwalk; Member of the CT Department of Emergency Services and Public Protection Advisory Board

- Barbara O'Connor: Director of Public Safety and Chief of Police, University of Connecticut

- Wayne Sandford: Professor, University of New Haven, Henry C. Lee College of Criminal Justice & Forensic Sciences / Former Deputy Commissioner, Connecticut Department of Emergency Management & Homeland Security / Former Fire Chief, Town of East Haven

- David J. Schonfeld, M.D., FAAP: Director, National Center for School Crisis and Bereavement; Professor of Pediatrics, Drexel University College of Medicine

- Harold I. Schwartz, M.D.: Psychiatrist-in-Chief, Hartford Hospital's Institute of Living; Hartford Healthcare Regional Vice President, Behavioral Health; Professor of Psychiatry, University of Connecticut School of Medicine; Adjunct Professor of Psychiatry, Yale University School of Medicine

- Bernard R. Sullivan (Vice-Chair): Former Chief of Police, City of Hartford; Former Commissioner, Connecticut Department of Public Safety; Former Chief of Staff to Speaker of the House, Connecticut General Assembly

## ACKNOWLEDGMENTS

The members of the Sandy Hook Advisory Commission extend their deepest gratitude to the many persons and organizations that supported the work of the commission and contributed in so many different ways to this report. Over the course of two years and thirty meetings, more than 100 persons appeared before the Commission, sometimes more than once, and provided invaluable testimony.  Those individuals are identified in Appendix B. The Commission also gratefully acknowledges the information provided by various individuals, too numerous to name, who did not testify at public hearings, but who communicated their thoughts to the Commission.

The Commission thanks the staff of the Office of Governor Dannel P. Malloy, who helped organize the Commission under the extraordinarily difficult circumstances that prevailed following the December 14, 2012 tragedy and provided support throughout the two years that the Commission has met.

Several organizations and individuals warrant particular recognition. The law firm of McElroy, Deutsch, Mulvaney & Carpenter, LLP served as *pro bono* legal counsel to the Commission and provided extraordinary staff support. Attorney Daniel J. Klau provided sound legal advice to the Commission throughout its two years of work, and his knowledge and judgment proved invaluable.  Attorney Klau also did an exceptional job in assembling and integrating the recommendations from the Commission writing groups and formatting them into what is now the final report of the Commission.  He was supported by Louis R. Pepe, Esq., Sarah Droney, Esq., Cathy Hanrahan Ouellette, Heidi Zabit, Deirdre F. Rossing, Ronel M. Quealy, Bruce E. Beckius, James J. Edwards and Luis Merced.  The contribution of the firm's dedicated attorneys, paralegals, legal assistants, and IT and office support staff to this report cannot truly be calculated.

The Commission also thanks the The University of Connecticut School of Law, which provided both facilities and faculty to the commission.  The Commission is particularly grateful to Professor Susan Schmeiser, who served

as the Reporter for the Commission.  But for Professor Schmeiser's Herculean efforts, especially in connection with the Commission's mental health findings and recommendations, this report would not have been possible.  Thanks also to Catherine Dunn, Patrick Butler, Joshua LaPorte and student research assistant Andrew Glass of the Thomas J. Meskill Law Library, as well as UConn Law students Jeffrey Wisner and Emma Rotondo (Class of 2014), who assisted Professor Schmeiser with her work on behalf of the Commission.

Brenda Cavanaugh, the Executive Director of Community Mediation, Inc., generously donated her time and expertise to the Commission, particularly to members of the mental health writing group.  She was supported by members of her staff, including David Carter, Rachel Hereema and Marge Allende.

The Commission heard many, many hours of testimony over two years of hearings.  Several professional court reporting agencies and their members donated their time to transcribe those many hours of testimony, and members of the Commission frequently referred to those transcriptions during the preparation of this report.  The Commission expresses it great gratitude to John Brandon and his firm, Brandon Huseby Reporting & Video; the Connecticut Court Reporters Association; and the following individual reporters: Suzanne Benoit; Joanne Buck; Melanie G. Collard; Kathleen S. Norton; Michelle Keegan; Kathleen A. Morin; Aimée M. Suhie; Christine E. Borelli; Deborah A. Beausoleil; Chloe M. Stefanelli; Lynne Stein; Jill E. Remillard; Patricia L. Masi; Viktoria V. Stockmal; Susan K. Whitt; Tracy Gow; Marianne Bossé.

Finally, the Commission thanks the teachers and parents of Newtown, Connecticut, who experienced directly the deadly and traumatic events of December 14, 2012 and who shared their personal experience of that tragedy with members of the Commission.  This report cannot bring back their loved ones who died, nor can it heal the wounds of the living.  But the Commission hopes that this report will provide some solace by proposing recommendations

that may help other children, parents, teachers and communities avoid similar tragedies.

# EXECUTIVE SUMMARY

On the morning of December 14, 2012, Adam Lanza ("A.L.") killed his mother, Nancy Lanza, while she slept in her bed.  He then drove to the Sandy Hook Elementary School in Newtown, Connecticut, where in the space of several minutes he killed twenty children and six adult staff members.  After killing these persons, and as the police were about to enter the school, A.L. used a pistol to take his own life.

The mass shootings shocked and traumatized the Newtown community, the State of Connecticut, the nation, indeed the entire world.

On January 3, 2013, Governor Dannel P. Malloy announced the formation of the Sandy Hook Advisory Commission[2] to review current policy and make specific recommendations concerning public safety, with particular attention paid to school safety, mental health, and gun violence prevention.  In forming the Commission, Governor Malloy directed it to "look for ways to make sure our gun laws are as tight as they are reasonable, that our mental health system can reach those that need its help, and that our law enforcement has the tools it needs to protect public safety, particularly in our schools."

Recognizing that the Commission would need significant time to study the relevant issues, hold hearings and propose final recommendations, he nonetheless asked the Commission to submit an initial report, focusing largely on gun-related issues, in time for consideration during the regular session of the General Assembly.  The 16-member Commission, chaired by Town of Hamden Mayor Scott Jackson, met seven times between January 24 and March 15 and submitted its Interim Report on March 18, 2013.  The Interim Report proposed fifteen specific recommendations concerning firearm permitting and registration, the possession, sale and use of high-capacity firearms, high capacity magazines, and ammunition, as well as firearm storage

---

[2] The Office of the Governor established a web page specifically for the Commission to post agendas, meetings and other relevant documents, including this report.  *See http://www.governor.ct.gov/malloy/cwp/ view.asp?a=3997&q=516496.*

and security.   Significantly, the Commission proposed a total ban on the possession, sale or transfer of any firearm capable of firing more than ten rounds without reloading.

In stark contrast to the United States Congress, which was unable to pass meaningful gun legislation in the wake of the Sandy Hook tragedy, the Connecticut General Assembly adopted many of the proposals in the Commission's Interim Report and passed the most significant gun reform legislation in the nation.  That legislation is embodied in Public Act 13-3.[3]

The Commission's Interim Report also included recommendations regarding the development of detailed safe school design and operations standards.   These recommendations resulted in the creation of the School Security Infrastructure Council, see Public Act 13-3, sec. 80-83, and a state/local working group convened by the Department of Emergency Services and Public Protection/Division of Emergency Management and Homeland Security, in consultation with the Department of Education.  See Public Act 13-3, sec. 86.  These bodies initiated the development of safe school design and operation standards, which form the basis of rational and justifiable criteria to guide renovations, expansions and new school construction throughout our state.

Over the next two years, the Commission held twenty-three more hearings and received testimony from 100 experts in the areas of school safety and security, mental health and law enforcement.  *See* Appendix B.  Lacking subpoena power, the Commission necessarily relied on several other state agencies to gather, and eventually release, pertinent information about the shootings and A.L.  The State's Attorney for the Judicial District of Danbury, which had jurisdiction over the Sandy Hook crimes, released a report on November 25, 2013 that summarized the investigatory findings of the State Police.   The State Police released its own investigatory files, with extensive

---

[3] The Connecticut General Assembly passed several modifications to Public Act 13-3 during the same session in which that act was passed.  *See* Public Act 13-220.

2

redactions, on December 27, 2013.  Eleven months later, on November 21, 2014, the Office of the Child Advocate issued a report detailing and examining A.L.'s mental health history and the difficulties his family faced in attempting to meet his needs.

The information the Commission obtained from the reports of other state agencies was essential to formulating the final set of policy prescriptions and legislative recommendations presented in this report.  Except as otherwise stated below, this report supersedes the Interim Report.  Consistent with Governor Malloy's charge, those proscriptions and recommendations fall within three substantive areas: (1) safe school design and operations, (2) law enforcement, public safety and emergency response, and (3) mental health and wellness.   The subject-matter experts on the Commission developed a preliminary set of policies and recommendations, which were then submitted to the full Commission for debate, amendment and final approval.  Thus, the recommendations set forth herein represent the consensus of the full Commission.

A listing of all of the Commission's recommendations is set forth in Appendix A.   However, the Commission's recommendations are best understood and appreciated when read in the context of the full report. Accordingly, the main body of this report is comprised of three sub-sections, which correspond to substantive areas described in the preceding paragraph. The Table of Contents at the outset of this report is intended to serve as a detailed road map of the Commission's findings, analyses and recommendations.  For readers viewing this report on the Internet, the Table of Contents contains hyperlinks to the related sections of the report, enhancing the ease of navigating the report.  The body of the report also contains many hyperlinks to relevant source materials.  Although particular readers, based on their specific backgrounds, may find some parts of the report more or less relevant than others, the three sub-sections of the report form a cohesive whole.

I.      **THE SUBSTANTIVE COMPONENTS OF THE FINAL REPORT**

A.      **Safe School Design And Operation**

The Commission's recommendations concerning safe school design and operation, referred to herein as "SSDO," begin with the premise that there is at least one place, other than a home, in which every person, whether a child or an adult, should feel absolutely safe and secure from harm: *school*.  Short of transforming our schools into gated communities or prison-like environments, however, no school can be freed entirely from the risk of violence. Nevertheless, through safe school design and operation strategies, and through closer coordination with our educators, local law enforcement, fire departments, EMS, public safety personnel, security experts and mental health professionals, our schools can become much safer environments.

Although the Sandy Hook tragedy was a mass shooting incident, the Commission determined that it should not propose a set of recommendations intended only to reduce the risk of that specific type of event from reoccurring at a school. An "active shooter" represents just one type of risk.  Yet schools face a multitude of risks, including natural and man-made disasters. Consequently, the Commission determined that while recommendations concerning safe school design and operations should be informed by historical events, including those involving active shooters, they should address a broader range of potential risks, as planning for the future involves more than just learning from the past.  Consequently, the Commission adopted an "all hazards" risk management approach in developing its recommendations.

The Commission's SSDO recommendations include very detailed design standards, addressing such matters as specialized forced entry resistant glazing for school entry doors and locks for classroom doors.  In particular, the Commission largely endorses the very detailed set of school infrastructure design standards adopted by the state's School Security Infrastructure Council. *See* Appendix K.

4

The Commission's SSDO recommendations also acknowledge that the fundamental purpose of our schools is to educate our children and, therefore, that proposed security options must enhance, not diminish that educational experience.  Schools should be great places to learn, not just because they are safe and the educational process is uninterrupted, but because the physical design of schools facilitates, excites and engenders interactions between students and students, students and teachers, teachers and teachers, and students, teachers, and staff, the spaces they are in  and the world around them.

Site and school building designs can facilitate these interpersonal interactions or diminish their opportunity for occurrence and their efficacy.  They can affect how learning materials and media are presented, explained, studied, understood, and appreciated.  They can link and connect the theories and principles taught inside with what happens in the real world outside of the school walls, doors, and windows.  The Commission took all of these factors into account in its SSDO recommendations.

Finally, the Commission identifies three critical components of any effective SSDO plan.  First, SSDO strategies must be tailored to the specific needs of particular communities.  A "one-size-fits-all" SSDO strategy is destined for failure.  Second, SSDO standards are not static; they must be reviewed and updated on a regular basis.  Third, the successful implementation of SSDO strategies requires the support of "local champions." Each community or school district should have a small standing committee or commission, comprised of individuals representing the school community, law enforcement, fire, EMS and public health, whose responsibility is to ensure that the SSDO standards and strategies are actually implemented in their community.

### B.    Law Enforcement, Public Safety And Emergency Response

United States civilians own or possess in excess of 300 million guns: as of 2009, they owned or possessed approximately 114 million handguns, 110

million rifles and 86 million shotguns. The incidence of gun ownership/possession in the United States—nearly one gun on average for every resident—is the highest in the world. Most guns are lawfully owned by law abiding persons who use them for recreational activities, such as hunting and target practice, and/or for self-defense. However, many guns are owned or possessed illegally or, even if legal, are used for unlawful purposes.

Beyond the sheer number of guns in the United States, the *lethality* of readily available firearms and ammunition continues to increase. The connection between the extent of the tragedy at Sandy Hook Elementary School and the lethality of weapons used in the attack on the school is self-evident and beyond dispute. The Commission is deeply concerned about the proliferation, throughout the civilian population, of weapons that were specifically designed for military use during wartime. "Assault weapons" like the AR-15, as well as large capacity magazines often used with those weapons, have no legitimate place in the civilian population. The Commission finds that the cost to society of easy civilian access to assault weapons and large capacity magazines vastly outweighs the benefits of civilian ownership. By contrast, the Commission finds that the significant benefit to society from eliminating civilian ownership and possession of assault weapons and large capacity magazines can be realized with only a minimal burden on persons who want to hunt, engage in target practice or use weapons for self-defense. They remain free to engage in those activities with a vast array of long guns and handguns. In short, the Commission's first goal is simply to limit the possession and use of weapons designed for wartime use to members of our military services and law enforcement personnel.

The Commission acknowledges the United States' long tradition of gun ownership and the Second Amendment rights of gun owners. However, the Commission also notes that although United States Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment right to bear arms is a personal right, the court also held that the right is *not*

6

*absolute*.   The Supreme Court further acknowledged in *Heller* that society has the right to regulate gun ownership, possession and use within constitutionally permissible limits.     Through reasonable, constitutionally permissible regulations applicable to long guns, handguns and ammunition, the Commission seeks to minimize to the greatest extent possible the number of gun-related civilian deaths, while respecting the constitutional rights of lawful gun owners.

### C.     Mental and Behavioral Health

A.L.'s mental and behavioral health history, and the connection between that history and the mass shootings at the Sandy Hook Elementary School, has been the subject of intense discussion, analysis and debate over the past two years.   Rather than mine A.L.'s life and interactions with particular mental health systems for insights into how those systems can better serve the state's children, however, the Commission had a different charge.   It was tasked to study the systems themselves.

The mental and behavioral health section of this report begins by addressing the existing mental health system and identifies the essential elements for an effective system that promotes mental health across the lifespan.   These include comprehensive and coordinated systems of care in which behavioral health and physical health are understood as highly interrelated, are given equal priority, and are part of a holistic approach to wellness that sees the individual in the context of the family and broader community.

The report next considers the barriers that impede access to quality care in our current system.   Initially, the Commission examines the system's fragmented payment structure, which undermines care coordination and consistency, denies care to many who most need it, and limits care for reasons that often have little to do with its clinical justifications or efficacy.   The Commission's analysis identifies deficiencies in both the public and private systems of care and calls for increased integration to make effective, clinically

7

indicated services and evidence-based community programs available to children and adults regardless of economic status.

The Commission next addresses the ongoing burdens of stigma and discrimination that afflict the system and its participants, while deterring many in need from pursuing behavioral health services. Carefully considered efforts to diminish the stigma that attaches to mental disorder and its treatments must play a central role in systemic reform.

The mental health section next turns to issues that implicate potential conflicts between individual privacy and autonomy on the one hand, and community safety on the other. An overarching theme of this section of the Commission's report is that these interests should be viewed as overlapping, not oppositional. The report examines central laws and policies that govern matters of privacy, confidentiality and community safety in the domain of mental health treatment, making recommendations that preserve the existing balance while calling for clarification in areas that might frustrate the timely provision of needed care. The report then considers the vexing topic of violence. Unthinkably violent episodes such as the Sandy Hook shootings represent not only a loss of precious lives but also a profound disruption of the basic human need for safety and security, which is critical to adults and absolutely essential to children. There is little comfort to be taken from any explanation following such an event, but somehow it seems easier to believe that the source of such horror lies in an individual's pathology, in a condition that could be cured or contained if adequately identified, than in more indeterminate values and practices that shape our entire culture. While discerning no clear answers to the question of what role A.L.'s behavioral health challenges played in the violence he ultimately inflicted, the Commission nonetheless turns its attention to what we have learned about the role of mental disorder in violent events. We review and synthesize the available research on the topic, identify relevant risk factors for violence and offer recommendations for ways to address those risk factors in order to promote

8

mental health, diminish the suffering associated with untreated mental illness, and enhance the community's experience of safety.

Finally, the Commission proposes specific steps that communities and schools should take to buttress their members' resilience and equip them to care for one another and themselves in the face of trauma and loss. When a disaster event occurs, whether due to intentional violence or a terrible accident or a phenomenon of nature, its impact on individuals and communities can be devastating and can persist far beyond the immediate aftermath. The Commission contends that, while it is not yet possible to prevent such events from taking place or to insulate people from the suffering that ensues, there is much that governments, schools and other institutions can do to facilitate an effective and humane response. A carefully planned and coordinated response will help to reestablish a critical sense of security, ensure that needed services become available immediately and remain so for as long as necessary, and promote community-wide recovery. Unfortunately, experiences of trauma and loss afflict children, families and communities in ways that extend far beyond large-scale crises, and many of the Commission's recommended measures are germane to such experiences as well as to relatively rare disaster events.

# OVERVIEW OF MASS SHOOTINGS AT
# SANDY HOOK ELEMENTARY SCHOOL ON DECEMBER 14, 2012

The mass murder of twenty children and six adults at Sandy Hook Elementary School on December 14, 2012 has previously been described in detail in numerous publications, including the Danbury State's Attorney's report/appendix of November 25, 2013, the investigative files of the Connecticut State Police and the Report of the Child Advocate Concerning the Shootings at Sandy Hook Elementary School.  It is not the purpose of this report to provide a forensic examination of the events of that date.  Accordingly, what follows is an overview of those events, but one which still contains some graphic details.  Some readers may find this disturbing.

\* \* \*

On December 11, 2012, A.L.'s mother, Nancy Lanza, left her home in Newtown, CT for a several day trip to New Hampshire.  A.L. remained home alone during his mother's trip, which she told friends was intended to serve as both a respite from the difficulties of being A.L.'s mother and as an experiment in leaving A.L. alone for longer periods of time.  She checked into the Omni Mount Washington Resort on Tuesday, December 11 at midday and stayed there until shortly after noon on December 13.  She arrived back in Newtown, CT at approximately 10:00 p.m. that evening.

On the morning of December 14, sometime between 8:00 a.m. and 9:00 a.m., A.L. went into his mother's bedroom and shot her in the head four times with a .22 caliber Savage Mark II bolt-action rifle that she had lawfully purchased.  He left the rifle on the floor next to her bed.

After killing his mother, A.L. drove to Sandy Hook Elementary School, which he had attended as a child.  He drove a black 2010 Honda Civic his mother had purchased for him.  He brought with him a small arsenal of weapons, including: a semi-automatic Sig Sauer P226, 9mm pistol; a Glock 20, 10mm semi-automatic pistol; a Bushmaster Model XM15-E2S rifle (a semi-automatic civilian version of the fully automatic M-16 military assault rifle);

10

and an Izhmash Saiga-12, 12 gauge shotgun.  He also brought with him over 400 rounds of ammunition and several high capacity magazines, including two Magpul PMAG 30 magazines (for the Bushmaster rifle) duct-taped together in a tactical configuration and capable of holding a total of 60 rounds of 5.56 mm ammunition (30 rounds per magazine).  A.L.'s mother lawfully purchased all of these weapons and ammunition.

A.L. arrived at the school shortly before 9:30 a.m.  Approximately 489 students and 82 staff members were present at the time.  He parked his car in a "No Parking" zone and walked to the front entrance of the school,[4] carrying with him the Bushmaster rifle, the Sig Sauer and Glock pistols and a large supply of ammunition for all three weapons.  He left the shotgun in the car.

As was customary, the front doors of the school were locked.  A.L. used the Bushmaster rifle to shoot out a plate glass window on the right side of the entrance doors to the front lobby.  (Police subsequently recovered eight expended brass 5.56 mm bullet casings from that area of the building.)  A.L. entered the building, wearing a hat and sunglasses and appearing calm.  He turned to his left, facing a hallway with administrative offices and classrooms on each side.  Upon hearing shots, school principal Dawn Hochsprung and school psychologist Mary Sherlach entered the hallway from room 9, where they were attending a meeting.  Another staff member followed them.  A.L. shot and killed Hochsprung and Sherlach in the hallway.  The staff member was shot in the leg and fell to the ground, where she was struck again by further gunfire.  She laid still in the hallway momentarily and then crawled back into room 9 and held the door shut.  Another staff member, who was at the far end of the hallway from where A.L. was standing, was struck in the foot by a bullet. She retreated into a nearby classroom.

The first 911 call from the school was made at about this time, 9:35:39 a.m.  The Newtown Police Department responded immediately, with the first

---

[4] A floor plan of the school and its exterior is available at: http://www.governor.ct.gov/malloy/lib/malloy/shac_doc_final_report_-_117shesandparkinglotmap.pdf

officer arriving at the rear of the school (on Crestwood Drive) at 9:39:00.  Less than a minute later three officers, in two separate vehicles, arrived at Dickenson Drive, which leads up to the front of the school.  They drove up to the road to a baseball field near the school, parked their vehicles and proceeding towards the entrance of the school on foot.  A small team of police officers first entered the school at 9:44:50, less than eleven minutes after the first 911 call.

While the police were responding to the 911 calls, A.L. entered the main office, where staff members were hiding.  They heard A.L. open the office door, walk in the office and then leave.  A.L. then walked down the hall and entered two first grade classrooms, rooms 8 and 10, in an indeterminate order.

Substitute teacher Lauren Rousseau and behavioral therapist Rachel D'Avino were in room 8, along with sixteen children.   Using the Bushmaster rifle, A.L. killed Rousseau, D'Avino and 15 children.  (Fourteen children were killed in the classroom.  The fifteenth died after being transported to Danbury Hospital.)  A sixteenth child in the classroom was not shot.  Police investigators subsequently recovered eighty expended 5.56 mm bullet casings from room 8.

Teacher Victoria Soto, behavioral therapist Anne Marie Murphy and sixteen students were in room 10.  A.L. entered that room and, again using the Bushmaster rifle, killed Soto, Murphy and five students.  (Four students were found dead in the room and the fifth was pronounced dead after being transported to the hospital.)   Nine children were able to escape from the classroom and survived, either because A.L. stopped shooting in order to reload or because his weapon jammed.   The police also found two other children uninjured in the classroom.

After killing the occupants of rooms 8 and 10, A.L. killed himself with a single shot to the head from the Glock pistol.  This is believed to have occurred at 9:40 a.m.  His body was found in room 10.  Police subsequently recovered 49 expended 5.56 mm shell casings, and one 10 mm casing, from room 10.

\* \* \*

Although the Commission has chosen to conclude the description of the events of December 14, 2012 at the time of A.L.'s death, the Commission recognizes and acknowledges that, in many ways, the trauma of that event continues to this day for many of those involved.  While certain events, like the notification to parents and families that their loved ones were killed in the attack, can be fixed in time and place, the experiences of the many different participants are so different after 9:40 a.m. on December 14, 2012 that the Commission feels it would be a disservice to all to attempt to capture those experiences in this section of the report.

## PART ONE

## FINDINGS AND RECOMMENDATIONS OF THE SAFE SCHOOL DESIGN AND OPERATIONS WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION

### I.    PRELIMINARY STATEMENT

There is at least one place, other than a home, in which every person, whether a child or adult, should feel absolutely safe and secure from the threat of physical harm: *school*.  All schools—whether pre-K, K-12, colleges or other post-secondary institutions—are places for learning and personal growth. Sadly, the tragic shootings at Sandy Hook Elementary School, Columbine, Virginia Tech and other institutions taught Connecticut, and have reminded the nation at large, that schools, even elementary schools educating our youngest children, are not immune from the gun violence that afflicts our society.

The initial, and entirely natural, reaction to a tragedy like the shootings at Sandy Hook Elementary School is to consider steps that would make it virtually impossible for such a violent event to occur at a school ever again. The Commission heard testimony about how some countries have transformed their schools into what might at best be described as "gated communities," but which might more accurately be described as akin to minimum security prisons in terms of their design.  Such facilities may, in fact, effectively eliminate some of the risk of an event like Sandy Hook.  But they achieve that objective at great cost, not just financial, but mental, emotional and developmental as well.  That is not the direction the Commission believes the American educational system should follow.

Short of transforming our schools into gated communities or prison-like environments, no school can be freed entirely from the risk of violence. Nevertheless, through improved safe school design and operation (SSDO) strategies, and through closer coordination with our educators, local law enforcement, fire departments, EMS, public safety personnel, security

14

professionals and mental health experts, our schools can become much safer environments for students, faculty and staff.  Moreover, we can significantly reduce the risk of violence occurring on school grounds without sacrificing our schools' core educational mission and community outreach programs. Accomplishing these goals can actually improve the educational eco-system and create safe school climates that allow students, teachers, and staff to flourish and excel.

    **A.**    **Contents Of Safe School Design And Operations Writing Group Report**.

The Commission's final report on safe school design and operations reflects four basic goals and objectives.  First, the Commission wanted to learn from the shootings at Sandy Hook and to apply the knowledge it acquired to the areas of school safety and security, from both design and operational perspectives.  Second, the Commission sought to develop specific recommendations to address the absence of a uniform set of standards for safe school design and operations, to establish a mechanism to ensure implementation of proposed standards and to create a rational and credible impetus to fund these security enhancements.  Third, the Commission sought to create a usable resource document—a "best practices" template for use in the design of new schools, renovations, expansion and retrofits to existing schools—reflecting the lessons learned from the Sandy Hook, Columbine, Virginia Tech and other tragic school events.  Fourth, the Commission hoped its work would mark the beginning of a long-term, ongoing process, so that its proposed best practice standards would evolve over time and be updated to reflect new lessons learned, advancements in building construction materials and techniques, security technologies, improvements in our systems of incident response, situational awareness, mental and behavioral health, and changes in our educational institutions.

Consistent with these goals and objectives, this section of the Commission's final report is divided into three main parts.  Part II sets forth

the guiding principles or philosophy that informed the Commission's work and its recommendations with respect to SSDO.  Part III contains additional SSDO-related recommendations beyond those in the Commission's Interim Report dated March 18, 2013.  In Part IV the Commission endorses Public Act 13-3 ("An Act Concerning Gun Violence Prevention And Children's Safety") ("P.A. 13-3"), which adopted and implemented many of the Commission's SSDO recommendations from its Interim Report.  The Commission also endorses the work product of two important groups that P.A. 13-3 created: the Report of the School Safety Infrastructure Council (SSIC) and the School Security and Safety Plan Standards.  Finally, Part V sets forth what the Commission believes are the key standards adopted by the SSIC.

The SSDO portion of the SHAC Report has been extensively informed by the testimony provided to the Commission and the other SHAC sub-committee reports on Law Enforcement and Public Safety and Mental Health.

**B.     Who Should Read This Report?**

The Commission's recommendations, and the SSDO standards and strategies that flowed from them, should be of particular interest to all architects, engineers, consultants and contractors who are involved with school design and construction.  Of course, school faculty and staff, local school boards, and members of local and state government and organizations involved with new school design and construction or existing school renovations or expansion, should also review these recommendations.

For reasons explained in greater detail below, other organizational groups should also familiarize themselves with the recommendations.  In particular, emergency responders, including local law enforcement, fire and EMS personnel, will all play a crucial role in adapting the proposed standards, which are necessarily general in nature, to the specific needs of their particular communities and schools.

It is the Commission's position that building and fire code officials should review this report, as recommendations contained within it or endorsed

16

by standards referenced within it will need to be conformed and/or reconciled with Building and Fire Codes. Often, building and occupant protection schemes run contrary to the requirements for rapid and effective law enforcement, fire department, and EMS response and hence the need for these agencies to familiarize themselves with the report and its references to the Safe School Infrastructure Council recommendations and the School Security and Safety Plan Standards and Templates.

Additionally, a common theme which evolved in the SHAC hearings was the underlying principle that mental and behavioral health are affected by or have an effect upon a Safe School Climate and response to events that occur in and around schools. The Commission therefore advocates for professionals in this field to read this report as well.

Lastly, testimony from the First Selectman of the Town of Newtown identified clearly that events in school eventually require management support from the elected Town leaders. This strongly suggests that town leadership and government have a vested interest in safe schools and the contents of this document.

**C.     Why The Commission's Recommendations Should Be Credited.**

The SSDO recommendations set forth in its Interim Report and this report do not simply represent the views of the members of the Commission with expertise in school safety and design and operations, nor do they simply represent the informed opinions of school architects, design professionals, and emergency responders. To prepare this report, but especially to honor the Sandy Hook victims, their families, the on-scene emergency responders, and members of the Newtown school system with meaningful recommendations, the Commission brought together a broader range of subject matters experts than has ever been brought to bear on the creation of SSDO strategies and standards.

More specifically, the Commission explored the cutting edge risk and resiliency tools shared by the Department of Homeland Security. It studied the

17

Columbine Commission report and questioned Colorado Governor Bill Ritter about Colorado's response to that tragedy.  Professor Richard Bonnie, the Director of the Virginia Commission on Mental Health Law Report and consultant to the Virginia Tech Review Panel, discussed the importance of threat assessment teams as well as gaps in community mental health services. Commissioner Patricia Rehmer of the Connecticut Department of Mental Health and Addiction Services testified that school tragedies have unique aspects that may necessitate a specific plan that differs in some ways from our state comprehensive disaster response plans for natural and man-made disasters.  The need for short and long-term intervention may be appropriate in dealing with school response and recovery.  (*See* Section VII. "Response, Recovery And Resilience," *infra*, at p. 196.) The Connecticut State Troopers provided detailed testimony on guns, ammunitions, fire arms training, and legal constraints regarding gun sales, control and usage, and so informed the Commission on numerous aspects of school design and operations to address active shooter threats.  The Connecticut Police Chief's Association provided a report highlighting the need to take into consideration all of the school facilities used in order to provide the highest level of security and lessen the buildings' vulnerabilities.  The Commission learned that target-hardening and crime prevention methods must include an environmental design that incorporates locks, lighting, alarm systems, panic alarms, video surveillance, access control, natural surveillance and territorial concern, a theory that a well-cared for property is less apt to be an area where crime is committed.  Architects from the American Institute of Architects Connecticut Chapter and experienced in school design shared their expertise on building fortification and the importance of visibility and being able to delay an intruder, as well as design strategies to enhance incident response, evacuation, shelter-in-place, and rescue and recovery activities.  Mila Kennet, Project Manager, Federal Emergency Management Agency (Infrastructure Protection and Disaster Management Division) shared cutting edge risk and resiliency tools as well as

18

their Integrated Rapid Visual Screening Risk Assessment. The Commission also heard from Kenneth S. Trump, President, National School Safety and Security Services; William P. Shea, Deputy Commissioner of the Department of Emergency Services and Public Protection (DESPP) with jurisdiction over the Division of Emergency Management and Homeland Security (DEMHS), and William Hackett, State Emergency Management Director at DEMHS, who presented testimony on the role of DEMHS and the function of the State Emergency Operations Center response to the shooting at Sandy Hook Elementary School and described statewide emergency planning initiatives that are relevant to this incident. Gregg Champlin, New Hampshire School Emergency Planning and Natural Hazards Program Specialist, shared New Hampshire's Emergency Response Planning for Schools and Childcare Programs.

The Commission also received extraordinary testimony from the Newtown Police Chief, the Newtown School Superintendent and Newtown's First Selectman, whose testimony was based on their own personal experience and provided invaluable insights from their perspectives and the family members whom they represented.

The SSDO recommendations, while informing physical plant and school grounds security design and operations, were also informed by extensive testimony from the physical and mental/behavioral health subject matter experts. This included individuals with diagnosed behavioral health disorders, practicing clinicians, healthcare organizations and health insurance personnel. Insights from these testimonies informed recommendations in the SSDO report as part of the acknowledged premise that schools are an integral component of the community they serve and that the creation of a safe school climate is in part reliant upon a healthy community. (See Section II.A.4, "Places of care: schools and communities," *infra*, at p. 99.)

19

This is only a very partial list of the broad range of experts with whom the Commission consulted, nor does it include written materials that the Commission reviewed.

## II.   GUIDING PRINCIPLES OF SAFE SCHOOL DESIGN AND OPERATION RECOMMENDATIONS.

Although safe school design is ultimately reflected in the physical design and construction of an educational institution, and while safe school operation is ultimately reflected in a set of standards and strategies, the testimony the Commission received underscored the importance of certain basic principles that it believes should inform SSDO recommendations in general.

### A.   The "All Hazards" Approach To Safe School Design And Operation.

The mass shootings at Sandy Hook represent a particular type of violent event—the "active shooter"—that has become too common on school properties. The Commission heard extensive testimony concerning other active shooters, including the mass shootings at Columbine High School in 1999 and at Virginia Tech in 2007.   Commission members also reviewed the extensive written reports of those and other active shooter events.

The Commission notes that the Columbine and Virginia Tech reports focused on two things: 1) understanding and describing in detail the specific event that was that subject of the report; and 2) setting forth recommendations intended to reduce the likelihood of that type of event reoccurring in the future.

What these reports did not do, to the satisfaction of this Commission, was set forth a usable document that codified the recommendations on safe school design and operations learned from these tragedies.  Consequently, the Commission determined that this report would create an industry best practice document that set standards and recommendations to be used moving forward in the design and operation of schools from a safety and security perspective.

After considering the Columbine and Virginia Tech reports and examining how other states have addressed SSDO, the Commission concludes

20

that, while developing strategies specifically intended to address active shooter events is very important, a more holistic approach to SSDO is necessary and appropriate.  The active shooter event represents one type of risk.  But schools face a multitude of risks, including natural and man-made disasters. Consequently, the Commission finds that while recommendations concerning safe school design and operations should be informed by historical events, including those involving active shooters, they should address a broader range of potential risks as planning for the future involves more than just learning from the past.  Although history has a penchant for repeating itself, the Commission was continually reminded that crime profiles evolve as criminal methodologies are addressed.   In short, the Commission adopted an "all hazards" risk management approach in developing its recommendations as the most prudent means to address risk mitigation.

The Commission notes that the School Safety Infrastructure Council adopted the Commission's "all hazards" approach recommendation in its report:

> Based on testimony from experts at the state, regional and federal level, the Council determined that school safety infrastructure planning should be based on an "all hazards" assessment, and that school design safety standards should encourage the use of protective infrastructure design features in all levels or layers of school facility construction including:
>
> > Site development and preparation;
> > Perimeter boundaries and access points;
> > Secondary perimeters up to the building exterior;
> > and the interior of the building itself.
>
> Another important point, made repeatedly by professionals in the field, is that the conduct of these local uniform assessments must be an inclusive process involving police, fire, medical, school and other local officials. This public safety team approach is not only important in the assessment phase, but throughout the design and construction period as well. The need for redundancy and collaboration is essential.
>
> While the work of the SSIC is born of the events in Newtown

21

involving a rogue shooter, other potential threats, both natural and manmade, have led the Council to consider an "all hazards" approach to school design and security standards. As a result, the Council has broadened the preventive design standards to incorporate the most up to date seismic and weather related design requirements, while also considering architectural and design deterrents to terrorists, environmental and chemical accidents or attacks.

The need to take an "all hazards approach" to the assessment of school infrastructure vulnerabilities, and the need to develop compliance requirements in school design plans that minimize identified weaknesses and better prepare schools for a host of potential threats is a major goal of the SSIC. In order to develop a uniform set of standards that are adaptable to the many varied school construction sites and types of school construction in Connecticut, there is a need to develop, or adopt, an "all hazards" threat assessment tool that not only recognizes and differentiates the unique security challenges of each facility, but also provides a comparable security analysis of common school security infrastructure characteristics that are part of all major school construction projects.

A uniform risk assessment of a school facility during the design phase of construction allows school districts to acquire a threshold level of awareness and responsiveness to potential threats and can provide a thorough evaluation of school security. A number of potential threats face every individual school facility, each having its own likelihood of occurrence (probability) and potential for injury and damage (severity). A comprehensive risk assessment includes activities to identify and quantify risk utilizing an "all-hazards" approach to threat assessment for both natural and manmade hazards, and can be used as a screening tool for a preliminary design to determine if the critical systems will enhance deterrence, detection, denial, and damage limitation (response) in the event of an emergency. The primary objective of the risk assessment is to find the most effective mitigation measure(s) to achieve a desired level of protection.

SSIC Report at 9-11.

22

### B.     The Commission Based Its Recommendations On Their Perceived Efficacy, Not Their Anticipated Cost.

Judges and juries are often asked to award money damages as compensation for the loss of a person's life or limb.  In adopting its recommendations, however, the Commission started from the premise that one cannot truly put a price on a child's life.  Thus, the Commission declined to self-censor its own potential recommendations because of concerns about the potential cost of implementing them.  Instead, the Commission was primarily concerned with the efficacy of its recommendations; i.e., the likelihood that a particular recommendation, if implemented, would be effective in protecting students, faculty, staff and other persons authorized to be on school grounds.

The Commission does not believe that any of its recommendations are fiscally impossible or unachievable; such extreme recommendations were dismissed.  Of course, some will prove more expensive than others to implement.  This is to be expected in any protective design and operations strategy.  The development of sources of funding to implement the Commission's recommendations will be essential, but responsibility for identifying and creating funding sources lies primarily with state and local communities and their governing bodies, and the Commission feels strongly that these endeavors must be made a leading priority.

The Commission notes, however, that the cost of improving school safety and security has long-term financial benefits, as well as improved life safety considerations.  The quality of a community's school system is an important factor in maintaining, if not increasing, property values and attracting new residents and businesses.  The quality of a community's school system is not defined solely by traditional measures of student educational performance and the strength of its teachers and curriculum; it includes other factors, such as the perceived and documented safety and security of the community's schools. The Commission believes that communities that implement SSDO standards and strategies, *and therefore create safer schools*, will be more attractive to

23

potential homebuyers, renters and businesses than communities which, because of cost concerns, do not implement such strategies, or do so only minimally.  It is a generally acknowledged that the strength of a community's school system is a significant factor influencing individual's and family's selection of communities in which to live and work.  Accordingly, the long-term benefits of the Commission's SSDO recommendations should well outweigh their original implementation costs.

### C.    Safe School Design and Operation Strategies Can And Should Enhance, Not Diminish, Students' Educational Experience.

As noted in the Introduction, the Commission's recommendations are based on the principle that SSDO standards and strategies can and should enhance the educational experience, not diminish it. Indeed, the likelihood that states and communities will adopt and implement SSDO standards and strategies is significantly improved if the state and communities perceive them as supporting schools' educational mission.  There is no inherent conflict between implementing measures that create safe school grounds (not just buildings) and the design of physical spaces that contribute to a school's educational mission.

This principle is reflected in the report of the School Safety Infrastructure Council.  See SSIC Report at 2 ("Despite the urgency of achieving school security goals, the SSCI has recognized, from its inception, the need to preserve an educational environment that maintains an open, welcoming and supportive place for teaching and learning.")

Educational institutions are places of learning, cultural and social development, mastering of physical abilities, and should be the locus of community engagement.  They should provide an essential link between how these capabilities are nurtured at home and how they are taught in school.

Great places to learn are great, not just because they are safe, and the educational/learning process is uninterrupted, or because learning and self-development is more effective in an environment free of fear.  They are also

great because their designs facilitate, excite, and engender interactions among students, teachers and staff, the spaces they are in and the world around them.

Site and school building designs can facilitate these interpersonal interactions or diminish their opportunity for occurrence and their efficacy. They can affect how learning materials and media are presented, explained, studied, understood, and appreciated. They can link and connect the theories and principles taught inside with what happens in the real world outside of the school walls, doors, and windows.

Outdoor environments and indoor spaces affect the way we feel, move, and contemplate. These known design consequences must not be unbalanced in favor of protective designs, which while improving personal safety, actually detract from the core missions of self-development through learning from teachers, interacting with peers, and observing how the social process of the "internal school neighborhood" operates successfully or unsuccessfully.

Architectural building designs and the design and landscaping of exterior school grounds can significantly contribute to a sense of connection between interior school spaces and activities and exterior spaces and activities. They can welcome personal approach and engagement or encourage standoff and isolation. They can encourage active participation or informative passive engagement, or they can discourage participation and deny those who cannot participate the opportunity to view and determine their desire or ability to engage. This is true whether for interior classrooms, special event, and activity spaces or exterior areas for sports and recreation.

### D. The Importance Of "Situational Awareness."

The Commission finds that enhancing "situational awareness" should be a key SSDO objective. Specifically, safe school designs should create, not reduce, opportunities for faculty, staff and students to observe and be more aware, beyond the traditional classroom environment, so that they can observe

at the earliest opportunities changes in student or adult behavior that might be cause for concern.

The concept of situational awareness has been advanced in the public domain through the phrase, "if you see something, say something." The concept is that people cannot react to what they are unaware of. By contrast, when a person observes something unusual, he or she can respond or summon assistance.

Reviews of the Sandy Hook, Columbine and Virginia Tech tragedies and testimony received by the Commission demonstrated without any doubt that every second counts between the initiation of a threatening event and the arrival of emergency responders. Seconds and minutes equate to lives lost or saved. Situational awareness is critical to threat identification and the summoning of emergency response.

The Commission found this extremely important in the school environment, as students, teachers, and staff may well be the first incident observer and incident manager until summoned forces arrive. The earliest opportunity for detection is therefore a key ingredient in incident management and consequence mitigation.

School designs should support these observational opportunities irrespective of requirements to delay the aggressor and their acts. However, opportunities for observations of an aggressor may also provide opportunities for the aggressor to acquire their target. School designs must therefore provide the means for students, teachers, and staff to maintain visual control over their environment and close off sight lines once a perceived threat is identified.

As Dr. Marisa Randazzo explained during her presentation to the Commission on March 22, 2013 concerning school threat assessments, school-based attacks are rarely sudden, impulsive acts. To the contrary, they typically involve significant planning by the attacker, who initially conceives of the idea ("ideation"), develops plans to execute the idea ("planning"), gathers the tools he will use for the attack ("acquisition") and then executes the attack

26

("implementation").   By creating school environments that enhance the opportunity for faculty, staff and other students to observe student behavior, and by training faculty and staff to be attuned to changes in student behavior, information about a student's ideas and plans for violence may potentially be observed or discovered before harm can occur.  Because information is likely to be scattered and fragmented, however, Dr. Randazzo explained that the key is to act quickly upon an initial report of concern, rapidly gather other pieces of the puzzle, and then promptly assemble the pieces to see what picture emerges.

In short, situational awareness is a fundamental tool in behavioral observation, condition assessment, first response determination and management, and incident command control measures.

### E.      The Importance Of Creating A Safe School Climate.

While the physical design of a school, including its grounds, is a critical factor in increasing the safety and security of students, faculty and staff, other factors also contribute to creating a safe school climate.  For example, pre-service training for all teachers and administrators in character building, student responsibility, and anti-bullying has been shown to dramatically improve safe school climates.  (See Section VII.A.2, "Training and professional development," *infra*, at p. 203.)

Additionally, relationship building is key to ensuring and maintaining a culture of safety in every school.   Dr. George Sugai, of the University of Connecticut's Neag School of Education and an expert on school climate and student behavior, stressed that preventing school violence at every level requires better communication between parents, students, teachers, and administrators.   Dr. Sugai testified that communication and interpersonal relationships are critical to preventing school violence.  The most important thing parents and educators can do, according to Dr. Sugai, is to make sure that they are involved with their children, to prevent a sense of isolation and the breakdown in communication channels that can lead to violence.

27

Respectful, collaborative relationships between and among parents and teachers; teachers and administrators; teachers and students; administrators and the community including law enforcement, first responders, and mental/behavioral health specialists are essential if we are to have greater situational awareness in creating a nonthreatening, accepting, inviting, information sharing and therefore safe environment.    Staff, teachers and community members must feel comfortable referring a student whose behavior raises concern.  This will happen in a supportive non-threatening community. (See Section VI.A.7, "From prediction to prevention," *infra*, at p. 182.)

Safe School Climates are also known to depend upon maintaining acceptable behavioral interactions between students, students and teachers and staff. To assist in assessing the dimensions which help determine and foster a safe school environment, the National School Climate Center has developed a chart[5] which will provide schools with the opportunity to assess and measure their climates.  The Commission advocates for the inclusion of a requirement for every school in the State to assess the quality of their Safe School Climates by using the Comprehensive School Climate Inventory (CSCI) process. It is envisioned that this would assist in reducing the negative effects of bullying and other unacceptable behaviors. This would provide a valid/reliable and "gold standard" process to accomplish the goals of improving Safe School Climates. The CSCI surveys parent/guardians, faculty/staff and students (grades 3 – 12).

Site and school designs play a significant role in creating and supporting a "safe school climate."  Good things tend to happen in good places.  Bad things tend to happen in bad places.  Employing the well-accepted industry best practices of Crime Prevention through Environmental Design (CPTED), security sensitive architecturally spatial designs and space planning adjacencies for school spaces and grounds, and specifying the appropriate

---

[5] Available at: http://www.governor.ct.gov/malloy/lib/malloy/shac_doc_final_report_-_13_csci_dimension_chart_final.pdf

selection of security responsive building materials and components, has been shown to contribute to and create spaces which both feel and act secure.

Being in a place/space where one feels secure allows the focus to be on the school's mission and the roles teachers and students need and want to fulfill.  Self-protection from perceived threats requires expenditures of deleterious and defensive negative energy, a fundamentally subtle distraction from core school activities and accomplishments.

Situational awareness, the ability to know what is happening around you, also plays a fundamental role in providing a sense of comfort, safety, security, and/or heightened anxiety.  These perceptions participate in an individual's response to benevolent or threatening circumstances thereby aiding the opportunity to concentrate on school activities planned for that space or to provide an early warning and opportunity for more effective event management.  CPTED design strategies and security sensitive architectural and landscape designs foster situational awareness and assist in the creation of a safe school climate.

### F.     Safe School Design and Operations Strategies Must Be Tailored To The Needs Of Particular Communities And Specific Schools.

Although the Commission's recommendations grew out of a particular event at a particular school, they are general in nature and are intended to serve as a basis for safe school design and operation strategies in communities throughout Connecticut and across the country.  However, every community is different and every school district and school is different.  Thus, the recommendations set forth herein are offered with the expectation that they will be modified to address the particular needs of specific communities, school systems, and schools.

To illustrate, Connecticut has 169 towns and cities and 165 school districts.  Some districts have a large number of local police and public safety personnel who can respond to a major event at a school within a few minutes.  Other districts are small, may have no local police department at all, and thus

rely on State Police, making for potentially significantly longer response times. A community that faces longer response times may decide to undertake additional design and operational measures to delay a potential violent offender's entry into a school or onto its grounds.  In short, the basic SSDO standards set forth in the Commission's recommendations are intended to be adjusted on a community and site-specific basis.

The Commission notes that the SSIC acknowledged this issue in its report:

> Central to the security assessment process and the development of the School Security and Safety Plan is the need to conduct an emergency response time analysis (ERTA) to deter- mine the actual amount of time needed for a police response to a specific school in a crisis situation. This exercise will also help in appropriate design decisions related to architectural safeguards, locking technologies and locations, and other measures that could deter or delay an intruder for an amount of time necessary to ensure an onsite public safety response prior to deep building penetration. An Emergency Response Time Analysis should be conducted for each proposed school design plan to better inform local planners on which school security design features may be appropriate for impeding the entry of unwanted individuals or preventing or delaying the free movement of such parties in a school facility. (Knowing what the critical response time is can help planners build in essential design components to limit movement, isolate intruders and facilitate response efforts.)
>
> The need to balance uniform school security infrastructure standards with the needs of local communities to design and build schools that are responsive to local educational needs and objectives.
>
> > The need to preserve an educational environment for children;
> >
> > The need to establish a uniform school security infrastructure assessment procedure;
> >
> > The need to ensure the school building planning process is inclusive of all local decision makers, public safety, building code and fire and life safety code personnel; and

> The need to establish a cooperative and constructive compliance system that facilitates attainment of the new standards.

SSIC Report at 9.

### G. Safe School Design And Operation Standards Are Not Static. They Must Be Reviewed And Updated On A Regular Basis.

SSDO standards and strategies are not static. Like building and fire codes, SSDO standards and strategies must evolve over time as new security threats emerge, security and safety technologies and response strategies change and mental health and gun control programs advance. Accordingly, the Commission recommends that SSDO standards and strategies must be reviewed and updated regularly (every year) to ensure that they remain current and always reflect best practices. For that to happen, a standing organization or committee comprised of individuals with the relevant expertise must be created to conduct the regular reviews and updates.

The Commission notes that the General Assembly acknowledged this principle in Public Act 13-3, sec. 80(b):

> The School Safety Infrastructure Council shall develop school safety infrastructure standards for school building projects under chapter 173 of the general statutes and projects receiving reimbursement as part of the school security infrastructure competitive grant program, pursuant to section 84 of this act. . . . *The council shall meet at least annually to review and update, if necessary, the school safety infrastructure standards* and make such standards available to local and regional boards of education.

SSIC Report at 9 (emphasis supplied).

### H. Successful Implementation Of Safe School Design And Operation Strategies Requires "Local Champions."

The development of a concrete set of SSDO standards and strategies is the necessary first step in enhancing the safety and security of our schools, but it is a meaningless step unless the standards and strategies are actually implemented. The Commission believes that creating "local champions" is key

to successful implementation.  Each community or school district should have a small standing committee or commission, comprised of individuals representing the school community, law enforcement, fire, EMS and public health, whose responsibility is to ensure that the SSDO standards and strategies are actually implemented in their community.   This committee or commission may be stand-alone, or it may consist of members of the proposed School Safety Design Committee and the School Security and Safety Committee, based on whether there is a school construction project or an existing school without plans for renovation, expansion or new construction.

## III.   RECOMMENDATIONS

The Commission's Interim Report included twenty-two (22) recommendations addressing safe school design and human resource emergency preparedness.   As previously noted, virtually all of those recommendations were acknowledged and adopted in P.A. 13-3, the Report of the School Safety Infrastructure Council and/or the School Security and Safety Plan Standards.

The Commission's work did not end, however, with the issuance of the Interim Report.  The Commission continued to hear testimony on all issues within the scope of its mission, including SSDO.  In light of that testimony, and having considered P.A. 13-3 and the work of the commissions and task forces that it established, the Commission makes the following additional recommendations:

**RECOMMENDATION NO. 1**:  The SSIC Report includes a standard requiring classroom and other safe-haven areas to have doors that can be locked from the inside.  The Commission cannot emphasize enough the importance of this recommendation.  *The testimony and other evidence presented to the Commission reveals that there has never been an event in which an active shooter breached a locked classroom door.*   Accordingly, the Commission reiterates its recommendation that all classrooms in K-12 schools should be

equipped with locked doors that can be locked from the inside by the classroom teacher *or substitute*.

**RECOMMENDATION NO. 2**:   The Commission also reiterates its recommendation that all exterior doors in K-12 schools be equipped with hardware capable of implementing a full perimeter lockdown.

**RECOMMENDATION NO. 3**:   A feasibility study should be conducted to develop additional safety standards concerning the issuance of classroom keys to substitute teachers.

The Commission makes this recommendation due to the absence of standardized school district policies regarding the issuance of classroom keys to substitute teachers.  Testimony provided to the Commission confirms that the lack of such policies remains a national problem even after the Sandy Hook tragedy.   The Commission recommends the development of realistic, manageable and secure approach to key access and control to ensure that all teachers charged with the well-being of students can lock their assigned classroom doors, but also to address the overall need for maintaining strict building security requirements.  The management of classroom access control should be determined not only through the lens of new locking hardware, but also by examining the control and issuance of keys within all K – 12 schools. The logistics behind the monitor, control, and record keeping of classroom keys will be instrumental for improving school security plans moving forward.

**RECOMMENDATION NO. 4**:   School custodians should be included as members of school security and safety committees.  Custodians have a wealth of knowledge and experience to share with regard to the physical school building and grounds.   Accordingly, the Commission requests that the Governor submit the following recommendendation for consideration by the General Assembly during the 2015 legislative session:[6]

---

[6] The format of the proposed legislation follows the format the General Assembly uses when proposing amendments to existing legislation.  Proposed new text is underlined and proposed deletions from existing text appear in strike-through format.

33

Section 10-222m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall develop and implement a school security and safety plan for each school under the jurisdiction of such board. Such plans shall be based on the school security and safety plan standards developed by the Department of Emergency Services and Public Protection, pursuant to section 86 of this act. Each local and regional board of education shall annually review and update, if necessary, such plans.

(b) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall establish a school security and safety committee at each school under the jurisdiction of such board. The school security and safety committee shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan. Such school security and safety committee shall consist of**: (1)** a local police officer**;**, **(2)** a local first responder**;**, **(3)** a teacher **employed at the school, selected with the consent and approval of other school or district employees of that classification**; and **(4)** an administrator **employed at the school, selected with the consent and approval of other school or district employees of that classification**;  **(5) a custodian** employed at the school**, selected with the consent and approval of other school or district employees of that classification; (6) the school facilities managers; (7)** a mental health professional, as defined in section 10-76t of the general statutes**;**, **; (8)** a parent or guardian of a student enrolled in the school**;** and any other person the board of education deems necessary. Any parent or guardian serving as a member of a school security and safety committee shall not have access to any information reported to such committee, pursuant to subparagraph (c) of subdivision (2) of subsection (c) of section 10-222k of the general statutes, as amended by this act.

(c) Each local and regional board of education shall annually submit the school security and safety plan for each school under the jurisdiction of such board, developed pursuant to subsection (a) of this section, to the Department of Emergency Services and Public Protection.

34

In furtherance of this recommendation, the Commission also recommends that the School Security and Safety Plan Standards and Template should be changed so that school districts realize the importance of placing custodians on these vital committees.

**RECOMMENDATION NO. 5**: Teachers, administrators and custodians should be appointed to school security and safety committees with the consent and approval of other employees of their same classification.   The Commission believes that committee members so appointed may be more empowered to voice their concerns.   Accordingly, the Commission recommends the following:

Section 10-222m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

(a) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall develop and implement a school security and safety plan for each school under the jurisdiction of such board. Such plans shall be based on the school security and safety plan standards developed by the Department of Emergency Services and Public Protection, pursuant to section 86 of this act. Each local and regional board of education shall annually review and update, if necessary, such plans.

(b) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall establish a school security and safety committee at each school under the jurisdiction of such board. The school security and safety committee shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan. Such school security and safety committee shall consist of**: (1)** a local police officer**; (2)** a local first responder**; (3)** a teacher **employed at the school, selected with the consent and approval of other school or district employees of that classification**; and **(4)** an administrator **employed at the school, selected with the consent and approval of other school or district employees of that classification**;  **(5) a custodian** employed at the school**, selected with the consent and approval of other school or district employees of that classification; (6) the school facilities managers; (7)** a mental health professional, as defined in section 10-76t of the general statutes**; (8)** a parent or guardian of a student enrolled in the school**;** and any other person

35

the board of education deems necessary. Any parent or guardian serving as a member of a school security and safety committee shall not have access to any information reported to such committee, pursuant to subparagraph (c) of subdivision (2) of subsection (c) of section 10-222k of the general statutes, as amended by this act.

(c) Each local and regional board of education shall annually submit the school security and safety plan for each school under the jurisdiction of such board, developed pursuant to subsection (a) of this section, to the Department of Emergency Services and Public Protection.

**RECOMMENDATION NO. 6**:  Consistent with the guiding principle that the successful implementation of SSDO standards and strategies requires "local champions," as described previously at p.31**,** the Commission recommends that the State require each school district to create a permanent committee or commission, the purpose of which shall be to ensure SSDO standards and strategies are implemented in the district.  The Commission suggests that the committee consist of the following persons: 1) one person selected by the Superintendent of Schools; 2) one person selected by the local chief of police; 3) one person selected by the local fire chief; 4) one person selected by local EMS; 5) one person selected to represent local public health and safety; and 6) one mental/behavioral health professional.

Additionally, the State should designate an individual at the state Commissioner-level, such as the Commissioner of Education or Commission of the Department of Emergency Services and Public Protection, to whom the local committee shall be required to submit a written status report on or before December 31 of each year.

**RECOMMENDATION NO. 7**:  The State should amend section 80 (a) of P.A. 13-3 to include an architect licensed in the State of Connecticut among the members of the School Safety Infrastructure Council.   Therefore, the Commission requests that the Governor submit this recommendation for consideration by the General Assembly during the 2015 legislative session.

**RECOMMENDATION NO. 8**: The State should amend section 80(b) of P.A. 13-3 as follows:

> The School Safety Infrastructure Council shall develop school safety infrastructure standards for school building projects under chapter 173 of the general statutes and projects receiving reimbursement as part of the school security infrastructure competitive grant program, pursuant to section 84 of this act. Such school safety infrastructure standards shall conform to Connecticut and national industry best practice standards for school building safety infrastructure and shall include, but not be limited to, standards regarding ~~(1) entryways to school buildings and classrooms, such as, reinforcement of entryways, ballistic glass, solid core doors, double door access, computer-controlled electronic locks, remote locks on all entrance and exits and buzzer systems~~ (1) entryways to school buildings, classrooms and other space that can become areas of safe haven, such as, reinforcement of entryways, forced entry and/or ballistic rated glazing, solid core (FE and/or BR) doors, double door access, computer-controlled electronic locks, remotely controlled locks on all entrance and exits and buzzer systems, (2) the use of cameras throughout the school building and at all entrances and exits, including the use of closed-circuit television monitoring, (3) penetration resistant vestibules, and (4) other security infrastructure improvements and devices as they become industry standards. The council shall meet at least annually to review and update, if necessary, the school safety infrastructure standards and make such standards available to local and regional boards of education.

Therefore, the Commission requests that the Governor submit this recommendation for consideration by the General Assembly during the 2015 legislative session.

**RECOMMENDATION NO. 9**: Each school shall maintain an accurate list of faculty, staff and students, complete with emergency contact information, which shall include, but not be limited to, parents and guardians of students. This information shall be kept at two locations within each school known by appropriate school staff and the emergency response teams for that school.

**RECOMMENDATION NO. 10**: Each school shall provide safety and security training for faculty, staff and students on how to respond to hazards and/or events in order to provide competent compliance with the All Hazards School Security and Safety Plan Standards. This training shall include live exercises to test the efficacy of the training program and to provide a means to develop that program as informed by these exercises. These training programs and exercises shall also include the identification and use of rendezvous points,

escape routes, location of safe havens, the means of emergency communication and the role of faculty, staff, emergency responders, etc. These training and exercise programs may benefit from the participation of parents as part of post-event response and recovery operations as determined by each school and school district in accordance with their incident response plans.

**RECOMMENDATION NO. 11**: The Commission recommends that each school identify specific individuals to serve as safety and security wardens, who shall be responsible for executing and managing the safety and security strategies set forth in Recommendation No. 10.

**RECOMMENDATION NO. 12**: In the design of schools, the Commission recommends that classrooms and other spaces of denser population occupancy be located away from the points of building entry and that spaces of lesser occupancy be adjacent to school entry points, without giving up human visual surveillance and situational awareness of the entry points.

## IV.   ENDORSEMENTS AND COMMENTS

In addition to the making the foregoing recommendations, the Commissions also wishes to formally endorse the following actions of the General Assembly and other task forces and commissions created in the wake of the mass shootings at the Sandy Hook Elementary School:

### A.   Endorsement of Public Act 13-3.

In June 2013, the General Assembly passed, and Governor Malloy signed into law, Public Act 13-3, which adopted most of the Commission's Interim Report recommendations concerning safe school designs and operations. The Commission wishes to highlight and commend certain provisions of P.A. 13-3:

1.   The Commission endorses P.A. 13-3, sec. 80-83 which establishes the School Security Infrastructure Council. This provision adopts Interim Report Recommendation 27, which recommended the creation of a blue-ribbon panel of design and security experts to establish a set of school security design standards.

38

2.    The Commission endorses P.A. 13-3, sec. 86 which requires the Department of Emergency Services and Public Protection (DESPP), in consultation with the Department of Education (SDE), to develop school security and safety plan standards to provide guidance in emergency plan management and to further assist school districts in managing practices and policies relating to school security and safety planning.

3.    The Commission endorses P.A. 13-3, sec. 83(b), which states that the "School Building Projects Advisory Council shall (1) develop model blueprints for new school building projects that are in accordance with industry standards for school buildings and the school safety infrastructure standards, developed pursuant to section 80 of this act."

4.    The Commission endorses P.A. 13-3, sec. 86, which adopts the Commission's Interim Report recommendations that the State develop a set of tools and standards governing school threat and risk assessment and emergency planning and response.  (*See* Interim Report, Recommendations 18 through 26.)

5.    The Commission endorses P.A. 13-3, sec. 87(b), which requires each local and regional board of education to establish a school safety and security committee for each schools within its jurisdiction.   Each such committee "shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan." P.A. 13-3, sec. 87(b).

6.    The Commission endorses P.A. 13-3, sec. 88(c)(1) and (2), which require that the  "principal of each school shall establish a committee or designate at least one existing committee in the school to be responsible for developing and fostering a safe school climate and addressing issues relating to bullying in the school."  P.A. 13-3, sec. 88(c)(1).  Among other things, the committee shall "identify and address patterns of bullying among students in the school." P.A. 13-3, sec. 88(c)(2).

39

**B.      Endorsement of School Safety Infrastructure Council Report and School Security and Safety Plan Standards.**

The Commission's Interim Report recommended the creation of a blue-ribbon panel of design and security experts to establish a set of school security design standards.   See Interim Report, Recommendation 27.   The State adopted that recommendation in sections 80-83 of P.A. 13-3, which established the School Security Infrastructure Council.   The Council, in turn, issued a detailed report establishing specific school infrastructure standards.

The Interim Report also recommended that the State develop a set of tools and standards governing school threat and risk assessment and emergency planning and response.   Section 86 of P.A. 13-3 adopted that recommendation and required the Department of Emergency Services and Public Protection (DESPP), in consultation with the Department of Education (SDE), to develop School Security and Safety Plan Standards to provide guidance in emergency plan management and to further assist school districts in managing practices and policies relating to school security and safety planning.  The resultant standards are set forth in full in Appendix L.

The Commission endorses both the School Safety Infrastructure Standards Report and the School Security and Safety Plan Standards.  Certain aspects of those documents, however, warrant particular mention.

1.      The Commission endorses the SSIC's recognition of the connection between the state as the primary funding source for local school construction and school design.  The SSIC report states:

> For decades state government has been a primary funding source for local school construction, but has not established uniform preventative school security design standards. In practice, virtually all school safety infrastructure decisions have been made at the local level leading to school construction projects with significantly different security design features across school district boundaries. While maintaining the ability of local school boards to design facilities which are responsive to community needs and conducive to the educational process, the need to achieve a heightened and more uniform level of school safety infrastructure design in each

40

state funded project, as provided for in P.A. 13-3, is now policy.
. . .

Long a primary source of school construction funding, state government will now use its role to require a more comprehensive and uniform consideration of school security measures at the local level. By establishing a universal school security assessment process, by identifying areas of critical concern and by requiring mitigation of observed deficiencies, the state will assume greater responsibility in establishing a more uniform level of school security throughout the state.

SSIC Report at 1.

2.     The Commission endorses the SSIC's recognition of the importance of including all relevant state and local stakeholders in the process of improving school security infrastructure. The SSIC report states:

The state's role in this process does not end with funding state construction and in providing leadership in securing resources and expertise needed to improve school security. It also extends to mobilizing all affected parties in recognizing the importance of this undertaking, in sharing information and technology and in making the goal of improved school safety infrastructure a shared statewide objective. In this effort private vendors and a host of professional associations including the American Council of Engineering Companies of Connecticut, the American Institute of Architects, the Associated Builders and Contractors, the Associated General Contractors of Connecticut and the Connecticut School Construction Coalition have cooperated with the School Safety Infrastructure Council (SSIC) in promoting solutions to the challenging issues of improved school security design.

SSIC Report at 2.

The Commission recommends that the SSIC include among the professional associations referenced above the following: security professionals, law enforcement and emergency responder agencies, and members of the educational system.

3.     The Commission endorses the SSIC's requirement that school systems seeking state funding certify that they have complied with the new

41

School Security Infrastructure Standards and related requirements. The Commission feels this is important to provide a definite means of achieving compliance with the recommended security enhancements. The SSIC Report states:

> The provisions of the School Facilities Grant program (Chapter 173) will be modified to require school systems seeking state funding to certify compliance with the new School Safety Infrastructure Standards and related requirements.

SSIC Report at 9.

4.     The Commission endorses the SSIC's recommendations that assessments to determine means to enhance school security should include a broad base of subject matter experts. The SSIC Report states:

> Another important point, made repeatedly by professionals in the field, is that the conduct of these local uniform assessments must be an inclusive process involving police, fire, medical, school and other local officials. This public safety team approach is not only important in the assessment phase, but throughout the design and construction period as well. The need for redundancy and collaboration is essential.

SSIC Report at 9.

5.     The Commission endorses the SSIC position that developing school safety and security designs and operations must take into account response times by emergency responders. The Report states:

> Central to the security assessment process and the development of the School Security and Safety Plan is the need to conduct an emergency response time analysis (ERTA) to determine the actual amount of time needed for a police [and fire/EMS][7] response to a specific school in a crisis situation.

SSIC Report at 9. The Commission also recommends that the SSIC amend its Report to identify the person or entity who shall be responsible for conducting the emergency response time analysis.

6.     The Commission endorses the SSIC's recommendation that due to the sensitivity of school security infrastructure plans, such plans "should be shielded from disclosure under the Freedom of Information

---

[7] The Commission recommends the inclusion of the bracketed language in the SSIC Report.

Act." SSIC Report at 13.

7.     The Commission supports the following statement concerning the development of school safety infrastructure standards:

> These standards are to be developed by January 1, 2014 and submitted to the legislature at that time. Effective July 1, 2014, all school construction and renovation applications for state funding must comply with these standards, or they will not be approved. Additionally, state grants provided pursuant to the School Security Infrastructure Competitive Grant Program, jointly administered by the Departments of Emergency Services and Public Protection (DESPP), Education (SDE) and Administrative Services (DAS) under section 84 of P.A. 13-3, must be provided in accordance with the SSIC standards on and after these standards are submitted. Finally, any model blueprints for new school building projects that are developed by  the School Building Project Advisory Council pursuant to Conn. Gen. Stat. § 10-292q must include the SSIC standards.

SSIC Report at 3.

8.     The Commission supports the requirement in P.A. 13-3, sec. 86 concerning the development of school security and safety plan standards.  The report states:

> Development of School Security and Safety Plan Standards. P.A. 13-3 (section 86) also requires the Department of Emergency Services and Public Protection (DESPP), in consultation with the Department of Education (SDE), to develop School Security and Safety Plan Standards to provide guidance in emergency plan management and  to further assist school districts in managing practices and policies relating to  school security and safety planning. These standards are intended to assist school districts in developing operational school security procedures to respond to security events.

9.     In its Interim Report the Commission identified the need for uniform, comprehensive threat assessment standards.   The SSIC acknowledged the same need in its report:

> Until now school safety has been almost entirely determined by local decision makers, leading to a very uneven and unpredictable level of school security design across school district lines.

43

As an alternative, a uniform comprehensive threat-assessment process and consistent standards and corresponding building plans will help ensure a threshold level of awareness, responsiveness and security.

SSIC Report at 3.

10.    The Commission endorses the SSIC's requirement of a compliance determination process:

Once a local school district has completed the assessment, identified potential vulnerabilities and proposed specific plans to remediate deficiencies and secure compliance, the Office of School Facilities, Plan Review Unit will evaluate the local plan for adequacy and continue to work with local districts to ensure compliance with established standards

SSIC Report at 12.

11.    The Commission endorses the SSIC's recommendation concerning the timely creation and issuance of School Security Technical Compliance Guidelines:

At minimum, all school facilities are required to be compliant with state and federal building and fire codes. In other areas of school design and construction, standards and guidelines may be somewhat more variable providing local authorities with the flexibility to create an increased level of safety and security while meeting broader educational objectives. Areas not identified in the Mandatory or Critical Compliance sections noted above will be subject to more flexible guidelines to be incorporated in the School Security Technical Compliance Manual that is currently under development. Once complete this document will be incorporated in the SSIC final report as an updated and free standing Appendix E to be used by design and architectural professionals, along with Appendix A, to achieve security design objectives.

SSIC Report at 14.

12.    The Commission endorses the SSIC's call for the development of a program to inform key stakeholders of changes in school safety infrastructure standards:

As the Legislature considers implementation of the new standards, the Departments of Education, Administrative Services and

44

Emergency Services and Public Protection will develop a broad based orientation program designed to inform interested groups and the general public.

SSIC Report at 14.

13. P.A. 13-3, sec. 81(a) (2) provides that the Commissioner of Education shall have the authority to disapprove any application for a state grant that "is not accompanied by a life-cycle cost analysis approved by the Commissioner of Construction Services . . . ."  Section 81(a)(5) further provides that an application may be disapproved if "the estimated construction cost exceeds the per square foot cost for schools established in regulations adopted by the Commissioner of Construction Services. . . ."

The Commission notes that these provisions should be reviewed for practical applications for security/cost benefit metric.  The Commission further notes that security enactments cost money and, therefore, the per square foot costs will need to be adjusted.

## V.   KEY SAFE SCHOOL INFRASTRUCTURE COUNCIL STANDARDS

As noted, the full set of SSIC standards are set forth in Appendix K.  The Commission feels that it is appropriate, however, to provide in this report a subset of SSIC report's salient recommendations.  The criteria the Commission used to identify this subset of recommendations were:

1. Relative ease of feasibility to implement the recommendation.
2. Opportunity for the recommendation to provide significant safety and security value.
3. Ability to implement the recommendation at a reasonable cost for the extent of protective design value obtained.

The standards set forth below include the Commission's suggested amendments and additions for future SSIC revisions.[8]

---

[8] The reference numbers for each standard are the numbers that appear in the SSIC Report.  Additional standards recommended by the Commission are denoted by an "x."

45

## I.       School Site Perimeter Standards

1.1      Crime Prevention Through Environmental Design (CPTED) is a crime prevention strategy that uses architectural design, landscape planning, security systems, and visual surveillance to create a potentially crime free environment by influencing human behavior and should be applied when appropriate.

1.3      Fencing, landscaping, edge treatment, bollards, signage, exterior furnishings and exterior lighting may be used to establish territorial boundaries and clearly delineate areas of public, semi-public, semi-private, and private space.

### Access Control

1.4      School boundaries and property lines shall be clearly demarcated to control access to a school facility and shall clearly delineate areas of public, semi-public, semi-private, and private space.

1.5      Where a school is a shared use facility that serves the community, internal boundaries shall be clearly defined to establish a distinct perimeter for both the school and the shared use facilities with separate and secure access points that are clearly defined. Boundaries may be defined by installing fencing, signage, edge treatment, landscaping, and ground surface treatment.

1.7.     The number of vehicle and pedestrian access points to school property shall be kept to a minimum and shall be clearly designated as such.

1.8.     Directional signage shall be installed at primary points of entry to control pedestrian and vehicular access and to clearly delineate vehicular and pedestrian traffic routes, loading/unloading zones, parking and delivery areas. Signage should be simple and have the necessary level of clarity. Signage should have reflective or lighted markings.

1.x.     A means shall be provided to achieve and enforce identity authentication and entry authorization at locations and areas established by school operations protocols.

### Surveillance

1.17.    The design shall allow for the monitoring of points of entry/egress by natural and/or electronic surveillance during normal hours of operation and during special events.

1.18.    At minimum, electronic surveillance shall be used at the primary access points to the site for both pedestrian and vehicular traffic.

46

1.19.  All points of vehicular  entry/egress shall be adequately illuminated to enhance visibility for purposes of surveillance.

1.20.  Designated pedestrian and vehicular traffic routes shall be adequately illuminated to reinforce natural and or electronic surveillance during evening hours.

1.23.   Locate access points in areas of high visibility that can be easily observed and monitored by staff and students in the course of their normal activities. Natural surveillance may be maximized by controlling access points that clearly demarcate boundaries and spaces.

1.24.  Video surveillance systems may be used around the site perimeter to provide views of points of entry/egress and as a means to securely monitor an area when natural surveillance is not available.

1.26.  Lighting should be sufficient to illuminate potential areas of concealment, enhance observation, and to provide for the safety of individuals moving between adjacent parking areas, streets and around the school facility.

1.xx . Consider the design of video surveillance systems which have the ability to be used locally (on site) by emergency responders and viewed off-site at appropriate locations.

## II.    Parking Areas and Vehicular and Pedestrian Routes

2.2.    At the minimum, electronic surveillance shall be used at the primary access points to the site for both pedestrian and vehicular traffic.

2.3.    Designated pedestrian and vehicular points of entry/egress and traffic routes shall be adequately illuminated to reinforce natural and or electronic surveillance.

2.4.    Signage shall be posted at all vehicular access points and in delivery zones, parking areas and bus loading/unloading zones with rules as to who is allowed to use parking facilities and when they are allowed to do so. Signage should be simple and have the necessary level of clarity. Signage should have reflective or lighted markings.

2.6.    Parking areas shall be adequately illuminated with vandal resistant lighting.

2.7.    Parking shall be prohibited under or within the school building.

47

2.8.   Adequate lighting shall be provided at site entry locations, roadways, parking lots, and walkways from parking to buildings.

2.xx.  Gas service rooms, exterior meters/regulators shall be secured.

2.11.  External access to school facilities shall be kept to a limited number of controlled entrances. Vehicular circulation routes shall be separated and kept to a minimum of two routes per project site for purposes of separating service and delivery areas from visitors' entry, bus drop-off, student parking and staff parking. Circulation routes shall be separated, clearly demarcated, and easily supervised.   Provide vehicle interdiction devices at building entries to preclude vehicle access into the building.

2.13.  A drop-off/pick-up lane shall be designated for buses only with a dedicated loading and unloading zone designed to adequately allow for natural and/or electronic surveillance and to avoid overcrowding and accidents.

2.16.  Design entry roads so that vehicles do not have a straight-line approach to the main building. Use speed-calming features to keep vehicles from gaining enough speed to penetrate barriers. Speed-calming features may include, but are not limited to, speed bumps, safety islands, differing pavement surfaces, landscape buffers, exterior furnishings and light fixtures.

2.18.  Signage text should prevent confusion over site circulation, parking, and entrance location. Unless otherwise required, signs should not identify sensitive or high risk areas. However, signs should be erected to indicate areas of restricted admittance and use of video surveillance.

2.19.  Parking areas should be designed in locations that promote natural surveillance. Parking should be located within view from the occupied building, while maintaining the maximum stand-off distance possible.

2.20.  Locate visitor parking in areas that provide the fewest security risks to school personnel. The distance at which a potentially threatening vehicle can park in relation to school grounds and buildings should be controlled.

2.22.  Consider illuminating areas where recreational activities and other nontraditional uses of the building occur. If video surveillance systems are installed, adequate illumination shall be designed to accommodate it.

2.23.  Consider blue light emergency phones with a duress alarm in all parking areas and athletic fields. If utilized, blue light emergency phones shall be clearly visible, readily accessible and adequately illuminated to accommodate electronic surveillance.

2.xx.  Review vehicle access routes to the school and the site civil design with emergency responders to address their incident response requirements.

2.xx.  Design walkways from all parking areas so that they can be observed from within the school by appropriate school staff.

### III.   Recreational Areas – Playgrounds, Athletic Areas, Multipurpose Fields

3.1.   The design shall allow for ground level, unobstructed views, for natural and/or electronic surveillance of all outdoor athletic areas, playgrounds and recreation areas at all times.

3.3.   Pre-kindergarten  and kindergarten play areas shall be separated from play areas designed for other students and physically secured.

3.4.   Athletic areas and multipurpose fields at elementary school buildings shall contain a physical protective barrier to control access and protect the area.

3.5.   Playgrounds and other student gathering areas shall be located away from public vehicle access areas, such as streets or parking lots by a minimum of fifty (50) feet unless prohibited by site constraints.

3.6.   Consider a physical protective barrier around athletic areas and multipurpose fields at secondary school buildings to control access and protect the area.

3.7.   Locate access points to recreational areas in areas of high visibility that can be easily observed and monitored by staff and students in the course of their normal activities. Natural surveillance may be maximized by controlling access points that clearly demarcate boundaries and spaces.

3.9.   Pre-K and K play areas should be designed so that they have visual sightlines to school staff.  Fencing should not diminish this visual connection.

3.x.   Review the design of these areas with emergency responders to address their incident response requirements.

49

## IV.    Communication Systems

4.1.    All classrooms shall have two way communications with the administrative office.

4.2.    All communication systems shall be installed in compliance with Connecticut state building and fire code requirements.

4.3.    Emergency Communication Systems (ECS) and/or alarm systems shall have redundant means to notify first responders, supporting agencies, public safety officials and others of an event to allow for effective response and incident management. Alarm systems must be compatible with the municipal systems in place. These systems may include radio, electronic, wireless or multimedia technology which provides real time information (such as audio, visual, mapping and relevant data) directly to first responders.  Points of Broadcast input for these systems shall be reviewed with emergency responders.  A minimum of 2 shall be provided.

4.4.    Emergency Communication Systems (ECS) shall be installed and maintained in accordance with NFPA 72, 2010, or the most current fire code standard adopted by the State of Connecticut. ECS may include but is not limited to public address (PA) systems, intercoms, loudspeakers, sirens, strobes, SMS text alert systems, and other emerging interoperable resource sharing communication platforms.  The design of these systems shall be reviewed with emergency responders.

4.5.    All new buildings shall have approved radio coverage for first responders within the building based upon the existing coverage levels of communication systems at the exterior of the building. The system as installed must comply with all applicable sections of the Federal Communication Commission (FCC) Rules for Communication Systems and shall coordinate with the downlink and uplink pass band frequencies of the respective first responders.  Perform a radio audibility and intelligibility test and modify system design accordingly.

4.6.    All in-building radio systems shall be compatible with systems used by local first responders at the time of installation.

4.12.  Call buttons with direct intercom communication to the central administrative office and/or security office should be installed at key public contact areas.

4.xx.  Develop a strategy and "security team" and equip them with hand-held radios so they can be effective participants in the radio communications system.

50

## V.      School Building Exterior – Points of Entry/Egress and Accessibility

5.1.    Points of entry/egress shall be designed to allow for monitoring by natural and/or electronic surveillance during normal hours of operation and during special events.

5.2.    At minimum electronic surveillance shall be used at the primary points of entry.

5.4.    Lighting shall be sufficient to adequately illuminate potential areas of concealment and points of building entry, and, enhance natural and/or electronic surveillance, and discourage vandalism.

5.8.    Consider blue light emergency phones with a duress alarm along the building perimeter as needed to enhance security. If utilized, blue light emergency phones shall be clearly visible, readily accessible and adequately illuminated to accommodate electronic surveillance.

5.9.    Consider the use of forced entry resistance glazing materials for windows and glazed doors using laminated glass and/or polycarbonate to significantly improve forced entry delay time beyond standard glazing techniques.  A five (5) minute forced entry solution should be the design standard.

### *Main Entrance/Administrative Offices/Lobby*

5.10.  Main entrances shall be well lit and unobstructed to allow for natural and/or electronic surveillance at all times.

5.11.  The design shall allow for visitors to be guided to a single control point for entry.

5.12.  The main entrance assembly (glazing, frame, & door) shall be forced entry resistant to the project standard, with a forced entry time rating as informed by local law enforcement response timing.

5.13.  Plans shall carefully address the extent to which glazing is used in primary entry ways, areas of high risk and areas of high traffic and the degree to which glazing is installed or treated to be bullet, blast, or shatter resistant to enhance the level of security. The district's priorities for the use of natural surveillance, electronic surveillance, natural light and other related security measures may affect this decision and the overall level of security.

5.14.  Main entrance doors shall be  capable of being secured from a central location, such as the central administrative office and/or the school security office.

51

5.15.  Video surveillance cameras shall be installed in such a manner to show who enters and leaves the building and shall be monitored at locations which are attended whenever the school is occupied.

5.16.  The design shall allow for providing visitor accessibility only after proper identification.

5. xx. The use of vestibules with forced entry resistant doors and glazing to the project standard should be the design standard.

5.19.  The central administrative offices and/or security offices should have an unobstructed view of the main entrance lobby doors and hallways. If feasible, administrative offices abutting the main entrance should be on an exterior wall with windows for natural surveillance of visitor parking, drop off areas, and exterior routes leading to the main entrance.

5.20.  Walls, forced entry resistant to the project standard, should be hardened in foyers and public entries. Interior and exterior vestibule doors should be offset from each other in airlock configuration.

5.21.  Use vestibules to increase security. The entrance vestibule shall have both interior and exterior doors that are lockable and controllable from a remote location and be designed to achieved enhanced force entry performance as identified to the project forced entry standards.

5.23.  When possible, the design should force visitors to pass directly through a screening area prior to entering or leaving the school. The screening area should be an entrance vestibule, the administration/reception  area, a lobby check in station, an entry kiosk, or some other controlled area. This controlled entrance should serve as the primary control point between the main entrance and all other areas of the school.

5.24.  Control visitor access through electronic surveillance with intercom audio and remote lock release capability at the visitor entrance.

5.25.  Restrict visitor access during normal hours of operation to the primary entrance. If school buildings require multiple entry points, regulate those entry points with no access to people without proper identity authentication and entry authorization. Consider an electronic access control system for authorized persons if multiple entry points are utilized during normal hours of operation.

5.27.  Install a panic/duress alarm or call button at an administrative/security desk as a protective measure.

52

5.28.  Proximity cards, keys, key fobs, coded entries, or other devices may be used for access control of students and staff during normal hours of operation. The system may be local (residing in the door hardware) or global (building or district- wide). Prior to installing a customized door access control system refer to the local authority having jurisdiction for compliance with state building and fire code.

5.31.  Consider sensors that alert administrative offices when exterior doors at all primary and secondary points of entry are left open.

5.32.  Consider radio frequency access control devices at primary points of entry to allow rapid entry by emergency responders.  Review this technology with the emergency responders which serve the school facility.

5.33.  Where "forced entry" required construction is required, the forced entry delay time shall be based on the ERTA, and have the forced entry designs informed/validated by a licensed architect, professional engineer or qualified security consultant.

5.xx.  Provide closers on these doors so that they automatically return to a closed, latched, and locked position to preclude unauthorized entry.

### *Exterior Doors*

5.34.  The design shall allow for the points of entry/egress to be monitored by natural and/or electronic surveillance during normal hours of operation and during special events.

5.36.  Lighting at these entry points shall be sufficient to illuminate potential areas of concealment, enhance natural and/or electronic surveillance, discourage and protect against vandalism.

5.39.  Tertiary exterior doors shall be hardened to be penetration resistant and burglar resistant.

5.40.  All exterior doors shall be equipped with hardware capable of implementing a full perimeter lockdown by manual or electronic means and shall be numbered per the SSIC standards.

5.41.  All exterior doors shall be easy to lock and allow for quick release in the event of an emergency by authorized personnel and emergency responders.

5.45.  All exterior doors that allow access to the interior of the school shall be numbered in sequential order in a clockwise manner starting with the main

53

entrance. All numbers shall be visible from the street or closest point of entry/egress, contrast with its background and be retro-reflective.

5.48.  Doors vulnerable to unauthorized access may be monitored by adding door contacts or sensors, or may be secured through the use of other protective measures, such as delayed opening devices, or video surveillance cameras that are available for viewing from a central location, such as the central administrative office and/or security office.

5.53.  Specify high security keys and cylinders to prove access control.

5.xx.  Provide closers on these doors so that they automatically return to a closed, latched, and locked position to preclude unauthorized entry.

### *Exterior Windows/Glazing/Films*

5.55.  Windows may serve as a secondary means of egress in case of emergency. Any "rescue window" with a window latching device shall be capable of being operated from not more than forty eight (48) inches above the finished floor.

5.56.  Each classroom having exterior windows shall have the classroom number affixed to the upper right hand corner of the first and last window of the corresponding classroom. The numbers shall be reflective, with contrasting background and shall be readable from the ground plain at a minimum distance of fifty (50) feet.

5.57.  Plans shall carefully address the extent to which glazing is used in primary entry ways, areas of high risk and areas of high traffic and the degree to which glazing is installed or treated to be bullet, blast, or shatter resistant to enhance the level of security. The district's priorities for the use of natural surveillance, electronic surveillance, natural light and other related security measures may affect this decision and the overall level of security.

5.59.  Design windows, framing and anchoring systems to be shatter resistant, burglar resistant, and forced entry resistant to the project forced entry standards, especially in areas of high risk.  Whenever feasible, specify force entry resistant glazing on all exterior glazing.

5.60.  Resistance for glazing may be built into the window or applied with a film or a suitable additional forced entry resistant "storm" window.

5.61. Classroom windows should be operable to allow for evacuation in an emergency.  Review with the authority having jurisdiction and fire department to balance emergency evacuation, external access, and security requirements.

54

## VI.    School Building Interior

Interior physical security measures are a valuable part of a school's overall physical security infrastructure.  Some physical measures such as doors, locks, and windows deter, prevent or delay an intruder from freely moving throughout a school and from entering areas where students and personnel may be located. Natural and electronic surveillance can assist in locating and identifying a threat and minimizing the time it takes for first responders to neutralize a threat.

6.1.    The design shall provide for controlled access to classrooms and other areas in the interior that are predominantly used by students during normal hours of operation to protect against intruders.

6.4.    All interior room numbers shall be coordinated in a uniform room numbering system format. Numbering shall be in sequential order in a clockwise manner starting with the interior door closest to the main point of entry. Interior room number signage shall be wall mounted. Additional room number signage may be ceiling or flag mounted. Interior room number signage specifications and installation shall be in compliance with ADA standards and other applicable regulations as required.

6.x.    Record documentation drawings shall be kept which include floor plans with the room numbering system.  These drawings shall be safeguarded but available for emergency responders.  Review opportunities for emergency responders agencies to have these drawings as well.

6.x.    Review design opportunities to create interior safe havens with forced entry resistant walls and doors.  These may be libraries, auditoriums, cafeterias, gyms or portions of school wings or blocks of classrooms.

6.5.    Establish separate entrance and exit patterns for areas that have concentrated high- volume use, such as cafeterias and corridors, to reduce time required for movement into and out of spaces and to reduce the opportunity for personal conflict. Separation of student traffic flow can help define orderly movement and save time, and an unauthorized user will perceive a greater risk of detection.

6.6.    Consider intruder doors that automatically lock when an intruder alarm or lockdown is activated to limit intruder accessibility within the building. If installed, intruder doors shall automatically release in the event of an emergency or power outage and must be equipped with a means for law enforcement and other first responders to open as necessary.

55

### *Interior Surveillance*

6.7.   An intrusion detection system shall be installed in all school facilities.

6.8.   If video surveillance systems are utilized, the surveillance system shall be available for viewing from a central location, such as the central administrative office and/or the school security office, and at points of emergency responder incident management.  Review these locations with emergency responders in the design phase.

6.9.   Consider electronic surveillance in lobbies, corridors, hallways, large assembly areas, stairwells or other areas (such as areas of refuge/safe havens) as a means to securely monitor those areas when natural surveillance is not available.

6.10.  The design of a school facility should allow for the designation of controlled hiding spaces. A controlled hiding place should create a safe place for students and personnel to hide and protect themselves in the event of an emergency. The controlled hiding space should be lockable and readily accessible. A controlled hiding space could be a classroom or some other designated area within the building.

**6.**xx.  Design interior hallways and adjacent spaces to provide situational awareness of hallway conditions from these rooms, but also provide means to eliminate vision into these rooms as activated by room occupants.

### *Classroom Security*

6.11.  All classrooms shall be equipped with a communications system to alert administrators in case of emergency. Such communication systems may consist of a push-to-talk button system, an identifiable telephone system, or other means.

6.12.  Door hardware, handles, locks and thresholds shall be ANSI/BHMA Grade 1.

6.13.  All classroom doors shall be lockable from the inside without requiring lock activation from the hallway, and door locks shall be tamper resistant.

6.15.  Classroom door locks shall be easy to lock and allow for quick release in the event of an emergency.

6.16.  Classroom doors with interior locks shall have the capability of being unlocked/ released from the interior with one motion.

56

6.17.  All door locking systems must comply with life safety and State of Connecticut building and fire codes to allow emergency evacuation.

**6.**xx.  Provide doors between adjacent classrooms to provide means of moving classroom occupants from one classroom to the next as a means to relocate students and teachers from an impending hallway threat.  Provide such doors with suitable locking hardware to preclude unauthorized tailgating.

**6.xx.**  Provide closers on these doors so that they automatically return to a closed, latched, and locked position to preclude unauthorized entry.

6.20.  If classroom doors are equipped with a sidelight, the glazing should be penetration/forced entry resistant to the project forced entry standard.

6.21.  If interior windows are installed to provide lines of sight into/out of classrooms or other populated areas, certain factors should be taken into consideration relating to the size, placement and material used for those windows, including:

6.21.1.      Minimizing the size of windows or the installation of multiple interspersed smaller windows with barriers in a larger window area to deter intruder accessibility.

6.21.2.      Placing windows at a sufficient distance from the interior locking mechanism to prevent or make difficult the opening of a door or lock from outside.

6.21.3.      Concealing or obstructing window views to prevent an assailant's ability to ascertain the status or presence of persons inside of a classroom during lockdown.

6.21.4.      Hardening window frames and glazing to the project forced entry standards to lessen window vulnerability.

### *Large Assembly Areas (gym, auditorium, cafeteria, or other areas of large assembly)*

6.22.  Points of entrance and egress shall be clearly demarcated and designed to meet the project forced entry standards.

6.26.  Lighting shall be sufficient to illuminate potential areas of concealment, enhance natural and/or electronic surveillance, discourage vandalism and protect against vandalism.

57

6.29.  Electronic surveillance should be used in large assembly areas and at all exit doors to securely monitor those areas when natural surveillance is not available.

### *Shared Space or Mixed Occupancy (library, BOE, mixed use or other community service)*

6.32.  Shared space shall have separate, secure and controllable entrances.

6.33.  The design of shared space should prevent unauthorized access to the rest of the school.

6.34.  The design of shared space shall allow for the monitoring of points of entry/egress by natural and/or electronic surveillance during normal hours of operation.

## VII.  Roofs

7.1.    The design shall allow for roof accessibility to authorized personnel only.

7.2.    Access to the roof should be internal to the building. Roof access hatches shall be locked from the inside.

7.3.    If external access exists, roof ladders should be removable, retractable, or lockable. Screen walls around equipment or service yards should not provide easy access to the roof or upper windows.

**7.x.**  Provide adequate lighting and controls for roof access means and roof access points into the school.

## VIII.   Critical Assets/Utilities

8.1.    Screens at utilities, such as transformers, gas meters, generators, trash dumpsters, or other equipment shall be designed to minimize concealment opportunities and adequate to preclude unauthorized access. Installation of screens at utilities shall be compliant with utility company requirements.

8.2.    Access to building operations systems shall be restricted to designated users with locks, keys and/or electronic access controls. Secure all mechanical rooms with intruder detection sensors.

8.3.    Loading docks shall be designed to keep vehicles from driving into or parking under the facility.

8.x.    Spaces with critical systems shall be provided appropriate graphics to be recognizable to emergency responders.

8.x.    Gas meter/regulator rooms shall be provided with forced entry resistant doors and to the project standards.

8.x.    Gas leak detection systems/sensors shall be installed wherever gas metering or appliances are installed.

8.5.    Shipping and receiving areas shall be separated from all utility rooms by at least fifty (50) feet unless prohibited by site constraints. If a site is determined to be physically constrained from reasonably meeting the fifty (50) foot separation requirement, maximize the separation distance between the receiving area and the utility room to the greatest extent possible. Utility rooms and service areas include electrical, telephone, data, fire alarm, fire suppression rooms, and mechanical rooms.

8.6.    Critical building components should be located away from vulnerable areas.  Critical building components may include, but are not limited to:

•   Emergency generator;

•   Normal fuel storage;

•   Main switchgear;

•   Telephone distribution;

•   Fire pumps;

•   Building control centers;

•   Main ventilation systems if critical to building operation.

•   Elevator machinery and controls.

•   Shafts for stairs, elevators, and utilities.

**Other Security Infrastructure and Design Strategies**

9.1.    The design shall include special rooms for hazardous supplies that can be locked.

9.x.    The design shall include secured spaces, closets, cabinets or means of protection to minimize the use of dangerous objects from shop, cooking or other similar occupancies.

9.2.    Egress stairwells should be located remotely and should not discharge into lobbies, parking or loading areas.

59

9.4.   Trash receptacles, dumpsters, mailboxes and other large containers shall be kept at least thirty (30) feet from the building unless prohibited by site constraints. If a site is determined to be physically constrained from reasonably meeting the thirty (30) foot separation requirement,  maximize the separation distance to the greatest extent possible.

# PART TWO

## FINDINGS AND RECOMMENDATIONS OF THE LAW ENFORCEMENT WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION

### I.    INTRODUCTION

Regardless of socioeconomic, ethnic, or gender divisions, households across the state and across the nation seek and deserve safety and security for their families; the types of civic spaces that are conducive to supportive environments and places where we want to raise our children.  The ferocity of attacks like those perpetrated at Sandy Hook Elementary School shatters that sense of security and deprives us of the serenity that we all deserve.

In 21st century America, certain topics are destined to divide us.  With great rhetorical flourish, the message boards ignite with sincere passion on these topics.  How we manage firearms in our evolving community is one such topic.

The lethality of the weapons used in the attack on Sandy Hook Elementary School requires that the Commission evaluate access to firearms and ammunition.  The analysis of the Commission is not rooted in dogma or a particular ingrained "world view," but rather a rational analysis of what type of firearms are available to citizens and what that means to the security of communities.  In its analysis, the Commission engaged in a pragmatic, not dogmatic, review.

United States civilians own or possess in excess of 300 million guns: as of 2009, they owned or possessed approximately 114 million handguns, 110 million rifles and 86 million shotguns.[9]  The incidence of gun ownership/possession in the United States—nearly one gun on average for every resident—is the highest in the world.  Most guns are lawfully owned by law abiding persons who use them for recreational activities, such as hunting

---

[9] *See* "Gun Control Legislation," Report of the Congressional Research Service (Nov. 14, 2012) at 8.

and target practice, and/or for self-defense.  However, many guns are owned or possessed illegally or, even if legal, are used for unlawful purposes.

The Commission acknowledges the United States' long tradition of gun ownership and the Second Amendment rights of gun owners.  The Commission also notes that although a divided (5-4) United States Supreme Court held in *District of Columbia v. Heller*, 554 U.S. 570 (2008), that the Second Amendment right to bear arms is a *personal* right, it also held the right is *not absolute.*  The Supreme Court also acknowledged in *Heller* that society has the right to regulate gun ownership, possession and use within constitutionally permissible limits.

The Constitution of the United States compels us to evaluate our nation as a society that changes, grows, and evolves.  And as our world and our collective beliefs mature, so must the laws that govern us.  As Supreme Court Justice Oliver Wendell Holmes, Jr. so eloquently stated regarding the dynamic nature of our legal structure, "It is still more revolting if the grounds upon which [a law] was laid down have vanished long since, and the rule simply persists from blind imitation of the past." The Commission seeks to recommend a framework that applies the broad principles of the Constitution to contemporary reality. Technological advances, economic transformations, and broad changes in the way we perceive the world around us have irrevocably changed the world.  Even as we, as a community, discuss topics of controversy, we must avoid that "blind imitation of the past"; we must understand that we can apply our own technological and cultural tools, even if those tools were unavailable to our forefathers.  We must understand that innovation is a quintessential American trait, and it is our moral obligation to apply these principles of innovation to generate solutions to the issues that we face.

In setting forth the following recommendations, the Commission does not seek to deprive citizens of their right to hunt, engage in target practice or own a firearm for self-defense; nor does the Commission seek to rewrite the Constitution of the United States or centuries' worth of legal decisions

pertaining to the right to bear arms.   Rather, the Commission's goals and objectives are two-fold.

First, the Commission is deeply concerned about the proliferation, throughout the civilian population, of weapons that were specifically designed for military use during wartime.   The Commission believes that "assault weapons" like the AR-15, as well as large capacity magazines ("LCM's") often used with those weapons, have no legitimate place in the civilian population. The Commission finds that the cost to society of easy civilian access to assault weapons and LCM's vastly outweighs the benefits of civilian ownership.   By contrast, the Commission finds that the significant benefit to society from eliminating civilian ownership and possession of assault weapons and LCM's can be realized with only a minimal burden on persons who want to hunt, engage in target practice or use weapons for self-defense.   They remain free to engage in those activities with a vast array of long guns and handguns.   In short, the Commission's first goal is simply to limit the possession and use of weapons designed for wartime use to members of our military services and law enforcement personnel.

Second, through reasonable, constitutionally permissible regulations applicable to long guns, handguns and ammunition, the Commission seeks to minimize to the greatest extent possible the number of gun-related civilian deaths.

## II.   INTERIM REPORT RECOMMENDATIONS

In its Interim Report of March 19, 2013, the Commission made a number of recommendations concerning firearms and ammunition.   The Commission is pleased that the Connecticut General Assembly adopted many of the recommendations during its 2013 legislative session.   The Interim Report findings and recommendations, and their current status as reflected in law, are set forth below.

### A.   Firearm Permitting And Registration

As of the date of the Interim Report, Connecticut law required registration and permits to own and carry certain firearms.  The Commission found that firearms of significant lethality could be obtained legally without a permit or registration.  According to the Connecticut State Police, there are approximately 1.4 million registered firearms in the State of Connecticut, and possibly up to 2 million unregistered firearms.  Given the lethality of certain models of firearm that do not currently require registration of any sort, the Commission found this discrepancy in permitting and registration to be not only unwarranted, but shocking.  Furthermore, the Commission believed that the lack of uniform control abets "straw purchases"—purchases by one individual made on behalf of a third-party—that can be used to deliver firearms to potential criminals. In order for law enforcement agencies to safely engage in their lawful duties, the Commission proposed the following recommendations:

**RECOMMENDATION NO. 1**.  Mandatory background checks on the sale or transfer of any firearm, including long guns, at private and gun show sales.

**Status:**  Recommendation accepted and adopted by P.A. 13-3, § 1.

**RECOMMENDATION NO. 2**.  Require registration, including a certificate of registration, for every firearm.  This certificate of registration should be issued subsequent to the completion of a background check and is separate and distinct from a permit to carry.

**Status:** Not adopted.  The Commission reaffirms its recommendation requiring the registration of all firearms and requests that the Governor resubmit this recommendation for reconsideration by the General Assembly during the 2015 legislative session.

**RECOMMENDATION NO. 3.**  Require firearms permits to be renewed on a regular basis.  This renewal process should include a test of firearms handling capacity as well as an understanding of applicable laws and regulations.

**Status:** Not adopted.  (Note: Under existing law, a firearm permit is good for five years and may be renewed without the recommended process.  *See*

64

Conn. Gen. Stat. § 29-36h.)   The Commission requests that the Governor resubmit this recommendation for legislative action.

### B.    High-Capacity Firearms, Magazine Capacity, And Ammunition

The Commission found that certain types of ammunition and magazines that were readily available at the time it issued its Interim Report posed a distinct threat to safety in private settings as well as in places of assembly. The Commission further found that, despite the lethality of this ammunition, the law imposed only limited controls on its purchase.  The Commission understood that a life can be lost every few seconds in a spree killing.  The Commission took seriously the rights afforded under the Second Amendment, but balanced those rights against the language of the Preamble to the Constitution, which includes assurances of "domestic tranquility" and the obligation to "promote the general welfare."[10] In order to maintain the safety of places of assembly by ensuring that lawful, competent firearms owners are the only individuals lawfully allowed to possess certain types and quantities of ammunition, the Commission proposed the following recommendations:

**RECOMMENDATION NO. 4.**  Institute a ban on the sale, possession, or use of any magazine or ammunition feeding device in excess of 10 rounds except for military and police use. In proposing this recommendation, the Commission recognized that certain sporting events at times involve the use of higher capacity magazines.  However, the consensus of the Commission was that the spirit of sportsmanship can be maintained with lower capacity magazines.

**Status:**     Accepted and adopted by P.A. 13-3, §§ 23-24.

**RECOMMENDATION NO. 5.**  Institute a ban on the possession or sale of all armor-piercing and incendiary bullets, regardless of caliber.   First-time offenses should be classified as a Class D Felony.

---

[10]  The Commission notes that in January 2014 the Federal District Court of Connecticut rejected a legal challenge to the constitutionality of the gun legislation that the General Assembly enacted and Governor Malloy signed into law in 2013.  *See Shew v. Malloy*, 994 F.Supp.2d 234 (D. Conn. 2014).  As of the date of this report, the District Court's judgment is on review in the Second Circuit Court of Appeals.

65

**Status:** Accepted and adopted *in part* by P.A. 13-3, § 32 (banning armor-piercing bullets).  The Commission reaffirms its position that the ban should also apply to incendiary bullets and urges the Governor to submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 6**. Allow ammunition purchases only for registered firearms.

**Status:** Not adopted in absence of firearm registration requirement.  The Commission reaffirms its position that the law should only permit individuals to purchase ammunition for registered firearms and requests that the Governor submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 7.** Evaluate best practices for determining the regulation or prohibition of the sale and purchase of ammunition via the Internet.

**Status:** Not adopted. The Commission reaffirms its position that the state should study and evaluate best practices for determining the regulation or prohibition of the sale and purchase of ammunition via the Internet and requests that the Governor submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 8.**  Evaluate the effectiveness of federal law in limiting the purchase of firearms via the Internet to only those individuals who have passed the appropriate background screening.

**Status:**  Not adopted.  The Commission reaffirms its position that the state should study and evaluate the effectiveness of federal law in limiting the purchase of firearms via the Internet to only those individuals who have passed the appropriate background screening and urges the General Assembly to reconsider this recommendation during the 2015 legislative session.

**RECOMMENDATION NO. 9.**  Limit the amount of ammunition that can be purchased at any given time.

**Status:**  Not adopted. The Commission reaffirms its position that the law should only permit individuals to purchase ammunition for registered firearms and requests that the Governor submit this request to the General Assembly for reconsideration during the 2015 legislative session.

### C.    Assault Weapons

The Commission found that the legal definition of "assault weapon" at the time it issued its Interim Report allowed for cosmetic changes to military-style firearms that did not reduce their lethality, yet facilitated their lawful purchase.  The Commission determined that defining an "assault weapon" by its form rather than its function had been ineffective.  The consensus of the Commission was that gun violence is an issue that transcends the tragedy at Sandy Hook, and the commonality of high-capacity firearms in violent crimes had to be acknowledged.  According to the 2011 Connecticut Uniform Crime Reporting Program, only two (2) of 94 firearm-related homicides in the state were committed with a rifle or a shotgun.  It was the consensus of the Commission that firearm lethality directly correlated to capacity, a correlation borne out not only in Sandy Hook Elementary School, but in other violent confrontations in and beyond Connecticut.   Therefore, the Commission proposed the following recommendation:

**RECOMMENDATION NO. 10.**   Prohibit the possession, sale or transfer of *any* firearm capable of firing more than 10 rounds without reloading. This prohibition would extend to military-style firearms as well as handguns.  Law enforcement and military would be exempt from this ban.

**Status:** Not adopted.  Instead, the General Assembly created of a list of specific semiautomatic rifles, pistols and shotguns that are banned.  *See* P.A. 13-3, §§ 25-31.  The Commission requests the Governor to submit this request to the General Assembly for reconsideration during the 2015 legislative session.

### D.    Firearm Storage And Security

The Commission found that when firearms are present in a household, insufficient safeguards often existed to prevent household members or guests

who should not have access to the firearms from gaining access.  To better ensure that only appropriate handlers have direct access to firearms, the Commission recommended the following:

**RECOMMENDATION NO. 11.**  Require that trigger locks must be provided at the time of sale or transfer of any firearm.

**Status:** Not adopted.  The Commission reaffirms its position that the law should require trigger locks to be provided at the time of sale or transfer of any firearm, and requests that the Governor resubmit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 12.**  Require that the state develop and update a "best practices" manual and require that all firearms in a home be stored in a locked container and adhere to these best practices; with current minimum standards featuring a tamper-resistant mechanical lock or other safety (including biometric) device when they are not under the owner's direct control or supervision.  The owner should also be directly responsible for securing any key used to gain access to the locked container.

**Status:**  Accepted and adopted in part by P.A. 13-3, § 54-56.

**E.**     **Additional Recommendations Re: Firearms And Ammunition**

**RECOMMENDATION NO. 13.**  Require non-residents seeking to purchase a firearm or ammunition in the State of Connecticut to obtain a Certificate of Eligibility and conform to all other regulations applicable to Connecticut residents.

**Status:**  P.A. 13-3 requires that anyone who purchases ammunition in CT must have Connecticut state credentials.  See P.A. 13-3, § 14(c).

**RECOMMENDATION NO. 14.**  Require gun clubs to report any negligent or reckless behavior with a firearm, or illegal possession of any firearm or magazine, to the Connecticut Department of Emergency Services and Public Protection, Commissioner of Public Safety, and local law enforcement.

**Status:** Not adopted.  The Commission reaffirms this recommendation and requests that the Governor resubmit it to the General Assembly for reconsideration during the 2015 legislative session.

**RECOMMENDATION NO. 15.**  Requiring promoters of gun shows to receive a permit from the Chief of Police or Chief Elected Official as well as provide notice to the Commissioner of the Connecticut Department of Emergency Services and Public Protection.

**Status:**  Not adopted. The Commission reaffirms this recommendation and requests that the Governor resubmit it to the General Assembly for reconsideration during the 2015 legislative session.

**III.   FINAL REPORT ADDITIONAL RECOMMENDATIONS**

After issuing its Interim Report, the Commission continued to hear presentations by experts in a variety of fields, including law enforcement.  In addition to the recommendations in the Interim Report, which are resubmitted to the extent not previously adopted, the Commission made the following additional findings and proposes the following recommendations.

**A.   Firearms/Ammunition**

**RECOMMENDATION NO. 16.**  Require that any shell casing for ammunition sold or possessed in Connecticut have a serial number laser etched on it for tracing purposes.

*Rationale*:  "Straw purchases" of ammunition enable individuals to circumvent many laws intended to help prevent or reduce gun violence and to assist law enforcement personnel in solving gun-related crimes.  In addition to urging the General Assembly to reconsider Recommendation No. 6, which would limit purchases of ammunition to owners of registered firearms and solely for the specific type of firearm, the Commission also believes that making every round of ammunition traceable will discourage the use of firearms and ammunition for unlawful purposes.  At the same time, applying technological advances to both ammunition and firearms provides a clear and unique economic development opportunity for manufacturers in and beyond

69

Connecticut.  Given our state's rich manufacturing history, from Eli Whitney to Winchester Repeating Arms, to Colt's Manufacturing Company, we can and should take advantage of the opportunity to spark the next evolutionary leap in firearms and ammunition manufacturing.

**RECOMMENDATION NO. 17.**  Any person seeking a license to sell, purchase or carry any type of firearm in the state should be required to pass a suitability screening process.

*Rationale*:   The Commission finds that certain individuals are not suited to own, possess or use firearms.   A mental health diagnosis, alone, should not serve as a basis for unsuitability.[11] (See Section VI.A.8, *infra,* at p.185.)

---

[11] The Commission agrees with two proposals set forth in the December 2013 report of the Consortium for Risk-Based Firearm Policy, entitled "Guns, Public Health, and Mental Illness: An Evidence-Based Approach for State Policy."  The Consortium recommends the following:

1. Current state law should be strengthened to temporarily prohibit individuals from purchasing or possessing firearms after a short-term involuntary hospitalization [for psychiatric treatment].   Concurrently, the process for restoring firearms rights should be clarified and improved. Specifically: (i) States should enact new legislation temporarily prohibiting individuals from purchasing or possessing firearms after a short-term involuntary hospitalization.  This prohibition should be predicated on a clinical finding of danger to self or danger to others; (ii) Restoration of an individual's ability to purchase or possess a firearm following a firearm disqualification due to mental illness should be based on an evaluation by a qualified clinician and a finding that the petition is unlikely to relapse and present a danger to self or others in the foreseeable future.

2. States should enact new prohibitions on individuals' ability to purchase or possess a firearm that reflect evidence-based risk of dangerousness.  Such individuals include: (i) persons convicted of a violent misdemeanor; (ii) persons subject to a temporary domestic violence restraining order; (iii) persons convicted of two or more DWI or DUI's in a period of five years; (iv) persons convicted of two or more misdemeanor crimes involving a controlled substance in a period of five years; (v) a system should be devised to allow family members to obtain a "Gun Restraining Order."  This would allow those closest to an individual to ask the court, based on their testimony as to a threat of violence, to issue a court order authorizing the police to seize any firearms owned or possessed by such individual.

The Commission further finds that tension occasionally exists between permitting criteria used by the local firearm permit issuing authority (usually the Chief of Police) and the state Firearms Review Board, which reviews permit denials by the local issuing authority.  To ensure that both the local issuing authority and the Firearms Review Board apply the same criteria, the suitability screening process should be codified in law.  The Commission requests that the Governor submit this recommendation it to the General Assembly for consideration during the 2015 legislative session.

**RECOMMENDATION NO. 18.** To allow, at a judge's discretion, the opportunity to temporarily remove any firearms, ammunition, and carry permits from a person who is the subject of an *ex parte* restraining order, civil protection order or family violence protective order, at the time of the issuance of that order. The Commission believes that the time period between the *ex parte* request and the issuance of a full restraining order, civil protection order or family violence protective order, constitutes a period of critical danger, one that must be recognized under law and addressed via judicial discretion.

### B.      Best Practices/Protocols

**RECOMMENDATION NO. 19.**   Grant state-wide peace officer status to all sworn law enforcement officers in Connecticut to assure their ability to respond to any other jurisdiction within the state in the event of a major police emergency, but only at the express invitation of the requesting jurisdiction. Self-dispatch by public safety or EMS resources should be prohibited to prevent over-response.

*Rationale*:   Under existing law, a local law enforcement officer's legal status as such is limited to the specific town in which he/she works.  For example, a police officer in Hartford does not have the legal authority to make an arrest (other than a felony citizen arrest) in Bloomfield or Windsor.  The limited geographic scope of a local law enforcement officer's jurisdiction can be an impediment under certain circumstances, such as the tragedy in Sandy Hook, when a police department may find itself overwhelmed by events and

71

lacking sufficient resources, both in terms of personnel and equipment, to respond effectively.  In such a case, there is a clear need for police officers from surrounding towns and communities to be able to assist the overwhelmed department and to do so in their official capacities.

**RECOMMENDATION NO. 20.**    Provide funding for the Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security, to establish positions for regional School Safety Planners charged with assisting districts in the planning for all hazards emergencies and the effective exercising of those plans.

*Rationale*:  The Commission believes that developing a set of written standards governing safe school design and operation, and creating a written plan that instructs teachers, staff, local law enforcement, fire and emergency management personnel on how to respond to potential threats, is only the first step towards the goal of making local schools safer for students, faculty, staff and visitors.  A plan that sits on a shelf simply collects dust.  The law has long required local schools to have periodic fire drills to test the efficacy of fire response plans and to train teachers, staff and students how to respond to a real fire if one occurs, and data on school fires, specifically the lack of fatalities in the last half century, evidences the effectiveness of these drills.   The Commission believes that the law should also require local schools to undergo periodic training and drilling of school safety and security plans.

Because local school and law enforcement officials are already overwhelmed with existing responsibilities, the Commission recommends the creation of, and funding for, a new position of regional School Safety Planner.  The proposed School Safety Planner would be responsible for developing and overseeing drilling and training at all schools in his/her jurisdiction.   The School Safety Planner would also be responsible for reviewing school security plans on a periodic basis to ensure that they remain current, reflect best practices and are consistent with relevant statutes and ordinances.  The school

safety planner would also work with local school officials to ensure recovery, as well as prevention response and mitigation, planning was in place.

**RECOMMENDATION NO. 21.**   Develop regional multi-jurisdictional, multi-discipline, Unified Command concept of operations, integrating local and state police, for major events of great consequence. These plans should include administrative staff of local schools or other entities to assure best information is available.

*Rationale*:  An event in a town that ultimately requires the involvement of a large number of law enforcement officers may not necessarily begin as a major event.  The actual or apparent magnitude of the event may grow over time.   An event that begins as one that local police are fully capable of addressing may evolve into a major event that requires the assistance of law enforcement personnel, as well as fire and EMS personnel, from surrounding communities.

The Commission believes that local communities, acting in concert on a regional basis, should develop a plan that sets forth a *tiered* response to such events.   The Commission recommends the Capitol Region "Blue Plan" as a model for such a plan.[12]   The Blue Plan categorizes events into three stages, each stage reflecting an increasingly serious event that requires the assistance of more law enforcement personnel from surrounding communities.   The plan establishes a unified command for operations, identifies what personnel are required to respond for each stage and designates pre-established staging areas, establishes specific channels for electronic communications, and so on. These plans should give consideration to linkage with the state unified command structure where appropriate.

**RECOMMENDATION NO. 22.**   Establish statewide and/or regional Incident Management Teams for public safety personnel.

---

[12] *See* Appendix M.  Only a portion of the Blue Plan is included in the Appendix. Additional information is available from the Capitol Region Chiefs of Police Association.

*Rationale*: The preceding recommendation pertains primarily to local law enforcement. The Commission also finds, however, that public safety operations occasionally experience a "resource gap." For example, if a firefighter dies in the line of duty and the members of the department attend his funeral, a need exists in the relevant municipality for a group of qualified individuals from other communities to assume temporary responsibility for local fire department operations. Similarly, a small town with a volunteer fire department may face a major fire incident or disaster, which requires a larger and stronger response than the town is equipped to provide.

The Commission recommends the creation of statewide and/or regional Incident Management Teams to fill this resource gap when it occurs. Incident Management Teams would be comprised of appropriate staff from other towns and communities, who would be prepared to step in to assist with or assume responsibility for public safety management operations when circumstances require.

Ideally, the Commission believes that Incident Management Teams should be a component of the plan proposed in Recommendation No. 20. To the extent possible, the Commission encourages integration of law enforcement, fire and emergency management personnel into a single plan.

**RECOMMENDATION NO. 23.** Integrate Public Safety Dispatch centers, with minimum staffing levels, into all major event response plans.

*Rationale.* This recommendation addresses emergency 911 call centers. The Commission finds that the emergency 911 function is a critical component of any response to a major event. Accordingly, that function must be a component of any major event response plan.

The Commission further finds that many smaller 911 call centers are often staffed by a single person who handles both call intake and police dispatch functions. If a major event happens within such a call center's geographic area of responsibility, the single staffer may quickly become overwhelmed. Accordingly, the Commission believes that 911 call centers

74

should be subject to a minimum staffing requirement of two people.   If a major event occurs, one person would be responsible for call intake, the other for dispatch.

The Commission recognizes that some communities with smaller 911 call centers may not have the financial resources required to meet the minimum staffing requirement.   The Commission recommends that such communities regionalize their 911 call center function.   In making this recommendation, the Commission does not mean to suggest that communities that choose to regionalize their 911 call center functions should close their police stations at night, when staffing levels might otherwise fall below the recommended minimum level.   Members of the public typically view police stations as a "beacon of light" that should always be open.  The Commission notes, however, that a person other than a police officer (such as a cadet or supernumerary officer) can be available to provide basic assistance to members of the public during evening and early morning hours.

**RECOMMENDATION NO. 24.**   Require that lead agencies that respond to major events conduct a review and provide formal after-action reports, which should be maintained on file with the appropriate public agencies.   (In Connecticut, the Commission recommends that a copy of each after-action report should be provided to, and maintained on file by the Department of Emergency Services and Public Protection and the Connecticut Police Chiefs Association.)

*Rationale*:  The Commission finds that a formal after-the-fact study and analysis of man-made and natural disasters and other major events resulting in significant loss of life or property damage can help states and local communities plan for such events in the future, with the goal of preventing them if possible, but at least minimizing the extent of the damage they cause to persons and property.

For example, formal study and analysis of an event like Sandy Hook may reveal how the shooter entered the building; whether he was allowed entry

75

voluntarily or by force; whether surveillances cameras existed and, if so, where they were located and what events they captured; whether classroom doors could be locked (and whether they were locked), etc.  The preparation of formal after-action reports of major events will help ensure that states and communities have the most current information about, and are aware of the best practices for planning and responding to, such events.

**RECOMMENDATION NO. 25.**  Require the Department of Emergency Services and Public Protection, Division of State Police, in conjunction with the Connecticut Police Chiefs Association, to develop and conduct joint regional exercises of planned responses to major events. Those agencies should also review all existing policies concerning planned responses to active shooters. The review should focus on the best practices for disrupting active shooters as rapidly as possible.

*Rationale.*  The development of a plan for addressing major events, such as the Capitol Region "Blue Plan" discussed in connection with Recommendation No. 21, is only a first step toward improving law enforcement, fire and emergency management response to events like Sandy Hook and other manmade and natural disasters.  Any plan must be tested.  Testing serves multiple purposes.  For example, it reveals potential weaknesses in the plan, which can be addressed through revisions to the plan.  Testing also serves a critically important joint training function.  Events like Sandy Hook require local law enforcement and State Police to work collaboratively.  Joint training exercises will help ensure effective collaboration during actual events.

Any response plan should also reflect best practices.  Accordingly, the Commission recommends that the Department of Emergency Services and Public Protection and the Connecticut Police Chiefs Association jointly review all existing policies concerning response to active shooters to ensure that they reflect best practices, particularly with respect to disrupting active shooters as quickly as possible.

76

**RECOMMENDATION NO. 26.**   Expand incident training at Police and Fire Academies in Connecticut.

*Rationale.*   Although the Commission hopes that most law enforcement officers and firefighters will never have to face an event like Sandy Hook, training in how to respond to and manage such events should be part of the curriculum at the state's police and fire academies to better prepare First Responder graduates for major events, should they occur.

**RECOMMENDATION NO. 27.**   Create a statewide working group to address first responder mental health issues**.**

*Rationale.*   First responders face particular challenges in their jobs. Those challenges have the potential to adversely affect first responders' mental health, which in turn adversely affects their ability to perform their jobs effectively.

**RECOMMENDATION NO. 28.**   Create and publish a Statewide Donations Management Plan for incidents of statewide consequence. This could be done through Connecticut Care, which was established by P.A. 13-275.

*Rationale.*   In the days and weeks after the Sandy Hook tragedy, the Town of Newtown, Connecticut was inundated by gifts from well-meaning people around the country, indeed the world, who hoped the gifts would provide some comfort to the grieving families and members of the community in general.   Delivery trucks, even tractor-trailers, filled with items such as stuffed Teddy Bears essentially dumped these gifts on the Town, which was ill-equipped to distribute or store them.

### C.   Gun Violence Reduction Strategies

**RECOMMENDATION NO. 29.**   Programs should be developed that focus on violence reduction through the educational process or other entities.

*Rationale.*   When people feel that their concerns are being heard and addressed by a community that cares, such individuals are less likely to resort to violence as a solution to their problems.

**RECOMMENDATION NO. 30.**   Alcohol awareness programs should be included at appropriate points in the K-12 curriculum.

*Rationale.* Alcohol is the single most prevalent substance associated with violent crime.   Decreasing illegal alcohol consumption by minors and increasing the responsible use of alcohol by persons of legal age to consume it will reduce the number of violent crimes.   The state should develop and support educational programs intended to increase student understanding of the dangerous effects of alcohol consumption, including cognitive impairment.

# PART THREE

# FINDINGS AND RECOMMENDATIONS OF THE MENTAL HEALTH WRITING GROUP, AS ADOPTED AND APPROVED BY THE FULL COMMISSION

## I.    INTRODUCTION

This report now turns to matters surrounding mental health and the larger behavioral health system, topics on which the Commission heard extensive testimony over multiple hearings.    A distinguished group of clinicians, scholars, government officials, advocates and consumers testified on various aspects of our existing systems of care for children, adolescents and adults; others submitted written testimony.    While much of the material brought before the Commission addressed elements of the systems at work in Connecticut, as well as the experiences of individuals and families navigating those systems, the discussion below has broader relevance for mental health across the country and beyond.

As with the rest of this report, we begin with the events of December 14, 2012 to ascertain whether and how inadequacies in existing systems may have contributed to or exacerbated the terrible losses experienced that day.   This section, however, differs from our discussions of school security and law enforcement issues in several key respects.  First, while it has been clear from the beginning that the shootings of 20 first graders and six educators at Sandy Hook Elementary School would have implications for school security and infrastructure as well as for law enforcement and the regulation of firearms, it has been far less clear exactly how these tragic events would intersect with issues related to the mental health system.  This is especially so in light of the fact that almost no details about A.L.'s mental health history emerged until nearly a year after the shootings, and a more complete picture did not take shape until the final months of 2014.   Second, behavioral health and the systems that address it comprise an enormous, and enormously complex, subject.  Third, with the shooter and the person closest to him – his mother –

79

also deceased on December 14, 2012, much remains unknown about the state of his mind and his mental health in the months leading up to the shootings. Governor Malloy included a close examination of mental health and its systems of care among his charges to this Commission, and Commission members have embraced the opportunity to confront aspects of the behavioral health system that bear on the events of December 14 while possessing broader relevance. Below, we advance carefully considered recommendations for improvements to existing models of care and funding structures, problems of stigma and community safety, and recovery efforts following traumatic events.

The young man responsible for the tragic events of December 14, 2012 was, without a doubt, deeply disturbed.  As noted earlier, this Commission lacked direct access to records documenting his developmental and educational history and had to glean that information from sources in the public domain.  These sources included the Connecticut Police Report released in December of 2013 and State's Attorney Stephen Sedensky's summary of that investigation, both of which were heavily redacted, as well as journalistic accounts and, most recently, the report issued by Connecticut's Office of the Child Advocate, "Shooting at Sandy Hook Elementary School."  The Child Advocate's report, released on November 21, 2014, offers the most comprehensive, detailed and thorough examination of A.L.'s troubled life and the struggles faced by his family to meet his needs.  Its purpose was to review the circumstances that predated his commission of mass murder on December 14, 2012 and to issue any recommendations for improvements in the systems critical to children's developmental, educational and behavioral health that flowed from this review.  The report identifies many points over the course of his life when his needs and impairments went unrecognized, underappreciated, or underserved by the systems with which he had contact.   Ultimately, however, the report emphasizes that no distinct causal lines can be drawn between his experiences – even if in hindsight we can say that they reflected

80

systems failures – or relationships and his decision to take the lives of children and educators at Sandy Hook Elementary School.

This Commission's charge was different. Rather than mine one individual's life and interactions with particular systems for insights into how those systems can better serve the state's children, we were assigned the task of studying the systems themselves. Our work is therefore fully complementary with the work of Connecticut's Child Advocate and our own report incorporates by reference the findings and recommendations advanced in hers. It is important to acknowledge here that the extensive discussion of mental health in which we engage below might be taken as support for the belief that mental illness drove A.L. to commit mass murder at Sandy Hook Elementary School, and that effective treatment of this illness – whether forced on him or undertaken voluntarily – would have prevented the violence. Although he clearly suffered from profound mental, emotional and developmental challenges, nothing in the records addressed by the Child Advocate's report establishes a causal role for mental illness in A.L.'s crimes. Experts who contributed to that report found insufficient evidence to suggest that he would have qualified for a psychotic illness. He did appear to suffer from severe anxiety with obsessive-compulsive features and possibly from Obsessive-Compulsive Disorder, as well as from depression. He had been diagnosed with an autism spectrum disorder based on difficulties with communication, sensory sensitivities and rigidity that emerged at a very early age, and he received the post-mortem diagnosis of anorexia. Nonetheless, a narrow understanding of mental illness cannot fully account for the challenges facing this young man.

Similarly, the Commission recognizes that a narrow understanding of mental health remains insufficient to identify what could have been done to improve A.L.'s chances of living a functional, nonviolent life. His problems and the challenges encountered by his family were multifaceted and not reducible to any particular category of psychiatric illness. In addition, although the

Lanza family was fortunate enough to have financial resources that permitted them access to potentially helpful evaluation and treatment services, those resources proved insufficient to ensure that his complex needs were adequately met or to protect against increasing social isolation.   The discussion that follows takes as its premise the idea that mental health is not merely the absence of mental disorder.   Instead, mental health must be conceived more broadly to embrace social, emotional and behavioral health and wellness. Available evidence strongly suggests that A.L.'s life and the lives of those close to him, particularly his mother's, were increasingly characterized by a lack of well-being.   According to the World Health Organization, mental health is defined as "a state of well-being in which every individual realizes his or her own potential, can cope with the normal stresses of life, can work productively and fruitfully, and is able to make a contribution to her or his community." World Health Organization.   (2014). *Mental Health: A State of Well-Being.* Retrieved from http://www.who.int/features/factfiles/mental_health/en/.   The framework of wellness or well-being also has direct relevance to A.L.'s actions and their impact on his victims and the broader community.   Hence the task of the programs, policies and services that make up our mental health system must include not only the identification and treatment of mental illness but also the promotion of social, emotional and psychological wellness throughout the lifespan.

This section first addresses the mental health system that currently exists.   It begins by proposing essential elements for an effective system that promotes mental health across the lifespan.   These include comprehensive and coordinated systems of care in which behavioral health and physical health are understood as highly interrelated, are given equal priority, and are part of a holistic approach to wellness that sees the individual in the context of the family and broader community.   This approach must traverse payment systems and must form part of a concerted focus on healthy child development. Schools are essential players in this approach, both as sites for prevention,

82

early intervention and the delivery of services and as learning communities where social and emotional health come to be seen as essential to the process of educating young members of a just and caring society.

It then considers the barriers that impede access to quality care in our current system.  We first examine our fragmented payment structure, which undermines care coordination and consistency, denies care to many who most need it, and limits care for reasons that often have little to do with its clinical justifications or efficacy.  Our analysis identifies deficiencies in both the public and private systems of care and calls for increased integration to make effective, clinically indicated services and evidence-based community programs available to children and adults, regardless of economic status.  We then address the ongoing burdens of stigma and discrimination that afflict the system and its participants, while deterring many in need from pursuing behavioral health services.  Carefully considered efforts to diminish the stigma that attaches to mental disorder and its treatments must play a central role in systemic reform.

Following our analysis of systemic barriers that currently frustrate access to quality care and related recommendations, this section turns to issues that implicate potential conflicts between values at the core of our social order: interests in individual privacy and autonomy on the one hand, and community safety on the other.  An overarching theme these final subsections holds that these individual and community interests should be viewed as overlapping rather than opposed.  First we examine central laws and policies that govern matters of privacy, confidentiality and community safety in the domain of mental health treatment, making recommendations that preserve the existing balance while calling for clarification in areas that might frustrate the timely provision of needed care.  We then take up the vexing topic of violence.  Unthinkably violent episodes such as the Sandy Hook shootings represent not only a loss of precious lives but also a profound disruption of the basic human need for safety and security, which is critical to adults and

absolutely essential to children.  There is little comfort to be taken from any explanation following such an event, but somehow it seems easier to believe that the source of such horror lies in an individual's pathology, in a condition that could be cured or contained if adequately identified, than in more indeterminate values and practices that shape our entire culture.  While discerning no clear answers to the question of what role A.L.'s behavioral health challenges played in the violence he ultimately inflicted, the Commission nonetheless turns its attention to what we have learned about the role of mental disorder in violent events.  We review and synthesize the available research on the topic, identify relevant risk factors for violence and offer recommendations for ways to address those risk factors in order to promote mental health, diminish the suffering associated with untreated mental illness, and enhance the community's experience of safety.

Finally, this section proposes specific steps that communities and schools should take to buttress their members' resilience and equip them to care for one another and themselves in the face of trauma and loss.  When a disaster event occurs, whether due to intentional violence or a terrible accident or a phenomenon of nature, its impact on individuals and communities can be devastating and can persist far beyond the immediate aftermath.  Our contention is that, while it is not yet possible to prevent such events from taking place or to insulate people from the suffering that ensues, there is much that governments, schools and other institutions can do to facilitate an effective and humane response.  A carefully planned and coordinated response will help to reestablish a critical sense of security, ensure that needed services become available immediately and remain so for as long as necessary, and promote community-wide recovery.  Unfortunately, experiences of trauma and loss afflict children, families and communities in ways that extend far beyond large-scale crises, and many of our recommended measures are germane to such experiences as well as to relatively rare disaster events.

For each topic, we first offer a detailed analysis of the relevant issues and then identify the Commission's key findings and recommendations.  Our analysis draws on the testimony presented to the Commission in both oral and written form, as well as on the expertise of Commission members and on additional resources available in the public domain. Our goal in this section is to take a close look at the concrete systems, funding structures and programs in place to provide mental health services, as well as the laws, policies and attitudes that impact mental health, in order to ascertain how we can best promote the well-being and resilience of children, adults, families and communities.

## II.   MODELS OF CARE

### A.   Analysis: Reforming The System

Despite the existence of a broad array of potentially helpful treatment modalities and services and the efforts of dedicated and skilled professionals, our behavioral health system as a whole fails too many children and adults in need.   Indeed, in testimony offered to the Commission and in a variety of other venues, experts and participants at all levels persistently describe our mental health system as "broken."   Among the system's major shortcomings, a disproportionate focus on the etiology and symptoms of *illness* rather than the conditions conducive to *health* greatly limits its efficacy and reach.   Mental health extends significantly beyond the management of mental illness.  Yet for much of the past century, mental health care has remained largely reactive instead of proactive.  Our narrow approach to mental health care has generally confined strategies to screening, referral and treatment for mental illness.  Just as physical health entails more than the mere absence of disease, however, mental health encompasses overall psychological, emotional and social well-being.   Achievement of such well-being demands a more comprehensive approach that prioritizes the promotion of mental health as well as the treatment of mental disorder.  While it is critical that we have effective systems in place to identify and treat mental illness, such systems remain insufficient

to promote true mental health.  Instead, we must build systems of care that actively foster healthy individuals, families and communities.  Leading sources suggest that nearly one-quarter of the U.S. population suffers from a diagnosable mental disorder in any given year and up to half of us will struggle with mental health challenges during our lifetimes. If we include substance use disorders the numbers increase significantly, with an estimated 32% of Americans experiencing a behavioral health challenge every year. Many of these disorders emerge in childhood or adolescence. Approximately half of young people qualify for some behavioral health diagnosis by the time they reach 18, and at least one in five youths meets criteria for a lifetime mental disorder that is associated with severe distress and impaired functioning. Merikangas, K. R. et al. (2010). Lifetime Prevalence of Mental Disorders in U.S. Adolescents: Results from the National Comorbidity Survey Replication-Adolescent Supplement (NCS-A). *Journal of the American Academy of Child & Adolescent Psychiatry, 49*(10), 980-989.  As detailed later in this report, our current behavioral health care systems remain woefully fragmented, underfunded and tainted by stigma.  These systems inadequately serve the millions of Americans suffering from a diagnosable mental disorder each year, many of them children and adolescents.

> "Mental health is defined as a state of well-being in which every individual realizes his or her own potential, can cope with the normal stresses of life, can work productively and fruitfully, and is able to make a contribution to her or his community."
>
> World Health Organization. 2014. *Mental Health: A State of Well-Being.* Retrieved from http://www.who/int/features/factfiles/mental_health/en

Examined through the lens of illness, the numbers are sobering. Examined through the lens of wellness, though, they are truly disheartening. According to the Centers for Disease Control and Prevention (CDC), "only about 17% of U.S. adults are considered to be in a state of optimal mental health." Centers for Disease Control and Prevention. (2013). *Mental Health Basics.* Retrieved from http://www.cdc.gov/mentalhealth/basics.htm.  The foundation for optimal mental health is established in infancy and is reinforced through

childhood and beyond.  Our systems of behavioral health care serve the goal of
wellness promotion even less effectively than they do the goal of treating mental
disorder.  The Commission advocates a comprehensive, integrated approach to
mental health that prioritizes healthy child development, which in turn
requires healthy families and caring, resilient communities.

       1.    <u>Laying the groundwork for lifelong mental health</u>

Research in the social, behavioral and life sciences has firmly established
the centrality of early childhood to healthy brain development.  As Harvard
University's Center on the Developing Child explains, "[e]arly experiences affect
the development of brain architecture, which provides the foundation for all
future learning, behavior, and health.  Just as a weak foundation compromises
the quality and strength of a house, adverse experiences early in life can impair
brain architecture, with negative effects lasting into adulthood." Center on the
Developing Child at Harvard University. (2015). *Key Concepts: Brain
Architecture*. Retrieved from http://developingchild.harvard.edu/key_concepts
/brain_architecture/.html/.

But even a rough beginning does not condemn a child to a lifetime of
illness; rather, childhood offers multiple opportunities to develop the
psychological, emotional and social resources necessary for resilience.  We as a
society must endeavor to provide the conditions within which all infants and
children can form positive, secure attachments; know that their basic needs for
food, shelter and love can be met; receive competent and developmentally
appropriate health care; take advantage of educational opportunities to
cultivate social and emotional as well as cognitive capabilities; and access
effective support and treatment services for any behavioral health challenges
that may emerge.

Our current systems fail many children and youth who are at risk for
developing behavioral health disorders.  Later portions of this report address
some of the barriers that frustrate access to effective mental health care.  But
even where services to treat the symptoms of mental illness are available, these

"What is a picture you get in your head of a child who struggles with mental health, a child who needs mental health services? In response to recent calls for a registry of those with mental health issues, I've taken to saying, well, we do a census every ten years, let's just use that because mental health is a continuum, and nearly all of us will struggle with our mental health at one point in our lives.  Some of us will struggle more severely or more often than others, but few will never struggle at all.  When we, as a society, continue to think of those with mental health issues as an us vs. them instead of thinking of mental health as a we, fear and ignorance win.  And fear and ignorance lead to shame, denial and bullying on an individual level and lack of appropriate services, funding and supports on a systemic level."

Abby Anderson, Co-Chair, Children's Committee of The Keep the Promise Coalition, Executive Director, CT Juvenile Justice Alliance, testimony before the Sandy Hook Advisory Commission, April 12, 2013.

work – if at all – primarily for people with existing mental health diagnoses, offering very little in the service of prevention.  In addition, most existing programs and services are structured and financed in ways that deny continuity of care.  What we need instead is a holistic approach that will follow children from birth to adulthood, identifying risk factors, reinforcing protective factors, and promoting positive development throughout.  This approach must include peer as well as professional support and must direct services toward prevention as well as treatment.  It should embrace system-of-care principles, including greater coordination and efficiency of care, community partnerships, inclusion of families and youth as collaborators and decision-makers, and incorporation of evidence-based practices as an organizing framework.  The Commission endorses an integrated model of health care that consolidates primary/pediatric and behavioral health in a medical home.  This model should be family-centered and attuned to the environmental contexts in which families exist.  Although a comprehensive developmental approach begins in the earliest moments of life, our behavioral health system more generally must address the needs of individuals, families and communities across the lifespan.

The earliest years of a person's life lay the groundwork for future wellness.  Even if that person faces behavioral health challenges in later

childhood or beyond, a strong early foundation can help the person gain the tools necessary to weather such challenges and enjoy a healthy, fulfilling and productive life.  A weak early foundation, on the other hand, can render the person more susceptible to behavioral health problems and diminish the resources available to support recovery.  The comprehensive, integrated model of health care that the Commission supports is essential to reducing the psychological and biological stressors related to experiences of trauma, violence and grief, to stabilizing the health of families, and to promoting the resilience necessary for positive development.  Its promotion of mental health and overall wellness must address the unique needs of babies and young children as well as those of school-aged children, adolescents, young adults and older adults.  Our systems of care must afford access to age-appropriate programs and services across the lifespan.

## 2.    Treating the whole person and the whole family

For children and adults alike, physical and emotional health are so deeply interconnected that the separation of one from the other compromises both.  A recent policy brief by the Robert Wood Johnson Foundation called "Are the Children Well?  A Model and Recommendations for Promoting the Wellness of the Nation's Young People" notes that such separation, "which is not supported by science, is usually the result of custom and convenience, and contributes to inequities in services and the social marginalization of affected individuals." ." Murphy, D. at al. (2014). *Are the Children Well? A Model and Recommendation for Promoting the Mental Wellness of the Nation's Young People.*    Retrieved    from    www.rwjf.org/content/dam/farm/reports /issue_briefs/2014/rwjf414424.

At present, our physical and behavioral health care systems largely function independently, without real coordination or integration.  Existing mechanisms for financing health care have reinforced the barriers between these systems.  One persistent problem has been the existence of mental health carve-outs, separate benefits packages and/or funding mechanisms for

mental health and substance abuse services, detached from other health care, which emerged in the 1970s and 1980s as part of managed care's effort to rein in the rising cost of health care. Widely adopted in both private and public insurance programs, including Medicaid managed care, these carve-outs have contributed to fragmented and inefficient systems that serve most Americans poorly, particularly children. Although rare examples such as Connecticut's Behavioral Health Partnership have achieved a more integrated approach to behavioral health services through a funding mechanism distinct from other health benefits, in general carve-outs have served individuals and communities poorly.

The longstanding bifurcation of care between physical and mental health exacerbates the incidence and severity of illness and potentially contributes to other social problems. Our bodies and minds cannot be so easily separated. Physical ailments are frequently accompanied by psychological, emotional and social difficulties, and people who struggle with behavioral health challenges are especially prone to suffer from disease and even premature death. Yet in a system that addresses mental and physical health separately, these connections remain unlikely to be identified or addressed. In particular, primary care providers have not historically

> "Only a third of people with mental health problems access care in a timely manner, and there are significant human and economic costs to poor access and to care that is not effective or is not as effective as it could or should be. And just as an example of that, people with severe emotional or mental health issues tend to live much shorter lives than their peers."
>
> Gary Steck, CEO, Wellmore Behavioral Health, testimony presented to the Sandy Hook Advisory Commission, April 12, 2103

received the training, support or financing to attend to their patients' mental health. Our health care delivery systems and reimbursement paradigms must embrace a holistic approach to health that treats the whole person.

Just as our behavioral and physical health care systems generally exist in separate silos, within the behavioral care system additional silos exist for different populations based on age, employment, socio-economic status,

90

involvement with the criminal justice system, diagnosis and other factors.  The Commission heard repeatedly about the extent to which our private and public systems create different points of entry and afford access to disparate programs and services.  A pervasive lack of integration within and between systems leads to gaps in care, potentially duplicative care, and inappropriate cost-shifting.  It is clear to the Commission, and to many others who have studied these issues, that better integrated systems of care are critical to both the effective treatment of mental illness and the successful promotion of psychological, social and emotional wellness among children, adults and communities.  Recent findings by the Task Force to Study the Provision of Behavioral Health Services for Young Adults,[13] established after the Sandy Hook shootings pursuant to P.A. 13-3, identify critical shortcomings in Connecticut's overall system of behavioral health care for children, adolescents and young adults that fail individuals, families and the State of Connecticut.  Key shortcomings include inadequate identification of behavioral health problems early in children's development, workforce deficits – encompassing insufficient numbers of providers qualified to address the behavioral health care needs of children and young adults and inadequate training in evidence-based evaluation methods and treatments for the existing provider community – and pervasive system fragmentation.

A recent issue brief on integrated physical and behavioral health care from the SAMHSA-HRSA (the federal Substance Abuse and Mental Health Services Administration and Health Resources and Services Administration) Center for Integrated Health Solutions provides a useful schema for thinking about possible models of care integration.  This schema reflects a continuum of integrated services ranging from discrete behavioral and physical health care

---

[13] *See* http://www.cga.ct.gov/ph/tfs/20130701
_Task%20Force%20to%20Study%20The%20Provisions%20of%20Behavioral%20Healt
h%20Services%20For%20Young%20Adults/Final%20Report%20for%20the%20Task%
20Force%20to%20Study%20the%20Provision%20of%20Behavioral%20Health%20Serv
ices%20for%20Young%20Adults.pdf

systems and settings to blended ones.  On one end are models of coordinated care involving either minimal collaboration or basic collaboration at a distance between primary and behavioral health providers.  In the middle are models of co-located care, where physical proximity between providers who share the same facility facilitates more regular communication and potential collaboration.  At the other end, fully integrated care entails teams of primary and behavioral health providers who seek solutions together and eventually function in a fully merged practice that treats the whole patient. SAMHSA-HRSA Center for Integrated Health Solutions. (2013). *A Standard Framework for Levels of Integrated Healthcare.* Retrieved from www.integration.samhsa.gov/integrated-care-models/A_Standard _Framework_for_Levels_of_Integrated_Healthcare.pdf.  We must transform our fractured, siloed system of health care services into one that embraces care coordination at minimum with a longer-term goal of more complete integration. An integrated system can best treat the whole person, support the whole family and successfully promote true mental health.

In addition, the Commission endorses a model of health care that integrates pediatrics and behavioral health in ways that are specifically family-centered and attuned to the environmental contexts in which families exist. We must enhance existing medical models of health care services by incorporating findings from neuroscience, child development, family systems and public health on topics such as toxic stress and the lasting effects of trauma and loss on the mind, body and spirit.  To treat the whole person and cultivate wellness across the population, our health delivery systems and reimbursement paradigms should embrace a biopsychosocial model.  First proposed by psychiatrist George Engel in the late 1970s, the biopsychosocial approach departs from an exclusively biomedical model of human health by presuming that the science of medicine "must include the psychosocial dimensions (personal, emotional, family, community) in addition to the biological aspects (diseases) of all patients." Smith, R. C. (2002). The

Biopsychosocial Revolution: Interviewing and Provider-Patient Relationships Becoming Key Issues for Primary Care. *Journal of General Internal Medicine,* 17(4), 309-310.  A biopsychosocial approach treats the whole person in his or her social context and is by definition a model of integrated care.

Medical and behavioral health practitioners must work as partners in addressing the holistic needs of individual children and adults in the context of their family systems.  Providers that integrate both physical and mental health services – either through their own care delivery or through integration of services within a medical home model – should be adequately compensated. Funding paradigms that promote holistic health care will help to incentivize care integration.  Although more focused mental health treatment for acute and chronic conditions will remain a necessary component of an integrated system, the continued carving out of behavioral health services from primary health care is generally counterproductive.  While primary care providers who accept Medicaid can seek reimbursement for behavioral health screenings, coverage for such screenings is often not available through other funding mechanisms and reimbursement for interventions and treatment by primary care providers is particularly lacking.  Funding and care delivery mechanisms that promote wellness models focused on the whole person offer the only clear path to community health.

Positive child development requires access to effective health care, including programs and services associated with behavioral health, but our obligations to children do not end there.  We must help children learn pro-social skills and strategies to cope with distress, loss, frustration, and disappointment.  We need to ensure that children have sustained and meaningful relationships with caring adults, including supportive and nurturing relationships in schools, other sites of child congregate care, and throughout our communities.  We need to take deliberate action when we see a paucity of such relationships.  We need to make concerted efforts to minimize children's exposure to adverse events that might compromise healthy

93

development, rather than providing ourselves with the false reassurance that children in situations of chronic community violence or poverty get "used to it." We need to actively promote healthy communities and resilience, rather than assuming these will take shape on their own. We need to nurture a positive future outlook, creativity, inquiry, and a sense of mastery in our children. We have to view *healthy* child development as an active process and not just an inevitable product of the passage of time.

Treating mental health as the absence of mental illness works no better than treating physical health as the absence of physical illness. We need instead to promote healthy ways of living, encourage the adoption of health-promoting habits (such as healthy eating, exercise, stress reduction, etc.), and help children learn how to – *and want to* – avoid risky behaviors. We must help them develop the resilience they will need to flourish through adversity. In addition, we must communicate clearly to children and adults across the lifespan the centrality of psychological and emotional health to overall well-being.

3.    Family-centered care

The fragmented nature of Connecticut's care delivery system imposes significant burdens on children and families. Even if families are fortunate enough to connect with a primary care provider who can perform a comprehensive assessment and offer needed referrals, they may be at sea when it comes to navigating other essential programs and professional services. To attend to the needs of their developing children, many families must negotiate multiple systems, including a primary care office; a behavioral health clinic; birth-to-three services; and whatever school services are available. Families have largely been left to manage these on their own, a process that creates confusion and compounds isolation.

94

While some progress has been made in Connecticut, such as the expanding availability of home- and community-based behavioral health services for youth and their families, several issues remain unresolved.   Currently there are multiple eligibility categories for children based on poverty, custody, un-insurability or

> "Our system is broken.  It is broken for children.  There is nothing that is working for these kids and their parents.  Their parents don't know where to turn."
>
> Kim Pernerewski, NAMI-CT, testimony presented to the Sandy Hook Advisory Commission, March 22, 2013.

disability. Children often move from one eligibility category to another due to changing family circumstances, further fragmenting potential support structures and creating major disruptions in their behavioral health care.  In addition, providers must manage several contracts, authorization procedures, eligibility systems, payment structures, utilization criteria and billing procedures for essentially the same or a similar population of youth.  The current fee-for-service payment structure further maintains the "silo" funding that creates resource inefficiencies and erects barriers for families.  It also establishes disjointed delivery systems that do not require all providers to engage in the collaborative process of family-centered practice and planning that state agencies serving children and youths are committed to delivering.

A comprehensive developmental model of mental health has many advantages over the siloed approach that has prevailed in Connecticut and beyond.  By prioritizing the prevention of disease, the mitigation of factors that contribute to illness, and the promotion of resilience, the developmental model addresses problems *before* they disrupt the life course of individuals or the welfare of the community.  It reaches more than just severe or even episodic mental illness, but psychological, emotional and social well-being more generally.  This model emphasizes all aspects of healthy child development, including social, emotional, physical and cognitive development.  With the rapid brain growth that occurs in early childhood, efforts to promote the conditions for healthy development in the first years of life are likely to promote

mental health more effectively than treating problems later in life.  Center on the Developing Child at Harvard University. (2007). *A Science-Based Framework for Early Childhood Policy: Using Evidence to Improve Outcomes in Learning, Behavior, and Health for Vulnerable Children.*  Retrieved from http://developingchild.harvard.edu/index.php/download_file/-/view/63/. Critically, these conditions include a healthy family in which positive attachment develops between children and their caregivers.

Multiple risk factors that affect families, particularly poverty, family instability and violence, can create the sort of acute and persistent stress that damages the architecture of the developing brain.  Child development experts have labeled such stress "toxic" because its activation of the body's stress response systems, without adequate protections, can wreak severe and lasting damage on many organs of a child's body.  High and persistent levels of stress, particularly where healthy attachments are absent, disrupt neural circuits and weaken a child's foundation for learning and future health, potentially impacting not only the individual child but future generations as well.  To promote healthy child development and foster robust communities, our systems of care must attend to the factors affecting family welfare.  These include an ability to meet the family's basic needs, something we must address if we are to provide services in ways that are supportive, compassionate and preserving of dignity.

Recent research has established that the experience of chronic and potentially toxic stress profoundly affects children's well-being, including their susceptibility to disease and mental illness.  One large-scale study, an ongoing collaboration between the Centers for Disease Control and Prevention in Atlanta, GA and Kaiser Permanente in San Diego, CA, has persuasively linked what the study dubs — adverse childhood experiences (ACEs) to lifelong health and social consequences.  Centers for Disease Control and Prevention. (2014). *Injury prevention & control: Division of violence prevention.*  Retrieved from http://www.cdc.gov/violenceprevention/acestudy/; Health Presentations. *The*

*adverse       childhood      experiences      survey.*       Retrieved       from
http://acestudy.org/home.  Conducted by Doctors Vincent J. Flitti and Robert
F. Anda, this study examined 17,000 middle-class Kaiser Permanente Health
Plan members in the San Diego area (80% white/Hispanic, 10% black, 10%
Asian; 74% attended college; mean age 57) over fourteen years to determine
each individual's current state of health and well-being in light of that person's
early exposure to ACEs.  The study illuminated the pervasiveness of traumatic
experiences such as physical and sexual abuse, neglect, family violence, family
substance abuse, and the loss of a parent in the lives of American children and
drew a clear connection between adverse childhood experiences and chronic
disease as an adult, as well as risk of other health, social and emotional
problems.  Most participants in the study reported at least one ACE, and the
vast majority reported two or more.   The study also found that the more
traumatic events a participant suffered in childhood, the higher that person's
risk as an adult for disease, and social and emotional challenges.  Felitti, V. J.,
& Anda, R. F.  (2010).  The relationship of adverse childhood experiences to
adult medical disease, psychiatric disorders, and sexual behavior: Implications
for healthcare.  In R. A. Lanius, E. Vermetten, & C. Pain (Eds.), *The hidden
epidemic: The impact of early life trauma on health and disease* (pp. 77-87).
Cambridge: Cambridge University Press.

The Commission heard testimony from experts at Yale, UConn, and the
National Child Traumatic Stress Network confirming the prevalence of
traumatic stress in the lives of American children.  According to Dr. Julian
Ford, Professor of Psychiatry at UConn Health Center, by age seventeen up to
67% children have experienced some form of victimization and one in five have
experienced at least four different types.[14]   The ACEs study and similar
research establish a credible basis for a new paradigm of medical, public

---

[14] *See* http://www.governor.ct.gov/malloy/lib/malloy/SHAC_Doc_2013.04.26
_Ford_presentation.pdf.

health, and social service practice that would start with a comprehensive biopsychosocial evaluation at the outset of ongoing health care.

Whether or not factors such as severe economic deprivation or interpersonal violence afflict a family, the presence of mental health problems among family members can provide a source of significant stress. A child's illness in particular may create ongoing stress for parents, siblings and other family members, impact personal relationships within the family, and threaten the family's overall health. Stress on family members can invite other emotional and behavioral problems such as substance abuse, which in turn impact the development of children. An effective system of care must support families in managing the health care of their children. Current funding structures, including fee-for-service payment and mental health carve-outs that maintain siloed funding and delivery systems, exclude holistic treatment of the family. Moreover, just as pediatric providers must approach children's care in the context of their families and broader communities, so too adult providers should treat parents in the context of their families. The Commission recommends cross-training of behavioral health and primary care providers that focuses on families' strengths and accepts the family as a partner in treatment.

Most children fare best when their families take an active role in their health care. Family-centered systems of care must prepare families to become engaged, empowered and educated so that they can act as partners in children's care. Strategies to support families in managing the health care of their children should include incorporating families' input on multidisciplinary healthcare teams. Professionals should assess a family's knowledge about behavioral health, the support systems available to the family, and the barriers to good health facing its members. To identify potential obstacles to effective treatment, clinicians should elicit families' beliefs about the use of various treatment modalities, including psychotropic medications and talk therapy. Negative perceptions of psychiatric medications, mental health professionals or

other aspects of behavioral health care may interfere with understanding of and/or adherence to recommended treatment. While such attitudes may reflect specific family dynamics, personalities and/or histories, particular beliefs about behavioral health and mental illness often have broader cultural significance in the communities from which families hail. Systems of care serving children, adults and families must achieve cultural and linguistic competence to make appropriate services and supports available and relevant across a diverse population. Cultural and linguistic competence is also essential to eliminating disparities in care and health outcomes.[15]

### 4. Places of care: schools and communities

Children exist within multiple social systems, and their needs can't be isolated from those of the systems in which they function. Schools in particular must be understood as integral to their communities; what happens at school directly impacts the surrounding community and what happens in the community affects its schools and their occupants. Schools must play a critical role in fostering healthy child development and healthy communities. They should provide learning tools geared toward positive development and serve as a locus for preventive care, early identification of behavioral health problems, effective treatment offerings, and referral to appropriate programs and services in the community. Healthy social development can be conveyed by role models such as parents, teachers, community leaders, and other adults in children's lives, but it can also – and should – be actively taught in schools. Our educational system has prioritized children's cognitive development at the expense of their social and emotional development, and this disproportionate focus on academic achievement threatens to become even more entrenched with the increasing centrality of standardized testing. Research clearly demonstrates, however, that social and emotional learning (SEL) curricula have

---

[15] See Connecticut Children's Behavioral Health Plan, available at: http://www.plan4children.org/wp-content/uploads/2014/10/CBH_PLAN_FINAL-_2_.pdf.

a positive impact on children's development and actually enhance their academic progress.  Durlak, J.A., Weissberg, R.P., Dymnicki, A.B., Taylor, R.D., & Schellinger, K.B.  (2011). The Impact of Enhancing Students' Social and Emotional Learning: A Meta-analysis of School-based Universal Interventions.  *Child Development*, 82(1), 405-432.  See also Schonfeld, D.J. et al. (2014).  Cluster-Randomized Trial Demonstrating Impact on Academic Achievement of Elementary Social-Emotional Learning. *School Psychology Quarterly*.  Advance  online  publication.  Retrieved  from  http://eds.a.ebscohost.com/ehost/pdfviewer/pdfviewer?sid=6f697340-6fcb-4143-b5ea-f14a180f5b08%40sessionmgr4001&vid=0&hid=4113.

Social-emotional learning can help children identify and name feelings, including feelings such as frustration, anger and loneliness that potentially contribute to disruptive and self-destructive behaviors.  It can also teach children how to employ social problem-solving skills to manage difficult emotions and potentially conflictual situations, avoid and prevent risky behaviors, and establish and nurture positive social relationships.

Social-emotional learning should form an integral part of the curriculum from preschool through high school.  It works best when it is a pervasive component of the school environment that informs the culture of the school and the behavior of adult educators.  Too often school administrators and teachers view SEL as secondary to academic curricula, worrying that time spent on aspects of SEL will detract from students' academic achievement.  As a result, even evidence-based SEL curricula are rarely included past the earliest grades, and where SEL is taught it rarely receives the time and attention it deserves.  All schools should implement a sequenced social development curriculum.  This curriculum must include anti-bullying strategies and, as appropriate, alcohol and drug awareness as part of a broader substance  abuse  prevention  curriculum  for  school-aged  children.  Comprehensive youth development can prepare young people to meet the challenges of adolescence and adulthood through a progressive series of

100

activities and experiences that foster social, moral, emotional, physical and cognitive growth.  In this context, a coordinated, comprehensive system of support services for all students ensures that their physical, social, emotional and health needs are met and their school environments are safe and orderly while also promoting their optimal academic development.

While all students benefit from a concerted focus on social-emotional learning, for students struggling with mental health and/or developmental disorders inadequate supports for social and emotional wellness and a lack of attention to SEL can have particularly deleterious consequences.  The recent report issuing from Connecticut's Office of the Child Advocate, which exhaustively chronicles and reflects on A.L.'s educational, behavioral and developmental history, emphasizes the striking absence of social-emotional learning in his educational records.  According to these records, A.L.'s acute difficulties managing the social and behavioral demands of a school environment formed the basis for his placement on "homebound" status beginning in the 8th grade, a disposition under Connecticut education law reserved for children deemed "too disabled to receive services in school even with modifications and supports."  (OCA Report, 2014, p. 43.)  His parents sought, and eventually obtained, a doctor's recommendation that A.L. be exempted from attending school due to his debilitating anxiety.  "Homebound" status differs from home schooling in that the latter represents a commitment by parents to provide an equivalent education outside of a school environment; in Connecticut school districts are not required to provide special education or other services to home-schooled children.  A student on "homebound" status, on the other hand, is by definition a child receiving special education services pursuant to an Individualized Education Program (IEP).

Despite the centrality of social, emotional and behavioral health challenges to A.L.'s identified disabilities, his IEP was directed almost exclusively toward supports for his academic progress.  For example, as his tenth grade year approached and educators involved in crafting his IEP aspired

101

to reintegrate him fully into high school classes, "attention to A.L.'s severe disabilities focused [...] on curricular issues rather than on the social and emotional characteristics that were seriously impacting his ability to participate in a regular educational environment" (p. 64).  Indeed, the Child Advocate's investigation concluded that "[t]he absence of a plan to address A.L.'s social-emotional issues with a program that was sufficiently intense and therapeutic likely contributed to a situation in which he eventually became increasingly withdrawn and socially isolated" (*Id*).

"[W]e've got to be very careful, because teachers, caregivers, police officers, judges, courts, child welfare workers, pediatricians, all of us can think that there's something wrong with them [children who have experienced traumatic stress]. There's something wrong, but it is not something wrong with them. They are trying to survive."

Dr. Julian Ford, Professor of Psychiatry, UConn Health Center, testimony presented to the Sandy Hook Advisory Commission, April 26, 2013.

The Child Advocate's report makes clear, however, that this apparent neglect of social, emotional and behavioral health and development that emerges in A.L.'s educational records is not unique to the Newtown schools, but rather is a widespread phenomenon related to resource limitations and the misplaced segregation of academic skills from other aspects of development.  What behavioral or developmental support services are available may be "tightly rationed so that districts can serve many children with their allotted resources[,]" which may diminish still further under constrained budgets (p. 82).

The social and emotional health of our students, particularly in low-income communities but also in more affluent ones, is frequently compromised by chronic stress.  Such stress presents an ongoing problem in education that schools often lack the resources to address.  From bullying to interpersonal violence, substance abuse, parental loss and grief, many of our students and their families live under persistent and pervasive stress that interferes with learning and complicates the educational process.  Schools should develop therapeutic mentoring programs, particularly for youth and families

102

experiencing chronic stress.  These programs should be designed with an eye toward those children and families who lack positive supports and connections in their lives.  Since schools are essential parts of their communities, it is neither possible nor desirable to view issues impacting children categorically as either "community" or "school" problems.  Children's experiences in their homes and communities follow them through the school doors, and their experiences in schools accompany them when they leave.  Therefore it is paramount that what they learn, observe and encounter at school impact them positively as they return to their homes and neighborhoods.  While it is also important to respect family privacy, we should not assume that parents do not want, or that children will not benefit from, supportive services provided in school settings to assist them in dealing with the challenges they face in their communities.

School-based health services should be designed to provide screening and referral for developmental and behavioral health problems, exposure to toxic stress, and other risk factors, as well as effective treatment offerings to address trauma, loss and other stressors.  Schools might also invite families to screen for potential stressors and offer resources to parents and other family members to manage and address their own stress and exposure to adverse experiences.  As detailed below in our discussion of response and recovery efforts following disaster events, all professionals working in school-based health centers and indeed throughout the schools must receive training in recognizing signs of trauma exposure, toxic stress and behavioral health challenges.  To address the high cost of ACEs, Connecticut should build and support a collaborative system of care for children and families that starts with the schools.  Schools, primary care and behavioral health providers should use similar standardized, validated screening and assessment tools to improve early identification and treatment of emotional and behavioral problems, including screening for adverse events and other likely causes of toxic stress.

Schools should partner with behavioral and pediatric health providers and other organizations providing care and support to children and families to enhance community resources and augment the services available in schools. For many children, however, schools offer the only real possibility of accessing services. School districts should therefore increase the availability of school guidance counselors, social workers, psychologists, and other school health and behavioral health professionals during and after the school day as well as potentially on Saturdays. School staff should be prepared to assist children in crisis and able to initiate a process that may lead to referral to appropriate additional services (whether within the school or within the community) for support and treatment when indicated. This is not the same as training teachers and other school professionals who are not mental health providers to provide mental health treatment or therapy. Teachers of students facing loss can, for example, appreciate the impact of bereavement on children's learning and development, acquire strategies to bolster learning and adjustment for grieving students within the classroom and school setting, and offer empathy and support – all without being expected to provide grief counseling. They can become capable at identifying children who may benefit from additional support and knowledgeable about referral sources. Teachers need a school leadership that encourages this role by promoting ongoing professional development in these areas and offering consultation with those more knowledgeable about these issues when teachers have concerns about their students. Our mental health system in turn must make resources available across the state to assist school professionals in supporting children. The Commission therefore recommends that the State Department of Education establish a lead section or program on school mental health within its department to facilitate these activities. We also recommend that the Federal Department of Education develop a comparable department/program to provide guidance and facilitation to programs in individual states.

104

In addition, schools should form multidisciplinary risk-assessment teams that gather information on and respond supportively to children who may pose a risk to others or face a risk to themselves due to toxic stress, trauma, social isolation or other factors. These teams should look to factors such as social connectedness and behavioral changes in identifying children at risk rather than profiling them based on demographic characteristics, or other aspects of their identity in ways that contribute to stigma. We revisit the risk-assessment process later in this report when discussing the role of mental illness in violent events.

5.   Social isolation

Although the Lanza family was fortunate enough to escape the kind of financial stress that afflicts so many American families, the severe impairments that emerged for A.L. as he moved through elementary school and beyond placed an enormous strain on his parents, particularly his mother. Indeed, the stress of managing A.L.'s apparent needs and limitations led his mother down a path of isolation and disconnection from the school system and other community resources. A.L. himself became so isolated over the course of his adolescence and young adulthood that by the months before the Sandy Hook shootings he spent virtually all of his time alone in his room, his windows blacked out with garbage bags, communicating

> "Nearly 20% of adolescents can be classified as socially excluded (i.e., being ignored or excluded by others), an experience that most liken to "social death". Research has found significant associations between chronic social ostracism and participation in risk behaviors such as cigarette smoking, alcohol, and/or illicit drug use, higher levels of depression and anxiety, peer victimization, and aggression up to and including school violence. Retrospective studies have reported that chronic social ostracism, especially experienced during high school, is a risk factor for suicidal ideation and attempts during adulthood. In short, social exclusion threatens psychological and behavior systems that are critical for normal adolescent development, health, and life-longevity."
>
> Richard Gilman, PhD, Professor, University of Cincinnati Department of Pediatrics, Division of Child and Adolescent Psychiatry, Cincinnati Children's Hospital Medical Center, written testimony submitted to the Sandy Hook Advisory Commission

105

with his mother solely by e-mail.  While the isolation experienced by members of the Lanza family may have been unusually extreme, social isolation in general must be viewed as a pervasive public health problem.

In recent years, scientists have established clear associations between social isolation and ill health, even linking loneliness to increased risk of premature death.  Paradoxically enough, in an age of social networking and nearly ubiquitous electronic connection, many American adults, children and families are experiencing unprecedented social isolation.  Such isolation can impact people across the lifespan, but it may present the greatest risks during adolescence and in the later years of life.  Adolescents in particular may become disengaged from their peers and communities due to behavioral health disturbances, bullying, and other circumstances, and their isolation may result from practices of exclusion perpetrated by their peers.

We must educate parents and others about the dangers associated with social isolation.  But education alone is not enough.  In addition, we must build systems of care that include mechanisms and support structures to counter such isolation and offer opportunities for connection to isolated individuals and families.  In other words, systems of care must go hand-in-hand with communities of care.

The Commission is concerned that certain decisions related to educating children outside of a school environment may in some cases exacerbate the risks of social isolation, particularly for those children with identified and pronounced social, emotional and behavioral disturbances.  Although Connecticut in particular imposes very few regulatory requirements on parents who choose to home-school their children, and parents' rights to do so enjoy legal protection, the Commission finds that some home-schooled children with serious social, emotional and behavioral health difficulties may be cut off from needed services if their parents or guardians lack the resources, knowledge or motivation to provide support for healthy development in these areas.

Therefore the Commission recommends that each board of education in Connecticut ensure that all children with disabilities – including children with significant emotional, social and/or behavioral difficulties – who are in need of special education and related services in order to make adequate progress be identified and evaluated in accordance with the IDEA.  Without access to supportive services, home-schooling for children with severe social and emotional challenges may not adequately address those children's needs or help them develop the skills they will need to function in society.  Where parents elect to home-school a child with an identified disability, the home-schooled child should have an individual education program (IEP) approved by the special education director of the Area Education Agency and access to special education services.  Currently, Connecticut law requires that parents who choose to educate their children at home or outside of the public school system be prepared to demonstrate "that the child is elsewhere receiving equivalent instruction in the studies taught in the public schools." Conn. Gen. Stat. § 10-184 (2015).  Connecticut statutes afford parents who educate their children in private schools or at home the right to refuse any special education services, and exempts the school district from having to provide such services if the parents decline them.  Conn. Gen. Stat. § 10-184a (2015).  But targeted supports may be essential to address the developmental needs of students with identified social, emotional and behavioral challenges. The risk is particularly acute in a system where the state's attention is directed solely toward the academic content of children's home educational curriculum and where school districts' obligations to support their healthy development generally end there. Connecticut should therefore require that a parent providing home-schooling to a child with identified emotional, social and/or behavioral difficulties of a significant nature sufficient to require special education and related services file with the local superintendent on a regular basis (at least annually) progress reports prepared by an individualized education program team selected by the parent.  The state should also consider requiring that a parent's obligations

under Conn. Gen. Stat. § 10-184 encompass approval of the individualized education plan and adequate progress as documented in these reports.

When a student's medical and/or mental health condition interferes with the student's school attendance to the extent that the student will miss three or more weeks of school, special education law requires a board of education to provide homebound or hospitalized instruction if recommended by the student's planning and placement team.  In A.L.'s case, his mother appears to have sought a recommendation from a community psychiatrist that he be placed on homebound status, and the community psychiatrist furnished such a recommendation during A.L.'s eighth grade year.  Over the next few years he returned to school only to a limited extent and with extensive support services. Yet despite the fact that the basis for his original homebound status derived from his acute anxiety symptoms and emotional difficulties, his individualized education plan and related services persistently failed to address his social and emotional needs.  This was a grave oversight that the Commission sees as linked to the pervasive inattention to social and emotional learning that plagues our educational system.  If the particular disabilities that necessitate "homebound" education include social, emotional and behavioral difficulties, then a student's individualized education program and related services should address these difficulties expressly in addition to providing any necessary academic supports.

6.    Concluding thoughts

A growing chorus of voices has called for dramatic reforms to existing mental and behavioral health care systems at both the state and national levels.  Over a decade ago, the President's New Freedom Commission on Mental Health urged better coordination between primary and behavioral health care and a less fragmented, more consumer- and family-driven system of care, as well as more involvement by schools in children's mental health care.  Within the past several months, a Robert Wood Johnson Foundation brief embraced wellness promotion as a model for children's behavioral health, and illuminated

108

the harms wrought by the artificial distinction between physical and mental health that has long organized the financing and delivery of health care in our country.  In Connecticut, several reports have emerged over the past two years cataloguing the many shortcomings of our state's behavioral health systems serving child, youth and adult populations.  All of these thoughtful investigations have yielded specific recommendations designed to achieve a better integrated, more easily navigable and more equitable behavioral health system.

The Commission joins these voices in urging adoption of a new model of care, one that emphasizes wellness while effectively and compassionately addressing illness; that places positive child development and healthy families front and center; and that breaks down existing silos to provide holistic and continuous care across the population.  We support the Affordable Care Act's (ACA) affirmation that prevention, early intervention, and treatment of mental and substance use disorders are an integral part of improving and maintaining overall health.  Factors essential to this new model of care will include enhanced integration of primary and behavioral health care and a key role for schools in fostering healthy, resilient children, families and communities.

**B.**     **Recommendations**[16]

*1.*     *Recognizing that mental health is more than the absence of mental illness, we must build systems of care that go beyond treating mental illness to foster healthy individuals, families and communities and embrace  overall psychological, emotional and social well-being.*

*2.*     *To promote true wellness, Connecticut must build a mental health system that targets detection and treatment while building stronger, resilient communities of care.*

*3.*     *Addressing a fragmented and underfunded behavioral health system tainted by stigma requires building a comprehensive, integrated*

---

[16] The recommendations set forth in this subsection of the report, and in subsequent subsections, are numbered sequentially.

approach to care. The approach will stress family involvement and community resilience. Care will be holistic and involve pediatric and adult medical homes from birth to adulthood, with efforts to ensure continuity of care. Identifying risk factors, reinforcing protective factors, and promoting positive development throughout will be key goals, and peer as well as professional support will be involved. Treatment and prevention will be stressed.

4.     To treat the whole person and cultivate wellness across the population, our health delivery systems and reimbursement paradigms should embrace a biopsychosocial model that understands the individual's physical and mental health strengths and challenges in the context of that person's social environment and relationships.

5.     Providers should be incentivized through reimbursement mechanisms to integrate both physical and mental health services, whether through their own care delivery or through integration of services within a medical home model.

6.     To promote healthy child development and foster robust communities, our systems of care must attend to the factors affecting family welfare. Current funding structures must thus be revamped. The Commission recommends support for models of integrated care driven by family needs in which all providers focus on family strength, address their risk factors, and accept the family as a partner in treatment.

7.     Schools must play a critical role in fostering healthy child development and healthy communities. Healthy social development can be conveyed by role models such as parents, teachers, community leaders, and other adults in children's lives, but it can also – and should – be actively taught in schools.

8.     Social-emotional learning must form an integral part of the curriculum from preschool through high school. Social-emotional learning can help children identify and name feelings such as frustration, anger and loneliness that potentially contribute to disruptive and self-destructive behavior.

110

It can also teach children how to employ social problem-solving skills to manage difficult emotional and potentially conflictual situations.

9.     A sequenced social development curriculum must include anti-bullying strategies.  As appropriate, it should also include alcohol and drug awareness as part of a broader substance-abuse prevention curriculum for school-aged children.

10.     Many of our students and their families live under persistent and pervasive stress that interferes with learning and complicates the educational process.  There are many potential resources such as school based health centers that should provide a locus of  preventive care, including screenings and referrals for developmental and behavioral difficulties, exposure to toxic stress, and other risk factors, as well as treatment offerings that can address crisis, grief and other stressors.  Alternatively, schools can employ the services of community-based mental health providers such as child guidance clinics.

11.     Schools should form multidisciplinary risk-assessment teams that gather information on and respond supportively to children who may pose a risk to others or face a risk to themselves due to toxic stress, trauma, social isolation or other factors.  (See recommendation 39, infra, regarding the role of mental illness in violent events.)  Schools should look to factors such as social connectedness in identifying children at risk; all school staff should be trained in inquiry-based techniques to apply when disciplinary issues arise in order to deepen their understanding of how children's behavior can be linked to underlying stressors.

12.     Schools should work with all providers to enhance community resources and augment services available in schools.  For many children schools offer the only real possibility of accessing services, so districts should increase the availability of school guidance counselors, social workers, psychologists, and other school health and behavioral health professionals during and after school as well as potentially on Saturdays.

111

13.     The state and federal departments of education should establish lead sections or programs on school mental health to supplement (not replace) the work of CT DCF.     These sections would play a critical role in conducting and coordinating broad-based prevention and intervention efforts within the school system to help ensure a coordinated, seamless and comprehensive statewide system.

14.     The Commission endorses the recommendations advanced in *Connecticut Children's Behavioral Health Plan*, a report and implementation plan compiled pursuant to Connecticut's *Public Act 13-178*, that call for a comprehensive, developmentally appropriate continuum of care that expands and equalizes culturally relevant resources available to children and their families across payment systems and geographic boundaries.

15.     Each board of education must ensure that children with disabilities be identified and evaluated in accordance with the Individuals with Disabilities Education Act, or IDEA.  Where parents elect to home-school children with an identified disability, the home-schooled child shall have an individual education program (IEP) approved by the special education director of the Area Education Agency, as well as access to special education services.  Periodic reports regarding the progress of such home-schooled children should be filed with the local superintendent (at least annually) and be prepared by an individualized education program team selected by the parent.  The state should consider requiring that a parent's obligations under state law encompass approval of the individualized education plan and adequate progress as documented in these reports.

16.     When the particular disabilities that necessitate "homebound" education include social, emotional and behavioral difficulties, the student's individualized education program and related services must address these difficulties expressly in addition to providing any necessary academic supports.

### III.   BARRIERS TO ACCESS: INSURANCE AND FUNDING ISSUES

### A.   Analysis: System Fragmentation As A Barrier To Effective Care

Funding for mental health services in our system of care comes from a variety of public and private sources.  The system itself, which is routinely described as "fragmented," depends for its organization on how its services are funded.  Currently, Connecticut's healthcare system has three tiers: the private system of care, funded through insurance, group health plans, a Consumer-Operated and Oriented Plan (CO-OP) such as HealthyCT, or out-of-pocket expenditures; the public system, funded through Medicaid, Medicare, and Tricare; and healthcare services for those without insurance or other coverage, provided largely through emergency departments and acute care hospitals, community health centers, and free clinics.  These tiers serve different populations largely based on income, and they provide access to disparate services.  Within the behavioral health field, individuals and families who obtain care in the public system may fare better in some respects than those with private insurance, although across these systems underfunding and uncoordinated funding result in inadequate and disorganized access even when services are available.  A fully functional mental health system will require better coordination and access to a broad range of necessary services across payment systems.  In addition, it is essential to institute higher rates of reimbursement for behavioral health providers to cover the actual cost of care and build up a workforce that remains able to meet the ever-expanding needs in this area.

Ample testimony presented to the Commission made clear that the services to which individuals and families have access depend greatly on the source and method of their funding. The Commission heard testimony from Connecticut's Health Care Advocate, Victoria Veltri, suggesting that despite the existence of mental health services in Connecticut targeted toward populations across the lifespan, the fragmentation of such services creates widespread confusion about what exactly is available and who is eligible to receive it.  In

Connecticut, as in states across the country, many state agencies are involved in the provision of mental health and substance abuse services, including the Department of Children and Families, the Department of Mental Health and Addiction Services, the Department of Social Services, the Judicial Branch and the Department of Corrections; yet very little coordination among these agencies takes place.  Such coordination is essential to bring coherence and efficacy to a system with a diverse array of services targeting different segments of the population.

Major reports on Connecticut's mental health system released over the past few years have identified significant problems with fragmentation resulting from diverse payment systems and a lack of coordination or consistency among state agencies. Connecticut Office of the Health Care Advocate (OHA). (2013). *Findings and Recommendations: Access to Mental Health and Substance Use Services.* Retrieved from http://www.ct.gov/oha/lib/oha/ report_of_findings_and_recs_on_oha_hearing_1-2-13.pdf; The Task Force to Study the Provision of Behavioral Health Services for Young Adults. (2014). *Final Report.* Retrieved from http://www.cga.ct.gov/ph/tfs/20130701 _Task%20Force%20to%20Study%20The%20Provisions%20of%20Behavioral%2 0Health%20Services%20For%20Young%20Adults/Final%20Report%20for%20t he%20Task%20Force%20to%20Study%20the%20Provision%20of%20Behaviora l%20Health%20Services%20for%20Young%20Adults.pdf; and Connecticut Department of Children and Families (DCF). (2014.) Connecticut Children's Behavioral Health Plan. Retrieved from http://www.plan4children.org/wp- content/uploads/2014/10/CBH_PLAN_FINAL-_2_.pdf. A fragmented system yields unequal access to effective treatment, discontinuities of care for those receiving services, and unsustainable financial burdens for individuals, families and communities.

Definitional issues are critical to the discussion of access.  If we restrict our definition of "care" to the traditional medical model of inpatient, outpatient day and residential programs, we will limit access for many to the innovative

programs that have come to be seen as essential to improved outcomes from mental illness and other challenges to emotional and behavioral health. Funding decisions about behavioral health services must look beyond the biomedical model of mental disorder that has prevailed over the past few decades.  Pharmaceutical treatments and more traditional therapies do afford precious relief to many people.   For others struggling with mental and substance use disorders, however, psychosocial interventions, programs that address the social environments in which they live, services directed toward the achievement of functional skills and other efforts to engage the whole person are critical elements of recovery.

In Connecticut, major discrepancies exist in the services available to individuals and families based on payment source.  Publicly funded programs generally provide a much wider array of services for children and adults suffering from mental illness than do private insurance plans.  Commercial insurance tends to limit reimbursement to traditional inpatient and outpatient, episodic services and often will not reimburse care once the symptoms are considered chronic.  The full range of services necessary for the effective treatment and recovery of individuals with mental illness remains unavailable to many with commercial insurance.  For instance, programs that provide housing and vocational support can be essential components of an effective treatment strategy for individuals battling major mental illness, and without these a person whose illness progresses from acute to chronic will be at a distinct disadvantage.   Commercial insurance should reimburse the full panoply of services available through the public system, from those directed toward individuals with severe psychiatric disabilities to those that help the many Americans suffering from mental health challenges across the spectrum.

As a general matter, the bifurcation of behavioral health from other health care has had a number of pernicious effects, one of which is the persistent underfunding of the former.  This bifurcation finds vivid expression in behavioral health carve-outs, particularly in the commercial market, which

115

over the past two decades have removed behavioral health services from many health benefits packages.  Many Medicaid managed care plans have provided behavioral health services on a fee-for-service basis apart from other health benefits.  In Connecticut, the Behavioral Health Partnership has pioneered a more integrated approach for children, adults and families on the state Medicaid plans that administers behavioral health services in ways designed to promote care coordination, particularly for children.  Carve-outs that thwart holistic care as well as true parity between physical and mental health care persist, however, in commercial insurance.  Private health plans frequently contract with managed care operations to administer mental health services separate from other benefits.  Such carve-outs increase systems fragmentation and perpetuate discriminatory practices that affect both mental health consumers and providers.

1.   Improving access to effective services in the public system

While Connecticut's public mental health system is better funded per capita than those of most other states, its resources remain inadequate to serve the ever-expanding needs of the child, adolescent and adult populations.  Behavioral health services have suffered in an era of tight state budgets.  In her testimony before the Commission and the comprehensive 2013 report issued out of her office, Connecticut's Health Care Advocate Victoria Veltri identified cost-shifting and a dearth of research on the cost-effectiveness

> "In order to facilitate optimum treatment, health care information must flow between providers and a seamless transition of care must be available when multiple systems of care are involved with the individual and family.  Payers have not generally incentivized care coordination or communication across treaters, contributing to a fragmented and poorly coordinated mental health system.  Current providers are frequently unable to access patients' past psychiatric records in a timely manner which can contribute to care fragmentation."
>
> The Task Force to Study the Provision of Behavioral Health Services for Young Adults. (2014). *Final Report*

of current state programs as two problems plaguing the public system.  State agencies such as DCF and DMHAS fund community-based services that assist

116

residents in the public system as well as residents with private insurance, and yet the state picks up the tab in many instances.  The OHA report suggests that insight into the relative cost-effectiveness of particular programs might permit the state to accomplish more in areas of real need, even with limited resources.

In addition, recent reports by the legislative Task Force to Study the Provision of Behavioral Health Services for Young Adults and the Department of Children and Families identify a lack of care integration as a feature of Connecticut's system that poorly serves the needs of state residents.  Children, adolescents and young adults are often involved in multiple systems of care, including the mental health system, the substance abuse treatment system, educational systems, the primary care system, DCF, DMHAS and the juvenile justice system.  The lack of treatment coordination among systems addressing the needs of this population increases the likelihood that some people will fall through the cracks and others will receive inadequate care.  Moreover, for the many adolescents and adults with co-occurring mental health disorders and substance use disorders, separate systems of care with diverse funding streams undermine treatment efficacy.  The Commission supports creation of incentives for care coordination, including reimbursement of integrated services and communication between providers.  Across private and public systems, the funding for preventive services and early intervention programs remains inadequate.  Significant improvement in the delivery of necessary services will require additional funding on a consistent basis.

2.    Elevating reimbursement rates to meet the costs of care

Inadequate rates for mental health services under both public and private systems have materially impacted access to and quality of care.  The theme of insufficient reimbursement rates reverberated throughout the Commission's hearings.  People who receive services through Medicaid have virtually no access to private practitioners because payment rates are woefully low.  Testimony before the Commission established that existing Medicaid rates

have been covering only *half* the cost of providing mental health care.  (See Steck, Plant and Amdur's presentation, April 12, 2013.)   For inpatient care, reimbursement remains substantially below costs.   Hospitals providing inpatient psychiatric care to children and adolescents with Medicaid lose between $300 and $500 per day due to low reimbursement rates even as demand for inpatient treatment increases.  (See testimony of Stephen Larcen, Ph.D., Senior Vice President of Behavioral Health at Hartford Healthcare, May 3, 2013.)  Inadequate reimbursement rates also mean that outpatient clinics furnishing intensive behavioral health services to children and adults lose hundreds of thousands of dollars each year.   *See generally* Report of the Connecticut Community Providers Association, "Prioritizing Community Based Services in CT: How investing in the cost of care for health and human services strengthens families, community and the state economy" (February 2015).[17]

Connecticut has pioneered the model of Enhanced Care Clinics (ECC's), which deliver comprehensive and coordinated outpatient behavioral health care to adults and children on Medicaid on both a routine and an urgent basis.  The number of children seen in such specially designated clinics has doubled in recent years while reimbursement rates have remained static, forcing ECC's to operate at enormous

> There are different definitions that dictate whether something is medically necessary.  So as a condition for getting your treatment or service covered under any kind of plan, whether it's Medicaid or a state-regulated plan or a federally regulated plan, you have to prove that it's medically necessary, that you need it basically.  But the definition of what's medically necessary is different in state law than in the Medicaid program, for instance.  So the Medicaid program has a very broad definition of medical necessity, broader than it is for private insurance plans.  So depending on what program you're in, you have a different standard to meet to get your service.  You may also have different benefits, and that happens all the time.
>
> Victoria Veltri, Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013

---

[17] Available at: http://www.governor.ct.gov/malloy/lib/malloy/ shac_doc_final_report_-_final-ccpa-report-february-2015.pdf.

losses.    Though somewhat better, Medicare rates increasingly raise the same issue.

Even the rates provided by commercial insurers are inadequate, and many mental health clinicians now decline to accept any forms of insurance, whether public or private.  Access to their services is therefore limited to those who can pay out of pocket.   Inadequate reimbursement rates have had dramatic effects on the behavioral health workforce.   Provider networks for adult care through the public and private systems are insufficient to meet existing needs, and those for child and adolescent care are even more deficient. The dearth of providers creates a substantial barrier to access.  (Office of the Health Care Advocate, 2013, p. 26-27).  It is critical to provide reimbursement rates under Medicaid and otherwise that actually cover the costs of care.

### 3.    Improving access to effective services in the private system

Alongside insufficient rates of payment, additional factors impede access to care for those with commercial insurance.   Even if a clinician has recommended a certain course of treatment, insurers routinely deny payment for such care through precertification requirements and review of covered services.    An individual seeking coverage for behavioral health services generally must obtain prior authorization from the insurer, although a limited number of outpatient therapy sessions may be exempt from this requirement. The principles of mental health parity, enshrined in the Mental Health Parity and Addiction Equity Act of 2008 and reiterated in the Affordable Care Act, preclude outright discrimination in private coverage for behavioral health services; insurance plans may not apply limitations on coverage more stringently for behavioral health services than for other medical services.   Even with enhanced parity, though, employment of "medical necessity" criteria in the precertification and review processes too often facilitates the *denial* rather than the *provision* of care.

For most services funded through any external source, the payer will cover only those found to be "medically necessary."   Ms. Veltri testified that

119

various funding sources, whether a public plan such as Medicaid or a private insurance plan subject to either state or federal regulation, all employ different definitions of medical necessity to determine whether mental health services will be covered. In general, Medicaid uses a broader definition of medical necessity than do most private insurance plans. These vastly divergent approaches to determinations of medical necessity contribute a troubling degree of arbitrariness and inscrutability to our systems of care.

For those with private insurance, "medical necessity" may become an insurmountable obstacle to receiving the care that their providers have deemed most appropriate. In addition to outright denials of care, the processes through which medical necessity determinations are rendered, reviewed, and potentially reversed function to obstruct treatment when it is most needed. These processes are deeply flawed in ways that frustrate access to effective behavioral health care. First, the performance of reviews by contractors or employees of the insurer creates an inherent conflict of interest that compromises the fairness of the process. Second, placement of the burden of proof on the policyholder not only delays much effective treatment but frequently places it altogether out of reach. Individuals and families wrestling with behavioral health challenges are just not equipped to marshal the evidence required to sway a reviewer, who, at least at the internal stages, may be allied with the insurer. Before the enactment of P.A. 13-3 (An Act Concerning Gun Violence Prevention and Children's Safety) in Connecticut, reviewers conducting these determinations did not necessarily have the behavioral health training necessary to qualify as a "clinical peer" to the provider. Conn. Gen. Stat. § 38a-591c (2015). The new law appears to remedy this problem by requiring that health carriers contract with clinical peers to conduct utilization reviews, and specifying minimum qualifications for clinical peers across child, adolescent and adult mental and substance use disorders. Conn. Gen. Stat. § 38a-591c (2015).

Even with concerted efforts at the federal and state levels to eradicate discrimination in coverage for behavioral health services and implement parity, the employment of "medical necessity" criteria in the precertification and review process around behavioral health services too often results in the denial or delay of needed care. Currently, a private insurer may fail to pre-certify care or deny ongoing care by virtue of its own determination that the proposed services do not meet medical necessity criteria. Following such a denial, clinicians employed or chosen by the insurer conduct an initial review, and additional layers of internal review may follow. Ultimately, in Connecticut, the policyholder may obtain an external review through the Office of the Insurance Commissioner, which assigns independent review organizations on a rotating basis to make final coverage determinations and provides a toolkit to aid consumers in navigating this difficult process.[18]

According to Anne Melissa Dowling, Deputy Commissioner of Insurance, these reviewers end up reversing up to 40% of the denials of coverage. Throughout the process, the policyholder and provider retain the burden of proof to demonstrate that the proposed treatment is medically necessary. Some residents also reach out for assistance to the Office of the Healthcare Advocate, much of whose caseload is devoted to behavioral health issues. Sometimes, patients and families withdraw from treatment out of concern that the obligation for payment will fall to them. Before the enactment of P.A. 13-3 in Connecticut, reviewers conducting these determinations did not necessarily have the behavioral health training necessary to qualify as a clinical peer to the provider; the recent statute appears to remedy this problem by requiring that health carriers contract with clinical peers to conduct utilization review. Despite this change, behavioral health providers continue, virtually unanimously, to report repeated and inappropriate denials of care.

---

[18] See http://www.ct.gov/cid/lib/cid/Behavioral_Health_Consumer_Tool_Kit.pdf.

The Commission concludes that this process still poses a formidable barrier to timely and appropriate care and remains concerned about the conflict of interest inherent in a process in which the payor reviews its own denials of care.  The Commission therefore recommends that all appeals of denials of care be processed through an independent entity such as the Office of the Health Care Advocate.  Independent clinicians selected by this entity should be available around the clock for such reviews.  A second level of review should be available through the same entity.  Insurers should be required to provide reimbursement during the denial and appeals period up to the point of ultimate denial by the neutral reviewing party.  When a licensed provider determines that a particular course of treatment is medically necessary, the burden of proof should fall to the insurer to demonstrate otherwise.  Any conclusion by a reviewer that care is not medically necessary should be based, to the extent possible, on findings in the medical literature.  The results of scientific studies, and/or recommendations of recognized health care professional organizations and recognized authorities of evidence of efficacy especially in the absence of scientific studies, should not be discredited solely on the assertion of the insurer.  While essential, the involvement of clinical peers alone does not guarantee a fair and impartial review.

> "So it's a major burden on a family to assemble medical documents for reimbursement in a field it knows nothing about.  And it's probably not at its best anyway because it's so stressed with the severity of the issue. [...] And some of the terrible things we've seen families have to do in order to qualify for plans or to get coverage just adds to the stress."
>
> Anne Melissa Dowling, Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013

Many people with private health coverage lack access to evidence-based mental health treatment programs available to those in the publicly funded system.  The recent Task Force Report identifies this disparity as a significant barrier to effective behavioral health services for children and adults alike in Connecticut.  Such programs include Integrated Dual Disorders Treatment

(IDDT), Intensive In-Home Child and Adolescent Psychiatric Services (IICAPS), Trauma-Focused Cognitive-Behavioral Therapy (TF-CBT), Extended Day Treatment (EDT), Multi-Systems Therapy (MST), Functional Family Therapy (FFT), Multi-Dimensional Family Therapy (MDFT), and Trauma Affect Regulation: Guide for Education and Therapy (TARGET). Despite the fact that these programs have strong evidence of success when implemented effectively (often with the support of a quality assurance process), including reductions in emergency psychiatric admissions, commercial insurers have been historically unwilling to cover such services.

For those with commercial insurance, inadequate provider panels further impede access to care. Most health plans maintain networks, or panels, of providers with whom they contract to furnish services to the plan's members. In the area of behavioral health services, many providers are reluctant to join such panels when the reimbursement they would receive remains so inadequate. Other providers appear on multiple panels but do not actually accept patients from certain plans because of low reimbursement rates. Insurers publish these panel lists for their policyholders to assist them in locating available providers whose services will be eligible for coverage. All too frequently, though, these panel lists become inaccurate and/or outdated, retaining names of clinicians who have resigned from the panel or remain on the panel but do not actually accept new patients with that insurance. To guarantee that panel lists facilitate rather than frustrate access to care, insurers should be required to maintain up-to-date and accurate provider panel lists and to furnish these to policyholders. Connecticut should establish standards for accurate lists, as well as a mechanism for fining or otherwise holding insurers accountable for publishing inadequate lists.

When policyholders reach beyond provider panels to seek treatment from out-of-network providers, their efforts to seek reimbursement from their health plans encounter the same obstacles as those with in-network providers whose prescribed treatments have been denied on medical necessity grounds. Indeed,

123

the process of filing for reimbursement and pursuing appeals may fall even harder on those seeking reimbursement who have paid up front for otherwise covered services.  As Deputy Commissioner Dowling observed, many families facing this situation are so ill-equipped to complete the necessary paperwork that they are unable to make an effective case until they have reached their third or fourth reviews, often with the assistance of someone from the Office of the Healthcare Advocate.

4.    Expanding an overtaxed workforce

As noted above, inadequate rates of reimbursement have contributed significantly to workforce deficits in the behavioral health sector.  Clinicians in private practice have been increasingly unwilling to accept insurance due to low reimbursement rates as well as the considerable administrative burdens – altogether unreimbursed – that go along with submitting claims.  The problem is particularly acute in the area of child and adolescent care, with far too few providers serving a population with expanding needs.  In Connecticut, the private provider system of care, in particular nonprofit child guidance clinics, form the central hub for children and families seeking mental health services.  Yet the system has been woefully underfunded and burdened by requirements that mandate oversight of every treatment plan by an MD psychiatrist as well as preauthorization for treatment.  It lacks incentives for growth, improvements in technology or implementation of evidence-based practices.    Although Enhanced Care Clinic requirement have improved access to care for families with Husky insurance under the state Medicaid plan, they have created additional barriers for those with private insurance or who pay out of pocket.  Testimony before the Commission established that demand for child and adolescent psychiatric beds in Connecticut routinely exceeds supply.  The total number of child/adolescent beds in Connecticut has decreased over the last ten years due to the significant financial disincentives for hospitals to provide such beds.

124

Connecticut and the rest of the nation must take steps to increase the behavioral health workforce, above all in child and adolescent specialties. According to Connecticut's Health Care Advocate Victoria Veltri, fewer than 8,000 child psychiatrists serve the entire United States population of over 74 million children. Nonprofit providers such as child guidance clinics are currently overwhelmed and underfunded, but strengthening and expanding these providers can quickly develop desperately needed systems of care in Connecticut. Indeed, to meet the expanding needs of children, adults and families, it will be essential to increase the number of clinicians working throughout the system. Measures might include reimbursing psychiatrists serving both adult and pediatric populations at rates equivalent to other specialty care providers; enacting educational loan forgiveness programs that encourage medical students to pursue training in psychiatry, particularly child and adolescent psychiatry; enacting similar programs for graduate students in clinical psychology and social work programs; as well as other targeted efforts

> "Workforce issues have an enormous influence on the provision of mental health care. At the most basic level they affect **access to care**, since workforce shortages limit the availability of services to children and families in need. For example, there are serious shortages of professionals trained to assess and treat children and adolescents, and severe shortages of child psychiatrists and advanced practice nurses who have prescriptive authority. High levels of workforce turnover negatively affect **continuity of care** since turnover disrupts the relationships between children, families and their providers. Training of the workforce affects **quality of care**, with many non-degreed direct care staff receiving little training, while many professionals receive inadequate training in advanced evidence-based practices for children, youth and families. Training of the workforce also impacts the **appropriateness of care** delivered. For example, most mental health professionals are not formally educated about substance abuse and therefore may not detect or treat abuse in adolescents and their families. Lastly, workforce diversity and cultural competence impact the **relevance of care**. The current mental health workforce lacks much racial diversity and the professions are struggling to define and teach cultural competence within the workforce."
>
> Michael A. Hoge, Ph.D., Yale School of Medicine, Department of Psychiatry, written testimony submitted to the Sandy Hook Advisory Commission.

to bring talented professionals into the mental health workforce and encourage such professionals to serve high-need populations.

     5.    <u>Concluding thoughts: Toward a more integrated system of care</u>

Implementation of the Affordable Care Act promises to bring significant changes to the ways in which we think about, organize and fund health care more generally, and behavioral health care specifically, as we move from traditional fee-for-service models of care to what are known as value-based models. Value-based models purport to reward quality of care rather than quantity. More importantly, the ACA embraces the goal of care integration by prioritizing medical homes, which take a patient-centered, comprehensive, team-based and coordinated approach to primary care. It seeks to contain costs in part by encouraging the formation of Accountable Care Organizations, whereby physicians, hospitals and other health care providers create networks to coordinate population-based patient care and receive rewards for delivering care efficiently. As with medical homes, the growth of Accountable Care Organizations under the ACA represents a shift toward better integrated care. The Commission agrees that services that "wrap around" the patient should become

> "[S]omething that interferes with accessing care is that we have a very complicated system of providing mental health services. [...] [F]or too many Americans with mental illness, the mental health services and supports they need remain fragmented, disconnected and often inadequate, frustrating the opportunity for recovery. And so what we have are many different provider systems. We have many different state agencies. We have private insurance. We have Medicaid. We have different criteria. And as a result, trying to navigate that when you have a problem is a significant barrier to receiving care. [...] [I]f you're a family or an individual, it can be really daunting to figure out where do I go, which door do I enter. And they all have their own criteria, eligibility criteria, means of access, exclusions, etc. "
>
> Robert Plant, Ph.D., Chief Clinical Officer , Wellmore Behavioral Health, Testimony presented to the Sandy Hook Advisory Commission, April 12, 2013.

the norm. But the transition from a fee-for-service system to population-based care will present systematic complexities, and it is essential that behavioral

126

health needs remain a focal point of these coordinated systems.  Behavioral health carve-outs may soon be behind us.

The comprehensive system of care envisioned by the Affordable Care Act will require behaviorally competent and collaborative primary care delivered in coordination with co-located mental health professionals.  Primary care providers must also have access to effective screening tools and education around behavioral health matters, as well as psychiatric consultation where needed.  Connecticut's ACCESS-MH program, funded through DCF pursuant to P.A. 13-3, provides one example of a program geared toward integrating behavioral health services with primary care – in this case, at pediatricians' offices.  It is designed to enhance the behavioral health services available to all children and adolescents, regardless of insurance status, by making teams of behavioral health professionals available to primary care providers for consultation, assistance and care services.  As detailed elsewhere in this report, the Commission supports efforts such as this one to make behavioral health services available through primary care offices and schools.

**B.**   **Key Findings And Recommendations**

17.   *A fully functional mental health system will require better coordination and access to a broad range of necessary services across payment systems.*

18.   *Inadequate reimbursement rates combined with high utilization rates at many outpatient behavioral health clinics have made this model of care financially unsustainable.  In addition, overall Medicaid rates for adult inpatient care have not increased in at least eight years.  Recent increases in rates for inpatient child and adolescent care have been coupled with decreases in other Medicaid reimbursement rates to the same hospitals.  The Commission recommends that higher reimbursement rates in both outpatient and inpatient settings, which better reflect the costs of care, be a core component of a redesigned behavioral health care system.*

127

19.    Inadequate reimbursement rates have also impacted the behavioral health workforce, which remains insufficient to meet the needs of many Connecticut residents.   The Commission recommends that, in addition to addressing reimbursement rates, Connecticut identify and take measures to increase the behavioral health workforce.   These might include educational incentives such as loan forgiveness programs.

20.    Connecticut has significant problems with system fragmentation resulting from diverse payment systems and a lack of coordination or consistency among state agencies.  A fragmented system yields unequal access to effective treatment, discontinuities of care for those receiving service, and unsustainable financial burdens for individuals, families and communities.

21.    The definition of "care" must be reviewed. Funding decisions about behavioral health "care" must look beyond the model that has prevailed over the past several decades to embrace psychosocial interventions, services directed toward the achievement of functional skills and other efforts to engage the whole person, which frequently offer the best prognosis for recovery.   A behavioral health diagnosis accompanied by acute, rather than chronic, symptoms should be removed as a prerequisite for access to care.

22.    Commercial insurance should cover the full panoply of services available through the public behavioral health system, e.g., programs that provide housing, vocational and occupational support, and drop-in services that can be essential components of an effective treatment strategy for individuals struggling with severe mental illness.  The Commission recommends continuing efforts to expand coverage to a broad range of evidence-supported services for individuals with private insurance.

23.    Since the goal of optimal health care is to integrate behavioral health seamlessly into comprehensive care, continued use of behavioral health carve-outs, designed to control behavioral health costs rather than increase access, should be phased out as quickly as possible.  The Connecticut Behavioral Health Partnership is noteworthy in designing incentives to coordinated care across

128

physical and mental health as well as substance abuse services for Medicaid-funded care despite the existence of a behavioral health carve-out, but full integration and comprehensive care is most likely achieved through eliminating mental health carve-outs altogether.

24.    To guarantee that provider panel lists facilitate, rather than frustrate, access to care, health plans should be required to maintain up-to-date and accurate provider panel lists and to make these available to all members. The Commission recommends that Connecticut establish standards for accurate lists, as well as a mechanism for fining or otherwise holding insurers accountable for publishing inaccurate lists.

25.    Despite recent changes in Connecticut law, behavioral health providers continue, virtually unanimously, to report repeated and inappropriate denials of care.   The Commission therefore recommends that appeals of all denials of care be processed through an independent entity such as the Office of the Health Care Advocate.   Independent clinicians selected by this entity should be available around the clock for such reviews.   A second level of review should be available through the same entity.   Insurers should be required to provide reimbursement during the denial and appeals period up to the point of ultimate denial by the neutral reviewing party.   When a licensed provider determines that a particular course of treatment is medically necessary, the burden of proof should fall to the insurer to demonstrate otherwise. Any conclusion by a reviewer that care is not medically necessary should be based, to the extent possible, on findings in the medical literature.   The results of scientific studies, and/or recommendations of recognized health care professional organizations and recognized authorities of evidence of efficacy especially in the absence of scientific studies, should not be discredited solely on the assertion of the insurer.

26.    The Commission has recommended adoption of models of care that integrate behavioral and general health services.  In the current world of diverse funding and delivery mechanisms, it is impossible to talk about access to mental or behavioral health services in a unified way.   In the Commission's view,

129

*Connecticut must find ways to fund integrated models of care for both children and adults that ensure access to quality, affordable, culturally appropriate and timely care for residents throughout the state.*

## IV.   BARRIERS TO ACCESS: STIGMA AND DISCRIMINATION

### A.   Analysis: Confronting Mental Health Stigma

When Governor Malloy addressed this Commission at its first meeting on January 24, 2013, he emphasized the need to reduce the stigma of mental illness, noting aptly that our culture has destigmatized violence yet failed to destigmatize mental health treatment.  Throughout the testimony presented to the Commission, users of mental health services, mental health providers, government officials, academics, members of the law enforcement community and others spoke repeatedly of the ways in which stigma frustrates effective treatment and recovery of individuals with mental health challenges.   Many members of the public still view mental illness as shameful and frightening and perceive people with behavioral health difficulties as different and dangerous. The problem is not limited to people's attitudes, though.  Stigma infects our laws, policies and institutions.

The stigma associated with mental illness impacts individuals, families and communities in significant ways.   Stigma discourages people from accessing care, interferes with care once it is accessed, and informs a fragmented and inadequately funded system of care.  Many individuals who struggle with mental health challenges either do not seek care or discontinue care prematurely, and experts have identified stigma as a major factor.  Despite widespread efforts over the past fifteen years to combat stigma, catalyzed in part by former U.S. Surgeon General David Satcher's 1999 report on Mental Health and the 2003 report of the President's New Freedom Commission on Mental Health, recent studies have found that many Americans still regard people with mental illness as dangerous, incompetent and at fault for their condition. Department of Health and Human Services, U.S. Public Health Service. (1999). *Mental Health, A Report of the Surgeon General.*  Retrieved from

http://profiles.nlm.nih.gov/ps/access/NNBBHS.pdf; The President's New Freedom Commission on Mental Health. (2003). Retrieved from http://govinfo.library.unt.edu/mentalhealthcommission/reports/FinalReport/downloads/FinalReport.pdf.

      1.    <u>Defining stigma</u>

According to its common dictionary definition, stigma is a mark of disgrace associated with a particular circumstance, quality or person. The concept of social stigma came into focus following the 1963 publication of sociologist Erving Goffman's book *Stigma: Notes on the Management of Spoiled Identity.* Over the past half-century since that book emerged, academic researchers, policy makers and others have sought to understand how and why certain conditions and markers of identity, including disability, get stigmatized and how the affected individuals or groups internalize, manage or resist stigma. One of the most fundamental insights to come out of this decades-long investigation is that language itself can serve as a powerful agent of stigma. It may seem obvious that derogatory terms for individuals who struggle with mental health challenges such as "psycho" or "lunatic" convey profound disrespect, but language can also contribute to stigma in more subtle ways. When we refer, for example, to "the mentally ill" or call someone "a schizophrenic" we are

> "Mental illness stigma has many components. Stigma involves disrespectful language, inaccurate stereotypes, negative public attitudes, social exclusion, and loss of self-esteem. Many people believe, incorrectly, that mental illness indicates fundamental character flaws, a propensity for violence, and lifelong limitations and then act according to those beliefs by isolating, avoiding and belittling those who manifest mental illness. Those beliefs and behaviors create significant barriers to help-seeking. Even when effective help is available, many will not take advantage of it for fear of the rejection, isolation, and loss of opportunities that may result when others learn they have sought mental health treatment. Youth with mental health problems are particularly vulnerable to teasing and bullying and, as a result, may try to hide their problems rather than seek appropriate professional assistance."
>
> Dr. Otto Wahl, Professor of Psychology and Director of the Graduate Institute of Professional Psychology, University of Hartford, written testimony submitted to the Sandy Hook Advisory Commission.

reducing individuals with mental health challenges to markers of pathology; such language, in turn, helps to justify discriminatory policies and practices. Above all, people living with mental illness are people first.

More recently, experts have developed our understanding of stigma by illuminating its mechanisms. Dr. Bruce Link and Dr. Peggy Phelan have offered an influential model of stigma that identifies four dynamic components through which stigma works its harm. The first is *labeling* – the process by which certain human differences are socially selected for salience. Then labels must be linked to negative attributes or *stereotypes*. In the mental health arena, diagnostic categories help organize information about a person's difficulties and assist providers in designing appropriate treatments to relieve that person's suffering. A diagnosis may also enable someone to better understand his or her condition, to avoid self-blame, and to see a way forward. But mental illness diagnoses can also become labels that subject a person to negative stereotypes, including assumptions about incompetence or dangerousness, and they can limit the person's sense of his or her own potential.

Labels can have a dramatic impact on a person's present and future experience that extends far beyond the descriptive. Nearly fifty years ago, in a groundbreaking study examining the power of labeling, social psychologists Robert Rosenthal and Lenore Jacobson told teachers that certain of their students had scored in the top 20% on a test purported to identify "academic bloomers," or children who were entering a period of intense intellectual development. In reality they chose the children at random, and the students they identified had scored no differently from their peers on an I.Q. test. A year later, when they administered the same I.Q. test, the students labeled "academic bloomers" outperformed their peers by 10-15 points. In other words, the identification of these students as "academic bloomers" influenced the way their teachers taught the children; the teachers' higher expectations of certain students in turn actually fostered dramatic intellectual development.

132

The label, randomly assigned, became a self-fulfilling prophecy.[19] Unfortunately, labels can constrain people's potential just as they can expand it.

In addition to labeling, stigma requires the *separation* of insiders from outsiders through which a labeled group is understood as so fundamentally different from the rest of "us" that "they" come to seem less than fully human. For example, although more than one in four Americans wrestles with a diagnosable mental health condition every year, and at least half of Americans will qualify for a diagnosis of mental illness over the course of their lifetimes, we tend to see "the mentally ill" as a discrete group of outsiders whose condition justifies avoidance and a curtailment of rights. Mental illness labels frequently activate a process of dehumanization. ("The default response to a target labeled with mental illness, in the absence of corrective information, may be dehumanization." Martinez, A. G., Piff, P. K., & Hinshaw, S. P. (2011). The Power of a Label: Mental Illness Diagnoses, Ascribed Humanity, and Social Rejection. *Journal of Social and Clinical Psychology*, 30, 1-23, 20.) Labels accompanied by negative stereotypes can blind us to people's full humanity.

Finally, the labeled person experiences *loss of status* and *discrimination*. Link and Phelan emphasize that stigma depends on power differences between those doing the labeling and those labeled. Without social conditions that produce and maintain such power disparities, labels may combine with negative stereotypes and practices of separation but they will not result in significant status loss or discrimination. One of their examples may help to illuminate this distinction. Participants in a program for the treatment of serious mental illness may develop labels for certain members of the hospital staff, dismissively designating some clinicians "pill pushers" and stereotyping them as cold, paternalistic and arrogant. They may even avoid, disparage and exclude members of the labeled group, but the program participants lack "the social, cultural, economic and political power to imbue their cognitions about

---

[19] See generally http://rosenthal.socialpsychology.org.

staff with serious discriminatory consequences." Link, B.G., & Phelan, J.C. (2001). Conceptualizing Stigma. *American Review of Sociology*, 27, 363-385, 376.   The stigma attached to mental illness, on the other hand, does have serious discriminatory consequences that impact most aspects of a person's life.   In recent years, researchers have identified stigma as a fundamental cause of what they call "diminished life chances," which include housing, employment opportunities and income levels, education and academic outcomes, social relationships, psychological well-being, access to quality health care and good health itself.   Hatzenbuehler, M.L., Phelan, J.C., and Link, B.G. (2013). Stigma as a Fundamental Cause of Population Health Inequalities. *American Journal of Public Health*, 103(5), 813-821.

2.   The pervasiveness of stigma

Despite widespread advances in understandings of mental illness among experts and the general public alike, negative attitudes toward people with mental illness appear to have become increasingly pervasive over the past several decades.   A 1991 poll measuring Americans' attitudes toward disabilities concluded that "mental illness was the most disturbing type of disability related condition for the general public."   Hinshaw, S.P. (2007). *The Mark of Shame: Stigma of Mental Illness and an Agenda for Change.* New York: Oxford University Press, p. 102.   Research conducted later that decade found that stigma regarding major depression and schizophrenia in particular had increased since the middle of the century even though Americans knew more about mental illness than at any earlier time.   It seems that members of the public had become more likely to

> "I've worked in this field all of my adult life.  I have experienced in my own family serious mental illness.  I'm very much aware of the fact that stigma is the overwhelming issue to people seeking access.  The Surgeon General highlighted this in his 1999 groundbreaking report. […] Today, even though I think the public understands much more so than ever that these are biologically based illnesses, the public's view of mental health and what we internalize in our own belief system is much more negative than it ever was."
>
> Sheila Amdur, testimony presented to the Sandy Hook Advisory Commission, April 12, 2013.

associate major mental illness with dangerousness, possibly due in part to the closing of state psychiatric hospitals beginning in the 1960s and 1970s, inadequate funding of community services, and the increasing numbers of people with mental illness living homeless on the streets, factors that contributed to what some have called the "criminalization of mental illness." As a result of their fears, many Americans are reluctant to interact with people who have mental illnesses.  One large-scale 1996 study capturing Americans' views of mental illness revealed that 38% are unwilling to be friends with someone having mental health difficulties, 64% do not want someone with schizophrenia as a close coworker, and more than 68% would not want someone with depression to marry into their family.  Pescosolido, B.A., et al. (2000). Americans' Views of Mental Health and Illness at Century's End: Continuity and Change. Public report on the MacArthur Mental Health Module, 1996 General Social Survey. Bloomington, IN: Indiana Consortium of Mental Health Services Research, Indiana University; New York, NY: The Joseph P. Mailman School of Public Health, Columbia University.  More recently, in a 2013 poll conducted by the Kaiser Family Foundation, 66% of respondents reported that they would feel very or somewhat uncomfortable if a person with a serious mental illness worked at their child's school, 47% would feel uncomfortable living next door to someone with a serious mental illness, and 41% would feel uncomfortable working with someone who has a serious mental illness.[20]

Stigma is by no means a uniquely American problem; instead, stigma surrounding mental illness has been documented in countries across the globe, whatever their laws and policies on mental disorder.  In their preface to a recent book on mental illness stigma, the authors write: "We know of no society where the stigma of mental illness is not present and potent."  Corrigan, P.,

---

[20] *See*  http://kff.org/disparities-policy/poll-finding/kaiser-health-tracking-poll-february-2013/)

Roe, D. & Tsang, H. (2011). *Challenging the Stigma of Mental Illness: Lessons for Therapists and Advocates.* Oxford: Wiley-Blackwell.

Advocates hoped that advances in brain science would help to counteract misunderstandings about mental illness that fuel stigma. But efforts over the past fifteen years to identify the neurobiological basis of some psychiatric illnesses and impart this knowledge to the public do not appear to have diminished stigma. If anything, such efforts seem to have increased social distancing around mental illness and strengthened perceptions of dangerousness. Pescosolido, et al. (2010). "A Disease Like Any Other"? A Decade of Change in Public Reactions to Schizophrenia, Depression, and Alcohol Dependence. *American Journal of Psychiatry*, 167(11), 1321-1330. The explanation that a person's brain is just "wired differently" may elicit fear rather than acceptance. Unfortunately, it appears that little has changed since the publication of the comprehensive Surgeon General's report on mental health in 1999: stigma remains "*the most formidable obstacle* in the arena of mental illness and health" (Surgeon General's Report, 1999, p. 3).

3. <u>Stigma deters access to care</u>

Fear of getting labeled "mentally ill" often discourages people from seeking help for themselves. The potential loss of friends, employment, and the regard of others may eclipse the potential relief from suffering. Indeed, a recent analysis drawing on data from one hundred and forty-four separate studies conducted across the globe concludes that stigma is a key deterrent in accessing mental health

> "This central misconception [conflating mental illness and violent behavior] can distract from other efforts to reduce violence and unnecessarily stigmatize millions with mental health disorders. It could also actually undermine public safety by discouraging people who pose the greatest risk from seeking services, which in turn could result in many with serious mental illness ending up in the criminal justice system, often for minor quality of life offenses and other non-violent offenses. This of course would further perpetuate the mistaken impression that mental illness, criminality and violence are inextricably linked."
>
> Joette Katz, Commissioner, Connecticut Department of Children and Families & former Justice of the Connecticut Supreme Court, testimony before the Sandy Hook Advisory Commission, March 22, 2013

care. Clement, et al. (2015). What is the impact of mental-health-related stigma on help seeking? A Systematic Review of Quantitative and Qualitative Studies. *Psychological Medicine*, 45(1): 11-27. Doi:10.1017/S0033291714000129. A significant percentage (approximately 40% according to the most recent data) of people with serious mental health challenges never pursue treatment, and others begin treatment but discontinue it or fail to adhere fully to the recommended course. (For a comprehensive review of the topic, see Corrigan, P., Druss, B., and Perlick, D. (2014). The Impact of Mental Illness Stigma on Seeking and Participating in Mental Health Care. *Psychological Science in the Public Interest*, 15(2): 37-70.) According to one sociologist summarizing research on public beliefs about mental illness in the United States, "studies of unmet need consistently report attitudes/beliefs are the primary barrier to care, exceeding the influence of otherwise formidable structural factors (e.g., insurance, finances)," Schnittker, J. (2013). Public Beliefs about Mental Illness. In C.S. Anesthensel, J.C. Phelan & A. Bierman (Eds.), *Handbook of the Sociology of Mental Health* (pp. 75-93). New York, NY: Springer. The problem may be even more pronounced in the context of child and adolescent mental disorders, with low rates of diagnosis relative to the number of youths who meet diagnostic criteria, and still lowers rates of treatment for those whose disorders are identified. Pescosolido, B.A. et al. (2008). Public Knowledge and Assessment of Child Mental Health Problems: Findings from the National Stigma Study-Children. *Journal of the American Academy of Child and Adolescent Psychiatry*, 47(3), 339-349.

The consequences of such deterrence can be grim for the individual, including unrelieved suffering and worse outcomes down the road. Experts have concluded that "stigma represents a significant public health concern because it is a major barrier to care seeking or ongoing treatment participation." Corrigan, P. (2004). How Stigma Interferes with Mental Health Care. *American Psychologist,* 59(7), 614-625. Family members and friends may also suffer. They may not understand what is happening to their loved

137

one or may feel helpless to do anything if that person will not pursue treatment.   And the community at large bears a burden when one of its members will not get the help he or she needs.  Symptoms of untreated mental illness may interfere with a person's ability to participate fully in society.   For those with severe mental illness, the consequences could be even more devastating.  Although as a general matter mental illness alone contributes little to rates of violence, certain forms of severe mental illness may, if left untreated, increase the risk for violent behavior, and psychiatric illnesses such as major depression clearly raise the risk for *self-harm.*  Paradoxically, the stigma surrounding a perceived association between mental illness and violence may actually undermine general safety, since this stigma poses a barrier to care for many who need it most.

### 4.   Stigma impacts what care is available

Stigma also affects the availability and quality of care.  The persistent underfunding of mental health services, evident in such discriminatory public policies as Medicare lifetime limits on psychiatric treatment and low rates of reimbursement for mental health providers, may result from the stigma attached to mental illness.  Although recent reforms such as the federal Mental Health Parity and Addiction Equity Act of 2008 seek to achieve parity between insurance benefits for mental health services and those for other medical care, we have a long way to go before behavioral health care receives equal coverage.  As highlighted in this report's discussion of insurance and funding issues as barriers to effective care, precertification requirements that delay and even deter access to behavioral health services must be understood as a product of stigma as well as a mechanism that compounds its effects.  Under most private and public insurance plans, behavioral health services (with the exception of limited psychotherapy sessions) require prior authorization – a determination before treatment begins that the services are medically necessary.  Private insurers routinely deny coverage under this ill-defined standard for everything from inpatient hospitalization to intensive outpatient treatment to evidence-

based community services.   Long-established fundamental elements of recovery, such as vocational, occupational and social rehabilitation programs, are not reimbursed under private plans. Likewise, more recently validated approaches such as Integrated Dual Disorder Treatment or IDDT, an evidence-based practice that combines substance abuse services with mental health services for people with co-occurring mental health and substance use disorder, receive no coverage.   In addition, commercial insurers generally distinguish between acute and chronic care, denying care for the latter.   By comparison, it is impossible to imagine that reimbursement would be denied at the point that symptoms of congestive heart failure or COPD fail to remit and become chronic.

Even when people do access treatment, they may face expectations of less than full recovery due to stigma within the behavioral health system itself. Individuals with mental health issues are often forced into systems delivery models that focus on their limitations rather than their strengths.   They may encounter dismissive or paternalistic attitudes from clinicians, who may neglect to ask patients about their goals.   Research has established that mental health professionals often harbor some of the same stigmatizing views of their clients that members of the general public do.   Horsfall, J., Cleary, M., & Hunt, G.E. (2010). Stigma in Mental Health: Clients and Professionals.   *Issues in Mental Health Nursing,* 31(7), 450-455.   Systems that make use of peer support and recovery support specialists in addition to professional mental health providers may best promote wellness and encourage consumers to flourish. Such support specialists, however, can be effective only if they receive respect in their dual capacity: as professional partners to other members of the treatment team, and as peers to the person in recovery.

139

5.   <u>Internalized stigma</u>

Stigma is first and foremost a function of negative attitudes, exclusionary practices, and discriminatory systems – all external impediments to human flourishing.   But stigma is frequently internalized as well through a dynamic called "self-stigma."   For example, when people with mental health challenges constantly hear messages about their own inferiority, they can begin to believe that a diagnosis of mental illness means an end to achieving their life's goals.   One study dubbed this the "why try" effect, whereby individuals with mental illness internalize negative stereotypes, applying these attitudes toward themselves in ways that undermines their self-esteem and self-efficacy.   They may decline to pursue opportunities that would advance their personal aspirations because they accept the idea that their illness defines them.   Corrigan, P.W., Larson, J.E., Rusch, N. (2009). Self-Stigma and the 'Why Try' Effect: Impact on Life Goals and Evidence-Based Practices. *World Psychiatry*, 8(2), 75-81.   This experience contributes significantly to isolation and demoralization and has been shown to impact a wide range of life outcomes.   Livingston, J.D. & Boyd, J.E. (2010). Correlates and Consequences of Internalized Stigma for People Living With Mental Illness: A Systematic Review and Meta-analysis. *Social Science & Medicine*, 71(12), 2150-2161.

> "My son was diagnosed at the age of eight with bipolar disorder, eight years old.  And let me tell you, when that happened, it was like somebody hit us with a brick, and we didn't know where to turn, we didn't know what to do, we didn't know who to look to. "
>
> Kim Pernerewski, President of NAMI Waterbury, Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013.

Moreover, stigma affects not only the individual diagnosed but also that person's family.   Researchers call this "stigma by association" or "associative stigma."   Van Der Sanden, R.L., Bos, A.E., Slutterheim, S.E., Pryor, J.B., & Kok, G.  (2013). Experiences of Stigma by Association among Family Members of People with Mental Illness. *Rehabilitative Psychology,* 58(1), 73-80.  The fear and shame that surround mental illness, and the social distancing it entails,

compound the family's burden and deplete its resources.  Family members wrestling with a loved one's psychiatric illness frequently go through a grieving process, one that they must endure alone.  For both the individual and that person's family, a diagnosis of mental illness evokes a very different response than does a diagnosis of cancer.  Rather than bring casseroles, friends and neighbors may stay away, expressing their discomfort through avoidance and gossip.  Family members may suffer severe psychological strain and their relationships may become imperiled.

Although it is unclear exactly what role stigma played in the Lanza household, it seems likely that the stigma attached to mental illness and the behavioral health system affected the family's choices and internal dynamics as well as its interactions with the community.  Stigma may have informed his mother's decision to withdraw A.L. from treatment at Yale.  Stigma almost certainly contributed to the isolation that both experienced.  According to the recent report issuing from the Office of the Child Advocate, Ms. Lanza may have both overestimated and underestimated her son's social, emotional, and behavioral health challenges.  On the one hand she created and perfected what the Yale Child Study Center's evaluating psychiatrist dubbed a "prosthetic environment" that unwittingly undermined her son's healthy development and enabled his progressive alienation from the community of his peers.  Ultimately he became so isolated that he eschewed live human contact altogether.  On the other hand, she may have failed to appreciate the full and increasingly alarming extent of his social and emotional impairments.  Out of concern for his welfare she narrowed her own world dramatically to accommodate her son, thereby cutting both of them off from potential support structures.  The stress and shame of parenting a deeply troubled child may have made it impossible for Ms. Lanza to ask for help in those final years.  Nothing in the record before the Commission suggests that offers of assistance were forthcoming.  Pervasive stigma compounds the stress and shame that many families experience, and this experience may encourage family members to retreat still further from

141

potential social supports.  The Child Advocate's report notes emphatically that stigma can impede the sort of successful family engagement strategies that are critical to the effective care and support of children with emotional, developmental and behavioral challenges.

6.    The media's role in perpetuating stigma

Any discussion of this topic would be incomplete without a reflection on the significant role the media plays in perpetuating stigma.  In 1999, a *New York Daily News* headline screamed, "Get The Violent Crazies Off Our Streets!"  A 2013 headline on the cover of the British paper *The Sun* announced "1,200 Killed By Mental Patients," with the number 1,200 highlighted in blood red.  Such headlines strongly bolster the misconception that people with psychiatric illnesses are routinely violent and dangerous.  Since many Americans learn about mental illness principally through visual and print media, the messages they encounter there go a long way toward shaping their attitudes.  As the New Jersey Governor's Council on Mental Health Stigma explains, "[t]hose living with mental illness are sometimes exempt from the sensitivity and compassion that writers, journalists, filmmakers, and television producers afford those living with illnesses such as cancer and diabetes."[21]

Even less obviously sensationalistic media coverage can compound these damaging and inaccurate stereotypes.  Much of the coverage on access to firearms in the wake of tragedies such as the Sandy Hook shootings has focused on restrictions related to a person's history of psychiatric treatment.  For example, a December 21, 2013 *New York Times* article bearing the headline "When the Right to Bear Arms Includes the Mentally Ill" was followed one week later by an editorial provocatively titled "When the Mentally Ill Own Guns." In the second piece, the editors of the *New York Times* referred to the earlier article as a "recent report showing how people who brandish guns, threaten family and neighbors and *even admit to mental illness* are able to get around the police" Editorial Board (December 28, 2013). When the Mentally Ill Own

---

[21] *See* http://www.state.nj.us/mhstigmacouncil/community/media/

142

Guns. *The New York Times.* The implication here is that an identified mental illness clearly signals dangerousness even if the laws on firearm eligibility do not preclude all of "the mentally ill" from owning guns. As discussed elsewhere in this report, mental illness plays a marginal role in the risk of gun violence, particularly gun violence directed toward strangers, but headlines such as these suggest otherwise. Moreover, recent research confirms that the inordinate focus on mental illness in media coverage of mass shootings clearly increases stigma toward people with serious mental illness and provides fodder for discriminatory policies and practices. McGinty, E.E., Webster, D.W., & Barry, C.L. (2013). Effects of News Media Messages About Mass Shootings on Attitudes Towards Persons With Serious Mental Illness and Public Support for Gun Control Policies. *American Journal of Psychiatry,* 170(5), 494-501. In addition to exacerbating negative attitudes toward people with psychiatric illnesses, media coverage that places mental illness at the center of debates over gun control may irresponsibly distort the issues by suggesting that access to firearms by individuals with mental illness constitutes a significant factor in overall rates of gun violence.

       7.   <u>Effectively combating stigma</u>

While it is clear that we must work to eradicate stigma and its effects on people suffering from mental health challenges and their families, it is far less clear how we should go about doing so. Concerted stigma-reduction efforts have had a mixed record of success. For example, as described earlier, clinicians, advocates and policy makers have increasingly presented mental illness as a medical disease with neurobiological origins, partly in response to scientific knowledge and partly in an effort to decrease stigma. At least one recent study, however, establishes that even if the public embraces neurobiological explanations for disorders such as schizophrenia, major depression and alcohol dependence, signs of stigma have not diminished significantly. Indeed, while researchers did identify widespread support for mental health *treatment*, they also found that such support actually went

hand-in-hand with exclusionary policies toward people with behavioral health challenges.  (Pescosolido, B. A., 2010).

Other studies have focused on the particular mechanisms employed in anti-stigma campaigns, identifying three general categories: protest efforts, education, and direct contact with people living with mental illness.   They suggest that these approaches have varying degrees of efficacy and that their impact may well depend on the audience.   Protests launched against stigmatizing media images and stereotypical depictions of mental illness have witnessed some success in reducing such representations, but their impact on the public's attitudes is less clear.  Indeed, the suppression of stereotypes, if not combined with efforts to promote personal contact, may actually exacerbate stigma.  Corrigan, P.W., Penn, D.L. (1999).  Lessons from Social Psychology on Discrediting Psychiatric Stigma. *American Psychologist,* 54(9), 765-776. Educational campaigns that address many of the misconceptions surrounding mental illness may influence the attitudes of providers within the healthcare system but are unlikely, without more, to make much of a difference to members of the general public.   Finally, and of particular concern to this Commission, strong evidence suggests that discussions linking mental illness and violence may exacerbate negative, fearful attitudes toward people with mental health challenges and encourage exclusion and avoidance.  Even where such discussions occur in an effort to generate support for mental health services, these negative stereotypes may coincide with contrary impulses, undercutting such support.

A clearly effective way to correct the negative stereotypes held by those outside the mental health field is to contest dehumanization by illuminating the humanity of those who live with mental illness.   Where possible, we should foster personal contact between members of the public and people with lived experience of mental illness.   Rusch, N., Angermeyer, M.C., Corrigan, P.W. (2005).   Mental Illness Stigma: Concepts, Consequences, and Initiatives to Reduce Stigma. *European Psychiatry,* 20(8), 529-539; Corrigan, P.W., Penn,

D.L. (1999).   Lessons from Social Psychology on Discrediting Psychiatric Stigma. *American Psychologist,* 54(9), 765-776.   In addition to programs promoting personal contact, media outlets can expose the public to those with lived experience.  We can look to places such as New Zealand, Canada and the United Kingdom, among others, for examples of broad-scale media campaigns to combat stigma.  These efforts appear to have had some salutary effects.  In the case of England's "Time to Change" anti-stigma campaign, launched in 2009, recent survey data finds that media messages aimed at changing attitudes and behaviors around mental health problems have had a positive impact, though a moderate one.    Evans-Lacko, S., Corker, E., Williams, P., Henderson, C., and Thornicroft, G. (2014).  Effect of the Time to Change Anti-Stigma Campaign, Launched in 2009, Recent Survey Data Finds That Media Messages Aimed at Changing Attitude and Behaviors Around Mental Health Problems Have Had a Positive Impact, Though a Moderate One.  *The Lancet Psychiatry*, 1(2), 121-128.[22]  Experts who study mental health stigma agree that media campaigns must incorporate two types of messages to combat stigma effectively: "see the person" messages and recovery-oriented messages.  Both draw attention to the person behind the label and refute gloomy, and potentially self-fulfilling, prognoses.   While short of clear consensus, two additional messages also receive broad support: those that promote social inclusion (also described as a "human rights" message) and those that emphasize the high prevalence of mental disorders.  Experts caution against a "one size fits all" approach, stressing that particular combinations of messages, targeted toward particular audiences, are likely to be most effective.   Clement, S., Jarrett, M., Henderson, C., and Thornicroft, G. (2010).  Messages to Use in Population-Level Campaigns to Reduce Mental Health-Related Stigma: Consensus Development Study. *Epidemiologia e Psichiatria Sociale,* 19(1), 72-29.   The Substance Abuse and Mental Health Services Administration (SAMHSA) has published a comprehensive toolkit called *Developing a Stigma*

---

[22] Available at http://www.time-to-change.org.uk/.

*Reduction Initiative* that includes a step-by-step guide as well as best practices for successful campaigns to reduce stigma.[23]

Many of the Commission's additional recommendations, while not addressed directly to stigma reduction, may have the salutary effect of decreasing stigma.  For example, school-based behavioral health services have the potential to enable children and families to address mental health challenges in an environment relatively free from the stigma that attaches to the mental health system.  Even more significantly, they could over time diminish the stigma associated with mental illness by integrating mental health care with other forms of health screening and care available to children through the schools.  Schools can communicate to students and their families that mental health is an important component of total wellness.

Programs such as CIT (Crisis Intervention Team Training) and CIT-Y (training directed toward youth issues) for the law enforcement community and Mental Health First Aid for teachers, counselors, parents, neighbors, coaches, youth group leaders, police officers and others can have a direct impact on stigma. The former programs equip law enforcement officers with the tools necessary to assist people experiencing behavioral health crises and to deescalate situations that could otherwise lead to arrest, injury or worse. Mental Health First Aid, a program first developed in Australia, has since 2008 prepared teachers, counselors, parents and others across the United States to recognize the warning signs of a mental health challenge and to offer help until appropriate treatment and support become

> "What CIT and CIT-Y both do, is they create opportunities.  [A program like these] reduces the stigma even by us, because we wear badges, we wear uniforms, but we're human beings. Do we have a stigma, do we have a perception of what mental health looks like or what a person in crises looks like?  It helps reduce that for everyone. "
>
> Sergeant Chris McKee, Windsor Connecticut Police Department, Testimony before Sandy Hook Advisory Commission, March 22, 2013

---

[23] Available at http://store.samhsa.gov/shin/content//SMA06-4176/SMA06-4176.pdf.

available.  Strong evidence suggests that this program has not only increased mental health literacy among its participants and connected people to needed services, but also reduced stigma.  The program has taken hold already in parts of Connecticut.

An early focus on social and emotional learning that continues through the upper grades may also work to combat stigma and discrimination. Children who learn not merely to recognize and regulate but also to tolerate emotion may develop less fearful attitudes toward those who do experience behavioral and emotional challenges.  As children proceed through middle and high school, mental health issues should play a central role in the health education curriculum.  Our educational system places an undue emphasis on cognitive skills, and the ascendancy of high-stakes testing only compounds the problem.  To promote healthy development of children and adolescents, we must foster the capacity for empathy alongside critical thinking and creative problem solving.

For adolescents and adults facing mental health diagnoses, effective psychoeducation of both individuals and families can promote acceptance and decrease stigma.  Psychoeducation involves structured programs in which individuals and families are educated about mental illness, its treatments, and strategies for handling typical challenges that might arise in association with a particular condition.  Psychoeducation can also encompass information relevant to a broad range of conditions or circumstances that trigger psychological stress.  The premise of psychoeducation is that knowledge provides a powerful tool for managing behavioral health challenges.  When taught by peers alongside providers, it not only promotes recovery but also offers built-in peer support.

Psychoeducation should embrace evidence-based practices. Some examples of effective programs include courses such as Parents and Teachers as Allies, eCPR, Mental Health First Aid, Think Trauma and TARGET (Trauma Affect Regulation: Guide for Education and Therapy) that educate the community at large about how to recognize signs of emotional distress and how best to assist those in need. The goal of such programs is not to teach people how to diagnose their family members, friends and neighbors with a mental illness, but instead to recognize that someone whom they might consider "different" or "odd" may in fact need help. Participants learn ways to connect with an individual in need and to empower that person to get help. Courses such as NAMI's Family to

"Allocating money to support people in distress is a natural and conscientious response to a tragedy of this nature. Our communities are in dire need of constructive outlets for aggression and supportive engagement. However, increasing funding for status quo mental health programs [alone] will not accomplish this objective of supporting people experiencing distress. The experience of many patients in the current mental health system is one of frustration after diagnosis because the focus often becomes managing symptoms and minimizing side effects of medication, rather than feeling good and striving for happiness and a meaningful life. This approach is leading to oppression, discrimination and a significant loss of human potential. It is time to support people in ways that appreciate experiences contextually and conceive of suffering as transient. The mental health system should not treat people as if there is something inherently wrong with them from which they cannot recover. We should focus on promoting resilience and encouraging people to take responsibility and be accountable for their actions and their lives. It has been my experience and that of many others that when people learn what they need to do to be well, including the power of nutrition, of working through troubling emotions, of belief in self, of living intentionally rather than simply existing, they recover. Let's work together to create an environment where there are options. Communities need to be created where people feel as if they have been supported when they reach out to talk about their troubles. We must foster the expectation that people will rebuild their lives. We cannot accomplish this aim without including people with psychiatric histories in the conversation. "

Deron Drumm, Co-Executive Director of Advocacy Unlimited & Director of Recovery University, written testimony submitted to the Sandy Hook Advisory Commission

148

Family and Peer to Peer partner affected individuals and families with others who have been through similar experiences.[24]  Above all, such programs need to incorporate a model of wellness rather than illness.  People living with mental health challenges, their family members and friends need to learn skills to manage their condition.  Diagnosis brings with it a distinct set of challenges, only some of which are due to symptoms of the illness itself.  People with lived experience are role models and can provide examples of a path to a successful recovery.  They can be part of a treatment team as peer support specialists, or providers can refer people in treatment to peer support groups outside of the treatment setting.

Personal accounts coming from those with lived experience of mental illness or their families play an important part in effective stigma-reduction. Such stories can reach people currently struggling with mental health challenges as well as the general public, providing vivid examples for both of recovery and resilience.   One in five people currently lives with a mental fillness.  While most of us know someone living with a mental health challenge, too many of us are afraid to talk about it.  As a community we need to move beyond this silence and toward true acceptance.

8.   <u>Concluding thoughts</u>

As Governor Malloy stated, we must combat the stigma surrounding mental health challenges if we are to achieve a mental health system that effectively and compassionately helps people overcome barriers to health and achieve full participation in our society.   Money invested in anti-stigma campaigns must be spent wisely to create social change.  Since stigma works its harm through stereotyping, social distancing and dehumanization, anti-stigma efforts must involve participants with lived experience of behavioral

---

[24] For resources see http://www.ct.gov/dmhas/lib/dmhas/cosig/ FamilyToolkit.pdf; *see also* http://store.samhsa.gov/product/Family-Psychoeducation-Evidence-Based-Practices-EBP-KIT/SMA09-4423.

health problems who put a human face on mental illness.  Stigma can also distort people's self-understandings as they internalize messages about their own inferiority. Providing people with evidence-based psychoeducation helps to educate, empower and embrace individuals, families, and communities impacted by mental illness. Anti-stigma campaigns must communicate in clear and persuasive terms that a diagnosis of mental illness doesn't have to mean an end to achieving one's life goals.

These efforts should embrace the broader purview of social and emotional health and psychological resilience rather than focusing exclusively on serious mental illness.  Stigma around mental health issues can take hold in part because our culture has devalued psychological wellness and emotional awareness.  Behavioral health challenges affect all of us, and even diagnosable mental disorder will touch each one of us directly or through those we love.  If we can cultivate the capacity for empathy in our children and ourselves, we will go a long way toward eradicating stigma and building a system that promotes true wellness across our society.

### B.    Key Findings And Recommendations

27.    *Notwithstanding widespread efforts over the past two decades to combat stigma, recent studies have found that many members of our society still regard people with mental illness as dangerous, incompetent and at fault for their condition. But a diagnosis of mental illness does not have to mean an end to achieving one's life goals.  Systems of care that promote wellness generally and recovery for those who struggle with behavioral health challenges and the effects of traumatic stress can help to diminish stigma and its effects.  The media plays a pivotal role in perpetuating stigma but it can also serve as an agent of change, a key player in efforts to eradicate stigma.*

28.    *Research suggests that anti-stigma campaigns should incorporate two types of messages to combat stigma effectively: "see the person" messages that highlight the full humanity of individuals living with mental illness rather than focusing on labels; and recovery-oriented messages that refute gloomy, and*

potentially self-fulfilling, prognoses.  But experts caution against a "one size fits all" approach, stressing that particular combinations of messages, targeted toward particular audiences, are likely to be most effective.  The Commission strongly supports research that will identify the most effective measures to reduce stigma, as well as implementation of those measures.

29.    Many of the Commission's recommendations regarding models of care and the organization and funding of systems of care, while not addressed directly toward stigma reduction, may have the effect of decreasing stigma.  For example, school-based behavioral health services have the potential to enable children and families to address mental health challenges in an environment relatively free from the stigma that attaches to the mental health system.  Even more significantly, they could over time diminish the stigma associated with mental illness by integrating mental health care with other forms of health screening and care available to children through schools.

30.    The Commission recommends the expansion of programs that engage people across the community in issues relevant to mental health. Programs such as CIT (Crisis Intervention Training) and CIT-Y (training directed toward youth issues) for the law enforcement community, as well as Mental Health First Aid for teachers, counselors, parents, neighbors, coaches, youth group leaders, police officers and others, increase mental health awareness among members of the community who can then offer support to children and adults facing mental health challenges and help them access the resources they need.

31.    For adolescents and adults facing mental health diagnoses, effective psychoeducation of both individuals and families can promote acceptance and decrease stigma.  Psychoeducation involves structured programs in which individuals and families are educated about mental illness and its treatment, and strategies are given for handling typical challenges that might arise in association with a particular condition.   The goal of such programs is to recognize that someone whom they might consider "different" or "odd" may in

151

*fact need help.  Participants learn ways to connect with an individual in need and to empower that person to seek help.  Above all, such programs need to incorporate a model of wellness rather than focus primarily on illness.  People with lived experience serve as role models and can provide examples of a path to a successful recovery.*

## V.      PRIVACY, CONFIDENTIALITY AND COMMUNITY SAFETY

### A.      Analysis: Privacy In The Service Of Mental Health

Privacy and confidentiality form integral aspects of an effective and humane mental health system.  Federal and state privacy laws shield information regarding medical treatment generally, and behavioral health treatment specifically, from unauthorized disclosure.  Obligations of confidentiality on the part of medical providers, however, begin with the Hippocratic Oath and find expression in codes of medical ethics.  Additional laws, policies and professional ethics protect the confidentiality of communications between mental health consumers and their treatment providers.  Writing that "[t]he mental health of our citizenry, no less than its physical health, is a public good of transcendent importance," the United States Supreme Court recognized a federal psychotherapist-patient privilege in a 1996 case, *Jaffee v. Redmond*, 518 U.S. 1, 11 (1996).  Such privileges, which exist in every state, safeguard confidential communications between individuals and their psychotherapists against compelled disclosure in court.  They are predicated on the recognition that successful mental health treatment requires honesty and trust.  Very few of us would be willing to share our most intimate thoughts and feelings with a provider without assurance that these would not be revealed publicly, much less used against us in a legal proceeding.

152

The right to privacy more broadly garners protection under federal and state constitutions.  But guarantees of privacy are not absolute, even in the context of mental health care.  Instead, they entail a balancing of rights and responsibilities in the interests of individual well-being and community safety.  Questions of privacy and confidentiality implicate a complex tangle of federal laws, including the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, the Family Educational Rights and Privacy Act (FERPA), and statutes directed toward the confidentiality of substance abuse treatment.  In addition to these federal provisions, states have their own laws and policies prohibiting, limiting or – in some cases – mandating the disclosure of mental health information.

In the wake of recent high-profile events in which individuals with psychiatric histories committed acts of mass violence, including the shootings at Virginia Tech University and at an Aurora, CO movie theater, some commentators have called for changes to existing laws in order to permit more ready disclosure of protected health and educational information in the name of public safety.  A closer examination of existing laws, along with the sort of guidance recently provided by the U.S. Department of Health and Human Services, illuminates provisions that permit appropriate disclosure of private information when a clear and imminent and serious threat to public safety exists.  Additional clarification is particularly important in light of the fact that, as the panel appointed to study the Virginia Tech shootings observed, fear of violating applicable laws sometimes leads to

> "The widespread perception is that information privacy laws make it difficult to respond effectively to troubled students.  This perception is only partly correct.  Privacy laws can block some attempts to share information, but even more often may cause holders of such information to default to the nondisclosure options – even when laws permit the option to disclose. […] Much of the frustration about privacy laws stems from lack of understanding.  When seen clearly, the privacy laws contain many provisions that allow for information sharing where necessary."
>
> *Mass Shootings at Virginia Tech, Report of the Review Panel* (August 2007), p. 63.

153

excessive caution in cases where disclosure is warranted.  The Commission is divided on whether revisions to existing laws are warranted to permit mental health professionals in some cases to share relevant information about a patient's treatment with family members over the patient's objections.

1.    The HIPAA Privacy Rule

The federal HIPAA Privacy Rule, which took effect in 2003, protects the privacy of patients' health information while permitting appropriate uses and disclosures of the information when necessary for a patient's treatment, for public health purposes, or for other critical needs such as a serious threat to the health or safety of the patient or third parties.  It applies to "covered entities," which include all health care providers, including mental health care providers, and health plans that transmit health information in electronic form. The information protected, though, encompasses individually identifiable health information transmitted in any format.  Providers must observe the minimum requirements of the Privacy Rule regardless of the state in which they practice, although if a state's laws provide greater protections to patients then providers must adhere to the more stringent laws.  HIPAA distinguishes between situations that permit disclosure of a patient's health information with that patient's express or implied consent and those that require further authorization, typically in the form of a detailed release.

At the same time that it expands patients' rights to control the disclosure of protected health information ("PHI") and communications about their care, the Privacy Rule permits disclosure of such information in a variety of circumstances.   For instance, HIPAA allows a health care provider to communicate in the patient's presence with a patient's family, friends or other persons who are involved in the patient's care or payment for care, as long as the patient does not object.  Ideally, family and friends play a supportive and integral role in a patient's health care.  When a patient has capacity to make health care decisions and expressly consents to disclosure, HIPAA clearly permits a provider to share relevant information with family members or

154

others.   In circumstances where, using professional judgment, the provider may infer consent from a patient's conduct – for example, when a family member or friend is invited into the treatment room – that provider may also discuss such information with third parties.   A more complicated situation arises where a patient is not capable of objecting or granting consent, because the patient is either incapacitated or not present.   In such situations, providers may still disclose information to family members or friends as long as the provider determines, based on professional judgment, that disclosure is in the patient's best interests.   Where the third party is neither a family member nor a friend, the provider "must be reasonably sure that the patient asked the person to be involved in his or her care or payment for care."   U.S. Department of Health and Human Services (HHS). (2014). *Guidance Document: HIPAA Privacy Rule and Sharing Information Related to Mental Health.* http://www.hhs.gov/ocr/privacy/hipaa/understanding/special/mhguidance.html.   In all cases, however, disclosures must be limited to protected health information directly relevant to the person's involvement in the patient's care or payment for care.

The Privacy Rule enumerates other circumstances in which covered entities may use and disclose PHI, including as part of their own "treatment, payment and health care operations."   In other words, they may reveal a patient's health information to further the patient's health care services, to obtain payment or reimbursement for care provided, or to advance their own internal operations.   Providers may not release protected health information to employers, schools, or others for purposes other than treatment, payment or health care operations without a very specific written authorization.

Several external conditions permit providers to disclose portions of a patient's health information.   If a statute or court order requires a provider to disclose individually identifiable health information, then the provider may do so.   In limited circumstances, the Rule permits disclosure for certain public health purposes as well as for the protection of individuals from abuse, neglect

155

or domestic violence.   The Rule also allows disclosure for certain law enforcement purposes. In cases where a serious and imminent physical threat to the safety of an individual or the public exists providers may disclose to someone they believe may be able to prevent or lessen that threat.   Again, in all cases disclosure should be limited to the minimum amount of information needed to accomplish its intended purpose.

Like the *Jaffee* case, HIPAA identifies a particularly pressing need for confidentiality in psychotherapeutic relationships.   While the Privacy Rule covers all health information, additional privacy protections apply to notes from psychotherapy sessions.   According to the Privacy Rule, psychotherapy notes are "notes recorded by a health care provider who is a mental health professional documenting or analyzing the contents of a conversation during a private counseling session or a group, joint, or family counseling session and that are separate from the rest of the patient's medical record." (HHS Guidance, p.3.)   These are to be distinguished from information about medication, the modalities and frequency of treatments, results of clinical tests, diagnoses, progress reports, or the like.   They do not include any information contained in a patient's medical record.   Disclosure of psychotherapy notes requires *written authorization* from the patient.

An exception to this extra solicitude granted psychotherapy notes arises if disclosure is mandated by other law.   Such compelled disclosure would generally arise only in situations involving mandatory reporting of abuse and mandatory "duty to warn" situations in which the patient threatens serious and imminent harm against reasonably identifiable victims, or those in which the patient poses a threat of imminent harm to self.   Since the California Supreme Court decided the landmark case of *Tarasoff v. Regents of the University of California* in 1976, almost all states have recognized an exception to therapist-patient confidentiality where a therapist determines that a patient poses a serious threat of harm to others.   In some states, such knowledge triggers a duty to warn or to take other measures to protect potential victims,

156

while in others, such as Connecticut, it gives providers permission to breach confidentiality without fear of legal reprisal.  Connecticut law currently defines this exception differently depending on the professional status of the therapist, with separate statutory provisions applying to psychologists, psychiatrists, social workers, marital and family therapists, and professional counselors. While the statutory "duty" in Connecticut is couched in permissive language, court cases appear to recognize a potentially mandatory duty to protect in situations where a patient poses a threat of imminent harm to a known victim or class of victims.

Under the HIPAA Privacy Rule, if a provider discerns a serious, imminent threat of harm to the patient or to others, the provider may contact a patient's family or law enforcement, consistent with applicable law and standards of ethical conduct.  Even where a threat exists, however, disclosures may not be made indiscriminately; they should be made only to people who are reasonably able to prevent the harm or lessen the threat.  These may include police officers, family members, school administrators, and campus security.

2.    <u>The health information of a minor child</u>

Children are generally not accorded the same rights to control their health information as are emancipated minors and adults.  The Privacy Rule authorizes a health care provider to share information regarding the health and treatment of a minor child with that child's personal representative.  HIPAA recognizes that parents, guardians or others acting "in loco parentis" usually have the authority to make health care decisions about their minor children and therefore serve in most cases as personal representatives who can access PHI, authorize disclosure to third parties, and exercise other privacy rights of the child.  Exceptions to this provision arise when state law permits a child to access health (including mental health) services without a parent's consent; when someone other than the parent is authorized by law to make health care decisions for the child; or when the parent or guardian assents to a particular confidentiality agreement between the provider and the child.  State laws

157

determine the specific age at which a child may make his or her own health care decisions for HIPAA purposes. Although parents serving as personal representatives generally have access to information contained in their child's medical records, including information about diagnosis, symptoms and treatment plans, they do not have the right to a copy of notes from the child's psychotherapy sessions. Moreover, if a provider suspects that permitting the parent or guardian to exercise the child's privacy rights might endanger the child or is otherwise not in the child's best interests then the provider need not do so. Similar provisions apply to a legal representative, such as the guardian, of an adult or emancipated minor patient.

3.   <u>Limits on a parent or guardian's access to health information of an adult child</u>

When a child reaches the age of majority, his or her parents or legal guardian no longer have the right to make decisions regarding the adult child's medical care. Under non-emergency circumstances, HIPAA prevents doctors, therapists and other providers from sharing protected information about an adult patient's treatment – even with family members – when the patient has objected to disclosure. Many in the behavioral health community see these HIPAA restrictions as too stringent when applied to family members, particularly in the context of treatment for mental and substance use disorders. A person suffering from the symptoms of a serious mental illness, which might include hallucinations, paranoia, suicidal feelings, and other experiences with the potential to cloud judgment and distort reality, could be poorly positioned to make such decisions. If not privy to critical information about the patient's condition and treatment, family members may remain unable to provide the support necessary for the patient's recovery and may lack the preparation to respond to a potentially volatile situation.

A hypothetical scenario may help to illustrate these dangers. An 18-year-old young man has had to take leave from his first year in college due to his third psychotic episode; he has recently received a diagnosis of

158

schizophrenia.  He lives at home with his parents and is entirely dependent on them, unable to hold employment or live independently.  He does well when he takes medication but rapidly decompensates when he becomes non-compliant.  Although his parents attempt to supervise his medication to ensure that he remains compliant, he does not always cooperate.  He has been readmitted to an inpatient unit following his latest discontinuation of medication.  On the unit, he refuses to sign a release allowing the staff to share information about him with his parents.  When he reveals to staff that he intends to stop his medications again, once discharged, the staff is unable to disclose this to his parents.  In addition, he has decided that his parents are plotting against him and that remaining in their household is dangerous for him.  He has developed a plan to go home on discharge, gather some belongings and hitch-hike to another state where he has a friend who, although they have not been in communication for several years, the patient is sure will take him in.  The staff is similarly unable to advise the parents of this plan because the patient has failed to sign a release.  HIPAA requires a finding of imminent dangerousness to share information without a patient's express or implied permission.  While his treatment providers fear that this patient is clearly on a path to chronic psychosis, homelessness and revolving door admissions, because his behavior cannot be considered imminently dangerous either to himself or others HIPAA makes it unlikely that his parents – his sole support system – will be able to intervene.  If they violate HIPAA's Privacy Rule, providers may be subject to very large fines or, under some circumstances, even graver penalties.

Others within the mental health community, however, maintain that HIPAA's existing exceptions afford sufficient opportunities to protect patients and others from danger.  They are concerned that weakening privacy protections for mental health patients may frustrate treatment by deterring some who need it from seeking or continuing care, and by discouraging truly forthcoming communications with providers in the course of treatment.  Moreover, a less robust approach to privacy might threaten the autonomy of

159

mental health consumers, at least in the short-term.  Whereas those persuaded that HIPAA protections go too far in elevating privacy rights over other concerns support efforts to amend the federal law in Congress, advocates of patient privacy oppose such efforts.  Opponents claim that in many cases providers actually hide behind HIPAA, overestimating its restrictions and their own potential liability.  At the very least, efforts must be made to clarify these issues, educate participants across the mental health system on the precise contours of the law, and encourage voluntary communication about treatment to the extent it promotes recovery.

4.   <u>Communications to health care providers from concerned friends or family members</u>

"It's not that this is a person who is only acting badly in their counseling setting and [is] fine everywhere else.  If we're starting to see real behavioral concerns, we're seeing it in the different areas of their life: in the classroom, in the home, on the playing field, in the workplace if we're dealing with an adult case, for example, and not just in a counseling setting.  So trying to get access to that protected information often doesn't get us more than what we're able to find out through publicly available information or just talking with teachers, for example, or colleagues.  But with mental health professionals involved, one thing that's very important is that we can always provide information to a counselor, to a therapist.  So while psychologists, psychiatrists, social workers can't give us information from a patient, there is nothing that prevents them from receiving information. "

Marisa Randazzo, Ph.D., SIGMA Threat Management Associates, testimony before Sandy Hook Advisory Commission, March 22, 2013.

Although HIPAA and state laws place significant constraints on the disclosure of individually identifiable health information absent a patient's consent or authorization, HIPAA does not prevent concerned family members and others from communicating their own worries about a person's health or safety to a provider.  In the context of mental health treatment, HIPAA permits a health care provider to take information in from family members or friends who are concerned about someone receiving mental health treatment, even if that provider cannot reveal information to those parties.  For instance, in her testimony to the Commission, Marisa

160

Randazzo, Ph.D., a national expert on threat assessment and violence prevention, suggested that privacy laws such as HIPAA do not pose a major obstacle to the work of teams focused on identifying students or workers who may pose a threat of harm to themselves or others. According to Dr. Randazzo, while privacy laws may prevent teams conducting threat assessments from accessing protected health information absent emergency services, teams often have access to equally relevant information through other channels such as teachers, friends and family members that may suffice to inform the team as to a person's particular risk factors. Moreover, since HIPAA permits communications *to* providers, knowledge that family members, friends and even threat assessment teams have of a particular patient's behavior may actually contribute to the patient's treatment.   HHS recently clarified that HIPAA "in no way prevents health care providers from listening to family members or other caregivers who may have concerns about the health and well-being of the patient, so the health care provider can factor that information into the patient's care." (HHS Guidance, 2014, p. 8.)  Any such information transmitted to a provider by someone close to the patient, if given under a promise of confidentiality, may be withheld from the patient "if the disclosure would be reasonably likely to reveal the source of information." (HHS Guidance, 2014, p. 8); 45 C.F.R. § 164.524(a)(2)(v).  The regulations implementing HIPAA carve out this exception to a patient's right of access to protected health information so that family members may communicate relevant safety information without worrying that the patient will feel betrayed upon learning of this communication.

> 5.   <u>FERPA</u>

The HIPAA Privacy Rule specifically excludes from its reach records that are protected under The Family Educational Rights and Privacy Act, or FERPA. FERPA guards the privacy of students' education and treatment records.  It applies to all educational agencies and institutions that receive funds under any program administered by the U.S. Department of Education, and therefore

reaches virtually all public schools and school districts, as well as most private and all public colleges and university, including medical, law and other professional schools.   Since it does not apply to schools that do not receive funding from the U.S. Department of Education, private and parochial elementary and secondary schools are generally exempt from FERPA's requirements. The law requires the written consent of a parent or eligible student before an educational agency or institution may disclose education records or personally identifiable information from education records.   At the elementary or secondary school level, "education records" not only encompass a student's academic records but also a student's health records such as immunization records and those residing with a school nurse that are maintained by an educational agency or institution.   They also include a student's records on special education services provided under the Individuals With Disabilities Education Act (IDEA).   FERPA gives students and their parents the right to inspect all education records.

At postsecondary institutions, a student's medical and psychological treatment records relating to student health or psychological services are generally excluded from the definition of "education records" under FERPA so long as they are created, maintained and used only in connection with that student's treatment.   This means that treatment records are available only to professionals providing medical or mental health care to the student, or to other appropriate professionals of the student's choice.   A student does not have an automatic right to inspect such records if they are not considered "education records."   Such records may be disclosed for other purposes with the written consent of the student or, if a relevant exception applies, without the student's consent.   For example, disclosure may be made in connection with a health or safety emergency.   Once the records are disclosed for any purposes other than treatment, however, including to the student himself or herself, they become "education records" subject to all other FERPA requirements.   If the student is receiving treatment at a university hospital that

162

provides such services without regard to a person's status as a student and not on behalf of the university, then records related to the treatment are subject to the HIPAA Privacy Rule rather than FERPA.

As with HIPAA, FERPA's provisions include exceptions that apply when a student's or third party's health or safety is at stake.  Both education and treatment records may be disclosed to appropriate parties without consent in connection with an emergency if necessary to protect the health or safety of the student or others.

6.   Gray areas between FERPA and HIPAA

Because both laws protect the privacy of records that may pertain to a person's health history or treatment, some confusion exists around areas of potential intersection between FERPA and HIPAA.   One area of potential confusion involves the records of health care provided to students in an educational setting.   A public elementary or secondary school that provides health care to students through school-based health clinics, nurses, social workers or other professionals is generally not considered a "covered entity" subject to HIPAA.  The actual records relating to student health are generally considered "education records," and for all schools receiving funding from the Department of Education these records are therefore subject to FERPA rather than the HIPAA Privacy Rule.  In other words, the HIPAA Privacy Rule usually does not apply to schools or those acting on behalf of schools to provide health services to students.  But where an outside provider or entity provides services directly to students without acting on behalf of the school, even if it does so on school grounds, then its records are not subject to FERPA.  Those records may be subject to the HIPAA Privacy Rule if that provider is a "covered entity."  For schools that are not covered by FERPA, such as private schools that do not receive funding from the U.S. Department of Education, the HIPAA Privacy

Rule may apply to all individually identifiable health information of students as long as the schools qualify as "covered entities."[25]

### 7.   Concluding thoughts: Balancing privacy and safety under both HIPAA and FERPA

With their extensive limitations on disclosure of private information and their recognition of individual privacy rights, both HIPAA and FERPA codify the deep respect for personal privacy that our society has embraced for more than a century. Yet both statutes shield private health and educational information from unauthorized disclosure while maintaining exceptions that serve equally significant interests in community safety. When a person's behavioral health challenges are contributing to a serious and imminent safety threat, then provisions within existing laws permit the sharing of relevant information that would otherwise be shielded from disclosure to the extent that this information is likely to lessen or avert this threat. Recent guidance from the U.S. Department of Health and Human Services helps to clarify when and how such information may be communicated. This sort of clarification needs to be combined with outreach to and education of behavioral health care providers. It remains the case, however, that the language of these laws is exceedingly complex. The guidance documents issued by HHS are themselves densely written and fail to adequately elucidate all relevant issues. Additional efforts at both the state and federal levels to facilitate appropriate interpretation and application of these laws are therefore warranted. As recommended by the Task Force to Study the Provision of Behavioral Health Services for Young Adults, Connecticut should "[c]larify, and educate all health care providers regarding, the current HIPAA and FERPA laws that address communications between clinical providers and college, school and university settings where adolescents and young adults study in order to allow enhanced and timely communication when safety due to a mental illness (threat to self or others) is an issue." (Task Force Report, 2014, p. 62)

---

[25] See http://www2.ed.gov/policy/gen/guid/fpco/doc/ferpa-hipaa-guidance.pdf.

Some members of the Commission remain concerned that existing laws such as HIPAA that restrict disclosure of treatment information even to parents or other family members over a patient's objection erect an additional barrier to effective care.  Others support communication about treatment consistent with an adult patient's choice as long as no emergency or threat to safety exists. Since threats to safety occur on a continuum from minimal to extreme, there will always be gray zones in which the assessment of the degree of threat and the interpretation of privacy laws create a conundrum for clinicians considering disclosure of patient information.  Although the Commission was unable to arrive at a recommendation concerning these issues, its members agree that privacy laws must be interpreted and applied in ways that facilitate care coordination and the provision of integrated care to the maximum extent possible.  It is particularly critical that information-sharing take place to the full extent permitted under law so that children's needs can be adequately recognized and addressed across schools, health care settings, child guidance clinics, and other institutions critical to their healthy development.

## B. <u>Recommendations</u>

*32.   The Commission cautions against measures that would curtail the privacy rights of people living with mental illness in the absence of a clear understanding of what current laws and policies do and do not allow.  Although recent guidance issuing from federal agencies attempts to clear up widespread confusion about how far existing laws go in limiting the sorts of disclosures that might arise in the context of concerns about safety, ambiguities and potential misunderstandings persist.   Additional efforts to clarify and educate providers and the public on these issues are sorely needed.*

*33.   Existing laws permit appropriate disclosure of otherwise private mental health information in situations where a threat to someone's safety appears imminent.  Privacy laws still, however, restrict most communications about a person's mental health treatment absent that person's consent, even where barriers to disclosure frustrate effective care or subject the patient and*

165

others to less obvious dangers.    The Commission supports efforts to facilitate communication in the service of effective care while respecting individuals' rights to privacy and autonomy.

34.    With respect to children's behavioral health, it is essential that information-sharing take place to the full extent permitted by law so that children's needs can be adequately recognized and addressed across schools, health care settings, guidance clinics, and other institutions critical to their healthy development.  Educational privacy laws should be implemented in such a way that they do not compromise essential communication for children struggling with serious emotional, behavioral and developmental challenges. With parent permission, schools and treatment providers should in general be allowed to share important information that will facilitate the care and education of children.

## VI.    THE ROLE OF MENTAL ILLNESS IN VIOLENT EVENTS

### A.    Analysis: Mental Illness And Violence, Misconceptions And Realities

What role did mental illness play in A.L.'s decision to take the lives of twenty-six children and adults at Sandy Hook Elementary School, as well as that of his own mother and himself?    As noted in the Child Advocate's exhaustive report on his developmental and educational history, we do not have a definitive answer to that question and may never discover one.  Simply posing the question here, in the context of the Commission's report, may lend credence to popular misconceptions surrounding the extent to which mental illness contributes to violence in America.  As we shift focus from the gun safety implications of the Sandy Hook shootings to the implications for mental health treatment, the Commission remains concerned that a report dwelling on questions of mental illness or mental health risks may cement associations between mental illness and violence for the public.  Indeed, many of the experts who testified before the Commission expressed their hope that discussions of mental health in the aftermath of mass shootings avoid reinforcing the

166

perceived link between mental illness and violence.  Nearly half of Americans believe that persons with serious mental illness are "more dangerous than the general population," according to a 2013 public opinion survey whose results appeared online in the *New England Journal of Medicine*.[26]  As noted earlier, such beliefs flow from the pervasive stigma attached to mental illness and contribute unmistakably to the attitudes and behaviors that comprise ongoing stigma.  Therefore, it is essential that we address these

> "The first mental hospital in the American colonies was founded by no lesser light than Benjamin Franklin, who first argued before the Pennsylvania colony that treatment should be provided to people with mental illness for humanitarian reasons because they were in pain.  He was told that the resources weren't available.  He came back in the next session and argued that people with mental illness were 'a terror to their neighbors, who are daily apprehensive of the violences they may commit.'  If you go to Philadelphia now, the treatment facility that was built at that time still stands."
>
> Dr. John Monahan, Professor at the University of Virginia School of Law, Testimony presented to the Sandy Hook Advisory Commission, April 26, 2013.

popular beliefs alongside the relevant empirical research, which largely refutes the presumed association between psychiatric illness and violence while providing a more nuanced account of the salient risk factors for violence. While the Commission's case for improvements to our behavioral health systems may find readier acceptance if accompanied by a promised reduction in societal violence, the real picture is far more complicated.

No significant correlation exists between most psychiatric illness per se and violence, including gun violence, in our culture.  This is true even for severe psychiatric disorders, such as bipolar disorder and major depression. Approximately one fifth of American adults suffer from a diagnosable mental disorder in any given year.  NIMH, *Any Mental Illness Among Adults.* Available at: http://www.nimh.nih.gov/health/statistics/prevalence/any-mental-illness-

---

[26] Barry, C.L., McGinty, E.E., Vernick, J.S., and Webster, D.W. (2013). After Newtown – Public Opinion on Gun Policy and Mental Illness. *The New England Journal of Medicine.* Available at: http://www.nejm.org/doi/full/10.1056/NEJMp1300512.

ami-among-adults.shtml.  Close to 6% of the U.S. population qualifies for a diagnosis of major psychiatric illness, generally understood to be an illness marked by psychosis, disordered thinking, delusions, hallucinations, and/or severe impairments in daily living.  According to the leading research, however, mental illness underlies somewhere between 3%-5% of violent acts committed in the United States.  Studies demonstrate repeatedly that while untreated psychiatric illness in a narrow subset of the population may increase the risk of violence  to a significant degree for that subset, a diagnosable mental illness is a very weak predictor of interpersonal violence -- particularly compared to other factors such as substance abuse, a history of violence, socio-economic disadvantage, youth, and male gender.  For gun violence in particular, mental illness contributes greatly to rates of suicide but marginally to homicide rates.  Likewise, the Commission heard testimony from experts in the field of Autism Spectrum Disorders suggesting a similarly weak link between such disorders and externally directed violence.   These developmental disorders involve challenges in social functioning, communication and adjustment to change.  Researchers to date have not found any correlation between the presence of an Autism Spectrum Disorder alone and an increased risk for criminal violence.

Yet it is impossible to avoid talking about the mental health implications of tragedies such as the Newtown shootings for a number of reasons.  Despite the widespread assumption that anyone who could commit an act like this *must* be mentally ill, reviews of mass murders committed over the past three decades suggest that many perpetrators would not qualify for a diagnosable mental illness. For example, "offender and offense characteristics of a nonrandom sample of adolescent mass murderers," in *American Academy of Child and Adolescent Psychiatry* found that out of 34 adolescent males involved in 27 school shootings between 1958 and 1999, only 23% had a documented psychiatric history and 6% demonstrated evidence of psychosis around the time of the killings.  Meloy, J.R., Hempel, A.G., Mohandie, K., Shiva, A.A., and Gray, B.T. (2001). Offender and Offense Characteristics of a Nonrandom

Sample of Adolescent Mass Murderers. *Journal of the American Academy of Child & Adolescent Psychiatry*, 40(6), 719-728.  But even if many would not qualify for a diagnosable mental illness under the current edition of the *Diagnostic and Statistical Manual of Mental Disorders* (the *DSM*), our experience tells us that there is something terribly wrong with such individuals.  We want to assign mental illness as a cause because to do so appears to provide some sort of answer to the question, "How could this happen?"  It also feels unsatisfying to assert that people who commit mass murder do not have a mental illness in the face of several recent mass killings where perpetrators clearly appeared to have psychotic illnesses, specifically the shootings at the Navy Yard, at an Aurora, CO movie theater, and in Tucson, Arizona.

While psychiatric illness is associated with real symptoms and real suffering, diagnosable mental disorder must be understood as both a scientific and a socio-cultural entity. The entire world of aberrant thoughts, feelings and behavior is not captured by any edition of the *DSM*; nevertheless, we experience some types of aberrant behavior as so deviant from the norm that we assume they must reflect illness.  This confusion is compounded by the many conditions which, while technically mental disorders appearing in the *DSM*, are not generally what we mean when we conflate mental illness and violence.

For example, mental health experts understand the personality disorders as constellations of personality characteristics that deviate from the norm, are pervasive and inflexible and lead to distress or impairment.  The behaviors and inner experiences of the personality disorders occur on a continuum with normal behavior and experiences.  They differ vastly from psychosis, the condition many in the general public assume underlies serious violence in the mentally ill.  Press accounts and the written manifesto of Elliot Rodger, who murdered six people and injured thirteen others in a shooting spree in Isla Vista, California in May 2014, suggest strongly that Rodger suffered from an extreme degree of narcissism and likely qualified for a diagnosis of narcissistic personality disorder.  It was a profound sense of entitlement, lack of empathy,

169

and rage toward others (particularly women) for rejecting him and achieving happiness that made Rodgers dangerous.  There is little, if anything, to suggest that he suffered from a psychotic disorder, and yet media accounts of his crimes reinvigorated the myth that mental illness causes mass violence.  Our frequent conflation of serious antisocial deviance and aberrant behavior – of bad behavior and mad behavior – impairs our ability to arrive at even a common definition of mental illness in relation to violent behaviors.

Across the population, mental illness accounts for approximately 4% (with estimates ranging from 3-5%) of the violent acts committed in the United States.  If we could somehow eliminate mental illness from American society, then, we would likely be left with more than 95% of the violence we currently experience.  With these figures in mind, we can say with confidence that persons who suffer from even significant psychiatric challenges should not in general be considered more prone to violence than the population at large.

Certain exceptions apply to this general observation.  These exceptions are primarily limited to two groups: individuals with psychotic/delusional disorders who are currently abusing drugs or alcohol; and young men in their first episode of untreated psychosis, particularly those with persecutory delusions and unregulated anger.  We address these issues in more detail below.

But leading studies clearly suggest that, under most circumstances, people living with mental illness are no more violent than the general public.  Such studies repeatedly find that a mental illness diagnosis is a weak predictor of violent acts, defined broadly to include hitting, throwing objects and engaging in physical fights as well as using weapons.  A diagnosis such as depression, anxiety, bipolar disorder, or schizophrenia alone tells us almost nothing about a person's likelihood of committing acts of violence toward others.  For psychiatric patients who are not currently psychotic, there is most likely no more risk of violence than for the average person.  Across the

170

population, however, certain risk factors are understood to increase the likelihood that particular individuals will engage in violent behavior.

   1. <u>Identifying risk factors</u>

   Experts have identified certain factors that heighten the risk of violence among people with and without psychiatric disorders.  As a general matter, mental illness correlates with a risk of violent acts far less than do male gender, youth, and social or economic disadvantage.  Other clear risk factors for externally directed violence include a history of serious abuse or other trauma as a child and violent victimization over the life course.  In addition, episodes of recent violence, prior arrests, certain personality disorders such as psychopathy, conduct disorders, high levels of anger, and the presence of escalating violent fantasies all increase the likelihood of violence.  According to a recent article by experts in behavioral health, public health and gun violence, "[e]vidence from studies in criminology and developmental epidemiology has shown that risk factors for crime and violence are similar in persons with mental illness and the general population, and that risk exposure often begins early in life."  Swanson, J.W., McGinty, E.E., Fazel, S., and Mays, V.M. (2014.) Mental Illness and Reduction of Gun Violence and Suicide: Bringing Epidemiologic Research to Policy. *Annals of Epidemiology.* Advance online publication. Available at: http://www.sciencedirect.com/science/journal/10472797. Although some variations emerge with a closer look at particular types of violence, these factors remain salient for violence across the board and homicide in particular.  For example, men perpetrate more than 90% of homicides in the United States.  Men also complete the act of suicide approximately four times as often as women do, many of those by firearm.  The vast majority of school shooters and perpetrators of other mass killings have been male.

We also know that substance abuse has a stronger association with acts of violence than does a psychiatric diagnosis.  Substance abuse also combines with mental illness to increase the risk of violence significantly.  In what has been called the best epidemiological study ever conducted on rates of violence among populations with and without diagnosed mental illnesses, persons who abused alcohol were more than twice as likely to commit acts of violence than those diagnosable with a major mental disorder who did not abuse alcohol, and those who abused drugs were nearly three times as likely to engage in violence.  Swanson, J.W., Holzer, C.E., Ganju, V.K., and Jono, R.T. (1990). Violence and Psychiatric Disorder in the Community: Evident from the Epidemiologic Catchment Area Surveys. *Psychiatric Services*, 41(7), 761-770. Another major study showed that where persons living with mental illness were not abusing drugs or alcohol, they had no statistically significant differences in their rates of violence compared to the general public.  Alcohol and drug abuse are highly salient risk factors for violence, and when a person with a psychiatric condition has a simultaneous substance abuse problem, the risk of violence escalates.  Steadman, H. et al. (1998). Violence by People Discharged from Acute Psychiatric Inpatient Facilities and by Others in the Same Neighborhoods. *Archives of General Psychiatry*, 55, 393-401.  (A summary of the study is available at http://www.macarthur.virginia.edu/violence.html.) Substance abuse frequently co-occurs with symptoms of mental disorder, particularly when those symptoms have not received adequate treatment. Drugs and alcohol likely account for much of the increased risk of violence among individuals with psychiatric illnesses.  Therefore, efforts to address the contribution of mental illness to violence generally must confront substance

> "What we know about violence is that it's dynamic.  So every single one of us is capable of engaging in violence under the right circumstances.  If our lives are threatened, a family member's life is threatened, we are capable of acting violently."
>
> Marissa Randazzo, Ph.D., Sigma Threat Management Associates, Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013.

172

abuse to have any measurable effect.

We also know that rates of gun violence in general, and particularly gun fatalities, correlate strongly with higher rates of gun ownership. Whereas the United States has both extremely high rates of gun ownership and high rates of firearm-related deaths, Japan and the United Kingdom have very low gun ownership rates and correspondingly low rates of gun-related deaths. In a recent study evaluating the relationship between rates of gun ownership and deaths by firearms across twenty-seven developed countries, researchers found "a significant positive correlation between guns per capita per country and the rate of firearm related deaths, with Japan being on one end of the spectrum and the US being on the other." Their statistical analysis identified a far weaker correlation between rates of mental illness – estimated by looking at major depressive disorder – and gun deaths, and no significant correlation at all between rates of mental illness and general crime. Bangalore, S. and Messerli, F.H. (2013). Gun Ownership and Firearm-related Deaths, *The American Journal of Medicine*, 126(10), 873-876.

Some countries have dramatically reduced their rates of gun violence with heightened regulation of firearms. For example, Australia implemented strict gun control legislation across its states and territories following the 1996 murder of thirty-five people at a popular tourist destination by a young man with assault weapons. Since then, Australia has seen a significant reduction in firearms-related deaths. The new law banned all automatic and semi-automatic long guns (establishing national buybacks of semi-automatic rifles, self-loading and pump-action shotguns, and handguns) and instituted a strict licensing and registration requirement for all legal firearms. There have been *no mass shootings* in Australia since 1996, and the firearms mortality rate has decreased from approximately .27 per 100,000 to .13 per 100,000 in recent years. Viewed from a different angle, death by firearm is now well over twenty times (and as much as twenty-seven times) more likely to occur in the United States than in Australia. As the Child Advocate's report observed, "[t]he

173

conclusion that access to guns drives shooting episodes far more than the presence of mental illness is inescapable" (OCA Report, 2014, p. 79).   In addition to declining rates of gun homicide and elimination of mass shootings altogether, rates of suicide by firearm also saw striking declines in Australia during this period.   Peters, R. (2013). Rational firearm regulation: evidence-based gun laws in Australia. In D. Webster & J. Vernick (Eds.), *Reducing gun violence in America: informing policy with evidence and analysis* (pp. 195-204). Baltimore: Johns Hopkins Press.  See also Alpers, P. (2013). The big melt: how one democracy changed after scrapping a third of its firearms. In D. Webster & J. Vernick (Eds.), *Reducing gun violence in America: informing policy with evidence and analysis* (pp. 205-211). Baltimore: Johns Hopkins Press.

One exception to the weak correlation between psychiatric disorder and violence involves individuals undergoing a first psychotic episode, particularly if high levels of anger accompany persecutory or paranoid delusions.   In testimony presented to the Commission, Dr. Madelon Baranoski of the Yale School of Medicine offered a useful account of why particular symptoms of psychosis may increase the risk of violence.   A person suffering from a psychotic illness often confuses internal thought processes with real events in the world.  So if that person is feeling scared, he or she may mistake *thoughts* of danger for *actual* danger.  Likewise, internal feelings of anger and unease may appear to be coming from external sources.  Persecutory delusions, such as beliefs that a person is being spied on or is the target of a conspiracy, can be extremely frightening for someone who cannot reliably distinguish his or her own thoughts from external reality.  Yet even such delusions of persecution do not generally appear to lead to violence in the absence of unregulated anger. High levels of anger increase the risk of violence across our society, whether or not psychiatric illness is present.

Some researchers have estimated that a relatively significant risk of violence – several times the risk for the general public – accompanies a first episode of untreated psychosis, especially during the period between the onset

174

of illness and the beginning of treatment known as the duration of untreated psychosis, or DUP.   A large-scale analysis of the available research on homicides committed by persons with a psychotic illness found that annual homicide rates by individuals with untreated psychosis were  approximately *fifteen times higher* than rates for individuals with treated psychotic illnesses. Nielssen, O. and Large, M. (2010). Rates of Homicide During the First Episode of Psychosis and After Treatment: A Systematic Review and Meta-analysis. *Schizophrenia Bulletin*, 36(4), 702-712.   For those who had received mental health treatment, total homicide rates were approximately 1 in 10,000 annually.   For those in a first episode of psychosis before treatment began, however, homicide rates approached 1 in 700.

A very recent study out of Sweden suggests that a diagnosis of schizophrenia or related psychotic disorder *is* associated with an increased risk for violent offenses, suicide and premature mortality.   Researchers also found, though, that specific risk factors beyond the diagnosis enhance the likelihood of these poor outcomes.   Published in *The Lancet*, this large-scale study compared records of over 24,000 Swedes diagnosed with schizophrenia to those of their siblings without such diagnoses and of the general population. It isolated three risk factors that typically increase the rates of all three adverse outcomes: drug use disorders, a history of violent criminal behavior, and self-harm.  Fazel, S., Wolf, A., Palm, C., and Lichtenstein, P. (2014.) Violent Crime, Suicide, and Premature Mortality in Patients with Schizophrenia and Related Disorders: A 38-Year Total Population Study in Sweden. *The Lancet Psychiatry*, 1(1), 44-54.   Once again, this study supports the conclusion that a specific diagnosis alone tells us very little about a person's likelihood of engaging in acts of violence.  Instead, we must attend carefully to the particular risk factors that research conducted throughout the world has linked to violence and self-harm.

175

2.    Types of violence

We have noted that approximately 3-5% of all violence committed in the United States is attributable to persons living with mental illness.  That includes aggressive acts such as pushing another person, other types of assaultive or threatening behavior, and gun violence, among other things. Researchers have identified hitting another person as the type of violence most frequently committed by discharged psychiatric patients.  In one major study, only 2%-3% of the violent acts attributable to discharged psychiatric patients involved a gun or threats of a gun.  Monahan, J. et al. (2001). *Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence*. New York: Oxford University Press.

Absolute rates of violence are low among individuals with mental illness and homicidal violence is extremely rare.  Stranger homicide in particular – the killing of a person unknown to the perpetrator – comprises a very small fraction of the larger picture of violence in our society.  A study conducted by an international team of researchers looking at data from countries across the globe confirmed that stranger homicide by persons with schizophrenia is an extraordinarily rare and unpredictable event, likely occurring at a rate of approximately 1/140,000 people with schizophrenia per year.  The same large-scale analysis found that, across the population, the risk that any person will die at the hands of a stranger with a psychotic illness in any given year amounts to one in 14 million.  Nielssen, O. et al. (2011). Homicide of Strangers by People with a Psychotic Illness. *Schizophrenia Bulletin*, 37(3), 572-579.

3.    Protective factors

When symptoms of mental illness are controlled, the rates of violence among people with psychiatric disorders appear to decrease even further.  The highly regarded MacArthur Violence Risk Assessment Study found that, among individuals with a history of psychiatric hospitalization but no active symptoms of psychiatric disorder in the past year, the rate of any violent behavior was 2% – equivalent to that of the general population.  Monahan, J. et al. (2001).

176

*Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence.* New York: Oxford University Press.  A summary of the study and references to additional analyses of the dataset are available at http://macarthur.virginia.edu/risk.html.   As noted earlier, such studies tend to define violence broadly to include acts that range from hitting someone or engaging in a physical altercation to threatening others and/or using weapons.

Where an increased risk of externally directed violence exists, the availability of community treatment appears to offer a critical protective measure.  According to the MacArthur study, while recently discharged psychiatric patients had somewhat elevated rates of violence (11.5% vs. 4.6% in the community) in the first ten weeks after discharge, within this group those who had attended outpatient treatment sessions had considerably lower rates of violence than those who hadn't.  Indeed, *discharged psychiatric patients who had received one session per week of outpatient treatment had rates of violence significantly lower than the general population.*

Early intervention programs intended to reach adolescents and young adults in the prodromal phase of schizophrenia – the period of weeks, months or years in which individuals experience behavioral and psychological abnormalities that precede the onset of fully psychotic symptoms – with supports and early treatment may help to mitigate the risk associated with early psychosis.  Connecticut pioneered two of the first such programs in the country.  STEP, the clinic for Specialized Treatment Early in Psychosis at the Connecticut Mental Health Center in New Haven, is a Yale-DMHAS partnership established in 2006 that provides extensive outpatient services and supports for young people suffering early symptoms of psychosis and their families.  The program has witnessed reductions in inpatient hospitalizations and other clear benefits associated with comprehensive early intervention in the prodromal phase of psychosis.  Srihari, V.H. et al. (2015) First-Episode Services for Psychotic Disorders in the U.S. Public Sector: A Pragmatic Randomized Controlled Trial. *Psychiatric Services.* Advance online publication. Available at:

177

http://ps.psychiatryonline.org/doi/10.1176/appi.ps.201400236.        The POTENTIAL Early Psychosis Program at Hartford Hospital's Institute of Living, first initiated on a small scale in 2004 and since expanded, has achieved similar results, with a large proportion of the young adults treated thus far successfully pursuing work and/or educational goals.   De Maio, M., Graham, P., Vaughan, D., Haber, L., and Madonick, S. (2015.) Review of International Early Psychosis Programmes and a Model to Overcome Unique Challenges to the Treatment of Early Psychosis in the United States. *Early Intervention in Psychiatry*, 9(1), 1-11.

       4.   Self-harm and victimization

It is essential to remember that those with mental health challenges are far more likely to be victims of violence than perpetrators.  This is true both at the hands of others and through self-harming behavior.   For example, women with mental illness face a five-fold greater likelihood of experiencing domestic violence than do women without a psychiatric disorder.  *Suicide, the leading type of firearm-related death, is highly correlated with mental disorder.*  Some studies estimate that up to 90-95% of completed suicides are attributable to depression and other psychiatric illnesses, often in combination with substance abuse.  Guns play a major role in suicide; over half of completed suicides involve firearms.  The use of a gun makes it far more likely that a suicide attempt will actually result in death.  Significantly more gun-related deaths in American occur by suicide than by homicide.  In 2010, suicides made up 61.2% of the 31,672 deaths by firearm in the United States, whereas homicides accounted for 35%.   Similar figures exist for 2011: 32,163 gun deaths, of which 19,392 were suicides and 11,078 homicides.  GunPolicy.org.  *United States – Gun Facts, Figures and the Law.*  Retrieved from http://www.gunpolicy.org/firearms/region/united-states.        Indeed, mass shootings frequently end with the shooter's suicide, whether directly or through the intervention of law enforcement (a phenomenon known as "suicide by cop").

These tragic events cannot be adequately understood without attention to their suicidal dimensions.

     5.   <u>Managing the risk of violence</u>

How can we know who is likely to become violent in the future, and what can we do to stop them?  Risk factors alone tell us little about any individual's future acts of violence.  Mental health professionals have developed two very different approaches to risk assessment: an actuarial approach and a clinical approach. An actuarial risk assessment engages in inductive reasoning, applying known information about others who share certain characteristics such as age, education level, etc. with a particular individual to assess that individual's risk of violence.   Clinical assessments, on the other hand, focus on the particular facts of a particular person's life experience over time.  Neither mechanism, on its own, can reliably predict future violence, although actuarial measures tend to be more accurate than clinical predictions alone.  Clinical factors may be most relevant for hospitalized psychiatric patients with acute illness.  Actuarial methods that look beyond the individual to historical factors appear to be more predictive for long-term community violence.  The most effective approach to managing the risk of future violence combines actuarial and clinical measures in a dynamic assessment that evaluates a person's likelihood of committing violent acts in ways that are sensitive to how that person responds to various interventions.

The fact that experts have identified certain risk factors that enhance the likelihood of violence, however, neither guarantees a certain outcome nor determines what interventions, if any, will effectively mitigate that risk.  Findings of "dangerousness" cannot be equated with predictions of a violent act.  In other words, mere knowledge of risk factors does not yield conclusions about what to do next.  Short of involuntary inpatient commitment, involuntary outpatient commitment in those states that have such laws, and gun seizure laws, most risk factors for violence in individuals facing mental health challenges are not susceptible to intervention without their voluntary

participation. Where clinicians do identify risk factors that are associated with bad outcomes, they should focus targeted treatment and intervention on those factors that can be changed and monitor those that can't. For high-risk patients, mental health treatment should attempt to increase risk mitigators and decrease risk aggravators.

In a variety of contexts, risk factors alone produce no certainty of outcome. For example, cell phone use while driving certainly constitutes a risk factor for accidents – and therefore a kind of dangerousness – and yet it is nearly impossible to predict which drivers will cause accidents in the future. A diagnosis of mental illness has far less predictive value for future violence than driving while talking or texting on a phone does for future car accidents. Efforts to manage risk should identify and address risky behaviors, not risky persons.

A person's prior history of violence is the best predictor of future episodes, and each additional episode enhances the predictability of the next one. Measures that ensure earlier treatment of psychosis and continued treatment in the community would likely prevent at least some violent acts. Equally important, evidence suggests that early intervention can dramatically

> "[J]ust knowing somebody has mental illness does not make them at an increased risk for violence. It isn't an associated risk factor."
>
> Dr. Madelon Baranoski, Testimony presented to the Sandy Hook Advisory Commission, April 12, 2013

alter the course of psychotic illness and prevent acute episodes from becoming chronic. Early intervention, then, not only offers a better prognosis but may further reduce the risk that a young person slipping into untreated psychosis would lash out violently toward family members or strangers.

### 6.   The limits of violence prediction

While it can feel as if our culture is saturated with violence, for predictive purposes stranger violence in general is what is known as a "low base-rate event," and acts of mass violence are considerably more rare. Attempts to predict such events face little likelihood of success. Even if we could devise an

instrument or method of predicting violence with a 95% rate of accuracy, violence is a rare enough occurrence (with rates of serious violence among even identifiably high risk populations hovering in the low single digits) that our predictions would still yield an unacceptable number of false positives.  In reality, our predictions are far less accurate than that, with actual measures generally achieving no more than a 50% accuracy rate.  Any test that purports to predict future violence will produce far more wrong answers than correct ones.  This combination of low base rate events and tests with low levels of accuracy therefore makes predictions of specific future violent acts something of a fool's errand, with overreaching a near certainty.  Mass fatality incidents such as those that have occurred over the past few years in Newtown, Aurora, Tucson, the Washington Navy Yard, Fort Hood, TX, and – most recently – Isla Vista, CA remain extremely rare, despite their prominence in the media. Although their incidence appears to have increased in the past several years, such events still account for only *one-tenth of 1%* of all firearm-related homicides in the United States.  American Psychological Association. (2013). *Gun Violence: Prediction, Prevention and Policy*, p. 4.  Retrieved from http://www.apa.org/pubs/info/reports/gun-violence-prevention.aspx.

Although A.L. evidently received no mental health treatment during the five years preceding the shootings at Sandy Hook, some other recent perpetrators of mass violence were involved with the mental health system shortly before their crimes.  The question inevitably arises as to why any mental health professionals who encountered that person failed to prevent such violence. Certain legal reforms that have arisen in the wake of these tragedies assign new reporting requirements to such professionals on the assumption that clinicians possess the expertise and prescience to predict and prevent violence.  Yet the reality is that mental health professionals are ill-equipped to make specific predictions of violence with any accuracy.  Such predictions differ from assessments of risk that equate with the general condition of "dangerousness" (being at significantly higher risk than the norm).

181

According to Dr. Michael Norko, Director of Forensic Services at Connecticut's DMHAS and Associate Professor in Yale's Department of Psychiatry, "[w]e can determine current dangerousness reasonably well, for clinical purposes, when the danger is due to psychiatric conditions." (Norko, M. (April 12, 2013). Testimony to the Sandy Hook Advisory Commission.) In other words, clinicians are skilled at identifying which patients currently pose a danger to themselves or to others and at devising ways to manage risks related to psychiatric conditions. But testimony before the Commission from forensic psychiatrists and others makes clear that no one has yet devised a reliable method for predicting *future* violence – who will and will not be violent, when violence will occur, or what the targets of that violence might be.

The field of future violence prediction, whether art or science, achieves modest accuracy at best and is therefore of little clinical utility. Predictive instruments are truly helpful only if nearly infallible. In looking to address deficiencies in the mental health system and productive points of intervention, the Commission's recommendations should not be taken as having the primary goal of violence risk-reduction. Even an improved mental health system, alone, will at best modestly reduce violence in our society. Instead, a welcome outcome of improved and more widely accessible mental health services might be *harm reduction*, including a reduction in self-harm and suffering. Reductions in harm to others may constitute a secondary benefit of a better resourced and more cohesive mental health system that can effectively promote psychological wellness and recovery.

7.    From prediction to prevention

Just as clinical risk assessment is of limited utility in efforts to prevent violence, trait-based profiling appears to represent an ineffective and even counterproductive means of identifying individuals likely to commit acts of targeted violence. The Commission heard testimony from law enforcement officials and others, including an expert school security consultant who worked for the United States Secret Service, suggesting that profiling tends to be

182

inaccurate and far more likely to create stigma than to avert harm.   An influential report compiled by the Secret Service in collaboration with the U.S. Department of Education on school shootings carried out between 1974 and 2000 specifically determined that "[t]here is no accurate or useful profile of students who engaged in targeted school violence."     U.S.   Secret   Service   and   U.S. Department of Education. (2002). *The Final Report and Findings of the Safe School Initiative: Implications for the Prevention of School Attacks in the    United    States.*    Available    at: http://www.secretservice.gov/ntac/ssi_final_report.pdf.

> "When we connect those people, students, former students or others to the right resources to help solve those problems, their thoughts and plans of violence typically go away."
>
> Marissa Randazzo, Ph.D., Testimony presented to the Sandy Hook Advisory Commission, March 22, 2013.

Instead, experts have developed a promising alternative to psychological or demographic profiling called behavioral threat assessment, which focuses on identifying   and   intervening   with   individuals   whose   behavior   and/or communications clearly indicate an intention to commit violence.  The Secret Service's behavioral threat assessment model has been adapted for use in educational institutions, workplace settings, and the U.S. military.  Dr. Marissa Randazzo, a national expert on threat assessment and targeted violence, testified at length to the Commission on the composition, workings and goals of teams called "threat assessment teams" that gather information from multiple sources in response to indications that a student, colleague or other person's behavior has raised alarms.  The threat assessment process should focus less on a person's static qualities – an approach closer to profiling – than on the person's current situation, particularly the dynamic elements of what might be changing for the better or worse.   Once a team has identified someone who appears to be on a pathway to violence, the team ideally becomes a resource connecting the troubled child, adolescent or adult to the help they need to address their underlying problems.  The Commission has recommended above

183

that all schools form such multidisciplinary teams to conduct risk assessments for students when concerns are raised.  These would not only identify students at risk for committing violence, but also serve as a resource for children and families facing multiple stressors.  Rather than stigmatize these individuals and families, risk assessment teams should become a "go to" community resource that supports and strengthens families and community connections.

Expertise in predicting any individual person's likelihood of committing violent acts need not form the core of violence-prevention efforts in any event. Instead, a public health approach to violence prevention would emphasize comprehensive, population-based strategies that implement protective mechanisms on a broad scale long before any particular person poses a specific danger.  It takes violence as a systemic problem rather than an individual failing and attempts to address the underlying root causes and risk factors. Hemenway, D. and Miller, M. (2013). Public Health Approach to the Prevention of Gun Violence. *New England Journal of Medicine*, 368, 2033-2035. See also American Psychological Association. (2013). *Gun Violence: Prediction, Prevention and Policy*. Available at: http://www.apa.org/pubs/info/reports/gun-violence-prevention.aspx.  Experts who advocate this sort of approach point to examples such as traffic fatalities and tobacco use, where effective regulation, public awareness campaigns, and other system-wide interventions have successfully enhanced public safety.  To return to the analogy of cell phone use while driving, we do not need to predict the likelihood that any particular driver will cause a traffic accident in order to address the risks such behavior may present.  Rather, we can regulate the use of hand-held devices while driving and communicate to the public about the dangers of distracted driving.

Any effort to reduce violence on a broad scale, however, must address factors known to contribute to the risk of harm, including developmental factors such as chronic childhood adversity, poor behavioral regulation, and social disconnectedness, as well as environmental factors such as poverty and unemployment.  As detailed above, both substance abuse and access to

184

firearms also clearly contribute to the risk that a person will pose a danger to self or others. Therefore, an effective violence-prevention strategy cannot ignore or discount these major risk factors. Likewise, a young man such as A.L. with severe and largely untreated social and emotional challenges, profound and worsening social isolation, a longstanding and obsessive fascination with violence and mass murder, and—perhaps most importantly—unfettered access to an arsenal of firearms would appear to present a number of risk factors for behaviors that could pose a danger to himself and/or others. According to the Child Advocate's extensive investigation of his educational, health and familial history, in A.L.'s case these risk factors were persistently neglected and underestimated.

8.   Mandatory reporting and firearm ownership

In the wake of the Sandy Hook shootings, several states rushed to implement mandatory reporting laws and to augment existing laws that make certain persons ineligible to own or purchase firearms. For example, New York enacted the SAFE Act of 2013, which compels mental health professionals to report to county authorities anyone to whom they are currently providing treatment if they believe that person "is likely to engage in conduct that would result in serious harm to self or others." Such a report sets in motion a process for including that person on a statewide database limiting their access to firearms for at least five years. Available at https://www.omh.ny.gov/omhweb/safe_act/nysafe.pdf. While removing guns from those who may legitimately be considered at risk for violence is an eminently worthy goal, the statute incorporates poorly defined criteria for making such determinations and thus threatens to compromise the provider-patient relationship toward uncertain ends. According to the *New York Times*, within the first year and a half of its existence this reporting requirement had led to approximately 34,500 individuals being identified as too mentally

unstable to possess firearms.[27]  The long term impact of New York's reporting requirement may well include increased stigma and diminished trust of the mental health system, which in turn may deter those who need it from seeking treatment.  By contrast, California recently enacted a law that seeks input on a person's potential dangerousness from a broader range of sources close to that person.  The "Gun Violence Restraining Order" bill permits family members to petition a court for a gun restraining order authorizing temporary seizure of firearms – as well as temporarily banning gun purchases – from anyone deemed potentially violent.[28]

While eschewing the broad reporting requirement that New York has assigned to mental health professionals, Connecticut's law now extends mandatory reporting of a person's history of psychiatric treatment in ways that are likely overinclusive and potentially underinclusive.  Connecticut's statute disqualifies for a gun permit or eligibility certificate anyone committed by a court to a psychiatric facility during the prior sixty months.  Conn. Gen. Stat. § 29-38c (2015).  This five-year ban on gun ownership for anyone with a court-ordered commitment represents a significant extension of the prior ineligibility period, which was limited to twelve months.

Controversially, Connecticut's statute makes anyone *voluntarily* admitted to an inpatient psychiatric facility within the past six months ineligible for gun ownership.  Since voluntary admission does not require a clinical determination of dangerousness, some of these voluntary patients may pose no particular risk of violence.  The law now requires the Department of Mental Health and Addiction Services to maintain information on voluntary admissions and to make that information available to the state Department of

---

[27] Available at http://www.nytimes.com/2014/10/19/nyregion/mental-reports-put-34500-on-new-yorks-no-guns-list.html.

[28] Available at https://leginfo.legislature.ca.gov/faces/billHistoryClient.xhtml.

Emergency Services and Public Protection so that DESPP can enforce these gun restrictions.

Laws such as these overreach by employing mental illness as a proxy for dangerousness. In most states, even involuntary inpatient commitment may occur on the basis of *either* dangerousness *or* criteria such as an inability to meet one's basic needs and refusal of treatment. The latter may bear little or no correlation to a risk of violent acts. A recent report by the Consortium for Risk-Based Firearm Policy, composed of leading experts on gun violence prevention, mental health and public health, supports state laws that temporarily prohibit individuals from purchasing or possessing firearms after short-term involuntary hospitalizations predicated on a *clinical finding of danger to self or others*. While such a finding forms the basis for most involuntary commitments, this may not be the case for voluntary hospitalizations, which do not require a finding of dangerousness. The inclusion of voluntary inpatient treatment among the criteria for mandatory reporting to DMHAS and ineligibility for gun ownership also risks discouraging people who need care from accessing it, and adds to the stigma surrounding mental health treatment.

On the other hand, the law does not address individuals who are admitted involuntarily to a psychiatric facility on an emergency basis. In Connecticut, a Physician's Emergency Certificate (PEC) attesting that the person being admitted is a danger to self or others or gravely disabled and in need of immediate care in a psychiatric hospital can result in a 15-day involuntary hospitalization, which can be challenged in court. Without a probate court order supporting or extending the involuntary hospitalization, however, such a hospitalization has no impact on a person's eligibility for gun ownership. Prohibiting gun eligibility for a voluntarily admitted patient while allowing it for a patient admitted under a PEC—and in most instances deemed by two physicians to be dangerous to self or others—reflects an incoherent approach to public safety.

187

Current categories of disqualification for firearm ownership under both state and federal law serve as a rough, and often inadequate, proxy for dangerousness.  They miss many, if not most, of the people who actually pose a danger of violence.    They may also capture people whose psychiatric admissions are predicated on designations such as "grave disability," which generally entail an inability to take care of one's basic needs and have little or no bearing on the likelihood of violence.  Hence the December 2013 report by the Consortium for Risk-Based Firearm Policy titled *Guns, Public Health, and Mental Illness: An Evidence-Based Approach for State Policy* recommends that states expand prohibitions on gun ownership using specific criteria that reflect evidence-based risk of dangerousness rather than generalizations informed by stigma.[29]  In addition to involuntarily hospitalized patients clinically identified as dangerous, the report identifies four categories of ineligibility with demonstrable relevance to a risk of future violence: (1) persons convicted of a violent misdemeanor; (2) persons subject to a temporary domestic violence restraining order; (3) persons convicted of two or more DWI or DUIs in a period of five years; and (4) persons convicted of two or more misdemeanor crimes involving a controlled substance in a period of five years.    In a companion report proposing updates to the existing mental health firearm disqualification policies under federal law, the Consortium for Risk-Based Firearm Policy again recommends expansion of existing categories to include evidence-based risk factors for violence.  Consortium for Risk-Based Firearm Policy. (2013.) *Guns, Public Health, and Mental Illness: An Evidence-Based Approach for Federal Policy*.    Available    at:    http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/GPHMI-Federal.pdf.   The Commission agrees that these criteria offer a sound basis on which to restrict access to firearms, although the fourth category may

_____

[29] Available at: http://www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/GPHMI-State.pdf

require additional thought in light of the evolving legal status of substances
such as marijuana.

The Commission also supports a reexamination of the language with
which existing laws and policies invoke mental health to disqualify individuals
from gun ownership.   At present, federal law includes a "mental health
prohibitor" barring sales of firearms to anyone "adjudicated a mental defective"
or "committed to any mental institution."  18 U.S.C. § 922(d)(4) (2012).  States
report information that might disqualify a person from possessing firearms to a
national database called the National Instant Criminal Background Check
System, or NICS.  Part of the Brady Handgun Violence Prevention Act of 1993,
NICS requires federally licensed gun dealers to perform an instant background
check on any prospective purchaser.   The system began operating in 1998
through databases managed by the FBI. A 1997 Supreme Court decision,
however, ruled under the Tenth Amendment to the United States Constitution
that participation in NICS on the part of states must be voluntary rather than
mandatory.   *Printz v. United States*, 521 U.S. 898 (1997).   Following the
shootings at Virginia Tech, Congress enacted the NICS Improvement
Amendments Act of 2007 to augment reporting requirements and increased the
number of records maintained in the NICS, but state compliance remains
inconsistent and the NICS system remains of limited effectiveness.   NICS
Improvement Amendments Act of 2007, Pub. L. No. 110-180, 121 Stat. 2559.
Within the NICS index, a disqualifying mental health history appears in "the
Mental Defective File."   Such language reflects and compounds the deep and
damaging stigma associated with psychiatric illness.

9.   <u>What interventions to take when individuals are at risk for
violence</u>

Programs such as Mental Health First Aid and CIT (Crisis Intervention
Team training) that train law enforcement and laypersons to intervene
sensitively and effectively when someone is experiencing a mental health crisis
may help to avert harmful behaviors.  In addition, Connecticut law currently

authorizes law enforcement officers, upon securing a warrant, to seize firearms from anyone who poses a risk of imminent personal injury to self or others.  A court must find that probable cause exists and that there is no reasonable alternative to prevent such imminent harm.  Rather than single out a psychiatric history as grounds for seizure, the statute includes past involuntary commitment as one among many factors that a court may consider in determining whether a person's recent threats or acts of violence toward self or others suffice to find probable cause for seizure.  Other factors include a history of force or threats of force toward others, illegal use of drugs or abuse of alcohol, and the reckless use or brandishing of a gun.  Conn. Gen. Stat. § 29-38c (2015).  This law represents a sensible approach to gun-violence prevention.

In cases where a mental health professional believes that a client actually poses a risk of imminent harm, state laws across the country permit or even mandate that those professionals take some protective measure, even if doing so breaches confidentiality.  Known as Tarasoff duties after the 1976 case by that name, such reporting requirements are spelled out in statutes, case law, or both.  While Connecticut statutes merely permit mental health professionals to take action when they believe a patient poses an imminent risk of harm to self or others, our court decisions may recognize an actual duty to protect identifiable victims.  Any additional reporting requirements for mental health professionals are likely to be counterproductive, discouraging providers from taking on potentially dangerous patients, deterring people in need from accessing help, and impairing the therapeutic alliance necessary for effective treatment.  Such requirements also contribute to the problem of stigma.

A subset of severely mentally ill individuals persistently refuse treatment. There are many reasons for such noncompliance, including unpleasant and even dangerous medication side effects and treatment programs that may be poorly tailored to an individual's needs.  For some, however, noncompliance is based on denial of illness. Agnosonosia represents a particularly severe form of

190

denial of illness in which the person cannot recognize that he or she is ill. Agnosonosia results from a deficit in brain function exactly analogous to the stroke victim's inability to recognize a paralyzed limb.  It is not uncommon in severe and persistent psychotic illness and the prognosis is always poor.  Such individuals often become "revolving door" patients, hospitalized when most ill, then discharged to the community where they soon stop taking medication again, only to deteriorate rapidly and be rehospitalized.  The course of illness is often a worsening one, leading to homelessness and incarceration.

Options for the treatment of such individuals are limited.  In Connecticut, as in most states, when a person is assessed as dangerous to self or others or gravely disabled, the person may be involuntarily committed through a number of procedures.  Once admission to an inpatient unit occurs, procedures are in place through which medication may be administered involuntarily if necessary.  But again, once discharged, the patient may discontinue medication and embark on a cycle of rehospitalization because there is currently no way to require compliance with medication as an outpatient.

In contrast, forty-four states have involuntary outpatient commitment statutes (also known as assisted outpatient treatment) that establish programs through which patients can be treated involuntarily as outpatients.  Many consider such programs controversial.  They clearly challenge the balance between the liberty interests of individuals and their need for treatment. Critics argue that the effectiveness of such programs is unproven, that they are an unjustified intrusion on autonomous decision making, and that they erode trust in caregivers.  Recent research suggests that the burden of involuntary treatment may fall disproportionately on minorities.  Although the outcome data are complex and ambiguous, they do confirm that these programs only work in conjunction with robust treatment services in the community.

Proponents, on the other hand, argue that outpatient commitment is in fact less intrusive than recurrent involuntary inpatient commitments and that

it might end the cycle of "revolving door" hospitalizations for some.   Most importantly, they contend that for a subset of the most persistently noncompliant patients, involuntary outpatient commitment may offer the only alternative to a life of chronic persistent illness, with all the dysfunction, early mortality and risk to self and others that condition so often portends.

The Commission was unable to reach agreement on a recommendation pertaining to outpatient commitment.   In a recent editorial appearing in the *Journal of the American Academy of Psychiatry and the Law*, Dr. Michael Rowe of the Department of Psychiatry at Yale Medical School cautioned that "[c]oercive treatment should be undertaken with reluctance, with protections against abuse, and only when there is clear evidence of benefit to the individual, to society, or to both."  Rowe, M. (2013). Alternatives to Outpatient Commitment. *Journal of the American Academy of Psychiatry and the Law*, 41, 332-336, 334.

10.   <u>Concluding thoughts</u>

Dr. Paul Appelbaum of Columbia University's Department of Psychiatry, past president of the American Psychiatric Association, has urged caution in endorsing proposals for increased mental health funding that are predicated on the proposition that violence is largely a problem of mental illness.  He writes that "tying the need for increased funding to public safety will lead to further demonization of people with mental disorders, as well as an inevitable backlash when it becomes clear that more mental health or inpatient beds have not had a major effect on the prevalence of violence. [...] An adequately funded mental health system should be a national priority—but for the right reasons." Appelbaum, P.S. (2013). Public Safety, Mental Disorders, and Guns. *JAMA Psychiatry*, 70, 565-566.   The Commission finds the connection between psychiatric illness and violent behavior, particularly gun violence, to be far less salient than much recent public discussion would suggest.   Mental illness accounts for no more than 3-5% of the violence our society confronts on a regular basis.  The harms traceable to mental illness are far more likely to be

self-directed than other-directed, and overall the risk of homicidal violence toward strangers by persons suffering from psychiatric illness remains extremely remote.  While a narrow subset of the many individuals wrestling with mental health challenges may be at an increased risk for violent behavior, much of this increased risk derives from additional factors such as alcohol or drug abuse, a history of violent victimization, and low socio-economic status.  If they are to be effective, any attempts to address the contribution of psychiatric illness to societal violence must take on these other factors rather than deal with mental illness in a vacuum.

In general, clinical predictions of violence have little relevance to public safety and need not form a central component of a broad harm-reduction strategy.  One group of individuals with a major psychiatric illness, specifically young men facing a first psychotic episode, may indeed have significantly increased rates of violence as compared to the general population.  Yet the evidence strongly suggests that comprehensive early intervention involving effective psycho-education, vocational support, and other elements, in addition to more traditional mental health treatment, helps adolescents and young adults in the early stages of a psychotic disorder weather the dangers of psychosis and achieve real recovery.

Although the Commission emphatically supports additional funding for mental health treatment in Connecticut and beyond, our support does not rest on the claim that better treatment will prevent future acts of mass violence, or indeed will reduce violence generally across our society to a significant degree. Widespread promotion of wellness that prioritizes psychological and emotional health may indeed diminish many of the risk factors for violence.  But such efforts must address anger, alienation, and an underdeveloped capacity for empathy – all far more predictive of serious violence than mental illness is.

### B.    Key Findings And Recommendations

*35.    The Commission has found that while untreated psychiatric illness in a narrow subset of the population does increase the risk of violence, a*

193

diagnosable mental illness alone is a very weak predictor of interpersonal violence – particularly compared to other factors such as substance abuse, a history of violence, socio-economic disadvantage, youth, and male gender. All of these factors have far stronger correlations with a risk of violence than does a psychiatric diagnosis. For gun violence in particular, mental illness contributes greatly to rates of suicide but marginally to homicide rates.

36.    Accessible community treatment programs can reduce the relatively low risk of violence among most people living with mental illness. The Commission recommends expansion and increased availability of early intervention programs for those young adults early in the course of developing and/or established mental illness to reduce the likelihood that a person facing a psychotic illness might resort to violence or self-harm. Also, this would offer the best prognosis for a less chronic course of illness, fewer emergency hospitalizations, and greater opportunities for recovery.

37.    The testimony before the Commission from forensic psychiatrists and other experts makes clear that despite the ability to identify the condition of dangerousness, no one has yet devised a reliable method for predicting future violence. Trait-based profiling appears to represent an ineffective and even counterproductive means of identifying individuals likely to commit acts of targeted violence and instead more likely creates stigma. Instead, behavioral threat assessment could be useful; it focuses on identifying and intervening with individuals whose behavior and/or communications clearly indicate an intention to commit violence. This model has been adapted for use in educational institutions, workplace settings, and the U.S. military.

38.    The Commission recommends the formation of multidisciplinary teams to conduct risk assessments in schools. Each school district in Connecticut should have policies in place that are related to threat assessment and violence management. School [district]s should form multidisciplinary teams that include an Administrator, a school Police Department Officer, and a school mental health professional (e.g., Psychiatric Social Worker, School Psychologist,

194

*Pupil Services and Attendance Counselor), as well as a community mental health provider, to assess threats made in schools. Such teams may also include representatives of faith communities and members of the youth services bureau. These teams should receive training in threat assessment that will enable them to review specific threats and help manage or support any person who issues a threat as well as warning the potential victims. They should also be available when a child or family has been identified with complex stressors that might indicate a need for additional resources to stabilize the family. In this way, risk assessment teams will become "go to" community resources that will support and strengthen families in the community.*

*39. People with mental health challenges are far more likely to be victims of violence than perpetrators. As a general matter, mass fatalities comprise less than one-tenth of 1% of gun homicides committed in the United States. Guns play a major role in suicide; over half of completed suicides involve firearms; 90-95% of completed suicides are attributable to depression, bipolar disorder, and other psychiatric illnesses, often in combination with substance abuse.*

*40. As noted in the Law Enforcement section of this report, the Commission supports adoption of the Consortium for Risk-Based Firearm Policy's December 2013 recommendations. The Consortium's recommendations take evidence-based risk categories as a basis for limiting gun eligibility. These are based principally on a history of violent behavior, a reckless use of alcohol or illegal drugs, and a clinical finding of dangerousness. Conversely, recently enacted legislation regarding gun eligibility may go too far in excluding individuals recently admitted to psychiatric institutions as voluntary inpatients, and the Commission urges reconsideration of this provision.*

*41. The Commission was unable to arrive at a recommendation concerning adopting involuntary outpatient commitment as an option short of involuntary hospitalization in Connecticut.*

195

## VII.  RESPONSE, RECOVERY AND RESILIENCE

### A.    Analysis:  Promoting  Resilience  Through  Response  And Recovery Efforts

The  Commission  has  advanced  recommendations  for  improving  our systems  of  mental  health  care  and  expanding  access  to  care.   We  have identified a vision for Connecticut's behavioral health system that embraces the total  wellness  of  children,  adults  and  families  and  fosters  empathy, connectedness  and  resilience  throughout  our  communities.   Caring,  resilient communities  are  best  positioned  to  help  members  recover  from  individual challenges as well as from disasters affecting larger groups.   Recovery should focus  on  the  centrality  of  individuals,  families  and  communities;  promote autonomous  functioning  throughout  life;  and  champion  social  connectedness and engagement for all children and adults.

The  term  "recovery"  has  various  meanings.   We  may  speak  of  "recovery" when describing a person's rehabilitation from a physical illness or injury.   We also  use  "recovery"  to  describe  the  restoration  of  lost  money  or  objects.   Both senses  of  recovery  suggest  a  return  to  a  prior  state  of  wellness  or  wholeness. But  when  we  say  someone  is  "in  recovery"  from  a  substance  use  or  mental disorder,  we  generally  mean  that  the  person  is  managing  his  or  her  symptoms in ways that permit a productive and satisfying life.   We are not necessarily suggesting that the person has achieved a cure or returned to an earlier state of  wholeness,  nor  that  the  person  has  reversed  a  loss.   The  recovery  model posits that every individual with mental health challenges, including those with serious psychiatric illnesses, can live a meaningful life, participate fully in his or her community, and strive to reach his or her full potential.   While recovery from individual mental illness is an important consideration, the Commission, given  its  charge,  has  chosen  to  focus  our  discussion  of  recovery  on considerations unique to the context of a school or community crisis event. For  recommendations  on  national  disaster  preparedness  focusing  on  mental health concerns and issues relevant to children, see National Commission on

196

Children and Disasters. *2010 Report to the President and Congress* (AHRQ Publication No. 10-M037). (http://archive.ahrq.gov/prep/nccdreport/nccdreport.pdf). See also Disaster Mental Health Subcommittee of the National Biodefense Science Board. (2008.) *Disaster Mental Health Recommendations Report.* (http://www.phe.gov/Preparedness/legal/boards/nprsb/Documents/nsbs-dmhreport-final.pdf.)

When a community experiences a horrific crisis event such as the shootings at Sandy Hook Elementary School, recovery in the sense of a cure or reversal is likely unattainable: there is no returning to the state of affairs before twenty-six of Newtown's children and educators were murdered.  The lives lost that day are irrecoverable.  The community is forever changed.  For the victims' families, as well as for those who survived the shootings, the impact is especially profound and indelible.  Testifying before the Commission, some victims' families emphasized that the although it is common to speak of a "new normal," this idea does not accord with their reality; when you have lost a young child and so many of the child's classmates, teachers and others in a school massacre, nothing feels normal again.  It makes more sense to view recovery as a process, one that will differ for every individual and family affected and will take still different paths for the schools and the community as a whole.  Nonetheless, the state can take concrete steps to facilitate this process.

In public sessions the Commission considered extensive testimony related to response and recovery that encompassed both what has been learned from prior disaster events and what has worked and not worked thus far in the aftermath of the Sandy Hook shootings.  The Commission heard from the families of victims, local and state officials involved in the recovery efforts, as well as national experts on trauma, disaster recovery and school crisis events.  Some Commission members also met in small, private sessions with teachers and parents of children who survived the shootings.  Four broad themes emerged out of these sessions: planning; training and professional

development; coordination; and involvement of victims' families.  Each of these is critical in assisting a school and broader community and its members through the recovery process.  These themes have helped to organize our recommendations.

A horrific event such as the Sandy Hook shootings is nearly unimaginable before it occurs.  With so many young children – six and seven years old – murdered at their elementary school along with the adults who cared for them, this tragedy in particular was without precedent in our nation's history.  Sadly, though, this was far from the only school shooting in recent memory, and it was one of many mass killings to take place in the past decade.  A recent FBI report confirmed that mass shootings have become far more frequent over the past several years, from an annual average of 6.4 such shootings per year between 2000 and 2006 to 16.4 per year between 2007 and 2013.[30]  Although no community wants to contemplate another such tragedy on the horizon, Connecticut and the nation must proceed in the knowledge that crisis events, whatever form they take, may befall our communities at any time.

1.    Disaster response planning

Crisis events are traumatic for everyone involved, particularly those affected directly.  Effective response to and recovery from trauma and loss are best served by advance planning and careful thought.  It is essential to have disaster response protocols in place that can quickly bring order to chaos and begin the long process of recovery.  While certain commonalities exist among different types of crisis events, whether precipitated by natural or human causes, schools have distinctive needs and resources that call for a context-specific approach.   We must consider schools' special populations, developmental and educational missions, and central roles in their communities when devising response and recovery efforts relevant to school crisis events.

---

[30] Available at http://www.nytimes.com/2014/09/25/us/25shooters.html.

Although such crisis events are rare, crisis, trauma and loss affect many individual children and families every day and negatively impact their adjustment, development, capacity to learn and function, and ability to reach their full potential.  When we better prepare to meet these needs on a daily basis in each of our schools and throughout our communities, we take a major step forward in preparing to recover from the rare, large-scale crisis events.  In turn, what we invest in preparing to recover from a major crisis will pay major dividends every day, even in communities fortunate enough to escape a major school or community crisis event.

When planning for recovery in the aftermath of a school or community crisis, we should begin from the principle that reliance on individual treatment services alone cannot adequately address the broad range of needs for supportive and therapeutic services such events engender.  A school community response is not the same as providing individual evaluation and treatment to everyone in the school community.  Other models, including psychoeducation and school-based group treatment, are important considerations in this context.  An additional principle that should guide this work is that response and recovery efforts should promote and empower the capacity of local schools and communities to facilitate their own recovery.  While short-term support by mental health professionals from outside the community may be required or helpful in the immediate aftermath of a crisis event, the goal should be to transition direct services provided during the recovery process to those who are part of the impacted community or adjoining/nearby communities.  Although ongoing consultation, support, and training may be delivered by outside consultants, these outside supports should ultimately facilitate the training and empowerment of providers within the school and community to enable the recovery to become self-sustaining to the extent possible.

Thus far, schools and school districts throughout the state have had to respond to crisis events on an ad hoc basis.  Earlier in this report we outlined

specific recommendations for coordinating the law enforcement response to disaster events.   In addition, we recommend that Connecticut develop a comprehensive statewide plan for responding to large-scale school crisis events that includes educational and behavioral health agencies. The plan should specify short- and longer-term interventions and acknowledge that responses may require the recruitment of additional behavioral health professionals outside the school district and community so that agency functions are not compromised during a sustained response.   A crisis event of significant magnitude tends to draw well-meaning volunteers who want to help in whatever ways they can.   As soon as news of the Sandy Hook shootings reached the world beyond Newtown, behavioral health professionals, clergy members and others appeared in the town offering their services.  Although the mental health and pastoral needs of the community were considerable, no process existed for screening the credentials of individuals who arrived offering professional services.   Going forward, any crisis response plan must include protocols for reviewing and approving credentialed professionals who do not belong to existing networks.

The plan should clarify a range of roles and responsibilities, including the management of the school behavioral health response, provision of security, and operation of a family assistance center and a community assistance center.   Lead agencies should be designated for each function as indicated.   Relationships with local, regional, state and national experts, agencies and organizations should be in place prior to the event to assist with potential recovery efforts.   Competition among mental health providers for access to children has been noted nationally after several high-profile crisis events and can be very disruptive to recovery efforts.   Pre-existing memorandums of understanding that anticipate and plan for surge capacity for behavioral health needs in the aftermath of a disaster, while also establishing relationships for service delivery prior to any crisis event, can facilitate more seamless, and less contentious, service delivery when ultimately needed.

The state should also provide a short-term support team to school districts overwhelmed by tragedies to assist in planning and decision-making, such as communications, provision of security, and management of the mental health response, personnel and labor issues, and donations.  After the shooting at Sandy Hook Elementary School, business groups that volunteered their support and services, such as those related to management of donated goods, were essential to the community's recovery; the Commission therefore recommends including the business community and other groups within the state in such a group.  This would be an optional service offered to schools and developed prior to an event.  Since school tragedies impact students, parents, school staff, and the larger community, the plan must identify possible interventions for each of these groups.

In addition to the state-level advance plans and protocols, schools and districts should establish standing School Crisis Intervention Teams composed of members from inside and outside of the school systems that can play a critical role in coordinating recovery efforts.  These teams should develop plans and policies that can be adapted to each situation.  Connecticut's local governance of schools makes it especially critical that a school system's response and recovery efforts are integrated with those of the town in which a crisis event takes place.

An effective recovery plan must recognize that those exposed to mass violence and loss comprise a special community with unique needs.  In the context of a school, this community includes students, teachers, families, first responders and other helping professionals such as school and community-based behavioral health and health care providers.  Children process traumatic events differently than adults do, and for young children in particular, the full effects of trauma may not emerge for years.  Dr. Marleen Wong of the USC School of Social Work, a national expert in school crisis and recovery, cautioned in her testimony to the Commission that existing knowledge about responses to trauma and processes of healing may prove insufficient to

account for the developmental trajectories of the very young children at Sandy Hook Elementary School who experienced the sudden rupture of deadly violence in their school and classrooms.  But we do know that it is essential for children's recovery to provide school-based services as well as those in the community.

Pre-existing or concurrent stressors or challenges in the lives of students and school staff may be exacerbated or become the primary focus for a child or adult in the aftermath of a school crisis, even if these stressors or challenges have no direct connection with the crisis event.  For example, a student whose parents are experiencing marital conflict or illness may become more concerned about their well-being after a school shooting and seek support for these family issues.  As a result, the needs for supportive services can be significantly underestimated if based only on an assessment of the needs of students or staff who were most directly impacted by the crisis itself; the potential impact on all students and staff within the school or school district must also be considered.  Hence it is critical to assess and address the needs of the entire school community (and broader community) and to develop a systematic response beyond screening and referral for individual treatment services.

In addition to focusing on the distinctive needs of children, we must strengthen our knowledge base about how to meet the needs of the adult personnel who are part of the crisis response in the schools and ensure that we have a plan to address those needs promptly.  Early intervention is crucial for educators as well as students.  While teachers affected by trauma or loss may want to be with their students in the immediate recovery period, as victims themselves as well as caregivers they need significant support to meet the needs of highly traumatized children.   Teachers play a critical role in reestablishing a calm, emotionally stable learning environment in which parents and children alike feel secure, but in order to accomplish this the teachers' own emotional and psychological needs must be adequately

202

addressed.  Beyond those who are directly impacted by a crisis event, including first responders, professionals who work with affected children and families, law enforcement personnel, educators and others may be vulnerable to what is known as vicarious or secondary trauma.  Researchers have determined that exposure to the profound suffering and trauma narratives of others may induce symptoms of trauma, so an effective response and recovery plan should anticipate this possibility and identify mechanisms to help prevent, identify and mitigate secondary traumatic stress.

The process of recovering from traumatic events and adjusting to the deaths of friends or family members must be measured not in weeks or even months, but in years and perhaps decades.  Therefore any recovery plan must anticipate long-term as well as short-term needs.  While funding for immediate recovery efforts must be readily available, it is equally important to harmonize funding mechanisms with the true length of time that services are required and to minimize the discontinuity of services that results from transitory funding mechanisms such as short-term grants.  The plan should also include provisions addressing bereavement and meaning-making through memorialization and commemoration activities so that communities can approach these proactively.  Without such forethought, critical decisions about elements of the recovery process are often made under great stress and less than optimal approaches taken.  A response and recovery plan addressed to large-scale crisis events must also include an articulated policy for dealing with gifts, donations and other resources that can otherwise become a source of conflict and unnecessary suffering for a traumatized and grieving community.

2.    Training and professional development.

In addition to developing written plans and protocols for dealing with major crisis events, our communities should cultivate skills and relationships that will serve their members well if a crisis event occurs.  In particular, schools can and must prepare teachers, staff and students to take care of themselves and each other in the wake of a crisis.  As discussed above in the

203

context of models of care, trauma, loss and toxic stress are common enough events in the lives of American children that schools should have ongoing mechanisms in place to recognize and assist children in managing the effects of such adversity.   We have recommended that school personnel receive behavioral health training across the board; we now urge that some of this training focus on providing teachers, administrators and other staff with tools they would need to handle crisis events and support students in the recovery process.

School staff should be prepared to be supportive of children and able to initiate a process that may lead to referral to appropriate additional services (within the school and/or within the community) for support and treatment, when indicated.   This is not the same as training school teachers and other school professionals that are not mental health providers to provide mental health treatment or therapy.   Teachers can, for example, appreciate the impact of bereavement on children's learning and development (even outside the context of a school or community crisis event), learn strategies to support learning and adjustment for grieving students within the classroom and school setting, and demonstrate empathy and support – all without being expected to provide grief counseling.   They will then be more capable of identifying children who may benefit from additional support and knowledgeable about referral sources.   The school leadership must support this role by promoting ongoing professional development in these areas and the ability to obtain consultation from those more knowledgeable in these areas when they have concerns about their students, and avenues for referral.

A 2012 survey of over 1,000 American educators, conducted by the New York Life Foundation in conjunction with the American Federation of Teachers (AFT), revealed that a majority of teachers observed declining academic performance and classroom behavior after the death of a student's parent or guardian; 92 percent of educators believe childhood grief is a serious problem that deserves more attention from schools.   Teachers reported that they wanted

to provide support and assistance to their students who are grieving, but identified insufficient training and/or professional development as the single most important barrier preventing them from providing this support.  Indeed, 93% of classroom teachers reported they had never received bereavement training and only 3% said that their school or district offers this training.  The Coalition to Support Grieving Students came together in 2013 to remedy this gap in the educational professions and to develop a set of resources broadly approved by leading professional organizations to guide educators and other school personnel in supporting and caring for their grieving students, available at no charge at www.grievingstudents.org (a site launched in January 2015).  The materials can form the foundation for more structured presentations or facilitate self-directed professional development, and were developed and endorsed by the Coalition's Founding Members: American Federation of Teachers (AFT) and National Education Association (NEA); American Federation of School Administrators (AFSA), National Association of Elementary School Principals (NAESP), National Association for Secondary School Principals (NASSP), and School Superintendents Association (AASA); the American School Counselor Association (ASCA), National Association of School Nurses (NASN), National Association of School Psychologists (NASP), and School Social Work Association of America (SSWAA); and the National Center for School Crisis and Bereavement and the New York Life Foundation.  We need similar approaches to advancing the comfort level and skills of all school professionals in other areas that relate to the behavioral needs of children and school staff in the aftermath of a crisis.

Teachers, school administrators, and other school personnel should be trained to understand the impact of trauma and loss on learning and provide basic supportive services to help students adjust to a disaster and its aftermath and promote academic achievement.  Several studies have shown that after disasters, many children experience post-traumatic stress disorder (PTSD), bereavement, and other behavioral problems, such as increased

aggression or delinquency.   Common effects of crises on students include school absenteeism; school behavior problems, such as aggressive or risk-taking behavior; academic failure; and exacerbation of pre-existing educational problems.   Without sufficient training, educators may not be aware that a student is having difficulty adjusting or coping, and as a result, the student's behaviors, learning patterns, or social interactions may be misinterpreted or mislabeled.

Connecticut should establish statewide training requirements tied to professional certification and recertification, since the most effective way to ensure that teachers and other school personnel receive the basic training necessary to teach and support children effectively in the setting of trauma or loss is to include such training at the pre-service level as a condition of certification/licensure, and at the in-service level as a condition of recertification/license renewal.  Training for teachers and school personnel on how to support children following a disaster should impart basic skills and knowledge in the following areas: the impact of trauma and bereavement on children and their learning; likely reactions; strategies for providing psychological first aid, brief supportive services, and bereavement support; and indications for referral for additional mental health services.

Advance preparation in disaster response is particularly critical in light of the fact that the immediate aftermath of a disaster frequently includes dramatic disruptions to normal routines, increased demands on adults, and other adverse conditions that limit the time and resources available to provide urgently needed training as well as the capacity of professional staff, who are often personally impacted by the crisis themselves, to effectively learn.  Just-in-time training delivered in the immediate aftermath of a crisis event, though certainly better than no training at all, is often not really "in time." Connecticut should therefore create mechanisms to implement ongoing training and professional development programs for teachers and school personnel that impart basic skills outside of crisis circumstances to enable

206

these adults to provide services to affected students and to establish statewide training requirements tied to professional certification and recertification.

In addition to school personnel, other professionals who work with children should receive basic training in disaster-related behavioral health issues, including Psychological First Aid, cognitive-behavioral interventions (for school mental health providers), social support interventions, and bereavement counseling and support.  Mental health professionals who work in schools and other child congregate care settings must also receive adequate training related to disaster mental health care for children.  Again, this training should be provided prior to an event, since supportive services should begin during the disaster or in the immediate aftermath and are needed on an ongoing basis at an individual level outside the context of a school or community crisis event.

Connecticut has already begun this process by establishing the DBHIRN network (Disaster Behavioral Health Intervention Response Team),[31] a mobile corps of public and private behavioral health professionals and clergy members who have been trained to respond to crisis events by providing psychological first aid and grief counseling to disaster victims and their families.  Members of the DBHIRN network were deployed to Newtown in the immediate aftermath of the shootings.  Although the network is envisioned as a short-term resource until additional resources can be brought in to address longer term needs, the DBHIRN clinicians formed the nucleus of a three-month mental health response in Sandy Hook.  Clinicians were assigned to each of Newtown's schools as of December 18, and they became available to support family members, students, teachers and other school personnel in the relocated Sandy Hook Elementary School as of its reopening on January 3, 2013.  While the DBHIRN network affords access to an extensive corps of disaster-qualified behavioral health professionals, its function is time-bound, especially given that it is staffed by volunteer clinicians who have pre-existing service responsibilities to other critical government or community agencies.  Therefore

---

[31] *See* http://www.ct.gov/dmhas/lib/dmhas/publications/dbhfactsheetr5.pdf.

schools and school districts should form preexisting relationships with child behavioral health providers to facilitate more seamless service delivery in the aftermath of a crisis event.

Response and recovery efforts must begin as soon as possible during a crisis event. In a school environment, priority should be placed on stabilizing the situation and establishing an environment in which students and staff feel secure.   Recovery must include restoration of the learning environment, reestablishment of emotional safety, and return to a calm routine.   Schools should be prepared to support the emotional stabilization of teachers and parents as well as students.   These efforts must adapt to an evolving situation and must afford continuing supports and services over time.   School districts should develop a monitoring process that will follow affected children throughout their school careers to protect against future vulnerability, victimization and mental health difficulties.   School can be a sanctuary, an ideal place to help children learn the skills necessary to manage stress, cope with loss and develop resilience.   Although a school crisis event temporarily disrupts this function, specific preparation in disaster recovery will help to restore it.   Schools characterized by a well-established culture of empathy, understanding, support and common purpose are particularly likely to remain places of refuge.  All schools should promote positive ways to move forward in the face of crisis or adversity.

3.   Coordination

Effective response and recovery efforts after crisis events require extensive coordination across local and state entities.  For school crisis events, Connecticut should better integrate the behavioral health and education responses by creating a mechanism that facilitates the immediate coordination of supportive services. Although there may be one lead agency overseeing the recovery efforts, the response and recovery will require integrated and complementary services from multiple state agencies and departments (including the State Department of Education (SDE), DMHAS and DCF).

Following the Sandy Hook shootings, activation of a unified command system at DMHAS called Incident Command Structure helped to facilitate coordinated decision-making.  State Commissioners intimately involved in response and recovery efforts that began hours after the shootings testified before the Commission that the events of December 14 and their aftermath revealed the deep interdependence of various agencies, state and local systems and communities that too often occupy separate silos.

An overwhelming need for behavioral health supports and services emerged in the days, weeks and months that followed the shootings.  Mental health professionals assisted with death notification, provided short-term psychological first aid and bereavement counseling, offered trauma treatment to children, school personnel, families, first responders and others, and furnished supports in classrooms and throughout Newtown schools and the relocated Sandy Hook Elementary School.  The depth and breadth of this need calls for stronger integration of schools and behavioral health agencies to facilitate the prompt and consistent provision of services for as long as the need exists.  It is also important to create linkages to community programs offering bereavement support, faith-based groups that can provide supportive services, and agencies providing victim services.  Department of Public Health Commissioner Jewel Mullen highlighted the importance of strengthening the integration of our educational and behavioral health agencies into the unified command system.

4.    Involvement of victims' families

Victims' families spoke eloquently to the Commission of their particular recovery journeys.  Despite the extensive resources state and local agencies have devoted to the response and recovery efforts, some families unfortunately have experienced confusion about where to turn for help and whether their input is valued.  Family members who testified uniformly praised the state's decision to assign state troopers to each family and indicated that the chaos, bewilderment and desperation of December 14, 2012 began to improve as soon

209

as these connections were forged, even while awareness that their children had died in the shootings began to take hold.  They commended the troopers themselves for conducting their roles with the utmost professionalism, compassion and responsiveness.

Other connections have been less successful.  It became clear through their testimony that channels of communication between the families and town government, as well as between the families, the schools and the school board, were less than ideal in the weeks and months after the shootings.  One explanation these families identified was that everyone involved in the response and recovery effort was understandably concerned about exacerbating the traumatic shock and loss these families were experiencing.  This solicitude, combined with what may have been an incomplete understanding of trauma and bereavement, appears to have led school and community officials to exclude victims' families from crucial decision-making processes and to withhold information in an effort to preserve families' privacy.  A couple of parents aptly characterized this as being "kid gloved," or treated with a degree of a caution that felt to some like avoidance.

Each of these family members acknowledged that recovery from trauma and loss involves highly individualized processes; one person may need access to information regarding commemorative activities, school yearbooks and other aspects of the recovery process, while another may need to be insulated from such reminders of their trauma and loss to the maximum extent possible.  Since one of the effects of trauma is to shatter a person's sense of control, it is essential to the recovery process that survivors begin regaining control where possible.  Hence communication and engagement with victims of crisis events should not follow a one-size-fits-all approach, but instead should be calculated to enhance each individual's capacity to control his or her own recovery process.  Clear, open channels of information and persistent efforts to make information available to victims are compatible with the individualized experience of trauma and loss to the extent that they leave it to the victims

210

themselves to decide whether and how to engage. Exclusion and avoidance, even if motivated by compassion, take this decision away from those most directly affected by the crisis event. A central clearing house for information relevant to disaster response and recovery, with clearly identified channels of access, would help to mitigate the sorts of communication barriers that can impede recovery and risk re-traumatizing vulnerable members of the community.

5. <u>Concluding thoughts.</u>

Throughout this discussion of response and recovery efforts following large-scale crisis events, we have emphasized the need for advance planning; training and professional development around issues related to trauma, loss and bereavement; broad coordination across agencies, particularly those in the fields of behavioral health and education; and involvement of victims' families in critical decisions. In addition to these specific recommendations, it is essential to remember that *resilient* individuals and communities generally fare best in the face of adversity. As a state and a nation, we must seek out and embrace measures that will foster such resilience.

All of the Commission's recommendations in this section of our report should be understood to promote a broad and holistic approach to mental health across the lifespan. Such an approach will require changes to the funding and delivery structures that provide care as outlined above, as well as multifaceted efforts to destigmatize mental health and prioritize social, emotional and psychological wellness across our culture. Ultimately, our best prospects for a healthy society, and one less likely to be ravaged by the effects of violence, lie in strong, caring communities where every child, adult and family has enough -- not merely enough to survive, but enough to flourish.

**B.    Key Findings And Recommendations**

*42.    Connecticut should develop a comprehensive statewide plan for effectively responding to large-scale school crisis events that includes educational and behavioral health agencies. The plan should specify short- and*

211

longer-term interventions for different populations, and identify funding mechanisms that will minimize discontinuity of services.  It should clarify a range of roles and responsibilities for state and local entities and designate lead agencies for key functions.

43.     Connecticut and its municipalities should incorporate an enhanced focus on the mental health implications of disasters and other crisis events into all disaster preparedness and response protocols, and implement measures to address the behavioral health needs of children as well as adults.

44.     Connecticut should better integrate behavioral health and educational responses to disaster events by thoughtfully incorporating educational and behavioral health agencies into the state's Unified Command System.

45.     Investment in preparing to recover from a major crisis will pay major dividends every day, even in communities fortunate enough to escape a major school or community crisis event.   Meeting needs daily in schools and communities will be a major step in improving everyday functioning as well as recovery from large-scale crises.

46.     While short-term support by mental health professionals from outside the community may be required or helpful in the immediate aftermath of a crisis event, the goal should be to transition direct services provided during the recovery process to those who are part of the impacted community or adjoining/nearby communities.  With some outside support, the goal should be empowering and training providers within the school and community to ensure that the recovery is self-sustaining to the extent possible.

47.     The state should also offer the option of engaging a short-term support team, developed prior to an event, to school districts overwhelmed by tragedies to assist in planning and decision-making, such as communications, management of mental health response, provision of security, managing personnel and labor issues, and donations.

212

48.    We must strengthen our knowledge base about how to meet the emotional and psychological needs of the adult personnel who are part of the crisis response in the schools and ensure that we have a plan to address those needs promptly.

49.    Any recovery plan must anticipate long-term as well as short-term needs, because the process of recovering from traumatic events may take years. While funding for immediate recovery efforts must be readily available, it is equally important to harmonize funding mechanisms with the true length of time that services are required and to minimize the discontinuity of services that results from transitory funding mechanisms such as short-term grants. The plan should also include provisions addressing bereavement and meaning-making through memorialization and commemoration activities so that communities can approach these proactively.

50.    Connecticut should create mechanisms to implement ongoing training and professional development programs outside of crisis circumstances for teachers and school personnel, and establish statewide training requirements tied to professional certification and recertification. Training for teachers and school personnel on how to support children following a disaster should impart basic skills and knowledge in the following areas: the impact of trauma and bereavement on children and their learning; likely reactions; strategies for providing psychological first aid, brief supportive services, and bereavement support; and indications for referral for additional mental health services.

51.    Connecticut should better integrate the behavioral health and education responses to school crisis events by creating a mechanism that facilitates the immediate coordination of supportive services. Although there may be one lead agency overseeing the recovery efforts, the response and recovery will require integrated and complementary services from multiple state agencies and departments (including SDE, DMHAS and DCF). It is also important to create linkages to community programs offering bereavement support, faith-

based groups that can provide supportive services, and agencies providing victim services.

52.     To help victims regain a sense of control, communication and engagement with victims of crisis events should not follow a one-size-fits-all approach but instead should be calculated to enhance each individual's capacity to control his or her own recovery process.   A central clearing house for information relevant to disaster response and recovery, with clearly identified channels of access, would help to mitigate the sorts of communication barriers that can impede recovery and risk re-traumatizing vulnerable members of the community.

214

# CLOSING QUOTE

*"In my house, we believe every day is an opportunity to allow love to win."*

–Nelba Márquez-Greene,
mother of Ana Márquez-Greene

# **APPENDIX**[*]

A.   Consolidated Recommendations of the Sandy Hook Advisory Commission

B.   List of Individuals Who Testified Before the Sandy Hook Advisory Commission

C.   Sandy Hook Advisory Commission Agendas and Meeting Minutes*

D.   Sandy Hook Advisory Commission Interim Report (dated March 18, 2013)*

E.   Sandy Hook Elementary School Floor Plan*

F.   Photographs of weapons used in Sandy Hook Elementary School shootings

G.   Legislation Passed During 2013 General Assembly Session Relating To Sandy Hook:

Public Act 13-3 ("An Act Concerning Gun Violence Prevention And Children's Safety")*

Public Act 13-220 ("An Act Concerning Revisions To The Gun Violence Prevention And Children's Safety Act")*

Public Act 13-178 ("An Act Concerning The Mental, Emotional And Behavioral Health of Youths") and Report on Implementation of PA 13-178*

Public Act 13-188 ("An Act Concerning School Safety")*

H.   Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newton, Connecticut on December 14, 2012 (dated Nov. 25, 2013), with accompaning Appendix.*

I.   Report of the Child Advocate, "Shooting at Sandy Hook Elementary School," released on November 21, 2014*

---

[*] Appendix entries denoted by an asterisk (*) are not included in the main report, but are available for download from the Internet via hyperlink.

A

J.     State Police Investigative Files re: Shootings at Sandy Hook Elementary School and 36 Yogananda Street*

K.    Report of the Safe School Infrastructure Council (revised and updated to June 27, 2014)

L.    School Security and Safety Plan Standards (v 1.0) (dated Dec. 30, 2013)*

M.   Capitol Region Chiefs of Police Association "Blue Plan" (dated April 24, 2013) (mutual aid response to incidents within Capitol Region)*

B

# APPENDIX A

## CONSOLIDATED RECOMMENDATIONS OF THE SANDY HOOK ADVISORY COMMISSION

### I.    SAFE SCHOOL DESIGN AND OPERATION RECOMMENDATIONS

1.    The Safe School Infrastructure Council Report ("SSIC Report") includes a standard requiring classroom and other safe-haven areas to have doors that can be locked from the inside.  The Commission cannot emphasize enough the importance of this recommendation.   The testimony and other evidence presented to the Commission reveals that *there has never been an event in which an active shooter breached a locked classroom door.* Accordingly, the Commission reiterates its recommendation that all classrooms in K-12 schools should be equipped with locked doors that can be locked from the inside by the classroom teacher *or substitute.*

2.    The Commission also reiterates its recommendation that all exterior doors in K-12 schools be equipped with hardware capable of implementing a full perimeter lockdown.

3.    A feasibility study should be conducted to develop additional safety standards concerning the issuance of classroom keys to substitute teachers.

4.    School custodians should be included as members of school security and safety committees.  Custodians have a wealth of knowledge and experience to share with regard to the physical school building and grounds. Accordingly, the Commission requests that the Governor submit the following recommendation for consideration by the General Assembly during the 2015 legislative session:[32]

Section 10-222m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):

---

[32] The format of the proposed legislation follows the format the General Assembly uses when proposing amendments to existing legislation.  Proposed new text is underlined and proposed deletions from existing text appear in strike-through format.

A-1

(a) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall develop and implement a school security and safety plan for each school under the jurisdiction of such board. Such plans shall be based on the school security and safety plan standards developed by the Department of Emergency Services and Public Protection, pursuant to section 86 of this act. Each local and regional board of education shall annually review and update, if necessary, such plans.

(b) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall establish a school security and safety committee at each school under the jurisdiction of such board. The school security and safety committee shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan. Such school security and safety committee shall consist of**: (1)** a local police officer**;, (2)** a local first responder**;, (3)** a teacher **employed at the school, selected with the consent and approval of other school or district employees of that classification**; and **(4)** an administrator **employed at the school, selected with the consent and approval of other school or district employees of that classification**; **(5) a custodian** employed at the school**, selected with the consent and approval of other school or district employees of that classification; (6) the school facilities managers; (7)** a mental health professional, as defined in section 10-76t of the general statutes**;, (8)** a parent or guardian of a student enrolled in the school**;** and any other person the board of education deems necessary. Any parent or guardian serving as a member of a school security and safety committee shall not have access to any information reported to such committee, pursuant to subparagraph (c) of subdivision (2) of subsection (c) of section 10-222k of the general statutes, as amended by this act.

(c) Each local and regional board of education shall annually submit the school security and safety plan for each school under the jurisdiction of such board, developed pursuant to subsection (a) of this section, to the Department of Emergency Services and Public Protection.

In furtherance of this recommendation, the Commission also recommends that the School Security and Safety Plan Standards and Template should be

changed so that school districts realize the importance of placing custodians on these vital committees.

     5.   Teachers, administrators and custodians should be appointed to school security and safety committees with the consent and approval of other employees of their same classification.  The Commission believes that committee members so appointed may be more empowered to voice their concerns.  Accordingly, the Commission recommends the following:

> Section 10-222m of the general statutes is repealed and the following is substituted in lieu thereof (*Effective from passage*):
>
> (a) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall develop and implement a school security and safety plan for each school under the jurisdiction of such board. Such plans shall be based on the school security and safety plan standards developed by the Department of Emergency Services and Public Protection, pursuant to section 86 of this act. Each local and regional board of education shall annually review and update, if necessary, such plans.
>
> (b) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall establish a school security and safety committee at each school under the jurisdiction of such board. The school security and safety committee shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan. Such school security and safety committee shall consist of**: (1)** a local police officer**;**, **(2)** a local first responder**;**, **(3)** a teacher **employed at the school, selected with the consent and approval of other school or district employees of that classification**; and **(4)** an administrator **employed at the school, selected with the consent and approval of other school or district employees of that classification**; **(5) a custodian** employed at the school**, selected with the consent and approval of other school or district employees of that classification; (6) the school facilities managers; (7)** a mental health professional, as defined in section 10-76t of the general statutes**;**, **(8)** a parent or guardian of a student enrolled in the school**;** and any other person the board of education deems necessary. Any parent or guardian serving as a member of a school security and safety committee shall not have access to any information reported to such committee, pursuant to subparagraph (c) of subdivision (2) of

A-3

subsection (c) of section 10-222k of the general statutes, as amended by this act.

(c) Each local and regional board of education shall annually submit the school security and safety plan for each school under the jurisdiction of such board, developed pursuant to subsection (a) of this section, to the Department of Emergency Services and Public Protection.

6.   The Commission recommends that the State require each school district to create a permanent committee or commission, the purpose of which shall be to ensure SSDO standards and strategies are implemented in the district.  The Commission suggests that the committee consist of the following persons: 1) one person selected by the Superintendant of Schools; 2) one person selected by the local chief of police; 3) one person selected by the local fire chief; 4) one person selected by local EMS; 5) one person selected to represent local public health and safety; and 6) one mental/behavioral health professional.

Additionally, the State should designate an individual at the state Commissioner-level, such as the Commissioner of Education or Commission of the Department of Emergency Services and Public Protection, to whom the local committee shall be required to submit a written status report on or before December 31 of each year.

7.   The State should amend section 80 (a) of P.A. 13-3 to include an architect licensed in the State of Connecticut among the members of the School Safety Infrastructure Council.  Therefore, the Commission requests that the Governor submit this recommendation for consideration by the General Assembly during the 2015 legislative session.

8.     The State should amend section 80(b) of P.A. 13-3 as follows:

The School Safety Infrastructure Council shall develop school safety infrastructure standards for school building projects under chapter 173 of the general statutes and projects receiving reimbursement as part of the school security infrastructure competitive grant program, pursuant to section 84 of this act. Such school safety infrastructure standards shall conform to Connecticut and national industry best practice standards for school building safety infrastructure and shall include, but not be

A-4

limited to, standards regarding ~~(1) entryways to school buildings and classrooms, such as, reinforcement of entryways, ballistic glass, solid core doors, double door access, computer controlled electronic locks, remote locks on all entrance and exits and buzzer systems~~ (1) entryways to school buildings, classrooms and other space that can become areas of safe haven, such as, reinforcement of entryways, forced entry and/or ballistic rated glazing, solid core (FE and/or BR) doors, double door access, computer-controlled electronic locks, remotely controlled locks on all entrance and exits and buzzer systems, (2) the use of cameras throughout the school building and at all entrances and exits, including the use of closed-circuit television monitoring, (3) penetration resistant vestibules, and (4) other security infrastructure improvements and devices as they become industry standards. The council shall meet at least annually to review and update, if necessary, the school safety infrastructure standards and make such standards available to local and regional boards of education.

Therefore, the Commission requests that the Governor submit this recommendation for consideration by the General Assembly during the 2015 legislative session.

9.   Each school shall maintain an accurate list of faculty, staff and students, complete with emergency contact information, which shall include, but not be limited to, parents and guardians of students.  This information shall be kept at two locations within each school known by appropriate school staff and the emergency response teams for that school.

10.   Each school shall provide safety and security training for faculty, staff and students on how to respond to hazards and or events in order to provide competent compliance with the All Hazards School Security and Safety Plan Standards.  This training shall include live exercises to test the efficacy of the training program and to provide a means to develop that program as informed by these exercises.  These training programs and exercises shall also include the identification and use of rendezvous points, escape routes, location of safe havens, the means of emergency communication and the role of faculty, staff, emergency responders, etc.  These training and exercise programs may benefit from the participation of parents as part of post-event response and recovery operations as determined by each school and school district in accordance with their incident response plans.

11.   The Commission recommends that each school identify specific individuals to serve as safety and security wardens, who shall be responsible for executing and managing the safety and security strategies set forth in Recommendation No. 10.

12.   In the design of schools, the Commission recommends that classrooms and other spaces of denser population occupancy be located away from the points of building entry and that spaces of lesser occupancy be adjacent to school entry points, without giving up human visual surveillance and situational awareness of the entry points.

## II.   LAW ENFORCEMENT RECOMMENDATIONS

### A.   Interim Report Recommendations And Status

1.  Mandatory background checks on the sale or transfer of any firearm, including long guns, at private and gun show sales.

**Status:**  Recommendation accepted and adopted by P.A. 13-3, § 1.

2.  Require registration, including a certificate of registration, for every firearm.  This certificate of registration should be issued subsequent to the completion of a background check and is separate and distinct from a permit to carry.

**Status:** Not adopted.  The Commission reaffirms its recommendation requiring the registration of all firearms and requests that the Governor resubmit this recommendation for reconsideration by the General Assembly during the 2015 legislative session.

3.  Require firearms permits to be renewed on a regular basis.  This renewal process should include a test of firearms handling capacity as well as an understanding of applicable laws and regulations.

**Status:** Not adopted.  (Note: Under existing law, a firearm permit is good for five years and may be renewed without the recommended process.  *See* Conn. Gen. Stat. § 29-36h.)  The Commission requests that the Governor resubmit this recommendation for legislative action.

4.  Institute a ban on the sale, possession, or use of any magazine or ammunition feeding device in excess of 10 rounds except for military and police

use. In proposing this recommendation, the Commission recognized that certain sporting events at times involve the use of higher capacity magazines. However, the consensus of the Commission was that the spirit of sportsmanship can be maintained with lower capacity magazines.

**Status:**     Accepted and adopted by P.A. 13-3, §§ 23-24.

5.   Institute a ban on the possession or sale of all armor-piercing and incendiary bullets, regardless of caliber.   First-time offenses should be classified as a Class D Felony.

**Status:** Accepted and adopted *in part* by P.A. 13-3, § 32 (banning armor-piercing bullets).   The Commission reaffirms its position that the ban should also apply to incendiary bullets and urges the Governor to submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

6.     Allow ammunition purchases only for registered firearms.

**Status:** Not adopted in absence of firearm registration requirement.   The Commission reaffirms its position that the law should only permit individuals to purchase ammunition for registered firearms and requests that the Governor submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

7.     Evaluate best practices for determining the regulation or prohibition of the sale and purchase of ammunition via the Internet.

**Status:** Not adopted. The Commission reaffirms its position that the state should study and evaluate best practices for determining the regulation or prohibition of the sale and purchase of ammunition via the Internet and requests that the Governor submit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

8.     Evaluate the effectiveness of federal law in limiting the purchase of firearms via the Internet to only those individuals who have passed the appropriate background screening.

**Status:**   Not adopted.   The Commission reaffirms its position that the state should study and evaluate the effectiveness of federal law in limiting the

purchase of firearms via the Internet to only those individuals who have passed the appropriate background screening and urges the General Assembly to reconsider this recommendation during the 2015 legislative session.

9.  Limit the amount of ammunition that can be purchased at any given time.

**Status:**  Not adopted. The Commission reaffirms its position that the law should only permit individuals to purchase ammunition for registered firearms and requests that the Governor submit this request to the General Assembly for reconsideration during the 2015 legislative session.

10.   Prohibit the possession, sale or transfer of *any* firearm capable of firing more than 10 rounds without reloading. This prohibition would extend to military-style firearms as well as handguns.  Law enforcement and military would be exempt from this ban.

**Status:** Not adopted.  Instead, the General Assembly created of a list of specific semiautomatic rifles, pistols and shotguns that are banned.  *See* P.A. 13-3, §§ 25-31.  The Commission requests the Governor to submit this request to the General Assembly for reconsideration during the 2015 legislative session.

11.  Require that trigger locks must be provided at the time of sale or transfer of any firearm.

**Status:** Not adopted.  The Commission reaffirms its position that the law should require trigger locks to be provided at the time of sale or transfer of any firearm, and requests that the Governor resubmit this recommendation to the General Assembly for reconsideration during the 2015 legislative session.

12.   Require that the state develop and update a "best practices" manual and require that all firearms in a home be stored in a locked container and adhere to these best practices; with current minimum standards featuring a tamper-resistant mechanical lock or other safety (including biometric) device when they are not under the owner's direct control or supervision.  The owner should also be directly responsible for securing any key used to gain access to the locked container.

A-8

13. Require non-residents seeking to purchase a firearm or ammunition in the State of Connecticut to obtain a Certificate of Eligibility and conform to all other regulations applicable to Connecticut residents.

**Status:** P.A. 13-3 requires that anyone who purchases ammunition in CT must have Connecticut state credentials. See P.A. 13-3, § 14(c).

14. Require gun clubs to report any negligent or reckless behavior with a firearm, or illegal possession of any firearm or magazine, to the Connecticut Department of Emergency Services and Public Protection, Commissioner of Public Safety, and local law enforcement.

**Status:** Not adopted. The Commission reaffirms this recommendation and requests that the Governor resubmit it to the General Assembly for reconsideration during the 2015 legislative session.

15. Requiring promoters of gun shows to receive a permit from the Chief of Police or Chief Elected Official as well as provide notice to the Commissioner of the Connecticut Department of Emergency Services and Public Protection.

**Status:** Not adopted. The Commission reaffirms this recommendation and requests that the Governor resubmit it to the General Assembly for reconsideration during the 2015 legislative session.

**B.    Final Report Additional Recommendations**

16. Require that any shell casing for ammunition sold or possessed in Connecticut have a serial number laser etched on it for tracing purposes.

17. Any person seeking a license to sell, purchase or carry any type of firearm in the state should be required to pass a suitability screening process.

18. To allow, at a judge's discretion, the opportunity to temporarily remove any firearms, ammunition, and carry permits from a person who is the subject of an *ex parte* restraining order, civil protection order or family violence protective order, at the time of the issuance of that order. The Commission believes that the time period between the *ex parte* request and the issuance of a full restraining order, civil protection order or family violence protective order, constitutes a period of critical danger, one that must be

A-9

19.    Grant state-wide peace officer status to all sworn law enforcement officers in Connecticut to assure their ability to respond to any other jurisdiction within the state in the event of a major police emergency, but only at the express invitation of the requesting jurisdiction.  Self-dispatch by public safety or EMS resources should be prohibited to prevent over-response.

20.    Provide funding for the Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security, to establish positions for regional School Safety Planners charged with assisting districts in the planning for all hazards emergencies and the effective exercising of those plans.

21.    Develop regional multi-jurisdictional, multi-discipline, Unified Command concept of operations, integrating local and state police, for major events of great consequence. These plans should include administrative staff of local schools or other entities to assure best information is available.

22.    Establish statewide and/or regional Incident Management Teams for public safety personnel.

23.    Integrate Public Safety Dispatch centers, with minimum staffing levels, into all major event response plans.

24.    Require that lead agencies that respond to major events conduct a review and provide formal after-action reports, which should be maintained on file with the appropriate public agencies.  (In Connecticut, the Commission recommends that a copy of each after-action report should be provided to, and maintained on file by the Department of Emergency Services and Public Protection and the Connecticut Police Chiefs Association.)

25.    Require the Department of Emergency Services and Public Protection, Division of State Police, in conjunction with the Connecticut Police Chiefs Association, to develop and conduct joint regional exercises of planned responses to major events. Those agencies should also review all existing policies concerning planned responses to active shooters.  The review should focus on the best practices for disrupting active shooters as rapidly as possible.

A-10

26.     Expand incident training at Police and Fire Academies in Connecticut.

27.     Create a statewide working group to address first responder mental health issues.

28.     Create and publish a Statewide Donations Management Plan for incidents of statewide consequence. This could be done through Connecticut Care, which was established by P.A. 13-275.

29.     Programs should be developed that focus on violence reduction through the educational process or other entities.

30. Alcohol awareness programs should be included at appropriate points in the K-12 curriculum.

III.    **MENTAL AND BEHAVIORAL HEALTH RECOMMENDATIONS**

A.      **Recommendations Re: Models of Care**

1.      Recognizing that mental health is more than the absence of mental illness, we must build systems of care that go beyond treating mental illness to foster healthy individuals, families and communities and embrace overall psychological, emotional and social well-being.

2.      To promote true wellness, Connecticut must build a mental health system that targets detection and treatment while building stronger, resilient communities of care.

3.      Addressing a fragmented and underfunded behavioral health system tainted by stigma requires building a comprehensive, integrated approach to care.  The approach will stress family involvement and community resilience. Care will be holistic and involve pediatric and adult medical homes from birth to adulthood, with efforts to ensure continuity of care.  Identifying risk factors, reinforcing protective factors, and promoting positive development throughout will be key goals, and peer as well as professional support will be involved.  Treatment and prevention will be stressed.

4.      To treat the whole person and cultivate wellness across the population, our health delivery systems and reimbursement paradigms should embrace a biopsychosocial model that understands the individual's physical

A-11

and mental health strengths and challenges in the context of that person's social environment and relationships.

5.     Providers should be incentivized through reimbursement mechanisms to integrate both physical and mental health services, whether through their own care delivery or through integration of services within a medical home model.

6.     To promote healthy child development and foster robust communities, our systems of care must attend to the factors affecting family welfare. Current funding structures must thus be revamped.  The Commission recommends support for models of integrated care driven by family needs in which all providers focus on family strength, address their risk factors, and accept the family as a partner in treatment.

7.     Schools must play a critical role in fostering healthy child development and healthy communities.  Healthy social development can be conveyed by role models such as parents, teachers, community leaders, and other adults in children's lives, but it can also – and should – be actively taught in schools.

8.     Social-emotional learning must form an integral part of the curriculum from preschool through high school.  Social-emotional learning can help children identify and name feelings such as frustration, anger and loneliness that potentially contribute to disruptive and self-destructive behavior.  It can also teach children how to employ social problem-solving skills to manage difficult emotional and potentially conflictual situations.

9.     A sequenced social development curriculum must include anti-bullying strategies.  As appropriate, it should also include alcohol and drug awareness as part of a broader substance-abuse prevention curriculum for school-aged children.

10.     Many of our students and their families live under persistent and pervasive stress that interferes with learning and complicates the educational process.  There are many potential resources such as school based health centers that should provide a locus of  preventive care, including screenings

A-12

and referrals for developmental and behavioral difficulties, exposure to toxic stress, and other risk factors, as well as treatment offerings that can address crisis, grief and other stressors.  Alternatively, schools can employ the services of community-based mental health providers such as child guidance clinics.

11.    Schools should form multidisciplinary risk-assessment teams that gather information on and respond supportively to children who may pose a risk to others or face a risk to themselves due to toxic stress, trauma, social isolation or other factors.  (See recommendation 39 below regarding the role of mental illness in violent events.)  Schools should look to factors such as social connectedness in identifying children at risk; all school staff should be trained in inquiry-based techniques to apply when disciplinary issues arise in order to deepen their understanding of how children's behavior can be linked to underlying stressors.

12.    Schools should work with all providers to enhance community resources and augment services available in schools.  For many children schools offer the only real possibility of accessing services, so districts should increase the availability of school guidance counselors, social workers, psychologists, and other school health and behavioral health professionals during and after school as well as potentially on Saturdays.

13.    The state and federal departments of education should establish lead sections or programs on school mental health to supplement (not replace) the work of CT DCF.   These sections would play a critical role in conducting and coordinating broad-based prevention and intervention efforts within the school system to help ensure a coordinated, seamless and comprehensive statewide system.

14.    The Commission endorses the recommendations advanced in Connecticut Children's Behavioral Health Plan, a report and implementation plan compiled pursuant to Connecticut's Public Act 13-178, that call for a comprehensive, developmentally appropriate continuum of care that expands and equalizes culturally relevant resources available to children and their families across payment systems and geographic boundaries.

15.    Each board of education must ensure that children with disabilities be identified and evaluated in accordance with the Individuals with Disabilities Education Act, or IDEA.  Where parents elect to home-school children with an identified disability, the home-schooled child shall have an individual education program (IEP) approved by the special education director of the Area Education Agency, as well as access to special education services. Periodic reports regarding the progress of such home-schooled children should be filed with the local superintendent (at least annually) and be prepared by an individualized education program team selected by the parent.  The state should consider requiring that a parent's obligations under state law encompass approval of the individualized education plan and adequate progress as documented in these reports.

16.    When the particular disabilities that necessitate "homebound" education include social, emotional and behavioral difficulties, the student's individualized education program and related services must address these difficulties expressly in addition to providing any necessary academic supports.

## B.    Recommendations Concerning Barriers To Access: Insurance And Funding Issues.

17.    A fully functional mental health system will require better coordination and access to a broad range of necessary services across payment systems.

18.    Inadequate reimbursement rates combined with high utilization rates at many outpatient behavioral health clinics have made this model of care financially unsustainable.  In addition, overall Medicaid rates for adult inpatient care have not increased in at least eight years.  Recent increases in rates for inpatient child and adolescent care have been coupled with decreases in other Medicaid reimbursement rates to the same hospitals.  The Commission recommends that higher reimbursement rates in both outpatient and inpatient settings, which better reflect the costs of care, be a core component of a redesigned behavioral health care system.

A-14

19.   Inadequate reimbursement rates have also impacted the behavioral health workforce, which remains insufficient to meet the needs of many Connecticut residents.   The Commission recommends that, in addition to addressing reimbursement rates, Connecticut identify and take measures to increase the behavioral health workforce.   These might include educational incentives such as loan forgiveness programs.

20.   Connecticut has significant problems with system fragmentation resulting from diverse payment systems and a lack of coordination or consistency among state agencies.   A fragmented system yields unequal access to effective treatment, discontinuities of care for those receiving service, and unsustainable financial burdens for individuals, families and communities.

21.   The definition of "care" must be reviewed. Funding decisions about behavioral health "care" must look beyond the model that has prevailed over the past several decades to embrace psychosocial interventions, services directed toward the achievement of functional skills and other efforts to engage the whole person, which frequently offer the best prognosis for recovery.   A behavioral health diagnosis accompanied by acute, rather than chronic, symptoms should be removed as a prerequisite for access to care.

22.   Commercial insurance should cover the full panoply of services available through the public behavioral health system, e.g., programs that provide housing, vocational and occupational support, and drop-in services that can be essential components of an effective treatment strategy for individuals struggling with severe mental illness.   The Commission recommends continuing efforts to expand coverage to a broad range of evidence-supported services for individuals with private insurance.

23.   Since the goal of optimal health care is to integrate behavioral health seamlessly into comprehensive care, continued use of behavioral health carve-outs, designed to control behavioral health costs rather than increase access, should be phased out as quickly as possible.   The Connecticut Behavioral Health Partnership is noteworthy in designing incentives to coordinated care across physical and mental health as well as substance abuse

A-15

services for Medicaid-funded care despite the existence of a behavioral health carve-out, but full integration and comprehensive care is most likely achieved through eliminating mental health carve-outs altogether.

24.   To guarantee that provider panel lists facilitate, rather than frustrate, access to care, health plans should be required to maintain up-to-date and accurate provider panel lists and to make these available to all members.  The Commission recommends that Connecticut establish standards for accurate lists, as well as a mechanism for fining or otherwise holding insurers accountable for publishing inaccurate lists.

25.   Despite recent changes in Connecticut law, behavioral health providers continue, virtually unanimously, to report repeated and inappropriate denials of care.  The Commission therefore recommends that appeals of all denials of care be processed through an independent entity such as the Office of the Health Care Advocate.  Independent clinicians selected by this entity should be available around the clock for such reviews.  A second level of review should be available through the same entity.  Insurers should be required to provide reimbursement during the denial and appeals period up to the point of ultimate denial by the neutral reviewing party.  When a licensed provider determines that a particular course of treatment is medically necessary, the burden of proof should fall to the insurer to demonstrate otherwise. Any conclusion by a reviewer that care is not medically necessary should be based, to the extent possible, on findings in the medical literature. The results of scientific studies, and/or recommendations of recognized health care professional organizations and recognized authorities of evidence of efficacy especially in the absence of scientific studies, should not be discredited solely on the assertion of the insurer.

26.   The Commission has recommended adoption of models of care that integrate behavioral and general health services.  In the current world of diverse funding and delivery mechanisms, it is impossible to talk about access to mental or behavioral health services in a unified way.  In the Commission's view, Connecticut must find ways to fund integrated models of care for both

A-16

children and adults that ensure access to quality, affordable, culturally appropriate and timely care for residents throughout the state.

**C.    Recommendations Concerning Barriers To Access: Stigma And Discrimination.**

27.    Notwithstanding widespread efforts over the past two decades to combat stigma, recent studies have found that many members of our society still regard people with mental illness as dangerous, incompetent and at fault for their condition. But a diagnosis of mental illness does not have to mean an end to achieving one's life goals.  Systems of care that promote wellness generally and recovery for those who struggle with behavioral health challenges and the effects of traumatic stress can help to diminish stigma and its effects. The media plays a pivotal role in perpetuating stigma but it can also serve as an agent of change, a key player in efforts to eradicate stigma.

28.    Research suggests that anti-stigma campaigns should incorporate two types of messages to combat stigma effectively: "see the person" messages that highlight the full humanity of individuals living with mental illness rather than focusing on labels; and recovery-oriented messages that refute gloomy, and potentially self-fulfilling, prognoses.  But experts caution against a "one size fits all" approach, stressing that particular combinations of messages, targeted toward particular audiences, are likely to be most effective.  The Commission strongly supports research that will identify the most effective measures to reduce stigma, as well as implementation of those measures.

29.    Many of the Commission's recommendations regarding models of care and the organization and funding of systems of care, while not addressed directly toward stigma reduction, may have the effect of decreasing stigma.  For example, school-based behavioral health services have the potential to enable children and families to address mental health challenges in an environment relatively free from the stigma that attaches to the mental health system.  Even more significantly, they could over time diminish the stigma associated with mental illness by integrating mental health care with other forms of health screening and care available to children through schools.

A-17

30.     The Commission recommends the expansion of programs that engage people across the community in issues relevant to mental health. Programs such as CIT (Crisis Intervention Training) and CIT-Y (training directed toward youth issues) for the law enforcement community, as well as Mental Health First Aid for teachers, counselors, parents, neighbors, coaches, youth group leaders, police officers and others, increase mental health awareness among members of the community who can then offer support to children and adults facing mental health challenges and help them access the resources they need.

31.     For adolescents and adults facing mental health diagnoses, effective psychoeducation of both individuals and families can promote acceptance and decrease stigma.   Psychoeducation involves structured programs in which individuals and families are educated about mental illness and its treatment, and strategies are given for handling typical challenges that might arise in association with a particular condition.   The goal of such programs is to recognize that someone whom they might consider "different" or "odd" may in fact need help.   Participants learn ways to connect with an individual in need and to empower that person to seek help.  Above all, such programs need to incorporate a model of wellness rather than focus primarily on illness.  People with lived experience serve as role models and can provide examples of a path to a successful recovery.

### D.     Recommendations Concerning Privacy And Confidentiality.

32.     The Commission cautions against measures that would curtail the privacy rights of people living with mental illness in the absence of a clear understanding of what current laws and policies do and do not allow. Although recent guidance issuing from federal agencies attempts to clear up widespread confusion about how far existing laws go in limiting the sorts of disclosures that might arise in the context of concerns about safety, ambiguities and potential misunderstandings persist.   Additional efforts to clarify and educate providers and the public on these issues are sorely needed.

33.    Existing laws permit appropriate disclosure of otherwise private mental health information in situations where a threat to someone's safety appears imminent.  Privacy laws still, however, restrict most communications about a person's mental health treatment absent that person's consent, even where barriers to disclosure frustrate effective care or subject the patient and others to less obvious dangers.   The Commission supports efforts to facilitate communication in the service of effective care while respecting individuals' rights to privacy and autonomy.

34.    With respect to children's behavioral health, it is essential that information-sharing take place to the full extent permitted by law so that children's needs can be adequately recognized and addressed across schools, health care settings, guidance clinics, and other institutions critical to their healthy development.   Educational privacy laws should be implemented in such a way that they do not compromise essential communication for children struggling with serious emotional, behavioral and developmental challenges. With parent permission, schools and treatment providers should in general be allowed to share important information that will facilitate the care and education of children.

**E.    Recommendations Concerning Mental Illness And Violence.**

35.    The Commission has found that while untreated psychiatric illness in a narrow subset of the population does increase the risk of violence, a diagnosable mental illness alone is a very weak predictor of interpersonal violence – particularly compared to other factors such as substance abuse, a history of violence, socio-economic disadvantage, youth, and male gender.  All of these factors have far stronger correlations with a risk of violence than does a psychiatric diagnosis.   For gun violence in particular, mental illness contributes greatly to rates of suicide but marginally to homicide rates.

36.    Accessible community treatment programs can reduce the relatively low risk of violence among most people living with mental illness. The Commission recommends expansion and increased availability of early intervention programs for those young adults early in the course of developing

and/or established mental illness to reduce the likelihood that a person facing a psychotic illness might resort to violence or self-harm. Also, this would offer the best prognosis for a less chronic course of illness, fewer emergency hospitalizations, and greater opportunities for recovery.

37.    The testimony before the Commission from forensic psychiatrists and other experts makes clear that despite the ability to identify the condition of dangerousness no one has yet devised a reliable method for predicting future violence.   Trait-based profiling appears to represent an ineffective and even counterproductive means of identifying individuals likely to commit acts of targeted violence and instead more likely creates stigma.   Instead, behavioral threat assessment could be useful; it focuses on identifying and intervening with individuals whose behavior and/or communications clearly indicate an intention to commit violence.    This model has been adapted for use in educational institutions, workplace settings, and the U.S. military.

38.    The Commission recommends the formation of multidisciplinary teams to conduct risk assessments in schools.   Each school district in Connecticut should have policies in place that are related to threat assessment and violence management.   School [district]s should form multidisciplinary teams that include an Administrator, a school Police Department Officer, and a school mental health professional (e.g., Psychiatric Social Worker, School Psychologist, Pupil Services and Attendance Counselor), as well as a community mental health provider, to assess threats made in schools.   Such teams may also include representatives of faith communities and members of the youth services bureau.   These teams should receive training in threat assessment that will enable them to review specific threats and help manage or support any person who issues a threat as well as warning the potential victims.   They should also be available when a child or family has been identified with complex stressors that might indicate a need for additional resources to stabilize the family.   In this way, risk assessment teams will become "go to" community resources that will support and strengthen families in the community.

A-20

Case 3:17-cv-01017-BEN-JLB   Document 18-5   Filed 06/05/17   PageID.3109   Page 478 of 497

39.    People with mental health challenges are far more likely to be victims of violence than perpetrators. As a general matter, mass fatalities comprise less than one-tenth of 1% of gun homicides committed in the United States.    Guns play a major role in suicide; over half of completed suicides involve firearms; 90-95% of completed suicides are attributable to depression, bipolar disorder, and other psychiatric illnesses, often in combination with substance abuse.

40.    As noted in the Law Enforcement section of this report, the Commission supports adoption of the Consortium for Risk-Based Firearm Policy's    December    2013    recommendations.    The    Consortium's recommendations take evidence-based risk categories as a basis for limiting gun eligibility. These are based principally on a history of violent behavior, a reckless use of alcohol or illegal drugs, and a clinical finding of dangerousness. Conversely, recently enacted legislation regarding gun eligibility may go too far in excluding individuals recently admitted to psychiatric institutions as voluntary inpatients, and the Commission urges reconsideration of this provision.

41.    The Commission was unable to arrive at a recommendation concerning adopting involuntary outpatient commitment as an option short of involuntary hospitalization in Connecticut.

**F.    Recommendations Concerning Response, Recovery And Resilience.**

42.    Connecticut should develop a comprehensive statewide plan for effectively responding to large-scale school crisis events that includes educational and behavioral health agencies.  The plan should specify short- and longer-term interventions for different populations, and identify funding mechanisms that will minimize discontinuity of services.  It should clarify a range of roles and responsibilities for state and local entities and designate lead agencies for key functions.

43.    Connecticut and its municipalities should incorporate an enhanced focus on the mental health implications of disasters and other crisis

A-21

events into all disaster preparedness and response protocols, and implement measures to address the behavioral health needs of children as well as adults.

44.     Connecticut should better integrate behavioral health and educational responses to disaster events by thoughtfully incorporating educational and behavioral health agencies into the state's Unified Command System.

45.     Investment in preparing to recover from a major crisis will pay major dividends every day, even in communities fortunate enough to escape a major school or community crisis event.  Meeting needs daily in schools and communities will be a major step in improving everyday functioning as well as recovery from large-scale crises.

46.     While short-term support by mental health professionals from outside the community may be required or helpful in the immediate aftermath of a crisis event, the goal should be to transition direct services provided during the recovery process to those who are part of the impacted community or adjoining/nearby communities.  With some outside support, the goal should be empowering and training providers within the school and community to ensure that the recovery is self-sustaining to the extent possible.

47.     The state should also offer the option of engaging a short-term support team, developed prior to an event, to school districts overwhelmed by tragedies to assist in planning and decision-making, such as communications, management of mental health response, provision of security, managing personnel and labor issues, and donations.

48.     We must strengthen our knowledge base about how to meet the emotional and psychological needs of the adult personnel who are part of the crisis response in the schools and ensure that we have a plan to address those needs promptly.

49.     Any recovery plan must anticipate long-term as well as short-term needs, because the process of recovering from traumatic events may take years.  While funding for immediate recovery efforts must be readily available, it is equally important to harmonize funding mechanisms with the true length

of time that services are required and to minimize the discontinuity of services that results from transitory funding mechanisms such as short-term grants. The plan should also include provisions addressing bereavement and meaning-making through memorialization and commemoration activities so that communities can approach these proactively.

50.    Connecticut should create mechanisms to implement ongoing training and professional development programs outside of crisis circumstances for teachers and school personnel, and establish statewide training requirements tied to professional certification and recertification. Training for teachers and school personnel on how to support children following a disaster should impart basic skills and knowledge in the following areas: the impact of trauma and bereavement on children and their learning; likely reactions; strategies for providing psychological first aid, brief supportive services, and bereavement support; and indications for referral for additional mental health services.

51.    Connecticut should better integrate the behavioral health and education responses to school crisis events by creating a mechanism that facilitates the immediate coordination of supportive services.  Although there may be one lead agency overseeing the recovery efforts, the response and recovery will require integrated and complementary services from multiple state agencies and departments (including, SDE, DMHAS and DCF).  It is also important to create linkages to community programs offering bereavement support, faith-based groups that can provide supportive services, and agencies providing victim services.

52.    To help victims regain a sense of control, communication and engagement with victims of crisis events should not follow a one-size-fits-all approach but instead should be calculated to enhance each individual's capacity to control his or her own recovery process.  A central clearing house for information relevant to disaster response and recovery, with clearly identified channels of access, would help to mitigate the sorts of

A-23

communication barriers that can impede recovery and risk re-traumatizing vulnerable members of the community.

# APPENDIX B

## List of Individuals Who Testified Before the Sandy Hook Advisory Commission

| DATE | SPEAKER | TITLE | TOPIC |
|------|---------|-------|-------|
| 01/24/13 | Dannel P. Malloy | Governor of the State of Connecticut | Charge to the Committee |
| 01/24/13 | Stephen Sedensky, Esq. | Danbury State's Attorney | Update on the Sandy Hook investigation |
| 01/24/13 | William Ritter | Former Governor of Colorado | Work of the Columbine Commission |
| 01/24/13 | Richard J. Bonnie, LLB | Director, Institute of Law – Psychiatry and Public Policy, University of Virginia School of Law/Chair of Virginia Commission on Mental Health Law Reform/Consultant to Virginia Tech Review Panel | Work of the Virginia Commission on mental health law reform and the Virginia Tech Review Panel |
| 02/15/13 | Diane Harp Jones | Chief Executive Officer, American Institute of Architects – Conn. Chapter | Safe school design |
| 02/15/13 | Randall S. Luther | Tai Soo Kim Architects | Safe school design |
| 02/15/13 | Richard Munday | Newman Architects | Safe school design |
| 02/15/13 | Richard T. Connell | S/L/A/M Collaborative | Safe school design |
| 02/15/13 | Glenn Gollenberg | S/L/A/M Collaborative | Safe school design |
| 02/15/13 | Jim Laposta | JCJ Architects | Safe school design |
| 02/15/13 | Mila Kennett | Project Manager, Federal Emergency Management Agency | FEMA resources |
| 02/15/13 | Robert Mahoney | Executive Director, Emergency Management Group | Emergency management |
| 02/22/13 | Patricia Rehmer, MSN, HCSE | Commissioner, Department of Mental Health and Addiction Services | State agency trauma response to Sandy Hook |

B-1

| 02/22/13 | Joette Katz, J.D. | Commissioner, Department of Children and Families | State agency trauma response to Sandy Hook |
|---|---|---|---|
| 02/22/13 | Stefan Pryor | Commissioner, Department of Education | State agency trauma Response to Sandy Hook |
| 02/22/13 | Jewel Mullen, M.D., MPH, MPA | Commissioner, Department of Public Health | State agency trauma response to Sandy Hook |
| 02/22/13 | Marleen Wong, LCSW Ph.D. | Assistant Dean and Clinical Professor at the University of Southern California School of Social Work | National Child Traumatic Stress Network |
| 02/22/13 | Thomas Demaria, Ph.D. | Long Island University, Director of the Psychological Services Center and Trauma Response Team of the Doctoral Psychology Program | Foundation of the 9/11 Family Center |
| 02/22/13 | John Barry | Superintendent of Aurora Public Schools | Role of school district in meeting needs of a community |
| 02/22/13 | Francis Pumbar | Recovery Coordinator of Aurora Public Schools | Role of school district in meeting needs of a community |
| 03/01/13 | Joe Delehanty | Connecticut State Police, Firearms Training Unit | Processes of purchasing, transferring, or possessing a firearm; regulations on storage and safeguarding weapons; training and qualifications for certain permits and licenses; and different types of weapons, ammunition and magazines |

| 03/01/13 | Barbara Mattson | Connecticut State Police, Special Licensing and Firearms Unit | Processes of purchasing, transferring, or possessing a firearm; regulations on storage and safeguarding weapons; and training and qualifications for certain permits and licenses |
|---|---|---|---|
| 03/01/13 | Christine Plourde, Esq. | Connecticut State Police, Legal Affairs Unit, Labor Relations Attorney | Overview of CT firearm statutes |
| 03/01/13 | Marc Montminy | Chief of Police, Manchester Police Department | Emergency protocol by state and local police |
| 03/01/13 | Michael Kehoe | Chief of Police, Newtown Police Department | Emergency protocol by state and local police |
| 03/01/13 | Brendan Campbell | Doctor, Connecticut Children's Medical Center | Use of Firearms in today's society |
| 03/01/13 | Anthony Salvatore | Chief of Police, Town of Cromwell, representing Connecticut Police Chief Association | Gun violence prevention and child safety |
| 03/01/13 | Matthew Reed | Chief of Police, Town of South Windsor, Legislative co-chair of the Connecticut Police Chief Association | Gun violence prevention and child safety |
| 03/08/13 | Gregg Champlin | New Hampshire School Emergency Planning & Natural Hazards Program Specialist | State systems for school emergency planning |
| 03/08/13 | Col. (Ret.) William P. Shea | Deputy Commissioner, Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security | Emergency management infrastructure in Connecticut |
| 03/08/13 | Thomas Vannini | Region 5 Coordinator for The Emergency Management and Homeland Security (DEMHS) | Emergency management infrastructure in Connecticut |

| | | | |
|---|---|---|---|
| 03/08/13 | William Hackett | State Emergency Management Director, Division of Emergency Management and Homeland Security (DEMHS), Department of Emergency Services and Public Protection (DESPP) | Emergency management infrastructure in Connecticut |
| 03/22/13 | Kim Pernerewski | President of the Waterbury Chapter of the National Alliance of Mental Illness | Increasing public awareness of mental health issues and decreasing discrimination through a personal lens |
| 03/22/13 | Louise Pyers | Executive Director of the Connecticut Alliance to Benefit Law Enforcement | Mental health issues that law enforcement officers face |
| 03/22/13 | Chris McKee | Sergeant, Windsor Police Department | Mental health issues that law enforcement officers face |
| 03/22/13 | Sue Bowman | Officer, Windsor Police Department | Mental health issues that law enforcement officers face |
| 03/22/13 | Deron Drumm | Executive Director of Advocacy Unlimited | Personal experiences as a person with mental health disorder |
| 03/22/13 | Bryan Gibb | Director of Public Education at the Nat'l Council for Community Behavioral Healthcare | Mental health first aid |
| 03/22/13 | Anne Melissa Dowling, CFA | Deputy Commissioner, State Department of Insurance | Role of mental health risk assessment and management in the Connecticut insurance and health care sectors |

| 03/22/13 | Victoria Veltri, JD, LLM | Connecticut Healthcare Advocate | Role of mental health risk assessment and management in the Connecticut insurance and health care sectors |
|---|---|---|---|
| 03/22/13 | Marisa (Reddy) Randazzo, Ph.D. | Managing Partner, SIGMA Threat Management Associates | Violent case studies where risk assessment and management could have averted tragedy |
| 04/12/13 | Gary Steck | CEO, Wellmore Behavioral Health & Chairman of the Board, Connecticut Community Providers Association | Behavioral health needs of children and youth |
| 04/12/13 | Robert Plant, Ph.D. | Chief Clinical Officer, Wellmore Behavioral Health | Behavioral health needs of children and youth |
| 04/12/13 | Sheila Amdur, MSW | Interim President/CEO, Connecticut Community Providers Association | Behavioral health needs of children and youth |
| 04/12/13 | Eric Arzubi, M.D. | Co-Chair, Keep the Promise Coalition Children's Committee & Fellow, Yale Child Study Center | Behavioral health needs of children and youth |
| 04/12/13 | Abby Anderson, M.A. | Co-Chair, Keep the Promise Coalition Children's Committee & CT Juvenile Justice Alliance | Behavioral health needs of children and youth |
| 04/12/13 | Michael Norko, M.D. | Director of Forensic Services, DMHAS & Associate Professor of Psychiatry, Yale University School of Medicine | Assessment and management of risk, emphasizing the use of a clinical risk assessment model |
| 04/12/13 | Madelon Baranoski, Ph.D., M.S.N. | Associate Professor of Psychiatry/ Vice-Chair of Human Investigation Committee, Yale University | Assessment and management of risk, emphasizing the use of a clinical risk assessment model |

B-5

| 04/19/13 | Nadia Ward, Ph.D. | Yale University Department of Psychiatry & Bridgeport School System Intervention Project | Mental health system for adolescents and young adults |
|---|---|---|---|
| 04/19/13 | Cheryl L. Jacques, M.S.N. & A.P.R.N. | Director, Young Adult Services – CT Department of Mental Health and Addiction Services | Mental health system for adolescents and young adults |
| 04/19/13 | Sara Lourie | Client Interagency Planning, CT Department of Children and Families | Mental health system for adolescents and young adults |
| 04/19/13 | Tim Marshall, L.C.S.W. | Director of Community Mental Health Services, CT Department of Children and Families | Mental health system for adolescents and young adults |
| 04/19/13 | Mary Guerrera, L.C.S.W. | Executive Director, Fellowship Place | Mental health system for adults |
| 04/19/13 | Vinod Srihari, M.D. | Yale University, Department of Psychiatry | Mental health system for adults |
| 04/26/13 | John Monahan, Ph.D. | Professor of Law, University of Virginia School of Law | Violence and mental health issues |
| 04/26/13 | Richard J. Bonnie, LLB | Director, Institute of Law – Psychiatry and Public Policy, University of Virginia School of Law/Chair of Virginia Commission on Mental Health Law Reform/Consultant to Virginia Tech Review Panel | Violence and mental health issues |
| 04/26/13 | Robert Pynoos, M.D. & M.P.H. | Co-Director, National Child Traumatic Stress Network | Violence and mental health issues addressing trauma |
| 04/26/13 | Julian Ford, Ph.D. | Professor of Psychiatry, University of Connecticut Health Center | Violence and mental health issues addressing trauma |
| 04/26/13 | Steve Marans, M.S.W. & Ph.D. | Harris Professor of Child Psychiatry/ Professor of Psychiatry/Director, National Center for Child Exposed to Violence/Childhood Violent Trauma Center – Yale University | Violence and mental health issues addressing trauma |

| 04/26/13 | Robert Franks, Ph.D. | Vice President/Director of Connecticut Center for Effective Practice, Child Health Development Institute | Violence and mental health issues addressing trauma |
|---|---|---|---|
| 04/26/13 | Paul Appelbaum, M.D. | Columbia University – Professor of Psychiatry & Director, Division of Psychiatry, Law, and Ethics | Mandatory reporting |
| 04/26/13 | R. Traci Cipriano, J.D., Ph.D. | Licensed Clinical Psychologist, Director of Professional Affairs, Connecticut Psychological Association, Assistance Clinical Professor – Yale Department of Psychology | Mandatory reporting |
| 04/26/13 | Lisa Namerow, M.D. | Attending psychiatrist, Institute of Living/Assistant Professor of Psychiatry and Pediatrics, UCONN School of Medicine | Barriers to access to care |
| 04/26/13 | Stephen Larcen, Ph.D. | Senior Vice President of Behavioral Health, Hartford HealthCare | Barriers to access to care |
| 04/26/13 | Andrew Lustbader, M.D. | Connecticut Council of Child & Adolescent Psychiatry | Mental health access |
| 04/26/13 | Sandra Carbonari, M.D. | Connecticut Chapter of American Academy of Pediatrics | Mental health Access |
| 07/12/13 | Louis R. Pepe, Esq. | McElroy, Deutsch, Mulvaney & Carpenter LLP | Summary of legislation passed in 2013 session that is relevant and meaningful to Commission |
| 07/12/13 | Daniel J. Klau, Esq. | McElroy, Deutsch, Mulvaney & Carpenter LLP | Summary of legislation passed in 2013 session relevant to Commission |

| 07/12/13 | Kenneth S. Trump | President, National School Safety and Security Services | Conversation, focus, policy and funding on school safety |
|---|---|---|---|
| 08/16/13 | Donald DeFronzo | Commissioner, Department of Administrative Services, Chair, School Security Infrastructure Council | Update on key topics discussed with SSIC and emerging issues |
| 08/16/13 | David Rubin, Assaf Heffetz, Dov Shiloah | The TIX Group (The Israel Experience in Homeland Security) | Presents perspective method used in Israel to safeguard schools |
| 08/16/13 | Daniel J. Klau, Esq. | McElroy, Deutsch, Mulvaney & Carpenter LLP | Current status of task forces created by recent legislation |
| 12/20/13 | Matthew Reed | Chief, Town of South Windsor Police Department | Newtown police response to the Sandy Hook Elementary School shooting |
| 12/20/13 | Marc Montminy | Chief, Town of Manchester Police Department | Newtown police response to the Sandy Hook Elementary School shooting |
| 1/10/14 | Brenda Bergeron, Esq. | Legal Advisor, Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security | All-hazards school security and safety plan |
| 1/10/14 | Col. (Ret.) William P. Shea | Deputy Commissioner, Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security | All-hazards school security and safety plan |
| 1/17/14 | Terrence W. Macy, Ph.D. | Commissioner, Department of Developmental Services | State of Connecticut resources for individuals with autism |
| 1/17/14 | Jennifer A. Bogin | Director, Division of Autism Services, Department of Developmental Services | State of Connecticut resources for individuals with autism |

| | | | |
|---|---|---|---|
| 1/17/14 | Fred R. Volkmar, M.D. | Irving B. Harris Professor in the Child Study Center and Professor of Pediatrics, of Psychiatry and of Psychology, Yale School of Medicine | Autism spectrum disorders and violence |
| 1/17/14 | Mathew D. Lerner, Ph.D. | Assistant Professor of Psychology, Psychiatry and Pediatrics, Psychology Department, Stony Brook University; Director, Social Competence and Treatment Lab | Autism spectrum disorders and violence |
| 1/17/14 | Irving B. Harris | Professor in the Child Study Center and Professor of Pediatrics, Psychiatry and Psychology; Chief, Child Psychiatry at Yale-New Haven Children's Hospital; Chair, Child Study Center | Autism spectrum disorders and violence |
| 1/17/14 | Robert and Rose Shea | Parent Advocates | Experience of parents of child with autism |
| 1/17/14 | Timothy K. Carroll, LCSW | Director, Capitol Region Education Council ("CREC") Health Services; Director, CREC Polaris Center | CREC program structure and services |
| 1/17/14 | Carol Kerkin | Assistance Director, CREC Student Services | CREC program structure and services |
| 1/17/14 | Ann Cuvelier | CREC River Street School, Social Worker | CREC program structure and services |
| 1/17/14 | Nancy Canata | CREC Program Director | CREC program structure and services |
| 1/17/14 | Denis McCarthy | Fire Chief and Emergency Management Director, City of Norwalk | Emergency plan for schools and municipal buildings for Norwalk public schools |

B-9

| 1/24/14 | Daniel Dodgen, Ph.D. | Director, Division for At Risk Individuals, Behavioral Health, and Community Resilience; Office of the Assistant Secretary for Preparedness and Response; Office of the Secretary; U.S. Department of Health and Human Services | Federal resources |
|---|---|---|---|
| 1/24/14 | Thomas Demaria, Ph.D. | Director of the Psychological Services Center & Trauma Response Team of the Doctoral Psychology Program at C.W. Post Campus of Long Island University | Trauma response |
| 1/24/14 | Vincent B. Giordano, MS | Partner with Denizen Consulting | Student support services policy development |
| 1/24/14 | Francis Pombar | Former Recovery Coordinator for Aurora Public Schools | Recommendations on potential utility of the role of a school system recovery coordinator to promote longer term recovery efforts and how to assess and address mental health needs |
| 1/24/14 | Marleen Wong, LCSW, Ph.D. | Associate Dean and Clinical Professor at the University of Southern California School of Social Work | |
| 2/28/14 | Dora Schriro | Commissioner, Department of Emergency Services and Public Protection | Incident command / unified command |
| 2/28/14 | Col. (Ret.) William P. Shea | Deputy Commissioner, Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security | Incident command / unified command |

B-10

| 2/28/14 | Michael K. Kehoe | Police Chief, Town of Newton | Incident command / unified command |
|---|---|---|---|
| 2/28/14 | Robin Montgomery | Police Chief, Town of Brookfield | Incident command / unified command |
| 2/28/14 | Marc Montminy | Police Chief, Town of Manchester | Incident command/ unified command |
| 2/28/14 | David Billings | Ass't Fire Chief, town of Manchester | Incident command/ unified command |
| 2/28/14 | Brian Gould | Police Captain, Town of Bristol | Blue Plan |
| 2/28/14 | John Oates | Fire Chief, Town of East Hartford | Incident management teams |
| 2/28/14 | Tami Hodges, MS, CPC | Evergreen Consulting | EAP programs for first responders |
| 2/28/14 | William Rubenstein | Commissioner, Department of Consumer Protection | Donations management issues |
| 6/27/14 | David & Francine Wheeler | Parents of Benjamin Wheeler | Parent perspective |
| 6/27/14 | Michelle Gay | Mother of Josephine Gay | Parent perspective |
| 8/15/14 | Tom Kuroski | President of Newtown Federation of Teachers | Experiences of Newtown teachers following shooting at Sandy Hook Elementary School |
| 8/15/14 | Vincent Riccio | Owner of Security Academy of Connecticut | Active shooter prevention & response efforts |
| 9/12/14 | Joseph V. Erardi, Jr. | Superintendent of Schools of Newtown | Recovery from tragedy; Update on Newtown's school system |
| 9/12/14 | E. Patricia Llodra | First Selectman of Newtown | Making our schools and communities safer and the reflections and concerns of Newtown municipal & school leaders |
| 11/14/14 | Jeremy Richman and Jennifer Hansel | Parents of Avielle Richman | Parent perspective |

B-11

| 11/14/14 | Nelba Marquez-Greene | Parent of Ana Marquez-Greene | Parent perspective |
|----------|----------------------|------------------------------|--------------------|

# **APPENDICES C THROUGH E**
# **(available online only)**

C.    Sandy Hook Advisory Commission Agendas and Meeting Minutes

D.    Sandy Hook Advisory Commission Interim Report (dated March 18, 2013)*

E.    Sandy Hook Elementary School Floor Plan

# [APPENDIX](#) F

## WEAPONS USED IN
## SANDY HOOK ELEMENTARY SCHOOL SHOOTINGS

[Glock 20,10mm](#)



**[Sig Sauer P226 9mm](#)**



F-1

**Bushmaster Rifle**



**MagPul PMAG 30 cartridges**



**Savage 22 Rifle**



F-2

# APPENDICES G THROUGH M
# (available online only)

G.   Legislation Passed During 2013 General Assembly Session Relating To Sandy Hook:

Public Act 13-3 ("An Act Concerning Gun Violence Prevention And Children's Safety")*

Public Act 13-220 ("An Act Concerning Revisions To The Gun Violence Prevention And Children's Safety Act")*

Public Act 13-178 ("An Act Concerning The Mental, Emotional And Behavioral Health of Youths") and Report on Implementation of PA 13-178*

Public Act 13-188 ("An Act Concerning School Safety")*

H.   Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newton, Connecticut on December 14, 2012 (dated Nov. 25, 2013), with accompanying Appendix.*

I.   Report of the Child Advocate, "Shooting at Sandy Hook Elementary School," released on November 21, 2014*

J.   State Police Investigative Files re: Shootings at Sandy Hook Elementary School and 36 Yogananda Street*

K.   Report of the Safe School Infrastructure Council (revised and updated to June 27, 2014)

L.   School Security and Safety Plan Standards (v 1.0) (dated Dec. 30, 2013)*

M.   Capitol Region Chiefs of Police Association "Blue Plan" (dated April 24, 2013) (mutual aid response to incidents within Capitol Region)*