1   XAVIER BECERRA
    Attorney General of California
2   TAMAR PACHTER
    Supervising Deputy Attorney General
3   NELSON R. RICHARDS
    ANTHONY P. O'BRIEN
4   Deputy Attorneys General
    ALEXANDRA ROBERT GORDON
5   Deputy Attorney General
    State Bar No. 207650
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone: (415) 703-5509
     Fax: (415) 703-5480
8    E-mail:
     Alexandra.RobertGordon@doj.ca.gov
9   *Attorneys for Defendant*
    *Attorney General of California*

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| **VIRGINIA DUNCAN, et al.**<br><br>Plaintiffs,<br><br>v.<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of the State of California; et al.,**<br><br>Defendants. | 17-cv-1017-BEN-JLB<br><br>**EXHIBITS 70-73 TO THE DECLARATION OF ALEXANDRA ROBERT GORDON IN SUPPORT OF DEFENDANT ATTORNEY GENERAL XAVIER BECERRA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:          June 13, 2017<br>Time:         10:00 a.m.<br>Dept:         5A<br>Judge:       Hon. Roger T. Benitez<br>Action Filed:     May 17, 2017 |

# Exhibit 70

March 18, 2013

Dear Governor Malloy:

On behalf of the Sandy Hook Advisory Commission, I would like to submit this interim report. It is a product of testimony shared and information received since its establishment on January 3, 2013.

I must stress that this is an interim report.  The findings found within are key elements of any policy reform or changes that must be undertaken in response to the tragic events that took place on December 14, 2012.

I realize that you may agree with some of our interim recommendations, and disagree with others.  In any case, I am grateful for your support for the Sandy Hook Advisory Commission as we examine policies and issues that require extensive deliberation, and for allowing us to take the time to incorporate a variety of perspectives. There are principles which we will address in our final report, but which we did not take up in this document as we plan for a long-term study in crafting meaningful recommendations for thoughtful legislative and policy changes. It is important to note that the Commission postponed discussion of mental health issues until after the interim report in order to develop a strategy to call upon the vast research and the many experts who would want to provide input.

We believe there are common-sense principles upon which short-term change is possible and action should be taken. We understand the necessity for the legislature to make progress this session, and we hope that this report will serve as an endorsement of general areas upon which change is within reach, and as a guidepost for future deliberations.

Following this submission, we will continue our efforts through the end of this year to learn from state officials, experts or practitioners, concerned advocates, and the general public. We will then synthesize that information and produce our final account of the Sandy Hook tragedy, the lessons that must be learned, and the reforms that must be made to address key policy areas in violence prevention.

The work in the coming months will focus on: mental health services, a deeper investigation of best practices in issues addressed in this report, and reaction to any new findings as a result of the State's Attorney investigation, as well as responding to the directives in your February 21 letter on gun violence prevention.

Thank you again for your support for the work of the Sandy Hook Advisory Commission, and we look forward to getting back to work.


Regards,

Scott Jackson
Mayor, Town of Hamden
Chairman, Sandy Hook Advisory Commission

1

**Sandy Hook Advisory Commission
Interim Report of Findings**
March 18, 2013

# Table of Contents

Sandy Hook Advisory Commission Membership.........................................................................3

Introduction and Background.......................................................................................................4

Firearms and Ammunition...........................................................................................................6

    Firearm Permitting and Registration........................................................................................6

    High-capacity Firearms, Magazine Capacity, and Ammunition................................................6

    Firearm Storage and Security..................................................................................................8

    Miscellaneous (Firearms and Ammunition)............................................................................8

Safe School Design and Human Resource Emergency Preparedness...........................................10

    Minimum Classroom Security Standards................................................................................10

    Threat and Risk Assessment/Emergency Planning and Response Standards...........................10

    Identification and Financing of School Hardening Tactics.......................................................13

    Human Resource Training and Capacity-Building...................................................................13

Additional Required Partnerships and Support............................................................................15

Miscellaneous.............................................................................................................................16

    Commission Findings:.............................................................................................................16

## Sandy Hook Advisory Commission Membership

**Scott D. Jackson** (Chair): *Mayor, Town of Hamden*

**Dr. Adrienne Bentman**: *Director, Adult Psychiatry Residency Program, Hartford Hospital's Institute of Living*

**Ron Chivinski**: *Teacher, Newtown Middle School*

**Robert Ducibella**: *Founding Principal, DVS Security Consulting and Engineering*

**Terry Edelstein** (Vice-Chair): *Nonprofit Liaison to Governor Malloy*

**Kathleen Flaherty**: *Staff Attorney, Statewide Legal Services of Connecticut, Inc. / Facilitator and State Trainer, National Alliance for Mental Illness in Connecticut*

**Dr. Alice M. Forrester**: *Executive Director, Clifford W. Beers Guidance Clinic, Inc.*

**Dr. Ezra Griffith**: *Professor Emeritus of and Senior Research Scientist in Psychiatry, Deputy Chair for Diversity and Organizational Ethics, Department of Psychiatry, Yale University*

**Patricia Keavney-Maruca**: *Member, State Board of Education / Former technical high school teacher*

**Christopher Lyddy**: *Former State Representative, 106th Assembly District of Newtown / Program Manager, Trainer & Consultant, Advanced Trauma Solutions, Inc. / Former Program Director, Youth Equipped for Success!, Forensic Health Services, Inc. / Former Clinical Supervisor, Juvenile Risk Reduction Center, Community Solutions, Inc.*

**Denis McCarthy**: *Fire Chief, City of Norwalk*

**Barbara O'Connor**: *Director of Public Safety and Chief of Police, University of Connecticut*

**Wayne Sandford**: *Professor, University of New Haven, Henry C. Lee College of Criminal Justice & Forensic Sciences / Former Deputy Commissioner, Connecticut Department of Emergency Management & Homeland Security / Former Fire Chief, Town of East Haven*

**Dr. David J. Schonfeld**: *Director, National Center for School Crisis and Bereavement / Professor, University of Cincinnati Department of Pediatrics*

**Dr. Harold I. Schwartz**: *Psychiatrist-in-Chief, Hartford Hospital's Institute of Living / Vice President, Behavioral Health, Hartford Hospital / Professor of Psychiatry, University of Connecticut School of Medicine*

**Bernard R. Sullivan** (Vice-Chair): *Former Chief of Police, City of Hartford / Former Commissioner, Connecticut Department of Public Safety / Former Chief of Staff to House Speaker Tom Ritter*

3

## Introduction and Background

On December 14, 2012, the world's eyes turned to Newtown, Connecticut. This quiet town became the epicenter of an unimaginable tragedy. We cannot and will not forget the loss of 20 precious children and six heroic adults at Sandy Hook Elementary School. But if we are to truly honor their memory, we know that our grief must be turned into thoughtful change as we evaluate our laws and policies. The state and national debate is underway as officials seek to evolve and determine what actions, laws, policies, and cultural changes are necessary to reduce gun violence, secure our schools, and improve the way in which we provide mental health services. Our response to these issues will speak to the lessons our society has learned from that unspeakable tragedy.

On January 3, 2013 Governor Dannel P. Malloy established the Sandy Hook Advisory Commission (henceforth referred to as the Commission) to review current policy and make specific recommendations in the areas of public safety and mental health policy, with a focus on children and schools. With a public debate focusing on individual issues, the Commission has been committed to comprehensively evaluating all of the charges issued by the Governor. This Commission is comprised of experts in different areas, including education, mental health, law enforcement and emergency response. Commission members have taken the lead in developing the Commission's roadmap and agenda to shape conversations within their respective fields of expertise. The Commission was tasked with delivering an interim report on March 15th.

This initial report was to deliver early consensus recommendations in order to be included in the regular session of the Connecticut General Assembly; as well as identifying major issues or concern, areas for review, and a process to evaluate the standards by which the state could and should respond to the Sandy Hook tragedy. This interim report also strives to provide a roadmap by which the Commission will operate to develop a thorough understanding of the events that occurred in Newtown, and what changes can be made to prevent such an event from occurring again.

Informational meetings have thus far focused on:

1. infrastructure design, school safety and security;
2. trauma services and responses to school crisis;
3. gun violence prevention; and
4. emergency planning, preparedness, and response.

These hearings have provided the Commission the opportunity to hear from a number of parties, including state officials directly involved in responding to the Sandy Hook tragedy, experts who have dealt with these issues through their work or during past crises, and other key stakeholders.

4

Their testimonies provided Commission members with an understanding of the issues at stake and provided members with objectives to strive for in final recommendations. Following these hearings, the Commission was able to develop and review an exhaustive list of items for consideration that had been raised by presenters and other interested parties. Throughout the process, the Commission has welcomed and continues to encourage testimony and suggestions from the general public as they learn about relevant issues and review possible courses of action. With consensus governing the decision-making process, the Commission approved certain findings, and agreed to move forward in other areas to produce meaningful recommendation to address certain goals.

This interim report sets forward findings in which the Commission looks to make recommendations, and through subsequent hearings members will develop a consensus in how they would recommend the state to act.  As the Commission continues its deliberations, it will seek to involve stakeholders and advocacy groups on all sides of each finding to fully understand the rationale of, the impacts due to, and the purpose of the final recommendations that will be submitted. This commission recognizes that there will be issues upon which there may be great controversy and upon which there are fundamental differences in opinion; yet members believe in light of the charge issued by Governor Malloy it is the responsibility of the Commission to submit findings and recommendations in all areas of its charge. In light of the Governor's directive from February 21, 2013, the Commission will also be acting to respond to new and more precise questions in the context of gun violence prevention.

As the Commission continues to meet, it will look to build upon and fill out these initial recommendations to develop a comprehensive final report within the year.  Those recommendations will be a result of examining relevant policy discussions, utilizing reputable research, and expanding upon analysis from previous task forces and advisory groups; all the while the Commission will be taking into account the views of the general public, other advocacy groups and stakeholder organizations. These recommendations will be presented in a written report that will incorporate the investigative report from the State's Attorney, in order to convey the underlying facts and principles involved in this tragedy. Based on the experiences and lessons from previous task forces, the Commission will be supported by a recorder to detail meetings and discussions. There will be a written account that can serve as a record of the Commission's activities and will detail what the Commission investigated, why it investigated issues, and how it reached consensus on recommendations. This written report is crucial to recognizing and responding to the fundamental question of how we prevent this from happening again in Connecticut or anywhere around the country.

## Firearms and Ammunition

### Firearm Permitting and Registration

While some firearms are required to be registered in the State of Connecticut and some require a permit to carry, these requirements are not uniform. The Commission has found that firearms of significant lethality can be legally obtained without permit and without registration. According to the Connecticut State Police, there are approximately 1.4 million registered firearms in the State of Connecticut, and possibly up to 2 million unregistered firearms. The Commission finds this discrepancy in permitting and registration to be unwarranted. Furthermore, the Commission believes that this lack of uniform control abets "straw purchases" that can be used to deliver firearms to potential criminals.

In order for law enforcement agencies to safely engage in their lawful duties, the Commission believes the State of Connecticut should carefully consider the following items:

1. Mandatory background checks on the sale or transfer of any firearm, including long guns, at private sales and sales at gun shows.

2. Requiring registration, including a certificate of registration, for any firearm. This certificate of registration should be issued subsequent to the completion of a background check and is separate and distinct from a permit to carry.

3. Requiring the renewal of firearms permits on a regular basis. This renewal process should include a test of firearms handling capacity as well as an understanding of applicable laws and regulations.

### High-capacity Firearms, Magazine Capacity, and Ammunition

The Commission finds that types of ammunition and magazines currently available can pose a distinct threat to safety in private settings as well as places of assembly. Furthermore, the Commission has found that, despite the lethality of this ammunition, there are limited controls on its purchase. The Commission understands that, in a spree killing, a life could be lost every few seconds. The Commission takes seriously the rights afforded under the Second Amendment of the United States Constitution, but balances those rights against the language of the Preamble to the Constitution, which includes assurances of "domestic tranquility" and the obligation to "promote the general welfare."

6

In order to maintain the safety of places of assembly by ensuring that lawful, competent firearms owners are the only individuals able to lawfully possess certain types and quantities of ammunition, the Commission believes that the State of Connecticut should carefully consider the following items:

4. Instituting a ban on the sale, possession, or use of any magazine or ammunition feeding device in excess of 10 rounds except for military and police use. The Commission recognizes that certain sporting events may at times seek to utilize higher capacity magazines, however the consensus of the Commission is that the spirit of sportsmanship can be maintained with lower capacity magazines.

5. Instituting a ban on the possession or sale of all armor-piercing and incendiary bullets, regardless of caliber.  The Commission also believes that a first-time offense should be classified as a Class D Felony under Connecticut General Statutes.

6. Allowing the purchase of ammunition for registered firearms only.

7. Evaluating best practices for determining the regulation or prohibition of the sale and purchase of ammunition via the internet.

8. Evaluating the effectiveness of federal law in limiting the purchase of firearms via the internet to those who have passed the appropriate background screening.

9. Limiting the amounts of ammunition that may be purchased at any given time.

The Commission has found that the definition of "assault weapon" has allowed for cosmetic changes to military-style firearms that does not reduce their lethality but does allow them to be legally possessed. The Commission believes that, defining an "assault weapon" by form rather than function has been ineffective.  It is the consensus of the Commission that gun violence is an issue that goes far beyond the tragedy at Sandy Hook, and the commonality of high-capacity firearms in violent crimes must be acknowledged.  According to the 2011 Connecticut Uniform Crime Reporting Program, only two (2) of 94 firearm-related homicides in the state were committed with a rifle or a shotgun.  It is the consensus of the Commission that firearm lethality is correlated to capacity, a correlation borne out not only in Sandy Hook Elementary School, but in other violent confrontations in and beyond Connecticut.  Therefore, the Commission believes that the State of Connecticut should carefully consider:

10. Prohibiting the possession, sale or transfer of any firearm capable of firing more than 10 rounds without reloading.  This prohibition would extend to military-style firearms as well as handguns.  Law enforcement and military would be exempt from this ban.

## Firearm Storage and Security

The Commission has found that, in households where firearms are present, ample care is not always given to ensuring household members or guests who should not have access to the firearms are effectively prevented from gaining access.  To better ensure that only appropriate handlers have direct access to firearms, the Commission believes the State of Connecticut should carefully consider:

11. Requiring that trigger locks be provided at the time of sale or transfer of any firearm.

12. Requiring that the State of Connecticut develop and update a "best practices" manual and require that all firearms in a home be stored in a locked container and adhere to these best practices; with current minimum standards featuring a tamper-resistant mechanical lock or other safety (including biometric) device when they are not under the owner's direct control or supervision.  The owner should also be directly responsible for securing any key used to gain access to the locked container.

## Miscellaneous (Firearms and Ammunition)

While the Commission attests that the above items create an enhanced framework for safety in our homes, in our schools, in places of assembly, and in our neighborhoods, the Commission also concludes that other targeted actions would yield beneficial results.  The Commission believes that the State of Connecticut should also carefully consider:

13. Requiring non-residents seeking to purchase a firearm or ammunition in the State of Connecticut to obtain a Certificate of Eligibility and conform to all other regulations applicable to Connecticut residents.

14. Requiring gun clubs to report any negligent or reckless behavior with a firearm, or illegal possession of any firearm or magazine, to the Connecticut Department of Emergency Services and Public Protection, Commissioner of Public Safety, and local law enforcement.

15. Requiring promoters of gun shows to receive a permit from the Chief of Police or Chief Elected Official as well as provide notice to the Commissioner of the Connecticut Department of Emergency Services and Public Protection.

The Commission understands and appreciates the role and challenges of law enforcement and the principle of "general defense," therefore the Commission believes that the State of Connecticut should also exempt law enforcement and military personnel from proposed changes in law or regulation (as appropriate).

The Commission also appreciates the role, historic and contemporary, of firearms manufacturers in the State of Connecticut.  No item of consideration identified above should be construed as a prohibition against the manufacture of any device legal for sale or possession in other jurisdictions.

The Commission also recognizes the significance of federal law as it pertains to the sale and transfer of firearms and ammunition, and believes that the series of recommendations set forth above provide a rational framework to increase the safety of Connecticut residents.

## Safe School Design and Human Resource Emergency Preparedness

### Minimum Classroom Security Standards

While design standards exist for a number of school features, ranging from lighting appropriateness to air changes per hour, no standard exists for the baseline of safe school design or a process to determine appropriate safe school design elements. The Commission believes that K-12 schools, licensed day care centers, and institutions of higher learning should undertake a process to determine minimum design standards for safety, although it recognizes that the implementation of a robust security program in a licensed daycare facility is very different from implementation of a robust security program at a college campus.

Each institution, depending on a myriad of physical and community characteristics, can achieve safe school design through widely divergent mechanisms. The Commission recognizes that the expense of safe school design and construction may be significant, and each school district will have different factors in its cost-benefit analysis of various design tools or retrofit opportunities.

The items of considerations set forth in this section address the built environment of facilities and training to maximize the effectiveness physical security programs and policies. Items pertaining to behavioral health and trauma response will be further developed in the Commission's final report.

Notwithstanding the Commission's endorsement of local process over required outcome, the Commission has highlighted a singular element in which it believes the potential benefit outweighs the cost in all K-12 facilities. As precious seconds matter in an episode like the tragedy at Sandy Hook Elementary School, the Commission believes that the State of Connecticut should carefully consider:

16. Requiring that all classrooms in K-12 schools be equipped with locking doors that can be locked from the inside by the classroom teacher or substitute. These doors should also be compliant with building code, fire safety code, and other regulations as required.

17. Requiring that all exterior doors in K-12 schools be equipped with hardware capable of implementing a full perimeter lockdown.

### Threat and Risk Assessment/Emergency Planning and Response Standards

The Commission finds that different schools and different school districts have fundamentally different capacities in effectively analyzing their security strengths and weaknesses. Therefore, the Commission has endorsed the development of a common Threat and Risk Assessment

10

Security Recommendations (TRASR) tool by the State of Connecticut as well as a uniform process to develop an Emergency Response Plan (ERP). This tool would be applied to all facilities and provide a common planning and assessment baseline for all schools, public and private. In conjunction with a broader Safe Schools Plan (SSP) and with appropriate review and comment by the Connecticut Department of Emergency Services and Public Protection, Division of Emergency Management and Homeland Security, the Commission believes that school security can be appreciably enhanced. Likewise, the consolidation of information at the State (or DESPP Division of Emergency Management and Homeland Security region) would assist in effective deployment of State or mutual aid resources in time of emergency.

As such, the Commission believes the State of Connecticut should carefully consider:

18. Developing an All-Hazards Threat and Risk Assessment Security Recommendations (TRASR) tool able to be applied, in a site-specific fashion, to all schools and day care centers statewide. School districts should be required to perform a TRASR within 12 months of its availability and review/update this TRASR every three to five years, unless intelligence or events suggest a more rigorous schedule.

