1   XAVIER BECERRA
Attorney General of California
2   TAMAR PACHTER
Supervising Deputy Attorney General
3   NELSON R. RICHARDS
ANTHONY P. O'BRIEN
4   Deputy Attorneys General
ALEXANDRA ROBERT GORDON
5   Deputy Attorney General
State Bar No. 207650
6    455 Golden Gate Avenue, Suite 11000
San Francisco, CA  94102-7004
7    Telephone: (415) 703-5509
Fax: (415) 703-5480
8    E-mail:
Alexandra.RobertGordon@doj.ca.gov
9   *Attorneys for Defendant*
*Attorney General of California*

10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

| | |
|---|---|
| 15  **VIRGINIA DUNCAN, et al.** | 17-cv-1017-BEN-JLB |
| 16                    Plaintiffs, | |
| 17        **v.** | **EXHIBITS 77-84 TO THE DECLARATION OF ALEXANDRA ROBERT GORDON IN SUPPORT OF DEFENDANT ATTORNEY GENERAL XAVIER BECERRA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| 18 | |
| 19  **XAVIER BECERRA, in his official capacity as Attorney General of the State of California; et al.,** | |
| 20 | |
| 21                    Defendants. | |
| 22 | Date:       June 13, 2017 |
| 23 | Time:       10:00 a.m. |
| | Dept:       5A |
| 24 | Judge:      Hon. Roger T. Benitez |
| | Action Filed:    May 17, 2017 |

25

26

27

28

Decl. of Alexandra Robert Gordon ISO Def's Opp'n to Pls.' Mot. For Prelim. Inj.
(17-cv-1017-BEN-JLB)

# Exhibit 77

# APPENDIX

<span style="color:red">MARCH 2017</span>

# Mass Shootings in the United States: 2009–2016



## Appendix

# Mass shooting incidents, January 2009–December 2016

The following incidents are presented in reverse chronological order. Information comes from police and court records, or media reports when no records were available.

### Chicago, IL, 12/17/2016

Four people were shot and killed and one person was shot and injured in a home in the Fernwood neighborhood of Chicago. The identity of the shooter remains unknown.

**Shooter name**: Unknown
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria**: Unknown
**GVRO red flag**: Unknown
**Not a gun-free zone**: The shooting took place in a private home.

### Los Angeles, CA, 10/15/2016

A dispute involving multiple shooters led to four people being fatally shot and 11 more being shot and injured.  The shooting took place during a birthday party, at a home that also served as an underground restaurant in the West Adams neighborhood of Los Angeles.  Though investigators suspect multiple shooters were involved, only Marlon Jones has been charged in connection with the crime.

**Shooter name:** Marlon Jones (alleged)
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria:** Marlon Jones was likely prohibited from possessing firearms as he was believed to be living in the United States illegally, according to the FBI.
**GVRO red flag**: There is no evidence to suggest that Jones exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place in a private home.

### Burlington, WA, 09/23/2016

Arcan Cetin, 20, allegedly shot and killed five people at the Cascade Mall.  Cetin fled the mall in a vehicle, and was arrested by police after a 24-hour manhunt.

**Shooter name**: Arcan Cetin, 20 (alleged)
**Gun details**: .22-caliber Ruger rifle
**Gun acquired**: Cetin's stepfather owned a .22-caliber Ruger rifle and told detectives the weapon was missing from his home.
**Prohibiting criteria**: Cetin was likely prohibited from possessing firearms.  In November 2015, he attempted suicide and was involuntarily committed at Fairfax Hospital, an inpatient psychiatric facility in Kirkland, WA.

**GVRO red flag**: In addition to his November 2015 suicide attempt, Cetin exhibited several warning signs in advance of the shooting.  In the spring of 2015, Cetin was accused of sexually touching two female classmates at Oak Harbor High.  A month later, he was arrested for misdemeanor domestic violence assault after an argument with his stepfather.

**Gun-free zone**: Cascade Mall, which is owned by the Macerich Group, prohibits the carrying of all weapons, including firearms, on the property as a term of their corporate code of conduct.

## Sinking Spring, PA, 08/06/2016

Mark Short, 40, fatally shot his wife and their three children –ages 2 to 8 –before fatally shooting himself.

**Shooter name:** Mark Short, 40

**Gun details**: Handgun

**Gun acquired**: Short bought the gun from a licensed dealer in Lancaster County, PA approximately two weeks before the shooting.

**Prohibiting criteria**: There is no evidence to suggest Short was prohibited from possessing firearms.

**GVRO red flag**: Approximately two weeks before the shooting, police responded to a call from Short's wife, who indicated she was afraid of her husband.

**Not a gun-free zone**: The shooting took place in a private home.

## Dallas, TX, 07/07/2016

Micah Johnson, 25, fatally shot five police officers and shot and injured nine more people during a protest in downtown Dallas.  After the shooting subsided, Johnson hid in a parking garage, holding off police for hours.  The police killed him the following morning, using an explosive delivered by a remote-controlled robot.

**Shooter name**: Micah Johnson, 25

**Gun details**: Izhmash-Saiga 5.45mm rifle, 9mm handgun, .25-caliber handgun

**Gun acquired**: Investigators believe Johnson acquired the guns legally, either online or at a gun show.

**Prohibiting criteria**: There is no evidence to suggest that Johnson was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Johnson exhibited recent behavior that would have qualified for a GVRO.

**Not a gun-free zone**: Under Texas law, the open and concealed carrying of firearms was lawful at the protest.  There were several armed individuals at the protest.

## Las Vegas, NV, 06/29/2016

Jason Dej-Odoum, 34, fatally shot his wife outside a Walgreens store. He then fatally shot their three children –ages 9 to 15 –in the family's apartment before fatally shooting himself.

**Shooter name**: Jason Dej-Odoum, 34

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria:** There is no evidence to suggest Dej-Odoum was prohibited from possessing firearms.

**GVRO red flag**: Dej-Odoum's wife had applied for a protective order weeks before the shooting,

but it was denied.  In the protective order application, she alleged that Dej-Odoum had threatened the family with guns many times in the past. The application also suggests that Dej-Odoum threatened his children in conversation with his wife approximately three weeks before the shooting.

**Not a gun-free zone**: The shootings took place outside a Walgreens store and in a private home.  Neither location would prohibit the carrying of firearms.

### Roswell, NM, 06/12/2016

Juan David Villegas-Hernandez, 34, allegedly shot and killed his wife and four children, ages 7 to 14, in the family's home.

**Shooter name**: Juan David Villegas-Hernandez, 34 (alleged)

**Gun details**: .22-caliber rifle

**Gun acquired**: Unknown

**Prohibiting criteria:** There is no evidence to suggest that Villegas-Hernandez was prohibited from possessing firearms.

**GVRO red flag:** Days before the shooting, Villegas-Hernandez threatened to kill his wife, according to her brother.  There was a history of abuse in the relationship, and Villegas-Hernandez's wife had recently asked for a divorce.

**Not a gun-free zone:** The shooting took place in a private home.

### Orlando, FL, 06/12/2016

Omar Mateen, 29, fatally shot 49 people and shot and wounded 53 more at Pulse, a gay nightclub in Orlando.  After the initial attack, Mateen held the people inside the club hostage for approximately three hours before police raided the club.  Over a dozen police officers and sheriff's deputies engaged in a shootout with Mateen, shooting him fatally.

**Shooter name**: Omar Mateen, 29

**Gun details**: Sig Sauer MCX assault rifle, 9mm handgun

**Gun acquired**: Mateen legally purchased the guns from a Florida gun store about a week before the shooting.

**Prohibiting criteria**: The FBI had investigated Mateen for possible ties to terrorism, but eventually closed the investigation because agents concluded he was not a threat. This would not have prevented the shooter from buying or having firearms as the FBI currently has no authority to block gun sales to suspected terrorists.

**GVRO red flag**: There were several signs that Mateen was potentially dangerous.  His ex-wife alleged that Mateen beat her before their divorce in 2011.  A man who was Mateen's colleague in 2014 and 2015 said that he had violent tendencies and that he threatened to kill people.

**Gun-free zone**: Pulse nightclub was a gun-free zone under Florida law, which prohibits permit holders from carrying concealed handguns in bars and other venues that primarily serve alcohol.

### Appling, GA, 4/22/2016

Wayne Anthony Hawes, 50, fatally shot five adults before fatally shooting himself.  The shooting was related to a domestic dispute, with Hawes killing three of his girlfriend's family members.

**Shooter name:** Wayne Anthony Hawes, 50

**Gun details:** .357 magnum revolver, and shotgun

**Gun acquired:** Unknown

**Prohibiting criteria:** There is no evidence to suggest Hawes was prohibited from possessing firearms.
**GVRO red flag:** Hawes' girlfriend reported a long and ongoing history of verbal and physical abuse, as well as alcohol abuse.
**Not a gun-free zone:** This shooting took place between three private homes.

## Pike County, OH, 04/22/2016

Eight members of the same family were shot and killed between four homes in the Piketon, OH area. No arrests have been made, and the identity of the shooter(s) is unknown. There were marijuana grow operations found at three of the crime scenes, though it is unknown if this was related to the shooting.
**Shooter name:** Unknown
**Gun details**: Unknown
**Gun acquired:** Unknown
**Prohibiting criteria:** Unknown
**GVRO red flag:** Unknown
**Not a gun-free zone**: The shootings took place between 4 private homes.

## Wilkinsburg, PA, 03/09/2016

Cheron Shelton, 29, and Robert Thomas, 27, allegedly shot and killed five people and shot and injured three more at a backyard cookout.  Officials believe the shooting was retaliation for another shooting in 2013.
**Shooter names:** Cheron Shelton, 29, and Robert Thomas, 27 (alleged)
**Gun details**: 7.62-caliber assault rifle, .40-caliber handgun
**Gun acquired**: Unknown
**Prohibiting criteria**: Both Shelton and Thomas were prohibited from possessing firearm, because of their history of violent felony convictions.  Shelton also had a 2009 felony drug conviction which prohibited him.
**GVRO red flag**: There is no evidence that Shelton or Thomas exhibited recent behavior that would have qualified for a GVRO.
**Not a gun-free zone**: The shooting took place at a private home.

## Kansas City, KS, 03/07/2016

Pablo Antonio Serrano-Vitorino, 40, allegedly shot and killed four men in Kansas City, KS; at least one of these men lived in the house next door to him.  The next day he fatally shot another man at that man's home in Montgomery County, MO.  A police manhunt ended in his arrest.
**Shooter name**: Pablo Antonio Serrano-Vitorino, 40 (alleged)
**Gun details**: A shotgun was used in the Kansas City shootings; an assault rifle was used in the Montgomery County shootings.
**Gun acquired**: Unknown
**Prohibiting criteria**: Serrano-Vitorino was prohibited from possessing firearms because, according to media reports, he was in the United States illegally.
**GVRO red flag**: In June 2015, Serrano-Vitorino was charged after allegedly punching his brother in the face.
**Not a gun-free zone**: The shootings took place between two private homes.

### Belfair, WA, 02/26/2016

David Wayne Campbell, 51, fatally shot his wife, her two sons, a neighbor, and then himself.

**Shooter name**: David Wayne Campbell, 51

**Gun details**: Handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: Campbell was likely prohibited from possessing firearms due to past felony and misdemeanor convictions in Pennsylvania, including theft by deception and forgery.

**GVRO red flag**: One of Campbell's former employees alleged that Campbell pulled a gun on him, and threatened to kill him in July 2015.

**Not a gun-free zone**: The shooting took place in a private home.

### Phoenix, AZ, 02/23/2016

Alex Arthur Buckner, 26, fatally shot his parents and his two sisters in the family's home.  He set fire to the house before being fatally shot by responding police officers.

**Shooter name**: Alex Arthur Buckner, 26

**Gun details**: Unknown

**Gun acquired**: The gun used in the shooting belonged to Buckner's father, one of the victims.

**Prohibiting criteria**: There is no evidence to suggest that Buckner was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence that Buckner exhibited recent behavior that would have qualified him for a GVRO.  His family members noted that he had been treated for drug abuse in the past, but it is unclear exactly when this occurred.

**Not a gun-free zone**: The shooting took place in a private home.

### Kalamazoo, MI, 02/20/2016

Jason Brian Dalton, 45, allegedly shot and killed six people and injured two more in a spree shooting.  The first shooting took place in the parking lot of an apartment building; a woman was critically injured, but survived. The second shooting –in the parking lot of a car dealership –killed a man and his 17-year-old son. And the third shooting –in the parking lot of a Cracker Barrel restaurant –killed four women and injured a 14-year-old girl.  Dalton was working as an Uber driver during the spree, telling investigators that the Uber app took over his body.

**Shooter name:** Jason Brian Dalton, 45 (alleged)

**Gun details:** Walther P99 9mm handgun, Glock 19 9mm handgun

**Gun acquired:** Both guns used in the shooting were purchased from a licensed dealer.

**Prohibiting criteria:** There is no evidence that Dalton was prohibited from possessing firearms.

**GVRO red flag:** There is no evidence that Dalton exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone:** There is no evidence to suggest that any of the three locations was a gun-free zone.

### Chesapeake, VA, 01/27/2016

Cameron Dooley, 26, fatally shot his mother, father, brother, sister, and grandmother between two homes.  He then fatally shot himself.

**Shooter name**: Cameron Dooley, 26

**Gun details**: Handgun

**Gun acquired**: Unknown
**Prohibiting criteria:** There is no evidence to suggest Dooley was prohibited from possessing firearms.
**GVRO red flag:** There is no evidence to suggest Dooley exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shootings took place between two private homes.

## San Bernardino, CA, 12/02/2016

Married couple Syed Rizwan Farook, 28, and Tashfeen Malik, 29, fatally shot 14 people and shot and injured 22 more at Farook's office holiday party.  Farook and Malik fled in a vehicle, but were shot and killed by pursuing police officers.  The FBI investigated the incident as terrorism, suggesting that Farook and Malik may have been inspired by ISIS.
**Shooter names:** Syed Rizwan Farook, 28, and Tashfeen Malik, 29
**Gun details**: Five firearms were used in the attack: two 9mm handguns, two .223-caliber assault rifles, and a .22-caliber rifle.
**Gun acquired**: Three of the guns were purchased legally by Farook between 2007 and 2012.  The other two were purchased by Farook's friend and former neighbor in 2011 or 2012.
**Prohibiting criteria**: There is no evidence to suggest that Farook or Malik were prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest that Farook or Malik exhibited recent behavior that would have qualified for a GVRO.
**Not a Gun-free zone**: The shooting took place at the Inland Regional Center, which is a state-run facility for individuals with developmental disabilities, including children. According to California law, the carrying of firearms is prohibited in state or local public buildings. However, concealed carry permit holders are exempt from this prohibition. Everytown found no other evidence that firearms were prohibited in the facility.

## Palestine, TX, 11/14/2015

William Hudson, 33, allegedly shot and killed six people at a campsite.  Hudson lived next to the campsite, and appeared to know the victims, though the motive for the shooting is unclear.
**Shooter name**: William Hudson, 33 (alleged)
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria**: There is no evidence to suggest Hudson was prohibited from possessing firearms.
**GVRO red flag**:  In the month before the shooting, Hudson was arrested for assault after an incident at a local convenience store.
**Not a gun-free zone**: The campsite was privately owned; there is no evidence to suggest that firearms were prohibited on the land.

## Pendleton, SC, 11/01/2015

Four family members were fatally shot in the Pendleton home where they lived.  The identity of the shooter(s) is unknown.
**Shooter name**: Unknown
**Gun details**: Unknown
**Gun acquired**: Unknown

**Prohibiting criteria:** Unknown
**GVRO red flag**: Unknown
**Not a gun-free zone**: The shooting took place in a private home.

## Roseburg, OR, 10/01/2015

Christopher Harper-Mercer, 26, fatally shot nine people and shot and injured nine more during an English class at Umpqua Community College.  Two responding police officers engaged Harper-Mercer in a shootout, hitting him once in the right side.  Harper-Mercer then went back into the classroom and fatally shot himself.
**Shooter name**: Christopher Harper-Mercer, 26
**Gun details**: Harper-Mercer had five handguns and one rifle at the scene of the crime.  Seven more guns were found at Harper-Mercer's home.
**Gun acquired**: According to ATF, all of the guns recovered were purchased legally, either by Harper-Mercer or his family members.
**Prohibiting criteria**: There is no evidence to suggest that Harper-Mercer was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest that Harper-Mercer exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: Concealed carry permit holders were allowed to carry firearms on the Umpqua Community College campus.

## Platte, SD, 09/17/2015

Scott Westerhuis, 41, fatally shot his wife and their four children before setting their home on fire and fatally shooting himself.
**Shooter name**: Scott Westerhuis, 41
**Gun details**: Shotgun
**Gun acquired**: Unknown
**Prohibiting criteria**: There is no evidence that Westerhuis was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence that Westerhuis exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place in a private home.

## Greenwood, NM, 9/10/2015

Brian Short, 45, fatally shot his wife and their three children –ages 13, 15, and 17 –before fatally shooting himself.  The shooting took place in the family's home.
**Shooter name**: Brian Short, 45
**Gun details**: Remington 870 Express 12-gauge shotgun
**Gun acquired**: Short legally purchased the gun at a local gun store 4 days before the shooting.
**Prohibiting criteria**: There is no evidence that Short was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest Short exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place in a private home.

### Harris County, TX, 08/08/2015

David Conley, 49, allegedly shot and killed the woman he formerly lived with, her husband, and her six children in his former home.  Conley was arrested after a standoff with police.

**Shooter name**: David Conley, 49 (alleged)

**Gun details**: 9mm handgun

**Gun acquired**: Conley reportedly bought the gun online in a private sale within two weeks of the shooting.

**Prohibiting criteria**: Conley was likely prohibited from possessing firearms due to a lengthy criminal history, including a 1989 conviction for aggravated robbery and auto theft, and a 1994 conviction for possession of a controlled substance.

**GVRO red flag**: In July 2015, the woman Conley ultimately shot and killed called police claiming that Conley had threatened to strike her son with a belt, and pushed her head against the refrigerator multiple times.

**Not a gun-free zone**: The shooting took place in a private home.

### Barre, VT, 08/07/2015

Jody Herring, 40, allegedly shot and killed a social worker in a public parking lot.  She then allegedly shot and killed her aunt, and two of her cousins in their home.

**Shooter name**: Jody Herring, 40 (alleged)

**Gun details**: Remington 700 .270-caliber rifle

**Gun acquired**: Herring stole the rifle from her ex-boyfriend.

**Prohibiting criteria**: Herring was prohibited from possessing firearms.  She had a lengthy criminal record with 11 misdemeanor convictions, including heroin possession, petit larceny, and driving under the influence.  Approximately 5 months before the shooting, Herring, on two separate dates, attempted to buy handguns from two licensed dealers in Vermont.  On both occasions, the dealers denied her after requesting background checks.

**GVRO red flag**: Approximately a week before the shooting, Herring told her ex-boyfriend that she was going to "shoot some people".  Her ex-boyfriend told investigators that Herring had a "hit list".

**Not a gun-free zone**: The shootings took place between a public parking lot and a private home, neither of which are gun-free zones.

### Chattanooga, TN, 07/16/2015

Mohammad Abdulazeez, 24, fired from a vehicle into an Army/Navy recruitment center.  He then traveled to the U.S. Naval Reserve where he fatally shot four marines and one sailor, and shot and injured two others, including a police officer. Ultimately, he was fatally shot by responding police.

**Shooter name**: Mohammed Youssuf Abdulazeez, 24

**Gun details**: AK-47-style assault rifle, shotgun, 9mm handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Abdulazeez was prohibited from possessing firearms.

**GVRO red flag**: Approximately 3 months before the shooting, Abdulazeez was charged with a DUI.  Abdulazeez's relatives also attempted to have him admitted to an in-patient drug and alcohol program.

**Gun-free zone**: Abdulazeez fired at the Army/Navy recruitment center from the parking lot. Under Tennessee law, permit holders are allowed to keep guns in their cars in public and private parking lots. Under Department of Defense regulations, it is likely that most service members and

personnel at the US Naval Reserve were prohibited from carrying firearms. But, this prohibition would not have applied to authorized personnel, including those acting as security personnel or law enforcement. Media reports suggest that there was at least one service member on the premises who had a personal firearm and used it to fire at Abdulazeez.

## Holly Hill, SC, 07/15/2015

An unknown assailant entered a residence and fatally shot two teenage girls, an adult male, an adult female, and shot and injured a child.

**Shooter name**: Unknown
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria**: Unknown
**GVRO red flag**: Unknown
**Not a gun-free zone**: The shooting took place in a private home.

## Charleston, SC, 06/17/2015

Dylann Roof, 21, fatally shot nine people during Bible study at the Emanuel African Methodist Episcopal Church.

**Shooter name**: Dylann Roof, 21
**Gun details**: .45 caliber Glock handgun
**Gun acquired**: Roof bought the gun at a licensed gun store in April 2015.
**Prohibiting criteria**: In the six-month period before the shooting, Roof was convicted for misdemeanor trespass and was facing a charge of misdemeanor possession of a controlled substance. Though neither the trespassing conviction nor the drug arrest would have caused him to fail a gun background check, the police report of the drug arrest contained evidence that he was an admitted unlawful user of a controlled substance. According to the FBI, that admission prohibited him from possessing firearms, so when he tried to purchase a handgun at a licensed gun dealer and underwent a background check, the FBI operator would have denied the sale had they had the record. The FBI operator did delay the sale of the gun used in the shooting to examine the details of the drug arrest, but they did not locate the police report within the three-business-day limit provided under law, and after that period elapsed, the gun dealer lawfully sold Roof the gun.
**GVRO red flag**: According to the police report from his 2015 arrest, Roof was an unlawful user of a controlled substance.  This is echoed by one of Roof's high school classmates, who also identified him as a heavy drug user.
**Gun-free zone**: According to South Carolina law, the carrying of handguns is generally prohibited in churches and other religious sanctuaries.

## Columbus, OH, 06/12/2015

Robert Lee Adams, 27, fatally shot a man, his daughter, and two other victims inside the man's home.  He also shot and injured a 16-year-old girl. Adams was accompanied by a 16-year-old boy who helped rob the victims, but did not shoot them.

**Shooter name**: Robert Lee Adams, 27
**Gun details**: Handgun
**Gun acquired**: Unknown
**Prohibiting criteria**: Adams was prohibited from possessing firearms due to a 2008 conviction for armed robbery.

**GVRO red flag**: There is no evidence to suggest that Adams exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

## Missoula, MT, 06/07/2015

Michael Bournes, 59, fatally shot his wife and their three children—ages 1, 4, and 5—in their home.  He then set the house on fire and fatally shot himself.

**Shooter name**: Michael Bournes, 59

**Gun details**: .45-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: Despite a previous criminal history, Bournes was likely not prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Bournes exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

## Waco, TX, 05/17/2015

A brawl between rival biker gangs escalated into a shootout in which nine bikers were fatally shot and 18 others were shot and injured. Police engaged in the shootout and fired on the bikers.

**Shooter names**: Multiple unknown shooters

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: Unknown

**GVRO red flag**: Unknown

**Not a gun-free zone**: The shooting took place in the parking lot around a restaurant.  There is no evidence to suggest that the parking lot prohibited the carrying of firearms.

## Tucson, AZ, 05/13/2015

Christopher Carrillo, 25, fatally shot his parents, his brother, and his niece in the family's home.  He then fatally shot himself.

**Shooter name:** Christopher Carrillo, 25

**Gun details:** 9mm handgun

**Gun acquired:** Carrillo legally purchased the gun five days before the shooting.

**Prohibiting criteria**: Carrillo was not prohibited from possessing firearms.

**GVRO red flag:** There is no evidence to suggest Carrillo exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone:** The shooting took place in a private home.

## Phoenix, AZ, 05/13/2015

Driss Diaddinne, 50, fatally shot his mother, two brothers, and a sister-in-law in the home they all shared. He then fatally shot himself.

**Shooter name:** Driss Diaddinne, 50

**Gun details:** Handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Diaddinne was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Diaddinne exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

### Indianapolis, IN, 03/24/2015

An unknown assailant shot and killed a woman, her cousin, her son, and a friend of the family in a home.

**Shooter name:** Unknown

**Gun details:** Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: Unknown

**GVRO red flag**: Unknown

**Not a gun-free zone**: The shooting took place in a private home.

### Tyrone, MO, 02/26/2015

Joseph Jesse Aldridge, 36, drove from house to house in his neighborhood, fatally shooting two of his cousins, their wives, and three unrelated neighbors. He shot and injured another neighbor. He fled the scene and ultimately shot and killed himself in his car.

**Shooter name**: Joseph Jesse Aldridge, 36

**Gun details**: .45-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: Aldridge was prohibited from possessing firearms due to a 2008 felony conviction for possession of a firearm by an unlawful user of a controlled substance.

**GVRO red flag**: There is no evidence to suggest that Aldridge exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shootings took place in private homes.

### Douglasville, GA, 02/07/2015

Cedric G. Prather, 33, went to the home where his ex-wife lived and fatally shot her, their two sons, and the ex-wife's new boyfriend. He also shot and injured two other children, and then fatally shot himself.

**Shooter name**: Cedric G. Prather, 33

**Gun details**: .45-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: Prather was prohibited from possessing firearms due to a 2011 felony conviction for possessing cocaine.

**GVRO red flag**: Prather's ex-wife had asked a judge for a temporary protective order in August 2013, alleging that Prather had forced his way into her locked home and sexually assaulted her.

**Not a gun-free zone**: The shooting took place in a private home.

### La Grange, GA, 01/31/2015

Thomas Jesse Lee, 26, fatally shot his wife, mother-in-law, father-in-law, and a teenage family friend in the home he shared with his wife's family. Lee also strangled and killed his stepdaughter.

**Shooter name**: Thomas Jesse Lee, 26

**Gun details**: .22-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Lee was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Lee exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

### San Francisco, CA, 01/09/2015

An unknown assailant fatally shot four young men while they sat in a parked car on the street.

**Shooter name**: Unknown

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: Unknown

**GVRO red flag**: Unknown

**Not a gun-free zone**: In California, persons with a concealed carry permit may carry a concealed firearm in a car and on a public street.

### Rockford, IL, 12/20/2014

Calvin Carter, 22, allegedly shot and killed his ex-girlfriend, her boyfriend, and her two children–ages 4 and 6.

**Shooter name**: Calvin Carter, 22 (alleged)

**Gun details**: .45 caliber handgun

**Gun acquired:** Unknown

**Prohibiting criteria:** There is no evidence that the shooter was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest Carter exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

### Souderton, PA, 12/15/2014

Bradley Stone, 35, fatally shot his ex-wife, mother-in-law, sister-in-law, brother-in-law, and grandmother-in-law.  He also fatally stabbed his niece and stabbed and injured his nephew before killing himself with a drug overdose.

**Shooter name:** Bradley Stone, 35

**Gun details:** .40-caliber handgun, 9mm Beretta

**Gun acquired:** Unknown

**Prohibiting criteria:** It is unclear if Stone was prohibited from possessing firearms. He was arrested and charged for a third DUI offense in 2013, admitted to Veteran's Treatment Court, and sentenced to 23 months of supervision. He agreed not to possess firearms as a condition of his admission to the treatment program, though it is unclear whether Stone would have failed a criminal background check.

**GVRO red flag:** Stone has several DUI arrests on his record, including one about 18 months before the shooting.

**Not a gun-free zone:** The shootings took place between three private homes.

## Morgantown, WV 12/01/2014

Jody Lee Hunt, 39, fatally shot four people at three different locations: a business rival at his towing company, his ex-girlfriend and her new boyfriend in their shared home, and his cousin at his home.  Hunt then fatally shot himself in his vehicle.

**Shooter name**: Jody Lee Hunt, 39

**Gun details**: 9mm handgun

**Gun acquired**: ATF traced the shooter's gun to a Monongalia County resident, who sold Hunt the 9mm handgun in an unlicensed transfer one year prior to the shooting.  He was able to purchase the handgun in a private sale after responding to an ad for the gun posted on Facebook.  Authorities do not believe that Hunt and the seller previously knew each other, and the seller was not charged with a crime.

**Prohibiting criteria**: The shooter was prohibited from possessing firearms due to multiple felony convictions. In 1999 in Virginia, he was convicted of felony kidnapping for abducting a former girlfriend and holding her hostage at gunpoint.

**GVRO red flag**: There is no evidence to suggest that Hunt exhibited recent behavior that would have qualified for a GVRO.

**Not a gun-free zone**: Three of the victims were killed in private homes.  There is no evidence to suggest that the towing company had a specific policy prohibiting firearms on the premises.

## Cleveland, OH, 11/21/14

James Sparks-Henderson, 19, allegedly shot and killed his close friend, a woman who was seven months pregnant, and two other victims inside a residence. He also allegedly shot and injured a nine-year-old girl.

**Shooter name**: James Sparks-Henderson, 19 (alleged)

**Gun details**: 9mm handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: The shooter was prohibited from possessing firearms due to a 2010 felony conviction for aggravated robbery.

**GVRO red flag**: There is no evidence to suggest that Sparks-Henderson exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

## Springfield, MO, 11/15/2014

Scott Goodwin-Bey, 47, is suspected of fatally shooting four people in a motel room because he thought they were acting as informants to the police.  He was convicted for being a felon in possession of a firearm.  The murder charges were dropped in December 2016; though

Goodwin-Bey remains the only suspect, and prosecutors anticipate re-filing charges after additional testing is complete.

**Shooter name**: Scott Goodwin-Bey, 47 (suspected)

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: Goodwin-Bey was prohibited from possessing firearms due to multiple felony convictions.  In 1992, he was convicted of three felonies: possession of a controlled substance, unlawful use of a weapon, and resisting arrest.

**GVRO red flag**: There is no evidence that Goodwin-Bey exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: In a phone conversation, a motel employee told Everytown that a person with a concealed carry permit could carry on the premises.


## Marysville, WA, 10/24/2014

Jaylen Fryberg, 15, shot five of his friends and classmates as they sat eating lunch in the cafeteria of Marysville-Pilchuck high school, killing four and injuring one. Fryberg then fatally shot himself.

**Shooter name**: Jaylen Fryberg, 15

**Gun details**: .40-caliber Beretta handgun

**Gun acquired**: The gun used in the shooting was owned by Fryberg's father, who said he kept the gun in his pickup truck.

**Prohibiting criteria**: As a juvenile, the shooter was prohibited from possessing handguns.

**GVRO red flag**: There is no evidence that Fryberg exhibited recent behavior that would have qualified him for a GVRO.

**Gun-free zone**: Washington law prohibits any person from carrying firearms onto elementary or secondary schools.


## Bell, FL, 09/18/2014

Don Charles Spirit, 51, fatally shot his daughter and his six grandchildren, ranging from two months to 11 years of age. He then fatally shot himself.

**Shooter name:** Don Charles Spirit, 51

**Gun details:** .45-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: The shooter was prohibited from possessing firearms due to multiple felony convictions. In 1998, Spirit was convicted of felony possession of marijuana. In 2001, he unintentionally shot and killed his 8-year-old son while on a hunting trip; he was convicted of possession of a firearm by a felon.

**GVRO red flag**: Florida's Department of Children and Families (DCF) had been alerted to problems in the family about two weeks before the shooting.  Spirit was allegedly abusing drugs, and physically abusing his grandchildren.

**Not a gun-free zone**: The shooting took place in a private home.


## Culpeper, VA, 08/04/2014

Clarence Washington, 35, fatally shot his wife and three daughters –ages 4, 6, and 13 –and then fatally shot himself inside their home.

**Shooter name**: Clarence Washington, 35

**Gun details**: A .380 Hi-Point handgun and .22-caliber rifle were found at the scene; it is unclear which weapons were used in the shooting.

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence that Washington was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence that Washington exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

## Saco, ME, 07/26/2014

Joel Smith, 33, fatally shot his wife, their two children, ages 4 and 7, and his 12-year-old stepson in the family's home.  He then fatally shot himself.

**Shooter name**: Joel Smith, 33

**Gun details**: Shotgun

**Gun details**: Smith's brother purchased the shotgun for him.

**Prohibiting criteria**: There is no evidence that Smith was prohibited from possessing firearms.

**GVRO red flag**: Smith's father indicated that Smith suffered from alcohol abuse.  Smith's wife told a family friend that Smith had threatened suicide in the week before the shooting.

**Not a gun-free zone**: The shooting took place in a private home.

## Spring, TX, 07/09/2014

Ronald Lee Haskell, 33, allegedly shot and killed the sister of his ex-wife, her husband, and four of their children, injuring a fifth, before being captured by police.

**Shooter name**: Ronald Lee Haskell, 33 (alleged)

**Gun details**: Handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: Haskell was likely prohibited from possessing firearms. There was a mutual restraining order enacted as part of his divorce proceedings in February 2014.  He had also been charged with simple assault and domestic violence in the presence of a child in 2008, but the charges were dismissed.

**GVRO red flag**: In July, weeks before the shooting, Haskell's family attempted to take out a protective order against him. According to media reports, the mother accused her son of choking her until she passed out and threatened to kill her. In November of 2013, he was accused of choking his sister and throwing her to the ground.

**Not a gun-free zone:** The shooting took place in a private home.

## Fort Myers, FL, 6/8/2014

Sonny Medina, 36, shot and killed his girlfriend and three daughters –ages 2, 5, and 10 –before fatally shooting himself.  The shooting took place after a party at Medina's home.

**Shooter name:** Sonny Medina, 36

**Gun details:** Ruger .22 handgun, Glock 9mm handgun

**Gun acquired:** Unknown

**Prohibiting criteria:** There is no evidence that the shooter was prohibited from possessing firearms.

**GVRO red flag:** Medina's brother told police that Medina told him about an incident approximately two years before the shooting in which Medina shoved his girlfriend, causing bruising.

**Not a gun-free zone**: The shooting took place in a private home.

### Indianapolis, IN, 02/20/2014

During an attempt to rob the home of a drug dealer, the shooters killed the drug dealer and three others.

**Shooter names**: Kenneth Rackemann, 24, and Valencia Williams, 21

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: Rackemann had several felony convictions on his record, including battery and burglary, which prohibited him from possessing a gun.  There is no evidence to suggest that Williams was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence that the shooters exhibited recent behavior that would have qualified for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

### Alturas, CA, 02/20/2014

Cherie Rhoades, 44, fatally shot four people, wounded another by gunshot, and wounded another with a knife at her eviction hearing at the Cedarville Rancheria Tribal Community Council. Among the fatalities were Rhoades' brother, niece, and nephew.

**Shooter name**: Cherie Rhoades, 44

**Gun details**: Two 9mm handguns

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence that Rhoades was prohibited from possessing firearms.

**GVRO red flag**: Rhoades' nephew told investigators that she had made statements for years that she was going to kill her brother.

**Not a gun-free zone**: The shooting took place at a public building called the Cedarville Rancheria Tribal Office and Community Center. According to California law, the carrying of firearms is prohibited in state or local public buildings. However, concealed carry permit holders are exempt from this prohibition. Everytown has found no other evidence that firearms were prohibited in the building.

### Cypress, TX, 02/03/2014

An unknown assailant fatally shot a married couple and their two sons, ages 7 and 9, in their home.

**Shooter name**: Unknown

**Gun details:** Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: Unknown

**GVRO red flag**: Unknown

**Not a gun-free zone**: The shooting took place in a private home.

### Spanish Fork, UT, 01/16/2014

Joshua Boren, 34, an officer in the Lindon Police Department, fatally shot his wife, their two children, and his mother-in-law inside of their family home before fatally shooting himself.
**Shooter name**: Joshua Boren, 34
**Gun details**: Handgun
**Gun acquired**: The handgun used in the shooting was Boren's service weapon.
**Prohibiting criteria**: Boren was an actively serving as a police officer and there is no evidence to suggest he was prohibited from possessing firearms.
**GVRO red flag**: Boren repeatedly drugged and raped his wife, recording the incidents on videotape.  His wife learned of the attacks in 2013, but did not report him.
**Not a gun-free zone**: The shooting took place in a private home.

### Topeka, KS, 12/01/2013

An unknown assailant shot and killed four people –a woman whose body was found behind a strip mall, and her brother, ex-husband, and female friend, whose bodies were found in her house.
**Shooter name**: Unknown
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria**: Unknown
**GVRO red flag**: Unknown
**Not a gun-free zone**: Neither of the locations where bodies were found would have prohibited the carrying of firearms.

### Tulsa, OK, 11/23/2013

An unknown assailant shot a woman and two married couples, killing four and leaving one male victim in critical condition.
**Shooter name**: Unknown
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria**: Unknown
**GVRO red flag**: Unknown
**Not a gun-free zone**: The shooting took place in a private home.

### Jacksonville, FL, 11/07/2013

An unknown assailant fatally shot two sisters and two other men in a home.
**Shooter name**: Unknown
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria**: Unknown
**GVRO red flag**: Unknown
**Not a gun-free zone**: The shooting took place in a private home.

### Callison, SC, 10/29/2013

Bryan Eugene Sweatt, 27, fatally shot the mother of his child, her parents, and her two nephews in their home before fatally shooting himself.

**Shooter name**: Bryan Eugene Sweatt
**Gun details**: .44 caliber handgun
**Gun acquired**: Unknown
**Prohibiting criteria**: Sweatt was likely prohibited from possessing firearms. He had a lengthy arrest record and was out on bond at the time of the shooting.
**GVRO red flag**: In the month before the shooting, Sweatt posted increasingly troubling messages on Facebook.  On October 9, he indicated a desire to crash his truck into a pole.
**Not a gun-free zone**: The shooting took place in a private home.

## Terrell, TX, 10/28/2013

Charles Everett Brownlow, Jr., 36, fatally shot his mother, his aunt, two acquaintances, and a store clerk in a spree of attacks before being captured by police.  He killed the first four victims in their respective homes and the final one –the clerk –at Ali's Market on W. Moore Avenue, apparently in an attempt to rob the store.
**Shooter name**: Charles Everett Brownlow, Jr., 36
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria**: Brownlow had a criminal record that prohibited him from possessing firearms.  He had convictions for drug possession, burglary, and assaulting a family member.
In 2009, he was sentenced to three years in prison for being a felon in possession of a firearm.
**GVRO red flag**: Brownlow's brother told the Associated Press that Brownlow struggled with drug addiction.
**Not a gun-free zone**: The first four victims were killed in private homes. The final victim was fatally shot at Ali's Market; there is no evidence to suggest that firearms were prohibited on the premises.

## Phoenix, AZ, 10/26/2013

Michael Guzzo, 56, entered his neighbor's' home and killed all four family members and their two dogs. Guzzo then tried to enter another nearby residence, firing twice into the door, but ultimately failed and returned home to fatally shoot himself. Other neighbors and family members pointed to Guzzo's annoyance at the dogs' barking as a possible motive for the shooting.
**Shooter name**: Michael Guzzo, 56
**Gun details**: Shotgun
**Gun acquired**: Unknown
**Prohibiting criteria**: There is no evidence to suggest that Guzzo was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest that Guzzo exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place between three private homes.

## Paris, TX, 10/09/2013

In a Paris, TX home, an unknown assailant shot and killed four men who ranged in age from 18 to 32.
**Shooter name**: Unknown
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria**: Unknown

**GVRO red flag**: Unknown
**Not a gun-free zone**: The shooting took place in a private home.

## Rice, TX, 09/22/2013

Guadalupe Ronquillo-Ovalle, 33, fatally shot her husband and three children—ages 4, 8, and 10—before fatally shooting herself.  The shooting took place at the family's home.
**Shooter name:** Guadalupe Ronquillo-Ovalle, 33
**Gun details:** .22-caliber rifle
**Gun acquired:** Unknown
**Prohibiting criteria:** There is no evidence to suggest that Ronquillo-Ovalle was prohibited from possessing firearms.
**GVRO red flag:** There is no evidence to suggest Ronquillo-Ovalle exhibited recent behavior that would have qualified her for a GVRO.
**Not a gun-free zone:** The shooting took place in a private home.

## Washington, DC, 09/16/2013

Aaron Alexis, 34, fatally shot 12 people and wounded three more in an attack on Building 197 at the Navy Yard. Alexis was a civilian contractor working to update computer systems at military installations.
**Shooter name**: Aaron Alexis, 34
**Gun details**: Alexis arrived with a shotgun, and also obtained a 9mm handgun from one of the security guards he killed.
**Gun acquired**: Two days before the incident, Alexis passed a background check and legally bought the shotgun at a licensed gun dealer in Lorton, VA.
**Prohibiting criteria**: There is no evidence to suggest Alexis was prohibited from possessing firearms.  He passed a background check and legally bought a firearm two days before the shooting.
**GVRO red flag**: In September 2010, Alexis was arrested after he fired a bullet through his ceiling into a neighbor's apartment.  He told police it was an accident, and he was never charged with a crime.
**Not a gun-free zone**: There were armed guards at the Washington Navy Yard, and Alexis was familiar with the premises, so he did not select it as a target on the presumption he would not face armed resistance.

## Crab Orchard, TN, 9/12/13

The shooters killed a 22-year-old woman and three teenagers while attempting to rob them and steal marijuana. The victims' bodies were discovered in a parked car.
**Shooter name**: Jacob Allen Bennett, 26 and Brittany Lina Yvonn Moser, 25
**Gun details**: .40 caliber Glock handgun
**Gun acquired**: Unknown
**Prohibiting criteria**: Bennett was prohibited from possessing firearms. According to media reports, in 2010, he received a prison sentence for charges of theft, forgery, and being a felon in possession of a firearm, but was paroled on March 4, 2013.
**GVRO red flag**: Bennett received regular drug tests as a condition of his parole. He failed a drug test in prison in 2012 and again several months before the shooting, indicating that he had an ongoing drug problem.
**Not a gun-free zone**: There is no evidence that permit holders were prohibited from carrying guns in this area.

### Oklahoma City, OK, 08/14/2013

Daniel Green, 40, allegedly shot and killed four of his family members, including a 4-month-old infant, in the family's home.

**Shooter name**: Daniel Green, 40 (alleged)

**Gun details**: .380-caliber handgun

**Gun acquired**: The handgun used in the shooting belonged to one of the residents of the house.

**Prohibiting criteria**: Though Green had a history of mental illness, there is no clear evidence to suggest that he was prohibited from possessing firearms.

**GVRO red flag:** Although his family reported some alcohol abuse in the past, the timeframe for this is unclear, so it is unclear if is Green would have qualified for a GVRO.

**Not a gun-free zone:** The shooting took place in a private home.

### Dallas, TX, 08/07/2013

Erbie Lee Bowser, 44, allegedly shot and killed his ex-girlfriend and her daughter, and injured two others. Then, in a separate shooting, he allegedly shot and killed his estranged wife and her daughter, and injured two other children.

**Shooter name**: Erbie Lee Bowser, 44 (alleged)

**Gun details**: .380 handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Bowser was prohibited from possessing firearms.  He had a domestic violence charge, but it was expunged from his record after he completed a court program for veterans in the summer of 2012.

**GVRO red flag**: According to Bowser's estranged wife, he shoved her and threatened to kill her in January 2011.

**Not a gun-free zone**: The shootings took place between two private homes.

### Clarksburg, WV, 07/26/2013

Sidney Muller, 27, fatally shot four people after an argument related to a drug debt.  Muller was trying to collect $10,000 two men owed him for drugs when one of them aimed a handgun at him.  Muller reportedly stripped the man of the weapon and used it to kill both men; he then fatally shot a father-son newspaper delivery team that happened to be outside the house.

**Shooter name**: Sidney Muller, 27

**Gun details**: 9mm Beretta handgun

**Gun acquired**: Gun apparently belonged to one of the victims

**Prohibiting criteria**:  Muller had been convicted previously for driving under the influence and had been arrested for driving with a suspended license, but was not prohibited from possessing firearms.  Muller was also a veteran of the U.S. Marine Corps and his lawyer indicated he had scored four out of five on a post-traumatic stress disorder test and had been diagnosed as bipolar.  There is no evidence his mental illness rose to the level of prohibiting him from possessing guns.

**GVRO red flag**: There is no evidence that Muller exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home, and in the area directly outside the home.

### Hialeah, FL, 07/26/2013

Pedro Alberto Vargas, 42, fatally shot the building manager of his apartment complex, the manager's wife, a bystander across the street, and three more occupants before police fatally shot him in a standoff.

**Shooter name**: Pedro Alberto Vargas, 42

**Gun details**: Glock 17 9mm semiautomatic handgun

**Gun acquired**: Vargas obtained a concealed weapons permit in the fall of 2010.  In October 2010, he passed a background check and legally purchased a Glock 17 handgun, the firearm used in the shootings.

**Prohibiting criteria**: Vargas was not prohibited from possessing firearms.

**GVRO red flag**: The shooter had developed a pattern of anonymously harassing his former co-workers online, and was confronted about it three days before the shooting.  His mother also expressed concerns about her son's behavior on a 911 call hours before the shooting, suggesting that he needed a psychiatric evaluation.

**Not a gun-free zone**: The shooting took place within an apartment complex.

### Santa Monica, CA, 06/07/2013

John Zawahri, 23, fatally shot his father and brother, burned down their house, and shot and wounded a passing driver who tried to intervene.  He then carjacked another vehicle and made the driver transport him to Santa Monica College, firing at a city bus and police cruiser along the way, injuring three.  Once on the college's campus, he shot and killed three people outside and fired several rounds at individuals in the library before he was shot and killed by police.

**Shooter name**: John Zawahri, 23

**Gun details**: AR-15-style assault rifle, .44-caliber handgun

**Gun acquired**: Law enforcement sources believe that the assault rifle was put together from various parts, possibly in an attempt to circumvent California's restrictions on such guns.

**Prohibiting criteria**: Zawahri was not prohibited from possessing firearms.  He had a history of mental illness and had previously been held for a short-term psychiatric evaluation, which would have prohibited him from possessing a firearm for five years, but the prohibition expired in 2011.

**GVRO red flag**: There is no evidence to suggest that Zawahri exhibited recent behavior that would have qualified him for a GVRO.

**Gun-free zone**: Part of the shooting took place at Santa Monica College, which prohibits the carrying of firearms by virtue of being a college in California.

### Fernley, NV, 5/13/2013

Jeremiah Bean, 25, fatally shot five people over a three-day spree, in connection with multiple burglaries.  Bean fatally shot an elderly couple in their Fernley, NV home, and proceeded to steal their jewelry and their truck.  On his way to California, Bean fatally shot another man and stole his truck.  He then returned to Fernley, where he broke into another home, stole a handgun, and fatally shot and stabbed two of the home's residents.

**Shooter name:** Jeremiah Bean, 25

**Gun details:** .22-caliber handgun, .38-caliber handgun

**Gun acquired:** It is unknown how Bean acquired the .22-caliber handgun; he stole the .38-caliber handgun from the residence of his last two victims.

**Prohibiting criteria:** As a convicted felon, Bean was prohibited from possessing firearms.

**GVRO red flag**: Bean's friend and former roommate told police that Bean once broke a window in his house with a rock or brick.  He also said that Bean was a heroin user.

**Not a gun-free zone**:  The shootings took place between two private homes, and on a highway overpass.

### Waynesville, IN, 5/11/2013

Samuel Earl Sallee, 55, fatally shot four people in a home.  He had initially gone to the home attempting to trade a gun for drugs.  A confrontation ensued, resulting in the shootings.
**Shooter name:** Samuel Earl Sallee, 55
**Gun details:** .22-caliber rifle
**Gun acquired:** The gun used was owned by Sallee's son.  Sallee had borrowed the gun about a year before the shooting and never returned it.
**Prohibiting criteria:** Sallee was prohibited from possessing firearms due to several prior felony convictions, including for intimidation.
**GVRO red flag:** There is no evidence to suggest that Sallee exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone:** The shooting took place in a private home.

### Ottawa, KS, 04/28/2013

Kyle Flack, 27, raped and fatally shot a woman at a farm in eastern Kansas. He also fatally shot her 18-month-old daughter, and two men who were with her at the farm.
**Shooter name**: Kyle Flack, 27
**Gun details**: 12-gauge shotgun
**Gun acquired**: Unknown
**Prohibiting criteria**: In 2005, Flack was convicted of attempted murder in the 2nd degree.  This conviction prohibited him from possessing firearms.
**GVRO red flag**: There is no evidence that Flack exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place in a private home.

### Manchester, IL, 04/24/2013

Rick Odell Smith, 43, broke into a home and fatally shot the grandmother of his child and four of her family members, including two young children.  Another young girl was shot and injured.  Smith was subsequently shot and killed in a firefight with law enforcement.
**Shooter name**: Rick Odell Smith, 43
**Gun details**: Shotgun
**Gun acquired**: Unknown
**Prohibiting criteria**: Smith was likely prohibited from possessing firearms, as he had been previously convicted for reckless homicide, along with drug possession and writing bad checks.
**GVRO red flag**: There is no evidence to suggest that Smith exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place in a private home.

### Federal Way, WA, 04/21/2013

Dennis Clark III, 27, fatally shot his girlfriend inside the apartment they shared and then fatally shot two men in a nearby parking lot.  When a neighbor called 911, the shooter broke down the man's door with a shotgun and killed him.  He was subsequently shot and killed by police.

**Shooter name**: Dennis Clark III, 27

**Gun details**: .40-caliber handgun, shotgun

**Gun acquired**: Unknown

**Prohibiting criteria**: Clark was not prohibited from possessing firearms; he had a permit to carry a concealed weapon.

**GVRO red flag**: There is no evidence to suggest that Clark exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place inside two private homes and a public parking lot.

### Akron, OH, 04/18/2013

Derrick Brantley and Deshanon Haywood fatally shot four people inside a townhouse; the initial motive for the crime was robbery.

**Shooter name**: Derrick Brantley, 21, and Deshanon Haywood, 21

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: Both shooters were likely prohibited from possessing firearms due to their criminal histories.  Brantley was free on bond awaiting trial on felony charges for heroin trafficking.  Haywood was paroled from prison in February 2012 after serving part of a two-year sentence for cocaine trafficking and heroin possession.  He immediately violated his parole and was sentenced to 45 days of house arrest.

**GVRO red flag**: There is no evidence to suggest either shooter exhibited recent behavior that would have qualified for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

### Herkimer, NY, 04/13/2013

Kurt Myers, 64, fatally shot two people and wounded two people at a barbershop, and then fatally shot two more people at a car service center.  He was fatally shot by responding officers.

**Shooter name**: Kurt Myers, 64

**Gun details**: Shotgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Myers was prohibited from possessing firearms.  He was arrested in 1973 for drunk driving.

**GVRO red flag**: There is no evidence to suggest that Myers exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The car service center, Gaffey's Fast Lube, does not have a specific policy prohibiting guns.  The barbershop, John's Barbershop, did not reopen following the shooting, but there is no evidence to suggest it had an explicit firearm policy or ban.

### Albuquerque, NM, 1/19/2013

Nehemiah Griego, 15, fatally shot his parents and three siblings in their home. Griego was apprehended by police after speaking with the pastor of a local church and the church's head of security.

**Shooter name:** Nehemiah Griego, 15

**Gun details**: AR-15 assault rifle, .22-caliber rifle

**Gun acquired**: The guns were kept in Griego's parents' closet, and appear to belong to Griego's father.

**Prohibiting criteria:** As a juvenile, Griego was prohibited from purchasing firearms, but it was lawful for him to possess long guns like those used in the shooting.

**GVRO red flag**: A neighbor of Griego's saw him exhibit violent and threatening behavior a few months before the shooting.  He observed Griego pretending to cut a dog's throat with an open knife in his hand, and then performing a similar gesture on his younger brother.

**Not a gun-free zone**: The shooting took place in a private home.

## Tulsa, OK, 01/07/2013

During a robbery, Cedric Dwayne Poore and James Stanford Poore fatally shot four women in an apartment.  A 3-year-old boy was in the apartment at the time of the incident but was unharmed.

**Shooter names**: Cedric Dwayne Poore, 39, and James Stanford Poore, 32

**Gun details**: .40-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: Both shooters had extensive criminal histories: Cedric Poore received a 35-year prison sentence in 1995 for armed robbery, and James Poore received a 12-year sentence in 2000 for armed robbery with a firearm.  Both were released in 2011, but likely remained prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that either shooter exhibited recent behavior that would have qualified for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

## Newtown, Connecticut, 12/14/12

Adam Peter Lanza, 20, fatally shot his mother in her home and then traveled to a nearby elementary school where he shot twenty-eight people, killing twenty-six of them, including twenty children.  He then fatally shot himself.

**Shooter name:** Adam Peter Lanza, 20

**Gun details:** A Bushmaster .223 assault-style rifle was used in the attack at the elementary school. A 10mm Glock handgun, a 9mm SIG Sauer handgun, and a shotgun were also recovered at the crime scene.

**Gun acquired:** The guns were legally registered to Lanza's mother, who he shot and killed earlier in the day and with whom he lived.

**Prohibiting criteria:** Under Connecticut law, Lanza would have been prohibited from possessing handguns because he had not reached the legal age, 21. However, he would not have been prohibited from possessing a long gun like the Bushmaster rifle used in the shooting. Lanza's mental health was also scrutinized after the shooting, and while his social isolation had been noted, there is no evidence that concerns had been brought to the attention of a public authority.

**GVRO red flag:** Lanza displayed symptoms of psychological distress, but there was no evidence that he voiced or gave indication that he intended to commit a crime prior to the shooting.

**Gun-free zone**: The shooting took place in an elementary school, which is a gun-free zone according to federal law.

## Tule River Reservation, CA, 12/08/2012

Hector Celaya, 31, fatally shot his mother and two uncles, and shot and injured his young son in the trailer where they lived.  He then shot his two daughters, one fatally, in a car while fleeing from police.  Celaya died after a shootout with police in which he also shot himself in the head.

**Shooter name**: Hector Celaya, 31

**Gun details**: .38-caliber revolver

**Gun acquired**: Unknown

**Prohibiting criteria**: Celaya was prohibited from possessing firearms. He had been imprisoned in 2008 for an assault and battery charge, and was prohibited from having weapons as a condition of three years' probation.  He was subsequently arrested multiple times for driving while intoxicated.

**GVRO red flag**: Celaya was arrested just two months before the shooting on suspicion of drunk driving and being under the influence of drugs.  Celaya was a known drug user, according to the Tulare County Sheriff's Office.

**Not a gun-free zone**: The shootings took place between a private home and an automobile.

## Detroit, MI, 12/04/2012

Three adults and one minor were shot to death in a house on the east side of the city before a fire broke out, apparently set by the shooter. There are no reports of arrests or suspects.

**Shooter name**: Unknown

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: Unknown

**GVRO red flag**: Unknown

**Not a gun-free zone:** The shooting took place in a private home.

## Northridge, CA, 12/02/2012

Ka Pasasouk, 31, fatally shot four people outside a boarding house in the Granada Hills neighborhood of Los Angeles County.  The attack reportedly began as an attempted robbery.

**Shooter name**: Ka Pasasouk, 31

**Gun details:** Handgun

**Gun acquired:** Unknown

**Prohibiting criteria:** Pasasouk was prohibited from possessing firearms, having been convicted of car theft and robbery.

**GVRO red flag:** Pasasouk was a methamphetamine user. About three months before the shooting, Pasasouk pleaded no contest to methamphetamine possession, and was reportedly under the influence of alcohol and methamphetamine during the shooting.

**Not a gun-free zone:** The shooting took place on the street outside a boarding house; permit holders were not prohibited from carrying guns in this area.

## New Town, ND, 11/18/2012

Kalcie Eagle, 21, fatally shot a woman and her three grandchildren in their home on Fort Berthold Indian Reservation.  When confronted by police, he stabbed himself and died of his injuries.

**Shooter name:** Kalcie Eagle, 21

**Gun details**: .25-06 hunting rifle

**Gun acquired**: Unknown

**Prohibiting criteria**: In March 2012, Eagle was arrested in a stolen pickup truck after a high-speed chase with police.  He pled guilty to felony unauthorized use of a vehicle and was sentenced to a year in jail. Because of this conviction, he was likely prohibited from possessing firearms.

**GVRO red flag**: Eagle was a user of methamphetamines, and was on methamphetamines at the time of the shooting.

**Not a gun-free zone**: The shooting took place in a private home.

### Minneapolis, MN, 09/27/2012

Andrew John Engeldinger, 36, fatally shot six people and shot and injured two more at a signage business from which he was fired earlier in the day.  He then fatally shot himself.

**Shooter name**: Andrew John Engeldinger, 36

**Gun details**: Glock 9mm handgun

**Gun acquired**: The handgun was legally purchased from a Minneapolis gun store.

**Prohibiting criteria**: Engeldinger had a concealed carry permit and was not prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Engeldinger exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: There is no evidence to suggest that the signage business had a specific policy prohibiting employees from carrying firearms on the premises.

### Oak Creek, WI, 08/05/2012

Wade Michael Page, 40, fatally shot six people at a Sikh temple and injured three others, including a responding police officer, before fatally shooting himself.

**Shooter name**: Wade Michael Page, 40.

**Gun details**: 9mm semiautomatic handgun

**Gun acquired**: Page legally acquired the gun at a local gun shop a week before the shooting.

**Prohibiting criteria**: Page was not prohibited from possessing firearms.  He received a less than honorable discharge from the army and was demoted from sergeant to specialist, but this did not affect his access to firearms. Federal officials investigated Page's ties to supremacist groups more than once prior to the shooting, but did not collect enough evidence to open an investigation.

**GVRO red flag**: Page received a citation for driving while impaired in North Carolina in 2010.  Despite this, there is no evidence to suggest he suffered from ongoing alcohol abuse, and so would likely not qualify for a GVRO.

**Not a gun-free zone**:  Wisconsin state law permits people to carry guns in places of worship unless there is a sign or they have been personally notified that carrying firearms is prohibited by the property owner or occupant.  Amardeep Kaleka, whose father founded the temple and was killed during the attack, confirmed that there was no such sign on the property.

### Aurora, CO, 07/20/2012

James Holmes, 24, fatally shot 12 and injured 70 in an attack on a suburban movie theater during a midnight screening of the new Batman movie.

**Shooter name**: James Holmes, 24

**Gun details**: Smith & Wesson M&P15 assault rifle, Remington 870 12-gauge shotgun, and two Glock .40-caliber handguns.

**Gun acquired**: Holmes legally acquired the guns at local gun shops.

**Prohibiting criteria**: Holmes was not prohibited from purchasing firearms.  While a student at the University of Colorado, he was treated by the school psychiatrist, who expressed concern about his behavior and referred him to the university Behavioral Evaluation and Threat Assessment (BETA) team.  They took no further action and he was never adjudicated mentally ill.  He had no prior criminal record.

**GVRO red flag**: On March 16th, he told a social worker that he had regular thoughts of killing people.  During a psychiatric examination on March 21, 2012, Holmes indicated that he thought about homicide three to four times daily.  He repeatedly expressed homicidal ideations to a variety of mental health professionals.

**Gun-free zone**: In Colorado, businesses determine whether concealed carry permit holders can carry guns on their private property.  The Cinemark theater in Aurora was a gun-free zone.

### Newton Falls, OH, 07/06/2012

Robert Brazzon, 55, fatally shot his girlfriend, another couple, and their son in two separate shootings.  He was then cornered by police and fatally shot himself.  Brazzon was allegedly a heavy user of illegally obtained prescription drugs, and thought that his girlfriend and the man he killed were stealing pills from him.

**Shooter name**: Robert Brazzon, 55

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: Brazzon had previously pled guilty to felony drug trafficking charges.  In 1999, police found 47 guns, 100,000 rounds of ammunition, homemade bombs, 7,400 pills, and $27,000 cash inside his home. He was also convicted of domestic violence in 1984, and of sexual battery and gross sexual imposition in 1987.  But due to Ohio laws that provide for the restoration of felons' firearm rights, it is unclear whether Brazzon was prohibited from possessing firearms at the time of the shooting.

**GVRO red flag**: Brazzon was a heavy user of illegally obtained prescription drugs.  Investigators found that Brazzon consumed painkillers, Valium, and heroin on the day of the shootings.

**Not a gun-free zone**: The shootings took place between two private homes.

### Tempe, AZ, 06/02/2012

James Butwin, 47, fatally shot his wife and three children inside of their home. He then drove the bodies to a location in the Vekol Valley desert, where he lit the car on fire and fatally shot himself.

**Shooter name**: James Butwin, 47

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Butwin was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Butwin exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

### Seattle, WA, 5/20/2012

Ian Lee Stawicki, 40, fatally shot four people and wounded one in a restaurant. Less than an hour later, he fatally shot a woman in a parking lot, stealing her car. Later in the afternoon, as police officers closed in on him, Stawicki shot and killed himself.

**Shooter name:** Ian Lee Stawicki, 40

**Gun details:** Two .45-caliber semi-automatic handguns

**Gun acquired:** Stawicki was a concealed carry permit holder, and bought the guns used in the shooting legally.

**Prohibiting criteria:**  As a concealed carry permit holder, Stawicki was not prohibited from possessing firearms.

**GVRO red flag:**  Approximately two years before the shooting, Stawicki was charged with misdemeanor assault for attacking his brother, but prosecutors dropped the charges.  Stawicki's father and brother said that he had battled mental illness for a long time, but they never pushed for a mental health intervention.

**Gun-free zone**:  According to Gun Free Seattle, Cafe Racer, where the first shootings took place, is a gun free zone.

## Leivasy, WV, 05/19/2012

James Roy Belknap, 27, fatally shot a man, his girlfriend, and his two children after a dispute over a debt for drugs.

**Shooter name**: James Roy Belknap, 27

**Gun details**: Shotgun

**Gun acquired**: Unknown

**Prohibiting criteria**: In 2007, Belknap pled guilty to charges of conspiracy to deliver cocaine and was sentenced to 1 to 5 years in prison.  In exchange, prosecutors dismissed a grand jury indictment charging him with murder.  He was therefore prohibited from possessing a gun.

**GVRO red flag**: Belknap had a history of drug abuse, and illegally purchased prescription drugs from one of the shooting victims.

**Not a gun-free zone**: The victims were shot in their car while it was on Belknap's property.

## Port St. John, FL, 5/15/12

Tonya Thomas, 33, fatally shot her four children –ages 12, 13, 15, and 17 –before fatally shooting herself.  The shooting took place in the family's home.

**Shooter name:** Tonya Thomas, 33

**Gun details:** Taurus .38-caliber revolver

**Gun acquired:** Thomas legally purchased the gun used in the shooting from a local licensed gun dealer.

**Prohibiting criteria:** There is no evidence to suggest Thomas was prohibited from possessing firearms.

**GVRO red flag:** There is no evidence to suggest Thomas exhibited recent behavior that would have qualified her for a GVRO.

**Not a gun-free zone:** The shooting took place in a private home.

## Gilbert, AZ, 05/02/2012

Jason Todd ("J.T.") Ready, 39, fatally shot four people including his girlfriend, her daughter, and her granddaughter, before fatally shooting himself.  Ready was a former member of the U.S. Marine Corps, and a founder of a border militia group.  At the time of the incident, he was running for the office of Pinal County Sheriff.

**Shooter name**: Jason Todd ("J.T.") Ready, 39

**Gun details**: Two handguns and a shotgun were found at the scene.

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Ready was prohibited from possessing firearms.

**GVRO red flag**: On February 28, 2012, Ready's girlfriend went to police headquarters and told police about two domestic violence incidents.  But no charges were filed, and Ready's girlfriend did not go to court to file for an order of protection.

**Not a gun-free zone**: The shooting took place in a private home.

## Oakland, CA, 04/02/2012

One L. Goh, 43, allegedly shot and killed 7 people at a Oikos University, a Christian college affiliated with a Korean-American church, where he had formerly been a student.

**Shooter name**: One L. Goh, 43 (alleged)

**Gun details**: .45-caliber handgun

**Gun acquired**: Goh legally bought the handgun at a gun store in California in early 2012.

**Prohibiting criteria**: There is no evidence that Goh was prohibited from possessing firearms; he was able to legally purchase a firearm in early 2012.

**GVRO red flag**: Though Goh reportedly had disputes with his classmates and administrators at Oikos University, there is no evidence to suggest that he exhibited recent behavior that would have qualified him for a GVRO.

**Gun-free zone**: According to California law, the carrying of firearms is generally prohibited on private or public college or university campuses.

## Norcross, GA, 2/20/2012

Jeong Soo Paek, 59, fatally shot two of his sisters and both of their husbands before fatally shooting himself.  The shooting took place in a health spa which Paek had invested in.

**Shooter name**: Jeong Soo Paek, 59

**Gun details**: .45-caliber handgun

**Gun acquired:** Paek legally purchased the gun in Maryland in 2002.

**Prohibiting criteria:** Paek does not appear to have been prohibited from possessing firearms.  In 2006, he was arrested on charges of simple battery for striking one of his sisters in the face, but the charges were ultimately dropped.

**GVRO red flag:** There is no evidence to suggest Paek exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone:** There is no evidence that the spa prohibited firearms on the premises.

## Birmingham, AL, 01/29/2012

During an attempted robbery at a home, three shooters fatally shot five men.

**Shooter names**: Rashad Stoves, 17, Artavius Underwood, 16, Reginald Mims, 16

**Gun details**: Two 9mm handguns and a .38-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: All three shooters were prohibited from possessing handguns due to their age.

**GVRO red flag**: There is no evidence to suggest that any of the shooters exhibited recent warning signs that would have qualified them for a GVRO.

**Not a gun-free zone**: The shooting took place at a private home.

### Villa Park, IL, 01/17/2012

Cedric Anderson, 42, fatally shot his girlfriend, her two sons, and her niece while they slept. After leaving the scene of the crime he fatally shot himself.

**Shooter name**: Cedric Anderson, 42

**Gun details**: .357 Magnum handgun.

**Gun acquired**: Unknown.

**Prohibiting criteria**: Anderson has several drug-related offenses dating back to 1990, and in 2008 received probation for possessing a firearm without the required license. On December 29, 2011, he was convicted of felony heroin possession, and was awaiting sentencing at the time of the massacre. He was therefore prohibited from possessing a gun.

**GVRO red flag**: Anderson's multiple convictions related to controlled substances indicate that he suffered from ongoing drug abuse.  In 2009, he was ordered to undergo treatment for substance abuse after he failed a random drug test that was part of his probation.

**Not a gun-free zone**: The shooting took place in a private home.

### Grapevine, TX, 12/25/2011

Aziz Yazdanpanah, 56, fatally shot his estranged wife, two children, and three other family members as they opened their Christmas presents. He then fatally shot himself.

**Shooter name**: Aziz Yazdanpanah, 56

**Gun details**: 9mm and .40-caliber handguns

**Gun acquired**: The 9mm handgun was purchased in 1996 and owned by Yazdanpanah.

**Prohibiting criteria**: There is no evidence to suggest that Yazdanpanah was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence that Yazdanpanah exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

### Emington, IL, 12/16/2011

Sara McMeen, 30, fatally shot her boyfriend and her three children before fatally shooting herself in the backyard of their home.

**Shooter name**: Sara McMeen, 30

**Gun details**: Semiautomatic handgun

**Gun acquired**: Unknown

**Prohibiting criteria:** There is no evidence to suggest that McMeen was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that McMeen exhibited recent behavior that would have qualified for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

### Gargatha, VA, 12/15/2011

Esteban Quintero-Gonzales, 37, fatally shot two of his children, their mother, and the man they were living with before fatally shooting himself.  Quintero-Gonzales was reportedly in a custody dispute with the woman at the time of her death.

**Shooter name**: Esteban Quintero-Gonzales, 37

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Quintero-Gonzales was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Quintero-Gonzales exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

## Bay City, TX, 11/20/2011

Jose Avila-Alva, 27, shot and injured his wife and fatally shot his four children, ages 2 to 5, before fatally shooting himself.

**Shooter name**: Jose Avila-Alva, 27

**Gun details**: .22-caliber handgun

**Gun acquired**: The handgun was reported stolen in 2010.  It is unclear how Avila-Alva came to possess it.

**Prohibiting criteria**: Avila-Alva was not a legal resident of the U.S., and had been deported to Mexico in 2006 for unlawful entry, which would have prohibited him from purchasing firearms.

**GVRO red flag**: The week before the shooting, Avila-Alva was reported to police for domestic assault.  His wife was taken to a women's crisis center, but she did not file charges.

**Not a gun-free zone**: The shooting took place in a private home.

## Greensboro, NC, 11/20/2011

Mary Ann Holder, 36, fatally shot five children, shot and injured a man, and fatally shot herself in a shooting spree.  The first shooting took place at Holder's home, where she fatally shot her older son, his girlfriend, a niece, and a nephew.  The second shooting took place in the parking lot of the Guilford Technical Community College Aviation Center, where Holder shot and injured a married man she had been having an affair with.  Finally, Holder went to pick up her younger son from a sleepover, and fatally shot him in the car, before fatally shooting herself.

**Shooter name**: Mary Ann Holder, 36

**Gun details**: .38-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence that Holder was prohibited from possessing firearms.  The wife of the man Holder was having an affair with sought a restraining order against her; Holder responded by requesting a restraining order against the man and his wife.  These restraining orders were dismissed or had expired.

**GVRO red flag**: There is no evidence that Holder exhibited recent behavior that would have qualified for a GVRO.

**Gun-free zone**: The shootings took place in a private home, the parking lot of a community college aviation center, and in a car. Guns were prohibited by law on the property of the community college at the time of the shooting.

## Liberty, SC, 10/14/2011

Susan Diane Hendricks, 48, fatally shot her ex-husband, their two sons, and her stepmother. She admitted that she had murdered her family members so that she could collect $700,000 in life insurance policies.

**Shooter name**: Susan Diane Hendricks, 48

**Gun details**: .380-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: In April 2006, Hendricks fatally shot a man after he allegedly entered her trailer without permission.  She claimed self-defense and was not charged with a crime.  There is no evidence that she was prohibited from possessing a firearm.

**GVRO red flag**: There is no evidence that Hendricks exhibited recent behavior that would have qualified her for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

## Seal Beach, CA, 10/12/2011

Scott Evans Dekraai, 41, fatally shot eight people, including his ex-wife, and injured one more at a hair salon.

**Shooter name**: Scott Evans Dekraai, 41

**Gun details**: Three handguns

**Gun acquired**: All three guns were purchased legally and registered in accordance with California law.

**Prohibiting criteria**: Dekraai was not prohibited from possessing firearms at the time of the shooting.  He had been subject to a protection order that prohibited him from possessing firearms, but it expired in 2008.

**GVRO red flag**: There is no evidence to suggest that Dekraai exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: According to California law, the business owners would have been free to carry guns at the salon.

## Laurel, IN, 9/25/2011

David E. Ison, 46, killed a man, the man's estranged wife, their two children, and one of their neighbors. The murdered father had sold the prescription pain-reliever Oxycontin to Ison in the past, and on the day of the shooting they argued over the terms of the sale.

**Shooter name:** David E. Ison, 46

**Gun details:** .357-caliber revolver, .380-caliber handgun

**Gun acquired:** Unknown

**Prohibiting criteria:** Ison was prohibited from possessing firearms due to a lengthy criminal record with at least twenty convictions, including armed robbery.  He was on probation at the time of the shooting.

**GVRO red flag:** Ison was illegally buying prescription medication from one of the men he fatally shot.  Despite this, there is no evidence to suggest that Ison exhibited recent behavior that would have qualified for a GVRO.

**Not a gun-free zone:** The shooting took place in a private home.

## Carson City, NV, 09/06/2011

Eduardo Sencion, 32, fatally shot four people at an IHOP restaurant, including three National Guard members, before fatally shooting himself. Seven others were shot and wounded.

**Shooter name:** Eduardo Sencion, 32

**Gun details:** Norinko Mak 90 assault rifle, .38-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: Sencion was taken into protective custody during a mental health commitment in April 2000, but no court order was involved and it remains unclear if the incident would have prohibited Sencion from possessing firearms.

**GVRO red flag**: Family members reported that Sencion had paranoid schizophrenia, and was hearing voices telling him to do "bad things" to people in the months before the shooting.

**Not a gun-free zone**: According to Nevada law, a permit holder can carry a concealed firearm in restaurants.  There is no evidence to suggest that this IHOP had a specific policy prohibiting firearms.

## Monongalia County, WV, 09/06/2011

Shayne Riggleman, 22, fatally shot five people in a rural West Virginia home.  Fleeing from police, he shot and injured a gas station attendant and eventually fatally shot himself.

**Shooter name**: Shayne Riggleman, 22

**Gun details**: A rifle was used.  A second rifle and .22-caliber handgun were also recovered.

**Gun acquired**: Unknown

**Prohibiting criteria**: In 2008, Riggleman was convicted of armed robbery, and served 14 months at a state prison for young offenders.  This offense would have prohibited him from possessing firearms, though it is possible his rights were restored under West Virginia law.

**GVRO red flag**:  According to Riggleman's mother, he suffered from bipolar disorder and schizophrenia, and had stopped taking his medications.  Despite this, there is no evidence to suggest Riggleman exhibited recent behavior that would have qualified for a GVRO.

**Not a gun-free zone**: The shooting took place primarily in a private home, with a subsequent shooting occurring at a Pennsylvania gas station.

## Chesterfield, VA, 08/27/2011

Leonard Egland, 37, fatally shot his ex-wife, her boyfriend, his son, and another woman at a home.  He then went to another home and fatally shot his former mother-in-law.  As police chased him, he fired at several officers, wounding two.  He then proceeded to fatally shoot himself.

**Shooter name**: Leonard Egland, 37

**Gun details**: Handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Egland was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Egland exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place between two private homes.

## Copley Township, OH, 08/07/2011

Michael Hance, 51, fatally shot seven of his girlfriend's neighbors and family members, and shot and wounded his girlfriend.  He was fatally shot by a responding police officer.

**Shooter name**: Michael Hance, 51

**Gun details**: Two handguns

**Gun acquired**: Hance legally bought one of the handguns at a pawn shop five days before the shooting.

**Prohibiting criteria**: There is no evidence to suggest that Hance was prohibited from possessing firearms.  He passed a background check to buy a gun days before the shooting.

**GVRO red flag**: There is no evidence to suggest that Hance exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place in the area around a private home.

## Marion County, FL, 08/05/2011

James Edward Bannister, 31, allegedly shot and killed his girlfriend, her mother, and his two children who lived in the house. He then set the house on fire. Bannister reportedly told a friend that he had smoked synthetic marijuana laced with cocaine before the shooting.
**Shooter name:** James Edward Bannister, 31 (alleged)
**Gun details**: Believed to be a handgun
**Gun acquired:** Unknown
**Prohibiting criteria**: There is no evidence to suggest that Bannister was prohibited from possessing firearms.
**GVRO red flag**: Bannister reportedly told a friend that he had smoked synthetic marijuana laced with cocaine before the shooting.
**Not a gun-free zone**: The shooting took place in a private home.

## Wheatland, Wyoming, 07/07/11

Everett E. Conant III, 35, fatally shot his three sons and his brother, and shot and injured his wife before surrendering to police. His sons were 11, 13, and 18. His wife later reported he had become upset because he wanted to keep the curtains of their home drawn to prevent the neighbors from looking inside.
**Shooter name**: Everett E. Conant III, 35
**Gun details**: Two semiautomatic handguns
**Gun acquired**: Unknown
**Prohibiting criteria**: There is no evidence to indicate that Conant was prohibited from possessing firearms.
**GVRO red flag**: Media reports suggest that Conant attempted suicide a few months before the shooting.
**Not a gun-free zone**: The shooting took place in a private home.

## Grand Rapids, MI, 07/07/2011

Rodrick Shonte Dantzler, 34, fatally shot seven people between two homes, including his ex-girlfriend, wife, and their daughter.  He fatally shot himself after leading police on car chase, and taking three hostages at a nearby home.
**Shooter name**: Rodrick Shonte Dantzler, 34
**Gun details**: .40-caliber handgun
**Gun acquired**: The gun was reportedly stolen from a home in Kent County, MI.
**Prohibiting criteria**: Dantzler was prohibited from possessing firearms due to his past felony conviction for felony assault.  He also had previous convictions for domestic violence, property destruction, and assault and battery.
**GVRO red flag**: There is no evidence to suggest that Dantzler exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place between two private homes.

### Wagener, SC, 07/03/2011

Kenneth Myers, 46, fatally shot his wife, her twin sister, their mother, and his ex-girlfriend in two different residences. He was then confronted by law enforcement and fatally shot himself.

**Shooter name**: Kenneth Myers, 46

**Gun details**: Shotgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Myers was prohibited from possessing firearms.

**GVRO red flag**: Myers exhibited threatening behavior in the past.  His friend said that Myers pointed a handgun at his head and threatened to kill him in October 2009.

**Not a gun-free zone**: The shootings took place between two private homes.

### Grand Prairie, TX, 06/23/2011

Tan Do, 35, fatally shot his wife and four of her family members at his daughter's birthday party before fatally shooting himself.  Four others were shot and wounded in the incident.

**Shooter name**: Tan Do, 35

**Gun details**: Handgun

**Gun acquired**: Unknown

**Prohibiting criteria:** There is no evidence to suggest that Do was prohibited from possessing firearms.

**GVRO red flag**: Do had a history of domestic violence.  His wife filed a protective order against him in December 2010 because he had threatened her three times with a gun over the course of the year.  But, she asked that the protective order be dismissed weeks later.

**Gun-free zone**: In a call with Forum Roller World, they confirmed to Everytown that they prohibit firearms on the premises, and have explicit signage indicating this.

### Medford, NY, 06/19/2011

David Laffer, 33, fatally shot four people at a pharmacy, Haven Drugs, and stole thousands of pain pills, mostly hydrocodone, before fleeing in a vehicle.  His wife participated in the robbery as a driver and lookout.

**Shooter name**: David Laffer, 33

**Gun details**: .45-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: The gun was legally registered to Laffer and there is no evidence to suggest he was prohibited from possessing firearms.

**GVRO red flag**: Months before the shooting, a Suffolk County detective was concerned about Laffer having guns.  Five months before the shooting, a Suffolk County detective investigated an identity theft claim made by Laffer's mother, who said Laffer had stolen her debit card.  After questioning Laffer and his mother, the detective advised the Suffolk County Pistol License Bureau that Laffer was dangerous and that his guns should be confiscated.  Despite the detective's report, the guns were not removed.

**Not a gun-free zone**: There is no evidence to suggest that Haven Drugs posted a sign or had a policy prohibiting the carrying of firearms.

### Yuma, AZ, 06/02/2011

Carey H. Dyess, 73, fatally shot his ex-wife, her lawyer, and three of her friends. He shot and injured another of his ex-wife's friends.  Ultimately, Dyess fatally shot himself.

**Shooter name**: Carey H. Dyess, 73

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Dyess was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Dyess exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place over multiple locations, including private homes and an office building.  There is no evidence to suggest that any of the locations prohibited the carrying of firearms.

### Ammon, ID, 05/11/2011

Gaylin Leirmoe, 26, fatally shot his two infant children, their mother, and her sister before setting fire to the house and fatally shooting himself. He had separated from the victim several months before the incident.

**Shooter name**: Gaylin Leirmoe, 26

**Gun details**: .45-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Leirmoe was prohibited from possessing firearms.

**GVRO red flag**: In October 2009, Leirmoe was charged with misdemeanor battery for domestic violence with no traumatic injury.  The charges were dismissed by the court.

**Not a gun-free zone**: The shooting took place in a private home.

### Oak Harbor, OH, 04/16/11

Alan Atwater, 31, fatally shot his wife and their three children –ages 1, 2, and 4 –before fatally shooting himself. The shooting took place in the family's home.

**Shooter name:** Alan Atwater, 31

**Gun details:** .22-caliber rifle, shotgun

**Gun acquired:** Unknown

**Prohibiting criteria:** There is no evidence to suggest that Atwater was prohibited from possessing a firearm.

**GVRO red flag:** Atwater had exhibited violent and threatening behavior in the past. Both he and his wife separately reported to friends that he had held her up against a wall and choked her. Five days before the shooting, Atwater reportedly told a friend that if his wife cheated on him he would kill her.

**Not a gun-free zone:** The shooting took place in a private home.

### Willowbrook, CA, 02/11/2011

Three brothers and their cousin were shot and killed by an unknown assailant on the backyard patio of their home.

**Shooter name**: Unknown

**Gun details**: Unknown
**Prohibiting criteria**: Unknown
**GVRO red flag**: Unknown
**Not a gun-free zone**: The shooting took place in a private home.

## Minot, ND, 01/28/2011

Omar Mohamed Kalmio, 28, fatally shot his ex-girlfriend in her home; he then fatally shot her brother, her mother, and her mother's boyfriend at a nearby home.  The gun was never recovered.
**Shooter name**: Omar Mohamed Kalmio, 28
**Gun details:** Believed to be a 9mm handgun
**Gun acquired:** Unknown
**Prohibiting criteria:** Kalmio was prohibited from possessing firearms due to a 2006 felony conviction for second-degree assault with a dangerous weapon.
**GVRO red flag:** In the weeks leading up to the shooting, Kalmio threatened to kill his ex-girlfriend's mother and her entire family.
**Not a gun-free zone**:  The shootings took place between two private homes.

## Tucson, AZ, 01/08/2011

Jared Loughner, 22, attacked a constituent event hosted by Congresswoman Gabrielle Giffords, killing six and wounding 13, including Giffords, before he was apprehended.
**Shooter name**: Jared Loughner, 22
**Gun details**: Glock semiautomatic handgun
**Gun acquired**: Loughner passed a background check and purchased the Glock handgun at Sportsman's Warehouse in Tucson two months before the attack.
**Prohibiting criteria**: There is no evidence to suggest that Loughner was prohibited from possessing firearms; he purchased the gun used in the shooting legally.
**GVRO red flag**: Loughner had exhibited troubling behavior in the months before the shooting.  He was dismissed from Pima Community College after making a video in which he railed against the college.  Loughner's parents were also concerned about his behavior, suggesting that he had been laughing or talking to himself, and that he was growing increasingly angry with the government.  As a result, they took away his shotgun, and forbade him from using the family vehicle after dark.
**Not a gun-free zone**: The shooting took place in a public parking lot where the carrying of firearms was lawful according to Arizona law.

## Boston, MA, 09/28/2010

Dwayne Moore, 33, fatally shot four people including a 2-year-old boy, and wounded one more.  The shooting occurred after a drug-related robbery.
**Shooter name**: Dwayne Moore, 33
**Gun details**: 9mm handgun, .40-caliber handgun
**Gun acquired**: Unknown
**Prohibiting criteria**: Moore was likely prohibited from possessing firearms.  He had been convicted of manslaughter in 1996 after fatally stabbing someone, and was sentenced to 16 to 18 years in prison.
**GVRO red flag**: There is no evidence to suggest that Moore exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place on a public street.

### Riviera Beach, FL 9/27/2010

Patrick Dell, 41, fatally shot his estranged wife and four of his stepchildren, ages 10, 11, 13, and 14. He shot and injured another one of his stepchildren, 15. As police arrived on the scene, Dell fatally shot himself.

**Shooter name:** Patrick Dell, 41

**Gun details:** Ruger .357 Magnum Revolver

**Gun acquired:** The gun had previously been reported stolen, but it is not clear how Dell came to possess the gun.

**Prohibiting criteria:** Based on a May 2010 protective order sought by his wife, active at the time of the shooting, Dell was prohibited from possessing firearms and required to relinquish any firearms in his possession.

**GVRO red flag**: Less than a year before the shooting, Dell was arrested for threatening his wife and another woman with a knife.

**Not a gun-free zone:** The shooting took place in a private home.

### Jackson, KY, 09/10/2010

Stanley Neace, 46, fatally shot his wife, his step-daughter, and three neighbors following a domestic dispute with his wife.  Neace then fatally shot himself.  The shootings took place between three trailer homes.

**Shooter name:** Stanley Neace, 46

**Gun details:** Shotgun

**Gun acquired:** Unknown

**Prohibiting criteria:** There is no evidence that the shooter was prohibited from possessing firearms.

**GVRO red flag**: A neighbor reported that, a year before the shooting, Neace shot at his wife and put a hole in the bathtub.

**Not a gun-free zone:** The shooting took place between three private homes.

### Chicago, IL, 09/02/2010

Raul Segura-Rodriguez, 36, allegedly shot and killed four people in a garage. Officials believe he was part of a drug-trafficking crew that had been involved in at least 10 killings.

**Shooter name**: Raul Segura-Rodriguez, 36 (alleged)

**Gun details**: Unknown

**Gun acquired**: Unknown

**Prohibiting criteria:** There is no evidence to suggest that Segura-Rodriguez was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Segura-Rodriguez exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: There is no evidence to suggest that the carrying of firearms was prohibited in the garage where the shooting took place.

## Lake Havasu City, AZ, 08/29/2010

Brian Diez, 26, fatally shot his ex-girlfriend, her new boyfriend, and three other adults at a Lake Havasu City house.  The house belonged to his ex-girlfriend, and she lived there with their 4-year-old daughter and 1-year-old son.  Diez proceeded to drive the two children to his sister's house before fatally shooting himself in his car.
**Shooter name:** Brian Diez, 26
**Gun details:** .40 caliber handgun
**Gun acquired:** Unknown
**Prohibiting criteria:** Diez was prohibited from possessing firearms at the time of the shooting due to a prior conviction.  In July 2010, one month before the killings, he was convicted of assaulting his infant son.
**GVRO red flag:** Diez was convicted of assaulting his infant son in the year before the shooting.
**Not a gun-free zone:** The shooting took place in a private home.

## Buffalo, NY, 08/14/2010

Riccardo McCray, 23, opened fire on a group of people outside a restaurant, killing four and wounding four others.
**Shooter name**: Riccardo McCray, 23
**Gun details**: 9mm handgun
**Gun acquired**: Unknown
**Prohibiting criteria**: There is no evidence to suggest that McCray was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest that McCray exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place on a public street outside of a restaurant.

## Lanham, MD, 08/06/2010

Darrell Lynn Bellard, 43, fatally shot two children, their mother, and their paternal aunt in the home where they resided.  Police say Bellard was involved in drug trafficking and the victims owed him money.  Bellard's girlfriend helped commit the crime by blocking the door to prevent anyone from escaping.
**Shooter name:** Darrell Lynn Bellard, 43
**Gun details**: Unknown
**Gun acquired**: Unknown
**Prohibiting criteria:** There is no evidence to suggest that Bellard was prohibited from possessing firearms.
**GVRO red flag:** There is no evidence to suggest that Bellard exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone:** The shooting took place in a private home.

## Manchester, CT, 08/03/2010

Omar Thornton, 34, fatally shot 8 of his coworkers at his place of employment, Hartford Distributors Inc; two other coworkers were seriously injured.  Thornton proceeded to shoot and kill himself as police officers closed in.  The shooting occurred immediately after Thornton was forced

to resign from his job as a truck driver; management had discovered evidence that he was stealing product from his delivery truck.

**Shooter name:** Omar Thornton, 34

**Gun details:** Two Ruger SR9 9mm handguns

**Gun acquired:** Unknown

**Prohibiting criteria:** There is no evidence to suggest Thornton was prohibited from possessing a gun.

**GVRO red flag:** The night before the shooting, Thornton made a disturbing comment to his uncle.  He was showing his uncle a Ruger 9mm handgun, and made the comment, "that's 34 bullets…those guys at work".

**Not a gun-free zone:** The shooting took place at a distribution center; there is no evidence to suggest that the carrying of firearms was prohibited on site.


## Hialeah, FL, 06/06/2010

Gerardo Regalado, 38, fatally shot his wife and three other women at a restaurant before fatally shooting himself.

**Shooter name**: Gerardo Regalado, 38

**Gun details**: .45-caliber handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Regalado was prohibited from possessing firearms.  He had a permit to carry concealed handguns.

**GVRO red flag**: There is no evidence to suggest that Regalado exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: Under Florida law, the carrying of concealed firearms by permit holders is lawful in restaurants, except in areas primarily devoted to the serving of alcohol.


## Chicago, IL, 4/14/2010

James A. Larry, 32, fatally shot his mother, his pregnant wife, their infant son, and two of his nieces in his sister's home.  He also shot and injured his nephew.  Larry was apprehended by police; investigators determined that he had converted to Islam in prison and committed the shootings because his family members would not go along with his conversion.

**Shooter name**: James A. Larry, 32

**Gun details**: Hi-Point 9mm semi-automatic pistol

**Gun acquired:** The gun belonged to an acquaintance of Larry's in Madison, WI.  He did not know how Larry came into possession of the gun.

**Prohibiting criteria:** Larry was almost certainly prohibited from possessing firearms, having recently served a prison term in Wisconsin for a weapons conviction.

**GVRO red flag**: Approximately six months before the shooting, Larry attacked his wife in the parking lot of a Walmart.  He pled no contest to misdemeanor battery.

**Not a gun-free zone:** The shooting took place in a private home.


## Los Angeles, CA, 04/03/10

Nerses Arthur Galstyan, 28, fatally shot four and injured two at a San Fernando Valley restaurant after a dispute with other patrons.  He was indicted in a separate investigation for selling firearms without a license, and possessing a firearm with the serial number removed.

**Shooter name**: Nerses Arthur Galstyan, 28

**Gun details**: Handgun
**Gun acquired**: Unknown
**Prohibiting criteria**: There is no evidence to suggest that Galstyan was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest that Galstyan exhibited recent behavior that would have qualified him for a GVRO.
**Gun-free zone**: There is no evidence to suggest that the restaurant prohibited permit holders from carrying concealed firearms.

## Washington, DC, 03/30/2010

Four assailants shot 10 people, killing four and wounding six.  The shootings were retaliation for an earlier shooting.
**Shooter names**: Nathaniel D. Simms, Orlando Carter, Robert Bost, and Jeffrey Best
**Gun details**: Glock 9mm handgun, .45-caliber handgun, AK-47 assault rifle
**Gun acquired**: Jeffrey Best provided the Glock 9mm handgun, Robert Bost provided the .45-caliber handgun, and another co-conspirator who was not present for the shooting provided the AK-47 assault rifle.  It is unclear how each of these individuals acquired their gun.
**Prohibiting criteria**: Simms was likely prohibited from possessing firearms. He had four prior misdemeanor convictions, three for drug offenses and one for a violation of the Bail Reform Act. The criminal histories of the other shooters is unclear; there is no evidence to suggest they were prohibited from possessing firearms.
**GVRO red flag**: Three of the shooters were involved in committing another fatal shooting approximately 8 days before this mass shooting.
**Gun free zone**: The shooting likely took place in a gun free zone. According to DC law, the carrying of concealed firearms is prohibited in all areas within 1000 feet of a day care center, school, public swimming pool or playground, video arcade, youth center, public library, or public housing. It appears that there was public housing within this vicinity.

## New Orleans, LA, 03/26/2010

 Damian Jordan, 22, fatally shot his uncle's girlfriend, her two children, and her sister in their home.
**Shooter name:** Damian Jordan, 22
**Gun details:** Handgun
**Gun acquired:** Unknown
**Prohibiting criteria:** In 2009, Jordan pled guilty to burglary, a felony, prohibiting him from possessing firearms.
**GVRO red flag:** About a year before the shooting, Jordan struck his girlfriend in the face with the butt of a rifle, resulting in charges for home invasion and aggravated battery.
**Not a gun-free zone:** The shooting took place in a private home.

## Appomattox, VA, 1/19/2010

Christopher Speight, 39, fatally shot 8 family members and acquaintances, including his sister, brother-in-law, niece, and nephew.  He then fired at responding police officers before surrendering.
**Shooter name:** Christopher Speight, 39
**Gun details:** High-powered rifle
**Gun acquired:** Unknown

**Prohibiting criteria:** Speight was not prohibited from possessing firearms. He was a concealed carry permit holder.
**GVRO red flag:** There is no evidence to suggest that Speight exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place in a private home, immediately outside the home, and in the middle of a nearby road.  It was lawful to carry a firearm in all of these places.

## Belleville, TX, 01/16/2010

Maron Thomas, 20, fatally shot his mother, stepfather, sister, brother, and niece after a household argument.
**Shooter name:** Maron Thomas, 20
**Gun details:** Handgun and shotgun
**Gun acquired**: Unknown
**Prohibiting criteria**: There is no evidence to suggest that Thomas was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest that Thomas exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place in a private home.

## Madison, WI, 12/03/2009

Tyrone Adair, 38, fatally shot two women and each of their infant daughters. Adair was involved in paternity disputes with both women. Approximately four days after the shootings, Adair was found dead in his car with a self-inflicted gunshot wound.
**Shooter name**: Tyrone Adair, 38
**Gun details:** Two handguns were found inside the vehicle where Adair died, one believed to be the same caliber used in the shootings.
**Gun acquired**: Police reported that Adair bought one of the guns, a 9mm handgun, on the online site Craigslist.
**Prohibiting criteria**: Adair was prohibited from possessing firearms due to an active restraining order involving a third woman.
**GVRO red flag**: Approximately a year and a half before the shooting, Adair got into a fight with one of the women he eventually shot.  Charges were referred to the District Attorney, but were not filed.
**Not a gun-free zone**: The bodies were found in the garage of a duplex and the trunk of a car.  There is no evidence that either of the shootings took place in an area where the carrying of firearms was prohibited.

## Lakewood, WA 11/29/2009

Maurice Clemmons, 37, fatally shot four police officers in a coffee shop.  He eluded capture for two days before being shot and killed by police.
**Shooter name:** Maurice Clemmons
**Gun details:** Glock 17 9mm handgun, Smith and Wesson .38-caliber revolver
**Gun acquired:** The Glock 9mm was reported stolen in Seattle approximately three years before the shooting.  The .38-caliber revolver could not be traced.  It is not known how Clemmons came to possess either weapon.

**Prohibiting criteria:** Clemmons was prohibited from possessing firearms due to a long history of felony convictions.  Just six days before the shooting, he was released on bail in connection with a child rape charge.

**GVRO red flag:** In an interview with investigators, Clemmons' cousin indicated that Clemmons threatened to kill police officers on Thanksgiving, days before the shooting.

**Not a gun-free zone:** There is no evidence that the coffee shop prohibited the carrying of firearms.  The police officers were armed at the time of the shooting.

## Osage, KS, 11/28/2009

James Kahler, 46, fatally shot his estranged wife, her grandmother, and their two daughters in the grandmother's home.

**Shooter name**: James Kahler, 46

**Gun details**: .223-caliber assault rifle

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Kahler was prohibited from possessing firearms.  In March 2009, he was charged with misdemeanor domestic assault, but the case had not yet been adjudicated at the time of the shooting.

**GVRO red flag:** Kahler's wife alleged abuse in the past, including a New Year's Eve 2008 fight during which Kalher pushed her hard enough that she hit her head on the street.

**Not a gun-free zone**: The shooting took place in a private home.

## Jupiter, FL, 11/26/2009

Paul Merhige, 35, fatally shot his two sisters, his aunt, and his 6-year-old cousin during a Thanksgiving celebration.  Two other family members were shot and injured.  Merhige fled the scene and eluded capture for over a month before police arrested him.

**Shooter name:** Paul Merhige, 35

**Gun details:** Semi-automatic handgun

**Gun acquired:** According to media reports, Merhige bought two handguns and a rifle from a licensed gun dealer in Fort Lauderdale the day before the shooting, although it is unclear if any of the handguns were the gun he used in the shooting

**Prohibiting criteria:**  According to media reports, the shooter was involuntarily committed to mental health facilities at least three times in the decade before the killing, which, according to state, federal, and county officials, prohibited him under federal law from possessing guns.  According to press reports, however, the relevant records were not submitted to the NICS database.

**GVRO red flag:** Although Merhige had a history of mental illness, there is no evidence to suggest that he exhibited recent behavior that would have qualified for a GVRO.

**Not a gun-free zone:** The shooting took place in a private home.

## Pearcy, AR, 11/12/2009

Three shooters—Samuel Conway, 23, Marvin Lamar Stringer, 22, and Jeremy Pickney, 23—fatally shot five people in connection with a robbery. Surviving family members reported missing guns, tires and rims, televisions, and two checkbooks. Stringer was shot and killed by police officers as they attempted to enter his hotel room; one officer was shot and injured in the exchange. Conway and Pickney were arrested during traffic stops.

**Shooter names**: Samuel Conway, 23; Marvin Lamar Stringer, 22; and Jeremy Pickney, 23

**Gun details:** .22, .25, and .45-caliber handguns
**Gun acquired**: Unknown
**Prohibiting criteria:** There is no evidence to suggest that the shooters were prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest that any of the shooters exhibited recent behavior that would have qualified for a GVRO.
**Not a gun-free zone**: The shootings took place on a private residence.


## Oklahoma City, OK, 11/09/2009

Multiple shooters fatally shot four people in a house before setting the house on fire. Two of the victims were pregnant. Four men have been convicted for planning and committing the crime— David Allen Tyner, Jonathan Allen Cochran, Denny Edward Phillips, and Russell Lee Hogshooter. The shooting was tied to a drug-related robbery.
**Shooter names:** David Allen Tyner, Jonathan Allen Cochran, Denny Edward Phillips, and Russell Lee Hogshooter. All four men were in their thirties.
**Gun details**: .40 caliber &.380 caliber handguns
**Gun acquired:** Unknown
**Prohibiting criteria**: Phillips was prohibited from possessing firearms due to a lengthy criminal history including multiple felony convictions. Phillips was convicted in 1996 for assault with a deadly weapon, and other crimes including a jail escape. He was also convicted in 2010 for possession of a firearm by a felon. Cochran was prohibited because of a conviction for second degree burglary in 2002. There is no indication that Tyner or Hogshooter were prohibited, though they were reportedly involved with a local gang.
**GVRO red flag**: In the months leading up to the shooting, the conspirators discussed the crime in front of multiple witness.
**Not a gun-free zone**: The shooting took place in a private home.


## Fort Hood, TX, 11/05/2009

Nidal Malik Hasan, 39, fatally shot 13 and wounded 32 soldiers during an attack at the Fort Hood army base.
**Shooter name**: Nidal Malik Hasan, 39
**Gun details:** An FN Herstal 5.7 semiautomatic handgun was used in the attack.  A Smith and Wesson .357 revolver was also recovered.
**Gun acquired**: The FN Herstal 5.7 semiautomatic handgun used in the attack was purchased legally at a local gun store.
**Prohibiting criteria**: Hasan was investigated by the FBI for ties to terrorist organizations, but the inquiry was reportedly closed in early 2009.  Hasan was not prohibited from possessing firearms, and bought the gun used in the attack legally.
**GVRO red flag**: There is no evidence to suggest that Hasan exhibited recent behavior that would have qualified him for a GVRO.
**Gun-free zone**: Due to Department of Defense regulations, it is likely that most personnel at the Fort Hood army base were prohibited from carrying firearms. But this prohibition would not have applied to authorized personnel, including those acting as security personnel or law enforcement. It is unclear from news reports the extent of armed law enforcement presence at the base.

### Mount Airy, NC, 11/01/2009

Marcos Chavez Gonzalez, 29, fatally shot four people outside a television store before eventually surrendering to police.

**Shooter name**: Marcos Chavez Gonzalez, 29

**Gun details**: Assault rifle

**Gun acquired**: Unknown

**Prohibiting criteria**: Gonzalez was  prohibited from possessing firearms having been convicted of kidnapping a minor, a felony, in 2002.

**GVRO red flag**: There is no evidence to suggest that Gonzalez exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a parking lot outside a television store.  There is no evidence to suggest that the carrying of firearms was prohibited in this area.

### Lawrenceville, GA, 08/27/2009

Richard Ringold, 44, fatally shot his girlfriend, her daughter, and two others in a domestic dispute.  Another 4-year-old girl was shot and injured in the incident.

**Shooter name:** Richard Ringold, 44

**Gun details:** Unknown

**Gun acquired:** Unknown

**Prohibiting criteria**: There is no evidence to suggest that Ringold was prohibited from possessing firearms.

**GVRO red flag**: There is no evidence to suggest that Ringold exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

### Kansas City, KS, 06/22/2009

Adrian Burks, 37, fatally shot his ex-girlfriend, and three others at the house where she was staying.

**Shooter name:** Adrian Burks, 37

**Gun details:** Unknown

**Gun acquired:** Unknown

**Prohibiting criteria:** Burks was prohibited from possessing firearms.  He had served about 10 years in Kansas prisons for robbery and aggravated assault.  He also fatally shot a man in March 2009, but was not charged in the incident, which his cousin later described as self-defense.  In April 2009, he was charged with battery and a criminal threat against against a woman and was ordered not to possess firearms.

**GVRO red flag:** Burks exhibited violent and threatening behavior in the months before the shooting, including the April 2009 charge for battery and criminal threatening.

**Not a gun-free zone:** The shooting took place in a private home.

### Middletown, MD, 04/19/2009

Christopher Alan Wood, 34, fatally shot his wife and three children before fatally shooting himself.  The incident took place in the family's home.

**Shooter name:** Christopher Alan Wood, 34

**Gun details:** .25-caliber pistol, shotgun

**Gun acquired**: The .25-caliber pistol was given to Wood twelve years before the shooting, by his

former girlfriend's father in Florida.  It is unknown how Wood acquired the shotgun.
**Prohibiting criteria**: There is no evidence to suggest that Wood was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest Wood exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone:** The shooting took place in a private home.

## Green Hill, AL, 04/06/2009

Kevin Garner, 45, fatally shot his estranged wife, their teenage daughter, his sister, and his nephew a day before his divorce proceedings were scheduled to take place.  He then lit the house on fire and fatally shot himself.
**Shooter name:** Kevin Garner, 45
**Gun details:** Handgun
**Gun acquired:** Unknown
**Prohibiting criteria:** There is no evidence to suggest that Garner was prohibited from possessing firearms.
**GVRO red flag:** In Garner's divorce proceedings, his estranged wife alleged that he had been both physically and emotionally abusive. Despite this, it is unclear when the alleged abuse occurred, and hence unclear if Garner would have qualified for a GVRO.
**Not a gun-free zone:** The shooting took place in a private home.

## Graham, WA, 04/04/2009

After a dispute with his wife in which she told him she was ending their relationship, James Harrison, 34, returned home and fatally shot his five children, ages 7 to 16.  Police believe he then made an unsuccessful attempt to find his wife again, before fatally shooting himself in his car.
**Shooter name**: James Harrison, 34
**Gun details**: Unspecified rifle
**Gun acquired**: Unknown
**Prohibiting criteria**: There is no evidence to suggest that Harrison was prohibited from possessing firearms.
**GVRO red flag**: The North Carolina State Children's Administration found that Harrison had abused one of his children in February 2007, but none of the children were removed from the home.  Neighbors also reported that Harrison frequently threatened his children.
**Not a gun-free zone**: The shooting took place in a private home.

## Binghamton, NY, 4/3/2009

Jiverly Wong, 42, fatally shot thirteen people and wounded four others before fatally shooting himself.  The shooting took place at the American Civic Association, where Wong had been taking English classes.
**Shooter name:** Jiverly Wong, 42
**Gun details:** 9mm Beretta handgun, .45-caliber Beretta handgun
**Gun acquired:** The guns were purchased legally and registered to Wong's New York State pistol license.
**Prohibiting criteria:** Wong was not prohibited from possessing firearms, and had a New York State pistol license.

**GVRO red flag:** There is no evidence to suggest that Wong exhibited recent behavior that would have qualified him for a GVRO.

**Gun-free zone:** Because the American Civic Association offered a full range of educational programs, it is a gun-free zone according to New York state law.

## Carthage, NC, 03/29/2009

Robert Stewart, 45, opened fire at a nursing home where his estranged wife worked, killing eight and injuring three before he was shot and arrested by responding police officers.

**Shooter name:** Robert Stewart, 45

**Gun details:** .357-caliber handgun, .22-caliber handgun, 12-gauge shotgun

**Gun acquired:** Unknown

**Prohibiting criteria:** There is no evidence to suggest that Stewart was prohibited from possessing firearms.

**GVRO red flag:** There is no evidence to suggest that Stewart exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone:** There is no evidence to suggest that the nursing home prohibited the carrying of firearms.

## Santa Clara, CA, 03/29/2009

Devan Kalathat, 45, fatally shot five family members, including three children, before fatally shooting himself.  He also shot and wounded his wife.  The shooting took place in the family's home.

**Shooter name:** Devan Kalathat

**Gun details:** Two .45-caliber handguns

**Gun acquired:** Kalathat legally bought the handguns in the weeks before the shooting.

**Prohibiting criteria:** Kalathat was not prohibited from purchasing firearms.

**GVRO red flag:** There is no evidence to suggest that Kalathat exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone:** The shooting took place in a private home.

## East Oakland, CA, 03/21/2009

Lovelle Mixon, 26, fatally shot two police officers who pulled him over during a routine traffic stop.  He then fled to a nearby apartment, where he fatally shot two SWAT officers and injured a third.  Mixon was eventually shot and killed by responding SWAT officers.

**Shooter name:** Lovelle Mixon, 26

**Gun details:** Semiautomatic handgun, assault rifle

**Gun acquired:** Unknown

**Prohibiting criteria:** Mixon was prohibited from possessing firearms.  He was convicted in 2002 of assault with a deadly weapon after an armed robbery in San Francisco, serving time in San Francisco County Jail and Corcoran State Prison.  Mixon was released on parole in 2007 and remanded back to prison in 2008 after a parole violation.

**GVRO red flag:** According to the Oakland Police Department, Mixon had become the main suspect in a rape that occurred in February 2009.

**Not a gun-free zone:** Two of the victims were shot on a public roadway –the 7400 block of Macarthur Boulevard in East Oakland –where no state law prohibits a citizen with appropriate permit to carry a firearm.

### Miami, FL, 03/15/2009

At a birthday party, Guillermo Lopez, 49, fatally shot his estranged wife, her mother, her daughter, and her daughter's boyfriend.  He then returned to his house where he set the building on fire and fatally shot himself.
**Shooter name**: Guillermo Lopez, 49
**Gun details**: Semiautomatic handgun
**Gun acquired**: Unknown
**Prohibiting criteria**: There is no evidence to suggest that Lopez was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest that Lopez exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone**: The shooting took place in a private home.

### Catawba, NC, 03/12/2009

Chiew Chan Saevang, 38, shot and stabbed a woman and her three children in their home.  The killings were related to a drug robbery.  Saevang later fatally shot himself and his girlfriend as police officers closed in on their car in Utah.
**Shooter name:** Chiew Chan Saevang, 38
**Gun details:** Unknown
**Gun acquired:** Unknown
**Prohibiting criteria:** There is no evidence to suggest that Saevang was prohibited from possessing firearms.
**GVRO red flag**: There is no evidence to suggest that Saevang exhibited recent behavior that would have qualified for a GVRO.
**Not a gun-free zone:** The shootings took place in a private home and an automobile.

### Geneva County, AL, 3/10/2009

Michael Kenneth McLendon, 28, fatally shot 10 people and wounded 6 in a spree-style shooting, before fatally shooting himself.  Several of the victims were members of McLendon's family, including his mother and his uncle.
**Shooter name:** Michael Kenneth McLendon, 28
**Gun details:** Two assault rifles, one handgun, one shotgun
**Gun acquired:** Unknown.
**Prohibiting criteria:** McLendon was not prohibited from possessing firearms.  According to the Geneva Police Chief, McLendon was licensed to carry a handgun.
**GVRO red flag:** There is no evidence to suggest that McLendon exhibited recent behavior that would have qualified him for a GVRO.
**Not a gun-free zone:** The shootings took place between two private homes, a public street, and outside a convenience store.  It was lawful to carry a firearm in all of these places.

### Cleveland, OH, 03/05/2009

Davon Crawford, 33, fatally shot his wife and four of her relatives, before fatally shooting himself.
**Shooter name**: Davon Crawford, 33
**Gun details**: At least one handgun
**Gun acquired**: Unknown

**Prohibiting criteria**: Crawford was likely prohibited from possessing a firearm.  He was convicted of manslaughter in 1995, and of felonious assault with a firearm in 2002; though Ohio enables felons to restore their gun rights, so it is possible he was no longer prohibited.

**GVRO red flag**: There is no evidence to suggest that Crawford exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone**: The shooting took place in a private home.

**Brockport, NY, 02/14/2009** Frank Garcia, 34, fatally shot a nurse in the parking lot of the Lakeside Memorial Hospital.  He also fatally shot a motorist who intervened, and wounded the motorist's girlfriend.  He then drove to Canandaigua and fatally shot another nurse and her husband in their home.  Both nurses killed by Garcia had filed sexual harassment complaints against him.

**Shooter Name**: Frank Garcia, 34

**Gun details**: .40-caliber Glock handgun

**Gun acquired**: Unknown

**Prohibiting criteria**: There is no evidence to suggest that Garcia was prohibited from possessing firearms.  He had applied for concealed carry permits and been denied three times because of previous arrests on his record.  But, in 2007, a judge reversed the denial and granted Garcia a concealed weapon permit.

**GVRO red flag**: A former coworker and friend of Garcia testified that Garcia told her about his plan to kill the couple in Canandaigua.

**Not a gun-free zone**: We found no indication that permit holders were prohibited from carrying guns in this area at the time of the incident.


## Wilmington, CA, 1/27/2009

Ervin Lupoe, 40, fatally shot his wife and their five children, before fatally shooting himself.

**Shooter name:** Ervin Lupoe, 40

**Gun details:** Handgun

**Gun acquired**: Unknown

**Prohibiting criteria:** There is no evidence to suggest that Lupoe was prohibited from possessing firearms.

**GVRO red flag:** There is no evidence to suggest that Lupoe exhibited recent behavior that would have qualified him for a GVRO.

**Not a gun-free zone:** The shooting took place in a private home.

# Exhibit 78



A non-partisan non-profit organization working to make criminal justice
and public safety policies and practices more effective through innovation,
research, and education.

HOME      ABOUT      SPEAKER SERIES      INITIATIVES      MEDIA      RESOURCES      CONTACT      DONATE

INITIATIVE

Mass Shooting Incidents in America (1984-2012)

Mass shootings are a unique feature of American life which have occurred consistently throughout history in every region of the country. The increased lethality of such incidents is made possible by the use of large capacity ammunition magazines (defined as more than 10-rounds) which enable a shooter to rapidly fire off as many as 100-rounds without having to reload the firearm. Designed for military use to kill greater numbers of people more effectively, large capacity ammunition magazines have facilitated some of the worst mass murders ever committed in the United States. As these incidents occur in every region of the country, restricting civilian access to these weapons is not a state specific problem. The federal government needs to take action to protect all Americans by reinstating the ban on large capacity ammunition magazines.



This database provides an overview of significant mass shooting incidents in America (defined by the FBI as four or more victims killed), all of which involved large capacity ammunition magazines. *

| December 14, 2012 | Sandy Hook Elementary School |
| --- | --- |
| Newtown, CT | **Incident** <br> On December 14, 2012, Adam Lanza armed with a .22-caliber rifle killed his mother in her home in Newtown, CT. Lanza then stocked his mother's car with firearms and drove to Sandy Hook Elementary School. He shot his way into the school and opened fire with a Bushmaster XM15 .223-caliber semiautomatic assault rifle equipped with a 30-round large capacity ammunition magazine, killing 26, including 20 students' ages six and seven. As police closed in Lanza committed suicide by shooting himself with a GLOCK 10mm handgun. He fired over 154 shots in less than five minutes. |
| **Shooter** <br> Adam Lanza, 20 | |
| Ammo Magazine Capacity <br> 30-rounds | |
| Shots Fired >154 <br> Killed 27 (plus shooter = 28) <br> Wounded unknown | **Weapons** <br> An unknown make and model .22-caliber rifle, a Bushmaster XM15 .223-caliber semiautomatic assault rifle equipped with a 30-round large capacity ammunition magazine, and a GLOCK 10mm handgun were used. According to the Danbury State's Attorney, police also recovered in Lanza's possession a SIG SAUER P226 9mm handgun and three loaded 30-round large capacity ammunition magazines for the Bushmaster. Six additional 30-round large capacity ammunition magazines were recovered at the scene. A loaded unknown make and model 12-gauge shotgun was found in the passenger compartment of the car (later moved to the trunk by police). All of the guns used in the shooting were purchased by Lanza's mother. <br><br> **Outcome** <br> Suicide. |

| September 27, 2012 | Accent Signage Systems |

**Minneapolis, MN**

**Incident**
On September 27, 2012, after working his shift at Accent Signage Systems, Andrew Engeldinger was told by two company managers that he was being fired for chronic tardiness and poor performance. Upon hearing this news, Engeldinger pulled out a semiautomatic handgun equipped with a 15-round large capacity ammunition magazine, the managers tried to get the gun from him, unable to both mangers were shot. The large capacity ammunition magazine was dropped during the struggle; Engeldinger reinserted the magazine into the firearm and began to move through the office, shooting at some employees but not others. Over approximately 15 minutes, Engeldinger shot seven employees and a UPS driver before turning the gun on himself. Four victims died at the scene, two died at the hospital (one the following day and the other two weeks later), and two others were injured.

**Shooter**
Andrew John
Engeldinger, 36

<span style="color:red">**Ammo Magazine Capacity**</span>
15-rounds

Shots Fired >46
Killed 6 (plus shooter = 7)
Wounded 2

**Weapons**
GLOCK 19 9mm semiautomatic pistol equipped with a 15-round large capacity ammunition magazine. Engeldinger purchased the firearm one year before the shooting at KGS Guns and Ammo in Minneapolis after passing a background check and obtaining a permit to purchase. Police reportedly found packaging for 10,000 rounds of ammunition and another handgun in Engeldinger's home.

**Outcome**
Suicide.

| August 5, 2012 | Sikh Temple of Wisconsin |

**Oak Creek, WI**

**Incident**
Around 10:30 AM, Wade Michael Page, a U.S. Army veteran, opened fire in the parking lot of a Sikh temple, then entered the building shooting congregants gathering for Sunday meditation. Police officers arrived on the scene in response to 911 calls, and exchanged fire with the shooter. Page killed six and injured three, including a responding officer, before committing suicide.

**Shooter**
Wade Michael Page, 40

<span style="color:red">**Ammo Magazine Capacity**</span>
19-rounds

Shots Fired unknown
Killed 6 (plus shooter = 7)
Wounded 3

**Weapons**
Springfield Armory XD(M) 9mm semiautomatic handgun equipped with a 19-round large capacity ammunition magazine. Weeks before the shooting, Wade legally purchased the handgun and three 19-round large capacity ammunition magazines from a federal firearms licensed dealer in nearby West Allis, WI. According to media reports, Wade served in the U.S. Army from 1992 until 1998, when he was given an other-than-honorable discharge or general discharge. In 1994, while stationed at Fort Bliss in Texas, he was arrested by El Paso police, and pled guilty to a misdemeanor charge of criminal mischief. Federal law does not prohibit persons with convictions for misdemeanors other than domestic violence misdemeanors or persons who have been discharged from the military for reasons other than "dishonorably" from purchasing firearms.

**Outcome**
Wade committed suicide after being shot by police at the scene. The FBI is leading the investigation which is being treated as a possible act of domestic terrorism.

| July 20, 2012 | The Dark Knight Rises: Movie theatre Shooting |

**Aurora, CO**

**Incident**
Shortly after the start of the midnight premiere screening of *Batman: The Dark Knight Rises* on July 20, 2012, at the Century Aurora 16 movie theatre in Aurora, CO, James Holmes exited the theatre through an emergency exit. He returned through the propped open emergency exit door, clad in ballistic body armor, wearing a gas mask, and armed with multiple firearms. After

**Shooter**
James Holmes, 24

Ammo Magazine
Capacity
100-rounds

Shots Fired >80
Killed 12
Wounded 70

tossing two canisters of tear gas into the theatre he began firing upon the audience. He first used an AR-15-type assault rifle equipped with a 100-round drum large capacity ammunition magazine, after the assault rifle jammed, he then continued with a 12-gauge shotgun and a handgun--killing 12 and wounding 70 (including three wounded when bullets went through a wall into an adjacent theatre).

Weapons
A Smith & Wesson M&P15 assault rifle equipped with a 100-round drum large capacity ammunition magazine, a Remington Model 870 12-gauge pump shotgun, and two GLOCK .40-caliber handguns, were recovered at the scene by police. In the months leading to the shooting, Holmes purchased the weapons and 6,000-rounds of ammunition at gun shops and over the Internet. In addition to the weapons used in the shooting, Holmes booby-trapped his apartment, rigging trip wire to detonate 30 plastic shells stuffed with gunpowder, several glass jars filled with gasoline and gunpowder, and 10 gallons of gasoline in canisters.

Outcome
Holmes was apprehended by the police in the theatre's rear parking lot within seven minutes of the first 911 calls from moviegoers. On July 30, 2012, Holmes appeared before the District Court of Arapahoe County, CO for formal charging on 142 counts. Later in the court process, the prosecution amended the charges to include 24 counts of murder in the first degree (two counts for each of the 12 victims killed); 140 counts of attempted murder in the first degree (two counts for each of the 70 victims injured); one count of possession of explosive or incendiary devices; and one count of unlawful use of a deadly weapon in the commission of a violent crime. On June 4, 2013, Holmes changed his original plea of not guilty to a plea of not guilty by reason of insanity. Trial began on April 27, 2015, and on July 16, 2015, the jurors found Holmes guilty on 24 counts of murder in the first degree, 134 counts of attempted murder in the first degree, 6 counts of the lesser included offense of attempted murder in the second degree, one count of possession of explosive or incendiary devices; and one count of unlawful use of a deadly weapon in the commission of a violent crime. On August 27, 2015, Holmes was sentenced to 12 consecutive life imprisonment sentences without the possibility of parole plus 3,318 years imprisonment.

September 6, 2011

Carson City, NV

Shooter
Eduardo Sencion, 32

Ammo Magazine
Capacity
30-rounds

Shots Fired unknown
Killed 4 (plus shooter = 5)
Wounded 7

Carson City IHOP

Incident
At about 9 AM, Sencion entered an IHOP restaurant and began shooting at a table of uniformed National Guard members. He hit all 5 of the members, in addition to 5 civilians inside the restaurant. He eventually moved out into the parking lot, where he shot one woman before turning the gun on himself. Though his eight-minute rampage seemed focused on the Guardsmen, Sencion had no known association with the military and his motives remain unknown. He had no criminal record, but his family has indicated that he had a history of mental illness.

Weapons
AK-47 type assault rifle equipped with a 30-round large capacity ammunition magazine. Two additional guns and two more magazines were found in his vehicle.

Outcome
Suicide.

July 7, 2011

Grand Rapids, MI

Shooter

Grand Rapids

Incident
On a Thursday afternoon, Dantzler went to two homes on a shooting rampage, killing two ex-girlfriends and members of their families, including his own ten-year-old daughter and

Rodrick Shonte Dantzler, 34

Ammo Magazine Capacity
30-rounds

Shots Fired >10
Killed 7 (plus shooter = 8)
Wounded 2

another child. He then led police on a high-speed chase, shooting two bystanders before crashing his car into an embankment. Dantzler fled, forced his way inside a nearby home, and held three occupants hostage for four hours before shooting himself in the head at about 11:30 PM. He had been arrested once before for assault with intent to do great bodily harm.

Weapons
GLOCK 9mm semiautomatic pistol (unknown model) equipped with a 30-round large capacity ammunition magazine.

Outcome
Suicide.


January 8, 2011

Tucson, AZ

Shooter
Jared Lee Loughner, 22

Ammo Magazine Capacity
33-rounds
15-rounds

Shots Fired 33
Killed 6
Wounded 13

U.S. Rep. Gabriel Giffords Congress on Your Corner

Incident
During an outdoor constituent meet-and-greet at a Tucson grocery store, Loughner allegedly attempted to assassinate Rep. Giffords, and in the process murdered 6 and wounded 12 others. He first shot Rep. Giffords in the head from about three feet away and then turned to the crowd, firing over 30 rounds in just 15 seconds. Among those killed include a federal judge, Hon. John M. Roll, congressional staff, and civilians ranging in age from 9 to 79.

Weapons
GLOCK 19 9mm semiautomatic pistol equipped with a 33-round large capacity ammunition magazine. Loughner was also carrying two 15-round large capacity ammunition magazines, and a knife. The ATF determined Loughner legally purchased the GLOCK pistol with an extended magazine and one box of Winchester ammunition on November 30, 2010, from Sportsman's Warehouse in Tucson.

Outcome
Loughner was tackled while attempting to reload his firearm with another large capacity ammunition magazine. He was later taken into custody by Sheriff's deputies at the scene. The day following the shooting, Loughner was charged with five federal counts to which he pleaded not guilty. On March 4, 2011, he was charged with an additional 49 federal charges, to which he also pleaded not guilty. On May 25, 2011, Loughner was found not mentally competent to stand trial. A federal judge ruled on September 28, 2011, that efforts to treat him for mental illness in a federal facility should continue until he is mentally fit to be tried. Loughner was diagnosed with and treated for schizophrenia. After he was found mentally competent to stand trial, Loughner pleaded guilty on August 7, 2012, to 19 counts related to the date of the shooting. On November 8, 2012, Loughner was sentenced to seven consecutive life terms, plus 140 years in prison without the possibility of parole (one life term for the attempted assassination of Congresswoman Gabrielle Giffords; two life terms for the murder of two federal employees; four life terms for the murders of four participants at the event; two 20 year terms for the attempted murders of two federal employees; and ten 10 year terms for causing the injuring through the use of a firearm of ten participants at the event).

| | |
|---|---|
| August 3, 2010 | **Hartford Beer Distributor** |
| Manchester, CT | **Incident** |
| Shooter | Thornton arrived at work early in the morning for a meeting with his employers. During the meeting he was shown video surveillance which proved he had been stealing beer from the company. Thornton was offered the choice to either resign from his position as a truck driver or be fired. Following the meeting, Thornton went into the employee kitchen to retrieve two handguns equipped with 17-round large capacity ammunition magazines he had previously hidden. He then traveled through the Distributor warehouse shooting deliberately. During the rampage, he murdered eight co-workers and wounded two more. Thornton eventually hid in a far office where he called the police to explain his motive prior to committing suicide. In his 911 call, Thornton claimed that the Hartford Beer Distributor was a "racist place." As he told the 911 dispatcher, "They treat me bad over here and they treat all the other black employees bad over here too." |

**Shooter**
Omar Thornton, 34

**Ammo Magazine Capacity**
17-rounds

**Shots Fired** >11
**Killed** 8 (plus shooter = 9)
**Wounded** 2

**Weapons**
Two Ruger SR9 9mm semiautomatic pistols equipped with 17-round magazines. Thornton purchased both firearms legally from an East Windsor, CT gun dealer.

**Outcome**
Suicide.

---

November 5, 2009

Fort Hood, TX

**Shooter**
Nidal Malik Hasan, 39

**Ammo Magazine Capacity**
30-rounds
20-rounds

**Shots Fired** 214
**Killed** 13
**Wounded** 32

**Fort Hood**

**Incident**
On the afternoon of November 5, 2009, Major Nidal Malik Hasan—an army psychiatrist—walked into a medical processing center and began firing upon those inside. The rampage began at 1:20 pm, and lasted for about four minutes, during which Hasan fired off about 214 shots, killing 13 and wounding 32 more. After running outside the building to chase down a wounded soldier, Hasan was confronted by a police officer. Engaging in a brief firefight, the officer managed to down Hasan with a shot to the torso. Reports have linked the incident to domestic terrorism.

**Weapons**
FN Herstal 5.7 Tactical Pistol equipped with 20-round large capacity ammunition magazine. When Hasan was apprehended, investigators found in his possession 177-rounds in 30-round and 20-round large capacity ammunition magazines, another handgun, a revolver, and two gunsights (for different lighting conditions). Hasan purchased the FN Herstal 5.7 Tactical Pistol legally at Guns Galore, a shop in Killeen, TX.

**Outcome**
After he was shot, Hasan was arrested. In 2009, he was charged with 13 counts of premeditated murder and 32 counts of attempted murder under the Uniform Code of Military Justice. In August 2013, following a 22-day court-martial, during which he represented himself, Hasan was convicted of all charges. He was sentenced to the death penalty.

---

April 3, 2009

Binghamton, NY

**Shooter**
Jiverly Wong, 41

**Ammo Magazine Capacity**

**American Civic Association**

**Incident**
Armed with two handguns and 30- and 15-round large capacity ammunition magazines, Wong drove to the American Civic Association building, where he previously took classes. He first barricaded the back entrance of the building with a borrowed car, then entered through the front entrance and began firing. He first opened fire on the association's receptionists, killing one and wounding the other. The surviving receptionist, Shirley DeLucia, feigned death and, after Wong moved further into the building, called 911. Meanwhile, Wong entered a classroom and resumed

30-rounds
15-rounds

Shots Fired 99
Killed 13 (plus shooter = 14)
Wounded 4

fire, killing 12 and wounding 3 students and association workers, before eventually turning his gun on himself. His exact motives remain unclear; however, a letter he wrote a month prior to the attack indicates great frustration both with the police and with his lack of employment.

Weapons
Beretta .45-caliber semiautomatic pistol, Beretta 9mm semiautomatic pistol (models unknown), and two 30-round large capacity ammunition magazines and two 15-round large capacity ammunition magazines.

Outcome
Suicide.

---

February 14, 2008

DeKalb, IL

Shooter
Steven Phillip Kazmierczak, 27

Ammo Magazine Capacity
33-rounds
15-rounds

Shots Fired 54
Killed 5 (plus shooter = 6)
Wounded 21

Northern Illinois University

Incident
Armed with four firearms and 33- and 15-round large capacity ammunition magazines, graduate student Steven Kazmierczak kicked in the door of a Cole Hall lecture room and began firing on the 162-person class. Firing approximately 54 shots, he killed 5 students and wounded 17 others, before taking his own life. Kazmierczak had a history of mental illness, erratic behavior, and self-mutilation, and had reportedly stopped taking his medication in the weeks leading up to the shooting.

Weapons
SIG SAUER Kurz 9mm semiautomatic pistol, Hi-Point CF380 .380 caliber semiautomatic pistol, GLOCK 19 9mm semiautomatic pistol, Remington Sportsman 48 12-gauge shotgun, and 33-round and 15-round large capacity ammunition magazines. Kazmierczak purchased all four weapons from Tony's Gun & Ammo in Champaign, IL between August 3, 2007 and February 9, 2008. Kazmierczak also purchased gun accessories from a website operated by TGSCOM, Inc., the same company patronized by the VA Tech shooter.

Outcome
Suicide.

---

December 5, 2007

Omaha, NE

Shooter
Robert Hawkins, 19

Ammo Magazine Capacity
30-rounds

Shots Fired >14
Killed 8 (plus shooter = 9)
Wounded 5

Westroads Mall

Incident
Armed with an assault rifle and two 30-round large capacity ammunition magazines, Hawkins opened fire from the third floor balcony of the Westroads Mall. He killed six employees and two customers, and wounded five more, before taking his own life. Police arrived on the scene about six minutes after the shooting began, by which time it was already over. Hawkins had a history of mental illness and a criminal record. Police say the shooting was random.

Weapons
WASR-10 semiautomatic assault rifle and two 30-round large capacity ammunition magazines.

Outcome
Suicide.

---

April 16, 2007

Blacksburg, VA

Shooter

Virginia Polytechnic Institute and State University

Incident
At about 7 AM, Cho entered West Ambler Johnston dormitory, shot and killed two students,

Seung-Hui Cho, 23

Ammo Magazine
Capacity
15-rounds

Shots Fired 176
Killed 32 (plus shooter =
33)
Wounded 17

then returned to his dormitory to change out of his bloody clothes. At approximately 9:40 AM, he entered Norris Hall and began shooting at students and faculty in classrooms on the second floor. The rampage—during which 30 more people were killed and 17 wounded—lasted until approximately 9:51 AM, when Cho committed suicide. Exact motives remain unclear. Cho had a long history of mental and physical illness, depression, selective mutism, and wrote "dark and troubling" papers for his classes, which included fantasies about the Columbine shooting.

Weapons
GLOCK 19 9mm semiautomatic pistol and Walther P22 .22-caliber semiautomatic pistol. Investigators found a total of 17 empty magazines at the scene of the shooting, a mix of several 15-round, and 10-round magazines loaded with hollow-point rounds (bullets with the tip hollowed out, designed to expand upon impact). He possessed over 400 rounds of ammunition. Cho ordered the Walther P22 from a website operated by TGSCOM, Inc. Kazmierczak patronized the same company before the NIU shooting. On February 9, 2007, Cho picked up the pistol from J-N-D Pawn-brokers, located across the street from the VA Tech campus. In compliance with the state law limiting handgun purchases to one every 30 days, Cho purchased the GLOCK 19 on March 13, 2007. He also purchased five 10-round magazines from eBay in March. Cho's purchase of these firearms was in violation of federal law; he was disqualified from purchasing or possessing a firearm and ammunition, because a special justice of the Montgomery County General District Court had found him to be a danger to himself on December 14, 2005.

Outcome
Suicide.

January 30, 2006

Goleta, CA

Shooter
Jennifer San Marco, 44

Ammo Magazine
Capacity
15-rounds

Shots Fired unknown
Killed 7 (plus shooter = 8)
Wounded 0

Santa Barbara Postal Processing and Distribution Center

Incident
On the night of January 30, 2006, Jennifer San Marco sneaked into a Santa Barbara condominium where she shot and killed a former neighbor. Less than an hour later, her rampage continued at the Santa Barbara Postal Processing and Distribution Center where she had worked for about six years. Armed with a semiautomatic handgun equipped with a 15-round large capacity ammunition magazine, San Marco shot six postal employees (two in the parking lot and four in the building), before turning the gun on herself. Five victims died at the scene and one died in the hospital two days later. San Marco's employment at the postal facility ended in 2003 when she was placed on retirement disability for psychological reasons. No suicide note was left to explain her motive, but police reportedly found writings in San Marco's New Mexico home (where she moved in 2004) alluding to a conspiracy plot involving the postal facility where the shooting occurred, a local medical facility, and the Santa Barbara County Sheriff's Department.

Weapons
Smith & Wesson 915 9mm semiautomatic handgun equipped with a 15-round large capacity ammunition magazine. San Marco purchased the firearm at a pawn shop in New Mexico in August 2005.

Outcome
Suicide.

| November 21, 2004 | Hunting Camp |

Meteor, WI

Shooter
Chai Vang, 36

Ammo Magazine
Capacity
20-rounds

Shots Fired 20
Killed 6
Wounded 3

**Incident**
On a hunting trip in Northwest Wisconsin, at about noon on a Sunday, Vang was sitting in a hunting stand used to look out for deer, when he encountered a group of other hunters who informed him that he was trespassing on private property. Police report that Vang began to walk away, then turned, and opened fire. During the course of the shooting, he shot nine people, five of whom died during the incident (the sixth victim succumbed to the gunshot wounds the following week). One of the wounded victims recorded the hunting license number posted on Vang's orange vest and supplied it to police.

**Weapons**
SKS 7.62mm semiautomatic assault rifle equipped with a 20-round large capacity ammunition magazine.

**Outcome**
At about 5 PM that same day, police arrested Vang. At Vang's preliminary hearing, he pleaded not guilty to six counts of murder and three counts of attempted murder. During the trial, which lasted from September 11 to 18, 2005, Vang's defense argued that he had felt "under siege" from the other hunters, and that they had been using racial slurs against him. Vang was convicted of murder and eventually sentenced to six life sentences without the possibility of parole.

December 26, 2000 — Edgewater Technology Office

Wakefield, MA

Shooter
Michael McDermott, 42

Ammo Magazine
Capacity
60-rounds

Shots Fired 37
Killed 7
Wounded 0

**Incident**
Armed with multiple firearms and a 60-round large capacity ammunition magazine, McDermott arrived at his workplace at about 9 AM. After about two hours, he began his rampage by walking to the reception desk and shooting and killing the office manager. He moved throughout the building continuing to shoot at specific coworkers, firing 37 shots over the course of five to six minutes before he stopped firing, returned to the reception area and sat down. Authorities speculated that McDermott's motive centered on anger that his wages were to be collected by the IRS for the payment of back taxes.

**Weapons**
AK-47-type semiautomatic assault rifle, unknown make and model 12-gauge shotgun, unknown make and model .32-caliber semiautomatic pistol, and 60-round large capacity ammunition magazine.

**Outcome**
McDermott was arrested at the scene. He was charged with seven counts of murder, to which he pleaded not guilty. Over the course of a 14-day trial in April 2002, McDermott's defense was based on insanity. During his testimony, he expressed a belief that he had been sent back in time to kill Nazis, a move which the prosecution claimed to be a fabricated "psychic alibi." At the end of the trial, McDermott was convicted of seven counts of murder and received seven life sentences.

November 2, 1999 — Xerox Office Building

Honolulu, HI

Shooter
Byran Uyesugi, 40

Ammo Magazine
Capacity

**Incident**
Armed with a handgun and three 17-round large capacity ammunition magazines, Uyesugi entered offices of the Xerox corporation in Honolulu and commenced firing. After firing approximately 28 shots, killing 7 people (he missed an 8th), Uyesugi promptly left and drove to the Hawaii Nature Center. After a 5-hour standoff with police, he surrendered. Uyesugi is said to have been a disgruntled employee—with a history of anger issues—who at the time was feeling work-related pressure.

17-rounds

Shots Fired 28
Killed 7
Wounded 0

Weapons
GLOCK 17 9mm semiautomatic pistol and three 17-round large capacity ammunition magazines, loaded with hollow point bullets (bullets with the tip hollowed out, designed to expand upon impact). Uyesugi legally purchased the GLOCK in 1989.

Outcome
On November 9, 1999, Uyesugi was indicted on nine felony counts, including one count of first degree murder, seven counts of murder in the second degree, and one count of attempted murder in the second degree. On May 15, 2000, the trial against Uyesugi began. He pleaded not guilty by reason of insanity, but the jury rejected that plea and found him guilty. Uyesugi was sentenced to life without the possibility of parole. In 2002, he appealed his conviction but the State of Hawai'i Supreme Court upheld his conviction.

---

September 15, 1999

Fort Worth, TX

Shooter
Larry Gene Ashbrook, 47

Ammo Magazine Capacity
15-rounds

Shots Fired 30
Killed 7 (plus shooter = 8)
Wounded 7

Wedgwood Baptist Church

Incident
Armed with two handguns and three 15-round large capacity ammunition magazines, Ashbrook walked into Wedgwood Baptist Church during a teen rally and began shooting. He killed 7 people (three of whom were teenagers) and wounded 7 more. Over the course of the attack, he fired approximately 30 shots and threw a pipe bomb in the church. Ashbrook then committed suicide. According to witnesses, during the shooting Ashbrook was yelling anti-religious invectives. In addition, a news report described him as one who "seethed with hostility, distrusted neighbors, and sometimes victimized the vulnerable."

Weapons
Ruger P85 9mm semiautomatic pistol, unknown make and model .380 caliber semiautomatic pistol, and three 15-round large capacity ammunition magazines. Ashbrook legally acquired both weapons from federally licensed firearms dealers in 1992.

Outcome
Suicide.

---

April 20, 1999

Littleton, CO

Shooter
Eric Harris, 18
Dylan Klebold, 17

Ammo Magazine Capacity
52-rounds
32-rounds
28-rounds

Shots Fired 188
Killed 13 (plus shooters = 15)
Wounded 24

Columbine High School

Incident
On the morning of April 20th, Harris and Klebold entered Columbine High School and placed two propane bombs in the cafeteria. They then returned to their cars, awaiting detonation. After the bombs failed to detonate, Harris and Klebold gathered their guns and large capacity ammunition magazines ranging from 28- to 52-rounds, then they approached the school's west entrance. At approximately 11:20 AM, they begin shooting at students outside the school. After entering the school, they commenced shooting and throwing pipe bombs at random, eventually proceeding to the library where they killed 10 and injured 12 more. Leaving the library, they continued wandering about the school, occasionally firing through windows at law enforcement, until—at around noon—they committed suicide. In less than an hour, Harris and Klebold killed 13 and wounded 24.

Weapons
Savage Springfield 67H 12-gauge pump-action shotgun, Savage Stevens 311D 12-gauge sawed-off shotgun, Hi-Point 995 9mm semiautomatic rifle, INTRATEC TEC-DC9 9mm semiautomatic pistol, and thirteen 10-round magazines, one 52-, one 32-, one 28-round large capacity ammunition magazines. Harris and Klebold illegally acquired the shotguns and Hi-Point rifle through a "straw purchase" (a transaction in which a legal buyer makes a purchase for someone who cannot legally purchase the firearm). Their friend, Robyn Anderson, purchased the three firearms at the Tanner Gun Show from unlicensed sellers in December of

1998. A pizza shop employee, Mark Manes, illegally sold them the INTRATEC TEC-DC9.

Outcome
Suicide.

| | |
|---|---|
| May 20-21, 1998 | **Thurston High School** |
| Springfield, OR | **Incident** |
| | At about 3 PM, Kinkel, who had earlier been suspended from school for illegal possession of a |
| **Shooter** | firearm, loaded a .22-caliber rifle and shot his father in the back of the head. Roughly 3 hours |
| Kipland Philip "Kip" | later, Kinkel's mother returned home and he fatally shot her six times. The next morning, Kinkel |
| Kinkel, 15 | armed himself with multiple weapons including a 50-round large capacity ammunition |
| | magazine, then drove to his school, arriving at about 7:55 AM. Walking through a school |
| **Ammo Magazine** | hallway, he shot 27 students, killing 2 of them, before he was finally tackled to the ground by |
| **Capacity** | other students while trying to reload. |
| 50-rounds | |
| | **Weapons** |
| **Shots Fired >50** | GLOCK 19 9mm semiautomatic pistol, Ruger (unknown model) .22-caliber semiautomatic |
| **Killed 4** | pistol, Ruger (unknown model) .22-caliber rifle, and a 50-round large capacity ammunition |
| **Wounded 25** | magazine. The GLOCK and rifle were legally purchased by Kinkel's father. |

Outcome
Kinkel was taken into custody by the police at the scene. On the 16th of June, Kinkel was indicted on 58 charges, 4 of which were for aggravated murder. In September of the following year, Kinkel pleaded guilty to the aggravated murder charges and 25 counts of attempted murder, and pleaded no contest to one attempted murder count. During his sentencing hearing, psychiatrists testified that Kinkel showed signs of schizophrenia. Evidence was also presented that he expressed admiration for the Westside Middle School shooting which occurred two months earlier. On November 2nd, Kinkel was sentenced to 111 years and 8 months in prison without the possibility of parole. In 2002, he appealed his sentence, but the Court of Appeals of Oregon found the sentence did not violate the Oregon Constitution. In 2007, he petitioned for a new trial, but a Marion County judge denied the motion. Kinkel then appealed that decision but on January 12, 2011, the Oregon Court of Appeals affirmed the trial court decision denying his motion for a new trial.

| | |
|---|---|
| March 24, 1998 | **Westside Middle School** |
| Jonesboro, AR | **Incident** |
| | On the morning of March 24, Golden and Johnson stole a van owned by the Johnson family, |
| **Shooter** | drove to Golden's grandparents' house to acquire weaponry, including multiple 30- and 15-round |
| Andrew Golden, 11 | large capacity ammunition magazines, and then continued on to Westside Middle School. |
| Mitchell Johnson, 13 | Golden entered the school and pulled the fire alarm, then ran back outside to wait with Johnson. |
| | As students and teachers came running out of the school, the two boys opened fire, killing 5 |
| **Ammo Magazine** | (one of whom was a teacher) and wounding 10 (9 students and 1 teacher). Johnson claims |
| **Capacity** | Golden came up with the plan just to scare the kids who had bullied him. |
| 30-rounds | |
| 15-rounds | **Weapons** |
| | Universal M1 Carbine .30-caliber replica, Davis Industries .38-caliber two-shot derringer, |
| **Shots Fired >26** | Double Deuce Buddie .22-caliber two-shot derringer, Charter Arms .38-caliber revolver, Star |
| **Killed 5** | .380-caliber pistol, FIE .380-caliber pistol, Ruger Security Six .357-caliber revolver, Ruger .44 |
| **Wounded 10** | magnum rifle, Smith & Wesson .38-caliber revolver, Remington 742 .30-06-caliber rifle, |
| | 15-round large capacity ammunition magazines, three 30-round large capacity ammunition |
| | magazines, and over 150-rounds of ammunition. |

Outcome

After the shooting, Golden and Johnson ran into the woods and were eventually caught by police. The boys were convicted as juveniles to the maximum sentence possible under state law, imprisonment until they turned 18. Prior to their 18th birthdays, they were convicted of a federal crime for bringing a gun to school. They were then transferred to federal prisons until their 21st birthdays. Upon release they would have no criminal record, making them legally eligible to purchase a firearm. Johnson was released on August 11, 2005, and Golden was released on May 25, 2007.

| | |
|---|---|
| March 6, 1998 | **Connecticut State Lottery Headquarters** |
| Newington, CT | **Incident** |
| Shooter<br>Matthew Beck, 35 | Nearly two weeks after retuning to work following several months of "stress-related" medical leave, Beck, a State Lottery employee, arrived at work armed with a handgun equipped with a 19-round large capacity ammunition magazine. He shot and killed four of his bosses. As police |
| Ammo Magazine Capacity<br>19-rounds | arrived, Beck shot and killed himself. Beck had a history of depression and was disgruntled with his employer over a salary dispute and being passed over for a promotion. |
| Shots Fired >5<br>Killed 4 (plus shooter = 5)<br>Wounded 0 | **Weapons**<br>GLOCK model unknown 9mm semiautomatic pistol equipped with a 19-round large capacity ammunition magazine. Beck had a permit for the 9mm pistol used in the shooting.<br><br>**Outcome**<br>Suicide. |

| | |
|---|---|
| December 18, 1997 | **Caltrans Maintenance Yard** |
| Orange, CA | **Incident** |
| Shooter<br>Arturo Reyes Torres, 41 | Armed with an assault rifle and five 30-round large capacity ammunition magazines, Torres fired 144 rounds in just over two minutes upon his former co-workers. He killed four, including his former supervisor, and wounded two more. Torres had recently been accused of stealing and |
| Ammo Magazine Capacity<br>30-rounds | selling government-owned materials and subsequently fired from his job at Caltrans. He is believed to have been seeking revenge against his former supervisor, who Torres felt set him up. |
| Shots Fired 144<br>Killed 4 (plus shooter = 5)<br>Wounded 2 | **Weapons**<br>Chinese-made AK-47-type 7.62mm semiautomatic assault rifle and five 30-round large capacity ammunition magazines. Torres legally purchased the rifle on April 30, 1988, from B&B Gun Sales in Orange County, CA.<br><br>**Outcome**<br>Torres was shot and killed by police. |

| | |
|---|---|
| June 20, 1994 | **Fairchild Air Force Base** |
| Fairchild Air Force Base, WA | **Incident** |
| Shooter<br>Dean Allen Mellberg, 20 | Weeks after receiving an involuntary honorable discharge from the Air Force, Dean Allen Mellberg took a cab to the Fairchild Air Force Base hospital armed with a Mak-90 semiautomatic assault rifle equipped with a 75-round drum large capacity ammunition magazine. He shot and killed two doctors, who he reportedly blamed for his discharge from the |
| Ammo Magazine Capacity<br>75-rounds | military. Mellberg then fired upon others in the hospital, chasing some outside the building. Once outside he encountered a military police officer who fatally shot him. In the few minutes Mellberg was shooting, he killed 5 and wounded 23. |

| | |
|---|---|
| Shots Fired unknown<br>Killed 5 (plus shooter = 6)<br>Wounded 23 | **Weapons**<br>Chinese-made Mak-90 semiautomatic assault rifle equipped with a 75-round drum large capacity ammunition magazine. He purchased the assault rifle on June 15, 1994, five days before the shooting, and the following day purchased 80 rounds of 7.62x39mm ammunition and a 75-round drum large capacity ammunition magazine.<br><br>**Outcome**<br>Shot and killed by military police. |

| | |
|---|---|
| December 7, 1993 | Long Island Railroad |
| Long Island, NY | **Incident** |
| Shooter<br>Colin Ferguson, 35 | Armed with a handgun and four 15-round large capacity ammunition magazines, Ferguson boarded a 5:33 PM Long Island bound commuter train from NYC's Pennsylvania Station. During the journey he began firing on passengers. He emptied approximately 30 rounds upon 25 people, killing 6. Ferguson's motives for the shooting are believed to stem from a variety of |
| Ammo Magazine<br>Capacity<br>15-rounds | complaints. Police discovered a notebook in which Ferguson vented his hatred for "Caucasians and Uncle Tom Negroes," then-Governor Mario Cuomo, and the state Workers' Compensation Board. |
| Shots Fired 30<br>Killed 6<br>Wounded 19 | **Weapons**<br>Ruger P89 9mm semiautomatic pistol and four 15-round large capacity ammunition magazines. Ferguson legally acquired the weapon in California at an outlet of Turner's Outdoorsman.<br><br>**Outcome**<br>Stopping to reload, Ferguson was tackled by three train passengers. Ferguson was indicted on January 19, 1994. A lengthy and controversial trial ensued, during which Ferguson's lawyers —William Kunstler and Ronald Kuby—insisted that he was overcome with "black rage." Ferguson rejected that defense and eventually dismissed Kunstler and Kuby. Maintaining his plea of not guilty, Ferguson was finally convicted of murder on February 17, 1995. |

| | |
|---|---|
| July 1, 1993 | 101 California Street Office of Pettit & Martin Law Firm |
| San Francisco, CA | **Incident** |
| Shooter<br>Gian Luigi Ferri, 55 | Armed with three firearms and 40- and 50-round large capacity ammunition magazines, Ferri opened fire on the offices of the law firm Pettit & Martin on the 34th floor of a San Francisco high-rise. He fired between 75 to 100 rounds, killing eight and wounding six, before killing |
| Ammo Magazine<br>Capacity<br>50-rounds<br>40-rounds | himself. Ferri—a real estate speculator undergoing major financial trouble—had previously hired the law firm. His exact motives remain unclear, but police found a letter written by Ferri indicating frustrations with Pettit & Martin over real estate advice they had given him in 1981. |
| Shots Fired >75<br>Killed 8 (plus shooter = 9)<br>Wounded 6 | **Weapons**<br>Two INTRATEC TEC-DC9 semiautomatic pistols, Colt (unknown model) .45-caliber semiautomatic pistol, and 40-round and 50-round large capacity ammunition magazines loaded with a mix of Black Talon and standard ammunition. According to the Las Vegas Metropolitan Police Department, Ferri purchased the pistols from two stores in Las Vegas: Super Pawn and Pacific Tactical Weapons.<br><br>**Outcome**<br>Suicide. |

| | |
|---|---|
| October 16, 1991 | Luby's Cafeteria |

Killeen, TX

Shooter
George Hennard, 35

Ammo Magazine
Capacity
17-rounds
15-rounds

Shots Fired 100
Killed 23 (plus shooter =
24)
Wounded 20

Incident
Armed with two handguns and 17-round and 15-round large capacity ammunition magazines,
Hennard crashed his pickup into Luby's Cafeteria during a busy lunch hour. Stepping out of the
vehicle, he began shooting randomly, killing 23 and wounding 20. After firing approximately
100 shots over 10 minutes, Hennard shot himself in the head. His motives remain unclear, but
neighbors described him as "combative and unstable."

Weapons
GLOCK 17 9mm semiautomatic pistol, Ruger P89 semiautomatic pistol, and 17-round and
15-round large capacity ammunition magazines. Hennard legally purchased the weapons from
Mike's Gun Shop in Henderson, NV, in February and March of 1991.

Outcome
Suicide.

June 18, 1990

Jacksonville, FL

Shooter
James Edward Pough, 42

Ammo Magazine
Capacity
30-rounds

Shots Fired >14
Killed 9 (plus shooter =
10)
Wounded 4

General Motors Acceptance Corporation Office

Incident
Armed with two firearms and a 30-round large capacity ammunition magazine, Pough opened
fire in offices of General Motors. He killed nine and wounded four before taking his own life. It
is believed Pough was angered by having his 1988 Pontiac Grand Am repossessed by the
Corporation.

Weapons
Universal M1 .30-caliber semiautomatic assault rifle, unknown make and model .38-caliber
revolver, and a 30-round large capacity ammunition magazine.

Outcome
Suicide.

September 14, 1989

Louisville, KY

Shooter
Joseph Wesbecker, 47

Ammo Magazine
Capacity
30-rounds

Shots Fired >21
Killed 8 (plus shooter = 9)
Wounded 12

Standard Gravure Corporation

Incident
Armed with a duffle-bag full of firearms and 30-round large capacity ammunition magazines,
Wesbecker opened fire at the offices of his former employer, shooting and killing 8 and
wounding 12, before taking his own life. Wesbecker had been placed on permanent disability
leave due to mental illness.

Weapons
Chinese-made AK-47-type semiautomatic assault rifle, two INTRATEC MAC-11
semiautomatic assault pistols, SIG SAUER unknown model 9mm semiautomatic pistol,
unknown make and model .38-caliber revolver, and 30-round large capacity ammunition
magazines. Wesbecker legally purchased the AK-47-type assault rifle from Tilford's Gun Sales
in Louisville.

Outcome
Suicide.

| January 17, 1989 | Cleveland Elementary School |

Stockton, CA

Shooter
Patrick Purdy, 24

Ammo Magazine
Capacity
75-rounds
35-rounds

Shots Fired 106
Killed 5 (plus shooter = 6)
Wounded 30

**Incident**
Armed with two firearms and multiple 75- and 35-round large capacity magazines, Purdy first set his car on fire in the parking lot of Cleveland Elementary School. He then entered school grounds and began shooting. Over the course of the rampage, Purdy killed 5 students and wounded 30 others, including one teacher. After firing approximately 106 shots with an AK-47-type assault rifle over less than two minutes, he shot himself in the head with a pistol. Purdy's former acquaintances reported that he "developed a hate for everybody" including an intense dislike of Asian Americans. Of the five fatalities incurred during the Cleveland School Massacre, four were born in Cambodia and one in Vietnam.

**Weapons**
Chinese-made AK-47-type semiautomatic assault rifle, Taurus unknown model 9mm semiautomatic pistol, a 75-round large capacity ammunition drum magazine, a 75-round large capacity ammunition rotary magazine, and four 35-round large capacity ammunition banana magazines. Purdy legally purchased the AK-47-type rifle at Sandy Trading Post, in Sandy, OR on August 3, 1988, and the Taurus 9mm pistol at Hunter Loan and Jewelry Co. in Stockton, CA on December 28, 1988.

**Outcome**
Suicide.

---

April 23, 1987 — Palm Bay shopping center

Palm Bay, FL

Shooter
William Cruse, Jr., 59

Ammo Magazine
Capacity
30-rounds

Shots Fired unknown
Killed 6
Wounded 10

**Incident**
On April 23, 1987, William Cruse, Jr., loaded his car with a Strum, Ruger Mini-14 semiautomatic assault rifle equipped with a 30-round large capacity ammunition magazine, five 30-round large capacity ammunition magazines, 180 rounds of ammunition, a shotgun, and a pistol, and began to drive to a local shopping center. He first stopped at a neighbor's driveway, opened the car window, picked up his shotgun and opened fire upon two brothers and their father and mother, wounding one of the brothers. Cruse then continued on to the Palm Bay Center where he shot and killed three people and wounded three others with the assault rifle. He then drove across the street to the Sabal Palm Square shopping center, exited his car and again opened fire. As officers approached, Cruse reloaded his assault rifle and fired into the police car killing an officer. Another officer arrived and exited his police car, Cruse continued firing upon the officers, killing another officer. Cruse then fled into a grocery store firing upon the shoppers inside, killing one and wounding several more. He then found two women hiding in the restroom; he let one out of the store to negotiate with police and kept the other hostage. After several hours, Cruse released the hostage. Police then fired tear gas and stun grenades into the store, forcing Cruse out of the store and allowing officers to take him into custody. During the over 7 hour rampage, Cruse killed 6, including 2 police officers, and wounded 10 more. Police officers were so outgunned that a neighbor provided police an AR-15 assault rifle to help match Cruse's firepower.

**Weapons**
Strum, Ruger Mini-14 semiautomatic assault rifle equipped with a 30-round large capacity ammunition magazine, five 30-round large capacity ammunition magazines, 180 rounds of ammunition, a shotgun (unknown make and model), and a pistol (unknown make and model). Cruse ordered the assault rifle on March 21, 1987. On April 17, 1987, he purchased 100-rounds of ammunition and six 30-round large capacity ammunition magazines.

**Outcome**
Cruse was arrested at the scene. He pleaded not guilty by reason of insanity. In 2009, a jury in Polk County, FL, convicted Cruse of 6 counts of first-degree murder, 22 counts of attempted first-degree murder, 2 counts of attempted second-degree murder, 1 count of false imprisonment, and 1 count of kidnapping. In 1989, Curse was sentenced to the death penalty for

the murders of the two officers and sentenced to consecutive life sentences for the other four murders and attempted murders. While on death row, Cruse died of natural causes in 2009.

---

**July 18, 1984**

---

San Ysidro, CA

---

Shooter
James Oliver Huberty, 41

---

Ammo Magazine Capacity
25-rounds

---

Shots Fired 257
Killed 21 (plus shooter = 22)
Wounded 19

---

McDonald's Restaurant

Incident
Armed with multiple firearms and 25-round large capacity ammunition magazines, Huberty entered the McDonald's restaurant and opened fire. He shot 40 people, killing 21 and wounding 19. He expended 257 rounds over 77 minutes, before being killed by a police sniper. No motive has been established. Prior to the shooting, Huberty told his wife, "I'm going hunting humans."

Weapons
Browning P-35 9mm semiautomatic pistol, Winchester 1200 pump-action 12-gauge shotgun, Israeli Military Industries 9mm Model A Carbine (Uzi), and 25-round large capacity ammunition magazines.

Outcome
Huberty was shot and killed by police.

---

**June 29, 1984**

---

Dallas, TX

---

Shooter
Abdelkrim Belachheb, 39

---

Ammo Magazine Capacity
14-rounds

---

Shots Fired unknown
Killed 6
Wounded 1

---

Ianni's Club

Incident
On June 29, 1984, after offending his dancing partner at a Dallas night club, Abdelkrim Belachheb, a Moroccan in the U.S. illegally, left the club and returned with a Smith & Wesson 9mm semiautomatic pistol equipped with a 14-round large capacity ammunition magazine. He emptied the magazine into his dance partner, reloaded and fired into the crowd. Belachheb killed his dance partner, five others, and wounded one more.

Weapons
Smith & Wesson (unknown model) 9mm semiautomatic pistol and two 14-round large capacity ammunition magazines.

Outcome
Belachheb surrendered to police hours later. He pleaded not guilty by reason of insanity. On November 15, 1984, a jury found Belachheb guilty of the six murders. He was sentenced to six consecutive life sentences plus 20 years, and $70,000 in fines.

---

* *Disclaimer*: Information for this database has been compiled from publicly available news sources. Every effort has been made to obtain the most accurate information, however, contradictions may exist between this database and other sources. As the ATF does not require police departments to collect data related to the capacity of a firearm's ammunition magazine, this database is not an exhaustive list of mass shootings involving large capacity ammunition magazines.

335 Madison Avenue, 9th Floor, NY, NY 10017 · 212-608-4700 · info@nycrimecommission.org

©2017 Citizens Crime Commission of New York City

# Exhibit 79



**Violence Policy Center**

1730 Rhode Island Avenue, NW
Suite 1014
Washington, DC 20036

202.822.8200 voice
202.822.8205 fax
www.vpc.org web

# High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States



*Columbine shooter armed with Intratec TEC-DC9 assault pistol equipped with high-capacity ammunition magazine*

**Since 1980, there have been at least 55 mass shootings (3 or more fatalities) where the shooter used high-capacity ammunition magazines. A total of 503 people were killed in these shootings and 495 were wounded. This number is likely a significant undercount of actual incidents since there is no consistent collection or reporting of this data. Even in many high-profile shootings information on magazine capacity is not released or reported.**

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| House party<br>Mukilteo, Washington<br>July 30, 2016<br>Shooter: Allen Christopher Ivanov | 3 dead, 1 wounded | Sturm Ruger AR-15 assault rifle | **30-round magazine** |

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Baton Rouge, Louisiana<br>July 17, 2016<br>Shooter: Gavin Long | 3 law enforcement officers dead, 3 wounded | Tavor SAR assault rifle, Stag Arms M4 variant assault rifle, Springfield XD 9 mm semiautomatic pistol | **High capacity ammunition magazines** |
| Dallas, Texas<br>July 7, 2016<br>Shooter: Micah Johnson | 5 law enforcement officers dead, 9 officers and two citizens wounded | Saiga AK-74 assault rifle, Glock 19 Gen 4 and Fraser .25 semiautomatic pistols | **Multiple high-capacity ammunition magazines** |
| Pulse nightclub<br>Orlando, Florida<br>June 12, 2016<br>Shooter: Omar Mateen | 50 dead (including shooter), 53 wounded | Sig Sauer MCX assault rifle | **Multiple 30 round magazines, some taped together for faster reloading** |
| Kalamazoo Michigan<br>Multiple parking lots<br>February 20, 2016<br>Shooter: Jason Dalton | 6 dead, 2 wounded | Glock 19 semiautomatic pistol, Walther P99 9mm semiautomatic pistol | **Extended magazine** |
| Inland Regional Center<br>San Bernardino, California<br>December 2, 2015<br>Shooters: Syed Farook and Tashfeen Malik | 14 dead, 21 wounded | Smith&Wesson M&P assault rifle, DPMS A15 assault rifle | **4 30-round magazines** |
| Navy Operational Support Center and Marine Corps Reserve Center<br>Chattanooga, Tennessee<br>July 16, 2015<br>Shooter: Muhammad Youssef Abdulazeez | 6 dead (including shooter), 2 wounded | AK-variant assault rifle, Saiga assault shotgun, handgun | **multiple 30-round magazines** |
| Emanuel African Methodist Episcopal Church<br>Charleston, South Carolina<br>June 17, 2015<br>Shooter: Dylann Roof | 9 dead | Glock .45 Model 41 pistol | **13-round magazines** |

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Marysville-Pilchuck High School, Marysville, Washington October 24, 2014 Shooter: Jaylen Fryberg | 5 dead (including shooter) | Beretta .40 semiautomatic pistol | **High-capacity, number of rounds unstated** |
| Apartment complex Hialeah, Florida July 26, 2013 Shooter: Pedro Vargas | 6 dead | Glock 17 semiautomatic pistol | **17-round magazine** |
| Santa Monica, California June 7, 2013 Shooter:  John Zawahri | 6 dead, (including shooter) | AR-type assault rifle built from parts | **40 30-round magazines** |
| Sandy Hook Elementary School Newtown, Connecticut December 14, 2012 Shooter:  Adam Lanza | 28 dead, (including shooter) | Bushmaster XM15 assault rifle, Glock 10mm pistol, 9mm Sig Sauer pistol | **30-round magazines** |
| Accent Signage Systems Minneapolis, Minnesota September 27, 2012 Shooter:  Andrew Engeldinger | 7 dead (including shooter), 3 wounded | Springfield XDM semiautomatic pistol | **2 15-round magazines** |
| Sikh Temple Oak Creek, Wisconsin August 5, 2012 Shooter:  Wade Michael Page | 7 dead (including shooter), 2 wounded | Glock 9mm semiautomatic pistol | **3 19-round magazines** |
| Café Racer Seattle, Washington May 30, 2012 Shooter:  Ian Stawicki | 6 dead (including shooter) | Colt .45 semiautomatic pistol | **Extended magazine** |
| Century Aurora 16 movie theater Aurora, Colorado July 20, 2012 Shooter:  James Holmes | 12 dead, 58 wounded | Smith & Wesson M&P15 assault rifle, .40 Glock pistol, Remington model 870 12 gauge shotgun | **100-round magazine** |
| IHOP Carson City, Nevada September 6, 2011 Shooter:  Eduardo Sencion | 5 dead, (including shooter), 7 wounded | MAK-90 assault rifle (illegally converted to full-auto) | **20- and 30-round magazines** |

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Safeway parking lot<br>Tucson, Arizona<br>January 8, 2011<br>Shooter:  Jared Loughner | 6 dead, 13 wounded | Glock 19 semiautomatic pistol | **Two 31-round magazines<br>Two 15-round magazines** |
| Shreveport, Louisiana<br>August 16, 2010<br>Shooter:  Marcus Donte Reed | 3 dead | Assault weapon | **30-round magazine** |
| Hartford Distributors<br>Manchester, Connecticut<br>August 3, 2010<br>Shooter:  Omar Thornton | 9 dead (including shooter), 2 wounded | Sturm, Ruger SR9 semiautomatic pistol | **17- and 15-round magazines** |
| ABB, Inc.<br>St. Louis, Missouri<br>January 7, 2010<br>Shooter:  Timothy Hendron | 4 dead (including shooter), 5 wounded | Romarm AK-47 assault rifle, Tristar 12 gauge shotgun, Hi-Point .40 pistol | **Two "banana-style" high- capacity magazines (capacity not stated)** |
| Fort Hood<br>Fort Hood, Texas<br>November 5, 2009<br>Shooter:  Nidal Hasan | 13 dead, 34 wounded | FN Five-seveN 5.7mm semiautomatic pistol | **30- and 20-round magazines** |
| LA Fitness Center<br>Collier, Pennsylvania<br>August 4, 2009<br>Shooter:  George Sodini | 4 dead (including shooter), 9 wounded | Two 9mm semiautomatic pistols, .45 pistol, .32 pistol | **30-round magazines** |
| American Civic Association<br>Binghamton, New York<br>April 3, 2009<br>Shooter:  Jiverly Wong | 14 dead (including shooter), 4 wounded | 9mm Beretta semiautomatic pistol, .45 handgun | **30-round magazine** |
| Oakland, California<br>March 21, 2009<br>Shooter: Lovelle Mixon | 4 dead | SKS assault rifle | **Large capacity magazine** |
| Alabama, multiple locations<br>March 10, 2009<br>Shooter:  Michael McLendon | 11 dead (including shooter) | Two assault rifles | **High-capacity magazines taped together** |
| Walt Lou Trailer Park<br>Stafford, Virginia<br>May 5, 2008<br>Shooter:  Aaron Poseidon Jackson | 4 dead (including shooter) | WASR-10 assault rifle, Smith & Wesson .38 revolver | **30-round magazines** |

4

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Northern Illinois University DeKalb, Illinois February 14, 2008 Shooter:  Steven Phillip Kazmierczak | 6 dead (including shooter), 21 wounded | Glock19 9mm pistol, Hi-Point 380, Remington12 gauge Sportsman 48 shotgun | **33- and 15-round magazines** |
| Westroads Mall Omaha, Nebraska December 5, 2007 Shooter:  Robert Hawkins | 9 dead (including shooter), 5 wounded | WASR-10 assault rifle | **Two 30-round magazines taped together** |
| Virginia Tech Blacksburg, Virginia April 16, 2007 Shooter:  Seung-Hui Cho | 33 dead (including shooter), 17 wounded | Glock 19 semiautomatic pistol, Walther P22 pistol | **15-round magazines** |
| Mail Processing Plant Goleta, California January 30, 2006 Shooter: Jennifer San Marco | 7 dead | Smith & Wesson 9mm model 915 semiautomatic pistol | **15-round magazine** |
| Living Church of God Brookfield, Wisconsin March 13, 2005 Shooter: Terry Ratzmann | 8 dead (including shooter) | Beretta 9mm semiautomatic pistol | **2 13-round magazines** |
| Hunting Camp Birchwood, Wisconsin November 21, 2004 Shooter:  Chai Vang | 6 dead, 3 wounded | SKS assault rifle | **20-round magazine** |
| Edgewater Technology Inc. Wakefield, Massachusetts December 26, 2000 Shooter:  Michael McDermott | 7 dead | AK-47 assault rifle, 12 gauge pump-action shotgun | **60-round, large-capacity feeding device** |
| Xerox Honolulu, Hawaii November 2, 1999 Shooter:  Byran Uyesugi | 7 dead | Glock 17 9mm semiautomatic pistol | **Three 15-round magazines** |
| Wedgewood Baptist Church Fort Worth, Texas September 15, 1999 Shooter:  Larry Gene Ashbrook | 8 dead (including shooter), 7 wounded | Sturm, Ruger P85 9mm semiautomatic pistol, .380 pistol | **Three 15-round magazines** |

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Columbine High School Littleton, Colorado April 20,1999 Shooters:  Eric Harris and Dylan Klebold | 15 dead (including shooters), 23 wounded | Intratec TEC-DC9 assault pistol, Hi-Point 9mm Carbine, Savage 67H pump-action shotgun, Savage 311-D 12-gauge shotgun | **High-capacity magazines (capacity unstated)** |
| Thurston High School Springfield, Oregon May 21,1998 Shooter:  Kip Kinkel | 4 dead, 22 wounded | 9mm Glock semiautomatic pistol, .22 Sturm Ruger rifle, .22 Sturm Ruger pistol | **50-round magazine** |
| Westside Middle School Jonesboro, Arkansas March 24, 1998 Shooters:  Andrew Golden and Mitchell Johnson | 5 dead, 10 wounded | M-1 rifle, Remington .30-06 rifle, various handguns | **15-round magazine** |
| Connecticut State Lottery Headquarters Newington, Connecticut March 6, 1998 Shooter:  Matthew Beck | 5 dead (including shooter) | Glock 9mm semiautomatic pistol | **19-round magazine** |
| Caltrans Maintenance Yard Orange, California December 18, 1997 Shooter:  Arturo Reyes Torres | 5 dead (including shooter), 2 wounded | AK-47 assault rifle | **Five 30-round magazines** |
| Piper Technical Center Los Angeles, California July, 19, 1995 Shooter: Willie Woods | 4 dead | Glock semiautomatic pistol | **19-round magazine** |
| DC Police Headquarters Washington, DC November 22, 1994 Shooter:  Bennie Lee Lawson | 4 dead (including shooter), 1 wounded | Cobray —11 assault pistol | **Extended magazine** |

6

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Fairchild Air Force Base hospital<br>Spokane, Washington<br>June 20, 1994<br>Shooter:  Dean Mellberg | 5 dead (including shooter), 23 wounded | MAK-90 assault rifle | **75-round drum magazine** |
| Long Island Railroad<br>Long Island, New York<br>December 7, 1993<br>Shooter:  Colin Ferguson | 6 dead, 19 wounded | Sturm, Ruger P-89 9mm semiautomatic pistol | **Four 15-round magazines** |
| Pettit & Martin Law Offices<br>San Francisco, California<br>July 1, 1993<br>Shooter:  Gian Luigi Ferri | 9 dead (including shooter), 6 wounded | Two Intratec TEC-DC9 assault pistols, .45 pistol | **40- to 50-round magazines** |
| Luby's Cafeteria<br>Killeen, Texas<br>October 16, 1991<br>Shooter:  George Hennard | 24 dead (including shooter), 20 wounded | Sturm, Ruger P-89 9mm semiautomatic pistol, Glock 9mm semiautomatic pistol | **17- and 15-round magazines** |
| General Motors Acceptance Corp.<br>Jacksonville, Florida<br>June 18, 1990<br>Shooter:  James Pough | 10 dead (including shooter), 4 wounded | M-1 rifle, .38 revolver | **30-round magazines** |
| Standard Gravure Corporation<br>Louisville, Kentucky<br>September 14, 1989<br>Shooter:  Joseph Wesbecker | 9 dead (including shooter), 12 wounded | AK-47 assault rifle, 2 MAC-11 assault pistols,.38 revolver, Sig Sauer 9mm pistol | **30-round magazines** |
| Cleveland Elementary School<br>Stockton, California<br>January 17, 1989<br>Shooter:  Patrick Purdy | 6 dead (including shooter), 30 wounded | AK-47 assault rifle, Taurus 9mm pistol, unidentified pistol | **75-round drum magazine** |
| Palm Bay shopping center<br>Palm Bay, Florida<br>April 23, 1987<br>Shooter:  William Cruse | 6 dead (including 2 police officers) | Sturm, Ruger Mini-14 assault rifle | **Five 30-round magazines** |
| McDonald's<br>San Ysidro, California<br>July 18, 1984<br>Shooter:  James Huberty | 22 dead (including shooter), 19 wounded | Uzi Carbine, Browning 9mm pistol, Winchester 1200 pump-action 12-gauge shotgun | **25-round magazine** |

7

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Ianni's Nightclub<br>Dallas, Texas<br>June 29, 1984<br>Shooter: Abdelkrim Belachheb | 6 dead, 1 wounded | Smith & Wesson 9mm semiautomatic pistol | **Two 14-round magazines** |
| Pennsylvania, multiple locations<br>September 25, 1982<br>Shooter: George Emil Banks | 13 dead, 1 wounded | AR-15 semiautomatic assault rifle | **30-round magazines** |
| Oregon Museum Tavern<br>Salem, Oregon<br>May 7, 1981<br>Shooter: Lawrence Moore | 4 dead, 19 wounded | Browning 9mm semiautomatic pistol | **Two 14-round magazine**s |

8

# Exhibit 80

AMENDED IN COMMITTEE
10/10/13

FILE NO.  130585                    ORDINANCE NO.   249-13

[Police Code - Large Capacity Magazines; Sales of Firearms and Ammunition; Reporting Lost or Stolen Firearms; Shooting Ranges]

1

2  **Ordinance amending the Police Code to ban the possession of large capacity**

3  **magazines for firearm ammunition; require that dealers advise persons purchasing a**

4  **firearm of local firearms laws; establish a rebuttable presumption that the owner who**

5  **has not reported the theft or loss of a firearm as required by law remains in possession**

6  **of the firearm; <u>modify certain requirements for ammunition sales</u> require local dealers**

7  **to report all ammunition sales to the Chief of Police; and, prohibit the operator of a**

8  **shooting range from allowing minors to enter the premises.**

9      NOTE:    **Unchanged Code text and uncodified text** are in plain Arial font.
           **Additions to Codes** are in *single-underline italics Times New Roman font*.
10         **Deletions to Codes** are in *strikethrough italics Times New Roman font*.
           **Board amendment additions** are in <u>double-underlined Arial font</u>.
11         **Board amendment deletions** are in strikethrough Arial font.
           Asterisks (*  *  *  *) indicate the omission of unchanged Code
12         subsections or parts of tables.Do NOT delete this NOTE: area.

13

14      Be it ordained by the People of the City and County of San Francisco:

15

16      Section 1.  The San Francisco Police Code is hereby amended by adding Section <u>619</u>

17  618, to read as follows:

18  <u>*SEC. 619 618.  PROHIBITION AGAINST POSSESSION OF LARGE CAPACITY MAGAZINES*</u>

19      *(a)  Findings.*

20          *(1)  In 2007, 3,231 people died from firearm-related injuries in California, and 4,491*

21  *other people were treated for non-fatal gunshot wounds.*

22          *(2)  The ability of an automatic or semiautomatic firearm to fire multiple bullets without*

23  *reloading is directly related to the capacity of the firearm's feeding device or "magazine."  Inside the*

24

25

Supervisors Cohen, Chiu, Campos, Yee, Mar, Breed
**BOARD OF SUPERVISORS**                                      Page 1
                                                            10/10/2013

1    *magazine, a spring forces the cartridges into position to be fed into the chamber by operation of the*

2    *firearm's action.*

3            *(3)  Magazines with a capacity of more than 10 rounds of ammunition are generally*

4    *considered to be "large capacity" magazines, although the statutory definitions vary.  In some cases,*

5    *large capacity magazines can hold up to 100 rounds of ammunition.  Other types of firearms, in*

6    *contrast, are generally capable of holding far less ammunition; for example, revolvers typically hold*

7    *six rounds of ammunition in a rotating cylinder.*

8            *(4)  Although detachable large capacity magazines are typically associated with*

9    *machine guns or semiautomatic assault weapons, such devices are available for any semiautomatic*

10   *firearm that accepts a detachable magazine, including semiautomatic handguns.*

11           *(5)  The ability of large capacity magazines to hold numerous rounds of ammunition*

12   *significantly increases the lethality of the automatic and semiautomatic firearms using them.*

13           *(6)  Large capacity magazines were used in a number of recent high-profile shootings,*

14   *including:*

15           *The shooting on the campus of Virginia Tech on April 16, 2007, where 32 people were*

16   *killed and many others wounded,*

17           *The shooting in a gym in Pittsburgh on August 4, 2009, where three people were killed*

18   *and nine others injured,*

19           *The shooting on November 5, 2009 at Fort Hood, Texas, where 13 people were killed*

20   *and 34 more were wounded,*

21           *The shooting on January 8, 2011, at Tucson, Arizona, where 6 people were killed and 13*

22   *people were injured, including a member of the United States House of Representatives, and*

23           *The shootings on December 14, 2012, at Newtown, Connecticut, where 27 people (not*

24   *including the shooter) were killed.*

25

1        *(7) Large capacity magazines have also been used against San Francisco police*

2   *officers, including a recent incident at India Basin Shoreline Park, where undercover police officers*

3   *were targeted with semiautomatic pistols containing 30-round magazines. Prohibiting large capacity*

4   *magazines serves police safety by requiring perpetrators to pause to reload their firearms more*

5   *frequently, giving police officers greater opportunity to apprehend them.*

6        *(8) Large capacity magazine bans reduce the capacity, and thus the potential lethality,*

7   *of any firearm that can accept a large capacity magazine.*

8        *(9) Large capacity magazines are not necessary for individuals to vindicate their right*

9   *to self-defense. Only in an extraordinarily rare circumstance would a person using a firearm in self-*

10  *defense ever be required to use a large capacity magazine to defend himself or herself effectively. This*

11  *is particularly true in an urban center like San Francisco, where law enforcement can and does*

12  *respond quickly to threats and incidents. Conversely, the dangers of large capacity magazines are*

13  *heightened in dense urban areas like San Francisco.*

14       *(10) In 1994, in recognition of the dangers posed by these devices, Congress adopted a*

15  *law prohibiting the transfer and possession of large capacity magazines as part of the federal assault*

16  *weapon ban. That law was filled with loopholes, however.*

17       *(11) The federal law was enacted with a sunset clause, providing for its expiration after*

18  *ten years. Despite overwhelming public support for the law, Congress allowed the federal ban to*

19  *expire on September 13, 2004.*

20       *(12) Research commissioned by the U.S. Department of Justice to analyze the effect of*

21  *the 1994 federal ban on assault weapons and large capacity magazines found that attacks with*

22  *semiautomatics including assault weapons and other semiautomatics equipped with large capacity*

23  *magazines result in more shots fired, more persons hit, and more wounds inflicted per victim than do*

24  *attacks with other firearms.*

25

1       *(13)  Since January 1, 2000, California Penal Code §§ 32310 et seq., have, with limited*

2 *exceptions, prohibited the manufacture, importation into the state, keeping for sale, offering or*

3 *exposing for sale, giving, or lending of large capacity magazines.  California law does not, however,*

4 *prohibit the possession of these magazines, and this gap in the law threatens public safety.*

5       *(b)  **Definition.**  "Large capacity magazine" means any detachable ammunition feeding device*

6 *with the capacity to accept more than 10 rounds, but shall not be construed to include any of the*

7 *following:*

8       *(1)  A feeding device that has been permanently altered so that it cannot accommodate*

9 *more than 10 rounds;*

10       *(2)  A .22 caliber tube ammunition feeding device; or*

11       *(3)  A tubular magazine that is contained in a lever-action firearm.*

12       *(c)  **Prohibition on Possession of Large Capacity Magazines.***

13       *(1)  No person, corporation, or other entity in the City may possess a large capacity*

14 *magazine, whether assembled or disassembled.*

15       *(2)  Any person who, prior to the effective date of this chapter, was legally in possession*

16 *of a large capacity magazine shall have 90 days from such effective date to do any of the following*

17 *without being subject to prosecution:*

18       *(A)  Remove the large capacity magazine from the City;*

19       *(B)  Surrender the large capacity magazine to the Police Department for*

20 *destruction; or*

21       *(C)  Sell or transfer the large capacity magazine lawfully in accordance with*

22 *Penal Code § 12020.*

23       *(d)  **Exceptions.**  Subsection (c) shall not apply to the following:*

24

25

1        *(1)  Any government officer, agent, or employee, member of the armed forces of the*

2  *United States, or peace officer, to the extent that such person is otherwise authorized to possess a large*

3  *capacity magazine in connection with his or her official duties;*

4        *(2)  A person licensed pursuant to Penal Code §§ 26700 to 26915, inclusive;*

5        *(3)  A gunsmith for the purposes of maintenance, repair or modification of the large*

6  *capacity magazine;*

7        *(4)  Any entity that operates an armored vehicle business pursuant to the laws of the*

8  *state, and an authorized employee of such entity, while in the course and scope of his or her*

9  *employment for purposes that pertain to the entity's armored vehicle business;*

10        *(5)  Any person, corporation or other entity that manufactures the large capacity*

11  *magazine for a person mentioned in subsection (a) or for export pursuant to applicable federal*

12  *regulations;*

13        *(6)  Any person using the large capacity magazine solely as a prop for a motion picture,*

14  *television, or video production, or entertainment event;*

15        *(7)  Any holder of a special weapons permit issued pursuant to Penal Code § 33300,*

16  *32650, 32700, 31000, or 18900;*

17        *(8)  Any person issued a permit pursuant to Penal Code § 32315 by the California*

18  *Department of Justice upon a showing of good cause for the possession, transportation, or sale of large*

19  *capacity magazines between a person licensed pursuant to Penal Code §§ 26700 to 26915 and an out-*

20  *of-state client, when those activities are in accordance with the terms and conditions of that permit;*

21        *(9)  Any federal, state or local historical society, museum, or institutional collection*

22  *which is open to the public, provided that the large capacity magazine is properly housed, secured from*

23  *unauthorized handling, and unloaded;*

24        *(10)  Any person who finds the large capacity magazine, if the person is not prohibited*

25  *from possessing firearms or ammunition pursuant to federal or state law, and the person possesses the*

1   *large capacity magazine no longer than is necessary to deliver or transport the same to a law*

2   *enforcement agency for that agency's disposition according to law;*

3   *(11) A forensic laboratory or any authorized agent or employee thereof in the course*

4   *and scope of his or her authorized activities;*

5   *(12) Any person in the business of selling or transferring large capacity magazines in*

6   *accordance with Penal Code § 12020, who is in possession of a large capacity magazine solely for the*

7   *purpose of doing so; or*

8   *(13) Any person lawfully in possession of a firearm that the person obtained prior to*

9   *January 1, 2000 if no magazine that holds 10 or less rounds of ammunition is compatible with that*

10   *firearm and the person possesses the large capacity magazine solely for use with that firearm.*

11   *(e) **Penalty.** Any person violating this chapter is guilty of a misdemeanor.*

12   *(f) **Severability.** If any subsection, sentence, clause, phrase, or word of this Section be for any*

13   *reason declared unconstitutional or invalid or ineffective by any court of competent jurisdiction, such*

14   *decision shall not affect the validity or the effectiveness of the remaining portions of this Section or any*

15   *part thereof. The Board of Supervisors hereby declares that it would have adopted this Section*

16   *notwithstanding the unconstitutionality, invalidity, or ineffectiveness of any one or more of its*

17   *subsections, sentences, clauses, phrases, or words.*

18   *(g) **No duplication of state law.** In the event that the State of California enacts legislation*

19   *prohibiting possession of large capacity magazines, this Section 618 shall have no force or effect to the*

20   *extent that it duplicates any such state law.*

21

22   Section 2.  The San Francisco Police Code is hereby amended by amending

23   Section 613.10, to read as follows:

24   **SEC. 613.10.  LICENSE—CONDITIONS.**

25   * * * *

1    *(n)  At or prior to the time of delivering a firearm, licensees shall provide the person buying,*

2    *leasing, or receiving the loan of the firearm with a copy of a notice, to be prepared by the Chief of*

3    *Police, advising the reader of local firearms laws, including safe gun storage requirements and the*

4    *requirement to report a lost or stolen firearm.  The notice may also include summary information on*

5    *relevant State firearms laws, including the requirement that the sale, loan or other transfer of a firearm*

6    *to a non-licensed person be completed through a licensed firearms dealer.*

7

8    Section 3.  The San Francisco Police Code is hereby amended by amending

9    Section 616, to read as follows:

10   **SEC. 616.  REPORTING THE LOSS OR THEFT OF FIREARMS.**

11   (a)  Any person that owns or is otherwise in possession of a firearm shall report the

12   theft or loss of such firearm to the San Francisco Police Department within 48 hours of

13   becoming aware of the theft or loss whenever

14   (1)  the owner resides in San Francisco, or

15   (2)  the theft or loss of the firearm occurs in San Francisco.

16   (b)  The failure of an owner or person in possession of a firearm to report the theft or

17   loss of the firearms within 48 hours of when the owner or person in possession becomes

18   aware or should have become aware of the theft or loss shall be punishable in accordance

19   with Section 613.19.

20   *(c)  The failure of an owner or person in possession of a firearm to report the theft or loss of the*

21   *firearms in a timely manner shall create a rebuttable presumption that the owner or person remains in*

22   *possession of the firearm.*

23

24   /  /  /

25   /  /  /

1      Section 4.  The San Francisco Police Code is hereby amended by amending
2    Section 615, to read as follows:

3    **SEC. 615. RECORDS OF AMMUNITION SALES.**

4         (a) **Definitions.**

5         (1) "Firearm ammunition," as used in this Section, shall include any ammunition
6    for use in any pistol or revolver, or semiautomatic rifle or assault weapon, but shall not include
7    ammunition for shotguns that contains shot that is No. 4 or smaller.

8         (2) "Semiautomatic rifle," as used in this Section, shall mean any repeating rifle
9    which utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and
10   chamber the next round, and which requires a separate pull of the trigger to fire each
11   cartridge.

12        (3) "Assault weapon," as used in this Section, shall mean any of the weapons
13   designated in California Penal Code Section 12276 or 12276.1.

14        (4) "Vendor," as used in this Section, shall mean any person located in the City
15   and County of San Francisco who is engaged in the sale of firearm ammunition, including any
16   retail firearms dealer.

17        (5) "Remote Vendor," as used in this Section, shall mean any person engaged
18   in the sale of firearm ammunition, including any retail firearms dealer, who is located outside
19   the City and County of San Francisco but delivers or causes to be delivered firearm
20   ammunition to an address within the City and County of San Francisco.

21       (b) No Vendor shall sell or otherwise transfer ownership of any firearm ammunition
22   without at the time of purchase recording the following information on a form to be prescribed
23   by the Chief of Police:

24        (1) the name of the Vendor (including the name of the specific individual)
25   transferring ownership to the transferee;

1              (2)  the place where the transfer occurred;

2              (3)  the date and time of the transfer;

3              (4)  the name, address and date of birth of the transferee;

4              (5)  the transferee's driver's license number, or other identification number, and

5    the state in which it was issued;

6              (6)  the brand, type and amount of ammunition transferred; and

7              (7)  the transferee's signature *and thumbprint*.

8        ~~Within 24 hours of the commencement of the transaction, regardless of when the~~

9    ~~firearm ammunition is delivered, the Vendor shall report the transaction to the Chief of Police~~

10   ~~by electronic mail at _____ or by such other means specified by the Chief of Police.~~

11   ~~The report shall contain the same information required above.~~

12       (c)  *~~(1)  The records required by this Section shall be maintained on the premises of the~~*

13   *~~vendor for a period of not less than two years from the date of the recorded transfer.  Said records shall~~*

14   *~~be subject to inspection at any time during normal business hours.~~*

15           *~~(2)  Any vendor or remote vendor~~* *Any* Vendor or *Remote Vendor* who sells or

16   otherwise transfers ownership of five hundred (500) or more rounds of any firearm

17   ammunition to a transferee in a single transaction, where the transaction occurs within the

18   City and County of San Francisco or the firearm ammunition is ordered for delivery to an

19   address within the City and County of San Francisco, shall be subject to the reporting

20   requirement of this subsection *(c)* *~~(c)(2)~~*.  Within 24 hours of the commencement of the

21   transaction, regardless of when the firearm ammunition is delivered, the Vendor or ~~Vendor or~~

22   ~~Remote Vendor~~ shall report the transaction to the Chief of Police by electronic mail ~~at~~

23   _____ or by such other means specified by the Chief of Police.  The report shall

24   contain the same information required under subsection (b).  In determining the number of

25   rounds sold or otherwise transferred for purposes of complying with this subsection *(c)* *~~(c)(2)~~*,

1   the Vendor or *Remote Vendor* ~~vendor or remote vendor~~ shall include any combination of types,
2   brands or calibers sold or transferred to the transferee.

3       (d)  No Vendor shall knowingly make a false entry in, or fail to make a required entry in,
4   ~~or fail to maintain in the required manner~~ records prepared in accordance with *subsection (b)*
5   ~~subsections (b) and (c)(1). No vendor shall refuse to permit a Police Department employee to examine~~
6   ~~any record prepared in accordance with this Section during any inspection conducted pursuant to this~~
7   ~~Section.~~ No Vendor or Remote Vendor shall fail to submit the report required under
8   subsection (c) ~~subsections (b) or (c)~~ *in a timely manner* ~~subsection (c)(2)~~, or knowingly include
9   false information in such report.  *A Vendor must maintain the records required under subsection (b)*
10  *on the premises for a period of not less than two years from the date of the recorded transfer.  Said*
11  *records shall be subject to inspection by the Police Department at any time during normal business*
12  *hours.*

13      (e)  **Penalties.**

14      (1)  **First Conviction.**  Any person violating any provision of this Section shall
15  be guilty of an infraction.  Upon conviction of the infraction, the violator shall be punished by a
16  fine of not less than $50 nor more than $100.

17      (2)  **Subsequent Convictions.**  In any accusatory pleading charging a violation
18  of this Section, if the defendant has been previously convicted of a violation of this Section,
19  each such previous violation and conviction shall be charged in the accusatory pleading.  Any
20  person violating any provision of this Section a second time within a 90-day period shall be
21  guilty of a misdemeanor and shall be punished by a fine of not less than $300 and not more
22  than $400 for each provision violated, or by imprisonment in the County Jail for a period of not
23  more than six months, or by both such fine and imprisonment.  Any person violating any
24  provision of this Section, a third time, and each subsequent time, within a 30-day period shall
25  be guilty of a misdemeanor and shall be punished by a fine of not less than $400 and not

1 | more than $500 for each provision violated, or by imprisonment in the County Jail for a period
2 | of not more than six months, or by both such fine and imprisonment.

3 | (f) **Severability.** If any subsection, sentence, clause, phrase, or word of this Section
4 | be for any reason declared unconstitutional or invalid or ineffective by any court of competent
5 | jurisdiction, such decision shall not affect the validity or the effectiveness of the remaining
6 | portions of this Section or any part thereof.  The Board of Supervisors hereby declares that it
7 | would have adopted this Section notwithstanding the unconstitutionality, invalidity, or
8 | ineffectiveness of any one or more of its subsections, sentences, clauses, phrases, or words.
9 |

10 | Section 5.  The San Francisco Police Code is hereby amended by amending
11 | Section 1040, to read as follows:

12 | **SEC. 1040.  FIREARMS REGULATED***; MINORS PROHIBITED*.

13 | *(a)* It shall be unlawful for any person, firm, corporation, club or association,
14 | maintaining or conducting any shooting gallery or range to use or permit to be used or
15 | discharged therein any firearms of greater than 22 caliber, unless the cartridges used in such
16 | firearms be loaded with reduced charges.

17 | *(b) It shall be unlawful for any person, firm, corporation, club or association, maintaining or*
18 | *conducting any shooting gallery or range to permit any person under the age of 18 to enter the*
19 | *premises that are the subject of the permit unless accompanied by a parent or guardian.*
20 |

21 | Section 6.  Effective Date.  This ordinance shall become effective 30 days after
22 | enactment.  Enactment occurs when the Mayor signs the ordinance, the Mayor returns the
23 | ordinance unsigned or does not sign the ordinance within ten days of receiving it, or the Board
24 | of Supervisors overrides the Mayor's veto of the ordinance.
25 |

Supervisors Cohen, Chiu, Campos, Yee, Mar, Breed
**BOARD OF SUPERVISORS**

1       Section 7. Scope of Ordinance. In enacting this ordinance, the Board of Supervisors

2 intends to amend only those words, phrases, paragraphs, subsections, sections, articles,

3 numbers, punctuation marks, charts, diagrams, or any other constituent parts of the Municipal

4 Code that are explicitly shown in this ordinance as additions, deletions, Board amendment

5 additions, and Board amendment deletions in accordance with the "Note" that appears under

6 the official title of the ordinance.

7

8

9

10 APPROVED AS TO FORM:
DENNIS J. HERRERA, City Attorney

11

12 By:

13         THOMAS J. OWEN
Deputy City Attorney

14

15

16 n:\legana\as2013\1300396\00878805.doc

17

18

19

20

21

22

23

24

25

Supervisors Cohen, Chiu
**BOARD OF SUPERVISORS**



### City and County of San Francisco
### Tails
### Ordinance

City Hall
1 Dr. Carlton B. Goodlett Place
San Francisco, CA 94102-4689

**File Number:**   130585          **Date Passed:**   October 29, 2013

Ordinance amending the Police Code to ban the possession of large capacity magazines for firearm ammunition; require that dealers advise persons purchasing a firearm of local firearms laws; establish a rebuttable presumption that the owner who has not reported the theft or loss of a firearm as required by law remains in possession of the firearm; modify certain requirements for ammunition sales; and prohibit the operator of a shooting range from allowing minors to enter the premises.

October 10, 2013 Neighborhood Services and Safety Committee - AMENDED, AN AMENDMENT OF THE WHOLE BEARING NEW TITLE

October 10, 2013 Neighborhood Services and Safety Committee - RECOMMENDED AS AMENDED

October 22, 2013 Board of Supervisors - PASSED ON FIRST READING
Ayes: 9 - Avalos, Breed, Campos, Chiu, Cohen, Farrell, Mar, Tang and Yee
Excused: 2 - Kim and Wiener

October 29, 2013 Board of Supervisors - FINALLY PASSED
Ayes: 11 - Avalos, Breed, Campos, Chiu, Cohen, Farrell, Kim, Mar, Tang, Wiener and Yee

File No. 130585

**I hereby certify that the foregoing Ordinance was FINALLY PASSED on 10/29/2013 by the Board of Supervisors of the City and County of San Francisco.**

**Angela Calvillo**
**Clerk of the Board**

Mayor

11/8/13

Date Approved

# Exhibit 81

(3) Each dealer shall be provided instructions regarding the procedure for completion of the form and routing of the form.  Dealers shall comply with these instructions which shall include the information set forth in this subdivision.

(4) One firearm transaction shall be reported on each record of sale document.  For purposes of this subdivision, a "transaction" means a single sale, loan, or transfer of any number of firearms that are not pistols, revolvers, or other firearms capable of being concealed upon the person.

(e) The dealer or salesperson making a sale shall ensure that all required information has been obtained from the purchaser.  The dealer and all salespersons shall be informed that incomplete information will delay sales.

(f) As used in this section, the following definitions shall control:

(1) "Purchaser" means the purchaser or transferee of a firearm or the person being loaned a firearm.

(2) "Purchase" means the purchase, loan, or transfer of a firearm.

(3) "Sale" means the sale, loan, or transfer of a firearm.

SEC. 5.   No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

———————

## WEAPONS—LARGE CAPACITY MAGAZINES—SENTENCES

### CHAPTER 129

#### S.B. No. 23

**AN ACT to amend Sections 245, 12001, 12020, 12022, 12022.5, 12280, 12285, and 12289 of, and to add Sections 12079 and 12276.1 to, the Penal Code, relating to firearms.**

[Filed with Secretary of State July 19, 1999.]

LEGISLATIVE COUNSEL'S DIGEST

SB 23, Perata.   Firearms: assault weapons.

(1) Existing law makes it a misdemeanor for any person to manufacture, cause to be manufactured, import into this state, keep or offer for sale, give, lend, or possess specified weapons and explosives.

This bill would make it a misdemeanor or a felony, beginning January 1, 2000, for any person, except as provided, to manufacture, import into the state, keep or offer for sale, give, or lend any large-capacity magazine.  A large-capacity magazine would be defined to mean any ammunition feeding device with the capacity to accept more than 10 rounds.  By expanding the definition of, and increasing the penalty for, a crime, this bill imposes a state-mandated local program.

(2) Existing law requires imposition of a longer term of imprisonment on any person convicted of assault with a deadly weapon, and for enhanced terms of imprisonment for a person convicted of a felony, if that person was either armed with, or personally used, an assault weapon or machinegun, as defined, in the commission of, or attempted commission of that felony.

Existing law makes it a crime to engage in specified activities regarding assault weapons and regulates the lawful possession of those weapons.  Existing law defines the term "assault weapon" by, among other things, designating a list of specified semiautomatic firearms.

**Additions or changes indicated by <u>underline</u>; deletions by asterisks * * *      1535**

This bill would further define the term "assault weapon" by providing descriptive definitions concerning the capacity and function of the weapon. These expanded definitions would specifically apply to the above-mentioned increased term and enhancement provisions and to related provisions. By expanding the definition of a crime, this bill would impose a state-mandated local program.

(3) Existing law makes it a crime, punishable either as a felony or a misdemeanor, for any person to possess any assault weapon, as defined. However, if a person charged with a first-time violation of that offense presents proof that he or she lawfully possessed the assault weapon within a specified period, and has since registered the weapon or relinquished it, the offense is punishable as an infraction, if the person has also complied with specified conditions. Existing law also provides a period of forgiveness to persons in possession of an assault weapon during a specified period under specified conditions. In addition, existing law exempts specified law enforcement agencies from the prohibition against possession, purchase, or sale of assault weapons.

This bill would make it an infraction, punishable by a fine up to $500, for a first-time violation of the above-mentioned offense, if the offender was found in possession of no more than 2 firearms in compliance with specified provisions and proves that he or she lawfully possessed the assault weapon prior to the date it was defined as an assault weapon under the proposed provision set forth in (2). This bill would also add an additional period of forgiveness for persons in possession of assault weapons, as defined, pursuant to the proposed provision set forth in (2), to extend to the one-year period after the weapon was defined as an assault weapon under that proposed provision. By defining a new crime, this bill would impose a state-mandated local program. The bill would also exempt certain additional off-duty and certain retired law enforcement personnel from the prohibition against possession, purchase, or sale of assault weapons.

(4) Existing law requires any person who lawfully possesses an assault weapon, as defined, prior to specified periods, to register that weapon with the Department of Justice, within a specified period of time.

This bill would require any person who lawfully possessed an assault weapon prior to the date it was defined as an assault weapon pursuant to the proposed provision mentioned in (2) above, to register the weapon within one year of the effective date of that provision.

(5) Existing law requires the Department of Justice to conduct a public education and notification program regarding the registration of assault weapons, the limited forgiveness period of the registration requirement and the consequences of nonregistration.

This bill would require that the public education and notification program include the new definition of assault weapons discussed in paragraph (2) above.

(6) The bill would state legislative intent.

(7) The bill would provide that its provisions are severable.

(8) This bill would incorporate additional changes in Section 12020 of the Penal Code proposed by SB 359, to be operative if SB 359 and this bill are both enacted and become effective on or before January 1, 2000, and this bill is enacted last.

(9) The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1.   Section 245 of the Penal Code is amended to read:

245.   (a)(1) Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment.

**Ch. 129, § 2**

(2) Any person who commits an assault upon the person of another with a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not less than six months and not exceeding one year, or by both a fine not exceeding ten thousand dollars ($10,000) and imprisonment.

(3) Any person who commits an assault upon the person of another with a machinegun, as defined in Section 12200, or an assault weapon, as defined in Section 12276 or 12276.1, shall be punished by imprisonment in the state prison for 4, 8, or 12 years.

(b) Any person who commits an assault upon the person of another with a semiautomatic firearm shall be punished by imprisonment in the state prison for three, six, or nine years.

(c) Any person who commits an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for three, four, or five years.

(d)(1) Any person who commits an assault with a firearm upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for four, six, or eight years.

(2) Any person who commits an assault upon the person of a peace officer or firefighter with a semiautomatic firearm and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for five, seven, or nine years.

(3) Any person who commits an assault with a machinegun, as defined in Section 12200, or an assault weapon, as defined in Section 12276 or 12276.1, upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for 6, 9, or 12 years.

(e) When a person is convicted of a violation of this section in a case involving use of a deadly weapon or instrument or firearm, and the weapon or instrument or firearm is owned by that person, the court shall order that the weapon or instrument or firearm be deemed a nuisance, and it shall be confiscated and disposed of in the manner provided by Section 12028.

(f) As used in this section, "peace officer" refers to any person designated as a peace officer in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2.

SEC. 2.   Section 12001 of the Penal Code is amended to read:

12001.   (a) As used in this title, the terms "pistol," "revolver," and "firearm capable of being concealed upon the person" shall apply to and include any device designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or other form of combustion, and that has a barrel less than 16 inches in length.  These terms also include any device that has a barrel 16 inches or more in length which is designed to be interchanged with a barrel less than 16 inches in length.

(b) As used in this title, "firearm" means any device, designed to be used as a weapon, from which is expelled through a barrel a projectile by the force of any explosion or other form of combustion.

(c) As used in Sections 12021, 12021.1, 12070, 12071, 12072, 12073, 12078, and 12101 of this code, and Sections 8100, 8101, and 8103 of the Welfare and Institutions Code, the term "firearm" includes the frame or receiver of the weapon.

(d) For the purposes of Sections 12025 and 12031, the term "firearm" also shall include any rocket, rocket propelled projectile launcher, or similar device containing any explosive or incendiary material whether or not the device is designed for emergency or distress signaling purposes.

(e) For purposes of Sections 12070, 12071, and paragraph (7) of subdivision (a), and subdivisions (b), (c), (d), and (f) of Section 12072, the term "firearm" does not include an

unloaded firearm that is defined as an "antique firearm" in Section 921(a)(16) of Title 18 of the United States Code.

(f) Nothing shall prevent a device defined as a "pistol," "revolver," or "firearm capable of being concealed upon the person" from also being found to be a short-barreled shotgun or a short-barreled rifle, as defined in Section 12020.

(g) For purposes of Sections 12551 and 12552, the term "BB device" means any instrument that expels a metallic projectile, such as a BB or a pellet, through the force of air pressure, $CO_2$ pressure, or spring action, or any spot marker gun.

(h) As used in this title, "wholesaler" means any person who is licensed as a dealer pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto who sells, transfers, or assigns firearms, or parts of firearms, to persons who are licensed as manufacturers, importers, or gunsmiths pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code, or persons licensed pursuant to Section 12071, and includes persons who receive finished parts of firearms and assemble them into completed or partially completed firearms in furtherance of that purpose.

"Wholesaler" shall not include a manufacturer, importer, or gunsmith who is licensed to engage in those activities pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code or a person licensed pursuant to Section 12071 and the regulations issued pursuant thereto. A wholesaler also does not include those persons dealing exclusively in grips, stocks, and other parts of firearms that are not frames or receivers thereof.

(i) As used in Section 12071, 12072, or 12084, "application to purchase" means any of the following:

(1) The initial completion of the register by the purchaser, transferee, or person being loaned the firearm as required by subdivision (b) of Section 12076.

(2) The initial completion of the LEFT by the purchaser, transferee, or person being loaned the firearm as required by subdivision (d) of Section 12084.

(3) The initial completion and transmission to the department of the record of electronic or telephonic transfer by the dealer on the purchaser, transferee, or person being loaned the firearm as required by subdivision (c) of Section 12076.

(j) For purposes of Section 12023, a firearm shall be deemed to be "loaded" whenever both the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person.

(k) For purposes of Sections 12021, 12021.1, 12025, 12070, 12072, 12073, 12078, and 12101 of this code, and Sections 8100, 8101, and 8103 of the Welfare and Institutions Code, notwithstanding the fact that the term "any firearm" may be used in those sections, each firearm or the frame or receiver of the same shall constitute a distinct and separate offense under those sections.

(*l*) For purposes of Section 12020, a violation of that section as to each firearm, weapon, or device enumerated therein shall constitute a distinct and separate offense.

(m) Each application that requires any firearms eligibility determination involving the issuance of any license, permit, or certificate pursuant to this title shall include two copies of the applicant's fingerprints on forms prescribed by the Department of Justice. One copy of the fingerprints may be submitted to the United States Federal Bureau of Investigation.

(n) As used in this chapter, a "personal handgun importer" means an individual who meets all of the following criteria:

(1) He or she is not a person licensed pursuant to Section 12071.

(2) He or she is not a licensed manufacturer of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code.

(3) He or she is not a licensed importer of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(4) He or she is the owner of a pistol, revolver, or other firearm capable of being concealed upon the person.

**Ch. 129, § 3**

(5) He or she acquired that pistol, revolver, or other firearm capable of being concealed upon the person outside of California.

(6) He or she moves into this state on or after January 1, 1998, as a resident of this state.

(7) He or she intends to possess that pistol, revolver, or other firearm capable of being concealed upon the person within this state on or after January 1, 1998.

(8) The pistol, revolver, or other firearm capable of being concealed upon the person was not delivered to him or her by a person licensed pursuant to Section 12071 who delivered that firearm following the procedures set forth in Section 12071 and subdivision (c) of Section 12072.

(9) He or she, while a resident of this state, had not previously reported his or her ownership of that pistol, revolver, or other firearm capable of being concealed upon the person to the Department of Justice in a manner prescribed by the department that included information concerning him or her and a description of the firearm.

(10) The pistol, revolver, or other firearm capable of being concealed upon the person is not a firearm that is prohibited by subdivision (a) of Section 12020.

(11) The pistol, revolver, or other firearm capable of being concealed upon the person is not an assault weapon, as defined in Section 12276 or 12276.1.

(12) The pistol, revolver, or other firearm capable of being concealed upon the person is not a machinegun, as defined in Section 12200.

(13) The person is 18 years of age or older.

(o) For purposes of paragraph (6) of subdivision (n):

(1) Except as provided in paragraph (2), residency shall be determined in the same manner as is the case for establishing residency pursuant to Section 12505 of the Vehicle Code.

(2) In the case of members of the armed forces of the United States, residency shall be deemed to be established when he or she was discharged from active service in this state.

SEC. 3.   Section 12020 of the Penal Code is amended to read:

12020.  (a) Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison:

(1) Manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any cane gun or wallet gun, any undetectable firearm, any firearm which is not immediately recognizable as a firearm, any camouflaging firearm container, any ammunition which contains or consists of any fléchette dart, any bullet containing or carrying an explosive agent, any ballistic knife, any multiburst trigger activator, any nunchaku, any short-barreled shotgun, any short-barreled rifle, any metal knuckles, any belt buckle knife, any leaded cane, any zip gun, any shuriken, any unconventional pistol, any lipstick case knife, any cane sword, any shobi-zue, any air gauge knife, any writing pen knife, any metal military practice handgrenade or metal replica handgrenade, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag * * *:

(2) Commencing January 1, 2000, manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, or lends, any large-capacity magazine.

(3) Carries concealed upon his or her person any explosive substance, other than fixed ammunition * * *:

(4) Carries concealed upon his or her person any dirk or dagger * * *.

However, a first offense involving any metal military practice handgrenade or metal replica handgrenade shall be punishable only as an infraction unless the offender is an active participant in a criminal street gang as defined in the Street Terrorism and Enforcement and Prevention Act (Chapter 11 (commencing with Section 186.29) of Title 7 of Part 1).  A bullet containing or carrying an explosive agent is not a destructive device as that term is used in Section 12301.

(b) Subdivision (a) does not apply to any of the following:

**Additions or changes indicated by <u>underline</u>; deletions by asterisks * * ***          **1539**

(1) The sale to, purchase by, or possession of short-barreled shotguns or short-barreled rifles by police departments, sheriffs' offices, marshals' offices, the California Highway Patrol, the Department of Justice, or the military or naval forces of this state or of the United States for use in the discharge of their official duties or the possession of short-barreled shotguns and short-barreled rifles by regular, salaried, full-time members of a police department, sheriff's office, marshal's office, the California Highway Patrol, or the Department of Justice when on duty and the use is authorized by the agency and is within the course and scope of their duties.

(2) The manufacture, possession, transportation or sale of short-barreled shotguns or short-barreled rifles when authorized by the Department of Justice pursuant to Article 6 (commencing with Section 12095) of this chapter and not in violation of federal law.

(3) The possession of a nunchaku on the premises of a school which holds a regulatory or business license and teaches the arts of self-defense.

(4) The manufacture of a nunchaku for sale to, or the sale of a nunchaku to, a school which holds a regulatory or business license and teaches the arts of self-defense.

(5) Any antique firearm.  For purposes of this section, "antique firearm" means any firearm not designed or redesigned for using rimfire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar type of ignition system or replica thereof, whether actually manufactured before or after the year 1898) and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

(6) Tracer ammunition manufactured for use in shotguns.

(7) Any firearm or ammunition which is a curio or relic as defined in Section 178.11 of Title 27 of the Code of Federal Regulations and which is in the possession of a person permitted to possess the items pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.  Any person prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition who obtains title to these items by bequest or intestate succession may retain title for not more than one year, but actual possession of these items at any time is punishable pursuant to Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.  Within the year, the person shall transfer title to the firearms or ammunition by sale, gift, or other disposition.  Any person who violates this paragraph is in violation of subdivision (a).

(8) Any other weapon as defined in subsection (e) of Section 5845 of Title 26 of the United States Code and which is in the possession of a person permitted to possess the weapons pursuant to the federal Gun Control Act of 1968 (Public Law 90–618), as amended, and the regulations issued pursuant thereto.  Any person prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing these weapons who obtains title to these weapons by bequest or intestate succession may retain title for not more than one year, but actual possession of these weapons at any time is punishable pursuant to Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.  Within the year, the person shall transfer title to the weapons by sale, gift, or other disposition.  Any person who violates this paragraph is in violation of subdivision (a).  The exemption provided in this subdivision does not apply to pen guns.

(9) Instruments or devices that are possessed by federal, state, and local historical societies, museums, and institutional collections which are open to the public, provided that these instruments or devices are properly housed, secured from unauthorized handling, and, if the instrument or device is a firearm, unloaded.

(10) Instruments or devices, other than short-barreled shotguns or short-barreled rifles, that are possessed or utilized during the course of a motion picture, television, or video production or entertainment event by an authorized participant therein in the course of making that production or event or by an authorized employee or agent of the entity producing that production or event.

Case 3:17-cv-01017-BEN-JLB   Document 18-8   Filed 06/05/17   PageID.3460   Page 100 of 159

(11) Instruments or devices, other than short-barreled shotguns or short-barreled rifles, that are sold by, manufactured by, exposed or kept for sale by, possessed by, imported by, or lent by persons who are in the business of selling instruments or devices listed in subdivision (a) solely to the entities referred to in paragraphs (9) and (10) when engaging in transactions with those entities.

(12) The sale to, possession of, or purchase of any weapon, device, or ammunition, other than a short-barreled rifle or short-barreled shotgun, by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law for use in the discharge of their official duties, or the possession of any weapon, device, or ammunition, other than a short-barreled rifle or short-barreled shotgun, by peace officers thereof when on duty and the use is authorized by the agency and is within the course and scope of their duties.

(13) Weapons, devices, and ammunition, other than a short-barreled rifle or short-barreled shotgun, that are sold by, manufactured by, exposed, or kept for sale by, possessed by, imported by, or lent by, persons who are in the business of selling weapons, devices, and ammunition listed in subdivision (a) solely to the entities referred to in paragraph (12) when engaging in transactions with those entities.

(14) The manufacture for, sale to, exposing or keeping for sale to, importation of, or lending of wooden clubs or batons to special police officers or uniformed security guards authorized to carry any wooden club or baton pursuant to Section 12002 by entities that are in the business of selling wooden batons or clubs to special police officers and uniformed security guards when engaging in transactions with those persons.

(15) Any plastic toy handgrenade, or any metal military practice handgrenade or metal replica handgrenade that is a relic, curio, memorabilia, or display item, that is filled with a permanent inert substance or that is otherwise permanently altered in a manner that prevents ready modification for use as a grenade.

(16) Any instrument, ammunition, weapon, or device listed in subdivision (a) that is not a firearm that is found and possessed by a person who meets all of the following:

(A) The person is not prohibited from possessing firearms or ammunition pursuant to Section 12021 or 12021.1 or paragraph (1) of subdivision (b) of Section 12316 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person possessed the instrument, ammunition, weapon, or device no longer than was necessary to deliver or transport the same to a law enforcement agency for that agency's disposition according to law.

(C) If the person is transporting the listed item, he or she is transporting the listed item to a law enforcement agency for disposition according to law.

(17) Any firearm, other than a short-barreled rifle or short-barreled shotgun, that is found and possessed by a person who meets all of the following:

(A) The person is not prohibited from possessing firearms or ammunition pursuant to Section 12021 or 12021.1 or paragraph (1) of subdivision (b) of Section 12316 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person possessed the firearm no longer than was necessary to deliver or transport the same to a law enforcement agency for that agency's disposition according to law.

(C) If the person is transporting the firearm, he or she is transporting the firearm to a law enforcement agency for disposition according to law.

(D) Prior to transporting the firearm to a law enforcement agency, he or she has given prior notice to that law enforcement agency that he or she is transporting the firearm to that law enforcement agency for disposition according to law.

(E) The firearm is transported in a locked container as defined in subdivision (d) of Section 12026.2.

(18) The possession of any weapon, device, or ammunition, by a forensic laboratory or any authorized agent or employee thereof in the course and scope of his or her authorized activities.

(19) The sale of, giving of, lending of, importation into this state of, or purchase of, any large-capacity magazine to or by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

(20) The sale to, lending to, transfer to, purchase by, receipt of, or importation into this state of, a large capacity magazine by a sworn peace officer as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 who is authorized to carry a firearm in the course and scope of his or her duties.

(21) The sale or purchase of any large-capacity magazine to or by a person licensed pursuant to Section 12071.

(22) The loan of a lawfully possessed large-capacity magazine between two individuals if all of the following conditions are met:

(A) The person being loaned the large-capacity magazine is not prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition.

(B) The loan of the large-capacity magazine occurs at a place or location where the possession of the large-capacity magazine is not otherwise prohibited and the person who lends the large-capacity magazine remains in the accessible vicinity of the person to whom the large-capacity magazine is loaned.

(23) The importation of a large-capacity magazine by a person who lawfully possessed the large-capacity magazine in the state prior to January 1, 2000, lawfully took it out of the state, and is returning to the state with the large-capacity magazine previously lawfully possessed in the state.

(24) The lending or giving of any large-capacity magazine to a person licensed pursuant to Section 12071, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine.

(25) The return to its owner of any large-capacity magazine by a person specified in paragraph (24).

(26) The importation into this state of, or sale of, any large-capacity magazine by a person who has been issued a permit to engage in those activities pursuant to Section 12079, when those activities are in accordance with the terms and conditions of that permit.

(27) The sale of, giving of, lending of, importation into this state of, or purchase of, any large-capacity magazine, to or by entities that operate armored vehicle businesses pursuant to the laws of this state.

(28) The lending of large-capacity magazines by the entities specified in paragraph (27) to their authorized employees, while in the course and scope of their employment for purposes that pertain to the entity's armored vehicle business.

(29) The return of those large-capacity magazines to those entities specified in paragraph (27) by those employees specified in paragraph (28).

(c)(1) As used in this section, a "short-barreled shotgun" means any of the following:

(A) A firearm which is designed or redesigned to fire a fixed shotgun shell and having a barrel or barrels of less than 18 inches in length.

(B) A firearm which has an overall length of less than 26 inches and which is designed or redesigned to fire a fixed shotgun shell.

(C) Any weapon made from a shotgun (whether by alteration, modification, or otherwise) if that weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length.

(D) Any device which may be readily restored to fire a fixed shotgun shell which, when so restored, is a device defined in subparagraphs (A) to (C), inclusive.

(E) Any part, or combination of parts, designed and intended to convert a device into a device defined in subparagraphs (A) to (C), inclusive, or any combination of parts from which

Additions or changes indicated by <u>underline</u>; deletions by asterisks * * *

**Ch. 129, § 3**

a device defined in subparagraphs (A) to (C), inclusive, can be readily assembled if those parts are in the possession or under the control of the same person.

(2) As used in this section, a "short-barreled rifle" means any of the following:

(A) A rifle having a barrel or barrels of less than 16 inches in length.

(B) A rifle with an overall length of less than 26 inches.

(C) Any weapon made from a rifle (whether by alteration, modification, or otherwise) if that weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length.

(D) Any device which may be readily restored to fire a fixed cartridge which, when so restored, is a device defined in subparagraphs (A) to (C), inclusive.

(E) Any part, or combination of parts, designed and intended to convert a device into a device defined in subparagraphs (A) to (C), inclusive, or any combination of parts from which a device defined in subparagraphs (A) to (C), inclusive, may be readily assembled if those parts are in the possession or under the control of the same person.

(3) As used in this section, a "nunchaku" means an instrument consisting of two or more sticks, clubs, bars or rods to be used as handles, connected by a rope, cord, wire, or chain, in the design of a weapon used in connection with the practice of a system of self-defense such as karate.

(4) As used in this section, a "wallet gun" means any firearm mounted or enclosed in a case, resembling a wallet, designed to be or capable of being carried in a pocket or purse, if the firearm may be fired while mounted or enclosed in the case.

(5) As used in this section, a "cane gun" means any firearm mounted or enclosed in a stick, staff, rod, crutch, or similar device, designed to be, or capable of being used as, an aid in walking, if the firearm may be fired while mounted or enclosed therein.

(6) As used in this section, a "fléchette dart" means a dart, capable of being fired from a firearm, which measures approximately one inch in length, with tail fins which take up five-sixteenths of an inch of the body.

(7) As used in this section, "metal knuckles" means any device or instrument made wholly or partially of metal which is worn for purposes of offense or defense in or on the hand and which either protects the wearer's hand while striking a blow or increases the force of impact from the blow or injury to the individual receiving the blow. The metal contained in the device may help support the hand or fist, provide a shield to protect it, or consist of projections or studs which would contact the individual receiving a blow.

(8) As used in this section, a "ballistic knife" means a device that propels a knifelike blade as a projectile by means of a coil spring, elastic material, or compressed gas. Ballistic knife does not include any device which propels an arrow or a bolt by means of any common bow, compound bow, crossbow, or underwater spear gun.

(9) As used in this section, a "camouflaging firearm container" means a container which meets all of the following criteria:

(A) It is designed and intended to enclose a firearm.

(B) It is designed and intended to allow the firing of the enclosed firearm by external controls while the firearm is in the container.

(C) It is not readily recognizable as containing a firearm.

"Camouflaging firearm container" does not include any camouflaging covering used while engaged in lawful hunting or while going to or returning from a lawful hunting expedition.

(10) As used in this section, a "zip gun" means any weapon or device which meets all of the following criteria:

(A) It was not imported as a firearm by an importer licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(B) It was not originally designed to be a firearm by a manufacturer licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(C) No tax was paid on the weapon or device nor was an exemption from paying tax on that weapon or device granted under Section 4181 and subchapters F (commencing with Section 4216) and G (commencing with Section 4221) of Chapter 32 of Title 26 of the United States Code, as amended, and the regulations issued pursuant thereto.

(D) It is made or altered to expel a projectile by the force of an explosion or other form of combustion.

(11) As used in this section, a "shuriken" means any instrument, without handles, consisting of a metal plate having three or more radiating points with one or more sharp edges and designed in the shape of a polygon, trefoil, cross, star, diamond, or other geometric shape for use as a weapon for throwing.

(12) As used in this section, an "unconventional pistol" means a firearm that does not have a rifled bore and has a barrel or barrels of less than 18 inches in length or has an overall length of less than 26 inches.

(13) As used in this section, a "belt buckle knife" is a knife which is made an integral part of a belt buckle and consists of a blade with a length of at least 2½ inches.

(14) As used in this section, a "lipstick case knife" means a knife enclosed within and made an integral part of a lipstick case.

(15) As used in this section, a "cane sword" means a cane, swagger stick, stick, staff, rod, pole, umbrella, or similar device, having concealed within it a blade that may be used as a sword or stiletto.

(16) As used in this section, a "shobi-zue" means a staff, crutch, stick, rod, or pole concealing a knife or blade within it which may be exposed by a flip of the wrist or by a mechanical action.

(17) As used in this section, a "leaded cane" means a staff, crutch, stick, rod, pole, or similar device, unnaturally weighted with lead.

(18) As used in this section, an "air gauge knife" means a device that appears to be an air gauge but has concealed within it a pointed, metallic shaft that is designed to be a stabbing instrument which is exposed by mechanical action or gravity which locks into place when extended.

(19) As used in this section, a "writing pen knife" means a device that appears to be a writing pen but has concealed within it a pointed, metallic shaft that is designed to be a stabbing instrument which is exposed by mechanical action or gravity which locks into place when extended or the pointed, metallic shaft is exposed by the removal of the cap or cover on the device.

(20) As used in this section, a "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(21) As used in this section, a "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger.

(22) As used in this section, an "undetectable firearm" means any weapon which meets one of the following requirements:

(A) When, after removal of grips, stocks, and magazines, it is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar.

(B) When any major component of which, when subjected to inspection by the types of X-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

**1544**

(C)  For purposes of this paragraph, the terms "firearm," "major component," and "Security Exemplar" have the same meanings as those terms are defined in Section 922 of Title 18 of the United States Code.

All firearm detection equipment newly installed in nonfederal public buildings in this state shall be of a type identified by either the United States Attorney General, the Secretary of Transportation, or the Secretary of the Treasury, as appropriate, as available state-of-the-art equipment capable of detecting an undetectable firearm, as defined, while distinguishing innocuous metal objects likely to be carried on one's person sufficient for reasonable passage of the public.

(23)  As used in this section, a "multiburst trigger activator" means one of the following devices:

(A)  A device designed or redesigned to be attached to a semiautomatic firearm which allows the firearm to discharge two or more shots in a burst by activating the device.

(B)  A manual or power-driven trigger activating device constructed and designed so that when attached to a semiautomatic firearm it increases the rate of fire of that firearm.

(24)  As used in this section, a "dirk" or "dagger" means a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death.  A nonlocking folding knife, a folding knife that is not prohibited by Section 653k, or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position.

(25)  As used in this section, "large-capacity magazine" means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include a feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds nor shall it include any .22 caliber tube ammunition feeding device.

(d)  Knives carried in sheaths which are worn openly suspended from the waist of the wearer are not concealed within the meaning of this section.

SEC. 3.5.   Section 12020 of the Penal Code is amended to read:

12020.   (a)  Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison:

(1)  Manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any cane gun or wallet gun, any undetectable firearm, any firearm which is not immediately recognizable as a firearm, any camouflaging firearm container, any ammunition which contains or consists of any fléchette dart, any bullet containing or carrying an explosive agent, any ballistic knife, any multiburst trigger activator, any nunchaku, any short-barreled shotgun, any short-barreled rifle, any metal knuckles, any belt buckle knife, any leaded cane, any zip gun, any shuriken, any unconventional pistol, any lipstick case knife, any cane sword, any shobi-zue, any air gauge knife, any writing pen knife, any metal military practice handgrenade or metal replica handgrenade, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag * * *.

(2)  Commencing January 1, 2000, manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, or lends, any large-capacity magazine.

(3)  Carries concealed upon his or her person any explosive substance, other than fixed ammunition * * *.

(4)  Carries concealed upon his or her person any dirk or dagger * * *.

However, a first offense involving any metal military practice handgrenade or metal replica handgrenade shall be punishable only as an infraction unless the offender is an active participant in a criminal street gang as defined in the Street Terrorism and Enforcement and Prevention Act (Chapter 11 (commencing with Section 186.29) of Title 7 of Part 1).  A bullet containing or carrying an explosive agent is not a destructive device as that term is used in Section 12301.

(b)  Subdivision (a) does not apply to any of the following:

**Additions or changes indicated by <u>underline</u>; deletions by asterisks * * *** 1545

(1) The sale to, purchase by, or possession of short-barreled shotguns or short-barreled rifles by police departments, sheriffs' offices, marshals' offices, the California Highway Patrol, the Department of Justice, or the military or naval forces of this state or of the United States for use in the discharge of their official duties or the possession of short-barreled shotguns and short-barreled rifles by * * * <u>peace officer</u> members of a police department, sheriff's office, marshal's office, the California Highway Patrol, or the Department of Justice when on duty and the use is authorized by the agency and is within the course and scope of their duties <u>and the peace officer has completed a training course in the use of these weapons certified by the Commission on Peace Officer Standards and Training</u>.

(2) The manufacture, possession, transportation or sale of short-barreled shotguns or short-barreled rifles when authorized by the Department of Justice pursuant to Article 6 (commencing with Section 12095) of this chapter and not in violation of federal law.

(3) The possession of a nunchaku on the premises of a school which holds a regulatory or business license and teaches the arts of self-defense.

(4) The manufacture of a nunchaku for sale to, or the sale of a nunchaku to, a school which holds a regulatory or business license and teaches the arts of self-defense.

(5) Any antique firearm. For purposes of this section, "antique firearm" means any firearm not designed or redesigned for using rimfire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar type of ignition system or replica thereof, whether actually manufactured before or after the year 1898) and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

(6) Tracer ammunition manufactured for use in shotguns.

(7) Any firearm or ammunition which is a curio or relic as defined in Section 178.11 of Title 27 of the Code of Federal Regulations and which is in the possession of a person permitted to possess the items pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto. Any person prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition who obtains title to these items by bequest or intestate succession may retain title for not more than one year, but actual possession of these items at any time is punishable pursuant to Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code. Within the year, the person shall transfer title to the firearms or ammunition by sale, gift, or other disposition. Any person who violates this paragraph is in violation of subdivision (a).

(8) Any other weapon as defined in subsection (e) of Section 5845 of Title 26 of the United States Code and which is in the possession of a person permitted to possess the weapons pursuant to the federal Gun Control Act of 1968 (Public Law 90-618), as amended, and the regulations issued pursuant thereto. Any person prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing these weapons who obtains title to these weapons by bequest or intestate succession may retain title for not more than one year, but actual possession of these weapons at any time is punishable pursuant to Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code. Within the year, the person shall transfer title to the weapons by sale, gift, or other disposition. Any person who violates this paragraph is in violation of subdivision (a). The exemption provided in this subdivision does not apply to pen guns.

(9) Instruments or devices that are possessed by federal, state, and local historical societies, museums, and institutional collections which are open to the public, provided that these instruments or devices are properly housed, secured from unauthorized handling, and, if the instrument or device is a firearm, unloaded.

(10) Instruments or devices, other than short-barreled shotguns or short-barreled rifles, that are possessed or utilized during the course of a motion picture, television, or video production or entertainment event by an authorized participant therein in the course of making that production or event or by an authorized employee or agent of the entity producing that production or event.

**Ch. 129, § 3.5**

(11) Instruments or devices, other than short-barreled shotguns or short-barreled rifles, that are sold by, manufactured by, exposed or kept for sale by, possessed by, imported by, or lent by persons who are in the business of selling instruments or devices listed in subdivision (a) solely to the entities referred to in paragraphs (9) and (10) when engaging in transactions with those entities.

(12) The sale to, possession of, or purchase of any weapon, device, or ammunition, other than a short-barreled rifle or short-barreled shotgun, by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law for use in the discharge of their official duties, or the possession of any weapon, device, or ammunition, other than a short-barreled rifle or short-barreled shotgun, by peace officers thereof when on duty and the use is authorized by the agency and is within the course and scope of their duties.

(13) Weapons, devices, and ammunition, other than a short-barreled rifle or short-barreled shotgun, that are sold by, manufactured by, exposed * * * or kept for sale by, possessed by, imported by, or lent by, persons who are in the business of selling weapons, devices, and ammunition listed in subdivision (a) solely to the entities referred to in paragraph (12) when engaging in transactions with those entities.

(14) The manufacture for, sale to, exposing or keeping for sale to, importation of, or lending of wooden clubs or batons to special police officers or uniformed security guards authorized to carry any wooden club or baton pursuant to Section 12002 by entities that are in the business of selling wooden batons or clubs to special police officers and uniformed security guards when engaging in transactions with those persons.

(15) Any plastic toy handgrenade, or any metal military practice handgrenade or metal replica handgrenade that is a relic, curio, memorabilia, or display item, that is filled with a permanent inert substance or that is otherwise permanently altered in a manner that prevents ready modification for use as a grenade.

(16) Any instrument, ammunition, weapon, or device listed in subdivision (a) that is not a firearm that is found and possessed by a person who meets all of the following:

(A) The person is not prohibited from possessing firearms or ammunition pursuant to Section 12021 or 12021.1 or paragraph (1) of subdivision (b) of Section 12316 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person possessed the instrument, ammunition, weapon, or device no longer than was necessary to deliver or transport the same to a law enforcement agency for that agency's disposition according to law.

(C) If the person is transporting the listed item, he or she is transporting the listed item to a law enforcement agency for disposition according to law.

(17) Any firearm, other than a short-barreled rifle or short-barreled shotgun, that is found and possessed by a person who meets all of the following:

(A) The person is not prohibited from possessing firearms or ammunition pursuant to Section 12021 or 12021.1 or paragraph (1) of subdivision (b) of Section 12316 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person possessed the firearm no longer than was necessary to deliver or transport the same to a law enforcement agency for that agency's disposition according to law.

(C) If the person is transporting the firearm, he or she is transporting the firearm to a law enforcement agency for disposition according to law.

(D) Prior to transporting the firearm to a law enforcement agency, he or she has given prior notice to that law enforcement agency that he or she is transporting the firearm to that law enforcement agency for disposition according to law.

(E) The firearm is transported in a locked container as defined in subdivision (d) of Section 12026.2.

(18) The possession of any weapon, device, or ammunition, by a forensic laboratory or any authorized agent or employee thereof in the course and scope of his or her authorized activities.

**Additions or changes indicated by <u>underline</u>; deletions by asterisks * * *     1547**

(19) The sale of, giving of, lending of, importation into this state of, or purchase of, any large-capacity magazine to or by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

(20) The sale to, lending to, transfer to, purchase by, receipt of, or importation into this state of, a large capacity magazine by a sworn peace officer as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 who is authorized to carry a firearm in the course and scope of his or her duties.

(21) The sale or purchase of any large-capacity magazine to or by a person licensed pursuant to Section 12071.

(22) The loan of a lawfully possessed large-capacity magazine between two individuals if all of the following conditions are met:

(A) The person being loaned the large-capacity magazine is not prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition.

(B) The loan of the large-capacity magazine occurs at a place or location where the possession of the large-capacity magazine is not otherwise prohibited and the person who lends the large-capacity magazine remains in the accessible vicinity of the person to whom the large-capacity magazine is loaned.

(23) The importation of a large-capacity magazine by a person who lawfully possessed the large-capacity magazine in the state prior to January 1, 2000, lawfully took it out of the state, and is returning to the state with the large-capacity magazine previously lawfully possessed in the state.

(24) The lending or giving of any large-capacity magazine to a person licensed pursuant to Section 12071, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine.

(25) The return to its owner of any large-capacity magazine by a person specified in paragraph (24).

(26) The importation into this state of, or sale of, any large-capacity magazine by a person who has been issued a permit to engage in those activities pursuant to Section 12079, when those activities are in accordance with the terms and conditions of that permit.

(27) The sale of, giving of, lending of, importation into this state of, or purchase of, any large-capacity magazine, to or by entities that operate armored vehicle businesses pursuant to the laws of this state.

(28) The lending of large-capacity magazines by the entities specified in paragraph (27) to their authorized employees, while in the course and scope of their employment for purposes that pertain to the entity's armored vehicle business.

(29) The return of those large-capacity magazines to those entities specified in paragraph (27) by those employees specified in paragraph (28).

(c)(1) As used in this section, a "short-barreled shotgun" means any of the following:

(A) A firearm which is designed or redesigned to fire a fixed shotgun shell and having a barrel or barrels of less than 18 inches in length.

(B) A firearm which has an overall length of less than 26 inches and which is designed or redesigned to fire a fixed shotgun shell.

(C) Any weapon made from a shotgun (whether by alteration, modification, or otherwise) if that weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length.

(D) Any device which may be readily restored to fire a fixed shotgun shell which, when so restored, is a device defined in subparagraphs (A) to (C), inclusive.

(E) Any part, or combination of parts, designed and intended to convert a device into a device defined in subparagraphs (A) to (C), inclusive, or any combination of parts from which

Additions or changes indicated by underline; deletions by asterisks * * *

a device defined in subparagraphs (A) to (C), inclusive, can be readily assembled if those parts are in the possession or under the control of the same person.

(2) As used in this section, a "short-barreled rifle" means any of the following:

(A) A rifle having a barrel or barrels of less than 16 inches in length.

(B) A rifle with an overall length of less than 26 inches.

(C) Any weapon made from a rifle (whether by alteration, modification, or otherwise) if that weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length.

(D) Any device which may be readily restored to fire a fixed cartridge which, when so restored, is a device defined in subparagraphs (A) to (C), inclusive.

(E) Any part, or combination of parts, designed and intended to convert a device into a device defined in subparagraphs (A) to (C), inclusive, or any combination of parts from which a device defined in subparagraphs (A) to (C), inclusive, may be readily assembled if those parts are in the possession or under the control of the same person.

(3) As used in this section, a "nunchaku" means an instrument consisting of two or more sticks, clubs, bars or rods to be used as handles, connected by a rope, cord, wire, or chain, in the design of a weapon used in connection with the practice of a system of self-defense such as karate.

(4) As used in this section, a "wallet gun" means any firearm mounted or enclosed in a case, resembling a wallet, designed to be or capable of being carried in a pocket or purse, if the firearm may be fired while mounted or enclosed in the case.

(5) As used in this section, a "cane gun" means any firearm mounted or enclosed in a stick, staff, rod, crutch, or similar device, designed to be, or capable of being used as, an aid in walking, if the firearm may be fired while mounted or enclosed therein.

(6) As used in this section, a "fléchette dart" means a dart, capable of being fired from a firearm, which measures approximately one inch in length, with tail fins which take up five-sixteenths of an inch of the body.

(7) As used in this section, "metal knuckles" means any device or instrument made wholly or partially of metal which is worn for purposes of offense or defense in or on the hand and which either protects the wearer's hand while striking a blow or increases the force of impact from the blow or injury to the individual receiving the blow.  The metal contained in the device may help support the hand or fist, provide a shield to protect it, or consist of projections or studs which would contact the individual receiving a blow.

(8) As used in this section, a "ballistic knife" means a device that propels a knifelike blade as a projectile by means of a coil spring, elastic material, or compressed gas.  Ballistic knife does not include any device which propels an arrow or a bolt by means of any common bow, compound bow, crossbow, or underwater spear gun.

(9) As used in this section, a "camouflaging firearm container" means a container which meets all of the following criteria:

(A) It is designed and intended to enclose a firearm.

(B) It is designed and intended to allow the firing of the enclosed firearm by external controls while the firearm is in the container.

(C) It is not readily recognizable as containing a firearm.

"Camouflaging firearm container" does not include any camouflaging covering used while engaged in lawful hunting or while going to or returning from a lawful hunting expedition.

(10) As used in this section, a "zip gun" means any weapon or device which meets all of the following criteria:

(A) It was not imported as a firearm by an importer licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(B) It was not originally designed to be a firearm by a manufacturer licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

**Additions or changes indicated by <u>underline</u>; deletions by asterisks \* \* \***          **1549**

(C) No tax was paid on the weapon or device nor was an exemption from paying tax on that weapon or device granted under Section 4181 and subchapters F (commencing with Section 4216) and G (commencing with Section 4221) of Chapter 32 of Title 26 of the United States Code, as amended, and the regulations issued pursuant thereto.

(D) It is made or altered to expel a projectile by the force of an explosion or other form of combustion.

(11) As used in this section, a "shuriken" means any instrument, without handles, consisting of a metal plate having three or more radiating points with one or more sharp edges and designed in the shape of a polygon, trefoil, cross, star, diamond, or other geometric shape for use as a weapon for throwing.

(12) As used in this section, an "unconventional pistol" means a firearm that does not have a rifled bore and has a barrel or barrels of less than 18 inches in length or has an overall length of less than 26 inches.

(13) As used in this section, a "belt buckle knife" is a knife which is made an integral part of a belt buckle and consists of a blade with a length of at least 2½ inches.

(14) As used in this section, a "lipstick case knife" means a knife enclosed within and made an integral part of a lipstick case.

(15) As used in this section, a "cane sword" means a cane, swagger stick, stick, staff, rod, pole, umbrella, or similar device, having concealed within it a blade that may be used as a sword or stiletto.

(16) As used in this section, a "shobi-zue" means a staff, crutch, stick, rod, or pole concealing a knife or blade within it which may be exposed by a flip of the wrist or by a mechanical action.

(17) As used in this section, a "leaded cane" means a staff, crutch, stick, rod, pole, or similar device, unnaturally weighted with lead.

(18) As used in this section, an "air gauge knife" means a device that appears to be an air gauge but has concealed within it a pointed, metallic shaft that is designed to be a stabbing instrument which is exposed by mechanical action or gravity which locks into place when extended.

(19) As used in this section, a "writing pen knife" means a device that appears to be a writing pen but has concealed within it a pointed, metallic shaft that is designed to be a stabbing instrument which is exposed by mechanical action or gravity which locks into place when extended or the pointed, metallic shaft is exposed by the removal of the cap or cover on the device.

(20) As used in this section, a "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(21) As used in this section, a "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger.

(22) As used in this section, an "undetectable firearm" means any weapon which meets one of the following requirements:

(A) When, after removal of grips, stocks, and magazines, it is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar.

(B) When any major component of which, when subjected to inspection by the types of X-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

Ch. 129, § 4

(C) For purposes of this paragraph, the terms "firearm," "major component," and "Security Exemplar" have the same meanings as those terms are defined in Section 922 of Title 18 of the United States Code.

All firearm detection equipment newly installed in nonfederal public buildings in this state shall be of a type identified by either the United States Attorney General, the Secretary of Transportation, or the Secretary of the Treasury, as appropriate, as available state-of-the-art equipment capable of detecting an undetectable firearm, as defined, while distinguishing innocuous metal objects likely to be carried on one's person sufficient for reasonable passage of the public.

(23) As used in this section, a "multiburst trigger activator" means one of the following devices:

(A) A device designed or redesigned to be attached to a semiautomatic firearm which allows the firearm to discharge two or more shots in a burst by activating the device.

(B) A manual or power-driven trigger activating device constructed and designed so that when attached to a semiautomatic firearm it increases the rate of fire of that firearm.

(24) As used in this section, a "dirk" or "dagger" means a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. A nonlocking folding knife, a folding knife that is not prohibited by Section 653k, or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position.

(25) As used in this section, "large-capacity magazine" means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include a feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds nor shall it include any .22 caliber tube ammunition feeding device.

(d) Knives carried in sheaths which are worn openly suspended from the waist of the wearer are not concealed within the meaning of this section.

SEC. 4.   Section 12022 of the Penal Code is amended to read:

12022.   (a)(1) Except as provided in subdivisions (c) and (d), any person who is armed with a firearm in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year, unless the arming is an element of the offense of which he or she was convicted. This additional term shall apply to any person who is a principal in the commission or attempted commission of a felony if one or more of the principals is armed with a firearm, whether or not the person is personally armed with a firearm.

(2) Except as provided in subdivision (c), and notwithstanding subdivision (d), if the firearm is an assault weapon, as defined in Section 12276 or Section 12276.1, or a machinegun, as defined in Section 12200, the additional term described in this subdivision shall be three years whether or not the arming is an element of the offense of which he or she was convicted. The additional term provided in this paragraph shall apply to any person who is a principal in the commission or attempted commission of a felony if one or more of the principals is armed with an assault weapon or machinegun whether or not the person is personally armed with an assault weapon or machinegun.

(b)(1) Any person who personally uses a deadly or dangerous weapon in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year, unless use of a deadly or dangerous weapon is an element of the offense of which he or she was convicted.

(2) If the person described in paragraph (1) has been convicted of carjacking or attempted carjacking, the additional term shall be one, two, or three years.

(3) When a person is found to have personally used a deadly or dangerous weapon in the commission or attempted commission of a felony as provided in this subdivision and the weapon is owned by that person, the court shall order that the weapon be deemed a nuisance and disposed of in the manner provided in Section 12028.

(c) Notwithstanding the enhancement set forth in subdivision (a), any person who is personally armed with a firearm in the commission or attempted commission of a violation of Section 11351, 11351.5, 11352, 11366.5, 11366.6, 11378, 11378.5, 11379, 11379.5, or 11379.6 of the Health and Safety Code, shall, upon conviction of that offense and in addition and consecutive to the punishment prescribed for that offense of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for three, four, or five years in the court's discretion. The court shall order the middle term unless there are circumstances in aggravation or mitigation. The court shall state the reasons for its enhancement choice on the record at the time of the sentence.

(d) Notwithstanding the enhancement set forth in subdivision (a), any person who is not personally armed with a firearm who, knowing that another principal is personally armed with a firearm, is a principal in the commission or attempted commission of an offense specified in subdivision (c), shall, upon conviction of that offense, be punished by an additional term of one, two, or three years in the court's discretion. The court shall order the middle term unless there are circumstances in aggravation or mitigation. The court shall state the reasons for its enhancement choice on the record at the time of the sentence.

(e) For purposes of imposing an enhancement under Section 1170.1, the enhancements under this section shall count as one, single enhancement.

(f) Notwithstanding any other provision of law, the court may strike the additional punishment for the enhancements provided in subdivision (c) or (d) in an unusual case where the interests of justice would best be served, if the court specifies on the record and enters into the minutes the circumstances indicating that the interests of justice would best be served by that disposition.

SEC. 5.   Section 12022.5 of the Penal Code is amended to read:

12022.5.   (a)(1) Except as provided in subdivisions (b) and (c), any person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of the offense of which he or she was convicted.

(2) If the person described in paragraph (1) has been convicted of carjacking or attempted carjacking, the additional term shall be 4, 5, or 10 years. The court shall order imposition of the middle term unless there are circumstances in aggravation or mitigation. The court shall state its reasons for its enhancement choice on the record at the time of sentencing.

(b)(1) Notwithstanding subdivision (a), any person who is convicted of a felony or an attempt to commit a felony, including murder or attempted murder, in which that person discharged a firearm at an occupied motor vehicle which caused great bodily injury or death to the person of another, shall, upon conviction of that felony or attempted felony, in addition and consecutive to the sentence prescribed for the felony or attempted felony, be punished by an additional term of imprisonment in the state prison for 5, 6, or 10 years.

(2) Notwithstanding subdivision (a), any person who personally uses an assault weapon, as specified in Section 12276 or Section 12276.1, or a machinegun, as defined in Section 12200, in the commission or attempted commission of a felony, shall, upon conviction of that felony or attempted felony, in addition and consecutive to the sentence prescribed for the felony or attempted felony, be punished by an additional term of imprisonment in the state prison for 5, 6, or 10 years.

(c) Notwithstanding the enhancement set forth in subdivision (a), any person who personally uses a firearm in the commission or attempted commission of a violation of Section 11351, 11351.5, 11352, 11366.5, 11366.6, 11378, 11378.5, 11379, 11379.5, or 11379.6 of the Health and Safety Code, shall, upon conviction of that offense and in addition and consecutive to the punishment prescribed for the offense of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for 3, 4, or 10 years in the court's discretion. The court shall order the imposition of the middle term unless there are circumstances in aggravation or mitigation. The court shall state the reasons for its enhancement choice on the record.

   Additions or changes indicated by <u>underline</u>; deletions by asterisks * * *

Ch. 129, § 7

(d) The additional term provided by this section may be imposed in cases of assault with a firearm under paragraph (2) of subdivision (a) of Section 245, or assault with a deadly weapon which is a firearm under Section 245, or murder if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury or death.

(e) When a person is found to have personally used a firearm, an assault weapon, or a machinegun in the commission or attempted commission of a felony as provided in this section and the firearm, assault weapon, or machinegun is owned by that person, the court shall order that the firearm be deemed a nuisance and disposed of in the manner provided in Section 12028.

(f) For purposes of imposing an enhancement under Section 1170.1, the enhancements under this section shall count as one, single enhancement.

SEC. 6.   Section 12079 is added to the Penal Code, to read:

12079.   (a) Upon a showing that good cause exists, the Department of Justice may issue permits for the possession, transportation, or sale between a person licensed pursuant to Section 12071 and an out-of-state client, of large capacity magazines.

(b) For purposes of this section, "large capacity magazine" shall have the same meaning as that set forth in paragraph (25) of subdivision (c) of Section 12020.

SEC. 7.   Section 12276.1 is added to the Penal Code, to read:

12276.1.   (a) Notwithstanding Section 12276, "assault weapon" shall also mean any of the following:

(1) A semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and any one of the following:

(A) A pistol grip that protrudes conspicuously beneath the action of the weapon.

(B) A thumbhole stock.

(C) A folding or telescoping stock.

(D) A grenade launcher or flare launcher.

(E) A flash suppressor.

(F) A forward pistol grip.

(2) A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.

(3) A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

(4) A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following:

(A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer.

(B) A second handgrip.

(C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, except a slide that encloses the barrel.

(D) The capacity to accept a detachable magazine at some location outside of the pistol grip.

(5) A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

(6) A semiautomatic shotgun that has both of the following:

(A) A folding or telescoping stock.

(B) A pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

(7) A semiautomatic shotgun that has the ability to accept a detachable magazine.

(8) Any shotgun with a revolving cylinder.

(b) "Assault weapon" does not include any antique firearm.

(c) The following definitions shall apply under this section:

(1) "Magazine" shall mean any ammunition feeding device.

(2) "Capacity to accept more than 10 rounds" shall mean capable of accommodating more than 10 rounds, but shall not be construed to include a feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.

(3) "Antique firearm" means any firearm manufactured prior to January 1, 1899.

(d) This section shall become operative January 1, 2000.

SEC. 8.  Section 12280 of the Penal Code is amended to read:

12280.  (a)(1) Any person who, within this state, manufactures or causes to be manufactured, distributes, transports, or imports into the state, keeps for sale, or offers or exposes for sale, or who gives or lends any assault weapon, except as provided by this chapter, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for four, six, or eight years.

(2) In addition and consecutive to the punishment imposed under paragraph (1), any person who transfers, lends, sells, or gives any assault weapon to a minor in violation of paragraph (1) shall receive an enhancement of one year.

(b) Except as provided in Section 12288, and in subdivisions (c) and (d), any person who, within this state, possesses any assault weapon, except as provided in this chapter, is guilty of a public offense and upon conviction shall be punished by imprisonment in the state prison, or in a county jail, not exceeding one year.  However, if the person presents proof that he or she lawfully possessed the assault weapon prior to June 1, 1989, or prior to the date it was specified as an assault weapon, and has since either registered the firearm and any other lawfully obtained firearm * * * specified by Section 12276 or 12276.5 pursuant to Section 12285 or relinquished them pursuant to Section 12288, a first-time violation of this subdivision shall be an infraction punishable by a fine of up to five hundred dollars ($500), but not less than three hundred fifty dollars ($350), if the person has otherwise possessed the firearm in compliance with subdivision (c) of Section 12285.  In these cases, the firearm shall be returned unless the court finds in the interest of public safety, after notice and hearing, that the assault weapon should be destroyed pursuant to Section 12028.

(c) A first-time violation of subdivision (b) shall be an infraction punishable by a fine of up to five hundred dollars ($500), if the person was found in possession of no more than two firearms in compliance with subdivision (c) of Section 12285 and the person meets all of the following conditions:

(1) The person proves that he or she lawfully possessed the assault weapon prior to the date it was defined as an assault weapon pursuant to Section 12276.1.

(2) The person is not found in possession of a firearm specified as an assault weapon pursuant to Section 12276 or 12276.5.

(3) The person has not previously been convicted of violating this section.

(4) The person was found to be in possession of the assault weapons within one year following the end of the one-year registration period established pursuant to subdivision (a) of Section 12285.

(5) The person has since registered the firearms and any other lawfully obtained firearms defined by Section 12276.1, pursuant to Section 12285, except as provided for by this section, or relinquished them pursuant to Section 12288.

(d) Firearms seized pursuant to subdivision (c) shall be returned unless the court finds in the interest of public safety, after notice and hearing, that the assault weapon should be destroyed pursuant to Section 12028.

(e) Notwithstanding Section 654 or any other provision of law, any person who commits another crime while violating this section may receive an additional, consecutive punishment of one year for violating this section in addition and consecutive to the punishment, including enhancements, which is prescribed for the other crime.

Ch. 129, § 8

(f) Subdivisions (a) and (b) shall not apply to the sale to, purchase by, or possession of assault weapons by the Department of Justice, police departments, sheriffs' offices, marshals' offices, the * * * Youth and Adult Corrections Agency, the Department of the California Highway Patrol, district attorneys' offices, Department of Fish and Game, Department of Parks and Recreation, or the military or naval forces of this state or of the United States for use in the discharge of their official duties * * *.

(g) Subdivision (b) shall not prohibit the possession or use of assault weapons by sworn peace officer members of those agencies * * * specified in subdivision (f) for law enforcement purposes, whether on or off duty.

(h) Subdivisions (a) and (b) shall not prohibit the sale or transfer of assault weapons by an entity specified in subdivision (f) to a person, upon retirement, who retired as a sworn officer from that entity.

(i) Subdivision (b) shall not apply to the possession of an assault weapon by a retired peace officer who received that assault weapon pursuant to subdivision (h).

(j) Subdivision (b) shall not apply to the possession of an assault weapon, as defined in Section 12276, by any person during the 1990 calendar year, * * * during the 90–day period immediately after the date it was specified as an assault weapon pursuant to Section 12276.5, or during the one-year period after the date it was defined as an assault weapon pursuant to Section 12276.1, if all of the following are applicable:

(1) The person is eligible under this chapter to register the particular assault weapon.

(2) The person lawfully possessed the particular assault weapon described in paragraph (1) prior to June 1, 1989, * * * if the weapon is specified as an assault weapon pursuant to Section 12276, or prior to the date it was specified as an assault weapon pursuant to Section 12276.5, or prior to the date it was defined as an assault weapon pursuant to Section 12276.1.

(3) The person is otherwise in compliance with this chapter.

(k) Subdivisions (a) and (b) shall not apply to the manufacture by persons who are issued permits pursuant to Section 12287 of assault weapons for sale to the following:

(1) Exempt entities listed in subdivision (f).

(2) Entities and persons who have been issued permits pursuant to Section 12286.

(3) Entities outside the state who have, in effect, a federal firearms dealer's license solely for the purpose of distribution to an entity listed in paragraphs (4) to (6), inclusive.

(4) Federal military and law enforcement agencies.

(5) Law enforcement and military agencies of other states.

(6) Foreign governments and agencies approved by the United States State Department.

(l) Subdivision (a) shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon registered under Section 12285 or that was possessed pursuant to subdivision (g) or (i) which is disposed of as authorized by the probate court, if the disposition is otherwise permitted by this chapter.

(m) Subdivision (b) shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon registered under Section 12285 or that was possessed pursuant to subdivision (g) or (i), if the assault weapon is possessed at a place set forth in paragraph (1) of subdivision (c) of Section 12285 or as authorized by the probate court.

(n) Subdivision (a) shall not apply to:

(1) A person who lawfully possesses and has registered an assault weapon pursuant to this chapter who lends that assault weapon to another if all the following apply:

(A) The person to whom the assault weapon is lent is 18 years of age or over and is not in a class of persons prohibited from possessing firearms by virtue of Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person to whom the assault weapon is lent remains in the presence of the registered possessor of the assault weapon.

(C) The assault weapon is possessed at any of the following locations:

(i) While on a target range that holds a regulatory or business license for the purpose of practicing shooting at that target range.

(ii) While on the premises of a target range of a public or private club or organization organized for the purpose of practicing shooting at targets.

(iii) While attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms.

(2) The return of an assault weapon to the registered possessor which is lent by the same pursuant to paragraph (1).

(o) Subdivision (b) shall not apply to the possession of an assault weapon by a person to whom an assault weapon is lent pursuant to subdivision (n).

(p) Subdivisions (a) and (b) shall not apply to the possession and importation of an assault weapon into this state by a nonresident if all of the following conditions are met:

(1) The person is attending or going directly to or coming directly from an organized competitive match or league competition that involves the use of an assault weapon.

(2) The competition or match is conducted on the premises of one of the following:

(i) A target range that holds a regulatory or business license for the purpose of practicing shooting at that target range.

(ii) A target range of a public or private club or organization that is organized for the purpose of practicing shooting at targets.

(3) The match or competition is sponsored by, conducted under the auspices of, or approved by, a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms.

(4) The assault weapon is transported in accordance with Section 12026.1 or 12026.2.

(5) The person is 18 years of age or over and is not in a class of persons prohibited from possessing firearms by virtue of Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(q) Subdivision (b) shall not apply to any of the following persons:

(1) A person acting in accordance with Section 12286.

(2) A person who has a permit to possess an assault weapon issued pursuant to Section 12286 when he or she is acting in accordance with Section 12285 or 12286.

(r) Subdivisions (a) and (b) shall not apply to any of the following persons:

(1) A person acting in accordance with Section 12285.

(2) A person acting in accordance with Section 12286 or 12290.

(s) Subdivision (b) shall not apply to the registered owner of an assault weapon possessing that firearm in accordance with subdivision (c) of Section 12285.

(t) Subdivision (a) shall not apply to the importation into this state of an assault weapon by the registered owner of that assault weapon, if it is in accordance with the provisions of subdivision (c) of Section 12285.

(u) As used in this chapter, the date a firearm is * * * an assault weapon * * * is the earliest of the following:

(1) The effective date of an amendment to Section 12276 that adds the designation of the specified firearm.

(2) The effective date of the list promulgated pursuant to Section 12276.5 that adds or changes the designation of the specified firearm.

(3) The operative date of Section 12276.1, as specified in subdivision (b) of that section.

SEC. 9.   Section 12285 of the Penal Code is amended to read:

12285.  (a) Any person who lawfully possesses an assault weapon, as defined in Section 12276, prior to June 1, 1989, shall register the firearm by January 1, 1991, and any person who lawfully possessed an assault weapon prior to the date it was specified as an assault

weapon pursuant to Section 12276.5 shall register the firearm within 90 days * * * with the Department of Justice pursuant to those procedures that the department may establish. Except as provided in subdivision (a) of Section 12280, any person who lawfully possessed an assault weapon prior to the date it was defined as an assault weapon pursuant to Section 12276.1, and which was not specified as an assault weapon under Section 12276 or 12276.5, shall register the firearm within one year of the effective date of Section 12276.1, with the department pursuant to those procedures that the department may establish. The registration shall contain a description of the firearm that identifies it uniquely, including all identification marks, the full name, address, date of birth, and thumbprint of the owner, and any other information that the department may deem appropriate. The department may charge a fee for registration of up to twenty dollars ($20) per person but not to exceed the actual processing costs of the department. After the department establishes fees sufficient to reimburse the department for processing costs, fees charged shall increase at a rate not to exceed the legislatively approved annual cost-of-living adjustment for the department's budget or as otherwise increased through the Budget Act.

(b)(1) Except as provided in paragraph (2), no assault weapon possessed pursuant to this section may be sold or transferred on or after January 1, 1990, to anyone within this state other than to a licensed gun dealer, as defined in subdivision (c) of Section 12290, or as provided in Section 12288. Any person who (A) obtains title to an assault weapon registered under this section or that was possessed pursuant to subdivision (g) or (i) of Section 12280 by bequest or intestate succession, or (B) lawfully possessed a firearm subsequently declared to be an assault weapon pursuant to Section 12276.5, or subsequently defined as an assault weapon pursuant to Section 12276.1, shall, within 90 days, render the weapon permanently inoperable, sell the weapon to a licensed gun dealer, obtain a permit from the Department of Justice in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2, or remove the weapon from this state. A person who lawfully possessed a firearm that was subsequently declared to be an assault weapon pursuant to Section 12276.5 may alternatively register the firearm within 90 days of the declaration issued pursuant to subdivision (f) of Section 12276.5.

(2) A person moving into this state, otherwise in lawful possession of an assault weapon, shall do one of the following:

(A) Prior to bringing the assault weapon into this state, that person shall first obtain a permit from the Department of Justice in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2.

(B) The person shall cause the assault weapon to be delivered to a licensed gun dealer, as defined in subdivision (c) of Section 12290, in this state in accordance with Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto. If the person obtains a permit from the Department of Justice in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2, the dealer shall redeliver that assault weapon to the person. If the licensed gun dealer, as defined in subdivision (c) of Section 12290, is prohibited from delivering the assault weapon to a person pursuant to this paragraph, the dealer shall possess or dispose of the assault weapon as allowed by this chapter.

(c) A person who has registered an assault weapon under this section may possess it only under any of the following conditions unless a permit allowing additional uses is first obtained under Section 12286:

(1) At that person's residence, place of business, or other property owned by that person, or on property owned by another with the owner's express permission.

(2) While on the premises of a target range of a public or private club or organization organized for the purpose of practicing shooting at targets.

(3) While on a target range that holds a regulatory or business license for the purpose of practicing shooting at that target range.

(4) While on the premises of a shooting club which is licensed pursuant to the Fish and Game Code.

(5) While attending any exhibition, display, or educational project which is about firearms and which is sponsored by, conducted under the auspices of, or approved by a law

## Ch. 129, § 9

enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms.

(6) While on publicly owned land if the possession and use of a firearm described in Section 12276 or 12276.1 is specifically permitted by the managing agency of the land.

(7) While transporting the assault weapon between any of the places mentioned in this subdivision, or to any licensed gun dealer, as defined in subdivision (c) of Section 12290, for servicing or repair pursuant to subdivision (b) of Section 12290, if the assault weapon is transported as required by Section 12026.1.

(d) No person who is under the age of 18 years, no person who is prohibited from possessing a firearm by Section 12021 or 12021.1, and no person described in Section 8100 or 8103 of the Welfare and Institutions Code may register or possess an assault weapon.

(e) The department's registration procedures shall provide the option of joint registration for assault weapons owned by family members residing in the same household.

(f) For 90 days following January 1, 1992, a forgiveness period shall exist to allow persons specified in subdivision (b) of Section 12280 to register with the Department of Justice assault weapons that they lawfully possessed prior to June 1, 1989.

(g) Any person who registered a firearm as an assault weapon pursuant to the provisions of law in effect prior to January 1, 2000, where the assault weapon is thereafter defined as an assault weapon pursuant to Section 12276.1, shall be deemed to have registered the weapon for purposes of this chapter and shall not be required to reregister the weapon pursuant to this section.

(h) Any person who registers his or her assault weapon during the 90-day forgiveness period described in subdivision (f), and any person whose registration form was received by the Department of Justice after January 1, 1991, and who was issued a temporary registration prior to the end of the forgiveness period, shall not be charged with a violation of subdivision (b) of Section 12280, if law enforcement becomes aware of that violation only as a result of the registration of the assault weapon. This subdivision shall have no effect upon persons charged with a violation of subdivision (b) of Section 12280 of the Penal Code prior to January 1, 1992, provided that law enforcement was aware of the violation before the weapon was registered.

SEC. 10.  Section 12287 of the Penal Code is amended to read:

12287.  (a) The Department of Justice may, upon a finding of good cause, issue permits for the manufacture of assault weapons to federally licensed manufacturers of firearms for the sale to, purchase by, or possession of assault weapons by, any of the following:

(1) The agencies listed in subdivision (f) of Section 12280.

(2) Entities and persons who have been issued permits pursuant to Section 12286.

(3) Entities outside the state who have, in effect, a federal firearms dealer's license solely for the purpose of distribution to an entity listed in paragraphs (4) to (6), inclusive.

(4) Federal law enforcement and military agencies.

(5) Law enforcement and military agencies of other states.

(6) Foreign governments and agencies approved by the United States State Department.

(b) Application for the permits, the keeping and inspection thereof, and the revocation of permits shall be undertaken in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2.

SEC. 11.  Section 12289 of the Penal Code is amended to read:

12289.  (a) The Department of Justice shall conduct a public education and notification program regarding the registration of assault weapons * * * and the definition of the weapons set forth in Section 12276.1.  The public education and notification program shall include outreach to local law enforcement agencies and utilization of public service announcements in a variety of media approaches, to ensure maximum publicity of the limited forgiveness period of the registration requirement specified in subdivision (f) of Section 12285 and the consequences of nonregistration.  The department shall develop posters describing

Additions or changes indicated by underline; deletions by asterisks * * *

**Ch. 130, § 1**

gunowners' responsibilities under this chapter which shall be posted in a conspicuous place in every licensed gun store in the state during the forgiveness period.

(b) Any costs incurred by the Department of Justice to implement this section which cannot be absorbed by the department shall be funded from the Dealers' Record of Sale Special Account, as set forth in subdivision (d) of Section 12076, upon appropriation by the Legislature.

SEC. 12.  It was the original intent of the Legislature in enacting Chapter 19 of the Statutes of 1989 to ban all assault weapons, regardless of their name, model number, or manufacture.  It is the purpose of this act to effectively achieve the Legislature's intent to prohibit all assault weapons.

SEC. 13.  If any phrase, clause, sentence, section, or provision of this act or application thereof is held invalid as to any person or circumstance, such invalidity shall not affect any other phrase, clause, sentence, section, provision, or application of this act, that can be given effect without the invalid phrase, clause, sentence, section, provision, or application and to this end the provisions of the act are declared to be severable.

SEC. 14.  Section 3.5 of this bill incorporates amendments to Section 12020 of the Penal Code proposed by this bill and SB 359.  It shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2000, (2) each bill amends Section 12020 of the Penal Code, and (3) this bill is enacted after SB 359, in which case Section 12020 of the Penal Code, as amended by SB 359, shall remain operative only until the operative date of this bill, at which time Section 3.5 of this bill shall become operative, and Section 3 of this bill shall not become operative.

SEC. 15.  No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

---

# FINANCIAL INSTITUTIONS—TRUST COMPANIES—INVESTMENTS

## CHAPTER 130

### A.B. No. 459

**AN ACT to amend Section 1561.1 of the Financial Code, relating to investments.**

[Filed with Secretary of State July 20, 1999.]

### LEGISLATIVE COUNSEL'S DIGEST

AB 459, Ackerman.  Trust companies: investments.

Existing law authorizes a trust company to invest or reinvest in the securities or other interests of any fund for which the trust company or its affiliate is providing specified investment or management services.  The trust company is required to provide written notice to certain persons at least 30 days prior to an initial investment.

This bill instead requires that notice to be provided within 30 days before or after the initial investment.

*The people of the State of California do enact as follows:*

SECTION 1.  Section 1561.1 of the Financial Code is amended to read:

1561.1.  (a)  As used in this section:

(1) "Fund" means any investment company registered under the Investment Company Act of 1940 (15 U.S.C. Sec. 80a–1 et seq.), as amended from time to time.

**Additions or changes indicated by <u>underline</u>; deletions by asterisks * * *** **1559**

# Exhibit 82

**BILL TEXT:**


# STATE OF NEW YORK

---

S. 8234                                                                         A. 11535

# SENATE - ASSEMBLY

June 22, 2000

---

        IN SENATE -- Introduced by Sens. PADAVAN, SPANO, GOODMAN, BALBONI,
LACK,
        MARCELLINO,  RATH,  VELELLA  --  (at  request of the Governor) --
read
        twice and ordered printed, and when printed to  be  committed  to
the
        Committee on Rules

        IN  ASSEMBLY -- Introduced by COMMITTEE ON RULES -- (at request of M.
of
        A. Silver, Dinowitz, Matusow, Weisenberg, Koon, Abbate, Arroyo,
Aubry,
        Bea, Boyland, Brennan, Brodsky, D. Butler, Cahill, Canestrari,
Carroz-
        za, Clark, A. Cohen, M. Cohen, Colton, Cook, Cymbrowitz, Davis,
Denis,
        Diaz, DiNapoli, Englebright, Espaillat, Eve,  Farrell,  Galef,
Gantt,
        Glick, Gottfried, Grannis, Green, Greene, Griffith, Hikind,
Hochberg,
        Hoyt, John, Kaufman, Lafayette,  Lentol,  Lopez,  Luster,
Magnarelli,
        Markey, Mayersohn, Mazzarelli, McEneny, Millman, Morelle,
Nolan,
        Norman, Ortiz, Perry, Pheffer, Pretlow,  Ramirez,  Rhodd-
Cummings,
        Rivera, Sanders, Seddio, E. C. Sullivan, Vann, Weinstein,
Weprin,
        Wright) -- (at request of the Governor) -- read once and  referred
to
        the Committee on Codes

        AN ACT to amend the criminal procedure law, the general business law
and
        the penal law, in relation to assault weapons and large capacity
ammu-
        nition feeding devices, gun locking devices, creating a
ballistic
        identification databank, sales of firearms, rifles or shotguns at
gun

shows  and  establishing  a  minimum  age  to  possess  a  firearm;  to  amend
the executive law and the state finance law, in relation to establish-
ing a gun trafficking interdiction program and a gun  tracer program;
to  amend  the  penal  law,  in  relation to requiring the report of a
stolen or lost weapon to a police agency; and  to  authorize  a  study
relating  to the availability and effectiveness of existing technology
for use of smart guns

**The People of the State of New York, represented in Senate and Assem-**
**bly, do enact as follows:**

1    Section  1.  Subparagraph  (iv)  of  paragraph (d) of subdivision 5 of
2  section 220.10 of the criminal procedure law, as amended by  chapter 33
3  of the laws of 1999, is amended to read as follows:

EXPLANATION--Matter in *italics* (underscored) is new; matter in brackets
[-] is old law to be omitted.

LBD12429-01-0

S. 8234                                     2                                     A. 11535

1    (iv)  Where the indictment charges the class D violent felony offenses
2  of  criminal  possession  of  a weapon in the third degree as defined in
3  subdivision four of section 265.02 of the penal law and  the  provisions
4  of  subparagraph  (iii)  of  this subparagraph do not apply, or subdivision
5  five**, seven or eight** of section 265.02 of the penal law, then a plea of
6  guilty must include at least a plea of guilty to a class E violent felo-
7  ny offense.
8    § 2.  Subparagraph (v) of paragraph (b) of subdivision  3  of section
9  220.30  of  the  criminal procedure law, as amended by chapter 33 of the
10  laws of 1999, is amended to read as follows:
11    (v)  A plea of guilty, whether to the entire indictment or part of the
12  indictment, for any crime other than a violent felony offense as defined
13  in section 70.02 of the penal law, may not be accepted on the condition

14  that  it constitutes a complete disposition of one or more other indict-

15  ments against the defendant wherein is charged the class D violent felo-

16  ny offenses of criminal possession of a weapon in the  third  degree as

17  defined in subdivision four [~~or~~], five, seven or eight of section 265.02

18  of  the  penal law; provided, however, a  plea of guilty, whether to the

19  entire indictment or part of the indictment, for the class A misdemeanor

20  of criminal possession of a weapon in the fourth degree  as  defined in

21  subdivision  one  of  section 265.01 of the penal law may be accepted on

22  the condition that it constitutes a complete disposition of one or more

23  other  indictments  against the defendant wherein is charged the class D

24  violent felony offense of criminal possession of a weapon in  the  third

25  degree as defined in subdivision four of section 265.02 of the penal law

26  when the defendant has not been previously convicted of a class A misde-

27  meanor  defined  in the penal law in the five years preceding the commis-

28  sion of the offense.

29    § 3. The general business law is amended by adding a new section 396-

30  ee to read as follows:

31    § 396-ee.  Sale  of certain weapons; locking devices therefor. (1) No

32  person, firm or corporation engaged in the retail  business  of  selling

33  rifles,  shotguns  or  firearms,  as  such  terms are defined in section

34  265.00 of the penal law, shall sell, deliver or transfer any such rifle,

35  shotgun or firearm to another person unless the transferee  is  provided

36  at  the  time of sale, delivery or transfer with a gun locking device and

37  a label containing the quoted language specified in subdivision  two  of

38  this  section  is  either  affixed  to such rifle, shotgun or firearm or

39  placed in the container in which such rifle, shotgun or firearm is sold,

40  delivered or transferred. For the purposes of  this  section,  the  term

41  "gun  locking  device"  shall  mean  an  integrated design feature or an

42  attachable accessory that is resistant to tampering and is effective in

43  preventing  the  discharge of such rifle, shotgun or firearm by a
person
44  who does not have access to the key, combination or other mechanism
used
45  to disengage the device. The division of state police shall develop
and
46  promulgate  rules  and regulations setting forth the specific devices
or
47  the minimum standards and criteria therefor which constitute  an
effec-
48  tive gun locking device.
49    (2)  Every  person, firm or corporation engaged in the retail
business
50  of selling rifles, shotguns or firearms, as such terms  are  defined
in
51  section  265.00 of the penal law, shall, in the place where such
rifles,
52  shotguns or firearms are displayed or transferred to the purchaser,
post
53  a notice conspicuously stating in bold print that: "The use of a
locking
54  device or safety lock is only one aspect of responsible firearm
storage.
55  For increased safety firearms should be stored unloaded and locked in
a

S. 8234                        3                        A. 11535

 1  location that is both separate from their ammunition and inaccessible
to
 2  children and any other unauthorized person."
 3    (3)  Any  person, firm  or  corporation  who fails to comply with
the
 4  provisions of this section shall be guilty of a violation punishable
as
 5  provided in the penal law. Any person, firm, or corporation who fails
to
 6  comply  with the provisions of this section after having been
previously
 7  convicted of a violation of this section shall be guilty of  a  class
A
 8  misdemeanor, punishable as provided in the penal law.
 9    §  4. The general business law is amended by adding a new section
396-
10  ff to read as follows:
11    § 396-ff. Pistol and revolver ballistic identification databank.
(1)
12  For  the  purposes  of  this section, the following terms shall have
the
13  following meanings:
14    (a) "Manufacturer" means any person, firm or corporation possessing
a
15  valid  federal  license that permits such person, firm or corporation
to
16  engage in the business of manufacturing pistols or revolvers or
ammuni-
17  tion therefor for the purpose of sale or distribution.

18      (b) "Shell casing" means that part of ammunition capable of being used
19   in a pistol or revolver that contains the primer and propellant powder
20   to discharge the bullet or projectile.
21      (2) On and after March first, two thousand one, any manufacturer that
22   ships, transports or delivers a pistol or revolver to any person in this
23   state shall, in accordance with rules and regulations promulgated by the
24   division of state police, include in the container with such pistol or
25   revolver a separate sealed container that encloses:
26      (a) a shell casing of a bullet or projectile discharged from such
27   pistol or revolver; and
28      (b) any additional information that identifies such pistol or revolver
29   and shell casing as required by such rules and regulations.
30      (3) A gunsmith or dealer in firearms licensed in this state shall,
31   within ten days of the receipt of any pistol or revolver from a manufac-
32   turer that fails to comply with the provisions of this section, either
33   (a) return such pistol or revolver to such manufacturer, or (b) notify
34   the division of state police of such noncompliance and thereafter obtain
35   a substitute sealed container through participation in a program oper-
36   ated by the state police as provided in subdivision four of this
37   section.
38      (4) The division of state police shall no later than October first,
39   two thousand, promulgate rules and regulations for the operation of a
40   program which provides a gunsmith or a dealer in firearms licensed in
41   this state with a sealed container enclosing the items specified in
42   subdivision two of this section. The program shall at a minimum:
43      (a) be operational by January first, two thousand one;
44      (b) operate in at least five regional locations within the state; and
45      (c) specify procedures by which such gunsmith or dealer is to deliver
46   a pistol or revolver to the regional program location closest to his or
47   her place of business for testing and prompt return of such pistol or
48   revolver.
49      (5) On and after March first, two thousand one, a gunsmith or dealer

    50  in firearms licensed in this state shall, within ten days of
delivering
    51  to  any  person a pistol or revolver received by such gunsmith or
dealer
    52  in firearms on or after such date, forward  to  the  division  of
state
    53  police,  along with the original transaction report required by
subdivi-
    54  sion twelve of section 400.00 of the penal  law,  the  sealed
container
    55  enclosing  the  shell  casing  from  such  pistol or revolver either
(a)
    56  received from the manufacturer, or (b) obtained through participation
in

S. 8234                            4                            A. 11535

     1  the program operated by the division of state police in accordance
with
     2  subdivision four of this section.
     3    (6) Upon receipt of the sealed container, the division of state
police
     4  shall  cause to be entered in an automated electronic databank
pertinent
     5  data and other ballistic information relevant to identification  of
the
     6  shell casing and to the pistol or revolver from which it was
discharged.
     7  The automated electronic databank will be operated and maintained by
the
     8  division  of  state police, in accordance with its rules and
regulations
     9  adopted after consultation with the Federal Bureau of Investigation
and
    10  the United States Department of Treasury, Bureau of Alcohol, Tobacco
and
    11  Firearms to ensure compatibility with national ballistic technology.
    12    (7)  Any person, firm or corporation who knowingly violates any of
the
    13  provisions of this section shall be guilty of a violation, punishable
as
    14  provided in the penal law. Any person, firm or corporation who
knowingly
    15  violates any of the provisions of this section after having been
previ-
    16  ously  convicted  of  a  violation  of this section shall be guilty
of a
    17  class A misdemeanor, punishable as provided in the penal law.
    18    § 5. The general business law is amended by adding a new article
39-DD
    19  to read as follows:
    20                        ARTICLE 39-DD
    21              SALE OF FIREARMS, RIFLES OR SHOTGUNS
    22                        AT GUN SHOWS
    23  Section 895. Definitions.
    24          896. Operation of a gun show.
    25          897. Sale of a firearm, rifle or shotgun at a gun show.

26      § 895. Definitions. For the purposes of this article:
27      1. "Gun show" means an event sponsored, whether for profit or not, by
28      an  individual,  national,  state  or local organization, association or
29      other entity devoted to the collection, competitive use,  sporting use,
30      or  any  other legal use of firearms, rifles or shotguns, or an event at
31      which (a) twenty percent or more of the total number of  exhibitors are
32      firearm exhibitors or (b) ten or more firearm exhibitors are participat-
33      ing  or  (c)  a  total  of  twenty-five or more pistols or revolvers are
34      offered for sale or transfer or (d) a total of fifty or  more  firearms,
35      rifles  or  shotguns are offered for sale or transfer. The term gun show
36      shall include any building, structure or facility where firearms, rifles
37      or shotguns are offered for sale or transfer and  any  grounds  used  in
38      connection with the event.
39      2.  "Firearm  exhibitor"  means  any person, firm, partnership, corpo-
40      ration or company that exhibits, sells, offers for sale,  transfers,  or
41      exchanges firearms, rifles or shotguns at a gun show.
42      3.  "Gun  show  operator"  means any person, firm, partnership, corpo-
43      ration or company that organizes, produces, sponsors or operates  a  gun
44      show.
45      4. "Firearm" has the same meaning as that term is defined in 18 U.S.C.
46      921(a)(3),  but  shall  not include an "antique firearm" as that term is
47      defined in 18 U.S.C. 921(a)(16).
48      5. "Rifle" has the same meaning as that term is defined in  18  U.S.C.
49      921(a)(7).
50      6. "Shotgun" has the same meaning as that term is defined in 18 U.S.C.
51      921(a)(5).
52      § 896. Operation of a gun show. 1. A gun show operator shall:
53      (a)  at  all  times  during  such show conspicuously post and maintain
54      signs stating "A National Instant  Criminal  Background  Check  must  be
55      completed  prior  to  all firearm sales or transfers, including sales or
56      transfers of rifles or shotguns". Signs must be posted at all entrances

S. 8234                            5                            A. 11535

1   to  the  gun show, at all places where admission tickets to the gun show
2   are sold and not less than four additional locations within the grounds
3   of the gun show;
4     (b)  notify  all firearm exhibitors in writing that a national instant
5   criminal background check must be completed prior to all  firearm sales
6   or transfers, including sales or transfers of rifles or shotguns; and
7     (c)  provide access at the gun show to a firearm dealer licensed under
8   federal law who is authorized to perform  a  national  instant criminal
9   background  check  where the seller or transferor of a firearm, rifle or
10  shotgun is not authorized to conduct  such  a  check  by  (i)  requiring
11  firearm  exhibitors  who  are firearm dealers licensed under federal law
12  and who are authorized to conduct a national instant criminal background
13  check to provide such a check at cost or  (ii)  designating  a  specific
14  location  at  the gun show where a firearm dealer licensed under federal
15  law who is authorized to conduct a national instant criminal background
16  check  will  be  present  to  perform such a check at cost.  Any firearm
17  dealer licensed under federal law who performs a national instant crimi-
18  nal background check pursuant to this paragraph shall provide the seller
19  or transferor of the firearm, rifle or shotgun with a copy of the United
20  States Department of Treasury, Bureau of Alcohol, Tobacco  and Firearms
21  Form  ATF  F 4473 and such dealer shall maintain such form and make such
22  form available for inspection by law enforcement agencies for  a  period
23  of ten years thereafter.
24    2. Whenever the attorney general shall believe from evidence satisfac-
25  tory  to  him  or  her  that a gun show operator has violated any of the
26  provisions of this section, the attorney general may  bring an action or
27  special proceeding in the supreme court for  a  judgment  enjoining  the
28  continuance  of  such violation and for a civil penalty in an amount not
29  to exceed ten thousand dollars. If it shall appear to  the  satisfaction
30  of  the  court or justice that the defendant has violated any provisions

31  of this section, no proof shall be required that  any  person  has  been
32  injured  thereby  nor  that  the  defendant  intentionally violated such
33  provision. In such action preliminary relief may be granted under arti-
34  cle  sixty-three of the civil practice law and rules. In connection with
35  any such proposed application, the attorney  general  is  authorized to
36  take  proof, issue subpoenas and administer oaths in the manner provided
37  in the civil practice law and rules.
38    § 897. Sale of a firearm, rifle  or  shotgun  at  a  gun  show. 1. A
39  national  instant  criminal  background  check shall be conducted and no
40  person shall sell or transfer a firearm, rifle or shotgun at a gun show,
41  except in accordance with the provisions of 18 U.S.C. 922(t).
42    2. No person shall offer or agree to sell or transfer a firearm, rifle
43  or shotgun to another person at a gun show and transfer or deliver such
44  firearm,  rifle or shotgun to such person or person acting on his or her
45  behalf thereafter at a location other than the gun show for the purpose
46  of evading or avoiding compliance with 18 U.S.C. 922(t).
47    3.  Any  person  who  knowingly violates any of the provisions of this
48  section shall be guilty of a class A misdemeanor punishable as provided
49  for in the penal law.
50    § 6.  Paragraphs (c) and (d) of subdivision 1 of section 70.02 of the
51  penal law, paragraph (c) as amended by chapter 635 of the laws  of  1999
52  and  paragraph  (d)  as  amended by chapter 378 of the laws of 1998, are
53  amended to read as follows:
54    (c) Class D violent felony offenses: an attempt to commit any  of  the
55  class  C  felonies set  forth  in  paragraph (b); assault in the second
56  degree as defined in section 120.05, stalking in the  first  degree, as

S. 8234                              6                              A. 11535

 1  defined  in subdivision one of section 120.60, sexual abuse in the first
 2  degree as defined in section 130.65, course of sexual conduct against a
 3  child in  the  second  degree  as defined in section 130.80, aggravated

     4  sexual  abuse in the third degree as defined in section 130.66, criminal
     5  possession of a weapon in the third degree as defined in [~~subdivisions~~]
     6  **subdivision** four, five [~~and~~]**,** six**, seven or eight** of section 265.02, and
     7  intimidating a victim or witness  in the second degree as defined in
     8  section 215.16.
     9  (d) Class E violent felony offenses: an attempt to commit any  of the
    10  felonies of criminal possession of a weapon in the third degree as
    11  defined in [~~subdivisions~~] **subdivision** four, five [~~and~~]**,** six**, seven or**
    12  **eight** of section 265.02 as a lesser included offense of that section as
    13  defined in section 220.20 of the criminal procedure law.
    14  § 7. Paragraph (b) and the  opening  paragraph  of  paragraph  (c)  of
    15  subdivision 2  of section 70.02 of the penal law, as amended by chapter
    16  33 of the laws of 1999, are amended to read as follows:
    17  (b) Except as provided in subdivision six of section 60.05 and subdi-
    18  vision  four  of  this  section, the sentence imposed upon a person who
    19  stands convicted of a class D violent felony  offense, other  than  the
    20  offense  of  criminal  possession  of  a  weapon  in the third degree as
    21  defined in [~~subdivisions~~] **subdivision** four [~~and~~]**,** five**, seven  or**
    **eight**
    22  of  section 265.02, must be in accordance with the applicable provisions
    23  of this chapter relating to sentencing for class  D  felonies provided,
    24  however, that where a sentence of imprisonment is imposed which requires
    25  a  commitment  to  the  state  department of correctional services, such
    26  sentence shall be a determinate sentence in  accordance  with paragraph
    27  (c) of subdivision three of this section.
    28  Except  as  provided in subdivision six of section 60.05, the sentence
    29  imposed upon a person who stands convicted of the class D violent felony
    30  offenses of criminal possession of a  weapon  in  the  third  degree as
    31  defined  in  [~~subdivisions~~] **subdivision** four [~~and~~]**,** five**, seven or**
    **eight**
    32  of section 265.02 or the class E violent felonies of attempted criminal
    33  possession  of a weapon in the third degree as defined in [~~subdivisions~~]

34  **subdivision** four [~~and~~]**,** five**, seven or eight** of section 265.02 must be a

35  sentence to a determinate period of imprisonment, or,  in  the  alterna-

36  tive,  a  definite sentence of imprisonment for a period of no less than

37  one year, except that:

38    § 8. Subdivision 3 of section 265.00 of the penal law, as  amended by

39  chapter 264 of the laws of 1988, is amended to read as follows:

40    3. "Firearm" means (a) any pistol or revolver; or (b) a shotgun having

41  one  or more barrels less than eighteen inches in length; or (c) a rifle

42  having one or more barrels less than sixteen inches in  length;  or  (d)

43  any weapon made from a shotgun or rifle whether by alteration, modifica-

44  tion, or otherwise if such weapon as altered, modified, or otherwise has

45  an  overall  length  of  less  than twenty-six inches**; or (e) an assault**

46  **weapon**. For the purpose of this subdivision the length of the barrel on

47  a shotgun or rifle shall be determined by measuring the distance between

48  the  muzzle  and the face of the bolt, breech, or breechlock when closed

49  and when the shotgun or rifle is cocked; the overall length of a weapon

50  made from a shotgun or rifle is the distance between the extreme ends of

51  the  weapon  measured  along  a  line parallel to the center line of the

52  bore. Firearm does not include an antique firearm.

53    § 9.  Subdivisions 8 and 9 of section 265.00 of the penal law, subdi-

54  vision 8 as amended by chapter 588 of the laws of 1972 and subdivision 9

55  as  amended  by  chapter 462 of the laws of 1974, are amended to read as

56  follows:

S. 8234                           7                            A. 11535


1    8. "Gunsmith" means any  person,  firm,  partnership,  corporation  or

2  company  who engages in the business of repairing, altering, assembling,

3  manufacturing,  cleaning,  polishing,  engraving  or  trueing,  or  who

4  performs  any mechanical operation on, any firearm**, large capacity ammu-**

5  **nition feeding device** or machine-gun.

6    9.  "Dealer  in  firearms" means any person, firm, partnership, corpo-

    7  ration or company who engages in the business  of  purchasing, selling,

    8  keeping  for  sale, loaning, leasing, or in any manner disposing of, any

    9  <u>assault weapon, large capacity  ammunition  feeding  device,</u> pistol or

   10  revolver.

   11   §  10.  Section 265.00 of the penal law is amended by adding three new

   12  subdivisions 21, 22 and 23 to read as follows:

   13  <u>21. "Semiautomatic" means any  repeating  rifle,  shotgun  or pistol,</u>

   14  <u>regardless  of barrel or overall length, which utilizes a portion of the</u>

   15  <u>energy of a firing cartridge or shell to  extract  the  fired cartridge</u>

   16  <u>case  or  spent  shell  and chamber the next round, and which requires a</u>

   17  <u>separate pull of the trigger to fire each cartridge or shell.</u>

   18  <u>22. "Assault weapon" means (a) a semiautomatic rifle that has an abil-</u>

   19  <u>ity to accept a detachable magazine and has at least two of the follow-</u>

   20  <u>ing characteristics:</u>

   21  <u>(i) a folding or telescoping stock;</u>

   22  <u>(ii)  a pistol grip that protrudes conspicuously beneath the action of</u>

   23  <u>the weapon;</u>

   24  <u>(iii) a bayonet mount;</u>

   25  <u>(iv) a flash suppressor or threaded barrel designed to  accommodate a</u>

   26  <u>flash suppressor;</u>

   27  <u>(v) a grenade launcher; or</u>

   28  <u>(b)  a  semiautomatic  shotgun  that has at least two of the following</u>

   29  <u>characteristics:</u>

   30  <u>(i) a folding or telescoping stock;</u>

   31  <u>(ii) a pistol grip that protrudes conspicuously beneath the action of</u>

   32  <u>the weapon;</u>

   33  <u>(iii) a fixed magazine capacity in excess of five rounds;</u>

   34  <u>(iv) an ability to accept a detachable magazine; or</u>

   35  <u>(c)  a semiautomatic pistol that has an ability to accept a detachable</u>

   36  <u>magazine and has at least two of the following characteristics:</u>

   37  <u>(i) an ammunition magazine that attaches to the pistol outside of the</u>

   38  <u>pistol grip;</u>

   39  <u>(ii)  a  threaded barrel capable of accepting a barrel extender, flash</u>

   40  <u>suppressor, forward handgrip, or silencer;</u>

   41  <u>(iii) a shroud that is attached to, or partially or completely encir-</u>

   42  <u>cles,  the  barrel and that permits the shooter to hold the firearm with</u>

   43  <u>the nontrigger hand without being burned;</u>

44    (iv) a manufactured weight of fifty ounces or more when the pistol is
45    unloaded;
46    (v) a semiautomatic version of an automatic rifle, shotgun or firearm;
47    or
48    (d)  any  of  the  weapons, or functioning frames or receivers of such
49    weapons, or copies or duplicates of such weapons, in any caliber, known
50    as:
51    (i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all
52    models);
53    (ii) Action Arms Israeli Military Industries UZI and Galil;
54    (iii) Beretta Ar70 (SC-70);
55    (iv) Colt AR-15;
56    (v) Fabrique National FN/FAL, FN/LAR, and FNC;
S. 8234                       8                       A. 11535

1    (vi) SWD M-10, M-11, M-11/9, and M-12;
2    (vii) Steyr AUG;
3    (viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and
4    (ix)  revolving  cylinder shotguns, such as (or similar to) the Street
5    Sweeper and Striker 12;
6    (e) provided, however, that such term does not include: (i) any rifle,
7    shotgun or pistol that (A) is manually operated by bolt, pump, lever or
8    slide action; (B) has been rendered permanently inoperable; or (C) is an
9    antique firearm as defined in 18 U.S.C. 921(a)(16);
10    (ii)  a  semiautomatic  rifle that cannot accept a detachable magazine
11    that holds more than five rounds of ammunition;
12    (iii) a semiautomatic shotgun that cannot hold more than  five rounds
13    of ammunition in a fixed or detachable magazine;
14    (iv)  a rifle, shotgun or pistol, or a replica or a duplicate thereof,
15    specified in Appendix A to section 922 of 18 U.S.C. as such  weapon was
16    manufactured  on  October first, nineteen hundred ninety-three. The mere
17    fact that a weapon is not listed in Appendix A shall not be construed to
18    mean that such weapon is an assault weapon; or
19    (v) a semiautomatic rifle, a semiautomatic shotgun or a semiautomatic
20    pistol  or  any of the weapons defined in paragraph (d) of this subdivi-
21    sion lawfully possessed prior to September fourteenth, nineteen hundred
22    ninety-four.

23      23. "Large capacity ammunition feeding device" means a magazine, belt,

24    drum, feed strip, or similar device, manufactured after September thir-

25    teenth, nineteen hundred ninety-four, that has a capacity of, or that

26    can be readily restored or converted to accept, more than ten rounds of

27    ammunition; provided, however, that such term does not include an

28    attached tubular device designed to accept, and capable of operating

29    only with, .22 caliber rimfire ammunition.

30      § 11. Subdivisions 4, 5 and 6 of section 265.02 of the penal law,

31    subdivision 4 as added by chapter 1041 of the laws of 1974, subdivision

32    5 as amended by chapter 175 of the laws of 1981 and subdivision 6 as

33    added by chapter 378 of the laws of 1998, are amended and two new subdi-

34    visions 7 and 8 are added to read as follows:

35      (4) [He] Such person possesses any loaded firearm. Such possession

36    shall not, except as provided in subdivision one or seven, constitute a

37    violation of this section if such possession takes place in such

38    person's home or place of business[.]; or

39      (5) (i) [He] Such person possesses twenty or more firearms; or (ii)

40    [he] such person possesses a firearm and has been previously convicted

41    of a felony or a class A misdemeanor defined in this chapter within the

42    five years immediately preceding the commission of the offense and such

43    possession did not take place in the person's home or place of busi-

44    ness[.]; or

45      (6) [He] Such person knowingly possesses any disguised gun[.]; or

46      (7) Such person possesses an assault weapon; or

47      (8) Such person possesses a large capacity ammunition feeding device.

48      § 12. Section 265.10 of the penal law, subdivisions 1 and 2 as amended

49    by chapter 378 of the laws of 1998, subdivision 3 as amended by chapter

50    695 of the laws of 1987, subdivision 4 as amended by chapter 233 of the

51    laws of 1980, subdivision 5 as amended by chapter 3 of the laws of 1978

52    and subdivision 7 as amended by chapter 1041 of the laws of 1974, is

53    amended to read as follows:

54    § 265.10 Manufacture, transport, disposition and defacement of weapons

55                    and dangerous instruments and appliances.
S. 8234                              9                        A. 11535

 1    1. Any person who  manufactures  or  causes  to  be  manufactured  any
 2  machine-gun**, assault weapon, large capacity ammunition feeding device** or
 3  disguised gun is guilty of a class D felony. Any person who manufactures
 4  or causes to be manufactured any switchblade knife, gravity knife, pilum
 5  ballistic  knife, metal knuckle knife, billy, blackjack, bludgeon, metal
 6  knuckles, Kung Fu star, chuka stick, sandbag, sandclub or  slungshot  is
 7  guilty of a class A misdemeanor.
 8    2. Any person who transports or ships any machine-gun, firearm silenc-
 9  er,  **assault  weapon  or  large  capacity  ammunition  feeding device** or
10  disguised gun, or who transports or ships as merchandise  five  or  more
11  firearms,  is  guilty  of a class D felony. Any person who transports or
12  ships as merchandise any firearm, **other than an assault weapon,** switch-
13  blade  knife,  gravity  knife,  pilum ballistic knife, billy, blackjack,
14  bludgeon, metal knuckles, Kung Fu star, chuka stick, sandbag  or  slung-
15  shot is guilty of a class A misdemeanor.
16    3.  Any  person who disposes of any machine-gun**, assault weapon, large
17  capacity ammunition feeding device** or firearm silencer is  guilty  of  a
18  class D felony. Any person who knowingly buys, receives, disposes of,  or
19  conceals  a  machine-gun,  firearm,  **large  capacity  ammunition feeding
20  device,** rifle or shotgun which has  been  defaced  for  the  purpose  of
21  concealment or prevention of the detection of a crime or misrepresenting
22  the  identity  of  such  machine-gun, firearm, **large capacity ammunition
23  feeding device,** rifle or shotgun is guilty of a class D felony.
24    4. Any person who disposes of  any  of  the  weapons,  instruments  or
25  appliances  specified  in  subdivision  one  of section 265.01, except a
26  firearm, is guilty of a class A misdemeanor, and he is guilty of a class
27  D felony if he has previously been convicted of any crime.
28    5. Any person who disposes of any of the weapons, instruments, appli-

29  ances  or  substances  specified  in  section 265.05 to any other
person
30  under the age of sixteen years is guilty of a class A misdemeanor.
31  6. Any person who wilfully defaces  any  machine-gun**, large
capacity**
32  **ammunition feeding device** or firearm is guilty of a class D felony.
33  7. Any person, other than a wholesale dealer, or gunsmith or dealer
in
34  firearms  duly  licensed  pursuant  to  section  400.00,  lawfully
in
35  possession of a firearm, who disposes of the same without first
notify-
36  ing  in  writing the licensing officer in the city of New York and
coun-
37  ties of Nassau and Suffolk and elsewhere  in  the  state  the
executive
38  department,  division  of  state  police,  Albany, is guilty of a
class A
39  misdemeanor.
40  § 13. Subdivision 1 of section 265.11 of the penal law, as amended
by
41  chapter 310 of the laws of 1995, is amended to read as follows:
42  (1) sells, exchanges, gives or disposes of a firearm **or large
capacity**
43  **ammunition feeding device** to another person; or
44  § 14. Subdivision 3 of section 265.15 of the penal law, as amended
by
45  chapter 219 of the laws of 1995, is amended to read as follows:
46  3. The presence in an automobile, other than a stolen one or a
public
47  omnibus,  of  any  firearm, **large  capacity  ammunition  feeding
device,**
48  defaced rifle, defaced rifle or shotgun, **defaced large capacity
ammu-**
49  **nition feeding device,** firearm silencer, explosive or incendiary
bomb,
50  bombshell, gravity knife,  switchblade  knife,  pilum  ballistic
knife,
51  metal  knuckle  knife,  dagger,  dirk, stiletto, billy, blackjack,
metal
52  knuckles, chuka stick, sandbag, sandclub  or  slungshot  is
presumptive
53  evidence  of  its possession by all persons occupying such automobile
at
54  the time such weapon, instrument or appliance is found, except under
the
55  following circumstances: (a) if such weapon, instrument or appliance
is
56  found upon the person of one of the occupants therein; (b) if such
weap-
    S. 8234                        10                              A.
11535

 1  on, instrument  or  appliance  is found in an automobile which is
being
 2  operated for hire by a duly licensed driver in the due, lawful and
prop-

3   er pursuit of his **or her** trade, then such presumption shall not apply to

4   the driver; or (c) if the weapon so found is a pistol or revolver and

5   one of the occupants, not present under duress, has in his **or her**

6   possession a valid license to have and carry concealed the same.

7   § 14-a. The penal law is amended by adding a new section 265.17 to

8   read as follows:

9   **§ 265.17 Criminal purchase of a weapon.**

10   **A person is guilty of criminal purchase of a weapon when:**

11   **1. Knowing that he or she is prohibited by law from possessing a**

12   **firearm, rifle or shotgun because of a prior conviction or because of**

13   **some other disability which would render him or her ineligible to**

14   **lawfully possess a firearm, rifle or shotgun in this state, such person**

15   **attempts to purchase a firearm, rifle or shotgun from another person; or**

16   **2. Knowing that it would be unlawful for another person to possess a**

17   **firearm, rifle or shotgun, he or she purchases a firearm, rifle or shot-**

18   **gun for, on behalf of, or for the use of such other person.**

19   **Criminal purchase of a weapon is a class A misdemeanor.**

20   § 15. Paragraph 2 of subdivision a of section 265.20 of the penal law,

21   as amended by chapter 328 of the laws of 1986, is amended to read as

22   follows:

23   2. Possession of a machine-gun, **large capacity ammunition feeding**

24   **device,** firearm, switchblade knife, gravity knife, pilum ballistic

25   knife, billy or blackjack by a warden, superintendent, headkeeper or

26   deputy of a state prison, penitentiary, workhouse, county jail or other

27   institution for the detention of persons convicted or accused of crime

28   or detained as witnesses in criminal cases, in pursuit of official duty

29   or when duly authorized by regulation or order to possess the same.

30   § 15-a. Subdivision a of section 265.20 of the penal law is amended by

31   adding a new paragraph 7-e to read as follows:

32   **7-e. Possession and use of a pistol or revolver, at an indoor or**

33   **outdoor pistol range located in or on premises owned or occupied by a**

34   **duly incorporated organization organized for conservation purposes or to**

35   **foster proficiency in small arms or at a target pistol shooting competi-**

36   tion under the auspices of or approved by an association or organization
37   described in paragraph 7-a of this subdivision for the purpose of load-
38   ing  and  firing the same by a person at least eighteen years of age but
39   under the age of twenty-one who has not been previously convicted  of a
40   felony  or  serious  offense,  and  who does not appear to be, or pose a
41   threat to be, a danger to himself or to others; provided  however,  that
42   such  possession  shall  be of a pistol or revolver duly licensed to and
43   shall be used under the immediate supervision, guidance and instruction
44   of, a person specified in paragraph seven of this subdivision.
45      § 16. Paragraph 8 of subdivision a of section 265.20 of the penal law,
46   as  amended  by  chapter  378 of the laws of 1998, is amended to read as
47   follows:
48      8. The manufacturer of machine-guns, assault weapons,  large capacity
49   ammunition  feeding  devices,  disguised  guns,  pilum ballistic knives,
50   switchblade or gravity knives, billies or blackjacks as merchandise and
51   the  disposal  and shipment thereof direct to a regularly constituted or
52   appointed state or municipal police department,  sheriff,  policeman or
53   other  peace  officer,  or  to  a state prison, penitentiary, workhouse,
54   county jail or other institution for the detention of persons convicted
55   or  accused  of  crime or held as witnesses in criminal cases, or to the
56   military service of this state or of the United States.
     S. 8234                          11                            A. 11535

1      § 17. Paragraphs 11 and 16 of subdivision a of section 265.20  of the
2    penal  law, paragraph 11 as added by chapter 498 of the laws of 1976 and
3    paragraph 16 as added by chapter 378 of the laws of 1998, are amended to
4    read as follows:
5      11. Possession  of  a  [pistol or revolver] firearm or large capacity
6    ammunition feeding device by a police officer or sworn peace officer of
7    another  state  while conducting official business within the state of New
8    York.

9    16.  The terms **"rifle," "shotgun,"** "pistol," "revolver," and "firearm"

10  as used in paragraphs three, **four, five, seven,** seven-a, seven-b, nine,

11  nine-a,  ten,  twelve, thirteen and thirteen-a of this subdivision shall

12  not include a disguised gun **or an assault weapon**.

13    § 18. Subdivision 1 of section 400.00 of the penal law, as amended by

14  chapter 446 of the laws of 1997, is amended to read as follows:

15    1. Eligibility. No license shall be issued or renewed pursuant to this

16  section  except  by  the  licensing officer, and then only after investi-

17  gation and finding that all statements in a  proper  application  for  a

18  license  are  true.  No license shall be issued or renewed except for an

19  applicant (a) **twenty-one years of age or older, provided, however, that**

20  **where  such  applicant  has  been  honorably  discharged from the United**

21  **States army, navy, marine corps,  air  force  or  coast  guard,  or  the**

22  **national  guard  of the state of New York, no such age restriction shall**

23  **apply; (b)** of good moral character; [~~(b)~~] **(c)** who has not been convicted

24  anywhere of a felony or a serious offense; [~~(c)~~]  **(d)**  who  has  stated

25  whether  he  **or she** has ever suffered any mental illness or been confined

26  to any hospital or institution, public or private, for  mental  illness;

27  [~~(d)~~] **(e)**  who  has  not  had  a  license revoked or who is not under a

28  suspension or ineligibility order issued pursuant to the  provisions  of

29  section  530.14  of  the criminal procedure law or section eight hundred

30  forty-two-a of the family court act; [~~(e)~~] **(f)** in the  county  of  West-

31  chester,  who  has  successfully  completed a firearms safety course and

32  test as evidenced by a certificate of completion issued in  his  or  her

33  name  and endorsed and affirmed under the penalties of perjury by a duly

34  authorized instructor, except  that:  (i)  persons  who  are  honorably

35  discharged  from  the  United  States  army, navy, marine corps or coast

36  guard, or of the national guard of the state of New  York,  and  produce

37  evidence  of  official  qualification  in  firearms  during  the term of

38  service are not required to have completed those  hours  of  a firearms
39  safety  course pertaining to the safe use, carrying, possession, mainte-
40  nance and storage of a firearm; and (ii) persons who  were  licensed to
41  possess  a  pistol or revolver prior to the effective date of this para-
42  graph are not required to have completed a firearms  safety  course and
43  test;  and  [(f)]  (g) concerning whom no good cause exists for the denial
44  of the license. No person shall engage in the business  of  gunsmith or
45  dealer  in  firearms unless licensed pursuant to this section. An appli-
46  cant to engage in such business shall also be a citizen  of  the United
47  States,  more than twenty-one years of age and maintain a place of busi-
48  ness in the city or county where the license is issued. For  such busi-
49  ness,  if  the  applicant  is a firm or partnership, each member thereof
50  shall comply with all of the requirements set forth in this subdivision
51  and  if  the  applicant  is a corporation, each officer thereof shall so
52  comply.
53    § 19. Subdivision 2 of section 400.00 of the penal law, as amended by
54  chapter 378 of the laws of 1998, is amended to read as follows:
55    2.  Types  of  licenses.  A license for gunsmith or dealer in firearms
56  shall be issued to engage in such business. A license for  a  pistol or

S. 8234                           12                           A. 11535

1  revolver,  other  than  **an  assault  weapon or** a disguised gun, shall be
2  issued to (a) have and possess in his dwelling  by  a  householder; (b)
3  have  and possess in his place of business by a merchant or storekeeper;
4  (c)  have  and carry concealed while so employed by a messenger employed
5  by a  banking  institution  or  express  company;  (d)  have  and carry
6  concealed by a justice of the supreme court in the first or second judi-
7  cial  departments, or by a judge of the New York city civil court or the
8  New York city criminal court; (e) have  and  carry  concealed  while so
9  employed by a regular employee of an institution of the state, or of any

10  county, city, town or village, under control of a commissioner of

11  correction of the city or any warden, superintendent or head keeper of

12  any state prison, penitentiary, workhouse, county jail or other institu-

13  tion for the detention of persons convicted or accused of crime or held

14  as witnesses in criminal cases, provided that application is made there-

15  for by such commissioner, warden, superintendent or head keeper; (f)

16  have and carry concealed, without regard to employment or place of

17  possession, by any person when proper cause exists for the issuance

18  thereof;  and (g) have, possess, collect and carry antique pistols which

19  are defined as follows: (i) any single shot, muzzle loading pistol with

20  a matchlock, flintlock, percussion cap, or similar type of ignition

21  system manufactured in or before 1898, which is not designed for using

22  rimfire or conventional centerfire fixed ammunition; and (ii) any repli-

23  ca of any pistol described in clause (i) hereof if such replica--

24     (1) is not designed or redesigned for using rimfire or conventional

25  centerfire fixed ammunition, or

26     (2) uses rimfire or conventional centerfire fixed ammunition which is

27  no longer manufactured in the United States and which is not readily

28  available in the ordinary channels of commercial trade.

29     § 20. Subdivision 8 of section 400.00 of the penal law, as amended by

30  chapter 320 of the laws of 1992, is amended to read as follows:

31     8. License: exhibition  and display. Every licensee while carrying a

32  pistol or revolver shall have on his **or her** person a  license  to carry

33  the same.  Every  person  licensed to possess a pistol or revolver on

34  particular premises shall have the license for the same  on  such prem-

35  ises.  Upon demand, the license shall be exhibited for inspection to any

36  peace officer, who is acting pursuant to his **or her** special  duties, or

37  police  officer. A  license as gunsmith or dealer in firearms shall be

38  prominently displayed on the licensed premises. A gunsmith or dealer of

39  firearms may  conduct business temporarily at a location other than the

40  location specified on the license if  such  temporary  location  is  the
41  location  for  a  gun show or event sponsored by any national, state, or
42  local organization, or any affiliate of any such organization devoted to
43  the collection, competitive use or other sporting use of firearms. **Any**
44  **sale  or  transfer at a gun show must also comply with the provisions of**
45  **article thirty-nine-DD of the general business law.** Records  of receipt
46  and  disposition  of  firearms  transactions conducted at such temporary
47  location shall include the location of the sale or other disposition and
48  shall be entered in the permanent records of the gunsmith or  dealer of
49  firearms  and retained on the location specified on the license. Nothing
50  in this section shall authorize any licensee to  conduct  business from
51  any  motorized or towed vehicle. A separate fee shall not be required of
52  a licensee with respect to business conducted  under  this subdivision.
53  Any inspection or examination of inventory or records under this section
54  at  such temporary location shall be limited to inventory consisting of,
55  or records related to, firearms  held  or  disposed  at  such temporary
56  locations.  Failure  of any licensee to so exhibit or display his **or her**

S. 8234                          13                          A. 11535

1  license, as the case may be, shall be presumptive evidence  that  he **or**
2  **she** is not duly licensed.
3    § 21. The executive law is amended by adding a new section 230 to read
4  as follows:
5    **§ 230.  Gun  trafficking  interdiction  program.  1.  There is hereby**
6  **created within the division of criminal justice services a gun traffick-**
7  **ing interdiction program to be administered by the commissioner  of the**
8  **division  of criminal justice services to distribute funds in accordance**
9  **with the provisions of this section for the purpose of interdicting guns**
10  **and components of guns illegally entering New York with a focus on those**
11  **"supplier" states from which substantial numbers of guns illegally enter**

    12  this state.
    13     2. The superintendent of the division of state police, in cooperation
    14  with the United States department of treasury, bureau of alcohol, tobac-
    15  co  and firearms and district attorneys in New York state, shall develop
    16  and implement a strategy for the interdiction of guns illegally entering
    17  New York from supplier states. The strategy  shall  include identifying
    18  and  prosecuting  gun  traffickers and suppliers of such guns who may be
    19  violating federal, state or local laws, and cooperating with the United
    20  States  department  of treasury, bureau of alcohol, tobacco and firearms
    21  and appropriate prosecutorial agencies and law enforcement  agencies in
    22  supplier  states  in  the  investigation  and  enforcement of such laws.
    23  District attorneys are authorized to enter into collaborative agreements
    24  with prosecutorial and  other  governmental  agencies  and  entities in
    25  supplier  states  in an effort to stop the movement of illegal guns into
    26  New York.
    27     3. The commissioner of the division of criminal justice services shall
    28  award grant monies to district attorneys for programs which are designed
    29  to interdict the flow of illegal guns across New York state borders. In
    30  order  to qualify for such grant monies, a district attorney must submit
    31  an application to the commissioner of the division of  criminal justice
    32  services  in  accordance  with  guidelines prescribed by the division of
    33  criminal justice services.  The application shall  identify  a strategy
    34  and  implementation plan for preventing the entry of illegal guns across
    35  New York's borders. Funds awarded under this section shall not  be used
    36  to  supplant  federal, state or local funds.  No more than fifty percent
    37  of the funds available pursuant to this section in any one  fiscal year
    38  shall  be  awarded  for  programs  within a single city, county, town or
    39  village.
    40     4. The superintendent of the division of state police shall establish
    41  and  maintain  within  the  division  a  criminal gun clearinghouse as a

42   central repository of information regarding all guns seized, forfeited,
43   found  or otherwise coming into the possession of any state or local law
44   enforcement agency which are believed to have been used in  the commis-
45   sion  of  a  crime.  The  superintendent of the division of state police
46   shall adopt and promulgate regulations prescribing reporting procedures
47   for such state or local law enforcement agencies, including the form for
48   reporting  such  information. In addition to any other information which
49   the superintendent of the division of state police may require, the form
50   shall require (a) the serial number or other identifying information on
51   the gun,  if available and (b) a brief description of the circumstances
52   under which the gun came into the  possession  of  the  law enforcement
53   agency,  including  the   crime which was or may have been committed with
54   the gun.
55      5. In any case where a state or local law enforcement agency investi-
56   gates  the  commission  of  a  crime in this state and a specific gun is

S. 8234                          14                          A. 11535

 1   known to have been used in  such  crime,  such  agency  shall  submit a
 2   request  to  the national tracing center of the United States Department
 3   of Treasury, bureau of alcohol, tobacco and firearms to trace the move-
 4   ment  of  such gun and such federal agency shall be requested to provide
 5   the superintendent of the division of state police  and  the  local law
 6   enforcement  agency  with the results of such a trace.  This subdivision
 7   shall not apply where the source of a gun is already known  to  a local
 8   law enforcement agency.
 9      §  22. The state finance law is amended by adding a new section 97-www
10   to read as follows:
11      § 97-www. Gun trafficking interdiction fund. 1. There is hereby estab-
12   lished in the custody of the state comptroller  a  special  fund  to be
13   known as the "gun trafficking interdiction fund".
14      2.  Such fund shall consist of all moneys appropriated for the purpose

15    of such fund, all other moneys credited  or  transferred  to  such
fund
16    pursuant  to  law, all moneys required by the provisions of this
section
17    or any other law to be paid into or  credited  to  such  fund,  and
all
18    moneys received by the fund or donated to it.
19       3.  Moneys of such fund shall be available for appropriation and
allo-
20    cation to the division of criminal justice services for the  purpose
of
21    funding the gun trafficking interdiction program as set forth in
section
22    two hundred thirty of the executive law.
23       4.  Moneys  shall  be  paid  out on the audit and warrant of the
comp-
24    troller on vouchers certified or approved by  the  commissioner  of
the
25    division of criminal justice services.
26       § 23.  Subdivision  1 of section 400.10 of the penal law, as added
by
27    chapter 531 of the laws of 1984, is amended to read as follows:
28       1.  (a) Any owner or other person lawfully in possession of a
firearm,
29    rifle  or  shotgun  who  suffers  the loss or theft of said weapon
shall
30    within twenty-four hours of the discovery of the loss  or  theft
report
31    the  facts and circumstances of the loss or theft to a police
department
32    or sheriff's office.
33       (b) Whenever a person reports the theft or loss of a firearm, rifle
or
34    shotgun to any [peace officer,] police department or  sheriff's
office,
35    the  officer or department receiving such report shall forward notice
of
36    such theft or loss to the division of state  police  via  the  New
York
37    [State  Automated  Criminal Justice Information System] Statewide
Police
38    Information Network.  The notice shall contain information in
compliance
39    with the New York Statewide Police Information Network Operating
Manual,
40    including the caliber,  make,  model,  manufacturer's  name  and
serial
41    number,  if  any,  and any other distinguishing number or
identification
42    mark on the weapon.
43       § 24. Section 400.10 of the penal law  is  amended  by  adding  a
new
44    subdivision 3 to read as follows:
45       3.  Notwithstanding  any  other provision of law, a violation of
para-
46    graph (a) of subdivision one of this section shall be punishable only
by

47  **a fine not to exceed one hundred dollars.**

48  § 25. The legislature believes that many needless deaths caused by

49  firearms may be prevented by the use of personalized firearms, more

50  commonly known as "smart guns", which may only be fired by the author-

51  ized user.  As an important first step in the possible use of this new

52  type of personalized or "smart gun", the legislature is hereby directing

53  the division of state police to conduct a comprehensive study of the

54  feasibility of requiring the use of personalized firearms in this state.

55  2.  The superintendent of the division of state police shall, in

56  consultation with the United States Secretary of the Treasury, bureau of

S. 8234                            15                              A. 11535

1  alcohol, tobacco and firearms, the National Law Enforcement and

2  Correction Technology Lab located in Rome, New York, and such other

3  private and public entities as the superintendent deems appropriate,

4  conduct a comprehensive study of the availability and effectiveness of

5  existing technology for the use of personalized firearms, commonly known

6  as "smart guns" which may only be fired by the authorized user. Such

7  study, shall include, but not be limited to, an examination of the

8  availability and effectiveness of personalized firearms that incorporate

9  within their design, and as part of their original manufacture, technol-

10  ogy which limits their operational use and an examination of the avail-

11  ability and effectiveness of technology to transform non-personalized

12  firearms into personalized firearms. Such technology may involve a vari-

13  ety of systems, such as mechanical or electronic systems, which restrict

14  the operation of the firearm through radio frequency tagging, touch

15  memory, remote control, fingerprint, magnetic encoding or other auto-

16  mated user identification systems. In addition, the superintendent shall

17  examine and evaluate reports and studies conducted on the use of person-

18  alized firearms.

19    The superintendent of the division of state police shall,  in collab-
20  oration  with  the  United  States  Secretary  of  the  Treasury, bureau of
21  alcohol,  tobacco  and  firearms,  the  National  Law  Enforcement and
22  Correction  Technology  Lab  located  in  Rome, New York, and such other
23  public or private entities  as  the  superintendent  deems appropriate,
24  formulate the necessary testing procedures for personalized firearms and
25  test  such firearms and prototypes of firearms or observe the testing of
26  firearms and prototypes of firearms, to evaluate the  effectiveness and
27  safety  of  such  firearms,  including, but not limited to, whether such
28  personalized firearms effectively preclude or prevent  the personalized
29  characteristics of such firearms from being deactivated.
30    A report, with recommendations, shall be submitted to the governor and
31  the  legislature not later than October 1, 2001. As part of such report,
32  the superintendent of the division of state police shall make recommen-
33  dations  as  to  the feasibility or desirability of requiring the use of
34  personalized  firearm  technology  for  all  firearms manufactured,
35  possessed,  sold,  offered  for  sale,  received,  transferred, shipped,
36  transported or distributed within this state, including whether,  or to
37  what extent the use of personalized firearm technology may not be appro-
38  priate for certain categories of firearms. For purposes of this section,
39  the  terms: (a) "authorized user" means the person who lawfully owns the
40  firearm or a person to whom the  owner  has  given  express  consent to
41  lawfully use the firearm; and (b) "firearm" means a pistol or revolver.
42    § 26.  Nothing  in  this act shall be construed to prohibit a munici-
43  pality or other unit of local government from adopting or maintaining a
44  stricter  standard  regulating the subject matters contained in sections
45  three, ten or the amendments made to paragraph (a) of subdivision  1 of
46  section 400.00 of the penal law by section eighteen of this act by local
47  law or ordinance.

48    § 27. Severability.   If any clause, sentence, paragraph, section or

49   part of this act shall be adjudged by any court of  competent jurisdic-

50   tion  to be invalid, the judgment shall not affect, impair or invalidate

51   the remainder thereof, but shall be confined in  its  operation  to the

52   clause,  sentence,  paragraph,  section  or  part  of  this act directly

53   involved in the controversy  in  which  the  judgment  shall  have been

54   rendered.

55    § 28. This act shall take effect immediately; provided, however, that:

S. 8234                              16                              A. 11535

 1    1.  Sections  one through three, six through nineteen and twenty-three

 2   and twenty-four of this act shall take effect on the first day of Novem-

 3   ber next succeeding the date on  which  it  shall  have  become  a law;

 4   provided,  further,  however, that effective immediately the division of

 5   state  police  is  authorized  and directed to promulgate such rules and

 6   regulations as may be necessary to effectuate the provisions of sections

 7   three and four of this act; provided, further, that  the  amendments to

 8   subdivision  3  of section 265.00 of the penal law made by section eight

 9   of this act shall apply to offenses committed in  violation  of article

10   265  or  400 of the penal law on or after the first day of November next

11   succeeding the date on which this act shall have become a law; and

12    2.  The gun trafficking interdiction program and  gun  tracer program

13   contained  in  section twenty-one of this act shall take effect November

14   1, 2000, provided further, however, that the superintendent of the divi-

15   sion of state police is authorized and directed  to  immediately adopt,

16   amend  and promulgate such rules and regulations as may be necessary and

17   desirable to effectuate the purposes of sections twenty-one and twenty-

18   two of this act.

# Exhibit 83

2002 Maryland Laws Ch. 26 (H.B. 11)

MARYLAND 2002 SESSION LAWS
REGULAR SESSION

Additions are indicated by <<+ Text +>>; deletions by
<<- Text ->>. Changes in tables are made but not highlighted.

Ch. 26
H.B. No. 11
CRIMINAL LAW

AN ACT concerning

**Criminal Law**

FOR the purpose of adding a new article to the Annotated Code of Maryland, to be designated and known as the "Criminal Law Article", to revise, restate, and recodify the laws of the State relating to criminal law; revising, restating, and recodifying certain provisions relating to consignment of agricultural products and other goods, humane slaughter of livestock, disposition of certain materials and returnable containers, use of organizational insignia, operation of junkyards and automobile recycling facilities, powers of child welfare organizations, citations for certain alcoholic beverages violations, certain alcoholic beverages violations and crimes, debt adjustment, false advertising, required reports of certain injuries, misuse of certain food containers, operation of certain vessels and related boating provisions, real estate settlements, fortune telling, and local animal control; defining certain terms; providing for the construction and application of this Act; providing for the continuity of certain units and the terms of certain officials; providing for the continuity of the status of certain transactions, employees, rights, duties, titles, interests, licenses, registrations, certifications, and permits; providing a delayed effective date for certain provisions of this Act; and generally relating to Maryland criminal laws.

BY repealing Article 27—Crimes and Punishments Section 2 and the subheading "Abduction"; 2A and the subheading "Accessory After the Fact"; 3 and the subheading "Adultery"; 4 and the subheading "Appropriating Property by Bailee"; 5 through 11 and the subheading "Arson and Burning"; 12 through 12A–7 and the subheading "Assault"; 18 and 19 and the subheading "Bigamy"; 20 and the subheading "Blasphemy"; 21 and the subheading "Boating"; 22 through 27 and the subheading "Bribery; Obstructing Justice"; 27A through 27C and the subheading "Bulletproof Body Armor"; 28 through 35B and the subheading "Burglary and Related Offenses"; 35C and 35D and the subheading "Abuse of Children or Vulnerable Adults"; 35E and the subheading "Child Selling"; 36 and the subheading "Carrying or Wearing Weapon"; 36A and the subheading "Carrying Deadly Weapons on Public School Property"; 36A–1 and the subheading "Disarming a Law Enforcement Officer"; 36B, 36D, 36E(l), 36F(c) through (g), (i), and (k), 36G, and 36H; 36H–1 through 36H–6 and 36K; 38 through 40 and the subheading "Conspiracy"; 40A and the subheading "Clove Cigarettes—Sales Prohibited"; 40B and the subheading "Code Grabbing"; 41 and 41A and the subheading "Contraceptives—Sale by Vending Machines"; 44 through 58 and the subheading "Counterfeiting and Forgery"; 59 through 70E and the subheading "Cruelty to Animals"; 79A and the subheading "Debt Adjustment"; 80 and the subheading "Defaulters"; 81 through 87 and the subheading "Desecration of the National or State Flag"; 111 through 118 and the subheading "Destroying, Injuring, etc., Property Maliciously"; 120A and the subheading "Grocery Carts"; 120B and the subheading "Food Packages or Containers"; 121 and 122 and the subheading "Disturbing the Public Peace and Disorderly Conduct"; 123 and 124 and the subheading "Harassment and Stalking"; 125 ½ and the subheading "Interference in Athletic Events"; 125A and the subheading "Emergency Communications—Interference"; 126 through 135 and the subheading "Embezzling Property and Writings"; 136 through 139 and the subheading "Escape and Contraband in Places of Confinement"; 139A through 139D and the subheading "Destructive Devices"; 140 through 144 and the subheading "Bad Checks"; 145 and 146 and the subheading "Credit Card Offenses"; 150 through 151C and the subheading "False Statements"; 152 and 153 and the subheading "Female Sitters"; 156 and the subheading "Fire

Also in the introductory language of subsection (a) of this section, the former effective date "June 1, 1994" is deleted as obsolete.

In subsection (a)(2) of this section, the former phrase "in the State" is deleted because the State's jurisdiction is limited to activities within the State.

Defined terms: "Assault pistol" § 4–301

"Person" § 1–101

<< MD CRIM LAW § 4–304 >>

<<+4–304. Same—Seizure and disposition.+>>

 <<+A law enforcement unit may seize as contraband and dispose of according to regulation an assault pistol transported, sold, transferred, purchased, received, or possessed in violation of this subtitle.+>>

REVISOR'S NOTE: This section is new language derived without substantive change from former Art. 27, § 36H–4.

The word "unit" is substituted for the former word "agency" to conform with standard terminology used to describe governmental bodies. *See* General Revisor's Note to article.

The Criminal Law Article Review Committee notes, for the consideration of the General Assembly, that it is unclear which "regulation" on contraband and disposal the law enforcement unit may use—that of the State, the United States, or a local government.

Defined term: "Assault pistol" § 4–301

<< MD CRIM LAW § 4–305 >>

<<+4–305. Detachable magazines—Prohibited.+>>

 <<+(a) Scope.+>>

 <<+This section does not apply to a .22 caliber rifle with a tubular magazine.+>>

 <<+(b) Prohibited.+>>

 <<+A person may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than 20 rounds of ammunition for a firearm.+>>

REVISOR'S NOTE: This section is new language derived without substantive change from former Art. 27, § 36H–5(b).

The former reference to "any type of" firearm is deleted as surplusage.

Defined term: "Person" § 1–101

<< MD CRIM LAW § 4–306 >>

<<+4–306. Penalties.+>>

 <<+(a) In general.+>>

 <<+A person who violates this subtitle is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.+>>

 <<+(b) Use in a felony or crime of violence.+>>

 <<+(1) A person who uses an assault pistol, or a magazine that has a capacity of more than 20 rounds of ammunition, in the commission of a felony or a crime of violence as defined in Article 27, § 441 of the Code is guilty of a misdemeanor and on conviction, in addition to any other sentence imposed for the felony or crime of violence, shall be sentenced under this subsection.+>>

 <<+(2)(i) For a first violation, the person shall be sentenced to imprisonment for not less than 5 and not exceeding 20 years.+>>

 <<+(ii) The court may not impose less than the minimum sentence of 5 years.+>>

 <<+(iii) The mandatory minimum sentence of 5 years may not be suspended.+>>

# Exhibit 84

# Chapter 47. Dangerous Articles

[HISTORY: Adopted by the Rochester City Council 11-25-1941. Amendments noted where applicable.]

## § 47-1. (Reserved)

[1]   *Editor's Note: Former § 47-1, Squawkers, was repealed 11-10-1987 by Ord. No. 87-370.*

## § 47-2. Darts, arrows and pointed instruments.

[Amended 6-22-1954; 10-13-1987 by Ord. No. 87-347]
No person shall sell, offer for sale, keep for sale, give, loan or lease to any person under 18 years of age any metal-tipped arrow or sharp pointed wooden or plastic arrow, or any sharp pointed wooden, plastic or metal instrument or weapon, so weighted and constructed as to be capable of being thrown or hurled to strike a person or object with its sharpest point, commonly known as a "dart"; or any sword, machete or knife other than a folding pocketknife with no blade more than three inches in length; nor shall any person under 18 years of age possess any such object. The provisions of this section shall not apply to the use of bows and arrows and darts in supervised recreation programs and on archery ranges.

## § 47-3. (Reserved)

[1]   *Editor's Note: Former § 47-3, Writing implements made of glass, was repealed 11-10-1987 by Ord. No. 87-370.*

## § 47-4. Storage and display of firearms, ammunition and explosives.

[Added 9-24-1996 by Ord. No. 96-297]

A.   Purpose and intent. The Council finds that it is necessary to regulate the commercial storage, possession and display of firearms, ammunition or explosives pursuant to § 139-d of the General Municipal Law in order to provide for the public health, safety and welfare of all persons in the City of Rochester. The Council finds that the location of such activities close to residential uses is not compatible with residential uses and can pose a danger to residents through fire or explosion or as a result of burglaries at such locations. The Council therefore intends to regulate the location of such activities and to place additional regulations upon those activities in order to assure that such activities arc conducted in a safe manner. The restrictions found herein shall be in addition to restrictions found in Chapter **120** of the Municipal Code, Zoning Code, and whichever regulations are more restrictive shall be applicable to any potential location where such activities are to be conducted.
[Amended 11-19-2002 by Ord. No. 2002-354]

B.   Location. The storage, possession or display of firearms, ammunition or explosives within a building occupied by a residential use, or within a building located within 100 feet of any residential use, which distance shall be measured from the closest point of the building, or portion thereof, used for the storage, possession or display of firearms, ammunition or explosives to the nearest point of the lot line of the

property with a residential use, is hereby prohibited.

C.   Standards of design, construction and maintenance of buildings and structures in which firearms, ammunition or explosives are stored.

(1)   Perimeter doorways. All perimeter doorways shall meet one of the following:

(a)   A windowless steel security door equipped with a high-security cylinder lock;

(b)   A windowed metal door that is equipped with a high-security cylinder lock. If the window has an opening of five inches or more measured in any direction, the window shall be covered with steel bars of at least one-half-inch diameter no further than six inches apart, or metal grating of at least nine gauge which has no spaces larger than six inches wide measured in any direction, affixed to the exterior or interior of the door; or

(c)   A metal grate or a metal folding scissors gate of at least nine gauge which has no spaces larger than six inches wide measured in any direction that is padlocked and affixed to the premises independent of the door and doorframe when the premises is not open for business.

(2)   Windows. All windows shall be covered with steel bars of a least one-half-inch diameter no further than six inches apart; or metal grating of at least nine gauge which has no spaces larger than six inches wide measured in any direction, affixed to the exterior or interior of the window frame; or a metal grate or a metal folding scissors gate of at least nine gauge which has no spaces larger than six inches wide measured in any direction that is padlocked and affixed to the premises independent of the door and doorframe when the premises is not open for business.

(3)   Heating, ventilating, air-conditioning and service openings. All heating, ventilating, air-conditioning and service openings shall be secured with steel bars, metal grating or an alarm system.

(4)   Alarm systems. Any building or structure used for the storage, possession and display of firearms, ammunition or explosives shall be protected by an alarm system which, when activated, directly notifies either a security guard on duty at the location, the Emergency Communications Center (through a designated line other than 911), an answering service or a central station, of a fire or smoke or intrusion or attempted intrusion into the premises. If an answering service or central station is used, the answering service or central station shall provide the service of receiving on a continuous basis through trained employees, emergency signals from the alarm systems and, thereafter, immediately relaying the message by live voice to 911.

D.   Visibility of interior to be maintained at all times. The interior of any building or structure used for the storage, possession and display of firearms, ammunition or explosives shall be visible through any windows at all times when open for business, and no drapes or blinds should be used that would block the view of police or passersby who might observe unusual activity within the premises. The exterior of the premises shall be illuminated at night and during the hours when business is not conducted within.

E.   Combustible materials. Combustible materials shall not be stored in any building or structure or that portion thereof used for the storage, possession and display of firearms, ammunition or explosives.

F.   Fire-extinguishing equipment. Fully operable listed fire-extinguishing equipment shall be maintained in any building or structure used for the storage, possession and display of firearms, ammunition or explosives and made easily accessible.

G.   Smoking and open flames prohibited. Smoking, matches, spark-producing devices and open flames shall be prohibited in any building or structure or that portion thereof used for the storage, possession and display of firearms, ammunition or explosives.

H.   Standards of security for storage of firearms, ammunition or explosives.

(1)   Storage of ammunition and explosives. All ammunition and explosives shall be stored in compliance with 9 NYCRR 1176 et seq. and 12 NYCRR 39 et seq. Further, all ammunition when being displayed shall be kept in locked cases or behind the counter in an area not accessible to the public.

(2) Storage of firearms when open for business.

     (a) No firearms shall be stored, exhibited or displayed in windows of the premises.

     (b) Firearms storage or inventory areas shall be physically separated from counter and display areas and access to these areas shall be carefully controlled.

     (c) All firearm display cases shall be kept locked and secured at all times and not readily accessible to the public. All keys to such display cases shall not leave the control of authorized personnel.

     (d) Trigger locks which disable firearms and prevent them from functioning must be locked to each firearm at all times, or the firearms must be secured in a locked case or be otherwise locked, or the firearms must be dispensed in an area behind the counter that is not accessible to the public. These requirements shall not apply to a firearm being shown to a customer, being repaired, or otherwise being worked on.

(3) Storage of firearms when not open for business. When not open for business, all firearms shall be stored in accordance with one of the following:

     (a) All firearms shall be stored in a locked fireproof safe or vault located in the business premises;

     (b) All firearms must be secured by a hardened steel rod or cable of at least 1/8 inch in diameter through the trigger guard of the firearm. The steel cord or cable shall be secured with a hardened steel lock that has a shackle. The lock and shackle shall be protected or shielded from the use of a bolt cutter and the rod or cable shall be anchored in a manner that prevents the ready removal of the firearms from the premises; or

     (c) All firearms shall be secured in a manner that prevents the ready removal of the firearms from the premises, as approved by the Chief of Police or the Chief's designee.

I. The regulations provided for herein shall not apply to the personal possession, use or ownership of firearms or ammunition therefor.

[1] *Editor's Note: Former § 47-4, Sale or gift of dangerous weapons, was repealed 3-16-1993 by Ord. No. 93-62.*

# § 47-5. Firearms, shotguns, rifles and other dangerous weapons.

[Amended 9-11-1951; 1-11-1955; 5-10-1960; 1-27-1970 by Ord. No. 70-36; 5-28-1974 by Ord. No. 74-180; 5-27-1986 by Ord. No. 86-163; 3-16-1993 by Ord. No. 93-62]

A. Purpose and intent. The Council finds that violent crime is a serious problem in the City and firearms and other dangerous weapons are frequently used in the commission of crimes, particularly homicides and assaults. The possession of such weapons also often leads to accidental deaths and injuries. The possession and use of assault weapons and ammunition feeding devices for criminal purposes is increasing and poses a serious danger to public safety. The use of weapons by persons under the influence of drugs and/or alcohol can readily lead to serious injury or death. The possession of weapons in public facilities also poses a serious danger to public safety. The possession of toy or imitation weapons which substantially duplicate actual weapons poses a danger to the person possessing the weapon and to others. In order to promote and protect the health, safety and welfare of the public, the Council finds it necessary to place restrictions upon the possession and use of such weapons. The restrictions imposed by this section are intended to be in addition to restrictions found in state law and are not intended to conflict with state law provisions.

B. As used in this section, the following terms shall have the meanings indicated:

**AIR GUN**
Any pistol, revolver, rifle or shotgun which fires projectiles by means of a spring or compressed air or other gas, instead of an explosive.
[Amended 12-15-2009 by Ord. No. 2009-410[2]]

**AMMUNITION**

Explosives suitable to be fired from a firearm, machine gun, pistol, revolver, rifle, shotgun, assault weapon or other dangerous weapon.

**AMMUNITION FEEDING DEVICE**

Magazines, belts, feedstrips, drums or clips capable of being attached to or utilized with any center-fire rifle, shotgun or pistol which employs the force of the expanding gases from a discharging cartridge to chamber a fresh round after each single pull of the trigger which, in the case of a rifle or shotgun holds in excess of five cartridges, or in the case of a pistol holds in excess of 17 cartridges.

**ASSAULT WEAPON**

(1)   Any center-fire rifle or shotgun which employs the force of the expanding gases from a discharging cartridge to chamber a fresh round after each single pull of the trigger, and which is loaded or capable of being loaded with a combination of more than six cartridges in the ammunition feeding device and chamber combined. For the purposes of this section, a weapon is capable of being loaded if it is possessed by one who, at the same time, possesses:

   (a)   In the case of a rifle, a fixed or detachable ammunition feeding device which is attached to or utilized with or capable of being attached to or utilized with such rifle and which has a capacity of more than five cartridges; or

   (b)   In the case of a shotgun, an ammunition feeding device which is attached to or utilized with or capable of being attached to or utilized with such shotgun and which has a capacity of more than five cartridges.

(2)   A center-fire rifle or shotgun which employs the force of expanding gases from a discharging cartridge to chamber a fresh round after each single pull of the trigger, and which has:

   (a)   A flash suppressor attached to the weapon reducing muzzle flash;

   (b)   A grenade launcher;

   (c)   A sighting device making a target visible at night;

   (d)   A barrel jacket surrounding all or a portion of the barrel to dissipate heat therefrom; or

   (e)   A multi-burst trigger activator.

(3)   Any stockless pistol grip shotgun.

(4)   The following weapons manufactured prior to the effective date of this section. [NOTE: This section was found unconstitutional by the Honorable Charles J. Siragusa, Supreme Court Justice, Monroe County, in Citizens for a Safer Community v. City of Rochester, Index No. 93-08421.]

(5)   For purposes of this section, the term "assault weapon" shall not include any of the following:

   (a)   Any weapon which has been modified to render it permanently inoperable or permanently make it a device no longer defined as an "assault weapon";

   (b)   Weapons that do not use cartridges or shells;

   (c)   Manually operated bolt-action weapons, lever-action weapons, slide-action weapons or single-shot weapons;

   (d)   Multiple-barrel weapons, revolving-cylinder weapons except shotguns, weapons that use exclusively a rotary Mannlicher-style magazine; or

   (e)   Any antique firearm as defined in § 265.00 of the New York State Penal Law or any curio or relic as defined under United States law which is possessed by a licensed collector in accordance with United States Law.

**DISPOSE OF**

To dispose of, give away, give, lease, loan, keep for sale, offer, offer for sale, sell, transfer or otherwise dispose of.

**DRUG**

Any substance listed in § 3306 of the Public Health Law of the State of New York.

**DWELLING**

As defined in Chapter **120** of the Municipal Code, Zoning Code.

[Amended 11-19-2002 by Ord. No. 2002-354]

**FIREARM**

Any pistol or revolver; or a shotgun having one or more barrels less than 18 inches in length or any weapon made from a shotgun (whether by alteration, modification or otherwise) if such weapon as modified has an overall length of less than 26 inches; or a rifle having one or more barrels less than 16 inches in length or any weapon made from a rifle (whether by alteration, modification or otherwise) if such weapon as modified has an overall length of less than 26 inches. For purposes of this definition, the length of the barrel on a shotgun or rifle shall be determined by measuring the distance between the muzzle and the face of the bolt, breech or breechlock when closed and when the shotgun or rifle is cocked; the overall length of a weapon made from a shotgun or rifle is the distance between the extreme ends of the weapon measured along a line parallel to the center line of the bore. Such definition, except as otherwise indicated, shall include both loaded and unloaded firearms, except that it shall not include any antique firearm as defined in federal or New York State law or any curio or relic as defined under United States law which is possessed by a licensed collector in accordance with United States law.

**PARK**

As defined in § **79-1** of the Municipal Code.

**POSSESS**

Have physical possession or otherwise to exercise dominion or control over. The presence in an automobile of any firearm, rifle or shotgun which is openly visible is presumptive evidence of its possession by all persons occupying such automobile at the time such firearm, rifle or shotgun is found, except if such firearm, rifle or shotgun is found in a vehicle for hire.

**PUBLIC FACILITY**

Any building or facility owned, leased, operated or controlled by or on behalf of any government, municipality or public authority or corporation within the boundaries of the City, except buildings or facilities used for educational purposes.

**PUBLIC PLACE**

Any street, including the sidewalk portion thereof, park, playground, recreation area, cemetery or lot owned, leased, operated or controlled by or on behalf of any government, municipality or public authority or corporation within the boundaries of the City, which is generally accessible to the public, except grounds used for educational purposes.

**RIFLE**

A weapon designed or redesigned, made or remade and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed metallic cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

**SHOTGUN**

A weapon designed or redesigned, made or remade and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of ball shot or a single projectile for each single pull of the trigger.

[2]      *Editor's Note: This ordinance provided an effective date of 1-11-2010.*

C.  No person shall possess a loaded or unloaded firearm, rifle, shotgun or air gun, or a dagger, dangerous knife, dirk, razor or stiletto, in a public place or public facility in the City. This prohibition shall not apply to:

(1)  A police officer or peace officer authorized to possess the same;

(2)  A government employee or licensed security guard authorized or required by employment or office to possess the same while acting within the scope of such employment;

(3)  A person in the military service of the State of New York or the United States when duly authorized to possess the same;

(4)  A person transporting a rifle or shotgun in a motor vehicle in the City in accordance with the provisions of § 11-0931, Subdivision 2, of the New York State Environmental Conservation Law, or otherwise transporting an unloaded rifle, shotgun or air gun in the City, provided that the same is completely enclosed or contained in a nontransparent carrying case and either:

(a)  Said carrying case is locked; or

(b)  A locking device is attached to the weapon and locked in a manner so as to prevent the weapon from being fired;

(5)  An authorized person who, for the purpose of shooting practice, possesses a weapon at an established target range in a public place other than a park or public facility;

(6)  A person voluntarily surrendering the same in accordance with the provisions of § 265.20 of the Penal Law; or

(7)  Possession of a firearm by a person licensed to carry a firearm pursuant to § 400.00 of the Penal Law or possession or transportation by a gunsmith or dealer in firearms in accordance with a license issued by the State of New York or the United States, except that this subsection shall not apply in a park or a public facility other than a parking garage.

D.  No person shall store a firearm, rifle, shotgun or air gun in a dwelling in the City unless said firearm, rifle, shotgun or air gun is completely enclosed or contained in a nontransparent locked carrying case or in a locked gun rack, cabinet, closet or safe, or a locking device is attached to the weapon and locked in a manner so as to prevent the weapon from being fired. This requirement shall not apply to a rifle, shotgun or licensed firearm carried on the body of the owner or within such close proximity of the owner that the owner can retrieve it as quickly and easily as if it were carried on the owner's body.

E.  No person shall dispose of any firearm, rifle, shotgun, air gun or ammunition in the City. This prohibition shall not apply to:

(1)  A gunsmith or dealer in firearms duly licensed by the State of New York or the United States;

(2)  A person disposing of the same to a gunsmith or dealer in firearms duly licensed by the State of New York or the United States;

(3)  A person voluntarily surrendering the same in accordance with the provisions of § 265.20 of the Penal Law;

(4)  A person disposing of a licensed firearm in accordance with law;

(5)  Disposition by intestate or testamentary bequest; or

(6)  A person disposing of a rifle, shotgun, air gun or ammunition to a family member.

F.  No person shall possess an assault weapon or an ammunition feeding device in the City. This prohibition shall not apply to:

(1)  A police officer or peace officer authorized to possess the same;

(2)  A person in the military service of the State of New York or the United States when duly authorized to

possess the same;

(3)   A person voluntarily surrendering the same in accordance with the provisions of § 265.20 of the Penal Law; or

(4)   A gunsmith or dealer in firearms duly licensed by the State of New York or the United States for weapons to be used by police officers or persons in the military service or for delivery outside of the City.

G.   No person shall dispose of an assault weapon or ammunition feeding device in the City. This prohibition shall not apply to:

(1)   A person voluntarily surrendering the same in accordance with the provisions of § 265.20 of the Penal Law; or

(2)   A gunsmith or dealer in firearms duly licensed by the State of New York or the United States for weapons to be used by police officers or persons in the military service or for delivery outside of the City.

H.   No person shall carry a firearm, shotgun, rifle or air gun in the City while such person has 1/10 of 1% or more by weight of alcohol in the person's blood as shown by chemical analysis of the person's blood, breath, urine or saliva.

I.   No person shall carry a firearm, shotgun, rifle or air gun in the City while in an intoxicated condition.

J.   No person shall carry a firearm, shotgun, rifle or air gun in the City while the person's ability to safely carry such weapon is impaired by the use of a drug.

K.   Any person who carries a firearm, shotgun, rifle or air gun in this City shall be deemed to have given consent to a breath test and a chemical test of the person's breath, blood, urine or saliva for the purpose of determining the alcoholic or drug content of the person's blood, provided that any test is administered at the direction of a police officer having reasonable grounds therefor. A chemical test must be administered within two hours after such person has been placed under arrest for a violation of this section or any other law or ordinance involving the use or possession of a firearm, rifle, shotgun or air gun, or within two hours after a breath test indicates that alcohol has been consumed by such person. Upon the trial of any action arising out of an arrest for a violation of Subsection **H**, **I** or **J** of this section, the court shall admit evidence of the amount of alcohol or drugs in the blood of the person carrying the firearm, shotgun, rifle or air gun as shown by a test administered pursuant to this section. Evidence of a refusal to submit to a chemical test shall be admissible in any trial, proceeding or hearing based upon a violation of such subsections, but only upon a showing that the person was given sufficient warning, in clear and unequivocal language, of the effect of such refusal and the person persisted in such refusal.

L.   [NOTE: This section was found unconstitutional by the Honorable Charles J. Siragusa, Supreme Court Justice, Monroe County, in Citizens for a Safer Community v. City of Rochester, Index No. 93-08421.]

M.   Discharge of weapons; permits.

(1)   No person shall discharge an air gun, shotgun, rifle, assault weapon, machine gun, submachine gun or a firearm of any kind or description in the City, except police officers, peace officers, members of the military and persons holding permits as in this subsection provided.

(2)   The Chief of Police is hereby authorized to grant permits for the discharge of shotguns at clay pigeons at any particular location or for the discharge of weapons at target ranges subject to such restrictions and conditions as the Chief may deem necessary. Any person holding such a permit shall obey all the restrictions and conditions contained herein.

N.   The owner of a firearm, shotgun, rifle, assault weapon, machine gun or submachine gun, which becomes lost or stolen, shall report the loss or theft to the Rochester Police Department within 24 hours after the loss or theft is discovered or reasonably should be discovered. The owner of such a weapon shall store the weapon in a safe and secure manner as required in Subsection **D** of this section and shall check such

weapon at least once each week, or immediately upon returning to the City if the owner is absent from the City for more than one week. Failure to perform such a check shall not be a defense to a prosecution for a violation of this subsection.

[Added 9-15-1998 by Ord. No. 98-345[3]]

[3]     *Editor's Note: This ordinance also relettered former Subsections N and O as Subsections O and P.*

O.    Notwithstanding the penalties contained in § **47-8**, a violation of any provision of this section shall be punishable by a fine not to exceed $1,000 or by imprisonment not to exceed 180 days, or by both such fine and imprisonment.

P.    The provisions of this section are severable, and if any of its provisions shall be held unconstitutional or invalid, the decision of the court shall not affect or impair any of the remaining provisions of the same. It is hereby declared to be the intention of the Council that this section would have been adopted had such unconstitutional or invalid provision not been included herein. If any term or provision of this section shall be declared unconstitutional, invalid or ineffective in whole, or in part, by a court of competent jurisdiction, then to the extent that it is not constitutional, invalid or ineffective, such term or provision shall be in force and effect, nor shall such determination be deemed to invalidate the remaining terms or provisions thereof.

[1]     *Editor's Note: For additional provisions relating to firearms, see Ch. 43, Cemeteries, § 43-11, and Ch. 79, Parks, § 79-5.*

# § 47-6. (Reserved)

[1]     *Editor's Note: Former Subsection A of § 47-6, Barbed wire, as amended, was redesignated as § 39-307D and former Subsection B was deleted 4-15-1997 by Ord. No. 97-133.*

# § 47-7. Discarded refrigerators and other containers.

[Added 9-8-1953]

It shall be unlawful for any person, firm or corporation to leave outside of any building or dwelling in a place accessible to children any abandoned, unattended or discarded icebox, refrigerator or any other container of any kind which has an airtight door or lock which may not be released for opening from inside of said icebox, refrigerator or container. It shall be unlawful for any person, firm or corporation to leave outside of any building or dwelling in a place accessible to children any abandoned, unattended or discarded icebox, refrigerator or any other container of any kind which has an airtight snap-lock or other device thereon without first removing the said snap-lock or doors from said icebox, refrigerator or container.

# § 47-8. Penalties.

[Amended 7-22-1969 by Ord. No. 69-329]

Any person or corporation violating any of the provisions of this chapter shall, upon conviction be punishable by a fine not exceeding $150, or by imprisonment not exceeding 15 days, or by both such fine and imprisonment, or by a penalty of not less than $5 nor more than $500 to be recovered by the City of Rochester in a civil action.