1  XAVIER BECERRA
   Attorney General of California
2  TAMAR PACHTER
   Supervising Deputy Attorney General
3  NELSON R. RICHARDS
   ANTHONY P. O'BRIEN
4  Deputy Attorneys General
   ALEXANDRA ROBERT GORDON
5  Deputy Attorney General
   State Bar No. 207650
6    455 Golden Gate Avenue, Suite 11000
     San Francisco, CA  94102-7004
7    Telephone: (415) 703-5509
     Fax: (415) 703-5480
8    E-mail:
     Alexandra.RobertGordon@doj.ca.gov
9  *Attorneys for Defendant*
   *Attorney General of California*
10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16 | **VIRGINIA DUNCAN, et al.** | 17-cv-1017-BEN-JLB |

17                          Plaintiffs,

18        v.                          **EXHIBITS 85-108 TO THE DECLARATION OF ALEXANDRA ROBERT GORDON IN SUPPORT OF DEFENDANT ATTORNEY GENERAL XAVIER BECERRA'S OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

19 **XAVIER BECERRA, in his official capacity as Attorney General of the**
20 **State of California; et al.,**
                          Defendants.
21

22                                    Date:      June 13, 2017
                                      Time:      10:00 a.m.
23                                    Dept:      5A
                                      Judge:     Hon. Roger T. Benitez
24                                    Action Filed:   May 17, 2017

25

26

27

28

—————————————————————————————————————————
Decl. of Alexandra Robert Gordon ISO Def's Opp'n to Pls.' Mot. For Prelim. Inj.
                                              (17-cv-1017-BEN-JLB)

# Exhibit 85

Print

Municipal Code of Chicago

8-20-010  Definitions.

For purposes of this chapter the following terms shall apply:

"The Act" means the Illinois Firearm Owners Identification Card Act, 430 ILCS 65/1 et seq., as amended.

"Ammunition" means any self-contained cartridge or shotgun shell, by whatever name known, which is designed to be used or adaptable to use in a firearm; excluding however:

    (1)   any ammunition used exclusively for line-throwing, signaling, or safety and required or recommended by the United States Coast Guard or Interstate Commerce Commission; or

    (2)   any ammunition designed exclusively for use with a stud or rivet driver or other similar industrial ammunition.

"Antique firearm" has the same meaning ascribed to that term in 18 U.S.C. § 921(a)(16).

"Assault weapon" means any of the following, regardless of the caliber of ammunition accepted:

    (a)   (1)   A semiautomatic rifle that has the ability to accept a detachable magazine and has one or more of the following:

        (A)   a folding, telescoping or detachable stock;

        (B)   a handgun grip;

        (C)   a forward grip;

        (D)   a threaded barrel;

        (E)   a grenade, flare or rocket launcher; or

        (F)   a barrel shroud.

    (2)   A semiautomatic rifle that has a fixed magazine with the capacity to accept more than 10 rounds, except for an attached tubular device designed to accept, and capable of operating only with, .22 caliber rimfire ammunition.

    (3)   A semiautomatic version of an automatic rifle.

    (4)   Any part, combination of parts, component, device, attachment, or accessory that is designed or functions to accelerate the rate of fire of a semiautomatic rifle but not convert the semiautomatic rifle into a machine gun.

    (5)   A semiautomatic shotgun that has one or more of the following:

        (A)   a folding, telescoping or detachable stock;

(B)   a handgun grip;

(C)   a fixed magazine with the capacity to accept more than 5 rounds;

(D)   a forward grip; or

(E)   a grenade, flare or rocket launcher.

(6)   A semiautomatic handgun that has the ability to accept a detachable magazine and has one or more of the following:

(A)   the capacity to accept a detachable magazine at some location outside of the handgun grip;

(B)   a threaded barrel;

(C)   a barrel shroud; or

(D)   a second handgun grip.

(7)   A semiautomatic version of an automatic handgun.

(8)   A semiautomatic handgun with a fixed magazine that has the capacity to accept more than 15 rounds.

(9)   A machine gun.

(10)   All of the following rifles, including any copies or duplicates thereof with the capability of any such weapon:

(A)   All AK types, including the following:

(i)   AK, AK47, AK47S, AK-74, AKM, AKS, ARM, MAK90, MISR, NHM90. NHM91, Rock River Arms LAR-47, SA85, SA93, Vector Arms AK-47, VEPR, WASR-10, and WUM

(ii)   IZHMASH Saiga AK

(iii)   MAADI AK47 and ARM

(iv)   Norinco 56S, 56S2, 84S, and 86S

(v)   Poly Technologies AK47 and AKS.

(B)   All AR types, including the following:

(i)   AR-10

(ii)   AR-15

(iii)   Armalite M15 22LR Carbine

(iv)   Armalite M15-T

(v)   Barrett REC7

(vi)   Beretta AR-70

(vii)   Bushmaster ACR

(viii)   Bushmaster Carbon 15

(ix)   Bushmaster MOE series

(x)   Bushmaster XM15

(xi)   Colt Match Target Rifles

(xii)   DoubleStar AR rifles

(xiii)   DPMS Tactical Rifles

(xiv)   Heckler & Koch MR556

(xv)   Olympic Arms

(xvi)   Remington R-15 rifles

(xvii)   Rock River Arms LAR-15

(xviii)   Sig Sauer SIG516 rifles

(xix)   Smith & Wesson M&P15 rifles

(xx)   Stag Arms AR rifles

(xxi)   Sturm, Ruger & Co. SR556 rifles.

(C)   Barrett M107A1.

(D)   Barrett M82A1.

(E)   Beretta CX4 Storm.

(F)   Calico Liberty Series.

(G)   CETME Sporter.

(H)\   Daewoo K-1. K-2, Max 1, Max 2, AR 100. and AR 110PC.

(I)   Fabrique Nationale/FN Herstal FAL, LAR, 22 FNC, 308 Match, L1A1 Sporter, PS90, SCAR, and FS2000.

(J)   Feather Industries AT-9.

(K)   Galil Model AR and Model ARM.

(L)   Hi-Point Carbine.

(M)   HK-91, HK-93, HK-94, HK-PSG-1, and HK USC.

(N)   Kel-Tec Sub-2000, SU-16, and RFB.

(O)   SIG AMT, SIG PE-57, Sig Sauer SG 550, and Sig Sauer SG 551.

(P)  Springfield Armory SAR-48.

(Q)  Steyr AUG.

(R)  Sturm, Ruger Mini-14 Tactical Rifle M-14/20CF.

(S)  All Thompson rifles, including the following:

   (i)  Thompson M1SB

   (ii)  Thompson T1100D

   (iii)  Thompson T150D

   (iv)  Thompson T1B

   (v)  Thompson T1B100D

   (vi)  Thompson T1B50D

   (vii)  Thompson T1BSB

   (viii)  Thompson T1-C

   (ix)  Thompson T1D

   (x)  Thompson T1SB

   (xi)  Thompson T5

   (xii)  Thompson T5100D

   (xiii)  Thompson TM1

   (xiv)  Thompson TM1C.

(T)  UMAREX UZI Rifle.

(U)  UZI Mini Carbine, UZI Model A Carbine, and UZI Model B Carbine.

(V)  Valmet M62S, M71S, and M78.

(W)  Vector Arms UZI Type.

(X)  Weaver Arms Nighthawk.

(Y)  Wilkinson Arms Linda Carbine.

(11)  All of the following handguns, including any copies or duplicates thereof with the capability of any such weapon:

(A)  All AK-47 types, including the following:

   (i)  Centurion 39 AK handgun

   (ii)  Draco AK-47 handgun

    (iii)  HCR AK-47 handgun

    (iv)  IO, Inc. Hellpup AK-47 handgun

    (v)  Krinkov handgun

    (vi)  Mini Draco AK-47 handgun

    (vii)  Yugo Krebs Krink handgun.

(B)  All AR-15 types, including the following:

    (i)  American Spirit AR-15 handgun

    (ii)  Bushmaster Carbon 15 handgun

    (iii)  DoubleStar Corporation AR handgun

    (iv)  DPMS AR-15 handgun

    (v)  Olympic Arms AR-15 handgun

    (vi)  Rock River Arms LAR 15 handgun.

(C)  Calico Liberty handguns.

(D)  PSA SA58 PKP FAL handgun.

(E)  Encom MP-9 and MP-45.

(F)  Heckler & Koch model SP-89 handgun.

(G)  Intratec AB-10, TEC-22 Scorpion, TEC-9, and TEC-DC9.

(H)  Kel-Tec PLR 16 handgun.

(I)  The following MAC types:

    (i)  MAC-10

    (ii)  MAC-11

    (iii)  Masterpiece Arms MPA A930 Mini Pistol, MPA460 Pistol. MPA Tactical Pistol, and MPA Mini Tactical Pistol

    (iv)  Military Armament Corp. Ingram M-11

    (v)  Velocity Arms VMAC.

(J)  Sig Sauer P556 handgun.

(K)  Sites Spectre.

(L)  All Thompson types, including the following:

    (i)  Thompson TA510D

(M)   All UZI types, including Micro-UZI.

(12)   All of the following shotguns, including any copies or duplicates thereof with the capability of any such weapon:

(A)   Franchi LAW-12 and SPAS 12.

(B)   All IZHMASH Saiga 12 types, including the following:

(i)   IZHMASH Saiga 12

(ii)   IZHMASH Saiga 12S

(iii)   IZHMASH Saiga 12S EXP-01

(iv)   IZHMASH Saiga 12K

(v)   IZHMASH Saiga 12K-030

(vi)   IZHMASH Saiga 12K-040 Taktika.

(C)   Streetsweeper.

(D)   Striker 12.

(13)   All belt-fed semiautomatic firearms, including TNW M2HB.

(14)   Any combination of parts from which a firearm described in subparagraphs (1) through (13) can be assembled.

(15)   The frame or receiver of a rifle or shotgun described in subparagraph (1), (2), (5), (9), (10), (12), (13), or (18).

(16)   A sawed-off shotgun.

(17)   A short-barrel rifle.

(18)   A .50 caliber rifle.

(b)   An "assault weapon" shall not include any firearm that:

(1)   is manually operated by bolt, pump, lever, or slide action:

(2)   has been rendered permanently inoperable.  "Permanently inoperable" means a firearm which is incapable of discharging a projectile by means of an explosive and incapable of being restored to a firing condition; or

(3)   is an antique firearm.

(c)   For purposes of this definition of "assault weapon" the following terms apply:

(1)   "barrel shroud" means a shroud that is attached to, or partially or completely encircles, the barrel of a firearm so that the shroud protects the user of the firearm from heat generated by the barrel.  The term

does not include (i) a slide that partially or completely encloses the barrel; or (ii) an extension of the stock along the bottom of the barrel which does not completely or substantially encircle the barrel.

(2)   "detachable magazine" means an ammunition feeding device that can be removed from a firearm without disassembly of the firearm action.

(3)   "fixed magazine" means an ammunition feeding device that is permanently fixed to the firearm in such a manner that it cannot be removed without disassembly of the firearm.

(4)   "folding, telescoping, or detachable stock" means a stock that folds, telescopes, detaches or otherwise operates to reduce the length, size, or any other dimension, or otherwise to enhance the concealability, of a firearm.

(5)   "forward grip" means a grip located forward of the trigger that functions as a handgun grip.

(6)   "rocket" means any simple or complex tubelike device containing combustibles that on being ignited liberate gases whose action propels the device through the air and has a propellant charge of not more than 4 ounces.

(7)   "grenade, flare or rocket launcher" means an attachment for use on a firearm that is designed to propel a grenade, flare, rocket, or other similar device.

(8)   "handgun grip" means a grip, a thumbhole stock, or any other part, feature or characteristic that can function as a grip.

(9)   "threaded barrel" means a feature or characteristic that is designed to allow for the attachment of a device such as a firearm silencer or a flash suppressor.

(10)   "belt-fed semiautomatic firearm" means any repeating firearm that:

(i)   utilizes a portion of the energy of a firing cartridge to extract the fired cartridge case and chamber the next round;

(ii)   requires a separate pull of the trigger to fire each cartridge; and

(iii)   has the capacity to accept a belt ammunition feeding device.

(11)   ".50 caliber rifle" means a centerfire rifle capable of firing a .50 caliber cartridge. The term does not include any antique firearm, any shotgun including a shotgun that has a rifle barrel, or any muzzle-loader which uses black powder for hunting or historical re-enactments.

(12)   ".50 caliber cartridge" means a fixed cartridge in .50 BMG caliber, either by designation or actual measurement, that is capable of being fired from a centerfire rifle. ".50 caliber cartridge" does not include any memorabilia or display item that is filled with a permanent inert substance or that is otherwise permanently altered in a manner that prevents ready modification for use as live ammunition or shotgun ammunition with a caliber measurement that is equal to or greater than .50 caliber.

"Corrections officer" means wardens, superintendents and keepers of prisons, penitentiaries, jails and other institutions for the detention of persons accused or convicted of an offense.

"Department" means the department of police.

"Duty-related firearm" shall mean any firearm which is authorized by any law enforcement agency or employer to be utilized by their personnel in the performance of their official duties.

"Firearm" means any device, by whatever name known, which is designed or restored to expel a projectile or projectiles by the action of any explosive, expansion of gas or escape of gas.  Provided, that such term shall not include:

(1)   any pneumatic gun, spring gun, paint ball gun or B-B gun which either expels a single globular projectile not exceeding .18 inch in diameter and which has a maximum muzzle velocity of less than 700 feet per second or breakable paint balls containing washable marking colors;

(2)   any device used exclusively for line- throwing, signaling, or safety and required or recommended by the United States Coast Guard or Interstate Commerce Commission; or

(3)   any device used exclusively for firing explosives, rivets, stud cartridges, or any similar industrial ammunition.

"Firearm case" means any firearm case, carrying box, shipping box or other similar container that is designed for the safe transportation of the firearm.

"FOID" means the Firearm Owner's Identification Card issued pursuant to the Act.

"High capacity magazine" means a magazine, belt, drum, feed strip, or similar device, including any such device joined or coupled with another in any manner, that has an overall capacity of more than 15 rounds of ammunition.  A "high capacity magazine" does not include an attached tubular device to accept, and capable of operating only with, .22 caliber rimfire ammunition.

"Laser sight accessory" means a laser sighting device which is either integrated into a firearm or capable of being attached to a firearm.

"Licensed shooting range facility" means a shooting range facility that is duly licensed pursuant to Chapter 4-151.

"Licensee of a licensed shooting range facility" or "licensee" means any person issued a shooting range facility license under Chapter 4-151.

"Machine gun" means any firearm which can fire multiple rounds of ammunition by a single function of the firing device or one press of the trigger.

"Peace officer" means any person who by virtue of his office or public employment is vested by law with a duty to maintain public order or make arrests for offenses, whether that duty extends to all offenses or is limited to specific offenses.

"Sawed-off shotgun" means a shotgun having one or more barrels less than 18 inches in length and any weapon made from a shotgun, whether by alteration, modification or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

"Short-barreled rifle" means a rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

"Superintendent" means the superintendent of the department or his designated representative.

"Safety mechanism" means a design adaption or nondetachable accessory that lessens the likelihood of unanticipated use of the handgun.

"Trigger lock" means a device that when locked in place by means of a key, prevents a potential user from pulling the trigger of the firearm without first removing the trigger lock by use of the trigger lock's key.

"Manager", "Employee", "Range Master", "CCL", "Shooting range patron" and "Shooting range facility" have the meaning ascribed to those terms in Section 4-151-010.

(Added Coun. J. 7-2-10, p. 96234, § 4; Amend Coun. J. 7-6-11, p. 3073, § 4; Amend Coun. J. 1-17-13, p. 45370, § 4; Amend Coun. J. 7-17-13, p. 57262, § 1; Amend Coun. J. 9-11-13, p. 59869, § 3)

**8-20-085  High capacity magazines and certain tubular magazine extensions – Sale and possession prohibited – Exceptions.**

   (a)   It is unlawful for any person to carry, possess, sell, offer or display for sale, or otherwise transfer any high capacity magazine or tubular magazine extension for a shotgun.  This section shall not apply to corrections officers, members of the armed forces of the United States, or the organized militia of this or any other state, and peace officers, to the extent that any such person is otherwise authorized to acquire or possess a high capacity magazine or tubular magazine extension for a shotgun, and is acting within the scope of his duties, or to any person while in the manufacturing, transportation or sale of high capacity magazines or tubular magazine extension for a shotgun to people authorized to possess them under this section.

   (b)   Any high capacity magazine or tubular magazine extension for a shotgun carried, possessed, displayed, sold or otherwise transferred in violation of this section is hereby declared to be contraband and shall be seized by and forfeited to the city.

(Added Coun. J. 7-2-10, p. 96234, § 4; Amend Coun. J. 7-17-13, p. 57262, § 1)

# Exhibit 86



HOUSE BILL 13-1224

BY REPRESENTATIVE(S) Fields, Court, Fischer, Hullinghorst, Labuda, Levy, Melton, Pabon, Rosenthal, Schafer, Williams, Young, Buckner, Ferrandino;
also SENATOR(S) Hodge, Aguilar, Guzman, Heath, Nicholson, Ulibarri, Morse.

CONCERNING PROHIBITING LARGE-CAPACITY AMMUNITION MAGAZINES.

*Be it enacted by the General Assembly of the State of Colorado:*

**SECTION 1.** In Colorado Revised Statutes, **add** part 3 to article 12 of title 18 as follows:

PART 3
LARGE-CAPACITY AMMUNITION MAGAZINES

**18-12-301.  Definitions.** AS USED IN THIS PART 3, UNLESS THE CONTEXT OTHERWISE REQUIRES:

(1)  "BUREAU" MEANS THE COLORADO BUREAU OF INVESTIGATION CREATED AND EXISTING PURSUANT TO SECTION 24-33.5-401, C.R.S.

(2) (a)  "LARGE-CAPACITY MAGAZINE MEANS:

_____

*Capital letters indicate new material added to existing statutes; dashes through words indicate deletions from existing statutes and such material not part of act.*

(I)  A FIXED OR DETACHABLE MAGAZINE, BOX, DRUM, FEED STRIP, OR SIMILAR DEVICE CAPABLE OF ACCEPTING, OR THAT IS DESIGNED TO BE READILY CONVERTED TO ACCEPT, MORE THAN FIFTEEN ROUNDS OF AMMUNITION;

(II)  A FIXED, TUBULAR SHOTGUN MAGAZINE THAT HOLDS MORE THAN TWENTY-EIGHT INCHES OF SHOTGUN SHELLS, INCLUDING ANY EXTENSION DEVICE THAT IS ATTACHED TO THE MAGAZINE AND HOLDS ADDITIONAL SHOTGUN SHELLS; OR

(III)  A NONTUBULAR, DETACHABLE MAGAZINE, BOX, DRUM, FEED STRIP, OR SIMILAR DEVICE THAT IS CAPABLE OF ACCEPTING MORE THAN EIGHT SHOTGUN SHELLS WHEN COMBINED WITH A FIXED MAGAZINE.

(b)  "LARGE-CAPACITY MAGAZINE" DOES NOT MEAN:

(I)  A FEEDING DEVICE THAT HAS BEEN PERMANENTLY ALTERED SO THAT IT CANNOT ACCOMMODATE MORE THAN FIFTEEN ROUNDS OF AMMUNITION;

(II)  AN ATTACHED TUBULAR DEVICE DESIGNED TO ACCEPT, AND CAPABLE OF OPERATING ONLY WITH, .22 CALIBER RIMFIRE AMMUNITION; OR

(III)  A TUBULAR MAGAZINE THAT IS CONTAINED IN A LEVER-ACTION FIREARM.

**18-12-302.  Large-capacity magazines prohibited - penalties - exceptions.** (1) (a)  EXCEPT AS OTHERWISE PROVIDED IN THIS SECTION, ON AND AFTER JULY 1, 2013, A PERSON WHO SELLS, TRANSFERS, OR POSSESSES A LARGE-CAPACITY MAGAZINE COMMITS A CLASS 2 MISDEMEANOR.

(b)  ANY PERSON WHO VIOLATES SUBSECTION (1) OF THIS SECTION AFTER HAVING BEEN CONVICTED OF A PRIOR VIOLATION OF SAID SUBSECTION (1) COMMITS A CLASS 1 MISDEMEANOR.

(c)  ANY PERSON WHO VIOLATES SUBSECTION (1) OF THIS SECTION COMMITS A CLASS 6 FELONY IF THE PERSON POSSESSED A LARGE-CAPACITY MAGAZINE DURING THE COMMISSION OF A FELONY OR ANY CRIME OF VIOLENCE, AS DEFINED IN SECTION 18-1.3-406.

PAGE 2-HOUSE BILL 13-1224

(2) (a)  A PERSON MAY POSSESS A LARGE-CAPACITY MAGAZINE IF HE OR SHE:

(I)  OWNS THE LARGE-CAPACITY MAGAZINE ON THE EFFECTIVE DATE OF THIS SECTION; AND

(II)  MAINTAINS CONTINUOUS POSSESSION OF THE LARGE-CAPACITY MAGAZINE.

(b)  IF A PERSON WHO IS ALLEGED TO HAVE VIOLATED SUBSECTION (1) OF THIS SECTION ASSERTS THAT HE OR SHE IS PERMITTED TO LEGALLY POSSESS A LARGE-CAPACITY MAGAZINE PURSUANT TO PARAGRAPH (a) OF THIS SUBSECTION (2), THE PROSECUTION HAS THE BURDEN OF PROOF TO REFUTE THE ASSERTION.

(3)  THE OFFENSE DESCRIBED IN SUBSECTION (1) OF THIS SECTION SHALL NOT APPLY TO:

(a)  AN ENTITY, OR ANY EMPLOYEE THEREOF ENGAGED IN HIS OR HER EMPLOYMENT DUTIES, THAT MANUFACTURES LARGE-CAPACITY MAGAZINES WITHIN COLORADO EXCLUSIVELY FOR TRANSFER TO, OR ANY LICENSED GUN DEALER, AS DEFINED IN SECTION 12-26.1-106 (6), C.R.S., OR ANY EMPLOYEE THEREOF ENGAGED IN HIS OR HER OFFICIAL EMPLOYMENT DUTIES, THAT SELLS LARGE-CAPACITY MAGAZINES EXCLUSIVELY TO:

(I)  A BRANCH OF THE ARMED FORCES OF THE UNITED STATES;

(II)  A DEPARTMENT, AGENCY, OR POLITICAL SUBDIVISION OF THE STATE OF COLORADO, OR OF ANY OTHER STATE, OR OF THE UNITED STATES GOVERNMENT;

(III)  A FIREARMS RETAILER FOR THE PURPOSE OF FIREARMS SALES CONDUCTED OUTSIDE THE STATE;

(IV)  A FOREIGN NATIONAL GOVERNMENT THAT HAS BEEN APPROVED FOR SUCH TRANSFERS BY THE UNITED STATES GOVERNMENT; OR

(V)  AN OUT-OF-STATE TRANSFEREE WHO MAY LEGALLY POSSESS A LARGE-CAPACITY MAGAZINE; OR

PAGE 3-HOUSE BILL 13-1224

(b) AN EMPLOYEE OF ANY OF THE FOLLOWING AGENCIES WHO BEARS A FIREARM IN THE COURSE OF HIS OR HER OFFICIAL DUTIES:

(I) A BRANCH OF THE ARMED FORCES OF THE UNITED STATES; OR

(II) A DEPARTMENT, AGENCY, OR POLITICAL SUBDIVISION OF THE STATE OF COLORADO, OR OF ANY OTHER STATE, OR OF THE UNITED STATES GOVERNMENT; OR

(c) A PERSON WHO POSSESSES THE MAGAZINE FOR THE SOLE PURPOSE OF TRANSPORTING THE MAGAZINE TO AN OUT-OF-STATE ENTITY ON BEHALF OF A MANUFACTURER OF LARGE-CAPACITY MAGAZINES WITHIN COLORADO.

**18-12-303. Identification markings for large-capacity magazines - rules.** (1) A LARGE-CAPACITY MAGAZINE THAT IS MANUFACTURED IN COLORADO ON OR AFTER THE EFFECTIVE DATE OF THIS SECTION MUST INCLUDE A PERMANENT STAMP OR MARKING INDICATING THAT THE LARGE-CAPACITY MAGAZINE WAS MANUFACTURED OR ASSEMBLED AFTER THE EFFECTIVE DATE OF THIS SECTION. THE STAMP OR MARKING MUST BE LEGIBLY AND CONSPICUOUSLY ENGRAVED OR CAST UPON THE OUTER SURFACE OF THE LARGE-CAPACITY MAGAZINE.

(2) THE BUREAU MAY PROMULGATE SUCH RULES AS MAY BE NECESSARY FOR THE IMPLEMENTATION OF THIS SECTION, INCLUDING BUT NOT LIMITED TO RULES REQUIRING A LARGE-CAPACITY MAGAZINE THAT IS MANUFACTURED ON OR AFTER THE EFFECTIVE DATE OF THIS SECTION TO BEAR IDENTIFYING INFORMATION IN ADDITION TO THE IDENTIFYING INFORMATION DESCRIBED IN SUBSECTION (1) OF THIS SECTION.

(3) A PERSON WHO MANUFACTURES A LARGE-CAPACITY MAGAZINE IN COLORADO IN VIOLATION OF SUBSECTION (1) OF THIS SECTION COMMITS A CLASS 2 MISDEMEANOR AND SHALL BE PUNISHED IN ACCORDANCE WITH SECTION 18-1.3-501.

**SECTION 2.  Effective date.** This act takes effect July 1, 2013.

**SECTION 3.  Safety clause.** The general assembly hereby finds,

determines, and declares that this act is necessary for the immediate preservation of the public peace, health, and safety.


_____        _____

Mark Ferrandino                                             John P. Morse
SPEAKER OF THE HOUSE                          PRESIDENT OF
OF REPRESENTATIVES                               THE SENATE




_____        _____

Marilyn Eddins                                              Cindi L. Markwell
CHIEF CLERK OF THE HOUSE                    SECRETARY OF
OF REPRESENTATIVES                               THE SENATE



        APPROVED_____




        _____
        John W. Hickenlooper
        GOVERNOR OF THE STATE OF COLORADO




PAGE 5-HOUSE BILL 13-1224

# Exhibit 87

2013 Conn. Legis. Serv. P.A. 13-3 (S.B. 1160) (WEST)

CONNECTICUT 2013 LEGISLATIVE SERVICE

2013 January Regular Session of the General Assembly

Additions are indicated by Text; deletions by
~~Text~~ .
Vetoes are indicated by ~~Text~~ ;
stricken material by Text .

P.A. No. 13–3
S.B. No. 1160
FIREARMS—OMNIBUS AMENDMENT

AN ACT CONCERNING GUN VIOLENCE PREVENTION AND CHILDREN'S SAFETY.

Be it enacted by the Senate and House of Representatives in General Assembly convened:

Section 1. Section 29–37a of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 29–37a >>

(a) For the purposes of this section, "long gun" means a firearm, as defined in section 53a–3, other than a pistol or revolver.

(b) (1) Except as provided in subdivision (2) of this subsection, no person, firm or corporation may sell, deliver or otherwise transfer, at retail, any long gun to any person under eighteen years of age.

(2) No person, firm or corporation may sell, deliver or otherwise transfer, at retail, any semi-automatic centerfire rifle that has or accepts a magazine with a capacity exceeding five rounds to any person under twenty-one years of age. The provisions of this subdivision shall not apply to the sale, delivery or transfer of such a rifle to any person who is a member or employee of an organized local police department, the Department of Emergency Services and Public Protection or the Department of Correction or a member of the military or naval forces of this state or of the United States for use in the discharge of their duties.

(c) On and after April 1, 2014, no person may purchase or receive any long gun unless such person holds a valid long gun eligibility certificate issued pursuant to section 2 of this act, a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29–28, as amended by this act, a valid permit to sell at retail a pistol or revolver issued pursuant to subsection (a) of section 29–28 or a valid eligibility certificate for a pistol or revolver issued pursuant to section 29–36f, as amended by this act, or is a federal marshal, parole officer or peace officer.

~~(a)~~ (d) No person, firm or corporation may ~~deliver, at retail,~~ sell, deliver or otherwise transfer, at retail, any ~~firearm, as defined in section 53a–3, other than a pistol or revolver,~~ long gun to any person unless such person makes application on a form prescribed and furnished by the Commissioner of Emergency Services and Public Protection, which shall be filed and retained by the transferor for at least twenty years or, if the transferor is a federally licensed firearm dealer, attached by the ~~vendor~~ transferor to the federal sale or transfer document and filed and retained by the ~~vendor~~ transferor for at least twenty years or until such ~~vendor~~ transferor goes out of business. Such application shall be available for inspection during normal business hours by law enforcement officials. ~~No sale or delivery of any firearm shall be made until the expiration of two weeks from the date of the application, and~~ No such sale, delivery or other transfer of any long gun shall be made until the person, firm or corporation

WestlawNext © 2013 Thomson Reuters. No claim to original U.S. Government Works.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3539   Page 20 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

making such sale, delivery or transfer has ~~insured~~ ensured that such application has been completed properly and has obtained an authorization number from the Commissioner of Emergency Services and Public Protection for such sale, delivery or transfer. The Department of Emergency Services and Public Protection shall make every effort, including performing the national instant criminal background check, to determine if the applicant is eligible to receive such ~~firearm~~ long gun. If it is determined that the applicant is ineligible to receive such ~~firearm~~ long gun, the Commissioner of Emergency Services and Public Protection shall immediately notify the person, firm or corporation to whom such application was made and no such ~~firearm~~ long gun shall be sold, ~~or~~ delivered or otherwise transferred to such applicant by such person, firm or corporation. When any ~~firearm~~ long gun is delivered in connection with ~~the~~ any sale or purchase, such ~~firearm~~ long gun shall be enclosed in a package, the paper or wrapping of which shall be securely fastened, and no such ~~firearm~~ long gun when delivered on any sale or purchase shall be loaded or contain any gunpowder or other explosive or any bullet, ball or shell.

~~(b)~~ Upon the sale, delivery or other transfer of the ~~firearm~~ long gun, the ~~purchaser~~ transferee shall sign in triplicate a receipt for such ~~firearm~~ long gun, which shall contain the name, ~~and~~ address and date and place of birth of such ~~purchaser~~ transferee, the date of such sale, delivery or transfer and the caliber, make, model and manufacturer's number and a general description thereof. Not later than twenty-four hours after such sale, delivery or transfer, the ~~vendor~~ transferor shall send by first class mail or electronically transfer one receipt to the Commissioner of Emergency Services and Public Protection and one receipt to the chief of police or, where there is no chief of police, the warden of the borough or the first selectman, of the town in which the ~~purchaser~~ transferee resides, and shall retain one receipt, together with the original application, for at least five years. ~~The~~

(e) No sale, delivery or other transfer of any long gun shall be made by a person who is not a federally-licensed firearm manufacturer, importer or dealer to a person who is not a federally-licensed firearm manufacturer, importer or dealer unless:

(1) The prospective transferor and prospective transferee comply with the provisions of subsection (d) of this section and the prospective transferor has obtained an authorization number from the Commissioner of Emergency Services and Public Protection for such sale, delivery or transfer; or

(2) A national instant criminal background check has been initiated by a federally-licensed firearm dealer who has consented to initiate such check at the request of the prospective transferor or prospective transferee in accordance with subsection (f) of this section and the response received by the federally-licensed firearm dealer indicates the prospective transferee is eligible to receive such long gun.

(f) (1) On and after January 1, 2014, for purposes of a transfer pursuant to subdivision (2) of subsection (e) of this section, a prospective transferor or prospective transferee may request a federally-licensed firearm dealer to initiate a national instant criminal background check of the prospective transferee. If a federally-licensed firearm dealer consents to initiate a national instant criminal background check, the prospective transferor or prospective transferee shall provide to such dealer the name, sex, race, date of birth and state of residence of the prospective transferee and, if necessary to verify the identity of the prospective transferee, may provide a unique numeric identifier including, but not limited to, a Social Security number, and additional identifiers including, but not limited to, height, weight, eye and hair color, and place of birth. The prospective transferee shall present to the dealer such prospective transferee's valid long gun eligibility certificate issued pursuant to section 2 of this act, valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29–28, as amended by this act, valid permit to sell at retail a pistol or revolver issued pursuant to subsection (a) of section 29–28 or valid eligibility certificate for a pistol or revolver issued pursuant to section 29–36f, as amended by this act. The dealer may charge a fee not to exceed twenty dollars for initiating such background check.

(2) Notwithstanding the provisions of subsections (d) and (f) of section 29–36*l*, the dealer shall initiate a background check of such prospective transferee by contacting the national instant criminal background check system operations center for purposes of conducting such background check. Upon receiving a response from the operations center of the results of such check, the dealer shall immediately notify the prospective transferor or prospective transferee of such response. If the response indicates the prospective transferee is ineligible to receive such long gun, no long gun shall be sold, delivered or otherwise transferred by the

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3540 Page 21 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

prospective transferor to the prospective transferee. If the response indicates the prospective transferee is eligible to receive such long gun, the prospective transferor may proceed to sell, deliver or otherwise transfer the long gun to the prospective transferee.

(3) Upon the sale, delivery or other transfer of the long gun, the transferor or transferee shall complete a form, prescribed by the Commissioner of Emergency Services and Public Protection, that contains the name and address of the transferor, the name and address of the transferee, the date and place of birth of such transferee, the firearm permit or certificate number of the transferee, the firearm permit or certificate number of the transferor, if any, the date of such sale, delivery or transfer, the caliber, make, model and manufacturer's number and a general description of such long gun and the transaction number assigned by the national instant criminal background check system to the background check request. Not later than twenty-four hours after such sale, delivery or transfer, the transferor shall send by first class mail or electronically transfer one copy of such form to the Commissioner of Emergency Services and Public Protection and one copy to the chief of police or, where there is no chief of police, the warden of the borough or the first selectman, of the town in which the transferee resides, and shall retain one copy, for at least five years.

(g) Prior to April 1, 2014, no sale, delivery or other transfer of any long gun shall be made until the expiration of two weeks from the date of the application, except that such waiting period ~~specified in subsection (a) of this section during which delivery may not be made and the provisions of this subsection~~ shall not apply to any federal marshal, parole officer or peace officer, or to the ~~delivery at retail~~ sale, delivery or other transfer of (1) any ~~firearm~~ long gun to a holder of a valid state permit to carry a pistol or revolver issued under the provisions of section 29–28, as amended by this act, or a valid eligibility certificate issued under the provisions of section 29–36f, as amended by this act, or a valid long gun eligibility certificate issued under the provisions of section 2 of this act, (2) any ~~firearm~~ long gun to an active member of the armed forces of the United States or of any reserve component thereof, (3) any ~~firearm~~ long gun to a holder of a valid hunting license issued pursuant to chapter 490,[1] or (4) antique firearms. For the purposes of this ~~section~~ subsection, "antique firearm" means any firearm which was manufactured in or before 1898 and any replica of such firearm, provided such replica is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition except rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and not readily available in the ordinary channel of commercial trade.

(h) The provisions of this section shall not apply to the sale, delivery or transfer of long guns between (1) a federally-licensed firearm manufacturer and a federally-licensed firearm dealer, (2) a federally-licensed firearm importer and a federally-licensed firearm dealer, or (3) federally-licensed firearm dealers.

(i) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution. The court shall not order suspension of prosecution unless the accused person has acknowledged that he understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the tolling of any statute of limitations with respect to such violation and to a waiver of his right to a speedy trial. Such person shall appear in court and shall be released to the custody of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes his period of probation, he may apply for dismissal of the charges against him and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against him after satisfactorily completing his period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed his period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54–142a. An order of the court denying a motion to dismiss the charges against a person who has completed his period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3541   Page 22 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(j) Any person who violates any provision of this section shall be guilty of a class D felony, except that any person who sells, delivers or otherwise transfers a long gun in violation of the provisions of this section, knowing that such long gun is stolen or that the manufacturer's number or other mark of identification on such long gun has been altered, removed or obliterated, shall be guilty of a class B felony, and any long gun found in the possession of any person in violation of any provision of this section shall be forfeited.

1      C.G.S.A. § 26–1 et seq.

Sec. 2. (NEW) (Effective July 1, 2013)

(a) Any person who is eighteen years of age or older may apply to the Commissioner of Emergency Services and Public Protection for a long gun eligibility certificate.

(b) The Commissioner of Emergency Services and Public Protection shall issue a long gun eligibility certificate unless said commissioner finds that the applicant: (1) Has failed to successfully complete a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of firearms including, but not limited to, a safety or training course in the use of firearms available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Energy and Environmental Protection and a safety or training course in the use of firearms conducted by an instructor certified by the state or the National Rifle Association; (2) has been convicted of (A) a felony, or (B) a violation of subsection (c) of section 21a–279 of the general statutes or section 53a–58, 53a–61, 53a–61a, 53a–62, 53a–63, 53a–96, 53a–175, 53a–176, 53a–178 or 53a–181d of the general statutes; (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b–120 of the general statutes; (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a–13 of the general statutes; (5) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a–495 of the general statutes, within the preceding sixty months by order of a probate court; (6) has been voluntarily admitted to a hospital for persons with psychiatric disabilities, as defined in section 17a–495 of the general statutes, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a–680 of the general statutes; (7) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person; (8) is subject to a firearms seizure order issued pursuant to subsection (d) of section 29–38c of the general statutes, as amended by this act, after notice and hearing; (9) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to 18 USC 922(g)(4); or (10) is an alien illegally or unlawfully in the United States.

Sec. 3. (NEW) (Effective July 1, 2013)

(a) Requests for long gun eligibility certificates under section 2 of this act shall be submitted to the Commissioner of Emergency Services and Public Protection on application forms prescribed by the commissioner. No long gun eligibility certificate shall be issued under the provisions of section 2 of this act unless the applicant for such certificate gives to the Commissioner of Emergency Services and Public Protection, upon the commissioner's request, full information concerning the applicant's criminal record and relevant information concerning the applicant's mental health history. The commissioner shall require each applicant to submit to state and national criminal history records checks in accordance with section 29–17a of the general statutes. The commissioner shall take a full description of such applicant. The commissioner shall take the fingerprints of such applicant or conduct any other method of positive identification required by the State Police Bureau of Identification or the Federal Bureau of Investigation. The commissioner shall record the date the fingerprints were taken in the applicant's file and shall conduct criminal history records checks in accordance with section 29–17a of the general statutes. The commissioner shall, not later than sixty days after receipt of the national criminal history records check from the Federal Bureau of Investigation,

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3542 Page 23 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

either approve the application and issue the long gun eligibility certificate or deny the application and notify the applicant of the reason for such denial in writing.

(b) A long gun eligibility certificate shall be of such form and content as the commissioner may prescribe, shall be signed by the certificate holder and shall contain an identification number, the name, address, place and date of birth, height, weight and eye color of the certificate holder and a full-face photograph of the certificate holder.

(c) A person holding a long gun eligibility certificate issued by the commissioner shall notify the commissioner not later than two business days after any change of such person's address. The notification shall include both the old address and the new address of such person.

(d) Notwithstanding the provisions of sections 1–210 and 1–211 of the general statutes, the name and address of a person issued a long gun eligibility certificate under the provisions of section 2 of this act shall be confidential and shall not be disclosed, except (1) such information may be disclosed to law enforcement officials acting in the performance of their duties, including, but not limited to, employees of the United States Probation Office acting in the performance of their duties, (2) the Commissioner of Emergency Services and Public Protection may disclose such information to the extent necessary to comply with a request made pursuant to section 29–37a of the general statutes, as amended by this act, or section 14 of this act for verification that such certificate is still valid and has not been suspended or revoked, and (3) such information may be disclosed to the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a–500 of the general statutes, as amended by this act.


Sec. 4. (NEW) (Effective July 1, 2013)

(a) The fee for each long gun eligibility certificate originally issued under the provisions of section 2 of this act shall be thirty-five dollars and for each renewal thereof thirty-five dollars, which fees shall be paid to the Commissioner of Emergency Services and Public Protection. Upon deposit of such fees in the General Fund, the fees shall be credited to the appropriation to the Department of Emergency Services and Public Protection to a separate nonlapsing account for the purposes of the issuance of long gun eligibility certificates under said section.

(b) A long gun eligibility certificate originally issued under the provisions of section 2 of this act shall expire five years after the date it becomes effective and each renewal thereof shall expire five years after the expiration date of the certificate being renewed.

(c) The renewal fee shall apply for each renewal that is requested not earlier than thirty-one days before, and not later than thirty-one days after, the expiration date of the certificate being renewed.

(d) No fee or portion thereof paid under the provisions of this section for issuance or renewal of a long gun eligibility certificate shall be refundable except if the certificate for which the fee or portion thereof was paid was not issued or renewed.

(e) The Commissioner of Emergency Services and Public Protection shall send a notice of the expiration of a long gun eligibility certificate issued pursuant to section 2 of this act to the holder of such certificate, by first class mail, at the address of such person as shown by the records of the commissioner, not less than ninety days before such expiration, and shall enclose therein a form for the renewal of such certificate. A long gun eligibility certificate issued pursuant to said section shall be valid for a period of ninety days from the expiration date, except this provision shall not apply to any certificate which has been revoked or for which revocation is pending, pursuant to section 5 of this act.


Sec. 5. (NEW) (Effective July 1, 2013)

(a) A long gun eligibility certificate shall be revoked by the Commissioner of Emergency Services and Public Protection upon the occurrence of any event which would have disqualified the holder from being issued the certificate pursuant to section 2 of this act.

(b) Upon the revocation of any long gun eligibility certificate, the person whose certificate is revoked shall be notified, in writing, and such certificate shall be forthwith delivered to the Commissioner of Emergency Services and Public Protection. Any person who fails to surrender such certificate within five days of notification, in writing, of revocation thereof shall be guilty of a class A misdemeanor.

Sec. 6. Subsection (b) of section 29–32b of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 29–32b >>

(b) Any person aggrieved by any refusal to issue or renew a permit or certificate under the provisions of section 29–28, as amended by this act, or 29–36f, as amended by this act, or section 2 of this act, or by any limitation or revocation of a permit or certificate issued under any of said sections, or by a refusal or failure of any issuing authority to furnish an application as provided in section 29–28a, may, within ninety days after receipt of notice of such refusal, limitation or revocation, or refusal or failure to supply an application as provided in section 29–28a, and without prejudice to any other course of action open to such person in law or in equity, appeal to the board. On such appeal the board shall inquire into and determine the facts, de novo, and unless it finds that such a refusal, limitation or revocation, or such refusal or failure to supply an application, as the case may be, would be for just and proper cause, it shall order such permit or certificate to be issued, renewed or restored, or the limitation removed or modified, as the case may be. If the refusal was for failure to document compliance with local zoning requirements, under subsection (a) of section 29–28, the board shall not issue a permit.

Sec. 7. Subsection (a) of section 29–36l of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 29–36l >>

(a) The Commissioner of Emergency Services and Public Protection shall establish a state database that any person, firm or corporation who sells or otherwise transfers pistols or revolvers firearms may access, by telephone or other electronic means in addition to the telephone, for information to be supplied immediately, on whether a permit to carry a pistol or revolver, issued pursuant to subsection (b) of section 29–28, as amended by this act, a permit to sell at retail a pistol or revolver, issued pursuant to subsection (a) of section 29–28, or an eligibility certificate for a pistol or revolver, issued pursuant to section 29–36f, as amended by this act, or a long gun eligibility certificate, issued pursuant to section 2 of this act, is valid and has not been revoked or suspended.

Sec. 8. Section 29–38b of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 29–38b >>

(a) The Commissioner of Emergency Services and Public Protection, in fulfilling his obligations under sections 29–28 to 29–38, inclusive, as amended by this act, sections 2 to 5, inclusive, of this act and section 53–202d, as amended by this act, shall verify that any person who, on or after October 1, 1998, applies for or seeks renewal of a permit to sell at retail a pistol or revolver, a permit to carry a pistol or revolver, an eligibility certificate for a pistol or revolver or a certificate of possession for an assault weapon, or who, on or after July 1, 2013, applies for or seeks renewal of a long gun eligibility certificate, has not been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding twelve sixty months by order of a probate court or has not been voluntarily admitted to a hospital for persons with psychiatric disabilities,

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3544   Page 25 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

as defined in section 17a–495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a–680, by making an inquiry to the Department of Mental Health and Addiction Services in such a manner so as to only receive a report on the commitment or admission status of the person with respect to whom the inquiry is made including identifying information in accordance with the provisions of subsection (b) of section 17a–500, as amended by this act.

(b) If the Commissioner of Emergency Services and Public Protection determines pursuant to subsection (a) of this section that a person has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding twelve sixty months by order of a probate court or has been voluntarily admitted to a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a–680, said commissioner shall report the status of such person's application for or renewal of a permit to sell at retail a pistol or revolver, a permit to carry a pistol or revolver, an eligibility certificate for a pistol or revolver, or a certificate of possession for an assault weapon or a long gun eligibility certificate to the Commissioner of Mental Health and Addiction Services for the purpose of fulfilling his responsibilities under subsection (c) of section 17a–500, as amended by this act.

Sec. 9. Subsection (b) of section 54–36e of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 54–36e >>

(b) Firearms turned over to the state police pursuant to subsection (a) of this section which are not destroyed or retained for appropriate use shall be sold at public auctions, conducted by the Commissioner of Administrative Services or such said commissioner's designee. Pistols and revolvers, as defined in section 53a–3, which are antiques, as defined in section 29–33, as amended by this act, or curios or relics, as defined in the Code of Federal Regulations, Title 27, Chapter 1, Part 178, or modern pistols and revolvers which have a current retail value of one hundred dollars or more may be sold at such public auctions, provided such pistols and revolvers shall be sold only to persons who have a valid permit to sell a pistol or revolver, or a valid permit to carry a pistol or revolver, issued pursuant to section 29–28, as amended by this act. Rifles and shotguns, as defined in section 53a–3, shall be sold only to persons qualified under federal law to purchase such rifles and shotguns and who have a valid long gun eligibility certificate issued pursuant to section 2 of this act. The proceeds of any such sale shall be paid to the State Treasurer and deposited by the State Treasurer in the forfeit firearms account within the General Fund.

Sec. 10. (NEW) (Effective October 1, 2013)

Whenever a person is voluntarily admitted to a hospital for persons with psychiatric disabilities, as defined in section 17a–495 of the general statutes, for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a–680 of the general statutes, the hospital shall forthwith notify the Commissioner of Mental Health and Addiction Services of such admission and provide identifying information including, but not limited to, name, address, sex, date of birth and the date of admission. The commissioner shall maintain such identifying information on all such admissions occurring on and after the effective date of this section.

Sec. 11. Section 17a–500 of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 17a–500 >>

(a) Each court of probate shall keep a record of the cases relating to persons with psychiatric disabilities coming before it under sections 17a–75 to 17a–83, inclusive, 17a–450 to 17a–484, inclusive, 17a–495 to 17a–528, inclusive, 17a–540 to 17a–550,

inclusive, 17a–560 to 17a–576, inclusive, and 17a–615 to 17a–618, inclusive, and the disposition of them. It shall also keep on file the original application and certificate of physicians required by said sections, or a microfilm duplicate of such records in accordance with regulations issued by the Probate Court Administrator. All records maintained in the courts of probate under the provisions of said sections shall be sealed and available only to the respondent or his or her counsel unless the Court of Probate, after hearing held with notice to the respondent, determines such records should be disclosed for cause shown.

(b) Notwithstanding the provisions of subsection (a) of this section, the  The Commissioner of Mental Health and Addiction Services shall, notwithstanding the provisions of subsection (a) of this section, maintain information, in accordance with section 17a–499, shall maintain information  on commitment orders by a probate court, and shall maintain information, in accordance with section 10 of this act, on voluntary admissions, and shall provide such information to the Commissioner of Emergency Services and Public Protection in fulfillment of his obligations under sections 29–28 to 29–38, inclusive, as amended by this act, sections 2 to 5, inclusive, of this act and section 53–202d, as amended by this act, in such a manner as to report identifying information on the commitment or voluntary admission status, including, but not limited to, name, address, sex, date of birth and date of commitment or admission, for a person who applies for or holds a permit or certificate under said sections 29–28 to 29–38, inclusive, as amended by this act, sections 2 to 5, inclusive, of this act and section 53–202d, as amended by this act. The Commissioner of Emergency Services and Public Protection shall maintain as confidential any such information provided to him and shall use such information only for purposes of fulfilling his obligations under sections 29–28 to 29–38, inclusive, as amended by this act, sections 2 to 5, inclusive, of this act and section 53–202d, as amended by this act, except that nothing in this section shall prohibit said commissioner from entering such information into evidence at a hearing held in accordance with section 29–32b, as amended by this act.

(c) (1) The Commissioner of Mental Health and Addiction Services shall obtain from the Commissioner of Emergency Services and Public Protection the status of any firearm application, permit or certificate under sections 29–28 to 29–38, inclusive, as amended by this act, sections 2 to 5, inclusive, of this act and section 53–202d, as amended by this act, of each person who is the subject of an order of commitment pursuant to  as provided in section 17a–499 or is the subject of a voluntary admission as provided in section 10 of this act, in such a manner so as to only receive a report on the firearm application, permit or certificate status of the person with respect to whom the inquiry is made.

(2) The Commissioner of Mental Health and Addiction Services shall report to the Commissioner of Emergency Services and Public Protection any commitment or voluntary admission status and identifying information for any person who is an applicant for or holder of any permit or certificate under said sections 29–28 to 29–38, inclusive, as amended by this act, sections 2 to 5, inclusive, of this act and section 53–202d, as amended by this act.

(3) The Commissioner of Mental Health and Addiction Services shall advise the hospital for psychiatric disabilities to which a person has been committed or voluntarily admitted of the status of a firearm application, permit or certificate of such person under sections 29–28 to 29–38, inclusive, as amended by this act, sections 2 to 5, inclusive, of this act and section 53–202d, as amended by this act, as reported by the Commissioner of Emergency Services and Public Protection for consideration by such hospital in any psychiatric treatment procedures.

(4) The Commissioner of Mental Health and Addiction Services and a hospital for psychiatric disabilities shall maintain as confidential any information provided to said commissioner or such hospital concerning the status of a firearm application, permit or certificate under sections 29–28 to 29–38, inclusive, as amended by this act, sections 2 to 5, inclusive, of this act and section 53–202d, as amended by this act, of any person.

Sec. 12. Subsection (a) of section 53–202g of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 53–202g >>

(a) Any person who lawfully possesses an assault weapon under sections 29–37j and 53–202a to 53–202k, inclusive, as amended by this act, and subsection (h) of section 53a–46a or a firearm, as defined in section 53a–3, that is lost or stolen from such person shall report the loss or theft to the organized local police department for the town in which the loss or theft occurred or, if such town does not have an organized local police department, to the state police troop having jurisdiction for such town within seventy-two hours of when such person discovered or should have discovered the loss or theft. Such department or troop shall forthwith forward a copy of such report to the Commissioner of Emergency Services and Public Protection. The provisions of this subsection shall not apply to the loss or theft of an antique firearm as defined in subsection (b) of section 29–37a, as amended by this act.

Sec. 13. Subsection (c) of section 53–202aa of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 53–202aa >>

(c) For the purposes of this section, "firearm" means "firearm" as defined in section 53a–3, but does not include a rifle or shotgun or an antique firearm as defined in subsection (b) of section 29–37a, as amended by this act.

Sec. 14. (NEW) (Effective from passage)

(a) For the purposes of this section and sections 15 to 17, inclusive, of this act, "ammunition" means a loaded cartridge, consisting of a primed case, propellant or projectile, designed for use in any firearm, "firearm" has the meaning provided in section 53a–3 of the general statutes, and "magazine" means any firearm magazine, belt, drum, feed strip or similar device that accepts ammunition.

(b) No person, firm or corporation shall sell ammunition or an ammunition magazine to any person under eighteen years of age.

(c) On and after October 1, 2013, no person, firm or corporation shall sell ammunition or an ammunition magazine to any person unless such person holds a valid permit to carry a pistol or revolver issued pursuant to subsection (b) of section 29–28 of the general statutes, as amended by this act, a valid permit to sell at retail a pistol or revolver issued pursuant to subsection (a) of section 29–28 of the general statutes, a valid eligibility certificate for a pistol or revolver issued pursuant to section 29–36f of the general statutes, as amended by this act, or a valid long gun eligibility certificate issued pursuant to section 2 of this act and presents to the transferor such permit or certificate, or unless such person holds a valid ammunition certificate issued pursuant to section 15 of this act and presents to the transferor such certificate and such person's motor vehicle operator's license, passport or other valid form of identification issued by the federal government or a state or municipal government that contains such person's date of birth and photograph.

(d) The provisions of this section shall not apply to the sale, delivery or transfer of ammunition between (1) a federally-licensed firearm manufacturer and a federally-licensed firearm dealer, (2) a federally-licensed firearm importer and a federally-licensed firearm dealer, or (3) federally-licensed firearm dealers.

(e) Any person who violates any provision of this section shall be guilty of a class D felony.

Sec. 15. (NEW) (Effective July 1, 2013)

(a) Any person who is eighteen years of age or older may request the Commissioner of Emergency Services and Public Protection to (1) conduct a national criminal history records check of such person, in accordance with the provisions of section 29–17a of the general statutes, using such person's name and date of birth only, and (2) issue an ammunition certificate to such person in accordance with the provisions of this section.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3547   Page 28 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(b) After conducting the national criminal history records check of such person, the commissioner shall issue an ammunition certificate to such person unless the commissioner determines, based on a review of the results of such criminal history records check, that such person would be ineligible to be issued a long gun eligibility certificate under section 2 of this act, except that a conviction of a violation specified in subparagraph (B) of subdivision (2) of subsection (b) of section 2 of this act shall cause such person to be ineligible for an ammunition certificate only if such conviction was for a violation committed on or after the effective date of this section.

(c) Such ammunition certificate shall be of such form as the commissioner may prescribe, contain an identification number and the name, address and date of birth of the certificate holder and be signed by the certificate holder.

(d) A person holding an ammunition certificate issued by the commissioner shall notify the commissioner not later than two business days after any change of such person's address. The notification shall include both the old address and the new address of such person.

(e) Notwithstanding the provisions of sections 1–210 and 1–211 of the general statutes, the name and address of a person issued an ammunition certificate under this section shall be confidential and shall not be disclosed, except (1) such information may be disclosed to law enforcement officials acting in the performance of their duties, including, but not limited to, employees of the United States Probation Office acting in the performance of their duties, (2) the Commissioner of Emergency Services and Public Protection may disclose such information to the extent necessary to comply with a request made pursuant to section 14 of this act for verification that such certificate is still valid and has not been suspended or revoked, and (3) such information may be disclosed to the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a–500 of the general statutes, as amended by this act.

Sec. 16. (NEW) (Effective July 1, 2013)

(a) The fee for each ammunition certificate originally issued under the provisions of this section shall be thirty-five dollars and for each renewal thereof thirty-five dollars, which fees shall be paid to the Commissioner of Emergency Services and Public Protection and shall be in addition to the fee paid pursuant to subsection (b) of section 29–17a of the general statutes for conducting the national criminal history records check. Upon deposit of such fees in the General Fund, the fees shall be credited to the appropriation to the Department of Emergency Services and Public Protection to a separate nonlapsing account for the purposes of the issuance of ammunition certificates under section 15 of this act.

(b) An ammunition certificate originally issued under the provisions of section 15 of this act shall expire five years after the date it becomes effective and each renewal thereof shall expire five years after the expiration date of the certificate being renewed.

(c) The renewal fee shall apply for each renewal that is requested not earlier than thirty-one days before, and not later than thirty-one days after, the expiration date of the certificate being renewed.

(d) No fee or portion thereof paid under the provisions of this section for issuance or renewal of an ammunition certificate shall be refundable except if the certificate for which the fee or portion thereof was paid was not issued or renewed.

(e) An ammunition certificate issued pursuant to section 15 of this act shall be valid for a period of ninety days from the expiration date, except this provision shall not apply to any certificate which has been revoked or for which revocation is pending, pursuant to section 17 of this act.

Sec. 17. (NEW) (Effective July 1, 2013)

(a) An ammunition certificate shall be revoked by the Commissioner of Emergency Services and Public Protection upon the occurrence of any event which would have disqualified the holder from being issued the certificate pursuant to section 15 of this act.

(b) Upon the revocation of any ammunition certificate, the person whose certificate is revoked shall be notified, in writing, and such certificate shall be forthwith delivered to the Commissioner of Emergency Services and Public Protection. Any person who fails to surrender such certificate within five days of notification, in writing, of revocation thereof shall be guilty of a class A misdemeanor.

Sec. 18. (NEW) (Effective January 1, 2014)

(a) For the purposes of this section and sections 19 and 20 of this act, and sections 45a–99 and 52–11 of the general statutes, as amended by this act:

(1) "Commissioner" means the Commissioner of Emergency Services and Public Protection;

(2) "Convicted" means that a person has a judgment entered in this state against such person by a court upon a plea of guilty, a plea of nolo contendere or a finding of guilty by a jury or the court notwithstanding any pending appeal or habeas corpus proceeding arising from such judgment;

(3) "Deadly weapon" means a deadly weapon, as defined in section 53a–3 of the general statutes;

(4) "Department" means the Department of Emergency Services and Public Protection;

(5) "Identifying factors" means fingerprints, a photographic image, and a description of any other identifying characteristics as may be required by the Commissioner of Emergency Services and Public Protection;

(6) "Not guilty by reason of mental disease or defect" means a finding by a court or jury of not guilty by reason of mental disease or defect pursuant to section 53a–13 of the general statutes notwithstanding any pending appeal or habeas corpus proceeding arising from such finding;

(7) "Offender convicted of committing a crime with a deadly weapon" or "offender" means a person who has been convicted of an offense committed with a deadly weapon;

(8) "Offense committed with a deadly weapon" or "offense" means: (A) A violation of subsection (c) of section 2–1e, subsection (e) of section 29–28, subsections (a) to (e), inclusive, or (i) of section 29–33, as amended by this act, section 29–34, as amended by this act, subsection (a) of section 29–35, section 29–36, as amended by this act, 29–36k, as amended by this act, 29–37a, as amended by this act, or 29–37e, subsection (c) of section 29–37g, section 29–37j, as amended by this act, subsection (b), (c) or (g) of section 53–202, section 53–202b, as amended by this act, 53–202c, as amended by this act, 53–202j, 53–202k, 53–202*l*, as amended by this act, 53–202aa, as amended by this act, or 53–206b, subsection (b) of section 53a–8, section 53a–55a, 53a–56a, 53a–60a, 53a–60c, 53a–72b, 53a–92a, 53a–94a, 53a–102a, 53a–103a, 53a–211, 53a–212, as amended by this act, 53a–216, 53a–217, as amended by this act, 53a–217a, as amended by this act, 53a–217b or 53a–217c, as amended by this act, or a second or subsequent violation of section 53–202g of the general statutes, as amended by this act; or (B) a violation of any section of the general statutes which constitutes a felony, as defined in section 53a–25 of the general statutes, provided the court makes a finding that, at the time of the offense, the offender used a deadly weapon, or was armed with and threatened the use of or displayed or represented by words or conduct that the offender possessed a deadly weapon;

(9) "Registrant" means a person required to register under section 19 of this act;

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3549   Page 30 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(10) "Registry" means a central record system in this state that is established pursuant to this section and receives, maintains and disseminates to law enforcement agencies information on persons convicted or found not guilty by reason of mental disease or defect of an offense committed with a deadly weapon; and

(11) "Release into the community" means, with respect to a conviction or a finding of not guilty by reason of mental disease or defect of an offense committed with a deadly weapon, (A) any release by a court after such conviction or finding of not guilty by reason of mental disease or defect, a sentence of probation or any other sentence under section 53a–28 of the general statutes that does not result in the offender's immediate placement in the custody of the Commissioner of Correction; (B) release from a correctional facility at the discretion of the Board of Pardons and Paroles, by the Department of Correction to a program authorized by section 18–100c of the general statutes or upon completion of the maximum term or terms of the offender's sentence or sentences, or to the supervision of the Court Support Services Division in accordance with the terms of the offender's sentence; or (C) temporary leave to an approved residence by the Psychiatric Security Review Board pursuant to section 17a–587 of the general statutes, conditional release from a hospital for mental illness or a facility for persons with intellectual disability by the Psychiatric Security Review Board pursuant to section 17a–588 of the general statutes, or release upon termination of commitment to the Psychiatric Security Review Board.

(b) The Department of Emergency Services and Public Protection shall, not later than January 1, 2014, establish and maintain a registry of all persons required to register under section 19 of this act as offenders convicted of an offense committed with a deadly weapon. The department shall, in cooperation with the Office of the Chief Court Administrator, the Department of Correction and the Psychiatric Security Review Board, develop appropriate forms for use by agencies and individuals to report registration information, including changes of address. Upon receipt of registration information, the department shall enter the information into the registry and notify the local police department or state police troop having jurisdiction where the registrant resides or plans to reside. Upon receiving notification pursuant to section 19 of this act that a registrant has changed his or her address, the department shall enter the information into the registry and notify the local police departments or state police troops having jurisdiction where the registrant previously resided and the jurisdiction where the registrant has relocated. The Commissioner of Emergency Services and Public Protection shall also ensure that the name and residence address of each registrant is available through the Connecticut on-line law enforcement communication teleprocessing system maintained by the department. If a registrant reports a residence in another state, the department may notify the state police agency of that state or such other agency in that state that maintains registry information, if known.

(c) The Department of Emergency Services and Public Protection may suspend the registration of any person registered under section 19 of this act while such person is incarcerated, under civil commitment or residing outside this state. During the period that such registration is under suspension, the department may withdraw the registration information from access to law enforcement agencies. Upon the release of the registrant from incarceration or civil commitment or resumption of residency in this state by the registrant, the department shall reinstate the registration and redistribute the registration information in accordance with subsection (b) of this section. Suspension of registration shall not affect the date of expiration of the registration obligation of the registrant under section 19 of this act.

(d) The Department of Emergency Services and Public Protection shall include in the registry the most recent photographic image of each registrant taken by the department, the Department of Correction, a law enforcement agency or the Court Support Services Division of the Judicial Department.

(e) Whenever the Commissioner of Emergency Services and Public Protection receives notice from a superior court pursuant to section 52–11 of the general statutes, as amended by this act, or a probate court pursuant to section 45a–99 of the general statutes, as amended by this act, that such court has ordered the change of name of a person, and the department determines that such person is listed in the registry, the department shall revise such person's registration information accordingly.

(f) The Commissioner of Emergency Services and Public Protection shall develop a protocol for the notification of other state agencies, the Judicial Department and local police departments whenever a person listed in the registry changes such person's

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3550  Page 31 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

name and notifies the commissioner of the new name pursuant to section 19 of this act or whenever the commissioner determines pursuant to subsection (e) of this section that a person listed in the registry has changed such person's name.

(g) The information in the registry shall not be a public record or file for the purposes of section 1–200 of the general statutes. Any information disclosed pursuant to this section or section 19 or 20 of this act, shall not be further disclosed unless such disclosure is permitted under this section or section 19 or 20 of this act.

Sec. 19. (NEW) (Effective January 1, 2014)

(a) (1) Any person who has been convicted or found not guilty by reason of mental disease or defect of an offense committed with a deadly weapon and is released into the community on or after January 1, 2014, shall, within fourteen calendar days following such release or, if such person is in the custody of the Commissioner of Correction, at such time prior to release as the Commissioner of Correction shall direct, and whether or not such person's place of residence is in this state, register such person's name, identifying factors, criminal history record, residence address and electronic mail address with the Commissioner of Emergency Services and Public Protection, on such forms and in such locations as the Commissioner of Emergency Services and Public Protection shall direct, and shall maintain such registration for five years.

(2) Prior to accepting a plea of guilty or nolo contendere from a person with respect to an offense committed with a deadly weapon, the court shall (A) inform the person that the entry of a finding of guilty after acceptance of the plea will subject the person to the registration requirements of this section, and (B) determine that the person fully understands the consequences of the plea.

(3) If any person who is subject to registration under this section changes such person's name, such person shall, without undue delay, notify the Commissioner of Emergency Services and Public Protection in writing of the new name. If any person who is subject to registration under this section changes such person's address, such person shall, without undue delay, notify the Commissioner of Emergency Services and Public Protection in writing of the new address. During such period of registration, each registrant shall complete and return any forms mailed to such registrant to verify such registrant's residence address and shall submit to the retaking of a photographic image upon request of the Commissioner of Emergency Services and Public Protection.

(b) Any offender convicted of committing a crime with a deadly weapon who is required to register under this section shall, not later than twenty calendar days after each anniversary date of such initial registration, until the date such registration requirement expires under subdivision (1) of subsection (a) of this section, personally appear at the local police department or state police troop having jurisdiction where the registrant resides to verify and update, as appropriate, the contents of his or her registration. The local police department or state police troop, as the case may be, may defer such requirement to personally appear to a later date for good cause shown. Not later than thirty calendar days prior to such anniversary date, the Department of Emergency Services and Public Protection shall mail written notice of the personal appearance requirement of this subsection to the registrant and the local police department or state police troop having jurisdiction where the registrant resides. Not later than thirty calendar days after the anniversary date of each registrant, the local police department or state police troop having jurisdiction where the registrant resides shall notify the Commissioner of Emergency Services and Public Protection, on such form as the commissioner may prescribe, (1) whether the registrant complied with the personal appearance requirement of this subsection or whether such personal appearance requirement was deferred to a later date for good cause shown, and (2) if the personal appearance requirement was deferred to a later date for good cause shown, the local police department or state police troop shall indicate the later date established for such personal appearance and describe the good cause shown.

(c) Any person who is subject to registration under this section who violates any provisions of subsection (a) or (b) of this section, except a violation consisting of failure to notify the Commissioner of Emergency Services and Public Protection of a change of name or address, shall be guilty of a class D felony. Any person who is subject to registration under this section who

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3551 Page 32 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

fails to notify the Commissioner of Emergency Services and Public Protection of a change of name or address not later than five business days after such change of name or address shall be guilty of a class D felony.

Sec. 20. (NEW) (Effective January 1, 2014)

(a) The registration information for each registrant shall include:

(1) The offender's name, including any other name by which the offender has been legally known, and any aliases used by the offender;

(2) Identifying information, including a physical description of the offender;

(3) The current residence address of the offender;

(4) The date of conviction of the offense;

(5) A description of the offense; and

(6) If the offender was sentenced to a term of incarceration for such offense, a portion of which was not suspended, the date the offender was released from such incarceration.

(b) The offender shall sign and date the registration.

(c) At the time that the offender appears for the purpose of registering, the Department of Emergency Services and Public Protection shall photograph the offender and arrange for the fingerprinting of the offender and include such photograph and a complete set of fingerprints in the registry. If the offender is required to submit to the taking of a blood or other biological sample of sufficient quality for DNA (deoxyribonucleic acid) analysis pursuant to section 54–102g of the general statutes, and has not submitted to the taking of such sample, the commissioner shall also require such sample to be taken for analysis pursuant to section 54–102g of the general statutes.

(d) The Department of Emergency Services and Public Protection may require the offender to provide documentation to verify the contents of his or her registration.

Sec. 21. Section 45a–99 of the general statutes is repealed and the following is substituted in lieu thereof (Effective January 1, 2014):

<< CT ST § 45a–99 >>

(a) The courts of probate shall have concurrent jurisdiction with the Superior Court, as provided in section 52–11, as amended by this act, to grant a change of name, except a change of name granted in accordance with subsection (a) of section 46b–63, except that no court of probate may issue an order or otherwise allow for the change of name of a person who is required to register with the Commissioner of Emergency Services and Public Protection as a sexual offender or as an offender convicted of committing a crime with a deadly weapon unless such person complies with the requirements of subdivision (1) of subsection (b) of this section.

(b) (1) Any person who is required to register with the Commissioner of Emergency Services and Public Protection as a sexual offender or as an offender convicted of committing a crime with a deadly weapon who files an application with the Court of Probate for a change of name shall (A) prior to filing such application, notify the Commissioner of Emergency Services and Public Protection, on such form as the commissioner may prescribe, that the person intends to file an application for a change

of name, indicating the change of name sought, and (B) include with such application a sworn statement that such change of name is not being sought for the purpose of avoiding the legal consequences of a criminal conviction, including, but not limited to, a criminal conviction that requires such person to register as a sexual offender or as an offender convicted of committing a crime with a deadly weapon.

(2) The Commissioner of Emergency Services and Public Protection shall have standing to challenge such person's application for a change of name in the court of probate where such change of name is sought. The commissioner shall challenge the change of name through the Attorney General. The court of probate may deny such person's application for a change of name if the court finds, by a preponderance of the evidence, that the person is applying for such change of name for the purpose of avoiding the legal consequences of a criminal conviction.

(c) Whenever the court, pursuant to this section, orders a change of name of a person, the court shall notify the Commissioner of Emergency Services and Public Protection of the issuance of such order if the court finds that such person is listed in the registry established and maintained pursuant to section 54–257 or in the registry established and maintained pursuant to section 18 of this act.

Sec. 22. Section 52–11 of the general statutes is repealed and the following is substituted in lieu thereof (Effective January 1, 2014):

<< CT ST § 52–11 >>

(a) The superior court in each judicial district shall have jurisdiction of complaints praying for a change of name, brought by any person residing in the judicial district, and may change the name of the complainant, who shall thereafter be known by the name prescribed by said court in its decree, except that no superior court may issue an order or otherwise allow for the change of name of a person who is required to register with the Commissioner of Emergency Services and Public Protection as a sexual offender or as an offender convicted of committing a crime with a deadly weapon unless such person complies with the requirements of subdivision (1) of subsection (b) of this section.

(b) (1) Any person who is required to register with the Commissioner of Emergency Services and Public Protection as a sexual offender or as an offender convicted of committing a crime with a deadly weapon who files an application with the Superior Court for a change of name shall (A) prior to filing such application, notify the Commissioner of Emergency Services and Public Protection, on such form as the commissioner may prescribe, that the person intends to file an application for a change of name, indicating the change of name sought, and (B) include with such application a sworn statement that such change of name is not being sought for the purpose of avoiding the legal consequences of a criminal conviction, including, but not limited to, a criminal conviction that requires such person to register as a sexual offender or as an offender convicted of committing a crime with a deadly weapon.

(2) The Commissioner of Emergency Services and Public Protection shall have standing to challenge such person's application for a change of name in the superior court where such change of name is sought. The commissioner shall challenge the change of name through the Attorney General. The superior court may deny such person's application for a change of name if the court finds, by a preponderance of the evidence, that the person is applying for such change of name for the purpose of avoiding the legal consequences of a criminal conviction.

(c) Whenever the court, pursuant to this section, orders a change of name of a person, the clerk of the court shall notify the Commissioner of Emergency Services and Public Protection of the issuance of such order if the clerk finds that such person is listed in the registry established and maintained pursuant to section 54–257 or in the registry established and maintained pursuant to section 18 of this act.

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3553  Page 34 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

Sec. 23. (NEW) (Effective from passage)

(a) As used in this section and section 24 of this act:

(1) "Large capacity magazine" means any firearm magazine, belt, drum, feed strip or similar device that has the capacity of, or can be readily restored or converted to accept, more than ten rounds of ammunition, but does not include: (A) A feeding device that has been permanently altered so that it cannot accommodate more than ten rounds of ammunition, (B) a .22 caliber tube ammunition feeding device, (C) a tubular magazine that is contained in a lever-action firearm, or (D) a magazine that is permanently inoperable;

(2) "Lawfully possesses", with respect to a large capacity magazine, means that a person has (A) actual and lawful possession of the large capacity magazine, or (B) constructive possession of the large capacity magazine pursuant to a lawful purchase of a firearm that contains a large capacity magazine that was transacted prior to the effective date of this section, regardless of whether the firearm was delivered to the purchaser prior to the effective date of this section; and

(3) "Licensed gun dealer" means a person who has a federal firearms license and a permit to sell firearms pursuant to section 29–28 of the general statutes.

(b) Except as provided in this section, on and after the effective date of this section, any person who, within this state, distributes, imports into this state, keeps for sale, offers or exposes for sale, or purchases a large capacity magazine shall be guilty of a class D felony. On and after the effective date of this section, any person who, within this state, transfers a large capacity magazine, except as provided in subsection (f) of this section, shall be guilty of a class D felony.

(c) Except as provided in this section and section 24 of this act: (1) Any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained prior to the effective date of this section shall commit an infraction and be fined not more than ninety dollars for a first offense and shall be guilty of a class D felony for any subsequent offense, and (2) any person who possesses a large capacity magazine on or after January 1, 2014, that was obtained on or after the effective date of this section shall be guilty of a class D felony.

(d) A large capacity magazine may be possessed, purchased or imported by:

(1) Members or employees of the Department of Emergency Services and Public Protection, police departments, the Department of Correction or the military or naval forces of this state or of the United States for use in the discharge of their official duties or when off duty;

(2) Employees of a Nuclear Regulatory Commission licensee operating a nuclear power generating facility in this state for the purpose of providing security services at such facility, or any person, firm, corporation, contractor or subcontractor providing security services at such facility; or

(3) Any person, firm or corporation engaged in the business of manufacturing large capacity magazines in this state that manufactures or transports large capacity magazines in this state for sale within this state to persons specified in subdivision (1) or (2) of this subsection or for sale outside this state.

(e) A large capacity magazine may be possessed by:

(1) A licensed gun dealer;

(2) A gunsmith who is in a licensed gun dealer's employ, who possesses such large capacity magazine for the purpose of servicing or repairing a lawfully possessed large capacity magazine;

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3554   Page 35 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(3) Any person who has declared possession of the magazine pursuant to section 24 of this act; or

(4) Any person who is the executor or administrator of an estate that includes a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 24 of this act, which is disposed of as authorized by the Probate Court, if the disposition is otherwise permitted by this section and section 24 of this act.

(f) Subsection (b) of this section shall not prohibit:

(1) The transfer by bequest or intestate succession of a large capacity magazine, the possession of which has been declared to the Department of Emergency Services and Public Protection pursuant to section 24 of this act;

(2) The transfer of a large capacity magazine to a police department or the Department of Emergency Services and Public Protection; or

(3) The transfer of a large capacity magazine to a licensed gun dealer in accordance with section 24 of this act.

(g) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection (h) of section 29–33 of the general statutes, as amended by this act.

Sec. 24. (NEW) (Effective from passage)

(a) Any person who lawfully possesses a large capacity magazine prior to January 1, 2014, shall apply by January 1, 2014, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by January 1, 2014, because such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection to declare possession of such magazine. Such application shall be made on such form or in such manner as the Commissioner of Emergency Services and Public Protection prescribes.

(b) In addition to the application form prescribed under subsection (a) of this section, the department shall design or amend the application forms for a certificate of possession for an assault weapon under section 53–202d of the general statutes, as amended by this act, or for a permit to carry a pistol or revolver under section 29–28a of the general statutes, a long gun eligibility certificate under section 2 of this act, an eligibility certificate for a pistol or revolver under section 29–36f of the general statutes, as amended by this act, or any renewal of such permit or certificate to permit an applicant to declare possession of a large capacity magazine pursuant to this section upon the same application.

(c) The department may adopt regulations, in accordance with the provisions of chapter 54 [1] of the general statutes, to establish procedures with respect to applications under this section. Notwithstanding the provisions of sections 1–210 and 1–211 of the general statutes, the name and address of a person who has declared possession of a large capacity magazine shall be confidential and shall not be disclosed, except such records may be disclosed to (1) law enforcement agencies and employees of the United States Probation Office acting in the performance of their duties, and (2) the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a–500 of the general statutes, as amended by this act.

(d) Any person who moves into the state in lawful possession of a large capacity magazine shall, within ninety days, either render the large capacity magazine permanently inoperable, sell the large capacity magazine to a licensed gun dealer or remove the large capacity magazine from this state, except that any person who is a member of the military or naval forces of this state or of the United States, is in lawful possession of a large capacity magazine and has been transferred into the state after January

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3555  Page 36 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

1, 2014, may, within ninety days of arriving in the state, apply to the Department of Emergency Services and Public Protection to declare possession of such large capacity magazine.

(e) (1) If an owner of a large capacity magazine transfers the large capacity magazine to a licensed gun dealer, such dealer shall, at the time of delivery of the large capacity magazine, execute a certificate of transfer. For any transfer prior to January 1, 2014, the dealer shall provide to the Commissioner of Emergency Services and Public Protection monthly reports, on such form as the commissioner prescribes, regarding the number of transfers that the dealer has accepted. For any transfer on or after January 1, 2014, the dealer shall cause the certificate of transfer to be mailed or delivered to the Commissioner of Emergency Services and Public Protection. The certificate of transfer shall contain: (A) The date of sale or transfer; (B) the name and address of the seller or transferor and the licensed gun dealer, and their Social Security numbers or motor vehicle operator license numbers, if applicable; (C) the licensed gun dealer's federal firearms license number; and (D) a description of the large capacity magazine.

(2) The licensed gun dealer shall present such dealer's federal firearms license and seller's permit to the seller or transferor for inspection at the time of purchase or transfer.

(3) The Commissioner of Emergency Services and Public Protection shall maintain a file of all certificates of transfer at the commissioner's central office.

(f) Any person who declared possession of a large capacity magazine under this section may possess the large capacity magazine only under the following conditions:

(1) At that person's residence;

(2) At that person's place of business or other property owned by that person, provided such large capacity magazine contains not more than ten bullets;

(3) While on the premises of a target range of a public or private club or organization organized for the purpose of practicing shooting at targets;

(4) While on a target range which holds a regulatory or business license for the purpose of practicing shooting at that target range;

(5) While on the premises of a licensed shooting club;

(6) While transporting the large capacity magazine between any of the places set forth in this subsection, or to any licensed gun dealer, provided (A) such large capacity magazine contains not more than ten bullets, and (B) the large capacity magazine is transported in the manner required for an assault weapon under subdivision (2) of subsection (a) of section 53–202f of the general statutes, as amended by this act; or

(7) Pursuant to a valid permit to carry a pistol or revolver, provided such large capacity magazine (A) is within a pistol or revolver that was lawfully possessed by the person prior to the effective date of this section, (B) does not extend beyond the bottom of the pistol grip, and (C) contains not more than ten bullets.

(g) Any person who violates the provisions of subsection (f) of this section shall be guilty of a class C misdemeanor.

---

[1]    C.G.S.A. § 4–166 et seq.

Sec. 25. Section 53–202a of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 53–202a >>

(a) As used in this section and sections 53–202b to 53–202k, inclusive:, "assault weapon" means:

(1) Any "Assault weapon" means:

(A) (i) Any selective-fire firearm capable of fully automatic, semiautomatic or burst fire at the option of the user or any of the following specified semiautomatic firearms: Algimec Agmi; Armalite AR–180; Australian Automatic Arms SAP Pistol; Auto–Ordnance Thompson type; Avtomat Kalashnikov AK–47 type; Barrett Light–Fifty model 82A1; Beretta AR–70; Bushmaster Auto Rifle and Auto Pistol; Calico models M–900, M–950 and 100–P; Chartered Industries of Singapore SR–88; Colt AR–15 and Sporter; Daewoo K–1, K–2, Max–1 and Max–2; Encom MK–IV, MP–9 and MP–45; Fabrique Nationale FN/FAL, FN/LAR, or FN/FNC; FAMAS MAS 223; Feather AT–9 and Mini–AT; Federal XC–900 and XC–450; Franchi SPAS–12 and LAW–12; Galil AR and ARM; Goncz High–Tech Carbine and High–Tech Long Pistol; Heckler & Koch HK–91, HK–93, HK–94 and SP–89; Holmes MP–83; MAC–10, MAC–11 and MAC–11 Carbine type; Intratec TEC–9 and Scorpion; Iver Johnson Enforcer model 3000; Ruger Mini–14/5F folding stock model only; Scarab Skorpion; SIG 57 AMT and 500 series; Spectre Auto Carbine and Auto Pistol; Springfield Armory BM59, SAR–48 and G–3; Sterling MK–6 and MK–7; Steyr AUG; Street Sweeper and Striker 12 revolving cylinder shotguns; USAS–12; UZI Carbine, Mini–Carbine and Pistol; Weaver Arms Nighthawk; Wilkinson "Linda" Pistol;

(2) (ii) A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in subparagraph (A)(i) of this subdivision,(1) of this subsection, or any combination of parts from which an assault weapon, as defined in subparagraph (A)(i) of this subdivision,(1) of this subsection, may be rapidly assembled if those parts are in the possession or under the control of the same person;

(B) Any of the following specified semiautomatic centerfire rifles, or copies or duplicates thereof with the capability of any such rifles, that were in production prior to or on the effective date of this section: (i) AK–47; (ii) AK–74; (iii) AKM; (iv) AKS–74U; (v) ARM; (vi) MAADI AK47; (vii) MAK90; (viii) MISR; (ix) NHM90 and NHM91; (x) Norinco 56, 56S, 84S and 86S; (xi) Poly Technologies AKS and AK47; (xii) SA 85; (xiii) SA 93; (xiv) VEPR; (xv) WASR–10; (xvi) WUM; (xvii) Rock River Arms LAR–47; (xviii) Vector Arms AK–47; (xix) AR–10; (xx) AR–15; (xxi) Bushmaster Carbon 15, Bushmaster XM15, Bushmaster ACR Rifles, Bushmaster MOE Rifles; (xxii) Colt Match Target Rifles; (xxiii) Armalite M15; (xxiv) Olympic Arms AR–15, A1, CAR, PCR, K3B, K30R, K16, K48, K8 and K9 Rifles; (xxv) DPMS Tactical Rifles; (xxvi) Smith and Wesson M&P15 Rifles; (xxvii) Rock River Arms LAR–15; (xxviii) Doublestar AR Rifles; (xxix) Barrett REC7; (13–3) Beretta Storm; (13–3i) Calico Liberty 50, 50 Tactical, 100, 100 Tactical, I, I Tactical, II and II Tactical Rifles; (13–3ii) Hi–Point Carbine Rifles; (13–3iii) HK–PSG–1; (13–3iv) Kel–Tec Sub–2000, SU Rifles, and RFB; (13–3v) Remington Tactical Rifle Model 7615; (13–3vi) SAR–8, SAR–4800 and SR9; (13–3vii) SLG 95; (13–3viii) SLR 95 or 96; (13–3ix) TNW M230 and M2HB; (xl) Vector Arms UZI; (xli) Galil and Galil Sporter; (xlii) Daewoo AR 100 and AR 110C; (xliii) Fabrique Nationale/FN 308 Match and L1A1 Sporter; (xliv) HK USC; (xlv) IZHMASH Saiga AK; (xlvi) SIG Sauer 551–A1, 556, 516, 716 and M400 Rifles; (xlvii) Valmet M62S, M71S and M78S; (xlviii) Wilkinson Arms Linda Carbine; and (xlix) Barrett M107A1;

(C) Any of the following specified semiautomatic pistols, or copies or duplicates thereof with the capability of any such pistols, that were in production prior to or on the effective date of this section: (i) Centurion 39 AK; (ii) Draco AK–47; (iii) HCR AK–47; (iv) IO Inc. Hellpup AK–47; (v) Mini–Draco AK–47; (vi) Yugo Krebs Krink; (vii) American Spirit AR–15; (viii) Bushmaster Carbon 15; (ix) Doublestar Corporation AR; (x) DPMS AR–15; (xi) Olympic Arms AR–15; (xii) Rock River Arms LAR 15; (xiii) Calico Liberty III and III Tactical Pistols; (xiv) Masterpiece Arms MPA Pistols and Velocity Arms VMA Pistols; (xv) Intratec TEC–DC9 and AB–10; (xvi) Colefire Magnum; (xvii) German Sport 522 PK and Chiappa Firearms Mfour–22;

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3557 Page 38 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B...

(xviii) DSA SA58 PKP FAL; (xix) I.O. Inc. PPS–43C; (xx) Kel–Tec PLR–16 Pistol; (xxi) Sig Sauer P516 and P556 Pistols; and (xxii) Thompson TA5 Pistols;

(D) Any of the following semiautomatic shotguns, or copies or duplicates thereof with the capability of any such shotguns, that were in production prior to or on the effective date of this section: All IZHMASH Saiga 12 Shotguns;

(3) (E) Any semiautomatic firearm ~~not listed in subdivision (1) of this subsection~~ regardless of whether such firearm is listed in subparagraphs (A) to (D), inclusive, of this subdivision, and regardless of the date such firearm was produced, that meets the following criteria:

(A) (i) A semiautomatic, centerfire rifle that has an ability to accept a detachable magazine and has at least ~~two~~ one of the following:

(i) (I) A folding or telescoping stock;

(ii) A (II) Any grip of the weapon, including a pistol grip, ~~that protrudes conspicuously beneath the action of the weapon~~ a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing;

(iii) (III) A ~~bayonet mount~~ forward pistol grip;

(iv) (IV) A flash suppressor; or ~~threaded barrel designed to accommodate a flash suppressor; and~~

(v) (V) A grenade launcher or flare launcher; or

(ii) A semiautomatic, centerfire rifle that has a fixed magazine with the ability to accept more than ten rounds; or

(iii) A semiautomatic, centerfire rifle that has an overall length of less than thirty inches; or

(B) (iv) A semiautomatic pistol that has an ability to accept a detachable magazine and has at least ~~two~~ one of the following:

(i) (I) An ability to accept a detachable ammunition magazine that attaches ~~to the pistol~~ at some location outside of the pistol grip;

(ii) (II) A threaded barrel capable of accepting a ~~barrel extender,~~ flash suppressor, forward ~~handgrip~~ pistol grip or silencer;

(iii) (III) A shroud that is attached to, or partially or completely encircles, the barrel and that permits the shooter to ~~hold~~ fire the firearm ~~with the nontrigger hand~~ without being burned~~,~~; except a slide that encloses the barrel; or

(iv) A manufactured weight of fifty ounces or more when the pistol is unloaded; and

(IV) A second hand grip; or

(v) A semiautomatic pistol with a fixed magazine that has the ability to accept more than ten rounds;

(v) A semiautomatic version of an automatic firearm; or

(C) (vi) A semiautomatic shotgun that has ~~at least two~~ both of the following:

(i)  (I) A folding or telescoping stock; and

(ii) A  (II) Any grip of the weapon, including a pistol grip, that protrudes conspicuously beneath the action of the weapon; a thumbhole stock, or any other stock, the use of which would allow an individual to grip the weapon, resulting in any finger on the trigger hand in addition to the trigger finger being directly below any portion of the action of the weapon when firing; or

(iii) A fixed magazine capacity in excess of five rounds; and

(iv) An  (vii) A semiautomatic shotgun that has the ability to accept a detachable magazine;

(viii) A shotgun with a revolving cylinder; or

(4)  (F) A part or combination of parts designed or intended to convert a firearm into an assault weapon, as defined in subdivision (3) of this subsection  any provision of subparagraphs (B) to (E), inclusive, of this subdivision, or any combination of parts from which an assault weapon, as defined in subdivision (3) of this subsection  any provision of subparagraphs (B) to (E), inclusive, of this subdivision, may be rapidly   assembled if those parts are in the possession or under the control of the same person;.

(b) As used in this section and sections 53–202b to 53–202k, inclusive, the term "assault weapon" does not include any firearm modified to render it permanently inoperable.

(2) "Assault weapon" does not include (A) any firearm modified to render it permanently inoperable, or (B) a part or any combination of parts of an assault weapon, that are not assembled as an assault weapon, when in the possession of a licensed gun dealer, as defined in subsection (d) of section 53–202f, as amended by this act, or a gunsmith who is in the licensed gun dealer's employ, for the purposes of servicing or repairing lawfully possessed assault weapons under sections 53–202a to 53–202k, inclusive, as amended by this act;

(3) "Action of the weapon" means the part of the firearm that loads, fires and ejects a cartridge, which part includes, but is not limited to, the upper and lower receiver, charging handle, forward assist, magazine release and shell deflector;

(4) "Detachable magazine" means an ammunition feeding device that can be removed without disassembling the firearm action;

(5) "Firearm" means a firearm, as defined in section 53a–3;

(6) "Forward pistol grip" means any feature capable of functioning as a grip that can be held by the nontrigger hand;

(7) "Lawfully possesses" means, with respect to an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of this subdivision, (A) actual possession that is lawful under sections 53–202b to 53–202k, as amended by this act, or (B) constructive possession pursuant to a lawful purchase transacted prior to the effective date of this section, regardless of whether the assault weapon was delivered to the purchaser prior to the effective date of this section;

(8) "Pistol grip" means a grip or similar feature that can function as a grip for the trigger hand; and

(9) "Second hand grip" means a grip or similar feature that can function as a grip that is additional to the trigger hand grip.

Sec. 26. Section 53–202b of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 53–202b >>

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3559  Page 40 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(a) (1) Any person who, within this state, distributes, transports or imports into the state, keeps for sale, or offers or exposes for sale, or who gives any assault weapon, except as provided by sections 29–37j and  53–202a to 53–202k, inclusive, as amended by this act, and subsection (h) of section 53a–46a,  shall be guilty of a class C felony and shall be sentenced to a term of imprisonment of which two years may not be suspended or reduced by the court.

(2) Any person who transfers, sells or gives any assault weapon to a person under eighteen years of age in violation of subdivision (1) of this subsection shall be sentenced to a term of imprisonment of six years, which shall not be suspended or reduced by the court and shall be in addition and consecutive to the term of imprisonment imposed under subdivision (1) of this subsection.

(b) The provisions of subsection (a) of this section shall not apply to:

(1) The sale of assault weapons to (A) the Department of Emergency Services and Public Protection, police departments, the Department of Correction or the military or naval forces of this state or of the United States, for use in the discharge of their official duties or when off duty, or (B) any employee of a Nuclear Regulatory Commission licensee operating a nuclear power generating facility in this state for the purpose of providing security services at such facility, or any person, firm, corporation, contractor or subcontractor providing security services at such facility for use in the discharge of their official duties;

(2) A person who is the executor or administrator of an estate that includes an assault weapon for which a certificate of possession has been issued under section 53–202d, as amended by this act, which is disposed of as authorized by the Probate Court, if the disposition is otherwise permitted by sections 29–37j and  53–202a to 53–202k, inclusive, as amended by this act; and subsection (h) of section 53a–46a;

(3) The transfer by bequest or intestate succession of an assault weapon for which a certificate of possession has been issued under section 53–202d, as amended by this act.

Sec. 27. Section 53–202c of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 53–202c >>

(a) Except as provided in section 53–202e, any person who, within this state, possesses any  an assault weapon, except as provided in sections 29–37j,  53–202a to 53–202k, inclusive, as amended by this act, and 53–202o, and subsection (h) of section 53a–46a,  shall be guilty of a class D felony and shall be sentenced to a term of imprisonment of which one year may not be suspended or reduced ;  by the court, except that a first-time violation of this subsection shall be a class A misdemeanor if (1) the person presents proof that he  such person lawfully possessed the assault weapon (A) prior to October 1, 1993, with respect to an assault weapon described in subparagraph (A) of subdivision (1) of section 53–202a, as amended by this act, or (B) on the date immediately preceding the effective date of this act, under the provisions of sections 53–202a to 53–202k, inclusive, in effect on January 1, 2013, with respect to an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53–202a, as amended by this act, and (2) the person has otherwise possessed the firearm  assault weapon in compliance with subsection (d)  (f) of section 53–202d, as amended by this act.

(b) The provisions of subsection (a) of this section shall not apply to the possession of assault weapons by members or employees of the Department of Emergency Services and Public Protection, police departments, the Department of Correction, or the military or naval forces of this state or of the United States, any employee of a Nuclear Regulatory Commission licensee operating a nuclear power generating facility in this state for the purpose of providing security services at such facility, or any person, firm, corporation, contractor or subcontractor providing security services at such facility for use in the discharge of their official duties; nor shall anything  any provision in sections 29–37j and  53–202a to 53–202k, inclusive, as amended by this act, and subsection (h) of section 53a–46a  prohibit the possession or use of assault weapons by sworn members of these agencies when on duty and the  when the possession or use is within the scope of their  such member's duties.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3560   Page 41 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(c) The provisions of subsection (a) of this section shall not apply to the possession of an assault weapon described in subparagraph (A) of subdivision (1) of section 53–202a, as amended by this act, by any person prior to July 1, 1994, if all of the following are applicable:

(1) The person is eligible under sections 29–37j and   53–202a to 53–202k, inclusive, as amended by this act, and subsection (h) of section 53a–46a   to apply for a certificate of possession for the assault weapon by July 1, 1994;

(2) The person lawfully possessed the assault weapon prior to October 1, 1993; and

(3) The person is otherwise in compliance with sections 29–37j and   53–202a to 53–202k, inclusive, as amended by this act. and subsection (h) of section 53a–46a.

(d) The provisions of subsection (a) of this section shall not apply to the possession of an assault weapon described in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53–202a, as amended by this act, by any person prior to the effective date of this section if all of the following are applicable:

(1) The person is eligible under sections 53–202a to 53–202k, inclusive, as amended by this act, to apply for a certificate of possession for the assault weapon by January 1, 2014;

(2) The person lawfully possessed the assault weapon on the date immediately preceding the effective date of this section, under the provisions of sections 53–202a to 53–202k, inclusive, in effect on January 1, 2013; and

(3) The person is otherwise in compliance with sections 53–202a to 53–202k, inclusive, as amended by this act.

(d)  (e) The provisions of subsection (a) of this section shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon for which a certificate of possession has been issued under section 53–202d, as amended by this act, if the assault weapon is possessed at a place set forth in subdivision (1) of subsection (d)  (f) of section 53–202d, as amended by this act, or as authorized by the Probate Court.

Sec. 28. Section 53–202d of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 53–202d >>

(a) (1) Any person who lawfully possesses an assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53–202a, as amended by this act, prior to October 1, 1993, shall apply by October 1, 1994, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by October 1, 1994, because he or she  such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection, for a certificate of possession with respect to such assault weapon.

(2) Any person who lawfully possesses an assault weapon, as defined in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53–202a, as amended by this act, on the date immediately preceding the effective date of this section, under the provisions of sections 53–202a to 53–202k, inclusive, in effect on January 1, 2013, shall apply by January 1, 2014, or, if such person is a member of the military or naval forces of this state or of the United States and is unable to apply by January 1, 2014, because such member is or was on official duty outside of this state, shall apply within ninety days of returning to the state to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon.

(3) Any person who obtained a certificate of possession for an assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53–202a, as amended by this act, prior to the effective date of this section, that is defined as an assault weapon pursuant to any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53–202a, as amended by this act, shall be deemed to have obtained a certificate of possession for such assault weapon for the purposes of sections 53–202a to 53–202k, inclusive, as amended by this act, and shall not be required to obtain a subsequent certificate of possession for such assault weapon.

(4) The certificate of possession shall contain a description of the firearm that identifies it uniquely, including all identification marks, the full name, address, date of birth and thumbprint of the owner, and any other information as the department may deem appropriate.

(5) The department shall adopt regulations, in accordance with the provisions of chapter 54,[1] to establish procedures with respect to the application for and issuance of certificates of possession pursuant to this section. Notwithstanding the provisions of sections 1–210 and 1–211, the name and address of a person issued a certificate of possession shall be confidential and shall not be disclosed, except such records may be disclosed to (1) (A) law enforcement agencies and employees of the United States Probation Office acting in the performance of their duties, and (2) (B) the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a–500, as amended by this act.

(b) (1) No assault weapon, as defined in subparagraph (A) of subdivision (1) of section 53–202a, as amended by this act, possessed pursuant to a certificate of possession issued under this section may be sold or transferred on or after January 1, 1994, to any person within this state other than to a licensed gun dealer, as defined in subsection (d) of section 53–202f, as amended by this act, or as provided in section 53–202e, or by bequest or intestate succession.

(2) No assault weapon, as defined in any provision of subparagraphs (B) to (F), inclusive, of subdivision (1) of section 53–202a, as amended by this act, possessed pursuant to a certificate of possession issued under this section may be sold or transferred on or after the effective date of this section, to any person within this state other than to a licensed gun dealer, as defined in subsection (d) of section 53–202f, as amended by this act, or as provided in section 53–202e, or by bequest or intestate succession.

(c) Any person who obtains title to an assault weapon for which a certificate of possession has been issued under this section by bequest or intestate succession shall, within ninety days of obtaining title, apply to the Department of Emergency Services and Public Protection for a certificate of possession as provided in subsection (a) of this section, render the assault weapon permanently inoperable, sell the assault weapon to a licensed gun dealer or remove the assault weapon from the state.

(d) Any person who moves into the state in lawful possession of an assault weapon, shall, within ninety days, either render the assault weapon permanently inoperable, sell the assault weapon to a licensed gun dealer or remove the assault weapon from this state, except that any person who is a member of the military or naval forces of this state or of the United States, is in lawful possession of an assault weapon and has been transferred into the state after October 1, 1994, may, within ninety days of arriving in the state, apply to the Department of Emergency Services and Public Protection for a certificate of possession with respect to such assault weapon.

(e) (e) If an owner of an assault weapon sells or transfers the assault weapon to a licensed gun dealer, he or she such dealer shall, at the time of delivery of the assault weapon, execute a certificate of transfer and cause the certificate of transfer to be mailed or delivered to the Commissioner of Emergency Services and Public Protection. The certificate of transfer shall contain: (1) The date of sale or transfer; (2) the name and address of the seller or transferor and the licensed gun dealer, their Social Security numbers or motor vehicle operator license numbers, if applicable; (3) the licensed gun dealer's federal firearms license number and seller's permit number; (4) a description of the assault weapon, including the caliber of the assault weapon and its make, model and serial number; and (5) any other information the commissioner prescribes. The licensed gun dealer shall present his or her such dealer's motor vehicle operator's license or Social Security card, federal firearms license and seller's

permit to the seller or transferor for inspection at the time of purchase or transfer. The Commissioner of Emergency Services and Public Protection shall maintain a file of all certificates of transfer at said the commissioner's central office.

(d) A (f) Any person who has been issued a certificate of possession of for an assault weapon under this section may possess it the assault weapon only under the following conditions:

(1) At that person's residence, place of business or other property owned by that person, or on property owned by another person with the owner's express permission;

(2) While on the premises of a target range of a public or private club or organization organized for the purpose of practicing shooting at targets;

(3) While on a target range which holds a regulatory or business license for the purpose of practicing shooting at that target range;

(4) While on the premises of a licensed shooting club;

(5) While attending any exhibition, display or educational project which is about firearms and which is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms; or

(6) While transporting the assault weapon between any of the places mentioned set forth in this subsection, or to any licensed gun dealer, as defined in subsection (d) of section 53–202f, as amended by this act, for servicing or repair pursuant to subsection (c) of section 53–202f, as amended by this act, provided the assault weapon is transported as required by section 53–202f, as amended by this act.

1    C.G.S.A. § 4–166 et seq.

Sec. 29. Section 53–202f of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 53–202f >>

(a) While transporting an assault weapon between any of the places mentioned set forth in subdivisions (1) to (6), inclusive, of subsection (d) (f) of section 53–202d, as amended by this act, no person shall carry a loaded assault weapon concealed from public view or knowingly have, in any motor vehicle owned, operated or occupied by him such person (1) a loaded assault weapon, or (2) an unloaded assault weapon unless such weapon is kept in the trunk of such vehicle or in a case or other container which is inaccessible to the operator of such vehicle or any passenger in such vehicle. Any person who violates the provisions of this subsection shall be fined not more than five hundred dollars or imprisoned not more than three years, or both.

(b) Any licensed gun dealer, as defined in subsection (d) of this section, who lawfully possesses an assault weapon pursuant to section 53–202d, as amended by this act, in addition to the uses allowed in section 53–202d, as amended by this act, may transport the assault weapon between dealers or out of the state, display it the assault weapon at any gun show licensed by a state or local governmental entity or sell it the assault weapon to a resident outside the state. Any transporting of the assault weapon allowed by this subsection must be done as required by subsection (a) of this section.

(c) (1) Any licensed gun dealer, as defined in subsection (d) of this section, may take possession of any assault weapon for the purposes of servicing or repair from any person to whom has been issued a certificate of possession for such weapon pursuant to sections 29–37j and 53–202a to 53–202k, inclusive, as amended by this act.and subsection (h) of section 53a–46a.

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3563 Page 44 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(2) Any licensed gun dealer may transfer possession of any assault weapon received pursuant to subdivision (1) of this subsection ; to a gunsmith for purposes of accomplishing service or repair of the same. ~~Transfers~~ Such transfers are permissible only to the following persons:

(A) A gunsmith who is in the licensed gun dealer's employ; or

(B) A gunsmith with whom the dealer has contracted for gunsmithing services, provided the gunsmith receiving the assault weapon holds a dealer's license issued pursuant to Chapter 44, commencing with Section 921, of Title 18 of the United States Code and the regulations issued pursuant thereto.

(d) The term "licensed gun dealer", as used in sections ~~29–37j and~~ 53–202a to 53–202k, inclusive, as amended by this act, ~~and subsection (h) of section 53a–46a~~ means a person who has a federal firearms license and a permit to sell firearms pursuant to section 29–28, as amended by this act.

Sec. 30. Section 53–202i of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 53–202i >>

Nothing in sections ~~29–37j and~~ 53–202a to 53–202k, inclusive, as amended by this act, ~~and subsection (h) of section 53a–46a~~ shall be construed to prohibit any person, firm or corporation engaged in the business of manufacturing assault weapons in this state from manufacturing or transporting assault weapons in this state for sale within this state in accordance with subdivision (1) of subsection (b) of section 53–202b, as amended by this act, or for sale outside this state.

Sec. 31. Subsection (a) of section 53–202*o* of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 53–202*o* >>

(a) In any prosecution for a violation of section 53–202c, as amended by this act, based on the possession by the defendant of a specified assault weapon, it shall be an affirmative defense that the defendant (1) in good faith purchased or otherwise obtained title to such specified assault weapon on or after October 1, 1993, and prior to May 8, 2002, in compliance with any state and federal laws concerning the purchase or transfer of firearms, (2) is not otherwise disqualified or prohibited from possessing such specified assault weapon, and (3) has possessed such specified assault weapon in compliance with subsection ~~(d)~~ (f) of section 53–202d, as amended by this act.

Sec. 32. Section 53–202*l* of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 53–202*l* >>

(a) For the purposes of this section:

(1) "Armor piercing ~~.50 caliber~~ bullet" means (A) any .50 caliber bullet that ~~is (A)~~ (i) is designed for the purpose of, ~~(B)~~ (ii) is held out by the manufacturer or distributor as, or ~~(C)~~ (iii) is generally recognized as having a specialized capability to penetrate armor or bulletproof glass, including, but not limited to, such bullets commonly designated as "M2 Armor–Piercing" or "AP", "M8 Armor–Piercing Incendiary" or "API", "M20 Armor–Piercing Incendiary Tracer" or "APIT", "M903 Caliber .50 Saboted Light Armor Penetrator" or "SLAP", or "M962 Saboted Light Armor Penetrator Tracer" or "SLAPT", or (B) any bullet that can be fired from a pistol or revolver that (i) has projectiles or projectile cores constructed entirely, excluding the presence

of traces of other substances, from tungsten alloys, steel, iron, brass, bronze, beryllium copper or depleted uranium, or (ii) is fully jacketed with a jacket weight of more than twenty-five per cent of the total weight of the projectile, is larger than .22 caliber and is designed and intended for use in a firearm, and (iii) does not have projectiles whose cores are composed of soft materials such as lead or lead alloys, zinc or zinc alloys, frangible projectiles designed primarily for sporting purposes, or any other projectiles or projectile cores that the Attorney General of the United States finds to be primarily intended to be used for sporting purposes or industrial purposes or that otherwise does not constitute "armor piercing ammunition" as defined in federal law. "Armor piercing bullet" does not include a shotgun shell.

(2) "Incendiary .50 caliber bullet" means any .50 caliber bullet that is (A) is designed for the purpose of, (B) is held out by the manufacturer or distributor as, or (C) is generally recognized as having a specialized capability to ignite upon impact, including, but not limited to, such bullets commonly designated as "M1 Incendiary", "M23 Incendiary", "M8 Armor–Piercing Incendiary" or "API", or "M20 Armor–Piercing Incendiary Tracer" or "APIT".

(b) Any person who knowingly distributes, transports or imports into the state, keeps for sale or offers or exposes for sale or gives to any person any ammunition that is an armor piercing .50 caliber bullet or an incendiary. 50 caliber bullet shall be guilty of a class D felony, except that a first-time violation of this subsection shall be a class A misdemeanor.

(c) Any person who knowingly transports or carries a firearm with an armor piercing bullet or incendiary .50 caliber bullet loaded shall be guilty of a class D felony.

(c) (d) The provisions of subsection subsections (b) and (c) of this section shall not apply to the following:

(1) The sale of such ammunition to the Department of Emergency Services and Public Protection, police departments, the Department of Correction or the military or naval forces of this state or of the United States for use in the discharge of their official duties;

(2) A person who is the executor or administrator of an estate that includes such ammunition that is disposed of as authorized by the Probate Court; or

(3) The transfer by bequest or intestate succession of such ammunition.

(d) (e) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it may order suspension of prosecution in accordance with the provisions of subsection (h) of section 29–33.

Sec. 33. Section 29–38c of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–38c >>

(a) Upon complaint on oath by any state's attorney or assistant state's attorney or by any two police officers, to any judge of the Superior Court, that such state's attorney or police officers have probable cause to believe that (1) a person poses a risk of imminent personal injury to himself or herself or to other individuals, (2) such person possesses one or more firearms, and (3) such firearm or firearms are within or upon any place, thing or person, such judge may issue a warrant commanding a proper officer to enter into or upon such place or thing, search the same or the person and take into such officer's custody any and all firearms and ammunition. Such state's attorney or police officers shall not make such complaint unless such state's attorney or police officers have conducted an independent investigation and have determined that such probable cause exists and that

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3565 Page 46 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

there is no reasonable alternative available to prevent such person from causing imminent personal injury to himself or herself or to others with such firearm.

(b) A warrant may issue only on affidavit sworn to by the complainant or complainants before the judge and establishing the grounds for issuing the warrant, which affidavit shall be part of the seizure file. In determining whether grounds for the application exist or whether there is probable cause to believe they exist, the judge shall consider: (1) Recent threats or acts of violence by such person directed toward other persons; (2) recent threats or acts of violence by such person directed toward himself or herself; and (3) recent acts of cruelty to animals as provided in subsection (b) of section 53–247 by such person. In evaluating whether such recent threats or acts of violence constitute probable cause to believe that such person poses a risk of imminent personal injury to himself or herself or to others, the judge may consider other factors including, but not limited to (A) the reckless use, display or brandishing of a firearm by such person, (B) a history of the use, attempted use or threatened use of physical force by such person against other persons, (C) prior involuntary confinement of such person in a hospital for persons with psychiatric disabilities, and (D) the illegal use of controlled substances or abuse of alcohol by such person. If the judge is satisfied that the grounds for the application exist or that there is probable cause to believe that they exist, such judge shall issue a warrant naming or describing the person, place or thing to be searched. The warrant shall be directed to any police officer of a regularly organized police department or any state police officer. It shall state the grounds or probable cause for its issuance and it shall command the officer to search within a reasonable time the person, place or thing named for any and all firearms and ammunition. A copy of the warrant shall be given to the person named therein together with a notice informing the person that such person has the right to a hearing under this section and the right to be represented by counsel at such hearing.

(c) The applicant for the warrant shall file a copy of the application for the warrant and all affidavits upon which the warrant is based with the clerk of the court for the geographical area within which the search will be conducted no later than the next business day following the execution of the warrant. Prior to the execution and return of the warrant, the clerk of the court shall not disclose any information pertaining to the application for the warrant or any affidavits upon which the warrant is based. The warrant shall be executed and returned with reasonable promptness consistent with due process of law and shall be accompanied by a written inventory of all firearms and ammunition seized.

(d) Not later than fourteen days after the execution of a warrant under this section, the court for the geographical area where the person named in the warrant resides shall hold a hearing to determine whether the seized firearm or firearms and any ammunition seized should be returned to the person named in the warrant or should continue to be held by the state. At such hearing the state shall have the burden of proving all material facts by clear and convincing evidence. If, after such hearing, the court finds by clear and convincing evidence that the person poses a risk of imminent personal injury to himself or herself or to other individuals, it the court may order that the firearm or firearms and any ammunition seized pursuant to the warrant issued under subsection (a) of this section continue to be held by the state for a period not to exceed one year, otherwise the court shall order the seized firearm or firearms and any ammunition seized to be returned to the person named in the warrant. If the court finds that the person poses a risk of imminent personal injury to himself or herself or to other individuals, it the court shall give notice to the Department of Mental Health and Addiction Services which may take such action pursuant to chapter 319i [1] as it deems appropriate.

(e) Any person whose firearm or firearms and ammunition have been ordered seized pursuant to subsection (d) of this section, or such person's legal representative, may transfer such firearm or firearms and ammunition in accordance with the provisions of section 29–33, as amended by this act, or other applicable state or federal law, to any person eligible to possess such firearm or firearms and ammunition. Upon notification in writing by such person, or such person's legal representative, and the transferee, the head of the state agency holding such seized firearm or firearms and ammunition shall within ten days deliver such firearm or firearms and ammunition to the transferee.

(f) For the purposes of this section, "ammunition" means a loaded cartridge, consisting of a primed case, propellant or projectile, designed for use in any firearm.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3566   Page 47 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

1      C.G.S.A. § 17a–450 et seq.

Sec. 34. Section 29–36k of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–36k >>

(a) Not later than two business days after the occurrence of any event that makes a person ineligible to possess a pistol or revolver or other firearm or ammunition, such person shall (1) transfer in accordance with section 29–33, as amended by this act, all pistols and revolvers which such person then possesses to any person eligible to possess a pistol or revolver and transfer in accordance with any applicable state and federal laws all other firearms to any person eligible to possess such other firearms by obtaining an authorization number for the sale or transfer of the firearm from the Commissioner of Emergency Services and Public Protection, and submit a sale or transfer of firearms form to said commissioner within two business days, except that a person described in subdivision (3) (4) of subsection (a) of section 53a–217, as amended by this act, may only transfer a pistol, revolver or other firearm or ammunition under this subdivision to a federally licensed firearms dealer pursuant to the sale of the pistol, revolver or other firearm and ammunition to the federally licensed firearms dealer, or (2) deliver or surrender such pistols and revolvers and other firearms and ammunition to the Commissioner of Emergency Services and Public Protection, or (3) transfer such ammunition to any person eligible to possess such ammunition. The commissioner shall exercise due care in the receipt and holding of such pistols and revolvers and other firearms or ammunition. For the purposes of this section, a "person described in subdivision (3) (4) of subsection (a) of section 53a–217" means a person described in said subdivision, regardless of whether such person was convicted under said subdivision.

(b) Such person, or such person's legal representative, may, at any time up to one year after such delivery or surrender, transfer such pistols and revolvers in accordance with the provisions of section 29–33, as amended by this act, to any person eligible to possess a pistol or revolver and transfer such other firearms and ammunition, in accordance with any applicable state and federal laws, to any person eligible to possess such other firearms and ammunition, provided any such person described in subdivision (3) (4) of subsection (a) of section 53a–217, as amended by this act, or such person's legal representative, may only transfer such pistol, revolver or other firearm or ammunition to a federally licensed firearms dealer pursuant to the sale of the pistol, revolver or other firearm or ammunition to the federally licensed firearms dealer. Upon notification in writing by the transferee and such person, the Commissioner of Emergency Services and Public Protection shall, within ten days, deliver such pistols and revolvers or other firearms or ammunition to the transferee. If, at the end of such year, such pistols and revolvers or other firearms or ammunition have not been so transferred, the commissioner shall cause them to be destroyed.

(c) Any person who fails to transfer, deliver or surrender any such pistols and revolvers and other firearms or ammunition as provided in this section shall be subject to the penalty provided for in section 53a–217, as amended by this act, or 53a–217c, as amended by this act.

Sec. 35. Section 29–36n of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–36n >>

(a) The Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney and the Connecticut Police Chiefs Association, shall develop a protocol to ensure that persons who become ineligible to possess a pistol or revolver or ammunition have, in accordance with section 29–36k, as amended by this act, transferred such pistol or revolver or ammunition to a person eligible to possess such pistol or revolver or ammunition or have delivered or surrendered such pistol or revolver or ammunition to said commissioner.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3567   Page 48 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(b) The Commissioner of Emergency Services and Public Protection, in conjunction with the Chief State's Attorney and the Connecticut Police Chiefs Association, shall update the protocol developed pursuant to subsection (a) of this section to reflect the provisions of sections 29–7h, 29–28, as amended by this act, 29–28a, 29–29, 29–30, 29–32, as amended by this act, and 29–35, subsections (b) and (e) of section 46b–15, as amended by this act, subsections (c) and (d) of section 46b–38c, as amended by this act, and sections 53–202a, as amended by this act, 53–202l, as amended by this act, 53–202m and 53a–217, as amended by this act, and shall include in such protocol specific instructions for the transfer, delivery or surrender of pistols and revolvers and ammunition when the assistance of more than one law enforcement agency is necessary to effect the requirements of section 29–36k, as amended by this act.

Sec. 36. Subsection (b) of section 46b–15 of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 46b–15 >>

(b) The application form shall allow the applicant, at the applicant's option, to indicate whether the respondent holds a permit to carry a pistol or revolver or possesses one or more firearms or ammunition. The application shall be accompanied by an affidavit made under oath which includes a brief statement of the conditions from which relief is sought. Upon receipt of the application the court shall order that a hearing on the application be held not later than fourteen days from the date of the order. The court, in its discretion, may make such orders as it deems appropriate for the protection of the applicant and such dependent children or other persons as the court sees fit. In making such orders, the court, in its discretion, may consider relevant court records if the records are available to the public from a clerk of the Superior Court or on the Judicial Branch's Internet web site. Such orders may include temporary child custody or visitation rights, and such relief may include, but is not limited to, an order enjoining the respondent from (1) imposing any restraint upon the person or liberty of the applicant; (2) threatening, harassing, assaulting, molesting, sexually assaulting or attacking the applicant; or (3) entering the family dwelling or the dwelling of the applicant. Such order may include provisions necessary to protect any animal owned or kept by the applicant including, but not limited to, an order enjoining the respondent from injuring or threatening to injure such animal. If an applicant alleges an immediate and present physical danger to the applicant, the court may issue an ex parte order granting such relief as it deems appropriate. If a postponement of a hearing on the application is requested by either party and granted, the order shall not be continued except upon agreement of the parties or by order of the court for good cause shown.

Sec. 37. Subsection (a) of section 46b–38b of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 46b–38b >>

(a) Whenever a peace officer determines upon speedy information that a family violence crime has been committed within such officer's jurisdiction, such officer shall arrest the person or persons suspected of its commission and charge such person or persons with the appropriate crime. The decision to arrest and charge shall not (1) be dependent on the specific consent of the victim, (2) consider the relationship of the parties, or (3) be based solely on a request by the victim. Whenever a peace officer determines that a family violence crime has been committed, such officer may seize any firearm or electronic defense weapon, as defined in section 53a–3, or ammunition at the location where the crime is alleged to have been committed that is in the possession of any person arrested for the commission of such crime or suspected of its commission or that is in plain view. Not later than seven days after any such seizure, the law enforcement agency shall return such firearm, or electronic defense weapon or ammunition in its original condition to the rightful owner thereof unless such person is ineligible to possess such firearm, or electronic defense weapon or ammunition or unless otherwise ordered by the court.

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3568  Page 49 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

Sec. 38. Subsection (c) of section 46b–38c of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 46b–38c >>

(c) Each such local family violence intervention unit shall: (1) Accept referrals of family violence cases from a judge or prosecutor, (2) prepare written or oral reports on each case for the court by the next court date to be presented at any time during the court session on that date, (3) provide or arrange for services to victims and offenders, (4) administer contracts to carry out such services, and (5) establish centralized reporting procedures. All information provided to a family relations counselor, family relations counselor trainee or family services supervisor employed by the Judicial Department in a local family violence intervention unit shall be used solely for the purposes of preparation of the report and the protective order forms for each case and recommendation of services and shall otherwise be confidential and retained in the files of such unit and not be subject to subpoena or other court process for use in any other proceeding or for any other purpose, except that a family relations counselor, family relations counselor trainee or family services supervisor employed by the Judicial Department:

(A) Shall disclose to the court and the prosecuting authority for appropriate action information that the victim has indicated that the defendant holds a permit to carry a pistol or revolver, or possesses one or more firearms or possesses ammunition;

(B) Shall disclose to an employee of the Department of Children and Families information that indicates that a defendant poses a danger or threat to a child or a custodial parent of the child;

(C) May disclose to another family relations counselor, family relations counselor trainee or family services supervisor information pursuant to guidelines adopted by the Chief Court Administrator;

(D) May disclose to a bail commissioner or an intake, assessment and referral specialist employed by the Judicial Department information regarding a defendant who is on or is being considered for pretrial release;

(E) May disclose to a law enforcement agency information that indicates that a defendant poses a danger or threat to another person;

(F) May disclose, after disposition of a family violence case, to a probation officer or a juvenile probation officer, for purposes of determining service needs and supervision levels, information regarding a defendant who has been convicted and sentenced to a period of probation in the family violence case;

(G) May disclose, after a conviction in a family violence case, to a probation officer for the purpose of preparing a presentence investigation report, any information regarding the defendant that has been provided to the family relations counselor, family relations counselor trainee or family services supervisor in the case or in any other case that resulted in the conviction of the defendant;

(H) May disclose to any organization under contract with the Judicial Department to provide family violence programs and services, for the purpose of determining program and service needs, information regarding any defendant who is a client of such organization, provided no information that personally identifies the victim may be disclosed to such organization; and

(I) Shall disclose such information as may be necessary to fulfill such counselor's, trainee's or supervisor's duty as a mandated reporter under section 17a–101a to report suspected child abuse or neglect.

Sec. 39. Section 54–36e of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 54–36e >>

(a) Except as provided in sections 26–85 and 26–90, firearms and ammunition, adjudged by the court to be contraband pursuant to subsection (c) of section 54–36a, or adjudicated a nuisance pursuant to section 54–33g, shall be turned over to the Bureau of Identification of the Connecticut Division of State Police within the Department of Emergency Services and Public Protection for destruction or appropriate use or disposal by sale at public auction.

(b) Firearms and ammunition turned over to the state police pursuant to subsection (a) of this section which are not destroyed or retained for appropriate use shall be sold at public auctions, conducted by the Commissioner of Administrative Services or such commissioner's designee. Pistols and revolvers, as defined in section 53a–3, which are antiques, as defined in section 29–33, as amended by this act, or curios or relics, as defined in the Code of Federal Regulations, Title 27, Chapter 1, Part 178, or modern pistols and revolvers which have a current retail value of one hundred dollars or more may be sold at such public auctions, provided such pistols and revolvers shall be sold only to persons who have a valid permit to sell a pistol or revolver, or a valid permit to carry a pistol or revolver, issued pursuant to section 29–28, as amended by this act. Rifles and shotguns, as defined in section 53a–3, shall be sold only to persons qualified under federal law to purchase such rifles and shotguns. The proceeds of any such sale shall be paid to the State Treasurer and deposited by the State Treasurer in the forfeit firearms account within the General Fund.

Sec. 40. Subsection (d) of section 29–38f of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–38f >>

(d) The receipts from the sale of seized firearms and ammunition pursuant to section 54–36e, as amended by this act, shall be deposited in the General Fund and credited to a separate, nonlapsing forfeit firearms account which shall be established by the Comptroller. All moneys in the account are deemed to be appropriated and shall be expended for the purposes established in section 29–38e.

Sec. 41. Subsection (d) of section 54–36n of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 54–36n >>

(d) Whenever a firearm is identified and is determined to have been stolen, the law enforcement agency shall return such firearm, and any ammunition seized or recovered with such firearm that is determined to be stolen, to the rightful owner thereof, provided such owner is not prohibited from possessing such firearm or ammunition and such agency does not need to retain such firearm or ammunition as evidence in a criminal prosecution.

Sec. 42. Subsections (a) and (b) of section 53–202aa of the general statutes are repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 53–202aa >>

(a) A person is guilty of firearms trafficking if such person, knowingly and intentionally, directly or indirectly, causes one or more firearms that such person owns, is in possession of or is in control of to come into the possession of or control of another person who such person knows or has reason to believe is prohibited from owning or possessing any firearm under state or federal law.

(b) (1) Any person who violates any provision of this section shall be guilty of a class C felony if such person, on or after October 1, 2007, but prior to October 1, 2013, sells, delivers or otherwise transfers five or fewer firearms, and a class B felony if such person, on or after October 1, 2007, but prior to October 1, 2013, sells, delivers or otherwise transfers more than five firearms. (2) Any person who violates any provision of this section on or after October 1, 2013, shall be guilty of a class B felony for which three years of the sentence imposed may not be suspended or reduced by the court, and ten thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

Sec. 43. Section 53a–212 of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 53a–212 >>

(a) A person is guilty of stealing a firearm when, with intent to deprive another person of his such other person's firearm or to appropriate the same firearm to himself such person or a third party, he such person wrongfully takes, obtains or withholds a firearm, as defined in subdivision (19) of section 53a–3.

(b) Stealing a firearm is a class Ð C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

Sec. 44. Section 53a–217 of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 53a–217 >>

(a) A person is guilty of criminal possession of a firearm, ammunition or an electronic defense weapon when such person possesses a firearm, ammunition or an electronic defense weapon and (1) has been convicted of a felony committed prior to, on or after October 1, 2013, or of a violation of subsection (c) of section 21a–279 or section 53a–58, 53a–61, 53a–61a, 53a–62, 53a–63, 53a–96, 53a–175, 53a–176, 53a–178 or 53a–181d committed on or after October 1, 2013, (2) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b–120, (3) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a–13, (4) knows that such person is subject to (A) a restraining or protective order of a court of this state that has been issued against such person, after notice and an opportunity to be heard has been provided to such person, in a case involving the use, attempted use or threatened use of physical force against another person, or (B) a foreign order of protection, as defined in section 46b–15a, that has been issued against such person in a case involving the use, attempted use or threatened use of physical force against another person, (4) (5) (A) has been confined on or after October 1, 2013, in a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding sixty months by order of a probate court, or with respect to any person who holds a valid permit or certificate that was issued or renewed under the provisions of section 29–28, as amended by this act, or 29–36f, as amended by this act, in effect prior to October 1, 2013, such person has been confined in such hospital within the preceding twelve months, or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a–680, (6) knows that such person is subject to a firearms seizure order issued pursuant to subsection (d) of section 29–38c, as amended by this act, after notice and an opportunity to be heard has been provided to such person, or (5) (7) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to 18 USC 922(g)(4). For the purposes of this section, "convicted" means having a judgment of conviction entered by a court of competent jurisdiction, "ammunition" means a loaded cartridge, consisting of a primed case, propellant or projectile, designed for use in any firearm,

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3571 Page 52 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

and a motor vehicle violation for which a sentence to a term of imprisonment of more than one year may be imposed shall be deemed an unclassified felony.

(b) Criminal possession of a firearm, ammunition or an electronic defense weapon is a class Ð C felony, for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

Sec. 45. Section 53a–217c of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 53a–217c >>

(a) A person is guilty of criminal possession of a pistol or revolver when such person possesses a pistol or revolver, as defined in section 29–27, and (1) has been convicted of a felony or of a violation of subsection (c) of section 21a–279 or section 53a–58, 53a–61, 53a–61a, 53a–62, 53a–63, 53a–96, 53a–175, 53a–176, 53a–178 or 53a–181d, (2) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b–120, (3) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a–13, (4) (A) has been confined prior to October 1, 2013, in a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding twelve months by order of a probate court, or has been confined on or after October 1, 2013, in a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding sixty months by order of a probate court, or, with respect to any person who holds a valid permit or certificate that was issued or renewed under the provisions of section 29–28, as amended by this act, or 29–36f, as amended by this act, in effect prior to October 1, 2013, such person has been confined in such hospital within the preceding twelve months, or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a–680, (5) knows that such person is subject to (A) a restraining or protective order of a court of this state that has been issued against such person, after notice and an opportunity to be heard has been provided to such person, in a case involving the use, attempted use or threatened use of physical force against another person, or (B) a foreign order of protection, as defined in section 46b–15a, that has been issued against such person in a case involving the use, attempted use or threatened use of physical force against another person, (6) knows that such person is subject to a firearms seizure order issued pursuant to subsection (d) of section 29–38c after notice and an opportunity to be heard has been provided to such person, (7) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to 18 USC 922(g)(4), or (8) is an alien illegally or unlawfully in the United States. For the purposes of this section, "convicted" means having a judgment of conviction entered by a court of competent jurisdiction.

(b) Criminal possession of a pistol or revolver is a class Ð C felony, for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

Sec. 46. Section 29–32 of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–32 >>

(a) For the purposes of this section, "conviction" means the entry of a judgment of conviction by any court of competent jurisdiction.

(b) Any state permit or temporary state permit for the carrying of any pistol or revolver may be revoked by the Commissioner of Emergency Services and Public Protection for cause and shall be revoked by said commissioner upon conviction of the holder

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3572 Page 53 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

of such permit of a felony or of any misdemeanor specified in subsection (b) of section 29–28, as amended by this act, or upon the occurrence of any event which would have disqualified the holder from being issued the state permit or temporary state permit pursuant to subsection (b) of section 29–28, as amended by this act. Upon the revocation of any state permit or temporary state permit, the person whose state permit or temporary state permit is revoked shall be notified in writing and such state permit or temporary state permit shall be forthwith delivered to the commissioner. Any law enforcement authority shall confiscate and immediately forward to the commissioner any state permit or temporary state permit that is illegally possessed by any person. The commissioner may revoke the state permit or temporary state permit based upon the commissioner's own investigation or upon the request of any law enforcement agency. Any person who fails to surrender any permit within five days of notification in writing of revocation thereof shall be guilty of a class ∈ A misdemeanor.

(c) Any local permit for the carrying of a pistol or revolver issued prior to October 1, 2001, may be revoked by the authority issuing the same for cause, and shall be revoked by the authority issuing the same upon conviction of the holder of such permit of a felony or of any misdemeanor specified in subsection (b) of section 29–28, as amended by this act or upon the occurrence of any event which would have disqualified the holder from being issued such local permit. Upon the revocation of any local permit, the person whose local permit is revoked shall be notified in writing and such permit shall be forthwith delivered to the authority issuing the same. Upon the revocation of any local permit, the authority issuing the same shall forthwith notify the commissioner. Upon the revocation of any permit issued by the commissioner, the commissioner shall forthwith notify any local authority which the records of the commissioner show as having issued a currently valid local permit to the holder of the permit revoked by the commissioner. Any person who fails to surrender such permit within five days of notification in writing or revocation thereof shall be guilty of a class ∈ A misdemeanor.

Sec. 47. Subsections (h) and (i) of section 29–33 of the general statutes are repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–33 >>

(h) If the court finds that a violation of this section is not of a serious nature and that the person charged with such violation (1) will probably not offend in the future, (2) has not previously been convicted of a violation of this section, and (3) has not previously had a prosecution under this section suspended pursuant to this subsection, it the court may order suspension of prosecution. The court shall not order suspension of prosecution unless the accused person has acknowledged that he understands the consequences of the suspension of prosecution. Any person for whom prosecution is suspended shall agree to the tolling of any statute of limitations with respect to such violation and to a waiver of his right to a speedy trial. Such person shall appear in court and shall be released to the custody of the Court Support Services Division for such period, not exceeding two years, and under such conditions as the court shall order. If the person refuses to accept, or, having accepted, violates such conditions, the court shall terminate the suspension of prosecution and the case shall be brought to trial. If such person satisfactorily completes his period of probation, he may apply for dismissal of the charges against him and the court, on finding such satisfactory completion, shall dismiss such charges. If the person does not apply for dismissal of the charges against him after satisfactorily completing his period of probation, the court, upon receipt of a report submitted by the Court Support Services Division that the person satisfactorily completed his period of probation, may on its own motion make a finding of such satisfactory completion and dismiss such charges. Upon dismissal, all records of such charges shall be erased pursuant to section 54–142a. An order of the court denying a motion to dismiss the charges against a person who has completed his period of probation or terminating the participation of a defendant in such program shall be a final judgment for purposes of appeal.

(i) Any person who violates any provision of this section shall be guilty of a class Ð C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, except that any person who sells, delivers or otherwise transfers a pistol or revolver in violation of the provisions of this section ;  knowing that such pistol or revolver is stolen or that the manufacturer's number or other mark of identification on such pistol or revolver has been altered, removed or obliterated, shall be guilty of a class B felony for which three years of the sentence imposed may

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3573 Page 54 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

not be suspended or reduced by the court, and ten thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, and any pistol or revolver found in the possession of any person in violation of any provision of this section shall be forfeited.

Sec. 48. Section 29–34 of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–34 >>

(a) No person shall make any false statement or give any false information connected with any purchase, sale, delivery or other transfer of any pistol or revolver. Any person violating any provision of this subsection shall be guilty of a class Ð C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

(b) No person shall sell, barter, hire, lend, give, deliver or otherwise transfer to any person under the age of twenty-one years any pistol or revolver, except that a pistol or revolver may be temporarily transferred to any person only for the use by such person in target shooting or on a firing or shooting range, provided such use is otherwise permitted by law and is under the immediate supervision of a person eligible to possess a pistol or revolver. Any person violating any provision of this subsection shall be guilty of a class Ð C felony for which one year two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

(c) Any pistol or revolver found in the possession of any person in violation of any provision of this section shall be forfeited.

Sec. 49. Section 29–36 of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–36 >>

(a) No person shall remove, deface, alter or obliterate the name of any maker or model or any maker's number or other mark of identification on any firearm as defined in section 53a–3. The possession of any firearm upon which any identifying mark, number or name has been removed, defaced, altered or obliterated shall be prima facie evidence that the person owning or in possession of such firearm has removed, defaced, altered or obliterated the same.

(b) Any person who violates any provision of this section shall be fined not more than one thousand dollars or imprisoned not more than five years or both guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine, and any firearm found in the possession of any person in violation of said provision shall be forfeited.

Sec. 50. Subsection (b) of section 53–202g of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 53–202g >>

(b) Any person who fails to make a report required by subsection (a) of this section, as amended by this act, within the prescribed time period shall commit an infraction and be fined not more than ninety dollars for a first offense and be guilty of a class Ð C felony for any subsequent offense, except that, if such person intentionally fails to make such report within the prescribed time

period, such person shall be guilty of a class ∈ B felony. Any person who violates subsection (a) of this section, as amended by this act, for the first offense shall not lose such person's right to hold or obtain any firearm permit under the general statutes.

Sec. 51. Subsection (e) of section 29–36g of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 29–36g >>

(e) Notwithstanding the provisions of sections 1–210 and 1–211, the name and address of a person issued an eligibility certificate for a pistol or revolver under the provisions of section 29–36f, as amended by this act, shall be confidential and shall not be disclosed, except (1) such information may be disclosed to law enforcement officials acting in the performance of their duties, including, but not limited to, employees of the United States Probation Office acting in the performance of their duties, (2) the Commissioner of Emergency Services and Public Protection may disclose such information to the extent necessary to comply with a request made pursuant to section 29–33, as amended by this act, section 29–37a, as amended by this act, or section 14 of this act for verification that such certificate is still valid and has not been suspended or revoked, and (3) such information may be disclosed to the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a–500, as amended by this act.

Sec. 52. Section 29–36i of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–36i >>

(a) Any eligibility certificate for a pistol or revolver shall be revoked by the Commissioner of Emergency Services and Public Protection upon the occurrence of any event which would have disqualified the holder from being issued the certificate pursuant to section 29–36f, as amended by this act.

(b) Upon the revocation of any eligibility certificate, the person whose eligibility certificate is revoked shall be notified in writing and such certificate shall be forthwith delivered to the Commissioner of Emergency Services and Public Protection. Any person who fails to surrender such certificate within five days of notification in writing of revocation thereof shall be guilty of a class ∈ A misdemeanor.

Sec. 53. Section 29–37j of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–37j >>

(a) Any person who purchases a firearm, as defined in section 53a–3, pursuant to section 29–33, as amended by this act, or 29–37a, as amended by this act, with the intent to transfer such firearm to any other person who the transferor knows or has reason to believe is prohibited from purchasing or otherwise receiving such a firearm pursuant to section 29–33, as amended by this act, or 29–37a, as amended by this act, shall be fined not more than one thousand dollars or imprisoned not more than five years or both guilty of a class C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

(b) Any person prohibited from purchasing or otherwise receiving or possessing a firearm and who solicits, employs or assists any person in violating the provisions of subsection (a) of this section shall be guilty of a class B misdemeanor. If the D felony for which one year of the sentence imposed may not be suspended or reduced by the court, and three thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing

such fine, except that if such person who is prohibited from purchasing or otherwise receiving or possessing a firearm obtains a firearm pursuant to a violation of subsection (a) of this section, involves a transfer of more than one firearm, such person shall be guilty of a class A misdemeanor C felony for which two years of the sentence imposed may not be suspended or reduced by the court, and five thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine. Each transfer shall constitute a separate offense.

(c) Any person convicted of violating the provisions of subsection (a) or (b) of this section and who was convicted of a felony within the prior five-year period shall be guilty of a class D B felony for which three years of the sentence imposed may not be suspended or reduced by the court, and ten thousand dollars of the fine imposed may not be remitted or reduced by the court unless the court states on the record its reasons for remitting or reducing such fine.

Sec. 54. Section 29–37i of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–37i >>

No person shall store or keep any loaded firearm on any premises under his such person's control if he such person knows or reasonably should know that (1) a minor is likely to gain access to the firearm without the permission of the parent or guardian of the minor, (2) a resident of the premises is ineligible to possess a firearm under state or federal law, or (3) a resident of the premises poses a risk of imminent personal injury to himself or herself or to other individuals, unless such person (1) (A) keeps the firearm in a securely locked box or other container or in a location which a reasonable person would believe to be secure, or (2) (B) carries the firearm on his or her person or within such close proximity thereto that he such person can readily retrieve and use it the firearm as if he such person carried it the firearm on his or her person. For the purposes of this section, "minor" means any person under the age of sixteen years.

Sec. 55. Section 52–571g of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 52–571g >>

Any person whose act or omission constitutes a violation of section 29–37i, as amended by this act, shall be strictly liable for damages when a minor or, a resident of the premises who is ineligible to possess a firearm under state or federal law or who poses a risk of imminent personal injury to himself or herself or to other individuals, obtains a firearm, as defined in section 53a–3, and causes the injury or death of such minor, resident or any other person. For the purposes of this section, "minor" means any person under the age of sixteen years.

Sec. 56. Section 53a–217a of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 53a–217a >>

(a) A person is guilty of criminally negligent storage of a firearm when he such person violates the provisions of section 29–37i, as amended by this act, and a minor or, a resident of the premises who is ineligible to possess a firearm under state or federal law or who poses a risk of imminent personal injury to himself or herself or to other individuals, obtains the firearm and causes the injury or death of himself such minor, resident or any other person. For the purposes of this section, "minor" means any person under the age of sixteen years.

(b) The provisions of this section shall not apply if the minor obtains the firearm as a result of an unlawful entry to any premises by any person.

(c) Criminally negligent storage of a firearm is a class D felony.

Sec. 57. Subsections (b) to (f), inclusive, of section 29–28 of the general statutes are repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–28 >>

(b) Upon the application of any person having a bona fide permanent residence or place of business within the jurisdiction of any such authority, such chief of police, warden or selectman may issue a temporary state permit to such person to carry a pistol or revolver within the state, provided such authority shall find that such applicant intends to make no use of any pistol or revolver which such applicant may be permitted to carry under such permit other than a lawful use and that such person is a suitable person to receive such permit. No state or temporary state permit to carry a pistol or revolver shall be issued under this subsection if the applicant (1) has failed to successfully complete a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of pistols and revolvers including, but not limited to, a safety or training course in the use of pistols and revolvers available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Energy and Environmental Protection and a safety or training course in the use of pistols or revolvers conducted by an instructor certified by the state or the National Rifle Association, (2) has been convicted of a felony or of a violation of subsection (c) of section 21a–279 or section 53a–58, 53a–61, 53a–61a, 53a–62, 53a–63, 53a–96, 53a–175, 53a–176, 53a–178 or 53a–181d, (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b–120, (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a–13, (5) (A) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding twelve sixty months by order of a probate court, or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a–680, (6) is subject to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person, (7) is subject to a firearms seizure order issued pursuant to subsection (d) of section 29–38c after notice and hearing, (8) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to 18 USC 922(g)(4), (9) is an alien illegally or unlawfully in the United States, or (10) is less than twenty-one years of age. Nothing in this section shall require any person who holds a valid permit to carry a pistol or revolver on October 1, 1994, to participate in any additional training in the safety and use of pistols and revolvers. No person may apply for a temporary state permit to carry a pistol or revolver more than once within any twelve-month period, and no temporary state permit to carry a pistol or revolver shall be issued to any person who has applied for such permit more than once within the preceding twelve months. Any person who applies for a temporary state permit to carry a pistol or revolver shall indicate in writing on the application, under penalty of false statement in such manner as the issuing authority prescribes, that such person has not applied for a temporary state permit to carry a pistol or revolver within the past twelve months. Upon issuance of a temporary state permit to carry a pistol or revolver to the applicant, the local authority shall forward the original application to the commissioner. Not later than sixty days after receiving a temporary state permit, an applicant shall appear at a location designated by the commissioner to receive the state permit. Said The commissioner may then issue, to any holder of any temporary state permit, a state permit to carry a pistol or revolver within the state. Upon issuance of the state permit, the commissioner shall make available to the permit holder a copy of the law regarding the permit holder's responsibility to report the loss or theft of a firearm and the penalties associated with the failure to comply with such law. Upon issuance of the state permit, the commissioner shall forward a record of such permit to the local authority issuing the temporary state permit. The commissioner shall retain records of all applications, whether approved or denied. The copy of the state permit delivered to the permittee shall be laminated and shall contain a full-face photograph of such permittee. A person holding a state permit issued pursuant to this subsection shall notify the issuing authority within two business days of any change of such person's address. The notification shall include the old address and the new address of such person.

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3577  Page 58 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(c) No issuing authority may require any sworn member of the Department of Emergency Services and Public Protection or an organized local police department to furnish such sworn member's residence address in a permit application. The issuing authority shall allow each such sworn member who has a permit to carry a pistol or revolver issued by such authority to revise such member's application to include a business or post office address in lieu of the residence address. The issuing authority shall notify each such member of the right to revise such application.

(d) Notwithstanding the provisions of sections 1–210 and 1–211, the name and address of a person issued a permit to sell at retail pistols and revolvers pursuant to subsection (a) of this section or a state or a temporary state permit to carry a pistol or revolver pursuant to subsection (b) of this section, or a local permit to carry pistols and revolvers issued by local authorities prior to October 1, 2001, shall be confidential and shall not be disclosed, except (1) such information may be disclosed to law enforcement officials acting in the performance of their duties, including, but not limited to, employees of the United States Probation Office acting in the performance of their duties, (2) the issuing authority may disclose such information to the extent necessary to comply with a request made pursuant to section 29–33, as amended by this act, section 29–37a, as amended by this act, or section 14 of this act for verification that such state or temporary state permit is still valid and has not been suspended or revoked, and the local authority may disclose such information to the extent necessary to comply with a request made pursuant to section 29–33, as amended by this act, section 29–37a, as amended by this act, or section 14 of this act for verification that a local permit is still valid and has not been suspended or revoked, and (3) such information may be disclosed to the Commissioner of Mental Health and Addiction Services to carry out the provisions of subsection (c) of section 17a–500, as amended by this act.

(e) The issuance of any permit to carry a pistol or revolver does not thereby authorize the possession or carrying of a pistol or revolver in any premises where the possession or carrying of a pistol or revolver is otherwise prohibited by law or is prohibited by the person who owns or exercises control over such premises.

(f) Any bona fide resident of the United States having no bona fide permanent residence or place of business within the jurisdiction of any local authority in the state, but who has a permit or license to carry a pistol or revolver issued by the authority of another state or subdivision of the United States, may apply directly to the Commissioner of Emergency Services and Public Protection for a permit to carry a pistol or revolver in this state. All provisions of subsections (b), (c), (d) and (e) of this section shall apply to applications for a permit received by the commissioner under this subsection.

Sec. 58. Subsection (b) of section 29–36f of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 29–36f >>

(b) The Commissioner of Emergency Services and Public Protection shall issue an eligibility certificate unless said commissioner finds that the applicant: (1) Has failed to successfully complete a course approved by the Commissioner of Emergency Services and Public Protection in the safety and use of pistols and revolvers including, but not limited to, a safety or training course in the use of pistols and revolvers available to the public offered by a law enforcement agency, a private or public educational institution or a firearms training school, utilizing instructors certified by the National Rifle Association or the Department of Energy and Environmental Protection and a safety or training course in the use of pistols or revolvers conducted by an instructor certified by the state or the National Rifle Association; (2) has been convicted of a felony or of a violation of subsection (c) of section 21a–279 or section 53a–58, 53a–61, 53a–61a, 53a–62, 53a–63, 53a–96, 53a–175, 53a–176, 53a–178 or 53a–181d; (3) has been convicted as delinquent for the commission of a serious juvenile offense, as defined in section 46b–120; (4) has been discharged from custody within the preceding twenty years after having been found not guilty of a crime by reason of mental disease or defect pursuant to section 53a–13; (5) (A) has been confined in a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding twelve sixty months by order of a probate court; or (B) has been voluntarily admitted on or after October 1, 2013, to a hospital for persons with psychiatric disabilities, as defined in section 17a–495, within the preceding six months for care and treatment of a psychiatric disability and not solely for being an alcohol-dependent person or a drug-dependent person as those terms are defined in section 17a–680, (6) is subject

to a restraining or protective order issued by a court in a case involving the use, attempted use or threatened use of physical force against another person; (7) is subject to a firearms seizure order issued pursuant to subsection (d) of section 29–38c after notice and hearing; (8) is prohibited from shipping, transporting, possessing or receiving a firearm pursuant to 18 USC 922(g)(4); or (9) is an alien illegally or unlawfully in the United States.

Sec. 59. Section 54–125a of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 54–125a >>

(a) A person convicted of one or more crimes who is incarcerated on or after October 1, 1990, who received a definite sentence or aggregate sentence of more than two years, and who has been confined under such sentence or sentences for not less than one-half of the aggregate sentence less any risk reduction credit earned under the provisions of section 18–98e or one-half of the most recent sentence imposed by the court less any risk reduction credit earned under the provisions of section 18–98e, whichever is greater, may be allowed to go at large on parole in the discretion of the panel of the Board of Pardons and Paroles for the institution in which the person is confined, if (1) it appears from all available information, including any reports from the Commissioner of Correction that the panel may require, that there is reasonable probability that such inmate will live and remain at liberty without violating the law, and (2) such release is not incompatible with the welfare of society. At the discretion of the panel, and under the terms and conditions as may be prescribed by the panel including requiring the parolee to submit personal reports, the parolee shall be allowed to return to the parolee's home or to reside in a residential community center, or to go elsewhere. The parolee shall, while on parole, remain under the jurisdiction of the board until the expiration of the maximum term or terms for which the parolee was sentenced less any risk reduction credit earned under the provisions of section 18–98e. Any parolee released on the condition that the parolee reside in a residential community center may be required to contribute to the cost incidental to such residence. Each order of parole shall fix the limits of the parolee's residence, which may be changed in the discretion of the board and the Commissioner of Correction. Within three weeks after the commitment of each person sentenced to more than two years, the state's attorney for the judicial district shall send to the Board of Pardons and Paroles the record, if any, of such person.

(b) (1) No person convicted of any of the following offenses, which was committed on or after July 1, 1981, shall be eligible for parole under subsection (a) of this section: (A) Capital felony, as provided under the provisions of section 53a–54b in effect prior to April 25, 2012, (B) murder with special circumstances, as provided under the provisions of section 53a–54b in effect on or after April 25, 2012, (C) felony murder, as provided in section 53a–54c, (D) arson murder, as provided in section 53a–54d, (E) murder, as provided in section 53a–54a, or (F) aggravated sexual assault in the first degree, as provided in section 53a–70a. (2) A person convicted of (A) a violation of section 53a–100aa or 53a–102, or (B) an offense, other than an offense specified in subdivision (1) of this subsection, where the underlying facts and circumstances of the offense involve the use, attempted use or threatened use of physical force against another person shall be ineligible for parole under subsection (a) of this section until such person has served not less than eighty-five per cent of the definite sentence imposed.~~less any risk reduction credit earned under the provisions of section 18–98e.~~

(c) The Board of Pardons and Paroles shall, not later than July 1, 1996, adopt regulations in accordance with chapter 54 [1] to ensure that a person convicted of an offense described in subdivision (2) of subsection (b) of this section is not released on parole until such person has served eighty-five per cent of the definite sentence imposed by the court.~~less any risk reduction credit earned under the provisions of section 18–98e.~~  Such regulations shall include guidelines and procedures for classifying a person as a violent offender that are not limited to a consideration of the elements of the offense or offenses for which such person was convicted.

(d) The Board of Pardons and Paroles shall hold a hearing to determine the suitability for parole release of any person whose eligibility for parole release is not subject to the provisions of subsection (b) of this section upon completion by such person of seventy-five per cent of such person's definite or aggregate sentence less any risk reduction credit earned under the provisions

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3579   Page 60 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

of section 18–98e. An employee of the board or, if deemed necessary by the chairperson, a panel of the board shall reassess the suitability for parole release of such person based on the following standards: (1) Whether there is reasonable probability that such person will live and remain at liberty without violating the law, and (2) whether the benefits to such person and society that would result from such person's release to community supervision substantially outweigh the benefits to such person and society that would result from such person's continued incarceration. After hearing, if the board determines that continued confinement is necessary, it shall articulate for the record the specific reasons why such person and the public would not benefit from such person serving a period of parole supervision while transitioning from incarceration to the community. The decision of the board under this subsection shall not be subject to appeal.

(e) The Board of Pardons and Paroles shall hold a hearing to determine the suitability for parole release of any person whose eligibility for parole release is subject to the provisions of subdivision (2) of subsection (b) of this section upon completion by such person of eighty-five per cent of such person's definite or aggregate sentence.~~less any risk reduction credit earned under the provisions of section 18–98e.~~   An employee of the board or, if deemed necessary by the chairperson, a panel of the board shall assess the suitability for parole release of such person based on the following standards: (1) Whether there is reasonable probability that such person will live and remain at liberty without violating the law, and (2) whether the benefits to such person and society that would result from such person's release to community supervision substantially outweigh the benefits to such person and society that would result from such person's continued incarceration. After hearing, if the board determines that continued confinement is necessary, it shall articulate for the record the specific reasons why such person and the public would not benefit from such person serving a period of parole supervision while transitioning from incarceration to the community. The decision of the board under this subsection shall not be subject to appeal.

(f) Any person released on parole under this section shall remain in the custody of the Commissioner of Correction and be subject to supervision by personnel of the Department of Correction during such person's period of parole.

1      C.G.S.A. § 4–166 et seq.

Sec. 60. Subsection (a) of section 29–32b of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 29–32b >>

(a) There ~~shall be~~  is established a Board of Firearms Permit Examiners, within the Office of Governmental Accountability established under section 1–300, to be comprised of ~~seven~~  nine members, eight of whom shall be appointed by the Governor to serve during ~~his~~  the Governor's term and until ~~their~~  such members' successors are appointed and qualify, and one of whom shall be a retired judge of the Superior Court appointed by the Chief Court Administrator. With the exception of two public members, the members appointed by the Governor shall be appointed from nominees of the Commissioner of Emergency Services and Public Protection, the Commissioner of Mental Health and Addiction Services, the Connecticut State Association of Chiefs of Police, the Commissioner of Energy and Environmental Protection, The Connecticut State Rifle and Revolver Association, Inc., and Ye Connecticut Gun Guild, Inc., and each of said organizations shall be entitled to representation on the board. At least one member of the board appointed by the Governor shall be a lawyer licensed to practice in this state ~~,~~  ;  who shall act as chairman of the board during the hearing of appeals brought under this section.

Sec. 61. Subsection (c) of section 29–32b of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 29–32b >>

(c) Any person aggrieved by the action of an issuing authority may file with the board a clear and concise statement of the facts on which ~~he~~  such person relies for relief, and shall state the relief sought by the appellant. The receipt by the board of

the appellant's statement shall initiate the appeals process, and no appeal may be rejected for mere lack of formality. The board shall, ~~within~~ not later than ten days ~~next following~~ after receipt of the appeal, set a time and place at which the appeal shall be heard. The board, while such appeal is pending, may request such additional information from the appellant and from the issuing authority as it deems reasonably necessary to conduct a fair and impartial hearing, and shall require of the issuing authority from whose decision or action the appeal is being sought a written statement ~~in writing~~ setting forth the reasons for such failure, refusal, revocation or limitation. ~~Failure~~ The failure, absent good cause shown, or refusal of the issuing authority to furnish such written statement, or to supply the appellant with an application, at least ten days prior to the hearing shall be cause for the board to grant the relief sought, forthwith and without further hearing. If the issuing authority shows good cause for its failure to furnish such written statement, the board shall continue the matter to the next scheduled meeting of the board, provided the issuing authority shall be allowed only one such continuance.

<< *CT ST §§ 29–33, 29–37a, 29–36l* >>, 29–30, 29–36h, 53–202d, 11–4a

Sec. 62. (Effective from passage) (a) The Commissioner of Emergency Services and Public Protection shall study the

feasibility and cost of establishing and maintaining a system to electronically submit and access information required for the sale, delivery or transfer of a firearm. Such system shall permit the electronic submission to the Department of Emergency Services and Public Protection of information required for the sale, delivery or transfer of a firearm, including, but not limited to, the information required by sections 29–33 and 29–37a of the general statutes, as amended by this act. Such system shall permit electronic access to the state database established pursuant to section 29–36*l* of the general statutes, as amended by this act. Notwithstanding the provisions of subsections (d) and (f) of section 29–36*l* of the general statutes, the system shall permit a retail seller to directly initiate a background check on individuals purchasing firearms through the National Instant Criminal Background Check System (NICS).
(b) The system may permit the electronic submission of other documents and forms related to firearms permitting including, but not limited to, an application for the renewal of a permit to carry a pistol or revolver pursuant to section 29–30 of the general statutes, an application for renewal of an eligibility certificate pursuant to section 29–36h of the general statutes, an application for renewal of a long gun eligibility certificate pursuant to section 4 of this act, an application for a certificate of possession for an assault weapon pursuant to section 53–202d of the general statutes, as amended by this act, and an application to declare possession of a large capacity magazine pursuant to section 24 of this act.

(c) The commissioner shall submit a report to the General Assembly, in accordance with section 11–4a of the general statutes, on or before January 1, 2014, on the results of the study and shall include in such report recommendations for the development and implementation of such system.

<< Note: CT ST § 29–38e >>

Sec. 63. (Effective July 1, 2013) The sum of one million dollars is appropriated to the Department of Emergency Services and Public Protection, from the General Fund, for the fiscal year ending June 30, 2014, for the purpose of funding the activities of the state-wide firearms trafficking task force established in section 29–38e of the general statutes.

Sec. 64. Subsection (a) of section 10–220a of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 10–220a >>

(a) Each local or regional board of education shall provide an in-service training program for its teachers, administrators and pupil personnel who hold the initial educator, provisional educator or professional educator certificate. Such program shall provide such teachers, administrators and pupil personnel with information on (1) the nature and the relationship of drugs,

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3581  Page 62 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

as defined in subdivision (17) of section 21a–240, and alcohol to health and personality development, and procedures for discouraging their abuse, (2) health and mental health risk reduction education which includes, but need not be limited to, the prevention of risk-taking behavior by children and the relationship of such behavior to substance abuse, pregnancy, sexually transmitted diseases, including HIV-infection and AIDS, as defined in section 19a–581, violence, teen dating violence, domestic violence, child abuse and youth suicide, (3) the growth and development of exceptional children, including handicapped and gifted and talented children and children who may require special education, including, but not limited to, children with attention-deficit hyperactivity disorder or learning disabilities, and methods for identifying, planning for and working effectively with special needs children in a regular classroom, including, but not limited to, implementation of student individualized education programs, (4) school violence prevention, conflict resolution, the prevention of and response to youth suicide and the identification and prevention of and response to bullying, as defined in subsection (a) of section 10–222d, except that those boards of education that implement any evidence-based model approach that is approved by the Department of Education and is consistent with subsection (d) of section 10–145a, subsection (a) of section 10–220a, sections 10–222d, 10–222g and 10–222h, subsection (g) of section 10–233c and sections 1 and 3 of public act 08–160, shall not be required to provide in-service training on the identification and prevention of and response to bullying, (5) cardiopulmonary resuscitation and other emergency life saving procedures, (6) computer and other information technology as applied to student learning and classroom instruction, communications and data management, (7) the teaching of the language arts, reading and reading readiness for teachers in grades kindergarten to three, inclusive, (8) second language acquisition in districts required to provide a program of bilingual education pursuant to section 10–17f, (9) the requirements and obligations of a mandated reporter. Each local and regional board of education may allow any paraprofessional or noncertified employee to participate, on a voluntary basis, in any in-service training program provided pursuant to this section, and (10) the teacher evaluation and support program developed pursuant to subsection (b) of section 10–151b. The State Board of Education, within available appropriations and utilizing available materials, shall assist and encourage local and regional boards of education to include: (A) Holocaust and genocide education and awareness; (B) the historical events surrounding the Great Famine in Ireland; (C) African–American history; (D) Puerto Rican history; (E) Native American history; (F) personal financial management; (G) domestic violence and teen dating violence; and (H) mental health first aid training; and (I) topics approved by the state board upon the request of local or regional boards of education as part of in-service training programs pursuant to this subsection.

<< Note: CT ST §§ 10–145a, 11–4a >>

Sec. 65. (Effective from passage) (a) The Commissioner of Education shall consider whether to include mental health first aid training as a requirement for a candidate in a program of teacher preparation leading to professional certification pursuant to section 10–145a of the general statutes.

(b) Not later than January 1, 2014, the Commissioner of Education shall report, in accordance with the provisions of section 11–4a of the general statutes, to the joint standing committees of the General Assembly having cognizance of matters relating to education, public health and appropriations concerning the commissioner's recommendation for inclusion of such training as a requirement for such program of teacher preparation.

<< Note: CT ST § 11–4a >>

Sec. 66. (Effective from passage) (a) There is established a task force to study the provision of behavioral health services in the state with particular focus on the provision of behavioral health services for persons sixteen to twenty-five years of age, inclusive.

(b) The task force shall analyze and make recommendations concerning: (1) Improving behavioral health screening, early intervention and treatment; (2) closing gaps in private insurance coverage; (3) improving behavioral health case management services; (4) addressing the insufficient number of certain behavioral health providers, including psychiatrists who specialize in treating children and those offering specialized services; (5) improving the delivery system for behavioral health services; (6) improving payment models for behavioral health services; (7) creating

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3582  Page 63 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

a central clearinghouse with information for members of the public concerning behavioral health services; (8) providing intensive, individualized behavioral health intervention services in schools for students who are exhibiting violent tendencies; (9) requiring the State Department of Education to provide technical assistance to school districts concerning behavioral intervention specialists in public and private schools and for preschool programs; (10) employing the use of assisted outpatient behavioral health services and involuntary outpatient commitment as treatment options; (11) conducting behavioral health screenings of public school children; (12) requiring disclosure of communications by mental health professionals concerning persons who present a clear and present danger to the health or safety of themselves or other persons; and (13) reducing the stigma of mental illness as it presents a barrier to a person's receipt of appropriate mental health services.

(c) The task force shall consist of the following members:

(1) The Healthcare Advocate;

(2) The Child Advocate;

(3) Two appointed by the president pro tempore of the Senate, one of whom shall be a child psychiatrist and the other a primary care provider;

(4) Two appointed by the speaker of the House of Representatives, one of whom shall be a pediatrician whose practice is focused on treating adolescents and the other a representative of a school-based health center;

(5) Two appointed by the majority leader of the Senate, one of whom shall be a judge of probate and the other a parent with a child who has utilized behavioral health services;

(6) Two appointed by the majority leader of the House of Representatives, one of whom shall be a school psychologist and the other a representative of a community health center;

(7) Two appointed by the minority leader of the Senate, one of whom shall be a representative of a health insurer and the other a representative of a hospital that offers behavioral health services; and

(8) Two appointed by the minority leader of the House of Representatives, one of whom shall be a representative of an organization that offers behavioral health case management services and the other a consumer of behavioral health services or the representative of an organization that advocates for consumers of behavioral health services;

(9) One appointed by the Governor, who shall be a representative of an institution of higher education; and

(10) The Commissioners of Children and Families, Mental Health and Addiction Services, Public Health and Education, and the Insurance Commissioner or the commissioners' designees.

(d) All appointments to the task force shall be made not later than thirty days after the effective date of this section. Any vacancy shall be filled by the appointing authority.

(e) The president pro tempore of the Senate and the speaker of the House of Representatives shall each appoint one chairperson of the task force from among the members. Such chairpersons shall schedule the first meeting of the task force, which shall be held not later than sixty days after the effective date of this section. A majority of the voting task force members shall constitute a quorum. A majority vote of a quorum shall be required for any official action of the task force. Any tie vote shall be decided by the chairpersons. The task force shall meet not less than monthly until February 1, 2014, and at other times upon the call of the chairs or upon the request of a majority of the members.

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3583  Page 64 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(f) The administrative staff of the joint standing committee of the General Assembly having cognizance of matters relating to public health shall serve as administrative staff of the task force.

(g) Members of the task force shall serve without compensation, except for necessary expenses incurred in the performance of their duties.

(h) The task force may seek funding from any state, federal or private source and may enter into contracts to carry out its duties.

(i) Not later than February 1, 2014, the task force shall submit a report on its findings and recommendations to the Governor, the president pro tempore of the Senate, the speaker of the House of Representatives, the minority leader of the Senate, the minority leader of the House of Representatives, and the joint standing committees of the General Assembly having cognizance of matters relating to appropriations, public health, human services, education and insurance, in accordance with the provisions of section 11–4a of the general statutes. The task force shall provide additional information not contained in such report to said members of the General Assembly, upon their request. The task force shall terminate on July 1, 2014.

Sec. 67. (NEW) (Effective July 1, 2013)

The Commissioner of Mental Health and Addiction Services shall implement an assertive community treatment program to provide behavioral health support services in three cities of the state that, on June 30, 2013, do not have a program that offers such services. Such program shall use a person-centered, recovery-based approach to provide to persons, including those released from commitment, who have been diagnosed with a severe and persistent mental illness: (1) Assertive outreach; (2) mental health services; (3) vocational assistance; (4) education concerning family issues; (5) information to develop wellness skills; and (6) peer support services. Such services shall be provided by mobile, multi-disciplinary teams in community settings.

Sec. 68. (NEW) (Effective July 1, 2013)

The Commissioner of Mental Health and Addiction Services shall provide case management and case coordination services to not more than one hundred persons with mental illness who are involved in the Probate Court system and who, on June 30, 2013, are not receiving such services.

Sec. 69. (NEW) (Effective from passage)

(a) Not later than January 1, 2014, the Commissioner of Children and Families shall establish and implement a regional behavioral health consultation and care coordination program for primary care providers who serve children. Such program shall provide to such primary care providers: (1) Timely access to a consultation team that includes a child psychiatrist, social worker and a care coordinator; (2) patient care coordination and transitional services for behavioral health care; and (3) training and education concerning patient access to behavioral health services. Said commissioner may enter into a contract for services to administer such program.

(b) Not later than October 1, 2013, said commissioner shall submit a plan, in accordance with the provisions of section 11–4a of the general statutes, to the joint standing committees of the General Assembly having cognizance of matters relating to public health, children, human services and appropriations concerning the program to be established pursuant to subsection (a) of this section.

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3584  Page 65 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(c) The Commissioner of Children and Families may adopt regulations, in accordance with the provisions of chapter 54 [1] of the general statutes, to implement the provisions of this section.

[1]        C.G.S.A. § 4–166 et seq.

Sec. 70. Subdivision (7) of section 38a–591a of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 38a–591a >>

(7) "Clinical peer" means a physician or other health care professional who (A) holds a nonrestricted license in a state of the United States and in the same or similar specialty as typically manages the medical condition, procedure or treatment under review, and (B) for a review specified under subparagraph (B) or (C) of subdivision (38) of section 38a–591a, as amended by this act, concerning (i) a child or adolescent substance use disorder or a child or adolescent mental disorder, holds a national board certification in child and adolescent psychiatry or child and adolescent psychology, and has training or clinical experience in the treatment of child and adolescent substance use disorder or child and adolescent mental disorder, as applicable, or (ii) an adult substance use disorder or an adult mental disorder, holds a national board certification in psychiatry or psychology, and has training or clinical experience in the treatment of adult substance use disorders or adult mental disorders, as applicable.

Sec. 71. Subdivision (38) of section 38a–591a of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 38a–591a >>

(38) "Urgent care request" means a request for a health care service or course of treatment (A) for which the time period for making a non-urgent care request determination (A) (i) could seriously jeopardize the life or health of the covered person or the ability of the covered person to regain maximum function, or (B) (ii) in the opinion of a health care professional with knowledge of the covered person's medical condition, would subject the covered person to severe pain that cannot be adequately managed without the health care service or treatment being requested, or (B) for a substance use disorder, as described in section 17a–458, or for a co-occurring mental disorder, or (C) for a mental disorder requiring (i) inpatient services, (ii) partial hospitalization, as defined in section 38a–496, (iii) residential treatment, or (iv) intensive outpatient services necessary to keep a covered person from requiring an inpatient setting.

Sec. 72. Section 38a–591c of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 38a–591c >>

(a) (1) Each health carrier shall contract with (A) health care professionals to administer such health carrier's utilization review program, and oversee utilization review determinations,  and (B) with  clinical peers to conduct utilization reviews and to evaluate the clinical appropriateness of an adverse determination.

(2) Each utilization review program shall use documented clinical review criteria that are based on sound clinical evidence and are evaluated periodically by the health carrier's organizational mechanism specified in subparagraph (F) of subdivision (2) of subsection (c) of section 38a–591b to assure such program's ongoing effectiveness. A health carrier may develop its own clinical review criteria or it may purchase or license clinical review criteria from qualified vendors approved by the commissioner. Each health carrier shall make its clinical review criteria available upon request to authorized government agencies.

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(3) (A) Notwithstanding subdivision (2) of this subsection, for any utilization review for the treatment of a substance use disorder, as described in section 17a–458, the clinical review criteria used shall be: (i) The most recent edition of the American Society of Addiction Medicine's Patient Placement Criteria; or (ii) clinical review criteria that the health carrier demonstrates is consistent with the most recent edition of the American Society of Addiction Medicine's Patient Placement Criteria, in accordance with subparagraph (B) of this subdivision.

(B) A health carrier that uses clinical review criteria as set forth in subparagraph (A)(ii) of this subdivision shall create and maintain a document in an easily accessible location on such health carrier's Internet web site that (i) compares each aspect of such clinical review criteria with the American Society of Addiction Medicine's Patient Placement Criteria, and (ii) provides citations to peer-reviewed medical literature generally recognized by the relevant medical community or to professional society guidelines that justify each deviation from the American Society of Addiction Medicine's Patient Placement Criteria.

(4) (A) Notwithstanding subdivision (2) of this subsection, for any utilization review for the treatment of a child or adolescent mental disorder, the clinical review criteria used shall be: (i) The most recent guidelines of the American Academy of Child and Adolescent Psychiatry's Child and Adolescent Service Intensity Instrument; or (ii) clinical review criteria that the health carrier demonstrates is consistent with the most recent guidelines of the American Academy of Child and Adolescent Psychiatry's Child and Adolescent Service Intensity Instrument, in accordance with subparagraph (B) of this subdivision.

(B) A health carrier that uses clinical review criteria as set forth in subparagraph (A)(ii) of this subdivision for children and adolescents shall create and maintain a document in an easily accessible location on such health carrier's Internet web site that (i) compares each aspect of such clinical review criteria with the guidelines of the American Academy of Child and Adolescent Psychiatry's Child and Adolescent Service Intensity Instrument, and (ii) provides citations to peer-reviewed medical literature generally recognized by the relevant medical community or to professional society guidelines that justify each deviation from the guidelines of the American Academy of Child and Adolescent Psychiatry's Child and Adolescent Service Intensity Instrument.

(5) (A) Notwithstanding subdivision (2) of this subsection, for any utilization review for the treatment of an adult mental disorder, the clinical review criteria used shall be: (i) The most recent guidelines of the American Psychiatric Association or the most recent Standards and Guidelines of the Association for Ambulatory Behavioral Healthcare; or (ii) clinical review criteria that the health carrier demonstrates is consistent with the most recent guidelines of the American Psychiatric Association or the most recent Standards and Guidelines of the Association for Ambulatory Behavioral Healthcare, in accordance with subparagraph (B) of this subdivision.

(B) A health carrier that uses clinical review criteria as set forth in subparagraph (A)(ii) of this subdivision for adults shall create and maintain a document in an easily accessible location on such health carrier's Internet web site that (i) compares each aspect of such clinical review criteria with the guidelines of the American Psychiatric Association or the most recent Standards and Guidelines of the Association for Ambulatory Behavioral Healthcare, and (ii) provides citations to peer-reviewed medical literature generally recognized by the relevant medical community or to professional society guidelines that justify each deviation from the guidelines of the American Psychiatric Association or the most recent Standards and Guidelines of the Association for Ambulatory Behavioral Healthcare.

(b) Each health carrier shall:

(1) Have procedures in place to ensure that (A) the health care professionals administering such health carrier's utilization review program are applying the clinical review criteria consistently in utilization review determinations, and (B) the appropriate or required clinical peers are being designated to conduct utilization reviews;

(2) Have data systems sufficient to support utilization review program activities and to generate management reports to enable the health carrier to monitor and manage health care services effectively;

(3) Provide covered persons and participating providers with access to its utilization review staff through a toll-free telephone number or any other free calling option or by electronic means;

(4) Coordinate the utilization review program with other medical management activity conducted by the health carrier, such as quality assurance, credentialing, contracting with health care professionals, data reporting, grievance procedures, processes for assessing member satisfaction and risk management; and

(5) Routinely assess the effectiveness and efficiency of its utilization review program.

(c) If a health carrier delegates any utilization review activities to a utilization review company, the health carrier shall maintain adequate oversight, which shall include (1) a written description of the utilization review company's activities and responsibilities, including such company's reporting requirements, (2) evidence of the health carrier's formal approval of the utilization review company program, and (3) a process by which the health carrier shall evaluate the utilization review company's performance.

(d) When conducting utilization review, the health carrier shall (1) collect only the information necessary, including pertinent clinical information, to make the utilization review or benefit determination, and (2) ensure that such review is conducted in a manner to ensure the independence and impartiality of the individual or individuals clinical peer or peers involved in making the utilization review or benefit determination. No health carrier shall make decisions regarding the hiring, compensation, termination, promotion or other similar matters of such individual or individuals clinical peer or peers based on the likelihood that the individual or individuals clinical peer or peers will support the denial of benefits.

Sec. 73. Section 38a–591d of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 38a–591d >>

(a) (1) Each health carrier shall maintain written procedures for (A) utilization review and benefit determinations, (B) expedited utilization review and benefit determinations with respect to prospective urgent care requests and concurrent review urgent care requests, and (C) notifying covered persons or covered persons' authorized representatives of such review and benefit determinations. Each health carrier shall make such review and benefit determinations within the specified time periods under this section.

(2) In determining whether a benefit request shall be considered an urgent care request, an individual acting on behalf of a health carrier shall apply the judgment of a prudent layperson who possesses an average knowledge of health and medicine, except that any benefit request (A) determined to be an urgent care request by a health care professional with knowledge of the covered person's medical condition, or (B) specified under subparagraph (B) or (C) of subdivision (38) of section 38a–591a, as amended by this act, shall be deemed an urgent care request.

(3) After a covered person, a covered person's authorized representative or a covered person's health care professional is notified of an initial adverse determination that was based, in whole or in part, on medical necessity, of a concurrent or prospective utilization review or of a benefit request, a health carrier may offer a covered person's health care professional the opportunity to confer with a clinical peer of such health carrier, provided such covered person, covered person's authorized representative or covered person's health care professional has not filed a grievance of such initial adverse determination prior to such conference. Such conference shall not be considered a grievance of such initial adverse determination.

(b) With respect to a nonurgent care request:

(1) (A) For a prospective or concurrent review request, a health carrier shall make a determination within a reasonable period of time appropriate to the covered person's medical condition, but not later than fifteen calendar days after the date the health carrier receives such request, and shall notify the covered person and, if applicable, the covered person's authorized representative of such determination, whether or not the carrier certifies the provision of the benefit.

(B) If the review under subparagraph (A) of this subdivision is a review of a grievance involving a concurrent review request, pursuant to 45 CFR 147.136, as amended from time to time, the treatment shall be continued without liability to the covered person until the covered person has been notified of the review decision.

(2) For a retrospective review request, a health carrier shall make a determination within a reasonable period of time, but not later than thirty calendar days after the date the health carrier receives such request.

(3) The time periods specified in subdivisions (1) and (2) of this subsection may be extended once by the health carrier for up to fifteen calendar days, provided the health carrier:

(A) Determines that an extension is necessary due to circumstances beyond the health carrier's control; and

(B) Notifies the covered person and, if applicable, the covered person's authorized representative prior to the expiration of the initial time period, of the circumstances requiring the extension of time and the date by which the health carrier expects to make a determination.

(4) (A) If the extension pursuant to subdivision (3) of this subsection is necessary due to the failure of the covered person or the covered person's authorized representative to provide information necessary to make a determination on the request, the health carrier shall:

(i) Specifically describe in the notice of extension the required information necessary to complete the request; and

(ii) Provide the covered person and, if applicable, the covered person's authorized representative with not less than forty-five calendar days after the date of receipt of the notice to provide the specified information.

(B) If the covered person or the covered person's authorized representative fails to submit the specified information before the end of the period of the extension, the health carrier may deny certification of the benefit requested.

(c) With respect to an urgent care request:

(1) (A) Unless the covered person or the covered person's authorized representative has failed to provide information necessary for the health carrier to make a determination and except as specified under subparagraph (B) of this subdivision, the health carrier shall make a determination as soon as possible, taking into account the covered person's medical condition, but not later than seventy-two hours after the health carrier receives such request, provided, if the urgent care request is a concurrent review request to extend a course of treatment beyond the initial period of time or the number of treatments, such request is made at least twenty-four hours prior to the expiration of the prescribed period of time or number of treatments.;

(B) Unless the covered person or the covered person's authorized representative has failed to provide information necessary for the health carrier to make a determination, for an urgent care request specified under subparagraph (B) or (C) of subdivision (38) of section 38a–591a, as amended by this act, the health carrier shall make a determination as soon as possible, taking into account the covered person's medical condition, but not later than twenty-four hours after the health carrier receives such request, provided, if the urgent care request is a concurrent review request to extend a course of treatment beyond the initial period of time or the number of treatments, such request is made at least twenty-four hours prior to the expiration of the prescribed period of time or number of treatments.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3588   Page 69 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(2) (A) If the covered person or the covered person's authorized representative has failed to provide information necessary for the health carrier to make a determination, the health carrier shall notify the covered person or the covered person's representative, as applicable, as soon as possible, but not later than twenty-four hours after the health carrier receives such request.

(B) The health carrier shall provide the covered person or the covered person's authorized representative, as applicable, a reasonable period of time to submit the specified information, taking into account the covered person's medical condition, but not less than forty-eight hours after notifying the covered person or the covered person's authorized representative, as applicable.

(3) The health carrier shall notify the covered person and, if applicable, the covered person's authorized representative of its determination as soon as possible, but not later than forty-eight hours after the earlier of (A) the date on which the covered person and the covered person's authorized representative, as applicable, provides the specified information to the health carrier, or (B) the date on which the specified information was to have been submitted.

(d) (1) Whenever a health carrier receives a review request from a covered person or a covered person's authorized representative that fails to meet the health carrier's filing procedures, the health carrier shall notify the covered person and, if applicable, the covered person's authorized representative of such failure not later than five calendar days after the health carrier receives such request, except that for an urgent care request, the health carrier shall notify the covered person and, if applicable, the covered person's authorized representative of such failure not later than twenty-four hours after the health carrier receives such request.

(2) If the health carrier provides such notice orally, the health carrier shall provide confirmation in writing to the covered person and the covered person's health care professional of record not later than five calendar days after providing the oral notice.

(e) Each health carrier shall provide promptly to a covered person and, if applicable, the covered person's authorized representative a notice of an adverse determination.

(1) Such notice may be provided in writing or by electronic means and shall set forth, in a manner calculated to be understood by the covered person or the covered person's authorized representative:

(A) Information sufficient to identify the benefit request or claim involved, including the date of service, if applicable, the health care professional and the claim amount;

(B) The specific reason or reasons for the adverse determination, including, upon request, a listing of the relevant clinical review criteria, including professional criteria and medical or scientific evidence and a description of the health carrier's standard, if any, that was were used in reaching the denial;

(C) Reference to the specific health benefit plan provisions on which the determination is based;

(D) A description of any additional material or information necessary for the covered person to perfect the benefit request or claim, including an explanation of why the material or information is necessary to perfect the request or claim;

(E) A description of the health carrier's internal grievance process that includes (i) the health carrier's expedited review procedures, (ii) any time limits applicable to such process or procedures, (iii) the contact information for the organizational unit designated to coordinate the review on behalf of the health carrier, and (iv) a statement that the covered person or, if applicable, the covered person's authorized representative is entitled, pursuant to the requirements of the health carrier's internal grievance process, to (I) submit written comments, documents, records and other material relating to the covered person's benefit request for consideration by the individual or individuals conducting the review, and (II) receive from the health carrier, free of charge upon request, reasonable access to and copies of all documents, records, communications and other information and evidence regarding the covered person's benefit request;

Case 3:17-cv-01017-BEN-JLB    Document 18-9    Filed 06/05/17    PageID.3589    Page 70 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(F) If the adverse determination is based on a health carrier's internal rule, guideline, protocol or other similar criterion, (i) the specific rule, guideline, protocol or other similar criterion, or (ii) (I) a statement that a specific rule, guideline, protocol or other similar criterion of the health carrier was relied upon to make the adverse determination and that a copy of such rule, guideline, protocol or other similar criterion will be provided to the covered person free of charge upon request, and (II) instructions for requesting such copy, and (III) the links to such rule, guideline, protocol or other similar criterion on such health carrier's Internet web site. If the adverse determination involves the treatment of a substance use disorder, as described in section 17a–458, or a mental disorder, the notice of adverse determination shall also include, if applicable, a link to the document created and maintained by such health carrier pursuant to subdivision (3), (4) or (5) of subsection (a) of section 38a–591c, as amended by this act, as applicable, on such health carrier's Internet web site;

(G) If the adverse determination is based on medical necessity or an experimental or investigational treatment or similar exclusion or limit, the written statement of the scientific or clinical rationale for the adverse determination and (i) an explanation of the scientific or clinical rationale used to make the determination that applies the terms of the health benefit plan to the covered person's medical circumstances or (ii) a statement that an explanation will be provided to the covered person free of charge upon request, and instructions for requesting a copy of such explanation; and

(H) A statement explaining the right of the covered person to contact the commissioner's office or the Office of the Healthcare Advocate at any time for assistance or, upon completion of the health carrier's internal grievance process, to file a civil suit in a court of competent jurisdiction. Such statement shall include the contact information for said offices;. and

(I) A statement that if the covered person or the covered person's authorized representative chooses to file a grievance of an adverse determination, (i) such appeals are sometimes successful, (ii) such covered person or covered person's authorized representative may benefit from free assistance from the Office of the Healthcare Advocate, which can assist such covered person or covered person's authorized representative with the filing of a grievance pursuant to 42 USC 300gg–93, as amended from time to time, or from the Division of Consumer Affairs within the Insurance Department, (iii) such covered person or covered person's authorized representative is entitled and encouraged to submit supporting documentation for the health carrier's consideration during the review of an adverse determination, including narratives from such covered person or covered person's authorized representative and letters and treatment notes from such covered person's health care professional, and (iv) such covered person or covered person's authorized representative has the right to ask such covered person's health care professional for such letters or treatment notes.

(2) Upon request pursuant to subparagraph (E) of subdivision (1) of this subsection, the health carrier shall provide such copies in accordance with subsection (a) of section 38a–591n.

(f) If the adverse determination is a rescission, the health carrier shall include with the advance notice of the application for rescission required to be sent to the covered person, a written statement that includes:

(1) Clear identification of the alleged fraudulent act, practice or omission or the intentional misrepresentation of material fact;

(2) An explanation as to why the act, practice or omission was fraudulent or was an intentional misrepresentation of a material fact;

(3) A disclosure that the covered person or the covered person's authorized representative may file immediately, without waiting for the date such advance notice of the proposed rescission ends, a grievance with the health carrier to request a review of the adverse determination to rescind coverage, pursuant to sections 38a–591e and 38a–591f, as amended by this act;

(4) A description of the health carrier's grievance procedures established under sections 38a–591e and 38a–591f, as amended by this act, including any time limits applicable to those procedures; and

(5) The date such advance notice of the proposed rescission ends and the date back to which the coverage will be retroactively rescinded.

(g) (1) Whenever a health carrier fails to strictly adhere to the requirements of this section with respect to making utilization review and benefit determinations of a benefit request or claim, the covered person shall be deemed to have exhausted the internal grievance process of such health carrier and may file a request for an external review in accordance with the provisions of section 38a–591g, as amended by this act, regardless of whether the health carrier asserts it substantially complied with the requirements of this section or that any error it committed was de minimis.

(2) A covered person who has exhausted the internal grievance process of a health carrier may, in addition to filing a request for an external review, pursue any available remedies under state or federal law on the basis that the health carrier failed to provide a reasonable internal grievance process that would yield a decision on the merits of the claim.

Sec. 74. Section 38a–591e of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 38a–591e >>

(a) (1) Each health carrier shall establish and maintain written procedures for (A) the review of grievances of adverse determinations that were based, in whole or in part, on medical necessity, (B) the expedited review of grievances of adverse determinations of urgent care requests, including concurrent review urgent care requests involving an admission, availability of care, continued stay or health care service for a covered person who has received emergency services but has not been discharged from a facility, and (C) notifying covered persons or covered persons' authorized representatives of such adverse determinations.

(2) Each health carrier shall file with the commissioner a copy of such procedures, including all forms used to process requests, and any subsequent material modifications to such procedures.

(3) In addition to a copy of such procedures, each health carrier shall file annually with the commissioner, as part of its annual report required under subsection (e) of section 38a–591b, a certificate of compliance stating that the health carrier has established and maintains grievance procedures for each of its health benefit plans that are fully compliant with the provisions of sections 38a–591a to 38a–591n, inclusive, as amended by this act.

(b) (1) A covered person or a covered person's authorized representative may file a grievance of an adverse determination that was based, in whole or in part, on medical necessity with the health carrier not later than one hundred eighty calendar days after the covered person or the covered person's authorized representative, as applicable, receives the notice of an adverse determination.

(2) For prospective or concurrent urgent care requests, a covered person or a covered person's authorized representative may make a request for an expedited review orally or in writing.

(c) (1) (A) When conducting a review of an adverse determination under this section, the health carrier shall ensure that such review is conducted in a manner to ensure the independence and impartiality of the individual or individuals clinical peer or peers involved in making the review decision.

(B) If the adverse determination involves utilization review, the health carrier shall designate an appropriate clinical peer or peers to review such adverse determination. Such clinical peer or peers shall not have been involved in the initial adverse determination.

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3591 Page 72 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(C) The ~~individual or individuals~~ clinical peer or peers conducting a review under this section shall take into consideration all comments, documents, records and other information relevant to the covered person's benefit request that is the subject of the adverse determination under review, that are submitted by the covered person or the covered person's authorized representative, regardless of whether such information was submitted or considered in making the initial adverse determination.

(D) Prior to issuing a decision, the health carrier shall provide free of charge, by facsimile, electronic means or any other expeditious method available, to the covered person or the covered person's authorized representative, as applicable, any new or additional documents, communications, information and evidence relied upon and any new or additional scientific or clinical rationale used by the health carrier in connection with the grievance. Such documents, communications, information, evidence and rationale shall be provided sufficiently in advance of the date the health carrier is required to issue a decision to permit the covered person or the covered person's authorized representative, as applicable, a reasonable opportunity to respond prior to such date.

(2) If the review under subdivision (1) of this subsection is an expedited review, all necessary information, including the health carrier's decision, shall be transmitted between the health carrier and the covered person or the covered person's authorized representative, as applicable, by telephone, facsimile, electronic means or any other expeditious method available.

(3) If the review under subdivision (1) of this subsection is an expedited review of a grievance involving an adverse determination of a concurrent review ~~urgent care~~ request, pursuant to 45 CFR 147.136, as amended from time to time, the treatment shall be continued without liability to the covered person until the covered person has been notified of the review decision.

(d) (1) The health carrier shall notify the covered person and, if applicable, the covered person's authorized representative, in writing or by electronic means, of its decision within a reasonable period of time appropriate to the covered person's medical condition, but not later than:

(A) For prospective review and concurrent review requests, thirty calendar days after the health carrier receives the grievance;

(B) For retrospective review requests, sixty calendar days after the health carrier receives the grievance; ~~and~~

(C) For expedited review requests, except as specified under subparagraph (D) of this subdivision, seventy-two hours after the health carrier receives the grievance; and

(D) For expedited review requests of a health care service or course of treatment specified under subparagraph (B) or (C) of subdivision (38) of section 38a–591a, as amended by this act, twenty-four hours after the health carrier receives the grievance.

(2) The time periods set forth in subdivision (1) of this subsection shall apply regardless of whether all of the information necessary to make a decision accompanies the filing.

(e) (1) The notice required under subsection (d) of this section shall set forth, in a manner calculated to be understood by the covered person or the covered person's authorized representative:

(A) The titles and qualifying credentials of the ~~individual or individuals~~ clinical peer or peers participating in the review process;

(B) Information sufficient to identify the claim involved with respect to the grievance, including the date of service, if applicable, the health care professional and the claim amount;

(C) A statement of such ~~individual's or individuals'~~ clinical peer's or peers' understanding of the covered person's grievance;

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3592  Page 73 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(D) The ~~individual's or individuals'~~ clinical peer's or peers' decision in clear terms and the health benefit plan contract basis or scientific or clinical rationale for such decision in sufficient detail for the covered person to respond further to the health carrier's position;

(E) Reference to the evidence or documentation used as the basis for the decision;

(F) For a decision that upholds the adverse determination:

(i) The specific reason or reasons for the final adverse determination, including the denial code and its corresponding meaning, as well as a description of the health carrier's standard, if any, that was used in reaching the denial;

(ii) Reference to the specific health benefit plan provisions on which the decision is based;

(iii) A statement that the covered person may receive from the health carrier, free of charge and upon request, reasonable access to and copies of, all documents, records, communications and other information and evidence not previously provided regarding the adverse determination under review;

(iv) If the final adverse determination is based on a health carrier's internal rule, guideline, protocol or other similar criterion, (I) the specific rule, guideline, protocol or other similar criterion, or (II) a statement that a specific rule, guideline, protocol or other similar criterion of the health carrier was relied upon to make the final adverse determination and that a copy of such rule, guideline, protocol or other similar criterion will be provided to the covered person free of charge upon request and instructions for requesting such copy;

(v) If the final adverse determination is based on medical necessity or an experimental or investigational treatment or similar exclusion or limit, the written statement of the scientific or clinical rationale for the final adverse determination and (I) an explanation of the scientific or clinical rationale used to make the determination that applies the terms of the health benefit plan to the covered person's medical circumstances, or (II) a statement that an explanation will be provided to the covered person free of charge upon request and instructions for requesting a copy of such explanation;

(vi) A statement describing the procedures for obtaining an external review of the final adverse determination;

(G) If applicable, the following statement: "You and your plan may have other voluntary alternative dispute resolution options such as mediation. One way to find out what may be available is to contact your state Insurance Commissioner."; and

(H) A statement disclosing the covered person's right to contact the commissioner's office or the Office of the Healthcare Advocate at any time. Such disclosure shall include the contact information for said offices.

(2) Upon request pursuant to subparagraph (F)(iii) of subdivision (1) of this subsection, the health carrier shall provide such copies in accordance with subsection (b) of section 38a–591n.

(f) (1) Whenever a health carrier fails to strictly adhere to the requirements of this section with respect to receiving and resolving grievances involving an adverse determination, the covered person shall be deemed to have exhausted the internal grievance process of such health carrier and may file a request for an external review, regardless of whether the health carrier asserts that it substantially complied with the requirements of this section, or that any error it committed was de minimis.

(2) A covered person who has exhausted the internal grievance process of a health carrier may, in addition to filing a request for an external review, pursue any available remedies under state or federal law on the basis that the health carrier failed to provide a reasonable internal grievance process that would yield a decision on the merits of the claim.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3593   Page 74 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

Sec. 75. Subsection (d) of section 38a–591f of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 38a–591f >>

(d) (1) The written decision issued pursuant to subsection (c) of this section shall contain:

(A) The titles and qualifying credentials of the individual or individuals participating in the review process;

(B) A statement of such individual's or individuals' understanding of the covered person's grievance;

(C) The individual's or individuals' decision in clear terms and the health benefit plan contract basis for such decision in sufficient detail for the covered person to respond further to the health carrier's position;

(D) Reference to the documents, communications, information and evidence used as the basis for the decision; and

(E) For a decision that upholds the adverse determination, a statement (i) that the covered person may receive from the health carrier, free of charge and upon request, reasonable access to and copies of, all documents, communications, information and evidence regarding the adverse determination that is the subject of the final adverse determination, and (ii) disclosing the covered person's right to contact the commissioner's office or the Office of the Healthcare Advocate at any time, and that such covered person may benefit from free assistance from the Office of the Healthcare Advocate, which can assist such covered person with the filing of a grievance pursuant to 42 USC 300gg–93, as amended from time to time, or from the Division of Consumer Affairs within the Insurance Department. Such disclosure shall include the contact information for said offices.

(2) Upon request pursuant to subparagraph (E) of subdivision (1) of this subsection, the health carrier shall provide such copies in accordance with subsection (b) of section 38a–591n.

Sec. 76. Subdivision (1) of subsection (i) of section 38a–591g of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 38a–591g >>

(i) (1) The independent review organization shall notify the commissioner, the health carrier, the covered person and, if applicable, the covered person's authorized representative in writing of its decision to uphold, reverse or revise the adverse determination or the final adverse determination, not later than:

(A) For external reviews, forty-five calendar days after such organization receives the assignment from the commissioner to conduct such review;

(B) For external reviews involving a determination that the recommended or requested health care service or treatment is experimental or investigational, twenty calendar days after such organization receives the assignment from the commissioner to conduct such review;

(C) For expedited external reviews, except as specified under subparagraph (D) of this subdivision, as expeditiously as the covered person's medical condition requires, but not later than seventy-two hours after such organization receives the assignment from the commissioner to conduct such review; and

(D) For expedited external reviews involving a health care service or course of treatment specified under subparagraph (B) or (C) of subdivision (38) of section 38a–591a, as amended by this act, as expeditiously as the covered person's medical condition

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3594  Page 75 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

requires, but not later than twenty-four hours after such organization receives the assignment from the commissioner to conduct such review; and

(D) (E) For expedited external reviews involving a determination that the recommended or requested health care service or treatment is experimental or investigational, as expeditiously as the covered person's medical condition requires, but not later than five calendar days after such organization receives the assignment from the commissioner to conduct such review.

Sec. 77. Section 38a–1046 of the general statutes is repealed and the following is substituted in lieu thereof (Effective October 1, 2013):

<< CT ST § 38a–1046 >>

Each employer , other than a self-insured employer,  that provides health insurance or health care benefits to employees shall obtain from the Healthcare Advocate and post, in a conspicuous location, a notice concerning the services that the Healthcare Advocate provides.

Sec. 78. Section 38a–478*l* of the general statutes is amended by adding subsection (e) as follows (Effective October 1, 2013):

<< *CT ST § 38a–478l* >>

(NEW) (e) The commissioner shall analyze annually the data submitted under subparagraphs (E) and (F) of subdivision (1) of subsection (b) of this section for the accuracy of, trends in and statistically significant differences in such data among the health care centers and licensed health insurers included in the consumer report card. The commissioner may investigate any such differences to determine whether further action by the commissioner is warranted.

<< Note: CT ST § 11–4a >>

Sec. 79. (Effective from passage) (a) Not later than September 15, 2013, the Insurance Commissioner shall seek input from stakeholders, including, but not limited to, the Healthcare Advocate, health insurance companies, health care professionals and behavioral health advocacy groups on methods the Insurance Department might use to check for compliance with state and federal mental health parity laws by health insurance companies and other entities under its jurisdiction. The department shall also post notice of such request for input on its Internet web site and provide for a written public comment period of thirty days following the posting of such notice. The department shall include in such posting the date the public comment period closes and instructions on how to submit comments to the department.

(b) (1) Not later than January 1, 2014, the commissioner shall issue a report, in accordance with the provisions of section 11–4a of the general statutes, to the joint standing committees of the General Assembly having cognizance of matters relating to insurance and public health and provide an educational presentation to said committees. Such report and presentation shall (A) cover the methodology the department is using to check for compliance with the interim regulations or guidance or the final regulations or guidance, whichever is in effect, published by the United States Department of Health and Human Services relating to the compliance and oversight requirements of the Paul Wellstone and Pete Domenici Mental Health Parity and Addiction Equity Act of 2008, [1] (B) cover the methodology the department is using to check for compliance with mental health parity under state law, and (C) detail the department's regulatory and educational approaches relating to the financing of mental health services in this state. The report shall describe and address any public comments received pursuant to subsection (a) of this section.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3595   Page 76 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

(2) Not later than February 1, 2014, the joint standing committees of the General Assembly having cognizance of matters relating to insurance and public health shall hold a joint public hearing on the report.

[1]    Pub.L. 110-343, Div. C, Title V, Subtitle B, Oct. 3, 2008, 122 Stat. 3881.

Sec. 80. (NEW) (Effective from passage)

(a) There is established a School Safety Infrastructure Council. The council shall consist of: (1) The Commissioner of Construction Services, or the commissioner's designee; (2) the Commissioner of Emergency Services and Public Protection, or the commissioner's designee; (3) the Commissioner of Education, or the commissioner's designee; (4) one appointed by the president pro tempore of the Senate, who shall be a person with expertise in building security, preferably school building security; (5) one appointed by the speaker of the House of Representatives, who shall be a licensed professional engineer who is a structural engineer; (6) one appointed by the majority leader of the Senate, who shall be a public school administrator certified by the State Board of Education; (7) one appointed by the majority leader of the House of Representatives, who shall be a firefighter, emergency medical technician or a paramedic; (8) one appointed by the minority leader of the Senate, who shall be a school resource officer; and (9) one appointed by the minority leader of the House of Representatives, who shall be a public school teacher certified by the State Board of Education. The Commissioner of Construction Services shall serve as the chairperson of the council. The administrative staff of the Department of Construction Services shall serve as staff for the council and assist with all ministerial duties.

(b) The School Safety Infrastructure Council shall develop school safety infrastructure standards for school building projects under chapter 173 [1] of the general statutes and projects receiving reimbursement as part of the school security infrastructure competitive grant program, pursuant to section 84 of this act. Such school safety infrastructure standards shall conform to industry standards for school building safety infrastructure and shall include, but not be limited to, standards regarding (1) entryways to school buildings and classrooms, such as, reinforcement of entryways, ballistic glass, solid core doors, double door access, computer-controlled electronic locks, remote locks on all entrance and exits and buzzer systems, (2) the use of cameras throughout the school building and at all entrances and exits, including the use of closed-circuit television monitoring, (3) penetration resistant vestibules, and (4) other security infrastructure improvements and devices as they become industry standards. The council shall meet at least annually to review and update, if necessary, the school safety infrastructure standards and make such standards available to local and regional boards of education.

(c) Not later than January 1, 2014, and annually thereafter, the School Safety Infrastructure Council shall submit the school safety infrastructure standards to the Commissioners of Emergency Services and Public Protection and Education, the School Building Projects Advisory Council, established pursuant to section 10–292q of the general statutes, as amended by this act, and the joint standing committees of the General Assembly having cognizance of matters relating to public safety and education, in accordance with the provisions of section 11–4a of the general statutes.

[1]    C.G.S.A. § 10–282 et seq.

Sec. 81. Subsection (a) of section 10–284 of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 10–284 >>

(a) The Commissioner of Education shall have authority to receive and review applications for state grants under this chapter, and the Commissioner of Construction Services shall have authority to review and approve any such application, or to disapprove any such application if (1) it does not comply with the requirements of the State Fire Marshal or the Department of Public Health, (2) it is not accompanied by a life-cycle cost analysis approved by the Commissioner of Construction Services

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3596 Page 77 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

pursuant to section 16a–38, (3) it does not comply with the provisions of sections 10–290d and 10–291, (4) it does not meet (A) the standards or requirements established in regulations adopted in accordance with section 10–287c, or (B) school building categorization requirements described in section 10–283, as amended by this act, (5) the estimated construction cost exceeds the per square foot cost for schools established in regulations adopted by the Commissioner of Construction Services for the county in which the project is proposed to be located, (6) on and after July 1, 2014, the application does not comply with the school safety infrastructure standards developed by the School Safety Infrastructure Council, pursuant to section 80 of this act, or (6) (7) the Commissioner of Education determines that the proposed educational specifications for or theme of the project for which the applicant requests a state grant duplicates a program offered by a technical high school or an interdistrict magnet school in the same region.

Sec. 82. Subdivision (1) of subsection (a) of section 10–283 of the general statutes is repealed and the following is substituted in lieu thereof (Effective July 1, 2013):

<< CT ST § 10–283 >>

(a) (1) Each town or regional school district shall be eligible to apply for and accept grants for a school building project as provided in this chapter. Any town desiring a grant for a public school building project may, by vote of its legislative body, authorize the board of education of such town to apply to the Commissioner of Education and to accept or reject such grant for the town. Any regional school board may vote to authorize the supervising agent of the regional school district to apply to the Commissioner of Education for and to accept or reject such grant for the district. Applications for such grants under this chapter shall be made by the superintendent of schools of such town or regional school district on the form provided and in the manner prescribed by the Commissioner of Construction Services. The application form shall require the superintendent of schools to affirm that the school district considered the maximization of natural light, and the use and feasibility of wireless connectivity technology and, on and after July 1, 2014, the school safety infrastructure standards, developed by the School Safety Infrastructure Council, pursuant to section 80 of this act, in projects for new construction and alteration or renovation of a school building. The Commissioner of Education shall review each grant application for a school building project for compliance with educational requirements and on the basis of categories for building projects established by the State Board of Education in accordance with this section, and shall evaluate, if appropriate, whether the project will assist the state in meeting the goals of the 2008 stipulation and order for Milo Sheff, et al. v. William A. O'Neill, et al., provided grant applications submitted for purposes of subsection (a) of section 10–65 or section 10–76e shall be reviewed annually by the commissioner on the basis of the educational needs of the applicant. The Commissioner of Education shall forward each application and the category that the Commissioner of Education has assigned to each such project in accordance with subdivision (2) of this subsection to the Commissioner of Construction Services not later than August thirty-first of each fiscal year. The Commissioner of Construction Services shall review all grant applications for school building projects on the basis of each grant application for a school building project for compliance with standards for school construction, established in regulation building projects pursuant to regulations, adopted in accordance with section 10–287c, and, on and after July 1, 2014, the school safety infrastructure standards, developed by the School Safety Infrastructure Council pursuant to section 80 of this act. Notwithstanding the provisions of this chapter, the Board of Trustees of the Community–Technical Colleges on behalf of Quinebaug Valley Community College and Three Rivers Community College and the following entities that will operate an interdistrict magnet school that will assist the state in meeting the goals of the 2008 stipulation and order for Milo Sheff, et al. v. William A. O'Neill, et al., as determined by the Commissioner of Education, may apply for and shall be eligible to receive grants for school building projects pursuant to section 10–264h for such a school: (A) The Board of Trustees of the Community–Technical Colleges on behalf of a regional community-technical college, (B) the Board of Trustees of the Connecticut State University System on behalf of a state university, (C) the Board of Trustees for The University of Connecticut on behalf of the university, (D) the board of governors for an independent college or university, as defined in section 10a–37, or the equivalent of such a board, on behalf of the independent college or university, (E) cooperative arrangements pursuant to section 10–158a, and (F) any other third-party not-for-profit corporation approved by the Commissioner of Education.

Sec. 83. Subsection (b) of section 10–292q of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 10–292q >>

(b) The School Building Projects Advisory Council shall (1) develop model blueprints for new school building projects that are in accordance with industry standards for school buildings and the school safety infrastructure standards, developed pursuant to section 80 of this act, (2) conduct studies, research and analyses, and (3) make recommendations for improvements to the school building projects processes to the Governor and the joint standing committee of the General Assembly having cognizance of matters relating to appropriations and the budgets of state agencies, education and finance, revenue and bonding.

<< Note: CT ST §§ 10–262f, 10–266p >>

Sec. 84. (Effective from passage) (a) For the fiscal years ending June 30, 2013, to June 30, 2015, inclusive,

the Departments of Emergency Services and Public Protection, Construction Services and Education shall jointly administer a school security infrastructure competitive grant program to reimburse towns for certain expenses for schools under the jurisdiction of the town's school district incurred on or after the effective date of this section for: (1) The development or improvement of the security infrastructure of schools, based on the results of school building security assessments pursuant to subsection (b) of this section, including, but not limited to, the installation of surveillance cameras, penetration resistant vestibules, ballistic glass, solid core doors, double door access, computer-controlled electronic locks, entry door buzzer systems, scan card systems, panic alarms or other systems; and (2) (A) the training of school personnel in the operation and maintenance of the security infrastructure of school buildings, or (B) the purchase of portable entrance security devices, including, but not limited to, metal detector wands and screening machines and related training.

(b) On and after the effective date of this section, each local and regional board of education may, on behalf of its town or its member towns, apply, at such time and in such manner as the Commissioner of Emergency Services and Public Protection prescribes, to the Department of Emergency Services and Public Protection for a grant. Prior to the date that the School Safety Infrastructure Council makes its initial submission of the school safety infrastructure standards, pursuant to subsection (c) of section 80 of this act, the Commissioner of Emergency Services and Public Protection, in consultation with the Commissioners of Construction Services and Education, shall determine which expenses are eligible for reimbursement under the program. On and after the date that the School Safety Infrastructure Council submits the school safety infrastructure standards, the decision to approve or deny an application and the determination of which expenses are eligible for reimbursement under the program shall be in accordance with the most recent submission of the school safety infrastructure standards, pursuant to subsection (c) of section 80 of this act.

(c) A town may receive a grant equal to a percentage of its eligible expenses. The percentage shall be determined as follows: (1) Each town shall be ranked in descending order from one to one hundred sixty-nine according to town wealth, as defined in subdivision (26) of section 10–262f of the general statutes, (2) based upon such ranking, a percentage of not less than twenty or more than eighty shall be assigned to each town on a continuous scale, and (3) the town ranked first shall be assigned a percentage of twenty and the town ranked last shall be assigned a percentage of eighty. If there are not sufficient funds to provide grants to all towns based on the percentage determined pursuant to this subsection, the Commissioner of Emergency Services and Public Protection, in consultation with the Commissioners of Construction Services and Education, shall give priority to applicants on behalf of schools with the greatest need for security infrastructure, as determined by said commissioners based on school building security assessments of the schools under the jurisdiction of the town's school district conducted pursuant to this subsection. Of the applicants on behalf of such schools with the greatest need for security infrastructure, said commissioners shall give first priority to applicants on behalf of schools that have no security infrastructure at the

time of such school building security assessment and succeeding priority to applicants on behalf of schools located in priority school districts pursuant to section 10–266p of the general statutes. To be eligible for reimbursement pursuant to this section, an applicant board of education shall (A) demonstrate that it has developed and periodically practices an emergency plan at the schools under its jurisdiction and that such plan has been developed in concert with applicable state or local first-responders, and (B) provide for a uniform assessment of the schools under its jurisdiction, including any security infrastructure, using the National Clearinghouse for Educational Facilities' Safe Schools Facilities Check List. The assessment shall be conducted under the supervision of the local law enforcement agency.

<< Note: CT ST § 3–20 >>

Sec. 85. (Effective from passage) (a) For the purposes described in subsection (b) of this section, the State Bond Commission shall have the power from time to time to authorize the issuance of bonds of the state in one or more series and in principal amounts not exceeding in the aggregate fifteen million dollars.

(b) The proceeds of the sale of said bonds, to the extent of the amount stated in subsection (a) of this section, shall be used by the Department of Education for the purpose of the school security infrastructure competitive grant program, established pursuant to section 84 of this act.

(c) All provisions of section 3–20 of the general statutes, or the exercise of any right or power granted thereby, which are not inconsistent with the provisions of this section are hereby adopted and shall apply to all bonds authorized by the State Bond Commission pursuant to this section, and temporary notes in anticipation of the money to be derived from the sale of any such bonds so authorized may be issued in accordance with said section 3–20 and from time to time renewed. Such bonds shall mature at such time or times not exceeding twenty years from their respective dates as may be provided in or pursuant to the resolution or resolutions of the State Bond Commission authorizing such bonds. None of said bonds shall be authorized except upon a finding by the State Bond Commission that there has been filed with it a request for such authorization which is signed by or on behalf of the Secretary of the Office of Policy and Management and states such terms and conditions as said commission, in its discretion, may require. Said bonds issued pursuant to this section shall be general obligations of the state and the full faith and credit of the state of Connecticut are pledged for the payment of the principal of and interest on said bonds as the same become due, and accordingly and as part of the contract of the state with the holders of said bonds, appropriation of all amounts necessary for punctual payment of such principal and interest is hereby made, and the State Treasurer shall pay such principal and interest as the same become due.

Sec. 86. (NEW) (Effective from passage)

(a) Not later than January 1, 2014, the Department of Emergency Services and Public Protection, in consultation with the Department of Education, shall develop school security and safety plan standards. The school security and safety plan standards shall be an all-hazards approach to emergencies at public schools and shall include, but not be limited to, (1) involvement of local officials, including the chief executive officer of the municipality, the superintendent of schools, law enforcement, fire, public health, emergency management and emergency medical services, in the development of school security and safety plans, (2) a command center organization structure based on the federal National Incident Management System and a description of the responsibilities of such command center organization, (3) a requirement that a school security and safety committee be established at each school, in accordance with the provisions of section 87 of this act, (4) crisis management procedures, (5) a requirement that local law enforcement and other local public safety officials evaluate, score and provide feedback on fire drills and crisis response drills, conducted pursuant to section 10–231 of the general statutes, (6) a requirement that local and regional boards of education annually submit reports to the Department of Emergency Services and Public Protection regarding such fire drills and crisis response drills, (7) procedures for managing various types of emergencies, (8) a requirement that each local and regional board of education conduct a security and vulnerability assessment for each school under the jurisdiction of such board every two years and develop a school security and safety plan for each such school, in accordance with the provisions of

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3599  Page 80 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

section 87 of this act, based on the results of such assessment, (9) a requirement that the safe school climate committee for each school, established pursuant to section 10–222k of the general statutes, as amended by this act, collect and evaluate information relating to instances of disturbing or threatening behavior that may not meet the definition of bullying, as defined in section 10–222d of the general statutes, and report such information, as necessary, to the district safe school climate coordinator, described in section 10–222k of the general statutes, as amended by this act, and the school security and safety committee for the school, established pursuant to section 87 of this act, and (10) a requirement that the school security and safety plan for each school provide an orientation on such school security and safety plan to each school employee, as defined in section 10–222d of the general statutes, at such school and provide violence prevention training in a manner prescribed in such school security and safety plan. The Department of Emergency Services and Public Protection shall make such standards available to local officials, including local and regional boards of education.

(b) Not later than January 1, 2014, and annually thereafter, the Department of Emergency Services and Public Protection shall submit the school security and safety plan standards and any recommendations for legislation regarding such standards to the joint standing committees of the General Assembly having cognizance of matters relating to public safety and education, in accordance with the provisions of section 11–4a of the general statutes.

Sec. 87. (NEW) (Effective from passage)

(a) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall develop and implement a school security and safety plan for each school under the jurisdiction of such board. Such plans shall be based on the school security and safety plan standards developed by the Department of Emergency Services and Public Protection, pursuant to section 86 of this act. Each local and regional board of education shall annually review and update, if necessary, such plans.

(b) For the school year commencing July 1, 2014, and each school year thereafter, each local and regional board of education shall establish a school security and safety committee at each school under the jurisdiction of such board. The school security and safety committee shall be responsible for assisting in the development of the school security and safety plan for the school and administering such plan. Such school security and safety committee shall consist of a local police officer, a local first responder, a teacher and an administrator employed at the school, a mental health professional, as defined in section 10–76t of the general statutes, a parent or guardian of a student enrolled in the school and any other person the board of education deems necessary. Any parent or guardian serving as a member of a school security and safety committee shall not have access to any information reported to such committee, pursuant to subparagraph (c) of subdivision (2) of subsection (c) of section 10–222k of the general statutes, as amended by this act.

(c) Each local and regional board of education shall annually submit the school security and safety plan for each school under the jurisdiction of such board, developed pursuant to subsection (a) of this section, to the Department of Emergency Services and Public Protection.

Sec. 88. Subsection (c) of section 10–222k of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 10–222k >>

(c) (1) For the school year commencing July 1, 2012, and each school year thereafter, the principal of each school shall establish a committee or designate at least one existing committee in the school to be responsible for developing and fostering a safe school climate and addressing issues relating to bullying in the school. Such committee shall include at least one parent or guardian of a student enrolled in the school appointed by the school principal.

(2) Any such committee shall: (A) ~~receive~~ Receive copies of completed reports following investigations of bullying, (B) identify and address patterns of bullying among students in the school, (C) implement the provisions of the school security and safety plan, developed pursuant to section 87 of this act, regarding the collection, evaluation and reporting of information relating to instances of disturbing or threatening behavior that may not meet the definition of bullying, (D) review and amend school policies relating to bullying, ~~(D)~~ (E) review and make recommendations to the district safe school climate coordinator regarding the district's safe school climate plan based on issues and experiences specific to the school, ~~(E)~~ (F) educate students, school employees and parents and guardians of students on issues relating to bullying, ~~(F)~~ (G) collaborate with the district safe school climate coordinator in the collection of data regarding bullying, in accordance with the provisions of subsection (b) of section 10–222d and subsection (a) of section 10–222h, and ~~(G)~~ (H) perform any other duties as determined by the school principal that are related to the prevention, identification and response to school bullying for the school.

(3) Any parent or guardian serving as a member of any such committee shall not participate in the activities described in subparagraphs (A) ~~and (B)~~ to (C), inclusive, of subdivision (2) of this subsection or any other activity that may compromise the confidentiality of a student.

Sec. 89. Section 10–222h of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 10–222h >>

(a) The Department of Education shall, within available appropriations, (1) document school districts' articulated needs for technical assistance and training related to safe learning and bullying, (2) collect information on the prevention and intervention strategies used by schools to reduce the incidence of bullying, improve school climate and improve reporting outcomes, (3) develop or recommend a model safe school climate plan for grades kindergarten to twelve, inclusive, and (4) in collaboration with the Connecticut Association of Schools, disseminate to all public schools grade-level appropriate school climate assessment instruments approved by the department, including surveys, to be used by local and regional boards of education for the purposes of collecting information described in subdivision (2) of this subsection so that the department can monitor bullying prevention efforts over time and compare each district's progress to state trends.

(b) On or before February 1, ~~2010~~ 2014, and ~~biennially~~ annually thereafter, the department shall, in accordance with the provisions of section 11–4a, submit a report on the status of its efforts pursuant to this section including, but not limited to, the number of verified acts of bullying in the state, an analysis of the responsive action taken by school districts and any recommendations it may have regarding additional activities or funding to prevent bullying in schools and improve school climate to the joint standing ~~committee~~ committees of the General Assembly having cognizance of matters relating to education and ~~to the select committee of the General Assembly having cognizance of matters relating to~~ children and to the speaker of the House of Representatives, the president pro tempore of the Senate and the majority and minority leaders of the House of Representatives and the Senate.

~~(b)~~ (c) The department may accept private donations for the purposes of this section.

Sec. 90. (NEW) (Effective from passage)

(a) The Commissioner of Mental Health and Addiction Services, in consultation with the Commissioner of Education, shall administer a mental health first aid training program. Said program shall: (1) Help persons attending the training program recognize the signs of mental disorders in children and young adults; and (2) connect children and young adults who show signs of having a mental disorder with a professional who offers the appropriate services.

(b) Said commissioners may seek federal and state funding and may accept private donations for the administration of, and providing for persons to participate in, the mental health first aid training program.

(c) (1) For the school year commencing July 1, 2014, the Commissioner of Mental Health and Addiction Services shall provide mental health first aid training to any person appointed to serve as the district safe school climate coordinator, pursuant to section 10–222k of the general statutes, as amended by this act. Each such district safe school climate coordinator shall successfully complete such mental health first aid training.

(2) For the school year commencing July 1, 2015, the Commissioner of Mental Health and Addiction Services shall provide mental health and first aid training to any person appointed to serve as the district safe school climate coordinator for such school year and who did not serve as the district safe school climate coordinator for the prior school year or did not otherwise successfully complete such training. Each such district safe school climate coordinator shall successfully complete such mental health first aid training.

(3) No district safe school climate coordinator shall be required to successfully complete such mental health first aid training more than once.

(d) Each local and regional board of education may require teachers, school nurses, counselors and other school employees to participate in mental health first aid training.


Sec. 91. (NEW) (Effective from passage)

The Department of Emergency Services and Public Protection shall establish and maintain a registry of school security consultants operating in the state. The registry shall contain the names and employers of school security consultants and such other information as the Commissioner of Emergency Services and Public Protection may require. Such registry shall be updated at least annually by the department, be made available to the public upon request and be published on the department's Internet web site.


Sec. 92. Section 10a–156a of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 10a–156a >>

Each (a) Not later than October 1, 2013, each constituent unit of the state system of higher education and each independent college or university institution of higher education, as defined in section 10a–37, as amended by this act, shall submit a plan described in this section to the Department of Higher Education by January 1, 2009 an up-to-date security protocol plan to the Department of Emergency Services and Public Protection. Such plan shall identify procedures specifically designed to heighten awareness by all faculty and staff regarding potentially at-risk students and other individuals on campus through effective educational strategies. Such procedures shall be designed to educate faculty and staff on how to recognize and respond to students and such other individuals who may be at risk of harm to themselves or others. Not later than July 1, 2015, and biennially thereafter, each constituent unit and independent institution of higher education shall review the security protocol plan with each of its chiefs of police or heads of campus security to determine whether such plan adequately addresses campus security concerns or requires revisions. In the event that revisions are required, the constituent unit or independent institution of higher education making revisions shall submit a revised security protocol plan to the Department of Emergency Services and Public Protection not later than August first of the year in which revisions are deemed necessary.

(b) Not later than January 1, 2014, each constituent unit and independent institution of higher education shall establish a trained threat assessment team for each of its campuses. The threat assessment team shall consist of individuals selected by the president of each state college, regional community-technical college or independent institution of higher education in consultation with its chief of police or head of campus security and may include not less than one member of its special police force or campus security personnel, administration, faculty and senior and mid-level staff. The chief of police or head of campus security at

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3602  Page 83 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

each state college, regional community-technical college and independent institution of higher education shall be responsible for ensuring that every member of the treat assessment team (1) is capable of executing the security protocol plan developed in accordance with subsection (a) of this section, and (2) receives comprehensive training in identifying potentially at-risk students, other potentially at-risk individuals on campus and any other potential threats to campus safety.

Sec. 93. Section 10a–142 of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 10a–142 >>

(a) There are established special police forces for The University of Connecticut at Storrs and its several campuses, The University of Connecticut Health Center in Farmington, Central Connecticut State University in New Britain, Southern Connecticut State University in New Haven, Eastern Connecticut State University in Willimantic and Western Connecticut State University in Danbury. The members of each special police force shall have the same duties, responsibilities and authority under sections 7–281, 14–8, 54–1f and 54–33a and title 53a as members of a duly organized local police department. The jurisdiction of said special police forces shall extend to the geographical limits of the property owned or under the control of the above institutions, and to property occupied by The University of Connecticut in the town of Mansfield, except as provided in subsection (b) of section 7–277a.

(b) Members of said special police forces shall continue to be state employees and, except as provided in subsection (e) of this section, shall be subject to the provisions of chapter 67,[1] and parts III[2] and IV[3] of this chapter. The provisions of part V[4] of chapter 104 and section 7–433c shall not apply to such members.

(c) Said special police forces shall have access to, and use of, the Connecticut on-line law enforcement communications teleprocessing system without charge.

(d) The chief executive officer of any institution listed in subsection (a) of this section which maintains a special police force may enter into an agreement with one or more of said other institutions which maintain a special police force to furnish or receive police assistance under the same conditions and terms specified in subsection (a) of section 7–277a.

(e) (1) Notwithstanding any provision of chapter 67,[5] the Board of Regents for Higher Education shall determine (A) the preliminary requirements, including educational qualifications, for members of the special police forces for the state colleges, and (B) the timeline for filling any vacancies on any of such special police forces, including, but not limited to, when an examination for a vacant position shall occur and how soon after the examination is conducted shall an appointment to a vacant position be made or, in the event an examination for a vacant position is unnecessary due to a sufficient candidate list provided in accordance with section 5–215a, when an appointment of a candidate from such candidate list shall be made.

(2) Notwithstanding any provision of chapter 67, the Board of Trustees of The University of Connecticut shall determine (A) the preliminary requirements including educational qualifications, for members of the special police force for The University of Connecticut, and (B) the timeline for filling any vacancies on such police force, including, but not limited to, when an examination for a vacant position shall occur and how soon after the examination is conducted shall an appointment to a vacant position be made or, in the event an examination for a vacant position is unnecessary due to a sufficient candidate list provided in accordance with section 5–215a, when an appointment of a candidate from such candidate list shall be made.

[1]   C.G.S.A. § 5–193 et seq.

[2]   C.G.S.A. § 10a–102 et seq.

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3603  Page 84 of 472

FIREARMS—OMNIBUS AMENDMENT, 2013 Conn. Legis. Serv. P.A. 13-3 (S.B....

3    C.G.S.A. § 10a–143 et seq.

4    C.G.S.A. § 7–323a et seq.

5    C.G.S.A. § 5–193 et seq.

<< Note: CT ST § 11–4a >>

Sec. 94. (Effective from passage) (a) The Board of Regents for Higher Education, in consultation with the Department

of Emergency Services and Public Protection, shall evaluate the effectiveness of establishing a special police force for each regional community-technical college and replacing campus security personnel at each regional community-technical college with the special police force. Not later than January 1, 2014, the president of the Board of Regents for Higher Education shall report, in accordance with the provisions of section 11–4a of the general statutes, on such evaluation to the joint standing committee of the General Assembly having cognizance of matters relating to higher education.

(b) The Board of Regents for Higher Education shall develop a coordinated security plan for the Connecticut State University System and the regional community-technical college system. Not later than January 1, 2014, the president of the Board of Regents for Higher Education shall report, in accordance with the provisions of section 11–4a of the general statutes, on such plan to the joint standing committee of the General Assembly having cognizance of matters relating to higher education.

Sec. 95. (NEW) (Effective from passage)

Any armed security personnel of any public institution of higher education or armed member of a special police force established under section 10a–142 of the general statutes shall be certified under the provision of sections 7–294a to 7–294e, inclusive, of the general statutes.

<< Note: CT ST §§ 10a–1, 10a–156a >>

Sec. 96. (Effective from passage) (a) Not later than December 1, 2014, the Department of Emergency Services and

Public Protection shall conduct or require a safety and security audit of every campus of the constituent units identified in subdivisions (1) to (4), inclusive, of section 10a–1 of the general statutes, to determine the safety and security characteristics of each campus and any building or structure located thereon. Such security audit shall be conducted in cooperation with the Board of Regents for Higher Education or, for a safety and security audit of any campus of The University of Connecticut, with the Board of Trustees of The University of Connecticut.

(b) Any recommendations for safety or security upgrades in any such safety and security audit shall be based on the audit's findings and, at a minimum, shall enable the constituent unit to successfully implement its security protocol plan developed in accordance with section 10a–156a of the general statutes, as amended by this act.

(c) Not later than January 1, 2015, the department shall report on such audit to the joint standing committee of the General Assembly having cognizance of matters relating to higher education.

Sec. 97. Subsection (d) of section 10a–37 of the general statutes is repealed and the following is substituted in lieu thereof (Effective from passage):

<< CT ST § 10a–37 >>

(d) An ~~"independent college or university"~~ "independent institution of higher education": (1) Is a nonprofit institution established in this state; (2) has degree-granting authority in this state; (3) has its home campus located in this state; (4) is not included in the Connecticut system of public higher education; and (5) is an institution whose primary function is not the preparation of students for religious vocation;

Sec. 98. Section 12 of public act 07–7 of the June special session, as amended by section 233 of public act 10–44 and section 143 of public act 10–179, is amended to read as follows (Effective from passage):

The State Bond Commission shall have power, in accordance with the provisions of sections 12 to 19, inclusive, of public act 07–7 of the June special session, from time to time to authorize the issuance of bonds of the state in one or more series and in principal amounts in the aggregate, not exceeding ~~$195,103,868~~ $192,103,868.

Sec. 99. Subdivision (6) of subsection (j) of section 13 of public act 07–7 of the June special session, as amended by section 309 of public act 10–44, is repealed. (Effective from passage)

Approved April 4, 2013.

---

**End of Document**

© 2013 Thomson Reuters. No claim to original U.S. Government Works.

---

# Exhibit 88

S T A T E   O F   N E W   Y O R K
_____

S. 2230                                                        A. 2388

2013-2014 Regular Sessions

S E N A T E - A S S E M B L Y

January 14, 2013
_____

IN  SENATE  --  Introduced  by  Sens. KLEIN, SMITH -- (at request of the
    Governor) -- read twice and ordered printed, and when  printed  to  be
    committed to the Committee on Rules

IN  ASSEMBLY  --  Introduced by M. of A. SILVER, LENTOL, ORTIZ, MORELLE,
    FARRELL, WEINSTEIN, CAMARA, HOOPER, O'DONNELL, TITONE,  PAULIN,  MOYA,
    GLICK,  WRIGHT, SCHIMEL, GOTTFRIED, ROSENTHAL, KAVANAGH, STECK, WEPRIN
    --  Multi-Sponsored  by  --  M.  of  A.  ABINANTI,  BOYLAND,  BRENNAN,
    BROOK-KRASNY,  BUCHWALD,  CASTRO, COLTON, DINOWITZ, ENGLEBRIGHT, ESPI-
    NAL,  FAHY,  JACOBS,  JAFFEE,  KELLNER,  KIM,  LAVINE,  LIFTON,  MARKEY,
    MAYER, MILLMAN, MOSLEY, OTIS, ROSA, ROZIC -- (at request of the Gover-
    nor) -- read once and referred to the Committee on Codes

AN  ACT  to  amend  the  criminal procedure law, the correction law, the
    family court act, the executive law, the  general  business  law,  the
    judiciary  law,  the  mental hygiene law, the penal law and the surro-
    gate's court procedure act, in relation to suspension  and  revocation
    of  firearms licenses; private sale or disposal of firearms, rifles or
    shotguns and establishing a minimum age to possess a firearm; to amend
    the family court act, the domestic  relations  law  and  the  criminal
    procedure  law,  in relation to providing for the mandatory suspension
    or revocation of the firearms license of  a  person  against  whom  an
    order of protection or a temporary order of protection has been issued
    under  certain  circumstances, or upon violation of any such order; to
    amend the penal law, in relation to community guns  and  the  criminal
    sale of a firearm and in relation to the definitions of aggravated and
    first  degree murder; to amend chapter 408 of the laws of 1999 consti-
    tuting Kendra's Law, in relation to extending the expiration  thereof;
    and  to  amend  the  education  law, in relation to the New York state
    school safety improvement teams; and in relation to building  aid  for
    metal detectors and safety devices

    THE  PEOPLE OF THE STATE OF NEW YORK, REPRESENTED IN SENATE AND ASSEM-
BLY, DO ENACT AS FOLLOWS:

    EXPLANATION--Matter in ITALICS (underscored) is new; matter in brackets
                 [ ] is old law to be omitted.
                                                         LBD12007-03-3

1    Section 1. Section 330.20 of the criminal procedure law is amended  by
2  adding a new subdivision 2-a to read as follows:
3    2-A. FIREARM, RIFLE OR SHOTGUN SURRENDER ORDER. UPON ENTRY OF A
4  VERDICT OF NOT RESPONSIBLE BY REASON OF MENTAL  DISEASE  OR  DEFECT,  OR
5  UPON  THE  ACCEPTANCE  OF  A PLEA OF NOT RESPONSIBLE BY REASON OF MENTAL
6  DISEASE OR DEFECT, OR UPON A FINDING THAT THE DEFENDANT IS AN  INCAPACI-
7  TATED  PERSON  PURSUANT TO ARTICLE SEVEN HUNDRED THIRTY OF THIS CHAPTER,
8  THE COURT SHALL REVOKE THE DEFENDANT'S FIREARM LICENSE, IF ANY,  INQUIRE
9  OF  THE DEFENDANT AS TO THE EXISTENCE AND LOCATION OF ANY FIREARM, RIFLE
10 OR SHOTGUN OWNED OR POSSESSED BY SUCH DEFENDANT AND DIRECT THE SURRENDER
11 OF SUCH FIREARM, RIFLE OR SHOTGUN PURSUANT TO SUBPARAGRAPH (F) OF  PARA-
12 GRAPH  ONE  OF  SUBDIVISION  A  OF SECTION 265.20 AND SUBDIVISION SIX OF
13 SECTION 400.05 OF THE PENAL LAW.
14   S 2. The criminal procedure law is amended by  adding  a  new  section
15 380.96 to read as follows:
16 S 380.96 OBLIGATION OF SENTENCING COURT PURSUANT TO ARTICLE FOUR HUNDRED
17          OF THE PENAL LAW.
18   UPON  JUDGMENT  OF  CONVICTION  OF ANY OFFENSE WHICH WOULD REQUIRE THE
19 SEIZURE OF FIREARMS, SHOTGUNS OR RIFLES FROM AN INDIVIDUAL SO CONVICTED,
20 AND THE REVOCATION OF ANY LICENSE OR  REGISTRATION  ISSUED  PURSUANT  TO
21 ARTICLE  FOUR  HUNDRED  OF THE PENAL LAW, THE JUDGE PRONOUNCING SENTENCE
22 SHALL DEMAND SURRENDER OF ANY  SUCH  LICENSE  OR  REGISTRATION  AND  ALL
23 FIREARMS,  SHOTGUNS AND RIFLES. THE FAILURE TO SO DEMAND SURRENDER SHALL
24 NOT EFFECT THE VALIDITY OF  ANY  REVOCATION  PURSUANT  TO  ARTICLE  FOUR
25 HUNDRED OF THE PENAL LAW.
26   S  3.  Section  404  of  the correction law is amended by adding a new
27 subdivision 3 to read as follows:
28   3. WITHIN A REASONABLE PERIOD PRIOR TO DISCHARGE OF AN INMATE  COMMIT-
29 TED FROM A STATE CORRECTIONAL FACILITY FROM A HOSPITAL IN THE DEPARTMENT
30 OF  MENTAL  HYGIENE  TO  THE COMMUNITY, THE DIRECTOR SHALL ENSURE THAT A
31 CLINICAL ASSESSMENT HAS BEEN COMPLETED TO DETERMINE WHETHER  THE  INMATE
32 MEETS  THE  CRITERIA FOR ASSISTED OUTPATIENT TREATMENT PURSUANT TO SUBDI-
33 VISION (C) OF SECTION 9.60 OF THE MENTAL HYGIENE LAW. IF, AS  A  RESULT
34 OF  SUCH  ASSESSMENT, THE DIRECTOR DETERMINES THAT THE INMATE MEETS SUCH
35 CRITERIA, PRIOR TO DISCHARGE THE DIRECTOR OF THE HOSPITAL  SHALL  EITHER
36 PETITION  FOR  A  COURT  ORDER PURSUANT  TO  SECTION 9.60 OF THE MENTAL
37 HYGIENE LAW, OR REPORT IN WRITING TO THE DIRECTOR OF COMMUNITY  SERVICES
38 OF THE LOCAL GOVERNMENTAL UNIT IN WHICH THE INMATE IS EXPECTED TO RESIDE
39 SO  THAT  AN  INVESTIGATION MAY BE CONDUCTED PURSUANT TO SECTION 9.47 OF
40 THE MENTAL HYGIENE LAW.
41   S 4. Subdivisions 1, 2 and 3 of section 842-a of the family court act,
42 as added by chapter 644 of the laws of 1996, paragraph (a)  of  subdivi-
43 sion  1 as amended by chapter 434 of the laws of 2000, the opening para-
44 graph of subdivision 3 as amended by chapter 597 of the  laws  of  1998,
45 paragraph  (a) of subdivision 3 as amended by chapter 635 of the laws of
46 1999, are amended to read as follows:
47   1. [Mandatory and permissive suspension] SUSPENSION of  firearms
48 license  and  ineligibility  for  such a license upon the issuance of a
49 temporary order of protection. Whenever a temporary order of protection
50 is issued  pursuant  to  section  eight  hundred  twenty-eight  of  this
51 article,  OR  PURSUANT TO ARTICLE FOUR, FIVE, SIX, SEVEN OR TEN OF THIS
52 ACT:
53   (a) the court shall suspend any such existing license possessed by the
54 respondent, order the respondent ineligible  for  such  a  license,  and
55 order  the immediate surrender PURSUANT TO SUBPARAGRAPH (F) OF PARAGRAPH
56 ONE OF SUBDIVISION A OF SECTION 265.20 AND SUBDIVISION  SIX  OF  SECTION

1  400.05 OF THE PENAL LAW, of any or all firearms owned or possessed where
2  the  court  receives  information  that  gives  the  court good cause to
3  believe that: (i) the respondent has a prior conviction of  any  violent
4  felony  offense  as  defined in section 70.02 of the penal law; (ii) the
5  respondent has previously been found to have willfully failed to obey  a
6  prior  order  of  protection  and  such willful failure involved (A) the
7  infliction of [serious] physical injury, as defined in subdivision [ten]
8  NINE of section 10.00 of the penal law, (B) the use or threatened use of
9  a  deadly weapon or dangerous instrument as those terms  are  defined  in
10 subdivisions  twelve  and thirteen of section 10.00 of the penal law, or
11 (C) behavior constituting any  violent  felony  offense  as  defined  in
12 section  70.02  of  the  penal  law; or (iii) the respondent has a prior
13 conviction for stalking in the first degree as defined in section 120.60
14 of the penal law, stalking in the second degree as  defined  in  section
15 120.55  of  the  penal  law,  stalking in the third degree as defined in
16 section 120.50 of the penal law or stalking  in  the  fourth  degree  as
17 defined in section 120.45 of such law; and
18    (b)  the  court  [may]  SHALL where the court finds a substantial risk
19 that the respondent may use or threaten  to  use  a  firearm  unlawfully
20 against  the  person or persons for whose protection the temporary order
21 of protection is issued, suspend any such existing license possessed  by
22 the  respondent,  order the respondent ineligible for such a license, and
23 order the immediate surrender PURSUANT TO SUBPARAGRAPH (F) OF  PARAGRAPH
24 ONE  OF  SUBDIVISION  A OF SECTION 265.20 AND SUBDIVISION SIX OF SECTION
25 400.05 OF THE PENAL LAW, of any or all firearms owned or possessed.
26    2. [Mandatory and permissive revocation] REVOCATION or  suspension  of
27 firearms  license and ineligibility for such a license upon the issuance
28 of an order of protection. Whenever an order  of  protection  is  issued
29 pursuant to section eight hundred forty-one of this part, OR PURSUANT TO
30 ARTICLE FOUR, FIVE, SIX, SEVEN OR TEN OF THIS ACT:
31    (a)  the court shall revoke any such existing license possessed by the
32 respondent,  order  the  respondent  ineligible  for  such  a  license,  and
33 order  the immediate surrender PURSUANT TO SUBPARAGRAPH (F) OF PARAGRAPH
34 ONE OF SUBDIVISION A OF SECTION 265.20 AND SUBDIVISION  SIX  OF  SECTION
35 400.05 OF THE PENAL LAW, of any or all firearms owned or possessed where
36 the  court  finds that the conduct which resulted in the issuance of the
37 order of protection involved (i) the infliction of  [serious]  physical
38 injury,  as  defined  in  subdivision [ten] NINE of section 10.00 of the
39 penal law, (ii) the use or threatened use of a deadly weapon or  danger-
40 ous  instrument  as  those  terms are defined in subdivisions twelve and
41 thirteen of section 10.00 of the penal law, or (iii) behavior constitut-
42 ing any violent felony offense as defined in section 70.02 of the  penal
43 law; and
44    (b)  the  court  [may] SHALL, where the court finds a substantial risk
45 that the respondent may use or threaten  to  use  a  firearm  unlawfully
46 against  the  person  or  persons  for  whose protection the order of
47 protection is issued, (i) revoke any such existing license possessed  by
48 the  respondent,  order the respondent ineligible for such a license and
49 order the immediate surrender PURSUANT TO SUBPARAGRAPH (F) OF  PARAGRAPH
50 ONE  OF  SUBDIVISION  A OF SECTION 265.20 AND SUBDIVISION SIX OF SECTION
51 400.05 OF THE PENAL LAW, of any or all firearms owned  or  possessed  or
52 (ii)  suspend or continue to suspend any such existing license possessed
53 by the respondent, order the respondent ineligible for  such  a  license,
54 and  order the immediate surrender PURSUANT TO SUBPARAGRAPH (F) OF PARA-
55 GRAPH ONE OF SUBDIVISION A OF SECTION  265.20  AND  SUBDIVISION  SIX  OF

```
 1  SECTION 400.05 OF THE PENAL LAW, of any or all firearms owned or
 2  possessed.
 3     3. [Mandatory and permissive revocation] REVOCATION or suspension of
 4  firearms license and ineligibility for such a license upon a finding of
 5  a willful failure to obey an order of protection OR TEMPORARY ORDER OF
 6  PROTECTION. Whenever a respondent has been found, pursuant to section
 7  eight hundred forty-six-a of this part to have willfully failed to obey
 8  an order of protection OR TEMPORARY ORDER OF PROTECTION issued PURSUANT
 9  TO THIS ACT OR THE DOMESTIC RELATIONS LAW, OR by this court or [an order
10  of protection issued] by a court of competent jurisdiction in another
11  state, territorial or tribal jurisdiction, in addition to any other
12  remedies available pursuant to section eight hundred forty-six-a of this
13  part:
14     (a) the court shall revoke any such existing license possessed by the
15  respondent, order the respondent ineligible for such a license, and
16  order the immediate surrender PURSUANT TO SUBPARAGRAPH (F) OF PARAGRAPH
17  ONE OF SUBDIVISION A OF SECTION 265.20 AND SUBDIVISION SIX OF SECTION
18  400.05 OF THE PENAL LAW, of any or all firearms owned or possessed where
19  the willful failure to obey such order involves (i) the infliction of
20  [serious] physical injury, as defined in subdivision [ten] NINE of
21  section 10.00 of the penal law, (ii) the use or threatened use of a
22  deadly weapon or dangerous instrument as those terms are defined in
23  subdivisions twelve and thirteen of section 10.00 of the penal law, or
24  (iii) behavior constituting any violent felony offense as defined in
25  section 70.02 of the penal law; or (iv) behavior constituting stalking
26  in the first degree as defined in section 120.60 of the penal law,
27  stalking in the second degree as defined in section 120.55 of the penal
28  law, stalking in the third degree as defined in section 120.50 of the
29  penal law or stalking in the fourth degree as defined in section 120.45
30  of such law; and
31     (b) the court [may] SHALL where the court finds a substantial risk
32  that the respondent may use or threaten to use a firearm unlawfully
33  against the person or persons for whose protection the order of
34  protection was issued, (i) revoke any such existing license possessed by
35  the respondent, order the respondent ineligible for such a license,
36  whether or not the respondent possesses such a license, and order the
37  immediate surrender PURSUANT TO SUBPARAGRAPH (F) OF PARAGRAPH ONE OF
38  SUBDIVISION A OF SECTION 265.20 AND SUBDIVISION SIX OF SECTION 400.05 OF
39  THE PENAL LAW, of any or all firearms owned or possessed or (ii) suspend
40  any such existing license possessed by the respondent, order the
41  respondent ineligible for such a license, and order the immediate
42  surrender of any or all firearms owned or possessed.
43     S 5. Section 846-a of the family court act, as amended by chapter 597
44  of the laws of 1998, is amended to read as follows:
45     S 846-a.  Powers on failure to obey order. If a respondent is brought
46  before the court for failure to obey any lawful order issued under this
47  article or an order of protection OR TEMPORARY ORDER OF PROTECTION
48  issued PURSUANT TO THIS ACT OR ISSUED by a court of competent jurisdic-
49  tion of another state, territorial or tribal jurisdiction [in a proceed-
50  ing] and if, after hearing, the court is satisfied by competent proof
51  that the respondent has willfully failed to obey any such order, the
52  court may modify an existing order OR TEMPORARY ORDER OF PROTECTION to
53  add reasonable conditions of behavior to the existing order [of
54  protection], make a new order of protection in accordance with section
55  eight hundred forty-two OF THIS PART, may order the forfeiture of bail
56  in a manner consistent with article five hundred forty of the criminal
```

S. 2230                                    5                                    A. 2388

1  procedure law if bail has been ordered pursuant to this act,  may  order
2  the  respondent to pay the petitioner's reasonable and necessary counsel
3  fees in connection with the violation petition  where  the  court  finds
4  that the violation of its order was willful, and may commit the respond-
5  ent to jail for a term not to exceed six months.  Such commitment may be
6  served  upon  certain  specified  days or parts of days as the court may
7  direct, and the court may, at any time within the term of such sentence,
8  revoke such suspension and commit the respondent for  the  remainder  of
9  the original sentence, or suspend the remainder of such sentence. If the
10 court  determines  that  the  willful failure to obey such order involves
11 violent behavior constituting the crimes of menacing, reckless endanger-
12 ment, assault or attempted assault and if such a respondent is  licensed
13 to  carry,  possess,  repair and dispose of firearms pursuant to section
14 400.00 of the penal law, the court  may  also  immediately  revoke  such
15 license and may arrange for the immediate surrender PURSUANT TO SUBPARA-
16 GRAPH (F) OF PARAGRAPH ONE OF SUBDIVISION A OF SECTION 265.20 AND SUBDI-
17 VISION  SIX  OF  SECTION  400.05  OF  THE PENAL LAW, and disposal of any
18 firearm such respondent owns or possesses.  If the willful  failure  to
19 obey  such order involves the infliction of [serious] physical injury as
20 defined in subdivision [ten] NINE of section 10.00 of the penal  law  or
21 the use or threatened use of a deadly weapon or dangerous instrument, as
22 those  terms  are defined in subdivisions twelve and thirteen of section
23 10.00 of the penal law, such revocation and immediate surrender PURSUANT
24 TO SUBPARAGRAPH (F) OF PARAGRAPH ONE OF SUBDIVISION A OF SECTION  265.20
25 AND  SUBDIVISION SIX OF SECTION 400.05 OF THE PENAL LAW SIX and disposal
26 of any firearm owned or possessed  by  respondent  shall  be  mandatory,
27 pursuant to subdivision eleven of section 400.00 of the penal law.
28    S 6. The family court act is amended by adding a new section 446-a to
29 read as follows:
30    S 446-A. FIREARMS; SURRENDER AND LICENSE  SUSPENSION,  REVOCATION  AND
31 INELIGIBILITY.  UPON THE ISSUANCE OF AN ORDER OF PROTECTION OR TEMPORARY
32 ORDER  OF PROTECTION, OR UPON A VIOLATION OF SUCH ORDER, THE COURT SHALL
33 MAKE A DETERMINATION REGARDING  THE  SUSPENSION  AND  REVOCATION  OF  A
34 LICENSE  TO  CARRY,  POSSESS, REPAIR OR DISPOSE OF A FIREARM OR FIREARMS,
35 INELIGIBILITY FOR SUCH A LICENSE  AND  THE  SURRENDER  OF  FIREARMS  IN
36 ACCORDANCE WITH SECTION EIGHT HUNDRED FORTY-TWO-A OF THIS ACT.
37    S 7.  The  family court act is amended by adding a new section 552 to
38 read as follows:
39    S 552. FIREARMS; SURRENDER AND LICENSE  SUSPENSION,  REVOCATION  AND
40 INELIGIBILITY.  UPON THE ISSUANCE OF AN ORDER OF PROTECTION OR TEMPORARY
41 ORDER OF PROTECTION, OR UPON A VIOLATION OF SUCH ORDER, THE COURT  SHALL
42 MAKE  A  DETERMINATION REGARDING THE  SUSPENSION  AND  REVOCATION OF A
43 LICENSE TO CARRY, POSSESS, REPAIR OR DISPOSE OF A FIREARM  OR  FIREARMS,
44 INELIGIBILITY  FOR  SUCH  A  LICENSE  AND  THE  SURRENDER OF FIREARMS IN
45 ACCORDANCE WITH SECTION EIGHT HUNDRED FORTY-TWO-A OF THIS ACT.
46    S 8.  The family court act is amended by adding a new section 656-a to
47 read as follows:
48    S 656-A. FIREARMS; SURRENDER AND LICENSE  SUSPENSION,  REVOCATION  AND
49 INELIGIBILITY.  UPON THE ISSUANCE OF AN ORDER OF PROTECTION OR TEMPORARY
50 ORDER OF PROTECTION, OR UPON A VIOLATION OF SUCH ORDER, THE COURT  SHALL
51 MAKE  A  DETERMINATION REGARDING THE  SUSPENSION  AND  REVOCATION OF A
52 LICENSE TO CARRY, POSSESS, REPAIR OR DISPOSE OF A FIREARM  OR  FIREARMS,
53 INELIGIBILITY  FOR  SUCH  A  LICENSE  AND  THE  SURRENDER OF FIREARMS IN
54 ACCORDANCE WITH SECTION EIGHT HUNDRED FORTY-TWO-A OF THIS ACT.
55    S 9. The family court act is amended by adding a new section  780-a  to
56 read as follows:

```
 1    S  780-A.  FIREARMS;  SURRENDER AND LICENSE SUSPENSION, REVOCATION AND
 2  INELIGIBILITY. UPON THE ISSUANCE OF AN ORDER OF PROTECTION OR  TEMPORARY
 3  ORDER  OF PROTECTION, OR UPON A VIOLATION OF SUCH ORDER, THE COURT SHALL
 4  MAKE A DETERMINATION REGARDING THE  SUSPENSION  AND  REVOCATION  OF  A
 5  LICENSE  TO  CARRY, POSSESS, REPAIR OR DISPOSE OF A FIREARM OR FIREARMS,
 6  INELIGIBILITY FOR SUCH A LICENSE AND  THE  SURRENDER  OF  FIREARMS  IN
 7  ACCORDANCE WITH SECTION EIGHT HUNDRED FORTY-TWO-A OF THIS ACT.
 8    S 10.  The family court act is amended by adding a new section 1056-a
 9  to read as follows:
10    S 1056-A. FIREARMS; SURRENDER AND LICENSE SUSPENSION,  REVOCATION  AND
11  INELIGIBILITY.  UPON THE ISSUANCE OF AN ORDER OF PROTECTION OR TEMPORARY
12  ORDER OF PROTECTION, OR UPON A VIOLATION OF SUCH ORDER, THE  COURT  SHALL
13  MAKE  AN  ORDER  IN ACCORDANCE WITH SECTION EIGHT HUNDRED FORTY-TWO-A OF
14  THIS ACT.
15    S 11. The first undesignated and closing paragraphs of  subdivision  3
16  of section 240 of the domestic relations law, as added by chapter 606 of
17  the laws of 1999, are amended to read as follows:
18    G.  Any  party  moving for a temporary order of protection pursuant to
19  this subdivision during hours when the court is open shall  be  entitled
20  to  file  such  motion  or pleading containing such prayer for emergency
21  relief on the same day that such person first appears at such court, and
22  a hearing on the motion or portion of the pleading requesting such emer-
23  gency relief shall be held on the same day or  the  next  day  that  the
24  court is in session following the filing of such motion or pleading.
25    H.  Upon  issuance  of  an  order  of protection or temporary order of
26  protection or upon a violation of such order, the court [may] SHALL make
27  [an order] A DETERMINATION REGARDING THE SUSPENSION AND REVOCATION OF  A
28  LICENSE  TO  CARRY, POSSESS, REPAIR OR DISPOSE OF A FIREARM OR FIREARMS,
29  INELIGIBILITY FOR SUCH A LICENSE AND  THE  SURRENDER  OF  FIREARMS  in
30  accordance  with  [section] SECTIONS eight hundred forty-two-a AND EIGHT
31  HUNDRED FORTY-SIX-A of the family court act [directing the surrender  of
32  firearms,  revoking  or  suspending  a  party's firearms license, and/or
33  directing that such party be ineligible to receive a firearms  license],
34  AS  APPLICABLE. Upon issuance of an order of protection pursuant to this
35  section or upon a finding of a violation thereof,  the  court  also  may
36  direct  payment  of  restitution in an amount not to exceed ten thousand
37  dollars in accordance with subdivision  (e)  of  section  eight  hundred
38  forty-one of such act; provided, however, that in no case shall an order
39  of  restitution  be  issued  where  the  court determines that the party
40  against whom the order would  be  issued  has  already  compensated  the
41  injured  party  or  where  such  compensation is incorporated in a final
42  judgment or settlement of the action.
43    S 12. Subdivision 9 of section 252 of the domestic relations  law,  as
44  added by chapter 606 of the laws of 1999, is amended to read as follows:
45    9.  Upon  issuance  of  an  order  of  protection or temporary order of
46  protection or upon a violation of such order, the court  [may  take  an
47  order]  SHALL  MAKE A DETERMINATION REGARDING THE SUSPENSION AND REVOCA-
48  TION OF A LICENSE TO CARRY, POSSESS, REPAIR OR DISPOSE OF A  FIREARM  OR
49  FIREARMS, INELIGIBILITY FOR SUCH A LICENSE AND THE SURRENDER OF FIREARMS
50  in  accordance  with  [section]  SECTIONS  eight hundred forty-two-a AND
51  EIGHT HUNDRED FORTY-SIX-A of the family court act [directing the surren-
52  der of firearms, revoking or  suspending  a  party's  firearms  license,
53  and/or  directing  that  such  party be ineligible to receive a firearms
54  license], AS APPLICABLE. Upon issuance of an order of protection  pursu-
55  ant  to this section or upon a finding of a violation thereof, the court
56  also may direct payment of restitution in an amount not  to  exceed  ten
```

S. 2230 7 A. 2388

1  thousand  dollars  in  accordance  with subdivision (e) of section eight
2  hundred forty-one of such act; provided, however, that in no case  shall
3  an  order  of  restitution be issued where the court determines that the
4  party against whom the order would be issued has already compensated the
5  injured  party  or  where  such  compensation is incorporated in a final
6  [judgement] JUDGMENT or settlement of the action.
7    S 13. The opening paragraph and paragraph  (b)  of  subdivision  1  of
8  section 530.14 of the criminal procedure law, as added by chapter 644 of
9  the laws of 1996, are amended to read as follows:
10   [Mandatory  and  permissive suspension] SUSPENSION of firearms license
11  and ineligibility for such a license upon issuance of temporary order of
12  protection.  Whenever a temporary order of protection is issued pursuant
13  to subdivision one of section  530.12  or  subdivision  one  of  section
14  530.13 of this article:
15   (b)  the  court  [may]  SHALL where the court finds a substantial risk
16  that the defendant may use or  threaten  to  use  a  firearm  unlawfully
17  against  the  person or persons for whose protection the temporary order
18  of protection is issued, suspend any such existing license possessed  by
19  the  defendant,  order  the  defendant ineligible for such a license and
20  order the immediate surrender PURSUANT TO SUBPARAGRAPH (F) OF  PARAGRAPH
21  ONE  OF  SUBDIVISION  A OF SECTION 265.20 AND SUBDIVISION SIX OF SECTION
22  400.05 OF THE PENAL LAW, of any or all firearms owned or possessed.
23   S 14. The opening paragraph and paragraph  (b)  of  subdivision  2  of
24  section 530.14 of the criminal procedure law, as added by chapter 644 of
25  the laws of 1996, are amended to read as follows:
26   [Mandatory  and  permissive  revocation]  REVOCATION  or suspension of
27  firearms license and ineligibility for such a license upon  issuance  of
28  an order of protection. Whenever an order of protection is issued pursu-
29  ant to subdivision five of section 530.12 or subdivision four of section
30  530.13 of this article:
31   (b)  the  court  [may]  SHALL where the court finds a substantial risk
32  that the defendant may use or  threaten  to  use  a  firearm  unlawfully
33  against  the  person  or  persons  for  whose  protection  the order of
34  protection is issued, (i) revoke any such existing license possessed  by
35  the  defendant,  order  the  defendant ineligible for such a license and
36  order the immediate surrender of any or all firearms owned or  possessed
37  or  (ii)  suspend  or  continue  to  suspend  any such existing license
38  possessed by the defendant, order the defendant ineligible  for  such  a
39  license  and  order the immediate surrender PURSUANT TO SUBPARAGRAPH (F)
40  OF PARAGRAPH ONE OF SUBDIVISION A OF SECTION 265.20 AND SUBDIVISION  SIX
41  OF  SECTION  400.05  OF  THE  PENAL LAW, of any or all firearms owned or
42  possessed.
43   S 15. The opening paragraph and paragraph  (b)  of  subdivision  3  of
44  section  530.14  of the criminal procedure law, the opening paragraph as
45  amended by chapter 597 of the laws of 1998 and paragraph (b) as added by
46  chapter 644 of the laws of 1996, are amended to read as follows:
47   [Mandatory  and  permissive  revocation]  REVOCATION  or  suspension of
48  firearms  license and ineligibility for such a license upon a finding of
49  a willful failure to obey an order of protection. Whenever  a  defendant
50  has  been  found  pursuant  to  subdivision  eleven of section 530.12 or
51  subdivision eight of section 530.13 of this article to have  willfully
52  failed  to  obey  an  order of protection issued by a court of competent
53  jurisdiction in this state  or  another  state,  territorial  or  tribal
54  jurisdiction,  in  addition  to any other remedies available pursuant to
55  subdivision eleven of section 530.12 or  subdivision  eight  of  section
56  530.13 of this article:

1    (b)  the  court  [may]  SHALL where the court finds a substantial risk
2   that the defendant may use or  threaten  to  use  a  firearm  unlawfully
3   against  the  person  or  persons  for  whose  protection  the  order of
4   protection was issued, (i) revoke any such existing license possessed by
5   the  defendant,  order  the  defendant ineligible for such a license and
6   order the immediate surrender PURSUANT TO SUBPARAGRAPH (F) OF  PARAGRAPH
7   ONE  OF  SUBDIVISION  A OF SECTION 265.20 AND SUBDIVISION SIX OF SECTION
8   400.05 OF THE PENAL LAW, of any or all firearms owned  or  possessed  or
9   (ii) suspend any such existing license possessed by the defendant, order
10  the  defendant  ineligible  for  such  a license and order the immediate
11  surrender PURSUANT TO SUBPARAGRAPH (F) OF PARAGRAPH ONE OF SUBDIVISION A
12  OF SECTION 265.20 AND SUBDIVISION SIX OF SECTION  400.05  OF  THE  PENAL
13  LAW, of any or all firearms owned or possessed.
14   S  16.  Section  837 of  the executive law is amended by adding a new
15  subdivision 19 to read as follows:
16   19. RECEIVE  NAMES  AND  OTHER  NON-CLINICAL  IDENTIFYING  INFORMATION
17  PURSUANT  TO  SECTION 9.46 OF THE MENTAL HYGIENE LAW; PROVIDED, HOWEVER,
18  ANY SUCH INFORMATION SHALL BE DESTROYED FIVE YEARS AFTER  SUCH  RECEIPT,
19  OR  PURSUANT  TO A PROCEEDING BROUGHT UNDER ARTICLE SEVENTY-EIGHT OF THE
20  CIVIL PRACTICE LAW AND RULES DETERMINING THAT AN INDIVIDUAL IS  ELIGIBLE
21  FOR  A LICENSE PURSUANT TO SECTION 400.00 OF THE PENAL LAW AND OTHERWISE
22  PERMITTED TO POSSESS A FIREARM.
23   S 17. The general business law is amended by  adding  a  new  article
24  39-DDD to read as follows:
25                          ARTICLE 39-DDD
26       PRIVATE SALE OR DISPOSAL OF FIREARMS, RIFLES AND SHOTGUNS
27  SECTION 898. PRIVATE SALE OR DISPOSAL OF FIREARMS, RIFLES AND SHOTGUNS.
28   S  898.  PRIVATE SALE OR DISPOSAL OF FIREARMS, RIFLES AND SHOTGUNS. 1.
29  IN ADDITION TO ANY OTHER REQUIREMENTS PURSUANT TO STATE AND FEDERAL LAW,
30  ALL SALES, EXCHANGES OR DISPOSALS OF FIREARMS, RIFLES OR SHOTGUNS  SHALL
31  BE  CONDUCTED IN ACCORDANCE WITH THIS SECTION UNLESS SUCH SALE, EXCHANGE
32  OR DISPOSAL IS CONDUCTED BY A LICENSED IMPORTER,  LICENSED  MANUFACTURER
33  OR  LICENSED  DEALER,  AS  THOSE TERMS ARE DEFINED IN 18 USC S 922, WHEN
34  SUCH SALE, EXCHANGE OR DISPOSAL IS CONDUCTED PURSUANT TO  THAT  PERSON'S
35  FEDERAL  FIREARMS  LICENSE OR SUCH SALE, EXCHANGE OR DISPOSAL IS BETWEEN
36  MEMBERS OF AN IMMEDIATE FAMILY. FOR PURPOSES OF THIS SECTION, "IMMEDIATE
37  FAMILY" SHALL MEAN SPOUSES, DOMESTIC PARTNERS, CHILDREN  AND  STEP-CHIL-
38  DREN.
39   2.  BEFORE  ANY SALE, EXCHANGE OR DISPOSAL PURSUANT TO THIS ARTICLE, A
40  NATIONAL INSTANT CRIMINAL BACKGROUND CHECK MUST BE COMPLETED BY A DEALER
41  WHO CONSENTS TO CONDUCT SUCH CHECK, AND UPON COMPLETION  OF  SUCH  BACK-
42  GROUND  CHECK,  SHALL  COMPLETE  A  DOCUMENT, THE FORM OF WHICH SHALL BE
43  APPROVED BY THE SUPERINTENDENT OF  STATE  POLICE,  THAT  IDENTIFIES  AND
44  CONFIRMS THAT SUCH CHECK WAS PERFORMED.
45   3.  ALL DEALERS SHALL MAINTAIN A RECORD OF SUCH TRANSACTIONS CONDUCTED
46  PURSUANT TO THIS SECTION AND SUCH RECORD  SHALL  BE  MAINTAINED  ON  THE
47  PREMISES MENTIONED AND DESCRIBED IN THE LICENSE AND SHALL BE OPEN AT ALL
48  REASONABLE HOURS FOR INSPECTION BY ANY PEACE OFFICER, ACTING PURSUANT TO
49  HIS OR HER SPECIAL DUTIES, OR POLICE OFFICER.
50   4.  A  DEALER MAY REQUIRE THAT ANY SALE OR TRANSFER CONDUCTED PURSUANT
51  TO THIS SECTION BE SUBJECT TO A FEE OF NOT TO  EXCEED  TEN  DOLLARS  PER
52  TRANSACTION.
53   5.  ANY  RECORD PRODUCED PURSUANT TO THIS SECTION AND ANY TRANSMISSION
54  THEREOF TO ANY GOVERNMENT AGENCY SHALL NOT BE CONSIDERED A PUBLIC RECORD
55  FOR PURPOSES OF ARTICLE SIX OF THE PUBLIC OFFICERS LAW.

1    6. ANY PERSON WHO KNOWINGLY VIOLATES THE PROVISIONS  OF  THIS  ARTICLE
2  SHALL  BE  GUILTY OF A CLASS A MISDEMEANOR PUNISHABLE AS PROVIDED FOR IN
3  THE PENAL LAW.
4    S 18.  Paragraph (q) of subdivision 2 of section 212 of the judiciary
5  law, as added by chapter 491 of the laws of 2008, is amended to read  as
6  follows:
7    (q) Adopt rules to require transmission,  to the criminal justice
8  information services division of the federal bureau of investigation  or
9  to  the  division  of  criminal  justice services, of the name and other
10 identifying information of each person who has a guardian appointed  for
11 him  or  her pursuant to any provision of state law, based on a determi-
12 nation that  as  a  result  of  marked  subnormal  intelligence,  mental
13 illness,  incapacity,  condition  or disease, he or she lacks the mental
14 capacity to contract or manage his or her own affairs.  ANY SUCH RECORDS
15 TRANSMITTED DIRECTLY TO THE FEDERAL BUREAU OF INVESTIGATION MUST ALSO BE
16 TRANSMITTED TO THE  DIVISION  OF  CRIMINAL  JUSTICE  SERVICES,  AND  ANY
17 RECORDS  RECEIVED  BY THE DIVISION OF CRIMINAL JUSTICE SERVICES PURSUANT
18 TO THIS PARAGRAPH MAY BE  CHECKED  AGAINST  THE  STATEWIDE  LICENSE  AND
19 RECORD DATABASE.
20   S 19.  Subdivision  (j) of section 7.09 of the mental hygiene law, as
21 added by chapter 491 of the laws of 2008, is amended to read as follows:
22   (j) (1) The commissioner, in cooperation with other  applicable  state
23 agencies,  shall  [be  authorized  to] collect, retain or modify data or
24 records, [or to] AND SHALL transmit such data or  records:  (I)  to  the
25 division  of criminal justice services, or to the criminal justice infor-
26 mation services division of the federal bureau of investigation, for the
27 purposes  of responding to queries to the national instant criminal back-
28 ground  check  system  regarding  attempts to purchase or otherwise take
29 possession of firearms, as defined in 18 USC  921(a)(3),  in  accordance
30 with  applicable federal laws or regulations, OR (II) TO THE DIVISION OF
31 CRIMINAL JUSTICE SERVICES, WHICH MAY RE-DISCLOSE SUCH DATA  AND  RECORDS
32 ONLY FOR DETERMINING WHETHER A LICENSE ISSUED PURSUANT TO SECTION 400.00
33 OF  THE PENAL LAW SHOULD BE DENIED, SUSPENDED OR REVOKED, UNDER SUBDIVI-
34 SION ELEVEN OF SUCH SECTION, OR FOR DETERMINING WHETHER A PERSON  IS  NO
35 LONGER  PERMITTED UNDER FEDERAL OR STATE LAW TO POSSESS A FIREARM.  Such
36 records, WHICH MAY NOT BE USED FOR ANY OTHER PURPOSE, shall include  only
37 names and other non-clinical identifying information of persons who have
38 been involuntarily committed to a hospital pursuant to article  nine  of
39 this  chapter, OR SECTION FOUR HUNDRED TWO OR SUBDIVISION TWO OF SECTION
40 FIVE HUNDRED EIGHT OF THE CORRECTION LAW, or article seven hundred thir-
41 ty or section 330.20 of the criminal procedure law or sections 322.2  or
42 353.4  of  the family court act, or to a secure treatment facility pursu-
43 ant to article ten of this chapter.
44   (2) The commissioner shall  establish  within  the  office  of  mental
45 health  an administrative process to permit a person who has been or may
46 be disqualified from possessing  such  a  firearm  pursuant  to  18  USC
47 922(4)(d) OR WHO HAS BEEN OR MAY BE DISQUALIFIED FROM CONTINUING TO HAVE
48 A  LICENSE  TO  CARRY,  POSSESS,  REPAIR,  OR DISPOSE OF A FIREARM UNDER
49 SECTION 400.00 OF THE PENAL LAW BECAUSE SUCH  PERSON  WAS  INVOLUNTARILY
50 COMMITTED  OR  CIVILLY  CONFINED TO A FACILITY UNDER THE JURISDICTION OF
51 THE COMMISSIONER, to petition for relief from that disability where such
52 person's record and reputation are such that such  person  will  not  be
53 likely  to  act  in  a  manner  dangerous to public safety and where the
54 granting of the relief would not  be  contrary  to  public  safety.  The
55 commissioner  shall  promulgate regulations to establish the relief from
56 disabilities program, which  shall  include,  but  not  be  limited  to,

1 provisions providing for: (i) an opportunity for a disqualified person
2 to petition for relief in writing; (ii) the authority for the agency to
3 require that the petitioner undergo a clinical evaluation and risk
4 assessment; and (iii) a requirement that the agency issue a decision in
5 writing explaining the reasons for a denial or grant of relief. The
6 denial of a petition for relief from disabilities may be reviewed de
7 novo pursuant to the proceedings under article seventy-eight of the
8 civil practice law and rules.
9 S 20. The mental hygiene law is amended by adding a new section 9.46
10 to read as follows:
11 S 9.46 REPORTS OF SUBSTANTIAL RISK OR THREAT OF HARM BY MENTAL HEALTH
12        PROFESSIONALS.
13 (A) FOR PURPOSES OF THIS SECTION, THE TERM "MENTAL HEALTH PROFES-
14 SIONAL" SHALL INCLUDE A PHYSICIAN, PSYCHOLOGIST, REGISTERED NURSE OR
15 LICENSED CLINICAL SOCIAL WORKER.
16 (B) NOTWITHSTANDING ANY OTHER LAW TO THE CONTRARY, WHEN A MENTAL
17 HEALTH PROFESSIONAL CURRENTLY PROVIDING TREATMENT SERVICES TO A PERSON
18 DETERMINES, IN THE EXERCISE OF REASONABLE PROFESSIONAL JUDGMENT, THAT
19 SUCH PERSON IS LIKELY TO ENGAGE IN CONDUCT THAT WOULD RESULT IN SERIOUS
20 HARM TO SELF OR OTHERS, HE OR SHE SHALL BE REQUIRED TO REPORT, AS SOON
21 AS PRACTICABLE, TO THE DIRECTOR OF COMMUNITY SERVICES, OR THE DIRECTOR'S
22 DESIGNEE, WHO SHALL REPORT TO THE DIVISION OF CRIMINAL JUSTICE SERVICES
23 WHENEVER HE OR SHE AGREES THAT THE PERSON IS LIKELY TO ENGAGE IN SUCH
24 CONDUCT. INFORMATION TRANSMITTED TO THE DIVISION OF CRIMINAL JUSTICE
25 SERVICES SHALL BE LIMITED TO NAMES AND OTHER NON-CLINICAL IDENTIFYING
26 INFORMATION, WHICH MAY ONLY BE USED FOR DETERMINING WHETHER A LICENSE
27 ISSUED PURSUANT TO SECTION 400.00 OF THE PENAL LAW SHOULD BE SUSPENDED
28 OR REVOKED, OR FOR DETERMINING WHETHER A PERSON IS INELIGIBLE FOR A
29 LICENSE ISSUED PURSUANT TO SECTION 400.00 OF THE PENAL LAW, OR IS NO
30 LONGER PERMITTED UNDER STATE OR FEDERAL LAW TO POSSESS A FIREARM.
31 (C) NOTHING IN THIS SECTION SHALL BE CONSTRUED TO REQUIRE A MENTAL
32 HEALTH PROFESSIONAL TO TAKE ANY ACTION WHICH, IN THE EXERCISE OF REASON-
33 ABLE PROFESSIONAL JUDGMENT, WOULD ENDANGER SUCH MENTAL HEALTH PROFES-
34 SIONAL OR INCREASE THE DANGER TO A POTENTIAL VICTIM OR VICTIMS.
35 (D) THE DECISION OF A MENTAL HEALTH PROFESSIONAL TO DISCLOSE OR NOT TO
36 DISCLOSE IN ACCORDANCE WITH THIS SECTION, WHEN MADE REASONABLY AND IN
37 GOOD FAITH, SHALL NOT BE THE BASIS FOR ANY CIVIL OR CRIMINAL LIABILITY
38 OF SUCH MENTAL HEALTH PROFESSIONAL.
39 S 21. Paragraph 5 of subdivision (b) of section 9.47 of the mental
40 hygiene law is renumbered paragraph 7 and two new paragraphs 5 and 6 are
41 added to read as follows:
42 (5) ENSURING EVALUATION OF THE NEED FOR ONGOING ASSISTED OUTPATIENT
43 TREATMENT PURSUANT TO SUBDIVISION (K) OF SECTION 9.60 OF THIS ARTICLE
44 PRIOR TO THE EXPIRATION OF ANY ASSISTED OUTPATIENT TREATMENT ORDER;
45 (6) IF HE OR SHE HAS BEEN ORDERED TO PROVIDE FOR OR ARRANGE FOR
46 ASSISTED OUTPATIENT TREATMENT PURSUANT TO PARAGRAPH FIVE OF SUBDIVISION
47 (J) OF SECTION 9.60 OF THIS ARTICLE OR BECAME THE APPROPRIATE DIRECTOR
48 PURSUANT TO THIS PARAGRAPH OR SUBDIVISION (C) OF SECTION 9.48 OF THIS
49 ARTICLE, NOTIFYING THE DIRECTOR OF COMMUNITY SERVICES OF THE NEW COUNTY
50 OF RESIDENCE WHEN HE OR SHE HAS REASON TO BELIEVE THAT AN ASSISTED
51 OUTPATIENT HAS OR WILL CHANGE HIS OR HER COUNTY OF RESIDENCE DURING THE
52 PENDENCY OF AN ASSISTED OUTPATIENT TREATMENT ORDER. UPON SUCH CHANGE OF
53 RESIDENCE, THE DIRECTOR OF THE NEW COUNTY OF RESIDENCE SHALL BECOME THE
54 APPROPRIATE DIRECTOR, AS SUCH TERM IS DEFINED IN SECTION 9.60 OF THIS
55 ARTICLE; AND

1    S 22. Section 9.48 of the mental hygiene law is amended by  adding  a
2  new subdivision (c) to read as follows:
3    (C)  DIRECTORS  OF  ASSISTED  OUTPATIENT  TREATMENT PROGRAMS PROVIDING
4  SERVICES DESCRIBED IN PARAGRAPH ONE OF SUBDIVISION (A) OF  SECTION   9.60
5  OF  THIS  ARTICLE  PURSUANT TO ANY COURT ORDER ISSUED UNDER SUCH SECTION
6  SHALL EVALUATE THE NEED FOR ONGOING ASSISTED OUTPATIENT TREATMENT PURSU-
7  ANT TO SUBDIVISION (K) OF SECTION 9.60  OF  THIS  ARTICLE  PRIOR  TO  THE
8  EXPIRATION  OF ANY ASSISTED OUTPATIENT TREATMENT ORDER; AND SHALL NOTIFY
9  THE DIRECTOR OF COMMUNITY SERVICES OF THE NEW COUNTY OF  RESIDENCE   WHEN
10 HE  OR SHE HAS REASON TO BELIEVE THAT AN ASSISTED OUTPATIENT HAS OR WILL
11 CHANGE HIS OR HER COUNTY OF RESIDENCE DURING THE PENDENCY OF AN ASSISTED
12 OUTPATIENT TREATMENT ORDER.  UPON SUCH CHANGE OF RESIDENCE, THE DIRECTOR
13 OF THE NEW COUNTY OF RESIDENCE SHALL BECOME THE APPROPRIATE DIRECTOR, AS
14 SUCH TERM IS DEFINED IN SECTION 9.60 OF THIS ARTICLE.
15   S 23. Paragraph 3 of subdivision (a), paragraphs 2 and 5 of  subdivi-
16 sion  (j)  and  subdivisions  (k)  and (n) of section 9.60 of the mental
17 hygiene law, as amended by chapter 158 of the laws of 2005, are  amended
18 to read as follows:
19   (3)  "director  of  community  services" and "local governmental unit"
20 shall have the same meanings as provided in article  forty-one  of  this
21 chapter.  THE "APPROPRIATE DIRECTOR" SHALL MEAN THE DIRECTOR OF COMMUNI-
22 TY SERVICES OF THE COUNTY WHERE THE ASSISTED OUTPATIENT RESIDES, EVEN IF
23 IT  IS  A DIFFERENT COUNTY THAN THE COUNTY WHERE THE ASSISTED OUTPATIENT
24 TREATMENT ORDER WAS ORIGINALLY ISSUED.
25   (2) If after hearing all relevant evidence, the court finds  by  clear
26 and  convincing  evidence  that  the  subject  of the petition meets the
27 criteria for assisted outpatient treatment, and there is no  appropriate
28 and  feasible  less  restrictive  alternative,  the  court may order the
29 subject to receive assisted outpatient treatment for an  initial  period
30 not to exceed [six months] ONE YEAR.  In fashioning the order, the court
31 shall  specifically  make findings by clear and convincing evidence that
32 the proposed treatment is the least  restrictive  treatment  appropriate
33 and  feasible  for the subject. The order shall state an assisted outpa-
34 tient treatment plan, which shall include  all  categories  of  assisted
35 outpatient  treatment,  as set forth in paragraph one of subdivision (a)
36 of this section, which the assisted outpatient is to receive, but  shall
37 not  include any such category that has not been recommended in both the
38 proposed written treatment plan and the testimony provided to the  court
39 pursuant to subdivision (i) of this section.
40   (5)  If  the petitioner is the director of a hospital that operates an
41 assisted outpatient treatment program, the court order shall direct  the
42 hospital  director  to provide or arrange for all categories of assisted
43 outpatient treatment for the assisted outpatient throughout the  period
44 of  the order. [For all other persons] IN ALL OTHER INSTANCES, the order
45 shall require the APPROPRIATE director [of  community  services  of  the
46 appropriate  local  governmental  unit], AS THAT TERM IS DEFINED IN THIS
47 SECTION, to provide or arrange for all categories of assisted outpatient
48 treatment for the assisted  outpatient  throughout  the  period  of  the
49 order.
50   (k)  Petition  for  additional  periods of treatment. (1) PRIOR TO THE
51 EXPIRATION OF AN ORDER PURSUANT TO THIS SECTION, THE APPROPRIATE  DIREC-
52 TOR  SHALL  REVIEW WHETHER THE ASSISTED OUTPATIENT CONTINUES TO MEET THE
53 CRITERIA FOR ASSISTED OUTPATIENT TREATMENT. IF,  AS  DOCUMENTED  IN  THE
54 PETITION,  THE DIRECTOR DETERMINES THAT SUCH CRITERIA CONTINUE TO BE MET
55 OR HAS MADE APPROPRIATE ATTEMPTS TO, BUT  HAS  NOT  BEEN  SUCCESSFUL  IN
56 ELICITING,  THE  COOPERATION OF THE SUBJECT TO SUBMIT TO AN EXAMINATION,

S. 2230                                12                               A. 2388

1  WITHIN THIRTY DAYS PRIOR TO THE  EXPIRATION  OF  AN  ORDER  OF  ASSISTED
2  OUTPATIENT   TREATMENT,   SUCH   DIRECTOR   MAY   PETITION THE COURT TO ORDER
3  CONTINUED ASSISTED OUTPATIENT TREATMENT PURSUANT  TO  PARAGRAPH  TWO  OF
4  THIS  SUBDIVISION. UPON DETERMINING WHETHER SUCH CRITERIA CONTINUE TO BE
5  MET, SUCH DIRECTOR SHALL NOTIFY THE PROGRAM COORDINATOR IN WRITING AS TO
6  WHETHER A  PETITION  FOR  CONTINUED  ASSISTED  OUTPATIENT  TREATMENT  IS
7  WARRANTED AND WHETHER SUCH A PETITION WAS OR WILL BE FILED.
8     (2) Within thirty days prior to the expiration of an order of assisted
9  outpatient  treatment, the appropriate director or the current petition-
10 er, if the current petition was filed pursuant to  subparagraph  (i)  or
11 (ii)  of  paragraph  one  of  subdivision  (e)  of  this section, and the
12 current petitioner retains his or her original status  pursuant  to  the
13 applicable  subparagraph, may  petition  the  court  to order continued
14 assisted outpatient treatment for a period not to exceed one  year  from
15 the  expiration date of the current order. If the court's disposition of
16 such petition does not occur prior to the expiration date of the current
17 order, the current order shall remain in effect until such  disposition.
18 The  procedures  for  obtaining  any  order pursuant to this subdivision
19 shall be in accordance with the provisions of the foregoing subdivisions
20 of this section; provided that the time restrictions included  in  para-
21 graph  four  of subdivision (c) of this section shall not be applicable.
22 The notice provisions set forth in paragraph six of subdivision  (j)  of
23 this  section  shall be applicable.  Any court order requiring periodic
24 blood tests or urinalysis for the presence of alcohol or  illegal  drugs
25 shall  be subject to review after six months by the physician who devel-
26 oped the written treatment plan or another physician designated  by  the
27 director, and such physician shall be authorized to terminate such blood
28 tests or urinalysis without further action by the court.
29    (n) Failure to comply with assisted outpatient treatment. Where in the
30 clinical  judgment  of  a  physician,  (i)  the assisted outpatient, has
31 failed or refused to comply with the assisted outpatient treatment, (ii)
32 efforts were made to solicit compliance, and (iii) such assisted  outpa-
33 tient  may be in need of involuntary admission to a hospital pursuant to
34 section 9.27 of this article or immediate observation, care  and  treat-
35 ment  pursuant  to  section 9.39 or 9.40 of this article, such physician
36 may request the APPROPRIATE director of community services, the  direc-
37 tor's designee, or any physician designated by the director of community
38 services pursuant to section 9.37 of this article, to direct the removal
39 of  such  assisted outpatient to an appropriate hospital for an examina-
40 tion to determine if such person has a mental illness for  which  hospi-
41 talization  is  necessary pursuant to section 9.27, 9.39 or 9.40 of this
42 article. Furthermore, if such assisted outpatient refuses to take  medi-
43 cations as required by the court order, or he or she refuses to take, or
44 fails  a  blood test, urinalysis, or alcohol or drug test as required by
45 the court order, such physician may consider  such  refusal  or  failure
46 when  determining whether the assisted outpatient is in need of an exam-
47 ination to determine whether he or she has a mental  illness  for  which
48 hospitalization  is  necessary.  Upon the request of such physician, the
49 APPROPRIATE director, the director's designee, or any  physician  desig-
50 nated  pursuant  to section 9.37 of this article, may direct peace offi-
51 cers, acting pursuant to their special duties, or  police  officers  who
52 are  members  of  an authorized police department or force or of a sher-
53 iff's department to take the assisted outpatient into custody and trans-
54 port him or her to the hospital operating the assisted outpatient treat-
55 ment program or to any hospital authorized by the director of  community
56 services  to  receive such persons. Such law enforcement officials shall

1  carry out such directive. Upon the request of such physician, the APPRO-
2  PRIATE director, the director's designee, or any physician designated
3  pursuant to section 9.37 of this article, an ambulance service, as
4  defined by subdivision two of section three thousand one of the public
5  health law, or an approved mobile crisis outreach team as defined in
6  section 9.58 of this article shall be authorized to take into custody
7  and transport any such person to the hospital operating the assisted
8  outpatient treatment program, or to any other hospital authorized by the
9  APPROPRIATE director of community services to receive such persons. Any
10 director of community services, or designee, shall be authorized to
11 direct the removal of an assisted outpatient who is present in his or
12 her county to an appropriate hospital, in accordance with the provisions
13 of this subdivision, based upon a determination of the appropriate
14 director of community services directing the removal of such assisted
15 outpatient pursuant to this subdivision. Such person may be retained for
16 observation, care and treatment and further examination in the hospital
17 for up to seventy-two hours to permit a physician to determine whether
18 such person has a mental illness and is in need of involuntary care and
19 treatment in a hospital pursuant to the provisions of this article. Any
20 continued involuntary retention in such hospital beyond the initial
21 seventy-two hour period shall be in accordance with the provisions of
22 this article relating to the involuntary admission and retention of a
23 person. If at any time during the seventy-two hour period the person is
24 determined not to meet the involuntary admission and retention
25 provisions of this article, and does not agree to stay in the hospital
26 as a voluntary or informal patient, he or she must be released. Failure
27 to comply with an order of assisted outpatient treatment shall not be
28 grounds for involuntary civil commitment or a finding of contempt of
29 court.
30   S 24. Subdivision (g) of section 13.09 of the mental hygiene law, as
31 amended by chapter 168 of the laws of 2010, is amended to read as
32 follows:
33   (g) (1) The commissioner, in cooperation with other applicable state
34 agencies, shall [be authorized to] collect, retain or modify data or
35 records, [or to] AND SHALL transmit such data or records to: (I) the
36 division of criminal justice services, or to the criminal justice infor-
37 mation services division of the federal bureau of investigation, for the
38 purposes of responding to queries to the national instant criminal back-
39 ground check system regarding attempts to purchase or otherwise take
40 possession of firearms, as defined in 18 USC 921(a)(3), in accordance
41 with applicable federal laws or regulations, OR (II) TO THE DIVISION OF
42 CRIMINAL JUSTICE SERVICES, FOR THE PURPOSES OF DETERMINING WHETHER A
43 LICENSE ISSUED PURSUANT TO SECTION 400.00 OF THE PENAL LAW SHOULD BE
44 DENIED, SUSPENDED OR REVOKED, UNDER SUBDIVISION ELEVEN OF SUCH SECTION,
45 OR FOR DETERMINING WHETHER A PERSON IS NO LONGER PERMITTED UNDER FEDERAL
46 OR STATE LAW TO POSSESS A FIREARM. Such records shall include only
47 names and other non-clinical identifying information of persons who have
48 had a guardian appointed for them pursuant to any provision of state
49 law, based on a determination that as a result of marked subnormal
50 intelligence, mental illness, incapacity, condition or disease, they
51 lack the mental capacity to contract or manage their own affairs, and
52 persons who have been involuntarily committed to a facility pursuant to
53 article fifteen of this chapter, or article seven hundred thirty or
54 section 330.20 of the criminal procedure law or sections 322.2 or 353.4
55 of the family court act.

S. 2230                             14                              A. 2388

1      (2) The commissioner shall establish within the office for people with
2  developmental disabilities an administrative process to permit a  person
3  who  has  been  or  may  be  disqualified from possessing such a firearm
4  pursuant to 18 USC 922(4)(d), OR WHO HAS BEEN  OR  MAY  BE  DISQUALIFIED
5  FROM  CONTINUING TO HAVE A LICENSE TO CARRY, POSSESS, REPAIR, OR DISPOSE
6  OF A FIREARM UNDER SECTION 400.00 OF THE PENAL LAW BECAUSE  SUCH  PERSON
7  WAS  INVOLUNTARILY COMMITTED OR CIVILLY CONFINED TO A FACILITY UNDER THE
8  JURISDICTION OF THE COMMISSIONER, to petition for relief from that disa-
9  bility where such person's record and  reputation  are  such  that  such
10 person  will not be likely to act in a manner dangerous to public safety
11 and where the granting of the relief would not  be  contrary  to  public
12 safety.  The  commissioner shall promulgate regulations to establish the
13 relief from disabilities program, which shall include, but not be limit-
14 ed to, provisions providing for: (i) an opportunity for  a  disqualified
15 person  to  petition  for  relief in writing; (ii) the authority for the
16 agency to require that the petitioner undergo a clinical evaluation  and
17 risk  assessment;  and (iii) a requirement that the agency issue a deci-
18 sion in writing explaining the reasons for a denial or grant of  relief.
19 The denial of a petition for relief from disabilities may be reviewed de
20 novo  pursuant  to  the  proceedings  under article seventy-eight of the
21 civil practice law and rules.
22     S 25. Paragraph 12 of subdivision (c) of section 33.13 of  the  mental
23 hygiene law,  as amended by chapter 158 of the laws of 2005, is amended
24 and a new paragraph 15 is added to read as follows:
25     12. to a director of community services as defined in article nine  of
26 this  chapter or his OR HER designee, provided that such director or his
27 or her designee (I) requests such information in the exercise of his  or
28 her  statutory  functions,  powers  and duties pursuant to section 9.37,
29 9.45, 9.47, 9.48, 9.60 or 41.13 of this chapter; OR (II) THE  DISCLOSURE
30 OF INFORMATION IS REQUIRED PURSUANT TO SECTION 9.46 OF THIS CHAPTER.
31     15.  TO  THE  DIVISION  OF  CRIMINAL JUSTICE SERVICES, NAMES AND OTHER
32 NON-CLINICAL IDENTIFYING INFORMATION FOR THE SOLE PURPOSE OF  IMPLEMENT-
33 ING THE DIVISION'S RESPONSIBILITIES AND DUTIES UNDER SECTIONS 400.00 AND
34 400.02 OF THE PENAL LAW.
35     S 26. Section 10.00 of the penal law is amended by adding a new subdi-
36 vision 21 to read as follows:
37     21.  "DRUG  TRAFFICKING  FELONY"  MEANS  ANY OF THE FOLLOWING OFFENSES
38 DEFINED IN ARTICLE TWO HUNDRED TWENTY OF THIS CHAPTER: VIOLATION OF  USE
39 OF  A  CHILD  TO  COMMIT  A  CONTROLLED  SUBSTANCE OFFENSE AS DEFINED IN
40 SECTION 220.28; CRIMINAL SALE OF A CONTROLLED SUBSTANCE  IN  THE  FOURTH
41 DEGREE  AS  DEFINED  IN  SECTION  220.34;  CRIMINAL SALE OF A CONTROLLED
42 SUBSTANCE IN THE THIRD DEGREE AS DEFINED  IN  SECTION  220.39;  CRIMINAL
43 SALE  OF  A  CONTROLLED  SUBSTANCE  IN  THE  SECOND DEGREE AS DEFINED IN
44 SECTION 220.41; CRIMINAL SALE OF A CONTROLLED  SUBSTANCE  IN  THE  FIRST
45 DEGREE  AS  DEFINED  IN  SECTION  220.43;  CRIMINAL SALE OF A CONTROLLED
46 SUBSTANCE IN OR NEAR SCHOOL GROUNDS AS DEFINED IN SECTION 220.44; UNLAW-
47 FUL MANUFACTURE OF METHAMPHETAMINE IN THE SECOND DEGREE  AS  DEFINED  IN
48 SECTION  220.74;  UNLAWFUL  MANUFACTURE  OF METHAMPHETAMINE IN THE FIRST
49 DEGREE AS DEFINED IN SECTION 220.75; OR OPERATING AS A MAJOR  TRAFFICKER
50 AS DEFINED IN SECTION 220.77.
51     S 26-a.  The  penal law is amended by adding a new section 60.11-a to
52 read as follows:
53 S 60.11-A AUTHORIZED DISPOSITIONS;  CERTAIN  CRIMINAL  POSSESSION  OF  A
54             WEAPON IN THE THIRD DEGREE OFFENDERS.
55     WHEN A PERSON IS TO BE SENTENCED UPON CONVICTION OF THE CRIME OF CRIM-
56 INAL  POSSESSION  OF  A WEAPON IN THE THIRD DEGREE AS DEFINED IN SUBDIVI-

1  SION TEN OF SECTION 265.02 OF THIS CHAPTER, THE COURT MUST SENTENCE SUCH
2  DEFENDANT TO A DETERMINATE SENTENCE AS PROVIDED IN SUBPARAGRAPH (II)  OF
3  PARAGRAPH  (C)  OF  SUBDIVISION  THREE OF SECTION 70.02 OF THIS CHAPTER,
4  UNLESS  A  GREATER  MINIMUM  SENTENCE  IS  OTHERWISE REQUIRED BY ANOTHER
5  PROVISION OF THIS CHAPTER.
6     S 27. Paragraphs (b) and (c) of subdivision 1 of section 70.02 of  the
7  penal  law,  paragraph  (b) as amended by chapter 148 of the laws of 2011
8  and paragraph (c) as amended by chapter 405 of the  laws  of  2010,  are
9  amended to read as follows:
10    (b)  Class  C violent felony offenses: an attempt to commit any of the
11  class B felonies set forth in paragraph (a) of this subdivision;  aggra-
12  vated criminally negligent homicide as defined in section 125.11, aggra-
13  vated  manslaughter  in  the second degree as defined in section 125.21,
14  aggravated sexual abuse in the  second  degree  as  defined  in  section
15  130.67, assault on a peace officer, police officer, fireman or emergency
16  medical services professional as defined in section 120.08, assault on a
17  judge  as defined in section 120.09, gang assault in the second degree as
18  defined  in section 120.06, strangulation in the first degree as defined
19  in section 121.13, burglary in the second degree as defined  in  section
20  140.25, robbery in the second degree as defined in section 160.10, crim-
21  inal  possession  of a weapon in the second degree as defined in section
22  265.03, criminal use of a firearm in the  second  degree  as  defined  in
23  section  265.08,  criminal  sale  of  a  firearm in the second degree as
24  defined in section 265.12, criminal sale of a firearm with the aid of  a
25  minor  as defined in section 265.14, AGGRAVATED CRIMINAL POSSESSION OF A
26  WEAPON AS DEFINED IN SECTION 265.19, soliciting or providing support for
27  an act of terrorism in the first degree as defined  in  section  490.15,
28  hindering  prosecution  of  terrorism in the second degree as defined in
29  section 490.30, and criminal possession of a chemical weapon or  biolog-
30  ical weapon in the third degree as defined in section 490.37.
31    (c)  Class  D  violent felony offenses: an attempt to commit any of the
32  class C felonies set forth in paragraph (b); reckless assault of a child
33  as defined in section 120.02, assault in the second degree as defined in
34  section 120.05, menacing a police officer or peace officer as defined in
35  section 120.18, stalking in the first degree, as defined in  subdivision
36  one  of  section 120.60, strangulation in the second degree as defined in
37  section 121.12, rape in the second degree as defined in section  130.30,
38  criminal  sexual  act in the second degree as defined in section 130.45,
39  sexual abuse in the first degree as defined in section 130.65, course of
40  sexual conduct against a child  in  the  second  degree  as  defined  in
41  section  130.80,  aggravated sexual abuse in the third degree as defined
42  in  section  130.66, facilitating  a  sex  offense  with  a  controlled
43  substance  as defined in section 130.90, criminal possession of a weapon
44  in the third degree as defined in subdivision  five,  six,  seven  [or],
45  eight,  NINE OR TEN of section 265.02, criminal sale of a firearm in the
46  third degree as defined in section  265.11,  intimidating  a  victim  or
47  witness in the second degree as defined in section 215.16, soliciting or
48  providing  support  for  an  act  of  terrorism  in the second degree as
49  defined in section 490.10, and making a terroristic threat as defined in
50  section 490.20, falsely reporting an incident in  the  first  degree  as
51  defined  in  section 240.60, placing a false bomb or hazardous substance
52  in the first degree as defined in section 240.62, placing a  false  bomb
53  or hazardous substance in a sports stadium or arena, mass transportation
54  facility  or  enclosed  shopping  mall as defined in section 240.63, and
55  aggravated unpermitted use of indoor pyrotechnics in the first degree as
56  defined in section 405.18.

```
 1    S 28. The opening paragraph of  paragraph  (c)  of  subdivision  2  of
 2  section 70.02 of the penal law, as amended by chapter 764 of the laws of
 3  2005, is amended to read as follows:
 4    Except  as  provided in subdivision six of section 60.05, the sentence
 5  imposed upon a person who stands convicted of the class D violent felony
 6  offenses of criminal possession of a  weapon  in  the  third  degree  as
 7  defined  in  subdivision  [four,]  five,  seven  [or],  eight OR NINE of
 8  section 265.02, criminal sale of  a  firearm  in  the  third  degree  as
 9  defined  in  section 265.11 or the class E violent felonies of attempted
10  criminal possession of a weapon in the third degree as defined in subdi-
11  vision [four,] five, seven [or], eight OR NINE of section 265.02 must be
12  a sentence to a determinate period of imprisonment, or, in the  alterna-
13  tive,  a  definite sentence of imprisonment for a period of no less than
14  one year, except that:
15    S 29. Paragraph (b) of subdivision 3 of section  70.02  of  the  penal
16  law,  as  amended by chapter 765 of the laws of 2005, is amended to read
17  as follows:
18    (b) For a class C felony, the term must be at least three and one-half
19  years and must not exceed fifteen years,  provided,  however,  that  the
20  term  must be: (i) at least seven years and must not exceed twenty years
21  where the sentence is for the crime of aggravated  manslaughter  in  the
22  second  degree  as  defined  in  section 125.21 of this chapter; (ii) at
23  least seven years and must not exceed twenty years where the sentence is
24  for the crime of attempted aggravated assault upon a police  officer  or
25  peace  officer as defined in section 120.11 of this chapter; [and] (iii)
26  at least three and one-half years and must not exceed twenty years where
27  the sentence is for the crime of aggravated criminally  negligent  homi-
28  cide  as  defined  in  section 125.11 of this chapter; AND (IV) AT LEAST
29  FIVE YEARS AND MUST NOT EXCEED  FIFTEEN  YEARS  WHERE  THE  SENTENCE  IS
30  IMPOSED  FOR  THE  CRIME OF AGGRAVATED CRIMINAL POSSESSION OF A WEAPON AS
31  DEFINED IN SECTION 265.19 OF THIS CHAPTER;
32    S 30. Paragraph (c) of subdivision 3 of section  70.02  of  the  penal
33  law,  as  amended by chapter 765 of the laws of 2005, is amended to read
34  as follows:
35    (c) For a class D felony, the term must be at least two years and must
36  not exceed seven years, provided, however, that the term must be: (I) at
37  least two years and must not exceed eight years where  the  sentence  is
38  for  the  crime of menacing a police officer or peace officer as defined
39  in section 120.18 of this chapter; and (II) AT LEAST THREE AND  ONE-HALF
40  YEARS  AND MUST NOT EXCEED SEVEN YEARS WHERE THE SENTENCE IS IMPOSED FOR
41  THE CRIME OF CRIMINAL POSSESSION OF A WEAPON  IN  THE  THIRD  DEGREE  AS
42  DEFINED IN SUBDIVISION TEN OF SECTION 265.02 OF THIS CHAPTER;
43    S  31. The penal law is amended by adding a new section 115.20 to read
44  as follows:
45  S 115.20 CRIMINAL FACILITATION; DEFINITIONS AND CONSTRUCTION.
46    FOR PURPOSES OF THIS ARTICLE, SUCH CONDUCT SHALL INCLUDE, BUT  NOT  BE
47  LIMITED TO,  MAKING AVAILABLE, SELLING, EXCHANGING, GIVING OR DISPOSING
48  OF A COMMUNITY GUN, WHICH IN FACT, AIDS A  PERSON  TO  COMMIT  A  CRIME.
49  "COMMUNITY  GUN"  SHALL  MEAN  A  FIREARM  THAT IS ACTUALLY SHARED, MADE
50  AVAILABLE, SOLD, EXCHANGED, GIVEN OR DISPOSED OF AMONG OR BETWEEN TWO OR
51  MORE PERSONS, AT LEAST ONE OF WHOM IS NOT AUTHORIZED PURSUANT TO LAW  TO
52  POSSESS  SUCH  FIREARM. "DISPOSE OF" SHALL HAVE THE SAME MEANING AS THAT
53  TERM IS DEFINED IN SECTION 265.00 OF THIS  CHAPTER.  "SHARE"  AND  "MAKE
54  AVAILABLE"  SHALL,  IN  THE  CASE  OF A FIREARM, BE CONSTRUED TO INCLUDE
55  KNOWINGLY PLACING SUCH FIREARM AT A LOCATION ACCESSIBLE AND KNOWN TO ONE
56  OR MORE OTHER PERSONS.
```

S. 2230                              17                              A. 2388

```
 1     S 32. Section 120.05 of the penal law is  amended  by  adding  a  new
 2  subdivision 4-a to read as follows:
 3     4-A.  HE  RECKLESSLY CAUSES PHYSICAL INJURY TO ANOTHER PERSON WHO IS A
 4  CHILD UNDER THE AGE OF EIGHTEEN BY INTENTIONAL DISCHARGE OF  A  FIREARM,
 5  RIFLE OR SHOTGUN; OR
 6     S 33. Sections 34,  35 and 36 of this act shall be known and may be
 7  cited as "Mark's Law".
 8     S 34. The opening paragraph of subdivision 1 of section 125.26 of  the
 9  penal  law,  as  added by chapter 765 of the laws of 2005, is amended to
10  read as follows:
11     With intent to cause the death of another person, he or she causes the
12  death of such person, or of a third person who was a person described in
13  subparagraph (i), (ii), (II-A) or (iii) of paragraph (a) of this  subdi-
14  vision  engaged  at  the time of the killing in the course of performing
15  his or her official duties; and
16     S 35. Paragraph (a) of subdivision 1 of section 125.26  of  the  penal
17  law is amended by adding a new subparagraph (ii-a) to read as follows:
18     (II-A) THE INTENDED VICTIM WAS A FIREFIGHTER, EMERGENCY MEDICAL TECH-
19  NICIAN,  AMBULANCE  DRIVER,  PARAMEDIC,  PHYSICIAN  OR  REGISTERED NURSE
20  INVOLVED IN A FIRST RESPONSE TEAM, OR ANY OTHER INDIVIDUAL WHO,  IN  THE
21  COURSE  OF  OFFICIAL  DUTIES, PERFORMS EMERGENCY RESPONSE ACTIVITIES AND
22  WAS ENGAGED IN SUCH ACTIVITIES AT THE TIME OF KILLING AND THE  DEFENDANT
23  KNEW  OR  REASONABLY SHOULD HAVE KNOWN THAT THE INTENDED VICTIM WAS SUCH
24  FIREFIGHTER, EMERGENCY MEDICAL TECHNICIAN, AMBULANCE DRIVER,  PARAMEDIC,
25  PHYSICIAN OR REGISTERED NURSE; OR
26     S 36.  Paragraph  (a) of subdivision 1 of section 125.27 of the penal
27  law is amended by adding a new subparagraph (ii-a) to read as follows:
28     (II-A) THE INTENDED VICTIM WAS A FIREFIGHTER, EMERGENCY MEDICAL TECH-
29  NICIAN, AMBULANCE  DRIVER,  PARAMEDIC,  PHYSICIAN  OR  REGISTERED  NURSE
30  INVOLVED  IN  A FIRST RESPONSE TEAM, OR ANY OTHER INDIVIDUAL WHO, IN THE
31  COURSE OF OFFICIAL DUTIES, PERFORMS EMERGENCY  RESPONSE  ACTIVITIES  AND
32  WAS  ENGAGED IN SUCH ACTIVITIES AT THE TIME OF KILLING AND THE DEFENDANT
33  KNEW OR REASONABLY SHOULD HAVE KNOWN THAT THE INTENDED VICTIM  WAS  SUCH
34  FIREFIGHTER,  EMERGENCY MEDICAL TECHNICIAN, AMBULANCE DRIVER, PARAMEDIC,
35  PHYSICIAN OR REGISTERED NURSE; OR
36     S 37. Subdivision 22 of section 265.00 of the penal law, as  added  by
37  chapter 189 of the laws of 2000, is amended to read as follows:
38     22. "Assault  weapon"  means  [(a)  a semiautomatic rifle that has an
39  ability to accept a detachable magazine and has  at  least  two  of  the
40  following characteristics:
41     (i) a folding or telescoping stock;
42     (ii)  a pistol grip that protrudes conspicuously beneath the action of
43  the weapon;
44     (iii) a bayonet mount;
45     (iv) a flash suppressor or threaded barrel designed to  accommodate  a
46  flash suppressor;
47     (v) a grenade launcher; or
48     (b)  a  semiautomatic  shotgun  that has at least two of the following
49  characteristics:
50     (i) a folding or telescoping stock;
51     (ii) a pistol grip that protrudes conspicuously beneath the action  of
52  the weapon;
53     (iii) a fixed magazine capacity in excess of five rounds;
54     (iv) an ability to accept a detachable magazine; or
55     (c)  a semiautomatic pistol that has an ability to accept a detachable
56  magazine and has at least two of the following characteristics:
```

S. 2230                            18                            A. 2388

1    (i) an ammunition magazine that attaches to the pistol outside of  the
2  pistol grip;
3    (ii) a  threaded barrel capable of accepting a barrel extender, flash
4  suppressor, forward handgrip, or silencer;
5    (iii) a shroud that is attached to, or partially or completely  encir-
6  cles,  the  barrel and that permits the shooter to hold the firearm with
7  the nontrigger hand without being burned;
8    (iv) a manufactured weight of fifty ounces or more when the pistol  is
9  unloaded;
10   (v) a semiautomatic version of an automatic rifle, shotgun or firearm;
11 or
12   (d)  any  of  the  weapons, or functioning frames or receivers of such
13 weapons, or copies or duplicates of such weapons, in any caliber,  known
14 as:
15   (i) Norinco, Mitchell, and Poly Technologies Avtomat Kalashnikovs (all
16 models);
17   (ii) Action Arms Israeli Military Industries UZI and Galil;
18   (iii) Beretta Ar70 (SC-70);
19   (iv) Colt AR-15;
20   (v) Fabrique National FN/FAL, FN/LAR, and FNC;
21   (vi) SWD M-10, M-11, M-11/9, and M-12;
22   (vii) Steyr AUG;
23   (viii) INTRATEC TEC-9, TEC-DC9 and TEC-22; and
24   (ix)  revolving  cylinder shotguns, such as (or similar to) the Street
25 Sweeper and Striker 12;
26   (e) provided, however, that such term does not include: (i) any rifle,
27 shotgun or pistol that (A) is manually operated by bolt, pump, lever  or
28 slide action; (B) has been rendered permanently inoperable; or (C) is an
29 antique firearm as defined in 18 U.S.C. 921(a)(16);
30   (ii)  a  semiautomatic  rifle that cannot accept a detachable magazine
31 that holds more than five rounds of ammunition;
32   (iii) a semiautomatic shotgun that cannot hold more than  five  rounds
33 of ammunition in a fixed or detachable magazine;
34   (iv)  a  rifle, shotgun or pistol, or a replica or a duplicate thereof,
35 specified in Appendix A to section 922 of 18 U.S.C. as such  weapon  was
36 manufactured  on  October first, nineteen hundred ninety-three. The mere
37 fact that a weapon is not listed in Appendix A shall not be construed to
38 mean that such weapon is an assault weapon; or
39   (v) a semiautomatic rifle, a semiautomatic shotgun or a  semiautomatic
40 pistol  or  any of the weapons defined in paragraph (d) of this subdivi-
41 sion lawfully possessed prior to September fourteenth, nineteen  hundred
42 ninety-four.]
43   (A)  A  SEMIAUTOMATIC RIFLE THAT HAS AN ABILITY TO ACCEPT A DETACHABLE
44 MAGAZINE AND HAS AT LEAST ONE OF THE FOLLOWING CHARACTERISTICS:
45   (I) A FOLDING OR TELESCOPING STOCK;
46   (II) A PISTOL GRIP THAT PROTRUDES CONSPICUOUSLY BENEATH THE ACTION  OF
47 THE WEAPON;
48   (III) A THUMBHOLE STOCK;
49   (IV)  A  SECOND  HANDGRIP OR A PROTRUDING GRIP THAT CAN BE HELD BY THE
50 NON-TRIGGER HAND;
51   (V) A BAYONET MOUNT;
52   (VI) A FLASH SUPPRESSOR, MUZZLE BREAK, MUZZLE COMPENSATOR, OR THREADED
53 BARREL DESIGNED TO ACCOMMODATE A  FLASH  SUPPRESSOR,  MUZZLE  BREAK,  OR
54 MUZZLE COMPENSATOR;
55   (VII) A GRENADE LAUNCHER; OR

1    (B)  A  SEMIAUTOMATIC  SHOTGUN  THAT HAS AT LEAST ONE OF THE FOLLOWING
2  CHARACTERISTICS:
3    (I) A FOLDING OR TELESCOPING STOCK;
4    (II) A THUMBHOLE STOCK;
5    (III)  A  SECOND HANDGRIP OR A PROTRUDING GRIP THAT CAN BE HELD BY THE
6  NON-TRIGGER HAND;
7    (IV) A FIXED MAGAZINE CAPACITY IN EXCESS OF SEVEN ROUNDS;
8    (V) AN ABILITY TO ACCEPT A DETACHABLE MAGAZINE; OR
9    (C) A SEMIAUTOMATIC PISTOL THAT HAS AN ABILITY TO ACCEPT A  DETACHABLE
10  MAGAZINE AND HAS AT LEAST ONE OF THE FOLLOWING CHARACTERISTICS:
11    (I) A FOLDING OR TELESCOPING STOCK;
12    (II) A THUMBHOLE STOCK;
13    (III)  A  SECOND HANDGRIP OR A PROTRUDING GRIP THAT CAN BE HELD BY THE
14  NON-TRIGGER HAND;
15    (IV) CAPACITY TO ACCEPT AN AMMUNITION MAGAZINE THAT  ATTACHES  TO  THE
16  PISTOL OUTSIDE OF THE PISTOL GRIP;
17    (V)  A  THREADED  BARREL CAPABLE OF ACCEPTING A BARREL EXTENDER, FLASH
18  SUPPRESSOR, FORWARD HANDGRIP, OR SILENCER;
19    (VI) A SHROUD THAT IS ATTACHED TO, OR PARTIALLY OR  COMPLETELY  ENCIR-
20  CLES,  THE  BARREL AND THAT PERMITS THE SHOOTER TO HOLD THE FIREARM WITH
21  THE NON-TRIGGER HAND WITHOUT BEING BURNED;
22    (VII) A MANUFACTURED WEIGHT OF FIFTY OUNCES OR MORE WHEN THE PISTOL IS
23  UNLOADED; OR
24    (VIII) A SEMIAUTOMATIC VERSION  OF  AN  AUTOMATIC  RIFLE,  SHOTGUN  OR
25  FIREARM;
26    (D) A REVOLVING CYLINDER SHOTGUN;
27    (E)  A SEMIAUTOMATIC RIFLE, A SEMIAUTOMATIC SHOTGUN OR A SEMIAUTOMATIC
28  PISTOL OR WEAPON DEFINED IN SUBPARAGRAPH (V) OF PARAGRAPH (E) OF  SUBDI-
29  VISION  TWENTY-TWO OF SECTION 265.00 OF THIS CHAPTER AS ADDED BY CHAPTER
30  ONE HUNDRED EIGHTY-NINE OF  THE  LAWS  OF  TWO  THOUSAND  AND  OTHERWISE
31  LAWFULLY  POSSESSED PURSUANT TO SUCH CHAPTER OF THE LAWS OF TWO THOUSAND
32  PRIOR TO SEPTEMBER FOURTEENTH, NINETEEN HUNDRED NINETY-FOUR;
33    (F) A SEMIAUTOMATIC RIFLE, A SEMIAUTOMATIC SHOTGUN OR A  SEMIAUTOMATIC
34  PISTOL  OR  WEAPON DEFINED IN PARAGRAPH (A), (B) OR (C) OF THIS SUBDIVI-
35  SION, POSSESSED PRIOR TO THE DATE OF ENACTMENT OF  THE  CHAPTER  OF  THE
36  LAWS OF TWO THOUSAND THIRTEEN WHICH ADDED THIS PARAGRAPH;
37    (G) PROVIDED, HOWEVER, THAT SUCH TERM DOES NOT INCLUDE:
38    (I)  ANY  RIFLE,  SHOTGUN  OR  PISTOL THAT (A) IS MANUALLY OPERATED BY
39  BOLT, PUMP, LEVER OR SLIDE ACTION; (B)  HAS  BEEN  RENDERED  PERMANENTLY
40  INOPERABLE;  OR  (C)  IS  AN  ANTIQUE  FIREARM  AS  DEFINED IN 18 U.S.C.
41  921(A)(16);
42    (II) A SEMIAUTOMATIC RIFLE THAT CANNOT ACCEPT  A  DETACHABLE  MAGAZINE
43  THAT HOLDS MORE THAN FIVE ROUNDS OF AMMUNITION;
44    (III)  A  SEMIAUTOMATIC SHOTGUN THAT CANNOT HOLD MORE THAN FIVE ROUNDS
45  OF AMMUNITION IN A FIXED OR DETACHABLE MAGAZINE; OR
46    (IV) A RIFLE, SHOTGUN OR PISTOL, OR A REPLICA OR A DUPLICATE  THEREOF,
47  SPECIFIED IN APPENDIX A TO 18 U.S.C. 922 AS SUCH WEAPON WAS MANUFACTURED
48  ON  OCTOBER  FIRST,  NINETEEN HUNDRED NINETY-THREE. THE MERE FACT THAT A
49  WEAPON IS NOT LISTED IN APPENDIX A SHALL NOT BE CONSTRUED TO MEAN  THAT
50  SUCH WEAPON IS AN ASSAULT WEAPON;
51    (V) ANY WEAPON VALIDLY REGISTERED PURSUANT TO SUBDIVISION SIXTEEN-A OF
52  SECTION  400.00  OF  THIS  CHAPTER. SUCH WEAPONS SHALL BE SUBJECT TO THE
53  PROVISIONS OF PARAGRAPH (H) OF THIS SUBDIVISION;
54    (VI) ANY FIREARM, RIFLE, OR SHOTGUN THAT  WAS  MANUFACTURED  AT  LEAST
55  FIFTY YEARS PRIOR TO THE CURRENT DATE, BUT NOT INCLUDING REPLICAS THERE-

1  OF  THAT  IS  VALIDLY  REGISTERED  PURSUANT  TO SUBDIVISION SIXTEEN-A OF
2  SECTION 400.00 OF THIS CHAPTER;
3     (H) ANY WEAPON DEFINED IN PARAGRAPH (E) OR (F) OF THIS SUBDIVISION AND
4  ANY  LARGE CAPACITY AMMUNITION FEEDING DEVICE THAT WAS LEGALLY POSSESSED
5  BY AN INDIVIDUAL PRIOR TO THE ENACTMENT OF THE CHAPTER OF  THE  LAWS  OF
6  TWO  THOUSAND  THIRTEEN WHICH ADDED THIS PARAGRAPH, MAY ONLY BE SOLD TO,
7  EXCHANGED WITH OR DISPOSED OF TO A PURCHASER AUTHORIZED TO POSSESS  SUCH
8  WEAPONS OR TO AN INDIVIDUAL OR ENTITY OUTSIDE OF THE STATE PROVIDED THAT
9  ANY  SUCH  TRANSFER TO AN INDIVIDUAL OR ENTITY OUTSIDE OF THE STATE MUST
10 BE REPORTED TO THE ENTITY WHEREIN THE WEAPON IS REGISTERED WITHIN SEVEN-
11 TY-TWO HOURS OF SUCH TRANSFER. AN  INDIVIDUAL  WHO  TRANSFERS  ANY  SUCH
12 WEAPON  OR  LARGE CAPACITY AMMUNITION DEVICE TO AN INDIVIDUAL INSIDE NEW
13 YORK STATE OR WITHOUT COMPLYING WITH THE PROVISIONS  OF  THIS  PARAGRAPH
14 SHALL  BE  GUILTY  OF  A  CLASS A MISDEMEANOR UNLESS SUCH LARGE CAPACITY
15 AMMUNITION FEEDING DEVICE, THE POSSESSION OF WHICH IS  MADE  ILLEGAL  BY
16 THE  CHAPTER OF THE LAWS OF TWO THOUSAND THIRTEEN WHICH ADDED THIS PARA-
17 GRAPH, IS TRANSFERRED WITHIN ONE YEAR OF THE EFFECTIVE DATE OF THE CHAP-
18 TER OF THE LAWS OF TWO THOUSAND THIRTEEN WHICH ADDED THIS PARAGRAPH.
19    S 38. Subdivision 23 of section 265.00 of the penal law, as  added  by
20 chapter 189 of the laws of 2000, is amended to read as follows:
21    23. "Large capacity ammunition feeding device" means a magazine, belt,
22 drum, feed strip, or similar device, [manufactured after September thir-
23 teenth,  nineteen  hundred  ninety-four,] that (A) has a capacity of, or
24 that can be readily restored or converted  to  accept,  more  than  ten
25 rounds  of ammunition, OR (B) CONTAINS MORE THAN SEVEN ROUNDS OF AMMUNI-
26 TION, or (C) IS OBTAINED AFTER THE EFFECTIVE DATE OF THE CHAPTER OF  THE
27 LAWS  OF  TWO THOUSAND THIRTEEN WHICH AMENDED THIS SUBDIVISION AND HAS A
28 CAPACITY OF, OR THAT CAN BE READILY RESTORED  OR  CONVERTED  TO  ACCEPT,
29 MORE  THAN SEVEN ROUNDS OF AMMUNITION; provided, however, that such term
30 does not include an attached tubular  device  designed  to  accept,  and
31 capable  of  operating  only  with,  .22 caliber rimfire ammunition OR A
32 FEEDING DEVICE THAT IS A CURIO OR RELIC. A  FEEDING  DEVICE  THAT  IS  A
33 CURIO OR RELIC IS DEFINED AS A DEVICE THAT (I) WAS MANUFACTURED AT LEAST
34 FIFTY  YEARS  PRIOR  TO  THE CURRENT DATE, (II) IS ONLY CAPABLE OF BEING
35 USED EXCLUSIVELY IN A FIREARM, RIFLE, OR SHOTGUN THAT  WAS  MANUFACTURED
36 AT LEAST FIFTY YEARS PRIOR TO THE CURRENT DATE, BUT NOT INCLUDING REPLI-
37 CAS  THEREOF,  (III) IS POSSESSED BY AN INDIVIDUAL WHO IS NOT PROHIBITED
38 BY STATE OR FEDERAL LAW FROM POSSESSING A FIREARM AND (IV) IS REGISTERED
39 WITH THE DIVISION OF STATE POLICE PURSUANT TO SUBDIVISION SIXTEEN-A  OF
40 SECTION  400.00 OF THIS CHAPTER, EXCEPT SUCH FEEDING DEVICES TRANSFERRED
41 INTO THE STATE MAY BE REGISTERED AT ANY TIME, PROVIDED THEY ARE  REGIS-
42 TERED  WITHIN THIRTY DAYS OF THEIR TRANSFER INTO THE STATE. NOTWITH-
43 STANDING PARAGRAPH (H) OF SUBDIVISION TWENTY-TWO OF THIS  SECTION,  SUCH
44 FEEDING  DEVICES MAY BE TRANSFERRED PROVIDED THAT SUCH TRANSFER SHALL BE
45 SUBJECT TO THE PROVISIONS OF SECTION 400.03 OF  THIS  CHAPTER  INCLUDING
46 THE CHECK REQUIRED TO BE CONDUCTED PURSUANT TO SUCH SECTION.
47    S 39. Section 265.00 of the  penal law is amended by adding a new
48 subdivision 24 to read as follows:
49    24. "SELLER OF AMMUNITION" MEANS ANY PERSON, FIRM, PARTNERSHIP, CORPO-
50 RATION OR COMPANY WHO ENGAGES IN THE BUSINESS OF PURCHASING, SELLING  OR
51 KEEPING AMMUNITION.
52    S 40. Section 265.01 of the penal law, as added by chapter 1041 of the
53 laws  of  1974,  subdivision  1 as amended by chapter 257 of the laws of
54 2008, subdivision 2 as amended by chapter  220  of  the  laws  of  1988,
55 subdivision 3 as amended by chapter 199 of the laws of 2006, subdivision
56 4  as amended by chapter 357 of the laws of 2011, subdivision 7 as added

1 by chapter 807 of the laws of 1981, and subdivision 8 as added by  chap-
2 ter 646 of the laws of 1986, is amended to read as follows:
3 S 265.01 Criminal possession of a weapon in the fourth degree.
4     A  person  is  guilty of criminal possession of a weapon in the fourth
5 degree when:
6     (1) He or she possesses any firearm, electronic dart  gun,  electronic
7 stun gun, gravity knife, switchblade knife, pilum ballistic knife, metal
8 knuckle knife, cane sword, billy, blackjack, bludgeon, plastic knuckles,
9 metal knuckles, chuka stick, sand bag, sandclub, wrist-brace type sling-
10 shot or slungshot, shirken or "Kung Fu star"; or
11     (2)  He  possesses any dagger, dangerous knife, dirk, razor, stiletto,
12 imitation pistol, or any other dangerous or deadly instrument or  weapon
13 with intent to use the same unlawfully against another; or
14     (3) [He or she knowingly has in his or her possession a rifle, shotgun
15 or  firearm  in  or  upon  a  building or grounds, used for educational
16 purposes, of any school, college or  university,  except  the  forestry
17 lands, wherever located, owned and maintained by the State University of
18 New York college of environmental science and forestry, or upon a school
19 bus as defined in section one hundred forty-two of the vehicle and traf-
20 fic  law, without the written authorization of such educational institu-
21 tion]; or
22     (4) He possesses a  rifle,  shotgun,  antique  firearm,  black  powder
23 rifle, black powder shotgun, or any muzzle-loading firearm, and has been
24 convicted of a felony or serious offense; or
25     (5)  He  possesses any dangerous or deadly weapon and is not a citizen
26 of the United States; or
27     (6) He is a person who has been certified not suitable  to  possess  a
28 rifle  or  shotgun, as defined in subdivision sixteen of section 265.00,
29 and refuses to yield possession of such rifle or shotgun upon the demand
30 of a police officer. Whenever a person  is  certified  not  suitable  to
31 possess  a  rifle or shotgun, a member of the police department to which
32 such certification is made, or of  the  state  police,  shall  forthwith
33 seize  any rifle or shotgun possessed by such person. A rifle or shotgun
34 seized as herein provided shall not be destroyed, but shall be delivered
35 to the headquarters of such police  department,  or  state  police,  and
36 there retained until the aforesaid certificate has been rescinded by the
37 director  or  physician  in charge, or other disposition of such rifle or
38 shotgun has been ordered or authorized by a court of competent jurisdic-
39 tion.
40     (7) He knowingly possesses a bullet containing an explosive  substance
41 designed to detonate upon impact.
42     (8)  He  possesses any armor piercing ammunition with intent to use the
43 same unlawfully against another.
44     Criminal possession of a weapon in the fourth  degree  is  a  class  A
45 misdemeanor.
46     S  41.  The  penal  law is amended by adding a new section 265.01-a to
47 read as follows:
48 S 265.01-A. CRIMINAL POSSESSION OF A WEAPON ON SCHOOL GROUNDS.
49     A PERSON IS GUILTY OF  CRIMINAL  POSSESSION  OF  A  WEAPON  ON  SCHOOL
50 GROUNDS  WHEN  HE OR SHE KNOWINGLY HAS IN HIS OR HER POSSESSION A RIFLE,
51 SHOTGUN, OR FIREARM IN OR UPON A BUILDING OR GROUNDS,  USED  FOR  EDUCA-
52 TIONAL  PURPOSES,  OF  ANY  SCHOOL,  COLLEGE,  OR UNIVERSITY, EXCEPT THE
53 FORESTRY LANDS, WHEREVER LOCATED, OWNED AND  MAINTAINED  BY  THE  STATE
54 UNIVERSITY OF NEW YORK COLLEGE OF ENVIRONMENTAL SCIENCE AND FORESTRY, OR
55 UPON  A  SCHOOL  BUS  AS DEFINED IN SECTION ONE HUNDRED FORTY-TWO OF THE

1  VEHICLE AND TRAFFIC LAW, WITHOUT THE WRITTEN AUTHORIZATION OF SUCH
2  EDUCATIONAL INSTITUTION.
3    CRIMINAL POSSESSION OF A WEAPON ON SCHOOL GROUNDS IS A CLASS E FELONY.
4    S 41-a. The penal law is amended by adding a new section 265.01-b to
5  read as follows:
6  S 265.01-B CRIMINAL POSSESSION OF A FIREARM.
7    A PERSON IS GUILTY OF CRIMINAL POSSESSION OF A FIREARM WHEN HE OR SHE:
8  (1) POSSESSES ANY FIREARM OR; (2) LAWFULLY POSSESSES A FIREARM PRIOR  TO
9  THE  EFFECTIVE  DATE OF THE CHAPTER OF THE LAWS OF TWO THOUSAND THIRTEEN
10 WHICH ADDED THIS SECTION SUBJECT TO THE  REGISTRATION  REQUIREMENTS  OF
11 SUBDIVISION  SIXTEEN-A  OF  SECTION 400.00 OF THIS CHAPTER AND KNOWINGLY
12 FAILS TO REGISTER SUCH FIREARM PURSUANT TO SUCH SUBDIVISION.
13   CRIMINAL POSSESSION OF A FIREARM IS A CLASS E FELONY.
14   S 41-b. Subdivision 8 of section 265.02 of the penal law,  as  amended
15 by  chapter 764 of the laws of 2005, is amended and two new subdivisions
16 9 and 10 are added to read as follows:
17   (8) Such person possesses a large capacity ammunition feeding  device.
18 FOR  PURPOSES  OF  THIS SUBDIVISION, A LARGE CAPACITY AMMUNITION FEEDING
19 DEVICE SHALL NOT INCLUDE AN AMMUNITION FEEDING DEVICE LAWFULLY POSSESSED
20 BY SUCH PERSON BEFORE THE EFFECTIVE DATE OF THE CHAPTER OF THE  LAWS  OF
21 TWO THOUSAND THIRTEEN WHICH AMENDED THIS SUBDIVISION, THAT HAS A CAPACI-
22 TY  OF, OR THAT CAN BE READILY RESTORED OR CONVERTED TO ACCEPT MORE THAN
23 SEVEN BUT LESS THAN ELEVEN ROUNDS OF AMMUNITION, OR  THAT  WAS  MANUFAC-
24 TURED  BEFORE  SEPTEMBER  THIRTEENTH, NINETEEN HUNDRED NINETY-FOUR, THAT
25 HAS A CAPACITY OF, OR THAT CAN  BE  READILY  RESTORED  OR  CONVERTED  TO
26 ACCEPT, MORE THAN TEN ROUNDS OF AMMUNITION; OR
27   (9)  SUCH PERSON POSSESSES AN UNLOADED FIREARM AND ALSO COMMITS A DRUG
28 TRAFFICKING FELONY AS DEFINED IN SUBDIVISION TWENTY-ONE OF SECTION 10.00
29 OF THIS CHAPTER AS PART OF THE SAME CRIMINAL TRANSACTION; OR
30   (10) SUCH PERSON POSSESSES AN UNLOADED FIREARM AND  ALSO  COMMITS  ANY
31 VIOLENT FELONY OFFENSE AS DEFINED IN SUBDIVISION ONE OF SECTION 70.02 OF
32 THIS CHAPTER AS PART OF THE SAME CRIMINAL TRANSACTION.
33   S  42.  Subdivision  2 of section 265.09 of the penal law, as added by
34 chapter 650 of the laws of 1996, is amended to read as follows:
35   (2) Sentencing. Notwithstanding any other  provision  of  law  to  the
36 contrary,  when a person is convicted of criminal use of a firearm in the
37 first  degree  as  defined in subdivision one of this section, the court
38 shall impose an additional consecutive sentence of  five  years  to  the
39 [minimum  term  of  an indeterminate] sentence imposed on the underlying
40 class B violent felony offense where the person convicted of such  crime
41 displays a loaded weapon from which a shot, readily capable of producing
42 death  or  other serious injury may be discharged, in furtherance of the
43 commission of  such  crime,  provided,  however,  that  such  additional
44 sentence  shall not be imposed if the court, having regard to the nature
45 and circumstances of the crime and to the history and character  of  the
46 defendant, finds on the record that such additional consecutive sentence
47 would  be  unduly  harsh  and  that  not imposing such sentence would be
48 consistent with the public safety and would not deprecate  the  serious-
49 ness  of  the  crime.   Notwithstanding any other provision of law to the
50 contrary, the aggregate of the five year consecutive term imposed pursu-
51 ant to this subdivision  and  the  minimum  term  of  the  indeterminate
52 sentence  imposed on the underlying class B violent felony shall consti-
53 tute the new aggregate  minimum  term  of  imprisonment,  and  a  person
54 subject  to  such  term  shall be required to serve the entire aggregate
55 minimum term and shall not be eligible for release on parole  or  condi-
56 tional  release during such term. This subdivision shall not apply where

S. 2230                                    23                                    A. 2388

1  the defendant's criminal liability for displaying a loaded  weapon  from
2  which a shot, readily capable of producing death or other serious injury
3  may be discharged, in furtherance of the commission of crime is based on
4  the conduct of another pursuant to section 20.00 of [the penal law] THIS
5  CHAPTER.
6    S  43. Section 265.17 of the penal law, as added by chapter 189 of the
7  laws of 2000, is amended to read as follows:
8  S 265.17 Criminal purchase OR DISPOSAL of a weapon.
9    A person is guilty of criminal purchase OR DISPOSAL of a weapon when:
10   1. Knowing that he or she is  prohibited  by  law  from  possessing  a
11  firearm,  rifle  or  shotgun because of a prior conviction or because of
12  some other disability which would  render  him  or  her  ineligible  to
13  lawfully  possess a firearm, rifle or shotgun in this state, such person
14  [attempts to purchase] PURCHASES a firearm, rifle or shotgun from anoth-
15  er person; or
16   2. Knowing that it would be unlawful for another person to  possess  a
17  firearm, rifle or shotgun, he or she purchases a firearm, rifle or shot-
18  gun for, on behalf of, or for the use of such other person[.]; OR
19   3.  KNOWING THAT ANOTHER PERSON IS PROHIBITED BY LAW FROM POSSESSING A
20  FIREARM, RIFLE OR SHOTGUN BECAUSE OF A PRIOR CONVICTION  OR  BECAUSE  OF
21  SOME  OTHER  DISABILITY  WHICH  WOULD RENDER HIM OR HER INELIGIBLE TO
22  LAWFULLY POSSESS A FIREARM, RIFLE OR SHOTGUN IN  THIS  STATE,  A  PERSON
23  DISPOSES OF A FIREARM, RIFLE OR SHOTGUN TO SUCH OTHER PERSON.
24   Criminal purchase OR DISPOSAL of a weapon is a class [A misdemeanor] D
25  FELONY.
26   S 44. Intentionally omitted.
27   S  45. The penal law is amended by adding a new section 265.19 to read
28  as follows:
29  S 265.19 AGGRAVATED CRIMINAL POSSESSION OF A WEAPON.
30   A PERSON IS GUILTY OF AGGRAVATED CRIMINAL POSSESSION OF A WEAPON  WHEN
31  HE  OR  SHE  COMMITS THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE
32  SECOND DEGREE AS DEFINED IN SUBDIVISION THREE OF SECTION 265.03 OF  THIS
33  ARTICLE AND ALSO COMMITS ANY VIOLENT FELONY OFFENSE AS DEFINED IN SUBDI-
34  VISION ONE OF SECTION 70.02 OF THIS CHAPTER OR A DRUG TRAFFICKING FELONY
35  AS  DEFINED  IN  SUBDIVISION TWENTY-ONE OF SECTION 10.00 OF THIS CHAPTER
36  ARISING OUT OF THE SAME CRIMINAL TRANSACTION.
37   AGGRAVATED CRIMINAL POSSESSION OF A WEAPON IS A CLASS C FELONY.
38   S 46. Paragraph 3 of subdivision a of section 265.20 of the penal law,
39  as amended by chapter 210 of the laws of 1999,  is  amended  and  a  new
40  paragraph 7-f is added to read as follows:
41   3.  Possession  of  a pistol or revolver by a person to whom a license
42  therefor has been issued as provided under section 400.00  or  400.01  of
43  this  chapter  OR  POSSESSION OF A WEAPON AS DEFINED IN PARAGRAPH (E) OR
44  (F) OF SUBDIVISION TWENTY-TWO OF SECTION 265.00 OF THIS ARTICLE WHICH IS
45  REGISTERED PURSUANT TO PARAGRAPH (A) OF SUBDIVISION SIXTEEN-A OF SECTION
46  400.00 OF THIS CHAPTER OR IS  INCLUDED  ON  AN  AMENDED  LICENSE  ISSUED
47  PURSUANT  TO  SECTION 400.00 OF THIS CHAPTER.  IN THE EVENT SUCH LICENSE
48  IS REVOKED, OTHER THAN BECAUSE SUCH LICENSEE IS NO LONGER  PERMITTED  TO
49  POSSESS A FIREARM, RIFLE OR SHOTGUN UNDER FEDERAL OR STATE LAW, INFORMA-
50  TION  SUFFICIENT TO SATISFY THE REQUIREMENTS OF SUBDIVISION SIXTEEN-A OF
51  SECTION 400.00 OF THIS CHAPTER, SHALL BE  TRANSMITTED  BY  THE  LICENSING
52  OFFICER  TO THE STATE POLICE, IN A FORM AS DETERMINED BY THE SUPERINTEN-
53  DENT OF STATE POLICE. SUCH TRANSMISSION SHALL CONSTITUTE A VALID  REGIS-
54  TRATION UNDER SUCH SECTION.  FURTHER PROVIDED, NOTWITHSTANDING ANY OTHER
55  SECTION  OF THIS TITLE, A FAILURE TO REGISTER SUCH WEAPON BY AN INDIVID-
56  UAL WHO POSSESSES SUCH WEAPON BEFORE THE ENACTMENT OF THE CHAPTER OF THE

1 LAWS OF TWO THOUSAND THIRTEEN WHICH AMENDED THIS PARAGRAPH  AND  MAY  SO
2 LAWFULLY  POSSESS IT THEREAFTER UPON REGISTRATION, SHALL ONLY BE SUBJECT
3 TO PUNISHMENT PURSUANT TO PARAGRAPH  (C)  OF  SUBDIVISION  SIXTEEN-A  OF
4 SECTION  400.00 OF THIS CHAPTER; provided, that such a license OR REGIS-
5 TRATION shall not preclude a  conviction  for  the  offense  defined  in
6 subdivision  three of section 265.01 of this article OR SECTION 265.01-A
7 OF THIS ARTICLE.
8    7-F. POSSESSION AND USE OF A MAGAZINE, BELT,  FEED  STRIP  OR  SIMILAR
9 DEVICE,  THAT  CONTAINS  MORE  THAN SEVEN ROUNDS OF AMMUNITION, BUT THAT
10 DOES NOT HAVE A CAPACITY OF OR CAN READILY BE RESTORED OR  CONVERTED  TO
11 ACCEPT  MORE  THAN  TEN  ROUNDS  OF  AMMUNITION, AT AN INDOOR OR OUTDOOR
12 FIRING RANGE LOCATED IN OR ON PREMISES OWNED OR OCCUPIED  BY  A  DULY
13 INCORPORATED  ORGANIZATION  ORGANIZED  FOR  CONSERVATION PURPOSES OR TO
14 FOSTER PROFICIENCY IN ARMS; AT AN INDOOR OR OUTDOOR FIRING RANGE FOR THE
15 PURPOSE OF FIRING A RIFLE OR SHOTGUN; AT A COLLEGIATE, OLYMPIC OR TARGET
16 SHOOTING COMPETITION UNDER THE AUSPICES OF OR APPROVED BY  THE  NATIONAL
17 RIFLE  ASSOCIATION;  OR AT AN ORGANIZED MATCH SANCTIONED BY THE INTERNA-
18 TIONAL HANDGUN METALLIC SILHOUETTE ASSOCIATION.
19    S 46-a. The penal law is amended by adding two new sections 265.36 and
20 265.37 to read as follows:
21 S 265.36 UNLAWFUL POSSESSION OF  A  LARGE  CAPACITY  AMMUNITION  FEEDING
22          DEVICE.
23    IT SHALL BE UNLAWFUL FOR A PERSON TO KNOWINGLY POSSESS A LARGE CAPACI-
24 TY  AMMUNITION  FEEDING DEVICE MANUFACTURED BEFORE SEPTEMBER THIRTEENTH,
25 NINETEEN HUNDRED NINETY-FOUR, AND IF SUCH PERSON LAWFULLY POSSESSED SUCH
26 LARGE CAPACITY FEEDING DEVICE BEFORE THE EFFECTIVE DATE OF  THE  CHAPTER
27 OF  THE LAWS OF TWO THOUSAND THIRTEEN WHICH ADDED THIS SECTION, THAT HAS
28 A CAPACITY OF, OR THAT CAN BE READILY RESTORED OR CONVERTED  TO  ACCEPT,
29 MORE THAN TEN ROUNDS OF AMMUNITION.
30    AN  INDIVIDUAL WHO HAS A REASONABLE BELIEF THAT SUCH DEVICE IS OF SUCH
31 A CHARACTER THAT IT MAY LAWFULLY BE  POSSESSED  AND  WHO  SURRENDERS  OR
32 LAWFULLY DISPOSES OF SUCH DEVICE WITHIN THIRTY DAYS OF BEING NOTIFIED BY
33 LAW  ENFORCEMENT  OR  COUNTY LICENSING OFFICIALS THAT SUCH POSSESSION IS
34 UNLAWFUL SHALL NOT BE GUILTY OF THIS OFFENSE. IT SHALL BE  A  REBUTTABLE
35 PRESUMPTION  THAT  SUCH PERSON KNOWS THAT SUCH LARGE CAPACITY AMMUNITION
36 FEEDING DEVICE MAY NOT BE LAWFULLY POSSESSED  IF  HE  OR  SHE  HAS  BEEN
37 CONTACTED  BY LAW ENFORCEMENT OR COUNTY LICENSING OFFICIALS AND INFORMED
38 THAT SUCH DEVICE MAY NOT BE LAWFULLY POSSESSED.
39    UNLAWFUL POSSESSION OF A LARGE CAPACITY AMMUNITION FEEDING DEVICE IS A
40 CLASS A MISDEMEANOR.
41 S 265.37 UNLAWFUL POSSESSION OF CERTAIN AMMUNITION FEEDING DEVICES.
42    IT SHALL BE UNLAWFUL FOR A PERSON TO KNOWINGLY POSSESS  AN  AMMUNITION
43 FEEDING  DEVICE THAT SUCH PERSON LAWFULLY POSSESSED BEFORE THE EFFECTIVE
44 DATE OF THE CHAPTER OF THE LAWS OF TWO  THOUSAND  THIRTEEN  WHICH  ADDED
45 THIS SECTION, THAT HAS A CAPACITY OF, OR THAT CAN BE READILY RESTORED OR
46 CONVERTED  TO ACCEPT MORE THAN SEVEN BUT LESS THAN TEN ROUNDS OF AMMUNI-
47 TION, WHERE SUCH DEVICE CONTAINS MORE THAN SEVEN ROUNDS OF AMMUNITION.
48    IF SUCH DEVICE CONTAINING MORE THAN  SEVEN  ROUNDS  OF  AMMUNITION  IS
49 POSSESSED WITHIN THE HOME OF THE POSSESSOR, THE PERSON SO POSSESSING THE
50 DEVICE  SHALL, FOR A FIRST OFFENSE, BE GUILTY OF A VIOLATION AND SUBJECT
51 TO A FINE OF TWO HUNDRED DOLLARS, AND FOR A SECOND OFFENSE, BE GUILTY OF
52 A CLASS B MISDEMEANOR AND SUBJECT TO A FINE OF TWO HUNDRED DOLLARS AND A
53 TERM OF UP TO THREE MONTHS IMPRISONMENT.
54    IF SUCH DEVICE CONTAINING MORE THAN  SEVEN  ROUNDS  OF  AMMUNITION  IS
55 POSSESSED  IN  ANY  LOCATION  OTHER  THAN THE HOME OF THE POSSESSOR, THE
56 PERSON SO POSSESSING THE DEVICE SHALL, FOR A FIRST OFFENSE, BE GUILTY OF

1  A CLASS B MISDEMEANOR AND SUBJECT TO A FINE OF TWO HUNDRED DOLLARS AND A
2  TERM OF UP TO SIX MONTHS IMPRISONMENT, AND FOR A SECOND OFFENSE, BE
3  GUILTY OF A CLASS A MISDEMEANOR.
4     S  47. The penal law is amended by adding a new section 265.45 to read
5  as follows:
6  S 265.45 SAFE STORAGE OF RIFLES, SHOTGUNS, AND FIREARMS.
7     NO PERSON WHO OWNS OR IS CUSTODIAN OF A RIFLE, SHOTGUN OR FIREARM  WHO
8  RESIDES  WITH  AN INDIVIDUAL WHO SUCH PERSON KNOWS OR HAS REASON TO KNOW
9  IS PROHIBITED FROM POSSESSING A FIREARM PURSUANT TO 18 U.S.C.  S  922(G)
10 (1),  (4), (8) OR (9) SHALL STORE OR OTHERWISE LEAVE SUCH RIFLE, SHOTGUN
11 OR FIREARM OUT OF HIS OR HER IMMEDIATE  POSSESSION  OR  CONTROL  WITHOUT
12 HAVING FIRST SECURELY LOCKED SUCH RIFLE, SHOTGUN OR FIREARM IN AN APPRO-
13 PRIATE  SAFE  STORAGE DEPOSITORY OR RENDERED IT INCAPABLE OF BEING FIRED
14 BY USE OF A GUN LOCKING DEVICE APPROPRIATE TO THAT WEAPON. FOR  PURPOSES
15 OF  THIS  SECTION  "SAFE  STORAGE DEPOSITORY" SHALL MEAN A SAFE OR OTHER
16 SECURE CONTAINER WHICH, WHEN LOCKED, IS INCAPABLE OF  BEING  OPENED  WITH-
17 OUT  THE KEY, COMBINATION OR OTHER UNLOCKING MECHANISM AND IS CAPABLE OF
18 PREVENTING AN  UNAUTHORIZED  PERSON  FROM  OBTAINING  ACCESS  TO  AND
19 POSSESSION  OF  THE  WEAPON CONTAINED THEREIN.  WITH RESPECT TO A PERSON
20 WHO IS PROHIBITED FROM POSSESSING A  FIREARM  PURSUANT  TO  18  USC  S
21 922(G)(9),  FOR  PURPOSES  OF THIS SECTION, THIS SECTION APPLIES ONLY IF
22 SUCH PERSON HAS BEEN CONVICTED OF A CRIME INCLUDED IN SUBDIVISION ONE OF
23 SECTION 370.15 OF THE CRIMINAL PROCEDURE LAW AND SUCH GUN  IS  POSSESSED
24 WITHIN FIVE YEARS FROM THE LATER OF THE DATE OF CONVICTION OR COMPLETION
25 OF SENTENCE.
26    A VIOLATION OF THIS SECTION SHALL CONSTITUTE A CLASS A MISDEMEANOR.
27    S  48.  Subdivision 1, paragraph (a) of subdivision 3, subdivisions 4,
28 5, 9, 10, 11, 12 and 15 of section 400.00 of the penal law,  subdivision
29 1 as amended by chapter 189 of the laws of 2000, paragraph (a) of subdi-
30 vision 3 as designated by chapter 778 of the laws of 1985, subdivision 4
31 as  amended by chapter 331 of the laws of 2005, subdivision 5 as amended
32 by chapter 332 of the laws of 1994, subdivision 9 as amended by  chapter
33 172 of the laws of 1973, subdivision 10 as amended by chapter 447 of the
34 laws  of  1997,  subdivision 11 as amended by chapter 210 of the laws of
35 1999, and subdivision 12 as amended by chapter 449 of the laws of  1993,
36 are  amended and two new subdivisions 16-a and 16-b are added to read as
37 follows:
38    1. Eligibility. No license shall be issued or renewed pursuant to this
39 section except by the licensing officer, and then  only  after  investi-
40 gation  and  finding  that  all statements in a proper application for a
41 license are true. No license shall be issued or renewed  except  for  an
42 applicant  (a) twenty-one years of age or older, provided, however, that
43 where such applicant has  been  honorably  discharged  from  the  United
44 States  army,  navy,  marine  corps,  air  force  or coast guard, or the
45 national guard of the state of New York, no such age  restriction  shall
46 apply;  (b)  of  good  moral  character;  (c) who has not been convicted
47 anywhere of a felony or a serious offense; (d) WHO  IS  NOT  A  FUGITIVE
48 FROM  JUSTICE;  (E)  WHO  IS  NOT AN UNLAWFUL USER OF OR ADDICTED TO ANY
49 CONTROLLED SUBSTANCE AS DEFINED IN SECTION 21 U.S.C. 802; (F) WHO  BEING
50 AN ALIEN (I) IS NOT ILLEGALLY OR UNLAWFULLY IN THE UNITED STATES OR (II)
51 HAS  NOT  BEEN  ADMITTED  TO THE UNITED STATES UNDER A NONIMMIGRANT VISA
52 SUBJECT TO THE EXCEPTION IN 18 U.S.C. 922(Y)(2); (G) WHO  HAS  NOT  BEEN
53 DISCHARGED FROM THE ARMED FORCES UNDER DISHONORABLE CONDITIONS; (H) WHO,
54 HAVING BEEN A CITIZEN OF THE UNITED STATES, HAS NOT RENOUNCED HIS OR HER
55 CITIZENSHIP;  (I) who has stated whether he or she has ever suffered any
56 mental illness [or been confined to any hospital or institution,  public

S. 2230                                      26                                      A. 2388

1   or private, for mental illness]; (J) WHO HAS NOT BEEN INVOLUNTARILY
2   COMMITTED TO A FACILITY UNDER THE JURISDICTION OF AN OFFICE OF THE
3   DEPARTMENT OF MENTAL HYGIENE PURSUANT TO ARTICLE NINE OR FIFTEEN OF THE
4   MENTAL HYGIENE LAW, ARTICLE SEVEN HUNDRED THIRTY OR SECTION 330.20 OF
5   THE CRIMINAL PROCEDURE LAW, SECTION FOUR HUNDRED TWO OR FIVE HUNDRED
6   EIGHT OF THE CORRECTION LAW, SECTION 322.2 OR 353.4 OF THE FAMILY COURT
7   ACT, OR HAS NOT BEEN CIVILLY CONFINED IN A SECURE TREATMENT FACILITY
8   PURSUANT TO ARTICLE TEN OF THE MENTAL HYGIENE LAW; [(e)] (K) who has not
9   had a license revoked or who is not under a suspension or ineligibility
10  order issued pursuant to the provisions of section 530.14 of the crimi-
11  nal procedure law or section eight hundred forty-two-a of the family
12  court act; [(f)] (L) in the county of Westchester, who has successfully
13  completed a firearms safety course and test as evidenced by a certif-
14  icate of completion issued in his or her name and endorsed and affirmed
15  under the penalties of perjury by a duly authorized instructor, except
16  that: (i) persons who are honorably discharged from the United States
17  army, navy, marine corps or coast guard, or of the national guard of the
18  state of New York, and produce evidence of official qualification in
19  firearms during the term of service are not required to have completed
20  those hours of a firearms safety course pertaining to the safe use,
21  carrying, possession, maintenance and storage of a firearm; and (ii)
22  persons who were licensed to possess a pistol or revolver prior to the
23  effective date of this paragraph are not required to have completed a
24  firearms safety course and test; [and (g)] (M) WHO HAS NOT HAD A GUARDI-
25  AN APPOINTED FOR HIM OR HER PURSUANT TO ANY PROVISION OF STATE LAW,
26  BASED ON A DETERMINATION THAT AS A RESULT OF MARKED SUBNORMAL INTELLI-
27  GENCE, MENTAL ILLNESS, INCAPACITY, CONDITION OR DISEASE, HE OR SHE LACKS
28  THE MENTAL CAPACITY TO CONTRACT OR MANAGE HIS OR HER OWN AFFAIRS; AND
29  (N) concerning whom no good cause exists for the denial of the license.
30  No person shall engage in the business of gunsmith or dealer in firearms
31  unless licensed pursuant to this section. An applicant to engage in such
32  business shall also be a citizen of the United States, more than twen-
33  ty-one years of age and maintain a place of business in the city or
34  county where the license is issued. For such business, if the applicant
35  is a firm or partnership, each member thereof shall comply with all of
36  the requirements set forth in this subdivision and if the applicant is a
37  corporation, each officer thereof shall so comply.
38      (a) Applications shall be made and renewed, in the case of a license
39  to carry or possess a pistol or revolver, to the licensing officer in
40  the city or county, as the case may be, where the applicant resides, is
41  principally employed or has his OR HER principal place of business as
42  merchant or storekeeper; and, in the case of a license as gunsmith or
43  dealer in firearms, to the licensing officer where such place of busi-
44  ness is located. Blank applications shall, except in the city of New
45  York, be approved as to form by the superintendent of state police. An
46  application shall state the full name, date of birth, residence, present
47  occupation of each person or individual signing the same, whether or not
48  he OR SHE is a citizen of the United States, whether or not he OR SHE
49  complies with each requirement for eligibility specified in subdivision
50  one of this section and such other facts as may be required to show the
51  good character, competency and integrity of each person or individual
52  signing the application. An application shall be signed and verified by
53  the applicant. Each individual signing an application shall submit one
54  photograph of himself OR HERSELF and a duplicate for each required copy
55  of the application. Such photographs shall have been taken within thirty
56  days prior to filing the application. In case of a license as gunsmith

1  or  dealer  in  firearms,  the photographs submitted shall be two inches
2  square, and the application shall also state the previous occupation of
3  each  individual  signing the same and the location of the place of such
4  business,  or  of the bureau, agency, subagency, office or branch office
5  for which the license is sought, specifying the name of the city, town
6  or  village,  indicating the street and number and otherwise giving such
7  apt description as to point out reasonably the location thereof. In such
8  case, if the applicant is a firm, partnership or corporation, its name,
9  date  and  place  of formation, and principal place of business shall be
10 stated. For such firm or partnership, the application shall be signed
11 and  verified  by  each individual composing or intending to compose the
12 same, and for such corporation, by each officer thereof.
13     4. Investigation. Before a license is issued or renewed, there shall
14 be an investigation of all statements required in the application by the
15 duly  constituted police authorities of the locality where such applica-
16 tion is made, INCLUDING BUT NOT LIMITED TO SUCH RECORDS AS MAY BE ACCES-
17 SIBLE TO THE DIVISION OF STATE POLICE OR DIVISION  OF  CRIMINAL  JUSTICE
18 SERVICES  PURSUANT TO SECTION 400.02 OF THIS ARTICLE.  For that purpose,
19 the records of the  appropriate  office  of  the  department  of  mental
20 hygiene  concerning  previous or present mental illness of the applicant
21 shall be available for inspection by the investigating officer  of  the
22 police  authority.   In order to ascertain any previous criminal record,
23 the  investigating  officer  shall  take  the  fingerprints  and physical
24 descriptive  data in quadruplicate of each individual by whom the appli-
25 cation is signed and verified. Two copies of such fingerprints shall be
26 taken  on  standard  fingerprint cards eight inches square, and one copy
27 may be taken on a card supplied for that purpose by the  federal  bureau
28 of  investigation;  provided,  however,  that in the case of a corporate
29 applicant that has already been issued a dealer in firearms license  and
30 seeks  to  operate  a  firearm  dealership at a second or subsequent
31 location, the original fingerprints on file may be used to ascertain any
32 criminal record in the second or subsequent application  unless  any  of
33 the  corporate  officers  have  changed  since the prior application, in
34 which case the  new  corporate  officer  shall  comply  with  procedures
35 governing  an  initial application for such license. When completed, one
36 standard card shall be forwarded to and retained by the  division  of
37 criminal  justice  services  in  the  executive  department, at Albany. A
38 search of the files of such division and  written  notification  of  the
39 results of the search to the investigating officer shall be made without
40 unnecessary delay.  Thereafter, such division shall notify the licensing
41 officer  and the executive department, division of state police, Albany,
42 of any criminal record of the applicant filed therein subsequent to  the
43 search  of its files. A second standard card, or the one supplied by the
44 federal bureau of investigation, as the case may be, shall be  forwarded
45 to that bureau at Washington with a request that the files of the bureau
46 be searched and notification of the results of the search be made to the
47 investigating  police  authority. [The failure or refusal of the federal
48 bureau of investigation to make the fingerprint check  provided  for  in
49 this  section  shall not constitute the sole basis for refusal to issue a
50 permit pursuant to the provisions of this section.] Of the remaining two
51 fingerprint cards, one shall be filed  with  the  executive  department,
52 division  of state police, Albany, within ten days after issuance of the
53 license, and the other remain on  file  with  the  investigating  police
54 authority.  No  such  fingerprints  may be inspected by any person other
55 than a peace officer, who is acting pursuant to his special duties, or a
56 police officer, except on order of a judge or  justice  of  a  court  of

1  record either upon notice to the licensee or without notice, as the
2  judge or justice may deem appropriate. Upon completion of the investi-
3  gation, the police authority shall report the results to the licensing
4  officer without unnecessary delay.
5      5.   Filing of approved applications.   (A) The application for any
6  license, if granted, shall be filed by the licensing officer with the
7  clerk of the county of issuance, except that in the city of New York
8  and, in the counties of Nassau and Suffolk, the licensing officer shall
9  designate the place of filing in the appropriate division, bureau or
10  unit of the police department thereof, and in the county of Suffolk the
11  county clerk is hereby authorized to transfer all records or applica-
12  tions relating to firearms to the licensing authority of that county.
13  [The] EXCEPT AS PROVIDED IN PARAGRAPHS (B) THROUGH (F) OF THIS SUBDIVI-
14  SION, THE name and address of any person to whom an application for any
15  license has been granted shall be a public record. Upon application by a
16  licensee who has changed his place of residence such records or applica-
17  tions shall be transferred to the appropriate officer at the licensee's
18  new place of residence. A duplicate copy of such application shall be
19  filed by the licensing officer in the executive department, division of
20  state police, Albany, within ten days after issuance of the license.
21  THE SUPERINTENDENT OF STATE POLICE MAY DESIGNATE THAT SUCH APPLICATION
22  SHALL BE TRANSMITTED TO THE DIVISION OF STATE POLICE ELECTRONICALLY. IN
23  THE EVENT THE SUPERINTENDENT OF THE DIVISION OF STATE POLICE DETERMINES
24  THAT IT LACKS ANY OF THE RECORDS REQUIRED TO BE FILED WITH THE DIVISION,
25  IT MAY REQUEST THAT SUCH RECORDS BE PROVIDED TO IT BY THE APPROPRIATE
26  CLERK, DEPARTMENT OR AUTHORITY AND SUCH CLERK, DEPARTMENT OR AUTHORITY
27  SHALL PROVIDE THE DIVISION WITH SUCH RECORDS. IN THE EVENT SUCH CLERK,
28  DEPARTMENT OR AUTHORITY LACKS SUCH RECORDS, THE DIVISION MAY REQUEST THE
29  LICENSE HOLDER PROVIDE INFORMATION SUFFICIENT TO CONSTITUTE SUCH RECORD
30  AND SUCH LICENSE HOLDER SHALL PROVIDE THE DIVISION WITH SUCH INFORMA-
31  TION.   SUCH INFORMATION SHALL BE LIMITED TO THE LICENSE HOLDER'S NAME,
32  DATE OF BIRTH, GENDER,RACE, RESIDENTIAL ADDRESS, SOCIAL SECURITY NUMBER
33  AND FIREARMS POSSESSED BY SAID LICENSE HOLDER. Nothing in this subdivi-
34  sion shall be construed to change the expiration date or term of such
35  licenses if otherwise provided for in law. RECORDS ASSEMBLED OR
36  COLLECTED FOR PURPOSES OF INCLUSION IN THE DATABASE ESTABLISHED BY THIS
37  SECTION SHALL BE RELEASED PURSUANT TO A COURT ORDER. RECORDS ASSEMBLED
38  OR COLLECTED FOR PURPOSES OF INCLUSION IN THE DATABASE CREATED PURSUANT
39  TO SECTION 400.02 OF THIS CHAPTER SHALL NOT BE SUBJECT TO DISCLOSURE
40  PURSUANT TO ARTICLE SIX OF THE PUBLIC OFFICERS LAW.
41      (B) EACH APPLICATION FOR A LICENSE PURSUANT TO PARAGRAPH (A) OF THIS
42  SUBDIVISION SHALL INCLUDE, ON A SEPARATE WRITTEN FORM PREPARED BY THE
43  DIVISION OF STATE POLICE WITHIN THIRTY DAYS OF THE EFFECTIVE DATE OF THE
44  CHAPTER OF THE LAWS OF TWO THOUSAND THIRTEEN, WHICH AMENDED THIS
45  SECTION, AND PROVIDED TO THE APPLICANT AT THE SAME TIME AND IN THE SAME
46  MANNER AS THE APPLICATION FOR A LICENSE, AN OPPORTUNITY FOR THE APPLI-
47  CANT TO REQUEST AN EXCEPTION FROM HIS OR HER APPLICATION INFORMATION
48  BECOMING PUBLIC RECORD PURSUANT TO PARAGRAPH (A) OF THIS SUBDIVISION.
49  SUCH FORMS, WHICH SHALL ALSO BE MADE AVAILABLE TO INDIVIDUALS WHO HAD
50  APPLIED FOR OR BEEN GRANTED A LICENSE PRIOR TO THE EFFECTIVE DATE OF THE
51  CHAPTER OF THE LAWS OF TWO THOUSAND THIRTEEN WHICH AMENDED THIS SECTION,
52  SHALL NOTIFY APPLICANTS THAT, UPON DISCOVERY THAT AN APPLICANT KNOWINGLY
53  PROVIDED FALSE INFORMATION, SUCH APPLICANT MAY BE SUBJECT TO PENALTIES
54  PURSUANT TO SECTION 175.30 OF THIS CHAPTER, AND FURTHER, THAT HIS OR HER
55  REQUEST FOR AN EXCEPTION SHALL BE NULL AND VOID, PROVIDED THAT WRITTEN
56  NOTICE CONTAINING SUCH DETERMINATION IS PROVIDED TO THE APPLICANT.

1  FURTHER, SUCH FORMS SHALL PROVIDE EACH APPLICANT AN OPPORTUNITY TO SPEC-
2  IFY THE GROUNDS ON WHICH HE OR SHE BELIEVES HIS OR HER APPLICATION
3  INFORMATION SHOULD NOT BE PUBLICLY DISCLOSED. THESE GROUNDS, WHICH SHALL
4  BE IDENTIFIED ON THE APPLICATION WITH A BOX BESIDE EACH FOR CHECKING, AS
5  APPLICABLE, BY THE APPLICANT, SHALL BE AS FOLLOWS:
6    (I) THE APPLICANT'S LIFE OR SAFETY MAY BE ENDANGERED BY DISCLOSURE
7  BECAUSE:
8    (A) THE APPLICANT IS AN ACTIVE OR RETIRED POLICE OFFICER, PEACE OFFI-
9  CER, PROBATION OFFICER, PAROLE OFFICER, OR CORRECTIONS OFFICER;
10   (B) THE APPLICANT IS A PROTECTED PERSON UNDER A CURRENTLY VALID ORDER
11 OF PROTECTION;
12   (C) THE APPLICANT IS OR WAS A WITNESS IN A CRIMINAL PROCEEDING INVOLV-
13 ING A CRIMINAL CHARGE;
14   (D) THE APPLICANT IS PARTICIPATING OR PREVIOUSLY PARTICIPATED AS A
15 JUROR IN A CRIMINAL PROCEEDING, OR IS OR WAS A MEMBER OF A GRAND JURY; OR
16 OR
17   (E) THE APPLICANT IS A SPOUSE, DOMESTIC PARTNER OR HOUSEHOLD MEMBER OF
18 A PERSON IDENTIFIED IN THIS SUBPARAGRAPH OR SUBPARAGRAPH (II) OF THIS
19 PARAGRAPH, SPECIFYING WHICH SUBPARAGRAPH OR SUBPARAGRAPHS AND CLAUSES
20 APPLY.
21   (II) THE APPLICANT HAS REASON TO BELIEVE HIS OR HER LIFE OR SAFETY MAY
22 BE ENDANGERED BY DISCLOSURE DUE TO REASONS STATED BY THE APPLICANT.
23   (III) THE APPLICANT HAS REASON TO BELIEVE HE OR SHE MAY BE SUBJECT TO
24 UNWARRANTED HARASSMENT UPON DISCLOSURE OF SUCH INFORMATION.
25   (C) EACH FORM PROVIDED FOR RECERTIFICATION PURSUANT TO PARAGRAPH (B)
26 OF SUBDIVISION TEN OF THIS SECTION SHALL INCLUDE AN OPPORTUNITY FOR THE
27 APPLICANT TO REQUEST AN EXCEPTION FROM THE INFORMATION PROVIDED ON SUCH
28 FORM BECOMING PUBLIC RECORD PURSUANT TO PARAGRAPH (A) OF THIS SUBDIVI-
29 SION. SUCH FORMS SHALL NOTIFY APPLICANTS THAT, UPON DISCOVERY THAT AN
30 APPLICANT KNOWINGLY PROVIDED FALSE INFORMATION, SUCH APPLICANT MAY BE
31 SUBJECT TO PENALTIES PURSUANT TO SECTION 175.30 OF THIS CHAPTER, AND
32 FURTHER, THAT HIS OR HER REQUEST FOR AN EXCEPTION SHALL BE NULL AND
33 VOID, PROVIDED THAT WRITTEN NOTICE CONTAINING SUCH DETERMINATION IS
34 PROVIDED TO THE APPLICANT. FURTHER, SUCH FORMS SHALL PROVIDE EACH
35 APPLICANT AN OPPORTUNITY TO EITHER DECLINE TO REQUEST THE GRANT OR
36 CONTINUATION OF AN EXCEPTION, OR SPECIFY THE GROUNDS ON WHICH HE OR SHE
37 BELIEVES HIS OR HER INFORMATION SHOULD NOT BE PUBLICLY DISCLOSED. THESE
38 GROUNDS, WHICH SHALL BE IDENTIFIED IN THE APPLICATION WITH A BOX BESIDE
39 EACH FOR CHECKING, AS APPLICABLE, BY THE APPLICANT, SHALL BE THE SAME AS
40 PROVIDED IN PARAGRAPH (B) OF THIS SUBDIVISION.
41   (D) INFORMATION SUBMITTED ON THE FORMS DESCRIBED IN PARAGRAPH (B) OF
42 THIS SUBDIVISION SHALL BE EXCEPTED FROM DISCLOSURE AND MAINTAINED BY THE
43 ENTITY RETAINING SUCH INFORMATION SEPARATE AND APART FROM ALL OTHER
44 RECORDS.
45   (E) (I) UPON RECEIVING A REQUEST FOR EXCEPTION FROM DISCLOSURE, THE
46 LICENSING OFFICER SHALL GRANT SUCH EXCEPTION, UNLESS THE REQUEST IS
47 DETERMINED TO BE NULL AND VOID, PURSUANT TO PARAGRAPH (B) OR (C) OF THIS
48 SUBDIVISION.
49   (II) A REQUEST FOR AN EXCEPTION FROM DISCLOSURE MAY BE SUBMITTED AT
50 ANY TIME, INCLUDING AFTER A LICENSE OR RECERTIFICATION HAS BEEN GRANTED.
51   (III) IF AN EXCEPTION IS SOUGHT AND GRANTED PURSUANT TO PARAGRAPH (B)
52 OF THIS SUBDIVISION, THE APPLICATION INFORMATION SHALL NOT BE PUBLIC
53 RECORD, UNLESS THE REQUEST IS DETERMINED TO BE NULL AND VOID. IF AN
54 EXCEPTION IS SOUGHT AND GRANTED PURSUANT TO PARAGRAPH (C) OF THIS SUBDI-
55 VISION, THE INFORMATION CONCERNING SUCH RECERTIFICATION APPLICATION

1 SHALL NOT BE PUBLIC RECORD, UNLESS THE REQUEST IS DETERMINED TO BE  NULL
2 AND VOID.
3    (F) THE INFORMATION OF LICENSEES OR APPLICANTS FOR A LICENSE SHALL NOT
4 BE DISCLOSED TO THE PUBLIC DURING THE FIRST ONE HUNDRED TWENTY DAYS
5 FOLLOWING THE EFFECTIVE DATE OF THE CHAPTER OF THE LAWS OF TWO  THOUSAND
6 THIRTEEN, WHICH AMENDED THIS SECTION. AFTER SUCH PERIOD, THE INFORMA-
7 TION OF THOSE WHO HAD APPLIED FOR OR BEEN GRANTED A LICENSE PRIOR TO THE
8 PREPARATION OF THE FORM FOR REQUESTING AN EXCEPTION, PURSUANT  TO  PARA-
9 GRAPH  (B) OF THIS SUBDIVISION, MAY BE RELEASED ONLY IF SUCH INDIVIDUALS
10 DID NOT FILE A REQUEST FOR SUCH AN EXCEPTION DURING THE FIRST SIXTY DAYS
11 FOLLOWING SUCH PREPARATION; PROVIDED, HOWEVER, THAT NO  INFORMATION
12 CONTAINED  IN  AN  APPLICATION FOR LICENSURE OR RECERTIFICATION SHALL BE
13 DISCLOSED BY AN ENTITY  THAT  HAS  NOT  COMPLETED  PROCESSING  ANY  SUCH
14 REQUESTS RECEIVED DURING SUCH SIXTY DAYS.
15    (G)  IF  A  REQUEST FOR AN EXCEPTION IS DETERMINED TO BE NULL AND VOID
16 PURSUANT TO PARAGRAPH (B) OR (C) OF THIS SUBDIVISION, AN  APPLICANT  MAY
17 REQUEST  REVIEW  OF SUCH DETERMINATION PURSUANT TO ARTICLE SEVENTY-EIGHT
18 OF THE CIVIL PRACTICE LAWS AND RULES.  SUCH PROCEEDING MUST  COMMENCE
19 WITHIN  THIRTY  DAYS  AFTER SERVICE OF THE WRITTEN NOTICE CONTAINING THE
20 ADVERSE DETERMINATION. NOTICE OF THE RIGHT TO COMMENCE SUCH A  PETITION,
21 AND  THE  TIME  PERIOD  THEREFOR, SHALL BE INCLUDED IN THE NOTICE OF THE
22 DETERMINATION. DISCLOSURE FOLLOWING SUCH A PETITION SHALL  NOT  BE  MADE
23 PRIOR TO THE DISPOSITION OF SUCH REVIEW.
24    9. License: amendment. Elsewhere  than  in  the city of New York, a
25 person licensed to carry or possess a pistol or revolver may  apply  at
26 any  time  to  his  OR HER licensing officer for amendment of his OR HER
27 license to include one or more such weapons or to  cancel  weapons  held
28 under  license.  If  granted,  a  record of the amendment describing the
29 weapons involved shall be filed by the licensing officer in  the  execu-
30 tive department, division of state police, Albany. THE SUPERINTENDENT OF
31 STATE  POLICE  MAY AUTHORIZE THAT SUCH AMENDMENT BE COMPLETED AND TRANS-
32 MITTED TO THE STATE POLICE  IN  ELECTRONIC  FORM.  Notification  of  any
33 change  of residence shall be made in writing by any licensee within ten
34 days after such change occurs, and a record  of  such  change  shall  be
35 inscribed  by  such  licensee on the reverse side of his OR HER license.
36 Elsewhere than in the city of New York, and in the  counties  of  Nassau
37 and  Suffolk,  such notification shall be made to the executive depart-
38 ment, division of state police, Albany, and in the city of New  York  to
39 the police commissioner of that city, and in the county of Nassau to the
40 police  commissioner of that county, and in the county of Suffolk to the
41 licensing officer of that county, who shall, within ten days after  such
42 notification  shall be received by him OR HER, give notice in writing of
43 such change to the executive department, division of  state  police,  at
44 Albany.
45    10.  License:  expiration,  certification and renewal. (A) Any license
46 for gunsmith or dealer in firearms and, in the city of  New  York,  any
47 license  to  carry  or  possess a pistol or revolver, issued at any time
48 pursuant to this section or prior to the first  day  of  July,  nineteen
49 hundred  sixty-three  and not limited to expire on an earlier date fixed
50 in the license, shall expire not more than three years after the date of
51 issuance. In the counties of  Nassau,  Suffolk  and  Westchester,  any
52 license  to  carry  or  possess a pistol or revolver, issued at any time
53 pursuant to this section or prior to the first  day  of  July,  nineteen
54 hundred  sixty-three  and not limited to expire on an earlier date fixed
55 in the license, shall expire not more than five years after the date  of
56 issuance; however, in the county of Westchester, any such license shall

1  be certified prior to the first day of April, two thousand, in accord-
2  ance with a schedule to be contained in regulations promulgated by the
3  commissioner of the division of criminal justice services, and every
4  such license shall be recertified every five years thereafter. For
5  purposes of this section certification shall mean that the licensee
6  shall provide to the licensing officer the following information only:
7  current name, date of birth, current address, and the make, model, cali-
8  ber and serial number of all firearms currently possessed. Such certif-
9  ication information shall be filed by the licensing officer in the same
10 manner as an amendment. Elsewhere than in the city of New York and the
11 counties of Nassau, Suffolk and Westchester, any license to carry or
12 possess a pistol or revolver, issued at any time pursuant to this
13 section or prior to the first day of July, nineteen hundred sixty-three
14 and not previously revoked or cancelled, shall be in force and effect
15 until revoked as herein provided. Any license not previously cancelled
16 or revoked shall remain in full force and effect for thirty days beyond
17 the stated expiration date on such license. Any application to renew a
18 license that has not previously expired, been revoked or cancelled shall
19 thereby extend the term of the license until disposition of the applica-
20 tion by the licensing officer. In the case of a license for gunsmith or
21 dealer in firearms, in counties having a population of less than two
22 hundred thousand inhabitants, photographs and fingerprints shall be
23 submitted on original applications and upon renewal thereafter only at
24 six year intervals. Upon satisfactory proof that a currently valid
25 original license has been despoiled, lost or otherwise removed from the
26 possession of the licensee and upon application containing an additional
27 photograph of the licensee, the licensing officer shall issue a dupli-
28 cate license.
29   (B) ALL LICENSEES SHALL BE RECERTIFIED TO THE DIVISION OF STATE POLICE
30 EVERY FIVE YEARS THEREAFTER. ANY LICENSE ISSUED BEFORE THE EFFECTIVE
31 DATE OF THE CHAPTER OF THE LAWS OF TWO THOUSAND THIRTEEN WHICH ADDED
32 THIS PARAGRAPH SHALL BE RECERTIFIED BY THE LICENSEE ON OR BEFORE JANUARY
33 THIRTY-FIRST, TWO THOUSAND EIGHTEEN, AND NOT LESS THAN ONE YEAR PRIOR TO
34 SUCH DATE, THE STATE POLICE SHALL SEND A NOTICE TO ALL LICENSE HOLDERS
35 WHO HAVE NOT RECERTIFIED BY SUCH TIME. SUCH RECERTIFICATION SHALL BE IN
36 A FORM AS APPROVED BY THE SUPERINTENDENT OF STATE POLICE, WHICH SHALL
37 REQUEST THE LICENSE HOLDER'S NAME, DATE OF BIRTH, GENDER, RACE, RESIDEN-
38 TIAL ADDRESS, SOCIAL SECURITY NUMBER, FIREARMS POSSESSED BY SUCH LICENSE
39 HOLDER, EMAIL ADDRESS AT THE OPTION OF THE LICENSE HOLDER AND AN AFFIR-
40 MATION THAT SUCH LICENSE HOLDER IS NOT PROHIBITED FROM POSSESSING
41 FIREARMS. THE FORM MAY BE IN AN ELECTRONIC FORM IF SO DESIGNATED BY THE
42 SUPERINTENDENT OF STATE POLICE. FAILURE TO RECERTIFY SHALL ACT AS A
43 REVOCATION OF SUCH LICENSE. IF THE NEW YORK STATE POLICE DISCOVER AS A
44 RESULT OF THE RECERTIFICATION PROCESS THAT A LICENSEE FAILED TO PROVIDE
45 A CHANGE OF ADDRESS, THE NEW YORK STATE POLICE SHALL NOT REQUIRE THE
46 LICENSING OFFICER TO REVOKE SUCH LICENSE.
47   11. License: revocation and suspension. (A) The conviction of a licen-
48 see anywhere of a felony or serious offense OR A LICENSEE AT ANY TIME
49 BECOMING INELIGIBLE TO OBTAIN A LICENSE UNDER THIS SECTION shall operate
50 as a revocation of the license. A license may be revoked or suspended as
51 provided for in section 530.14 of the criminal procedure law or section
52 eight hundred forty-two-a of the family court act. Except for a license
53 issued pursuant to section 400.01 of this article, a license may be
54 revoked and cancelled at any time in the city of New York, and in the
55 counties of Nassau and Suffolk, by the licensing officer, and elsewhere
56 than in the city of New York by any judge or justice of a court of

1  record;  a license issued pursuant to section 400.01 of this article may
2  be revoked and cancelled at any time by the  licensing  officer  or  any
3  judge  or  justice of a court of record. The official revoking a license
4  shall give written notice thereof without unnecessary delay to the exec-
5  utive department, division of state police, Albany, and shall also noti-
6  fy immediately the duly constituted police authorities of the locality.
7     (B) WHENEVER THE DIRECTOR OF COMMUNITY SERVICES OR HIS OR HER DESIGNEE
8  MAKES  A  REPORT PURSUANT TO SECTION 9.46 OF THE MENTAL HYGIENE LAW, THE
9  DIVISION OF CRIMINAL JUSTICE SERVICES  SHALL  CONVEY  SUCH  INFORMATION,
10 WHENEVER  IT  DETERMINES THAT THE PERSON NAMED IN THE REPORT POSSESSES A
11 LICENSE ISSUED PURSUANT TO THIS SECTION, TO  THE  APPROPRIATE  LICENSING
12 OFFICIAL, WHO SHALL ISSUE AN ORDER SUSPENDING OR REVOKING SUCH LICENSE.
13    (C)  IN  ANY  INSTANCE  IN  WHICH  A  PERSON'S LICENSE IS SUSPENDED OR
14 REVOKED UNDER PARAGRAPH (A) OR (B)  OF  THIS  SUBDIVISION,  SUCH  PERSON
15 SHALL  SURRENDER  SUCH LICENSE TO THE APPROPRIATE LICENSING OFFICIAL AND
16 ANY AND ALL FIREARMS, RIFLES, OR SHOTGUNS OWNED  OR  POSSESSED  BY  SUCH
17 PERSON  SHALL BE SURRENDERED TO AN APPROPRIATE LAW ENFORCEMENT AGENCY AS
18 PROVIDED IN SUBPARAGRAPH (F)  OF  PARAGRAPH  ONE  OF  SUBDIVISION  A  OF
19 SECTION  265.20  OF  THIS  CHAPTER.  IN THE EVENT SUCH LICENSE, FIREARM,
20 SHOTGUN, OR RIFLE IS NOT SURRENDERED, SUCH ITEMS SHALL  BE  REMOVED  AND
21 DECLARED  A  NUISANCE  AND  ANY  POLICE  OFFICER OR PEACE OFFICER ACTING
22 PURSUANT TO HIS OR HER SPECIAL DUTIES IS AUTHORIZED TO  REMOVE  ANY  AND
23 ALL SUCH WEAPONS.
24    12.  Records required of gunsmiths and dealers in firearms. Any person
25 licensed as gunsmith or dealer in firearms  shall  keep  a  record  book
26 approved  as to form, except in the city of New York, by the superinten-
27 dent of state police. In the record book shall be entered at the time of
28 every transaction involving a firearm the date,  name,  age,  occupation
29 and residence of any person from whom a firearm is received or to whom a
30 firearm  is delivered, and the calibre, make, model, manufacturer's name
31 and serial number, or if none, any other distinguishing number or  iden-
32 tification  mark  on  such  firearm.  Before delivering a firearm to any
33 person, the licensee shall require him to produce either a license valid
34 under this section to carry or possess the  same,  or  proof  of  lawful
35 authority  as  an exempt person pursuant to section 265.20. In addition,
36 before delivering a firearm to a peace officer, the licensee shall veri-
37 fy that person's status as a peace officer with the  division  of  state
38 police.  After  completing  the foregoing, the licensee shall remove and
39 retain the attached coupon and enter in the record book the date of such
40 license, number, if any, and name of the licensing officer, in the  case
41 of  the  holder of a license to carry or possess, or the shield or other
42 number, if any, assignment and department, unit or agency, in  the  case
43 of an exempt person.  The original transaction report shall be forwarded
44 to  the division of state police within ten days of delivering a firearm
45 to any person, and a duplicate copy shall be kept by the  licensee.  THE
46 SUPERINTENDENT  OF  STATE POLICE MAY DESIGNATE THAT SUCH RECORD SHALL BE
47 COMPLETED AND TRANSMITTED IN ELECTRONIC FORM.  A DEALER MAY BE GRANTED A
48 WAIVER FROM TRANSMITTING SUCH RECORDS IN ELECTRONIC FORM IF  THE  SUPER-
49 INTENDENT  DETERMINES THAT SUCH DEALER IS INCAPABLE OF SUCH TRANSMISSION
50 DUE TO TECHNOLOGICAL LIMITATIONS THAT ARE  NOT  REASONABLY  WITHIN  THE
51 CONTROL  OF  THE DEALER, OR OTHER EXCEPTIONAL CIRCUMSTANCES DEMONSTRATED
52 BY THE DEALER, PURSUANT TO A PROCESS ESTABLISHED IN REGULATION,  AND  AT
53 THE DISCRETION OF THE SUPERINTENDENT. RECORDS ASSEMBLED OR COLLECTED FOR
54 PURPOSES OF INCLUSION IN THE DATABASE CREATED PURSUANT TO SECTION 400.02
55 OF  THIS  ARTICLE SHALL NOT BE SUBJECT TO DISCLOSURE PURSUANT TO ARTICLE
56 SIX OF THE PUBLIC OFFICERS LAW. The record book shall be  maintained  on

1  the premises mentioned and described in the license and shall be open at
2  all  reasonable hours for inspection by any peace officer, acting pursu-
3  ant to his special duties, or police officer. In the event of  cancella-
4  tion or revocation of the license for gunsmith or dealer in firearms, or
5  discontinuance  of  business  by  a  licensee, such record book shall be
6  immediately surrendered to the licensing officer  in  the  city  of  New
7  York,  and  in  the counties of Nassau and Suffolk, and elsewhere in the
8  state to the executive department, division of state police.
9    15. Any violation by any person of any provision of this section is  a
10 class A misdemeanor.
11   16-A.  REGISTRATION. (A) AN OWNER OF A WEAPON DEFINED IN PARAGRAPH (E)
12 OR (F) OF SUBDIVISION TWENTY-TWO OF SECTION  265.00  OF  THIS  CHAPTER,
13 POSSESSED  BEFORE  THE  DATE OF THE EFFECTIVE DATE OF THE CHAPTER OF THE
14 LAWS OF TWO THOUSAND THIRTEEN WHICH ADDED THIS PARAGRAPH, MUST  MAKE  AN
15 APPLICATION  TO  REGISTER  SUCH  WEAPON WITH THE SUPERINTENDENT OF STATE
16 POLICE, IN THE MANNER PROVIDED BY THE SUPERINTENDENT, OR BY  AMENDING  A
17 LICENSE ISSUED PURSUANT TO THIS SECTION WITHIN ONE YEAR OF THE EFFECTIVE
18 DATE  OF  THIS  SUBDIVISION EXCEPT ANY WEAPON DEFINED UNDER SUBPARAGRAPH
19 (VI) OF PARAGRAPH (G) OF SUBDIVISION TWENTY-TWO OF  SECTION  265.00  OF
20 THIS  CHAPTER  TRANSFERRED INTO THE STATE MAY BE REGISTERED AT ANY TIME,
21 PROVIDED SUCH WEAPONS ARE REGISTERED WITHIN THIRTY DAYS OF THEIR  TRANS-
22 FER  INTO  THE  STATE. REGISTRATION INFORMATION SHALL INCLUDE THE REGIS-
23 TRANT'S NAME, DATE OF BIRTH, GENDER, RACE, RESIDENTIAL  ADDRESS,  SOCIAL
24 SECURITY  NUMBER  AND  A  DESCRIPTION OF EACH WEAPON BEING REGISTERED. A
25 REGISTRATION OF ANY WEAPON DEFINED UNDER SUBPARAGRAPH (VI) OF  PARAGRAPH
26 (G)  OF  SUBDIVISION TWENTY-TWO OF SECTION 265.00 OR A FEEDING DEVICE AS
27 DEFINED UNDER SUBDIVISION TWENTY-THREE OF SECTION 265.00 OF THIS CHAPTER
28 SHALL BE TRANSFERABLE, PROVIDED  THAT  THE  SELLER  NOTIFIES  THE  STATE
29 POLICE  WITHIN  SEVENTY-TWO HOURS OF THE TRANSFER AND THE BUYER PROVIDES
30 THE STATE POLICE WITH INFORMATION SUFFICIENT TO CONSTITUTE A  REGISTRA-
31 TION  UNDER  THIS  SECTION. SUCH REGISTRATION SHALL NOT BE VALID IF SUCH
32 REGISTRANT IS PROHIBITED OR BECOMES PROHIBITED FROM POSSESSING A FIREARM
33 PURSUANT TO STATE OR FEDERAL LAW.  THE SUPERINTENDENT  SHALL  DETERMINE
34 WHETHER  SUCH  REGISTRANT  IS PROHIBITED FROM POSSESSING A FIREARM UNDER
35 STATE OR FEDERAL LAW.  SUCH CHECK SHALL BE LIMITED TO DETERMINING WHETH-
36 ER THE FACTORS IN 18 USC 922 (G) APPLY OR  WHETHER A REGISTRANT HAS BEEN
37 CONVICTED OF A SERIOUS OFFENSE AS DEFINED IN  SUBDIVISION  SIXTEEN-B  OF
38 SECTION  265.00  OF THIS CHAPTER, SO AS TO PROHIBIT SUCH REGISTRANT FROM
39 POSSESSING A FIREARM, AND WHETHER A REPORT HAS BEEN ISSUED  PURSUANT  TO
40 SECTION 9.46 OF THE MENTAL HYGIENE LAW.  ALL REGISTRANTS SHALL RECERTIFY
41 TO THE DIVISION OF STATE POLICE EVERY FIVE YEARS THEREAFTER.  FAILURE TO
42 RECERTIFY SHALL RESULT IN A REVOCATION OF SUCH REGISTRATION.
43   (B)  THE  SUPERINTENDENT  OF STATE POLICE SHALL CREATE AND MAINTAIN AN
44 INTERNET WEBSITE TO EDUCATE THE PUBLIC AS TO WHICH SEMIAUTOMATIC  RIFLE,
45 SEMIAUTOMATIC SHOTGUN OR SEMIAUTOMATIC PISTOL OR WEAPON THAT ARE ILLEGAL
46 AS  A RESULT OF THE ENACTMENT OF THE CHAPTER OF THE LAWS OF TWO THOUSAND
47 THIRTEEN WHICH ADDED THIS PARAGRAPH, AS WELL  AS  SUCH  ASSAULT  WEAPONS
48 WHICH  ARE  ILLEGAL  PURSUANT TO ARTICLE TWO HUNDRED SIXTY-FIVE OF THIS
49 CHAPTER. SUCH WEBSITE SHALL CONTAIN INFORMATION TO ASSIST THE PUBLIC  IN
50 RECOGNIZING THE RELEVANT FEATURES PROSCRIBED BY SUCH ARTICLE TWO HUNDRED
51 SIXTY-FIVE,  AS  WELL  AS  WHICH  MAKE AND MODEL OF WEAPONS THAT REQUIRE
52 REGISTRATION.
53   (C) A PERSON WHO KNOWINGLY FAILS TO APPLY TO REGISTER SUCH WEAPON,  AS
54 REQUIRED  BY  THIS SECTION, WITHIN ONE YEAR OF THE EFFECTIVE DATE OF THE
55 CHAPTER OF THE LAWS OF TWO THOUSAND THIRTEEN WHICH ADDED THIS  PARAGRAPH
56 SHALL BE GUILTY OF A CLASS A MISDEMEANOR AND SUCH PERSON WHO UNKNOWINGLY

```
 1  FAILS  TO VALIDLY REGISTER SUCH WEAPON WITHIN SUCH ONE YEAR PERIOD SHALL
 2  BE GIVEN A WARNING BY AN APPROPRIATE  LAW  ENFORCEMENT  AUTHORITY  ABOUT
 3  SUCH  FAILURE  AND  GIVEN THIRTY DAYS IN WHICH TO APPLY TO REGISTER SUCH
 4  WEAPON  OR  TO SURRENDER IT. A FAILURE TO APPLY OR SURRENDER SUCH WEAPON
 5  WITHIN SUCH THIRTY-DAY PERIOD SHALL RESULT IN SUCH WEAPON BEING  REMOVED
 6  BY AN APPROPRIATE LAW ENFORCEMENT AUTHORITY AND DECLARED A NUISANCE.
 7    16-B.  THE COST OF THE SOFTWARE, PROGRAMMING AND INTERFACE REQUIRED TO
 8  TRANSMIT ANY RECORD THAT MUST BE ELECTRONICALLY TRANSMITTED BY THE DEAL-
 9  ER OR LICENSING OFFICER TO THE DIVISION OF STATE POLICE PURSUANT TO THIS
10  CHAPTER SHALL BE BORNE BY THE STATE.
11    S 49. The penal law is amended by adding a new section 400.02 to  read
12  as follows:
13  S 400.02 STATEWIDE LICENSE AND RECORD DATABASE.
14    THERE  SHALL BE A STATEWIDE LICENSE AND RECORD DATABASE WHICH SHALL BE
15  CREATED AND MAINTAINED BY THE DIVISION OF STATE POLICE THE COST OF WHICH
16  SHALL NOT BE BORNE BY ANY MUNICIPALITY.  RECORDS ASSEMBLED OR  COLLECTED
17  FOR  PURPOSES  OF  INCLUSION  IN  SUCH  DATABASE SHALL NOT BE SUBJECT TO
18  DISCLOSURE PURSUANT TO ARTICLE SIX OF THE PUBLIC OFFICERS LAW.  RECORDS
19  CONTAINING GRANTED LICENSE APPLICATIONS SHALL BE PERIODICALLY CHECKED BY
20  THE  DIVISION  OF CRIMINAL JUSTICE SERVICES AGAINST CRIMINAL CONVICTION,
21  MENTAL HEALTH, AND ALL OTHER RECORDS AS ARE NECESSARY TO DETERMINE THEIR
22  CONTINUED ACCURACY AS WELL AS WHETHER  AN INDIVIDUAL  IS  NO  LONGER  A
23  VALID  LICENSE  HOLDER.  THE DIVISION OF CRIMINAL JUSTICE SERVICES SHALL
24  ALSO CHECK PENDING APPLICATIONS MADE PURSUANT TO  THIS  ARTICLE  AGAINST
25  SUCH  RECORDS  TO  DETERMINE WHETHER A LICENSE MAY BE GRANTED. ALL STATE
26  AGENCIES SHALL COOPERATE WITH THE DIVISION OF CRIMINAL JUSTICE SERVICES,
27  AS OTHERWISE AUTHORIZED BY LAW, IN MAKING THEIR RECORDS AVAILABLE  FOR
28  SUCH CHECKS. THE DIVISION OF CRIMINAL JUSTICE SERVICES, UPON DETERMINING
29  THAT AN INDIVIDUAL IS INELIGIBLE TO POSSESS A LICENSE, OR IS NO LONGER A
30  VALID  LICENSE HOLDER, SHALL NOTIFY THE APPLICABLE LICENSING OFFICIAL OF
31  SUCH DETERMINATION AND SUCH LICENSING OFFICIAL SHALL NOT ISSUE A LICENSE
32  OR REVOKE SUCH LICENSE AND ANY WEAPONS OWNED OR POSSESSED BY SUCH  INDI-
33  VIDUAL  SHALL  BE  REMOVED CONSISTENT WITH THE PROVISIONS OF SUBDIVISION
34  ELEVEN OF SECTION 400.00 OF THIS ARTICLE. LOCAL AND STATE  LAW  ENFORCE-
35  MENT SHALL HAVE ACCESS TO SUCH DATABASE, AS OTHERWISE AUTHORIZED BY LAW,
36  IN  THE  PERFORMANCE OF THEIR DUTIES. RECORDS ASSEMBLED OR COLLECTED FOR
37  PURPOSES OF INCLUSION IN THE DATABASE ESTABLISHED BY THIS SECTION  SHALL
38  BE RELEASED PURSUANT TO A COURT ORDER.
39    S  50. The penal law is amended by adding a new section 400.03 to read
40  as follows:
41  S 400.03 SELLERS OF AMMUNITION.
42    1. A SELLER OF AMMUNITION AS DEFINED  IN  SUBDIVISION  TWENTY-FOUR  OF
43  SECTION 265.00 OF THIS CHAPTER SHALL REGISTER WITH THE SUPERINTENDENT OF
44  STATE  POLICE IN A MANNER PROVIDED BY THE SUPERINTENDENT.  ANY DEALER IN
45  FIREARMS THAT IS VALIDLY LICENSED PURSUANT TO  SECTION  400.00  OF  THIS
46  ARTICLE SHALL NOT BE REQUIRED TO COMPLETE SUCH REGISTRATION.
47    2.  ANY SELLER OF AMMUNITION OR DEALER IN FIREARMS SHALL KEEP A RECORD
48  BOOK APPROVED AS TO FORM BY THE SUPERINTENDENT OF STATE POLICE.  IN  THE
49  RECORD  BOOK SHALL BE ENTERED AT THE TIME OF EVERY TRANSACTION INVOLVING
50  AMMUNITION THE DATE, NAME, AGE, OCCUPATION AND RESIDENCE OF  ANY  PERSON
51  FROM WHOM AMMUNITION IS RECEIVED OR TO WHOM AMMUNITION IS DELIVERED, AND
52  THE  AMOUNT, CALIBRE, MANUFACTURER'S NAME AND SERIAL NUMBER, OR IF NONE,
53  ANY OTHER DISTINGUISHING NUMBER OR IDENTIFICATION MARK ON  SUCH  AMMUNI-
54  TION.  THE RECORD BOOK SHALL BE MAINTAINED ON THE PREMISES MENTIONED AND
55  DESCRIBED  IN  THE LICENSE AND SHALL BE OPEN AT ALL REASONABLE HOURS FOR
56  INSPECTION BY ANY PEACE OFFICER, ACTING PURSUANT TO HIS OR  HER  SPECIAL
```

1  DUTIES, OR POLICE OFFICER.  ANY RECORD PRODUCED PURSUANT TO THIS SECTION
2  AND  ANY  TRANSMISSION  THEREOF  TO  ANY  GOVERNMENT AGENCY SHALL NOT BE
3  CONSIDERED A PUBLIC RECORD FOR PURPOSES OF ARTICLE  SIX  OF  THE  PUBLIC
4  OFFICERS LAW.
5    3.  NO  LATER  THAN  THIRTY DAYS AFTER THE SUPERINTENDENT OF THE STATE
6  POLICE CERTIFIES THAT THE STATEWIDE LICENSE AND RECORD DATABASE  ESTAB-
7  LISHED PURSUANT TO SECTION 400.02 OF THIS ARTICLE IS OPERATIONAL FOR THE
8  PURPOSES  OF  THIS  SECTION,  A  DEALER IN FIREARMS LICENSED PURSUANT TO
9  SECTION 400.00 OF THIS ARTICLE, A SELLER OF  AMMUNITION  AS  DEFINED  IN
10  SUBDIVISION  TWENTY-FOUR  OF  SECTION  265.00  OF THIS CHAPTER SHALL NOT
11  TRANSFER ANY AMMUNITION TO ANY OTHER PERSON  WHO  IS  NOT  A  DEALER  IN
12  FIREARMS  AS  DEFINED  IN  SUBDIVISION  NINE OF SUCH SECTION 265.00 OR A
13  SELLER OF AMMUNITION AS DEFINED IN SUBDIVISION  TWENTY-FOUR  OF  SECTION
14  265.00 OF THIS CHAPTER, UNLESS:
15    (A)  BEFORE  THE  COMPLETION  OF  THE TRANSFER, THE LICENSEE OR SELLER
16  CONTACTS THE STATEWIDE LICENSE AND  RECORD  DATABASE  AND  PROVIDES  THE
17  DATABASE  WITH INFORMATION SUFFICIENT TO IDENTIFY SUCH DEALER OR SELLER,
18  TRANSFEREE BASED ON INFORMATION ON THE TRANSFEREE'S IDENTIFICATION DOCU-
19  MENT AS DEFINED IN PARAGRAPH (C) OF THIS SUBDIVISION,  AS  WELL  AS  THE
20  AMOUNT,  CALIBRE, MANUFACTURER'S NAME AND SERIAL NUMBER, IF ANY, OF SUCH
21  AMMUNITION;
22    (B) THE SYSTEM PROVIDES THE LICENSEE OR SELLER WITH A UNIQUE IDENTIFI-
23  CATION NUMBER; AND
24    (C) THE TRANSFEROR HAS VERIFIED THE  IDENTITY  OF  THE  TRANSFEREE  BY
25  EXAMINING A VALID STATE IDENTIFICATION DOCUMENT OF THE TRANSFEREE ISSUED
26  BY  THE DEPARTMENT OF MOTOR VEHICLES OR IF THE TRANSFEREE IS NOT A RESI-
27  DENT OF THE STATE OF NEW YORK, A VALID IDENTIFICATION DOCUMENT ISSUED BY
28  THE TRANSFEREE'S STATE OR COUNTRY OF RESIDENCE CONTAINING  A  PHOTOGRAPH
29  OF THE TRANSFEREE.
30    4.  IF  THE  DATABASE  DETERMINES  THAT THE PURCHASER OF AMMUNITION IS
31  ELIGIBLE TO POSSESS AMMUNITION PURSUANT TO STATE AND FEDERAL  LAWS,  THE
32  SYSTEM SHALL:
33    (A) ASSIGN A UNIQUE IDENTIFICATION NUMBER TO THE TRANSFER; AND
34    (B) PROVIDE THE LICENSEE OR SELLER WITH THE NUMBER.
35    5.  IF THE STATEWIDE LICENSE AND RECORD DATABASE NOTIFIES THE LICENSEE
36  OR SELLER THAT THE INFORMATION AVAILABLE TO THE DATABASE DOES NOT DEMON-
37  STRATE THAT THE RECEIPT OF AMMUNITION BY SUCH OTHER PERSON WOULD VIOLATE
38  18 U.S.C. 922(G) OR STATE LAW, AND THE LICENSEE TRANSFERS AMMUNITION  TO
39  SUCH OTHER PERSON, THE LICENSEE SHALL INDICATE TO THE DATABASE THAT SUCH
40  TRANSACTION  HAS  BEEN  COMPLETED AT WHICH POINT A RECORD OF SUCH TRANS-
41  ACTION SHALL BE CREATED WHICH SHALL BE ACCESSIBLE  BY  THE  DIVISION  OF
42  STATE  POLICE  AND  MAINTAINED FOR NO LONGER THAN ONE YEAR FROM POINT OF
43  PURCHASE, WHICH SHALL NOT BE INCORPORATED INTO THE DATABASE  ESTABLISHED
44  PURSUANT  TO  SECTION 400.02 OF THIS ARTICLE OR THE REGISTRY ESTABLISHED
45  PURSUANT TO SUBDIVISION SIXTEEN-A OF SECTION 400.00 OF THIS ARTICLE. THE
46  DIVISION OF STATE POLICE MAY SHARE SUCH INFORMATION  WITH  A  LOCAL  LAW
47  ENFORCEMENT  AGENCY.  EVIDENCE  OF  THE  PURCHASE OF AMMUNITION IS NOT
48  SUFFICIENT TO ESTABLISH PROBABLE CAUSE TO BELIEVE THAT THE PURCHASER HAS
49  COMMITTED A CRIME ABSENT OTHER INFORMATION TENDING TO PROVE THE  COMMIS-
50  SION  OF A CRIME. RECORDS ASSEMBLED OR ACCESSED PURSUANT TO THIS SECTION
51  SHALL NOT BE SUBJECT TO DISCLOSURE PURSUANT TO ARTICLE SIX OF THE PUBLIC
52  OFFICERS LAW. THIS REQUIREMENT OF THIS SECTION SHALL NOT APPLY (I) IF  A
53  BACKGROUND  CHECK  CANNOT  BE COMPLETED BECAUSE THE SYSTEM IS NOT OPERA-
54  TIONAL AS DETERMINED BY THE SUPERINTENDENT OF STATE POLICE, OR WHERE  IT
55  CANNOT  BE ACCESSED BY THE PRACTITIONER DUE TO A TEMPORARY TECHNOLOGICAL
56  OR ELECTRICAL FAILURE, AS SET FORTH IN REGULATION, OR (II) A  DEALER  OR

S. 2230                                36                                A. 2388

1  SELLER  HAS  BEEN  GRANTED A WAIVER FROM CONDUCTING SUCH BACKGROUND CHECK
2  IF THE SUPERINTENDENT OF STATE POLICE DETERMINES  THAT  SUCH  DEALER  IS
3  INCAPABLE  OF  SUCH  CHECK DUE TO TECHNOLOGICAL LIMITATIONS THAT ARE NOT
4  REASONABLY  WITHIN  THE  CONTROL  OF  THE  DEALER,  OR OTHER EXCEPTIONAL
5  CIRCUMSTANCES DEMONSTRATED BY THE DEALER, PURSUANT TO A  PROCESS  ESTAB-
6  LISHED IN REGULATION, AND AT THE DISCRETION OF SUCH SUPERINTENDENT.
7    6.  IF  THE  SUPERINTENDENT  OF STATE POLICE CERTIFIES THAT BACKGROUND
8  CHECKS OF AMMUNITION PURCHASERS MAY BE CONDUCTED  THROUGH  THE  NATIONAL
9  INSTANT CRIMINAL BACKGROUND CHECK SYSTEM, USE OF THAT SYSTEM BY A DEALER
10 OR  SELLER  SHALL BE SUFFICIENT TO SATISFY SUBDIVISIONS FOUR AND FIVE OF
11 THIS SECTION AND SUCH CHECKS SHALL BE  CONDUCTED  THROUGH  SUCH  SYSTEM,
12 PROVIDED  THAT  A RECORD  OF SUCH TRANSACTION SHALL BE FORWARDED TO THE
13 STATE POLICE IN A FORM DETERMINED BY THE SUPERINTENDENT.
14   7. NO COMMERCIAL TRANSFER OF AMMUNITION  SHALL  TAKE  PLACE  UNLESS  A
15 LICENSED  DEALER  IN FIREARMS OR REGISTERED SELLER OF AMMUNITION ACTS AS
16 AN INTERMEDIARY BETWEEN THE TRANSFEROR AND THE  ULTIMATE  TRANSFEREE  OF
17 THE  AMMUNITION FOR THE PURPOSES OF CONTACTING THE STATEWIDE LICENSE AND
18 RECORD DATABASE PURSUANT TO THIS SECTION.  SUCH  TRANSFER  BETWEEN  THE
19 DEALER OR SELLER, AND TRANSFEREE MUST OCCUR IN PERSON.
20   8.  A  SELLER  OF  AMMUNITION  WHO  FAILS TO REGISTER PURSUANT TO THIS
21 SECTION AND SELLS AMMUNITION, FOR A FIRST OFFENSE, SHALL BE GUILTY OF  A
22 VIOLATION  AND  SUBJECT  TO  THE  FINE OF ONE THOUSAND DOLLARS AND FOR A
23 SECOND OFFENSE, SHALL BE GUILTY OF A CLASS A MISDEMEANOR.
24   A SELLER OF AMMUNITION THAT FAILS TO KEEP ANY RECORD REQUIRED PURSUANT
25 TO THIS SECTION, FOR A FIRST OFFENSE SHALL BE GUILTY OF A VIOLATION  AND
26 SUBJECT  TO  A  FINE  OF  FIVE HUNDRED DOLLARS, AND FOR A SECOND OFFENSE
27 SHALL BE GUILTY OF A CLASS B MISDEMEANOR, AND THE REGISTRATION  OF  SUCH
28 SELLER SHALL BE REVOKED.
29   S  51. Section 400.10 of the penal law, as added by chapter 531 of the
30 laws of 1984, and subdivision 1 as amended and subdivision 3 as added by
31 chapter 189 of the laws of 2000, is amended to read as follows:
32 S 400.10 Report of theft or loss of a firearm, rifle or shotgun.
33   1. (a) Any owner or other person lawfully  in  possession  of:  (I)  a
34 firearm, rifle or, shotgun who suffers the loss or theft of said weapon;
35 (II)  AMMUNITION  AS WELL AS A FIREARM, RIFLE OR SHOTGUN WHO SUFFERS THE
36 LOSS OR THEFT OF SUCH AMMUNITION AS WELL AS A FIREARM, RIFLE OR SHOTGUN;
37 OR (III) AMMUNITION AND IS A DEALER IN FIREARMS OR SELLER OF  AMMUNITION
38 WHO  SUFFERS  THE  LOSS OR THEFT OF SUCH AMMUNITION shall within twenty-
39 four hours of the discovery of the loss or theft report  the  facts  and
40 circumstances  of  the loss or theft to a police department or sheriff's
41 office.
42   (b) Whenever a person reports the theft or loss of  a  firearm,  rifle
43 [or],  shotgun OR AMMUNITION to any police department or sheriff's
44 office, the officer or department receiving such  report  shall  forward
45 notice of such theft or loss to the division of state police via the New
46 York  Statewide  Police  Information  Network.  The notice shall contain
47 information in compliance with the New York Statewide Police Information
48 Network Operating Manual, including the caliber, make,  model,  manufac-
49 turer's  name  and  serial  number, if any, and any other distinguishing
50 number or identification mark on the weapon.
51   2. The division of state police shall receive, collect  and  file  the
52 information referred to in subdivision one of this section. The division
53 shall  cooperate,  and  undertake  to  furnish  or make available to law
54 enforcement agencies this information, for the purpose  of  coordinating
55 law enforcement efforts to locate such weapons.

```
 1    3.  Notwithstanding  any  other provision of law, a violation of para-
 2  graph (a) of subdivision one of this section shall be [punishable  only
 3  by a fine not to exceed one hundred dollars] A CLASS A MISDEMEANOR.
 4    S  52. The penal law is amended by adding a new section 460.22 to read
 5  as follows:
 6  S 460.22 AGGRAVATED ENTERPRISE CORRUPTION.
 7    A PERSON IS GUILTY OF AGGRAVATED ENTERPRISE CORRUPTION WHEN HE OR  SHE
 8  COMMITS  THE  CRIME OF ENTERPRISE CORRUPTION AND TWO OR MORE OF THE ACTS
 9  THAT CONSTITUTE HIS OR HER PATTERN OF  CRIMINAL  ACTIVITY  ARE  CLASS  B
10  FELONIES  OR HIGHER, AND AT LEAST TWO ACTS ARE ARMED FELONIES AS DEFINED
11  IN PARAGRAPH (A) OF SUBDIVISION FORTY-ONE OF SECTION 1.20 OF THE  CRIMI-
12  NAL  PROCEDURE  LAW  OR ONE ACT IS SUCH AN ARMED FELONY AND ONE ACT IS A
13  VIOLATION OF SUBDIVISION TWO OF SECTION 265.17 OF THIS  CHAPTER  OR  ONE
14  ACT  IS  A  CLASS B VIOLENT FELONY AND TWO ARE VIOLATIONS OF SUBDIVISION
15  TWO OF SECTION 265.17 OF THIS CHAPTER.
16    AGGRAVATED ENTERPRISE CORRUPTION IS A CLASS A-I FELONY.
17    S 53. The surrogate's court procedure act is amended by adding  a  new
18  section 2509 to read as follows:
19  S 2509. FIREARMS INVENTORY
20    WHENEVER,  BY  REGULATION, RULE OR STATUTE, A FIDUCIARY OR ATTORNEY OF
21  RECORD MUST FILE A LIST OF ASSETS CONSTITUTING A DECEDENT'S ESTATE, SUCH
22  LIST MUST INCLUDE A PARTICULARIZED DESCRIPTION OF EVERY FIREARM, SHOTGUN
23  AND RIFLE, AS SUCH TERMS ARE DEFINED IN SECTION 265.00 OF THE PENAL LAW,
24  THAT ARE PART OF SUCH ESTATE. SUCH LIST MUST BE FILED  WITH  THE  SURRO-
25  GATE'S  COURT  IN  THE COUNTY IN WHICH THE ESTATE PROCEEDING, IF ANY, IS
26  PENDING AND A COPY MUST BE FILED WITH THE DIVISION OF  CRIMINAL  JUSTICE
27  SERVICES.
28    S  54.  Section  18  of  chapter 408 of the laws of 1999, constituting
29  Kendra's Law, as amended by chapter 139 of the laws of 2010, is  amended
30  to read as follows:
31    S  18.  This  act shall take effect immediately, provided that section
32  fifteen of this act shall take effect April 1, 2000, provided,  further,
33  that  subdivision (e) of section 9.60 of the mental hygiene law as added
34  by section six of this act shall be effective 90 days  after  this  act
35  shall  become  law; and that this act shall expire and be deemed repealed
36  June 30, [2015] 2017.
37    S 55. The education law is amended by adding a new section  2801-b  to
38  read as follows:
39    S  2801-B. NEW YORK STATE SCHOOL SAFETY IMPROVEMENT TEAMS.  THE GOVER-
40  NOR SHALL ESTABLISH NEW YORK  STATE  SCHOOL  SAFETY  IMPROVEMENT  TEAMS,
41  WHICH  MAY  BE COMPOSED OF REPRESENTATIVES FROM THE DIVISION OF HOMELAND
42  SECURITY AND EMERGENCY SERVICES, THE DIVISION OF STATE POLICE, THE DIVI-
43  SION OF CRIMINAL JUSTICE SERVICES, AND THE  DEPARTMENT.  SUCH  NEW  YORK
44  STATE  SCHOOL  SAFETY  IMPROVEMENT  TEAMS SHALL REVIEW AND ASSESS SCHOOL
45  SAFETY PLANS SUBMITTED, ON A VOLUNTARY BASIS, BY SCHOOL DISTRICTS HAVING
46  A POPULATION OF LESS THAN ONE HUNDRED TWENTY-FIVE THOUSAND  INHABITANTS,
47  BOARDS OF COOPERATIVE EDUCATIONAL SERVICES, AND COUNTY VOCATIONAL EDUCA-
48  TION  AND EXTENSION BOARDS, AND MAY MAKE RECOMMENDATIONS TO IMPROVE SUCH
49  SCHOOL SAFETY PLANS.
50    S 56. Subdivision 6-c of section 3602 of the education law, as amended
51  by section 1 of part A-2 of chapter 62 of the laws of 2003,  is  amended
52  to read as follows:
53    6-c. A. Building aid for metal detectors, and safety devices for elec-
54  trically  operated  partitions,  room dividers and doors. In addition to
55  the apportionments payable to a school district pursuant to  subdivision
56  six  of this section, the commissioner is hereby authorized to apportion
```

1  to any school district additional building aid pursuant to this subdivi-
2  sion for its approved expenditures in the base year for the purchase  of
3  stationary  metal  detectors, security cameras, safety devices for elec-
4  trically  operated  partitions  and  room  dividers required pursuant to
5  section four hundred nine-f of this chapter, or other  security  devices
6  approved  by  the  commissioner that increase the safety of students and
7  school personnel, provided, however, that funds apportioned  to  school
8  districts pursuant to this section shall not supplant funds for existing
9  district  expenditures  or  for  existing contractual obligations of the
10 district for stationary metal detectors, security cameras, partition and
11 room divider safety devices, or security devices.  Portable or hand held
12 metal detectors shall not be eligible for aid pursuant to this  subdivi-
13 sion.  Such  additional  aid shall equal the product of the building aid
14 ratio computed for use in the current year pursuant to  paragraph  c  of
15 subdivision  six  of  this  section and the actual approved expenditures
16 incurred in the base year pursuant to this  subdivision,  provided  that
17 the limitations on cost allowances prescribed by paragraph a of subdivi-
18 sion six of this section shall not apply. The commissioner shall  annual-
19 ly  prescribe a special cost allowance for metal detectors, and security
20 cameras, and the approved expenditures shall not exceed such cost allow-
21 ance. The commissioner shall annually prescribe a special cost allowance
22 for partition and room divider safety devices, and the approved expendi-
23 tures shall not exceed such cost allowance.
24    B. FOR PROJECTS APPROVED BY THE  COMMISSIONER  AUTHORIZED  TO  RECEIVE
25 ADDITIONAL BUILDING AID PURSUANT TO THIS SUBDIVISION FOR THE PURCHASE OF
26 STATIONARY  METAL  DETECTORS, SECURITY CAMERAS OR OTHER SECURITY DEVICES
27 APPROVED BY THE COMMISSIONER THAT INCREASE THE SAFETY  OF  STUDENTS  AND
28 SCHOOL  PERSONNEL,  PROVIDED  THAT  FOR  PURPOSES OF THIS PARAGRAPH SUCH
29 OTHER SECURITY DEVICES SHALL BE LIMITED TO ELECTRONIC  SECURITY  SYSTEMS
30 AND  HARDENED  DOORS,  AND  PROVIDED  THAT  FOR PROJECTS APPROVED BY THE
31 COMMISSIONER ON OR AFTER THE FIRST DAY OF JULY TWO THOUSAND THIRTEEN AND
32 BEFORE THE FIRST DAY OF JULY TWO THOUSAND SIXTEEN  SUCH  ADDITIONAL  AID
33 SHALL  EQUAL  THE PRODUCT OF (I) THE BUILDING AID RATIO COMPUTED FOR USE
34 IN THE CURRENT YEAR PURSUANT TO PARAGRAPH C OF SUBDIVISION SIX  OF  THIS
35 SECTION  PLUS  TEN  PERCENTAGE POINTS, EXCEPT THAT IN NO CASE SHALL THIS
36 AMOUNT EXCEED ONE HUNDRED PERCENT, AND (II) THE ACTUAL APPROVED EXPENDI-
37 TURES INCURRED IN THE BASE YEAR PURSUANT TO THIS  SUBDIVISION,  PROVIDED
38 THAT  THE  LIMITATIONS  ON  COST ALLOWANCES PRESCRIBED BY PARAGRAPH A OF
39 SUBDIVISION SIX OF THIS SECTION SHALL NOT APPLY,  AND  PROVIDED  FURTHER
40 THAT  ANY  PROJECTS  AIDED  UNDER  THIS  PARAGRAPH MUST BE INCLUDED IN A
41 DISTRICT'S SCHOOL SAFETY PLAN. THE COMMISSIONER SHALL ANNUALLY PRESCRIBE
42 A SPECIAL COST ALLOWANCE FOR METAL DETECTORS, AND SECURITY CAMERAS,  AND
43 THE APPROVED EXPENDITURES SHALL NOT EXCEED SUCH COST ALLOWANCE.
44    S 57.  Severability.  If  any clause, sentence, paragraph, section or
45 part of this act shall be adjudged by any court of  competent  jurisdic-
46 tion  to be invalid and after exhaustion of all further judicial review,
47 the judgment shall not affect, impair or invalidate the remainder there-
48 of, but shall be confined in its  operation  to  the  clause,  sentence,
49 paragraph,  section or part of this act directly involved in the contro-
50 versy in which the judgment shall have been rendered.
51    S 58. This act shall take effect immediately; provided, however, that:
52    a. Sections one, two, three, four, five, six, seven, eight, nine, ten,
53 eleven, twelve, thirteen, fourteen, fifteen, sixteen,  seventeen,  eigh-
54 teen,  nineteen,  twenty,  twenty-one, twenty-two, twenty-three, twenty-
55 four, twenty-five, twenty-six, twenty-six-a, twenty-seven, twenty-eight,
56 twenty-nine, thirty, thirty-one, thirty-two, thirty-three,  thirty-four,

```
 1 thirty-five,  thirty-six,  thirty-nine,  forty,  forty-one, forty-one-a,
 2 forty-one-b, forty-two, forty-three, forty-five, forty-six, forty-six-a,
 3 forty-seven, fifty-one, fifty-two, fifty-three, fifty-four,  fifty-five,
 4 and fifty-six of this act shall take effect on the sixtieth day after it
 5 shall have become a law;
 6    b. The amendments to subdivision 23 of section 265.00 of the penal law
 7 made  by section thirty-eight of this act shall take effect on the nine-
 8 tieth day after this act shall have become a law, except that the amend-
 9 ments made to paragraph (a) of subdivision 23 shall  take  effect  imme-
10 diately;
11    c.  The  amendments  to subdivision 1, paragraph (a) of subdivision 3,
12 and subdivisions 4, 9, 10, 11, 12, 15, and 16-b of section 400.00 of the
13 penal law made by section forty-eight of this act shall take effect  one
14 year after this act shall have become a law;
15    d.  The  amendments to subdivision 16-a of section 400.00 of the penal
16 law made by section forty-eight of this act shall  take  effect  on  the
17 ninetieth day after this act shall have become a law;
18    e.  The amendments to sections 400.02 and 400.03 of the penal law made
19 by sections forty-nine and fifty of this act shall take effect one  year
20 after it shall have become a law; and
21    f. The amendments to subdivision (b) of section 9.47 and sections 9.48
22 and  9.60 of the mental hygiene law made by sections twenty-one, twenty-
23 two and twenty-three of this act shall not  affect  the  expiration  and
24 repeal of such paragraph and sections and shall be deemed repealed ther-
25 ewith.
```

# Exhibit 89

# Chapter 427

### (Senate Bill 281)

AN ACT concerning

### Firearm Safety Act of 2013

FOR the purpose of *establishing a certain exception to the prohibition against carrying a deadly weapon on public school property; making it a misdemeanor to possess or use certain firearm ammunition during and in relation to the commission of a certain crime of violence;* altering the authorization for a person to wear, carry, or transport a handgun to be within certain limitations; designating certain firearms as assault weapons; prohibiting, with certain exceptions, a person from transporting an assault weapon into the State or possessing, selling, offering to sell, transferring, purchasing, or receiving an assault weapon; ~~authorizing certain licensed firearms dealers to continue to possess, sell, offer for sale, or transfer assault long guns or copycat weapons~~ providing that certain prohibitions relating to certain assault weapons and detachable magazines do not apply to certain persons under certain circumstances; authorizing a person to transport certain assault weapons under certain circumstances; authorizing certain persons to continue to possess assault long guns or copycat weapons under certain circumstances; ~~providing that certain registration requirements for certain assault weapons do not apply under certain circumstances;~~ altering the maximum capacity of rounds of ammunition allowable to be manufactured, sold, offered for sale, purchased, received, or transferred for a firearm*, with certain exceptions*; making it a misdemeanor to use an assault long gun or a copycat weapon or a magazine that exceeds a certain maximum capacity of rounds of ammunition in the commission of a felony or a crime of violence; requiring a certain hearing officer, after making a certain determination, to order certain individuals to surrender ~~or consign~~ firearms in the individual's possession under certain circumstances; prohibiting an individual, while hunting for any wild bird or mammal, from shooting or discharging a firearm within a certain distance of a public or nonpublic school during certain times; *repealing certain duties of the Police Training Commission relating to a certain firearms safety training course;* requiring the Secretary of State Police to disapprove an application for a State–regulated firearms dealer's license if the Secretary determines that the applicant intends a certain person to participate or hold a certain interest in the management or operation of the business for which the license is sought; ~~requiring that~~ *requiring the Secretary to include certain information in a certain notice if a State–regulated firearms dealer's license application is denied; authorizing* the Secretary *to* suspend a dealer's license if the licensee is not in compliance with certain record keeping and reporting requirements; *authorizing the Secretary to lift a certain license suspension under certain circumstances;* prohibiting a certain person from

selling, purchasing, renting, transferring, or receiving a certain regulated firearm unless the person presents or possesses a certain handgun qualification license issued by the Secretary ~~of State Police~~ <u>or certain credentials or identification;</u> <u>providing for certain exceptions to the requirement to present and possess a certain handgun qualification license under certain circumstances;</u> establishing certain requirements and procedures for the issuance and renewal of a certain handgun qualification license; authorizing the Secretary to revoke a certain handgun qualification license under certain circumstances; requiring a certain person to return a certain handgun qualification license under certain circumstances; <u>establishing certain requirements and procedures for the issuance of a replacement handgun qualification license under certain circumstances;</u> requiring certain fees; requiring a certain licensee or designated law enforcement agency to transfer a certain firearm application to the Secretary in an electronic format; authorizing a certain hearing for a certain aggrieved person under certain circumstances; <u>altering the information required in a certain statement for a certain firearm application;</u> altering the circumstances under which a person is prohibited from possessing a certain regulated firearm; making it a misdemeanor for a certain person to possess certain ammunition if the person is prohibited from possessing a certain firearm under certain circumstances; establishing certain penalties; requiring certain persons to provide certain data about a certain person to a certain federal index in a certain manner under certain circumstances; authorizing a certain person who is subject to certain prohibitions from possessing certain firearms to apply for certain relief from certain prohibitions under certain circumstances; establishing the procedures and requirements for a person who is subject to certain prohibitions on the possession of certain firearms to apply for certain relief for certain prohibitions; ~~requiring certain persons to enter into a certain memorandum of understanding~~ <u>*authorizing the Secretary of Health and Mental Hygiene to adopt certain regulations; providing that certain individuals may not be held criminally or civilly liable for certain actions*</u>; requiring a person who moves into the State for the purpose of establishing residency to register certain firearms within a certain time period with the Secretary in a certain manner; <u>requiring that a licensed dealer keep records of all receipts, sales, and other dispositions of firearms affected in connection with the licensed dealer's business; requiring the Secretary to adopt certain regulations specifying certain information; requiring that the records that licensed dealers maintain include certain information; specifying certain record keeping requirements to be met when a firearms business is discontinued; requiring that a licensee respond in a certain way after receipt of a request from the Secretary for certain information; authorizing the Secretary to implement a system by which a certain person may request certain information; requiring the Secretary to inspect the inventory and records of a licensed dealer under certain circumstances; authorizing the Secretary to conduct a certain inspection during a certain time;</u> <u>*requiring certain persons who sell or transfer regulated firearms to notify certain purchasers or recipients at the time of purchase or transfer that the purchaser or*</u>

MARTIN O'MALLEY, Governor                                                  Ch. 427

*recipient is required to report a lost or stolen regulated firearm to a certain law enforcement agency; requiring the owner of a regulated firearm to report the loss or theft of the regulated firearm to a certain law enforcement agency within a certain period of time after the owner discovers the loss or theft; requiring a law enforcement agency on receipt of a report of a lost or stolen regulated firearm to enter certain information into a certain database;* providing that certain information is not open to public inspection; prohibiting a certain person from possessing a rifle or shotgun under certain circumstances; repealing a provision of law that prohibits a certain person from possessing a rifle or shotgun unless the person possesses a certain physician's certificate; requiring a certain applicant for a certain firearm permit to complete a certain firearm training course under certain circumstances; exempting a certain applicant for a permit from a certain training requirement under certain circumstances; authorizing the Secretary to issue a certain handgun qualification license without an additional application or fee under certain circumstances; *prohibiting public inspection of the records of certain regulated firearm dealers, owners, or permit holders; authorizing the individual named in the record and the individual's attorney to view certain records; providing that this Act does not prohibit the Department of Public Safety and Correctional Services and the Department of State Police from accessing certain records in the performance of official duties;* defining certain terms; *requiring the Department of State Police to make certain investigations and to report its findings to the Governor and the General Assembly on or before a certain date; providing for the termination of certain provisions of this Act;* and generally relating to firearms.

*BY adding to*
    *Article – Criminal Law*
    *Section 4–110*
    *Annotated Code of Maryland*
    *(2012 Replacement Volume and 2012 Supplement)*

BY repealing and reenacting, with amendments,
    Article – Criminal Law
    Section *4–102*, 4–203(b), and 4–301 through 4–306 to be under the amended subtitle "Subtitle 3. Assault Weapons and Detachable Magazines"
    Annotated Code of Maryland
    (2012 Replacement Volume and 2012 Supplement)

BY adding to
    Article – Health – General
    Section 10–632(g)
    Annotated Code of Maryland
    (2009 Replacement Volume and 2012 Supplement)

BY repealing and reenacting, with amendments,
    Article – Natural Resources

Ch. 427                                2013 LAWS OF MARYLAND

Section 10–410(g)
Annotated Code of Maryland
(2012 Replacement Volume)

BY repealing and reenacting, with amendments,
        Article – Public Safety
        Section *3–208,* 5–101, 5–110(a) *and (b),* 5–114(a), 5–115, 5–118(b)(2) and (3),
            5–120, 5–133, 5–143, 5–205, 5–206, 5–301, and 5–306
        Annotated Code of Maryland
        (2011 Replacement Volume and 2012 Supplement)

BY adding to
        Article – Public Safety
        Section 5–117.1, 5–118(b)(4), 5–133.1, 5–133.2, 5–133.3, ~~and 5–143~~ 5–143, *and*
            *5–145, and 5–146*
        Annotated Code of Maryland
        (2011 Replacement Volume and 2012 Supplement)

BY repealing
        Article – Public Safety
        Section 5–119
        Annotated Code of Maryland
        (2011 Replacement Volume and 2012 Supplement)

*BY repealing and reenacting, without amendments,*
        *Article – State Government*
        *Section 10–616(a)*
        *Annotated Code of Maryland*
        *(2009 Replacement Volume and 2012 Supplement)*

*BY adding to*
        *Article – State Government*
        *Section 10–616(v)*
        *Annotated Code of Maryland*
        *(2009 Replacement Volume and 2012 Supplement)*

SECTION 1. BE IT ENACTED BY THE GENERAL ASSEMBLY OF MARYLAND, That the Laws of Maryland read as follows:

**Article – Criminal Law**

*4–102.*

        *(a)     This section does not apply to:*

                *(1)     a law enforcement officer in the regular course of the officer's duty;*

– 4 –

MARTIN O'MALLEY, Governor                    Ch. 427

*(2)      AN OFF–DUTY LAW ENFORCEMENT OFFICER WHO IS A PARENT, GUARDIAN, OR VISITOR OF A STUDENT ATTENDING A SCHOOL LOCATED ON THE PUBLIC SCHOOL PROPERTY, PROVIDED THAT:*

*(I)      THE OFFICER IS DISPLAYING THE OFFICER'S BADGE OR CREDENTIAL; AND*

*(II)      THE WEAPON CARRIED OR POSSESSED BY THE OFFICER IS CONCEALED;*

*[(2)] (3)      a person hired by a county board of education specifically for the purpose of guarding public school property;*

*[(3)] (4)      a person engaged in organized shooting activity for educational purposes; or*

*[(4)] (5)      a person who, with a written invitation from the school principal, displays or engages in a historical demonstration using a weapon or a replica of a weapon for educational purposes.*

*(b)      A person may not carry or possess a firearm, knife, or deadly weapon of any kind on public school property.*

*(c)      (1)      Except as provided in paragraph (2) of this subsection, a person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.*

*(2)      A person who is convicted of carrying or possessing a handgun in violation of this section shall be sentenced under Subtitle 2 of this title.*

*4–110.*

*(A)      IN THIS SECTION, "RESTRICTED FIREARM AMMUNITION" MEANS A CARTRIDGE, A SHELL, OR ANY OTHER DEVICE THAT:*

*(1)      CONTAINS EXPLOSIVE OR INCENDIARY MATERIAL DESIGNED AND INTENDED FOR USE IN A FIREARM; AND*

*(2)      HAS A CORE CONSTRUCTED, EXCLUDING TRACES OF OTHER SUBSTANCES, ENTIRELY FROM ONE OR A COMBINATION OF:*

*(I)      TUNGSTEN ALLOYS;*

*(II)      STEEL;*

     *(III)*   *IRON;*

     *(IV)*   *BRASS;*

     *(V)*   *BERYLLIUM COPPER;*

     *(VI)*   *DEPLETED URANIUM; OR*

     *(VII)*   *AN EQUIVALENT MATERIAL OF SIMILAR DENSITY OR HARDNESS.*

     *(B)*   *A PERSON MAY NOT, DURING AND IN RELATION TO THE COMMISSION OF A CRIME OF VIOLENCE AS DEFINED IN § 14–101 OF THIS ARTICLE, POSSESS OR USE RESTRICTED FIREARM AMMUNITION.*

     *(C)*   *A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 5 YEARS OR A FINE NOT EXCEEDING $5,000 OR BOTH.*

4–203.

     (b)   This section does not prohibit:

     (1)   the wearing, carrying, or transporting of a handgun by a person who [is on active assignment engaged in law enforcement,] is authorized at the time and under the circumstances to wear, carry, or transport the handgun as part of the person's official equipment, and is:

     (i)   a law enforcement official of the United States, the State, or a county or city of the State;

     (ii)   a member of the armed forces of the United States or of the National Guard on duty or traveling to or from duty;

     (iii)   a law enforcement official of another state or subdivision of another state temporarily in this State on official business;

     (iv)   a correctional officer or warden of a correctional facility in the State;

     (v)   a sheriff or full–time assistant or deputy sheriff of the State; or

     (vi)   a temporary or part–time sheriff's deputy;

(2)     the wearing, carrying, or transporting of a handgun**, IN COMPLIANCE WITH ANY LIMITATIONS IMPOSED UNDER § 5–307 OF THE PUBLIC SAFETY ARTICLE,** by a person to whom a permit to wear, carry, or transport the handgun has been issued under Title 5, Subtitle 3 of the Public Safety Article;

(3)     the carrying of a handgun on the person or in a vehicle while the person is transporting the handgun to or from the place of legal purchase or sale, or to or from a bona fide repair shop, or between bona fide residences of the person, or between the bona fide residence and place of business of the person, if the business is operated and owned substantially by the person if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(4)     the wearing, carrying, or transporting by a person of a handgun used in connection with an organized military activity, a target shoot, formal or informal target practice, sport shooting event, hunting, a Department of Natural Resources–sponsored firearms and hunter safety class, trapping, or a dog obedience training class or show, while the person is engaged in, on the way to, or returning from that activity if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(5)     the moving by a bona fide gun collector of part or all of the collector's gun collection from place to place for public or private exhibition if each handgun is unloaded and carried in an enclosed case or an enclosed holster;

(6)     the wearing, carrying, or transporting of a handgun by a person on real estate that the person owns or leases or where the person resides or within the confines of a business establishment that the person owns or leases;

(7)     the wearing, carrying, or transporting of a handgun by a supervisory employee:

(i)      in the course of employment;

(ii)     within the confines of the business establishment in which the supervisory employee is employed; and

(iii)    when so authorized by the owner or manager of the business establishment;

(8)     the carrying or transporting of a signal pistol or other visual distress signal approved by the United States Coast Guard in a vessel on the waterways of the State or, if the signal pistol or other visual distress signal is unloaded and carried in an enclosed case, in a vehicle; or

(9)     the wearing, carrying, or transporting of a handgun by a person who is carrying a court order requiring the surrender of the handgun, if:

(i)     the handgun is unloaded;

(ii)    the person has notified the law enforcement unit, barracks, or station that the handgun is being transported in accordance with the court order; and

(iii)   the person transports the handgun directly to the law enforcement unit, barracks, or station.

Subtitle 3.  Assault [Pistols] **WEAPONS** and Detachable Magazines.

4–301.

(A)     IN THIS SUBTITLE THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.

(B)     "ASSAULT LONG GUN" MEANS ANY ASSAULT WEAPON LISTED UNDER § 5–101(R)(2) OF THE PUBLIC SAFETY ARTICLE.

(C)     [In this subtitle, "assault] "ASSAULT pistol" means any of the following firearms [or a copy regardless of the producer or manufacturer]:

(1)     AA Arms AP–9 semiautomatic pistol;

(2)     Bushmaster semiautomatic pistol;

(3)     Claridge HI–TEC semiautomatic pistol;

(4)     D Max Industries semiautomatic pistol;

(5)     Encom MK–IV, MP–9, or MP–45 semiautomatic pistol;

(6)     Heckler and Koch semiautomatic SP–89 pistol;

(7)     Holmes MP–83 semiautomatic pistol;

(8)     Ingram MAC 10/11 semiautomatic pistol and variations including the Partisan Avenger and the SWD Cobray;

(9)     Intratec TEC–9/DC–9 semiautomatic pistol in any centerfire variation;

Case 3:17-cv-01017-BEN-LB Document 18-9 Filed 06/05/17 PageID 3654 Page 135 of
472
Case 3:13-cv-05351-WHA Document 39-3 Filed 01/16/14 Page 854 of 223

MARTIN O'MALLEY, Governor                                    Ch. 427

    (10)    P.A.W.S. type semiautomatic pistol;

    (11)    Skorpion semiautomatic pistol;

    (12)    Spectre double action semiautomatic pistol (Sile, F.I.E., Mitchell);

    (13)    UZI semiautomatic pistol;

    (14)    Weaver Arms semiautomatic Nighthawk pistol; or

    (15)    Wilkinson semiautomatic "Linda" pistol.

**(D)    "ASSAULT WEAPON" MEANS:**

    **(1)    AN ASSAULT LONG GUN;**

    **(2)    AN ASSAULT PISTOL; OR**

    **(3)    A COPYCAT WEAPON.**

**(E)    (1)    "COPYCAT WEAPON" MEANS:**

    **(I)    A SEMIAUTOMATIC CENTERFIRE RIFLE THAT CAN ACCEPT A DETACHABLE MAGAZINE AND HAS ANY <u>TWO</u> OF THE FOLLOWING:**

    **1.    ~~A PISTOL GRIP THAT PROTRUDES CONSPICUOUSLY BENEATH THE ACTION OF THE WEAPON;~~**

    **~~2.~~    ~~A THUMBHOLE STOCK;~~**

    **~~3.~~    A FOLDING ~~OR TELESCOPING~~ STOCK;**

    **~~4.~~ ~~3.~~ *2.* A GRENADE LAUNCHER OR FLARE LAUNCHER; *OR***

    **~~5.~~ ~~4.~~ *3.* A FLASH SUPPRESSOR; ~~OR~~**

    **~~6.~~ ~~5.~~    ~~A FORWARD PISTOL GRIP;~~**

    **(II)    A SEMIAUTOMATIC CENTERFIRE RIFLE THAT HAS A FIXED MAGAZINE WITH THE CAPACITY TO ACCEPT MORE THAN 10 ROUNDS;**

    **(III)    A SEMIAUTOMATIC CENTERFIRE RIFLE THAT HAS AN OVERALL LENGTH OF LESS THAN ~~30~~ *29* INCHES;**

~~(IV)   A   SEMIAUTOMATIC   PISTOL   THAT   CAN   ACCEPT   A DETACHABLE MAGAZINE AND HAS ANY~~ TWO OF THE FOLLOWING:

~~1.   A THREADED BARREL, CAPABLE OF ACCEPTING A FLASH SUPPRESSOR, FORWARD HANDGRIP, OR SILENCER;~~

~~2.   A SECOND HANDGRIP;~~

~~3.   A   SHROUD   THAT   IS   ATTACHED   TO   OR   THAT PARTIALLY OR COMPLETELY ENCIRCLES THE BARREL, EXCEPT FOR A SLIDE THAT ENCLOSES THE BARREL, AND THAT ALLOWS THE BEARER TO FIRE THE WEAPON WITHOUT BURNING THE BEARER'S HAND; OR~~

~~4.   THE   CAPACITY   TO   ACCEPT   A   DETACHABLE MAGAZINE OUTSIDE THE PISTOL GRIP;~~

~~(V)~~ *(IV)*   A   SEMIAUTOMATIC   PISTOL   WITH   A   FIXED MAGAZINE THAT CAN ACCEPT MORE THAN 10 ROUNDS;

~~(VI)~~ *(V)*   A SEMIAUTOMATIC SHOTGUN THAT HAS~~:~~

~~1.~~   A FOLDING ~~OR TELESCOPING~~ STOCK; ~~AND~~

~~2.   A   PISTOL   GRIP   THAT   PROTRUDES CONSPICUOUSLY BENEATH THE ACTION OF THE WEAPON, THUMBHOLE STOCK, OR VERTICAL HANDGRIP;~~ OR

~~(VII)~~ *(VI)*   A SHOTGUN WITH A REVOLVING CYLINDER.

(2)   "COPYCAT WEAPON" DOES NOT INCLUDE AN ASSAULT LONG GUN OR AN ASSAULT PISTOL.

(F)   "DETACHABLE MAGAZINE" MEANS AN AMMUNITION FEEDING DEVICE THAT CAN BE REMOVED READILY FROM A FIREARM WITHOUT REQUIRING DISASSEMBLY OF THE FIREARM ACTION OR WITHOUT THE USE OF A TOOL, INCLUDING A BULLET OR CARTRIDGE.

(G)   "FLASH SUPPRESSOR" MEANS A DEVICE THAT FUNCTIONS, OR IS INTENDED TO FUNCTION, TO PERCEPTIBLY REDUCE OR REDIRECT MUZZLE FLASH FROM THE SHOOTER'S FIELD OF VISION.

~~(H)   "FORWARD   PISTOL   GRIP"   MEANS   A   GRIP   THAT   ALLOWS   FOR   A PISTOL-STYLE GRASP FORWARD OF THE TRIGGER.~~

MARTIN O'MALLEY, Governor                    Ch. 427

~~(I)~~ *(H)*    "LICENSED FIREARMS DEALER" MEANS A PERSON WHO HOLDS A DEALER'S LICENSE UNDER TITLE 5, SUBTITLE 1 OF THE PUBLIC SAFETY ARTICLE.

~~(J)    "PISTOL GRIP THAT PROTRUDES CONSPICUOUSLY BENEATH THE ACTION OF THE WEAPON" MEANS A GRIP THAT ALLOWS FOR A PISTOL-STYLE GRASP IN WHICH THE WEB OF THE TRIGGER HAND BETWEEN THE THUMB AND INDEX FINGER CAN BE PLACED BELOW THE TOP OF THE EXPOSED PORTION OF THE TRIGGER WHILE FIRING.~~

~~(K)    "THUMBHOLE STOCK" MEANS A STOCK WITH A HOLE THAT ALLOWS THE THUMB OF THE TRIGGER HAND TO PENETRATE INTO OR THROUGH THE STOCK WHILE FIRING.~~

4–302.

This subtitle does not apply to:

(1)    if acting within the scope of official business, personnel of the United States government or a unit of that government, members of the armed forces of the United States or of the National Guard, ***MEMBERS OF THE MARYLAND DEFENSE FORCE,*** ~~or~~ law enforcement personnel of the State or a local unit in the State**, OR A RAILROAD POLICE OFFICER AUTHORIZED UNDER TITLE 3 OF THE PUBLIC SAFETY ARTICLE OR 49 U.S.C. § 28101**;

(2)    a firearm modified to render it permanently inoperative;

(3)    **POSSESSION,** *IMPORTATION,* **MANUFACTURE, RECEIPT FOR MANUFACTURE, SHIPMENT FOR MANUFACTURE,** *STORAGE,* purchases, sales, and transport to or by a licensed firearms dealer or manufacturer who is:

(i)    providing or servicing an assault [pistol] WEAPON or detachable magazine for a law enforcement unit or for personnel exempted under item (1) of this section; ~~or~~

(ii)    acting to sell or transfer an assault [pistol] WEAPON or detachable magazine to a licensed firearm dealer in another state ***OR TO AN INDIVIDUAL PURCHASER IN ANOTHER STATE THROUGH A LICENSED FIREARMS DEALER***; **OR**

**(III)    ACTING TO RETURN TO A CUSTOMER IN ANOTHER STATE AN ASSAULT WEAPON TRANSFERRED TO THE LICENSED FIREARMS DEALER OR MANUFACTURER UNDER THE TERMS OF A WARRANTY OR FOR REPAIR;**

(4)    organizations that are required or authorized by federal law governing their specific business or activity to maintain assault **[**pistols**] WEAPONS** and applicable ammunition and detachable magazines;

(5)    the receipt of an assault **[**pistol**] WEAPON** or detachable magazine by inheritance*, AND POSSESSION OF THE INHERITED ASSAULT WEAPON OR DETACHABLE MAGAZINE,* if the decedent lawfully possessed the assault **[**pistol**] WEAPON *OR DETACHABLE MAGAZINE AND THE PERSON INHERITING THE ASSAULT WEAPON OR DETACHABLE MAGAZINE IS NOT OTHERWISE DISQUALIFIED FROM POSSESSING A REGULATED FIREARM*; ~~or~~

(6)    the receipt of an assault **[**pistol**] WEAPON** or detachable magazine by a personal representative of an estate for purposes of exercising the powers and duties of a personal representative of an estate**; ~~OR~~**

**(7)    POSSESSION BY A PERSON WHO IS RETIRED IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE STATE OR A LOCAL UNIT IN THE STATE AND IS NOT OTHERWISE PROHIBITED FROM RECEIVING AN ASSAULT WEAPON OR DETACHABLE MAGAZINE IF:**

**(I)    THE ASSAULT WEAPON OR DETACHABLE MAGAZINE IS SOLD OR TRANSFERRED TO THE PERSON BY THE LAW ENFORCEMENT AGENCY ON RETIREMENT; OR**

**(II)    THE ASSAULT WEAPON OR DETACHABLE MAGAZINE WAS PURCHASED OR OBTAINED BY THE PERSON FOR OFFICIAL USE WITH THE LAW ENFORCEMENT AGENCY BEFORE RETIREMENT; ~~OR~~**

**(8)    POSSESSION OR TRANSPORT BY AN EMPLOYEE OF AN ARMORED CAR COMPANY IF THE INDIVIDUAL IS ACTING WITHIN THE SCOPE OF EMPLOYMENT AND HAS A PERMIT ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE*; OR***

***(9)    POSSESSION, RECEIPT, AND TESTING BY, OR SHIPPING TO OR FROM:***

***(I)    AN ISO 17025 ACCREDITED, NATIONAL INSTITUTE OF JUSTICE–APPROVED BALLISTICS TESTING LABORATORY; OR***

***(II)    A FACILITY OR ENTITY THAT MANUFACTURES OR PROVIDES RESEARCH AND DEVELOPMENT TESTING, ANALYSIS, OR ENGINEERING FOR PERSONAL PROTECTIVE EQUIPMENT OR VEHICLE PROTECTION SYSTEMS***.

4–303.

(a)      Except as provided in subsection (b) of this section, a person may not:

(1)      transport an assault [pistol] **WEAPON** into the State; or

(2)      possess, sell, offer to sell, transfer, purchase, or receive an assault [pistol] **WEAPON**.

(b)      **(1)**      A person who lawfully possessed an assault pistol before June 1, 1994, and who registered the assault pistol with the Secretary of State Police before August 1, 1994, may:

[(1)]   **(I)**      continue to possess **AND TRANSPORT** the assault pistol; or

[(2)]   **(II)**      while carrying a court order requiring the surrender of the assault pistol, transport the assault pistol directly to the law enforcement unit, barracks, or station if the person has notified the law enforcement unit, barracks, or station that the person is transporting the assault pistol in accordance with a court order and the assault pistol is unloaded.

**(2)**      *A LICENSED FIREARMS DEALER MAY CONTINUE TO POSSESS, SELL, OFFER FOR SALE, OR TRANSFER AN ASSAULT LONG GUN OR A COPYCAT WEAPON THAT THE LICENSED FIREARMS DEALER LAWFULLY POSSESSED ON OR BEFORE OCTOBER 1, 2013.*

~~*(3)*~~      ~~*A LICENSED FIREARMS DEALER MAY CONTINUE TO POSSESS, SELL, OFFER FOR SALE, OR TRANSFER AN ASSAULT LONG GUN OR A COPYCAT WEAPON THAT THE LICENSED FIREARMS DEALER LAWFULLY POSSESSED ON OR BEFORE OCTOBER 1, 2013.*~~

**(3)**      ~~**(1)**~~      **A PERSON WHO LAWFULLY POSSESSED** ~~*OR PLACED A VERIFIABLE PURCHASE ORDER FOR,*~~ *HAS A PURCHASE ORDER FOR, OR COMPLETED AN APPLICATION TO PURCHASE* **AN ASSAULT LONG GUN OR A COPYCAT WEAPON BEFORE OCTOBER 1, 2013,** ~~**AND WHO REGISTERS THE ASSAULT LONG GUN OR COPYCAT WEAPON WITH THE SECRETARY OF STATE POLICE BEFORE NOVEMBER 1, 2013**~~ **JANUARY 1, 2014, MAY:**

~~**(I)**~~      ~~**1.**~~ *(I)*      ~~**CONTINUE TO**~~ **POSSESS** **AND TRANSPORT** **THE ASSAULT LONG GUN OR COPYCAT WEAPON; OR**

~~**(II)**~~      ~~**2.**~~ *(II)*      **WHILE CARRYING A COURT ORDER REQUIRING THE SURRENDER OF THE ASSAULT LONG GUN OR COPYCAT WEAPON,**

TRANSPORT THE ASSAULT LONG GUN OR COPYCAT WEAPON DIRECTLY TO THE LAW ENFORCEMENT UNIT, BARRACKS, OR STATION IF THE PERSON HAS NOTIFIED THE LAW ENFORCEMENT UNIT, BARRACKS, OR STATION THAT THE PERSON IS TRANSPORTING THE ASSAULT LONG GUN OR COPYCAT WEAPON IN ACCORDANCE WITH A COURT ORDER AND THE ASSAULT LONG GUN OR COPYCAT WEAPON IS UNLOADED.

~~(II)   A PERSON WHO PURCHASED AN ASSAULT LONG GUN BEFORE OCTOBER 1, 2013, AND REGISTERED THE ASSAULT LONG GUN WITH THE SECRETARY OF STATE POLICE IS NOT REQUIRED TO REREGISTER THE ASSAULT LONG GUN UNDER THIS SUBSECTION.~~

~~(3)   (I)   SUBJECT TO PARAGRAPH (4) OF THIS SUBSECTION, A PERSON WHO LAWFULLY POSSESSED AN ASSAULT LONG GUN OR A COPYCAT WEAPON BEFORE OCTOBER 1, 2013, AND WHO VOLUNTARILY REGISTERS THE ASSAULT LONG GUN OR COPYCAT WEAPON ON OR AFTER NOVEMBER 1, 2013 JANUARY 1, 2014, IS NOT SUBJECT TO THE PENALTIES IN § 4–306 OF THIS SUBTITLE.~~

~~(II)   A PERSON WHO VOLUNTARILY REGISTERS AN ASSAULT LONG GUN OR A COPYCAT WEAPON AS DESCRIBED IN SUBPARAGRAPH (I) OF THIS PARAGRAPH IS SUBJECT TO A CIVIL PENALTY NOT EXCEEDING $1,000:~~

~~1.   BEFORE MAY 1, 2014, A CIVIL PENALTY NOT EXCEEDING $290 PER REGISTERED FIREARM;~~

~~2.   ON OR AFTER MAY 1, 2014 AND BEFORE NOVEMBER 1, 2015, A CIVIL PENALTY NOT EXCEEDING $580 PER REGISTERED FIREARM; AND~~

~~3.   ON OR AFTER NOVEMBER 1, 2015 AND BEFORE MAY 1, 2016, A CIVIL PENALTY NOT EXCEEDING $1,000 PER REGISTERED FIREARM.~~

~~(4)   (I)   A PERSON WHO LAWFULLY POSSESSED AN ASSAULT LONG GUN OR A COPYCAT WEAPON BEFORE OCTOBER 1, 2013, AND WHO REGISTERS THE ASSAULT LONG GUN OR COPYCAT WEAPON ON OR AFTER NOVEMBER 1, 2013 JANUARY 1, 2014, ONLY AFTER BEING DISCOVERED IN POSSESSION OF THE ASSAULT LONG GUN OR COPYCAT WEAPON BY A LAW ENFORCEMENT OFFICER IS NOT SUBJECT TO THE PENALTIES IN § 4–306 OF THIS SUBTITLE.~~

MARTIN O'MALLEY, Governor                    Ch. 427

~~(II)    A PERSON DESCRIBED IN SUBPARAGRAPH (I) OF THIS PARAGRAPH IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 18 MONTHS 1 YEAR FOR EACH INCIDENT IN WHICH THE PERSON IS DISCOVERED WITH UNREGISTERED FIREARMS.~~

*(4)    A PERSON MAY TRANSPORT AN ASSAULT WEAPON TO OR FROM:*

*(I)    AN ISO 17025 ACCREDITED, NATIONAL INSTITUTE OF JUSTICE–APPROVED BALLISTICS TESTING LABORATORY; OR*

*(II)    A FACILITY OR ENTITY THAT MANUFACTURES OR PROVIDES RESEARCH AND DEVELOPMENT TESTING, ANALYSIS, OR ENGINEERING FOR PERSONAL PROTECTIVE EQUIPMENT OR VEHICLE PROTECTION SYSTEMS.*

4–304.

A law enforcement unit may seize as contraband and dispose of according to regulation an assault **[**pistol**] WEAPON** transported, sold, transferred, purchased, received, or possessed in violation of this subtitle.

4–305.

(a)    This section does not apply to**:**

*(1)*    a .22 caliber rifle with a tubular magazine**; OR**

*(2)    A LAW ENFORCEMENT OFFICER OR A PERSON WHO RETIRED IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE UNITED STATES, THE STATE, OR ANY LAW ENFORCEMENT AGENCY IN THE STATE*.

(b)    A person may not manufacture, sell, offer for sale, purchase, receive, or transfer a detachable magazine that has a capacity of more than **[**20**] 10** rounds of ammunition for a firearm.

4–306.

(a)    ~~A~~ **EXCEPT AS OTHERWISE PROVIDED IN THIS SUBTITLE, A** person who violates this subtitle is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $5,000 or both.

(b)    (1)    A person who uses an assault **[**pistol**] WEAPON**, or a magazine that has a capacity of more than **[**20**] 10** rounds of ammunition, in the commission of a

felony or a crime of violence as defined in § 5–101 of the Public Safety Article is guilty of a misdemeanor and on conviction, in addition to any other sentence imposed for the felony or crime of violence, shall be sentenced under this subsection.

(2)      (i)      For a first violation, the person shall be sentenced to imprisonment for not less than 5 years and not exceeding 20 years.

(ii)      The court may not impose less than the minimum sentence of 5 years.

(iii)      The mandatory minimum sentence of 5 years may not be suspended.

(iv)      Except as otherwise provided in § 4–305 of the Correctional Services Article, the person is not eligible for parole in less than 5 years.

(3)      (i)      For each subsequent violation, the person shall be sentenced to imprisonment for not less than 10 years and not exceeding 20 years.

(ii)      The court may not impose less than the minimum sentence of 10 years.

(iii)      A sentence imposed under this paragraph shall be consecutive to and not concurrent with any other sentence imposed for the felony or crime of violence.

## Article – Health – General

10–632.

(G)      IF A HEARING OFFICER ENTERS AN ORDER FOR INVOLUNTARY ~~ADMISSION~~ *COMMITMENT* UNDER PART III OF THIS SUBTITLE AND THE HEARING OFFICER DETERMINES THAT THE INDIVIDUAL CANNOT SAFELY POSSESS A FIREARM BASED ON CREDIBLE EVIDENCE OF DANGEROUSNESS TO OTHERS, THE HEARING OFFICER SHALL ORDER THE INDIVIDUAL WHO IS SUBJECT TO THE INVOLUNTARY ~~ADMISSION~~ *COMMITMENT* TO:

(1)      ~~(I)~~      SURRENDER TO LAW ENFORCEMENT AUTHORITIES ANY FIREARMS IN THE INDIVIDUAL'S POSSESSION~~; OR~~

~~(II)      TEMPORARILY CONSIGN ANY FIREARMS IN THE INDIVIDUAL'S POSSESSION TO A LICENSED DEALER FOR STORAGE OR CONSIGNMENT~~; AND

**(2)** R**EFRAIN FROM POSSESSING A FIREARM UNLESS THE INDIVIDUAL IS GRANTED RELIEF FROM FIREARMS DISQUALIFICATION IN ACCORDANCE WITH § 5–133.3 OF THE PUBLIC SAFETY ARTICLE.**

## Article – Natural Resources

<u>10–410.</u>

<u>(g)</u>      <u>(1)</u>      <u>Except as provided in</u> **[**paragraph (2)**] PARAGRAPHS (2) AND (3)** <u>of this subsection, a person, other than the owner or occupant, while hunting for any wild bird or mammal may not shoot or discharge any firearm or other deadly weapon within 150 yards, known as the "safety zone," of a dwelling house, residence, church, or other building or camp occupied by human beings, or shoot at any wild bird or mammal while it is within this area, without the specific advance permission of the owner or occupant.</u>

**(2)      A PERSON, WHILE HUNTING FOR ANY WILD BIRD OR MAMMAL, MAY NOT SHOOT OR DISCHARGE ANY FIREARM WITHIN 300 YARDS OF A PUBLIC OR NONPUBLIC SCHOOL DURING SCHOOL HOURS OR AT A TIME WHEN A SCHOOL–APPROVED ACTIVITY IS TAKING PLACE.**

**[**<u>(2)</u>**] (3)**      <u>For archery hunters in Carroll County or Frederick County, the safety zone described in paragraph (1) of this subsection extends for 50 yards from a dwelling house, residence, church, or any other building or camp occupied by human beings.</u>

**[**<u>(3)</u>**] (4)**      <u>During any open hunting season, a person, other than the owner or occupant, may not hunt or chase willfully any wild bird or mammal within the safety zone without the specific advance permission of the owner or occupant.</u>

## Article – Public Safety

<u>*3–208.*</u>

**[**<u>*(a)*</u>**]**      <u>*Subject to the authority of the Secretary, the Commission has the following powers and duties:*</u>

<u>*(1)      to adopt regulations necessary or appropriate to carry out this subtitle; and*</u>

<u>*(2)      to adopt regulations that establish and enforce standards for prior substance abuse by individuals applying for certification as a police officer.*</u>

**[**<u>*(b)*</u>      <u>*Subject to subsections (c) and (d) of this section, the Commission shall adopt regulations on or before January 1, 2001, for a certified firearms safety training*</u>

Ch. 427                          2013 LAWS OF MARYLAND

*course required for an applicant for a regulated firearms purchase, rental, or transfer made on or after January 1, 2002.*

*(c)      The certified firearms safety training course required under subsection (b) of this section shall:*

*(1)      be offered by the Commission; or*

*(2)      contain a handgun safety component and be conducted by an individual or organization certified by:*

*(i)      the Commission;*

*(ii)      the Department of Natural Resources;*

*(iii)      the Department of State Police; or*

*(iv)      any reputable organization:*

*1.      that has as one of its objectives the promotion of competency and safety in handling handguns; and*

*2.      whose course has been determined by the Commission to meet the regulations adopted by the Commission.*

*(d)      Any course offered by the Commission under subsection (c) of this section:*

*(1)      shall be offered free of charge or fee;*

*(2)      may not be more than 2 hours in duration;*

*(3)      shall be conducted or offered at least once each week in all geographic areas of the State;*

*(4)      shall be available after regular business hours;*

*(5)      shall be open to each individual required by law to complete the firearms safety training course, within 2 weeks after request of the individual;*

*(6)      shall only require attendance throughout the duration of the course in order to complete the course successfully; and*

*(7)      may not require any skills or knowledge testing in the use of a regulated firearm in order to complete the course successfully.*]

5–101.

(a)      In this subtitle the following words have the meanings indicated.

(b)      "Antique firearm" has the meaning stated in § 4–201 of the Criminal Law Article.

*(B–1) (1)      "CONVICTED OF A DISQUALIFYING CRIME" INCLUDES:*

*(I)      A CASE IN WHICH A PERSON RECEIVED PROBATION BEFORE JUDGMENT FOR A CRIME OF VIOLENCE; AND*

*(II)      A CASE IN WHICH A PERSON RECEIVED PROBATION BEFORE JUDGMENT IN A DOMESTICALLY RELATED CRIME AS DEFINED IN § 6–233 OF THE CRIMINAL PROCEDURE ARTICLE.*

*(2)      "CONVICTED OF A DISQUALIFYING CRIME" DOES NOT INCLUDE A CASE IN WHICH A PERSON RECEIVED A PROBATION BEFORE JUDGMENT:*

*(I)      FOR ASSAULT IN THE SECOND DEGREE; OR*

*(II)      THAT WAS EXPUNGED UNDER TITLE 10, SUBTITLE 1 OF THE CRIMINAL PROCEDURE ARTICLE.*

(c)      "Crime of violence" means:

(1)      abduction;

(2)      arson in the first degree;

(3)      assault in the first or second degree;

(4)      burglary in the first, second, or third degree;

(5)      carjacking and armed carjacking;

(6)      escape in the first degree;

(7)      kidnapping;

(8)      voluntary manslaughter;

(9)      maiming as previously proscribed under former Article 27, § 386 of the Code;

(10)    mayhem as previously proscribed under former Article 27, § 384 of the Code;

(11)    murder in the first or second degree;

(12)    rape in the first or second degree;

(13)    robbery;

(14)    robbery with a dangerous weapon;

(15)    sexual offense in the first, second, or third degree;

(16)    an attempt to commit any of the crimes listed in items (1) through (15) of this subsection; or

(17)    assault with intent to commit any of the crimes listed in items (1) through (15) of this subsection or a crime punishable by imprisonment for more than 1 year.

(d)    "Dealer" means a person who is engaged in the business of:

(1)    selling, renting, or transferring firearms at wholesale or retail; or

(2)    repairing firearms.

(e)    "Dealer's license" means a State regulated firearms dealer's license.

(f)    "Designated law enforcement agency" means a law enforcement agency that the Secretary designates to process applications to purchase regulated firearms for secondary sales.

(g)    "Disqualifying crime" means:

(1)    a crime of violence;

(2)    a violation classified as a felony in the State; or

(3)    a violation classified as a misdemeanor in the State that carries a statutory penalty of more than 2 years.

(h)    (1)    "Firearm" means:

(i)    a weapon that expels, is designed to expel, or may readily be converted to expel a projectile by the action of an explosive; or

(ii)     the frame or receiver of such a weapon.

(2)     "Firearm" includes a starter gun.

(i)     "Firearm applicant" means a person who makes a firearm application.

(j)     "Firearm application" means an application to purchase, rent, or transfer a regulated firearm.

(k)     "Fugitive from justice" means a person who has fled to avoid prosecution or giving testimony in a criminal proceeding.

(l)     "Habitual drunkard" means a person who has been found guilty of any three crimes under § 21–902(a), (b), or (c) of the Transportation Article, one of which occurred in the past year.

(m)     "Habitual user" means a person who has been found guilty of two controlled dangerous substance crimes, one of which occurred in the past 5 years.

(n)     (1)     "Handgun" means a firearm with a barrel less than 16 inches in length.

(2)     "Handgun" includes signal, starter, and blank pistols.

**(O)     "HANDGUN QUALIFICATION LICENSE" MEANS A LICENSE ISSUED BY THE SECRETARY THAT AUTHORIZES A PERSON TO PURCHASE, RENT, OR RECEIVE A HANDGUN.**

[(o)] **(P)**     "Licensee" means a person who holds a dealer's license.

**(Q)     "QUALIFIED HANDGUN INSTRUCTOR" MEANS A** ~~PERSON CERTIFIED BY THE SECRETARY WHO MEETS THE REQUIREMENTS ESTABLISHED BY THE SECRETARY TO PROVIDE TRAINING IN THE CARE, SAFETY, AND USE OF HANDGUNS~~ *CERTIFIED FIREARMS INSTRUCTOR WHO:*

*(1)     IS RECOGNIZED BY THE MARYLAND POLICE AND CORRECTIONAL TRAINING COMMISSIONS;*

*(2)     HAS A QUALIFIED HANDGUN INSTRUCTOR LICENSE ISSUED BY THE SECRETARY; OR*

*(3)     HAS A CERTIFICATION ISSUED* ~~AND RECOGNIZED BY A NATIONAL ORGANIZATION~~ *BY A NATIONALLY RECOGNIZED FIREARMS ORGANIZATION.*

[(p)] **(R)**     "Regulated firearm" means:

(1)     a handgun; or

(2)     a firearm that is any of the following specific assault weapons or their copies, regardless of which company produced and manufactured that assault weapon:

(i)     American Arms Spectre da Semiautomatic carbine;

(ii)     AK–47 in all forms;

(iii)     Algimec AGM–1 type semi–auto;

(iv)     AR 100 type semi–auto;

(v)     AR 180 type semi–auto;

(vi)     Argentine L.S.R. semi–auto;

(vii)     Australian Automatic Arms SAR type semi–auto;

(viii)     Auto–Ordnance Thompson M1 and 1927 semi–automatics;

(ix)     Barrett light .50 cal. semi–auto;

(x)     Beretta AR70 type semi–auto;

(xi)     Bushmaster semi–auto rifle;

(xii)     Calico models M–100 and M–900;

(xiii)     CIS SR 88 type semi–auto;

(xiv)     Claridge HI TEC C–9 carbines;

(xv)     Colt AR–15, CAR–15, and all imitations except Colt AR–15 Sporter H–BAR rifle;

(xvi)     Daewoo MAX 1 and MAX 2, aka AR 100, 110C, K–1, and K–2;

(xvii)     Dragunov Chinese made semi–auto;

(xviii)     Famas semi–auto (.223 caliber);

(xix)   Feather AT–9 semi–auto;

(xx)    FN LAR and FN FAL assault rifle;

(xxi)   FNC semi–auto type carbine;

(xxii)  F.I.E./Franchi LAW 12 and SPAS 12 assault shotgun;

(xxiii) Steyr–AUG–SA semi–auto;

(xxiv) Galil models AR and ARM semi–auto;

(xxv)  Heckler and Koch HK–91 A3, HK–93 A2, HK–94 A2 and A3;

(xxvi)     Holmes model 88 shotgun;

(xxvii)     Avtomat Kalashnikov semiautomatic rifle in any format;

(xxviii)     Manchester Arms "Commando" MK–45, MK–9;

(xxix) Mandell TAC–1 semi–auto carbine;

(xxx)  Mossberg model 500 Bullpup assault shotgun;

(xxxi) Sterling Mark 6;

(xxxii)  P.A.W.S. carbine;

(xxxiii)   Ruger mini–14 folding stock model (.223 caliber);

(xxxiv)   SIG 550/551 assault rifle (.223 caliber);

(xxxv)  SKS with detachable magazine;

(xxxvi) AP–74 Commando type semi–auto;

(xxxvii) Springfield   Armory   BM–59,   SAR–48,   G3,   SAR–3, M–21 sniper rifle, M1A, excluding the M1 Garand;

(xxxviii)  Street sweeper assault type shotgun;

(xxxix)  Striker 12 assault shotgun in all formats;

(xl)    Unique F11 semi–auto type;

(xli)   Daewoo USAS 12 semi–auto shotgun;

                (xlii)   UZI 9mm carbine or rifle;

                (xliii)  Valmet M–76 and M–78 semi–auto;

                (xliv)  Weaver Arms "Nighthawk" semi–auto carbine; or

                (xlv)   Wilkinson Arms 9mm semi–auto "Terry".

**[(q)] (S)**    "Rent" means the temporary transfer for consideration of a regulated firearm that is taken from the property of the owner of the regulated firearm.

**[(r)] (T)**    "Secondary sale" means a sale of a regulated firearm in which neither party to the sale:

        (1)    is a licensee;

        (2)    is licensed by the federal government as a firearms dealer;

        (3)    devotes time, attention, and labor to dealing in firearms as a regular course of trade or business with the principal objective of earning a profit through the repeated purchase and resale of firearms; or

        (4)    repairs firearms as a regular course of trade or business.

**[(s)] (U)**    "Secretary" means the Secretary of State Police or the Secretary's designee.

**[(t)] (V)**    "Straw purchase" means a sale of a regulated firearm in which a person uses another, known as the straw purchaser, to:

        (1)    complete the application to purchase a regulated firearm;

        (2)    take initial possession of the regulated firearm; and

        (3)    subsequently transfer the regulated firearm to the person.

<u>5–110.</u>

    <u>(a)</u>    <u>The Secretary shall disapprove an application for a dealer's license if:</u>

        <u>(1)    the Secretary determines that the applicant supplied false information or made a false statement;</u>

MARTIN O'MALLEY, Governor

Ch. 427

(2)     the Secretary determines that the application is not properly completed; **[**or**]**

(3)     the Secretary receives a written notification from the applicant's licensed attending physician that the applicant suffers from a mental disorder and is a danger to the applicant or to another**; OR**

**(4)     THE SECRETARY DETERMINES THAT THE APPLICANT INTENDS THAT A PERSON WHO IS NOT ELIGIBLE TO BE ISSUED A DEALER'S LICENSE OR WHOSE DEALER'S LICENSE HAS BEEN REVOKED OR SUSPENDED:**

**(I)     WILL PARTICIPATE IN THE MANAGEMENT OR OPERATION OF THE BUSINESS FOR WHICH THE LICENSE IS SOUGHT; OR**

**(II)     HOLDS A LEGAL OR EQUITABLE INTEREST IN THE BUSINESS FOR WHICH THE LICENSE IS SOUGHT**.

*(b)     If the Secretary disapproves an application for a dealer's license, the Secretary shall notify the applicant in writing of***:**

*(1)     the disapproval* **OF THE APPLICATION; AND**

*(2)* **THE REASON THE APPLICATION WAS DENIED**.

5–114.

(a)  *(1)*   The Secretary shall suspend a dealer's license if the licensee:

~~(1)~~  *(I)*    is under indictment for a crime of violence; **[**or**]**

~~(2)~~  *(II)*   is arrested for a violation of this subtitle that prohibits the purchase or possession of a regulated firearm**; OR** .

~~(3)~~ *(2)*   *(I)*   **THE SECRETARY MAY SUSPEND A DEALER'S LICENSE IF THE LICENSEE IS NOT IN COMPLIANCE WITH THE RECORD KEEPING AND REPORTING REQUIREMENTS OF § 5–145 OF THIS SUBTITLE**.

*(II)*   **THE SECRETARY MAY LIFT A SUSPENSION UNDER THIS PARAGRAPH AFTER THE LICENSEE PROVIDES EVIDENCE THAT THE RECORD KEEPING VIOLATION HAS BEEN CORRECTED.**

5–115.

– 25 –

(a)      (1)      A person whose dealer's license is suspended or revoked **OR WHO IS FINED FOR A VIOLATION OF THIS SUBTITLE** and who is aggrieved by the action of the Secretary may request a hearing by writing to the Secretary within 30 days after the Secretary forwards notice to the applicant under § 5–114(c) of this subtitle.

(2)      The Secretary shall grant the hearing within 15 days after receiving the request.

(b)      The hearing shall be held in accordance with Title 10, Subtitle 2 of the State Government Article.

**5–117.1.**

(A)      THIS SECTION DOES NOT APPLY TO:

(1)      A LICENSED FIREARMS MANUFACTURER;

(2)      A LAW ENFORCEMENT OFFICER OR PERSON WHO IS RETIRED IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE UNITED STATES, THE STATE, OR A LOCAL LAW ENFORCEMENT AGENCY OF THE STATE; ~~OR~~

(3)      A MEMBER OR RETIRED MEMBER OF THE ARMED FORCES OF THE UNITED STATES ~~OR,~~ *OR* THE NATIONAL GUARD~~, OR THE MARYLAND DEFENSE FORCE~~; OR

*(4)      A PERSON PURCHASING, RENTING, OR RECEIVING AN ANTIQUE, CURIO, OR RELIC FIREARM, AS DEFINED IN FEDERAL LAW OR IN DETERMINATIONS PUBLISHED BY THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES.*

~~(A)~~ (B)      A DEALER OR ANY OTHER PERSON MAY NOT SELL, RENT, OR TRANSFER A ~~REGULATED FIREARM~~ *HANDGUN* TO A PURCHASER, LESSEE, OR TRANSFEREE UNLESS THE PURCHASER, LESSEE, OR TRANSFEREE PRESENTS TO THE DEALER OR OTHER PERSON A VALID ~~REGULATED FIREARM~~ HANDGUN QUALIFICATION LICENSE ISSUED TO THE PURCHASER, LESSEE, OR TRANSFEREE BY THE SECRETARY UNDER THIS SECTION.

~~(B)~~ (C)      A PERSON MAY PURCHASE, RENT, OR RECEIVE A HANDGUN ONLY IF THE PERSON:

(1)      (I)      POSSESSES A VALID HANDGUN QUALIFICATION LICENSE ISSUED TO THE PERSON BY THE SECRETARY IN ACCORDANCE WITH THIS SECTION; ~~AND~~

(II)   POSSESSES VALID CREDENTIALS FROM A LAW ENFORCEMENT AGENCY OR RETIREMENT CREDENTIALS FROM A LAW ENFORCEMENT AGENCY; ~~OR~~

(III)   IS AN ACTIVE OR RETIRED MEMBER OF THE ARMED FORCES OF THE UNITED STATES ~~OR,~~ *OR* THE NATIONAL GUARD~~, OR THE MARYLAND DEFENSE FORCE~~ AND POSSESSES A VALID MILITARY IDENTIFICATION CARD; ~~AND~~ *OR*

(IV)   *IS PURCHASING, RENTING, OR RECEIVING AN ANTIQUE, CURIO, OR RELIC FIREARM, AS DEFINED IN FEDERAL LAW OR IN DETERMINATIONS PUBLISHED BY THE BUREAU OF ALCOHOL, TOBACCO, FIREARMS AND EXPLOSIVES; AND*

(2)   IS NOT OTHERWISE PROHIBITED FROM PURCHASING OR POSSESSING A HANDGUN UNDER STATE OR FEDERAL LAW.

~~(C)~~ (D)   SUBJECT TO SUBSECTIONS ~~(E) AND (F)~~ (F) AND (G) OF THIS SECTION, THE SECRETARY SHALL ISSUE A HANDGUN QUALIFICATION LICENSE TO A PERSON WHO THE SECRETARY FINDS:

(1)   ~~(I)~~   IS AT LEAST 21 YEARS OLD; ~~OR~~

~~(II)   IS AT LEAST 18 YEARS OLD IF THE PERSON IS A MEMBER OF THE UNITED STATES ARMED FORCES, THE NATIONAL GUARD, OR THE MARYLAND DEFENSE FORCE;~~

(2)   IS A RESIDENT OF THE STATE;

(3)   EXCEPT AS PROVIDED IN SUBSECTION ~~(D)~~ (E) OF THIS SECTION, HAS DEMONSTRATED SATISFACTORY COMPLETION~~,~~ *:*

~~(I),~~ WITHIN ~~1 YEAR~~ 3 YEARS PRIOR TO THE SUBMISSION OF THE APPLICATION, OF A FIREARMS SAFETY TRAINING COURSE APPROVED BY THE SECRETARY THAT INCLUDES:

~~(I)~~   ~~1.~~ *(I)*   A MINIMUM OF ~~8~~ 4 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR;

~~(II)~~   ~~2.~~ *(II)*   CLASSROOM INSTRUCTION ON:

~~1. A.~~ *1.*   STATE FIREARM LAW;

~~2.~~ ~~B.~~ *2.*   HOME FIREARM SAFETY; AND

~~3.~~ ~~C.~~ *3.*   HANDGUN MECHANISMS AND OPERATION; AND

~~(III)~~ ~~(II)~~ *(III)*   ~~WITHIN 10 YEARS PRIOR TO THE SUBMISSION OF THE APPLICATION, OF A FIREARMS SAFETY TRAINING COURSE APPROVED BY THE SECRETARY THAT INCLUDES~~ A FIREARMS ~~QUALIFICATION COMPONENT THAT DEMONSTRATES THE PERSON'S PROFICIENCY AND USE OF THE~~ *ORIENTATION COMPONENT THAT DEMONSTRATES THE PERSON'S SAFE OPERATION AND HANDLING OF A* FIREARM; AND

(4)   BASED ON AN INVESTIGATION, IS NOT PROHIBITED BY FEDERAL OR STATE LAW FROM PURCHASING OR POSSESSING A HANDGUN.

~~(D)~~ (E)   AN APPLICANT FOR A HANDGUN QUALIFICATION LICENSE IS NOT REQUIRED TO COMPLETE A FIREARMS SAFETY TRAINING COURSE UNDER SUBSECTION ~~(C)~~ (D) OF THIS SECTION IF THE APPLICANT:

(1)   ~~IS A LAW ENFORCEMENT OFFICER OF THE UNITED STATES, THE STATE, OR ANY LOCAL LAW ENFORCEMENT AGENCY IN THE STATE;~~

~~(2)   IS A MEMBER OF THE ARMED FORCES OF THE UNITED STATES OR THE NATIONAL GUARD; OR~~

~~(3)~~   HAS COMPLETED A CERTIFIED FIREARMS TRAINING COURSE APPROVED BY THE SECRETARY; ~~OR~~

*(2)*   *HAS COMPLETED A COURSE OF INSTRUCTION IN COMPETENCY AND SAFETY IN THE HANDLING OF FIREARMS PRESCRIBED BY THE DEPARTMENT OF NATURAL RESOURCES UNDER § 10–301.1 OF THE NATURAL RESOURCES ARTICLE;*

~~(2)~~ *(3)*   IS ~~CURRENTLY A CERTIFIED FIREARMS INSTRUCTOR WHO:~~

~~(I)   IS RECOGNIZED BY THE MARYLAND POLICE AND CORRECTIONAL TRAINING COMMISSIONS;~~

~~(II)   HAS A QUALIFIED HANDGUN INSTRUCTOR LICENSE ISSUED BY THE SECRETARY; OR~~

~~(III)   HAS A CERTIFICATION ISSUED AND RECOGNIZED BY A NATIONAL ORGANIZATION~~ *A QUALIFIED HANDGUN INSTRUCTOR*; ~~OR~~

~~(3)~~ *(4)*      IS AN HONORABLY DISCHARGED MEMBER OF THE ARMED FORCES OF THE UNITED STATES OR THE NATIONAL GUARD; ~~OR~~

~~(4)~~ *(5)*      IS AN EMPLOYEE OF AN ARMORED CAR COMPANY AND HAS A PERMIT ISSUED UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE *; OR*

*(6)*      *LAWFULLY OWNS A REGULATED FIREARM*.

~~(E)~~ (F)      (1)   IN THIS SUBSECTION, "CENTRAL REPOSITORY" MEANS THE CRIMINAL JUSTICE INFORMATION SYSTEM CENTRAL REPOSITORY OF THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES.

(2)   ~~IN ORDER TO OBTAIN A HANDGUN QUALIFICATION LICENSE, AN APPLICANT SHALL APPLY TO THE CENTRAL REPOSITORY FOR A NATIONAL AND STATE CRIMINAL HISTORY RECORDS CHECK~~ THE SECRETARY SHALL APPLY TO THE CENTRAL REPOSITORY FOR A STATE AND NATIONAL CRIMINAL HISTORY RECORDS CHECK FOR EACH APPLICANT FOR A HANDGUN QUALIFICATION LICENSE.

(3)   AS PART OF THE APPLICATION FOR A CRIMINAL HISTORY RECORDS CHECK, THE ~~APPLICANT~~ SECRETARY SHALL SUBMIT TO THE CENTRAL REPOSITORY:

(I)   ~~TWO COMPLETE SETS~~ A COMPLETE SET OF THE APPLICANT'S LEGIBLE FINGERPRINTS TAKEN IN A FORMAT APPROVED BY THE DIRECTOR OF THE CENTRAL REPOSITORY AND THE DIRECTOR OF THE FEDERAL BUREAU OF INVESTIGATION;

(II)   THE FEE AUTHORIZED UNDER § 10–221(B)(7) OF THE CRIMINAL PROCEDURE ARTICLE FOR ACCESS TO MARYLAND CRIMINAL HISTORY RECORDS; AND

(III)   THE MANDATORY PROCESSING FEE REQUIRED BY THE FEDERAL BUREAU OF INVESTIGATION FOR A NATIONAL CRIMINAL HISTORY RECORDS CHECK.

(4)   THE CENTRAL REPOSITORY SHALL PROVIDE A RECEIPT TO THE APPLICANT FOR THE FEES PAID IN ACCORDANCE WITH PARAGRAPH (3)(II) AND (III) OF THIS SUBSECTION.

(5)   IN ACCORDANCE WITH §§ 10–201 THROUGH 10–234 OF THE CRIMINAL PROCEDURE ARTICLE, THE CENTRAL REPOSITORY SHALL FORWARD

TO THE APPLICANT AND THE SECRETARY A PRINTED STATEMENT OF THE APPLICANT'S CRIMINAL HISTORY INFORMATION.

(6) INFORMATION OBTAINED FROM THE CENTRAL REPOSITORY UNDER THIS SECTION:

(I) IS CONFIDENTIAL AND MAY NOT BE DISSEMINATED; AND

(II) SHALL BE USED ONLY FOR THE LICENSING PURPOSE AUTHORIZED BY THIS SECTION.

(7) IF CRIMINAL HISTORY RECORD INFORMATION IS REPORTED TO THE CENTRAL REPOSITORY AFTER THE DATE OF THE INITIAL CRIMINAL HISTORY RECORDS CHECK, THE CENTRAL REPOSITORY SHALL PROVIDE TO THE DEPARTMENT OF STATE POLICE LICENSING DIVISION A REVISED PRINTED STATEMENT OF THE APPLICANT'S OR LICENSEE'S STATE CRIMINAL HISTORY RECORD.

(F) (G) AN APPLICANT FOR A HANDGUN QUALIFICATION LICENSE SHALL SUBMIT TO THE SECRETARY:

(1) AN APPLICATION IN THE MANNER AND FORMAT DESIGNATED BY THE SECRETARY;

(2) A NONREFUNDABLE APPLICATION FEE OF $100 TO COVER THE COSTS TO ADMINISTER THE PROGRAM OF UP TO $50 $25 $50;

(3) (I) PROOF OF SATISFACTORY COMPLETION OF:

1. A FIREARMS SAFETY TRAINING COURSE APPROVED BY THE SECRETARY; OR

2. A COURSE OF INSTRUCTION IN COMPETENCY AND SAFETY IN THE HANDLING OF FIREARMS PRESCRIBED BY THE DEPARTMENT OF NATURAL RESOURCES UNDER § 10–301.1 OF THE NATURAL RESOURCES ARTICLE; OR

(II) A VALID FIREARMS INSTRUCTOR CERTIFICATION;

(4) ANY OTHER IDENTIFYING INFORMATION OR DOCUMENTATION REQUIRED BY THE SECRETARY; AND

(5)     A STATEMENT MADE BY THE APPLICANT UNDER THE PENALTY OF PERJURY THAT THE APPLICANT IS NOT PROHIBITED UNDER FEDERAL OR STATE LAW FROM POSSESSING A HANDGUN.

~~(G)~~ (H)     *(1)*     WITHIN 30 DAYS AFTER RECEIVING A PROPERLY COMPLETED APPLICATION, THE SECRETARY SHALL ISSUE TO THE APPLICANT:

~~(1)~~ *(I)*     A HANDGUN QUALIFICATION LICENSE IF THE APPLICANT IS APPROVED; OR

~~(2)~~ *(II)*     A WRITTEN DENIAL OF THE APPLICATION THAT CONTAINS*:*

~~(I)~~ *1.*     *THE REASON THE APPLICATION WAS DENIED; AND*

~~(II)~~ *2.*     A STATEMENT OF THE APPLICANT'S APPEAL RIGHTS UNDER SUBSECTION ~~(J)~~ (L) OF THIS SECTION.

*(2)     (I)     AN INDIVIDUAL WHOSE FINGERPRINTS HAVE BEEN SUBMITTED TO THE CENTRAL REPOSITORY, AND WHOSE APPLICATION HAS BEEN DENIED, MAY REQUEST THAT THE RECORD OF THE FINGERPRINTS BE EXPUNGED BY OBLITERATION.*

*(II)     PROCEEDINGS TO EXPUNGE A RECORD UNDER THIS PARAGRAPH SHALL BE CONDUCTED IN ACCORDANCE WITH § 10–105 OF THE CRIMINAL PROCEDURE ARTICLE.*

*(III)     ON RECEIPT OF AN ORDER TO EXPUNGE A FINGERPRINT RECORD, THE CENTRAL REPOSITORY SHALL EXPUNGE BY OBLITERATION THE FINGERPRINTS SUBMITTED AS PART OF THE APPLICATION PROCESS.*

*(IV)     AN INDIVIDUAL MAY NOT BE CHARGED A FEE FOR THE EXPUNGEMENT OF A FINGERPRINT RECORD IN ACCORDANCE WITH THIS PARAGRAPH.*

~~(H)~~ (I)     ~~(1)~~     A HANDGUN QUALIFICATION LICENSE ISSUED UNDER THIS SECTION EXPIRES ~~5~~ 10 YEARS FROM THE DATE OF ISSUANCE.

~~(2)~~ (J)     ~~(1)~~     THE HANDGUN QUALIFICATION LICENSE MAY BE RENEWED FOR SUCCESSIVE PERIODS OF ~~5~~ 10 YEARS EACH IF, AT THE TIME OF AN APPLICATION FOR RENEWAL, THE APPLICANT ~~POSSESSES THE QUALIFICATIONS FOR THE ISSUANCE OF THE HANDGUN QUALIFICATION~~

~~LICENSE AND PAYS THE FEES REQUIRED IN SUBSECTIONS (E)(3) AND (F)(2) OF THIS SECTION:~~

(I)     POSSESSES THE QUALIFICATIONS FOR THE ISSUANCE OF THE HANDGUN QUALIFICATION LICENSE; AND

(II)     SUBMITS A NONREFUNDABLE APPLICATION FEE TO COVER THE COSTS TO ADMINISTER THE PROGRAM UP TO $20.

(2)     AN APPLICANT RENEWING A HANDGUN QUALIFICATION LICENSE UNDER THIS SUBSECTION IS NOT REQUIRED TO:

(I)     COMPLETE THE FIREARMS SAFETY TRAINING COURSE REQUIRED IN SUBSECTION (D)(3) OF THIS SECTION; OR

(II)     SUBMIT TO A STATE AND NATIONAL CRIMINAL HISTORY RECORDS CHECK AS REQUIRED IN SUBSECTION (F) OF THIS SECTION.

~~(I)~~ (K)     (1)     THE SECRETARY MAY REVOKE A HANDGUN QUALIFICATION LICENSE ISSUED OR RENEWED UNDER THIS SECTION ON A FINDING THAT THE LICENSEE NO LONGER SATISFIES THE QUALIFICATIONS SET FORTH IN SUBSECTION ~~(C)~~ (D) OF THIS SECTION.

(2)     A PERSON HOLDING A HANDGUN QUALIFICATION LICENSE THAT HAS BEEN REVOKED BY THE SECRETARY SHALL RETURN THE LICENSE TO THE SECRETARY WITHIN 5 DAYS AFTER RECEIPT OF THE NOTICE OF REVOCATION.

~~(J)~~ (L)     (1)     A PERSON WHOSE ORIGINAL OR RENEWAL APPLICATION FOR A HANDGUN QUALIFICATION LICENSE IS DENIED OR WHOSE HANDGUN QUALIFICATION LICENSE IS REVOKED, MAY SUBMIT A WRITTEN REQUEST TO THE SECRETARY FOR A HEARING WITHIN 30 DAYS AFTER THE DATE THE WRITTEN NOTICE OF THE DENIAL OR REVOCATION WAS SENT TO THE AGGRIEVED PERSON.

(2)     A HEARING UNDER THIS SECTION SHALL BE GRANTED BY THE SECRETARY WITHIN 15 DAYS AFTER THE REQUEST.

(3)     A HEARING AND ANY SUBSEQUENT PROCEEDINGS OF JUDICIAL REVIEW UNDER THIS SECTION SHALL BE CONDUCTED IN ACCORDANCE WITH TITLE 10, SUBTITLE 2 OF THE STATE GOVERNMENT ARTICLE.

(4)    A HEARING UNDER THIS SECTION SHALL BE HELD IN THE COUNTY OF THE LEGAL RESIDENCE OF THE AGGRIEVED PERSON.

(M)    (1)    IF AN ORIGINAL OR RENEWAL HANDGUN QUALIFICATION LICENSE IS LOST OR STOLEN, A PERSON MAY SUBMIT A WRITTEN REQUEST TO THE SECRETARY FOR A REPLACEMENT LICENSE.

(2)    UNLESS THE APPLICANT IS OTHERWISE DISQUALIFIED, THE SECRETARY SHALL ISSUE A REPLACEMENT HANDGUN QUALIFICATION LICENSE ON RECEIPT OF A WRITTEN REQUEST AND A NONREFUNDABLE FEE TO COVER THE COST OF REPLACEMENT UP TO $20.

(N)    THE SECRETARY MAY ADOPT REGULATIONS TO CARRY OUT THE PROVISIONS OF THIS SECTION.

5–118.

(b)    A firearm application shall contain:

(2)    the date and time that the firearm applicant delivered the completed firearm application to the prospective seller or transferor; [and]

(3)    a statement by the firearm applicant under the penalty of perjury that the firearm applicant:

(i)    1,    is at least 21 years old; OR

2.    IS AT LEAST 18 YEARS OLD IF THE FIREARM APPLICANT IS A MEMBER OF THE UNITED STATES ARMED FORCES, THE NATIONAL GUARD, OR THE MARYLAND DEFENSE FORCE;

(ii)    has never been convicted of a disqualifying crime;

(iii)    has never been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years;

(iv)    is not a fugitive from justice;

(v)    is not a habitual drunkard;

(vi)    is not addicted to a controlled dangerous substance or is not a habitual user;

(VII)    DOES NOT SUFFER FROM A MENTAL DISORDER AS DEFINED IN § 10–101(F)(2) OF THE HEALTH – GENERAL ARTICLE AND HAVE A

HISTORY OF VIOLENT BEHAVIOR AGAINST ~~THEMSELVES~~ *THE FIREARM APPLICANT* OR ANOTHER**, ~~UNLESS THE PERSON HAS A PHYSICIAN'S CERTIFICATE THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER~~;**

~~(vii)~~ **(VIII)**   has never ~~spent more than 30 consecutive days in a medical institution for treatment of a mental disorder, unless a physician's certificate issued within 30 days before the date of application is attached to the application, certifying that the firearm applicant is capable of possessing a regulated firearm without undue danger to the firearm applicant or to another~~;

~~(viii)   is not a respondent against whom a current non ex parte civil protective order has been entered under § 4–506 of the Family Law Article~~ BEEN FOUND INCOMPETENT TO STAND TRIAL UNDER § 3–106 OF THE CRIMINAL PROCEDURE ARTICLE;

(IX)   HAS NEVER BEEN FOUND NOT CRIMINALLY RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

(X)   ~~HAS NEVER BEEN~~ ~~BEFORE OCTOBER 1, 2013, WAS~~ *HAS* NEVER *BEEN* VOLUNTARILY ADMITTED FOR MORE THAN 30 CONSECUTIVE DAYS TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

(XI)   HAS NEVER BEEN INVOLUNTARILY COMMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

~~(XII)   HAS NEVER BEEN ADMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE AS THE RESULT OF AN EMERGENCY EVALUATION UNDER § 10–622 OF THE HEALTH – GENERAL ARTICLE OR, IF THE PERSON HAS BEEN ADMITTED TO A FACILITY, POSSESSES A CERTIFICATE FROM THE FACILITY THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER~~;

~~(XIII)~~ *(XII)*   IS NOT UNDER THE PROTECTION OF A GUARDIAN APPOINTED BY A COURT UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND TRUSTS ARTICLE *, EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY*;

~~(XIII)~~ ~~(XIV)~~ *(XIII)*   IS NOT A RESPONDENT AGAINST WHOM:

1.   A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE; OR

MARTIN O'MALLEY, Governor                    Ch. 427

**2.      AN ORDER FOR PROTECTION, AS DEFINED IN §
4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF
ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT**; AND

(ix) (XIV) (XV) *(XIV)*      if under the age of 30 years at the time of
application, has not been adjudicated delinquent by a juvenile court for an act that
would be a disqualifying crime if committed by an adult**[**; and

(x)      subject to § 5–119 of this subtitle, has completed a certified
firearms safety training course that the Police Training Commission conducts without
charge or that meets the standards that the Police Training Commission establishes
under § 3–207 of this article**]**; **AND**

**(4)      A COPY OF THE APPLICANT'S HANDGUN QUALIFICATION
LICENSE**.

**[**5–119.

A firearm applicant is not required to complete a certified firearms training
course required under §§ 5–118 and 5–134 of this subtitle if the firearm applicant:

(1)      has already completed a certified firearms training course required
under §§ 5–118 and 5–134 of this subtitle;

(2)      is a law enforcement officer of the State or any local law
enforcement agency in the State;

(3)      is a member, retired member, or honorably discharged member of
the armed forces of the United States or the National Guard;

(4)      is a member of an organization that is required by federal law
governing its specific business or activity to maintain handguns and applicable
ammunition; or

(5)      holds a permit to carry a handgun under Subtitle 3 of this title.**]**

5–120.

(a)      (1)      On receipt of a firearm application, a licensee or designated law
enforcement agency shall promptly forward one copy of it to the Secretary by**[**:

(i)      certified mail;

(ii)      facsimile machine; or

(iii)**]**   electronic means approved by the Secretary.

(2)     The copy of the firearm application forwarded to the Secretary shall contain the name, address, and signature of the prospective seller, lessor, or transferor.

(b)     (1)     The prospective seller, lessor, or transferor shall keep one copy of the firearm application for not less than 3 years.

(2)     The firearm applicant is entitled to **[**the remaining**]** <u>**A**</u> copy of the firearm application.

(c)     **[**(1)     Except as provided in paragraph (2) of this subsection, the**]** **THE** licensee or designated law enforcement agency shall forward the $10 application fee with the firearm application to the Secretary.

**[**(2)     A licensee or designated law enforcement agency that uses a facsimile machine to forward the firearm application to the Secretary shall:

(i)     be billed $10 for each firearm application forwarded to the Secretary during the month; and

(ii)     pay the total application fee by the fifteenth day of the following month.**]**

5–133.

(a)     This section supersedes any restriction that a local jurisdiction in the State imposes on the possession by a private party of a regulated firearm, and the State preempts the right of any local jurisdiction to regulate the possession of a regulated firearm.

(b)     **[**A**]** **SUBJECT TO § 5–133.3 OF THIS SUBTITLE, A** person may not possess a regulated firearm if the person:

(1)     has been convicted of a disqualifying crime;

(2)     has been convicted of a violation classified as a common law crime and received a term of imprisonment of more than 2 years;

(3)     is a fugitive from justice;

(4)     is a habitual drunkard;

(5)     is addicted to a controlled dangerous substance or is a habitual user;

MARTIN O'MALLEY, Governor                     Ch. 427

(6)     ~~[suffers from a mental disorder as defined in § 10–101(f)(2) of the Health – General Article and has a history of violent behavior against the person or another, unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another, unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another];~~

*(6)     SUFFERS FROM A MENTAL DISORDER AS DEFINED IN § 10–101(F)(2) OF THE HEALTH – GENERAL ARTICLE AND HAS A HISTORY OF VIOLENT BEHAVIOR AGAINST THE PERSON OR ANOTHER;*

**(7)     HAS BEEN FOUND INCOMPETENT TO STAND TRIAL UNDER § 3–106 OF THE CRIMINAL PROCEDURE ARTICLE;**

~~(7)~~ **(8)     HAS BEEN FOUND NOT CRIMINALLY RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;**

[(7)] ~~(8)~~ **(9)**     has been ~~[confined~~ **VOLUNTARILY ADMITTED** for more than 30 consecutive days to~~] A PATIENT IN~~ a facility as defined in § 10–101 of the Health – General Article ~~BEFORE OCTOBER 1, 2013~~[, unless the person has a physician's certificate that the person is capable of possessing a regulated firearm without undue danger to the person or to another] ~~AND:~~**:**

~~(I)~~ ~~(10)     HAS BEEN A VOLUNTARY OR AN INVOLUNTARY PATIENT FOR 30 CONSECUTIVE DAYS OR MORE; OR~~

~~(II)     HAS BEEN DETERMINED BY A COURT TO BE UNABLE TO SAFELY POSSESS A FIREARM BASED ON CREDIBLE EVIDENCE OF DANGEROUSNESS TO OTHERS INVOLUNTARILY COMMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;~~

~~(9)~~ ~~(11)     HAS BEEN ADMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE AS THE RESULT OF AN EMERGENCY EVALUATION UNDER § 10–622 OF THE HEALTH – GENERAL ARTICLE, UNLESS THE PERSON HAS A CERTIFICATE FROM THE FACILITY THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER;~~

*(10)     HAS BEEN INVOLUNTARILY COMMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;*

~~(12)~~ *(11)*     IS UNDER THE PROTECTION OF A GUARDIAN APPOINTED BY A COURT UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND TRUSTS

**ARTICLE** , *EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY*;

[(8)] ~~(10)~~ ~~(12)~~ ~~(13)~~ *(12)*   except as provided in subsection (e) of this section, is a respondent against whom [a current non ex parte civil protective order has been entered under § 4–506 of the Family Law Article; or]:

**(I)    A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE; OR**

**(II)    AN ORDER FOR PROTECTION, AS DEFINED IN § 4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; OR**

[(9)] ~~(11)~~ ~~(13)~~ ~~(14)~~ *(13)*   if under the age of 30 years at the time of possession, has been adjudicated delinquent by a juvenile court for an act that would be a disqualifying crime if committed by an adult.

(c)    (1)    A person may not possess a regulated firearm if the person was previously convicted of:

(i)    a crime of violence;

(ii)    a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–612, § 5–613, or § 5–614 of the Criminal Law Article; or

(iii)    an offense under the laws of another state or the United States that would constitute one of the crimes listed in item (i) or (ii) of this paragraph if committed in this State.

(2)    (i)    Subject to paragraph (3) of this subsection, a person who violates this subsection is guilty of a felony and on conviction is subject to imprisonment for not less than 5 years and not exceeding 15 years.

(ii)    The court may not suspend any part of the mandatory minimum sentence of 5 years.

(iii)    Except as otherwise provided in § 4–305 of the Correctional Services Article, the person is not eligible for parole during the mandatory minimum sentence.

(3)    At the time of the commission of the offense, if a period of more than 5 years has elapsed since the person completed serving the sentence for the most recent conviction under paragraph (1)(i) or (ii) of this subsection, including all imprisonment, mandatory supervision, probation, and parole:

(i)      the imposition of the mandatory minimum sentence is within the discretion of the court; and

(ii)      the mandatory minimum sentence may not be imposed unless the State's Attorney notifies the person in writing at least 30 days before trial of the State's intention to seek the mandatory minimum sentence.

(4)      Each violation of this subsection is a separate crime.

(d)      (1)      Except as provided in paragraph (2) of this subsection, a person who is under the age of 21 years may not possess a regulated firearm.

(2)      Unless a person is otherwise prohibited from possessing a regulated firearm, this subsection does not apply to:

(i)      the temporary transfer or possession of a regulated firearm if the person is:

1.      under the supervision of another who is at least 21 years old and who is not prohibited by State or federal law from possessing a firearm; and

2.      acting with the permission of the parent or legal guardian of the transferee or person in possession;

(ii)      the transfer by inheritance of title, and not of possession, of a regulated firearm;

(iii)      a member of the armed forces of the United States or the National Guard *while performing official duties* ~~while performing official duties~~;

(iv)      the temporary transfer or possession of a regulated firearm if the person is:

1.      participating in marksmanship training of a recognized organization; and

2.      under the supervision of a qualified instructor;

(v)      a person who is required to possess a regulated firearm for employment and who holds a permit under Subtitle 3 of this title; or

(vi)      the possession of a firearm for self–defense or the defense of others against a trespasser into the residence of the person in possession or into a residence in which the person in possession is an invited guest.

(e)     This section does not apply to a respondent transporting a regulated firearm if the respondent is carrying a civil protective order requiring the surrender of the regulated firearm and:

(1)     the regulated firearm is unloaded;

(2)     the respondent has notified the law enforcement unit, barracks, or station that the regulated firearm is being transported in accordance with the civil protective order; and

(3)     the respondent transports the regulated firearm directly to the law enforcement unit, barracks, or station.

**5–133.1.**

(A)     IN THIS SECTION, "AMMUNITION" MEANS A CARTRIDGE, SHELL, OR ANY OTHER DEVICE CONTAINING EXPLOSIVE OR INCENDIARY MATERIAL DESIGNED AND INTENDED FOR USE IN A FIREARM.

(B)     A PERSON MAY NOT POSSESS AMMUNITION IF THE PERSON IS PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133 (B) OR (C) OF THIS SUBTITLE.

(C)     A PERSON WHO VIOLATES THIS SECTION IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 1 YEAR OR A FINE NOT EXCEEDING $1000 OR BOTH.

**5–133.2.**

(A)     (1)     IN THIS SECTION THE FOLLOWING WORDS HAVE THE MEANINGS INDICATED.

(2)     "FACILITY" HAS THE MEANING STATED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE.

(3)     "NICS INDEX" MEANS THE FEDERAL BUREAU OF INVESTIGATION'S NATIONAL INSTANT CRIMINAL BACKGROUND CHECK SYSTEM.

(B)     (1)     A COURT SHALL PROMPTLY REPORT INFORMATION REQUIRED IN PARAGRAPH (2) OF THIS SUBSECTION THROUGH A SECURE DATA PORTAL APPROVED BY THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES IF A COURT:

(I)    DETERMINES THAT A PERSON IS NOT CRIMINALLY RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

(II)    FINDS THAT A PERSON IS INCOMPETENT TO STAND TRIAL UNDER § 3–106 OF THE CRIMINAL PROCEDURE ARTICLE; OR

(III)   FINDS UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND TRUST ARTICLE THAT A PERSON SHOULD BE UNDER THE PROTECTION OF A GUARDIAN, *EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY*.

(2)    ON A FINDING OR DETERMINATION UNDER PARAGRAPH (1) OF THIS SUBSECTION, THE FOLLOWING INFORMATION SHALL BE REPORTED TO THE NICS INDEX:

(I)    THE NAME AND IDENTIFYING INFORMATION OF THE PERSON; AND

(II)    THE DATE OF THE DETERMINATION OR FINDING.

(C)    (1)    A FACILITY SHALL REPORT INFORMATION REQUIRED IN PARAGRAPH (2) OF THIS SUBSECTION REGARDING A PERSON ADMITTED TO THE FACILITY UNDER § 10–609 OF THE HEALTH – GENERAL ARTICLE OR COMMITTED TO THE FACILITY UNDER TITLE 10, SUBTITLE 6, PART III OF THE HEALTH – GENERAL ARTICLE TO THE NICS INDEX THROUGH A SECURE DATA PORTAL APPROVED BY THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES, IF:

(I)    THE PERSON HAS BEEN ADMITTED ~~OR COMMITTED~~ TO A FACILITY FOR 30 CONSECUTIVE DAYS OR MORE; OR

(II)    ~~IN THE CASE OF AN INVOLUNTARY ADMISSION TO A FACILITY, A COURT MAKES A DETERMINATION THAT THE PERSON CANNOT SAFELY POSSESS A FIREARM BASED ON CREDIBLE EVIDENCE OF DANGEROUSNESS TO OTHERS~~ THE PERSON HAS BEEN INVOLUNTARILY COMMITTED TO A FACILITY.

(2)    ON ADMISSION TO A FACILITY THE FOLLOWING INFORMATION SHALL BE REPORTED TO THE NICS INDEX:

(I)    THE NAME AND IDENTIFYING INFORMATION OF THE PERSON ADMITTED OR COMMITTED;

(II)    THE DATE THE PERSON WAS ADMITTED OR COMMITTED TO THE FACILITY; AND

(III)    THE NAME OF THE FACILITY TO WHICH THE PERSON WAS ADMITTED OR COMMITTED.

~~5–133.3.~~

~~(A)    IN THIS SECTION, "HEALTH DEPARTMENT" MEANS THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE.~~

~~(B)    A PERSON SUBJECT TO A REGULATED FIREARMS DISQUALIFICATION UNDER § 5–133(B)(6), (7), (8), OR (9) (9), (10), OR (11) (11), OR (12) OF THIS SUBTITLE OR A RIFLE OR SHOTGUN DISQUALIFICATION UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11) (11), OR (12) OF THIS TITLE MAY BE AUTHORIZED TO POSSESS A FIREARM IF:~~

~~(1)    THE PERSON IS NOT SUBJECT TO ANOTHER FIREARMS RESTRICTION UNDER STATE OR FEDERAL LAW; AND~~

~~(2)    THE HEALTH DEPARTMENT, IN ACCORDANCE WITH THIS SECTION, DETERMINES THAT THE PERSON MAY POSSESS A FIREARM.~~

~~(C)    A PERSON WHO SEEKS RELIEF FROM A FIREARMS DISQUALIFICATION SHALL FILE AN APPLICATION WITH THE HEALTH DEPARTMENT IN THE FORM AND MANNER SET BY THE HEALTH DEPARTMENT.~~

~~(D)    (1)    AN APPLICANT SHALL PROVIDE COMPLETE AND ACCURATE DATA ON ALL INFORMATION REQUIRED IN AN APPLICATION UNDER THIS SECTION.~~

~~(2)    THE APPLICANT SHALL INCLUDE THE FOLLOWING INFORMATION IN THE APPLICATION:~~

~~(I)    THE REASON WHY THE APPLICANT IS PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133(B)(6), (7), (8), OR (9) (9), (10), OR (11) (11), OR (12) OF THIS SUBTITLE OR A RIFLE OR SHOTGUN UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11) (11), OR (12) OF THIS TITLE AND WHY THE APPLICANT SHOULD BE RELIEVED FROM THAT PROHIBITION;~~

~~(II)    A CERTIFICATE ON A FORM APPROVED BY THE HEALTH DEPARTMENT AND SIGNED BY AN INDIVIDUAL LICENSED IN THE STATE AS A PHYSICIAN WHO IS BOARD–CERTIFIED IN PSYCHIATRY OR AS A PSYCHOLOGIST~~

AND LISTED IN THE NATIONAL REGISTER OF HEALTH SERVICE PROVIDERS IN PSYCHOLOGY THAT PROVIDES:

       1. THAT THE CERTIFICATE WAS ISSUED WITHIN 30 DAYS OF THE DATE OF THE FILING OF THE PETITION;

       2. THAT THE APPLICANT HAS BEEN EVALUATED AND THE SIGNATORY REASONABLY BELIEVES THAT THE APPLICANT IS COMPETENT TO UNDERSTAND AND COMPLY WITH THE RULES, REGULATIONS, AND LAW GOVERNING FIREARM OWNERSHIP AND POSSESSION AND THE RISKS AND RESPONSIBILITIES INHERENT TO FIREARM OWNERSHIP;

       3. THAT THERE IS NO REASON TO BELIEVE THAT THE PERSON WILL BECOME INCOMPETENT IN THE FORESEEABLE FUTURE;

       4. AN OPINION AS TO WHETHER THE APPLICANT WILL BE LIKELY TO ACT IN A MANNER THAT IS DANGEROUS TO SELF OR PUBLIC SAFETY; AND

       5. AN OPINION ON WHETHER GRANTING A FIREARM HANDGUN QUALIFICATION LICENSE UNDER § 5–117 § 5–117.1 OF THIS SUBTITLE OR AUTHORIZING A PERSON TO POSSESS A RIFLE OR SHOTGUN WOULD BE CONTRARY TO THE PUBLIC INTEREST;

       (III) A SIGNED AUTHORIZATION, ON A FORM APPROVED BY THE HEALTH DEPARTMENT ALLOWING THE HEALTH DEPARTMENT TO ACCESS ALL RELEVANT HEALTH CARE, MENTAL HEALTH, DISABILITY, GUARDIANSHIP, AND CRIMINAL JUSTICE RECORDS, INCLUDING COURT ORDERED OR REQUIRED MENTAL HEALTH RECORDS, OF THE APPLICANT FOR USE WITH THE DISQUALIFICATION AND HEARING PROCESS;

       (IV) THREE STATEMENTS ON A FORM DESIGNATED BY THE HEALTH DEPARTMENT ATTESTING TO THE APPLICANT'S REPUTATION AND CHARACTER RELEVANT TO FIREARM OWNERSHIP OR POSSESSION; AND

       (V) ANY OTHER INFORMATION REQUIRED BY THE HEALTH DEPARTMENT.

       (3) (I) AT LEAST TWO OF THE STATEMENTS REQUIRED UNDER PARAGRAPH (2)(IV) OF THIS SUBSECTION SHALL BE PROVIDED BY AN INDIVIDUAL WHO IS NOT RELATED TO THE APPLICANT.

       (II) STATEMENTS PROVIDED UNDER PARAGRAPH (2)(IV) OF THIS SUBSECTION MUST BE SIGNED AND DATED WITHIN 30 DAYS OF

~~SUBMISSION TO THE HEALTH DEPARTMENT AND PROVIDE CONTACT INFORMATION FOR EACH INDIVIDUAL PROVIDING A STATEMENT.~~

~~(4)   IF THE APPLICANT IS PROHIBITED FROM FIREARM OWNERSHIP UNDER § 5–133(B)(9) § 5–133(B)(11) § 5–133(B)(12) OF THIS SUBTITLE OR § 5–205(B)(11) § 5–205(B)(12) OF THIS TITLE, THE FOLLOWING ADDITIONAL INFORMATION SHALL BE INCLUDED IN AN APPLICATION FOR RELIEF FROM THE PROHIBITION:~~

~~(I)   A COPY OF ALL PLEADINGS, AFFIDAVITS, AND CERTIFICATES SUBMITTED INTO EVIDENCE AT THE GUARDIANSHIP PROCEEDING; AND~~

~~(II)   ALL ORDERS ISSUED BY THE COURT RELATING TO THE GUARDIANSHIP, INCLUDING, IF APPLICABLE, AN ORDER INDICATING THAT THE GUARDIANSHIP IS NO LONGER IN EFFECT.~~

~~(5)   IF THE APPLICANT IS PROHIBITED FROM FIREARM OWNERSHIP UNDER § 5–133(B)(6), (7), OR (8) (8), (9), OR (10) (10), OR (11) OF THIS SUBTITLE OR § 5–205(B)(6), (7), (8), (9), OR (10) (10), OR (11) OF THIS TITLE, THE CERTIFICATE REQUIRED UNDER PARAGRAPH (2)(II) OF THIS SUBSECTION SHALL ALSO INCLUDE:~~

~~(I)   AN OPINION AS TO WHETHER THE APPLICANT HAS SYMPTOMS OF A MENTAL DISORDER OR DEVELOPMENTAL DISABILITY THAT CAUSES THE APPLICANT TO BE A DANGER TO SELF OR OTHERS;~~

~~(II)   IF THE APPLICANT HAS NO SYMPTOMS THAT CAUSE THE APPLICANT TO BE A DANGER, HOW MANY MONTHS THE APPLICANT HAS NOT HAD SYMPTOMS OF A MENTAL DISORDER OR DEVELOPMENTAL DISABILITY THAT CAUSED THE APPLICANT TO BE A DANGER TO SELF OR OTHERS;~~

~~(III)   THE TIME PERIOD THE APPLICANT HAS BEEN COMPLIANT WITH TREATMENT RECOMMENDATIONS FOR THE INDIVIDUAL'S MENTAL ILLNESS;~~

~~(IV)   THE NAME, ADDRESS, AND TELEPHONE NUMBER OF ALL MENTAL HEALTH PROVIDERS OR SERVICE PROVIDERS SEEN WITHIN THE LAST 12 MONTHS;~~

~~(V)   IF THE APPLICANT WAS FOUND NOT GUILTY BY REASON OF INSANITY OR NOT CRIMINALLY RESPONSIBLE, A STATEMENT ATTESTING TO~~

MARTIN O'MALLEY, Governor                    Ch. 427

~~WHETHER THE APPLICANT IS ON CONDITIONAL RELEASE UNDER § 3–114 OF THE CRIMINAL PROCEDURE ARTICLE; AND~~

~~(VI)    IF THE APPLICANT WAS FOUND NOT COMPETENT TO STAND TRIAL AND DANGEROUS, A WRITTEN STATEMENT REGARDING THE STATUS OF THE RELATED CRIMINAL CHARGE.~~

~~(E)    THE HEALTH DEPARTMENT MAY NOT APPROVE AN APPLICATION UNDER THIS SECTION IF A DETERMINATION IS MADE THAT:~~

~~(1)    THE APPLICANT SUPPLIED FALSE INFORMATION OR MADE A FALSE STATEMENT;~~

~~(2)    THE APPLICATION IS NOT PROPERLY COMPLETED; OR~~

~~(3)    ON REVIEW OF THE APPLICATION AND SUPPORTING DOCUMENTATION AND ANY OTHER INFORMATION RELATING TO THE APPLICATION REQUESTED BY THE HEALTH DEPARTMENT, THE APPLICANT HAS NOT SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT THE APPLICANT WILL BE UNLIKELY TO ACT IN A MANNER DANGEROUS TO SELF OR PUBLIC SAFETY AND THAT GRANTING A PERMIT TO POSSESS A REGULATED FIREARM OR AUTHORIZING THE POSSESSION OF A RIFLE OR SHOTGUN WOULD NOT BE CONTRARY TO THE PUBLIC INTEREST.~~

~~(F)    (1)    IF THE HEALTH DEPARTMENT DETERMINES THAT THE APPLICATION SHALL BE APPROVED ON REVIEW UNDER SUBSECTION (E)(3) OF THIS SECTION, THE HEALTH DEPARTMENT SHALL PROVIDE THE APPLICANT WITH A CERTIFICATE AFFIRMING THE APPLICANT'S MENTAL COMPETENCE TO POSSESS A REGULATED FIREARM.~~

~~(2)    A CERTIFICATE UNDER THIS SUBSECTION SHALL BE PRESENTED TO THE DEPARTMENT OF STATE POLICE AS EVIDENCE OF THE APPLICANT'S ELIGIBILITY TO POSSESS A REGULATED FIREARM.~~

~~(G)    AN APPLICANT WHO IS AGGRIEVED BY THE ACTION OF THE HEALTH DEPARTMENT MAY REQUEST A HEARING BY WRITING TO THE SECRETARY OF HEALTH AND MENTAL HYGIENE WITHIN 30 DAYS AFTER THE HEALTH DEPARTMENT MAILS THE DECISION TO THE APPLICANT.~~

~~(H)    THE HEARING SHALL BE HELD IN ACCORDANCE WITH TITLE 10, SUBTITLE 2 OF THE STATE GOVERNMENT ARTICLE WITHIN 60 DAYS AFTER THE HEALTH DEPARTMENT RECEIVES THE REQUEST.~~

(I)      IF THE APPLICANT REQUESTS A HEARING, THE ADMINISTRATIVE LAW JUDGE SHALL CONDUCT A HEARING AT WHICH THE APPLICANT MAY TESTIFY AND PROVIDE OTHER EVIDENCE.

(J)      AT A HEARING, THE APPLICANT IS REQUIRED TO PROVIDE EVIDENCE THAT:

(1)      THE APPLICANT DOES NOT HAVE SYMPTOMS OF A MENTAL DISORDER THAT WOULD CAUSE THE APPLICANT TO BE A DANGER TO SELF OR OTHERS AND HAS NOT HAD SYMPTOMS OF A MENTAL DISORDER FOR AT LEAST 6 MONTHS;

(2)      THE APPLICANT DOES NOT HAVE A MENTAL DISORDER OR MENTAL HEALTH CONDITION THAT PREVENTS THE APPLICANT FROM UNDERSTANDING THE RULES, REGULATIONS, AND LAWS GOVERNING FIREARM OWNERSHIP AND POSSESSION, OR THE RESPONSIBILITIES AND RISKS INVOLVED IN FIREARM OWNERSHIP AND POSSESSION;

(3)      THE APPLICANT IS NOT LIKELY TO ACT IN A MANNER DANGEROUS TO PUBLIC SAFETY;

(4)      GRANTING RELIEF WOULD NOT BE CONTRARY TO PUBLIC INTEREST; AND

(5)      THE APPLICANT IS NOT OTHERWISE PROHIBITED FROM OWNING OR POSSESSING A FIREARM.

(K)      AT A HEARING UNDER THIS SECTION, THE HEALTH DEPARTMENT IS A PARTY AND SHALL PROVIDE EVIDENCE REGARDING:

(1)      THE CIRCUMSTANCES UNDER WHICH THE FIREARMS PROHIBITION WAS IMPOSED UNDER STATE OR FEDERAL LAW; AND

(2)      THE APPLICANT'S RECORD, INCLUDING THE APPLICANT'S MENTAL HEALTH AND CRIMINAL HISTORY RECORDS.

(L)      IF THE ADMINISTRATIVE LAW JUDGE FINDS THAT THE APPLICANT HAS MET, BY CLEAR AND CONVINCING EVIDENCE, THE STANDARDS OF SUBSECTION (J) OF THIS SECTION THE ADMINISTRATIVE LAW JUDGE SHALL:

(1)      ISSUE A WRITTEN DETERMINATION THAT THE APPLICANT IS RELIEVED FROM THE FIREARMS DISQUALIFICATION IMPOSED BY 18 U.S.C. § 922(D)(4) AND (G)(4) AND § 5–133(B)(6), (7), (8), OR (9) (9), (10), OR (11) (11),

~~OR (12) OF THIS SUBTITLE OR § 5–205(B)(6), (7), (8), (9), (10), OR (11) (11), OR (12) OF THIS TITLE; AND~~

~~(2)     PROVIDE TO THE NICS INDEX, THROUGH A SECURE DATA PORTAL APPROVED BY THE DEPARTMENT OF STATE POLICE PUBLIC SAFETY AND CORRECTIONAL SERVICES:~~

~~(I)     THE NAME AND IDENTIFYING INFORMATION OF THE APPLICANT; AND~~

~~(II)     THE DATE OF THE DETERMINATION.~~

~~(M)     AN APPLICANT OR THE HEALTH DEPARTMENT MAY SEEK JUDICIAL REVIEW OF A DETERMINATION OF THE ADMINISTRATIVE LAW JUDGE ON AN APPLICATION UNDER THIS SECTION FOR RELIEF FROM A FIREARMS PROHIBITION IN ACCORDANCE WITH §§ 10–222 AND 10–223 OF THE STATE GOVERNMENT ARTICLE.~~

~~(N)     AFTER A DETERMINATION ON THE MERITS OF A HEARING REQUESTED UNDER THIS SECTION, AN APPLICANT MAY NOT REQUEST A SUBSEQUENT HEARING WITHIN 1 YEAR AFTER THE COMPLETION OF THE HEARING PROCESS AND ANY JUDICIAL REVIEW OF THE ADMINISTRATIVE DECISION.~~

~~(O)     THE HEALTH DEPARTMENT SHALL ENTER INTO A MEMORANDUM OF UNDERSTANDING WITH THE DEPARTMENT OF STATE POLICE TO ASSIST IN CLINICAL CONSULTATION AND IMPLEMENTATION OF THIS SECTION.~~

*5–133.3.*

*(A)     IN THIS SECTION, "HEALTH DEPARTMENT" MEANS THE DEPARTMENT OF HEALTH AND MENTAL HYGIENE.*

*(B)     A PERSON SUBJECT TO A REGULATED FIREARMS DISQUALIFICATION UNDER § 5–133(B)(6), (7), (8), (9), (10), OR (11) OF THIS SUBTITLE, A RIFLE OR SHOTGUN DISQUALIFICATION UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11) OF THIS TITLE, OR PROHIBITED FROM THE SHIPMENT, TRANSPORTATION, POSSESSION, OR RECEIPT OF A FIREARM BY 18 U.S.C. §§ 922(D)(4) OR (G)(4) AS A RESULT OF AN ADJUDICATION OR COMMITMENT THAT OCCURRED IN THE STATE MAY BE AUTHORIZED TO POSSESS A FIREARM IF:*

*(1)     THE PERSON IS NOT SUBJECT TO ANOTHER FIREARMS RESTRICTION UNDER STATE OR FEDERAL LAW; AND*

Ch. 427                         2013 LAWS OF MARYLAND

      *(2)   THE HEALTH DEPARTMENT, IN ACCORDANCE WITH THIS SECTION, DETERMINES THAT THE PERSON MAY POSSESS A FIREARM.*

      *(C)   A PERSON WHO SEEKS RELIEF FROM A FIREARMS DISQUALIFICATION SHALL FILE AN APPLICATION WITH THE HEALTH DEPARTMENT IN THE FORM AND MANNER SET BY THE HEALTH DEPARTMENT.*

      *(D)   AN APPLICATION FOR RELIEF FROM A FIREARMS DISQUALIFICATION SHALL INCLUDE:*

      *(1)   A COMPLETE AND ACCURATE STATEMENT EXPLAINING THE REASON WHY THE APPLICANT IS PROHIBITED FROM POSSESSING A REGULATED FIREARM UNDER § 5–133(B)(6), (7), (8), (9), (10), OR (11) OF THIS SUBTITLE OR A RIFLE OR SHOTGUN UNDER § 5–205(B)(6), (7), (8), (9), (10), OR (11) OF THIS TITLE, OR IS PROHIBITED FROM THE SHIPMENT, TRANSPORTATION, POSSESSION, OR RECEIPT OF A FIREARM BY 18 U.S.C. §§ 922(D)(4) OR (G)(4) AS A RESULT OF AN ADJUDICATION OR COMMITMENT THAT OCCURRED IN THE STATE;*

      *(2)   A STATEMENT WHY THE APPLICANT SHOULD BE RELIEVED FROM THE PROHIBITION DESCRIBED IN ITEM (1) OF THIS SUBSECTION;*

      *(3)   IF THE APPLICANT IS SUBJECT TO A PROHIBITION DESCRIBED IN ITEM (1) OF THIS SUBSECTION, A CERTIFICATE ISSUED WITHIN 30 DAYS OF THE SUBMISSION OF THE APPLICATION ON A FORM APPROVED BY THE HEALTH DEPARTMENT AND SIGNED BY AN INDIVIDUAL LICENSED IN THE STATE AS A PHYSICIAN WHO IS BOARD CERTIFIED IN PSYCHIATRY OR AS A PSYCHOLOGIST STATING:*

      *(I)   THE LENGTH OF TIME THAT THE APPLICANT HAS NOT HAD SYMPTOMS THAT CAUSE THE APPLICANT TO BE A DANGER TO THE APPLICANT OR OTHERS, OR, IF THE DISQUALIFICATION RELATES TO AN INTELLECTUAL DISABILITY, THE LENGTH OF TIME THAT THE APPLICANT HAS NOT ENGAGED IN BEHAVIORS THAT CAUSE THE APPLICANT TO BE A DANGER TO THE APPLICANT OR OTHERS;*

      *(II)   THE LENGTH OF TIME THAT THE APPLICANT HAS BEEN COMPLIANT WITH THE TREATMENT PLAN FOR THE APPLICANT'S MENTAL ILLNESS, OR, IF THE DISQUALIFICATION RELATES TO AN INTELLECTUAL DISABILITY, THE LENGTH OF TIME THAT THE APPLICANT HAS BEEN COMPLIANT WITH ANY BEHAVIOR PLAN OR BEHAVIOR MANAGEMENT PLAN;*

MARTIN O'MALLEY, Governor                    Ch. 427

(III)   AN OPINION AS TO WHETHER THE APPLICANT, BECAUSE OF MENTAL ILLNESS, WOULD BE A DANGER TO THE APPLICANT IF ALLOWED TO POSSESS A FIREARM AND A STATEMENT OF REASONS FOR THE OPINION; AND

(IV)   AN OPINION AS TO WHETHER THE APPLICANT, BECAUSE OF MENTAL ILLNESS, WOULD BE A DANGER TO ANOTHER PERSON OR POSES A RISK TO PUBLIC SAFETY IF ALLOWED TO POSSESS A FIREARM;

(4)   IF THE APPLICANT IS PROHIBITED FROM POSSESSING A FIREARM UNDER § 5–133(B)(11) OF THIS SUBTITLE OR § 5–205(B)(11) OF THIS TITLE:

(I)   A COPY OF ALL PLEADINGS, AFFIDAVITS, AND CERTIFICATES SUBMITTED INTO EVIDENCE AT THE GUARDIANSHIP PROCEEDING; AND

(II)   ALL ORDERS ISSUED BY THE COURT RELATING TO THE GUARDIANSHIP, INCLUDING, IF APPLICABLE, AN ORDER INDICATING THAT THE GUARDIANSHIP IS NO LONGER IN EFFECT;

(5)   A SIGNED AUTHORIZATION, ON A FORM APPROVED BY THE HEALTH DEPARTMENT, ALLOWING THE HEALTH DEPARTMENT TO ACCESS ANY RELEVANT HEALTH CARE, MENTAL HEALTH, DISABILITY, GUARDIANSHIP, AND CRIMINAL JUSTICE RECORDS, INCLUDING COURT ORDERED OR REQUIRED MENTAL HEALTH RECORDS, OF THE APPLICANT FOR USE IN DETERMINING WHETHER THE APPLICANT SHOULD BE RELIEVED FROM A FIREARMS DISQUALIFICATION;

(6)   THREE STATEMENTS SIGNED AND DATED WITHIN 30 DAYS OF SUBMISSION TO THE HEALTH DEPARTMENT ON A FORM DESIGNATED BY THE HEALTH DEPARTMENT ATTESTING TO THE APPLICANT'S REPUTATION AND CHARACTER RELEVANT TO FIREARM OWNERSHIP OR POSSESSION INCLUDING:

(I)   AT LEAST TWO STATEMENTS PROVIDED BY AN INDIVIDUAL WHO IS NOT RELATED TO THE APPLICANT; AND

(II)   CONTACT INFORMATION FOR EACH INDIVIDUAL PROVIDING A STATEMENT; AND

(7)   ANY OTHER INFORMATION REQUIRED BY THE HEALTH DEPARTMENT.

(E)   THE HEALTH DEPARTMENT MAY NOT APPROVE AN APPLICATION UNDER THIS SECTION IF A DETERMINATION IS MADE THAT:

(1)     THE   APPLICANT   SUPPLIED   INCOMPLETE   OR   FALSE INFORMATION OR MADE A FALSE STATEMENT;

(2)     THE APPLICATION IS NOT PROPERLY COMPLETED; OR

(3)     ON   REVIEW   OF   THE   APPLICATION   AND   SUPPORTING DOCUMENTATION   AND   ANY   OTHER   INFORMATION   RELATING   TO   THE APPLICATION   REQUESTED   BY   THE   HEALTH   DEPARTMENT,   INCLUDING   ANY CRIMINAL   HISTORY   RECORDS   AND   MENTAL   HEALTH   RECORDS   OF   THE APPLICANT,  THE  APPLICANT  HAS  NOT  SHOWN  BY  A  PREPONDERANCE  OF  THE EVIDENCE   THAT   THE   APPLICANT   WILL   BE   UNLIKELY   TO   ACT   IN   A   MANNER DANGEROUS TO THE APPLICANT OR TO PUBLIC SAFETY AND THAT GRANTING A LICENSE   TO   POSSESS   A   REGULATED   FIREARM   OR   AUTHORIZING   THE POSSESSION OF A RIFLE OR SHOTGUN WOULD NOT BE CONTRARY TO THE PUBLIC INTEREST.

(F)     (1)     IF   THE   HEALTH   DEPARTMENT   DETERMINES   THAT   THE APPLICATION SHALL BE APPROVED, THE HEALTH DEPARTMENT SHALL PROVIDE THE   APPLICANT   WITH   A   CERTIFICATE   AFFIRMING   THE   APPLICANT'S   MENTAL COMPETENCE TO POSSESS A FIREARM.

(2)     A   CERTIFICATE   PROVIDED   UNDER   PARAGRAPH   (1)   OF   THIS SUBSECTION   OR   A   WRITTEN   STATEMENT   THAT   THE   INDIVIDUAL   IS   NOT MENTALLY COMPETENT TO POSSESS A FIREARM SHALL BE PROVIDED TO THE APPLICANT WITHIN 60 DAYS FROM THE HEALTH DEPARTMENT'S RECEIPT OF A COMPLETED   APPLICATION,   WHICH   INCLUDES   ANY   RECORDS   NECESSARY   TO REVIEW AN APPLICATION.

(3)     A   CERTIFICATE   ISSUED   UNDER   PARAGRAPH   (1)   OF   THIS SUBSECTION SHALL BE PRESENTED TO THE DEPARTMENT OF STATE POLICE AS EVIDENCE OF THE APPLICANT'S ELIGIBILITY TO POSSESS A FIREARM.

(G)     (1)     AN  APPLICANT  WHO  IS  AGGRIEVED  BY  THE  ACTION  OF  THE HEALTH DEPARTMENT UNDER SUBSECTION (E) OF THIS SECTION MAY REQUEST A HEARING IN WRITING TO THE SECRETARY OF HEALTH AND MENTAL HYGIENE WITHIN   30   DAYS   AFTER   THE   HEALTH   DEPARTMENT   MAILS   NOTICE   OF   THE DECISION TO THE APPLICANT.

(2)     (I)     THE  HEARING  REQUESTED  UNDER  PARAGRAPH  (1)  OF THIS SUBSECTION SHALL BE HELD IN ACCORDANCE WITH TITLE 10, SUBTITLE 2 OF  THE  STATE  GOVERNMENT  ARTICLE  WITHIN  60  DAYS  AFTER  THE  HEALTH DEPARTMENT RECEIVES THE REQUEST.

MARTIN O'MALLEY, Governor                    Ch. 427

*(II)   AT THE HEARING, THE INFORMATION DESCRIBED IN SUBSECTIONS (D) AND (E) OF THIS SECTION SHALL BE CONSIDERED AND USED TO DETERMINE WHETHER THE APPLICANT, IF ALLOWED TO POSSESS A FIREARM, WOULD NOT BE LIKELY TO ACT IN A MANNER DANGEROUS TO THE PUBLIC SAFETY AND WHETHER GRANTING THE RELIEF WOULD NOT BE CONTRARY TO THE PUBLIC INTEREST.*

*(3)   (I)   JUDICIAL REVIEW OF THE DETERMINATION ON AN APPLICATION UNDER THIS SECTION FOR RELIEF FROM A FIREARMS PROHIBITION MAY BE SOUGHT IN ACCORDANCE WITH §§ 10–222 AND 10–223 OF THE STATE GOVERNMENT ARTICLE.*

*(II)   NOTWITHSTANDING THE PROVISIONS OF § 10–222 OF THE STATE GOVERNMENT ARTICLE, THE CIRCUIT COURT MAY GIVE DEFERENCE TO THE FINAL DECISION OF THE HEALTH DEPARTMENT AND MAY IN ITS DISCRETION RECEIVE ADDITIONAL EVIDENCE THAT IT DETERMINES TO BE NECESSARY TO CONDUCT AN ADEQUATE REVIEW.*

*(H)   THE BOARD OF REVIEW OF THE HEALTH DEPARTMENT DOES NOT HAVE JURISDICTION TO REVIEW A FINAL DECISION OF THE HEALTH DEPARTMENT UNDER THIS SECTION.*

*(I)   AFTER A DETERMINATION ON THE MERITS OF A HEARING REQUESTED UNDER THIS SECTION, AN APPLICANT MAY NOT REQUEST A SUBSEQUENT HEARING WITHIN 1 YEAR AFTER THE COMPLETION OF THE HEARING PROCESS AND ANY JUDICIAL REVIEW OF THE ADMINISTRATIVE DECISION.*

*(J)   THE SECRETARY OF HEALTH AND MENTAL HYGIENE MAY ADOPT REGULATIONS ESTABLISHING FEES TO COVER THE ADMINISTRATIVE COSTS ASSOCIATED WITH THE IMPLEMENTATION OF THIS SECTION.*

*(K)   AN INDIVIDUAL LICENSED IN THE STATE AS A PHYSICIAN WHO IS BOARD CERTIFIED IN PSYCHIATRY, OR A PSYCHOLOGIST WHO, IN GOOD FAITH AND WITH REASONABLE GROUNDS, ACTS IN COMPLIANCE WITH THIS SECTION, MAY NOT BE HELD CIVILLY OR CRIMINALLY LIABLE FOR ACTIONS AUTHORIZED BY THIS SECTION.*

**5–143.**

(A)   (1)   A PERSON WHO MOVES INTO THE STATE WITH THE INTENT OF BECOMING A RESIDENT SHALL REGISTER ALL REGULATED FIREARMS WITH THE SECRETARY WITHIN ~~30~~ *90* DAYS AFTER ESTABLISHING RESIDENCY.

(2)    THE SECRETARY SHALL PREPARE AND, ON REQUEST OF AN APPLICANT, PROVIDE AN APPLICATION FORM FOR REGISTRATION UNDER THIS SECTION.

(B)    AN APPLICATION FOR REGISTRATION UNDER THIS SECTION SHALL CONTAIN:

(1)    THE MAKE, MODEL, MANUFACTURER'S SERIAL NUMBER, CALIBER, TYPE, BARREL LENGTH, FINISH, AND COUNTRY OF ORIGIN OF ~~THE~~ *EACH* REGULATED FIREARM; AND

(2)    THE FIREARM APPLICANT'S NAME, ADDRESS, SOCIAL SECURITY NUMBER, PLACE AND DATE OF BIRTH, HEIGHT, WEIGHT, RACE, EYE AND HAIR COLOR, SIGNATURE, DRIVER'S OR PHOTOGRAPHIC IDENTIFICATION SOUNDEX NUMBER, AND OCCUPATION.

(C)    ~~EACH~~ *AN* APPLICATION FOR REGISTRATION FILED WITH THE SECRETARY OF STATE POLICE SHALL BE ACCOMPANIED BY A NONREFUNDABLE *TOTAL* REGISTRATION FEE OF $15*, REGARDLESS OF THE NUMBER OF FIREARMS REGISTERED*.

(D)    REGISTRATION DATA PROVIDED UNDER THIS SECTION IS NOT OPEN TO PUBLIC INSPECTION.

[5–143.] **5–144.**

(a)    Except as otherwise provided in this subtitle, a dealer or other person may not:

(1)    knowingly participate in the illegal sale, rental, transfer, purchase, possession, or receipt of a regulated firearm in violation of this subtitle; or

(2)    knowingly violate § 5–142 of this subtitle.

(b)    A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 5 years or a fine not exceeding $10,000 or both.

(c)    Each violation of this section is a separate crime.

**5–145.**

MARTIN O'MALLEY, Governor                    Ch. 427

(A)   (1)   A LICENSED DEALER SHALL KEEP RECORDS OF ALL RECEIPTS, SALES, AND OTHER DISPOSITIONS OF FIREARMS AFFECTED IN CONNECTION WITH THE LICENSED DEALER'S BUSINESS.

(2)   THE SECRETARY SHALL ADOPT REGULATIONS SPECIFYING:

(I)   SUBJECT TO PARAGRAPH (3) OF THIS SUBSECTION, THE INFORMATION THAT THE RECORDS SHALL CONTAIN;

(II)   THE TIME PERIOD FOR WHICH THE RECORDS ARE TO BE KEPT; AND

(III)   THE FORM IN WHICH THE RECORDS ARE TO BE KEPT.

(3)   THE RECORDS SHALL INCLUDE:

(I)   THE NAME AND ADDRESS OF EACH PERSON FROM WHOM THE DEALER ACQUIRES A FIREARM AND TO WHOM THE DEALER SELLS OR OTHERWISE DISPOSES OF A FIREARM;

(II)   A PRECISE DESCRIPTION, INCLUDING MAKE, MODEL, CALIBER, AND SERIAL NUMBER OF EACH FIREARM ACQUIRED, SOLD, OR OTHERWISE DISPOSED OF; AND

(III)   THE DATE OF EACH ACQUISITION, SALE, OR OTHER DISPOSITION.

(4)   ~~THE SECRETARY MAY PROVIDE THAT RECORDS~~ *RECORDS* MAINTAINED UNDER 18 U.S.C. § 923(G)(1)(A) MAY BE USED TO SATISFY THE REQUIREMENTS OF THIS SECTION, *IF THE SECRETARY IS GRANTED ACCESS TO THOSE RECORDS.*

(B)   (1)   WHEN REQUIRED BY A LETTER ISSUED BY THE SECRETARY, A LICENSEE SHALL SUBMIT TO THE SECRETARY THE INFORMATION REQUIRED TO BE KEPT UNDER SUBSECTION (A) OF THIS SECTION FOR THE TIME PERIODS SPECIFIED BY THE SECRETARY.

(2)   THE SECRETARY SHALL DETERMINE THE FORM AND METHOD BY WHICH THE RECORDS SHALL BE MAINTAINED.

(C)   WHEN A FIREARMS BUSINESS IS DISCONTINUED AND SUCCEEDED BY A NEW LICENSEE, THE RECORDS REQUIRED TO BE KEPT UNDER THIS SECTION SHALL REFLECT THE BUSINESS DISCONTINUANCE AND SUCCESSION AND SHALL BE DELIVERED TO THE SUCCESSOR LICENSEE.

Ch. 427                           2013 LAWS OF MARYLAND

(D)      (1)      A LICENSEE SHALL RESPOND WITHIN 48 HOURS AFTER RECEIPT OF A REQUEST FROM THE SECRETARY FOR INFORMATION CONTAINED IN THE RECORDS REQUIRED TO BE KEPT UNDER THIS SECTION WHEN THE INFORMATION IS REQUESTED IN CONNECTION WITH A BONA FIDE CRIMINAL INVESTIGATION.

(2)      THE INFORMATION REQUESTED UNDER THIS SUBSECTION SHALL BE PROVIDED ORALLY OR IN WRITING, AS REQUIRED BY THE SECRETARY.

(3)      THE SECRETARY MAY IMPLEMENT A SYSTEM BY WHICH A LICENSEE CAN POSITIVELY ESTABLISH THAT A PERSON REQUESTING INFORMATION BY TELEPHONE IS AUTHORIZED BY THE SECRETARY TO REQUEST THE INFORMATION.

(E)      THE SECRETARY MAY MAKE AVAILABLE TO A FEDERAL, STATE, OR LOCAL LAW ENFORCEMENT AGENCY ANY INFORMATION THAT THE SECRETARY OBTAINS UNDER THIS SECTION RELATING TO THE IDENTITIES OF PERSONS WHO HAVE UNLAWFULLY PURCHASED OR RECEIVED FIREARMS.

(F)      THE SECRETARY:

(1)      SHALL INSPECT THE INVENTORY AND RECORDS OF A LICENSED DEALER AT LEAST ONCE EVERY 2 YEARS; AND

(2)      MAY INSPECT THE INVENTORY AND RECORDS AT ANY TIME DURING THE NORMAL BUSINESS HOURS OF THE LICENSED DEALER'S BUSINESS.

(G)      (1)      A PERSON WHO VIOLATES THIS SECTION IS SUBJECT TO A CIVIL PENALTY NOT EXCEEDING $1,000 IMPOSED BY THE SECRETARY.

(2)      FOR A SECOND OR SUBSEQUENT OFFENSE, A PERSON WHO KNOWINGLY VIOLATES THIS SECTION IS GUILTY OF A MISDEMEANOR AND IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 3 YEARS OR A FINE NOT EXCEEDING $10,000 OR BOTH.

*(3)      THE PENALTIES PROVIDED IN THIS SUBSECTION ARE NOT INTENDED TO APPLY TO INCONSEQUENTIAL OR INADVERTENT ERRORS.*

*5–146.*

*(A)   A DEALER OR ANY OTHER PERSON WHO SELLS OR TRANSFERS A REGULATED FIREARM SHALL NOTIFY THE PURCHASER OR RECIPIENT OF THE REGULATED FIREARM AT THE TIME OF PURCHASE OR TRANSFER THAT THE PURCHASER OR RECIPIENT IS REQUIRED TO REPORT A LOST OR STOLEN REGULATED FIREARM TO THE LOCAL LAW ENFORCEMENT AGENCY AS REQUIRED UNDER SUBSECTION (B) OF THIS SECTION.*

*(B)   IF A REGULATED FIREARM IS LOST OR STOLEN, THE OWNER OF THE REGULATED FIREARM SHALL REPORT THE LOSS OR THEFT TO THE LOCAL LAW ENFORCEMENT AGENCY WITHIN 72 HOURS AFTER THE OWNER FIRST DISCOVERS THE LOSS OR THEFT.*

*(C)   ON RECEIPT OF A REPORT OF A LOST OR STOLEN REGULATED FIREARM, A LOCAL LAW ENFORCEMENT AGENCY SHALL REPORT TO THE SECRETARY AND ENTER INTO THE NATIONAL CRIME INFORMATION CENTER (NCIC) DATABASE, TO THE EXTENT KNOWN, THE CALIBER, MAKE, MODEL, MANUFACTURER, AND SERIAL NUMBER OF THE REGULATED FIREARM AND ANY OTHER DISTINGUISHING NUMBER OR IDENTIFICATION MARK ON THE REGULATED FIREARM.*

*(D)   (1)   A KNOWING AND WILLFUL FIRST–TIME VIOLATION OF THIS SECTION IS A CIVIL OFFENSE PUNISHABLE BY A FINE NOT EXCEEDING $500.*

*(2)   A PERSON WHO KNOWINGLY AND WILLFULLY VIOLATES THIS SECTION FOR A SECOND OR SUBSEQUENT TIME IS GUILTY OF A MISDEMEANOR AND ON CONVICTION IS SUBJECT TO IMPRISONMENT NOT EXCEEDING 90 DAYS OR A FINE NOT EXCEEDING $500 OR BOTH.*

*(E)   THE IMPOSITION OF A CIVIL OR CRIMINAL PENALTY UNDER THIS SECTION DOES NOT PRECLUDE THE PURSUIT OF ANY OTHER CIVIL REMEDY OR CRIMINAL PROSECUTION AUTHORIZED BY LAW.*

5–205.

(A)   THIS SUBTITLE DOES NOT APPLY TO A RIFLE OR SHOTGUN THAT IS AN ANTIQUE FIREARM AS DEFINED IN § 4–201 OF THE CRIMINAL LAW ARTICLE.

(B)   A PERSON MAY NOT POSSESS A RIFLE OR SHOTGUN IF THE PERSON:

(1)   HAS BEEN CONVICTED OF A DISQUALIFYING CRIME AS DEFINED IN § 5–101 OF THIS TITLE;

(2)    HAS BEEN CONVICTED OF A VIOLATION CLASSIFIED AS A CRIME UNDER COMMON LAW AND RECEIVED A TERM OF IMPRISONMENT OF MORE THAN 2 YEARS;

(3)    IS A FUGITIVE FROM JUSTICE;

(4)    IS A HABITUAL DRUNKARD AS DEFINED IN § 5–101 OF THIS TITLE;

(5)    IS ADDICTED TO A CONTROLLED DANGEROUS SUBSTANCE OR IS A HABITUAL USER AS DEFINED IN § 5–101 OF THIS TITLE;

(6)    SUFFERS FROM A MENTAL DISORDER AS DEFINED IN § 10–101(F)(2) OF THE HEALTH – GENERAL ARTICLE AND HAS A HISTORY OF VIOLENT BEHAVIOR AGAINST THE PERSON OR ANOTHER, UNLESS THE PERSON HAS A PHYSICIAN'S CERTIFICATE THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER;

(7)    HAS BEEN FOUND INCOMPETENT TO STAND TRIAL UNDER § 3–106 OF THE CRIMINAL PROCEDURE ARTICLE;

(8)    HAS BEEN FOUND NOT CRIMINALLY RESPONSIBLE UNDER § 3–110 OF THE CRIMINAL PROCEDURE ARTICLE;

(9)    HAS BEEN BEFORE OCTOBER 1, 2013, WAS *HAS BEEN* VOLUNTARILY ADMITTED FOR MORE THAN 30 CONSECUTIVE DAYS TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

(10)   HAS BEEN ADMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE AS THE RESULT OF AN EMERGENCY EVALUATION UNDER § 10–622 OF THE HEALTH – GENERAL ARTICLE, UNLESS THE PERSON HAS A CERTIFICATE FROM THE FACILITY THAT THE PERSON IS CAPABLE OF POSSESSING A REGULATED FIREARM WITHOUT UNDUE DANGER TO THE PERSON OR TO ANOTHER;

(10) (11) *(10)*    HAS BEEN INVOLUNTARILY COMMITTED TO A FACILITY AS DEFINED IN § 10–101 OF THE HEALTH – GENERAL ARTICLE;

(11) (12) *(11)*    IS UNDER THE PROTECTION OF A GUARDIAN APPOINTED BY A COURT UNDER § 13–201(C) OR § 13–705 OF THE ESTATES AND TRUSTS ARTICLE, *EXCEPT FOR CASES IN WHICH THE APPOINTMENT OF A GUARDIAN IS SOLELY A RESULT OF A PHYSICAL DISABILITY*;

MARTIN O'MALLEY, Governor                                    Ch. 427

    **(6)** ~~**(12) (13)**~~ *(12)* EXCEPT AS PROVIDED IN SUBSECTION (C) OF THIS SECTION, IS A RESPONDENT AGAINST WHOM:

        (I)   A CURRENT NON EX PARTE CIVIL PROTECTIVE ORDER HAS BEEN ENTERED UNDER § 4–506 OF THE FAMILY LAW ARTICLE; OR

        (II)   AN ORDER FOR PROTECTION, AS DEFINED IN § 4–508.1 OF THE FAMILY LAW ARTICLE, HAS BEEN ISSUED BY A COURT OF ANOTHER STATE OR A NATIVE AMERICAN TRIBE AND IS IN EFFECT; OR

    **(7)** ~~**(13) (14)**~~ *(13)* IF UNDER THE AGE OF 30 YEARS AT THE TIME OF POSSESSION, HAS BEEN ADJUDICATED DELINQUENT BY A JUVENILE COURT FOR AN ACT THAT WOULD BE A DISQUALIFYING CRIME IF COMMITTED BY AN ADULT.

    ~~**[(a)] (C)**   Unless the person possesses a physician's certificate that the person is capable of possessing a rifle or shotgun without undue danger to the person or to another, a person may not possess a rifle or shotgun if the person:~~

        ~~(1)   suffers from a mental disorder as defined in § 10–101(f)(2) of the Health – General Article and has a history of violent behavior against the person or another; or~~

        ~~(2)   has been confined for more than 30 consecutive days in a facility as defined in § 10–101 of the Health – General Article.~~

    ~~**(D)**~~ **(C)**   THIS SECTION DOES NOT APPLY TO A PERSON TRANSPORTING A RIFLE OR SHOTGUN IF THE PERSON IS CARRYING A CIVIL PROTECTIVE ORDER REQUIRING THE SURRENDER OF THE RIFLE OR SHOTGUN AND:

        (1)   THE RIFLE OR SHOTGUN IS UNLOADED;

        (2)   THE PERSON HAS NOTIFIED THE LAW ENFORCEMENT UNIT, BARRACKS, OR STATION THAT THE RIFLE OR SHOTGUN IS BEING TRANSPORTED IN ACCORDANCE WITH THE CIVIL PROTECTIVE ORDER; AND

        (3)   THE PERSON TRANSPORTS THE RIFLE OR SHOTGUN DIRECTLY TO THE LAW ENFORCEMENT UNIT, BARRACKS, OR STATION.

    [(b)] ~~**(E)**~~ **(D)** A person who violates this section is guilty of a misdemeanor and on conviction is subject to imprisonment not exceeding 3 years or a fine not exceeding $1,000 or both.

    **(E)   A PERSON WHO IS DISQUALIFIED FROM OWNING A RIFLE OR SHOTGUN UNDER SUBSECTION (B)(6), (7), (8), (9), (10), OR (11) OF THIS**

**SECTION MAY SEEK RELIEF FROM THE DISQUALIFICATION IN ACCORDANCE WITH § 5–133.3 OF THIS TITLE.**

5–206.

(a)     A person may not possess a rifle or shotgun if the person was previously convicted of:

(1)     a crime of violence **AS DEFINED IN § 5–101 OF THIS TITLE**;

(2)     a violation of § 5–602, § 5–603, § 5–604, § 5–605, § 5–612, § 5–613, or § 5–614 of the Criminal Law Article; or

(3)     an offense under the laws of another state or the United States that would constitute one of the crimes listed in item (1) or (2) of this subsection if committed in this State.

(b)     A person who violates this section is guilty of a felony and on conviction is subject to imprisonment not exceeding 15 years.

(c)     Each violation of this subsection is a separate crime.

5–301.

(a)     In this subtitle the following words have the meanings indicated.

(b)     "Board" means the Handgun Permit Review Board.

(c)     "Handgun" has the meaning stated in § 4–201 of the Criminal Law Article.

(d)     "Permit" means a permit issued by the Secretary to carry, wear, or transport a handgun.

**(E)     "QUALIFIED HANDGUN INSTRUCTOR" HAS THE MEANING STATED IN § 5–101 OF THIS TITLE.**

[(e)] **(F)**     "Secretary" means the Secretary of State Police or the Secretary's designee.

5–306.

(a)     Subject to subsection [(b)] **(C)** of this section, the Secretary shall issue a permit within a reasonable time to a person who the Secretary finds:

MARTIN O'MALLEY, Governor                    Ch. 427

(1)     is an adult;

(2)     (i)     has not been convicted of a felony or of a misdemeanor for which a sentence of imprisonment for more than 1 year has been imposed; or

(ii)     if convicted of a crime described in item (i) of this item, has been pardoned or has been granted relief under 18 U.S.C. § 925(c);

(3)     has not been convicted of a crime involving the possession, use, or distribution of a controlled dangerous substance;

(4)     is not presently an alcoholic, addict, or habitual user of a controlled dangerous substance unless the habitual use of the controlled dangerous substance is under legitimate medical direction; **[**and**]**

**(5)     EXCEPT AS PROVIDED IN SUBSECTION (B) OF THIS SECTION, HAS SUCCESSFULLY COMPLETED PRIOR TO APPLICATION AND EACH RENEWAL, A FIREARMS TRAINING COURSE APPROVED BY THE SECRETARY THAT INCLUDES:**

**(I)     1.     FOR AN INITIAL APPLICATION, A MINIMUM OF 16 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR; OR**

**2.     FOR A RENEWAL APPLICATION, 8 HOURS OF INSTRUCTION BY A QUALIFIED HANDGUN INSTRUCTOR;**

**(II)     CLASSROOM INSTRUCTION ON:**

**1.     STATE FIREARM LAW;**

**2.     HOME FIREARM SAFETY; AND**

**3.     HANDGUN MECHANISMS AND OPERATION; AND**

**(III)     A FIREARMS QUALIFICATION COMPONENT THAT DEMONSTRATES THE APPLICANT'S PROFICIENCY AND USE OF THE FIREARM; AND**

**[**(5)**] (6)**     based on an investigation:

(i)     has not exhibited a propensity for violence or instability that may reasonably render the person's possession of a handgun a danger to the person or to another; and

(ii)     has good and substantial reason to wear, carry, or transport a handgun, such as a finding that the permit is necessary as a reasonable precaution against apprehended danger.

(B)     AN APPLICANT FOR A PERMIT IS NOT REQUIRED TO COMPLETE A CERTIFIED FIREARMS TRAINING COURSE UNDER SUBSECTION (A) OF THIS SECTION IF THE APPLICANT:

(1)     IS A LAW ENFORCEMENT OFFICER OR A PERSON WHO IS RETIRED IN GOOD STANDING FROM SERVICE WITH A LAW ENFORCEMENT AGENCY OF THE UNITED STATES, THE STATE, OR ANY LOCAL LAW ENFORCEMENT AGENCY IN THE STATE;

(2)     IS A MEMBER ~~OR,~~ RETIRED MEMBER, OR HONORABLY DISCHARGED MEMBER OF THE ARMED FORCES OF THE UNITED STATES OR THE NATIONAL GUARD~~; OR~~;

(3)     IS ~~CURRENTLY A CERTIFIED FIREARMS INSTRUCTOR WHO:~~

~~(I)     IS RECOGNIZED BY THE MARYLAND POLICE AND CORRECTIONAL TRAINING COMMISSIONS;~~

~~(II)     HAS A QUALIFIED HANDGUN INSTRUCTOR LICENSE ISSUED BY THE SECRETARY; OR~~

~~(III)     HAS A CERTIFICATION ISSUED AND RECOGNIZED BY A NATIONAL ORGANIZATION~~ *A QUALIFIED HANDGUN INSTRUCTOR*; OR

~~(3)~~ (4)     HAS COMPLETED A FIREARMS TRAINING COURSE APPROVED BY THE SECRETARY.

[(b)] (C)     An applicant under the age of 30 years is qualified only if the Secretary finds that the applicant has not been:

(1)     committed to a detention, training, or correctional institution for juveniles for longer than 1 year after an adjudication of delinquency by a juvenile court; or

(2)     adjudicated delinquent by a juvenile court for:

(i)     an act that would be a crime of violence if committed by an adult;

MARTIN O'MALLEY, Governor                     Ch. 427

(ii)    an act that would be a felony in this State if committed by an adult; or

(iii)   an act that would be a misdemeanor in this State that carries a statutory penalty of more than 2 years if committed by an adult.

**(D)     THE SECRETARY MAY ISSUE A HANDGUN QUALIFICATION LICENSE, WITHOUT AN ADDITIONAL APPLICATION OR FEE, TO A PERSON WHO:**

**(1)     MEETS THE REQUIREMENTS FOR ISSUANCE OF A PERMIT UNDER THIS SECTION; AND**

**(2)     DOES NOT HAVE A HANDGUN QUALIFICATION LICENSE ISSUED UNDER § 5–117.1 OF THIS TITLE.**

*Article – State Government*

*10–616.*

*(a)     Unless otherwise provided by law, a custodian shall deny inspection of a public record, as provided in this section.*

*(V)  (1)     EXCEPT AS PROVIDED IN PARAGRAPHS (2) AND (3) OF THIS SUBSECTION, A CUSTODIAN SHALL DENY INSPECTION OF ALL RECORDS OF A PERSON AUTHORIZED TO:*

*(I)     SELL, PURCHASE, RENT, OR TRANSFER A REGULATED FIREARM UNDER TITLE 5, SUBTITLE 1 OF THE PUBLIC SAFETY ARTICLE; OR*

*(II)    CARRY, WEAR, OR TRANSPORT A HANDGUN UNDER TITLE 5, SUBTITLE 3 OF THE PUBLIC SAFETY ARTICLE.*

*(2)     A CUSTODIAN SHALL ALLOW INSPECTION OF FIREARM OR HANDGUN RECORDS BY:*

*(I)     THE INDIVIDUAL NAMED IN THE RECORD; OR*

*(II)    THE ATTORNEY OF RECORD OF THE INDIVIDUAL NAMED IN THE RECORD.*

*(3)     THE PROVISIONS OF THIS SUBSECTION MAY NOT BE CONSTRUED TO PROHIBIT THE DEPARTMENT OF STATE POLICE OR THE DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES FROM ACCESSING FIREARM OR HANDGUN RECORDS IN THE PERFORMANCE OF THAT DEPARTMENT'S OFFICIAL DUTY.*

_SECTION 2. AND BE IT FURTHER ENACTED, That, on or before October 1, 2013:_

_(a)    The Department of State Police shall investigate illegal transfers, possession, and transport of firearms within the State, including the number and types of firearms seized by the Department of State Police and the best information available as to the source of the seized firearms._

_(b)    On or before December 31, 2015, the Department of State Police shall report its findings to the Governor and, in accordance with § 2–1246 of the State Government Article, the General Assembly._

SECTION ~~2.~~ _3._ AND BE IT FURTHER ENACTED, That this Act shall take effect October 1, 2013. _Section 2 of this Act shall remain effective for a period of 3 years and, at the end of September 30, 2016, with no further action required by the General Assembly, Section 2 of this Act shall be abrogated and of no further force and effect._

**Approved by the Governor, May 16, 2013.**

# Exhibit 90

## PROPOSED ORDINANCE TO AMEND
## THE CITY OF SUNNYVALE MUNICIPAL CODE
## ESTABLISHING GUN SAFETY REGULATIONS

The City Council of the City of Sunnyvale, on its own motion, submits to the electors the following proposed ordinance to amend the Municipal Code of the City of Sunnyvale.  The City Council has called a Special Municipal Election to be held on Tuesday, November 5, 2013, for the purpose of voting on the proposed amendments.

The proposed ordinance to amend the Municipal Code of the City of Sunnyvale follows the statement of the measure; it is set out in full.

### CITY OF SUNNYVALE MEASURE   _C_

Shall the City of Sunnyvale adopt a gun safety ordinance to require: 1) reporting to police, within 48 hours, known loss or theft of a firearm; 2) storing firearms in residences in a locked container or disabling them with a trigger lock when not in the owner's immediate possession; 3) prohibiting the possession of ammunition magazines capable of holding more than 10 rounds, with certain exceptions; and 4) logging and tracking of ammunition sales within the City of Sunnyvale?

Yes   _____
No    _____

If Measure   _C_   carries, an ordinance amending the Municipal Code of the City of Sunnyvale shall be adopted, adding new Sections 9.44.030, 9.44.040, 9.44.050, 9.44.060 to Chapter 9.44, entitled "Firearms," which reads as follows:

### AN ORDINANCE AMENDING CHAPTER 9.44 (FIREARMS) OF THE SUNNYVALE MUNICIPAL CODE TO ADD GUN SAFETY MEASURES

WHEREAS, the People of the City of Sunnyvale find that the violence and harm caused by and resulting from both the intentional and accidental misuse of guns constitutes a clear and present danger to the populace, and find that sensible gun safety measures provide some relief from that danger and are of benefit to the entire community; and

WHEREAS, the People of the City of Sunnyvale find that laws that provide for safe storage of guns in homes, that require a gun owner to report a stolen or lost gun, that prohibit the possession of ammunition magazines capable of holding more than ten rounds unless circumstances warrant such possession, and that require record-keeping relating to the sale of ammunition constitute sensible gun safety regulations because they are not unduly burdensome for gun owners, they aid law enforcement officers in their duties, and they offer some protection to all members of the community.

NOW THEREFORE, THE PEOPLE OF THE CITY OF SUNNYVALE DO ORDAIN AS FOLLOWS:

SECTION 1.   SMC§§9.44.030, 9.44.040, 9.44.050, 9.44.060.   ADDED.

Sunnyvale Municipal Code Title IX (Public Peace, Safety or Welfare), Chapter 9.44 (Firearms), is amended to add four new Sections to read as follows:

### 9.44.030.   Duty to report theft or loss of firearms.

Any person who owns or possesses a firearm (as defined in Penal Code Section 16520 or as amended) shall report the theft or loss of the firearm to the Sunnyvale Department of Public Safety within forty-eight (48) hours of the time he or she knew or reasonably should have known that the firearm had been stolen or lost, whenever:  (1) the person resides in the City of Sunnyvale; or (2) the theft or loss of the firearm occurs in the City of Sunnyvale.

### 9.44.040.   Safe storage of firearms.

Except when carried on his or her person, or in his or her immediate control and possession, no person shall keep a firearm (as defined in Penal Code Section 16520 or as amended) in any residence owned or controlled by that person unless the firearm is stored in a locked container, or the firearm is disabled with a trigger lock that is listed on the California Department of Justice's list of approved firearms safety devices.

### 9.44.050.   Possession of large-capacity ammunition magazines prohibited.

(a)  No person may possess a large-capacity magazine in the City of Sunnyvale whether assembled or disassembled.  For purposes of this section, "large-capacity magazine" means any detachable ammunition feeding device with the capacity to accept more than ten (10) rounds, but shall not be construed to include any of the following:

(1)  A feeding device that has been permanently altered so that it cannot accommodate more than ten (10) rounds; or
(2)  A .22 caliber tubular ammunition feeding device; or
(3)  A tubular magazine that is contained in a lever-action firearm.

(b)  Any person who, prior to the effective date of this section, was legally in possession of a large-capacity magazine shall have ninety (90) days from such effective date to do either of the following without being subject to prosecution:

(1)  Remove the large-capacity magazine from the City of Sunnyvale; or
(2)  Surrender the large-capacity magazine to the Sunnyvale Department of Public Safety for destruction; or
(3)  Lawfully sell or transfer the large-capacity magazine in accordance with Penal Code Section 12020.

(c)  This section shall not apply to the following:

2

(1)  Any federal, state, county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties;

(2)  Any government officer, agent, or employee, member of the armed forces of the United States, or peace officer, to the extent that such person is otherwise authorized to possess a large-capacity magazine and does so while acting within the course and scope of his or her duties;

(3)  A forensic laboratory or any authorized agent or employee thereof in the course and scope or his or her duties;

(4)  Any entity that operates an armored vehicle business pursuant to the laws of the state, and an authorized employee of such entity, while in the course and scope of his or her employment for purposes that pertain to the entity's armored vehicle business;

(5)  Any person who has been issued a license or permit by the California Department of Justice pursuant to Penal Code Sections 18900, 26500-26915, 31000, 32315, 32650, 32700-32720, or 33300, when the possession of a large capacity magazine is in accordance with that license or permit;

(6)  A licensed gunsmith for purposes of maintenance, repair or modification of the large capacity magazine;

(7)  Any person who finds a large capacity magazine, if the person is not prohibited from possessing firearms or ammunition pursuant to federal or state law, and the person possesses the large capacity magazine no longer than is reasonably necessary to deliver or transport the same to a law enforcement agency;

(8)  Any person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds fewer than 10 rounds of ammunition is compatible with the firearm and the person possesses the large capacity magazine solely for use with that firearm.

(9)  Any retired peace officer holding a valid, current Carry Concealed Weapons (CCW) permit issued pursuant to the California Penal Code.

## 9.44.060.        Ammunition Sales.

(a)  It is unlawful for any person to engage in the business of selling, leasing, or otherwise transferring firearm ammunition within the City of Sunnyvale except in compliance with this code.

(b)  Definitions:

(1)  "Ammunition" means any cartridge or encasement containing a bullet or projectile, propellant, or explosive charge, and a primer which is used in the operation of a firearm.

(2)  "Ammunition vendor" means any person engaged in the business of selling, leasing, or otherwise transferring firearm ammunition.

(3)  "Person" means a natural person, association, partnership, firm, corporation, or other entity.

(c)  Every ammunition vendor shall maintain an ammunition sales log which records all ammunition sales made by the vendor.  The transferee shall provide, and the ammunition vendor shall record on the ammunition sales log, at the time of sale, all of the following information for each sale of firearms ammunition:

(1)  The name, address, and date of birth of the transferee;

(2)  The date of the sale;

3

(3)  The transferee's driver's license number, state identification card number, passport number, or other valid government-issued photographic identification;

(4)  The brand, type, and quantity of firearms ammunition transferred;

(5)  The identity of the person transferring the firearms ammunition on behalf of the ammunition vendor;

(6)  The transferee's signature and right thumbprint.

(d)  The ammunition sales log shall be recorded on a form approved by the Director of Public Safety. All ammunition sales logs shall be kept at the location of the firearms ammunition sale for a period of not less than two years from the date of the sale. Ammunition sales logs shall be open to reasonable inspection by peace officers at all times the ammunition vendor is regularly open for business.

(e)  No person shall knowingly provide false, inaccurate, or incomplete information to an ammunition vendor for the purpose of purchasing firearms ammunition. No ammunition vendor shall knowingly make a false, inaccurate, or incomplete entry in any ammunition sales log, nor shall any ammunition vendor refuse any reasonable inspection of an ammunition sales log subject to inspection.

SECTION 2.   SEVERABILITY.

If any section, subsection, sentence, clause or phrase of this Ordinance is for any reason held by a court of competent jurisdiction to be invalid, such a decision shall not affect the validity of the remaining portions of this Ordinance.  The People of the City of Sunnyvale hereby declare that they would have passed this Ordinance and each section or subsection, sentence, clause and phrase thereof, irrespective of the fact that any one or more sections, subsections, sentences, clauses or phrases be declared invalid.

# Exhibit 91

## Senate Bill No. 1446

### CHAPTER 58

An act to amend Sections 32310, 32400, 32405, 32410, 32425, 32430, 32435, and 32450 of, to add Section 32406 to, and to repeal Section 32420 of, the Penal Code, relating to firearms.

[Approved by Governor July 1, 2016. Filed with Secretary of State July 1, 2016.]

##### LEGISLATIVE COUNSEL'S DIGEST

SB 1446, Hancock. Firearms: magazine capacity.

(1) Existing law prohibits the sale, gift, and loan of a large-capacity magazine. A violation of this prohibition is punishable as a misdemeanor with specified penalties or as a felony.

This bill would, commencing July 1, 2017, make it an infraction punishable by a fine not to exceed $100 for the first offense, by a fine not to exceed $250 for the 2nd offense, and by a fine not to exceed $500 for the 3rd or subsequent offense, for a person to possess any large-capacity magazine, regardless of the date the magazine was acquired. The bill would require a person in lawful possession of a large-capacity magazine prior to July 1, 2017, to dispose of the magazine, as provided.

By creating a new crime, this bill would impose a state-mandated local program.

(2) Existing law creates various exceptions to the crime described in paragraph (1) above, which include, but are not limited to, the sale of, giving of, lending of, importation into this state of, or purchase of, any large-capacity magazine to or by the holder of a special weapons permit for use as a prop for a motion picture, or any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties, whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

This bill would make conforming changes to those exceptions by including possession of a large-capacity magazine in those provisions and would establish additional exceptions to the crime described in paragraph (1) above, including exceptions to allow licensed gunsmiths and honorably retired sworn peace officers to possess a large-capacity magazine.

The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

*The people of the State of California do enact as follows:*

SECTION 1. Section 32310 of the Penal Code is amended to read:

32310. (a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing July 1, 2017, any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) upon the first offense, by a fine not to exceed two hundred fifty dollars ($250) upon the second offense, and by a fine not to exceed five hundred dollars ($500) upon the third or subsequent offense.

(c) A person who, prior to July 1, 2017, legally possesses a large-capacity magazine shall dispose of that magazine by any of the following means:

(1) Remove the large-capacity magazine from the state.

(2) Prior to July 1, 2017, sell the large-capacity magazine to a licensed firearms dealer.

(3) Destroy the large-capacity magazine.

(4) Surrender the large-capacity magazine to a law enforcement agency for destruction.

(d) For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

(e) The provisions of this section are cumulative and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by different provisions of this code shall not be punished under more than one provision.

SEC. 2. Section 32400 of the Penal Code is amended to read:

32400. Section 32310 does not apply to the sale of, giving of, lending of, possession of, importation into this state of, or purchase of, any large-capacity magazine to or by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties, whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

SEC. 3. Section 32405 of the Penal Code is amended to read:

32405. Section 32310 does not apply to the sale to, lending to, transfer to, purchase by, receipt of, possession of, or importation into this state of, a large-capacity magazine by a sworn peace officer, as defined in Chapter

4.5 (commencing with Section 830) of Title 3 of Part 2, or a sworn federal law enforcement officer who is authorized to carry a firearm in the course and scope of that officer's duties.

SEC. 4.  Section 32406 is added to the Penal Code, to read:

32406.  Subdivisions (b) and (c) of Section 32310 do not apply to the following:

(a) An individual who honorably retired from being a sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or an individual who honorably retired from being a sworn federal law enforcement officer, who was authorized to carry a firearm in the course and scope of that officer's duties. For purposes of this section, "honorably retired" has the same meaning as provided in Section 16690.

(b) A federal, state, or local historical society, museum or institutional society, or museum or institutional collection, that is open to the public, provided that the large-capacity magazine is unloaded, properly housed within secured premises, and secured from unauthorized handling.

(c) A person who finds a large-capacity magazine, if the person is not prohibited from possessing firearms or ammunition, and possessed it no longer than necessary to deliver or transport it to the nearest law enforcement agency.

(d) A forensic laboratory, or an authorized agent or employee thereof in the course and scope of his or her authorized activities.

(e) The receipt or disposition of a large-capacity magazine by a trustee of a trust, or an executor or administrator of an estate, including an estate that is subject to probate, that includes a large-capacity magazine.

(f) A person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds 10 or fewer rounds of ammunition is compatible with that firearm and the person possesses the large-capacity magazine solely for use with that firearm.

SEC. 5.  Section 32410 of the Penal Code is amended to read:

32410.  Section 32310 does not apply to the possession, sale, or purchase of any large-capacity magazine to or by a person licensed pursuant to Sections 26700 to 26915, inclusive.

SEC. 6.  Section 32420 of the Penal Code is repealed.

SEC. 7.  Section 32425 of the Penal Code is amended to read:

32425.  Section 32310 does not apply to either of the following:

(a) The lending or giving of any large-capacity magazine to, or possession of that magazine by, a person licensed pursuant to Sections 26700 to 26915, inclusive, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine.

(b) The return to its owner of any large-capacity magazine by a person specified in subdivision (a).

SEC. 8.  Section 32430 of the Penal Code is amended to read:

32430.  Section 32310 does not apply to the possession of, importation into this state of, or sale of, any large-capacity magazine by a person who has been issued a permit to engage in those activities pursuant to Section

32315, when those activities are in accordance with the terms and conditions of that permit.

SEC. 9.  Section 32435 of the Penal Code is amended to read:

32435.  Section 32310 does not apply to any of the following:

(a)  The sale of, giving of, lending of, possession of, importation into this state of, or purchase of, any large-capacity magazine, to or by any entity that operates an armored vehicle business pursuant to the laws of this state.

(b)  The lending of large-capacity magazines by an entity specified in subdivision (a) to its authorized employees, and the possession of those large-capacity magazines by those authorized employees, while in the course and scope of employment for purposes that pertain to the entity's armored vehicle business.

(c)  The return of those large-capacity magazines to the entity specified in subdivision (a) by those employees specified in subdivision (b).

SEC. 10.  Section 32450 of the Penal Code is amended to read:

32450.  Section 32310 does not apply to the purchase or possession of a large-capacity magazine by the holder of a special weapons permit issued pursuant to Section 31000, 32650, or 33300, or pursuant to Article 3 (commencing with Section 18900) of Chapter 1 of Division 5 of Title 2, or pursuant to Article 4 (commencing with Section 32700) of Chapter 6 of this division, for any of the following purposes:

(a)  For use solely as a prop for a motion picture, television, or video production.

(b)  For export pursuant to federal regulations.

(c)  For resale to law enforcement agencies, government agencies, or the military, pursuant to applicable federal regulations.

SEC. 11.  No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

O

# Exhibit 92

SENATE THIRD READING
SB 1446 (Hancock)
As Amended  March 28, 2016
Majority vote

SENATE VOTE:  22-15

| Committee | Votes | Ayes | Noes |
|---|---|---|---|
| **Public Safety** | 5-2 | Jones-Sawyer, Lopez, Low, Quirk, Santiago | Melendez, Lackey |

**SUMMARY**: Prohibits the possession of large-capacity magazines, with specified exceptions. Specifically, **this bill**:

1) Makes it an infraction, commencing July 1, 2017, for any person who possesses a large-capacity magazine punishable as follows:

   a) A fine not to exceed $100 for the first offense;

   b) A fine not to exceed $250 for the second offense; and,

   c) A fine not to exceed $500 for the third or subsequent offense.

2) Requires a person who, prior to July 1, 2017, legally possesses a large-capacity magazine to dispose of that magazine by any of the following means:

   a) Remove the large-capacity magazine from the state;

   b) Prior to July 1, 2017, sell the large-capacity magazine to a licensed firearms dealer;

   c) Destroy the large-capacity magazine; or,

   d) Surrender the large-capacity magazine to a law enforcement agency for destruction.

3) Specifies the following exceptions:

   a) An individual who honorably retired from being a sworn peace officer, or an individual who honorably retired from being a sworn federal law enforcement officer, who was authorized to carry a firearm in the course and scope of that officer's duties;

   b) A federal, state, or local historical society, museum or institutional society, or museum or institutional collection, that is open to the public, provided that the large-capacity magazine is unloaded, properly housed within secured premises, and secured from unauthorized handling;

   c) A person who finds a large-capacity magazine, if the person is not prohibited from possessing firearms or ammunition, and possessed it no longer than necessary to deliver or transport it to the nearest law enforcement agency;

d) A forensic laboratory, or an authorized agent or employee thereof in the course and scope of his or her authorized activities;

e) The receipt or disposition of a large-capacity magazine by a trustee of a trust, or an executor or administrator of an estate, including an estate that is subject to probate, that includes a large-capacity magazine; or,

f) A person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds 10 or fewer rounds of ammunition is compatible with that firearm and the person possesses the large-capacity magazine solely for use with that firearm.

**EXISTING LAW**:

1) Defines a "large-capacity magazine" as any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include any of the following:

a) A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds;

b) A .22 caliber tube ammunition feeding device; or,

c) A tubular magazine that is contained in a lever-action firearm.

2) States, except as provided, commencing January 1, 2000, any person in California who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, or lends, any large-capacity magazine is punishable by imprisonment in the county jail for either a misdemeanor or a felony.

3) Provides the following exceptions to the prohibition against manufacturing or causing to be manufactured, importing into the state, keeping for sale, or offering or exposing for sale, or giving, or lending, any large-capacity magazine:

a) Government agency charged with law enforcement;

b) Sworn peace officer who is authorized to carry a firearm in the course and scope of that officer's duties ;

c) Sale or purchase by a licensed person;

d) Loan under specified circumstances;

e) Importation by a person in legal possession prior to January 1, 2000;

f) Delivery to a gun smith;

g) Person with permit to sell to an out-of-state client;

h) Entity that operates armored vehicle business;

i) Manufacture for government agency or military;

j)   Use as a prop; or,

k)   Holder of a special weapons permit for specified purposes.

4)   Declares large-capacity magazines to be a nuisance.

5)   Provides that the Attorney General, district attorney, or city attorney may bring an action to enjoin the manufacture of, importation of, keeping for sale of, offering or exposing for sale, giving, lending, or possession of, any item that constitutes a nuisance under any of the specified code sections, including the code section relating to large-capacity magazines.

6)   States that the weapons listed in the specified code sections constituting a nuisance shall be subject to confiscation and summary destruction whenever found within California.

**FISCAL EFFECT**:  Unknown.  This bill is keyed non-fiscal by the Legislative Counsel.

**COMMENTS**:  According to the author, "In 1999, the Legislature passed SB 23 (Perata) [Chapter 129, Statutes of 1999] which prohibited the possession of assault weapons, such as the AK-47 and created a generic definition of an assault weapon.  As part of that legislation, the importation, manufacture and sale of large capacity ammunition magazines was strictly prohibited.  However, the possession of high capacity magazines was not prohibited.

"Federal law also outlawed possession of high capacity magazines as part of the 1994 federal assault weapons ban but allowed current owners to keep them under a 'grandfathering' provision. The federal assault weapons ban was allowed to expire in 2004.  Research has shown that, prior to the implementation of the federal assault weapons ban, these high capacity magazines were used in between 14 and 26% of guns used in crime.

"High capacity ammunition magazines are ammunition feeding devices that hold more than ten rounds of ammunition.  These mega-magazines can hold upwards of 100 rounds of ammunition and allow a shooter to rapidly fire without reloading.

"High capacity magazines are not designed for hunting or target shooting.  High capacity magazines are military designed devices.  They are designed for one purpose only – to allow a shooter to fire a large number of bullets in a short period of time.

"This bill will make clear that possession of these 'mega-magazines' is also prohibited.  Law enforcement officers have told us that, because the Penal Code currently fails to specifically prohibit possession, the law is very difficult to enforce.  This needs to be fixed and this measure addresses that by prohibiting the possession."

**Analysis Prepared by**:   Stella Choe / PUB. S. / (916) 319-3744    FN: 0003530

# Exhibit 93

**THOMSON REUTERS**
**WESTLAW**    **California Code of Regulations**

Home  Table of Contents

**§ 5480. Requirements for Large-Capacity Magazine Permits Pursuant to Penal Code Section 32315.**
11 CA ADC § 5480
BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Barclays Official California Code of Regulations Currentness
   Title 11. Law
     Division 5. Firearms Regulations
       Chapter 39. Assault Weapons and Large- Capacity Magazines
         Article 4. Large-Capacity Magazine Permits

11 CCR § 5480

**§ 5480. Requirements for Large-Capacity Magazine Permits Pursuant to Penal Code Section 32315.**

(a) This article applies to Penal Code section 32315 permits for the out-of-state importation and exportation of large-capacity magazines as defined in Penal Code section 16740. Importation and exportation includes the transportation of magazines as necessary to complete a transfer to or from an out-of-state source.

(b) No permit shall be issued to any person who fails to establish "good cause" for issuance of the permit and that the permit would not endanger public safety. "Good cause" shall be established by the following:

     (1) A statement from the applicant that a large-capacity magazine marketplace exists for their dealership; and

     (2) Compliance with The Dangerous Weapons Control Law comprised of the provisions listed in Penal Code section 16580 relative to large-capacity magazines and record keeping requirements specified in section 5483 of these regulations.

(c) Large-capacity magazine permit applications shall be filed on a DOJ form, BOF 050 (Rev. 01/2012) which requires the following information: California Firearms Dealership (CFD) number; dealership name; dealership mailing address; statement of good cause; signature of dealership licensees; and date.

Note: Authority cited: Section 32315, Penal Code. Reference: Sections 16740, 32310, 32315, 32400, 32405, 32410, 32415, 32420, 32425, 32430, 32435, 32440, 32445 and 32450, Penal Code.

**HISTORY**

1. Change without regulatory effect renumbering section 978.40 to section 5480, including amendment of subsection (b)(2), filed 6-28-2006 pursuant to section 100, title 1, California Code of Regulations (Register 2006, No. 26).

2. Change without regulatory effect amending article heading, section heading, section and Note filed 12-27-2011 pursuant to section 100, title 1, California Code of Regulations (Register 2011, No. 52).

This database is current through 5/19/17 Register 2017, No. 20

11 CCR § 5480, 11 CA ADC § 5480

---

**END OF DOCUMENT**      © 2017 Thomson Reuters. No claim to original U.S. Government Works.

© 2017 Thomson Reuters

**THOMSON REUTERS**
**WESTLAW** **California Code of Regulations**

Home Table of Contents

### § 5482. Term Length of Large-Capacity Magazine Permits.
11 CA ADC § 5482
BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Barclays Official California Code of Regulations Currentness
   Title 11. Law
      Division 5. Firearms Regulations
         Chapter 39. Assault Weapons and Large- Capacity Magazines
            Article 4. Large-Capacity Magazine Permits

11 CCR § 5482

## § 5482. Term Length of Large-Capacity Magazine Permits.

(a) The term of a large-capacity magazine permit shall be from January 1 through December 31. It is the responsibility of the permittee to submit a completed renewal application prior to December 31 of each year in order to maintain uninterrupted status as a large-capacity magazine permittee. Renewal applications shall be submitted on the form BOF 050 (Rev. 01/2012) prescribed in section 5480, subdivision (b) of these regulations.

(b) If at any time a permittee is not among the licensed firearms dealers on the DOJ Centralized List of Firearms Dealers, the large-capacity magazine permit is no longer valid and shall be canceled.

Note: Authority cited: Section 32315, Penal Code. Reference: Sections 16740. 32310, 32315, 32400, 32405, 32410, 32415, 32420, 32425, 32430, 32435, 32440, 32445 and 32450, Penal Code.

### HISTORY

1. Change without regulatory effect renumbering section 978.42 to section 5482, including amendment of subsection (a), filed 6-28-2006 pursuant to section 100, title 1, California Code of Regulations (Register 2006, No. 26).

2. Change without regulatory effect amending section heading, section and Note filed 12-27-2011 pursuant to section 100, title 1, California Code of Regulations (Register 2011, No. 52).

This database is current through 5/19/17 Register 2017, No. 20

11 CCR § 5482, 11 CA ADC § 5482

**END OF DOCUMENT**                              © 2017 Thomson Reuters. No claim to original U.S. Government Works.

© 2017 Thomson Reuters

**THOMSON REUTERS**
**WESTLAW**    **California Code of Regulations**

Home Table of Contents

§ 5483. Large-Capacity Magazine Permit Record Keeping.
11 CA ADC § 5483
BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Barclays Official California Code of Regulations Currentness
    Title 11. Law
      Division 5. Firearms Regulations
        Chapter 39. Assault Weapons and Large- Capacity Magazines
          Article 4. Large-Capacity Magazine Permits

11 CCR § 5483

## § 5483. Large-Capacity Magazine Permit Record Keeping.

Permittees shall maintain acquisition and disposition transaction records of the importation and exportation of large-capacity magazines. Records shall include transaction date, transaction volume; and the name, address, and Federal Firearms License number (if any) of the out of state transferee or transferor. Records must be maintained at the dealership for three years and be made available to representatives of the DOJ or any other law enforcement agency upon request.

Note: Authority cited: Section 32315, Penal Code. Reference: Sections 16740 and 32315, Penal Code.

### HISTORY

1. Change without regulatory effect renumbering section 978.43 to section 5483 filed 6-28-2006 pursuant to section 100, title 1, California Code of Regulations (Register 2006, No. 26).

2. Change without regulatory effect amending section heading, section and Note filed 12-27-2011 pursuant to section 100, title 1, California Code of Regulations (Register 2011, No. 52).

This database is current through 5/19/17 Register 2017, No. 20

11 CCR § 5483, 11 CA ADC § 5483

**END OF DOCUMENT**            © 2017 Thomson Reuters. No claim to original U.S. Government Works.

THOMSON REUTERS
**WESTLAW**   **California Code of Regulations**

Home Table of Contents

**§ 5484. Large-Capacity Magazine Permit Revocations.**
11 CA ADC § 5484
BARCLAYS OFFICIAL CALIFORNIA CODE OF REGULATIONS

Barclays Official California Code of Regulations Currentness
    Title 11. Law
        Division 5. Firearms Regulations
            Chapter 39. Assault Weapons and Large- Capacity Magazines
                Article 4. Large-Capacity Magazine Permits

11 CCR § 5484

**§ 5484. Large-Capacity Magazine Permit Revocations.**

(a) Large-capacity magazine permits shall be subject to revocation for failure to comply with record keeping requirements specified in section 5483 of these regulations or for failure to comply with The Dangerous Weapons Control Law comprised of the provisions listed in Penal Code section 16580 relative to large-capacity magazines.

(b) All procedures and hearings related to the revocation of a large-capacity magazine permit shall be conducted in accordance with Government Code sections 11500 et seq.

Note: Authority cited: Section 32315, Penal Code. Reference: Sections 16740 and 32315, Penal Code.

**HISTORY**

1. Change without regulatory effect renumbering section 978.44 to section 5484, including amendment of subsection (a), filed 6-28-2006 pursuant to section 100, title 1, California Code of Regulations (Register 2006, No. 26).

2. Change without regulatory effect amending section heading, section and Note filed 12-27-2011 pursuant to section 100, title 1, California Code of Regulations (Register 2011, No. 52).

This database is current through 5/19/17 Register 2017, No. 20

11 CCR § 5484, 11 CA ADC § 5484

**END OF DOCUMENT**                                        © 2017 Thomson Reuters. No claim to original U.S. Government Works.

© 2017 Thomson Reuters

# Exhibit 94



| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

**SB-1446 Firearms: magazine capacity.** (2015-2016)

| Date | Action |
|------|--------|
| 07/01/16 | Chaptered by Secretary of State. Chapter 58, Statutes of 2016. |
| 07/01/16 | Approved by the Governor. |
| 06/30/16 | Enrolled and presented to the Governor at 1:30 p.m. |
| 06/30/16 | In Senate. Ordered to engrossing and enrolling. |
| 06/30/16 | Read third time. Passed. (Ayes 44. Noes 31. Page 5575.) Ordered to the Senate. |
| 06/23/16 | Ordered to third reading. |
| 06/23/16 | Withdrawn from committee. |
| 06/23/16 | Assembly Rule 96 suspended. (Ayes 50. Noes 27. Page 5473.) |
| 06/15/16 | From committee: Do pass and re-refer to Com. on APPR. (Ayes 5. Noes 2.) (June 14). Re-referred to Com. on APPR. |
| 06/01/16 | Referred to Com. on PUB. S. |
| 05/19/16 | In Assembly. Read first time. Held at Desk. |
| 05/19/16 | Read third time. Passed. (Ayes 22. Noes 15. Page 3901.) Ordered to the Assembly. |
| 05/17/16 | Read second time. Ordered to third reading. |
| 05/16/16 | From committee: Be ordered to second reading pursuant to Senate Rule 28.8. |
| 05/11/16 | Set for hearing May 16. |
| 04/28/16 | May 2 hearing postponed by committee. |
| 04/22/16 | Set for hearing May 2. |
| 04/20/16 | From committee: Do pass and re-refer to Com. on APPR. (Ayes 4. Noes 3. Page 3615.) (April 19). Re-referred to Com. on APPR. |
| 04/01/16 | Set for hearing April 19. |
| 03/30/16 | April 5 hearing postponed by committee. |
| 03/28/16 | From committee with author's amendments. Read second time and amended. Re-referred to Com. on PUB. S. |
| 03/15/16 | Set for hearing April 5. |
| 03/10/16 | Referred to Com. on PUB. S. |
| 02/22/16 | Read first time. |
| 02/22/16 | From printer. May be acted upon on or after March 23. |
| 02/19/16 | Introduced. To Com. on RLS. for assignment. To print. |

# Exhibit 95

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3730   Page 211 of 472

SAFETY FOR ALL ACT, 2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

2016 Cal. Legis. Serv. Prop. 63 (PROPOSITION 63) (WEST)

CALIFORNIA 2016 LEGISLATIVE SERVICE

Additions are indicated by **Text**; deletions by
* * *
Vetoes are indicated by ~~Text~~;
stricken material by ~~Text~~.

PROPOSITION 63
PROPOSITION 63
SAFETY FOR ALL ACT

[Approved by the Voters on Nov. 8, 2016.]

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

**PROPOSED LAW**
The Safety for All Act of 2016

SECTION 1. Title.

This measure shall be known and may be cited as "The Safety for All Act of 2016."

SEC. 2. Findings and Declarations.

The people of the State of California find and declare:

1. Gun violence destroys lives, families and communities. From 2002 to 2013, California lost 38,576 individuals to gun violence. That is more than seven times the number of U.S. soldiers killed in combat during the wars in Iraq and Afghanistan combined. Over this same period, 2,258 children were killed by gunshot injuries in California. The same number of children murdered in the Sandy Hook elementary school massacre are killed by gunfire in this state every 39 days.

2. In 2013, guns were used to kill 2,900 Californians, including 251 children and teens. That year, at least 6,035 others were hospitalized or treated in emergency rooms for non-fatal gunshot wounds, including 1,275 children and teens.

3. Guns are commonly used by criminals. According to the California Department of Justice, in 2014 there were 1,169 firearm murders in California, 13,546 armed robberies involving a firearm, and 15,801 aggravated assaults involving a firearm.

4. This tragic violence imposes significant economic burdens on our society. Researchers conservatively estimate that gun violence costs the economy at least $229 billion every year, or more than $700 per American per year. In 2013 alone, California gun deaths and injuries imposed $83 million in medical costs and $4.24 billion in lost productivity.

5. California can do better. Reasonable, common-sense gun laws reduce gun deaths and injuries, keep guns away from criminals and fight illegal gun trafficking. Although California has led the nation in gun safety laws, those laws still have

loopholes that leave communities throughout the state vulnerable to gun violence and mass shootings. We can close these loopholes while still safeguarding the ability of law-abiding, responsible Californians to own guns for self-defense, hunting and recreation.

6. We know background checks work. Federal background checks have already prevented more than 2.4 million gun sales to convicted criminals and other illegal purchasers in America. In 2012 alone, background checks blocked 192,043 sales of firearms to illegal purchasers including 82,000 attempted purchases by felons. That means background checks stopped roughly 225 felons from buying firearms every day. Yet California law only requires background checks for people who purchase firearms, not for people who purchase ammunition. We should close that loophole.

7. Right now, any violent felon or dangerously mentally ill person can walk into a sporting goods store or gun shop in California and buy ammunition, no questions asked. That should change. We should require background checks for ammunition sales just like gun sales, and stop both from getting into the hands of dangerous individuals.

8. Under current law, stores that sell ammunition are not required to report to law enforcement when ammunition is lost or stolen. Stores should have to report lost or stolen ammunition within 48 hours of discovering that it is missing so law enforcement can work to prevent that ammunition from being illegally trafficked into the hands of dangerous individuals.

9. Californians today are not required to report lost or stolen guns to law enforcement. This makes it difficult for law enforcement to investigate crimes committed with stolen guns, break up gun trafficking rings, and return guns to their lawful owners. We should require gun owners to report their lost or stolen guns to law enforcement.

10. Under current law, people who commit felonies and other serious crimes are prohibited from possessing firearms. Yet existing law provides no clear process for those people to relinquish their guns when they become prohibited at the time of conviction. As a result, in 2014, the Department of Justice identified more than 17,000 people who possess more than 34,000 guns illegally, including more than 1,400 assault weapons. We need to close this dangerous loophole by not only requiring prohibited people to turn[i] in their guns, but also ensuring that it happens.

11. Military–style large-capacity ammunition magazines—some capable of holding more than 100 rounds of ammunition—significantly increase a shooter's ability to kill a lot of people in a short amount of time. That is why these large capacity ammunition magazines are common in many of America's most horrific mass shootings, from the killings at 101 California Street in San Francisco in 1993 to Columbine High School in 1999 to the massacre at Sandy Hook Elementary School in Newtown, Connecticut in 2012.

12. Today, California law prohibits the manufacture, importation and sale of military-style, large capacity ammunition magazines, but does not prohibit the general public from possessing them. We should close that loophole. No one except trained law enforcement should be able to possess these dangerous ammunition magazines.

13. Although the State of California conducts background checks on gun buyers who live in California, we have to rely on other states and the FBI to conduct background checks on gun buyers who live elsewhere. We should make background checks outside of California more effective by consistently requiring the state to report who is prohibited from possessing firearms to the federal background check system.

14. The theft of a gun is a serious and potentially violent crime. We should clarify that such crimes can be charged as felonies, and prevent people who are convicted of such crimes from possessing firearms.


SEC. 3. Purpose and Intent.

The people of the State of California declare their purpose and intent in enacting "The Safety for All Act of 2016" (the "Act") to be as follows:

1. To implement reasonable and common-sense reforms to make California's gun safety laws the toughest in the nation while still safeguarding the Second Amendment rights of all law-abiding, responsible Californians.

2. To keep guns and ammunition out of the hands of convicted felons, the dangerously mentally ill, and other persons who are prohibited by law from possessing firearms and ammunition.

3. To ensure that those who buy ammunition in California—just like those who buy firearms—are subject to background checks.

4. To require all stores that sell ammunition to report any lost or stolen ammunition within 48 hours of discovering that it is missing.

5. To ensure that California shares crucial information with federal law enforcement by consistently requiring the state to report individuals who are prohibited by law from possessing firearms to the federal background check system.

6. To require the reporting of lost or stolen firearms to law enforcement.

7. To better enforce the laws that require people to relinquish their firearms once they are convicted of a crime that makes them ineligible to possess firearms.

8. To make it illegal in California to possess the kinds of military-style ammunition magazines that enable mass killings like those at Sandy Hook Elementary School; a movie theater in Aurora, Colorado; Columbine High School; and an office building at 101 California Street in San Francisco, California.

9. To prevent people who are convicted of the theft of a firearm from possessing firearms, and to effectuate the intent of Proposition 47 that the theft of a firearm is felony grand theft, regardless of the value of the firearm, in alignment with Sections 25400 and 1192.7 of the Penal Code.

SEC. 4. Lost or Stolen Firearms.

SEC. 4.1. Division 4.5 (commencing with Section 25250) is added to Title 4 of Part 6 of the Penal Code, to read:

pt. 6 t. 4 d. 4.5 pr. § 25250

DIVISION 4.5. LOST OR STOLEN FIREARMS

<< CA PENAL § 25250 >>

25250. (a) Commencing July 1, 2017, every person shall report the loss or theft of a firearm he or she owns or possesses to a local law enforcement agency in the jurisdiction in which the theft or loss occurred within five days of the time he or she knew or reasonably should have known that the firearm had been stolen or lost.

(b) Every person who has reported a firearm lost or stolen under subdivision (a) shall notify the local law enforcement agency in the jurisdiction in which the theft or loss occurred within five days if the firearm is subsequently recovered by the person.

(c) Notwithstanding subdivision (a), a person shall not be required to report the loss or theft of a firearm that is an antique firearm within the meaning of subdivision (c) of Section 16170.

<< CA PENAL § 25255 >>

25255. Section 25250 shall not apply to the following:

(a) Any law enforcement agency or peace officer acting within the course and scope of his or her employment or official duties if he or she reports the loss or theft to his or her employing agency.

(b) Any United States marshal or member of the Armed Forces of the United States or the National Guard, while engaged in his or her official duties.

(c) Any person who is licensed, pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, and who reports the theft or loss in accordance with Section 923(g)(6) of Title 18 of the United States Code, or the successor provision thereto, and applicable regulations issued thereto.

(d) Any person whose firearm was lost or stolen prior to July 1, 2017.

<< CA PENAL § 25260 >>

25260. Pursuant to Section 11108, every sheriff or police chief shall submit a description of each firearm that has been reported lost or stolen directly into the Department of Justice Automated Firearms System.

<< CA PENAL § 25265 >>

25265. (a) Every person who violates Section 25250 is, for a first violation, guilty of an infraction, punishable by a fine not to exceed one hundred dollars ($100).

(b) Every person who violates Section 25250 is, for a second violation, guilty of an infraction, punishable by a fine not to exceed one thousand dollars ($1,000).

(c) Every person who violates Section 25250 is, for a third or subsequent violation, guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding six months, or by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment.

<< CA PENAL § 25270 >>

25270. Every person reporting a lost or stolen firearm pursuant to Section 25250 shall report the make, model, and serial number of the firearm, if known by the person, and any additional relevant information required by the local law enforcement agency taking the report.

<< CA PENAL § 25275 >>

25275. (a) No person shall report to a local law enforcement agency that a firearm has been lost or stolen, knowing the report to be false. A violation of this section is an infraction, punishable by a fine not exceeding two hundred fifty dollars ($250) for a first offense, and by a fine not exceeding one thousand dollars ($1,000) for a second or subsequent offense.

(b) This section shall not preclude prosecution under any other law.

SEC. 4.2. Section 26835 of the Penal Code is amended to read:

<< CA PENAL § 26835 >>

26835. A licensee shall post conspicuously within the licensed premises the following warnings in block letters not less than one inch in height:

(a) "IF YOU KEEP A LOADED FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE OBTAINS IT AND USES IT, RESULTING IN INJURY OR DEATH, OR CARRIES IT TO A PUBLIC PLACE, YOU MAY BE GUILTY OF A MISDEMEANOR OR A FELONY UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER OR LOCKED THE FIREARM WITH A LOCKING DEVICE, TO KEEP IT FROM TEMPORARILY FUNCTIONING."

(b) "IF YOU KEEP A PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON, WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE GAINS ACCESS TO THE FIREARM, AND CARRIES IT OFF–PREMISES, YOU MAY BE GUILTY OF A MISDEMEANOR, UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE, TO KEEP IT FROM TEMPORARILY FUNCTIONING."

(c) "IF YOU KEEP ANY FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE GAINS ACCESS TO THE FIREARM, AND CARRIES IT OFF–PREMISES TO A SCHOOL OR SCHOOL–SPONSORED EVENT, YOU MAY BE GUILTY OF A MISDEMEANOR, INCLUDING A FINE OF UP TO FIVE THOUSAND DOLLARS ($5,000), UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE."

(d) "IF YOU NEGLIGENTLY STORE OR LEAVE A LOADED FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, WHERE A PERSON UNDER 18 YEARS OF AGE IS LIKELY TO ACCESS IT, YOU MAY BE GUILTY OF A MISDEMEANOR, INCLUDING A FINE OF UP TO ONE THOUSAND DOLLARS ($1,000), UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE."

(e) "DISCHARGING FIREARMS IN POORLY VENTILATED AREAS, CLEANING FIREARMS, OR HANDLING AMMUNITION MAY RESULT IN EXPOSURE TO LEAD, A SUBSTANCE KNOWN TO CAUSE BIRTH DEFECTS, REPRODUCTIVE HARM, AND OTHER SERIOUS PHYSICAL INJURY. HAVE ADEQUATE VENTILATION AT ALL TIMES. WASH HANDS THOROUGHLY AFTER EXPOSURE."

(f) "FEDERAL REGULATIONS PROVIDE THAT IF YOU DO NOT TAKE PHYSICAL POSSESSION OF THE FIREARM THAT YOU ARE ACQUIRING OWNERSHIP OF WITHIN 30 DAYS AFTER YOU COMPLETE THE INITIAL BACKGROUND CHECK PAPERWORK, THEN YOU HAVE TO GO THROUGH THE BACKGROUND CHECK PROCESS A SECOND TIME IN ORDER TO TAKE PHYSICAL POSSESSION OF THAT FIREARM."

(g) "NO PERSON SHALL MAKE AN APPLICATION TO PURCHASE MORE THAN ONE PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON WITHIN ANY 30–DAY PERIOD AND NO DELIVERY SHALL BE MADE TO ANY PERSON WHO HAS MADE AN APPLICATION TO PURCHASE MORE THAN ONE PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON WITHIN ANY 30–DAY PERIOD."

(h) "IF A FIREARM YOU OWN OR POSSESS IS LOST OR STOLEN, YOU MUST REPORT THE LOSS OR THEFT TO A LOCAL LAW ENFORCEMENT AGENCY WHERE THE LOSS OR THEFT OCCURRED WITHIN FIVE DAYS OF THE TIME YOU KNEW OR REASONABLY SHOULD HAVE KNOWN THAT THE FIREARM HAD BEEN LOST OR STOLEN."

SEC. 5. Strengthening the National Instant Criminal Background Check System.

SEC. 5.1. Section 28220 of the Penal Code is amended to read:

<< CA PENAL § 28220 >>

28220. (a) Upon submission of firearm purchaser information, the Department of Justice shall examine its records, as well as those records that it is authorized to request from the State Department of State Hospitals pursuant to Section 8104 of the Welfare and Institutions Code, in order to determine if the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm.

(b) * * * **The** Department of Justice **shall** participate in the National Instant Criminal Background Check System (NICS), as described in subsection (t) of Section 922 of Title 18 of the United States Code, and * * * shall notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, that the purchaser is a person prohibited from acquiring a firearm under federal law.

(c) If the department determines that the purchaser is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm or is a person described in subdivision (a) of Section 27535, it shall immediately notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact.

(d) If the department determines that the copies of the register submitted to it pursuant to subdivision (d) of Section 28210 contain any blank spaces or inaccurate, illegible, or incomplete information, preventing identification of the purchaser or the handgun or other firearm to be purchased, or if any fee required pursuant to Section 28225 is not submitted by the dealer in conjunction with submission of copies of the register, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall submit corrected copies of the register to the department, or shall submit any fee required pursuant to Section 28225, or both, as appropriate and, if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(e) If the department determines that the information transmitted to it pursuant to Section 28215 contains inaccurate or incomplete information preventing identification of the purchaser or the handgun or other firearm to be purchased, or if the fee required pursuant to Section 28225 is not transmitted by the dealer in conjunction with transmission of the electronic or telephonic record, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall transmit corrections to the record of electronic or telephonic transfer to the department, or shall transmit any fee required pursuant to Section 28225, or both, as appropriate, and if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(f)(1)(A) The department shall immediately notify the dealer to delay the transfer of the firearm to the purchaser if the records of the department, or the records available to the department in the National Instant Criminal Background Check System, indicate one of the following:

(i) The purchaser has been taken into custody and placed in a facility for mental health treatment or evaluation and may be a person described in Section 8100 or 8103 of the Welfare and Institutions Code and the department is unable to ascertain whether the purchaser is a person who is prohibited from possessing, receiving, owning, or purchasing a firearm, pursuant to Section 8100 or 8103 of the Welfare and Institutions Code, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(ii) The purchaser has been arrested for, or charged with, a crime that would make him or her, if convicted, a person who is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm, and the department is unable to ascertain whether the purchaser was convicted of that offense prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(iii) The purchaser may be a person described in subdivision (a) of Section 27535, and the department is unable to ascertain whether the purchaser, in fact, is a person described in subdivision (a) of Section 27535, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(B) The dealer shall provide the purchaser with information about the manner in which he or she may contact the department regarding the delay described in subparagraph (A).

(2) The department shall notify the purchaser by mail regarding the delay and explain the process by which the purchaser may obtain a copy of the criminal or mental health record the department has on file for the purchaser. Upon receipt of that criminal or mental health record, the purchaser shall report any inaccuracies or incompleteness to the department on an approved form.

(3) If the department ascertains the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), after the waiting period described in Sections 26815 and 27540, but within 30 days of the dealer's original submission of the purchaser information to the department pursuant to this section, the department shall do the following:

(A) If the purchaser is not a person described in subdivision (a) of Section 27535, and is not prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer of that fact and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to him or her.

(B) If the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer and the chief of the police department in the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact in compliance with subdivision (c) of Section 28220.

(4) If the department is unable to ascertain the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), within 30 days of the dealer's original submission of purchaser information to the department pursuant to this section, the department shall immediately notify the dealer and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to him or her.

**(g) Commencing July 1, 2017, upon receipt of information demonstrating that a person is prohibited from possessing a firearm pursuant to federal or state law, the department shall submit the name, date of birth, and physical description of the person to the National Instant Criminal Background Check System Index, Denied Persons Files. The information provided shall remain privileged and confidential, and shall not be disclosed, except for the purpose of enforcing federal or state firearms laws.**

SEC. 6. Possession of Large–Capacity Magazines.

SEC. 6.1. Section 32310 of the Penal Code is amended to read:

<< CA PENAL § 32310 >>

32310. (a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, * * * any person in this state who manufactures or causes to be manufactured,

imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b) For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

**(c) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing July 1, 2017, any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, or is guilty of a misdemeanor punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.**

**(d) Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:**

**(1) Remove the large-capacity magazine from the state;**

**(2) Sell the large-capacity magazine to a licensed firearms dealer; or**

**(3) Surrender the large-capacity magazine to a law enforcement agency for destruction.**

SEC. 6.2. Section 32400 of the Penal Code is amended to read:

<< CA PENAL § 32400 >>

32400. Section 32310 does not apply to the sale of, giving of, lending of, **possession of,** importation into this state of, or purchase of, any large-capacity magazine to or by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties, whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

SEC. 6.3. Section 32405 of the Penal Code is amended to read:

<< CA PENAL § 32405 >>

32405. Section 32310 does not apply to the sale to, lending to, transfer to, purchase by, receipt of, **possession of,** or importation into this state of, a large-capacity magazine by a sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, **or sworn federal law enforcement officer,** who is authorized to carry a firearm in the course and scope of that officer's duties.

SEC. 6.4. Section 32406 is added to the Penal Code, to read:

<< CA PENAL § 32406 >>

32406. Subdivision (c) of Section 32310 does not apply to an honorably retired sworn peace officer, as defined in Chapter 4.5

(commencing with Section 830) of Title 3 of Part 2, or honorably retired sworn federal law enforcement officer, who was authorized to carry a firearm in the course and scope of that officer's duties. "Honorably retired" shall have the same meaning as provided in Section 16690.

SEC. 6.5. Section 32410 of the Penal Code is amended to read:

<< CA PENAL § 32410 >>

32410. Section 32310 does not apply to the sale * * *, purchase, **or possession** of any large-capacity magazine to or by a person licensed pursuant to Sections 26700 to 26915, inclusive.

<< Repealed: CA PENAL § 32420 >>

SEC. 6.6. Section 32420 of the Penal Code is repealed.

SEC. 6.7. Section 32425 of the Penal Code is amended to read:

<< CA PENAL § 32425 >>

32425. Section 32310 does not apply to **any** of the following:

(a) The lending or giving of any large-capacity magazine to a person licensed pursuant to Sections 26700 to 26915, inclusive, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine.

**(b) The possession of any large-capacity magazine by a person specified in subdivision (a) for the purposes specified in subdivision (a).**

**(c)** The return to its owner of any large-capacity magazine by a person specified in subdivision (a).

SEC. 6.8. Section 32435 of the Penal Code is amended to read:

<< CA PENAL § 32435 >>

32435. Section 32310 does not apply to any of the following:

(a) The sale of, giving of, lending of, **possession of,** importation into this state of, or purchase of, any large-capacity magazine, to or by any entity that operates an armored vehicle business pursuant to the laws of this state.

(b) The lending of large-capacity magazines by an entity specified in subdivision (a) to its authorized employees, while in the course and scope of employment for purposes that pertain to the entity's armored vehicle business.

**(c) The possession of any large-capacity magazines by the employees of an entity specified in subdivision (a) for purposes that pertain to the entity's armored vehicle business.**

**(d)** The return of those large-capacity magazines to the entity specified in subdivision (a) by those employees specified in

subdivision (b).

SEC. 6.9. Section 32450 of the Penal Code is amended to read:

<< CA PENAL § 32450 >>

32450. Section 32310 does not apply to the purchase **or possession** of a large-capacity magazine by the holder of a special weapons permit issued pursuant to Section 31000, 32650, or 33300, or pursuant to Article 3 (commencing with Section 18900) of Chapter 1 of Division 5 of Title 2, or pursuant to Article 4 (commencing with Section 32700) of Chapter 6 of this division, for any of the following purposes:

(a) For use solely as a prop for a motion picture, television, or video production.

(b) For export pursuant to federal regulations.

(c) For resale to law enforcement agencies, government agencies, or the military, pursuant to applicable federal regulations.

SEC. 7. Firearms Dealers.

SEC. 7.1. Section 26885 of the Penal Code is amended to read:

<< CA PENAL § 26885 >>

26885. (a) Except as provided in subdivisions (b) and (c) of Section 26805, all firearms that are in the inventory of a licensee shall be kept within the licensed location.

(b) Within 48 hours of discovery, a licensee shall report the loss or theft of any of the following items to the appropriate law enforcement agency in the city, county, or city and county where the licensee's business premises are located:

(1) Any firearm **or ammunition** that is merchandise of the licensee.

(2) Any firearm **or ammunition** that the licensee takes possession of pursuant to Chapter 5 (commencing with Section 28050)**, or pursuant to Section 30312**.

(3) Any firearm **or ammunition** kept at the licensee's place of business.

SEC. 7.2. Section 26915 of the Penal Code is amended to read:

<< CA PENAL § 26915 >>

26915. (a) ~~* * *~~ **Commencing January 1, 2018, a** firearms dealer **shall** require any agent **or employee** who handles, sells, or delivers firearms to obtain and provide to the dealer a certificate of eligibility from the Department of Justice pursuant to Section 26710. On the application for the certificate, the agent or employee shall provide the name and California firearms dealer number of the firearms dealer with whom the person is employed.

(b) The department shall notify the firearms dealer in the event that the agent or employee who has a certificate of eligibility

is or becomes prohibited from possessing firearms.

(c)  If the local jurisdiction requires a background check of the agents or employees of a firearms dealer, the agent or employee shall obtain a certificate of eligibility pursuant to subdivision (a).

(d)(1)  Nothing in this section shall be construed to preclude a local jurisdiction from conducting an additional background check pursuant to Section 11105. The local jurisdiction may not charge a fee for the additional criminal history check.

(2)  Nothing in this section shall be construed to preclude a local jurisdiction from prohibiting employment based on criminal history that does not appear as part of obtaining a certificate of eligibility.

(e)  The licensee shall prohibit any agent who the licensee knows or reasonably should know is within a class of persons prohibited from possessing firearms pursuant to Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, or Section 8100 or 8103 of the Welfare and Institutions Code, from coming into contact with any firearm that is not secured and from accessing any key, combination, code, or other means to open any of the locking devices described in subdivision (g).

(f)  Nothing in this section shall be construed as preventing a local government from enacting an ordinance imposing additional conditions on licensees with regard to agents **or employees**.

(g)  For purposes of this article, "secured" means a firearm that is made inoperable in one or more of the following ways:

(1)  The firearm is inoperable because it is secured by a firearm safety device listed on the department's roster of approved firearm safety devices pursuant to subdivision (d) of Section 23655.

(2)  The firearm is stored in a locked gun safe or long-gun safe that meets the standards for department-approved gun safes set forth in Section 23650.

(3)  The firearm is stored in a distinct locked room or area in the building that is used to store firearms, which can only be unlocked by a key, a combination, or similar means.

(4)  The firearm is secured with a hardened steel rod or cable that is at least one-eighth of an inch in diameter through the trigger guard of the firearm. The steel rod or cable shall be secured with a hardened steel lock that has a shackle. The lock and shackle shall be protected or shielded from the use of a boltcutter and the rod or cable shall be anchored in a manner that prevents the removal of the firearm from the premises.

SEC. 8. Sales of Ammunition.

SEC. 8.1. Section 16150 of the Penal Code is amended to read:

<< CA PENAL § 16150 >>

16150.  **\* \* \* (a) As used in this part, except in subdivision (a) of Section 30305 and in Section 30306, "ammunition" means one or more loaded cartridges consisting of a primed case, propellant, and with one or more projectiles. "Ammunition" does not include blanks.**

(b)  As used in subdivision (a) of Section 30305 and in Section 30306, "ammunition" includes, but is not limited to, any bullet, cartridge, magazine, clip, speed loader, autoloader, or projectile capable of being fired from a firearm with a deadly consequence. "Ammunition" does not include blanks.

SEC. 8.2. Section 16151 is added to the Penal Code, to read:

## << CA PENAL § 16151 >>

16151. (a) As used in this part, commencing January 1, 2018, "ammunition vendor" means any person, firm, corporation, or other business enterprise that holds a current ammunition vendor license issued pursuant to Section 30385.

(b) Commencing January 1, 2018, a firearms dealer licensed pursuant to Sections 26700 to 26915, inclusive, shall automatically be deemed a licensed ammunition vendor, provided the dealer complies with the requirements of Articles 2 (commencing with Section 30300) and 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4.

## << Repealed: CA PENAL § 16662 >>

SEC. 8.3. Section 16662 of the Penal Code is repealed.

SEC. 8.4. Section 17315 of the Penal Code is amended to read:

## << CA PENAL § 17315 >>

17315. As used in \* \* \* **Articles 2 through 5** of Chapter 1 of Division 10 of Title 4, "vendor" means \* \* \* **an** ammunition vendor.

SEC. 8.5. Section 30306 of the Penal Code is amended to read:

## << CA PENAL § 30306 >>

30306. (a) Any person, corporation, \* \* \* firm**, or other business enterprise** who supplies, delivers, sells, or gives possession or control of, any ammunition to any person who he or she knows or using reasonable care should know is prohibited from owning, possessing, or having under custody or control, any ammunition or reloaded ammunition pursuant to subdivision (a) or (b) of Section 30305, is guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, or a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment.

**(b) Any person, corporation, firm, or other business enterprise who supplies, delivers, sells, or gives possession or control of, any ammunition to any person whom the person, corporation, firm, or other business enterprise knows or has cause to believe is not the actual purchaser or transferee of the ammunition, with knowledge or cause to believe that the ammunition is to be subsequently sold or transferred to a person who is prohibited from owning, possessing, or having under custody or control any ammunition or reloaded ammunition pursuant to subdivision (a) or (b) of Section 30305, is guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, or a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment.**

**(c)** The provisions of this section are cumulative and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by this section and another provision of law shall not be punished under more than one provision.

SEC. 8.6. Section 30312 of the Penal Code is amended to read:

<< CA PENAL § 30312 >>

30312. \* \* \* **(a)(1)  Commencing January 1, 2018, the sale of ammunition by any party shall be conducted by or processed through a licensed ammunition vendor.**

**(2)  When neither party to an ammunition sale is a licensed ammunition vendor, the seller shall deliver the ammunition to a vendor to process the transaction. The ammunition vendor shall then promptly and properly deliver the ammunition to the purchaser, if the sale is not prohibited, as if the ammunition were the vendor's own merchandise. If the ammunition vendor cannot legally deliver the ammunition to the purchaser, the vendor shall forthwith return the ammunition to the seller. The ammunition vendor may charge the purchaser an administrative fee to process the transaction, in an amount to be set by the Department of Justice, in addition to any applicable fees that may be charged pursuant to the provisions of this title.**

**(b)  Commencing January 1, 2018, the sale,** delivery or transfer of ownership of \* \* \* ammunition **by any party** may only occur in a face-to-face transaction with the **seller,** deliverer, or transferor \* \* \*, **provided, however, that ammunition may be purchased or acquired over the Internet or through other means of remote ordering if a licensed ammunition vendor initially receives the ammunition and processes the transaction in compliance with this section and Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of this part**.

\* \* \* **(c)  Subdivisions** (a) **and (b)** shall not apply to \* \* \* the sale, delivery, or transfer of \* \* \* ammunition to any of the following:

(1)  An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale, delivery, or transfer is for exclusive use by that government agency and, prior to the sale, delivery, or transfer of the \* \* \* ammunition, written authorization from the head of the agency employing the purchaser or transferee is obtained, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency employing the individual.

(2)  A sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2**, or sworn federal law enforcement officer,** who is authorized to carry a firearm in the course and scope of the officer's duties.

(3)  An importer or manufacturer of \* \* \* ammunition or firearms who is licensed to engage in business pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(4)  A person who is on the centralized list **of exempted federal firearms licensees** maintained by the Department of Justice pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of this title.

(5)  A person whose licensed premises are outside this state and who is licensed as a dealer or collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(6)  A person who is licensed as a collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, whose licensed premises are within this state, and who has a current certificate of eligibility issued by the Department of Justice pursuant to Section 26710.

(7)  \* \* \* **An** ammunition vendor.

(8)  A consultant-evaluator.

**(9)  A person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises.**

**(10)  A person who purchases or receives ammunition from a spouse, registered domestic partner, or immediate family member as defined in Section 16720.**

**(d)** A violation of this section is a misdemeanor.

SEC. 8.7. Section 30314 is added to the Penal Code, to read:

<< CA PENAL § 30314 >>

30314. (a) Commencing January 1, 2018, a resident of this state shall not bring or transport into this state any ammunition that he or she purchased or otherwise obtained from outside of this state unless he or she first has that ammunition delivered to a licensed ammunition vendor for delivery to that resident pursuant to the procedures set forth in Section 30312.

(b) Subdivision (a) does not apply to any of the following:

(1) An ammunition vendor.

(2) A sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.

(3) An importer or manufacturer of ammunition or firearms who is licensed to engage in business pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(4) A person who is on the centralized list of exempted federal firearms licensees maintained by the Department of Justice pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6.

(5) A person who is licensed as a collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, whose licensed premises are within this state, and who has a current certificate of eligibility issued by the Department of Justice pursuant to Section 26710.

(6) A person who acquired the ammunition from a spouse, registered domestic partner, or immediate family member as defined in Section 16720.

(c) A violation of this section is an infraction for any first time offense, and either an infraction or a misdemeanor for any subsequent offense.

SEC. 8.8. The heading of Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code is amended to read:

pt. 6 t. 4 d. 10 ch. 1 art. 3 pr. § 30342

Article 3. *** Ammunition Vendors

SEC. 8.9. Section 30342 is added to the Penal Code, immediately preceding Section 30345, to read:

<< CA PENAL § 30342 >>

30342. (a) Commencing January 1, 2018, a valid ammunition vendor license shall be required for any person, firm, corporation, or other business enterprise to sell more than 500 rounds of ammunition in any 30–day period.

(b) A violation of this section is a misdemeanor.

SEC. 8.10. Section 30347 of the Penal Code is amended to read:

<< CA PENAL § 30347 >>

30347. **(a) An ammunition vendor shall require any agent or employee who handles, sells, delivers, or has under his or her custody or control any ammunition, to obtain and provide to the vendor a certificate of eligibility from the Department of Justice issued pursuant to Section 26710. On the application for the certificate, the agent or employee shall provide the name and address of the ammunition vendor with whom the person is employed, or the name and California firearms dealer number of the ammunition vendor if applicable.**

**(b) The department shall notify the ammunition vendor in the event that the agent or employee who has a certificate of eligibility is or becomes prohibited from possessing ammunition under subdivision (a) of Section 30305 or federal law.**

\* \* \* **(c) An ammunition** vendor shall not permit any **agent or** employee who the vendor knows or reasonably should know is a person described in Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title or Section 8100 or 8103 of the Welfare and Institutions Code to handle, sell, \* \* \* deliver, **or have under his or her custody or control, any** \* \* \* ammunition in the course and scope of employment.

SEC. 8.11. Section 30348 is added to the Penal Code, to read:

<< CA PENAL § 30348 >>

30348. (a) Except as provided in subdivision (b), the sale of ammunition by a licensed vendor shall be conducted at the location specified in the license.

(b) A vendor may sell ammunition at a gun show or event if the gun show or event is not conducted from any motorized or towed vehicle.

(c) For purposes of this section, "gun show or event" means a function sponsored by any national, state, or local organization, devoted to the collection, competitive use, or other sporting use of firearms, or an organization or association that sponsors functions devoted to the collection, competitive use, or other sporting use of firearms in the community.

(d) Sales of ammunition at a gun show or event shall comply with all applicable laws including Sections 30347, 30350, 30352, and 30360.

SEC. 8.12. Section 30350 of the Penal Code is amended to read:

<< CA PENAL § 30350 >>

30350. \* \* \* **An ammunition** vendor shall not sell or otherwise transfer ownership of, offer for sale or otherwise offer to transfer ownership of, or display for sale or display for transfer of ownership of any \* \* \* ammunition in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor.

SEC. 8.13. Section 30352 of the Penal Code is amended to read:

<< CA PENAL § 30352 >>

30352. (a) Commencing * * ***July 1, 2019, an ammunition** vendor shall not sell or otherwise transfer ownership of any * * * ammunition without, at the time of delivery, legibly recording the following information **on a form to be prescribed by the Department of Justice**:

(1) The date of the sale or other **transfer**.

(2) The purchaser's or transferee's driver's license or other identification number and the state in which it was issued.

(3) The brand, type, and amount of ammunition sold or otherwise transferred.

(4) The purchaser's or transferee's **full name and** signature.

(5) The name of the salesperson who processed the sale or other transaction.

* * *

**(6)** The purchaser's or transferee's full residential address and telephone number.

**(7)** The purchaser's or transferee's date of birth.

**(b) Commencing July 1, 2019, an ammunition vendor shall electronically submit to the department the information required by subdivision (a) for all sales and transfers of ownership of ammunition. The department shall retain this information in a database to be known as the Ammunition Purchase Records File. This information shall remain confidential and may be used by the department and those entities specified in, and pursuant to, subdivision (b) or (c) of Section 11105, through the California Law Enforcement Telecommunications System, only for law enforcement purposes. The ammunition vendor shall not use, sell, disclose, or share such information for any other purpose other than the submission required by this subdivision without the express written consent of the purchaser or transferee.**

**(c) Commencing on July 1, 2019, only those persons listed in this subdivision, or those persons or entities listed in subdivision (e), shall be authorized to purchase ammunition. Prior to delivering any ammunition, an ammunition vendor shall require bona fide evidence of identity to verify that the person who is receiving delivery of the ammunition is a person or entity listed in subdivision (e) or one of the following:**

**(1) A person authorized to purchase ammunition pursuant to Section 30370.**

**(2) A person who was approved by the department to receive a firearm from the ammunition vendor, pursuant to Section 28220, if that vendor is a licensed firearms dealer, and the ammunition is delivered to the person in the same transaction as the firearm.**

**(d) Commencing July 1, 2019, the ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition by comparing the person's ammunition purchase authorization number to the centralized list of authorized ammunition purchasers. If the person is not listed as an authorized ammunition purchaser, the vendor shall deny the sale or transfer.**

* * ***(e) Subdivisions** (a) **and (d)** shall not apply to * * *sales or other transfers of ownership of * * *ammunition by * * * ammunition vendors to any of the following, if properly identified:

* * *

* * ***(1) An** ammunition vendor.

**(2)** A person who is on the centralized list **of exempted federal firearms licensees** maintained by the department pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of this title.

\* \* \*

**(3) A person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises.**

**(4)** A gunsmith.

**(5)** A wholesaler.

**(6)** A manufacturer or importer of firearms **or ammunition** licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code, and the regulations issued pursuant thereto.

**(7)** An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale or other transfer of ownership is for exclusive use by that government agency, and, prior to the sale, delivery, or transfer of the \* \* \* ammunition, written authorization from the head of the agency authorizing the transaction is presented to the person from whom the purchase, delivery, or transfer is being made. Proper written authorization is defined as verifiable written certification from the head of the agency by which the purchaser, transferee, or person otherwise acquiring ownership is employed, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency by which that individual is employed.

**(8) A properly identified sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or properly identified sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.**

**(f)(1) Proper identification is defined as verifiable written certification from the head of the agency by which the purchaser or transferee is employed, identifying the purchaser or transferee as a full-time paid peace officer who is authorized to carry a firearm in the course and scope of the officer's duties.**

**(2) The certification shall be delivered to the vendor at the time of purchase or transfer and the purchaser or transferee shall provide bona fide evidence of identity to verify that he or she is the person authorized in the certification.**

**(3) The vendor shall keep the certification with the record of sale and submit the certification to the department.**

**(g) The department is authorized to adopt regulations to implement the provisions of this section.**

SEC. 8.14. Section 30363 is added to the Penal Code, to read:

<< CA PENAL § 30363 >>

30363. Within 48 hours of discovery, an ammunition vendor shall report the loss or theft of any of the following items to the appropriate law enforcement agency in the city, county, or city and county where the vendor's business premises are located:

(1) Any ammunition that is merchandise of the vendor.

(2) Any ammunition that the vendor takes possession of pursuant to Section 30312.

(3) Any ammunition kept at the vendor's place of business.

SEC. 8.15. Article 4 (commencing with Section 30370) is added to Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code, to read:

pt. 6 t. 4 d. 10 ch. 1 art. 4 pr. § 30370

Article 4. Ammunition Purchase Authorizations

<< CA PENAL § 30370 >>

30370. (a)(1) Commencing on January 1, 2019, any person who is 18 years of age or older may apply to the Department of Justice for an ammunition purchase authorization.

(2) The ammunition purchase authorization may be used by the authorized person to purchase or otherwise seek the transfer of ownership of ammunition from an ammunition vendor, as that term is defined in Section 16151, and shall have no other force or effect.

(3) The ammunition purchase authorization shall be valid for four years from July 1, 2019, or the date of issuance, whichever is later, unless it is revoked by the department pursuant to subdivision (b).

(b) The ammunition purchase authorization shall be promptly revoked by the department upon the occurrence of any event which would have disqualified the holder from being issued the ammunition purchase authorization pursuant to this section. If an authorization is revoked, the department shall upon the written request of the holder state the reasons for doing so and provide the holder an appeal process to challenge that revocation.

(c) The department shall create and maintain an internal centralized list of all persons who are authorized to purchase ammunition and shall promptly remove from the list any persons whose authorization was revoked by the department pursuant to this section. The department shall provide access to the list by ammunition vendors for purposes of conducting ammunition sales or other transfers, and shall provide access to the list by law enforcement agencies for law enforcement purposes.

(d) The department shall issue an ammunition purchase authorization to the applicant if all of the following conditions are met:

(1) The applicant is 18 years of age or older.

(2) The applicant is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law.

(3) The applicant pays the fees set forth in subdivision (g).

(e)(1) Upon receipt of an initial or renewal application, the department shall examine its records, and the records it is authorized to request from the State Department of State Hospitals, pursuant to Section 8104 of the Welfare and Institutions Code, and if authorized, the National Instant Criminal Background Check System, as described in Section 922(t) of Title 18 of the United States Code, in order to determine if the applicant is prohibited from possessing or acquiring ammunition under subdivision (a) of Section 30305 or federal law.

(2) The applicant shall be approved or denied within 30 days of the date of the submission of the application to the department. If the application is denied, the department shall state the reasons for doing so and provide the applicant an appeal process to challenge that denial.

(3) If the department is unable to ascertain the final disposition of the application within 30 days of the applicant's submission, the department shall grant authorization to the applicant.

(4) The ammunition purchase authorization number shall be the same as the number on the document presented by the person as bona fide evidence of identity.

(f) The department shall renew a person's ammunition purchase authorization before its expiration, provided that the department determines that the person is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law, and provided the applicant timely pays the renewal fee set forth in subdivision (g).

(g) The department may charge a reasonable fee not to exceed fifty dollars ($50) per person for the issuance of an ammunition purchase authorization or the issuance of a renewal authorization, however, the department shall not set these fees any higher than necessary to recover the reasonable, estimated costs to fund the ammunition authorization program provided for in this section and Section 30352, including the enforcement of this program and maintenance of any data systems associated with this program.

(h) The Ammunition Safety and Enforcement Special Fund is hereby created within the State Treasury. All fees received pursuant to this section shall be deposited into the Ammunition Safety and Enforcement Special Fund of the General Fund, and, notwithstanding Section 13340 of the Government Code, are continuously appropriated for purposes of implementing, operating and enforcing the ammunition authorization program provided for in this section and Section 30352, and for repaying the start-up loan provided for in Section 30371.

(i) The department shall annually review and may adjust all fees specified in subdivision (g) for inflation.

(j) The department is authorized to adopt regulations to implement the provisions of this section.

<< CA PENAL § 30371 >>

30371. (a) There is hereby appropriated twenty-five million dollars ($25,000,000) from the General Fund as a loan for the start-up costs of implementing, operating and enforcing the provisions of the ammunition authorization program provided for in Sections 30352 and 30370.

(b) For purposes of repaying the loan, the Controller shall, after disbursing moneys necessary to implement, operate and enforce the ammunition authorization program provided for in Sections 30352 and 30370, transfer all proceeds from fees received by the Ammunition Safety and Enforcement Special Fund up to the amount of the loan provided by this section, including interest at the pooled money investment account rate, to the General Fund.

SEC. 8.16. Article 5 (commencing with Section 30385) is added to Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code, to read:

pt. 6 t. 4 d. 10 ch. 1 art. 5 pr. § 30385

Article 5. Ammunition Vendor Licenses

<< CA PENAL § 30385 >>

30385. (a) The Department of Justice is authorized to issue ammunition vendor licenses pursuant to this article. The department shall, commencing July 1, 2017, commence accepting applications for ammunition vendor licenses. If an application is denied, the department shall inform the applicant of the reason for denial in writing.

(b) The ammunition vendor license shall be issued in a form prescribed by the department and shall be valid for a period of one year. The department may adopt regulations to administer the application and enforcement provisions of this article. The license shall allow the licensee to sell ammunition at the location specified in the license or at a gun show or event as set forth in Section 30348.

(c)(1) In the case of an entity other than a natural person, the department shall issue the license to the entity, but shall require a responsible person to pass the background check pursuant to Section 30395.

(2) For purposes of this article, "responsible person" means a person having the power to direct the management, policies, and practices of the entity as it pertains to ammunition.

(d) Commencing January 1, 2018, a firearms dealer licensed pursuant to Sections 26700 to 26915, inclusive, shall automatically be deemed a licensed ammunition vendor, provided the dealer complies with the requirements of Article 2 (commencing with Section 30300) and Article 3 (commencing with Section 30342).

<< CA PENAL § 30390 >>

30390. (a) The Department of Justice may charge ammunition vendor license applicants a reasonable fee sufficient to reimburse the department for the reasonable, estimated costs of administering the license program, including the enforcement of this program and maintenance of the registry of ammunition vendors.

(b) The fees received by the department pursuant to this article shall be deposited in the Ammunition Vendors Special Account, which is hereby created. Notwithstanding Section 13340 of the Government Code, the revenue in the fund is continuously appropriated for use by the department for the purpose of implementing, administering and enforcing the provisions of this article, and for collecting and maintaining information submitted pursuant to Section 30352.

(c) The revenue in the Firearms Safety and Enforcement Special Fund shall also be available upon appropriation to the department for the purpose of implementing and enforcing the provisions of this article.

<< CA PENAL § 30395 >>

30395. (a) The Department of Justice is authorized to issue ammunition vendor licenses to applicants who the department has determined, either as an individual or a responsible person, are not prohibited from possessing, receiving, owning, or purchasing ammunition under subdivision (a) of Section 30305 or federal law, and who provide a copy of any regulatory or business license required by local government, a valid seller's permit issued by the State Board of Equalization, a federal firearms license if the person is federally licensed, and a certificate of eligibility issued by the department.

(b) The department shall keep a registry of all licensed ammunition vendors. Law enforcement agencies shall be provided access to the registry for law enforcement purposes.

(c) An ammunition vendor license is subject to forfeiture for a breach of any of the prohibitions and requirements of Article 2 (commencing with Section 30300) or Article 3 (commencing with Section 30342).

SEC. 9. Nothing in this Act shall preclude or preempt a local ordinance that imposes additional penalties or requirements in regard to the sale or transfer of ammunition.

SEC. 10. Securing Firearms From Prohibited Persons.

SEC. 10.1. Section 1524 of the Penal Code is amended to read:

<< CA PENAL § 1524 >>

1524. (a) A search warrant may be issued upon any of the following grounds:

(1) When the property was stolen or embezzled.

(2) When the property or things were used as the means of committing a felony.

(3) When the property or things are in the possession of any person with the intent to use them as a means of committing a public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing them from being discovered.

(4) When the property or things to be seized consist of an item or constitute evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony.

(5) When the property or things to be seized consist of evidence that tends to show that sexual exploitation of a child, in violation of Section 311.3, or possession of matter depicting sexual conduct of a person under 18 years of age, in violation of Section 311.11, has occurred or is occurring.

(6) When there is a warrant to arrest a person.

(7) When a provider of electronic communication service or remote computing service has records or evidence, as specified in Section 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in the possession of any person with the intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery.

(8) When the property or things to be seized include an item or evidence that tends to show a violation of Section 3700.5 of the Labor Code, or tends to show that a particular person has violated Section 3700.5 of the Labor Code.

(9) When the property or things to be seized include a firearm or other deadly weapon at the scene of, or at the premises occupied or under the control of the person arrested in connection with, a domestic violence incident involving a threat to human life or a physical assault as provided in Section 18250. This section does not affect warrantless seizures otherwise authorized by Section 18250.

(10) When the property or things to be seized include a firearm or other deadly weapon that is owned by, or in the possession of, or in the custody or control of, a person described in subdivision (a) of Section 8102 of the Welfare and Institutions Code.

(11) When the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to Section 6389 of the Family Code, if a prohibited firearm is possessed, owned, in the custody of, or controlled by a person against whom a protective order has been issued pursuant to Section 6218 of the Family Code, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law.

(12) When the information to be received from the use of a tracking device constitutes evidence that tends to show that either a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code has been committed or is being committed, tends to show that a particular person has committed a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or will assist in locating an individual who has committed or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code. A tracking device search warrant issued pursuant to this paragraph shall be executed in a manner meeting the requirements specified in subdivision (b) of Section 1534.

(13) When a sample of the blood of a person constitutes evidence that tends to show a violation of Section 23140, 23152, or 23153 of the Vehicle Code and the person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by Section 23612 of the Vehicle Code, and the sample will be drawn from the person in a reasonable, medically approved manner. This paragraph is not intended to abrogate a court's mandate to determine the propriety of the issuance of a search warrant on a case-by-case basis.

(14) Beginning January 1, 2016, the property or things to be seized are firearms or ammunition or both that are owned by, in the possession of, or in the custody or control of a person who is the subject of a gun violence restraining order that has been issued pursuant to Division 3.2 (commencing with Section 18100) of Title 2 of Part 6, if a prohibited firearm or ammunition or both is possessed, owned, in the custody of, or controlled by a person against whom a gun violence restraining order has been issued, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law.

**(15) Beginning January 1, 2018, the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to Section 29800 or 29805, and the court has made a finding pursuant to paragraph (3) of subdivision (c) of Section 29810 that the person has failed to relinquish the firearm as required by law.**

**(16)** When the property or things to be seized are controlled substances or a device, contrivance, instrument, or paraphernalia used for unlawfully using or administering a controlled substance pursuant to the authority described in Section 11472 of the Health and Safety Code.

**(17)** (A) When all of the following apply:

(i) A sample of the blood of a person constitutes evidence that tends to show a violation of subdivision (b), (c), (d), (e), or (f) of Section 655 of the Harbors and Navigation Code.

(ii) The person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by Section 655.1 of the Harbors and Navigation Code.

(iii) The sample will be drawn from the person in a reasonable, medically approved manner.

(B) This paragraph is not intended to abrogate a court's mandate to determine the propriety of the issuance of a search warrant on a case-by-case basis.

(b) The property, things, person, or persons described in subdivision (a) may be taken on the warrant from any place, or from any person in whose possession the property or things may be.

(c) Notwithstanding subdivision (a) or (b), no search warrant shall issue for any documentary evidence in the possession or under the control of any person who is a lawyer as defined in Section 950 of the Evidence Code, a physician as defined in Section 990 of the Evidence Code, a psychotherapist as defined in Section 1010 of the Evidence Code, or a member of the clergy as defined in Section 1030 of the Evidence Code, and who is not reasonably suspected of engaging or having engaged in criminal activity related to the documentary evidence for which a warrant is requested unless the following procedure has been complied with:

(1) At the time of the issuance of the warrant, the court shall appoint a special master in accordance with subdivision (d) to accompany the person who will serve the warrant. Upon service of the warrant, the special master shall inform the party served of the specific items being sought and that the party shall have the opportunity to provide the items requested. If the party, in the judgment of the special master, fails to provide the items requested, the special master shall conduct a search for the items in the areas indicated in the search warrant.

(2)(A) If the party who has been served states that an item or items should not be disclosed, they shall be sealed by the special master and taken to court for a hearing.

(B) At the hearing, the party searched shall be entitled to raise any issues that may be raised pursuant to Section 1538.5 as well as a claim that the item or items are privileged, as provided by law. The hearing shall be held in the superior court. The court shall provide sufficient time for the parties to obtain counsel and make motions or present evidence. The hearing shall be held within three days of the service of the warrant unless the court makes a finding that the expedited hearing is impracticable. In that case, the matter shall be heard at the earliest possible time.

(C) If an item or items are taken to court for a hearing, any limitations of time prescribed in Chapter 2 (commencing with Section 799) of Title 3 of Part 2 shall be tolled from the time of the seizure until the final conclusion of the hearing, including any associated writ or appellate proceedings.

(3) The warrant shall, whenever practicable, be served during normal business hours. In addition, the warrant shall be served upon a party who appears to have possession or control of the items sought. If, after reasonable efforts, the party serving the warrant is unable to locate the person, the special master shall seal and return to the court, for determination by the court, any item that appears to be privileged as provided by law.

(d)(1) As used in this section, a "special master" is an attorney who is a member in good standing of the California State Bar and who has been selected from a list of qualified attorneys that is maintained by the State Bar particularly for the purposes of conducting the searches described in this section. These attorneys shall serve without compensation. A special master shall be considered a public employee, and the governmental entity that caused the search warrant to be issued shall be considered the employer of the special master and the applicable public entity, for purposes of Division 3.6 (commencing with Section 810) of Title 1 of the Government Code, relating to claims and actions against public entities and public employees. In selecting the special master, the court shall make every reasonable effort to ensure that the person selected has no relationship with any of the parties involved in the pending matter. Information obtained by the special master shall be confidential and may not be divulged except in direct response to inquiry by the court.

(2) In any case in which the magistrate determines that, after reasonable efforts have been made to obtain a special master, a special master is not available and would not be available within a reasonable period of time, the magistrate may direct the party seeking the order to conduct the search in the manner described in this section in lieu of the special master.

(e) Any search conducted pursuant to this section by a special master may be conducted in a manner that permits the party serving the warrant or his or her designee to accompany the special master as he or she conducts his or her search. However, that party or his or her designee may not participate in the search nor shall he or she examine any of the items being searched by the special master except upon agreement of the party upon whom the warrant has been served.

(f) As used in this section, "documentary evidence" includes, but is not limited to, writings, documents, blueprints, drawings, photographs, computer printouts, microfilms, X-rays, files, diagrams, ledgers, books, tapes, audio and video recordings, films, and papers of any type or description.

(g) No warrant shall issue for any item or items described in Section 1070 of the Evidence Code.

(h) Notwithstanding any other law, no claim of attorney work product as described in Chapter 4 (commencing with Section 2018.010) of Title 4 of Part 4 of the Code of Civil Procedure shall be sustained where there is probable cause to believe that the lawyer is engaging or has engaged in criminal activity related to the documentary evidence for which a warrant is requested unless it is established at the hearing with respect to the documentary evidence seized under the warrant that the services of the lawyer were not sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud.

(i) Nothing in this section is intended to limit an attorney's ability to request an in-camera hearing pursuant to the holding of the Supreme Court of California in People v. Superior Court (Laff) (2001) 25 Cal.4th 703.

(j) In addition to any other circumstance permitting a magistrate to issue a warrant for a person or property in another county, when the property or things to be seized consist of any item or constitute evidence that tends to show a violation of Section 530.5, the magistrate may issue a warrant to search a person or property located in another county if the person whose identifying information was taken or used resides in the same county as the issuing court.

(k) This section shall not be construed to create a cause of action against any foreign or California corporation, its officers, employees, agents, or other specified persons for providing location information.

SEC. 10.2. Section 27930 of the Penal Code is amended to read:

<< CA PENAL § 27930 >>

27930. Section 27545 does not apply to deliveries, transfers, or returns of firearms made pursuant to any of the following:

(a) Sections 18000 and 18005.

(b) Division 4 (commencing with Section 18250) of Title 2.

(c) Chapter 2 (commencing with Section 33850) of Division 11.

(d) Sections 34005 and 34010.

**(e) Section 29810.**

SEC. 10.3. Section 29810 of the Penal Code is amended to read:

<< CA PENAL § 29810 >>

29810. (a) For any person who is subject to Section 29800 or 29805, the court shall, at the time judgment is imposed, provide on a form supplied by the Department of Justice, a notice to the defendant prohibited by this chapter from owning, purchasing, receiving, possessing, or having under custody or control, any firearm. The notice shall inform the defendant of the prohibition regarding firearms and include a form to facilitate the transfer of firearms. If the prohibition on owning or possessing a firearm will expire on a date specified in the court order, the form shall inform the defendant that he or she may elect to have his or her firearm transferred to a firearms dealer licensed pursuant to Section 29830.

(b) Failure to provide the notice described in subdivision (a) is not a defense to a violation of this chapter.

**(c) This section shall be repealed effective January 1, 2018.**

SEC. 10.4. Section 29810 is added to the Penal Code, to read:

<< CA PENAL § 29810 >>

29810. (a) (1) Upon conviction of any offense that renders a person subject to Section 29800 or Section 29805, the person shall relinquish all firearms he or she owns, possesses, or has under his or her custody or control in the manner provided in this section.

(2) The court shall, upon conviction of a defendant for an offense described in subdivision (a), instruct the defendant that he or she is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control, any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines, and shall order the defendant to relinquish all firearms in the manner provided in this section. The court shall also provide the defendant with a Prohibited

Persons Relinquishment Form developed by the Department of Justice.

(3) Using the Prohibited Persons Relinquishment Form, the defendant shall name a designee and grant the designee power of attorney for the purpose of transferring or disposing of any firearms. The designee shall be either a local law enforcement agency or a consenting third party who is not prohibited from possessing firearms under state or federal law. The designee shall, within the time periods specified in subdivisions (d) and (e), surrender the firearms to the control of a local law enforcement agency, sell the firearms to a licensed firearms dealer, or transfer the firearms for storage to a firearms dealer pursuant to Section 29830.

(b) The Prohibited Persons Relinquishment Form shall do all of the following:

(1) Inform the defendant that he or she is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control, any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines, and that he or she shall relinquish all firearms through a designee within the time periods set forth in subdivision (d) or (e) by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830.

(2) Inform the defendant that any cohabitant of the defendant who owns firearms must store those firearms in accordance with Section 25135.

(3) Require the defendant to declare any firearms that he or she owned, possessed, or had under his or her custody or control at the time of his or her conviction, and require the defendant to describe the firearms and provide all reasonably available information about the location of the firearms to enable a designee or law enforcement officials to locate the firearms.

(4) Require the defendant to name a designee, if the defendant declares that he or she owned, possessed, or had under his or her custody or control any firearms at the time of his or her conviction, and grant the designee power of attorney for the purpose of transferring or disposing of all firearms.

(5) Require the designee to indicate his or her consent to the designation and, except a designee that is a law enforcement agency, to declare under penalty of perjury that he or she is not prohibited from possessing any firearms under state or federal law.

(6) Require the designee to state the date each firearm was relinquished and the name of the party to whom it was relinquished, and to attach receipts from the law enforcement officer or licensed firearms dealer who took possession of the relinquished firearms.

(7) Inform the defendant and the designee of the obligation to submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer within the time periods specified in subdivisions (d) and (e).

(c)(1) When a defendant is convicted of an offense described in subdivision (a), the court shall immediately assign the matter to a probation officer to investigate whether the Automated Firearms System or other credible information, such as a police report, reveals that the defendant owns, possesses, or has under his or her custody or control any firearms. The assigned probation officer shall receive the Prohibited Persons Relinquishment Form from the defendant or the defendant's designee, as applicable, and ensure that the Automated Firearms System has been properly updated to indicate that the defendant has relinquished those firearms.

(2) Prior to final disposition or sentencing in the case, the assigned probation officer shall report to the court whether the defendant has properly complied with the requirements of this section by relinquishing all firearms identified by the probation officer's investigation or declared by the defendant on the Prohibited Persons Relinquishment Form, and by timely submitting a completed Prohibited Persons Relinquishment Form. The probation officer shall also report to the Department of Justice on a form to be developed by the department whether the Automated Firearms System has been updated to indicate which firearms have been relinquished by the defendant.

(3) Prior to final disposition or sentencing in the case, the court shall make findings concerning whether the probation

officer's report indicates that the defendant has relinquished all firearms as required, and whether the court has received a completed Prohibited Persons Relinquishment Form, along with the receipts described in paragraph (1) of subdivision (d) or paragraph (1) of subdivision (e). The court shall ensure that these findings are included in the abstract of judgment. If necessary to avoid a delay in sentencing, the court may make and enter these findings within 14 days of sentencing.

(4) If the court finds probable cause that the defendant has failed to relinquish any firearms as required, the court shall order the search for and removal of any firearms at any location where the judge has probable cause to believe the defendant's firearms are located. The court shall state with specificity the reasons for and scope of the search and seizure authorized by the order.

(5) Failure by a defendant to timely file the completed Prohibited Persons Relinquishment Form with the assigned probation officer shall constitute an infraction punishable by a fine not exceeding one hundred dollars ($100).

(d) The following procedures shall apply to any defendant who is a prohibited person within the meaning of paragraph (1) of subdivision (a) who does not remain in custody at any time within the five-day period following conviction:

(1) The designee shall dispose of any firearms the defendant owns, possesses, or has under his or her custody or control within five days of the conviction by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830, in accordance with the wishes of the defendant. Any proceeds from the sale of the firearms shall become the property of the defendant. The law enforcement officer or licensed dealer taking possession of any firearms pursuant to this subdivision shall issue a receipt to the designee describing the firearms and listing any serial number or other identification on the firearms at the time of surrender.

(2) If the defendant owns, possesses, or has under his or her custody or control any firearms to relinquish, the defendant's designee shall submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer within five days following the conviction, along with the receipts described in paragraph (1) of subdivision (d) showing the defendant's firearms were surrendered to a local law enforcement agency or sold or transferred to a licensed firearms dealer.

(3) If the defendant does not own, possess, or have under his or her custody or control any firearms to relinquish, he or she shall, within five days following conviction, submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, with a statement affirming that he or she has no firearms to be relinquished.

(e) The following procedures shall apply to any defendant who is a prohibited person within the meaning of paragraph (1) of subdivision (a) who is in custody at any point within the five-day period following conviction:

(1) The designee shall dispose of any firearms the defendant owns, possesses, or has under his or her custody or control within 14 days of the conviction by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830, in accordance with the wishes of the defendant. Any proceeds from the sale of the firearms shall become the property of the defendant. The law enforcement officer or licensed dealer taking possession of any firearms pursuant to this subdivision shall issue a receipt to the designee describing the firearms and listing any serial number or other identification on the firearms at the time of surrender.

(2) If the defendant owns, possesses, or has under his or her custody or control any firearms to relinquish, the defendant's designee shall submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, within 14 days following conviction, along with the receipts described in paragraph (1) of subdivision (e) showing the defendant's firearms were surrendered to a local law enforcement agency or sold or transferred to a licensed firearms dealer.

(3) If the defendant does not own, possess, or have under his or her custody or control any firearms to relinquish, he or she shall, within 14 days following conviction, submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, with a statement affirming that he or she has no firearms to be relinquished.

(4) If the defendant is released from custody during the 14 days following conviction and a designee has not yet taken

temporary possession of each firearm to be relinquished as described above, the defendant shall, within five days following his or her release, relinquish each firearm required to be relinquished pursuant to paragraph (1) of subdivision (d).

(f) For good cause, the court may shorten or enlarge the time periods specified in subdivisions (d) and (e), enlarge the time period specified in paragraph (3) of subdivision (c), or allow an alternative method of relinquishment.

(g) The defendant shall not be subject to prosecution for unlawful possession of any firearms declared on the Prohibited Persons Relinquishment Form if the firearms are relinquished as required.

(h) Any firearms that would otherwise be subject to relinquishment by a defendant under this section, but which are lawfully owned by a cohabitant of the defendant, shall be exempt from relinquishment, provided the defendant is notified that the cohabitant must store the firearm in accordance with Section 25135.

(i) A law enforcement agency shall update the Automated Firearms System to reflect any firearms that were relinquished to the agency pursuant to this section. A law enforcement agency shall retain a firearm that was relinquished to the agency pursuant to this section for 30 days after the date the firearm was relinquished. After the 30–day period has expired, the firearm is subject to destruction, retention, sale or other transfer by the agency, except upon the certificate of a judge of a court of record, or of the district attorney of the county, that the retention of the firearm is necessary or proper to the ends of justice, or if the defendant provides written notice of an intent to appeal a conviction for an offense described in subdivision (a), or if the Automated Firearms System indicates that the firearm was reported lost or stolen by the lawful owner. If the firearm was reported lost or stolen, the firearm shall be restored to the lawful owner, as soon as its use as evidence has been served, upon the lawful owner's identification of the weapon and proof of ownership, and after the law enforcement agency has complied with Chapter 2 (commencing with Section 33850) of Division 11 of Title 4. The agency shall notify the Department of Justice of the disposition of relinquished firearms pursuant to Section 34010.

(j) A city, county, or city and county, or a state agency may adopt a regulation, ordinance, or resolution imposing a charge equal to its administrative costs relating to the seizure, impounding, storage, or release of a firearm pursuant to Section 33880.

(k) This section shall become operative on January 1, 2018.

SEC. 11. Theft of Firearms.

SEC. 11.1. Section 490.2 of the Penal Code is amended to read:

<< CA PENAL § 490.2 >>

(a) Notwithstanding Section 487 or any other provision of law defining grand theft, obtaining any property by theft where the value of the money, labor, real or personal property taken does not exceed nine hundred fifty dollars ($950) shall be considered petty theft and shall be punished as a misdemeanor, except that such person may instead be punished pursuant to subdivision (h) of Section 1170 if that person has one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense requiring registration pursuant to subdivision (c) of Section 290.

(b) This section shall not be applicable to any theft that may be charged as an infraction pursuant to any other provision of law.

(c) **This section shall not apply to theft of a firearm.**

SEC. 11.2. Section 29805 of the Penal Code is amended to read:

<< CA PENAL § 29805 >>

29805. Except as provided in Section 29855 or subdivision (a) of Section 29800, any person who has been convicted of a misdemeanor violation of Section 71, 76, 136.1, 136.5, or 140, subdivision (d) of Section 148, Section 171b, paragraph (1) of subdivision (a) of Section 171c, 171d, 186.28, 240, 241, 242, 243, 243.4, 244.5, 245, 245.5, 246.3, 247, 273.5, 273.6, 417, 417.6, 422, 626.9, 646.9, or 830.95, subdivision (a) of former Section 12100, as that section read at any time from when it was enacted by Section 3 of Chapter 1386 of the Statutes of 1988 to when it was repealed by Section 18 of Chapter 23 of the Statutes of 1994, Section 17500, 17510, 25300, 25800, 30315, or 32625, subdivision (b) or (d) of Section 26100, or Section 27510, or Section 8100, 8101, or 8103 of the Welfare and Institutions Code, any firearm-related offense pursuant to Sections 871.5 and 1001.5 of the Welfare and Institutions Code, **Section 490.2 if the property taken was a firearm,** or of the conduct punished in subdivision (c) of Section 27590, and who, within 10 years of the conviction, owns, purchases, receives, or has in possession or under custody or control, any firearm is guilty of a public offense, which shall be punishable by imprisonment in a county jail not exceeding one year or in the state prison, by a fine not exceeding one thousand dollars ($1,000), or by both that imprisonment and fine. The court, on forms prescribed by the Department of Justice, shall notify the department of persons subject to this section. However, the prohibition in this section may be reduced, eliminated, or conditioned as provided in Section 29855 or 29860.

SEC. 12. Interim Standards.

Notwithstanding the Administrative Procedure Act (APA), and in order to facilitate the prompt implementation of the Safety for All Act of 2016, the California Department of Justice may adopt interim standards without compliance with the procedures set forth in the APA. The interim standards shall remain in effect for no more than two years, and may be earlier superseded by regulations adopted pursuant to the APA. "Interim standards" means temporary standards that perform the same function as "emergency regulations" under the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code), except that in order to provide greater opportunity for public comment on permanent regulations, the interim standards may remain in force for two years rather than 180 days.

SEC. 13. Amending the Measure.

This Act shall be broadly construed to accomplish its purposes. The provisions of this measure may be amended by a vote of 55 percent of the members of each house of the Legislature and signed by the Governor so long as such amendments are consistent with and further the intent of this Act.

SEC. 14. Conflicting Measures.

(a) In the event that this measure and another measure on the same subject matter, including but not limited to the regulation of the sale or possession of firearms or ammunition, shall appear on the same statewide ballot, the provisions of the other measure or measures shall be deemed to be in conflict with this measure. In the event that this measure receives a greater number of affirmative votes than a measure deemed to be in conflict with it, the provisions of this measure shall prevail in their entirety, and the other measure or measures shall be null and void.

(b) If this measure is approved by voters but superseded by law by any other conflicting measure approved by voters at the same election, and the conflicting ballot measure is later held invalid, this measure shall be self-executing and given full force and effect.

SEC. 15. Severability.

If any provision of this measure, or part of this measure, or the application of any provision or part to any person or circumstance, is for any reason held to be invalid or unconstitutional, the remaining provisions, or applications of provisions, shall not be affected, but shall remain in full force and effect, and to this end the provisions of this measure are severable.


SEC. 16. Proponent Standing.

Notwithstanding any other provision of law, if the State, government agency, or any of its officials fail to defend the constitutionality of this Act, following its approval by the voters, any other government employer, the proponent, or in their absence, any citizen of this State shall have the authority to intervene in any court action challenging the constitutionality of this Act for the purpose of defending its constitutionality, whether such action is in trial court, on appeal, or on discretionary review by the Supreme Court of California or the Supreme Court of the United States. The reasonable fees and costs of defending the action shall be a charge on funds appropriated to the Department of Justice, which shall be satisfied promptly.


Footnotes

[1]        So in enrolled Prop. 63.

---

**End of Document** © 2017 Thomson Reuters. No claim to original U.S. Government Works.

# Exhibit 96

**University of California, Hastings College of the Law**
## UC Hastings Scholarship Repository

Propositions                                   California Ballot Propositions and Initiatives

2016

# Firearms. Ammunition Sales. Initiative Statute.

Follow this and additional works at: http://repository.uchastings.edu/ca_ballot_props

Recommended Citation

Firearms. Ammunition Sales. Initiative Statute. California Proposition 63 (2016).
http://repository.uchastings.edu/ca_ballot_props/1356

This Proposition is brought to you for free and open access by the California Ballot Propositions and Initiatives at UC Hastings Scholarship Repository.
It has been accepted for inclusion in Propositions by an authorized administrator of UC Hastings Scholarship Repository. For more information, please
contact marcusc@uchastings.edu.

PROPOSITION
# 63

## FIREARMS. AMMUNITION SALES. INITIATIVE STATUTE.

63

### OFFICIAL TITLE AND SUMMARY

PREPARED BY THE ATTORNEY GENERAL

- Requires individuals to pass a background check and obtain Department of Justice authorization to purchase ammunition.

- Prohibits possession of large-capacity ammunition magazines, and requires their disposal, as specified.

- Requires most ammunition sales be made through licensed ammunition vendors and reported to Department of Justice.

- Requires lost or stolen firearms and ammunition be reported to law enforcement.

- Prohibits persons convicted of stealing a firearm from possessing firearms.

- Establishes new procedures for enforcing laws prohibiting firearm possession.

- Requires Department of Justice to provide information about prohibited persons to federal National Instant Criminal Background Check System.

### SUMMARY OF LEGISLATIVE ANALYST'S ESTIMATE OF NET STATE AND LOCAL GOVERNMENT FISCAL IMPACT:

- Increased state and local court and law enforcement costs, potentially in the tens of millions of dollars annually, related to a new court process for removing firearms from prohibited persons after they are convicted.

- Potential increase in state costs, not likely to exceed the millions of dollars annually, related to regulating ammunition sales. These costs would likely be offset by fee revenues.

- Potential net increase in state and local correctional costs, not likely to exceed the low millions of dollars annually, related to changes in firearm and ammunition penalties.

---

### ANALYSIS BY THE LEGISLATIVE ANALYST

## BACKGROUND

### Restrictions on Firearm and Ammunition Possession

Under federal and state law, certain individuals are not allowed to have firearms. These "prohibited persons" include individuals (1) convicted of felonies and some misdemeanors (such as assault or battery), (2) found by a court to be a danger to themselves or others due to mental illness, and (3) with a restraining order against them. In California, individuals who are not allowed to have firearms are also not allowed to have ammunition.

### Regulation of Firearm Sales

Both federal and state law include various regulations related to firearm sales, including the licensing of firearm dealers. Such regulations include:

- *Background Checks.* Under federal law, firearm dealers must request background checks of individuals seeking to buy firearms from the National Instant Criminal Background Check System (NICS). The NICS searches a number of federal databases to ensure that the buyer is not a prohibited person. As allowed by federal law, California processes all background check requests from firearm dealers in the state directly by using NICS and various state databases.

- *Removal of Firearms From Prohibited Persons.* The California Department of Justice (DOJ) maintains a database of individuals who have legally bought or registered a firearm with the state. DOJ agents use this information to remove firearms from individuals who are no longer allowed to have firearms.

- *Other Regulations.* Other state regulations related to firearms include: limits on the type of firearms that can be bought, a ten-day waiting period before a dealer may give a firearm to a buyer, and requirements for recording and reporting firearm sales.

Fees charged to firearm dealers and buyers generally offset the state's costs to regulate firearm sales.

FIREARMS. AMMUNITION SALES.
INITIATIVE STATUTE.

PROPOSITION
**63**

**63**

CONTINUED

## Regulation of Ammunition Sales

Prior to this year, the state did not regulate ammunition sales in the same manner as firearms. In July 2016, the state enacted legislation to increase the regulation of ammunition sales. Such regulations include:

- ***Licenses to Sell Ammunition.*** Beginning January 2018, individuals and businesses will be required to obtain a one-year license from DOJ to sell ammunition. Certain individuals and businesses would not be required to obtain a license, such as licensed hunters selling less than 50 rounds of ammunition per month to another licensed hunter while on a hunting trip. In order to obtain a license, ammunition dealers will need to demonstrate that they are not prohibited persons. In addition, certain entities will be able to automatically receive an ammunition license, such as firearm dealers licensed by both the state and federal government and firearm wholesalers. A vendor who fails to comply with ammunition sale requirements three times would have their ammunition dealer's license permanently revoked. DOJ could charge a fee to individuals and businesses seeking a license to sell ammunition to support its administrative and enforcement costs.

- ***DOJ Approval to Buy Ammunition.*** Beginning July 2019, ammunition dealers will be required to check with DOJ at the time of purchase that individuals seeking to buy ammunition are not prohibited persons. This requirement would not apply to some individuals, such as persons permitted to carry concealed weapons. In addition, ammunition dealers will generally be required to collect and report information—such as the date of the sale, the buyers' identification information, and the type of ammunition purchased—to DOJ for storage in a database for two years. Failure to comply with these requirements is a misdemeanor (punishable by a fine and/or imprisonment in county jail). DOJ could generally charge an individual seeking to purchase ammunition a fee of up to $1 per

transaction to support its administrative and enforcement costs. DOJ could adjust this fee cap annually for inflation.

- ***Other Regulations.*** Beginning January 2018, state law generally will require that most ammunition sales (including Internet and out-of-state sales) take place through a licensed ammunition dealer. In addition, beginning July 2019, most California residents will be prohibited from bringing ammunition into the state without first having the ammunition delivered to a licensed ammunition dealer. Failure to comply with these requirements is a misdemeanor.

### Status of Recent Legislation

As discussed above, the state recently enacted legislation to increase the regulation of ammunition sales. The state also recently enacted legislation to further limit the ownership of large-capacity magazines and to create a penalty for filing a false lost or stolen firearm report to law enforcement. These laws will take effect unless they are placed before the voters as referenda. If that occurs, voters will determine whether the laws take effect.

## PROPOSAL

Proposition 63 (1) changes state regulation of ammunition sales, (2) creates a new court process to ensure the removal of firearms from prohibited persons after they are convicted of a felony or certain misdemeanors, and (3) implements various other provisions. Additionally, Proposition 63 states that the Legislature can change its provisions if such changes are "consistent with and further the intent" of the measure. Such changes can only be made if 55 percent of the members of each house of the Legislature passes them and the bill is enacted into law.

### Changes to State Regulation of Ammunition Sales

Proposition 63 includes various regulations related to the sale of ammunition. Some of the regulations would replace existing law with similar provisions. However, other regulations proposed by Proposition 63 are different, as discussed below.

PROPOSITION

# 63

FIREARMS. AMMUNITION SALES.
INITIATIVE STATUTE.

**63**

### ANALYSIS BY THE LEGISLATIVE ANALYST

CONTINUED

***Requirements to Buy Ammunition.*** Proposition 63 includes various requirements for individuals seeking to buy ammunition and for DOJ to regulate such purchases. Specifically, the measure:

- Requires individuals to obtain a four-year permit from DOJ to buy ammunition and for ammunition dealers to check with DOJ that individuals buying ammunition have such permits.

- Requires DOJ to revoke permits from individuals who become prohibited.

- Allows DOJ to charge each person applying for a four-year permit a fee of up to $50 to support its various administrative and enforcement costs related to ammunition sales.

The state, however, enacted legislation in July 2016 to replace the above provisions with alternative ones if Proposition 63 is approved by the voters. (This legislation was enacted pursuant to the provision of Proposition 63 allowing for changes that are "consistent with and further the intent" of the proposition, as described earlier.) Specifically, under the legislation: (1) ammunition dealers would be required to check with DOJ that individuals seeking to buy ammunition are not prohibited persons at the time of purchase and (2) DOJ could generally charge such individuals up to $1 per transaction. These provisions are similar to current law. Fewer individuals, however, would be exempt from this check than under current law. For example, individuals permitted to carry concealed weapons would be subject to this check.

***Licenses to Sell Ammunition.*** Similar to current law, Proposition 63 requires individuals and businesses to obtain a one-year license from DOJ to sell ammunition. However, the measure changes the types of individuals and businesses that would be exempt from obtaining a license. For example, the measure generally exempts individuals and businesses that sell a small number of rounds of ammunition from the requirement to get a license. The measure also makes various changes in the penalties for failure to follow ammunition sale requirements. For example, it establishes a new criminal penalty—specifically, a misdemeanor—for failing to follow vendor licensing requirements.

***Other Ammunition Requirements.*** This measure prohibits most California residents from bringing ammunition into the state without first having the ammunition delivered to a licensed ammunition dealer beginning in January 2018—a year and a half earlier than under current law. Additionally, failure to comply with this requirement would change from a misdemeanor to an infraction (punishable by a fine) for the first offense and either an infraction or a misdemeanor for any additional offense. The measure also requires DOJ to store certain ammunition sales information in a database indefinitely, rather than for two years.

## Creates New Court Process for Removal of Firearms

This measure creates a new court process to ensure that individuals convicted of offenses that prohibit them from owning firearms do not continue to have them. Beginning in 2018, the measure requires courts to inform offenders upon conviction that they must (1) turn over their firearms to local law enforcement, (2) sell the firearms to a licensed firearm dealer, or (3) give the firearms to a licensed firearm dealer for storage. The measure also requires courts to assign probation officers to report on what offenders have done with their firearms. If the court finds that there is probable cause that an offender still has firearms, it must order that the firearms be removed. Finally, local governments or state agencies could charge a fee to reimburse them for certain costs in implementing the measure (such as those related to the removal or storage of firearms).

## Implements Other Provisions

***Reporting Requirements.*** The measure includes a number of reporting requirements related to firearms and ammunition. For example, the measure requires that ammunition dealers report the loss or theft of ammunition within 48 hours. It also requires that most individuals report the loss or theft of firearms within five days to local law enforcement. An individual who does not make such a report within five days would be guilty of an infraction for the first two violations. Additional violations would be a misdemeanor. This measure

FIREARMS. AMMUNITION SALES.
INITIATIVE STATUTE.

PROPOSITION

# 63

**63**

### ANALYSIS BY THE LEGISLATIVE ANALYST

CONTINUED

also reduces the penalty for an individual who knowingly submits a false report to local law enforcement from a misdemeanor to an infraction and eliminates the prohibition from owning firearms for ten years for such an individual. This measure also requires DOJ to submit the name, date of birth, and physical description of any newly prohibited person to NICS.

***Large-Capacity Magazines.*** Since 2000, state law has generally banned individuals from obtaining large-capacity magazines (defined as those holding more than ten rounds of ammunition). The law, however, allowed individuals who had large-capacity magazines before 2000 to keep them for their own use. Beginning July 2017, recently enacted law will prohibit most of these individuals from possessing these magazines. Individuals who do not comply are guilty of an infraction. However, there are various individuals who will be exempt from this requirement—such as an individual who owns a firearm (obtained before 2000) that can only be used with a large-capacity magazine. Proposition 63 eliminates several of these exemptions, as well as increases the maximum penalty for possessing large-capacity magazines. Specifically, individuals who possess such magazines after July 2017 would be guilty of an infraction or a misdemeanor.

***Penalty for Theft of Firearms.*** Under current state law, the penalty for theft of firearms worth $950 or less is generally a misdemeanor punishable by up to one year in county jail. Under this measure, such a crime would be a felony and could be punishable by up to three years in state prison. Additionally, individuals previously convicted of a misdemeanor for the theft of a firearm would be prohibited from owning firearms for ten years. Currently, there is no such prohibition for a misdemeanor conviction for theft of firearms.

## FISCAL EFFECTS

***Increased Court and Law Enforcement Costs.*** The new court process for removing firearms from prohibited persons after they are convicted would result in increased workload for the state and local governments. For example, state courts and county probation departments would have some increased

workload to determine whether prohibited persons have firearms and whether they have surrendered them. In addition, state and local law enforcement would have new workload related to removing firearms from offenders who fail to surrender them as part of the new court process. They could also have increased costs related to the storage or return of firearms. Some of the increased law enforcement costs related to the removal, storage, or return of firearms would be offset to the extent that local governments and state agencies charge and collect fees for these activities, as allowed by this measure. The total magnitude of these state and local costs **could be in the tens of millions of dollars annually.** Actual costs would depend on how this measure was implemented.

***Potential Increased State Regulatory Costs***. On balance, the measure's changes to the regulation of ammunition sales could increase state costs. For example, more individuals or businesses would likely be subject to state ammunition requirements under the measure. The actual fiscal effect of the changes would depend on how they are implemented and how individuals respond to them. We estimate that the potential increase in state costs would not likely exceed the millions of dollars annually. These costs would likely be offset by the various fees authorized by the measure and existing state law.

***Potential Net Increased Correctional Costs.*** This measure makes various changes to penalties related to firearms and ammunition. While some changes reduce penalties for certain offenses, other changes increase penalties for certain offenses. On net, these changes could result in increased correctional costs to state and local governments, such as to house individuals in prison and jail. The magnitude of such costs would depend primarily on the number of violations and how the measure is enforced. The potential net increase in correctional costs would **likely not exceed the low millions of dollars annually.**

Visit *http://www.sos.ca.gov/measure-contributions* for a list of committees primarily formed to support or oppose this measure. Visit *http://www.fppc.ca.gov/ transparency/top-contributors/nov-16-gen-v2.html* to access the committee's top 10 contributors.

PROPOSITION
**63**

FIREARMS. AMMUNITION SALES.
INITIATIVE STATUTE.

**63**

---

### ★ ARGUMENT IN FAVOR OF PROPOSITION 63 ★

*PROPOSITION 63 WILL KEEP US SAFER BY REDUCING GUN VIOLENCE*

Police in Dallas doing their job . . .. A nightclub in Orlando . . .. An office holiday party in San Bernardino . . .. A church in Charleston . . .. A movie theater in Aurora . . .. An elementary school in Newtown . . ..

*What's next? How many more people need to die from gun violence before we take bold action to save lives?*

More than 300 Americans are shot each day, more than 80 of them fatally.

More than 1 million Americans were killed or seriously injured by guns from 2004–2014.

ENOUGH!

*It's time to take action to keep guns and ammo out of the wrong hands.*

Proposition 63—the Safety for All Act—will save lives by closing loopholes to prevent dangerous criminals, domestic abusers, and the dangerously mentally ill from obtaining and using deadly weapons.

PROPOSITION 63 WILL:

• Remove illegal guns from our communities by ensuring that dangerous criminals and domestic abusers sell or transfer their firearms after they're convicted.

• Require any business that sells ammunition to report if their ammunition is lost or stolen.

• Require people to notify law enforcement if their guns are lost or stolen, before the weapons end up in the wrong hands.

• Ensure people convicted of gun theft are ineligible to own guns.

• Strengthen our background check systems and ensure that California law enforcement shares data about dangerous people with the FBI.

*Proposition 63 keeps guns and ammo out of the wrong hands, while protecting the rights of law-abiding Californians to own guns for self-defense, hunting, and recreation.*

Right now, thousands of dangerous felons remain illegally armed because we don't ensure that people convicted of violent crimes actually relinquish their guns after conviction. The Department of Justice identified more than 17,000 felons and other dangerous people with more than 34,000 guns, including more than 1,400 assault weapons.

*Passing Proposition 63 will represent a historic and unprecedented step forward for gun safety.*

LEADERS FROM ACROSS CALIFORNIA SUPPORT PROPOSITION 63, INCLUDING:

• Lieutenant Governor Gavin Newsom • U.S. Senator Dianne Feinstein • Law Center to Prevent Gun Violence • California Democratic Party • California Secretary of State Alex Padilla • Speaker Emeritus of the Assembly Toni Atkins • Speaker Emeritus of the Assembly John Pérez • Sheriff Vicki Hennessy, San Francisco • Former Police Chief Ken James, Emeryville • SEIU • League of Women Voters of California • California Young Democrats • California Federation of Teachers • San Francisco Board of Education • Equality California • Courage Campaign • California American College of Physicians • California American College of Emergency Physicians • Southern California Public Health Association • Clergy and Laity United for Economic Justice • Coalition Against Gun Violence • Rabbis Against Gun Violence • States United to Prevent Gun Violence • Stop Handgun Violence • Stop Our Shootings • Women Against Gun Violence • Youth Alive!

To learn more please visit *www.SafetyforAll.com.*

**GAVIN NEWSOM,** Lieutenant Governor of California
**DIANNE FEINSTEIN,** United States Senator
**ROBYN THOMAS,** Executive Director
Law Center to Prevent Gun Violence

---

### ★ REBUTTAL TO ARGUMENT IN FAVOR OF PROPOSITION 63 ★

*Terrorists don't follow the law!*

Gavin Newsom refuses to acknowledge that the Orlando and San Bernardino attacks were ISIS inspired Islamic radicalism. It is the same ideology that motivated the 9/11 terror attacks that killed 2,996 innocents.

Exploiting terrorist attacks to push sweeping laws affecting law-abiding peoples' civil liberties is misleading, wrong, and dangerous.

None of the proposed laws would prevent terrorist attacks. The reality is terrorists can always find the means to wreak havoc, a box cutter in a plane on 9/11, a homemade bomb in Boston, or a truck in Nice, France. Terrorists and criminals get weapons from the black market, make them, or steal them from law-abiding citizens.

Everyone agrees that preventing weapons from falling into the wrong hands is crucial. We all share the concern about the growing trends of terrorism and radicalization.

*But, Prop. 63 is NOT the answer.*

Spending tens of millions of taxpayer dollars year after year on useless lists of everyone who buys and sells ammunition diverts critical resources and focus away from effective anti-terrorism efforts, leaving the public more vulnerable to attack and *LESS SAFE*.

*There's a reason law enforcement overwhelmingly opposes Prop. 63.*

The public interest would be better served if these resources were used to educate more Californians about what they can do to protect their families and communities from terrorist attacks or to further train law enforcement to do so.

*Stop this dangerous abuse of public resources.*

Vote NO on Prop. 63!

**ALON STIVI,** President
Direct Measures International, Inc.
**WILLIAM "BILLY" BIRDZELL,** U.S. Special Operations Command Anti-Terrorism Instructor
**RICHARD GRENELL,** Longest serving U.S. Spokesman at the United Nations

---

*Arguments printed on this page are the opinions of the authors, and have not been checked for accuracy by any official agency.*

FIREARMS. AMMUNITION SALES.
INITIATIVE STATUTE.

PROPOSITION
# 63

**63**

## ★ ARGUMENT AGAINST PROPOSITION 63 ★

Prop. 63 is overwhelmingly opposed by the law enforcement community and civil rights groups because it will burden law abiding citizens without keeping violent criminals and terrorists from accessing firearms and ammunition.

The California State Sheriffs' Association, Association of Deputy District Attorneys for Los Angeles County, California Correctional Peace Officers Association, California Fish & Game Wardens' Association, California Reserve Peace Officers Association, and numerous other law enforcement and civic groups, representing tens of thousands of public safety professionals throughout California, are united in their opposition to this ineffective, burdensome, and costly proposal.

Prop. 63 would divert scarce law enforcement resources away from local law enforcement and overburden an already overcrowded court system with the enforcement of flawed laws that will turn harmless, law-abiding citizens into criminals. In fact, New York recently abandoned its enforcement of a similar proposal after it was passed, finding that it was impossible to implement and effectively maintain.

Doing what actually works to keep the public safe is the highest priority of law enforcement professionals who dedicate their lives to protecting Californians. Unfortunately, Prop. 63 will not make anyone safer. To the contrary, by directing resources away from measures that are truly effective at preventing the criminal element from acquiring guns and ammunition, it would make us all less safe. The immense public resources that Prop. 63

would waste should be used to hire more officers and to target, investigate, and prosecute dangerous individuals and terrorists.

After closely analyzing the language of Prop. 63, the law enforcement community found many problems in the details. Due to strict limitations on the Legislature's ability to amend voter-enacted propositions, most of these problems will be difficult or impossible for the Legislature to fix if Prop. 63 passes, saddling California with the burdens and costs of this flawed proposal forever.

By going around the Legislature, this initiative limits public safety professionals in developing future legislation that would truly promote public safety. California taxpayers should not waste hundreds of millions of their dollars on ineffective laws that have no value to law enforcement and will harm public safety by diverting resources away from effective law enforcement activities that are critical to public safety.

Please visit *WWW.WHERESMYAMMO.COM* for more information.

PLEASE VOTE NO ON PROP. 63.

**DONNY YOUNGBLOOD,** President
California State Sheriffs' Association
**KEVIN BERNZOTT,** Chief Executive Officer
California Reserve Peace Officers Association
**TIFFANY CHEUVRONT,** Principal Officer
Coalition for Civil Liberties

## ★ REBUTTAL TO ARGUMENT AGAINST PROPOSITION 63 ★

As law enforcement and public safety officials, we're not surprised that groups such as the NRA and its affiliates oppose Proposition 63. Make no mistake, the so-called "Coalition for Civil Liberties" is actually an NRA front group.

The gun lobby often claims we should focus on enforcing existing gun laws, and that's exactly what this initiative does—*Prop. 63 closes loopholes and helps enforce existing laws to keep guns and ammo out of the wrong hands.*

For example, Prop. 63 *ensures dangerous convicts prohibited from owning weapons follow the law and get rid of their firearms.* Law enforcement professionals have found that felons and dangerous people currently possess thousands of guns illegally—so closing this loophole will save lives.

Prop. 63 also *requires reporting lost and stolen firearms,* to help police shut down gun trafficking rings and locate caches of illegal weapons. Prop. 63 will help police recover stolen guns before they're used in crimes and return them to their lawful owners.

Prop. 63 also *improves background check systems* so that law enforcement can prevent people banned from owning weapons—such as violent felons—from buying guns and ammo.

And Prop. 63 clarifies existing law so that any gun theft is a felony, *ensuring that people who steal guns can't own guns.* That's another common-sense reform to save lives overwhelmingly supported by law enforcement professionals.

*Prop. 63 will close loopholes in our existing laws and prevent dangerous criminals, domestic abusers, and the dangerously mentally ill from obtaining and using deadly weapons.*

**NANCY O'MALLEY,** District Attorney
Alameda County
**JEFF ROSEN,** District Attorney
Santa Clara County
**VICKI HENNESSY,** Sheriff
San Francisco

subdivision (h) of Section 1170, in connection with a civil action brought against a federal, state, or local jail, prison, or correctional facility, or any official or agent thereof, shall be paid directly, after payment of reasonable attorney's fees and litigation costs approved by the court, to satisfy any outstanding restitution orders or restitution fines against that person. The balance of the award shall be forwarded to the payee after full payment of all outstanding restitution orders and restitution fines, subject to subdivisions (e) and (i). The Department of Corrections and Rehabilitation shall make all reasonable efforts to notify the victims of the crime for which that person was convicted concerning the pending payment of any compensatory or punitive damages. For any prisoner punished by imprisonment in a county jail pursuant to subdivision (h) of Section 1170, the agency is authorized to make all reasonable efforts to notify the victims of the crime for which that person was convicted concerning the pending payment of any compensatory or punitive damages.

(o) (1) Amounts transferred to the California Victim Compensation   Board for payment of direct orders of restitution shall be paid to the victim within 60 days from the date the restitution revenues are received by the California Victim Compensation Board. If the restitution payment to a victim is less than twenty-five dollars ($25), then payment need not be forwarded to that victim until the payment reaches twenty-five dollars ($25) or when the victim requests payment of the lesser amount.

(2) If a victim cannot be located, the restitution revenues received by the California Victim Compensation Board on behalf of the victim shall be held in trust in the Restitution Fund until the end of the state fiscal year subsequent to the state fiscal year in which the funds were deposited or until the time that the victim has provided current address information, whichever occurs sooner. Amounts remaining in trust at the end of the specified period of time shall revert to the Restitution Fund.

(3) (A) A victim failing to provide a current address within the period of time specified in paragraph (2) may provide documentation to the Department of Corrections and Rehabilitation, which shall verify that moneys were collected on behalf of the victim. Upon receipt of that verified information from the Department of Corrections and Rehabilitation, the California Victim Compensation Board shall transmit the restitution revenues to the victim in accordance with the provisions of subdivision (c) or (h).

(B) A victim failing to provide a current address within the period of time specified in paragraph (2) may provide documentation to the agency designated by the board of supervisors in the county where the prisoner punished by imprisonment in a county jail pursuant to subdivision (h) of Section 1170 is incarcerated, which may verify that moneys were collected on behalf of the victim. Upon receipt of that verified information from the agency, the California Victim Compensation Board shall transmit the restitution revenues to the victim in accordance with the provisions of subdivision (d) or (h).

SEC. 10.   Retroactive Application of Act.

(a) In order to best achieve the purpose of this act as stated in Section 3 and to achieve fairness, equality, and uniformity in sentencing, this act shall be applied retroactively.

(b) In any case where a defendant or inmate was sentenced to death prior to the effective date of this act, the sentence shall automatically be converted to imprisonment in the state prison for life without the possibility of parole under the terms and conditions of this act. The State of California shall not carry out any execution following the effective date of this act.

(c) Following the effective date of this act, the Supreme Court may transfer all death penalty appeals and habeas petitions pending before the Supreme Court to any district of the Court of Appeal or superior court, in the Supreme Court's discretion.

SEC. 11.   Effective Date.

This act shall become effective on the day following the election at which it was approved, pursuant to subdivision (a) of Section 10 of Article II of the California Constitution.

SEC. 12.   Severability.

The provisions of this act are severable. If any provision of this act or its application is held invalid, including but not limited to Section 10, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

# PROPOSITION 63

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure amends, repeals, and adds sections to the Penal Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

## PROPOSED LAW

The Safety for All Act of 2016

SECTION 1.   Title.

This measure shall be known and may be cited as "The Safety for All Act of 2016."

SEC. 2.   Findings and Declarations.

The people of the State of California find and declare:

1. Gun violence destroys lives, families and communities. From 2002 to 2013, California lost 38,576 individuals to gun violence. That is more than seven times the number of U.S. soldiers killed in combat during the wars in Iraq and Afghanistan combined. Over this same period, 2,258 children were killed by gunshot injuries in California. The same number of children murdered in the Sandy Hook elementary school massacre are killed by gunfire in this state every 39 days.

2. In 2013, guns were used to kill 2,900 Californians, including 251 children and teens. That year, at least 6,035 others were hospitalized or treated in emergency rooms for non-fatal gunshot wounds, including 1,275 children and teens.

3. Guns are commonly used by criminals. According to the California Department of Justice, in 2014 there were 1,169 firearm murders in California, 13,546 armed robberies involving a firearm, and 15,801 aggravated assaults involving a firearm.

4. This tragic violence imposes significant economic burdens on our society. Researchers conservatively estimate that gun violence costs the economy at least $229 billion every year, or more than $700 per American

**63**

per year. In 2013 alone, California gun deaths and injuries imposed $83 million in medical costs and $4.24 billion in lost productivity.

5. California can do better. Reasonable, common-sense gun laws reduce gun deaths and injuries, keep guns away from criminals and fight illegal gun trafficking. Although California has led the nation in gun safety laws, those laws still have loopholes that leave communities throughout the state vulnerable to gun violence and mass shootings. We can close these loopholes while still safeguarding the ability of law-abiding, responsible Californians to own guns for self-defense, hunting and recreation.

6. We know background checks work. Federal background checks have already prevented more than 2.4 million gun sales to convicted criminals and other illegal purchasers in America. In 2012 alone, background checks blocked 192,043 sales of firearms to illegal purchasers including 82,000 attempted purchases by felons. That means background checks stopped roughly 225 felons from buying firearms every day. Yet California law only requires background checks for people who purchase firearms, not for people who purchase ammunition. We should close that loophole.

7. Right now, any violent felon or dangerously mentally ill person can walk into a sporting goods store or gun shop in California and buy ammunition, no questions asked. That should change. We should require background checks for ammunition sales just like gun sales, and stop both from getting into the hands of dangerous individuals.

8. Under current law, stores that sell ammunition are not required to report to law enforcement when ammunition is lost or stolen. Stores should have to report lost or stolen ammunition within 48 hours of discovering that it is missing so law enforcement can work to prevent that ammunition from being illegally trafficked into the hands of dangerous individuals.

9. Californians today are not required to report lost or stolen guns to law enforcement. This makes it difficult for law enforcement to investigate crimes committed with stolen guns, break up gun trafficking rings, and return guns to their lawful owners. We should require gun owners to report their lost or stolen guns to law enforcement.

10. Under current law, people who commit felonies and other serious crimes are prohibited from possessing firearms. Yet existing law provides no clear process for those people to relinquish their guns when they become prohibited at the time of conviction. As a result, in 2014, the Department of Justice identified more than 17,000 people who possess more than 34,000 guns illegally, including more than 1,400 assault weapons. We need to close this dangerous loophole by not only requiring prohibited people to turn in their guns, but also ensuring that it happens.

11. Military-style large-capacity ammunition magazines— some capable of holding more than 100 rounds of ammunition—significantly increase a shooter's ability to kill a lot of people in a short amount of time. That is why these large capacity ammunition magazines are common in many of America's most horrific mass shootings, from the killings at 101 California Street in San Francisco in 1993 to Columbine High School in 1999 to the massacre at Sandy Hook Elementary School in Newtown, Connecticut in 2012.

12. Today, California law prohibits the manufacture, importation and sale of military-style, large capacity ammunition magazines, but does not prohibit the general public from possessing them. We should close that loophole. No one except trained law enforcement should be able to possess these dangerous ammunition magazines.

13. Although the State of California conducts background checks on gun buyers who live in California, we have to rely on other states and the FBI to conduct background checks on gun buyers who live elsewhere. We should make background checks outside of California more effective by consistently requiring the state to report who is prohibited from possessing firearms to the federal background check system.

14. The theft of a gun is a serious and potentially violent crime. We should clarify that such crimes can be charged as felonies, and prevent people who are convicted of such crimes from possessing firearms.

SEC. 3.   Purpose and Intent.

The people of the State of California declare their purpose and intent in enacting "The Safety for All Act of 2016" (the "Act") to be as follows:

1. To implement reasonable and common-sense reforms to make California's gun safety laws the toughest in the nation while still safeguarding the Second Amendment rights of all law-abiding, responsible Californians.

2. To keep guns and ammunition out of the hands of convicted felons, the dangerously mentally ill, and other persons who are prohibited by law from possessing firearms and ammunition.

3. To ensure that those who buy ammunition in California— just like those who buy firearms—are subject to background checks.

4. To require all stores that sell ammunition to report any lost or stolen ammunition within 48 hours of discovering that it is missing.

5. To ensure that California shares crucial information with federal law enforcement by consistently requiring the state to report individuals who are prohibited by law from possessing firearms to the federal background check system.

6. To require the reporting of lost or stolen firearms to law enforcement.

7. To better enforce the laws that require people to relinquish their firearms once they are convicted of a crime that makes them ineligible to possess firearms.

8. To make it illegal in California to possess the kinds of military-style ammunition magazines that enable mass killings like those at Sandy Hook Elementary School; a movie theater in Aurora, Colorado; Columbine High School; and an office building at 101 California Street in San Francisco, California.

9. To prevent people who are convicted of the theft of a firearm from possessing firearms, and to effectuate the intent of Proposition 47 that the theft of a firearm is felony grand theft, regardless of the value of the firearm, in alignment with Sections 25400 and 1192.7 of the Penal Code.

SEC. 4.   Lost or Stolen Firearms.

SEC. 4.1.   Division 4.5 (commencing with Section 25250) is added to Title 4 of Part 6 of the Penal Code, to read:

### DIVISION 4.5.    LOST OR STOLEN FIREARMS

25250.  (a) Commencing July 1, 2017, every person shall report the loss or theft of a firearm he or she owns or possesses to a local law enforcement agency in the jurisdiction in which the theft or loss occurred within five days of the time he or she knew or reasonably should have known that the firearm had been stolen or lost.

(b) Every person who has reported a firearm lost or stolen under subdivision (a) shall notify the local law enforcement agency in the jurisdiction in which the theft or loss occurred within five days if the firearm is subsequently recovered by the person.

(c) Notwithstanding subdivision (a), a person shall not be required to report the loss or theft of a firearm that is an antique firearm within the meaning of subdivision (c) of Section 16170.

25255.  Section 25250 shall not apply to the following:

(a) Any law enforcement agency or peace officer acting within the course and scope of his or her employment or official duties if he or she reports the loss or theft to his or her employing agency.

(b) Any United States marshal or member of the Armed Forces of the United States or the National Guard, while engaged in his or her official duties.

(c) Any person who is licensed, pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, and who reports the theft or loss in accordance with Section 923(g)(6) of Title 18 of the United States Code, or the successor provision thereto, and applicable regulations issued thereto.

(d) Any person whose firearm was lost or stolen prior to July 1, 2017.

25260.  Pursuant to Section 11108, every sheriff or police chief shall submit a description of each firearm that has been reported lost or stolen directly into the Department of Justice Automated Firearms System.

25265.  (a) Every person who violates Section 25250 is, for a first violation, guilty of an infraction, punishable by a fine not to exceed one hundred dollars ($100).

(b) Every person who violates Section 25250 is, for a second violation, guilty of an infraction, punishable by a fine not to exceed one thousand dollars ($1,000).

(c) Every person who violates Section 25250 is, for a third or subsequent violation, guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding six months, or by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment.

25270.  Every person reporting a lost or stolen firearm pursuant to Section 25250 shall report the make, model, and serial number of the firearm, if known by the person, and any additional relevant information required by the local law enforcement agency taking the report.

25275.  (a) No person shall report to a local law enforcement agency that a firearm has been lost or stolen, knowing the report to be false. A violation of this section is an infraction, punishable by a fine not exceeding two hundred fifty dollars ($250) for a first offense, and by a fine not exceeding one thousand dollars ($1,000) for a second or subsequent offense.

(b) This section shall not preclude prosecution under any other law.

SEC. 4.2.    Section 26835 of the Penal Code is amended to read:

26835.   A licensee shall post conspicuously within the licensed premises the following warnings in block letters not less than one inch in height:

(a) "IF YOU KEEP A LOADED FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE OBTAINS IT AND USES IT, RESULTING IN INJURY OR DEATH, OR CARRIES IT TO A PUBLIC PLACE, YOU MAY BE GUILTY OF A MISDEMEANOR OR A FELONY UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER OR LOCKED THE FIREARM WITH A LOCKING DEVICE, TO KEEP IT FROM TEMPORARILY FUNCTIONING."

(b) "IF YOU KEEP A PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON, WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE GAINS ACCESS TO THE FIREARM, AND CARRIES IT OFF-PREMISES, YOU MAY BE GUILTY OF A MISDEMEANOR, UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE, TO KEEP IT FROM TEMPORARILY FUNCTIONING."

(c) "IF YOU KEEP ANY FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE GAINS ACCESS TO THE FIREARM, AND CARRIES IT OFF-PREMISES TO A SCHOOL OR SCHOOL-SPONSORED EVENT, YOU MAY BE GUILTY OF A MISDEMEANOR, INCLUDING A FINE OF UP TO FIVE THOUSAND DOLLARS ($5,000), UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE."

(d) "IF YOU NEGLIGENTLY STORE OR LEAVE A LOADED FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, WHERE A PERSON UNDER 18 YEARS OF AGE IS LIKELY TO ACCESS IT, YOU MAY BE GUILTY OF A MISDEMEANOR, INCLUDING A FINE OF UP TO ONE THOUSAND DOLLARS ($1,000), UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE."

(e) "DISCHARGING FIREARMS IN POORLY VENTILATED AREAS, CLEANING FIREARMS, OR HANDLING AMMUNITION MAY RESULT IN EXPOSURE TO LEAD, A SUBSTANCE KNOWN TO CAUSE BIRTH DEFECTS, REPRODUCTIVE HARM, AND OTHER SERIOUS PHYSICAL INJURY. HAVE ADEQUATE VENTILATION AT ALL TIMES. WASH HANDS THOROUGHLY AFTER EXPOSURE."

(f) "FEDERAL REGULATIONS PROVIDE THAT IF YOU DO NOT TAKE PHYSICAL POSSESSION OF THE FIREARM THAT YOU ARE ACQUIRING OWNERSHIP OF WITHIN 30 DAYS AFTER YOU COMPLETE THE INITIAL BACKGROUND CHECK PAPERWORK, THEN YOU HAVE TO GO THROUGH THE BACKGROUND CHECK PROCESS A SECOND TIME IN ORDER TO TAKE PHYSICAL POSSESSION OF THAT FIREARM."

(g) "NO PERSON SHALL MAKE AN APPLICATION TO PURCHASE MORE THAN ONE PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON WITHIN ANY 30-DAY PERIOD AND NO DELIVERY SHALL BE MADE TO ANY PERSON WHO HAS MADE AN APPLICATION TO PURCHASE MORE THAN ONE PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON WITHIN ANY 30-DAY PERIOD."

**63**

**63**

*(h) "IF A FIREARM YOU OWN OR POSSESS IS LOST OR STOLEN, YOU MUST REPORT THE LOSS OR THEFT TO A LOCAL LAW ENFORCEMENT AGENCY WHERE THE LOSS OR THEFT OCCURRED WITHIN FIVE DAYS OF THE TIME YOU KNEW OR REASONABLY SHOULD HAVE KNOWN THAT THE FIREARM HAD BEEN LOST OR STOLEN."*

SEC. 5.   Strengthening the National Instant Criminal Background Check System.

SEC. 5.1.   Section 28220 of the Penal Code is amended to read:

28220.  (a) Upon submission of firearm purchaser information, the Department of Justice shall examine its records, as well as those records that it is authorized to request from the State Department of State Hospitals pursuant to Section 8104 of the Welfare and Institutions Code, in order to determine if the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm.

(b) ~~To the extent that funding is available, the~~ *The* Department of Justice ~~may~~ *shall* participate in the National Instant Criminal Background Check System (NICS), as described in subsection (t) of Section 922 of Title 18 of the United States Code, and~~, if that participation is implemented,~~ shall notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, that the purchaser is a person prohibited from acquiring a firearm under federal law.

(c) If the department determines that the purchaser is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm or is a person described in subdivision (a) of Section 27535, it shall immediately notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact.

(d) If the department determines that the copies of the register submitted to it pursuant to subdivision (d) of Section 28210 contain any blank spaces or inaccurate, illegible, or incomplete information, preventing identification of the purchaser or the handgun or other firearm to be purchased, or if any fee required pursuant to Section 28225 is not submitted by the dealer in conjunction with submission of copies of the register, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall submit corrected copies of the register to the department, or shall submit any fee required pursuant to Section 28225, or both, as appropriate and, if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(e) If the department determines that the information transmitted to it pursuant to Section 28215 contains inaccurate or incomplete information preventing identification of the purchaser or the handgun or other firearm to be purchased, or if the fee required pursuant to Section 28225 is not transmitted by the dealer in conjunction with transmission of the electronic or telephonic record, the department may notify the dealer of

that fact. Upon notification by the department, the dealer shall transmit corrections to the record of electronic or telephonic transfer to the department, or shall transmit any fee required pursuant to Section 28225, or both, as appropriate, and if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(f) (1) (A) The department shall immediately notify the dealer to delay the transfer of the firearm to the purchaser if the records of the department, or the records available to the department in the National Instant Criminal Background Check System, indicate one of the following:

(i) The purchaser has been taken into custody and placed in a facility for mental health treatment or evaluation and may be a person described in Section 8100 or 8103 of the Welfare and Institutions Code and the department is unable to ascertain whether the purchaser is a person who is prohibited from possessing, receiving, owning, or purchasing a firearm, pursuant to Section 8100 or 8103 of the Welfare and Institutions Code, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(ii) The purchaser has been arrested for, or charged with, a crime that would make him or her, if convicted, a person who is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm, and the department is unable to ascertain whether the purchaser was convicted of that offense prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(iii) The purchaser may be a person described in subdivision (a) of Section 27535, and the department is unable to ascertain whether the purchaser, in fact, is a person described in subdivision (a) of Section 27535, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(B) The dealer shall provide the purchaser with information about the manner in which he or she may contact the department regarding the delay described in subparagraph (A).

(2) The department shall notify the purchaser by mail regarding the delay and explain the process by which the purchaser may obtain a copy of the criminal or mental health record the department has on file for the purchaser. Upon receipt of that criminal or mental health record, the purchaser shall report any inaccuracies or incompleteness to the department on an approved form.

(3) If the department ascertains the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), after the waiting period described in Sections 26815 and 27540, but within 30 days of the dealer's original submission of the purchaser information to the department pursuant to this section, the department shall do the following:

(A) If the purchaser is not a person described in subdivision (a) of Section 27535, and is not prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer of that fact and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or

record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to him or her.

(B) If the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer and the chief of the police department in the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact in compliance with subdivision (c) of Section 28220.

(4) If the department is unable to ascertain the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), within 30 days of the dealer's original submission of purchaser information to the department pursuant to this section, the department shall immediately notify the dealer and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to him or her.

*(g)  Commencing July 1, 2017, upon receipt of information demonstrating that a person is prohibited from possessing a firearm pursuant to federal or state law, the department shall submit the name, date of birth, and physical description of the person to the National Instant Criminal Background Check System Index, Denied Persons Files. The information provided shall remain privileged and confidential, and shall not be disclosed, except for the purpose of enforcing federal or state firearms laws.*

SEC. 6.   Possession of Large-Capacity Magazines.

SEC. 6.1.   Section 32310 of the Penal Code is amended to read:

32310.   (a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing January 1, 2000, any person in this state who manufactures or causes to be manufactured, imports into this state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b)  For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

*(c) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing July 1, 2017, any person in this state who* possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, or is guilty of a misdemeanor punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

*(d) Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:*

*(1)  Remove the large-capacity magazine from the state;*

*(2)  Sell the large-capacity magazine to a licensed firearms dealer; or*

*(3)  Surrender the large-capacity magazine to a law enforcement agency for destruction.*

SEC. 6.2.   Section 32400 of the Penal Code is amended to read:

32400.   Section 32310 does not apply to the sale of, giving of, lending of, *possession of,* importation into this state of, or purchase of, any large-capacity magazine to or by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties, whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

SEC. 6.3.   Section 32405 of the Penal Code is amended to read:

32405.   Section 32310 does not apply to the sale to, lending to, transfer to, purchase by, receipt of, *possession of,* or importation into this state of, a large-capacity magazine by a sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, *or sworn federal law enforcement officer,* who is authorized to carry a firearm in the course and scope of that officer's duties.

SEC. 6.4.   Section 32406 is added to the Penal Code, to read:

*32406.   Subdivision (c) of Section 32310 does not apply to an honorably retired sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or honorably retired sworn federal law enforcement officer, who was authorized to carry a firearm in the course and scope of that officer's duties. "Honorably retired" shall have the same meaning as provided in Section 16690.*

SEC. 6.5.   Section 32410 of the Penal Code is amended to read:

32410.   Section 32310 does not apply to the sale, or purchase, *or possession* of any large-capacity magazine to or by a person licensed pursuant to Sections 26700 to 26915, inclusive.

SEC. 6.6.   Section 32420 of the Penal Code is repealed.

32420.   Section 32310 does not apply to the importation of a large-capacity magazine by a person who lawfully possessed the large-capacity magazine in the state prior to January 1, 2000, lawfully took it out of the state, and is returning to the state with the same large-capacity magazine.

SEC. 6.7.   Section 32425 of the Penal Code is amended to read:

**63**

**63**

32425.   Section 32310 does not apply to ~~either~~ *any* of the following:

(a) The lending or giving of any large-capacity magazine to a person licensed pursuant to Sections 26700 to 26915, inclusive, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine.

*(b) The possession of any large-capacity magazine by a person specified in subdivision (a) for the purposes specified in subdivision (a).*

~~(b)~~ *(c)* The return to its owner of any large-capacity magazine by a person specified in subdivision (a).

SEC. 6.8.   Section 32435 of the Penal Code is amended to read:

32435.   Section 32310 does not apply to any of the following:

(a) The sale of, giving of, lending of, *possession of,* importation into this state of, or purchase of, any large-capacity magazine, to or by any entity that operates an armored vehicle business pursuant to the laws of this state.

(b) The lending of large-capacity magazines by an entity specified in subdivision (a) to its authorized employees, while in the course and scope of employment for purposes that pertain to the entity's armored vehicle business.

*(c) The possession of any large-capacity magazines by the employees of an entity specified in subdivision (a) for purposes that pertain to the entity's armored vehicle business.*

~~(c)~~ *(d)* The return of those large-capacity magazines to the entity specified in subdivision (a) by those employees specified in subdivision (b).

SEC. 6.9.   Section 32450 of the Penal Code is amended to read:

32450.   Section 32310 does not apply to the purchase *or possession* of a large-capacity magazine by the holder of a special weapons permit issued pursuant to Section 31000, 32650, or 33300, or pursuant to Article 3 (commencing with Section 18900) of Chapter 1 of Division 5 of Title 2, or pursuant to Article 4 (commencing with Section 32700) of Chapter 6 of this division, for any of the following purposes:

(a) For use solely as a prop for a motion picture, television, or video production.

(b) For export pursuant to federal regulations.

(c) For resale to law enforcement agencies, government agencies, or the military, pursuant to applicable federal regulations.

SEC. 7.   Firearms Dealers.

SEC. 7.1.   Section 26885 of the Penal Code is amended to read:

26885.   (a) Except as provided in subdivisions (b) and (c) of Section 26805, all firearms that are in the inventory of a licensee shall be kept within the licensed location.

(b) Within 48 hours of discovery, a licensee shall report the loss or theft of any of the following items to the appropriate law enforcement agency in the city, county, or city and county where the licensee's business premises are located:

(1) Any firearm *or ammunition* that is merchandise of the licensee.

(2) Any firearm *or ammunition* that the licensee takes possession of pursuant to Chapter 5 (commencing with Section 28050)*, or pursuant to Section 30312.*

(3) Any firearm *or ammunition* kept at the licensee's place of business.

SEC. 7.2.   Section 26915 of the Penal Code is amended to read:

26915.   (a) *Commencing January 1, 2018, a* ~~A~~ firearms dealer ~~may~~ *shall* require any agent *or employee* who handles, sells, or delivers firearms to obtain and provide to the dealer a certificate of eligibility from the Department of Justice pursuant to Section 26710. On the application for the certificate, the agent or employee shall provide the name and California firearms dealer number of the firearms dealer with whom the person is employed.

(b) The department shall notify the firearms dealer in the event that the agent or employee who has a certificate of eligibility is or becomes prohibited from possessing firearms.

(c) If the local jurisdiction requires a background check of the agents or employees of a firearms dealer, the agent or employee shall obtain a certificate of eligibility pursuant to subdivision (a).

(d) (1) Nothing in this section shall be construed to preclude a local jurisdiction from conducting an additional background check pursuant to Section 11105. The local jurisdiction may not charge a fee for the additional criminal history check.

(2) Nothing in this section shall be construed to preclude a local jurisdiction from prohibiting employment based on criminal history that does not appear as part of obtaining a certificate of eligibility.

(e) The licensee shall prohibit any agent who the licensee knows or reasonably should know is within a class of persons prohibited from possessing firearms pursuant to Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, or Section 8100 or 8103 of the Welfare and Institutions Code, from coming into contact with any firearm that is not secured and from accessing any key, combination, code, or other means to open any of the locking devices described in subdivision (g).

(f) Nothing in this section shall be construed as preventing a local government from enacting an ordinance imposing additional conditions on licensees with regard to agents *or employees.*

(g) For purposes of this article, "secured" means a firearm that is made inoperable in one or more of the following ways:

(1) The firearm is inoperable because it is secured by a firearm safety device listed on the department's roster of approved firearm safety devices pursuant to subdivision (d) of Section 23655.

(2) The firearm is stored in a locked gun safe or long-gun safe that meets the standards for department-approved gun safes set forth in Section 23650.

(3) The firearm is stored in a distinct locked room or area in the building that is used to store firearms, which can only be unlocked by a key, a combination, or similar means.

(4) The firearm is secured with a hardened steel rod or cable that is at least one-eighth of an inch in diameter through the trigger guard of the firearm. The steel rod or cable shall be secured with a hardened steel lock that has

a shackle. The lock and shackle shall be protected or shielded from the use of a boltcutter and the rod or cable shall be anchored in a manner that prevents the removal of the firearm from the premises.

SEC. 8.   Sales of Ammunition.

SEC. 8.1.   Section 16150 of the Penal Code is amended to read:

16150.   (a) ~~As used in Section 30300, "ammunition" means handgun ammunition as defined in Section 16650.~~ *As used in this part, except in subdivision (a) of Section 30305 and in Section 30306, "ammunition" means one or more loaded cartridges consisting of a primed case, propellant, and with one or more projectiles. "Ammunition" does not include blanks.*

(b) As used in subdivision (a) of Section 30305 and in Section 30306, "ammunition" includes, but is not limited to, any bullet, cartridge, magazine, clip, speed loader, autoloader, or projectile capable of being fired from a firearm with a deadly consequence. "Ammunition" does not include blanks.

SEC. 8.2.   Section 16151 is added to the Penal Code, to read:

*16151.   (a)  As used in this part, commencing January 1, 2018, "ammunition vendor" means any person, firm, corporation, or other business enterprise that holds a current ammunition vendor license issued pursuant to Section 30385.*

*(b) Commencing January 1, 2018, a firearms dealer licensed pursuant to Sections 26700 to 26915, inclusive, shall automatically be deemed a licensed ammunition vendor, provided the dealer complies with the requirements of Articles 2 (commencing with Section 30300) and 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4.*

SEC. 8.3.   Section 16662 of the Penal Code is repealed.

~~16662.   As used in this part, "handgun ammunition vendor" means any person, firm, corporation, dealer, or any other business enterprise that is engaged in the retail sale of any handgun ammunition, or that holds itself out as engaged in the business of selling any handgun ammunition.~~

SEC. 8.4.   Section 17315 of the Penal Code is amended to read:

17315.   As used in ~~Article 3 (commencing with Section 30345)~~ *Articles 2 through 5* of Chapter 1 of Division 10 of Title 4, "vendor" means a ~~an handgun~~ ammunition vendor.

SEC. 8.5.   Section 30306 of the Penal Code is amended to read:

30306.   (a) Any person, corporation, ~~or~~ firm *, or other business enterprise* who supplies, delivers, sells, or gives possession or control of, any ammunition to any person who he or she knows or using reasonable care should know is prohibited from owning, possessing, or having under custody or control, any ammunition or reloaded ammunition pursuant to subdivision (a) or (b) of Section 30305, is guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, or a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment.

*(b) Any person, corporation, firm, or other business enterprise who supplies, delivers, sells, or gives possession or control of, any ammunition to any person whom the person, corporation, firm, or other business enterprise*

knows or has cause to believe is not the actual purchaser or transferee of the ammunition, with knowledge or cause to believe that the ammunition is to be subsequently sold or transferred to a person who is prohibited from owning, possessing, or having under custody or control any ammunition or reloaded ammunition pursuant to subdivision (a) or (b) of Section 30305, is guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, or a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment.

~~(b)~~ *(c)* The provisions of this section are cumulative and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by this section and another provision of law shall not be punished under more than one provision.

SEC. 8.6.   Section 30312 of the Penal Code is amended to read:

30312.   (a) ~~Commencing February 1, 2011, the~~ *(1) Commencing January 1, 2018, the sale of ammunition by any party shall be conducted by or processed through a licensed ammunition vendor.*

*(2)  When neither party to an ammunition sale is a licensed ammunition vendor, the seller shall deliver the ammunition to a vendor to process the transaction. The ammunition vendor shall then promptly and properly deliver the ammunition to the purchaser, if the sale is not prohibited, as if the ammunition were the vendor's own merchandise. If the ammunition vendor cannot legally deliver the ammunition to the purchaser, the vendor shall forthwith return the ammunition to the seller. The ammunition vendor may charge the purchaser an administrative fee to process the transaction, in an amount to be set by the Department of Justice, in addition to any applicable fees that may be charged pursuant to the provisions of this title.*

*(b) Commencing January 1, 2018, the sale,* delivery or transfer of ownership of ~~handgun~~ ammunition *by any party* may only occur in a face-to-face transaction with the *seller,* deliverer, or transferor ~~being provided bona fide evidence of identity from the purchaser or other transferee~~ *, provided, however, that ammunition may be purchased or acquired over the Internet or through other means of remote ordering if a licensed ammunition vendor initially receives the ammunition and processes the transaction in compliance with this section and Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of this part.*

~~(b)~~ *(c)* ~~Subdivision~~ *Subdivisions* (a) *and (b)* shall not apply to ~~or affect~~ the sale, delivery, or transfer of ~~handgun~~ ammunition to any of the following:

(1) An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale, delivery, or transfer is for exclusive use by that government agency and, prior to the sale, delivery, or transfer of the ~~handgun~~ ammunition, written authorization from the head of the agency employing the purchaser or transferee is obtained, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency employing the individual.

(2) A sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2*, or sworn federal law enforcement officer,* who is authorized to carry a firearm in the course and scope of the officer's duties.

**63**

(3) An importer or manufacturer of ~~handgun~~ ammunition or firearms who is licensed to engage in business pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(4) A person who is on the centralized list *of exempted federal firearms licensees* maintained by the Department of Justice pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of this title.

(5) A person whose licensed premises are outside this state and who is licensed as a dealer or collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(6) A person who is licensed as a collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, whose licensed premises are within this state, and who has a current certificate of eligibility issued by the Department of Justice pursuant to Section 26710.

(7) ~~A handgun~~ *An* ammunition vendor.

(8) A consultant-evaluator.

*(9) A person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises.*

*(10) A person who purchases or receives ammunition from a spouse, registered domestic partner, or immediate family member as defined in Section 16720.*

~~(c)~~ *(d)* A violation of this section is a misdemeanor.

SEC. 8.7.   Section 30314 is added to the Penal Code, to read:

*30314.   (a) Commencing January 1, 2018, a resident of this state shall not bring or transport into this state any ammunition that he or she purchased or otherwise obtained from outside of this state unless he or she first has that ammunition delivered to a licensed ammunition vendor for delivery to that resident pursuant to the procedures set forth in Section 30312.*

*(b) Subdivision (a) does not apply to any of the following:*

*(1) An ammunition vendor.*

*(2) A sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.*

*(3) An importer or manufacturer of ammunition or firearms who is licensed to engage in business pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.*

*(4) A person who is on the centralized list of exempted federal firearms licensees maintained by the Department of Justice pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6.*

*(5) A person who is licensed as a collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, whose licensed premises are within this state, and who has a current certificate of*

eligibility issued by the Department of Justice pursuant to Section 26710.

*(6) A person who acquired the ammunition from a spouse, registered domestic partner, or immediate family member as defined in Section 16720.*

*(c) A violation of this section is an infraction for any first time offense, and either an infraction or a misdemeanor for any subsequent offense.*

SEC. 8.8.   The heading of Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code is amended to read:

Article 3.   ~~Handgun~~ Ammunition Vendors

SEC. 8.9.   Section 30342 is added to the Penal Code, immediately preceding Section 30345, to read:

*30342.   (a) Commencing January 1, 2018, a valid ammunition vendor license shall be required for any person, firm, corporation, or other business enterprise to sell more than 500 rounds of ammunition in any 30-day period.*

*(b) A violation of this section is a misdemeanor.*

SEC. 8.10.   Section 30347 of the Penal Code is amended to read:

30347.   *(a)* An ammunition vendor shall require any agent or employee who handles, sells, delivers, or has under his or her custody or control any ammunition, to obtain and provide to the vendor a certificate of eligibility from the Department of Justice issued pursuant to Section 26710. On the application for the certificate, the agent or employee shall provide the name and address of the ammunition vendor with whom the person is employed, or the name and California firearms dealer number of the ammunition vendor if applicable.

*(b) The department shall notify the ammunition vendor in the event that the agent or employee who has a certificate of eligibility is or becomes prohibited from possessing ammunition under subdivision (a) of Section 30305 or federal law.*

*(c)* ~~A~~ *An* ammunition vendor shall not permit any *agent or employee* who the vendor knows or reasonably should know is a person described in Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title or Section 8100 or 8103 of the Welfare and Institutions Code to handle, sell, ~~or~~ deliver, *or have under his or her custody or control, any* ~~handgun~~ ammunition in the course and scope of employment.

SEC. 8.11.   Section 30348 is added to the Penal Code, to read:

*30348.   (a) Except as provided in subdivision (b), the sale of ammunition by a licensed vendor shall be conducted at the location specified in the license.*

*(b) A vendor may sell ammunition at a gun show or event if the gun show or event is not conducted from any motorized or towed vehicle.*

*(c) For purposes of this section, "gun show or event" means a function sponsored by any national, state, or local organization, devoted to the collection, competitive use, or other sporting use of firearms, or an organization or association that sponsors functions devoted to the collection, competitive use, or other sporting use of firearms in the community.*

TEXT OF PROPOSED LAWS

*(d) Sales of ammunition at a gun show or event shall comply with all applicable laws including Sections 30347, 30350, 30352, and 30360.*

SEC. 8.12.   Section 30350 of the Penal Code is amended to read:

30350.   A̶ *An ammunition* vendor shall not sell or otherwise transfer ownership of, offer for sale or otherwise offer to transfer ownership of, or display for sale or display for transfer of ownership of any h̶a̶n̶d̶g̶u̶n̶ ammunition in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor.

SEC. 8.13.   Section 30352 of the Penal Code is amended to read:

30352.   (a) Commencing F̶e̶b̶r̶u̶a̶r̶y̶ 1̶,̶ 2̶0̶1̶1̶,̶ a *July 1, 2019, an ammunition* vendor shall not sell or otherwise transfer ownership of any h̶a̶n̶d̶g̶u̶n̶ ammunition without, at the time of delivery, legibly recording the following information *on a form to be prescribed by the Department of Justice*:

(1) The date of the sale or other t̶r̶a̶n̶s̶a̶c̶t̶i̶o̶n̶ *transfer*.

(2) The purchaser's or transferee's driver's license or other identification number and the state in which it was issued.

(3) The brand, type, and amount of ammunition sold or otherwise transferred.

(4) The purchaser's or transferee's *full name and* signature.

(5) The name of the salesperson who processed the sale or other transaction.

(6̶)̶ T̶h̶e̶ r̶i̶g̶h̶t̶ t̶h̶u̶m̶b̶p̶r̶i̶n̶t̶ o̶f̶ t̶h̶e̶ p̶u̶r̶c̶h̶a̶s̶e̶r̶ o̶r̶ t̶r̶a̶n̶s̶f̶e̶r̶e̶e̶ o̶n̶ t̶h̶e̶ a̶b̶o̶v̶e̶ f̶o̶r̶m̶.̶

(7̶)̶ *(6)* The purchaser's or transferee's full residential address and telephone number.

(8̶)̶ *(7)* The purchaser's or transferee's date of birth.

*(b) Commencing July 1, 2019, an ammunition vendor shall electronically submit to the department the information required by subdivision (a) for all sales and transfers of ownership of ammunition. The department shall retain this information in a database to be known as the Ammunition Purchase Records File. This information shall remain confidential and may be used by the department and those entities specified in, and pursuant to, subdivision (b) or (c) of Section 11105, through the California Law Enforcement Telecommunications System, only for law enforcement purposes. The ammunition vendor shall not use, sell, disclose, or share such information for any other purpose other than the submission required by this subdivision without the express written consent of the purchaser or transferee.*

*(c) Commencing on July 1, 2019, only those persons listed in this subdivision, or those persons or entities listed in subdivision (e), shall be authorized to purchase ammunition. Prior to delivering any ammunition, an ammunition vendor shall require bona fide evidence of identity to verify that the person who is receiving delivery of the ammunition is a person or entity listed in subdivision (e) or one of the following:*

*(1) A person authorized to purchase ammunition pursuant to Section 30370.*

*(2) A person who was approved by the department to receive a firearm from the ammunition vendor, pursuant to Section 28220, if that vendor is a licensed firearms dealer,* and the ammunition is delivered to the person in the same transaction as the firearm.

*(d) Commencing July 1, 2019, the ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition by comparing the person's ammunition purchase authorization number to the centralized list of authorized ammunition purchasers. If the person is not listed as an authorized ammunition purchaser, the vendor shall deny the sale or transfer.*

(b̶)̶ *(e)* S̶u̶b̶d̶i̶v̶i̶s̶i̶o̶n̶ *Subdivisions* (a) *and (d)* shall not apply to o̶r̶ a̶f̶f̶e̶c̶t̶ sales or other transfers of ownership of h̶a̶n̶d̶g̶u̶n̶ ammunition by h̶a̶n̶d̶g̶u̶n̶ ammunition vendors to any of the following, if properly identified:̶

(1̶)̶ A̶ p̶e̶r̶s̶o̶n̶ l̶i̶c̶e̶n̶s̶e̶d̶ p̶u̶r̶s̶u̶a̶n̶t̶ t̶o̶ S̶e̶c̶t̶i̶o̶n̶s̶ 2̶6̶7̶0̶0̶ t̶o̶ 2̶6̶9̶1̶5̶,̶ i̶n̶c̶l̶u̶s̶i̶v̶e̶.̶

(2̶)̶ *(1)* A̶ h̶a̶n̶d̶g̶u̶n̶ *An* ammunition vendor.

(3̶)̶ *(2)* A person who is on the centralized list *of exempted federal firearms licensees* maintained by the department pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of this title.

(4̶)̶ *(3)* A t̶a̶r̶g̶e̶t̶ f̶a̶c̶i̶l̶i̶t̶y̶ t̶h̶a̶t̶ h̶o̶l̶d̶s̶ a̶ b̶u̶s̶i̶n̶e̶s̶s̶ o̶r̶ r̶e̶g̶u̶l̶a̶t̶o̶r̶y̶ l̶i̶c̶e̶n̶s̶e̶ *person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises*.

(5̶)̶ *(4)* A gunsmith.

(6̶)̶ *(5)* A wholesaler.

(7̶)̶ *(6)* A manufacturer or importer of firearms *or ammunition* licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code, and the regulations issued pursuant thereto.

(8̶)̶ *(7)* An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale or other transfer of ownership is for exclusive use by that government agency, and, prior to the sale, delivery, or transfer of the h̶a̶n̶d̶g̶u̶n̶ ammunition, written authorization from the head of the agency authorizing the transaction is presented to the person from whom the purchase, delivery, or transfer is being made. Proper written authorization is defined as verifiable written certification from the head of the agency by which the purchaser, transferee, or person otherwise acquiring ownership is employed, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency by which that individual is employed.

*(8) A properly identified sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or properly identified sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.*

*(f) (1) Proper identification is defined as verifiable written certification from the head of the agency by which the purchaser or transferee is employed, identifying the purchaser or transferee as a full-time paid peace officer who is authorized to carry a firearm in the course and scope of the officer's duties.*

*(2) The certification shall be delivered to the vendor at the time of purchase or transfer and the purchaser or transferee shall provide bona fide evidence of identity to verify that he or she is the person authorized in the certification.*

**63**

**63**

*(3) The vendor shall keep the certification with the record of sale and submit the certification to the department.*

*(g) The department is authorized to adopt regulations to implement the provisions of this section.*

SEC. 8.14.   Section 30363 is added to the Penal Code, to read:

*30363.  Within 48 hours of discovery, an ammunition vendor shall report the loss or theft of any of the following items to the appropriate law enforcement agency in the city, county, or city and county where the vendor's business premises are located:*

*(1) Any ammunition that is merchandise of the vendor.*

*(2) Any ammunition that the vendor takes possession of pursuant to Section 30312.*

*(3) Any ammunition kept at the vendor's place of business.*

SEC. 8.15.   Article 4 (commencing with Section 30370) is added to Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code, to read:

*Article 4.   Ammunition Purchase Authorizations*

*30370.  (a) (1) Commencing on January 1, 2019, any person who is 18 years of age or older may apply to the Department of Justice for an ammunition purchase authorization.*

*(2) The ammunition purchase authorization may be used by the authorized person to purchase or otherwise seek the transfer of ownership of ammunition from an ammunition vendor, as that term is defined in Section 16151, and shall have no other force or effect.*

*(3) The ammunition purchase authorization shall be valid for four years from July 1, 2019, or the date of issuance, whichever is later, unless it is revoked by the department pursuant to subdivision (b).*

*(b) The ammunition purchase authorization shall be promptly revoked by the department upon the occurrence of any event which would have disqualified the holder from being issued the ammunition purchase authorization pursuant to this section. If an authorization is revoked, the department shall upon the written request of the holder state the reasons for doing so and provide the holder an appeal process to challenge that revocation.*

*(c) The department shall create and maintain an internal centralized list of all persons who are authorized to purchase ammunition and shall promptly remove from the list any persons whose authorization was revoked by the department pursuant to this section. The department shall provide access to the list by ammunition vendors for purposes of conducting ammunition sales or other transfers, and shall provide access to the list by law enforcement agencies for law enforcement purposes.*

*(d) The department shall issue an ammunition purchase authorization to the applicant if all of the following conditions are met:*

*(1) The applicant is 18 years of age or older.*

*(2) The applicant is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law.*

*(3) The applicant pays the fees set forth in subdivision (g).*

*(e) (1) Upon receipt of an initial or renewal application, the department shall examine its records, and the records it is authorized to request from the State Department of State Hospitals, pursuant to Section 8104 of the Welfare*

*and Institutions Code, and if authorized, the National Instant Criminal Background Check System, as described in Section 922(t) of Title 18 of the United States Code, in order to determine if the applicant is prohibited from possessing or acquiring ammunition under subdivision (a) of Section 30305 or federal law.*

*(2) The applicant shall be approved or denied within 30 days of the date of the submission of the application to the department. If the application is denied, the department shall state the reasons for doing so and provide the applicant an appeal process to challenge that denial.*

*(3) If the department is unable to ascertain the final disposition of the application within 30 days of the applicant's submission, the department shall grant authorization to the applicant.*

*(4) The ammunition purchase authorization number shall be the same as the number on the document presented by the person as bona fide evidence of identity.*

*(f) The department shall renew a person's ammunition purchase authorization before its expiration, provided that the department determines that the person is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law, and provided the applicant timely pays the renewal fee set forth in subdivision (g).*

*(g) The department may charge a reasonable fee not to exceed fifty dollars ($50) per person for the issuance of an ammunition purchase authorization or the issuance of a renewal authorization, however, the department shall not set these fees any higher than necessary to recover the reasonable, estimated costs to fund the ammunition authorization program provided for in this section and Section 30352, including the enforcement of this program and maintenance of any data systems associated with this program.*

*(h) The Ammunition Safety and Enforcement Special Fund is hereby created within the State Treasury. All fees received pursuant to this section shall be deposited into the Ammunition Safety and Enforcement Special Fund of the General Fund, and, notwithstanding Section 13340 of the Government Code, are continuously appropriated for purposes of implementing, operating and enforcing the ammunition authorization program provided for in this section and Section 30352, and for repaying the start-up loan provided for in Section 30371.*

*(i) The department shall annually review and may adjust all fees specified in subdivision (g) for inflation.*

*(j) The department is authorized to adopt regulations to implement the provisions of this section.*

*30371.  (a) There is hereby appropriated twenty-five million dollars ($25,000,000) from the General Fund as a loan for the start-up costs of implementing, operating and enforcing the provisions of the ammunition authorization program provided for in Sections 30352 and 30370.*

*(b) For purposes of repaying the loan, the Controller shall, after disbursing moneys necessary to implement, operate and enforce the ammunition authorization program provided for in Sections 30352 and 30370, transfer all proceeds from fees received by the Ammunition Safety and Enforcement Special Fund up to the amount of the loan provided by this section, including interest at the pooled money investment account rate, to the General Fund.*

SEC. 8.16.   Article 5 (commencing with Section 30385) is added to Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code, to read:

Article 5.   Ammunition Vendor Licenses

30385.   (a) The Department of Justice is authorized to issue ammunition vendor licenses pursuant to this article. The department shall, commencing July 1, 2017, commence accepting applications for ammunition vendor licenses. If an application is denied, the department shall inform the applicant of the reason for denial in writing.

(b) The ammunition vendor license shall be issued in a form prescribed by the department and shall be valid for a period of one year. The department may adopt regulations to administer the application and enforcement provisions of this article. The license shall allow the licensee to sell ammunition at the location specified in the license or at a gun show or event as set forth in Section 30348.

(c) (1) In the case of an entity other than a natural person, the department shall issue the license to the entity, but shall require a responsible person to pass the background check pursuant to Section 30395.

(2) For purposes of this article, "responsible person" means a person having the power to direct the management, policies, and practices of the entity as it pertains to ammunition.

(d) Commencing January 1, 2018, a firearms dealer licensed pursuant to Sections 26700 to 26915, inclusive, shall automatically be deemed a licensed ammunition vendor, provided the dealer complies with the requirements of Article 2 (commencing with Section 30300) and Article 3 (commencing with Section 30342).

30390.   (a) The Department of Justice may charge ammunition vendor license applicants a reasonable fee sufficient to reimburse the department for the reasonable, estimated costs of administering the license program, including the enforcement of this program and maintenance of the registry of ammunition vendors.

(b) The fees received by the department pursuant to this article shall be deposited in the Ammunition Vendors Special Account, which is hereby created. Notwithstanding Section 13340 of the Government Code, the revenue in the fund is continuously appropriated for use by the department for the purpose of implementing, administering and enforcing the provisions of this article, and for collecting and maintaining information submitted pursuant to Section 30352.

(c) The revenue in the Firearms Safety and Enforcement Special Fund shall also be available upon appropriation to the department for the purpose of implementing and enforcing the provisions of this article.

30395.   (a) The Department of Justice is authorized to issue ammunition vendor licenses to applicants who the department has determined, either as an individual or a responsible person, are not prohibited from possessing, receiving, owning, or purchasing ammunition under subdivision (a) of Section 30305 or federal law, and who provide a copy of any regulatory or business license required by local government, a valid seller's permit issued by the State Board of Equalization, a federal firearms license if the person is federally licensed, and a certificate of eligibility issued by the department.

(b) The department shall keep a registry of all licensed ammunition vendors. Law enforcement agencies shall be provided access to the registry for law enforcement purposes.

(c) An ammunition vendor license is subject to forfeiture for a breach of any of the prohibitions and requirements of Article 2 (commencing with Section 30300) or Article 3 (commencing with Section 30342).

SEC. 9.   Nothing in this Act shall preclude or preempt a local ordinance that imposes additional penalties or requirements in regard to the sale or transfer of ammunition.

SEC. 10.   Securing Firearms From Prohibited Persons.

SEC. 10.1.   Section 1524 of the Penal Code is amended to read:

1524.   (a) A search warrant may be issued upon any of the following grounds:

(1) When the property was stolen or embezzled.

(2) When the property or things were used as the means of committing a felony.

(3) When the property or things are in the possession of any person with the intent to use them as a means of committing a public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing them from being discovered.

(4) When the property or things to be seized consist of an item or constitute evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony.

(5) When the property or things to be seized consist of evidence that tends to show that sexual exploitation of a child, in violation of Section 311.3, or possession of matter depicting sexual conduct of a person under 18 years of age, in violation of Section 311.11, has occurred or is occurring.

(6) When there is a warrant to arrest a person.

(7) When a provider of electronic communication service or remote computing service has records or evidence, as specified in Section 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in the possession of any person with the intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery.

(8) When the property or things to be seized include an item or evidence that tends to show a violation of Section 3700.5 of the Labor Code, or tends to show that a particular person has violated Section 3700.5 of the Labor Code.

(9) When the property or things to be seized include a firearm or other deadly weapon at the scene of, or at the premises occupied or under the control of the person arrested in connection with, a domestic violence incident involving a threat to human life or a physical assault as provided in Section 18250. This section does not affect warrantless seizures otherwise authorized by Section 18250.

(10) When the property or things to be seized include a firearm or other deadly weapon that is owned by, or in the possession of, or in the custody or control of, a person described in subdivision (a) of Section 8102 of the Welfare and Institutions Code.

**63**

(11) When the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to Section 6389 of the Family Code, if a prohibited firearm is possessed, owned, in the custody of, or controlled by a person against whom a protective order has been issued pursuant to Section 6218 of the Family Code, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law.

(12) When the information to be received from the use of a tracking device constitutes evidence that tends to show that either a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code has been committed or is being committed, tends to show that a particular person has committed a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or will assist in locating an individual who has committed or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code. A tracking device search warrant issued pursuant to this paragraph shall be executed in a manner meeting the requirements specified in subdivision (b) of Section 1534.

(13) When a sample of the blood of a person constitutes evidence that tends to show a violation of Section 23140, 23152, or 23153 of the Vehicle Code and the person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by Section 23612 of the Vehicle Code, and the sample will be drawn from the person in a reasonable, medically approved manner. This paragraph is not intended to abrogate a court's mandate to determine the propriety of the issuance of a search warrant on a case-by-case basis.

(14) Beginning January 1, 2016, the property or things to be seized are firearms or ammunition or both that are owned by, in the possession of, or in the custody or control of a person who is the subject of a gun violence restraining order that has been issued pursuant to Division 3.2 (commencing with Section 18100) of Title 2 of Part 6, if a prohibited firearm or ammunition or both is possessed, owned, in the custody of, or controlled by a person against whom a gun violence restraining order has been issued, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law.

*(15) Beginning January 1, 2018, the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to Section 29800 or 29805, and the court has made a finding pursuant to paragraph (3) of subdivision (c) of Section 29810 that the person has failed to relinquish the firearm as required by law.*

~~(15)~~ *(16)* When the property or things to be seized are controlled substances or a device, contrivance, instrument, or paraphernalia used for unlawfully using or administering a controlled substance pursuant to the authority described in Section 11472 of the Health and Safety Code.

~~(16)~~ *(17)* (A) When all of the following apply:

(i) A sample of the blood of a person constitutes evidence that tends to show a violation of subdivision (b), (c), (d),

(e), or (f) of Section 655 of the Harbors and Navigation Code.

(ii) The person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by Section 655.1 of the Harbors and Navigation Code.

(iii) The sample will be drawn from the person in a reasonable, medically approved manner.

(B) This paragraph is not intended to abrogate a court's mandate to determine the propriety of the issuance of a search warrant on a case-by-case basis.

(b) The property, things, person, or persons described in subdivision (a) may be taken on the warrant from any place, or from any person in whose possession the property or things may be.

(c) Notwithstanding subdivision (a) or (b), no search warrant shall issue for any documentary evidence in the possession or under the control of any person who is a lawyer as defined in Section 950 of the Evidence Code, a physician as defined in Section 990 of the Evidence Code, a psychotherapist as defined in Section 1010 of the Evidence Code, or a member of the clergy as defined in Section 1030 of the Evidence Code, and who is not reasonably suspected of engaging or having engaged in criminal activity related to the documentary evidence for which a warrant is requested unless the following procedure has been complied with:

(1) At the time of the issuance of the warrant, the court shall appoint a special master in accordance with subdivision (d) to accompany the person who will serve the warrant. Upon service of the warrant, the special master shall inform the party served of the specific items being sought and that the party shall have the opportunity to provide the items requested. If the party, in the judgment of the special master, fails to provide the items requested, the special master shall conduct a search for the items in the areas indicated in the search warrant.

(2) (A) If the party who has been served states that an item or items should not be disclosed, they shall be sealed by the special master and taken to court for a hearing.

(B) At the hearing, the party searched shall be entitled to raise any issues that may be raised pursuant to Section 1538.5 as well as a claim that the item or items are privileged, as provided by law. The hearing shall be held in the superior court. The court shall provide sufficient time for the parties to obtain counsel and make motions or present evidence. The hearing shall be held within three days of the service of the warrant unless the court makes a finding that the expedited hearing is impracticable. In that case, the matter shall be heard at the earliest possible time.

(C) If an item or items are taken to court for a hearing, any limitations of time prescribed in Chapter 2 (commencing with Section 799) of Title 3 of Part 2 shall be tolled from the time of the seizure until the final conclusion of the hearing, including any associated writ or appellate proceedings.

(3) The warrant shall, whenever practicable, be served during normal business hours. In addition, the warrant shall be served upon a party who appears to have possession or control of the items sought. If, after reasonable efforts, the party serving the warrant is unable to locate the person, the special master shall seal and return to the court, for

determination by the court, any item that appears to be privileged as provided by law.

(d) (1) As used in this section, a "special master" is an attorney who is a member in good standing of the California State Bar and who has been selected from a list of qualified attorneys that is maintained by the State Bar particularly for the purposes of conducting the searches described in this section. These attorneys shall serve without compensation. A special master shall be considered a public employee, and the governmental entity that caused the search warrant to be issued shall be considered the employer of the special master and the applicable public entity, for purposes of Division 3.6 (commencing with Section 810) of Title 1 of the Government Code, relating to claims and actions against public entities and public employees. In selecting the special master, the court shall make every reasonable effort to ensure that the person selected has no relationship with any of the parties involved in the pending matter. Information obtained by the special master shall be confidential and may not be divulged except in direct response to inquiry by the court.

(2) In any case in which the magistrate determines that, after reasonable efforts have been made to obtain a special master, a special master is not available and would not be available within a reasonable period of time, the magistrate may direct the party seeking the order to conduct the search in the manner described in this section in lieu of the special master.

(e) Any search conducted pursuant to this section by a special master may be conducted in a manner that permits the party serving the warrant or his or her designee to accompany the special master as he or she conducts his or her search. However, that party or his or her designee may not participate in the search nor shall he or she examine any of the items being searched by the special master except upon agreement of the party upon whom the warrant has been served.

(f) As used in this section, "documentary evidence" includes, but is not limited to, writings, documents, blueprints, drawings, photographs, computer printouts, microfilms, X-rays, files, diagrams, ledgers, books, tapes, audio and video recordings, films, and papers of any type or description.

(g) No warrant shall issue for any item or items described in Section 1070 of the Evidence Code.

(h) Notwithstanding any other law, no claim of attorney work product as described in Chapter 4 (commencing with Section 2018.010) of Title 4 of Part 4 of the Code of Civil Procedure shall be sustained where there is probable cause to believe that the lawyer is engaging or has engaged in criminal activity related to the documentary evidence for which a warrant is requested unless it is established at the hearing with respect to the documentary evidence seized under the warrant that the services of the lawyer were not sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud.

(i) Nothing in this section is intended to limit an attorney's ability to request an in-camera hearing pursuant to the holding of the Supreme Court of California in People v. Superior Court (Laff) (2001) 25 Cal.4th 703.

(j) In addition to any other circumstance permitting a magistrate to issue a warrant for a person or property in another county, when the property or things to be seized consist of any item or constitute evidence that tends to show a violation of Section 530.5, the magistrate may issue a warrant to search a person or property located in another county if that person whose identifying information was taken or used resides in the same county as the issuing court.

(k) This section shall not be construed to create a cause of action against any foreign or California corporation, its officers, employees, agents, or other specified persons for providing location information.

SEC. 10.2.    Section 27930 of the Penal Code is amended to read:

27930.    Section 27545 does not apply to deliveries, transfers, or returns of firearms made pursuant to any of the following:

(a) Sections 18000 and 18005.

(b) Division 4 (commencing with Section 18250) of Title 2.

(c) Chapter 2 (commencing with Section 33850) of Division 11.

(d) Sections 34005 and 34010.

(e) Section 29810.

SEC. 10.3.    Section 29810 of the Penal Code is amended to read:

29810.    (a) For any person who is subject to Section 29800 or 29805, the court shall, at the time judgment is imposed, provide on a form supplied by the Department of Justice, a notice to the defendant prohibited by this chapter from owning, purchasing, receiving, possessing, or having under custody or control, any firearm. The notice shall inform the defendant of the prohibition regarding firearms and include a form to facilitate the transfer of firearms. If the prohibition on owning or possessing a firearm will expire on a date specified in the court order, the form shall inform the defendant that he or she may elect to have his or her firearm transferred to a firearms dealer licensed pursuant to Section 29830.

(b) Failure to provide the notice described in subdivision (a) is not a defense to a violation of this chapter.

(c) This section shall be repealed effective January 1, 2018.

SEC. 10.4.    Section 29810 is added to the Penal Code, to read:

29810.    (a) (1) Upon conviction of any offense that renders a person subject to Section 29800 or Section 29805, the person shall relinquish all firearms he or she owns, possesses, or has under his or her custody or control in the manner provided in this section.

(2) The court shall, upon conviction of a defendant for an offense described in subdivision (a), instruct the defendant that he or she is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control, any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines, and shall order the defendant to relinquish all firearms in the manner provided in this section. The court shall also provide the defendant with a Prohibited Persons Relinquishment Form developed by the Department of Justice.

(3) Using the Prohibited Persons Relinquishment Form, the defendant shall name a designee and grant the designee power of attorney for the purpose of transferring or disposing of any firearms. The designee shall be either a local law enforcement agency or a consenting third party

**63**

**63**

who is not prohibited from possessing firearms under state or federal law. The designee shall, within the time periods specified in subdivisions (d) and (e), surrender the firearms to the control of a local law enforcement agency, sell the firearms to a licensed firearms dealer, or transfer the firearms for storage to a firearms dealer pursuant to Section 29830.

(b) The Prohibited Persons Relinquishment Form shall do all of the following:

(1) Inform the defendant that he or she is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control, any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines, and that he or she shall relinquish all firearms through a designee within the time periods set forth in subdivision (d) or (e) by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830.

(2) Inform the defendant that any cohabitant of the defendant who owns firearms must store those firearms in accordance with Section 25135.

(3) Require the defendant to declare any firearms that he or she owned, possessed, or had under his or her custody or control at the time of his or her conviction, and require the defendant to describe the firearms and provide all reasonably available information about the location of the firearms to enable a designee or law enforcement officials to locate the firearms.

(4) Require the defendant to name a designee, if the defendant declares that he or she owned, possessed, or had under his or her custody or control any firearms at the time of his or her conviction, and grant the designee power of attorney for the purpose of transferring or disposing of all firearms.

(5) Require the designee to indicate his or her consent to the designation and, except a designee that is a law enforcement agency, to declare under penalty of perjury that he or she is not prohibited from possessing any firearms under state or federal law.

(6) Require the designee to state the date each firearm was relinquished and the name of the party to whom it was relinquished, and to attach receipts from the law enforcement officer or licensed firearms dealer who took possession of the relinquished firearms.

(7) Inform the defendant and the designee of the obligation to submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer within the time periods specified in subdivisions (d) and (e).

(c) (1) When a defendant is convicted of an offense described in subdivision (a), the court shall immediately assign the matter to a probation officer to investigate whether the Automated Firearms System or other credible information, such as a police report, reveals that the defendant owns, possesses, or has under his or her custody or control any firearms. The assigned probation officer shall receive the Prohibited Persons Relinquishment Form from the defendant or the defendant's designee, as applicable, and ensure that the Automated Firearms System has been properly updated to indicate that the defendant has relinquished those firearms.

(2) Prior to final disposition or sentencing in the case, the assigned probation officer shall report to the court whether the defendant has properly complied with the requirements of this section by relinquishing all firearms identified by the probation officer's investigation or declared by the defendant on the Prohibited Persons Relinquishment Form, and by timely submitting a completed Prohibited Persons Relinquishment Form. The probation officer shall also report to the Department of Justice on a form to be developed by the department whether the Automated Firearms System has been updated to indicate which firearms have been relinquished by the defendant.

(3) Prior to final disposition or sentencing in the case, the court shall make findings concerning whether the probation officer's report indicates that the defendant has relinquished all firearms as required, and whether the court has received a completed Prohibited Persons Relinquishment Form, along with the receipts described in paragraph (1) of subdivision (d) or paragraph (1) of subdivision (e). The court shall ensure that these findings are included in the abstract of judgment. If necessary to avoid a delay in sentencing, the court may make and enter these findings within 14 days of sentencing.

(4) If the court finds probable cause that the defendant has failed to relinquish any firearms as required, the court shall order the search for and removal of any firearms at any location where the judge has probable cause to believe the defendant's firearms are located. The court shall state with specificity the reasons for and scope of the search and seizure authorized by the order.

(5) Failure by a defendant to timely file the completed Prohibited Persons Relinquishment Form with the assigned probation officer shall constitute an infraction punishable by a fine not exceeding one hundred dollars ($100).

(d) The following procedures shall apply to any defendant who is a prohibited person within the meaning of paragraph (1) of subdivision (a) who does not remain in custody at any time within the five-day period following conviction:

(1) The designee shall dispose of any firearms the defendant owns, possesses, or has under his or her custody or control within five days of the conviction by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830, in accordance with the wishes of the defendant. Any proceeds from the sale of the firearms shall become the property of the defendant. The law enforcement officer or licensed dealer taking possession of any firearms pursuant to this subdivision shall issue a receipt to the designee describing the firearms and listing any serial number or other identification on the firearms at the time of surrender.

(2) If the defendant owns, possesses, or has under his or her custody or control any firearms to relinquish, the defendant's designee shall submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer within five days following the conviction, along with the receipts described in paragraph (1) of subdivision (d) showing the defendant's firearms were surrendered to a local law enforcement agency or sold or transferred to a licensed firearms dealer.

(3) If the defendant does not own, possess, or have under his or her custody or control any firearms to relinquish, he or she shall, within five days following conviction, submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, with a statement affirming that he or she has no firearms to be relinquished.

*(e) The following procedures shall apply to any defendant who is a prohibited person within the meaning of paragraph (1) of subdivision (a) who is in custody at any point within the five-day period following conviction:*

*(1) The designee shall dispose of any firearms the defendant owns, possesses, or has under his or her custody or control within 14 days of the conviction by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830, in accordance with the wishes of the defendant. Any proceeds from the sale of the firearms shall become the property of the defendant. The law enforcement officer or licensed dealer taking possession of any firearms pursuant to this subdivision shall issue a receipt to the designee describing the firearms and listing any serial number or other identification on the firearms at the time of surrender.*

*(2) If the defendant owns, possesses, or has under his or her custody or control any firearms to relinquish, the defendant's designee shall submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, within 14 days following conviction, along with the receipts described in paragraph (1) of subdivision (e) showing the defendant's firearms were surrendered to a local law enforcement agency or sold or transferred to a licensed firearms dealer.*

*(3) If the defendant does not own, possess, or have under his or her custody or control any firearms to relinquish, he or she shall, within 14 days following conviction, submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, with a statement affirming that he or she has no firearms to be relinquished.*

*(4) If the defendant is released from custody during the 14 days following conviction and a designee has not yet taken temporary possession of each firearm to be relinquished as described above, the defendant shall, within five days following his or her release, relinquish each firearm required to be relinquished pursuant to paragraph (1) of subdivision (d).*

*(f) For good cause, the court may shorten or enlarge the time periods specified in subdivisions (d) and (e), enlarge the time period specified in paragraph (3) of subdivision (c), or allow an alternative method of relinquishment.*

*(g) The defendant shall not be subject to prosecution for unlawful possession of any firearms declared on the Prohibited Persons Relinquishment Form if the firearms are relinquished as required.*

*(h) Any firearms that would otherwise be subject to relinquishment by a defendant under this section, but which are lawfully owned by a cohabitant of the defendant, shall be exempt from relinquishment, provided the defendant is notified that the cohabitant must store the firearm in accordance with Section 25135.*

*(i) A law enforcement agency shall update the Automated Firearms System to reflect any firearms that were relinquished to the agency pursuant to this section. A law enforcement agency shall retain a firearm that was relinquished to the agency pursuant to this section for 30 days after the date the firearm was relinquished. After the 30-day period has expired, the firearm is subject to destruction, retention, sale or other transfer by the agency, except upon the certificate of a judge of a court of record, or of the district attorney of the county, that the retention of the firearm is necessary or proper to the ends of justice,* or if the defendant provides written notice of an intent to appeal a conviction for an offense described in subdivision (a), or if the Automated Firearms System indicates that the firearm was reported lost or stolen by the lawful owner. If the firearm was reported lost or stolen, the firearm shall be restored to the lawful owner, as soon as its use as evidence has been served, upon the lawful owner's identification of the weapon and proof of ownership, and after the law enforcement agency has complied with Chapter 2 (commencing with Section 33850) of Division 11 of Title 4. The agency shall notify the Department of Justice of the disposition of relinquished firearms pursuant to Section 34010.*

*(j) A city, county, or city and county, or a state agency may adopt a regulation, ordinance, or resolution imposing a charge equal to its administrative costs relating to the seizure, impounding, storage, or release of a firearm pursuant to Section 33880.*

*(k) This section shall become operative on January 1, 2018.*

SEC. 11.   Theft of Firearms.

SEC. 11.1.   Section 490.2 of the Penal Code is amended to read:

(a) Notwithstanding Section 487 or any other provision of law defining grand theft, obtaining any property by theft where the value of the money, labor, real or personal property taken does not exceed nine hundred fifty dollars ($950) shall be considered petty theft and shall be punished as a misdemeanor, except that such person may instead be punished pursuant to subdivision (h) of Section 1170 if that person has one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense requiring registration pursuant to subdivision (c) of Section 290.

(b) This section shall not be applicable to any theft that may be charged as an infraction pursuant to any other provision of law.

*(c) This section shall not apply to theft of a firearm.*

SEC. 11.2.   Section 29805 of the Penal Code is amended to read:

29805.   Except as provided in Section 29855 or subdivision (a) of Section 29800, any person who has been convicted of a misdemeanor violation of Section 71, 76, 136.1, 136.5, or 140, subdivision (d) of Section 148, Section 171b, paragraph (1) of subdivision (a) of Section 171c, 171d, 186.28, 240, 241, 242, 243, 243.4, 244.5, 245, 245.5, 246.3, 247, 273.5, 273.6, 417, 417.6, 422, 626.9, 646.9, or 830.95, subdivision (a) of former Section 12100, as that section read at any time from when it was enacted by Section 3 of Chapter 1386 of the Statutes of 1988 to when it was repealed by Section 18 of Chapter 23 of the Statutes of 1994, Section 17500, 17510, 25300, 25800, 30315, or 32625, subdivision (b) or (d) of Section 26100, or Section 27510, or Section 8100, 8101, or 8103 of the Welfare and Institutions Code, any firearm-related offense pursuant to Sections 871.5 and 1001.5 of the Welfare and Institutions Code, *Section 490.2 if the property taken was a firearm,* or of the conduct punished in subdivision (c) of Section 27590, and who, within 10 years of the conviction, owns, purchases, receives, or has in possession or under custody or control, any firearm is guilty of a public offense, which shall be punishable by imprisonment in a county jail not exceeding one year or in the state prison, by a fine not

**63**

exceeding one thousand dollars ($1,000), or by both that imprisonment and fine. The court, on forms prescribed by the Department of Justice, shall notify the department of persons subject to this section. However, the prohibition in this section may be reduced, eliminated, or conditioned as provided in Section 29855 or 29860.

SEC. 12.   Interim Standards.

Notwithstanding the Administrative Procedure Act (APA), and in order to facilitate the prompt implementation of the Safety for All Act of 2016, the California Department of Justice may adopt interim standards without compliance with the procedures set forth in the APA. The interim standards shall remain in effect for no more than two years, and may be earlier superseded by regulations adopted pursuant to the APA. "Interim standards" means temporary standards that perform the same function as "emergency regulations" under the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code), except that in order to provide greater opportunity for public comment on permanent regulations, the interim standards may remain in force for two years rather than 180 days.

SEC. 13.   Amending the Measure.

**64**

This Act shall be broadly construed to accomplish its purposes. The provisions of this measure may be amended by a vote of 55 percent of the members of each house of the Legislature and signed by the Governor so long as such amendments are consistent with and further the intent of this Act.

SEC. 14.   Conflicting Measures.

(a) In the event that this measure and another measure on the same subject matter, including but not limited to the regulation of the sale or possession of firearms or ammunition, shall appear on the same statewide ballot, the provisions of the other measure or measures shall be deemed to be in conflict with this measure. In the event that this measure receives a greater number of affirmative votes than a measure deemed to be in conflict with it, the provisions of this measure shall prevail in their entirety, and the other measure or measures shall be null and void.

(b) If this measure is approved by voters but superseded by law by any other conflicting measure approved by voters at the same election, and the conflicting ballot measure is later held invalid, this measure shall be self-executing and given full force and effect.

SEC. 15.   Severability.

If any provision of this measure, or part of this measure, or the application of any provision or part to any person or circumstance, is for any reason held to be invalid or unconstitutional, the remaining provisions, or applications of provisions, shall not be affected, but shall remain in full force and effect, and to this end the provisions of this measure are severable.

SEC. 16.   Proponent Standing.

Notwithstanding any other provision of law, if the State, government agency, or any of its officials fail to defend the constitutionality of this Act, following its approval by the voters, any other government employer, the proponent, or in their absence, any citizen of this State shall have the authority to intervene in any court action challenging the constitutionality of this Act for the purpose of defending its constitutionality, whether such action is in trial court, on appeal, or on discretionary review by the Supreme Court

of California or the Supreme Court of the United States. The reasonable fees and costs of defending the action shall be a charge on funds appropriated to the Department of Justice, which shall be satisfied promptly.

# PROPOSITION 64

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure amends, repeals, and adds sections to the Business and Professions Code, the Food and Agricultural Code, the Health and Safety Code, the Labor Code, the Revenue and Taxation Code, and the Water Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

## PROPOSED LAW

SECTION 1.   Title.

This measure shall be known and may be cited as the Control, Regulate and Tax Adult Use of Marijuana Act ("the Adult Use of Marijuana Act").

SEC. 2.   Findings and Declarations.

A. Currently in California, nonmedical marijuana use is unregulated, untaxed, and occurs without any consumer or environmental protections. The Control, Regulate and Tax Adult Use of Marijuana Act will legalize marijuana for those over 21 years old, protect children, and establish laws to regulate marijuana cultivation, distribution, sale and use, and will protect Californians and the environment from potential dangers. It establishes the Bureau of Marijuana Control within the Department of Consumer Affairs to regulate and license the marijuana industry.

B. Marijuana is currently legal in our state for medical use and illegal for nonmedical use. Abuse of the medical marijuana system in California has long been widespread, but recent bipartisan legislation signed by Governor Jerry Brown is establishing a comprehensive regulatory scheme for medical marijuana. The Control, Regulate and Tax Adult Use of Marijuana Act (hereafter called the Adult Use of Marijuana Act) will consolidate and streamline regulation and taxation for both nonmedical and medical marijuana.

C. Currently, marijuana growth and sale is not being taxed by the State of California, which means our state is missing out on hundreds of millions of dollars in potential tax revenue every year. The Adult Use of Marijuana Act will tax both the growth and sale of marijuana to generate hundreds of millions of dollars annually. The revenues will cover the cost of administering the new law and will provide funds to: invest in public health programs that educate youth to prevent and treat serious substance abuse; train local law enforcement to enforce the new law with a focus on DUI enforcement; invest in communities to reduce the illicit market and create job opportunities; and provide for environmental cleanup and restoration of public lands damaged by illegal marijuana cultivation.

D. Currently, children under the age of 18 can just as easily purchase marijuana on the black market as adults can. By legalizing marijuana, the Adult Use of Marijuana Act will incapacitate the black market, and move marijuana purchases into a legal structure with strict safeguards against children accessing it. The Adult Use of Marijuana Act prohibits the sale of nonmedical marijuana to those

# Exhibit 97

Bill Text - SB-23 Firearms: assault weapons.                     Page 1 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3784   Page 265 of 472



| Home | Bill Information | California Law | Publications | Other Resources | My Subscriptions | My Favorites |

**SB-23 Firearms: assault weapons.**  (1999-2000)

SHARE THIS:  

## Senate Bill No. 23

## CHAPTER 129

An act to amend Sections 245, 12001, 12020, 12022, 12022.5, 12280, 12285, and 12289 of, and to add Sections 12079 and 12276.1 to, the Penal Code, relating to firearms.

[ Filed with Secretary of State  July 19, 1999. Approved by Governor  July 19, 1999. ]

## LEGISLATIVE COUNSEL'S DIGEST

SB 23, Perata. Firearms: assault weapons.

(1) Existing law makes it a misdemeanor for any person to manufacture, cause to be manufactured, import into this state, keep or offer for sale, give, lend, or possess specified weapons and explosives.

This bill would make it a misdemeanor or a felony, beginning January 1, 2000, for any person, except as provided, to manufacture, import into the state, keep or offer for sale, give, or lend any large-capacity magazine. A large-capacity magazine would be defined to mean any ammunition feeding device with the capacity to accept more than 10 rounds. By expanding the definition of, and increasing the penalty for, a crime, this bill imposes a state-mandated local program.

(2) Existing law requires imposition of a longer term of imprisonment on any person convicted of assault with a deadly weapon, and for enhanced terms of imprisonment for a person convicted of a felony, if that person was either armed with, or personally used, an assault weapon or machinegun, as defined, in the commission of, or attempted commission of that felony.

Existing law makes it a crime to engage in specified activities regarding assault weapons and regulates the lawful possession of those weapons. Existing law defines the term "assault weapon" by, among other things, designating a list of specified semiautomatic firearms.

This bill would further define the term "assault weapon" by providing descriptive definitions concerning the capacity and function of the weapon. These expanded definitions would specifically apply to the above-mentioned increased term and enhancement provisions and to related provisions. By expanding the definition of a crime, this bill would impose a state-mandated local program.

(3) Existing law makes it a crime, punishable either as a felony or a misdemeanor, for any person to possess any assault weapon, as defined. However, if a person charged with a first-time violation of that offense presents proof that he or she lawfully possessed the assault weapon within a specified period, and has since registered the weapon or relinquished it, the offense is punishable as an infraction, if the person has also complied with specified conditions. Existing law also provides a period of forgiveness to persons in possession of an assault weapon during a specified period under specified conditions. In addition, existing law exempts specified law enforcement agencies from the prohibition against possession, purchase, or sale of assault weapons.

This bill would make it an infraction, punishable by a fine up to $500, for a first-time violation of the above-mentioned offense, if the offender was found in possession of no more than 2 firearms in compliance with specified provisions and proves that he or she lawfully possessed the assault weapon prior to the date it was

Bill Text - SB-23 Firearms: assault weapons.                    Page 2 of 23
Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3785   Page 266 of
472

defined as an assault weapon under the proposed provision set forth in (2). This bill would also add an additional period of forgiveness for persons in possession of assault weapons, as defined, pursuant to the proposed provision set forth in (2), to extend to the one-year period after the weapon was defined as an assault weapon under that proposed provision. By defining a new crime, this bill would impose a state-mandated local program. The bill would also exempt certain additional off-duty and certain retired law enforcement personnel from the prohibition against possession, purchase, or sale of assault weapons.

(4) Existing law requires any person who lawfully possesses an assault weapon, as defined, prior to specified periods, to register that weapon with the Department of Justice, within a specified period of time.

This bill would require any person who lawfully possessed an assault weapon prior to the date it was defined as an assault weapon pursuant to the proposed provision mentioned in (2) above, to register the weapon within one year of the effective date of that provision.

(5) Existing law requires the Department of Justice to conduct a public education and notification program regarding the registration of assault weapons, the limited forgiveness period of the registration requirement and the consequences of nonregistration.

This bill would require that the public education and notification program include the new definition of assault weapons discussed in paragraph (2) above.

(6) The bill would state legislative intent.

(7) The bill would provide that its provisions are severable.

(8) This bill would incorporate additional changes in Section 12020 of the Penal Code proposed by SB 359, to be operative if SB 359 and this bill are both enacted and become effective on or before January 1, 2000, and this bill is enacted last. (9) The California Constitution requires the state to reimburse local agencies and school districts for certain costs mandated by the state. Statutory provisions establish procedures for making that reimbursement.

This bill would provide that no reimbursement is required by this act for a specified reason.

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

**SECTION 1.** Section 245 of the Penal Code is amended to read:

**245.** (a) (1) Any person who commits an assault upon the person of another with a deadly weapon or instrument other than a firearm or by any means of force likely to produce great bodily injury shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not exceeding one year, or by a fine not exceeding ten thousand dollars ($10,000), or by both the fine and imprisonment.

(2) Any person who commits an assault upon the person of another with a firearm shall be punished by imprisonment in the state prison for two, three, or four years, or in a county jail for not less than six months and not exceeding one year, or by both a fine not exceeding ten thousand dollars ($10,000) and imprisonment.

(3) Any person who commits an assault upon the person of another with a machinegun, as defined in Section 12200, or an assault weapon, as defined in Section 12276 or 12276.1, shall be punished by imprisonment in the state prison for 4, 8, or 12 years.

(b) Any person who commits an assault upon the person of another with a semiautomatic firearm shall be punished by imprisonment in the state prison for three, six, or nine years.

(c) Any person who commits an assault with a deadly weapon or instrument, other than a firearm, or by any means likely to produce great bodily injury upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for three, four, or five years.

(d) (1) Any person who commits an assault with a firearm upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for four, six, or eight years.

Bill Text - SB-23 Firearms: assault weapons.                    Page 3 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3786   Page 267 of
                                     472

(2) Any person who commits an assault upon the person of a peace officer or firefighter with a semiautomatic firearm and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, when the peace officer or firefighter is engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for five, seven, or nine years.

(3) Any person who commits an assault with a machinegun, as defined in Section 12200, or an assault weapon, as defined in Section 12276 or 12276.1, upon the person of a peace officer or firefighter, and who knows or reasonably should know that the victim is a peace officer or firefighter engaged in the performance of his or her duties, shall be punished by imprisonment in the state prison for 6, 9, or 12 years.

(e) When a person is convicted of a violation of this section in a case involving use of a deadly weapon or instrument or firearm, and the weapon or instrument or firearm is owned by that person, the court shall order that the weapon or instrument or firearm be deemed a nuisance, and it shall be confiscated and disposed of in the manner provided by Section 12028.

(f) As used in this section, "peace officer" refers to any person designated as a peace officer in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2.

**SEC. 2.** Section 12001 of the Penal Code is amended to read:

**12001.** (a) As used in this title, the terms "pistol," "revolver," and "firearm capable of being concealed upon the person" shall apply to and include any device designed to be used as a weapon, from which is expelled a projectile by the force of any explosion, or other form of combustion, and that has a barrel less than 16 inches in length. These terms also include any device that has a barrel 16 inches or more in length which is designed to be interchanged with a barrel less than 16 inches in length.

(b) As used in this title, "firearm" means any device, designed to be used as a weapon, from which is expelled through a barrel a projectile by the force of any explosion or other form of combustion.

(c) As used in Sections 12021, 12021.1, 12070, 12071, 12072, 12073, 12078, and 12101 of this code, and Sections 8100, 8101, and 8103 of the Welfare and Institutions Code, the term "firearm" includes the frame or receiver of the weapon.

(d) For the purposes of Sections 12025 and 12031, the term "firearm" also shall include any rocket, rocket propelled projectile launcher, or similar device containing any explosive or incendiary material whether or not the device is designed for emergency or distress signaling purposes.

(e) For purposes of Sections 12070, 12071, and paragraph (7) of subdivision (a), and subdivisions (b), (c), (d), and (f) of Section 12072, the term "firearm" does not include an unloaded firearm that is defined as an "antique firearm" in Section 921(a)(16) of Title 18 of the United States Code.

(f) Nothing shall prevent a device defined as a "pistol," "revolver," or "firearm capable of being concealed upon the person" from also being found to be a short-barreled shotgun or a short-barreled rifle, as defined in Section 12020.

(g) For purposes of Sections 12551 and 12552, the term "BB device" means any instrument that expels a metallic projectile, such as a BB or a pellet, through the force of air pressure, CO2 pressure, or spring action, or any spot marker gun.

(h) As used in this title, "wholesaler" means any person who is licensed as a dealer pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto who sells, transfers, or assigns firearms, or parts of firearms, to persons who are licensed as manufacturers, importers, or gunsmiths pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code, or persons licensed pursuant to Section 12071, and includes persons who receive finished parts of firearms and assemble them into completed or partially completed firearms in furtherance of that purpose.

"Wholesaler" shall not include a manufacturer, importer, or gunsmith who is licensed to engage in those activities pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code or a person licensed pursuant to Section 12071 and the regulations issued pursuant thereto. A wholesaler also does not include those persons dealing exclusively in grips, stocks, and other parts of firearms that are not frames or receivers thereof.

(i) As used in Section 12071, 12072, or 12084, "application to purchase" means any of the following:

(1) The initial completion of the register by the purchaser, transferee, or person being loaned the firearm as required by subdivision (b) of Section 12076.

Bill Text - SB-23 Firearms: assault weapons.            Page 4 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3787   Page 268 of
472

(2) The initial completion of the LEFT by the purchaser, transferee, or person being loaned the firearm as required by subdivision (d) of Section 12084.

(3) The initial completion and transmission to the department of the record of electronic or telephonic transfer by the dealer on the purchaser, transferee, or person being loaned the firearm as required by subdivision (c) of Section 12076.

(j) For purposes of Section 12023, a firearm shall be deemed to be "loaded" whenever both the firearm and the unexpended ammunition capable of being discharged from the firearm are in the immediate possession of the same person.

(k) For purposes of Sections 12021, 12021.1, 12025, 12070, 12072, 12073, 12078, and 12101 of this code, and Sections 8100, 8101, and 8103 of the Welfare and Institutions Code, notwithstanding the fact that the term "any firearm" may be used in those sections, each firearm or the frame or receiver of the same shall constitute a distinct and separate offense under those sections.

(l) For purposes of Section 12020, a violation of that section as to each firearm, weapon, or device enumerated therein shall constitute a distinct and separate offense.

(m) Each application that requires any firearms eligibility determination involving the issuance of any license, permit, or certificate pursuant to this title shall include two copies of the applicant's fingerprints on forms prescribed by the Department of Justice. One copy of the fingerprints may be submitted to the United States Federal Bureau of Investigation.

(n) As used in this chapter, a "personal handgun importer" means an individual who meets all of the following criteria:

(1) He or she is not a person licensed pursuant to Section 12071.

(2) He or she is not a licensed manufacturer of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code.

(3) He or she is not a licensed importer of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(4) He or she is the owner of a pistol, revolver, or other firearm capable of being concealed upon the person.

(5) He or she acquired that pistol, revolver, or other firearm capable of being concealed upon the person outside of California.

(6) He or she moves into this state on or after January 1, 1998, as a resident of this state.

(7) He or she intends to possess that pistol, revolver, or other firearm capable of being concealed upon the person within this state on or after January 1, 1998.

(8) The pistol, revolver, or other firearm capable of being concealed upon the person was not delivered to him or her by a person licensed pursuant to Section 12071 who delivered that firearm following the procedures set forth in Section 12071 and subdivision (c) of Section 12072.

(9) He or she, while a resident of this state, had not previously reported his or her ownership of that pistol, revolver, or other firearm capable of being concealed upon the person to the Department of Justice in a manner prescribed by the department that included information concerning him or her and a description of the firearm.

(10) The pistol, revolver, or other firearm capable of being concealed upon the person is not a firearm that is prohibited by subdivision (a) of Section 12020.

(11) The pistol, revolver, or other firearm capable of being concealed upon the person is not an assault weapon, as defined in Section 12276 or 12276.1.

(12) The pistol, revolver, or other firearm capable of being concealed upon the person is not a machinegun, as defined in Section 12200.

(13) The person is 18 years of age or older.

(o) For purposes of paragraph (6) of subdivision (n):

(1) Except as provided in paragraph (2), residency shall be determined in the same manner as is the case for establishing residency pursuant to Section 12505 of the Vehicle Code.

Bill Text - SB-23 Firearms: assault weapons.                    Page 5 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3788   Page 269 of
472

(2) In the case of members of the armed forces of the United States, residency shall be deemed to be established when he or she was discharged from active service in this state.

**SEC. 3.** Section 12020 of the Penal Code is amended to read:

**12020.** (a) Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison:

(1) Manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any cane gun or wallet gun, any undetectable firearm, any firearm which is not immediately recognizable as a firearm, any camouflaging firearm container, any ammunition which contains or consists of any fléchette dart, any bullet containing or carrying an explosive agent, any ballistic knife, any multiburst trigger activator, any nunchaku, any short-barreled shotgun, any short-barreled rifle, any metal knuckles, any belt buckle knife, any leaded cane, any zip gun, any shuriken, any unconventional pistol, any lipstick case knife, any cane sword, any shobi-zue, any air gauge knife, any writing pen knife, any metal military practice handgrenade or metal replica handgrenade, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag.

(2) Commencing January 1, 2000, manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, or lends, any large-capacity magazine.

(3) Carries concealed upon his or her person any explosive substance, other than fixed ammunition.

(4) Carries concealed upon his or her person any dirk or dagger.

However, a first offense involving any metal military practice handgrenade or metal replica handgrenade shall be punishable only as an infraction unless the offender is an active participant in a criminal street gang as defined in the Street Terrorism and Enforcement and Prevention Act (Chapter 11 (commencing with Section 186.29) of Title 7 of Part 1). A bullet containing or carrying an explosive agent is not a destructive device as that term is used in Section 12301.

(b) Subdivision (a) does not apply to any of the following:

(1) The sale to, purchase by, or possession of short-barreled shotguns or short-barreled rifles by police departments, sheriffs' offices, marshals' offices, the California Highway Patrol, the Department of Justice, or the military or naval forces of this state or of the United States for use in the discharge of their official duties or the possession of short-barreled shotguns and short-barreled rifles by regular, salaried, full-time members of a police department, sheriff's office, marshal's office, the California Highway Patrol, or the Department of Justice when on duty and the use is authorized by the agency and is within the course and scope of their duties.

(2) The manufacture, possession, transportation or sale of short-barreled shotguns or short-barreled rifles when authorized by the Department of Justice pursuant to Article 6 (commencing with Section 12095) of this chapter and not in violation of federal law.

(3) The possession of a nunchaku on the premises of a school which holds a regulatory or business license and teaches the arts of self-defense.

(4) The manufacture of a nunchaku for sale to, or the sale of a nunchaku to, a school which holds a regulatory or business license and teaches the arts of self-defense.

(5) Any antique firearm. For purposes of this section, "antique firearm" means any firearm not designed or redesigned for using rimfire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar type of ignition system or replica thereof, whether actually manufactured before or after the year 1898) and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

(6) Tracer ammunition manufactured for use in shotguns.

(7) Any firearm or ammunition which is a curio or relic as defined in Section 178.11 of Title 27 of the Code of Federal Regulations and which is in the possession of a person permitted to possess the items pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto. Any person prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition who obtains title to these items by bequest or intestate succession may retain title for not more than one year, but actual possession of

Bill Text - SB-23 Firearms: assault weapons.                    Page 6 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3789   Page 270 of
472

these items at any time is punishable pursuant to Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code. Within the year, the person shall transfer title to the firearms or ammunition by sale, gift, or other disposition. Any person who violates this paragraph is in violation of subdivision (a).

(8) Any other weapon as defined in subsection (e) of Section 5845 of Title 26 of the United States Code and which is in the possession of a person permitted to possess the weapons pursuant to the federal Gun Control Act of 1968 (Public Law 90-618), as amended, and the regulations issued pursuant thereto. Any person prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing these weapons who obtains title to these weapons by bequest or intestate succession may retain title for not more than one year, but actual possession of these weapons at any time is punishable pursuant to Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code. Within the year, the person shall transfer title to the weapons by sale, gift, or other disposition. Any person who violates this paragraph is in violation of subdivision (a). The exemption provided in this subdivision does not apply to pen guns.

(9) Instruments or devices that are possessed by federal, state, and local historical societies, museums, and institutional collections which are open to the public, provided that these instruments or devices are properly housed, secured from unauthorized handling, and, if the instrument or device is a firearm, unloaded.

(10) Instruments or devices, other than short-barreled shotguns or short-barreled rifles, that are possessed or utilized during the course of a motion picture, television, or video production or entertainment event by an authorized participant therein in the course of making that production or event or by an authorized employee or agent of the entity producing that production or event.

(11) Instruments or devices, other than short-barreled shotguns or short-barreled rifles, that are sold by, manufactured by, exposed or kept for sale by, possessed by, imported by, or lent by persons who are in the business of selling instruments or devices listed in subdivision (a) solely to the entities referred to in paragraphs (9) and (10) when engaging in transactions with those entities.

(12) The sale to, possession of, or purchase of any weapon, device, or ammunition, other than a short-barreled rifle or short-barreled shotgun, by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law for use in the discharge of their official duties, or the possession of any weapon, device, or ammunition, other than a short-barreled rifle or short-barreled shotgun, by peace officers thereof when on duty and the use is authorized by the agency and is within the course and scope of their duties.

(13) Weapons, devices, and ammunition, other than a short-barreled rifle or short-barreled shotgun, that are sold by, manufactured by, exposed, or kept for sale by, possessed by, imported by, or lent by, persons who are in the business of selling weapons, devices, and ammunition listed in subdivision (a) solely to the entities referred to in paragraph (12) when engaging in transactions with those entities.

(14) The manufacture for, sale to, exposing or keeping for sale to, importation of, or lending of wooden clubs or batons to special police officers or uniformed security guards authorized to carry any wooden club or baton pursuant to Section 12002 by entities that are in the business of selling wooden batons or clubs to special police officers and uniformed security guards when engaging in transactions with those persons.

(15) Any plastic toy handgrenade, or any metal military practice handgrenade or metal replica handgrenade that is a relic, curio, memorabilia, or display item, that is filled with a permanent inert substance or that is otherwise permanently altered in a manner that prevents ready modification for use as a grenade.

(16) Any instrument, ammunition, weapon, or device listed in subdivision (a) that is not a firearm that is found and possessed by a person who meets all of the following:

(A) The person is not prohibited from possessing firearms or ammunition pursuant to Section 12021 or 12021.1 or paragraph (1) of subdivision (b) of Section 12316 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person possessed the instrument, ammunition, weapon, or device no longer than was necessary to deliver or transport the same to a law enforcement agency for that agency's disposition according to law.

(C) If the person is transporting the listed item, he or she is transporting the listed item to a law enforcement agency for disposition according to law.

(17) Any firearm, other than a short-barreled rifle or short-barreled shotgun, that is found and possessed by a person who meets all of the following:

Bill Text - SB-23 Firearms: assault weapons.                    Page 7 of 23

Case 3:17-cv-01017-BEN-JLB    Document 18-9    Filed 06/05/17    PageID.3790    Page 271 of
472

(A) The person is not prohibited from possessing firearms or ammunition pursuant to Section 12021 or 12021.1 or paragraph (1) of subdivision (b) of Section 12316 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person possessed the firearm no longer than was necessary to deliver or transport the same to a law enforcement agency for that agency's disposition according to law.

(C) If the person is transporting the firearm, he or she is transporting the firearm to a law enforcement agency for disposition according to law.

(D) Prior to transporting the firearm to a law enforcement agency, he or she has given prior notice to that law enforcement agency that he or she is transporting the firearm to that law enforcement agency for disposition according to law.

(E) The firearm is transported in a locked container as defined in subdivision (d) of Section 12026.2.

(18) The possession of any weapon, device, or ammunition, by a forensic laboratory or any authorized agent or employee thereof in the course and scope of his or her authorized activities.

(19) The sale of, giving of, lending of, importation into this state of, or purchase of, any large-capacity magazine to or by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

(20) The sale to, lending to, transfer to, purchase by, receipt of, or importation into this state of, a large capacity magazine by a sworn peace officer as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 who is authorized to carry a firearm in the course and scope of his or her duties.

(21) The sale or purchase of any large-capacity magazine to or by a person licensed pursuant to Section 12071.

(22) The loan of a lawfully possessed large-capacity magazine between two individuals if all of the following conditions are met:

(A) The person being loaned the large-capacity magazine is not prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition.

(B) The loan of the large-capacity magazine occurs at a place or location where the possession of the large-capacity magazine is not otherwise prohibited and the person who lends the large-capacity magazine remains in the accessible vicinity of the person to whom the large-capacity magazine is loaned.

(23) The importation of a large-capacity magazine by a person who lawfully possessed the large-capacity magazine in the state prior to January 1, 2000, lawfully took it out of the state, and is returning to the state with the large-capacity magazine previously lawfully possessed in the state.

(24) The lending or giving of any large-capacity magazine to a person licensed pursuant to Section 12071, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine.

(25) The return to its owner of any large-capacity magazine by a person specified in paragraph (24).

(26) The importation into this state of, or sale of, any large-capacity magazine by a person who has been issued a permit to engage in those activities pursuant to Section 12079, when those activities are in accordance with the terms and conditions of that permit.

(27) The sale of, giving of, lending of, importation into this state of, or purchase of, any large-capacity magazine, to or by entities that operate armored vehicle businesses pursuant to the laws of this state.

(28) The lending of large-capacity magazines by the entities specified in paragraph (27) to their authorized employees, while in the course and scope of their employment for purposes that pertain to the entity's armored vehicle business.

(29) The return of those large-capacity magazines to those entities specified in paragraph (27) by those employees specified in paragraph (28).

(c) (1) As used in this section, a "short-barreled shotgun" means any of the following:

(A) A firearm which is designed or redesigned to fire a fixed shotgun shell and having a barrel or barrels of less than 18 inches in length.

Bill Text - SB-23 Firearms: assault weapons.                    Page 8 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3791   Page 272 of
472

(B) A firearm which has an overall length of less than 26 inches and which is designed or redesigned to fire a fixed shotgun shell.

(C) Any weapon made from a shotgun (whether by alteration, modification, or otherwise) if that weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length.

(D) Any device which may be readily restored to fire a fixed shotgun shell which, when so restored, is a device defined in subparagraphs (A) to (C), inclusive.

(E) Any part, or combination of parts, designed and intended to convert a device into a device defined in subparagraphs (A) to (C), inclusive, or any combination of parts from which a device defined in subparagraphs (A) to (C), inclusive, can be readily assembled if those parts are in the possession or under the control of the same person.

(2) As used in this section, a "short-barreled rifle" means any of the following:

(A) A rifle having a barrel or barrels of less than 16 inches in length.

(B) A rifle with an overall length of less than 26 inches.

(C) Any weapon made from a rifle (whether by alteration, modification, or otherwise) if that weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length.

(D) Any device which may be readily restored to fire a fixed cartridge which, when so restored, is a device defined in subparagraphs (A) to (C), inclusive.

(E) Any part, or combination of parts, designed and intended to convert a device into a device defined in subparagraphs (A) to (C), inclusive, or any combination of parts from which a device defined in subparagraphs (A) to (C), inclusive, may be readily assembled if those parts are in the possession or under the control of the same person.

(3) As used in this section, a "nunchaku" means an instrument consisting of two or more sticks, clubs, bars or rods to be used as handles, connected by a rope, cord, wire, or chain, in the design of a weapon used in connection with the practice of a system of self-defense such as karate.

(4) As used in this section, a "wallet gun" means any firearm mounted or enclosed in a case, resembling a wallet, designed to be or capable of being carried in a pocket or purse, if the firearm may be fired while mounted or enclosed in the case.

(5) As used in this section, a "cane gun" means any firearm mounted or enclosed in a stick, staff, rod, crutch, or similar device, designed to be, or capable of being used as, an aid in walking, if the firearm may be fired while mounted or enclosed therein.

(6) As used in this section, a "fléchette dart" means a dart, capable of being fired from a firearm, which measures approximately one inch in length, with tail fins which take up five-sixteenths of an inch of the body.

(7) As used in this section, "metal knuckles" means any device or instrument made wholly or partially of metal which is worn for purposes of offense or defense in or on the hand and which either protects the wearer's hand while striking a blow or increases the force of impact from the blow or injury to the individual receiving the blow. The metal contained in the device may help support the hand or fist, provide a shield to protect it, or consist of projections or studs which would contact the individual receiving a blow.

(8) As used in this section, a "ballistic knife" means a device that propels a knifelike blade as a projectile by means of a coil spring, elastic material, or compressed gas. Ballistic knife does not include any device which propels an arrow or a bolt by means of any common bow, compound bow, crossbow, or underwater spear gun.

(9) As used in this section, a "camouflaging firearm container" means a container which meets all of the following criteria:

(A) It is designed and intended to enclose a firearm.

(B) It is designed and intended to allow the firing of the enclosed firearm by external controls while the firearm is in the container.

(C) It is not readily recognizable as containing a firearm.

"Camouflaging firearm container" does not include any camouflaging covering used while engaged in lawful hunting or while going to or returning from a lawful hunting expedition.

Bill Text - SB-23 Firearms: assault weapons.    Page 9 of 23
Case 3:17-cv-01017-BEN-JLB    Document 18-9    Filed 06/05/17    PageID.3792    Page 273 of
472

(10) As used in this section, a "zip gun" means any weapon or device which meets all of the following criteria:

(A) It was not imported as a firearm by an importer licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(B) It was not originally designed to be a firearm by a manufacturer licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(C) No tax was paid on the weapon or device nor was an exemption from paying tax on that weapon or device granted under Section 4181 and subchapters F (commencing with Section 4216) and G (commencing with Section 4221) of Chapter 32 of Title 26 of the United States Code, as amended, and the regulations issued pursuant thereto.

(D) It is made or altered to expel a projectile by the force of an explosion or other form of combustion.

(11) As used in this section, a "shuriken" means any instrument, without handles, consisting of a metal plate having three or more radiating points with one or more sharp edges and designed in the shape of a polygon, trefoil, cross, star, diamond, or other geometric shape for use as a weapon for throwing.

(12) As used in this section, an "unconventional pistol" means a firearm that does not have a rifled bore and has a barrel or barrels of less than 18 inches in length or has an overall length of less than 26 inches.

(13) As used in this section, a "belt buckle knife" is a knife which is made an integral part of a belt buckle and consists of a blade with a length of at least 2 1/2 inches.

(14) As used in this section, a "lipstick case knife" means a knife enclosed within and made an integral part of a lipstick case.

(15) As used in this section, a "cane sword" means a cane, swagger stick, stick, staff, rod, pole, umbrella, or similar device, having concealed within it a blade that may be used as a sword or stiletto.

(16) As used in this section, a "shobi-zue" means a staff, crutch, stick, rod, or pole concealing a knife or blade within it which may be exposed by a flip of the wrist or by a mechanical action.

(17) As used in this section, a "leaded cane" means a staff, crutch, stick, rod, pole, or similar device, unnaturally weighted with lead.

(18) As used in this section, an "air gauge knife" means a device that appears to be an air gauge but has concealed within it a pointed, metallic shaft that is designed to be a stabbing instrument which is exposed by mechanical action or gravity which locks into place when extended.

(19) As used in this section, a "writing pen knife" means a device that appears to be a writing pen but has concealed within it a pointed, metallic shaft that is designed to be a stabbing instrument which is exposed by mechanical action or gravity which locks into place when extended or the pointed, metallic shaft is exposed by the removal of the cap or cover on the device.

(20) As used in this section, a "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(21) As used in this section, a "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger.

(22) As used in this section, an "undetectable firearm" means any weapon which meets one of the following requirements:

(A) When, after removal of grips, stocks, and magazines, it is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar.

(B) When any major component of which, when subjected to inspection by the types of X-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

(C) For purposes of this paragraph, the terms "firearm," "major component," and "Security Exemplar" have the same meanings as those terms are defined in Section 922 of Title 18 of the United States Code.

Bill Text - SB-23 Firearms: assault weapons.                    Page 10 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3793   Page 274 of
472

All firearm detection equipment newly installed in nonfederal public buildings in this state shall be of a type identified by either the United States Attorney General, the Secretary of Transportation, or the Secretary of the Treasury, as appropriate, as available state-of-the-art equipment capable of detecting an undetectable firearm, as defined, while distinguishing innocuous metal objects likely to be carried on one's person sufficient for reasonable passage of the public.

(23) As used in this section, a "multiburst trigger activator" means one of the following devices:

(A)A device designed or redesigned to be attached to a semiautomatic firearm which allows the firearm to discharge two or more shots in a burst by activating the device.

(B) A manual or power-driven trigger activating device constructed and designed so that when attached to a semiautomatic firearm it increases the rate of fire of that firearm.

(24) As used in this section, a "dirk" or "dagger" means a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. A nonlocking folding knife, a folding knife that is not prohibited by Section 653k, or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position.

(25) As used in this section, "large-capacity magazine" means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include a feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds nor shall it include any .22 caliber tube ammunition feeding device.

(d) Knives carried in sheaths which are worn openly suspended from the waist of the wearer are not concealed within the meaning of this section.

SEC. 3.5. Section 12020 of the Penal Code is amended to read:

12020. (a) Any person in this state who does any of the following is punishable by imprisonment in a county jail not exceeding one year or in the state prison:

(1) Manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any cane gun or wallet gun, any undetectable firearm, any firearm which is not immediately recognizable as a firearm, any camouflaging firearm container, any ammunition which contains or consists of any fléchette dart, any bullet containing or carrying an explosive agent, any ballistic knife, any multiburst trigger activator, any nunchaku, any short-barreled shotgun, any short-barreled rifle, any metal knuckles, any belt buckle knife, any leaded cane, any zip gun, any shuriken, any unconventional pistol, any lipstick case knife, any cane sword, any shobi-zue, any air gauge knife, any writing pen knife, any metal military practice handgrenade or metal replica handgrenade, or any instrument or weapon of the kind commonly known as a blackjack, slungshot, billy, sandclub, sap, or sandbag.

(2) Commencing January 1, 2000, manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, or lends, any large-capacity magazine.

(3) Carries concealed upon his or her person any explosive substance, other than fixed ammunition.

(4) Carries concealed upon his or her person any dirk or dagger.

However, a first offense involving any metal military practice handgrenade or metal replica handgrenade shall be punishable only as an infraction unless the offender is an active participant in a criminal street gang as defined in the Street Terrorism and Enforcement and Prevention Act (Chapter 11 (commencing with Section 186.29) of Title 7 of Part 1). A bullet containing or carrying an explosive agent is not a destructive device as that term is used in Section 12301.

(b) Subdivision (a) does not apply to any of the following:

(1) The sale to, purchase by, or possession of short-barreled shotguns or short-barreled rifles by police departments, sheriffs' offices, marshals' offices, the California Highway Patrol, the Department of Justice, or the military or naval forces of this state or of the United States for use in the discharge of their official duties or the possession of short-barreled shotguns and short-barreled rifles by peace officer members of a police department, sheriff's office, marshal's office, the California Highway Patrol, or the Department of Justice when on duty and the use is authorized by the agency and is within the course and scope of their duties and the peace officer has

Bill Text - SB-23 Firearms: assault weapons.                    Page 11 of 23

Case 3:17-cv-01017-BEN-JLB  Document 18-9  Filed 06/05/17  PageID.3794  Page 275 of
472

completed a training course in the use of these weapons certified by the Commission on Peace Officer Standards and Training.

(2) The manufacture, possession, transportation or sale of short-barreled shotguns or short-barreled rifles when authorized by the Department of Justice pursuant to Article 6 (commencing with Section 12095) of this chapter and not in violation of federal law.

(3) The possession of a nunchaku on the premises of a school which holds a regulatory or business license and teaches the arts of self-defense.

(4) The manufacture of a nunchaku for sale to, or the sale of a nunchaku to, a school which holds a regulatory or business license and teaches the arts of self-defense.

(5) Any antique firearm. For purposes of this section, "antique firearm" means any firearm not designed or redesigned for using rimfire or conventional center fire ignition with fixed ammunition and manufactured in or before 1898 (including any matchlock, flintlock, percussion cap, or similar type of ignition system or replica thereof, whether actually manufactured before or after the year 1898) and also any firearm using fixed ammunition manufactured in or before 1898, for which ammunition is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

(6) Tracer ammunition manufactured for use in shotguns.

(7) Any firearm or ammunition which is a curio or relic as defined in Section 178.11 of Title 27 of the Code of Federal Regulations and which is in the possession of a person permitted to possess the items pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto. Any person prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition who obtains title to these items by bequest or intestate succession may retain title for not more than one year, but actual possession of these items at any time is punishable pursuant to Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code. Within the year, the person shall transfer title to the firearms or ammunition by sale, gift, or other disposition. Any person who violates this paragraph is in violation of subdivision (a).

(8) Any other weapon as defined in subsection (e) of Section 5845 of Title 26 of the United States Code and which is in the possession of a person permitted to possess the weapons pursuant to the federal Gun Control Act of 1968 (Public Law 90-618), as amended, and the regulations issued pursuant thereto. Any person prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing these weapons who obtains title to these weapons by bequest or intestate succession may retain title for not more than one year, but actual possession of these weapons at any time is punishable pursuant to Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code. Within the year, the person shall transfer title to the weapons by sale, gift, or other disposition. Any person who violates this paragraph is in violation of subdivision (a). The exemption provided in this subdivision does not apply to pen guns.

(9) Instruments or devices that are possessed by federal, state, and local historical societies, museums, and institutional collections which are open to the public, provided that these instruments or devices are properly housed, secured from unauthorized handling, and, if the instrument or device is a firearm, unloaded.

(10) Instruments or devices, other than short-barreled shotguns or short-barreled rifles, that are possessed or utilized during the course of a motion picture, television, or video production or entertainment event by an authorized participant therein in the course of making that production or event or by an authorized employee or agent of the entity producing that production or event.

(11) Instruments or devices, other than short-barreled shotguns or short-barreled rifles, that are sold by, manufactured by, exposed or kept for sale by, possessed by, imported by, or lent by persons who are in the business of selling instruments or devices listed in subdivision (a) solely to the entities referred to in paragraphs (9) and (10) when engaging in transactions with those entities.

(12) The sale to, possession of, or purchase of any weapon, device, or ammunition, other than a short-barreled rifle or short-barreled shotgun, by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law for use in the discharge of their official duties, or the possession of any weapon, device, or ammunition, other than a short-barreled rifle or short-barreled shotgun, by peace officers thereof when on duty and the use is authorized by the agency and is within the course and scope of their duties.

Bill Text - SB-23 Firearms: assault weapons.                                    Page 12 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3795   Page 276 of
472

(13) Weapons, devices, and ammunition, other than a short-barreled rifle or short-barreled shotgun, that are sold by, manufactured by, exposed or kept for sale by, possessed by, imported by, or lent by, persons who are in the business of selling weapons, devices, and ammunition listed in subdivision (a) solely to the entities referred to in paragraph (12) when engaging in transactions with those entities.

(14) The manufacture for, sale to, exposing or keeping for sale to, importation of, or lending of wooden clubs or batons to special police officers or uniformed security guards authorized to carry any wooden club or baton pursuant to Section 12002 by entities that are in the business of selling wooden batons or clubs to special police officers and uniformed security guards when engaging in transactions with those persons.

(15) Any plastic toy handgrenade, or any metal military practice handgrenade or metal replica handgrenade that is a relic, curio, memorabilia, or display item, that is filled with a permanent inert substance or that is otherwise permanently altered in a manner that prevents ready modification for use as a grenade.

(16) Any instrument, ammunition, weapon, or device listed in subdivision (a) that is not a firearm that is found and possessed by a person who meets all of the following:

(A) The person is not prohibited from possessing firearms or ammunition pursuant to Section 12021 or 12021.1 or paragraph (1) of subdivision (b) of Section 12316 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person possessed the instrument, ammunition, weapon, or device no longer than was necessary to deliver or transport the same to a law enforcement agency for that agency's disposition according to law.

(C) If the person is transporting the listed item, he or she is transporting the listed item to a law enforcement agency for disposition according to law.

(17) Any firearm, other than a short-barreled rifle or short-barreled shotgun, that is found and possessed by a person who meets all of the following:

(A) The person is not prohibited from possessing firearms or ammunition pursuant to Section 12021 or 12021.1 or paragraph (1) of subdivision (b) of Section 12316 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person possessed the firearm no longer than was necessary to deliver or transport the same to a law enforcement agency for that agency's disposition according to law.

(C) If the person is transporting the firearm, he or she is transporting the firearm to a law enforcement agency for disposition according to law.

(D) Prior to transporting the firearm to a law enforcement agency, he or she has given prior notice to that law enforcement agency that he or she is transporting the firearm to that law enforcement agency for disposition according to law.

(E) The firearm is transported in a locked container as defined in subdivision (d) of Section 12026.2.

(18) The possession of any weapon, device, or ammunition, by a forensic laboratory or any authorized agent or employee thereof in the course and scope of his or her authorized activities.

(19) The sale of, giving of, lending of, importation into this state of, or purchase of, any large-capacity magazine to or by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

(20) The sale to, lending to, transfer to, purchase by, receipt of, or importation into this state of, a large capacity magazine by a sworn peace officer as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2 who is authorized to carry a firearm in the course and scope of his or her duties.

(21) The sale or purchase of any large-capacity magazine to or by a person licensed pursuant to Section 12071.

(22) The loan of a lawfully possessed large-capacity magazine between two individuals if all of the following conditions are met:

(A) The person being loaned the large-capacity magazine is not prohibited by Section 12021, 12021.1, or 12101 of this code or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition.

Bill Text - SB-23 Firearms: assault weapons.  Page 13 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3796   Page 277 of 472

(B) The loan of the large-capacity magazine occurs at a place or location where the possession of the large-capacity magazine is not otherwise prohibited and the person who lends the large-capacity magazine remains in the accessible vicinity of the person to whom the large-capacity magazine is loaned.

(23) The importation of a large-capacity magazine by a person who lawfully possessed the large-capacity magazine in the state prior to January 1, 2000, lawfully took it out of the state, and is returning to the state with the large-capacity magazine previously lawfully possessed in the state.

(24) The lending or giving of any large-capacity magazine to a person licensed pursuant to Section 12071, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine.

(25) The return to its owner of any large-capacity magazine by a person specified in paragraph (24).

(26) The importation into this state of, or sale of, any large-capacity magazine by a person who has been issued a permit to engage in those activities pursuant to Section 12079, when those activities are in accordance with the terms and conditions of that permit.

(27) The sale of, giving of, lending of, importation into this state of, or purchase of, any large-capacity magazine, to or by entities that operate armored vehicle businesses pursuant to the laws of this state.

(28) The lending of large-capacity magazines by the entities specified in paragraph (27) to their authorized employees, while in the course and scope of their employment for purposes that pertain to the entity's armored vehicle business.

(29) The return of those large-capacity magazines to those entities specified in paragraph (27) by those employees specified in paragraph (28).

(c) (1) As used in this section, a "short-barreled shotgun" means any of the following:

(A) A firearm which is designed or redesigned to fire a fixed shotgun shell and having a barrel or barrels of less than 18 inches in length.

(B) A firearm which has an overall length of less than 26 inches and which is designed or redesigned to fire a fixed shotgun shell.

(C) Any weapon made from a shotgun (whether by alteration, modification, or otherwise) if that weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 18 inches in length.

(D) Any device which may be readily restored to fire a fixed shotgun shell which, when so restored, is a device defined in subparagraphs (A) to (C), inclusive.

(E) Any part, or combination of parts, designed and intended to convert a device into a device defined in subparagraphs (A) to (C), inclusive, or any combination of parts from which a device defined in subparagraphs (A) to (C), inclusive, can be readily assembled if those parts are in the possession or under the control of the same person.

(2) As used in this section, a "short-barreled rifle" means any of the following:

(A) A rifle having a barrel or barrels of less than 16 inches in length.

(B) A rifle with an overall length of less than 26 inches.

(C) Any weapon made from a rifle (whether by alteration, modification, or otherwise) if that weapon, as modified, has an overall length of less than 26 inches or a barrel or barrels of less than 16 inches in length.

(D) Any device which may be readily restored to fire a fixed cartridge which, when so restored, is a device defined in subparagraphs (A) to (C), inclusive.

(E) Any part, or combination of parts, designed and intended to convert a device into a device defined in subparagraphs (A) to (C), inclusive, or any combination of parts from which a device defined in subparagraphs (A) to (C), inclusive, may be readily assembled if those parts are in the possession or under the control of the same person.

(3) As used in this section, a "nunchaku" means an instrument consisting of two or more sticks, clubs, bars or rods to be used as handles, connected by a rope, cord, wire, or chain, in the design of a weapon used in connection with the practice of a system of self-defense such as karate.

Bill Text - SB-23 Firearms: assault weapons.                    Page 14 of 23

Case 3:17-cv-01017-BEN-JLB    Document 18-9    Filed 06/05/17    PageID.3797    Page 278 of
472

(4) As used in this section, a "wallet gun" means any firearm mounted or enclosed in a case, resembling a wallet, designed to be or capable of being carried in a pocket or purse, if the firearm may be fired while mounted or enclosed in the case.

(5) As used in this section, a "cane gun" means any firearm mounted or enclosed in a stick, staff, rod, crutch, or similar device, designed to be, or capable of being used as, an aid in walking, if the firearm may be fired while mounted or enclosed therein.

(6) As used in this section, a "fléchette dart" means a dart, capable of being fired from a firearm, which measures approximately one inch in length, with tail fins which take up five-sixteenths of an inch of the body.

(7) As used in this section, "metal knuckles" means any device or instrument made wholly or partially of metal which is worn for purposes of offense or defense in or on the hand and which either protects the wearer's hand while striking a blow or increases the force of impact from the blow or injury to the individual receiving the blow. The metal contained in the device may help support the hand or fist, provide a shield to protect it, or consist of projections or studs which would contact the individual receiving a blow.

(8) As used in this section, a "ballistic knife" means a device that propels a knifelike blade as a projectile by means of a coil spring, elastic material, or compressed gas. Ballistic knife does not include any device which propels an arrow or a bolt by means of any common bow, compound bow, crossbow, or underwater spear gun.

(9) As used in this section, a "camouflaging firearm container" means a container which meets all of the following criteria:

(A) It is designed and intended to enclose a firearm.

(B) It is designed and intended to allow the firing of the enclosed firearm by external controls while the firearm is in the container.

(C) It is not readily recognizable as containing a firearm.

"Camouflaging firearm container" does not include any camouflaging covering used while engaged in lawful hunting or while going to or returning from a lawful hunting expedition.

(10) As used in this section, a "zip gun" means any weapon or device which meets all of the following criteria:

(A) It was not imported as a firearm by an importer licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(B) It was not originally designed to be a firearm by a manufacturer licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(C) No tax was paid on the weapon or device nor was an exemption from paying tax on that weapon or device granted under Section 4181 and subchapters F (commencing with Section 4216) and G (commencing with Section 4221) of Chapter 32 of Title 26 of the United States Code, as amended, and the regulations issued pursuant thereto.

(D) It is made or altered to expel a projectile by the force of an explosion or other form of combustion.

(11) As used in this section, a "shuriken" means any instrument, without handles, consisting of a metal plate having three or more radiating points with one or more sharp edges and designed in the shape of a polygon, trefoil, cross, star, diamond, or other geometric shape for use as a weapon for throwing.

(12) As used in this section, an "unconventional pistol" means a firearm that does not have a rifled bore and has a barrel or barrels of less than 18 inches in length or has an overall length of less than 26 inches.

(13) As used in this section, a "belt buckle knife" is a knife which is made an integral part of a belt buckle and consists of a blade with a length of at least 2½ inches.

(14) As used in this section, a "lipstick case knife" means a knife enclosed within and made an integral part of a lipstick case.

(15) As used in this section, a "cane sword" means a cane, swagger stick, stick, staff, rod, pole, umbrella, or similar device, having concealed within it a blade that may be used as a sword or stiletto.

(16) As used in this section, a "shobi-zue" means a staff, crutch, stick, rod, or pole concealing a knife or blade within it which may be exposed by a flip of the wrist or by a mechanical action.

Bill Text - SB-23 Firearms: assault weapons.                                    Page 15 of 23

Case 3:17-cv-01017-BEN-JLB    Document 18-9    Filed 06/05/17    PageID.3798    Page 279 of
472

(17) As used in this section, a "leaded cane" means a staff, crutch, stick, rod, pole, or similar device, unnaturally weighted with lead.

(18) As used in this section, an "air gauge knife" means a device that appears to be an air gauge but has concealed within it a pointed, metallic shaft that is designed to be a stabbing instrument which is exposed by mechanical action or gravity which locks into place when extended.

(19) As used in this section, a "writing pen knife" means a device that appears to be a writing pen but has concealed within it a pointed, metallic shaft that is designed to be a stabbing instrument which is exposed by mechanical action or gravity which locks into place when extended or the pointed, metallic shaft is exposed by the removal of the cap or cover on the device.

(20) As used in this section, a "rifle" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed cartridge to fire only a single projectile through a rifled bore for each single pull of the trigger.

(21) As used in this section, a "shotgun" means a weapon designed or redesigned, made or remade, and intended to be fired from the shoulder and designed or redesigned and made or remade to use the energy of the explosive in a fixed shotgun shell to fire through a smooth bore either a number of projectiles (ball shot) or a single projectile for each pull of the trigger.

(22) As used in this section, an "undetectable firearm" means any weapon which meets one of the following requirements:

(A) When, after removal of grips, stocks, and magazines, it is not as detectable as the Security Exemplar, by walk-through metal detectors calibrated and operated to detect the Security Exemplar.

(B) When any major component of which, when subjected to inspection by the types of X-ray machines commonly used at airports, does not generate an image that accurately depicts the shape of the component. Barium sulfate or other compounds may be used in the fabrication of the component.

(C) For purposes of this paragraph, the terms "firearm," "major component," and "Security Exemplar" have the same meanings as those terms are defined in Section 922 of Title 18 of the United States Code.

All firearm detection equipment newly installed in nonfederal public buildings in this state shall be of a type identified by either the United States Attorney General, the Secretary of Transportation, or the Secretary of the Treasury, as appropriate, as available state-of-the-art equipment capable of detecting an undetectable firearm, as defined, while distinguishing innocuous metal objects likely to be carried on one's person sufficient for reasonable passage of the public.

(23) As used in this section, a "multiburst trigger activator" means one of the following devices:

(A) A device designed or redesigned to be attached to a semiautomatic firearm which allows the firearm to discharge two or more shots in a burst by activating the device.

(B) A manual or power-driven trigger activating device constructed and designed so that when attached to a semiautomatic firearm it increases the rate of fire of that firearm.

(24) As used in this section, a "dirk" or "dagger" means a knife or other instrument with or without a handguard that is capable of ready use as a stabbing weapon that may inflict great bodily injury or death. A nonlocking folding knife, a folding knife that is not prohibited by Section 653k, or a pocketknife is capable of ready use as a stabbing weapon that may inflict great bodily injury or death only if the blade of the knife is exposed and locked into position.

(25) As used in this section, "large-capacity magazine" means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include a feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds nor shall it include any .22 caliber tube ammunition feeding device.

(d) Knives carried in sheaths which are worn openly suspended from the waist of the wearer are not concealed within the meaning of this section.

**SEC. 4.** Section 12022 of the Penal Code is amended to read:

**12022.** (a) (1) Except as provided in subdivisions (c) and (d), any person who is armed with a firearm in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in

Bill Text - SB-23 Firearms: assault weapons.                    Page 16 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3799   Page 280 of
472

addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year, unless the arming is an element of the offense of which he or she was convicted. This additional term shall apply to any person who is a principal in the commission or attempted commission of a felony if one or more of the principals is armed with a firearm, whether or not the person is personally armed with a firearm.

(2) Except as provided in subdivision (c), and notwithstanding subdivision (d), if the firearm is an assault weapon, as defined in Section 12276 or Section 12276.1, or a machinegun, as defined in Section 12200, the additional term described in this subdivision shall be three years whether or not the arming is an element of the offense of which he or she was convicted. The additional term provided in this paragraph shall apply to any person who is a principal in the commission or attempted commission of a felony if one or more of the principals is armed with an assault weapon or machinegun whether or not the person is personally armed with an assault weapon or machinegun.

(b) (1) Any person who personally uses a deadly or dangerous weapon in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of one year, unless use of a deadly or dangerous weapon is an element of the offense of which he or she was convicted.

(2) If the person described in paragraph (1) has been convicted of carjacking or attempted carjacking, the additional term shall be one, two, or three years.

(3) When a person is found to have personally used a deadly or dangerous weapon in the commission or attempted commission of a felony as provided in this subdivision and the weapon is owned by that person, the court shall order that the weapon be deemed a nuisance and disposed of in the manner provided in Section 12028.

(c) Notwithstanding the enhancement set forth in subdivision (a), any person who is personally armed with a firearm in the commission or attempted commission of a violation of Section 11351, 11351.5, 11352, 11366.5, 11366.6, 11378, 11378.5, 11379, 11379.5, or 11379.6 of the Health and Safety Code, shall, upon conviction of that offense and in addition and consecutive to the punishment prescribed for that offense of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for three, four, or five years in the court's discretion. The court shall order the middle term unless there are circumstances in aggravation or mitigation. The court shall state the reasons for its enhancement choice on the record at the time of the sentence.

(d) Notwithstanding the enhancement set forth in subdivision (a), any person who is not personally armed with a firearm who, knowing that another principal is personally armed with a firearm, is a principal in the commission or attempted commission of an offense specified in subdivision (c), shall, upon conviction of that offense, be punished by an additional term of one, two, or three years in the court's discretion. The court shall order the middle term unless there are circumstances in aggravation or mitigation. The court shall state the reasons for its enhancement choice on the record at the time of the sentence.

(e) For purposes of imposing an enhancement under Section 1170.1, the enhancements under this section shall count as one, single enhancement.

(f) Notwithstanding any other provision of law, the court may strike the additional punishment for the enhancements provided in subdivision (c) or (d) in an unusual case where the interests of justice would best be served, if the court specifies on the record and enters into the minutes the circumstances indicating that the interests of justice would best be served by that disposition.

**SEC. 5.** Section 12022.5 of the Penal Code is amended to read:

**12022.5.** (a) (1) Except as provided in subdivisions (b) and (c), any person who personally uses a firearm in the commission or attempted commission of a felony shall, upon conviction of that felony or attempted felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for 3, 4, or 10 years, unless use of a firearm is an element of the offense of which he or she was convicted.

(2) If the person described in paragraph (1) has been convicted of carjacking or attempted carjacking, the additional term shall be 4, 5, or 10 years. The court shall order imposition of the middle term unless there are circumstances in aggravation or mitigation. The court shall state its reasons for its enhancement choice on the record at the time of sentencing.

Bill Text - SB-23 Firearms: assault weapons.                    Page 17 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3800   Page 281 of
                                                472

(b) (1) Notwithstanding subdivision (a), any person who is convicted of a felony or an attempt to commit a felony, including murder or attempted murder, in which that person discharged a firearm at an occupied motor vehicle which caused great bodily injury or death to the person of another, shall, upon conviction of that felony or attempted felony, in addition and consecutive to the sentence prescribed for the felony or attempted felony, be punished by an additional term of imprisonment in the state prison for 5, 6, or 10 years.

(2) Notwithstanding subdivision (a), any person who personally uses an assault weapon, as specified in Section 12276 or Section 12276.1, or a machinegun, as defined in Section 12200, in the commission or attempted commission of a felony, shall, upon conviction of that felony or attempted felony, in addition and consecutive to the sentence prescribed for the felony or attempted felony, be punished by an additional term of imprisonment in the state prison for 5, 6, or 10 years.

(c) Notwithstanding the enhancement set forth in subdivision (a), any person who personally uses a firearm in the commission or attempted commission of a violation of Section 11351, 11351.5, 11352, 11366.5, 11366.6, 11378, 11378.5, 11379, 11379.5, or 11379.6 of the Health and Safety Code, shall, upon conviction of that offense and in addition and consecutive to the punishment prescribed for the offense of which he or she has been convicted, be punished by an additional term of imprisonment in the state prison for 3, 4, or 10 years in the court's discretion. The court shall order the imposition of the middle term unless there are circumstances in aggravation or mitigation. The court shall state the reasons for its enhancement choice on the record.

(d) The additional term provided by this section may be imposed in cases of assault with a firearm under paragraph (2) of subdivision (a) of Section 245, or assault with a deadly weapon which is a firearm under Section 245, or murder if the killing was perpetrated by means of shooting a firearm from a motor vehicle, intentionally at another person outside of the vehicle with the intent to inflict great bodily injury or death.

(e) When a person is found to have personally used a firearm, an assault weapon, or a machinegun in the commission or attempted commission of a felony as provided in this section and the firearm, assault weapon, or machinegun is owned by that person, the court shall order that the firearm be deemed a nuisance and disposed of in the manner provided in Section 12028.

(f) For purposes of imposing an enhancement under Section 1170.1, the enhancements under this section shall count as one, single enhancement.

**SEC. 6.** Section 12079 is added to the Penal Code, to read:

**12079.** (a) Upon a showing that good cause exists, the Department of Justice may issue permits for the possession, transportation, or sale between a person licensed pursuant to Section 12071 and an out-of-state client, of large capacity magazines.

(b) For purposes of this section, "large capacity magazine" shall have the same meaning as that set forth in paragraph (25) of subdivision (c) of Section 12020.

**SEC. 7.** Section 12276.1 is added to the Penal Code, to read:

**12276.1.** (a) Notwithstanding Section 12276, "assault weapon" shall also mean any of the following:

(1) A semiautomatic, centerfire rifle that has the capacity to accept a detachable magazine and any one of the following:

(A) A pistol grip that protrudes conspicuously beneath the action of the weapon.

(B) A thumbhole stock.

(C) A folding or telescoping stock.

(D) A grenade launcher or flare launcher.

(E) A flash suppressor.

(F) A forward pistol grip.

(2) A semiautomatic, centerfire rifle that has a fixed magazine with the capacity to accept more than 10 rounds.

(3) A semiautomatic, centerfire rifle that has an overall length of less than 30 inches.

(4) A semiautomatic pistol that has the capacity to accept a detachable magazine and any one of the following:

Bill Text - SB-23 Firearms: assault weapons.                    Page 18 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3801   Page 282 of
472

(A) A threaded barrel, capable of accepting a flash suppressor, forward handgrip, or silencer.

(B) A second handgrip.

(C) A shroud that is attached to, or partially or completely encircles, the barrel that allows the bearer to fire the weapon without burning his or her hand, except a slide that encloses the barrel.

(D) The capacity to accept a detachable magazine at some location outside of the pistol grip.

(5) A semiautomatic pistol with a fixed magazine that has the capacity to accept more than 10 rounds.

(6) A semiautomatic shotgun that has both of the following:

(A) A folding or telescoping stock.

(B) A pistol grip that protrudes conspicuously beneath the action of the weapon, thumbhole stock, or vertical handgrip.

(7) A semiautomatic shotgun that has the ability to accept a detachable magazine.

(8) Any shotgun with a revolving cylinder.

(b) "Assault weapon" does not include any antique firearm.

(c) The following definitions shall apply under this section:

(1) "Magazine" shall mean any ammunition feeding device.

(2) "Capacity to accept more than 10 rounds" shall mean capable of accommodating more than 10 rounds, but shall not be construed to include a feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.

(3) "Antique firearm" means any firearm manufactured prior to January 1, 1899.

(d) This section shall become operative January 1, 2000.

**SEC. 8.** Section 12280 of the Penal Code is amended to read:

**12280.** (a) (1) Any person who, within this state, manufactures or causes to be manufactured, distributes, transports, or imports into the state, keeps for sale, or offers or exposes for sale, or who gives or lends any assault weapon, except as provided by this chapter, is guilty of a felony, and upon conviction shall be punished by imprisonment in the state prison for four, six, or eight years.

(2) In addition and consecutive to the punishment imposed under paragraph (1), any person who transfers, lends, sells, or gives any assault weapon to a minor in violation of paragraph (1) shall receive an enhancement of one year.

(b) Except as provided in Section 12288, and in subdivisions (c) and (d), any person who, within this state, possesses any assault weapon, except as provided in this chapter, is guilty of a public offense and upon conviction shall be punished by imprisonment in the state prison, or in a county jail, not exceeding one year. However, if the person presents proof that he or she lawfully possessed the assault weapon prior to June 1, 1989, or prior to the date it was specified as an assault weapon, and has since either registered the firearm and any other lawfully obtained firearm specified by Section 12276 or 12276.5 pursuant to Section 12285 or relinquished them pursuant to Section 12288, a first-time violation of this subdivision shall be an infraction punishable by a fine of up to five hundred dollars ($500), but not less than three hundred fifty dollars ($350), if the person has otherwise possessed the firearm in compliance with subdivision (c) of Section 12285. In these cases, the firearm shall be returned unless the court finds in the interest of public safety, after notice and hearing, that the assault weapon should be destroyed pursuant to Section 12028.

(c) A first-time violation of subdivision (b) shall be an infraction punishable by a fine of up to five hundred dollars ($500), if the person was found in possession of no more than two firearms in compliance with subdivision (c) of Section 12285 and the person meets all of the following conditions:

(1) The person proves that he or she lawfully possessed the assault weapon prior to the date it was defined as an assault weapon pursuant to Section 12276.1.

(2) The person is not found in possession of a firearm specified as an assault weapon pursuant to Section 12276 or Section 12276.5.

Bill Text - SB-23 Firearms: assault weapons.                    Page 19 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3802   Page 283 of
472

(3) The person has not previously been convicted of violating this section.

(4) The person was found to be in possession of the assault weapons within one year following the end of the one-year registration period established pursuant to subdivision (a) of Section 12285.

(5) The person has since registered the firearms and any other lawfully obtained firearms defined by Section 12276.1, pursuant to Section 12285, except as provided for by this section, or relinquished them pursuant to Section 12288.

(d) Firearms seized pursuant to subdivision (c) shall be returned unless the court finds in the interest of public safety, after notice and hearing, that the assault weapon should be destroyed pursuant to Section 12028.

(e) Notwithstanding Section 654 or any other provision of law, any person who commits another crime while violating this section may receive an additional, consecutive punishment of one year for violating this section in addition and consecutive to the punishment, including enhancements, which is prescribed for the other crime.

(f) Subdivisions (a) and (b) shall not apply to the sale to, purchase by, or possession of assault weapons by the Department of Justice, police departments, sheriffs' offices, marshals' offices, the Youth and Adult Corrections Agency, the Department of the California Highway Patrol, district attorneys' offices, Department of Fish and Game, Department of Parks and Recreation, or the military or naval forces of this state or of the United States for use in the discharge of their official duties.

(g) Subdivision (b) shall not prohibit the possession or use of assault weapons by sworn peace officer members of those agencies specified in subdivision (f) for law enforcement purposes, whether on or off duty.

(h) Subdivisions (a) and (b) shall not prohibit the sale or transfer of assault weapons by an entity specified in subdivision (f) to a person, upon retirement, who retired as a sworn officer from that entity.

(i) Subdivision (b) shall not apply to the possession of an assault weapon by a retired peace officer who received that assault weapon pursuant to subdivision (h).

(j) Subdivision (b) shall not apply to the possession of an assault weapon, as defined in Section 12276, by any person during the 1990 calendar year, during the 90-day period immediately after the date it was specified as an assault weapon pursuant to Section 12276.5, or during the one-year period after the date it was defined as an assault weapon pursuant to Section 12276.1, if all of the following are applicable:

(1) The person is eligible under this chapter to register the particular assault weapon.

(2) The person lawfully possessed the particular assault weapon described in paragraph (1) prior to June 1, 1989, if the weapon is specified as an assault weapon pursuant to Section 12276, or prior to the date it was specified as an assault weapon pursuant to Section 12276.5, or prior to the date it was defined as an assault weapon pursuant to Section 12276.1.

(3) The person is otherwise in compliance with this chapter.

(k) Subdivisions (a) and (b) shall not apply to the manufacture by persons who are issued permits pursuant to Section 12287 of assault weapons for sale to the following:

(1) Exempt entities listed in subdivision (f).

(2) Entities and persons who have been issued permits pursuant to Section 12286.

(3) Entities outside the state who have, in effect, a federal firearms dealer's license solely for the purpose of distribution to an entity listed in paragraphs (4) to (6), inclusive.

(4) Federal military and law enforcement agencies.

(5) Law enforcement and military agencies of other states.

(6) Foreign governments and agencies approved by the United States State Department.

(l) Subdivision (a) shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon registered under Section 12285 or that was possessed pursuant to subdivision (g) or (i) which is disposed of as authorized by the probate court, if the disposition is otherwise permitted by this chapter.

(m) Subdivision (b) shall not apply to a person who is the executor or administrator of an estate that includes an assault weapon registered under Section 12285 or that was possessed pursuant to subdivision (g) or (i), if the

Bill Text - SB-23 Firearms: assault weapons.                    Page 20 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3803   Page 284 of
472

assault weapon is possessed at a place set forth in paragraph (1) of subdivision (c) of Section 12285 or as authorized by the probate court.

(n) Subdivision (a) shall not apply to:

(1) A person who lawfully possesses and has registered an assault weapon pursuant to this chapter who lends that assault weapon to another if all the following apply:

(A) The person to whom the assault weapon is lent is 18 years of age or over and is not in a class of persons prohibited from possessing firearms by virtue of Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(B) The person to whom the assault weapon is lent remains in the presence of the registered possessor of the assault weapon.

(C) The assault weapon is possessed at any of the following locations:

(i) While on a target range that holds a regulatory or business license for the purpose of practicing shooting at that target range.

(ii) While on the premises of a target range of a public or private club or organization organized for the purpose of practicing shooting at targets.

(iii) While attending any exhibition, display, or educational project that is about firearms and that is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms.

(2) The return of an assault weapon to the registered possessor which is lent by the same pursuant to paragraph (1).

(o) Subdivision (b) shall not apply to the possession of an assault weapon by a person to whom an assault weapon is lent pursuant to subdivision (n).

(p) Subdivisions (a) and (b) shall not apply to the possession and importation of an assault weapon into this state by a nonresident if all of the following conditions are met:

(1) The person is attending or going directly to or coming directly from an organized competitive match or league competition that involves the use of an assault weapon.

(2) The competition or match is conducted on the premises of one of the following:

(i) A target range that holds a regulatory or business license for the purpose of practicing shooting at that target range.

(ii) A target range of a public or private club or organization that is organized for the purpose of practicing shooting at targets.

(3) The match or competition is sponsored by, conducted under the auspices of, or approved by, a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms.

(4) The assault weapon is transported in accordance with Section 12026.1 or 12026.2.

(5) The person is 18 years of age or over and is not in a class of persons prohibited from possessing firearms by virtue of Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code.

(q) Subdivision (b) shall not apply to any of the following persons:

(1) A person acting in accordance with Section 12286.

(2) A person who has a permit to possess an assault weapon issued pursuant to Section 12286 when he or she is acting in accordance with Section 12285 or 12286.

(r) Subdivisions (a) and (b) shall not apply to any of the following persons:

(1) A person acting in accordance with Section 12285.

(2) A person acting in accordance with Section 12286 or 12290.

Bill Text - SB-23 Firearms: assault weapons.                    Page 21 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3804   Page 285 of
472

(s) Subdivision (b) shall not apply to the registered owner of an assault weapon possessing that firearm in accordance with subdivision (c) of Section 12285.

(t) Subdivision (a) shall not apply to the importation into this state of an assault weapon by the registered owner of that assault weapon, if it is in accordance with the provisions of subdivision (c) of Section 12285.

(u) As used in this chapter, the date a firearm is an assault weapon is the earliest of the following:

(1) The effective date of an amendment to Section 12276 that adds the designation of the specified firearm.

(2) The effective date of the list promulgated pursuant to Section 12276.5 that adds or changes the designation of the specified firearm.

(3) The operative date of Section 12276.1, as specified in subdivision (b) of that section.

**SEC. 9.** Section 12285 of the Penal Code is amended to read:

**12285.** (a) Any person who lawfully possesses an assault weapon, as defined in Section 12276, prior to June 1, 1989, shall register the firearm by January 1, 1991, and any person who lawfully possessed an assault weapon prior to the date it was specified as an assault weapon pursuant to Section 12276.5 shall register the firearm within 90 days with the Department of Justice pursuant to those procedures that the department may establish. Except as provided in subdivision (a) of Section 12280, any person who lawfully possessed an assault weapon prior to the date it was defined as an assault weapon pursuant to Section 12276.1, and which was not specified as an assault weapon under Section 12276 or 12276.5, shall register the firearm within one year of the effective date of Section 12276.1, with the department pursuant to those procedures that the department may establish. The registration shall contain a description of the firearm that identifies it uniquely, including all identification marks, the full name, address, date of birth, and thumbprint of the owner, and any other information that the department may deem appropriate. The department may charge a fee for registration of up to twenty dollars ($20) per person but not to exceed the actual processing costs of the department. After the department establishes fees sufficient to reimburse the department for processing costs, fees charged shall increase at a rate not to exceed the legislatively approved annual cost-of-living adjustment for the department's budget or as otherwise increased through the Budget Act.

(b) (1) Except as provided in paragraph (2), no assault weapon possessed pursuant to this section may be sold or transferred on or after January 1, 1990, to anyone within this state other than to a licensed gun dealer, as defined in subdivision (c) of Section 12290, or as provided in Section 12288. Any person who (A) obtains title to an assault weapon registered under this section or that was possessed pursuant to subdivision (g) or (i) of Section 12280 by bequest or intestate succession, or (B) lawfully possessed a firearm subsequently declared to be an assault weapon pursuant to Section 12276.5, or subsequently defined as an assault weapon pursuant to Section 12276.1, shall, within 90 days, render the weapon permanently inoperable, sell the weapon to a licensed gun dealer, obtain a permit from the Department of Justice in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2, or remove the weapon from this state. A person who lawfully possessed a firearm that was subsequently declared to be an assault weapon pursuant to Section 12276.5 may alternatively register the firearm within 90 days of the declaration issued pursuant to subdivision (f) of Section 12276.5.

(2) A person moving into this state, otherwise in lawful possession of an assault weapon, shall do one of the following:

(A) Prior to bringing the assault weapon into this state, that person shall first obtain a permit from the Department of Justice in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2.

(B) The person shall cause the assault weapon to be delivered to a licensed gun dealer, as defined in subdivision (c) of Section 12290, in this state in accordance with Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto. If the person obtains a permit from the Department of Justice in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2, the dealer shall redeliver that assault weapon to the person. If the licensed gun dealer, as defined in subdivision (c) of Section 12290, is prohibited from delivering the assault weapon to a person pursuant to this paragraph, the dealer shall possess or dispose of the assault weapon as allowed by this chapter.

(c) A person who has registered an assault weapon under this section may possess it only under any of the following conditions unless a permit allowing additional uses is first obtained under Section 12286:

Bill Text - SB-23 Firearms: assault weapons.                    Page 22 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3805   Page 286 of
472

(1) At that person's residence, place of business, or other property owned by that person, or on property owned by another with the owner's express permission.

(2) While on the premises of a target range of a public or private club or organization organized for the purpose of practicing shooting at targets.

(3) While on a target range that holds a regulatory or business license for the purpose of practicing shooting at that target range.

(4) While on the premises of a shooting club which is licensed pursuant to the Fish and Game Code.

(5) While attending any exhibition, display, or educational project which is about firearms and which is sponsored by, conducted under the auspices of, or approved by a law enforcement agency or a nationally or state recognized entity that fosters proficiency in, or promotes education about, firearms.

(6) While on publicly owned land if the possession and use of a firearm described in Section 12276 or 12276.1 is specifically permitted by the managing agency of the land.

(7) While transporting the assault weapon between any of the places mentioned in this subdivision, or to any licensed gun dealer, as defined in subdivision (c) of Section 12290, for servicing or repair pursuant to subdivision (b) of Section 12290, if the assault weapon is transported as required by Section 12026.1.

(d) No person who is under the age of 18 years, no person who is prohibited from possessing a firearm by Section 12021 or 12021.1, and no person described in Section 8100 or 8103 of the Welfare and Institutions Code may register or possess an assault weapon.

(e) The department's registration procedures shall provide the option of joint registration for assault weapons owned by family members residing in the same household.

(f) For 90 days following January 1, 1992, a forgiveness period shall exist to allow persons specified in subdivision (b) of Section 12280 to register with the Department of Justice assault weapons that they lawfully possessed prior to June 1, 1989.

(g) Any person who registered a firearm as an assault weapon pursuant to the provisions of law in effect prior to January 1, 2000, where the assault weapon is thereafter defined as an assault weapon pursuant to Section 12276.1, shall be deemed to have registered the weapon for purposes of this chapter and shall not be required to reregister the weapon pursuant to this section.

(h) Any person who registers his or her assault weapon during the 90-day forgiveness period described in subdivision (f), and any person whose registration form was received by the Department of Justice after January 1, 1991, and who was issued a temporary registration prior to the end of the forgiveness period, shall not be charged with a violation of subdivision (b) of Section 12280, if law enforcement becomes aware of that violation only as a result of the registration of the assault weapon. This subdivision shall have no effect upon persons charged with a violation of subdivision (b) of Section 12280 of the Penal Code prior to January 1, 1992, provided that law enforcement was aware of the violation before the weapon was registered.

**SEC. 10.** Section 12287 of the Penal Code is amended to read:

**12287.** (a) The Department of Justice may, upon a finding of good cause, issue permits for the manufacture of assault weapons to federally licensed manufacturers of firearms for the sale to, purchase by, or possession of assault weapons by, any of the following:

(1) The agencies listed in subdivision (f) of Section 12280.

(2) Entities and persons who have been issued permits pursuant to Section 12286.

(3) Entities outside the state who have, in effect, a federal firearms dealer's license solely for the purpose of distribution to an entity listed in paragraphs (4) to (6), inclusive.

(4) Federal law enforcement and military agencies.

(5) Law enforcement and military agencies of other states.

(6) Foreign governments and agencies approved by the United States State Department.

(b) Application for the permits, the keeping and inspection thereof, and the revocation of permits shall be undertaken in the same manner as specified in Article 3 (commencing with Section 12230) of Chapter 2.

Bill Text - SB-23 Firearms: assault weapons.                                    Page 23 of 23

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3806   Page 287 of
472

**SEC. 11.** Section 12289 of the Penal Code is amended to read:

**12289.** (a) The Department of Justice shall conduct a public education and notification program regarding the registration of assault weapons and the definition of the weapons set forth in Section 12276.1. The public education and notification program shall include outreach to local law enforcement agencies and utilization of public service announcements in a variety of media approaches, to ensure maximum publicity of the limited forgiveness period of the registration requirement specified in subdivision (f) of Section 12285 and the consequences of nonregistration. The department shall develop posters describing gunowners' responsibilities under this chapter which shall be posted in a conspicuous place in every licensed gun store in the state during the forgiveness period.

(b) Any costs incurred by the Department of Justice to implement this section which cannot be absorbed by the department shall be funded from the Dealers' Record of Sale Special Account, as set forth in subdivision (d) of Section 12076, upon appropriation by the Legislature.

**SEC. 12.** It was the original intent of the Legislature in enacting Chapter 19 of the Statutes of 1989 to ban all assault weapons, regardless of their name, model number, or manufacture. It is the purpose of this act to effectively achieve the Legislature's intent to prohibit all assault weapons.

**SEC. 13.** If any phrase, clause, sentence, section, or provision of this act or application thereof is held invalid as to any person or circumstance, such invalidity shall not affect any other phrase, clause, sentence, section, provision, or application of this act, that can be given effect without the invalid phrase, clause, sentence, section, provision, or application and to this end the provisions of the act are declared to be severable.

**SEC. 14.** Section 3.5 of this bill incorporates amendments to Section 12020 of the Penal Code proposed by this bill and SB 359. It shall only become operative if (1) both bills are enacted and become effective on or before January 1, 2000, (2) each bill amends Section 12020 of the Penal Code, and (3) this bill is enacted after SB 359, in which case Section 12020 of the Penal Code, as amended by SB 359, shall remain operative only until the operative date of this bill, at which time Section 3.5 of this bill shall become operative, and Section 3 of this bill shall not become operative.

**SEC. 15.** No reimbursement is required by this act pursuant to Section 6 of Article XIII B of the California Constitution because the only costs that may be incurred by a local agency or school district will be incurred because this act creates a new crime or infraction, eliminates a crime or infraction, or changes the penalty for a crime or infraction, within the meaning of Section 17556 of the Government Code, or changes the definition of a crime within the meaning of Section 6 of Article XIII B of the California Constitution.

# Exhibit 98

**Proposals to Reduce Gun Violence:**
**Protecting Our Communities While Respecting the Second Amendment.**

Senate Judiciary Committee
Subcommittee on the Constitution, Civil Rights and Human Rights

February 12, 2013

Prepared Testimony by Laurence H. Tribe[*]

Mr. Chairman and members of the Committee:

I am honored and grateful for the invitation to testify before you today.  I know I am not alone in wanting us to do all we can, consistent with the Constitution, to reduce the awful specter of rampant gun violence and the far too frequent massacres of our children, our friends, and our fellow citizens.

Like all decent Americans, I felt a pang of unspeakable horror on December 14, when I learned that twenty first-grade children had been brutally slaughtered in their first-grade classroom in Newtown, Connecticut.  Those children, and the brave grown-ups who died at Adam Lanza's hands as they tried to save the young lives entrusted to their care, deserve every effort to translate our shared grief into shared national action.  That action must not be deterred by the defeatist argument that, because we will never solve this problem in its entirety, we might as well give up. Nor should it be deterred by distorted interpretations of the United States Constitution. As others have often reminded us about that great and enduring document, it is many things to many people, but one thing it is *not* is a suicide pact.

---

[*] Carl M. Loeb University Professor and Professor of Constitutional Law, Harvard Law School. The institutional affiliation is noted for identification purposes only.

While we debate the pending proposals to reduce gun violence through measures focused on gun safety as part of a holistic national response, it's crucial that we not permit any part of our Constitution to become a collateral casualty of our conversation. Proposals to disarm the American people, to leave firearms solely in the hands of the military and the police, have been decisively taken off the table – if they were ever truly *on* the table – by the Supreme Court's Second Amendment decisions in 2008 and 2010. "Slippery slope" arguments predicated on the unsettled state of the law prior to 2008 have been rendered irrelevant. The only proposals under serious consideration in this body are reasonable measures that would fully respect the basic rights of responsible citizens to use ordinary firearms for self-defense and other lawful purposes. They cannot lead to unacceptably extreme measures as long as the Supreme Court sits.

Having examined those proposals, having looked at the steps announced by the President under his power faithfully to execute the laws of the United States, and having studied the decisions of the Supreme Court and lower courts around the country, I am convinced that nothing under discussion in the Senate Judiciary Committee represents a threat to the Constitution or even comes close to violating the Second Amendment or the Constitution's structural limits either on congressional power or on executive authority.

Undoubtedly we should have a national debate about how best to reconcile the Second Amendment rights of every individual with the full range of proposals to reduce gun violence in America. As someone who has studied and taught constitutional law for four decades and argued dozens of cases in the Supreme Court and dozens more in the lower courts, I am obviously interested in engaging those questions.  In today's testimony, however, I will focus not on

competing theories of how the Second Amendment ought to have been interpreted but on the law as it stands. I am here not as an academic theorist but as a constitutional lawyer.  As a lawyer, I've won some and I've lost some, and I know a losing argument when I see it. And the argument that any of the proposals to reduce gun violence currently being considered here might be struck down as unconstitutional is decidedly a losing argument.

There is plenty of room for policy debate over the best steps to take to reduce gun violence, but we mustn't confuse those policy differences or the ideological and cultural divisions that underlie them with genuine constitutional doubts about whether any of those steps crosses the constitutional line. Everyone in this room knows that anything Congress or the President does in this field will confront opposition. And in a nation as litigious as ours, some of that opposition will no doubt find its way into the courts.  But there is no basis to suppose that the courts will or should rebuff any of the steps being debated here today.  They should not, and they will not.

What I hope to do this morning, setting all hyperbole aside and approaching the law on the books with a fair-minded eye, is explain why reforms such as those this committee is considering clearly pass constitutional muster.

## I. Introduction:

## Taking the Second Amendment Seriously, But Applying it Cautiously

I begin by reaffirming my agreement with the Supreme Court that the Second Amendment guarantees Americans the right as individuals to possess guns for reasonable self-defense.  Some of my friends and colleagues devoted to the cause of responsible firearms regulation evidently wish to relitigate this point.  They continue to insist that the best reading of the Second Amendment would secure gun rights only in connection with service in the state militia and not for individual possession and use.  For nearly a decade and a half, I have disagreed with them and have defended the individual rights view ultimately taken by the Supreme Court in 2008.  In October of 1999, for example, I joined a fellow constitutional law scholar in publishing an op-ed in *The New York Times* arguing that ―bearing arms [is] a ‗privilege‘ of each citizen.‖[1]  I continue to defend this position today.

That matters only insofar as it bears on my credibility as a witness in today‘s hearing. If I were among those who had *opposed* the individual rights interpretation adopted by the Supreme Court in *Heller*, some might wonder whether my conclusions about the regulations *Heller* permits Congress to adopt reflect wishful thinking rather than a realistic and sympathetic appraisal of what the Court that decided *Heller* would in fact permit. But there is no wishful thinking here. I am being a hard-headed realist in reading the *Heller* decision and extrapolating conclusions from the majority opinion.

---

[1] Laurence H. Tribe & Akhil Reed Amar, *Well Regulated Militias and More*, N.Y. TIMES, Oct. 28, 1999, at A25; 1 Laurence H. Tribe, *American Constitutional Law* 900–902 (3d ed. 2000).

Although many in the community advocating gun rights had long assumed that the individual rights interpretation governed the scope of the Second Amendment, it was not until the Supreme Court's 2008 ruling in *District of Columbia v. Heller*[2] that a majority of the Court's Justices agreed.  In so doing, the Court recognized that the core individual liberty protected by the amendment affords Americans the right to purchase and store operable firearms for self-defense in the home.  Two years later, in *McDonald v. City of Chicago*,[3] the Court extended the *Heller* ruling to cover restrictions imposed by state and local governments, making it unmistakably clear that the right at issue was not and is not simply a right of the state-organized militia against being overrun by federal authority.

Despite this fundamental affirmation, the *Heller* decision is exceedingly narrow in many important respects.  As Judge Brett Kavanaugh of the D.C. Circuit Court of Appeals recently put it, "It bears emphasis that *Heller*, while enormously significant jurisprudentially, was not revolutionary in terms of its immediate real-world effects on American gun regulation." "Indeed," he continued, "*Heller* largely preserved the status quo of gun regulation in the United States."[4]  To understand what he meant, it helps to look first to the Washington, DC ordinance implicated in the *Heller* case.  The District had in place one of the most restrictive firearms regulations in the nation; it essentially outlawed the possession of handguns in the home, where the need for self-defense is, as Justice Scalia wrote, "most acute."[5]  For the majority on the Court, a policy like the one the District had adopted, a policy on the outer edge of gun control's reach in the United States, was irreconcilable with the Second Amendment.

---

[2] 554 U.S. 570 (2008).
[3] 130 S.Ct. 3020 (2010).
[4] Heller v. Dist. of Columbia, 670 F.3d 1244, 1270 (D.C. Cir. 2011) (Kavanaugh, J., dissenting).
[5] *Heller*, 544 U.S. at 628.

The *Heller* decision took great pains to emphasize its relative modesty.  It repeated the mantra that the Second Amendment right —is not unlimited"[6] and devoted an entire section to listing types of regulation – for example, limits on gun ownership —by felons and the mentally ill" and, most relevant to today's hearing, regulation of —dangerous and unusual weapons" – the constitutionality of which the Court had no intention of casting into doubt.[7]  The decision paused to note that, by specifically giving a constitutional green light to some regulatory efforts, the Court did not mean to signal that others were constitutionally dubious.[8]  Justice Scalia closed his opinion for the Court with an expression of solicitude for the regulatory goals that Washington, DC sought to advance and, more importantly, an invitation to pursue those goals with the —variety of tools" still available to the District and to other states and localities across the country even in *Heller*'s wake.[9]

Since that decision and its extension to state and local laws in 2010, the vast majority of federal and state courts to adjudicate Second Amendment claims have responsibly hewed to the cautious approach espoused by the Supreme Court in *Heller* and *McDonald*.  For example, in a ruling highly relevant to the topic of this hearing, the D.C. Circuit recently upheld the constitutionality of Washington D.C.'s assault weapons ban, which included a restriction on

---

[6] *Id.* at 595, 626.
[7] *Id.*  at 626 – 28.
[8] *Id*. at 627 n. 26. There is no doubt, for instance, that regulatory provisions targeting firearms and ammunitions *manufacturers* in addition to those who transfer, possess, carry, or use the resulting weapons are at least as easy to defend from Second Amendment challenge as are measures that do not take effect until the point of sale.
[9] *Id.* at 636.

high-capacity magazines, as well as gun registration requirements.[10]   The majority in the case, following the broad consensus that has emerged among federal and state judges,[11] evaluated the regulations against a standard of heightened judicial scrutiny while preserving both the option to adopt a more skeptical mode of review for restrictions on core self-defense firearm possession and the option to exempt other laws from Second Amendment review entirely when they do not enter the amendment's zone of protected conduct.[12]   In another notable decision staking out a similar approach, a panel of the Seventh Circuit Court of Appeals struck down Chicago's firing-range ban given the close nexus between regular firing practice and training and safe, responsible self-defense in the home.[13]   And state appellate courts from North Carolina to Wisconsin to California have joined with their federal brethren in upholding state restrictions on firearms ownership under this middle-of-the-road approach that molds the degree of judicial scrutiny to the extent of a law's burden on the core self-defense right secured by the Second Amendment.[14]

The central message of *Heller* and its lower-court progeny is thus to take the application of the Second Amendment seriously but also cautiously.  When necessary to vindicate the core right to self-defense respected by *Heller*, neither courts nor lawmakers should be shy about invoking the Second Amendment.  But because few public responsibilities are as important to

---

[10] Heller v. Dist. of Columbia, 670 F.3d 1244 (D.C. Cir. 2011).

[11] *See, e.g.*, Kachalsky v. County of Westchester, 701 F.3d 81, 93 – 94 (2d Cir. 2012); United States v. Booker, 644 F.3d 12, 25 (1st Cir. 2011) cert. denied, 132 S. Ct. 1538 (U.S. 2012); United States v. Masciandaro, 638 F.3d 458, 469-70 (4th Cir. 2011) cert. denied, 132 S. Ct. 756 (U.S. 2011); United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010);

[12] *Heller*, 670 F.3d at 1256 – 58.

[13] The court applied what it called ―not quite strict scrutiny‖ because the law's burden struck so close to the core Second Amendment right to self-defense in the home.  Ezell v. City of Chicago, 651 F.3d 684, 708 (7th Cir. 2011).

[14] *See, e.g.*, Johnston v. State, 735 S.E.2d 859 (N.C. Ct. App. 2012); State v. Brown, 815 N.W.2d 407 (Ct. App. Wisc. 2012); People v. Ellison, 196 Cal. App. 4th 1342, 1347 (2011).

good governance as legislating to secure public safety, lawmakers and jurists should not casually

give the amendment an expansive scope nor unduly scrutinize reasonable firearm regulations.  In

the wake of the Newtown massacre and the push to propose sensible new rules about firearms,

the Obama administration and many leaders in Congress have conducted themselves precisely

along these lines.

## II. The Second Amendment Propriety of Recent Policy Proposals

### Limits on Large-Capacity Magazines

A core feature of the Assault Weapons Ban of 2013, introduced by Senator Dianne

Feinstein, as well as the primary component of a freestanding bill championed by Senator Frank

Lautenberg, is a ban on magazines capable of firing more than ten rounds of ammunition without

reloading.[15]  Before moving into the weeds of the constitutional analysis, it would be useful to

contrast such a high-capacity magazine restriction to the law *Heller* struck down.  *Heller* axed a

local ordinance that adopted about as blunt an approach to restraining gun violence as possible:

By its very design, the DC law espoused disagreement with the whole idea of law-abiding gun

ownership for self-defense in the home.  A limit on large-capacity magazines, by contrast, is a

regulation of an entirely different caliber.  It does not challenge the fundamental recognition that

gun possession for self-defense is a right of every citizen; it merely seeks to reset the parameters

of responsible ownership to advance the cause of public safety.   It operates with a scalpel rather

than an ax. Even Robert Levy, the man who largely funded the challenge to DC's sweeping

---

[15] The Assault Weapons Ban of 2013 also prohibits firearms with fixed magazines capable of holding more than ten rounds of ammunition.

handgun ban in *Heller* and served as an attorney on the case, concedes that bans on both high-capacity magazines and assault weapons almost certainly do not infringe the Second Amendment rights he successfully fought to vindicate in court.[16]

By any reasonable reckoning, this crucial measure might not even trigger heightened Second Amendment review at the threshold stage that the *Heller* ruling requires courts to undertake. But even if the high-capacity magazine prohibition does require further analysis, it safely falls within a zone of regulations that do not unconstitutionally abridge Second Amendment rights.

Most constitutional challenges require lawyers and scholars to carry out two stages of analysis. First, we must assess whether a given government policy even *implicates* a given right in the first place. For example, in 1915, the Supreme Court entertained a First Amendment challenge to a filmmaker's punishment under an Ohio censorship law but, in a clear misjudgment the Court would later correct, decided that movies were not even a form of "speech" entitled to First Amendment protection.[17] More recently, in a ruling that may perhaps give pause to members of this committee (despite the distinct protections of the Constitution's Speech and Debate Clause), the Court concluded that votes by legislators are not a form of "speech" over which any public official can claim a personal First Amendment right.[18] Assuming that a law *does* implicate the right in question, the government must then proceed to justify the challenged

---

[16] Interview with Robert A. Levy by the Washington Post (Jan. 10, 2013), *transcript available at* http://articles.washingtonpost.com/2013-01-10/lifestyle/36272630_1_assault-weapons-high-capacity-magazines-military-style-guns.

[17] Mut. Film Corp. v. Indus. Comm'n of Ohio, 236 U.S. 230, 243 (1915).

[18] Nevada Comm'n on Ethics v. Carrigan, 131 S. Ct. 2343, 2350 (2011).

law so that the court hearing the challenge may evaluate, roughly speaking, whether the justification is strong enough to permit the law to stand or, alternatively, whether the measure goes too far and thus violates the Constitution.

I begin with this return to fundamentals because it never ceases to surprise me how often those engaged in legal debate talk past one another by conflating these distinct steps. In the Second Amendment context particularly, there is no excuse for making that mistake. For *Heller* itself makes it absolutely plain that not every gun regulation even triggers Second Amendment review.  In other words, sometimes governments may enact regulations addressing the manufacture, transfer, possession or use of firearms that categorically fall outside the Second Amendment's scope, freeing governments of any burden even to make detailed defenses of the provisions in question.   For example, the *Heller* opinion specifically named ―longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings" as illustrative examples of regulations that should not even receive further constitutional review.[19]  The importance of this point should not be underemphasized.  If too many entirely reasonable firearm regulations, like assault weapon bans and background checks, or rules about trafficking and straw purchases, are subjected to heightened Second Amendment review, it will become difficult if not impossible to separate those regulations categorically from the restrictions that *Heller* specifically approved without subjecting them to any ―scrutiny" at all.

_____
[19] Dist. of Columbia v. Heller, 554 U.S. 570, 626 - 27 (2008).

10

Beyond the examples appearing in the decision, *Heller* also identifies the three primary factors to consider in judging whether other types of regulation trip the Second Amendment's alarm.   First, the Court carefully frames the scope of the Second Amendment to cover *only* firearms "in common use at the time."[20]

Second, *Heller* recognized that "dangerous or unusual" weapons may be and have historically been heavily regulated or banned.[21]  It is not inconceivable – indeed, it seems quite likely – that the Court's pause to distinguish unusually dangerous weapons from widely possessed handguns had precisely the 1994 Assault Weapons Ban, which included a prohibition on high-capacity magazines, in mind.   At the very least, the *Heller* majority recognized that the government could keep machine guns ——"M16 rifles and the like"—out of the hands of civilians.[22] The Supreme Court thus emphatically rejected the extravagant, or as Justice Scalia characterized it, "startling" notion, still promoted by some, that the Second Amendment could fulfill its original purposes only if citizens were guaranteed a right to arm themselves to the teeth, matching in their private armories essentially the full array of weapons possessed by the United States Military.[23]

Third and finally, the Court emphasized the importance of a nexus to core self-defense needs.[24]  The majority in *Heller* had no trouble recognizing that handguns represented the

---

[20] *Id.* at 627.
[21] *Id.*
[22] *Id.*
[23] *Id.* at 624.
[24] *Id.* at 599 ("Justice Breyer's assertion that individual self-defense is merely a 'subsidiary interest' of the right to keep and bear arms . . . is profoundly mistaken.  He bases that assertion

—quintessential self-defense weapon," particularly in the home.[25]  Moreover, handguns were not categorically more dangerous than other types of firearms.  So Washington D.C.'s handgun ban clearly fell within the scope of the Second Amendment.

The clarity of *Heller*'s guidance on how to apply these threshold factors begins to dissipate, however, when they no longer align so strikingly in one direction.  To begin with, the Court left —dangerousness" undefined, and what the Court meant by that term is not entirely self-evident.  In an obvious sense, *all* firearms are dangerous; that is what makes them effective instruments of self-defense.  The *Heller* ruling, therefore, asks us to balance any *exceptional* dangerousness of particular firearm design features against the potential self-defense value of those features.  For example, even if home possession of machine guns for self-defense might, on rare occasion, deter criminal trespassers more than home possession of handguns, that benefit is simply not sufficient to overcome the substantial hazards to innocent bystanders and intentional targets, in particular the police.  *Heller* obviously does not contemplate asking the government to provide an intricately reasoned justification for banning machine guns; instead, it recognizes – and it surely authorizes Congress, and indeed all of us, to recognize – excessive dangerousness in the inherent design of the weapon[26] so as to cut off Second Amendment review at the threshold.

---

solely upon the prologue—but that can only show that self-defense had little to do with the right's *codification;* it was the *central component* of the right itself." (emphasis in original)).
[25] *Heller*, 544 U.S. at 629.
[26] Throughout this debate, opponents of restrictions on large-capacity magazines have repeatedly demanded empirical evidence showing a link between magazine capacity and gun violence. Studies in that mold certainly exist, and I discuss them later. *See, e.g.,* text accompanying notes 48 – 50.  But at this threshold stage of the Second Amendment inquiry, the *Heller* decision's meaning of dangerousness cannot be equivalent to an empirically demonstrated effect on public safety.  Rather, the standard is one that asks us to examine design features to assess whether the

All things considered, I conclude that reasonably restricting magazine size and availability does not implicate the core Second Amendment right as *Heller* conceived of it.   The reason is not the first factor, that of ―common use,‖ because, of course, large-capacity ammunition magazines and the firearms outfitted for them are, by any reasonable measure, in quite common use in the United States.  I note here just a few examples.  The standard Glock pistol, the firearm that one reporter called ―America‗s handgun‖ in a recent book on the subject, comes equipped with a seventeen-round magazine.[27]   And America‗s most popular rifle, the AR-15 model,[28] typically comes with a thirty-round magazine and can accommodate magazines with even larger capacities.[29]

But to contend that the sizeable market presence of a particular firearm feature is sufficient in itself to trigger full Second Amendment scrutiny is to misrepresent the lesson of *Heller*.  The relative dangerousness and self-defense-serving capacity of a firearm or design

weapon poses an aggravated threat to safety as a common-sense matter.  First, if the former were the meaning of dangerousness, the threshold inquiry, which may lead courts to conclude that the Second Amendment does not even apply, would become indistinguishable from the more advanced stage of review, in which courts scrutinize a government‗s public safety rationale.  Second, making empirical evidence of salutary public-safety impacts a prerequisite to gun regulation would defeat efforts to respond to new technologies and lethal features that pose a substantial threat to public safety.  The Second Amendment does not require that Americans afford the gun industry a ―wait and see‖ grace period on the (in)famous theory that even a vicious dog deserves one free bite.

[27] Erin McCarthy, *Why the Glock Became America's Handgun,* POPULAR MECHANICS (Jan. 12, 2012, 6:30 AM), http://www.popularmechanics.com/technology/military/weapons/why-the-glock-became-americas-handgun

[28] Erica Goode, *Rifle Used in Killings, America's Most Popular, Highlights Regulation Debate*, N.Y. TIMES (Dec. 16, 2012), http://www.nytimes.com/2012/12/17/us/lanza-used-a-popular-ar-15-style-rifle-in-newtown.html?pagewanted=all.

[29] Steven Almasy, *Newton Shooter's Guns: What We Know*, CNN (Dec. 19, 2012, 10:11 AM), http://www.cnn.com/2012/12/18/us/connecticut-lanza-guns/index.html.

feature are also crucial considerations.  This approach makes complete sense.  The common use and possession of a given firearm feature is, at best, just one helpful indicator of whether restricting that feature will stymie or frustrate the exercise of the core Second Amendment protection of lawful self-defense to a constitutionally cognizable degree.  For instance, in the case of high-capacity magazines, significant market presence does not necessarily translate into heavy reliance by American gun owners on those magazines for self-defense.  Analysis of the modern development of the U.S. gun market demonstrates that the firearms industry, driven by an obvious profit motive, ushered in a revolution in the state of the market during the 1980s. Manufacturers began to roll out increasing numbers of pistols with ever-larger-capacity magazines rather than revolvers, which take just six rounds of ammunition and had traditionally been the most popular firearm for personal self-defense.[30]  The frequent purchase of such large-capacity magazines, then, may not be attributable purely or even primarily to actual gun-owner preferences, much less to gun-owner needs.  Rather, guns equipped with or ready for large-capacity magazines may simply be the weapons most readily made available on the market.  And even if this market presence begins to influence more Americans to purchase firearms with high-capacity magazines because they fear attacks from criminals possessing guns outfitted with the same high-capacity magazines, nothing in *Heller* suggests that it is improper for the government to halt the escalation of this arms race in its tracks.  The one-way ratchet of ever more powerful firearms is not a constitutional inevitability. For unlike the doctrine of mutually assured destruction that some say maintained an uneasy peace during the nuclear arms buildup of the

---

[30] *See* DC Reedy & CS Koper, *Impact of handgun types on gun assault outcomes: a comparison of gun assaults involving semiautomatic pistols and revolvers*, 9 INJURY PREVENTION 151, 151 (2002), *available at* http://injuryprevention.bmj.com/content/9/2/151.full#aff-1.
 VIOLENCE POLICY CENTER, BACKGROUNDER ON GLOCK 19 PISTOL AND AMMUNITION MAGAZINES USED IN ATTACK ON REPRESENTATIVE GABRIELLE GIFFORDS AND OTHERS 1 (2011), *available at* www.vpc.org/fact_sht/AZbackgrounder.pdf.

Cold War, the propagation of increasingly dangerous guns on American streets has already taken an all-too- violent toll.  In other words, tempering the trend toward more dangerous weapons actually *vindicates* the core Second Amendment right of self-defense and personal safety that *Heller* recognizes. In this context, as in many others, less is more.

But even looking beyond the market saturation of large-capacity magazines, this feature runs headlong into the other threshold obstacles that *Heller* requires Second Amendment claims to clear.   As experts in effective firearms regulation have preached for years and particularly fervently in recent weeks, higher-capacity magazines pose greater dangers to public safety.  By permitting shooters using semi-automatic weapons to continue firing more bullets without interruption, these magazines increase the potential lethality of armed killers.[31]  Though well-trained gun users can change magazines quickly, this interruption may, as we saw last year in the Arizona shooting of Rep. Gabby Giffords, afford time for heroic men or women to intervene and disarm the shooter.[32]  Moreover, this interruption gives our police a chance to return fire.[33]  And it may even provide time for reflection and rethinking before murder becomes massacre.

---

[31] BRADY CAMPAIGN TO PREVENT GUN VIOLENCE, ASSAULT-STYLE WEAPONS: HIGH-CAPACITY MAGAZINES, http://www.bradycampaign.org/legislation/msassaultweapons/highcapacity (last visited Feb. 2, 2013).

[32] Ken Dolak & Justin Wealer, *Woman Wrestled Fresh Ammo Clip From Tucson Shooter as He Tried to Reload*, ABC NEWS (Jan. 9, 2011), http://abcnews.go.com/Politics/patricia-maisch-describes-stopping-gunman-reloading/story?id=12577933.

[33] I believe I can speak for many Americans when I thank Baltimore County Police Chief Jim Johnson for the illuminating insights he has publicly offered on the threats of high-capacity weapons not just to public safety in general but also law enforcement officer safety more specifically.  *See, e.g.*, John Quinones, *Baltimore Police Chief Wants to Ban High-Capacity Firepower*, ABC NEWS (Dec. 20, 2012), http://abcnews.go.com/US/baltimore-police-chief-ban-high-capacity-firepower/story?id=18030163

Against the evident dangerousness of high-capacity magazines as a design feature, we must evaluate the strength and plausibility of asserted self-defense interests.  Critics of recent proposals to reestablish a limit on high-capacity magazines have argued that firing more than ten rounds without changing a magazine is necessary for effective self-defense.  While I have no doubt that subscription to this perspective among some law-abiding gun owners is sincere, I doubt that it is well-founded.  It's rhetorically effective to ask, "How many bullets do *you* want in your magazine when an intruder breaks into your home?" But the answer tells us little that is of relevance to the Second Amendment as *Heller* conceives that provision. I might want a magazine with twice as many bullets as any possible home intruder; I might want a machine gun too. But in the end that can't be the measure of what the Second Amendment says I have a *right* to own and deploy.

Despite the emotional resonance of this kind of appeal, incidents like burglaries and home invasions – even when they lead to the exchange of fire – are unlikely to *require* firing many shots.  The NRA publishes a regular column featuring newspaper clippings of gun owners protecting themselves against intruder attacks, and an analysis of these reports over a five-year period demonstrated that in 50% of all cases, two or fewer shots were fired, and the average number of shots fired across the entire data sample was also about two.[34]  Of course, this data comes from the episodes the NRA chooses to report, so selection bias is possible, meaning the

---

[34] Claude Verner performed the analysis of reporting over the period 1997 to 2001.  The findings further show that when many shots were fired, a (presumably frightened) gun owner finished an entire magazine rather than firing the number of shots that necessarily had to be fired in light of the scenario.  The analysis can be found reprinted with the author's permission at *Analysis of Five Years of Armed Encounters (With Data Tables)*, GunsSaveLives.net (March 12, 2012), http://gunssavelives.net/self-defense/analysis-of-five-years-of-armed-encounters-with-data-tables/.

16

average number of shots fired per incident could be even lower.[35]   Even police officers

traditionally found revolvers with six-bullet magazines sufficient for their own safety until more

dangerous guns flooded the market.[36]   And we should not lose track of the bigger picture: studies

show that self-defense in the home with firearms is rare.[37]   Additionally, firearms accidents are

all too common: between 1965 and 2000, unintentional shootings accounted for the deaths of

over 60,000 Americans.[38]   Firing more bullets quickly may compound their damage.

Another version of the critics' response is that in scary situations, like home invasions,

gun owners may go through bullets too quickly in a fit of nervousness or panic.[39]   That may be

true, but it also aggravates the downside hazard in cases of error,[40] so it is not at all clear that

increased access to large-capacity magazines for shooters subject to fragile nerves represents a

---

[35] It seems likely, for example, that merely brandishing a weapon may often lead intruders to flee.  A non-exhaustive review of the NRA column reveals several examples of exactly this scenario, giving me the impression that the NRA's reporting is not demonstrably biased toward extreme scenarios or even those in which some shots are fired.   *See, e.g.*, Armed Citizen, NRA (March 2012), http://www.nrapublications.org/index.php/12492/armed-citizen-23/ ("[The resident] met the intruder at her bedroom door, pointed the gun at him and demanded he leave. The trespasser fled without hesitation.").

[36] *See* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1489 (2009).

[37] A study of Atlanta police records, for example, found that victims of burglaries used guns in self-defense just 3% of the time.  For a description of the study and a rich discussion of self-defense uses for firearms, see David Hemenway, Private Guns, Public Health 67 (2004). The study is A.L. Kellermann et al., *Weapon involvement in home invasion crises*, 273 J. of the Am. Med. Assoc. 1759 (1995).

[38] Hemenway, *supra* note 38, at 27 – 35.

[39] *See, e.g.*, Heller v. Dist. of Columbia, 670 F.3d 1244, 1261 (D.C. Cir. 2011); Emily Miller, *The High Capacity Magazine Myth*, Washington Times (Jan. 27, 2013), http://www.washingtontimes.com/news/2013/jan/27/the-high-capacity-magazine-myth/; Jacob Sullum, *The Threat Posed by Gun Magazine Limits*, Reason (Jan. 16, 2013), http://reason.com/archives/2013/01/16/the-threat-posed-by-gun-magazine-limits.

[40] *Heller*, 670 F.3d at 1263 - 64 ("[T]he tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders." (internal quotations omitted)).

net gain for home security or public safety.  Finally, some critics of magazine-capacity limits have pointed out that, realistically, many gun owners have not received proper training and for that reason, may fire bullets indiscriminately; a larger magazine – so the thinking presumably goes – will increase the chances that at least one of their wayward shots will hit its mark.[41]  As the Supreme Court recognized in *Heller*, however, the Second Amendment protects only the right of ―*responsible* citizens to use arms in defense of hearth and home.‖[42]  In other words, a dangerous firearms feature otherwise outside the Second Amendment‘s scope cannot become subject to heightened constitutional scrutiny because of the shortcomings of *irresponsible* gun owners.

To be sure, *some* gun owners may struggle to change magazines quickly not for lack of adequate training but rather by reason of disability or old age.[43]  Perhaps a ban on high-capacity magazines without any exception for the disabled or elderly might, for this reason, trigger heightened scrutiny of such a ban as applied specifically to those individuals.  But the possibility that a prohibition could raise constitutional questions in some subset of its applications does not mean that the prohibition is constitutionally vulnerable on its face.[44]  And it remains the case that

---

[41] *See, e.g.*, Stephen Hunder, *Why 33 rounds makes sense in a defensive weapon*, WASHINGTON POST (Feb. 6, 2011),
 http://www.washingtonpost.com/wp-dyn/content/article/2011/02/04/AR2011020407083.html
[42] Dist. of Columbia v. Heller, 554 U.S. 570, 635 (2008) (emphasis added).
[43] Yih Chau-Chang, *High-Capacity Magazines And Their Critical Role In Lawful Self-Defense*, THE EXAMINER (March 10, 2011), http://www.examiner.com/article/high-capacity-magazines-and-their-critical-role-lawful-self-defense
[44] The Supreme Court has exhibited an extreme reluctance to strike down laws on their face – meaning in all applications – when only some applications would fall afoul of a constitutional provision (with the exception of the First Amendment, as facially overbroad laws may chill protected free speech).  *See* RICHARD H. FALLON, DANIEL J. MELTZER & DAVID L. SHAPIRO, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 162, 168 (6th ed. 2009).

large-capacity magazines are highly unlikely to be necessary to self-defense in the vast majority of home invasions or burglaries, even those that resort to the exchange of fire. The facial validity of a high-capacity magazine ban is therefore clear.

Despite the considerable market presence of high-capacity magazines, the danger they pose to public safety and the weakness of the self-defense justification for their possession means that two of the three threshold *Heller* factors point strongly against extending Second Amendment protection to high-capacity magazines.   The D.C. Circuit Court of Appeals, in a case challenging Washington D.C.'s restriction on magazines with more than ten rounds, recently struggled with this first stage of analysis and determined that the court did not have before it sufficient evidence to decide whether the Second Amendment even *reached* large-capacity magazines.[45]   However, the court went on to conclude that, even if it was proper to extend coverage of the amendment to large-capacity magazines, the government's interest in banning them was strong enough to do so without violating Second Amendment rights.[46]

Having now reviewed the best evidence and argumentation advanced by defenders of high-capacity magazine possession, I doubt that the Supreme Court would find it necessary to reach that second stage of review in dealing with a ban on high-capacity magazines and am quite confident that, in any event, the Court would agree with the ultimate conclusion that, even if the amendment applies, a ban on high-capacity magazines withstands Second Amendment scrutiny.

---

[45] *Heller*, 670 F.3d at 1261.
[46] *Id.* at 1263 – 64.

In explaining that conclusion, I emphasize that commonly advanced rejections of a legitimate government interest in banning high-capacity magazines are deeply misleading.  Many opponents of reasonable firearms regulation insist that we tried banning large-capacity magazines in 1994: the results are in, they say, and we failed.  One favorite trope is to cite to a 1997 Department of Justice study, which, according to the recent testimony of Wayne LaPierre, "proved that [the] ban had no impact on lowering crime."[47]  But no one is even *arguing* that a ban on high-capacity magazines (or on assault weapons, for that matter) will necessarily decrease crime rates; highly lethal firearms will still be widely available on the market, and some criminals will use them, just as they do now.

What defenders of a ban on high-capacity magazines *do* argue is that such a ban will help prevent these criminals from killing or maiming as many people when they commit violent crimes.  And that argument is solidly grounded. One study, for example, found that between 1984 and 1993, criminals using guns with high-capacity magazines  or assault weapons as defined by the 1994 Assault Weapons Ban killed or injured an average of 29 victims, compared to the average 13 victims shot by criminals unequipped with large-capacity magazines.[48]  Another study suggests that, since the lapse of the ban in 2004, high-capacity magazines have once again

---

[47] *See, e.g.*, *What Should America Do About Gun Violence?: Hearing Before the S. Judiciary Comm.,* 113th Cong. (2013) (prepared testimony of Wayne LaPierre, Executive Vice President and Chief Executive Officer of the National Rifle Association).

[48] This study considered all "mass shooting" incidents: those in which six or more were killed or twelve or more were wounded.  For an explanation of this study, see Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban*, *in* REDUCING GUN VIOLENCE IN AMERICA 167 (Daniel W. Webster & Jon S. Vernick, eds., 2013).  The study is Christopher S. Koper & Jeffrey A. Roth, *The Impact of the 1994 Federal Assault Weapon Ban on Gun Violence Outcomes: An Assessment of Multiple Outcome Measures and Some Lessons for Policy Evaluation*, 17 J. OF QUANTITATIVE CRIMINOLOGY 33 (2001).

become common in episodes of violent crime after the beginnings of a decline, which probably took place because the black market for these magazines had begun to dry up.[49]

Even more misleading is the suggestion that in 1997 we could (or even today that we can) draw meaningful conclusions from the absence of unmistakable evidence of a decrease in violence following the 1994 ban.  That legislation grandfathered or exempted many thousands of weapons already owned, and those could still be sold or transferred.[50]  In other words, the 1994 ban was crafted with long-term effects in mind; to measure its effects notwithstanding its untimely end is to misunderstand fundamentally how the legislation was designed to work.  It is therefore all the more telling that supporters of reasonable regulation can cite studies based upon identifiable trends emerging during the latter years of the ban, as well as evidence from both before and after the ban, showing that the legal availability of large-capacity magazines is indeed correlated with increased deaths and injuries caused by gun violence.  Considered alongside the dangerousness inherent in a large-capacity magazine as a design feature, this evidence provides the government with a sufficient basis to satisfy the Second Amendment under any plausible understanding of the Supreme Court's jurisprudence surrounding that amendment.

---

[49] *See* David S. Fallis and James V. Grimaldi, *Va. data show drop in criminal firepower during assault gun ban*, WASH. POST (Jan. 23, 2011), http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html (finding that in Richmond, Virginia, the percentage of guns with high-capacity magazines seized from criminals by police fell to a low of 10% by 2004, when the federal assault weapons ban expired, but has since rebounded to 22%).

[50] Koper, REDUCING GUN VIOLENCE IN AMERICA, *supra* note 49, at 165 – 66.

**Assault Weapons Ban**

By many accounts, the most important component of the newly proposed assault weapons ban is its prohibition on high-capacity magazines.[51]  But that does not mean that the remaining features of the proposal stand on weaker constitutional ground.   Far from it.  Application of *Heller*'s three threshold factors – dangerousness, commonness of use, and connection to core self-defense interests – demonstrates that the Second Amendment does not provide legal shelter to the features that trigger a firearm's prohibition under the ban.

Opponents of the legislation as well as some proponents of new firearms regulation have observed that some of the ―military characteristics" that can lead to prohibition under the legislation[52] (and, by some accounts, under assault weapons bans in general[53]) are mostly cosmetic traits designed to make a gun *appear* dangerous and are not, in fact, intrinsically hazardous.  But Congress would surely be acting within its constitutional authority if it were to reject this characterization as self-serving or otherwise unreliable. For example, the Brady Campaign to Prevent Gun Violence insists that ―[p]istol grips . . . help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position [and that] [b]arrel

---

[51] Tom Diaz, a researcher for the Violence Policy Center, has repeatedly called on lawmakers to focus their attention on a high-capacity magazine ban.  *E.g.*, Tom Diaz, *Ten Ways to Spot a Sell-Out on Gun Control*, FAIRLY CIVIL (Jan. 14, 2013, 2:26 PM), http://tomdiazgunsandgangs.com/2013/01/14/ten-ways-to-spot-a-sell-out-on-gun-control/ (―An effective law will focus on one prime feature—the ability to accept a high-capacity magazine.").

[52] *See, e.g.*, *What Should America Do About Gun Violence?: Hearing Before the S. Judiciary Comm.,* 113th Cong. (2013) (statement by Sen. Ted Cruz) (―Now, what the assault weapons ban instead targets are cosmetic features.").

[53] See, e.g., Nicholas J. Johnson, *Supply Restrictions at the Margins of Heller and the Abortion Analogue: Stenberg Principles, Assault Weapons, and the Attitudinalist Critique*, 60 HASTINGS L.J. 1285, 1295 (2009).

shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession."[54]   Moreover, even if the characterization of these features as cosmetic were accurate, it would make little difference as a constitutional matter.   In a recent televised interview, Justice Scalia explained the basis in history for exempting certain types of regulations from Second Amendment review.  Certain limitations on gun ownership are constitutionally permissible, he contended, ―because there were some [regulations] that were acknowledged at the time [of the Founding]. For example, there was a tort called affrighting . . . if you carried around a really horrible weapon just to scare people, like a head ax or something. . . ."[55]  What the Justice evidently meant was that regulating weapons because they are chosen specifically for their intimidating appearance is constitutionally unproblematic because the very use of intimidation is unnecessarily disruptive to organized society.[56]


        Even more important to the constitutionality of the assault weapons ban is the absence of any connection to the core Second Amendment right to defend oneself with a firearm.  At this committee's hearing on January 30, several witnesses criticized the assault weapons ban on policy grounds, but in my role as a constitutional lawyer listening intently for arguments relevant to the proposal's Second Amendment propriety, I was struck by the failure of anyone's

---

[54] Brady Campaign to Prevent Gun Violence, The Top 10 NRA Myths About Assault Weapons, http:// www.bradycampaign.org/issues/assaultweapons/nramyths/.

[55] Interview with Justice Antonin Scalia by Chris Wallace, FOX NEWS SUNDAY (July 29, 2012), *transcript available at* http://www.foxnews.com/on-air/fox-news-sunday/2012/07/29/justice-antonin-scalia-issues-facing-scotus-and-country#p//v/1760654457001.

[56] Justice Scalia's point about the tort of affrighting surfaces in the *Heller* decision itself: the majority opinion cited three illustrative examples of state courts entertaining such actions in the nineteenth century.  *See* Dist. of Columbia v. Heller, 554 U.S. 570, 627 (2008) (citing, e.g., State v. Lanier, 71 N.C. 288, 289 (1874) (―The elementary writers say that the offence of going armed with dangerous or unusual weapons is a crime against the public peace by terrifying the good people of the land, and this Court has declared the same. . . .")).

testimony to support these features as essential to self-defense.   In fact, I have searched in vain for any reasoned arguments that pistol grips, forward grips, telescoping stocks, grenade or rocket launchers, and barrel shrouds are indispensable or even contribute to self-defense.

Finally, it is relevant to ask how many assault weapons Americans currently own.  Data is hard to come by in large part because firearms manufacturers refuse to release data tracking their sales.[57]  What we do know is that the number of weapons that would qualify under either the proposed ban's so-called ―characteristics test" or its explicit list of banned models is smaller than the number of guns with standard-issue high-capacity magazines.[58]  One reporter's painstaking analysis estimated that there are 3.75 million AR-15-style rifles owned in the U.S. today, and AR-15s are the most popular although not the exclusive type of qualifying assault weapon.[59]  The NRA's lobbying arm estimates that, depending upon the definition of assault weapon, assault weapons represent 15% of all semi-automatic guns owned in the U.S., which in turn represent about 15% of all firearms owned in the U.S.[60]  Given that the Congressional Research Service recently found that, as of 2009, Americans own about 310 million guns,[61] the NRA's estimate would translate into approximately 7 million assault weapons owned today. Although 7 million is hardly a negligible figure, it still corresponds to quite a small portion of the

---

[57] Justin Peters, *How Many Assault Weapons Are There in America? How Much Would It Cost the Government To Buy Them Back?,* SLATE (Dec. 20, 2012), http://www.slate.com/blogs/crime/2012/12/20/assault_rifle_stats_how_many_assault_rifles_are_there_in_america.html.

[58] *See* Koper, REDUCING GUN VIOLENCE IN AMERICA, *supra* note 49, at 161 (explaining that the universe of large-capacity magazine equipped firearms is broader than the universe of weapons satisfying the criteria for categorization as an assault weapon).

[59] Peters, *supra* note 58.

[60] *Top Ten Frequently Asked Questions*, NRA-ILA, http://www.gunbanfacts.com/FAQ.aspx (last visited February 2, 2013).

[61] WILLIAM J. KROUSE, CONG. RES. SERV., RL32842, GUN CONTROL LEGISLATION 8 (2012).

overall gun market – hardly enough to justify calling such weapons —common" within the meaning of *Heller*.

But for the purposes of constitutional analysis, debating how to characterize the significance of assault weapons' market presence would be a waste of time.  To make a difference to *Heller*'s threshold inquiry, which must take notice of the complete lack of any connection of assault-weapon features to self-defense as well as these features' dangerousness in both fact and appearance, the market presence of assault weapons would have to be overwhelmingly large (and even then, I doubt seriously the bottom line would change as a constitutional matter).  And overwhelmingly large it assuredly is not.

## Universal Registration and Background Checks

All responsible participants in the gun safety debate agree that some groups of people simply should not be allowed to own, keep, or carry guns. Those groups include children, dangerous felons, and those with serious mental illnesses that preclude safe gun ownership. When some observers casually compare the Second Amendment to the First, they forget this essential difference: Although freedom of speech sometimes comes at a price, and although speech can at times pose dangers, our constitutional system addresses those dangers by permitting government to impose carefully crafted limits on speech, not by limiting or licensing eligible speakers. The Constitution's strategy with respect to guns is entirely different. It addresses the dangers of guns in the wrong hands by permitting government to keep them out of

those hands in the first place, and, of course, by permitting government to regulate where and under what conditions people can bear those weapons in possible confrontation with others.

Accordingly, this Congress might be called upon to consider measures designed to minimize the risk that guns fall into the hands of such prohibited purchasers and owners. Measures dealing with straw purchases and trafficking are obviously important in that effort and are clearly constitutional. Rather than spending the committee's time on those measures, I will focus here on provisions that mandate universal registration requirements or a universal background check, closing the many notorious loopholes that characterize current laws on the subject. There is no serious doubt that requiring universal registration or a universal background check would comply with the Second Amendment.

It is important to recognize, at the outset, that prohibiting particular groups of people from owning or possessing guns is fully compatible with the Second Amendment. In the first place, such prohibitions are consistent with the original and traditional understanding of the Second Amendment. It was widely accepted at the time of the framing that not every person had a right to keep and bear arms; instead, the right was closely tied to the notion of responsible citizenship, and it has long been denied to criminals and others whose possession of guns would pose a severe danger to the public.[62] On this point, precedent aligns closely with history. The Supreme Court said in *District of Columbia v. Heller*: "[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the

---

[62] *See United States v. Rene E.*, 583 F.3d 8, 15–16 (1st Cir. 2009).

mentally ill …"[63] The Court fortified this conclusion in *McDonald v. City of Chicago*, when it added: ―We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as ‗prohibitions on the possession of firearms by felons and the mentally ill‗ … We repeat those assurances here."[64]

Once the constitutionality of prohibiting gun possession by some people is accepted, the constitutionality of a reasonable system of registration or background checks follows automatically. The most powerful argument for this inference is not a technical legal point; it is, instead, common sense. And, although it shouldn‗t be necessary to cite authority for the point, it‗s worth noting that as eminent an authority as Alexander Hamilton wrote in *The Federalist* that ―[t]he rules of legal interpretation are rules of *common sense*," and that the ―true test" of a ―just application" of these rules is whether the resulting interpretation is ―consistent with reason and common sense."[65]

Consider, then, whether the Constitution would be ―consistent with reason and common sense" if it allowed prohibitions on firearms purchases by felons but disallowed background checks to determine whether a felon was the would-be purchaser of a firearm. As a matter of common sense, we all know that guns do not of their own accord stay out of the hands of prohibited purchasers. Nor are prohibited purchasers likely to confess their legal inability to buy guns when talking to gun dealers. The prohibitions, in short, do not enforce themselves. In order to be effective, in order to be meaningful, in order to be anything more than rules on paper, they

---

[63] 554 U.S. 570, 626 (2008).

[64] 130 S. Ct. 3020, 3047 (2010) (plurality opinion).

[65] *The Federalist* No. 83, at 495 (Alexander Hamilton) (Clinton Rossiter ed., 1961).

must be comprehensive and must be carried into operation by the government. It contradicts common sense—it ignores the fact that "the framers of the Constitution were not mere visionaries, toying with speculations or theories, but practical men"[66]—to say on the one hand that prohibiting felons from owning guns is constitutional, but to insist on the other hand that the background checks that seek to make those prohibitions effective are unconstitutional.

The Supreme Court's decisions in *District of Columbia v. Heller* and *McDonald v. City of Chicago* confirm the constitutionality of reasonable background check requirements. *Heller* expressly affirms that the Court was not calling into doubt "laws imposing conditions and qualifications on the commercial sale of arms."[67] The *McDonald* Court "repeat[ed] those assurances," observing that its holding "does not imperil every law regulating firearms."[68] The universal registration requirement or background check is simply a "condition[]" on the transfer of arms; it is therefore expressly within the zone of permissible regulation identified by *Heller* and *McDonald*.

Analogous Supreme Court doctrine points in the same direction. The right to vote, like the right to keep and bear arms, is a fundamental right of Americans.[69] But no serious legal scholar doubts that before letting a citizen cast his ballot, the government may require the citizen to register and may take steps to check whether he or she really is an eligible voter. And the

---

[66] *NFIB v. Sebelius*, 132 S. Ct. 2566, 2589 (2012) (opinion of Roberts, C.J.) (quoting *South Carolina v. United States*, 199 U.S. 437, 449 (1905)).

[67] 554 U.S. at 626–27.

[68] 130 S. Ct. at 3047 (plurality opinion).

[69] *Compare Harper v. Virginia State Board of Elections*, 383 U.S. 663 (1966) (holding that the right to vote is fundamental), *with McDonald v. City of Chicago*, 130 S. Ct. 2020 (2010) (holding that the right to keep and bear arms is fundamental).

28

Supreme Court agrees; in *Crawford v. Marion County Election Board*, for example, it concluded that Indiana's voter ID law was a permissible means of ensuring that only eligible voters participate in an election.[70] Checking whether a voter is eligible before giving that voter a ballot is comparable to checking whether a purchaser is eligible before letting her acquire a gun. Just as the former is constitutional, so is the latter. And the argument is of course even stronger in the instance of firearms. For, unlike a ballot in the hands of an ineligible voter, which might in the end prove to make no difference to who wins or loses the election at issue, a gun in the hands of even one ineligible owner poses a deadly danger all by itself.

History reinforces common sense and case law in this regard. The Supreme Court in *Heller* and *McDonald* stressed the role of history in interpreting the scope of the Second Amendment; ―longstanding‖ prohibitions upon gun ownership, the Court indicated, are presumptively exempt from Second Amendment scrutiny.[71] Lower courts have likewise noted that history plays an important, though not exclusive, role in determining the scope of permissible regulation under the Second Amendment.[72] Measures to keep guns out of the hands of prohibited owners – owners who could not safely be entrusted with control of a lethal weapon – have a strong historical pedigree. For example, many states have longstanding laws— sometimes, laws dating back a century or more—requiring sellers to keep registers of all firearm purchasers; the registers had to be open to peace officers.[73] The government could use thus use

---

[70] 553 U.S. 181 (2008) (plurality opinion).

[71] *See* 554 U.S. at 626–27; 130 S. Ct. at 3047 (plurality opinion).

[72] *See, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1253 (D.C. Cir. 2011); *Ezell v. City of Chicago*, 651 F.3d 684, 701–04 (7th Cir. 2011); *United States v. Marzzarella*, 614 F.3d 85, 89 (3d Cir. 2010); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010); *United States v. Reese*, 627 F.3d 792, 800–01 (10th Cir. 2010).

[73] *See Heller*, 670 F.3d at 1253–54.

these registers to determine whether any of the purchasers had obtained weapons in violation of the law.

To be sure, modern computerized background checks differ from the more cumbersome historical enforcement measures known to hisory. But "a constitution [is] intended to endure for ages to come."[74] Just as the Second Amendment covers modern weapons, like handguns, that did not exist when the Bill of Rights was ratified in 1791, so too does it cover modern enforcement measures, like mandatory computerized background checks, that could not have been anticipated in 1791. Reasonable background checks fit into the long historical tradition to which registration requirements belong, and that is enough to sustain them without further ado under the tests established by the Supreme Court in *Heller* and *McDonald*.

In short, all relevant legal considerations—logic and common sense, directly applicable precedent, analogies to surrounding legal doctrines, and history and tradition—point to the same conclusion. The Second Amendment does not prohibit Congress from passing laws to carry into effect concededly constitutional prohibitions on firearm purchases. The universal background check, in particular, easily passes constitutional muster as a permissible regulation of the transfer of firearms.

This is not to say that all conceivable background check systems would comport with the Constitution. Suppose, for example, that Congress were to pass a law requiring handgun purchasers to undergo an extensive check on the purchasers themselves and all their family

---

[74] *McCulloch v. Maryland*, 17 U.S. 316, 415 (1819).

members and housemates, a check that took years to complete. Such a scheme would plainly impose a very severe burden on the right to keep and bear arms for self-defense. The burden would be entirely disproportionate to the objective the government is seeking to pursue. Where a background check is taken to such lengths that it effectively destroys the right to keep and bear arms, rather than ensuring that the right is enjoyed only by those constitutionally entitled to it, the government has overstepped the lawful boundaries of its power.

Such concerns are entirely out of place here, however. Whether a particular background check scheme that Congress adopts would go too far obviously depends on the specific details of that scheme. But none of the proposals seriously under consideration at the present come remotely close to overstepping constitutional boundaries. The proposed background check frameworks, especially those that rely on checks conducted instantaneously through the National Instant Background Check System, impose a constitutionally insignificant burden upon law-abiding citizens. Indeed, an instant background check is much *less* onerous than the Voter ID law that the Supreme Court upheld in *Crawford v. Marion County Election Board*; it is also much less cumbersome than longstanding registration requirements and other conditions on sale[75] that are concededly constitutional. Ultimately, therefore, I see no merit to the constitutional objections to the background check proposals presently being seriously considered by Congress.

### III. The Consistency of the President's Measures with the Separation of Powers

---

[75] *See Heller*, 670 F.3d at 1253.

This January, President Obama announced twenty-three steps that his Administration would take to prevent gun violence.[76] The President has begun to implement these steps by using the executive powers vested in him by the Constitution and laws of the United States. Because the President adopted these measures by executive action, without specific congressional involvement, some have concluded that the President violated the separation of powers established by the Constitution. This claim is legally untenable; the President is acting well within his powers as head of the executive branch.

Some of the President's measures involve nothing beyond communicating with members of the public. Measure 23, for example, is to ―[l]aunch a national dialogue … on mental health.‖ There is plainly no constitutional problem with executive steps of this sort. The President obviously does not need congressional permission every time he decides to give a speech or publish a press release.

Another category of measures—and this covers the great majority of the actions that the President has committed to take—includes steps that will improve the enforcement of federal laws already on the books. Thus, the President has agreed to ―[m]aximize enforcement efforts to prevent gun violence and prosecute gun crime.‖[77] He has likewise decided ―to require federal law enforcement to trace guns recovered in criminal investigations.‖[78] These improvements to

---

[76] *See, e.g.*, Colleen Curtis, *President Obama Announces New Measures to Prevent Gun Violence*, Jan. 16, 2013, available at http://www.whitehouse.gov/blog/2013/01/16/president-obama-announces-new-measures-prevent-gun-violence.

[77] Measure 13.

[78] Measure 9.

federal law enforcement efforts plainly fall within the President's constitutional power—and constitutional responsibility—to ―take Care that the Laws be faithfully executed."[79]

A third group of measures involves the making of rules and regulations under preexisting congressionally granted authority. For instance, step 21—―[f]inalize regulations clarifying essential health benefits and parity requirements within ACA exchanges"—simply carries into effect authority granted by the Patient Protection and Affordable Care Act.[80]

Step 11, ―[n]ominate an ATF director," is equally clearly within the President's constitutional powers; the Constitution expressly states that the President ―shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … Officers of the United States."[81] Likewise, the Constitution plainly authorizes the President's requests for information from executive branch officials, such as step 15, ―direct[ing] the Attorney General to issue a report on the availability and most effective use of new gun safety technologies and challenge the private sector to develop innovative technologies"; Article II provides that the President ―may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices."[82]

Finally, and perhaps most controversially, some of the President's measures entail the issuance of interpretations of existing laws. To this class belongs, for instance, step 16, ―[c]larify[ing] that the Affordable Care Act does not prohibit doctors asking their patients about

---

[79] U.S. Const. art. II, § 3.
[80] Patient Protection and Affordable Care Act of 2010, Pub. L. 111-148, § 1321(a).
[81] U.S. Const. art. II, § 2, cl. 2.
[82] U.S. Const. art. II, § 2, cl. 1.

guns in their homes." To be sure, the Article III judiciary must ultimately interpret laws when applying those laws in the context of concrete cases or controversies. But it is well established that the President also has the authority to interpret the law—and especially the power to announce legal interpretations concerning issues that have not yet been settled by the courts. In fact, the tradition of presidential clarifications of the law goes back to President George Washington's Neutrality Proclamation. The tradition also has a solid grounding in the text of the Constitution; it is based on the Constitution's vesting in the President of "the executive Power," and in its imposition on the President of the power and duty to "take Care that the Laws be faithfully executed."[83]

In sum, although some opponents of gun regulation might disagree with some of the President's executive actions as a matter of policy, those disagreements cannot plausibly be translated into constitutional objections. From a separation-of-powers perspective, the President has acted well within the bounds of his constitutionally assigned authority.

*****************

In closing, I note that I share the beliefs of many that the prevalence of guns in our country is by no means the only significant contributor to the tragedy at Newtown and to the many other gun-related massacres we have seen in recent months and recent years, or to the deaths of an average of over 30 Americans, nearly 5 of them children, *each and every day* as a result of gunfire homicides in less visible, and often virtually unnoticed, tragic incidents. [84]

---

[83] U.S. Const. art. II, §§ 1, 3.

[84] The Center for Disease Control reports that in 2010, 11,078 individuals in the U.S. died from firearm-related homicides.  1,773 of them were between the ages of 0 and 19.  *See* CENTER FOR DISEASE CONTROL, NATIONAL CENTER FOR INJURY PREVENTION & CONTROL, *WISQARS*

Violence has many causes. Violent video games, for example, some of them simulating mass shootings, may well play a significant role in the inculcation of violent attitudes among children.[85] And mental illness plainly played a significant part in bringing about the massacre at Newtown. If our country is to reduce the incidence of similar unspeakable violence in the future, the widespread availability of high-powered guns to people who should not possess them and who have no constitutional right to do so is by no means the only phenomenon that our government, our society, and our families need to address.

But it is simply not true that the presence of other causes of gun violence means that we neither can nor should do anything significant about the prevalence, too often in the wrong hands, of high-powered guns and high-capacity magazines that turn those guns from means of self-defense into weapons of mass destruction. It is not true constitutionally, it is not true politically, and it is not true morally. We must do our best to address in a serious way *every* source of avoidable death by firearms that we can, and if we always point to other problems still waiting to be solved we will never get started.

The time to get started on sensible gun regulation is not now—it was weeks, months, years, even decades ago. The Second Amendment is not a barrier. We have already delayed too long, and our society has paid a terrible price. We should delay no longer.

---

*Fatal Injury Reports, National and Regional, 1999 – 2010,*
http://webappa.cdc.gov/sasweb/ncipc/mortrate10_us.html (last visited Feb. 4, 2013).
[85] *See Brown v. Entertainment Merchants Ass'n*, 131 S. Ct. 2729, 2767–71 (2011) (Breyer, J., dissenting).

35

# Exhibit 99

Responses to Questions for the Record, March 6, 2013
Professor Laurence Tribe

**QFRs from Senator Grassley**

(1)   **Your prepared testimony quite correctly noted that the Supreme Court's** *Heller*
**decision confirmed the constitutionality of "longstanding prohibitions on the
possession of firearms by felons and the mentally ill" as well as historic
prohibitions on "dangerous or unusual" weapons.  However, on page 11, you
wrote, "It is not inconceivable – indeed, it seems quite likely—that the Court's
pause to distinguish unusually dangerous weapons from widely possessed
handguns had precisely the 1994 Assault Weapons Ban, which included a
prohibition on high-capacity magazines, in mind."**

**I fail to see the basis for the inference.  The Court made clear the
constitutionality of existing statutory prohibitions on possession of firearms by
felons and the mentally ill, which dated back many decades.  The analogous
longstanding prohibition on dangerous weapons that the Court signaled was
constitutional was obviously the longstanding ban on very dangerous machine
guns.  By contrast, the "assault weapons" ban existed for only ten years, and it
had expired by the time of the** *Heller* **ruling. I do not think any fair reading of
this language from the Court's opinion conclusively determines that an "assault
weapons" ban, as opposed to a ban on machine guns, is constitutional under the
Second Amendment.  What is your basis for concluding that this language
shows that such a ban would not "even implicate[] a [Second Amendment] right
in the first place"?**

*RESPONSE*

In *Heller*, the Supreme Court recognized the "historical tradition of prohibiting the
carrying of 'dangerous and unusual weapons'" and unambiguously advised that the
decision did not cast doubt upon this tradition.[1]  Furthermore, the 1994 Assault Weapons
Ban fit soundly within this tradition.  At the time *Heller* was argued, the federal assault
weapons ban was the most recently enacted – and still to this day remains – the
paradigmatic contemporary example of major federal legislation prohibiting dangerous
weapons.  Thus, when I wrote in my prepared testimony that "it seems quite likely . . .
that the Court[] had precisely the 1994 Assault Weapons Ban . . . in mind," I meant
simply that, because the federal assault weapons ban was the paradigmatic example of
contemporary federal gun-control legislation, it was likely on the minds of the justices
and one factor that prompted the Court to reaffirm explicitly the tradition of prohibiting
dangerous weapons.   Although the federal assault weapons ban was, of course, not

---

[1] Dist. of Columbia v. Heller, 554 U.S. 570, 627 (2008).

1

before the Court in *Heller*, it was referenced throughout the briefs submitted to the Court,[2] confirming that it was almost certainly on the minds of the justices.

I also feel compelled to point out that your question mischaracterizes, in several respects, the point I made in my testimony as well the *Heller* decision itself.  First, you assert that no "fair reading of [the] language from the Court's opinion *conclusively* determines that an 'assault weapons' ban . . . is constitutional under the Second Amendment." (emphasis added).   I agree entirely and never contended that the Court's reference to prohibitions on "dangerous and unusual" weapons or any part of *Heller conclusively* addresses the constitutional questions raised by the proposed assault weapons and high-capacity magazine bans.  The majority decision in *Heller* never so much as mentions the term "assault weapon," so I hardly could have argued that the decision takes a conclusive position on the matter.  But a reasonable inference from *Heller* is that the majority went out of its way to affirm the constitutionality of "dangerous" weapon prohibitions to quell any concern that the Second Amendment would restrict future efforts to reauthorize the most well-known contemporary prohibition on "dangerous" weapons.

Second, your reading of *Heller*'s reference to a "historical tradition" of prohibiting "dangerous" weapons seems to presume that the Court meant to freeze that tradition in place, permitting the government to prohibit dangerous weapons historically banned but not newer weapons that lack the same regulatory pedigree.   Yet the very nature of a "tradition" is that it links our past with our present.  From that perspective, I find it quite significant that the Court did *not* narrowly define the relevant tradition as, for example, "the tradition of banning machine guns."  In defining the tradition as the "tradition of prohibiting . . . 'dangerous and unusual' weapons,"[3] the Court signaled its support for allowing contemporary legislatures to maintain that tradition by banning especially dangerous weapons that new technologies introduce to American markets.

**(2)  On page 21 of your prepared testimony, you criticized the original "assault weapons" ban because it "grandfathered many thousands of weapons already owned, and those could still be sold or transferred."  Do you believe that assuming that an "assault weapons" ban were constitutional, it could only be truly effective if it did not grandfather existing weapons, or at least criminalized the sale or transfer or such weapons?**

*RESPONSE:*

As someone who supports an assault weapons ban because it will help to stem the tide of gun violence in our country, I of course would like to see the enactment of a ban that is as effective as possible, consistent with all applicable constitutional constraints.  Many gun-

---

[2] *See, e.g.*, Brief of the American Bar Association as Amicus Curiae Supporting Petitioners, at 13 – 14, District of Columbia v. Heller, 554 U.S. 570 (2008), 2008 WL 136349; Brief for State Firearm Associations as Amici Curiae in Support of Respondent at 21, n. 19, District of Columbia v. Heller, 554 U.S. 570 (2008), 2008 WL 383519.
[3] *Heller*, 544 U.S. at 627.

control experts believe that the best means to effectuate the goals of an assault weapons ban is to get those guns off the streets immediately. However, I recognize that at least some steps designed to achieve that aim would raise substantial constitutional questions. I also understand that, as with any sweeping regulatory change, sometimes the best way to change minds and gain broad-based buy-in from the American public is to take incremental steps.

I believe an assault weapons ban, with or without a grandfathering provision, will be an effective measure in reducing gun violence. The grandfathering approach may, however, take more time to prove its effectiveness. In drawing attention to the grandfathering policy in the 1994 ban, I meant only to rebut unfair criticisms of that ban for failing to contribute to a significant decline in gun violence before its premature expiration. The ban was not designed to work in a single a decade, and the Second Amendment certainly does not require that courts adopt such a short window for evaluating effectiveness.

**(3)  You testified that universal registration of firearms is constitutional under the Second Amendment. Do you believe that universal registration is an advisable measure to enact?**

*RESPONSE:*

Many states have enacted gun registration laws, and as my prepared testimony demonstrates, there is no Second Amendment bar to reasonable registration requirements at either the state or federal level. As a policy matter, I find that mandatory, loophole-free registration is an eminently sensible means to aid law enforcement efforts to investigate crime and to ensure that firearms do not fall into the hands of felons and mentally ill persons, as well as others to whom the Second Amendment, rightly understood, does not extend a right to keep and bear arms. And federal efforts in particular are essential because no state or locality is an island when it comes to the sea of firearms.

**(4)  On page 24 of your prepared testimony, you indicated that conditions and qualifications on the commercial sale of arms are constitutional under the Second Amendment. Does this mean that Congress can ban the sale or transfer of all arms that are not handguns? Can Congress constitutionally ban the sale of any arms by citizens?**

*RESPONSE:*

I believe your question mistakenly cites to page 24 of my prepared testimony. Perhaps you intended to reference page 28, in which I quote the Supreme Court in *Heller* as recognizing the common sense proposition that "laws imposing conditions and qualifications on the commercial sale of arms" are constitutionally permissible.[4]  As my testimony demonstrates, this statement in the *Heller* decision means that Congress may

---

[4] *Id.* at 626 – 27.

enact reasonable background-check rules for gun sales.  I have no doubt that Congress may lawfully enact similar types of regulations governing all firearm sales, including private sales between citizens.  Your question further asks whether Congress may ban the "sale of any arms by citizens" or whether Congress may prohibit the sale or transfer of "all arms that are not handguns."  As my prepared testimony makes clear, the constitutionality of any ban on the sale or possession of a certain type of weapon must be determined, *first*, by evaluating the law in light of the three threshold factors that determine the scope of Second Amendment coverage (dangerousness, nexus to self-defense, and commonality of use), and *second*, assuming the law does not implicate core Second Amendment values, by applying an intermediate level of scrutiny to the law, just as most federal and state courts have done in response to Second Amendment challenges.  Beyond offering that response, I do not think it would be sensible for me to speculate about the legality of hypothetical laws described at such an abstract level of generality.

**QFRs from Senator Graham**

(1) **How can the lower courts' widespread adoption of an "intermediate scrutiny" standard be squared with the Heller court's rejection of the interest-balancing approach advocated by Justice Breyer?  Isn't intermediate scrutiny just another name for interest balancing?**

*RESPONSE:*

State and federal courts have typically applied some form of intermediate scrutiny when evaluating the constitutionality of gun regulations under the Second Amendment.  This approach is not inconsistent with the Court's rejection of Justice Breyer's "interest-balancing approach," and the *Heller* majority expressly said so.  In rejecting Justice Breyer's approach, Justice Scalia's majority opinion argued that Justice Breyer favored "none of the traditionally expressed levels (strict scrutiny, *intermediate scrutiny,* rational basis), but rather a judge-empowering 'interest-balancing inquiry.'"[5]  Moreover, the Court in *Heller* expressly noted that the D.C. handgun ban failed to withstand "any of the standards of scrutiny that we have applied to enumerated constitutional rights."[6]  It is unclear whether Judge Breyer's "interest-balancing" approach would have meaningfully differed from traditional intermediate scrutiny in practice.  The *Heller* majority certainly supposed that it could, and for that reason, we will never find out.  What is unambiguously clear is that the plain text of *Heller* forecloses any contention that intermediate scrutiny is inappropriate for evaluating Second Amendment claims.

(2) **You mention the 1915 case in which the Supreme Court held that motion pictures—a new technology at the time—weren't entitled to First Amendment protection.  You call that a "misjudgment," and I agree.  But isn't this comparable to your argument that certain modern firearms that**

---

[5] *Id.* at 634 (emphasis added).
[6] *Id.* at 628.

4

**you consider "unusually dangerous" aren't protected by the Second Amendment?**

*RESPONSE:*

My characterization of the Supreme Court's 1915 ruling in *Mutual Film Corp. v. Indus. Comm'n of Ohio* is not at all analogous to my conclusion that the Second Amendment does not protect assault weapons and high-capacity magazines. First, the explanation for the Court's decision in *Mutual Film* seems to lie in the Court's inadequate understanding of film as a new technology and its unduly limited conception of "speech" as a constitutionally protected activity. By contrast, I contend that assault weapons and high-capacity magazines fall outside the Second Amendment's scope *precisely because of* my understanding of how they operate and the special dangers they pose.

Second, although they are of course comparable in some respects, the First and Second Amendments implicate different values and concerns, making simplistic analogies between the two fields more misleading than instructive. Given the potentially enormous hazards to public safety inherent in the development of new weapons technologies, our Second Amendment doctrine must take cognizance of the dangerousness of modern weaponry when determining whether certain types of weapons are constitutionally protected. It is for this reason that the Supreme Court in *Heller* was so wise to incorporate dangerousness as a threshold consideration. Though certain new types of speech may pose novel threats to public welfare – violent interactive video games, for example – the degree of that threat is not nearly so strong, and the threat is in any event far less direct. This difference means that special judicial caution when construing the First Amendment to embrace new technologies is unwarranted.

**(3) You refer to the Heller court's list of "longstanding prohibitions" as "examples of regulations that should not even receive further constitutional review." But the Court referred to these measures as "presumptively lawful." In your view, can that presumption ever be rebutted? For example, not every "condition and qualification on the commercial sale of arms" is automatically constitutional, is it? In fact, you say that a background check that took years to complete would be "a very severe burden" on Second Amendment rights, so doesn't that confirm that the "presumptively lawful" measures mentioned in Heller aren't immune from review?**

*RESPONSE:*

The text of the *Heller* opinion states unequivocally that longstanding regulations are "permissible"[7] and that these regulations fall within "exceptions" to the right to keep and bear arms.[8] These statements establish that, if a regulation falls squarely within a historical tradition, then it is no longer subject to Second Amendment scrutiny. There is

---

[7] 554 U.S. at 635
[8] *Id.*

no other way to make sense of *Heller*'s clear statement that such a regulation comes within an "exception" to the right.

To be sure, even if a longstanding regulation is not subject to *Second Amendment* scrutiny, it may still be unconstitutional because it violates *some other constitutional principle*. For example, it is an unfortunate truth that in our country many states historically had laws prohibiting African Americans from bearing arms. Notwithstanding the historical pedigree of these laws, they are obviously unconstitutional; they are blatant violations of the principle of equality expressed in the Fifth and Fourteenth Amendments. Hence, I agree that longstanding regulations are "presumptively lawful"—not automatically so.

But when it comes to the proposed regulations pending before Congress, there can be no suggestion that they violate a constitutional principle apart from the Second Amendment. It follows that, under *Heller*, the long historical pedigree of these types of regulations establishes that they fall within an "exception" to the Second Amendment—without any need for further constitutional review.

> **(4) You mention the court's reference to "dangerous and unusual weapons." But isn't the historical record clear that the old rule against carrying such arms—going back to 14th century England—was really a time, place and manner restriction? After all, in the 14th century, there wasn't that much variety of swords, spears, crossbows and so on, and in the American cases applying it (notably in North Carolina, well into the 1960s) it was held to refer to perfectly ordinary, unquestionably common guns that were brandished or fired in a dangerous way. In fact, in the Lanier case that you cite, wasn't the North Carolina Supreme Court dealing with a defendant who rode his horse through a courthouse, and didn't the court say it would "attach no importance to the fact that *the defendant had no arms*"?**

*RESPONSE:*

When *Heller* says that historical tradition supports excluding "dangerous and unusual weapons" from Second Amendment coverage, it clearly means that certain *types of weapons* may be prohibited outright—not just that these weapons are subject to time, place, and manner restrictions.

First, as a matter of ordinary English usage, "dangerous and unusual weapons" refers to a category of weapons, not to a category of times, places, or ways to use a weapon. Second, the *Heller* Court explicitly said that the dangerous-and-unusual exception concerns the "sorts of weapons" covered by the Second Amendment.[9] Third, the Court said that a prohibition on machineguns was an example of a regulation of "dangerous and unusual weapons."[10] Such a regulation obviously cannot be rationalized as a time, place, and

---

[9] *Id.* at 627.

[10] *Id.* at 624, 627.

manner restriction; rather, it is an outright prohibition of a type of weapon – and indeed of a type of weapon that could easily have become "common" had it not been banned so quickly.

It is true that legislatures may go beyond prohibiting particularly dangerous and unusual weapons, and may in addition prohibit using ordinary weapons at dangerous times, in dangerous places, or in dangerous ways. For example, *Heller* indicated that longstanding laws "forbidding the carrying of firearms in sensitive places" comport with the Second Amendment.[11] But these time, place, and manner restrictions fall within a *separate* exception to the right to keep and bear arms. There is no sound basis in the *Heller* opinion or in the historical record for collapsing that exception into the rule that dangerous weapons may be prohibited altogether.

> **(5) You suggest that guns with "large" magazines may have become common simply because they're "most readily … available on the market." Are you really suggesting that revolvers or smaller-capacity pistols are not readily available? How can you square this with the ATF manufacturing and export reports, which show that more than 500,000 revolvers were sold in the U.S. in 2011? Surely, between those new guns and all the used ones on the market, anyone who wants a lower-capacity gun can find one.**

*RESPONSE:*

I certainly did not suggest that smaller-capacity pistols are not readily available in the market. Instead, I merely said that "guns equipped with or ready for large-capacity magazines may simply be the weapons *most* readily made available on the market."[12]  To say that large-capacity guns may be the weapons *most* readily available does not imply that small-capacity guns are not readily available at all.

---

[11] *Id.* at 626.
[12] Tribe Testimony, at 12 (emphasis added).

7

# Exhibit 100

**TESTIMONY FOR**
**CHIEF JIM JOHNSON, BALTIMORE COUNTY, MARYLAND**
**CHAIR, NATIONAL LAW ENFORCEMENT PARTNERSHIP**
**TO PREVENT GUN VIOLENCE**
**Senate Judiciary Committee Hearing**
**Wednesday, January 30, 2013**

Mr. Chairman, Ranking Member, and Members of the Committee, I want to thank you for the opportunity to testify today. I am here on behalf of the National Law Enforcement Partnership to Prevent Gun Violence, an alliance of the nation's law enforcement leadership organizations concerned about the unacceptable level of gun violence in the United States.

The Partnership, founded in 2010, includes: the Commission on Accreditation of Law Enforcement Agencies; Hispanic American Police Command Officers Association; International Association of Campus Law Enforcement Administrators; International Association of Chiefs of Police; Major Cities Chiefs Association; National Association of Women Law Enforcement Executives; National Organization of Black Law Enforcement Executives; Police Executive Research Forum; and the Police Foundation.

We mourn those lost to gun violence, including the 20 children in Newtown, along with the six brave adults whose lives were cut short by a deranged individual armed with firepower originally designed for combat, not for gunning down innocent members of our communities.

More than 30 homicides occur in America each day. Two-thousand children, ages 18 and under, die of firearm-related deaths in the U.S. every year. In 2011, for the first time in 14 years, firearms were the leading cause of death for police officers killed in the line of duty. In just the two-week period after the Newtown massacre, six police officers were killed and 10 injured in 12 separate shootings.

In a one-week period in 2011, the Police Executive Research Forum (PERF) found that gun crime in six cities cost more than $38 million, and in the year 2010 cost the entire country more than $57 billion.

We urgently need Congress to address the rising epidemic of gun violence. Law enforcement leaders support the President's comprehensive approach, which includes enhancing safety at educational institutions and addressing mental health issues. But on behalf of my colleagues across the nation, I am here today to tell you that we are long overdue in strengthening our nation's gun laws. Doing so must be a priority for Congress.

The organizations in the National Law Enforcement Partnership to Prevent Gun Violence are united in urgently calling on Congress to:

- Require background checks for *all* firearm purchasers;
- Ensure that prohibited purchaser records in the National Instant Criminal Background Check System (NICS), are up-to-date and accurate; and
- Limit high capacity ammunition feeding devices to ten rounds.

Seven of our nine groups, including the largest organizations among us, also support a ban on

assault weapons and Senator Feinstein's legislation.

Federal law prohibits dangerous individuals, such as convicted felons and those with mental health disqualifiers, from possessing firearms. While background checks are required for purchases through federally licensed gun dealers, no check is required for private sales, such as those through Internet postings, print ads or gun shows.

From November 2011 to November 2012, an estimated 6.6 million firearm transactions occurred without a background check. Up to 40 percent of firearm transactions occur through private individuals rather than licensed gun dealers. Allowing 40 percent of those acquiring guns to bypass background checks is like allowing 40 percent of airline passengers to board a plane without going through airport security.

Last October, in Brookfield, Wisconsin, seven women were shot by a prohibited purchaser who was under a domestic violence restraining order. The shooter answered an online ad and was able to buy a gun without a background check. Had the sale required a check, this tragedy could have been prevented.

Background checks work. They stopped nearly 2 million prohibited purchases between 1994 and 2009. We already have a national background check system in place. Therefore, extending background checks to *all* firearm purchasers can easily be implemented – and should be, without delay.

States can't do it alone. Interstate firearms trafficking is a serious problem that must be addressed federally. The problem is rampant: According to the ATF, in 2009, 30 percent of guns recovered at crime scenes had crossed state lines.

Submissions to NICS must be improved, especially mental health and drug abuse records. The 2007 massacre at Virginia Tech is a tragic example of a prohibited purchaser slipping between the cracks due to incomplete NICS records.

The ban on assault weapons and high-capacity ammunition magazines must be reinstated. Like assault weapons, high-capacity magazines are not used for hunting, do not belong in our homes and wreak havoc in our communities. Banning these magazines will reduce the number of bullets a shooter can use before having to reload. Reloading can provide a window of time in which to take down a shooter, as we saw in Tucson.

In 1998, four years after the assault weapons and high-capacity ammunition magazine ban was enacted, the percentage of firearms with large-capacity magazines recovered by Virginia police decreased and continued to drop until it hit a low of 9 percent in 2004, the year the ban expired. It hit a high of 20 percent in 2010, according to a Washington Post analysis.

After the 1994 law expired, 37 percent of police agencies saw increases in criminals' use of assault weapons, according to a 2010 PERF survey.

I have been in law enforcement for nearly 35 years, and have seen an explosion in firepower since the assault weapons ban expired. It is common to find many shell casings at crime scenes these days, as victims are being riddled with multiple gunshots.

The common-sense measures we are calling for will not infringe on Second Amendment rights,

2

but will ensure that we keep guns out of dangerous hands and excessive firepower out of our communities.

Generations of Americans, including our youngest ones, are depending on you to ensure they will grow up and fulfill their roles in the great human experience. None of us can fail them. I urge you to follow the will of the American public and stand with law enforcement to enact these common-sense public safety measures.

Thank you.

# Exhibit 101

Written Testimony for Chief Jim Bueermann (Ret.)
President, Police Foundation, Washington, D.C.
Senate Judiciary Committee Hearing
on Gun-related Violence
Wednesday, January 30, 2013

I write to you in my capacity as both President of the Police Foundation and the former Chief of Police of the Redlands, CA Police Department. The Police Foundation, established in 1970 by the Ford Foundation, is a non-partisan, non-constituency research organization. Our mission is to advance policing through innovation and scientific research. The Foundation is committed to disseminating science and evidence-based practices to the field. My written testimony reflects these principles and my personal experience after 33 years as a police officer during which time I witnessed countless acts of violence. I urge the passage of the Assault Weapons Ban Act of 2013 and ask Congress to consider funding additional scientific research to help this country implement evidence-based approaches to reducing gun violence in our communities and schools.

The most recent available data reveal this alarming picture of America's experience with gun-related violence: in 2011, of the 32,163 deaths from firearms, 19,766 were suicides and 11,101 were homicides.[1] Additionally, there were 467,321 non-fatal violent crimes committed with a firearm.[2] These numbers all reflect the unique position of the United States in relation to other high-income nations: our homicide rate is 6.9 times higher than the combined homicide rate of 22 other high-income countries.[3] We all know that gun violence must be stemmed. The Police Foundation supports a comprehensive and holistic approach to preventing and reducing gun violence that includes:

- Legislation that bans assault weapons, requires universal background checks for all firearm purchases and limits high capacity ammunition feeding devices to ten rounds;
- Enhanced funding for research on the availability of firearms, the causes and prevention of gun violence and the connection between mental health and gun violence;
- Specific funding to replicate the 1996 US DOJ, National Institute of Justice study *Guns in America* that provided a comprehensive view of guns in our society;
- Increased funding to states for community-based mental health treatment; and,
- Sustained funding and support of the Justice and Mental Health Collaboration Program Act, which allows for collaborative efforts between law enforcement, criminal justice and mental health professionals.

Gun violence, especially violence that is mental health-related, is a complex social, cultural, health and safety issue. It is one that we do not know enough about. As the leader of a research organization that focuses on policing crime and disorder, I stress the need for scientific research and an evidence-based approach to understanding important societal issues. As a country, we

---

[1] Ibid.

[2] Bureau of Justice Statistics. Number of violent victimizations by weapons category. Generated using the NCVS Victimization Analysis Tool at www.bjs.gov. 29-Jan-13.

[3] Richardson EG, Hemenway D. Homicide, suicide, and unintentional firearm mortality: comparing the United States with other high-income countries, 2003. Journal of Trauma 2011; 70:238-243.

need a robust and rigorous agenda on the causes of gun violence, effective, community-based prevention and intervention strategies and the link between mental illness and gun violence. Lifting the freeze on gun violence research at the Centers for Disease Control is heartening, and I hope Congress will support additional funding for interdisciplinary, scientific research and collaboration across government agencies, including the Department of Justice and the Department of Health and Human Services.

Mental health-related gun violence has been brought to the fore with the shootings in Newtown, CT, Aurora, CO and Tucson, AZ. While these tragic incidents are statistically rare, when combined with the number of gun-related suicides each year, the necessity of addressing the mental health needs of individuals, and the availability of firearms in our communities, is paramount.

We do not want to stigmatize individuals with mental illness nor solely focus the current dialogue on gun violence on the role of mental illness. The best available data on violence attributable to mental illness shows that 3-5% of violent acts are committed by individuals with mental illness[4] and most of these acts do not involve guns.[5] Yet, we cannot ignore the number of gun-involved suicides each year and the connection between mass shootings and mental illness. Increased scientific research across the fields of medicine, public health, criminal justice and law will help us understand how to prevent mental health-related gun violence. This requires both robust funding and time.

As a former chief of police, I recognize that local law enforcement agencies require immediate strategies to prevent another incident of mass violence. Earlier this month, the Police Foundation convened a roundtable meeting of expert researchers and practitioners from the fields of law enforcement, mental health, public health, criminal justice and policy. The group discussed how available interdisciplinary research might be used to develop practical strategies for law enforcement that prevent mental health-related gun violence. Existing research establishes the difficulty in predicting a violent act,[6] but the group committed to three strategies that law enforcement can adopt now. Based on innovative practices defined in the literature, the group proposed that law enforcement executives:

- Create local partnerships with mental health service providers, school officials and appropriate community groups to develop a mental health crisis response capacity;
- Advocate for increased mental health services in their communities. Law enforcement executives should convene local service providers and community members to assess local mental health services and community needs and increase community members' knowledge of the exiting science on mental health and gun violence;

[4] Swanson JW: Mental disorder, substance abuse, and community violence: an epidemiological approach; in Violence and Mental Disorder. Edited by Monahan J, Steadman H. Chicago, University of Chicago Press,1994. Cited in Appelbaum, PS and JW Swanson. Gun laws and mental illness: How sensible are current restrictions? Psychiatric Services 2010, 61: 652-654.
[5] Monahan J, Steadman H, Silver E, et al: Rethinking Risk Assessment: The MacArthur Study of Mental Disorder and Violence. New York, Oxford University Press, 2001. Cited in Appelbaum, PS and JW Swanson. Gun laws and mental illness: How sensible are current restrictions? Psychiatric Services 2010, 61: 652-654.
[6]

- Adopt specific policies and practices that reduce the availability of guns to people in mental health crisis, institutionalize mental health training for their officers and facilitate community-wide "mental health first aid" training for all community members.

Clearly, more work needs to be done in this area so police departments can effectively operationalize these ideas. With additional Congressional support, strategies like these can be supported by legislation such as the Justice and Mental Health Collaboration Act or through an enhancement of programs at the Department of Justice and the Departments of Health and Human Services and Education. The JMHC Act has bipartisan support across the House of Representatives and Senate, and I ask that Congress sustain funding for these important ideas as part of a targeted approach to specifically reducing gun violence.

Charting a path to respond to gun violence will not be easy, but I encourage Congress to rely on the police, community leaders and science to guide that path. The Police Foundation, along with law enforcement leaders across the country, support reducing the availability of assault weapons and high capacity ammunition feeding device as a first step to reducing gun violence. However, to effectively reduce gun violence, there must be more comprehensive action. Congress should prioritize funding to better understand guns in America, research on the causes and prevention of gun violence and the connection between mental illness and gun violence. It should also enhance the funding and availability of mental health services in communities, and support programs that increase local collaboration between law enforcement, criminal justice and mental health professionals.

Thank you for your consideration of this written testimony.

Written Testimony

Submitted for the record by

**Sheldon Greenberg, Ph.D.**
**Associate Dean**
**Johns Hopkins University, School of Education, Division of Public Safety Leadership**
**Former Associate Director, Police Executive Research Forum**
**Former Officer, Supervisor, and Bureau Commander, Howard County (MD) Police Department**
**Past President, Maryland Crime Prevention Association**

For the hearing before the
Senate Committee on the Judiciary

on

"What Should American Do About Gun Violence?"

Wednesday, January 30, 2013


Two months ago, Johns Hopkins University co-sponsored the National Summit on Multiple Casualty Shootings, in partnership with the Department of Justice, Office of Community Oriented Policing Services (COPS), and the Department of Homeland Security, Federal Law Enforcement Training Center (FLETC).  While much attention is being given to multiple casualty shootings, the nation's public safety personnel are equally concerned about the violence and trauma resulting from gun-related acts of domestic violence, street crime, and suicide that occur every day.  These incidents devastating and disrupt neighborhood and community well-being.

We can do more to tend to the public's safety and provide people with a greater sense of peace and safety where they live, work, shop, and recreate.  We believe, and evidence supports, that much of the gun-related violence and subsequent suffering that occurs in our nation's homes, neighborhoods, small businesses, and schools can be prevented.  One of the most effective ways to prevent tragic events from occurring is to do more to control access to guns.

In seeking new and better ways to prevent gun violence, the Division of Public Safety Leadership embraces the principles established by the National Law Enforcement Partnership to Prevent Gun Violence and with Mayors Against Illegal Guns.  These principles were embraced by the Ad Hoc Committee of the Maryland Chiefs of Police Association last week. They are:

- The level of gun violence in the United States, specifically firearm-related injuries and deaths including homicides, suicides, and accidental shootings, is unacceptable and demands immediate attention.

- The level and lethality of gun violence directed at police officers requires an organized and aggressive response from policy makers at the federal, state, and local levels.

- Elected officials must close the gaps in the current regulatory system, including those that enable felons, minors, persons with mental illness, and other prohibited persons to access firearms, and those that allow the trafficking of illegal guns.

1

- Law enforcement plays a critical role in preventing gun violence and solving crime.

- Effective strategies for the strict enforcement of laws concerning the illegal possession, trafficking, and criminal use of firearms are vital, and need to be supported by data, research, technology, training, and best practices.

- Because the public's health and safety depends on the efforts of law enforcement, agencies must have resources sufficient to prioritize the protection of officers and communities against illegal guns and firearm violence.

- The crisis of gun violence in our nation necessitates a sustained, coordinated, and collaborative effort involving citizens, elected officials, law enforcement, and the entire criminal justice system.

In response, we join the above cited organizations in calling upon the President of the United States and members of Congress to:

1. Require background checks for all firearm purchasers.
2. Improve background checks by ensuring that the National Instant Criminal Background Check System (NICS), which maintains records of those who are legally prohibited from purchasing guns, be complete and accurate.
3. Ban new semi-automatic assault weapons.
4. Limit high-capacity ammunition magazines to ten rounds.
5. Oppose federal preemption of state laws governing the carrying of concealed weapons.

In January, the Johns Hopkins University, School of Education, Division of Public Safety Leadership hosted the second national Summit on Campus Public Safety for the Department of Justice, Bureau of Justice Assistance and facilitated the meeting of the Maryland Chiefs of Police Association Ad Hoc Committee on Gun Violence. We have a legacy of scholarship and leadership in this area and welcome the opportunity to support all reasonable efforts to prevent gun violence.

*The Johns Hopkins University, School of Education, Division of Public Safety Leadership (DPSL) provides education, research, and technical assistance to the fields of law enforcement, fire/EMS, intelligence analysis, emergency management, public health, security, corrections, and the military. DPSL cultivates viable communities by developing and disseminating educational and technical assistance programs that foster the ethical, social, operational and intellectual development of professionals who serve public safety and related fields.  The Division provides graduate, undergraduate, certificate, and noncredit education designed to advance and sustain the well-being of people and their neighborhoods and communities. All students in PSL are active public safety practitioners. Over 1,000 PSL graduates hold leadership positions nationwide in federal, state, and local agencies and play a significant role in shaping the future of American public safety.  PSL graduates currently serve as chiefs of police in Denver, San Antonio, Washington, D.C., and Prince George's Counties in Maryland.  They also serve as senior executives in federal agencies, such as the U.S. Secret Service, U.S. Bureau of Alcohol, Tobacco, Firearms, and Explosives, and Immigration and Customs Enforcement.*



Written Testimony

Submitted for the record by

**Daniel W. Webster, ScD, MPH**
**Professor and Director**
**Johns Hopkins Center for Gun Policy and Research**

For the hearing before the
Senate Committee on the Judiciary

on

"What Should American Do About Gun Violence?"

Wednesday, January 30, 2013


On January 14-15, 2013, more than twenty of the top researchers and gun policy experts gathered to participate in a Summit on Reducing Gun Violence in America at Johns Hopkins, and presented findings and analyses that were just published in a book.[1]  These leading scholars identified numerous weaknesses in current federal firearms policy which enable criminals, those with severe mental illness, perpetrators of domestic violence, and underage youth to obtain firearms.  These weaknesses in our firearms policies play an important role in explaining why the United States' homicide rate is seven times higher than the average rate among other high-income countries.[2]

A recent national survey we conducted found very broad support – among gun owners and non-gun-owners and across political party affiliation – for laws prohibiting these and other high-risk groups from possessing firearms.  There was similarly broad support for measures to keep guns from these groups, such as requiring background checks for all gun sales and stronger laws governing licensed gun dealers.[3] Importantly, research shows that prohibiting high-risk groups from possessing firearms reduces violence and saves lives,[4,5] especially if necessary records are available for law enforcement to deny prohibited individuals.[6]

Opponents of stronger gun laws often claim that we simply need to do a better job of enforcing current gun laws. But current federal laws are written in ways that make it very difficult to hold firearm sellers, whether licensed dealers or private sellers, accountable if they sell firearms to criminals or traffickers.[7,8] Non-licensed sellers of firearms have no obligation to ensure that the prospective purchasers have passed a background check and can legally possess firearms.

Such a policy is indefensible and is commonly exploited by criminals and traffickers. It is not surprising that nearly eighty percent of handguns used by offenders incarcerated in state prisons report that they acquired their handguns from non-licensed sellers – friends, family, and sellers in the underground market.[9]  Nor is it surprising that states that fail to regulate private handgun transactions export guns to criminals in states that do regulate private handgun sales.  If you follow the logic of arguments that requiring background checks for private gun sales is pointless because criminals won't obey the law, then laws against drunk driving are pointless because drunks will always disobey those laws.  Just as drunk

driving laws provide law enforcement with the tools to arrest individuals who break those laws and deter others from driving drunk, requiring background checks for all sales will provide law enforcement with the tools it needs to combat illegal gun trafficking and keep guns from prohibited individuals. Unfortunately, Congress has enacted several laws that shield scofflaw gun dealers from scrutiny, civil penalties, and criminal prosecution. The 1986 Firearm owners Protection Act weakened penalties for gun sales violations, increased standards of proof for prosecutions and actions against licensed gun dealers, and limited ATF law compliance inspections. The Protection of Lawful Commerce in Arms Act provided special immunity from lawsuits for negligent practices which enable criminals and other prohibited individuals to obtain guns. The Tiahrt amendments provided further protections to licensed gun dealers who sell many guns that subsequently are recovered from criminals.[8]

There is a growing body of research that has consistently demonstrated that laws which increase gun seller accountability and increase the risk to those involved in illegal gun transactions significantly reduce the number of guns diverted for criminal use. Whereas the federal Tiahrt amendments have been shown to increase the diversion of guns to criminals from suspect gun dealers,[10] strong regulation and oversight of gun dealers reduces guns diverted to criminals,[11] as does being vulnerable to lawsuits for making illegal sales.[12,13] Research has also shown that regulation of private sales of handguns,[8] mandatory reporting of loss or theft of firearms from private owners, and permit-to-purchase licensing for handguns reduces the diversion of guns to criminals.[9]

By adopting many laws shown to be effective at that the state level, Congress could significantly reduce the availability of guns to dangerous individuals, which would translate into fewer lives lost, safer streets and homes, increased quality of life, and reduced government expenditures on health care, disability payments, criminal justice, and corrections.

---

**Research Cited**

[1] Webster, Daniel W. and Jon S. Vernick. *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.* Baltimore, MD: Johns Hopkins University Press, 2013.

[2] Richardson EG, Hemenway D. Homicide, suicide, and unintentional firearm fatality: comparing the United States with other high-income countries, 2003. *Journal of Trauma Injury, Infection and Critical Care* 2011;70:238-243.

[3] Barry CL, McGinty EE, Vernick JS, Webster DW. After Newtown – public opinion on gun policy and mental illness. *New England Journal of Medicine* Jan. 28, 2013; DOI: 10.1056/NEJMp1300512

[4] Wintemute GJ. "Broadening denial criteria for the purchase and possession of firearms: Need, feasibility, and effectiveness." Pages 77-94 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

[5] Zeoli AM, Frattaroli S. "Evidence for optimism: policies to limit batters' access to firearms. Pages 53-64 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

[6] Swanson JW, Robertson AG, Frisman LK, Norko MA, Lin HJ, Swartz MS, Cook PJ. "Preventing gun violence involving people with severe mental illness. Pages 33-52 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

[7] Braga AA, PL Gagliardi. "Enforcing federal firearms laws against firearms traffickers: Raising operational effectiveness by lowering enforcement obstacles." Pages 143-156 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

[8] Vernick JS, Webster DW. "Curtailing dangerous sales practices by licensed firearms dealers: legal opportunities and obstacles". Pages 133-142 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis,* Daniel W. Webster and Jon S. Vernick, Eds., Baltimore, MD: Johns Hopkins University Press, 2013.

---

[9] Webster DW, Vernick JS, McGinty EE, Alcorn T.  "Preventing the diversion of guns to criminals through effective firearm sales laws." Pages 109-122 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.*  Daniel W. Webster and Jon S. Vernick, Eds.  Baltimore, MD: Johns Hopkins University Press, 2013.

[10] Webster DW, Vernick JS, Bulzacchelli MT, Vittes KA.  Recent federal gun laws, gun dealer accountability and the diversion of guns to criminals in Milwaukee.  *J Urban Health* 2012;89:87-97.

[11] Webster DW, Vernick JS, Bulzacchelli MT.  Effects of state-level firearm seller accountability policies on firearms trafficking.  *Journal of Urban Health* 2009;86:525-537.

[12] Webster DW, Zeoli AM, Bulzacchelli MT, Vernick JS.  Effects of police stings of gun dealers on the supply of new guns to criminals.  *Injury Prevention* 2006;12:225-230.

[13] Webster DW, Vernick JS.  "Spurring responsible firearms sales practices through litigation: the impact of New York City's lawsuits against gun dealers on interstate gun trafficking." Pages 123-132 in *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis.*  Daniel W. Webster and Jon S. Vernick, Eds.  Baltimore, MD: Johns Hopkins University Press, 2013.

# Exhibit 102

**The Washington Post**

**Politics**

# Senate Judiciary Committee hearing on gun violence on Jan. 30, 2013 (Transcript)

January 30, 2013

*Here's a complete transcript of testimony from the Senate Judiciary Committee hearing on gun-related violence on Jan. 30, 2013.*

SEN. PATRICK LEAHY: We have more than 200 people here today and hundreds more watching on our committee web cast. I expect everybody in this room to be respectful of the senators and the witnesses speaking about this very serious subject.

That means I do not want applause for or against any position I might take or anybody else takes. The Capitol Police have been notified to remove any audience member who interferes with the orderly conduct of this important hearing.

This incidentally, is a warning I give at many hearings.

We're going to hear a lot of different perspectives on gun violence.

And both Senator Grassley and I will give opening statements . But we have a former member of Congress here, Gabby Giffords, who's going to give a brief message and -- and leave.

And Captain Kelly, thank you for your help in bringing your wife here.

Ms. Giffords?

GIFFORDS: OK . Thank you for inviting me here today. This is an important conversation for our children, for our communities, for Democrats and Republicans.

Speaking is difficult. But I need to say something important. Violence is a big problem. Too many children are dying. Too many children. We must do something.

It will be hard, but the time is now. You must act. Be bold, be courageous, Americans are counting on you.

Thank you.

LEAHY: Captain Kelly, do you want to help Ms. Giffords out? And we'll give you a few moments and then...

(RECESS)

LEAHY: We return to the hearing.

LEAHY: And I -- I thank former Congressman (sic) Giffords and -- and her husband. We will be calling up the witnesses shortly. And Senator Grassley and I will give our opening statements.

You know, on December 14th, America's heart was broken when 20 young children and six dedicated educators were murdered. This is the first Judiciary Committee hearing of the 113th Congress. And I want everybody here to join the discussion as part of a collective effort to find solutions, to help ensure that no family, no school, no community ever has to endure such a grievous tragedy again.

We have to come together today as Americans seeking common cause. I hope we can forego sloganeering and demagoguery and partisan recrimination. It's too important for that. We should all be here as Americans. Every American abhors the recent tragedies. In just the last two years, an elementary school in Connecticut; a movie theater in Colorado; in a sacred place of worship in Wisconsin; in front of a shopping mall in Arizona. And Americans are looking to us for solutions and for action. This committee is a focal point for that process.

I've introduced a measure to provide law enforcement agencies with stronger tools against illegal gun trafficking. Others have proposed restrictions on military-style weapons and the size of ammunition clips. Others have proposed modifications to the background check system to keep guns out of the wrong hands while not unnecessarily burdening law-abiding citizens.

I'm a lifelong Vermonter. I know gun store owners in Vermont. They follow the law. They conduct background checks to block the conveyance of guns to those who should not have them. And they wonder why others who sell guns do not have to follow these same protective rules. And I agree with these responsible business owners.

If we could all agree that criminals and those adjudicated as mentally ill should not buy firearms, why should we not try to plug the loopholes in the law that allows them to buy guns without background checks? It's a simple matter of common sense. And if we agree that the background check system is worthwhile, shouldn't we try to improve its content and use it so it could be more effective? What responsible gun owner objects to improving the background check system? When I buy firearms in Vermont, I go through the background check. I would expect everybody else to.

Now, at the outset of this hearing, I note that the Second Amendment is secure and will remain secure and protected. In two recent cases, the Supreme Court has confirmed that the Second Amendment, like the other aspects of our Bill of Rights, secures a fundamental individual right. Americans have the right to self- defense; as the court has said, to have guns in their homes to protect their families. No one can take away those rights or their guns.

Second Amendment rights are the foundation on which our discussion rests. They're not at risk. What is at risk are lives. Lives are at risk when responsible people fail to stand up for laws that will keep guns out of the hands of those who use them to commit murder, especially mass murders. I ask that we focus our discussion on additional statutory measures to better protect our children and all Americans. I say this as a parent and as a grandparent.

Ours is a free society, an open society. We come together today to consider how to become a safer and more secure society. No one begrudges the government assistance provided to victims of mass tragedies made possible by the law we passed after the bombing in Oklahoma City. The bill introduced last week against gun trafficking will similarly prove helpful, and I believe will become an accepted part of our crime control framework.

LEAHY: It, too, is common-sense reform. It fills a hole in our law enforcement arsenal so that straw purchasers who acquire weapons for criminals can be prosecuted more effectively. Last Thursday, the president nominated the U.S. attorney for Minnesota -- and we have two from his state here on this committee -- nominated the U.S. attorney to direct the Federal Bureau of Alcohol, Tobacco, Firearms and Explosives. And I trust that all the senators will cooperate in a prompt hearing in action on that nomination. We will join (ph) good faith to strengthen our law enforcement efforts against gun violence and to protect public safety.

As a responsible governor and someone who cherishes all of our constitutional rights, as a senator who has sworn an oath to uphold those rights, as a father and a grandfather, and as a former prosecutor who has seen the results of gun violence firsthand in graphic detail, I undertake these efforts with the hope that this hearing can build consensus around common sense solutions.

Previous measures to close the gun show loophole or to improve the background check system have been bipartisan. And I hope in this new Congress, further improvements will also become bipartisan. We could act together as Americans. I have said what kind of measures I can support. Now I ask other senators to come forward and do, as well. I will ask our witnesses what legislative proposals they support to make America safer, and I thank everybody here for joining in today's discussion.

Senator Grassley?

GRASSLEY: Mr. Chairman, and thank you, as well, for this hearing. And thanks to everybody who is here, and, particularly, our witnesses.

What happened at Newtown shocks our nation. We will never forget where we were or how we reacted when we learned that 20 very young children and six adults were killed that day, or if we forgot about that specific incident, you don't forget about all the tragedies that have happened recently.

As a grandfather and great- grandfather, I cannot imagine how anyone would commit an evil act like that. And I cannot ever begin to know what it would be like to be a relative of one of those slain children. We pray for the families who continue to mourn the loss of loved ones. We pay for -- pray for all victims of violence and guns, by guns and otherwise. Clearly, violent crimes and those who commit them are a plague on our society, one that has been with us for far too long. We have looked at these issues before, but I welcome this renewed discussion. I think the need for the judiciary committee to hold hearings after Newtown is very clear. All over America, people were appalled by what happened to those vulnerable and precious victims. And we all want to exam (ph) sensible actions that could reduce the likelihood of future crimes.

And we've extended a special welcome to former Congresswoman Giffords. She was doing what a conscientious representative should do, but I hope all of us do, taking the pulse of constituents to represent them in Congress. She was representing the people of her congressional district when a gunman opened fire. The shooting was a horrible tragedy, but her determination to overcome her injuries, progress through rehabilitation, and continued contribution to society are an inspiration, or at least should be an inspiration to all of us. I thank her for being here today and with her husband, Captain Kelly.

Although Newtown and Tucson are terrible tragedies, the deaths in Newtown should not be used to put forward every gun control measure that's been floating around for years. Because the problem is greater than just guns alone, and I think the chairman's speech indicates that, as well. Any serious discussion of the causes of gun violence must include a complex re-examination of mental health as it relates to mass shootings. Society, as a whole, has changed as well, and that statement's made. It's difficult for remeasure, (ph) but I think you see a lack of civility in American society has grown considerably in the last couple decades.

GRASSLEY: You see it here on the -- in the Congress, as well, when we are partisan and don't treat each other with the respect that we ought to. There are too many video games that celebrate the mass killing of innocent people, games that, despite attempts at industry's self-regulation, find their way into the hands of children.

An example: One video game released November 2009, which has sold over 22 million copies in the U.S. and U.K., was for foreign distribution because the opening level depicted shooting innocent civilians in an airport security line.

This game was specifically cited in a manifesto of the Norway mass shooter as, quote, "part of my training simulation," end of quote, for carrying out his attacks.

Where is the artistic value of shooting innocent victims? I share of vice president Joe Biden's disbelief of manufacturer denial that these games have no affect on real-world violence.

Above all, we should not rush to pass legislation that will not reduce mass killings. Banning guns based on their appearance does not make sense. The 1994 assault weapon ban did not stop Columbine. The Justice Department found the ban ineffective. Scholars have indicated that refining or expanding such legislation will not cut gun violence.

I also question the limitation on magazine capacities. Those can be circumvented by carrying multiple guns, as many killers have done.

We hear that no one needs to carry larger magazines than those that hunters used to shoot deers (sic), but an attacking criminal, unlike a deer, shoots back.

I do not think that we may be able -- I do think that we may be able to work together to prevent straw purchasers from trafficking in guns.

The oversight work I conducted on illegal Operation Fast and Furious shows that there are some gaps in this area of law that should be closed.

Besides legislative proposals, the presently -- president recently took 23 executive actions on guns. And without knowing exactly how they're worded, we don't -- can't find fault with them. And probably should not find fault with a lot of his actions.

Despite this administration's claim to be the most transparent in history, the text of these actions is still not posted on the White House website, only very brief statements about what they do.

But all of those executive actions could have been issued years ago or after the Tucson shooting or after Aurora. Why only now?

One order directs the Center for Disease Control to research causes of gun violence. Contrary to what you may have heard, Congress has never prohibited CDC from researching gun violence rather.

Rather, Congress prevented federal research to, quote, "advocate or promote gun control," which some government researchers had been doing under the guise of taxpayer-supported science.

Had Congress actually prohibited gun violence research, the president could not legally have directed CDC to conduct that research.

I was taken aback when the president cited the Declaration of Independence and the Constitution as sources of government power to restrict gun ownership rights.

The Constitution, in fact, creates a limited federal government. It separates powers among branches of the federal government and preserves state power against federal power.

The framers believed that these structures would adequately control the government so as to protect individual liberty. But the American people disagreed. They feared that the Constitution gave the federal government so much power that it could be tyrannical and violate individual rights. So the Bill of Rights was added.

Each of those rights, including the Second Amendment, was adopted to further limit government power and protect individual rights.

President Obama's remarks turned the Constitution on its head. He said, quote, "The right to worship freely and safely, that right was denied to Sikhs in Oak Creek, Wisconsin."

Quote, "the right to assemble peacefully, that right was denied shoppers in Clackmas, Oregon, and moviegoers in Aurora, Colorado. That most fundamental set of rights to life, liberty, and the pursuit of happiness are fundamental rights that were denied to college students at Virginia Tech and high school students at Columbine and elementary school students in Newtown," end of quote.

But this is not so. Except for its prohibition on slavery, the Constitution limits only actions of government, not individuals.

So, for instance, the right to peacefully assemble protects individual rights to organize, to protest, and seek to change to government action. That right is trivialized and mischaracterized as protecting shopping and watching movies.

GRASSLEY: And those constitutional rights are not the source of governmental power to enact legislation, as the president suggested. In fact, just the opposite: They were included in the Bill of Rights because throughout history, governments have wanted to shut up those who would criticize government, to suppress unpopular religions, or to disarm people.

The president's citing of constitutional protections of individual rights is the basis for expanding federal power over the lives of private individuals. This is the same president who exceeded his power under the Constitution to appoint recess appointments. So, no wonder millions of Americans fear that the president might take executive action and Congress may enact legislation that could lead to tyrannical federal government.

So, I cannot accept the president's claim that, quote, "There will be politicians and special interest lobbyists publicly warning of tyrannical all-out assault on liberty, not because that's true, but because they want to gin up fear," end of quote. This necessarily and understandably leads many citizens to fear that their individual rights will be violated. And that extends well beyond the Second Amendment. It should be a matter of deep concern to all of us. The Constitution for 225 years has established a government that is the servant of the people, not the master.

So, Mr. Chairman, as we consider and debate legislation arising from these tragedies, I hope that we will proceed with proper understanding of the relationship that the Constitution establishes between government power and individual liberty, and I hope we will pass those bills that would actually be effective in reducing gun violence.

I welcome the witnesses and look forward to this hearing. Thank you very much.

LEAHY: Thank you.

I'd ask that Captain Mark Kelly, Professor David Kopel, Chief James Johnson, Ms. Gayle Trotter and Mr. Wayne LaPierre step forward. Just stand behind your chairs for the moment and I can swear in the panel at one time.

Please raise your right hand. Do you solemnly swear that the testimony you're giving us is the truth, the whole truth and

nothing but the truth, so help you God?

Let the record show that all witnesses have been sworn in.

Please take your -- take your seat. What I'm going to suggest we do, I'm going to call on each witness. We're going to try to keep to fairly strict time and call on each one to give their testimony. Then, we'll open it to questions in the usual way, alternating on both sides.

Our first witness is Mark Kelly. He's -- our first witness is Mark Kelly. He's a retired astronaut and U.S. Navy captain. Captain Kelly recently co-founded Americans for Responsible Solutions. This is an advocacy group that promotes solutions to prevent gun violence and protect responsible gun ownership. He is with his wife, former Congresswoman Gabrielle Giffords.

So Captain Kelly, please go ahead, sir.

KELLY: Thank you, Chairman Leahy and Ranking Member Grassley for inviting me here today. I look forward to a constructive dialogue with your committee.

I also want to take the opportunity to congratulate Gabby's friend and much-respected former colleague, Jeff Flake, on his new role as Arizona's junior senator.

As you know, our family has been immeasurably affected by gun violence. Gabby's gift for speech is a distant memory. She struggles to walk and she is partially blind. And a year ago, she left a job she loves, serving the people of Arizona.

But in the past two years, we have watched Gabby's determination, spirit and intellect conquer her disabilities. We aren't here as victims. We're speaking to you today as Americans. We're a lot like many of our fellow citizens following this debate about gun violence. We're moderates. Gabby was a Republican long before she was a Democrat.

We're both gun owners and we take that right and the responsibilities that come with it very seriously. And we watch with horror when the news breaks to yet another tragic shooting. After 20 kids and six of their teachers were gunned down in their classrooms at Sandy Hook Elementary, we said: "This time must be different; something needs to be done." We are simply two reasonable Americans who have said "enough."

On January 8th of 2011, a young men walked up to Gabby at her constituent event in Tucson, leveled his gun and shot her through the head. He then turned down the line and continued firing. In 15 seconds, he emptied his magazine. It contained 33 bullets and there were 33 wounds.

KELLY: As the shooter attempted to reload, he fumbled. A woman grabbed the next magazine and others restrained him.

Gabby was the first victim. Christina Taylor Green, nine years old, born on 9/11 of 2001, was shot with the 13th bullet or after. And others followed.

The killer in the Tucson shooting suffered from severe mental illness, but even after being -- even after being deemed unqualified for service in the Army and expulsion from Pima (ph) Community College, he was never reported to mental health authorities.

On November 30, 2010, he walked into a sporting goods store, passed the background check, and walked out with a semiautomatic handgun. He had never been legally adjudicated as mentally ill, and even if he had, Arizona, at the time, had over 121,000 records of disqualifying mental illness that it had not submitted into the system.

Looking back, we can't say with certainly -- with certainty, "Only if we had done this, this would never have happened." There is not just one thing that would have prevented the Tucson shooting from being written into the history books. Gabby is one of roughly 100,000 victims of gun violence in America each and every year. Behind every victim lays a matrix of failure and inadequacy in our families, in our communities, in our values, in our society's approach to poverty, violence, and mental illness and yes, also in our politics and in our gun laws.

One of our messages is simple, the breadth and complexity of gun violence is great, but it is not an excuse for inaction. There's another side to our story, Gabby is a gun owner and I am a gun owner. We have our firearms for the same reasons that millions of Americans just like us have guns, to defend ourselves, to defend our families, for hunting, and for target shooting.

We believe wholly and completely in the second amendment and that it confers upon all Americans the right to own a firearm for protection, collection, and recreation. We take that right very seriously and we would never, ever give it up, just like Gabby with never relinquish her gun and I would never relinquish mine. But rights demand responsibility and this right does not extend to terrorists, it does not extend to criminals, and it does not extend to the mentally ill.

When dangerous people get guns, we are all vulnerable at the movies, at church, conducting our everyday business, meeting with a government official. And time after time after time, at school, on our campuses, and in our children's classrooms. When dangerous people get dangerous guns, we are all the more vulnerable. Dangerous people with weapons specifically designed to inflict maximum lethality upon others have turned every single corner of our society into places of carnage and gross human loss. Our rights are paramount, but our responsibilities are serious. And as a nation, we're not take responsibility for the gun rights that our founding fathers have conferred upon us.

Now we have some ideas on how we can take responsibility. First, fixed on background checks. The holes and our laws make a mockery of the background check system. Congress should close the private sales loophole, and the dangers people entered into that system. Second, remove the limitations on collecting data and conducting scientific research on gun violence. Enact -- enact a tough federal gun trafficking statute, this is really important . And finally, let's have a careful and civil conversation about the lethality of fire arms we permit to be legally bought and sold in this country.

Gabby and I are pro-gun ownership. We are also anti-gun violence, and we believe that in this debate, Congress should look not toward special interests and ideology, which push us apart, but towards compromise which brings us together. We believe whether you call yourself protest gun, or anti-gun violence, or both, that you can work together to pass laws that save lives.

KELLY: Thank you.

LEAHY: Thank you.

Next witness, David Kopel is the research director for the Independence Institute as well an associate policy analyst with the Cato Institute, an adjunct professor of advance constitutional law at Denver University's Sturm College of Law. Did I get that all correct?

(OFF-MIKE)

LEAHY: Thank you. Go ahead, please.

KOPEL: Thank you, Chairman Leahy and then Senator Grassley.

I think, to -- to continue the themes that the Captain Kelly so eloquently spoken about, gun rights and gun control don't have to be culture-war enemies. Properly conceived, they can work together and reinforce each other. It's important to recognize that the Second Amendment is not absolute any more than the First Amendment is. It certainly has an absolute core that can't be violated under any circumstances, but that doesn't prohibit all firearms controls.

LEAHY: Excuse me, and this won't come out of your time.

KOPEL: OK.

LEAHY: All of the statements will be put in the record in full so we can keep close to the time.

Go ahead.

KOPEL: Thank you, I will keep very close to the time.

And, likewise, gun controls don't violate the Second Amendment if they are constructed so they don't violate the rights of law-abiding citizens, and they actually do something constructive, significant, and effective to protect law-abiding citizens.

Captain Kelly talked about the matrix of failure. 20 years ago, I testified before this committee -- some of the senators are still here -- about one thing that turned out to be part of that matrix of failure. And that was the ban on so-called assault weapons. I warned during that testimony then that it was based, not on the function of guns, or how fast they fired, or how powerful they were, but on superficial, cosmetic characteristics and accessories. As part of the compromise that eventually led to that bill being mistakenly passed by Congress, the bill had a 10-year sunset in it and a requirement that the Department of Justice supervise a study of the effectiveness of that law. That study was -- the people to carry out that study were chosen by Attorney General Reno at the Department of Justice. They did several interim studies, and then a final study. And they concluded that the law had done nothing. It had not save lives. It had did not reduced the number of bullets that were fired in crimes. It had

been a failure. It had -- to some minor degree, switched the types of guns that were used in crimes, so you had a gun with one name instead of another name, but it didn't -- it didn't reduce crime overall.

And indeed, it was a dangerous bill in the sense that so much political attention was distracted by the focus on this that it took public attention away from debate on measures that might have been more constructive and life-saving.

Today, police and law-abiding citizens choose semi-automatic handguns and rifles such as the AR-15 for the same reason. They are often the best choice for the lawful defense of self and others. To assert that such firearms, and their standard capacity factory magazines, are only meant for mass murder, is truly to libel law- abiding citizens and the many law-enforcement officers who choose these guns, not for hunting, not for collecting, but for the purpose for which police officers always carry firearms, for the lawful defense of self and others.

Great Britain shows the perils of mass gun -- gun confiscation that some people have proposed. It has a hire violent crime rate than the United States, and especially high rate of home invasion burglaries. Congress has repeatedly outlawed gun registration because of the accurate recognition that another country's, and in the United States -- in New York city, gun registration has been used as a tool for confiscation. These 1941, 1986, and 1993 congressional statutes are one way that gun rights can be protected against future abuses.

Unfortunately, the bill's that -- about universal background checks that have been proposed in recent Congresses, with the support of mayor -- New York City Michael Bloomberg, have often been -- had provisions in them for gun registration and for many other violations of the civil liberties of law-abiding persons, such as allowing gun bans for people accused but acquitted of drug crimes.

KOPEL: Universal background checks should be available. It was a wise move by President Obama in his January 16th press conference to begin changes in federal regulations and their interpretation to allow private sellers to access the background check system via federally licensed firearms dealer. Many people will choose to take advantage of that, and I commend them. But mandating universal checks can only be enforceable if there is universal gun registration, and we know that universal gun registration, in every country in the world where it's existed, has been a serious peril to gun ownership.

Universal gun registration was imposed by Canada in 1995 and was later repealed in 2012 by the Canadian Parliament because it was such a fiasco.

If we want to save lives right now, not with constructive reforms that might do some good in the future, there is only one thing that will stop the next copycat killer and that is lawful armed self- defense in the schools not only by armed guards, but also by teachers.

Utah provides the successful model. There, a teacher who has a permit to carry after a background check and a safety training class everywhere else in the state is not prohibited from carrying at the schools.

Gun prohibition lobbies come up with all kinds of fantastic scenarios about what -- the harms that these would cause -- and

teachers will shoot each other or threaten students, or the students will steal the guns.

But we've had this policy in practice in Utah for many years, and we've never had been a single problem. And, quite notably, we've never had an attack on a Utah school.

If we want to save lives, armed defense in schools is the immediate and best choice, while other constructive solutions may take longer to have an effect.

Thank you.

LEAHY: Thank you very much. As I said, the full statement will be placed in the record.

Chief James Johnson is the police chief of the Baltimore County Police Department. He started his career as a police cadet at the age of 18. He has more than 30 years of experience with the department. He's also the chair of the National Law Enforcement Partnership to Prevent Gun Violence and represents nine national law enforcement organizations.

Chief, thank you for taking the time to be here. Please go ahead, sir.

J. JOHNSON: Thank you.

Mr. Chairman, Ranking Member and members of the committee, thank you for the opportunity to testify. I am here on behalf of the National Law Enforcement Partnership to Prevent Gun Violence .

Yes, sir, it is.

I'm here on behalf of the National Law Enforcement Partnership to Prevent Gun Violence. It aligns to the nation's law enforcement leadership organizations concerned about the unacceptable level of gun violence in the United States.

We mourn the loss of gun violence victims including the 20 children and six adults in Newtown whose lives were cut short by an individual armed with firepower originally designed for combat.

More than 30 homicides occur in America each day, 2,000 children and six adults, certainly, in Newtown are amongst those individuals. Folks 18 and under die from fire-related (ph) violence and deaths every year.

In 2011, for the first time in 14 years, firearms was the leading cause of death for police officers killed in the line of duty. In a one-week period in 2011, the Police Executive Research Forum found that gun crime in six cities had cost more than $38 million. And in the year 2010, the cost in the entire country was more than $57 billion.

We urgently need Congress to address the rising epidemic of gun violence in this nation.

Law enforcement leaders support the president's comprehensive approach which includes enhancing safety in educational institutions and addressing mental health issues.

On behalf of my colleagues across the nation, I'm here today to tell you that we are long overdue in strengthening our nation's gun laws. Doing so must be a priority for Congress.

The organizations in the National Law Enforcement Partnership to Prevent Gun Violence urgently call on you to require background checks for all firearms purchases, ensure that prohibited purchasers' records in a National Instant Criminal Background Check System, NICS, are complete, and limit high-capacity-ammunition-feeding devices to 10 rounds.

Seven of our nine groups, including the largest among us, also support Senator Feinstein's assault weapons ban legislation.

Federal law prohibits dangerous individuals, such as convicted felons and those with mental health disqualifiers from possessing firearms. While background checks are required for purchases through licensed gun dealers, no check is required for private sales, such as those through online or print ads or gun shows. It's a major problem.

J. JOHNSON: From November 2011 to November 2012, an estimated 6.6 million gun transactions occurred without a background check. Up to 40 percent of firearm transactions occur through private individuals rather than licensed gun dealers. Allowing 40 percent of those acquiring to bypass checks is like allowing 40 percent of passengers to board a plane without going through security. Would we do this? Last October in Brookfield, Wisconsin, seven women were shot by a prohibited purchaser who as under a domestic violence restraining order.

The shooter answered an online ad, was able to buy a gun without a check very quickly. He had -- had the sale been -- or sale required to have a check, this tragedy could have been prevented. Background checks work. They stopped nearly 2 million prohibited purchasers between 1994, and 2009. We already have a national background check system in place. Therefore, extending a background check to all firearms purchases can easily be implemented, and it should be without delay.

States can't do it alone. Interstate firearms trafficking is a -- a rampant problem, and it must be addressed federally. According to ATF, in 2009, 30 percent of guns recovered at crime scenes crossed state lines. Maryland recovered nearly 2,000 last year from outside the state. Submissions to NICS must be approved, especially mental health and drug abuse records. The 2009 -- a 2007 massacre at Virginia Tech is a great example of a prohibited purchaser slipping through the cracks due to incomplete NICS background check.

The ban on assault weapons, and high-capacity ammunition must be reinstated. Like assault weapons, high-capacity magazines are not used for hunting, and they do not belong in our homes. And they reek havoc on our communities. Banning these magazines will limit the number of rounds a shooter can discharge before he has to reload. Reloading can provide a window to escape, to seek cover, or concealment, or attack the adversary to take down the shooter, as we have heard in Tuscon.

In 1998, four years after the assault weapons and high-capacity magazine ban was enacted, the percentage of firearms with

large capacity magazines recovered by Virginia police decreased, and continued to drop until it hit a low of 9 percent of the weapons recovered in 2004. The year the ban expired, it hit a high of 20 percent in 2010. I've been in law enforcement for nearly 35 years, and I've seen an explosion of fire power since the assault weapons ban expired. It is common to find many shell casings at crime scenes when you go out, and you investigate these days. Victims are being riddled with multiple gunshots. The common-sense measures we call for will not infringe on the Second Amendment rights, but will keep guns out of the dangerous hands of -- of people who are out there to commit danger in our society, and excessive firepower out of our communities.

Generations of Americans, including our youngest ones are depending on you to ensure that they will grow up, and fill their roles in the great human experience. None of us can fail them and I urge you to follow the will of the American people on this issue, and stand with law enforcement on these common-sense public safety measures. Thank you.

LEAHY: Thank you, Chief. Our next witnesses is Gayle Trotter. She was in the co-founder, Shaffer and Trotter, PLC. It's a law firm here in Washington. She's also a senior fellow with the Independent Women's Forum. Attorney Trotter,, good to have you here. Go ahead, please?

TROTTER: Chairman Leahy, Ranking Member Grassley, and members of this committee, thank you for inviting me to appear before you today.

We all want a safer society. We differ on how to make our society safer, and we differ whether some proposals will actually increase public safety. I urge you to reject any actions that will fail to make American's safer, and in particular, harm women the most. I would like to begin with the compelling story of Sara McKinley.

Home alone with her baby, she called 911 when two violent intruders began to break down her front door. These men were forcing their way into her home to steal the prescription medication of her recently deceased husband. Before police could arrive, while Ms. McKinley was still on the phone with 911, these violent intruders broke down her door. One of the men had a foot-long hunting knife.

TROTTER: As the intruders forced their way into their home, Ms. McKinley fired her weapon, fatally wounding one of the violent attackers. The other fled. Later Ms McKinley explained; "It was either going to be him, or my son. And it wasn't going to be my son." Guns make women safer. Over 90 percent of violent crimes occur without a firearm which makes guns the great equalizer for women. The vast majority of violent criminals use their size and their physical strength to prey on women who are at a severe disadvantage. In a violent confrontation guns reverse the balance of power. An armed woman does not need superior strength or the proximity of a hand-to- hand struggle.

Concealed carry laws reverse that balance of power even before a violent confrontation occurs. For a would-be criminal concealed carry laws dramatically increase the risk of committing a crime. This indirectly benefits even those who do not carry. Research shows that in jurisdictions with concealed carry laws, women are less likely to be raped or murdered than they are in states with more restrictions on gun ownership. Armed security works.

Brave men and women stand guard over Capitol Hill, including this building where we are now. Armed guards protect high-profile individuals including prominent gun-control advocates, some of whom also rely on personal gun permits.

While armed security works, gun bans do not. Anti-gun legislation keep guns away from the sane and the law-abiding but not criminals. No sober minded person would advocate a gun ban instead of armed security to protect banks, airports, or government buildings. We need sensible enforcement of laws that are already on the books.

Currently, we have thousands, thousands of under-enforced or selectively enforce gun laws, and we fail to prosecute serious gun violations and impose meaningful, consistent penalties for violent felonies involving firearms.

Instead of self-defeating gestures, we should address the gun violence based on what works. Guns make women safer. The Supreme Court has recognized that lawful self-defense is a central component of the Second Amendment's guarantee of the right to keep and bear arms. For women, the ability to arm ourselves for our protection is even more consequential than for men. Because guns are the great equalizer in a violent confrontation. As a result, we protect women by safeguarding our Second Amendment rights. Every woman deserves a fighting chance.

Thank you.

LEAHY (?): Excuse me, thank you very much, Ms. Trotter.

Our last witness, then we'll go to questions.

Wayne La Pierre the executive vice president CEO of the National Rifle Association. I believe, Mr. La Pierre you have been there since 1970?

Is that correct?

LAPIERRE: That is correct.

LEAHY (?): Please go ahead.

LAPIERRE: Thank you, Mr. Chairman and members of the committee. It's an honor to here today on behalf of the more than 4.5 million moms and dads and sons and daughters...

(UNKNOWN): Press that white button.

LAPIERRE: Thank you.

It is an honor to be here today on behalf of the more than 4.5 million moms and dads, sons and daughters in every state across our nation who make up the National Rifle Association of America. There are 4.5 million active members of the NRA, and

they're joined by tens of millions of supporters throughout the country. It's on behalf of those millions of decent, hard-working, law-abiding citizens that I am here today to give voice to their concerns.

The title of today's hearing is "What Should America Do About Gun Violence?" We believe the answer is to be honest about what works and honest about what doesn't work.

Teaching safe and responsible gun ownership works, and the NRA has a long and proud history of doing exactly that. Our Eddy Eagle Child Safety Program has taught 25 million young people that if they see a gun, they should do four things: stop, don't touch it, leave the area, and call an adult. As a result of this and other private- sector programs, fatal fire arms accidents are at the lowest level in 100 years.

LAPIERRE: The NRA has over 80,000 certified instructors to teach our military personnel, law enforcement officers, and hundreds of thousands of other American men and women how to safely use firearms.

We do more and spend more than anyone else on teaching safe and responsible gun ownership. We join the nation in sorrow over the tragedy that occurred in Newtown, Connecticut. There is nothing more precious than our children and we have no more sacred duty than to protect our children and to keep them safe.

That's why we asked former congressman and under secretary of homeland security, Asa Hutchinson, to bring in every available expert to develop a model school shield program, one that can be individually tailored to make our schools as safe as possible.

It's time to throw an immediate blanket of security around our children. About a third of our schools right now have armed security already because it works, and that number if growing every day. Right now, state officials, local authorities and school districts in 50 states are considering their own plans to protect children in schools.

In addition, we need to enforce the thousands of gun laws already on the books. Prosecuting criminals who misuse firearms works. Unfortunately, we've seen a dramatic collapse in federal gun prosecutions in recent years. Overall in 2011, federal firearms prosecutions per capita were down 35 percent from their peak in the previous administration. That means violent felons, violent gangmembers and drug dealers with guns, and the mentally ill who possess firearms are not being prosecuted. And that is completely and totally unacceptable.

And out of more than 76,000 firearms purchases supposedly denied by the federal instant check system, only 62 were referred for prosecution and only 44 were actually prosecuted. Proposing more gun laws while failing to enforce the thousands we already have, it's not a serious solution for reducing crime.

I think we can also agree that our mental health system is broken. We need to look at the full range of mental health issues from early detection to treatment to civil commitment laws to privacy laws that needlessly prevent mental health records from being included in the national instant check system.

While we're ready to participate in a meaningful effort to solve these pressing problems, we must respectively (sic), but honestly and firmly disagree with some members of the committee and many in the media, and all the gun control groups, on what will keep our kids and keep our streets safe. Law-abiding gun owners will not accept blame for the acts of violent or deranged criminals, nor do we believe that government should dictate what we can lawfully own and use to protect our families.

As I said earlier, we need to be honest about what works and what does not work. Proposals that would only serve to burden the law- abiding have failed in the past and they'll fail again in the future. Semi-automatic firearms technology has been around for 100 years. They're the most popular guns for hunting, target-shooting, self- defense.

Despite this fact, Congress banned the manufacture and sale of hundreds of semi-automatic firearms and magazines from '94 to 2004. And independent studies, including one from the Clinton Justice Department, proved that it had no impact on lowering crime. And when it comes to background checks, let's be honest. Background checks will never be universal because criminals will never submit to them.

There are a lot of things that can be done and we ask you to join with us. The NRA is made up of millions of Americans who support what works. The immediate protection for all, not just some of our school children is what's needed, and swift, certain punishment of criminals who misuse guns, and fixing our mental health system.

We love our families. We love our country. We believe in freedom. And we're the millions from all walks of life who take responsibility for our safety and protection as a God-given fundamental American right.

Thank you, Mr. Chairman.

LEAHY: Thank you.

Now, Chief Johnson, let me begin with you, sir, if I could. I've found in my experience that many criminals are able to get guns illegally because they use straw purchasers. In other words, the person who has no criminal record can easily pass background check, goes in and buys the guns, and turns around and gives them to criminals.

LEAHY: There's no federal law that makes it illegal to act as a straw purchaser of firearms. So last week I -- I introduced a bill that will strengthen federal law to combat firearms trafficking. It would specifically target straw purchasers.

Do you think there should be such a law?

J. JOHNSON: The background procedures in this nation are seriously in need of -- of modification. Again, 40 percent of those acquiring firearms tried to do it outside that background procedure.

Senator, you are absolutely correct, many will use a straw purchaser to go in and acquire these firearms. It happens each and every day across America. It is a serious problem. And the National Law Enforcement Partnership To Prevent Gun Violence

supports your initiative to address that issue.

LEAHY: Thank you, chief. We also heard testimony about the safety of women and gun violence. Now I'm seeking immediate consideration of the Leahy-Crapo Violence Against Women Reauthorization Act. I was told yesterday that sometime in the next couple weeks we'll have it on the floor of the Senate for a vote.

I do this out of concern for domestic violence victims. We -- we have statistics that show women in this country are killed at alarming rates by domestic abusers with guns. Fortunately if a woman has a protective order against her abuser, if he is able to get a gun with a straw purchaser, of course, he still gets it, but he is not going to be able to purchase a gun and a background check is conducted. And we have at least one side that says in states that require a background check for every handgun sale, 38 percent fewer women are shot by their partners (inaudible).

Do you agree that if we want to keep firearms away from domestic abusers, who are not supposed to have them anyway, we have to have to improve the background check system and require a background check for every firearm purchasers?

J. JOHNSON: Absolutely.

I'd like to stand before this group today and say, I've spent my years of chasing down violent armed robbers each and every day. The fact of the matter is, as a young patrol officer, most of my day was one domestic to another it was the post that I had. Statistics show that when females are killed, it's more likely -- over 50 percent of the time to be by a spouse or household member. A gun and a home where there is a history of domestic violence, statistics show that there is a 500 percent increase of chance that, that person will be victimized by gun violence.

The state of Maryland in the last several years enacted legislation to address this domestic violence issue to allow us to go out and seize the guns of domestic violence abusers where the spouse has won and obtained a protective order. This has been very effective. And in my jurisdiction, which averages generally about 35 homicides a year, unfortunately most being domestic violence related, this has had a significant impact in reducing the amount of those domestics.

Two of the last three years, the statistic was below the 41 year homicide rate. And I credit, in this case, lieutenant governor state of Maryland, Lieutenant Governor Brown for this initiative, and it's helped us tremendously.

LEAHY:

Thank you.

Captain Kelly Mr. La Pierre has testified that universal background checks won't work because criminals would never submit to them. And I understand that, but under current law, criminals don't have to go through background checks because there are so many loopholes, gun show loophole, no real punishment for straw purchasers.

Do you agree that there is nothing that we can do to strengthen our background checks?

KELLY: Chairman Leahy, I disagree. There is a lot we can do.

The situation that I know best is what happened in Tucson, January 8th, 2011. Jared Loughner (ph), the shooter in this case, when he purchased a gun, he did purchased it through a background check. But there was a lot of evidence that could possibly been in the national instant criminal background check system about him that would have prevented him from buying a gun through a background check. So that's part of the solution.

KELLY: Now, the other problem is, let's say, he was denied, denied the purchase of the gun which he purchased in November of 2010. It would have been very easy for him to go to a gun show and purchase a gun without a background check.

So, you know, there are several things that need to be done. And in my opinion, and in Gabby's opinion, this is one of the most important things that we must do to prevent criminals, terrorists and the mentally ill from having easy access to guns, I mean, closing the gun-show loopholes and requiring private sellers to require a background check before they transfer a gun is -- I mean -- I mean, for us, I mean, I can't think of something that would make our country safer than doing just that .

LEAHY: Thank you.

And, Mr. LaPierre, in 1999, you testified before the House Judiciary Committee. And you testified, quote, "Nobody is more committed than we are to keeping guns out of criminals' hands. That's obviously in our best interest," close quote.

I assume you are still just as committed to keeping guns out of the hands of criminals. Is that correct?

LAPIERRE: Yes, sir.

LEAHY: And would you agree that we should prosecute and punish those who help criminals get guns?

LAPIERRE: If you're talking about strawman sales, we've said strawman sales should be prosecuted for years. There are about six to eight statutes on the books right now...

LEAHY: So you agree that we should prosecute and punish those who help criminals get guns?

LAPIERRE: Absolutely. If someone is doing a strawman sale, they should be prosecuted. Absolutely.

LEAHY: And in your testimony in '99, you supported mandatory instant criminal background checks for every sale and every gun show. You said, quote, "No loopholes anywhere, for anyone."

Now, today, of course, you say criminals would never submit to background checks. Statistics show that plenty of them do. Nearly 2 million convicted criminals and other dangerous people have tried to buy firearms and (inaudible), as Chief Johnson said, were prevented.

So let me ask you this: Do you still, as you did in 1999, still support mandatory background checks at gun shows? Yes or no?

LAPIERRE: We supported the National Instant Check System on dealers. I -- we were here when Senator Birch Bayh, one of your colleagues, held the hearings in terms of who would be a dealer and who would be required to have a license. If you did it for livelihood and profit, yes. If you were a hobbyist, then no.

LEAHY: Let's make -- let's make it easier, though. I'm talking about gun shows. Should we have mandatory background checks at gun shows for sales of weapons?

LAPIERRE: If you're a dealer, that's already the law. If you're talking...

LEAHY: That's not my question. Please, Mr. LaPierre, I'm not trying to play games here. But, if you could, (inaudible) just answer my question.

LAPIERRE: Senator, I do not believe the way the law is working now, unfortunately, that it does any good to extend the law to private sales between hobbyists and collectors.

LEAHY: OK, so you do not support...

(CROSSTALK)

LEAHY: ... mandatory background checks in all instances at gun shows?

LAPIERRE: We do not, because the fact is, the law right now is a failure the way it's working. The fact is, you have 76,000-some people that have been denied under the present law. Only 44 were prosecuted. You're letting them go. They're walking the streets...

(CROSSTALK)

LEAHY: And do you -- then, I understand, back in 1999, you said no loopholes anywhere for anyone. But now you do not support background checks for all buyers of firearms?

LAPIERRE: I think the National Instant Check System, the way it's working now, is a failure. Because this administration is not prosecuting the people that they catch.

They're not -- 23 states are not even putting the mental records of those adjudicated mentally incompetent into the system. Now, assume that if you don't prosecute and they try to buy a gun, even if you catch 'em, and you let 'em walk away, to assume they're not going to get a gun -- they're criminals, they're homicidal maniacs, and they're mentally ill.

I mean, we all know that homicidal maniacs, criminals and the insane don't -- don't -- don't -- don't... LEAHY: Mr. LaPierre...

LAPIERRE: ... don't abide by the law.

LEAHY: Mr. LaPierre, my time is up. With all due respect, that was not the question I asked. Nor did you answer it.

LAPIERRE: But I think it is the answer. I honestly do. I -- the fact...

LEAHY: All right. It's your testimony.

Senator Grassley?

GRASSLEY: Yes.

Before I ask questions, Senator Hatch asked if I would explain to everybody here why he left. He's ranking member Finance Committee, and Senator Baucus has scheduled a hearing for 10:45 and he has to be there for that.

Professor -- Professor Kopel, was the 1994 assault weapons ban a sensible and effective means of reducing gun violence?

And, secondly, is there any reason to re-enact a more extensive assault weapons ban?

KOPEL: (OFF-MIKE)

GRASSLEY: Turn it up. Turn...

KOPEL: Sorry.

Based on the Department of Justice study, the answer was no, that it was something that was tried with great sincerity. A lot of people thought it would be a good idea, but it didn't seem to save any lives -- that the researchers could -- could find.

The revised law is just more of the same, but it suffers from the same fundamental problem. You can have a 1994 law that lists some guns by name and a 2013 law that lists more guns by name. But the very fact that you're banning guns by name, what's -- that's just an example of how the law doesn't address the guns firepower or their rate of fire. It simply -- if there's something that makes these guns more dangerous then legislation ought to be able to describe it in neutral terms. So all these -- these names, I think, are a sign of exactly what's wrong with the bill.

Now, the -- the present bill, like its 1994 predecessor, also has outlaws that is based on various features. But, again, these are -- there aren't things that have to do with internal mechanics of the gun, how fast it fires or how powerful the bullets are. There're things like whether a rifle has a forward grip. Well, a forward grip on a rifle helps the user stabilize it and make the gun more accurate. So that if you're deer hunting the second shot is almost as accurate as the first, or if you're target shooting, or more importantly -- most importantly, if you're engaged in lawful self- defense.

And that's why you see guns like the AR-15 with their standard factory-issued 30-round magazines in police cars all over the country, is because they make the gun more accurate for the core purpose of the Second Amendment, which is lawful self-defense.

GRASSLEY: OK.

Chief Johnson and Professor Kopel, listen while I read, and I'll ask each of you a question. Recently, Iowa law enforcement officials were quoted in an article -- that I ask consent to include in the record -- entitled, "Law Officers Tell Congressmen Mental Health Issues More Important than Gun Ban," end of quote.

In it, a bipartisan group of elected sheriffs and police chiefs offered candid assessments of current legislative proposals. One chief of police stated, quote, "I think banning assault weapons and high-capacity magazines is strictly a feel-good measure. It's not going to accomplish anything," end of quote.

Instead, they asked for options for getting mentally ill individuals treatment. Chief Jim Clark, Ottumwa, Iowa, added, quote, "We identify some that are mentally ill. They need treatment. But we can't access the system."

So Chief Johnson, what options do your officers have, from your experience -- because I quoted in Iowa -- (inaudible) currently have in dealing with individuals they believe to have untreated mental illness?

J. JOHNSON: It is a major problem in America today, in my jurisdiction. I'm here today to talk about guns and ways to stop gun violence. We know a comprehensive background check that picks up these mental health issue disqualifiers will make our nation a safer place.

We know that banning high-capacity magazines will make our police officers safer. We've lost dozens of police officers in America due to assault weapons. And we've seen tragedies all across this great nation (inaudible) Newtown, in Webster, New York -- an off-duty police officer -- we're never off duty, he's a police officer -- shot down by an assault weapon. It's a serious problem, and it must be addressed.

GRASSLEY: Professor Kopel, you authored an article, Wall Street Journal, last month entitled, "Guns, Mental Illness, Newtown." And I would also like to have that included in the record.

Is there evidence that mental illness and changes to civil commitment laws that play a part in mass shootings? And what can we do to keep guns away from mentally ill consistent with our Second Amendment?

KOPEL: Well, certainly, they play quite a major role in -- in homicides in general, probably about -- according to the Department of Justice research, about one-sixth of the people in state prisons for homicide are mentally ill. If you look at the -- these mass murders where suicidal people try to end their lives in the most infamous way possible -- in -- in Tucson, Virginia Tech, Newtown, Aurora, you have a very strong threat of mental illness running through that.

And certainly, improving the background -- the data about mental health adjudications, not just a psychiatrist recommendation or something like that, but what due process and the Constitution require, which is an adjudication, a fair decision by a neutral decision-maker. Getting those into the background check system is something that Congress started working on after Virginia Tech, and there's -- there's more progress to be made.

But that's -- it's not just a matter of checks. It's -- even if you have the most ideal check system in the world, at least -- and imagine these criminals, violently insane criminals could never get a gun anywhere else. You know, Adam Lanza at Newtown didn't have background checks. He stole the guns after murdering his mother.

So, the long-term solution is not just about background checks. It's about why are these people on the streets in the first place. All of these killers I've just mentioned could have been civilly committed under the civil commitment laws we had several decades ago. Those laws were changed. Sometimes -- because they were sometimes abused, but I think we can move back to a more sensible position that strongly protects the due process rights of people against involuntary commitment, but also gets dangerous people off the streets. And that will cost money at the state level, but it's money that will be greatly saved in the long term through reduced incarceration costs for crimes.

GRASSLEY: OK.

Ms. Trotter, your testimony discussed the need for women to be able to use firearms to defend themselves and their families. The law currently permits the lawful possession of semi-automatic rifles such as AR-15s. Can you tell us why you believe a semi-automatic rifle such as AR-15 has value as a weapon of self-defense? And does banning weapons -- banning guns which feature designed to improve accuracy disproportionately burden women?

TROTTER: I believe it does. Young women are speaking out as to why AR-15 weapons are their weapon of choice. The guns are accurate. They have good handling. They're light. They're easy for women to whole. And most importantly, their appearance. An assault weapon in the hands of a young woman defending her babies in her home becomes a defense weapon. And the peace of mind that a woman has as she's facing three, four, five violent attackers, intruders in her home with her children screaming in the background -- the peace of mind that she has knowing that she has a scary-looking gun gives her more courage when she's fighting hardened violent criminals.

And if we ban these types of assault weapons, you are putting women at a great disadvantage, more so than men, because they do not have the same type of physical strength and opportunity to defend themselves in a hand-to-hand struggle. And they're -- they're not criminals. They're moms. They're young women. And they're not used to violent confrontations.

So, I absolutely urge -- I -- I speak on behalf of millions of American women across the country who urge you to defend our Second Amendment right to choose to defend ourself.

GRASSLEY: Thank you.

LEAHY: Thank you.

Senator Feinstein?

FEINSTEIN: Thank you very much, Mr. Chairman, for holding this hearing. And I want to thank everybody for being here, particularly our witnesses. Even you, Mr. LaPierre -- it's good to see you again.

(LAUGHTER)

I guess we tangled...

LAPIERRE: We have.

FEINSTEIN: ... we tangled, what was it? Eighteen years ago. You look pretty good, actually.

(LAUGHTER)

LEAHY: I will give a little prerogative to the laughter.

(CROSSTALK)

FEINSTEIN: I'd like to add something to the record, Mr. Chairman -- page 44 of the Department of Justice report, "Assault Weapons As A Percentage of Gun -- of Gun Traces," which shows a 70 percent decline from '92-'93 to 2001-2002.

LEAHY: Without objection, so ordered.

FEINSTEIN: Thank you. Thank you very much.

Chief Johnson, I'd like to talk with you. First of all, I am very grateful for the support of your organization, of the major chiefs, and the International Association of Chiefs of Police, as well as trauma surgeons who see what these guns do in tearing apart bodies.

FEINSTEIN: I have become very concerned as I looked at the bill before, in '93, at the technological improvement in these weapons over this -- these years. And one of the things that we've tried to do in this new bill is prevent that from happening in the future. In looking at the AR-15 magazine on a device, which is legal, called a slide fire, I note that with practice, a shooter may control his rate of fire from 400 to 800 rounds per minute, or shoot two, three, or four rounds at a time, and just as easily fire single shots. So this is a weapon, and I think Ms. Trotter's right, it apparently is versatile. It apparently is rather easy to use, but it has tremendous philosophy -- velocity, and tremendous killing power,and I suspect tears young bodies apart.

Additionally, it's my understanding that Mrs. Lanza actually gave this gun to her son. Is that correct?

J. JOHNSON: These guns used in Newtown were not stolen, Professor. They were in the home, accessible to the shooter.

FEINSTEIN: Thank you.

J. JOHNSON: It's a major problem, safety and security of weapons. In my jurisdiction, two school shootings, safety and security of weapons would have made a difference in that case. And Senator, you bill, I salute, and applaud you for including a safety and security measure.

FEINSTEIN: Well, thank you very much, Chief. This is such a hard debate because people have such fixed positions. Police, I think see killings as they are. Many people do not. So in a sense, the streets speak about this issue. The more you add highly technologically efficient weapons, which are originally designed to kill people in close combat, and they fall in the hands of the wrong people.

It's my understanding that Mrs. Lanza's son, the shooter in this case, had no mental health record. Is that correct?

J. JOHNSON: It is my understanding that no record exists. It is my understanding that there was ample evidence though, amongst those close to him, that there was a serious problem.

FEINSTEIN: Which is really something that I think we need to tackle today. Mental health laws are usually the preserve of the state, and the local governments. They provide the facilities. Do you have any suggestions there with respect to anything that we might be able to do, to improve mental health laws nationally, which might catch people who are a danger to themselves, or others in this area?

J. JOHNSON: It's a -- a major problem for law enforcement. Citizens, police officers, doctors, parents, can petition for an emergency evaluation when they see behavior that presents an individual as being a danger to themselves, or others. It's really important that we all do this. It's a tough decision, but sometimes you have to make it against your own son. Very, very hard. It could affect their entire life, but it has to be done.

The improvement that needs to be made is, we need to have this information entered instantly into a data system in the event that the -- the individual tries to go out within 24 hours to get a gun. The fellow in Wisconsin who went into the salon to shoot his wife, he wanted a gun fast. He wanted it fast. He as hot, he was emotional, he was out of control. And he wanted to get a gun fast.

And the way you do that, is you reach outside the established background check system and acquire it. If that record would have been entered into the system's domestic violence order, it would have been entered instantly, like we can do today all right? In many areas. That gun could have been -- a gun could have been prevented from getting in the hands of a person who is going to carry it out when they're in a high emotional stage. This is really, really important.

FEINSTEIN: We have millions and millions of big clips. The Aurora shooter used a 100 round drum. Fortunately it jammed. Otherwise he would have killed more people. I think most people believe that, sure we can have guards at schools. I'm well aware that at Columbine there was a deputy sheriff who was armed, who actually took a shot, but couldn't hit the shooter there.

FEINSTEIN: The question comes, what do you do about the malls then? What do you do about our movie theaters? What do you do about businesses? We can't have a totally armed society. And that's my feeling in terms of the need to say that there are certain categories of guns. We actually exempt over 2,000 specific weapons by make and model name to create and then ban about 158 assault weapons, and then go to a one-characteristic test.

You have looked at this bill. Do you believe it will be effective?

J. JOHNSON: Yes, ma'am, I do. I believe that holistically addressing all of the issues in the president's plan, as well as a comprehensive, universal background check procedure, banning high- capacity magazines, and banning the sale of assault weapons, frankly, collectively all these together will create a system. The best way to stop a bad guy from getting a gun in the first place is a good background check.

FEINSTEIN: Thank you, very much.

Thank you, Mr. Chairman.

LEAHY: Thank -- thank you.

As Senator Grassley noted, Senator Hatch has to be at other thing. Recognize him when he comes back. I'm gonna go back and forth, go in seniority. We'll go to Senator Sessions. But I'll talk -- announce that all members can put statements in the record by the close of business today as -- as (inaudible) read (ph).

Senator Sessions?

SESSIONS: Thank you, Mr. Chairman.

I've spent the better part of our career, I guess, prosecuting cases, 12 years as a United States attorney, and during that time I gave a high emphasis to prosecutions of gun violations. We were one of the top prosecuting districts in the country. I note, in the latest University of Syracuse report, they list my district, the southern district of Alabama as number one in the nation still today in prosecutions of gun violations.

This is what the University of Syracuse study said, however, in its lead comment, "Weapons prosecution's declined to the lowest level in a decade," quote, "The latest available data from the Justice Department shows that during January of 2011, the government reported 484 new weapons prosecutions. This is the lowest level to which prosecutions federally have fallen since January of 2001, when 445 at the time that President Bush assumed office," close quote.

They go on to note some of the declines in various categories. And so first and foremost, I would say to you, as someone who has personally tried a lot of these cases before a jury, written appellate briefs on these cases, that these -- the bread and butter criminal cases are felons in possession of a firearm, and carrying a firearm during a crime, both of which are serious offenses. Carrying a firearm during a crime, drug crime, or crime of violence, or other serious crimes is a mandatory five-year sentence

without parole.

Those prosecutions have declined, unfortunately, substantially, under President Obama's presidency. Chief, does it concern you that in -- comparing total prosecutions per month for guns in federal court with those for a month in , with those for the same period in 2010, the number of filings went down 7.9 percent and were down 28.8 percent from 2006 in federal court.

Does that concern you?

J. JOHNSON: Senator, I can tell you that in the Baltimore County Police Department...

SESSIONS: I'm asking if those are the numbers, did that concern you?

J. JOHNSON: No, because you don't -- sir, you're...

SESSIONS: It doesn't concern you?

J. JOHNSON: ... not including local prosecutions. I can't stand before you today and tell you of a single case in Baltimore County of an illegal possessed gun that was not prosecuted...

SESSIONS: Are we trying to pass a state or federal law today?

J. JOHNSON: Certainly, background checks...

SESSIONS: That's what you guys call a federal law. We'd like to see the federal laws that are on the books enforced. I suggest and with with regard to the crimes of -- of carrying a firearm during the furtherance of a violence or drug trafficking offense, those prosecutions declined 28.5 percent between 2007 and 2011.

SESSIONS: So I would say that, first of all, we need to make sure we are doing our job there. I would also note that although crime is a very, very important matter, we should never lose our emphasis on bringing down crime -- the murder rate in America today is half what it was in 1993. We have made progress on that. And -- and we can continue to drive those numbers down. It's not as if we have an unusual surge in violent crime in America.

Now, with regard to the background checks and straw purchases, let's -- let's be frank: Straw purchases are a problem and should be prosecuted. I have prosecuted those cases before on a number of occasions. I've prosecuted gun dealers who fail to keep records as required by the law.

But the number of defendants charged under 18 USC 922(a)(6), making material misrepresentations under the federal firearms law regarding the lawfulness of a transfer, have declined from 459 in 2004 to 218 in 2010. That's -- that's about half, 52 percent decline under this administration's leadership.

And I -- I would just say to you, mathematically speaking, violence in America is impacted mostly when you're enforcing these bread-and-butter violations that are effective, they're proven and they work. They have support of Mr. LaPierre, I think -- I know that group (inaudible) support 'em. I think everybody supports these strong laws. And that's where the rubber meets the road. That's where you really begin to impact crime.

If you can intimidate -- and I believe the word is getting out -- it did in our district -- that if you carry a gun in a crime, a drug dealing offense, you could be prosecuted in federal court, given five years in jail without parole. And I believe we saw a decline in the violent rate -- violence rate and the number of drug dealers and criminals carrying guns. But you have to prosecute those cases.

Mr. LaPierre, it does appear that the straw purchase prohibition that's out there, that prohibition seems to me to be legitimate. And I support -- and you said you support the prosecutions of it. But if we expand the number of people covered (inaudible) we don't have any prosecutions -- I believe you used the number 44, was all. There're 90 United States attorneys in America. Only 44, only one out of every two, apparently, is prosecuting a single case in a single year. That's the weakness in the system.

LAPIERRE: Senator, there needs to be a change in the culture of prosecution at the entire federal level. It's a national disgrace. The fact is, we could dramatically cut crime in this country with guns and save lives all over this country if we would start enforcing the 9,000 federal laws we have on the books.

I'm talking about drug dealers with guns, gangs with guns and felons with guns. There're simply not being enforced. The numbers are shocking. I mean, in Chicago, one of the worst areas in the country in gun violence by criminals, it is 89 of 90 in terms of federal prosecutions in the entire United States; 62 people prosecuted under all of the federal gun laws.

I mean (inaudible) Dave Schiller and Project Exile cleaned up Richmond years ago, they did 350 cases in Richmond. I mean, if you want to stop crime, interdict violent criminals, incarcerate 'em and get 'em off the street before they get to the next crime...

(CROSSTALK)

SESSIONS: Well, I -- I agree. My time is up.

LAPIERRE: ... or worse.

SESSIONS. And I -- Richmond was a great model. And I would just say, I would call on President Obama to call in Attorney General Eric Holder and ask him why the prosecutions have dropped dramatically across all categories of federal gun laws. And he should call in his U.S. attorneys and tell them, you need to look at your numbers and get them up and emphasize these prosecutions.

Thank you, Mr. Chairman.

LEAHY: Senator Schumer?

SCHUMER: Well, thank you.

First, let me apologize to the witnesses. At the end -- we have a Finance Committee meeting on reconciliation, which probably affects our police chief anyway. And so I had to be there.

And I want to thank you, Chairman Leahy, for organizing this important hearing.

Thank all the witnesses for being here, particularly Congresswoman Giffords and Captain Kelly for your testimony. We've been moved by your strength, your courage that your family has demonstrated in this face of unspeakable tragedy.

By being here instead of cursing the darkness you're lighting a candle. Thank you.

Now, I do believe today we have a chance to do something reasonable in the aftermath of the Sandy Hook tragedy. But when we discuss ways to stop violence, guns must be included in that discussion.

SCHUMER: I heard Ranking Member Grassley say that we must go beyond guns. That's true. But we must include guns as well. Not including guns when discussing mass killings is like not including cigarettes when discussing lung cancer.

But at the same time, I agree. We can't simply replay the usual sum zero political game on guns, or the moment'll pass us by.

The Supreme Court ruling in Heller, which struck down the District of Columbia's ban on handguns laid out a good framework. It said an individual right to bear arms does exist, but it comes with limitations, like very amendment.

In other words, it is now settled law that the government is never going to take away America's guns -- Americans' guns.

Progressives need not to accept this decision, but to endorse it. We've got to follow it, not just de jure, but de facto. And it makes sense. You can't argue for an expansive reading of amendments like the First, Fourth and Fifth, but see the Second Amendment through the pinhole of saying it only affects militias.

At the same time, those on the pro-gun side must recognize no amendment is absolute. The First Amendment protects freedom of speech. It's hallowed. But you still can't falsely shouts fire in a crowded theater or traffic in child pornography. Those are reasonable limits on the First Amendment.

The Second Amendment has sensible limits, too. My colleagues have offered a range of impressive and thoughtful proposals on the topic of gun violence.

For example, Chairman Leahy has introduced a bill on trafficking. Senator Feinstein has introduced one of assault weapons. Senator Blumenthal on ammunition.

But for the last several years, my particular focus in the area of gun safety has been on responsible gun ownership and

background checks. Universal background checks is a proven, effective step we can take to reduce gun violence. And I believe it has a good chance of passing.

Federally licensed firearm dealers have been required to conduct background checks on prospective gun purchasers since we passed the Brady bill. And we've that they work. Since 1999, the federal background check system has blocked 1.7 million prohibited purchasers from buying firearms at federally licensed dealers.

Yes, we should prosecute them. But the number one goal is to prevent a felon from getting a gun in the first place. That's what this did 1.7 million times.

The current system works well. But there are some glaring holes.

First of all, not all gun sales are covered by a background check. The problem, sometimes referred to as the gun-show loophole, means that a private seller could set up a tent at a gun show or somewhere else and not have to conduct background check on his purchasers.

Current estimates show because of these loopholes 48 percent of gun sales are made without a background check. If you're a felon, if you're a gun trafficker, if you're a -- a mentally ill person, you know that you can go to a gun show and not have any check. So, of course, that's what they do.

This isn't fair, also, to dealers who follow the rules and conduct checks. The registered dealers at their gun stores have to obey the rules. Why should someone going to a gun show have a different rule? There's no logic to it. None.

I was there. I was the author of the Brady bill, and that was something that we were forced to put in the bill, those of us who weren't for it, as a way to get the bill passed. But the last 15 years has proven it doesn't make sense.

The second problem with the current system is that not all records are fed into the system. This is especially true with mental health records. Nineteen states have submitted fewer than 100 mental health records to NICS.

I think we can get bipartisan agreement on a bill that solves these problems by doing two things. One, it'll prevent felons and mentally ill from getting guns by requiring a background check before all purchases. And, two, it will get relevant records into the system.

Now, at the moment, right now, as we meet here today, I am having productive conversations with colleagues on both sides of the aisle, including a good number with high NRA ratings. And I'm hopeful that we are close to having legislation we can introduce.

And I would urge the NRA, Mr. LaPierre, and other gun advocacy groups to work with us on this proposal. The NRA supported our 2007 legislation that improved the NICS background check system. And I hope they'll reconsider and try to do that again.

It's a simple, straightforward solution. It's one the American people support. A recent survey by the New England Journal of Medicine found 90 percent of Republicans, 74 percent of NRA members support requiring background checks for all gun sales.

SCHUMER: I understand, because we haven't introduced it, I can't ask the witnesses about it, but I want to tell you what it won't do.

It won't create any gun registry. That is already illegal and it will be repeated as illegal in our law. That's particularly for Mr. Kopel. And it will not limit your ability to borrow your Uncle Willy's hunting rifle or share a gun with your friend at a shooting range.

It will include reasonable exceptions to make sure we're only requiring background checks for bona fide sales and transfers. So specious claims about background checks are a tactic made by those who can't argue with the facts.

Now, I'd like to ask Chief Johnson a question or two about those checks. Do you agree with the logic that even -- you know, that we should prosecute people who illegally try to buy guns, but even without that, the law has done a whole lot of good because people who are felons or adjudicated mentally ill, millions have been stopped from buying guns and getting guns?

J. JOHNSON: Yes, since 1994 to 2009, the record is very clear. It is a fact that nearly 2 million prohibited purchases were stopped. God only knows what they would have done with those weapons had it not been for that particular law.

SCHUMER: And from a law enforcement point of view, wouldn't we rather -- we want to do both, but wouldn't we rather stop them from having a gun than after they shoot somebody or buy a gun illegally, then arrest them and put them in jail for that crime?

J. JOHNSON: Yes, sir. You have to address the pathology -- how you get the gun in the first place. And that is what we're trying to achieve here by a universal background check. And I'm very proud to stand before you this morning and let you know that the entire national law enforcement partnership to prevent gun violence, every member of our organization supports background checks.

SCHUMER: Right. And does it make any sense to exclude the same people who sell them in a gun shop or others, to go to a gun show, and now have any background check at all?

J. JOHNSON: It's absolutely insane. Again, it's like letting 40 percent of people just pass a TSA checkpoint at an airport. It's not an inconvenience. The record shows that nearly 92 percent of the individuals that go in to try to do a background check at a gun shop, in minute-and-a-half, they're done. I can't write a ticket, a citation in a minute-and-a-half. Even with e-tick technology, I can't do it that fast.

It's not inconvenient. And it's fair to the gun owner and the shop owner, too. Why impose on a shop owner, a gun dealer, a federally licensed dealer, more restrictions than you do on anyone else? And if you think for a minute you can sell your gun to

your neighbor that you've known for 10 years, you don't know your neighbor. You do not know your neighbor. And the only way to make sure that you're safe in what you're doing is a comprehensive background check.

SCHUMER: One final quick question. Many police officers are avid sportsmen. They, you know, enjoy shooting, not in their official professional duties. The surveys show the overwhelming majority of gun owners are for background checks. Does your personal experience corroborate that?

J. JOHNSON: It's my understanding that 74 percent of NRA members support a background check. I am a hunter. I love to hunt. I own several guns. I love going to the range with my son who is a police officer today. It's enjoyable. I've met many great people.

SCHUMER: Thank you, Mr. Chairman.

LEAHY: Thank you.

I understand (inaudible) quite the order we'd said before, but Senator Graham has graciously said for Senator Cornyn to go. So please, Senator Cornyn?

CORNYN: Well, thank you, Mr. Chairman. And thanks to all of the witnesses for being here today and sharing your observations and testimony. I'm particularly gratified to see Congresswoman Giffords here doing so well and speaking so forcefully.

I hope this hearing serves as a starting point for us to consider a range of ideas on this topic. Anything that falls short of serious examination and discussion is just window dressing, just symbolism over substance. I have a hard time telling my constituents in Texas that Congress is looking at passing a whole raft of new laws, when the laws that we currently have on the books are so woefully unenforced.

I think we can and we should come together to address shortcomings in mental health care, both in the general response to mental illness and also in the background checks mechanisms we use to screen out prohibited gun buyers.

CORNYN: We need to ask whether years of de-institutionalization of the mental health population have left America more vulnerable. Perhaps it's time to consider our background checks laws to see if they need to be updated to screen out the growing number of people who are subjected to court-ordered outpatient mental health treatment.

It's unclear whether the tens of thousands of committed outpatients in this country are falling through the cracks, and surely, we can agree that more needs to be done to enforce existing gun laws as I said a moment ago.

Gun crime prosecutions are down across the board, including enforcement of laws against lying on background checks. And Mr. Chairman, I hope -- I hope you -- we will have a follow-on hearing where we'll ask administration witnesses to come before the panel and to testify why the Department of Justice and other law enforcement agencies of the federal government

are not enforcing laws that Congress has already passed.

It's worth noting that five years ago, Congress was asking the same questions we are asking right now. In 2008, there was an attempt made to strengthen the background check laws following the murders at Virginia Tech. Looking back, we have to ask ourself, did those laws work. Well, the department -- the Government Accountability Office just last July gave it mixed reviews.

The GAO reports that only a handful of states have taken seriously the responsibility to share mental health records. And I'm pleased that Texas is highlighted by the GAO as outperforming other states in this area, but we have a lot -- we have a long way to go.

So I think there are areas where Congress can come together right now, examine the nexus between gun crime, violence, and mental health care. and I'm willing to listen to serious ideas, not just window dressing, to try to come up with solutions.

Captain Kelly, I noticed in your testimony you alluded to the -- part of what I talked about, which is the fact that at the time in Arizona there were 121,000 records of disqualifying mental illness for people in Arizona that had not been subjected to background checks, because the state hadn't send that information to the federal government.

Could you expand on the significance of that?

KELLY: Yes sir. So, in the case of Jared Loughner, the person who shot my wife and murdered six of her constituents, he was clearly mentally ill. He was expelled from Pima -- Pima Community College because of that. There was nowhere for -- or his parents and the school did not send him anywhere to be adjudicated or evaluated with regards to his mental illness.

Now Mr. LaPierre earlier tried to make the point that criminals do not submit to the background checks. Well, Mr. -- Jared Loughner, the guy -- the Tucson shooter, was -- was an admitted drug user. He was rejected from the U.S. Army because of his drug use. He was clearly mentally ill. And when he purchased the gun in November, his plan was to assassinate my wife and commit mass murder at that Safeway in Tucson. He was a criminal. Because of his drug use and because of what he was planning on doing.

But he -- because of these gaps in the mental health system -- now, in this case, those 121,000 records, I admit, did not include a record on him. But it could have. And if it did, he would have failed that background check.

Now, obviously, in this case, he would have likely have gone to a gun show or a private seller and avoided a background check. But if we close the gun show loophole, if we require private sellers to complete a background check, and we get those 121,000 records and others into the systems, we will prevent gun crimes. That is an absolute truth. It would have happened in Tucson . My wife would not be sitting in this seat. She would not have been sitting here today if we had a strong background checks.

CORNYN: Mr. LaPierre, you talk about a laws already on the books and the fact that the federal government has a poor record of enforcing current laws. And I fail to see out that the Department of Justice will not in force will is gonna make America any

safer.

But let me just ask you to react briefly to these statistics. From 2007-2011, the Department of Justice charged 13 percent fewer total firearms cases. In each of the years during that span, the current administration's brought fewer firearms prosecution's than the year before.

CORNYN: In January, 2011, only 484 new firearm prosecutions were initiated by the Department of Justice, the fewest number of prosecutions in 10 years. As far as background check prosecutions 2006-2010, the number of investigations for unlawful possession decreased 26 percent. During the same period, 77 percent fewer NICS denials were referred by the Bureau of Alcohol, Tobacco and Firearms for prosecution. Federal prosecutors declined 82 percent more cases over the same period. In 2010, out of the 76,125 denied background checks, the FBI referred to the ATF, a verdict or plea was reached in just 13 cases.

Would you give us your reaction to that -- that record?

LAPIERRE: I think -- I think it's tragic, Senator.

I mean, the fact is, in the shadow of this Capitol, right under everyone's noses, in this building, right now there are drug dealers out in the street with guns, violating federal law, illegal. There's all kinds of drugs and cocaine being sold. By God, gangs are trafficking 13-year-old girls. And it goes on day, after day, after day.

What we've got to do is interdict these people. Get them off the street before they get to the next crime scene. I mean -- and get in the real world in terms of checks. I mean the fact is, the NRA has been trying for 20-some years -- Senator Schumer and I went back and forth on "Face the Nation" where I asked him if he'd help get those adjudicated mentally incompetent into the system 20 years ago. He said yes, and they're still not in the system. And my point is, even if you turn up someone on an instant check that's a mentally ill person, or a felon, as long as you let them go, you're not keeping them from getting a gun.

And you're not preventing them from getting to the next crime scene. I mean we've got to get in the real world of this discussion. The problem with gun laws is, criminals don't cooperate with them. The -- the mentally ill don't cooperate with them. So you've got to interdict, incarcerate, interdict, get in treatment, and do things that matter. And then you've got to put police officers in schools, armed security in schools. But let's do the things that work. Let's get serious about this.

I mean this discussion -- I mean I sit here and listen to it and my reaction is, how little it has to do with making the country and our kids safe. And how much it has to do with this decade long, or two decade long gun ban agenda that -- that we don't enforce the laws even when they're on the books. The attorney general of the United States -- Attorney General Eric Holder during the Richmond Program, called it a cookie-cutter approach to solving crime that, you know he really didn't have a lot of enthusiasm about.

I remember Senator Sessions held a hearing and they -- the Department of Justice testified, well a drug dealer with a gun is a guppy, and we can't really concentrate on guppies. Those guppies are what is ruining neighborhoods, destroying lives, and

killing people. And we've got to confront their behavior, take them off the street because they don't obey by all the laws we have right now. We've got to get in the real world on what works, and what doesn't work.

My problem with back -- background checks is, you're never going to get criminals to go through universal background checks. I mean they're -- all the law abiding people, you'll create an enormous federal bureaucracy, unfunded, hitting -- all of the little people in the country will have to go through it, pay the fees, pay the taxes. We don't even prosecute anybody right now who goes through the system we have.

So, we're going to make all those law abiding people go through the system, and then we aren't going to prosecute any of the bad guys if they do catch one. And it -- none of it makes any sense in the real world. We have 80,000 police families in the NRA. We care about safety. We'll support what works.

LEAHY: I'm trying to be fair to everybody here, and certainly you're going to have a lot more chance to speak. Senator Durbin?

DURBIN: Mr. LaPierre, that's the point. The criminals won't go to purchase the guns because there will be a background check. We'll stop them from the original purchase. You miss that point completely.

LAPIERRE: Senator...

DURBIN: I think it's -- it's basic.

LAPIERRE: Senator, I think you missed...

(CROSSTALK)

LEAHY: Let there be order.

LAPIERRE: I think you're missing...

(CROSSTALK)

LEAHY: Let there be order.

(CROSSTALK)

LAPIERRE: If you don't prosecute them, you're not stopping them.

(CROSSTALK)

LEAHY: Please wait -- everybody for a moment. (CROSSTALK)

LEAHY: I said earlier, there will be order in the committee room. Senator Durbin, and then...

DURBIN: I -- I'm going to give you a chance, but let me just say at the outset, Captain Kelly thank you. Thank you for bringing that wonderful, brave wife of yours today to remind us what victims suffer from gun violence. What a heroic figure she is, and what a great pillar of strength you are, to stand by her during this entire ordeal, and her rehabilitation. We're so proud of her, and of you.

KELLY: Thank you.

DURBIN: And I say with some regret, there should have been a hearing just like this right after your wife, one of our own, a member of Congress, was shot point-blank in the face at a town meeting in Tuscon, Arizona.

I'm sorry it's taken two years for us to convene this hearing, but it took Newtown, Connecticut to finally bring us to our senses and to open this national conversation. But I hope that you will extend to her our best wishes, our love and our support for what she is doing today and what she has meant to all of us for this long period of time.

I also want to say a word about an incident. There was a young lady from Chicago, Illinois, 15 years old. She attended the University Prep School in Chicago. She was an honor student and a majorette. And she marched in the inaugural parade last week here in Chicago. It was the highlight of her young 15-year-old life.

Yesterday, in a rainstorm after school she raced to a shelter. A gunman came in and shot her dead. Just a matter of days after the happiest day of her life she's gone.

A lot has been said about the city of Chicago, and I want to say a few words too. The biggest problem in Chicago, according to Superintendent McCarthy, who came to Chicago from New York, we are awash in guns.

The confiscation of guns per capita in Chicago is six times the number of New York City. We have guns everywhere. And some believe the solution to this is more guns. I disagree.

When you take a look at where these guns come from, 25 percent plus are sold in the surrounding towns around the city of Chicago, not in the city.

And you look over the last 10 or 12 years, of the 50,000 guns confiscated in crimes, almost one out of 10 crime guns in Chicago came to that city from Mississippi -- Mississippi. Why? Because the background checks there, the gun dealers there are a lot easier than they are in other places. And they end up selling these guns in volume and they come up the interstate and kill wantonly on the way.

Here's the basics. I think we all agree -- I hope we all agree that the Supreme Court decision in Heller said we can have reasonable limitations on a Second Amendment right in terms of the type of weapon and the people who own them and the background checks on those people.

It's something we desperately need to do.

But we know now that 40 percent of the sales are not going through the background checks. That's a huge problem. It's created this abundance of weapons that are available.

And the straw purchasers -- I salute the chairman for addressing this issue on straw purchasers. It's one of the worst situations in our state and in the city of Chicago.

I can point to one gun store -- one gun store in Riverdale, Illinois, that accounts for more than 20 percent of the crime guns in Chicago. Straw purchasers buy the guns there and they end up in the hands of criminals in the city of Chicago. We got to put an end to this.

Chairman, thank you for your bill.

And let me ask -- I'm gonna ask a question here of some of the panelists.

Mr. LaPierre, I run into some of your members in Illinois and here's what they tell me, "Senator, you don't get the Second Amendment." Your NRA members say, "You just don't get it. It's not just about hunting. It's not just about sports. It's not just about shooting targets. It's not just about defending ourselves from criminals," as Ms. Trotter testified. "We need the firepower and the ability to protect ourselves from our government" -- from our government, from the police -- "if they knock on our doors and we need to fight back."

Do you agree with that point of view?

LAPIERRE: Senator, I think without any doubt, if you look at why our founding fathers put it there, they had lived under the tyranny of King George and they wanted to make sure that these free people in this new country would never be subjugated again and have to live under tyranny.

I also think, though, that what people all over the country fear today is being abandoned by their government. If a tornado hits, if a hurricane hits, if a riot occurs that they're gonna be out there alone. And the only way they're gonna protect themself (ph) in the cold and the dark, when they're vulnerable is with a fire arm. And I think that indicates how relevant and essential the Second Amendment is in today's society to fundamental human survival.

DURBIN: Well, Chief Johnson, you've heard it.

The belief of NRA is the Second Amendment has to give American citizens the firepower to fight back against you, against our government.

LAPIERRE: That's not (OFF-MIKE)

DURBIN: So how do you conduct your business in enforcing the law and not knowing what is behind that door?

J. JOHNSON: I find it to be scary, creepy. And it's simply just not based on logic. Certainly, law enforcement across this nation is well-prepared to deal with any natural or man-made disaster that will occur. And, frankly, I just -- I can't relate to that kind of thinking.

DURBIN: I can't either. I can't relate to the need of that man in Aurora. Colorado, to have a 100-round drum, 100 cartridges.

Professor Kopel, do you think that's necessary for hunting, sports, target practice, even self defense?

KOPEL: I -- it would be not legal for hunting in most states, where there are limits on how many rounds you can have in a magazine.

But, as I think you've recognized, the Second Amendment is not primarily about hunting. What I've been talking about is what the Supreme Court said in District of Columbia v. Heller, which is what is core of the Second Amendment, which is the firearms and their accessories which are commonly owned by law-abiding people for legitimate purposes.

DURBIN: But, let me tell you -- let me ask...

(CROSSTALK)

KOPEL: And -- and -- and those are not, I'm not talking about 100-round magazines. I'm talking about what police officers carry, what citizens carry, semi-automatic handguns, typically with magazines of below 19 rounds...

DURBIN: But those are police officers.

KOPEL: ... and rifles.

DURBIN: But those are police officers. Those are members of our military.

(CROSSTALK)

KOPEL: No, they're not -- they're not military men. They're not coming to attack people, They're coming to protect people. And they want to protect -- and citizens protect themselves the same way that police officers do.

DURBIN: What I'm trying to get to is this, if you can rationalize a 100-round drum that someone can strap onto an automatic -- semi-automatic weapon, as did in Aurora, Colorado, and turn it loose, killing dozens of people there, and saving lives only because it jammed, then you certainly ought to object to the laws that have been on the books for 80 years about machine guns. Why aren't they allowed under the Second Amendment?

KOPEL: Because, as the -- because, according to Heller, because they are not commonly used by law-abiding citizens for legitimate purposes.

DURBIN: But 100-round magazines are?

KOPEL: You're the one who wants to talk about 100-round magazines.

DURBIN: I sure do.

KOPEL: And thank goodness -- thank goodness he had a piece of junk like that that jammed, instead of something better made, where he could have killed more people with it.

(CROSSTALK)

DURBIN: Well, we -- that's what it's all about, then?

KOPEL: It's about saving...

DURBIN: We're playing God here?

KOPEL: It's about saving lives -- it's about saving lives with ordinary magazines. Hundred magazines are novelties that are not used by police officers or hunters or most other people.

(CROSSTALK)

KOPEL: But what you're talking about banning, Senator, is normal magazines.

DURBIN: Tell us about -- tell us about the lives that were saved in Tucson and what it had to do with magazines.

KELLY: The shooter in Tucson showed up with two 33-round magazines, one of which was in his 9 millimeter. He unloaded the contents of that magazine in 15 seconds. Very quickly. It all happened very, very fast.

The first bullet went into Gabby's head. Bullet number 13 went into a nine-year old girl named Christina Taylor Green, who was very interested in democracy and our government, and really deserved a full life committed to advancing those ideas.

If he had a 10-round magazine -- well, let me back up. When he tried to reload one 33-round magazine with another 33-round magazine, he dropped it. And a woman named Patricia Maisch grabbed it, and it gave bystanders a time to tackle him. I contend if that same thing happened when he was trying to reload one 10-round magazine with another 10-round magazine, meaning he did not have access to a high-capacity magazine, and the same thing happened, Christina Taylor Green would be alive today.

I certainly am willing to give up my right to own a high-capacity magazine to bring that young woman back, that young girl.

Now, let me -- let me -- let me continue with what happened that day. In that 15 seconds -- or, actually, with the first shot, a man ran out of Walgreen's, a good guy with a gun, with the intent to do the right thing, An armed citizen.

He came within -- he admits that he came within about a half a second of shooting the man who tackled during Jared Loughner and nearly killing him.

I mean, we almost had this horrific mass murder followed up with a horrific accident. The horrific mass murder because of the high- capacity magazine and the horrific accident because of the -- the armed person there who, with good intention, wanted to end the something that was -- that was going really bad.

DURBIN: Thank you.

Thank you, Mr. Chairman.

LEAHY: Senator Graham?

GRAHAM: Thank you, Mr. Chairman.

I think I'm speaking for a lot of people when they say we're heartbroken when a family member is taken through an act of gun violence, whether it be a child or anyone else, but particularly children. That's just a heartbreaking episode in society. And I think most people would -- would appreciate the fact that there are thousands, it not millions of Americans who saved their families from home invasions or violent assault because they had a gun to protect themselves. And most of us are glad it ended well for you.

So, those are the two bookends. And you mentioned, Captain Kelly, and I very much appreciate your being here and your service to the country, about you and your wife are reasonable Americans. I don't doubt that one bit. I'm sure you are. The question is, am I a reasonable American if I oppose this bill? Am I a reasonable American believing that the Constitution says guns commonly used by the population (inaudible) for legitimate purposes?

(inaudible) the Second Amendment, I don't want to own a gun to attack my government. That's just not what I think a legitimate purpose is.

Let's talk about a real-world incident that happened in Loganville, Georgia on January 4th, 2013. My basic premise is that one bullet in the hand of a mentally unstable person or a convicted felon is one too many. Six bullets in the hands of a mother protecting her twin 9-year-olds may not be enough. So, I've got a chart here. At the very top is a .38 revolver and on the right is a 9-millimeter pistol that holds 15 rounds.

Does everybody on the panel agree that a convicted felon should not have either one of those guns? Does everybody agree that

a mentally unstable person shouldn't have either one of those tools? OK, common ground there.

Put yourself in the shoes of the mother. The guy broke into the home. She ran upstairs. She hid in a closet. She got on the phone to the police. And she was talking to her husband in real time. The intruder broke into the home, had a crowbar, and he found them in the closet. And they were confronted -- confronted face to face. According to media report, her husband said, "shoot, shoot." She emptied the gun, a six-shot revolver. The guy was hit five of the six times. He was able still to get up and drive away. My question is: Put your family member in that situation. Would I be a reasonable American to want my family to have the 15-round magazine in a semi-automatic weapon to make sure that if there's two intruders, she doesn't run out of bullets? Am I an unreasonable person for saying that in that situation, the 15-round magazine makes sense?

Well, I'll say I don't believe I am. So I can give you an example of where a 15-round magazine could make the difference between protecting a family if there's more than one attacker.

Now, back to your point, Captain Kelly. In the situation you described, I don't want that person to have one bullet or one gun. And the point of regulating magazines is to interrupt the shooter. That's the point of all this.

And I guess what I'm saying is that we live in a world where there are 4 million high-capacity magazines out there or more. I think the best way to interrupt the shooter if they come to a schoolhouse is not to try to deny the woman in Atlanta the ability to have more than 10 rounds, but to have somebody like you, Chief Johnson, meet them when they come into the door. I think that's the best way to do it.

Now, my good friend Joe Biden, who we have very spirited conversations about a lot of things, was online recently talking to someone in California who mentioned the fact, what is there's an earthquake out here -- out here and there's a lawless situation? In 1992, you had the riots in Los Angeles. I think it was the King event. But you could find yourself in this country in a lawless environment through a natural disaster or a riot, and the story was about a place called Koreatown. There were marauding gangs going throughout the area burning stores, looting and robbing and raping. And the vice president said in response to "that's why I want my AR- 15," he said, "No, you would be better off with a 12-gauge shotgun."

GRAHAM: Well, that's his opinion and I respect it. I have an AR-15 at home and I haven't hurt anybody and I don't intend to do it. But I think I would be better off protecting my business or my family if there was law-and-order breakdown in my community, people roaming around my neighborhood to have the AR-15, and I don't think that makes me and on reasonable person.

Now, Ms. Trotter when you mention that you're speaking on behalf of millions of women out there who believe an AR-15 makes them safer, there were a lot of giggles and the room, and I think that explains the dilemma we have.

The people who were giggling were saying to you, that is crazy. Nobody I know thinks that way. Which reminds me of the Harvard professor who said, "I cannot believe Mcgovern lost. Everyone I know voted for him." And I bet there are people on our side that can't believe Obama won, because everyone they know voted against him.

The point is that we have different perspectives on this. And the reason I'm going to oppose the legislation, Chief Johnston, is because I respect what your do as a law enforcement officer.

Has your budget been cut?

J. JOHNSON: Yes.

GRAHAM: Will it be cut in the future?

J. JOHNSON: I am optimistic that it is not.

GRAHAM: Well I hope you're right, but I can tell people, throughout this land, because of the fiscal state of affairs we have, there will be less police officers, not more, over the next decade. Response time are gonna be less, not more.

So, Captain Kelly I really do want to get guns out of the hands of the wrong people. I honest to God believe that if we arbitrarily say nobody in this country can own a 10-round magazine in the future, the people who own them are the people we're trying to combat to begin with, and they (sic) could be a situation where a mother runs out of bullets because of something we do here.

I can't prevent every bad outcome, but I do know and I do believe in the bottom of my heart I am not an unreasonable person for saying that in some circumstances the 15-round magazine makes perfect sense and in some circumstances the AR-15 makes perfect sense. And I think our efforts to solve a problem that exists in the real world out there from Washington by having more gun laws that really do not hit the mark so to speak, politically, or situationally, that we're all face, but this is why we have these hearings. And I really do appreciate the fact that we have these hearings.

Professor Kopel -- Kopel, Kopel?

KOPEL: Either one.

GRAHAM: OK.

Some people on our side say -- and I'll wrap this up, Mr. Chairman -- that it is unconstitutional to put a limit on magazine size.

Do you agree with that?

KOPEL: I think if we follow Senator Schumer's approach and say we're gonna follow what the District of Columbia v. Heller Supreme Court decision says, what that tells you is the core of the Second Amendment is the firearms and accessories that are commonly owned by law abiding people for legitimate purposes.

GRAHAM: Is it constitutional to say 10 rounds versus 15?

KOPEL: Ten is plainly unconstitutional, because, as I was trying to explain to Senator Durbin, magazines of up to 19 are common on semiautomatic handguns.

GRAHAM: (inaudible) I do not know if 10 versus 19 is common or uncommon. I do know that 10 versus 19 in the hands of the wrong person is a complete disaster. I do know that six bullets in that hands of a woman trying to defend her children may not be enough. So I don't look at it from some academic debate.

Let's agree on one thing. One bullet in the hands of the wrong person we should all try to prevent. But when you start telling me that I am unreasonable for wanting that woman to have more than six bullets, or to have an AR-15 if people roaming around my neighborhood, I reject the concept.

LEAHY: Thank you, Senator.

Senator Whitehouse? And then after Senator Whitehouse, Senator Lee.

Senator Whitehouse?

WHITEHOUSE: Thank you, Mr. Chairman.

Mr. Chairman, I've heard testimony in this hearing that the federal gun crime prosecutions number 62 per year, and that, "We don't prosecute any." And I was surprised to hear that testimony because I was a United States attorney. And in my time that I was United States attorney it became an absolute priority of the Department of Justice to prosecute firearms.

WHITEHOUSE: So I went to every police department in my state to talk up what we could do with gun criminals. We set up a special procedure where the attorney general's office, which has criminal jurisdiction in Rhode Island, and our office viewed gun crimes together to make sure they were sent to the place where they could get the most effective treatment. And I believe that, that continues, although I'm no longer a U.S. attorney. So I hold up some quick statistics, and according to the executive office at United States attorneys, in 2012 more than 11,700 defendants were charged with federal gun crimes, which is a lot more than not doing it, and a lot more than 62.

And the numbers are up at the Department of Justice since 2000 and 2001 by more than 3,000 prosecutions. So, we may have a debate about whether more should be done, and who at the witness table actually wants more to be done in the way of gun prosecutions, but I think to pretend that the number is in double digits, or the number is zero, is flagrantly wrong, and I think inconsistent with the type of testimony that Senators should rely on in a situation like this.

I'd also add that there's been repeated testimony, also mentioned by Senator Durbin that criminals won't subject themselves to a background check. And my response to that is, that's exactly the point. Criminals won't subject themselves to a background check, so they won't go into the gun shops. And if they do, they get prevented from buying a gun. So instead, they go to illegal means. They go primarily to the way we distribute guns without a gun check -- a background check, which is to the gun shows.

And so I think to the extent we can expand the background check, the very fact that the criminals won't subject themselves to a background check provides the kind of prevention that Senator Graham was talking about, to keep the guns out of the hands of criminals in the very first case. Chief Johnson, tell me a little bit about the men and women with whom you serve in law enforcement, and the type of training, and screening that is important both in gun use, in gun safety, in situational awareness, before they are put in a position where they are expected to defend the public with firearms?

Is that just something you just give somebody a gun and say, get in there, and go defend the -- the community? Or how -- how rigorous, and how cautious are you about the training required?

J. JOHNSON: The process starts well before we even offer you a badge. And it is a very robust, in depth, psychological review of whether or not we're even going to allow you to enter the force itself. All departments are universal in this issue. It includes psychological, polygraph, and other means to determine whether or not you have the fiber to have that awesome responsibility to carry a gun. The training is exhaustive. Weeks and weeks of training on how to use the weapon, and tactically how to deal with it, how to care for it, and how to safeguard that weapon.

But it doesn't stop there. Once you're out in the field, a very robust psychological services section, yearly training and other safety equipment that must be carried. This talk about teachers having guns...

WHITEHOUSE: That's actually where I was going to go. But before we get to teachers, to your knowledge, does the military have the -- similar types of concerns and programs with respect to arming men and women who serve in our armed forces?

J. JOHNSON: It is my understanding talking with my associates in the military, that public policing mirrors much of what the military does.

WHITEHOUSE: So against that background, tell me how much sense you think it makes to have our line of defense be armed teachers?

J. JOHNSON: Certainly when we have this discussion, you have to -- does a teacher have the -- the -- the inner fiber to carry that weapon? The awesome responsibility? You're a teacher in a classroom. You're an educator. You dedicated your entire life to that pursuit, but you've got a sidearm strapped to yourself? You'd better have it all the time. Because if you put it in your desk drawer, your purse, or your briefcase -- and where you gonna leave it?

J. JOHNSON: Let me tell you something, carrying this weapon on my side has been a pain all these years. I'm glad I have it if I need it, but let me tell you, it's an awesome responsibility. And what do you do in the summertime when you dress down? How are you going to safeguard that weapon from a classroom full of 16-year-old boys that want to touch it? How are you gonna do that?

And certainly -- the holsters. I'm spending $200 a piece just for the holsters. You can't rip it from my side.

So these are all the factors that in a robust, psychological service section we all face catastrophic changes in our lives as we go

through divorce and other things that bring us down. But you need people to step in, like we have in policing, that notice those things and deal with them. This is a major issue.

WHITEHOUSE: We've had cases, including a case in Rhode Island, in which trained police officers who were off duty responded to a situation, because they hadn't been adequately trained in how to respond off duty and because they were out of uniform, it lead to tragic blue-on-blue events.

Presumably, that would have some bearing on armed police officers responding to an event in which a lot of armed and untrained teachers are trying to defend students in a school.

J. JOHNSON: Well, it's a very important point. Two years ago in Baltimore City an on-duty officer in plain clothes was shot by uniformed on-duty personnel, and they work the same shift. It's just in the darkness of the night they couldn't tell.

And as Captain Kelly has pointed out, that's a major issue in the Tucson shooting.

WHITEHOUSE: And Ms. Trotter, a quick question. Sarah McKinley, in defending her home, used a Remington 870 Express 12-gauge shotgun that would not be banned under this statute, correct -- under the proposed statute?

TROTTER: I don't -- I don't remember what type of weapon she used.

WHITEHOUSE: Well, trust me, that's what it was. And it would not be banned under the statute.

So it doesn't -- I think it proves the point that with ordinary firearms not 100-magazine, peculiar types of artifacts people are quite capable of defending themselves. In fact, that was your example.

TROTTER: I respectfully disagree. I understand that you are also a graduate from the University of Virginia School of Law, and you were close to Monticello where Thomas Jefferson penned our Declaration of Independence and close to Montpelier where James Madison was instrumental in drafting the Bill of Rights. And I think you can understand that as a woman I think it's very important not to place undue burdens on our Second Amendment right to choose to defend ourselves.

WHITEHOUSE: Oh, I have...

(CROSSTALK)

TROTTER: I don't know what -- I don't know what weapon she used...

WHITEHOUSE: ... the point. My point is that the example you used is one that would not bear (ph) an argument against the proposal that is before us, because that Remington 870 Express is a weapon that would be perfectly allowed.

TROTTER: So would it have been unreasonable for her to use a different gun to protect her child?

WHITEHOUSE: I think that if she was using a 100 weapon -- let me put it another way. She would clearly have an adequate ability to protect her family without the need for a 100-round piece.

TROTTER: How can you say that?

You -- you are a large man, and you are not a teenage...

(CROSSTALK)

TROTTER: a tall -- tall man. You are not a young mother who has a young child with her. And I am passionate about this position. Because you cannot understand. You are not a woman stuck in her house having to defend her children, not able to leave her child, not able to seek safety, on the phone with 911. And she cannot get the police there fast enough to protect her child...

(CROSSTALK)

TROTTER: ... and she's not used to being in a firefight.

WHITEHOUSE: And my point simply is that she did it adequately and safely with lawful firearms and without the kind of firepower that was brought to bear so that the 12th, 13th, 14th shots could be fired by the man who shot...

(CROSSTALK)

LEAHY: I'm gonna have to acknowledge and (inaudible) another round.

There are a number of things that I could say as a gun owner, but I won't. Pass up on the opportunity, and go to Senator Lee.

LEE: Thank you, Mr. Chairman.

And I -- I'd like to thank each of the distinguished members of our panel today for enduring now over two hours of this hearing.

As -- as a more junior member of the committee who sometimes gets to ask questions last or second to last, I'm especially appreciative of your willingness to stay this long.

LEE: I think every one of us, both here in this room and everyone watching on television, has been horrified by the incidents that occurred in Newtown, in -- in Tucson and elsewhere. And I don't think there is one of us that wouldn't like us to find a way as a society to put an end to events like this.

It would be my preference, if we could find a way to put an end to events like this, without doing violence to the Constitution

and also without leaving law-abiding citizens more vulnerable to crime.

There are a number of statistics on this, but one statistic I've read has indicated that about 2.5 million times a year in America, a gun is used to protect its owner, its possessor, from a crime. That's -- that's quite significant and that's a fact that we need to take into account.

There's been a lot of reference today to the fact that the protections of the Constitution -- the protections of the Second Amendment right to bear arms -- are not unlimited. And I agree that they are not unlimited. There are limits. I think it's important for us from time to time to focus on what those limits are.

The Supreme Court in District of Columbia v. Heller held that the guns that are within the zone of protection of the Second Amendment are those that are typically possessed by law-abiding citizens for lawful purposes.

Why don't we start with you, Professor Kopel. Can you tell me, is a gun -- a semi-automatic weapon, whether a rifle or a hand gun, that holds more than 10 rounds in its ammunition magazine, one that could fairly be characterized as one that's typically possessed by law-abiding citizens for lawful purposes?

KOPEL: In hand guns, semi-automatics are 81 percent of new hand guns sold. A very large percentage of those have as standard, not as high-capacity, but as standard factory magazines -- magazines between 11 and 19 rounds. Another thing that is very common, to get back to Senator Whitehouse's issue about the Remington 870 shotgun, is Senator Feinstein's bill would outlaw that shotgun if it has a seven-round magazine on it. It comes with a five-round magazine. You can extend it buy two rounds. And the Feinstein bill would outlaw that very standard home defense shotgun if it simply has a seven-round magazine.

So, it's all fine to talk about novelty items on the fringe, like a 100-round drum, but in practice what is at threat of being outlawed, that people are actually using, is their standard capacity hand gun magazines and standard capacity magazines for rifles and shotguns.

LEE: And what are the law -- what are the law-abiding citizens doing with these? In other words, what are the lawful purposes to which law-abiding citizens are putting these guns, who own them?

KOPEL: Self-defense, target shooting -- all the purposes which is lawful to possess a firearm. And I would -- regarding what the chief was talking about about all this extra training that police officers have. Well, since I represented the two leading police training organizations in the U.S. Supreme Court, I would certainly agree that the police have more training for all kinds of reasons, including they have the power to effectuate arrests, which ordinary citizens don't.

But the training -- in the view of the police training organizations, the International Law Enforcement Educators and Trainers Association, the International Association of Law Enforcement Firearms Instructors, they believe that the training that is required in most states to obtain a permit to carry a hand gun for lawful protection of self -- only nine states currently violate that by not letting trained citizens carry -- that that is appropriate, sufficient for people to be able to protect themselves, not necessarily to go out and do arrests, but to defend themselves. And that includes defending themselves in their place of

including if that place of employment happens to be a school.

LEE: Well, one of the arguments that I've frequently heard for making this type of weapon illegal or making any weapon illegal if you're using an ammunition magazine containing more than 10 rounds is that weapons like these are available on a widespread basis; that -- that it's relatively easy to buy them in the sense that, you know, most people may lawfully buy them and own them. And that's used as an argument in favor of restricting access to these weapons.

In your opinion, does that make it more or less constitutionally permissible to restrict their sale?

KOPEL: Well, I think you've hit exactly what District of Columbia v. Heller was all about, which, you know, you talk about how often are 100-round magazines used in crimes. Pretty rarely. How often are they used in self-defense? Pretty rarely, too.

Hand guns are used -- they're 70 percent of gun homicides are perpetrated with hand guns. And the Supreme Court said the fact that these are very frequently used in crimes does not mean that under the Constitution, you can prohibit them.

KOPEL: So the point -- the fact that you can point to any particular crime where a gun was misused and say, "Oh, that proves we have to ban this gun or this accessory," is the opposite of what the Supreme Court is saying. The Supreme Court is saying, "You don't look only at the misuse of an arm or an accessory, you look at its lawful use. Does it have common, lawful use?"

Yes, handguns have common, lawful use. Yes, handgun magazines in the standard size of 11 to 19 rounds have common, lawful use. And yes, the AR-15 rifle, the most popular, best-selling rifle in this country for years, has pervasive lawful use.

LEE: So, if we restrict access to these guns, we're -- we're limiting the ability of individual Americans, law-abiding Americans, to use them for lawful purposes?

KOPEL: Yes, and the -- and the teaching of Heller is the fact that Criminals may misuse something, but that does not constitute sufficient reason to prohibit law-abiding citizens from using a commonly used firearm.

LEE: Ms. Trotter, do most of the gun-owning women that you know have an inclination to abide by the law in connection with a gun ownership?

TROTTER: Yes, definitely.

LEE: If we were to ban all weapons that contained an ammunition magazine capable of accommodating more than 10 rounds, would most female gun owners abide by that law?

TROTTER: Of course.

LEE: What about criminals, those who use weapons like these in connection with crimes? Do you think they are as likely to abide by that law?

TROTTER: By definition, criminal are not abiding by the law.

LEE: Where does that then put women like those that you described -- women like those that you represent, what kind of position does this put them in relative to their -- their current position, as their ability to defend themselves?

TROTTER: It disarms the women, it puts them at a severe disadvantage and it not only affects them, but it affects anybody they are responsible for, their children, elderly relatives, incapacitated family members.

LEE: Mr. Chairman, I see my time's expired. I have one question for Mr. Johnson, if I could have -- Mr. Johnson, according to FBI statistics, about 72 percent of the gun homicides that are committed each year in America are committed with handguns, 4 percent with rifles, 4 percent with shotguns, 1 percent with other types of -- of firearms, and then 18 percent that fit into the category of unknown, but 72 percent classified as -- as handguns.

If 72 percent of gun homicides are being committed with handguns, would that suggest that you prefer banning handguns as well?

J. JOHNSON: Our partnership -- and frankly I've been party to no discussion of banning handguns or restricting handguns from women or any other group.

I don't want to give up my hand guns. We are here today to talk about a universal background check that would help make our nation safer and limit high-capacity magazines. They are used in crimes and violence across America.

LEE: Even though far more people die each year from handgun- inflicted injury is an assault weapon-inflicted injuries.

J. JOHNSON: We believe the limit on high-capacity magazines, even in handguns is necessary. No more than 10.

LEE: Thank you.

LEAHY: Senator Klobuchar.

KLOBUCHAR: Thank you very much, Mr. Chairman.

Thank you, I first wanted to just acknowledge all of the family out here who have lost loved ones in shootings. And I especially wanted to acknowledge Maya Ramin (ph) who's here from Minnesota, who lost their dad, (inaudible), in a horrible shooting at the company that he built and loved, a small business in which he was killed along with four other employees and a UPS guy who just happened to be there by a coworker who was mentally unstable. And this just happened this fall.

So thank you.

I also was listening to all the statistics here, which are very important. I am a former prosecutor, I believe in evidence. But the

statistic that I will never forget is the one from Newtown, Connecticut, shared with me by a relative of one of the young victims in that tragedy.

And that is that little Charlotte Bacon loved her Girl Scout troop. And her Girl Scout troop once had 10 girls, and now there are only five left.

We have to remember what this is all about as we look at solutions.

KLOBUCHAR: For me, as a former prosecutor, I've always believed in enforcing the laws on the books. And, Mr. LaPierre, I made it a major, major focus of our office to prosecute the (inaudible) and possession of guns. I think that is clearly part of the solution. You cannot lessen the importance of that as we go forward.

But there are other things as well, including the recommendations that have been made by Vice President Biden and that task force. And I think it's very important that we explore those in addition to enforcing the laws on the books.

I have heard from my sheriffs -- Republican sheriffs from all over my state, that there are major issues with background checks.

And so, I think I would turn to that first, Chief Johnson. We have had -- we had a guy in Minnesota that just came our paper, the Minneapolis paper, who had killed his parents as a juvenile. Got out. Somehow got a permit, and was able to obtain guns.

In fact, when they found him, he had 13 guns in his house. And he had a note that he had written to the gunman in Newtown. And he also said in the note, "I am so homicide, I think about killing all the time."

He was able to get a permit and get those guns. This just came out in our local paper.

And I wondered what you see as some of the biggest loopholes. We've talked about gun shows, Internet, private sales, and -- and how you think that could help?

And then I want to get to the thing you talked about, about how you can get those background checks done quickly, because I come from a hunting state. The last thing I want to do is hurt my Uncle Dick in his deer stand. And I want to make sure that what we do works.

And so, if you could address that.

J. JOHNSON: There's been great improvement in the nation. Some statistics show nearly 800 percent increase in data entered into the National Instant Criminal Background Check System. That's good, but it's not good enough. And we're really failing miserably, nationally, entering that data.

Statistics I've read indicate that nearly 18 states across the nation submit less than 100 records to the NICS system on a -- on a

regular basis. We've to improve that. Maryland has to improve that, in fact. We're not doing enough in Maryland.

KLOBUCHAR: And is it true that about 40 percent of gun sales take place at the gun shows?

J. JOHNSON: Statistics reveal that 40 percent of gun sales take place at gun shows and other non-licensed dealer sales arrangements. Nearly 6.6 million guns through that process a year.

KLOBUCHAR: And are more and more people now using the Internet to buy guns, as we see in other areas?

J. JOHNSON: I sat with my detectives in the gun squad for weeks before I had a chance to come -- the honor to come here today. And they regularly used Internet, PennySaver classified ads. They'll go outside the state in many cases. A variety of methods, including straw purchasers.

KLOBUCHAR: And you talked a little bit earlier about how quickly these background checks can get done. You compared it to issuing a ticket. If you could answer that.

J. JOHNSON: The analysis that we've conducted, the information I have, I believe it's 92 percent of NICS background checks come back in less than a minute and half when you go to a licensed federal dealer.

And, certainly, that's much quicker than I can write a citation. And I think that should be universal. That's what we're calling for. That's what's gonna make our nation safer.

KLOBUCHAR: Mr. LaPierre, do you want to respond about the -- the timing on the checks?

LAPIERRE: Sure, I'll respond to -- yes, Senator, a couple points. One, the chief's talking about using the Internet to do interstate sales. That is a federal crime and should be prosecuted. The only way you can do a sale, it would have to go through a dealer and it would have to be cleared through a check.

The senator from Rhode Island talked about the prosecution data. I get all that from the Syracuse University track data, which is who tracks the initial -- the prosecution of the federal gun laws where that's the initial charge.

And why Project Exile worked in Richmond, Virginia, is what they started to is they caught a drug dealer with a gun. They put signs up all over the city saying if you have an illegal gun in Richmond under federal law, you're going to be prosecuted 100 percent of the time. Drug dealers, gangs and felons stopped carrying guns.

So those -- the '62 (ph), Senator, statistic, was for Chicago alone, not for the entire country.

KLOBUCHAR: Mr. LaPierre, if you could...

LAPIERRE: Yeah. KLOBUCHAR: ... and I know you want to discuss this with Senator Whitehouse, but I have question about

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3916   Page 397 of
472

the timing. Could -- do you agree with the chief here that we could do this quickly? And all we're trying to do here is close some of these loophole so we expand some of the background checks, but that it still could be done in a way that won't interfere with law-abiding gun owners.

LAPIERRE: Well, gun shows, right now are -- according to all the surveys, are not a source of crime guns, anyway. It's 1.7 percent. Where criminals are guns, they're -- the black market. They're stealing them, They're not getting them through gun shows.

But if you're talking about expanding a system that is already overloaded, where they're not doing any prosecutions, basically. Even if they catch somebody, they're saying -- it's like Bonnie and Clyde. They catch Clyde, and he goes home and says, "Bonnie, they didn't do anything to me, so let's go commit our crime and get a gun."

LAPIERRE: I mean, if -- if you're talking about expanding that system to every hunter, to every family member, every relative all over the United States, when the system already can't handle what it has, you're creating an enormous federal bureaucracy. It's only going to hit the law-abiding people, not criminals.

Honest people are going to be entrapped into committing crimes they had no intention to commit and it's going to -- it's an unworkable universal federal nightmare bureaucracy being imposed under the federal government.

I just don't think that law-abiding people want every gun sale in the country to be under the thumb of the federal government.

KLOBUCHAR: But it's my understanding that when people buy guns, they do undergo a background check. We know that and we're just simply trying to close some of these loopholes.

Chief? Do you want to respond to this?

J. JOHNSON: Well, certainly when a weapon is purchased through a licensed federal dealer, they undergo a background check. But, as we've said many times here today 40 percent of these guns are being sold outside that process. This is not unreasonable. And certainly I don't consider it a restriction. If I buy a gun next year, you know through a private seller, I'll go to a licensed dealer to do it. This is not unreasonable.

KLOBUCHAR: And Captain Kelly, I think you really said it best at the very beginning of this lengthy hearing when you talked about your belief in the Second Amendment, and in those rights. But with those rights comes responsibility. And you talked about the responsibility to make sure that these guns do not get into the hands of criminals and terrorists, and those with mental illness. And do you see this, the background check, as a way to get at this problem?

KELLY: Gabby and I are both responsible gun owners. I bought a hunting rifle from Walmart a few months ago, and I went through a background check. It didn't take very long. And they -- you know they were able to very clearly determine that, you know I was a responsible person. You know in -- in Tuscon, and in many of these cases there are people that either would have failed a background check if the right data was in the system, like in the case of Jared Loughner, and certainly in that case he

would have the option to go to a gun show, or a private seller, and I imagine he would have gotten a weapon. You know he was a pretty marginalized person. I would imagine, and -- and quite mentally ill and didn't have much of a community around him. I imagine in that case, if he would have not been able to get -- not pass a background check, and -- if there was a universal background check, I actually don't see him going on the black market to get a gun. And maybe if he did, maybe it would have taken him a long time to do that. To find the right place to go.

And maybe in that period of time, just maybe his parents would have gotten him some treatment, got him on medication. And if they did, from what his attorney and the prosecutors have told me, on medication he would have never done what he did on that day. I mean, so you might not be able to prevent every single criminal from getting a weapon, but a universal background check is a common-sense thing to do.

I mean if we do them for federal licensed dealers, why can't we just do it at the gun show, and for a private sale?

KLOBUCHAR: Thank you very much. And I was thinking as I listened to you, about all the people in this room that have thought those maybes too. Maybe if this had been in place, maybe if that had been in place. And I think your acknowledgment that it's not one solution for every person, for every case. That we have to enforce the laws, but we have to do better with background checks and the number of the proposals that recommended out there by Vice President Biden's commission that we can do better. Thank you.

LEAHY: Thank you.

I want to welcome one of our three new members to the committee, Senator Cruz of Texas. And Senator Cruz, you have the floor. I apologize that the allergies cause my voice to be so bad.

CRUZ: I thank you Mr. Chairman and it is a pleasure to serve with you, and all the members of this committee. I want to begin by thanking each of the distinguished witnesses who have come here today. Thank you for taking your time. In particular, I want to thank you Captain Kelly for your service to this country, and for your wife's extraordinary journey, for her coming here.

CRUZ: Congresswoman Giffords has been lifted up in prayer by millions of Americans, and her heroic recovery is inspirational. And please know that you, and your family will continue in our prayers in the years to come.

My wife and I have two little girls. They are 4 and 2. I think no parent, and in particular no parent of young children could -- could watch what happened in Newtown without being utterly horrified -- utterly horrified at the depravity of a deranged criminal who -- who -- who would senselessly murder 20 young children at an elementary school.

Unfortunately in Washington, emotion often leads to bad policies. When a tragedy occurs, often this body rushes to act. And at times it seems the considerations of this body operate in a fact-free zone. I will suggest a philosophy that I think should guide this body in assessing gun violence, and then I would like to highlight and ask a few questions on a couple of points that I think are particularly salient to addressing this issue.

The philosophy I would suggest makes sense is that we should be vigorous and unrelenting in working to prevent, to deter and to punish violent criminals. I have spent a substantial portion of my professional life working in law enforcement. And the tragedies that are inflicted on innocent Americans every day by criminals are heartbreaking, and we need to do more to prevent them.

At the same time, I think we should remain vigilant in protecting the constitutional rights of law-abiding citizens. And I think far too often, the approaches that have been suggested by this Congress to the issue of gun violence restricts the liberties of law-abiding citizens rather than targeting the violent criminals that we should be targeting.

And I would point out that I hope some of the passion we have seen from members of this committee with respect to the need to prevent violent crime will be reflected equally should we find ourselves in a judicial confirmation hearing with a judicial nominee who has a record of abusing the exclusionary rule to exclude evidence that results in a violent criminal walking free and being able to commit yet another crime. I hope we see exactly the same passion devoted to assessing whether judicial nominees will enforce our criminal laws and not frustrate the administration of justice.

Three points I think are particularly salient. The first is, in my judgment, the proposed assault weapons ban is a singularly ineffective piece of legislation.

I was having a conversation recently with a loved one in my family who asked a very reasonable question. She said, why do regular people need machine guns? And, you know, one of the things that happens in this debate is the phrase "assault weapons ban" gets a lot of people really concerned, and they assume, much like the phrase "military-style weapons" that we're talking about ordinary citizens walking around with M-16s and Uzis that are fully automatic.

Fully automatic machine guns are already functionally illegal. Ordinary citizens cannot own them, absent very, very heavy regulation. This entire discussion does not concern machine guns, and yet I would venture to say, a large percentage of Americans do not understand that.

I want to begin by talking about the assault weapons ban as it was enforced before. And I would ask for slide number 1.

The assault weapons ban that used to be in effect, according to the Department of Justice, quote, "failed to reduce the average number of victims per gun murder incident or multiple gunshot wound victims." Now, that is the assessment of the United States Department of Justice, and that is in 1994. That was the Janet Reno Department of Justice under President Clinton that said the assault weapons ban was singularly ineffective.

If we can move to the second slide.

The Department of Justice, likewise, concluded that the assault weapons ban, quote, "under it there has been no discernible reduction in the lethality and injuriousness of gun violence."

So the reaction to this tragedy in Newtown is for a lot of elected officials in Washington to rush to re-enact a law that according

to the Department of Justice did absolutely nothing to reduce gun violence.

Now, why is that? That's not accidental. Because the assault weapons ban, if it doesn't ban machine guns, what does it ban? And what it bans, I would suggest to you, are scary-looking guns.

If we can move to slide 3.

This is a photograph of a Remington 750. It is one of the most popular hunting rifles in America. This rifle would be entirely legal under this so-called assault weapons ban.

CRUZ: Now, I have a question for you, Mr. LaPierre. Functionally, in terms of the operation of this firearm -- this is a semi-automatic firearm. You pull the trigger once, one bullet comes out. Is the operational firing mechanism in this firearm materially different from the so-called assault weapons ban that this -- this bill is targeted at?

LAPIERRE: No, it's not.

CRUZ: Now, what the assault weapons ban instead targets are cosmetic features. So, for example, I am holding in my hand a pistol grip. Under this proposed legislation, if this piece of plastic, this pistol grip were attached to this rifle, it would suddenly become a banned assault weapon.

Now, I would ask you, Mr. LaPierre, are you aware of any evidence to suggest that attaching a piece of plastic to this rifle would make it in any way whatsoever even slightly more dangerous?

LAPIERRE: No, that -- that -- the problem with the whole bill that Senator Feinstein introduced is it's based on falsehoods to people that do not understand firearms, to convince them that the performance characteristics of guns that they are trying to ban through that bill are different than the performance characteristics that they're not trying to ban.

They make bigger holes. They're rapid-fire. They spray bullets. They're more powerful. They're heavy armor. All of that is simply not true. I mean, the -- AR-15 that people -- uses a .223s, and then I hear in the media all the time and people say, "Well, no deer hunter would use something that powerful." I mean, .243s, .270s, 25.06, 30.06, .308s -- dozens of other calibers used in hunting are more powerful.

I mean...

CRUZ: So let me make sure I understand that right. This deer rifle which is entirely legal and is used by millions of Americans, is the -- is sold in the identical caliber as the so-called assault weapons ban, although those look scarier because they have a piece of plastic attached to them.

LAPIERRE: And the Ruger Mini-14, which Senator Feinstein exempts in her bill, uses .223. The AR-15, which has the handle on the bottom, which she prohibits, also uses the exact same. CRUZ: I'm -- I'm out of time. I want to make one final point if I

may, which is there has been much attention drawn to gun shows. And indeed, the statistic of 40 percent has been bandied about. Now, that statistic is unfortunately based on a study that occurred before the background check went into effect. And so it is a highly dubious figure.

But I do want to point to what the Department of Justice has said, which is in slide five. The Department of Justice has said that firearms used in crimes, 1.9 percent of those firearms come from gun shows. So again, in response to this crime, this body does not act to enact anti-crime legislation to prevent violent crimes. Instead, it targets 1.9 percent of the guns, and a substantial portion of those guns were sold by licensed firearms dealers who already conducted a background check. So even that 1.9 percent, a substantial portion area already subject to a background check.

I would ask, Mr. Chairman, if we have a second round, I would like to additionally get into the effectiveness or lack thereof of gun controls.

LEAHY: I'm -- I'm going to leave the record open for questions. I think, because of the Senate's schedule this afternoon we probably will not have a second round. So, we will leave the record open so the senator -- and I have further questions. I won't have time either, so I can submit my questions.

Senator Franken?

FRANKEN: Thank you, Mr. Chairman.

Thank you to all the witnesses, especially you, Captain Kelly, and thanks to your beautiful wife -- and beautiful in every, every way.

My wife Frannie and I were heartbroken for the families in Sandy Hook. We're heartbroken for the families in Tucson. For those of you who are listening or watching this hearing in Newtown, I want you to know that Minnesotans have you in our -- our thoughts and our prayers, and that we shared in your grief. We shared it when we lost lives at a sign factory -- Maya (ph) is here, lost her father. This was in Minneapolis in September.

FRANKEN: We share it every time we hear gun shots and ambulance sirens interrupting an otherwise quiet school night. We share it every time we bury one of our sons or daughters. I know that a group of students from Redlake Reservation in Minnesota, students who lost their classmates to gun violence, made 1,500-mile trip -- drive to Newtown just a few days before Christmas just to let the people in Newtown know that they are not alone, we're all in this together.

Over the past month or so, I've been talking to my constituents about their ideas on how to make our communities safer. I traveled safely with hunters and school officials, with law enforcement officers , with mental health experts. I have convened round table discussions and I have had many, many conversations. And what I've learned is that there is a balance to be struck here. We can honor the Second Amendment, and we can honor the Minnesota's culture of responsible gun ownership while taking basic measures that will make our kids and our communities safer.

So I have co-sponsored a bill to limit the number of rounds in a magazine. I have co-sponsored a bill to require background checks at gun shows. I have co-sponsored Senator Feinstein's bill to ban assault weapons. I am reviewing legislation to address gun trafficking. I have supported funding for law enforcement programs and I work every day to carry out the work Paul Wellstone -- his unfinished work to improve our nation's mental health system.

Tomorrow I will introduce the Mental Health In School Act which will improve access to mental health care for kids, because catching these issues at an early age is really important. And I want to be careful here that we don't stigmatize mental illness.

The vast majority of people with mental illness are no more violent than the rest of the population. In fact, they are more likely to be the victims of violence. But these recent events have caused us as a nation to scrutinize our failed mental health and system, and I'm glad we're talking about this and a serious way.

Police Chief Johnson, I -- I met with some mothers from the Mountain's View school district in Minnesota whose children's lives and their own lives were changed for the better, because their kids got access to mental health care that they needed at an early age. They got treatment. Their lives are improving, and their moms lives were improved.

As a community leader and law enforcement official, do you think it will benefit our communities if we are able to use schools to improve access to mental health care?

J. JOHNSON: I applaud your -- your initiatives and your work Senator. And the answer is, absolutely. As a father with a child that has mental health issues I think this is absolutely essential. And if my child has access to medical care that she needs, but the record shows and reflect that nearly half the children and adults in this nation who are diagnosed with mental health issues do not have access to the care they need, and it gets even worse after the aged 18.

And we're seeing this in crimes of violence, and we're seeing this in crimes across our nation and in my jurisdiction. It's a major problem and I do recognize that most people with mental health issues do not go on to commit violent crimes. However, we have seen over and over again, it seems to be a common thread or theme or issue that we must deal with.

FRANKEN: Again, Police Chief Johnson, I've heard from some gun owners who are worried that Congress is gonna outlaw features that they really like in guns, things like pistol grips and barrel shrouds and threaded barrels. Some say that these features are merely cosmetic, but it seems to me that a lot of these features are not just cosmetic, they are functional.

Can you explain why a pistol grip in the right place makes a functional difference, why it isn't just a piece of plastic? Why collapsible stocks present a danger; bullet buttons and some of the other features are dangerous?

I think this is a crucial point.

J. JOHNSON: I -- I agree completely. It's not just about the capacity of the weapon to handle numerous rounds, which obviously is absolutely critical in this discussion. And, again, we believe no more than 10.

We use that weapon in (ph) police because of its technical capacity, it's ability to cool down and handle round after round after round; it's ability -- it's rugged, it's ruggedized, it's meant for a combat or environment that one would be placed in facing adversaries, human beings, people. That weapon can be retrofitted with other devices to enhance your offensive capability.

The weapon itself has features to adjust it; optics sights, for example, that can cost hundreds of dollars -- and I've shot this weapon many times -- that would enhance our capability in various tactical maneuvers, whether it's from the shoulder or the hip or whether you choose to spray fire that weapon or individually shoot from the shoulder. The optic sights are amazing, the technology advances that weapon has.

That weapon is the weapon of our time. It's the place that we find ourselves in today. And, certainly, I believe it's meant for the battlefield and in a public safety environment only.

FRANKEN: Thank you.

Mr. Chairman, before I yield my time, I just would like to submit testimony of Miya Rahamim (ph) who is here today. She lost her father in a shooting in September in Minneapolis. And I'd just like unanimous consent to submit her testimony for the record.

LEAHY: It will be. As Senator Grassley and I indicated earlier, each -- there will be other statements for the record, as there will be. The record kept open for questions.

As I indicated also earlier, Senator Hatch, a very senior member of this committee, had to be at two different committees. And I yield now to his time, and then we'll go to the next Republican. After we go back (inaudible) Senator Flake.

Senator Hatch?

HATCH: Well, thank you so much, Mr. Chairman.

And I thank all of you for being here today.

Captain Kelly, I appreciate you and your wife and your testimony and your feelings very much. And I appreciated much of your testimony. And I'm grateful that you would take the time to be with us, and that was wonderful to see your wife again.

Let me go to you, Mr. LaPierre. President Obama's issued 23 executive actions on gun violence. Can you please discuss the commonalities between your organization, the NRA, and the Obama administration when it comes to finding ways to reduce gun violence?

LAPIERRE: Well, I mean, what we think works -- and we support what works, is what NRA's done historically. I've talked about our Ready Eagle child safety program, which we put more money into than anybody in the country; that's cut accident to the lowest level ever.

We support enforcing the federal gun laws on the books 100 percent of the time against drug dealers with the guns, gangs with guns, felons with guns. That -- that works.

We've supported prison building. You've got states like California where they (inaudible) more than any other state in the country they send more inmates back to the street and have to put more back in jail for new crimes committed against their citizens than any other country in the nation. New York state is too. I mean, the collapse of the fiscal situation in those states has also collapsed the criminal justice system in those states.

It -- I mean, NRA has always supported what works. We have 11,000 police instructors. And we represent honest people all over this country.

There are 25,000 violent crimes a week in this country. The innocent are being preyed upon. The statistics are numbing. Those 911 calls are horrible.

LAPIERRE: But at the scene of the crime, it's the criminal and the victim. And victims all over the country want to be able to protect themselves.

I mean, you know, this whole debate almost puts it into two different categories. If you're in the elite, you get bodyguards, you get right here and you get high-cap mags with semi-automatics protecting this whole Capitol. The -- the titans of industry get the bodyguards whenever they want. Criminals don't obey the law at any -- anyway, they get what they want. And in the middle is the hardworking, law abiding, taxpaying American that we're going to make the least capable of defending themselves.

We're going to say, you can have a bolt action rifle, but boy you can't have an AR-15. Or you can -- you can have a six shot revolver, but you can't have a semi-automatic handgun. You can have a four, or five, or six rounds in your magazine, but if three intruders are breaking down your door, you can't have 15 rounds because somebody thinks that's reasonable in their opinion. I mean...

HATCH: Understood.

LAPIERRE: People want to be able to protect themselves, that's why people support the Second Amendment, and that's why these bills are so troubling. They hit the -- they don't hit the elites. They don't hit the criminal, they hit the average, hardworking, taxpaying American that gets stuck with all the laws and regulations.

HATCH: I understand that one of the bills will ban well over 2,000 guns? I mean talking about individual guns?

LAPIERRE: Senator Feinstein's bill ban -- bans all kinds of guns, but the -- that are used for target shooting, hunting, personal protection. And yet on the other hand, she exempts guns that have the exact same performance characteristics as the guns she doesn't ban. I mean -- and -- and gun owners know the truth, I mean that's why gun owners in this country, the 100 million gun owners get upset about this stuff.

They may be the victim of these lies. About taking the term, assault, and applying it to the civilian firearms, that military term, assault. But they know the truth inherently. They look at their hands, and they shake their head, and they go, none of this makes any sense.

HATCH: Well, I appreciate that. Ms. Trotter, let me just ask you this, in your testimony you state that all women in jurisdictions that have conceal-carry laws reap the benefits of increased safety, even if they choose not to carry a weapon themselves. Can you -- can you please explain why?

TROTTER: Yes. Mr. LaPierre mentioned that gun owners are very concerned about all these burdens that could be possibly put on law abiding citizens. And I will tell you that non-gun owners are concerned about this too. Because you don't have to choose to carry to be the beneficiary of laws that allow people to carry. And for women, you reap the benefit of fewer murders, fewer rapes, fewer possibilities of being a victim of violence if your -- if the state that you live in does not ban anybody, particularly women from carrying weapons.

So it's a matter of choice. We're not saying that all women should, or need to carry weapons. But we need to protect the Second Amendment right to choose to defend yourself.

HATCH: Well, thank you, Mr. Kopel? Professor, you wrote an article that appears in the Wall Street Journal in December -- appeared in the Wall Street Journal on December 18, 2012. In the article, you point out that -- that firearms are the most heavily regulated consumer product in the United States. Gun control laws are more prevalent now than in the mid 1960's, when you could walk into any store and buy a semi-automatic weapon with no questions asked.

Now in your opinion, the lack of firearms regulations is not a contributing factor to the recent rise in the random mass shootings? So what factors have contributed to the rise in these random shootings? You may have answered this already but I -- I would like to hear it again if you haven't?

KOPEL: No.

HATCH: OK.

(OFF-MIKE)

KOPEL: For one thing there's a copycat effect.

HATCH: Could you put your mike on?

KOPEL: Certainly. There's a copycat effect, and lots of studies of the scholars of these -- of all kinds of criminals, but especially of these people seeking notoriety, show strong copycat effect. And that is something that makes me think we need immediate protection for schools because of the -- the copycat danger right now. In addition, there's been a -- there was a mass de-institutionalization of the mentally ill starting in the 1960s and going through the 1980s.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3925   Page 406 of
472

KOPEL: Some of that was because of budgetary issues, and a lot of the times the promise was, well we'll put these people in halfway houses so they can be partially in the community, which is a great idea. But then there was never the funding for the halfway houses, and people walk away. Nothing -- nothing is done to follow up. The Jared Loughner, Adam Lanza, so many -- James Holmes -- so many of these perpetrators absolutely would have been civilly committed under the system we had 50 years ago.

We need a -- we need to move back toward greater possibility for civil commitment for the dangerously violently mentally ill. It's certainly right, as Ms. -- I think both senators from Minnesota were saying that mentally ill people, per se, are not any more dangerous or violent than -- than anyone else. In fact, sometimes less so.

But there is a subset of them that are dangerously violently mentally ill. and we -- we need to have them off the streets before so that -- before they -- so that they can't endanger themselves or others.

HATCH: Well, thank you so much.

Mr. Chairman, I would like to have a statement put into the record at the -- following yours and Senator...

LEAHY: Without objection.

HATCH: Thank you so much.

I want to thank all of you for being here. I think it's been an enlightened hearing.

And this isn't a simple thing. And I've got to say there are some freedoms among the mentally ill that have to be considered, too. And this is -- this is complex. It's not -- not easy.

But I can say this that -- that I think this has been a particularly good panel, and I just appreciate all of you for testifying.

LEAHY: I thank -- I thank you for that, Senator Hatch.

And I yield now to Senator Coons.

COONS: Thank you, Chairman Leahy. And thank you for convening this important hearing. To the panel, thank you for your testimony.

And to Captain Kelly and to your wonderful wife, Congresswoman Giffords, thank you for everything you're doing to bring I think an important message.

We, as a committee, are wrestling here today and we as a country are wrestling with how to respond appropriately and effectively to a whole string of horrific shootings, whether in Newtown or in Tucson, whether in a Sikh temple or at a state

university like Virginia Tech, there are just too many of these incidents piled year upon year.

And I'm grateful for all my colleagues who've engaged in this thorough discussion today about how do we balance things.

One of the most important things, I think, is for us to get our facts right. A number of my colleagues have made a great deal of the number of cases of federal gun prosecutions going down.

But my staff's pulled the most recent report from the Executive Office of the United States Attorneys, and it turns out that the number of defendants charged with federal gun violations is actually steady.

In fact, in 2011, it was 46 percent higher than in 2000.

So I just encourage all who are paying attention to scoring at home the numbers, what matters is the number of defendants actually prosecuted with federal gun violations.

I've got lots of things I'd like to touch on. And I did want to say at the outset, I'm grateful that our vice-president, Joe Biden, has led, I think, a very broad and searching conversation, where he's listened. as I have, to folks across the country and, in my masse, across my state of Delaware.

And I've heard from parents whose children suffer from mental illness and who are really struggling to provide the care that they deserve and need. Law-enforcement officials, educators, community leaders, gun owners, sportsmen, people who are really concerned about how we strike the right balance and how we make our country safer.

If I could, to Captain Kelly, first, thank you for leading Americans for Responsible Solution.

One of the main ideas you and your wife have advanced is expanded background checks. Could you just explain for me, again, how it is today that convicted felons are able to get their hands on weapons despite our current background check laws and how we might fix that?

KELLY: Well, currently, certainly Senator Cruz mentioned earlier the statistic of, I think he said 1.9 percent of criminals that committed a crime with a gun...

(CROSSTALK)

KELLY: Of prisoners. Well, I want to just look at that for a second.

There's also a statistic that says 80 percent -- on a survey done of criminals, 80 percent of criminals got their guns from a private sale or a transfer.

So by closing that part of the existing loophole, which is the fact that with a private sale or transfer, there is no requirement to

get a background check, you could effectively reduce the number of guns in the hands of criminals.

And we know from what happened in Tucson that if there was an effective background check, which includes having the mental health data and the person's drug use, in the case of the Tucson shooter, into the system, and if, in fact, there was no gun show loophole, I would contend that he would have had a very difficult time getting a gun.

KELLY: So the first thing that needs to be done is we certainly need to have a universal background check. If background checks are good enough for somebody who's a federal firearms licensed dealer, like Wal-Mart, for instance, where I just purchased a gun a couple months ago, a hunting rifle, and I had to go through a background check, why isn't that good for other sales, sales from a private individual, or sales from somebody who is really kind of in business at a gun show?

COONS: Captain Kelly, as a gun owner yourself, how do you feel that a thorough universe a background checks of the types that you describe either for purchase of weapons or large capacity magazines, how would that affect or infringe your Second Amendment rights?

KELLY: I don't think it would infringe my Second Amendment rights at all. You know, I am -- I think I'm as -- a strong a supporter of the Second Amendment as anybody on this panel. You know, I've flown 38 combat missions over Iraq and Kuwait defending what I believe is our -- defending our Constitution.

You know, I've flown in combat -- I've been shot at dozens of times. You know, I find it interesting that often, we talk about putting a security guard to school. That's been brought up a lot. And, I -- I actually think, you know, that's better than no security guard in the school, but from my experience of being shot at and what that actually feels like and how chaotic it is, and with the exception of -- of Chief Johnson, I would suspect that not many members of this panel, or even in this room, for that matter, have been in any kind of a fire fight.

It is -- it is chaos. I think there are really some very effective things we can do. And one is, Senator, the background check. Let's make it difficult for the criminals, the terrorists, and the mentally ill to get a gun.

COONS: I agree with you, and I have agreed to co-sponsor legislation to this affect.

But let me ask Mr. LaPierre. I, just at the outset, want to say I', grateful for the work the NRA in providing training and safe gun ownership to millions of Americans. And I hope you'll take into account the data I have offered gone prosecutions.

But I -- I disagree with a point you made your testimony. You said -- and I think I quote, that, "Background checks will never be universal, because criminals will never submit to them. " And while that may be true, I think the point that Captain Kelly makes is telling. And if we in combination put in place tougher restrictions on straw purchases and tougher enforcement on those who buy guns legally, but then sell them to those who shouldn't have them, and we put in place universal background checks and impose some responsibility on responsible gun owners to report lost or stolen weapons in combination, wouldn't all of these things effectively move us towards a country where the number of those who should not have weapons cannot get access?

LAPIERRE: I think you will end up with a huge bureaucracy which honestly a huge waste of police resources and money that could go into doing things in the police criminal justice area that would actually save lives.

You know, that study that you were talking about actually says where criminals get their guns, 39.5 percent from friends and family, 37 percent from street or black market, 11 percent from licensed dealers, 10 percent by theft, 1.7 percent at gun shows. I just think that you're gonna -- if you try to do this universal background check which sounds -- sounds -- whatever, it ends up being a universal federal nightmare imposed upon law-abiding people all over this country.

Criminals will ignore it. We -- the federal government won't -- we already won't prosecute. The senator -- the -- the vice president told at the meeting with our people said they didn't have time to prosecute those types of cases. So what's the point of the whole thing?

COONS: Mr. -- Mr. LaPierre, I'm almost out of time, forgive me for the brief cycle.

Just to take at face value, the -- the data you just suggested is not just closing the gun show loophole. It is also thoroughly enforcing those who transfer weapons bought legally to those who shouldn't have them. And -- and awful lot of the folks you cited are getting their hands on weapons inappropriately through your so called straw purchases, or through illegal transfers.

I just want to ask a question of Chief Johnson, if I might, because I see Mr. Chairman, my time is almost up.

I think it's valuable to have the input of law enforcement professionals. In your view, with this sort of a universal background check combined with aggressive enforcement of the transfers to those who shouldn't have them, would that be a waste of police resources, or might it make a difference on the street for those of you who put your lives on the line for us every day?

J. JOHNSON: I have to respectfully disagree with Wayne on this issue. Public safety, police we -- we are ready. We are unified on this issue that a universal background check will make our society a safer place, will make my police officer is safer. It's absolutely essential.

COONS: Well, thank you, Chief. Thank you to the panel. I'll submit some more questions for the record. I see I'm out of time.

LEAHY: Thank you.

And again, another new member of this committee, Senator Flake of Arizona. I appreciate you being here, and your patience in waiting. If it's any consolation, I had that seat years ago.

(LAUGHTER)

FLAKE: It's good to know.

Thank you, Chairman, for convening this. And thank you to the panel for being here offering such excellent testimony and for

staying so long. I'll try not to take my full seven minutes. But I especially want to thank Mark for being here. I know that Gabby is watching the proceedings in a room in the back. I just visited here a while ago. And I -- I just want you to know, Mark, and I want Gabby to know how much we miss her here.

I was on a call this morning with a few dozen ranchers -- border ranchers in Arizona, and was reminded that this is a practice that she began years ago, to talk about immigration issues and to keep them up to speed and to seek their input. And I've continued that -- that practice. And I can tell you, she offered wonderful representation to the people of southern Arizona and she is missed. And I am so grateful to you and to her for the public service that you've offered in the last year under difficult circumstances, and for taking up this new cause.

So, thank you.

With regard to the Tucson shooting, you mentioned that Jared Loughner had had drug use in the past that might have triggered some kind of entry into a system that -- that he may have been checked, but also the mental health aspect. And that seems to be the -- the difficult problem to solve here, listening to the testimony, is the nexus between mental illness and some kind of entry into a background system.

In Maryland, I believe it is, there have only been like 56 mental health records provided to the NICS system. Arizona has 120,000 entries, but not interfaced with the system here. What are the major problems there? And I'll take anybody who can comment on this. Perhaps Chief Johnson, you know? Or Mark, if you have any ideas? Is it solely privacy issues? Many of those have a federal nexus, and that's something that we can deal with here. So I'm interested in -- in why it is that it's so difficult to have some of the mental health records entered into the system?

Chief, first? Do you want to take this?

J. JOHNSON: Well, Governor O'Malley in the state of Maryland last week introduced his plans to increase significantly data into the national instant criminal background check system. Senator, you are right. Maryland could do much better in this area, no question about it.

FLAKE: Is -- is this an issue with Maryland or any other state? And I'm not trying to pick on Maryland at all. I -- I assume it's similar with every state out there. I just had the figures for Maryland. But is that an issue of just resources? Or are there privacy concerns that prevent them from offering this information?

J. JOHNSON: I think there's confusion. Data that I've seen indicates some 18 states submit less than 100 records to -- to the system. I think there's confusion amongst -- amongst the medical community and even fear. Well, how does HIPPA affect the release of this information and this data system? And I do believe, as the president's plan has called for, incentive -- incentivize states to participate would drastically help this -- this problem.

FLAKE: Mark, do you want to comment on that?

KELLY: Yes, Senator. Thank you for your kind words. Gabby misses being here as well.

Of those 121,800 records that Arizona has not submitted to the background check system, I -- I don't know why. I imagine it could be something. It might be a matter of resources. You know, maybe the funding isn't there to have the manpower to do that. Possibly -- maybe there isn't the will. Maybe for some reason in the state of Arizona, maybe they don't have a desire to share that information.

I don't know, but I can guarantee you after this hearing I'm going to try to find out.

FLAKE: All right.

KELLY: I'll get back to you.

FLAKE: And so will I. I think that that's an area from the testimony today and what we know of this situation where we can have I think a real impact here. And so I thank you all for your testimony, especially Mark and Gabby for being here.

KELLY: Thank you.

LEAHY: Thank you, Senator Flake.

And Senator Blumenthal, I'll recognize you next. And I would just note, as everybody probably assumes, you and I have had a number of discussions since the tragedy in Connecticut, including one phone call I recall when you were just about to meet with some of the families.

And I have relied a great deal on your -- both your expertise, your law enforcement background but also the fact that you are from Connecticut.

Senator Blumenthal?

BLUMENTHAL: Thank you. Thank you, Mr. Chairman.

I want to express my appreciation to you for your sensitivity and your condolences, and so many of my colleagues for theirs as well and the expressions that we've had this morning and also, obviously, for convening this hearing, which is a beginning -- hardly an end -- just a first step in what I hope will be a call to action that Newtown has begun and action that is really bipartisan.

Whatever the impressions that may be left by this morning's proceedings, I think there is a real potential for bipartisan common ground on this issue, because we certainly have more in common than we have in conflict on this issue.

And I speak as a former prosecutor, having served as attorney general in the state of Connecticut for 20 years, but also as a

United States attorney, a federal prosecutor for four and a half years.

And I want to thank all of the members of the panel for your patience and your staying power today. It has been a very informative and worthwhile hearing.

But I want to say a particular thanks, as others have, to Captain Kelly and to Gabby Giffords for your courage and strength in being here today; and to all of the victims and their families -- Steve Barton, who is here from Connecticut, who was a victim in Aurora; many of the Sandy Hook families who are not here today, I know who are here in spirit.

Mark and Jackie Barden, who lost their wonderful son Daniel at Sandy Hook, wrote a profoundly moving and inspiring piece in today's Washington Post.

And Mr. Chairman, if there's no objection, I'd like to submit it for the record. It's entitled, "Make the Debate Over Guns Worthy of Our Son."

LEAHY: Without objection.

BLUMENTHAL: To Chief Johnson, you are here not only in a personal capacity but, in my view, as representing and reflecting the courage and heroism of the tens of thousands of law enforcement community, police and firefighters and first responders across the country who every day brave the threat of gunfire and are often outmanned or outgunned by criminals.

And I want to thank you for your service to our nation, as I do Captain Kelly for his in our military.

And just to say, you know, I was in Sandy Hook within hours of the shooting at the fire house where parents went to find out whether their children were alive. And I will never forget the sights and sounds of that day when the grief and pain was expressed in the voices and faces of those parents.

As much evil as there was on that day in Newtown, there was also a tremendous heroism and goodness: The heroism and goodness of the educators who perished literally trying to save those children by putting themselves between the bullets and their children. And the heroism of those first responders and police who ran into that building to stop the shooter not knowing that he was dead when they did. And their being there in fact stopped the tragedy.

So I want to thank also the community of Sandy Hook. I've spent countless hours there, the better part of three weeks after the shooting and most recently this past weekend, the dedication of a memorial and then time with one of the families.

And their strength and courage, I think, has been an inspiration to the country and very, very important to advancing an agenda of making our nation safer.

And one way they've done it -- one way, not the exclusive or only way, has been through a pledge called the Sandy Hook Promise. This promise I would like to read. Have it on a chart here.

BLUMENTHAL: It is, "I promise to honor the 26 lives lost at Sandy Hook Elementary School. I promise to do everything I can to encourage and support common-sense solutions that make my community and our country safer from similar acts of violence.

I promise this time there will be change. I'm proud to say Steve Barton, Gabby Giffords and Mark Kelly have made the Sandy Hook promise. Tens of thousands of Americans in Connecticut and across the country have made that promise, as have I.

So I want to ask Mr. LaPierre, will you make the Sandy Hook promise?

LAPIERRE: Senator, our Sandy Hook promise is -- is always to make this country safer, which is why we've advocated immediately putting police, armed security in schools, fixing the mental health system, computerizing the records of those mentally adjudicated. I would hope we could convince some of these companies that are just -- I'm not talking about First Amendment, I know they have a right to do it, to stop putting out such incredibly violent video games that desensitize.

And -- and finally we need to enforce the reasonable gun laws on the books and NRA support that -- that we do not do.

(CROSSTALK)

BLUMENTHAL: I'll take that as a yes?

(CROSSTALK)

LAPIERRE: That will make the country safer.

BLUMENTHAL: Can I take that as a yes?

LAPIERRE: Yes. That's a yes.

BLUMENTHAL: Thank you.

LAPIERRE: We're -- we have 11,000 police...

(CROSSTALK)

BLUMENTHAL: And can I -- can I invite and urge you to advocate that your members, responsible gun owners, and I thank them for being responsible gun owners, also join in the Sandy Hook promise? LAPIERRE: Senator there is not a -- a law-abiding firearms owner across this United States that wasn't torn to pieces by what happened in Sandy Hook. They just don't believe that their constitutional right to own a firearm, and the fact that they can protect their family with a firearm is -- is -- resulted in the problem.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3933   Page 414 of 472

(CROSSTALK)

BLUMENTHAL: Let me ask you this, Mr. LaPierre. You and I agree there ought to be more prosecutions of illegal gun possession, and illegal gun ownership.

LAPIERRE: You know the problem, Senator is I've been up here on this Hill for 20-some years agreeing to that, and nobody does it. And that's the problem. Every time we say we're going to do it -- I -- I make you this bet right now, when President Obama leaves office four years from now, his prosecutions will not be much different than they are now. If each U.S. attorney did ten a month, they'd have 12,000. If they did 20 a month, they'd have 24,000. Let's see if we get there.

BLUMENTHAL: Chief Johnson, you've -- you've testified very persuasively on the need for better background checks. Do you believe those background checks ought to be applied to ammunition purchases, as well as firearms purchases?

J. JOHNSON: Our organization supports background checks on ammunition sales.

BLUMENTHAL: Thank you. And Captain Kelly, I am just about out of time, but I -- I would like to ask you if you may, you supported better background checks, as a -- an advocate of the Second Amendment, and I join you in believing that Americans have a strong and robust right to possess firearms, it's the law of the land. Do you also believe that better background checks on firearms purchases would help make both Arizona, and our nation safer?

KELLY: Absolutely, Senator. While we were having this hearing, and we certainly don't know the details, but in Phoenix, Arizona there is another, what seems to be possibly a -- a shooting with multiple victims. And it doesn't seem like anybody has been killed, but the initial reports are three people injured in Phoenix, Arizona with multiple shots fired. There's 50 or so police cars on the scene. And I certainly agree with you, Sir that, you know a universal background check that's effective, that has the mental health records in it, that has the criminal records in it, will go a long way to saving and -- saving people's lives.

BLUMENTHAL: And improving the quality of information in the...

KELLY: Absolutely.

BLUMENTHAL: ... checks would make a difference. Let me just again thank the panel. My hope is that Newtown will be remembered, not just as a place, but as a promise. And that we use this tragedy as a means of transforming the debate, the discussion, the action that we need to make America safer. Thank you, Mr. Chairman.

LEAHY: Thank you.

Just so everybody understands, we are coming to a close. I'll make an exception to the normal rules. Senator Cruz said he had one more question, let him do that then we will -- then I'll yield to Senator Hirono, the newest member of this committee, and she will have the final word. Senator Cruz?

CRUZ: Thank you, Mr. Chairman, I very much appreciate your -- your allowing me to ask an additional question.

I wanted to ask a question of Chief Johnson. Your -- your testimony today was in -- in some tension with what I have heard from -- from police officer serving on the ground in the state of Texas, namely that your testimony, as I understand it, was, that in your judgment, stricter gun control laws would -- would prove effective in -- in limiting crime. And the data I have seen suggests that -- that the evidence doesn't support it.

If one looks in the District of Columbia which had district is gun-control laws in this country and banned firearms, we saw that when the ban was implemented in 1976, there were fewer than 200 and homicides that rose to over 350 in 1988, and two over 450 in 1993. That pattern is reflected across major urban centers. Those urban centers that have the strictest gun bans, for example, the city of Chicago unfortunately, suffers from according to the latest statistics 15.9 murders per hundred thousand citizens.

Your city, the city of Baltimore, has 31.3 murders per 100,000 citizens. That contrasts with other major urban areas such as my home town of Houston which does not have strict gun-control laws like the -- the jurisdictions I was talking about, that has a murder rate of 9.2 percent per 100,000, 1/3 of Baltimore's. And in fact, the city of Austin, our capital, has a murder rate of 3.5 per 100,000, 1/10 that of Baltimore.

So, my question to you is, in light of the evidence, what -- what empirical data supports your contention that -- that restricting the rights of law-abiding citizens to possess firearms would -- would decrease crime rather than making people more vulnerable to violent criminals, which is what I would suggest the data indicates has happened when it's been done?

J. JOHNSON: We know that nearly 2 million prohibited purchases were stopped from obtaining their firearms since 1994-2009. Senator, I would tell that your homicide statistics would be much greater and often missed from this conversation is the medical intervention and takes place to day at the EMT in the field to the shock trauma facilities that are very robust in our nation today, these -- this data would be much higher.

I'm here today representing nine major police executive leadership organizations. For the sake of time, I'm not gonna read all of those. I think they're a matter of record.

The problem in areas like Baltimore, and New York, and Chicago with some of the toughest gun regulations and laws in the nation is outside weapons coming in. It's about the background check problem. It is about acquisition of these firearms outside of the normal firearms licensed dealer process. And that's what we have to fix.

In addition, high-capacity magazines or a problem, and certainly we are seeing assault weapons used each and every day in crimes and police are seizing these weapons each and every day. And the -- holistically with the plan that the president's laid out and, frankly (ph), some of the bills that have been put forth, we can make our nation and much safer place.

LEAHY: Thank you.

We've been fortunate to have three new members of this committee, Senator Cruz, Senator Flake and Senator Hirono. And you, Senator, have the last word.

HIRONO: Are you saving the best for last, is that it?

LEAHY: Well, I was just saying you get the last word.

You're gonna have to prove whether it's the best, but I -- I would note that both you and Senator Flake -- I occupied the bad seed so you are very patient in waiting. So I thank Senator Blumenthal for bringing the -- representing so well the feelings of the people in Connecticut.

Senator Hirono?

HIRONO: Thank you so much, Mr. Chairman.

I would like to thank the panel for this very lively discussion on what is a highly emotional subject.

HIRONO: And, Captain Kelly, I would like to thank you for being here because Gabby and I were elected to the House of Representatives in the same year and her courage continues to inspire us. And I certainly take to heart her testimony today asking us to do something now to reduce gun violence in our country.

And, Chief Johnson, you are, literally, in the trenches. You're on the firing line and I -- and I certainly give much credence to your testimony.

We have a lot of hunters in Hawaii, so I certainly understand their perspective. And this -- to me, this issue is not about abrogating Second Amendment rights. It is about reasonable limits on those rights.

And one of those areas that has already been deemed reasonable is the requirement for background checks.

And so, what many of us are saying is what has already been deemed reasonable should be a reasonable requirement when guns are sold regardless of how or where they are sold.

So I -- I hope that we can reach bipartisan agreement on the reasonable limit of requiring background checks when guns are sold.

And, Captain Kelly, I do appreciate your starting your testimony today by saying that there is no perfect solution. I know there are all kinds of antecedent environmental issues and -- and community issues that lead to gun violence, but I believe we should do that which is reasonable. so nothing is perfect.

I believe that one of the areas of focus for your organization, Americans for Responsible Solutions, is the mental health part of

what we ought to be addressing that leads to gun violence.

Do you have some key suggestions that Congress can take to help address the mental illness problem?

KELLY: Well, thank you, Senator.

Well, you know, first of all, compelling states to share with the federal government the records, the appropriate records, of adjudicated mental illness and criminal records as well, also within the federal government.

I had a conversation with the vice president, who talked specifically about, you know, intergovernment agencies and why -- that there has also been, you know, some issues in certain federal government agencies at times getting the records into the background check system.

So if we could improve the system, close the gun-show loophole, require background checks for private sellers, I think we will go a long way to preventing many of these murders and mass shootings in this country.

We're not going to stop all of them, but there is certainly a reason that we have 20 times the murder rate -- 20 times the murder rate -- of other developed countries. And I think that's unacceptable.

But like -- you know, like you said, we -- you know, as an organization, I certainly think Congress can come together on this issue. We realize there's a problem, and it certainly can be solved.

HIRONO: Captain Kelly, it's one thing when someone has already been deemed to show signs of mental illness, and certainly if there's been any kind of an adjudication, that -- that identification is much easier and therefore that information should get into our system.

It becomes a lot harder when you're trying to determine whether someone is suffering from mental illness and needs help. And often these kinds of signs manifest themselves certainly in the home, but in the schools. And we don't have a lot of psychologists, therapists in our schools.

Would you also support more of those kinds of personnel in our schools so we can help these individuals?

KELLY: You know, absolutely. In the case of Jared Loughner in Tucson, Pima Community College was well aware of -- you know, that he had some form of mental illness. They expelled him over it. Multiple cases of very erratic and disruptive behavior in the classroom and outside the classroom.

But, for some reason, he was not referred, as far as I know, to an appropriate mental health authority for an evaluation. And I know often those need to be voluntary, but his parents, as well.

KELLY: I mean, there seems, in this case, that there was a lack of education within the community to get him some effective

treatment. And it's really -- it's actually really sad. Because in this case, as I know in many other cases, often you'll see a man who is paranoid schizophrenic that commits some of these horrific crimes.

But with treatment, they would never have done these things. So, absolutely. I mean, we are going to work -- at Americans For Responsible Solutions, we're going to work to help fix the mental health aspect of this, too.

It is a big part of it. I agree with Mr. LaPierre on that matter. I mean, that is a major issue, but so is a comprehensive, universal, a good background check without a loophole, without holes in it, and getting the data into the system. Those are critical things that can make our communities much safer.

HIRONO: Thank you.

I -- I do have one question for Chief Johnson. This is an area that has not been raised today so far. It has to do with an environment that allows bullying to occur in our schools. And sometimes bullying can lead to violent situations. I'm sure it's happened in Baltimore and just recently in Hawaii, we had a situation in our -- in our schools where bullying led to fights and the school had to be closed.

So, I think that one of the ways that we prevent escalation of violent behavior is to put in place programs that will address the issue of bullying, which takes place in just about -- in every state. Would you -- do you have any thoughts on -- on that?

J. JOHNSON: Yes. The president's plan calls for not only funding and an announcement for additional police officers. And I believe Congress should support these plans. They also call for funding to support additional counselors and psychological service providers as well in the schools.

Certainly, in my particular case and in many jurisdictions across America, we have police officers in all the high schools, and frankly, the middle schools, costing my jurisdiction nearly $8 million a year. And they have a place, but certainly we believe that more needs to be done in this area. In my two school shootings, in both shootings, bullying was alleged to be a factor.

HIRONO: Thank you. Thank you, Mr. Chairman.

LEAHY: Thank you very much.

I want to thank all the witnesses who came here. This was a lengthy hearing. It's the first of others we will have. I think what we're trying to do, and I hope people realize, on this committee we're trying to write laws to protect the public. And I cherish and exercise my Second Amendment rights as I do all my rights under the Constitution.

But I don't think individual rights include weapons of war like landmines or tanks or machine guns or rocket-propelled grenades. And where do we go as we step back from those levels? I came here to have a discussion, hope to build consensus. Obviously, there's more work that needs to be done.

I think there is one consensus. We all want to do what we can to prevent future tragedies and put an end to the violence that breaks all our hearts. You know, I live an hour's drive from another country, Canada. I don't see the same kind of problem there. I want to find out how we can stop what is happening. I believe there should be some areas of agreement, and I hope the committee can get together to mark up legislation next month -- this month is virtually over -- and then take it to the floor.

We will respect the diversity of viewpoints represented today. We will have hearings that have other viewpoints. We have to listen to one another. If we start with a basic thing that we abhor the kind of violence we see and the violence I saw years ago as a prosecutor, then let's find which steps (inaudible) for it.

So thank you all -- all five of you -- very, very much.

We stand in recess.

END

# Exhibit 103



# Brady Center
## To Prevent Gun Violence

**Testimony of Brian J. Siebel**
**Senior Attorney**
**Brady Center to Prevent Gun Violence**
**Before the Council of the District of Columbia**
**October 1, 2008**

Thank you, Chairman Mendelson and other members of the Council, for inviting the Brady Center to Prevent Gun Violence to speak at this important committee hearing.

The Brady Center to Prevent Gun Violence and the Brady Campaign to Prevent Gun Violence are the nation's largest organizations working for sensible gun policies. The Legal Action Project of the Brady Center represents victims of gun violence and defends gun laws in the courts.

In addition to the other measures being suggested here today, which we support, the Brady Center and Brady Campaign strongly urge the Council to pass an assault weapons ban, a ban on .50 caliber sniper rifles, and retain its recently-passed ban on high-capacity ammunition magazines, as part of its process of strengthening the District's gun laws in light of the *Heller* decision.

## The Need for An Assault Weapons Ban

Assault weapons had been banned for more than 30 years under the broader D.C. ban on all semiautomatic weapons. However, now that that ban has been repealed, an assault weapon ban is needed to protect the people of the District, visitors, and law enforcement from these particularly dangerous weapons. An assault weapons ban would continue to allow law-abiding citizens to have common pistols in their homes for self-defense, and would remain in compliance with the *Heller* decision. We believe it is imperative for the Council, now that it has legalized common semiautomatic pistols, to restore a ban on military-style assault weapons.

## Assault Weapons Are "Mass Produced Mayhem"

Assault weapons are semiautomatic versions of fully automatic guns designed for military use. Even semiautomatic assault weapons unleash extraordinary firepower. When San Jose, California, police test-fired an UZI, a 30-round magazine was emptied in slightly less than two seconds on full automatic, while the same magazine was emptied in just five seconds on semiautomatic.

The Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") has described assault weapons in stark terms.

197

Assault weapons were designed for rapid fire, close quarter shooting at human beings. That is why they were put together the way they were. You will not find these guns in a duck blind or at the Olympics. **They are mass produced mayhem.**[1]

Assault weapons have distinct features that separate them from sporting firearms.[2] While hunting rifles are designed to be fired from the shoulder and depend upon the accuracy of a precisely aimed projectile, the military features of semiautomatic assault weapons are designed to enhance their capacity to shoot multiple human targets very rapidly. Assault weapons are generally equipped with large-capacity ammunition magazines that allow the shooter to fire 20, 50, or even more than 100 rounds without having to reload. Pistol grips on assault rifles and shotguns help stabilize the weapon during rapid fire and allow the shooter to spray-fire from the hip position. Barrel shrouds on assault pistols protect the shooter's hands from the heat generated by firing many rounds in rapid succession. Far from being simply "cosmetic," these features all contribute to the unique function of any assault weapon to deliver extraordinary firepower. They are uniquely military features, with no sporting purpose whatsoever.

Accordingly, ATF has concluded that assault weapons "are not generally recognized as particularly suitable for or readily adaptable to sporting purposes" and instead "are attractive to certain criminals."[3] ATF's analysis of guns traced to crime showed that assault weapons "are preferred by criminals over law abiding citizens eight to one…. Access to them shifts the balance of power to the lawless."[4]

It is no accident that when a madman, Gian Luigi Ferri, decided to assault the law offices at 101 California Street in San Francisco, he armed himself with two TEC-9 assault weapons with 50 round magazines, which enabled him to kill eight people and wound six others.[5] Or that the Columbine high school shooters who killed 12 students and a teacher included a TEC-9 assault weapon in their arsenal. Or that James Huberty used an UZI assault pistol and a shotgun to kill 21 people and wound 19 others at a McDonald's in San Ysidro, California.[6] Or that Patrick Purdy used an AK-47 assault rifle to kill five children and wound 29 others and a teacher at an elementary School in Stockton, California. Equipped with a 75-round "drum" magazine, Purdy was able to shoot 106 rounds in less than two minutes.[7] The list goes on.

---

[1] ATF, *Assault Weapons Profile* 19 (1994) (emphasis added).

[2] *Id.* at 20.

[3] DEP'T OF TREASURY, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* 38 (1998).

[4] ATF, *Assault Weapons Profile, supra* note 1, at 19-20.

[5] *Ferri Used Guns That California Ban Does Not Forbid*, SAN FRANCISCO EXAMINER, July 4, 1993.

[6] *Satellite College Campus Helps to Heal the Scars at San Ysidro Massacre*, LOS ANGELES TIMES, Mar. 30, 1989; *A 77-Minute Moment in History That Will Never Be Forgotten*, LOS ANGELES TIMES, July 16, 1989.

[7] *The Kinds of Guns School Killer Used*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989; Michael Taylor & Leslie Guevarra, *Mysterious Scrawlings and Slogans, School Killer's Last Days, Toy Army in his Room*, SAN FRANCISCO CHRONICLE, Jan. 19, 1989.

2

## Assault Weapons Threaten Law Enforcement

Law enforcement officers are at particular risk from these weapons because of their high firepower, which often leaves them outgunned by criminals. A researcher for the Department of Justice found that

assault weapons account for a larger share of guns used in mass murders and murders of police, crimes for which weapons with greater firepower would seem particularly useful.[8]

Assault weapons have even been used in a brazen attack at D.C. Police Headquarters. On November 22, 1994, a man armed with a MAC-11 assault pistol walked into Metropolitan Police headquarters and shot and killed Sergeant Henry Daly and FBI Agents Mike Miller and Martha Martinez. The shooter seriously wounded FBI Agent John Kuchta and shot at couches, walls, computers, and desks before shooting and killing himself with Agent Martinez's gun.[9]

In addition, numerous law enforcement officers have been killed with high-firepower assault weapons. Here are a few recent examples:

- **Philadelphia, PA.  May 3, 2008.** Officer Stephen Liczbinski was shot and killed by an assault rifle as he was responding to a robbery at a Bank of America branch. Three men robbed the bank and were fleeing when Officer Liczbinski stopped their car and exited his patrol car. At that time, one of the bank robbers opened fire with an SKS assault rifle, striking Liczbinski numerous times. One suspect was eventually shot and killed by police and the other two suspects were arrested and charged with murder.[10]

- **Miami, Florida.  September 13, 2007.** Police spotted a vehicle driving erratically and followed it until it stopped in a residential complex. The suspect got out and hopped a fence to the rear of the home; the officers exited their patrol car and went to the front of the home and were granted permission to search by a female resident. The suspect grabbed a high-powered, military-grade rifle and fired at the police officers through a window, killing Officer Jose Somohano. The suspect then exited the house and shot three other officers as he escaped. The shooter was caught later that day but would not relinquish his assault rifle so he was shot and killed by police officers.[11]

---

[8] Christopher S. Koper, *Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, U. Penn. Jerry Lee Center of Criminology 87 (June 2004).

[9] Brian Reilly, *Cop killers' guns similar; handgun converted to fiercer weapon*, THE WASHINGTON TIMES, May 1, 1995.

[10] Joseph A. Gambardello, *Liczbinski suspect's girlfriend to stand trial*, PHILADELPHIA INQUIRER, July 17, 2008; *Officer shot, killed after bank robbery*, NBC 10.COM, May 3, 2008; Sergeant Stephen Liczbinski, www.odmp.org, *available at*: http://www.odmp.org/officer/19359-sergeant-stephen-liczbinski (last visited Sept. 30, 2008).

[11] David Ovalle et. al., *The murder and the manhunt started in a South Miami-Dade townhouse, zigzagged...*, MIAMI HERALD, Sept. 15, 2007.

3

- **Chantilly, Virginia.  May 8, 2006.**  A teenager with an AK-47 and 5 handguns engaged in a firefight at a police station in suburban Virginia, killing Detective Vicky Armel immediately and wounding two other officers, one of whom, Officer Michael Garbarino, died nine days later from his injuries.[12]

The threat posed to law enforcement is one reason why major law enforcement organizations are united in supporting bans on assault weapons.

### Assault Weapons Threaten Civilians

Assault weapons have also been used to massacre and terrorize civilians.  Who can forget the nightmare we lived through in the District of Columbia and surrounding communities during the attacks committed by the D.C. snipers.  Their weapon of choice?  A Bushmaster XM-15 assault rifle.

There have been hundreds of other shootings committed with semiautomatic assault weapons.  Here, we list just a few recent examples:

- **Arvada & Colorado Springs, Colorado.  December 9, 2007.**  One man with an assault rifle attacked a missionary training center in Arvada and a church in Colorado Springs.  He killed two people and injured two others in Arvada, and killed two and injured three others, including two teenage sisters, in Colorado Springs.  He died after being shot by a security guard and then shooting himself.[13]

- **Omaha, Nebraska.  December 5, 2007.**  Nine people were shot to death and five others were injured after a 20-year-old shooter, armed with a military-style assault rifle, attacked shoppers in a department store in a Nebraska mall.[14]

- **Indianapolis, Indiana.  June 2, 2006.**  Seven family members, four adults and three children, were shot and killed in their home by a robber armed with an assault rifle.  Nearly 30 shell casings were found.[15]

- **Tyler, Texas. February 25, 2005.**  A gunman with a history of domestic violence and a felony conviction, who was reportedly fighting with his ex-wife over child support for their two youngest children, shot over 50 rounds from an SKS assault rifle on the steps of his local courthouse when his ex-wife exited the building.  His ex-wife was killed along with a bystander who tried to shoot the gunman.  The shooter's 23-year-old son and three law enforcement officers were wounded during the shooting, including a 28-year-old deputy who

---

[12] Ian Urbina, *Fatal police station attach shocks tranquil community*, NEW YORK TIMES, May 10, 2006; *Officer Killed*, BOSTON GLOBE, May 18, 2006.

[13] Erin Emery, *Report details church shooting, the document chronicles the days leading up to the Dec. 9 deaths of four young people*, DENVER POST, Mar. 13, 2008.

[14] *The American Way*, REGISTER-GUARD, Dec. 17, 2007.

[15] Ashley M. Heher, *Suspect in slaying of 7 family members surrenders / Indianapolis police say he had nowhere else to go*, HOUSTON CHRONICLE, June 4, 2006.

was in grave condition. The gunman fled the scene but was pursued and shot by police when he exited his car and shot toward officers.[16]

- **Akron, Ohio. February 24, 2005.** A man shot and killed his girlfriend and her seven-year old son using an AR-15 assault weapon, then fired more than one hundred rounds at a dozen law enforcement officers as he fled the murder scene. The gunman was arrested the next morning inside the apartment of a Kent State University student, who he also murdered with the AR-15 assault weapon. Police subsequently seized 21 weapons kept by the suspect, including an Uzi and an AK-47.[17]

## Assault Weapons Threaten Homeland Security

These weapons pose particular and severe risks for homeland security here in the Nation's Capital. The extraordinary firepower of these weapons could wreak havoc at any number of high-profile sites or events that occur in Washington, or victimize any number of high-profile targets, from government officials to foreign dignitaries.

And make no mistake: these weapons have great appeal for terrorists. The oft-seen file footage of Osama Bin Laden, aiming his AK-47 at an unknown target, is now a familiar reminder of the incontrovertible connection between terrorism and assault weapons.

The *Chicago Tribune* has reported that, found among the mounds of rubble at a training facility in Kabul for a radical Pakistan-based Islamic terrorist organization, was a manual entitled "How Can I Train Myself for Jihad" containing an entire section on "Firearms Training."[18] Tellingly, the manual singles out the United States for its easy availability of firearms and stipulates that al-Qaeda members living in the United States "obtain an assault weapon legally, preferably AK-47 or variations."

Terrorists have used assault weapons in numerous attacks. I am going to mention just one that is close to home.

- **Langley, Virginia, January 25, 1993.** Pakistani national Mir Aimal Kasi killed two CIA employees and wounded three others outside the entrance to CIA headquarters in Langley, Virginia. Kasi used a Chinese-made semiautomatic AK-47 assault rifle equipped with a 30-round magazine purchased from a Northern Virginia gun store.[19] After fleeing the country, he was arrested in Pakistan in 1997.[20]

---

[16] Bill Hanna & Jack Douglas Jr., *Rampage in Tyler leaves three dead, four wounded*, FORT WORTH STAR-TELEGRAM, Feb. 25, 2005; Jack Douglas Jr. & Bill Hanna, *Police order emergency trace on weapon used in shootings*, FORT WORTH STAR-TELEGRAM, FEB. 26, 2005.

[17] Ed Meyer, *Police eye semiautomatic rifles, Brimfield officials want to be prepared after recent shooting rampage that killed 3 people*, AKRON BEACON JOURNAL, Feb. 24, 2005.

[18] Paul Salopek, *A Chilling Look into Terror's Lair*, CHICAGO TRIBUNE, Nov. 18, 2001.

[19] *CIA Killings Prompt Scrutiny on 2 Fronts; Fairfax Loophole Expedited Gun Purchase*, WASHINGTON POST, Feb. 11, 1993.

[20] Robert O'Harrow, Jr., *Kansi's Shadowy Stay in U.S. Leaves a Hazy Portrait*, WASHINGTON POST, Mar. 3, 1993.

5

## .50 Caliber Sniper Rifles Pose Serious Dangers

Fifty caliber sniper rifles also pose an extraordinary risk in the District.  In 1987, Barrett Firearms Manufacturing Inc., patented its self-described "armor-penetrating" .50 caliber BMG sniper rifle.[21]  Capable of destroying armored personnel carriers, aircraft and bulk fuel and ammunition sites, the .50 caliber sniper rifle is now proliferating in the civilian market.[22]  Accurate at up to 2,000 yards, it can inflict effective damage to targets over four miles away.[23]  With more power on impact then any other semi-automatic rifle legally available on the civilian market,[24] the .50 caliber represents a serious threat to local law enforcement and national security.  A 2004 report on airport security at Los Angeles International Airport warned that terrorists could use .50-caliber sniper rifles to target parked and taxiing airplanes "firing over 50 shots in five minutes."[25]  The Council should take action to prohibit the possession of these weapons in civilian hands.

## High-Capacity Magazines Increase Firepower

The threat posed by military-style assault weapons is increased significantly if they can be equipped with high-capacity ammunition magazines, defined as those accepting more than ten rounds.  The 1994-2004 federal ban on assault weapons also banned these magazines.  By permitting a shooter to fire more than ten rounds without reloading, they greatly increase the firepower of mass shooters.  For example, the shooter at Virginia Tech equipped himself with numerous high-capacity magazines of up to 30 rounds, which enabled him to get off nearly 200 rounds in his attack.  In self-defense situations, too much firepower is a hazard, because the tendency is for defenders to keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders.

## Assault Weapons Bans Already In Place

Six states currently ban assault weapons.  Those include California, which passed the nation's first statewide ban in May 1989, as well as New Jersey (1990), Hawaii (1991), Connecticut (1993), Maryland (1994), Massachusetts (1998), and New York (2000).  California expanded its ban in 2000 to include all semiautomatic rifles or pistols that have the ability to accept a detachable magazine and contain any one of a series of military-style features.  We strongly support that legislation as a model for the District of Columbia.

---

[21] Carolyn Marshall, *California Bans Large Caliber Guns, and the Battle is on*, NEW YORK TIMES, Jan. 4, 2005.

[22] *See,* Government Accounting Office for U.S. House of Representatives, Committee on Government Reform, *Long Range 50 Caliber Sniper Weapons* 4 (May 3, 1999).

[23] *Id.*

[24] *Id.* at 3.

[25] Donald Stevens, *Near Term Options for Improving Security at Los Angeles International Airport*, RAND (2004).

In addition, from 1994-2004, there was a federal ban on assault weapons. Plus, as mentioned above, ATF currently bans assault weapons from being imported into this country because they are not weapons suitable for sporting purposes.

### Banning Assault Weapons and Sniper Rifles Is Consistent with *Heller*

A ban on assault weapons and .50 caliber sniper rifles would be constitutional and consistent with the Supreme Court's decision in *District of Columbia v. Heller*. In *D.C. v. Heller*, the Supreme Court narrowly defined the Second Amendment as protecting the right of law-abiding citizens to keep and use guns in the home for self-defense. At the same time, the Court indicated that the right to keep and bear arms is limited in a number of ways. The Court made clear that the Second Amendment does not entitle citizens to any and all guns. Certainly, military-style assault weapons and .50 caliber sniper rifles are not a part of this right. The Court held that not all "arms" are protected.

> We also recognize another important limitation on the right to keep and carry arms. [*U.S. v.*] *Miller* said, as we have explained, that the sorts of weapons protected were those **"in common use at the time."** We think that limitation is fairly supported by the historical tradition of prohibiting carrying of **"dangerous and unusual weapons."**[26]

Assault weapons and .50 caliber sniper rifles are certainly "dangerous and unusual weapons" according to any reasonable analysis of that phrase. They are military-style offensive weapons designed to slaughter human beings. This differentiates them from all hunting rifles and shotguns, as well as common handguns, which are often used in crime but have also been used in self-defense.

Moreover, assault weapons and .50 caliber sniper rifles are not "in common use." As semiautomatic versions of machine guns developed for use during the World Wars of the 20th Century, assault weapons are a relatively recent invention. Plus, ATF has twice concluded, after thorough analyses in 1989 and 1998, that assault weapons have no sporting purpose. And the Barrett .50 caliber sniper rifles was patented a mere twenty-one years ago, and was made for military, not civilian use.

Finally, assault weapon bans have been challenged in court, but have never been struck down as unconstitutional under the Second Amendment or under right to bear arms provisions in state constitutions.[27]

### Conclusion

Outside of the military or law enforcement, assault weapons and .50 caliber sniper rifles have no place in civilized society. We would urge the D.C. Council to adopt a ban on these weapons. Thank you.

---

[26] *District of Columbia v. Heller*, 128 S.Ct. 2783 (2008).

[27] *See, e.g., Benjamin v. Bailey*, 662 A.2d 1226 (Conn. 1995); *Robertson v. Denver*, 874 P.2d 325 (Colo. 1994); *Arnold v. City of Cleveland*, 616 N.E.2d (Ohio 1993).

7

# Exhibit 104

Advertisement



YOU ARE HERE: LAT Home → Collections

Advertisement



**FROM THE ARCHIVES**

Colorado Senate OKs universal background checks on gun sales
*March 15, 2013*

Bill to expand background checks on gun sales advances
*March 12, 2013*

# Unraveling Some Brady Law Falsehoods

*Guns: Part of the national drop in crime is because more citizens are lawfully armed, not because of background checks.*

**July 02, 1997** | JOHN R. LOTT Jr. | John R. Lott Jr. is a visiting fellow at the University of Chicago Law School

Email    Share    G+1    0         Tweet         Recommend 0

The Brady law has received much credit for the country's rapidly dropping crime rate. Yet with the Supreme Court striking down the law's background check requirements, it faces its ultimate test. If President Clinton and gun control advocates are correct, the court's decision will unleash a new crime wave.

The Justice Department continually releases "new" studies crediting the law with reducing crime. Actually, the downward crime trend started in 1991, well before the Brady law became effective in March 1994. My research shows that this decline is in great measure because of higher arrest rates and more states allowing law-abiding citizens to carry concealed handguns.

Others estimate that the Brady bill had a much smaller effect on gun sales than the 100,000 rejections its proponents claim. Last year the General Accounting Office reported that initial rejections numbered about 60,000, and more than half were for purely technical reasons, mostly paperwork errors that eventually were corrected. A much smaller number of rejections, 3,000, were due to violent crime convictions--and presumably many of these people just proceeded to buy a gun on the street.

Brady law backers have focused almost exclusively on the value of background checks, the one part of the law that the Supreme Court specifically struck down. Yet there never was much controversy over this issue: When Congress debated the law, no one, not even the National Rifle Assn., opposed background checks. The dispute was over a five-day waiting period versus an "instant check." Ultimately, the success of background checks and waiting periods must be judged by their impact on crime. To seriously evaluate their impacts, however, one must recognize that other legal changes also occurred.

For example, during 1995 and 1996, 10 more states adopted nondiscretionary concealed handgun laws. In the belief that concealed handguns deter crime, 31 states now grant permits automatically to citizens who have no significant criminal records or histories of major mental illness. In all 31 states, more people now carry legally concealed handguns.

Considerable evidence supports the notion that permitted handguns deter criminals. Polls show that there are at least 760,000 and possibly as many as 3.6 million defensive uses of guns per year. In 98% of the cases, people simply brandish weapons to stop attacks. This is further reflected in the different rates of "hot burglaries," where a resident is at home when a criminal strikes. In Canada and Britain, both with tough gun control laws, almost half of all burglaries are "hot." The U.S., with laxer restrictions, has a "hot burglary" rate of only 13%.

This difference is no accident. Surveys of convicted American burglars indicate that the fear of potentially armed victims causes them to spend more time than their foreign counterparts "casing" a house to ensure that nobody is home. Felons frequently comment that they avoid late-night burglaries because "that's the way to get shot."

Fortunately, we can disentangle the different effects of waiting periods, background checks and concealed handgun laws, as many states adopted these different laws at different times. In a study examining these differences (published in the January issue of the Journal of Legal Studies) David Mustard and I analyzed the simultaneous effect on crime from background checks, state waiting periods, the lengths of waiting periods, nondiscretionary concealed handgun laws and other gun laws. Our research examined crime rates over 16 years in all 3,054 U.S. counties. The largest previous gun control study examined only 170 cities within a single year. We also accounted for changes in arrest and conviction rates, changes in prison sentence lengths and general variables affecting crime such as unemployment, income and poverty.

While arrest and conviction rates were the most important determinations of crime rates, of all the different gun laws, liberal concealed handgun laws were the most important. Passing these handgun laws caused murders to decrease by least 8%, rapes by 5%, aggravated assaults by 7% and robberies by 3%. The percentage drops were largest in the most urban, most crime-prone counties, and women benefited much more than men from carrying concealed handguns. In contrast, no evidence indicated that either waiting periods or background checks lowered crime rates.

Yet research does not convince everybody. Perhaps the Supreme Court's decision will be able to shed light on how effective the Brady law was. Will crime rates shoot up as quickly without the nationwide background checks as gun control advocates claimed that they fell because of them? My bet is that they will not. Will gun control advocates take me up on that wager?

Email       Share      G+1  0        Tweet        Recommend 0

**From the Web**                                          Sponsored Links by Taboola

**3 Foods To Avoid in 2017**
BIO X4 Supplement

**An Easy Way To Calculate Your Kitchen Cabinet Costs**
CliqStudios Cabinets

**Sacramento, California: The Auto Insurance Industry Is Being Disrupted By This Br...**
EverQuote Insurance Quotes

**Watch: Why We Love Emma Stone**
Fandor

**The Airline Miles Trick That Airlines Don't Want You to Know**
CreditDonkey.com

**Thinking About Solar? If You Live in California, Read This First**
Energy Bill Cruncher Solar Quotes

**Gain skills for a new career with Brightwood College**
Brightwood College

**Sacramento: This Meal Service is Cheaper Than Your Local Store**
Home Chef

**MORE:**

Seizure Led to FloJo's Death

His 104 scores make his case

Restaurant review: South Beverly Grill

Brutal Murder by Teen-Age Girls Adds to Britons' Shock

Comaneci Confirms Suicide Attempt, Magazine Says

---

**Los Angeles Times**   Copyright 2017 Los Angeles Times                    Index by Keyword  |  Index by Date  |  Privacy Policy  |  Terms of Service

# Exhibit 105

# NATIONAL REVIEW

## Suiting Down

Congress guns for fairness?

By John R. Lott Jr. & Jack Soltysik — October 20, 2005

Almost all products have illegitimate uses and undesirable consequences. In 2002, 45,380 people died in car accidents, 838 children drowned, 474 children died in house fires, and 130 children died in bicycle accidents. Luckily, local governments haven't started recouping medical costs or police salaries by suing car manufacturers, pool builders, makers of home heaters, or bike companies.

Many items, including cars and computers, are also used in the commission of crimes. But again, no one seriously proposes that these companies be held liable.

People understand that what makes a car useful for getting to work also makes it useful for escaping a crime. They also understand that the penalty should be on the person who uses the product for ill.

This logic is ignored when cities sue gun makers for costs incurred from improper firearm use, and the House of Representatives looks poised to end the practice today. Multibillionaire George Soros, via the Brady Campaign, has funded most of these suits. Last year the "Protection of Lawful Commerce in Arms Act," to rein in these suits, was defeated when Democrats added amendments to extend the so-called assault-weapons ban.

Generally, with the exception of some short-term victories, suits against gun makers haven't had any more legally success than if similar suits had been brought against car companies. The legislation would limit civil suits to cases where the sellers or manufacturer has broken any law. In practice, this will make the selling of guns similar to other products. Car dealers are not sued simply because their cars are used in a crime, but they can be if they knowingly provide a car to facilitate a crime.

While gun-control advocates can dream about more such victories, the Brady Campaign had more practical goals: imposing large legal costs on gun makers. Even the largest gun companies make only a few million dollars in a good year. Those below the top ten make just a few thousand guns a year and are usually family operations.

# The Bad and the Good

Obviously, bad things happen with guns. But the suits ignore that guns also prevent bad things by making it easier for victims to defend themselves. Unlike the tobacco suits, gun makers have powerful arguments about the benefits of gun ownership.

More than 450,000 crimes, including 10,800 murders, were committed with guns in 2002. But Americans also used guns defensively more than two million times that year, and more than 90 percent of the time merely brandishing the weapon was sufficient to stop an attack.

Police are important in reducing crime rates, but they virtually always arrive after a crime has been committed. When criminals confront people, resistance with a gun is by far the safest course of action. A 2004 survey found that 94 percent of 22,600 chiefs and sheriffs questioned thought that law-abiding citizens should be able to buy guns for self-defense.

John Lott's own research has shown Increased gun-ownership rates are associated with lower crime rates. Poor people in the highest crime areas benefit the most from owning guns. Lawsuits against gun makers will raise the price of firearms, which will most severely reduce gun ownership among the law-abiding, much-victimized poor.

Advocates for these suits claim that the gun makers make their weapons attractive to criminals through low price, easy concealability, corrosion resistance, accurate firing and high firepower. Lightweight, concealable guns may help criminals, but they also have helped protect law-abiding citizens and lower crime rates in the 46 states that to varying degrees allow concealed handguns.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3954   Page 435 of 472

Women benefit most and also find it easier to use smaller, lightweight guns. Poor victims benefit more than wealthier ones from the ability to protect themselves simply because they are more likely to be victims.

Some suits have sought to hold gun makers liable because accidental deaths are "foreseeable" and not enough was done to make guns safe. Nationally, the Centers for Disease Control shows that 26 children under 10 and 60 under 15 died from accidental gun deaths in 2002. Yet with 90 some million people owning more than 260 million guns, accidental deaths from guns are far less "foreseeable" than from many other products. Most gun owners must be very responsible or such gun accidents would be much more frequent.

Data collected from doing a Nexis search on all accidental gun shot cases for children under age ten show that accidental shooters overwhelmingly are adults with long histories of arrests for violent crimes, alcoholism, suspended or revoked driver's licenses, and involvement in car crashes. Meanwhile, the annual number of accidental gun deaths involving children under ten–most of these being cases where someone older shoots the child–is consistently a single digit number. It is a kind of media archetype story to report on "naturally curious" children shooting themselves or other children–though in the five years from 1997 to 2001 the entire United States averaged only ten cases a year where a child under ten accidentally shot himself or another child.

In contrast, in 2001 bicycles were much more likely to result in accidental deaths than guns. Ninety-three children under the age of ten drowned accidentally in bathtubs.

## And, Yet, Still…

Yet, despite all this the vote might in the House might depend on requirements on a Senate provision that required gunlocks to be included with any guns sold. As mentioned, the number of accidental gun deaths are many fewer than most suspect, but the real problem is that convincing people to lock up guns actually leads to more deaths. When people lock up their guns, they are less able to defend themselves from criminal attacks and criminals become more emboldened to attack people in their homes. Providing gunlocks with guns is just one additional way to exaggerate in

people's minds the risk of owning guns in the home. Including this provision may be the political price to pass the legislation, but it distracts from the overall benefits of the bill.

Attempts to have the court system ignore a product's benefits to society are bad enough. Even worse is the cynical attempt to file bogus lawsuits simply to impose massive legal costs to eventually try bankrupting legitimate companies.

Passing the "Protection of Lawful Commerce in Arms Act" today would still allow suits but would put gun makers on the same legal footing as other American manufacturers.

–_John Lott, a resident scholar at the American Enterprise Institute, is the author of_ More Guns, Less Crime _and_ The Bias Against Guns. Soltysik was an AEI summer intern and is currently a student at the University of Missouri. /span>

# Exhibit 106



HOME ⌄     TAKE ACTION ⌄     SEARCH     JOIN GOA ⌄     RESOURCES ⌄     MEDIA ⌄     CONTRIBUTE ⌄



Senate Confirms Neil Gorsuch
to the Supreme Court

READ MORE

## GOA News

### This is why Gun Owners of America is up in arms over a hearing aid bill



"Anti-gun senators like Warren have used any pretext, however attenuated, to interfere with hunting and the exercise of Second Amendment rights," the executive director of the Gun Owners of America, a group to the right of the bigger National Rifle Association and claims 1.5 million members, said.

WHY GOA IS FIGHTING THIS BILL

PRO 2A MOVES IN THE WORKS

HEARING AID ACT RILES GOA

GOA TARGETS ANTI-GUNNERS

GOA REPEAL SCHUMER REG.

READ MORE







## Fact Sheet: Guns Save Lives

**A. Guns save more lives than they take; prevent more injuries than they inflict**



* Guns used 2.5 million times a year in self-defense. Law-abiding citizens use guns to defend themselves against criminals as many as 2.5 million times every year -- or about 6,850 times a day. [1] This means that each year, firearms are used more than 80 times more often to protect the lives of honest citizens than to take lives. [2]

* Of the 2.5 million times citizens use their guns to defend themselves every year, the overwhelming majority merely brandish their gun or fire a warning shot to scare off their attackers. Less than 8% of the time, a citizen will kill or wound his/her attacker.[3]

* As many as 200,000 women use a gun every year to defend themselves against sexual abuse.[4]

* Even anti-gun Clinton researchers concede that guns are used 1.5 million times annually for self-defense. According to the Clinton Justice Department, there are as many as 1.5 million cases of self-defense every year. The National Institute of Justice published this figure in 1997 as part of "Guns in America" -- a study which was authored by noted anti-gun criminologists Philip Cook and Jens Ludwig.[5]

* Armed citizens kill more crooks than do the police. Citizens shoot and kill at least twice as many criminals as police do every year (1,527 to 606).[6] And readers of Newsweek learned that "only 2 percent of civilian shootings involved an innocent person mistakenly identified as a criminal. The 'error rate' for the police, however, was 11 percent, more than five times as high."[7]

* Handguns are the weapon of choice for self-defense. Citizens use handguns to protect themselves over 1.9 million times a year. [8] Many of these self-defense handguns could be labeled as "Saturday Night Specials."

## B. Concealed carry laws help reduce crime

* Nationwide: one-half million self-defense uses. Every year, as many as one-half million citizens defend themselves with a firearm away from home. [9] * Concealed carry laws are dropping crime rates across the country. A comprehensive national study determined in 1996 that violent crime fell after states made it legal to carry concealed firearms. The results of the study showed:

* States which passed concealed carry laws reduced their murder rate by 8.5%, rapes by 5%, aggravated assaults by 7% and robbery by 3%; [10] and * If those states not having concealed carry laws had adopted such laws in 1992, then approximately 1,570 murders, 4,177 rapes, 60,000 aggravated assaults and over 11,000 robberies would have been avoided yearly.[11]

* Vermont: one of the safest five states in the country. In Vermont, citizens can carry a firearm without getting permission... without paying a fee... or without going through any kind of government-imposed waiting period. And yet for ten years in a row, Vermont has remained one of the top-five, safest states in the union -- having three times received the "Safest State Award."[12]

* Florida: concealed carry helps slash the murder rates in the state. In the fifteen years following the passage of Florida's concealed carry law in 1987, over 800,000 permits to carry firearms were issued to people in the state. [13] FBI reports show that the homicide rate in Florida, which in 1987 was much higher than the national average, fell 52% during that 15-year period -- thus putting the Florida rate below the national average. [14]

* Do firearms carry laws result in chaos? No. Consider the case of Florida. A citizen in the Sunshine State is far more likely to be attacked by an alligator than to be assaulted by a concealed carry holder.

   1. During the first fifteen years that the Florida law was in effect, alligator attacks outpaced the number of crimes committed by carry holders by a 229 to 155 margin.

   2. And even the 155 "crimes" committed by concealed carry permit holders are somewhat misleading as most of these infractions resulted from Floridians who accidentally carried their firearms into restricted areas, such as an airport. [15]

## C. Criminals avoid armed citizens

* Kennesaw, GA. In 1982, this suburb of Atlanta passed a law requiring heads of households to keep at least one firearm in the house. The residential burglary rate subsequently dropped 89% in Kennesaw, compared to the modest 10.4% drop in Georgia as a whole. [16]

**The Li**
**Zones**

> **The Li**

**Limite**

1 oz., .999



**2A Up**

• Media
  Spiralii
  Media
  Spiralii
  Study
  barely

• Univer
  Party H
  Univer
  Party H
  politbu

• Police
  Than C
  Holder
  Lott: P
  Crimes
  Permit
  Resea

* Ten years later (1991), the residential burglary rate in Kennesaw was still 72% lower than it had been in 1981, before the law was passed. [17]

* Nationwide. Statistical comparisons with other countries show that burglars in the United States are far less apt to enter an occupied home than their foreign counterparts who live in countries where fewer civilians own firearms. Consider the following rates showing how often a homeowner is present when a burglar strikes:

* Homeowner occupancy rate in the gun control countries of Great Britain, Canada and Netherlands: 45% (average of the three countries); and, * Homeowner occupancy rate in the United States: 12.7%. [18] Rapes averted when women carry or use firearms for protection

* Orlando, FL. In 1966-67, the media highly publicized a safety course which taught Orlando women how to use guns. The result: Orlando's rape rate dropped 88% in 1967, whereas the rape rate remained constant in the rest of Florida and the nation. [19]

* Nationwide. In 1979, the Carter Justice Department found that of more than 32,000 attempted rapes, 32% were actually committed. But when a woman was armed with a gun or knife, only 3% of the attempted rapes were actually successful. [20] Justice Department study:

* 3/5 of felons polled agreed that "a criminal is not going to mess around with a victim he knows is armed with a gun." [21]

* 74% of felons polled agreed that "one reason burglars avoid houses when people are at home is that they fear being shot during the crime."[22] * 57% of felons polled agreed that "criminals are more worried about meeting an armed victim than they are about running into the police. [23]

---

[1] Gary Kleck and Marc Gertz, "Armed Resistance to Crime: The Prevalence and Nature of Self-Defense With a Gun," 86 The Journal of Criminal Law and Criminology, Northwestern University School of Law, 1 (Fall 1995):164. Dr. Kleck is a professor in the school of criminology and criminal justice at Florida State University in Tallahassee. He has researched extensively and published several essays on the gun control issue. His book, Point Blank: Guns and Violence in America, has become a widely cited source in the gun control debate. In fact, this book earned Dr. Kleck the prestigious American Society of Criminology Michael J. Hindelang award for 1993. This award is given for the book published in the past two to three years that makes the most outstanding contribution to criminology. Even those who don't like the conclusions Dr. Kleck reaches, cannot argue with his impeccable research and methodology. In "A Tribute to a View I Have Opposed," Marvin E. Wolfgang writes that, "What troubles me is the article by Gary Kleck and Marc Gertz. The reason I am troubled is that they have provided an almost clear-cut case of methodologically sound research in support of something I have theoretically opposed for years, namely, the use of a gun in defense against a criminal perpetrator.... I have to admit my admiration for the care and caution expressed in this article and this research. Can it be true that about two million instances occur each year in which a gun was used as a defensive measure against crime? It is hard to believe. Yet, it is hard to challenge the data collected. We do not have contrary evidence." Wolfgang, "A Tribute to a View I Have Opposed," The Journal of Criminal Law and Criminology, at 188.

Wolfgang says there is no "contrary evidence." Indeed, there are more than a dozen national polls -- one of which was conducted by The Los Angeles Times -- that have found figures comparable to the Kleck-Gertz study. Even the Clinton Justice Department (through the National Institute of Justice) found there were as many as 1.5 million defensive users of firearms every year. See National Institute of Justice, "Guns in America: National Survey on Private Ownership and Use of Firearms," Research in Brief (May 1997).

As for Dr. Kleck, readers of his materials may be interested to know that he is a member of the ACLU, Amnesty International USA, and Common Cause. He is not and has never been a member of or contributor to any advocacy group on either side of the gun control debate.

[2] According to the National Safety Council, the total number of gun deaths (by accidents, suicides and homicides) account for less than 30,000 deaths per year. See Injury Facts, published yearly by the National Safety Council, Itasca, Illinois.

[3] Kleck and Gertz, "Armed Resistance to Crime," at 173, 185.

[4]Kleck and Gertz, "Armed Resistance to Crime," at 185.



[5]Philip J. Cook and Jens Ludwig, "Guns in America: National Survey on Private Ownership and Use of Firearms," NIJ Research in Brief (May 1997); available at http://www.ncjrs.org/txtfiles/165476.txt on the internet. The finding of 1.5 million yearly self-defense cases did not sit well with the anti-gun bias of the study's authors, who attempted to explain why there could not possibly be one and a half million cases of self-defense every year. Nevertheless, the 1.5 million figure is consistent with a mountain of independent surveys showing similar figures. The sponsors of these studies -- nearly a dozen -- are quite varied, and include anti-gun organizations, news media organizations, governments and commercial polling firms. See also Kleck and Gertz, supra note 1, pp. 182-183.

[6]Kleck, Point Blank: Guns and Violence in America, (1991):111-116, 148.

[7]George F. Will, "Are We 'a Nation of Cowards'?," Newsweek (15 November 1993):93.

[8]Id. at 164, 185.

[9]Dr. Gary Kleck, interview with J. Neil Schulman, "Q and A: Guns, crime and self-defense," The Orange County Register (19 September 1993). In the interview with Schulman, Dr. Kleck reports on findings from a national survey which he and Dr. Marc Gertz conducted in Spring, 1993 -- a survey which findings were reported in Kleck and Gertz, "Armed Resistance to Crime."

[10]One of the authors of the University of Chicago study reported on the study's findings in John R. Lott, Jr., "More Guns, Less Violent Crime," The Wall Street Journal (28 August 1996). See also John R. Lott, Jr. and David B. Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns," University of Chicago (15 August 1996); and Lott, More Guns, Less Crime (1998, 2000).

[11]Lott and Mustard, "Crime, Deterrence, and Right-to-Carry Concealed Handguns."

[12]Kathleen O'Leary Morgan, Scott Morgan and Neal Quitno, "Rankings of States in Most Dangerous/Safest State Awards 1994 to 2003," Morgan Quitno Press (2004) at http://www.statestats.com/dang9403.htm. Morgan Quitno Press is an independent private research and publishing company which was founded in 1989. The company specializes in reference books and monthly reports that compare states and cities in several different subject areas. In the first 10 years in which they published their Safest State Award, Vermont has consistently remained one of the top five safest states.

[13]Memo by Jim Smith, Secretary of State, Florida Department of State, Division of Licensing, Concealed Weapons/Firearms License Statistical Report (October 1, 2002).
14Florida's murder rate was 11.4 per 100,000 in 1987, but only 5.5 in 2002. Compare Federal Bureau of Investigation, "Crime in the United States," Uniform Crime Reports, (1988): 7, 53; and FBI, (2003):19, 79.

[15]John R. Lott, Jr., "Right to carry would disprove horror stories," Kansas City Star, (July 12, 2003).

[16]Gary Kleck, "Crime Control Through the Private Use of Armed Force," Social Problems 35 (February 1988):15.

[17]Compare Kleck, "Crime Control," at 15, and Chief Dwaine L. Wilson, City of Kennesaw Police Department, "Month to Month Statistics: 1991." (Residential burglary rates from 1981-1991 are based on statistics for the months of March - October.)

[18]Kleck, Point Blank, at 140.

[19]Kleck, "Crime Control," at 13.

[20]U.S. Department of Justice, Law Enforcement Assistance Administration, Rape Victimization in 26 American Cities (1979), p. 31.

[21]U.S., Department of Justice, National Institute of Justice, "The Armed Criminal in America: A Survey of Incarcerated Felons," Research Report (July 1985): 27.

[22]Id.

[23]Id.

**Self-Defense Corner**

## Homeowner Shot, Killed Home Invasion Suspect Who Tased Him



A home invasion suspect was shot and killed after allegedly tasing a homeowner in Kingman, Arizona, around 7:30 p.m. Saturday night.

READ MORE

HOMEOWNER TASED--KILLS INTRUDER

CLERK SHOOTS ARMED ROBBER

HOME INVADER KILLED

ROBBERS GO TO WRONG HOUSE

TEXAN STOPS BAR SHOOTING

## GOA Media Clips



Tense Debate Between Erich Pratt and...

Praesidium | Short Film



Larry Pratt Debunks the "Gun Show Lo...



Erich Pratt Stumps CNN Host with Fac...

2015 - Gun Owners of America

# Exhibit 107

Case 3:17-cv-01017-BEN-JLB Document 18-30 Filed 06/05/17 PageID 3063 Page 444 of
Case 3:13-cv-00739-AVC Document 84 Filed 09/11/13 Page 383 of 389
472

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **JUNE SHEW, et al.** | : | **No. 3:13-CV-0739 (AVC)** |
| *Plaintiffs*, | : | |
| | : | |
| **v.** | : | |
| | : | |
| **DANNEL P. MALLOY, et al.** | : | |
| *Defendants*. | : | **SEPTEMBER 30, 2013** |

## AFFIDAVIT OF CHRISTOPHER S. KOPER

1. My name is Christopher S. Koper.  I am over eighteen years of age and I believe in the obligations of an oath.

2. I have read the Plaintiffs' First Amended Complaint in the above captioned matter, and am familiar with the claims set forth therein.

3. I am an Associate Professor for the Department of Criminology, Law and Society at George Mason University, in Fairfax, Virginia, and a senior fellow at George Mason's Center for Evidence-Based Crime Policy.  A copy of my curriculum vitae is attached to the Defendants' motion as Exhibit 27.

4. I have been studying firearms issues since 1994.  My primary areas of focus are firearms policy and policing issues.

5. In 1997, my colleague Jeffrey Roth and I conducted a study on the impact of Title XI, Subtitle A of the Violent Crime Control and Law Enforcement Act of 1994 (hereinafter the "federal assault weapons ban" or the "federal ban"), for the United States Department of Justice and the United States Congress.[1]  I updated our original 1997 study in 2004,[2] and briefly revisited the issue again by re-examining my 2004 report in 2013.[3]  My 2004

---

[1]    Jeffrey A. Roth & Christopher S. Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994: Final Report* (1997), attached to Defendants' motion as Exhibit 28 (hereinafter, "*Koper 1997*").

[2]    Christopher S. Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (2004), attached to Defendants' motion as Exhibit 29 (hereinafter, "*Koper 2004*").

[3]    Christopher S. Koper, *America's Experience with the Federal Assault Weapons Ban, 1994-2004: Key Findings and Implications,* ch. 12, pp. 157-71 in Reducing Gun Violence in America: Informing Policy with Evidence and Analysis (Daniel S. Webster & Jon S. Vernick eds. 2013), attached to Defendants' motion as Exhibit 30 (hereinafter "*Koper 2013*").

Case 3:17-cv-01017-BEN-JLB Document 18-80 Filed 06/05/17 PageID.3964 Page 445 of
472
Case 3:13-cv-00739-AVC Document 80 Filed 05/17/13 Page 394 of 399

and 2013 reports are the best resources for understanding my analysis of the impact of the federal ban. My 1997 report was based on limited data, especially with regard to the criminal use of large capacity magazines. As a result, my conclusions on the impact of the federal ban are most accurately and completely set forth in my 2004 and 2013 reports.

6. To my knowledge, the reports I authored are the only published academic studies to have examined the impacts of the federal bans on assault weapons and ammunition feeding devices holding more than ten rounds of ammunition (hereinafter referred to as "large-capacity magazines" or "LCMs").[4]

## SUMMARY OF FINDINGS

7. Based on my research, I found, among other things, that assault pistols are used disproportionately in crime in general, and that assault weapons more broadly were disproportionately used in murder and other serious crimes in jurisdictions for which there was data. I also found that assault weapons and other firearms with large capacity magazines are used in a higher share of mass public shootings and killings of law enforcement officers.

8. The evidence also suggests that gun attacks with semiautomatics—especially assault weapons and other guns equipped with large capacity magazines—tend to result in more shots fired, more persons wounded, and more wounds per victim, than do gun attacks with other firearms. There is evidence that victims who receive more than one gunshot wound are substantially more likely to die than victims who receive only one wound. Thus, it appears that crimes committed with these weapons are likely to result in more injuries, and more lethal injuries, than crimes committed with other firearms.

9. In addition, there is some evidence to suggest that assault weapons are more attractive to criminals, due to the weapons' military-style features and particularly large magazines.

10. Based on these and other findings in my studies discussed below, it is my considered opinion that Connecticut's recently strengthened ban on assault weapons and newly enacted ban on large capacity magazines,[5] and in particular its ban on LCMs which is in some ways stronger than the federal ban that I studied, is likely to advance Connecticut's

---

[4] As discussed below, there have been some additional studies about the impact and efficacy of the federal assault weapons ban conducted by non-academic institutions. In 2011, for example, the *Washington Post* published the results of its own investigation into the federal ban's impact on the criminal use of LCMs in Virginia. *See* ¶¶57, 74, 81, *infra*. I also am aware of gun tracing analyses conducted by the federal Bureau of Alcohol Tobacco and Firearms (2003 Congressional Q&A memo provided to the author) and the Brady Center to Prevent Gun Violence (2004). These analyses are consistent with the findings of my studies regarding the decline in assault weapons as a percentage of crime gun traces between the pre-ban and post-ban periods.

[5] *See generally* Public Act 13-3, An Act Concerning Gun Violence Prevention And Children's Safety (hereinafter, "the Act").

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3905 Page 446 of
Case 3:13-cv-00739-AVC Document 80 Filed 05/17/13 Page 3 of 389
472

interest in protecting public safety.  Specifically, it has the potential to: (1) reduce the number of crimes committed with assault weapons and other firearms with large capacity magazines; (2) reduce the number of shots fired in gun crimes; (3) reduce the number of gunshot victims in such crimes; (4) reduce the number of wounds per gunshot victim; (5) reduce the lethality of gunshot injuries when they do occur; and (6) reduce the substantial societal costs that flow from shootings.

## I.    Criminal Uses and Dangers of Assault Weapons and LCMs

11. The precise definition of "assault weapon" varies among the different federal, state, and local jurisdictions that have adopted bans on such weapons, although there is substantial overlap.  Assault weapons are usually defined as a subset of semiautomatic weapons,[6] and generally include semiautomatic pistols, rifles, and shotguns with military features that are conducive to military and potential criminal applications, but that are unnecessary in shooting sports or for self-defense.

12. The ability to accept a detachable magazine, including large capacity magazines, is a common feature in most assault weapon definitions, including Connecticut's.  However, LCMs can be and frequently are used with guns that fall outside of the definition of assault weapon.

13. One of the core rationales for banning or otherwise limiting the availability of both assault weapons and LCMs is that they are particularly dangerous, insofar as they are capable of and facilitate the wounding and killing of larger numbers of people because of their capacity for rapid firing of high numbers of rounds in a short period of time.  The evidence supports this rationale.  As discussed more fully below, attacks with semiautomatics—especially assault weapons and other guns with LCMs—generally result in more shots fired, persons wounded, and wounds per victim than do other gun attacks.  *See Koper 2004,* p. 97.  The rapid fire capability of these weapons thus increases the number and lethality of injuries from gun violence in which they are used.

14. Likely due to these characteristics, assault weapons and LCMs have been frequently and disproportionately used in mass public shootings and murders of law enforcement officers, crimes for which firearms with greater firepower would seem to be particularly desirable and effective.  *See Koper 2004,* pp. 14-19, 87.

15. During the 1980s and early 1990s, for example, assault weapons and other semiautomatic firearms equipped with LCMs were involved in a number of highly publicized mass

---

[6]     A semiautomatic weapon is a gun that fires one bullet for each pull of the trigger and, after each round of ammunition is fired, automatically loads the next round and cocks itself for the next shot.  This semiautomatic firing action permits a faster rate of fire relative to non-semiautomatic firearms.  Semiautomatics, however, are not to be confused with fully automatic weapons (*i.e.*, machine guns), which fire continuously so long as the trigger is depressed.  Fully automatic weapons have been illegal to own in the United States without a federal permit since 1934.  *See Koper 2004*, p. 4 n.l.

shootings. These incidents heightened public concern about the accessibility of high powered, military-style weaponry, and other guns capable of discharging high numbers of rounds in a short period of time. Such incidents include:

- On July 18, 1984, James Huberty killed 21 persons and wounded nineteen others in a San Ysidro, California McDonald's restaurant, using an Uzi carbine, a shotgun, and another semiautomatic handgun equipped with a 25-round LCM;
- On January 17, 1989, Patrick Purdy used a civilian version of the AK-47 military rifle and a 75-round LCM to open fire in a schoolyard in Stockton, California, killing five children and wounding twenty nine other persons;
- On September 14, 1989, Joseph Wesbecker, armed with an AK-47 rifle, two MAC-11 handguns, a number of other firearms, and multiple 30-round magazines, killed seven and wounded fifteen people at his former workplace in Louisville, Kentucky;
- On October 16, 1991, George Hennard, armed with two semiautomatic handguns with LCMs (and reportedly a supply of extra LCMs), killed twenty two people and wounded another twenty three in Killgren, Texas; and
- On December 7, 1993, Colin Ferguson, armed with a handgun and multiple LCMs, opened fire on commuters on a Long Island Rail Road train, killing six and wounding nineteen.

*See Koper 2004,* p. 14.[7]

16. More recently, in the years since the expiration of the federal ban in 2004, there have been numerous other mass shooting incidents involving previously banned assault weapons and/or LCMs. Since 2007, for example, there have been at least fifteen incidents in which offenders using assault-type weapons or other semiautomatics with LCMs have wounded and/or killed eight or more people.[8] Some of the more notorious of these incidents, both nationally and in Connecticut, include:

---

[7]    Additional details regarding these incidents were obtained from: Violence Policy Center, *Mass Shootings in the United States Involving High-Capacity Ammunition Magazines* (Washington, D.C. 2012) (hereinafter, "Violence Policy Center 2012"); Mark Follman, Gavin Aronsen & Deanna Pan, *US Mass Shootings, 1982-2012: Data from Mother Jones' Investigation* (updated Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2012/12/mass-shootings-mother-jones-full-data (hereinafter, "Follman, Aronsen & Pan 2013"); and Mark Follman, Gavin Aronsen & Jaeah Lee, *More Than Half of Mass Shooters Used Assault Weapons and High-Capacity Magazines* (Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2013/02/assault-weapons-high-capacity-magazines-mass-shootings-feinstein (hereinafter, "Follman, Aronsen & Lee 2013").

[8]    *See* Violence Policy Center 2012; Follman, Aronsen & Pan 2013; Follman, Aronsen & Lee 2013. The reference above to 15 cases is based on a tabulation from these sources.

Case 3:17-cv-01017-BEN-JLB Document 18-9 Filed 06/05/17 PageID.3967 Page 448 of
472
Case 3:13-cv-00739-AVC Document 80 Filed 05/17/13 Page 6 of 39

- Blacksburg, Virginia, April 16, 2007: Student Seung-Hui Cho killed thirty three (including himself) and wounded seventeen on the campus of Virginia Tech., armed with a handgun and multiple LCMs;
- Binghamton, New York, April 3, 2009: Jiverly Wong killed fourteen (including himself) and wounded four at the American Civic Association immigration center, armed with two handguns and a 30-round LCM;
- Tucson, Arizona, January 8, 2011: Jared Loughner, armed with a handgun and multiple LCMs, killed six and wounded thirteen, including Congresswoman Gabrielle Giffords and a federal judge;
- Aurora, Colorado, July 20, 2012: James Holmes killed twelve and wounded fifty eight in a movie theater, armed with a Smith & Wesson M&P15 assault rifle, 100-round LCMs, and other firearms; and
- Newtown, Connecticut, December 14, 2012: Adam Lanza killed twenty six (twenty of whom were young children) and wounded two at Sandy Hook Elementary School, armed with a Bushmaster AR-15-style assault rifle, two handguns, and multiple LCMs.[9]

*See Koper 2013,* p. 157-58.

## A. Assault Weapons

17. Though estimates are imprecise, assault weapons represented only a small percentage of the gun stock in this country when the federal ban was enacted, accounting for less than 1% of the gun stock around 1990 and about 2.5% of guns produced domestically between 1989 and 1993. This suggests that they likely accounted for 1% or less of the civilian gun stock at the time of the ban. Numerous studies suggest, however, that assault weapons accounted for up to 8% of guns used in crime overall before the federal ban, with most studies suggesting they accounted for about 2%. Further, evidence from studies of gun buyers suggests that assault pistols are at higher risk of being used in crime than other types of handguns.

18. In addition, there is some evidence that assault weapons are used more disproportionately in certain kinds of serious crime—in particular mass public shootings and killing of law enforcement officers—relative to their market presence.

19. Several local and national police data sources that my colleagues and I analyzed indicate that, before the ban went into effect, the most common assault weapons prohibited by the federal ban accounted for up to 6% of murders, up to 9% of murders of law enforcement officers, up to 13% of all mass shootings in which four or more people died (figures discussed below show that assault weapons are more heavily represented in mass public shootings and mass shootings involving particularly high numbers of victims), and up to 4% of other serious crimes. *See Koper 2004,* p. 15.

---

[9] Additional details regarding these incidents were obtained from: Violence Policy Center 2012; Follman, Aronsen & Pan 2013; and Follman, Aronsen & Lee 2013.

20. While the evidence suggests that assault weapons are used in a small share of gun crimes overall, these weapons pose particular dangers in connection with two very visible and destructive aspects of crime and violence: mass shootings and murders of police. *See Koper 2004,* pp. 14-19, 87.

21. For example, evidence from before the federal ban indicates that assault weapons and other semiautomatics with LCMs were involved in 40% of mass shooting incidents that occurred between 1984 and 1993 in which six or more persons were killed or a total of 12 or more were wounded. *See Koper 2004,* p. 14.[10]

22. More recently, a media investigation by *Mother Jones* magazine analyzed and compiled data on sixty two public mass shooting incidents that involved the death of four or more people between 1982 and 2012.[11] That study indicates that 42% of the incidents involved an assault weapon, and more than half of the perpetrators possessed assault weapons, LCMs, or both.

23. Working under my direction, a graduate student at George Mason University recently analyzed the *Mother Jones* data for his Master's thesis, and compared the number of deaths and fatalities across cases that involved assault weapons and large capacity magazines, and those that did not. With regard to assault weapons, although he found no difference in the average number of fatalities, he did find an increase in gunshot victimization. Specifically, he found that an average of 11.04 people were shot in public mass shootings involving assault weapons, compared to 5.75 people shot in non-assault weapon cases. This is a statistically significant finding, meaning that it was not likely due to chance. As a result, the total average number of people killed and injured in assault weapon cases was 19.27, compared to 14.06 in non-assault weapon cases.[12]

24. Assault weapons also appear to be used in a disproportionately high number of shootings of law enforcement officers. Specifically, although prior to the federal ban they represented less than 5% of crime guns in most data sources my colleagues and I analyzed, they were involved in 7% to 9% of gun murders of police from 1992 to 1994, and as many as 16% of gun murders of police in 1994 (the same year that the ban went into effect). *See Koper 2004,* p. 15 & n.12; *Koper 1997,* pp. 98-100.

25. This disproportionate use of assault weapons in these crimes is consistent with other data suggesting that the military features and large ammunition capacity of assault weapons

---

[10]    These figures are based on tabulations that I and my research team did using data reported in Gary Kleck, *Targeting Guns: Firearms and Their Control* (1997), pp. 124-26, 144.

[11]    This investigation and compilation of data on mass shootings was done by reporters at *Mother Jones* magazine. *See* Follman, Aronsen & Pan 2013; Follman Aronsen & Lee 2013; Mark Follman, Gavin Aronsen & Deanna Pan, *A Guide to Mass Shootings in America* (updated Feb. 27, 2013), *available at* http://www.motherjones.com/politics/2012/07/mass-shootings-map.

[12]    *See* Dillon, Luke. (2013). *Mass Shootings in the United States: An Exploratory Study of the Trends from 1982 to 2012.* Master's thesis. Fairfax, VA: Department of Criminology, Law and Society, George Mason University.

Case 3:17-cv-01017-BEN-JLB   Document 18-9   Filed 06/05/17   PageID.3069   Page 450 of
Case 3:13-cv-00739-AVC   Document 80   Filed 05/11/13   Page 8 of 8ge
472

make them more attractive to criminals overall, and in particular to offenders with serious
criminal histories, than to non-criminal gun owners.  Perhaps the best evidence of this
comes from a study of young adult handgun buyers in California that found buyers with
minor criminal histories (*i.e.*, arrests or misdemeanor convictions that did not disqualify
them from purchasing firearms) were more than twice as likely to purchase assault pistols
than were buyers with no criminal history (4.6% to 2%, respectively).  Those with more
serious criminal histories were even more likely to purchase assault pistols: 6.6% of those
who had been charged with a gun offense bought assault pistols, as did 10% of those who
had been charged with two or more serious violent offenses.  The study also found that
assault pistol purchasers were more likely to be arrested subsequent to their purchases
than were other gun purchasers.  Among handgun purchasers with prior histories of
violence, those who purchased assault-type pistols were three times as likely as other
handgun purchasers to be subsequently charged with a new offense involving guns or
violence.  *See Koper 2004,* pp. 17-18.

26. Although less reliable, some survey studies have indicated even higher ownership of
assault weapons among criminals and other high-risk individuals, particularly urban gang
members.  *See Koper 2004,* p. 16.

## B.  LCMs

27. LCMs appear to present even greater dangers to crime and violence than assault weapons
alone, in part because they are more prevalent and can be and are used as ammunition
feeding devices in both assault weapons and non-assault weapons.

28. Prior to the federal assault weapon and LCM bans, for example, guns with LCMs were
used in roughly 13-26% of gun crimes.  *See Koper 2004,* pp. 15, 18-19; *Koper 2013,* pp.
161-62.

29. And, in New York City, the New York State Division of Criminal Justice Services
reported that, in 1993, at least 16%, and as many as 25%, of guns recovered in murder
investigations were equipped with LCMs.  *See Koper 2004,* p. 18.[13]

30. Like assault weapons, it also appears that firearms (assault and non-assault) with LCMs
have been used disproportionately in killings of law enforcement officers. The available
data indicates that LCMs were used in somewhere between 31% and 41% of gun murders
of police before enactment of the federal ban.  *See Koper 2004,* p. 18; *Koper 2013,* p.
162.

31. The evidence of public safety threat posed by LCMs is even stronger in the context of
public mass shootings.  Prior to the federal ban semiautomatics with LCMs (including
assault weapons) were involved in 40% of the mass shooting incidents that occurred

---

[13]     The minimum estimate is based on cases in which discharged firearms were recovered,
while the maximum estimate is based on cases in which recovered firearms were positively
linked to the case with ballistics evidence.  *See Koper 2004,* p. 18 n.15.

Case 3:17-cv-01017-BEN-JLB Document 18-90 Filed 06/05/17 PageID.3970 Page 451 of
Case 3:13-cv-00739-AVC Document 80 Filed 05/11/13 Page 395 of 356
472

between 1984 and 1993 in which six or more persons were killed or a total of 12 or more
were wounded.  *See Koper 2004,* p. 14; *Koper 2013,* p. 161.  And the recent *Mother
Jones* investigative report shows that, since 1982, half of all public mass shooters who
killed four or more persons possessed LCMs when carrying out their attacks.[14]

32. Firearms with LCMs, both assault-type and non-assault-type, also are more destructive
and cause more death and injury in gun crime.

33. As discussed above, for example, a graduate student at George Mason University,
working at my direction, recently analyzed the *Mother Jones* data as part of his Master's
thesis.  He compared cases where an LCM was known to have been used (or at least
possessed by the shooter) against cases where either an LCM was not used or known to
have been used.  He found that the LCM cases (which included assault weapons) had
significantly higher numbers of fatalities and casualties; an average of 10.19 fatalities in
LCM cases compared to 6.35 fatalities in non-LCM/unknown cases.  He found an
average of 12.39 people were shot but not killed in public mass shooting involving
LCMs, compared to just 3.55 people shot in the non-LCM/unknown LCM shootings.
These findings reflect a total victim differential of 22.58 killed or wounded in the LCM
cases compared to 9.9 in the non-LCM/unknown LCM cases.[15]  All of these differences
were statistically significant and not a result of mere chance.

34. In my own studies, I similarly found that from 1984 through 1993, offenders who clearly
possessed assault weapons or other semiautomatics with LCMs on average wounded or
killed more than twice as many victims compared to offenders who used other kinds of
weapons (an average of twenty nine victims compared to thirteen) in mass shooting
incidents that resulted in at least six deaths or at least twelve total gunshot victims.  *See
Koper 2004,* pp. 85-86; *Koper 2013,* p. 167.

35. Localized studies of gunshot victimizations also corroborate this conclusion.  Between
1992 and 1995, gun homicide victims in Milwaukee who were killed by guns with LCMs
had 55% more wounds than those victims killed by non-LCM firearms.  *See Koper 2004,*
p. 86.

36. In Jersey City in the 1990s, criminals who used semiautomatic pistols fired roughly 23%
to 61% more shots and wounded 15% more people than did those who used revolvers.
Although only 2.5% of those attackers fired more than ten shots, those incidents had a
100% injury rate and accounted for nearly 5% of all gunshot victims. *Koper 2004,* p. 84-
85, 90-91; *Koper 2013,* p. 167.

[14]	*See* Follman, Aronsen & Lee 2013.
[15]	*See* Dillon, Luke. (2013). *Mass Shootings in the United States: An Exploratory Study of
the Trends from 1982 to 2012.* Master's thesis. Fairfax, VA: Department of Criminology, Law
and Society, George Mason University.  The patterns were also very similar when comparing the
LCM cases against just those cases in which it was clear that an LCM was not used (though this
was a very small number).

Case 3:17-cv-01017-BEN-JLB   Document 18-90   Filed 06/05/17   PageID.3971   Page 452 of
472
Case 3:13-cv-00739-AVC   Document 49-90   Filed 10/11/13   Page 101 of 386

37. The trend in more lethal and injurious outcomes of crimes committed with LCMs repeated itself in Baltimore.  In an analysis I conducted of guns recovered by police in that city, I found, among other things, that guns used in incidents where a victim was shot were 17% to 26% more likely to have LCMs than guns used in gunfire cases with no wounded victims.  Similarly, guns linked to murders were 8% to 17% more likely to have LCMs than guns linked to non-fatal gunshot victimizations. *See Koper 2004,* p. 87.

38. In short, while tentative, the available evidence suggests that, more often than not, attacks with semiautomatics—particularly those equipped with LCMs—result in more shots fired, more victims, and more wounds per victim.  Increased numbers of shots fired in a gunfire incident is significant because it increases the number of gunshot victims, and because gunshot victims who are shot more than once are 63% more likely to die than victims who receive only one wound.  *See Koper 2004,* p. 87.

## II.   **The 1994 Federal Assault Weapons Ban**

### A.  **Provisions of the Federal Assault Weapons Ban**

39. The federal assault weapons ban, which was enacted on September 13, 1994, prohibited and restricted the manufacture, transfer, and possession of certain semiautomatic firearms designated as assault weapons and certain LCMs.  Pub. L. No. 103-322, tit. XI, subtit. A, 108 Stat. 1796, 1996-2010 (1994).

40. The federal assault weapons ban expired on September 13, 2004 by operation of the statute, and was not renewed by Congress.  *Id.* § 1101 05(2).

*Banned assault weapons and features*

41. The federal ban was not a prohibition on all semiautomatic firearms; rather, it was directed against those semiautomatics firearms having features that are useful in military and criminal applications, but that are unnecessary or unsuitable in shooting sports or for self-defense.

42. Banned firearms were identified under the federal law in two ways.  First, the federal ban specifically prohibited eighteen models and variations of semiautomatic weapons by name (*e.g.,* the Intratec TEC-9 pistol and the Colt AR-15 rifle), as well as revolving cylinder shotguns.  The list also included a number of foreign rifles that the federal government had banned from importation into the country beginning in 1989 (*e.g.,* the Avtomat Kalashnikov models).  Several of the weapons banned by name were civilian copies of military weapons that accepted ammunition magazines made for those military weapons.[16]

---

[16]    A list of the weapons banned by name in the 1994 law is set forth in Table 2-1 of *Koper 2004,* p. 5.

Case 3:17-cv-01017-BEN-JLB Document 18-90 Filed 06/05/17 PageID 3072 Page 453 of
Case 3:19-cv-00739-RVC Document 49-90 Filed 06/11/13 Page 102 of 386
472

43. Second, the federal ban contained a "features test" provision that generally prohibited other semiautomatic weapons having two or more military-style features. Examples of such features include pistol grips on rifles, flash suppressors, folding rifle stocks, threaded barrels for attaching silencers, and the ability to accept detachable magazines.[17]

### Banned LCMs

44. The federal ban also prohibited most ammunition feeding devices that could hold more than ten rounds of ammunition, which I have referred to herein as "large capacity magazines" or "LCMs." The federal ban extended to LCMs or similar devices that had the capacity to accept more than ten rounds of ammunition, or that could be "readily restored or converted to or to accept" more than ten rounds of ammunition.[18]

### Exemptions and limitations to the federal ban

45. The federal ban contained several broad exemptions that delayed its impact. *See Koper 2004,* pp. 10-11. First, assault weapons and LCMs manufactured before the effective date of the ban were "grandfathered" in, and thus remained legal to not only own but also to transfer. Estimates suggest that there may have been upward of 1.5 million assault weapons and 25 to 50 million LCMs exempted from the federal ban. The statute also allowed the importation of an additional 4.8 million pre-ban LCMs into the country from 1994 through 2000, and an additional 42 million pre-ban LCMs from 2000-2004. *See Koper 2004,* p. 10; *Koper 2013,* pp. 160-61.

46. Furthermore, although the federal ban prohibited "copies or duplicates" of the assault weapons enumerated in the act, federal authorities applied this prohibition only to exact copies in enforcing this provision. The federal ban also did not apply to a semiautomatic weapon possessing only one military-style feature.[19] Thus, many civilian rifles patterned after military weapons were legal under the ban with only slight modifications. *See Koper 2004,* pp. 10-11.[20]

---

[17] The "features test" of the federal assault weapon ban is described more fully in Table 2-2 of *Koper 2004,* p. 6, and in Table 12-1 of *Koper 2013,* p. 160.
[18] The federal ban exempted attached tubular devices capable of operating only with .22 caliber rimfire ammunition.
[19] Notwithstanding these "grandfathering" exemptions, any firearms imported into the country still must meet the "sporting purposes test" established under the federal Gun Control Act of 1968. In 1989, ATF determined that foreign semiautomatic rifles having any one of a number of named military features (including those listed in the features test of the federal ban) fail the sporting purposes test and cannot be imported into the country. In 1998, ATF added the ability to accept a LCM made for a military rifle to the list of disqualifying features. Consequently, it was possible for foreign rifles to pass the features test of the federal assault weapons ban but not meet the sporting purposes test for imports. *See Koper 2004,* p. 10 n.7.
[20] Examples of some of these modified, legal versions of banned guns are listed in Table 2-1 of *Koper 2004,* p. 5.

Case 3:17-cv-01017-BEN-JLB   Document 18-0   Filed 06/05/17   PageID.3072   Page 454 of
472
Case 3:13-cv-00739-AVC   Document 80   Filed 05/17/15   Page 102 of 386

### B. Impact of the Federal Assault Weapons Ban

*Assault weapons*

47. Prior to the federal ban, the best estimates suggest that there were approximately 1.5 million privately owned assault weapons in the United States as of 1993, and they likely accounted for 1% or less of the total civilian gun stock. *See Koper 2013,* pp. 160-61; *Koper 2004,* p. 10.

48. Manufacturers increased production and sale of assault weapons during the Congressional debate about the federal ban that was ultimately enacted in 1994. This surge in demand helped drive up the prices for many assault weapons (notably assault pistols) and appeared to make them less accessible and affordable to criminal users. *See Koper 2013,* pp. 162-63; *Koper 2004,* pp. 25-38.

49. After the federal assault weapons ban was enacted in 1994, crimes with assault weapons declined. In particular, across six major cities (Baltimore, Miami, Milwaukee, Boston, St. Louis, and Anchorage), the share of gun crimes involving assault weapons declined by 17% to 72%, based on data covering all or portions of the 1995-2003 post-ban period. *See Koper 2004,* pp. 2, 46-60; *Koper 2013,* p. 163.

50. The pattern from these six major cities is consistent with that found in the national data on guns recovered by law enforcement and reported to the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") for investigative gun tracing.[21] Specifically, although the interpretation is complicated by changes in tracing practices that occurred during this time, the national gun tracing data suggests that use of assault weapons in crime declined after 1994 because the percentage of gun trace requests submitted to ATF involving assault weapons fell 70% between 1992/93 and 2001/02 (from 5.4% to 1.6%). And, notably, this downward trend did not begin until 1994, the year the federal ban became effective. *See Koper 2004,* pp. 2, 39-46, 51-52; *Koper 2013,* p. 163.[22]

51. In short, my research and analysis indicates that the criminal use of assault weapons declined after the federal assault weapons ban was implemented in 1994, independently of trends in gun crime. *See Koper 2004,* pp. 51-52; *Koper 2013,* p. 163.

52. The reduction in the use of assault pistols in crime was the biggest factor in criminal use of assault weapons. Assessment of trends in the use of assault rifles was complicated by

---

[21]     A gun trace is an investigation that typically tracks a gun from its manufacture to its first point of sale by a licensed dealer. It is undertaken by the ATF, upon request by a law enforcement agency. The trace is generally initiated when the requesting law enforcement agency provides ATF with a trace request including identifying information about the firearm, such as make, model and serial number. For the full discussion of the use of ATF gun tracing data, *see* section 6.2 of *Koper 2004,* pp. 40-46.

[22]     These findings are consistent with other tracing analyses conducted by ATF and the Brady Center to Prevent Gun Violence. *See Koper 2004,* p. 44 n.43.

the rarity of crimes with such rifles and by the substitution in some cases of post-ban rifles that were very similar to the banned models, but remained legal with slight modification. *See* ¶46, *supra.* The decline in assault weapon use was not completely offset by use of substitution assault weapon-type models. Even counting these substitute models, the share of crime guns that were assault weapons fell 24% to 60% across most of the local jurisdictions studied. Patterns in the local data sources also suggested that crimes with assault weapons were becoming increasingly rare as the years passed. *See Koper 2004,* pp. 46-52; *Koper 2013,* pp. 163-64.

53. Arriving at a nationwide estimate of the number of assault weapons crimes prevented due to the federal ban is made more complicated by the range of estimates of assault weapon use and changes therein derived from different data sources. Notwithstanding these complexities, it is my opinion based on my review of multiple data sources that the federal ban prevented a few thousand crimes with assault weapons annually. For example, using 2% as the best estimate of the percentage of gun crimes involving assault weapons prior to the ban, and 40% as a reasonable estimate of the post-ban drop in this figure, implies that almost 2,900 murders, robberies, and assaults with assault weapons were prevented in 2002 as a result of the federal ban. *See Koper 2004,* p. 52 n.61.[23]

   *LCMs*

54. Assessing trends in LCM use is much more difficult because there was, and is, no national data source on crimes with LCMs, and few local jurisdictions maintain this sort of information. Also LCMs, unlike firearms, do not have serial numbers and therefore are not always uniquely identifiable.

55. It was nevertheless possible to examine trends in the use of guns with LCMs in four jurisdictions: Baltimore, Milwaukee, Anchorage, and Louisville. In all four jurisdictions, the overall share of crime guns equipped with LCMs rose or remained steady through at least the late 1990s. This failure to reduce overall LCM use for at least several years after the federal ban was likely attributable to the immense stock of exempted pre-ban LCMs, which, as noted, was enhanced by post-ban imports. *See Koper 2004,* pp. 68-79; *Koper 2013,* p. 164.

56. Notwithstanding that initial increase, the criminal use of LCMs may have been starting to drop by the early 2000s. *See Koper 2013,* p. 164; *Koper 2004,* pp. 68-79. Although the data in the four cities I investigated were too limited and inconsistent to draw any clear overall conclusions in this regard, such a deferred decline in LCM use would make sense because of the grandfathering provision in the federal law, which delayed the

---

[23]   It is likely that many of these crimes still were committed with other guns that the perpetrator substituted for the banned assault weapon. Even if that is the case, however, for the reasons discussed it is likely that the number of victims per shooting incident, and the number of wounds inflicted per victim, was diminished in some of those instances in which an assault weapon or LCM was no longer available to the assailant.

Case 3:17-cv-01017-BEN-JLB Document 18-90 Filed 06/05/17 PageID.3975 Page 456 of
472
Case 3:13-cv-00739-AVC Document 90 Filed 05/17/13 Page 104 of 386

effectiveness of the ban by requiring more time for grandfathered LCMs to be taken out
of circulation.

57. A later investigative study by the *Washington Post* in January 2011 provides some
additional evidence that the ban may have reduced crimes with LCMs by the time it
expired in 2004. In its study, the *Washington Post* analyzed data maintained by the
Virginia State Police about guns recovered in crimes by local law enforcement officers
across the state. Those data indicated that between 1994 and 2004, the period the federal
ban was in effect, the share of crime guns with LCMs declined by roughly 31% to 44%,
and then rebounded after the ban was allowed to expire. Specifically, although the
percentage of recovered crime guns with LCMs generally ranged between 13% and 16%
from 1994 through 2000, by the time the ban had a chance to run its full course through
2004 that percentage fell to 9% of crime guns recovered. Following expiration of the
federal ban in 2004, the share of Virginia crime guns with an LCM rose again to 20% of
recovered crime guns by 2010. *See Koper 2013,* p. 165.[24]

58. Although it is difficult to extrapolate the Virginia data to the nation as a whole, these data
do suggest that the federal ban may have been reducing the use of LCMs in gun crime by
the time it expired in 2004, and that it could have had an even stronger impact had it
remained in effect.

### *Results of the Federal Assault Weapons Ban*

59. The federal ban's exemption of millions of pre-ban assault weapons and LCMs meant
that the effects of the law would occur only gradually, and that those effects were
growing when the ban expired in 2004. Nevertheless, while the ban did not appear to
have a measurable effect on overall gun crime in terms of crimes committed (due to
criminals' ability to substitute other guns in their crimes), the evidence does suggest a
significant impact on the number of gun crimes involving assault weapons. Had it
remained in effect over the long-term, moreover, it could have had a potentially
significant impact on the number of crimes involving LCMs.

---

[24]    The results of the *Washington Post's* original investigation (which are conveyed in *Koper
2013,* p. 165) are reported in David S. Fallis & James V. Grimaldi, *Va. Data Show Drop in
Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan. 23, 2011, *available at*
http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012203452.html.
Earlier this year, the *Post* updated this analysis and slightly revised the figures it reported by
identifying and excluding from its counts more than one thousand .22-caliber rifles with large-
capacity tubular magazines, which were not subject to the federal ban (and which are similarly
not subject to Connecticut's ban). *See* David S. Fallis, *Data Indicate Drop in High-Capacity
Magazines During Federal Gun Ban,* Wash. Post, Jan. 10, 2013, *available at*
http://www.washingtonpost.com/investigations/data-point-to-drop-in-highcapacity-magazines-
during-federal-gun-ban/2013/01/l0/d56d3bb6-4b91-11e2-a6a6-aabac85e8036_story.html.    This
updated data, is reported above.

Case 3:17-cv-01017-BEN-JLB   Document 18-90   Filed 06/05/17   PageID.3075   Page 457 of
472
Case 3:13-cv-00739-AVC   Document 90   Filed 05/17/13   Page 105 of 386

60. These implications are important.  By reducing the number of crimes in which assault weapons and LCMs are used and forcing criminals to use less lethal weapons and magazines, the federal ban could have potentially prevented hundreds of gunshot victimizations annually.  It also could have reduced the lethality and injuriousness of those gunshot victimizations that do occur by reducing the number of wounds per victim. *See Koper 2004,* p. 87.

61. Using the Jersey City data as a tentative guide, it is possible that the federal ban eventually could have reduced gunshot victimizations by up to 5% if it had remained in effect long enough to meaningfully reduce the number of LCMs in circulation.  *See Koper 2013,* p. 167.  Although that may be a small percentage, based on 2010 statistics from the Center for Disease Control and Prevention it would correlate to 3,241 fewer people being wounded or killed as a result of gun crime on an annual basis. *See id.*  Even if the federal ban's effect would not have been that substantial, however, a smaller reduction in the number and lethality of gunshot victimizations could still have yielded significant societal benefits.

62. In addition to the inherent benefits of such reductions, the federal ban also potentially could have produced millions of dollars of cost savings per year in medical care alone.  Some studies have shown, for example, that the lifetime medical costs for gunshot injuries are about $28,894 (adjusted for inflation).  Even if the federal ban would have been able to reduce gunshot victimizations by only 1%, that would result in roughly $18,781,100 in lifetime medical cost savings from the shootings prevented each year.[25] *See Koper 2013,* pp. 166-67; *see also Koper 2004,* p. 100 n.118.

63. The cost savings potentially could have been substantially higher if one looks beyond just medical costs.  For example, some estimates suggest that the full societal costs of gun violence—including medical, criminal justice, and other government and private costs (both tangible and intangible)—could be as high as $1 million per shooting.  Based on those estimates, even a 1% decrease in shootings could result in roughly $650 million in cost savings to society from shootings prevented each year.  *See Koper 2013,* pp. 166-67.

III.  **The Act Concerning Gun Violence Prevention And Children's Safety**

64. As noted above, the State of Connecticut recently enacted the Act Concerning Gun Violence Prevention And Children's Safety ("the Act").  Among other things, the Act strengthened Connecticut's existing ban on assault weapons, which was similar to the standards set forth in the 1994 federal assault weapons ban.  It also imposed a new ban on LCMs.  I examine these prohibitions and restrictions on assault weapons and large-capacity magazines, and opine as to their potential impact and likely efficacy, below.[26]

---

[25]     These savings calculations are based on a report by the federal Centers for Disease Control and Prevention which indicated that there were 64,816 gun homicides and other non-fatal assault-related shootings in the United States in 2010.  *See Koper 2013,* pp. 166-67.

[26]     The Act is a comprehensive law that contains many other provisions, including new regulations on long guns, ammunition, firearm storage, mental health, and school safety.  It also

## A. Connecticut's Assault Weapons Ban

65. In the Act, Connecticut strengthened its existing assault weapons ban by updating the list of enumerated weapons and the military features test to make it more stringent, and more consistent with modern assault weapon features. Like the 1994 federal ban, Connecticut's previous ban consisted of both a list of specifically prohibited firearms, and a "features test" that generally prohibited semiautomatic weapons having two or more military-style features and, for rifles, that also had a detachable magazine.

66. The Act broadens the assault weapon ban by including a number of additional specifically identified semiautomatic centerfire rifles, semiautomatic pistols, and semiautomatic shotguns. It also prohibits any semiautomatic centerfire rifle or semiautomatic pistol that has a fixed magazine with the ability to accept more than ten rounds of ammunition, and any semiautomatic shotgun that has the ability to accept a detachable magazine or a revolving cylinder. P.A. 13-3, § 25(1)(B)-(D); *id.*, § 25(1)(E)(ii), (v), (vii), (viii).

67. It also provides that any semiautomatic centerfire rifle or semiautomatic pistol that has an ability to accept a detachable magazine need only have one of the listed enumerated military-style features to qualify as an assault weapon (instead of the two feature requirement that existed previously). It also amended the number and type of those prohibited features. *Id.*, § 25(1)(E)(i), (iv).

68. The Act does not ban any weapons that were lawfully possessed prior to its effective date. Thus, those who lawfully possessed assault weapons at that time may continue to do so as long as they obtain a certificate of possession for it and possess it in compliance with all applicable state laws and regulations. *Id.*, § 28(a), (f)

## B. Connecticut's LCM Ban

69. The Act also imposed a ban on LCMs which, as noted, largely mirrors the 1994 federal ban. P.A. 13-3, § 23. As with assault weapons, the Act does not ban any LCMs that were lawfully possessed prior to its effective date. Those who lawfully possessed an LCM at that time may continue to do so as long as they declare it to the Department of Emergency Services and Public Protection, and possess it in compliance with all applicable state laws and regulations. *Id.*, § 23(e)(3), § 24(a), (f).

70. One important difference between the Connecticut and federal LCM ban is that, unlike the federal ban, the Act prohibits any individual who possesses a grandfathered LCM from selling or transferring it to another individual. Importantly, moreover, LCMs

---

establishes a deadly weapon offender registry, and increases the penalties for certain gun-related offenses. I limit my analysis here to Connecticut's bans on assault weapons and large-capacity magazines.

generally may not be imported into the state after the Act's effective date, including those produced before the effective date of the Act. *Id.*, § 23(b), (d), (f).

## C. The Potential Impact and Efficacy of Connecticut's Bans

71. The Act was only recently passed and not all of its provisions have gone into effect, and I have not undertaken any study or analysis of its effects. Nevertheless, it is my considered opinion that, based on the similarities of the Act to the federal ban, the impacts of the federal ban and the ways in which the Act address some of the weaknesses of the federal ban, the Act is likely to advance Connecticut's interest in protecting public safety.

72. First, the Act strengthens the assault weapons ban by moving it to a "one-feature" test rather than the "two-feature" test that existed under the federal ban and Connecticut's original ban. This change is likely to substantially limit—if not eliminate—the ability of gun manufacturers to quickly adopt minor cosmetic changes to their firearms that make them technically legal but that circumvent the purpose and effect of the law to remove military style assault weapons from civilian use. In doing so, the Act is likely to meaningfully limit the number of weapons with military-style characteristics considered conducive to criminal applications in Connecticut, and to further reduce the use of such weapons in crime.

73. Second, Connecticut's LCM ban is more robust than the expired federal ban, and may be more effective more quickly. Unlike the grandfather provision in the federal ban, the grandfathered LCMs in Connecticut may not be sold or transferred after the effective date of the Act. Unlike the experience under the federal ban, moreover, banned LCMs in Connecticut may not be imported into the state after the Act's effective date. Although these changes will not eliminate the lag in effectiveness created by the grandfather provision, they likely will minimize it and thereby reduce the time it otherwise would take for the benefits of the LCM ban to take hold.

74. Even with the grandfather provision, it is my opinion that Connecticut's LCM ban is likely to have a meaningful impact on gun crime if allowed to operate over the long-run. As discussed, the analogous grandfather provision in the federal ban and the immense stock of pre-ban LCMs that existed in this country delayed any impact that the federal LCM ban could have had on the use of such weapons in crime. The *Washington Post* study found, however, that the number of recovered crime guns with LCMs in Virginia nevertheless was beginning to substantially decline just as the ban expired. This suggests that, had the federal ban been renewed by Congress in 2004 and not allowed to expire, it could have had a meaningful impact on the use of such weapons in crime. That impact likely would have increased the longer the ban remained in effect. Thus, although Connecticut's LCM ban contains an analogous grandfather provision, it is reasonable to assume that it likewise would have a meaningful impact on the use of LCMs in crime if allowed to operate over the long-term.

75. If that is the case, it is likely that the Act could have a meaningful impact on public safety. As discussed above, *see* ¶¶8, 32-38, *supra*, the available evidence suggests that

16

attacks with semiautomatics, particularly assault weapons and other semiautomatics equipped with LCMs, result in more shots being fired, leading to both more injuries and injuries of greater severity. If the Act is allowed to operate over the long-term, it should reduce the number of LCMs in circulation and thereby reduce the number and lethality of gunshot victimizations. The potential benefits to victims and their families is obvious, and may well reduce the associated medical costs and overall costs to society. *See Koper 2004,* pp. 83-91, 100 n.118.

76. While the Act's provisions prohibiting and restricting assault weapons and large-capacity magazines certainly will not be a panacea for the gun violence epidemic in Connecticut or the United States more broadly, they appear to be reasonable and well-constructed measures that, like federal restrictions on fully automatic weapons and armor-piercing ammunition, will help prevent the spread of particularly dangerous weaponry.

77. In sum, therefore, it is my considered opinion, based on my nineteen years as a criminologist studying firearms generally and my detailed study of the federal assault weapon ban in particular, that Connecticut's bans on assault weapons and large-capacity magazines, and particularly its ban on LCMs, have the potential to prevent and limit shootings in the state over the long-run. In doing so, the Act is likely to advance Connecticut's interest in reducing the harms caused by gun violence.

## IV.  Plaintiffs' and *Amici's* Reliance On My Reports

78. I have read the Plaintiffs' brief in support of their motion for preliminary injunction (Document No. 15), their brief submitted in support of their motion for summary judgment (Document No. 62), and their Local Rule 56(a)(1) statement (Document No, 61). I also have read the briefs submitted by the *amici* in support of the Plaintiffs' motion (Document Nos. 33, 34, and 36). I hereby respond to those parties' reliance on, and characterizations of, the findings and conclusions in my reports.

79. As a general matter, the Plaintiffs and *amici* frequently cherry pick isolated statements from my studies and take them out of context. While the majority of their references to my works accurately quote from my reports, in most instances they do not reflect the totality of my discussion or the conclusions that I actually reached. The Plaintiffs and *amici* also rely heavily on my 1997 report which, as discussed above, was for the most part superseded by the more complete and up to date evidence contained in my 2004 and 2013 reports. I respond to some specific representations made by the Plaintiffs and *amici* below.

80. First, in the *amicus* brief filed by Pink Pistols, that group states that my reports support the conclusion that "this kind of legislation has no discernible impact on firearms violence." (Doc. 36 at 27). Specifically, they quote a variety of statements in my 1997 and 2004 reports to the effect that there is little evidence that such bans will have an impact on the lethality and injuriousness of gun violence based on indicators such as the number of victims per gun homicide incident, the number of gunshot wounds per victim,

Case 3:17-cv-01017-BEN-JLB Document 18-90 Filed 06/05/17 PageID.3080 Page 461 of
472
Case 3:13-cv-00739-AVC Document 80-1 Filed 06/05/15 Page 109 of 386

or the proportion of gunshot victims with multiple wounds. (*Id.* at 27-28 and n.71). In doing so, Pink Pistols does not fully convey the conclusions in my reports.

81. My research revealed that gun crimes involving assault weapons and other guns with LCMs do result in more shots fired, more victims shot, more gunshots per victim, and more lethal injuries. Although it is true that my research team and I cannot clearly credit the federal ban with decreasing gunshot victimizations during the time it was in effect, as explained in my report, that is due in large part to the delay in the ban's effectiveness caused by its grandfather provision and the large stock of pre-ban LCMs that remained in circulation.[27] In other words, had the federal ban remained in effect long enough to reduce the stock of those pre-ban LCMs—which the *Washington Post* study suggests it may have begun to do just as it expired in 2004—it is more likely that we would have seen a corresponding drop in the gun violence lethality indicators discussed above.[28]

82. Pink Pistols also quotes my 2004 report for the proposition that, "[s]hould it be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement", that "the evidence is not strong enough for us to conclude that there was any meaningful effect [on gun violence] (i.e., that the effect was different from zero)", and that "there is not a clear rationale for expecting the ban to reduce assaults and

---

[27] Pink Pistols cites my 1997 report for the proposition that "in fact, both 'victims per incident' and 'the average number of gunshot wounds per victim' *actually increased* under the Ban—although not by a statistically significant margin." (Document 36 at 28 n.71, citing *Koper 1997* at 85-86, 88, 91). Notably, the increase to which I referred in my 1997 report occurred during a period in which we also saw an increase in the use of LCMs in gun crime due to the federal ban's grandfathering provision and the large numbers of LCMs being imported into the country. *See* ¶¶55-58, *supra*. If anything, therefore, that finding corroborates the link between LCMs and increased lethality of gunshot victimizations.

[28] Pink Pistols contends that I concluded in my 2013 report that the *Washington Post* study nevertheless "showed no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years." (Doc. 36 at 29 n.75, quoting *Koper 2013,* p. 165). That is incorrect. My research team and I did not examine the *Washington Post* data to determine whether the drop in LCM use in Virginia during the last years of the federal ban correlated to a drop in the lethality or injuriousness of gun crime in that jurisdiction. Rather, our examination of the lethality of gun crime in the 2004 report was based on national data and data from a selected number of localities outside of Virginia. Further, the analyses in the 2004 report were limited to the first several years of the federal ban (they covered different portions of the 1995-2002 period, and most extended only through the late 1990s or through 2001), during which time we had not yet observed a reduction in the use of LCMs in crime. The *Washington Post* data suggests that LCM use may have declined more appreciably by 2004, but this was beyond the period I had studied for the 2004 report to the U.S. Department of Justice. Consequently, my conclusion that there was "no discernible reduction in the lethality or injuriousness of gun violence" during earlier portions of the ban when we had not seen a drop in LCM use in gun crime has no bearing on whether there would be such a reduction once the number of LCMs used in crime began to drop.

robberies with guns." (Doc. 36 at 27-29). While those are accurate quotes, they do not fully reflect the conclusions in my report on the efficacy of this kind of legislation.

83. Because criminals and mass shooters will be able to substitute legal firearms for the banned assault weapons and LCMs, it is true that this kind of legislation is unlikely to substantially reduce overall gun violence in terms of the number or rate of crimes committed. One should not conclude from that, however, that such bans will have no effect on public safety. As discussed above, if allowed to operate over the long-run, such bans can potentially reduce the number and lethality of gunshot victimizations by forcing criminals to substitute assault weapons and other weapons with LCMs with less destructive firearms. The effects on gun deaths and injuries overall would likely be small in percentage terms (and thus they could be difficult to measure reliably), but, as discussed above, even small reductions in gunshot victimizations could produce significant societal benefits.

84. Pink Pistols similarly cites my 2004 report for the proposition that "[s]tudies of state-law bans on AWs and LCMs likewise found that such bans 'have not reduced crime.'" (Document 36 at 28 and n.73, quoting *Koper 2004,* p. 81 n.95). That, again, does not accurately reflect my conclusions in the 2004 report. In discussing the effect of state assault weapons bans, I noted that there are a few studies that have suggested that such bans have not reduced crime. I specifically noted, however, that it is hard to draw definitive conclusions from these studies for the following reasons: (1) there is little evidence on how state assault weapon bans affect the availability and use of assault weapons; (2) studies have not always examined the effects of these laws on gun homicides and shootings, the crimes that are arguably most likely to be affected by assault weapon bans; and (3) the state assault weapon bans that were passed prior to the federal ban (those in California, New Jersey, Hawaii, Connecticut, and Maryland) were in effect for only three months to five years (two years or less in most cases) before the imposition of the federal ban, after which they became largely redundant with the federal legislation and their effects more difficult to predict and estimate. Perhaps more importantly, most of these state laws either lacked LCM bans or had LCM bans that were less restrictive than that of the federal ban or Connecticut's ban. Pink Pistols ignores these important qualifications that undermine the usefulness of the cited studies.

85. Second, both the National Rifle Association ("NRA") and the Law Enforcement Legal Defense Fund ("LELDF") argue that banning large capacity magazines will not advance public safety. In support of that conclusion they cite the findings in my reports that assailants fire an average of less than four shots in gun crimes, and rarely fire more than ten shots. (Doc. 33 at 19; Doc. 34 at 9-10). While those references to my studies are correct, they also do not fully reflect my conclusions.

86. Based on my study with Darin Reedy of handgun attacks in Jersey City, NJ, I found that assailants fired more than ten shots in 2.5% to 3% of gunfire incidents. As discussed above, however, my report specifically explains that those incidents had a 100% injury rate, and were responsible for 4.7% of the gunshot victimizations in our sample. The *amici* ignore this crucial piece of data, which was the whole point of that aspect of my

Case 3:17-cv-01017-BEN-JLB   Document 18-90   Filed 06/05/17   PageID.3982   Page 463 of
472
Case 3:19-cv-00739-JVC   Document 80-1   Filed 06/11/15   Page 252 of 380

discussion in the report.  It shows that, while rare, incidents in which more than ten shots are fired are especially lethal and injurious.  They produce a disproportionate share of gunshot victimizations and are more likely to result in gunshot injuries or deaths.  *See Koper 2004,* pp. 3, 90-91.

87. In addition to taking that data out of context, the *amici* completely ignore one of my central conclusions: gun crimes involving assault weapons and other weapons with LCMs tend to result in more victims wounded, more wounds per victim, and more lethal injuries than do gun crimes committed with other weapons.  They likewise ignore the evidence that both assault weapons and other guns with LCMs are used disproportionately in mass killings and murders of law enforcement officers.

88. Third, the *amici* argue that assault weapons bans are not likely to reduce overall gun violence based on the finding in my reports that such weapons are only used in between 2% and 8% of gun crimes.  (Doc. 33 at 14; Doc. 34 at 9; Doc. 36 at 27 and n. 69, 70).  While these selective references to my studies technically are correct, they are again misleading.  It ignores the fact that assault weapons were used more frequently and disproportionately in mass murders and killings of law enforcement officers.  It also ignores the fact that gun crimes involving semiautomatics—including assault weapons and other firearms with LCMs—generally result in more shots fired, more victims, and more wounds per victim.  Thus, although reducing the number of such weapons may not reduce the overall number of gun crimes due to the weapon substitution effect, it could reduce the number and lethality of gunshot victimizations in crimes in which such weapons otherwise would have been used.  Any such reduction in gun crime or gun crime lethality—even if difficult to measure precisely relative to the overall level of gun violence in the nation—would have a meaningful impact for the victims of such crimes, and for society more broadly.

The foregoing is true and accurate to the best of my knowledge and belief.


FURTHER AFFIANT SAYETH NOT.


*Christopher S. Koper*

Christopher S. Koper


STATE OF VIRGINIA        )

                            )ss: *Brambleton*, Virginia

COUNTY OF *Loudoun*     )


Subscribed and sworn to before me, this *30* day of September, 2013.


*Sarah Conrad*

Notary Public
Commissioner of the Superior Court


SARAH YORK CONRAD
NOTARY PUBLIC
Commonwealth of Virginia
Reg. #7365612
My Commission Expires Nov. 30, 2014

Case 3:17-cv-01017-BEN-JLB Document 18-90 Filed 06/05/17 PageID.3994 Page 465 of
472
Case 3:13-cv-00739-AVC Document 90-1 Filed 06/17/13 Page 214 of 386

## <u>CERTIFICATION</u>

     I hereby certify that on this 11th day of October, 2013, a copy of the foregoing Affidavit of Christopher S. Koper was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

_/s/ Maura Murphy Osborne_____

Assistant Attorney General

# Exhibit 108

# CITY ATTORNEY OF SAN FRANCISCO

DENNIS J. HERRERA, CITY ATTORNEY

HOME     ABOUT ⌄     NEWS     CASES ⌄     FILE A CLAIM     OPINIONS

GOOD GOVERNMENT ⌄                                              ⌕

## Connect







# Herrera secures court order to make California communities safer; gun suppliers must halt sale of high-capacity ammo 'repair kits' into state

May 16, 2017

*Settlement agreement includes a 10-year injunction with additional restrictions*

## Subscribe

Sign-up here to get news releases by email.

Email (required)

First name (opt



## News Topics

Select Category ▼



"Californians have spoken clearly. We don't want these weapons in our communities," said City Attorney Dennis Herrera on securing a court order prohibiting five online gun equipment suppliers from selling high-capacity ammo 'repair kits' into state.

SAN FRANCISCO (May 16, 2017) — City Attorney Dennis Herrera today announced that five online gun equipment suppliers have agreed to a stringent 10-year, court-imposed injunction prohibiting them from selling or advertising large-capacity firearm magazines or magazine repair kits to customers in California. The agreement is part of a settlement where the defendants will also face a number of other court-ordered restrictions on their business practices to help ensure that their products do not enter the state.

Herrera sued the suppliers on Feb. 9, 2017 for violating California's prohibition on the sale and advertisement of large-capacity magazines — military-style ammunition holders that can allow shooters to fire dozens of bullets without reloading. Some magazines hold more than 100 rounds of ammunition. According to the lawsuit, the suppliers had been flouting both state and San Francisco law by selling complete but disassembled large-capacity magazines as "repair" or "rebuild" kits to customers in California and San Francisco. The lawsuit was brought on

**Office of the City Attorney**
City Hall, Room 234
1 Dr. Carlton B. Goodlett Pl.
San Francisco, CA 94102

Hours: M–F, 8 a.m.–5 p.m.

(415) 554-4700 Phone
(415) 554-6770 TTY
info@sfcityattorney.org

Last name (opt

Organization (o

Submit

behalf of the People of the State of California.

Large-capacity magazines make guns significantly more lethal and have been used in high-profile mass shootings across the country, including the 2016 Orlando nightclub massacre, which killed 49 people, and the 2015 San Bernardino attack, which killed 14. California has prohibited their sale, manufacture or import since Jan. 1, 2000 to limit the danger they pose to public safety. State law defines large-capacity magazines as those holding more than 10 rounds of ammunition.

"Californians have spoken clearly. We don't want these weapons in our communities," Herrera said. "I have zero tolerance for gun sellers who try to skirt the law, and we will bring statewide enforcement action when needed. I'm glad we were able to get a tough, enforceable court order against these companies that were flouting the law. "

The settlement agreements were finalized earlier this month, and the court is expected to endorse them in a final judgment today. The defendants have agreed to submit to a stringent, statewide, 10-year injunction that requires them to stop violating the law and to notify California residents that large-capacity magazines may not legally be sold into California. Among other things, defendants have agreed to:

- cease selling large-capacity magazines or repair kits into California;

- notify customers on their websites that these products may not be purchased in California;

- remove California as a billing or shipping option for these items on their websites;

- permanently delete from their sites any suggestion that

these magazines or kits may legally be shipped to California; and

- produce affidavits to the San Francisco City Attorney's Office annually certifying that they have complied with the injunction, and with San Francisco and California law.

The defendants will also collectively pay $22,500 to cover the City Attorney's investigative costs.

"I would like to thank the San Francisco Police Department for their support and cooperation on this case, particularly Officer Joseph Emanuel, who provided compelling expert testimony regarding large-capacity firearms," Herrera said.

The settlement was reached with all of the online retailers that Herrera had sued in February: Badger Mountain Supply, located in Washington; 7.62 Precision in Alaska; Shooters Plus, located in Mississippi; LAK Supply of Wyoming; and Buymilsurp.com, located in Florida.

The companies had falsely represented that California and San Francisco consumers may lawfully purchase disassembled large-capacity magazines as "repair kits." 7.62 Precision, for example, marketed a disassembled magazine as a "California Magazine Rebuild Kit," saying "these parts kits are intended for California customers only." Badger Mountain Supply falsely represented to customers on its website that shipping disassembled magazines in two separate packages was permissible under California law. Shooters Plus' website referenced "ban States such as California" and instructed consumers to "simply click on the magazine/s you need, then click on the checkbox under each magazine that reads 'Convert to Rebuild Kit,'" which

enabled a customer to purchase a 30-round magazine and convert it to a rebuild kit for $2, for example.

After California's 2000 statewide ban, a number of companies tried to skirt the law by selling these so-called magazine repair kits to California residents. In 2013, Herrera sued four companies over the practice, and the state Legislature strengthened the existing law to specifically outlaw the sale or purchase of such "kits." San Francisco took further action in 2014, enacting a ban on possessing large-capacity magazines, not just buying or selling them. Similarly, state voters in November overwhelmingly approved Prop. 63, which, among other safety steps, will outlaw the possession of large-capacity magazines statewide starting July 1, 2017, with very narrow exceptions.

The case is: *The People of the State of California v. Badger Mountain Supply, Inc., et al*, San Francisco Superior Court, Case No. CGC 17-557010, filed Feb. 9, 2017.  Complete documentation on the case is available on the City Attorney's website at www.sfcityattorney.org

# # #

RELATED

| Start | | Date modified | Size |
|---|---|---|---|
| Name | | | |
| 7.62 Precisi... | | May 16, 2017 17:42 | 216.8 KB |
| Badger Stip... | | May 16, 2017 17:43 | 200.4 KB |
| Buymilsurp ... | | May 16, 2017 17:43 | 225.4 KB |
| Complaint... | | May 16, 2017 19:30 | 13.1 MB |

LAK Stipula... May 16, 2017 17:52         210.3 KB

Shooters Sti... May 16, 2017 17:52         234.1 KB



📁 GUN SAFETY, NEWS

‹ Herrera takes Uber to court to comply with Treasurer's subpoena

› The Facts About Immigration Law

Copyright © 2017 City Attorney of San Francisco • Go to SFGov.org