C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,<br><br>　　　　　　　　Plaintiffs,<br><br>　　v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,<br><br>　　　　　　　　Defendants. | Case No:  17-cv-1017-BEN-JLB<br><br>**PLAINTIFFS' REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:　June 13, 2017<br>Time:　10:00 a.m.<br>Dept:　5A<br>Judge:　Hon. Roger T. Benitez |

## INTRODUCTION

The Attorney General does not dispute that, in less than one month, California will criminalize the possession of magazines that *come standard* with half of all firearms sold in this country, are owned by *tens of millions* of law-abiding citizens for self-defense, were *entirely unregulated* for almost all of American history, and remain *fully lawful* in 43 of 50 states. Under any plausible understanding, the magazines the state seeks to ban are "typically possessed by law-abiding citizens for lawful purposes," and are not remotely "unusual." *District of Columbia v. Heller*, 554 U.S. 570, 625, 627 (2008). The magazines (so-called "LCMs") are thus protected by the Second Amendment, and the state's imposition of an outright criminal ban on their physical possession—the most draconian form of regulation available—must be justified under heightened scrutiny.

The AG falls far short of that standard. His defense of the law boils down to the assertion that criminals may abuse LCMs and that "the most effective way to eliminate" that risk is to "prohibit their . . . possession." Opp'n 18. But that sweeping rationale would permit the state to ban the possession of all usable firearms—precisely what *Heller* foreclosed. And the small number of abuses of LCMs by criminals willing to violate the laws against mass murder do not come close to justifying an outright ban on LCM possession by the tens of millions of law-abiding citizens who have owned and used them responsibly for the "core lawful purpose of self-defense" throughout American history. *Heller*, 554 U.S. at 630. The AG may sincerely believe that a broad prophylactic ban on LCM possession reflects "common sense," Opp'n 18, but the Second Amendment does not "allow state and local governments to enact any gun control law that they deem to be reasonable," *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010).

The AG's defense of the law's uncompensated physical dispossession of LCM owners as an exercise of its "police power" is no more persuasive. Binding Supreme Court precedent squarely forecloses the state's theory that exercises of the police power cannot constitute physical takings. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 425 (1982). And even if the law were not a taking, its retroactive

criminalization of LCM possession by Plaintiffs who have owned LCMs responsibly for decades would violate the Due Process Clause.

In short, the impending ban on the possession of LCMs is an extreme, novel, outlying law that violates multiple constitutional provisions. And in less than a month, Plaintiffs will suffer the clearest of irreparable injuries—criminal liability or mandated surrender of their constitutionally protected property for destruction. A preliminary injunction is warranted while the Court considers the constitutionality of the ban.

## ARGUMENT

**I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT SECTION 32310(C) VIOLATES THE SECOND AMENDMENT**

### A. The Second Amendment Protects Magazines Over 10 Rounds

The Second Amendment protects arms "typically possessed for lawful purposes." *Heller*, 554 U.S. at 625. The AG does not question this settled point of law, nor does he dispute that many popular handguns come standard with LCMs or that tens of millions of Americans possess LCMs—the vast majority of whom have never used them for anything other than lawful purposes. Unsurprisingly, virtually every court to address this issue—including the Ninth Circuit in *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015)—has assumed that the Second Amendment protects LCMs. *See* Mot. 7.[1]

The AG nevertheless devotes more than half his Second Amendment argument to contending that LCMs are unprotected. The thrust of his argument is that LCMs are among the "dangerous and usual" weapons that *Heller* held are outside the Second Amendment's scope. Opp'n 10 (quoting *Heller*, 554 U.S. at 627). But the AG cannot plausibly contend that magazines predating the adoption of the Second Amendment and owned by tens of millions of Americans today are "unusual." *Cf. Fyock*, 779 F.3d at 998.[2]

---

[1] The AG's assertion that "Plaintiffs' Second Amendment claim . . . has been rejected by the Ninth Circuit" in *Fyock*, Opp'n 7, is demonstrably wrong. *Fyock* itself expressly cautioned that its decision affirming the denial of a preliminary injunction under abuse of discretion review "may provide little guidance as to the appropriate disposition on the merits." 779 F.3d at 995; *see* Mot. 9-10.

