C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

VIRGINIA DUNCAN, RICHARD
LEWIS, PATRICK LOVETTE, DAVID
MARGUGLIO, CHRISTOPHER
WADDELL, CALIFORNIA RIFLE &
PISTOL ASSOCIATION,
INCORPORATED, a California
corporation,

                    Plaintiffs,

            v.

XAVIER BECERRA, in his official
capacity as Attorney General of the State
of California; and DOES 1-10,

                    Defendants.

Case No:  17-cv-1017-BEN-JLB

**SUPPLEMENTAL DECLARATION
OF ANNA M. BARVIR IN SUPPORT
OF PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION;
EXHIBIT NNN**

Date:      June 13, 2017
Time:      10:00 a.m.
Dept:      5A
Judge:     Hon. Roger T. Benitez

## DECLARATION OF ANNA M. BARVIR

1.     I am an attorney at the law firm Michel & Associates, P.C., attorneys of record for Plaintiffs in this action. I am licensed to practice law before the United States District Court for the Southern District of California. I am also admitted to practice before the Eastern, Central, and Northern Districts of California, the courts of the state of California, the Supreme Court of the United States, and the D.C., Fourth, Ninth, and Tenth Circuit Courts of Appeals. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

2.     Attached hereto as Exhibit "NNN" is a true and correct copy of excerpts from the February 3, 2014 deposition of Dr. Christopher S. Koper in the matter of *Tardy v. O'Malley*, United States District Court, District of Maryland, Case No. CCB-13-2841.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on June 9, 2017.

Anna M. Barvir
Declarant

# EXHIBIT NNN

**In The Matter Of:**

*Shawn J. Tardy, et al.  vs.*

*Martin J. O'Malley, et al.*

---

*Christopher S. Koper, Ph.D.*

*Vol. 1*

*February 3, 2014*

---

*Gore Brothers Reporting & Videoconferencing*

*20 South Charles Street, Suite 901*

*Baltimore, MD 21201*

*410-837-3027*

*www.gorebrothers.com*



Min-U-Script® with Word Index

EXHIBIT NNN

1

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3                  (Northern Division)

4

5   SHAWN J. TARDY, et al.

6            Plaintiffs          Case No.

7   vs.                          1:13-cv-02841-CCB

8   MARTIN J. O'MALLEY, et al.

9            Defendants

10  _____/

11

12          The deposition of CHRISTOPHER S. KOPER,

13  PH.D. was held on Monday, February 3, 2014, commencing

14  at 1:48 p.m., at George Mason University, Research

15  Hall, 4400 University Drive, Fairfax, Virginia 22030,

16  before Amanda J. Curtiss, CSR, Notary Public.

17

18

19

20

21  REPORTED BY:  Amanda J. Curtiss, CSR

0002

EXHIBIT NNN

2

```
 1   APPEARANCES:

 2

 3               ON BEHALF OF THE PLAINTIFFS:

 4               JOHN PARKER SWEENEY, ESQUIRE

 5               JAMES W. PORTER, III, ESQUIRE

 6               MARC A. NARDONE, ESQUIRE

 7                   Bradley, Arant, Boult, Cummings, LLP

 8                   1615 L Street, NW, Suite 1350

 9                   Washington, DC 20036

10                   Telephone: 202-719-8216

11                   Facsimile: 202-719-8316

12                   Email: jsweeney@babc.com

13

14               ON BEHALF OF DEFENDANT, MARTIN J. O'MALLEY:

15               MATTHEW J. FADER, ESQUIRE

16                   Maryland Office of the General Attorney

17                   200 Saint Paul Place, 20th Floor

18                   Baltimore, Maryland 21201

19                   Telephone: 410-576-7906

20                   Facsimile: 410-576-6955

21                   Email: mfader@oag.state.md.us
```

0003
EXHIBIT NNN

57

1    more new permits.  You would have to get one that's

2    already existing somehow.

3        Q      So I could -- I could purchase one from

4    somebody whose already owned?

5        A      Correct.  If -- if you went through all the

6    proper procedures and background checks.

