C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: cmichel@michellawyers.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,

                    Plaintiffs,

          v.

XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,

                    Defendant.

Case No:  17-cv-1017-BEN-JLB

**SUPPLEMENTAL DECLARATION OF GARY KLECK IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Date:     June 13, 2017
Time:     10:00 a.m.
Dept:     5A
Judge:    Hon. Roger T. Benitez

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

1

### DECLARATION OF GARY KLECK

**Americans Frequently Use Guns for Self-Protection**

1.      Defendant expert Alexandra Gordon cites (in her Exhibit 71) a report produced by a gun control advocacy organization, the Violence Policy Center, which claims that estimates of DGU frequency generated by Kleck and Gertz (1995) have been discredited.  The VPC report relies for this claim on critiques by David Hemenway (Violence Policy Center 2017, pp. 4-5).  What the VPC authors did not share with their readers is that *every single one* of Hemenway's criticisms of the Kleck-Gertz estimates of DGU frequency, as well as all other published criticisms, have been decisively rebutted.  These rebuttals have been published and widely available for years, and none of them have been refuted, or even responded to, by the critics of this survey.   A handy source compiling all of the rebuttals into one place is Chapter 6 of the 2001 book <u>Armed</u> (Kleck and Kates 2001).  None of the defendant's experts or sources cited by the defendants have refuted a single one of these rebuttals.

2.      Every single claim made by David Hemenway in his critique of the Kleck-Gertz survey has been shown to be false (Kleck 2001).  For example, that survey did <u>not</u>, as Hemenway claimed, "show 132,000 perpetrators killed or wounded by defenders each year," and thus there could not be any conflict between our survey results and hospital data on numbers killed or injured.  We had too few DGU sample incidents (n=213, unweighted) to reliably estimate the share that resulted in wounded offenders, so our survey did not imply any particular number of "perpetrators killed or wounded by defenders each year," and we did not report any such estimates (Kleck and Gertz 1995).  Therefore it was impossible to show any contradiction between our estimates and hospital data.

3.      Likewise, the Kleck-Gertz survey did <u>not</u> show, as Hemenway claimed, that "more guns are wielded to defend against rapes each year than there are actual rapes or attempted rapes each year," for the simple and indisputable reason that we do not know the actual number of such crimes that occur each year (among many other problems with

SUPPLEMENTAL DECLARATION OF GARY KLECK ISO MOTION FOR PRELIMINARY INJUNCTION

Hemenway's claim).  It is universally understood among criminologists that neither the National Crime Victims Survey ("NCVS") nor any other source can tell us the total number of sexual assaults or any other crime, because the true number of crimes is almost certainly larger than the number that respondents to the NCVS are willing to report. Hemenway also compared data on the wrong universe of sexual assaults, citing figures that pertained to a smaller, noncomparable, subset of these crimes, artificially creating an "inconsistency" between NCVS-based estimates and our estimates through his own error (Kleck and Kates 2001, Chapter 6).

4.      Hemenway falsely claimed the every external check of the validity of this survey's estimates failed to support those estimates, when in fact the opposite was true – every single alternative measure of DGU frequency supported the Kleck-Gertz estimates. The latter estimates were not only completely consistent with hospital data on numbers of persons medically treated for gunshot wounds, and estimates of the frequency of sexual assaults and other crimes, but have also been consistently confirmed by the results of every other professionally conducted national surveys of representative samples of the U.S. adult population.  By 2001 there were at least 20 such surveys that *all* indicated huge numbers of DGUs each year, ranging from 0.5 million to over 3 million, and exceeding the number of crimes in which offenders used guns (Kleck and Kates 2001, Chapter 6).

5.      There is no valid scholarly foundation for the claim that the Kleck-Gertz or other survey-based estimates of DGU frequency are even slightly too high.  Quite the contrary, the overwhelming weight of scholarly evidence on survey research methodology favors the proposition that surveys are more likely to *under*estimate the frequency of this sort of crime-related experience than to overestimate it.  In order to report a DGU in a survey, a respondent who has genuinely had such an experience must be willing to report (1) a victimization experience (otherwise there could not have been a defensive reaction to a crime), (2) their possession of a gun (otherwise the defensive action could not be classified as a defensive use of a gun), and (3) (usually) the crime of

unlawful possession of a firearm in a public place (since most DGUs occur in public places where, in 1993, it was unlawful for all but a tiny percent of the population to possess a gun). The scientific literature on survey response errors *uniformly* indicates that survey respondents in the general adult population on net underreport (1) crime victimizations, (2) gun possession, and (3) unlawful behaviors by the respondent (see Kleck 2001 for supporting citations). Consequently, estimates of DGU frequency are more likely to be too low than too high.

6. Advocates of the theory that DGUs are actually quite rare invariably rely on the National Crime Victimization Survey (NCVS) as their sole source of support, ignoring the 20-plus national surveys that have consistently yielded far higher estimates. Alexandra Gordon cites, in her Exhibit 71, a propaganda report produced by a gun control advocacy organization, the Violence Policy Center (Gordon, p. 11). That report's sole support for the proposition that DGUs are rare is the NCVS.

7. As has long been known, this survey radically underestimates the frequency of DGUs, because it never asks any respondents specifically about DGUs, is a nonanonymous survey, and is conducted by the federal government on behalf of the Justice Department, the law enforcement branch of the U. S. government (Kleck 2001). NCVS interviewers never ask respondents specifically about defensive use of guns; instead they only ask broadly about any self-protection actions the crime victim might have taken, giving respondents the opportunity to volunteer the specific information that their self-protective actions included use of a gun. As the Research Director of the National Opinion Research Center, Tom Smith, noted, "indirect questions that rely on a respondent volunteering a specific element as part of a broad and unfocused inquiry uniformly lead to undercounts of the particular of interest" (Smith 1997, p.p. 1462-1463).

8. Further, reporting a DGU in this survey may often require admitting to unlawful possession of a gun in a public place (where most DGUs occur), so the facts that (a) the respondent's identity is known to interviewers and that (b) respondents are told that their information is being reported to the Justice Department strongly

SUPPLEMENTAL DECLARATION OF GARY KLECK ISO MOTION FOR PRELIMINARY INJUNCTION

17cv1017

discourages reporting of DGUs in the NCVS.  Most decisively of all, NCVS estimates of DGU frequency are radically lower (c. 100,000 per year) than estimates generated by every other national survey that has asked about DGU (0.5-3 million per year) (Kleck 2001).  Thus, the NCVS cannot be used to support any claim about the frequency of DGU.

