1
2
3
4
5
6
7
8
9          UNITED STATES DISTRICT COURT

10        SOUTHERN DISTRICT OF CALIFORNIA

11

12   VIRGINIA DUNCAN, RICHARD          Case No.:  3:17-cv-1017-BEN
     LEWIS, PATRICK LOVETTE, DAVID
13   MARGUGLIO, CHRISTOPHER           **ORDER GRANTING**
14   WADDELL, CALIFORNIA RIFLE &      **PRELIMINARY INJUNCTION**
     PISTOL ASSOCIATION, INC.,
15
                              Plaintiffs,
16
17   v.

18   XAVIER BECERRA, in his official
     capacity as Attorney General of the State
19   of California,

20                            Defendant.

21

22                    **I.  INTRODUCTION**

23        On July 1, 2017, any previously law-abiding person in California who still

24   possesses a firearm magazine capable of holding more than 10 rounds will begin their

25
     new life of crime.  That is because California Penal Code § 32310 was amended last fall
26
27   by the passage of a California ballot initiative, Proposition 63.  With this change,

28   § 32310(c) requires persons who lawfully possess these magazines today to *dispossess*

                                      1

them or face criminal penalties of up to one year in a county jail and a fine of $100 per magazine, or both.[1]  Section 32310(d) provides three options for dispossession.  First, a person may "remove the large-capacity magazine from the State." § 32310(d)(1).  Second, a person may "sell the large-capacity magazine to a licensed firearm dealer." § 32310(d)(2).  Third, a person may "surrender the large-capacity magazine to a law enforcement agency for destruction." § 32310(d)(3).  Naturally, there are statutory exceptions for some individuals such as active and retired law enforcement officers

---

[1]The full text of § 32310 as amended by Proposition 63 is as follows:

§ 32310.  <u>Prohibition on manufacture, import, sale, gift, loan, purchase, receipt, or possession of large-capacity magazines; punishment</u>

(a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b) For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

(c) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing July 1, 2017, any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, or is guilty of a misdemeanor punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

(d) Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:

    (1) Remove the large-capacity magazine from the state;
    (2) Sell the large-capacity magazine to a licensed firearms dealer; or
    (3) Surrender the large-capacity magazine to a law enforcement agency for destruction.

(§§ 32400, 32405, and § 32406). There are also exceptions for employees of armored vehicle businesses (§ 32435) and for movie and television actors when magazines are used as a prop (§ 32445). While there are other exceptions for licensed firearm dealers, manufacturers, and gunsmiths, there are no exceptions made for members of the Armed Forces, or those honorably discharged or retired. Likewise, there are no exceptions for civilian firearms instructors, concealed weapon permit holders, or families who live far from timely help by local law enforcement agencies and who must be self-reliant for their own defense, defense of their families, or of home and property. Finally, there are no exceptions made for citizens who, should the need ever arise, may be called upon to form a militia for the protection of the state from either foreign or domestic enemies.

## A. Complexity

California's gun laws are complicated. *See Peruta v. County of San Diego*, 824 F.3d 919, 925 (9th Cir. 2016) (*en banc*), *cert. denied*, 2017 WL 176580 (June 26, 2017) ("California has a multifaceted statutory scheme regulating firearms."). Proposition 63 adds one more layer of complexity. Perhaps too much complexity. *See id.* at 953 (Callahan, J., dissenting) ("The counties and California have chipped away at the Plaintiffs' right to bear arms by enacting first a concealed weapons licensing scheme that is tantamount to a complete ban on concealed weapons, and then by enacting an open carry ban. Constitutional rights would become meaningless if states could obliterate them by enacting incrementally more burdensome restrictions while arguing that a reviewing court must evaluate each restriction by itself when determining

constitutionality.").  In California, the State has enacted, over the span of two decades, an incrementally more burdensome web of restrictions on the rights of law-abiding responsible gun owners to buy, borrow, acquire, modify, use, or possess ammunition magazines able to hold more than 10 rounds.  The language used, the internally-referenced provisions, the interplay among them, and the plethora of other gun regulations, have made the State's magazine laws difficult to understand for all but the most learned experts.  *See e.g.*, Cal. Pen. Code § 32310(a) (criminalizing manufacturing, importing, keeping for sale, offering for sale, giving, lending, buying or receiving a large capacity magazine while excepting "as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2"); § 32310(b) (defining "manufacturing" as fabricating or assembling a magazine from a combination of parts); § 32415(b) (§ 32310 prohibition on lending does not apply to the loan when it "occurs at a place or location where the possession of the large capacity magazine remains in the accessible vicinity of the person to whom the large capacity magazine is loaned"); § 32406(b) (excepting museums and institutional collections open to the public if securely housed and protected from unauthorized handling); § 32406(f) (excepting a "person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds 10 or fewer rounds of ammunition is compatible with that firearm and the person possesses the large-capacity magazine solely for use with the firearm"); § 16470 (defining "large capacity magazine" to include an ammunition feeding device with the capacity to accept more than 10 rounds

4

but not including a feeding device "that has been permanently altered so that it cannot accommodate more than 10 rounds," and a .22 caliber tube feeding device and a tubular magazine that is contained in a lever-action firearm); § 32311 (criminalizing manufacturing, importing, keeping for sale, offering for sale, giving, lending, buying, or receiving "any large capacity magazine conversion kit"); § 32390 (declaring any large capacity magazine to be a nuisance); § 18010 (destroying nuisance large capacity magazines). Too much complexity fails to give fair notice and violates due process. "[A] penal statute creating a new offense must be sufficiently explicit to inform those who are subject to it what conduct on their part will render them liable to its penalties . . . consonant alike with ordinary notions of fair play and the settled rules of law; and a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law." *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926); *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally*).

At the preliminary injunction hearing, the attorney for the Attorney General, although well prepared, was not able to describe all of the various exceptions to the dispossession and criminalization components of § 32310. Who could blame her? The California matrix of gun control laws is among the harshest in the nation and are filled with criminal law traps for people of common intelligence who desire to obey the law. Statutes must be sufficiently well-defined so that reasonably intelligent citizens can know

5

what conduct is against the law.  The plaintiffs, who are law-abiding responsible residents of California, want to keep pistols and rifles and the magazines that are commonly used with their firearms without running afoul of California's gun control statutes.  But these statutes are too complicated to give fair notice.

**B.  Magazines Able to Hold More than 10 Rounds Are Popular**

Ammunition magazines that hold more than 10 rounds are popular.  Some estimate that as many as 100,000,000 such magazines are currently owned by citizens of the United States.  Under federal law, they may be bought, sold, lent, used, and possessed.  However, unlike citizens and residents of 43 other states, and hundreds if not thousands of local jurisdictions, after June 30, 2017, all law-abiding citizens of California will be deemed criminals *if they simply possess* a lawfully acquired magazine capable of holding more than 10 rounds of ammunition.

**C.  Plaintiffs**

Plaintiffs are a group of California residents who either already own magazines holding more than 10 rounds or who want to own magazines holding more than 10 rounds for their defense of self and state.  Plaintiff Richard Lewis is a law-abiding citizen and an honorably discharged 22-year United States Marine Corps veteran.  For more than 20 years, Lewis has lawfully possessed and continues to possess large capacity magazines.  Plaintiff Patrick Lovette is a law-abiding citizen and an honorably retired 22-year United States Navy veteran.  For more than 20 years, Lewis has lawfully possessed and continues to possess large capacity magazines.  Plaintiffs allege they lawfully possess

6

large capacity magazines for self-defense and other lawful purposes. Plaintiff California Rifle and Pistol Association, Inc, is a membership organization almost as old as the State of California. The organization represents tens of thousands of its California members.

**D.  Constitutional Challenge and Motion for Preliminary Injunction**

Plaintiffs bring facial and as-applied challenges through 42 U.S.C. § 1983 seeking a declaratory judgment that California Penal Code § 32310 (the ban on magazines holding more than 10 rounds) impermissibly infringes on California citizens' federal constitutional right to keep and bear arms, a right protected by the Second Amendment to the United States Constitution. By this motion for preliminary injunction, Plaintiffs seek only to maintain the *status quo* until a final determination is made on the merits of their constitutional claims, by temporarily restraining the State from enforcing the dispossession requirement and criminal penalties associated with § 32310 (c) & (d).

**E.  Two Questions**

Ultimately, this case asks two questions. "Does a law-abiding responsible citizen have a right to defend his home from criminals using whatever common magazine size he or she judges best suits the situation? Does that same citizen have a right to keep and bear a common magazine that is useful for service in a militia? Because a final decision on the merits is likely to answer both questions "yes," but a final decision will take too long to offer relief, and because the statute will soon visit irrevocable harm on Plaintiffs and all those similarly situated, a state-wide preliminary injunction is necessary and justified to maintain the *status quo*. Because Plaintiffs have demonstrated on this

7

preliminary record a likelihood of success on the merits, a likelihood of irreparable harm, a balance of equities that tips in their favor, and that an injunction would be in the public interest, a preliminary injunction will issue.

## II. ARTICLE III STANDING & RIPENESS

Defendant does not challenge Plaintiffs' Article III standing at this time. Nevertheless, federal courts are obligated to satisfy themselves that a plaintiff has standing and that the case is ripe. *Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 11 (2004) (reversing because plaintiff lacked standing). To establish Article III standing, a plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Town of Chester, N.Y. v. Laroe Estates, Inc.*, _ S. Ct. __, 2017 WL 2407473, at *4 (June 5, 2017) (citations and quotation marks omitted). "The same principle applies when there are multiple plaintiffs. At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Id.* at *5. At a minimum, Plaintiffs Lewis and Lovette have standing to challenge the dispossession requirement and criminalization component of California's large capacity magazine ban and their case is ripe.

Article III standing analysis recognizes that, where threatened action by government is concerned, courts do not require a plaintiff to expose himself to criminal liability before bringing suit. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-129 (2007); *Steffel v. Thompson*, 415 U.S. 452 (1974). Under the statute at issue here,

8

merely continuing to possess a magazine able to hold more than 10 rounds may be charged as a criminal misdemeanor. The injury will be immediate and concrete. *See Jackson v. City & County of San Francisco,* 829 F. Supp. 2d 867, 871-872 (N.D. Cal. 2011). Ripeness, however, does require a credible threat of prosecution. That requirement is satisfied here as the Attorney General has not indicated that § 32310 (c) & (d) will not be enforced on July 1, 2017. Moreover, the State has vigorously enforced

§ 32310 in the past.[2]  Therefore, the Article III requirements of standing and ripeness are

---

[2]*See e.g., People v. Verches*, H041967, slip. op., 2017 WL 1880968, at *1-3 (Cal. Ct. App. May 9, 2017).  *Verches* describes the California investigation leading up to a prosecution under the predecessor to § 32310 for *importing a large capacity magazine*:

> "On May 21, 2011, a task force of California law enforcement agents, including special agent Bradley Bautista of the California Department of Justice, Bureau of Firearms, surveilled a gun show in Reno, Nevada.  Their objective was to identify suspected California residents who entered Nevada to purchase weapons or accessories that would be illegal in California. Agents observed an individual, later identified as Verches, purchase an upper receiver for an assault rifle and three large-capacity automatic rifle magazines capable of holding 30 rounds of ammunition.  They also heard Verches ask the vendor if he had a "lower" receiver so he could build an assault rifle. Agent Bautista observed Verches leave the gun show carrying a white plastic bag, which he placed in the rear compartment of a black Mercedes Benz bearing a California license plate.  Agent Bautista did not know if the plastic bag contained the items that Verches had purchased. Verches was accompanied by an unidentified man.
>
> Agent Bautista confirmed that the Mercedes was registered to Verches at a residential address in Morgan Hill, California.  He observed Verches and the unidentified man drive away in the Mercedes, with Verches in the passenger seat.  Agents followed Verches in the Mercedes to various stops around Reno, where Verches exited the vehicle for short periods of time, before eventually arriving at a casino-hotel valet parking lot around 6:33 p.m. Agents twice lost sight of the vehicle during the time they were following it. Agents terminated the surveillance after confirming that Verches was a registered guest at the hotel until May 22, 2011, the next day.  However, agents placed an electronic tracking device on the Mercedes.  Records from the tracking device show that the Mercedes made 15 stops between leaving the gun show and arriving the next day at Verches's house in Morgan Hill.
>
> Agent Bautista conducted a California Automated Firearms System records check that showed Verches did not have any assault rifles registered in his name.  He and another agent also made a positive identification of Verches by comparing his DMV photograph with video taken of Verches's purchase at the gun show.  Agent Bautista conducted an automated criminal history check and public database search, and later verified Verches's address with the Morgan Hill Police Department.  The address matched the registration

satisfied.

