```
1                 UNITED STATES DISTRICT COURT

2             FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3

4    VIRGINIA DUNCAN, ET AL.,           .
                                        .
5             PLAINTIFFS,               .  NO. 17-CV-1017
                                        .
6             V.                        .  JUNE 13, 2017
                                        .
7    XAVIER BECERRA, ET AL.,            .  10:05 A.M.
                                        .
8             DEFENDANTS.               .  SAN DIEGO, CALIFORNIA
     . . . . . . . . . . . . . . . .    .
9

10

11

                    TRANSCRIPT OF MOTION HEARING
12            BEFORE THE HONORABLE ROGER T. BENITEZ
                   UNITED STATES DISTRICT JUDGE
13

14      APPEARANCES:

15

        FOR THE PLAINTIFFS:      MICHEL & ASSOCIATES PC
16                               BY:  SEAN BRADY, ESQ.
                                 180 EAST OCEAN BOULEVARD, STE. 200
17                               LONG BEACH, CALIFORNIA  90802

18      FOR THE DEFENDANTS:      CALIFORNIA DEPARTMENT OF JUSTICE
                                 ATTORNEY GENERAL'S OFFICE
19                               BY:  ALEXANDRA ROBERT GORDON, ESQ.
                                 455 GOLDEN GATE AVENUE, STE. 11000
20                               SAN FRANCISCO, CALIFORNIA  94102

21

        COURT REPORTER:      DEBORAH M. O'CONNELL, RPR, RMR, CSR
22                           333 WEST BROADWAY, SUITE 420
                             SAN DIEGO, CALIFORNIA, 92101
23

24   REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER

25
```

```
 1                  SAN DIEGO, CALIFORNIA, JUNE 13, 2017, 10:05 A.M.

 2                                * * * *

 3

 4              THE COURT:  GOOD MORNING.

 5              THE CLERK:  ONE ON CALENDAR, CASE NO. 17-CV-1017,

 6      DUNCAN, ET AL. V. BECERRA, ET AL., MOTION HEARING.

 7              THE COURT:  ALL RIGHT.  COUNSEL, PLEASE REGISTER YOUR

 8      APPEARANCES.  PLEASE SPEAK SLOWLY SO I CAN WRITE DOWN YOUR

 9      NAMES.

10              MR. BRADY:  SEAN BRADY, ON BEHALF OF PLAINTIFFS.

11              MS. GORDON:  ALEXANDRA ROBERT GORDON, ON BEHALF OF

12      DEFENDANTS.

13              THE COURT:  TODAY IS THE DATE AND TIME SET FOR MOTION

14      HEARING ON THE REQUEST FOR PRELIMINARY INJUNCTION IN THIS CASE.

15          AND I BELIEVE THAT, MR. BRADY, YOU ARE THE ONE WHO IS

16      SEEKING THE INJUNCTION AND, THEREFORE, YOU HAVE THE BURDEN TO

17      GO FORWARD.

18          SO BEFORE WE START, HOWEVER, LET ME ASK MS. GORDON A

19      QUESTION.

20          WHICH VERSION OF SECTION 32310 IS IN EFFECT?  IS IT THE

21      PROP 63 VERSION, OR IS IT THE SB-1446 VERSION?

22              MS. GORDON:  IT IS THE PROP 63 VERSION, YOUR HONOR.

23      IT'S LATER ENACTED SO IT CONTROLS.

24              THE COURT:  THANK YOU.  ALL RIGHT.  MR. BRADY --

25          BY THE WAY, I HAVE READ YOUR BRIEFS.  I READ YOUR REPLY TO
```

1   THE OPPOSITION.  I READ AN AWFUL LOT OF THE MATERIAL.  I THINK

2   THERE WERE LIKE 2,000 PAGES BY -- SUBMITTED BY THE STATE, FILED

3   LATE, AS I RECALL.

4       YOU'RE SUPPOSED TO SUBMIT COURTESY COPIES TO US, ALONG

5   WITH YOUR OPPOSITION, WHICH YOU DID NOT DO.  BUT I WILL FORGIVE

6   YOU THIS TIME, OKAY.

7             MS. GORDON:  THANK YOU, YOUR HONOR.

8             THE COURT:  ALL RIGHT.  SO YOU COMPRESSED MY TIME TO

9   REVIEW ALL OF THIS.  I MADE AN EFFORT TO TRY TO REVIEW ALL OF

10  WHAT WAS SUBMITTED, BUT I WILL TELL YOU I WAS NOT ABLE TO

11  REVIEW ALL OF IT.  SO PLEASE FORGIVE ME IF I MISSPEAK OR MISS

12  SOMETHING.

13      ALL RIGHT, NOW MR. BRADY, THE FLOOR IS YOURS.

14            MR. BRADY:  THANK YOU, YOUR HONOR.

15      WITH THE MOTION BEFORE YOU, THE PLAINTIFFS SEEK MERELY TO

16  PAUSE IMPLEMENTATION OF SECTION 32310, WHICH BANS THE

17  POSSESSION OF CERTAIN AMMUNITION MAGAZINES.  AND IT IS BECAUSE

18  IT VIOLATES VARIOUS PROVISIONS OF THE CONSTITUTION AS LAID OUT

19  IN THE BRIEFING.  AND UNLESS ENJOINED PRIOR TO JULY 1ST, COMING

20  UP HERE SOON, PLAINTIFFS, AS WELL AS COUNTLESS THOUSANDS OF

21  OTHER CALIFORNIANS IN THEIR POSITION, WILL BE PERMANENTLY AND

22  UNLAWFULLY DISPOSSESSED OF PROPERTY THAT THEY LAWFULLY

23  ACQUIRED.  AS SUCH, I THINK THIS IS ESSENTIALLY A PERFECT

24  EXAMPLE OF A CASE WHERE PRELIMINARY INJUNCTION IS APPROPRIATE

25  TO PRESERVE THE LONGSTANDING STATUS QUO AND TO AVOID THOSE

1    INEQUITIES AND IRREPARABLE HARM OF DISPOSSESSING PEOPLE OF

2    THEIR PROPERTY.

3        THE RARITY OF CALIFORNIA'S LAW, BOTH IN SUBSTANCE AND

4    EFFECT, BELIES THE ATTORNEY GENERAL'S ASSERTIONS THAT THERE IS

5    SOME URGENCY OR NEED THAT THIS IS SOME NECESSARY PUBLIC SAFETY

6    MEASURE THAT NEEDS TO BE IMPLEMENTED BY JULY 1ST, AND THAT WE

7    CAN'T WAIT FOR LITIGATION.

8            THE COURT:  AS I RECALL, THERE IS, WHAT, SEVEN STATES

9    IN THE DISTRICT OF COLUMBIA THAT HAVE ADOPTED SIMILAR

10   LEGISLATION.

11           MR. BRADY:  THAT IS CORRECT, YOUR HONOR.

12           THE COURT:  AND I THINK THEY SAID 11 JURISDICTIONS

13   OUT OF HOWEVER MANY THOUSANDS OF JURISDICTIONS WE HAVE IN THE

14   U.S.

15           MR. BRADY:  THAT IS MY UNDERSTANDING.  I DIDN'T DO AN

16   EXHAUSTIVE STUDY OF EVERY CITY OR COUNTY THAT DOES.  WE FOCUSED

17   MAINLY ON THE STATES AND D.C.

18           THE COURT:  YOUR POINT IS, THAT BECAUSE OF THE RARITY

19   OF THESE TYPES OF REGULATIONS, THAT INDICATES THAT THERE IS

20   REALLY NO PRESSING NEED TO DISPOSSESS PEOPLE OF THEIR OTHERWISE

21   LAWFULLY POSSESSED MAGAZINES?

22           MR. BRADY:  PRECISELY, YOUR HONOR.  SO THAT GOES TO

23   THE RARITY OF THE SUBSTANCE OF THIS PARTICULAR STATUTE.  AND I

24   THINK THERE IS ALSO THE RARITY OF ITS EFFECT, WHICH IS ALSO

25   INSTRUCTIVE HERE.  AND THAT IS THAT FEW LAWS COMPEL PHYSICAL

1   DISPOSSESSION OF PRIVATE PROPERTY.  BUT FAR FEWER, IF ANY, GO

2   AS FAR AS CALIFORNIA'S LAW HERE, COMPELLING PHYSICAL

3   DISPOSSESSION OF PROPERTY OWNED BY TENS OF MILLIONS OF

4   AMERICANS, ACCORDING TO THE RECORD, FOR LAWFUL PURPOSES,

5   INCLUDING THE FUNDAMENTAL RIGHT TO SELF-DEFENSE AND CONVERTING

6   OTHERWISE LAW-ABIDING CITIZENS INTO CRIMINALS SOLELY FOR

7   CONTINUING TO POSSESS PROPERTY THAT THEY HAVE HAD FOR AT LEAST

8   17 YEARS WITHOUT INCIDENT.

9        SO AS YOUR HONOR SUGGESTED, SURELY IF THERE WAS THIS NEED

10  TO -- FOR THIS LAW TO GO INTO EFFECT, THERE WOULD BE MORE

11  STATES AND JURISDICTIONS THAT HAD SUCH A LAW --

12             THE COURT:  AND THE FEDERAL BAN WAS ALLOWED TO LAPSE,

13  RIGHT?

14             MR. BRADY:  THAT IS CORRECT, YOUR HONOR.

15             THE COURT:  SO, OBVIOUSLY, AFTER MUCH REVIEW AND

16  DEBATE, THE FEDERAL GOVERNMENT BELIEVED THAT IT WAS NOT

17  NECESSARY AND THEN ALLOWED IT TO LAPSE; IS THAT A FAIR

18  STATEMENT?

19             MR. BRADY:  THAT IS A COMPLETELY ACCURATE STATEMENT

20  AS FAR AS I UNDERSTAND HOW THINGS WENT.  AND IT IS VERY

21  INFORMATIVE AND INSTRUCTIVE HERE, I BELIEVE, THAT THE

22  INDIVIDUAL TASKED WITH REVIEWING THE FEDERAL BAN,

23  MR. CHRISTOPHER KOPER.

24             THE COURT:  DR. KOPER.

25             MR. BRADY:  KOPER.  MADE A REVIEW OF THAT PARTICULAR

```
 1    LAW AND FOUND THERE WAS NO EFFECT.  THAT IT HAD NO EFFECT ON

 2    CRIME.  IT HAD NO EFFECT ON SHOOTINGS.  AND SINCE THAT TIME, IN

 3    HIS -- AND THAT WAS IN 2004, WHEN HE MADE HIS INITIAL

 4    ASSESSMENT OF THAT LAW.  SINCE THEN, BECAUSE, YOU KNOW, PRO GUN

 5    GROUPS HAVE LATCHED ON TO HIS WORK TO SHOW, LOOK, THE

 6    INDIVIDUAL TASKED BY THE U.S. DEPARTMENT OF JUSTICE UNDER THE

 7    CLINTON ADMINISTRATION, WHO WAS IN FAVOR OF THE BAN, SAYS THERE

 8    IS NO DISCERNABLE EFFECT, HE SUDDENLY -- DR. KOPER SUDDENLY

 9    CHANGED HIS TUNE AND SAID, HOLD ON, I DON'T WANT MY WORK TO BE

10    USED TO SUGGEST THAT THERE IS, YOU KNOW, NO BENEFIT TO THESE

11    THINGS.  AND HE SAYS, BASED ON PURE SPECULATION, THAT I BELIEVE

12    THAT IF THE LAW HAD CONTINUED, OR IF IT WAS CHANGED SOMEWHAT,

13    THAT IT MAY HAVE MADE A DIFFERENCE.  BUT THAT'S NOT BASED ON

14    THE TYPE OF CONCRETE EVIDENCE THAT THE GOVERNMENT NEEDS TO

15    SURVIVE HEIGHTENED SCRUTINY.

16        AND SO I THINK BASED ON THAT ALONE, THE GOVERNMENT CAN'T

17    MEET ITS BURDEN.  BECAUSE UNDER ANY LEVEL OF HEIGHTENED

18    SCRUTINY FOR THE SECOND AMENDMENT CLAIM WE'RE TALKING ABOUT A

19    BAN.  AND SO ONCE YOU'RE IN THE -- ONCE YOU ACCEPT --

20            THE COURT:  YOU'RE NOT TALKING ABOUT A BAN.  YOU'RE

21    TALKING ABOUT DISPOSSESSING PEOPLE OF SOMETHING THEY ALREADY

22    POSSESS.

23            MR. BRADY:  CORRECT, YOUR HONOR.  THAT IS UNDER THE

24    TAKINGS CLAIM.

25            THE COURT:  BUT THAT'S OUR -- THAT IS WHY WE'RE
```

```
1    REALLY HERE TODAY IS ONLY WITH REGARDS TO C AND D, RIGHT?

2              MR. BRADY:  YEAH.

3              THE COURT:  THE STATUTE, RIGHT.  SO WE'RE GOING TO

4    DECIDE WHETHER OR NOT PEOPLE CAN BE REQUIRED TO DISPOSSESS

5    THEMSELVES OF THESE MAGAZINES, PENDING A HEARING ON THE MERITS.

6              MR. BRADY:  I THINK THAT IS FAIR TO SAY, YOUR HONOR,

7    YES.  HOWEVER I DO BELIEVE THAT DEPRIVING PEOPLE OF THEIR

8    SECOND AMENDMENT RIGHTS IN ADDITION TO THE DISPOSSESSION --

9              THE COURT:  THAT GOES MORE TO THE MERITS, RIGHT?

10             MR. BRADY:  TRUE.  IT DOES.  BUT, NONETHELESS, THEY

11   WOULD STILL BE INFLICTED WITH A CONSTITUTIONAL INFRINGEMENT,

12   WHICH EVEN FOR A DAY IS IRREPARABLE HARM.  BUT I WILL CONCEDE

13   THAT THE MORE PRESSING PROBLEM IS THE PHYSICAL DISPOSSESSION

14   UNDER THE TAKINGS ANALYSIS.  AND THE ATTORNEY GENERAL,

15   CALIFORNIA ATTORNEY GENERAL ONLY PUTS FORTH TWO POINTS TO

16   OPPOSE OUR TAKINGS CLAIM, BOTH OF WHICH ARE DEMONSTRABLY

17   ERRONEOUS IF YOU LOOK AT THE CASE LAW.

18        THE FIRST POINT IS THAT THE PROPERTY TAKEN HAS TO BE

19   ACTUALLY USED BY THE GOVERNMENT.  BUT IF YOU LOOK AT THE CASE

20   LAW, THE *RICHMOND ELKS HALL ASSOCIATION* CASE SAYS THAT A

21   PHYSICAL TAKING CAN OCCUR EVEN IF THE GOVERNMENT ITSELF DOES

22   NOT, QUOTE, *DIRECTLY APPROPRIATE THE TITLE, POSSESSION, OR USE*

23   *OF THE PROPERTY.*

24        THE *HAWAII HOUSING AUTHORITY VS. MIDKIFF* CASE ALSO SAYS

25   THAT THE GOVERNMENT DOES NOT HAVE TO ACTUALLY USE THE PROPERTY.
```

