C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al.,<br><br>                Plaintiffs,<br><br>           v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>                Defendant. | Case No:  17-cv-1017-BEN-JLB<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:    April 30, 2018<br>Hearing Time:    10:30 a.m.<br>Judge:            Hon. Roger T. Benitez<br>Courtroom:      5A |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

Table of Contents ................................................................................................. i

Table of Authorities............................................................................................ ii

Introduction ........................................................................................................ 1

Factual Background ............................................................................................ 2

I.     Prevalence of Firearms and Magazines Capable of Holding More Than Ten Rounds of Ammunition................................................................................. 2

II.    The History of Magazine Capacity Restrictions ....................................... 3

III.   California's Ban on Magazines Over Ten Rounds .................................... 4

Legal Standard.................................................................................................... 5

Argument ............................................................................................................ 6

I.     Section 32310 Violates the Second Amendment...................................... 6

       A.    California's "Large Capacity Magazine" Ban Plainly Implicates Second Amendment Conduct .......................................................... 7

             1.   Ammunition magazines are "arms" within the scope of the Second Amendment. ...................................................... 7

             2.   Magazines over ten rounds are in common use for lawful purposes........................................................................... 8

             3.   There is no longstanding history of laws in the United States restricting magazine capacity. ..................................... 10

       B.    Section 32310 Cannot Withstand Heightened Scrutiny .................. 12

             1.   Section 32310 is not "substantially related" to the state's public safety interests. .......................................................... 13

             2.   Section 32310 lacks a reasonable "fit" with the state's interest in preventing criminal misuse. ................................ 16

II.    Section 32310(c)-(d) Is an Unconstitutional Taking ............................. 19

III.   Section 32310(c)-(d) Violates the Due Process Clause .......................... 23

Conclusion........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
477 U.S. 242 (1986) ................................................................................ 5

*Ashcroft v. Free Speech Coal.,*
535 U.S. 234 (2002) .............................................................................. 18

*Buckley v. Valeo,*
424 U.S. 1 (1976) .................................................................................. 13

*Caetano v. Massachusetts,*
136 S. Ct. 1027 (2016) ................................................................... 6, 7, 9

*Carson Harbor Vill., Ltd. v. City of Carson,*
353 F.3d 824 (9th Cir. 2004) ........................................................... 22, 23

*Celotex Corp. v. Catrett,*
477 U.S. 317 (1986) ................................................................................ 5

*Chicago, B&Q Ry. Co. v. Chicago,*
166 U.S. 226 (1897) .............................................................................. 19

*Cincinnati v. Discovery Network, Inc.,*
507 U.S. 410 (1993) .............................................................................. 16

*District of Columbia v. Heller,*
554 U.S. 570 (2008) ...................................................................... passim

*E. Enters. v. Apfel,*
524 U.S. 498 (1998) ......................................................................... 23, 24

*Edenfield v. Fane,*
507 U.S. 761 (1993) ......................................................................... 13, 18

*Ezell v. City of Chicago,*
651 F.3d 684 (7th Cir. 2011) ................................................................... 7

*First English Evangel. Luth. Church v. Los Angeles Cty.,*
482 U.S. 304 (1987) .............................................................................. 22

*Friedman v. City of Highland Park,*
784 F.3d 406 (7th Cir. 2015) ............................................................... 7, 9

*Fyock v. City of Sunnyvale,*
25 F. Supp. 3d 1267 (N.D. Cal. 2014) ............................................... 8, 13

*Fyock v. City of Sunnyvale,*
779 F.3d 991 (9th Cir. 2015) ......................................................... 7, 8, 10

ii

*Heller v. District of Columbia* (*Heller II*),
   670 F.3d 1244 (D.C. Cir. 2011) ........................................................ 9, 12

*Heller v. District of Columbia* (*Heller III*),
   801 F.3d 264 (D.C. Cir. 2015) .......................................................... 19

*Hollis v. Lynch*,
   827 F.3d 436 (5th Cir. 2016) ............................................................. 9

*Horne v. Dep't of Agric.*,
   135 S. Ct. 2419 (2015) ..................................................... 1, 20, 21, 22

*Jackson v. City & Cty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) ..................................... 7, 13, 17, 22

*Kelo v. City of New London*,
   545 U.S. 469 (2005) ................................................................. 21, 24

*Kerr v. Hickenlooper*,
   744 F.3d 1156 (10th Cir. 2014) ...................................................... 12

*Koontz v. St. Johns River Water Mgmt. Dist.*,
   133 S. Ct. 2586 (2013) ................................................................. 21

*Lingle v. Chevron U.S.A., Inc.*,
   544 U.S. 528 (2005) .................................................................... 23

*Lorillard Tobacco Co. v. Reilly*,
   533 U.S. 525 (2001) .................................................................... 13

*Luis v. United States*,
   136 S. Ct. 1083 (2016) ............................................................. 7, 8

*McCutcheon v. FEC*,
   134 S. Ct. 1434 (2014) ............................................................ 13, 17

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ..................................................................... 6

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) ............................................................. 9

*Nixon v. United States*,
   978 F.2d 1269 (D.C. Cir. 1992) ...................................................... 20

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
   460 U.S. 37 (1983) .................................................................... 12

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) .................................................................... 12

*Richmond Elks Hall Ass'n v. Richmond Redevel. Agency*,
   561 F.2d 1327 (9th Cir. 1977) ........................................................ 21

*Robb v. Hungerbeeler*,
   370 F.3d 735 (8th Cir. 2004) .......................................................... 18

iii

*Se. Promotions Ltd. v. Conrad*,
 420 U.S. 546 (1975) ................................................................................ 18

*Silvester v. Becerra*,
 No. 17-342, 2018 WL 943032 (U.S. Sup. Ct. Feb. 20, 2018) ............................ 16

*Silvester v. Harris*,
 843 F.3d 816 (9th Cir. 2016) ................................................................ 6, 7

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
 535 U.S. 302 (2002) ........................................................................ 20, 22

*Tucson Woman's Clinic v. Eden*,
 379 F.3d 531 (9th Cir. 2004) .................................................................. 12

*Turner Broad. Sys., Inc. v. FCC*,
 520 U.S. 180 (1997) ........................................................................... 17

*United States v. Chester*,
 628 F.3d 673 (4th Cir. 2010) .................................................................. 12

*United States v. Chovan*,
 735 F.3d 1127 (9th Cir. 2013) ............................................................. 13, 16

*Usery v. Turner Elkhorn Mining Co.*,
 428 U.S. 1 (1976) .......................................................................... 23, 24

*Valle Del Sol Inc. v. Whiting*,
 709 F.3d 808 (9th Cir. 2013) .................................................................. 17

*Vincenty v. Bloomberg*,
 476 F.3d 74 (2d Cir. 2007) .................................................................... 18

*Ward v. Rock Against Racism*,
 491 U.S. 781 (1989) ........................................................................... 17

*Whole Woman's Health v. Hellerstedt*,
 136 S. Ct. 2292 (2016) ........................................................................ 22

**Statutes**

18 U.S.C. § 922 ................................................................................. 3

Cal. Penal Code § 16740 ......................................................................... 4

Cal. Penal Code § 16900 ......................................................................... 8

Cal. Penal Code § 31910 ......................................................................... 8

Cal. Penal Code § 32310 ................................................................... *passim*

Colo. Rev. Stat. § 18-12-301 .................................................................... 3

Colo. Rev. Stat. § 18-12-302 ................................................................... 3

Conn. Gen. Stat. § 53-202w ..................................................................... 3

D.C. Code § 7-2506.01 ............................................................................. 3

Haw. Rev. Stat. § 134-8 ............................................................................ 3

