XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
ANTHONY P. O'BRIEN
Deputy Attorney General
State Bar No. 232650
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
 300 South Spring Street, Suite 1702
 Los Angeles, CA  90013
 Telephone:  (213) 269-6249
 Fax:  (213) 897-5775
 E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Attorney General
Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | 17-cv-1017-BEN-JLB<br><br>**DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Date:         April 30, 2018<br>Time:         10:30 a.m.<br>Judge:        Hon. Roger T. Benitez<br>Courtroom:  5A<br>Action Filed:  May 17, 2017 |

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

STATEMENT OF FACTS .......................................................................... 2

    I.    The Prevalence of Large-Capacity Magazines in Mass Shootings and Gun Violence. ...................................................................... 2

    II.   The History of Federal and State Regulation of Large-Capacity Magazines. ................................................................................... 4

        A.    The Origins of Firing-Capacity Regulations. ............................. 4

        B.    The Federal Ban on Large-Capacity Magazines. ....................... 6

        C.    California's Ban on Large-Capacity Magazines. ........................ 6

LEGAL STANDARD ................................................................................ 8

ARGUMENT ............................................................................................. 8

    I.    Section 32310 Does Not Violate the Second Amendment. .................. 8

        A.    Large-Capacity Magazines Are Not Protected by the Second Amendment. .................................................................. 11

        B.    Section 32310 Satisfies Intermediate Scrutiny. ........................ 13

            1.    Intermediate Scrutiny Is the Appropriate Standard. ........ 14

            2.    Section 32310 Is Substantially Related to Important Government Interests. .................................................... 15

    II.   Section 32310 Does Not Violate the Takings Clause. ........................ 22

    III.   Section 32310 Does Not Violate the Due Process Clause. .................. 24

CONCLUSION .......................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page**

C ASES

*Akins v. United States*
   82 Fed. Cl. 619 (2008) ................................................................... 23

*Am. Sav. & Loan Ass'n v. Cnty. of Marin*
   653 F.2d 364 (9th Cir. 1981) ........................................................ 23

*Bauer v. Becerra*
   858 F.3d 1216 (9th Cir. 2017) ...................................................... 13

*Celotex Corp. v. Caltrett*
   477 U.S. 317 (1986) ....................................................................... 8

*Chi., B. & Q. R. Co. v. Illinois*
   200 U.S. 561 (1906) ..................................................................... 23

*Colo. Outfitters Ass'n v. Hickenlooper*
   24 F. Supp. 3d 1050 (D. Colo. 2014) ...................................... 9, 19, 20

*District of Columbia v. Heller*
   554 U.S. 570 (2008) ........................................................................ 9

*E. Enters. v. Apfel*
   524 U.S. 498 (1998) ..................................................................... 25

*Fesjian v. Jefferson*
   399 A.2d 861 (D.C. Ct. App. 1979) ............................................. 23

*Friedman v. City of Highland Park*
   784 F.3d 406 (7th Cir. 2015) .......................................................... 9

*Fyock v. Sunnyvale*
   779 F.3d 991 (9th Cir. 2015) .................................................... *passim*

*Heller v. District of Columbia*
   670 F.3d 1244 (D.C. Cir. 2011) ................................................ *passim*

*Hightower v. City of Boston*
   693 F.3d 61 (1st Cir. 2012) ...................................................... 11, 21

ii

1
2

## TABLE OF AUTHORITIES
### (continued)

Page

3
4
*Horne v. Dep't of Agric.*
    135 S. Ct. 2419 (2015) ...................................................... 24

5
6
*Jackson v. City & Cnty. of S.F.*
    746 F.3d 953 (9th Cir. 2014) ................................... 11, 14, 15

7
8
*Kachalsky v. Cnty. of Westchester*
    701 F.3d 81 (2d Cir. 2012) ................................................ 16

9
*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017) (en banc) ........................*passim*

10
11
*Kolbe v. O'Malley*
    42 F. Supp. 3d 768 (D. Md. 2014) .................................... 18

12
13
*Levald, Inc. v. City of Palm Desert*
    998 F.2d 680 (9th Cir. 1993) ............................................ 24

14
15
*Lingle v. Chevron U.S.A., Inc.*
    544 U.S. 528 (2005) ........................................... 14, 22, 23

16
17
*Loretto v. Teleprompter Manhattan CATV Corp.*
    458 U.S. 419 (1982) ................................................. 22, 24

18
19
*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*
    475 U.S. 574 (1986) ........................................................ 8

20
21
*McDonald v. City of Chi.*
    561 U.S. 742 (2010) ...................................................... 10

22
*MHC Fin. Ltd. P'ship v. City of San Rafael*
    714 F.3d 1118 (9th Cir. 2013) .......................................... 24

23
24
*N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo*
    990 F. Supp. 2d 349 (W.D.N.Y. 2013) .............................. 18

25
26
*N.Y.S. Rifle & Pistol Ass'n v. Cuomo*
    804 F.3d 242 (2d Cir. 2015) .................................... 9, 19, 21

27
28

iii

1
2

## TABLE OF AUTHORITIES
### (continued)

**Page**

3

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms,*

4
  *& Explosives*
  700 F.3d 185 (5th Cir. 2012) ................................................................. 12

5

6

*Nixon v. Shrink Mo. Gov't PAC*
  528 U.S. 377 (2000) .............................................................................. 19

7

8

*Penn Central Transp. Co. v. City of N.Y.*
  438 U.S. 104 (1978) ........................................................................ 22, 24

9

10

*People v. Bustamante*
  57 Cal. App. 4th 693 (1997) ................................................................... 7

11

12

*Peruta v. Cty. of San Diego*
  824 F.3d 919 (9th Cir. 2016) (en banc) ......................................... 10, 16

13

14

*S.F. Veteran Police Officers Ass'n v. City of S.F.*
  18 F. Supp. 3d 997 (N.D. Cal. 2014) ................................................ 9, 20

15

16

*Shew v. Malloy*
  994 F. Supp. 2d 234 (D. Conn. 2014) ................................................... 18

17

*Silveira v. Lockyer*
  312 F.3d 1052 (9th Cir. 2002) ............................................................... 23

18

19

*Silvester v. Harris*
  843 F.3d 816 (9th Cir. 2016) ........................................... 12, 14, 19, 20

20

21

*Turner Broad. Sys., Inc. v. FCC*
  512 U.S. 622 (1994) ........................................................................ 15, 19

22

23

*Turner Broad. Sys., Inc. v. FCC*
  520 U.S. 180 (1997) .............................................................................. 15

24

25

*U.S. v. Skoien*
  614 F.3d 638 (7th Cir. 2010) ................................................................. 12

26

*United States v. Chester*
  628 F.3d 673 (4th Cir. 2010) ................................................................. 10

27

28

iv

## TABLE OF AUTHORITIES
### (continued)

**Page**

*United States v. Chovan*
    735 F.3d 1127 (9th Cir. 2013) ................................................................ 10, 11, 15

*Usery v. Turner Elkhorn Mining Co.*
    428 U.S. 1 (1976) ................................................................................................ 25

*Wiese v. Becerra*
    263 F. Supp. 3d 986 (E.D. Cal. 2017) ..................................................... 9, 19, 22, 23

*Wilkins v. Daniels*
    913 F. Supp. 2d 517 (S.D. Ohio 2012) .............................................................. 23

*Wollard v. Gallagher*
    712 F.3d 865 (4th Cir. 2014) ............................................................................. 16

*Worman v. Healey*
    2018 WL 1663445 (D. Mass. Apr. 5, 2018) ........................................ 9, 11, 13, 16

**STATUTES**

Cal. Penal Code
    § 16740 ............................................................................................................... 6
    § 16740(a) ....................................................................................................... 8, 24
    § 18010 ............................................................................................................... 6
    § 32310 ............................................................................................................. 1, 5
    § 32310 ........................................................................................................*passim*
    § 32310(a) ....................................................................................................... 1, 6, 7
    § 32310(c) ........................................................................................................ 1, 8
    § 32310(d) ................................................................................................... 8, 24, 25
    § 32390 ............................................................................................................... 6

Cal. Stats. 1999, ch. 129, (S.B. 23) §§ 3, 3.5 ...................................................... 6

Cal. Stats. 2013, ch. 728 (A.B. 48) § 1 ................................................................. 6

Colo. Rev. Stat. §§ 18-12-301–302 ..................................................................... 5

Conn. Gen. Stat. §§ 53-202w ............................................................................... 5

