1    XAVIER BECERRA
     Attorney General of California
2    State Bar No. 118517
     MARK R. BECKINGTON
3    Supervising Deputy Attorney General
     State Bar No. 126009
4    ANTHONY P. O'BRIEN
     Deputy Attorney General
5    State Bar No. 232650
     JOHN D. ECHEVERRIA
6    Deputy Attorney General
     State Bar No. 268843
7      300 South Spring Street, Suite 1702
       Los Angeles, CA  90013
8      Telephone:  (213) 269-6249
       Fax:  (213) 897-5775
9      E-mail:  John.Echeverria@doj.ca.gov
     *Attorneys for Defendant Attorney General*
10   *Xavier Becerra*

11            IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16   **VIRGINIA DUNCAN, RICHARD**         17-cv-1017-BEN-JLB
     **LEWIS, PATRICK LOVETTE,**
17   **DAVID MARGUGLIO,**                 **EXHIBITS 7-11 TO THE**
     **CHRISTOPHER WADDELL, and**         **DECLARATION OF JOHN D.**
18   **CALIFORNIA RIFLE & PISTOL**        **ECHEVERRIA IN SUPPORT OF**
     **ASSOCIATION, INC., a California**  **DEFENDANT'S OPPOSITION TO**
     **corporation,**                    **PLAINTIFFS' MOTION FOR**
19                                        **SUMMARY JUDGMENT OR,**
                                          **ALTERNATIVELY, PARTIAL**
20                        Plaintiffs,     **SUMMARY JUDGMENT**

21        v.                              Date:         April 30, 2018
                                          Time:         10:30 a.m.
22   **XAVIER BECERRA, in his official**  Judge:        Hon. Roger T. Benitez
     **capacity as Attorney General of the**  Courtroom:    5A
23   **State of California; and DOES 1-10,**  Action Filed:  May 17, 2017

24                        Defendant.

25

26

27

28

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for
Summary Judgment  or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

## EXHIBITS
## TABLE OF CONTENTS

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 1 | Expert Report of Lucy P. Allen | 00001-00033 |
| 2 | Expert Rebuttal Report of John J. Donohue | 00034-00072 |
| 3 | Revised Expert Report of Louis J. Klarevas | 00073-00120 |
| 4 | Expert Report of Christopher S. Koper | 00121-00433 |
| 5 | Transcript of Deposition of Stephen Helsley (Excerpts) | 00434-00456 |
| 6 | Transcript of Deposition of Blake Graham, (Excerpts) | 00457-00463 |
| 7 | Transcript of Deposition of Carlisle Moody (Excerpts) | 00464-00480 |
| 8 | Transcript of Deposition of Gary Kleck (Excerpts) | 00481-00492 |
| 9 | Transcript of Deposition of Christopher S. Koper (Excerpts) | 00493-00501 |
| 10 | Transcript of Deposition of Lucy P. Allen (Excerpts & Ex. 7) | 00502-00518 |
| 11 | Transcript of Deposition of Louis J. Klarevas (Excerpts) | 00519-00533 |
| 12 | Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (ATF), *Recommendation on the Importability of Certain Semiautomatic Rifles* (1989) | 00534-00553 |
| 13 | Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (ATF), *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* (1998) | 00554-00680 |
| 14 | Sen. Bill No. 1446, 3d Reading Analysis, Mar. 28, 2016 (2015-2016 Reg. Sess.) (Cal. 2016) | 00681-00684 |

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment  or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

| Exhibit | Description | Page(s) |
|---|---|---|
| 15 | Prepared Testimony by Laurence H. Tribe, *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment: Hearing Before the Subcomm. on the Constitution, Civil Rights and Human Rights, S. Comm. on the Judiciary* (Feb. 12, 2013) Rights, *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment* (2013). | 00685-00721 |
| 16 | Mark Follman, et al., *U.S. Mass Shootings, 1982-2018: Data from Mother Jones' Investigation* (Mother Jones, 2018) | 00722-00736 |
| 17 | Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* (2013) | 00737-00772 |
| 18 | Declaration of Professor Daniel Webster in Support of Defendant Xavier Becerra's Opposition to Plaintiffs' Motion for Preliminary Injunction (June 5, 2017) (Dkt. No. 15) | 00773-00792 |
| 19 | Larry Buchanan, et al., *Nine Rounds a Second: How the Las Vegas Gunman Outfitted a Rifle to Fire Faster*, N.Y. Times, Oct. 5 2017 | 00793-00797 |
| 20 | Violence Policy Center, *High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States* (2018) | 00798-00807 |
| 21 | Alex Yablon, *Bans on High-Capacity Magazines, Not Assault Rifles, Most Likely to Limit Shooting Carnage*, The Trace, June 13, 2016 | 00808-00811 |
| 22 | State of Connecticut, Division of Criminal Justice, *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School* (2013) | 00812-00860 |

9

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

| Exhibit | Description | Page(s) |
|---|---|---|
| 23 | Mark Follman, *More Guns, More Mass Shootings—Coincidence?*, Mother Jones, Dec. 15, 2012 | 00861-00867 |
| 24 | Louis Klarevas, Rampage Nation: Securing America from Mass Shootings (2016) (Excerpts) | 00868-00898 |
| 25 | Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) | 00899-00904 |
| 26 | H.R. Rep. No. 103-489 (1994) | 00905-00981 |
| 27 | The Safety for All Act of 2016, 2016 Cal. Legis. Serv. Proposition 63 (West) | 00982-01011 |
| 28 | Sandy Hook Advisory Comm'n, *Final Report of the Sandy Hook Advisory Commission* (2015) | 01012-01289 |
| 29 | *LAPD Chief Backs Ban on Some Ammo Magazines*, NBC So. Cal., Mar. 2, 2011 | 01290-01294 |
| 30 | C. S. Koper & D. C. Reedy, *Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers*, 9 Injury Prevention 151 (2003) | 01295-01300 |
| 31 | Brady Center to Prevent Gun Violence, Assault Weapons: 'Mass Produced Mayhem' (2008) | 01301-01364 |
| 32 | Testimony of Brian J. Siebel, Senior Attorney, Brady Center to Prevent Gun Violence, Before the Council of the District of Columbia (Oct. 1, 2008) | 01365-01372 |
| 33 | Christopher S. Koper et al., *Gunshot Victimisations Resulting from High-Volume Gunfire Incidents in Minneapolis: Findings and Policy Implications*, Injury Prevention, Feb. 24, 2018 | 01373-01377 |

10

| Exhibit | Description | Page(s) |
|---|---|---|
| 34 | Nat. Law Enforcement P'ship to Prevent Gun Violence, Protecting Communities from Assault Weapons and High-capacity Ammunition Magazines (2017) | 01378-01382 |
| 35 | Declaration of San Francisco Police Department Officer Joseph Emanuel in Support of Plantiff's Ex Parte Application for Order to Show Cause Re: Preliminary Injunction, *People v. Badger Mountain Supply, et al.*, No. CGC-17-557010 (S.F. Super. Feb. 21, 2017) | 01383-01402 |
| 36 | Declaration of Detective Michael Mersereau of the Los Angeles Police Department in Support of Amici Curiae the City and County of San Francisco, the City of Los Angeles, and the City of Sunnyvale, *Duncan v. Becerra*, 9th Cir. No. 17-56081 (9th Cir. Oct. 19, 2017) | 01403-01412 |
| 37 | Mark Follman, et al., *A Guide to Mass Shootings in America*, Mother Jones (last updated Mar. 10, 2018, 9:00 AM) | 01413-01417 |
| 38 | David S. Fallis & James V. Grimaldi, *Va. Data Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan. 23, 2011 | 01418-01422 |
| 39 | David S. Fallis, *Data Indicate Drop in High-Capacity Magazines During Federal Gun Ban*, Wash. Post, Jan. 10, 2013 | 01423-01427 |
| 40 | Gary Kleck, Point Blank: Guns and Violence in America (1991) (Excerpts) | 01428-01437 |
| 41 | Claude Werner, *The Armed Citizen - Analysis of Five Years of Armed Encounters*, GunsSaveLives.com (Mar. 12, 2012) | 001438-01445 |

11

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 42 | California Voter Information Guide, Firearms. Ammunition Sales. Initiative Statute. California Proposition 63 (2016) | 01446-01469 |
| 43 | Larry Buchanan, et al., *How They Got Their Guns*, N.Y. Times, Nov. 5, 2017) | 01470-01478 |

12

# Exhibit 7

Exhibit 7
Page 00464

```
 1          IN THE UNITED STATES DISTRICT COURT

 2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   -------------------------:

 4   VIRGINIA DUNCAN, et al.,  :

 5                 Plaintiff, :Case No.

 6   v.                       :17-cv-1017-BEN-JLB

 7   XAVIER BECERRA, in his   :

 8   official capacity as     :

 9   Attorney General of the  :

10   State of California, et   :

11   al.,                     :

12                 Defendants.:

13   -------------------------:

14          Deposition of CARLISLE MOODY taken at the

15   offices of Kirkland & Ellis, LLP, 655 Fifteenth

16   Street, NW, Washington, DC on Tuesday, January 2,

17   2018, beginning at 10:00 a.m. before Sydney R.

18   Crawford, a Notary Public in and for the District of

19   Columbia.

20
     ATKINSON-BAKER, INC. COURT REPORTERS
21   (800) 288-3376
     www.depo.com
22   REPORTED BY:  Sydney R. Crawford
```

Carlisle Moody
January 2, 2018

Exhibit 7
Page 00465

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4         ANNA M. BARVIR, ESQUIRE

 5         Michel & Associates

 6         180 East Ocean Boulevard

 7         Suite 200

 8         Long Beach, California 90802

 9

10

11    ON BEHALF OF THE DEFENDANT:

12         ALEXANDRA ROBERT GORDON, ESQUIRE

13         Deputy Attorney General

14         455 Golden Gate Avenue

15         Suite 1100

16         San Francisco, California 94102

17

18

19

20

21

22
```

2

Atkinson-Baker Court Reporters
www.depo.com

```
 1                    P R O C E E D I N G S

 2                           *    *    *

 3  WHEREUPON,

 4                      CARLISLE MOODY

 5      called as a witness, having been first duly

 6  sworn to tell the truth, the whole truth, and

 7  nothing but the truth, was examined and testified as

 8  follows:

 9

10           EXAMINATION BY COUNSEL FOR THE DEFENDANT

11  BY MS. GORDON:

12      Q.   Good morning, Professor Moody.  Do you

13  prefer Professor Moody or Dr. Moody?

