1  XAVIER BECERRA
   Attorney General of California
2  State Bar No. 118517
   MARK R. BECKINGTON
3  Supervising Deputy Attorney General
   State Bar No. 126009
4  ANTHONY P. O'BRIEN
   Deputy Attorney General
5  State Bar No. 232650
   JOHN D. ECHEVERRIA
6  Deputy Attorney General
   State Bar No. 268843
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013
8    Telephone:  (213) 269-6249
     Fax:  (213) 897-5775
9    E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Attorney General*
10 *Xavier Becerra*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16 | **VIRGINIA DUNCAN, RICHARD** | 17-cv-1017-BEN-JLB |
   **LEWIS, PATRICK LOVETTE,**
17 **DAVID MARGUGLIO,**          | **EXHIBITS 20-23 TO THE**
   **CHRISTOPHER WADDELL, and**    **DECLARATION OF JOHN D.**
18 **CALIFORNIA RIFLE & PISTOL**   **ECHEVERRIA IN SUPPORT OF**
   **ASSOCIATION, INC., a California** **DEFENDANT'S OPPOSITION TO**
19 **corporation,**                **PLAINTIFFS' MOTION FOR**
                                    **SUMMARY JUDGMENT OR,**
                        Plaintiffs, **ALTERNATIVELY, PARTIAL**
20                                  **SUMMARY JUDGMENT**

21         **v.**                  Date:       April 30, 2018
                                    Time:       10:30 a.m.
22 **XAVIER BECERRA, in his official** Judge:    Hon. Roger T. Benitez
   **capacity as Attorney General of the** Courtroom: 5A
23 **State of California; and DOES 1-10,** Action Filed:  May 17, 2017

24                      Defendant.

25

26

27

28

**EXHIBITS**
**TABLE OF CONTENTS**

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 1 | Expert Report of Lucy P. Allen | 00001-00033 |
| 2 | Expert Rebuttal Report of John J. Donohue | 00034-00072 |
| 3 | Revised Expert Report of Louis J. Klarevas | 00073-00120 |
| 4 | Expert Report of Christopher S. Koper | 00121-00433 |
| 5 | Transcript of Deposition of Stephen Helsley (Excerpts) | 00434-00456 |
| 6 | Transcript of Deposition of Blake Graham, (Excerpts) | 00457-00463 |
| 7 | Transcript of Deposition of Carlisle Moody (Excerpts) | 00464-00480 |
| 8 | Transcript of Deposition of Gary Kleck (Excerpts) | 00481-00492 |
| 9 | Transcript of Deposition of Christopher S. Koper (Excerpts) | 00493-00501 |
| 10 | Transcript of Deposition of Lucy P. Allen (Excerpts & Ex. 7) | 00502-00518 |
| 11 | Transcript of Deposition of Louis J. Klarevas (Excerpts) | 00519-00533 |
| 12 | Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (ATF), *Recommendation on the Importability of Certain Semiautomatic Rifles* (1989) | 00534-00553 |
| 13 | Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (ATF), *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* (1998) | 00554-00680 |
| 14 | Sen. Bill No. 1446, 3d Reading Analysis, Mar. 28, 2016 (2015-2016 Reg. Sess.) (Cal. 2016) | 00681-00684 |

8

| Exhibit | Description | Page(s) |
|---|---|---|
| 15 | Prepared Testimony by Laurence H. Tribe, *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment: Hearing Before the Subcomm. on the Constitution, Civil Rights and Human Rights, S. Comm. on the Judiciary* (Feb. 12, 2013) Rights, *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment* (2013). | 00685-00721 |
| 16 | Mark Follman, et al., *U.S. Mass Shootings, 1982-2018: Data from Mother Jones' Investigation* (Mother Jones, 2018) | 00722-00736 |
| 17 | Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* (2013) | 00737-00772 |
| 18 | Declaration of Professor Daniel Webster in Support of Defendant Xavier Becerra's Opposition to Plaintiffs' Motion for Preliminary Injunction (June 5, 2017) (Dkt. No. 15) | 00773-00792 |
| 19 | Larry Buchanan, et al., *Nine Rounds a Second: How the Las Vegas Gunman Outfitted a Rifle to Fire Faster*, N.Y. Times, Oct. 5 2017 | 00793-00797 |
| 20 | Violence Policy Center, *High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States* (2018) | 00798-00807 |
| 21 | Alex Yablon, *Bans on High-Capacity Magazines, Not Assault Rifles, Most Likely to Limit Shooting Carnage*, The Trace, June 13, 2016 | 00808-00811 |
| 22 | State of Connecticut, Division of Criminal Justice, *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School* (2013) | 00812-00860 |

9

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 23 | Mark Follman, *More Guns, More Mass Shootings—Coincidence?*, Mother Jones, Dec. 15, 2012 | 00861-00867 |
| 24 | Louis Klarevas, Rampage Nation:  Securing America from Mass Shootings (2016) (Excerpts) | 00868-00898 |
| 25 | Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) | 00899-00904 |
| 26 | H.R. Rep. No. 103-489 (1994) | 00905-00981 |
| 27 | The Safety for All Act of 2016, 2016 Cal. Legis. Serv. Proposition 63 (West) | 00982-01011 |
| 28 | Sandy Hook Advisory Comm'n, *Final Report of the Sandy Hook Advisory Commission* (2015) | 01012-01289 |
| 29 | *LAPD Chief Backs Ban on Some Ammo Magazines*, NBC So. Cal., Mar. 2, 2011 | 01290-01294 |
| 30 | C. S. Koper & D. C. Reedy, *Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers*, 9 Injury Prevention 151 (2003) | 01295-01300 |
| 31 | Brady Center to Prevent Gun Violence, Assault Weapons: 'Mass Produced Mayhem' (2008) | 01301-01364 |
| 32 | Testimony of Brian J. Siebel, Senior Attorney, Brady Center to Prevent Gun Violence, Before the Council of the District of Columbia (Oct. 1, 2008) | 01365-01372 |
| 33 | Christopher S. Koper et al., *Gunshot Victimisations Resulting from High-Volume Gunfire Incidents in Minneapolis:  Findings and Policy Implications*, Injury Prevention, Feb. 24, 2018 | 01373-01377 |

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment  or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

| Exhibit | Description | Page(s) |
|---|---|---|
| 34 | Nat. Law Enforcement P'ship to Prevent Gun Violence, Protecting Communities from Assault Weapons and High-capacity Ammunition Magazines (2017) | 01378-01382 |
| 35 | Declaration of San Francisco Police Department Officer Joseph Emanuel in Support of Plantiff's Ex Parte Application for Order to Show Cause Re: Preliminary Injunction, *People v. Badger Mountain Supply, et al.*, No. CGC-17-557010 (S.F. Super. Feb. 21, 2017) | 01383-01402 |
| 36 | Declaration of Detective Michael Mersereau of the Los Angeles Police Department in Support of Amici Curiae the City and County of San Francisco, the City of Los Angeles, and the City of Sunnyvale, *Duncan v. Becerra*, 9th Cir. No. 17-56081 (9th Cir. Oct. 19, 2017) | 01403-01412 |
| 37 | Mark Follman, et al., *A Guide to Mass Shootings in America*, Mother Jones (last updated Mar. 10, 2018, 9:00 AM) | 01413-01417 |
| 38 | David S. Fallis & James V. Grimaldi, *Va. Data Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan. 23, 2011 | 01418-01422 |
| 39 | David S. Fallis, *Data Indicate Drop in High-Capacity Magazines During Federal Gun Ban*, Wash. Post, Jan. 10, 2013 | 01423-01427 |
| 40 | Gary Kleck, Point Blank: Guns and Violence in America (1991) (Excerpts) | 01428-01437 |
| 41 | Claude Werner, *The Armed Citizen - Analysis of Five Years of Armed Encounters*, GunsSaveLives.com (Mar. 12, 2012) | 001438-01445 |

11

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment  or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 42 | California Voter Information Guide, Firearms. Ammunition Sales. Initiative Statute. California Proposition 63 (2016) | 01446-01469 |
| 43 | Larry Buchanan, et al., *How They Got Their Guns*, N.Y. Times, Nov. 5, 2017) | 01470-01478 |

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment  or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

# Exhibit 20

Exhibit 20
Page 00798

**Violence Policy Center**



1730 Rhode Island Avenue, NW      202.822.8200 voice
Suite 1014                        202.822.8205 fax
Washington, DC 20036              wwww.vpc.org  web

# High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States



*Columbine shooter armed with Intratec TEC-DC9 assault pistol
equipped with high-capacity ammunition magazine*

**Since 1980, there have been at least 60 mass shootings (3 or more fatalities) where the shooter used high-capacity ammunition magazines. A total of 602 people were killed in these shootings and 1020 were wounded. This number is likely a significant undercount of actual incidents since there is no consistent collection or reporting of this data. Even in many high-profile shootings information on magazine capacity is not released or reported.**

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| First Baptist Church of Sutherland Springs<br>Sutherland Springs, Texas<br>November 5, 2017<br>Shooter: Devin Patrick Kelley | 27 dead (including the shooter), 20 injured | Sturm, Ruger AR-556 assault rifle | **15 30-round magazines** |

Exhibit 20
Page 00799

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Route 91 Harvest festival<br>Las Vegas, Nevada<br>October 1, 2017<br>Shooter: Stephen Paddock | 59 dead (including the shooter), 489 injured | Multiple AR-type assault rifles including 4 Daniel Defense assault rifles, 3 FN-15 assault rifles, 3 LMT assault rifles, and 2 POF assault rifles | **Multiple high-capacity ammunition magazines including 12 100-round magazines, 6 25-round magazines and 1 40-round magazine** |
| Cascade Mall<br>Burlington, Washington<br>September 23, 2016<br>Shooter: Arcan Cetin | 5 dead | Sturm, Ruger 10/22 rifle | **25-round magazine** |
| UPS distribution center<br>San Francisco, California<br>June 14, 2017<br>Shooter: Jimmy Lam | 4 dead (including shooter), 2 wounded | MasterPiece Arms MAC-10 assault pistol | **30-round magazine** |
| House party<br>Mukilteo, Washington<br>July 30, 2016<br>Shooter: Allen Christopher Ivanov | 3 dead, 1 wounded | Sturm Ruger AR-15 assault rifle | **30-round magazine** |
| Baton Rouge, Louisiana<br>July 17, 2016<br>Shooter: Gavin Long | 3 law enforcement officers dead, 3 wounded | Tavor SAR assault rifle, Stag Arms M4 variant assault rifle, Springfield XD 9 mm semiautomatic pistol | **High-capacity ammunition magazines** |
| Dallas, Texas<br>July 7, 2016<br>Shooter: Micah Johnson | 5 law enforcement officers dead, 9 officers and two citizens wounded | Saiga AK-74 assault rifle, Glock 19 Gen 4 and Fraser .25 semiautomatic pistols | **Multiple high-capacity ammunition magazines** |

Exhibit 20
Page 00800

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Pulse nightclub<br>Orlando, Florida<br>June 12, 2016<br>Shooter: Omar Mateen | 50 dead (including shooter), 53 wounded | Sig Sauer MCX assault rifle | **Multiple 30-round magazines, some taped together for faster reloading** |
| Excel Industries<br>Hesston, Kansas<br>February 25, 2016<br>Shooter: Cedric Ford | 4 dead (including shooter), 14 wounded | Zastava AK-variant assault rifle, Glock 22 semiautomatic pistol | **30-round magazine** |
| Kalamazoo Michigan<br>Multiple parking lots<br>February 20, 2016<br>Shooter: Jason Dalton | 6 dead, 2 wounded | Glock 19 semiautomatic pistol, Walther P99 9mm semiautomatic pistol | **Extended magazine** |
| Inland Regional Center<br>San Bernardino, California<br>December 2, 2015<br>Shooters: Syed Farook and Tashfeen Malik | 14 dead, 21 wounded | Smith&Wesson M&P assault rifle, DPMS A15 assault rifle | **4 30-round magazines** |
| Navy Operational Support Center and Marine Corps Reserve Center<br>Chattanooga, Tennessee<br>July 16, 2015<br>Shooter:  Muhammad Youssef Abdulazeez | 6 dead (including shooter), 2 wounded | AK-variant assault rifle, Saiga assault shotgun, handgun | **Multiple 30-round magazines** |
| Emanuel African Methodist Episcopal Church<br>Charleston, South Carolina<br>June 17, 2015<br>Shooter: Dylann Roof | 9 dead | Glock .45 Model 41 pistol | **13-round magazines** |
| Marysville-Pilchuck High School, Marysville, Washington<br>October 24, 2014<br>Shooter: Jaylen Fryberg | 5 dead (including shooter) | Beretta .40 semiautomatic pistol | **High-capacity, number of rounds unstated** |

3

Exhibit 20<br>Page 00801

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Apartment complex Hialeah, Florida July 26, 2013 Shooter: Pedro Vargas | 6 dead | Glock 17 semiautomatic pistol | **17-round magazine** |
| Santa Monica, California June 7, 2013 Shooter: John Zawahri | 6 dead, (including shooter) | AR-type assault rifle built from parts | **40 30-round magazines** |
| Sandy Hook Elementary School Newtown, Connecticut December 14, 2012 Shooter: Adam Lanza | 28 dead, (including shooter) | Bushmaster XM15 assault rifle, Glock 10mm pistol, 9mm Sig Sauer pistol | **30-round magazines** |
| Accent Signage Systems Minneapolis, Minnesota September 27, 2012 Shooter: Andrew Engeldinger | 7 dead (including shooter), 3 wounded | Springfield XDM semiautomatic pistol | **2 15-round magazines** |
| Sikh Temple Oak Creek, Wisconsin August 5, 2012 Shooter: Wade Michael Page | 7 dead (including shooter), 2 wounded | Glock 9mm semiautomatic pistol | **3 19-round magazines** |
| Café Racer Seattle, Washington May 30, 2012 Shooter: Ian Stawicki | 6 dead (including shooter) | Colt .45 semiautomatic pistol | **Extended magazine** |
| Century Aurora 16 movie theater Aurora, Colorado July 20, 2012 Shooter: James Holmes | 12 dead, 58 wounded | Smith & Wesson M&P15 assault rifle, .40 Glock pistol, Remington model 870 12 gauge shotgun | **100-round magazine** |
| IHOP Carson City, Nevada September 6, 2011 Shooter: Eduardo Sencion | 5 dead, (including shooter), 7 wounded | MAK-90 assault rifle (illegally converted to full-auto) | **20- and 30-round magazines** |
| Safeway parking lot Tucson, Arizona January 8, 2011 Shooter: Jared Loughner | 6 dead, 13 wounded | Glock 19 semiautomatic pistol | **Two 31-round magazines Two 15-round magazines** |

4

Exhibit 20
Page 00802

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Shreveport, Louisiana<br>August 16, 2010<br>Shooter:  Marcus Donte Reed | 3 dead | Assault weapon | **30-round magazine** |
| Hartford Distributors<br>Manchester, Connecticut<br>August 3, 2010<br>Shooter:  Omar Thornton | 9 dead (including shooter), 2 wounded | Sturm, Ruger SR9 semiautomatic pistol | **17- and 15-round magazines** |
| ABB, Inc.<br>St. Louis, Missouri<br>January 7, 2010<br>Shooter:  Timothy Hendron | 4 dead (including shooter), 5 wounded | Romarm AK-47 assault rifle, Tristar 12 gauge shotgun, Hi-Point .40 pistol | **Two "banana-style" high- capacity magazines (capacity not stated)** |
| Fort Hood<br>Fort Hood, Texas<br>November 5, 2009<br>Shooter:  Nidal Hasan | 13 dead, 34 wounded | FN Five-seveN 5.7mm semiautomatic pistol | **30- and 20-round magazines** |
| LA Fitness Center<br>Collier, Pennsylvania<br>August 4, 2009<br>Shooter:  George Sodini | 4 dead (including shooter), 9 wounded | Two 9mm semiautomatic pistols, .45 pistol, .32 pistol | **30-round magazines** |
| American Civic Association<br>Binghamton, New York<br>April 3, 2009<br>Shooter:  Jiverly Wong | 14 dead (including shooter), 4 wounded | 9mm Beretta semiautomatic pistol, .45 handgun | **30-round magazine** |
| Oakland, California<br>March 21, 2009<br>Shooter: Lovelle Mixon | 4 dead | SKS assault rifle | **High-capacity magazine** |
| Alabama, multiple locations<br>March 10, 2009<br>Shooter:  Michael McLendon | 11 dead (including shooter) | SKS assault rifle, Bushmaster AR-15 assault rifle, .38 pistol | **High-capacity magazines taped together** |
| Walt Lou Trailer Park<br>Stafford, Virginia<br>May 5, 2008<br>Shooter:  Aaron Poseidon Jackson | 4 dead (including shooter) | WASR-10 assault rifle, Smith & Wesson .38 revolver | **30-round magazines** |
| Northern Illinois University<br>DeKalb, Illinois<br>February 14, 2008<br>Shooter:  Steven Phillip Kazmierczak | 6 dead (including shooter), 21 wounded | Glock19 9mm pistol, Hi-Point 380, Remington12 gauge Sportsman 48 shotgun | **33- and 15-round magazines** |

