XAVIER BECERRA
Attorney General of California
State Bar No. 118517
MARK R. BECKINGTON
Supervising Deputy Attorney General
State Bar No. 126009
ANTHONY P. O'BRIEN
Deputy Attorney General
State Bar No. 232650
JOHN D. ECHEVERRIA
Deputy Attorney General
State Bar No. 268843
   300 South Spring Street, Suite 1702
   Los Angeles, CA  90013
   Telephone:  (213) 269-6249
   Fax:  (213) 897-5775
   E-mail:  John.Echeverria@doj.ca.gov
*Attorneys for Defendant Attorney General*
*Xavier Becerra*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**XAVIER BECERRA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendant. | 17-cv-1017-BEN-JLB<br><br>**EXHIBITS 34-43 TO THE DECLARATION OF JOHN D. ECHEVERRIA IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Date:          April 30, 2018<br>Time:          10:30 a.m.<br>Judge:         Hon. Roger T. Benitez<br>Courtroom:  5A<br>Action Filed:  May 17, 2017 |

# EXHIBITS
## TABLE OF CONTENTS

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 1 | Expert Report of Lucy P. Allen | 00001-00033 |
| 2 | Expert Rebuttal Report of John J. Donohue | 00034-00072 |
| 3 | Revised Expert Report of Louis J. Klarevas | 00073-00120 |
| 4 | Expert Report of Christopher S. Koper | 00121-00433 |
| 5 | Transcript of Deposition of Stephen Helsley (Excerpts) | 00434-00456 |
| 6 | Transcript of Deposition of Blake Graham, (Excerpts) | 00457-00463 |
| 7 | Transcript of Deposition of Carlisle Moody (Excerpts) | 00464-00480 |
| 8 | Transcript of Deposition of Gary Kleck (Excerpts) | 00481-00492 |
| 9 | Transcript of Deposition of Christopher S. Koper (Excerpts) | 00493-00501 |
| 10 | Transcript of Deposition of Lucy P. Allen (Excerpts & Ex. 7) | 00502-00518 |
| 11 | Transcript of Deposition of Louis J. Klarevas (Excerpts) | 00519-00533 |
| 12 | Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (ATF), *Recommendation on the Importability of Certain Semiautomatic Rifles* (1989) | 00534-00553 |
| 13 | Dep't of the Treasury, Bureau of Alcohol, Tobacco, and Firearms (ATF), *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* (1998) | 00554-00680 |
| 14 | Sen. Bill No. 1446, 3d Reading Analysis, Mar. 28, 2016 (2015-2016 Reg. Sess.) (Cal. 2016) | 00681-00684 |

8

| Exhibit | Description | Page(s) |
|---|---|---|
| 15 | Prepared Testimony by Laurence H. Tribe, *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment: Hearing Before the Subcomm. on the Constitution, Civil Rights and Human Rights, S. Comm. on the Judiciary* (Feb. 12, 2013) Rights, *Proposals to Reduce Gun Violence: Protecting Our Communities While Respecting the Second Amendment* (2013). | 00685-00721 |
| 16 | Mark Follman, et al., *U.S. Mass Shootings, 1982-2018: Data from Mother Jones' Investigation* (Mother Jones, 2018) | 00722-00736 |
| 17 | Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* (2013) | 00737-00772 |
| 18 | Declaration of Professor Daniel Webster in Support of Defendant Xavier Becerra's Opposition to Plaintiffs' Motion for Preliminary Injunction (June 5, 2017) (Dkt. No. 15) | 00773-00792 |
| 19 | Larry Buchanan, et al., *Nine Rounds a Second: How the Las Vegas Gunman Outfitted a Rifle to Fire Faster*, N.Y. Times, Oct. 5 2017 | 00793-00797 |
| 20 | Violence Policy Center, *High-Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States* (2018) | 00798-00807 |
| 21 | Alex Yablon, *Bans on High-Capacity Magazines, Not Assault Rifles, Most Likely to Limit Shooting Carnage*, The Trace, June 13, 2016 | 00808-00811 |
| 22 | State of Connecticut, Division of Criminal Justice, *Report of the State's Attorney for the Judicial District of Danbury on the Shootings at Sandy Hook Elementary School* (2013) | 00812-00860 |

9

| Exhibit | Description | Page(s) |
|---|---|---|
| 23 | Mark Follman, *More Guns, More Mass Shootings—Coincidence?*, Mother Jones, Dec. 15, 2012 | 00861-00867 |
| 24 | Louis Klarevas, Rampage Nation:  Securing America from Mass Shootings (2016) (Excerpts) | 00868-00898 |
| 25 | Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) | 00899-00904 |
| 26 | H.R. Rep. No. 103-489 (1994) | 00905-00981 |
| 27 | The Safety for All Act of 2016, 2016 Cal. Legis. Serv. Proposition 63 (West) | 00982-01011 |
| 28 | Sandy Hook Advisory Comm'n, *Final Report of the Sandy Hook Advisory Commission* (2015) | 01012-01289 |
| 29 | *LAPD Chief Backs Ban on Some Ammo Magazines*, NBC So. Cal., Mar. 2, 2011 | 01290-01294 |
| 30 | C. S. Koper & D. C. Reedy, *Impact of Handgun Types on Gun Assault Outcomes: A Comparison of Gun Assaults Involving Semiautomatic Pistols and Revolvers*, 9 Injury Prevention 151 (2003) | 01295-01300 |
| 31 | Brady Center to Prevent Gun Violence, Assault Weapons: 'Mass Produced Mayhem' (2008) | 01301-01364 |
| 32 | Testimony of Brian J. Siebel, Senior Attorney, Brady Center to Prevent Gun Violence, Before the Council of the District of Columbia (Oct. 1, 2008) | 01365-01372 |
| 33 | Christopher S. Koper et al., *Gunshot Victimisations Resulting from High-Volume Gunfire Incidents in Minneapolis:  Findings and Policy Implications*, Injury Prevention, Feb. 24, 2018 | 01373-01377 |

10

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 34 | Nat. Law Enforcement P'ship to Prevent Gun Violence, Protecting Communities from Assault Weapons and High-capacity Ammunition Magazines (2017) | 01378-01382 |
| 35 | Declaration of San Francisco Police Department Officer Joseph Emanuel in Support of Plantiff's Ex Parte Application for Order to Show Cause Re: Preliminary Injunction, *People v. Badger Mountain Supply, et al.*, No. CGC-17-557010 (S.F. Super. Feb. 21, 2017) | 01383-01402 |
| 36 | Declaration of Detective Michael Mersereau of the Los Angeles Police Department in Support of Amici Curiae the City and County of San Francisco, the City of Los Angeles, and the City of Sunnyvale, *Duncan v. Becerra*, 9th Cir. No. 17-56081 (9th Cir. Oct. 19, 2017) | 01403-01412 |
| 37 | Mark Follman, et al., *A Guide to Mass Shootings in America*, Mother Jones (last updated Mar. 10, 2018, 9:00 AM) | 01413-01417 |
| 38 | David S. Fallis & James V. Grimaldi, *Va. Data Show Drop in Criminal Firepower During Assault Gun Ban*, Wash. Post, Jan. 23, 2011 | 01418-01422 |
| 39 | David S. Fallis, *Data Indicate Drop in High-Capacity Magazines During Federal Gun Ban*, Wash. Post, Jan. 10, 2013 | 01423-01427 |
| 40 | Gary Kleck, Point Blank: Guns and Violence in America (1991) (Excerpts) | 01428-01437 |
| 41 | Claude Werner, *The Armed Citizen - Analysis of Five Years of Armed Encounters*, GunsSaveLives.com (Mar. 12, 2012) | 001438-01445 |

11

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 42 | California Voter Information Guide, Firearms. Ammunition Sales. Initiative Statute. California Proposition 63 (2016) | 01446-01469 |
| 43 | Larry Buchanan, et al., *How They Got Their Guns*, N.Y. Times, Nov. 5, 2017) | 01470-01478 |

Declaration of John D. Echeverria in Support of Defendant's Opposition to Plaintiffs' Motion for Summary Judgment  or, Alternatively, Partial Summary Judgment (17-cv-1017-BEN-JLB)

# Exhibit 34

Exhibit 34
Page 01378

# NATIONAL LAW ENFORCEMENT PARTNERSHIP TO PREVENT GUN VIOLENCE



## PROTECTING COMMUNITIES FROM ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES



### BACKGROUND ON ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES

Assault weapons were designed for the battlefield and have no place in our communities. These weapons were developed to enable a shooter to rapidly spray-fire multiple rounds at an enemy in combat, not to gun down small children, moviegoers, firefighters – or the law enforcement officers protecting them. This kind of excessive firepower has particular utility in the hands of dangerous people intent on wreaking havoc.



Each of the combat hardware features on assault weapons has a military purpose. For example, a pistol grip stabilizes the weapon and enables the shooter to spray-fire from the hip; a barrel shroud cools the barrel when multiple rounds are fired, preventing the weapon from overheating and allows the shooter to grasp the barrel; a threaded barrel accommodates military accessories such as a flash suppressor or grenade launcher; and a telescoping, folding or detachable stock allows for easier concealment.



High-capacity ammunition magazines dramatically increase a shooter's ability to massacre large numbers of people. Prohibiting the manufacture, transfer and importation of high-capacity magazines that hold more than ten rounds would reduce the number of bullets a shooter could use before having to stop to reload. Reloading can provide a critical window of time in which to take down a shooter, as we saw in Tucson.



### ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES ARE THE INSTRUMENTS OF MASS SHOOTERS





Horrific mass shootings are happening all too often all across our nation. Last December, Adam Lanza forced his way into a Newtown, CT, elementary school and opened fire with a .223 caliber Bushmaster AR-15 semiautomatic assault weapon and multiple 30-round ammunition magazines, killing 26 people, including 20 small children. In July of last year, James Holmes entered an Aurora, CO, movie theater and allegedly used an AR-15 assault weapon equipped with a 100-round drum magazine to mow down moviegoers, killing 12 and wounding 58 others.[1]

It is hard to imagine a gunman using a firearm equipped with a magazine holding fewer than ten rounds causing the devastation that resulted from an assault weapon equipped with a 100-round drum magazine. A semiautomatic assault rifle with a 100-round drum magazine – or a pistol equipped with a

---

[1] Goode, Erica, "Rifle Used in Killings, America's Most Popular, Highlights Regulation Debate," *New York Times*, Dec. 16, 2012 (http://www.nytimes.com/2012/12/17/us/lanza-used-a-popular-ar-15-style-rifle-in-newtown.html?pagewanted=all&_r=0) and Kleinfield, N.R., "Gunman Took Big Supply of Ammunition to School After Killing Mother at Home," *New York Times*, Dec. 16, 2012 (http://www.nytimes.com/2012/12/17/nyregion/sandy-hook-school-shooting-in-newtown.html?ref=us))..

Exhibit 34
Page 01379

30-round magazine – has one purpose: to kill as many people as possible as quickly as possible.

The devastating effects of these weapons are felt by law enforcement as criminals up the ante with firepower in excess of what police officers typically use. Reports from law enforcement leaders around the country indicate that assault weapons are increasingly being used against law enforcement officers. Current restrictions on the release of Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) trace data make it impossible to know exactly how often these firearms are being used in crimes.[2] But according to the Department of Justice, high-capacity ammunition magazines are used in 31 to 41 percent of fatal police shootings, varying across cities analyzed.[3]

## EFFECTIVENESS OF THE 1994 ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINE BAN

The 1994 assault weapons ban prohibited the manufacture, transfer, sale or possession of new semiautomatic assault weapons and high-capacity ammunition magazines in excess of ten rounds. The ban expired in 2004.

Studies show the 1994 assault weapons ban worked:

- A 2004 University of Pennsylvania study found that, in the nine years after the ban took effect, the percentage of gun crimes involving assault weapons decreased by 70 percent.[4]

- In 1998, four years after the assault weapons and high-capacity ammunition magazine ban was enacted, the percentage of firearms with large-capacity magazines recovered by Virginia police decreased and continued to drop until it hit a low of 9 percent in 2004, the year the ban expired. That figure more than doubled since the ban's expiration, hitting a high of 20 percent in 2010, according to a Washington Post analysis.[5]

- After the ban expired in 2004, 37 percent of police agencies saw increases in criminals' use of assault weapons, and 38 percent reported a noticeable increase in criminals' use of high-capacity magazines, according to a 2010 Police Executive Research Forum survey.[6]

## NEW LEGISLATION

The Partnership calls on Congress to pass S.150, the Assault Weapons Ban of 2013, introduced by Senator Dianne Feinstein (D-CA) in the U.S. Senate, and the companion bill, H.R.437, introduced by Representative Carolyn McCarthy (D-NY) in the House of Representatives. The legislation bans the sale, transfer, manufacture and importation of:

---

[2] International Association of Chiefs of Police (IACP), *Taking a Stand: Reducing Gun Violence in Our Communities*, Sept. 2007 (http://www.theiacp.org/PublicationsGuides/TopicalIndex/tabid/216/Default.aspx?id=893&v=1).
[3] Koper, Christopher S., "An Updated Assessment of the Federal Assault Weapons Ban," National Institute of Justice, U.S. Department of Justice, June 2004 (https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf).
[4] Koper, Christopher S., "An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003" (http://www.sas.upenn.edu/jerrylee/research/aw_final2004.pdf).
[5] Fallis, David S. and Grimaldi, James V.,"In Virginia, High-Yield Clip Seizures Rise," *Washington Post*, January 23, 2011 (http://www.washingtonpost.com/wp-dyn/content/article/2011/01/22/AR2011012204046.html).
[6] Police Executive Research Forum, *Guns and Crime: Breaking New Ground By Focusing on the Local Impact*, May 2010 (policeforum.org/library/critical-issues-in-policing.../GunsandCrime.pdf).

Exhibit 34
Page 01380

- *New* semiautomatic rifles that can accept a detachable magazine and have at least one military feature, such as pistol grip; forward grip; folding, telescoping, or detachable stock; grenade launcher or rocket launcher; barrel shroud; or threaded barrel.

- *New* semiautomatic pistols that can accept a detachable magazine and have at least one military feature, including threaded barrel; second pistol grip; barrel shroud; capacity to accept a detachable magazine at some location outside of the pistol grip; or semiautomatic version of an automatic firearm.

- *New* semiautomatic shotguns that have a folding, telescoping, or detachable stock; pistol grip; fixed magazine with the capacity to accept more than five rounds; ability to accept a detachable magazine; forward grip; grenade launcher or rocket launcher; or shotgun with a revolving cylinder.

- *New* high-capacity ammunition feeding devices that have the capacity to hold more than ten rounds of ammunition that come in many forms, including a magazine, belt, drum, or feed strip.

The 2013 Assault Weapons Ban excludes any weapon that is lawfully possessed when the bill is enacted; any firearm manually operated by a bolt, pump, lever or slide action; assault weapons used by military, law enforcement, and retired law enforcement; and antique weapons. It also excludes 2,258 legitimate hunting and sporting rifles and shotguns by specific make and model.

Additionally, the new legislation strengthens the provisions of the expired 1994 law by banning dangerous devices designed to circumvent the law, including bump or slide fire stocks, which are modified stocks that enable semi-automatic weapons to fire at rates similar to fully automatic machine guns; "bullet buttons" that allow rapid replacement of ammunition magazines, frequently used as a workaround to prohibitions on detachable magazines; and thumbhole stocks, a type of stock that was created as a workaround to avoid prohibitions on pistol grips.

The 2013 Assault Weapons Ban addresses the millions of assault weapons and large-capacity magazines currently in existence by requiring a background check on all sales or transfers of grandfathered assault weapons and prohibiting the sale or transfer of high-capacity ammunition feeding devices lawfully possessed on the date of enactment of the bill.

## OUTLAWING ASSAULT WEAPONS AND HIGH-CAPACITY MAGAZINES DOES NOT INFRINGE ON THE SECOND AMENDMENT

The Assault Weapons Ban would affect only a particularly dangerous class of weapons, and law-abiding citizens will continue to be able to choose from and acquire the vast array of firearm models on the market.  In the 2008 case of *District of Columbia v. Heller*, the United States Supreme Court ruled that the Second Amendment protects an individual's right to possess a firearm. The ruling, however, recognized that "like most rights, the right secured by the Second Amendment is not unlimited," and listed several categories of restrictions that are presumptively constitutional, such as: laws prohibiting convicted felons or the mentally ill from possessing firearms; laws prohibiting the carrying of firearms in government buildings or schools; laws prohibiting possession of "dangerous and unusual" weapons that are not "in common use at the time."[7]

## EXAMPLES OF THE DEVASTATION CAUSED BY ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES

---

[7] *District of Columbia v. Heller,* 554 U.S. 570 (2008).

Exhibit 34
Page 01381

- In Newtown, CT, on December 14, 2012, Adam Lanza allegedly shot and killed 26 people, including 20 first-grade children, at Sandy Hook Elementary School with an assault weapon and multiple 30-round magazines.

- On August 5, 2012, in Oak Creek, WI, Wade Michael Page killed six people and wounded three others at a Sikh temple with a semiautomatic handgun and three 19-round magazines.

- In Aurora, CO, on July 20, 2012, James Holmes allegedly shot and killed 12 people and injured 58 others at a movie theater. Holmes allegedly used two semiautomatic handguns, a shotgun and an assault weapon equipped with a 100-round drum magazine.

- On January 8, 2011, Jared Loughner shot and killed six people and wounded 13 others in Tucson, AZ, including U.S. Representative Gabrielle Giffords. Loughner fired all 33 rounds from a semiautomatic handgun with a 33-round magazine before being tackled while trying to reload another magazine.

- In Fort Hood, TX, on November 5, 2009, Major Nidal Hasan allegedly shot and killed 13 people and wounded 34 others during a rampage at the Fort Hood military installation. He allegedly used a semiautomatic handgun and 20- and 30-round magazines.

- On April 3, 2009, Jiverly Wong shot and killed 13 people and injured four others at the American Civic Association in Binghamton, NY, firing 99 rounds from two semiautomatic handguns. A 30-round capacity magazine was found at the scene.

## AMERICANS SUPPORT FOR A BAN ON ASSAULT WEAPONS AND HIGH-CAPACITY AMMUNITION MAGAZINES

- In a December 2012 poll, 81 percent of registered voters – including 71 percent of gun owners – supported renewing the federal ban on assault weapons.[8]

- In the same December 2012 poll, 72 percent of voters, including 59 percent of gun owners, supported a ban on the sale of high-capacity magazines.[9]

- In a Johns Hopkins University Bloomberg School of Public Health survey, 69 percent of respondents supported a ban on the sale of military-style assault rifles.[10]

- In a January 2013 Washington Post-ABC poll, 58 percent of Americans said they supported a nationwide ban on the sale of assault weapons.[11]

---

[8] Douglas E. Schoen, "National Gun Survey," January 2013
(http://libcloud.s3.amazonaws.com/9/13/a/1088/schoen_summary_memo_-3.pdf).
[9] Douglas E. Schoen, "National Gun Survey," January 2013
(http://libcloud.s3.amazonaws.com/9/13/a/1088/schoen_summary_memo_-3.pdf).
[10] Johns Hopkins Bloomberg School of Public Health Survey, "Majority of Americans Support Dozens of Policies to Strengthen U.S. Gun Laws," Jan. 28, 2013 (http://www.jhsph.edu/news/news-releases/2013/Barry-Majority-of-Americans-Support-Policies-to-Strengthen-Gun-Laws.html).
[11] ABC News/Washington Post Poll, "On Eve of Newtown Recommendations, Most Back New Gun Control Measures, Jan. 14, 2013 (http://www.langerresearch.com/uploads/1146a1GunControl.pdf).

Exhibit 34
Page 01382

# Exhibit 35

Exhibit 35
Page 01383

1  DENNIS J. HERRERA, State Bar #139669
   City Attorney
2  YVONNE R. MERÉ, State Bar #173594
   Chief of Complex and Affirmative Litigation
3  VICTORIA L. WEATHERFORD, State Bar #267499
   AILEEN M. MCGRATH, State Bar #280846
4  Deputy City Attorneys
   1390 Market Street, 6th Fl.
5  San Francisco, California 94102-5408
   Telephone:    (415) 554-4236
6  Facsimile:    (415) 554-3985
   E-Mail:       victoria.weatherford@sfgov.org
7  E-Mail:       aileen.mcgrath@sfgov.org

8
   Attorneys for Plaintiff
9  THE PEOPLE OF THE STATE OF CALIFORNIA
   Ex rel. San Francisco City Attorney Dennis J. Herrera
10

ELECTRONICALLY
**FILED**
Superior Court of California,
County of San Francisco
**02/21/2017**
Clerk of the Court
BY:BOWMAN LIU
Deputy Clerk

11

12              SUPERIOR COURT OF THE STATE OF CALIFORNIA

13                      COUNTY OF SAN FRANCISCO

14                      UNLIMITED JURISDICTION

15  THE PEOPLE OF THE STATE OF          Case No. CGC-17-557010
    CALIFORNIA, ex rel. San Francisco City
16  Attorney Dennis J. Herrera,

17          Plaintiff,                   EXPERT DECLARATION OF SAN FRANCISCO
                                         POLICE DEPARTMENT OFFICER JOSEPH
18          vs.                          EMANUEL IN SUPPORT OF PLAINTIFF'S EX
                                         PARTE APPLICATION FOR ORDER TO SHOW
19  BADGER MOUNTAIN SUPPLY, an           CAUSE RE: PRELIMINARY INJUNCTION AND
    unincorporated business; 7.62 PRECISION, an   PRELIMINARY INJUNCTION; AND EXHIBIT A
20  Alaska corporation; SHOOTERS PLUS, an
    unincorporated business; L.A.K.      Hearing Date:     February 21, 2017
21  ENTERPRISES, d/b/a/ LAK SUPPLY, a    Hearing Judge:    Hon. Harold E. Kahn
    Wyoming limited liability company; MARK   Time:          11:00 a.m.
22  THOMAS KUBES, d/b/a                  Place:            302
    BUYMILSURP.COM; and DOES 1 through
23  50, inclusive.                       Date Action Filed:  February 9, 2017
                                         Trial Date:       TBD
24          Defendants.

25

26  ///

27  ///

28

                                        1

I, Joseph Emanuel, declare are follows:

1.     I have personal knowledge of the following facts except those stated on information and belief. As to those facts, I believe them to be true. The matters stated in this declaration are based on my training, education, and experience. If called upon to testify, I can testify competently to the contents of this Declaration.

2.     I am a sworn police officer within the San Francisco Police Department ("SFPD"). I have been employed with the SFPD for approximately 11 years. I am currently assigned to Mission Station, where I have worked as Captain's Staff for 1.5 years.

3.     I make this Declaration in support of Plaintiff's request for a preliminary injunction against Defendants Badger Mountain Supply, 7.62 Precision, Shooters Plus, L.A.K. Enterprises, d/b/a/ LAK Supply ("LAK"), and Mark Thomas Kubes, d/b/a/ buymilsurp.com ("Buymilsurp.com"), barring these Defendants from advertising for sale into California and San Francisco, and selling to California and San Francisco residents, large-capacity magazines for firearms capable of holding more than 10 rounds of ammunition, and "repair" and "rebuild" kits for such magazines.

4.     In this Declaration, except where I state something to be based on my own personal observations, I am stating my opinion as a firearms expert, or am referring to information that I used to form my opinions. In addition to my general training and experience on firearms, the information I used to form my opinions regarding Defendants and the need for the preliminary injunction Plaintiff seeks includes my personal observations, including of Defendants' websites and online firearm enthusiast discussion boards, conversations I have had with firearms dealers, discussions with other law enforcement officers including other experts, information from state and federal law enforcement agencies, my review of the declarations submitted with San Francisco's request for a preliminary injunction, and my review of police reports and other articles and reports on topics related to firearms and firearms-related crimes.

5.     In this Declaration, I discuss my experience, education, and expertise on firearms, particularly within San Francisco. Additionally, I explain how large-capacity magazines are dangerous to the public and to police officers, by allowing shooters to fire more rounds of ammunition without having to stop to reload.

Exhibit 35
Page 01385

EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010

APPENDIX B

n:\affirm\li2017\170149\01172001.docx

## EXPERIENCE, EDUCATION, AND EXPERTISE REGARDING FIREARMS

6.    I attained an Associate's Degree from San Francisco City College in Administration of Justice. I have also taken courses in criminal justice from San Francisco State.

7.    I am a court-qualified firearms expert, and have testified in San Francisco Superior Court as a firearms and high-capacity magazines expert in San Francisco at a preliminary hearing.

8.    I am currently assigned as Captain's Staff at Mission Station, and have been in my current role for approximately 1.5 years. As Captain's Staff, I perform regular patrol duties, youth engagement, and am responsible for all police activities at Garfield Park in San Francisco. Before my current assignment as Captain's Staff, I was a patrol officer assigned to the Housing Unit at Mission Station for approximately one year.

9.    Before that, I was assigned to the Narcotics Division for one year, where my primary focus was firearms investigations. My primary duties included tracking individuals who possessed firearms but subsequently became ineligible to possess the firearm based on mental health status or a new criminal case, and seizing the firearms. As part of that assignment, I worked closely with the California Bureau of Firearms and the federal Bureau of Alcohol, Tobacco and Firearms, and performed multiple firearms investigations with those agencies, including state investigations on armed prohibited felons and federal "trigger-lock" investigations for certain felonies. I reviewed over 100 firearms-related SFPD incident reports, including all corresponding photographs booked into evidence. Upon reviewing the reports, I would identify the weapon and any illegal modifications or additions made to it, such as removing the serial number, illegal silencer, or illegal large-capacity magazine. I have gained a vast amount of knowledge from reviewing firearms arrest reports, studying firearm and ammunition images taken during these arrests, and performing physical inspections on seized firearms and ammunition. In studying this information, I have been able to identify hundreds of firearms and their component parts. As part of my assignment in the Narcotics Division and continuing to today, I conduct physical inspections of firearms and firearms accessories where the booking officer in the Property Department was unable to identify or classify it.

10.    As part of my duties related to firearms investigations, I also maintained the SFPD firearms database, which is a database of all firearms seized by the SFPD as well as the individuals

Exhibit 35
Page 01386

APPENDIX B

EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010

n:\affirm\li2017\170149\01172001.docx

Case 3:17-cv-01017-BEN-JLB Document 53-12-4 Filed 04/09/18 PageID.7150 Page 16 of
Case 3:17-cv-01017-BEN-JLB Document 53-12-4 Filed 04/09/18 PageID.7150 Page 16 of
107

1    arrested in possession of the firearm.  I also received continual and substantial training from SFPD

2    Officer Ignatius Chinn, who is himself a court-qualified expert on firearms and who is widely

3    recognized within and outside the SFPD as the SFPD's preeminent firearms and ammunition expert.

4    Officer Chinn is presently on medical leave.

5         11.    I also previously served in other patrol roles, and as a plainclothes officer at Mission

6    Station, focused on violent felonies and narcotics.

7         12.    In addition, during my 11 years in the SFPD, while executing numerous search

8    warrants, as well as probation and arrest searches, I have located, seized, and inspected hundreds of

9    firearms and their component parts.

10        13.    Before joining the SFPD, I was a United States Marine for eight years.  As a Marine, I

11   was responsible for training and becoming familiar with various assault weapons, including their

12   functionality and component parts.

13        14.    In addition to my SFPD-issued service weapon, I also own approximately 30 firearms

14   of various makes and models.  I am intimately familiar with all types of firearms, including handguns,

15   assault rifles, and shot guns, their component parts and accessories, and how to assemble and

16   disassemble them.

17        15.    I keep current on firearms and firearms accessory sales and trends in San Francisco by

18   talking directly to firearms dealers and consumers in the greater Bay Area.  In fact, both during my

19   assignment in the Narcotics Division investigating firearms offenses and continuing to today, I have

20   had numerous conversations with firearms and ammunitions dealers and their customers.  I have also

21   had several contacts with persons who unlawfully possess firearms and who possess unlawful firearms

22   and firearms components, including during investigation of firearms crimes, during police interviews

23   with arrested suspects, and during compliance investigations related to firearms probation conditions.

24        16.    I also have been able to gain a great deal of knowledge about firearms and firearms

25   component sales and trends in the Bay Area by viewing online forums related to firearms, most

26   notably the CalGuns.net online forum.  CalGuns is widely considered in the firearms community to be

27   the preeminent online forum for gun enthusiasts in California.  On the Calguns.net forum, users

28   connect with each other to buy and sell firearms, ammunition, and component parts, share information

1  related to online and physical retail sales locations, and ask and answer questions on all topics

2  regarding firearms, including issues related to various laws restricting the sale or possession of

3  firearms.

4        17.    I also served on the SFPD Specialist Team (counter-sniper and containment team),

5  under the Special Operations Group, from 2011 to 2016. In that assignment, my primary duties were

6  responding to critical incidents, passive and violent demonstrations, and executing high-risk search

7  warrants. As part of that assignment, I received training on and carried specialty weapons such as an

8  AR-15 rifle, less lethal shot gun, and .40 extended-range impact weapon.

9        18.    As part of my training as a firearms expert, I have attended hundreds of hours of

10  trainings on firearms. That training includes approximately 150 hours of California accredited

11  firearms training, including 100 hours of training with the SFPD as part of Special Operations Group

12  training on firearms, tactics, and critical incidents, and additional 50 hours of training consisting of

13  Basic and Advanced operators' courses for AR-15 assault rifles. I have also taken approximately 4

14  hours of training with the federal Bureau of Alcohol Tobacco, Firearms on subjects related to firearms

15  identification.

