1    Neal A. Potischman (SBN 254862)
     DAVIS POLK & WARDWELL LLP
2    1600 El Camino Real
     Menlo Park, California 94025
3    Phone: (650) 752-2000
     Fax: (650) 752-2156
4    neal.potischman@davispolk.com

5    *Attorneys for Amicus Curiae*
     *Everytown for Gun Safety*
6

7

8              **UNITED STATES DISTRICT COURT**

9        **FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

10

11   VIRGINIA DUNCAN, et al.,                    No. 3:17-cv-01017-BEN-JLB

12                  Plaintiffs,

13               - v. -                           **BRIEF OF AMICUS CURIAE**
                                                  **EVERYTOWN FOR GUN SAFETY**
14   XAVIER BECERRA, ATTORNEY GENERAL OF          **IN SUPPORT OF DEFENDANT'S**
     THE STATE OF CALIFORNIA,                     **OPPOSITION TO PLAINTIFFS'**
15                                                **MOTION FOR SUMMARY**
                    Defendant.                    **JUDGMENT OR,**
16                                                **ALTERNATIVELY, PARTIAL**
                                                  **SUMMARY JUDGMENT**
17

18

19

20

21

22

23

24

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CORPORATE DISCLOSURE STATEMENT**

Everytown for Gun Safety has no parent corporation.  It is not a publicly held corporation, has no stock and, therefore, no publicly held company owns ten percent or more of its stock.

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES ......................................................................... ii

INTEREST OF AMICUS CURIAE ...............................................................1

INTRODUCTION .........................................................................................2

ARGUMENT .................................................................................................4

I.  California's Prohibition of Large-Capacity Magazines Is Part of a Longstanding History of Identical and Analogous Prohibitions...................................4

    A.  There Is a Longstanding Tradition of Prohibiting Firearms Capable of Quickly Firing Multiple Rounds Without Reloading .......................................5

    B.  Proposition 63 Is Consistent with Centuries of Laws Prohibiting Weapons Deemed to Be Especially Dangerous......................................................8

II.  The "Common Use" Test Is Illogical and Should Not Be Followed...........................9

III.  Use of Large Capacity Magazines Makes Mass Shootings and Other Incidents of Gun Violence Deadlier, as Shown by the Mayors' Survey and Other Research .........................12

    A.  The Mayors' Survey Shows that the Use of LCMs In Mass Shootings Results in More Deaths and More Injuries ...........................12

    B.  Social Science Research Shows LCMs Pose a Serious Risk to Public Safety ...............................16

CONCLUSION.............................................................................................18

i

# TABLE OF AUTHORITIES

### CASES

PAGE(S)

*Aymette v. State,*
   21 Tenn. 154 (1840)..................................................................................8

*Bauer v. Becerra,*
   858 F.3d 1216 (9th Cir. 2017) ................................................................3

*Caetano v. Massachusetts,*
   136 S. Ct. 1027 (2016)............................................................................9

*City of Renton v. Playtime Theatres, Inc.,*
   475 U.S. 41 (1986)................................................................................11

*Cockrum v. State,*
   24 Tex. 394 (1859)..................................................................................8

*District of Columbia v. Heller,*
   554 U.S. 570 (2008).................................................................3, 4, 5, 9, 10

*Duncan v. Becerra,*
   265 F. Supp. 3d 1106 (S.D. Cal. 2017)........................................ *passim*

*Friedman v. City of Highland Park,*
   784 F.3d 406 (7th Cir. 2015) ......................................................... *passim*

*Friedman v. City of Highland Park,*
   136 S. Ct. 447 (2015)..............................................................................9

*Fyock v. City of Sunnyvale,*
   779 F.3d 991 (9th Cir. 2015) ...............................................................2, 4

*Heller v. District of Columbia,*
   670 F.3d 1244 (D.C. Cir. 2011)...............................................................2

*Jackson v. City & Cty. of San Francisco,*
   746 F.3d 953 (9th Cir. 2014) ................................................................11

*Kolbe v. Hogan,*
   849 F.3d 114 (4th Cir. 2017) (en banc) ......................................... *passim*

ii

*Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives,*
   700 F.3d 185 (5th Cir. 2012) ...................................................................4

*N.Y. State Rifle & Pistol Ass'n v. Cuomo,*
   804 F.3d 242 (2d Cir. 2015)................................................................2, 12

*Teixeira v. Cty. of Alameda,*
   873 F.3d 670 (9th Cir. 2017) (en banc) *petition for cert. filed,* No. 17-982 (Jan. 8, 2018).......5

*United States v. Chester,*
   628 F.3d 673 (4th Cir. 2010) ...................................................................4

*United States v. Chovan,*
   735 F.3d 1127 (9th Cir. 2013) .................................................................3

*United States v. Marzzarella,*
   614 F.3d 85 (3d Cir. 2010).......................................................................4

*United States v. Miller,*
   307 U.S. 174 (1939).................................................................................7

*United States v. Skoien,*
   614 F.3d 638 (7th Cir. 2010) (en banc) ...................................................4

*Wiese v. Becerra,*
   263 F. Supp. 3d 986 (E.D. Cal. 2017)......................................................2

*Worman v. Healey,*
   — F. Supp. 3d —, 2018 WL 1663445 (D. Mass. Apr. 5, 2018)...................2, 10, 12

STATUTES & RULES

7 Ric. 2, 35, ch. 13 (1383).............................................................................8

33 Hen. 8, ch. 6, § 1 (1541) ..........................................................................8

47 Stat. 650, ch. 465, §§ 1, 14 (1932) ...........................................................6

48 Stat. 1236, 1246 (1934)............................................................................7

1763-1775 N.J. Laws 346 .............................................................................8

1837 Ala. Laws 7, § 1 ...................................................................................8

iii

1837 Ga. Laws 90 ...................................................................................8

1837-1838 Tenn. Pub. Acts 200 .............................................................8

1879 Tenn. Pub. Acts 135, ch. 96, § 1 ..................................................8

1881 Ark. Acts § 1909 .............................................................................8

1903 S.C. Acts 127, § 1 ..........................................................................9

1907 Ala. Law 80, § 1 .............................................................................9

1909 Me. Laws 141 ..................................................................................9

1911 N.Y. Laws 442, ch. 195, § 1 .........................................................9

1912 Vt. Acts & Resolves 310, § 1 ........................................................9

1913 Iowa Acts 307, ch. 297, § 2 ..........................................................9

1913 Minn. Laws 55 ................................................................................9

1916 N.Y. Laws 338-39, ch. 137, § 1 ...................................................9

1917 Cal. Stat. 221, ch. 145, § 1 ...........................................................9

1917 Minn. Laws 614, ch. 243, § 1 .......................................................9

1926 Mass. Acts 256, ch. 261 ................................................................9

1927 Cal. Stat. 938, ch. 552, §§ 1-2 ......................................................6

1927 Mich. Pub. Acts 887, § 3...........................................................6, 9

1927 Mich. Pub. Acts 888-89, § 3 .........................................................9

1927 R.I. Pub. Laws 256, § 1 .............................................................6, 9

1927 R.I. Pub. Laws 256, § 4 .................................................................6

1931 Ill. Laws 452, § 1 ...........................................................................7

1932 La. Acts 337, § 1 ............................................................................7

1933 Cal. Stat. 1170, § 3 ........................................................................7

1933 Minn. Laws 232, § 1 ......................................................................7

1933 Ohio Laws 189, § 1 ........................................................................7

1933 S.D. Sess. Laws 245, § 1................................................................7

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
NO. 3:17-CV-01017-BEN-JLB

1933 Tex. Gen. Laws 219, § 1 .................................................................7

1934 S.C. Acts 1288, § 1 .......................................................................7

1934 Va. Acts 137, § 1............................................................................7

Records of the Colony of New Plymouth in New England 230 (Boston 1861)............................8

