C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al.,<br><br>  Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>  Defendant. | Case No: 17-cv-1017-BEN-JLB<br><br>**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:  April 30, 2018<br>Hearing Time:  10:30 a.m.<br>Judge:  Hon. Roger T. Benitez<br>Courtroom:  5A |

# INTRODUCTION

Under any plausible understanding, magazines capable of holding more than ten rounds of ammunition (so-called "LCMs") are "typically possessed . . . for lawful purposes." *District of Columbia v. Heller*, 554 U.S. 570, 625, 627 (2008). They are not remotely "unusual." The constitution thus protects these arms, and the state's draconian and retroactive criminal ban on their acquisition and possession must survive heightened scrutiny. The state falls far short of that standard. Indeed, its defense of the law boils down to this: Criminals may abuse LCMs and the most effective way to eliminate that risk is to prohibit them. But that sweeping rationale would allow the state to ban all usable firearms—precisely the sort of law *Heller* forecloses. The state may sincerely believe that a broad prophylactic ban on LCMs reflects common sense, but the Constitution simply does not "allow state and local governments to enact any gun control law that they deem to be reasonable," *McDonald v. City of Chicago*, 561 U.S. 742, 783 (2010).

The state's defense of the law's uncompensated physical dispossession of LCMs as an exercise of its "police power" is no more persuasive. Binding Supreme Court precedent forecloses the state's theory that exercises of the police power cannot constitute physical takings. Even if the law were not a taking, its retroactive criminalization of LCM possession by those who have owned LCMs responsibly for decades violates due process.

# ARGUMENT

**I.  Section 32310 Violates the Second Amendment**

   **A.  California's Magazine Ban Restricts Second Amendment Conduct**

The Second Amendment applies to arms "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625. The state does not question this settled point of law, nor does it dispute that the prohibited magazines are "arms" for Second Amendment purposes. And it has failed to overcome Plaintiffs' extensive evidence proving that law-abiding citizens commonly own LCMs. Given this

1

REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

17cv1017

evidence, and because the state cannot identify any longstanding tradition of restricting magazine capacity, section 32310 triggers Second Amendment scrutiny.[1]

**First,** as this Court has acknowledged, citizens commonly use LCMs for lawful purposes, including the core lawful purpose of self-defense. Order Granting Prelim. Inj.19. Plaintiffs' evidence overwhelmingly confirms this. Many of the most popular handguns in America come standard with LCMs. Mot. 9. While tens of millions of Americans possess them for self-defense and other lawful purposes. *Id.* The state makes no attempt to rebut Plaintiffs' evidence or to show that most citizens own these magazines for anything but lawful purposes. Instead, it asks this Court to assume—without explanation—that Plaintiffs' evidence does not show that LCMs are commonly possessed for lawful purposes. Opp'n 13, n.9. The state's bare assertion does nothing to undermine the weight of Plaintiffs' evidence to the contrary.

Rather than apply the controlling standard, the state argues that the Second Amendment does not protect LCMs because such magazines are "designed for" and "most useful in" military service. Opp'n 11. That argument is unpersuasive. Strikingly, the state's preferred test relies on a single out-of-circuit opinion, *Kolbe v. Hogan*, 849 F.2d 114, 142 (2017), that holds that the Second Amendment does not protect weapons useful in warfare. The *Kolbe* test, however, conflicts with Ninth Circuit precedent. *See Fyock v. Sunnyvale*, 779 F.3d 991, 997 (2015) (holding that the Second Amendment protects arms typically possessed by law-abiding citizens for lawful purposes). And it is based on a fundamental misreading of *Heller*. Although *Heller* acknowledged that the Second Amendment may not afford protection to "sophisticated military arms that are highly unusual in society," the Court did not

---

[1] The state (incorrectly) asserts that the Second Amendment protects arms in common use "at the time of ratification." Opp'n 10, citing *Heller*, 554 U.S. at 627. The Supreme Court rejected that proposition in *Commonwealth v. Caetano*, 136 S. Ct. 1027, 1027. In all events, firearms over ten rounds pre-date the Founding by hundreds of years and were commonly used by Americans by the time the Second Amendment was adopted. Mot. 2; Barvir Decl. at x. 1 at 22-23, Ex. 2 at 30-32, Ex. 12 at 295-304, 308-09.

suggest that arms commonly possessed by the American public are undeserving of Second Amendment protection simply because they have a military pedigree. *Heller*, 554 U.S. at 627-28, citing *United States v. Miller*, 307 U.S. 174, 179 (1939). Under the state's extreme approach, the Second Amendment would not apply to iconic civilian firearms like the 1903 Springfield Rifle or the Colt M1911 pistol simply because they were developed for use by the military. *See* Barvir Decl., Ex. 2 at 31.

