C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al.,<br><br>                              Plaintiffs,<br><br>                    v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>                              Defendant. | Case No:  17-cv-1017-BEN-JLB<br><br>**SUPPLEMENTAL DECLARATION OF ANNA M. BARVIR IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT; EXHIBITS 87-88**<br><br>Hearing Date:    April 30, 2018<br>Hearing Time:    10:30 a.m.<br>Judge:           Hon. Roger T. Benitez<br>Courtroom:       5A |

## SUPPLEMENTAL DECLARATION OF ANNA M. BARVIR

1.      I am an attorney at the law firm Michel & Associates, P.C., attorneys of record for Plaintiffs in this action. I am licensed to practice law before the United States District Court for the Southern District of California. I am also admitted to practice before the Eastern, Central, and Northern Districts of California, the courts of the state of California, the Supreme Court of the United States, and the D.C., Fourth, Ninth, and Tenth Circuit Courts of Appeals. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

2.      Attached hereto as **Exhibit 87** is a true and correct copy of excerpts from the February 3, 2014 deposition of Dr. Christopher S. Koper in the matter of *Tardy v. O'Malley*, United States District Court, District of Maryland, Case No. CCB-13-2841.

3.      On January 3, 2018, counsel for Defendant deposed Plaintiffs' designated rebuttal expert, Gary Kleck. Attached hereto as **Exhibit 88** is a true and correct copy of excerpts from the transcript of Dr. Kleck's deposition.

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on April 23, 2018.

Anna M. Barvir
Declarant

1
2

**EXHIBITS**
**TABLE OF CONTENTS**

3

| Exhibit | Description | Page(s) |
|---------|-------------|---------|
| 87 | Excerpts from the 2/3/14 deposition transcript of Dr. Christopher S. Koper in the matter *Tardy v. O'Malley* | 1-36 |
| 88 | Excerpts from the 1/3/18 deposition transcript of Dr. Gary Kleck | 37-68 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

EXHIBITS TABLE OF CONTENTS

17cv1017

# EXHIBIT 87

Exhibit 87

1

**In The Matter Of:**

*Shawn J. Tardy, et al.  vs.*

*Martin J. O'Malley, et al.*

---

*Christopher S. Koper, Ph.D.*

*Vol. 1*

*February 3, 2014*

---

*Gore Brothers Reporting & Videoconferencing*

*20 South Charles Street, Suite 901*

*Baltimore, MD 21201*

*410-837-3027*

*www.gorebrothers.com*



Since 1961 -  Serving MD, DC & VA - Worldwide

Min-U-Script® with Word Index

Exhibit 87

2

1

1          IN THE UNITED STATES DISTRICT COURT

2             FOR THE DISTRICT OF MARYLAND

3                  (Northern Division)

4

5   SHAWN J. TARDY, et al.

6           Plaintiffs          Case No.

7   vs.                          1:13-cv-02841-CCB

8   MARTIN J. O'MALLEY, et al.

9           Defendants

10   _____/

11

12          The deposition of CHRISTOPHER S. KOPER,

13   PH.D. was held on Monday, February 3, 2014, commencing

14   at 1:48 p.m., at George Mason University, Research

15   Hall, 4400 University Drive, Fairfax, Virginia 22030,

16   before Amanda J. Curtiss,  CSR, Notary Public.

17

18

19

20

21   REPORTED BY:  Amanda J. Curtiss, CSR

Exhibit 87

3

```
                                                                    2

 1   APPEARANCES:

 2

 3              ON BEHALF OF THE PLAINTIFFS:

 4              JOHN PARKER SWEENEY, ESQUIRE

 5              JAMES W. PORTER, III, ESQUIRE

 6              MARC A. NARDONE, ESQUIRE

 7                  Bradley, Arant, Boult, Cummings, LLP

 8                  1615 L Street, NW, Suite 1350

 9                  Washington, DC 20036

10                  Telephone: 202-719-8216

11                  Facsimile: 202-719-8316

12                  Email: jsweeney@babc.com

13

14              ON BEHALF OF DEFENDANT, MARTIN J. O'MALLEY:

15              MATTHEW J. FADER, ESQUIRE

16                  Maryland Office of the General Attorney

17                  200 Saint Paul Place, 20th Floor

18                  Baltimore, Maryland 21201

19                  Telephone: 410-576-7906

20                  Facsimile: 410-576-6955

21                  Email: mfader@oag.state.md.us
```

57

1   more new permits.  You would have to get one that's

2   already existing somehow.

3       Q     So I could -- I could purchase one from

4   somebody whose already owned?

5       A     Correct.  If -- if you went through all the

6   proper procedures and background checks.

7       Q     All right.  But I couldn't do that with

8   respect to a semi-automatic long gun that's banned in

9   Maryland?

10      A     You would -- you could keep the one that

11  you have right now, but you wouldn't be able to

12  transfer it, no.

13      Q     Right.  But I could if I jumped through the

14  right hoops get myself a machine gun; correct?

15      A     Well, you know, Maryland legislatures and

16  the federal -- federal legislatures have different

17  considerations, different ways they chose to approach

18  the issue.

19      Q     Right.  And so the federal government never

20  actually banned machine guns?

21      A     In a strict sense, that's perhaps true, but

58

1    they very heavily regulate them and restrict them.

2         Q     Understood.  We wouldn't want them falling

3    into criminal hands, would we?

4         A     No.

5         Q     Are you an expert in ballistics?

6         A     I have some general knowledge.  I -- I

7    should hesitate to call myself an expert, per se.

8         Q     All right.  And while you're an expert in

9    firearms policy, are you an expert in firearms?

10        A     How do you mean?

11        Q     Technical aspects of firearms, for

12   instance.

13        A     I have a limited basic working knowledge.

14   Of course in doing the assault weapons work, I had to

15   learn a lot about different makes and models and their

16   features.  I'm not the sort of person who could take

17   apart a firearm for you and put it back together.

18        Q     You are not?

19        A     No.

20        Q     Do you own any firearms?

21        A     No.

59

1        Q        Have you ever owned any firearms?

2        A        No.

3        Q        Have you fired firearms?

4        A        Yes.

5        Q        When did you do that?

6        A        In the -- I was in a police lab and I fired

7    some firearms before.

8        Q        And when was that?

9        A        Several years back.

10       Q        And where was that?

11       A        I remember firing some guns in a lab in

12   Kansas City.  I'm not sure if I've been any place else,

13   but I remember that one.

14       Q        All right.  And what firearms did you fire

15   at the police lab in Kansas City?

16       A        Some different handguns.

17       Q        And do you recall what makes and models you

18   fired?

19       A        Not clearly, no.

20       Q        Do you recall if you fired revolvers?

21       A        Yeah, there was one revolver and at least

82

1          MR. SWEENEY:  All right.  Let's pull out

2    the 2004 article.  Let's mark this as the next exhibit.

3    I think we're finally at five.

4          (Koper Exhibit 5 was marked for

5    identification.)

6                (Off the record.)

7    BY MR. SWEENEY:

8    Q      Let's go back on the record.

9          On page 81 of your 2004 report that we've

10   marked as Koper Exhibit 5, you state your conclusions

11   with respect to the effect of the assault weapon and

12   large capacity magazine federal ban; correct?

13   A      Are you referring to the first full

14   paragraph?

15   Q      Yes, I am.

16   A      That's a partial statement of it, yes.

17   Q      All right.  And you state there quote,

18   "Because offenders can substitute non-banned guns and

19   small magazines for banned AWs and LCMs," meaning

20   assault weapons and large capacity magazines?

21   A      Correct.

83

1      Q        "There is not a clear rationale for

2   expecting the ban to reduce assaults and robberies with

3   guns."  Am I reading that correctly?