    1) The TRASR should provide a common sense approach to the identification and provision of rational and credible protective design building and site components and related security operational policies and procedures which will enhance the safety of students, teachers, staff, and others on school grounds and in school buildings.

    2) The TRASR should incorporate Crime Prevention Through Environmental Design Strategies, technology solutions, building hardening techniques, operational policies and procedures, and the role of school staff, emergency responders, public health officials, and other appropriate resources. The TRASR should be broad enough in scope to include neighborhood conditions to represent the true school environment ecosystem.

    3) The TRASR should include a phased over time implementation strategy with achievable milestones representing increasing levels of security enhancement. This should apply to pre-school programs, licensed day cares and, regardless of their size, all other schools.

    4) In K-12 schools, the TRASR should include a definitive analysis of whether or not to have a School Resource Officer (SRO) and address after-school access/activities as well.

19. Requiring that schools, utilizing information developed using the TRASR tool as well as through input from relevant stakeholders, develop an Emergency Response Plan (ERP). This ERP should be sure to include information-sharing protocols and off-site reunification plans should the school require evacuation. Like fire drills, the exercise of this ERP (including response by outside public safety agencies) should be mandated and an age- and developmentally-appropriate curriculum around issues of safety/security should be developed by the State of Connecticut to assist in the effective integration of security policies into all classrooms. Evidence (including after-action reports) of drills

11

should be incorporated in the ERP to enhance accountability.

20. Requiring that all schools develop a Safe Schools Plan (SSP) that incorporates the TRASR, ERP, security policies, building design elements, staff responsibilities during emergencies, and other critical pieces of information. The SSP shall be submitted to and reviewed by the DESPP Division of Emergency Management and Homeland Security; updates to the SSP must respond to DESPP Division of Emergency Management and Homeland Security comments regarding hazards or oversights.

21. Requiring that every school establish a Safe Schools Planning Committee charged with oversight of safety and security issues as well as ensuring compliance with timelines affiliated with the TRASR, ERP, and SSP.  This Safe Schools Planning Committee should be required to meet no less than three times per year and should incorporate not only school personnel, but community members.

22. Requiring that the ERPs submitted to DESPP Division of Emergency Management and Homeland Security by institutes of higher learning be not only collected by DESPP Division of Emergency Management and Homeland Security, but also reviewed and approved by that agency.

23. Assigning a full-time emergency planner at DESPP Division of Emergency Management and Homeland Security to review and comment on submissions as well as assist schools and school districts, as necessary, with the preparation of emergency plans.

The Commission finds that, in an emergency, real-time and high-fidelity data is critical to an effective response by first responders.  Such data enhances situational awareness and can help establish a common operating picture during a multi-jurisdictional response. The Commission finds that changes to first responder protocols regarding an "active shooter" instituted in the law enforcement community after the tragedy at Columbine High School have saved lives. However, the Commission feels that additional efforts to provide current data to law enforcement can further improve response to such threats.  The Commission believes the State of Connecticut should consider:

24. Implementing a program which requires that each school provide local police, fire, and emergency response personnel with up-to-date copies of building floor plans, blueprints, schematics of school interiors, grounds, road maps of the surrounding area, evacuation routes, alternative evacuation routes, shelter site, procedures for addressing medical needs, transportation, and emergency notification to parents.  Efforts should be made to digitize plans and schematics to assist in dissemination in case of emergency.

25. Requiring school facilities to evaluate cell phone coverage throughout the facilities and grounds and make reasonable efforts to address deficiencies while, at the same time, reinforcing school policies on cell phone usage during non-emergencies.

26. Encouraging the deployment of enhanced WiFi in schools and the usage of IP enabled

cameras (to support response capacity).  Special attention should be given to perimeter surveillance and areas of assembly.


## Identification and Financing of School Hardening Tactics

The Commission finds that the "hardening" of schools as targets will require additional support of the State of Connecticut, to address both a lack of full access to the array of hardening tools/techniques, as well as the financing of those improvements.  The Commission also understands that the incorporation of security elements should be done at the earliest stages of design. The Commission believes the State of Connecticut should carefully consider:

27. Creating a blue-ribbon panel of design and security experts to establish, within 12 months, the toolbox of recommendations for safe design and retrofit of schools to be included in state's educational specifications.

28. Modifying State Construction Grant applications to include a new category of project: SU/Security Upgrades.

29. Requiring that the School Facility Survey (ED050) incorporate security criteria.

30. Requiring School Building Committees engaged in construction or renovation projects to seek input and comment from local first responders.

31. Requiring School Building Committees to reference a specific review of the toolbox created by the blue-ribbon commission when seeking State funding for construction or renovation.


## Human Resource Training and Capacity-Building

The Commission finds that effective training of staff resources provides the most critical, timely, and effective mechanism for resisting a threat to schools based upon a human actor.  The Commission notes that all adults present in the schools, be they teachers, substitute teachers, custodians, paraprofessionals, administrators, volunteers, or other staff, all play a critical role in time of emergency. The Commission also observes that, in the wake of recent tragedies and attempted efforts to destroy the sanctity of our school spaces, we must redouble our efforts to restrict access to school buildings by those who may, by effort or inadvertently, expose schoolchildren to risk. The Commission believes the State of Connecticut should consider:

32. Requiring the State Department of Education to establish a training course for school staff specifically designed to increase awareness of security policies and programs.

13

33. Requiring that, upon the implementation of any new security measure or change in the legislative or regulatory environments regarding school security, all relevant staff be trained in management or operation of any new equipment and instructed in their role during an emergency due to any change in policy, practice, or regulation. Such roles and responsibilities may include utility and alarm shutoffs.

34. Requiring the training of appropriate school personnel in the National Incident Management System and Incident Command System, the uniform mechanisms for emergency management response to a crisis situation.  Such Unified Command Structure should specifically incorporate municipal/regional officials, school officials, and emergency response personnel.

35. Requiring, for the purposes of supervised access and controlled entry, a Trusted Access Program (TAP) to be enforced at all schools. This TAP will allow, through the visual display of credentials, the identification of staff, contractors, parents, and others authorized to be on school grounds.

36. Requiring background screening for all staff in schools.

37. Establishing a best practices guide for effective bullying and threat identification, prevention, and response to be made available to all schools.

38. Requiring that a quality assurance (QA) program be implemented in all schools to ensure that appropriate matters arising within the school are referred to local law enforcement for review and action.

14

## Additional Required Partnerships and Support

The Commission recognizes that the resources available at the local, regional, and State levels are inadequate to establish norms, standards, and opportunities that enhance the safety of all of our public spaces.  As such, the Commission believes that the State of Connecticut should consider seeking additional support from federal officials in critical areas.

The Commission understands and acknowledges that, in order to effectively weave this tapestry of safe school design and human resource emergency preparedness, additional resources will be required (including for the funding of a full-time emergency manager for preparedness at DESPP Division of Emergency Management and Homeland Security).   In order to assist in the development of these necessary financial resources and technical assistance, the Commission believes the State of Connecticut should consider:

39. Seeking, through Connecticut's federal delegation, funding for:

    1)  National Incident Management System (NIMS) training;

    2)  Re-funding of the Safe and Drug Free Schools program at U.S. Department of Education;

    3)  Re-funding of the Readiness Emergency Management Program for Schools program.

40. Requesting assistance from the State of Connecticut's Congressional Delegation in ending the federal ban on research into gun violence.  The Commission believes that quality data in this area would support the development of quality public policy.

41. Developing, through partnerships with universities, medical groups, and other relevant parties, a Connecticut-based academic institute dedicated to providing quality research data on all aspects of gun violence and its impacts.  The Commission believes that the State of Connecticut should be the national leader in providing this research data.

## Miscellaneous

**Commission Findings:**

The Commission finds, that in the wake of an extreme tragedy, local resources are frequently overcome by the generous donations of others and the management of those donations. The Commission believes the State of Connecticut should consider:

42. Establishing best practices information for management of donated supplies and materials as well as a communications management plan for delivery of timely and appropriate material to press.

# Exhibit 71



**Violence Policy Center**

# Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use

## An Analysis of Federal Bureau of Investigation and National Crime Victimization Survey Data

**The Violence Policy Center** (VPC) is a national non-profit educational organization that conducts research and public education on violence in America and provides information and analysis to policymakers, journalists, advocates, and the general public. This study was funded with the support of the David Bohnett Foundation, The Herb Block Foundation, and The Joyce Foundation. This study was authored by VPC Senior Policy Analyst Marty Langley and VPC Executive Director Josh Sugarmann. Past studies released by the VPC include:

*Lost Youth: A County-by-County Analysis of 2011 California Homicide Victims Ages 10 to 24* (March 2013) ◆ *States With Higher Gun Ownership and Weak Gun Laws Lead Nation in Gun Death* (February 2013, annual study) ◆ *Black Homicide Victimization in the United States: An Analysis of 2010 Homicide Data* (January 2013, annual study) ◆ *When Men Murder Women: An Analysis of 2010 Homicide Data* (September 2012, annual study) ◆ *Understanding the Smith & Wesson M&P15 Semiautomatic Assault Rifle Used in the Aurora, Colorado Mass Murder* (July 2012) ◆ *Gun Deaths Outpace Motor Vehicle Deaths in 10 States in 2009* (May 2012) ◆ *Bullet Buttons: The Gun Industry's Attack on California's Assault Weapons Ban* (May 2012) ◆ *American Roulette: Murder-Suicide in the United States* (May 2012, Third Edition) ◆ *"Never Walk Alone"—How Concealed Carry Laws Boost Gun Industry Sales* (April 2012) ◆ *More Guns, More Shootings* (January 2012) ◆ *The Militarization of the U.S. Civilian Firearms Market* (June 2011) ◆ *A Shrinking Minority: The Continuing Decline of Gun Ownership in America* (April 2011) ◆ *Blood Money: How the Gun Industry Bankrolls the NRA* (April 2011) ◆ *Accessories to Murder* (January 2011) ◆ *Drive-by America: Second Edition* (July 2010) ◆ *Lessons Unlearned—The Gun Lobby and the Siren Song of Anti-Government Rhetoric* (April 2010) ◆ *Target: Law Enforcement—Assault Weapons in the News* (February 2010) ◆ *Law Enforcement and Private Citizens Killed by Concealed Handgun Permit Holders—An Analysis of News Reports, May 2007 to April 2009* (July 2009) ◆ *Indicted: Types of Firearms and Methods of Gun Trafficking from the United States to Mexico as Revealed in U.S. Court Documents* (April 2009) ◆ *Iron River: Gun Violence and Illegal Firearms Trafficking on the U.S.-Mexico Border* (March 2009) ◆ *Youth Gang Violence and Guns: Data Collection in California* (February 2009) ◆ *"Big Boomers"—Rifle Power Designed Into Handguns* (December 2008) ◆ *An Analysis of the Decline in Gun Dealers: 1994 to 2007* (August 2007) ◆ *Clear and Present Danger: National Security Experts Warn About the Danger of Unrestricted Sales of 50 Caliber Anti-Armor Sniper Rifles to Civilians* (July 2005) ◆ *The Threat Posed to Helicopters by 50 Caliber Anti-Armor Sniper Rifles* (August 2004) ◆ *United States of Assault Weapons: Gunmakers Evading the Federal Assault Weapons Ban* (July 2004) ◆ *Vest Buster: The .500 Smith & Wesson Magnum—The Gun Industry's Latest Challenge to Law Enforcement Body Armor* (June 2004) ◆ *Bullet Hoses—Semiautomatic Assault Weapons: What Are They? What's So Bad About Them?* (May 2003) ◆ *"Officer Down"—Assault Weapons and the War on Law Enforcement* (May 2003) ◆ *"Just Like Bird Hunting"—The Threat to Civil Aviation from 50 Caliber Sniper Rifles* (January 2003) ◆ *Sitting Ducks—The Threat to the Chemical and Refinery Industry from 50 Caliber Sniper Rifles* (August 2002) ◆ *License to Kill IV: More Guns, More Crime* (June 2002) ◆ *The U.S. Gun Industry and Others Unknown—Evidence Debunking the Gun Industry's Claim that Osama bin Laden Got His 50 Caliber Sniper Rifles from the U.S. Afghan-Aid Program* (February 2002) ◆ *"A .22 for Christmas"—How the Gun Industry Designs and Markets Firearms for Children and Youth* (December 2001) ◆ *Unintended Consequences: Pro-Handgun Experts Prove That Handguns Are a Dangerous Choice For Self-Defense* (November 2001) ◆ *Voting from the Rooftops: How the Gun Industry Armed Osama bin Laden, Other Foreign and Domestic Terrorists, and Common Criminals with 50 Caliber Sniper Rifles* (October 2001) ◆ *Hispanics and Firearms Violence* (May 2001) ◆ *Where'd They Get Their Guns?—An Analysis of the Firearms Used in High-Profile Shootings, 1963 to 2001* (April 2001) ◆ *A Deadly Myth: Women, Handguns, and Self-Defense* (January 2001) ◆ *Handgun Licensing and Registration: What it Can and Cannot Do* (September 2000) ◆ *Pocket Rockets: The Gun Industry's Sale of Increased Killing Power* (July 2000) ◆ *Guns For Felons: How the NRA Works to Rearm Criminals* (March 2000) ◆ *One Shot, One Kill: Civilian Sales of Military Sniper Rifles* (May 1999) ◆ *Cease Fire: A Comprehensive Strategy to Reduce Firearms Violence* (Revised, October 1997)

Violence Policy Center, 1730 Rhode Island Avenue, NW, Suite 1014, Washington, DC  20036
202-822-8200  phone, 202-822-8205  fax, www.vpc.org  web
© April 2013, Violence Policy Center

# Introduction

Guns are rarely used to kill criminals or stop crimes.

In 2010, across the nation there were only 230 justifiable homicides[1] involving a private citizen using a firearm reported to the Federal Bureau of Investigation's Uniform Crime Reporting (UCR) Program as detailed in its Supplementary Homicide Report (SHR).[2]  That same year, there were 8,275 criminal gun homicides tallied in the SHR.  *In 2010, for every justifiable homicide in the United States involving a gun, guns were used in 36 criminal homicides.*[3]  And this ratio, of course, does not take into account the thousands of lives ended in gun suicides (19,392) or unintentional shootings (60
6) that year.[4]

This report analyzes, on both the national and state levels, the use of firearms in justifiable homicides.  It also details, using the best data available on the national level, the *total* number of times guns are used for self-defense by the victims of both attempted and completed violent crimes and property crimes—whether or not the use of the gun by the victim resulted in a fatality.

Key findings of this report, as detailed in its accompanying tables, include the following.

---

[1]    The Federal Bureau of Investigation (FBI) defines "justifiable homicide" as the killing of a felon, during the commission of a felony, by a private citizen.

[2]    The Federal Bureau of Investigation's Uniform Crime Reporting (UCR) Program collects basic information on serious crimes from participating police agencies and records supplementary information about the circumstances of homicides in its unpublished Supplementary Homicide Report (SHR).  The SHR contains more detailed information not available through published UCR data or elsewhere including:  the age, sex, and race of victims and offenders; the types of weapons used; the relationship of victims to offenders; and, the circumstances of the homicides.  Detailed information (such as weapon used, relationship between the victim and offender, etc) in the SHR is available *only* for the first victim and/or offender in any justifiable homicide or homicide incident.  From 2006 to 2010, 97.8 percent of justifiable homicide incidents (1,008 out of 1,031) had just one victim.  Recognizing how the data is presented in the SHR and the fact that virtually all justifiable incidents had just one victim, throughout this report justifiable homicide incidents will be referred to as justifiable homicides.

[3]    Number of reported justifiable homicides and homicides taken from Federal Bureau of Investigation (FBI) Uniform Crime Reporting (UCR) Program Supplementary Homicide Report (SHR) as tabulated by the Violence Policy Center.  It is important to note that the coding contained in the SHR data used in this report comes from law enforcement reporting at the local level.  The level of information submitted to the SHR system may vary from agency to agency.  While this study utilizes the best and most recent data available, it is limited by the degree of detail in the information submitted.

[4]    Source:  Federal Centers for Disease Control and Prevention WISQARS database.

**Justifiable Homicides with a Gun Compared to Criminal Gun Homicides**

- In 2010, there were only 230 justifiable homicides involving a gun.  For the five-year period 2006 through 2010, there were only 1,031 justifiable homicides involving a gun.  [For additional information see *Table One:  Firearm Justifiable Homicides by State, 2006–2010.*]

- In 2010, 15 states[5] reported no justifiable homicides (Alabama, Connecticut, Hawaii, Idaho, Illinois, Iowa, Montana, New Hampshire, New York, North Carolina, North Dakota, Vermont, West Virginia, Wisconsin, and Wyoming).  [For additional information see *Table One:  Firearm Justifiable Homicides by State, 2006–2010.*]

- In 2010 for every justifiable homicide in the United States involving a gun, guns were used in 36 criminal homicides.  For the five-year period 2006 through 2010, for every justifiable homicide in the United States involving a gun, guns were used in 44 criminal homicides.  [For additional information see *Table Two:  Circumstances for Homicides by Firearm, 2006–2010.*]

**Relationship of Person Killed to Shooter in Justifiable Homicides**

- In 2010, 35.7 percent (82 of 230) of persons killed in a firearm justifiable homicide were known[6] to the shooter, 56.5 percent (130) were strangers, and in 7.8 percent (18) the relationship was unknown.   For the five-year period 2006 through 2010,  31.4 percent (324 of 1,031) of persons killed in a firearm justifiable homicide were known to the shooter, 57.0 percent (588) were strangers, and in 11.5 percent (119) the relationship was unknown.  [For additional information see *Table Three:  Relationship of Person Killed to Shooter in Justifiable Homicides by Firearm, 2006–2010.*]

---

[5]     In 2010, as in years past, the state of Florida did not submit any data to the FBI Supplementary Homicide Report.  Data from Florida was not requested individually because the difference in collection techniques would create a bias in the study results.  In addition, according to the FBI, limited SHR data was received from Illinois for 2010.  For the five-year period 2006 through 2010, the District of Columbia submitted SHR data only in 2009, during which there were no justifiable homicides in the District.

[6]     Relationship categories in which the justifiable homicide victim was known to the shooter are acquaintance, boyfriend, brother, common-law husband, employee, ex-husband, ex-wife, father, friend, girlfriend, husband, in-law, neighbor, other family, other known, son, stepfather, stepson, and wife.