[2] The AG quibbles with Plaintiffs' evidence showing that 115 million LCMs were in circulation between 1990 and 2015 by pointing to surveys estimating that 20% of gun

So he redefines *Heller*'s reference to unprotected "dangerous and usual" weapons as "unusually dangerous" weapons. Opp'n 10. Such a transparent misconstruction of Supreme Court precedent largely defeats itself. But in all events, the AG's position is irreconcilable with *Heller*'s explanation that the exclusion of "dangerous and unusual" weapons from Second Amendment protection stems from "historical tradition." 554 U.S. at 627; *see Jackson v. City and Cty. of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (first step of *Heller* analysis based on "historical understanding"). The most the AG can say about the historical pedigree of LCM restrictions is that they arose in 1989, Opp'n 2, which is plainly insufficient to qualify as historically unprotected, *cf. United States v. Chovan*, 735 F.3d 1127, 1137 (9th Cir. 2013) ("not clear that . . . prohibitions" arising in the 1930s had sufficient historical pedigree).

The AG makes the related argument that LCMs are so dangerous that they cannot be "typically used for lawful purposes." Opp'n 13; *see Heller*, 554 U.S. at 625. In the AG's view, "there is no evidence that civilians need or use LCMs to defend themselves"; there is only "data indicating that LCMs are used by criminals." Opp'n 15. The striking implication is that the tens of millions of Americans who own LCMs are criminals-in-waiting. That position is both facially indefensible and contradicted by extensive evidence that LCMs are in fact "typically possessed" for self-defense. *See* Mot. 2-4.

The fact that a limited number of individuals actually have occasion to fire more than 10 times in self-defense, Opp'n 13-15, does not change the "purposes" for which LCMs are possessed, *Heller*, 554 U.S. at 625, any more than the fact that a limited number of individuals actually have occasion to use fire or flood insurance changes the purposes for which such policies are possessed. *Heller* expressly recognizes that the Second Amendment protects "the individual right to possess . . . weapons *in case of confrontation*"—the purpose for which Plaintiffs and tens of millions of others have

---

owners possess approximately 60% of the nations' guns. Opp'n 13 n.11; Donohue Decl., ¶¶ 11, 13. But even if these surveys are reliable, and even if the pattern of gun ownership applies equally to magazine ownership, *but see id.*, ¶¶ 19-20, that would mean more than 60 million Americans own LCMs.

possessed LCMs for generations. 554 U.S. at 592 (emphasis added).

### B. Section 32310(c) Is Unconstitutional Because It Lacks the Required "Fit" with the State's Interests Under *Any* Standard of Review

Because LCMs are protected by the Second Amendment, the state's ban on their possession must satisfy heightened scrutiny. *See Fyock*, 779 F.3d at 998. Even if the most forgiving form of heightened scrutiny—intermediate scrutiny—is all that applies, Mot. 8 & n.4, the AG does not come close to meeting his burden of showing a "reasonable fit" between the government's interest in public safety and a complete, criminally enforceable ban on LCMs, *Chovan*, 735 F.3d at 1139.

The AG's primary rationale for the ban is that LCMs can be misused by criminals and that "the most effective way to eliminate th[at] threat" is to "prohibit their use" and ban their "possession." Opp'n 18; *see id.* ("banning possession of LCMs has the greatest potential to prevent shootings in the state over the long run") (internal quotation omitted). A flat ban on LCMs might well be "effective," *id.*, but it is not remotely drawn to reasonably "fit" the state's interest in public safety, *Chovan*, 735 F.3d at 1139. To the contrary, an across-the-board ban is the antithesis of "fit." *Id.* For that reason, sweeping bans on an entire category of constitutionally protected conduct or property are especially vulnerable to invalidation under heightened scrutiny. *E.g.*, *Heller*, 554 U.S. at 576 (invalidating "total ban" on handgun possession in the home); *see also Citizens United v. FEC*, 558 U.S. 310, 337 (2010) (invalidating "outright ban, backed by criminal sanctions" on political expenditures). Indeed, the Ninth Circuit has explained that the fact that a law "does not constitute a complete ban, either on its face or in practice," is a reason that the law may survive intermediate scrutiny. *Jackson*, 746 F.3d at 964.

The law at issue here is particularly problematic because it not only bans constitutionally protected property, but does so precisely to limit the amount of constitutionally protected property available. In the AG's words, a "reduction in the number of LCMs in circulation will reduce the number of crimes in which LCMs are used." Opp'n 18. But just as "a city may not regulate the secondary effects of speech by

suppressing the speech itself," a state may not regulate the secondary effects of constitutionally protected magazine ownership simply by reducing the number of constitutionally protected magazines. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring). Indeed, the D.C. Circuit has invalidated under intermediate scrutiny a firearms restriction aimed at limiting the number of handguns in circulation precisely "because, taken to its logical conclusion, that reasoning would justify a total ban on firearms kept in the home." *Heller v. District of Columbia*, 801 F.3d 264, 280 (D.C. Cir. 2015). So too here.