7        Q      All right.  But I couldn't do that with

8    respect to a semi-automatic long gun that's banned in

9    Maryland?

10       A      You would -- you could keep the one that

11   you have right now, but you wouldn't be able to

12   transfer it, no.

13       Q      Right.  But I could if I jumped through the

14   right hoops get myself a machine gun; correct?

15       A      Well, you know, Maryland legislatures and

16   the federal -- federal legislatures have different

17   considerations, different ways they chose to approach

18   the issue.

19       Q      Right.  And so the federal government never

20   actually banned machine guns?

21       A      In a strict sense, that's perhaps true, but

0004
EXHIBIT NNN

58

1    they very heavily regulate them and restrict them.

2         Q       Understood.  We wouldn't want them falling

3    into criminal hands, would we?

4         A       No.

5         Q       Are you an expert in ballistics?

6         A       I have some general knowledge.  I -- I

7    should hesitate to call myself an expert, per se.

8         Q       All right.  And while you're an expert in

9    firearms policy, are you an expert in firearms?

10        A       How do you mean?

11        Q       Technical aspects of firearms, for

12   instance.

13        A       I have a limited basic working knowledge.

14   Of course in doing the assault weapons work, I had to

15   learn a lot about different makes and models and their

16   features.  I'm not the sort of person who could take

17   apart a firearm for you and put it back together.

18        Q       You are not?

19        A       No.

20        Q       Do you own any firearms?

21        A       No.

0005
EXHIBIT NNN

59

1      Q      Have you ever owned any firearms?

2      A      No.

3      Q      Have you fired firearms?

4      A      Yes.

5      Q      When did you do that?

6      A      In the -- I was in a police lab and I fired

7   some firearms before.

8      Q      And when was that?

9      A      Several years back.

10     Q      And where was that?

11     A      I remember firing some guns in a lab in

12   Kansas City.  I'm not sure if I've been any place else,

13   but I remember that one.

14     Q      All right.  And what firearms did you fire

15   at the police lab in Kansas City?

16     A      Some different handguns.

17     Q      And do you recall what makes and models you

18   fired?

19     A      Not clearly, no.

20     Q      Do you recall if you fired revolvers?

21     A      Yeah, there was one revolver and at least

0006
EXHIBIT NNN

82

```
 1              MR. SWEENEY:  All right.  Let's pull out
 2     the 2004 article.  Let's mark this as the next exhibit.
 3     I think we're finally at five.
 4              (Koper Exhibit 5 was marked for
 5     identification.)
 6                   (Off the record.)
 7     BY MR. SWEENEY:
 8        Q     Let's go back on the record.
 9              On page 81 of your 2004 report that we've
10     marked as Koper Exhibit 5, you state your conclusions
11     with respect to the effect of the assault weapon and
12     large capacity magazine federal ban; correct?
13        A     Are you referring to the first full
14     paragraph?
15        Q     Yes, I am.
16        A     That's a partial statement of it, yes.
17        Q     All right.  And you state there quote,
18     "Because offenders can substitute non-banned guns and
19     small magazines for banned AWs and LCMs," meaning
20     assault weapons and large capacity magazines?
21        A     Correct.
```

83

1       Q       "There is not a clear rationale for

2  expecting the ban to reduce assaults and robberies with

3  guns."  Am I reading that correctly?

4       A       Yes.

5       Q       And that correctly and accurately state

6  your conclusion with respect to the impact on

7  firearm-related crime of the federal ban on assault

8  weapons and large capacity magazines; correct?

9       A       That's a partial statement of it.

10       Q       All right.  But -- but accurate in and of

11  itself?

12       A       Yes.

13       Q       Okay.  And when you say you would not

14  expect the assault weapon or large capacity magazine

15  ban to reduce assaults with guns, that would include

16  assaults leading to homicides; correct?

17       A       Not exactly.  What I'm saying here is I

18  don't expect the overall level of assaultive violence

19  with guns to change whether or not these guns and

20  magazines are available, but what I am hypothesizing is

21  that changes in the use of these guns and magazines

84

1    could affect the share of attacks that involve -- that

2    result in injuries or deaths.

3        Q    But -- but they -- you would not expect a

4    ban on assault weapons or large capacity magazines to

5    actually reduce the number of firearm-related assaults

6    or robberies; correct?