### Lucy Allen's Analysis of NRA-Selected Defensive Gun Uses (DGUs) Can Tell Us Nothing About How Often DGUs in General Involve Firing More than 10 Rounds

9.     Defendant's expert Lucy Allen analyzed a sample of 736 DGUs selected by the NRA for inclusion in the <u>American Rifleman</u> "Armed Citizen" column, and concluded that DGUs virtually never involve a crime victim firing over 10 rounds (pp. 3-4).  There is no foundation for believing that these incidents are representative of the full set of DGUs, and therefore her analysis can tell us nothing about the share of the full population of DGUs that involve use of LCMs.  The NRA's database of "armed citizen" stories is not a representative sample of defensive gun uses (DGUs), nor does the NRA even claim it to be so.  Findings from any analysis of this sample therefore cannot be generalized to the larger population of DGUs.  Allen admits the sample was "not compiled scientifically," but then proceeds to hint that the large size of the sample somehow makes up for this problem (p. 3).  It does not.  Larger sample size cannot in any way compensate for sample bias.

10.     Allen even concedes that the sample is "biased," but speculates that selection biases would favor inclusion of cases with many shots fired because such incidents would put DGUs "in the best possible light."  This is counterintuitive.  It is just as plausible that NRA compilers who wanted to put DGU in a favorable light would scarcely want to select DGUs in which the defenders appeared to indiscriminately "fling lead," firing arguably excessive numbers of rounds that might endanger bystanders.  Instead, NRA staff arguably would better serve their alleged political agenda by selecting stories of responsible gun uses in which the defenders used the minimum amount of force needed to defend themselves, firing the fewest rounds needed to serve that purpose.  This

SUPPLEMENTAL DECLARATION OF GARY KLECK ISO MOTION FOR PRELIMINARY INJUNCTION

17cv1017

would bias the sample of selected DGUs in the direction of *excluding* cases in which many rounds were fired.  Allen's sample would therefore understate the frequency of DGUs in which large numbers of shots were fired by the defender.

**Allen's Analysis of NRA-selected DGUs Nevertheless Confirms that DGUs with Large Numbers of Rounds Fired <u>Do</u> Occur, Possibly Thousands of Times Per Year**

11.    Allen's own findings, while seemingly indicating that DGUs with over 10 rounds fired are rare, also indicated that they do occur.  She found 2 such incidents in her sample of 736 DGU's, a 0.3% share.  Consider the implications, for example, if 0.3% of all DGUs involved over 10 rounds being fired.  National surveys that have specifically asked about DGU have indicated 0.5-3.5 million DGUs per year (Kleck 2001), so it would be reasonable to assume an average of at least 1 million DGUs per year in the U.S. If this were the total frequency of DGUs, 0.3% would imply a number of DGU incidents with over 10 rounds fired that was huge in absolute terms – about 3,000 per year – based on Allen's own figures.  Thus, the percent of DGUs involving many rounds fired does not have to be very large in order for it to imply a huge absolute number of incidents.

12.    Indeed, given how small Allen's sample was (n=736), her finding of 0.3% of DGUs with over 10 rounds fired *in her small sample of DGUs* is actually not statistically inconsistent with the hypothesis that *1%* of the *entire population* of DGUs involve over 10 rounds fired, since the 0.3% result is well within the bounds of what one could reasonably expect as a sample result in a randomly selected sample of just 736 cases if 1% of all DGUs involved more than 10 rounds fired.  Samples selected from larger populations of events do not all perfectly resemble the population, since they are always subject to random sampling error.  That is, due to the random character of the sampling process, an analyst may, by pure chance, obtain a sample that contains either more or fewer of the events of interest than would be the case if the sample resembled the population perfectly.

13.    The 95% confidence interval (CI) estimate of the percent of DGUs with over 10 rounds fired (symbolized as **p**) is the range in which one would expect to find 95% of

SUPPLEMENTAL DECLARATION OF GARY KLECK ISO MOTION FOR PRELIMINARY INJUNCTION

17cv1017

all the estimates one would obtain if one selected an infinite number of samples of a given size.  If one assumes that the true population percentage is 1% (**p**=.01), the 95% CI is 0.28% to 1.719%.

14.     This is the result of the following computations.  The formula for the 95% CI is:  **p**  plus or minus 1.96 (square root of ((p x q)/n), where  q=1-**p** and n is the sample size.  If **p**=.01, then the 95% CI is 0.01 +/ – 1.96 (square root of (.01 x .99)/736) =0.01 +/- 0.00719, or 0.0028 to .01719, or 0.28% to 1.719%.   This means that if the true population percentage of DGUs with over 10 rounds fired were 1%, and one took an infinite number of random samples, each with 736 DGUs, one would expect 95% of sample estimates of this percentage to be between 0.28% and 1.719%.

15.     In plain English, what this means is that even if 1% of <u>all</u> DGUs involved over 10 rounds, one could nevertheless realistically expect to get a percentage of 0.3% in a sample of 736 DGUs, due solely to random sampling error.  Thus, getting a sample result of 0.3%, as Allen did, is statistically consistent with the idea that the actual percentage all DGUs with over 10 rounds fired *in the full population* of DGUs is 1%.

16.     Ignoring Allen's fatally flawed analysis, no one really knows how many times LCMs are used defensively.  We can say, however, that there are probably at least 1 million defensive gun uses (DGUs) of all kinds per year (Kleck 2001).  Therefore, even if just 0.3% of DGUs involved LCM use (as Allen's results indicate), this would imply 3,000 defensive uses of LCMs per year. And if the Defendants chose to assert that it is reasonable to describe this many defensive uses of LCMs as "rare," the exact same characterization would apply with even greater force to the number of times LCMs were used in mass shootings and were likely to have affected the number of victims hurt in those incidents, since (as is demonstrated later) this number is close to zero.

**Are LCMs Ever Needed for Defense Against Criminals?**

17.     One reason why crime victims might need an LCM in order to effectively defend themselves or others against criminals would be if they confronted a large number of offenders, such as the members of a street gang or a rioting mob.  A crime victim who

1    had to shoot X number of offenders to preserve their safety, however, would need to be

2    able to fire more than X number of rounds, since recently released data from the FBI

3    indicate that even police officers are able to hit the offenders at which they shoot with

4    only 18.7% of the shots they fire (FBI 2016, Table 18).  Similar per shot hit rates have

5    been reported in other studies of police shooting (Geller and Scott 1992, pp. 105-106).