## III. STANDARD FOR A PRELIMINARY INJUNCTION

The standard for issuing a preliminary injunction is well established and not in dispute. A plaintiff seeking a preliminary injunction must establish: (1) that he is likely to succeed on the merits; (2) that he is likely to suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008); *Doe v. Harris*, 772 F.3d 563, 570 (9th Cir. 2014).

Plaintiffs claim that § 32310 (c) & (d) trenches on their federal Constitutional rights under the Second Amendment and the Takings Clause. Consequently, a judicial evaluation must be made, beginning with a judgment as to whether there is a likelihood that Plaintiffs will ultimately prevail on the merits of their claims. It is a preliminary judgment. It is made on an incomplete evidentiary record. But the evidence presented is important.[3]

---

address for the Mercedes that agents followed from the gun show. On May 24, 2011, Agent Bautista went to the residence and did not see the Mercedes, but observed Verches exiting the house and leaving in another vehicle that was parked in front and registered in his name. Two days after observing Verches at his house, Agent Bautista obtained a search warrant for unregistered AR–15 type or assault rifles and large-capacity magazines, to be found on Verches's person, in his vehicles, or in his home."

[3]"In *Fyock*, we affirmed the district court's denial of a preliminary injunction to enjoin a city ordinance restricting possession of large-capacity magazines . . . . We concluded that the ordinance would likely survive intermediate scrutiny *because the city presented sufficient evidence* to show that the ordinance was substantially related to the compelling government interest of public safety." *Silvester v. Harris*, 843 F.3d 816, 822 (9th Cir. 2016) (citations omitted) (emphasis added).

## A.  The Second Amendment – Certain Policy Choices Are off the Table

In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court made absolutely clear that "the enshrinement of constitutional rights necessarily takes certain policy choices off the table." *Heller*, 554 U.S. at 636.  The State of California's desire to criminalize simple possession of a firearm magazine able to hold more than 10 rounds is precisely the type of policy choice that the Constitution takes off the table.  Because the right to bear arms includes the right to keep and carry ammunition and magazines holding more than 10 rounds for those arms, for both self-defense and to be ready to serve in a militia, the State's criminalization of possession of "large capacity magazines" likely places an unconstitutional burden on the citizen plaintiffs.

### 1.  Likelihood of Success on the Merits

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. Amend. II.  Second Amendment rights are not watered-down,[4] second-class rights.[5]  "[I]t is clear that the Framers and ratifiers of the Fourteenth

---

[4]"In *Heller,* however, we expressly rejected the argument that the scope of the Second Amendment right should be determined by judicial interest balancing, and this Court decades ago abandoned 'the notion that the Fourteenth Amendment applies to the States only a *watered-down*, subjective version of the individual guarantees of the Bill of Rights.'"  *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 785–86 (2010) (citations omitted) (emphasis added).

[5]"Municipal respondents' remaining arguments are at war with our central holding in *Heller* : that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home.  Municipal respondents,

Amendment counted the right to keep and bear arms among those fundamental rights necessary to our system of ordered liberty." *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 778 (2010). The right to bear arms for a legal purpose is an inherent right pre-dating and transcending the Second Amendment. "The right there specified is that of 'bearing arms for a lawful purpose.' This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence." *United States v. Cruikshank,* 92 U.S. 542, 553 (1875), *overruled on other grounds*, *United States v. Miller*, 307 U.S. 174 (1939).

Some may fear that the right to keep and bear arms means citizens hold a right to "possess a deadly implement and thus has implications for public safety," and that "there is intense disagreement on the question whether the private possession of guns in the home increases or decreases gun deaths and injuries." *McDonald*, 561 U.S. at 782-83 (argument of the City of Chicago). True enough. But, public safety interests may not eviscerate the Second Amendment.[6] "The right to keep and bear arms, however, is not the only constitutional right that has controversial public safety implications. All of the

---

in effect, ask us to treat the right recognized in *Heller* as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees that we have held to be incorporated into the Due Process Clause." *McDonald*, 561 U.S. at 780.

[6]For example, the Supreme Court reminds us that, "[o]ur precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role . . . the Government's authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010).

13

constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category." *McDonald*, 561 U.S. at 783 (collecting cases where those likely guilty of a crime are set free because of constitutional rights).

The Supreme Court recognizes an individual's right to keep and bear arms under the Second Amendment for self-defense in the home. *Heller*, 554 U.S. at 636. This right to keep and bear arms is fundamental and is incorporated against states under the Fourteenth Amendment. *McDonald*, 561 U.S. at 791.

The Supreme Court also recognizes that the Second Amendment guarantee includes firearms that have "some reasonable relationship to the preservation or efficiency of a well regulated militia." *Miller*, 307 U.S. at 178. *Miller* implies that possession by a law-abiding citizen of a weapon that could be part of the ordinary military equipment for a militia member, or that would contribute to the common defense, is protected by the Second Amendment.[7] Concluding that magazines holding more than 10 rounds might be found among today's ordinary military equipment or that such magazines would contribute to the common defense, requires only a modest finding.

---

[7]In *Miller*, the weapon was a sawed-off shotgun. Because there was little evidence before the district court that a sawed-off shotgun could be "any part of the ordinary military equipment or that its use could contribute to the common defense," possession of the weapon was not protected by the Second Amendment. *Miller*, 307 U.S. at 178 (citation omitted).

### a. Self-defense and militia use

*Heller* and *Miller* are not inconsistent. *Heller* acknowledges that protection for weapons useful to a militia are also useful for defending the home. "It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self defense weapon . . . . Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid." *Heller*, 554 U.S. at 629. As *McDonald* puts it, "[i]n *Heller,* we recognized that the codification of this right was prompted by fear that the Federal Government would disarm and thus disable the militias, but we rejected the suggestion that the right was valued only as a means of preserving the militias. On the contrary, we stressed that the right was also valued because the possession of firearms was thought to be essential for self-defense. As we put it, self-defense was 'the *central component* of the right itself.'" *McDonald*, 561 U.S. at 742 (emphasis in original).

In *Caetano v. Massachusetts*, the Court underscored these two related points from *Heller* and *McDonald*. First, the Second Amendment extends to common modern firearms useful for self-defense in the home. Second, there is no merit to "the proposition 'that *only* those weapons useful in warfare are protected.'" *See Caetano*, 136 S. Ct. 1027, 1028 (2016) (per curiam) (quoting *Heller*, 554 U.S. at 582, 624-25) (remanding for further consideration of whether Second Amendment protects stun guns) (emphasis added); *contra Kolbe v. Hogan,* 849 F.3d 114, 131 (4th Cir. 2017) (weapons useful in warfare are not protected by the Second Amendment).

17cv1017-BEN

### b. Ammunition magazines are arms

The Second Amendment protects firearms and the ammunition and magazines that enable arms to fire. The Second Amendment does not explicitly protect ammunition. "Nevertheless, without bullets, the right to bear arms would be meaningless. A regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson,* 746 F.3d at 967. "Thus the right to possess firearms for protection implies a corresponding right to obtain the bullets necessary to use them." *Id.* (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (holding that the right to possess firearms implied a corresponding right to have access to firing ranges in order to train to be proficient with such firearms). Indeed, *Heller* did not differentiate between regulations governing ammunition and regulations governing the firearms themselves. *Id.* The same is true for magazines. "Constitutional rights thus implicitly protect those closely related acts necessary to their exercise . . . The right to keep and bear arms, for example 'implies a corresponding right to obtain the bullets necessary to use them.'" *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) (quoting *Jackson*, 746 F.3d at 967). Without protection for the closely related right to keep and bear ammunition magazines for use with the arms designed to use such magazines, "the Second Amendment would be toothless." *Id*.

Most, if not all, pistols and many rifles are designed to function with detachable magazines. They are necessary and integral to the designed operation of these arms. Of course, when a magazine is detached the magazine is not a firearm. It is not dangerous.

16

It may be made of stainless steel or it may be made of polymers, but it cannot fire a single round of ammunition. Its only function is to hold ammunition. Other parts of a firearm are also necessary and integral to the designed operation, but may be separated (*e.g.*, removable gun barrels, gun sights, trigger assemblies, hand grips, etc.). For firearms designed to have magazines, without the magazine attached, the weapon may be limited to firing a single round in the chamber, or not at all (as is the case with some popular pistols designed for safety reasons to fire only when a magazine is in place). Although the State does not concede the issue, neither does it press its case on the argument that magazines are not "arms" for purposes of Second Amendment analysis. Opposition at 9. Nor has any other court considering the question held that a magazine of any capacity is not subject to Second Amendment review. *See e.g., Fyock v. City of Sunnyvale*, 25 F. Supp. 3d. 1267, 1276 (N.D. Cal. 2014), *aff'd*, 779 F.3d 991 (9th Cir. 2015) ("Rather, the court finds that the prohibited magazines are 'weapons of offence, or armour of defence,' as they are integral components to vast categories of guns."). Thus, that which the State defines as a "large capacity magazine" will be analyzed according to Second Amendment principles. This is the theater of operations in which the constitutional battle will be fought.

## 2. Second Amendment Tests

### a. The tripartite binary test with a sliding scale and a reasonable fit

For a Second Amendment challenge, the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit. In other words, there are

three different two-part tests, after which the sliding scale of scrutiny is selected. Most

courts select intermediate scrutiny in the end. Intermediate scrutiny, in turn, looks for a

"reasonable fit." Courts in other circuits tend to also use some variation of a multi-part

test with the result that intermediate scrutiny is applied to gun restrictions. It is,

unfortunately, an overly complex analysis that people of ordinary intelligence cannot be

expected to understand. These complicated legal tests, which usually result in Second

Amendment restrictions passing an intermediate scrutiny test (a test that is little different

from a rational basis test), appear to be at odds with the simple test used by the Supreme

Court in *Heller*. The *Heller* test is a test that anyone can figure out.