1    THIRD PARTIES CAN BE INVOLVED, AND THAT IT JUST HAS TO BE FOR A

2    PUBLIC PURPOSE.

3        THE GOVERNMENT'S POSITION IS THAT THEY WANT THESE

4    MAGAZINES OUT OF THE PUBLIC TO BENEFIT THE PUBLIC GOOD.  AND SO

5    WHETHER THE GOVERNMENT IS TAKING PROPERTY TO MAKE SOMETHING, A

6    NEIGHBORHOOD SAFER FOR THE COMMUNITY, OR IS TAKING PERSONAL

7    PROPERTY FOR THE PURPOSE OF MAKING THE COMMUNITY SAFER, EITHER

8    WAY IT IS A TAKING.  THE GOVERNMENT DOESN'T HAVE TO ACTUALLY

9    USE IT.  IT JUST HAS TO BE FOR THE PUBLIC GOOD.  SO THEIR FIRST

10   POINT IS DEMONSTRABLY ERRONEOUS.

11       YOU MOVE ON TO THE SECOND POINT THAT THE ATTORNEY GENERAL

12   MAKES, AND THAT IS --

13           THE COURT:  DO THE PEOPLE HAVE A VESTED OWNERSHIP

14   INTEREST IN THESE MAGAZINES AT THIS TIME?

15           MR. BRADY:  YEAH.  JUST TO BE CLEAR, THE -- ANYBODY

16   WHO CURRENTLY POSSESSES ONE OF THESE MAGAZINES IN CALIFORNIA

17   HAD TO HAVE ACQUIRED THAT PRIOR TO THE YEAR 2000, WHICH MEANS

18   THEY HAVE HAD THEM FOR OVER 17 YEARS, OR THEY CANNOT HAVE

19   LAWFULLY ACQUIRED THEM.  BECAUSE IT HAS BEEN ILLEGAL TO ACQUIRE

20   ONE OR MAKE ONE OR IMPORT ONE SINCE THE YEAR 2000.  SO THAT'S

21   WHY I THINK IT IS PARTICULARLY PROBLEMATIC HERE UNDER THE DUE

22   PROCESS CLAUSE AND TAKINGS CLAUSE.

23           THE COURT:  WOULD THIS BE ANALOGOUS TO, SAY, FOR

24   EXAMPLE, IF YOU HAD A RADIO TOWER THAT HAD BEEN GIVEN TO YOU,

25   YOU'D BEEN GIVEN PERMISSION TO HAVE THAT RADIO TOWER PURSUANT

1   TO SOME CONDITIONAL USE PERMIT OR WHATEVER, AND THEN THE STATE

2   OR THE CITY OR THE COUNTY CAME ALONG AND SAID, WELL, YOU HAVE

3   GOT TO REMOVE IT.  YOU HAVE GOT TO TAKE IT DOWN?

4       MY RECOLLECTION IS THAT THERE ARE CASES THAT SAY THAT, NO,

5   YOU CAN'T DO THAT.  BECAUSE YOU HAVE A VESTED RIGHT IN THE

6   TOWER UNLESS YOU PROVIDE SOME OTHER COMPENSATION OR AN

7   AMORTIZATION PERIOD OR SOMETHING THAT ALLOWS THE PEOPLE TO NOW

8   BE ABLE TO RESOLVE THAT OWNERSHIP INTEREST.  IS THAT A FAIR

9   ANALOGY DO YOU THINK?

10          MR. BRADY:  I THINK THAT IS SPOT ON, YOUR HONOR.  AS

11  LONG AS -- THE GOVERNMENT DOES HAVE THE AUTHORITY TO PHYSICALLY

12  DISPOSSESS PEOPLE OF PROPERTY.  BUT THEY HAVE TO PROVIDE --

13  THEY HAVE TO PROVIDE COMPENSATION, JUST COMPENSATION FROM THE

14  GOVERNMENT.  SECTION 32310 DOES NOT HAVE ANY MECHANISM TO

15  PROVIDE SUCH COMPENSATION, NOR DOES ANY OTHER PROVISION IN

16  CALIFORNIA LAW.  THEY DON'T EVEN PRETEND TO WANT TO PROVIDE

17  COMPENSATION TO PLAINTIFFS OR ANY OF THE OWNERS HERE.  AND

18  THEY -- TO THE CONTRARY, THEY CONTEND THEY DON'T NEED TO.  THEY

19  SAY THIS IS JUST WITHIN THEIR POLICE POWERS.  IT'S NOT A

20  TAKINGS CLAUSE ISSUE, AND SO THEY CAN JUST -- THEY CAN JUST BAN

21  THESE THINGS.  BUT AGAIN, THAT'S THEIR SECOND POINT.  BECAUSE

22  IT'S WITHIN THEIR POLICE POWERS, THE TAKINGS CLAUSE DOESN'T

23  APPLY.  BUT THAT WOULD ESSENTIALLY NULLIFY THE TAKINGS CLAUSE

24  IF THE GOVERNMENT CAN DO ANYTHING WITHIN ITS POLICE POWERS AND

25  NOT BE SUBJECT TO CONSTITUTIONAL SCRUTINY.  AND THAT THE CASE

1    LAW ON THAT POINT, I WOULD DIRECT YOUR HONOR TO THE *LORETTO*

2    CASE AND THE *LUCAS* CASE, WHICH EXPRESSLY CONTRADICTS THAT

3    ASSERTION.  IT SAYS, YES, THE GOVERNMENT HAS THE POLICE POWER

4    TO DO THIS, BUT IT'S STILL A TAKING.  AND BECAUSE THEY DON'T

5    PROVIDE JUST COMPENSATION, IT'S A TAKING.

6        AND SO THOSE ARE THE ONLY TWO ARGUMENTS THAT THE ATTORNEY

7    GENERAL HAS PUT FORTH ON THE TAKINGS CLAIM.  THEY DO NOT

8    DISPUTE THAT IS A PHYSICAL DISPOSSESSION OF PROPERTY.  THEY DO

9    NOT CONTEND THERE IS ANY MECHANISM FOR JUST COMPENSATION, LET

10   ALONE ANY COMPENSATION.

11       AND I WANT TO BE CLEAR THAT THE ABILITY TO SELL A

12   MAGAZINE, SELL ONE OF THESE MAGAZINES FOR THE PLAINTIFFS, IN AN

13   ARTIFICIAL MARKET CREATED BY THE STATE BECAUSE THERE ARE VERY

14   FEW PEOPLE TO WHOM THESE PEOPLE CAN SELL --

15           THE COURT:  THERE WOULD BE NO DEMAND FOR IT.

16           MR. BRADY:  CORRECT.

17           THE COURT:  OR VERY LITTLE DEMAND.  UNLESS YOU SOLD

18   IT OUT OF STATE TO ONE OF THE OTHER 42 STATES THAT DON'T HAVE A

19   BAN ON THEM.

20           MR. BRADY:  CORRECT.  BUT IT WOULD STILL BE A -- IT

21   WOULD STILL BE A TAKINGS WITHOUT JUST COMPENSATION FROM THE

22   STATE.  IT HAS TO BE FROM THE STATE.  THIS IS QUITE CLEAR IN

23   THE STATE LAW THAT IT CANNOT BE A THIRD PARTY PROVIDING THE

24   COMPENSATION FOR THAT VERY REASON, THAT IT WOULD BE AN

25   ARTIFICIAL MARKET.  AND THEY'RE ENTITLED TO JUST COMPENSATION,

1   MARKET VALUE.  AND AS YOUR HONOR JUST INDICATED, IF MARKET

2   FORCES WOULD DICTATE THAT THE POTENTIAL PURCHASER KNOWS THAT

3   THE BUYER MUST SELL, THEN THEY'RE PROBABLY NOT GOING TO GET

4   JUST COMPENSATION.

5       AND, YOU KNOW, SOME OF THESE MAGAZINES THAT WE'RE TALKING

6   ABOUT ARE NOT SOLELY JUST, YOU KNOW, YOUR $20 MAGAZINE.  I'VE

7   SPOKEN TO INDIVIDUALS WHO HAVE COLLECTOR'S ITEMS FROM WORLD

8   WAR I, WORLD WAR II.

9           THE COURT:  THEY COULD SELL THEM TO THE MOVIE

10  INDUSTRY.

11          MR. BRADY:  CORRECT, YOUR HONOR.  WHICH I THINK

12  GOES -- THE FACT THAT THERE IS AN EXCEPTION TO THE LAW FOR THE

13  ENTERTAINMENT INDUSTRY GOES TO THE POINT THAT THIS IS REALLY

14  NOT A SERIOUS ATTEMPT AT CREATING A PUBLIC SAFETY MEASURE BY

15  BANNING THESE MAGAZINES.  IT'S POLITICS.  YOU'RE PRECISELY

16  RIGHT.  THEY WON'T TRUST AN INDIVIDUAL TO CONTINUE TO POSSESS

17  THIS PROPERTY THAT THEY HAVE OWNED FOR OVER 17 YEARS WITHOUT

18  INCIDENT, BUT THEY'LL TRUST THE MOVIE INDUSTRY, YOU KNOW, SOME

19  GUY DRIVING TO AND FROM THE PROP HOUSE TO HAVE ACCESS TO THESE

20  MAGAZINES SO THAT THEY CAN MAKE FILMS AND NOT UPSET THEIR

21  FRIENDS AND POLITICAL ALLIES IN HOLLYWOOD.

22      IT IS QUITE CYNICAL TO SUGGEST THAT THIS IS, YOU KNOW, A

23  DIRE NEED TO REMOVE THESE MAGAZINES.  AND FRANKLY, THAT THEY

24  MAKE AN EXCEPTION FOR RETIRED LAW ENFORCEMENT OFFICERS, IF

25  THERE IS A -- IF THEIR CONTENTION, THE STATE'S CONTENTION IS

1   THAT THESE MAGAZINES ARE ONLY UTILIZED FOR OFFENSIVE PURPOSES,

2   MILITARY PURPOSES, THEN WHAT NEED DOES A RETIRED LAW

3   ENFORCEMENT OFFICER HAVE FOR THEM?  NOW --

4           THE COURT:  LET ME ASK YOU A QUESTION.  SINCE YOU

5   JUST UTTERED THE WORDS *MILITARY PURPOSES.*

6           MR. BRADY:  YES, YOUR HONOR.

7           THE COURT:  DO YOU THINK IT IS INCONSISTENT FOR

8   LAW-ABIDING CITIZENS TO POSSESS WEAPONS THAT WOULD -- THAT ARE

9   NOT UNUSUAL WEAPONS, LIKE HAND GRENADES OR BAZOOKAS, ETC.,

10  WEAPONS LIKE, I DON'T KNOW, I'M GOING TO THROW SOMETHING OUT

11  THERE, SAY A GLOCK 19, FOR EXAMPLE?  DO YOU THINK IT IS

12  INCONSISTENT FOR PEOPLE TO OWN THOSE WEAPONS FOR BOTH

13  SELF-DEFENSE AND FOR THE MILITARY PURPOSES THAT *MILLER*

14  ACKNOWLEDGED WAS ONE OF THE REASONS FOR THE SECOND AMENDMENT?

15  DO YOU SEE ANY INCONSISTENCY IN THAT?

16          MR. BRADY:  NOT AT ALL, YOUR HONOR.  I THINK IF YOU

17  LOOK AT THE DECLARATION OF ONE OF PLAINTIFF'S EXPERTS, STEVE

18  HELSLEY, HE INDICATES THAT THE EVOLUTION OF PRIVATE FIREARM

19  OWNERSHIP COMES FROM THE MILITARY.  THE COLT 1911 PISTOL, WHICH

20  WAS CREATED BY JOHN BROWNING FOR WORLD WAR I IN 1911, HENCE ITS

21  NAME, WAS THE STANDARD ISSUE FOR THE U.S. ARMY UP UNTIL

22  RECENTLY AND IS MOST LIKELY THE MOST POPULAR HANDGUN MODEL.  IT

23  MIGHT BE EDGED OUT NOW BY THE NEW GLOCKS, AS YOUR HONOR

24  INDICATES.  BUT THE M1 GARAND IS -- THE FEDERAL GOVERNMENT HAS

25  A PROGRAM, THE CIVILIAN MARKSMANSHIP PROGRAM, THAT WILL SHIP AN

M1 GARAND TO YOUR DOOR IN A STATE WHERE YOU DON'T HAVE TO GO

THROUGH A DEALER.  HERE THEY WOULD HAVE TO SHIP IT TO A DEALER,

AND YOU WOULD HAVE TO OBTAIN IT.  BUT THOSE ARE THE

QUINTESSENTIAL MILITARY RIFLES THAT WERE USED BY OUR SERVICE

MILITARY MEN AND WOMEN IN WORLD WAR II AND KOREA.

SO NO, I DON'T THINK THERE IS ANY INCONSISTENCY.  NOW WHEN

YOU'RE TALKING ABOUT FLAME THROWERS, LIKE YOUR HONOR SAID, OR

GRENADES, NOW WE'RE TALKING DANGEROUS.  THEY'RE INHERENTLY

DANGEROUS -- THEY CAN BLOW UP -- AND UNUSUAL.  I THINK THAT IS

THE PART, THE UNUSUAL --

THE COURT:  THAT IS WHY I ASKED THE QUESTION.  SO I

HAVE READ *MILLER*.  AND *MILLER* SAID THAT A SHOTGUN -- ALTHOUGH

IT DIDN'T REALLY GO INTO GREAT DETAIL ABOUT IT, *MILLER* SAID

THAT A SHOTGUN IS NOT THE TYPE OF WEAPON THAT WOULD NORMALLY BE

USED IN A MILITARY SITUATION AND, THEREFORE, *MILLER* SAID WOULD

NOT BE COVERED BY THE SECOND AMENDMENT.