Mass. Gen. Laws ch. 140, § 121 ............................................................... 3

Mass. Gen. Laws ch. 140, § 131 ............................................................... 3

Md. Code, Crim. Law § 4-305 .................................................................. 3

N.J. Stat. § 2C:39-1y ................................................................................ 3

N.J. Stat. § 2C:39-3j ................................................................................. 3

N.J. Stat. § 2C:39-9h ................................................................................ 3

N.Y. Penal Law § 265.00 .......................................................................... 3

N.Y. Penal Law § 265.36 .......................................................................... 3

**Constitutional Provisions**

U.S. Const. amend. V ............................................................................... 19

U.S. Const., amend. II ....................................................................... *passim*

**Rules**

Fed. R. Civ. P. 56 ...................................................................................... 5

**Other Authorities**

Act of Apr. 22, 1927,
     ch. 1052, §§ 1, 4, 1927 R.I. Acts & Resolves 256 ............................. 11

Act of Apr. 6, 1933,
     No. 166, sec. 1, §§ 12819-3, -4, 1933 Ohio Laws 189 ...................... 11

Act of Dec. 22, 1972,
     No. 511, sec. 1, § 2923.11, 1972 Ohio Laws 1866 ........................... 11

Act of July 16, 1959,
     No. 175, sec. 1, § 224, 1959 Mich. Pub. Acts. 249 .......................... 11

Act of July 8, 1932,
     Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650 ................................. 12

MEMORANDUM OF POINTS & AUTHORITIES ISO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Act of June 2, 1927,
   No. 372, § 3, 1927 Mich. Pub. Acts 887 ........................................................... 11

Act of May 30, 1990,
   ch. 32, §§ 2C:39-1(y), -3(j), 1990 N.J. Laws 217 ............................................ 11

Amicus Brief for the States of New York, California, et al.,
   *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016) ........................... 22

Appellant's Opening Br.,
   No. 17-56081, *Duncan v. Becerra* (9th Cir. Oct. 12, 2017), ECF No. 12 ............. 18

Chad Adams,
   *Complete Guide to 3-Gun Competition* (2012) .................................................... 10

Christopher S. Koper, et al.,
   *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* (Nat'l Instit. Just. June 2004) .... 2, 9, 11, 14

David B. Kopel,
   *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849 (2015) ................................................................................................*passim*

Firearms Act,
   ch. 278, sec. 1, § 11-47-2, 1975 R.I. Pub. Laws 738 ........................................ 11

H.B. 234, 2013-2014 Leg., 130th Sess. § 2 (Ohio 2014) ........................................ 11

International Practical Shooting Confederation,
   http://www.ipsc.org ........................................................................................ 10

S. 1446, 2015-2016 Reg. Sess. (Cal. 2016) .......................................................... 4

S. 23, 1999-2000 Reg. Sess. (Cal. 1999) .............................................................. 4

U.S. Dep't of Justice, Bur. of Just. Statistics,
   *Criminal Victimization in the United States, 2008 Statistical Tables, National Crime Victimization Survey* table 37 (May 2011) ..................................................... 16

Uniform Crime Reports,
   *Crime in the United States 2012*, Fed. Bur. Invest., Dep't of Just. (2012),
   http://www.fbi.gov/about-us/cjis/ucr/crime-in-the.u.s/2012/crime-in-the-u.s.-2012/violent-crime/violent-crime; .......................................................................... 14

Uniform Crime Reports,
   *Crime in the United States 2012*, Fed. Bur. Invest., Dep't of Just., table 1 (2012),
   https://ucr.fbi.gov/crime-in-the.u.s/2012/crime-in-the-u.s.-2012/tables/1tabledatadecoverviewpdf/table_1_crime_ in_the_united_states_by_volume_and_rate_per_100000_inhabitants_1993-2012.xls. ........................................ 14

Violent Crime Control and Law Enforcement Act of 1994,
   Pub. L. 103-322, 108 Stat. 1999 (1994) ........................................................ 3, 11

*What Should America Do About Gun Violence?*: Hearing Before U.S. S. Comm. on Judiciary, 113th Cong. 11 (2013) .................................................................... 4

vi

# INTRODUCTION

Americans, by the tens of millions, typically choose magazines capable of holding more than ten rounds of ammunition for their self-defense needs. California has taken the extraordinary step of banning the acquisition, transfer, and possession of those magazines—including retrospectively requiring law-abiding citizens who have lawfully possessed the magazines for decades to dispossess themselves of them under threat of criminal penalty. This confiscatory and retrospective ban on the most commonly owned magazines violates the Second Amendment, the Takings Clause, and the Due Process Clause.

First, the state's total ban on magazines "typically possessed for lawful purposes," including self-defense, plainly violates the Second Amendment. *District of Columbia v. Heller*, 554 U.S. 570, 625 (2008). The state can point to no justification—let alone one sufficient to withstand heightened scrutiny—for banning magazines lawfully and safely owned by millions of Americans to defend themselves.

Second, *physically dispossessing* magazine owners of their private property without just compensation from the government violates the Takings Clause. It is no answer that the owner of a soon-to-be-illegal magazine can give it to the government, remove it from the state, or sell it on a state-restricted market. Whatever expectations people may have regarding regulation of their property, they do not expect it to be "occupied or taken away." *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427 (2015).

Third, because retroactively criminalizing and depriving law-abiding owners of lawfully acquired magazines does not advance the government's interest in public safety, the possession ban violates the Due Process Clause. There is simply no reason to believe that physical dispossession of magazines from those who have safely and lawfully possessed them since the state banned their acquisition in 2000 will meaningfully advance the state's interest in public safety.

This Court should enter summary judgment in favor of Plaintiffs and vindicate the rights of citizens to bear arms that are typically owned for self-defense; to be free

from government confiscation of private property without just compensation; and to be free from retroactive laws that take private property without due process.

## FACTUAL BACKGROUND

### I. PREVALENCE OF FIREARMS AND MAGAZINES CAPABLE OF HOLDING MORE THAN TEN ROUNDS OF AMMUNITION

Firearms and magazines capable of accepting more than ten rounds are commonly possessed by the American public—and they have been for generations. Barvir Decl., Ex. 1 at 22-23, Ex. 2 at 30-32, Ex. 12 at 295-304, 308-09 [David B. Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Alb. L. Rev. 849, 851-64, 871-72 (2015)]. Such magazines have existed since well before the American Revolution. *Id.*, Ex. 2 at 31; *see also id.*, Ex. 12 at 295-304, 308-09. They "have been very commonly possessed in the United States since 1862." *Id.*, Ex. 12 at 308; *see also id.*, Ex. 2 at 31. "In terms of large-scale commercial success, rifle magazines over more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified. Handgun magazines of more than ten rounds would become popular in the 1930s." *Id.*, Ex. 12 at 295-96. And their popularity has steadily increased over time, especially as technology has improved. *Id.*, Ex. 2 at 30-36, Ex. 12 at 295-303; *see id.*, Exs. 15-51, 55-57.