Haw. Rev. Stat. § 134-8(c) ................................................................................... 5

v

1
2

## <u>TABLE OF AUTHORITIES</u>
### (continued)

**Page**

3   La. Stat. Ann. § 40:1751 ...................................................................... 5

4   Mass. Gen. Laws Ann. Chapter 140, §§ 121, 131(a) ............................... 5

5
6   Md. Code, Crim. Law § 4-305(b) .......................................................... 5

7   N.J. Stat. Ann. §§ 2C:39-1(y), 39-3(j), 39-9(h) .................................... 5

8   N.Y. Penal Law §§ 265.00, 265.36 ....................................................... 5

9   Pub. L. 103-322, 108 Stat. 1796 (1994) ................................................ 6

10  Safety for All Act of 2016 ..................................................................... 7

11  Senate Bill 1446, 2015–2016 Reg. Sess. (Cal. 2016) .............................. 7

12
13  **CONSTITUTIONAL PROVISIONS**

14  U.S. Const. amend. II ...................................................................... *passim*

15  U.S. Const. amend. V ..................................................................... 22, 23

16  U.S. Const. amend. XIV ............................................................ 10, 12, 22

17  **COURT RULES**

18  Fed. R. Civ. P. 56(a) ............................................................................ 8

19
20  **OTHER AUTHORITIES**

21  Act of July 2, 1931, § 1, 1931 Ill. Laws 452 .......................................... 5

22  Act of July 7, 1932, no. 80, § 1, 1932 La. Acts 336 ................................ 5

23  Act of Mar. 7, 1934, Chapter 96, § 1(a), 1934 Va. Acts 137 ................... 5

24  Act of Mar. 2, 1934, no. 731, § 1, 1934 S.C. Acts 1288 .......................... 5

25  Aurora, Ill. Code of Ordinances, § 29-49 ............................................... 5

26
27  Chi., Ill. Muni. Code §§ 8-20-010, 8-20-085 .......................................... 5

28  Cook Cnty., Ill. Code of Ordinances, § 54-212 ....................................... 5

vi

Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or,
Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

1

## <u>TABLE OF AUTHORITIES</u>
**(continued)**

2

<u>**Page**</u>

3

D.C. Code § 7-2506.01(b) ........................................................................5

4

Franklin Park, Ill. Code of Ordinances, § 3-13G-3 ..................................5

5

6

Highland Park, Ill. Code of Ordinances, § 136.005 .................................5

7

L.A., Cal. Muni. Code §§ 46.30, 55.13 ....................................................5

8

Oakland, Cal. Code of Ordinances, § 9.38.030–9.38.040........................5

9

Oak Park, Ill. Muni. Code, § 27-2-1 ........................................................5

10

Rochester, N.Y., Muni. Code No. 47-5 ....................................................5

11

S.F., Cal. Police Code Art. 9, § 619 .........................................................5

12

13

Sunnyvale, Cal. Muni. Code, § 9.44.050..................................................5

14

Uniform Machine Gun Act, ch. 206, § 1, 1933 S.D. Sess. Laws 245.......5

15

Vill. of Deerfield, Ill. Code of Ordinances, § 15-90.................................5

16

17

18

19

20

21

22

23

24

25

26

27

28

Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or,
Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

# INTRODUCTION

In response to escalating mass shootings and gun violence, the Legislature and the people of California have banned all firearm magazines capable of holding more than ten rounds of ammunition.  Such large-capacity magazines ("LCMs") are disproportionately used in some of the most serious crime, including public mass shootings and the murder of law enforcement.  LCMs enable a criminal to fire more rounds in a given period of time, causing more injuries and more fatalities, than magazines holding ten rounds or less.  Because LCMs are so dangerous, federal and state laws have restricted them for decades.  Since 2000, California has prohibited the manufacture, importation, and sale of LCMs pursuant to California Penal Code section 32310 ("Section 32310").[1]  *See* § 32310(a).  In 2016, the people of California enhanced Section 32310 by prohibiting the possession of LCMs, closing a loophole that had allowed for their continued proliferation in the state.  *See* § 32310(c).[2]

Every circuit court to have considered the constitutionality of LCM bans has upheld them under the Second Amendment.  *See, e.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 130-41 (4th Cir. 2017) (en banc) (affirming grant of summary judgment in favor of state on Second Amendment challenge to statewide ban on magazines capable of holding more than ten rounds), *cert. denied*, 138 S. Ct. 469 (2017).  Section 32310 is similarly constitutional.  LCMs are not protected by the Second Amendment, and even if they were, Section 32310 satisfies the applicable level of scrutiny, intermediate scrutiny, because it is substantially related to important

---

[1] All subsequent statutory references are to the California Penal Code, unless otherwise noted.

[2] This Court has preliminarily enjoined enforcement of the possession ban, Dkt. No. 28, and Defendant has appealed that order to the Ninth Circuit Court of Appeals.  Oral argument has been scheduled for May 14, 2018.  In the interest of judicial economy, Defendant proposes continuing the hearing on Plaintiffs' Motion until after the Ninth Circuit has had an opportunity to issue a decision in the appeal, which may provide clarification on the legal standards applicable to Plaintiffs' Second Amendment and takings claims.

1

government interests: reducing and mitigating gun violence and mass shootings.
Thus, Plaintiffs are not entitled to judgment as a matter of law on their Second
Amendment claim.  Nor are they entitled to summary judgment or partial summary
judgment on their takings and related due process claims challenging the possession
ban added to Section 32310, because the statute is a valid exercise of the State's
police power and is rationally related to its important interests.

For these reasons, and those discussed in detail herein, Section 32310 is
plainly constitutional.  At a minimum, there are genuine issues of fact that remain
to be tried.  Accordingly, Plaintiffs' Motion must be denied.

## STATEMENT OF FACTS

### I.   THE PREVALENCE OF LARGE-CAPACITY MAGAZINES IN MASS SHOOTINGS AND GUN VIOLENCE.

LCMs were originally designed to afford soldiers in the battlefield an ample
supply of ammunition for combat, enabling them to expend large numbers of
rounds without pausing to reload.  *Kolbe*, 849 F.3d at 137; DX-12 at 540 ("[L]arge
capacity magazines are indicative of military firearms."); DX-13 at 557-58 (noting
that detachable large-capacity magazines were "originally designed and produced
for . . . military assault rifles" and referring to them as "large capacity military
magazines"); PX-2 at 31 (discussing "transition" of LCM-equipped firearms from
"military to civilian use for sport or self-defense"); DX-14 at 684 ("High capacity
magazines are military designed devices.").[3]  It was not until the 1970s and 1980s
that LCMs began to be purchased by civilian consumers in large quantities.  *See*
PX-2 at 31-32 (stating that law enforcement began transitioning to semiautomatic
handguns in the 1970s, which "increased demand in the civilian market"); DX-4

---

[3] Citations to Plaintiffs' exhibits annexed to the Declaration of Anna M.
Barvir (Dkt. No. 50-8) and Plaintiffs' Request for Judicial Notice (Dkt. No. 50-2)
are to "PX" followed by exhibit number.  Citations to Defendants' exhibits annexed
to the accompanying Declaration of John D. Echeverria are to "DX" followed by
exhibit number.

1   at 378 ("Nationally, semiautomatic handguns grew from 28% of handgun

2   production in 1973 to 80% in 1993.  Most of this growth occurred from the late

3   1980s onward, during which time the gun industry also increased marketing and

4   production of semiautomatics with LCMs." (internal citation omitted)); DX-15

5   at 699 (describing how, during the 1980s, firearm manufacturers "began to roll out

6   increasing numbers of pistols with ever-larger-capacity magazines").  Because they

7   enable shooters to sustain fire without pausing to reload, LCMs are "designed and

8   most suitable for military and law enforcement applications."  *Kolbe*, 849 F.3d at

9   137.  And in the wrong hands, LCMs enable criminals to fire more rounds in a

10  given period of time, resulting in more victims wounded, more wounds per victim,

11  and more fatalities.  *See, e.g.*, DX-4 at 125-26.

12        In numerous public mass shootings, shooters have utilized LCMs to kill and

13  injure their victims on a record scale.  *See* DX-16 at 722-36; DX-17 at 740; DX-20

14  at 799-807; DX-18 at 779; DX-4 at 127-28.  On October 1, 2017, in what was, as of

15  the date of this brief, the deadliest shooting in United States history, a gunman used

16  a variety of assault rifles and LCMs to fire over 1,000 rounds at concertgoers at an

17  outdoor music festival in Las Vegas, Nevada, killing 58 people and injuring more

18  than 500 others.  DX-19 at 794-97; Declaration of Blake Graham in Opposition to

19  Plaintiffs' Motion for Summary Judgment ("Graham Decl.") ¶ 19(o).  On June 12,

20  2016, in what was the deadliest mass shooting before the Las Vegas incident, a

21  gunman used multiple 30-round LCMs to murder 49 people and injure 53 others at

22  a nightclub in Orlando, Florida.  DX-18 at 778; Graham Decl. ¶ 19(l); DX-20

23  at 801; DX-21 at 809-11.  And on December 14, 2012, at Sandy Hook Elementary

24  School in Newtown, Connecticut, a gunman used an AR-15-type rifle equipped

25  with 30-round magazines to fire more than 144 rounds of ammunition, killing

26  twenty children (all first-grade pupils) and six adults.  DX-22 at 825-26; DX-20

27  at 802; DX-18 at 779.