14      A.   Either one.

15      Q.   Either one?

16      A.   Professor is what I hear most of at the

17  school, so let's go with that.

18      Q.   I'm Alexandra Robert Gordon, and I

19  represent the defendant, Attorney General Xavier

20  Becerra in this matter.  We haven't met before

21  today; correct?

22      A.   Correct.
```

4

Carlisle Moody
January 2, 2018

Exhibit 7

1   number?

2        A.   Yes.  Yes.

3        Q.   And what is -- what is a P value?

4        A.   P value is that number, .05.  In other

5   words, if you're two standard deviations away from

6   the mean, the P value is .05, which simply means

7   that there's less than, there's a 5 percent chance.

8   Only a 5 percent chance that the number would be

9   that far away from the mean and still actually be

10  zero.

11       Q.   Okay.  So can you infer -- let's say you

12  have a P value greater than .05.  Can you infer an

13  absence of causation from that?

14       A.   It is indicative of no causation.

15       Q.   Is it possible that something could have a

16  real world effect, though, and not be statistically

17  significant?

18       A.   Yes.

19       Q.   Okay.  Does the size of sample, sample

20  size of data affect the calculation of statistical

21  significance?

22       A.   Uh-hum.  Yes, it does.

Atkinson-Baker Court Reporters
www.depo.com

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3   --------------------------:

4   VIRGINIA DUNCAN, et al.,  :

5                   Plaintiff, :Case No.

6   v.                        :17-cv-1017-BEN-JLB

7   XAVIER BECERRA, in his    :

8   official capacity as      :

9   Attorney General of the   :

10  State of California, et    :

11  al.,                      :

12                  Defendants.:

13  --------------------------:

14      The Continued Deposition of CARLISLE MOODY taken

15  at the offices of Kirkland & Ellis, LLP, 655

16  Fifteenth Street, NW, Washington, DC on Thursday,

17  January 4, 2018, beginning at 9:00 a.m. before

18  Sydney R. Crawford, a Notary Public in and for the

19  District of Columbia.

20  ATKINSON-BAKER, INC. COURT REPORTERS
    (800) 288-3376
21  www.depo.com
    REPORTED BY:  Sydney R. Crawford
22  FILE NO: AC000EE

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4         ANNA M. BARVIR, ESQUIRE

 5         Michel & Associates

 6         180 East Ocean Boulevard

 7         Suite 200

 8         Long Beach, California 90802

 9

10

11    ON BEHALF OF THE DEFENDANT:

12         ALEXANDRA ROBERT GORDON, ESQUIRE

13         Deputy Attorney General

14         455 Golden Gate Avenue

15         Suite 1100

16         San Francisco, California 94102

17

18

19

20

21

22
```

149

Exhibit 7
Page 00470

```
1                    P R O C E E D I N G S

2                          *    *    *

3   WHEREUPON,

4                     CARLISLE MOODY

5       called as a witness, having been first duly

6   sworn to tell the truth, the whole truth, and

7   nothing but the truth, was examined and testified as

8   follows:

9

10          EXAMINATION BY COUNSEL FOR THE DEFENDANT

11  BY MS. GORDON:

12      Q.   We are resuming the deposition of

13  Dr. Carlisle Moody.

14           Doctor Moody, since there's been sort of a

15  break, do you need me to go over the basic

16  admonitions or housekeeping rules, or do you

17  remember them?

18      A.   I remember them.

19      Q.   The most important would be to ask you, is

20  there any reason why you can't give truthful and

21  accurate testimony today?

22      A.   No.
```

151

```
 1              (Exhibit No. 12 was marked for

 2              identification.)

 3   BY MS. GORDON:

 4        Q.   Is this the paper that we've been talking

 5   about, about your sort of study on large capacity

 6   magazines?

 7        A.   Yes.

 8        Q.   Okay.  I understand that, you know, you

 9   feel that we're not talking about this, and we're

10   going to move off of this momentarily, but could you

11   please go to page 6, and do you see where it says

12   "Summary and Conclusion," Roman numeral III?

13        A.   Yes.

14        Q.   Could you just read the first full

15   sentence, please?

16        A.   Repeat, please.

17        Q.   The first sentence.  It starts, "Firearms

18   fitted with large capacity magazines."

19        A.   "Firearms fitted with large capacity

20   magazines can be used to cause death and injury in

21   public shooting incidents, and can also result in

22   more rounds fired and more homicides in general than
```

194

1    similar firearms with smaller magazines."

2         Q.    Okay.  And just in the interest of

3    fairness and completeness, you do go on in that

4    paragraph to include other ways that people can

5    wreak havoc as well; right?

6         A.    Yes.

7         Q.    Okay.  But I'm just curious, do you agree

8    with the first -- that sentence that -- that you

9    just read?

10        A.    Yes.  Yes.

11        Q.    And what was the basis for that statement?

12   How did you arrive at that conclusion?

13        A.    Just theoretically.

14        Q.    Theoretically.

15        A.    Theoretically, if you have more rounds in

16   a single place, you might be able to do a better job

17   of creating mayhem.

18        Q.    Did you -- so this is -- this is dated

19   February 2015.  So you would have written this

20   before you did your expert report in Colorado;

21   correct?

22        A.    Correct.

Exhibit 7
Page 00473

1   articles about these things, and I've been doing

2   statistical analyses of these problems for a while.

3        Q.   No.  Of course.  But you didn't do a

4   statistical analysis --

5        A.   No.  Not here.

6        Q.   -- for that question?

7        A.   No.  This is just an aspect of these

8   things that I was asked to investigate, and so I

9   said okay, why not, I'll do it.

10       Q.   Okay.  So I'm also sort of wondering since

11  you're a rebuttal expert, that opinion, what in

12  Koper and Klarevas does that rebut?

13       A.   If you're -- I don't know -- I'm not --

14  that's not clear to me.  I don't know.  I was asked

15  to do it and I did it.

16       Q.   I understand.  And so do you -- but do you

17  read anything, and I think you have the reports if

18  you want to review them, do you read anything in the

19  Koper or Klarevas reports as saying, you know, we

20  know that large capacity magazines that were

21  grandfathered have been used in mass shootings in

22  California?

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00474

Atkinson-Baker Court Reporters
www.depo.com

```
 1       A.    No.

 2       Q.    Opinion -- opinion 3.  So top of page 3.

 3   You say, "Bans on such magazines have no effect on

 4   violent crime."  And you say, "As illustrated by the

 5   results of the Washington Post study of firearms

 6   recovered by Virginia law enforcement."  So what --

 7   what data did you use to come to that conclusion?

 8       A.    Virginia Clearinghouse, Virginia -- I

 9   can't remember what it's called, but it's

10   essentially a clearinghouse where -- for criminal

11   weapons, weapons taken from criminals at the -- at

12   the time that they are under arrest -- were sent to

13   a place called a clearinghouse, where they were --

14   data on those weapons was kept by the state police.

15            And this relatively unique data set was

16   revealed by the Washington Post, they seemed to hear

17   about it and got ahold of it and made it public.

18       Q.    And is that data set limited to Virginia?

19       A.    Yes.  It is.

20       Q.    So you were relying on Virginia specific

21   data to come up with -- as a basis of this opinion;

22   correct?
```

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00475

1    levels.

2         Q.   And did you?

3         A.   No.  Essentially the same answer.

4         Q.   Essentially the same answer.  Okay.

5    Great.  All right.  Thank you.  I think now I

6    understand sort of the relationship between this and

7    how this basically works, more or less.  All right.

8              So let's look at I believe we are now on

9    page 6 of your report, and it's number 2,

10   "California's Violent Crime Rate."

11             So I don't want this to sound rude, but

12   I'm wondering sort of why you are offering an

13   opinion on the relationship between the acquisition

14   ban and California's violent crime rate.

15        A.   I believe I was asked at one point to do

16   that.  Why not.  And I said okay, fine.

17        Q.   Okay.  But is this meant to rebut opinions

18   that you found in Klarevas --

19        A.   Not directly, no.

20        Q.   Indirectly?

21        A.   Well, I mean I wonder whether an LCM ban

22   might have an effect on violent crime.

Exhibit 7
Page 00476

1      Q.    Okay.

2      A.    If violent criminals use large capacity

3  magazines.

4      Q.    Okay.  But is there something in either of

5  their reports, Dr. Koper or Dr. Klarevas that you

6  read as making -- as offering an opinion about the

7  violent crime rate, the large --

8      A.    No.

9            MS. BARVIR:  Objection.  Asked and

10  answered.

11           (Off the record.)