5

Exhibit 20
Page 00803

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Westroads Mall<br>Omaha, Nebraska<br>December 5, 2007<br>Shooter:  Robert Hawkins | 9 dead (including shooter), 5 wounded | WASR-10 assault rifle | **Two 30-round magazines taped together** |
| Virginia Tech<br>Blacksburg, Virginia<br>April 16, 2007<br>Shooter:  Seung-Hui Cho | 33 dead (including shooter), 17 wounded | Glock 19 semiautomatic pistol, Walther P22 pistol | **15-round magazines** |
| Mail Processing Plant<br>Goleta, California<br>January 30, 2006<br>Shooter: Jennifer San Marco | 7 dead | Smith & Wesson 9mm model 915 semiautomatic pistol | **15-round magazine** |
| Living Church of God<br>Brookfield, Wisconsin<br>March 13, 2005<br>Shooter: Terry Ratzmann | 8 dead (including shooter) | Beretta 9mm semiautomatic pistol | **2 13-round magazines** |
| Hunting Camp<br>Birchwood, Wisconsin<br>November 21, 2004<br>Shooter:  Chai Vang | 6 dead, 3 wounded | SKS assault rifle | **20-round magazine** |
| Edgewater Technology Inc.<br>Wakefield, Massachusetts<br>December 26, 2000<br>Shooter:  Michael McDermott | 7 dead | AK-47 assault rifle, 12 gauge pump-action shotgun | **60-round, large-capacity feeding device** |
| Xerox<br>Honolulu, Hawaii<br>November 2, 1999<br>Shooter:  Byran Uyesugi | 7 dead | Glock 17 9mm semiautomatic pistol | **Three 15-round magazines** |
| Wedgewood Baptist Church<br>Fort Worth, Texas<br>September 15, 1999<br>Shooter:  Larry Gene Ashbrook | 8 dead (including shooter), 7 wounded | Sturm, Ruger P85 9mm semiautomatic pistol, .380 pistol | **Three 15-round magazines** |

6

Exhibit 20<br>Page 00804

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Columbine High School Littleton, Colorado April 20,1999 Shooters:  Eric Harris and Dylan Klebold | 15 dead (including shooters), 23 wounded | Intratec TEC-DC9 assault pistol, Hi-Point 9mm Carbine, Savage 67H pump-action shotgun, Savage 311-D 12-gauge shotgun | **High-capacity magazines (capacity unstated)** |
| Thurston High School Springfield, Oregon May 21,1998 Shooter:  Kip Kinkel | 4 dead, 22 wounded | 9mm Glock semiautomatic pistol, .22 Sturm Ruger rifle, .22 Sturm Ruger pistol | **50-round magazine** |
| Westside Middle School Jonesboro, Arkansas March 24, 1998 Shooters:  Andrew Golden and Mitchell Johnson | 5 dead, 10 wounded | M-1 rifle, Remington .30-06 rifle, various handguns | **15-round magazine** |
| Connecticut State Lottery Headquarters Newington, Connecticut March 6, 1998 Shooter:  Matthew Beck | 5 dead (including shooter) | Glock 9mm semiautomatic pistol | **19-round magazine** |
| Caltrans Maintenance Yard Orange, California December 18, 1997 Shooter:  Arturo Reyes Torres | 5 dead (including shooter), 2 wounded | AK-47 assault rifle | **Five 30-round magazines** |
| Piper Technical Center Los Angeles, California July, 19, 1995 Shooter: Willie Woods | 4 dead | Glock semiautomatic pistol | **19-round magazine** |
| DC Police Headquarters Washington, DC November 22, 1994 Shooter:  Bennie Lee Lawson | 4 dead (including shooter), 1 wounded | Cobray —11 assault pistol | **Extended magazine** |

7

Exhibit 20
Page 00805

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Fairchild Air Force Base hospital<br>Spokane, Washington<br>June 20, 1994<br>Shooter: Dean Mellberg | 5 dead (including shooter), 23 wounded | MAK-90 assault rifle | **75-round drum magazine** |
| Long Island Railroad<br>Long Island, New York<br>December 7, 1993<br>Shooter: Colin Ferguson | 6 dead, 19 wounded | Sturm, Ruger P-89 9mm semiautomatic pistol | **Four 15-round magazines** |
| Pettit & Martin Law Offices<br>San Francisco, California<br>July 1, 1993<br>Shooter: Gian Luigi Ferri | 9 dead (including shooter), 6 wounded | Two Intratec TEC-DC9 assault pistols, .45 pistol | **40- to 50-round magazines** |
| Luby's Cafeteria<br>Killeen, Texas<br>October 16, 1991<br>Shooter: George Hennard | 24 dead (including shooter), 20 wounded | Sturm, Ruger P-89 9mm semiautomatic pistol, Glock 9mm semiautomatic pistol | **17- and 15-round magazines** |
| General Motors Acceptance Corp.<br>Jacksonville, Florida<br>June 18, 1990<br>Shooter: James Pough | 10 dead (including shooter), 4 wounded | M-1 rifle, .38 revolver | **30-round magazines** |
| Standard Gravure Corporation<br>Louisville, Kentucky<br>September 14, 1989<br>Shooter: Joseph Wesbecker | 9 dead (including shooter), 12 wounded | AK-47 assault rifle, 2 MAC-11 assault pistols, .38 revolver, Sig Sauer 9mm pistol | **30-round magazines** |
| Cleveland Elementary School<br>Stockton, California<br>January 17, 1989<br>Shooter: Patrick Purdy | 6 dead (including shooter), 30 wounded | AK-47 assault rifle, Taurus 9mm pistol, unidentified pistol | **75-round drum magazine** |
| Palm Bay shopping center<br>Palm Bay, Florida<br>April 23, 1987<br>Shooter: William Cruse | 6 dead (including 2 police officers) | Sturm, Ruger Mini-14 assault rifle | **Five 30-round magazines** |
| McDonald's<br>San Ysidro, California<br>July 18, 1984<br>Shooter: James Huberty | 22 dead (including shooter), 19 wounded | Uzi Carbine, Browning 9mm pistol, Winchester 1200 pump-action 12-gauge shotgun | **25-round magazine** |

8

Exhibit 20<br>Page 00806

| Mass Shooting Incident | Casualties | Firearm(s) | High-Capacity Ammunition Magazine(s) |
|---|---|---|---|
| Ianni's Nightclub<br>Dallas, Texas<br>June 29, 1984<br>Shooter: Abdelkrim Belachheb | 6 dead, 1 wounded | Smith & Wesson 9mm semiautomatic pistol | **Two 14-round magazines** |
| Pennsylvania, multiple locations<br>September 25, 1982<br>Shooter: George Emil Banks | 13 dead, 1 wounded | AR-15 semiautomatic assault rifle | **30-round magazines** |
| Oregon Museum Tavern<br>Salem, Oregon<br>May 7, 1981<br>Shooter: Lawrence Moore | 4 dead, 19 wounded | Browning 9mm semiautomatic pistol | **Two 14-round magazines** |

9

Exhibit 20<br>Page 00807

# Exhibit 21

Exhibit 21
Page 00808

**Subscribe to The Trace's Newsletter**

× Close

# The Trace

March 22, 2018

- **Facebook**
- **Twitter**
- **Email**



*A 30 round magazine, left, and a 10 round magazine, right, below an AR-15.*

**GUN POLICY**

# Bans on High-Capacity Magazines, Not Assault Rifles, Most Likely to Limit Mass Shooting Carnage

**The Orlando shooting shows it's not what the gun looks like that matters — it's how many rounds it can fire without reloading.**

by **Alex Yablon**  · **@AlexYablon**  ·June 13, 2016

The day after the deadliest mass shooting in U.S. history, likely Democratic presidential nominee Hillary Clinton addressed the fears the massacre evoked. Speaking at an event in Cleveland, Ohio, Clinton highlighted what she saw as crucial steps for stopping such terrorist attacks in the future. Along with more aggressive intelligence gathering and better resources for local law enforcement, Clinton focused on one of the weapons used by the shooter in Orlando, Florida: a military-style rifle similar to the AR-15.

"It's essential we stop terrorists from getting the tools they need to carry out attacks," Clinton said, receiving the speech's loudest applause when she made clear that was referring to "assault

weapons" like the AR-15. Calling them "weapons of war," she argued that "they have no place on our streets."

Clinton's broad condemnation suggests she might push to revive the federal ban on assault weapons, a law her husband signed in 1994. The ban was among the most controversial gun reform policies of the past 20 years, and calls to re-institute it have come after many high-profile shootings.

But many experts doubt the ban had any significant impact before it expired in 2004.

Today, many experts instead believe the most effective means to lessen the carnage in attacks like the one in Orlando is to ban high-capacity magazines. These devices feed semiautomatic firearms, including handguns, large amounts of ammunition, allowing shooters to fire for longer before reloading. While assault-style rifles like the AR-15 could increase the lethality of an attack in some situations, they say, it is high-capacity magazines that allow shooters to fire dozens of shots without stopping.

**Officials** from the Bureau of Alcohol, Tobacco, Firearms, and Explosives said the Orlando shooter used a Sig Sauer MCX semiautomatic rifle, which fires as quickly as its user can pull the trigger and can be equipped with detachable magazines that hold any number of rounds. The Orlando shooter used 30-round magazines, according to the ATF, which are illegal in a handful of states, but not in Florida. That almost certainly contributed to the high body count, since the shooter did not have to pause to reload as frequently as he would have with a smaller magazine.

The semiautomatic rifle used in the Orlando massacre resembles those used in past mass shootings in Aurora, Colorado; Newtown, Connecticut; Roseburg, Oregon; and San Bernardino, California.

Though assault weapons have become a potent symbol of mass shootings, bans of that style of gun are a "distraction," said Adam Winkler, a UCLA law professor and the author of *Gunfight*. For starters, he says, it didn't actually stop manufacturers from selling assault rifles. Because the 1994 ban defined weapons based on "cosmetic" features like pistol grips or collapsible stocks, gun makers evaded these restrictions by removing just enough design features so as to not trigger the ban. Meanwhile, the weapons remained semiautomatic and could still accept magazines of any size.

Winkler says he believes a ban on magazines that hold lots of ammunition would be a more effective strategy in limiting the carnage from a mass shooting. "It makes far more sense to focus on high-capacity magazines than assault rifles," he says. Winkler notes that it's not the style of a gun but "the size of a magazine [that's] associated with the amount of damage a weapon can cause." (The 1994 law included such a ban, but there was no restriction on the sale or possession of high-capacity magazines, and millions remained in circulation.)

This thinking has guided policies in eight states, which ban in some form high-capacity magazines. New York's SAFE Act, signed into law weeks after the 2012 shooting in Newtown, Connecticut, included bans on possession of any magazine capable of holding more than 10 rounds. Later in 2013, Colorado banned the sale of magazines that carry more than 15 rounds.

In California, some local and state lawmakers have called for new restrictions on high-capacity magazines. The state already outlaws sale of the magazines, but not possession. After the state

Exhibit 21
Page 00810

was rocked by the San Bernardino shootings in December, Lieutenant Governor Gavin Newsom began campaigning to expand a Los Angeles law banning possession statewide.

Restrictions on assault weapons and high-capacity magazines are supported by a small majority of Americans. A poll conducted by the Johns Hopkins Bloomberg School of Public Health in March 2015 found that 63 percent of all Americans favored assault weapon bans, and 60 percent favored banning the sale of high-capacity magazines.

Californians support restrictions on assault weapons and magazine capacities at similar levels to the rest of the country. A poll conducted soon after the San Bernardino shooting by the Field Corporation, a San Francisco-based public opinion research firm, found that 58 percent of the state's voters supported banning possession of large magazines and 56 percent supported a broad assault weapons ban that included all semiautomatic rifles that can accept detachable magazines.

Florida voters have not been polled on assault weapon or magazine capacity restrictions since March 2013, when the most recent high-profile mass shooting had occurred about 1,000 miles away in Connecticut. Quinnipiac University pollsters found that Florida voters were slightly in favor of the laws: 56 percent favored a national assault weapons ban, and 53 percent favored a ban on magazines that hold more than 10 rounds.

At least one expert suspects those views might change in the wake of the nation's worst mass shooting. Susan MacManus, a professor of political science at the University of South Florida who conducts the Sunshine State poll on political issues, says of assault weapon and magazine capacity restrictions, "I am sure that support levels would be higher after yesterday's shooting."

*[Photo: AP Photo/Charles Krupa]*

## Support Our Work

### Help us tell the story of America's gun violence crisis.

Donate Now

# Exhibit 22

Exhibit 22
Page 00812



# Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School and 36 Yogananda Street, Newtown, Connecticut on December 14, 2012

## OFFICE OF THE STATE'S ATTORNEY
## JUDICIAL DISTRICT OF DANBURY
### Stephen J. Sedensky III, State's Attorney

**November 25, 2013**

Exhibit 22
Page 00813

## TABLE OF CONTENTS

EXECUTIVE SUMMARY ................................................................................................1

INTRODUCTION .........................................................................................................5

PURPOSE AND SCOPE OF REPORT .........................................................................6

SANDY HOOK ELEMENTARY SCHOOL - INCIDENT AND RESPONSE ............................9

SANDY HOOK ELEMENTARY SCHOOL – SCENE INVESTIGATION ..............................16

SANDY HOOK ELEMENTARY SCHOOL - AUTOPSY INFORMATION ............................23

36 YOGANANDA STREET, NEWTOWN, CT – INCIDENT AND RESPONSE ....................24

36 YOGANANDA STREET, NEWTOWN, CT – SCENE INVESTIGATION .........................24

36 YOGANANDA STREET, NEWTOWN, CT – AUTOPSY INFORMATION ......................27

SHOOTER – AUTOPSY INFORMATION ...................................................................27

INVESTIGATION TO DETERMINE ACCESSORIES AND/OR CO-CONSPIRATORS ........27

EVENTS AND BACKGROUND INFORMATION LEADING UP TO DEC. 14, 2012 ...........28

EVIDENCE EXAMINATION ......................................................................................35

MISCELLANEOUS INVESTIGATIVE LEADS ............................................................38

DETERMINATIONS OF CRIMES COMMITTED ........................................................40

CONCLUSION.........................................................................................................43

ACKNOWLEDGEMENTS.........................................................................................44

Exhibit 22
Page 00814

APPENDIX[1]

Search Warrants

Honda Civic – 12/14/2012 ..............................................................A1

36 Yogananda Street - 12/14/2012 at 5:29 p.m ..........................A10

36 Yogananda Street - 12/14/2012 at 7:25 p.m ..........................A21

36 Yogananda Street - 12/15/2012 at 3:03 p.m ..........................A31

36 Yogananda Street - 12/16/2012 at 4:31 p.m ..........................A38

ATT telephone – 4/10/2013 at 10:43 a.m. .................................A47

ATT telephone – 4/10/2013 at 10:47 a.m. .................................A54

Verizon telephone – 4/10/2013 at 10:51 a.m. ...........................A61

Combat Arms – Nexon – 08/27/2013 at 9:46 a.m. ....................A68

World of Warcraft – Blizzard - 8/27/2013 at 9:50 a.m..............A76

Time Line ...........................................................................................A84

SHES Floor Plan ...............................................................................A116

SHES and Parking Lot Map.............................................................A117

SHES Ballistics Diagram .................................................................A118

SHES Exterior Description ..............................................................A119

SHES Lobby, Hallway, Room 9 and Ballistics Description...........A125

SHES Classroom 8 Ballistics Description .....................................A134

SHES Classroom 10 Ballistics and Shooter Description...............A136

SHES Weight – Guns and Ammunition ..........................................A141

[1] Because of its volume, the Appendix to this report is published as a separate document.  Some of the search warrants and reports contained in the Appendix have been redacted to meet court orders, exceptions to the Freedom of Information Act, protect the identity of witnesses, protect records of child abuse or personal identification information.

Exhibit 22
Page 00815

SHES Newtown Emergency Response Plan ................................................................ A144

SHES Photographs ................................................................................................ A165

Yogananda Scene Description .............................................................................. A180

Yogananda Digital Image Report ........................................................................ A188

Yogananda Photographs ...................................................................................... A193

Yogananda Review of Electronic Evidence ......................................................... A211

Yogananda - Book of Granny .............................................................................. A220

Yogananda GPS Routes ........................................................................................ A223

Lanza, Adam – Toxicology .................................................................................. A231

iii

Exhibit 22
Page 00816

# EXECUTIVE SUMMARY

The purpose of this report is to identify the person or persons criminally responsible for the twenty-seven homicides that occurred in Newtown, Connecticut, on the morning of December 14, 2012, to determine what crimes were committed, and to indicate if there will be any state prosecutions as a result of the incident.

The State's Attorney for the Judicial District of Danbury is charged, pursuant to Article IV, Section 27 of the Constitution of the State of Connecticut and Connecticut General Statutes (C.G.S.) Sec. 51-276 *et seq.*, with the investigation and prosecution of all criminal offenses occurring within the Judicial District of Danbury. The Connecticut State Police have the responsibility to prevent and detect violations of the law and this State's Attorney has worked with and relied upon the Connecticut State Police since the incident occurred.

Since December 14, 2012, the Connecticut State Police and the State's Attorney's Office have worked with the federal authorities sharing responsibilities for various aspects of this investigation. Numerous other municipal, state and federal agencies assisted in the investigation. The investigation materials reflect thousands of law enforcement and prosecutor hours. Apart from physical evidence, the materials consist of more than seven-hundred individual files that include reports, statements, interviews, videos, laboratory tests and results, photographs, diagrams, search warrants and returns, as well as evaluations of those items.

In the course of the investigation, both state and federal law enforcement personnel received a large number of contacts purporting to provide information on the shootings and the shooter. Although many times these "leads" would go nowhere, each one was evaluated and often required substantial law enforcement time to pursue. An abundance of caution was used during the investigation to ensure that all leads were looked into, despite the fact that more than 40 such "leads" proved, after investigation, to be unsubstantiated. Information that was substantiated and relevant was made part of the investigation.

It is not the intent of this report to convey every piece of information contained in the voluminous investigation materials developed by the Connecticut State Police and other law enforcement agencies, but to provide information relevant to the purposes of this report. While no report is statutorily required of the State's Attorney once an investigation is complete, it has been the practice of State's Attorneys to issue reports on criminal investigations where there is no arrest and prosecution if the State's Attorney determines that some type of public statement is necessary. Given the gravity of the crimes committed on December 14, 2012, a report is in order.