16        19.    In addition to my required professional firearms licenses (including Carrying a

17  Concealed Weapon license), I also possess several civilian firearms certificates and have undergone

18  substantial additional firearms training. My additional training and certifications include a Basic

19  Certification from Glock Armor School for firearm maintenance and repair, which required 8 hours of

20  training and coursework. I also possess an Advanced Certificate from Roger Shooting School for

21  short-range carbine, which required 40 hours of training and coursework. I also possess an Advanced

22  Certificate in handguns from the Roger Shooting School, which required 40 hours of training and

23  coursework, which I have since repeated for a total of 80 hours of training.

24        20.    I have also received extensive training from my supervisors in the SFPD, Officer

25  Chinn, and other experts from the California Department of Justice in the identification of Category

26  One through Three assault weapons. Assault weapons are broken down into different categories.

27  Category One is defined under section 30510 of the California Penal Code as assault weapons, which

28  are named, by make and model. Category two firearms are defined under Penal Code section 30510(f)

1    and comprised of variants of Category One, AR-15s and AK-47 variants. Category Three firearms are

2    assault weapons as defined under section 30515 of the California Penal Code. Category Three assault

3    weapons are defined by specific characteristics and are also comprised of other weapons in the

4    military.

5      21.    I have also received extensive training from my supervisors in the SFPD, Officer

6    Chinn, and other experts from the California Department of Justice regarding extended and high-

7    capacity firearm magazines. I am intimately familiar with California laws restricting the sale of large-

8    capacity firearm magazines.

9      22.    In addition to the above experience and training, I have also read, and regularly read,

10    manuals, publications, and reports related to firearms issued by the California Bureau of Firearms and

11    the federal Bureau of Alcohol, Tobacco and Firearms. I also regularly review news media accounts of

12    firearms-related crime and other private and public studies on issues related to firearms and firearms-

13    related crime.

14         **AN OVERVIEW OF LARGE-CAPACITY MAGAZINES AND THE HARM THEY**

15                           **CAUSE**

16      23.    A firearm magazine is an ammunition storage and feeding device for a firearm.

17    Magazines can be detachable or integral to the firearm. Magazines are a component of every firearm

18    with the exception of chamber-loaded firearms such as revolvers, bolt-action rifles, and shot guns.

19    Magazines are a component in all automatic and semiautomatic pistols, automatic and semi-automatic

20    rifles, and assault weapons. A magazine is comprised of four parts: the body, spring, follower, and

21    floor plate or end plate. The body is the exterior shell that houses the ammunition. The floor plate is

22    the base of the magazine. As a firearm is discharged, the follower pushes the ammunition up into the

23    body of the firearm to be reloaded. The spring forces the ammunition into position to be fed into the

24    firearm chamber by operation of the firearm's action. Magazines are shaped as either a box or a drum.

25      24.    Assembling a completely disassembled magazine is fast and easy, even for persons who

26    are unfamiliar with firearms. A person familiar with firearms and their component parts can assemble

27    a magazine in as fast as ten seconds. As a firearms expert intimately familiar with hundreds of models

28

Case 3:17-cv-01017-BEN-JLB Document 53-1 Filed 04/09/18 PageID.7158 Page 19 of
Case 3:17-cv-01017-BEN-JLB Document 53-1 Filed 04/09/18 PageID.7158 Page 19 of
107

1    of firearms and their component parts, I am capable of assembling a large-capacity magazine in under

2    ten seconds.

3         25.     The ability of an automatic or semiautomatic firearm to fire multiple bullets without

4    reloading is directly related to the capacity of the firearm's magazine.  The larger the capacity of the

5    magazine, the more shots a shooter can fire without having to stop firing to reload.

6         26.     California Penal Code section 16740 defines a large-capacity magazine as "any

7    ammunition feeding device with the capacity to accept more than 10 rounds," excluding feeding

8    devices that have been permanently altered so that they cannot accommodate more than 10 rounds, .22

9    caliber tube ammunition feeding devices, and tubular magazines that are contained in a lever-action

10   firearm.  Large-capacity "repair kits" that contain all parts necessary to create a new large-capacity

11   magazine are simply that—a disassembled large-capacity magazine—and can be readily assembled by

12   a purchaser the same as any other disassembled magazine.

13        27.     California Penal Code section 32311(b) defines a "large-capacity conversion kit" as "a

14   device or combination of parts of a fully functioning large-capacity magazine, including, but not

15   limited to, the body, spring, follower, and floor plate or end plate, capable of converting an

16   ammunition feeding device into a large-capacity magazine."  Some large-capacity "repair" or

17   "rebuild" kits that lack one or more parts can be completed with parts from an existing legal magazine,

18   allowing a purchaser to create a new large-capacity magazine.

19        28.     Large-capacity conversion kits include magazine extenders, which are devices that

20   increase the ammunition capacity of a magazine.  Magazines that have been modified with a magazine

21   extender such that they are capable of holding more than 10 rounds of ammunition constitute large-

22   capacity magazines under Penal Code section 16740.

23        29.     To determine if a magazine is capable of holding over ten rounds of ammunition, you

24   can either put the ammunition into the magazine to check and see if it will hold more than ten rounds,

25   or check the buffer and the spring in the magazine to see whether it will go past the ten round marking.

26   Often, a quick visual check of a magazine is enough to determine that it is capable of holding more

27   than ten rounds, as certain magazines can hold 30, 50, or over 100 rounds of ammunition.

28

Exhibit 35
Page 01390
EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010

APPENDIX B
n:\affirm\li2017\170149\01172001.docx

Case 3:17-cv-01017-BEN-JLB Document 53-12 Filed 04/09/18 PageID.7154 Page 20 of
107
Case 3:17-cv-55681 15/19/2017, ID: 530824 DktEntry: 29, Page 50 54 107 Page 20 of
107

30.     California Penal Code section 32310, which has been in effect in various forms since January 1 2000, provides anyone who, with limited exceptions, "manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine" may be punished "by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170." (Penal Code § 32310(a).)

31.     California Penal Code section 32310(b) defines "manufacturing" as including "both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine."

32.     California Penal Code section 32311, effective January 1, 2014, provides anyone who, with limited exceptions, "manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large capacity magazine conversion kit" may be punished "by a fine of not more than one thousand dollars ($1,000) or imprisonment in a county jail not to exceed six months, or by both that fine and imprisonment."

33.     Furthermore, San Francisco Police Code section 619, which has been in effect since approximately April 1, 2014, prohibits the civilian possession of assembled or disassembled large-capacity magazines. Section 619(b) mirrors the definition of "large-capacity" magazine, including and the exceptions thereto, found in California Penal Code section 16740.

34.     Large-capacity magazines have not been regulated at the federal level since the federal assault weapons ban lapsed in 2004. Between 1994 and 2004, it was illegal to sell new large-capacity magazines capable of holding more than 10 rounds of ammunition, although large-capacity magazines that were manufactured before the ban could be legally resold.

**The Dangers to the Public Posed by Large-Capacity Magazines**

35.     The ability of large capacity magazines to hold numerous rounds of ammunition significantly increases the lethality of the automatic and semiautomatic firearms using them. The more bullets a shooter can fire without stopping to reload increases the shooter's ability to injure and kill large numbers of people quickly. In addition, in a dense urban area like San Francisco, every

Exhibit 35
Page 01391

EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010

n:\affirm\li2017\170149\01172001.docx

APPENDIX B

1 firearm discharge has the potential to injure innocent people who are nearby.  Increasing the number of
2 rounds a firearm can discharge through the use of large capacity magazines can and does result in
3 unnecessary injury to innocent people who are nearby.

4      36.    As repeatedly documented in governmental and independent third-party reports
5 analyzing FBI and other law enforcement data regarding shootings, shootings involving large-capacity
6 magazines result in more injuries, more bullets fired, and more casualties.  Examples of such reports
7 include the *Everytown for Gun* Safety "Analysis of Mass Shootings," revised August 31, 2016,
8 *Mayors Against Illegal Guns* "Analysis of Mass Shootings," dated September 2013, the *Citizens*
9 *Crime Commission of New York City* "Mass Shooting Incidents in America (1984-2002)," and *Mother*
10 *Jones* "A Guide to Mass Shootings in America, dated July 20, 2012."

11      37.    As reported in the national media, automatic and semiautomatic firearms equipped with
12 large-capacity magazines have been used in several recent high-profile mass shootings, including the
13 following shootings:

14     a.  The shooting on the campus of Virginia Tech on April 16, 2007, where 32
15         people were killed and many others wounded.  One such media account is the
16         *Washington Post* article, "Gunman Kills 32 at Virginia Tech In Deadliest
17         Shooting in U.S. History," dated April 17, 2007.

18     b.  The shooting on November 5, 2009 at Fort Hood, Texas, where 13 people were
19         killed and 34 more were wounded.  One such media account is the *NBC News*
20         article, "Gunman Kills 12, Wounds 31 at Fort Hood," dated November 11,
21         2009.

22     c.  The shooting on January 8, 2011, at Tucson, Arizona, where 6 people were
23         killed and 13 people were injured, including a member of the United States
24         House of Representatives.  One such media account is the *New York Times*
25         article, "In Attack's Wake, Political Repercussions," dated January 8, 2011.

26     d.  The shooting on December 14, 2012, at Sandy Hook Elementary School in
27         Newtown, Connecticut, where 27 people (not including the shooter), including
28         20 children, were killed.  One such media account is *The Guardian* article.

Exhibit 35
Page 01392

EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010
APPENDIX B
n:\affirm\li2017\170149\01172601.docx

Case 3:17-cv-01017-BEN-JLB Document 53-12-44 Filed 04/09/18 PageID.7156 Page 22 of
Case 3:17-cv-01017-BEN-JLB Document 53-12-44 Filed 04/09/18 DktEntry: 29, Page 52 of
107

1                "Newtown Gunman Kiss 20 Children in Elementary School Shooting," dated

2                December 15 2012.

3       e.   The shooting on July 20, 2012, in an Aurora, Colorado, movie theater, which

4             killed 12 people and left approximately 70 people injured.  One such media

5             account is the *Los Angeles Times* article, "Gunman Kills 12 at 'Dark Knight

6             Rises' screening in Colorado," dated July 20, 2012.

7       f.   The shooting on December 2, 2015, in San Bernardino, California, which killed

8             14 people and injured 22 others.  One such media account is the *New York

9             Times* article, "San Bernadino Shooting Kills at Least 14; Two Suspects Are

10            Dead," dated December 2, 2015.

11       g.   The shooting on June 17, 2015, in a Charleston, South Carolina church, which

12            killed nine people.  One such media account is the *USA Today* article, "9 Dead

13            in Shooting at Black Church in Charleston, S.C," dated June 15, 2015.

14       h.   The shooting on June 12, 2016, in an Orlando, Florida night club, which killed

15            49 people and wounded 53 others.  One such media account is the *New York

16            Times* article, "Orlando Gunman Attacks Gay Nightclub, Leaving 50 Dead,"

17            dated June 12, 2016.

18     38.    Despite the fact that it has been illegal to sell large-capacity magazines in California for

19 17 years, criminals who are arrested with firearms often also possess large-capacity magazines.  I have

20 been involved in arrests of hundreds of individuals in San Francisco who possessed firearms equipped

21 with large-capacity magazines.  In my experience, I estimate that, of the magazine-fed firearms seized

22 in San Francisco, approximately 50% are equipped with a large-capacity magazine.  It is my opinion

23 that criminals seek out firearms equipped with large-capacity magazines, in order to have more

24 firepower at their disposal when committing crimes.

25     39.    It is my opinion that purchasers of "repair" or "rebuild" kits for large-capacity

26 magazines, that include all or substantially all of the parts needed to assemble an entire new large-

27 capacity magazine, seek to evade existing state laws rather than lawfully repair an existing "pre-ban"

28

Exhibit 35
Page 01393

EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010

APPENDIX B

n:\affirm\li2017\170139\01172001.docx

magazine.  Consumers who need to repair an existing pre-ban magazine can easily do so by

purchasing individual parts directly from the manufacturer or another vendor.

**The Specific Dangers to Police Officers Posed by Large-Capacity Magazines**

40.     In my opinion, large-capacity magazines in the hands of criminals pose a greater danger

to police officers than standard-capacity magazines. When a shooter must pause, even briefly, to

reload, police officers have the opportunity to take action, either by advancing or falling back to take

cover.  A shooter who does not have to reload does not give police that opportunity, and has a greater

ability to injure or kill police officers.

41.     Unfortunately, this has been illustrated in a real-life tragedy here in San Francisco, the

story of which I am intimately familiar with as a former member of the SFPD Specialist Team. In

November 1994, San Francisco Police Department Officer James Guelff, who served on the Specialist

Team, was killed at Pine Street and Franklin Street by a shooter with an assault rifle who was carrying

what the media reported as about 1000 rounds of ammunition.  Officer Guelff responded to a report of

shots fired and a car-jacking in progress and was met with the suspect's fire from an assault rifle.

Officer Guelff returned fire with his service revolver, which contained six shots.  When Officer Guelff

ran out of ammunition, he took cover behind his vehicle to reload.  As he reloaded, the suspect—who

did not need to reload his weapon—advanced on Officer Guelff and murdered him behind his vehicle.

As a member of the SFPD Specialist Team, Officer Guelff had more training than the average SFPD

officer, yet he was overwhelmed by the gunfire from this criminal.

42.     There are additional examples of SFPD officers being targeted with large-capacity

magazines. Attached to this declaration as **Exhibit A** is a true and correct copy of a police report

concerning an attempted homicide of police officers which occurred in April 2013.  In this incident,

suspects fired 10-15 shots at an unmarked patrol vehicle, at least four of which hit the vehicle.  During

the investigation of the event, officers recovered a 30-round Glock magazine and a Glock 17

semiautomatic pistol from the suspects' path of travel and another extended capacity firearm magazine

in a backpack located in the backseat of the suspects' vehicle.

43.     Furthermore, one of the most infamous and well-known tragedies among law

enforcement officers is the North Hollywood Shootout, which was a 1997 shootout between the Los

Exhibit 35
Page 01394
APPENDIX B

11

EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010          n:\affirmlit2017\1701490\01172001.docx

1 Angeles Police Department ("LAPD") and two heavily armed bank robbers. The shootout

2 miraculously resulted in no law enforcement or civilian casualties, but did result in 10 police officers

3 and 6 civilians being injured from the gunfire. As was reported in the media, the suspects wore full

4 body armor and possessed multiple automatic and semiautomatic firearms, including illegally

5 converted firearms and over 3,000 rounds of ammunition. Four of the shooters' assault rifles—one

6 AR-15 converted to fully automatic and three AK-47 rifles converted to fully automatic—were

7 equipped with multiple 100-round magazines. The LAPD officers who responded to the bank robbery

8 call with only their standard-issue firearms were so outmatched in firepower they had to commandeer

9 weapons and ammunition from a nearby gun store. The continuous rain of fire from the suspects'

10 large-capacity magazines was a dramatic example of suppressive fire—shootings designed to degrade

11 and paralyze law enforcement's ability to stop the threat. Later reports determined that during the

12 shootout, the shooters fired approximately 1,100 rounds of ammunition.

13    44.    As has been reported in the national media, several shooters have in fact been subdued,

14 and civilians have been able to escape immediate danger, when a shooter must stop to reload his

15 firearm, for example in the following instances:

16        a.   The Tucson, Arizona shooter was subdued by two civilians when he stopped to

17             reload as reported in the *Los Angeles Times* article, "Crowd Member Took

18             Gunman Down," dated January 9, 2011, and in the *ABC News* article, "Woman

19             Wrestled Fresh Ammo Clip From Tucson Shooter As He Tried to Reload,"

20             updated August 23, 2016.

21        b.   As many as six elementary school children were able to escape from the Sandy

22             Hook Elementary School shooter when he stopped to reload or remove the

23             ammunition magazine to his rifle, as reported in the *Hartford Courant* article,

24             "Sandy Hook Shooter's Pause May Have Aided Students' Escape," dated

25             December 23, 2012.

26 **THE NEED FOR A PRELIMINARY INJUNCTION AGAINST THESE DEFENDANTS**

27 **Defendants' Websites Advertise for Sale Large-Capacity Magazines, Magazine Repair**

28 **Kits, and Magazine Extenders to California Residents**

Exhibit 35
Page 01395
APPENDIX B

12

45.     I have reviewed the Declaration of City Attorney Investigator Borys Procak, and the
exhibits attached thereto, which include screenshots taken of each Defendant's website, including
purchasing pages I am informed and believe were captured in January and February 2017 shortly
before Plaintiff filed this lawsuit.  I have also reviewed the Complaint in this Action, and all
screenshots of Defendants' websites embedded therein and attached as exhibits thereto, which I am
informed and believe were taken by the City Attorney's Office in February 2017.  I have also
reviewed each Defendant's website.

46.     Each Defendant flouts California law, by advertising for sale large-capacity magazines,
magazine extenders, and "repair kits" that cannot legally be sold in California, and by falsely stating
that such products can be legally sold in California.

47.     Defendant Badger Mountain Supply, which uses the websites www.loyalsguns.com and
www.badgermountainsupply.com, as shown in Exhibit E to Borys Procak's Declaration, offers dozens
of large-capacity magazines for sale to California consumers as "rebuild kits."  On a page titled
"Magazines (Rebuild Kits)" explains that each "rebuild / repair kit is a new magazine that has been
opened, disassembled, and packaged for shipping."  Defendant Badger Mountain Supply further
explains to California purchasers that, "To comply with recent California laws regarding magazine
rebuild kits, customers buying rebuild kits to be shipped to California will receive two shipments: the
contents of each shipment not containing sufficient parts to assemble a fully functional magazine.
Additional shipping charges may apply to CA customers due to additional packaging and shipping."

48.     One example shown in Exhibit E to Borys Procak's declaration is of a 30-round
magazine "rebuild kit" for an AK-47 semiautomatic assault rifle.  On the product page, Defendant
Badger Mountain Supply disclaims liability for its customers who "purchas[e] this item or its
components in an attempt to bypass Local, City, County or State laws," and again states rebuild kits
shipped to California will be shipped in two packages to "comply" with California law.  However,
"rebuild kits" are unlawful to sell in California under section 32311, and there is no exception for such
kits that are shipped in multiple packages.  Even if shipped in multiple packages, a "rebuild kit"
comprised of all parts of a large-capacity magazine is still capable of being assembled in seconds to
create an illegal large-capacity magazine in violation of Penal Code 32311.  Furthermore,

Exhibit 35
Page 01396

EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010

n:\affirmli\2017\170149\01172001.docx

APPENDIX B

1  disassembled large-capacity magazines may not be lawfully possessed by civilians in San Francisco

2  under Police Code section 619.

3      49.     Defendant 7.62 Precision, which uses the website www.7-62precision.com, offers for

4  sale on its website several large-capacity magazines which are unlawful under Penal Code section

5  32310 and, as shown in Exhibit C to Borys Procak's Declaration, offers for sale a "California

6  Magazine Rebuild Kit," for AR-15 assault rifle magazines, which "includes a complete set of parts

7  that may be used to replace worn or damaged parts on other magazines." Defendant 7.62 Precision

8  states these kits are for California consumers only. However, "rebuild kits" are unlawful to sell in

9  California under section 32311. Furthermore, disassembled large-capacity magazines may not be

10  lawfully possessed by civilians in San Francisco under Police Code section 619.

11      50.     Defendant Shooters Plus, which uses the website www.shootersplus.com, provides a

12  link with information "on converting High Capacity Magazines to Rebuild Kits for ban States such as

13  California" and other states. As shows in Exhibit D to Borys Procak's Declaration, on a page titled

14  "Magazine Rebuild Kits," Shooters Plus states, "it is legal for us to ship these magazines in the form

15  of rebuild kits as long as the customer is using the rebuild kit to rebuild / repair magazines that he or

16  she legally owned before the Assault Weapon Ban. Our rebuild kits will be shipped unassembled and

17  there is currently a $2.00 fee for each rebuild kit. To purchase our rebuild kits simply click on the

18  magazine/s you need, then click on the checkbox under each magazine that reads 'Convert to Rebuild

19  Kit.'" Despite their supposed legal disclaimers, Defendant Shooters Plus makes available to

20  California consumers every large-capacity magazine on their website in complete, disassembled form.

21  This is patently unnecessary to "repair" a broken component of an existing large-capacity magazine,

22  and violates California Penal Code section 32310 and San Francisco Police Code section 619.

23      51.     As one example, as shown in Exhibit D to Borys Procak's Declaration, Defendant

24  Shooters Plus offers a complete, disassembled 30-round magazine for an AK-47 semiautomatic assault

25  rifle as a "Magazine Rebuild Kit" for a $2.00 fee. Contrary to Defendant Shooters Plus's statements,

26  these "rebuild kits" are unlawful to sell in California under section 32311. Furthermore, disassembled

27  large-capacity magazines may not be lawfully possessed by civilians in San Francisco under Police

28  Code section 619.

Exhibit 35
Page 01397
APPENDIX B

EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010          n:\affirm\li2017\170149\01172001.docx

52.     Defendant L.A.K Enterprises, d/b/a/ LAK Supply ("LAK"), which uses the website www.laksupply.com, purports to "specialize" in large capacity magazines, and magazine repair kits for consumers in "anti-2A territory," which I understand to be shorthand for "anti Second Amendment" and a reference to states like California that have strict gun control laws.  LAK's website also states that LAK noting that their business "originated in California" and "absolutely support[s] those of you fighting the good fight behind enemy lines."  On a web page titled "Magazine repair kits," attached as Exhibit A to the Declaration of Borys Procak, LAK informs consumers that "All hi cap magazine orders from ban states will automatically be converted into compliant mag parts kits when you place your order. There is no extra charge, and there is nothing extra to add to your cart."  Defendant LAK further states that "KIT ORDERS TO CA WILL BE SHIPPED MISSING ONE PART FOR COMPLIANCE."

53.     Defendant LAK's statements misstate California law, which bans the sale of high-capacity magazine repair kits, including kits that lack one part of a magazine.  California defines a "large-capacity conversion kit" as "a device *or combination of parts* of a fully functioning large-capacity magazine, including, but not limited to, the body, spring, follower, and floor plate or end plate, *capable* of converting an ammunition feeding device into a large-capacity magazine."  (California Penal Code section 32311(b) (emphasis added).)  It is illegal to sell in California a combination of parts that allow a consumer to modify an existing magazine into a large-capacity magazine, even if the kit toes not include every single part of a magazine.  A magazine repair kit that lacks a floor plate, for example, may still be capable of converting an existing magazine into an illegal large-capacity magazine, and would therefore violate California's ban.  In fact, several well-known firearms manufacturers, such as Glock, have universal floor plates that can be used on almost any magazine of the same caliber of bullet.

54.     Furthermore, Defendant LAK offers for sale on its website a host of large-capacity magazines, which are unlawful under Penal Code section 32310 and which, when converted by LAK into a "repair kit," are unlawful under section 32311.  As one example, Defendant LAK offers for sale a 150-round drum magazine for an AR-15 semiautomatic assault rifle in violation of California Penal Code sections 32310 and 32311 (when disassembled into a "repair kit").

Exhibit 35
Page 01398
APPENDIX B

55.     Defendant Mark Thomas Kubes, d/b/a/ Buymilsurp.com ("Buymilsurp.com"), which uses the website www.buymilsurp.com, offers for sale on its website a host of large-capacity magazines which are unlawful under Penal Code section 32310. Buymilsurp.com also sells "spare parts kits" for several large-capacity magazines. Two examples in Exhibit B to Borys Procak's Declaration are repair kits for a 30- and 75-round magazines for AK-47 semiautomatic assault rifle. For the 30-round kit, Buymilsurp.com states: "This is a completely disassembled magazine for Spare Parts. Can Ship to CA." For the 75-round kit, Buymilsurp.com states: "These will be sold as Repair Kits, They will arrive disassembled (all parts included) and sold for spare parts only. CA OK." Contrary to Defendant Buymilsurp.com's statements, these "spare parts kits" are unlawful to sell in California under section 32311. Furthermore, disassembled large-capacity magazines may not be lawfully possessed by civilians in San Francisco under Police Code section 619.

56.     Defendant Buymilsurp also offers for sale to California magazine extenders for large-capacity magazines in violation of 32311. One example shown in Exhibit B to Borys Procak's Declaration is a 10-round extender capable of turning a 20-round magazine into a 30-round magazine. While the extender itself contains only 10 rounds, it is still an unlawful "large-capacity conversion kit" under Penal Code section 32311 as it extends the firing power of a magazine beyond 10 rounds.

57.     It is my opinion that Defendants know or should know that many of their California customers who purchase these "repair" or "rebuild" kits are doing to in order to assemble a new, fully functioning, large-capacity magazine in violation of California law, and are not seeking to obtain spare parts to repair existing magazines. It is my opinion that Defendants, by their statements on their websites to consumers in "ban" states, by offering "repair kits" as a shipping option for fully assembled large-capacity magazines (either automatically converting to disassembled upon receiving an order or asking consumers to check a box), and by offering "repair kits" that contain all or substantially all parts needed to assemble a new large-capacity magazine, are knowingly facilitating California consumers' illegal purchases of large-capacity magazines, by readily making available complete, disassembled magazines that can be assembled by a purchaser in seconds.

**Preliminary Injunctive Relief Is Needed Before the July 1, 2017 Statewide Possession Ban Goes Into Effect**

Exhibit 35
Page 01399
APPENDIX B

EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010          n:\affirm\li2017\170149\01172001.docx

Case 3:17-cv-01017-BEN-JLB   Document 53-12   Filed 04/09/18   PageID.7168   Page 29 of
107
Case 3:17-cv-05668-LB   Document 53-12   Filed 04/09/18   Page 59 of 107   Page 29 of

58.     In November 2016, California voters approved Proposition 63, which will generally prohibit possession large-capacity magazines after July 1, 2017. (See Penal Code, § 32310, subds. (c), (d).) Proposition 63 requires individuals who own large-capacity magazines to dispose of them prior to July 1, 2017 by selling them to a licensed firearms dealer, transferring them to law enforcement, or removing them from the state.  Attached as **Exhibit E** is a true and correct copy of the full text of Proposition 63, known as the Safety for All Act of 2016.

59.     In my opinion, and based on my years of experience as a SFPD Officer and firearms expert, California will likely see—if it has not already in the two and a half months since Prop 63 was passed by the voters of California—a sharp rise in Californians attempting to purchase large-capacity magazines, in whole or in part, in advance of the July 1, 2017 statewide ban.  In my personal experience as a SFPD Officer and firearms expert, I have repeatedly witnessed a surge in firearms and ammunition sales in advance of a new law or restriction going into effect.  In addition, in my meetings with owners of gun stores in the Bay Area, they have likewise repeatedly informed me of surges in sales immediately before a forthcoming gun restriction.

60.     One very recent example of a gun restriction leading to a surge in sales is "Bullet buttons."  California previously classified as assault rifles certain firearms with detachable magazines, and prohibited their sale.  "Bullet buttons" were then designed for certain AR-15 and other rifles to get around this ban.  Effective January 1, 2017, California outlawed the sale of semiautomatic firearms with "bullet buttons."   As documented in the December 29, 2016 *San Francisco Chronicle* article entitled "Gun sales spike as California's tougher 2017 laws loom," sales of semiautomatic firearms more than doubled in 2016, and sales of firearms with "bullet buttons" surged in the months leading up to the January 1, 2017 sales ban.  In my personal experience with speaking with gun store owners in the Bay Area, they also saw a surge in sales of firearms with "bullet buttons" and these weapons enjoyed an increased sales price as a result of the high demand before the ban went into effect.

61.     I am also aware of studies and articles that describe and analyze a longstanding trend of increased firearms sales before an expected legal restriction.  For example, the *New York Times* in June 2016 in a piece entitled "What happens after calls for new gun restrictions? Sales go up" examined nationwide and certain state gun sales since 2000, showing a marked increase in firearms

Exhibit 35
Page 01400

1  sales tied to a fear in future restrictions or a specific piece of legislation that tightened existing

2  restrictions. This phenomenon has been documented in other media reports, such as the July 24, 2012

3  *The Atlantic* article entitled "How come gun sales spike after mass shootings?"

4      62.    In addition, at least one Defendant is the topic of recent discussions on the CalGuns.net

5  online forum regarding large-capacity magazines and large-capacity magazine repair kits. In my

6  opinion, this demonstrates that California residents are looking for ways to obtain large-capacity

7  magazines and are in fact coming across these Defendants (here, Defendant Badger Mountain Supply)

8  when seeking to buy these products.

9      63.    For example, in a sub-forum for "California handguns," on the thread located at

10  https://www.calguns.net/calgunforum/showthread.php?t=1214226, the user "Germ1" asks on June 30,

11  2016, where he can purchase blocked 15 round Glock 19 magazines, which is a 15-round magazine

12  that has been "blocked" to only hold 10 rounds of ammunition. User "Germ1" later explains,

13  however, he is looking for a "block" that he can remove so he can have a functioning 15-round

14  magazine. In the course of the thread, user "stag6.8" recommends the www.loyalsguns.com website,

15  which is the website for Defendant Badger Mountain Supply. Attached as **Exhibit B** is a true and

16  correct copy of the first page of the CalGuns discussion thread.

17      64.    On another CalGuns.net discussion thread in a "general gun discussion" sub-forum,

18  located at https://www.calguns.net/calgunforum/showthread.php?t=1181887, the user "Zombie13" on

19  March 30, 2016 says, " I was browsing the web for rifle magazines and came across Loyal's Guns Inc.

20  http://www.loyalsguns.com/ This company sells magazine parts out of Washington and California.