The Laws of Plymouth Colony (1671) .....................................................8

OTHER AUTHORITIES

Alana Abramson, *After Newtown, Schools Across the Country Crack Down on Security*,
ABC News (Aug. 21, 2013), http://abcn.ws/1KwN9Ls .......................................................15

Bart Jansen, *Florida shooting suspect bought gun legally, authorities say*, USAToday.com
(Feb. 15, 2018), https://usat.ly/2F9kBfH................................................15

*Beretta M9 Pistols*, Cabela's, http://bit.ly/2xMx2IW .....................................13

Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-Capacity
Magazines, Despite Ban on Sales*, The Trace (Mar. 27, 2017), http://bit.ly/2o1UQrr...........16

Christopher Koper, Daniel Woods & Jeffrey Roth, *An Updated Assessment of the Federal
Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, National
Institute of Justice (2004), http://bit.ly/2vBTGTX .......................................16, 17

Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic
Firearms: an Updated Examination of Local and National Sources*, J. Urb. Health
(Oct. 2017), https://www.ncbi.nlm.nih.gov/pubmed/28971349 ........................................16, 18

Cody J. Jacobs, *End the Popularity Contest: A Proposal for Second Amendment "Type of
Weapon" Analysis*, 83 Tenn. L. Rev. 231 (2015)...................................................11

*Colt M-4 Carbine*, https://bit.ly/2JxXL2L...............................................13

Daniel W. Webster et al., *Epidemiologic changes in gunshot wounds in Washington, D.C.
1983-1990*, 127 Archives of Surgery 694 (1992) ...............................................17

David Fallis, *Data Indicate Drop in High Capacity Magazines During Federal Gun Ban*,
Wash. Post (Jan. 10, 2013), http://wapo.st/2wV9EMX........................................16

Everytown for Gun Safety, Mass Shootings in the United States: 2009-2016
(Apr. 11, 2017), http://every.tw/1XVAmcc...................................................13

Everytown for Gun Safety, appendix to *Mass Shootings in the United States: 2009-2016* (April
11, 2017), https://every.tw/2JPBIVz.......................................................14, 15

v

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
NO. 3:17-CV-01017-BEN-JLB

Frank Iannamico, *Design and Development of the U.S. Carbine Thirty Round Magazine*, Small Arms Review (May 13, 2013) ........................................................................15

Garen J. Wintemute et al., *Criminal Activity and Assault-Type Handguns: A Study of Young Adults*, 32 Annals Emer. Med. 44 (1998), http://bit.ly/2ymFodM ................................... 17-18

*Glock 17*, Glock, http://bit.ly/1OOg2HH ...........................................................................13

*Glock 19*, Glock, http://bit.ly/1UYJ1vZ ............................................................................13

Jackie Valley et al., *No Clear Motive in Las Vegas Strip Shooting That Killed 59, Injured 527*, Nevada Independent (Oct. 2, 2017), http://bit.ly/2x4m4is ......................................15

Jason Hanna & Holly Yan, *Sutherland Springs church shooting: What we know*, CNN.com (Nov. 7, 2017), https://cnn.it/2HlsfV6 ...................................................................15

Jeffrey Roth & Christopher Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*: Final Report, Urban Institute, (1997), http://urbn.is/2wQKkrA ....................................................................................................17

Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279 (2016) ......................................................................10

Justin George, *Shoot to Kill: Why Baltimore is One of The Most Lethal Cities in America*, Baltimore Sun (Sept. 30, 2016), https://bsun.md/2da4nci ......................................17

Lia Eustachewich & Danika Fears, *Las Vegas Shooter Had Cache of Weapons in Hotel Room*, N.Y. Post (Oct. 2, 2017), https://nyp.st/2qCjqzj ..................................................15

Lois Beckett, *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each*, The Trace (Sept. 20, 2016), http://bit.ly/2d89dGH..............................................10

Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 221 (2016)..............14

Mary Ellen Clark & Noreen O'Donnell, *Newtown school gunman fired 154 rounds in less than 5 minutes*, Reuters (Mar. 28, 2013, 8:55 AM), https://reut.rs/2qBhAhR ...................................2

Mike McIntire, *Weapons in San Bernardino Shootings Were Legally Obtained*, New York Times (Dec. 3, 2015), https://nyti.ms/2JPLR4F ........................................................................2

Nicholas Nehamas & David Smiley, *Florida School Shooter's AR-15 May Have Jammed, Saving Lives, Report Says*, Miami Herald (Feb. 27, 2018, 7:25 PM), https://hrld.us/2qDTLGc ........15

O. Ricardo Pimentel, *Nearly 50 Years Ago, bravery at UT tower*, MySA.com (June 19, 2016), https://bit.ly/2JAqu7s.........................................................................................15

Rachael Rettner, *Gunshot Wounds Are Getting Deadlier, One Hospital Finds*, LiveScience.com, June 14, 2016, https://bit.ly/2HBnMO9...............................................................17

vi

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT No. 3:17-CV-01017-BEN-JLB

Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting (1928).......................................6

Rich Jervis & Doug Stanglin, *Nidal Hasan Found Guilty in Fort Hood Killings*, USA Today (Aug. 23, 2013), https://usat.ly/2gMymFZ.................................................13

Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment*, Business Insider: Military & Defense (Dec. 17, 2012), http://read.bi/2x12PpU..................................................................... 5-6

Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68-69, 72 (2017).......................................................5

Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN.com (Oct. 5, 2017), https://www.cnn.com/2017/10/05/politics/gun-laws-magazines-las-vegas/index.html ...............................................................16

*Smith and Wesson M&P 15*, https://bit.ly/2IGvRBr ..................................................13

S. Rep. No. 72-575 (1932)...................................................................6

Violence Policy Center, *High Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States*, http://www.vpc.org/fact_sht/VPCshootinglist.pdf ....................................................15

**INTEREST OF AMICUS CURIAE**

Everytown for Gun Safety ("Everytown") is the nation's largest gun violence prevention organization, with supporters in every state, including tens of thousands of California residents and the mayors of fifty California cities.  It was founded in 2014 as the combined effort of Mayors Against Illegal Guns, a national, bipartisan coalition of mayors combating illegal guns and gun trafficking, and Moms Demand Action for Gun Sense in America, an organization formed in the wake of the murder of twenty children and six adults in an elementary school in Newtown, Connecticut by an individual using a firearm with a large-capacity magazine ("LCM").  Everytown's mission includes defending laws regulating weapons deemed unreasonably dangerous through the use of amicus briefs providing historical context, social science, and doctrinal analysis that might otherwise be overlooked.[1]