Moreover, the very text of the Constitution forecloses the state's contention. That the military might also find some arms useful can hardly suffice to take them outside the scope of an amendment designed, in part, to ensure the existence of "[a] well regulated militia." U.S. Const. amend. II. The Court should decline the state's invitation to stray from controlling precedent and to adopt a reading of the Second Amendment that is inconsistent with its text.

**Second,** California's sweeping ban on LCMs does not have any meaningful historical pedigree. Mot. 10-12. The handful of jurisdictions that have restricted magazine capacity simply do not amount to the sort of longstanding and widely accepted restrictions that might shield the State's magazine ban from Second Amendment scrutiny. *Id*. The state's rebuttal that Plaintiffs failed to cite "five other jurisdictions [that] enacted capacity-based" restrictions in the 1930s, each of which referenced limits of fewer than ten rounds" does not call that conclusion into question. Opp'n 4-5. But these restrictions focused on the ability of the firearm to disperse many shots "by a single function of the firing device." Defs.' Req. Jud. Notice, Ex. B, *see also id.*, Exs. A, C-E. The state ham-fistedly adds to Plaintiffs' list of magazine-capacity restrictions five Depression-era *machine gun bans*. This handful of laws provides no historical basis for excluding common handgun and rifle magazines from the Second Amendment's protection.

In the end, the few capacity-based magazine bans on the books today are far from longstanding, with all but one enacted in recent years. Thus, as this Court and nearly every appellate court to consider the issue has found or assumed, LCM bans

burden Second Amendment conduct. Mot. 8-9.

**B.     California's LCM Ban Cannot Withstand Heightened Scrutiny**

Because LCM acquisition and possession is constitutionally protected, the state's ban must satisfy heightened scrutiny. *See Fyock*, 779 F.3d at 998. Even assuming intermediate scrutiny applies, *but see* Mot. 12 & n.5, the state fails to show a "reasonable fit" between its interest in public safety and a complete, criminally enforceable ban on LCMs, *U.S. v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013).

The state's primary rationale for the ban is that criminals misuse LCMs and that banning them "has the greatest potential to prevent and limit shootings over the long run." Opp'n 19. The federal government's experience with an LCM ban suggests that a flat ban will not be as effective as the state speculates. But in all events, a flat ban is not remotely drawn to reasonably "fit" the state's interest in public safety. *Chovan*, 735 F.3d at 1139. To the contrary, a categorical ban is the antithesis of "fit." *Id.* As such, sweeping bans on an entire category of constitutionally protected conduct are especially vulnerable to invalidation. *E.g.*, *Heller*, 554 U.S. at 576 (invalidating "total ban" on in-home handgun possession); *see also Citizens United v. FEC*, 558 U.S. 310, 337 (2010) (invalidating "outright ban" on political expenditures).

The law at issue is particularly problematic because it not only bans constitutionally protected property but does so precisely to limit the amount of constitutionally protected property available. In the state's words, a "reduction in the number of LCMs in circulation will reduce the number of crimes in which LCMs are used[.]" Opp'n 20. But just as "a city may not regulate the secondary effects of speech by suppressing the speech itself," a state may not regulate the secondary effects of constitutionally protected magazine ownership simply by reducing the number of such magazines available. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (Kennedy, J., concurring). Indeed, the D.C. Circuit has invalidated under intermediate scrutiny a firearms restriction aimed at limiting the number of handguns in circulation precisely "because, taken to its logical conclusion, that reasoning would

1  justify a total ban on firearms kept in the home." *Heller v. District of Columbia*, 801
2  F.3d 264, 280 (D.C. Cir. 2015). So too here.

3  And even if reducing the number of constitutionally protected magazines in
4  circulation were a valid basis for regulation, which it is not, the state cannot
5  demonstrate that the ban is likely to advance its interest in public safety "to a material
6  degree." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996). "[M]ere
7  speculation or conjecture," will not suffice. *Lorillard Tobacco Co. v. Reilly*, 533 U.S.
8  525, 555 (2001). Here, the state provides only speculation that LCM bans promote
9  public safety. Opp'n 17-22. Its claim is rooted in flawed arguments and supposition
10 that would be unacceptable in other contexts. *See Alameda Books*, 535 U.S. at 438;
11 *see generally* Barvir Decl, Ex. 3-4. The notion that banning LCMs may reduce crime
12 by limiting the supply of LCMs to criminals is simply unsupported by the research.