4      A        Yes.

5      Q        And that correctly and accurately state

6   your conclusion with respect to the impact on

7   firearm-related crime of the federal ban on assault

8   weapons and large capacity magazines; correct?

9      A        That's a partial statement of it.

10     Q        All right.  But -- but accurate in and of

11  itself?

12     A        Yes.

13     Q        Okay.  And when you say you would not

14  expect the assault weapon or large capacity magazine

15  ban to reduce assaults with guns, that would include

16  assaults leading to homicides; correct?

17     A        Not exactly.  What I'm saying here is I

18  don't expect the overall level of assaultive violence

19  with guns to change whether or not these guns and

20  magazines are available, but what I am hypothesizing is

21  that changes in the use of these guns and magazines

84

1    could affect the share of attacks that involve -- that

2    result in injuries or deaths.

3         Q      But -- but they -- you would not expect a

4    ban on assault weapons or large capacity magazines to

5    actually reduce the number of firearm-related assaults

6    or robberies; correct?

7         A      Correct.

8         Q      And you would not expect a ban on assault

9    weapons or large capacity magazines to reduce

10   firearm-related home invasions; correct?

11        A      No.  Correct, I mean.

12        Q      And you wouldn't expect a ban on assault

13   weapons or large capacity magazines to reduce the

14   number of firearms assaults on police officers;

15   correct?

16        A      Correct.  That's fair enough.

17        Q      On note 95 on that page, you address I

18   believe state bans on assault weapons in which you say,

19   "A few studies suggest that state-level assault weapon

20   bans have not reduced crime."  Am I reading that

21   correct?

85

1       A       Yes.

2       Q       And is that still your view today?

3       A       I've not seen any further studies of this

4   yet, but yes, I mean, essentially that's the

5   conclusion.

6       Q       All right.

7       A       With the qualifiers that are stated in the

8   rest of the footnote.

9       Q       Let's mark this as Exhibit 6, please.  Let

10  me show you what I've marked as Exhibit 6, which is an

11  article authored by Mark Gius, G-I-U-S, on an

12  examination of the effects of concealed weapon laws and

13  assault weapons bans on state-level murder rates.

14              (Koper Exhibit 6 was marked for

15  identification.)

16      A       Okay.

17      Q       And I first ask you are you familiar with

18  this article?

19      A       No.  I've not read this.

20      Q       And has anyone mentioned this to you?

21      A       Defense counsel did mention the existence

86

1  of this.

2      Q      All right.  And this appeared in Applied

3  Economics Letters; right?

4      A      Okay.

5      Q      And is that a peer reviewed journal, to

6  your knowledge?

7      A      I don't know.

8      Q      All right.  And, you know, do you make it

9  your business to keep up with the literature on the

10  impact of firearms bans?

11     A      I try to.  How extensively I'm engaged in

12  that research might ebb and flow a little bit depending

13  on what exactly I'm working on at that time, so I see

14  this article, for example, just came out in last

15  November so that's quick to keep up with.

16     Q      All right.  And my reading of this, and I

17  appreciate if you just put it in front of you, is that

18  it concludes using data for the period I believe 1980

19  to 2009 that state-level assault weapons bans did not

20  reduce state-level murder rates.  And that would be

21  consistent with the prior studies in your footnote 95

93

1   matters as much or more than statistical significance.

2        Q        All right.  And above that -- no,

3   nevermind.  Scratch that.

4                 Turning back to your 2004 study, did you

5   have anything in here on the impact on homicide rates

6   of the federal assault weapons and large capacity

7   magazine ban?

8        A        We did a few things here that were a bit

9   tentative.  As I said, the analysis of the key initial

10  intermediate outcome measures showed mixed results.  So

11  we saw that there was a reduction in the use of assault

12  weapons, but not clearly a reduction yet in the use of

13  guns with large capacity magazines.  So any further

14  analysis of impacts on measures like of injuries and

15  deaths was going to be ambiguous and somewhat

16  problematic, but nonetheless I did put together a few

17  basic trend lines for descriptive purposes looking at

18  some measures that I thought might potentially be

19  affected by ups and downs in the use of assault weapons

20  and large capacity magazines.  So I was looking at a

21  few different things like the percentage of violent gun

94

1    crimes resulting in death.  I think the percentage of

2    gunshot victimizations resulting in death.  I also

3    summarized in chapter nine of this report some of the

4    other findings that we had had in the '97 report when

5    we had looked at some different similar types of

6    outcome measures.

7         Q     On page 96 of your 2004 report marked as

8    Exhibit 5, that's your summary of your conclusions;

9    correct?

10        A     Yes.

11        Q     And in the third sentence you state, "There

12   has been no discernable reduction in the lethality and

13   injuriousness of gun violence," is that correct?

14        A     Yes.

15        Q     And is that still your view today based

16   upon your study and analysis of the impact of the

17   federal ban on assault weapons and large capacity

18   magazines?

19        A     Yes.  Based on the data that I analyzed,

20   it's still my view of it.  Again, subject to the

21   qualifications that I noted earlier.

95

1     Q       All right.  And are you aware of anyone

2   else's data with respect to studying the impact of the

3   federal ban on assault weapons and large capacity

4   magazines that reached a conclusion different from the

5   conclusion that you state here?

6     A       No.

7     Q       Would you agree with me that the government

8   interest to be served by the federal assault weapon ban

9   and large capacity magazine ban was the reduction of

10  firearm-related violence; correct?

11    A       You could view it that way or you could

12  view it more specifically as trying to get a reduction

13  in shootings in incidents with high numbers of shots

14  fired.  And so, you know, again, I tended to view --

15  judge this more specifically in terms of effects on gun

16  injuries and gun deaths.  As I noted in the report,

17  given the trends in use of assault weapons and large

18  capacity magazines that had been observed to that

19  point, I felt it was actually premature to make any

20  definitive conclusions about the ban's effects on gun

21  deaths and injuries.  I felt that the effects of the

96

1   ban were still unfolding at that time and might still

2   take a while to fully unfold.

3       Q       Isn't it true that as you sit here today,

4   you cannot conclude with a reasonable degree of

5   scientific probability that the federal ban on assault

6   weapons and large capacity magazines reduced crimes

7   related to guns?

8       A       Correct.

9       Q       And it didn't reduce the number of deaths

10  or injuries caused by guns either; correct?

11      A       Correct.

12      Q       Returning to your report for a moment,

13  Professor.  I lost my copy of.

14              On paragraph five at the top of page two

15  you say, "Based on my research, I found, among other

16  things, that assault pistols" --

17      A       I'm sorry.  Could you clarify for me?

18      Q       I'm sorry.  Page two.

19      A       Page two.  Got you.

20      Q       Paragraph five.

21      A       Uh-huh.

97

1        Q        Under "Summary of Findings."

2        A        Okay.

3        Q        You state, "Based on my research, I found,

4    among other things, that assault pistols are used

5    disproportionately in crime in general, and that

6    assault weapons more broadly were disproportionately

7    used in murder and other serious crimes in some

8    available data sources," correct?

9        A        Yes.

10       Q        Let's see if we can pull that apart so I

11   can understand what you're saying here.  Now, how do

12   you define assault pistols?

13       A        Handguns that have the military style

14   features qualifying as assault weapons.

15       Q        And would you agree with me that they

16   became popularly used by criminals in connection with

17   the so-called crack epidemic of the 1980s?

18       A        I don't know that I can make a statement

19   that specific.  I can say that, I mean, there are

20   statistics in the report on how widely they were used

21   in crime.  Generally assault weapons accounted for a

131

1    and considering mass shootings by the number of people

2    shot as opposed to the number of people killed --

3         A       Uh-huh.

4         Q       -- and if you assume four or more, can you

5    state to a reasonable degree of scientific probability

6    based upon the evidence available to you that banning

7    assault rifles will reduce the number of incidents of

8    mass shootings?