**Sex of Shooter in Justifiable Homicides by Firearm**

- In 2010, of the 230 firearm justifiable homicides, 89.1 percent (205) were committed by men, 10.4 percent (24) were committed by women, and in one case (0.4 percent) the gender of the shooter was unknown.  For the five-year period 2006 through 2010, of the 1,031 firearm justifiable homicides, 91.3 percent (941) were committed by men, 7.3 percent (75) were committed by women, and in 15 cases (1.5 percent) the gender of the shooter was unknown.  [For additional information see *Table Four:  Sex of Shooter in Justifiable Homicides by Firearm, 2006–2010*.]

**Sex of Shooters and Persons Killed, Justifiable Homicides by Firearm**

- In 2010, of the 230 firearm justifiable homicides, 98.3 percent (226) of the persons shot and killed were men and 1.7 percent (four) were women.  For the five-year period 2006 through 2010, of the 1,031 firearm justifiable homicides, 98.5 percent (1,016) of the persons shot and killed were men and 1.5 percent (15) were women.  [For additional information see *Table Five:  Sex of Person Killed in Justifiable Homicides by Firearm, 2006–2010*.]

- In 2010, 98.5 percent (202) of the persons killed by a male with a gun in a justifiable homicide were male and 1.5 percent (three) were female.  For the five-year period 2006 through 2010, 98.7 percent (929) of the persons killed by a male with a gun in a justifiable homicide were male and 1.3 percent (12) were female.  [For additional information see *Table Six:  Sex of Shooter and Person Killed, Justifiable Homicides by Firearm, 2006–2010*.]

- In 2010, 95.8 percent (23) of the persons killed by a female with a gun in a justifiable homicide incident were male and 4.2 percent (one) were female.  For the five-year period 2006 through 2010, 96.0 percent (72) of the persons killed by a female with a gun in a justifiable homicide incident were male and 4.0 percent (three) were female.  [For additional information see *Table Six:  Sex of Shooter and Person Killed, Justifiable Homicides by Firearm, 2006–2010*.]

**Race of Shooter in Justifiable Homicides by Firearm**

■    In 2010, 52.6 percent (121) of the shooters who committed justifiable homicides were white, 44.3 percent (102) were black, 2.2 percent (five) were Asian, none were American Indian, and 0.9 percent (two) were of unknown race.[7]  For the five-year period 2006 through 2010, 53.1 percent (547) of the shooters who committed justifiable homicides were white, 40.8 percent (421) were black, 3.3 percent (34) were Asian, 0.4 percent (four) were American Indian, and 2.4 percent (25) were of unknown race.  [For additional information see *Table Seven:  Race of Shooter in Justifiable Homicides by Firearm, 2006–2010.*]

**Race of Persons Killed in Justifiable Homicides by Firearm**

■    In 2010, 39.1 percent (90) of persons killed with a gun in a justifiable homicide were white, 60.0 percent (138) were black, none were Asian, 0.4 percent (one) was American Indian, and 0.4 percent (one) were of unknown race.  For the five-year period 2006 through 2010,  39.6 percent (408) of persons killed with a gun in a justifiable homicide were white, 58.2 percent (600) were black, 0.4 percent (four) were Asian, 1.1 percent (11) were American Indian, and 0.8 percent (eight) were of unknown race.  [For additional information see *Table Eight:  Race of Persons Killed in Justifiable Homicides by Firearm, 2006–2010.*]

■    In 2010, 67.8 percent (82) of the persons killed with a gun in a justifiable homicide by a white shooter were white, 30.6 percent (37) were black, none were Asian, 0.8 percent (one) were American Indian, and 0.8 percent (one) were of unknown race.  For the five-year period 2006 through 2010,  65.1 percent (356) of the persons killed by white shooters were white, 32.7 percent (179) were black, 0.2 percent (one) were Asian, 1.1 percent (six) were American Indian, and 0.9 percent (five) were of unknown race.  [For additional information see *Table Nine:  Race of Shooter and Person Killed, Justifiable Homicides by Firearm, 2006–2010.*]

---

[7]    Detailed information (such as race of offender and victim) in the FBI's Supplementary Homicide Report is only available for the first victim and/or offender in the incident.  Hispanic ethnicity could not be determined because of the inadequacy of data collection and reporting.

■ In 2010, 4.9 percent (five) of the persons killed with a gun in a justifiable homicide by a black shooter were white, 95.1 percent (97) were black, none were Asian, none were American Indian, and none were of unknown race. For the five-year period 2006 through 2010, 7.6 percent (32) of the persons killed by black shooters were white, 92.2 percent (388) were black, none were Asian, 0.2 percent (one) were American Indian, and none were of unknown race. [For additional information see *Table Nine:  Race of Shooter and Person Killed, Justifiable Homicides by Firearm, 2006–2010*.]

**Types of Firearms Used in Justifiable Homicides**

■ In 2010, firearms were used in 83.0 percent of justifiable homicides (230 of 277).  Of these:  72.2 percent (166) were handguns; 12.2 percent (28) were shotguns; 3.5 percent (eight) were rifles; and, 12.2 percent (28) were firearm, type not stated.  For the five-year period 2006 through 2010, firearms were used in 81.3 percent of justifiable homicide incidents (1,031 of 1,268).  Of these:  77.7 percent (801) were handguns; 9.1 percent (94) were shotguns; 4.5 percent (46) were rifles; 8.5 percent (88) were firearm, type not stated; and, 0.2 percent (two) were "other gun."  [For additional information see *Table Ten:  Weapon Used in Justifiable Homicides, 2006–2010* and *Table Eleven:  Type of Firearms Used in Justifiable Homicides, 2006–2010*.]

**Number of Persons Shot and Killed in Justifiable Homicides by Firearm**

■ In 2010, of the 230 justifiable homicides involving a firearm:  98.3 percent (226) involved a single person killed in the justifiable homicide; 0.9 percent (two) involved two persons killed in the justifiable homicide; and, 0.9 percent (two) involved three persons killed in the justifiable homicide.  For the five-year period 2006 through 2010, of the 1,031 justifiable homicides involving a firearm:  97.8 percent (1,008) involved a single person killed in the justifiable homicide; 1.8 percent (19) involved two persons killed in the justifiable homicide; 0.3 percent (three) involved three persons killed in the justifiable homicide; and, 0.1 percent (one) involved five persons killed in the justifiable homicide.

### How Often are Guns Used in Self-Defense Whether or Not a Criminal is Killed?

While it is clear that guns are rarely used to justifiably kill criminals, an obvious question remains:  How often are guns used in self-defense whether or not a criminal is killed?

Pro-gun advocates—from individual gun owners to organizations like the National Rifle Association—frequently claim that guns are used up to 2.5 million times each year in self-defense in the United States.[8]  According to the 2004 book *Private Guns, Public Health* by Dr. David Hemenway, Professor of Health Policy at the Harvard School of Public Health and director of the Harvard Injury Control Research Center:

> Much discussion about the protective benefits of guns has focused on the incidence of self-defense gun use.  Proponents of such putative benefits often claim that 2.5 million Americans use guns in self-defense against criminal attackers each year.  This estimate is not plausible and has been nominated as the "most outrageous number mentioned in a policy discussion by an elected official."

In his book, Hemenway dissects the 2.5 million number from a variety of angles and, by extension, the NRA's own non-lethal self-defense claims for firearms.  He concludes, "It is clear that the claim of 2.5 million annual self-defense gun uses is a vast overestimate" and asks, "But what can account for it?"  As he details in his book, the main culprit is the "telescoping and...false positive problem" that derives from the very limited number of respondents claiming a self-defense gun use, "a matter of misclassification that is well known to medical epidemiologists."[9]

---

[8]       See, for example:  "The Armed Citizen" ("Studies indicate that firearms are used more than 2 million times a year for personal protection...."), *America's 1st Freedom*, National Rifle Association, March 2013; "Bob Costas interrupts football game to bash American gun owners" ("According to criminologist Gary Kleck, 2.5 million Americans use firearms to defend their lives and the lives of their loved ones each year"), Chris W. Cox, NRA-ILA Executive Director (http://www.nraila.org/about-nra-ila/from-the-director.aspx, downloaded April 8, 2013); and, "Chris Cox's NRA Armed Citizen:  True Stories of Your Right to Self Defense in Action," ("While the anti-gun media doesn't want to report the truth about Americans using guns for self-defense as often as 2.5 million times a year, you can read breaking stories of everyday citizens fending off violent criminals in CHRIS COX'S ARMED CITIZEN"), *Armed Citizen E-Newsletter* (https://www.nra.org/armedcitizen/, downloaded April 8, 2013).  The 2.5 million estimate is the result of a telephone survey conducted by Florida State University criminologist Dr. Gary Kleck, see Hemenway, David, "The Myth of Millions of Annual Self-Defense Gun Uses:  A Case Study of Survey Overestimates of Rare Events," *Chance* (American Statistical Association), Volume 10, No. 3, 1997.

[9]       For a more detailed discussion, please see Hemenway, David, *Private Guns, Public Health*, (The University of Michigan Press, 2004), pp. 66-69 and pp. 238-243.

### New Estimates on Self-Defense Uses of Firearms from the Bureau of Justice Statistics'
### National Crime Victimization Survey

Hemenway notes, and numerous others agree, that the most accurate survey of self-defense gun use is the National Crime Victimization Survey (NCVS) conducted by the Bureau of Justice Statistics.  The survey has been ongoing since 1973.[10]

**Violent Crime**

According to the NCVS, looking at the total number of self-protective behaviors undertaken by victims of both attempted and completed violent crime for the *five-year period 2007 through 2011*, in only 0.8 percent of these instances had the intended victim in resistance to a criminal "threatened or attacked with a firearm."[11]  As detailed in the chart on the next page, for the *five-year period 2007 through 2011*, the NCVS estimates that there were 29,618,300 victims of attempted or completed violent crime.  During this same *five-year period*, only 235,700 of the self-protective behaviors involved a firearm.  Of this number, it is not known what type of firearm was used or whether it was fired or not.  The number may also include off-duty law enforcement officers who use their firearms in self-defense.

---

[10]     According to the website of the Bureau of Justice Statistics, the National Crime Victimization Survey (NCVS) "is the Nation's primary source of information on criminal victimization.  Each year, data are obtained from a nationally representative sample of about 40,000 households comprising nearly 75,000 persons on the frequency, characteristics and consequences of criminal victimization in the United States.  Each household is interviewed twice during the year.  The survey enables BJS to estimate the likelihood of victimization by rape, sexual assault, robbery, assault, theft, household burglary, and motor vehicle theft for the population as a whole as well as for segments of the population such as women, the elderly, members of various racial groups, city dwellers, or other groups. The NCVS provides the largest national forum for victims to describe the impact of crime and characteristics of violent offenders," (see http://www.bjs.gov/index.cfm?ty=dcdetail&iid=245).

[11]     For "violent crime" the NCVS measures rape/sexual assault, robbery, and aggravated and simple assault (see Bureau of Justice Statistics, "Violent Crime," http://bjs.gov/index.cfm?ty=tp&tid=31#summary).

| Self-Protective Behaviors by Type of Crime, 2007–2011 | | | | |
|---|---|---|---|---|
| | Violent Crime 2007–2011 | | Property Crime 2007–2011 | |
| | Total | Percent | Total | Percent |
| **Total Number of Crimes** | 29,618,300 | 100 | 84,495,500 | 100 |
| | | | | |
| **Self-Protective Behavior** | | | | |
| Offered no resistance | 12,987,300 | 43.8 | 10,162,000 | 12.0 |
| Threatened or attacked with a firearm | 235,700 | 0.8 | 103,000 | 0.1 |
| Threatened or attacked with other weapon | 391,100 | 1.3 | 38,200 | – |
| Threatened or attacked without a weapon | 6,552,900 | 22.1 | 421,300 | 0.5 |
| Nonconfrontational tactics–yelled, ran, or argued | 7,768,700 | 26.2 | 1,187,100 | 1.4 |
| Other reaction | 1,641,300 | 5.5 | 223,400 | 0.3 |
| Unknown reaction | 41,300 | 0.1 | 12,200* | – |
| Property crime–victim not present | ~ | ~ | 72,348,200 | 85.6 |
| | | | | |
| – Less than 0.1 percent | ~ Not applicable | | | |
| * Interpret with caution. Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50 percent. | | | | |
| Source:  SPECIAL TABULATION, Bureau of Justice Statistics, National Crime Victimization Survey, 2007-2011 | | | | |

**Property Crime**

According to the NCVS, looking at the total number of self-protective behaviors undertaken by victims of attempted or completed property crime for the *five-year period 2007 through 2011*, in only 0.1 percent of these instances had the intended victim in resistance to a criminal "threatened or attacked with a firearm."[12]  As detailed in the table on the previous page, for the *five-year period 2007 through 2011*, the NCVS estimates that there were 84,495,500 victims of attempted or completed property crime.  During this same *five-year period*, only 103,000 of the self-protective behaviors involved a firearm.  Of this number, it is not known what type of firearm was used, whether it was fired or not, or whether the use of a gun would even be a legal response to the property crime.  And as before, the number may also include off-duty law enforcement officers.  In comparison, new data from the Department of Justice shows that an average of 232,400 guns were stolen *each year* from U.S. households from 2005 to 2010.[13]


**Comparing NCVS Data to Claims that Guns are Used in Self-Defense 2.5 Million Times a Year**

Using the NCVS numbers, for the *five-year period* 2007 through 2011, the total number of self-protective behaviors involving a firearm by victims of attempted or completed violent crimes or property crimes totaled only 338,700.  In comparison, the gun lobby claims that during the same *five-year period* guns were used 12.5 million times in self-defense (applying to the five-year period the gun lobby's oft-repeated claim, noted earlier, that firearms are used in self-defense 2.5 million times a year).

---

[12]     For "property crime" the NCVS measures household burglary, motor vehicle theft, as well as property theft.  Since the survey information is obtained from a sample of households, it does not include property crimes affecting businesses or other commercial establishments.  If such crimes are reported to law enforcement, they are included in the FBI's Uniform Crime Reporting Program.  The NCVS includes property crimes affecting victims and household members which were reported and not reported to the police.  (See Bureau of Justice Statistics, "Property Crime," http://bjs.gov/index.cfm?ty=tp&tid=32).

[13]     "Firearms Stolen during Household Burglaries and Other Property Crimes 2005–2010," U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, November 2012.

## Conclusion

The reality of self-defense gun use bears no resemblance to the exaggerated claims of the gun lobby and gun industry.  The number of justifiable homicides that occur in our nation each year pale in comparison to criminal homicides, let alone gun suicides and fatal unintentional shootings.  And contrary to the common stereotype promulgated by the gun lobby,[14] those killed in justifiable homicide incidents don't always fit the expected profile of an attack by a stranger:  in 35.7 percent of the justifiable homicides that occurred in 2010 the persons shot were known to the shooter.

The devastation guns inflict on our nation each and every year is clear:  nearly 32,000 dead, more than 73,000 wounded, and an untold number of lives and communities shattered.  Unexamined claims of the efficacy and frequency of the self-defense use of firearms are the default rationale offered by the gun lobby and gun industry for this unceasing, bloody toll.  The idea that firearms are frequently used in self-defense is the primary argument that the gun lobby and firearms industry use to expand the carrying of firearms into an ever-increasing number of public spaces and even to prevent the regulation of military-style semiautomatic assault weapons and high-capacity ammunition magazines.  Yet this argument is hollow and the assertions false.  When analyzing the most reliable data available, what is most striking is that in a nation of more than 300 million guns, how *rarely* firearms are used in self-defense.[15]

---

[14]     For an example of the images used by the NRA, see those accompanying "Chris Cox's NRA Armed Citizen:  True Stories of Your Right to Self Defense in Action," *Armed Citizen E-Newsletter* (https://www.nra.org/armedcitizen/, downloaded April 8, 2013).

[15]     It is estimated that the total number of firearms available to civilians in the United States is 310 million:  114 million handguns, 110 million rifles, and 86 million shotguns.  Krouse, William J., *Gun Control Legislation*, Congressional Research Service, November 14, 2012, p. 8.

**Table One:  Firearm Justifiable Homicides by State, 2006–2010**                    **Page 11**

| State | Number of Justifiable Homicides | | | | | |
|---|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010** | **Total** |
| Alabama | 1 | 2 | 3 | 0 | 0 | **6** |
| Alaska | 2 | 1 | 0 | 4 | 2 | **9** |
| Arizona | 10 | 10 | 17 | 13 | 16 | **66** |
| Arkansas | 1 | 1 | 2 | 0 | 3 | **7** |
| California | 24 | 24 | 17 | 20 | 23 | **108** |
| Colorado | 3 | 3 | 4 | 4 | 5 | **19** |
| Connecticut | 0 | 1 | 0 | 0 | 0 | **1** |
| Delaware | 0 | 0 | 0 | 1 | 1 | **2** |
| Florida | N/A | N/A | N/A | N/A | N/A | **N/A** |
| Georgia | 10 | 8 | 18 | 11 | 19 | **66** |
| Hawaii | 0 | 1 | 0 | 0 | 0 | **1** |
| Idaho | 0 | 1 | 0 | 0 | 0 | **1** |
| Illinois | 1 | 2 | 0 | 2 | 0 | **5** |
| Indiana | 7 | 5 | 3 | 2 | 12 | **29** |
| Iowa | 0 | 0 | 0 | 0 | 0 | **0** |
| Kansas | 1 | 1 | 1 | 1 | 3 | **7** |
| Kentucky | 1 | 3 | 5 | 9 | 4 | **22** |
| Louisiana | 10 | 12 | 7 | 9 | 10 | **48** |

| State | Number of Justifiable Homicides | | | | | |
|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | Total |
| Maine | 0 | 2 | 0 | 0 | 1 | **3** |
| Maryland | 6 | 1 | 2 | 1 | 6 | **16** |
| Massachusetts | 0 | 0 | 0 | 0 | 2 | **2** |
| Michigan | 5 | 5 | 4 | 16 | 13 | **43** |
| Minnesota | 0 | 0 | 3 | 1 | 2 | **6** |
| Mississippi | 0 | 0 | 1 | 2 | 1 | **4** |
| Missouri | 4 | 6 | 12 | 3 | 5 | **30** |
| Montana | 0 | 0 | 0 | 0 | 0 | **0** |
| Nebraska | 0 | 0 | 0 | 2 | 1 | **3** |
| Nevada | 3 | 5 | 4 | 5 | 3 | **20** |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | **0** |
| New Jersey | 2 | 0 | 2 | 0 | 2 | **6** |
| New Mexico | 4 | 1 | 1 | 3 | 2 | **11** |
| New York | 5 | 0 | 0 | 0 | 0 | **5** |
| North Carolina | 7 | 2 | 2 | 6 | 0 | **17** |
| North Dakota | 0 | 0 | 0 | 0 | 0 | **0** |
| Ohio | 7 | 6 | 1 | 2 | 2 | **18** |
| Oklahoma | 7 | 10 | 6 | 4 | 5 | **32** |
| Oregon | 7 | 0 | 0 | 3 | 4 | **14** |
| Pennsylvania | 5 | 11 | 11 | 11 | 8 | **46** |

| State | Number of Justifiable Homicides | | | | | |
|---|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010 | Total |
| Rhode Island | 0 | 0 | 0 | 0 | 1 | **1** |
| South Carolina | 5 | 5 | 9 | 6 | 7 | **32** |
| South Dakota | 0 | 0 | 0 | 0 | 1 | **1** |
| Tennessee | 10 | 18 | 19 | 10 | 14 | **71** |
| Texas | 30 | 38 | 41 | 44 | 44 | **197** |
| Utah | 0 | 0 | 0 | 0 | 1 | **1** |
| Vermont | 0 | 0 | 0 | 0 | 0 | **0** |
| Virginia | 4 | 5 | 6 | 9 | 5 | **29** |
| Washington | 3 | 3 | 0 | 3 | 2 | **11** |
| West Virginia | 0 | 0 | 0 | 0 | 0 | **0** |
| Wisconsin | 2 | 3 | 4 | 6 | 0 | **15** |
| Wyoming | 0 | 0 | 0 | 0 | 0 | **0** |
| **Total** | **187** | **196** | **205** | **213** | **230** | **1,031** |