Moreover, even if reducing the number of constitutionally protected magazines in circulation were a valid basis for regulation, the LCM ban fails intermediate scrutiny for the additional reason that the AG has not demonstrated that the ban is likely to advance the state's interest in public safety "to a material degree." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996). "[M]ere speculation or conjecture," will not suffice. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). Instead, the government "must demonstrate that . . . its restriction will in fact alleviate" the recited harms. *Id.*

Here, however, the AG provides only speculation that magazine bans promote public safety. Opp'n 18-19. His claim is rooted in flawed statistical arguments and supposition, "evidence" that would be unacceptable in other rights contexts. *See Alameda Books*, 535 U.S. at 438; *see generally* Kleck Suppl. Decl. The notion that banning LCMs may reduce crime by limiting the supply of LCMs to criminals is not supported by the research on capacity-based magazine bans. Mot. 11-12. Indeed, the same Dr. Koper the AG relies on has admitted under oath that he "cannot conclude to a reasonable degree of probability that the federal ban on . . . large capacity magazines reduced crimes related to guns. Barvir Suppl. Decl., Ex. NNN at 8,15. He also confirmed that the ban "didn't reduce the number of deaths or injuries caused by guns either . . .." *Id.* at 15. And contrary to the AG's claims, Opp'n 18, Koper has stated that the federal ban did not cause a decline in the criminal use of magazines over 10 rounds, Barvir Decl., Ex. PP at 454. Koper also declared that he is aware of no expert who has studied the impact of the

federal ban and arrived at different conclusions. Barvir Suppl. Decl., Ex. NNN at 14. Despite all these admissions, Dr. Koper (and those, like Professor Webster, who derive their opinions from his work) have opined that an LCM ban has the "potential" to reduce the lethality of gun crime based largely on Koper's study of the federal ban. Gordon Decl., Ex. 14 ¶¶ 17-50, 66, 74-75 (Koper declaration in *Fyock v. Sunnyvale*); Webster Decl., ¶¶ 17-21. But Koper's study found *no evidence* of a reduction in lethality or frequency of criminal firearm use. The opinion is based not on data, but conjecture. Such unsupported conclusions are not "reasonable inferences based on substantial evidence." Opp'n 17 (internal quotation omitted); Kleck Suppl. Decl. 50-53, 56.

Next, the AG dismisses the magazine ban's negative impact on public safety, claiming that law-abiding individuals rarely, if ever, fire more than 10 shots in self-defense. Opp'n 13-15. Plaintiffs provide the declarations of a criminologist, a renowned self-defense expert, and a firearms expert, explaining why LCMs are effective and, in some cases, crucial for self-defense. Ayoob Decl. ¶¶ 5-17; Helsley Decl. ¶¶ 11-15; Kleck Decl. ¶¶ 18-20, 25. These experts conclude that lacking these magazines in such situations makes a victim less safe. Ayoob Decl. ¶¶ 5, 21-22, 24, 28-30, 31-34; Kleck Decl. ¶¶ 25-32. The AG provides no expert in any relevant field to rebut Plaintiffs' evidence. Instead, he shrugs off Plaintiffs' concerns, citing economist Lucy Allen for the claim that self-defense situations rarely involve over 10 shots, making LCMs unnecessary. Opp'n 14. Allen's conclusion, however, was based on flawed analyses of limited databases of self-reported accounts of defensive gun uses. Opp'n 14, n.10; Pls' Objs. ¶¶ 5-6. Any conclusions drawn from these stories are suspect. Kleck Suppl. Decl. ¶¶ 9-18.

Ultimately, the state has the burden of establishing that its law satisfies heightened scrutiny, *see Jackson*, 746 F.3d at 965-66, but its position here comes down to the unsupported assertion that the benefits of keeping LCMs away from criminals outweighs the cost of taking them away from law-abiding citizens who keep them for self-defense. But *Heller* made clear that the right to keep and bear arms is not subject to such an

"interest-balancing" approach, because the Second Amendment "is the *very product* of an interest balancing by the people." 554 U.S. at 635. Thus, the Second Amendment "necessarily takes certain policy choices of the table," *id.* at 636, and an outright ban on magazines possessed and responsibly used by tens of millions of Americans is one of them.  Plaintiffs are likely to succeed on their Second Amendment claim.