7        A    Correct.

8        Q    And you would not expect a ban on assault

9    weapons or large capacity magazines to reduce

10   firearm-related home invasions; correct?

11       A    No.  Correct, I mean.

12       Q    And you wouldn't expect a ban on assault

13   weapons or large capacity magazines to reduce the

14   number of firearms assaults on police officers;

15   correct?

16       A    Correct.  That's fair enough.

17       Q    On note 95 on that page, you address I

18   believe state bans on assault weapons in which you say,

19   "A few studies suggest that state-level assault weapon

20   bans have not reduced crime."  Am I reading that

21   correct?

EXHIBIT NNN

85

1      A      Yes.

2      Q      And is that still your view today?

3      A      I've not seen any further studies of this

4  yet, but yes, I mean, essentially that's the

5  conclusion.

6      Q      All right.

7      A      With the qualifiers that are stated in the

8  rest of the footnote.

9      Q      Let's mark this as Exhibit 6, please.  Let

10  me show you what I've marked as Exhibit 6, which is an

11  article authored by Mark Gius, G-I-U-S, on an

12  examination of the effects of concealed weapon laws and

13  assault weapons bans on state-level murder rates.

14             (Koper Exhibit 6 was marked for

15  identification.)

16      A      Okay.

17      Q      And I first ask you are you familiar with

18  this article?

19      A      No.  I've not read this.

20      Q      And has anyone mentioned this to you?

21      A      Defense counsel did mention the existence

86

1    of this.

2         Q      All right.  And this appeared in Applied

3    Economics Letters; right?

4         A      Okay.

5         Q      And is that a peer reviewed journal, to

6    your knowledge?

7         A      I don't know.

8         Q      All right.  And, you know, do you make it

9    your business to keep up with the literature on the

10   impact of firearms bans?

11        A      I try to.  How extensively I'm engaged in

12   that research might ebb and flow a little bit depending

13   on what exactly I'm working on at that time, so I see

14   this article, for example, just came out in last

15   November so that's quick to keep up with.

16        Q      All right.  And my reading of this, and I

17   appreciate if you just put it in front of you, is that

18   it concludes using data for the period I believe 1980

19   to 2009 that state-level assault weapons bans did not

20   reduce state-level murder rates.  And that would be

21   consistent with the prior studies in your footnote 95

93

1  matters as much or more than statistical significance.

2      Q      All right.  And above that -- no,

3  nevermind.  Scratch that.

4           Turning back to your 2004 study, did you

5  have anything in here on the impact on homicide rates

6  of the federal assault weapons and large capacity

7  magazine ban?

8      A      We did a few things here that were a bit

9  tentative.  As I said, the analysis of the key initial

10  intermediate outcome measures showed mixed results.  So

11  we saw that there was a reduction in the use of assault

12  weapons, but not clearly a reduction yet in the use of

13  guns with large capacity magazines.  So any further

14  analysis of impacts on measures like of injuries and

15  deaths was going to be ambiguous and somewhat

16  problematic, but nonetheless I did put together a few

17  basic trend lines for descriptive purposes looking at

18  some measures that I thought might potentially be

19  affected by ups and downs in the use of assault weapons

20  and large capacity magazines.  So I was looking at a

21  few different things like the percentage of violent gun

94

1    crimes resulting in death.  I think the percentage of

2    gunshot victimizations resulting in death.  I also

3    summarized in chapter nine of this report some of the

4    other findings that we had had in the '97 report when

5    we had looked at some different similar types of

6    outcome measures.

7         Q       On page 96 of your 2004 report marked as

8    Exhibit 5, that's your summary of your conclusions;

9    correct?

10        A       Yes.

11        Q       And in the third sentence you state, "There

12   has been no discernable reduction in the lethality and

13   injuriousness of gun violence," is that correct?

14        A       Yes.

15        Q       And is that still your view today based

16   upon your study and analysis of the impact of the

17   federal ban on assault weapons and large capacity

18   magazines?

19        A       Yes.  Based on the data that I analyzed,

20   it's still my view of it.  Again, subject to the

21   qualifications that I noted earlier.