6    Under the assumption that the average civilian crime victim is unlikely to be a superior

7    marksman under stressful real-world circumstances, he is unlikely to strike his intended

8    targets more than one-sixth of the time.  Thus, victims facing four offenders would need

9    24 rounds to hit all four, 18 rounds to hit three of them, and 12 rounds to hit just two of

10   them.  Indeed, the average crime victim armed with a single magazine holding only 10 or

11   fewer rounds would not be able to fire enough rounds to shoot more than a single

12   offender.

13       18.    Is it a realistic prospect for a crime victim to face four or more attackers?  I

14   examined an NCVS dataset I happened to have on my hard drive, covering the period

15   1992-1994.  My analysis of that dataset indicated that the NCVS estimated, for the

16   United States in 1992-1994, that there were 30,497,554 violent crimes in which victims

17   directly confronted offenders and could state the number of offenders.  Of these,

18   6,368,235 involved multiple offenders.  Of these, 1,997,481 involved four or more

19   offenders.  Since this total pertained to a three-year period, the average for the U.S. was

20   2.1 million violent crimes with multiple offenders per year, and about 0.67 million per

21   year involving over four offenders.  This was a peak crime period, but even if there were

22   half as many such incidents in recent years, the annual totals would still be one million

23   and 0.33 million respectively.  In short, by any reasonable standard, it is a frequent

24   occurrence that American crime victims face four or more offenders in a violent crime.

25   **LCM Use in DGUs and Innocent Bystanders**

26       19.    Alexandra Gordon cites a passage from a study (Koper 2004) that she cites

27   as her Exhibit 66, which argues that "the ability to deliver more shots rapidly should raise

28   the likelihood that offenders hit their targets, not to mention innocent bystanders" (Koper

2004, p. 83).   To be sure, it is a logical possibility that defensive use of guns equipped with LCMs *could* result in the accidental shooting of innocent bystanders, this is a serious concern only if defenders using guns with LCMs actually *do* shoot innocent bystanders. Neither Gordon nor any of the Defendant's experts cite any cases of this actually happening, nor any evidence that it happens frequently.

20.     The best available evidence indicates that accidental shooting of bystanders in connection with any kind of DGU – with or without LCMs - is virtually nonexistent. My review of the literature on firearms accidents (Kleck 1997, pp. 309-310) found that accidental shootings linked with DGU were so rare that most studies of gun accidents that classified the circumstances in which the accidents occurred did not even include a category for accidents linked with defensive uses, even when their classifications of the circumstances of gun accidents included categories that included as little as 1% of the accidents.  One exceptional study was conducted by the Metropolitan Life Insurance Company (1968), which found just two cases of accidental firearms deaths linked with defensive gun use ("searching for prowlers") out of 143 total accidental gun deaths, or 1.4%.  Since other gun accident studies did not report *any* DGU-linked accidents, this 1.4% should probably be regarded as an upper limit on the share of accidental gun deaths linked with DGU.

21.     In 2014 there were 461 total accidental firearms deaths in the U.S., so 1.4% of this total would be 6.4 accidental deaths.  That is, there were probably no more than six fatal accidents involving DGU in the entire nation in 2014. National surveys that directly ask about DGU indicate there are probably over 1 million DGUs per year.  This means that someone is accidentally killed in connection with fewer than six out of every million DGUs.  The number linked with just DGUs involving LCMs is almost certainly substantially lower than six since, as the Defendant's expert Lucy Allen (pp. 4-5) acknowledges, relatively few DGUs entail large numbers of rounds being fired, and thus only a small share are likely to have involved LCM use.

22.     In any case, none of the Defendant's experts cite even one real-life incident

in which a person attempting to use a gun defensively accidentally killed an innocent bystander.  While innocent bystanders sometimes are shot, e.g. in connection with street gang violence, there is no evidence known to me that any significant number are shot as a byproduct of defensive gun use.

### How Large a Share of Mass Shootings Involve the Use of an LCM?

23.     Laura Allen makes the remarkable claim that "large-capacity magazines were used in the majority of mass shootings *with known magazine capacity* since 1982 (44 of 50 mass shootings)" (p. 7, emphasis added).  To support this claim, she relied on compilations of mass shootings that were in turn based on news media accounts (p. 6).  Reporters inform their audience, by definition, of information that is believed to be newsworthy.  In a period when there was intense public interest and political debate over LCMs, the involvement of LCMs in mass shootings was clearly newsworthy.  Thus, there is strong reason to expect that at least one news outlet would note the use of LCMs in every, or virtually every, mass shooting in which it was believed that the shooter used an LCM.  In contrast, there is nothing newsworthy about shooters using lower-capacity magazines, and thus no reason for reporters to state this fact in their stories about mass shootings.  In short, magazine capacity will ordinarily be mentioned in a story only if the capacity was unusually large.  This is consistent with the old news adage that "man bites dog" is news; "dog bites man" is not.

24.     In this light the only thing remarkable about Allen's finding is that there were *any* mass shootings for which magazine capacity was reported in news stories but the capacity was *not* large.  Her findings can tell us nothing about the share of *all* mass shootings that involved shooters using LCMs because she uses a sample of incidents biased to include almost entirely incidents for which news stories reported the use of LCMs.

25.     Allen sustained her erroneous claim by relying on grossly incomplete compilations of mass shootings, which actually encompass only a tiny share of all mass shootings, and which grossly overstate the prevalence of LCM use.   She used two

1  sources of mass shootings which she erroneously characterized as "comprehensive" (p.

2  5).  In fact these sources cover only a tiny minority of mass shootings, those in which

3  four or more persons were killed and that also had various other attributes such as

4  occurring in public places.  By counting only a small share of the mass shootings, Allen

5  grossly overstated the percent that involved LCMs by making the denominator of the

6  percentage far too small.

7      26.    There is no comprehensive listing of all mass shootings available, but the

8  most extensive one by far of which I am aware is at the Shootingtracker.com website.

9  For 2014-2016 (all the complete years available), the compilers identified 992 incidents

10 with four or more victims shot, fatally or nonfatally, or about 331 per year.  They did not

11 arbitrarily confine their sample of mass shootings to those occurring in public or that

12 involved four or more victims killed.  In contrast, Allen's supposedly "comprehensive"

13 Mother Jones compilation covered just 86 mass shootings over the far longer 37-year

14 period from 1982 to 2017, or about 2.3 per year, while her Citizens Crime Commission

15 compilation covered just 33 mass shootings from 1984 to 2012, or about 1.1 per year.  As

16 a result, Allen's sources covered well under one percent of the total number of mass

17 shootings.