> *Heller* asks whether the law bans types of firearms commonly used for
> a lawful purpose — regardless of whether alternatives exist. And
> *Heller* draws a distinction between such firearms and weapons
> specially adapted to unlawful uses and not in common use, such as
> sawed-off shotguns.
> . . .
> Roughly five million Americans own AR-style semiautomatic
> rifles. The overwhelming majority of citizens who own and use
> such rifles do so for lawful purposes, including self-defense and
> target shooting. Under our precedents, *that is all that is needed*
> for citizens to have a right under the Second Amendment to
> keep such weapons.

*Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Justices Thomas and

Scalia dissenting from denial of certiorari) (emphasis added) (citations omitted). A

complicated Second Amendment test obfuscates as it extirpates, but it is the test that this

Court is bound to follow.

18

### b. Constitutionally suspect under the simple test

Under the simple *Heller* test, § 32310 (c) & (d) are highly suspect. They are suspect because they broadly prohibit common pistol and rifle magazines used for lawful purposes. "[T]hat is all that is needed for citizens to have a right under the Second Amendment to keep such weapons." *Friedman*, 136 S. Ct. at 449.

Magazines holding more than 10 rounds are useful for self-defense by law-abiding citizens. And they are common. Lawful in at least 43 states and under federal law, these magazines number in the millions. *Cf. Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (defining the term "common" by applying the Supreme Court test in *Caetano* of 200,000 stun guns owned and legal in 45 states being "common"); *see also NYSR&PA v. Cuomo*, 804 F.3d 242, 255-57 (2nd Cir. 2015) (noting large-capacity magazines are "in common use" as the term is used in *Heller* based on even the most conservative estimates). To the extent they may be now uncommon within California, it would only be the result of the State long criminalizing the buying, selling, importing, and manufacturing of these magazines. To say the magazines are uncommon because they have been banned for so long is something of a tautology. It cannot be used as constitutional support for further banning. *See Friedman v. City of Highland Park, Illinois*, 784 F3d 406, 409 (7th Cir. 2015) ("Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so the it isn't commonly used. A law's existence can't be the source of its own constitutional validity.").

19

Nevertheless, § 32310 (c) & (d) are suspect even under the more complicated analysis employed by the Ninth Circuit Court of Appeals, because the statute is not a reasonable fit as a means to achieve the State's important objectives. To pass muster under the intermediate scrutiny test a statute must have "a reasonable fit" with the State's important interest. The analysis works like this.

### c.  Constitutionally suspect under the "reasonable fit" test

#### i.  burden & scrutiny

First, a court must evaluate the burden and then apply the correct scrutiny. *Jackson*, 746 F.3d at 960 (citing *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013)).  "This two-step inquiry: '(1) asks whether the challenged law burdens conduct protected by the Second Amendment; and (2) if so, directs courts to apply an appropriate level of scrutiny.'"  *Bauer v. Becerra*, 858 F.3d 1216, 2017 WL 2367988, at *3 (9th Cir. 2017) (quoting *Jackson*, 746 F.3d at 960).  As discussed below, § 32310 (c) & (d) burden conduct protected by the Second Amendment.

#### ii.  presumptively lawful or historical regulation

In determining whether a given regulation falls within the scope of the Second Amendment under the first step of this inquiry, another two-step test is used.  "[W]e ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment."  *Id.* (citations omitted).  If the regulation is

presentively lawful, the inquiry ends. Likewise, if the regulation is a historically approved prohibition not offensive to the Second Amendment, the inquiry ends. Section 32310 (c) & (d) fail both parts of the test. A complete ban on ammunition magazines of any size is not one of the presumptively lawful regulatory measures identified in *Heller*. Neither is there any evidence that magazine capacity restrictions have a historical pedigree.

### iii.  closeness to the core and severity of the burden

If the constitutional inquiry may continue, then the correct level of scrutiny must be selected. For that selection a third two-step evaluation is required. The first step measures how close the statute hits at the core of the Second Amendment right. The second step measures how severe the statute burdens the Second Amendment right. "Because *Heller* did not specify a particular level of scrutiny for all Second Amendment challenges, courts determine the appropriate level by considering '(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right.'" *Bauer*, 2017 WL 2367988, at *4 (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). *Fyock v. City of Sunnydale*, 779 F.3d 991, 999 (9th Cir. 2015), has already recognized that a regulation restricting law-abiding citizens from possessing large-capacity magazines within their homes hits at the core of the Second Amendment. *Fyock* said, "[b]ecause Measure C restricts the ability of law-abiding citizens to possess large capacity magazines within their homes for the purpose

of self-defense, we agree with the district court that Measure C may implicate the core of the Second Amendment." *Id.*

### iv. the sliding scale of scrutiny

*Heller* says the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of their home. 554 U.S. at 635.

> Guided by this understanding, our test for the appropriate level of scrutiny amounts to 'a sliding scale.' A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny. Further down the scale, a law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny. Otherwise, intermediate scrutiny is appropriate.

*Bauer*, 2017 WL 2367988, at *4 (citations and quotations marks omitted). Where a restriction "...does not 'severely burden' or even meaningfully impact the core of the Second Amendment right, . . . intermediate scrutiny is . . . appropriate." *See id.* (citing *Silvester,* 843 F.3d at 821 and *Chovan*, 735 F.3d at 1138). *Fyock* held that the district court did not abuse its discretion in finding Sunnyvale's magazine capacity restriction did not have a severe impact. "[T]here was no abuse of discretion in finding that the impact Measure C may have on the core Second Amendment right is not severe and that intermediate scrutiny is warranted." 779 F.3d at 999.

The State argues as a foregone conclusion that intermediate scrutiny is the correct point on the sliding scale for a regulation on magazines. According to the State, *Fyock*'s approval of "intermediate scrutiny" is controlling, and other courts have applied

22

intermediate scrutiny to regulations on large capacity magazines. The approach is consistent with past cases analyzing the appropriate level of scrutiny under the second step of *Heller*, as the Ninth Circuit has repeatedly applied intermediate scrutiny. *See e.g.*, *Silvester*, 843 F.3d at 823 (applying intermediate scrutiny to a law mandating ten-day waiting periods for the purchase of firearms); *Fyock*,779 F.3d at 999 (applying intermediate scrutiny to a law prohibiting the possession of large capacity magazines); *Jackson*, 746 F.3d at 965, 968 (applying intermediate scrutiny to laws mandating certain handgun storage procedures in homes and banning the sale of hollow-point ammunition in San Francisco); *Chovan*, 735 F.3d at 1138 (applying intermediate scrutiny to a law prohibiting domestic violence misdemeanants from possessing firearms). Applying intermediate scrutiny, *Fyock* did find that the plaintiffs were unlikely to succeed on the merits.

The difference here, and it is a important difference, is that the district court in *Fyock* had before it an evidentiary record that was credible, reliable, and on point. *Fyock*, 779 F.3d at 1000 ("Ultimately, the district court found that Sunnyvale submitted pages of credible evidence, from study data to expert testimony to the opinions of Sunnyvale public officials, indicating that the Sunnyvale ordinance is substantially related to the compelling government interest in public safety.''). That is not the case here. Here, the Attorney General has submitted at this preliminary stage incomplete studies from unreliable sources upon which experts base speculative explanations and predictions. The evidentiary record is a potpourri of news pieces, State-generated documents,

conflicting definitions of "mass shooting," amorphous harms to be avoided, and a homogenous mass of horrible crimes in jurisdictions near and far for which large capacity magazines were not the cause.

### v. tailoring required: "a reasonable fit"

Assuming intermediate scrutiny applies, "a reasonable fit" test is conducted. "Our intermediate scrutiny test under the Second Amendment requires that (1) the government's stated objective . . . be significant, substantial, or important; and (2) there . . . be a 'reasonable fit' between the challenged regulation and the asserted objective." *Silvester*, 843 F.3d at 821–22 (quoting *Chovan*, 735 F.3d at 1139). Under the second prong "intermediate scrutiny does not require the least restrictive means of furthering a given end." *Id.* at 827 (quoting *Jackson*, 746 F.3d at 969).

### vi. four important California interests

In this case, the Attorney General identifies four State interests. Each is important. The four articulated State interests are: (1) protecting citizens from gun violence; (2) protecting law enforcement from gun violence; (3) protecting the public safety (which is similar to protecting citizens and law enforcement from gun violence); and (4) preventing crime. *See* Oppo. at 9; 17-18. The question then becomes, whether the dispossession and criminalization components of § 32310's ban on firearm magazines holding any more than 10 rounds is a reasonable fit for achieving these important goals. For intermediate scrutiny "the burden of justification is demanding and it rests entirely on the State." *Tyler v. Hillsdale County Sheriff's Dept.*, 837 F. 3d 678, 694 (6th Cir. 2016) (quoting

24

*United States v. Virginia*, 518 U.S. 515, 533 (1996) (considering the constitutionality of 18 U.S.C. §922(g)(4)'s permanent gun ban for person previously treated for mental illness).

This Court finds on the preliminary evidentiary record before it that the dispossession and criminalization component of §32310 (c) & (d) *is not a reasonable fit.* It may well be that on a more robust evidentiary showing, made after greater time and testimony is taken, that the State will be able to establish a reasonable fit. But not yet. The Attorney General asserts that empirical evidence is not required. Oppo. at 19. He asserts that the substantial evidence demonstrating a reasonable fit can take other softer forms such as "history, consensus, and simple common sense," as well as "correlation evidence" and even simply "intuition." Oppo. at 19-20. But if this "evidence" were sufficient, all firearm restrictions except an outright ban on all firearms would survive review.

Yet, as the Second Circuit cautioned, "on intermediate scrutiny review, the state cannot 'get away with shoddy data or reasoning.' To survive intermediate scrutiny, the defendants must show '*reasonable* inferences based on *substantial* evidence' that the statutes are substantially related to the governmental interest." *NYSR&PA*, 804 F.3d at 264 (citations omitted) (emphasis in original) (striking down New York State's 7-round magazine limit). This Court declines to rely on anything beyond hard facts and reasonable inferences drawn from convincing analysis, which amounts to substantial evidence based on relevant and accurate data sets, when considering whether to maintain

25

the *status quo* or permit a state experiment that will irrevocably harm law-abiding responsible magazine-owning citizens.

### d. The State's evidence

The State's preliminary theoretical and empirical evidence is inconclusive. In fact, it would be reasonable to infer, based on the State's evidence, that a right to possess magazines that hold more than 10 rounds may *promote* self-defense – especially in the home – and would be ordinarily useful for a citizen's militia use. California must provide more than a rational basis to justify its sweeping ban on mere possession. *See e.g., Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("Illinois had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban [on carrying guns in public] is justified by an increase in public safety. It has failed to meet this burden.").

So what is the evidence? The Attorney General has provided expert declarations and 3,100 pages of exhibits.[8] Much of the evidence submitted is dated. Approximately 75% of the exhibits the Attorney General has submitted are older than 2013. The documents that are more recent include various surveys of shooting incidents, news articles, position pieces, and firearm descriptions. The amalgamation of exhibits often seems irrelevant. For example, Exhibit 37 is a smorgasbord of news articles about guns.

---

[8]Both sides interpose evidentiary objections to various documents. The objections are overruled. For a preliminary injunction, a court may "rely on otherwise inadmissible evidence, including hearsay evidence.'' *San Francisco Veteran Police Officers Ass'n, v. City and County of S.F.*, 18 F. Supp. 3d. 997, 1006 (N.D. Cal. 2014) (citations omitted).