BECAUSE *MILLER* SAID THAT WEAPONS PROTECTED BY THE SECOND

AMENDMENT WOULD BE THE TYPES OF WEAPONS THAT WOULD BE USED IN A

MILITARY CONTEXT AND IN THE CONTEXT OF A MILITIA, KEEPING IN

MIND THAT THE MILITIA IS A NONPROFESSIONAL GROUP OF CITIZENS --

BLACKSMITHS, CARPENTERS, LAWYERS, DOCTORS, ETC. -- WHO ARE

CALLED UPON TO DEFEND THE FREE STATE.  AND THEY WOULD GRAB

WHATEVER THEY HAD AVAILABLE TO THEM, WHICH MIGHT BE A MUSKET OR

A PISTOL, OR I SUPPOSE IN SOME CASES, A SWORD.  IT STRIKES ME

THAT -- I THINK *HELLER* ALLUDED TO IT IN A WAY, BUT *HELLER*

1    DIDN'T MAKE IT SPECIFIC THAT IT IS NOT INCONSISTENT TO SAY THAT

2    THE SECOND AMENDMENT PROTECTS THOSE WEAPONS THAT A MILITIA

3    MIGHT NEED, SAY IN THE CASE WE WERE INVADED BY THE RUSSIANS, OR

4    FOR PERSONAL SELF-DEFENSE.

5        DO YOU AGREE WITH THAT ANALYSIS?

6            MR. BRADY:  WELL, I THINK, YOUR HONOR, THAT THE

7    DIFFERENCE IS *MILLER* WAS OPERATING UNDER THE ASSUMPTION OF A

8    DIFFERENT VIEW OF THE MILITIA THAN YOUR HONOR IS, IN THAT IT

9    WAS TALKING ABOUT A MILITIA, A FORMAL MILITIA --

10           THE COURT:  RIGHT.

11           MR. BRADY:  -- BY THE STATE.  WHEREAS, *HELLER*

12   CLARIFIED THAT IS NOT THE CASE.

13           THE COURT:  I UNDERSTAND THAT.  I UNDERSTAND THAT.

14   BUT MY QUESTION GOES MORE TO THE TYPE OF WEAPON.

15           MR. BRADY:  SURE.

16           THE COURT:  *MILLER* SAID THAT THE REASON FOR THE

17   SECOND AMENDMENT OR THE TYPES OF WEAPONS THAT WERE PROTECTED BY

18   THE SECOND AMENDMENT WERE WEAPONS THAT WOULD HISTORICALLY HAVE

19   A MILITARY USE, RIGHT?

20           MR. BRADY:  CORRECT.

21           THE COURT:  AND WEAPONS THAT WOULD HISTORICALLY HAVE

22   A MILITARY USE, UNLESS THEY'RE UNUSUAL, RIGHT, WOULD INCLUDE

23   WEAPONS THAT WOULD HAVE A MAGAZINE GREATER THAN TEN ROUNDS,

24   RIGHT?

25           MR. BRADY:  CORRECT.

1          THE COURT:  LIKE A GLOCK 19, RIGHT?

2          MR. BRADY:  CORRECT.

3          THE COURT:  OR AN AR-15 OR SOMETHING ALONG THOSE

4   LINES, WHICH COULD ALSO BE USED FOR SELF-DEFENSE, RIGHT?

5          MR. BRADY:  THAT IS CORRECT.

6          THE COURT:  AND THEN THE *CRUIKSHANK* CASE, AS I

7   RECALL, SAID THAT THE RIGHT OF SELF-DEFENSE IS NOT GIVEN TO THE

8   PEOPLE BY THE CONSTITUTION.  IT IS AN INHERENT RIGHT, THE

9   SOURCE OF WHICH IS NOT THE SECOND AMENDMENT, RIGHT?

10          MR. BRADY:  THAT IS CORRECT, YOUR HONOR, YES.

11          THE COURT:  SO THOSE TWO THINGS -- SO *MILLER* IS NOT

12   INCONSISTENT WITH *CRUIKSHANK* TO THE EXTENT THAT THE TYPES OF

13   WEAPONS WE'RE TALKING ABOUT HERE -- AND, OF COURSE, I REALIZE

14   WE'RE NOT REALLY TALKING ABOUT THE WEAPONS NECESSARILY, PER SE;

15   WE'RE TALKING ABOUT THE MAGAZINES.  BUT THAT THE SAME TYPES OF

16   WEAPONS THAT THE SUPREME COURT IN *MILLER* SAID WOULD BE

17   PROTECTED BY THE SECOND AMENDMENT ARE THE SAME TYPES OF WEAPONS

18   THAT LAW-ABIDING CITIZENS MIGHT POSSESS FOR SELF-DEFENSE, WHICH

19   ARE THE SAME TYPES OF WEAPONS WE'RE TALKING ABOUT HERE.

20          MR. BRADY:  THAT IS CORRECT, YOUR HONOR.  I DON'T

21   THINK *HELLER* IS INCONSISTENT WITH THAT NOTION THAT WEAPONS FOR

22   THE MILITIA ARE APPROPRIATE.  AND THOSE ARE THE RIFLES AND THE

23   HANDGUNS THAT YOUR HONOR JUST INDICATED, THAT ARE COMMONLY

24   POSSESSED.  AND THAT IS THE STANDARD THAT *HELLER* SETS FORWARD

25   IS, ARE THESE ARMS THAT ARE COMMONLY OWNED, TYPICALLY POSSESSED

1  BY LAW-ABIDING PEOPLE FOR LAWFUL PURPOSES.  AND THE FLIP SIDE

2  OF THAT IS WHAT THE GOVERNMENT MUST SHOW TO TAKE THEM OUT OF

3  THAT CATEGORY, TO PUT THEM IN THE DANGEROUS AND UNUSUAL, FROM

4  *HELLER*, QUOTE, *HIGHLY UNUSUAL IN SOCIETY AT LARGE.*

5        I DON'T THINK THAT UNDER ANY VIEW ONE COULD SAY THAT

6  MAGAZINES OWNED BY THE TENS OF MILLIONS ARE HIGHLY -- ARE

7  HIGHLY UNUSUAL IN SOCIETY AT LARGE.  TO THE CONTRARY, THESE ARE

8  THE MAGAZINES THAT PEOPLE MOST OFTEN GO TO, PARTICULARLY FOR

9  HANDGUNS, WHICH *HELLER* -- THE *HELLER* COURT DESCRIBED AS THE

10 QUINTESSENTIAL SELF-DEFENSE WEAPON.  SO TO SUGGEST THEY'RE NOT

11 FOR SELF-DEFENSE IS, YOU KNOW, JUST SORT OF RISIBLE.  I HATE TO

12 -- I DON'T WANT TO CONDESCEND, YOU KNOW, MAKE LIGHT OF THE VIEW

13 THAT TO SUGGEST THAT THESE MAGAZINES AREN'T A COMMON USE IS NOT

14 REALLY A LEGITIMATE POSITION BASED ON THE RECORD AND BASED ON

15 THE FACTS.

16        AND I DON'T REALLY THINK THE ATTORNEY GENERAL TRIES TO

17 DISPUTE THAT MUCH.  I MEAN, HE DOES TAKE ISSUE WITH -- WITH OUR

18 FIGURES, RIGHT.  HE SAYS THAT, WELL, THESE MAGAZINES ARE SORT

19 OF BEING CONSOLIDATED IN THE HANDS OF AN EVER SHRINKING FEW.

20 BUT EVEN UNDER THOSE ESTIMATES, IF YOU LOOK, IT IS STILL TENS

21 OF MILLIONS OF PEOPLE.

22            THE COURT:  WHY WOULD THAT MATTER?

23            MR. BRADY:  I DON'T BELIEVE IT WOULD, YOUR HONOR.

24 BUT I'M JUST SAYING, EVEN IF YOU TAKE THE ATTORNEY GENERAL'S

25 VIEW OF THINGS THAT WE'RE TALKING ABOUT MAGAZINES OWNED BY TENS

1  OF MILLIONS OF PEOPLE, THAT ARE ONLY PROHIBITED BY SEVEN

2  STATES, ALL OF THOSE RESTRICTIONS ARE OF RECENT VINTAGE DESPITE

3  THE FACT THESE MAGAZINES HAVE BEEN IN CIRCULATION, BEEN AROUND

4  FOR HUNDREDS OF YEARS AND HAVE BEEN UBIQUITOUS FOR THE BETTER

5  PART OF THE LAST CENTURY.

6       SO I THINK UNDER THAT, ONCE YOU ACCEPT THAT THESE ARE

7  MAGAZINES, THESE ARE ARMS THAT ARE COMMONLY POSSESSED BY

8  LAW-ABIDING PEOPLE, THEN THEY COME WITHIN THE FIRST STEP OF THE

9  SHOVAN TEST, WHICH IS THEY ARE PROTECTED BY THE SECOND

10 AMENDMENT.  AND ONCE THEY ARE, AND YOU GET TO THE SECOND STEP

11 OF THE SHOVAN TEST, WHICH IS APPLYING SOME FORM OF HEIGHTENED

12 SCRUTINY.  AND I THINK THAT WE CAN -- THE FOIA COURT IN THE

13 NINTH CIRCUIT HAS DONE YOUR HONOR'S JOB FOR YOU IN DECIDING

14 WHICH TEST APPLIES, I BELIEVE, EVEN THOUGH PLAINTIFFS DISPUTE

15 WE DON'T THINK IT SHOULD BE INTERMEDIATE SCRUTINY.

16          THE COURT:  YOU THINK IT SHOULD BE STRICT SCRUTINY?

17          MR. BRADY:  YES, YOUR HONOR.  BUT THE REALITY IS,

18 BECAUSE WE'RE TALKING ABOUT CONDUCT --

19          THE COURT:  I'M BOUND BY THE NINTH CIRCUIT DECISION

20 IN THE SUNNYVALE --

21          MR. BRADY:  CORRECT.  AS FAR AS THE -- AS FAR AS THE

22 LEVEL OF SCRUTINY THAT APPLIES.  BEYOND THAT, THE COURT

23 EXPRESSLY SAID IT WAS NOT TAKING ANY POSITION ON THE SUBSTANCE.

24 IT SIMPLY INDICATED THAT INTERMEDIATE SCRUTINY WOULD APPLY.

25 BUT EVEN UNDER INTERMEDIATE SCRUTINY, WE'RE TALKING ABOUT A

1    BAN.  AND SO THE NOTION THAT SOMETHING THAT IS PROTECTED BY THE

2    SECOND AMENDMENT CAN BE BANNED IS SIMPLY INCOMPATIBLE WITH THE

3    WAY RIGHTS WORK.  WHAT GOOD IS CONSTITUTIONAL PROTECTION OF

4    SOMETHING IF IT CAN JUST BE BANNED?

5        AND SO I THINK ON THAT BASIS ALONE, EVEN IF THE GOVERNMENT

6    CAN SHOW THAT IT HAS A COMPELLING INTEREST, WHICH IT DOES,

7    ADMITTEDLY, OBVIOUSLY STOPPING MURDERS AND GUN VIOLENCE IS A

8    COMPELLING INTEREST, AND EVEN IF IT FURTHERED THAT INTEREST,

9    WHICH WE DISPUTE, BUT ASSUMING IT DOES, BASED ON, YOU KNOW,

10   MR. KOPER, DR. KOPER'S POSITIONS, WE THINK THERE IS NO BASIS

11   FOR THAT.  BUT EVEN ASSUMING THAT IT FURTHERED THAT POINT,

12   THERE STILL HAS TO BE A SUFFICIENT FIT, SUFFICIENT TAILORING TO

13   ACHIEVE THAT INTEREST.  AND AN OUTRIGHT BAN JUST SIMPLY CANNOT

14   MEET THAT STANDARD.  AND SO --

15           THE COURT:  WHAT WOULD?

16           MR. BRADY:  WHAT WOULD?  YOU KNOW, I THINK

17   POTENTIALLY -- IF WE'RE TALKING ABOUT MERE POSSESSION, I DON'T

18   KNOW IF YOU KNOW, MAKING IT MORE DIFFICULT FOR -- INCREASING

19   PENALTIES FOR ALLOWING PEOPLE TO GET THESE MAGAZINES INTO THE

20   WRONG HANDS.  SO, YOU KNOW, SO FOR EXAMPLE, LEAVING THESE

21   MAGAZINES OUT FOR SOMEBODY WHO YOU KNOW IS TROUBLED OR A MEMBER

22   OF A GANG OR INTENTIONALLY GIVE THEM TO SOMEBODY OF THAT

23   PERSUASION.

24       YOU KNOW, LET'S NOT FORGET THERE ARE ALREADY THOUSANDS OF

25   LAWS IN PLACE IN CALIFORNIA TO ADDRESS THE PROPER STORAGE OF

1   FIREARMS THAT WE'RE NOT CHALLENGING.  YOU HAVE TO GO THROUGH A

2   BACKGROUND CHECK TO OBTAIN THESE THINGS.  WE'RE NOT DISPUTING

3   THAT.  TEN-DAY WAIT PERIODS.  THERE ARE A WHOLE HOST OF LAWS

4   ALREADY IN PLACE.  I KNOW WE'RE LOOKING AT THIS IN A VACUUM,

5   BUT I THINK IT DOES SERVE US TO TAKE A STEP BACK AND LOOK --

6           THE COURT:  I THINK IT WAS JUDGE CALLAHAN IN -- I

7   THINK IT WAS A DISSENT IN *PERUTA* WHO TALKED ABOUT HOW WE KEEP

8   LOOKING AT THESE THINGS ON AN INDIVIDUAL BASES.  AND IF YOU

9   LOOK AT ANYTHING ON AN INDIVIDUAL BASES, YOU CAN MAKE IT MAKE

10  SENSE OF ALMOST ANYTHING.  BUT WHAT YOU'RE ALLUDING TO IS THE

11  FACT THAT IN CALIFORNIA, WE HAVE SIGNIFICANT GUN CONTROL LAWS.

12  AND IF YOU KEEP ADDING TO IT, EVENTUALLY THERE REALLY WON'T BE

13  A SECOND AMENDMENT, BASICALLY, RIGHT?

14          MR. BRADY:  PRECISELY, YOUR HONOR.  AND I THINK EVEN

15  THOUGH I'M MOST CERTAINLY NOT CONCEDING THAT THE BAN ON

16  TRANSFERS AND MANUFACTURING IMPORTATION THAT WE'RE CHALLENGING

17  IN THE UNDERLYING LAWSUIT, THAT THOSE LAWS WOULD MEET

18  INTERMEDIATE SCRUTINY.  I THINK THERE IS -- THEY'RE CERTAINLY

19  NOT AS INVIDIOUS AS A BAN ON POSSESSION.  YOU KNOW, ONCE YOU'RE

20  TALKING ABOUT AN OUTRIGHT BAN ON POSSESSION, YOU'RE TALKING

21  ABOUT CRIMINALIZING AN INDIVIDUAL WHO IS ENGAGING IN

22  CONSTITUTIONALLY PROTECTED CONDUCT, RETROACTIVELY, MIND YOU,

23  BECAUSE THESE PEOPLE HAVE HAD THESE MAGAZINES FOR OVER 17

24  YEARS.  NOW ALL OF A SUDDEN THE GOVERNMENT WANTS TO CHANGE THE

25  CONSEQUENCES SIGNIFICANTLY WITH A CRIMINAL CHARGE FOR

1    MAINTAINING POSSESSION OF PROPERTY THAT THEY HAVE HAD FOR OVER

2    17 YEARS WITHOUT INCIDENT.