Between 1990 and 2015, for example, approximately 115 million magazines capable of holding more than ten rounds were in circulation in the United States. Barvir Decl., Ex. 1 at 22-23, 26, Ex. 58 at 846 [Christopher S. Koper, et al., *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003* at 65 (Nat'l Instit. Just. June 2004)]. This number represents roughly half of all magazines acquired during that period. *Id.*, Ex. 1 at 23, Ex. 12 at 309. Indeed, magazines of a much larger capacity—up to 30 rounds for rifles and up to 20 rounds for handguns—are "*standard equipment* for many popular firearms." *Id.*, Ex. 12 at 300-02, 310 (emphasis added); *see also id.*, Ex. 2 at 30-32. / / /

2

## II.   THE HISTORY OF MAGAZINE CAPACITY RESTRICTIONS

As a historical matter, no evidence suggests a tradition of government regulation regarding magazine capacity. Firearms and magazines capable of holding more than ten rounds have existed since the mid-1500s, yet there were no restrictions on them at the time of the ratification of the Second Amendment. *Id.*, Ex. 12 at 304. In fact, the first such laws—found in just three states and the District of Columbia—appeared "during the prohibition era, nearly a century and half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment." *Id.* Save for the District's law, a version of which remains in effect, those original laws have since been repealed. *Id.*, Ex. 12 at 305. Today, the overwhelming majority of states place *no* restrictions on magazine-capacity, let alone demand that citizens surrender magazines deemed too "large" under threat of criminal penalty. The restrictions that *are* in place are of recent vintage, and they vary greatly as to what constitutes a "large capacity magazine."[1]

Except for one brief period, the federal government has taken the same approach as most states. That is, it did not regulate magazine capacity at all. In 1994, Congress adopted a nationwide prospective ban on certain magazines, which included a grandfather clause. Req. Jud. Ntc., Ex. 76 [Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, 108 Stat. 1999 (1994)(formerly codified at 18 U.S.C. § 922(w)]; *see also* Barvir Decl., Ex. 12 at 305. Ten years later, Congress vindicated the wisdom of the grandfather clause, but not the efficacy of the ban,

---

[1]   Barvir Decl., Ex. 12 at 303-06 (history of magazine capacity restrictions in the U.S.); Req. Jud. Ntc., Ex. 79 [Colo. Rev. Stat. §§ 18-12-301–302](15-round limit; adopted 2013); Ex. 80 [Conn. Gen. Stat. § 53-202w](10-round limit; adopted 2013), Ex. 81 [D.C. Code § 7-2506.01(b)](12-round limit adopted in 1932, reduced to ten rounds in 2009), Ex. 82 [Haw. Rev. Stat. § 134-8(c)](10-round limit for handguns only; adopted in 1992), Ex. 83 [Md. Code, Crim. Law § 4-305(b)](20-round limit on transfer adopted in 1994; reduced to 10 in 2013), Ex. 84 [Mass. Gen. Laws ch. 140, §§ 121, 131(a)](10-round limit without permit; adopted 1994), Ex. 85 [N.J. Stat. § 2C:39-1y, -3j, -9h](15-round limit; adopted 1990), Ex. 86 [N.Y. Penal Law §§ 265.00, 265.36](10-round limit; transfer banned in 2000, possession banned in 2013).

allowing the ban to expire after a study commissioned by the Department of Justice revealed that the law had resulted in no appreciable impact on crime. Barvir Decl., Ex. 59 at 878 [*What Should America Do About Gun Violence?*: Hearing Before U.S. S. Comm. on Judiciary, 113th Cong. 11 (2013)], Ex. 12 at 305. The possession and acquisition of magazines capable of holding more than ten rounds of ammunition remains legal under federal law today.

## III.   CALIFORNIA'S BAN ON MAGAZINES OVER TEN ROUNDS

Since January 1, 2000, California has taken the outlier position of prohibiting the manufacture, importation, sale, and transfer of any "large-capacity magazine," defined as "any ammunition feeding device with the capacity to accept more than 10 rounds," with some exceptions not relevant here. Cal. Penal Code § 32310; S. 23, 1999-2000 Reg. Sess. (Cal. 1999) (codified at Cal. Penal Code § 32310); Cal. Penal Code § 16740. While the 2000 law operated as a prospective ban on acquiring the prohibited magazines, it did not prohibit possession. So, while individuals who did not presently possess prohibited magazines could no longer legally obtain one, citizens who had obtained such magazines before the law took effect were permitted to continue to retain them. In other words, the law had a de facto grandfather clause.

In July 2016, however, the Legislature eliminated even that concession to the Second Amendment and the Takings Clause, amending the Code to prohibit the mere possession of "large-capacity magazines" as well, and thereby eliminating the grandfather clause. S. 1446, 2015-2016 Reg. Sess. (Cal. 2016). A few months later, in November 2016, the voters approved a referendum initiative, Proposition 63, that did the same. *See* Cal. Penal Code § 32310. As a result, under California law, anyone currently in possession of a magazine over ten rounds must surrender it to law enforcement for destruction, remove it from the state, or sell it to a licensed firearms dealer, who in turn is subject to the transfer and sale restrictions. *Id.* § 32310(a), (d). Failure to do so can result in criminal penalties, including up to a year in prison or fines. *Id.* § 32310(c). In other words, the law now affirmatively requires those in

4

present possession to surrender for destruction or otherwise dispossess themselves of their lawfully acquired (and heretofore lawfully possessed) magazines. That retrospective and confiscatory ban on the possession of lawfully acquired magazines has no analog in federal law and is an outlier among state laws as well.

The individual plaintiffs are responsible and law-abiding residents of San Diego County, California, who are not prohibited from owning or possessing firearms. Duncan Decl. ¶ 3; Lovette Decl. ¶ 3; Marguglio Decl. ¶ 3; Waddell Decl. ¶ 3. They either own and possess a lawfully acquired magazine capable of holding over ten rounds or seek to acquire and possess one. Duncan Decl. ¶ 6; Lovette Decl. ¶ 4; Marguglio Decl. ¶ 6; Waddell Decl. ¶ 6. Plaintiff California Rifle & Pistol Association, Incorporated (CRPA), represents its countless law-abiding members, who lawfully acquired and presently possess magazines over ten rounds, and who would retain possession of them if this Court declares invalid and enjoins section 32310(c)-(d). Travis Decl. ¶¶ 8-10. CRPA also represents countless more members who do not currently own the banned magazines but would immediately acquire them but for the enforcement of section 32310. *Id.* ¶¶ 4-7.

## LEGAL STANDARD

Summary judgment is proper when the record shows there is "no genuine dispute as to any material fact . . . and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Material facts are those which may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. *Id.* Initially, the moving party bears the burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the movant meets its burden, the nonmoving party must produce sufficient evidence to rebut the movant's claim and create a genuine issue of material fact. *Id.* at 322-23.

/ / /

1

**ARGUMENT**

2

**I.    SECTION 32310 VIOLATES THE SECOND AMENDMENT**

3

The Second Amendment provides that "the right of the people to keep and bear

4

Arms . . . shall not be infringed." After conducting an exhaustive textual and historical

5

analysis, the Supreme Court made clear in *District of Columbia v. Heller*, 554 U.S.

6

570 (2008), that the Second Amendment protects an "individual right to possess and

7

carry weapons" for self-defense. *Id.* at 592. In light of that conclusion, the Court

8

invalidated a District of Columbia ordinance banning the possession of operable

9

handguns in the home, holding that the possession ban violated the Second

10

Amendment under "any of the standards of scrutiny that we have applied to

11

enumerated constitutional rights"—that is, any standard stricter than rational basis

12

review. *Id.* at 628 & n.27.

13

In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court held that the

14

"right to keep and bear arms for the purpose of self-defense" recognized in *Heller* is

15

"fully applicable to the States," *id.* at 750, because it is "among those fundamental

16

rights necessary to our system of ordered liberty," *id.* at 778. Accordingly, states and

17

municipalities must protect the individual right protected by the Second Amendment

18

and may not simply "enact any gun control law that they deem to be reasonable." *Id.*

19

at 783 (plurality opinion); *see also Caetano v. Massachusetts*, 136 S. Ct. 1027 (2016).

20

In the years since *Heller* and *McDonald*, the Ninth Circuit has developed a

21

multi-step framework for adjudicating Second Amendment claims—a test this Court

22

has referred to as "the tripartite binary test with a sliding scale and a reasonable fit."