28

LCMs have also been used in a number of public mass shootings in California. Graham Decl. ¶ 19.  For example, on December 2, 2015, two assailants used assault weapons and LCMs to shoot 36 people during a holiday party in San Bernardino, killing 14 and seriously injuring 22 more.  DX-20 at 801; Graham Decl. ¶ 19(k). And on June 7, 2013, in Santa Monica, an assailant used a home-built AR-15 rifle equipped with LCMs to kill his father and brother and then kill three more people and injure at least three others.  DX-17 at 745; Graham Decl. ¶ 19(j).

Both the number and severity of mass shootings continues to increase.  DX-23 at 862-66.  The last ten years saw twice as many shooting incidents in which six or more people were killed than in the previous decade, and the use of LCMs in such massacres has increased substantially.  DX-16 at 722-36; DX-3 at 79-80.  The fatality rate in mass shootings has also risen.  DX-24 at 883 (finding that, from 1996 to 2015, high-fatality mass shootings involving at least six fatalities have reached "unprecedented levels in the past ten years"); *see also id.* at 877, 892.  In fact, the presence of LCMs in high-fatality gun massacres is "the factor most associated with high death tolls in gun massacres."  *Id.* at 892.

## II.  THE HISTORY OF FEDERAL AND STATE REGULATION OF LARGE-CAPACITY MAGAZINES.

### A.  The Origins of Firing-Capacity Regulations.

In the 1920s and 1930s, as firearm technology evolved, states and the federal government began imposing firing-capacity restrictions.  DX-25 at 901-04.  While Plaintiffs note that Michigan, Rhode Island, Ohio, and the District of Columbia enacted firing-capacity restrictions, Mem. at 3:5-9; PX-12 at 304, they argue that "[n]one of these laws set the limit as low as ten," Mem. at 11:11.  Plaintiffs, however, neglect to mention five other jurisdictions that enacted capacity-based restrictions in the 1930s, each of which referenced limits of less than ten rounds. DX-25 at 903-04.  In 1933, South Dakota banned any "weapon . . . from which more than *five shots* or bullets may be rapidly or automatically, or semi-

1   automatically discharged from a magazine." Def.'s Request for Judicial Notice

2   ("RJN"), Ex. A (Uniform Machine Gun Act, ch. 206, § 1, 1933 S.D. Sess. Laws

3   245, 245) at 3 (emphasis added). In 1934, Virginia enacted a ban on any "weapon

4   of any description . . . from which more than *seven shots* or bullets may be rapidly,

5   or automatically, or semi-automatically discharged from a magazine, by a single

6   function of the firing device." *Id.*, Ex. B (Act of Mar. 7, 1934, ch. 96, § 1(a), 1934

7   Va. Acts 137, 137) at 8 (emphasis added). Also in the 1930s, Illinois, Louisiana,

8   and South Carolina each imposed bans on firearms capable of "automatically

9   discharging more than *eight cartridges* successively without reloading." *Id.*, Ex. C

10   (Act of July 2, 1931, § 1, 1931 Ill. Laws 452, 452) at 14; *id.*, Ex. D (Act of July 7,

11   1932, no. 80, § 1, 1932 La. Acts 336, 337) at 20; *id.*, Ex. E (Act of Mar. 2, 1934,

12   no. 731, § 1, 1934 S.C. Acts 1288, 1288) at 25 (emphasis added).[4]

13       For the past several decades, LCMs have been heavily regulated in the United

14   States. Currently, at least eight states and 13 local jurisdictions restrict the

15   possession or sale of magazines on the basis of capacity.[5] The regulatory focus on

16   assault weapons and LCMs in the 1990s and 2000s "was presaged by the

17   successful, and at the time obviously uncontroversial, regulation of semiautomatic

18   weapons in the 1920s and 1930s." DX-25 at 902.

19

---

20   [4] At least one of these jurisdictions, Louisiana, has maintained its capacity-based prohibition. *See* La. Stat. Ann. § 40:1751.

21   [5] *See* § 32310; PX-82 (Haw. Rev. Stat. § 134-8(c)); PX-84 (Mass. Gen. Laws Ann. ch. 140, §§ 121, 131(a)); PX-83 (Md. Code, Crim. Law § 4-305(b)); PX-85

22   (N.J. Stat. Ann. §§ 2C:39-1(y), 39-3(j), 39-9(h)); PX-86 (N.Y. Penal Law §§ 265.00, 265.36); PX-80 (Conn. Gen. Stat. §§ 53-202w); PX-79 (Colo. Rev. Stat.

23   §§ 18-12-301–302); PX-81 (D.C. Code § 7-2506.01(b)); RJN, Ex. F (Rochester, N.Y., Muni. Code No. 47-5); RJN, Ex. G (Chi., Ill. Muni. Code §§ 8-20-010, 8-20-

24   085); RJN, Ex. H (Sunnyvale, Cal. Muni. Code, § 9.44.050); RJN, Ex. I (L.A., Cal. Muni. Code §§ 46.30, 55.13); RJN, Ex. J (S.F., Cal. Police Code Art. 9, § 619);

25   RJN, Ex. K (Oakland, Cal. Code of Ordinances, § 9.38.030–9.38.040 (Ord. No. 13352, § 1)); RJN, Ex. L (Cook Cnty., Ill. Code of Ordinances, § 54-212 (Ord. No.

26   13-O-32)); RJN, Ex. M (Aurora, Ill. Code of Ordinances, § 29-49); RJN, Ex. N (Franklin Park, Ill. Code of Ordinances, § 3-13G-3); RJN, Ex. O (Oak Park, Ill.

27   Muni. Code, § 27-2-1); RJN, Ex. P (Highland Park, Ill. Code of Ordinances, § 136.005); RJN, Ex. Q (Vill. of Deerfield, Ill. Code of Ordinances, § 15-90 (Ord.

28   No. O-18-06)).

## B.   The Federal Ban on Large-Capacity Magazines.

In 1994, following numerous mass shootings, the U.S. Congress enacted the Violent Crime Control and Law Enforcement Act (the "Federal Ban").  DX-26 at 906-81.  The Federal Ban prohibited the possession or transfer of all "large-capacity ammunition feeding devices," defined as those with the capacity to accept more than ten rounds.  *See* Pub. L. 103-322, 108 Stat. 1796, 1998-2000 (1994) (formerly codified at 18 U.S.C. §§ 921(a)(31)(A), 922(w)).  The Federal Ban, however, did not apply to LCMs that were lawfully possessed on the date of enactment, which were grandfathered in and permitted to be transferred.  DX-4 at 135 (noting that 25-50 million LCMs were grandfathered in and millions of pre-ban LCMs were imported under the Federal Ban).  In 2004, the authors of the study of the Federal Ban commissioned by the National Institute of Justice, including Defendant's expert, Christopher Koper, concluded that while they could not "clearly credit the ban with any of the nation's recent drop in gun violence," "the ban's exception of millions of pre-ban [assault weapons] and LCMs ensured that the effects of the law would occur only gradually" and "those effects are still unfolding and may not be fully felt for several years into the future."  DX-4 at 299-30.  Despite the need for more time to evaluate its efficacy, *id.*, the Federal Ban expired in 2004 pursuant to its sunset provision, 108 Stat. at 2000.