12  BY MS. GORDON:

13     Q.    So, first of all, I just want to make sure

14  I understand what you mean by "violent crime."  What

15  does that include?

16     A.    Murder rate, robbery and assault.

17     Q.    Including, I guess, gun assault as well?

18     A.    Yes.

19     Q.    Okay.  So it's not limited to only crimes

20  with large capacity magazines?

21     A.    No.

22     Q.    Okay.  So, I mean, that's going to include

1   research I did in this case presented in my report.

2        Q.   Okay.  What -- which research precisely

3   that you did for this case presented?

4        A.   Reading.  Reading all the reports, trying

5   to get, you know, some idea where these LCMs came

6   from, and whether they were likely to be somebody

7   who's three at the time in the year 2000 would

8   probably not store up a, not get an LCM as a present

9   from grandma and store it up until he shoots

10  somebody in 2012.

11       Q.   I should -- I should not hope not, yeah.

12            Have you looked at mass shootings that

13  occurred nationally during the federal assault

14  weapon ban?

15       A.   No.

16       Q.   So you don't know which mass shootings

17  occurred using grandfathered weapons; right, during

18  the assault weapon ban?

19       A.   No.

20       Q.   But you are aware that there were a

21  significant number of grandfathered weapons during

22  the federal assault weapon ban; correct?

1    A.   I -- I -- I do not have that data.  I

2    don't recall that data.

3    Q.   Okay.  So --

4    A.   I have no reason to disbelieve you.

5    Q.   Okay.  But so, then, just to be clear, the

6    data about how many grandfathered LCMs there were

7    during the assault weapons ban is not a factor in

8    any of the analysis that you've done?

9    A.   No.

10   Q.   Okay.  Is it possible that a stolen large

11   capacity magazine that was legally possessed within

12   California could be taken to another jurisdiction

13   and used in a mass shooting?

14   A.   It's possible, I suppose.

15   Q.   And so would that constitute a danger

16   created by a legally-possessed large capacity

17   magazine?

18   A.   What's a danger?  I mean, did this person

19   actually shoot somebody with it?

20   Q.   Yes.

21   A.   Oh, then it is a danger.

22   Q.   It's a hypothetical.  I'm not saying that

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00479

Atkinson-Baker Court Reporters
www.depo.com

1    that happened.

2         A.   The mere fact that it's stolen does not

3    constitute a danger, it's the -- it's the reason for

4    the use after it's stolen that constitutes the

5    danger.

6         Q.   Okay.  So let's move on to your section C.

7    Right.  So, again, this is also work that you did

8    originally for the Weise case; correct?

9         A.   No.

10        Q.   You didn't present information in the

11   Weise case?

12        A.   I did.  Oh, no.  Originally, it was -- it

13   was the research paper that --

14        Q.   The SSRN?

15        A.   The SSRN paper, yes.

16        Q.   Oh, okay.  So that's back in 2015 --

17        A.   Yes.  And I just -- this is just a -- yes.

18   That was back in 2015 and this is a reanalysis of

19   the same data.

20        Q.   So -- of the same data.  Did you add to

21   the data?

22        A.   No.

Carlisle Moody Vol. II
January 4, 2018

Exhibit 7
Page 00480

# Exhibit 8

Exhibit 8
Page 00481

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3    --------------------------:

 4    VIRGINIA DUNCAN, et al.,   :

 5                   Plaintiff, :Case No.

 6    v.                         :17-cv-1017-BEN-JLB

 7    XAVIER BECERRA, in his     :

 8    official capacity as       :

 9    Attorney General of the    :

10    State of California, et    :

11    al.,                       :

12                   Defendants.:

13    --------------------------:

14          Deposition of GARY KLECK taken at the

15    offices of Kirkland & Ellis, LLP, 655 Fifteenth

16    Street, NW, Washington, DC on Wednesday, January 3,

17    2018, beginning at 9:00 a.m. before Sydney R.

18    Crawford, a Notary Public in and for the District of

19    Columbia.

20    ATKINSON-BAKER, INC. COURT REPORTERS
      (800) 288-3376
21    www.depo.com
      REPORTED BY:  Sydney R. Crawford
22    FILE NO: AB0D9A1
```

Atkinson-Baker Court Reporters
www.depo.com

```
 1    APPEARANCES:

 2

 3    ON BEHALF OF THE PLAINTIFF:

 4         ANNA M. BARVIR, ESQUIRE

 5         Michel & Associates

 6         180 East Ocean Boulevard

 7         Suite 200

 8         Long Beach, California 90802

 9

10

11    ON BEHALF OF THE DEFENDANT:

12         JOSE ZELIDON-ZEPEDA, ESQUIRE

13         Deputy Attorney General

14         455 Golden Gate Avenue

15         Suite 11000

16         San Francisco, California 94102

17

18

19

20

21

22
```

2

Gary Kleck
January 3, 2018

Exhibit 8
Page 00483

```
 1                    P R O C E E D I N G S

 2                         *    *    *

 3   WHEREUPON,

 4                    GARY KLECK

 5        called as a witness, having been first duly

 6   sworn to tell the truth, the whole truth, and

 7   nothing but the truth, was examined and testified as

 8   follows:

 9

10            EXAMINATION BY COUNSEL FOR THE DEFENDANT

11   BY MR. ZELIDON-ZEPEDA:

12        Q.   Good morning.

13        A.   Good morning.

14        Q.   My name is Jose Zelidon-Zepeda.  I'm a

15   Deputy Attorney General for the State of California.

16   You understand that you're here for your deposition

17   in a case called Duncan versus Becerra.

18        A.   Okay.

19            MR. ZELIDON-ZEPEDA:  Could counsel please

20   identify themselves for the record?

21            MS. BARVIR:  Anna Barvir, B-A-R-V-I-R,

22   counsel for the plaintiffs.
```

4

```
 1    the fraction that will involve large capacity

 2    magazines.  That much is true, something that both

 3    advocates and opponents agree on.

 4         Q.   And then the opposite is true as well;

 5    right?

 6              MS. BARVIR:  Objection.  Form.  Vague and

 7    ambiguous.  Go ahead and answer.

 8              THE WITNESS:  What opposite?  I mean

 9    the -- the opposite that it's frequent, that are

10    frequently involved?

11    BY MR. ZELIDON-ZEPEDA:

12         Q.   No. the opposite of if you define the --

13    if you define gun massacres in terms of a -- a lower

14    number of individuals who are dead, obviously that's

15    going to impact the percentage, and it goes that --

16         A.   Yes.  Sorry.  Go ahead.

17         Q.   No.  No.  I was done.

18         A.   Yes.  The lower -- the lower your

19    criterion, your cutoff for what constitutes a mass

20    shooting, the less likely it is large capacity

21    magazines will be involved.

22              Because the one thing that advocates of
```

Atkinson-Baker Court Reporters
www.depo.com

```
1   bans on large capacity magazines are correct about

2   is the statistical point that large capacity

3   magazines are more likely to show up -- not likely,

4   but relatively more likely to show up in cases with

5   larger numbers of victims.

6        Q.   Do you think large capacity magazine have

7   an impact on crimes other than mass massacres?

8             MS. BARVIR:  Object to the form.  Vague

9   and ambiguous.  Go ahead.

10  BY MR. ZELIDON-ZEPEDA:

11       Q.   You know, let me reframe my question.

12            Do you think that LCM use has an impact in

13  crimes other than gun massacres?

14       A.   I know of no affirmative evidence to

15  suggest that's the case, that there is such an

16  effect.

17       Q.   Have you affirmatively researched that

18  issue?

19       A.   No.  No.  That's not been a focus of any

20  of my research.  Others, however, have kind of

21  indirectly approached it by looking at whether bans

22  on large capacity magazines affect other kinds of
```

```
 1              Do you see that?

 2         A.   Are you referring to page 17 at the top

 3    few lines?

 4         Q.   Yeah, the second paragraph, the --

 5         A.   Oh, the second paragraph.

 6         Q.   Yes.  And if you need some time to look at

 7    it, because I know it's sort of interrelated, please

 8    go ahead and take some time.

 9         A.   No, I don't need any additional time.  I

10    mean, pointing out, I'm basically saying what I just

11    said, that there's another reading of what he was

12    intending, which is not, you know, the point that he

13    was actually making, that is to say I cite

14    Christopher Koper, who accurately notes that large

15    capacity magazines allow people to fire more rounds

16    without reloading, which is true.

17              Whereas Klarevas was making a distinct

18    point saying that while you had the gun loaded with

19    a large capacity magazine, you could fire more

20    rapidly than if you had a smaller capacity magazine

21    with the gun, which is not true at all and it's not

22    a claim that any other expert makes.
```

177

Exhibit 8
Page 00487

1      Q.   But if in fact that's not what Klarevas

2   was claiming, then your statement is false.

3      A.   Well, your -- you're pro -- you're posing

4   a false hypothetical.  I mean, there's no doubt that

5   he was not making the point about, you know, you

6   don't have to reload so often because he makes that

7   point separately.

8           And so there's -- aside from that, once we

9   can rule that out, there are no other readings that

10  would reasonably impose on what Klarevas said that

11  are accurate.  I mean, none at all.  I mean, if he

12  were here today he would not be able to rephrase it

13  in a way that makes it into an accurate statement,

14  unless he was simply making the same point twice,

15  and that's rather dishonest to make, as if you have

16  two points to make, when in fact you only have one

17  point to make, the point that you don't have to

18  reload so often with a large capacity magazine.

19     Q.   So it sounds, and I might have missed it

20  because there was a flurry of words, but it sounds

21  like you agree with the argument that LCMs allow

22  certain weapons to fire more than 10 rounds without

178

Gary Kleck
January 3, 2018

Exhibit 8
Page 00488

```
1    requiring the shooter to reload the weapon.