On the morning of December 14, 2012, the shooter, age 20, heavily armed, went to Sandy Hook Elementary School (SHES) in Newtown, where he shot his way into the locked school building with a Bushmaster Model XM15-E2S rifle. He then shot and killed the principal and school psychologist as they were in the north hallway of the school responding to the noise of the shooter coming into the school. The shooter also shot and injured two other staff members who were also in the hallway.

Exhibit 22
Page 00817

The shooter then went into the main office, apparently did not see the staff who were hiding there, and returned to the hallway.

After leaving the main office, the shooter then went down the same hallway in which he had just killed two people and entered first grade classrooms 8 and 10, the order in which is unknown. While in those rooms he killed the two adults in each room, fifteen children in classroom 8 and five in classroom 10.  All of the killings were done with the Bushmaster rifle.

He then took his own life with a single shot from a Glock 20, 10 mm pistol in classroom 10.

Prior to going to the school, the shooter used a .22 caliber Savage Mark II rifle to shoot and kill his mother in her bed at the home where they lived at 36 Yogananda Street in Newtown.

The response to these crimes began unfolding at 9:35:39 a.m. when the first 911 call was received by the Newtown Police Department. With the receipt of that call, the dispatching and the arrival of the police, the law enforcement response to the shootings began. It was fewer than four minutes from the time the first 911 call was received until the first police officer arrived at the school. It was fewer than five minutes from the first 911 call, and one minute after the arrival of the first officer, that the shooter killed himself. It was fewer than six minutes from the time the first police officer arrived on SHES property to the time the first police officer entered the school building. In fewer than 11 minutes twenty first-grade pupils and six adults had lost their lives.

The following weapons were recovered in the course of this investigation: (1) a Bushmaster Model XM15-E2S semi-automatic rifle, found in the same classroom as the shooter's body. All of the 5.56 mm shell casings from the school that were tested were found to have been fired from this rifle. (2) a Glock 20, 10 mm semi-automatic pistol found near the shooter's body and determined to have been the source of the self-inflicted gunshot wound by which he took his own life. (3) a Sig Sauer P226, 9 mm semi-automatic pistol found on the shooter's person. There is no evidence this weapon had been fired. (4)  a Izhmash Saiga-12, 12 gauge semi-automatic shotgun found in the shooter's car in the parking lot outside the school, and which was secured in the vehicle's trunk by police responding to the scene. There is no evidence this weapon had been fired. (5) a Savage Mark II rifle found at 36 Yogananda Street on the floor of the master bedroom near the bed where the body of the shooter's mother was found. This rifle also was found to have fired the four bullets recovered during the autopsy of the shooter's mother.

All of the firearms were legally purchased by the shooter's mother. Additionally, ammunition of the types found had been purchased by the mother in the past, and there is no evidence that the ammunition was purchased by anyone else, including the shooter.

At the date of this writing, there is no evidence to suggest that anyone other than the shooter was aware of or involved in the planning and execution of the crimes that were committed on December 14, 2012, at Sandy Hook Elementary School and 36 Yogananda Street. From the time an unknown male was encountered by the Newtown police outside of the school during the initial response, until well after the staff and children had been evacuated, the thought that there may have been more than one shooter was a condition all responding law enforcement worked under as they cleared the school. Individuals located in the wooded areas surrounding the school

Exhibit 22
Page 00818

as the searches and evacuations were taking place were initially treated as suspect and handled accordingly (including being handcuffed) until their identity could be determined. The circumstances surrounding all of these individuals were fully investigated and revealed no additional shooters. DNA testing of evidence recovered from both the school and 36 Yogananda Street also revealed no potential accessories or co-conspirators.

It is the conclusion of this State's Attorney that the shooter acted alone and was solely criminally responsible for his actions of that day. Moreover, none of the evidence developed to date demonstrates probable cause to believe that any other person conspired with the shooter to commit these crimes or aided and abetted him in doing so.

Unless additional – and at this time unanticipated – evidence is developed, there will be no state criminal prosecution as result of these crimes. With the issuance of this report, the investigation is closed. Should additional reliable information related to the existence of accessories or co-conspirators come to the attention of the investigators, the investigation will be reopened.[2]

In the course of his rampage the shooter committed a number of crimes in violation of our Connecticut Penal Code.  The most significant are those where lives were taken and people were physically injured. In Sandy Hook Elementary School, the crime of Murder under Special Circumstances, in violation of C.G.S. Sec. 53a-54b, was committed twenty-six times and Attempted Murder under Special Circumstances in violation of C.G.S. Secs. 53a-49 and 53a-54b was committed twice as it relates to the two individuals who were shot by the shooter and survived. The crime of Murder in violation of C.G.S. Sec. 53a-54 was committed by the shooter in killing his mother.

The obvious question that remains is: "Why did the shooter murder twenty-seven people, including twenty children?" Unfortunately, that question may never be answered conclusively, despite the collection of extensive background information on the shooter through a multitude of interviews and other sources. The evidence clearly shows that the shooter planned his actions, including the taking of his own life, but there is no clear indication why he did so, or why he targeted Sandy Hook Elementary School.

It is known that the shooter had significant mental health issues that affected his ability to live a normal life and to interact with others, even those to whom he should have been close. As an adult he did not recognize or help himself deal with those issues. What contribution this made to the shootings, if any, is unknown as those mental health professionals who saw him did not see anything that would have predicted his future behavior. He had a familiarity with and access to firearms and ammunition and an obsession with mass murders, in particular the April 1999 shootings at Columbine High School in Colorado. Investigators however, have not discovered any evidence that the shooter voiced or gave any indication to others that he intended to commit such a crime himself.

---

[2] It should be noted that potentially important evidence, i.e., a computer hard drive recovered from the shooter's home, as of this date remains unreadable. Additional insight could be gained should efforts to recover data from the hard drive ever prove successful, which at this time appears highly improbable. It is because of this improbability, coupled with the current determination of no accessories or co-conspirators that the case is being closed.

Exhibit 22
Page 00819

This State's Attorney expresses his sincere sympathy and condolences to the victims of the incident of December 14, 2012, and to their families. He also expresses his appreciation for their continued patience and understanding during the course of the investigation and preparation of this report. He acknowledges and thanks law enforcement, which responded to Sandy Hook Elementary School in minutes and entered the building believing someone could be there ready to take *their* lives as well. He also acknowledges and thanks the staff of the Sandy Hook Elementary School who acted heroically.  The combination saved many children's lives.

This report would not have been possible if not for the assistance and cooperation of numerous agencies at the state, local and federal levels of government. The State's Attorney expresses his sincere gratitude and appreciation to all of these agencies and to all of the men and women who contributed so much to this investigation. The assistance of federal authorities has been invaluable. Particularly worthy of special note are the men and women of the Connecticut State Police, and in particular, the Western District Major Crime Squad.  The thoroughness and sensitivity with which they conducted their investigation is unmatched in my experience.

4

Exhibit 22
Page 00820

## INTRODUCTION

On the morning of December 14, 2012, Adam Lanza, the shooter,[3] age 20, went to Sandy Hook Elementary School (also SHES) in Newtown, Connecticut, where he shot his way into the building and killed twenty children and six adults and wounded two other adults, all with a Bushmaster Model XM15-E2S rifle. The shooter then took his own life with a single shot from a Glock 20, 10 mm handgun. From the time the doors of the school were locked at 9:30 a.m. until the time it is believed the shooter killed himself at 9:40:03, fewer than 11 minutes had elapsed.

Prior to going to the school, the shooter used a .22 caliber Savage Mark II rifle to shoot and kill his mother in her bed. This occurred at the home where they lived at 36 Yogananda Street, also in Newtown.

With these unprecedented horrific crimes came a responsibility for an investigation to determine what crimes were committed and, more importantly, if the shooter acted alone. Any person who aided and abetted the shooter or who conspired with him had to be held accountable.

Beginning on December 14, 2012, the Connecticut State Police and the State's Attorney's Office worked in cooperation with the federal authorities sharing responsibilities for various aspects of the case. The federal involvement has been invaluable. Though some evidence is still being examined, there is no indication in the investigation by either state or federal authorities to date that the shooter acted with anyone on December 14, 2012, or had co-conspirators or accessories who could be prosecuted.

In addition to physical evidence,[4] the investigation materials contain over seven-hundred individual files that include reports, statements, interviews, videos, laboratory tests and results, photographs, diagrams, search warrants and search warrant returns as well as evaluations of those items. Investigators interviewed individuals who were present at SHES on December 14, 2012, and witnessed the incident, among them students, staff members, parents of students and neighbors. Special attention and consideration was given to the interviewing of child witnesses, given their traumatic experience. Also interviewed were police officers and other first responders who were present at SHES during the course of the incident itself and in the course of the subsequent search, evacuation of the school and processing of the scenes.

Investigators attempted to obtain as much information about the shooter's life as possible in an effort to determine the reasons or motives for his actions on December 14, 2012. Interviews were conducted with members of the shooter's family, those who knew the shooter or his family throughout his life, as well as teachers and school personnel who had been involved with him and his family over his time in Newtown.

Efforts were made within the limits of privacy laws to gather information on medical consultations and/or treatments the shooter was involved with over the course of his years in Newtown. In doing so, investigators found no evidence to suggest the shooter had taken any

---

[3] Throughout the remainder of this report Adam Lanza will be referred to as "the shooter."

[4] Over 270 evidence designations were used, many grouping related items as one number.

Exhibit 22
Page 00821

medication that would affect his behavior or by any means to explain his actions on December 14, 2012.

An investigation of this magnitude requires careful planning and review. The interviews took substantial time, first to identify which individuals should be interviewed and then to conduct the actual interviews. Physical evidence had to be examined and forensically reviewed. This included ballistics, fingerprint and DNA analysis. Additionally, all of the information collected had to be reviewed and summarized in written statements that have since become a part of the investigation, reflecting thousands of dedicated law enforcement and prosecutor hours.

I had been working closely with the Connecticut State Police, who conducted the state investigation, and federal law enforcement officers since December 2012.   Once the investigation was delivered for my review, I took the time to read, digest, evaluate and summarize the material, mindful of the privacy interests involved and the approaching December 14, 2012, anniversary.

The federal authorities have stated that under federal law many of their reports and materials cannot become part of the public record due to rules regarding the dissemination of information obtained pursuant to grand jury subpoenas, sealed search warrants, and federal Freedom of Information law. Therefore, information obtained by federal authorities will not, for the most part, be incorporated into the Connecticut State Police criminal investigation file.

While the reports and materials will not be part of the state investigation record, such materials have been examined and considered by state law enforcement authorities. Based upon a review of all of the documentation, both state and federal, we are left confident at this time that the evidence developed to date does not reveal co-conspirators or accessories. Accordingly, as a result of the investigation to date, there will be no state criminal prosecution of anyone.

## PURPOSE AND SCOPE OF REPORT

The State's Attorney's Office for the Judicial District of Danbury is charged, pursuant to Article IV, Sec. 27 of the Connecticut State Constitution[5] and Connecticut General Statutes (C.G.S.) Sec. 51-276[6] *et seq*., with the investigation and prosecution of all criminal offenses occurring within the Judicial District of Danbury. The Connecticut State Police have the responsibility to prevent and detect violations of the law and this State's Attorney has worked with and relied upon the Connecticut State Police since the incident occurred. The investigation has been

---

[5] Connecticut Constitution Article 4, Sec. 27.  There shall be established within the executive department a division of criminal justice *which shall be in charge of the investigation and prosecution of all criminal matters.* Said division shall include the chief state's attorney, who shall be its administrative head, and the state's attorneys for each judicial district, which districts shall be established by law. The prosecutorial power of the state shall be vested in a chief state's attorney and the state's attorney for each judicial district.

[6] Sec. 51-276. Division established. There is hereby established the Division of Criminal Justice within the Executive Department, which shall be in charge of the investigation and prosecution of all criminal matters in the Superior Court. The Division of Criminal Justice shall be an agency within the Executive Department with all management rights except appointment of all state's attorneys.

Exhibit 22
Page 00822

tirelessly conducted by the Connecticut State Police (also CSP) with the assistance of multiple local, state and federal agencies, both in and out of Connecticut.

While no report is statutorily required of the State's Attorney once the investigation is complete, it has been the practice of state's attorneys to issue reports on criminal investigations where there is no arrest and prosecution if the state's attorney determines that some type of public statement is necessary.[7] Given the gravity of the crimes committed on December 14, 2012, a report is in order.

The purpose of this report is to identify the person or persons criminally responsible for the twenty-seven homicides that occurred in Newtown, Connecticut,[8] on the morning of December 14, 2012, to determine what crimes were committed, and to indicate if there will be any state prosecutions as a result of the incident.

Many witnesses to this case have expressed great concern that their identities will be disclosed publicly and make them susceptible to threats or intimidation as a result of their cooperation or connection with the investigation.[9] This cooperation has been essential and greatly appreciated. As a result of the witnesses' concerns, this report will not identify lay witnesses, except where necessary.

Consistent with Public Act 13-311,[10] exceptions to the state Freedom of Information Act[11] and C.G.S. Sec. 17a-101k(a) [12] this report will not list the names of the twenty children killed in

---

[7] See for example: Statement of David I. Cohen, State's Attorney for the Judicial District of Stamford/Norwalk, in reference to the February 16, 2009, attack on Charla Nash by the Chimpanzee Named Travis, Issued December 7, 2009;  Statement of the State's Attorney for the Judicial District of Stamford-Norwalk Concerning the Fatal Fire on December 25, 2011, at 2267 Shippan Avenue, Stamford, Issued June 8, 2012; and Report of the State's Attorney for the Judicial District of Ansonia-Milford on the Murder of Shangyl Rasim on January 17, 2010, Issued May 24, 2010.

[8] Newtown, Connecticut is within the Judicial District of Danbury.

[9] In fact, some witnesses have had that occur to them.

[10] An Act Limiting the Disclosure of Certain Records of Law Enforcement Agencies and Establishing a Task Force Concerning Victim Privacy Under the Freedom of Information Act.

[11] See C.G.S. Sec. 1-210.

[12] Sec. 17a-101k. Registry of findings of abuse or neglect of children maintained by Commissioner of Children and Families. Notice of finding of abuse or neglect of child. Appeal of finding. Hearing procedure. Appeal after hearing. Confidentiality. Regulations. (a) The Commissioner of Children and Families shall maintain a registry of the commissioner's findings of abuse or neglect of children pursuant to section 17a-101g that conforms to the requirements of this section. The regulations adopted pursuant to subsection (i) of this section shall provide for the use of the registry on a twenty-four-hour daily basis to prevent or discover abuse of children and the establishment of a hearing process for any appeal by a person of the commissioner's determination that such person is responsible for the abuse or neglect of a child pursuant to subsection (b) of section 17a-101g. The information contained in the registry and any other information relative to child abuse, wherever located, shall be confidential, subject to such statutes and regulations governing their use and access as shall conform to the requirements of federal law or regulations. Any violation of this section or the regulations adopted by the commissioner under this section shall be punishable by a fine of not more than one thousand dollars or imprisonment for not more than one year.

Exhibit 22
Page 00823

Sandy Hook Elementary School, nor will it recite 911 calls made from within the school on that morning or describe information provided by witnesses who were in the classrooms or heard what was occurring in the classrooms.

It is not the intent of this report to convey every piece of information contained in the voluminous investigation materials developed by the Connecticut State Police and other law enforcement agencies, but to provide information relevant to the purposes of this report.

---

To conclude that *all* such information, including the basic facts of the incident itself is confidential would prohibit even the disclosure of the children being killed. Such an interpretation would be unworkable and is not taken here. It is concluded though that the C.G.S. Sec. 17a-101k(a) is applicable in the present case and will be applied in the manner described.

Exhibit 22
Page 00824

## SANDY HOOK ELEMENTARY SCHOOL - INCIDENT AND RESPONSE

### Incident

On the morning of December 14, 2012, the shooter parked his 2010 Honda Civic next to a "No Parking" zone outside of Sandy Hook Elementary School in Newtown, Connecticut.[13] Shortly after 9:30 a.m. he approached the front entrance to the school.[14]   He was armed with a Bushmaster Model XM15-E2S rifle (also Bushmaster rifle), a Glock 20, 10 mm pistol and a Sig Sauer P226, 9 mm pistol and a large supply of ammunition.

The doors to the school were locked, as they customarily were at this time, the school day having already begun. The shooter proceeded to shoot his way into the school building through the plate glass window to the right of the front lobby doors.

The main office staff reported hearing noises and glass breaking at approximately 9:35 a.m. and saw the shooter, a white male with a hat and sunglasses, come into the school building with a rifle type gun. The shooter walked normally, did not say anything and appeared to be breathing normally. He was seen shooting the rifle down the hallway.

Just down the hallway from the main office, in the direction that the shooter was to be seen firing, a 9:30 a.m. Planning and Placement Team (PPT) meeting was being held in room 9, a conference room. It was attended by Principal Dawn Hochsprung and School Psychologist Mary Sherlach, together with a parent and other school staff. Shortly after the meeting started, the attendees heard loud banging. The principal and school psychologist then left the room followed shortly after by a staff member. After leaving the room, Mrs. Hochsprung yelled "Stay put!"

As the staff member left the room, the staff member heard gunshots and saw Mrs. Hochsprung and Mrs. Sherlach fall down in front of the staff member. The staff member felt a gunshot hit the staff member's leg. Once down, the staff member was struck again by additional gunfire, but laid still in the hallway. Not seeing anyone in the hallway, the staff member crawled back into room 9 and held the door shut. A call to 911 was made and in the ensuing moments the telephone in room 9 was also used to turn on the school wide intercom system. This appears to have been done inadvertently, but provided notice to other portions of the building.[15]

---

[13]  On December 13, 2012, the student enrollment was 489.  Official attendance had not yet been recorded as of 9:30 a.m. on December 14, 2012. The staff for the school is 91, but on December 14, 2012, there were nine staff members absent.  The staffing was at 82 for the day.