21  Without getting too much into details, is this legit?" The user "Librarian" responds, and "Zombie 13"

22  replies with a link to an earlier thread on the same seller. In that earlier thread, beginning on July 28,

23  2015, and located at http://www.calguns.net/calgunforum/showthread.php?t=1098096, user "beanz2"

24  quotes the following language from Defendant Badger Mountain Supply's website and asks whether it

25  is legal: "To comply with recent California laws regarding magazine rebuild kits, customers buying

26  rebuild kits to be shipped to California will receive two shipments: the contents of each shipment not

27  containing sufficient parts to assemble a fully functional magazine. Additional shipping charges may

28

Exhibit 35
Page 01401
APPENDIX B

1    apply to CA customers due to additional packaging and shipping." True and correct copies of the

2    relevant portions of these CalGuns.net threads are attached hereto as **Exhibits C and D.**

3         65.    In my opinion, a preliminary injunction is needed against Defendants to prevent them

4    from selling large-capacity magazines, "repair kits," and/or conversion kits into California in the

5    months leading up to the statewide ban on civilian possession of large-capacity magazines, as current

6    demand for these products is likely much higher than usual.

7         66.    It is my opinion that an injunction against Defendants, barring them from advertising

8    these products for sale to California and making false statements to California consumers, is necessary

9    to prevent Defendants from violating, and aiding and abetting the violation of, California and San

10   Francisco laws.

11        67.    It is my further opinion that an injunction against Defendants, that requires they place

12   on their online marketplaces statements that such products are not legal to sell in California or to

13   California residents, is necessary to correct the Defendants' prior misstatements. It if my further

14   opinion that an injunction against Defendants that requires they send all of their California customers

15   who purchased any of these products a corrective written notice, to inform their customers they may

16   have violated California law by purchasing (and, in the case of San Francisco consumers, possessing)

17   these products, and to inform these customers of the upcoming state-wide possession ban, is also

18   necessary to correct Defendants' prior misstatements.

19

20        I declare under penalty of perjury under the laws of the State of California that the foregoing is

21   true and correct and was executed in San Francisco, California.

22   Dated: 2/20/17

23                                                    JOSEPH EMANUEL # 2029

24

25

26

27

28
                                                            Exhibit 35
                                                            Page 01402
                                                            APPENDIX B
EXPERT DECL EMANUEL ISO PRELIM INJ & CASE NO. CGC-17-557010        n:\affirm\li2017\170149\01172001.docx

# Exhibit 36

Exhibit 36
Page 01403

Case: 17-56081, 10/19/2017, ID: 10624444, DktEntry: 29, Page 98 of 107

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

VIRGINIA DUNCAN, et al,

Plaintiffs/Appellees,

vs.

XAVIER BECERRA, in his official capacity as Attorney General of the State of California,

Defendant/Appellant.

No. 17-56081

D.C., Southern District of California, San Diego, Case No. 3:17-cv-1017-BEN

**DECLARATION OF DETECTIVE MICHAEL MERSEREAU OF THE LOS ANGELES POLICE DEPARTMENT IN SUPPORT OF AMICI CURIAE THE CITY AND COUNTY OF SAN FRANCISCO, THE CITY OF LOS ANGELES, AND THE CITY OF SUNNYVALE**

On Appeal from the United States District Court
for the Southern District of California

The Honorable Roger T. Benitez

DENNIS J. HERRERA
San Francisco City Attorney
PETER J. KEITH
Team Leader
VICTORIA L. WEATHERFORD
Deputy City Attorney
Fox Plaza
1390 Market Street, 6th Floor
San Francisco, California 94102-5408
Telephone: (415) 554-4287
Facsimile: (415) 437-4644
E-Mail: victoria.weatherford@sfgov.org

Attorneys for *Amicus Curiae*
CITY AND COUNTY OF SAN FRANCISCO

MICHAEL N. FEUER
Los Angeles City Attorney
JAMES P. CLARK
Chief Deputy City Attorney
BENJAMIN CHAPMAN
Deputy City Attorney
Office of the Los Angeles City Attorney
200 North Main Street, City Hall East, 8th Floor
Los Angeles, CA 90012
Telephone: (213) 367-4560
E-Mail: benjamin.chapman@lacity.org

Attorneys for *Amicus Curiae*
CITY OF LOS ANGELES

Additional Counsel for *Amici Curiae*:

JOHN A. NAGEL
  Sunnyvale City Attorney
REBECCA L. MOON
  Sr. Assistant City Attorney
ROBERT L. BOCO
  Sr. Assistant City Attorney
MELISSA C. TRONQUET
  Assistant City Attorney
City of Sunnyvale
456 West Olive Avenue
Sunnyvale, California 94086
Telephone:  (408) 730-7464
E-Mail:  jnagel@sunnyvale.ca.gov

Attorneys for *Amicus Curiae*
CITY OF SUNNYVALE

Exhibit 36
Page 01405
**APPENDIX K**

## DECLARATION OF MICHAEL MERSEREAU

I, Michael Mersereau, declare and state as follows:

    1.    I am a Detective employed by the Los Angeles Police Department (the "LAPD") as a sworn officer for approximately 21 years. I have personal knowledge of the facts set forth below except those stated on information and belief. As to those facts, I believe them to be true and if called as a witness, could and would testify competently thereto.

    2.    I am currently assigned to the LAPD Gun Unit and have been for approximately 14 years. The LAPD Gun Unit is involved exclusively in the enforcement of the California Dangerous Weapons Control Act and the Municipal Code of the City of Los Angeles as it pertains to firearms. Prior to this assignment, I worked uniform patrol, unformed gangs, and divisional gang detectives. In these assignments, I have encountered a wide variety of firearms and firearms accessories, including high capacity magazines, and I have made numerous arrests for firearms violations.

    3.    Pursuant to my current assignment, I received training from the Bureau of Alcohol, Tobacco, Firearms and Explosives (BATFE) on illegal firearms trafficking, firearms identification and tracing, undercover operations, hidden compartment identification and recognition, assault weapons, and Federal Firearms laws. I have also received informal training on the above- mentioned subjects from more experienced investigators. I routinely review California Department of Justice (DOJ) and BATFE publications related to firearm identification and transactions. I have attended numerous gun shows and firearms trade expositions. I routinely review Firearms Industry trade publications. I have spoken to hundreds of persons engaged in the business of firearms sales. I have also been involved in numerous investigations of illegally transferred firearms, possession of prohibited weapons including machine guns, assault weapons, and short barrel shotguns and rifles, as

Exhibit 36
Page 01406
**APPENDIX K**

well as possession of firearms by prohibited persons. As a result of these investigations, I have seized or participated in the seizure of hundreds of prohibited firearms and thousands of high capacity magazines.

4.      On July 28, 2015, the City of Los Angeles enacted Los Angeles Municipal Code section 46.30, which, with certain exceptions, prohibited any person from possessing a large capacity magazine, defined as a magazine with the capacity to accept more than ten rounds, within Los Angeles (the "Ordinance"). On September 19, 2015, the Ordinance went into effect. The Ordinance is very similar to the State-wide ban on the possession of large-capacity magazines passed by the voters in November 2016 (Proposition 63).

5.      It is my understanding based on information provided to me by the Office of the Los Angeles City Attorney that the City of Los Angeles has prosecuted twenty-two cases for unlawful possession of a large-capacity magazine.

6.      Subsequently, due to the passage of Proposition 63, the City of Los Angeles added a sunset provision to the Ordinance so that it would no longer be in effect once the state law went into effect on July 1, 2017. This was to avoid a preemption lawsuit. As a result, the City of Los Angeles currently does not prohibit the possession of large-capacity magazines.

7.      Gun violence is a particular problem in Los Angeles. The LAPD lacks a central database of all firearms related statistics. The statistics set forth below are accumulated by a number of different entities within the department including the Gun Unit and Robbery Homicide division. Here are some statistics for the past five years regarding gun-related crimes in Los Angeles:

Exhibit 36
Page 01407
**APPENDIX K**

| Year | Total Number of Gunshot Victims |
|---|---|
| 2013 | 1012 |
| 2014 | 994 |
| 2015 | 1119 |
| 2016 | 1180 |
| 2017 (as of 9/6/17) | 718 |

| Year | Total Number of "Shots Fired" Calls |
|---|---|
| 2013 | 2198 |
| 2014 | 2134 |
| 2015 | 2419 |
| 2016 | 2628 |
| 2017 | N/A |

| Year | Total Number of Firearms Related Arrests |
|---|---|
| 2013 | 1225 |
| 2014 | 1153 |
| 2015 | 1265 |
| 2016 | 1509 |
| 2017 | N/A |

Exhibit 36
Page 01408
**APPENDIX K**

| Year | Total Number of Homicide Victims Who Were Shot |
|------|------------------------------------------------|
| 2013 | 182 |
| 2014 | 185 |
| 2015 | 208 |
| 2016 | 127 |
| 2017 | N/A |

8.      Not surprisingly given the above statistics, the number of weapons seized both city-wide, and by the gun unit in particular, are high as well.  Here are some statistics for the past five years regarding gun-related seizures:

| Year | Total Number of Firearms Booked Citywide |
|------|------------------------------------------|
| 2013 | 5130 |
| 2014 | 5529 |
| 2015 | 6151 |
| 2016 | 5908 |
| 2017 (as of 9/6/17) | 4513 |

9.      Statistics regarding assault weapons and machine guns are provided because these guns typically use large-capacity magazines.  The LAPD does not keep statistics on the number of assault weapons and machine guns recovered citywide due to the expertise needed to determine whether a weapon is actually an assault weapon or a machine gun.  The below statistics represent Assault Weapons

Exhibit 36
Page 01409
APPENDIX K

/ Machine Guns recovered by the Gun Unit only. Citywide numbers are likely higher.

| Year | Number of Assault Rifles/Machine Guns recovered by the Gun Unit |
|---|---|
| 2013 | 123 |
| 2014 | 113 |
| 2015 | 145 |
| 2016 | 89 |
| 2017 (as of 9/6/17) | 83 |

10.    With respect to large-capacity magazines specifically, the statistics provided below represent only the seizure of large capacity magazines by the Gun Unit. As with assault rifles, the LAPD does not keep statistics on the number of large-capacity magazines recovered citywide.

| Year | Number of Large-Capacity Magazines Recovered by the Gun Unit |
|---|---|
| 2013 | 601 |
| 2014 | 392 |
| 2015 | 8826[1] |
| 2016 | 224 |
| 2017 (as of 9/6/17) | 456 |

[1] This was due to an abnormal seizure regarding a deceased individual at a condominium in the Pacific Palisades.

Exhibit 36
Page 01410
APPENDIX K

11.    It is my opinion, based on my training and experience, that large-capacity magazines in the hands of criminals pose a greater danger to both police officers and the public than standard-capacity magazines.    Large capacity magazines increase the number of rounds that the shooter can discharge in a given amount of time.  Large capacity magazines allow the shooter to fire more rounds at their target(s) before the need to stop firing in order to replace the magazine.  The use of large capacity magazines in conjunction with any semi-automatic or fully automatic firearm increases the potential lethality of the firearm.  There is a direct correlation between the number of rounds immediately available to the shooter and the ability to inflict more casualties among those persons targeted. This has been illustrated in various mass-shootings in and around the City of Los Angeles over the past twenty years.

12.    For example, in one of the most brazen crimes ever committed, on February 28, 1997, two heavily armed men robbed a Bank of America in North Hollywood.  According to reports that I have read, the bank robbers emptied more than one thousand rounds of ammunition using fully automatic machine guns with high-capacity drum magazines (holding 75 to 100 rounds), an AR-15 assault rifle converted to fire automatically with two high-capacity magazines (holding 100 rounds each), a semi-automatic HK-91 rifle with several 30-round high-capacity magazines, and armor-piercing bullets.  The LAPD officers responding to the scene were outgunned and injured as a result of this incident.   Indeed, twelve police officers and eight civilians were injured.

13.    On August 10, 1999, a white supremacist fired shots into the lobby of the North Valley Jewish Community Center in Granada Hills.  According to reports I have read, the shooter was armed with a fully-automatic Uzi machine gun, a semi-automatic pistol, and large capacity magazines.   Three children, a teenage counselor, and an office worker were injured.

Exhibit 36
Page 01411
**APPENDIX K**

14.     On June 7, 2013, a shooter opened fire in and around the campus of Santa Monica College. According to reports that I have read, the shooter was armed with a semi-automatic rifle (similar in type to an AR-15), 1,300 rounds of ammunition, and forty 30-round magazines. Five people were killed and four people were injured.

15.     On November 1, 2013, a gunman opened fire at the Los Angeles International Airport. According to reports that I have read, the shooter used a Smith & Wesson M&P15 semi-automatic rifle loaded with a 30-round large-capacity magazine. The shooter also had five additional 30-round large-capacity magazines and hundreds of rounds of ammunition in his carrying bag. One TSA agent was killed and several other people were injured.

16.     On December 2, 2015, a married couple targeted a San Bernardino County Department of Public Health event and Christmas party, killing fourteen people and wounding twenty-two others. According to reports that I have read, the shooters were armed with semi-automatic pistols, a Smith & Wesson M&P15 rifle that was modified to make it fully automatic, a DPMS A-15 rifle with it's bullet button removed allowing for the quick exchange of large-capacity magazines, and at least four large-capacity magazines.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed on October 18 , 2017 at Los Angeles, California.

Michael Mersereau

Exhibit 36
Page 01412
**APPENDIX K**

# Exhibit 37

Exhibit 37
Page 01413

# MotherJones

---

# A Guide to Mass Shootings in America

**There have been at least 98 in the past 35 years—and most of the killers got their guns legally.**

MARK FOLLMAN, GAVIN ARONSEN AND DEANNA PAN  UPDATED: MARCH 10, 2018, 9:00 A.M. PT

Looking for news you can trust?
Subscribe to our free newsletters.

| EMAIL | SIGN UP |

---

**Editor's note:** In July 2012, in the aftermath of the movie theater massacre in Aurora, Colorado, *Mother Jones* created the first open-source database documenting mass shootings in the United States. Our research has focused on indiscriminate rampages in public places resulting in four or more victims killed by the attacker. We exclude shootings stemming from more conventional crimes such as armed robbery or gang violence. Other news outlets and researchers have published larger tallies that include a wide range of gun crimes in which four or more people have been either wounded or killed. While those larger datasets of multiple-victim shootings may be useful for studying the broader problem of gun violence, our investigation provides an in-depth look at the distinct phenomenon of mass shootings—from the firearms used to mental health factors and the growing copycat problem. Tracking mass shootings is complex; we believe ours is the most useful approach.

The interactive map below and our downloadable database have been expanded with 36 additional cases from 2013-2018. Dating back to at least 2005, the FBI and leading criminologists essentially defined a mass shooting as a single attack in a public place in which four or more victims were killed. We adopted that baseline when we gathered data in 2012 on three decades worth of cases. (It is important to note that there have been many similar indiscriminate gun rampages—resulting in fewer fatalities—that would otherwise be included in our dataset.) In January 2013, a mandate for federal investigation of mass shootings authorized by President Barack Obama lowered that baseline to three or more victims killed. Accordingly, we include attacks dating from January 2013 in which three or more victims died. Our original analysis, which covers cases with four or more victims killed from 1982-2012, follows below. The cases we have documented since then using the revised federal baseline reaffirm our major findings.

**It is perhaps too easy** to forget how many times this has happened. The horrific massacre at a movie theater in Aurora, Colorado, in July 2012, another at a Sikh temple in Wisconsin that August, another at a manufacturer in Minneapolis that September—and then the unthinkable nightmare at a Connecticut elementary school that December—were some of the latest in an epidemic of such gun violence over the last three-plus decades. Since 1982, there have been at least 98 public mass shootings across the country, with the killings unfolding in 34 states from Massachusetts to Hawaii. Fifty-nine of these mass shootings have occurred since 2006. Seven of them took place in 2012 alone, including Sandy Hook. An analysis of this database by researchers at Harvard University, further corroborated by a recent FBI study, determined that mass shootings have been on the rise.

A Guide to Mass Shootings in America – Mother Jones                    Page 2 of 4
Case 3:17-cv-01017-BEN-JLB   Document 53-12   Filed 04/09/18   PageID.7178   Page 44 of
107

mentally troubled—and many displayed signs of mental health problems before setting out to kill. Explore the map for further details—we do not consider it to be all-inclusive, but based on the criteria we used, we believe that we've produced the most comprehensive rundown available on this particular type of violence. (Mass shootings represent only a sliver of America's overall gun violence.) For the stories of the 151 shooting rampage victims of 2012, click here, and for our groundbreaking investigation into the economic costs of the nation's gun violence, including mass shootings, click here.

**Click on the dots or use the search tool in the top-right corner of the map** to go to a specific location. Zoom in to find cases located geographically close together in Colorado, Texas, Wisconsin, and elsewhere. *[**Editor's note:** The Oct. 1, 2017 mass shooting on the Las Vegas Strip and several other recent attacks have not yet been added to this map; we will be publishing an updated version soon. In the meantime, see our fully updated database here.]*

Map created by   •   motherjones

Our focus is on public mass shootings in which the motive appeared to be indiscriminate killing. We used the following criteria to identify cases:

- **The perpetrator took the lives of at least four people**. A 2008 FBI report identifies an individual as a mass murderer—versus a spree killer or a serial killer—if he kills four or more people in a single incident (not including himself), typically in a single location. (*In 2013, the US government's fatality baseline was revised down to three.)

- **The killings were carried out by a lone shooter**. (Except in the case of the Columbine massacre and the Westside Middle School killings, which involved two shooters.)

- **The shootings occurred in a public place.** (Except in the case of a party on private property in Crandon, Wisconsin, and another in Seattle, where crowds of strangers had gathered.) Crimes primarily related to gang activity or armed robbery are not included, nor are mass killings that took place in private homes (often stemming from domestic violence).

- **Perpetrators who died or were wounded** during the attack are not included in the victim counts.

- **We included a handful of cases also known as "spree killings"**—cases in which the killings occurred in more than one location over a short period of time, that otherwise fit the above criteria.

For more on the thinking behind our criteria, see these two explanatory pieces. Plus: more on the crucial mental illness factor, and on the recent barrage of state laws rolling back gun restrictions across the US. And: Explore the full data set behind our investigation.

Here are two charts detailing the killers' weapons:

   This guide was first published on July 20, 2012. Since then, we've updated and expanded it multiple times with additional research and reporting. The analysis and charts above cover the data through 2012 (comprising 62 cases); additional data and analysis on the shooters' weapons are in this story. Information on 36 additional mass shootings from 2013-2018 is included in our full data set here. For much more of our reporting on mass shootings, gun violence, and gun laws, see our special investigations: **America Under the Gun**, **Newtown: One Year After**, and **The True Cost of Gun Violence.** (Return to intro.)

First published: Fri Jul. 20, 2012 7:32 PM PDT.

Interactive production by Tasneem Raja and Jaeah Lee

Exhibit 37
Page 01416

**FACT:**

*Mother Jones* was founded as a nonprofit in 1976 because we knew corporations and the wealthy wouldn't fund the type of hard-hitting journalism we set out to do.

Today, reader support makes up about two-thirds of our budget, allows us to dig deep on stories that matter, and lets us keep our reporting free for everyone. If you value what you get from *Mother Jones*, **please join us with a tax-deductible donation** so we can keep on doing the type of journalism that 2018 demands.

**DONATE NOW**

**MARK FOLLMAN** 🐦

Mark Follman is the national affairs editor at *Mother Jones*. Contact him with tips or feedback at mfollman@motherjones.com.

**GAVIN ARONSEN** 🐦

For more of Gavin's stories, click here.

**DEANNA PAN** 🐦

Deanna Pan is a former senior editorial fellow at *Mother Jones*.

# MotherJones

Copyright ©2018 Mother Jones and the Foundation for National Progress. All Rights Reserved.

Contact Us    Terms of Service    Privacy Policy

Powered by WordPress.com VIP

# Exhibit 38

Exhibit 38
Page 01418

Advertisement

**CORRECTION TO THIS ARTICLE**
An earlier version of this story incorrectly reported the limit on the capacity of gun magazines in Maryland. The limit is 20. This version has been corrected.

# Va. data show drop in criminal firepower during assault gun ban

By David S. Fallis and James V. Grimaldi
Washington Post Staff Writers
Sunday, January 23, 2011; 9:17 AM

The number of guns with high-capacity magazines seized by Virginia police dropped during a decade-long federal prohibition on assault weapons, but the rate has rebounded sharply since the ban was lifted in late 2004, according to a Washington Post analysis.

More than 15,000 guns equipped with high-capacity magazines - defined under the lapsed federal law as holding 11 or more bullets - have been seized by Virginia police in a wide range of investigations since 1993, the data show.

The role of high-capacity magazines in gun crime was thrust into the national spotlight two weeks ago when 22-year-old Jared Lee Loughner allegedly opened fire with a semiautomatic handgun outside a Tucson grocery store, killing six and wounding 13, including Rep. Gabrielle Giffords (D-Ariz.). Authorities say Loughner used a legally purchased 9mm Glock 19 handgun with a 31-round clip and was tackled while changing magazines.

Of the seized Virginia weapons, 2,000 had magazines with a capacity of 30 or more bullets. Some states still limit magazine capacity. California, for example, limits them to 10 and Maryland to 20.

Last year in Virginia, guns with high-capacity magazines amounted to 22 percent of the weapons recovered and reported by police. In 2004, when the ban expired, the rate had reached a low of 10 percent. In each year since then, the rate has gone up.

"Maybe the federal ban was finally starting to make a dent in the market by the time it ended," said Christopher Koper, head of research at the Police Executive Research Forum, who studied the assault weapons ban for the National Institute of Justice, the research arm of the Justice Department.

Congress is considering legislation to reinstitute the assault weapon ban's prohibition on high-capacity magazines, a measure strongly opposed by gun rights advocates.

The analysis of the Virginia records, obtained under the state's public information law, provides a rare window into the firepower of guns used in crimes. The Bureau of Alcohol, Tobacco, Firearms and Explosives, which traces guns for local police agencies and regulates the firearms industry, does not track magazine sizes. Academic researchers said they were unaware of any other comprehensive study of firearms magazines.

The pattern in Virginia "may be a pivotal piece of evidence" that the assault weapons ban eventually had an impact on the proliferation of high-capacity magazines on the streets, said Garen Wintemute, head of the Violence Prevention Research Program at the University of California at Davis.

"Many people, me included, were skeptical about the chances that the magazine ban would make a difference back in 1994," Wintemute said. "But what I am seeing here is that after a few years' lag time the prevalence of high-capacity magazines was declining. The increase since the ban's repeal is quite striking."

Guns with high-capacity magazines have appeared in Virginia crimes ranging from the mundane to the murderous. The Post found that 200 guns with high-capacity magazines figured in Virginia homicides, including these incidents:

- In Richmond in 2003, Michael Antoine Wilson, 21, used his semiautomatic rifle with its 30-round magazine to shoot his 17-year-old girlfriend to death in front of children and relatives. Then he went to a nearby convenience

Exhibit 38
Page 01419

store, killed two workers and stole a van before turning the gun on himself.

- In Roanoke in 2004, Marcus Jerome Nance, 22, used his legally purchased 9mm Glock 17 handgun with a high-capacity magazine to spray 33 bullets into a crowd that had gathered outside a Roanoke gas station after a nightclub closing, killing one and wounding two.

- In Newport News last year, Antonio Johnson, 34, began shooting at police during a traffic stop with a 9mm semiautomatic handgun outfitted with a 15-round magazine. "Subject shot police officer and then killed himself with weapon," state records say.

In the Arizona shootings, Loughner allegedly used a Glock 19 that he had legally purchased at a Tucson sporting goods store in November. The gun's capacity allowed Loughner to squeeze off more than 30 shots without reloading, authorities said.

The federal assault weapons ban from late 1994 through late 2004 prohibited the manufacturing of magazines capable of holding more than 10 rounds. But the act permitted the sale of magazines manufactured before the ban.

The federal prohibition was spurred by a mass killing in 1989 in Stockton, Calif., where Patrick Edward Purdy, 24, a mentally unbalanced drug addict, fired 110 shots from an AK-47 into a schoolyard, killing five children and wounding 29 others and a teacher. He used a 75-round rotary clip and a 35-round banana clip, one of four he was carrying.

**New legislative interest**

Rep. Carolyn McCarthy (N.Y.) and 57 other Democrats proposed legislation last week to ban the sale or transfer of high-capacity magazines, no matter when they were manufactured. McCarthy's husband and five others were killed in 1993 on the Long Island Rail Road by a gunman armed with a semiautomatic pistol and four 15-round magazines. He fired 30 shots before being subdued while changing magazines.

The bill's prospects are considered slim in the Republican-controlled House. In the Senate, the National Rifle Association says it has a solid 50-senator pro-gun block that could delay any legislation.

The NRA has announced its opposition to proposals that limit magazine capacity.

"These magazines are standard equipment for self-defense handguns and other firearms owned by tens of millions of Americans," according to a statement on its politics Web page, and in a letter circulating to members of Congress. "Law-abiding private citizens choose them for many reasons, including the same reason police officers do: to improve their odds in defensive situations."

The firearms industry also opposes the proposal. "The tragedy in Tucson was not about firearms, ammunition or magazine capacity," said Ted Novin, a spokesman for the National Shooting Sports Foundation, a gun industry group. "It was about the actions of a madman. Period."

The analysis by The Post is possible because of a little-known database of guns seized in Virginia. The database, called the Criminal Firearms Clearinghouse, has information on more than 100,000 firearms recovered by more than 200 local police departments since 1993. A federal law in 2003, known as the Tiahrt Amendment after the congressman who sponsored it, banned the release of federal data on guns recovered in crimes.

Last year, The Post mined the database to pierce the secrecy imposed by Congress on federal gun-tracing records. The analysis found that a fraction of licensed dealers in Virginia sell most of guns later seized by police. The vast majority of the guns in the database were confiscated because of illegal-possession charges. But thousands were swept up in the wake of assaults, robberies and shootings.

Two months before the ban expired in September 2004, Marcus Nance bought an extended magazine and a 9mm Glock 17 handgun at a Roanoke gun store. Three nights later, down the street from the store, Nance opened fire on a crowded parking lot after arguing and fighting with people in the crowd.

Exhibit 38
Page 01420

A police officer called to investigate a disturbance heard shots and saw Nance holding a gun at arm's length and firing "randomly into the mass of people" before shooting several rounds into the air.

A police car's dashboard camera recorded the jackhammer sound of gunfire. In a car parked nearby, police found a Glock gun box and two boxes of ammunition, one of them partially empty.

Police went to the gun shop and confirmed that Nance had bought the handgun ($555), a laser sight ($380) and two extended magazines ($135), paying cash in an entirely legal transaction. Police noted: "The magazines in question were manufactured before 1994 and not considered prohibited."

Nance, who said he had been attacked by members of the crowd and shot in self-defense, was convicted of second-degree murder and is in prison.

**The 2004 study**

Koper's 108-page 2004 study for the National Institute of Justice found the ban on assault weapons had mixed results.

"Assault weapons were rarely used in gun crimes even before the ban," he said in the report. But he also concluded that the prohibition on high-capacity magazines might have affected public safety, because such magazines allow shooters to inflict more damage.

"Tentatively I was able to show that guns associated with large-capacity magazines tended to be associated with more serious crimes, more serious outcomes," he said.

Some gun rights activists argue that a ban on high-capacity magazines would violate the Second Amendment right to bear arms. One prominent gun rights activist who takes a less absolute position is Robert A. Levy, chairman of the Cato Institute. He is also the lawyer who brought the case that overturned D.C.'s handgun ban.

But Levy said the government would need to prove that such a ban was effective.

"The burden is on the government, not on the individual to show that the regulation isn't unduly intrusive," Levy said.

Colin Goddard, a lobbyist for the Brady Campaign to Prevent Gun Violence and a victim of the 2007 Virginia Tech shootings, said the high-capacity ban could save lives. The Virginia Tech shooter, Seung Hui Cho, used several 15-round magazines to fire 174 shots and kill 32 people in the worst gun-related mass murder by an individual in U.S. history.

"When you double and triple the amount of the clip size, you don't double or triple the number of deer you kill, you double and triple the amount of innocent people who are killed in shootings like this," said Goddard, 25, who was shot four times by Cho.

Bradley A. Buckles, ATF director from 1999 to 2004, said bureau officials advised Congress to focus on high-capacity magazines, which were "completely unregulated" and had almost no sporting purpose.

"The whole thing with magazine capacity came out of ATF," Buckles said. "It wasn't so much guns, but it was firepower. What made them more deadly than a hunting rifle was the fact that you could have a 20-round, 30-round clip, when most hunting rifles wouldn't have more than five rounds."

Buckles said lawmakers should have extended the ban on high-capacity magazines in 2004. Banning them now, he said, just puts everyone back at square one.

"There are so many millions of them out there, it probably wouldn't make any immediate difference over the course of 20 years," Buckles said. "It is not a short-term solution to anything."

**fallisd@washpost.com grimaldij@washpost.com**

Va. data show drop in criminal firepower during assault gun ban
Case 3:17-cv-01017-BEN-JLB   Document 53-12   Filed 04/09/18   PageID.7185   Page 51 of
107

*Research editor Alice Crites and staff writer Sari Horwitz contributed to this story.*

© 2011 The Washington Post Company

Exhibit 38
Page 01422

# Exhibit 39

Exhibit 39
Page 01423

The Washington Post

**Investigations**

# Data indicate drop in high-capacity magazines during federal gun ban

By **David S. Fallis**  January 10, 2013

During the 10-year federal ban on assault weapons, the percentage of firearms equipped with high-capacity magazines seized by police agencies in Virginia dropped, only to rise sharply once the restrictions were lifted in 2004, according to an analysis by The Washington Post.