Everytown has a particular interest in this case because the Court's June 19, 2017 Order included a discussion of a 2013 survey of recent mass shootings published by Everytown's predecessor organization, Mayors Against Illegal Guns (the "Mayors' Survey").[2]  Everytown submits this amicus brief, in part, to aid the Court in its analysis of whether Proposition 63 is reasonably tailored to address a serious public safety concern.  Both the Mayors' Survey and

---

[1] Everytown has filed such briefs in several recent cases, including in support of the Attorney General's appeal of this Court's June 29, 2017 Preliminary Injunction Order.  *See, e.g.*, Brief for Everytown for Gun Safety as Amicus Curiae Supporting Defendant-Appellant, *Duncan v. Becerra*, No. 17-56081 (9th Cir. Oct. 19, 2017), ECF 47; Brief for Everytown for Gun Safety as Amicus Curiae Supporting Defendants, *Wiese v. Becerra*, 2:17-cv-00903-WBS-KJN (E.D. Cal. Oct. 4, 2017), ECF 63; Brief for Everytown for Gun Safety as Amicus Curiae Supporting Defendants, *Flanagan v. Becerra*, 2:16-cv-06164-JAK-AS (C.D. Cal. Sept. 18, 2017), ECF 54-1; Brief for Everytown for Gun Safety as Amicus Curiae Supporting Appellees, *Wrenn v. District of Columbia*, 864 F.3d 650 (D.C. Cir. July 20, 2016) (No. 16-7025), ECF 49; Brief for Everytown for Gun Safety as Amicus Curiae Supporting Appellee, *Peña v. Lindley*, No. 15-15449 (9th Cir. Sept. 28, 2015), ECF 34; Brief for Everytown for Gun Safety as Amicus Curiae Supporting Appellees, *Peruta v. Cty. of San Diego*, 824 F.3d 919 (9th Cir. Apr. 30, 2015) (Nos. 10-56971, 11-16255), ECF 150; Brief for Everytown for Gun Safety as Amicus Curiae Supporting Appellant, *Silvester v. Harris*, 843 F.3d 816 (9th Cir. Apr. 1, 2015) (No. 14-16840), ECF 34.

[2] *See Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1122-28 (S.D. Cal. 2017) (hereinafter, "Preliminary Injunction Order").

Everytown's research indicate that LCMs increase shooting fatalities and casualties and support Defendant's position that Proposition 63 is constitutionally permissible.

## INTRODUCTION

This case concerns California residents' right to be free from gun violence and their power to enact laws protecting that freedom. In light of the increasing toll of mass shootings, and in response to a massacre at a 2015 San Bernardino office party, the people of California sought legislation that would limit their risk of dying in one of these horrific crimes. Their efforts resulted in California Proposition 63 (hereinafter, "Proposition 63"), which amends the California Penal Code § 32310 to prohibit the sale or possession of LCMs of the type used in the Newtown and San Bernardino mass shootings.[3] The Ninth Circuit and every other Court of Appeals that has considered this issue have found that such prohibitions on LCMs are permissible under the Second Amendment.[4] The Court should reach the same conclusion here in considering Plaintiffs' challenge to Proposition 63 and deny Plaintiffs' Motion for Summary Judgment.

---

[3] *See* Mary Ellen Clark & Noreen O'Donnell, *Newtown school gunman fired 154 rounds in less than 5 minutes*, Reuters (Mar. 28, 2013, 8:55 AM), https://reut.rs/2qBhAhR; Mike McIntire, *Weapons in San Bernardino Shootings Were Legally Obtained*, New York Times (Dec. 3, 2015), https://nyti.ms/2JPLR4F.

[4] *See Fyock v. City of Sunnyvale*, 779 F.3d 991, 1001 (9th Cir. 2015) (upholding denial of preliminary injunction of local ordinance restricting the possession of LCMs accepting more than ten rounds); *Kolbe v. Hogan*, 849 F.3d 114, 137-38 (4th Cir. 2017) (en banc) (affirming the finding that Maryland's ban on LCMs over ten rounds was constitutional and holding that such magazines were not protected by the Second Amendment); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 247 (2d Cir. 2015) (hereinafter, "*NYSRPA*") (holding that New York and Connecticut prohibitions on possessing LCMs holding over ten rounds did not violate the Second Amendment); *Friedman v. City of Highland Park*, 784 F.3d 406, 412 (7th Cir. 2015) (holding that local ordinance banning LCMs did not violate the Second Amendment); *Heller v. District of Columbia*, 670 F.3d 1244, 1264 (D.C. Cir. 2011) (upholding D.C. prohibition on LCMs over ten rounds); *see also Wiese v. Becerra*, 263 F. Supp. 3d 986, 999 (E.D. Cal. 2017) (rejecting motion for preliminary injunction in case challenging same law at issue here); *Worman v. Healey*, — F. Supp. 3d —, 2018 WL 1663445, at *46 (D. Mass. April 5, 2018) (upholding state law prohibition on transfer or possession of assault weapons and LCMs)**;** *but see* Preliminary Injunction Order (enjoining Proposition 63 preliminarily and noting that Second Amendment rights are not eliminated "simply" because high-capacity magazines are "unpopular").

Courts in this Circuit analyze Second Amendment challenges through a two-step process: first by assessing "whether the challenged law burdens conduct protected by the Second Amendment" and then by "apply[ing] an appropriate level of scrutiny." *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013); *accord* Preliminary Injunction Order at 1118 (citing *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017). There is strong support for Proposition 63 at both steps of this analysis.

As an initial matter, Proposition 63 is part of a long tradition of regulating or prohibiting weapons that legislatures have determined to be unacceptably dangerous—including a century of restrictions on firearms capable of firing a large number of rounds without reloading. This historical tradition alone is sufficient for this Court to find Proposition 63 constitutional under *Heller*. *See District of Columbia v. Heller*, 554 U.S. 570, 626-27 (2008) ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms . . . or laws imposing conditions and qualifications on the commercial sale of arms.").

The Court should also reject Plaintiffs' argument that the national prevalence of a firearm feature places such a feature under the Second Amendment's protection. This approach cannot be reconciled with the Second Amendment exceptions articulated by the Supreme Court in *Heller* and by other circuits that have addressed this issue. *See, e.g.*, *id.* at 626-627 (recognizing that the Second Amendment is "not a right to keep and carry any weapon whatsoever" and "M-16 rifles and the like—may be banned"); *Kolbe*, 849 F.3d at 121 (holding that LCMs "are among those arms . . . the *Heller* Court singled out as being beyond the Second Amendment's reach"); *Friedman*, 784 F.3d at 407-08 (noting that under *Heller*, the Second Amendment does not protect "military-grade weapons . . . and weapons especially attractive to criminals"). Moreover, the "common use" test would transform the constitutional analysis into a consumer referendum and render existing firearms and firearm features like LCMs effectively immune from regulation.