13 To the contrary, Christopher Koper, the state's expert, has testified that he
14 "cannot conclude to a reasonable degree of probability that the federal ban on . . .
15 large capacity magazines reduced crimes related to guns." Barvir Suppl. Dec., Ex. 87
16 at 16. He also confirmed that the ban "didn't reduce the number of deaths or injuries
17 caused by guns either . . . ." *Id.*, Ex. 87 at 16. Koper has also declared that he is aware
18 of no expert who has studied the effect of the federal ban and arrived at different
19 conclusions. *Id.*, Ex. 87 at 15. Despite these admissions, Koper has opined that LCM
20 bans have the "potential" to reduce the lethality of gun crime. But his own studies
21 found *no evidence* of a reduction in lethality of criminal firearm use. Barvir Decl., Ex.
22 3 at 28-29. This coincides with Plaintiffs' expert's conclusion that "[t]here [was] no
23 significant effect of either the federal or the state LCM ban on the number of mass
24 shootings in California." Barvir Decl., Ex. 4 at 113; *see also id.* (no effect on number
25 of mass shooting deaths).

26 Expert Louis Klarevas' opinion fares no better. For he has not proven "the
27 slightest causal effect of LCM bans on the harm attributable to mass shootings."
28 Barvir Decl., Ex. 3 at 61. That is, in part, because Klarevas failed to study whether

5

REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
17cv1017

mass shootings decrease after an LCM ban takes effect. *Id.* Instead, he "compared states [that have] LCM bans with states that d[o] not." *Id.* This elementary analysis proves nothing. *Id.* At bottom, the state's position that an LCM ban has the "potential" to curb gun violence or mass shootings, specifically, is based not on data, but conjecture. Barvir Decl., Ex. 3 at 61-73. Such unsupported conclusions are not "reasonable inferences based on substantial evidence." Opp'n 15 (citing *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994)(plurality)).

The state also argues that LCM bans help to introduce a "critical pause" in shooting during mass shooting events, allowing potential victims to escape. Opp'n 19. The claim is baseless. All mass shooters in the United States from 1994 to 2013 "either used multiple guns or multiple magazines (usually both)." Barvir Decl., Ex. 3 at 63. This means that any pause prompted by a magazine change would be insignificant at best. *Id.* at 57-60, 63; *see also* Suppl. Barvir Decl., Ex. 88 at 49-51. That is because the shooter can either (a) continue to fire with additional guns or (b) pause only 2-4 seconds, as needed to change magazines. Barvir Decl., Ex. 3 at 63. at Generally, such a break would not perceptibly slow the rate of fire or provide additional time for victims to escape. *Id.*, Ex. 3 at 57-60, 62-63; *see also* Suppl. Barvir Decl., Ex. 88 at 40-42. Claims by the state that victims of Sandy Hook and Las Vegas might have escaped during "lulls" in the shooting created by magazine changes are uncorroborated. Barvir Decl., Ex. 3 at 57.

Finally, the state claims that "LCMs are not *necessary* to exercise the right of self-defense of the home." Opp'n 20 (internal quotation omitted). Setting aside the state's wrongheaded view that the Constitution protects only what it deems "necessary" to the exercise of the right, the argument misses the mark. Plaintiffs provide the opinion of a firearms expert with self-defense experience, explaining why LCMs are effective and, in some cases, crucial for self-defense. Barvir Decl., Ex. 2 at 32-34. The state provides no expert in any relevant field to rebut Plaintiffs' evidence. Instead, it shrugs off Plaintiffs' concerns, citing an economist for the claim that news

6
REPLY TO OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
17cv1017

1  reports rarely report more than 10 shots fired in self-defense. Opp'n 20-21, *but see*
2  Barvir Decl., Ex. 3 at 44 (even assuming only 0.3% of defensive gun uses involve
3  more than ten shots, that would still be about 3,000 cases annually). The state's
4  position, however, would justify banning any protected arm if citizens can engage in
5  self-defense with a different one. *Heller* rejected this rationale. 554 U.S. at 629.