9         A       I can't say that based -- I mean, I can't

10   make a firm projection of that based on any particular

11   available data.  There might be data to suggest that

12   there could be some reduction in that, but it's hard to

13   really clearly project what that would be or how

14   difficult it might be to detect statistically.

15        Q       We have to work with a legal standard for

16   expert opinion in the reasonable probability range.

17        A       Uh-huh.

18        Q       I'm not sure in the legal context what, you

19   know, firm means as you mean it, but I'm trying to

20   understand whether you can state your opinion to a

21   reasonable degree of scientific probability that

132

1   banning assault rifles would reduce the incidents of

2   public shootings, mass shootings.

3       A       Again, I mean, all I can say is attacks

4   with those sorts of weapons tend to result in more

5   victims being hit, so it stands to some reason that if

6   you reduced the use of these types of weapons, it could

7   reduce the tallies of victims hit in these incidents.

8   And it's not actually just a matter of the mass

9   shooting incidents.  It's also a matter of incidents

10  with high numbers of shots fired, regardless of how

11  many people get hit.  So that has to be taken into

12  account as well.

13          And I've tended to focus more on that issue

14  in my research, you know, going back to the Jersey City

15  data, for example, that suggested that about five

16  percent of gunshot victimization stemmed from incidents

17  with more than ten shots fired.  And so based on that,

18  one might project a small percentage reduction in

19  shootings overall from this type of legislation.

20      Q       Do you have your publication of your

21  New Jersey data?  Did you publish that?

133

1      A      Yes.  Uh-huh.

2      Q      And when we looked at your CV, I know we

3 talked about it briefly, and is this the Reedy and

4 Koper 2003 article?

5      A      Yes.

6      Q      How many incidents did you study that

7 involved more than ten shots being fired?

8      A      In the sample that we had, I believe there

9 were something like maybe six incidents that involved

10 more than ten shots fired.

11     Q      And do you recall what the base was of

12 total incidents?

13     A      It's in the -- it's in the study.

14     Q      Why don't we mark this since we're going to

15 be talking about it?  Exhibit 9.

16             (Koper Exhibit 9 was marked for

17 identification.)

18             MR. FADER:  And John, maybe in the next

19 five minutes if we can take a little water break.

20             MR. SWEENEY:  Now.  Let's break right now.

21                  (Off the record.)

134

1    BY MR. SWEENEY:

2         Q      Back on the record.

3                While we were on the break, I tried to

4    focus myself on the portions of your 2003 study which

5    we have marked as Exhibit 9.  First of all, it appears

6    that there were some -- well, if I look at the data

7    tables that you have on page 153 of Exhibit 9, figure

8    one involves assault incidents with a semi-automatic

9    pistol; correct?

10        A      Yes.

11        Q      And you had 239 of those; right?

12        A      Yes.

13        Q      How many of those involved more than ten

14   shots being fired?  Where would I find that number?

15        A      That would be on page 154 on table one.  We

16   had -- one column has minimum shots fired estimates,

17   the other has maximum shots fired estimates if there

18   happened to be a range in the data.

19        Q      Am I correct in interpreting this that it's

20   six out of approximately 165 pistol incidents in which

21   more than ten shots were fired?

135

1        A      Yes.

2        Q      So that's roughly 3.6 percent?  Does that

3    sound about right to you?

4        A      Yes.

5        Q      Okay.  Let me see if I can understand this

6    study a little bit more.  Going back to page 153 figure

7    one, outcomes of assault incidents involving

8    semi-automatic pistols, you state handgun type was not

9    associated with attack outcomes; correct?

10       A      In this categorical tree, that's correct.

11       Q      All right.  So regardless of whether

12   someone was using a semi-automatic pistol or a

13   revolver, there was no difference in the outcome be it

14   injury or death?

15       A      Overall for the incident, yes.

16       Q      All right.  And immediately below figure

17   two you state, "Although pistol cases involved higher

18   numbers of shots, they were not significantly more

19   likely to result in injuries either fatal or nonfatal

20   than were revolver cases," is that correct?

21       A      Yes.  I think what we're talking about

136

1    there is when you're looking at the likelihood that a

2    gunfire incident resulted in any victimization, you

3    know, any injury, I think there was no significant

4    difference there.  We did find a difference in the

5    number of people who are wounded.

6         Q       On the right-hand column, second full

7    paragraph you state, "Finally, figures one and two show

8    that gunshot injury incidents involving pistols were

9    less likely to produce a death than were those

10   involving revolvers," correct?

11        A       Yes.

12        Q       Had you differentiated between pistols with

13   large capacity magazines and those without large

14   capacity magazines here?

15        A       There was only limited data on that, so we

16   couldn't examine that in a great deal of depth.

17        Q       So is it fair to say that based upon the

18   data in this study, pistols involving larger capacity

19   magazines were less likely to produce a death than were

20   those involving revolvers?

21        A       I wouldn't necessarily say that.  It would

137

1    depend.  You'd have to look specifically at the cases

2    where a large capacity magazine was involved.

3        Q      All right.  But we don't really have that

4    breakdown reliably, do we, or at least completely?

5        A      Not completely.

6        Q      Can you interpret the data here to support

7    the statement that gunshot injury incidents involving

8    pistols with large capacity magazines were more likely

9    to produce death than were those involving revolvers?

10   Does your data support that statement?

11       A      More likely to produce death?

12       Q      Yes.

13       A      No.  I can't say that based on what we have

14   here.

15       Q      All right.  Now, under your discussion

16   below beginning with the second sentence, you state,

17   "Gun attackers using pistols tend to fire more shots

18   than attackers using revolvers," correct?

19       A      Yes.

20       Q      And then you go on to say, "This shot

21   differential does not appear to influence the

138

1    probability that an incident will result in injury or

2    death, nor the number of wounds sustained by gunshot

3    victims."  Am I reading that correctly?

4        A      Yes.

5        Q      And that's the conclusion of this study;

6    correct?

7               MR. FADER:  Objection.

8               THE WITNESS:  Well, that's -- yeah, that's

9    only one conclusion.  As we go on to say, offenders

10   using pistols tend to fire -- tend to wound more

11   persons.  Also, it should be noted that while this is

12   not reported in this particular article, for the 2004

13   report on assault weapons we did some additional

14   analyses of cases involving more than ten shots and

15   those cases actually had a 100 percent injury rate.

16   You know, at least one person was injured in all of

17   those cases.

18   BY MR. SWEENEY:

19       Q      Now, there were only a handful of such

20   cases in this study; correct?

21       A      Correct.

169

1              MR. FADER:  Objection.

2              THE WITNESS:  It's hard to -- to break

3    down -- once again, you know, as we mentioned earlier,

4    it's harder to break down all these specific features

5    and describe which ones put a gun at highest risk of

6    being used in crime, I think, other than noting that

7    they're -- they're large capacity magazines and

8    different aspects of their design that are designed to

9    facilitate rapid fire.

10   BY MR. SWEENEY:

11       Q      And isn't it true that criminals

12   overwhelmingly choose handguns over long guns to commit

13   crimes?

14       A      Yes.

15       Q      And your data would indicate that to the

16   extent there's a criminal preference for using assault

17   pistols, there isn't one evident from the evidence with

18   respect to using assault rifles by criminals; correct?

19              MR. FADER:  Objection.

20              THE WITNESS:  It's not as clear.  As we've

21   discussed earlier, there are a few statistics from

170

1    which one might try to infer that, but the case, yeah,

2    it's not as clear.  It's fair to say.