**Table Two:  Circumstances for Homicides by Firearm, 2006–2010**                                                   **Page 14**

| Circumstance | Number of Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| Criminal Homicide | 9,707 | 98.1% | 9,610 | 98.0% | 9,039 | 97.8% | 8,697 | 97.6% | 8,275 | 97.3% | **45,328** | **97.8%** |
| Justifiable Homicide | 187 | 1.9% | 196 | 2.0% | 205 | 2.2% | 213 | 2.4% | 230 | 2.7% | **1,031** | **2.2%** |
| Ratio of Criminal Homicide to Justifiable Homicide | 52-1 | | 49-1 | | 44-1 | | 41-1 | | 36-1 | | **44-1** | |
| **Total** | **9,894** | | **9,806** | | **9,244** | | **8,910** | | **8,505** | | **46,359** | |

**Table Three:  Relationship of Person Killed to Shooter in Justifiable Homicides by Firearm, 2006–2010**          Page 15

| Relationship | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| Acquaintance | 34 | 18.2% | 34 | 17.3% | 32 | 15.6% | 36 | 16.9% | 51 | 22.2% | 187 | 18.1% |
| Boyfriend | 0 | 0.0% | 2 | 1.0% | 2 | 1.0% | 1 | 0.5% | 2 | 0.9% | 7 | 0.7% |
| Brother | 0 | 0.0% | 1 | 0.5% | 2 | 1.0% | 0 | 0.0% | 0 | 0.0% | 3 | 0.3% |
| Common-Law Husband | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.1% |
| Employee | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.1% |
| Ex-Husband | 0 | 0.0% | 1 | 0.5% | 1 | 0.5% | 3 | 1.4% | 3 | 1.3% | 8 | 0.8% |
| Ex-Wife | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.4% | 1 | 0.1% |
| Father | 0 | 0.0% | 0 | 0.0% | 2 | 1.0% | 2 | 0.9% | 2 | 0.9% | 6 | 0.6% |
| Friend | 4 | 2.1% | 0 | 0.0% | 4 | 2.0% | 0 | 0.0% | 1 | 0.4% | 9 | 0.9% |
| Girlfriend | 0 | 0.0% | 1 | 0.5% | 1 | 0.5% | 0 | 0.0% | 1 | 0.4% | 3 | 0.3% |
| Husband | 3 | 1.6% | 2 | 1.0% | 0 | 0.0% | 1 | 0.5% | 1 | 0.4% | 7 | 0.7% |
| In-Law | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 1 | 0.4% | 2 | 0.2% |
| Neighbor | 3 | 1.6% | 3 | 1.5% | 3 | 1.5% | 4 | 1.9% | 3 | 1.3% | 16 | 1.6% |
| Other Family | 0 | 0.0% | 6 | 3.1% | 1 | 0.5% | 4 | 1.9% | 0 | 0.0% | 11 | 1.1% |
| Other Known | 11 | 5.9% | 7 | 3.6% | 9 | 4.4% | 9 | 4.2% | 7 | 3.0% | 43 | 4.2% |
| Son | 0 | 0.0% | 1 | 0.5% | 1 | 0.5% | 1 | 0.5% | 4 | 1.7% | 7 | 0.7% |
| Stepfather | 0 | 0.0% | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 2 | 0.9% | 3 | 0.3% |
| Stepson | 0 | 0.0% | 0 | 0.0% | 2 | 1.0% | 0 | 0.0% | 3 | 1.3% | 5 | 0.5% |
| Stranger | 105 | 56.1% | 106 | 54.1% | 124 | 60.5% | 123 | 57.7% | 130 | 56.5% | 588 | 57.0% |
| Wife | 1 | 0.5% | 1 | 0.5% | 1 | 0.5% | 1 | 0.5% | 0 | 0.0% | 4 | 0.4% |
| Unknown Relationship | 25 | 13.4% | 29 | 14.8% | 19 | 9.3% | 28 | 13.1% | 18 | 7.8% | 119 | 11.5% |
| **Total** | 187 | | 196 | | 205 | | 213 | | 230 | | 1,031 | |

**Table Four:  Sex of Shooter in Justifiable Homicides by Firearm, 2006–2010**                          **Page 16**

| Sex of Shooter | Number of Justifiable Homicides | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| Male | 166 | 88.8% | 179 | 91.3% | 192 | 93.7% | 199 | 93.4% | 205 | 89.1% | **941** | **91.3%** |
| Female | 15 | 8.0% | 12 | 6.1% | 11 | 5.4% | 13 | 6.1% | 24 | 10.4% | **75** | **7.3%** |
| Unknown | 6 | 3.2% | 5 | 2.6% | 2 | 1.0% | 1 | 0.5% | 1 | 0.4% | **15** | **1.5%** |
| **Total** | **187** | | **196** | | **205** | | **213** | | **230** | | **1,031** | |

**Table Five:  Sex of Person Killed in Justifiable Homicides by Firearm, 2006–2010**

| Sex of Person Killed | Number of Justifiable Homicides | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| Male | 184 | 98.4% | 192 | 98.0% | 202 | 98.5% | 212 | 99.5% | 226 | 98.3% | **1,016** | **98.5%** |
| Female | 3 | 1.6% | 4 | 2.0% | 3 | 1.5% | 1 | 0.5% | 4 | 1.7% | **15** | **1.5%** |
| **Total** | **187** | | **196** | | **205** | | **213** | | **230** | | **1,031** | |

**Table Six:  Sex of Shooter and Person Killed, Justifiable Homicides by Firearm, 2006–2010**

| Sex of Shooter | Sex of Person Killed | Number of Justifiable Homicides | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| Male | Male | 163 | 98.2% | 176 | 98.3% | 190 | 99.0% | 198 | 99.5% | 202 | 98.5% | **929** | **98.7%** |
| | Female | 3 | 1.8% | 3 | 1.7% | 2 | 1.0% | 1 | 0.5% | 3 | 1.5% | **12** | **1.3%** |
| Female | Male | 15 | 100.0% | 11 | 91.7% | 10 | 90.9% | 13 | 100.0% | 23 | 95.8% | **72** | **96.0%** |
| | Female | 0 | 0.0% | 1 | 8.3% | 1 | 9.1% | 0 | 0.0% | 1 | 4.2% | **3** | **4.0%** |
| **Total** | | **181** | | **191** | | **203** | | **212** | | **229** | | **1,016** | |

**Table Seven:  Race of Shooter in Justifiable Homicides by Firearm, 2006–2010**                    **Page 17**

| Race of Shooter | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| White | 103 | 55.1% | 97 | 49.5% | 114 | 55.6% | 112 | 52.6% | 121 | 52.6% | **547** | **53.1%** |
| Black | 71 | 38.0% | 83 | 42.3% | 74 | 36.1% | 91 | 42.7% | 102 | 44.3% | **421** | **40.8%** |
| Asian | 4 | 2.1% | 8 | 4.1% | 11 | 5.4% | 6 | 2.8% | 5 | 2.2% | **34** | **3.3%** |
| American Indian | 1 | 0.5% | 1 | 0.5% | 1 | 0.5% | 1 | 0.5% | 0 | 0.0% | **4** | **0.4%** |
| Unknown | 8 | 4.3% | 7 | 3.6% | 5 | 2.4% | 3 | 1.4% | 2 | 0.9% | **25** | **2.4%** |
| **Total** | **187** | | **196** | | **205** | | **213** | | **230** | | **1,031** | |

**Table Eight:  Race of Persons Killed in Justifiable Homicides by Firearm, 2006–2010**

| Race of Person Killed | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| White | 75 | 40.1% | 74 | 37.8% | 82 | 40.0% | 87 | 40.8% | 90 | 39.1% | **408** | **39.6%** |
| Black | 106 | 56.7% | 119 | 60.7% | 115 | 56.1% | 122 | 57.3% | 138 | 60.0% | **600** | **58.2%** |
| Asian | 1 | 0.5% | 0 | 0.0% | 2 | 1.0% | 1 | 0.5% | 0 | 0.0% | **4** | **0.4%** |
| American Indian | 4 | 2.1% | 1 | 0.5% | 3 | 1.5% | 2 | 0.9% | 1 | 0.4% | **11** | **1.1%** |
| Unknown | 1 | 0.5% | 2 | 1.0% | 3 | 1.5% | 1 | 0.5% | 1 | 0.4% | **8** | **0.8%** |
| **Total** | **187** | | **196** | | **205** | | **213** | | **230** | | **1,031** | |

**Table Nine:  Race of Shooter and Person Killed, Justifiable Homicides by Firearm, 2006–2010**                    **Page 18**

| Race of Shooter | Race of Person Killed | Number of Justifiable Homicides | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| White | White | 62 | 60.2% | 64 | 66.0% | 71 | 62.3% | 77 | 68.8% | 82 | 67.8% | 356 | 65.1% |
| | Black | 39 | 37.9% | 31 | 32.0% | 38 | 33.3% | 34 | 30.4% | 37 | 30.6% | 179 | 32.7% |
| | Asian | 0 | 0.0% | 0 | 0.0% | 1 | 0.9% | 0 | 0.0% | 0 | 0.0% | 1 | 0.2% |
| | American Indian | 1 | 1.0% | 0 | 0.0% | 3 | 2.6% | 1 | 0.9% | 1 | 0.8% | 6 | 1.1% |
| | Unknown | 1 | 1.0% | 2 | 2.1% | 1 | 0.9% | 0 | 0.0% | 1 | 0.8% | 5 | 0.9% |
| Black | White | 9 | 12.7% | 5 | 6.0% | 5 | 6.8% | 8 | 8.8% | 5 | 4.9% | 32 | 7.6% |
| | Black | 61 | 85.9% | 78 | 94.0% | 69 | 93.2% | 83 | 91.2% | 97 | 95.1% | 388 | 92.2% |
| | Asian | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| | American Indian | 1 | 1.4% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.2% |
| | Unknown | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| Asian | White | 1 | 25.0% | 2 | 25.0% | 5 | 45.5% | 0 | 0.0% | 1 | 20.0% | 9 | 26.5% |
| | Black | 2 | 50.0% | 6 | 75.0% | 5 | 45.5% | 4 | 66.7% | 4 | 80.0% | 21 | 61.8% |
| | Asian | 1 | 25.0% | 0 | 0.0% | 1 | 9.1% | 1 | 16.7% | 0 | 0.0% | 3 | 8.8% |
| | American Indian | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 16.7% | 0 | 0.0% | 1 | 2.9% |
| | Unknown | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| American Indian | White | 0 | 0.0% | 0 | 0.0% | 1 | 100.0% | 1 | 100.0% | 0 | 0.0% | 2 | 50.0% |
| | Black | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| | Asian | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| | American Indian | 1 | 100.0% | 1 | 100.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 2 | 50.0% |
| | Unknown | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% |
| **Total** | | **179** | | **189** | | **200** | | **210** | | **228** | | **1,006** | |

**Table Ten:  Weapon Used in Justifiable Homicides, 2006–2010**                    **Page 19**

| Weapon | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| Firearm | 187 | 80.3% | 196 | 78.1% | 205 | 83.0% | 213 | 81.9% | 230 | 83.0% | **1,031** | **81.3%** |
| Knife or cutting instrument | 31 | 13.3% | 37 | 14.7% | 30 | 12.1% | 29 | 11.2% | 32 | 11.6% | **159** | **12.5%** |
| Blunt object | 3 | 1.3% | 0 | 0.0% | 0 | 0.0% | 3 | 1.2% | 4 | 1.4% | **10** | **0.8%** |
| Bodily force | 3 | 1.3% | 10 | 4.0% | 3 | 1.2% | 8 | 3.1% | 4 | 1.4% | **28** | **2.2%** |
| Strangulation | 1 | 0.4% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.00% | **1** | **0.1%** |
| Asphyxiation | 0 | 0.0% | 0 | 0.0% | 1 | 0.4% | 1 | 0.4% | 0 | 0.00% | **2** | **0.2%** |
| Unknown | 8 | 3.4% | 8 | 3.2% | 8 | 3.2% | 6 | 2.3% | 7 | 2.5% | **37** | **2.9%** |
| **Total** | **233** | | **251** | | **247** | | **260** | | **277** | | **1,268** | |


**Table Eleven:  Type of Firearms Used in Justifiable Homicides, 2006–2010**

| Weapon | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2006 | | 2007 | | 2008 | | 2009 | | 2010 | | Total | |
| Firearm, type not stated | 11 | 5.9% | 9 | 4.6% | 19 | 9.3% | 21 | 9.9% | 28 | 12.2% | **88** | **8.5%** |
| Handgun | 152 | 81.3% | 158 | 80.6% | 162 | 79.0% | 163 | 76.5% | 166 | 72.2% | **801** | **77.7%** |
| Rifle | 10 | 5.3% | 8 | 4.1% | 11 | 5.4% | 9 | 4.2% | 8 | 3.5% | **46** | **4.5%** |
| Shotgun | 14 | 7.5% | 20 | 10.2% | 13 | 6.3% | 19 | 8.9% | 28 | 12.2% | **94** | **9.1%** |
| Other Gun | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | **2** | **0.2%** |
| **Total** | **187** | | **196** | | **205** | | **213** | | **230** | | **1,031** | |

# Exhibit 72

JUNE 2015


Violence Policy Center

# Firearm Justifiable Homicides and Non-Fatal Self-Defense Gun Use

An Analysis of Federal Bureau of Investigation and National Crime Victimization Survey Data

WWW.VPC.ORG

## COPYRIGHT AND ACKNOWLEDGMENTS

Copyright © June 2015 Violence Policy Center

The Violence Policy Center (VPC) is a national nonprofit educational organization that conducts research and public education on violence in America and provides information and analysis to policymakers, journalists, advocates, and the general public.

This study was funded with the support of The Herb Block Foundation and The Joyce Foundation.

For a complete list of VPC publications with document links, please visit http://www.vpc.org/studyndx.htm.

# INTRODUCTION

**Guns are rarely used to kill criminals or stop crimes.**

In 2012, across the nation there were only 259 justifiable homicides[1] involving a private citizen using a firearm reported to the Federal Bureau of Investigation's Uniform Crime Reporting (UCR) Program as detailed in its Supplementary Homicide Report (SHR).[2] That same year, there were 8,342 criminal gun homicides tallied in the SHR. *In 2012, for every justifiable homicide in the United States involving a gun, guns were used in 32 criminal homicides.*[3] And this ratio, of course, does not take into account the tens of thousands of lives ended in gun suicides or unintentional shootings that year.[4]

This report analyzes, on both the national and state levels, the use of firearms in justifiable homicides. It also details, using the best data available on the national level, the *total* number of times guns are used for self-defense by the victims of both attempted and completed violent crimes and property crimes whether or not the use of the gun by the victim resulted in a fatality.

Key findings of this report, as detailed in its accompanying tables, include the following.

## JUSTIFIABLE HOMICIDES WITH A GUN COMPARED TO CRIMINAL GUN HOMICIDES

■   In 2012, there were only 259 justifiable homicides involving a gun. For the five-year period 2008 through 2012, there were only 1,108 justifiable homicides involving a gun. [For additional information see *Table One: Firearm Justifiable Homicides by State, 2008-2012.*]

---

1   The Federal Bureau of Investigation (FBI) defines "justifiable homicide" as the killing of a felon, during the commission of a felony, by a private citizen.

2   The Federal Bureau of Investigation's Uniform Crime Reporting (UCR) Program collects basic information on serious crimes from participating police agencies and records supplementary information about the circumstances of homicides in its unpublished Supplementary Homicide Report (SHR). The SHR contains more detailed information not available through published UCR data or elsewhere including: the age, sex, and race of victims and offenders; the types of weapons used; the relationship of victims to offenders; and, the circumstances of the homicides. Detailed information (such as weapon used, relationship between the victim and offender, etc) in the SHR is available *only* for the first victim and/or offender in any justifiable homicide or homicide incident.  From 2008 to 2012, 97.9 percent of firearm justifiable homicide incidents (1,085 out of 1,108) had just one victim. Recognizing how the data is presented in the SHR and the fact that virtually all justifiable incidents had just one victim, throughout this report justifiable homicide incidents will be referred to as justifiable homicides.

3   Number of reported justifiable homicides and homicides taken from Federal Bureau of Investigation (FBI) Uniform Crime Reporting (UCR) Program Supplementary Homicide Report (SHR) as tabulated by the Violence Policy Center. It is important to note that the coding contained in the SHR data used in this report comes from law enforcement reporting at the local level. The level of information submitted to the SHR system may vary from agency to agency. While this study utilizes the best and most recent data available, it is limited by the degree of detail in the information submitted.

4   In 2012 there were 20,666 firearm suicide deaths and 548 fatal unintentional shootings. Source: Federal Centers for Disease Control and Prevention WISQARS database.