## II. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT SECTION 32310(C) IS AN UNCONSTITUTIONAL TAKING

By compelling the dispossession of private property without compensation, section 32310(c) also violates the Takings Clause. The AG does not dispute that the ban mandates "surrender" of lawfully acquired property, Opp'n 23, the hallmark of a physical taking, *see Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2429 (2015).  Nor does he suggest the law is not a taking because magazines owners have options as to how to dispossess themselves of their lawfully acquired property. *Cf.* Opp'n 23-24. Instead, the AG's response is that a ban on continued possession of magazines over 10 rounds is "not a physical taking" because it was imposed "pursuant to [the] police power." *Id.* at 22.

Even assuming the state possessed the police power to ban magazines over 10 rounds, *but see supra* Part I, the AG's position that a law enacted pursuant to that power "is not a physical taking" is foreclosed by Supreme Court precedent. In *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982)—a case the AG does not cite—the Supreme Court held that a law requiring physical occupation of private property was both "within the State's police power" *and* an unconstitutional physical taking, *id.* at 425. The Court expressly stated that whether a law effects a physical taking is "a separate question" from whether the state has the police power to enact it. *Id.*; *see also Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 197 (1985) (distinguishing between physical taking and exercise of police power).

Moreover, in *Lucas v. South Carolina Coastal Council*, the Court held that a law enacted pursuant to the state's "police powers to enjoin a property owner from activities akin to public nuisances" was not immune from scrutiny even under the more permissive

7
REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

*regulatory* takings doctrine. 505 U.S. 1003, 1020-27 (1992). The Court reasoned that it was true "*[a] fortiori*" that the "legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated." *Id.* at 1026. The same is true for the "categorical" rule that physical takings must be compensated. *Id.* at 1015; *Horne*, 135 S. Ct. at 2425.

The premise of the state's argument—that the "di[s]positive" question in determining whether a law constitutes a physical taking is "under what power and for what purpose the government is acting," Opp'n 22—is thus fundamentally incorrect. Indeed, the AG's own authority says as much: "If, in the execution of *any power, no matter what it is*, the government . . . finds it necessary to take private property for public use, it must obey the constitutional injunction to make or secure just compensation to the owner." *Chicago, B. & Q. Ry. Co. v. Illinois*, 200 U.S. 561, 593 (1906) (emphasis added); *see also Loretto*, 458 U.S. at 426 (state law was physical taking "without regard to the public interests that it may serve").[3]

The other cases cited by the state in support of its police power defense, Opp'n 23-24, are inapposite for the critical reason that they involved *regulatory* takings, not *physical* takings. Indeed, the Supreme Court has expressly explained that *Mugler v. Kansas*, 123 U.S. 623 (1887), and its progeny involved restrictions only on the *use* of property. *Lucas*, 505 U.S. at 1022 & n.13.[4] Here, the state seeks to deprive Plaintiffs not just of the *use* of their property, but of *possession*, one of the most essential sticks in the

---

[3] The AG suggests the law is immune from Takings Clause scrutiny because it is not taking Plaintiffs' property for "public use." Opp'n 23. But the " 'public use' requirement is" not limited to actual *use* by the government; rather, it is "coterminous with the scope of a sovereign's police powers." *Hawaii Hous. Auth. v. Midkiff*, 467 U.S. 229, 240 (1984). Moreover, if a state attempts to take property for a purpose other than public use, the remedy is that it may not take the property *at all*—not that it may take the property without paying compensation, as the AG seems to claim. *Id.* at 241.

[4] Likewise, *Everard's Breweries v. Day*, 265 U.S. 545 (1924), Opp'n 23, "involved a federal statute that forbade the sale of liquors," not their possession. *Andrus v. Allard*, 444 U.S. 51, 67 (1979). Both *Akins v. United States*, 82 Fed. Cl. 619, 623 (2008), and *Fesjian v. Jefferson*, 399 A.2d 861, 863 (D.C. 1979), Opp'n 22-23, involved firearm registration requirements, not absolute possession bans. And the AG admits that *Gun South, Inc. v. Brady*, 877 F.2d 858, 869 (11th Cir. 1989), *id.* at 23, involved a restriction on importation.

bundle of property rights. As the Court recently explained, whatever "reasonable expectations" people may have "with regard to regulations," they "do not expect their property, real or personal, to be actually occupied or taken away." *Horne*, 135 S. Ct. at 2427. Thus, whatever the state's arguable authority to ban the sale or use of magazines over 10 rounds, the Takings Clause prevents it from compelling the physical *dispossession* of such lawfully acquired private property without compensation, which the state appears to concede the statute does not provide. Plaintiffs are accordingly likely to succeed on their takings claim.