EXHIBIT NNN

95

1      Q      All right.  And are you aware of anyone

2   else's data with respect to studying the impact of the

3   federal ban on assault weapons and large capacity

4   magazines that reached a conclusion different from the

5   conclusion that you state here?

6      A      No.

7      Q      Would you agree with me that the government

8   interest to be served by the federal assault weapon ban

9   and large capacity magazine ban was the reduction of

10  firearm-related violence; correct?

11     A      You could view it that way or you could

12  view it more specifically as trying to get a reduction

13  in shootings in incidents with high numbers of shots

14  fired.  And so, you know, again, I tended to view --

15  judge this more specifically in terms of effects on gun

16  injuries and gun deaths.  As I noted in the report,

17  given the trends in use of assault weapons and large

18  capacity magazines that had been observed to that

19  point, I felt it was actually premature to make any

20  definitive conclusions about the ban's effects on gun

21  deaths and injuries.  I felt that the effects of the

96

1    ban were still unfolding at that time and might still

2    take a while to fully unfold.

3         Q       Isn't it true that as you sit here today,

4    you cannot conclude with a reasonable degree of

5    scientific probability that the federal ban on assault

6    weapons and large capacity magazines reduced crimes

7    related to guns?

8         A       Correct.

9         Q       And it didn't reduce the number of deaths

10   or injuries caused by guns either; correct?

11        A       Correct.

12        Q       Returning to your report for a moment,

13   Professor.  I lost my copy of.

14              On paragraph five at the top of page two

15   you say, "Based on my research, I found, among other

16   things, that assault pistols" --

17        A       I'm sorry.  Could you clarify for me?

18        Q       I'm sorry.  Page two.

19        A       Page two.  Got you.

20        Q       Paragraph five.

21        A       Uh-huh.

0015
EXHIBIT NNN

97

1        Q        Under "Summary of Findings."

2        A        Okay.

3        Q        You state, "Based on my research, I found,

4    among other things, that assault pistols are used

5    disproportionately in crime in general, and that

6    assault weapons more broadly were disproportionately

7    used in murder and other serious crimes in some

8    available data sources," correct?

9        A        Yes.

10        Q        Let's see if we can pull that apart so I

11    can understand what you're saying here.  Now, how do

12    you define assault pistols?

13        A        Handguns that have the military style

14    features qualifying as assault weapons.

15        Q        And would you agree with me that they

16    became popularly used by criminals in connection with

17    the so-called crack epidemic of the 1980s?

18        A        I don't know that I can make a statement

19    that specific.  I can say that, I mean, there are

20    statistics in the report on how widely they were used

21    in crime.  Generally assault weapons accounted for a

0016
EXHIBIT NNN

131

1    and considering mass shootings by the number of people

2    shot as opposed to the number of people killed --

3         A     Uh-huh.

4         Q     -- and if you assume four or more, can you

5    state to a reasonable degree of scientific probability

6    based upon the evidence available to you that banning

7    assault rifles will reduce the number of incidents of

8    mass shootings?

9         A     I can't say that based -- I mean, I can't

10   make a firm projection of that based on any particular

11   available data.  There might be data to suggest that

12   there could be some reduction in that, but it's hard to

13   really clearly project what that would be or how

14   difficult it might be to detect statistically.

15        Q     We have to work with a legal standard for

16   expert opinion in the reasonable probability range.

17        A     Uh-huh.

18        Q     I'm not sure in the legal context what, you

19   know, firm means as you mean it, but I'm trying to

20   understand whether you can state your opinion to a

21   reasonable degree of scientific probability that

132

1    banning assault rifles would reduce the incidents of

2    public shootings, mass shootings.

3         A      Again, I mean, all I can say is attacks

4    with those sorts of weapons tend to result in more

5    victims being hit, so it stands to some reason that if

6    you reduced the use of these types of weapons, it could

7    reduce the tallies of victims hit in these incidents.

8    And it's not actually just a matter of the mass

9    shooting incidents.  It's also a matter of incidents

10   with high numbers of shots fired, regardless of how

11   many people get hit.  So that has to be taken into

12   account as well.