18     27.    Thus, Allen managed to conclude that 88% (44 of 50) of mass killings

19 involved LCMs (p. 7) by focusing only on a tiny unrepresentative subset of mass

20 shootings, those with four or more deaths, and only on those where sources stated the

21 capacity of magazines used. For the same 2014-2016 period covered by the

22 ShootingTracker dataset, the Violence Policy Center (2015) identified just *nine* incidents

23 with four or more victims (excluding the shooter) in which a shooter was known to have

24 used a magazine with a capacity exceeding ten rounds.   The Violence Policy Center

25 (VPC) advocates for restrictions on magazine capacity, so its staffers are strongly

26 motivated to identify every single mass shootings in which an LCM was used.  To be

27 sure, VPC staffers would miss an LCM-involved mass shooting if not a single news

28 outlet available to them reported the LCM use, but there is no empirical evidence

whatsoever that such incidents are common.  Webster argues that VPC compilation of LCM-involved mass shootings is incomplete (p. 9), but does not offer a scintilla of empirical evidence that it is *significantly* incomplete.  As far as he or anyone else knows, the VPC compilation of LCM-involved mass shootings is the most comprehensive available.

28.     Based on this "best available evidence," the data indicate that there were at least 992 mass shootings (four or more victims) in the U.S. in 2014-2016 (ShootingTracker.com 2017), but only 9 mass shootings in which an LCM was known to have been used (Violence Policy Center 2017).   These more comprehensive data therefore imply that *only about 8/100th of one percent of mass shootings were known to involve the use of magazines with a capacity exceeding ten rounds*. – a far cry from the Defendant's experts claims that *most* mass shootings involve LCM use.

29.     One could speculate that there are huge numbers of mass shootings that involved LCMs but that not a single news source known to VPC reported the LCM involvement, but one should not lose sight of the fact that this is just guesswork, not evidence.  My conclusions are based on the best available empirical evidence.  In any case, even if the true number of LCM-involved mass shootings was double or triple the number indicated by the VPC data, the conclusion that mass shootings rarely involve use of LCMs would still be valid.  For example, if VPC staff discovered only one third of such incidents, it would imply there were 27 such incidents in 2014-2016 rather than nine, making the LCM-involved share of mass shootings 2.72% (27 of 992).  Either way, the claim by Allen that 88% of mass shootings involve LCMs is wildly inaccurate, and even a vaguer claim that LCMs are involved in a large share of mass shootings is not supported.  Even with substantial undercounting of LCM-linked incidents, the evidence would still indicate that mass shootings rarely involve LCMs.

/ / /

/ / /

/ / /

SUPPLEMENTAL DECLARATION OF GARY KLECK ISO MOTION FOR PRELIMINARY INJUNCTION

**The Use of LCMs Has No Known Causal Effect on the Number of Persons Shot in Mass Shooting Incidents**

30.     Advocates of LCM bans note that the use of LCMs allows offenders in mass shootings to fire many rounds without reloading, and argue that reloading is relevant to the casualty count in mass shootings because either (1) reloading gives bystanders an opportunity to tackle the shooter and stop the shooting, or (2) reloading provides nonshooting intervals when potential victims can escape.  For example, Defense expert John Donahue argues that "bans on large capacity magazines can help save lives by forcing mass shooters to pause and reload ammunition" (p. 5).  Close examination of the way mass shootings actually proceed indicates that bystanders in mass shootings having tackled mass shooters while they were reloading only once, or possibly twice, in the past 30 years, and that reloading detachable magazines does not make nonshooting intervals in these incidents any longer than when the shooter is not reloading (Kleck 2016).

31.     John Donahue (pp. 6-7) claimed to know of at least 20 mass shooting incidents in which bystanders tackled the shooter while he was "stopping to reload his weapon" (p. 6), based on "a review of the resolution of mass shootings in the U.S." Since Donahue does not cite any other person's review, this is presumably a review he conducted himself.  He failed, however, to describe or even briefly outline the methods by which he conducted the review, making it impossible to judge whether it was competently done.  Competent scholars describe their methods and cite sources.  Notwithstanding his allusion to 20 incidents, Donahue was actually able to cite just *four* specific mass shooting incidents occurring within the past thirty years, in which bystanders allegedly tackled shooters while they were reloading (p. 6).  One of them, which I have reported in previous research (Kleck 1997; 2016) genuinely qualifies – in the 1993 Long Island railroad incident bystanders did tackle the shooter while he was attempting to reload, though he was trying to reload individual rounds rather than an entire magazine.  On the other hand, a 1994 shooting near the White House cited by Donahue does not remotely qualify, since it was not even a mass shooting.  The

13

perpetrator did not shoot a single person, never mind a large number.  The 1998 Oregon incident cited by Donahue also does not qualify because the shooter was not reloading when he was tackled (Kleck 2016).  Finally, it is uncertain whether Donahue's fourth cited incident, the Gabrielle Giffords shooting in Tucson, qualifies, since it is unclear from media accounts whether bystanders were able to subdue the shooter because (1) he was reloading (Donahue's position), or because (2) his magazine had failed due to a broken spring and he was unable to fire (Kleck 2016).  Since such magazine defects would disrupt a mass shooter's firing regardless of whether the magazine's capacity was large or small, interpretation (2) would not support the position that use of smaller capacity magazines would have reduced the casualty count.  In short, there may be only a single unique mass shooting incident in the past 30 years (the 1993 Long Island shooting) that clearly involved the shooter being tackled while reloading, and none in the past 20 years.

32.     Donahue (pp. 6-7) padded out his list of mass shooting incidents in which magazine changes purportedly affected the casualty count by citing the Sandy Hook shooting, arguing that potential victims escaped "while the shooter was switching magazines."  While he claims that there have been "many" mass shooting incidents in which this happened, the Sandy Hook shooting is the only one he could cite.  He flatly stated that "11 children at Sandy Hook Elementary School were able to escape while Adam Lanza reloaded his 30 round LCM" (p. 7).   Donahue's sole support for this claim is an article in the *Hartford Courant.*  That article, however, made it clear that this claim was nothing more than a speculation made by an unnamed source.  Some children did escape, and there was a pause in the shooting, but according to the official report of the incident, investigators could not establish either (1) that the children escaped during the pause, or (2) that the shooter was reloading during the pause (State's Attorney Report 2013).