Among the offerings is a piece about thirteen separate incidents in Australia going back to 1867 in which there are no mentions of large capacity magazines. Oppo. Gordon Declaration Exh. 37, at 101-04. At Exhibit 37, page 151-52, one finds a news piece about a 17-year-old incident in Brazil involving a submachine gun. News about events in Paris, France and Shfaram, Israel fill pages 162-165 and 175-177, while page 195 tells of a shooter in 2010 using a revolver, and page 132 recounts a shooter using two revolvers.

Another exhibit, the Attorney General's Exhibit 50, appears to be a 100-page, 8-point type, 35-year survey of shooting incidents published by Mother Jones magazine. Oppo. Gordon Declaration at Exh. 50. Mother Jones magazine has rarely been mentioned by any court as reliable evidence. It is fair to say that the magazine survey lacks some of the earmarks of a scientifically designed and unbiased collection of data. In another example, Attorney General's Exhibit 30 includes an article from Mother Jones Magazine with a headline, "'A Killing Machine': Half of All Mass Shooters Used High-Capacity Magazines." Oppo. Gordon Declaration at Exh. 30. Yet, as will be discussed below, the survey found at Attorney General's Exhibit 59 describes in detail only six incidents out of 92 where a mass shooter used a high capacity magazine. Attorney General's Exhibit 14 contains an expert declaration from Christopher Koper that relies, *inter alia*, on Exhibit 30. The expert then concedes that "[A]ssessing trends in LCM [large capacity magazine] use is much more difficult because *there was, and is, no national data source on crimes with LCMs*, and few local jurisdictions maintain this sort of information." Oppo. Gordon Declaration at Exh. 14, n.7 & ¶ 47. Further illustrating

27

the lack of hard data underlying the muddled evidence, Koper then attaches his own published report in support of his Exhibit 14 declaration. Titled "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003," Koper summarizes his findings. He states, "it is not clear how often the ability to fire more than 10 shots without reloading (the current magazine capacity limit) affects the outcomes of gun attacks. All of this suggests that the ban's impact on gun violence is likely to be small." *Id.* at Exhibit "C," ¶ 3.3.

### i. The Mayors Against Illegal Guns survey

Another example of California's evidence is a survey of mass shooting incidents found in the Attorney General's Exhibit 59. Oppo. Gordon Declaration at Exh. 59. The Attorney General relies specifically on Exhibit 59 in its brief. Oppo. at 11-12. Yet, Exhibit 59 tends to prove the opposite of a justification for § 32310 (c) & (d), *i.e.*, it tends to prove there is no need to dispossess and criminalize law-abiding responsible citizens currently possessing magazines holding more than 10 rounds.

Exhibit 59 is a shorter survey of mass shooting incidents that occurred between January 2009 and September 2013. The survey was produced by Mayors Against Illegal Guns.[9] Although the survey describes little about the protocols used to select its data, it

---

[9]Mayors Against Illegal Guns is apparently not a pro-gun rights organization. According to Wikipedia, it was formed by Mayor Michael Bloomberg. Mayor John Tkazik of Poughkeepsie, New York, resigned along with fifty others in 2014, explaining that the organization: "under the guise of helping mayors facing a crime and drug epidemic, MAIG intended to promote confiscation of guns from law-abiding citizens." Later in 2014, it merged with another group and became "Everytown For Gun Safety."

does describe in helpful detail 92 mass shooting incidents (where a mass shooting is defined using the FBI's definition of an incident where four or more people were killed with a gun). The survey describes itself as relying on FBI reports and media reports. Though the study is not ideal, because gun violence is a deadly serious issue, some empirical data needs to be carefully reviewed for purposes of the motion for preliminary injunction.

Thus, to test the claims made by the Attorney General against a set of data he himself offers in support of his justification of § 32310 (c) & (d), the Court has reviewed closely the 92 incidents described in Ex 59.[10] Exhibit 59, like the rest of the Attorney General's anthology of evidence, does not demonstrate that the ban on possession of magazines holding any more than 10 rounds is a reasonable fit, at least at this preliminary stage of the proceedings.

Intermediate scrutiny requires the State to demonstrate a reasonable fit. A reasonable fit cannot be just any fit. This is not simply a policy decision by the State. This affects a Constitutionally protected right. The State may experiment. The State need not create a tight fit. The State need not choose the least restrictive means to achieve its important goals. But the means must provide a reasonable fit. The Attorney General claims that magazines holding any more than 10 rounds may be useful and

---

[10]Due to limited time and judicial resources, Ex 59 will be the empirical data set relied on by the Court to determine reasonable fit. Other surveys may cover larger time periods and use different parameters. Experts relied on by both parties criticize the reliability and inclusivity of all of the available data sets.

appropriate in the military context, but they pose a distinct threat to safety in private settings as well as places of assembly. The Attorney General asserts that the "military-style features of LCMs make them particularly attractive to mass shooters and other criminals and pose heightened risks to innocent civilians and law enforcement." Oppo. at 11. He asserts that "LCMs are used disproportionately in mass killings and in murders of police." Oppo. at 11. The Mayors Against Illegal Guns survey (hereinafter "Mayors' survey") belies these assertions. Oppo. Gordon Declaration, Exh. 59.

### (a) of 92 cases, only 10 are from California

What does the Mayors' survey teach about the fit of California's statute? First, it is noted that 82 of the 92 cases are from jurisdictions beyond California. Only ten of the 92 mass shootings in the survey took place in California. These ten incidents prove very little about whether § 32310 (c) & (d) provide a reasonable fit – or means – of achieving the State's four public safety goals.

### (b) the 10 California cases examined

In three of the ten California incidents, the firearm is unknown and the magazine type, if any, is unknown. (#52 Willowbrook (2/11/11), #65 Los Angeles (4/3/10), #92 Wilmington (1/27/09)).[11] In a fourth incident, a revolver was used. (#18 Tule River Reservation (12/8/12)). Revolvers, of course, do not use magazines at all. In a fifth incident, a pistol was used but no mention is made of a magazine holding any more than

---

[11] The Court has assigned numbers to the list of incidents in the Mayors' survey for ease of reference.

10 rounds. (#20 Northridge (12/2/12)). In a sixth incident, a pistol was used with four (legal) 10-round magazines. (#31 Oakland (4/2/12)). This, of course, tends to prove the statute would not have the desired effect. In two more incidents, the pistols used were purchased legally in California. (#40 Seal Beach (10/12/11); #84 Santa Clara (3/29/09)). These would have been sold with California-legal 10-round magazines. No mention is made of larger magazines being used. If that was the case, then again the data tends to prove that the statute would have no good effect.

### (c)  no effect in eight cases

In other words, only ten of 92 mass shootings occurred in California and § 32310 (c) & (d) would have had no effect on eight of those ten. The criminalization of possession of magazines holding more than 10 rounds would have had no effect on mass killings by revolver. It would have had no effect on pistols bought legally in California because they are sold with 10-round magazines. It would have had no effect on shootings where magazines holding any more than 10 rounds were not used.

### (d) a closer look at the two magazine cases

Of the 92 mass shootings recorded in the Mayors' survey, only two occurred in California *and* involved the use of illegal magazines. (#7 Santa Monica (6/7/13) and #85 Oakland (3/21/09)). In the Santa Monica incident, the shooter brought multiple firearms, as happens to be the case in almost all "mass shootings." He brought an AR-15, a revolver, and 3 zip guns. He reportedly possessed forty 30-round magazines. He killed five victims. The survey notes that the AR-15 and the illegal magazines may have been

31

illegally imported from *outside* of California.  Receiving and importing magazines holding any more than 10 rounds was already unlawful under California law at the time of the Santa Monica tragedy.  In that instance, criminalizing possession of magazines holding any more than 10 rounds likely would not have provided additional protection from gun violence for citizens or police officers or prevented the crime.

In the remaining incident, a shooter in Oakland, California also brought multiple guns.  He used an SKS assault-type rifle with a magazine holding more than 10 rounds and a pistol.  He killed four policemen.  He killed the first two policemen with the pistol when officers stopped his car in a traffic stop.  He then fled on foot to an apartment.  Two more officers were killed with the assault rifle and an illegal large capacity magazine and a third was wounded.  The murderer had a lengthy criminal history, according to the Mayors' survey.  At the time of the mass shooting, the killer *was on parole for assault with a deadly weapon*.  As such, he was *already prohibited from possessing* any kind of gun.  As in the Santa Monica example, criminalizing possession of magazines holding any more than 10 rounds likely would not have provided additional protection from gun violence for citizens and police officers or prevented crime in the Oakland example.

### (e) conclusions from California cases

To sum up, of the 92 mass killings occurring across the 50 states between 2013 and 2009, only ten occurred in California.  Of those ten, the criminalization and dispossession requirements of § 32310 would have had no effect on eight of the shootings, and only marginal good effects had it been in effect at the time of the remaining two shootings.

32

On this evidence, § 32310 is not a reasonable fit.  It hardly fits at all.  It appears on this record to be a haphazard solution likely to have no effect on an exceedingly rare problem, while at the same time burdening the constitutional rights of other California law-abiding responsible citizen-owners of gun magazines holding more than 10 rounds.

### (f)  no effect on revolvers

The evidence surveying the other 82 mass shooting incidents (which occurred outside of California) also suggests § 32310 makes for an uncomfortably poor fit.  For example, as noted earlier, some mass shootings involve only *revolvers* – a style for which there are no magazines.  (#18 Tule River Reservation, Cal. (12/8/12) 5 dead, #29 Port St. John, Fla. (5/15/12) 4 dead; #37 Bay City, Tex. (11/30/11) 4 dead).  California's statute will have no effect on these types of mass shootings.

### (g)  no effect on shotguns

A number of mass shootings involve a *shotgun* as the weapon of choice.  The vast majority of shotguns likewise cannot be equipped with a magazine holding more than 10 rounds.  (#1 Washington, D.C., Navy Yard (9/16/13) 12 dead; #11 Manchester, Ill. (4/24/13) 5 dead; #12 Federal Way, Wash. (4/21/13) 4 dead; #14 Herkimer, N.Y. (4/13/13) 4 dead; #30 Gilbert, Ariz. (5/2/12) shotgun & 2 pistols & 6 hand-grenades, 4 dead; #46 Wagener, S.C. (7/3/11) 4 dead; #51 Oak Harbor, Ohio (4/16/11) shotgun & .22 rifle, 4 dead; #57 Jackson, Ky. (9/10/10) 5 dead; #64 Chicago, Ill. (4/14/10) 5 dead; #69 Bellville, Tex. (1/16/10) shotgun & handgun 5 dead; #83 Carthage, N.C. (3/29/09)

33

shotgun & handgun, 8 dead).  California's statute will have little or no effect on these types of mass shootings.