3         AND THAT IS WHY THERE IS ALSO A DUE PROCESS COMPONENT TO

4    OUR LAWSUIT.  AND I THINK IT DOES APPLY HERE AT THIS PARTICULAR

5    HEARING.  BECAUSE ON JULY 2ND, SOMEBODY WHO OWNS ONE OF THESE

6    MAGAZINES MAY NOT KNOW THAT THIS LAW HAS TAKEN EFFECT AND IS

7    NOW SUBJECT TO CRIMINAL PROSECUTION FOR SIMPLY MAINTAINING THE

8    SAME PROPERTY THAT HE OR SHE HAS HAD FOR OVER 17 YEARS.  AND

9    THAT SIMPLY IS NOT ACCEPTABLE UNDER THE DUE PROCESS CLAUSE TO

10   CHANGE THE CONSEQUENCES OF PAST TRANSACTIONS.

11        YOU KNOW, YOU CAN BAN POSSESSION POTENTIALLY UNDER THE DUE

12   PROCESS CLAUSE PROSPECTIVELY.  I WOULD -- I DON'T THINK YOU CAN

13   BUT -- AT LEAST ARGUABLY, BUT WHAT YOU CAN'T DO IS GO

14   BACKWARDS.

15        AND SO I THINK THAT THE IMPENDING DATE OF JULY 1ST THAT

16   WILL CONVERT COUNTLESS THOUSANDS OF CALIFORNIANS INTO

17   CRIMINALS, INCLUDING PLAINTIFFS, IF THEY DON'T PERMANENTLY AND

18   UNLAWFULLY DISPOSSESS THEMSELVES OF THEIR PROPERTY IS

19   INDEFENSIBLE UNDER THE TAKINGS CLAUSE AND THE DUE PROCESS

20   CLAUSE.  AND THE --

21            THE COURT:  IF I DO NOT GRANT THE PRELIMINARY

22   INJUNCTION, BUT WE GET TO THE END OF THE ROAD AND ON THE MERITS

23   I FIND THAT THE PLAINTIFF SHOULD PREVAIL, ONE OF TWO THINGS

24   WILL HAVE HAPPENED.  EITHER PEOPLE THAT OWN THESE -- OR POSSESS

25   THESE MAGAZINES NOW WHO WILL, AS LAW-ABIDING CITIZENS WILL DO,

1    THEY WILL DISPOSSESS THEMSELVES, MEANING THAT THEY GET RID OF

2    THEM, BUT NOW SUDDENLY, THEY HAVE THE RIGHT TO POSSESS THEM

3    AGAIN, RIGHT.

4            MR. BRADY:  CORRECT, YOUR HONOR.  BUT THEY HAVE

5    ALREADY SUFFERED THE TAKINGS VIOLATION.  AND THERE IS NO

6    REPAIRING THAT.  THAT IS WHY THIS IS, PER SE, IRREPARABLE

7    INJURY.

8            THE COURT:  CAN I ASK A QUESTION.  IS THIS -- ARE YOU

9    ASSERTING A FACIAL OR AN AS APPLIED CHALLENGE TO 32310?

10           MR. BRADY:  BOTH, YOUR HONOR.  IF YOU LOOK AT

11   PLAINTIFFS' COMPLAINT, IT SAYS THAT THIS 32310 SHOULD BE

12   STRICKEN IN ITS ENTIRETY, OR ALTERNATIVELY, TO THE EXTENT IT

13   PROHIBITS THE POSSESSION OF THESE MAGAZINES.

14           THE COURT:  BEFORE I FORGET, I PROBABLY SHOULD HAVE

15   HAD BOTH OF YOU -- BOTH OF YOU SEEM TO HAVE PARTIES WITH YOU AT

16   COUNSEL TABLE.  I SHOULD HAVE HAD YOU INTRODUCE WHO IS WITH

17   YOU.

18      MR. BRADY, WHO IS SITTING NEXT TO YOU AT COUNSEL TABLE?

19           MR. BRADY:  THIS IS MY COLLEAGUE, MR. CLINTON

20   MONFORT.

21           MR. MONFORT:  GOOD MORNING, YOUR HONOR.

22           THE COURT:  AND MS. GORDON.

23           MS. GORDON:  THIS IS TAMAR PACHTER, MY COLLEAGUE FROM

24   THE DEPARTMENT OF JUSTICE.

25           THE COURT:  HOW DO YOU SPELL HER LAST NAME?

1          MS. GORDON:  P-A-C-H-T-E-R.

2          THE COURT:  ALL RIGHT.  GO AHEAD.

3          MR. BRADY:  WELL, I THINK, YOUR HONOR, I'M -- I

4     BELIEVE I'VE MADE ALL THE POINTS OTHER THAN I WOULD LEAVE YOUR

5     HONOR WITH THE REITERATION THAT THE ATTORNEY GENERAL HAS NOT

6     SHOWN THAT THEY'RE LIKELY TO OPPOSE US, SUCCEED ON THE MERITS.

7     WE'RE LIKELY TO SUCCEED ON THE MERITS.  THEY HAVE NOT SHOWN

8     THAT THERE IS SOME GRAVE PUBLIC SERVICE BY THIS LAW GOING INTO

9     EFFECT ON JULY 1ST.  AND THE EQUITIES OF THIS SHARPLY TIP IN

10    FAVOR OF THE PLAINTIFFS WHO WILL SUFFER A TAKINGS VIOLATION IF

11    THE LAW IS NOT ENJOINED ON JULY 1ST.  BECAUSE AS YOUR HONOR

12    INDICATED, THEY WILL BE GETTING RID OF THOSE MAGAZINES.  THEY

13    WILL NOT RECEIVE GOVERNMENT COMPENSATION.  THERE IS NO

14    MECHANISM FOR THAT TO HAPPEN.  AND SO THIS IS A -- ALMOST A

15    TEXTBOOK CASE OF THE APPROPRIATENESS FOR A PRELIMINARY

16    INJUNCTION.

17         WITH THAT, I THANK YOU, YOUR HONOR, UNLESS YOU HAVE ANY

18    QUESTIONS.

19          THE COURT:  ALL RIGHT.  THANK YOU.

20         MS. GORDON.

21         BEFORE YOU BEGIN, MS. GORDON, LET ME ASK YOU A QUESTION.

22    A FEW YEARS AGO I HAD A CASE, A RATHER CONTROVERSIAL CASE

23    BEFORE ME.  IT WAS A CRIMINAL CASE.  AND IT WAS BEING FILED

24    AGAINST SOME DEFENDANTS.  AND I DISMISSED THE INDICTMENT

25    AGAINST THE DEFENDANTS.  AND I DISMISSED IT BECAUSE I CONCLUDED

1  THAT THE LAW THAT THEY WERE BEING CHARGED WITH WAS SO VAGUE, SO

2  COMPLEX, SO BEYOND COMMON UNDERSTANDING THAT NOBODY COULD

3  POSSIBLY EVER REALLY UNDERSTAND WHAT THE LAW SAID.

4      I BELIEVE THE LAW IS, AND I BELIEVE THAT THE LAW SHOULD

5  BE, THAT LAWS SHOULD BE WRITTEN IN SUCH A WAY THAT PEOPLE OF

6  REASONABLE INTELLIGENCE SHOULD BE ABLE TO UNDERSTAND WHAT THE

7  LAW SAYS.  SO THAT THEY DON'T HAVE TO WALK AROUND WITH A LAWYER

8  ON THEIR HIP TO FIGURE OUT WHETHER OR NOT THEY'RE ABOUT TO

9  VIOLATE THE LAW OR WHETHER THEY HAVE VIOLATED THE LAW.

10     NOW I WAS TRYING TO FIGURE OUT THE EXCEPTIONS TO THIS LAW.

11 AND, FRANKLY, IT ALMOST DROVE ME TO DRINKING.  CAN YOU TELL ME

12 WHAT THE EXCEPTIONS ARE.  WHO WILL BE ALLOWED TO POSSESS THESE

13 MAGAZINES IF I DO NOT ENJOIN THE STATUTE GOING INTO EFFECT?

14 WHO WILL ACTUALLY BE ALLOWED TO OWN THESE MAGAZINES, AND WHERE

15 WOULD ONE GO TO FIND THOSE EXCEPTIONS?

16     I KNOW YOU'RE GOING TO TELL ME THAT YOU WOULD GO TO THE

17 LAW, RIGHT, AND LOOK AT IT.  BUT THE AVERAGE PERSON, WHO DOES

18 NOT HAVE A LAW DEGREE, HOW WOULD HE OR SHE KNOW WHETHER HE OR

19 SHE IS SOMEONE WHO IS EXEMPTED FROM THIS PROHIBITION?

20       MS. GORDON:  OKAY, SO TAKING YOUR LAST QUESTION

21 FIRST, THERE ARE, OF COURSE, NO ALLEGATIONS IN THIS COMPLAINT

22 THAT PLAINTIFFS DO NOT UNDERSTAND THE LAW AS IT -- AT ALL OR AS

23 IT APPLIES TO THEM.  THEY DO NOT LIKE IT, BUT IN SOME SENSE

24 THAT PRESUPPOSES THEY UNDERSTAND IT.  AND THEY'RE NOT HAPPY

25 WITH WHAT IT IS MANDATING THEM TO DO.

1        FOR THE REST OF THE PEOPLE, PENAL CODE SECTIONS 32400 TO

2    32450 SET OUT THE EXCEPTIONS TO THE BAN ON LARGE CAPACITY

3    MAGAZINES.  I DON'T HAVE ALL OF THEM IN FRONT OF ME.

4            THE COURT:  BOB, CAN YOU BRING ME THAT SECTION.

5        SO WHAT WERE THOSE SECTIONS AGAIN?

6            MS. GORDON:  SO IT STARTS AT SECTION 32400.  AND THE

7    NOTABLE EXCEPTIONS -- OBVIOUSLY, THESE ARE A LOT OF

8    EXCEPTIONS -- ARE THAT IT DOESN'T APPLY TO LAW ENFORCEMENT.  IT

9    DOESN'T APPLY TO A SWORN PEACE OFFICER.  IT DOES NOT APPLY TO

10   HONORABLY RETIRED LAW ENFORCEMENT, SWORN POLICE OFFICER.  AND

11   IF YOU LOOK AT 32406(F), IF YOU ARE A PERSON WHO HAS A FIREARM

12   PURCHASED BEFORE JANUARY 1ST, 2000, AND THERE IS NO COMPATIBLE

13   MAGAZINE WITH THAT THAT IS UNDER TEN, YOU MAY POSSESS A LARGER

14   CAPACITY MAGAZINE FOR THAT PARTICULAR FIREARM.

15           THE COURT:  SO READING 32405, IT SAYS SECTION 32310

16   DOES NOT APPLY TO THE SALE TO, LENDING TO, TRANSFER TO,

17   PURCHASE BY, RECEIPT OF, POSSESSION OF, OR IMPORTATION INTO THE

18   STATE OF A LARGE CAPACITY MAGAZINE BY A SWORN PEACE OFFICER AS

19   DEFINED IN CHAPTER 4.5, COMMENCING WITH SECTION 830, OF TITLE

20   III, OF PART 2, OR SWORN FEDERAL LAW ENFORCEMENT OFFICER IS

21   AUTHORIZED TO CARRY A FIREARM IN THE COURSE AND SCOPE OF THAT

22   OFFICER'S DUTY.

23       SO WHAT DOES TITLE III OF PART 2 SAY, CHAPTER 4.5 OF TITLE

24   III OF PART 2?  WHAT IS THAT?

25           MS. GORDON:  I DON'T HAVE IT IN FRONT OF ME.  I

1    APOLOGIZE, YOUR HONOR.

2            THE COURT:  YOU DON'T KNOW?

3            MS. GORDON:  OFF THE TOP OF MY HEAD, NO, I DO NOT.

4    BUT I BELIEVE THAT WHAT THE SECTIONS SET OUT ARE THE ABILITY

5    OF -- SORT OF WHO IS LAW ENFORCEMENT, WHO IS ABLE TO ACTUALLY

6    CARRY WEAPONS THAT ARE NOT AVAILABLE TO THE GENERAL PUBLIC.

7            THE COURT:  IS A JUDGE EXEMPT FROM THIS STATUTE?

8            MS. GORDON:  I ACTUALLY DON'T KNOW, YOUR HONOR.

9            THE COURT:  IF YOU DON'T KNOW, YOU REPRESENT THE

10   STATE.  YOU'RE PART OF THE ATTORNEY GENERAL'S OFFICE.  IF YOU

11   DON'T KNOW, HOW IS THE AVERAGE PERSON, ME, FOR EXAMPLE,

12   SUPPOSED TO KNOW?

13           MS. GORDON:  SO I CONFESS, YOUR HONOR, THAT I DON'T

14   KNOW.  AND THE REASON WHY I DON'T KNOW IS THAT NONE OF THE

15   EXEMPTIONS ARE ACTUALLY ALLEGED TO APPLY HERE.  SO I HAVE READ

16   THROUGH THEM.  I HAVE A BASIC FAMILIARITY WITH THEM.

17           THE COURT:  BUT --

18           MS. GORDON:  THEY'RE NOT --

19           THE COURT:  THE REASON I ASK YOU --

20           MS. GORDON:  THEY'RE NOT AT ISSUE HERE.

21           THE COURT:  THEY ARE.  THEY ARE AT ISSUE, AREN'T

22   THEY?  BECAUSE ONE OF THE THINGS WE'RE TRYING TO FIGURE OUT IS

23   WHETHER OR NOT THERE IS A REASONABLE FIT BETWEEN THE

24   LEGISLATION AND THE COMPELLING STATE INTEREST, RIGHT?

25           MS. GORDAN:  YES.

1          THE COURT:  AND WE'RE TRYING TO FIND OUT, OKAY, LET'S

2   TAKE A LOOK AT WHAT THE STATUTE COVERS AND WHAT IT EXEMPTS,

3   RIGHT.  SO, FOR EXAMPLE, I WAS SOMEWHAT CHIDING MR. BRADY ABOUT

4   TRANSFERRING THESE MAGAZINES TO THE MOVIE INDUSTRY, ACTORS,

5   GOVERNOR SCHWARZENEGGER, HE HAS TO HAVE HIS LARGE CAPACITY

6   MAGAZINE SO THAT HE CAN BE BACK, RIGHT.

7        SO MY QUESTION TO YOU IS, THIS LAW HAS TO MAKE SENSE.

8   EXPLAIN TO ME WHAT IS THE REASONABLE FIT IN EXCUSING OR

9   EXEMPTING THE MOVIE INDUSTRY FROM BEING ABLE TO POSSESS THESE

10  LARGE CAPACITY MAGAZINES?  WHAT IS THE THINKING BEHIND THAT?

11         MS. GORDON:  I ASSUME THAT THE THINKING BEHIND THE

12  ENTERTAINMENT INDUSTRY MIGHT BE TWOFOLD.  ONE, I DON'T ASSUME

13  THAT THE MAGAZINE IS ACTUALLY GOING TO BE LOADED WHEN IT'S ON A

14  LOT.

15         THE COURT:  BUT THAT IS AN ASSUMPTION, ISN'T IT?

16         MS. GORDON:  IT IS AN ASSUMPTION.  TWO --

17         THE COURT:  SO IF YOU HAVE SOMEONE IN THE MOVIE

18  INDUSTRY THAT POSSESSES IT AND DECIDES TO MISUSE IT, THEY CAN

19  DO THAT, RIGHT?

20         MS. GORDON:  PRESUMABLY THEY COULD, YOUR HONOR.  BUT

21  I'M NOT AWARE OF HIGH INSTANCES OF MASS SHOOTINGS ON

22  ENTERTAINMENT LOTS BY ACTORS.  SO WE NEED TO LOOK AT -- AND I

23  SAY THAT BECAUSE WE NEED TO LOOK -- OR ANYONE ELSE.  WE NEED TO

24  LOOK AT WHAT THIS LAW IS DESIGNED TO DO.  AND I THINK THE

25  EXCEPTIONS --

1          THE COURT:  WHAT IS IT DESIGNED TO DO?

2          MS. GORDON:  IT IS DESIGNED TO INCREASE THE PUBLIC

3     SAFETY, TO MITIGATE THE EFFECTS OF GUN VIOLENCE, AND TO STOP

4     CRIME.  THIS IS BECAUSE WE KNOW THAT LARGE CAPACITY MAGAZINES

5     ARE DISPROPORTIONATELY REPRESENTED IN CRIME.  IN CRIME --

6          THE COURT:  I SAW THAT.  I SAW THAT LANGUAGE IN YOUR

7     MOTION, BUT I REALLY DIDN'T SEE ANY EVIDENCE TO SUPPORT THAT,

8     OR AT LEAST NOT EVIDENCE THAT, IN MY OPINION, WOULD PASS

9     MUSTER.  SO HIGH CAPACITY MAGAZINES ARE USED DISPROPORTIONATELY

10    IN CRIME.

11         MS. GORDON:  YOUR HONOR, IN 86 PERCENT OF THE MASS

12    SHOOTINGS IN THE LAST 20 YEARS, LARGE CAPACITY MAGAZINES HAVE

13    BEEN FEATURED.

14         THE COURT:  OKAY.  THAT IS LARGE CAPACITY --

15         MS. GORDON:  MORE THAN TEN.

16         THE COURT:  YOU'RE TALKING ABOUT MASS SHOOTINGS?

17         MS. GORDON:  I'M TALKING ABOUT MASS SHOOTINGS.

18         THE COURT:  BUT YOUR LANGUAGE, WHICH IS WHAT KIND OF

19    THREW ME, YOUR LANGUAGE SAID -- LET ME FIND IT.  IT SAYS, *THESE*

20    *LARGE CAPACITY MAGAZINES ARE DISPROPORTIONATELY USED IN CRIME,*

21    COMMA, *AND FEATURED PROMINENTLY IN SOME OF THE MOST SERIOUS*

22    *CRIMES.*

23       THE FIRST PART OF THAT SENTENCE I DON'T THINK IS JUSTIFIED

24    BY ANY OF THE EVIDENCE THAT YOU SUBMITTED TO ME.  THAT IS, THAT

25    LARGE CAPACITY MAGAZINES ARE DISPROPORTIONATELY USED IN CRIME.

```
1              MS. GORDON:  OKAY, YOUR HONOR.

2              THE COURT:  YOU AGREE?

3              MS. GORDON:  I DON'T AGREE.

4              THE COURT:  YOU DON'T AGREE.  YOU DON'T AGREE THAT

5   THAT IS INACCURATE?

6              MS. GORDON:  I DO NOT AGREE THAT THAT IS INACCURATE.

7              THE COURT:  DO YOU HAVE ANY EVIDENCE TO SHOW THAT, IN

8   FACT, LARGE CAPACITY MAGAZINES ARE DISPROPORTIONATELY USED IN

9   CRIME?

10             MS. GORDON:  I WOULD LOOK AT THE EXPERT DECLARATIONS

11  WE HAVE SUBMITTED.  I WOULD LOOK AT THE FINDINGS OF OTHER

12  COURTS, EVERY ONE OF WHICH HAS UPHELD CHALLENGES TO LARGE

13  CAPACITY MAGAZINES AS CONSTITUTIONAL.

14             THE COURT:  LET ME TAKE AN EXAMPLE.  SO THE CITY OF

15  CHICAGO, FOR EXAMPLE, WHICH I BELIEVE, HAS THE HIGHEST MURDER

16  RATE IN THE COUNTRY, YOU'RE GOING TO TELL ME THAT IN THE

17  MAJORITY OF THOSE SHOOTINGS, THAT THERE WAS A WEAPON USED THAT

18  HAD A LARGE CAPACITY MAGAZINE?

19             MS. GORDON:  NO, YOUR HONOR.  BUT IT DOESN'T HAVE TO

20  BE THE MAJORITY OF EVERY MURDER.  CERTAINLY, IN THE MAJORITY,

21  86 PERCENT IS WELL MORE THAN THE MAJORITY OF MASS SHOOTINGS

22  YOU'RE GOING TO SEE SOMEONE USING A LARGE CAPACITY.

23             THE COURT:  WELL, THAT IS WHAT I'M TRYING TO GET AT.

24  SO IN OTHER WORDS, WHAT YOU'RE REALLY SAYING IS, THAT IN

25  CONNECTION WITH MASS SHOOTINGS, IN CONNECTION WITH MASS
```

1    SHOOTINGS, HIGH CAPACITY MAGAZINES ARE USED IN A

2    DISPROPORTIONATE WAY, BUT NOT CRIME, JUST IN MASS SHOOTINGS.

3          MS. GORDON:   CERTAINLY NOT ALL CRIME.  I BELIEVE IT

4    IS ACTUALLY GREATER THAN MASS SHOOTINGS.  BUT LET'S GO WITH

5    MASS SHOOTINGS, OKAY.  LET'S JUST SAY THAT ACTUALLY, ONLY IN

6    MASS SHOOTINGS AND I BELIEVE --

7          THE COURT:  HOW MANY MASS SHOOTINGS HAVE THERE BEEN

8    IN THE LAST 30 YEARS?

9          MS. GORDON:  IN THE LAST 30 YEARS?  IN THE LAST 30

10   YEARS, I DON'T KNOW THE WHOLE NUMBER.  I KNOW THAT IF YOU LOOK

11   BETWEEN 2007 TO 2013, AND THIS IS IN THE MAYORS AGAINST ILLEGAL

12   GUNS REPORT, THAT THERE ARE ABOUT TWO A MONTH.  SO I THINK THAT

13   WAS ABOUT 35 TOTAL.  MY MATH IS AWFUL.  LET'S NOT TRUST MY

14   MATH.  LET'S SAY TWO A MONTH DURING THAT PERIOD OF TIME.

15     AND THERE IS ALSO EVIDENCE, AND YOU CAN SEE THIS IN THE

16   EXHIBITS THAT ARE SUBMITTED BY AMICUS, THAT THE NUMBER IS GOING

17   UP.

18     NOW I MEAN IF THE POINT IS THAT MASS SHOOTINGS ARE

19   RELATIVELY RARE OCCURRENCES, THAT IS TRUE.  I'M NOT GOING TO

20   SUGGEST THAT MASS SHOOTINGS ARE HAPPENING EVERY HOUR OF EVERY

21   DAY.  BUT THEY DO A TREMENDOUS AMOUNT OF DAMAGE.  AND PART OF

22   WHAT ALLOWS A TREMENDOUS AMOUNT OF DAMAGE TO HAPPEN IS THE USE

23   OF LARGE CAPACITY MAGAZINES.  AND ALSO --

24          THE COURT:  LET ME ASK YOU A COUPLE OF QUESTIONS --

25          MS. GORDON:  SURE.

```
1            THE COURT:  -- IF YOU DON'T MIND.

2        WHAT ELSE DO MASS SHOOTINGS GENERALLY HAVE IN COMMON?

3            MS. GORDON:  WELL, THEY USUALLY INVOLVE A LOT OF

4    HELPLESS PEOPLE BEING HELD HOSTAGE BY A GUN.

5            THE COURT:  AND THAT IS REALLY TRAGIC.  AND BY THE

6    WAY, EVERYBODY WOULD AGREE THAT ANY TIME ANYBODY IS SHOT OR

7    INJURED, THAT IT IS TRAGIC.  WE ALL AGREE WITH THAT.

8        BUT WHAT ELSE?  WHAT ELSE DO YOU THINK IS COMMON TO THESE

9    MASS SHOOTINGS?  I ASSUME YOU HAVE READ ALL OF THESE MASS

10   SHOOTING INCIDENT REPORTS AND THAT YOUR EXPERTS HAVE TALKED

11   ABOUT AND SUBMITTED.  WHAT ELSE IS COMMON?

12           MS. GORDON:  WELL, YOUR HONOR, THE MOST SALIENT AND

13   PREVALENT CHARACTERISTIC THAT IS IN COMMON IS THE USE OF A

14   LARGE CAPACITY MAGAZINE.

15           THE COURT:  THERE IS SOMETHING ELSE THAT IS ACTUALLY

16   VERY, VERY COMMON IN ALL OF THOSE.

17           MS. GORDON:  MAY I ASK WHAT -- WHAT IS THE ANSWER,

18   YOUR HONOR, THAT YOU'RE LOOKING FOR?

19           THE COURT:  SURE.  I'LL TELL YOU WHAT THE RIGHT

20   ANSWER IS.

21           MS. GORDON:  THANK YOU.

22           THE COURT:  THE RIGHT ANSWER IS, THERE ARE MULTIPLE

23   WEAPONS.  IN ALMOST EVERY ONE OF THESE SHOOTINGS, WITH THE

24   POSSIBLE EXCEPTION OF THE SHOOTING OF CONGRESSWOMAN GIFFORD AND

25   JUDGE ROLL, WHO, BY THE WAY, I KNEW AND RESPECTED AND THOUGHT
```

1    AS A FRIEND.  IN ALMOST EVERY ONE OF THOSE SHOOTINGS, THERE

2    WERE ALSO -- THERE WERE NUMEROUS WEAPONS THAT WERE BEING USED.

3         MS. GORDON:  ACTUALLY, YOUR HONOR, IF YOU LOOK AT THE

4    ALLEN DECLARATION, LUCY ALLEN HAS STUDIED THIS.  AND SHE OPINES

5    THAT IN 47 PERCENT OF MASS SHOOTINGS, THERE IS ACTUALLY ONLY

6    ONE GUN BEING USED.

7         THE COURT:  YEAH, I READ HER DECLARATION.

8         MS. GORDON:  NOW PERHAPS IN THE ONES THAT GAIN THE

9    MOST NOTORIETY, THE SHOOTER HAS MULTIPLE WEAPONS.

10        THE COURT:  THE ONES THAT EVERYBODY THINKS ABOUT, FOR

11   EXAMPLE, SANDY HOOK.

12        MS. GORDON:  OKAY, BUT EVEN ACCEPTING --

13        THE COURT:  SAN BERNARDINO.

14        MS. GORDON:  ABSOLUTELY.  AND --

15        THE COURT:  ORLANDO.

16        MS. GORDON:  AND THE SHOOTING IN TUCSON.

17        THE COURT:  *PULSE.*

18        MS. GORDON:  WHICH IS A YEAR AGO YESTERDAY.

19        THE COURT:  SO THE POINT I'M TRYING TO MAKE IS SIMPLY

20   THIS, SO IF WE'RE LOOKING FOR A REASONABLE FIT, AND WE'RE

21   TRYING TO DO AWAY WITH THESE MASS SHOOTINGS, WHAT I'M CONCERNED

22   ABOUT AND I'M THINKING ABOUT IS, WHERE DO WE STOP?  WHERE DO WE

23   STOP INTERFERING WITH PEOPLE'S SECOND AMENDMENT RIGHTS?  IS THE

24   NEXT STEP FOR CALIFORNIA TO SAY, OH, BY THE WAY, YOU'RE ONLY

25   ALLOWED TO OWN ONE GUN?

1       MS. GORDON:  I THINK THERE IS A HUGE STEP, YOUR

2   HONOR, MULTIPLE HUGE STEPS BETWEEN SAYING, WE'RE GOING TO BAN A

3   SUBSET OF MAGAZINES, RIGHT, PROVEN TO BE THE MOST LETHAL.  YOU

4   CAN HAVE AS MANY MAGAZINES AS YOU WANT.

5       THE COURT:  I'M GLAD YOU JUST MENTIONED THAT.

6   BECAUSE NOW LET'S LOOK AT YOUR EXPERT'S DECLARATIONS.  YOUR

7   EXPERTS SAY THAT THE REASON WHY THESE MAGAZINES ARE SO

8   DANGEROUS IS BECAUSE PEOPLE WHO ARE GOING TO ENGAGE IN THESE

9   MASS SHOOTINGS GENERALLY SELECT THE WEAPON THAT WILL ALLOW THEM

10  TO HAVE THE MOST AMMUNITION, THE MOST ROUNDS, RIGHT?

11      MS. GORDON:  CORRECT.

12      THE COURT:  YOU AGREE?

13      MS. GORDON:  YES.  THERE IS A PERSON EFFECT VERSUS A

14  WEAPON EFFECT, YES.

15      THE COURT:  OKAY.  SO IF WE NOW BAN OR CAUSE PEOPLE

16  TO DISPOSSESS THEMSELVES OF WEAPONS THAT HAVE ANYTHING GREATER

17  THAN TEN ROUNDS, WHAT DO YOU THINK IS GOING TO HAPPEN THE NEXT

18  TIME THAT YOU HAVE A MASS SHOOTING?  WHAT KIND OF A WEAPON DO

19  YOU THINK YOU'RE GOING TO SEE THAT THE MASS SHOOTER IS GOING TO

20  USE?

21      MS. GORDON:  SO I WOULDN'T SPECULATE, BUT BASED ON

22  THE LAST CORRECT ANSWER, I'M GOING TO ASSUME THAT WE'RE GOING

23  TO POSIT THAT THE SHOOTER WILL JUST GET MORE MAGAZINES, WILL

24  GET MORE FIREARMS.

25      THE COURT:  OR WILL SIMPLY USE A WEAPON THAT HAS A

```
1   MAGAZINE THAT WILL HOLD TEN ROUNDS.

2            MS. GORDON:  CORRECT.

3            THE COURT:  RIGHT?

4            MS. GORDON:  BUT TEN ROUNDS CAN BE DISCHARGED

5   EXTREMELY QUICKLY, AND THEN THE SHOOTER HAS TO RELOAD.

6            THE COURT:  AS OPPOSED TO 15?

7            MS. GORDON:  SURE.  AND THE SHOOTER HAS TO RELOAD,

8   RIGHT?

9            THE COURT:  RIGHT.

10           MS. GORDON:  AND THEN -- OR GRAB ANOTHER MAGAZINE.

11           THE COURT:  LET ME GET BACK TO MY QUESTION.

12           MS. GORDON:  OKAY, YOUR HONOR.

13           THE COURT:  BECAUSE I'M TRYING -- I'M NOT THE

14  BRIGHTEST LIGHT BULB IN THE BUILDING SO I'M TRYING TO WORK MY

15  WAY THROUGH THIS.

16     SO THE STATE SAYS THAT IN ORDER TO PROTECT THE PUBLIC, WE

17  HAVE TO DISPOSSESS PEOPLE OF MAGAZINES THAT THEY CURRENTLY

18  LAWFULLY POSSESS AND HAVE POSSESSED FOR A LONG TIME.  AND THE

19  REASON WHY WE HAVE TO DO THAT IS BECAUSE MASS SHOOTERS

20  GENERALLY USE THE GUN THAT HAS THE HIGHEST CAPACITY MAGAZINE

21  THAT IS AVAILABLE.  THAT IS WHAT YOUR EXPERT TESTIFIED OR SAYS.

22           MS. GORDON:  THAT'S CORRECT.

23           THE COURT:  ALL RIGHT.  SO THE NEXT MASS SHOOTER,

24  AFTER WE HAVE NOW CAUSED EVERYBODY TO DISPOSSESS THEMSELVES OF

25  WEAPONS THAT HOLD MORE THAN TEN ROUNDS, THE NEXT DERANGED
```