23

Order Granting Prelim. Inj. at 17 (June 29, 2017). First, a court "asks if the challenged

24

law burdens conduct protected by the Second Amendment, based on a historical

25

understanding of the scope of the right." *Silvester v. Harris*, 843 F.3d 816, 821 (9th

26

Cir. 2016) (citing *Heller*, 554 U.S. at 625). If it does, the court must analyze the law

27

under heightened scrutiny, with the degree of scrutiny varying depending on "how

28

close the challenged law comes to the core of the Second Amendment right, and . . .

the severity of the law's burden on that right." *Id.* (citing *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 960-61 (9th Cir. 2014)).[2]

Because California's ban on magazines over ten rounds prohibits law-abiding citizens from acquiring and keeping commonly possessed arms within the sanctity of their homes for the core purpose of self-defense, it wholly forecloses protected conduct and is unconstitutional under any level of scrutiny.

### A.  California's "Large Capacity Magazine" Ban Plainly Implicates Second Amendment Conduct

#### 1.  Ammunition magazines are "arms" within the scope of the Second Amendment.

The Second Amendment protects the possession and acquisition of those "arms" that are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25; *see also Caetano*, 136 S. Ct. at 1027-28. While the Second Amendment does not explicitly protect ammunition and magazines, the right necessarily extends to them. *Jackson*, 746 F.3d at 967-68; *see also Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015). "Constitutional rights . . . implicitly protect those closely related acts necessary to their exercise. . . . The right to bear arms, for example, 'implies a corresponding right to obtain the bullets necessary to use them.' " *Luis v. United States*, 136 S. Ct. 1083, 1097 (2016) (Thomas, J., concurring) (quoting *Jackson*, 746 F.3d at 967 (recognizing that "without bullets, the right to bear arms would be meaningless")). Indeed, "[a] regulation eliminating a person's ability to obtain or use ammunition could thereby make it impossible to use firearms for their core purpose." *Jackson*, 746 F.3d at 967 (citing *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011)).

---

[2] While Plaintiffs recognize that the tripartite binary test "is the test that this Court is bound to follow," Order Granting Prelim, Inj. at 18, there is no need to decide what form of scrutiny applies in this case because section 32310 imposes a complete ban on arms commonly used for lawful purposes and is therefore categorically invalid. *See Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas & Scalia, Js., dissenting from denial of certiorari); *see also* Order Granting Prelim. Inj. at 19-20.

7

As this Court has recognized, the same is true for ammunition magazines. "Without protection for the closely related right to keep and bear ammunition magazines for use with the arms designed to use such magazines, 'the Second Amendment would be toothless.' " Order Granting Prelim. Inj. at 16 (quoting *Luis*, 136 S. Ct. at 1097). Magazines are essential to the operation of almost all pistols and many rifles. Barvir Decl., Ex. 7 at 245-47, Ex. 8 at 253-55, Ex. 9 at 262. Their function is to hold and to automatically feed individual ammunition cartridges into the chamber for firing. *Id.*, Ex. 7 at 243, Ex. 8 at 254-55, Ex. 9 at 262. Without the magazine in place, firearms designed for use with magazines are limited to firing a single round—or none at all—stripping the firearm of its utility. *See id.*, Ex. 11 at 291.[3] It is thus no surprise that no court has held that magazines fall outside the scope of the Second Amendment. *See e.g.*, *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d. 1267, 1276 (N.D. Cal. 2014), *aff'd*, 779 F.3d 991 (9th Cir. 2015) ("[T]he court finds that the prohibited magazines are 'weapons of offence, or armour of defence,' as they are integral components to vast categories of guns.").

### 2.   Magazines over ten rounds are in common use for lawful purposes.

The Second Amendment thus protects those magazines that are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 624-25. Applying that test here is straightforward. Nearly every appellate court that has analyzed this issue has found, or was willing to assume, that bans on magazines over ten rounds burden conduct protected by the Second Amendment. *See, e.g.*, *Fyock*, 779

---

[3] For safety reasons, many pistols are designed to fire *only* when the magazine is in place. Barvir Decl., Ex. 8 at 254, Ex. 10 at 284. Indeed, California prohibits licensed dealers from selling pistols that will fire a chambered cartridge with the detachable magazine removed. Cal. Penal Code § 31910(b)(6) (requiring pistols to be equipped with a "magazine disconnect mechanism"); *id.* § 16900 (defining "magazine disconnect mechanism" as "a mechanism that prevents a semiautomatic pistol that has a detachable magazine from operating . . . when a detachable magazine is not inserted in the semiautomatic pistol").

8

F.3d at 999 (holding lower court did not abuse its discretion in holding that magazines over ten rounds are in common use); *N.Y. State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015); *Friedman*, 784 F.3d at 415; *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1261 (D.C. Cir. 2011). And for good reason: It is well-documented that these magazines have long been commonly possessed in the United States for lawful purposes—including the core lawful purpose of self-defense. *See supra* Factual Background, Part I; Barvir Decl., Ex. 1 at 22-23, Ex. 2 at 30-32, Ex. 12 at 295, Ex. 56, Ex. 58 at 846-48; *see generally id.*, Exs. 52-57, 62.

There is nothing unusual or novel about magazines that can hold more than ten rounds. Firearms capable of discharging more than ten rounds without reloading pre-date the founding of the United States by at least 200 years, and they were indisputably common in the United States by the time the Second and Fourteenth Amendments were ratified. *Id.*, Ex. 2 at 31, Ex. 12 at 295; *see generally id.*, Exs. 13-51 (recounting the history of rifles and handguns with capacities over ten rounds). That popularity has only grown as technology has improved. *Id.*, Ex. 2 at 30-36, Ex. 12 at 295-303; *see generally id.*, Exs. 15-51, 55-57. Indeed, many of the nation's best-selling firearms—including the ever-popular Glock pistol—have for decades come *standard* with magazines California now prohibits. *Id.*, Ex. 1 at 23, Ex. 2 at 30-31, Ex. 12 at 302-03, Ex. 56 at 821-2. Today, *millions* of these magazines are in the hands of law-abiding Americans, and they are lawful in 43 states and under federal law. *Id.*, Ex. 1 at 23, 26; *cf. Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (defining the term "common" by applying the Supreme Court test in *Caetano* of 200,000 stun guns owned and legal in 45 states being "common"); *see also N.Y. State Rifle & Pistol Ass'n*, 804 F.3d at 255-57 (noting "large-capacity magazines" are "in common use" based on even the most conservative estimates). Even state-designated expert, Professor John Donohue, concedes that "[i]t is reasonable to assume that consumer demand for [magazines over ten rounds] is similar to demand for firearms generally." Barvir Decl., Ex. 6 at 209.

What's more, the magazines are overwhelmingly used for lawful purposes. Renowned firearms historian and Plaintiffs' expert, Stephen Helsley, explains that firearms and magazines over ten rounds were developed for self- and home-defense. *Id.*, Ex. 2 at 30-32. Manufacturers specifically market them for those purposes. *Id.*, Exs. 33-34. And civilians overwhelmingly choose them to increase their chances of staying alive in violent confrontations. *Id.*, Ex. 1 at 22-23, Ex. 2 at 32-33, Ex. 12 at 295-97; *see* Duncan Decl. ¶ 6; Lovette Decl. ¶¶ 6-7, 10; Marguglio Decl. ¶ 6; Waddell Decl. ¶ 6; Travis Decl. ¶¶ 6-8, 10.[4] The banned magazines are also essential in some of the most popular competitive shooting sports in America. *See* International Practical Shooting Confederation, http://www.ipsc.org; Chad Adams, *Complete Guide to 3-Gun Competition* 89 (2012). "Common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds that has existed since the mid-nineteenth century." Barvir Decl., Ex. 12 at 308-09.