## C.   California's Ban on Large-Capacity Magazines.

California law defines a "large-capacity magazine" as any ammunition-feeding device with the capacity to accept more than ten rounds.  § 16740.  In 2000, before the expiration of the Federal Ban, California adopted its own legislation prohibiting the manufacture, importation, keeping or offering for sale, giving, or lending of LCMs, Cal. Stats. 1999, ch. 129, (S.B. 23) §§ 3, 3.5, which is presently codified at Section 32310.  In 2013, California enacted a ban on the purchase or receipt of LCMs.  Cal. Stats. 2013, ch. 728 (A.B. 48) § 1 (amending § 32310(a)).  California also declared unlawfully possessed LCMs to be a "nuisance."  §§ 18010,

6

1   32390.  Thus, even though the Federal Ban expired in 2004, LCMs have remained

2   illegal to buy, sell, or import in California.  Since 2000, magazine manufacturers

3   have been producing magazines that hold no more than ten rounds of ammunition

4   for sale to California consumers, and such magazines have been widely available in

5   California and are compatible with most, if not all, semiautomatic firearms.

6   Graham Decl. ¶ 23.

7      California's regulation of LCMs, like the Federal Ban, initially exempted the

8   possession of LCMs legally obtained before its enactment in 2000.  Rather than

9   serving as a limited exception, however, the grandfathering provision made the

10  prior version of Section 32310 "very difficult to enforce."  DX-14 at 684.

11  Specifically, because LCMs lack identifying marks to indicate when they were

12  manufactured or sold, there is no reliable way for law enforcement to tell the

13  difference between properly grandfathered LCMs and those that have been illegally

14  smuggled and purchased or modified with "magazine conversion kits."  Graham

15  Decl. ¶¶ 24-32.  Just as the grandfather clause in the Federal Ban undermined its

16  effectiveness, the possession loophole in Section 32310 undermined existing LCM

17  restrictions.  *See* DX-4 at 146-48; DX-36 at 1409-10.

18     On November 8, 2016, the people of California passed Proposition 63, "The

19  Safety for All Act of 2016." [6]  DX-27 at 983-1011.  Proposition 63 was intended to

20  close "loopholes that leave communities throughout the state vulnerable to gun

21  violence and mass shootings," *id.* at 983-84, including the possession loophole in

22  Section 32310(a), *id.* at 984 ("We should close that loophole.  No one except

23  trained law enforcement should be able to possess these dangerous ammunition

24

25     [6] Approximately four months before the enactment of Proposition 63, in July 2016, the California Legislature enacted Senate Bill 1446, 2015–2016 Reg. Sess. (Cal. 2016) ("SB 1446").  SB 1446 included more exceptions to the possession ban

26  and less severe penalties for noncompliance, but was otherwise identical to Proposition 63.  Because Proposition 63's amendments were enacted after SB 1446,

27  under California law, they are the governing provisions.  *See People v. Bustamante*, 57 Cal. App. 4th 693, 701 (1997).  Accordingly, references to Section 32310 herein

28  are to the statute as amended by Proposition 63.

7

magazines."). Pursuant to Proposition 63's amendments, any person who possessed an LCM was required to dispose of it, prior to July 1, 2017, by any of the following means: (1) removing it from the state, (2) selling it to a licensed firearms dealer, or (3) surrendering it to a law enforcement agency for destruction. § 32310(d). Additionally, owners of LCMs could comply with the possession ban by permanently modifying their magazines to hold no more than ten rounds. § 16740(a). Possession of an LCM after July 1, 2017 was designated as an infraction or a misdemeanor punishable by a fine not to exceed $100 per LCM and/or imprisonment in a county jail not to exceed one year. § 32310(c).

## LEGAL STANDARD

A motion for summary judgment must be denied unless the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Caltrett*, 477 U.S. 317, 322 (1986) (quotation omitted). In considering a motion for summary judgment, or partial summary judgment, the Court must draw all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## ARGUMENT

### I.   SECTION 32310 DOES NOT VIOLATE THE SECOND AMENDMENT.

Consistent with the overwhelming weight of authority, Section 32310 does not violate the Second Amendment. *See Fyock v. Sunnyvale*, 779 F.3d 991, 1000-01 (9th Cir. 2015) (affirming denial of preliminary injunction of municipal LCM ban because "[t]he evidence identified by the district court is precisely the type of evidence that [the government] was permitted to rely upon to substantiate its

8

Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or,
Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

interest");[7] *Wiese v. Becerra*, 263 F. Supp. 3d 986, 990-93 (E.D. Cal. 2017)
(denying motion for preliminary injunction to enjoin the possession ban in Section
32310 because, *inter alia*, the statute satisfies intermediate scrutiny); *Kolbe*,
849 F.3d at 130-41 (affirming grant of summary judgment in favor of government
on Second Amendment challenge to ban); *N.Y.S. Rifle & Pistol Ass'n v. Cuomo*,
804 F.3d 242, 263-64 (2d Cir. 2015) ("*NYSRPA*") (same), *cert. denied sub nom.*
*Shew v. Malloy*, 136 S. Ct. 2486 (2016); *Friedman v. City of Highland Park*, 784
F.3d 406, 411-12 (7th Cir. 2015) (same), *cert. denied*, 136 S. Ct. 447 (2015); *Heller
v. District of Columbia*, 670 F.3d 1244, 1260-64 (D.C. Cir. 2011) ("*Heller II*")
(same); *S.F. Veteran Police Officers Ass'n v. City of S.F.*, 18 F. Supp. 3d 997,
1002-06 (N.D. Cal. 2014) (denying preliminary injunction in Second Amendment
challenge to municipal LCM ban); *Colo. Outfitters Ass'n v. Hickenlooper*,
24 F. Supp. 3d 1050, 1067-74 (D. Colo. 2014) (entering judgment for defendant
after a bench trial in Second Amendment challenge to LCM ban), *vacated and
remanded for lack of standing*, 823 F.3d 537 (10th Cir. 2016); *Worman v. Healey*,
__ F. Supp. 3d __, No. 1:17-10107-WGY, 2018 WL 1663445, at *8-11 (D. Mass.
Apr. 5, 2018) (granting summary judgment in favor of state on Second Amendment
challenge to statewide LCM ban).  Notably, the Fourth Circuit, ruling *en banc*,
determined that LCMs are not even protected under the Second Amendment.
*Kolbe*, 849 F.3d at 121; *accord Worman*, 2018 WL 1663445, at *10-11 (citing
*Kolbe*, 849 F.3d at 141-42).  And all of these courts, with the exception of the
recent *Worman* decision, which ended its analysis at step one, have concluded that
intermediate scrutiny applies to LCM bans and that such bans are at least
reasonably related to important government interests.

     In *District of Columbia v. Heller*, the U.S. Supreme Court held that the Second
Amendment confers an individual right to keep and bear arms.  554 U.S. 570, 595

---

[7] The record in this case is substantially the same as the record in *Fyock*, as
well as other cases upholding LCM bans under the Second Amendment.

1  (2008).  This right is incorporated against the states through the Fourteenth

2  Amendment.  *McDonald v. City of Chi.*, 561 U.S. 742, 790-91 (2010) (plurality).

3  The Supreme Court was clear, however, that the Second Amendment does not

4  provide "a right to keep and carry any weapon whatsoever in any manner

5  whatsoever and for whatever purpose."  *Heller*, 554 U.S. at 626; *see also Peruta v.*

6  *Cty. of San Diego*, 824 F.3d 919, 928 (9th Cir. 2016) (en banc) ("The Court in

7  *Heller* was careful to limit the scope of its holding."), *cert. denied sub nom. Peruta*

8  *v. California*, 137 S. Ct. 1995 (2017).  Rather, the right to keep and bear arms, like

9  other constitutional rights, is limited in scope and subject to regulation.  *Heller*,

10  554 U.S. at 626-28.  The Court made clear that *Heller* "did not cast doubt on such

11  longstanding regulatory measures as 'prohibitions on the possession of firearms by

12  felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive

13  places such as schools and government buildings, or laws imposing conditions and

14  qualifications on the commercial sale of arms.'"  *McDonald*, 561 U.S. at 786

15  (quoting *Heller*, 554 U.S. at 626-27).  Moreover, the Court emphasized that "the

16  sorts of weapons protected [by the Second Amendment] were those 'in common

17  use at the time'" of ratification, *Heller*, 554 U.S. at 627 (quoting *United States v.*

18  *Miller*, 307 U.S. 174, 179 (1939)), and that "weapons that are most useful in

19  military service—M-16 rifles and the like—may be banned" even though such arms

20  may be useful in present-day militia service.  *Id.* at 627.

21      In evaluating firearms regulations under the Second Amendment, this Court

22  must employ a two-step inquiry.  *United States v. Chovan*, 735 F.3d 1127, 1136-37

23  (9th Cir. 2013).  First, the court "asks whether the challenged law burdens conduct

24  protected by the Second Amendment."  *Id.* at 1136.  If not, the "challenged law is

25  valid."  *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).  If a Second

26  Amendment right is implicated, the court then selects an appropriate level of

27  scrutiny, depending on "the nature of the conduct being regulated and the degree to

28

1   which the challenged law burdens the right." *Chovan*, 735 F.3d at 1136, 1138

2   (quoting *Chester*, 628 F.3d at 682).