2         A.    I do.

3         Q.    And is it fair to say that you also agree

4    that victims who suffer multiple gunshot wounds are

5    more likely to die than those who suffer a single

6    wound?

7         A.    I do.

8         Q.    Going back to the previous point, ibid.

9    You stated that if Dr. Klarevas were to try to

10   explain what he meant regarding the -- the

11   facilitate firing comment, and reconcile that with a

12   later point that you say is a separate and distinct

13   point regarding firing multiple rounds, that that

14   would be, the word you used was "dishonest" or

15   something; is that correct?

16        A.    No.   What I said was dishonest was making

17   one point, but presenting it as if it's two separate

18   points.   As if you're creating a dishonest

19   impression of increasing the strength of your

20   argument.   Two valid points would be better than

21   just one valid point, but those are not two distinct

22   points.   He was -- or not two distinct valid points.
```

179

1   offender, and to shoot all let's say four offenders,

2   you'd obviously need a correspondingly larger number

3   of rounds.

4       Q.   Are you aware of any research that yields

5   these numbers regarding the rate at which defensive

6   gun requires the use of 10 or more bullets?

7       A.   To my knowledge no one has studied the

8   issue.  Me or anyone else.

9       Q.   So what is your basis for saying that this

10  is a scenario that's likely?

11      A.   Well, there are two solid reasons.  Number

12  one, we know that crime, violent crimes in which

13  victims face multiple offenders are commonplace, and

14  we know that from the National Crime Victimization

15  survey.

16           And number two, we know that it requires

17  considerably more than one round to shoot any one

18  offender.  We know that from two sources of

19  information -- well, really that's basically all one

20  source of information or one category of

21  information, which is how good police officers are

22  in their marksmanship in real world combat

Gary Kleck
January 3, 2018

Exhibit 8
Page 00490

1    Q.   On page 10 of your rebuttal report, you

2    state that shooters more intent on hurting many

3    people would prepare to do so by acquiring LCMs?

4    A.   Yes.

5    Q.   Why is that?

6    A.   Because of the belief, accurate or not,

7    that they can conflict more harm if they can fire

8    large numbers of rounds without reloading.

9    Q.   Did you perform any type of analysis in

10   order to derive this conclusion, or was this just a

11   common sense analysis or conclusion?

12   A.   Well, it's both common sense and sometimes

13   where there are surviving shooters they say

14   something to that effect.  In fact, I believe, one

15   of the defendants' experts quoted a defender as

16   saying he went to the gun dealer and told the gun

17   dealer that he wanted, you know, the deadliest

18   equipment that would allow him to shoot the largest

19   number of rounds, et cetera, et cetera.  So he was

20   in effect -- he wasn't admitting to an intent to

21   commit a mass murder, but he was saying that, yeah,

22   there's a connection between my desire to fire many

Gary Kleck
January 3, 2018

Exhibit 8
Page 00491

1  rounds and my desire to get a large capacity

2  magazine.

3       Q.   So isn't this like saying that having an

4  LCM enables an offender to cause more harm?

5       A.   No.  It only says that this is something

6  that offenders believe.

7       Q.   Okay.  Do you think it's an accurate or

8  inaccurate belief?

9       A.   It's inaccurate.

10      Q.   Is that because, as you discussed earlier,

11 an offender can just go ahead and not get a large

12 capacity magazine, but get the same amount of

13 bullets through smaller magazines?

14      A.   Right.  They can do everything that that

15 mass shooter might want to do if they had 10-round

16 magazines rather than 30-round magazines.  There's a

17 difference between hypothetical potential and the

18 reality of actual mass shootings, and the typical

19 mass shooter doesn't really, he's not done a study

20 of how mass shootings actually occur.

21           All he knows is yeah, I might be able to

22 fire many rounds with a large capacity magazine

324

# Exhibit 9

Exhibit 9
Page 00493

Page 1

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3    ------------------------------x

4    VIRGINIA DUNCAN, et al.,

5                  Plaintiffs,

6         v.                    Case No.

7    XAVIER BECERRA, in his         17-cv-1017-BEN-JLB

8    official capacity as Attorney

9    General of the State of

10   California,

11                 Defendant.

12   ------------------------------x

13

14

15      DEPOSITION OF CHRISTOPHER S. KOPER, PH.D.

16                 Washington, D.C.

17             Friday, January 5, 2018

18

19

20

21   Reported by:

22   Michele E. Eddy, CRR, RPR, CLR

23   JOB NO. 135559

24

25

Exhibit 9
Page 00494

Page 2

1

2

3

4                      Friday, January 5, 2018

5                           9:55 A.M.

6

7

8          Deposition of CHRISTOPHER S. KOPER,

9    PH.D., held at the offices of Kirkland & Ellis

10   LLP, 655 Fifteenth Street, Northwest, Washington,

11   D.C., pursuant to notice, before Michele E.

12   Eddy, a Registered Professional Reporter,

13   Certified Realtime Reporter, and Notary Public

14   of the state of Maryland, Commonwealth of

15   Virginia, and the District of Columbia.

16

17

18

19

20

21

22

23

24

25

Exhibit 9
Page 00495

Page 3

```
 1   APPEARANCES:

 2   MICHEL & ASSOCIATES

 3   Attorneys for Plaintiffs

 4   180 E. Ocean Boulevard, Suite 200

 5   Long Beach, California  90802

 6   BY:  ANNA BARVIR, ESQUIRE

 7

 8   STATE OF CALIFORNIA DEPARTMENT OF JUSTICE

 9   Attorneys for Defendants

10   455 Golden Gate Avenue

11   San Francisco, CA 94102

12   BY:  JOSE ZELIDON-ZEPEDA, ESQUIRE

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Exhibit 9
Page 00496

Page 4

1           P R O C E E D I N G S

2               Washington, D.C.

3               January 5, 2018

4                    - - -

5          CHRISTOPHER S. KOPER, Ph.D.,

6     having been duly sworn, testified as follows:

7               MS. BARVIR:  Good morning.  We're

8          here for the deposition of Dr. Christopher

9          Koper.

10                    EXAMINATION

11    BY MS. BARVIR:

12         Q     Could you state your name, your

13    title, and your business address for the

14    record, please.

15         A     Christopher Shawn Koper.  I'm an

16    associate professor at George Mason University

17    in Fairfax, Virginia.

18         Q     And just -- do you prefer if I call

19    you Dr. Koper or Professor Koper?  Which works

20    for you?

21         A     Either one.  Either is fine.

22         Q     My name is Anna Barvir.  I'm an

23    attorney for the plaintiffs in this matter

24    captioned Duncan v. Becerra.

25               What is your understanding of what

Exhibit 9
Page 00497

1    cases.

2         Q      What evidence, if any, do you have

3    that the presence of an LCM in a mass shooting

4    actually impacts the rate of fire, the amount

5    of time between shots in a mass shooting?

6              MR. ZELIDON-ZEPEDA:   Objection.

7         Compound.

8         A      There is -- and I suppose it's cited

9    in here.  I would have to look for it.  But I

10   know that there was -- in some of my writings,

11   we -- I or my colleagues have shown, at least

12   for some cases where data were available, that

13   the number of shots fired in cases involving

14   LCMs was higher -- substantially higher than in

15   other cases.  Then there's also the victim

16   counts.  The number of people shot and killed

17   in those cases that involve high-capacity

18   semiautomatics tends to be substantially larger

19   than in other mass shooting incidents.

20        Q      Right.  That suggests a higher number

21   of shots fired, right.  But what about the rate

22   of fire, like how much time is -- it takes

23   between shots in a mass shooting incident?

24        A      Well, the problem there is that you

25   have to know exactly -- to make clear

Exhibit 9
Page 00498

1    might be more likelihood of some retaliation

2    against the shooter or just generally slowing

3    down their rate of fire.

4        Q    What evidence do you have that that

5    actually happens in mass shooting events?

6        A    We largely infer it from the

7    statistics, from the results of the events.

8    It's also with reference to the broader

9    literature on weaponry effects on violent crime

10   outcomes.  There's been a good deal of research

11   looking at the impact that different weapons

12   have on the outcomes of attacks, and it

13   generally suggests that the type of weapon used

14   is important to determining the outcome even

15   independent of offender characteristics or

16   intent.

17       Q    Did you talk about those studies in

18   your expert report?

19       A    No, we haven't gotten into those.

20       Q    So can you say to a reasonable degree

21   of scientific probability that large-capacity

22   magazines are outcome determinative in how many

23   people are shot in a mass public shooting?

24       A    Well, what we can say in some of

25   these cases is that there have been statistical

Exhibit 9
Page 00499

1    tests of the differences in number of victims

2    across the two sets of cases and oftentimes

3    showing -- sometimes the differences are

4    examined in statistical tests, sometimes not.

5            In some of my recent work, we

6    actually did do a statistical test, and we

7    found that in those cases where a high-capacity

8    magazine was used, it was a statistically

9    significant difference with higher numbers of

10   victims in the LCM cases.

11           So we know that there is a

12   difference, and the question becomes what is

13   the mechanism of that, what is theoretically

14   the most likely mechanism.  I think many would

15   judge it as being the weaponry having an impact

16   on the outcome.

17       Q    Is this research in your 2017 report?

18       A    Yes.  Although I have -- I and others

19   have done comparisons of different types of

20   mass shootings as well.  So you don't have to

21   rely just on mine, but other people have done

22   that, too.