[14]  A more complete description of the school building and the front entrance starts on page A119 of the Appendix. For the purposes of this report, the front of SHES faces north.

[15]  Intercom system could be accessed from nine phones located in seven rooms.  These telephones and rooms were three phones in the main office, the principal's office, the nurse's office (room 57), room 9 conference room, room 29, room 32 and room 60. The "All Call" which opens the intercom to the entire school was accessed by pressing "#0" from the telephones mentioned. The All Call-except quiet rooms was accessed by pressing "#1."

Exhibit 22
Page 00825

At the same time the shooter was firing in the hallway, another staff member was at the far east end of the hallway near classroom 1. The staff member was struck by a bullet in the foot and retreated into a classroom.

Both Dawn Hochsprung, age 47, and Mary Sherlach, age 56, died as a result of being shot. Both wounded staff members shot in the hallway were later evacuated to the hospital and survived.

After shooting and killing the two adults and wounding the two others, the shooter entered the main office. The office staff had taken shelter in the office. They heard sounds of the office door opening, footsteps walking inside the office and then back toward the office door. Staff members heard the door open a second time and then heard more gunfire from outside the office. They called 911.

Where the shooter specifically went next is unclear. The evidence and witness statements establish the shooter went down the hallway in an easterly direction ultimately entering first grade classrooms 8 and 10. The order is not definitively known. While in classrooms 8 and 10, the shooter shot and killed four adults and twenty children with the Bushmaster rifle. Twelve children survived, one from classroom 8 and eleven from classroom 10.

The shooter finally killed himself in classroom 10 with one gunshot to his head from a Glock 20, 10 mm pistol. This is believed to have occurred at 9:40:03.[16]

Classroom 8's substitute teacher was Lauren Rousseau, age 30, who was assisted by Rachel D'Avino, age 29, a behavioral therapist. Fifteen children were found by police. Fourteen who were deceased and one who was transported to Danbury Hospital and later pronounced dead. The two adults were found deceased close to the children. In all, seventeen people were killed in classroom 8. A sixteenth child survived and exited classroom 8 after the police arrived.

Classroom 10's teacher was Victoria Soto, age 27.  Working with her was Anne Marie Murphy, age 52, a behavioral therapist.  Five children were found, with Mrs. Murphy partially covering one child.  Four of the five children were deceased. One of the five children was transported to the hospital and pronounced dead. Miss Soto was found deceased in the room near the north wall with a set of keys nearby. Nine children had run out of the room and survived. A police officer found two uninjured children in the class restroom.

In all, eighteen children and six adult school staff members were found deceased within the school.  Two more children were pronounced dead at Danbury Hospital. Two other adult school staff members were injured and were treated at nearby hospitals and survived.

The two classrooms on either side of 8 and 10 were numbered 6 and 12. Classroom 6 was on the eastern side of classroom 8 and classroom 12 was on the western side of classroom 10.  Staff and students hid in the class restrooms, locking the restroom doors from the inside.

---

[16] See the time line in the Appendix starting at page A84.

Exhibit 22
Page 00826

Throughout the rest of the school, staff and students hid themselves wherever they happened to be at the time they became aware of gunfire. The staff used various ways to keep the children calm, from reading to having them color or draw pictures. Those hiding in rooms closest to the shooter kept silent. Some people were able to escape out of the building prior to the police arrival and went to Sandy Hook center, nearby residences, or received rides from parents going to the school or from passersby.

One staff member heard a loud crashing noise and ran toward the front lobby. As the staff member got closer, bullet holes could be seen and gun powder smelled. Realizing what was going on, the staff member immediately called 911, turned and went back down the hall from where the staff member had come. During the incident, while staying on the line with the 911 operator, this staff member sent other staff to their rooms or had them stay in their rooms and this staff member went about locking doors. The staff member remained in the hallway on the telephone with the 911 operator until the police arrived.

**Response**

Upon the receipt of the first 911 call, law enforcement was immediately dispatched to the school. It was fewer than four minutes from the time the first 911 call was received until the first police officer arrived at SHES. It was fewer than five minutes from the time the first 911 call was received until the shooter killed himself. It was fewer than six minutes from the time the first police officer arrived on SHES property to the time the first police officer entered the school building.

Below is an abbreviated time line from the first 911 call received to the time the police entered the school building.[17]

9:35:39 - First 911 call to Newtown Police Department is received.

9:36:06 - Newtown Police Department dispatcher broadcasts that there is a shooting at Sandy Hook Elementary School.

9:37:38 - Connecticut State Police are dispatched to SHES for active shooter.

9:38:50 - CSP are informed that SHES is in lockdown.

9:39:00 - First Newtown police officer arrives behind SHES on Crestwood Rd.

9:39:13 - Two more Newtown officers arrive at SHES and park on the driveway near the ball field. Gunshots are heard in the background.

---

[17] See page A84 of the Appendix for full time line put together by the Connecticut State Police Western District Major Crime Squad. This time line was compiled from 911 calls, witness statements, police car cameras, police radio and police dispatch transmissions.

Exhibit 22
Page 00827

9:39:34 -   Newtown officer encounters unknown male running along the east side of SHES with something in his hand.

9:40:03 -   Last gunshot is heard. This is believed to be the final suicide shot from the shooter in classroom 10.

9:41:07 -   Information is relayed as to the location of the last known gunshots heard within SHES, the front of the building.

9:41:24 -   Newtown officer has unknown male prone on ground, starting information relay regarding possibly more than one shooter.

9:42:39 -   Newtown officer calls out the license plate of the shooter's car.

9:44:47 -   Newtown officers enter SHES.

9:46:23 -   CSP arrive at SHES.

9:46:48 -   CSP enter SHES.

As the gravity of the situation became known, local, state and federal agencies responded to the scene to assist.

From the time the unknown male was encountered by the Newtown police outside of SHES until after the staff and children were evacuated, all responding law enforcement operated under the belief that there may have been more than one shooter and acted accordingly.[18]

For example, K-9 units were brought in to search the area and officers were posted to act as lookouts to ensure the safety of those evacuating the school building. Some people were located in the areas surrounding the school as the searches and evacuations were taking place. Some of those individuals were treated initially as suspects and handled accordingly, including being handcuffed, until their identities and reason for being there could be determined.

Some of these detentions included:

1.  The initial unknown male who turned out to be a parent with a cell telephone in his hand;
2.  Two reporters located in the woods around SHES, who were held at gun point by Department of Energy and Environmental Protection (DEEP) police officers until their identities could be determined; and
3.  A man from New York who was working in a nearby town and went to SHES after an application on his cell telephone alerted him to the situation at the school. He drove to the firehouse and went up to the school on foot. He was taken from the scene

---

[18] In fact, the possibility that there was more than one shooter remained a consideration beyond December 14, 2012. It was only after potential leads were investigated that investigators became confident that the shooter was not aided in any way by others and that no one knew of the shooter's plan prior to December 14, 2012.

Exhibit 22
Page 00828

of the school in handcuffs and later to Newtown Police Department. It was later
determined that he did not have a connection to the shooting and had gone to SHES to
see what was going on.

As noted above, on December 14, 2012, there was a concern that there may have been more than
one shooter.  This was based upon a number of factors:

1. The initial police encounter with the unknown male outside SHES;[19]
2. Reports by school personnel during the shooting on a 911 call of seeing someone
   running outside the school while the shooting was ongoing;
3. The location of two black zip up sweat jackets on the ground outside of the shooter's
   car;
4. The discovery of an Izhmash Saiga-12, 12 gauge shotgun and ammunition in the
   passenger compartment of the shooter's car. A police officer moved this shotgun and
   ammunition to the car's trunk for safety purposes;
5. Shell casings that were located outside of the school; and
6. The apparent sound of gunfire coming from outside of the school;

The subsequent investigation revealed there were no additional shooters based upon:

1. Searches of the area and examinations of local business security surveillance videos;
2. Persons detained revealed they were not connected to the shootings. In the case of the
   initial unknown male, he was identified as the parent of a student and had a cell
   telephone, rather than a weapon, in his hand;
3. Witness interviews which indicated that no witness saw anyone other than the
   shooter, with a firearm;
4. Witness interviews in which it was determined that a number of SHES staff had
   escaped from the school through a window and had been running outside the school
   building during the shootings;
5. The shotgun located in the shooter's car had been purchased by the shooter's mother
   previously;
6. The two sweat jackets were both C-Sport brand black zip up hooded sweat jackets
   with no size listed and were located immediately outside the shooter's car;[20] Both are
   believed to have been brought there by the shooter;[21]
7. The live shotgun shells (other than the one found on the shooter and the ones found in
   the shooter's car) that were located inside and outside of the school were in locations
   where first responders had been. Additionally, there were first responders who

[19] The man was later determined to be the parent of one of the school's children and the item in his hand was a cell
telephone.

[20] See the Appendix at page A174.

[21] A parent who arrived at SHES as the shooting was taking place saw the shooter's car parked in front of the school
with the passenger side door open and the two sweat jackets on the ground near the car.  To the parent, the jackets
looked like two black blankets on the ground.

13

Exhibit 22
Page 00829

reported missing live shotgun rounds. Moreover, the shells were found in locations where there had not been reported sightings of any non-law enforcement individuals;

8. There were no expended shotgun shells found in the actual crime scene nor were any expended 12 gauge shotgun pellets or slugs recovered;

9. The only expended casings located outside of the school building were 5.56 mm casings located just outside the school's front entrance, consistent with the shooter's entry into the school; and

10. The officer who heard what he believed to be outside gunfire was in a position to have heard the shooter's gunfire coming from window openings in the classroom in which the shooter was firing.

Stopping the active shooter was the first priority. Once that occurred, the location and treatment of the victims, the search for additional shooters, and the safe evacuation of the school were of primary importance.[22] The collection of evidence and the preservation and documentation of the crime scene, while important, came second.

Two command centers were set up, one at the firehouse on Riverside Road and the other at Newtown's Emergency Operations Center, located on the Newtown Fairfield Hills Campus.  In the week immediately after the shootings, services to victims' families and victims, as well as support to the investigators in the school were handled out of the firehouse. All other aspects of the investigation not related to the school itself were run out of the Emergency Operations Center.

Investigation responsibilities were handled as follows:[23]

**Connecticut State Police (CSP)**

> **CSP-Western District Major Crime (WDMC)** squad was the lead CSP unit for the entire investigation and acted as the coordinating law enforcement agency for other agencies and units of the CSP.[24] The van unit processed the interior of SHES.

> **CSP-Central District Major Crime (CDMC)** squad van unit processed the exterior of SHES, including the shooter's car, and established the temporary morgue[25] with the

---

[22] One of the difficulties encountered was the inability of state police radios to operate within SHES.

[23] This report does not include a listing of all of the law-enforcement and non-law enforcement service providers and their actions. In the days and weeks that followed the tragedy, local, state and federal agencies provided help to the Town of Newtown and its families through counseling, funeral protection, traffic control, handling bomb threats as well as many other services. Additionally, the CSP set up an invaluable law enforcement liaison program with the families of the deceased victims in which a state or local police officer was specifically assigned to the family of a deceased victim to provide communication and protection in the days and weeks that followed December 14th.

[24] WDMC Squad and Van, as the lead CSP unit, over the course of the week that followed was there for seven days processing the interior scene, the shooter and victims' personal effects, including assisting with the packing and removal of furniture from the immediate scene.

[25] The Department of Public Health provided and set up the portable tent used for the temporary morgue.

Exhibit 22
Page 00830

OCME to identify and document the decedents prior to their being moved to the OCME in Farmington.[26] CDMC also attended the autopsies at the OCME and did a secondary search of 36 Yogananda Street, as well as photographing doors and locks in SHES.

**Eastern District Major Crime (EDMC)** squad processed the scene at 36 Yogananda Street and were the investigators for the shooting of Nancy Lanza, the shooter's mother.

**CSP-Emergency Services Unit (ESU), Tactical Teams**, were assigned to both SHES and 36 Yogananda Street to handle the clearing of the scenes and rendering them safe.[27]

**CSP – Troop A, Southbury and CSP from other troops and units,** in addition to being first responders, worked to secure the scene and worked with WDMC and the OCME.

**Computer Crimes and Electronic Evidence Unit** handled the seizure and examination of additional electronic evidence from 36 Yogananda Street together with EDMC, CDMC and WDMC.

**CSP - Collision, Analysis and Reconstruction Squad (CARS)** was assigned to produce the sketch maps for both the interior and exterior of the school.

**CSP -** On December 14, 2012, virtually every aspect of the CSP was engaged in the response to SHES and 36 Yogananda Street. For example, included in the first responders were troopers and detectives, not only from Troop A in Southbury, but other troops and units as well, including the Statewide Narcotics Task Force.

**Department of Energy and Environmental Protection (DEEP)** provided first responders at SHES.

**Forensic Science Laboratory, Division of Scientific Services, Department of Emergency Services and Public Protection (DESPP)** examined items seized and collected from SHES and 36 Yogananda Street.

**Office of the Chief Medical Examiner (OCME)** was responsible for investigating the cause and manner of the deaths involved in this case and worked with the CSP in setting up the temporary morgue at SHES that was used to identify and document the deceased prior to their being moved to Farmington.

**Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF)** in addition to responding to both scenes, worked on the firearms aspect of the investigation.

---

[26] WDMC and CDMC personnel were also assigned and paired with the FBI to conduct interviews and neighborhood canvasses as well as assist with the identification of victims, investigate a report of another shooter at a hospital, as well as prepare search warrants and attend autopsies.

[27] There were numerous law enforcement agencies that worked on the clearing of SHES and the protection of those who were doing the clearing.

Exhibit 22
Page 00831

**Federal Bureau of Investigation (FBI)** – in addition to responding to the scenes, handled interviewing of witnesses and investigation both at a local level and on a national level. The Tactical Team assisted with the clearing of the school. The Behavioral Analysis Unit (BAU), as part of the search warrant execution for 36 Yogananda Street, was provided with materials for review. They provided their expertise in the preparation of witness interviews. The Victim Assistance Unit worked with victims' families, victims and witnesses.

**United States Attorney's Office** was stationed at the Emergency Operations Center overseeing the investigation into the possible commission of federal crimes and the issuance of federal legal process, as well as coordinating the various federal agencies involved in assisting with the state investigation.

**United States Marshals Service, Technical Operations Group** provided technical and investigation assistance.

**United States Postal Service** looked for mail that may have been relevant to the investigation.

**Municipal Police Departments** from around the state assisted throughout the Town of Newtown, including being first responders at SHES, handling calls in town and the tremendous inflow of media and visitors to the Town in the weeks after December 14, 2012.

**Newtown Police Department** in addition to being first responders, worked to secure the scene and assisted WDMC.

**Office of the State's Attorney, Judicial District of Danbury (SAO)** – oversaw the state investigation, working with the Connecticut State Police.  Together with the assistance of the Office of the Chief State's Attorney, the SAO was stationed at the Emergency Operations Center starting December 14, 2012, and oversaw the legal issues and state aspect of the investigation including search warrant review, child witness issues, working with the federal authorities, etc.


## SANDY HOOK ELEMENTARY SCHOOL – SCENE INVESTIGATION

On the afternoon of December 14, 2012, the WDMC and CDMC van units began documenting the crime scene and collecting evidence. The units could not begin this process until the scene was declared safe. The scene processing took seven days.

The scene was thoroughly processed, with the WDMC van unit handling the interior of SHES and the CDMC van unit covering the exterior. This processing included extensive written documentation as well as taking videos and thousands of photographs and measurements. In addition to the recovery of evidence, bullet trajectories were analyzed and documented.

My description of the scene processing starts with the front entrance and moves into the school building itself. This does not necessarily reflect the actual order in which the crime scene was processed. Many descriptions come directly from the investigation reports but are not in quotation marks to ease reading.

Exhibit 22
Page 00832

The conditions of windows and doors were documented, but some may have been disturbed by police and emergency personnel during the emergency response and protective sweep of the building. Similarly, other items of evidence, such as shell casings, may not have been found in their original positions because, as mentioned previously, the first priority was to locate and neutralize any active shooter, followed by the location and treatment of the victims, the search for additional shooters and the safe evacuation of the school. Only then could evidence collection begin.

**Interior**

Sandy Hook Elementary School was[28] a one story brick public school building of approximately 66,000 square feet, built in 1954. The building was on Dickinson Drive off of Riverside Road in the Sandy Hook section of Newtown. The front of the building sat in a magnetic northeast direction, but will be considered north for the purposes of this report. See the diagram at page 19.

SHES was rectangular in shape with four hallways in the main building and portable classrooms attached to the rear (south) side which were accessed from the south side of the main building. Classrooms on the exterior walls had even numbers and interior classrooms had odd numbers.

-   **Main entrance**

The main entrance to the school was located next to the large glass window that the shooter shot out to enter the school. A patio area was just before the entrance doors. The entrance to the lobby consisted of two sets of locked full glass doors that opened outwardly using a pull handle. They were separated by a small vestibule. The doors were secured with an electronic locking mechanism.  The doors could be opened from the inside with a horizontal push bar across the middle of the door.

The broken area of the window that the shooter shot out measured approximately 35.33 inches wide and 42.5 inches high.[29]

The exterior of the main entrance door way had a call box, buzzer system with a video camera. The call box was installed in 2005.  The video camera did not record, but the video could be viewed live on three monitoring systems on the secretaries' desks in the main office, with no recording capabilities. The electronic unlocking of the front doors was done by using a "key button" on any of the three monitoring systems.

Glass shards were located just before and to the side of the outside entrance doors on the patio and plantings in the area and also on the floor in the lobby.[30] Eight expended brass colored 5.56

---

[28] SHES was demolished in October and November 2013.

[29] See the Appendix starting at page A168.

[30] See the Appendix at page A169 and A171.

Exhibit 22
Page 00833

mm bullet casings stamped with "S&B 60 5.56x45"[31] were located in the area outside the broken window and front entrance doors. These were seized.