The White House is leading a push to reinstate a national ban on large-capacity magazines and assault weapons after a gunman armed with an AR-15 and 30-round magazines killed 20 children and seven adults in Connecticut. Vice President Biden has been holding advisory meetings to hammer out a course of action that will address the issue of the larger magazines, which under the lapsed federal ban were those that held 11 or more rounds of ammunition.

In Virginia, The Post found that the rate at which police recovered firearms with high-capacity magazines — mostly handguns and, to a smaller extent, rifles — began to drop around 1998, four years into the ban. It hit a low of 9 percent of the total number of guns recovered the year the ban expired, 2004.

The next year, the rate began to climb and continued to rise in subsequent years, reaching 20 percent in 2010, according to the analysis of a little-known Virginia database of guns recovered by police. In the period The Post studied, police in Virginia recovered more than 100,000 firearms, more than 14,000 of which had high-capacity magazines.

## Researchers see impact

To some researchers, the snapshot in Virginia suggests that the federal ban may have started to curb the widespread availability of the larger magazines.

"I was skeptical that the ban would be effective, and I was wrong," said Garen Wintemute, head of the Violence Prevention Research Program at the University of California at Davis School of Medicine. The database analysis offers "about as clear an

Exhibit 39
Page 01424

example as we could ask for of evidence that the ban was working."

The analysis is based on an examination of the Criminal Firearms Clearinghouse, a database obtained from state police under Virginia's public information law. The data, which were first studied by The Post in 2011, offer a rare glimpse into the size of the magazines of guns seized during criminal investigations. The Bureau of Alcohol, Tobacco, Firearms and Explosives, which traces guns and regulates the industry, tracks details about the guns seized after crimes but not the magazine size.

The initial Post analysis was prompted by a mass shooting in Tucson. Jared Lee Loughner — armed with a legally purchased 9mm semiautomatic handgun and a 33-round magazine — opened fire outside a grocery store, killing six people and wounding 13, including Rep. Gabrielle Giffords (D-Ariz.).

In the following two years, a succession of mass shootings has occurred, including several in which the gunmen reportedly had high-capacity magazines.

At the Dec. 14 shooting in Newtown, Conn., the gunman was reported to have been armed with two handguns, an AR-15 rifle and numerous 30-round magazines. He killed himself at the scene. The guns were legally purchased by his mother.

The federal ban that expired in 2004 prohibited the manufacture of magazines capable of holding more than 10 rounds. But the law permitted the sale of magazines manufactured before the ban. By some estimates, 25 million of the large-capacity magazines were still on the market in 1995.

Many semiautomatic rifles and semiautomatic handguns accept magazines of various sizes. Larger magazines increase a gun's firepower, enabling more shots before reloading.

The Virginia database analyzed by The Post lists about three-quarters of guns recovered by police, missing the rest because some agencies failed to report their recoveries to the state. The database contains details about more than 100,000 guns recovered by 200 police departments in a wide range of investigations from 1993 through August 2010, when The Post last obtained it.

In recent weeks, The Post conducted additional analysis into the type of guns confiscated with large-capacity magazines. The guns included Glock and TEC-9 handguns and Bushmaster rifles. Most had magazines ranging from 11 to 30 rounds.

Of 14,478 guns equipped with large-capacity magazines that were confiscated by police, more than 87 percent — 12,664 — were classified as semiautomatic pistols. The remainder were mostly semiautomatic rifles.

The Post also identified and excluded from the counts more than 1,000 .22-caliber rifles with large-capacity tubular magazines, which were not subject to the ban.

In Virginia, handguns outfitted with large-capacity magazines saw the biggest fluctuation during and after the ban.

Exhibit 39
Page 01425
2 of 4                                                                                             6/1/17, 12:24 PM

In 1997, three years into the ban, police across the state reported seizing 944 handguns with large-capacity magazines. In 2004, the year the ban ended, they confiscated 452. In 2009, the last full year for which data were available, the number had rebounded to 986 handguns, analysis showed.

Of these, the single biggest group were handguns equipped with 15-round magazines, accounting overall for 4,270 firearms over the 18 years.

## Effect hard to measure

Nationwide, researchers who studied the federal ban had difficulty determining its effect, in part because weapons and magazines manufactured before the ban could still be sold and in part because most criminals do not use assault weapons.

Christopher Koper, who studied the ban's effect for the National Institute of Justice, the research arm of the Justice Department, noted in a 2004 report that the "success in reducing criminal use of the banned guns and magazines has been mixed."

He found that gun crimes involving assault weapons declined between 17 and 72 percent in the six cities covered in the study — Anchorage, Baltimore, Boston, Miami, Milwaukee and St. Louis. But he said he found no decline in crimes committed with other guns with large-capacity magazines, most likely "due to the immense stock of exempted pre-ban magazines."

Koper's study tracked guns through 2003. He said that The Post's findings, which looked at magazine capacity of guns recovered in Virginia before and after 2003, suggests that "maybe the federal ban was finally starting to make a dent in the market by the time it ended."

Koper, now an associate professor of criminology at George Mason University, also noted the ban on high-capacity magazines might improve public safety because larger magazines enable shooters to inflict more damage.

The use of high-capacity magazines is a contentious point in the gun debate.

"Anyone who's thought seriously about armed self-defense knows why honest Americans — private citizens and police alike — choose magazines that hold more than 10 rounds. Quite simply, they improve good people's odds in defensive situations," Chris W. Cox, the executive director of the National Rifle Association's legislative institute wrote in a piece posted online. He called the ban a "dismal failure."

The federal prohibition on high-capacity magazines and assault weapons was spurred in part by the 1989 mass killing in Stockton, Calif. Patrick Edward Purdy, a mentally unbalanced drug addict, fired 110 rounds from an AK-47 into a schoolyard, killing five children and wounding 29 others and a teacher. Purdy used a 75-round drum magazine and a 35-round banana clip, one of four he carried.

Some states still limit magazine size. Maryland limits the size to 20 rounds; California limits it to 10. Connecticut, the location

Exhibit 39
Page 01426
3 of 4                                                                                                          6/1/17, 12:24 PM

Case 3:17-cv-01017-BEN-JLB    Document 53-12    Filed 04/09/18    PageID.7190    Page 56 of 107

of Sandy Hook Elementary School, does not.

After Giffords's shooting, Rep. Carolyn McCarthy (N.Y.) and other Democrats proposed legislation to ban the sale or transfer of high-capacity magazines. McCarthy's husband and five others were killed in 1993 on the Long Island Rail Road by a gunman armed with a semiautomatic pistol and four 15-round magazines. He fired 30 shots before being subdued as he swapped magazines.

In the wake of the Newtown shooting, President Obama and lawmakers urged that a ban on assault weapons and high-capacity magazines be made permanent.

The NRA and the National Shooting Sports Foundation, a gun industry group, have historically opposed any restrictions on magazine capacity. The NRA did not respond to requests for comment, and the sports foundation declined to comment.

David S. Fallis is the Deputy Editor for the Washington Post's Investigations Unit. 🐦 Follow @DavidSFallis

Exhibit 39
Page 01427

# Exhibit 40

Exhibit 40
Page 01428

# Gary Kleck

# POINT BLANK

## Guns and Violence in America



**AldineTransaction**
A Division of Transaction Publishers
New Brunswick (U.S.A.) and London (U.K.)



Exhibit 40
Page 01429

Second paperback printing 2009
Paperback edition published 2005 by AldineTransaction, New Brunswick, New Jersey. Copyright © 1991 by Transaction Publishers.

All rights reserved under International and Pan-American Copyright Conventions. No part of this book may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without prior permission in writing from the publisher. All inquiries should be addressed to Transaction Publishers, Rutgers—The State University of New Jersey, 35 Berrue Circle, Piscataway, New Jersey 08854-8042. www.transactionpub.com

This book is printed on acid-free paper that meets the American National Standard for Permanence of Paper for Printed Library Materials.

Library of Congress Catalog Number: 91-16780
ISBN: 978-0-202-30762-6
Printed in the United States of America

Library of Congress Cataloging-in-Publication

Kleck, Gary, 1951-
    Point blank : guns and violence in America / Gary Kleck.
        p.  cm. — (Social institutions and social change)
    Includes bibliographical references and index.
        ISBN 0-202-30419-1 (cloth): 0-202-30762-X (paper)
    1. Violence—United States.   2. Firearms—Social aspects—United States.   3. Gun control—United States.  I. Title.  II. Series.

HN90.V5K56   1991
303.6'0973—dc20                                        91-16780

Exhibit 40
Page 01430

8                                        Ideology, Politics, and Propaganda

*Anything Short of Total Success is Utter Failure*

Opponents of gun laws, like opponents of any law, like to point to the failures of the laws—how many crimes are committed even in places with strict gun laws, how many criminals have guns despite the laws, and so on. This argument, however, is a non sequitur; it does not follow that gun laws are ineffective. All laws are violated and thus less than completely effective, and most important criminal laws are violated frequently, as a glance at criminal statistics indicates. Even some laws widely supported by the population have been violated by a majority of the population, as self-report surveys of the population have long shown (e.g., Wallerstein and Wyle 1947). Yet no one concludes that the thousands of homicides committed each year mean that laws prohibiting murder are ineffective and should be repealed. It is unreasonable to oppose a law merely because some people will violate it.

A more sensible standard to apply is to ask whether the benefits of the law exceed its costs, i.e., whether the world will, on balance, be a better place after the law is in effect. It is impossible to directly count the number of successes, i.e., the number of crimes deterred or otherwise prevented by the existence of laws prohibiting the acts, since one can never count the number of events that do not occur. And no matter how many failures there are, it is always possible that there are still more successes. The only way one can assess the relative balance of successes and failures is to compare jurisdictions having a law with those lacking the law, or to compare jurisdictions before and after they adopt a law, to see if there is, on balance, less crime with the law than without it. Just counting failures settles nothing.

*Criminals Will Ignore the Law*

A corollary to the previous fallacy is the assertion that many criminals will ignore gun laws and get guns anyway. This is indisputably true, but not especially decisive regarding the desirability of gun control, since it does not address the number of successes of gun control. There is no clearly established minimum level of compliance that must be achieved before a law is to be judged a success. And if there were such a standard, it certainly could not reasonably be 100%, and would not necessarily be even 50% or any other similarly high level. It is even conceivable that if just 1 or 2% of potentially violent persons could be denied a gun, the resulting benefits might exceed the costs of whatever measure produced this modest level of compliance.

As it happens, there appears to be some compliance with gun laws

Exhibit 40
Page 01431

even among the "hard-core" felons incarcerated in the nation's prisons. A survey of over 1800 felons in 11 state prisons found that 25% of felon gun owners reported having registered a firearm and 15% reported having applied for a permit to purchase or carry a gun, percentages that would have been higher had felons in states without such legal requirements been excluded from the computations (Wright and Rossi 1986, p. 84). Although the self-reported compliance levels were low, as one would expect in a sample of felons, they were also not zero. Among potentially violent persons not in prison, who are probably less persistently and seriously involved in law-breaking, compliance levels would presumably be even higher.

*One Thing Leads to Another*

Gun control supporters often wonder how the National Rifle Association (NRA) and other gun owner organizations can possibly oppose some of the more modest and apparently inoffensive regulations. Opponents reply that today's controls, no matter how limited and sensible, will just make it that much easier to take the next, more drastic step tomorrow, and then the next step, and the next, until finally total prohibition of private possession of firearms is achieved. They argue that gun control is a "slippery slope" on which it is hard to stop halfway, and that many proponents do not want to stop with just the more limited restrictions.

This fear is not completely unreasonable, as bills calling for a national ban on private possession of handguns have been introduced in Congress (Alviani and Drake 1975, pp. 55, 57) and much of the general public does favor prohibitions. In national opinion polls, about 40% of Americans say they support bans on the private possession of handguns, and one in six even support a ban on possession of *any* guns. Since about 75% of all Americans favor registering gun purchases and about 70% favor requiring police permits to buy a gun (Chapter 9), this means that *most* supporters of these moderate controls also favor a total ban on private handgun possession. If this is so among ordinary nonactivist supporters of gun control, it almost certainly is true of activists and leaders of gun control advocacy groups.

There have always been enough prominent prohibitionists willing to air their views in a highly visible way to lend credence to fears about a movement toward total prohibition. For example, criminologist Marvin Wolfgang, in a letter to the editor of *Time* magazine, advocated a total national ban on possession of all firearms (July 5, 1968, p. 6), a sentiment echoed by noted sociologist Morris Janowitz (*Time*, 6-21-68).

Exhibit 40
Page 01432

cators are necessarily "noisy," reflecting both gun availability and in-
clinations of violent people to choose guns for their aggressive or sui-
cidal purposes. Although the two measures often show similar trends,
they also moved in opposite directions during 1945–1951, 1976–1983,
and, to a lesser degree, 1958–1963. If the gun share of homicides were
used as an indicator of long-term trends in a general gun ownership, it
would indicate that gun ownership had declined since the 1920s. In
1920–1926, 71% of U.S. homicides were committed with guns (Brearley
1932, p. 68). Since at that time six states in the South and West, where a
high share of homicides were committed with guns, were not yet a part
of the national vital statistics system, the figure almost certainly would
have been higher had those states been included. By 1989, the national
figure was down to 62% (U.S. FBI 1990).

Table 2.3 provides estimates of the size of the U.S. gun stock, based on
national surveys that asked Rs how many guns they owned. They all
support the view that there was a huge number of guns in private
hands. All but one of the estimates, however, are substantially lower
than production-based estimates for the same years (Table 2.1). Flaws
in these estimates and reasons for the discrepancy are discussed in
Appendix 2.

Table 2.4 displays information on the combinations and numbers of
guns owned by gun-owning households and individuals. Part A shows
that most households with guns have long guns (85%), and that most
(56%) own *only* longguns, whereas only one-seventh of owning house-
holds have only handguns. However, it will be this handgun-only type
of household that will be of special interest later because it may be the
type most likely to have guns for crime-related reasons (Bordua et al.
1979). Conversely, two-thirds of households with handguns also have
long guns. This fact is significant because it suggests that when hand-
guns are used in crimes or for defense (at least when in the home), the
use was often the result of a choice between different types of guns,
rather than the fact that only handguns were available. This would
support the view that there is something about handguns that gun users
regard as especially suitable for defensive and criminal purposes. An
even more important implication is that if handguns were restricted,
most current handgun owners would not even have to acquire new guns
in order to have substitute firearms to use. The implications of this
substitution possibility will be discussed in detail in Chapter 3.

Part B of Table 2.4 attempts to provide more realistic estimates of the
number of guns owned per owner than were reported in Table 2.3. It has
been assumed that the true fraction of households and individuals own-

Exhibit 40
Page 01433

ing guns is 10% higher than survey figures indicate, to adjust for the underreporting previously discussed (see Appendix 2 for a justification). These survey figures were combined with the production cumulation figures in Table 2.1 to roughly estimate the numbers of guns owned per owner. Based on this procedure, among households owning guns, an average of over four guns are owned, considerably higher than most survey data suggest. The distribution, however, is undoubtedly skewed to the right, with a few households owning very large numbers of guns, and most households owning a few, based on the Table 2.3 survey results. Among households with a handgun, the average number of handguns owned is about 2.8. Among individuals age 18 or over who own guns, the average number owned is about 3.4, and among individuals with handguns, the average is about 2.0. Both these data and survey data support the conclusion that although gun ownership is widespread in the United States, a large share of the guns may also be in relatively few hands (see also Cook 1983, pp. 78–9).

Regardless of the major source on which one relies, it is clear that the number of guns currently in private hands in the United States is very large, whether the number is 100 or 200 million. One straightforward policy implication is that policies that seek to reduce gun violence by reducing the overall supply of guns, as distinct from reducing the number possessed by high-risk subsets of the population, face an enormous obstacle in this huge existing stock. Even if further additions to the stock could somehow be totally and immediately stopped, the size of the stock and durability of guns imply that, in the absence of mass confiscations or unlikely voluntary surrenders of guns, it might be decades before any perceptible impact became apparent.

## Who Owns Guns?

In a nation where at least half of the households have a gun, it would be difficult to regard gun ownership as an unusual or deviant status. Nevertheless, gun owners do differ from nonowners in some respects, as the figures in Table 2.5 demonstrate. These figures were computed from the combined 1980, 1982, and 1984 General Social Surveys conducted by the National Opinion Research Center (for details of the surveys, see Davis 1984). These surveys were superior to previous national surveys in that they asked whether each *respondent* (R) owned a gun, rather than asking only whether someone in the household did. This made it possible to relate attributes of the R to whether the R owned

Exhibit 40
Page 01434

of "ARs," it is unlikely that criminals would adopt them. But even if at least some types of criminals did seek out rifles as an alternative to handguns, they would have an ample supply of more lethal substitute rifles available to them even in the absence of "ARs."

While "ARs" are not unusually lethal relative to other rifles, they do have other technical attributes potentially relevant to criminal violence: (1) they are capable of firing single shots as fast as the shooter can pull the trigger, and (2) they can accept magazines that hold a large number of cartridges. It is unclear whether either of these attributes is of substantial criminological significance. "ARs" are capable of firing at a rate somewhat faster than other gun types, but it is unknown how often violent incidents occur in which this higher rate of fire would have any impact on the outcome of the incident. For example, even in a rare mass shooting such as the 1989 Stockton schoolyard killing of five children, the killer fired 110 rounds in 3 to 4 (or more) minutes, or about 28–37 rounds per minute (*Los Angeles Times* 1-18-89, p. 3; 1-19-89, p. 9). The same rate of fire can be achieved with an ordinary double-action revolver using speed-loaders to reload. Further, there was nothing to stop Purdy from continuing his attack for another 3 or 4 minutes. The higher rate of fire was unnecessary for Purdy to carry out his murderous intentions—he did all the shooting he wanted to do in 4 minutes and then killed himself.

The effective rate of fire of any gun is limited by its recoil. When a shot is fired, the force of the bullet leaving the barrel causes the gun to move back toward the shooter and off of its original aiming alignment. It cannot be fired at the same target again until the shooter puts it back in line with the target. Thus the somewhat higher rate of fire of semiautomatic weapons cannot be fully exploited, reducing the effective difference between these weapons and revolvers.

Ordinary revolvers can easily fire six rounds in 3 seconds without any special skill on the part of the shooter or modification to the weapon. Even assuming a semiautomatic gun could fire at twice this rate, it would only mean that a shooter could fire six rounds in 1.5 instead of 3 seconds. The issue comes down to this: How many violent incidents occur each year in which a shooter has 1.5 seconds to shoot the victim(s), but not 3 seconds? Such incidents are probably fairly rare, although there are no hard data on the matter.

Critics of "ARs" have also pointed to the high total *volume* of fire of which the weapons are capable, due to their large magazines. It should be noted that magazines for these weapons are almost always detachable, and the weapons are usually capable of accepting many different

common magazine sizes, whether one containing only 3 rounds, or one containing 30 or more (Warner 1989). Thus, the high volume of rounds is not, strictly speaking, an attribute of the gun itself, but rather of the magazine. Likewise, most of the millions of ordinary semiautomatic pistols sold in the United States for decades are also capable of accepting box-type magazines that can have very large capacities. Consequently, one legal difficulty in distinguishing "ARs" from other semiautomatic rifles, or AWs from other semiautomatic handguns, is that most varieties of all of these weapon categories accept box-type magazines. Since such magazines can be either big or small, it means that the unrestricted civilian-style guns are just as capable of using a large-capacity magazine as are the restricted modern military-style AWs. Consequently, rational controls based on concern over large ammunition capacity would have to either ban large magazines or ban all guns capable of receiving types of magazines that sometimes have large capacities. The former alternative would be very difficult to enforce, whereas the latter alternative would mean banning large numbers of hunting rifles and most semi-automatic pistols, and thus would negate the chief political benefit of restricting only rare weapons.

It is doubtful whether a high volume magazine is currently relevant to the outcome of a large number of violent incidents. The rare mass killing notwithstanding, gun assaults usually involve only a few shots being fired. Even in a sample of gun attacks on armed police officers, where the incidents are more likely to be mutual combat gunfights with many shots fired, the suspects fired an average of only 2.55 times (New York City Police Department 1989, p. 6). On the other hand, if high-volume guns did become popular among criminals in the future, this could change for the worse. Further, although "ARs" are not unique in any one of their attributes, they are unusual, although not unique, in com-bining the lethality of rifles, a potentially large ammunition capacity, *and* a high rate of fire. It is possible that the combination of all three at-tributes could have a crime-enhancing effect greater than that generated by any one of the attributes.

Whereas semiautomatic firearms offer a rate of fire only somewhat higher than other common gun types, fully automatic weapons have much higher rates of fire. "ARs" sold on the civilian market are not capable of fully automatic fire, but it has been argued that this distinc-tion is a minor one because "ARs" are so easily converted to fully auto-matic fire (*Newsweek* 10-14-85, pp. 48–9). The *New York Times*, in an editorial, even told its readers that "many semiautomatics can be made fully automatic with a screwdriver, even a paperclip" (8-2-88). Eight

Exhibit 40
Page 01436

share of defensive uses attributable to these sorts of users is relevant to assessing NCS information used later to evaluate the effectiveness of defensive gun uses, since that information is derived from questions that did not exclude any uses by persons with these violence-related occupations. Although the gun use surveys did not obtain sufficiently detailed occupational detail to assess this, the NCS did. In the 1979–1985 sample, members of these occupations accounted for 15.4% of self-protection gun uses. They do therefore account for a disproportionate share of the NCS-counted gun uses, but still a relatively small fraction. And again it should be stressed that on-duty uses by such persons were explicitly excluded from the surveys used to estimate the number of defensive gun uses.

### Shooting in Self-Defense

Most uses of guns for either criminal or defensive purposes are probably much less dramatic or consequential than one might think. Only a tiny fraction of criminal gun assaults involves anyone actually being wounded, even nonfatally, and one would expect the same to be true of defensive gun uses. More commonly, guns are merely pointed at another person, or perhaps only referred to ("I've got a gun") or displayed, and this is sufficient to accomplish the ends of the user, whether criminal or noncriminal. Nevertheless, most gun owners questioned in surveys assert that they would be willing to shoot criminals under the right circumstances. The 1989 Time/CNN survey found that 80% of gun owners thought they would get their guns if they thought someone was breaking into their home, and 78% said they would shoot a burglar if they felt threatened by that person (Quinley 1990, p. 9).

Despite this stated willingness of gun owners to shoot under certain circumstances, most defensive uses of guns do not in fact involve shooting anyone. Although the surveys listed in Table 4.1 did not delve into much detail about the circumstances in which guns were used defensively, or the manner in which they were used, most did ask whether the gun was fired. Results generally indicate the gun was fired in less than half of the defensive uses; the rest of the times the gun was merely displayed or referred to, in order to threaten or frighten away a criminal.

#### Self-Defense Killings

The rarest, but most serious form of self-defense with a gun is a defensive killing. Although shootings of criminals represent a small frac-

Exhibit 40
Page 01437

# Exhibit 41

Exhibit 41
Page 01438

Guns Save Lives

## Stories of Self Defense



- Home|
- Browse Stories|
- Incident Map|
- About|
- Submit Story|
- Advertise|
- Privacy Policy|
- Contact|

# Analysis of Five Years of Armed Encounters (With Data Tables)

March 12 2012

by GSL Staff

Share This Post

Like 878    Share    Tweet    G+1  2    ⌃ ⌄  4 points

| Incident at a Glance | | | |
|---|---|---|---|
| Gun(s) Used: | Unknown | Location: | Unknown |
| # of Suspects: | Unknown | Shots Fired: | Unknown |
| Suspect Killed: | Unknown | State: | |
| Source: | | Archive: | None |

## Foreword by GunsSaveLives.net

This article was originally written several years ago by Claude Werner. It is republished here, in its entirety (including data tables) with permission.

While the source material is somewhat dated there is still a lot of information we can learn from this. One thing to also note is that the stories used for this study were all situations in which a citizen *successfully* defended themselves. This means that the study focuses on and shows what works, not what doesn't work.

Exhibit 41
Page 01439

**Author**

Claude Werner

Firearms Safety Training LLC

**The Armed Citizen – A Five Year Analysis**

**Overview**

For the period 1997 – 2001, reports from "The Armed Citizen" column of the NRA Journals were collected. There were 482 incidents available for inclusion in the analysis. All involved the use of firearms by private citizens in self defense or defense of others. No law enforcement related incidents were included. The database is self-selecting in that no non-positive outcomes were reported in the column.

**Analysis**

As might be expected, the majority of incidents (52%) took place in the home. Next most common locale (32%) was in a business. Incidents took place in public places in 9% of reports and 7% occurred in or around vehicles.

The most common initial crimes were armed robbery (32%), home invasion (30%), and burglary (18%).

Overall, shots were fired by the defender in 72% of incidents. The average and median number of shots fired was 2. When more than 2 shots were fired, it generally appeared that the defender's initial response was to fire until empty. It appears that revolver shooters are more likely to empty their guns than autoloader shooters. At least one assailant was killed in 34% of all incidents. At least one assailant was wounded in an additional 29% of all incidents. Of the incidents where shots are fired by a defender, at least one assailant is killed in 53% of those incidents.

Handguns were used in 78% of incidents while long guns were used in 13%; in the balance the type of firearm was not reported. The most common size of handgun was the .35 caliber family (.38, .357, 9mm) at 61%, with most .38s apparently being of the 5 shot variety. Mouseguns (.380s and below) were at 23%, and .40 caliber and up at 15%.

The range of most incidents appears to be short but in excess of touching distance. It appears that most defenders will make the shoot decision shortly before the criminal comes within arm's length. Defenders frequently communicate with their attackers before shooting.

The firearm was carried on the body of the defender in only 20% of incidents. In 80% of cases, the firearm was obtained from a place of storage, frequently in another room.

Reloading was required in only 3 incidents. One of those involved killing an escaped lion with a .32 caliber revolver, which was eventually successful after 13 shots.

Exhibit 41
Page 01440

2 of 7                                                                                                                  5/31/17, 4:09 PM

Multiple conspirators were involved in 36% of the incidents. However, there were no apparent cases of getaway drivers or lookouts acting as reinforcements for the criminal actor(s) once shooting starts. At the sound of gunfire, immediate flight was the most common response for drivers and lookouts.

When multiple conspirators were involved, the first tier was a two man action team. If another member was available, he was usually the driver of the getaway car and remained in the car. If a fourth conspirator was involved, he was stationed immediately outside the target location as a lookout for the police or other possible intervening parties. The outside conspirators do not generally appear to be armed. It does appear that the trend over the period has increased from one weapon in the action team to two weapons.

The largest group of violent criminal actors was 7, a group that committed serial home invasions in Rochester NY. An alert and prepared homeowner, who saw them invade an adjacent home, accessed his shotgun, and dispatched them (2 killed and 1 seriously wounded) when they broke in his door.

Incidents rarely occurred in reaction time (i.e., ¼ second increments). Most commonly, criminals acted in a shark-like fashion, slowly circling and alerting their intended victims. The defender(s) then had time to access even weapons that were stored in other rooms and bring them to bear.

The most common responses of criminals upon being shot were to flee immediately or expire. With few exceptions, criminals ceased their advances immediately upon being shot. Even small caliber handguns displayed a significant degree of instant lethality (30 per cent immediate one shot kills) when employed at close range. Many criminal actors vocally expressed their fear of being shot when the defender displayed a weapon. Upon the criminals' flight, the "victims" frequently chased and captured or shot the criminals and held them for the authorities.

**Conclusions**
1) Even small caliber weapons are adequate to solve the vast majority of incidents requiring armed self-defense.
2) Mindset of the potential victim was far more important than the type of weapon used. All the victims were willing to fight their opponents in order to survive. Although not common, in some cases bridge weapons, such as pens, were used to gain time to access the firearm.
3) Frequently, the defenders were aware that something was amiss before the action started and then placed themselves in position to access their weapons. Awareness of the surroundings appears to be a key element of successful defense.
4) The defenders had some measure of familiarity with their firearms. Although perhaps not trained in the formal sense, they appear to be able to access a firearm and immediately put it into action. At least one defender learned from a previous experience and made the firearm more accessible for subsequent use.

Exhibit 41
Page 01441

5) Training or practice with a firearm should include a substantial amount of accessing the firearm from off body locations, such as drawers, underneath counters, etc.

6) This analysis does not present a view of the totality of armed self-defense in that non-positive outcomes were not available for inclusion in the database. The analysis may, however, be useful in helping to describe a methodology for successful armed self-defense. This methodology might be described as:

1. be aware,
2. be willing to fight,
3. have a weapon accessible,
4. be familiar enough with the weapon to employ it without fumbling,
5. when ready, communicate, both verbally and non-verbally, to the attacker that resistance will be given, and
6. if the attacker does not withdraw, counterattack without hesitation.

**Location of Incident**

| Location | % |
|---|---|
| Home | 52% |
| Business | 32% |
| Public | 9% |
| In/around Vehicle | 7% |

**Shots Fired**

| Type of Location | No | Yes |
|---|---|---|
| Business | 33% | 72% |
| Home | 25% | 75% |
| Public | 29% | 71% |
| In/around Vehicle | 35% | 65% |
| Total | 28% | 72% |

**Number of Shots Fired**

| | |
|---|---|
| Average | 2.2 |
| Median | 2 |
| Mode | 1 |
| Max | 20 |

Exhibit 41
Page 01442

## Gun Type

Handgun   78%

Long Gun  13%

Unknown   8%

## Body Carry

| Type of Location | No | Yes |
|---|---|---|
| Business | 69% | 31% |
| Home | 94% | 6% |
| Public | 49% | 51% |
| In/around Vehicle | 65% | 35% |
| Total | 80% | 20% |

## Multiple Assailants

| Type of Location | No | Yes |
|---|---|---|
| Business | 76% | 24% |
| Home | 72% | 28% |
| Public | 62% | 38% |
| Retail Business | 52% | 48% |
| In/around Vehicle | 49% | 51% |
| Total | 80% | 20% |

**Disqus Comments**

**Ellen Shocks LGBT Community & Confirms She Is Moving On**

Many knew what Ellen's plan was, but no one expected it to leak like this....