To the extent that the Court engages in the second step of Second Amendment analysis and considers the Mayors' Survey in assessing whether Proposition 63 is appropriately tailored, the Court should reconsider its prior conclusions about the report. Specifically, the Court should

note that the Mayors' Survey does not purport to show, for every mass shooting listed, whether an LCM was used.  Instead, it simply includes the limited publicly available information about magazine capacity in mass shootings.  Viewed in the proper context, the Mayors' Survey, as well as other relevant social science, demonstrates that LCMs make mass shootings more deadly and supports the reasonable fit of Proposition 63 in addressing California residents' public safety concerns.

**ARGUMENT**

**I.    California's Prohibition of Large-Capacity Magazines Is Part of a Longstanding History of Identical and Analogous Prohibitions**

As both the Supreme Court and the Ninth Circuit have emphasized, "longstanding prohibitions" on the possession of certain types of weapons are "traditionally understood to be outside the scope of the Second Amendment."  *Fyock*, 779 F.3d at 997; *see Heller*, 554 U.S. at 626-27, 635 (noting that such "longstanding" regulations are treated as tradition-based "exceptions" by virtue of their "historical justifications").[5]  These longstanding prohibitions need not "mirror limits that were on the books in 1791."  *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc).  Instead, courts have found that even "early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record." *Fyock*, 779 F.3d at 997 (citing *Nat'l Rifle Ass'n of Am. v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012)).[6]

---

[5] *See also United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("[L]ongstanding limitations are exceptions to the right to bear arms"); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) (noting that a law does not violate the Second Amendment if it does not infringe upon "conduct that was within the scope of the Second Amendment as historically understood").

[6] *See also Friedman*, 784 F.3d at 408 (noting that "*Heller* deemed a ban on private possession of machine guns to be obviously valid" despite the fact that "states didn't begin to regulate private use of machine guns until 1927," and that "regulating machine guns at the federal level" did not begin until 1934); *Skoien*, 614 F.3d at 639-41 (noting that "prohibitions on the possession of firearms by felons and the mentally ill" have been found to be sufficiently longstanding, despite the fact that "[t]he first federal statute disqualifying felons from possessing firearms was not enacted until 1938" and that "the ban on possession by *all* felons was not enacted until 1961").

4

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT NO. 3:17-CV-01017-BEN-JLB

Proposition 63 is part of a long tradition of regulating or prohibiting weapons that lawmakers have determined to be unacceptably dangerous—including a century of restrictions enacted shortly after semi-automatic weapons became widely commercially available that pertained to firearms capable of firing a large number of rounds without reloading.  *See* Robert Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55, 68-69, 72 (2017) (explaining that "[firearm] laws were enacted not when these weapons were invented, but when they began to circulate widely in society").  Many of these laws were passed around the same time as the prohibitions on sales to felons and the mentally ill and restrictions on commercial sale of arms that *Heller* identified as longstanding. *See id*. at 82 (discussing the passage of prohibitions on possession of firearms by felons and the mentally ill in the early 20th century and the possession of semi-automatic weapons with LCMs in the 1920s and 1930s).  This historical tradition alone is sufficient for the Court to find Proposition 63 constitutional under *Heller*.  *See Heller*, 554 U.S. at 626-27 ("[N]othing in our opinion should be taken to cast doubt on longstanding prohibition on possession of firearms . . . or laws imposing conditions and qualifications on the commercial sale of arms."); *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 673, 682-90 (9th Cir. 2017) (en banc) (applying "a textual and historical analysis" to conclude that "the Second Amendment . . . does not confer a freestanding right . . . to sell firearms") *petition for cert. filed*, No. 17-982 (Jan. 8, 2018).

## A.   There Is a Longstanding Tradition of Prohibiting Firearms Capable of Quickly Firing Multiple Rounds Without Reloading

States have regulated the ammunition capacity of semi-automatic firearms since they first became widely commercially available at the turn of the twentieth century.  *See* Robert Johnson & Geoffrey Ingersoll, *It's Incredible How Much Guns Have Advanced Since the Second Amendment*, Business Insider: Military & Defense (Dec. 17, 2012), http://read.bi/2x12PpU (explaining that semi-automatic weapons became commercially available in the early 1900s).  Such laws often categorized large-capacity, semi-automatic firearms, along with fully automatic weapons, as "machine guns," and imposed restrictions that effectively prohibited them entirely.

*See, e.g.*, 1927 R.I. Pub. Laws 256, §§ 1, 4 (prohibiting the "manufacture, s[ale], purchase or possess[ion]" of a "machine gun," which it defined as "any weapon which shoots more than twelve shots semi-automatically without reloading"); 1927 Mich. Pub. Acts 887, § 3 (prohibiting possession of "any machine gun or firearm which can be fired more than sixteen times without reloading").

In 1928, the National Conference on Uniform State Laws (now the Uniform Law Commission) adopted a model law prohibiting possession of "any firearm which shoots more than twelve shots semi-automatically without reloading," setting the national standard for laws prohibiting possession of semi-automatic firearms with large magazine capacities. *See* Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928).[7]  Shortly thereafter, the federal government enacted a similar prohibition applicable to the District of Columbia. *See* 47 Stat. 650, ch. 465, §§ 1, 14 (1932) (making it a crime to "possess any machine gun," which it defined as "any firearm which shoots . . . semiautomatically more than twelve shots without loading"). The National Rifle Association endorsed passage of the D.C. law, saying, "it is our desire [that] this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the states of the Union."  S. Rep. No. 72-575, at 5-6 (1932).

California first banned automatic weapons in 1927[8] and expanded this prohibition with a 1933 statute that prohibited the sale or possession of not only "all firearms . . . capable of discharging automatically," but also "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device

---

[7] This standard originated with a model law promulgated by the National Crime Commission in 1927.  *Report of Firearms Committee*, at 422-23.

[8] *See* 1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in Which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or Other Separable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1-2 (prohibiting "all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device").

1    *having a capacity of greater than ten cartridges*."  1933 Cal. Stat. 1170, § 3 (emphasis added).

2    These statutes were at least as restrictive as Proposition 63, and indeed appear more restrictive

3    inasmuch as the 1933 law prohibited *firearms* capable of receiving LCMs, rather than only the

4    LCMs at issue here.  *See id.*  Several other states, including Minnesota, Ohio, and Virginia, also

5    prohibited or regulated firearms based on magazine capacity.[9]  Other states passed laws limiting

6    possession of automatic weapons based on the number of rounds that a firearm could discharge

7    without reloading.[10]

8         The federal government then embraced such regulations in 1934 when Congress enacted

9    the National Firearms Act.  *See* 48 Stat. 1236, 1246 (1934) (requiring registration of automatic

10   weapons, short-barreled rifles and shotguns, and a variety of concealable and disguised firearms,

11   and imposing a significant transfer tax on these weapons).  The Supreme Court unanimously

12   upheld the National Firearms Act in one of its few pre-*Heller* Second Amendment decisions.

13   *See United States v. Miller*, 307 U.S. 174, 178 (1939) (affirming that the Second Amendment

14   does not guarantee the right to keep and bear short-barreled shotguns).

15        As this historical record shows, Proposition 63 reflects the continuation of nearly a

16   century of valid restrictions based on the ability to shoot large numbers of rounds in a short time

17   without reloading.