6        Ultimately, the state cannot establish that its law satisfies heightened scrutiny,
7  *Jackson v. San Francisco*, 746 F.3d 953, 965-66 (9th Cir. 2014), based on its position
8  that the benefits of keeping LCMs from criminals outweigh the cost of taking them
9  from law-abiding citizens. Indeed, arguing that its ban has a reasonable fit because an
10 earlier version was "difficult to enforce," the state reveals its view that the most
11 effective way to eliminate injuries from LCMs is simply to eliminate LCMs. Opp'n
12 22. That argument ignores the framers' judgments reflected in the Bill of Rights.

13       Surely, one could argue that the most effective way to eliminate defamation is
14 to prohibit printing presses, or the most effective way to eliminate crime is to
15 empower police officers with unlimited search authority, and so on. But the
16 Constitution prohibits such extreme measures by giving protection to free speech and
17 the privacy of the home. The Second Amendment is no different. *Heller* is clear that
18 the Constitution "necessarily takes certain policy choices off the table." 554 U.S. at
19 636. California's LCM ban is one of them, because it is far too sweeping to reflect any
20 sort of reasonable fit to the state's interest and because the state's rationale, "taken to
21 its logical conclusion," "justif[ies] a total ban on firearms kept in the home." *Heller*,
22 801 F.3d at 280.

23 **II.    Section 32310's Magazine Possession Ban Violates the Takings Clause**

24       The state does not meaningfully dispute that its confiscatory and retroactive
25 possession ban physically dispossesses law-abiding citizens of their lawfully acquired
26 property without just compensation. That is a straightforward violation of the Takings
27 Clause. *See Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2429 (2015).

28       Supreme Court precedent forecloses the state's only response—that it may take

1  citizens' property without compensation so long as it does so under its police power.
2  Opp'n 23. In *Loretto v. Teleprompter Manhattan CATV Corp.*, the Court held that a
3  law requiring physical occupation of private property was both "within the State's
4  police power" *and* a physical taking that required compensation. 458 U.S. 419, 425
5  (1982). The Court made clear that whether a law effects a physical taking is "a
6  separate question" from whether the state has the police power to enact it, and that an
7  uncompensated taking is unconstitutional "without regard to the public interests that it
8  might serve." *Id.* at 426; *see also Williamson Cty. Reg'l Planning Comm'n v.*
9  *Hamilton Bank of Johnson City*, 473 U.S. 172, 197 (1985).
10      The Supreme Court followed the same course in *Lucas v. South Carolina*
11 *Coastal Council*, 505 U.S. 1003, 1020-27 (1992)—a decision the state ignores—
12 holding that a law enacted under the " 'police powers' to enjoin a property owner
13 from activities akin to public nuisances" is not immune from scrutiny even under the
14 more permissive *regulatory* takings doctrine. The Court explained that the
15 "legislature's recitation of a noxious-use justification cannot be the basis for departing
16 from [the] categorical rule that total regulatory takings must be compensated." *Id.* at
17 1026. The same is true for the rule that the government must compensate for physical
18 takings. *Id.* at 1015; *Horne*, 135 S. Ct. at 2428.
19      None of the state's cases supports the proposition that a law "prohibit[ing] the
20 possession of property declared to be a public nuisance is not a physical taking."
21 Opp'n at 23. *Chicago, B&Q Railway v. Illinois* refutes that proposition, as it made
22 crystal clear that "if, in the execution of *any power, no matter what it is*, the
23 government . . . finds it necessary to take private property for public use, it must obey
24 the constitutional injunction to make or secure just compensation to the owner." 200
25 U.S. 561, 593 (1906) (emphasis added). Many cases the state cites did not involve
26 restrictions on possession at all. *See Silveira v. Lockyer*, 312 F.3d 1052, 1092 (9th Cir.
27 2002) (rejecting a takings claim because "plaintiffs who owned assault weapons prior
28 to the enactment of the [state law] are protected by a grandfather clause"); *Wilkins v.*

8

*Daniels*, 744 F.3d 409, 419 (6th Cir. 2014) (finding no taking because the government had merely required appellants to implant microchips into animals that they then "retain[ed] the ability to use and possess"). The two cases that *did* involve challenges to possession bans both notably pre-dated *Horne*. *See Akins v. United States*, 82 Fed. Ct. 619, 623 (Fed. Ct. 2008); *Fesjian v. Jefferson*, 399 A.2d 861 (D.C. Ct. Ap. 1979). To the extent those cases conflict with the Court's later admonition that there is a difference between a regulation restricting the *use* of private property and one that requires "physical surrender," *Horne*, 135 S. Ct. at 2429, they are no longer good law.