3    BY MR. SWEENEY:

4        Q      Now, in paragraph eight of your report, you

5    state in the second sentence that Maryland's

6    recently-enacted ban on assault weapons and large

7    capacity magazines has the quote "potential" close

8    quote to accomplish a couple of things; correct?

9        A      Yes.  Okay.

10       Q      Now, when you say potential, I'm trying to

11   understand what you mean here.  Would you agree with me

12   that any law would have the potential to produce a

13   benefit?

14              MR. FADER:  Objection.

15              THE WITNESS:  Might depend on -- on what it

16   is.  In this case, you know, I'm saying potential based

17   largely on my studies of the federal assault weapons

18   ban and what -- what we found there.

19   BY MR. SWEENEY:

20       Q      Can you state with a reasonable degree of

21   scientific probability that the ban on assault weapons

171

1  and large capacity magazines in Maryland will reduce

2  the number of crimes committed with assault weapons and

3  other firearms with large capacity magazines?

4      A      I can't put a probability on that.  You

5  know, all I can say is based on the experience with the

6  federal assault weapons ban, that there are grounds for

7  believing that the Maryland law could achieve that in

8  extrapolating from the results of the federal study.

9  Otherwise, one has to actually study the implementation

10  of the Maryland law to begin putting, you know,

11  probabilities on it and measuring those effects.

12      Q      All right.  Can you say to a reasonable

13  degree of scientific probability that the ban on

14  assault weapons and large capacity magazines in

15  Maryland will reduce the number of shots fired in gun

16  crimes?

17      A      Not sure what you mean by a reasonable

18  probability 'cause I just I can't put a probability on

19  it and tell you how likely it is to occur.

20      Q      Can you say to a reasonable degree of

21  scientific probability that the Maryland ban on assault

172

1   weapons and large capacity magazines will reduce the

2   number of gunshot victims in such crimes?

3        A     Again, same answer.  I can't state it with

4   an exact probability at this time.

5        Q     And if I ask you the same question with

6   respect to number four, reduce the number of wounds per

7   gunshot victim, and five, reduce the lethality of

8   gunshot injuries when they do occur, and six, reduce

9   the substantial societal costs that flow from

10  shootings, would your answer be the same?

11       A     Yes.

12       Q     Okay.  Now, the Maryland law does not

13  prohibit all semi-automatic firearms; correct?

14       A     Correct.

15       Q     And criminals can substitute semi-automatic

16  firearms that aren't banned; correct?

17       A     Those and other guns.

18       Q     Right.  And isn't that variable something

19  that you can't control and one of the reasons why you

20  can't say to any probability whether or not the ban

21  will accomplish the six items that you state in

173

1   paragraph eight of your report?

2                MR. FADER:  Objection.

3                THE WITNESS:  In principle, the

4   substitution of non-banned guns and magazines has the

5   potential to lessen the lethality and injuriousness of

6   gun attack incidents.  So I wouldn't say that the

7   Maryland ban is going to reduce the rate of gun crime,

8   but what I am saying is there's a possibility it could

9   reduce shots fired, people hit, wounds inflicted, those

10  sorts of things in attacks that -- that happen.

11  BY MR. SWEENEY:

12     Q      If a particular banned assault rifle, a

13  Colt AR-15, can readily be substituted with a Colt AR

14  HBAR, isn't the ban unlikely to have any significant

15  impact on the use of assault rifles in crime?

16     A      Well, that one particular instance, it

17  seems that the policy makers for whatever reason have

18  allowed one similar variation of the AR-15 to still be

19  legal.  I don't know what all the considerations were

20  in doing that.  I suppose it was part of political

21  bargaining.  But it does raise the possibility that

184

1        A        Uh-huh.

2        Q        Is that because you cannot say to a

3   reasonable degree of scientific probability?

4        A        In some of these cases, you have very small

5   numbers of incidents.  It may be hard to do say

6   statistical significance tests.  In some cases, there

7   are statistical significance tests showing that there

8   is a significant difference between the two sets of

9   cases.  So beyond that, it's harder to say.  I mean, we

10  don't -- we don't have randomized trials testing the

11  impact of weapon type on attack outcomes, so there

12  is -- there's always going to be some debate over the

13  patterns and the correlations in the data.

14       Q        To press my point but without trying to,

15  and please forgive me, I don't want to sound like I'm

16  badgering you in any respect.  But the limitations of

17  the scientific data are such that you simply can't say

18  to a reasonable degree of scientific probability that

19  you would be able to reduce public shootings even if

20  you were to eliminate large capacity magazines;

21  correct?

185

1              MR. FADER:  Objection.  You can answer.

2              THE WITNESS:  Again, you can't say that

3    you'll eliminate all public shootings.  What these data

4    suggest is that you would reduce the number of victims.

5    I can't necessarily -- it's hard to put specific

6    probabilities on it, but that's what these data

7    suggest.  When you see some -- some of these

8    comparisons that were done in Luke's Dillon's thesis

9    even showed statistically significant differences

10   between the LCM cases and the non-LCM cases, that would

11   seem to provide some better degree of scientific

12   certainty.

13   BY MR. SWEENEY:

14       Q      But because of the availability of multiple

15   firearms and multiple magazines that aren't large

16   capacity, can you truly say to a reasonable degree of

17   scientific probability that reducing the number of or

18   even eliminating the number of large capacity magazines

19   will reduce either the incidents of mass public

20   shootings or the number of people injured in such

21   public shootings?

186

1     A      I guess the best way to answer that would

2   be that we'd have to -- we'd have to test that.  We'd

3   have to see a circumstance where use of large capacity

4   magazines was significantly reduced and see what impact

5   that has on -- on these sorts of shootings.

6     Q      And that's because we simply don't have

7   that evidence today; correct?

8     A      We do have some evidence relevant to that.

9   It's just how -- how far you can push it, I guess.

10    Q      Not far enough to state with a reasonable

11  degree of scientific probability; correct?

12             MR. FADER:  Objection.

13             THE WITNESS:  Yeah, I struggle a little bit

14  with that particular phrase because I can't put any

15  specific probability or tell you with -- with, you

16  know, five percent, one percent probability that there

17  will be this change.  I can simply point to the numbers

18  that exist in these studies, and some of these

19  differences are statistically significant differences

20  and so it suggests in principle that if you could

21  reduce the use of these magazines, you could get a

1    reduction.

2    BY MR. SWEENEY:

3        Q      And when we're talking about the

4    probability, in order to say more probable than not

5    it's more than 50 percent likelihood.

6        A      Uh-huh.

7        Q      And I take it the evidence just doesn't

8    support that right now?

9                MR. FADER:  Objection.

10               THE WITNESS:  I would be cautious in making

11   the inferences about, you know, how certain it is that

12   it would happen.

13   BY MR. SWEENEY:

14       Q      And so you cannot say that it would be more

15   likely than not to achieve that?

16       A      Not -- I would have to see more

17   observation.  Have to see what happens.

18       Q      All right.  On page 13, footnote 26, you

19   touch on this in -- this issue of a perpetrator

20   substituting other guns for banned assault weapons, and

21   of course that would also include substituting multiple

188

1  magazines for banned large capacity magazines.  Isn't

2  it likely in Maryland that a criminal who wants to

3  commit a crime with a firearm will still do so even

4  with the new law?

5       A       Who wants to commit a?

6       Q       A crime.

7               MR. FADER:  Objection.

8               THE WITNESS:  Would commit a crime with

9  another weapon you're saying?

10  BY MR. SWEENEY:

11      Q       Yes.

12      A       Yes.

13      Q       And isn't it likely that in Maryland, the

14  law will have little or no impact on the frequency of

15  firearm crime in general?