- In 2012, 13 states[5] reported no justifiable homicides (Connecticut, Delaware, Hawaii, Idaho, Iowa, Montana, New Hampshire, New Jersey, New York, North Dakota, Rhode Island, Vermont, and Wyoming). [For additional information see *Table One: Firearm Justifiable Homicides by State, 2008-2012.*]

- In 2012 for every justifiable homicide in the United States involving a gun, guns were used in 32 criminal homicides. For the five-year period 2008 through 2012, for every justifiable homicide in the United States involving a gun, guns were used in 38 criminal homicides. [For additional information see *Table Two: Circumstances for Homicides by Firearm, 2008-2012.*]

## RELATIONSHIP OF PERSON KILLED TO SHOOTER IN JUSTIFIABLE HOMICIDES BY FIREARM

- In 2012, 35.5 percent (92 of 259) of persons killed in a firearm justifiable homicide were known to the shooter,[6] 51.4 percent (133) were strangers, and in 13.1 percent (34) the relationship was unknown. For the five-year period 2008 through 2012, 32.9 percent (364 of 1,108) of persons killed in a firearm justifiable homicide were known to the shooter, 56.0 percent (620) were strangers, and in 11.2 percent (124) the relationship was unknown. [For additional information see *Table Three: Relationship of Person Killed to Shooter in Justifiable Homicides by Firearm, 2008-2012.*]

## SEX OF SHOOTER IN JUSTIFIABLE HOMICIDES BY FIREARM

- In 2012, of the 259 firearm justifiable homicides, 91.5 percent (237) were committed by men, 7.7 percent (20) were committed by women, and in two cases the gender of the shooter was unknown. For the five-year period 2008 through 2012, of the 1,108 firearm justifiable homicides, 91.5 percent (1,014) were committed by men, 7.7 percent (85) were committed by women, and in nine cases (0.8 percent) the gender of the shooter was unknown. [For additional information see *Table Four: Sex of Shooter in Justifiable Homicides by Firearm, 2008-2012.*]

## SEX OF SHOOTER AND PERSON KILLED IN JUSTIFIABLE HOMICIDES BY FIREARM

- In 2012, of the 259 firearm justifiable homicides, 98.1 percent (254) of the persons shot and killed were men and 1.9 percent (five) were women. For the five-year period 2008 through 2012, of the 1,108 firearm justifiable homicides, 98.4 percent (1,090) of the persons shot and killed were men and 1.6 percent (18) were women. [For additional information see *Table Five: Sex of Person Killed in Justifiable Homicides by Firearm, 2008-2012.*]

---

5   The state of Florida did not submit any data to the FBI Supplementary Homicide Report (SHR) for the years 2008 through 2012. Alabama did not submit data to the SHR for the years 2011 and 2012. In addition, according to the FBI, limited SHR data was received from Illinois for the years 2010 through 2012. For the five-year period 2008 through 2012, the District of Columbia submitted SHR data only in 2009, during which there were no justifiable homicides in the District. Data from these jurisdictions was not requested individually because the difference in collection techniques would create a bias in the study results.

6   Relationship categories in which the justifiable homicide victim was known to the shooter are acquaintance, boyfriend, brother, common-law husband, employee, ex-husband, ex-wife, father, friend, girlfriend, husband, in-law, neighbor, other family, other known, son, stepfather, stepson, and wife.

■ In 2012, 97.9 percent (232) of the persons killed by a male with a gun in a justifiable homicide were male and 2.1 percent (five) were female. For the five-year period 2008 through 2012, 98.4 percent (998) of the persons killed by a male with a gun in a justifiable homicide were male and 1.6 percent (16) were female. [For additional information see *Table Six: Sex of Shooter and Person Killed in Justifiable Homicides by Firearm, 2008-2012*.]

■ In 2012, 100.0 percent (20) of the persons killed by a female with a gun in a justifiable homicide incident were male and 0.0 percent (zero) were female. For the five-year period 2008 through 2012, 97.6 percent (83) of the persons killed by a female with a gun in a justifiable homicide incident were male and 2.4 percent (two) were female. [For additional information see *Table Six: Sex of Shooter and Person Killed in Justifiable Homicides by Firearm, 2008-2012*.]

## RACE OF SHOOTER IN JUSTIFIABLE HOMICIDES BY FIREARM

■ In 2012, 50.6 percent (131) of the shooters who committed justifiable homicides were white, 45.2 percent (117) were black, 2.3 percent (six) were Asian, 0.4 percent (one) were American Indian, and 1.5 percent (four) were of unknown race.[7] For the five-year period 2008 through 2012, 50.9 percent (564) of the shooters who committed justifiable homicides were white, 44.2 percent (490) were black, 2.9 percent (32) were Asian, 0.5 percent (five) were American Indian, and 1.5 percent (17) were of unknown race. [For additional information see *Table Seven: Race of Shooter in Justifiable Homicides by Firearm, 2008-2012*.]

## RACE OF PERSON KILLED IN JUSTIFIABLE HOMICIDES BY FIREARM

■ In 2012, 37.8 percent (98) of persons killed with a gun in a justifiable homicide were white, 58.7 percent (152) were black, 1.5 percent (four) were Asian, 1.2 percent (three) were American Indian, and 0.8 percent (two) were of unknown race. For the five-year period 2008 through 2012, 38.5 percent (427) of persons killed with a gun in a justifiable homicide were white, 59.1 percent (655) were black, 0.8 percent (nine) were Asian, 0.9 percent (10) were American Indian, and 0.6 percent (seven) were of unknown race. [For additional information see *Table Eight: Race of Person Killed in Justifiable Homicides by Firearm, 2008-2012*.]

■ In 2012, 64.9 percent (85) of the persons killed with a gun in a justifiable homicide by a white shooter were white, 30.5 percent (40) were black, 0.8 percent (one) were Asian, 2.3 percent (three) were American Indian, and 1.5 percent (two) were of unknown race. For the five-year period 2008 through 2012, 66.8 percent (377) of the persons killed by white shooters were white, 30.5 percent (172) were black, 0.4 percent (two) were Asian, 1.6 percent (nine) were American Indian, and 0.7 percent (four) were of unknown race. [For additional information see *Table Nine:  Race of Shooter and Person Killed in Justifiable Homicides by Firearm, 2008-2012*.]

■ In 2012, 8.6 percent (10) of the persons killed with a gun in a justifiable homicide by a black shooter were white, 91.5 percent (107) were black, none were Asian, none were American Indian, and none were of unknown race.  For the five-year period 2008 through 2012, 6.3 percent (31) of the persons killed by

---

7   Detailed information (such as race of offender and victim) in the FBI's Supplementary Homicide Report is only available for the first victim and/or offender in the incident.  Hispanic ethnicity could not be determined because of the inadequacy of data collection and reporting.

black shooters were white, 93.5 percent (458) were black, 0.2 percent (one) were Asian, none were American Indian, and none were of unknown race. [For additional information see *Table Nine:  Race of Shooter and Person Killed in Justifiable Homicides by Firearm, 2008-2012*.]

### TYPES OF FIREARMS USED IN JUSTIFIABLE HOMICIDES

■  In 2012, firearms were used in 83.8 percent of justifiable homicides (259 of 309). Of these: 75.3 percent (195) were handguns; 5.8 percent (15) were shotguns; 7.3 percent (19) were rifles; and, 11.6 percent (30) were firearm, type not stated. For the five-year period 2008 through 2012, firearms were used in 81.8 percent of justifiable homicide incidents (1,108 of 1,354).  Of these:  75.6 percent (838) were handguns; 7.8 percent (86) were shotguns; 5.3 percent (59) were rifles; 11.2 percent (124) were firearm, type not stated; and, 0.1 percent (one) were other gun. [For additional information see *Table Ten: Weapon Used in Justifiable Homicides, 2008-2012* and *Table Eleven: Type of Firearms Used in Justifiable Homicides, 2008-2012*.]

### NUMBER OF PERSONS SHOT AND KILLED IN JUSTIFIABLE HOMICIDES BY FIREARM

■  In 2012, of the 259 justifiable homicides involving a firearm: 98.5 percent (255) involved a single person killed in the justifiable homicide; 1.5 percent (four) involved two persons killed in the justifiable homicide. For the five-year period 2008 through 2012, of the 1,108 justifiable homicides involving a firearm: 97.9 percent (1,085) involved a single person killed in the justifiable homicide; 1.9 percent (21) involved two persons killed in the justifiable homicide; and, 0.2 percent (two) involved three persons killed in the justifiable homicide.

## HOW OFTEN ARE GUNS USED IN SELF-DEFENSE WHETHER OR NOT A CRIMINAL IS KILLED?

While it is clear that guns are rarely used to justifiably kill criminals, an obvious question remains: How often are guns used in self-defense whether or not a criminal is killed?

Pro-gun advocates – from individual gun owners to organizations like the National Rifle Association – frequently claim that guns are used up to 2.5 million times each year in self-defense in the United States.[8] According to the 2004 book *Private Guns, Public Health* by Dr. David Hemenway, Professor of Health Policy at the Harvard School of Public Health and director of the Harvard Injury Control Research Center:

8    See, for example: The "Armed Citizen" ("Studies indicate that firearms are used more than 2 million times a year for personal protection...."), *American Rifleman*, National Rifle Association, April 2015; and, "Chris Cox's NRA Armed Citizen:  True Stories of Your Right to Self Defense in Action," ("While the anti gun media doesn't want to report the truth about Americans using guns for self defense as often as 2.5 million times a year, you can read breaking stories of everyday citizens fending off violent criminals in CHRIS COX'S ARMED CITIZEN"), *Armed Citizen E-Newsletter* (https://www.nra.org/armedcitizen/, downloaded March 26, 2015).  The 2.5 million estimate is the result of a telephone survey conducted by Florida State University criminologist Dr. Gary Kleck, see Hemenway, David, "The Myth of Millions of Annual Self-Defense Gun Uses:  A Case Study of Survey Overestimates of Rare Events," *Chance* (American Statistical Association), Volume 10, No. 3, 1997.

Much discussion about the protective benefits of guns has focused on the incidence of self-defense gun use.  Proponents of such putative benefits often claim that 2.5 million Americans use guns in self-defense against criminal attackers each year.  This estimate is not plausible and has been nominated as the most outrageous number mentioned in a policy discussion by an elected official.

In his book, Hemenway dissects the 2.5 million figure from a variety of angles and, by extension, the NRA's own non-lethal self-defense claims for firearms.  He concludes, "It is clear that the claim of 2.5 million annual self-defense gun uses is a vast overestimate" and asks, "But what can account for it?" As he details in his book, the main culprit is the "telescoping and…false positive problem" that derives from the very limited number of respondents claiming a self-defense gun use, "a matter of misclassification that is well known to medical epidemiologists."[9]

## ESTIMATES ON SELF-DEFENSE USE OF FIREARMS FROM THE BUREAU OF JUSTICE STATISTICS NATIONAL CRIME VICTIMIZATION SURVEY

Hemenway notes, and numerous others agree, that the most accurate survey of self-defense gun use is the National Crime Victimization Survey (NCVS) conducted by the Bureau of Justice Statistics. The survey has been ongoing since 1973.[10]

## VIOLENT CRIME

According to the NCVS, looking at the total number of self-protective behaviors undertaken by victims of both attempted and completed violent crime for the *five-year period 2007 through 2011*, in only 0.8 percent of these instances had the intended victim in resistance to a criminal "threatened or attacked with a firearm."[11] As detailed in the chart on the next page, for the five-year period 2007 through 2011, the NCVS estimates that there were 29,618,300 victims of attempted or completed violent crime. During this same *five-year period*, only 235,700 of the self-protective behaviors involved a firearm. Of this number, it is not known what type of firearm was used or whether it was fired or not. The number may also include off-duty law enforcement officers who use their firearms in self-defense.

---

9    For a more detailed discussion, please see Hemenway, David, *Private Guns, Public Health*, (The University of Michigan Press, 2004), pp. 66-69 and pp. 238-243.

10    According to the website of the Bureau of Justice Statistics, the National Crime Victimization Survey (NCVS) "is the nation's primary source of information on criminal victimization. Each year, data are obtained from a nationally representative sample of about 90,000 households, comprising nearly 160,000 persons, on the frequency, characteristics, and consequences of criminal victimization in the United States. Each household is interviewed twice during the year. The survey enables BJS to estimate the likelihood of victimization by rape or sexual assault, robbery, aggravated and simple assault, theft, household burglary, and motor vehicle theft for the population as a whole as well as for segments of the population such as women, the elderly, members of various racial or ethnic groups, city dwellers, and other groups. The NCVS provides the largest national forum for victims to describe the impact of crime and characteristics of violent offenders," (see http://www.bjs.gov/index.cfm?ty=dcdetail&iid=245).

11    For "violent crime" the NCVS measures rape/sexual assault, robbery, and aggravated and simple assault (see Bureau of Justice Statistics, "Violent Crime," (see http://www.bjs.gov/index.cfm?ty=tp&tid=931).

## SELF-PROTECTIVE BEHAVIORS, BY TYPE OF CRIME, 2007-2011

| | Violent Crime 2007-2011 | | Property Crime 2007-2011 | |
|---|---|---|---|---|
| | Total | Percent | Total | Percent |
| **Total Number of Crimes** | 29,618,300 | 100 | 84,495,500 | 100 |
| | | | | |
| **Self-Protective Behavior** | | | | |
| Offered no resistance | 12,987,300 | 43.8 | 10,162,000 | 12.0 |
| Threatened or attacked with a firearm | 235,700 | 0.8 | 103,000 | 0.1 |
| Threatened or attacked with other weapon | 391,100 | 1.3 | 38,200 | - |
| Threatened or attacked without a weapon | 6,552,900 | 22.1 | 421,300 | 0.5 |
| Nonconfrontational tactics include yelling, running, or arguing | 7,768,700 | 26.2 | 1,187,100 | 1.4 |
| Other reaction | 1,641,300 | 5.5 | 223,400 | 0.3 |
| Unknown reaction | 41,300 | 0.1 | 12,200* | - |
| Property crime, victim not present. | ⧺ | ⧺ | 72,348,200 | 85.6 |

| | |
|---|---|
| - Less than 0.05 percent | ⧺ Not applicable |

\* Interpret with caution.  Estimate based on 10 or fewer sample cases, or coefficient of variation is greater than 50 percent.

Source: Michael Planty, Ph.D., and Jennifer L. Truman, Ph.D, *Firearm Violence, 1993-2011*, Bureau Of Justice Statistics, May 2013, Table 11, page 12.

## PROPERTY CRIME

According to the NCVS, looking at the total number of self-protective behaviors undertaken by victims of attempted or completed property crime for the *five-year period 2007 through 2011,* in only 0.1 percent of these instances had the intended victim in resistance to a criminal threatened or attacked with a firearm.[12] As detailed

---

12    For "property crime" the NCVS measures household burglary, motor vehicle theft, as well as property theft. Since the survey information is obtained from a sample of households, it does not include property crimes affecting businesses or other commercial establishments. If such crimes are reported to law enforcement, they are included in the FBI's Uniform Crime Reporting Program. The NCVS includes property crimes affecting victims and household members which were reported and not reported to the police. (See Bureau of Justice Statistics, "Property Crime," http://bjs.gov/index.cfm?ty=tp&tid=32.)

in the prior table, for the *five-year period 2007 through 2011*, the NCVS estimates that there were 84,495,500 victims of attempted or completed property crime. During this same *five-year period*, only 103,000 of the self-protective behaviors involved a firearm. Of this number, it is not known what type of firearm was used, whether it was fired or not, or whether the use of a gun would even be a legal response to the property crime. And as before, the number may also include off-duty law enforcement officers. In comparison, data from the Department of Justice shows that an average of 232,400 guns were stolen *each year* from U.S. households from 2005 to 2010.[13]

## COMPARING NCVS DATA TO CLAIMS THAT GUNS ARE USED IN SELF-DEFENSE 2.5 MILLION TIMES A YEAR

Using the NCVS numbers, for the *five-year period* 2007 through 2011, the total number of self protective behaviors involving a firearm by victims of attempted or completed violent crimes or property crimes totaled only 338,700. In comparison, the gun lobby claims that during the same *five-year period* guns were used 12.5 million times in self defense (applying to the five-year period the gun lobby's oft repeated claim, noted earlier, that firearms are used in self defense 2.5 million times a year).

## CONCLUSION

The reality of self-defense gun use bears no resemblance to the exaggerated claims of the gun lobby and gun industry.  The number of justifiable homicides that occur in our nation each year pale in comparison to criminal homicides, let alone gun suicides and fatal unintentional shootings.  And contrary to the common stereotype promulgated by the gun lobby, those killed in justifiable homicide incidents don't always fit the expected profile of an attack by a stranger:  in 35.5 percent of the justifiable homicides that occurred in 2012 the persons shot were known to the shooter.

The devastation guns inflict on our nation each and every year is clear: more than 33,000 dead, more than 81,000 wounded, and an untold number of lives traumatized and communities shattered.  Unexamined claims of the efficacy and frequency of the self-defense use of firearms are the default rationale offered by the gun lobby and gun industry for this unceasing, bloody toll.  The idea that firearms are frequently used in self-defense is the primary argument that the gun lobby and firearms industry use to expand the carrying of firearms into an ever-increasing number of public spaces and even to prevent the regulation of military-style semiautomatic assault weapons and high-capacity ammunition magazines.  Yet this argument is hollow and the assertions false.  When analyzing the most reliable data available, what is most striking is that in a nation of more than 300 million guns, how *rarely* firearms are used in self-defense.[14]

---

13    "Firearms Stolen During Household Burglaries and Other Property Crimes 2005-2010," U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics, November 2012.

14    It is estimated that the total number of firearms available to civilians in the United States is 310 million:  114 million handguns, 110 million rifles, and 86 million shotguns. Krouse, William J., *Gun Control Legislation*, Congressional Research Service, November 14, 2012, p. 8.