### III. PLAINTIFFS ARE LIKELY TO SUCCEED ON THEIR CLAIM THAT SECTION 32310(d) VIOLATES THE DUE PROCESS CLAUSE

The ban on the continued possession of lawfully acquired property also violates the Due Process Clause. Indeed, to the extent the state argues that the Takings Clause does not apply because it is not taking LCMs for "public use," that confirms that the law deprives Plaintiffs of their property without due process. *See Williamson Cty.*, 473 U.S. at 197 (a "regulation that goes so far that it has the same effect as a taking" may instead be "an invalid exercise of the police power, violative of the Due Process Clause"); *E. Enters. v. Apfel*, 524 U.S. 498, 539 (1998) (Kennedy, J., concurring) (same).

Moreover, the AG does cannot justify the law's retroactive effect. Instead, he remarkably insists that the law "does not alter the legal consequences of acts completed before its effective date." Opp'n 24-25. That assertion blinks reality. The statute plainly changes the legal consequence of possessing magazines that were lawful when acquired, so the "retrospective aspects of [the] legislation . . . must meet the test of due process." *Usery v. Turner Elhorn Mining Co.*, 428 U.S. 1, 16-17 (1976). Yet the AG does not try to explain why banning the continued possession of property that Plaintiffs have possessed without incident for almost two decades is justified under the "careful consideration" that courts must give "to due process challenges to legislation with retroactive effects." *E. Enters.*, 524 U.S. at 547 (Kennedy, J.). Plaintiffs are likely to succeed on their due process claim.

## IV. THE REMAINING PRELIMINARY INJUNCTION FACTORS WARRANT RELIEF

As the AG acknowledges, "[a] preliminary injunction is appropriate when a plaintiff demonstrates that serious questions going to the merits were raised and the balance of hardships tips sharply in the plaintiff's favor." Opp'n 6. As explained above, the LCM ban is likely unconstitutional under the Second Amendment, the Takings Clause, and the Due Process Clause. At minimum, Plaintiffs have raised "serious questions going to the merits," and a preliminary injunction is justified because the remaining injunction factors tip "sharply in the plaintiff[s'] favor." *Id.*

The "deprivation of constitutional rights unquestionably constitutes irreparable injury," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), and neither the state nor the public have any interest in the enforcement of an unconstitutional law, *see Ariz. Dream Act Coalition v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014). Moreover, the case for a preliminary injunction is especially strong because Plaintiffs are on the verge of having to surrender their constitutionally protected property to the government "for destruction," Cal. Penal Code § 32310(d)—about as stark an example of irreparable injury as this Court is likely to find. And an injunction is particularly appropriate here because the law has not yet taken effect, minimizing any disruption to the government and allowing the Court to "preserve the status quo pending a determination of the action on the merits"—the fundamental "purpose of a preliminary injunction." *Chalk v. U.S. Dist. Ct.* (*Orange Cty. Superin. of Schs.*), 840 F.2d 701, 704 (9th Cir. 1998).

## CONCLUSION

Plaintiffs are likely to succeed on the merits, and they satisfy the remaining factors for preliminary relief. The Court should preserve the status quo as this case proceeds.

Date: June 9, 2017                                   MICHEL & ASSOCIATES, P.C.

                                                     s/ C.D. Michel
                                                     C.D. Michel
                                                     Email: cmichel@michellawyers.com
                                                     *Counsel for Plaintiffs*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,<br><br>     Plaintiffs,<br><br>    v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,<br><br>     Defendant. | Case No: 17-cv-1017-BEN-JLB<br><br>**CERTIFICATE OF SERVICE** |

IT IS HEREBY CERTIFIED THAT:

 I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

 I have cause service of the following documents, described as:

### PLAINTIFFS' REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

on the following parties by electronically filing the foregoing on June 9, 2017, with the Clerk of the District Court using its ECF System, which electronically notifies them.

| | |
|---|---|
| Ms. Alexandra Robert Gordon<br>Deputy Attorney General<br>455 Golden Gate Avenue, Suite 11000<br>San Francisco, CA 94102-7004<br>alexandra.robertgordon@doj.ca.gov | Mr. Anthony P. O'Brien<br>Deputy Attorney General<br>1300 I Street, Suite 125<br>Sacramento, CA 95814<br>anthony.obrien@doj.ca.gov |

 I declare under penalty of perjury that the foregoing is true and correct. Executed on June 9, 2017, at Long Beach, CA.

*/s/ Laura Palmerin*
Laura Palmerin

---

CERTIFICATE OF SERVICE

17-cv-1017