13              And I've tended to focus more on that issue

14   in my research, you know, going back to the Jersey City

15   data, for example, that suggested that about five

16   percent of gunshot victimization stemmed from incidents

17   with more than ten shots fired.  And so based on that,

18   one might project a small percentage reduction in

19   shootings overall from this type of legislation.

20        Q      Do you have your publication of your

21   New Jersey data?  Did you publish that?

133

1      A      Yes.  Uh-huh.

2      Q      And when we looked at your CV, I know we

3  talked about it briefly, and is this the Reedy and

4  Koper 2003 article?

5      A      Yes.

6      Q      How many incidents did you study that

7  involved more than ten shots being fired?

8      A      In the sample that we had, I believe there

9  were something like maybe six incidents that involved

10 more than ten shots fired.

11     Q      And do you recall what the base was of

12 total incidents?

13     A      It's in the -- it's in the study.

14     Q      Why don't we mark this since we're going to

15 be talking about it?  Exhibit 9.

16            (Koper Exhibit 9 was marked for

17 identification.)

18            MR. FADER:  And John, maybe in the next

19 five minutes if we can take a little water break.

20            MR. SWEENEY:  Now.  Let's break right now.

21                (Off the record.)

1   BY MR. SWEENEY:

2       Q       Back on the record.

3               While we were on the break, I tried to

4   focus myself on the portions of your 2003 study which

5   we have marked as Exhibit 9.  First of all, it appears

6   that there were some -- well, if I look at the data

7   tables that you have on page 153 of Exhibit 9, figure

8   one involves assault incidents with a semi-automatic

9   pistol; correct?

10      A       Yes.

11      Q       And you had 239 of those; right?

12      A       Yes.

13      Q       How many of those involved more than ten

14  shots being fired?  Where would I find that number?

15      A       That would be on page 154 on table one.  We

16  had -- one column has minimum shots fired estimates,

17  the other has maximum shots fired estimates if there

18  happened to be a range in the data.

19      Q       Am I correct in interpreting this that it's

20  six out of approximately 165 pistol incidents in which

21  more than ten shots were fired?

135

1        A       Yes.

2        Q       So that's roughly 3.6 percent?  Does that

3     sound about right to you?

4        A       Yes.

5        Q       Okay.  Let me see if I can understand this

6     study a little bit more.  Going back to page 153 figure

7     one, outcomes of assault incidents involving

8     semi-automatic pistols, you state handgun type was not

9     associated with attack outcomes; correct?

10       A       In this categorical tree, that's correct.

11       Q       All right.  So regardless of whether

12    someone was using a semi-automatic pistol or a

13    revolver, there was no difference in the outcome be it

14    injury or death?

15       A       Overall for the incident, yes.

16       Q       All right.  And immediately below figure

17    two you state, "Although pistol cases involved higher

18    numbers of shots, they were not significantly more

19    likely to result in injuries either fatal or nonfatal

20    than were revolver cases," is that correct?

21       A       Yes.  I think what we're talking about

1    there is when you're looking at the likelihood that a

2    gunfire incident resulted in any victimization, you

3    know, any injury, I think there was no significant

4    difference there.  We did find a difference in the

5    number of people who are wounded.

6        Q      On the right-hand column, second full

7    paragraph you state, "Finally, figures one and two show

8    that gunshot injury incidents involving pistols were

9    less likely to produce a death than were those

10   involving revolvers," correct?

11       A      Yes.

12       Q      Had you differentiated between pistols with

13   large capacity magazines and those without large

14   capacity magazines here?

15       A      There was only limited data on that, so we

16   couldn't examine that in a great deal of depth.

17       Q      So is it fair to say that based upon the

18   data in this study, pistols involving larger capacity

19   magazines were less likely to produce a death than were

20   those involving revolvers?

21       A      I wouldn't necessarily say that.  It would

0022
EXHIBIT NNN

137

1   depend.  You'd have to look specifically at the cases

2   where a large capacity magazine was involved.

3        Q      All right.  But we don't really have that

4   breakdown reliably, do we, or at least completely?