33.     Indeed, it is unlikely that the Sandy Hook shooter even needed to reload. Crime scene investigators found multiple magazines that had cartridges still left in them,

1    indicating that even when the shooter did change magazines, he did not do so because he

2    *had to,* i.e. because he had exhausted the magazines.  Instead, the shooter had *chosen* to

3    change magazines when he could have continued firing with the same magazine (State's

4    Attorney Report, p. 21).  The significance of this is that at the time the children were

5    escaping, the shooter could have chosen to fire at them by simply continuing to fire the

6    remaining rounds in the unexpended magazine in his gun, rather than changing

7    magazines "prematurely" while they still contained live rounds, as he evidently

8    repeatedly did.  This means even *if* the children escaped during the pause (which is not

9    known), and even *if* the pause was due to a magazine change (which is also not known),

10   one could still not reliably conclude that the children escaped because the shooter had to

11   change a magazine.  In sum, there was no factual foundation whatsoever for the

12   speculation that a need to reload saved any lives in the Sandy Hook incident.

13        34.    In sum, Donahue could cite only one genuinely supportive incident (the

14   1993 Long Island shooting), and one possibly supportive case (the Gabby Giffords

15   shooting), over a period of 30 years, to support his claim that citizens have "frequently"

16   subdued shooters while they stopped to reload.  One or two cases in 30 years in the entire

17   nation probably would not fit most people's notions of what "frequently" means.

18   Regarding his claim that there have been "at least 20 separate shootings" where this

19   happened, Donahue provided no documentation at all.  Twenty cases in thirty years, in a

20   nation with over 300 million people, would not be very frequent either, but Donahue did

21   not supply supporting evidence of this many relevant incidents or even half this many.

22        35.    Webster (p. 7) and Allen (p. 7) both accurately note that there are, on

23   average, more casualties in mass shootings in which LCMs are used than in those in

24   which they are not used, but go on to infer that LCM use *caused* shooters to inflict more

25   casualties.  This simple statistical association, by itself, cannot establish that LCM use

26   causes a higher casualty count.  Unless the use of LCMs has an actual *causal effect*, to at

27   least some degree, on the number of victims harmed in crime incidents, there is no

28   scientific basis for believing that restrictions on LCMs would cause a reduction in the

1   number of casualties in such incidents.  Instead, all evidence known to me, including all

2   evidence presented by the Defendant's experts, is completely consistent with the

3   proposition that LCM use has *no* causal effect of its own on the number of people killed

4   or injured in mass shooting incidents, and that the association between LCM use and

5   casualty count is a spurious (noncausal) association, due to the fact the shooter's

6   preexisting desire or intent to shoot many people affects both (1) the decision to acquire

7   and use LCMs, and (2) the number of people the shooter in fact ends up shooting.

8   Regarding the first effect, mass shootings are typically planned, and thought about by the

9   shooter for a long time, offering ample time for offenders to make preparations such as

10   acquiring guns, ammunition, and magazines (Kleck 2016).  Indeed, the very reasons the

11   Defendant's experts offer for why mass shooters prefer to use LCMs confirm the

12   proposition that a desire to hurt many victims motivates mass shooters to acquire and use

13   LCMs.  Donahue, for example, noted that one mass shooter sought to get a weapon with

14   the highest magazine capacity and commented that "this is exactly what one would do if

15   one wanted to simply kill as many people as possible" (p. 9).  Exactly so – lethality of

16   intent affects choice of weaponry.

17       36.    Regarding the second effect, the intentions of a mass shooter to hurt many

18   people surely has some effect on how many people he in fact ends up hurting.  This must

19   be true unless one is willing to believe that there is no connection whatsoever between

20   human intentions and actions.  I am not aware of any scholar, including the Defendant's

21   experts, who has disputed either causal effect (1) or (2).  Thus, as far as those experts

22   know, the association between LCM use and casualty count may be entirely spurious, i.e.

23   noncausal.

24       37.    The claim that LCM use has an actual causal effect of its own on victim

25   count in mass shootings would become more plausible if close analysis of the details of

26   actual incidents indicated the LCM use was actually necessary or significantly helpful for

27   inflicting as many injuries as were inflicted in LCM-involved mass shootings.  This sort

28   of analysis, however, indicates precisely the opposite (Kleck 2016).

SUPPLEMENTAL DECLARATION OF GARY KLECK ISO MOTION FOR PRELIMINARY INJUNCTION

17cv1017

38.     My close study of every known LCM-involved mass shooting of the past 20 years indicated that there have been *no* mass shootings in the U.S. in the past 20 years in which (1) it was known that LCMs were used and (2) the details of the incident indicated that the shooter needed an LCM to hurt the number of people he killed or injured. Instead, in all incidents where the relevant information was available, mass shooters possessed either multiple guns or multiple magazines, and thus could easily fire many rounds either without reloading at all or by quickly reloading a detachable magazine in a few seconds (Kleck 2016).

39.     The details likewise show that even if shooters had lower capacity magazines and had to reload more often, this would not slow their rate of fire, since the killers in actual mass shootings average so low a rate of fire that the 2-4 seconds it takes to reload would be no longer a time period than the average interval between shots actually fired in mass shootings, even when the offender was not reloading (Kleck 2016). Thus, the details of actual mass shootings do not support the hypothesis that, in the absence of LCMs, more victims would have time to escape because the shooters were making more magazine changes.

40.     Webster objects to my limiting my analysis of mass shootings to those with more than six victims killed or wounding, arguing that such a limitation fails to take account of the possibility that LCMs could also affect the casualty count in incidents with "one to five victims as well" (p. 8).  This observation is utterly irrelevant to the validity of the analysis I performed or my conclusions.  Webster withholds my explicitly stated rationale for analyzing only incidents with many victims.  I did so in an effort to give every possible benefit of the doubt to the proposition that mass shooters' use of LCMs *does* cause an increase in casualty counts.  I did this by intentionally limiting my sample of LCM-involved shooting incidents to those in which LCMs were most likely to have made a difference – those in which many people were shot and many shots were presumably fired.

/ / /

41.     The very fact that advocates of LCM bans focus so heavily on mass shootings rather than on ordinary crimes with few victims (e.g., Violence Policy Center 2015) is attributable to the widespread belief that it is the shootings with many victims where LCM use is most likely to matter.  While LCM use might affect casualty counts even in incidents in few victims, it is relatively *more* likely to affect casualty counts in incidents with many victims.