### (h)  no effect on handguns without large capacity magazines

A large number of mass shooting incidents (40 of 92) were the result of shooters using only *pistols or handguns* for which there is no indication in the Mayors' survey that a magazine holding any more than 10 rounds was employed.  (#2 Crab Orchard, Tenn. (9/11/13); #3 Oklahoma City, Okla. (8/14/13); #4 Dallas, Tex. (8/7/13); #5 Clarksburg, W.V. (7/26/13) (original assailants pointed gun at victim who wrested away the handgun he used to kill the assailants and 2 others); #6 Hialeah, Fla. (7/16/13); #8 Fernley, Nev. (5/13/13); #16 Tulsa, Okla. (1/7/13); #20 Northridge, Cal. (12/2/12); #22 Minneapolis, Minn. (9/27/12); #27 Seattle, Wash. (5/20/12); #31 Oakland, Cal. (4/2/12); #32 Norcross, Ga. (2/20/12); #33 Villa Park, Ill. (1/17/12); #34 Grapevine, Tex. (12/25/11); #35 Emington, Ill. (12/16/11); #38 Greensboro, N.C. (11/20/11); #39 Liberty, S.C. (10/14/11); #40 Seal Beach, Cal. (10/12/11); #41 Laurel, Ind. (9/26/11); #45 Wheatland, Wyo. (7/30/11); #47 Grand Prairie, Tex. (6/23/11); #48 Medford, N.Y. (6/9/11); #50 Ammon, Id. (5/11/11); #53 Minot, N.D. (1/28/11); #55 Boston, Mass. (9/28/10); #56 Riviera Beach, Fla. (9/27/10); #62 Manchester, Conn. (8/3/10); #63 Hialeah, Fla. (6/6/10); #65 Los Angeles, Cal. (4/3/10); #67 New Orleans, La. (3/26/10); #70 Madison, Wis. (12/3/09); #71 Lakewood, Wash. (11/29/09) (hand gun of slain police officer used to kill other officers); #73 Jupiter, Fla. (11/26/09); #74 Pearcy, Ark. (11/12/09); #75 Oklahoma City, Okla. (11/9/09); #79 Kansas City, Kan. (6/22/09) (2 guns stolen from a

34

police sgt.); #80 Middletown, Md. (4/19/09); #84 Santa Clara, Cal. (3/29/09); #87 Miami, Fla. (3/15/09); #90 Cleveland, Ohio (3/5/09); #91 Brockport, N.Y. (2/14/09)). California's statute will have no effect on these types of mass shootings.

### (i) no effects on unknowns and oddities

For 20 of the remaining 92 recorded incidents, the weapon and ammunition used was simply "*unknown*." A few incidents were oddities not easily categorized and not involving a magazine holding any more than 10 rounds. In #4 Dallas, Tex. (8/7/13), the shooter used a handgun and detonated a bomb. New Town, N.D. (#21) (11/18/12) involved a hunting rifle. Oakland, Cal. (#31) (4/2/12) involved a pistol and four 10-round magazines which are lawful in every state. Monongalia, W.V. (#42) (9/6/11) involved a .30-.30 rifle. Carson City, Nev. (#43) (9/6/11) involved an already-illegal machine gun. Appomattox, Va. (#68) (1/19/10) involved a rifle used to shoot at responding police officers. California's statute will have no effect on these types of mass shootings.

### (j) conclusions from 80 of 92 cases

Having examined the facts as reported by the Mayor's survey for all of the mass shooting incidents from around the United States over the fairly recent five-year period, it appears that the vast majority of events are identified as not involving either assault-type rifles or large capacity magazines. To reduce or eliminate such incidents requires some means other than § 32310's dispossession and criminalization approach. The § 32310

35

approach would have had little or no discernable good effect towards reaching California's four important safety objectives.

### (k) six assault rifle cases with no large capacity magazines

The twelve remaining incidents involved either assault-type rifles or magazines holding more than 10 rounds. These deserve a closer look. In six cases an *assault-type rifle* was used but there is no data identifying large capacity magazine use. In Albuquerque, N.M. (#15) (1/19/13) the shooter used four guns: two shotguns, a .22 rifle, and an AR-15. In Wagener, S.C. (#46) (7/3/11), although the shooter owned an AK-47, revolvers and pistols, he chose to use only a shotgun. Put another way, given the choice between using an assault rifle or pistols with large capacity magazines, this mass shooter selected a shotgun as his weapon of choice. In Washington, D.C. (#66) (3/30/10) there were three gunmen who among them used two pistols and one AK-47. In Osage, Kan. (#72) (11/28/09) an "assault rifle" was the weapon. Likewise, in Mount Airy, N.C. (#77) (11/1/09) an "assault rifle" was used. While in Geneva County, Ala. (#89) (3/10/09) the shooter used three weapons: an AR-15, an SKS, and a .38 pistol. The survey does not mention large capacity magazines being used in any of these six incidents.

### (l) remaining 6 cases involve large capacity magazines

The final group of incidents do involve use of magazines holding more than 10 rounds. Of the 92 mass shooting incidents over the five years from 2009 to 2013, although millions of magazines holding more than 10 rounds are owned by citizens nationwide, according to the Mayors' survey, *only six incidents* involved a magazine

36

holding more than 10 rounds.  Two incidents involved a pistol and a magazine holding more than 10 rounds.  Four incidents involved an assault rifle or other weapon and a magazine holding more than 10 rounds.

As noted earlier, the Santa Monica, California incident (#7) on June 7, 2013 involved a shooter with an AR-15, a revolver, and three "zip guns."  The shooter carried forty 30-round magazines (probably for use with the AR-15).  The AR-15 had no serial number.  The shooter was 23-years-old, suggesting that the large capacity magazines he possessed he obtained in violation of California law since he was not old enough to have owned such magazines before California criminalized their purchase or importation.  As mentioned earlier, the Mayors' survey notes that the "assault rifle, high-capacity magazines, and several components to modify the firearms *may have been shipped from outside California*." (Emphasis added).   It is hard to imagine that the shooter, having already evaded California law to acquire large capacity magazines, would have dispossessed himself of the illegally acquired large capacity magazines if the existing law had included the new Proposition 63 amendments to § 32310.

The next and probably most heinous shooting was the well-publicized Sandy Hook Elementary School shooting in Newtown, Connecticut.  (#17) (12/14/12).  The shooter carried a variety of weapons and large capacity magazines.  Shortly afterwards, the State of Connecticut made acquisition of large capacity magazines unlawful.  However, unlike in California, continued possession of pre-ban magazines remained lawful if declared and the magazines were permitted to be filled to capacity for home protection and shooting

37

range practice.  *See* State of Connecticut Department of Emergency Services and Public Protection, Division of State Police, Special Licensing & Firearms Unit: *FAQS REGARDING P.A. 13-3 As Amended by P.A. 13-220* (dated 3/5/14).

The Aurora, Colorado (#24) (7/20/12) movie theater shooting involved the use of a highly unusual 100-round drum magazine on an AR-15, along with a shotgun and two pistols.  The criminalization of possession of 100-round drum magazines would seem to be a reasonable fit as a means to achieve California's important safety objectives.  On the other hand, it may be the type of weapon that would be protected by the Second Amendment for militia use under *Miller*.  In any event, California's § 32310 (c) & (d) would not have prevented the shooter from acquiring and using the shotgun and pistols loaded with smaller 10-round magazines.[12]

The next incident is the Tuscon, Arizona shooting (#54) (1/8/11) in which Chief Judge John Roll, a friend of this Court, was killed.  It involved a 33-round magazine for a Glock 19 pistol.  Again, a 33-round magazine would seem unusual.  But a Glock 19 with its standard magazine would seem to be the quintessential self-defense weapon.

The fifth mass shooting took place in Binghamton, New York (#82) (4/3/09) where two handguns and a 30-round magazine were used in the killing of 14 victims.  The survey reports that 98 rounds were fired in the attack.  Since 1994, it has been illegal in New York to purchase a magazine holding more than 10 rounds.

---

[12]The Colorado incident is the only case where a truly high capacity 100-round magazine was used.

38

The sixth mass shooting occurred in East Oakland, California (#85) (3/21/09) and involved a pistol and a SKS assault-style rifle with a high-capacity magazine. As mentioned earlier, the shooting took place during a time when the shooter, who had a criminal history, was *on parole for assault with a deadly weapon*.

### (m) conclusions from the Mayor's survey

Some conclusions can be drawn from the Mayor's survey submitted by the Attorney General. Of the ten mass shooting events that occurred in California, only two involved the use of a magazine holding more than 10 rounds. In view of the large population of California and the five-year time period studied, it appears that the Prop 63 amendments to § 32310 aim to eliminate that which is an incredibly rare danger to public safety. Moreover, based on this preliminary evidentiary record submitted by the Attorney General, § 32310 is a poor fit as a means to eliminate the types of mass shooting events experienced in California. In other words, § 32310 appears to be a poor fit as a means for the State to achieve its four important objectives.

In East Oakland, the shooter had already demonstrated that he was not a law-abiding responsible gun owner. On the contrary, the Mayors' survey notes that "[t]he shooter had a lengthy criminal history, including a conviction for armed battery, which would have [already] prohibited him from possessing a gun." It notes that "he was on parole for assault with a deadly weapon at the time of the shooting." It also notes that one month before the mass shooting incident in which police officers were targeted, "[t]he shooter took part in a home invasion robbery . . . in which a rifle was reported

39

stolen." Criminalizing possession of a magazine holding any more than 10 rounds, as the amendments to § 32310 do, likely would have had no effect on this perpetrator.

The shooter was already prohibited from possessing a gun, by virtue of his criminal history. He was already at risk of arrest simply by possessing a gun. Moreover, he was probably subject to a Fourth Amendment waiver and search at any time by state parole officers, as a result of being on parole for assault with a deadly weapon. It does not take much imagination to guess that, notwithstanding the amendments to § 32310 (c) & (d), the shooter in that case would have continued to illegally possess his illegally acquired large capacity magazines for use with his illegally possessed firearms.

### (n) a slippery slope

What is clear from the preliminary evidence presented is that individuals who intend to engage in mass gun violence typically make plans. They use multiple weapons and come loaded with extra ammunition. They pick the place and the time and do much harm before police can intervene. Persons with violent intentions have used large capacity magazines, machine guns, hand grenades and pipe bombs, notwithstanding laws criminalizing their possession or use. Trying to legislatively outlaw the commonly possessed weapon *de jour* is like wearing flip flops on a slippery slope. A downhill slide is not hard to foresee.

Tragically, when 30-round magazines are banned, attackers will use 15 or 17-round magazines. If magazines holding more than 10 rounds are banned they will use multiple 10-round magazines. If all semi-automatic weapons are banned they will use

40

shotguns and revolvers.  All of these scenarios already occur.  Because revolvers and handguns are the quintessential home defense weapon protected by the Second Amendment and specifically approved in *Heller*, and because the average defensive gun use involves firing 2.2 rounds (according to the State's experts), states could rationalize a ban on possession of rounds in excess of three per weapon.[13]  Criminals intent on violence would then equip themselves with multiple weapons.  The State could then rationalize a one-weapon-per-individual law.  Since "merely" brandishing a firearm is usually effective as a defense to criminal attack (according to the State's experts), it could be argued that a one-revolver-with-one-round-per-individual ban is a reasonable experiment in state police power as a means to protect citizens and law enforcement officers from gun violence.

Statutes disarming law-abiding responsible citizen gun owners reflect an opinion on gun policy.  Courts are not free to impose their own policy choices on sovereign states.  But as *Heller* explains, the Second Amendment takes certain policy choices and removes them beyond the realm of debate.  Disarming California's law-abiding citizenry is not a constitutionally-permissible policy choice.

_____

[13]In drawing lines and defining how a regulation "fits," this is not so far-fetched.  Indeed, in the past New York State drew the line at seven live rounds arguing that since the average citizen expends only two rounds in self-defense, citizens should make do with seven rounds."  *See New York State Rifle and Pistol Ass'n v. Cuomo*, 990 F. Supp. 2d 349, 372 (W.D.N.Y. 2013), *aff'd in part and rev'd in part,* 804 F.3d 242 (2nd Cir. 2015) ("Defendants contend, pointing to a study conducted by the NRA, that the average citizen using his or her weapon in self-defense expends only two bullets.  Thus, New York argues, citizens do not truly need more than seven rounds.").