1    PERSON WHO DECIDES THAT THEY'RE GOING TO SHOOT SOMEONE, THEY'RE

2    GOING TO USE A WEAPON THAT HOLDS TEN ROUNDS, A MAGAZINE THAT

3    HOLDS TEN ROUNDS BECAUSE IT IS THE HIGHEST NUMBER OF ROUNDS

4    THAT THE GUN ALLOWS, RIGHT?

5         MS. GORDON:  CORRECT.

6         THE COURT:  OKAY.  SO THEN ISN'T IT LOGICAL TO ASSUME

7    THAT FIVE OR TEN YEARS DOWN THE ROAD, THE STATE WILL THEN COME

8    BACK AND SAY, WE HAVE TO -- WE HAVE TO GET RID OF PEOPLE WHO

9    HAVE MAGAZINES THAT HOLD TEN ROUNDS.  WE'LL MAKE IT SIX ROUNDS.

10   IS THAT NOT A LOGICAL PROGRESSION THAT YOU CAN SEE WHERE THIS

11   IS GOING?  BECAUSE REMEMBER, WE HAVE TO MAKE A DECISION AS TO

12   WHAT IS A REASONABLE FIT, RIGHT?

13        MS. GORDON:  CORRECT.

14        THE COURT:  SO I'M TRYING TO FIGURE OUT WHAT IS A

15   REASONABLE FIT?  SO WHEN WE GET DOWN TO THE POINT WHERE THE

16   MAGAZINES THAT HOLD TEN ROUNDS ARE THE ONES THAT ARE BEING

17   MOSTLY USED BY MASS MURDERERS, RIGHT, WE WILL THEN GET DOWN TO

18   A LAW THAT SAYS, YOU HAVE TO DISPOSSESS YOURSELF OF ANY

19   MAGAZINE THAT HOLDS TEN ROUNDS, HOLDS MORE THAN SIX ROUNDS.

20   DOES THAT MAKE SENSE?

21        MS. GORDON:  I UNDERSTAND THE PROGRESSION, YOUR

22   HONOR.

23        THE COURT:  AND THEN WE'LL GET FROM SIX DOWN TO

24   THREE.  AND YOUR EXPERT SAYS THAT THE AVERAGE PERSON WHO NEEDS

25   WEAPONS FOR SELF-DEFENSE ONLY FIRES 2.2 ROUNDS, WHICH MEANS

1    THAT EVENTUALLY, PEOPLE WILL NOT BE ALLOWED TO OWN ANY WEAPONS

2    UNLESS IT IS A DERRINGER.

3            MS. GORDON:  WELL, NO, YOUR HONOR.  BECAUSE THE

4    SECOND AMENDMENT AND *HELLER* WOULD PROHIBIT THE STATE FROM DOING

5    THAT.

6            THE COURT:  OKAY.  WHERE IS THE LINE?  THAT IS THE

7    LINE.  THE LINE I'M TRYING TO GET TO IS, WHERE IS THAT LINE?

8            MS. GORDON:  SO *HELLER*, AS WE KNOW, DIDN'T DRAW A

9    LINE.  EXCEPT FOR TO SAY THAT A CATEGORICAL BAN ON ALL HAND

10   GUNS IS UNCONSTITUTIONAL.  AND THE REASON FOR THAT, OF COURSE,

11   IS THAT THEY SAY THE HANDGUN IS THE QUINTESSENTIAL WEAPON THAT

12   PEOPLE CHOOSE TO DEFEND THEMSELVES IN THEIR HOME.

13           THE COURT:  LIKE A GLOCK 19.

14           MS. GORDON:  WELL, PEOPLE MIGHT LIKE A GLOCK 19 IN

15   THEIR HOME.  BUT THERE IS NO EVIDENCE THAT, IN FACT, PEOPLE ARE

16   USING ALL THE ROUNDS THAT THEY MIGHT BE ABLE TO DEFEND

17   THEMSELVES IN THEIR HOME.  IN FACT, EVEN PLAINTIFFS' EXPERTS

18   SAY THAT MOST OF THE TIME, ALL YOU HAVE TO DO IS SORT OF WAVE

19   YOUR GUN AT AN ATTACKER, AND THAT IS GOOD ENOUGH.

20     NOW THERE IS A HUGE DIFFERENCE, RIGHT.  SO WE KNOW BANNING

21   ALL HANDGUNS, QUINTESSENTIAL SELF-DEFENSE WEAPON.

22           THE COURT:  YEAH, *HELLER* ACCIDENT ALLOW THAT.

23           MS. GORDON:  CAN'T DO THAT.

24           THE COURT:  AGREED.

25           MS. GORDON:  SO THE CLOSER WE GET TO THAT LINE, THE

1    MORE DIFFICULTY WE'RE GOING TO HAVE SURVIVING CONSTITUTIONAL

2    ATTACK.

3            THE COURT:  OKAY, WHY NOT 15 AS OPPOSED TO 10?

4            MS. GORDON:  THE LEGISLATURE HAS MADE A DETERMINATION

5    AND BASED THIS, I GUESS, OFF OTHER JURISDICTIONS THAT HAVE COME

6    TO THIS CONCLUSION --

7            THE COURT:  SEVEN.

8            MS. GORDON:  SEVEN ACTUALLY WAS STRUCK DOWN BY THE

9    SECOND CIRCUIT.  TEN, HOWEVER, HAS BEEN UPHELD BY EVERY

10   JURISDICTION TO CONSIDER IT, AS EITHER NOT BEING PROTECTED BY

11   THE SECOND AMENDMENT, OR EVEN ASSUMING THAT IT IS PROTECTED BY

12   THE SECOND AMENDMENT, IT CLEARLY PASSES INTERMEDIATE SCRUTINY.

13   AND I SHOULD SAY, HAVING READ THE RECORDS IN ALL OF THESE

14   CASES, THEY LOOK REMARKABLY SIMILAR TO THE RECORDS HERE.  SAME

15   CAST, EXCEPT FOR ME, REALLY, AND YOUR HONOR.  IT IS REMARKABLY

16   SIMILAR RECORD.  AND EVERY COURT TO CONSIDER IT HAS UPHELD A

17   BAN ON TEN.  AND THE BAN ON TEN, OF COURSE, IS WHAT WE'RE HERE

18   TO TALK ABOUT, RIGHT.

19      NOW WHAT OTHER STATES DO, WELL, THERE ARE TREMENDOUS

20   POLICY CONSIDERATIONS, RIGHT, THAT STATES TAKE INTO ACCOUNT,

21   RIGHT, WHEN THEY DECIDE TO LEGISLATE IT ALL.

22            THE COURT:  BUT POLICY CONSIDERATIONS CAN'T TRUMP THE

23   SECOND AMENDMENT.

24            MS. GORDON:  ABSOLUTELY NOT.

25            THE COURT:  OKAY.

1          MS. GORDON:  BUT NOR CAN THE FACT THAT JUST BECAUSE

2     42 STATES HAVE NOT DECIDED TO DO THIS DICTATE WHAT ANY GIVEN

3     STATE CAN DO, WHEN *HELLER* AND *MCDONALD* TELL US THERE IS STILL A

4     PLACE FOR REASONABLE REGULATION OF FIREARMS.

5          THE COURT:  THAT IS WHAT I'M TRYING TO GET AT.  I'M

6     TRYING TO FIGURE OUT, HOW DO WE DECIDE WHAT IS A REASONABLE FIT

7     AND WHAT IS NOT A REASONABLE FIT?  AND WHEN DO WE TELL PEOPLE

8     THAT THEY CAN -- THEY SHOULD DISPOSSESS THEMSELVES OF SOMETHING

9     THAT THEY HAVE OWNED FOR A LONG PERIOD OF TIME WITHOUT ABUSING

10    IT, WITHOUT KILLING ANYONE, OR WITHOUT INJURING SOMEONE?  I'M

11    TRYING TO FIGURE OUT HOW DO WE DRAW THAT LINE?  WHERE DO WE

12    DO -- WHERE DO WE DO THE DISTINCTION BETWEEN POLICY AND AN

13    INFRINGEMENT ON THE SECOND AMENDMENT?  AND WHY IS TEN -- WHERE

14    IS THIS TEN NUMBER -- YOU KNOW, IS THIS LIKE A CLAY TABLET THAT

15    MOSES BROUGHT DOWN FROM THE MOUNTAIN THAT SAID, THOU SHALT NOT

16    OWN A MAGAZINE OF MORE THAN TEN ROUNDS?

17         MS. GORDON:  TEN IS GOING TO BE -- NO, I DON'T THINK

18    IT'S MODELED AFTER THE COMMANDMENTS, YOUR HONOR.  I THINK TEN

19    IS, OF COURSE, GOING TO BE A COMPROMISE BETWEEN WHAT PEOPLE

20    COULD CONCEIVABLY NEED FOR SELF-DEFENSE AND WHAT IS GOING TO

21    KEEP PEOPLE SAFE.  BECAUSE THAT'S ALWAYS THE DYNAMIC THAT IS

22    GOING ON.

23         THE COURT:  BUT WHO IS TO TELL PEOPLE WHAT -- I MEAN,

24    WHO IS TO TELL PEOPLE WHAT THEY NEED FOR SELF-DEFENSE?  JUST

25    LAST WEEK, THERE WAS AN INCIDENT HERE IN SAN DIEGO COUNTY,

1    WHERE A GENTLEMAN WAS STABBED TO DEATH IN A HOME INVASION.  WHO

2    IS TO SAY THAT IF THAT GENTLEMAN HAD HAD A GLOCK 19 THAT HE

3    COULD REACH, AND FIRED ALL 15 SHOTS AT THIS ASSAILANT, INSTEAD

4    OF HE BEING THE VICTIM, THE ASSAILANT WOULD HAVE BEEN THE ONE

5    WHO WOULD HAVE BEEN DOWN AND OUT.

6         AND WHO ARE WE TO TELL THAT UNFORTUNATE VICTIM NOW THAT

7    YOU ONLY NEED TO FIRE 2.2 ROUNDS, YOU ONLY NEED TO WAVE THE GUN

8    AROUND TO SCARE THIS ASSAILANT AWAY?  WHERE DO WE GET THAT?

9              MS. GORDON:  WE GET THAT BECAUSE THAT'S THE JOB OF

10   THE LEGISLATURE.  AND IN THIS CASE, THAT'S THE JOB OF THE

11   LEGISLATURE AND THE PEOPLE --

12             THE COURT:  BUT ISN'T THAT WHAT THE SECOND AMENDMENT

13   WAS INTENDED TO DO, WAS TO PROVIDE PEOPLE WITH THE RIGHT TO

14   DEFEND THEMSELVES -- NO, NOT TO GIVE THEM THE RIGHT, BECAUSE

15   THE RIGHT PREEXISTED THE SECOND AMENDMENT, BUT TO SIMPLY

16   CONFIRM AND GUARANTEE THE FACT THAT THEY HAVE THAT RIGHT.

17             MS. GORDON:  OF COURSE, YOUR HONOR.  BUT *HELLER* SAYS

18   THAT THEY DON'T GET TO DEFEND THEMSELVES WITH ANY WEAPON,

19   RIGHT.

20             THE COURT:  A BAZOOKA.

21             MS. GORDON:  RIGHT.  WHAT IF THAT POOR MAN WHO WAS

22   STABBED TO DEATH HAD HAD A MACHINE GUN, RIGHT.  IT MIGHT HAVE

23   GONE COMPLETELY DIFFERENTLY.  BUT NO ONE IS SUGGESTING THAT WE

24   NEED TO ALLOW PEOPLE TO HAVE MACHINE GUNS IN THEIR HOMES FOR

25   SELF-DEFENSE.

```
1              THE COURT:  YOU'RE RIGHT.

2              MS. GORDON:  YOU RAISE AN IMPORTANT POINT, RIGHT,

3    BECAUSE, OF COURSE, THERE ARE GOING TO BE INSTANCES, AND I

4    THINK THEY'RE RARE, RIGHT, WHERE, PERHAPS, BEING ABLE TO HAVE

5    MORE AMMUNITION, MORE FIRE POWER WITHOUT RELOADING COULD SAVE

6    SOMEONE'S LIFE.  BUT THEY ACTUALLY PALE IN COMPARISON TO THE

7    MANY MORE UNDOCUMENTED INSTANCES WHERE INNOCENT PEOPLE ARE

8    BEING SLAUGHTERED IN A MASS SHOOTING.

9              AND SO IT IS THE JOB OF THE LEGISLATURE AND THE PEOPLE TO

10   TAKE EVIDENCE AND WEIGH IT.  AND PEOPLE MAY NOT AGREE WITH EACH

11   OTHER.  EXPERTS MAY NOT AGREE WITH EACH OTHER.  BUT AS LONG

12   AS --

13             THE COURT:  WHICH GETS ME BACK TO THE QUESTION I WAS

14   TRYING TO POSE TO YOU.  SO IF THE PEOPLE AND THE LEGISLATURE

15   DECIDE IN FIVE YEARS THAT, YOU KNOW, MOST OF THE MASS SHOOTINGS

16   ARE OCCURRING BECAUSE PEOPLE ARE POSSESSING WEAPONS WITH

17   MAGAZINES OF TEN ROUNDS, WE, THEREFORE, NEED TO CHANGE THE LAW

18   AND REQUIRE PEOPLE TO DISPOSSESS THEMSELVES OF MAGAZINES THAT

19   HOLD MORE THAN SEVEN ROUNDS, THAT WOULD BE OKAY?

20             MS. GORDON:  I CAN ONLY SAY, YOUR HONOR, I ACTUALLY

21   THINK IT WOULD BE OKAY.

22             THE COURT:  I SEE.  WHAT ABOUT THREE ROUNDS?

23             MS. GORDON:  AND THE REASON BEING TOO CLOSE TO WHAT

24   WE'RE SEEING IS NEEDED FOR ACTUAL -- USED IN FOR ACTUAL

25   SELF-DEFENSE IN THE HOME.
```

```
1           THE COURT:  FIVE ROUNDS?

2           MS. GORDON:  I DON'T KNOW, YOUR HONOR, FIVE ROUNDS.

3  BUT THE POINT IS, THAT TEN IS NO WHERE CLOSE TO THAT LINE.

4           THE COURT:  OKAY.

5           MS. GORDON:  AND SO WE DON'T HAVE TO WORRY ABOUT

6  SEVEN, SIX, FIVE, FOUR BECAUSE WE'RE TALKING ABOUT TEN.

7           THE COURT:  LET ME ASK YOU A QUESTION.  LET ME GET

8  BACK TO THE EXCEPTIONS --

9           MS. GORDON:  SURE.

10          THE COURT:  -- BECAUSE THE EXCEPTIONS TROUBLE ME.  SO

11 THERE ARE THESE MILLIONS OF PEOPLE THAT OWN THESE MAGAZINES.

12 AND THEY HAVE OWNED THEM FOR A LONG TIME.  THEY'RE LAW-ABIDING

13 CITIZENS.  AND WE KNOW THAT.  WE KNOW THAT BECAUSE, IN FACT,

14 THEY HAVEN'T COMMITTED ANY CRIMES USING THESE MAGAZINES.  NOW

15 THERE IS AN EXCEPTION FOR POLICE OFFICERS, WHICH MAKES

16 ABSOLUTELY -- OR LAW ENFORCEMENT OFFICERS MAKES AWFULLY GOOD

17 SENSE TO ME.  THERE IS AN EXCEPTION FOR RETIRED LAW ENFORCEMENT

18 OFFICERS, WHICH I THINK JUDGE REINHARDT IN ONE CASE INDICATED

19 MADE ABSOLUTELY NO SENSE.  AND I DON'T THINK THAT JUDGE

20 REINHARDT IS A FAN OF GUN -- A GUN FAN.  BUT HE SAID THAT MADE

21 NO SENSE.  BUT I CAN UNDERSTAND THAT IF THE POINT IS TO REDUCE

22 VIOLENCE, I CAN SEE HOW A RETIRED POLICE OFFICER SHOULD BE

23 ALLOWED TO HAVE THESE KINDS OF WEAPONS.

24     I DON'T UNDERSTAND THE MOVIE INDUSTRY.  THAT IS A WEIRD

25 ONE.  AND THE ONLY THING I CAN THINK OF IS THEY HAVE A VERY
```