### 3.   There is no longstanding history of laws in the United States restricting magazine capacity.

Finally, California's broad restriction does not "resemble prohibitions historically exempted from the Second Amendment." *Fyock*, 779 F.3d at 997. "[L]arge-capacity magazines" have not been "the subject of longstanding, accepted regulation." *Id.* To the contrary, as this Court has recognized, there is simply no "evidence that magazine capacity restrictions have a historical pedigree." Order Granting Prelim. Inj. at 21.

Even though multi-shot firearms long pre-dated the Founding, there were *no* laws restricting ammunition capacity when the Second Amendment was adopted.

---

[4]   American citizens have long modeled their choice of defensive arms on what police carry. Barvir Decl., Ex. 2 at 32. Take Glock pistols, the most popular handguns among American law enforcement, they are "hugely popular" for personal defense. *Id.*, Ex. 56 at 823. They come standard with magazines up to 17 rounds. *Id.*, Ex. 53 at 753, 761-63, Ex. 56 at 821.

Barvir Decl., Ex. 12 at 304. Indeed, the first such law was not passed until 1927, when Michigan banned any "firearm which can be fired more than sixteen times without reloading." *Id.* (citing Req. Jud. Ntc., Ex. 69 [Act of June 2, 1927, No. 372, § 3, 1927 Mich. Pub. Acts 887, 888-89]). That year, Rhode Island also banned firearms over 12 rounds. *Id.* (citing Req. Jud. Ntc., Ex. 70 [Act of Apr. 22, 1927, ch. 1052, §§ 1, 4, 1927 R.I. Acts & Resolves 256, 256-57]). Ohio began requiring a license for semi-automatic firearms over 18 rounds in 1933. *Id.* (citing Req. Jud. Ntc., Ex. 71 [Act of Apr. 6, 1933, No. 166, sec. 1, §§ 12819-3, -4, 1933 Ohio Laws 189, 189]). That law was later amended to exempt .22 caliber firearms. *Id.* (citing Req. Jud. Ntc., Ex. 72 [Act of Dec. 22, 1972, No. 511, sec. 1, § 2923.11, 1972 Ohio Laws 1866, 1963]). None of these laws set the limit as low as ten, and all were eventually repealed. *Id.* (citing Req. Jud. Ntc., Ex. 73 [Act of July 16, 1959, No. 175, sec. 1, § 224, 1959 Mich. Pub. Acts. 249, 250], Ex. 74 [Firearms Act, ch. 278, sec. 1, § 11-47-2, 1975 R.I. Pub. Laws 738, 738-39, 742], Ex. 75 [H.B. 234, 2013-2014 Leg., 130th Sess. § 2 (Ohio 2014)]).

In 1994, Congress adopted the first federal restriction on magazine capacity—prohibiting new magazines over ten rounds. *Id.* (citing Req. Jud. Ntc., Ex. 76 [Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 110103(a)-(b), 108 Stat. 1796, 1998-99]). But the law failed to effect any "discernible reduction in the lethality and injuriousness of gun violence," so Congress allowed it to sunset in 2004. *Id.* (citing Ex. 58 at 865 [Koper, et al., *supra*, at 96]). The 1990s also saw the first statewide magazine ban of the modern era: New Jersey's 15-round restriction, which passed in 1990. *Id.* (citing Req. Jud. Ntc., Ex. 77 [Act of May 30, 1990, ch. 32, §§ 2C:39-1(y), -3(j), 1990 N.J. Laws 217, 221, 235]). Only six other states, including California, followed suit. *See supra* n. 1 (citing Req. Jud. Ntc., Exs. 79-86). Each less than 30 years old, it is indisputable that the now-lapsed federal ban and these modern state restrictions are not "longstanding." *See Heller*, 554 U.S. at 635 (overturning 33-year-old handgun ban).

The District of Columbia, which first restricted possession of firearms capable of discharging 12 or more rounds without reloading in 1932, thus stands alone as the only jurisdiction with an arguably longstanding restriction on magazine capacity. *Id.*, Ex. 12 at 305 (citing Req. Jud. Ntc., Ex. 78 [Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652]). The rarity of capacity-based magazine bans, throughout history and today, not only establishes that the restricted conduct is protected, but also casts doubt on the constitutionality of such bans. *See Kerr v. Hickenlooper*, 744 F.3d 1156, 1178 (10th Cir. 2014).

### B.     Section 32310 Cannot Withstand Heightened Scrutiny

Because the magazine ban burdens conduct protected by the Second Amendment, it must satisfy some form of heightened scrutiny. *See Heller*, 554 U.S. at 628. And under either form of heightened scrutiny, a challenged law is *presumed* unconstitutional, and the government bears the burden of justifying it. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (content-based speech regulations are presumptively invalid); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("unless the conduct at issue is not protected by the Second Amendment at all, the government bears the burden of justifying the constitutional validity of the law").

Here, there is no need to decide what level of scrutiny applies because flatly banning arms that the Constitution protects is undoubtedly unconstitutional. *See Heller*, 554 U.S. at 628. That said, the state could not meet its burden even if a traditional scrutiny analysis were necessary. To justify a burden on a constitutionally protected right, the government must prove that it is sufficiently tailored to advance a sufficiently important end. Under intermediate scrutiny,[5] the government must prove,

---

[5] If a level of means-end review is selected, strict scrutiny must be the test. *See, e.g.*, *Heller II*, 670 F.3d at 1284-85 (Kavanaugh, J., dissenting); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 544 (9th Cir. 2004) ("[A] law is subject to strict scrutiny . . . when that law impacts a fundamental right, not when it infringes it."); *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 54 (1983) (similar). That said, the magazine ban would fail intermediate scrutiny as well.

first, that the law is "substantially related" to an important government interest. *See Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993); *see United States v. Chovan*, 735 F.3d 1127, 1139-40 (9th Cir. 2013), and, second, that its chosen means are "closely drawn" to achieve that end without "unnecessary abridgment" of constitutionally protected conduct. *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456-57 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)); *see Jackson*, 746 F.3d at 961 (noting that Second Amendment heightened scrutiny is "guided by First Amendment principles"). While the government has an admittedly important interest in promoting public safety and preventing crime, it cannot begin to prove that the ban is substantially related and closely drawn to advancing that interest.

### 1.      Section 32310 is not "substantially related" to the state's public safety interests.

For a law to be substantially related to the government's interests, the government must demonstrate that its "restriction will in fact alleviate" its concerns. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). It is not enough for the government to rely on "mere speculation or conjecture." *Id.* But here, the state cannot identify a causal link between violent crime and the banned magazines. Instead, the state offers only "mere speculation" that, given time, its magazine ban *may* reduce gun violence because it has "the *potential* to":

> (1) reduce the number of crimes committed with [large capacity magazines]; (2) reduce the number of shots fired in gun crimes; (3) reduce the number of gunshot victims in such crimes; (4) reduce the number of wounds per gunshot victim; (5) reduce the lethality of gunshot injuries when they do occur; and (6) reduce the substantial societal costs that flow from shootings.

Barvir Decl., Ex. 5 at 194 (emphasis added); *see also Fyock*, 25 F. Supp. 3d at 1280 (quoting Koper's expert declaration supporting citywide magazine ban).