3       **A.   Large-Capacity Magazines Are Not Protected by the Second**
        **Amendment.**

4

5       While some Second Amendment protection may be afforded to ammunition

6   (and by extension, magazines), *see Jackson v. City & Cnty. of S.F.*, 746 F.3d 953,

7   967 (9th Cir. 2014), the Second Amendment does not extend to magazines with

8   heightened capacities.  LCMs comprise a subset of military-style magazines that

9   "are designed to enhance [a firearm's] capacity to shoot multiple human targets

10  very rapidly." *Heller II*, 670 F.3d at 1262.  Contrary to Plaintiffs' claim that

11  "magazines over ten rounds were developed for self- and home-defense," Mem. at

12  10:3-4 (citing PX-2 at 30-32), the undisputed evidence indicates that LCMs were

13  designed for military use in combat, *see* PX-2 at 31, and that they are most useful in

14  military service, *see* DX-12 at 540; DX-13 at 557-58; DX-14 at 684.  Due to their

15  lethality, LCMs "pose[] a distinct threat to safety in private settings as well as

16  places of assembly."  DX-28 at 1097; *see also* DX-29 at 1291 (LCMs transform a

17  firearm "into a weapon of mass death rather than a home-protection type device").

18  They are not "weapons of the type characteristically used to protect the home."

19  *Hightower v. City of Boston*, 693 F.3d 61, 66, 71 (1st Cir. 2012).  Consequently,

20  "whatever their other potential uses," including self-defense, LCMs are

21  "unquestionably most useful in military service" because they "are designed to

22  'kill[] or disable[e] the enemy' on the battlefield." *Kolbe*, 849 F.3d at 137 (citation

23  omitted).  Thus, they are not within the right secured by the Second Amendment.

24  *Id.* at 136-37 (citing *Heller*, 554 U.S. at 627); *see also Worman*, 2018 WL 1663445,

25  at *10.  For this reason, Plaintiffs' Second Amendment claim fails at the first step

26  of the analysis.[8]

27       _____

        [8] *Fyock* does not foreclose this conclusion, because the Ninth Circuit merely

28  held that the district court "did not clearly err in finding, *based on the record before*

11

1    Plaintiffs' Second Amendment challenge fails at the first step for an additional

2    reason: LCMs have been subject to longstanding regulation. *See Nat'l Rifle Ass'n*

3    *of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185,

4    196 (5th Cir. 2012) ("[W]e state that a longstanding, presumptively lawful

5    regulatory measure—whether or not it is specified on *Heller*'s illustrative list—

6    would likely fall outside the ambit of the Second Amendment; that is, such a

7    measure would likely be upheld at step one of our framework."); *Silvester v.*

8    *Harris*, 843 F.3d 816, 820 (9th Cir. 2016).  As Plaintiffs concede, firing-capacity

9    regulations date back to the 1920s.  Mem. at 3:5-9, 11:1-15, 12:1-5; PX-12 at 304.

10   In total, nine jurisdictions enacted firing-capacity limitations in the 1920s and

11   1930s.  *See supra* Section II.A at pp. 4-5.  In fact, Congress enacted such a ban in

12   the District of Columbia—which, prior the incorporation of the Second

13   Amendment through the Fourteenth Amendment in 2010, was one of the few

14   jurisdictions subject to the Second Amendment—and that ban remains in effect to

15   this day.  Plaintiffs argue that there were no firing-capacity restrictions when the

16   Second Amendment was ratified, Mem. at 10:17-24, but "[t]he term 'longstanding'

17   is not restricted to the time of the founding of the Republic," and regulations have

18   been deemed longstanding, and thus lawful, that date back to the late 1930s.

19   *Silvester*, 843 F.3d at 831 (Thomas, J., concurring) (citing cases); *U.S. v. Skoien*,

20   614 F.3d 638, 641 (7th Cir. 2010) (firearm restrictions "need not mirror limits that

21   were on the books in 1791").

22       In *Fyock*, the Ninth Circuit noted that "several state regulations from the early

23   twentieth century . . . restricted the possession of firearms based on the number of

24   rounds that the firearm could discharge automatically or semi-automatically without

25   reloading."  779 F.3d at 997.  The court observed that, "[a]lthough not from the

26   _____

27   *it*, that a regulation restricting possession of certain types of magazines burdens
     conduct falling within the scope of the Second Amendment."  779 F.3d at 998
     (emphasis added).  The record in this case demonstrates that LCMs are not
28   protected under the Second Amendment.

12

1    founding era, these early twentieth century regulations might nevertheless

2    demonstrate a history of longstanding regulation if their historical prevalence and

3    significance is properly developed in the record." *Id.*; *see also id.* at 997 n.3 ("As

4    the merits action proceeds and the parties develop the record, the district court will

5    be able to adequately assess the historical roots and implications of firing-capacity

6    regulations."). Here, the undisputed evidence reflects that firing capacity has been

7    subject to regulation since at least the 1920s and 1930s.

8        Because LCMs are not protected under the Second Amendment, Plaintiffs are

9    not entitled to judgment as a matter of law on their Second Amendment claim.[9]

10       **B.   Section 32310 Satisfies Intermediate Scrutiny.**

11       Even if LCMs fall within the scope of the Second Amendment,[10] Section

12   32310 must be subject to, at most, intermediate scrutiny, consistent with the

13   standard of scrutiny selected by every court to have considered a Second

14   Amendment challenge to an LCM ban. And because Section 32310 advances the

15   important government interests in promoting public safety and protecting civilians

16   and law enforcement from gun violence and mass shootings, it is constitutional.

17   *See Kolbe*, 849 F.3d at 141 ("Simply put, the State has shown all that is required: a

18   reasonable, if not perfect, fit between the [LCM ban] and [the State's] interest in

19   protecting public safety.").

20

21   _____

     [9] The vast majority of the evidence submitted in support of Plaintiffs'
22   Motion, totaling nearly 600 pages of firearm overviews and marketing materials,
     addresses the first step of the Court's Second Amendment analysis. *See* PX-7–
23   PX-57. However, Plaintiffs' evidence "does not necessarily show that large-
     capacity magazines are in fact commonly possessed by law-abiding citizens for
24   lawful purposes." *Fyock*, 779 F.3d at 998. And even if it did, none of this evidence
     rebuts Defendant's evidence that LCMs are designed and most appropriate for
25   military use and have been subject to longstanding regulation. *See Kolbe*, 849 F.3d
     at 141-42; *Worman*, 2018 WL 1663445, at *10 ("[P]resent day popularity is not
26   constitutionally material.").

         [10] Because Section 32310 satisfies heightened scrutiny, the Court may
27   assume, without deciding, that some Second Amendment protection applies to
     LCMs. *See Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017) (bypassing step
28   one in upholding certain firearm fees on motion for summary judgment).

13

Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or,
Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

### 1.   Intermediate Scrutiny Is the Appropriate Standard.

In Second Amendment cases, the Ninth Circuit—and every other circuit court to have considered the issue—employs a two-step inquiry for selecting the appropriate level of scrutiny, based on a consideration of "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Jackson*, 746 F.3d at 960-61 (quotation omitted).  So long as a law does not amount to "a destruction of the Second Amendment right" or "severely burden[] that right," "intermediate scrutiny is appropriate." *Silvester*, 843 F.3d at 821.  The Ninth Circuit, along with every other court to consider the issue, has already determined that, as a matter of law, intermediate scrutiny applies to LCM bans because "the prohibition of . . . large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves." *Fyock*, 779 F.3d at 999 (quoting *Heller II*, 670 F.3d at 1262).  Intermediate scrutiny thus applies here.[11]

Contrary to Plaintiffs' repeated assertions, Mem. at 7 & n.2, 12 & n.5, Section 32310 does not come close to a categorical ban on any class of firearm deemed to be "the quintessential self-defense weapon," *Heller*, 544 U.S. at 629, nor does it eliminate anyone's ability to obtain and use ammunition or magazines, *see Jackson*, 746 F.3d at 967; *Fyock*, 779 F.3d at 999.  Nor does Section 32310 severely burden any Second Amendment right.  To the contrary, Section 32310 *permits* law-abiding citizens to purchase and possess magazines capable of holding ten rounds or less, without any restriction on the number of magazines that they may lawfully possess, which can be used for self-defense.  *Fyock*, 25 F. Supp. 3d at 1278 (noting that the LCM ban allowed individuals "countless other handgun and magazine options to exercise their Second Amendment rights.").  Even if "[m]agazines are essential to

---

[11] The evidence in this case, which is substantially the same as the *Fyock* record, warrants at most intermediate scrutiny because Section 32310 does not severely burden "the fundamental right of self defense of the home." *Silvester*, 843 F.3d at 821; *see infra* Section I.B.2 at pp. 20-21.