23       Q    Could you direct me to any of those

24   other people's sources?

25       A    First of all, there are some

Exhibit 9
Page 00500

1   different places throughout this report where I

2   have compared different subsets of attacks with

3   different types of weaponry.  I talked about

4   the work that -- some earlier comparisons that

5   I did that are contained in the 2004 report

6   based on looking at some mass shootings.

7   There's the work of Luke Dillon, who was a

8   master's student at George Mason who looked at

9   this issue.

10          I've seen in some different reports

11   that people have produced that they have

12   documented differences in number of people shot

13   in cases involving high-capacity versus other

14   weapons.  Again, there's my 2017.  So I've seen

15   that in some different places.  I've seen that

16   in some other academic work, I think, too, at

17   least as demonstrated differences in number of

18   people shot for assault weapon versus other

19   types of cases.

20      Q    On page 5 at the top, I'm just

21   bringing us back to the sentence we read

22   earlier about "semiautomatics equipped with

23   LCMs have frequently been employed in highly

24   publicized mass shootings and are

25   disproportionately used in the murders of law

Exhibit 9
Page 00501

# Exhibit 10

Exhibit 10
Page 00502

**In the Matter Of:**

VIRGINIA DUNCAN vs XAVIER BECERRA

17-cv-1017-BEN-JLB

**LUCY P. ALLEN**

*January 18, 2018*



800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 10

1

2            UNITED STATES DISTRICT COURT

3          SOUTHERN DISTRICT OF CALIFORNIA

4     ------------------------------------------x

5     VIRGINIA DUNCAN, et al.,

6                          Plaintiffs,

7           -against-   No. 17-cv-1017-BEN-JLB

8     XAVIER BECERRA, in his official capacity as

9     Attorney General of the State of California,

10                         Defendant.

11    ------------------------------------------x

12

13

14

15            DEPOSITION OF LUCY P. ALLEN

16               New York, New York

17            Thursday, January 18, 2018

18

19

20

21

22

23
      Reported by:
24    Aydil M. Torres, CSR
      JOB NO. J1035413
25



```
 1

 2

 3              January 18, 2018

 4              9:53 a.m.

 5

 6

 7         Deposition of LUCY P. ALLEN,

 8   held at the offices of Esquire

 9   Deposition Solutions, LLC, 1384

10   Broadway, New York, New York,

11   pursuant to Notice, before Aydil M.

12   Torres, a Notary Public of the

13   State of New York.

14

15

16

17

18

19

20

21

22

23

24

25
```



1

2

3

4    A P P E A R A N C E S:

5

6       MICHEL & ASSOCIATES, P.C.

7       Attorneys for Plaintiffs

8            180 East Ocean Boulevard, Suite 200

9            Long Beach, California 90802

10      BY:  ANNA M. BARVIR, ESQ.

11            NICHOLAS W. STADMILLER, ESQ.

12

13

14      STATE OF CALIFORNIA

15      DEPARTMENT OF JUSTICE

16      OFFICE OF THE ATTORNEY GENERAL

17      Attorneys for Defendant

18            300 South Spring Street, Suite 1702

19            Los Angeles, California 90013

20      BY:  JOHN D. ECHEVERRIA, ESQ.

21

22

23

24

25



1

2                    S T I P U L A T I O N S

3

4          IT IS HEREBY STIPULATED AND AGREED

5    by and between the attorneys for the

6    respective parties herein, that filing,

7    sealing and the same are hereby waived.

8            IT IS FURTHER STIPULATED AND AGREED

9    that all objections, except as to the form

10   of the question, shall be reserved to the

11   time of the trial.

12           IT IS FURTHER STIPULATED AND AGREED

13   that the within deposition may be sworn to

14   and signed before any officer authorized to

15   administer an oath, with the same force

16   and effect as if signed and sworn to before

17   the Court.

18

19

20

21

22

23

24

25



```
 1
 2   L U C Y    P.    A L L E N,
 3               the witness herein, having been
 4               first duly sworn by a Notary Public
 5               of the State of New York, was
 6               examined and testified as follows:
 7                    THE REPORTER:  Please state
 8               your name for the record.
 9                    THE WITNESS:  Lucy Allen.
10               A-L-L-E-N.
11                    THE REPORTER:  Will you
12               please state your address for the
13               record.
14                    THE WITNESS:  1166 Avenue of
15               the Americas, New York, New York.
16               That's my work address.
17   EXAMINATION BY
18   MS. BARVIR:
19        Q.   Could you state your name, title,
20   and business address once more for the record
21   for me, please?
22        A.   Lucy Allen, managing director, 1166
23   Avenue of the Americas, New York, New York,
24   NERA Economic Consulting.
25        Q.   Thank you.  So NERA, N-E-R-A, if I
```



```
 1                    Lucy P. Allen
 2   report, is it your opinion, as an expert,
 3   that large-capacity magazines are not often
 4   used in self-defense in the home?
 5        A.   I wouldn't say I've addressed that
 6   specific question, no.
 7        Q.   And based on your findings, as you
 8   summarize them in this report -- excuse me --
 9   is it your opinion as an expert that these
10   large capacity magazines are often used in
11   mass shootings?
12        A.   I think I show data that a large
13   percentage of mass shootings involve large
14   capacity magazines, and that the number of
15   fatalities and injuries are higher in mass
16   shootings that involve large capacity
17   magazines, than those that do not involve
18   large capacity magazines.
19        Q.   Okay.  Have you ever been asked
20   before to determine a number of rounds of
21   ammunition that are fired in self-defense in
22   the home, in another legal case?
23        A.   I have been asked to determine
24   rates that are similar to this, so I believe,
25   for example, I was asked to determine the
```



1                     Lucy P. Allen

2    that occur in a public place or primarily

3    occur in a public place.

4         Q.   So do you know how many mass

5    shooting there would be per year if the

6    definitions were not limited to public

7    places?

8         A.   If you used a completely different

9    -- you use just a large -- like more than

10   three people being killed anywhere?

11        Q.   Uh-huh.

12        A.   I don't know the answer to that.

13        Q.   How about if you use the definition

14   that didn't limit the event to where four or

15   more people were killed and not connected

16   with another crime?

17        A.   I don't know the answer.

18        Q.   Do you know for sure whether the

19   Mother Jones and Citizens Crime Commission

20   data sets you use include every public mass

21   shooting event not connected to another crime

22   that occurred in the 36-year period that was

23   studied?

24        A.   Is your question, do they include

25   everything that would meet their definition



1                   Lucy P. Allen

2    or are you trying to change the definition?

3         Q.    That would meet their definition.

4    Are you certain that they've included every

5    single incident of mass shooting that meets

6    their definition within that 36-year period?

7         A.    I am not certain that they have

8    included everything.  I have looked at the

9    mass shootings that Dr. Kleck says that they

10   failed to include, and I found that the vast

11   majority of them did not meet the

12   definitions, but I have not done anything

13   else to determine whether -- to find other

14   mass shootings that they may have excluded.

15   I don't believe I recall anything in regard

16   to that.

17        Q.    So you don't know what percentage

18   of shootings with four or more people killed

19   were covered by those two sources; do you?

20        A.    I'm not aware of other mass

21   shootings that meet their definition, which

22   is a -- in general is what I understand to be

23   the common -- a common definition of mass

24   shooting that are not included, you know,

25   with the exception of one incident, I



                        Lucy P. Allen

 1
 2    believe.
 3         Q.   So you assume they cover all of
 4    them but you're not certain?
 5         A.   I have not assumed that.  I have --
 6    I have looked to see what other sources there
 7    are of mass shootings, and I have found that
 8    these are -- and I have not found that other
 9    sources include mass shootings that they have
10    -- I have found that their analysis is
11    comprehensive and systemic with, you know,
12    the minor exception here and there of one
13    that I'm not sure why they included or one
14    that I'm not sure why they excluded.  So I
15    have some, you know, some minor exceptions I
16    have found that both of them have a
17    systematic and comprehensive approach.
18         Q.   Are you familiar with the "Gun
19    Violence Archive"?
20         A.   I'm aware that Dr. Kleck mentioned
21    it and I looked at the data that Dr. Kleck
22    said that Mother Jones had in a biased way or
23    mistakenly excluded, and I found that he was
24    incorrect, and that -- so that is my
25    familiarity with it, is looking into the



1                    Lucy P. Allen

2          Ms. Allen.

3                    THE WITNESS:  Thank you.

4                    (Whereupon, a discussion was

5          held off the record at this time.)

6                    MS. BARVIR:  We are back on

7          record.  We are opening the record

8          again just to introduce as

9          Plaintiff's 7, I believe, the

10         updated pages of Lucy Allen's

11         expert report in this matter that

12         showed the new numbers with the Las

13         Vegas incident.

14                    THE WITNESS:  Correct.

15                    (Plaintiff's Exhibit 7,
                    Updated Pages, marked for
16                    identification, as of this
                    date.)
17                    -oOo-
                    (Whereupon, the examination
18         of LUCY P. ALLEN was adjourned at
           5:39 p.m.)

19

20                    LUCY P. ALLEN

21    Subscribed and sworn to

22    before me this      day

23    of                , 2010.

24

25    NOTARY PUBLIC





both sources and searched news stories on each mass shooting to obtain data on shots fired where available.[17] See attached Appendix B for a summary of the combined data.