The front entrance led into the school's lobby. The lobby measured approximately 28 feet north to south and 36 feet east to west.  The southeast corner of the lobby allowed open access to the north hallway of the school. Sixteen brass colored expended 5.56 mm bullet casings were located on the floor within the lobby area and were seized. Furniture in the lobby area had holes consistent with having been struck by a bullet. There were eleven damaged areas consistent with bullet strikes in the lobby.

-   **North Hallway**

The hallway on the north side of the building, where the shootings occurred, ran east to west and contained the lobby and main office, inside of which was the nurse's office. The hallway also contained rooms numbered 1-10, 11A-5 and 12. The bulk of the scene processing occurred in this area. See the diagram on page 19.

The ceiling as in the lobby was 8 feet high.  And the width of the hall was 8.5 feet. The even numbered rooms were on the north side of the hallway with classroom 12 being the western most classroom and classroom 2 being the eastern most. The odd numbered rooms were on the south side of the hallway with the main office being the western most room and classroom 1 being the eastern most. East of the main office was a closet labeled "11A-5 storage" and the east of the closet was a conference room identified as Room 9.

The doors in the hallway all locked from the outside with a key. The interior door handles had no locking mechanism. All of the doors opened outwardly toward the hallway. All doors were solid wood with a circular window in the upper half of the door.[32]

All classrooms in the north hallway had a restroom and a closet. The restrooms were uniformly designed, approximately 4 feet 7 inches by 3 feet 6 inches with a solid wood door. The door of each restroom opened inward and away from the toilet. Each restroom door had a knob push button lock on the inside handle and a key lock on the outside handle.[33] The conference room did not have a restroom.

Classrooms in the north hallway 12 and 10, 8 and 6, 6 and 4, and 3 and 5 respectively had an interior door that was shared by the two classrooms.

---

[31] The ammunition used by the shooter in the Bushmaster rifle has been described as .223 caliber, 5.56 mm NATO and 5.56 X 45.  All of these descriptions are for similar bullets (cartridges) that can be fired from the Bushmaster rifle. The ammunition that the shooter used in this case for the Bushmaster bore the stamp "S&B 60  5.56 X 45" on the base of the cartridges and will be referred to as a 5.56 mm round.  The distinction between a .223 cal. and a 5.56 mm is not relevant to this report.

[32] See the Appendix at page A178 for an example of classroom door locks.

[33] See the Appendix at page A177 for an example of restroom door locks.

Exhibit 22
Page 00834



Exhibit 22
Page 00835

The bodies of Mrs. Hochsprung and Mrs. Sherlach were located in the western-most area of the north hallway, near the lobby. One brass colored expended 5.56 mm casing was located and seized from the floor in the area of Mrs. Hochsprung and Mrs. Sherlach.[34] In addition to the 5.56 mm ballistics, one 10 mm shell casing was found in the north hallway and was later identified as having been fired from the Glock 20, 10 mm pistol found near the shooter.

- **Conference Room (Room 9)**

Conference room 9 was on the south side of the north hallway on the opposite side of the hallway and approximately 16 feet east of the door for classroom 12. The room had a telephone mounted in the center of the west wall.

- **Classroom 12**

Classroom 12 was located on the north side of the north hallway and was the first classroom east of the front lobby. The classroom door was located 23 feet east of the lobby. The window to the door was covered on the hallway side with dark colored paper that was there from a previous lockdown drill.

- **Classroom 10**

Classroom 10 was located on the north side of the north hallway and was the second classroom east of the front lobby. The hallway door was approximately 27 feet east of classroom 12. The window was not completely covered, but did have a decoration over part of the inside of the window.

The room measured 27 feet east to west and 30 feet north to south with carpeted floors and painted cinder block walls. There were large windows across the north wall, which provided a view into the front (north) parking lot. Fluorescent ceiling lights turned on automatically when the room was entered. As mentioned previously, there was a restroom in the room and a closet. This closet door had no lock. The door that provided access to classroom 12 was on the center of the west wall. This had a key lock on both sides and the door was unlocked. There was a telephone mounted on the south side of the east wall north of the closet. An Emergency Response Packet Plan was hanging on the south wall. The packet was above a map depicting the emergency evacuation route for this classroom.

The classroom door that opened into the north hallway could only be locked with a key from the outside (hallway side). The door was unlocked with no signs of forced entry.

In the window area for classroom 10 there were no less than nine holes consistent with being bullet holes. Investigators conducted a trajectory analysis of the shots that went through the window area of classroom 10. No determination could be made as to whether the shots through the window area were intended for the outside of the building. In other words, it could not be determined whether the shooter, while in classroom 10, had intentionally fired at something or

---

[34] See the Appendix starting at page A130 for a description of the ballistics evidence from the north hallway.

Exhibit 22
Page 00836

someone outside of the building. There was no indication that any shots through the window area of classroom 10 came from outside of the school. All of the evidence indicates that shots went out of the window area of classroom 10 and into the parking area north of the school.

Classroom 10 evidence is further described below.

- **Classroom 8**

Classroom 8 was located on the north side of the north hallway and was the third classroom east of the front lobby, with its entrance door approximately 27 feet east of classroom 10. As with the others, its classroom door opened out into the hallway and could only be locked from the hallway side with a key. The window was not covered. The classroom door to the hallway was unlocked with no signs of forced entry.

The room dimensions and construction were similar to those of classrooms 10 and 12. There was also a restroom in this classroom. The closet door in classroom 8 had no locking device. There were also large glass windows across the north wall providing a view into the front (north) parking lot of the school. There was a wall telephone in the room on the south side of the east wall, north of the closet. An "Emergency Response Plan" packet was hanging on the south wall adjacent to the east side of the entrance door. This packet was above a map depicting the emergency evacuation route for the classroom.

The door that connected into classroom 6 was on the north side of the east wall, had key locks on both sides of the door.  The door was unlocked.

Ballistic evidence located in classroom 8 is described in the Appendix at page A134, which includes a total of twenty-four rounds of 5.56 mm ammunition found, of which ten rounds were in one PMAG 30 magazine, thirteen rounds were in another such magazine and one live round was on the floor. There was a third empty PMAG 30 magazine seized. There were a total of eighty expended 5.56 mm casings seized from classroom 8.

- **Classrooms 6 and 4**

Located on the floor of classroom 6 was one live round "Federal Tactical" 12 gauge shotgun slug shell (Exhibit 49). This shotgun shell was made of clear-like plastic and was different in color from the shotgun shell that was seized on the shooter's person. On the floor of classroom 4 was a blue colored 12 gauge slug shotgun shell with the word "Federal Premium Tactical Rifled slug" stamped on the side and "12 GA Made in USA stamped on the head of the shell (Exhibit 99). This shotgun shell was made of a blue colored plastic and also was different in color from the shotgun gun shell that was seized from the shooter's person.

As mentioned previously, the loose shotgun shells not found on the shooter were in locations where first responders had been and had reported missing shotgun shells. Additionally, there were no witness reports of any persons being seen with firearms other than first responders in those locations, there were no expended shotgun shell casings or projectiles recovered at the scene and the live shotgun shell on the shooter's person and those recovered from his car did not

Exhibit 22
Page 00837

match any of those recovered from the three locations.  No shotgun was recovered from the school. It is believed that these live shells were dropped by first responders.

- **Shooter**

Responding police officers found the shooter in classroom 10 northwest of the hallway entrance dead from a self-inflicted gunshot wound to the head.  He was wearing a pale green pocket vest over a black polo style short sleeve shirt over a black t-shirt. He had yellow colored earplugs in each ear. He was wearing black cargo pocket pants, black socks, black sneakers, a black canvas belt and black fingerless gloves on each hand. He had an empty camouflage drop holster that was affixed to his right thigh.

After all of the victims were removed from the school, the shooter's body was removed once all firearms and ballistic evidence were recovered from his person. The body was moved to the OCME on December 15, 2012.

- **Weapons on Shooter and Ammunition in Classroom 10**

The weapons on the shooter together with a description of items seized related to the shooting are contained in the Appendix starting at page A136. On the shooter's person was a loaded semi-automatic Sig Sauer P226, 9 mm pistol and additional ammunition. Located near the shooter was a partially loaded Glock 20, 10 mm semi-automatic pistol that appeared to be jammed.

A Bushmaster Model XM15-E2S rifle was located some distance away from the shooter. The rifle's shoulder strap was attached in the front but disconnected at the butt of the rifle. The disconnected rear portion was the result of a failed nut attachment. It is unknown if the nut failed while the rifle was being used or as the result of being dropped or thrown to the floor.

The Bushmaster rifle was found with the safety in the "fire" position. There was one live 5.56 mm round in the chamber and one PMAG 30 magazine in the magazine well. The magazine contained fourteen live 5.56 mm rounds of ammunition. The rifle did not appear to have malfunctioned when observed by the WDMC van unit, but a CSP-ESU report described the weapon as appearing to have jammed.  When tested later, the rifle functioned properly.

Two empty PMAG 30 magazines that were duct-taped together in a tactical configuration and one live 5.56 mm round were found near the rifle.

Officers found two-hundred-fifty-three live rounds on the shooter's body: one-hundred-sixteen 9 mm rounds, seventy-five rounds of 10 mm, sixty-one rounds of 5.56 mm and one 12 gauge shotgun shell. Officers also seized forty-six 5.56 mm live rounds. This consisted of fifteen from the rifle, one from the floor and thirty from the magazine under the body of the shooter, as well as thirteen 10 mm live rounds (nine from the Glock and four from the floor).  There were forty-nine expended 5.56 mm casings seized and one 10 mm casing from classroom 10. Total live rounds seized were three-hundred-twelve and total expended casings seized from classroom 10 were fifty.

Exhibit 22
Page 00838

**Exterior**

CDMC processed the exterior of SHES.

- **Shooter's Car**

The shooter's car was found parked in front of the school, west of the front entrance, next to a "No Parking" zone. It was a black 2010 Honda Civic with Connecticut registration 872YEO. The car was registered to his mother, Nancy Lanza, but had been purchased for him.

Recovered from the car was an Izhmash Saiga-12, 12 gauge shotgun with two magazines containing a total of twenty rounds of ammunition.[35] The shotgun and ammunition were originally seen in the passenger compartment of the car and were moved by police to the car's trunk for safekeeping during the initial response and evacuation.

- **Parking Lot**

There were a number of cars parked in the north parking lot of SHES. Three of these cars were struck by gunfire. None of the cars struck belonged to law enforcement. A total of five strikes to those three cars were identified as having come from classroom 10. It could not be determined whether these shots were intended to go outside of the classroom.

Also found in the north parking lot, was a shotgun shell that was dropped by a first responder.

## SANDY HOOK ELEMENTARY SCHOOL – AUTOPSY INFORMATION

Deceased victims were removed from the school building to a large military-style tent located in the north parking lot, near the front of the school. The Office of the Chief Medical Examiner sought to make positive identification of the victims through photos, school records and personal and clothing descriptions.

On Saturday, December 15, 2012, all of the victims were transported to the OCME in Farmington for autopsies; autopsies were performed the same day. The cause of death for all of the victims was determined to have been gunshot wounds; the manner of death was determined to have been homicide.[36]

Evidence collected during the autopsies was turned over to CDMC and forwarded to the Division of Scientific Services for examination. The Evidence Examination section of this report contains a summary of the results.

---

[35] A search warrant was obtained for the car. The search warrant return originally reported the amount of ammunition as seventy rounds.  This was corrected to twenty rounds and the search warrant return was amended.

[36] Our law defines homicide as the killing of one human being by another human being.

Exhibit 22
Page 00839

## 36 YOGANANDA STREET, NEWTOWN, CT – INCIDENT AND RESPONSE

**Incident**

Sometime on the morning of December 14, 2012, before 9:30 a.m., the shooter shot and killed his mother, Nancy Lanza, in her bed at 36 Yogananda Street, Newtown. The weapon used was a .22 caliber Savage Mark II rifle. Someone in the area reported hearing "two or three" gunshots in the neighborhood between 8:00 a.m. and 9:00 a.m. That person thought them to be from hunters, though the person indicated the shots did "sound unusually close."

Between 9:30 a.m. and 10:00 a.m. there was a delivery made to the house. The delivery driver saw no one, did not see any vehicles in the driveway and the garage door was closed. A delivery slip was left and the driver continued on.

The mother was found by police dead in her bed when they entered the house. The rifle was found on the floor next to the bed.

**Response**

Once it was determined that the shooter's car was registered to his mother at 36 Yogananda Street, Newtown, Connecticut, the Newtown police went to the house and evacuated the surrounding homes. The CSP-ESU came to the scene to clear the residence of potential hazards, such as booby traps or trip wires.

## 36 YOGANANDA STREET, NEWTOWN, CT – SCENE INVESTIGATION

After the body of the shooter's mother was found and the scene declared safe, the process of obtaining search warrants for the house began, with the first warrant being reviewed and signed by a judge of the Superior Court at 5:29 p.m. on December 14, 2012, at the Emergency Operations Center.[37]

Additional search warrants were approved and issued as the search disclosed additional evidence. The investigation of the shooter's mother's killing and the scene processing was done by EDMC and the search for evidence at 36 Yogananda Street related to the shootings at SHES was investigated by both CDMC and WDMC. A list of the items seized from the home is contained in the search warrant returns in the Appendix, with some descriptions in the "Digital Image Report," starting at page A188 in the Appendix.[38]

---

[37] The Judicial Branch and the Honorable John F. Blawie are to be commended for their response to the SHES shootings. Judge Blawie was available at the Emergency Operations Center to review search warrants.

[38] A description of the home is also in the Appendix starting at page A181.

Exhibit 22
Page 00840

The weapon used to kill Nancy Lanza, the .22 cal. Savage Mark II rifle, was found near her bed and seized. In the chamber of the rifle was a spent .22 cal. shell casing and three live rounds were in the magazine. Three other spent .22 cal. shell casings were found in the room and seized.

The shooter's second floor bedroom windows were taped over with black trash bags. The second floor computer room also had its windows covered.  There, investigators found a computer hard drive that appeared to have been intentionally damaged. To date, because of the extensive damage, forensic experts have not yet been able to recover any information from that hard drive.

In a typical criminal case, the investigation would remain open when potentially important evidence was still being examined. Given the improbability of any information being recovered from the damaged hard drive, this outstanding piece of evidence is not preventing the closure of this case now. Should any relevant information related to the existence of any accessory or co-conspirator be obtained from the hard drive, the case will be reopened.

Investigators found a large number of firearms and related items in the home. All firearms involved in these incidents were legally purchased by the shooter's mother over the years. The home also contained many edged weapons, knives, swords, spears, etc.  A prescription bottle in the shooter's name for acetaminophen with codeine was found in the mother's bathroom, which was part of the master bedroom.

During the search of 36 Yogananda Street, a global positioning system (GPS) device was located in the shooter's room with various routes in the memory from April 25, 2012, through December 13, 2012.  Investigation revealed that the GPS was purchased for the shooter.

The routes taken indicate a number of trips from 36 Yogananda Street to the area of a local theater where a commercial version of the game "Dance Dance Revolution" is located.  Over that time period, trips were made that took the driver in the vicinity of some schools in Newtown, including SHES. On December 13, 2012, a trip was recorded from 2:09 p.m. to 2:32 p.m. starting and ending on Yogananda Street and driving in Sandy Hook, which is in the area of SHES, though the route does not indicate the shooter drove up to the school.

Numerous video games were located in the basement computer/gaming area.  The list of video games includes, but is not limited to:

| | |
|---|---|
| -"Left for Dead" | -"Grand Theft Auto" |
| -"Metal Gear Solid" | -"Shin Megami Tensei" |
| -"Dead Rising" | -"Dynasty Warriors" |
| -"Half Life" | -"Vice City" |
| -"Battlefield" | -"Team Fortress" |
| -"Call of Duty" | -"Doom" |

Exhibit 22
Page 00841

Other items found and noted for this report are:

- A Christmas check from the mother to the shooter to purchase a CZ 83 firearm;[39]
- A New York Times article from February 18, 2008, regarding the school shooting at Northern Illinois University;
- Three photographs of what appear to be a dead human, covered in blood and wrapped in plastic;
- The book *Amish Grace: How Forgiveness Transcended Tragedy*, Jossey-Bass, 2007, by Donald B. Kraybill, Steven Nolt and David Weaver-Zercher;[40] and
- Photocopied newspaper articles from 1891 pertaining to the shooting of school children

While the vast majority of persons interviewed had no explanation for the shooter's actions, a review of electronic evidence or digital media that appeared to belong to the shooter, revealed that the shooter had a preoccupation with mass shootings, in particular the Columbine shootings[41] and a strong interest in firearms. For example, there was a spreadsheet with mass murders over the years listing information about each shooting.

The review of the electronic evidence also found many things that are on a typical hard drive or memory card that would probably have no relevance to the investigation either because of creation date or subject matter.  That being said, the following selected topics or items were found within the digital evidence seized:

- Bookmarks pertaining to firearms, military, politics, mass murder, video games, music, books, Army Ranger, computers and programs, ammunition, candy, economic books
- Web page design folders
- Two videos showing suicide by gunshot
- Commercial movies depicting mass shootings
- The computer game titled "School Shooting" where the player controls a character who enters a school and shoots at students
- Screen shots (172) of the online game "Combat Arms"
- "Dance Dance Revolution" (DDR) game screen shots
- Videos of shooter playing DDR
- Images of the shooter holding a handgun to his head
- Images of the shooter holding a rifle to his head
- Five-second video (dramatization) depicting children being shot
- Images of shooter with a rifle, shotgun and numerous magazines in his pockets
- Documents on weapons and magazine capacity

---

[39] The return for the December 16, 2012, search warrant indicates that Exhibit #612 was a check for a "C183."  A closer inspection of the check makes it clear that "CZ83" is written.  A CZ 83 is a type of pistol.
The check reads "Christmas Day" in the check's date section.