Learn More

Sponsored by **Celebritique**

Report ad

Exhibit 41
Page 01443



0 Comments　　Guns Save Lives　　　　　　　　　　🔴 1 Login ▾

♡ Recommend 1　　🔗 Share　　　　　　　　　　Sort by Best ▾

Start the discussion…

Be the first to comment.

ALSO ON **GUNS SAVE LIVES**

**We Like Shooting 116 – Samhain**
1 comment • 2 years ago•
TroyMule — This is almost comical, haha. Why not just use your web url to redirect to welikeshooting?

**We Like Shooting 109 – Bear back**
4 comments • 2 years ago•
Renegade — What on earth has happened to this site? It used to be a very good source of accurate descriptions of …

**We Like Shooting 173 – AK's for days**
1 comment • 6 months ago•
DaraHolsters — Great show guys- does Nick have a rail under his drivers seat? I can send a tough-claw to keep the …

**We Like Shooting 129 – Cough Hack Snort**
1 comment • a year ago•
TroyMule — This site is a joke.

✉ Subscribe　　Ⓓ Add Disqus to your siteAdd DisqusAdd　　🔒 Privacy

- **Self Defense Counter**

# <u>1422 CASES</u>


Guns Save Lives
499,573 likes


Like Page　　　　Share
Be the first of your friends to like this

- **Most Popular Stories**
  - An Open Letter to 22LR Buyers and Seekers
  - Gun Rights Supporters Take Over Anti-Gun Presentation

Exhibit 41
Page 01444

- Armed Individual at Colorado School May Have Prevented Mass Shooting
  - 23 Pro Gun Celebrities – Yes, They Do Exist! **UPDATED July 2014**

- **Sub Menu**

  - Bullet Energy Calculator
  - Pro Gun Quotes
  - Gun Website Directory

- **Search**

  type and press enter

Copyright 2017

Exhibit 41
Page 01445

# Exhibit 42

Exhibit 42
Page 01446

**University of California, Hastings College of the Law**
**UC Hastings Scholarship Repository**

Propositions                                    California Ballot Propositions and Initiatives

2016

# Firearms. Ammunition Sales. Initiative Statute.

Follow this and additional works at: http://repository.uchastings.edu/ca_ballot_props

Recommended Citation

Firearms. Ammunition Sales. Initiative Statute. California Proposition 63 (2016).
http://repository.uchastings.edu/ca_ballot_props/1356

This Proposition is brought to you for free and open access by the California Ballot Propositions and Initiatives at UC Hastings Scholarship Repository. It has been accepted for inclusion in Propositions by an authorized administrator of UC Hastings Scholarship Repository. For more information, please contact marcusc@uchastings.edu.

Exhibit 42
Page 01447

PROPOSITION

# 63

## FIREARMS. AMMUNITION SALES. INITIATIVE STATUTE.

**63**

---

**OFFICIAL TITLE AND SUMMARY**                                        PREPARED BY THE ATTORNEY GENERAL

---

- Requires individuals to pass a background check and obtain Department of Justice authorization to purchase ammunition.

- Prohibits possession of large-capacity ammunition magazines, and requires their disposal, as specified.

- Requires most ammunition sales be made through licensed ammunition vendors and reported to Department of Justice.

- Requires lost or stolen firearms and ammunition be reported to law enforcement.

- Prohibits persons convicted of stealing a firearm from possessing firearms.

- Establishes new procedures for enforcing laws prohibiting firearm possession.

- Requires Department of Justice to provide information about prohibited persons to federal

National Instant Criminal Background Check System.

**SUMMARY OF LEGISLATIVE ANALYST'S ESTIMATE OF NET STATE AND LOCAL GOVERNMENT FISCAL IMPACT:**

- Increased state and local court and law enforcement costs, potentially in the tens of millions of dollars annually, related to a new court process for removing firearms from prohibited persons after they are convicted.

- Potential increase in state costs, not likely to exceed the millions of dollars annually, related to regulating ammunition sales. These costs would likely be offset by fee revenues.

- Potential net increase in state and local correctional costs, not likely to exceed the low millions of dollars annually, related to changes in firearm and ammunition penalties.

---

**ANALYSIS BY THE LEGISLATIVE ANALYST**

## BACKGROUND

### Restrictions on Firearm and Ammunition Possession

Under federal and state law, certain individuals are not allowed to have firearms. These "prohibited persons" include individuals (1) convicted of felonies and some misdemeanors (such as assault or battery), (2) found by a court to be a danger to themselves or others due to mental illness, and (3) with a restraining order against them. In California, individuals who are not allowed to have firearms are also not allowed to have ammunition.

### Regulation of Firearm Sales

Both federal and state law include various regulations related to firearm sales, including the licensing of firearm dealers. Such regulations include:

- **Background Checks.** Under federal law, firearm dealers must request background checks of individuals seeking to buy firearms from the National Instant Criminal Background

Check System (NICS). The NICS searches a number of federal databases to ensure that the buyer is not a prohibited person. As allowed by federal law, California processes all background check requests from firearm dealers in the state directly by using NICS and various state databases.

- **Removal of Firearms From Prohibited Persons.** The California Department of Justice (DOJ) maintains a database of individuals who have legally bought or registered a firearm with the state. DOJ agents use this information to remove firearms from individuals who are no longer allowed to have firearms.

- **Other Regulations.** Other state regulations related to firearms include: limits on the type of firearms that can be bought, a ten-day waiting period before a dealer may give a firearm to a buyer, and requirements for recording and reporting firearm sales.

Fees charged to firearm dealers and buyers generally offset the state's costs to regulate firearm sales.

---

Exhibit 42
Page 01448

FIREARMS. AMMUNITION SALES.
INITIATIVE STATUTE.

PROPOSITION
**63**



**ANALYSIS BY THE LEGISLATIVE ANALYST**

CONTINUED

63

## Regulation of Ammunition Sales

Prior to this year, the state did not regulate ammunition sales in the same manner as firearms. In July 2016, the state enacted legislation to increase the regulation of ammunition sales. Such regulations include:

- ***Licenses to Sell Ammunition.*** Beginning January 2018, individuals and businesses will be required to obtain a one-year license from DOJ to sell ammunition. Certain individuals and businesses would not be required to obtain a license, such as licensed hunters selling less than 50 rounds of ammunition per month to another licensed hunter while on a hunting trip. In order to obtain a license, ammunition dealers will need to demonstrate that they are not prohibited persons. In addition, certain entities will be able to automatically receive an ammunition license, such as firearm dealers licensed by both the state and federal government and firearm wholesalers. A vendor who fails to comply with ammunition sale requirements three times would have their ammunition dealer's license permanently revoked. DOJ could charge a fee to individuals and businesses seeking a license to sell ammunition to support its administrative and enforcement costs.

- ***DOJ Approval to Buy Ammunition.*** Beginning July 2019, ammunition dealers will be required to check with DOJ at the time of purchase that individuals seeking to buy ammunition are not prohibited persons. This requirement would not apply to some individuals, such as persons permitted to carry concealed weapons. In addition, ammunition dealers will generally be required to collect and report information—such as the date of the sale, the buyers' identification information, and the type of ammunition purchased—to DOJ for storage in a database for two years. Failure to comply with these requirements is a misdemeanor (punishable by a fine and/ or imprisonment in county jail). DOJ could generally charge an individual seeking to purchase ammunition a fee of up to $1 per

transaction to support its administrative and enforcement costs. DOJ could adjust this fee cap annually for inflation.

- ***Other Regulations.*** Beginning January 2018, state law generally will require that most ammunition sales (including Internet and out-of-state sales) take place through a licensed ammunition dealer. In addition, beginning July 2019, most California residents will be prohibited from bringing ammunition into the state without first having the ammunition delivered to a licensed ammunition dealer. Failure to comply with these requirements is a misdemeanor.

### Status of Recent Legislation

As discussed above, the state recently enacted legislation to increase the regulation of ammunition sales. The state also recently enacted legislation to further limit the ownership of large-capacity magazines and to create a penalty for filing a false lost or stolen firearm report to law enforcement. These laws will take effect unless they are placed before the voters as referenda. If that occurs, voters will determine whether the laws take effect.

## PROPOSAL

Proposition 63 (1) changes state regulation of ammunition sales, (2) creates a new court process to ensure the removal of firearms from prohibited persons after they are convicted of a felony or certain misdemeanors, and (3) implements various other provisions. Additionally, Proposition 63 states that the Legislature can change its provisions if such changes are "consistent with and further the intent" of the measure. Such changes can only be made if 55 percent of the members of each house of the Legislature passes them and the bill is enacted into law.

### Changes to State Regulation of Ammunition Sales

Proposition 63 includes various regulations related to the sale of ammunition. Some of the regulations would replace existing law with similar provisions. However, other regulations proposed by Proposition 63 are different, as discussed below.

*For the full text of Proposition 63, see page 163.*

Exhibit 42
Page 01449

PROPOSITION

# 63

FIREARMS. AMMUNITION SALES.
INITIATIVE STATUTE.

63

### ANALYSIS BY THE LEGISLATIVE ANALYST

CONTINUED

***Requirements to Buy Ammunition.*** Proposition 63 includes various requirements for individuals seeking to buy ammunition and for DOJ to regulate such purchases. Specifically, the measure:

- Requires individuals to obtain a four-year permit from DOJ to buy ammunition and for ammunition dealers to check with DOJ that individuals buying ammunition have such permits.

- Requires DOJ to revoke permits from individuals who become prohibited.

- Allows DOJ to charge each person applying for a four-year permit a fee of up to $50 to support its various administrative and enforcement costs related to ammunition sales.

The state, however, enacted legislation in July 2016 to replace the above provisions with alternative ones if Proposition 63 is approved by the voters. (This legislation was enacted pursuant to the provision of Proposition 63 allowing for changes that are "consistent with and further the intent" of the proposition, as described earlier.) Specifically, under the legislation: (1) ammunition dealers would be required to check with DOJ that individuals seeking to buy ammunition are not prohibited persons at the time of purchase and (2) DOJ could generally charge such individuals up to $1 per transaction. These provisions are similar to current law. Fewer individuals, however, would be exempt from this check than under current law. For example, individuals permitted to carry concealed weapons would be subject to this check.

***Licenses to Sell Ammunition.*** Similar to current law, Proposition 63 requires individuals and businesses to obtain a one-year license from DOJ to sell ammunition. However, the measure changes the types of individuals and businesses that would be exempt from obtaining a license. For example, the measure generally exempts individuals and businesses that sell a small number of rounds of ammunition from the requirement to get a license. The measure also makes various changes in the penalties for failure to follow ammunition sale requirements. For example, it establishes a new criminal penalty—specifically, a misdemeanor—for failing to follow vendor licensing requirements.

***Other Ammunition Requirements.*** This measure prohibits most California residents from bringing ammunition into the state without first having the ammunition delivered to a licensed ammunition dealer beginning in January 2018—a year and a half earlier than under current law. Additionally, failure to comply with this requirement would change from a misdemeanor to an infraction (punishable by a fine) for the first offense and either an infraction or a misdemeanor for any additional offense. The measure also requires DOJ to store certain ammunition sales information in a database indefinitely, rather than for two years.

## Creates New Court Process for Removal of Firearms

This measure creates a new court process to ensure that individuals convicted of offenses that prohibit them from owning firearms do not continue to have them. Beginning in 2018, the measure requires courts to inform offenders upon conviction that they must (1) turn over their firearms to local law enforcement, (2) sell the firearms to a licensed firearm dealer, or (3) give the firearms to a licensed firearm dealer for storage. The measure also requires courts to assign probation officers to report on what offenders have done with their firearms. If the court finds that there is probable cause that an offender still has firearms, it must order that the firearms be removed. Finally, local governments or state agencies could charge a fee to reimburse them for certain costs in implementing the measure (such as those related to the removal or storage of firearms).

## Implements Other Provisions

***Reporting Requirements.*** The measure includes a number of reporting requirements related to firearms and ammunition. For example, the measure requires that ammunition dealers report the loss or theft of ammunition within 48 hours. It also requires that most individuals report the loss or theft of firearms within five days to local law enforcement. An individual who does not make such a report within five days would be guilty of an infraction for the first two violations. Additional violations would be a misdemeanor. This measure

Exhibit 42
Page 01450

FIREARMS. AMMUNITION SALES.
INITIATIVE STATUTE.

PROPOSITION

**63**



## ANALYSIS BY THE LEGISLATIVE ANALYST

CONTINUED

**63**

also reduces the penalty for an individual who knowingly submits a false report to local law enforcement from a misdemeanor to an infraction and eliminates the prohibition from owning firearms for ten years for such an individual. This measure also requires DOJ to submit the name, date of birth, and physical description of any newly prohibited person to NICS.

***Large-Capacity Magazines.*** Since 2000, state law has generally banned individuals from obtaining large-capacity magazines (defined as those holding more than ten rounds of ammunition). The law, however, allowed individuals who had large-capacity magazines before 2000 to keep them for their own use. Beginning July 2017, recently enacted law will prohibit most of these individuals from possessing these magazines. Individuals who do not comply are guilty of an infraction. However, there are various individuals who will be exempt from this requirement—such as an individual who owns a firearm (obtained before 2000) that can only be used with a large-capacity magazine. Proposition 63 eliminates several of these exemptions, as well as increases the maximum penalty for possessing large-capacity magazines. Specifically, individuals who possess such magazines after July 2017 would be guilty of an infraction or a misdemeanor.

***Penalty for Theft of Firearms.*** Under current state law, the penalty for theft of firearms worth $950 or less is generally a misdemeanor punishable by up to one year in county jail. Under this measure, such a crime would be a felony and could be punishable by up to three years in state prison. Additionally, individuals previously convicted of a misdemeanor for the theft of a firearm would be prohibited from owning firearms for ten years. Currently, there is no such prohibition for a misdemeanor conviction for theft of firearms.

## FISCAL EFFECTS

***Increased Court and Law Enforcement Costs.*** The new court process for removing firearms from prohibited persons after they are convicted would result in increased workload for the state and local governments. For example, state courts and county probation departments would have some increased

workload to determine whether prohibited persons have firearms and whether they have surrendered them. In addition, state and local law enforcement would have new workload related to removing firearms from offenders who fail to surrender them as part of the new court process. They could also have increased costs related to the storage or return of firearms. Some of the increased law enforcement costs related to the removal, storage, or return of firearms would be offset to the extent that local governments and state agencies charge and collect fees for these activities, as allowed by this measure. The total magnitude of these state and local costs **could be in the tens of millions of dollars annually.** Actual costs would depend on how this measure was implemented.

***Potential Increased State Regulatory Costs***. On balance, the measure's changes to the regulation of ammunition sales could increase state costs. For example, more individuals or businesses would likely be subject to state ammunition requirements under the measure. The actual fiscal effect of the changes would depend on how they are implemented and how individuals respond to them. We estimate that the potential increase in state costs would not likely exceed the millions of dollars annually. These costs would likely be offset by the various fees authorized by the measure and existing state law.

***Potential Net Increased Correctional Costs.*** This measure makes various changes to penalties related to firearms and ammunition. While some changes reduce penalties for certain offenses, other changes increase penalties for certain offenses. On net, these changes could result in increased correctional costs to state and local governments, such as to house individuals in prison and jail. The magnitude of such costs would depend primarily on the number of violations and how the measure is enforced. The potential net increase in correctional costs would **likely not exceed the low millions of dollars annually.**

Visit *http://www.sos.ca.gov/measure-contributions* for a list of committees primarily formed to support or oppose this measure. Visit *http://www.fppc.ca.gov/ transparency/top-contributors/nov-16-gen-v2.html* to access the committee's top 10 contributors.

*For the full text of Proposition 63, see page 163.*

Exhibit 42
Page 01451

PROPOSITION
**63**

FIREARMS. AMMUNITION SALES.
INITIATIVE STATUTE.

**63**

---

### ★ ARGUMENT IN FAVOR OF PROPOSITION 63 ★

*PROPOSITION 63 WILL KEEP US SAFER BY REDUCING GUN VIOLENCE*

Police in Dallas doing their job . . .. A nightclub in Orlando . . .. An office holiday party in San Bernardino . . .. A church in Charleston . . .. A movie theater in Aurora . . .. An elementary school in Newtown . . ..

*What's next? How many more people need to die from gun violence before we take bold action to save lives?*

More than 300 Americans are shot each day, more than 80 of them fatally.

More than 1 million Americans were killed or seriously injured by guns from 2004–2014.

ENOUGH!

*It's time to take action to keep guns and ammo out of the wrong hands.*

Proposition 63—the Safety for All Act—will save lives by closing loopholes to prevent dangerous criminals, domestic abusers, and the dangerously mentally ill from obtaining and using deadly weapons.

PROPOSITION 63 WILL:

- Remove illegal guns from our communities by ensuring that dangerous criminals and domestic abusers sell or transfer their firearms after they're convicted.
- Require any business that sells ammunition to report if their ammunition is lost or stolen.
- Require people to notify law enforcement if their guns are lost or stolen, before the weapons end up in the wrong hands.
- Ensure people convicted of gun theft are ineligible to own guns.
- Strengthen our background check systems and ensure that California law enforcement shares data about dangerous people with the FBI.

*Proposition 63 keeps guns and ammo out of the wrong hands, while protecting the rights of law-abiding Californians to own guns for self-defense, hunting, and recreation.*

Right now, thousands of dangerous felons remain illegally armed because we don't ensure that people convicted of violent crimes actually relinquish their guns after conviction. The Department of Justice identified more than 17,000 felons and other dangerous people with more than 34,000 guns, including more than 1,400 assault weapons.

*Passing Proposition 63 will represent a historic and unprecedented step forward for gun safety.*

LEADERS FROM ACROSS CALIFORNIA SUPPORT PROPOSITION 63, INCLUDING:

• Lieutenant Governor Gavin Newsom • U.S. Senator Dianne Feinstein • Law Center to Prevent Gun Violence • California Democratic Party • California Secretary of State Alex Padilla • Speaker Emeritus of the Assembly Toni Atkins • Speaker Emeritus of the Assembly John Pérez • Sheriff Vicki Hennessy, San Francisco • Former Police Chief Ken James, Emeryville • SEIU • League of Women Voters of California • California Young Democrats • California Federation of Teachers • San Francisco Board of Education • Equality California • Courage Campaign • California American College of Physicians • California American College of Emergency Physicians • Southern California Public Health Association • Clergy and Laity United for Economic Justice • Coalition Against Gun Violence • Rabbis Against Gun Violence • States United to Prevent Gun Violence • Stop Handgun Violence • Stop Our Shootings • Women Against Gun Violence • Youth Alive!

To learn more please visit *www.SafetyforAll.com.*

**GAVIN NEWSOM,** Lieutenant Governor of California
**DIANNE FEINSTEIN,** United States Senator
**ROBYN THOMAS,** Executive Director
Law Center to Prevent Gun Violence

---

### ★ REBUTTAL TO ARGUMENT IN FAVOR OF PROPOSITION 63 ★

*Terrorists don't follow the law!*

Gavin Newsom refuses to acknowledge that the Orlando and San Bernardino attacks were ISIS inspired Islamic radicalism. It is the same ideology that motivated the 9/11 terror attacks that killed 2,996 innocents.

Exploiting terrorist attacks to push sweeping laws affecting law-abiding peoples' civil liberties is misleading, wrong, and dangerous.

None of the proposed laws would prevent terrorist attacks. The reality is terrorists can always find the means to wreak havoc, a box cutter in a plane on 9/11, a homemade bomb in Boston, or a truck in Nice, France. Terrorists and criminals get weapons from the black market, make them, or steal them from law-abiding citizens.

Everyone agrees that preventing weapons from falling into the wrong hands is crucial. We all share the concern about the growing trends of terrorism and radicalization.

*But, Prop. 63 is NOT the answer.*

Spending tens of millions of taxpayer dollars year after year on useless lists of everyone who buys and sells ammunition diverts critical resources and focus away from effective anti-terrorism efforts, leaving the public more vulnerable to attack and *LESS SAFE.*

*There's a reason law enforcement overwhelmingly opposes Prop. 63.*

The public interest would be better served if these resources were used to educate more Californians about what they can do to protect their families and communities from terrorist attacks or to further train law enforcement to do so.

*Stop this dangerous abuse of public resources.*

Vote NO on Prop. 63!

**ALON STIVI,** President
Direct Measures International, Inc.

**WILLIAM "BILLY" BIRDZELL,** U.S. Special Operations Command Anti-Terrorism Instructor

**RICHARD GRENELL,** Longest serving U.S. Spokesman at the United Nations

---

*Arguments printed on this page are the opinions of the authors, and have not been checked for accuracy by any official agency.*

Exhibit 42
Page 01452

★ **ARGUMENT AGAINST PROPOSITION 63** ★

Prop. 63 is overwhelmingly opposed by the law enforcement community and civil rights groups because it will burden law abiding citizens without keeping violent criminals and terrorists from accessing firearms and ammunition.

The California State Sheriffs' Association, Association of Deputy District Attorneys for Los Angeles County, California Correctional Peace Officers Association, California Fish & Game Wardens' Association, California Reserve Peace Officers Association, and numerous other law enforcement and civic groups, representing tens of thousands of public safety professionals throughout California, are united in their opposition to this ineffective, burdensome, and costly proposal.

Prop. 63 would divert scarce law enforcement resources away from local law enforcement and overburden an already overcrowded court system with the enforcement of flawed laws that will turn harmless, law-abiding citizens into criminals. In fact, New York recently abandoned its enforcement of a similar proposal after it was passed, finding that it was impossible to implement and effectively maintain.

Doing what actually works to keep the public safe is the highest priority of law enforcement professionals who dedicate their lives to protecting Californians. Unfortunately, Prop. 63 will not make anyone safer. To the contrary, by directing resources away from measures that are truly effective at preventing the criminal element from acquiring guns and ammunition, it would make us all less safe. The immense public resources that Prop. 63

would waste should be used to hire more officers and to target, investigate, and prosecute dangerous individuals and terrorists.

After closely analyzing the language of Prop. 63, the law enforcement community found many problems in the details. Due to strict limitations on the Legislature's ability to amend voter-enacted propositions, most of these problems will be difficult or impossible for the Legislature to fix if Prop. 63 passes, saddling California with the burdens and costs of this flawed proposal forever.

By going around the Legislature, this initiative limits public safety professionals in developing future legislation that would truly promote public safety. California taxpayers should not waste hundreds of millions of their dollars on ineffective laws that have no value to law enforcement and will harm public safety by diverting resources away from effective law enforcement activities that are critical to public safety.

Please visit *WWW.WHERESMYAMMO.COM* for more information.

PLEASE VOTE NO ON PROP. 63.

**DONNY YOUNGBLOOD,** President
California State Sheriffs' Association
**KEVIN BERNZOTT,** Chief Executive Officer
California Reserve Peace Officers Association
**TIFFANY CHEUVRONT,** Principal Officer
Coalition for Civil Liberties

★ **REBUTTAL TO ARGUMENT AGAINST PROPOSITION 63** ★

As law enforcement and public safety officials, we're not surprised that groups such as the NRA and its affiliates oppose Proposition 63. Make no mistake, the so-called "Coalition for Civil Liberties" is actually an NRA front group.

The gun lobby often claims we should focus on enforcing existing gun laws, and that's exactly what this initiative does—*Prop. 63 closes loopholes and helps enforce existing laws to keep guns and ammo out of the wrong hands.*

For example, Prop. 63 *ensures dangerous convicts prohibited from owning weapons follow the law and get rid of their firearms.* Law enforcement professionals have found that felons and dangerous people currently possess thousands of guns illegally—so closing this loophole will save lives.

Prop. 63 also *requires reporting lost and stolen firearms,* to help police shut down gun trafficking rings and locate caches of illegal weapons. Prop. 63 will help police recover stolen guns before they're used in crimes and return them to their lawful owners.

Prop. 63 also *improves background check systems* so that law enforcement can prevent people banned from owning weapons—such as violent felons—from buying guns and ammo.

And Prop. 63 clarifies existing law so that any gun theft is a felony, *ensuring that people who steal guns can't own guns.* That's another common-sense reform to save lives overwhelmingly supported by law enforcement professionals.

*Prop. 63 will close loopholes in our existing laws and prevent dangerous criminals, domestic abusers, and the dangerously mentally ill from obtaining and using deadly weapons.*

**NANCY O'MALLEY,** District Attorney
Alameda County
**JEFF ROSEN,** District Attorney
Santa Clara County
**VICKI HENNESSY,** Sheriff
San Francisco

*Arguments printed on this page are the opinions of the authors, and have not been checked for accuracy by any official agency.*   Arguments **89**

Exhibit 42
Page 01453

subdivision (h) of Section 1170, in connection with a civil action brought against a federal, state, or local jail, prison, or correctional facility, or any official or agent thereof, shall be paid directly, after payment of reasonable attorney's fees and litigation costs approved by the court, to satisfy any outstanding restitution orders or restitution fines against that person. The balance of the award shall be forwarded to the payee after full payment of all outstanding restitution orders and restitution fines, subject to subdivisions (e) and (i). The Department of Corrections and Rehabilitation shall make all reasonable efforts to notify the victims of the crime for which that person was convicted concerning the pending payment of any compensatory or punitive damages. For any prisoner punished by imprisonment in a county jail pursuant to subdivision (h) of Section 1170, the agency is authorized to make all reasonable efforts to notify the victims of the crime for which that person was convicted concerning the pending payment of any compensatory or punitive damages.

(o) (1) Amounts transferred to the California Victim Compensation  Board for payment of direct orders of restitution shall be paid to the victim within 60 days from the date the restitution revenues are received by the California Victim Compensation Board. If the restitution payment to a victim is less than twenty-five dollars ($25), then payment need not be forwarded to that victim until the payment reaches twenty-five dollars ($25) or when the victim requests payment of the lesser amount.

(2) If a victim cannot be located, the restitution revenues received by the California Victim Compensation Board on behalf of the victim shall be held in trust in the Restitution Fund until the end of the state fiscal year subsequent to the state fiscal year in which the funds were deposited or until the time that the victim has provided current address information, whichever occurs sooner. Amounts remaining in trust at the end of the specified period of time shall revert to the Restitution Fund.

(3) (A) A victim failing to provide a current address within the period of time specified in paragraph (2) may provide documentation to the Department of Corrections and Rehabilitation, which shall verify that moneys were collected on behalf of the victim. Upon receipt of that verified information from the Department of Corrections and Rehabilitation, the California Victim Compensation Board shall transmit the restitution revenues to the victim in accordance with the provisions of subdivision (c) or (h).

(B) A victim failing to provide a current address within the period of time specified in paragraph (2) may provide documentation to the agency designated by the board of supervisors in the county where the prisoner punished by imprisonment in a county jail pursuant to subdivision (h) of Section 1170 is incarcerated, which may verify that moneys were collected on behalf of the victim. Upon receipt of that verified information from the agency, the California Victim Compensation Board shall transmit the restitution revenues to the victim in accordance with the provisions of subdivision (d) or (h).

SEC. 10.   Retroactive Application of Act.

(a)  In order to best achieve the purpose of this act as stated in Section 3 and to achieve fairness, equality, and uniformity in sentencing, this act shall be applied retroactively.

(b)  In any case where a defendant or inmate was sentenced to death prior to the effective date of this act, the sentence shall automatically be converted to imprisonment in the state prison for life without the possibility of parole under the terms and conditions of this act. The State of California shall not carry out any execution following the effective date of this act.

(c)  Following the effective date of this act, the Supreme Court may transfer all death penalty appeals and habeas petitions pending before the Supreme Court to any district of the Court of Appeal or superior court, in the Supreme Court's discretion.

SEC. 11.   Effective Date.

This act shall become effective on the day following the election at which it was approved, pursuant to subdivision (a) of Section 10 of Article II of the California Constitution.

SEC. 12.   Severability.

The provisions of this act are severable. If any provision of this act or its application is held invalid, including but not limited to Section 10, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application.

# PROPOSITION 63

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure amends, repeals, and adds sections to the Penal Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

**PROPOSED LAW**

The Safety for All Act of 2016

SECTION 1.   Title.

This measure shall be known and may be cited as "The Safety for All Act of 2016."

SEC. 2.   Findings and Declarations.

The people of the State of California find and declare:

1. Gun violence destroys lives, families and communities. From 2002 to 2013, California lost 38,576 individuals to gun violence. That is more than seven times the number of U.S. soldiers killed in combat during the wars in Iraq and Afghanistan combined. Over this same period, 2,258 children were killed by gunshot injuries in California. The same number of children murdered in the Sandy Hook elementary school massacre are killed by gunfire in this state every 39 days.

2. In 2013, guns were used to kill 2,900 Californians, including 251 children and teens. That year, at least 6,035 others were hospitalized or treated in emergency rooms for non-fatal gunshot wounds, including 1,275 children and teens.

3. Guns are commonly used by criminals. According to the California Department of Justice, in 2014 there were 1,169 firearm murders in California, 13,546 armed robberies involving a firearm, and 15,801 aggravated assaults involving a firearm.

4. This tragic violence imposes significant economic burdens on our society. Researchers conservatively estimate that gun violence costs the economy at least $229 billion every year, or more than $700 per American

**63**

**2**

Exhibit 42
Page 01454

**63**

per year. In 2013 alone, California gun deaths and injuries imposed $83 million in medical costs and $4.24 billion in lost productivity.