18

19

20

21

---

22   [9] *See* 1933 Minn. Laws 232, § 1 (banning "[a]ny firearm capable of automatically reloading after
     each shot is fired, whether firing singly by separate trigger pressure or firing continuously" if the

23   weapon was modified to allow for a larger magazine capacity); 1933 Ohio Laws 189, § 1
     (banning "any firearm which shoots more than eighteen shots semi-automatically without

24   reloading"); 1934 Va. Acts 137, § 1 (effectively prohibiting possession or use of "weapons . . .
     from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically

25   or otherwise discharged without reloading").

26   [10] These limitations were more stringent than California's current magazine prohibition of ten
     rounds.  *See* 1933 S.D. Sess. Laws 245, § 1 (five rounds); 1933 Tex. Gen. Laws 219, § 1 (five

27   rounds); 1934 Va. Acts 137, § 1 (seven rounds for automatics, 16 for semi-automatics); 1931 Ill.
     Laws 452, § 1 (eight rounds); 1932 La. Acts 337, § 1 (eight rounds); 1934 S.C. Acts 1288, § 1

28   (eight rounds).

**B.      Proposition 63 Is Consistent with Centuries of Laws Prohibiting Weapons Deemed to Be Especially Dangerous**

The statute at issue here is also part of a long history of government prohibition of weapons that pose heightened threats to public safety, either because the weapons themselves are particularly lethal or because they are especially suitable for criminal use.

Prohibitions on weapons deemed to be especially dangerous date back to early English legal history, beginning with the 1383 prohibition of launcegays (a particularly lethal type of spear) and the 1541 prohibition of crossbows and firearms less than a yard long.  *See* 7 Ric. 2, 35, ch. 13 (1383); 33 Hen. 8, ch. 6, § 1 (1541).  The regulation of unusually dangerous weapons continued as the American colonies and first states adapted the English tradition.  *See generally* 1763-1775 N.J. Laws 346 (prohibiting set or trap guns); The Laws of Plymouth Colony (1671) (same); Records of the Colony of New Plymouth in New England 230 (Boston 1861) (same).

States continued to pass prohibitions or regulations on unreasonably dangerous weapons after ratification of the Second Amendment.  For example, several states banned or placed prohibitively high taxes on Bowie knives,[11] the assault weapon of their time, which were determined to be "instrument[s] of almost certain death."  *See Cockrum v. State*, 24 Tex. 394, 402 (1859) (finding Bowie knives are "differ[ent] from [guns, pistols, or swords] in [their] device and design" and are therefore more accurate and lethal than other contemporary weapons).  In addition, a number of states prohibited certain types of small and easily concealable handguns, which were determined to be ideal for criminal use.[12]

---

[11] *See* 1837 Ala. Laws 7, § 1 (prohibitively taxing Bowie knives); 1837 Ga. Laws 90 (banning Bowie knives); 1837-1838 Tenn. Pub. Acts 200 (prohibiting the sale of Bowie knives); *Aymette v. State*, 21 Tenn. 154, 158 (1840) (justifying a prohibition on Bowie knives on the basis that they are "weapons which are usually employed in private broils, and which are efficient only in the hands of the robber and the assassin").

[12] *See* 1881 Ark. Acts § 1909 (pocket pistols and "any kind of cartridge[] for any pistol"); 1879 Tenn. Pub. Acts 135, ch. 96, § 1 ("belt or pocket pistols, or revolvers, or any other kind of pistols, except army or navy pistol"); 1907 Ala. Law 80, § 1 (similar); 1903 S.C. Acts 127, § 1 (similar).

Throughout the early twentieth century, many states passed laws prohibiting unusually dangerous weapons or weapon features, such as silencers, as the technology of firearms and other dangerous weapons evolved.[13]  At least 28 states, as well as the federal government, passed prohibitions or severe restrictions on automatic weapons in the 1920s and 1930s, along with the restrictions on large capacity semi-automatic weapons discussed above.  *See supra* Part I.

Within this historical context, California's prohibition on LCMs can be understood as merely the latest part of a longstanding tradition of government prohibition or regulation of unusually dangerous weapons.  This long history of analogous regulation further supports the conclusion that Proposition 63 does not burden a "right secured by the Second Amendment." *Heller*, 554 U.S. at 626-27.

## II.   The "Common Use" Test Is Illogical and Should Not Be Followed

In analyzing a Second Amendment challenge, courts, including this Court, should not utilize a test that focuses on whether the law bans firearms that are "commonly used for a lawful purpose."[14]  Preliminary Injunction Order at *18-19.  Respectfully, this test is not well grounded in Second Amendment jurisprudence and does not fully account for important principles of federalism.  These flaws exist whether the test is applied categorically or as a threshold question at step one of the prevailing Second Amendment analysis.

The position that LCMs must be afforded Second Amendment protection because they are widely available misconstrues the Supreme Court's decision in *Heller* to suggest that a

---

[13] *See, e.g.*, 1909 Me. Laws 141 (prohibiting silencers); 1912 Vt. Acts & Resolves 310, § 1 (same); 1913 Minn. Laws 55 (same); 1916 N.Y. Laws 338-39, ch. 137, § 1 (same); 1926 Mass. Acts 256, ch. 261 (same); 1927 Mich. Pub. Acts 887-89, § 3 (same); 1927 R.I. Pub. Laws 256, § 1 (same).  States also banned a wide variety of unusually dangerous weapons, including blackjacks and billy clubs, slung-shots (a metal or stone weight tied to a string), brass knuckles, various kinds of knives, and explosives.  *See, e.g.*, 1917 Cal. Stat. 221, ch. 145, § 1 (blackjacks and billy clubs); 1911 N.Y. Laws 442, ch. 195, § 1 (slung-shots); 1917 Minn. Laws 614, ch. 243, § 1 (brass knuckles); 1913 Iowa Acts 307, ch. 297, § 2 (daggers and similar-length knives); 1927 Mich. Pub. Acts 887, No. 372, § 3 (explosives).

[14] This test was not used in *Heller*, but rather was articulated by two justices in dissent from a denial of certiorari in *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Thomas, J., joined by Scalia, J., dissenting from denial of certiorari); *see also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, J., joined by Thomas, J., concurring in the judgment).  It has never been endorsed by a majority of the Supreme Court.  *See Kolbe*, 849 F.3d at 142.

product's significant presence in the national market triggers Second Amendment protection. The Court in *Heller* held that the Second Amendment "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns."  554 U.S. at 625.  But it does not follow that the Second Amendment necessarily protects all weapons that have achieved a degree of commercial success.  *See Kolbe*, 849 F.3d at 142 ("The *Heller* majority said nothing to confirm that it was sponsoring the popularity test."); *Worman*, 2018 WL 1663445, at *10 ("[P]resent day popularity is not constitutionally material.").