Finally, the state's suggestion that there is no taking because Plaintiffs may "permanently" modify their firearms to hold fewer than 10 rounds cannot be reconciled with Supreme Court precedent either. Opp'n 24. In *Horne*, the raisin growers could have "plant[ed] different crops" or sold "their raisin-variety grapes as table grapes or for use in juice or wine." *Horne*, 135 S. Ct. at 2430. And in *Loretto*, the property owner could have converted her building into something other than an apartment complex. *See* 458 U.S. at 439 n.17. The Supreme Court rejected those arguments in both cases, admonishing that "property rights 'cannot be so easily manipulated.' " *Horne*, 135 S. Ct. at 2430 (quoting *Loretto*, 458 U.S. at 439 n.17).

In sum, there is no factual dispute that the law operates to dispossess citizens of their lawfully acquired property. That is a clear violation of the Takings Clause.

**III.   Section 32310's Magazine Possession Ban Violates Due Process**

The state's minimalist response to Plaintiffs' due process claim is unavailing. The state half-heartedly claims that its ban is not retroactive because it penalizes only the present-day failure of citizens to comply with the obligation to dispossess themselves of lawfully obtained magazines. Opp'n 25. But what makes a law retroactive is that it "change[s] the legal consequences of transactions long closed." *E. Enters. v. Apfel*, 524 U.S. 498, 548 (1998) (Kennedy, J., concurring). Declaring lawfully acquired magazines contraband after the fact does just that. The state must thus justify "[t]he retrospective aspects of legislation, as well as the prospective

aspects." *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 16-17 (1976).

The state first tries to satisfy that burden by noting that "assailants in many mass shootings" were once law-abiding citizens. Opp'n 25. That ipse dixit does not even justify the law's prospective aspects, let alone its retrospective aspects, and indeed just underscores the law's sweeping overbreadth. The question the state should be asking is whether the targets of the possession ban are likely misuse their magazines, and the state does not even try to prove (because it is not true) that law-abiding citizens who lawfully obtained a now-prohibited magazine are likely to use them to commit a mass shooting.

The state next claims that the possession ban "enable[s] the effective enforcement" of existing restrictions on magazine capacity. Opp'n 25. But the state's only support for that claim—that law enforcement officers will no longer have to "guess" which magazines are "grandfathered and which were acquired illegally," Opp'n 22—is once again just simple say-so that could be hypothesized where any retroactive possession ban is concerned. That does not cut it under "heightened scrutiny." *Kelo v. City of New London*, 545 U.S. 469, 493 (2005) (Kennedy, J., concurring). The state also fails to grapple with the reality that its possession ban is likely to impact only law-abiding citizens since criminals are exceedingly unlikely to comply anyway. *See* Mot. 24-25. Thus, the law will burden only law-abiding citizens, with no corresponding benefit to public safety. A retroactive law that operates in that way does not satisfy due process.

## CONCLUSION

For these reasons, Plaintiffs urge this Court to grant their Motion for Summary Judgment or, Alternatively, Partial Summary Judgment.

Dated: April 23, 2018              **MICHEL & ASSOCIATES, P.C.**

/s/ Anna M. Barvir
Anna M. Barvir
Email: abarvir@michellawyers.com
Attorneys for Plaintiffs

# CERTIFICATE OF SERVICE
# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

    I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

    I have caused service of the following documents, described as:

**PLAINTIFFS' REPLY TO DEFENDANT'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

on the following parties by electronically filing the foregoing on April 23, 2018, with the Clerk of the District Court using its ECF System, which electronically notifies them.

| | |
|---|---|
| John D. Echeverria | Anthony P. O'Brien |
| Deputy Attorney General | Deputy Attorney General |
| john.echeverria@doj.ca.gov | anthony.obrien@doj.ca.gov |
| 300 South Spring Street, Suite 1702 | 1300 I Street, Suite 125 |
| Los Angeles, CA 90013 | Sacramento, CA 95814 |

    I declare under penalty of perjury that the foregoing is true and correct. Executed on April 23, 2018, at Long Beach, CA.

/s/Laura Palmerin
Laura Palmerin