16      A       I would say that's a reasonable inference.

17      Q       Have you -- are you familiar with the Safe

18  Streets Program?

19      A       In Maryland?

20      Q       Yes.

21      A       Not specifically.  There's a lot of

215

1   Commonwealth of Virginia

2   County of Fairfax:

3          I, AMANDA J. CURTISS, a Notary Public of

4   the State of Virginia, Fairfax County, do hereby

5   certify that the within-named witness personally

6   appeared before me at the time and place herein set

7   out, and after having been duly sworn by me, according

8   to law, was examined by counsel.

9          I further certify that the examination was

10  recorded stenographically by me and this transcript is

11  a true record of the proceedings.

12         I further certify that I am not of counsel

13  to any of the parties, nor in any way interested in the

14  outcome of this action.

15         As witness my hand this 5th day of

16  February, 2014.

17  _____

18                          Amanda J. Curtiss, CSR

19                                  Notary Public

20  My Commission Expires:

21  October 31, 2015 - #7513095

# EXHIBIT 88

Exhibit 88

37

Atkinson-Baker Court Reporters
www.depo.com

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

3     --------------------------:

4     VIRGINIA DUNCAN, et al.,  :

5                    Plaintiff, :Case No.

6     v.                        :17-cv-1017-BEN-JLB

7     XAVIER BECERRA, in his    :

8     official capacity as      :

9     Attorney General of the   :

10    State of California, et    :

11    al.,                      :

12                    Defendants.:

13    --------------------------:

14          Deposition of GARY KLECK taken at the

15    offices of Kirkland & Ellis, LLP, 655 Fifteenth

16    Street, NW, Washington, DC on Wednesday, January 3,

17    2018, beginning at 9:00 a.m. before Sydney R.

18    Crawford, a Notary Public in and for the District of

19    Columbia.

20    ATKINSON-BAKER, INC. COURT REPORTERS
      (800) 288-3376
21    www.depo.com
      REPORTED BY:  Sydney R. Crawford
22    FILE NO.: AB0D9A1

```
 1   APPEARANCES:

 2

 3   ON BEHALF OF THE PLAINTIFF:

 4        ANNA M. BARVIR, ESQUIRE

 5        Michel & Associates

 6        180 East Ocean Boulevard

 7        Suite 200

 8        Long Beach, California 90802

 9

10

11   ON BEHALF OF THE DEFENDANT:

12        JOSE ZELIDON-ZEPEDA, ESQUIRE

13        Deputy Attorney General

14        455 Golden Gate Avenue

15        Suite 11000

16        San Francisco, California 94102

17

18

19

20

21

22
```

2

Gary Kleck
January 3, 2018

Exhibit 88

39

1    magazines, did they have multiple guns, so.

2           If they had not had that large capacity

3    magazine, could they still have inflicted as many

4    casualties by using smaller capacity magazines,

5    those that are legally allowed with 10 or fewer

6    rounds in them.

7           By definition, incidents where large

8    capacity magazines were not used could not possibly

9    have been influenced by large capacity magazines,

10   it's sort of ridiculously obvious.  But sometimes

11   you're too close to a subject and you miss the

12   obvious.

13      Q.   Is it your opinion that LCMs can only

14   impact mass shootings in terms of the casualty

15   counts involved?

16      A.   Well, there might be other aspects that

17   can be affected, but it wasn't the subject of my

18   research.

19      Q.   Okay.  How did you go about figuring out

20   whether there would have been an impact on the

21   number of fatalities if LCMs had not been available?

22      A.   Well, I wanted to know did the way the

Atkinson-Baker Court Reporters
www.depo.com

1    events occur require the use of a large capacity

2    magazine.  Is there not the same kind of potential

3    for shooting many people without large capacity

4    magazines, so that was a function of finding out,

5    well, how often did those who use large capacity

6    magazines also have other abilities to fire many

7    rounds fairly rapidly without significant

8    interruption.

9           That is to say, how many had either

10   multiple guns and/or multiple magazines which they

11   could use and rapidly reload.  And it turns out all

12   of them did.  In short, the mechanisms that had been

13   proposed by advocates of large capacity magazine

14   bans don't have any support when -- or virtually no

15   support when you study the way the mass shootings

16   have actually occurred.

17          They imply, for example, that somehow

18   without large capacity magazines, shooters would be

19   more often interrupted by bystanders or potential

20   victims tackling them, or they argue that the use of

21   large capacity magazines somehow affects how many

22   moments of non-firing there are when victims would

Atkinson-Baker Court Reporters
www.depo.com

1    have an opportunity to escape.

2           And so I was interested in those proposed

3    mechanisms.  They're not ones I invented, but

4    they're ones that are repeatedly mentioned by

5    supporters of large capacity magazine bans.  And so

6    I simply looked at the details of mass shootings

7    that are relevant to those, those claimed

8    mechanisms.  And what I found is virtually all mass

9    shooters, A, are not tackled while reloading.  And

10   B, don't significantly or in most cases at all slow

11   their rate of fire, increasing the time when they're

12   not shooting, allowing victims to escape.  While,

13   maybe there are maybe other mechanisms people have

14   never publicly articulated, or that nobody has

15   thought of yet, but with regard to the mechanisms

16   that advocates had articulated, they are

17   inconsistent with what we know about how mass

18   shootings occur.

19       Q.   Now, you use the term "mass shootings."

20   You explain what you mean by that?

21       A.   There's many different definitions.

22   They're always defined by a cutoff, in terms of

Gary Kleck
January 3, 2018

Exhibit 88

42

```
1    number of casualties.  One commonly used definition

2    is four or more people killed.  But I regard the

3    defining mass shootings on the basis of those who

4    were killed is somewhat arbitrary.

5           Because there may well be no more than

6    four people shot, total, if four are killed, it's

7    possible four are killed and there are no nonfatal

8    woundings.  And you scarcely need a magazine holding

9    over 10 rounds to shoot four times especially if

10   you're a mass shooting -- a mass shooter who is

11   strongly motivated to kill and who fires at very

12   close range against unarmed victims.

13          And so it didn't strike me as that

14   definition was a useful one because it didn't help

15   isolate cases where you would need a large magazine

16   capacity or where a large magazine capacity is

17   likely to be relevant.

18          So I thought a more appropriate definition

19   pertained to number of persons shot, period, whether

20   killed or not.  So -- and I also set as the cutoff

21   as to how many people had to be shot in order for it

22   to be qual -- to qualify as a mass shooting.
```

Gary Kleck
January 3, 2018

Exhibit 88

43

1          Any cutoff would be somewhat arbitrary.

2    You could make arguments for virtually any cutoff,

3    but I thought a less arbitrary rationale was you

4    could use an ordinary six-shot revolver, and that's

5    the most common magazine capacity of revolvers, if

6    you want to call it that.

7          You could easily shoot six people with an

8    ordinary revolver of the sort that, I don't know,

9    Wyatt Earp might have used in the 1880s.  And so if

10   you wanted to identify cases where it's very likely

11   you had to have a somewhat larger ammunition

12   capacity than that possessed by the typical

13   revolver, you'd have to look at incidents where more

14   than six people got shot.  So that's why I picked

15   the cutoff of six rather than five or seven or

16   whatever.  It was the most common ammunition

17   capacity of old fashioned revolvers.

18         Also by setting the cutoff higher, let's

19   say using six rather than five or four or whatever,

20   I was deliberately favoring the hypothesis that

21   large capacity magazines would affect the casual

22   count.  Because it's almost universally argued,

1    including by advocates, that it's mass shootings,

2    and it's cases where many rounds are fired, and

3    where many people are shot.