TABLE ONE:  FIREARM JUSTIFIABLE HOMICIDES BY STATE, 2008-2012

| State | Number of Justifiable Homicides | | | | | |
|-------|------|------|------|------|------|-------|
|  | 2008 | 2009 | 2010 | 2011 | 2012 | TOTAL |
| Alabama | 3 | 0 | 0 | N/A | N/A | 3 |
| Alaska | 0 | 4 | 2 | 3 | 6 | 15 |
| Arizona | 17 | 13 | 16 | 6 | 7 | 59 |
| Arkansas | 2 | 0 | 3 | 0 | 3 | 8 |
| California | 17 | 20 | 23 | 23 | 27 | 110 |
| Colorado | 4 | 4 | 5 | 3 | 2 | 18 |
| Connecticut | 0 | 0 | 0 | 0 | 0 | 0 |
| Delaware | 0 | 1 | 1 | 0 | 0 | 2 |
| Florida | N/A | N/A | N/A | N/A | N/A | N/A |
| Georgia | 18 | 11 | 19 | 5 | 8 | 61 |
| Hawaii | 0 | 0 | 0 | 0 | 0 | 0 |
| Idaho | 0 | 0 | 0 | 0 | 0 | 0 |
| Illinois | 0 | 2 | 0 | 4 | 1 | 7 |
| Indiana | 3 | 2 | 12 | 6 | 12 | 35 |
| Iowa | 0 | 0 | 0 | 0 | 0 | 0 |
| Kansas | 1 | 1 | 3 | 1 | 3 | 9 |
| Kentucky | 5 | 9 | 4 | 3 | 7 | 28 |
| Louisiana | 7 | 9 | 10 | 9 | 10 | 45 |
| Maine | 0 | 0 | 1 | 1 | 2 | 4 |
| Maryland | 2 | 1 | 6 | 2 | 6 | 17 |
| Massachusetts | 0 | 0 | 2 | 0 | 1 | 3 |
| Michigan | 4 | 16 | 13 | 31 | 20 | 84 |
| Minnesota | 3 | 1 | 2 | 0 | 1 | 7 |
| Mississippi | 1 | 2 | 1 | 0 | 1 | 5 |
| Missouri | 12 | 3 | 5 | 8 | 8 | 36 |
| Montana | 0 | 0 | 0 | 0 | 0 | 0 |

| State | Number of Justifiable Homicides | | | | | |
|---|---|---|---|---|---|---|
| | 2008 | 2009 | 2010 | 2011 | 2012 | TOTAL |
| Nebraska | 0 | 2 | 1 | 0 | 1 | 4 |
| Nevada | 4 | 5 | 3 | 2 | 1 | 15 |
| New Hampshire | 0 | 0 | 0 | 0 | 0 | 0 |
| New Jersey | 2 | 0 | 2 | 2 | 0 | 6 |
| New Mexico | 1 | 3 | 2 | 1 | 1 | 8 |
| New York | 0 | 0 | 0 | 0 | 0 | 0 |
| North Carolina | 2 | 6 | 0 | 3 | 5 | 16 |
| North Dakota | 0 | 0 | 0 | 1 | 0 | 1 |
| Ohio | 1 | 2 | 2 | 1 | 2 | 8 |
| Oklahoma | 6 | 4 | 5 | 5 | 11 | 31 |
| Oregon | 0 | 3 | 4 | 3 | 6 | 16 |
| Pennsylvania | 11 | 11 | 8 | 11 | 9 | 50 |
| Rhode Island | 0 | 0 | 1 | 0 | 0 | 1 |
| South Carolina | 9 | 6 | 7 | 6 | 11 | 39 |
| South Dakota | 0 | 0 | 1 | 0 | 1 | 2 |
| Tennessee | 19 | 10 | 14 | 21 | 20 | 84 |
| Texas | 41 | 44 | 44 | 29 | 47 | 205 |
| Utah | 0 | 0 | 1 | 0 | 2 | 3 |
| Vermont | 0 | 0 | 0 | 0 | 0 | 0 |
| Virginia | 6 | 9 | 5 | 6 | 7 | 33 |
| Washington | 0 | 3 | 2 | 5 | 4 | 14 |
| West Virginia | 0 | 0 | 0 | 0 | 1 | 1 |
| Wisconsin | 4 | 6 | 0 | 0 | 5 | 15 |
| Wyoming | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total** | **205** | **213** | **230** | **201** | **259** | **1,108** |

**TABLE TWO:  CIRCUMSTANCES FOR HOMICIDES BY FIREARM, 2008-2012**

| Circumstance | Number of Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | TOTAL | |
| Criminal Homicide | 9,039 | 97.8% | 8,697 | 97.6% | 8,275 | 97.3% | 8,066 | 97.6% | 8,342 | 97.0% | **42,419** | **97.5%** |
| Justifiable Homicide | 205 | 2.2% | 213 | 2.4% | 230 | 2.7% | 201 | 2.4% | 259 | 3.0% | **1,108** | **2.5%** |
| Ratio of Criminal Homicide to Justifiable Homicide | 44-1 | | 41-1 | | 36-1 | | 40-1 | | 32-1 | | **38-1** | |
| **Total** | **9,244** | | **8,910** | | **8,505** | | **8,267** | | **8,601** | | **43,527** | |

**TABLE THREE:  RELATIONSHIP OF PERSON KILLED TO SHOOTER IN JUSTIFIABLE HOMICIDES BY FIREARM, 2008-2012**

| Relationship | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | TOTAL | |
| Acquaintance | 32 | 15.6% | 36 | 16.9% | 51 | 22.2% | 36 | 17.9% | 52 | 20.1% | **207** | **18.7%** |
| Boyfriend | 2 | 1.0% | 1 | 0.5% | 2 | 0.9% | 2 | 1.0% | 1 | 0.4% | **8** | **0.7%** |
| Brother | 2 | 1.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 4 | 1.5% | **6** | **0.5%** |
| Common-Law Husband | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| Employee | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| Ex-Husband | 1 | 0.5% | 3 | 1.4% | 3 | 1.3% | 1 | 0.5% | 0 | 0.0% | **8** | **0.7%** |
| Ex-Wife | 0 | 0.0% | 0 | 0.0% | 1 | 0.4% | 0 | 0.0% | 0 | 0.0% | **1** | **0.1%** |
| Father | 2 | 1.0% | 2 | 0.9% | 2 | 0.9% | 1 | 0.5% | 0 | 0.0% | **7** | **0.6%** |
| Friend | 4 | 2.0% | 0 | 0.0% | 1 | 0.4% | 3 | 1.5% | 5 | 1.9% | **13** | **1.2%** |
| Girlfriend | 1 | 0.5% | 0 | 0.0% | 1 | 0.4% | 0 | 0.0% | 0 | 0.0% | **2** | **0.2%** |
| Husband | 0 | 0.0% | 1 | 0.5% | 1 | 0.4% | 3 | 1.5% | 1 | 0.4% | **6** | **0.5%** |
| In-Law | 0 | 0.0% | 0 | 0.0% | 1 | 0.4% | 1 | 0.5% | 2 | 0.8% | **4** | **0.4%** |
| Neighbor | 3 | 1.5% | 4 | 1.9% | 3 | 1.3% | 1 | 0.5% | 5 | 1.9% | **16** | **1.4%** |
| Other Family | 1 | 0.5% | 4 | 1.9% | 0 | 0.0% | 5 | 2.5% | 3 | 1.2% | **13** | **1.2%** |
| Other Known | 9 | 4.4% | 9 | 4.2% | 7 | 3.0% | 8 | 4.0% | 13 | 5.0% | **46** | **4.2%** |
| Son | 1 | 0.5% | 1 | 0.5% | 4 | 1.7% | 3 | 1.5% | 4 | 1.5% | **13** | **1.2%** |
| Stepfather | 1 | 0.5% | 0 | 0.0% | 2 | 0.9% | 1 | 0.5% | 0 | 0.0% | **4** | **0.4%** |
| Stepson | 2 | 1.0% | 0 | 0.0% | 3 | 1.3% | 1 | 0.5% | 1 | 0.4% | **7** | **0.6%** |
| Stranger | 124 | 60.5% | 123 | 57.7% | 130 | 56.5% | 110 | 54.7% | 133 | 51.4% | **620** | **56.0%** |
| Wife | 1 | 0.5% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 1 | 0.4% | **3** | **0.3%** |
| Unknown Relationship | 19 | 9.3% | 28 | 13.1% | 18 | 7.8% | 25 | 12.4% | 34 | 13.1% | **124** | **11.2%** |
| **Total** | **205** | | **213** | | **230** | | **201** | | **259** | | **1,108** | |

**TABLE FOUR: SEX OF SHOOTER IN JUSTIFIABLE HOMICIDES BY FIREARM, 2008-2012**

| Sex of Shooter | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2008** | | **2009** | | **2010** | | **2011** | | **2012** | | **TOTAL** | |
| Male | 192 | 93.7% | 199 | 93.4% | 205 | 89.1% | 181 | 90.1% | 237 | 91.5% | **1,014** | **91.5%** |
| Female | 11 | 5.4% | 13 | 6.1% | 24 | 10.4% | 17 | 8.5% | 20 | 7.7% | **85** | **7.7%** |
| Unknown | 2 | 1.0% | 1 | 0.5% | 1 | 0.4% | 3 | 1.5% | 2 | 0.8% | **9** | **0.8%** |
| **Total** | **205** | | **213** | | **230** | | **201** | | **259** | | **1,108** | |

**TABLE FIVE: SEX OF PERSON KILLED IN JUSTIFIABLE HOMICIDES BY FIREARM, 2008-2012**

| Sex of Person Killed | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2008** | | **2009** | | **2010** | | **2011** | | **2012** | | **TOTAL** | |
| Male | 202 | 98.5% | 212 | 99.5% | 226 | 98.3% | 196 | 97.5% | 254 | 98.1% | **1,090** | **98.4%** |
| Female | 3 | 1.5% | 1 | 0.5% | 4 | 1.7 | 5 | 2.5% | 5 | 1.9% | **18** | **1.6%** |
| **Total** | **205** | | **213** | | **230** | | **201** | | **259** | | **1,108** | |

**TABLE SIX: SEX OF SHOOTER AND PERSON KILLED IN JUSTIFIABLE HOMICIDES BY FIREARM, 2008-2012**

| Sex of Shooter | Sex of Person Killed | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | **2008** | | **2009** | | **2010** | | **2011** | | **2012** | | **TOTAL** | |
| Male | Male | 190 | 99.0% | 198 | 99.5% | 202 | 98.5% | 176 | 97.2% | 232 | 97.9% | **998** | **98.4%** |
| | Female | 2 | 1.0% | 1 | 0.5% | 3 | 1.5% | 5 | 2.8% | 5 | 2.1% | **16** | **1.6%** |
| Female | Male | 10 | 90.9% | 13 | 100.0% | 23 | 95.8% | 17 | 100.0% | 20 | 100.0% | **83** | **97.6%** |
| | Female | 1 | 9.1% | 0 | 0.0% | 1 | 4.2% | 0 | 0.0% | 0 | 0.0% | **2** | **2.4%** |
| **Total** | | **203** | | **212** | | **229** | | **198** | | **257** | | **1,099** | |

**TABLE SEVEN:  RACE OF SHOOTER IN JUSTIFIABLE HOMICIDES BY FIREARM, 2008-2012**

| Race of Shooter | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | TOTAL | |
| White | 114 | 55.6% | 112 | 52.6% | 121 | 52.6% | 86 | 42.8% | 131 | 50.6% | **564** | **50.9%** |
| Black | 74 | 36.1% | 91 | 42.7% | 102 | 44.3% | 106 | 52.7% | 117 | 45.2% | **490** | **44.2%** |
| Asian | 11 | 5.4% | 6 | 2.8% | 5 | 2.2% | 4 | 2.0% | 6 | 2.3% | **32** | **2.9%** |
| American Indian | 1 | 0.5% | 1 | 0.5% | 0 | 0.0% | 2 | 1.0% | 1 | 0.4% | **5** | **0.5%** |
| Unknown | 5 | 2.4% | 3 | 1.4% | 2 | 0.9% | 3 | 1.5% | 4 | 1.5% | **17** | **1.5%** |
| **Total** | **205** | | **213** | | **230** | | **201** | | **259** | | **1,108** | |

**TABLE EIGHT:  RACE OF PERSON KILLED IN JUSTIFIABLE HOMICIDES BY FIREARM, 2008-2012**

| Race of Person Killed | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | TOTAL | |
| White | 82 | 40.0% | 87 | 40.8% | 90 | 39.1% | 70 | 34.8% | 98 | 37.8% | **427** | **38.5%** |
| Black | 115 | 56.1% | 122 | 57.3% | 138 | 60.0% | 128 | 63.7% | 152 | 58.7% | **655** | **59.1%** |
| Asian | 2 | 1.0% | 1 | 0.5% | 0 | 0.0% | 2 | 1.0% | 4 | 1.5% | **9** | **0.8%** |
| American Indian | 3 | 1.5% | 2 | 0.9% | 1 | 0.4% | 1 | 0.5% | 3 | 1.2% | **10** | **0.9%** |
| Unknown | 3 | 1.5% | 1 | 0.5% | 1 | 0.4% | 0 | 0.0% | 2 | 0.8% | **7** | **0.6%** |
| **Total** | **205** | | **213** | | **230** | | **201** | | **259** | | **1,108** | |

**TABLE NINE:  RACE OF SHOOTER AND PERSON KILLED IN JUSTIFIABLE HOMICIDES BY FIREARM, 2008-2012**

| Race of Shooter | Race of Person Killed | Number of Justifiable Homicides | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | TOTAL | |
| White | White | 71 | 62.3% | 77 | 68.8% | 82 | 67.8% | 62 | 72.1% | 85 | 64.9% | **377** | **66.8%** |
| | Black | 38 | 33.3% | 34 | 30.4% | 37 | 30.6% | 23 | 26.7% | 40 | 30.5% | **172** | **30.5%** |
| | Asian | 1 | 0.9% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.8% | **2** | **0.4%** |
| | American Indian | 3 | 2.6% | 1 | 0.9% | 1 | 0.8% | 1 | 1.2% | 3 | 2.3% | **9** | **1.6%** |
| | Unknown | 1 | 0.9% | 0 | 0.0% | 1 | 0.8% | 0 | 0.0% | 2 | 1.5% | **4** | **0.7%** |
| Black | White | 5 | 6.8% | 8 | 8.8% | 5 | 4.9% | 3 | 2.8% | 10 | 8.6% | **31** | **6.3%** |
| | Black | 69 | 93.2% | 83 | 91.2% | 97 | 95.1% | 102 | 96.2% | 107 | 91.5% | **458** | **93.5%** |
| | Asian | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 1 | 0.9% | 0 | 0.0% | **1** | **0.2%** |
| | American Indian | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| | Unknown | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| Asian | White | 5 | 45.5% | 0 | 0.0% | 1 | 20.0% | 2 | 50.0% | 1 | 16.7% | **9** | **28.1%** |
| | Black | 5 | 45.5% | 4 | 66.7% | 4 | 80.0% | 1 | 25.0% | 2 | 33.3% | **16** | **50.0%** |
| | Asian | 1 | 9.1% | 1 | 16.7% | 0 | 0.0% | 1 | 25.0% | 3 | 50.0% | **6** | **18.8%** |
| | American Indian | 0 | 0.0% | 1 | 16.7% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **1** | **3.1%** |
| | Unknown | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| American Indian | White | 1 | 100.0% | 1 | 100.0% | 0 | 0.0% | 2 | 100.0% | 1 | 100.0% | **5** | **100.0%** |
| | Black | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| | Asian | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| | American Indian | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| | Unknown | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| **Total** | | **200** | | **210** | | **228** | | **198** | | **255** | | **1,091** | |

**TABLE TEN:  WEAPON USED IN JUSTIFIABLE HOMICIDES, 2008-2012**

| Weapon | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | TOTAL | |
| Firearm | 205 | 83.0% | 213 | 81.9% | 230 | 83.0% | 201 | 77.0% | 259 | 83.8% | **1,108** | **81.8%** |
| Knife or cutting instrument | 30 | 12.1% | 29 | 11.2% | 32 | 11.6% | 49 | 18.8% | 35 | 11.3% | **175** | **12.9%** |
| Blunt object | 0 | 0.0% | 3 | 1.2% | 4 | 1.4% | 4 | 1.5% | 4 | 1.3% | **15** | **1.1%** |
| Bodily force | 3 | 1.2% | 8 | 3.1% | 4 | 1.4% | 3 | 1.2% | 9 | 2.9% | **27** | **2.0%** |
| Strangulation | 0 | 0.0% | 0 | 0.0% | 0 | 0.00% | 0 | 0.0% | 0 | 0.0% | **0** | **0.0%** |
| Asphyxiation | 1 | 0.4% | 1 | 0.4% | 0 | 0.00% | 0 | 0.0% | 0 | 0.0% | **2** | **0.1%** |
| Unknown | 8 | 3.2% | 6 | 2.3% | 7 | 2.5% | 4 | 1.5% | 2 | 0.7% | **27** | **2.0%** |
| **Total** | **247** | | **260** | | **277** | | **261** | | **309** | | **1,354** | |

**TABLE ELEVEN:  TYPE OF FIREARMS USED IN JUSTIFIABLE HOMICIDES, 2008-2012**

| Weapon | Number of Justifiable Homicides | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2008 | | 2009 | | 2010 | | 2011 | | 2012 | | TOTAL | |
| Firearm, type not stated | 19 | 9.3% | 21 | 9.9% | 28 | 12.2% | 26 | 12.9% | 30 | 11.6% | **124** | **11.2%** |
| Handgun | 162 | 79.0% | 163 | 76.5% | 166 | 72.2% | 152 | 75.6% | 195 | 75.3% | **838** | **75.6%** |
| Rifle | 11 | 5.4% | 9 | 4.2% | 8 | 3.5% | 12 | 6.0% | 19 | 7.3% | **59** | **5.3%** |
| Shotgun | 13 | 6.3% | 19 | 8.9% | 28 | 12.2% | 11 | 5.5% | 15 | 5.8% | **86** | **7.8%** |
| Other Gun | 0 | 0.0% | 1 | 0.5% | 0 | 0.0% | 0 | 0.0% | 0 | 0.0% | **1** | **0.1%** |
| **Total** | **205** | | **213** | | **230** | | **201** | | **259** | | **1,108** | |

 **Violence Policy Center**

1730 Rhode Island Avenue, NW   Suite 1014

Washington, DC 20036

(202) 822-8200

# Exhibit 73



# ON TARGET

# THE IMPACT OF THE 1994 FEDERAL ASSAULT WEAPON ACT



BRADY CENTER TO PREVENT GUN VIOLENCE
Data Analysis by Crime Gun Solutions LLC



## ACKNOWLEDGEMENTS

This study was prepared by the **Brady Center to Prevent Gun Violence** using data obtained and analyzed by the experts at **Crime Gun Solutions LLC**. Founded in 1983, the Brady Center to Prevent Gun Violence is a national non-profit organization working to reduce the tragic toll of gun violence in America through education, research, and legal advocacy. The programs of the Center complement the legislative initiatives of its sister organization, the Brady Campaign to Prevent Gun Violence united with the Million Mom March.

This study was prepared under the direction of Brian J. Siebel, Senior Attorney for the Brady Center's Legal Action Project. Daniel Vice, Elizabeth Haile, and Dawn Canady prepared portions of the study.

The crime gun tracing analysis in this study was done by Gerald A. Nunziato of Crime Gun Solutions LLC (CGS). For eight years, Mr. Nunziato was the Special Agent in Charge of the Bureau of Alcohol, Tobacco, and Firearm's National Tracing Center, during which he dramatically improved and expanded firearms tracing as a law enforcement tool. The Brady Center would also like to thank Joseph J. Vince, Jr. of CGS. Mr. Vince has held numerous positions within ATF, including Special Agent in Charge, Intelligence Division; Chief, Firearms Division; and Chief, Crime Gun Analysis Branch.

All material within this study is protected by copyright law and may not be reproduced without the express written consent of the Brady Center to Prevent Gun Violence.

Copyright © 2004
Brady Center to Prevent Gun Violence

Study available at www.bradycampaign.org; www.bradycenter.org; and www.gunlawsuits.org.