5        A      Not completely.

6        Q      Can you interpret the data here to support

7   the statement that gunshot injury incidents involving

8   pistols with large capacity magazines were more likely

9   to produce death than were those involving revolvers?

10  Does your data support that statement?

11       A      More likely to produce death?

12       Q      Yes.

13       A      No.  I can't say that based on what we have

14  here.

15       Q      All right.  Now, under your discussion

16  below beginning with the second sentence, you state,

17  "Gun attackers using pistols tend to fire more shots

18  than attackers using revolvers," correct?

19       A      Yes.

20       Q      And then you go on to say, "This shot

21  differential does not appear to influence the

138

```
1   probability that an incident will result in injury or
2   death, nor the number of wounds sustained by gunshot
3   victims."  Am I reading that correctly?
4        A     Yes.
5        Q     And that's the conclusion of this study;
6   correct?
7              MR. FADER:  Objection.
8              THE WITNESS:  Well, that's -- yeah, that's
9   only one conclusion.  As we go on to say, offenders
10  using pistols tend to fire -- tend to wound more
11  persons.  Also, it should be noted that while this is
12  not reported in this particular article, for the 2004
13  report on assault weapons we did some additional
14  analyses of cases involving more than ten shots and
15  those cases actually had a 100 percent injury rate.
16  You know, at least one person was injured in all of
17  those cases.
18  BY MR. SWEENEY:
19       Q     Now, there were only a handful of such
20  cases in this study; correct?
21       A     Correct.
```

0024
EXHIBIT NNN

169

 1              MR. FADER:  Objection.

 2              THE WITNESS:  It's hard to -- to break

 3    down -- once again, you know, as we mentioned earlier,

 4    it's harder to break down all these specific features

 5    and describe which ones put a gun at highest risk of

 6    being used in crime, I think, other than noting that

 7    they're -- they're large capacity magazines and

 8    different aspects of their design that are designed to

 9    facilitate rapid fire.

10    BY MR. SWEENEY:

11        Q      And isn't it true that criminals

12    overwhelmingly choose handguns over long guns to commit

13    crimes?

14        A      Yes.

15        Q      And your data would indicate that to the

16    extent there's a criminal preference for using assault

17    pistols, there isn't one evident from the evidence with

18    respect to using assault rifles by criminals; correct?

19              MR. FADER:  Objection.

20              THE WITNESS:  It's not as clear.  As we've

21    discussed earlier, there are a few statistics from

EXHIBIT NNN

170

1  which one might try to infer that, but the case, yeah,

2  it's not as clear.  It's fair to say.

3  BY MR. SWEENEY:

4       Q       Now, in paragraph eight of your report, you

5  state in the second sentence that Maryland's

6  recently-enacted ban on assault weapons and large

7  capacity magazines has the quote "potential" close

8  quote to accomplish a couple of things; correct?

9       A       Yes.  Okay.

10      Q       Now, when you say potential, I'm trying to

11 understand what you mean here.  Would you agree with me

12 that any law would have the potential to produce a

13 benefit?

14              MR. FADER:  Objection.

15              THE WITNESS:  Might depend on -- on what it

16 is.  In this case, you know, I'm saying potential based

17 largely on my studies of the federal assault weapons

18 ban and what -- what we found there.

19 BY MR. SWEENEY:

20      Q       Can you state with a reasonable degree of

21 scientific probability that the ban on assault weapons

171

1   and large capacity magazines in Maryland will reduce

2   the number of crimes committed with assault weapons and

3   other firearms with large capacity magazines?

4        A      I can't put a probability on that.  You

5   know, all I can say is based on the experience with the

6   federal assault weapons ban, that there are grounds for

7   believing that the Maryland law could achieve that in

8   extrapolating from the results of the federal study.

9   Otherwise, one has to actually study the implementation

10  of the Maryland law to begin putting, you know,

11  probabilities on it and measuring those effects.

12       Q      All right.  Can you say to a reasonable

13  degree of scientific probability that the ban on

14  assault weapons and large capacity magazines in

15  Maryland will reduce the number of shots fired in gun

16  crimes?

17       A      Not sure what you mean by a reasonable

18  probability 'cause I just I can't put a probability on

19  it and tell you how likely it is to occur.