42.     As I explained at length in my research report (Kleck 2016, p. 33), by analyzing only incidents with a large number of victims, I was intentionally biasing the sample *in favor of* the hypothesis that LCM use increases casualty counts.  Had I included cases with few victims, as Webster seems to be recommending, this would necessarily have weakened support for this hypothesis, by including many incidents in which it was much less likely that the shooter needed an LCM to hurt as many people as he did.

43.     Webster falsely claims that I "made an argument ammunition capacity is only logically relevant in incidents in which there is a high rate of fire over a short span of time" (p. 9).  I never made such a bizarre argument, and Webster was unable to quote or cite any passage where I made this argument.

44.     Webster also makes yet another false claim about my research: "lost in Kleck's analysis and consideration is the fact that there is no way to measure the incidents where there was the potential for a large number of casualties in a shooting but fewer occurred *due to the absence of a LCM*" (p. 9).  This point was in no way "lost" in my research, given that I explicitly stressed this possibility in the published report of my analysis: "one might also speculate that incidents that did *not* end up with many shooting victims turned out that way because the shooter did *not* use an LCM" (Kleck 2016, p. 45).  Unlike Webster, however, I correctly stressed that this is only a speculation, not a fact.  Basing policy analysis on idle speculation while dismissing or downplaying known empirical evidence is irresponsible and unlikely to yield accurate conclusions.

**Allen's Misleading Analysis of the Details of Mass Shootings**

45.     Allen obscures the reality just outlined by describing mass shootings just one

attribute at a time.  For example, she states the percent of mass shooters that used only one gun, but does not say how many of those shooters also had just one magazine.  Likewise, she reports the percent who had only one magazine, but does not say how many of those also had a single gun.  Thus, there is nothing in her analysis to refute the proposition that all mass shooters had *either* multiple guns or multiple magazines – either of which would enable a shooter to fire many rounds with little or no interruption due to reloading.

46.   Allen also misleads the reader by computing these percentages based on all 88 mass shootings in her dataset, not just the 44 known to have involved LCMs.  This is clearly inappropriate because it is an indisputable logical point that LCMs could have affected the casualty counts only in incidents in which an LCM was actually used.  Thus, fully half of Allen's sample incidents (44 of 88 cases) were, as far as Allen could tell, irrelevant to a test of whether LCM use affects the casualty count in mass shootings.  Significantly, Allen does not report the share of incidents with a single gun and/or a single magazine among just mass shootings known to have involved use of LCMs, i.e. within the set of mass shootings known to be relevant to an inquiry as to the impact of LCM use on casualty counts.

47.   All this clearly matters, because when the analysis more appropriately focuses on the share of mass shootings in which the shooter had *either* multiple magazines *or* multiple guns, and is more appropriately confined to incidents in which an LCM was known to have been used, the results are quite different from those generated by Allen's misleading analysis.  My analysis indicated that U.S. mass shooters who used LCMs *all* possessed either multiple guns or multiple magazines, and thus did not need an LCM to fire many rounds without significant interruption (Kleck 2016).

48.   It is significant how Webster words his opinion about the impact of LCM use on casualty counts: "LCMs *can* increase the ability of criminal and those attempting to kill or wound large numbers of innocent people" (p. 17, emphasis added).  To be sure, it is a hypothetical *possibility* that LCM use *might* increase the ability of criminals to hurt

many people, but the best available evidence indicates that, over the past 20 years in the U. S., LCM use has not *actually* caused an increase in the number of people killed or injured in mass shootings (Kleck 2016).  One could justify even the most ineffective public policies to reduce violence by speculating about how crimes *might* occur, but this is surely not a responsible basis for implementing policies that could have serious harmful effects on the public.

49.    Attached as "Exhibit QQ" to the declaration of Anna M. Barvir in Support of Motion for Preliminary Injunction filed on May 26, 2017, is a true and correct copy of Kleck (2016).

**What Koper Actually Concluded Regarding the Impact of the Federal LCM Ban on Crime**

50.    Webster insists (p. 11) that Christopher Koper did not conclude that the federal ban on LCMs was ineffective, and that opponents of the ban have misrepresented his conclusions: "Some claim that bans of assault weapons and LCMs do not work; however, this is not the conclusion of Christopher Koper." This claim is easily refuted, simply by directly quoting Koper.  Here is Koper's conclusion, as conveyed in his last published report (Koper 2013) on the impact of the ban on crime:

> "On balance, these analyses showed no discernible reduction in the lethality or injuriousness of gun violence during the post-ban years (see Koper 2004, Koper and Roth 2001, and Roth and Koper 1997).  Nationally, for example, the percentage of violent gun crimes resulting in death (based on gun homicides, gun assaults, and gun robberies reported to the Uniform Crime Reports) was the same for the period 2001-2002 (2.9%) as it was for the immediate pre-ban period 1992-1993 (Koper 2004, 82, 92). Accordingly, it was difficult to credit the ban with contributing to the general decline in gun crime and gun homicide that occurred during the 1990s" (Koper 2013, p. 165)."

51.    The way Webster manages to suggest that Koper actually found the ban to be effective is by selectively stressing Koper's speculative conclusions about possible future effects of a revised AW ban, and discounting his evidence-based conclusions.

Koper's main evidence-based conclusion about the impact of the AW/LCM ban on crime is the one quoted above.  Koper also, however, *speculated* about the "*potential* long-term effects of banning assault weapons and large-capacity magazines" on violent crime that might be experienced if only various weaknesses of the ban were corrected (Koper 2013, p. 166, emphasis added).  Webster echoes these optimistic speculations (pp. 12-14).

52.    Webster pads out apparent support for the effectiveness of the AW/LCM ban by referring to the supposed effects of the AW ban that Koper found on "the percentage of guns recovered by police that were *assault weapons,*" but this is a red herring that has no relevance to the topic of current interest, i.e. whether the LCM ban reduced the criminal use of *LCMs*.  As Webster concedes (p. 12), Koper "saw no evidence of a decline in LCM use in crime."

**Webster's Analyses Do Not Establish Any Effect of the AW/LCM Ban on Mass Shootings**

53.    Webster professes to perceive a "temporal pattern" in mass shootings occurring in public "that is consistent with a hypothesized protective effect of the … LCM ban" (p. 15), relying on the data displayed in his Figure 1.  He does not explain how the ban could have caused a reduction in killings involving LCMs if the ban did not cause a reduction in criminal use or possession of LCMs, as Koper's research indicated.  Webster's crude visual examination of trends in the frequency of mass shootings can tell us nothing about the impact of the LCM ban because it does nothing to separate the effects of the ban from those of the many other factors that affect violence.