To the specific point, a mass shooting accomplished with the use of a gun magazine holding more than 10 rounds of ammunition, or any number of rounds, is an exceedingly tragic event. Fortunately, it is also a rare event. Section 32310's ban and criminalization of possession of magazines holding more than 10 rounds is not likely to prevent future mass shootings. And § 32310 (c) & (d) do not provide a reasonable fit to accomplish California's important goal of protecting the public from violent gun crime, as the preliminary data set from the Mayors' survey bears out.

### ii. The State's Expert Declarations

The preliminary expert witness declarations submitted by the Attorney General are likewise unpersuasive. They do not constitute evidence reasonably believed to be relevant to substantiate the State's important interests. *Fyock*, 779 F.3d at 1000 (city may rely on evidence reasonably believed to be relevant). On the contrary, the data offered by the Attorney General is made up of anecdotal accounts, collected by biased entities, upon which educated surmises and tautological observations are framed. A statute criminalizing the mere possession of an integral piece of a constitutionally protected firearm, cannot be justified on the basis of defective data or emotion-driven claims. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438–39 (2002) ("This is not to say that a municipality can get away with shoddy data or reasoning.").

### (a) Webster

For example, the Attorney General submits the expert declaration of a professor of health policy and management. *See* Declaration of Daniel W. Webster (filed 6/5/17).

42

Although the expert offers many opinions about the public safety threat posed by magazines holding any more than 10 rounds, he concedes that robust supporting data is missing. *"To date, there are no studies that have examined separately the effects of an assault weapons ban, on the one hand, and a LCM ban, on the other hand . . . ."* *Id.* at ¶ 25 (emphasis added). He then opines that the largest protective effect of these bans comes from restricting magazines holding any more than 10 rounds because "LCMs are used much more frequently than assault weapons." As discussed earlier, however, the Mayor's survey paints a different picture. Without the benefit of unbiased, scientifically collected empirical data, it is unclear upon what evidence Professor Webster is basing his opinions.

The professor also acknowledges, that *"no formal, sophisticated analyses of data on mass shootings in public places by lone shooters for the period 1982-2012 collected by Mother Jones magazine has been performed to my knowledge . . . ."* *Id.* at ¶ 22 (emphasis added). He grudgingly admits in his declaration that "it is possible that the federal ban on assault weapons and magazines holding more than 10 rounds did contribute to a proportionately small yet meaningful reduction in gun violence, *but available data and statistical models are unable to discern the effect.*" *Id.* at ¶ 21 (emphasis added). Nevertheless, the professor opines that California's 10-round magazine limit "seems prudent." *Id.* at ¶ 26. In fact, he opines that "[i]ndeed, a lower limit could be justified," based on a complete absence of reliable studies done on formal data sets. *Id.*

### (b) Allen

In another example, the Attorney General submits the declaration of an economist who, like the professor of public health, also acknowledges the shoddy state of empirical research on large capacity magazine use. *See* Declaration of Lucy P. Allen (filed 6/5/17). She found two comprehensive sources detailing mass shootings: (1) data from Mother Jones' investigation published by Mother Jones magazine covering mass shootings from 1982-2017; and (2) a study by the Citizens Crime Commission of New York City covering 1984-2012. *Id.* at ¶ 11. She admits that between the two sources, "[f]or many of the mass shootings, the data does not indicate whether a large-capacity magazine is used." *Id.* at ¶ 13 and n.9. In opining about the use of firearms in self-defense, the economist relies on a data set from the NRA Institute for Legislative Action, but admits that "it is not compiled scientifically." *Id.* at ¶ 6.

### (c) Donahue

In yet another example, the Attorney General submits the declaration of a professor with graduate degrees in economics (from Yale) and law (from Harvard University). *See* Declaration of John J. Donahue (filed 6/5/17). Professor Donahue also notes the dearth of solid data, conceding, *"I am not aware of any current social science research providing an estimate for the number of American households that own large-capacity magazines or LCMs . . . or for the number of LCMs in private hands in America."* *Id.* at ¶ 19 (emphasis added). Citing a few news articles and little more, he opines that, "a review of the resolution of mass shootings in the U.S. suggests that bans on large

44

capacity magazines can help save lives by forcing mass shooters to pause and reload ammunition." *Id*. at ¶ 21.

Ironically, Professor Donahue's declaration was signed, and the preliminary injunction hearing in this case was held, one day before the shooting incident at the baseball field in Alexandria, Virginia. There, a shooter targeted members of a Congressional baseball team firing up to 100 rounds. No one tried to tackle or disarm the shooter while he paused to reload. Instead, it ultimately took two Capitol Police members who were already at the scene to stop the shooter. As Michigan Representative Mike Bishop told CBS News Detroit at the scene,

> "The only reason why any of us walked out of this thing, by the grace of God, one of the folks here had a weapon to fire back and give us a moment to find cover. We were inside the backstop and if we didn't have that cover by a brave person who stood up and took a shot themselves, we would not have gotten out of there and every one of us would have been hit – every single one of us."

*See* http://detroit.cbslocal.com/2017/06/14/michigan-representative-ok; http://dailymail.co.uk/news/article-4603404. Likewise, the shooting at Fort Hood,Texas, involved a shooter using a FN "Five-seveN" pistol which comes standard with a 10 or 20 round magazine. The shooter fired some 220 rounds, meaning he would have had to stop and re-load a 20-round high capacity magazine ten times. Yet no one, even on a military base, tried to tackle or disarm the shooter while he paused to reload.

The expert witness also belittles the possibility of an elderly or disabled homeowner needing a firearm for self-defense from a violent home invasion that would

hold enough rounds such that reloading was not necessary. The elderly or disabled homeowner suffering a violent home invasion attack may need (more than anyone else) a larger capacity magazine for home protection. That person, the expert decries as "mythical," and "conjured" up by NRA experts, and dismisses as irrelevant. *Id.* at ¶ 28.

Professor Donahue then speculates about how *if* there were a "future case" of a law-abiding citizen who needs a gun for self-defense and needs more than 10 rounds, that citizen "can either re-load the defensive weapon by inserting a new clip or by using a second weapon." *Id.* at ¶ 36. Based upon his own speculation, he then opines that this implies the large capacity magazine ban is "well-tailored" and likely to have little or no impact on self-defense capability. *Id.*

The professor did not need to speculate about some unlikely, hypothetical, future case. The scenario has actually played out in the past. And it turns out that his speculation was a bit off. Among the Attorney General's evidentiary presentation is a news account of a law-abiding woman and her husband who late one night needed to fire a gun in self-defense against armed robbers. Oppo. Gordon Declaration, Exh. 41.

As two armed men broke in, Susan Gonzalez was shot in the chest. She made it back to their bedroom and found her husband's .22 pistol. Wasting the first rounds on warning shots, she then emptied the single pistol at one attacker. Unfortunately, out of ammunition, she was shot again by the other armed attacker. She was not able to re-load or use a second gun. Both her and her husband were shot twice. Forty-two bullets were fired. *Id.*, Exh. 41 (Jacksonville Times-Union, July 18, 2000) ("Suddenly the door flew

open and two masked men burst into the doublewide wearing gloves and camouflage jackets and waving guns . . . . She was shot in the chest . . . dialed 911 . . . then grabbed her husband's Ruger .22 from a drawer . . . fired several shots over the robbers' heads to scare them off . . . saw one of the gunmen . . . crouched near her refrigerator. . . sneaked up behind him and emptied the Ruger, hitting him twice with her seven or eight remaining bullets.  The other gunman . . . then shot Susan Gonzalez, now out of ammunition.  [The gunman] fled from the house but returned . . . [.] He put a gun to Susan Gonzalez's head and demanded the keys to the couple's truck."); *cf.* Oppo. Gordon Declaration, Exh. 102 at 388 (Washington Post, Jan. 30, 2013, Transcript of Senate Judiciary Committee Hearing on Gun Violence), Senator L. Graham remarks: "I do not know if 10 versus 19 is common or uncommon.  I do know that 10 versus 19 in the hands of the wrong person is a complete disaster.  I do know that six bullets in that hands [sic] of a woman trying to defend her children may not be enough. . . [.] One bullet in the hands of the wrong person we should all try to prevent.  But when you start telling me that I am unreasonable for wanting that woman to have more than six bullets, or to have and AR-15 if people [are] roaming around my neighborhood, I reject the concept.").  The Attorney General's own evidence casts doubt on the reliability of his experts' opinions.

### (d) James

The Attorney General submits the declaration of a retired police chief of Emeryville, California.  *See* Declaration of Ken James (filed 6/5/17).  James relies on his police experience and debriefings of several high profile mass shootings.  He says that

47

the existence of high capacity magazines only serves to enhance the killing and injuring potential of a firearm. *Id.* at ¶ 6. No quarrel there. Firearms have the potential to injure and kill.[14] He then opines that "possession and use of high capacity magazines by individuals committing criminal acts pose a significant threat to law enforcement personnel and the general public." No doubt about that. He does not, however, try to explain why forcing law-abiding individuals to disarm and dispossess themselves of magazines holding more than 10-rounds is the solution. He simply suggests that victims have not used them in the past and so they do not need them now. *Id.* at ¶ 8. It is hardly surprising, however, that law-abiding citizens in California, who have been prohibited for years from buying guns with magazines holding more than 10 rounds, would fire no more than 10 rounds in a self-defense situation.

James also describes one professional investigation experience in which he took part. Whatever else James draws from the experience, his experience suggests that a criminal firing 40 rounds does not always result in a mass shooting disaster or wounded bystanders. He describes an Emeryville drive-by shooting where more than 40 shell casings were found at the scene; only one person was killed and no other person was injured. *Id.* at ¶ 7. Having read and viewed news accounts of self-defense gun use, James then says, "I have performed these reviews to discover evidence that the ability of a victim to fire a large number was necessary." *Id.* at ¶ 8. Perhaps he meant to say the

---

[14]At the same time, they have the potential to deter and protect.

48

opposite.  Lastly, James' declaration relies on a position paper that appears to have been inadvertently omitted.

### (e)  City of Sunnyvale

In the *Fyock* case, the court had a sufficiently convincing evidentiary record of a reasonable fit.  But there are important differences between the City of Sunnyvale and the entire State of California.  Sunnyvale is the crown jewel of California's Silicon Valley.  It has a population density of approximately 6,173 persons per square mile, according to the 2010 census.  Sunnyvale has consistently ranked among the ten safest cities (of similar size) according to the FBI's crime reports.  According to a Wikipedia article, "Sunnyvale is one of the few U.S. cities to have a single unified Department of Public Safety, where all personnel are trained as firefighters, police officers, and EMTs, so they can respond to an emergency in any of the three roles."  In a dense population municipality where the local government has uniquely cross-trained emergency personnel that can quickly respond to crime, perhaps a law-abiding citizen can make do with a maximum of ten rounds for self-defense.  And perhaps there is a higher risk of stray bullets penetrating walls and wounding bystanders.  And perhaps there are few elderly or disabled single adults living alone and far from help in Sunnydale.  Perhaps residents are wealthy enough to purchase multiple firearms or live in gated, security-guarded enclaves.