1   POWERFUL LOBBY.  THEY CAN USE A PLASTIC, YOU KNOW, A PLASTIC

2   WEAPON.  BUT WHY NOT, FOR EXAMPLE, PEOPLE THAT HAVE CCW'S, WHO

3   HAVE BEEN PROVEN TO BE OF GOOD MORAL CHARACTER, WHO KNOW HOW TO

4   HANDLE A WEAPON.  THERE IS NO EXCEPTION FOR THEM.  THEY'RE

5   TREATED AS OF JULY 1, IF THEY DO NOT DISPOSSESS -- IF THEY OWN,

6   SAY, FOR EXAMPLE, AN AR-15 OR IF THEY OWN A GLOCK 19, IF ON

7   JULY 1ST, THEY DO NOT DISPOSSESS THEMSELVES OF THOSE MAGAZINES,

8   ON THAT DATE, THEY BECOME A CRIMINAL.

9           MS. GORDON:  CORRECT.

10          THE COURT:  WHAT IS THE POINT OF THAT?

11          MS. GORDON:  THE POINT IS, IS THAT ANYTHING ELSE IS

12  THE SYSTEM THAT WE HAVE RIGHT NOW, WHICH IS NOT WORKING, RIGHT,

13  FOR A VARIETY OF REASONS.  BECAUSE THERE ARE LOOPHOLES, WHICH

14  IS WHAT THE AMENDMENTS ARE ATTEMPTING TO CLOSE.  IT IS

15  EXTREMELY DIFFICULT.  IT IS FRUSTRATING LAW ENFORCEMENT

16  EFFORTS.  BECAUSE THEY CAN'T TELL WHETHER A HIGH CAPACITY

17  MAGAZINE WAS ACTUALLY PURCHASED BEFORE THE DATE, BEFORE 2000.

18  IT IS ALSO THE CASE THAT IN SOMETHING LIKE 76 PERCENT OF CRIMES

19  WITH FIREARMS, THEY'RE STOLEN.  OR IN THE CASE OF NEWTOWN, THAT

20  IS SOMEONE WHO TAKES HIS MOTHER'S --

21          THE COURT:  YOU THINK THAT IS GOING TO MAKE A BIT OF

22  DIFFERENCE?

23          MS. GORDON:  I DO.

24          THE COURT:  DO YOU THINK THAT THE PEOPLE THAT HAVE

25  THESE HIGH CAPACITY MAGAZINES, BUT WHO ARE NOT LAW-ABIDING

1    CITIZENS, ARE JUST GOING TO GO RUNNING INTO POLICE DEPARTMENTS

2    AND THEY'RE GOING TO SAY, HEY, HERE IS MY MAGAZINE THAT HOLDS

3    MORE THAN TEN ROUNDS?

4           MS. GORDON:  I DO NOT, NO.

5           THE COURT:  NO.

6           MS. GORDON:  NO.  BUT IN NO WAY DO I THINK THAT THAT

7    DEFEATS THE PURPOSE AND CONSTITUTIONALITY OF THIS BAN.  THE

8    FACT THAT THERE ARE INSTANCES THAT MAY NOT MAKE SENSE, LIKE THE

9    ENTERTAINMENT INDUSTRY MAKES SENSE TO YOUR HONOR, THE FACT

10    THAT -- IT IS NOT PERFECT BUT REMEMBER IT DOESN'T NEED TO BE

11    PERFECT, YOUR HONOR.

12           THE COURT:  YOU READ JUDGE REINHARDT'S OPINION IN,

13    WHAT IS IT, *SILVEIRA*, I GUESS.

14           MS. GORDON:  I'M FAMILIAR WITH IT, YES.

15           THE COURT:  WHERE HE SAID THAT RETIRED POLICE

16    OFFICERS SAID THAT DISTINCTION DIDN'T MAKE ANY SENSE TO HIM.

17           MS. GORDON:  I HAVE, YES.

18           THE COURT:  HOW WOULD I EXPLAIN TO JUDGE REINHARDT

19    THIS EXCEPTION FOR THE ENTERTAINMENT INDUSTRY?  AND WHAT

20    BASIS -- I MEAN, IF HE DIDN'T THINK THAT LAW ENFORCEMENT,

21    RETIRED LAW ENFORCEMENT OFFICERS SHOULD HAVE THE ABILITY TO

22    POSSESS THESE WEAPONS, DO YOU THINK YOU'D BE ABLE TO CONVINCE

23    HIM THAT THE ENTERTAINMENT INDUSTRY SHOULD BE ALLOWED TO HAVE

24    THESE WEAPONS?

25           MS. GORDON:  I HIGHLY DOUBT THAT I COULD CONVINCE

1    JUDGE REINHARDT --

2              THE COURT:  DO YOU THINK ANYBODY COULD --

3              MS. GORDON:  BUT, YOUR HONOR, NO ONE IS ACTUALLY

4    CHALLENGING THOSE EXCEPTIONS HERE.  IF, IN FACT, YOUR HONOR

5    FEELS THAT THEY IN SOME WAY -- OR THE ISSUE THAT MAKES THIS

6    STATUTE PROBLEMATIC, I AM NOT QUITE SURE OF HOW THIS WORKS, BUT

7    I ASSUME THAT THE COURT HAS THE ABILITY TO ENJOIN THE STATE

8    FROM GIVING LARGE CAPACITY MAGAZINES TO THE ENTERTAINMENT

9    INDUSTRY.  BUT THAT IS VERY DIFFERENT FROM ENJOINING THE STATE

10   FROM ENFORCING A DULY-ENACTED PIECE OF LEGISLATION THAT IS

11   MEANT TO PROTECT PEOPLE.

12             THE COURT:  IT GOES TO THE QUESTION OF WHETHER IT IS

13   A REASONABLE FIT.  WHAT IS A REASONABLE FIT?  AND I'M TRYING TO

14   FIGURE OUT, WHY IS THIS A REASONABLE FIT FOR THE LEGISLATION?

15   AND I DON'T UNDERSTAND IT.  I HAVE A VERY DIFFICULT TIME.  AS

16   OPPOSED TO, FOR EXAMPLE, AS I SAID, CREATING AN EXCEPTION FOR

17   PEOPLE WHO HAVE A CONCEAL CARRY PERMIT.  THEY'VE ALREADY BEEN

18   -- THEY HAVE ALREADY GONE THROUGH TESTING AND HAVE BEEN --

19   THEIR BACKGROUND HAS BEEN CHECKED, ETC.  THOSE PEOPLE, THOSE

20   WHO MAY POSSESS A GLOCK 19, I BELIEVE ONE OF THE MOST POPULAR

21   HANDGUNS OUT THERE ON THE MARKET, AS OF JULY 1, THEY HAVE TO

22   GET RID OF THOSE GUNS.  THEY NOW HAVE TO GO OUT, THEY HAVE TO

23   PURCHASE A NEW GUN.  THEY HAVE TO GO OUT AND THEY HAVE TO

24   QUALIFY WITH THE NEW GUN BECAUSE OF WHAT, BECAUSE THE

25   ENTERTAINMENT INDUSTRY CAN KEEP THEIR MAGAZINES?  IS THAT --

1   YOU SEE WHAT I'M SAYING?

2           MS. GORDON:  I UNDERSTAND WHAT YOU'RE SAYING.  AND I

3   UNDERSTAND THAT THE EXCEPTION FOR THE ENTERTAINMENT INDUSTRY IS

4   TROUBLING TO YOUR HONOR.  BUT I DON'T ACTUALLY THINK THAT IN

5   THE VAST MAJORITY OF CASES, RIGHT, THAT THE EXCEPTION FOR THE

6   ENTERTAINMENT INDUSTRY UNDERMINES THE FACT THAT THERE IS A

7   REASONABLE FIT BETWEEN WHAT PLAINTIFFS CONCEDE IS A COMPELLING

8   INTEREST IN PROTECTING PEOPLE AND PROTECTING LAW ENFORCEMENT,

9   AND THIS LAW TAKEN AS A WHOLE.

10      AT THE MARGINS, COULD IT BE BETTER?  COULD IT BE MORE

11  PRECISE?  COULD IT NOT HAVE AN EXCEPTION FOR THE ENTERTAINMENT

12  INDUSTRY?  SURE.  BUT THAT IS AT THE MARGINS.  AND REALLY,

13  WE'RE HERE TO SORT OF ASK IF THERE IS A REASONABLE FIT.  NOT

14  LEAST RESTRICTIVE MEANS NOT PERFECT, JUST REASONABLE.  AND I

15  WOULD SUGGEST THERE IS NOTHING IN THIS LAW, RIGHT, THAT IS

16  UNREASONABLE.  IT IS ABSOLUTELY A REASONABLE FIT.  I THINK THIS

17  LAW COULD ACTUALLY SURVIVE ANY LEVEL OF SCRUTINY.  BUT OF

18  COURSE IT ONLY HAS TO SURVIVE INTERMEDIATE SCRUTINY.  I'M

19  SORRY, I DON'T WANT TO GET OFF THIS IF YOU HAD --

20          THE COURT:  NO, GO AHEAD.

21          MS. GORDON:  I WAS JUST GOING TO TOUCH ON THE TAKINGS

22  POINT JUST QUICKLY.

23          THE COURT:  GOOD.  BECAUSE I WAS GOING TO MOVE ONTO

24  THAT MYSELF.

25      ALL RIGHT, GO AHEAD.

1        MS. GORDON:  I THINK THERE IS A LITTLE BIT OF

2   CONFUSION ABOUT WHAT THE STATE IS AND ISN'T SAYING.  SO REALLY,

3   A PHYSICAL TAKING, WHICH IS THE TAKING THAT PLAINTIFFS SAY THEY

4   ARE ALLEGING AND ARGUING HERE, HAPPENS WHEN THE GOVERNMENT

5   EITHER INVADES YOUR PROPERTY OR APPROPRIATES YOUR PROPERTY FOR

6   PUBLIC USE.  AND IT IS ALSO TRUE, AS PLAINTIFFS RIGHTLY POINTED

7   OUT, THAT IT DOESN'T HAVE TO BE THE GOVERNMENT ITSELF.  THE

8   GOVERNMENT COULD SEND AN AGENT TO DO THAT, BUT IT HAS THE SAME

9   EFFECT.  BUT THERE IS NOTHING ABOUT SOMETHING BEING A BAN ON

10  POSSESSION THAT IMMEDIATELY MAKES IT A TAKING, RIGHT.  THE

11  QUESTION --

12       THE COURT:  CAN YOU CITE ME TO ANY OTHER LAWS THAT

13  HAVE FORCED PEOPLE TO DISPOSSESS THEMSELVES OF PROPERTY THAT

14  THEY HAVE OWNED, LAWFULLY OWNED FOR A LONG TIME THAT IS NOT A

15  TAKING?

16       MS. GORDON:  WELL, THAT WOULD -- SO OFF THE TOP OF MY

17  HEAD, I CAN.  I CAN GIVE YOU ONE.  AND I'M HAPPY TO SUBMIT

18  MORE.

19       THE COURT:  TELL ME WHAT IT IS.

20       MS. GORDON:  THIS IS A LITTLE OBSCURE.  BUT IT IS

21  FISH AND GAME 2021 AND 2021.5.  AND HERE IS WHAT IT DID, IT

22  BANNED -- AND IN A WAY, IT SORT OF OPERATED THE SAME WAY AS

23  THIS LAW IN THAT SHARK FIN, IT BANNED SHARK FIN.

24       THE COURT:  YOU COULDN'T POSSESS SHARK FIN.  SO IF

25  YOU HAD A SHARK FIN, YOU HAD TO GET RID OF IT?

1          MS. GORDON:  SUBJECT TO CERTAIN EXCEPTIONS, YES.

2     IT'S A COMPLETE BAN ON POSSESSION, SALE, DISTRIBUTION.  YOU

3     CANNOT HAVE A SHARK FIN IN CALIFORNIA.

4          THE COURT:  HOW LONG CAN YOU KEEP A SHARK FIN?

5          MS. GORDON:  I DON'T THINK THAT A SHARK FIN ACTUALLY

6     STAYS GOOD FOR THAT LONG.  BUT A SHARK FIN USUALLY IS AN

7     INCREDIBLY LUCRATIVE ITEM.  PEOPLE WILL PAY SOMETHING LIKE $100

8     FOR A BOWL OF SHARK FIN SOUP AND UP TO $600 FOR THE SHARK FIN.

9     SO THERE IS A BAN ON POSSESSION OF THAT.  THERE ARE, OBVIOUSLY,

10    BANS ON POSSESSION OF ALL KINDS OF OTHER THINGS THAT ARE

11    ILLEGAL, RIGHT, SO ILLEGAL DRUGS.  THERE IS A BAN ON POSSESSION

12    ON MOUNTAIN LION PARTS.  THERE ARE BANS ON ALL KINDS OF THINGS.

13    BUT THE POINT I'M TRYING TO MAKE IS, THAT IT MATTERS WHAT POWER

14    THE GOVERNMENT IS USING AND FOR WHAT PURPOSE.

15      SO IF THE GOVERNMENT WERE SEIZING, USING ITS POWER OF

16    EMINENT DOMAIN, LARGE CAPACITY MAGAZINES, AND WE WERE

17    DISTRIBUTING THEM TO HIGHWAY PATROL OFFICERS BECAUSE WE REALLY

18    THOUGHT THAT CHP HAVING LARGE CAPACITY MAGAZINES WOULD MAKE THE

19    STREET SAFER, THAT IS A TAKING, RIGHT.  BECAUSE WE'VE

20    CONFISCATED YOUR PROPERTY FOR PUBLIC GOOD, FOR PUBLIC USE.  AND

21    THE LAW IS THAT NO SUBSET OF PEOPLE SHOULD HAVE TO BEAR THE

22    EXPENSE, THE BURDEN OF WHAT IS GOOD FOR THE PUBLIC.  THAT'S NOT

23    WHAT WE'VE DONE HERE.  PURSUANT TO OUR -- THE POLICE POWER, WE

24    ARE REGULATING AND WE ARE CONFISCATING THIS PROPERTY BECAUSE WE

25    HAVE DETERMINED THAT IT IS A NUISANCE.  IT IS DANGEROUS.  THAT

```
 1   IS AN -- THE LAW IS VERY CLEAR OVER AND OVER AGAIN --

 2             THE COURT:  BUT --

 3             MS. GORDON:  -- THAT IS NOT A TAKING.

 4             THE COURT:  BUT GETTING BACK TO MY QUESTION EARLIER,

 5   LOOK, IS THERE ANYONE WHO CAN DISPUTE THAT A GUN IS NOT A

 6   DANGEROUS DEVICE?  NOBODY CAN DISPUTE THAT.  BUT IT'S DANGEROUS

 7   IN BOTH DIRECTIONS.  IT'S DANGEROUS FOR THE PERPETRATOR WHO

 8   USES IT INAPPROPRIATELY, AND IT'S ALSO DANGEROUS TO THE

 9   PERPETRATOR WHEN THE VICTIM HAPPENS TO HAVE THE WEAPON, RIGHT.

10   SO IT IS DANGEROUS.  BUT SIMPLY BECAUSE IT'S DANGEROUS DOESN'T

11   MEAN THAT THE GOVERNMENT CAN SIMPLY COME IN AND SAY, YOU MUST

12   DISPOSSESS YOURSELF OF IT, PARTICULARLY IF IT IS -- AT LEAST

13   ARGUABLY, PROTECTED BY THE SECOND AMENDMENT.

14             MS. GORDON:  WELL, YOU'RE RIGHT.  THE GOVERNMENT HAS

15   TO ACT WITHIN CONSTITUTIONAL BOUNDS, RIGHT.  AND THE GOVERNMENT

16   HAS DONE SO HERE.  THERE IS REALLY NO APPRECIABLE USE OR

17   BENEFIT TO HAVING A LARGE CAPACITY MAGAZINE TO DEFEND YOURSELF

18   IN YOUR HOME, RIGHT.

19             THE COURT:  BUT YOU KEEP SAYING THAT TO ME.  BUT MY

20   QUESTION TO YOU IS, WHY WOULD YOU SAY THAT?

21             MS. GORDON:  I WOULD SAY IT BECAUSE POLICE CHIEFS SAY

22   IT.

23             THE COURT:  OH, GREAT.

24             MS. GORDON:  BECAUSE EXPERTS SAY IT.  BECAUSE THE

25   COLLATERAL DAMAGE THAT YOU'RE DOING, SPRAYING BULLETS AROUND IN
```

1    YOUR HOME, THEY GO THROUGH WALLS, THEY GO THROUGH WINDOWS,

2    RIGHT.  AND IN POINT OF FACT, PLAINTIFFS THEMSELVES, THE

3    DATABASES INDICATE THAT THEY'RE NOT FIRING MORE THAN TWO

4    ROUNDS.  THERE ARE NO REPORTED CASES IN CALIFORNIA IN THE LAST

5    TEN YEARS OF ANYONE FIRING TEN ROUNDS IN THEIR HOME.

6              THE COURT:  IS THAT THE TEST?

7              MS. GORDON:  SORRY?

8              THE COURT:  IS THAT THE TEST?

9              MS. GORDON:  WELL, IT IS PART OF THE TEST, RIGHT.

10   BECAUSE THE CLOSER THAT A LAW GETS TO THE FUNDAMENTAL RIGHTS

11   SECURED BY THE SECOND AMENDMENT, WHICH IS THE RIGHT OF PEOPLE

12   TO DEFEND THEMSELVES, RIGHT, THAT IS --

13             THE COURT:  LISTEN, IF YOU'RE A WOMAN, AND YOU'RE IN

14   YOUR BEDROOM, AND YOU HEAR IN THE MIDDLE OF THE NIGHT SOMEONE

15   BREAKING INTO YOUR HOUSE, DO YOU THINK -- DO YOU THINK YOU'RE

16   GOING TO ASK YOURSELF, YOU KNOW, I HAVE 15 ROUNDS IN THIS

17   WEAPON, AND SO I FEEL PRETTY COMFORTABLE THAT I CAN FIRE 15

18   ROUNDS IN PROTECTING MYSELF?  DO YOU THINK -- DO YOU THINK THAT

19   RESTRICTING THAT WOMAN TO DEFENDING HERSELF TO TEN ROUNDS AND

20   IF SHE'S NOT LUCKY ENOUGH TO DETER THE PERPETRATOR WITH TEN

21   ROUNDS THAT THE OTHER FIVE ROUNDS MIGHT HAVE DONE IT?  DO YOU

22   THINK THAT THAT IS SOMETHING THE GOVERNMENT SHOULD BE MEDDLING

23   IN AND TELLING THAT WOMAN THAT, HEY, LISTEN, TEN ROUNDS, THAT

24   IS ALL YOU GET.  YOU FIRE TEN ROUNDS, AND IF YOU CAN'T HIT THAT

25   PERPETRATOR, TOO BAD, SO SAD.  THAT IS JUST THE WAY IT GOES.

```
 1   OH, AND IF YOU WOULD HAVE HAD THE OTHER FIVE, YOU MIGHT HAVE
 2   GOTTEN HIM, AND YOU MIGHT HAVE KEPT YOURSELF FROM BEING RAPED
 3   OR ASSAULTED OR MURDERED.  DO YOU THINK THAT IS REALLY THE
 4   GOVERNMENT'S -- FOR THE GOVERNMENT TO TELL PEOPLE WHAT THEY CAN
 5   DO TO PROTECT THEMSELVES IN THOSE KINDS OF SITUATIONS?  REALLY?
 6              MS. GORDON:  YES, YOUR HONOR.  I THINK -- I MEAN, THE
 7   WAY YOUR HONOR HAS PHRASED IT, NO.  BUT I THINK THE
 8   GOVERNMENT'S JOB IS TO PROTECT ITS PEOPLE.
 9              THE COURT:  INCLUDING THE WOMAN WHO HEARS SOMEBODY
10   BREAKING INTO HER PLACE, WHO IS ABOUT TO BE RAPED OR MURDERED.
11              MS. GORDON:  WELL, HERE IS THE THING, IF YOU LOOK AT
12   THE EVIDENCE, THERE IS REALLY ALMOST NONE ON THIS SIDE OF THAT,
13   THAT THAT WOMAN HAS ACTUALLY NEEDED OR FIRED MORE THAN TEN
14   SHOTS TO DEFEND HERSELF; WHEREAS, WE HAVE A LOT OF EVIDENCE ON
15   THE OTHER SIDE OF LARGE CAPACITY MAGAZINES BEING USED TO KILL A
16   LOT OF INNOCENT PEOPLE.  SO --
17              THE COURT:  RARELY.
18              MS. GORDON:  NOT THAT RARELY.  AND REALLY, HOW MANY
19   PEOPLE HAVE TO DIE IN MORE MASS SHOOTINGS BEFORE IT'S OKAY FOR
20   THE GOVERNMENT TO ACT?
21              THE COURT:  BUT IF THAT IS THE ANALYSIS, YOU GET BACK
22   TO WHAT I WAS ASKING YOU EARLIER, WHICH IS WHY I WAS ASKING
23   YOU, WHY NOT SEVEN?  WHY NOT SIX?  WHY NOT THREE?  WHY NOT
24   SIMPLY HAVE PEOPLE THROW THEIR HANDGUNS AT SOMEONE WHO BREAKS
25   IN THROUGH THEIR WINDOW BECAUSE THEY'RE NOT ALLOWED TO PUT A
```