That speculative, abstract theory has no basis in reality—as Dr. Koper's own research shows. A Department of Justice study commissioned by the Clinton administration to study the effects of the 1994 federal ban on magazines over ten

13

rounds and "assault weapons" concluded that, ***10 years after the ban was imposed***, "there [had been] no discernible reduction in the lethality and injuriousness of gun violence." Barvir Decl., Ex. 58 at 865. Indeed, "[t]here was no evidence that lives were saved [and] no evidence that criminals fired fewer shots during gun fights." *Id.*, Ex. 59 at 878. Koper's final report declared that the federal ban could not be "clearly credit[ed] . . . with any of the nation's recent drop in gun violence," *id.*, Ex. 58 at 834, and that, "[s]hould [a nationwide ban] be renewed, the ban's effects on gun violence are likely to be small at best and perhaps too small for reliable measurement," *id.*, Ex. 58 at 835. It is no wonder, then, that Congress allowed the ban to expire in 2004. Since that time, likely *millions* more of the formerly banned magazines have been purchased throughout the United States. *Id.*, Ex. 1 at 22-23, 26. But violent crime has steadily declined.[6] What the 1994 federal experiment proves is that the availability of magazines over ten rounds is not causally related to violent crime.

As this Court recognized, the evidence the state submitted in opposition to preliminary injunction was likely insufficient to meet its burden under intermediate scrutiny. Order Granting Prelim. Inj. at 26-49. What the state has since presented to Plaintiffs through the discovery process likewise falls short. And for good reason. No empirical evidence establishes that reducing access to the magazines the state bans will reduce violent crime, generally, or mass shootings, more specifically. *See id.*, Ex. 60 at 906-22. Without that link, the state cannot establish that section 32310 is substantially related to its interest in promoting public safety.

Indeed, contrary to the state's claims that magazine bans promote public safety, such laws may well *decrease* public safety because they restrict the self-defense

---

[6] Uniform Crime Reports, *Crime in the United States 2012*, Fed. Bur. Invest., Dep't of Just. (2012), http://www.fbi.gov/about-us/cjis/ucr/crime-in-the-u.s/2012/crime-in-the-u.s.-2012/violent-crime/violent-crime; *id.* at table 1, https://ucr.fbi.gov/crime-in-the-u,s/2012/crime-in-the-u.s.-2012/tables/1tabledatadecoverviewpdf/table_1_crime_in_the_united_states_by_volume_and_rate_per_100000_inhabitants_1993-2012.xls.

capabilities of the law-abiding—as the time it takes to change magazines is much more likely to negatively affect crime victims than their attackers. *Id.*, Ex. 2 at 33-34. Unlike perpetrators of violent crime and mass shootings, victims do not choose when or where an attack will take place. *Id.* The number of attackers, the location of the attack, the attacker's intentions, and the time of the attack are completely unknown. *Id.*, Ex. 2 at 34. For that reason, the prohibited magazines are overwhelmingly preferred by law-abiding Americans for personal and home defense.

The availability of more ammunition in a firearm increases the likelihood of surviving a criminal attack, while limiting the number of rounds available decreases one's chances of survival. A firearm's ammunition capacity is thus directly related to its suitability for self-defense. Evidence of this point is overwhelming. Mr. Helsley describes the suitability of firearms with increased ammunition capacities for self-defense: "A firearm equipped with a magazine capable of holding more than ten rounds is more effective at incapacitating a deadly threat and, under some circumstances, may be necessary to do so." *Id.* He further describes the impact of magazine restrictions like California's:

> [L]imits on magazine capacity are likely to impair the ability of citizens to engage in lawful self-defense in those crime incidents necessitating that the victim fire many rounds in order to stop the aggressive actions of offenders, while having negligible impact on the ability of criminals to carry out violent crimes.

*Id.*, Ex. 2 at 32, Exs. 62-68 (stories of victims requiring more than ten rounds to fight off attacker(s)).

The reasons citizens benefit from having more than ten rounds immediately available in a self-defense emergency are clear. Given that criminal attacks occur at a moment's notice, taking the victim by surprise, usually at night and in confined spaces, victims rarely have multiple magazines or extra ammunition readily available for reloading. *Id.*, Ex. 2 at 32-34. Certainly, most people do not keep back-up magazines or firearms strapped to their bodies while they sleep; they must typically make do with a single gun and its ammunition capacity. *Id.*, Ex. 2 at 33. Those who do

may be unable to hold onto a spare magazine while using both hands to grasp the firearm or using one hand to hold the phone to call the police. *Id.*

Even if additional magazines are available, it is extremely difficult—and potentially deadly—to stop to change magazines when one is under attack, the stress of which degrades the fine motor skills necessary for the task. That same stress can also reduce the accuracy of any shots that are fired. *Id.*, Ex. 2 at 33. Even if accurate, it is rare that a single shot will immediately neutralize an attacker. *Id.*, Ex. 2 at 34-36. And the presence of multiple attackers[7] may require far more defensive discharges to eliminate the threat. Limited to ten rounds by the state's ban, victims are left defenseless should they be unable to incapacitate their attackers with just ten bullets.

In short, section 32310 is not a small burden on self-defense. Forcing law-abiding citizens to change magazines while attempting to defend against a criminal attack could cost them their lives. Because the magazine ban restricts the self-defense capabilities of the law-abiding (with potentially deadly consequences), it cannot be said that the law promotes the government's asserted public safety interests.

### 2.   Section 32310 lacks a reasonable "fit" with the state's interest in preventing criminal misuse.

Even assuming the law does advance the state's public safety interests, "intermediate scrutiny requires a 'reasonable fit' between the law's ends and means." *Silvester v. Becerra*, No. 17-342, 2018 WL 943032 *4 (U.S. Sup. Ct. Feb. 20, 2018) (Thomas, J., dissenting from denial of certiorari) (quoting *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416 (1993)); *see also Chovan*, 735 F.3d at 1136, 1139. The fit requirement seeks to ensure that the encroachment on liberty is "not more extensive than necessary" to serve the government's interest. *Valle Del Sol Inc. v.*

---

[7]  Far from rare, of violent crimes for which the number of assailants is known, 17.4 percent involved multiple offenders in 2008—*10.5 percent (nearly 800,000 incidents) involved at least three.* Barvir Decl., Ex. 61 at 929 [U.S. Dep't of Justice, Bur. of Just. Statistics, *Criminal Victimization in the United States, 2008 Statistical Tables, National Crime Victimization Survey* table 37 (May 2011)].

*Whiting*, 709 F.3d 808, 816 (9th Cir. 2013). The government thus bears the burden of establishing that the law is "closely drawn to avoid unnecessary abridgment" of constitutional rights, *McCutcheon*, 134 S. Ct. at 1456; *see Ward v. Rock Against Racism*, 491 U.S. 781, 782-83 (1989). The government is entitled to *no deference* when assessing the fit between its purported interests and the means selected to advance them. *See Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 214 (1997). Rather, the government must *prove* that those means do not burden the right "substantially more" than "necessary to further [its important] interest." *Id.*

Here, the state has chosen the opposite of tailoring. It flatly bans Californians—including those who, like Plaintiff Lovette and members of CRPA, have lawfully owned the now-banned magazines for over 20 years without incident—from acquiring or possessing magazines over ten rounds. *See Jackson*, 746 F.3d at 964 (contrasting "complete ban" with regulations). The state paints with the broadest strokes possible, simply obliterating the right to acquire, keep, and use these common magazines for self-defense. This is *not* the sort of "fit" that survives even intermediate scrutiny.

First, as a legal matter, the Second Amendment does not tolerate banning the constitutionally protected arms simply because they are involved in certain crimes, even serious ones like mass shootings. In *Heller*, the District of Columbia attempted to justify its handgun ban on the ground that handguns are involved in the clear majority of firearm-related homicides in the United States. 554 U.S. at 696 (Breyer, J., dissenting) (collecting statistics). Despite the government's clear and compelling interest in preventing homicides, the Supreme Court held that a ban on possession of those common arms by law-abiding citizens lacks the required fit to further that goal "[u]nder any of the standards of scrutiny." *Id.* at 628-29 (maj. op.).