14

1   the operation of almost all pistols and many rifles," Mem. at 8:5-6, LCMs are not.

2   Graham Decl. ¶ 23.  Indeed, since 2000, firearm manufacturers have been

3   producing such magazines for sale in California, magazines which are widely

4   available in the state and compatible with most, if not all, semiautomatic firearms.

5   *Id.*  At most, Section 32310 regulates the *manner* in which individuals may exercise

6   their Second Amendment rights.  *See Jackson*, 746 F.3d at 961.

7
8
### 2.   Section 32310 Is Substantially Related to Important Government Interests.

9        Intermediate scrutiny requires that (1) the government's stated objective must

10  be "significant, substantial, or important," and (2) there must be a "reasonable fit"

11  between the challenged regulation and the asserted objective.  *Chovan*, 735 F.3d at

12  1139.  The challenged regulation must be "substantially related" to an important

13  government interest.  *Id.* at 1140.  Intermediate scrutiny does not require a perfect

14  fit, nor does it require that the regulation be the least restrictive means of serving

15  the government's interest.  *Jackson*, 746 F.3d at 969; *Fyock*, 779 F.3d at 1000.

16  Rather, the government "must be allowed a reasonable opportunity to experiment

17  with solutions to admittedly serious problems."  *Jackson*, 746 F.3d at 969-70

18  (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986)).  The

19  Court's narrow role is to "assure that, in formulating its judgments, [the

20  government] has drawn reasonable inferences based on substantial evidence."

21  *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (plurality) ("*Turner*").

22       In applying intermediate scrutiny, the Court may consider "the legislative

23  history of the enactment as well as studies in the record or cited in pertinent case

24  law."  *Jackson*, 746 F.3d at 966.  In so doing, the Court must "accord substantial

25  deference to the predictive judgments of the [legislature]."  *Turner Broad. Sys., Inc.*

26  *v. FCC*, 520 U.S. 180, 195 (1997) ("*Turner II*").  Under intermediate scrutiny, the

27  "question is not whether [the government], as an objective matter, was correct."  *Id.*

28  at 211; *see also Jackson*, 746 F.3d at 966.  Instead, the evidence must support a

15

1   reasonable inference that the law "promotes a substantial government interest that
2   would be achieved less effectively absent the regulation."  *Peruta*, 824 F.3d at 942.
3   Even when the record contains conflicting evidence, "[i]t is the legislature's job,
4   not [the courts'], to weigh conflicting evidence and make policy judgments."
5   *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012); *accord Wollard*
6   *v. Gallagher*, 712 F.3d 865, 881-82 (4th Cir. 2014).

7        Here, it is undisputed that the promotion of public safety, and the prevention
8   and mitigation of gun violence and mass shootings, constitute important
9   government interests.  Mem. at 13:8-10, 24:12; *see also Fyock*, 779 F.3d at 1000.
10  The evidence demonstrates that Section 32310 is substantially related to those
11  interests and exhibits a reasonable fit.  Even if reasonable minds may disagree
12  about the policy's wisdom, it is plainly constitutional under intermediate scrutiny.
13  *See Kolbe*, 849 F.3d at 140 ("The judgment made by the [legislature] in enacting
14  the [LCM ban] is precisely the type of judgment that legislatures are allowed to
15  make without second-guessing by a court."); *Worman*, 2018 WL 1663445, at *15
16  ("Both the[] general acceptance and the[] regulation [of LCMs], if any, are policy
17  matters not for courts, but left to the people directly through their elected
18  representatives. . . . These policy matters are simply not of constitutional moment.
19  Americans are not afraid of bumptious, raucous, and robust debate about these
20  matters.  We call it democracy.").  The evidence in this case substantiates the
21  Legislature's and the people's decision to ban LCMs.

22       ***First***, LCMs are uniquely dangerous because they enable a shooter to fire
23  more rounds in a given period of time, resulting in more shots fired, more victims
24  wounded, more wounds per victim, and more fatalities.  *Kolbe*, 849 F.3d at 137
25  (noting that LCMs enable a shooter to hit "multiple human targets very rapidly"
26  and "contribute to the unique function of any assault weapon to deliver
27  extraordinary firepower"); DX-4 at 125; DX-18 at 780; DX-30 at 1299-300; DX-7
28  at 472-73 (LCMs can "result in more rounds fired and more homicides in general

16

than similar firearms with smaller magazines"); Graham Decl. ¶¶ 16-18; DX-9 at 498-501 (testifying to a "statistically significant difference with higher numbers of victims in the LCM cases"); DX-10 at 509 (testifying that "a large percentage of mass shootings involve large capacity magazines, and that the number of fatalities and injuries are higher in mass shootings that involve large capacity magazines"); DX-8 at 487 (noting that Christopher Koper "accurately notes that [LCMs] allow people to fire more rounds without reloading"); DX-14 at 684; DX-27 at 984.  Even where an LCM-equipped firearm is used in lawful self-defense, LCMs can cause collateral damage and injury when civilians fire more rounds than necessary, thereby endangering themselves and bystanders.  *Kolbe*, 849 F.3d at 127; DX-31 at 1324; DX-32 at 1371; DX-2 at 41-42.

Mass shooters often use LCMs to commit their crimes precisely because they inflict maximum damage on as many people as possible.  DX-4 at 125, 129; DX-18 at 777, 783; DX-8 at 491-92 (shooters may acquire LCMs "[b]ecause of the belief, accurate or not, that they can [inflict] more harm if they can fire large numbers of rounds without reloading").  On average, assailants who use LCMs shoot more than twice as many victims and kill 40-60 percent more victims as compared to other mass shootings.  DX-18 at 780; DX-17 at 740; DX-10 at 517 (public mass shootings that involved LCMs resulted in an average of 30.6 fatalities or injuries compared to 9.2 fatalities or injuries for public mass shootings without LCMs); DX-4 at 131 (analysis of 62 mass shootings involved an average of 10.19 fatalities in LCM cases compared to 6.35 in non-LCM cases or cases with unknown capacity); DX-10 at 509; *see also* DX-33 at 1376 (20% to 28% of gun victims were wounded in incidents involving more than ten rounds fired); DX-8 at 485-86 ("[L]arge capacity magazines are . . . relatively more likely to show up in cases with larger numbers of victims.").[12]  The use of LCMs and assault weapons in

---

[12] A victim is 60 percent more likely to die if he or she receives more than one gunshot wound, DX-4 at 133; DX-8 at 488-89, and thus the ability to inflict

17

recent mass shootings was associated with a 151 percent increase in the number of people shot and a 63 percent increase in fatalities.  DX-17 at 740; *see also* DX-4 at 144 (finding it "statistically significant" that mass shootings involving LCMs resulted in 13.7 victims on average compared to 5.2 for other shootings).  Thus, as the Commission that examined the Sandy Hook mass shooting determined, the lethality of a firearm is directly "correlated to capacity."  DX-28 at 1097.

 *Second*, LCMs are disproportionately used in mass shootings and violence against police.  *See* DX-20 at 799-807.  Researchers have found that LCMs have been used in a substantial number of public mass shootings over the last 30 years.  DX-4 at 129-30 (noting that 86% of public mass shootings in which magazine capacity was known involved an LCM); DX-10 at 514 (finding that LCMs were used in 65% of public mass shootings with known capacity and 56% of public mass shootings if it is assumed that incidents with unknown capacity did not involve LCMs); DX-18 at 779.[13]  LCMs have also featured prominently in violence against police.  *See Kolbe*, 849 F.3d at 127; *Heller II*, 670 F.3d at 1263; DX-4 at 143 ("For the period of 2009 through 2013, LCM firearms constituted 41% of guns used in murders of police, with annual estimates ranging from 35% to 48%."); *see also id.* at 125, 127, 299, 311, 316, 414-15; DX-18 at 782-83; Graham Decl. ¶¶ 19(c)-(d), (e); Declaration of Ken James in Opposition to Plaintiffs' Motion for Summary Judgment ("James Decl.") ¶ 7; DX-6 at 462-63; DX-34 at 1380; DX-35 at 1394-95; DX-31 at 1307, 1313-15; DX-36 at 1411.  And prior to the Federal Ban, LCMs were used in 14% to 26% of gun crimes.  DX-14 at 684; DX-4 at 130.  Thus, as the

---

more injuries per victim increases the lethality of a mass shooting.