22.     Based on the combined data we found that large-capacity magazines (those with a capacity to hold more than 10 rounds of ammunition) are often used in mass shootings. Magazine capacity is known in 83 out of the 96 mass shootings (86%) considered in this analysis. We found that large-capacity magazines were used in the majority of mass shootings since 1982 regardless of how mass shootings with unknown magazine capacity are treated. In particular, out of 83 mass shootings with known magazine capacity, 54 involved large-capacity magazines or 65% of mass shootings with known magazine capacity. Even assuming the mass shootings with unknown magazine capacity *all* did not involve large-capacity magazines, the majority of mass shootings involved large capacity magazines (*i.e.*, 54 out of 96 mass shootings or 56%).

23.     The combined data on mass shootings indicates that it is common for offenders to fire more than ten rounds when using a gun with a large-capacity magazine in mass shootings. In particular, in mass shootings that involved use of large-capacity magazine guns, the average number of shots fired was 99.[18]

### 2. Casualties in mass shootings with large-capacity magazine guns compared with other mass shootings

24.     Based on our analysis of the combined mass shootings data in the past 35 years, casualties were higher in the mass shootings that involved large-capacity magazine guns than in

---

to another crime (such as robbery or domestic violence). *See* "Mayhem Multiplied: Mass Shooters and Assault Weapons," *Citizens Crime Commission of New York City*, 2016.

The second source covers 33 mass shootings from 1984 to 2012, in which a shooter killed four or more people and the gun used by the shooter had a magazine capacity greater than ten. All but one of the mass shooting incidents in the second source are covered by the first, but the combination of the two sources provides additional detail, such as the number of shots fired. *See* "Mass Shooting Incidents in America (1984-2012)," *Citizens Crime Commission of New York City*, http://www.nycrimecommission.org/mass-shooting-incidents-america.php, accessed June 1, 2017.

[17]  The October 1, 2017 Las Vegas Strip mass shooting occurred a few days before the filing of this report, so numbers for this shooting have been updated based on Mother Jones data accessed January 17, 2018.

[18]  There were 36 mass shootings in which the magazine used was known to be a large capacity magazine and the number of shots fired were known. The October 1, 2017 Las Vegas Strip mass shooting occurred a few days before the filing of this report. Details on the Las Vegas shooting are updated based on Mother Jones data accessed January 17, 2018 and "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," *Las Vegas Review Journal*, November 22, 2017.

other mass shootings. In particular, we found an average number of fatalities or injuries of 31 per mass shooting with a large-capacity magazine versus 9 for those without.[19]

### 3.  Percent of mass shooters' guns legally obtained

25.    The combined data on mass shootings indicates that the majority of guns used in mass shootings were obtained legally.[20] According to the data, shooters in at least 71% of mass shootings in the past 35 years obtained their guns legally (at least 68 of the 96 mass shootings) and at least 76% of the guns used in these 96 mass shootings were obtained legally (at least 170 of the 224 guns).[21]

## C.  Rate in California that victims use a firearm in self-defense in the home

26.    Plaintiffs claim the banned large-capacity magazines are commonly used in the home for self-defense.[22] We estimated how common it is in California for a person in their home to defend themselves with a gun against an armed robber.

27.    Using California-specific crime data collected by the California Department of Justice,[23] we estimated the number of residential robberies committed with a firearm. This estimate was based on the average annual rate for the six-year period between 2011-2016 using

---

[19] An analysis of the mass shootings detailed in an article by Plaintiffs' expert Gary Kleck yielded similar results (21 average fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without). The article covered 88 mass shooting incidents between 1994 and 2013. *See* Kleck, Gary, "Large-Capacity Magazines and the Casualty Counts in Mass Shootings: The Plausibility of Linkages," 17 *Justice Research and Policy* 28 (2016).

A 2013 study by Mayors Against Illegal Guns found that when mass shootings involved assault weapons or high capacity magazines, the number of deaths was higher. The study was based on data from the FBI and media reports covering the period January 2009 through January 2013. The study found that mass shootings where assault weapons or high-capacity magazines were used resulted in an average of 14.4 people shot and 7.8 deaths versus other mass shootings that resulted in 5.7 people shot and 4.8 deaths. *See* "Analysis of Recent Mass Shootings," *Mayors Against Illegal Guns*, September 2013.

[20] The determination of whether guns were obtained legally is based on Mother Jones reporting.

[21] Mother Jones did not indicate whether the guns were obtained legally for 10% of mass shootings (9 out of the 91 mass shootings covered by Mother Jones).

[22] Complaint at 47.

[23] "Crime in California 2016," *California Department of Justice: Criminal Justice Statistics Center*.

# Appendix B
## Combined Mass Shootings Data
## 1982 – October 2017

| | Case (1) | Location (2) | Date (3) | Source (4) | Large Cap. Mag.?[a] (5) | Fatalities[b] (6) | Injuries[b] (7) | Total Fatalities & Injuries[b] (8) | Shots Fired (9) | Gun(s) Obtained Legally?[c] (10) | Offenders' Number of Guns (11) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1. | Las Vegas Strip [d] | Las Vegas, NV | 10/1/2017 | MJ | Yes | 58 [d] | 546 [d] | 604 [d] | 1,100 [d] | Yes [d] | 23 [d] |
| 2. | San Francisco UPS | San Francisco, CA | 6/14/2017 | MJ | Yes | 3 | 2 | 5 | - | No | 2 |
| 3. | Pennsylvania Supermarket | Tunkhannock, PA | 6/7/2017 | MJ | No | 3 | 0 | 3 | 59 [e] | - | 2 |
| 4. | Fiamma Workplace | Orlando, FL | 6/5/2017 | MJ | - | 5 | 0 | 5 | - | - | 1 |
| 5. | Ohio Nursing Home | Kirkersville, OH | 5/12/2017 | MJ | - | 3 | 0 | 3 | - | - | 2 |
| 6. | Fresno Downtown | Fresno, CA | 4/18/2017 | MJ | No | 3 | 0 | 3 | 16 [f] | - | 1 |
| 7. | Fort Lauderdale Airport | Fort Lauderdale, FL | 1/6/2017 | MJ | - | 5 | 6 | 11 | 15 [g] | Yes | 1 |
| 8. | Cascade Mall | Burlington, WA | 9/23/2016 | MJ | - | 5 | 0 | 5 | - | - | 3 |
| 9. | Baton Rouge Police | Baton Rouge, LA | 7/17/2016 | MJ | Yes | 3 | 3 | 6 | 43 [h] | - | 3 |
| 10. | Dallas Police | Dallas, TX | 7/7/2016 | MJ | Yes | 5 | 11 | 16 | - | Yes | 3 |
| 11. | Orlando Nightclub | Orlando, FL | 6/12/2016 | MJ/CC | Yes | 49/50 | 53 | 102/103 | 110 [i] | Yes | 2 |
| 12. | Excel Industries | Hesston, KS | 2/25/2016 | MJ | Yes | 3 | 14 | 17 | - | Yes | 2 |
| 13. | Kalamazoo | Kalamazoo County, MI | 2/20/2016 | MJ | - | 6 | 2 | 8 | - | Yes | 1 |
| 14. | San Bernardino | San Bernardino, CA | 12/2/2015 | MJ/CC | Yes | 14/16 | 21 | 35/37 | 150 [j] | Yes | 4 |
| 15. | Planned Parenthood Clinic | Colorado Springs, CO | 11/27/2015 | MJ | - | 3 | 9 | 12 | - | - | 1 |
| 16. | Colorado Springs | Colorado Springs, CO | 10/31/2015 | MJ | Yes | 3 | 0 | 3 | - | Yes | 3 |
| 17. | Umpqua Community College | Roseburg, OR | 10/1/2015 | MJ/CC | Yes | 9/10 | 9 | 18/19 | - | Yes | 6 |
| 18. | Chattanooga Military Center | Chattanooga, TN | 7/16/2015 | MJ/CC | Yes | 5/6 | 2/3 | 7/9 | - | Yes | 3 |
| 19. | Charleston Church | Charleston, SC | 6/17/2015 | MJ/CC | Yes | 9 | 1 | 10 | - | Yes | 1 |
| 20. | Trestle Trail Bridge | Menasha, WI | 6/11/2015 | MJ | - | 3 | 1 | 4 | - | Yes | 2 |
| 21. | Marysville High School | Marysville, WA | 10/24/2014 | MJ/CC | Yes | 5 | 1 | 6 | - | Stolen | 1 |
| 22. | Isla Vista | Santa Barbara, CA | 5/23/2014 | MJ | Yes | 6 | 13 | 19 | 50 [k] | Yes | 3 |
| 23. | Fort Hood | Fort Hood, TX | 4/3/2014 | MJ | - | 3 | 12 | 15 | - | Yes | 1 |
| 24. | Alturas Tribal | Alturas, CA | 2/20/2014 | MJ | - | 4 | 2 | 6 | - | - | 2 |
| 25. | Washington Navy Yard | Washington, D.C. | 9/16/2013 | MJ/CC | No | 12/13 | 8/7 | 20 | - | Yes | 2 |