[40] In October 2006 a gunman entered a one-room Amish school in Pennsylvania, killed five children and leaving others wounded.

[41] The Columbine High School shootings occurred in April 1999 at Columbine High School in Colorado.  Two shooters, in a planned attack, killed a number of students and a teacher and injured others.

26

Exhibit 22
Page 00842

- A document written showing the prerequisites for a mass murder spreadsheet
- A spreadsheet listing mass murders by name and information about the incident
- Materials regarding the topic of pedophilia and advocating for rights for pedophiles (not child pornography)[42]
- Large amount of materials relating to Columbine shootings and documents on mass murders
- Large amount of materials on firearms
- Comedy videos
- Music
- Images of hamsters
- Images of Lego creations

## 36 YOGANANDA STREET, NEWTOWN, CT – AUTOPSY INFORMATION

The OCME performed an autopsy on the body of Nancy Lanza, age 52, on December 16, 2012, at the OCME. The cause of death was determined to be multiple gunshots to the head. The manner of death was homicide.

## SHOOTER - AUTOPSY INFORMATION

The autopsy of the shooter was conducted on December 16, 2012, at the OCME. The shooter, age 20, was 72 inches tall and weighed 112 pounds. No drugs were found in the shooter's system. The cause of death was determined to be a gunshot wound to the head. The manner of death was suicide.

## INVESTIGATION TO DETERMINE ACCESSORIES AND/OR CO-CONSPIRATORS

The investigation sought to determine if the shooter was aided by or had conspired with anyone to commit these crimes. As detailed above, none of the persons found in the vicinity of SHES on December 14, 2012, played any role in the shootings. Most were attempting to escape the area; others were responding to the school after learning of the shootings. None had any association with the shooter.

Investigators then sought to determine if anyone had conspired with or aided the shooter <u>before</u> the shootings. To that end, investigators examined social contacts, writings, e-mails, internet blogs, telephone records and his general internet presence. One of the internet blogs on which the shooter posted focused on mass shootings and in particular the Columbine shootings. The shooter also exchanged e-mails with others who were interested in the topic of mass shootings. None of these communications, however, related to SHES or in any way suggested that the shooter intended to commit a mass shooting. Thus, the evidence as developed to date, does not demonstrate that any of those with whom he communicated conspired with the shooter or criminally aided and abetted him in committing the murders on December 14, 2012.

---

[42] No child pornography was seen on any of the digital media.

Exhibit 22
Page 00843

## EVENTS AND BACKGROUND INFORMATION LEADING UP TO DECEMBER 14, 2012

**Recent Background Information**

As of December 14, 2012, the shooter and his mother lived at 36 Yogananda Street. This had been the family home for years, although only the shooter and his mother had resided in the house for an extended time.

Both the shooter's and his mother's bedrooms were on the second floor; the mother occupied the master bedroom.

In November 2012, the mother sought to buy the shooter another computer or parts for a computer for the shooter to build one himself. She was concerned about him and said that he hadn't gone anywhere in three months and would only communicate with her by e-mail, though they were living in the same house. The mother never expressed fear of the shooter, for her own safety or that of anyone else.

The mother said that she had plans to sell her home in Newtown and move to either Washington state or North Carolina. She reportedly had told the shooter of this plan and he apparently stated that he wanted to move to Washington. The intention was for the shooter to go to a special school in Washington or get a computer job in North Carolina. In order to effectuate the move, the mother planned to purchase a recreational vehicle (RV) to facilitate the showing and sale of the house and the eventual move to another state. The RV would provide the shooter with a place to sleep as he would not sleep in a hotel. In fact, during Hurricane Sandy in October 2012, with no power in the house, the shooter refused to leave the home and go to a hotel.

The mother wanted to buy the shooter a CZ 83 pistol for Christmas and had prepared a check for that purchase to give the shooter.

On December 10, 2012, the mother indicated to a friend that the shooter had bumped his head badly, there was some bleeding, but he was okay. This appeared to have occurred at 5:30 a.m. She then prepared for her trip to New Hampshire and cooked for the shooter before she left, leaving him his favorites.

During the week of December 10, 2012, the shooter's mother was out of town in New Hampshire. She arrived home Thursday evening December 13, 2012, at approximately 10:00 p.m.

As mentioned above, the GPS found in the home, revealed that on Thursday, December 13, 2012, the device was used. It recorded a trip from and back to 36 Yogananda Street with a route in the Sandy Hook area of Newtown between 2:09 p.m. and 2:32 p.m. The GPS did not report that the driver drove up to SHES. Presumably this was the shooter driving the black Honda Civic as this would have been the only car available to the shooter and it was reportedly his, having been purchased for him.

Exhibit 22
Page 00844

**General Background Information**

Investigators conducted many interviews with persons who knew the shooter and members of his family. As explained above, they did so principally to determine if anyone had conspired with the shooter or aided his crimes. But they also sought to ascertain what might have motivated him to murder children and their teachers and his mother.

The first question was whether the shooter had a reason specifically to target SHES or any student, teacher, or employee. No evidence suggests that he did. In fact, as best as can be determined, the shooter had no prior contact with anyone in the school that day. And, apart from having attended the school as a child, he appears to have had no continuing involvement with SHES.

More generally, those who knew the shooter describe him in contradictory ways. He was undoubtedly afflicted with mental health problems; yet despite a fascination with mass shootings and firearms, he displayed no aggressive or threatening tendencies. In some contexts he was viewed as having above-average intelligence; in others below-average. Some recalled that the shooter had been bullied; but others – including many teachers – saw nothing of the sort. With some people he could talk with them and be humorous; but many others saw the shooter as unemotional, distant, and remote.

What follows are some observations that investigators developed in attempting to determine the shooter's motive.

**Parents**

The shooter's mother and father Peter Lanza had been married to each other. They moved from New Hampshire to the Sandy Hook section of Newtown in 1998.  In addition to the shooter, they had another son Ryan Lanza, who was four years older than the shooter.[43]  In 2001 the shooter's parents separated. The children continued to reside with the mother.  The parents subsequently divorced. The father remarried in 2011; the mother never remarried.

After college, the brother moved out of state. He reached out to the shooter a few times but the shooter did not respond. As of December 14, 2012, the older brother had not had contact with the shooter since 2010. The brother believed that the shooter and his mother had a close relationship. After his older brother left for college, the shooter reportedly became interested in firearms and at one point considered joining the military.

Both the shooter's mother and father indicated that the shooter was bullied growing up. The father indicated that it was not excessive and concerned his social awkwardness and physical gait. As expanded upon in the Education and Mental Health section below, other witnesses did not recall the shooter being overtly bullied. Nonetheless, the shooter appears to have had few friends growing up.

---

[43] Both the shooter's father and brother cooperated fully with the investigation.

Exhibit 22
Page 00845

The shooter's father saw him regularly until he turned 18. They would go hiking, play video games and other activities. They went shooting twice. The shooter had a cell phone but never used it. Calls all went to voice mail. His father would just e-mail him when he wanted to reach him.

The shooter's relationship with his father deteriorated in the last quarter of 2010 and the father last saw the shooter in that year. After that the father would reach out to the shooter by mail or through e-mails regularly, asking him to join him at various places for different activities. The shooter stopped responding at some point prior to December 2012.

One witness who knew the shooter in 2011 and 2012 said that he rarely mentioned his father or his brother; though he would mention briefly something he did with his father or brother in the past.

While it appears that the shooter's mother did volunteer at SHES, it was when the shooter was a student.  There is no indication that she volunteered there in recent years.

The mother took care of all of the shooter's needs. The mother indicated that she did not work because of her son's condition. She worried about what would happen to the shooter if anything happened to her.

One witness indicated that the shooter did not have an emotional connection to his mother. Recently when his mother asked him if he would feel bad if anything happened to her, he replied, "No."  Others, however, have indicated that they thought the shooter was close to his mother and she was the only person to whom the shooter would talk.

A person who knew the shooter in 2011 and 2012 said the shooter described his relationship with his mother as strained because the shooter said her behavior was not rational.

The shooter was particular about the food that he ate and its arrangement on a plate in relation to other foods on the plate. Certain types of dishware could not be used for particular foods. The mother would shop for him and cook to the shooter's specifications, though sometimes he would cook for himself. Reportedly the shooter did not drink alcohol, take drugs, prescription or otherwise, and hated the thought of doing any of those things.

The mother did the shooter's laundry on a daily basis as the shooter often changed clothing during the day.  She was not allowed in the shooter's room, however, even to clean. No one was allowed in his room.

The shooter disliked birthdays, Christmas and holidays. He would not allow his mother to put up a Christmas tree. The mother explained it by saying that shooter had no emotions or feelings. The mother also got rid of a cat because the shooter did not want it in the house.

Exhibit 22
Page 00846

**People Outside the Family**

When the shooter had his hair cut, he did not like to be touched and did not like the sound of clippers, so they were not used much. He would sit with his hands in his lap and always look down, giving one word answers if the cutter tried to engage him in conversation.

Those who worked on the property at 36 Yogananda Street never entered the home. They spoke with the mother outside in the yard or at the bottom of driveway. They were instructed never to ring the doorbell and to make prior arrangements before using power equipment as her son had issues with loud noises. The shooter was observed at times coming and going from the residence.

There were a number of people who knew the mother over the years, some fairly well, who had never met the shooter – although were aware of his existence – and had never been inside her residence.

**Shooter's Interests**

Over the years his hobbies included building computers,[44] writing poetry and hiking. The shooter worked briefly at a computer repair shop.  When he was younger he played the saxophone. The shooter had a cell phone but never used it.

Shooting was a pastime in which the family engaged. Over the years the shooter enjoyed target shooting and would go to a range with his brother and mother. The mother had grown up with firearms and had a pistol permit. The shooter did not. Both the mother and the shooter took National Rifle Association (NRA) safety courses. The mother thought it was good to learn responsibility for guns. Both would shoot pistols and rifles at a local range and the shooter was described as quiet and polite.

He played video games often, both solo at home and online. They could be described as both violent and non-violent. One person described the shooter as spending the majority of his time playing non-violent video games all day, with his favorite at one point being "Super Mario Brothers."

Another said he used the computer to play games online and communicate. Sometimes the shooter would not respond to e-mails and be unavailable for a couple of weeks.  The shooter explained that he was "moping around." The shooter frequently formatted the hard drive of his computer as a way of "staying off the grid" and minimizing his internet trace.

Initially the shooter did not drive but he eventually got a driver's license and the Honda was purchased for him.  The shooter was issued a driver's license in July 2010.

The shooter liked to play a game called "Dance Dance Revolution" (DDR), which is a music video game in which the player stands on a platform, watches a video screen and moves his feet

---

[44] By all accounts the shooter was extremely computer savvy.

Exhibit 22
Page 00847

as directed by the video. A home version of this was seen and photographed in the shooter's home.[45] Several videos of him playing DDR were found on digital media taken from the home.

The GPS found in the home and reportedly belonging to the shooter indicated that he regularly went to the area of a theater that had a commercial version of the DDR game in the lobby. In 2011 and up until a month before December 14, 2012, the shooter went to the theater and played the game. He went most every Friday through Sunday and played the game for four to ten hours.

The shooter was specific about the clothes he wore. He typically wore the same clothing when at the theater: a grey hoodie and slacks. After a snowstorm in 2011 the shooter was not seen at the theater until about February 2012. At that time he seemed more anti-social and no longer played DDR with others.

An acquaintance of the shooter from 2011 to June 2012 said that the shooter and the acquaintance played DDR quite a bit. They would play the game and occasionally see a movie. They did not play first person shooter games at the theater.[46] The shooter had stamina for DDR and never appeared winded unless really exhausted.

The acquaintance said the shooter seemed to enjoy nature and mentioned the possibility of going hiking more than once. The shooter was capable of laughing, smiling and making jokes, though always in a dry fashion. The shooter never mentioned being bullied while growing up. Topics of conversation included world and current events, and included chimpanzee society and how they interacted.

In the course of their conversations, the shooter indicated that he had an interest in mass murders and serial killing. They never spent a lot of time discussing them, but it would be a topic of conversation.[47] There were no conversations about weapons or shooting at a gun range.

**Shooter – Education and Mental Health**

The following background information is compiled from a variety of sources and may at times appear to be inconsistent. This is a function of the differing perspectives of those interviewed. The information also varied based upon the time period during which the witness knew or associated with the shooter or his family.

The shooter went through the Newtown public school system, though part of seventh grade and part of eighth grade were done at St. Rose of Lima School in Newtown.

---

[45] See the Appendix at page A197.

[46] Online first person shooter games that the shooter did play as determined by a search of the digital media in the home, "Combat Arms" and "World of Warcraft" were played on the computer using a keyboard to control the player.

[47] The shooter also wrote about all of these topics.  Other topics of discussion included human nature, perception, judgment, morality, lack of control, prejudice, empathy, suicide, mental illness, existential crisis, urban exploration of abandoned areas, hiking and cookies.

Exhibit 22
Page 00848

While the shooter did attend SHES from 1998 to 2003, the first through fifth grade, he was never assigned to the classrooms where the shootings occurred. The shooter went for walks with his family around and near SHES after he had gotten out of the school. The shooter indicated that he loved the school and liked to go there.

According to some, the shooter was more social when he first moved to Connecticut and was younger. He would attend play groups and parties. The early school years have him portrayed as a nice kid, though sort of withdrawn. He loved music and played saxophone.

As he got older his condition seemed to worsen, he became more of a loner. As the shooter got into the higher grades of middle school, he did not like noise and confusion and began to have issues when he had to walk to different classes. As a result, in high school, the shooter was home schooled for a period of time. Though not in a mainstream setting, he could sit through a quiet lecture. The mother drove the shooter where he needed to go.  He did not want to go to events with crowds.

He attended Newtown High School (NHS) with a combination of home schooling, tutoring and classes at NHS and Western Connecticut State University (WCSU). At NHS he was considered a special education student. Having enough credits, the shooter graduated from NHS in 2009. He continued to take classes at WCSU after high school graduation.

Various witnesses made the following observations about the shooter through his school years:

1. In the 2002-2003 school year, when the shooter was in the fifth grade, he was quiet, reluctant, very bright and had good ideas regarding creative writing. He wouldn't necessarily engage in conversation, but wouldn't ignore one. There was no recollection of him being bullied or teased.
2. The fifth grade was also the year that, related to a class project, the shooter produced the "Big Book of Granny" in which the main character has a gun in her cane and shoots people. The story includes violence against children. There is no indication this was ever handed in to the school.[48]
3. In the fifth grade the shooter indicated that he did not like sports, did not think highly of himself and believed that everyone else in the world deserved more than he did.
4. In intermediate school from 2002-2004 he was a quiet shy boy who participated in class and listened. He did not show enthusiasm, extreme happiness or extreme sadness. He was neutral.
5. In the fifth and sixth grades from 2003 to 2004 the shooter participated in concerts at school. He was not remembered by the teacher as having been bullied and the shooter had at least one friend.
6. A sixth grade teacher described the shooter as an average student with A's and B's; homework was never an issue. The shooter never made trouble or distracted others. He had friends and was friendly to others. He was a normal child with no oddities and there were no reports of bullying or teasing.

---

[48] See the Appendix starting at page A220.

Exhibit 22
Page 00849

7. In 2004 while at the intermediate school he was described as respectful and cooperated with others.
8. One person who remembered him from the middle school never saw the shooter bullied.
9. In seventh grade, a teacher described the shooter as intelligent but not normal, with anti-social issues. He was quiet, barely spoke and did not want to participate in anything. His writing assignments obsessed about battles, destruction and war, far more than others his age. The level of violence in the writing was disturbing. At the same time, when asked to write a poem, he was able to write a beautiful one and presented it in public.
10. In the ninth and tenth grades the shooter was reclusive, shutting himself in the bedroom and playing video games all day. In the upper classes the shooter compiled a journal instead of attending physical education.
11. In high school the shooter did not have good social skills. He did not show any signs of violence.
12. In high school the shooter would have "episodes"[49] and his mother would be called to the school. The episodes would last about fifteen minutes each. There were no signs of violence during any of these episodes and the shooter was more likely to be victimized than to act in violence against another.
13. In high school the shooter was not willing to talk much, hard to communicate with and had poor social skills. He often became withdrawn in a social environment. The shooter would have both inclusive class time and leave the class for specialized sessions.
14. At NHS the shooter was in the "Tech Club" in 2007–2008. He was remembered in a variety of ways including as a quiet person who was smart. He wore the same clothing repeatedly and might not speak to you, even if you were talking to him. He was not remembered to have been bullied or to have spoken about violence. The advisor looked out for him and tried to have him included wherever possible. He was also remembered for pulling his sleeves over his hand to touch something. He was not known to be a violent kid at all and never spoke of violence.
15. The shooter had a LAN party[50] at his home in 2008 with Tech Club members; no firearms were seen at the shooter's home.
16. In terms of video games, the shooter liked to play "Phantasy Star Online" (a role playing game), "Paper Mario," "Luigi's Mansion" and "Pikmin." He also liked Japanese animated films and television.

Over the years from the late 1990s and into the 2000s, the shooter had evaluations of various types, some of which were available to the investigators. In the late 1990s he was described as having speech and language needs. At that time he was also being followed medically for seizure activities. In preschool his conduct included repetitive behaviors, temper tantrums, smelling things that were not there, excessive hand washing and eating idiosyncrasies.

In 2005, the shooter was diagnosed with Asperger's Disorder and was described as presenting with significant social impairments and extreme anxiety. It was also noted that he lacked empathy and had very rigid thought processes. He had a literal interpretation of written and

---

[49] What these episodes were was unclear.

[50] This is a party where attendees eat pizza and play video games.

Exhibit 22
Page 00850

verbal material. In the school setting, the shooter had extreme anxiety and discomfort with changes, noise, and physical contact with others.