5. California can do better. Reasonable, common-sense gun laws reduce gun deaths and injuries, keep guns away from criminals and fight illegal gun trafficking. Although California has led the nation in gun safety laws, those laws still have loopholes that leave communities throughout the state vulnerable to gun violence and mass shootings. We can close these loopholes while still safeguarding the ability of law-abiding, responsible Californians to own guns for self-defense, hunting and recreation.

6. We know background checks work. Federal background checks have already prevented more than 2.4 million gun sales to convicted criminals and other illegal purchasers in America. In 2012 alone, background checks blocked 192,043 sales of firearms to illegal purchasers including 82,000 attempted purchases by felons. That means background checks stopped roughly 225 felons from buying firearms every day. Yet California law only requires background checks for people who purchase firearms, not for people who purchase ammunition. We should close that loophole.

7. Right now, any violent felon or dangerously mentally ill person can walk into a sporting goods store or gun shop in California and buy ammunition, no questions asked. That should change. We should require background checks for ammunition sales just like gun sales, and stop both from getting into the hands of dangerous individuals.

8. Under current law, stores that sell ammunition are not required to report to law enforcement when ammunition is lost or stolen. Stores should have to report lost or stolen ammunition within 48 hours of discovering that it is missing so law enforcement can work to prevent that ammunition from being illegally trafficked into the hands of dangerous individuals.

9. Californians today are not required to report lost or stolen guns to law enforcement. This makes it difficult for law enforcement to investigate crimes committed with stolen guns, break up gun trafficking rings, and return guns to their lawful owners. We should require gun owners to report their lost or stolen guns to law enforcement.

10. Under current law, people who commit felonies and other serious crimes are prohibited from possessing firearms. Yet existing law provides no clear process for those people to relinquish their guns when they become prohibited at the time of conviction. As a result, in 2014, the Department of Justice identified more than 17,000 people who possess more than 34,000 guns illegally, including more than 1,400 assault weapons. We need to close this dangerous loophole by not only requiring prohibited people to turn in their guns, but also ensuring that it happens.

11. Military-style large-capacity ammunition magazines—some capable of holding more than 100 rounds of ammunition—significantly increase a shooter's ability to kill a lot of people in a short amount of time. That is why these large capacity ammunition magazines are common in many of America's most horrific mass shootings, from the killings at 101 California Street in San Francisco in 1993 to Columbine High School in 1999 to the massacre at Sandy Hook Elementary School in Newtown, Connecticut in 2012.

12. Today, California law prohibits the manufacture, importation and sale of military-style, large capacity

ammunition magazines, but does not prohibit the general public from possessing them. We should close that loophole. No one except trained law enforcement should be able to possess these dangerous ammunition magazines.

13. Although the State of California conducts background checks on gun buyers who live in California, we have to rely on other states and the FBI to conduct background checks on gun buyers who live elsewhere. We should make background checks outside of California more effective by consistently requiring the state to report who is prohibited from possessing firearms to the federal background check system.

14. The theft of a gun is a serious and potentially violent crime. We should clarify that such crimes can be charged as felonies, and prevent people who are convicted of such crimes from possessing firearms.

SEC. 3.    Purpose and Intent.

The people of the State of California declare their purpose and intent in enacting "The Safety for All Act of 2016" (the "Act") to be as follows:

1. To implement reasonable and common-sense reforms to make California's gun safety laws the toughest in the nation while still safeguarding the Second Amendment rights of all law-abiding, responsible Californians.

2. To keep guns and ammunition out of the hands of convicted felons, the dangerously mentally ill, and other persons who are prohibited by law from possessing firearms and ammunition.

3. To ensure that those who buy ammunition in California—just like those who buy firearms—are subject to background checks.

4. To require all stores that sell ammunition to report any lost or stolen ammunition within 48 hours of discovering that it is missing.

5. To ensure that California shares crucial information with federal law enforcement by consistently requiring the state to report individuals who are prohibited by law from possessing firearms to the federal background check system.

6. To require the reporting of lost or stolen firearms to law enforcement.

7. To better enforce the laws that require people to relinquish their firearms once they are convicted of a crime that makes them ineligible to possess firearms.

8. To make it illegal in California to possess the kinds of military-style ammunition magazines that enable mass killings like those at Sandy Hook Elementary School; a movie theater in Aurora, Colorado; Columbine High School; and an office building at 101 California Street in San Francisco, California.

9. To prevent people who are convicted of the theft of a firearm from possessing firearms, and to effectuate the intent of Proposition 47 that the theft of a firearm is felony grand theft, regardless of the value of the firearm, in alignment with Sections 25400 and 1192.7 of the Penal Code.

SEC. 4.    Lost or Stolen Firearms.

SEC. 4.1.    Division    4.5    (commencing    with Section 25250) is added to Title 4 of Part 6 of the Penal Code, to read:

Exhibit 42

Page 01455

*DIVISION 4.5.    LOST OR STOLEN FIREARMS*

*25250.  (a) Commencing July 1, 2017, every person shall report the loss or theft of a firearm he or she owns or possesses to a local law enforcement agency in the jurisdiction in which the theft or loss occurred within five days of the time he or she knew or reasonably should have known that the firearm had been stolen or lost.*

*(b) Every person who has reported a firearm lost or stolen under subdivision (a) shall notify the local law enforcement agency in the jurisdiction in which the theft or loss occurred within five days if the firearm is subsequently recovered by the person.*

*(c) Notwithstanding subdivision (a), a person shall not be required to report the loss or theft of a firearm that is an antique firearm within the meaning of subdivision (c) of Section 16170.*

*25255.  Section 25250 shall not apply to the following:*

*(a) Any law enforcement agency or peace officer acting within the course and scope of his or her employment or official duties if he or she reports the loss or theft to his or her employing agency.*

*(b) Any United States marshal or member of the Armed Forces of the United States or the National Guard, while engaged in his or her official duties.*

*(c) Any person who is licensed, pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, and who reports the theft or loss in accordance with Section 923(g)(6) of Title 18 of the United States Code, or the successor provision thereto, and applicable regulations issued thereto.*

*(d) Any person whose firearm was lost or stolen prior to July 1, 2017.*

*25260.  Pursuant to Section 11108, every sheriff or police chief shall submit a description of each firearm that has been reported lost or stolen directly into the Department of Justice Automated Firearms System.*

*25265.  (a) Every person who violates Section 25250 is, for a first violation, guilty of an infraction, punishable by a fine not to exceed one hundred dollars ($100).*

*(b) Every person who violates Section 25250 is, for a second violation, guilty of an infraction, punishable by a fine not to exceed one thousand dollars ($1,000).*

*(c) Every person who violates Section 25250 is, for a third or subsequent violation, guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding six months, or by a fine not to exceed one thousand dollars ($1,000), or by both that fine and imprisonment.*

*25270.  Every person reporting a lost or stolen firearm pursuant to Section 25250 shall report the make, model, and serial number of the firearm, if known by the person, and any additional relevant information required by the local law enforcement agency taking the report.*

*25275.  (a) No person shall report to a local law enforcement agency that a firearm has been lost or stolen, knowing the report to be false. A violation of this section is an infraction, punishable by a fine not exceeding two hundred fifty dollars ($250) for a first offense, and by a fine not exceeding one thousand dollars ($1,000) for a second or subsequent offense.*

*(b) This section shall not preclude prosecution under any other law.*

SEC. 4.2.    Section 26835 of the Penal Code is amended to read:

26835.  A licensee shall post conspicuously within the licensed premises the following warnings in block letters not less than one inch in height:

(a) "IF YOU KEEP A LOADED FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE OBTAINS IT AND USES IT, RESULTING IN INJURY OR DEATH, OR CARRIES IT TO A PUBLIC PLACE, YOU MAY BE GUILTY OF A MISDEMEANOR OR A FELONY UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER OR LOCKED THE FIREARM WITH A LOCKING DEVICE, TO KEEP IT FROM TEMPORARILY FUNCTIONING."

(b) "IF YOU KEEP A PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON, WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE GAINS ACCESS TO THE FIREARM, AND CARRIES IT OFF-PREMISES, YOU MAY BE GUILTY OF A MISDEMEANOR, UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE, TO KEEP IT FROM TEMPORARILY FUNCTIONING."

(c) "IF YOU KEEP ANY FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, AND A PERSON UNDER 18 YEARS OF AGE GAINS ACCESS TO THE FIREARM, AND CARRIES IT OFF-PREMISES TO A SCHOOL OR SCHOOL-SPONSORED EVENT, YOU MAY BE GUILTY OF A MISDEMEANOR, INCLUDING A FINE OF UP TO FIVE THOUSAND DOLLARS ($5,000), UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE."

(d) "IF YOU NEGLIGENTLY STORE OR LEAVE A LOADED FIREARM WITHIN ANY PREMISES UNDER YOUR CUSTODY OR CONTROL, WHERE A PERSON UNDER 18 YEARS OF AGE IS LIKELY TO ACCESS IT, YOU MAY BE GUILTY OF A MISDEMEANOR, INCLUDING A FINE OF UP TO ONE THOUSAND DOLLARS ($1,000), UNLESS YOU STORED THE FIREARM IN A LOCKED CONTAINER, OR LOCKED THE FIREARM WITH A LOCKING DEVICE."

(e) "DISCHARGING FIREARMS IN POORLY VENTILATED AREAS, CLEANING FIREARMS, OR HANDLING AMMUNITION MAY RESULT IN EXPOSURE TO LEAD, A SUBSTANCE KNOWN TO CAUSE BIRTH DEFECTS, REPRODUCTIVE HARM, AND OTHER SERIOUS PHYSICAL INJURY. HAVE ADEQUATE VENTILATION AT ALL TIMES. WASH HANDS THOROUGHLY AFTER EXPOSURE."

(f) "FEDERAL REGULATIONS PROVIDE THAT IF YOU DO NOT TAKE PHYSICAL POSSESSION OF THE FIREARM THAT YOU ARE ACQUIRING OWNERSHIP OF WITHIN 30 DAYS AFTER YOU COMPLETE THE INITIAL BACKGROUND CHECK PAPERWORK, THEN YOU HAVE TO GO THROUGH THE BACKGROUND CHECK PROCESS A SECOND TIME IN ORDER TO TAKE PHYSICAL POSSESSION OF THAT FIREARM."

(g) "NO PERSON SHALL MAKE AN APPLICATION TO PURCHASE MORE THAN ONE PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON WITHIN ANY 30-DAY PERIOD AND NO DELIVERY SHALL BE MADE TO ANY PERSON WHO HAS MADE AN APPLICATION TO PURCHASE MORE THAN ONE PISTOL, REVOLVER, OR OTHER FIREARM CAPABLE OF BEING CONCEALED UPON THE PERSON WITHIN ANY 30-DAY PERIOD."

**63**

Exhibit 42
Page 01456

**63**

*(h) "IF A FIREARM YOU OWN OR POSSESS IS LOST OR STOLEN, YOU MUST REPORT THE LOSS OR THEFT TO A LOCAL LAW ENFORCEMENT AGENCY WHERE THE LOSS OR THEFT OCCURRED WITHIN FIVE DAYS OF THE TIME YOU KNEW OR REASONABLY SHOULD HAVE KNOWN THAT THE FIREARM HAD BEEN LOST OR STOLEN."*

SEC. 5.   Strengthening the National Instant Criminal Background Check System.

SEC. 5.1.   Section 28220 of the Penal Code is amended to read:

28220. (a) Upon submission of firearm purchaser information, the Department of Justice shall examine its records, as well as those records that it is authorized to request from the State Department of State Hospitals pursuant to Section 8104 of the Welfare and Institutions Code, in order to determine if the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm.

(b) To the extent that funding is available, the *The* Department of Justice may *shall* participate in the National Instant Criminal Background Check System (NICS), as described in subsection (t) of Section 922 of Title 18 of the United States Code, and, if that participation is implemented, shall notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, that the purchaser is a person prohibited from acquiring a firearm under federal law.

(c) If the department determines that the purchaser is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm or is a person described in subdivision (a) of Section 27535, it shall immediately notify the dealer and the chief of the police department of the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact.

(d) If the department determines that the copies of the register submitted to it pursuant to subdivision (d) of Section 28210 contain any blank spaces or inaccurate, illegible, or incomplete information, preventing identification of the purchaser or the handgun or other firearm to be purchased, or if any fee required pursuant to Section 28225 is not submitted by the dealer in conjunction with submission of copies of the register, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall submit corrected copies of the register to the department, or shall submit any fee required pursuant to Section 28225, or both, as appropriate and, if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(e) If the department determines that the information transmitted to it pursuant to Section 28215 contains inaccurate or incomplete information preventing identification of the purchaser or the handgun or other firearm to be purchased, or if the fee required pursuant to Section 28225 is not transmitted by the dealer in conjunction with transmission of the electronic or telephonic record, the department may notify the dealer of that fact. Upon notification by the department, the dealer shall transmit corrections to the record of electronic or telephonic transfer to the department, or shall transmit any fee required pursuant to Section 28225, or both, as appropriate, and if notification by the department is received by the dealer at any time prior to delivery of the firearm to be purchased, the dealer shall withhold delivery until the conclusion of the waiting period described in Sections 26815 and 27540.

(f) (1) (A) The department shall immediately notify the dealer to delay the transfer of the firearm to the purchaser if the records of the department, or the records available to the department in the National Instant Criminal Background Check System, indicate one of the following:

(i) The purchaser has been taken into custody and placed in a facility for mental health treatment or evaluation and may be a person described in Section 8100 or 8103 of the Welfare and Institutions Code and the department is unable to ascertain whether the purchaser is a person who is prohibited from possessing, receiving, owning, or purchasing a firearm, pursuant to Section 8100 or 8103 of the Welfare and Institutions Code, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(ii) The purchaser has been arrested for, or charged with, a crime that would make him or her, if convicted, a person who is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm, and the department is unable to ascertain whether the purchaser was convicted of that offense prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(iii) The purchaser may be a person described in subdivision (a) of Section 27535, and the department is unable to ascertain whether the purchaser, in fact, is a person described in subdivision (a) of Section 27535, prior to the conclusion of the waiting period described in Sections 26815 and 27540.

(B) The dealer shall provide the purchaser with information about the manner in which he or she may contact the department regarding the delay described in subparagraph (A).

(2) The department shall notify the purchaser by mail regarding the delay and explain the process by which the purchaser may obtain a copy of the criminal or mental health record the department has on file for the purchaser. Upon receipt of that criminal or mental health record, the purchaser shall report any inaccuracies or incompleteness to the department on an approved form.

(3) If the department ascertains the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), after the waiting period described in Sections 26815 and 27540, but within 30 days of the dealer's original submission of the purchaser information to the department pursuant to this section, the department shall do the following:

(A) If the purchaser is not a person described in subdivision (a) of Section 27535, and is not prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer of that fact and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or

Exhibit 42
Page 01457

record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to him or her.

(B) If the purchaser is a person described in subdivision (a) of Section 27535, or is prohibited by state or federal law, including, but not limited to, Section 8100 or 8103 of the Welfare and Institutions Code, from possessing, receiving, owning, or purchasing a firearm, the department shall immediately notify the dealer and the chief of the police department in the city or city and county in which the sale was made, or if the sale was made in a district in which there is no municipal police department, the sheriff of the county in which the sale was made, of that fact in compliance with subdivision (c) of Section 28220.

(4) If the department is unable to ascertain the final disposition of the arrest or criminal charge, or the outcome of the mental health treatment or evaluation, or the purchaser's eligibility to purchase a firearm, as described in paragraph (1), within 30 days of the dealer's original submission of purchaser information to the department pursuant to this section, the department shall immediately notify the dealer and the dealer may then immediately transfer the firearm to the purchaser, upon the dealer's recording on the register or record of electronic transfer the date that the firearm is transferred, the dealer signing the register or record of electronic transfer indicating delivery of the firearm to that purchaser, and the purchaser signing the register or record of electronic transfer acknowledging the receipt of the firearm on the date that the firearm is delivered to him or her.

*(g) Commencing July 1, 2017, upon receipt of information demonstrating that a person is prohibited from possessing a firearm pursuant to federal or state law, the department shall submit the name, date of birth, and physical description of the person to the National Instant Criminal Background Check System Index, Denied Persons Files. The information provided shall remain privileged and confidential, and shall not be disclosed, except for the purpose of enforcing federal or state firearms laws.*

SEC. 6.   Possession of Large-Capacity Magazines.

SEC. 6.1.   Section 32310 of the Penal Code is amended to read:

32310.   (a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, ~~commencing January 1, 2000,~~ any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b)   For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

*(c) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing July 1, 2017, any person in this state who*

*possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, or is guilty of a misdemeanor punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.*

*(d) Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:*

*(1) Remove the large-capacity magazine from the state;*

*(2) Sell the large-capacity magazine to a licensed firearms dealer; or*

*(3) Surrender the large-capacity magazine to a law enforcement agency for destruction.*

SEC. 6.2.   Section 32400 of the Penal Code is amended to read:

32400.   Section 32310 does not apply to the sale of, giving of, lending of, *possession of,* importation into this state of, or purchase of, any large-capacity magazine to or by any federal, state, county, city and county, or city agency that is charged with the enforcement of any law, for use by agency employees in the discharge of their official duties, whether on or off duty, and where the use is authorized by the agency and is within the course and scope of their duties.

SEC. 6.3.   Section 32405 of the Penal Code is amended to read:

32405.   Section 32310 does not apply to the sale to, lending to, transfer to, purchase by, receipt of, *possession of,* or importation into this state of, a large-capacity magazine by a sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, *or sworn federal law enforcement officer,* who is authorized to carry a firearm in the course and scope of that officer's duties.

SEC. 6.4.   Section 32406 is added to the Penal Code, to read:

*32406.   Subdivision (c) of Section 32310 does not apply to an honorably retired sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or honorably retired sworn federal law enforcement officer, who was authorized to carry a firearm in the course and scope of that officer's duties. "Honorably retired" shall have the same meaning as provided in Section 16690.*

SEC. 6.5.   Section 32410 of the Penal Code is amended to read:

32410.   Section 32310 does not apply to the sale*, ~~or~~ purchase, or possession* of any large-capacity magazine to or by a person licensed pursuant to Sections 26700 to 26915, inclusive.

SEC. 6.6.   Section 32420 of the Penal Code is repealed.

~~32420.   Section 32310 does not apply to the importation of a large-capacity magazine by a person who lawfully possessed the large-capacity magazine in the state prior to January 1, 2000, lawfully took it out of the state, and is returning to the state with the same large-capacity magazine.~~

SEC. 6.7.   Section 32425 of the Penal Code is amended to read:

Exhibit 42
Page 01458

**63**

**63**

32425.   Section 32310 does not apply to ~~either~~ *any* of the following:

(a) The lending or giving of any large-capacity magazine to a person licensed pursuant to Sections 26700 to 26915, inclusive, or to a gunsmith, for the purposes of maintenance, repair, or modification of that large-capacity magazine.

*(b) The possession of any large-capacity magazine by a person specified in subdivision (a) for the purposes specified in subdivision (a).*

~~(b)~~ *(c)* The return to its owner of any large-capacity magazine by a person specified in subdivision (a).

SEC. 6.8.   Section 32435 of the Penal Code is amended to read:

32435.   Section 32310 does not apply to any of the following:

(a) The sale of, giving of, lending of, *possession of,* importation into this state of, or purchase of, any large-capacity magazine, to or by any entity that operates an armored vehicle business pursuant to the laws of this state.

(b) The lending of large-capacity magazines by an entity specified in subdivision (a) to its authorized employees, while in the course and scope of employment for purposes that pertain to the entity's armored vehicle business.

*(c) The possession of any large-capacity magazines by the employees of an entity specified in subdivision (a) for purposes that pertain to the entity's armored vehicle business.*

~~(c)~~ *(d)* The return of those large-capacity magazines to the entity specified in subdivision (a) by those employees specified in subdivision (b).

SEC. 6.9.   Section 32450 of the Penal Code is amended to read:

32450.   Section 32310 does not apply to the purchase *or possession* of a large-capacity magazine by the holder of a special weapons permit issued pursuant to Section 31000, 32650, or 33300, or pursuant to Article 3 (commencing with Section 18900) of Chapter 1 of Division 5 of Title 2, or pursuant to Article 4 (commencing with Section 32700) of Chapter 6 of this division, for any of the following purposes:

(a) For use solely as a prop for a motion picture, television, or video production.

(b) For export pursuant to federal regulations.

(c) For resale to law enforcement agencies, government agencies, or the military, pursuant to applicable federal regulations.

SEC. 7.   Firearms Dealers.

SEC. 7.1.   Section 26885 of the Penal Code is amended to read:

26885.   (a) Except as provided in subdivisions (b) and (c) of Section 26805, all firearms that are in the inventory of a licensee shall be kept within the licensed location.

(b) Within 48 hours of discovery, a licensee shall report the loss or theft of any of the following items to the appropriate law enforcement agency in the city, county, or city and county where the licensee's business premises are located:

(1) Any firearm *or ammunition* that is merchandise of the licensee.

(2) Any firearm *or ammunition* that the licensee takes possession of pursuant to Chapter 5 (commencing with Section 28050)*, or pursuant to Section 30312.*

(3) Any firearm *or ammunition* kept at the licensee's place of business.

SEC. 7.2.   Section 26915 of the Penal Code is amended to read:

26915.   (a) *Commencing January 1, 2018, a* ~~A~~ firearms dealer ~~may~~ *shall* require any agent *or employee* who handles, sells, or delivers firearms to obtain and provide to the dealer a certificate of eligibility from the Department of Justice pursuant to Section 26710. On the application for the certificate, the agent or employee shall provide the name and California firearms dealer number of the firearms dealer with whom the person is employed.

(b) The department shall notify the firearms dealer in the event that the agent or employee who has a certificate of eligibility is or becomes prohibited from possessing firearms.

(c) If the local jurisdiction requires a background check of the agents or employees of a firearms dealer, the agent or employee shall obtain a certificate of eligibility pursuant to subdivision (a).

(d) (1) Nothing in this section shall be construed to preclude a local jurisdiction from conducting an additional background check pursuant to Section 11105. The local jurisdiction may not charge a fee for the additional criminal history check.

(2) Nothing in this section shall be construed to preclude a local jurisdiction from prohibiting employment based on criminal history that does not appear as part of obtaining a certificate of eligibility.

(e) The licensee shall prohibit any agent who the licensee knows or reasonably should know is within a class of persons prohibited from possessing firearms pursuant to Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title, or Section 8100 or 8103 of the Welfare and Institutions Code, from coming into contact with any firearm that is not secured and from accessing any key, combination, code, or other means to open any of the locking devices described in subdivision (g).

(f) Nothing in this section shall be construed as preventing a local government from enacting an ordinance imposing additional conditions on licensees with regard to agents *or employees*.

(g) For purposes of this article, "secured" means a firearm that is made inoperable in one or more of the following ways:

(1) The firearm is inoperable because it is secured by a firearm safety device listed on the department's roster of approved firearm safety devices pursuant to subdivision (d) of Section 23655.

(2) The firearm is stored in a locked gun safe or long-gun safe that meets the standards for department-approved gun safes set forth in Section 23650.

(3) The firearm is stored in a distinct locked room or area in the building that is used to store firearms, which can only be unlocked by a key, a combination, or similar means.

(4) The firearm is secured with a hardened steel rod or cable that is at least one-eighth of an inch in diameter through the trigger guard of the firearm. The steel rod or cable shall be secured with a hardened steel lock that has

Exhibit 42
Page 01459

a shackle. The lock and shackle shall be protected or shielded from the use of a boltcutter and the rod or cable shall be anchored in a manner that prevents the removal of the firearm from the premises.

SEC. 8.    Sales of Ammunition.

SEC. 8.1.    Section 16150 of the Penal Code is amended to read:

16150.    (a) ~~As used in Section 30300, "ammunition"~~ ~~means handgun ammunition as defined in Section 16650.~~ *As used in this part, except in subdivision (a) of Section 30305 and in Section 30306, "ammunition" means one or more loaded cartridges consisting of a primed case, propellant, and with one or more projectiles. "Ammunition" does not include blanks.*

(b) As used in subdivision (a) of Section 30305 and in Section 30306, "ammunition" includes, but is not limited to, any bullet, cartridge, magazine, clip, speed loader, autoloader, or projectile capable of being fired from a firearm with a deadly consequence. "Ammunition" does not include blanks.

SEC. 8.2.    Section 16151 is added to the Penal Code, to read:

*16151.    (a)  As used in this part, commencing January 1, 2018, "ammunition vendor" means any person, firm, corporation, or other business enterprise that holds a current ammunition vendor license issued pursuant to Section 30385.*

*(b) Commencing January 1, 2018, a firearms dealer licensed pursuant to Sections 26700 to 26915, inclusive, shall automatically be deemed a licensed ammunition vendor, provided the dealer complies with the requirements of Articles 2 (commencing with Section 30300) and 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4.*

SEC. 8.3.    Section 16662 of the Penal Code is repealed.

~~16662.   As used in this part, "handgun ammunition~~ ~~vendor" means any person, firm, corporation, dealer, or~~ ~~any other business enterprise that is engaged in the retail~~ ~~sale of any handgun ammunition, or that holds itself out as~~ ~~engaged in the business of selling any handgun ammunition.~~

SEC. 8.4.    Section 17315 of the Penal Code is amended to read:

17315.    As used in ~~Article 3 (commencing with Section~~ ~~30345)~~ *Articles 2 through 5* of Chapter 1 of Division 10 of Title 4, "vendor" means a *an* ~~handgun~~ ammunition vendor.

SEC. 8.5.    Section 30306 of the Penal Code is amended to read:

30306.    (a) Any person, corporation, ~~or~~ firm, *or other business enterprise* who supplies, delivers, sells, or gives possession or control of, any ammunition to any person who he or she knows or using reasonable care should know is prohibited from owning, possessing, or having under custody or control, any ammunition or reloaded ammunition pursuant to subdivision (a) or (b) of Section 30305, is guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, or a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment.

*(b) Any person, corporation, firm, or other business enterprise who supplies, delivers, sells, or gives possession or control of, any ammunition to any person whom the person, corporation, firm, or other business enterprise* knows or has cause to believe is not the actual purchaser or transferee of the ammunition, with knowledge or cause to believe that the ammunition is to be subsequently sold or transferred to a person who is prohibited from owning, possessing, or having under custody or control any ammunition or reloaded ammunition pursuant to subdivision (a) or (b) of Section 30305, is guilty of a misdemeanor, punishable by imprisonment in a county jail not exceeding one year, or a fine not exceeding one thousand dollars ($1,000), or by both that fine and imprisonment.*

~~(b)~~ *(c)* The provisions of this section are cumulative and shall not be construed as restricting the application of any other law. However, an act or omission punishable in different ways by this section and another provision of law shall not be punished under more than one provision.

SEC. 8.6.    Section 30312 of the Penal Code is amended to read:

30312.    (a) ~~Commencing February 1, 2011, the~~ *(1) Commencing January 1, 2018, the sale of ammunition by any party shall be conducted by or processed through a licensed ammunition vendor.*

*(2)  When neither party to an ammunition sale is a licensed ammunition vendor, the seller shall deliver the ammunition to a vendor to process the transaction. The ammunition vendor shall then promptly and properly deliver the ammunition to the purchaser, if the sale is not prohibited, as if the ammunition were the vendor's own merchandise. If the ammunition vendor cannot legally deliver the ammunition to the purchaser, the vendor shall forthwith return the ammunition to the seller. The ammunition vendor may charge the purchaser an administrative fee to process the transaction, in an amount to be set by the Department of Justice, in addition to any applicable fees that may be charged pursuant to the provisions of this title.*

*(b) Commencing January 1, 2018, the sale,* delivery or transfer of ownership of ~~handgun~~ ammunition *by any party* may only occur in a face-to-face transaction with the *seller,* deliverer, or transferor ~~being provided bona fide evidence~~ ~~of identity from the purchaser or other transferee~~, *provided, however, that ammunition may be purchased or acquired over the Internet or through other means of remote ordering if a licensed ammunition vendor initially receives the ammunition and processes the transaction in compliance with this section and Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of this part.*

~~(b)~~ *(c)* ~~Subdivision~~ *Subdivisions* (a) *and (b)* shall not apply to ~~or affect~~ the sale, delivery, or transfer of ~~handgun~~ ammunition to any of the following:

(1) An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale, delivery, or transfer is for exclusive use by that government agency and, prior to the sale, delivery, or transfer of the ~~handgun~~ ammunition, written authorization from the head of the agency employing the purchaser or transferee is obtained, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency employing the individual.

(2) A sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, *or sworn federal law enforcement officer,* who is authorized to carry a firearm in the course and scope of the officer's duties.

**63**

(3) An importer or manufacturer of ~~handgun~~ ammunition or firearms who is licensed to engage in business pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(4) A person who is on the centralized list *of exempted federal firearms licensees* maintained by the Department of Justice pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of this title.

(5) A person whose licensed premises are outside this state and who is licensed as a dealer or collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.

(6) A person who is licensed as a collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, whose licensed premises are within this state, and who has a current certificate of eligibility issued by the Department of Justice pursuant to Section 26710.

(7) ~~A handgun~~ *An* ammunition vendor.

(8) A consultant-evaluator.

*(9) A person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises.*

*(10) A person who purchases or receives ammunition from a spouse, registered domestic partner, or immediate family member as defined in Section 16720.*

~~(c)~~ *(d)* A violation of this section is a misdemeanor.