In addition to lacking firm jurisprudential foundation, the "common use" test ultimately proves hopelessly circular.  Following this approach would allow the constitutionality of weapons prohibitions to be decided not by how dangerous a weapon is, but rather by "how widely it is circulated to law-abiding citizens by the time a bar on its private possession has been enacted and challenged."  *Kolbe*, 849 F.3d at 141.  As this Court has recognized, "it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly owned," Preliminary Injunction Order at 19 (quoting *Friedman,* 784 F.3d at 409).  It would be similarly absurd to allow the fact that a law previously did not exist to stand as a constitutional bar to its enactment.  *See* Joseph Blocher & Darrell A.H. Miller, *Lethality, Public Carry, and Adequate Alternatives*, 53 Harv. J. on Legis. 279, 288 (2016) (discussing the "central circularity" that plagues the "common use" test: "what is common depends largely on what is, and has been, subject to regulation").  Yet this is what application of the "common use" test would dictate here.

This approach also lacks guidance as to whether a court should determine "common use" by considering the number of LCMs produced or sold or the number of law-abiding owners of the same.  *See Kolbe*, 849 F.3d at 135-36.  This distinction is critical because firearm ownership is extremely concentrated, with 3% of American adults possessing 50% of the country's guns. *See* Lois Beckett, *Meet America's Gun Super-Owners—With An Average of 17 Firearms Each*, The Trace (Sept. 20, 2016), http://bit.ly/2d89dGH.  If production or sales numbers form the basis of the common use analysis, this small group of gun owners would be essentially placed in

control of the meaning of the Second Amendment.  This tyranny by a tiny minority cannot be

what the *Heller* Court intended.  A constitutional analysis driven by the prevalence of the

prohibited firearm in the market also creates perverse incentives for the firearms industry, giving

it the unilateral ability to insulate highly dangerous firearms, and firearm features, with Second

Amendment protection "simply by manufacturing and heavily marketing them" before the

government has had the chance to assess their danger, determine whether to regulate them and

build the political momentum to actually do so.  Cody J. Jacobs, *End the Popularity Contest: A*

*Proposal for Second Amendment "Type of Weapon" Analysis*, 83 Tenn. L. Rev. 231, 265 (2015).

Such an approach also raises federalism concerns, as states that fail to immediately

regulate new and potentially dangerous firearms or firearm features would risk losing the ability

to do so if such firearms or features are quickly adopted by consumers in other states.[15]  Thus,

firearm safety decisions made in some states would render the laws of other states "more or less

open to challenge under the Second Amendment," and "would imply that no jurisdiction other

than the United States as a whole can regulate firearms."  *Friedman*, 784 F.3d at 412.  But *Heller*

"does not foreclose *all* possibility of experimentation" by state and local governments.

*Friedman*, 784 F.3d at 408, 412.  Rather, it permits states and localities to do what they have

long done in the realm of firearm legislation: "experiment with solutions to admittedly serious

problems," *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 966 (9th Cir. 2014) (quoting

*City of Renton v. Playtime Theatres, Inc.* 475 U.S. 41, 52 (1986)).

The Court should instead be guided by the Fourth Circuit's en banc opinion in *Kolbe*, and

the historical tradition discussed above, along with governing Ninth Circuit precedent, and

consider whether the firearm, or firearm component, at issue is appropriate for self-defense or

instead is a weapon designed to produce mass casualties.  *See* 849 F.3d at 121.  The *Kolbe* court

found that "large-capacity magazines . . . [that] allow a shooter to fire more than ten rounds

---

[15] A counterfactual further demonstrates why the "common use" test is inappropriate: If
Congress had renewed the federal prohibition on LCMs rather than permitting it to lapse in 2004,
the weapons prohibited by Proposition 63 would not be in widespread use today and would
therefore not be subject to Second Amendment protection under Plaintiffs' "common use"
theory.

BRIEF OF AMICUS CURIAE EVERYTOWN FOR GUN SAFETY IN SUPPORT OF DEFENDANT'S OPPOSITION TO
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT
NO. 3:17-CV-01017-BEN-JLB

without having to pause to reload . . . 'are particularly designed and most suitable for military and law enforcement applications' [as they] enhance a shooter's capacity to shoot multiple human targets very rapidly." *Id.* at 125 (internal citations omitted); *see id.* at 137 (noting that LCMs "are a 'uniquely military feature[]'"). "Because . . . large-capacity magazines are clearly most useful in military service," the *Kolbe* court held that it was "compelled by *Heller* to recognize that those . . . magazines are not constitutionally protected." *Id.* at 137. The same reasoning should apply to the Court's analysis here as well. *See Worman*, 2018 WL 1663445, at *10 (following *Kolbe*, and holding that "LCMs are most useful in military service [and therefore] . . . beyond the scope of the Second Amendment"); *see also NYSRPA*, 804 F.3d at 256 (noting that *Heller* permitted the prohibition of military-grade weapons "without implicating the Second Amendment" before applying intermediate scrutiny to an assault weapon and LCM prohibition); *Friedman*, 784 F.3d at 408 (noting that, under *Heller*, the Second Amendment does not protect "military-grade weapons" or "weapons especially attractive to criminals" before applying intermediate scrutiny to an assault weapon and LCM prohibition).

III.  **Use of Large Capacity Magazines Makes Mass Shootings and Other Incidents of Gun Violence Deadlier, as Shown by the Mayors' Survey and Other Research**

The use of LCMs, whether in mass shootings or in everyday gun violence, results in more people being shot, more injuries per victim, and more deaths. Both the Mayors' Survey and the relevant social science research indicate that the use of LCMs makes shootings more dangerous and more deadly. By prohibiting the possession and use of LCMs throughout California, Proposition 63 is a reasonably tailored attempt to address this serious public safety concern, and is thus constitutional, for this reason as well.

A.  **The Mayors' Survey Shows that the Use of LCMs In Mass Shootings Results in More Deaths and More Injuries**

In its June 29, 2017 Preliminary Injunction Order, the Court relied on the Mayors' Survey as a basis for the conclusion that "§ 32310 makes for an uncomfortably poor fit" with California's goal of reducing mass shootings. Preliminary Injunction Order at *33. Everytown

1   respectfully submits that this conclusion is not supported by the Mayors' Survey.  First, the

2   Mayors' Survey notes that available information on magazine capacity is incomplete.

3   Accordingly, the Court should not assume that the mass shootings listed without information

4   about magazine capacity did *not* involve an LCM.  In fact, in most cases, such information

5   simply was not available.[16]  In over two-thirds of the mass shootings listed in the Mayors'

6   Survey the "ammo details" information is listed as "unknown."  *See* Mayors' Survey, Exhibit 59

7   to the Declaration of Alexandra Robert Gordon in Support of Defendant Attorney General

8   Xavier Becerra's Opposition to Plaintiff's Motion for Preliminary Injunction, 128-62, *Duncan v.*

9   *Becerra*, No. 17-cv-1017-BEN-JLB (S.D. Cal. May 17, 2017).  The researchers responsible for

10  the Mayors' Survey relied on press coverage and FBI data for details regarding individual mass

11  shootings.  *See* Mayors' Survey at 2.  But not all press coverage regarding mass shootings

12  addresses the magazine capacity of the weapons used.  Everytown's own tracking of such crimes

13  demonstrates the limited information available through media coverage.[17]

14          To the contrary, where information about the ammunition used in a mass shooting is

15  unknown, one might reasonably assume that an LCM was involved.  In those jurisdictions

16  without existing LCM restrictions, many popular handguns and most semi-automatic rifles are

17  sold with LCMs as a standard feature.[18]  In fact, in eleven of the incidents that this Court

18  characterized as not involving LCMs, a weapon was used that comes standard with an LCM.[19]

19

20

_____

[16] For instance, for the Fort Hood shooting, the Mayors' Survey does not indicate whether LCMs were used.  *See* Mayors' Survey, at 30.  However, later reporting showed that the shooter used several LCMs to kill thirteen and wound thirty-one people.  Rich Jervis & Doug Stanglin, *Nidal Hasan Found Guilty in Fort Hood Killings*, USA Today (Aug. 23, 2013), https://usat.ly/2gMymFZ (noting the use of several high-capacity magazines).