4            Those are the ones where it's most likely

5    the use of a large capacity magazine will have an

6    impact.  And so by setting the cutoff higher, I was

7    in effect favoring the hypothesis that large

8    capacity magazine use makes a difference.

9        Q.   You mentioned advocates of large capacity

10   magazines.  Is it fair to say that you do not

11   consider yourself an advocate of large capacity

12   magazines?

13       A.   You mean bans on them?

14       Q.   Thank you.  Yes.

15       A.   Right.  I'm not an advocate of either.  Of

16   either using them or banning them.

17       Q.   Okay.  You said that if LCMs, large

18   capacity magazines, are not used in a particular

19   mass shooting, then they could not have impacted

20   that shooting.

21            Can you explain that?

22       A.   No, I'm not sure there's anything I can

Gary Kleck
January 3, 2018

Exhibit 88

45

1   add.  If there was no large capacity magazine used,

2   then obviously it can't have any effect.  I mean,

3   I'm not sure I can offer any further clarification

4   on that.  It's just a logical point.

5       Q.   In your opinion, if a large capacity

6   magazine is not available to an individual

7   committing a mass shooting, could it have impacted

8   that particular shooting?

9       A.   Well, no.  Because if it's not available

10  to them, then they obviously also couldn't have used

11  it.  And if they didn't use it; then, no.  There was

12  no use that could have affected the outcome of the

13  incident.

14      Q.   What about the reverse, if a large

15  capacity magazine is available to a mass shooter,

16  could it have affected that particular shooting?

17          MS. BARVIR:  I'm going to object to these

18  questions as calling for speculation, incomplete

19  hypotheticals, vague and ambiguous.

20          But go ahead if you can understand.

21          THE WITNESS:  Okay.  Could you ask the

22  question again?

Gary Kleck
January 3, 2018

Exhibit 88

46

1          (Record read.)

2          THE WITNESS:  It would be entirely a

3     function of whether they actually used it, not

4     whether it was available to them.  I mean, only

5     actual use, meaning they fired rounds from, and only

6     that could affect the casualty count.

7          And if I had to be more specific, really

8     only firing a number of rounds that only a larger

9     capacity magazine would be capable of holding, only

10    that would imply some possible effect on the

11    casualty count.

12    BY MR. ZELIDON-ZEPEDA:

13         Q.   Okay.  Thanks for the clarification.

14         Are there any other aspects of mass

15    shootings that you have studied in this context

16    regarding LCM bans other than casualty counts?

17         A.   Not that I recall, although some stuff

18    I've done on assault weapons goes way, way back to

19    like the late '80s, so nothing that I can recall at

20    this time.

21         Q.   How did you go about studying this

22    particular phenomenon, whether LCMs had an impact in

Gary Kleck
January 3, 2018

Exhibit 88

47

1   mass shootings as to casualty count?

2       A.   Well, first of all, I had to get as

3   comprehensive a set of mass shootings in which more

4   than six people were shot, and it was known that a

5   large capacity magazine was used.  So I consulted

6   multiple resources, including Violence Policy

7   Center's compilation of mass shootings regarding

8   large capacity magazines.

9           I consulted other sources but it turned

10  out none of the other sources yielded any additional

11  cases beyond what the Violence Policy Center had

12  identified.

13          And so, for example, there's -- there's a

14  website called ShootingTracker.com, and it attempts

15  to document every single mass shooting where they

16  define it rather liberally as anything involving I

17  think five or more people shot, but it's a more

18  liberal definition, a more inclusive definition than

19  I use.

20          And yet I did not find any cases there

21  either that hadn't already been included in the

22  Violence Policy Center compilation.  So that is the

82

Exhibit 88

48

1    first step, identifying all of the cases in which it

2    was at least possible that use of a large capacity

3    magazine had affected the casualty count.

4            And then I gathered whatever accounts were

5    publicly available on each of the incidents.  There

6    was always press accounts, because this was a very

7    newsworthy topic.  And in some cases there were also

8    official investigative reports that were publicly

9    available, so, for example, particularly important

10   mass shootings like the Sandy Hook shooting had an

11   official governmental report on it.  And so when

12   those were available, I used those as well to gather

13   information about the key details of each incident.

14           And in particular, I was interested in how

15   many guns did the shooter use and how many magazines

16   did they have or make use of.  So not just, you

17   know, whether they had a large capacity magazine,

18   whether they were disrupted in their fire by -- by

19   bystanders tackling them or otherwise disrupting

20   their shooting, whether or not they reloaded during

21   the incident or at least whether it was reported

22   that they had reloaded.

1          And then the next step was statistically

2     analyzing the data I had gathered and put it into a

3     computer file where I recorded each of these bits of

4     information about each of the mass shootings.

5          And so it was a matter of whether or not

6     there was a relationship -- mostly I wanted to know:

7     Were there mass shootings in which the shooter only

8     had one magazine and one gun, and therefore would

9     have had to have had a large capacity magazine in

10    order to continue firing large numbers of rounds

11    without -- without interruption.

12         Because I was testing specifically the

13    notions proposed by advocates of large capacity

14    magazine bans as to how that kind of ban, or

15    conversely, the possession of large capacity

16    magazines would affect how many people got hurt.

17         So in effect, my analysis was determined

18    largely by the concerns and the rationales offered

19    by supporters of these bans for how large capacity

20    magazines might affect how many people got killed or

21    injured.

22         And so I had to know things like did they

Gary Kleck
January 3, 2018

Exhibit 88

50

Atkinson-Baker Court Reporters
www.depo.com

1    have the ability to simply continue firing without

2    large capacity magazines, because they had multiple

3    magazines, or because they had multiple guns.   And

4    could literally have simply continued firing with

5    either no interruption or minimal interruption of a

6    few seconds, even had they only had small capacity

7    magazines.

8              So what I found is all of the mass

9    shooters who use large capacity magazines had the

10   ability to simply continue firing large number of

11   rounds even had they only been equipped with

12   magazines holding quantities of rounds permitted

13   under existing law.

14        Q.   What is the Violence Policy Center?

15        A.   It's a gun control advocacy organization.

16   It's -- it's not a membership organization, I think

17   it's financed mostly by pro-gun control private

18   foundations.   And, you know, it's mostly an office

19   and a letterhead and a website, and, you know, and a

20   staff who are interested in promoting various forms

21   of gun control, which changes over time.

22             But one of the things they recently have

85

Gary Kleck
January 3, 2018

Exhibit 88

51

1   advocated is banning large capacity magazines.

2       Q.   You also mention that you relied on press

3   accounts of mass shootings.  I'm assuming where they

4   were available?

5       A.   There are always news accounts available

6   on mass shootings.  It's an extremely newsworthy

7   kind of event.  And usually multiple sources are

8   available, especially as the casualty count goes up,

9   which means these are cases where it's more likely

10  that one would need a magazine with a large capacity

11  to carry out such massive shootings.

12          Those become even more newsworthy, and so

13  it's likely that you have more and more news

14  accounts including some that provide details that

15  the others did not.

16          So I would usually look through all of

17  those that I could locate, they were heavily

18  duplicative.  I would always use official sources

19  when they were available.  They usually weren't

20  except for the various highest scale mass shootings.

21          But for the most part, I would rely on a

22  limited number of news accounts to provide the

1    necessary details.

2         Q.   Did that in any way impact your ability to

3    generalize to the broader population?

4         A.   The broader population of what?

5         Q.   Of mass shootings?

6         A.   You mean to generalize to those that did

7    not involve large capacity magazines?

8         Q.   Yes.

9         A.   Well, I had no interest in generalizing to

10   those.  The relevant population was strictly those

11   in which large capacity magazines were used.  Simply

12   because it was a logical point that they couldn't

13   have had any effect where they were used at all.