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY** .............................. **2**

**INTRODUCTION** ................................... **3**
- THE FEDERAL ASSAULT WEAPONS ACT ............... **3**
- THE "COPYCAT" PROBLEM ........................ **4**
- PRIOR STUDIES OF ASSAULT WEAPONS LAWS ......... **5**

**FINDINGS** ........................................ **7**

Finding #1:   Assault weapons banned by name in the Federal Assault
Weapons Act have declined significantly as a percentage of
guns the Bureau of Alcohol, Tobacco, Firearms and Explosives
has traced to crime, and in absolute numbers of traces, since
the Act was passed. Had this decline not occurred, thousands
more of these banned assault weapons would likely have been
traced to crime over the last 10 years ...................... **7**

Finding #2:   The gun industry's efforts to evade the Federal Assault
Weapons Act through the sale of "copycat" guns has not sub-
stantially undercut the positive effect of the statute in reducing
the incidence of assault weapons among crime guns ............. **10**

**CONCLUSION** .................................... **12**

**APPENDICES** .................................... **13**

**ENDNOTES** ..................................... **17**

# EXECUTIVE SUMMARY

To evaluate the questions below, the Brady Center to Prevent Gun Violence asked Crime Gun Solutions LLC to review and analyze national crime gun trace data maintained by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). The data represent guns nationwide that have been illegally possessed, used in a crime, or suspected of being used in a crime, thereafter recovered by law enforcement and then traced to learn about the sales history of the gun.

## Has the Federal Assault Weapons Act reduced the incidence of assault weapons used in crime?

**Yes.** In the five year period before enactment of the Federal Assault Weapons Act (1990-1994), assault weapons named in the Act constituted **4.82%** of the crime gun traces ATF conducted nationwide. Since the law's enactment, however, these assault weapons have made up only **1.61%** of the guns ATF has traced to crime—a drop of **66% from the pre-ban rate.** Moreover, ATF trace data show a steady year-by-year decline in the percentage of assault weapons traced, suggesting that the longer the statute has been in effect, the less available these guns have become for criminal misuse. Indeed, the absolute number of assault weapons traced has also declined.

This decline is extremely significant to law enforcement and has clearly enhanced public safety, especially since these military-style weapons are among the deadliest ever sold on the civilian market. For example, if the Act had not been passed and the banned assault weapons continued to make up the same percentage of crime gun traces as before the Act's passage, approximately **60,000** additional assault weapons would have been traced to crime in the last 10 years—an average of 6,000 additional assault weapons traced to crime each year.

## Have industry efforts to evade the Act through "copycat" assault weapons eliminated its positive effects?

**No.** After the Assault Weapons Act was passed, gun manufacturers sought to evade the ban by producing weapons with minor changes or new model names. The Act was designed to prevent this occurrence by defining assault weapons to include "copies or duplicates" of the firearms listed in the ban in any caliber,[1] though this provision has never been enforced. Yet, even if copycats of the federally banned guns are considered, there has still been a **45%** decline between the pre-ban period (1990 – 1994) and the post-ban period (1995 and after) in the percentage of ATF crime gun traces involving assault weapons and copycat models.

The results of this study make it clear that the United States Congress needs to renew the Federal Assault Weapons Act. If the Act is not renewed, a decade of progress could be lost and thousands of additional assault weapons are likely to be used in crime in the future.

# INTRODUCTION

## THE FEDERAL ASSAULT WEAPONS ACT

### The Assault Weapons Problem

While all firearms are dangerous, assault weapons pose special dangers. They are semiautomatic, civilian versions of weapons designed for military use. The weapons are capable of holding large-capacity magazines that allow a shooter to fire up to 150 shots without having to reload. Assault weapons also typically include features that help the shooter control the gun during rapid firing, such as pistol grips or forward handgrips.[2]

These weapons were specifically designed for military use in order to kill greater numbers of people more effectively. ATF has explained this as follows:

> Assault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics. **They are mass produced mayhem.**[3]

As ATF has noted, the weapons "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes" and instead "are attractive to certain criminals."[4] The combination of semiautomatic firing capability with large capacity magazines allows criminals to fire more times within a limited period of time—making these weapons especially lethal. According to ATF, semiautomatic assault weapons "are preferred by criminals over law abiding citizens eight to one....Access to them shifts the balance of power to the lawless."[5] A study of ATF tracing data released prior to the enactment of the 1994 federal assault weapons law revealed that assault weapons were 20 times more likely than conventional firearms to be used in crime.[6]

In the 1980s, law enforcement reported that assault weapons were the "weapons of choice" for drug traffickers, gangs, terrorists, and paramilitary extremist groups. Assault weapons were used to perpetrate some of the worst mass murders ever committed in the United States.

In 1989, the Administration of George H.W. Bush took the first step in addressing the problem of the availability of assault weapons and assault weapon use in crime by suspending importation of assault weapons "not suitable or readily adaptable to sporting purposes."[7] This import ban was expanded by President Bill Clinton in 1998.[8]

In May 1989, California became the first state to pass an assault weapons ban.[9] The statute banned the sale, production and possession of certain listed assault weapons and those that have specific military features such as pistol grips and folding stocks. People who owned such assault weapons prior to the law were

> **Examples of Mass Shootings With Assault Weapons**
>
> - Using an Uzi assault pistol and a shotgun, James Huberty killed 21 people and wounded 19 others in a San Ysidro, California, McDonald's on July 18, 1984.
>
> - Using an AK-47 rifle, two MAC-11 assault pistols, and a duffle-bag full of other firearms, Joseph Wesbecker killed 7 people and wounded 13 others on September 14, 1989, at his former place of work in Louisville, Kentucky, before taking his own life.
>
> - Patrick Edward Purdy used an AK-47 to open fire on a schoolyard in Stockton, California, firing over 100 rounds in less than 2 minutes, killing 5 children and wounding 29 others on January 17, 1989.
>
> - Using two TEC-DC9s, Gian Luigi Ferri opened fire in a San Francisco, California, office tower on July 1, 1993, killing 8 people and wounding 6 more.

required to register the weapons and were not allowed to sell or give them to anyone in the state. California also restricts the sale of rapid-fire ammunition magazines in excess of 10 rounds.[10]

## Congress Responds to the Problem

In response to mass shootings and mounting public pressure, Congress took up consideration of a ban on assault weapons in 1989. Over a span of five years, several bills were introduced aimed at curbing assault weapon use before final passage of the current assault weapons ban in 1994.

In hearings on the bills, the Senate Judiciary Committee explained the need to:

> address the carnage wrought by deadly military-style assault weapons on innocent citizens and the law enforcement officers who seek to protect us all. Recent events illustrate again, and with chilling vividness, the tragedy that results from the wide and easy availability of guns with fire power that overwhelm our police, of weapons that have no place in hunting or sport and whose only real function is to kill human beings at a ferocious pace.[11]

The "Public Safety and Recreational Firearms Use Protection Act of 1994," referred to here as the "Federal Assault Weapons Act," was passed on September 13, 1994, as part of a larger crime bill—The Federal Violent Crime Control and Law Enforcement Act of 1994. The Assault Weapons Act has a 10-year sunset provision. It will expire on September 13, 2004, unless it is renewed by Congress.

The ban makes it unlawful to "manufacture, transfer or possess a semiautomatic assault weapon," as well as large capacity magazines capable of holding more than 10 rounds.[12] However, assault weapons and large capacity magazines legally possessed on the effective date of the Act remain legal under the Act's "grandfather clause."[13] Banned weapons encompass certain named firearms, including the AK-47, Uzi, Colt AR-15, and Street Sweeper, as well as copies or duplicates of these named firearms in any caliber, and any weapons with two or more of a list of military features, such as flash suppressors or grenade launchers.[14] The Act also specifically exempts by name 661 sporting rifles.

## THE "COPYCAT" PROBLEM

The gun industry responded to passage of the Federal Assault Weapons Act by renaming guns and/or making minor changes in guns to skirt the ban. Below are three examples out of dozens of industry attempts to evade the ban.

### Bushmaster XM-15



Bushmaster Firearms of Windham, Maine, manufactures the Bushmaster XM-15 rifle. This gun is an AR-15 type rifle with minor changes that have allowed it to evade the Assault Weapons Act. According to Bushmaster officer and spokesperson Allen Faraday, "the changes were all cosmetic and didn't affect the gun's performance."[15] The Bushmaster XM-15 rifle has been used in violent crimes, including the Washington, DC-area sniper attacks in late 2002.[16]

Bushmaster markets the XM-15 to the general public as a military style weapon made "to military specification."[17] The XM-15 "fires...the same round used in the Colt M-16 (the standard U.S. military rifle)" and "is a semiautomatic version of the M-16. This round has an effective range of 300 meters and can pierce most body armor."[18]

Bushmaster advertises that the XM-15 is accurate when shooting "targets" at long range with the slogan "The Best—By A Long Shot!" Bushmaster designed its guns to appeal to people wishing to prepare for and engage in military-style operations. Bushmaster advertises that the guns it sells to civilians have a "military look" and that its guns have been used by elite military units such as "Special Forces Units; Seals; Rangers [and] Green Berets." Bushmaster markets an "ultimate sniper grip" for its guns and touts that a new model of its gun, which it concedes is not legal for hunting in some states, "is proving to be very popular as a Counter-Sniper Rifle."[19]

Bushmaster sells attachments for its guns, including bayonets and bayonet lugs, flash suppressors, telescoping stocks, flare launchers, and "Tactical Assault Sling" adapters "to allow easier assault position carry of your weapon." In addition, although the Assault

Weapons Act prohibits the manufacture of ammunition magazines that can hold more than 10 rounds, Bushmaster apparently stockpiled enough "pre-ban" magazines that it still markets 40 round ammunition magazines as available for sale to the general public for only $24.95, allowing the firing of 40 ammunition rounds without pausing to reload.[20]

### Intratec AB-10 - "After Ban-10"



Prior to the Assault Weapons Act, Intratec of Miami, Florida, manufactured the infamous TEC-9, a high-powered gun weighing only 3.1 pounds, yet equipped with a 32-round ammunition magazine. Intratec advertised the TEC-9 to appeal to criminals, bragging that it had "excellent resistance to finger prints."[21]

According to ATF data, annual production of the TEC-9 increased dramatically from 2,995 pistols in 1981 to an average of 14,466 in the last four years of the 1980s. When Washington, DC, enacted a law in 1991 imposing strict liability for shootings with TEC-9 guns, Intratec mockingly renamed the gun the "TEC-DC9" to evade liability and the law. The TEC-DC9 was used in massacres at Columbine High School in Littleton, Colorado, and at the 101 California Street office building in downtown San Francisco.[22]

The Federal Assault Weapons Act banned both the TEC-9 and TEC-DC9 by name. Intratec responded by renaming the gun the AB-10 (AB standing for "after ban") and making minor changes to evade the features test. Even though the assault weapons ban prohibits the manufacture of ammunition magazines that can hold more than 10 rounds, Intratec marketed the AB-10 with pre-ban 32-round ammunition magazines.[23]

Following passage of the Assault Weapons Act, Intratec's production of semiautomatic pistols dropped dramatically, from 75,102 semiautomatic pistols in 1994 to 9,584 in 1995 and 5,820 in 1996. Intratec ceased operations in 2001.[24]

### Olympic Arms PCR - "Politically Correct Rifle"



Following the Act's ban on assault rifles, Olympic Arms of Olympia, Washington, redesigned its weapons to evade the Act's features test. Although the Assault Weapons Act prohibits the manufacture of Colt AR-15 rifles, Olympic Arms sells an AR-15 type rifle called the "PCR," which the company contemptuously explains is short for "Politically Correct Rifle."[25] This rifle incorporates changes, such as a removed bayonet lug, that have allowed it to skirt the Assault Weapons Act.[26]

## PRIOR STUDIES OF ASSAULT WEAPON LAWS

### National Institute of Justice Study

Following enactment of the Assault Weapons Act, the U.S. Department of Justice National Institute of Justice conducted a study, mandated by the Act, of the short-term impact on crime of the assault weapons ban. The study, published in 1999, found that the ban had "clear short-term effects on the gun market," leading to semiautomatic assault weapons "becom[ing] less accessible to criminals because there was at least a short-term decrease in criminal use of the banned weapons."[27]

The study also explained that ATF data showed that crime gun traces of assault weapons dropped 20% in the year following enactment of the Assault Weapons

> A Study for the Department of Justice published in 1999 concluded that the ban led to assault weapons "becom[ing] less accessible to criminals because there was at least a short-term decrease in criminal use of the banned weapons."

Act, from 4,077 assault weapon traces in 1994 to 3,268 in 1995. This 20% drop in assault weapon traces was double the 10% overall decline in the gun murder rate that year, suggesting that, at least in the short-term, the ban reduced the use of assault weapons in crime. Moreover, murder rates dropped 6.7% below what the rates were projected to be without the ban, once researchers isolated the impact of the Assault Weapons Act by accounting for other factors such as murder trends, demographic and economic changes, a federal juvenile handgun possession ban, and state initiatives.[28]

> After analyzing the short-term effects of the Assault Weapons Act, the study for the Department of Justice concluded that the ban "may affect gun markets in ways that at least temporarily reduce criminals' access to the regulated guns, with little impact on law-abiding owners."

Murders of police officers with assault weapons also dropped from about 16% of gun murders of police in 1994 and early 1995 to 0% of murders of police officers in the latter half of 1995 and 1996.[29]

The National Institute of Justice study also found further evidence that the national decrease in assault weapons traced to crime was an effect of the ban. Assault weapon traces from states that already had their own assault weapon bans dropped only an estimated 6-8% in 1995, suggesting that the national downward trends in assault weapons traces reflect effects of the Federal ban.[30]

Further, the study found that there were fewer assault weapon traces in 1995 than in 1993, suggesting that the decrease in assault weapons traced to crime was not attributable to a surge in assault weapon tracing after the effective date of the Assault Weapon Act. Moreover, analysis of assault weapons recovered in crime in two cities without preexisting state assault weapon bans, Boston and St. Louis, showed a respec-

tive 24% and 29% drop in assault weapons recovered in crime, supporting the conclusion that the drop in assault weapon use in crime was attributable to the ban and not to any potential biases in trace request data.[31]

Although National Institute of Justice researchers could not reach long-term conclusions because of the limited time-span of their study, their analysis of the short-term effects of the assault weapons ban concluded: "The findings suggest that the relatively modest gun control measures that are politically feasible in this country may affect gun markets in ways that at least temporarily reduce criminals' access to the regulated guns, with little impact on law-abiding owners."[32]

## Maryland Assault Pistol Ban Study

A study of the effect of one state's ban on assault pistols showed similar positive effects. In June 1994, a Maryland law took effect that banned the sale of assault pistols and high capacity magazines, including those manufactured prior to implementation of the law. A year later a study was performed, based on data provided by the Baltimore City Police Department, that concluded that 55% fewer assault pistols were used to commit crimes than would have been used had Maryland not passed a ban.[33]

## Analysis Done for Senators Feinstein and Schumer

A more recent analysis of the long-term effects of the Assault Weapons Act on crime confirmed the initial conclusions of the NIJ Report that the ban has resulted in a decline of the rate at which assault weapons are recovered in crime. This analysis, by United States Senators Dianne Feinstein and Charles Schumer, showed that the proportion of banned assault weapons traced to crime has dropped by more than 65% since 1995, according to ATF crime gun trace data.[34] The Feinstein-Schumer report did not, however, address the effect of the industry's development of "copycat" guns on the overall effectiveness of the ban in reducing the rate of assault weapons in crime.

# FINDINGS

**FINDING #1:** **Assault weapons banned by name in the Federal Assault Weapons Act have declined significantly as a percentage of guns ATF has traced to crime, and in absolute numbers of traces, since the Act was passed. Had this decline not occurred, thousands more of these banned assault weapons would likely have been traced to crime over the last 10 years.**

## METHOD

This study analyzed national crime gun trace data maintained by ATF that it has previously released to the public through the Freedom of Information Act.[35] It is important to understand that the firearms listed in this data are considered by ATF to be "crime guns," which means they have been illegally possessed, used in a crime, or suspected of having been used in a crime.[36]

The data available for CGS to analyze covered the years 1990–2001. This data includes more than 1,424,949 crime gun traces.[37] To evaluate the effect of the Assault Weapons Act, the Brady Center first asked CGS to limit its calculations to firearms named in the Act. (These are identified in Appendix 1.) Guns that could be considered "copies or duplicates" of those firearms were not included.

To establish a pre-ban level of tracing, CGS looked at the five year period (1990–1994) leading up to the federal ban. The federal ban was passed in September 1994, but, to be conservative, all of 1994 was included in the pre-ban analysis.[38]

## RESULTS

During the pre-ban period (1990–1994), a total of **4.82%** of the crime gun traces conducted by ATF nationwide were assault weapons named in the Act, even though ATF estimated that assault weapons comprised only about 1% of the 200 million guns then in circulation in the United States.[39] The disproportionate use of these guns in crime was one of the reasons Congress passed the Assault Weapons Act.[40]

Since the law's enactment, however, assault weapons have steadily declined as a percentage of overall crime gun traces. In the post-ban period (1995

and after) assault weapons have made up only **1.61%** of the guns ATF has traced to crime—**a drop of 66% from the pre-ban rate.** Moreover, as dramatic as this drop has been, it measures only the decline in the *average* percentage of assault weapons traces from the pre-ban to the post-ban period. The *year-by-year* percentage of assault weapons traced to crime has been even lower than the average of 1.61% since 1999. By 2001, the last year for which CGS has data, only 1.1%



of ATF's traces involved assault weapons named in the Federal ban. See Table 1. In addition, when measured by total crime guns traced, the number of named assault weapons traced in both 2000 and 2001 is less than the number of these guns that were traced in 1993 and 1994. This strongly suggests that over time these deadly guns have become less available for criminal misuse. If this decline is to continue, it is imperative that Congress renew the Assault Weapons Act.



**TABLE 1 - Banned Assault Weapons as a Percentage of All Crime Guns, 1990 – 2001**

Note - Banned assault weapons are guns listed by name in the Federal Assault Weapons Act.

This decline is extremely significant to law enforcement and has clearly enhanced public safety, especially since these military-style weapons are among the deadliest ever sold on the civilian market. For example, if the Assault Weapons Act had not been passed, there is every reason to believe the rate at which they would have been traced would have at least stayed relatively constant throughout the 1990s. After all, the rate remained fairly steady above 5% of ATF traces in each year from 1990–1993, before the ban was enacted.[41]

If this pre-ban rate—which CGS has calculated was 4.82%—continued after the ban took effect, approximately 60,000 additional assault weapons would have been traced to crime in the last 10 years. See Table 2.[42] If the ban is allowed to lapse, it is likely that these weapons would comprise more and more of the guns recovered in crime into the future.