20       Q      Can you say to a reasonable degree of

21  scientific probability that the Maryland ban on assault

0027
EXHIBIT NNN

1   weapons and large capacity magazines will reduce the

2   number of gunshot victims in such crimes?

3       A      Again, same answer.  I can't state it with

4   an exact probability at this time.

5       Q      And if I ask you the same question with

6   respect to number four, reduce the number of wounds per

7   gunshot victim, and five, reduce the lethality of

8   gunshot injuries when they do occur, and six, reduce

9   the substantial societal costs that flow from

10  shootings, would your answer be the same?

11      A      Yes.

12      Q      Okay.  Now, the Maryland law does not

13  prohibit all semi-automatic firearms; correct?

14      A      Correct.

15      Q      And criminals can substitute semi-automatic

16  firearms that aren't banned; correct?

17      A      Those and other guns.

18      Q      Right.  And isn't that variable something

19  that you can't control and one of the reasons why you

20  can't say to any probability whether or not the ban

21  will accomplish the six items that you state in

0028
EXHIBIT NNN

173

1   paragraph eight of your report?

2                   MR. FADER:  Objection.

3                   THE WITNESS:  In principle, the

4   substitution of non-banned guns and magazines has the

5   potential to lessen the lethality and injuriousness of

6   gun attack incidents.  So I wouldn't say that the

7   Maryland ban is going to reduce the rate of gun crime,

8   but what I am saying is there's a possibility it could

9   reduce shots fired, people hit, wounds inflicted, those

10  sorts of things in attacks that -- that happen.

11  BY MR. SWEENEY:

12      Q       If a particular banned assault rifle, a

13  Colt AR-15, can readily be substituted with a Colt AR

14  HBAR, isn't the ban unlikely to have any significant

15  impact on the use of assault rifles in crime?

16      A       Well, that one particular instance, it

17  seems that the policy makers for whatever reason have

18  allowed one similar variation of the AR-15 to still be

19  legal.  I don't know what all the considerations were

20  in doing that.  I suppose it was part of political

21  bargaining.  But it does raise the possibility that

0029
EXHIBIT NNN

184

1        A        Uh-huh.

2        Q        Is that because you cannot say to a

3    reasonable degree of scientific probability?

4        A        In some of these cases, you have very small

5    numbers of incidents.  It may be hard to do say

6    statistical significance tests.  In some cases, there

7    are statistical significance tests showing that there

8    is a significant difference between the two sets of

9    cases.  So beyond that, it's harder to say.  I mean, we

10   don't -- we don't have randomized trials testing the

11   impact of weapon type on attack outcomes, so there

12   is -- there's always going to be some debate over the

13   patterns and the correlations in the data.

14       Q        To press my point but without trying to,

15   and please forgive me, I don't want to sound like I'm

16   badgering you in any respect.  But the limitations of

17   the scientific data are such that you simply can't say

18   to a reasonable degree of scientific probability that

19   you would be able to reduce public shootings even if

20   you were to eliminate large capacity magazines;

21   correct?

0030
EXHIBIT NNN

185

1            MR. FADER:  Objection.  You can answer.

2            THE WITNESS:  Again, you can't say that

3     you'll eliminate all public shootings.  What these data

4     suggest is that you would reduce the number of victims.

5     I can't necessarily -- it's hard to put specific

6     probabilities on it, but that's what these data

7     suggest.  When you see some -- some of these

8     comparisons that were done in Luke's Dillon's thesis

9     even showed statistically significant differences

10    between the LCM cases and the non-LCM cases, that would

11    seem to provide some better degree of scientific

12    certainty.

13    BY MR. SWEENEY:

14        Q      But because of the availability of multiple

15    firearms and multiple magazines that aren't large

16    capacity, can you truly say to a reasonable degree of

17    scientific probability that reducing the number of or

18    even eliminating the number of large capacity magazines

19    will reduce either the incidents of mass public

20    shootings or the number of people injured in such

21    public shootings?

0031
EXHIBIT NNN

186

1        A       I guess the best way to answer that would

2   be that we'd have to -- we'd have to test that.  We'd

3   have to see a circumstance where use of large capacity

4   magazines was significantly reduced and see what impact

5   that has on -- on these sorts of shootings.