54.    At best, the simple examination of trends in mass shootings can only be used to check whether declines in mass shootings coincided with the time the AW/LCM ban was implemented.  In fact, what is most striking about the patterns in Figure 1 is declines in mass shootings did *not* even approximately coincide with the time that the AW/LCM ban went into effect.  Indeed, mass shootings substantially *increased* after the ban was implemented in 1994, and continued to do so right through 1999.  Webster excuses this by speculating that all the ban's effects were "delayed" (p. 14), and suggests that later

declines in mass shootings reflected the impact of the ban.  Unfortunately, under this line of reasoning, literally *any* drop in violence, at *any* time after 1994, could be attributed to the ban, no matter how ineffective the ban actually was.   Leaving aside this sort of fruitless speculation, the only conclusion we can definitely derive from Figure 1 is that declines in mass shootings did not begin when the LCM ban went into effect.  In any case, Webster's claims are purely speculative.

55.    None of Webster's crude "negative binomial regression analyses" reported on pp. 16-17 do anything to establish *why* the number of victims per mass shooting changed over the 1982-2016, or whether the LCM ban had any effect.  They do no more than what a crude visual examination of the trends shown in Figure 2 (p. 16) could do because they do not control for the effects of any other factors that affect violence.  That is, these simplistic univariate analyses do nothing to establish that the LCM had any causal effect on these trends, as opposed to effects produced by thousands of other possibly relevant factors.  Webster's claim that his results suggest a protective effect of the LCM ban is sheer guesswork.

**The Virginia Data Cannot be Used to Support the Claim that The AW Ban Was Effective in Reducing Criminal Use of LCMs**

56.    Webster (pp. 12-13) tried to buttress his claim that the AW/LCM ban was actually effective by citing a <u>Washington Post</u> article to the effect that the ban, in effect from 1994 to 2004, caused a reduction in LCM use, and that when the ban sunsetted, LCM use went back up.  (From this point forward, Webster simply ignores Koper's finding that the LCM ban did not reduce the use of LCMs in crime.)  Webster concludes that the AW ban was therefore effective in reducing LCM use in crime while it was in effect.

57.    The Virginia data cannot sustain Webster's conclusions.  Webster failed to inform his readers of two critical facts about the Virginia data source.  First, the data source does not even concern guns *used to commit* violent crimes, but merely guns recovered by police (even though Webster explicitly alludes to LCM "use in crime," p.

13).  This is not a minor quibble, since the vast majority of guns recovered by police were not used in violent crimes, but rather were recovered in connection with violations of gun control laws, such as "unlawful possession" (Kleck and Wang 2009).  Thus, the data cited by Webster say nothing whatsoever about trends in the criminal use of LCMs among violent criminals.  This is crucial because guns used in violent crimes are quite different from those connected only with unlawful possession charges (Kleck and Wang 2009).  One therefore cannot infer the characteristics of guns used to commit violent crimes from the characteristics of all guns recovered by police, only a small fraction of which were used to commit violent crimes.

58.    Second, the Virginia data cannot even be used to establish trends in criminal *possession* of guns equipped with LCMs, because it was strictly *optional* whether Virginia police officers chose to record the presence of an LCM in connection with firearms recovered.  They were not required to always record the capacity of every magazine with which recovered firearms were equipped. The inclination of police to record the presence of an LCM can change over time, reflecting the ebbs and flows of police and public concern about LCMs rather than trends in the actual prevalence of LCMs among guns used to commit violent crimes.  As public debate and news media focus on LCMs rose in the 1980s and early 1990s, we would expect that this increased the likelihood that police recorded the presence of LCMs among guns they recovered. Then when the AW ban was enacted in 1994, if police concern about LCMs declined because the LCM problem had supposedly been at least partly "solved" by the LCM ban, this would have reduced the likelihood that police officers would record the presence of an LCM – even if the actual prevalence of LCMs among recovered violent crime guns had remained unchanged.  Finally, after the AW ban sunsetted out of existence in 2004, media attention and public concern would have increased once again, encouraging police officers to record the presence of LCMs in more gun recoveries.

59.    This possibility is not mere speculation.  Prior evidence indicates that when the national debate over "assault weapons" (AWs) was at its peak, the guns chosen by

police to be traced by the Bureau of Alcohol, Tobacco and Firearms (ATF) grossly overrepresented the prevalence of AWs in the full population of crime guns.  Studies of *all* the guns recovered by police typically indicated that less than 2% were AWs, but fully *14%* of guns submitted by police for ATF tracing in 1986-1990 were AWs (Kleck 1997, pp. 112, 141-143).   Thus, police decisions about which subset of recovered guns to submit for tracing resulted in the overrepresentation of AWs by a factor of *over seven*.  Police clearly preferred to request traces on the origins of AWs far more than they did for other types of guns.  That is, when popular and political interest in AWs was high, police focused their attention disproportionately on AWs.  By the same token, when popular and political interest in LCMs became similarly intense, one would expect the same kind of disproportionate police focus on guns equipped with LCMs.

60.    The only thing about the Washington Post data that might have weakly suggested a causal connection between the LCM ban and the prevalence criminal LCM possession was the supposed temporal correspondence between the span of years when the ban was in effect and the timing of increases and decreases in LCM prevalence.  As it happens, the Virginia data did not display any such correspondence.  The start of the drop in LCM prevalence among Virginia recovered "crime guns" did *not* correspond with the year the year the federal LCM ban went into effect, 1994.  From 1994 through 1998, there was no consistent pattern of decline in LCM prevalence among recovered VA crime guns.  *The decline only began in 1999, long after the ban went into effect.*

61.    Although some of the effects of the ban may well have been lagged, as Webster speculates, there nevertheless should have been some immediate reduction in LCM use if the AW ban actually caused such a reduction.  The ban *immediately* stopped the inflow of new LCMs the instant it became effective in 1994, so some of its effects should likewise have begun to become evident immediately, even if its full effects would only became evident later.   Thus, even if one charitably interpreted the Virginia data as reflecting actual changes in criminal use of LCMs (or at least in criminals' possession of LCMs), the timing of changes in LCM trends do not support Webster's thesis that the

AW caused a reduction in criminal LCM use while it was in effect.