Compare this with Imperial County, California, with a population approximately the same as the City of Sunnyvale.  There the population density is only 34 persons per square mile.  In Alpine County, California, the entire county population is 1,175 people,

49

according to the 2010 census. Population density is two persons per square mile. Law enforcement response times are no doubt longer there. The risk of stray bullets wounding bystanders is probably low. It is likely that many rely on themselves and their lawfully-owned firearms for self-defense. Certainly in suburban and rural settings, there will be occasions when more than 10-rounds are needed for self-defense. Even in San Francisco, with the densest population area in the State (17,858 people per square mile[15]), one court conceded that more than 10 rounds may be needed for defense from criminals. *See San Francisco Police Officers Ass'n v. City and County of S.F.*, 18 F. Supp. 3d 997, 1005 (N.D. Cal. 2014) ("Although there will be some occasions when a law-abiding citizen needs more than ten rounds to defend himself or his family, the record shows that such occasions are rare. This will be even rarer in a dense urban area like San Francisco where police will likely be alerted at the onset of gunfire and come to the aid of the victim. Nonetheless, in those rare cases, to deprive the citizen of more than ten shots may lead to his of her own death. Let this point be conceded.").

### iii. False Dichotomy

In the end, it is a false dichotomy upon which the Attorney General rests his evidentiary case. The Attorney General argues that any magazine in criminal hands with more than 10 rounds is "unusually dangerous" to law-abiding citizens. ("Unusually dangerous" is not the same as the Second Amendment reference point of "unusual and

---

[15]*See* www.sacbee.com/news/politics-government/capitol-alert/article 12486362.html (Mar. 4, 2015).

dangerous.")  At the same time he (and his experts) declare that no good law-abiding

citizen really *needs* a gun magazine holding more than 10 rounds for self-defense.

As a purely public policy choice, a government may declare that firearms of any

capacity are dangerous in the hands of criminals, a proposition with which this Court

would certainly agree.  At the same time, it can also be the case that firearms with larger

than 10-round magazines in the hands of law-abiding citizens makes every individual

safer and the public as a whole safer.  Guns in the hands of criminals are dangerous; guns

in the hands of law-abiding responsible citizens ameliorate that danger.  The Second

Amendment takes the policy choice away from state government.  To give full life to the

core right of self-defense of the home, every law-abiding responsible United States

citizen has a constitutionally-protected right to keep and bear a handgun (a handgun

being the quintessential weapon of choice).  Pistols are handguns.  Pistols are designed to

use magazines of various capacities and some of the most popular come standard with 15

or 17 round magazines.

Using the resources of the criminal justice system against the law-abiding

responsible citizen to wrest a heretofore lawfully-possessed magazine holding any more

than 10 rounds out of his or her hands, is hardly the reasonable fit required by

intermediate scrutiny.  The "evidence must fairly support" the "rationale" for the state's

statute.  *Jackson*, 746 F.3d at 969–70.  "[A]nd courts should not credit facially

implausible legislative findings."  *Id.*

51

### iv.  Ballot Initiative Finding

Here, there are no legislative findings as the statutory provisions in effect are the product of a voter initiative.  The initiative contains findings.  But to the extent the findings are relevant, they expresses a purpose that affronts the over-arching ideal of the Second Amendment.  Sections 2.11 and 2.12 of Proposition 63, in the section titled "Findings and Declarations" addresses "military-style large-capacity ammunition magazines."  It declares, "*No one except trained law enforcement should be able to possess these dangerous magazines.*" (Emphasis added.)

The rationale is anathema to the United States Constitution's Bill of Rights guarantee of a right to keep and bear arms.  It is a right naturally possessed by regular, law-abiding responsible citizens, whom are neither reliant upon, nor subservient to, a privileged, powerful, professional police state.[16]

---

[16] *See e.g., Silveira v. Lockyer*, 328 F.3d 567, 569-70 (9th Cir. 2003) (Kozinski, J., dissenting from denial of rehearing *en banc*).  Judge Kozinski cautions against,

> . . . fall[ing] prey to the delusion – popular in some circles – that ordinary people are too careless and stupid to own guns, and we would be far better off leaving all weapons in the hands of professionals on the government payroll.  But the simple truth – born of experience – is that tyranny thrives best where government need not fear the wrath of an armed people.  Our own sorry history bears this out: Disarmament was the tool of choice for subjugating both slaves and free blacks in the South.  In Florida, patrols searched blacks' homes for weapons, confiscated those found and punished their owners without judicial process.  *See* Robert J. Cottrol & Raymond T. Diamond, *The Second Amendment: Toward an Afro-Americanist Reconsideration,* 80 Geo. L.J. 309, 338 (1991).  In the North, by contrast, blacks exercised their right to bear arms to defend against racial mob violence.  *Id.* at 341-42.  As Chief Justice Taney well appreciated, the institution of slavery required a class of people who lacked the means to

52

A reasonable fit as a means to protect citizens and law enforcement from gun violence and crime, in a state with numerous military bases and service men and service women, would surely permit the honorably discharged member of the Armed Forces who has lawfully maintained a magazine holding more than 10 rounds for more than twenty years to continue to keep and use his magazine. These citizens are perhaps the best

---

resist. *See Dred Scott v. Sandford,* 60 U.S. (19 How.) 393 (1857) (finding black citizenship unthinkable because it would give blacks the right to "keep and carry arms wherever they went"). A revolt by Nat Turner and a few dozen other armed blacks could be put down without much difficulty; one by four million armed blacks would have meant big trouble.

All too many of the other great tragedies of history – Stalin's atrocities, the killing fields of Cambodia, the Holocaust, to name but a few – were perpetrated by armed troops against unarmed populations. Many could well have been avoided or mitigated, had the perpetrators known their intended victims were equipped with a rifle and twenty bullets apiece, as the Militia Act required here. If a few hundred Jewish fighters in the Warsaw Ghetto could hold off the Wehrmacht for almost a month with only a handful of weapons, six million Jews armed with rifles could not so easily have been herded into cattle cars.

My excellent colleagues have forgotten these bitter lessons of history. The prospect of tyranny may not grab the headlines the way vivid stories of gun crime routinely do. But few saw the Third Reich coming until it was too late. The Second Amendment is a doomsday provision, one designed for those exceptionally rare circumstances where all other rights have failed where the government refuses to stand for reelection and silences those who protest; where courts have lost the courage to oppose, or can find no one to enforce their decrees. However improbable these contingencies may seem today, facing them unprepared is a mistake a free people get to make only once.

Fortunately, the Framers were wise enough to entrench the right of the people to keep and bear arms within our constitutional structure. The purpose and importance of that right was still fresh in their minds, and they spelled it out clearly so it would not be forgotten.

53

among us.  They have volunteered to serve and have served and sacrificed to protect our country.  They have been specially trained to expertly use firearms in a conflict.  Oppo. Gordon Declaration, Exh. 102 at 389 (Washington Post, Jan. 30, 2013, Transcript of Senate Judiciary Committee Hearing on Gun Violence), Senator J. Johnson remarks: "It is my understanding talking with my associates in the military, that public policing mirrors much of what the military does."  They have proven their good citizenship by years of lawfully keeping firearms as civilians.  What possibly better citizen candidates to protect the public against violent gun-toting criminals?

Similarly, a reasonable fit as a means to protect citizens and law enforcement from gun violence and crime, would surely make an exception for a Department of Justice-vetted, privately trained citizen to whom the sheriff has granted a permit to carry a concealed weapon, and whom owns a magazine holding more than 10 rounds. California's statute does not except such proven, law-abiding, trustworthy, gun-owning individuals.  Quite the opposite.  Under the statute, if not enjoined, all of these worthy individuals will become outlaws on July 1, 2017, should they not dispossess themselves of magazines holding 10+ rounds they currently own.[17]

---

[17]There is some irony in the fact that these CCW holders have abided by the law.  In applying for a concealed weapon permit, they disclose, *inter alia*, their name, physical address, date and place of birth, criminal history, traffic violation history, and the particular type and caliber of firearm (including serial number) they intend to carry.  *See* Cal. Pen. Code § 26175.  In so doing, they provided a ready-made list of gun-owning citizens and a list of the types of guns they carry, which guns are likely to use magazines holding more than 10 rounds.

54

The Attorney General articulates four important objectives to justify this new statutory bludgeon. They all swing at reducing "gun violence." The bludgeon swings to knock large capacity magazines out of the hands of criminals. If the bludgeon does not work, then the criminals still clinging to their large capacity magazines will be thrown in jail while the magazines are destroyed as a public nuisance. The problem is the bludgeon indiscriminately hammers all that is in its path. Here, it also hammers magazines out of the hands of long time law-abiding citizens. It hammers the 15-round magazine as well as the 100-round drum. And it throws the law-abiding, self-defending citizen who continues to possess a magazine able to hold more than 10 rounds into the same jail cell as the criminal. Gun violence to carry out crime is horrendous and should be condemned by all. Defensive gun violence may be the only way a law-abiding citizen can avoid becoming a victim.

Put differently, violent gun use is a constitutionally-protected means for law-abiding citizens to protect themselves from criminals. The phrase "gun violence" may not be invoked as a talismanic incantation to justify any exercise of state power. Implicit in the concept of public safety is the right of law-abiding people to use firearms and the magazines that make them work to protect themselves, their families, their homes, and their state against all armed enemies, foreign and domestic. To borrow a phrase, it would indeed be ironic if, in the name of public safety and reducing gun violence, statutes were permitted to subvert the public's Second Amendment rights – which may repel criminal gun violence and which ultimately ensure the safety of the Republic. *Cf. United States v.*

55

*Robel*, 389 U.S. 258, 264 (1967) ("Implicit in the term 'national defense' is the notion of defending the values and ideals which set this Nation apart. . . . It would indeed be ironic if, in the name of national defense, we would sanction the subversion of one of those liberties – the freedom of association – which makes the defense of the Nation worthwhile.").

### 2. Irreparable Harm

There are elements of Second Amendment jurisprudence that have First Amendment analogies. *See Jackson*, 746 F.3d at 960. The Ninth Circuit has held that the "'[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (alteration in original) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). A "colorable First Amendment claim" is "irreparable injury sufficient to merit the grant of relief." *Warsoldier v. Woodford*, 418 F.3d 989, 1001 (9th Cir. 2005) (internal quotation marks omitted). "If the underlying constitutional question is close. . . we should uphold the injunction and remand for trial on the merits." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 664-65 (2004). The same is true for Second Amendment rights. Their loss constitutes irreparable injury. Perhaps even more so in this context, where additional rounds may save lives, and where Plaintiffs and those like them will irrevocably lose possession and use of their magazines upon delivery to the police to be destroyed, or upon sale to a firearms dealer who will have little market for re-sale, or upon shipment somewhere out of state. The right to keep and bear arms protects

56

tangible and intangible interests which cannot be compensated by damages. *Grace v. District of Columbia*, 187 F. Supp. 3d 124, 150 (D.D.C. 2016) (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011). "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence – and psychic comfort – that comes with knowing one could protect oneself if necessary." *Grace*, 187 F. Supp. 3d at 150. Loss of that peace of mind, the physical magazines, and the enjoyment of Second Amendment rights constitutes irreparable injury.