1  ROUND IN THE CHAMBER?

2         MS. GORDON:  AS I'VE SAID, THE CLOSER WE GET TO THE

3  CORE RIGHT, WHICH IS THE RIGHT TO PROTECT ONESELF, RIGHT, BUT

4  NOT WITH ANY WEAPON, NOT IN ANY MANNER, NOT ANY WAY ONE FEELS

5  THEY MIGHT LIKE TO DO SO, RIGHT.  WE KNOW THAT THESE ARE BOTH

6  TRUE.  YOU HAVE A RIGHT TO HAVE A FIREARM FOR SELF-DEFENSE.

7  YOU DO NOT HAVE A RIGHT TO HAVE SOMETHING THAT COULD REASONABLY

8  BE DEEMED DANGEROUS BY THE STATE.  AND THIS IS PRETTY

9  REASONABLY DEEMED DANGEROUS.

10        THE COURT:  BUT THERE IS NO EVIDENCE THAT THE PEOPLE

11 THAT NOW POSSESS THESE HAVE MISUSED THEM OR ARE ABOUT TO MISUSE

12 THEM.  I DIDN'T SEE ONE BIT OF EVIDENCE ANYWHERE IN THE

13 EVIDENCE YOU SUBMITTED TO ME THAT SAYS THAT THE PEOPLE THAT

14 CURRENTLY POSSESS THESE MAGAZINES ARE ABOUT TO ABUSE THEM OR

15 USE THEM IN AN IMPROPER MANNER.  AND AS OF JULY 1, IF THEY

16 DON'T DISPOSSESS THEMSELVES OF THESE WEAPONS, THEY

17 AUTOMATICALLY BECOME A CRIMINAL, HAVING DONE ABSOLUTELY NOTHING

18 IN THE PAST TO JUSTIFY THAT LABEL, RIGHT.

19        MS. GORDON:  YOUR HONOR, I MEAN, THAT IS A PARTICULAR

20 WAY OF SEEING IT, AND I'M NOT GOING TO ATTEMPT TO ACTUALLY PUSH

21 TOO HARD AGAINST THAT.  BUT AGAIN, THE QUESTION -- THAT'S

22 RIGHT.  SO THERE ARE LAW-ABIDING PEOPLE WHO HAVE DONE NOTHING

23 WRONG.  AND MAYBE THEY COULD KEEP THEIR LARGE CAPACITY MAGAZINE

24 FOREVER WITH NO INCIDENT.  THAT SYSTEM ISN'T WORKING TO

25 ACTUALLY ACHIEVE THE GOALS AND TO SERVE THE COMPELLING INTEREST

1    THAT THE STATE HAS.  TOO MANY LARGE CAPACITY MAGAZINES ARE

2    COMING IN.  TOO MANY ARE IN CIRCULATION.  TOO MANY ARE FALLING

3    INTO THE WRONG HANDS.  TOO MANY ARE CAUSING SHOOTINGS LIKE

4    SAN BERNARDINO, AND LIKE ORLANDO, AND LIKE NEWTOWN.

5        AND SO THE STATE JUST MADE A REASONED JUDGMENT THAT WHAT

6    WE'RE DOING ISN'T WORKING.  BUT THAT THERE IS ACTUALLY

7    EVIDENCE, AND THERE WAS EVIDENCE, FOR EXAMPLE -- AND THIS IS IN

8    THE WEBSTER DECLARATION, AND ALSO IN KOPER'S DECLARATION,

9    EXHIBIT 107 TO MY DECLARATION, WHERE THEY'RE VERY CLEAR ABOUT

10   WHAT THE FEDERAL BAN ACTUALLY ACHIEVED.

11       AND, IN FACT, AS YOU -- THERE IS A HUGE STOCK PILING OF

12   ASSAULT WEAPONS AND LARGE CAPACITY MAGAZINES BEFORE THE BAN

13   GOES INTO EFFECT.  SO THERE IS A DELAYED SORT OF ABILITY TO

14   KIND OF SEE WHAT IT'S DOING.  BUT IN THE LATER YEARS, VIOLENT

15   CRIME, MASS SHOOTINGS START TO GO DOWN.  SPECIFICALLY THERE ARE

16   FEWER FATALITIES AND FEWER MASS SHOOTINGS AS YOU GET CLOSER TO

17   2004.  AND THOSE NUMBERS GO BACK UP AFTER THE BAN IS ALLOWED TO

18   EXPIRE.

19       THERE IS A LOT OF EVIDENCE THAT SUGGESTS AND, YOU KNOW,

20   YOUR HONOR COULD SIMPLY LOOK AT THE FINDINGS THAT HAVE BEEN

21   ADOPTED BY EVERY COURT TO CONSIDER THIS ISSUE, THAT THIS BAN IS

22   A REASONABLE FIT.  THIS IS WHAT IS NEEDED.  IS IT PERFECT?  NO,

23   IT ISN'T.  AND WE'VE DOCUMENTED ALL THE WAYS I THINK TODAY THAT

24   IT IS NOT PERFECT.  IT DOESN'T NEED TO BE PERFECT.  IT NEEDS TO

25   BE REASONABLE TO DO THE IMPORTANT JOB OF PROTECTING THE PEOPLE

1   OF CALIFORNIA.  THAT IS THE LEGISLATURE'S JOB, YOUR HONOR.

2   THEY'RE ENTITLED TO WEIGH CONFLICTING OPINIONS AND TO MAKE THE

3   BEST DETERMINATION THAT THEY CAN.  THE PEOPLE, OF COURSE, ARE

4   EMPOWERED TO DO THE SAME.  THAT IS WHAT THEY HAVE DONE HERE.

5   AND SO TO -- TO OFFER THE EXTRAORDINARY REMEDY OF ENJOINING A

6   DULY-ENACTED PIECE OF LEGISLATION SIMPLY BECAUSE IT'S NOT

7   PERFECT, I'M ASKING YOUR HONOR NOT TO DO THAT.  PLEASE DENY THE

8   PRELIMINARY INJUNCTION.

9           THE COURT:  JUST A SECOND.  DON'T GO AWAY YET.

10          MS. GORDON:  OKAY.

11          THE COURT:  LET ME ASK YOU ABOUT *MILLER*.  I KNOW

12  THERE IS THIS DISCUSSION, YOU KNOW, THERE ARE THOSE WHO WANT TO

13  LIMIT THE SECOND AMENDMENT TO SOME SORT OF AN ORGANIZED

14  MILITIA, SOMETHING WHICH I BELIEVE *HELLER* HAS INDICATED WAS NOT

15  INTENDED, AND SOMETHING WHICH I BELIEVE IF ONE READS THE REAL

16  HISTORY BETWEEN THE SECOND AMENDMENT, ONE WOULD FIND IS NOT

17  SUPPORTED BY THE HISTORY.  BUT LET'S SET THAT ASIDE FOR THE

18  TIME BEING.

19      THERE IS NO QUESTION THAT *MILLER* SAID, THE SUPREME COURT

20  DECISION IN *MILLER* SAID THAT THE TYPES OF WEAPONS THAT ARE

21  PROTECTED BY THE SECOND AMENDMENT ARE THOSE TYPES OF WEAPONS

22  THAT CAN BE USED FOR MILITARY PURPOSES AND WHICH WOULD BE

23  AVAILABLE TO A LAW-ABIDING CITIZEN WHO WAS CALLED UPON TO SERVE

24  IN A MILITIA.  AGAIN, A MILITIA BEING A GROUP OF CITIZENS WHO

25  ARE CALLED UPON TO PROTECT A FREE STATE FROM EITHER INVASION OR

1   OTHER TYRANNY OR WHATEVER.

2       SO YOU WOULD AGREE THAT *MILLER*, IF WE ADOPT THAT REASONING

3   UNDER *MILLER*, THESE TYPES OF MAGAZINES WOULD, IN FACT, BE THE

4   TYPES OF MAGAZINES THAT WOULD BE PROTECTED BY THE SECOND

5   AMENDMENT, WOULDN'T YOU?

6           MS. GORDON:  I'M SORRY, JUST SO I'M FOLLOWING, IS

7   THAT ON THE THEORY THAT THESE MAGAZINES WERE AVAILABLE AT THE

8   TIME OF THE SECOND AMENDMENT OR --

9           THE COURT:  I READ -- NO, NO.  ON THE THEORY THAT THE

10  MILITIA, WHICH WAS A GROUP OF CITIZENS --

11          MS. GORDON:  RIGHT.

12          THE COURT:  JUST CITIZENS, CITIZENS WHO SOMEBODY

13  SAID, WE'RE BEING ATTACKED.  YOU RECALL THE STORY OF LEXINGTON

14  AND CONCORD?

15          MS. GORDON:  I DO.

16          THE COURT:  WHERE THE BRITISH CAME TO DISARM THE

17  COLONISTS.

18          MS. GORDON:  YES, OF COURSE.

19          THE COURT:  AND AS THEY ARRIVED THERE, MORE AND MORE

20  CITIZENS BEGAN TO SHOW UP WITH THEIR MUSKETS AND THEIR PISTOLS;

21  REMEMBER THAT?

22          MS. GORDON:  I DO.

23          THE COURT:  SO THEY GRABBED WHATEVER THEY HAD

24  AVAILABLE TO THEM, AND THAT'S WHAT THEY USED, WHETHER IT WAS A

25  MUSKET OR PISTOL OR WHATEVER.  SO WE ASSUME THAT *MILLER* STANDS

1   FOR THE PROPOSITION THAT THE WEAPONS THAT THE SECOND AMENDMENT

2   WAS INTENDED TO PROTECT WERE THE KINDS OF WEAPONS THAT WOULD BE

3   USED BY A CITIZEN IN THE MILITARY CONTEXT, YOU WOULD AGREE THAT

4   A LARGE CAPACITY MAGAZINE WOULD BE PRECISELY THE KIND OF WEAPON

5   THAT YOU WOULD NEED AS A MEMBER OF THAT MILITIA, RIGHT?

6           MS. GORDON:  NO, I WOULD NOT AGREE.

7           THE COURT:  NO?

8           MS. GORDON:  BECAUSE WHY WOULDN'T AN M16 BE PRECISELY

9   THE KIND OF WEAPON ONE WOULD NEED, RIGHT, TO BE PART OF THAT

10  MILITIA.  YET WE KNOW UNDER *HELLER*, THAT IT'S PERMISSIBLE TO

11  BAN AN M16.  SO I DON'T THINK THE TEST IS JUST, WHAT DO PEOPLE

12  LIKE, YOU KNOW, AND WHAT COULD THEY GRAB?  AT A CERTAIN POINT,

13  I THINK THE DESTRUCTIVE FIRE POWER OF A WEAPON IS GOING TO

14  ACTUALLY COME INTO PLAY.  AND I'M NOT SURE IT IS --

15          THE COURT:  SO YOU'RE SAYING THAT THE MILITIA SHOULD

16  BE USING WEAPONS THAT DO NOT HAVE DESTRUCTIVE FIRE POWER?

17          MS. GORDON:  WHY IS IT -- NO, I WOULDN'T SAY DO NOT

18  HAVE DESTRUCTIVE FIRE POWER.  BUT IT GETS A LITTLE CONFUSING,

19  RIGHT.  BECAUSE NOW WE'RE NOT TALKING ABOUT THEM SERVING IN THE

20  MILITIA, OF COURSE, BUT TALKING ABOUT THEM WALKING AROUND WITH

21  LARGE CAPACITY MAGAZINES.  WE'RE TALKING ABOUT PRIVATE

22  CITIZENS.

23          THE COURT:  WHICH ARE WHAT MAKES UP A MILITIA.

24          MS. GORDON:  ABSOLUTELY.

25          THE COURT:  OKAY.

```
1              MS. GORDON:  AND, OF COURSE, YOU WANT THEM TO BE ABLE

2    TO DEFEND THEMSELVES.  BUT THE TYPES OF WEAPONS WE'RE TALKING

3    ABOUT THAT A MILITIA HAS IS DISTINCT FROM THE TYPES OF WEAPONS

4    THAT THE MODERN MILITARY USES, RIGHT.  MODERN MILITARY COULD

5    USE THE M16, BUT INDIVIDUAL CITIZENS CANNOT.

6              THE COURT:  JUST A SECOND.  IT IS IN YOUR MOTION

7    SOMEWHERE WHERE YOU TALK ABOUT THESE WEAPONS HAVING MILITARY

8    USE.  IT WILL TAKE ME A MINUTE TO FIND IT.

9              MS. GORDON:  TEN, STARTING AT TEN, YOUR HONOR.

10             THE COURT:  THANKS FOR HELPING ME.  I APPRECIATE

11   THAT.

12       YEAH, IT SAYS THAT THESE MAGAZINES ARE MOST SUITABLE FOR

13   MILITARY AND LAW ENFORCEMENT APPLICATIONS.  THAT IS EXACTLY

14   WHAT MILLER SAID, THAT THE TYPES OF WEAPONS THAT THE SECOND

15   AMENDMENT PROTECTS ARE THE TYPES OF WEAPONS THAT WOULD BE ABLE

16   TO BE USED BY MILITARY, FOR MILITARY USE.  NOW WE UNDERSTAND

17   THAT HELLER SAYS IF IT IS AN UNUSUAL WEAPON, SUCH AS, FOR

18   EXAMPLE, WE DON'T EXPECT CITIZENS TO OWN F18'S.  WE DON'T

19   EXPECT THEM TO OWN BAZOOKAS OR HAND GRENADES OR FLAME THROWERS,

20   AS MR. BRADY POINTED OUT.  BUT CERTAINLY, AS WE KNOW, THERE ARE

21   MILLIONS OF LAW-ABIDING CITIZENS WHO POSSESS GLOCK 19'S,

22   AR-15'S, ETC., WHO HAVE NEVER HURT ANYONE WITH THOSE WEAPONS.

23   BUT IF, AS I KIND OF JOKINGLY SAID EARLIER, THE RUSSIANS WERE

24   TO INVADE, WE MIGHT ALL WANT TO GO OUT AND PULL OUR AR-15'S AND

25   OUR GLOCK 19'S IN ORDER TO PROTECT THE FREE STATE, RIGHT?
```

1          MS. GORDON:  WE MIGHT, BUT WE CAN'T.

2          THE COURT:  AND THAT IS EXACTLY WHAT *MILLER* SAID THE

3  SECOND AMENDMENT WAS INTENDED TO PROTECT, RIGHT?

4          MS. GORDON:  TRUE.  BUT *HELLER* --

5          THE COURT:  AND *MILLER* HAS NOT BEEN OVERTURNED, HAS

6  IT?

7          MS. GORDON:  IT HAS NOT.

8          THE COURT:  IT IS STILL GOOD LAW.

9          MS. GORDON:  IT IS.

10          THE COURT:  RIGHT.  AND ALL THAT *HELLER* HAS DONE IS

11  SAID, YES, THAT IS EXACTLY RIGHT.  THOSE ARE THE KINDS OF

12  WEAPONS THAT LAW-ABIDING CITIZENS WOULD OWN.  BUT YOU ALSO

13  WOULD USE THEM FOR SELF-DEFENSE.  AND THE QUINTESSENTIAL WEAPON

14  YOU WOULD USE FOR SELF-DEFENSE IS A HANDGUN, SUCH AS A GLOCK

15  19, THAT HOLDS MORE THAN 15 ROUNDS, RIGHT?