*Heller* similarly rejected the argument that protected arms may be prohibited because criminals might misuse them. Again, there, the government argued that handguns made up a significant majority of all stolen guns and that they were overwhelmingly used in violent crimes. *Id.* at 698 (Breyer, J., dissenting). But despite

17

1  the government's clear interest in keeping handguns out of the hands of criminals and

2  unauthorized users, the Supreme Court rejected that argument, too, concluding that a

3  ban on possession by law-abiding citizens is not a permissible means of attempting to

4  prevent misuse by criminals. *Id.* at 628-29 (maj. op.). Moreover, California's

5  retrospective ban is a particularly poor fit for invocation of a criminal misuse interest

6  because compliance with the confiscatory aspect of the ban requires the kind of

7  voluntary action only a law-abiding citizen would undertake.

8       *Heller* follows a long history of cases rejecting the notion that the government

9  may flatly ban constitutionally protected activity because the activity could lead to

10  abuses. *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002)

11  (government cannot ban virtual child pornography on the ground that it might lead to

12  child abuse because "[t]he prospect of crime" "does not justify laws suppressing

13  protected speech"); *Edenfield*, 507 U.S. at 770-71 (state cannot impose a "flat ban" on

14  solicitations by public accountants on the ground that solicitations "create[] the

15  dangers of fraud, overreaching, or compromised independence"). That extreme degree

16  of prophylaxis is incompatible with the decision to give the activity constitutional

17  protection. California's over inclusive approach violates the basic principle that "a

18  free society prefers to punish the few who abuse [their] rights . . . after they break the

19  law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*,

20  420 U.S. 546, 559 (1975); *accord Vincenty v. Bloomberg*, 476 F.3d 74, 84-85 (2d Cir.

21  2007); *Robb v. Hungerbeeler*, 370 F.3d 735, 743 (8th Cir. 2004).

22       Ultimately, the state can only justify its extraordinary magazine ban on the

23  ground that it reflects the *non plus ultra* of its policy choice regarding the types of

24  arms it desires its residents to use. As the state has acknowledged, its view is that "the

25  most effective way to eliminate" injuries due to magazines over ten rounds "is to

26  prohibit them." Appellant's Opening Br. at 49, No. 17-56081, *Duncan v. Becerra* (9th

27  Cir. Oct. 12, 2017), ECF No. 12. But that argument simply ignores the Framers'

28  judgments reflected in the Bill of Rights. Surely the most effective way to eliminate

defamation is to prohibit printing presses, the most effective way to eliminate crime is to empower police officers with unlimited search authority, and so on. But the Constitution prohibits such extreme measures by giving protection to free speech and the privacy of the home. The right to arms is no different. *Heller* made clear that the Second Amendment "necessarily takes certain policy choices off the table." 554 U.S. at 636. California's possession ban is one of them, both because it is far too sweeping to reflect any sort of reasonable fit to the state's interest, and because the state's rationale, "taken to its logical conclusion," would "justify a total ban on firearms kept in the home." *Heller v. District of Columbia* (*Heller III*), 801 F.3d 264, 280 (D.C. Cir. 2015).

## II.   SECTION 32310(C)-(D) IS AN UNCONSTITUTIONAL TAKING

Even if the magazine ban were constitutional as applied to some people, it is not constitutional as applied to individuals who presently lawfully possess now-prohibited magazines that were lawful when they were acquired. To the contrary, the state's confiscatory and retrospective possession ban violates the Takings Clause, as it forces Plaintiff Lovette and members of the CPRA to dispossess themselves of their lawfully acquired property without just compensation. Compl. ¶¶ 69-71.

The Takings Clause provides that "private property" shall not "be taken for public use, without just compensation." U.S. Const. amend. V; *see Chicago, B&Q Ry. Co. v. Chicago*, 166 U.S. 226, 239 (1897) (holding that the Takings Clause applies to the states). A physical taking occurs whenever the state "absolutely dispossess[es] the owner" of property. *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 n.12 (1982). As the Clause requires, whenever a physical taking occurs, the government must pay just compensation. *Id.* at 421.

By prohibiting the possession of magazines over ten rounds even by those who lawfully acquired and have long lawfully possessed them, California clearly seeks to effectuate a physical taking. The state has never disputed that the law requires the physical surrender of lawfully acquired property without compensation. Nor could it,

19

1    as the law on its face subjects to criminal penalties "any person in this state who

2    possesses any large-capacity magazine" after July 1, 2017, "regardless of the date the

3    magazine was required." Cal. Penal Code § 32310(c). A statute that requires citizens

4    to dispossess themselves of lawfully acquired property, like section 32310(c)-(d), is a

5    textbook example of a physical taking. *Loretto*, 458 U.S. at 435 n.12; *see also Tahoe-*

6    *Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 324 n.19

7    (2002) (a physical taking "dispossess[es] the owner" of property); *Nixon v. United*

8    *States*, 978 F.2d 1269, 1287 (D.C. Cir. 1992) (statute that "physically dispossessed"

9    property owner "resulted in" per se taking).

10          Further, a physical taking occurs when the government dispossesses an owner

11   of personal property, not just real property, as the "categorical duty" imposed by the

12   Takings Clause applies "when [the government] takes your car, just as when it takes

13   your home." *Horne*, 135 S. Ct. at 2426. The Supreme Court's decision in *Horne* is

14   particularly instructive. There, the Court overturned a law requiring raisin farmers to

15   surrender a percentage of their crops to the Department of Agriculture. *Id.* at 2428.

16   Because the law dispossessed the farmers of the "[a]ctual raisins," the Court held that

17   the law resulted in "a clear physical taking" that required compensation. *Id.* The same

18   is true here, where the entire aim of the law is to "dispossess[]" Californians of their

19   "actual" magazines. *Id.* at 2428, 2438.

20          There can be no dispute that requiring Plaintiffs to "[s]urrender the large-

21   capacity magazine" to the government for destruction, Cal. Penal Code § 32310(d)(3),

22   results in a physical taking. That conclusion is obvious, as relinquishing both title and

23   possession forfeits "the entire 'bundle' of property rights" in the subject magazines.

24   *Horne*, 135 S. Ct. at 2428. The state instead has claimed that the law is not a physical

25   taking because citizens may surrender their property to persons or places other than

26   the government or destroy it altogether: Plaintiffs may sell the magazines to a firearms

27   dealer, move them to another state, or permanently alter the magazines so that they

28   cannot hold more than ten rounds. Cal. Penal Code § 32310(d). But none of those

options renders the law anything other than a physical taking.[8]

The first option—forcing plaintiffs to sell their property—is no less a taking than if the government seized it. As controlling precedent makes clear, the gravamen of a taking is the dispossession of the property from the owner. Whether the government edict forces the owner to hand the property over to the government or to a third party, there is still a taking. Thus, in the landmark *Kelo* case, it made no difference that the law allowed Ms. Kelo to sell her property to a "private nonprofit entity." *Kelo v. City of New London*, 545 U.S. 469, 473-75 (2005). Instead, as this Court has emphasized, "it is sufficient" that the law "involves a direct interference with or disturbance of property rights," even if the government itself does not "directly appropriate the title, possession or use of the propert[y]." *Richmond Elks Hall Ass'n v. Richmond Redevel. Agency*, 561 F.2d 1327, 1330 (9th Cir. 1977). At a minimum, forcing citizens to sell their property places an unconstitutional condition on the possession of their property, which effects an unconstitutional taking. *See Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 606-07 (2013).