 [13] This analysis is based on the *Mother Jones* survey of public mass shootings, which is arguably the most comprehensive compilation of public mass shootings in the county.  DX-10 at 510-12; DX-37 at 1415 (describing the methodology employed by *Mother Jones*).  The *Mother Jones* survey has been cited favorably in numerous cases upholding LCM bans under the Second Amendment. *See N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo*, 990 F. Supp. 2d 349, 369 (W.D.N.Y. 2013); *Kolbe v. O'Malley*, 42 F. Supp. 3d 768, 780 & n.17 (D. Md. 2014); *Shew v. Malloy*, 994 F. Supp. 2d 234, 250 (D. Conn. 2014).

California Police Chiefs Association has recognized, "justifiable reasons exist for limiting magazine capacity" to ten rounds of ammunition.  James Decl. ¶ 10.

   **Third**, the evidence also indicates that because shooters limited to ten-round magazines must reload or switch weapons more frequently, the prohibition of LCMs helps create a "critical pause" that has been proven to give victims an opportunity to hide, escape, or disable a shooter.  *Kolbe*, 849 F.3d at 128 (discussing the "important lesson" learned from several mass shootings regarding pauses); *Heller II*, 670 F.3d at 1264 (discussing "critical benefit" of "2 or 3 second pause" in mass shootings); *Colo. Outfitters*, 24 F. Supp. 3d at 1072-73; DX-2 at 42-43; DX-3 at 82-83.  For example, several children at Sandy Hook Elementary School were able to escape while the shooter reloaded his assault rifle.  *See id.*; DX-11 at 526-29.  And victims of the Las Vegas shooting were able to use the pauses in the shooting to seek cover.  DX-2 at 42; DX-11 at 530-33 (discussing the pauses during the Las Vegas shooting).  "[L]imiting a shooter to a ten-round magazine could mean the difference between life and death for many people." *Kolbe*, 849 F.3d at 128.

   **Fourth**, banning LCMs, including their possession, has the greatest potential to "prevent and limit shootings in the state over the long-run."[14]  *NYSRPA*, 804 F.3d at 264 (citing the opinion of Defendant's expert, Christopher Koper); *accord Wiese*,

_____

[14] Plaintiffs' insistence that Defendant prove that Section 32310 "will in fact" achieve the State's goals and "will reduce violent crime, generally, or mass shootings, more specifically," Mem. at 13:13-15, 14:18-20, misstates Defendant's burden.  Defendant is not required to prove that Section 32310 will, in fact, eliminate or affect gun violence or mass shootings, that there is scientific consensus as to the optimal way to reduce the dangerous impact of LCMs, or that Section 32310 will not be circumvented by criminals.  *See Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 390-91, 393-94 (2000); *Turner*, 512 U.S. at 666; *Silvester*, 843 F.3d at 827-29; *Fyock*, 779 F.3d at 1001-01.  Defendant need only demonstrate that the State "has drawn reasonable inferences based on substantial evidence."  *Turner*, 512 U.S. at 666.  Thus, Plaintiffs' expert's opinion that California's LCM ban has not had a "statistically significant" impact on violent crime in California, *see* PX-4 at 115, does not undermine the law's constitutionality.  In fact, that expert testified that even a regulation that has no "statistically significant" impact could still have "a real world effect."  DX-7 at 468.

19

263 F. Supp. 3d at 992-93; DX-4 at 124, 136-37; DX-18 at 790-91; DX-33 at 1376 (concluding that "restrictions on LCMs may have greater potential for preventing gunshot [victimizations] than has been previously estimated"). A reduction in the number of LCMs in circulation will reduce the number of crimes in which LCMs are used, thereby reducing the lethality and devastation of gun crime when it does occur. *See* DX-4 at 124; James Decl., Ex. A at 2; DX-18 at 790-91. A comprehensive study of the effect of the Federal Ban demonstrates that it reduced the use of LCMs in gun crimes and that it would have had an even more substantial impact had it not expired in 2004. DX-4 at 139-41; DX-18 at 784, 791; DX-31 at 1307-08. While the use of LCMs initially remained steady or increased after the Federal Ban went into effect, due in large part to the massive stock of grandfathered and imported magazines exempted under the Federal Ban, LCM use in crime appeared to be decreasing by the early 2000s. DX-4 at 139-40; DX-18 at 785-86, 791. A later investigation by the *Washington Post*, using more current data on the use of LCMs in crime in Virginia, found that while the Federal Ban was in effect, crime guns with LCMs recovered by police declined from between 13% to 16% in 1994 to a low of 9% by 2004. DX-4 at 140-41; DX-38 at 1419-21; DX-39 at 1424; DX-34 at 1380. This investigation also determined that once the Federal Ban expired in 2004, recovered crime guns with LCMs more than doubled. DX-4 at 140-41; DX-18 at 788-89; DX-39 at 1424; DX-34 at 1380. Section 32310, which is far more robust than the Federal Ban, can reasonably be expected to be more effective in reducing LCM use and its consequent harms. DX-4 at 147-48.

**Fifth**, Section 32310 exhibits a reasonable fit to the government's important interests because LCMs are not necessary to exercise "the fundamental right of self defense of the home." *Silvester*, 843 F.3d at 821; *see also Fyock*, 779 F.3d at 1000-01; *Kolbe*, 849 F.3d at 127; *S.F. Veteran Police Officers*, 18 F. Supp. 3d at 1003-04; *Colo. Outfitters*, 24 F. Supp. 3d at 1070; DX-18 at 783-84; DX-15 at 699; James Decl. ¶ 8; DX-40 at 1437 (noting that most defensive-gun uses result in few

20

1    if any shots being fired).[15]  Plaintiffs' argument to the contrary is without any

2    evidentiary basis.  There is simply no study or systematic data to suggest that

3    LCMs are necessary for self-defense.  DX-18 at 783; DX-8 at 490 (testifying that

4    "no one has studied" whether more than ten rounds are required for self-defense).

5    In fact, LCMs have been illegal to acquire in California since 2000, and Plaintiffs

6    provide no evidence that anyone has been unable to defend themselves in California

7    on account of that nearly two-decade ban.  *See* DX-5 at 453 (testifying that "[s]ome

8    may have," without knowing of any examples).  Nor do any of the individual

9    plaintiffs claim that they have actually needed an LCM to engage in lawful self-

10   defense.  *See* Dkt. Nos. 50-3–50-7.  Indeed, the National Rifle Association's

11   ("NRA") Armed Citizen reports confirm that far fewer than ten rounds are

12   expended when individuals defend themselves with guns.  *Kolbe*, 849 F.3d at 127;

13   DX-41 at 1440-43; DX-1 at 8-11 (finding that the NRA's reports from January

14   2011 to May 2017 involved an average of 2.2 rounds fired).[16]  For these reasons,

15   courts that have examined the civilian use of LCMs for self-defense have found

16   evidence of such use to be lacking.  *See NYSRPA*, 804 F.3d at 263; *Hightower*, 693

17   F.3d at 66, 71; *Heller II*, 670 F.3d at 1262.

18        ***Finally***, Section 32310's ban on possession, in particular, has a reasonable fit

19   to the State's important interests.  Even lawfully possessed LCMs can be lost or

20   stolen and thereafter used in mass murder.  *See, e.g.*, DX-17 at 749 (noting that the

21   Sandy Hook shooter stole his mother's lawfully acquired guns and LCMs before

22        [15] Plaintiffs' evidence regarding the use of LCMs by law enforcement
     officers, *see, e.g.*, PX-2 at 32-36, PX-64 at 943-46, does not establish that LCMs
23   are necessary for civilian self-defense because peace officers require firearms that
     are appropriate for the effective enforcement of the law and the protection of
24   themselves and the public.

25        [16] A comprehensive review of news stories published from January 2011 to
     May 2017 indicated that an average 2.34 shots are fired in self-defense in the home.
26   DX-1 at 11-15.  Plaintiffs' expert, Professor Gary Kleck, attempted to criticize this
     supplementary analysis by claiming that Defendant's expert, Lucy Allen, relied on
27   a "needlessly small" random sample of 200 news stories.  PX-3 at 45-46.  Professor
     Kleck misunderstood the methodology of the analysis, as the sample size was 1,400
28   random news articles from a pool of 35,000 stories.  DX-1 at 12.

murdering her and 26 other victims).  Additionally, the evidence indicates that the

prior version of Section 32310 was "very difficult to enforce."  DX-14 at 684;

*accord* DX-42 at 1452-53; Graham Decl. ¶¶ 31-32.  Reflecting on this difficulty,

the Los Angeles Police Department continued to recover guns equipped with LCMs

in the years after the 2000 restrictions were enacted, a trend that is consistent with

the experience of other jurisdictions that have prohibited the sale, but not

possession, of LCMs.  DX-36 at 1409-10; Graham Decl. ¶¶ 24-32.  Section 32310

eliminates these impediments to enforcement and strengthens existing law, as there

will be no longer be a need for law enforcement to guess which LCMs are

"grandfathered" and which were acquired illegally.  Graham Decl. ¶¶ 24-32; *see*

*also Wiese*, 263 F. Supp. 3d at 993 ("[A]fter the 2004 federal ban on large capacity

magazines was lifted, the illegal importation of LCMs into California increased,

giving further impetus to California's efforts to ease enforcement of its existing

ban.  The proposed [possession] ban will facilitate that effort.").