Page 1 of 5

Exhibit 10
Page 00516

# Appendix B
## Combined Mass Shootings Data
### 1982 – October 2017

| Case | Location | Date | Source | Large Cap. Mag.?[a] | Fatalities[b] | Injuries[b] | Total Fatalities & Injuries[b] | Shots Fired | Gun(s) Obtained Legally?[c] | Offenders' Number of Guns |
|---|---|---|---|---|---|---|---|---|---|---|
| (1) | (2) | (3) | (4) | (5) | (6) | (7) | (8) | (9) | (10) | (11) |
| 76. Piper Technical Center | Los Angeles, CA | 7/19/1995 | CC | Yes | 4 | 0 | 4 | - | - | - |
| 77. Walter Rossler Company | Corpus Christi, TX | 4/3/1995 | MJ/CC | No | 6 | 0 | 6 | - | Yes | 2 |
| 78. Air Force Base | Fairchild Base, WA | 6/20/1994 | MJ/CC | Yes | 5/6 | 23 | 28/29 | 50[r] | Yes | 1 |
| 79. Chuck E. Cheese | Aurora, CO | 12/14/1993 | MJ/CC | No | 4 | 1 | 5 | - | - | 1 |
| 80. Long Island Railroad | Garden City, NY | 12/7/1993 | MJ/CC | Yes | 6 | 19 | 25 | 30 | Yes | 1 |
| 81. Luigi's Restaurant | Fayetteville, NC | 8/6/1993 | MJ/CC | No | 4 | 8 | 12 | - | Yes | 3 |
| 82. 101 California Street | San Francisco, CA | 7/1/1993 | MJ/CC | Yes | 9 | 6 | 15 | 75 | No | 3 |
| 83. Watkins Glen | Watkins Glen, NY | 10/15/1992 | MJ/CC | No | 5 | 0 | 5 | - | Yes | 1 |
| 84. Lindhurst High School | Olivehurst, CA | 5/1/1992 | MJ/CC | No | 4 | 10 | 14 | - | Yes | 2 |
| 85. Royal Oak Postal | Royal Oak, MI | 11/14/1991 | MJ/CC | No | 5 | 5/4 | 10/9 | - | Yes | 1 |
| 86. University of Iowa | Iowa City, IA | 11/1/1991 | MJ/CC | No | 6 | 1 | 7 | - | Yes | 1 |
| 87. Luby's Cafeteria | Killeen, TX | 10/16/1991 | MJ/CC | Yes | 24 | 20 | 44 | 100 | Yes | 2 |
| 88. GMAC | Jacksonville, FL | 6/18/1990 | MJ/CC | Yes | 10 | 4 | 14 | 14 | Yes | 2 |
| 89. Standard Gravure Corporation | Louisville, KY | 9/14/1989 | MJ/CC | Yes | 9 | 12 | 21 | 21 | Yes | 5 |
| 90. Stockton Schoolyard | Stockton, CA | 1/17/1989 | MJ/CC | Yes | 6 | 29/30 | 35/36 | 106 | Yes | 2 |
| 91. ESL | Sunnyvale, CA | 2/16/1988 | MJ/CC | No | 7 | 4 | 11 | - | Yes | 7 |
| 92. Shopping Centers | Palm Bay, FL | 4/23/1987 | MJ/CC | Yes | 6 | 14/10 | 20/16 | 40[s] | Yes | 3 |
| 93. United States Postal Service | Edmond, OK | 8/20/1986 | MJ/CC | No | 15 | 6 | 21 | - | Yes | 3 |
| 94. San Ysidro McDonald's | San Ysidro, CA | 7/18/1984 | MJ/CC | Yes | 22 | 19 | 41 | 257 | Yes | 3 |
| 95. Dallas Nightclub | Dallas, TX | 6/29/1984 | MJ/CC | Yes | 6 | 1 | 7 | - | No | 1 |
| 96. Welding Shop | Miami, FL | 8/20/1982 | MJ | No | 8 | 3 | 11 | - | Yes | 1 |
| Large Capacity Magazine Average | | | | | 10.2 | 20.3 | 30.6 | 99.3 | | |
| Non-Large Capacity Magazine Average | | | | | 6.3 | 2.9 | 9.2 | 22.6 | | |

Page 4 of 5

Exhibit 10
Page 00517

# Appendix B
## Combined Mass Shootings Data
### 1982 – October 2017

| Case (1) | Location (2) | Date (3) | Source (4) | Large Cap. Mag.?[a] (5) | Fatalities[b] (6) | Injuries[b] (7) | Total Fatalities & Injuries[b] (8) | Shots Fired (9) | Gun(s) Obtained Legally?[c] (10) | Offenders' Number of Guns (11) |
|---|---|---|---|---|---|---|---|---|---|---|

**Notes and Sources:**

Data from Mother Jones ("US Mass Shootings, 1982-2017: Data from Mother Jones' Investigation," accessed June 1, 2017) and the Citizens Crime Commission of New York City ("Mayhem Multiplied: Mass Shooters and Assault Weapons," 2016, and "Citizens Crime Commission of New York City, Mass Shooting Incidents in America (1984-2012)," accessed June 1, 2017).

MJ indicates Mother Jones data. CC indicates Citizens Crime Commission of New York City data. If sources differ on data, "/" is added between values. In these instances, values from MJ are listed first. Except where noted, all data on shots fired obtained from CC.

[a] Large capacity magazines are those with a capacity to hold more than 10 rounds of ammunition.

[b] Offender(s) included in counts of fatalities and injuries.

[c] The determination of whether guns were obtained legally is based on Mother Jones reporting.

[d] The October 1, 2017 Las Vegas Strip mass shooting occurred a few days before the filing of this report, so numbers for this shooting have been updated based on Mother Jones data accessed January 17, 2018. Shots fired from: "Sheriff Says More than 1,100 Rounds Fired in Las Vegas," *Las Vegas Review Journal*, November 22, 2017.

[e] Shots fired from: "Killer in Supermarket Shooting Posted Chilling Videos Online, Lauding Columbine Massacre," *Washington Post*, June 9, 2017.

[f] Shots fired from: "Hate Crime is Suspected After Gunman Kills 3 White Men in Downtown Fresno," *Los Angeles Times*, April 19, 2017.

[g] Shots fired from: "Fort Lauderdale Shooting Suspect Appears in Court, Ordered Held Without Bond," *Washington Post*, January 9, 2017.

[n] Shots fired from: "Baton Rouge Cop Killer Left Note, Fired At Least 43 Rounds," *CNN*, July 9, 2017.

[i] Shots fired from: "'We Thought It Was Part of the Music': How the Pulse Nightclub Massacre Unfolded in Orlando," *The Telegraph*, June 13, 2016.

[j] Shots fired from: "San Bernardino Suspects Left Trail of Clues, but No Clear Motive," *New York Times*, December 3, 2015.

[k] Shots fired from: "Sheriff: Elliot Rodger Fired 50-plus Times in Isle Vista Rampage," *Los Angeles Times*, June 4, 2014.

[l] Shots fired from: "Shooter Set $10,000 on Fire in Hialeah Shooting Rampage," *NBC News*, July 28, 2013.

[m] Shots fired from: "Police Call Santa Monica Gunman 'Ready for Battle,'" *New York Times*, June 8, 2013.

[n] Shots fired from: "Hialeah Gunman's Rage Over Estranged Wife Leaved 5 Dead," *Sun-Sentinel*, June 7, 2010.

[o] Shots fired from: "Small Town Grieves for 6, and the Killer," *Los Angeles Times*, October 9, 2007.

[p] Shots fired from: "National Briefing | Midwest: Ohio: Shooter At Club May Have Reloaded," *New York Times*, January 15, 2005.

[q] Shots fired from: "5 Beach Workers in Florida are Slain by Ex-Colleague," *New York Times*, February 10, 1996.

[r] Shots fired from: "Man Bent On Revenge Kills 4, Hurts 23 -- Psychiatrist Is First Slain In Rampage At Fairchild Air Force Base," *The Seattle Times*, June 21, 1994.

[s] Shots fired from: "6 Dead in Florida Sniper Siege; Police Seize Suspect in Massacre," *Chicago Tribune*, April 25, 1987.

Exhibit 10
Page 00518

# Exhibit 11

Exhibit 11
Page 00519

## In the Matter Of:

DUNCAN vs BECERRA

17-cv-1017-BEN-JLB

## LOUIS KLAREVAS

*January 19, 2018*

800.211.DEPO (3376)
EsquireSolutions.com

Exhibit 11

1

2          UNITED STATES DISTRICT COURT

3        SOUTHERN DISTRICT OF CALIFORNIA

4    ------------------------------------------x

5    VIRGINIA DUNCAN, et al.,

6                          Plaintiffs,

7            -against-   No. 17-cv-1017-BEN-JLB

8    XAVIER BECERRA, in his official capacity as

9    Attorney General of the State of California,

10                         Defendant.

11   ------------------------------------------x

12

13

14

15          DEPOSITION OF LOUIS KLAREVAS

16               New York, New York

17             Friday, January 19, 2018

18

19

20

21

22

23   Reported by:
     Aydil M. Torres, CSR
24   JOB NO. J1035515

25



LOUIS KLAREVAS                                    January 19, 2018
DUNCAN vs BECERRA                                               2

1

2

3              January 19, 2018

4              10:04 a.m.

5

6

7         Deposition of LOUIS

8    KLAREVAS, held at the offices of

9    Esquire Deposition Solutions, LLC,

10   1384 Broadway, New York, New York,

11   pursuant to Notice, before Aydil M.