In 2006 the shooter had an overall IQ in the average range. He had no learning disability. Depending on the psychological test taken he could be average, below average or above average. Testing that required the touching of objects could not be done. It was reported that his school issues related to his identified emotional and/or Pervasive Developmental Disorder (PDD) spectrum behaviors. His high level of anxiety, Asperger's characteristics, Obsessive Compulsive Disorder (OCD) concerns and sensory issues all impacted his performance to a significant degree, limiting his participation in a general education curriculum. Tutoring, desensitization and medication were recommended. It was suggested that he would benefit by continuing to be eased into more regular classroom time and increasing exposure to routine events at school.

The shooter refused to take suggested medication and did not engage in suggested behavior therapies.

Over the years his mother consistently described the shooter as having Asperger's syndrome. She had a number of books in the home on the topic. She also described the shooter as being unable to make eye contact, sensitive to light and couldn't stand to be touched.  Over time he had multiple daily rituals, an inability to touch door knobs,[51] repeated hand washing and obsessive clothes changing, to the point that his mother was frequently doing laundry.

In 2006, the shooter's mother noted that there were marked changes to the shooter's behavior around the seventh grade. Prior to that, he would ride his bike and do adventurous things such as climbing trees or climbing a mountain. He had stopped playing the saxophone. He had been in a school band but dropped out. He had withdrawn from playing soccer or baseball which he said he did not enjoy.

It is important to note that it is unknown, what contribution, if any, the shooter's mental health issues made to his attack on SHES. Those mental health professionals who saw him did not see anything that would have predicted his future behavior.

## EVIDENCE EXAMINATION

### Electronics

Examinations of the following seized items were done by the WDMC squad and the Computer Crimes and Electronic Evidence Laboratory of the Department of Emergency Services and Public Protection (DESPP).

Sony PlayStation 2: An older games history was found. Games located included "Dynasty Tactics," "Kingdom Hearts," "Kingdom Hearts 2," "Onimusha," "Dynasty Warriors," and "The Two Towers." The PlayStation 2 games could not be played with others over the internet.

---

[51] This included not opening doors for himself because he did not like touching the door handle or other metal objects, often going through a box of tissues a day to avoid the contact.

Exhibit 22
Page 00851

Xbox: A game history for the console and an indication of an Xbox Live user account were found. Games found in the gaming history included "Call of Duty 2: Big Red One," "Call of Duty: Finest Hour," "Dead or Alive 3," "Halo," "Halo 2," "Lego Star Wars," "MechAssault," "Mercenaries," "MGS2 Substance," "Panzer Dragoon ORTA," "PSO," "Shenmue II," "Spiderman," "Splinter Cell 2," "Splinter Cell-CT," "Star Wars Battlefront," "Star Wars Republic Commando," "Tenchu: Return from Darkness," "The Return of the King," and "Worms Forts Under Seige."

It was noted on both of the above items that the gaming history found may not be the complete history of those actually played. No evidence regarding the existence of any accessories or co-co-conspirators was found.

Xbox 360: Found to be damaged and inoperable.

**Firearms and Related Evidence**

Of the firearms seized in this case, five are directly involved, four from SHES and one from 36 Yogananda Street.

-   **History**

All of the firearms below and involved in these cases were legally purchased by the shooter's mother. Additionally, ammunition of the type used in these cases had been purchased by the shooter's mother in the past. There is no reason to believe the ammunition used here was purchased by anyone else. The evidence does not show any ammunition purchases by the shooter.

The shooter did not have a permit to carry a pistol, nor had he ever had one. His mother had a valid pistol permit.

A pistol is defined as "… any firearm having a barrel less than twelve inches."[52] Both the Glock 20, 10 mm and the Sig Sauer P226, 9 mm qualify as pistols. They are firearms and their barrel lengths were less than 12 inches.

-   **Firearms, Recovered Bullets and Fragments**

Recovered from Shooter's Honda Civic Outside of SHES

Izhmash Saiga-12, 12 gauge, semiautomatic shotgun: The Izhmash Saiga-12 was found in the shooter's Honda Civic that was parked outside SHES. It was tested and found to be operable without malfunction. There was no physical evidence indicating this weapon had been fired at SHES, i.e., the bullets, bullet fragments and expended shell casings recovered at the scene and from the OCME could not have been fired from this weapon.

---

[52] C.G.S. Sec. 53a-3(18).

Exhibit 22
Page 00852

Recovered from Classroom 10, SHES

Bushmaster Model XM15-E2S semiautomatic rifle: The Bushmaster rifle was found in classroom 10. The Bushmaster was tested and found to be operable without malfunction. All of the 5.56 mm shell casings from SHES that were tested were found to have been fired from this rifle. All of the bullets and fragments, recovered from SHES and the OCME that were tested, with the exception of those mentioned immediately below, are consistent with having been fired from the Bushmaster rifle.[53] They could not have been fired from the Saiga-12, the Glock 20 or the Sig Sauer P226.

Glock 20, 10 mm, semiautomatic pistol: The Glock 20 was found in classroom 10 near the shooter's body. The Glock 20 was tested and found to be operable without malfunction. It was found to have fired both of the 10 mm shell casings recovered at SHES. It was consistent with having fired the bullet that was recovered in the ceiling of classroom 8 in a location along the trajectory of the suicide shot of the shooter in classroom 10. It could have fired the three bullet fragments recovered from classroom 10. The three fragments together weigh less than one bullet and are presumed to have been parts of the same one bullet. Though all lacked sufficient striate for a positive identification, all had polygonal rifling consistent with the Glock 20. They could not have been fired from the Saiga-12, the Bushmaster or the Sig Sauer P226.

Sig Sauer P226, 9 mm, semiautomatic pistol: The Sig Sauer P226 was found in classroom 10 on the shooter's person. The Sig Sauer P226 was tested and found to be operable without malfunction. There was no physical evidence found indicating that this weapon had been fired at SHES, i.e. casings, bullets and bullet fragments recovered at the scene and from the OCME could not have been fired from this weapon.

The total weight of the guns and ammunition from the shooter at SHES was 30.47 lbs.[54]

Recovered from 36 Yogananda Street, Newtown, CT

Savage Mark II, .22 cal. Long Rifle, bolt action: The Savage Mark II rifle was found on the floor of the master bedroom near the bed where the body of the shooter's mother was found. The rifle was found to be operable without malfunction. The rifle was found to have fired the .22 cal. casing recovered from the rifle's chamber and the three .22 cal. casings found in the master bedroom. The rifle also was found to have fired the four bullets recovered during the autopsy of the shooter's mother.

---

[53] "No positive identification could be made to any of the bullet evidence submissions noted … … in 5.56 mm caliber.  The physical condition of the bullet jacket surfaces were severely damaged and corroded. They all lacked individual striated marks of sufficient agreement for the identification process.  The test fires also exhibited a lack of individual striated marks on the bullet surface for comparison purposes. This condition can be caused by fouling in the barrel of the rifle and the ammunition itself.  The Bushmaster rifle cannot be eliminated as having fired the 5.56 caliber bullet evidence examined," quoting from the 6/19/13 Forensic Science Laboratory report.

[54] See the Appendix at page A141.

Exhibit 22
Page 00853

**Other Testing**

In the course of the investigation swabbings to test for DNA were taken from various pieces of evidence in the case, both at Sandy Hook Elementary School and 36 Yogananda Street. The purpose was to determine if anyone else had actively been involved in the planning or carrying out of the shootings. These swabbings were tested and compared to known samples in the case and no potential accessories or co-conspirators were revealed by the testing.[55]

## MISCELLANEOUS INVESTIGATIVE LEADS

In the course of the investigation, law enforcement personnel received a large number of contacts purporting to provide information on the shootings and the shooter.  This applied to both state and federal law enforcement.  Information that was substantiated and relevant was made part of the investigation.  Other information, after investigation was not substantiated.

Typically someone would call the CSP and leave a message that they had information relevant to the shootings at Sandy Hook Elementary School.  In an abundance of caution, a detective was assigned to follow up on every "lead," regardless of its presumed validity.

Some of the more than forty unsubstantiated leads and information are described below because of their nature or mention in investigation documents.

1.  In the December 14, 2012, 7:25 p.m. search warrant for 36 Yogananda Street, paragraphs 8 and 9 read as follows:

    8.  That investigators determined that on 12/12/12, an individual logged onto a website called 4Chan.com and anonymously posted "I'm going to kill myself on Friday and it will make the news. be watching at 9:00 am."  That another anonymous individual asked "Where at?"  The first individual responded "I live in Connecticut, that's as much as I'll say."

    9.  That additionally on 12/14/12, a concerned individual in Texas contacted the Hartford Police Department and reported that her son was playing a video game named 'Call of Duty' approximately 20 hours ago.  She continued that a gamer with the screen name [RaWr]i<3EmoGirls (hereinafter "User") stated; "next week or very soon there maybe a shooting at my school and other schools so if i die remember me plz if I don't get on for 3-5 not including weeks that means i died and im being 100 percent serious."  The User then stated: "something might go bad tomorrow this could possibly be my last moments alive.-." Finally, User stated, "as far as I know theres a list of ppl that are gunna get shot-. I hope I aint on it."

---

[55] Two of the items examined from outside the building of SHES, one from the shotgun in the shooter's car and a second from 36 Yogananda Street yielded DNA profiles consistent with the DNA profiles of two victims killed in SHES, one in each.  It is strongly believed that this resulted from an accidental transference as a result of the unique circumstances of this case.  There is no reason to believe that either victim would ever have come in contact with these items. The DESPP is conducting a separate protocol inquiry in an attempt to determine the reason that the DNA appears on the items.

Exhibit 22
Page 00854

Both of these leads were immediately investigated by federal law enforcement and found to have no validity and no relation to Newtown.[56]

2. A December 14, 2012, search of the Stamford residence of Peter Lanza, the father of the shooter, was conducted with the FBI. Some illegal fireworks were seized and secured. After consultation with David I. Cohen, the State's Attorney for the Judicial District of Stamford/Norwalk, and based on all of the circumstances involved, this state's attorney has decided to exercise his discretion and not prosecute Mr. Lanza for possession of the fireworks, which are in no way related to the events of December 14, 2012.

3. Dick's Sporting Goods – Police received a lead that the shooter had tried to buy ammunition at a Dick's Sporting Goods store. Store security surveillance videos were recovered and reviewed. None of the individuals depicted in the videos appear to be the shooter or connected to shooter.

4. A person called the police indicating that the shooter had tried to rent a room from her and indicated he was having problems with his mother. This proved to be unsubstantiated after an investigation.

5. Some callers indicated that they chatted with the shooter online in postings.  These postings were determined to be false.

6. Numerous citizens in Newtown received calls on their telephones with messages left saying "I am [the shooter's name] and I am going to kill you." It was determined that these calls were made from out of state and the investigation is ongoing. Preliminary investigation results establish that the callers were not associated with the shooter.

7. CSP investigated a lead that the shooter went to Newtown High School before going to SHES.  In the course of this investigation one parent refused to let her high school child be interviewed by police and related that a friend of the child had told the child they saw the shooter in the parking lot before the shooting. A review of Newtown High School video did not substantiate this claim.

8. There were reports of the shooter being at SHES on December 12, 2012, that were investigated and found not to be substantiated.

9. A report that a man claimed that while in Oklahoma a woman told him about the planned shooting before the shooting occurred.  Federal law enforcement investigated this and found that it could not be true.

---

[56] These search warrants were applied for with information that was available at the time.  Some of the information was later determined to be inaccurate.

Exhibit 22
Page 00855

## DETERMINATIONS OF CRIMES COMMITTED

In the course of his rampage the shooter committed a number of state crimes. The most significant are those where lives were taken and people were specifically injured.

At Sandy Hook Elementary School, the crime of Murder under Special Circumstances[57] in violation of C.G.S. Sec. 53a-54b was committed twenty-six times. Attempted Murder under Special Circumstances[58] in violation of C.G.S. Secs. 53a-49 and 53a-54b was committed twice as it relates to the two individuals who were shot and survived. These crimes reflect the killings of the children and adults, as well as those physically injured.[59]   The crime of Murder in violation of C.G.S. Sec. 53a-54a was committed by the shooter in killing his mother at 36 Yogananda Street.[60]

Also listed are other major crimes committed by the shooter on December 14, 2012.[61]

The major felonies[62] committed by the shooter in this case are:

- Murder with Special Circumstances
- Attempted Murder with Special Circumstances
- Assault in the First Degree[63]

---

[57] Sec. 53a-54b. Murder with special circumstances. A person is guilty of murder with special circumstances who is convicted of any of the following: (1)… … (7) murder of two or more persons at the same time or in the course of a single transaction; or (8) murder of a person under sixteen years of age.

[58] Sec. 53a-49. Criminal attempt: Sufficiency of conduct; renunciation as defense. (a) A person is guilty of an attempt to commit a crime if, acting with the kind of mental state required for commission of the crime, he: … … (2) intentionally does or omits to do anything which, under the circumstances as he believes them to be, is an act or omission constituting a substantial step in a course of conduct planned to culminate in his commission of the crime.

[59] Though state law as to who is a "victim" in a criminal case is very broad, only those victims mentioned above will be discussed. Connecticut defines a "victim of crime" as an individual who suffers direct or threatened physical, emotional or financial harm as a result of a crime and includes immediate family members of a minor, incompetent individual or homicide victim and a person designated by a homicide victim in accordance with section 1-56r.  See C.G.S. Sec. 1-1k.

[60] Sec. 53a-54a. Murder. (a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

[61] The investigation has not discovered any evidence that Nancy Lanza was in any way aware of her son's plans.

[62] In any given situation, the facts giving rise to the commission of one crime will suffice to meet the elements of additional crimes.  Here the focus will be on the major crimes committed and not go into every possible felony justified by the evidence.

Exhibit 22
Page 00856

- Burglary in the First Degree[64]
- Risk of Injury to a Minor[65]
- Possession of a Weapon on School Grounds[66]
- Carrying a Pistol Without a Permit,[67]

The crimes listed above all require some type of mental state whether it is a specific intent, knowledge or a general intent to do the prohibited act.

The intent to kill for the crime of murder can be seen in the circumstantial evidence such as the type of weapon used, the manner in which it was used, the type of wounds inflicted and the events leading to and immediately following the deaths, as well as with the shooter intending the natural consequences of his voluntary acts.[68]

Here the intent is clear from the evidence that the shooter intentionally armed himself heavily, drove to SHES, parked in a manner out of direct sight of the front door, shot his way into the building and immediately killed those who confronted him as well as those in classrooms 8 and 10. The evidence found at his home on the digital media further support his intentions to kill, both at the school and with his mother. Further the manner in which he killed his mother reflects the shooter's intent to kill her.

---

[63] Sec. 53a-59. Assault in the first degree: Class B felony: Nonsuspendable sentences. (a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument;... ... or (5) with intent to cause physical injury to another person, he causes such injury to such person or to a third person by means of the discharge of a firearm.

[64] Sec. 53a-101. Burglary in the first degree: Class B felony. (a) A person is guilty of burglary in the first degree when (1) such person enters or remains unlawfully in a building with intent to commit a crime therein and is armed with explosives or a deadly weapon or dangerous instrument, or (2) such person enters or remains unlawfully in a building with intent to commit a crime therein and, in the course of committing the offense, intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone, or .....

[65] Sec. 53-21. Injury or risk of injury to, or impairing morals of, children. Sale of children. (a) Any person who (1) wilfully or unlawfully causes or permits any child under the age of sixteen years to be placed in such a situation that the life or limb of such child is endangered, the health of such child is likely to be injured or the morals of such child are likely to be impaired, or does any act likely to impair the health or morals of any such child, or ... ..., shall be guilty of a class C felony for a violation of subdivision (1) ....

[66] Sec. 53a-217b. Possession of a weapon on school grounds: Class D felony. (a) A person is guilty of possession of a weapon on school grounds when, knowing that such person is not licensed or privileged to do so, such person possesses a firearm or deadly weapon, as defined in section 53a-3, (1) in or on the real property comprising a public or private elementary or secondary school, or ....

[67] Sec. 29-35. Carrying of pistol or revolver without permit prohibited. Exceptions. (a) No person shall carry any pistol or revolver upon his or her person, except when such person is within the dwelling house or place of business of such person, without a permit to carry the same issued as provided in section 29-28.

[68] State v. Otto, 305 Conn. 51, 66-67 (2012).

Exhibit 22
Page 00857

Murder with Special Circumstances is met both in the killing of the children and in the killing of more than one person at the same time.

In this case the shooter's mental status is no defense to his conduct as the evidence shows he knew his conduct to be against the law. He had the ability to control his behavior to obtain the results he wanted, including his own death. This evidence includes his possession of materials related to mass murders, his removal of the GPS from his car, his utilization of ear plugs, the damaging of the hard drive and waiting for his mother's return from New Hampshire.[69]

The existence of an extreme emotional disturbance for which there is a reasonable explanation or excuse is also not present in this case.[70]  It is clear that the shooter planned his crimes in advance and was under no extreme emotional disturbance for which there was a reasonable explanation or excuse.

---

[69] Sec. 53a-13. Lack of capacity due to mental disease or defect as affirmative defense. (a) In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law.

[70]  Sec. 53a-54a. Murder. (a) A person is guilty of murder when, … …with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

Exhibit 22
Page 00858

## CONCLUSION

With the issuance of this report, the investigation is closed.[71] If additional reliable information, related to the existence of others' involvement in the case, comes to the attention of the investigators, it is subject to being reopened. I do not anticipate that occurring. As of now, there will be no state prosecution of anyone as an accessory or co-conspirator.

Many people have asked why the shooter did what he did on December 14, 2012. Or, in the vernacular of the criminal justice system, "Did he have a motive to do what he did?" This investigation, with the substantial information available, does not establish a conclusive motive.

What we do know is that the shooter had significant mental health issues that, while not affecting the criminality of the shooter's mental state for the crimes or his criminal responsibility for them, did affect his ability to live a normal life and to interact with others, even those to whom he should have been close. Whether this contributed in any way is unknown. The shooter did not recognize or help himself deal with those issues. He had a familiarity with and access to firearms and ammunition and an obsession with mass murders, in particular the Columbine shootings.