SEC. 8.7.   Section 30314 is added to the Penal Code, to read:

*30314.   (a) Commencing January 1, 2018, a resident of this state shall not bring or transport into this state any ammunition that he or she purchased or otherwise obtained from outside of this state unless he or she first has that ammunition delivered to a licensed ammunition vendor for delivery to that resident pursuant to the procedures set forth in Section 30312.*

*(b) Subdivision (a) does not apply to any of the following:*

*(1) An ammunition vendor.*

*(2) A sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.*

*(3) An importer or manufacturer of ammunition or firearms who is licensed to engage in business pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto.*

*(4) A person who is on the centralized list of exempted federal firearms licensees maintained by the Department of Justice pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6.*

*(5) A person who is licensed as a collector of firearms pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code and the regulations issued pursuant thereto, whose licensed premises are within this state, and who has a current certificate of*

eligibility issued by the Department of Justice pursuant to Section 26710.

*(6) A person who acquired the ammunition from a spouse, registered domestic partner, or immediate family member as defined in Section 16720.*

*(c) A violation of this section is an infraction for any first time offense, and either an infraction or a misdemeanor for any subsequent offense.*

SEC. 8.8.   The heading of Article 3 (commencing with Section 30342) of Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code is amended to read:

Article 3.   ~~Handgun~~ Ammunition Vendors

SEC. 8.9.   Section 30342 is added to the Penal Code, immediately preceding Section 30345, to read:

*30342.   (a) Commencing January 1, 2018, a valid ammunition vendor license shall be required for any person, firm, corporation, or other business enterprise to sell more than 500 rounds of ammunition in any 30-day period.*

*(b) A violation of this section is a misdemeanor.*

SEC. 8.10.   Section 30347 of the Penal Code is amended to read:

*30347.   (a) An ammunition vendor shall require any agent or employee who handles, sells, delivers, or has under his or her custody or control any ammunition, to obtain and provide to the vendor a certificate of eligibility from the Department of Justice issued pursuant to Section 26710. On the application for the certificate, the agent or employee shall provide the name and address of the ammunition vendor with whom the person is employed, or the name and California firearms dealer number of the ammunition vendor if applicable.*

*(b) The department shall notify the ammunition vendor in the event that the agent or employee who has a certificate of eligibility is or becomes prohibited from possessing ammunition under subdivision (a) of Section 30305 or federal law.*

*(c)* ~~A~~ *An* ammunition vendor shall not permit any *agent or* employee who the vendor knows or reasonably should know is a person described in Chapter 2 (commencing with Section 29800) or Chapter 3 (commencing with Section 29900) of Division 9 of this title or Section 8100 or 8103 of the Welfare and Institutions Code to handle, sell, ~~or~~ deliver, *or have under his or her custody or control, any* ~~handgun~~ ammunition in the course and scope of employment.

SEC. 8.11.   Section 30348 is added to the Penal Code, to read:

*30348.   (a) Except as provided in subdivision (b), the sale of ammunition by a licensed vendor shall be conducted at the location specified in the license.*

*(b) A vendor may sell ammunition at a gun show or event if the gun show or event is not conducted from any motorized or towed vehicle.*

*(c) For purposes of this section, "gun show or event" means a function sponsored by any national, state, or local organization, devoted to the collection, competitive use, or other sporting use of firearms, or an organization or association that sponsors functions devoted to the collection, competitive use, or other sporting use of firearms in the community.*

Exhibit 42
Page 01461

*(d) Sales of ammunition at a gun show or event shall comply with all applicable laws including Sections 30347, 30350, 30352, and 30360.*

SEC. 8.12.   Section 30350 of the Penal Code is amended to read:

30350.   ~~A~~ *An ammunition* vendor shall not sell or otherwise transfer ownership of, offer for sale or otherwise offer to transfer ownership of, or display for sale or display for transfer of ownership of any ~~handgun~~ ammunition in a manner that allows that ammunition to be accessible to a purchaser or transferee without the assistance of the vendor or an employee of the vendor.

SEC. 8.13.   Section 30352 of the Penal Code is amended to read:

30352.   (a) Commencing ~~February 1, 2011, a~~ *July 1, 2019, an ammunition* vendor shall not sell or otherwise transfer ownership of any ~~handgun~~ ammunition without, at the time of delivery, legibly recording the following information *on a form to be prescribed by the Department of Justice*:

(1) The date of the sale or other ~~transaction~~ *transfer*.

(2) The purchaser's or transferee's driver's license or other identification number and the state in which it was issued.

(3) The brand, type, and amount of ammunition sold or otherwise transferred.

(4) The purchaser's or transferee's *full name and* signature.

(5) The name of the salesperson who processed the sale or other transaction.

~~(6) The right thumbprint of the purchaser or transferee on the above form.~~

~~(7)~~ *(6)* The purchaser's or transferee's full residential address and telephone number.

~~(8)~~ *(7)* The purchaser's or transferee's date of birth.

*(b) Commencing July 1, 2019, an ammunition vendor shall electronically submit to the department the information required by subdivision (a) for all sales and transfers of ownership of ammunition. The department shall retain this information in a database to be known as the Ammunition Purchase Records File. This information shall remain confidential and may be used by the department and those entities specified in, and pursuant to, subdivision (b) or (c) of Section 11105, through the California Law Enforcement Telecommunications System, only for law enforcement purposes. The ammunition vendor shall not use, sell, disclose, or share such information for any other purpose other than the submission required by this subdivision without the express written consent of the purchaser or transferee.*

*(c) Commencing on July 1, 2019, only those persons listed in this subdivision, or those persons or entities listed in subdivision (e), shall be authorized to purchase ammunition. Prior to delivering any ammunition, an ammunition vendor shall require bona fide evidence of identity to verify that the person who is receiving delivery of the ammunition is a person or entity listed in subdivision (e) or one of the following:*

*(1) A person authorized to purchase ammunition pursuant to Section 30370.*

*(2) A person who was approved by the department to receive a firearm from the ammunition vendor, pursuant to Section 28220, if that vendor is a licensed firearms dealer,*

*and the ammunition is delivered to the person in the same transaction as the firearm.*

*(d) Commencing July 1, 2019, the ammunition vendor shall verify with the department, in a manner prescribed by the department, that the person is authorized to purchase ammunition by comparing the person's ammunition purchase authorization number to the centralized list of authorized ammunition purchasers. If the person is not listed as an authorized ammunition purchaser, the vendor shall deny the sale or transfer.*

~~(b)~~ *(e)* ~~Subdivision~~ *Subdivisions* (a) *and (d)* shall not apply to ~~or affect~~ sales or other transfers of ownership of ~~handgun~~ ammunition by ~~handgun~~ ammunition vendors to any of the following, if properly identified:

~~(1) A person licensed pursuant to Sections 26700 to 26915, inclusive.~~

~~(2)~~ *(1)* A ~~handgun~~ *An* ammunition vendor.

~~(3)~~ *(2)* A person who is on the centralized list *of exempted federal firearms licensees* maintained by the department pursuant to Article 6 (commencing with Section 28450) of Chapter 6 of Division 6 of this title.

~~(4)~~ *(3)* A ~~target facility that holds a business or regulatory license~~ *person who purchases or receives ammunition at a target facility holding a business or other regulatory license, provided that the ammunition is at all times kept within the facility's premises*.

~~(5)~~ *(4)* A gunsmith.

~~(6)~~ *(5)* A wholesaler.

~~(7)~~ *(6)* A manufacturer or importer of firearms *or ammunition* licensed pursuant to Chapter 44 (commencing with Section 921) of Title 18 of the United States Code, and the regulations issued pursuant thereto.

~~(8)~~ *(7)* An authorized law enforcement representative of a city, county, city and county, or state or federal government, if the sale or other transfer of ownership is for exclusive use by that government agency, and, prior to the sale, delivery, or transfer of the ~~handgun~~ ammunition, written authorization from the head of the agency authorizing the transaction is presented to the person from whom the purchase, delivery, or transfer is being made. Proper written authorization is defined as verifiable written certification from the head of the agency by which the purchaser, transferee, or person otherwise acquiring ownership is employed, identifying the employee as an individual authorized to conduct the transaction, and authorizing the transaction for the exclusive use of the agency by which that individual is employed.

*(8) A properly identified sworn peace officer, as defined in Chapter 4.5 (commencing with Section 830) of Title 3 of Part 2, or properly identified sworn federal law enforcement officer, who is authorized to carry a firearm in the course and scope of the officer's duties.*

*(f) (1) Proper identification is defined as verifiable written certification from the head of the agency by which the purchaser or transferee is employed, identifying the purchaser or transferee as a full-time paid peace officer who is authorized to carry a firearm in the course and scope of the officer's duties.*

*(2) The certification shall be delivered to the vendor at the time of purchase or transfer and the purchaser or transferee shall provide bona fide evidence of identity to verify that he or she is the person authorized in the certification.*

**63**

Exhibit 42
Page 01462

**63**

(3) The vendor shall keep the certification with the record of sale and submit the certification to the department.

(g) The department is authorized to adopt regulations to implement the provisions of this section.

SEC. 8.14.   Section 30363 is added to the Penal Code, to read:

30363.   Within 48 hours of discovery, an ammunition vendor shall report the loss or theft of any of the following items to the appropriate law enforcement agency in the city, county, or city and county where the vendor's business premises are located:

(1) Any ammunition that is merchandise of the vendor.

(2) Any ammunition that the vendor takes possession of pursuant to Section 30312.

(3) Any ammunition kept at the vendor's place of business.

SEC. 8.15.   Article 4 (commencing with Section 30370) is added to Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code, to read:

*Article 4.   Ammunition Purchase Authorizations*

30370.   (a) (1) Commencing on January 1, 2019, any person who is 18 years of age or older may apply to the Department of Justice for an ammunition purchase authorization.

(2) The ammunition purchase authorization may be used by the authorized person to purchase or otherwise seek the transfer of ownership of ammunition from an ammunition vendor, as that term is defined in Section 16151, and shall have no other force or effect.

(3) The ammunition purchase authorization shall be valid for four years from July 1, 2019, or the date of issuance, whichever is later, unless it is revoked by the department pursuant to subdivision (b).

(b) The ammunition purchase authorization shall be promptly revoked by the department upon the occurrence of any event which would have disqualified the holder from being issued the ammunition purchase authorization pursuant to this section. If an authorization is revoked, the department shall upon the written request of the holder state the reasons for doing so and provide the holder an appeal process to challenge that revocation.

(c) The department shall create and maintain an internal centralized list of all persons who are authorized to purchase ammunition and shall promptly remove from the list any persons whose authorization was revoked by the department pursuant to this section. The department shall provide access to the list by ammunition vendors for purposes of conducting ammunition sales or other transfers, and shall provide access to the list by law enforcement agencies for law enforcement purposes.

(d) The department shall issue an ammunition purchase authorization to the applicant if all of the following conditions are met:

(1) The applicant is 18 years of age or older.

(2) The applicant is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law.

(3) The applicant pays the fees set forth in subdivision (g).

(e) (1) Upon receipt of an initial or renewal application, the department shall examine its records, and the records it is authorized to request from the State Department of State Hospitals, pursuant to Section 8104 of the Welfare and Institutions Code, and if authorized, the National Instant Criminal Background Check System, as described in Section 922(t) of Title 18 of the United States Code, in order to determine if the applicant is prohibited from possessing or acquiring ammunition under subdivision (a) of Section 30305 or federal law.

(2) The applicant shall be approved or denied within 30 days of the date of the submission of the application to the department. If the application is denied, the department shall state the reasons for doing so and provide the applicant an appeal process to challenge that denial.

(3) If the department is unable to ascertain the final disposition of the application within 30 days of the applicant's submission, the department shall grant authorization to the applicant.

(4) The ammunition purchase authorization number shall be the same as the number on the document presented by the person as bona fide evidence of identity.

(f) The department shall renew a person's ammunition purchase authorization before its expiration, provided that the department determines that the person is not prohibited from acquiring or possessing ammunition under subdivision (a) of Section 30305 or federal law, and provided the applicant timely pays the renewal fee set forth in subdivision (g).

(g) The department may charge a reasonable fee not to exceed fifty dollars ($50) per person for the issuance of an ammunition purchase authorization or the issuance of a renewal authorization, however, the department shall not set these fees any higher than necessary to recover the reasonable, estimated costs to fund the ammunition authorization program provided for in this section and Section 30352, including the enforcement of this program and maintenance of any data systems associated with this program.

(h) The Ammunition Safety and Enforcement Special Fund is hereby created within the State Treasury. All fees received pursuant to this section shall be deposited into the Ammunition Safety and Enforcement Special Fund of the General Fund, and, notwithstanding Section 13340 of the Government Code, are continuously appropriated for purposes of implementing, operating and enforcing the ammunition authorization program provided for in this section and Section 30352, and for repaying the start-up loan provided for in Section 30371.

(i) The department shall annually review and may adjust all fees specified in subdivision (g) for inflation.

(j) The department is authorized to adopt regulations to implement the provisions of this section.

30371.   (a) There is hereby appropriated twenty-five million dollars ($25,000,000) from the General Fund as a loan for the start-up costs of implementing, operating and enforcing the provisions of the ammunition authorization program provided for in Sections 30352 and 30370.

(b) For purposes of repaying the loan, the Controller shall, after disbursing moneys necessary to implement, operate and enforce the ammunition authorization program provided for in Sections 30352 and 30370, transfer all proceeds from fees received by the Ammunition Safety and Enforcement Special Fund up to the amount of the loan provided by this section, including interest at the pooled money investment account rate, to the General Fund.

Exhibit 42
Page 01463

SEC. 8.16.   Article 5 (commencing with Section 30385) is added to Chapter 1 of Division 10 of Title 4 of Part 6 of the Penal Code, to read:

*Article 5.   Ammunition Vendor Licenses*

*30385.   (a) The Department of Justice is authorized to issue ammunition vendor licenses pursuant to this article. The department shall, commencing July 1, 2017, commence accepting applications for ammunition vendor licenses. If an application is denied, the department shall inform the applicant of the reason for denial in writing.*

*(b) The ammunition vendor license shall be issued in a form prescribed by the department and shall be valid for a period of one year. The department may adopt regulations to administer the application and enforcement provisions of this article. The license shall allow the licensee to sell ammunition at the location specified in the license or at a gun show or event as set forth in Section 30348.*

*(c) (1) In the case of an entity other than a natural person, the department shall issue the license to the entity, but shall require a responsible person to pass the background check pursuant to Section 30395.*

*(2) For purposes of this article, "responsible person" means a person having the power to direct the management, policies, and practices of the entity as it pertains to ammunition.*

*(d) Commencing January 1, 2018, a firearms dealer licensed pursuant to Sections 26700 to 26915, inclusive, shall automatically be deemed a licensed ammunition vendor, provided the dealer complies with the requirements of Article 2 (commencing with Section 30300) and Article 3 (commencing with Section 30342).*

*30390.   (a) The Department of Justice may charge ammunition vendor license applicants a reasonable fee sufficient to reimburse the department for the reasonable, estimated costs of administering the license program, including the enforcement of this program and maintenance of the registry of ammunition vendors.*

*(b) The fees received by the department pursuant to this article shall be deposited in the Ammunition Vendors Special Account, which is hereby created. Notwithstanding Section 13340 of the Government Code, the revenue in the fund is continuously appropriated for use by the department for the purpose of implementing, administering and enforcing the provisions of this article, and for collecting and maintaining information submitted pursuant to Section 30352.*

*(c) The revenue in the Firearms Safety and Enforcement Special Fund shall also be available upon appropriation to the department for the purpose of implementing and enforcing the provisions of this article.*

*30395.   (a) The Department of Justice is authorized to issue ammunition vendor licenses to applicants who the department has determined, either as an individual or a responsible person, are not prohibited from possessing, receiving, owning, or purchasing ammunition under subdivision (a) of Section 30305 or federal law, and who provide a copy of any regulatory or business license required by local government, a valid seller's permit issued by the State Board of Equalization, a federal firearms license if the person is federally licensed, and a certificate of eligibility issued by the department.*

*(b) The department shall keep a registry of all licensed ammunition vendors. Law enforcement agencies shall be*

*provided access to the registry for law enforcement purposes.*

*(c) An ammunition vendor license is subject to forfeiture for a breach of any of the prohibitions and requirements of Article 2 (commencing with Section 30300) or Article 3 (commencing with Section 30342).*

SEC. 9.   Nothing in this Act shall preclude or preempt a local ordinance that imposes additional penalties or requirements in regard to the sale or transfer of ammunition.

SEC. 10.   Securing Firearms From Prohibited Persons.

SEC. 10.1.   Section 1524 of the Penal Code is amended to read:

1524.   (a) A search warrant may be issued upon any of the following grounds:

(1) When the property was stolen or embezzled.

(2) When the property or things were used as the means of committing a felony.

(3) When the property or things are in the possession of any person with the intent to use them as a means of committing a public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing them from being discovered.

(4) When the property or things to be seized consist of an item or constitute evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony.

(5) When the property or things to be seized consist of evidence that tends to show that sexual exploitation of a child, in violation of Section 311.3, or possession of matter depicting sexual conduct of a person under 18 years of age, in violation of Section 311.11, has occurred or is occurring.

(6) When there is a warrant to arrest a person.

(7) When a provider of electronic communication service or remote computing service has records or evidence, as specified in Section 1524.3, showing that property was stolen or embezzled constituting a misdemeanor, or that property or things are in the possession of any person with the intent to use them as a means of committing a misdemeanor public offense, or in the possession of another to whom he or she may have delivered them for the purpose of concealing them or preventing their discovery.

(8) When the property or things to be seized include an item or evidence that tends to show a violation of Section 3700.5 of the Labor Code, or tends to show that a particular person has violated Section 3700.5 of the Labor Code.

(9) When the property or things to be seized include a firearm or other deadly weapon at the scene of, or at the premises occupied or under the control of the person arrested in connection with, a domestic violence incident involving a threat to human life or a physical assault as provided in Section 18250. This section does not affect warrantless seizures otherwise authorized by Section 18250.

(10) When the property or things to be seized include a firearm or  other deadly weapon that is owned by, or in the possession of, or in the custody or control of, a person described in subdivision (a) of Section 8102 of the Welfare and Institutions Code.

Exhibit 42
Page 01464

63

**63**

(11) When the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to Section 6389 of the Family Code, if a prohibited firearm is possessed, owned, in the custody of, or controlled by a person against whom a protective order has been issued pursuant to Section 6218 of the Family Code, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law.

(12) When the information to be received from the use of a tracking device constitutes evidence that tends to show that either a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code has been committed or is being committed, tends to show that a particular person has committed a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code, or will assist in locating an individual who has committed or is committing a felony, a misdemeanor violation of the Fish and Game Code, or a misdemeanor violation of the Public Resources Code. A tracking device search warrant issued pursuant to this paragraph shall be executed in a manner meeting the requirements specified in subdivision (b) of Section 1534.

(13) When a sample of the blood of a person constitutes evidence that tends to show a violation of Section 23140, 23152, or 23153 of the Vehicle Code and the person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by Section 23612 of the Vehicle Code, and the sample will be drawn from the person in a reasonable, medically approved manner. This paragraph is not intended to abrogate a court's mandate to determine the propriety of the issuance of a search warrant on a case-by-case basis.

(14) Beginning January 1, 2016, the property or things to be seized are firearms or ammunition or both that are owned by, in the possession of, or in the custody or control of a person who is the subject of a gun violence restraining order that has been issued pursuant to Division 3.2 (commencing with Section 18100) of Title 2 of Part 6, if a prohibited firearm or ammunition or both is possessed, owned, in the custody of, or controlled by a person against whom a gun violence restraining order has been issued, the person has been lawfully served with that order, and the person has failed to relinquish the firearm as required by law.

*(15) Beginning January 1, 2018, the property or things to be seized include a firearm that is owned by, or in the possession of, or in the custody or control of, a person who is subject to the prohibitions regarding firearms pursuant to Section 29800 or 29805, and the court has made a finding pursuant to paragraph (3) of subdivision (c) of Section 29810 that the person has failed to relinquish the firearm as required by law.*

(15) *(16)* When the property or things to be seized are controlled substances or a device, contrivance, instrument, or paraphernalia used for unlawfully using or administering a controlled substance pursuant to the authority described in Section 11472 of the Health and Safety Code.

(16) *(17)* (A) When all of the following apply:

(i) A sample of the blood of a person constitutes evidence that tends to show a violation of subdivision (b), (c), (d),

(e), or (f) of Section 655 of the Harbors and Navigation Code.

(ii) The person from whom the sample is being sought has refused an officer's request to submit to, or has failed to complete, a blood test as required by Section 655.1 of the Harbors and Navigation Code.

(iii) The sample will be drawn from the person in a reasonable, medically approved manner.

(B) This paragraph is not intended to abrogate a court's mandate to determine the propriety of the issuance of a search warrant on a case-by-case basis.

(b) The property, things, person, or persons described in subdivision (a) may be taken on the warrant from any place, or from any person in whose possession the property or things may be.

(c) Notwithstanding subdivision (a) or (b), no search warrant shall issue for any documentary evidence in the possession or under the control of any person who is a lawyer as defined in Section 950 of the Evidence Code, a physician as defined in Section 990 of the Evidence Code, a psychotherapist as defined in Section 1010 of the Evidence Code, or a member of the clergy as defined in Section 1030 of the Evidence Code, and who is not reasonably suspected of engaging or having engaged in criminal activity related to the documentary evidence for which a warrant is requested unless the following procedure has been complied with:

(1) At the time of the issuance of the warrant, the court shall appoint a special master in accordance with subdivision (d) to accompany the person who will serve the warrant. Upon service of the warrant, the special master shall inform the party served of the specific items being sought and that the party shall have the opportunity to provide the items requested. If the party, in the judgment of the special master, fails to provide the items requested, the special master shall conduct a search for the items in the areas indicated in the search warrant.

(2) (A) If the party who has been served states that an item or items should not be disclosed, they shall be sealed by the special master and taken to court for a hearing.

(B) At the hearing, the party searched shall be entitled to raise any issues that may be raised pursuant to Section 1538.5 as well as a claim that the item or items are privileged, as provided by law. The hearing shall be held in the superior court. The court shall provide sufficient time for the parties to obtain counsel and make motions or present evidence. The hearing shall be held within three days of the service of the warrant unless the court makes a finding that the expedited hearing is impracticable. In that case, the matter shall be heard at the earliest possible time.

(C) If an item or items are taken to court for a hearing, any limitations of time prescribed in Chapter 2 (commencing with Section 799) of Title 3 of Part 2 shall be tolled from the time of the seizure until the final conclusion of the hearing, including any associated writ or appellate proceedings.

(3) The warrant shall, whenever practicable, be served during normal business hours. In addition, the warrant shall be served upon a party who appears to have possession or control of the items sought. If, after reasonable efforts, the party serving the warrant is unable to locate the person, the special master shall seal and return to the court, for

Exhibit 42
Page 01465

**63**

determination by the court, any item that appears to be privileged as provided by law.

(d) (1) As used in this section, a "special master" is an attorney who is a member in good standing of the California State Bar and who has been selected from a list of qualified attorneys that is maintained by the State Bar particularly for the purposes of conducting the searches described in this section. These attorneys shall serve without compensation. A special master shall be considered a public employee, and the governmental entity that caused the search warrant to be issued shall be considered the employer of the special master and the applicable public entity, for purposes of Division 3.6 (commencing with Section 810) of Title 1 of the Government Code, relating to claims and actions against public entities and public employees. In selecting the special master, the court shall make every reasonable effort to ensure that the person selected has no relationship with any of the parties involved in the pending matter. Information obtained by the special master shall be confidential and may not be divulged except in direct response to inquiry by the court.

(2) In any case in which the magistrate determines that, after reasonable efforts have been made to obtain a special master, a special master is not available and would not be available within a reasonable period of time, the magistrate may direct the party seeking the order to conduct the search in the manner described in this section in lieu of the special master.

(e) Any search conducted pursuant to this section by a special master may be conducted in a manner that permits the party serving the warrant or his or her designee to accompany the special master as he or she conducts his or her search. However, that party or his or her designee may not participate in the search nor shall he or she examine any of the items being searched by the special master except upon agreement of the party upon whom the warrant has been served.

(f) As used in this section, "documentary evidence" includes, but is not limited to, writings, documents, blueprints, drawings, photographs, computer printouts, microfilms, X-rays, files, diagrams, ledgers, books, tapes, audio and video recordings, films, and papers of any type or description.

(g) No warrant shall issue for any item or items described in Section 1070 of the Evidence Code.

(h) Notwithstanding any other law, no claim of attorney work product as described in Chapter 4 (commencing with Section 2018.010) of Title 4 of Part 4 of the Code of Civil Procedure shall be sustained where there is probable cause to believe that the lawyer is engaging or has engaged in criminal activity related to the documentary evidence for which a warrant is requested unless it is established at the hearing with respect to the documentary evidence seized under the warrant that the services of the lawyer were not sought or obtained to enable or aid anyone to commit or plan to commit a crime or a fraud.

(i) Nothing in this section is intended to limit an attorney's ability to request an in-camera hearing pursuant to the holding of the Supreme Court of California in People v. Superior Court (Laff) (2001) 25 Cal.4th 703.

(j) In addition to any other circumstance permitting a magistrate to issue a warrant for a person or property in another county, when the property or things to be seized consist of any item or constitute evidence that tends to show a violation of Section 530.5, the magistrate may

issue a warrant to search a person or property located in another county if the person whose identifying information was taken or used resides in the same county as the issuing court.

(k) This section shall not be construed to create a cause of action against any foreign or California corporation, its officers, employees, agents, or other specified persons for providing location information.

SEC. 10.2.   Section 27930 of the Penal Code is amended to read:

27930.   Section 27545 does not apply to deliveries, transfers, or returns of firearms made pursuant to any of the following:

(a) Sections 18000 and 18005.

(b) Division 4 (commencing with Section 18250) of Title 2.

(c) Chapter 2 (commencing with Section 33850) of Division 11.

(d) Sections 34005 and 34010.

*(e) Section 29810.*

SEC. 10.3.   Section 29810 of the Penal Code is amended to read:

29810.   (a) For any person who is subject to Section 29800 or 29805, the court shall, at the time judgment is imposed, provide on a form supplied by the Department of Justice, a notice to the defendant prohibited by this chapter from owning, purchasing, receiving, possessing, or having under custody or control, any firearm. The notice shall inform the defendant of the prohibition regarding firearms and include a form to facilitate the transfer of firearms. If the prohibition on owning or possessing a firearm will expire on a date specified in the court order, the form shall inform the defendant that he or she may elect to have his or her firearm transferred to a firearms dealer licensed pursuant to Section 29830.

(b) Failure to provide the notice described in subdivision (a) is not a defense to a violation of this chapter.

*(c) This section shall be repealed effective January 1, 2018.*

SEC. 10.4.   Section 29810 is added to the Penal Code, to read:

*29810.   (a) (1) Upon conviction of any offense that renders a person subject to Section 29800 or Section 29805, the person shall relinquish all firearms he or she owns, possesses, or has under his or her custody or control in the manner provided in this section.*

*(2) The court shall, upon conviction of a defendant for an offense described in subdivision (a), instruct the defendant that he or she is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control, any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines, and shall order the defendant to relinquish all firearms in the manner provided in this section. The court shall also provide the defendant with a Prohibited Persons Relinquishment Form developed by the Department of Justice.*

*(3) Using the Prohibited Persons Relinquishment Form, the defendant shall name a designee and grant the designee power of attorney for the purpose of transferring or disposing of any firearms. The designee shall be either a local law enforcement agency or a consenting third party*

Exhibit 42
Page 01466

**63**

who is not prohibited from possessing firearms under state or federal law. The designee shall, within the time periods specified in subdivisions (d) and (e), surrender the firearms to the control of a local law enforcement agency, sell the firearms to a licensed firearms dealer, or transfer the firearms for storage to a firearms dealer pursuant to Section 29830.

(b) The Prohibited Persons Relinquishment Form shall do all of the following:

(1) Inform the defendant that he or she is prohibited from owning, purchasing, receiving, possessing, or having under his or her custody or control, any firearms, ammunition, and ammunition feeding devices, including but not limited to magazines, and that he or she shall relinquish all firearms through a designee within the time periods set forth in subdivision (d) or (e) by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830.

(2) Inform the defendant that any cohabitant of the defendant who owns firearms must store those firearms in accordance with Section 25135.

(3) Require the defendant to declare any firearms that he or she owned, possessed, or had under his or her custody or control at the time of his or her conviction, and require the defendant to describe the firearms and provide all reasonably available information about the location of the firearms to enable a designee or law enforcement officials to locate the firearms.

(4) Require the defendant to name a designee, if the defendant declares that he or she owned, possessed, or had under his or her custody or control any firearms at the time of his or her conviction, and grant the designee power of attorney for the purpose of transferring or disposing of all firearms.

(5) Require the designee to indicate his or her consent to the designation and, except a designee that is a law enforcement agency, to declare under penalty of perjury that he or she is not prohibited from possessing any firearms under state or federal law.

(6) Require the designee to state the date each firearm was relinquished and the name of the party to whom it was relinquished, and to attach receipts from the law enforcement officer or licensed firearms dealer who took possession of the relinquished firearms.

(7) Inform the defendant and the designee of the obligation to submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer within the time periods specified in subdivisions (d) and (e).

(c) (1) When a defendant is convicted of an offense described in subdivision (a), the court shall immediately assign the matter to a probation officer to investigate whether the Automated Firearms System or other credible information, such as a police report, reveals that the defendant owns, possesses, or has under his or her custody or control any firearms. The assigned probation officer shall receive the Prohibited Persons Relinquishment Form from the defendant or the defendant's designee, as applicable, and ensure that the Automated Firearms System has been properly updated to indicate that the defendant has relinquished those firearms.