[17] Everytown continues to track mass shootings (incidents in which four or more people are killed with a firearm, not including the shooter).  From 2009 to 2016, there were 156 mass shootings, resulting in 848 people shot and killed and 339 people shot and injured.  *See* Everytown for Gun Safety, Mass Shootings in the United States: 2009-2016 (Apr. 11, 2017), http://every.tw/1XVAmcc.  Many of these shootings did not receive national media attention.

[18] *See, e.g.*, *Glock 19*, Glock, http://bit.ly/1UYJ1vZ (last visited Apr. 12, 2018) (listing standard magazine capacity as 15 rounds); *Glock 17*, Glock, http://bit.ly/1OOg2HH (last visited Apr. 12, 2018) (17 rounds); *Beretta M9 Pistols*, Cabela's, http://bit.ly/2xMx2IW (last visited Apr. 12, 2017) (listing models with capacities of 10 and 15 rounds); Colt M-4 Carbine,

While the Mayors' Survey and Everytown's subsequent research do not present a comprehensive dataset of the magazines used in mass shootings, the data they do include indicates that LCMs make shootings significantly more deadly.  The Mayors' Survey shows that, on average, shooters who use LCMs, or assault weapons (which are typically equipped with LCMs), shoot more than twice as many victims (151% more) and kill 63% more victims as compared to other mass shooters.  Mayors' Survey at 3.  Data from Everytown's continued tracking of mass shootings also shows that where an assault-style weapon is used,[20] an average of twice as many people are killed (10.1 per shooting vs. 4.9) and more than ten times as many are shot and injured (11.4 per shooting vs. 1.1).  *See* Everytown for Gun Safety, appendix to *Mass Shootings in the United States: 2009-2016* (Apr. 11 2017), https://every.tw/2JPBIVz; *see also* Louis Klarevas, *Rampage Nation: Securing America from Mass Shootings* 221 (2016) (finding the use of LCMs in high casualty mass shootings increased the death toll by 17%).

The applicable time period for the Mayors' Survey, January 2009 to September 2013, also excludes multiple post-September 2013 mass shootings involving LCMs that have occurred since the Mayors' Survey was released, including the shooting in San Bernardino, California, that resulted in fourteen deaths and twenty-two injuries, the massacre of forty-nine people and wounding of fifty-three more in a nightclub in Orlando, Florida, the attack in Las Vegas, in which the shooter used dozens of LCMs to fire hundreds of rounds into a concert crowd resulting

---

https://bit.ly/2JxXL2L (last visited Apr. 12, 2018) (30 rounds); Smith and Wesson M&P 15, https://bit.ly/2IGvRBr (last Visited Apr. 12, 2018) (30 rounds).

[19] *See* Mayors' Survey, at 2-13 (listing the weapons used in incidents as follows: Hialeah, Fla. 7/16/13 ("Glock 17"); Albuquerque, N.M. 1/19/13 ("AR-15"); Minneapolis, Minn. 9/27/12 ("Glock 9mm"); Oak Creek, Wis. 8/5/12 (LCM-capable "9mm semiautomatic handgun," purchased along with three 19-round magazines); Carson City, Nev. 9/6/2011 ("Norinco Mak 90 . . . Romarm/Cugir AK-47 . . . Glock 26"); Washington, D.C. 3/30/10 ("AK-47"); Appomattox, Va. 1/19/10 ("high-powered rifle"); Osage, Kan. 11/28/09 ("Assault Rifle"); Fort Hood, Tex. 11/5/09 ("FN Five-Seven", which comes equipped with a 10  or 20 round magazine); Mount Airy, N.C. 11/1/09 ("Assault Rifle"); Geneva Cty., Ala. 3/10/09 ("Bushmaster AR-15, SKS Rifle")).

[20] Assault weapons, which are generally sold with LCMs, serve as a reasonable, though underinclusive, proxy for LCMs.  Everytown stopped tracking magazine capacity after the 2013 report due to the difficulty of obtaining comprehensive data discussed above.

in the death of fifty-nine people and the injury of over 500 more, and the attack on a church in Sutherland Springs, Texas that resulted in twenty-six deaths and twenty injuries.[21]

Mass shootings involving LCMs also have a unique impact that the Court should consider when weighing the significant harm caused by LCMs. Mass shootings like those that occurred in Aurora, Sandy Hook, Tucson, Orlando, Las Vegas, Sutherland Springs and Parkland sear themselves into the national consciousness and affect the way people live their everyday lives. *See* Alana Abramson, *After Newtown, Schools Across the Country Crack Down on Security*, ABC News (Aug. 21, 2013), http://abcn.ws/1KwN9Ls (comparing the impact of the Sandy Hook shooting on school security to that of 9/11 on airport security and noting school districts have spent tens of millions of dollars on security improvements); *see also Friedman*, 784 F.3d at 412 (noting that mass shootings "are highly salient"). Moreover, at least nine of the ten deadliest mass shootings in modern American history involved the use of a gun with an LCM.[22] While mass shootings on the scale of these tragedies remain statistically rare, their enormous impact reinforces the justifications for California's law.

---

[21] *See* Everytown for Gun Safety, appendix to *Mass Shootings*, *supra* p. 14, at 3, 6; *see* Jackie Valley et al., *No Clear Motive in Las Vegas Strip Shooting That Killed 59, Injured 527*, Nevada Independent (Oct. 2, 2017), http://bit.ly/2x4m4is; Lia Eustachewich & Danika Fears, *Las Vegas Shooter Had Cache of Weapons in Hotel Room*, New York Post (October 2, 2017), https://nyp.st/2qCjqzj; Jason Hanna & Holly Yan, *Sutherland Springs church shooting: What we know*, CNN.com (Nov. 7, 2017), https://cnn.it/2HlsfV6.