14        Q.   So you mentioned you also used, besides

15   press accounts and the Violence Policy Council,

16   official investigations or reports; is that right?

17        A.   Yes.

18        Q.   Okay.  And that you were looking for, I

19   counted four particular questions, and I can go

20   ahead and go through them, but did all the reports

21   for the incidents of mass shootings have this

22   information available?

Gary Kleck                          Exhibit 88
January 3, 2018

1        A.   They had information on all of the -- all

2   of the -- at least one news account would have

3   information on all of the things I discussed so far,

4   but what I did not discuss so far was the rapidity

5   of fire.  That is, how many shots were fired per

6   second or how many seconds per shot.

7             And that was the kind of information that

8   was most frequently missing from news accounts.

9   When semi-automatic weapons are used, it's easy to

10  establish how many shots are fired.  You don't have

11  to rely on eyewitness testimony for that, because

12  investigators can simply count the number of

13  expended shells.

14            And unless somebody has swiped, you know,

15  the expended shells, which I suspect would be very

16  unusual, they know pretty much exactly how many

17  rounds were fired.

18            On the other hand, as to how long the

19  shooting lasts, that's the kind of information

20  that's most likely to be missing from news accounts

21  because it relies ultimately on eyewitness

22  testimony.

Gary Kleck
January 3, 2018

Exhibit 88

1          The reporters may talk to the police, but

2     the police in turn are relying on eyewitness

3     guesses.  And under stressful circumstances, you

4     know, there is likely to be a certain amount of the

5     error in eyewitness testimony on such a subtle issue

6     as to how long did the firing go on.

7          Q.   And how did you account for that in your

8     review of this information?

9          A.   Well, I studied all of the incidents where

10    those two pieces of information were available.

11    There's nothing I can do about cases where it wasn't

12    available.  But where it was known, A, how many

13    rounds were fired; and B, how long the firing

14    lasted, those are the ones I studied for the purpose

15    of judging rapidity of fire.

16         Q.   And how could you derive the rate of a

17    rapidity of fire from knowing the amounts of, sounds

18    like bullet casings retrieved, and an approximate

19    time of how long the shooting lasted?

20         A.   Simply by dividing one number by the

21    other.

22         Q.   Okay.

89

Gary Kleck                                 Exhibit 88
January 3, 2018
55

1        A.    So you divide the total number of seconds

2    that the shooting lasted by the number of rounds

3    fired as measured by the number of recovered shell

4    casings.

5        Q.    Now, that would give you the average

6    amount of time between --

7        A.    Correct.

8        Q.    But it wouldn't give you an idea of the

9    rate of the particular shooting?

10       A.    No.  You'd be lucky enough to get the

11   average, but to get, you know, different rates of

12   fire in different, you know, sub portions of the

13   shooting, that would be very, very difficult to

14   acquire.

15              One unique exception to that would be

16   the -- the shooting in -- the Batman shooting as it

17   was known, it was in a movie theater.  And I think

18   the manager of the movie theater had called 911 when

19   the shooting began or after the shooting had begun,

20   and so there was a police 911 recording -- audio

21   recording of what they could hear from, you know,

22   their end of the shooting going on at the movie

1    theater.

2            But that's really unusual; normally you

3    wouldn't have an audio recording.  That's because

4    somebody was still calling the cops while the

5    incident was going on.

6        Q.   And you mentioned potential factors that

7    might affect the ability to measure the time that

8    the particular shooting lasted, including the fact

9    that the individuals involved are under stressful

10   situations, so they're not able to keep literal

11   track of time?

12       A.   That's correct.

13       Q.   Okay.  So another one of the things that

14   you looked at when you're doing this research of

15   mass shootings was whether the shooter reloaded

16   during the incident?  Is that correct?

17       A.   Yes.

18       Q.   To your recollection, did all your sources

19   of information have some info -- have some data on

20   this particular point?

21       A.   No.

22       Q.   They didn't?

1        A.    Did not.

2        Q.    Could you give me an approximation of how

3   many did?

4        A.    No.  I really wouldn't be able to say.

5        Q.    All right.

6        A.    Just the -- you know, there were some that

7   didn't have the information.

8        Q.    Is it fair to say that this would also be

9   a factor that's influenced by distress that an

10  eyewitness might be under in this situation?

11       A.    It -- it might affect whether or not any

12  one eyewitness retained that -- noticed in the first

13  place and stored the information away and then could

14  recover it later on, when police or reporters asked

15  them about it.  But it's less likely that everyone

16  would fail to notice that.  See, this is a different

17  kind of issue from the time issue.

18            It only takes one person to see the person

19  reloading and accurately report that afterwards to

20  establish that, yes, the shooter did reload.

21            On the other hand, with time that the

22  shooting lasted, you might have 12 eyewitnesses,

1   five of which can't you give you any estimate and

2   then the rest offer differing estimates of how long

3   the shooting lasted.

4           And so, you know, there's, a lack of

5   consensus whereas it really only takes one person to

6   say, yeah, I saw him reloading.

7       Q.   Is it fair to say that news accounts, for

8   example, don't generally rely on one person's

9   account of a particular incident?

10      A.   No.   Unless you're talking about a police

11  department spokesperson, often, you know, the

12  reporters are getting the information indirectly.

13  They don't always interview eyewitnesses themselves,

14  and so it's only in that sense that they're relying

15  on one person, the police department spokesman, that

16  he in turn is almost certainly relying on eyewitness

17  testimony from multiple eyewitnesses.

18      Q.   Okay.   And is it -- for these types of

19  accounts, isn't it fair to say that it's possible

20  that different witnesses view different events of,

21  for example, reloading, specifically?

22      A.   Well, it's certainly possible.   Only some

93

Gary Kleck
January 3, 2018

Exhibit 88

59

1  would notice and others would not notice, that's

2  true.

3      Q.  Or is it also possible that from some news

4  accounts that I've read, for example, if a shooter

5  went through different rooms and then one person was

6  only in one room, he or she would only notice if

7  that shooter reloaded in that particular room; for

8  example.

9          Or if another witness was in another room

10  where the shooter went, then that specific witness

11  would only notice those particular ones.  Do you see

12  what I'm saying?

13      A.  Well, those who saw the reloading,

14  regardless of what rooms it occurred in, could say,

15  yes, this person, the shooter reloaded.  But nobody

16  could be sure the shooter did not reload, just from

17  the fact that they didn't witness it.

18          It could have been, they did reload, but

19  they just weren't looking in the right direction at

20  the time, or in your hypothetical, they weren't in

21  the right room to witness it.

22      Q.  But it's fair to say just more broadly

Atkinson-Baker Court Reporters
www.depo.com

1    that it's kind of, there's a lot of difficulties

2    involved in gathering this type of information?

3         A.   Right, but less so with the reloading

4    issue than with the rate of fire issue for the

5    reasons I've mentioned.  You know, it only takes one

6    person to see that the individual reloaded in order

7    to identify, yeah, this guy was a reloading mass

8    shooter, so I should point out that, you know, with

9    reloading what you're establishing sort of a minimum

10   baseline.

11        You know that there were at least this

12   many mass shooters who reloaded because they were --

13   there were that many who witnessed by at least one

14   eyewitness as reloading.  But there are, of course,

15   others who may have reloaded and it was not

16   witnessed by anyone, not even one eyewitness.

17        Q.   And going to another aspect that you're

18   looking at of these mass shootings, if the shooter

19   was obstructed by a victim, would that also be

20   particularly complicated with different eyewitness

21   accounts?

22        A.   Whether the shooter was tackled by

Atkinson-Baker Court Reporters
www.depo.com

1    bystanders?