**Table 2—Potential Additional Assault Weapon Crime Traces By Year, Without Federal Assault Weapons Act**

| Year | Crime Traces | |
|---|---|---|
| 1995 | 1358 | crime traces |
| 1996 | 3663 | crime traces |
| 1997 | 5679 | crime traces |
| 1998 | 5698 | crime traces |
| 1999 | 6228 | crime traces |
| 2000 | 6733 | crime traces |
| 2001 | 7884 | crime traces |
| 2002 | 7884* | crime traces |
| 2003 | 7884* | crime traces |
| 2004 | 7884* | crime traces |

**Total: 60,895**

*Estimated

**FINDING #2:** **The gun industry's efforts to evade the Federal Assault Weapons Act through the sale of "copycat" guns has not substantially undercut the positive effect of the statute in reducing the incidence of assault weapons among crime guns.**

## METHOD

In addition to looking at assault weapons named in the Federal Act, an evaluation of copycat weapons is necessary. Many of these copycat guns should be covered under the original Act's intent to ban "copies or duplicates" of listed firearms in any caliber. ATF has never defined this phrase nor identified any firearms that might be considered "copies or duplicates."[43] The gun industry has sought to exploit this by selling guns they have advertised as "copies" of banned guns to take advantage of their notorious image.

To determine the extent to which the gun industry has been successful in undercutting the Act, the Brady Center asked CGS to evaluate tracing data for copycat assault weapons. CGS included copycat AK and AR-15 assault weapons identified by name by the California Department of Justice as models that are only "variations, with minor differences" of those firearms, regardless of the manufacturer.[44] Certainly these weapons should be considered copycats under the Federal Act. In addition, CGS counted all other AK and AR-15 models listed in the ATF database, regardless of the manufacturer. (These guns are identified in Appendix 2.)

The Brady Center asked CGS to consider additional firearm models beyond AK or AR-15 variations that are identified in legislation pending in the United States House of Representatives (H.R. 2038, introduced by Representative McCarthy), and in the United States Senate (S. 1431, introduced by Senator Lautenberg). The intent of the bills is to expand the reach of the Federal Assault Weapons Act to encompass a more comprehensive set of military-style guns. (A list of the assault weapons banned by name in H.R. 2038 and S. 1431 is given in Appendix 3.) According to CGS's analysis of the ATF tracing data, only a few of these additional guns have been traced in quantities significant enough to affect the analysis. Of these guns with significant trace counts, only one gun—the Intratec AB-10—could be considered a "copy or duplicate" of a gun banned in the 1994 Act and it was

therefore included. The other guns with significant trace counts—the Hi-Point Carbine, the Ruger Mini 14, various iterations of the M1 Carbine, and various SKS models—for the most part pre-dated the 1994 Act, but were not included by Congress in the definition of assault weapons. They, therefore, have not been included in this analysis of the incidence of copycat assault weapons among overall crime gun traces.



## RESULTS

CGS found that even if the grouping of copycat guns is included in the count of assault weapons traced to crime, there has still been a significant decline in the percentage of ATF crime gun traces involving assault weapons. In the pre-ban period, assault weapons, including copycats, made up 5.7% of ATF traces. In the post-ban period, the same group of guns has constituted 3.1% of ATF traces, a decline of 45%. As with Finding #1, this measures the decline in the *average* percentage of assault weapons traces from the pre-ban to the post-ban period. The *year-by-year* percentage of assault weapons traced has been even lower than



# TABLE 3 - Banned Assault Weapons and Copycats as a Percentage of All Crime Guns, 1990 – 2001



the average of 3.1% since 1999. By 2001, the last year for which CGS has data, only 2.57% of ATF's crime gun traces involved assault weapons named in the Act. See Table 3.

Moreover, even if all of the guns listed in H.R. 2038 and S. 1431 (including the Hi-Point Carbine, the Ruger Mini-14, the M1 Carbine, and the SKS) were counted as assault weapons in the analysis, CGS found

that assault weapons traced to crime made up 7.2% of ATF's nationwide crime gun traces from 1990 – 1994, but only 4.5% of crime gun traces after the Assault Weapons Act took effect, a decline of more than 37%.

Thus, the data suggests that although, to some extent, criminals are substituting copycat assault weapons for guns banned by name, this substitution effect is far from complete.

# CONCLUSION

Enacted into law in 1994, the Federal Assault Weapons Act was designed to reduce the use in crime of military-style semiautomatic firearms, seen by law enforcement authorities as posing a special threat to public safety. The Act was narrowly drawn to ban certain named assault weapons and their "copies and duplicates," along with other guns that have certain specified military features. Soon after the Act went into effect, assault weapon manufacturers sought to evade it by producing copycat assault weapons that were either renamed or differed in design in minor ways from the banned weapons. The industry's success in introducing such copycat guns, along with the federal government's failure to move against copycats under the "copies and duplicates" language of the statute, has raised concerns about whether the Act has had any measurable impact on the use of assault weapons in crime.

This study has demonstrated that, since the Act became law, assault weapons banned by name in the Act have declined from almost 5% of guns traced to crime in the pre-ban period to only 1.6% in the years following the ban—a decline of 66%. The absolute number of named assault weapons traced to crime also has declined, even though the absolute number of crime gun traces has steadily increased. Moreover, even if copycat guns are included, assault weapons have declined from almost 6% of traced guns to about 3%—a decline of 45%. This suggests that although, to some extent, criminals are substituting copycat assault weapons for guns banned by name, this substitution effect is far from complete. Put another way, the Federal Assault Weapons Act has contributed to a substantial reduction in the use of assault weapons in crime, despite the industry's efforts to evade the law through the sale of copycat assault weapons.

Like most laws, the Assault Weapons Act is not perfect. It should be strengthened to cover a more comprehensive set of military-style weapons. Nevertheless, it has reduced the use of high-firepower assault weapons available for criminal use. Its loss, through Congressional inaction, would be a serious blow to public safety.

# APPENDICES

## Appendix 1: Assault Weapons Named in the 1994 Assault Weapons Act by Group

Israel Military Industries Action Arms UZI



Israel Military Arms Galil



North China Industries 56, 84, 86, 320, AKM, AKS; Polytechnologies AK47, AK47/S, AKS; Mitchell Arms AK



Colt AR-15



Beretta AR 70



Steyr AUG



Fabrique Nationale FN/FAL, FN/LAR, and FNC



SWD M-10, M-11, M-11/9, and M-12



Intratec TEC-9, TEC-DC9 and TEC-22



Street Sweeper/Striker 12 (including USAS 12)



## Appendix 2: AK Series and AR-15 Series Copycat Assault Weapons Identified by the California Department of Justice

**American Arms**
AK-C47
AK-F39
AK-F47
AK-Y39

**American Spirit**
USA Model

**Armalite**
AR10 (all)
Golden Eagle
M15 (all)

**Arsenal Co. of Bulgaria**
SLG (all)
SLR (all)

**B-West**
AK-47 (all)

**Bushmaster**
XM15 (all)

**Colt**
Law Enforcement (6920)
Match Target (all)
Sporter (all)

**Dalphon**
BFD

**DPMS**
Panther (all)

**Eagle Arms**
EA-15 E1
EA-15 A2 H-BAR
M15 (all)

**Frankford Arsenal**
AR-15 (all)

**Hesse Ltd.**
HAR 15A2 (all)
Model 47 (all)
Wieger STG 940 Rifle

**Internationale Ordnance**
AK-47 (all)
M-97
RPK

**Kalashnikov**
Hunter Rifle/Saiga

**Knights Mfg. Co.**
RAS (all)
SR-15 (all)
SR-25 (all)

**Les Baer Custom, Inc.**
AR (all)

**MARS**
Pistol

**MAADI Co.**
AK47
ARM
MISR (all)
MISTR (all)

**Mitchell Arms, Inc.**
M-76
M-90
RPK

**North China Industries**
MAK90
NHM90
NHM90-2
NHM91
RPK Rifle
Hunter Rifle

**Ohio Ordnance Works**
ROMAK 991
AK-74

**Olympic Arms**
AR-15
CAR-97
PCR (all)

**Ordnance, Inc.**
AR-15

**Pac West Arms**
All Models

Brady Center to Prevent Gun Violence

**Palemtto Armory**
SGA (all)

**Professional Ordnance, Inc.**
Carbon 15 Rifle
Carbon 15 Pistol

**Rock River Arms, Inc.**
Car A2
Car A4 Flattop
LE Tactical Carbine
NM A2 DCM Legal
Standard A2
Standard A4 Flattop

**Valmet**
Hunter Rifle
76S

**Wilson Combat**
AR-15

**Wum Wum**
All Models

## Additional Copycat AK and AR-15 Series Models[*]

**American Arms**
ZCY308

**Armsco**
AK22

**Armscorp of the Phillippines**
AR15
AK22
AK47
AK47/22

**Arsenal Co. of Bulgaria**
AK74

**Charter Arms**
AK7 series
AKC47
AR15

**FEG**
AK47
AK47S
AK47SAM85
AKN Hungarian

**Imez**
Saiga

**Jager, Armi**
AK22
M/AK22

**Knights Mfg. Co.**
Stoner SR50

**MAADI-Griffin**
(model unknown)

**Machine Crafters, Inc.**
AKS

**Ohio Ordnance Works**
AK47

**Ratmil**
WUM 1
WUM 2

**Rock Island Armory**
AR15

**Russian**
AK47

**Sendra Corp.**
AR15

**SGW Enterprises**
AR15
CAR15
LAR-AR

**U.S.A. Military Surplus**
AR15

**Valmet**
M62
M71
M78
M82

**Zastava**
AK47
AKY39

[*] Model names are listed as they appear in the ATF trace data. Additional copycat models may exist, but were not included if they did not appear as crime guns in the trace data.

# ENDNOTES

[1] 18 U.S.C. § 921(30)(A).

[2] ATF, *Assault Weapons Profile* at 20 (1994).

[3] *Id.* at 19.

[4] Dep't of Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles*, at 38 (1998).

[5] ATF, *Assault Weapons Profile* at 19-20.

[6] Jim Stewart & Andrew Alexander, *Deadly Numbers for Assault Guns*, The Atlanta Constitution, May 21, 1989, at A1.

[7] On March 21, 1989, ATF announced a temporary suspension of the importation of five assault weapons. On March 29, 1989, ATF expanded the scope of the suspension to cover all assault weapons "indistinguishable in design, appearance and function to the original five" and established a working group to decide whether to make this import ban permanent. On March 30, 1989, a gun importer challenged ATF's authority to suspend the importation of these weapons. The Eleventh Circuit Court of Appeals upheld ATF's authority to issue the import suspensions. *Gun South, Inc. v. Brady*, 877 F.2d 858 (11th Cir. 1989). ATF then issued its working group report and, pursuant to 18 U.S.C. § 925(d)(3), made the import ban permanent. ATF, *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles* (July 6, 1989).

[8] In April 1998, ATF determined that the 1989 ban on the importation of assault rifles remained valid and expanded the import ban to include rifles with the "ability to accept a detachable large capacity military magazine" because those weapons "cannot fairly be characterized as sporting rifles." ATF, *Department of the Treasury Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* (1998).

[9] Numerous other states have passed assault weapons bans since California, including Connecticut, Hawaii, Maryland, Massachusetts, New Jersey and New York.

[10] Roberti-Roos Assault Weapons Control Act of 1989, Cal. Penal Code §§ 12275-88.

[11] Hearings on S. 639 and S. 653 Before the Committee on the Judiciary, U.S. Senate, 103d Cong. 1 (Aug. 3, 1993) (statement of Hon. Joseph Biden).

[12] 18 U.S.C. § 922(v)(1) and (w)(1).

[13] 18 U.S.C. § 922(v)(2) and (w)(2).

[14] 18 U.S.C. § 922(a)(30).

[15] Matt Wickenheiser, *As Sales Soar, Bushmaster Shrugs At Bid to Renew Gun Ban*, Portland Press Herald, May 14, 2003.

[16] Eric M. Weiss, *United in Loss, Families Grieve Independently; Sniper Case Leaves Split Legacy*, The Washington Post, October 4, 2003.

[17] Bushmaster Firearms 2002 product catalog at 2.

[18] Congressional Research Service, *Foreign Terrorists and the Availability of Firearms and Black Powder in the United States*, May 16, 2003, at 9.

[19] Bushmaster Firearms 2002 product catalog at 1-3, 5, 42.

[20] *Id.* at 19, 38, 46, 48.

[21] Intratec brochure, "Intratec—Your Choice Keeps America Working."

[22] Richard Willing, *Advocates of gun control protest law's loopholes*, USA Today, April 27, 1999; Harriet Chiang, *State justices hear S.F. massacre case, Families want gunmaker held liable*, San Francisco Chronicle, May 10, 2001.

[23] Richard Willing, *Advocates of gun control protest law's loopholes*, USA Today, April 27, 1999.

[24] *Id.*; Larry Celona, *Anatomy of a Nightmare: How NYPD's Most Perilous Job Cost 2 Cops Their Lives*, New York Post, March 12, 2003. Intratec's corporate name was Navegar, Inc.

[25] Olympic Arms website, http://www.olyarms.com/faq.html, visited February 27, 2004.

[26] Ken Ramage (ed.), *Gun Digest 2002* at 322.

[27] Jeffrey A. Roth and Christopher S. Koper, *Impacts of the 1994 Assault Weapons Ban: 1994-96* (U.S. Department of Justice National Institute of Justice 1999) at 1, 9 (available at http://www.ncjrs.org/pdffiles1/173405.pdf).

[28] *Id.* at 6, 9.

[29] *Id.*

[30] *Id.* at 6-7.

[31] *Id.*

[32] *Id.* at 10.

[33] Douglas Weil and Rebecca Knox, *Estimating the Impact in Baltimore of the Maryland Ban on the Sale of Assault Pistols and High Capacity Magazines* (Center to Prevent Handgun Violence 1995) at 2, 4.

## Appendix 3: Assault Weapons Identified in H.R. 2038 and S. 1431

**Rifles:**

AK

AKM

AKS

AK-47

AK-74

ARM

MAK90

Misr

NHM 90

NHM 91

SA 85

SA 93

VEPR

AR-10

AR-15

Bushmaster XM15

Armalite M15

Olympic Arms PCR

AR70

Calico Liberty

Dragunov SVD Sniper Rifle

Dragunov SVU

Fabrique National FN/FAL

FN/LAR

FNC

Hi-Point Carbine

HK-91

HK-93

HK-94

HK-PSG-1

Kel-Tec Sub Rifle SUB series

M1 Carbine

Saiga

SAR-8

SAR-4800

SKS with detachable magazine

SLG 95

SLR9 95 or 96

Steyr AUG

Ruger Mini 14

Tavor

Thompson Center Arms Co.
1927 series

Thompson M1

Thompson 1927 Commando

Uzi

Galil

Uzi Sporter

Galil Sporter

Galil Sniper Rifle (Galatz)

**Pistols:**

Calico M-110

MAC-10 series

MAC-11

MPA3

Olympic Arms OA

TEC-9

TEC-DC9

TEC-22

Scorpion

AB10

Uzi

**Shotguns:**

Armscor 30 BG

SPAS 12

LAW 12

Striker 12

Streetsweeper

Brady Center to Prevent Gun Violence

[34] See report released on November 5, 2003, accessible at http://feinstein.senate.gov/03Releases/r-assault wepsrate1.htm.

[35] Unfortunately, this year the U.S. Congress passed an amendment to the Consolidated Appropriations Act of 2004, Public Law No. 108-199 (Division B, Title I), barring ATF from continuing to release this valuable data to the public.

[36] ATF, The Youth Crime Gun Interdiction Initiative, Crime Gun Trace Analysis Reports: The Illegal Youth Firearms Market in 27 Communities, at 5 (1999).

[37] During these years, ATF steadily increased the number of guns traced as more and more law enforcement agencies throughout the United States engaged in comprehensive crime gun tracing. For this reason, simply counting the absolute number of assault weapons traced to crime over the relevant period would not accurately capture the impact of the Federal Assault Weapons Act. Therefore, CGS has calculated the percentage of traced guns that are assault weapons. In this connection, however, two facts are worth noting. First, as researchers for the National Institute of Justice found, two cities that comprehensively traced firearms before the ban took effect—St. Louis and Boston—showed similar post-ban declines in the percentage of assault weapons they traced to crime that the researchers found in national data. NIJ Report at 6-7. Second, since the data show there were fewer assault weapons traced nationally in 2000 and 2001 than were traced in 1993 or 1994, even the absolute number of traces of these dangerous weapons has declined over time.

[38] Including all of 1994 in the pre-ban analysis makes the results more conservative than they otherwise might be, as from 1990-1993, the rate of assault weapons traces remained above 5% each year. See Table 1.

[39] Dep't of Justice, Bureau of Justice Statistics, Guns Used in Crime, July 1995.

[40] See Hearing Before the Subcommittee on Crime and Criminal Justice of the Committee of the Judiciary on the Public Safety and Recreational Firearms Use Protection Act, 103d Cong 79 (April 25, 1994) (statement of Rep. Reynolds). In addition, an expert analysis completed by Professor James Alan Fox, noted criminologist at Northeastern University, established that the TEC-9 was four to five times more likely to be traced to criminal activity than other handguns. This disproportionality was even more pronounced for overall violent offenses and murder. See Declaration of James Alan Fox in 101 California Street Litigation.

[41] In 1994, the year the Federal Assault Weapons Act was passed, assault weapons traces as a percentage of overall traces began to decline. We are not attributing this decline to the Federal Act. By this time, however, several state assault weapons laws had been passed, and these could have begun to have an effect on overall assault weapons traces. Indeed, as researchers for the National Institute of Justice measured, after the federal law was passed, there was a higher decline in states that had not passed their own assault weapons laws than in states that had. Jeffrey A. Roth and Christopher S. Koper, Impacts of the 1994 Assault Weapons Ban: 1994-96 (Dep't of Justice National Institute of Justice 1999), at 6-7 (available at http://www.ncjrs.org/pdffiles1/173405.pdf).

[42] CGS calculated the number of assault weapons that would have been traced to crime in each year from 1995 through 2001 if the 4.82% rate held and then subtracted from this number the number of assault weapons that were actually traced in each of those years. For the years 2002-2004, CGS applied the differential in the year 2001. This is a fairly conservative estimate since the differential increased in every year between 1995 and 2001.

[43] The California Department of Justice, pursuant to California's assault weapons ban, has defined copycat AK-47 and AR-15 assault weapons and published a list of them on its website (available at http://caag.state.ca.us/firearms/awguide/). Crime Gun Solutions has considered all of these guns in its tracing analysis of copycat assault weapons.

[44] Cal. Penal Code § 12276(e).



**BRADY CENTER TO PREVENT GUN VIOLENCE**

**1225 Eye Street, NW**

**Suite 1100**

**Washington, DC 20005**

**www.gunlawsuits.org**