6        Q       And that's because we simply don't have

7   that evidence today; correct?

8        A       We do have some evidence relevant to that.

9   It's just how -- how far you can push it, I guess.

10       Q       Not far enough to state with a reasonable

11  degree of scientific probability; correct?

12               MR. FADER:  Objection.

13               THE WITNESS:  Yeah, I struggle a little bit

14  with that particular phrase because I can't put any

15  specific probability or tell you with -- with, you

16  know, five percent, one percent probability that there

17  will be this change.  I can simply point to the numbers

18  that exist in these studies, and some of these

19  differences are statistically significant differences

20  and so it suggests in principle that if you could

21  reduce the use of these magazines, you could get a

0032
EXHIBIT NNN

187

1    reduction.

2    BY MR. SWEENEY:

3        Q     And when we're talking about the

4    probability, in order to say more probable than not

5    it's more than 50 percent likelihood.

6        A     Uh-huh.

7        Q     And I take it the evidence just doesn't

8    support that right now?

9             MR. FADER:  Objection.

10            THE WITNESS:  I would be cautious in making

11   the inferences about, you know, how certain it is that

12   it would happen.

13   BY MR. SWEENEY:

14       Q     And so you cannot say that it would be more

15   likely than not to achieve that?

16       A     Not -- I would have to see more

17   observation.  Have to see what happens.

18       Q     All right.  On page 13, footnote 26, you

19   touch on this in -- this issue of a perpetrator

20   substituting other guns for banned assault weapons, and

21   of course that would also include substituting multiple

EXHIBIT NNN

188

1    magazines for banned large capacity magazines.  Isn't

2    it likely in Maryland that a criminal who wants to

3    commit a crime with a firearm will still do so even

4    with the new law?

5         A       Who wants to commit a?

6         Q       A crime.

7                 MR. FADER:  Objection.

8                 THE WITNESS:  Would commit a crime with

9    another weapon you're saying?

10   BY MR. SWEENEY:

11        Q       Yes.

12        A       Yes.

13        Q       And isn't it likely that in Maryland, the

14   law will have little or no impact on the frequency of

15   firearm crime in general?

16        A       I would say that's a reasonable inference.

17        Q       Have you -- are you familiar with the Safe

18   Streets Program?

19        A       In Maryland?

20        Q       Yes.

21        A       Not specifically.  There's a lot of

0034
EXHIBIT NNN

215

1   Commonwealth of Virginia

2   County of Fairfax:

3          I, AMANDA J. CURTISS, a Notary Public of

4   the State of Virginia, Fairfax County, do hereby

5   certify that the within-named witness personally

6   appeared before me at the time and place herein set

7   out, and after having been duly sworn by me, according

8   to law, was examined by counsel.

9          I further certify that the examination was

10  recorded stenographically by me and this transcript is

11  a true record of the proceedings.

12         I further certify that I am not of counsel

13  to any of the parties, nor in any way interested in the

14  outcome of this action.

15         As witness my hand this 5th day of

16  February, 2014.

17  _____

18                      Amanda J. Curtiss, CSR

19                           Notary Public

20  My Commission Expires:

21  October 31, 2015 - #7513095

0035
EXHIBIT NNN

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,

                    Plaintiffs,

        v.

XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,

                 Defendant.

Case No:  17-cv-1017-BEN-JLB

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED THAT:

      I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

      I have caused service of the following documents, described as:

**SUPPLEMENTAL DECLARATION OF ANNA M. BARVIR IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; EXHIBIT NNN**

on the following parties by electronically filing the foregoing on June 9, 2017, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Ms. Alexandra Robert Gordon
Deputy Attorney General
alexandra.robertgordon@doj.ca.gov
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

Mr. Anthony P. O'Brien
Deputy Attorney General
anthony.obrien@doj.ca.gov
1300 I Street, Suite 125
Sacramento, CA 95814

      I declare under penalty of perjury that the foregoing is true and correct. Executed on June 9, 2017, at Long Beach, CA.

Laura Palmerin