**LCMs Are Almost Never Used to Kill Police Officers**

62.     Webster (p. 10) cites a study produced by Handgun Control Inc., the previous name of the gun control advocacy organization now known as the Brady Campaign to Prevent Gun Violence (see his fn. 11).  (The study Webster cited in his fn. 12 has no information of the use of LCMs.)  This study purportedly indicated that an astounding 31-41% of police officers murdered in 1994 were killed with a firearm equipped with a LCM (see his fn. 11).  The cited study is no longer available on the organization's website, if it ever was, and I could not find a copy anywhere else on the Internet, so I cannot evaluate its merits.  Certainly there is reason to question why analysts would focus on a single year's worth of cases when data on killings of police are available for far more years.

63.     I therefore examined the summaries of felonious killings of police officers found on the FBI's website (U. S. Federal Bureau of Investigation 2016) to establish how often LCMs were used in these murders for the most recent 10-year period for which data are available, 2006-2015.  There were *no* cases where it was clear that a LCM was used.  A case occurring in Marlin, TX on 11-1-15 was described involving an offender with a ".38 caliber revolver" that supposedly  had a "magazine …which was designed to hold 15 rounds."  Revolvers do not have magazines; they hold cartridges in a revolving cylinder.  Further, revolver cylinders do not hold 15 rounds; they usually hold just six rounds and almost never more than nine.  Thus, this account was almost certainly erroneous, but it is possible that the authors of the account meant to describe a semi-automatic pistol, which could hold 15 rounds.  Nevertheless, the account also indicated that the magazine still had 14 rounds in it when recovered by police, indicating that the shooter made no use of the supposed large capacity of the magazine.  If a LCM was used at all in this incident, it clearly did not contribute to the killing of the police officer.

64.     I found seven other incidents in which LCMs *might* have been used, based on the fact that offenders fired more than 10 rounds, with no explicit mention of

SUPPLEMENTAL DECLARATION OF GARY KLECK ISO MOTION FOR PRELIMINARY INJUNCTION

reloading or use of multiple guns or multiple magazines (see the incidents occurring in Puerto Rico on 3-10-14 and 12-7-06; in Tallahassee, FL on 11-22-14; in San Antonio, TX on 5-28-11; in Greene County, NC on 7-28-10; in Tucson, AZ on 6-1-9; and in Bastrop, LA on 8-10-07).  Even in these seven cases, however, LCM use is uncertain because it is unknown whether the shooters merely reloaded smaller-capacity magazines or used multiple guns.  Still, if we generously classify all seven of these incidents as cases in which LCMs were used to kill police officers, this means that no more than 1.4% of the 491 police officers killed in the U. S. in 2006-2015 were killed by offenders using LCMs.

65.    This is a long way from Webster's claimed LCM share of "31% to 41% of police officers murdered" (p. 10).  It would be more accurate to say that LCMs are almost never used in the killing of police officers.  Further, it should be noted that, as with mass shootings, we do not know that offenders *needed* LCMs to kill police officers.  It is possible that the offenders who happened to use LCMs could just as easily have killed the officers using multiple guns or multiple smaller-capacity magazines – an issue that neither Webster nor the other Defendant's experts address.

### References

Kleck, Gary. 1997. Targeting Guns.  NY: Aldine.

Kleck, Gary. 2001. Chapter 6 in Armed. NY: Prometheus Books.

Kleck, Gary. 2016. "The effect of large-capacity magazines on the casualty count of mass shootings."  Justice Research and Policy 17:28-47.

Kleck, Gary, and Marc Gertz. 1995. "Armed resistance to crime: the prevalence and nature of self-defense with a gun." Journal of Criminal Law & Criminology 86(1):150-187.

Koper, Christopher S. 2013. "America's experience with the Federal assault weapons ban, 1994-2004." Pp. 157-182 in Reducing Gun Violence in America, edited by Daniel W. Webster and Jon S. Vernick. Baltimore: Johns Hopkins University Press.

1  Metropolitan Life Insurance Company. 1968. "How fatal home firearm accidents occur."
2      Metropolitan Life Insurance Bulletin 49:12-13.
3  ShootingTracker.com. 2017.  Gun Violence Archive – Mass Shootings. Available online
4      at http://www.shootingtracker.com/.
5  State's Attorney Report. 2013. Report of the State's Attorney for the Judicial District of
6      Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda
7      Street, Newtown, Connecticut on December 14, 2012. Office Of The State's
8      Attorney Judicial District of Danbury, Stephen J. Sedensky III, State's Attorney.
9      Report dated November 25, 2013.
10  U.S. Federal Bureau of Investigation. 2016. Law Enforcement Officers Killed and
11      Assaulted. Available online at https://ucr.fbi.gov/ucr-publications.
12  U.S. National Center for Health Statistics (NCHS). 2016.  Deaths: Final Data for 2014.
13      National Vital Statistics Reports.  Available online at
14      https://www.cdc.gov/nchs/data/nvsr/nvsr65/nvsr65_04.pdf.
15  Violence Policy Center. 2017. "Mass Shootings in the United States Involving High-
16      Capacity Ammunition Magazines." Available online at
17      http://www.vpc.org/fact_sht/VPCshootinglist.pdf.
18  Vizzard, William J.  Shots in the Dark: The Policy, Politics, and Symbolism of Gun
19      Control. Lanham, MD: Rowman and Littlefield.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on June 9, 2017.

_Gary Kleck_

Gary Kleck

SUPPLEMENTAL DECLARATION OF GARY KLECK ISO MOTION FOR PRELIMINARY INJUNCTION
17cv1017

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, CALIFORNIA RIFLE & PISTOL ASSOCIATION, INCORPORATED, a California corporation,

Plaintiffs,

v.

XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,

Defendant.

Case No:  17cv1017

**CERTIFICATE OF SERVICE**

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**SUPPLEMENTAL DECLARATION OF GARY KLECK IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

on the following parties by electronically filing the foregoing on June 9, 2017, with the Clerk of the District Court using its ECF System, which electronically notifies them.

Ms. Alexandra Robert Gordon
Deputy Attorney General
alexandra.robertgordon@doj.ca.gov
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004

Anthony P. O'Brien
Deputy Attorney General
anthony.obrien@doj.ca.gov
1300 I Street, Suite 125
Sacramento, CA 95814

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 9, 2017, at Long Beach, CA.

Laura Palmerin

1