### 3. Balance of Hardships

Balancing in the First Amendment context weighs more heavily the chilled rights of individuals, especially when criminal sanctions loom. "As to the balance of equities, we recognize that while the preliminary injunction is pending, there will be some hardship on the State. Nevertheless, the balance of equities favors Appellees, whose First Amendment rights are being chilled. This is especially so because the Act under scrutiny imposes criminal sanctions for failure to comply." *Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014). "Where a prosecution is a likely possibility, yet only an affirmative defense is available, speakers may self-censor rather than risk the perils of trial. There is a potential for extraordinary harm and a serious chill upon protected speech." *Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 670-71 (2004). The same is true here. While a preliminary injunction is pending, there will be some hardship on the State. Nevertheless, because §32310 (c) & (d) impose criminal sanctions for a failure to act it

57

poses the potential for extraordinary harm on Plaintiffs, while discounting their Second Amendment rights. The balance of hardships favors Plaintiffs.

### 4. Public Interest

"Once an applicant satisfies the first two factors [likelihood of success on the merits and irreparable harm], the traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *U.S. S.E.C. v. Wilde*, 2013 WL 2303761, at *8 (C.D. Cal. May 20, 2013); *Native Songbird Care and Conservation v. LaHood*, 2013 WL 3355657, at *12 (N.D. Cal. July 2, 2013); *Tracy Rifle & Pistol LLC v. Harris,* 118 F. Supp. 3d 1182, 1193 (E.D. Cal. 2015).

The public interest favors the exercise of Second Amendment rights by law-abiding responsible citizens. And it is always in the public interest to prevent the violation of a person's constitutional rights. *Hobby Lobby Stores, Inc. v. Sibelius*, 723 F.3d 1114, 1145 (10th Cir. 2013), *aff'd sub nom., Burwell v. Hobby Lobby Stores, Inc.*, 134 S. Ct. 2751 (2014); *Doe*, 772 F.3d at 583 (quoting *Sammartano v. First Judicial Dist. Court*, 303 F.3d 959, 974 (9th Cir. 2002)) ("Finally, the public interest favors the exercise of First Amendment rights. Although we appreciate the State's significant interest in protecting its citizens from crime, nothing in the record suggests that enjoining the CASE Act would seriously hamper the State's efforts to investigate online sex offenses, as it can still employ other methods to do so. On the other hand, we 'have consistently recognized the significant public interest in upholding First Amendment

principles.'").  The balance of equities and the public interest merge when a likely constitutionally infringing statute is preliminarily enjoined to maintain the *status quo*. That is the case here.

**B.  The Government Takings Claim**

The Attorney General asserts that, when the government acts pursuant to its police power to protect the safety, health, and general welfare of the public, a prohibition on possession of property declared to be a public nuisance is not a physical taking.  *See* Oppo. at 22, (citing *Chicago, B. & Q. Railway Co. v. Illinois*, 200 U.S. 561, 593-594 (1906) and *Akins v. United States,* 82 Fed. Cl. 619, 622 (2008)).  The Attorney General then cites a number of courts that have rejected Takings Clause challenges to laws banning the possession of dangerous weapons.  *See* Oppo. at 23 (citing *Akins*, 82 Fed. Cl. at 623-24 (restrictions on manufacture and sale of machine guns not a taking) and *Gun South, Inc. v. Brady*, 877 F.2d 858, 869 (11th Cir. 1989) (temporary suspension on importation of assault weapons not a taking)).  California has deemed large capacity magazines to be a nuisance.  *See* Cal. Pen. Code § 32390.  That designation is dubious. As the Supreme Court recognized a decade before *Heller*, "[g]uns in general are not 'deleterious devices or products or obnoxious waste materials.'"  *Staples v. United States*, 511 U.S. 600, 610 (1994) (citation omitted).

Plaintiffs remonstrate that defending the law's forced, uncompensated, physical dispossession of magazines holding more than 10 rounds as an exercise of its "police power" is not persuasive.  Supreme Court precedent casts doubt on the State's theory that

an exercise of the police power cannot constitute physical takings. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982). In *Loretto* – a case the Attorney General does not cite – the Supreme Court held that a law requiring physical occupation of private property was both "within the State's police power" *and* an unconstitutional physical taking. The Court explained that whether a law effects a physical taking is "a separate question" from whether the state has the police power to enact the law. *Id.* at 425-26 ("It is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid. We conclude that a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve.").

In a similar vein, the Supreme Court holds that a law enacted pursuant to the state's "police powers to enjoin a property owner from activities akin to public nuisances" is not immune from scrutiny under the regulatory takings doctrine. *Lucas v. South Carolina Coastal Council* 505 U.S. 1003, 1020-27 (1992). The Court reasoned that it was true "*[a] fortiori*" that the "legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated." *Id.* at 1026.

Recently, the Supreme Court summarized some of the fundamental principles of takings law. *Murr v. Wisconsin*, __ S. Ct. __, 2017 WL 2694699 (Jun. 23, 2017). "The Takings Clause of the Fifth Amendment provides that private property shall not be taken for public use, without just compensation. The Clause is made applicable to the States

60

through the Fourteenth Amendment.  As this Court has recognized, the plain language of the Takings Clause requires the payment of compensation whenever the government acquires private property for a public purpose, but it does not address in specific terms the imposition of regulatory burdens on private property."  *Id.* at *7 (quotations and citations omitted).  *Murr* notes that almost a century ago, the Court held that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking."  *Id.* (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

Takings jurisprudence is flexible.  There are however, two guides set out by *Murr* for detecting when government regulation is so burdensome that it constitutes a taking.  "First, with certain qualifications a regulation which denies all economically beneficial or productive use of land will require compensation under the Takings Clause.  Second, when a regulation impedes the use of property without depriving the owner of all economically beneficial use, a taking still may be found based on a complex of factors, including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action."  *Murr*, 2017 WL 2694699, at *8 (citations and quotation marks omitted).  "[A] physical *appropriation* of property g[ives] rise to a *per se* taking, without regard to other factors."  *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015).

The dispossession requirement of § 32310(c) & (d) imposes a rare hybrid taking. Subsection (d)(3) is a type of physical appropriation of property in that it forces owners of large capacity magazines to "surrender" them to a law enforcement agency "for destruction." Thus, (d)(3) forces a *per se* taking requiring just compensation. But there are two other choices. Subsection (d)(2) forces the owner to sell his magazines to a firearms dealer. It is a fair guess that the fair market value of a large capacity magazine on or after July 1, 2017, in the State of California, will be near zero. Of course, the parties spend little time debating the future fair market value for the to-be-relinquished magazines. Subsection (d)(1) forces the owner to "remove" their large capacity magazines "from the state," without specifying a method or supplying a place. This choice obviously requires a place to which the magazines may be lawfully removed. In other words, (d)(1) relies on other states, in contrast to California, which permit importation and ownership of large capacity magazines. With the typical retail cost of a magazine running between $20 and $50, the associated costs of removal and storage and retrieval may render the process more costly than the fair market value (if there is any) of the magazine itself. Whatever stick of ownership is left in the magazine-owner's "bundle of sticks," it is the short stick.

Here, California will deprive Plaintiffs not just of the *use* of their property, but of *possession*, one of the most essential sticks in the bundle of property rights. Of course, a taking of one stick is not necessarily a taking of the whole bundle. *Murr*, 2017 WL 2694699, at *19 (Roberts, C.J., dissenting) ("Where an owner possesses a full 'bundle' of

62

property rights, the destruction of one strand of the bundle is not a taking, because the aggregate must be viewed in its entirety.").  Nevertheless, whatever expectations people may have regarding property regulations, they "do not expect their property, real or personal, to be actually occupied or taken away." *Horne*, 135 S. Ct. at 2427.  Thus, whatever might be the State's authority to ban the sale or use of magazines over 10 rounds, the Takings Clause prevents it from compelling the physical *dispossession* of such lawfully-acquired private property without just compensation.

Plaintiffs have demonstrated a likelihood of success on the merits of their governmental takings claim.  Without compensation, Plaintiffs will be irreparably harmed as they will no longer be able to retrieve or replace their "large" capacity magazines as long as they reside in California.  As the law-abiding owner relinquishes his magazine, he or she may also forfeit the self-defense peace of mind that a large capacity magazine had instilled.  As in other cases where constitutional rights are likely chilled, the balance of hardships weighs in the citizen's favor. *Doe*, 772 F.3d at 583 ("As to the balance of equities, we recognize that while the preliminary injunction is pending, there will be some hardship on the State.").

The public interest also favors the protection of an individual's core Second Amendment rights and his or her protection from an uncompensated governmental taking that goes too far.  Notably, a preliminary injunction will not increase the number of large capacity magazines lawfully present in California.  The State may continue to investigate and prosecute the unlawful importation, purchase, sale, manufacturing, etc., of large

63

capacity magazines during the pendency of a preliminary injunction.  Regardless of the likelihood of success on Plaintiffs' Second Amendment claims, Plaintiffs are also entitled to a preliminary injunction to maintain the *status quo* and prevent irreparable injury under the Takings Clause of the Constitution.

## IV.  CONCLUSION

Every injury or death caused by the misuse of a firearm is a tragedy.  That the mentally ill and violent criminals choose to misuse firearms is well known.  This latest incremental incursion into solving the "gun violence" problem is a reflexively simple solution.  But as H.L. Mencken wrote, "There is always a well-known solution to every human problem – neat, plausible, and wrong."[18]

Magazines holding more than 10 rounds are "arms."  California Penal Code Section 32310, as amended by Proposition 63, burdens the core of the Second Amendment by criminalizing the mere possession of these magazines that are commonly held by law-abiding citizens for defense of self, home, and state.  The regulation is neither presumptively legal nor longstanding.  The statute hits close to the core of the Second Amendment and is more than a slight burden.  When the simple test of *Heller* is applied, a test that persons of common intelligence can understand, the statute is adjudged an unconstitutional abridgment.  Even under the more forgiving test of intermediate scrutiny, the statute is not likely to be a reasonable fit.  It is not a reasonable

---

[18] H.L. Mencken, *Prejudices: Second Series*, Alfred A. Knopf, Inc. (1920), p. 158.

fit because, among other things, it requires law-abiding concealed carry weapon permit holders and Armed Forces veterans to dispossess themselves of lawfully-owned gun magazines that hold more than 10 rounds – or suffer criminal penalties.

The Court does not lightly enjoin a state statute, even on a preliminary basis. However, just as the Court is mindful that a majority of California voters approved Proposition 63 and that the government has a legitimate interest in protecting the public from gun violence, it is equally mindful that the Constitution is a shield from the tyranny of the majority. Plaintiffs' entitlements to enjoy Second Amendment rights and just compensation are not eliminated simply because they possess "unpopular" magazines holding more than 10 rounds.

If this injunction does not issue, hundreds of thousands, if not millions, of otherwise law-abiding citizens will have an untenable choice: become an outlaw or dispossess one's self of lawfully acquired property. That is a choice they should not have to make. Not on this record.

Accordingly, with good cause appearing for the reasons stated in this opinion, Plaintiffs' motion for a preliminary injunction is GRANTED.

///

///

///

**IT IS HEREBY ORDERED** that:

1.  Defendant Attorney General Xavier Becerra, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order or know of the existence of this injunction order, are enjoined from implementing or enforcing California Penal Code sections 32310 (c) & (d), as enacted by Proposition 63, or from otherwise requiring persons to dispossess themselves of magazines able to hold more than 10 rounds lawfully acquired and possessed.

2.  Defendant Becerra shall provide, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute.  The government shall file a declaration establishing proof of such notice.

**IT IS SO ORDERED.**

DATED:  June 29, 2017

_____
Hon. Roger T. Benitez
United States District Judge