16          MS. GORDON:  OR CAN, YES.

17          THE COURT:  UNLESS WE'RE GOING TO GET INTO THE *HELLER*

18  II -- WAS IT *HELLER* II, WHERE THEY TALKED ABOUT, YOU CAN HAVE A

19  TEN-ROUND MAGAZINE, BUT YOU CAN ONLY PUT SEVEN ROUNDS IN IT?

20  WASN'T THAT *HELLER* II?

21          MS. GORDON:  NO.  THAT IS THE SECOND CIRCUIT CASE WE

22  CITED.  AND THAT IS THE LOAD LIMIT.

23          THE COURT:  YEAH.

24          MS. GORDON:  SO IT IS NOT THE MAGAZINE CAPACITY

25  LIMIT.  IT'S THE LOAD LIMIT THAT GETS STRUCK DOWN.

```
1              THE COURT:  YEAH, RIGHT.  EXACTLY.
2              MS. GORDON:  YEAH.  THAT IS THAT CASE.  IT IS NEW
3   YORK STATE PISTOL AND RIFLE OR RIFLE AND PISTOL ASSOCIATION.  I
4   THINK THERE IS SOME AMBIGUITY.  AND I DON'T THINK IT'S
5   SUFFICIENT THAT A LOT OF LAW-ABIDING PEOPLE MAY ACTUALLY
6   POSSESS A LARGE CAPACITY MAGAZINE.  BUT LET'S SAY IT IS.  LET'S
7   SAY THAT DECIDES RIGHT THERE THAT SOMEHOW LARGE CAPACITY
8   MAGAZINES FALL UNDER THE PURVIEW OF THE SECOND AMENDMENT.
9   THEY'RE PROTECTED.  WE'RE STILL GOING TO INTERMEDIATE SCRUTINY.
10  AND AGAIN, AS EVERY COURT CONSIDERED THE ISSUE HAS HELD, THE
11  LAW PASSES INTERMEDIATE SCRUTINY.
12             THE COURT:  THANKS.  YOU'VE WITHSTOOD MY WITHERING
13  CROSS-EXAMINATION OF YOU QUITE WELL.
14             MS. GORDON:  THANK YOU, YOUR HONOR.
15             THE COURT:  DO YOU HAVE ANYTHING ELSE YOU WANTED TO
16  ADD?
17             MS. GORDON:  I DO NOT.  THANK YOU.
18             THE COURT:  MR. BRADY, SO WHY DO YOU THINK THAT
19  MS. GORDON IS ALL WET?
20             MR. BRADY:  YOUR HONOR, WHAT I BELIEVE I HEARD FROM
21  COUNSEL IS A CONCESSION THAT LAW-ABIDING PEOPLE WILL BE
22  IMPACTED BY THIS LAW, AND THAT IN SOME INSTANCES, PEOPLE WILL
23  NOT BE ABLE TO DEFEND THEMSELVES WITH ONLY TEN ROUNDS.  AND
24  ALL --
25             THE COURT:  BUT SHE SAID IT'S NEVER HAPPENED BEFORE.
```

1        MR. BRADY:  SHE SAID THERE IS NOTHING RECENTLY IN

2   CALIFORNIA.  BUT THE RECORDS SHOW SEVERAL INCIDENTS.  AND IF

3   YOU LOOK AT THE EXPERT MASSAD AYOOB DECLARATION, HE INDICATES

4   THAT IN REVIEWING THESE SHOOTINGS, IT'S THE AMOUNT OF SHOTS

5   FIRED ARE RARELY RECORDED FOR SOME REASON.  THAT IS SOMETHING

6   THAT DOES NOT GET RECORDED IN CIVILIAN SHOOTS.

7        IN POLICE OFFICER SHOOTINGS, THEY ARE ALWAYS RECORDED FOR

8   THE PURPOSE OF THE OFFICER HAS TO DEFEND THE SHOOT, RIGHT.  AND

9   IN THOSE INSTANCES, IT'S QUITE FREQUENT THAT OVER TEN ROUNDS

10  ARE FIRED.  AND EVEN IN THE CASES WHERE THEY'RE NOT BY ONE

11  PARTICULAR OFFICER, IF THERE ARE TWO OR THREE OFFICERS

12  RESPONDING, AND EACH OF THEM DISCHARGE THEIR WEAPON FOUR TIMES,

13  WELL, THAT IS TWELVE ROUNDS, THAT'S OVER TEN.

14       SO BUT I WANT TO GET BACK TO THE CONCESSION THAT ALBEIT

15  RARE, IT WILL IMPACT LAW-ABIDING PEOPLE AND THE CONCESSION THAT

16  IT WILL NOT IMPACT CRIMINALS.  SHE INDICATED, ADMITTED THAT

17  THEY WILL NOT DISPOSSESS THEMSELVES OF THESE ARMS, WHICH GOES

18  TO THE EFFICACY OF THIS LAW AND WHY IT COULDN'T MEET

19  INTERMEDIATE SCRUTINY.

20       THE COURT:  BUT WHAT ABOUT HER COMMENT, THOUGH, WHICH

21  MAKES SENSE AND THAT I UNDERSTAND, AND THAT IS THAT, SO A

22  LAW-ABIDING CITIZEN CAN POSSESS THESE MAGAZINES, BUT AS WE ALL

23  KNOW, THERE ARE BURGLARIES THAT OCCUR AND SOMETIMES THESE

24  WEAPONS THAT USE THESE MAGAZINES ARE STOLEN BY, BY DEFINITION

25  CRIMINALS, RIGHT, WHO ARE NOT LIKELY TO OBEY THE LAW, RIGHT.

```
 1    AND THEY'RE LIKELY TO, PERHAPS, MISUSE THOSE WEAPONS, RIGHT?

 2              MR. BRADY:  SURE.  WELL, FIRST, I DON'T THINK THAT

 3    THE CONSTITUTIONAL RIGHTS OF THE LAW ABIDING CAN BE IMPACTED BY

 4    THE ACTIONS OF CRIMINALS.  BUT EVEN ASSUMING THEY COULD --

 5              THE COURT:  THAT IS THE WHOLE POINT OF THE STATUTE,

 6    ISN'T IT?

 7              MR. BRADY:  THAT'S THE POINT OF THE STATUTE, BUT

 8    THAT'S WHY IT IS UNCONSTITUTIONAL.  IT INFRINGES UNNECESSARILY

 9    ON CONSTITUTIONAL RIGHTS.  BUT EVEN ASSUMING THAT THE

10    GOVERNMENT CAN, THERE ARE FAR LESS RESTRICTIVE MEANS, FOR

11    EXAMPLE, CALIFORNIA'S REQUIREMENT THAT FIREARMS BE STORED IN A

12    WAY THAT THOSE WHO ARE PROHIBITED FROM POSSESSING THEM CAN

13    OBTAIN THEM.  SO IF THEY WANT TO SAY YOU HAVE TO STORE YOUR

14    MAGAZINE IN A WAY THAT A BAD GUY COULD NOT OBTAIN ONE --

15              THE COURT:  THAT WOULD, IN ESSENCE, CREATE A LEAST

16    RESTRICTIVE STANDARD, WHICH IS A STRICT SCRUTINY STANDARD,

17    WHICH THE NINTH CIRCUIT HAS SAID DOES NOT APPLY IN THESE KINDS

18    OF CASES, RIGHT?

19              MR. BRADY:  NO, YOUR HONOR.  REMEMBER WE DON'T NEED

20    TO MEET -- EVEN UNDER INTERMEDIATE SCRUTINY, THEY STILL HAVE TO

21    HAVE A FIT.  I WAS SIMPLY POSING AN EXAMPLE FOR YOUR HONOR OF A

22    LESS -- OF A LESSER RESTRICTED MEANS.  I KNOW THE TEST IS NOT

23    THAT IT HAS TO BE THE LEAST RESTRICTIVE MEANS.  I WAS PROVIDING

24    THAT AS AN EXAMPLE OF A SITUATION WHERE THERE IS LESS

25    RESTRICTIVE MEANS.  AND AGAIN, I THINK WE'RE TALKING ABOUT A
```

1    BAN, OKAY.  WHEN YOU'RE TALKING ABOUT A BAN, EVEN THOUGH IT

2    DOESN'T HAVE TO BE THE LEAST RESTRICTIVE MEANS, THERE HAS TO BE

3    A REASONABLE FIT.  AND BANNING CONDUCT THAT IS PROTECTED BY THE

4    CONSTITUTION SIMPLY CANNOT WITHSTAND ANY FORM OF HEIGHTENED

5    SCRUTINY, OTHERWISE --

6              THE COURT:  LOOK --

7              MR. BRADY:  -- THAT RESTRICTION IS WORTHLESS.

8              THE COURT:  FACIALLY AND SUPERFICIALLY, ALMOST ANYONE

9    THAT YOU TELL THEM, YOU SAY TO THEM, LOOK, IF WE BAN THESE HIGH

10   CAPACITY MAGAZINES, WE'RE GOING TO KEEP PEOPLE FROM GETTING

11   SHOT, WHO CAN POSSIBLY DISAGREE WITH THAT?  I MEAN, YOU KNOW,

12   RIGHT.  SO THE REASONABLE FIT STANDARD IS KIND OF A DIFFICULT

13   STANDARD FOR ME TO GET THROUGH.  BECAUSE, YEAH, SURE, WE BAN

14   THESE MAGAZINES, FEWER ROUNDS, FEWER PEOPLE LIKELY TO GET SHOT,

15   KILLED, OR INJURED.  SUPERFICIALLY THAT MAKES PERFECTLY GOOD

16   SENSE TO ALMOST ANYONE, RIGHT?

17             MR. BRADY:  SUPERFICIALLY IT MIGHT, YOUR HONOR.  BUT

18   WHEN YOU DELVE DOWN INTO THE FACTS, THE FLIP SIDE OF THAT IS

19   THAT A PERSON IN SELF-DEFENSE MIGHT NEED MORE THAN TEN ROUNDS.

20   AND THIS LAW WOULD MAKE THAT PERSON A VICTIM.  AND IF YOU LOOK

21   AT PLAINTIFFS' EXPERT'S DECLARATION, PROFESSOR DR. GARY KLECK,

22   HE INDICATES THAT BASED ON HIS REVIEW OF INCIDENTS AND

23   STATISTICS, THAT IT IS FAR MORE LIKELY FOR SOMEBODY TO USE A

24   FIREARM AND NEED MORE THAN TEN ROUNDS TO DEFEND THEMSELVES THAN

25   SOMEBODY -- THAN THE MAGAZINE CAPACITY MAKING A DIFFERENCE IN A

1  MASS SHOOTING.  AND I THINK THAT'S KEY.  YOUR HONOR, I THINK,

2  WAS HONING IN ON THIS, THAT THE MAGAZINE CAPACITY ALMOST NEVER

3  MATTERS IN THESE MASS SHOOTINGS.  SURE, THEY USE OVER TEN-ROUND

4  MAGAZINES FAIRLY OFTEN; ALTHOUGH, I'M NOT SURE IT IS A

5  MAJORITY.  DR. KLECK'S DECLARATION EXPLAINS ALL OF THAT STUFF.

6  BUT EVEN IF IT DOES, THE VIRGINIA TECH SHOOTING, ONE OF THE

7  DEADLIEST SHOOTINGS IN HISTORY, HE USED A BACKPACK FULL OF

8  TEN-ROUND MAGAZINES.  SO THE MAGAZINE -- AND LIKE YOUR HONOR

9  INDICATED, THEY OFTEN USE MULTIPLE FIREARMS AND CHANGE AS THEY

10  GO.  AND SO --

11          THE COURT:  THERE WAS ONE THING THAT I OMITTED TO ASK

12  MS. GORDON ABOUT.  THERE IS SOMETHING ELSE THAT IS COMMON WITH

13  ALL THESE MASS SHOOTINGS, AND THAT IS PLANNING, UNLIKE THE

14  PERSON AT HOME WHO IS ASLEEP.  I USE THE WOMAN AS AN EXAMPLE

15  BECAUSE I'VE SEEN THOSE CASES IN MY CRIMINAL SENTENCINGS.  THE

16  WOMAN IS ASLEEP, WAKES UP IN THE MIDDLE OF THE NIGHT, HEARS A

17  NOISE IN HER APARTMENT.  AND SHE IS NOT PLANNING -- SHE IS NOT

18  PLANNING TO SHOOT ANYONE.  SHE IS BASICALLY WANTING TO PROTECT

19  HERSELF.  BUT IN ALL THESE MASS SHOOTINGS, THE OTHER THING THAT

20  IS IN COMMON BESIDES THE FACT THAT THEY NORMALLY BRING A LOT OF

21  WEAPONS TO THE SHOOTING, IS THE FACT THEY HAVE HAD A CHANCE TO

22  PLAN FOR THOSE, RIGHT, WHETHER THEY BRING A 15-ROUND MAGAZINE

23  OR TEN-ROUND MAGAZINE DOESN'T REALLY MAKE A DIFFERENCE.

24          MR. BRADY:  THAT IS EXACTLY RIGHT, YOUR HONOR.  AND

25  THE EXPERT DECLARATIONS FOR PLAINTIFFS SHOW THAT BOTH THAT OF

1    MASSAD AYOOB AND DR. GARY KLECK.  AND LET'S BE CLEAR, MR. AYOOB

2    IS A SELF-DEFENSE EXPERT, WHOM THE POLICE, HIGHEST POLICE

3    AGENCIES IN THE COUNTRY HIRE TO TRAIN THEIR PEOPLE FOR

4    SELF-DEFENSE PURPOSES.

5         THE COURT:  HE SEEMS VERY CREDIBLE IN HIS

6    DECLARATION.

7         MR. BRADY:  AND SO TO SUGGEST THAT THE ACADEMICS THAT

8    WERE REVIEWING THE STATISTICS FOR THE ATTORNEY GENERAL KNOW

9    WHAT IS BETTER IN A SELF-DEFENSE SITUATION THAN MR. AYOOB IS --

10   DOESN'T REALLY PASS MUSTER.

11        I ALSO, ON THE SECOND AMENDMENT POINT, I'D JUST LIKE TO

12   POINT OUT THAT EVEN IF PEOPLE RARELY NEED TO ACTUALLY DISCHARGE

13   OVER TEN ROUNDS IN A SELF-DEFENSE SITUATION, THAT IS NOT THE

14   TEST.  *HELLER* IS VERY CLEAR THAT THE RIGHT IS TO BARE ARMS IN

15   CASE OF CONFRONTATION.  THAT MEANS IN CASE YOU NEED MORE THAN

16   TEN ROUNDS, YOU SHOULD BE ABLE TO HAVE IT.  IT ALLOWS YOU TO

17   HAVE THE WEAPONRY THAT IS IN COMMON USE, TYPICALLY POSSESSED BY

18   LAW-ABIDING PEOPLE FOR LAWFUL PURPOSES.  IT IS INDISPUTABLE

19   THAT THESE MAGAZINES FIT THAT DESCRIPTION.  AGAIN, THE STANDARD

20   IS THAT THE GOVERNMENT MUST PROVE THAT THEY ARE HIGHLY UNUSUAL

21   IN SOCIETY AT LARGE, AND THAT IS JUST NOT THE CASE HERE.  SO

22   WHEN YOU'RE TALKING ABOUT BANNING THEM, THAT CAN'T MEET THE FIT

23   TEST OF INTERMEDIATE SCRUTINY.

24        NOW UNLESS YOUR HONOR HAS ANY MORE QUESTIONS ON THE SECOND

25   AMENDMENT, I'D LIKE TO MOVE ON TO THE TAKINGS --

```
 1          THE COURT:  GO AHEAD.

 2          MR. BRADY:  -- ISSUE.  SO COUNSEL SUGGESTED THAT

 3   THERE IS, PERHAPS, A MISUNDERSTANDING OF THE ATTORNEY GENERAL'S

 4   POSITION ON THE TAKINGS ISSUE.  I BELIEVE I HAVE THEIR POSITION

 5   QUITE CLEAR.  AND THAT IS THAT THEY SAY THE GOVERNMENT MUST

 6   ACTUALLY TAKE THE PROPERTY AND USE IT ITSELF.  AGAIN, AS I

 7   INDICATED PREVIOUSLY, THAT IS DEMONSTRABLY ERRONEOUS BASED ON

 8   THE CASE LAW.  AND I WILL CITE TO YOU, TO YOUR HONOR, HAWAII

 9   HOUSING AUTHORITY VS. MIDKIFF, 467 U.S. 229, AT 255.

10      QUOTE, THE COURT LONG AGO REJECTED ANY LITERAL REQUIREMENT

11   THAT CONDEMNED PROPERTY BE PUT INTO USE FOR THE GENERAL PUBLIC.

12   IT IS NOT ESSENTIAL THAT THE ENTIRE COMMUNITY, NOR EVEN ANY

13   CONSIDERABLE PORTION, DIRECTLY ENJOY OR PARTICIPATE IN ANY

14   IMPROVEMENT IN ORDER FOR IT TO CONSTITUTE A PUBLIC USE.

15      IT GOES ON TO SAY THAT THERE IS NO NEED FOR THE GOVERNMENT

16   TO ACTUALLY USE THE PROPERTY.  IN THE KELO CASE, THE GOVERNMENT

17   WAS GETTING IT TO A THIRD PARTY.  THE GOVERNMENT DIDN'T TAKE

18   POSSESSION OF THE PROPERTY.  THE ISSUE IN KELO --

19          THE COURT:  I KNOW KELO.

20          MR. BRADY:  YEAH, IS WHETHER IT WAS A PUBLIC USE.  SO

21   JUST BECAUSE IT'S GOING TO A THIRD PARTY, OR NOT GOING TO ANY

22   PARTY AT ALL, THE QUESTION IS NOT WHETHER THE GOVERNMENT

23   ACTUALLY USES IT.  THE QUESTION IS WHETHER IT IS FOR THE PUBLIC

24   GOOD.  AND HERE, THAT IS -- IF IT'S NOT FOR THE PUBLIC GOOD,

25   THEN THEY CAN'T TAKE IT UNDER THE TAKINGS CLAUSE.  AND THEY
```

1   HAVE NO INTEREST UNDER THE SECOND AMENDMENT TO BAN THEM IF IT

2   DOESN'T FURTHER THE PUBLIC GOOD.

3        SO WITH THAT, YOUR HONOR, I WILL SUBMIT UNLESS YOU HAVE

4   ANY QUESTIONS.

5             THE COURT:  MS. GORDON?

6             MS. GORDON:  I WILL ALSO SUBMIT, YOUR HONOR, UNLESS

7   YOUR HONOR HAS ANY QUESTIONS.

8             THE COURT:  ALL RIGHT.  WELL, LISTEN, I WANT TO THANK

9   YOU BOTH.  I THINK YOU BOTH DID AN EXCELLENT JOB OF

10  REPRESENTING YOUR RESPECTIVE POSITIONS.  THE BRIEFING WAS

11  CERTAINLY MORE THAN SUFFICIENT, AND YOUR ARGUMENTS WERE

12  ENLIGHTENING.  I WILL TAKE THE MATTER UNDER SUBMISSION.  AND

13  HOPEFULLY I'LL BE ABLE TO ISSUE A DECISION BEFORE THIS LAW GOES

14  INTO EFFECT, OKAY.

15       ANYTHING ELSE?  IF NOT, WE'RE ADJOURNED.  THANK YOU.

16             MS. GORDON:  THANK YOU, YOUR HONOR.

17             MR. BRADY:  THANK YOU, YOUR HONOR.

18                  (RECESS AT 11:42 A.M.)

19                       ---000---

20

21

22

23

24

25

```
 1                      C-E-R-T-I-F-I-C-A-T-I-O-N

 2              I HEREBY CERTIFY THAT I AM A DULY APPOINTED,

 3   QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED

 4   STATES DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT

 5   TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;

 6   THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY

 7   STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES

 8   WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL

 9   CONFERENCE.

10              DATED:  AUGUST 1, 2017, AT SAN DIEGO, CALIFORNIA

11

12                         _____
                           S/DEBORAH M. O'CONNELL, CSR #10563
13                         REGISTERED PROFESSIONAL REPORTER

14

15

16

17

18

19

20

21

22

23

24

25
```