The second option—moving the property out of California—fares no better. Like a mandatory sale to a third party or surrender to the government, a mandatory transfer of property out of state, often away from the owner's primary home, involves "a direct interference with or disturbance of" the owner's right to the property. *Richmond Redevel. Agency*, 561 F.2d at 1330. It is no answer that citizens can possess their property in another state. As California itself has recognized, "each State bears an independent obligation to ensure that its regulations do not infringe the

_____

[8] To the extent the option to sell or move the magazines is characterized as a regulatory taking, rather than a physical one, the result is the same. As this Court previously observed, "whatever expectations people may have regarding property regulations, they 'do not expect their property, real or personal, to be actually occupied or taken away.'" Order Granting Prelim. Inj. at 63 (quoting *Horne*, 135 S. Ct. at 2427); *see also Loretto*, 458 U.S. at 436. Indeed, most regulatory takings restrict the use of property without transferring a property interest to the government, which underscores that government possession (as opposed to private dispossession) is not a prerequisite for a taking.

21

constitutional rights of persons within its borders." Amicus Brief for the States of New York, California, et al., at 20, *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). California cannot invoke the permissive laws of another state to validate its own unconstitutional restriction. *See Jackson*, 746 F.3d at 967 ("That Jackson may easily purchase ammunition elsewhere is irrelevant."); *cf. Whole Woman's Health*, 136 S. Ct. at 2304, 2312 (the availability of abortion services in a nearby state did not cure constitutional violation).

The third option—permanently altering the magazines to accept fewer than ten rounds—cannot be squared with Supreme Court takings precedents either. In *Horne*, for example, the raisin growers could have "plant[ed] different crops," or "[sold] their raisin-variety grapes as table grapes or for use in juice or wine." *Horne*, 135 S. Ct. at 2430. Likewise, in *Loretto*, the property owner could have converted her building into something other than an apartment complex. *See* 458 U.S. at 439 n.17. The Supreme Court rejected those arguments, admonishing that "property rights 'cannot be so easily manipulated.' " *Horne*, 135 S. Ct. at 2430 (quoting *Loretto*, 458 U.S. at 439 n.17).

Because the magazine ban works a physical taking of property, the state "has a categorical duty to compensate the former owner." *Tahoe-Sierra*, 535 U.S. at 322. The law plainly fails to fulfill that duty. Section 32310 makes no provision for government compensation. Of course, surrendering property to the government, moving it out of state, or permanently altering it results in *no* compensation at all. Cal. Penal Code § 32310(d)(1), (3). But even sale to a licensed firearms dealer, *id.* § 32310(d)(2), which may result in *some* compensation, is not compensation *from the government*. The Supreme Court "has invariably operated under the assumption that *the government is the entity charged with paying just compensation*." *Carson Harbor Vill., Ltd. v. City of Carson*, 353 F.3d 824, 831 (9th Cir. 2004) (O'Scannlain, J., concurring) (emphasis added) (collecting cases); *see, e.g.*, *First English Evangel. Luth. Church v. Los Angeles Cty.*, 482 U.S. 304, 319 (1987) ("[T]he Just Compensation Clause of the Fifth Amendment requires that the government pay the landowner for the value of the use

22

of the land."). Even if private-party compensation were sufficient, nothing in California's magazine ban even suggests, let alone ensures, that the magazine owner's compensation a will reflect its fair market value. To the contrary, by limiting the universe of potential purchasers to licensed firearms dealers, compelling sale by a fixed date, and prohibiting possession by nearly everyone in the state, the law practically ensures that the owner will receive less than fair market value. *See* Cal. Penal Code § 32310(d)(2). Precisely to avoid such a result, the Takings Clause prevents "government attempts to lay the general public's burden of just compensation on third parties." *Carson*, 353 F.3d at 831.

## III. SECTION 32310(C)-(D) VIOLATES THE DUE PROCESS CLAUSE

For largely the same reasons that it runs afoul of the Takings Clause, the ban also violates due process as applied to individuals who presently lawfully possess the now-prohibited magazines. Retroactively prohibiting the possession of lawfully acquired magazines does not substantially advance a "legitimate governmental objective." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 542 (2005).

At the outset, the magazine ban clearly operates retroactively and is thus subject to heightened scrutiny. Our legal system "for centuries . . . has harbored a singular distrust of retroactive statutes, and that distrust is reflected in th[e Supreme] Court's due process jurisprudence." *E. Enters. v. Apfel*, 524 U.S. 498, 502 (1998) (maj. op.). "If retroactive laws change the legal consequences of transactions long closed, the change can destroy the reasonable certainty and security which are the very objects of property ownership." *Id.* at 548. It thus "does not follow . . . that what [a legislature] can legislate prospectively it can legislate retrospectively. The retrospective aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976). Courts accordingly have "given careful consideration to due process challenges to legislation with retroactive effects," *E. Enters.*, 524 U.S. at 547-48 (Kennedy, J., concurring in part and dissenting in part)

1    (collecting cases), subjecting such laws to "heightened scrutiny," *Kelo*, 545 U.S. at

2    493 (Kennedy, J., concurring). Here, there can be no serious dispute that the law is

3    retroactive: it requires citizens who, long ago, lawfully obtained standard-issue

4    magazines to dispossess themselves of those arms, never mind that they have lawfully

5    possessed them for decades.

6          As the precedents above reflect, even assuming the ban furthers a legitimate

7    government interest as to individuals who do not presently lawfully possess a

8    magazine over ten rounds (a dubious assumption), the state must independently justify

9    its *retroactive* enforcement against magazine owners who lawfully acquired their

10   property before California banned the importation, sale, or transport of magazines

11   over ten rounds in 2000. That, the state cannot do. Although the state undoubtedly has

12   a legitimate interest in public safety, applying its ban retroactively against magazine

13   owners who have complied with the law since at least 1999, like Plaintiffs Lovette,

14   does not further that interest in any meaningful way. There is no reason to think that

15   applying a criminal possession ban to individuals who have lawfully possessed the

16   now-banned magazines for decades will have a tangible public safety benefit. To the

17   contrary, depriving them of their magazines will have the perverse effect of punishing

18   compliance with the law and may well reduce public safety by preventing individuals

19   from effectively exercising self-defense. The state's effort to "change the legal

20   consequences of transactions long closed," *E. Enters.*, 524 U.S. at 548, cannot "meet

21   the test of due process," *Usery*, 428 U.S. at 17.

22         What's more, the retroactive nature of the possession ban also makes it a

23   particularly poor fit for advancing public safety goals because it depends to a unique

24   degree on voluntary compliance. While a restriction on the sale of magazines would

25   impact law-abiding citizens and criminals alike, the addition of a possession ban to a

26   law that has prohibited acquisition for nearly two decades essentially impacts only the

27   law-abiding. For only such citizens would have lawfully possessed magazines over ten

28   rounds before their possession was prohibited. It is hard to imagine that criminals will

surrender their *unlawfully* acquired magazines or otherwise dispossess themselves of magazines they already *unlawfully* possess. Thus, as a practical matter, section 32310(c)-(d) burdens only law-abiding citizens, while failing to materially advance the state's public-safety interests. The Court should grant summary judgment to Plaintiffs on the independent ground that the possession ban violates due process.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that this Court grant summary judgment as to all claims adverse to Defendant. Alternatively, to the extent the Court finds some genuine issue as to any material fact related to Plaintiffs' Second Amendment claim, and is thus inclined to deny summary judgment, Plaintiffs seek partial summary judgment on their takings and due process claims.

Dated: March 5, 2018                    **MICHEL & ASSOCIATES, P.C.**


                                        /s/ Anna M. Barvir
                                        Anna M. Barvir
                                        Email: abarvir@michellawyers.com
                                        Attorneys for Plaintiffs