For these reasons, even if LCMs are protected under the Second Amendment

(and they are not), Plaintiffs are not entitled to judgment as a matter of law on their

Second Amendment claim.

## II.   SECTION 32310 DOES NOT VIOLATE THE TAKINGS CLAUSE.

The Takings Clause of the Fifth Amendment, made applicable to the states

through the Fourteenth Amendment, provides that private property shall not "be

taken for public use, without just compensation."  *Lingle v. Chevron U.S.A., Inc.*,

544 U.S. 528, 536 (2005).  Its purpose is to prohibit the "[g]overnment from forcing

some people alone to bear public burdens which, in all fairness and justice, should

be borne by the public as a whole."  *Penn Central Transp. Co. v. City of N.Y.*,

438 U.S. 104, 123 (1978) (quotation omitted).  Takings claims are divided into two

classes: physical and regulatory takings.  A physical taking occurs when the

government physically invades or takes title to property either directly or by

authorizing others to do so.  *Loretto v. Teleprompter Manhattan CATV Corp.*,

22

458 U.S. 419, 426 (1982).  By contrast, a regulatory taking occurs where "government regulation of private property [is] so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537. Government regulation that completely deprives an owner of all economically beneficial use of property is generally deemed to be a taking compensable under the Fifth Amendment. *Id.* at 538.  In their Motion, Plaintiffs argue that Section 32310 as applied to individuals who own LCMs legally in the State constitutes a physical taking without compensation.  Mem. at 19:12-23:9.  Plaintiffs' takings claim fails as a matter of law.  *See Wiese*, 263 F. Supp. 3d at 995-97 (rejecting takings challenge to Section 32310's possession ban).

In a physical taking, the government exercises its eminent domain power to take private property for "public use." S*ee Lingle*, 544 U.S. at 536.  By contrast, where, as here, the government acts pursuant to its police power to protect the safety, health, and general welfare of the public, a prohibition on possession of property declared to be a public nuisance is not a physical taking.  *See Chi., B. & Q. R. Co. v. Illinois*, 200 U.S. 561, 593-594 (1906) ("It has always been held that the legislature may make police regulations, although they may interfere with the full enjoyment of private property, and though no compensation is given."); *Silveira v. Lockyer*, 312 F.3d 1052, 1092 (9th Cir. 2002); *Am. Sav. & Loan Ass'n v. Cnty. of Marin*, 653 F.2d 364, 368 (9th Cir. 1981).

Recognizing this distinction, courts have rejected takings challenges to laws banning the possession of dangerous weapons.  *See Akins v. United States*, 82 Fed. Cl. 619, 623-24 (2008) (restrictions on sale and possession of machine guns not a taking); *Fesjian v. Jefferson*, 399 A.2d 861, 866 (D.C. Ct. App. 1979) (ban on machine guns with various disposal options not a taking).  Courts have also rejected takings challenges more generally where the government prohibits property found to be harmful or dangerous.  *See, e.g.*, *Wilkins v. Daniels*, 913 F. Supp. 2d 517, 543 (S.D. Ohio 2012), *aff'd*, 744 F.3d 409, 418-19 (6th Cir. 2014).

23

1   Unlike those cases in which the government has permanently and physically

2   occupied or appropriated private property for its own use, *see Horne v. Dep't of*

3   *Agric.*, 135 S. Ct. 2419, 2427-29 (2015); *Loretto*, 458 U.S. at 432, 434-35, Section

4   32310 is a valid exercise of the State's police power to protect the public by

5   eliminating the dangers posed by LCMs.  The purpose of the statute is to remove

6   LCMs from circulation in the state, not to transfer title to the government or an

7   agent of the government for use in service of the public good.  § 32310(d).  Further,

8   owners are allowed to modify their LCMs permanently to hold less than ten rounds,

9   which would allow them to retain the core function of their magazines.  § 16740(a).

10  Accordingly, Section 32310 cannot constitute a physical taking as a matter of law.[17]

11  ### III.  SECTION 32310 DOES NOT VIOLATE THE DUE PROCESS CLAUSE.

12  As with their takings claim, Plaintiffs' due process challenge to the possession

13  ban in Section 32310 fails as a matter of law.  While a regulation that fails to serve

14  *any* legitimate governmental objective may be so arbitrary or irrational that it runs

15  afoul of the Due Process Clause, Section 32310, as discussed, serves important

16  public safety goals.  Regulations "survive a substantive due process challenge if

17  they were *designed to* accomplish an objective within the government's police

18  power, and if a rational relationship existed between the provisions and purpose" of

19  the regulations.  *Levald, Inc. v. City of Palm Desert*, 998 F.2d 680, 690 (9th Cir.

20  1993) (quotation omitted).  The "threshold for a rationality review challenge asks

21  only whether the enacting body could have rationally believed at the time of

22  enactment that the law would promote its objective."  *MHC Fin. Ltd. P'ship*, 714

23

24   _____

     [17] Plaintiffs' only reference to a regulatory taking is in a footnote, in which
25   they claim that the options to sell LCMs or move them out of state, if characterized
     as a regulatory taking, would produce the same result.  Mem. at 21 n.8.  Plaintiffs
26   have not demonstrated either a sufficient loss of value or any meaningful
     interference with distinct investment-backed expectations in LCMs that were
27   acquired decades ago, especially where they are permitted to modify their
     magazines permanently.  *See Penn Central*, 438 U.S. at 123; *MHC Fin. Ltd. P'ship
28   v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013).

24

Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or,
Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

F.3d at 1130-31 (internal quotation omitted); *see also Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 15 (1976) (noting that "the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.").[18]

As discussed, the possession ban enacted by Proposition 63 was a valid exercise of the State's police powers.  Plaintiffs contend that applying the LCM ban "retroactively"[19] to individuals who have complied with the ban since 2000 "does not further [the government's interest] in any meaningful way" because applying the LCM ban to lawful owners of LCMs will not have "a tangible public safety benefit."  Mem. at 24:11-14.  This misses the point of the public safety interest. The assailants in many mass shootings were "law-abiding citizens" who legally obtained their firearms before using them to slaughter innocent people.  DX-10 at 515-18; DX-16 at 722-36; DX-43 at 1471-77.  Legally owned LCMs can also be lost or stolen before being used to commit mass violence.  *See, e.g.*, DX-17 at 749. In any event, the possession ban was enacted not only to ensure that grandfathered LCMs are not used in gun violence, but also to enable the effective enforcement of Section 32310's existing LCM restrictions.  *See supra* Section I.B.2 at pp. 22. Thus, Plaintiffs are not entitled to judgment on their due process claim.

## CONCLUSION

For these reasons, Defendant respectfully requests that the Court deny Plaintiffs' Motion.

---

[18] In support of their due process claim, Plaintiffs' incorrectly cite *Eastern Enterprises v. Apfel*, 524 U.S. 498 (1998).  Mem. at 23:17-25, 24:19-20 (incorrectly cited as a majority opinion).  The quoted material was taken from the *syllabus*, which describes Justice Kennedy's *concurrence*, not the plurality opinion.  The plurality opinion held only that the statute in question violated the Takings Clause, not the Due Process Clause.  524 U.S. at 538.

[19] Plaintiffs incorrectly characterize the possession ban as retroactive.  Mem. at 24:2-5.  Section 32310(c) and (d) apply *prospectively* and do not penalize anyone for past conduct; the statute does, however, impose penalties for individuals who fail to comply with Section 32310(d) by a future date.

25

Dated:  April 9, 2018                    Respectfully Submitted,

                                         XAVIER BECERRA
                                         Attorney General of California
                                         MARK R. BECKINGTON
                                         Supervising Deputy Attorney General
                                         ANTHONY P. O'BRIEN
                                         Deputy Attorney General


                                         /s/ John D. Echeverria

                                         JOHN D. ECHEVERRIA
                                         Deputy Attorney General
                                         *Attorneys for Defendant Attorney*
                                         *General Xavier Becerra*

Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or,
Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)