12   Torres, a Notary Public of the

13   State of New York.

14

15

16

17

18

19

20

21

22

23

24

25



```
 1
 2   A P P E A R A N C E S:
 3
 4      MICHEL & ASSOCIATES, P.C.
 5      Attorneys for Plaintiffs
 6          180 East Ocean Boulevard, Suite 200
 7          Long Beach, California 90802
 8      BY:  NICHOLAS W. STADMILLER, ESQ.
 9           ANNA M. BARVIR, ESQ.
10
11
12
13      STATE OF CALIFORNIA
14      DEPARTMENT OF JUSTICE
15      OFFICE OF THE ATTORNEY GENERAL
16      Attorneys for Defendant
17          300 South Spring Street, Suite 1702
18          Los Angeles, California 90013
19      BY:  JOSE A. ZELIDON-ZEPEDA, ESQ.
20
21
22
23
24
25
```



```
 1

 2

 3                S T I P U L A T I O N S

 4

 5          IT IS HEREBY STIPULATED AND AGREED

 6    by and between the attorneys for the

 7    respective parties herein, that filing,

 8    sealing and the same are hereby waived.

 9          IT IS FURTHER STIPULATED AND AGREED

10    that all objections, except as to the form

11    of the question, shall be reserved to the

12    time of the trial.

13          IT IS FURTHER STIPULATED AND AGREED

14    that the within deposition may be sworn to

15    and signed before any officer authorized to

16    administer an oath, with the same force

17    and effect as if signed and sworn to before

18    the Court.

19

20

21

22

23

24

25
```



```
 1
 2   L O U I S   K L A R E V A S,
 3              the witness herein, having been
 4              first duly sworn by a Notary Public
 5              of the State of New York, was
 6              examined and testified as follows:
 7                    THE REPORTER:  Please state
 8              your name for the record.
 9                    THE WITNESS:  Louis,
10              L-O-U-I-S, Klarevas,
11              K-L-A-R-E-V-A-S.
12                    THE REPORTER:  Please state
13              your business address for the
14              record.
15                    THE WITNESS:  69-12 62nd
16              Road, Middle Village, Queens, New
17              York.  Sorry, Middle Village, New
18              York 11379.
19                    MR. STADMILLER:  So we are
20              all taking notes on how to
21              pronounce it but you've just
22              clarified that, Klarevas.
23                    THE WITNESS:  Yeah, it's a
24              long "E" and then try to imagine
25              the "A"s are, like, Klarevas.
```



```
 1                    Louis Klarevas
 2     those opportunities.
 3          Q.   Have you expressed any opinion that
 4     the children in the Sandy Hook school
 5     shooting incident escaped while the shooter
 6     was changing magazines?
 7          A.   That is correct, they did.
 8          Q.   And what is that based on?
 9          A.   It's based on my review of the
10     witness statements that the children gave to
11     police officers immediately following the
12     Sandy Hook massacre.  These were the
13     statements of the actual children who fled.
14          Q.   Now, even assuming -- if what you
15     are saying is true, does that indicate that
16     the magazine change in question did provide
17     additional time for victims to escape, beyond
18     the time that elapsed between the shots when
19     the shooter was not firing?
20          A.   It -- it -- it did provide the time
21     necessary.
22          Q.   How do you make that determination?
23          A.   Well, we know that he was firing --
24     well, first of all we -- we -- I make that
25     determination based on what the witness
```



1                    Louis Klarevas

2    statements say.  The students said, you know,

3    that when he was changing out his magazines,

4    one of the student recognized this as an

5    opportunity, he yelled for the other

6    students, and they all ran.  And in -- I

7    believe in one of the witness statements, one

8    of the students actually even pushed him,

9    physically pushed him aside, or grazed by him

10   and bumped him, and then all the other

11   students ran out.  Additional students ran

12   out behind that student.

13        Q.   Would you agree with the statement

14   that

15   "the best available information indicates

16   that mass shooters generally fire their

17   weapons slowly and deliberately with

18   substantial intervals between shots?

19        A.   I disagree with that statement,

20   because we know based on audio and video

21   recordings that, in general, when mass

22   shooters undertake their attacks, they tend

23   to fire in a different kind of pattern, which

24   is burst of fires at a very rapid pace,

25   usually two to three rounds per second, if



```
 1              Louis Klarevas
 2   you're using a semiautomatic firearm,
 3   followed by, if they're continuing their
 4   shooting, long pauses, and then again bursts.
 5   That assumes, of course, that someone is
 6   going to fire more than one magazine's worth
 7   of bullets.
 8        Q.   Okay.  Would you agree with the
 9   statement that "shooters can easily change
10   detachable magazines in approximately two to
11   four seconds, depending on experience"?
12        A.   I would qualify that.  I mean,
13   competitive shooters probably shoot at a rate
14   of, you know, magazine changes of around 3 or
15   4 seconds.  Based on what we know from mass
16   shooters and, you know, the evidence that I
17   have seen, which would be looking again at
18   video and audio tape, usually it's a little
19   bit longer.  I mean, these are high stress
20   situations, you have shooters that are under
21   duress.  A good example would be one that I
22   cited in my exhibits.  It's the audio
23   recording of a very recent active shooting
24   involving --
25        Q.   The list --
```



```
 1                      Louis Klarevas
 2       A.    Sorry, yeah, I will do the things.
 3  Exhibit 6.  It would be the very last link,
 4  because they're presented chronologically.
 5  It is a link to a recording that the active
 6  shooter actually live fed this onto a site
 7  called Parascope and while he was attacking
 8  Douglas County Sheriff Deputies outside of
 9  Denver, Colorado, and this is a military
10  veteran.  It took him approximately ten
11  seconds to change magazines and you can hear
12  that.  So the idea that somehow -- and also
13  we know the Las Vegas shooter, his shortest
14  interval of pause between firing burst of
15  rounds onto the concert attendants attendees
16  was, I believe, 25 seconds.  So the idea that
17  it takes two to four seconds is really maybe
18  theoretical, but it's really something you
19  perhaps see in competitive shooting.  It's
20  not something that we see, in terms of active
21  shooters.
22       Q.    In terms of active shooters, do you
23  have any opinion on what the average time for
24  them to change a magazine attachment would
25  be?
```



```
 1                      Louis Klarevas
 2        Q.   Did those play any part in the
 3   basis for your opinions for your expert
 4   report?
 5        A.   Well, that is something I state
 6   explicitly in my expert report.
 7        Q.   Okay.  And did you say that --
 8   okay.
 9             You further state "Imagine how many
10   lives would have been spared if the Las Vegas
11   strip shooter had to pause firing in order to
12   reload after 10 rounds."
13        A.   Yes.
14        Q.   Do you have any estimate as to how
15   many lives would have been spared if he had
16   to reload after 10 rounds?
17        A.   I have not put together an
18   estimate.  I'm still confident in the
19   statement because we know that in between
20   bursts of gun fire, his shortest time span
21   was 25 seconds.  So just taking that
22   across-the-board, if every time he had to
23   reload and it takes him 25 seconds or he had
24   to switch guns and it took him 25 seconds,
25   that would have been -- to shoot 90 rounds,
```



```
 1                   Louis Klarevas
 2   like he did, now take that, instead of having
 3   -- which what I believe were 11 pauses, take
 4   that and multiply that by 10 or by -- or by.
 5        Q.   20?
 6        A.   No, no, by ten-fold, because it's
 7   instead of 100 rounds, you are dividing it by
 8   10.  You are looking at upwards of -- I said
 9   11 -- 110 pauses, each 25 seconds.  That's a
10   lot of time for people to flee.
11        Q.   Okay.  Just to confirm, you haven't
12   started to perform any sort of analysis on
13   that.  It's more of a statement that lives
14   could have been spared, as you just
15   explained?
16        A.   Actually, I think I just did, kind
17   of off the cuff, an analysis for you.  If you
18   do 110 times 25, you get an idea of how many
19   --
20        Q.   That would be your best estimate?
21        A.   That would be a really long time
22   that would be -- yeah, that -- that would be,
23   like, over 2,000 seconds, I believe.  So
24   that's more time not shooting than shooting.
25   That's a lot of time for people to get out of
```



1            Louis Klarevas

2   the way.  And there were, obviously, a lot of

3   survivors.  We're talking about tens of

4   thousands of people who were in the line of

5   fire.  Some of them who panicked and tried

6   to, you know, many of them who stayed because

7   they were afraid of -- of -- of the gun fire,

8   but then when there were pauses, you see in

9   the video evidence image, they ran.  Imagine

10  if we could have created 100 more

11  opportunities for them to run.  Not to

12  mentions that in the initial gun burst,

13  instead of shooting 90 rounds, he would have

14  shot just 10.

15      Q.   Did the fact that he had multiple

16  guns set up which we already talked about,

17  contribute at all into your statement?

18      A.   Well, it certainly leads you to

19  believe that if someone can have multiple

20  guns, as opposed to one gun, it requires that

21  person to switch and get that gun, and if you

22  are shooting from a sniper position, you

23  know, you will have to get up, you are on

24  your belly, for example, on that hotel room

25  firing your rifle, you're going to have to



                         Louis Klarevas

1
2    get up, get rid of that gun that you just
3    used, go grab your other gun that's got a
4    fresh magazine in it, come back, set it up,
5    shoot again, which could explain, in part,
6    why it took him a minimum of 25 seconds
7    between the bursts of fire.  So when you have
8    more guns, it could in theory create even
9    longer pauses.  So, again, another advantage
10   to an active shooter of having large capacity
11   magazine is that doesn't have to stop to
12   reload, doesn't have to stop to switch guns.
13   At most, you know, would stop much more
14   infrequently, would stop with less frequency
15   to switch out one large capacity magazine for
16   another.  So it definitely provides
17   advantages to the active shooter and
18   disadvantages to those in the line of fire.
19        Q.   So could -- so could reviving the
20   assault weapons ban be a contributing factor
21   in causing less gun massacres?
22        A.    Could it result in less gun
23   massacres?  Sure.  Particularly because I
24   think that the most effective part of the
25   assault weapons ban was the ban on large