There is no clear indication why Sandy Hook Elementary School was selected, other than perhaps its close proximity to the shooter's home.

What is clear is that on the morning of December 14, 2012, the shooter intentionally committed horrendous crimes, murdering 20 children and 6 adults in a matter of moments, with the ability and intention of killing even more. He committed these heinous acts after killing his own mother. The evidence indicates the shooter planned his actions, including the taking of his own life.

It is equally clear that law enforcement arrived at Sandy Hook Elementary School within minutes of the first shots being fired. They went into the school to save those inside with the knowledge that someone might be waiting to take *their* lives. It is also clear that the staff of Sandy Hook Elementary School acted heroically in trying to protect the children. The combination saved many children's lives.

November 25, 2013

Stephen J. Sedensky III
State's Attorney
Judicial District of Danbury

---

[71] There remain some outstanding reports, returns and an evidence examination evaluation to be filed.

43

Exhibit 22
Page 00859

## <u>ACKNOWLEDGEMENTS</u>

Over the course of the last eleven months many agencies, governmental and private, have come together to assist the victims' families, victims, first responders, others affected by the crimes, the Connecticut State Police and the State's Attorney's Office for the Judicial District of Danbury.

I wish to thank the below agencies, listed alphabetically, for their investigative work, cooperation and assistance in this investigation. Though I have tried to list all of the agencies that provided assistance to the investigation, I suspect some will be inadvertently left out.  For this I apologize.

- Connecticut State Police and in particular Western District Major Crime Squad[72]*
- Connecticut Intelligence Center (CTIC)
- Bureau of Alcohol, Tobacco, Firearms and Explosives
- Department of Emergency Services and Public Protection Forensic Science Laboratory
- Faculty of Finding Words-Connecticut, A ChildFirst State[73]
- Family & Children's Aid of Danbury[74]
- Federal Bureau of Investigation,[75] including Victim Services and Behavior Analysis units
- Gundersen Health System's National Child Protection Training Center
- Hoboken, New Jersey, Police Department
- Homeland Security
- Municipal police departments in Connecticut
- Newtown Police Department
- Office of the Chief Medical Examiner
- Office of the Chief State's Attorney[76]*
- State of Connecticut Judicial Branch
- United States Attorney's Office for the District of Connecticut*
- United States Drug Enforcement Agency
- United States Marshals Service

I would also like to thank the members of the Danbury State's Attorney's Office, in particular, Supervisory Assistant State's Attorney Warren Murray and Inspectors Donald Brown and John Mahoney for their assistance and support.

---

[72] The Western District Major Crime Squad under the leadership of Lt. David Delvecchia investigated this case with a thoroughness and sensitivity that is unmatched in my experience.

[73] Connecticut is a ChildFirst state whose one week program Finding Words Connecticut, Interviewing Children and Preparing for Court is funded by the Governor's Task Force on Justice for Abused Children.

[74] Family & Children's Aid of Danbury hosts the Multidisciplinary Investigation Team.

[75] This includes FBI agents across the country who sought out evidence and interviewed witnesses in many states.

[76] Chief State's Attorney Kevin T. Kane's counsel and assistance has been an invaluable asset to me and this case, together with the assistance of those in his office who worked on the case.

* I am grateful for the suggestions, editing and reviews of the drafts of this report provided by these organizations. Any errors that remain are mine.

Exhibit 22
Page 00860

# Exhibit 23

Exhibit 23
Page 00861

# MotherJones

# More Guns, More Mass Shootings—Coincidence?

*The unthinkable massacre in Connecticut adds to what is now the worst year of mass shootings in modern US history.*

By Mark Follman | Wed Sep. 26, 2012 6:00 AM EDT

In the fierce debate that always follows the latest mass shooting, it's an argument you hear frequently from gun rights promoters: If only more people were armed, there would be a better chance of stopping these terrible events. This has plausibility problems—what are the odds that, say, a moviegoer with a pack of Twizzlers in one pocket and a Glock in the other would be mentally prepared, properly positioned, and skilled enough to take out a body-armored assailant in a smoke- and panic-filled theater? But whether you believe that would happen is ultimately a matter of theory and speculation. Instead, let's look at some facts gathered in a five-month investigation by *Mother Jones*.

In the wake of the massacres this year at a Colorado movie theater, a Sikh temple in Wisconsin, and Sandy Hook Elementary School in Connecticut, we set out to track mass shootings in the United States over the last 30 years. We identified and analyzed 62 of them [1], and one striking pattern in the data is this: In not a single case was the killing stopped by a civilian using a gun. And in other recent (but less lethal) rampages in which armed civilians attempted to intervene, those civilians not only failed to stop the shooter but also were gravely wounded or killed. Moreover, we found that the rate of mass shootings has increased in recent years—at a time when America has been flooded with millions of additional firearms and a barrage of new laws has made it easier than ever to carry them in public places, including bars, parks, and schools.



[1]

*MoJo's* **map, timeline, and analysis of 30 years of mass shootings in America.**
[1]

America has long been heavily armed relative to other societies, and our arsenal keeps growing. A precise count isn't possible because most guns in the United States aren't registered and the government has scant ability to track them, thanks to a legislative landscape shaped by powerful pro-gun groups such as the National Rifle Association. But through a combination of national surveys and manufacturing and sales data, we know that the increase in firearms has far outpaced population growth. In 1995 there were an estimated 200 million guns in private hands. Today, there are around 300 million—about a 50 percent jump. The US population, now over 314 million, grew by about 20 percent in that period. At this rate, there will be a gun for every man, woman, and child before the decade ends.

Exhibit 23
Page 00862



**Number of civilian firearms vs. US population (millions)**

Mother Jones

There is no evidence indicating that arming Americans further will help prevent mass shootings or reduce the carnage, says Dr. Stephen Hargarten, a leading expert on emergency medicine and gun violence at the Medical College of Wisconsin. To the contrary, there appears to be a relationship between the proliferation of firearms and a rise in mass shootings: By our count, there have been two per year on average since 1982. Yet, 25 of the 62 cases we examined have occurred since 2006. In 2012 alone there have been seven mass shootings [2], and a record number of casualties, with more than 140 people injured and killed.

Armed civilians attempting to intervene are actually more likely to increase the bloodshed, says Hargarten, "given that civilian shooters are less likely to hit their targets than police in these circumstances." A chaotic scene in August at the Empire State Building put this starkly into perspective when New York City police officers trained in counterterrorism [3] confronted a gunman and wounded nine innocent bystanders in the process [4].

Surveys suggest America's guns may be concentrated in fewer hands today: Approximately 40 percent of households had them in the past decade, versus about 50 percent in the 1980s. But far more relevant is a recent barrage of laws that have rolled back gun restrictions throughout the country. In the past four years, across 37 states, the NRA and its political allies have pushed through 99 laws making guns easier to own, carry, and conceal from the government [5].

Among the more striking measures: Eight states now allow firearms in bars. Law-abiding Missourians can carry a gun while intoxicated and even fire it if "acting in self-defense." In Kansas, permit holders can carry concealed weapons inside K-12 schools, and Louisiana allows them in houses of worship. Virginia not only repealed a law requiring handgun vendors to submit sales records, but the state also ordered the destruction of all such previous records. More than two-thirds of these laws were passed by Republican-controlled statehouses, though often with bipartisan support.

**The NRA surge: 99 recent laws rolling back gun regulations in 37 states.** [5]

The laws have caused dramatic changes, including in the two states hit with the recent carnage. Colorado passed its concealed-carry measure in 2003, issuing 9,522 permits that year; by the end of last year the state had handed out a total of just under 120,000, according to data we obtained from the County Sheriffs of Colorado. In March of this year, the Colorado Supreme Court ruled that concealed weapons are legal on the state's college campuses. (It is now the fifth state explicitly allowing them [6].) If former neuroscience student James Holmes were still attending the University of Colorado today,

Exhibit 23
Page 00863

the movie theater killer—who had no criminal history and obtained his weapons legally—could've gotten a permit to tote his pair of .40 caliber Glocks straight into the student union. Wisconsin's concealed-carry law went into effect just nine months before the Sikh temple shooting in suburban Milwaukee this August. During that time, the state issued a whopping 122,506 permits, according to data from Wisconsin's Department of Justice. The new law authorizes guns on college campuses, as well as in bars, state parks, and some government buildings.

And we're on our way to a situation where the most lax state permitting rules—say, Virginia's, where an online course now qualifies for firearms safety training and has drawn a flood of out-of-state applicants [7]—are in effect national law. Eighty percent of states now recognize handgun permits from at least some other states. And gun rights activists are pushing hard for a federal reciprocity bill [8]—passed in the House late last year, with GOP vice presidential candidate Paul Ryan among its most ardent supporters—that would essentially make any state's permits valid nationwide.





Indeed, the country's vast arsenal of handguns—at least 118 million of them as of 2010—is increasingly mobile, with 69 of the 99 new state laws making them easier to carry. A decade ago, seven states and the District of Columbia still prohibited concealed handguns; today, it's down to just Illinois and DC. (And Illinois recently passed an exception [9] cracking the door open to carrying). In the 62 mass shootings we analyzed, 54 of the killers had handguns—including in all 15 of the mass shootings since the surge of pro-gun laws began in 2009.

In a certain sense the law was on their side: nearly 80 percent of the killers in our investigation obtained their weapons legally.

We used a conservative set of criteria to build a comprehensive rundown of high-profile attacks in public places—at schools, workplaces, government buildings, shopping malls—though they represent only a small fraction of the nation's overall gun violence. The FBI defines a mass murderer [10] as someone who kills four or more people in a single incident, usually in one location. (As opposed to spree or serial killers, who strike multiple times.) We excluded cases involving armed robberies or gang violence; dropping the number of fatalities by just one, or including those motives, would add many [11], many [12] more [13] cases [14]. (More about our criteria here [15].)

There was one case in our data set in which an armed civilian played a role. Back in 1982, a man opened fire at a welding shop in Miami, killing eight and wounding three others before fleeing on a bicycle. A civilian who worked nearby pursued the assailant in a car, shooting and killing him a few blocks away (in addition to ramming him with the car). Florida authorities, led by then-state attorney Janet Reno, concluded that the vigilante had used force justifiably, and speculated that he may have prevented additional killings. But even if we were to count that case as a successful

Exhibit 23
Page 00864

armed intervention by a civilian, it would account for just 1.6 percent of the mass shootings in the last 30 years.

More broadly, attempts by armed civilians to stop shooting rampages are rare—and successful ones even rarer. There were two school shootings in the late 1990s, in Mississippi and Pennsylvania, in which bystanders with guns ultimately subdued the teen perpetrators, but in both cases it was after the shooting had subsided. Other cases led to tragic results. In 2005, as a rampage unfolded inside a shopping mall in Tacoma, Washington, a civilian named Brendan McKown confronted the assailant with a licensed handgun he was carrying. The assailant pumped several bullets into McKown and wounded six people before eventually surrendering to police after a hostage standoff. (A comatose McKown eventually recovered after weeks in the hospital.) In Tyler, Texas, that same year, a civilian named Mark Wilson fired his licensed handgun at a man on a rampage at the county courthouse. Wilson—who was a firearms instructor—was shot dead by the body-armored assailant, who wielded an AK-47. (None of these cases were included in our mass shootings data set because fewer than four victims died in each.)

Appeals to heroism on this subject abound. So does misleading information. Gun rights die-hards frequently [16] credit [17] the end of a rampage in 2002 at the Appalachian School of Law in Virginia to armed "students" who intervened— while failing to disclose that those students were also current and former law enforcement officers [18], and that the killer, according to police investigators, was out of bullets by the time they got to him. It's one of several cases commonly cited as examples of ordinary folks with guns stopping massacres that do not stand up to scrutiny [19].

How do law enforcement authorities view armed civilians getting involved? One week after the slaughter at the *Dark Knight* screening in July, the city of Houston—hardly a hotbed of gun control—released a new Department of Homeland Security-funded video instructing the public on how to react to such events [20]. The six-minute production foremost advises running away or otherwise hiding, and suggests fighting back only as a last resort. It makes no mention of civilians using firearms.


[21]
Screen shot: City of Houston video on mass shooters.

Law enforcement officials are the first to say that civilians should not be allowed to obtain particularly lethal weaponry, such as the AR-15 assault rifle and ultra-high-capacity, drum-style magazine used by Holmes to mow down Batman fans. The expiration of the Federal Assault Weapons Ban under President George W. Bush in 2004 [22] has not helped that cause: Seven killers since then have wielded assault weapons in mass shootings [1].

But while access to weapons is a crucial consideration for stemming the violence, stricter gun laws are no silver bullet. Another key factor is mental illness. A major *New York Times* *[23]* investigation [23] in 2000 examined 100 shooting

Exhibit 23
Page 00865

rampages and found that at least half of the killers showed signs of serious mental health problems. Our own data reveals that the majority of mass shootings are murder-suicides: In the 62 cases we analyzed, 36 of the shooters killed themselves. Others may have committed "suicide by cop"—seven died in police shootouts. Still others simply waited, as Holmes did in the movie theater parking lot, to be apprehended by authorities.



Mental illness among the killers is no surprise, ranging from paranoid schizophrenia to suicidal depression. But while some states have improved their sharing of mental health records with federal authorities, millions of records reportedly are still missing from the FBI's database for criminal background checks [25].

Hargarten of the Medical College of Wisconsin argues that mass shootings need to be scrutinized as a public health emergency so that policy makers can better focus on controlling the epidemic of violence. It would be no different than if there were an outbreak of Ebola virus, he says—we'd be assembling the nation's foremost experts to stop it.

**Drum-style magazine for assault rifles** Brownells.com [24]

But real progress will require transcending hardened politics [26]. For decades gun rights promoters have framed measures aimed at public safety—background checks, waiting periods for purchases, tracking of firearms—as dire attacks on constitutional freedom. They've wielded the gun issue so successfully as a political weapon that Democrats hardly dare to touch it [27], while Republicans have gone to new extremes in their party platform [28] to enshrine gun rights. Political leaders have failed to advance the discussion "in a credible, thoughtful, evidence-driven way," says Hargarten.

In the meantime, the gun violence in malls and schools and religious venues [12] continues apace. As a superintendent told his community in suburban Cleveland this February, after a shooter at Chardon High School snuffed out the lives of three students and injured three others [29], "We're not just any old place, Chardon. This is every place. As you've seen in the past, this can happen anywhere."

*Additional research contributed by Deanna Pan and Gavin Aronsen.*

---

**Source URL:** http://www.motherjones.com/politics/2012/09/mass-shootings-investigation

**Links:**
[1] http://www.motherjones.com/politics/2012/07/mass-shootings-map
[2] http://www.motherjones.com/politics/2012/07/mass-shootings-map?page=2
[3] http://www.cnn.com/2012/08/27/us/new-york-empire-state-building-shooting/index.html
[4] http://www.nytimes.com/2012/08/26/nyregion/bystanders-shooting-wounds-caused-by-the-police.html
[5] http://www.motherjones.com/politics/2012/09/map-gun-laws-2009-2012

Exhibit 23
Page 00866

[6] http://www.nytimes.com/2012/09/23/education/guns-on-campus-at-university-of-colorado-causes-unease.html?pagewanted=all

[7] http://www.foxnews.com/us/2012/09/03/online-classes-make-it-easy-for-non-virginia-gun-owners-to-get-permits/

[8] http://www.motherjones.com/politics/2011/11/concealed-guns-laws

[9] http://smartgunlaws.org/recent-developments-in-state-law-2009-2010/

[10] http://www.fbi.gov/stats-services/publications/serial-murder/serial-murder-1#two

[11] http://www.foxnews.com/story/0,2933,537004,00.html

[12] http://www.motherjones.com/politics/2012/07/mass-shooting-survivor

[13] http://www.nytimes.com/2010/01/21/us/21virginia.html

[14] http://www.jsonline.com/news/crime/multiple-victims-shot-near-brookfield-square-le7a3b4-175147441.html

[15] http://www.motherjones.com/mojo/2012/08/what-is-a-mass-shooting

[16] http://johnrlott.tripod.com/postsbyday/7-4-03.html

[17] http://dailyanarchist.com/2012/07/31/auditing-shooting-rampage-statistics/

[18] http://www.cse.unsw.edu.au/%7Elambert/guns/appalachian/nd/tackle/gun/use/index.html

[19] http://www.motherjones.com/politics/2012/12/armed-civilians-do-not-stop-mass-shootings

[20] http://www.tylerpaper.com/article/20120729/NEWS01/120729768/0/FEATURES09

[21] http://www.youtube.com/watch?v=5VcSwejU2D0&amp;feature=youtu.be

[22] http://www.usatoday.com/news/washington/2004-09-12-weapons-ban_x.htm

[23] http://www.nytimes.com/2000/04/09/us/they-threaten-seethe-and-unhinge-then-kill-in-quantity.html?pagewanted=all&amp;src=pm

[24] http://www.brownells.com/.aspx/pid=23282/Product/AR-15-M16-90-ROUNDER-reg-MAGAZINE

[25] http://www.demandaplan.org/fatalgaps

[26] http://www.ethanzuckerman.com/blog/2012/08/14/what-would-it-take-to-start-a-gun-control-debate-in-the-us/

[27] http://www.cnn.com/2012/07/20/politics/gun-politics/index.html

[28] http://www.washingtonpost.com/politics/in-wake-of-mass-shootings-gop-platforms-calls-for-expanded-rights-for-gun-owners/2012/08/30/8a4881f0-f2ad-11e1-b74c-84ed55e0300b_story.html

[29] http://www.nytimes.com/2012/02/29/us/ohio-school-shooting-suspect-confesses-prosecutor-says.html?pagewanted=all

Exhibit 23
Page 00867