(2) Prior to final disposition or sentencing in the case, the assigned probation officer shall report to the court whether the defendant has properly complied with the requirements of this section by relinquishing all firearms identified by the probation officer's investigation or declared by the defendant on the Prohibited Persons Relinquishment Form, and by timely submitting a completed Prohibited Persons Relinquishment Form. The probation officer shall also report to the Department of Justice on a form to be developed by the department whether the Automated Firearms System has been updated to indicate which firearms have been relinquished by the defendant.

(3) Prior to final disposition or sentencing in the case, the court shall make findings concerning whether the probation officer's report indicates that the defendant has relinquished all firearms as required, and whether the court has received a completed Prohibited Persons Relinquishment Form, along with the receipts described in paragraph (1) of subdivision (d) or paragraph (1) of subdivision (e). The court shall ensure that these findings are included in the abstract of judgment. If necessary to avoid a delay in sentencing, the court may make and enter these findings within 14 days of sentencing.

(4) If the court finds probable cause that the defendant has failed to relinquish any firearms as required, the court shall order the search for and removal of any firearms at any location where the judge has probable cause to believe the defendant's firearms are located. The court shall state with specificity the reasons for and scope of the search and seizure authorized by the order.

(5) Failure by a defendant to timely file the completed Prohibited Persons Relinquishment Form with the assigned probation officer shall constitute an infraction punishable by a fine not exceeding one hundred dollars ($100).

(d) The following procedures shall apply to any defendant who is a prohibited person within the meaning of paragraph (1) of subdivision (a) who does not remain in custody at any time within the five-day period following conviction:

(1) The designee shall dispose of any firearms the defendant owns, possesses, or has under his or her custody or control within five days of the conviction by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830, in accordance with the wishes of the defendant. Any proceeds from the sale of the firearms shall become the property of the defendant. The law enforcement officer or licensed dealer taking possession of any firearms pursuant to this subdivision shall issue a receipt to the designee describing the firearms and listing any serial number or other identification on the firearms at the time of surrender.

(2) If the defendant owns, possesses, or has under his or her custody or control any firearms to relinquish, the defendant's designee shall submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer within five days following the conviction, along with the receipts described in paragraph (1) of subdivision (d) showing the defendant's firearms were surrendered to a local law enforcement agency or sold or transferred to a licensed firearms dealer.

(3) If the defendant does not own, possess, or have under his or her custody or control any firearms to relinquish, he or she shall, within five days following conviction, submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, with a statement affirming that he or she has no firearms to be relinquished.

Exhibit 42
Page 01467

**63**

(e) The following procedures shall apply to any defendant who is a prohibited person within the meaning of paragraph (1) of subdivision (a) who is in custody at any point within the five-day period following conviction:

(1) The designee shall dispose of any firearms the defendant owns, possesses, or has under his or her custody or control within 14 days of the conviction by surrendering the firearms to the control of a local law enforcement agency, selling the firearms to a licensed firearms dealer, or transferring the firearms for storage to a firearms dealer pursuant to Section 29830, in accordance with the wishes of the defendant. Any proceeds from the sale of the firearms shall become the property of the defendant. The law enforcement officer or licensed dealer taking possession of any firearms pursuant to this subdivision shall issue a receipt to the designee describing the firearms and listing any serial number or other identification on the firearms at the time of surrender.

(2) If the defendant owns, possesses, or has under his or her custody or control any firearms to relinquish, the defendant's designee shall submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, within 14 days following conviction, along with the receipts described in paragraph (1) of subdivision (e) showing the defendant's firearms were surrendered to a local law enforcement agency or sold or transferred to a licensed firearms dealer.

(3) If the defendant does not own, possess, or have under his or her custody or control any firearms to relinquish, he or she shall, within 14 days following conviction, submit the completed Prohibited Persons Relinquishment Form to the assigned probation officer, with a statement affirming that he or she has no firearms to be relinquished.

(4) If the defendant is released from custody during the 14 days following conviction and a designee has not yet taken temporary possession of each firearm to be relinquished as described above, the defendant shall, within five days following his or her release, relinquish each firearm required to be relinquished pursuant to paragraph (1) of subdivision (d).

(f) For good cause, the court may shorten or enlarge the time periods specified in subdivisions (d) and (e), enlarge the time period specified in paragraph (3) of subdivision (c), or allow an alternative method of relinquishment.

(g) The defendant shall not be subject to prosecution for unlawful possession of any firearms declared on the Prohibited Persons Relinquishment Form if the firearms are relinquished as required.

(h) Any firearms that would otherwise be subject to relinquishment by a defendant under this section, but which are lawfully owned by a cohabitant of the defendant, shall be exempt from relinquishment, provided the defendant is notified that the cohabitant must store the firearm in accordance with Section 25135.

(i) A law enforcement agency shall update the Automated Firearms System to reflect any firearms that were relinquished to the agency pursuant to this section. A law enforcement agency shall retain a firearm that was relinquished to the agency pursuant to this section for 30 days after the date the firearm was relinquished. After the 30-day period has expired, the firearm is subject to destruction, retention, sale or other transfer by the agency, except upon the certificate of a judge of a court of record, or of the district attorney of the county, that the retention of the firearm is necessary or proper to the ends of justice,

or if the defendant provides written notice of an intent to appeal a conviction for an offense described in subdivision (a), or if the Automated Firearms System indicates that the firearm was reported lost or stolen by the lawful owner. If the firearm was reported lost or stolen, the firearm shall be restored to the lawful owner, as soon as its use as evidence has been served, upon the lawful owner's identification of the weapon and proof of ownership, and after the law enforcement agency has complied with Chapter 2 (commencing with Section 33850) of Division 11 of Title 4. The agency shall notify the Department of Justice of the disposition of relinquished firearms pursuant to Section 34010.

(j) A city, county, or city and county, or a state agency may adopt a regulation, ordinance, or resolution imposing a charge equal to its administrative costs relating to the seizure, impounding, storage, or release of a firearm pursuant to Section 33880.

(k) This section shall become operative on January 1, 2018.

SEC. 11.   Theft of Firearms.

SEC. 11.1.   Section 490.2 of the Penal Code is amended to read:

(a) Notwithstanding Section 487 or any other provision of law defining grand theft, obtaining any property by theft where the value of the money, labor, real or personal property taken does not exceed nine hundred fifty dollars ($950) shall be considered petty theft and shall be punished as a misdemeanor, except that such person may instead be punished pursuant to subdivision (h) of Section 1170 if that person has one or more prior convictions for an offense specified in clause (iv) of subparagraph (C) of paragraph (2) of subdivision (e) of Section 667 or for an offense requiring registration pursuant to subdivision (c) of Section 290.

(b) This section shall not be applicable to any theft that may be charged as an infraction pursuant to any other provision of law.

(c) This section shall not apply to theft of a firearm.

SEC. 11.2.   Section 29805 of the Penal Code is amended to read:

29805.   Except as provided in Section 29855 or subdivision (a) of Section 29800, any person who has been convicted of a misdemeanor violation of Section 71, 76, 136.1, 136.5, or 140, subdivision (d) of Section 148, Section 171b, paragraph (1) of subdivision (a) of Section 171c, 171d, 186.28, 240, 241, 242, 243, 243.4, 244.5, 245, 245.5, 246.3, 247, 273.5, 273.6, 417, 417.6, 422, 626.9, 646.9, or 830.95, subdivision (a) of former Section 12100, as that section read at any time from when it was enacted by Section 3 of Chapter 1386 of the Statutes of 1988 to when it was repealed by Section 18 of Chapter 23 of the Statutes of 1994, Section 17500, 17510, 25300, 25800, 30315, or 32625, subdivision (b) or (d) of Section 26100, or Section 27510, or Section 8100, 8101, or 8103 of the Welfare and Institutions Code, any firearm-related offense pursuant to Sections 871.5 and 1001.5 of the Welfare and Institutions Code, *Section 490.2 if the property taken was a firearm,* or of the conduct punished in subdivision (c) of Section 27590, and who, within 10 years of the conviction, owns, purchases, receives, or has in possession or under custody or control, any firearm is guilty of a public offense, which shall be punishable by imprisonment in a county jail not exceeding one year or in the state prison, by a fine not

Exhibit 42
Page 01468

exceeding one thousand dollars ($1,000), or by both that imprisonment and fine. The court, on forms prescribed by the Department of Justice, shall notify the department of persons subject to this section. However, the prohibition in this section may be reduced, eliminated, or conditioned as provided in Section 29855 or 29860.

SEC. 12.   Interim Standards.

Notwithstanding the Administrative Procedure Act (APA), and in order to facilitate the prompt implementation of the Safety for All Act of 2016, the California Department of Justice may adopt interim standards without compliance with the procedures set forth in the APA. The interim standards shall remain in effect for no more than two years, and may be earlier superseded by regulations adopted pursuant to the APA. "Interim standards" means temporary standards that perform the same function as "emergency regulations" under the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code), except that in order to provide greater opportunity for public comment on permanent regulations, the interim standards may remain in force for two years rather than 180 days.

SEC. 13.   Amending the Measure.

This Act shall be broadly construed to accomplish its purposes. The provisions of this measure may be amended by a vote of 55 percent of the members of each house of the Legislature and signed by the Governor so long as such amendments are consistent with and further the intent of this Act.

SEC. 14.   Conflicting Measures.

(a)  In the event that this measure and another measure on the same subject matter, including but not limited to the regulation of the sale or possession of firearms or ammunition, shall appear on the same statewide ballot, the provisions of the other measure or measures shall be deemed to be in conflict with this measure. In the event that this measure receives a greater number of affirmative votes than a measure deemed to be in conflict with it, the provisions of this measure shall prevail in their entirety, and the other measure or measures shall be null and void.

(b)  If this measure is approved by voters but superseded by law by any other conflicting measure approved by voters at the same election, and the conflicting ballot measure is later held invalid, this measure shall be self-executing and given full force and effect.

SEC. 15.   Severability.

If any provision of this measure, or part of this measure, or the application of any provision or part to any person or circumstance, is for any reason held to be invalid or unconstitutional, the remaining provisions, or applications of provisions, shall not be affected, but shall remain in full force and effect, and to this end the provisions of this measure are severable.

SEC. 16.   Proponent Standing.

Notwithstanding any other provision of law, if the State, government agency, or any of its officials fail to defend the constitutionality of this Act, following its approval by the voters, any other government employer, the proponent, or in their absence, any citizen of this State shall have the authority to intervene in any court action challenging the constitutionality of this Act for the purpose of defending its constitutionality, whether such action is in trial court, on appeal, or on discretionary review by the Supreme Court

of California or the Supreme Court of the United States. The reasonable fees and costs of defending the action shall be a charge on funds appropriated to the Department of Justice, which shall be satisfied promptly.

# PROPOSITION 64

This initiative measure is submitted to the people in accordance with the provisions of Section 8 of Article II of the California Constitution.

This initiative measure amends, repeals, and adds sections to the Business and Professions Code, the Food and Agricultural Code, the Health and Safety Code, the Labor Code, the Revenue and Taxation Code, and the Water Code; therefore, existing provisions proposed to be deleted are printed in ~~strikeout type~~ and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

## PROPOSED LAW

SECTION 1.   Title.

This measure shall be known and may be cited as the Control, Regulate and Tax Adult Use of Marijuana Act ("the Adult Use of Marijuana Act").

SEC. 2.   Findings and Declarations.

A.  Currently in California, nonmedical marijuana use is unregulated, untaxed, and occurs without any consumer or environmental protections. The Control, Regulate and Tax Adult Use of Marijuana Act will legalize marijuana for those over 21 years old, protect children, and establish laws to regulate marijuana cultivation, distribution, sale and use, and will protect Californians and the environment from potential dangers. It establishes the Bureau of Marijuana Control within the Department of Consumer Affairs to regulate and license the marijuana industry.

B.  Marijuana is currently legal in our state for medical use and illegal for nonmedical use. Abuse of the medical marijuana system in California has long been widespread, but recent bipartisan legislation signed by Governor Jerry Brown is establishing a comprehensive regulatory scheme for medical marijuana. The Control, Regulate and Tax Adult Use of Marijuana Act (hereafter called the Adult Use of Marijuana Act) will consolidate and streamline regulation and taxation for both nonmedical and medical marijuana.

C.  Currently, marijuana growth and sale is not being taxed by the State of California, which means our state is missing out on hundreds of millions of dollars in potential tax revenue every year. The Adult Use of Marijuana Act will tax both the growth and sale of marijuana to generate hundreds of millions of dollars annually. The revenues will cover the cost of administering the new law and will provide funds to: invest in public health programs that educate youth to prevent and treat serious substance abuse; train local law enforcement to enforce the new law with a focus on DUI enforcement; invest in communities to reduce the illicit market and create job opportunities; and provide for environmental cleanup and restoration of public lands damaged by illegal marijuana cultivation.

D.  Currently, children under the age of 18 can just as easily purchase marijuana on the black market as adults can. By legalizing marijuana, the Adult Use of Marijuana Act will incapacitate the black market, and move marijuana purchases into a legal structure with strict safeguards against children accessing it. The Adult Use of Marijuana Act prohibits the sale of nonmedical marijuana to those

Exhibit 42
Page 01469

# Exhibit 43

Exhibit 43
Page 01470



Exhibit 43
Page 01471

sentenced to 12 months' confinement and a reduction to the lowest possible rank, E-1.

from the Air Force.

Antonio. He passed federal background in both cases, according to a statement released by the store.

vehicle. The police recovered two additional handguns from the car.

buying the rifle he used in the massacre.



OCT. 1, 2017

Fifty-eight people were killed and more than 500 were wounded when Stephen Paddock, from a perch high in a hotel, opened fire onto a crowd of concertgoers at an outdoor music festival in Las Vegas. Authorities recovered an arsenal of weapons — at least 23 from his hotel room — including AR-15-style rifles.

RELATED ARTICLE

| SINCE 1982 | WITHIN A YEAR OF THE SHOOTING | OCT. 1 | AFTER THE SHOOTING |
|---|---|---|---|
| Mr. Paddock started buying firearms in 1982, said Jill Snyder, a special agent in charge at the Bureau of Alcohol, Tobacco, Firearms and Explosives. | Mr. Paddock legally purchased 33 firearms from Oct. 2016 to Sept. 2017, Ms. Snyder said. Most of those guns were rifles. Such purchases do not prompt reports to the bureau because there is no federal law requiring a seller to alert the bureau when a person buys multiple rifles. | Fifty-eight people were killed when Mr. Paddock fired onto the crowd of more than 22,000 from his hotel room at the Mandalay Bay Resort and Casino in Las Vegas. He used at least one semiautomatic rifle modified to fire like an automatic weapon by attaching a "bump stock," not shown above. | Authorities retrieved 47 guns from the hotel room and Mr. Paddock's homes in Mesquite and Verdi, Nev. The bureau found Mr. Paddock purchased most of the guns in Nevada, Utah, California and Texas. Twelve of the rifles recovered from the hotel were each outfitted with a bump stock. |



JUNE 12, 2016

Forty-nine people were killed and 53 wounded when Omar Mateen opened fire at a crowded gay nightclub in Orlando, Fla. He used two guns: a Sig Sauer AR-15-style assault rifle and a Glock handgun.

RELATED ARTICLE



| 2013 | A FEW DAYS BEFORE THE SHOOTING | JUNE 12, 2016 |
|---|---|---|
| The F.B.I. learned that Mr. Mateen had made comments to co-workers alleging possible terrorist ties, an official said. The next year, the F.B.I. investigated him again for possible ties to an American who went to Syria to fight for an extremist group, but authorities concluded that he "did not constitute a substantive threat at that time." | Mr. Mateen legally bought two guns, a federal official said. "He is not a prohibited person, so he can legally walk into a gun dealership and acquire and purchase firearms," said Trevor Velinor, an agent at the Bureau of Alcohol, Tobacco, Firearms and Explosives. | Forty-nine people were killed and 53 more were wounded in the crowded nightclub. Mr. Mateen was killed inside the club by the police. |

Exhibit 43
Page 01472





DEC. 2, 2015

Syed Rizwan Farook and Tashfeen
Malik, husband and wife, killed 14
people at a holiday office party in
San Bernardino, Calif. Four guns
were recovered: a Smith & Wesson
M&P assault rifle, a DPMS Panther
Arms assault rifle, a Smith &
Wesson handgun and a Llama
handgun.

RELATED ARTICLE

| BEFORE THE SHOOTING | BETWEEN 2007 AND 2012 | BETWEEN 2007 AND 2012 | DEC. 2, 2015 |
|---|---|---|---|
| "We believe that both subjects were radicalized and for quite some time," said David Bowdich, the F.B.I. assistant director. The attackers are not known to have had previous contact with law enforcement. | Mr. Farook ==bought the two handguns legally== in California, federal officials said. The guns were purchased at Annie's Get Your Gun, a gun store in Corona, Calif., The Los Angeles Times reported. | Enrique Marquez, a former neighbor of Mr. Farook's family, bought the two assault rifles in California, officials said. Mr. Marquez was later charged with lying about the rifle purchases and supplying the assault weapons to the attackers. | The couple killed 14 people at a holiday party. Moments before the attack began, Ms. Malik posted an oath of allegiance to the Islamic State on Facebook. |



OCT. 1, 2015

Christopher Harper-Mercer, 26, killed nine people at Umpqua
Community College in Oregon, where he was a student. He was
armed with six guns, including a Glock pistol, a Smith & Wesson
pistol, a Taurus pistol and a Del-Ton assault rifle, according to The
Associated Press.

RELATED ARTICLE

| 2008 | 2009 | BEFORE SHOOTING | OCT. 1, 2015 |
|---|---|---|---|
| Mr. Harper-Mercer was in the Army for one month, but was discharged before completing basic training. | He graduated from the Switzer Learning Center in Torrance, Calif., which teaches students with learning disabilities and emotional issues. | In all, Mr. Harper-Mercer owned 14 firearms, ==all of which were bought legally through a federally licensed firearms dealer==, a federal official said. Some were bought by Mr. Harper-Mercer, and some by members of his family. | He killed nine people in Roseburg, Ore. |

AUG. 26, 2015

Vester Lee Flanagan II, 41, shot and
killed a Roanoke, Va., television
reporter and a cameraman with a
Glock handgun while they were
reporting a story live.

RELATED ARTICLE



| 2000 | 2012 | JUNE 2015 | AUG. 26, 2015 |
|---|---|---|---|
| Mr. Flanagan filed a lawsuit against a TV station in Tallahassee, Fla., that had fired him, alleging he was the victim of | He was hired at WDBJ in Roanoke, but within months his bosses had documented problems with his harsh language | Federal officials said Mr. Flanagan ==bought the gun legally from a licensed dealer==. He had not been convicted of a crime or | Mr. Flanagan killed the reporter and cameraman, injured a woman who was being interviewed and died after shooting himself. |

Exhibit 43
Page 01473

racial slurs and bullying.

aggressive behavior. He was later fired and filed another harassment lawsuit.

determined to be mentally ill.

JULY 23, 2015

Using a .40-caliber semiautomatic pistol bought from a pawnshop, John R. Houser killed two people and wounded nine others at a movie theater in Lafayette, La.

RELATED ARTICLE



2006
Mr. Houser was denied a state-issued concealed weapons permit because he was accused of domestic violence and soliciting arson.

2008
A judge ordered him sent to a psychiatric hospital.

2014
Mr. Houser bought the weapon in Alabama. Officials said it had been purchased legally, though he had been denied a concealed weapons permit earlier, and despite concerns among family members that he was violent and mentally ill.

JULY 23, 2015
He killed two people in Lafayette.

JUNE 17, 2015

Dylann Roof, 21, killed nine people with a .45-caliber Glock pistol at a historic black church in Charleston, S.C.

RELATED ARTICLE



FEBRUARY 2015
Mr. Roof was charged with a misdemeanor for possessing Suboxone, a prescription drug frequently sold in illegal street transactions.

APRIL 2015
He purchased a gun from a store in West Columbia, S.C. Mr. Roof should have been barred from buying a gun because he had admitted to possessing drugs, but the F.B.I. examiner conducting the required background check failed to obtain the police report from the February incident.

JUNE 17, 2015
Mr. Roof joined a Bible study group at Emanuel A.M.E. Church and opened fire with the gun he bought in April.

OCT. 24, 2014

Jaylen Ray Fryberg, 15, used his father's Beretta pistol to shoot and kill four students in his high school's cafeteria in Marysville, Wash.

RELATED ARTICLE



2002
Raymond Lee Fryberg Jr., Jaylen's father, was the subject of a permanent domestic violence protection order, which should have been entered into the federal criminal background database.

2013
Mr. Fryberg applied to buy the Beretta from a gun shop on the Indian reservation where he lived with Jaylen. A background check failed to come up with the protection order because it was never entered into the system.

OCT. 24, 2014
Jaylen Fryberg texted five of his fellow students to come to the cafeteria, where he opened fire.

Exhibit 43
Page 01474

APRIL 2, 2014

Specialist Ivan Antonio Lopez opened fire at Fort Hood with a Smith & Wesson semiautomatic pistol, killing three people and wounding 16 others.

RELATED ARTICLE



2011
Specialist Lopez came back from a four-month deployment to Iraq and told his superiors that he had suffered a traumatic head injury there. Military officials said he had never seen combat and was being evaluated for possible post-traumatic stress disorder.

MARCH 2014
Specialist Lopez had seen a military psychiatrist as recently as the month before the shooting. He was being treated for depression and anxiety, and had been prescribed Ambien to help him sleep.

MARCH 1, 2014
Mr. Lopez legally bought his gun at the same shop where Nidal Malik Hasan, an Army major, had bought at least one of the weapons used in a 2009 mass shooting on the base that killed 13 people.

APRIL 2, 2014
Around 4 p.m., Mr. Lopez started firing on soldiers.



SEPT. 16, 2013

Aaron Alexis, 34, used a Remington shotgun to kill 12 people at the Washington Navy Yard.

RELATED ARTICLE

2011
Mr. Alexis was given an honorable discharge after showing what Navy officials called a "pattern of misbehavior" during four years as a reservist.

A MONTH BEFORE THE SHOOTING
He twice sought treatment from the Department of Veterans Affairs for psychiatric issues. He told police in Rhode Island that people were pursuing him and sending vibrations through the walls of his hotel.

SEPT. 2013
He was stopped from buying an assault rifle at a Virginia gun store, but was allowed to buy a shotgun. He passed local and state background checks.

SEPT. 16, 2013
He killed 12 people at the Navy Yard.

DEC. 14, 2012

Adam Lanza, 20, shot and killed his mother in their home, then killed 26 people, mostly children, at Sandy Hook Elementary School in Newtown, Conn., using a Bushmaster XM-15 rifle and a .22-caliber Savage Mark II rifle.

RELATED ARTICLE

2009
Mr. Lanza graduated from high school. Some classmates said he had been bullied in high school. He struggled with a developmental disorder and was described as acutely shy, not known to have close friends.

AFTER HIGH SCHOOL
He was "completely untreated in the years before the shooting" for psychiatric and physical ailments like anxiety and obsessive-compulsive disorder, a state report found.

BEFORE THE SHOOTING
His mother, Nancy Lanza, a gun enthusiast, legally obtained and registered a large collection of weapons, and would often take her sons to shooting ranges.

DEC. 14, 2012
Mr. Lanza used his mother's guns to kill her and 26 others.

AUG. 5, 2012

Wade M. Page, 40, killed six people with a Springfield Armory semiautomatic handgun when he opened fire in the lobby of a Sikh temple in Oak Creek, Wis., as congregants arrived for Sunday



Exhibit 43
Page 01475

services.

RELATED ARTICLE

| | | | |
|---|---|---|---|
| 1994 | EARLY 2000S | JULY 2012 | AUG. 5, 2012 |
| While in the Army at Fort Bliss in El Paso, Tex., Mr. Page was charged with criminal mischief after kicking holes in the wall of a bar. He pleaded guilty. | He came to the attention of authorities because of his affiliation with a white-power band called End Apathy, which performed songs with violent lyrics. | He bought the firearm legally at a gun shop outside Milwaukee. He passed a background check and paid $650 in cash. | He killed six people and wounded three others at the temple. |





JULY 20, 2012

James E. Holmes, 24, killed 12 people and wounded 70 at a theater in Aurora, Colo., using a Smith & Wesson semiautomatic rifle, a Remington shotgun and a Glock .40-caliber semiautomatic pistol.

RELATED ARTICLE



| | | | |
|---|---|---|---|
| MARCH 2012 | MAY 2012 | MAY 2012 | JULY 20, 2012 |
| Over four months, Mr. Holmes legally bought more than 3,000 rounds of ammunition for handguns, 3,000 rounds for a semiautomatic rifle and 350 shells for a 12-gauge shotgun, all over the Internet. | He was seeing a psychiatrist and in the process of withdrawing from a graduate program at the University of Colorado Denver's Anschutz Medical Campus. | In the 60 days before the shooting, he bought four guns legally at local gun shops. Seeing a psychiatrist, even for a serious mental illness, would not disqualify him from buying a gun. | He opened fire in the theater, killing 12 people. |

APRIL 2, 2012

One L. Goh, 43, opened fire with a semiautomatic handgun at a small religious college in Oakland, Calif., where he had been a student. He killed seven people.

RELATED ARTICLE



| | | | |
|---|---|---|---|
| BEFORE SHOOTING | EARLY 2012 | APRIL 2, 2012 | JAN. 2013 |
| "He was a loner and what some might call a loser, but he didn't exhibit any behaviors that would have alerted anyone," a district attorney told reporters after the shooting, according to CNN. | Mr. Goh legally bought the handgun at a gun store in Castro Valley, Calif., passing a federal background check. | He killed seven people at Oikos University in Oakland. | A judge ruled he was not fit for trial after two psychiatric evaluations concluded that he had paranoid schizophrenia. |

Exhibit 43
Page 01476

JAN. 8, 2011

Jared L. Loughner, 22, killed six people with a Glock handgun in a supermarket parking lot in Tucson, Ariz., at an event for Gabrielle Giffords, who was a Democratic representative from Arizona.

RELATED ARTICLE



| 2007 | OCT. 2010 | NOV. 30, 2010 | JAN. 8, 2011 |
|---|---|---|---|
| Mr. Loughner was arrested for possession of drug paraphernalia, but the charges were dropped. The next year, he failed a drug test when trying to enlist in the Army. Neither incident barred him from buying a gun. | He was forced to withdraw from community college because of campus officials' fears about the safety of the staff and students, his parents later said. The incident would not have shown up on a background check. | He ==passed a background check== and bought the handgun at a store in Tucson, Ariz. | He killed six people in Tucson. |

NOV. 5, 2009

Maj. Nidal Malik Hasan, 39, an Army psychiatrist facing deployment to Afghanistan, opened fire inside a medical processing building at Fort Hood in central Texas, killing 13 people and wounding 43 others. He was armed with an FN Herstal pistol.

RELATED ARTICLE



| DEC. 2008-JUNE 2009 | JUNE 2009 | JULY 31, 2009 | NOV. 5, 2009 |
|---|---|---|---|
| Intelligence agencies intercepted 10 to 20 messages between Mr. Hasan and Anwar al-Awlaki, a radical cleric in Yemen known for his incendiary anti-American teachings. | Federal authorities dropped an inquiry about the messages after deciding that they did not suggest any threat of violence. | Mr. Hasan ==bought the pistol legally== at a popular weapons store in Killeen, Tex., paying more than $1,100. | He shot and killed 13 people at Fort Hood. |

APRIL 3, 2009

Jiverly Wong, 41, fired at least 98 shots from two handguns, a Beretta 92 FS 9-millimeter pistol and a Beretta PX4 Storm pistol, inside a civic association in Binghamton, N.Y., where he had taken an English class. He killed 13 former classmates and association employees.

RELATED ARTICLE

 

| BEFORE THE SHOOTING | MARCH 2009 | MARCH 2009 | APRIL 3, 2009 |
|---|---|---|---|
| Mr. Wong had been arrested, cited or had some minor contact with the police at least five times since 1990, but details about the cases remain unclear. At the time of the shootings, he was not a subject in any investigation, nor did he have a documented mental health issue. | Mr. Wong bought the first gun, the Beretta 92, at a store in Johnson City, N.Y. ==He passed a background check.== | Mr. Wong bought the second gun from the same store, but his background check was not approved immediately. ==He received the gun under a federal rule that allows a gun to be sold if the background check system does not return a decision in three business days.== | He killed 13 people in Binghamton. |

Exhibit 43
Page 01477

Note: Information on the precise version or year of manufacture of each gun was not always available, so a version of the model or a similar one is shown. The handguns used by Christopher Harper-Mercer are omitted because the models have not been released. The guns shown for Adam Lanza do not include the gun he used to shoot himself.

Source: Government and law enforcement officials

Additional work by Wilson Andrews, Sarah Almukhtar, Alicia DeSantis, Guilbert Gates, Josh Katz, Julie Shaver and Karen Yourish.

**Orlando Shooting**



Why the Orlando Shooting Was So Deadly   APRIL 29, 2018

What Happened Inside the Orlando Nightclub   APRIL 20, 2017

How Many People Have Been Killed in ISIS Attacks Around the World   JULY 16, 2016

ISIS in America   JUNE 15, 2018

Orlando Gunman Was 'Cool and Calm' After Massacre...
JAN. 25, 2018
The Orlando police chief offered new details on the worst shooting in United States history, and other officials said that all but one of...

McDonald's FREE COUPONS!   Get Coupons   BeFrugal.com

© 2018 The New York Times Company   Contact Us   Work With Us   Advertise   Your Ad Choices   Privacy   Terms of Service   Terms of Sale         Site Map   Help   Site Feedback   Subscriptions

Exhibit 43
Page 01478