[22] Las Vegas, Nev. (58 Fatalities); Orlando, Fla. (49); Blacksburg, Va. (32); Newtown, Conn. (26); Sutherland Springs, Tex. (26); Killeen, Tex. (23); San Ysidro, Cal. (21); Austin, Tex. (18); San Bernardino, Cal. (14). *See* Violence Policy Center, *High Capacity Ammunition Magazines are the Common Thread Running Through Most Mass Shootings in the United States*, http://www.vpc.org/fact_sht/VPCshootinglist.pdf. Information on the magazines used in the Texas Tower shooting in Austin, Tex. is unavailable, but the M1 Carbine used comes standard with a either a 15 or 30 round box magazine. *See*. O. Ricardo Pimentel, *Nearly 50 Years Ago, bravery at UT tower*, MySA.com (June 19, 2016), https://bit.ly/2JAqu7s; Frank Iannamico, *Design and Development of the U.S. Carbine Thirty Round Magazine*, Small Arms Review (May 13, 2013). The attack on Marjory Stoneman Douglas High School in Parkland Florida, which killed seventeen and injured at least fifteen people, involved use of a Smith and Wesson M&P 15, which comes standard with a thirty round magazine. Bart Jansen, *Florida shooting suspect bought gun legally, authorities say*, USAToday.com (Feb. 15, 2018), https://usat.ly/2F9kBfH. It has been reported that the shooter "abandoned at least six magazines that each contained 30 bullets at the scene of the shooting." Paula McMahon, *Nikolas Cruz left 180 rounds of ammunition – with swastikas – at Parkland school, sources say*, Sun Sentinel (Mar. 2, 2018, 1:20

15

### B.    Social Science Research Shows LCMs Pose a Serious Risk to Public Safety

Additional research supports the conclusion reached by both the people of California and the State Legislature: that LCMs pose a significant danger to public safety.  State prohibitions on LCMs are correlated with a 63% lower rate of shootings with three or more casualties.  *See* Sam Petulla, *Here is 1 Correlation Between State Gun Laws and Mass Shootings*, CNN.com (Oct. 5, 2017), https://www.cnn.com/2017/10/05/politics/gun-laws-magazines-las-vegas/index.html (noting Boston University Professor Michael Siegel's conclusion that "[w]hether a state has a [LCM] ban is the single best predictor of the mass shooting rate in that state").

Several studies also indicate that criminals are increasingly using LCMs in everyday violent crimes, as evidenced by the number of LCMs recovered by police.  *See*, *e.g.*, Brian Freskos, *Baltimore Police Are Recovering More Guns Loaded With High-Capacity Magazines, Despite Ban on Sales*, The Trace (March 27, 2017), http://bit.ly/2o1UQrr (noting a more than 5% increase in the percentage of guns recovered with LCMs by Baltimore police from 2010 to 2016, despite Maryland's 2013 law prohibiting the sale or manufacture of LCMs); David Fallis, *Data Indicate Drop in High Capacity Magazines During Federal Gun Ban*, Washington Post, (Jan. 10, 2013), http://wapo.st/2wV9EMX (noting that the percentage of LCM-equipped guns recovered by Virginia police has more than doubled since the federal LCM ban expired in 2004).  Indeed, a recent study found that assault weapons and LCM–compatible firearms "appear to account for 22 to 36% of crime guns in most places, with some estimates upwards of 40% for cases involving serious violence."  Christopher S. Koper et al., *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources*, J. Urb. Health (Oct. 2017), at https://www.ncbi.nlm.nih.gov/pubmed/28971349.

---

PM), http://www.sun-sentinel.com/local/broward/parkland/florida-school-shooting/fl-florida-school-shooting-nikolas-cruz-left-180-rounds-20180302-story.html.  However, other sources reported that the shooter "went in with only 10-round magazines because larger clips would not fit in his duffel bag."  *See* Nicholas Nehamas & David Smiley, *Florida School Shooter's AR-15 May Have Jammed, Saving Lives, Report Says*, Miami Herald (Feb. 27, 2018, 7:25 PM), https://hrld.us/2qDTLGc.

When criminals use LCMs in violent crimes and shootings, they generally fire more shots and cause more injuries.[23]  For example, a study of Milwaukee homicides found that those killed with guns containing LCMs had on average one additional gunshot injury, and the Maryland medical examiner's office reported that the number of cadavers with ten or more bullets more than doubled between 2006 and 2016.  *See, e.g.*, Jeffrey Roth & Christopher Koper, *Impact Evaluation of the Public Safety and Recreational Firearms Use Protection Act of 1994*: Final Report, Urban Institute, (1997), at http://urbn.is/2wQKkrA; Justin George, *Shoot to Kill: Why Baltimore is One of The Most Lethal Cities in America*, Baltimore Sun (Sept. 30, 2016), https://bsun.md/2da4nci.  Shootings with more injuries invariably lead to more deaths.  One study found that gunshot victims shot twice are 60% more likely to die than those shot once.  *See* Koper, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, *supra* note 23, at 87; s*ee also* Daniel W. Webster et al., *Epidemiologic changes in gunshot wounds in Washington, D.C. 1983-1990*, 127 Archives of Surgery 694 (1992) (finding that the fatality rate for multiple chest wounds is 61% higher than the fatality rate for a single chest wound).  This finding is supported by the correlation between the prevalence of LCMs and increases in lethal shootings reported in several American cities. *See* Rachael Rettner, *Gunshot Wounds Are Getting Deadlier, One Hospital Finds*, LiveScience.com, June 14, 2016, https://bit.ly/2HBnMO9 (speculating that that increases in gunshot death rates could be connected to the use of LCMs).[24]

A California study also indicates that assault pistols equipped with LCMs are more likely to be purchased by individuals with a criminal background.  *See* Garen J. Wintemute et al., *Criminal Activity and Assault-Type Handguns: A Study of Young Adults*, 32 Annals Emer. Med. 44 (1998), http://bit.ly/2ymFodM (finding assault pistols were selected by 2% of purchasers with

---

[23] Christopher Koper, Daniel Woods & Jeffrey Roth, *An Updated Assessment of the Federal Assault Weapons Ban: Impacts on Gun Markets and Gun Violence, 1994-2003*, National Institute of Justice (2004), http://bit.ly/2vBTGTX (finding that violent crimes resulting in gunshot injuries are up to 50% more likely to have been committed with LCMs and that shootings resulting in injuries are nearly 26% more likely to have involved LCMs).

[24] *See also* George, *supra* p. 17 (attributing increased shooting lethality, in part, to increasingly lethal tactics enabled by LCMs).

no criminal record, 6.5% of purchasers with a prior gun charge, and 10% of purchasers with two or more previous violent felonies).  LCMs also pose a threat to California's law enforcement.  A recent analysis found that "LCM weapons overall account for 41% of the guns used to kill officers."  *See* Koper, *Criminal Use of Assault Weapons and High-Capacity Semiautomatic Firearms: an Updated Examination of Local and National Sources*, *supra* p. 16, at 7.

In sum, the Mayors' Survey suggests that mass shootings involving LCMs are substantially more dangerous than those in which LCMs are not involved.  This is further supported by research showing that LCMs increase the harms of gun crime, even apart from the mass shooting context.  Everytown's research, along with the other support that the Defendant has introduced into the record, supports a finding that Proposition 63 is appropriately tailored to address the significant public safety threat presented by LCMs and that Proposition 63 therefore is constitutional.

## CONCLUSION

For the foregoing reasons, Everytown respectfully requests that the Court deny Plaintiffs' Motion for Summary Judgment.

Dated:  April 16, 2018

Respectfully submitted,

DAVIS POLK & WARDWELL LLP

By:  /s/ Neal A. Potischman

Neal A. Potischman (SBN 254862)
1600 El Camino Real
Menlo Park, California 94025
Phone: (650) 752-2000
Fax: (650) 752-2156
neal.potischman@davispolk.com

*Attorneys for Amicus Curiae*
*Everytown for Gun Safety*