2        Q.   Yes.

3        A.   No.  I don't think so.  I mean the exact

4    details of how it happened, maybe, but not -- not

5    the fact that the guy was tackled and then caused to

6    no longer shoot.

7        Q.   Okay.  So did the fact that at the very at

8    least rapidity of fire and whether the shooter

9    reloaded, is the fact that those particular factors

10   could have been reported differently from different

11   sources, did that somehow impact your ultimate

12   conclusion?

13            MS. BARVIR:  Objection.  I think that

14   misstates the prior testimony, but go ahead.

15            THE WITNESS:  Well, the fact that some

16   reports said the guy reloaded and others were silent

17   on the issue, that didn't create a complication to

18   me.  I had affirmative evidence, the guy had

19   reloaded.

20            It's not necessarily all news outlets that

21   would have paid attention to that, or thought it was

22   worth reporting in the story.  So in that case, no,

1   it was not problematic that multiple sources

2   mentioned the reloading or didn't mention the

3   reloading, it was sufficient, that one report of it.

4          On the other hand, rates of fire, you

5   might have different news outlets reporting the

6   statements of different eyewitnesses for their

7   estimate for how long the time, the shooting lasted.

8   And there was a conflict, but unfortunately the real

9   problem was news accounts not mentioning it at all,

10  period.  There are a lot of mass shootings in which

11  I didn't have any information from any of the news

12  sources, either because eyewitnesses couldn't say

13  how long the shooting lasted or at least none of the

14  news outlets bothered to put that information into

15  the story, so that was a problem, yeah.

16  BY MR. ZELIDON-ZEPEDA:

17      Q.   We discussed how many cases you have been

18  involved in as an expert in the past four years.

19  Could you give me an estimate of how many cases

20  total you have provided work as an expert?

21      A.   Not without looking at my vitae.  But I'd

22  say, I don't know, maybe 15 maybe.  15 to 20,

Gary Kleck
January 3, 2018

Exhibit 88

63

```
1      R E P O R T E R    C E R T I F I C A T I O N

2              I, Sydney R. Crawford, Shorthand

3    Reporter in and for the District of Columbia do

4    hereby certify to the following: That the witness

5    was duly sworn by the officer and that the

6    transcript of the oral deposition is a true record

7    of the testimony given by the witness, That pursuant

8    to the information given to the deposition officer

9    at the time said testimony was taken, the following

10   includes counsel for all parties of record: I

11   further certify that I am neither counsel for,

12   related to nor employed by any of the parties or

13   attorneys in the action in which this proceeding was

14   taken, and further that I am not financially or

15   otherwise interested in the outcome of the action.

16   Certified to by me this 26th day of January, 2018.

17              _____

18                        Sydney Crawford
                          Notary Public
19                        of the District of Columbia

20

21   My Commission Expires on:

22   April 20, 2019
```

336

Gary Kleck
January 3, 2018

Exhibit 88

64

AB0D9A1

8 FEB '18 PM 3:15

1   STATE OF _Florida_____ )

2   COUNTY OF _Leon_____ )

3

4

5

6

7            I, the undersigned, declare under penalty

8   of perjury that I have read the foregoing transcript,

9   and I have made any corrections, additions or

10   deletions that I was desirous of making; that the

11   foregoing is a true and correct transcript of

12   my testimony contained therein.

13            EXECUTED this _3rd_ day of _February_,

14   _2018_, at _Tallahassee_, _Florida_.
                    (City)            (State)

15

16

17

18   _____Gary Kleck_____
                    Gary Kleck

19

20

21   State of Florida, County of Leon

22   Sworn to (or affirmed) and subscribed before me this _3rd_ day of _Feb._
     _2018_ by _Gary Kleck_

23                              _Shalayne Scott_
                                        Notary

24   Personally known_____ or Produced Identification __X__
     Type of Identification _FL DL_

25

SHALAYNE SCOTT
MY COMMISSION # GG 100112
EXPIRES: May 2, 2021
Bonded Thru Notary Public Underwriters

Exhibit 88

65

AB0D9A1                          JANUARY 31, 2018

LETTER TO DEPOSITION OFFICER/ERRATA SHEET

DEPOSITION OF:                   GARY KLECK

DATE OF DEPOSITION:              JANUARY 3, 2018

CASE:                            VIRGINIA DUNCAN, ET AL. VS. XAVIER BECERRA,
                                 ETC., ET AL.

The following are the corrections which I have made to my transcript:

| PAGE# | LINE# | CORRECTION | REASON FOR CORRECTION |
|---|---|---|---|
| 31 | 20 | I've → They've | Court reporter error |
| 38 | 14 | Causal → Cause and | " " " |
| 57 | 10 | most research → most recent research | " " " |
| 67 | 14 | process. I → process that I | " " " |
| 78 | 21 | casual → casualty | " " " |
| 82 | 17 | five → four | I misspoke |
| 85 | 3 | guns. And → guns, and | Court reporter error |
| 105 | 6 | person → person who | " " " |
| 107 | 11 | who ought to → who | I misspoke |
| 108 | 22 | prior or → priori | Court reporter error |

Please sign your name and date it on the below line. As needed, use additional paper to note corrections,
dating and signing each page. If you have no corrections, please write the word "None" above and sign,
date, and return this page.

EXECUTED this _3rd_ day of _February_, 20_18_,
at _Tallahassee_, _Florida_,
                  (City)                (State)

_____ (Signature)

Exhibit 88
66

*Gary Kleck* 2-3-18

**Additional Corrections to Transcript of January 3, 2018 Deposition of Gary Kleck**

| Page | Line | Correction |
|------|------|------------|
| 131 | 8 | standards → standard |
| 135 | 1 | I'm → Am I |
| 141 | 1 | past → passed |
| 184 | 18 | separately → separately made |
| 194 | 18 | range → rate |
| 197 | 21 | fire → firing |
| 205 | 7 | capacity → caliber |
| 205 | 8 | capacity → caliber |
| 222 | 22 | either → either didn't |
| 233 | 5 | of → or |
| 241 | 5 | aggravate → aggregate |
| 246 | 5 | number → matter |
| 249 | 9 | of → are |
| 253 | 8 | whereas → whereby |
| 262 | 5 | shootings → shootings, as if |
| 262 | 6 | example → sample |
| 263 | 20 | mass shootings → LCMs |
| 270 | 13 | remember → remembered |
| 288 | 3 | about → from |
| 288 | 21 | 1983 → 1993 |
| 292 | 15 | filling → flinging |
| 292 | 20 | at → as |
| 293 | 5 | case → place |
| 304 | 8 | path → past |
| 308 | 12 | victimization → victimizations |

Exhibit 88

67

Gary Kleck 2-3-18

**Additional Corrections to Transcript of January 3, 2018 Deposition of Gary Kleck**

308    14    other → year

308    20    or → to

321    5    casual → casualty

323    7    conflict → inflict

Exhibit 88

68

# CERTIFICATE OF SERVICE

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**SUPPLEMENTAL DECLARATION OF ANNA M. BARVIR IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT; EXHIBITS 87-88**

on the following parties by electronically filing the foregoing on April 23, 2018, with the Clerk of the District Court using its ECF System, which electronically notifies them.

John D. Echeverria
Deputy Attorney General
john.echeverria@doj.ca.gov
300 South Spring Street, Suite 1702
Los Angeles, CA 90013

Mr. Anthony P. O'Brien
Deputy Attorney General
anthony.obrien@doj.ca.gov
1300 I Street, Suite 125
Sacramento, CA 95814

I declare under penalty of perjury that the foregoing is true and correct. Executed on April 23, 2018, at Long Beach, CA.

/s/Laura Palmerin
Laura Palmerin