08:43:20  1                    UNITED STATES DISTRICT COURT

          2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

          3

          4    VIRGINIA DUNCAN, ET AL,              .
                                                    .
          5         PLAINTIFFS,                     . NO. 17-CV-1017
                                                    .
          6              V.                         . MAY 10, 2018
                                                    .
          7    XAVIER BECERRA, ET AL.,              . SAN DIEGO, CALIFORNIA
                                                    .
          8         DEFENDANTS.                     .
               . . . . . . . . . . . . . . . . . ..

          9

08:43:20 10

         11              TRANSCRIPT OF MOTION HEARING
                      BEFORE THE HONORABLE ROGER T. BENITEZ
         12              UNITED STATES DISTRICT JUDGE

         13    APPEARANCES:

         14    FOR THE PLAINTIFFS:    MICHEL & ASSOCIATES PC
                                      BY: ANNA M. BARVIER AND CLINT MONFORT
         15                           180 EAST OCEAN BOULEVARD, STE. 200
                                      LONG BEACH, CALIFORNIA  90802
         16
               FOR THE DEFENDANTS:    OFFICE OF THE CALIFORNIA ATTORNEY GENERAL
         17                           BY: JOHN DARROW ECHEVERRIA
                                      300 S. SPRING STREET, STE. 1702
         18                           LOS ANGELES, CALIFORNIA  90013

         19    COURT REPORTER:        JULIET Y. EICHENLAUB, RPR, CSR
                                      USDC CLERK'S OFFICE
         20                           333 WEST BROADWAY, ROOM 420
                                      SAN DIEGO, CALIFORNIA  92101
         21                           JULIET_EICHENLAUB@CASD.USCOURTS.GOV

         22

         23

         24

         25    REPORTED BY STENOTYPE, TRANSCRIBED BY COMPUTER

08:43:20   1              SAN DIEGO, CALIFORNIA; MAY 10, 2018; 10:06 A.M.

           2                               -OOO-

           3              THE CLERK:  ONE ON CALENDAR, 17CV1017, DUNCAN VS.

           4   BECERRA, ET AL; MOTION HEARING.

           5              THE COURT:  ALL RIGHT.  COUNSEL, PLEASE REGISTER YOUR

           6   APPEARANCES FOR THE RECORD.

           7              MS. BARVIR:  ANNA M. BARVIR, B-A-R-V-I-R, FOR

           8   PLAINTIFF VIRGINIA DUNCAN.

           9              MR. ECHEVERRIA:  GOOD MORNING, YOUR HONOR.  JOHN

          10   ECHEVERRIA, E-C-H-E-V-E-R-R-I-A, FOR DEFENDANT XAVIER

          11   BECERRA.

          12              MR. MONFORT:  GOOD MORNING, YOUR HONOR.  CLINT

          13   MONFORT, ALSO FOR THE PLAINTIFF DUNCAN.

          14              THE COURT:  I'M SORRY; WHAT WAS YOUR LAST NAME?

10:06:05  15              MR. MONFORT:  MONFORT, M-O-N-F-O-R-T.

          16              THE COURT:  ALL RIGHT.  WELL, LET'S SEE.  TODAY WE

          17   HAVE A MOTION FOR SUMMARY JUDGMENT FILED BY THE PLAINTIFF.  AND

          18   I GUESS THE RECORD SHOULD REFLECT THAT IN SUPPORT OF THE

          19   MOTION, IN OPPOSITION TO THE MOTION, I HAVE, I BELIEVE TO BE

          20   APPROXIMATELY A FOOT AND A HALF OF EXHIBITS AND BRIEFS THAT

          21   HAVE BEEN FILED.  I HAVE DONE MY BEST TO READ THROUGH ALL OF

          22   THIS AND TO TRY TO DIGEST IT.  I CERTAINLY DON'T PROMISE THAT I

          23   RECALL EVERYTHING THAT I'VE READ, OR THAT I RECALL IT

          24   CORRECTLY, BUT I'VE CERTAINLY DONE MY BEST.

          25              SO WHY DON'T WE BEGIN, FIRST OF ALL, WITH THE

10:07:18  1  PLAINTIFF.  YOU TELL ME:  WHAT IS THE STANDARD THAT I HAVE TO

2  LOOK TO IN ORDER TO DECIDE THIS MOTION AND WHY YOU THINK I

3  SHOULD RULE IN YOUR FAVOR?  SO THE FLOOR IS YOURS.

4       MS. BARVIR:  THANK YOU, YOUR HONOR.  IN RESPONSE TO

5  THE COURT'S QUESTION ABOUT THE STANDARD THAT PLAINTIFFS MUST

6  MEET IN ORDER FOR THE COURT TO RULE IN OUR FAVOR, OBVIOUSLY ON

7  A MOTION FOR SUMMARY JUDGMENT THERE NEEDS TO BE NO DISPUTED

8  FACT, MATERIAL FACT, AND PLAINTIFFS SHOULD BE ENTITLED TO

9  JUDGMENT AS A MATTER OF LAW.

10       IN THE SECOND AMENDMENT CASE, ACCORDING TO NINTH

11  CIRCUIT PRECEDENT, STEMMING FROM UNITED STATES VERSUS CHOVAN,

12  THE PLAINTIFFS MUST SHOW THAT THE CONDUCT THAT THEY'RE BARRED

13  FROM PARTICIPATING IN IS PROTECTED UNDER THE SCOPE OF THE

14  SECOND AMENDMENT.  THEN ONCE THEY'VE DONE THAT, IT BECOMES THE

10:08:28  15  BURDEN OF THE STATE TO ESTABLISH THAT THE LAW THAT THEY HAVE

16  PASSED AND ENFORCED AGAINST PLAINTIFFS CAN MEET THE APPROPRIATE

17  LEVEL OF HEIGHTENED REVIEW.  THAT SHOULD BE STRICT SCRUTINY --

18  EXCUSE ME -- SHOULD BE AT LEAST INTERMEDIATE SCRUTINY.

19       BUT IN THIS CASE, BECAUSE THE LAW AT ISSUE IMPOSES A

20  FLAT BAN ON ITEMS OVERWHELMINGLY CHOSEN BY LAW-ABIDING CITIZENS

21  FOR THE CORE LAWFUL PURPOSE OF SELF-DEFENSE, IT IS INIMICAL TO

22  SECOND AMENDMENT PROTECTIONS FOR SUCH ARMS AND IT IS INVALID

23  UNDER UNDER ANY TEST THE COURT MAY APPLY.  IT IS CATEGORICALLY

24  INVALID AS THE COURT RECOGNIZED IN ITS ORDER GRANTING MOTION

25  FOR PRELIMINARY INJUNCTION LAST JUNE.

10:09:07  1          THE COURT:  CAN YOU DISTINGUISH FOR ME THE FYOCK

2    CASE?

3          MS. BARVIR:  THE FYOCK CASE, I BELIEVE, IS

4    DISTINGUISHABLE BECAUSE THAT WAS ON APPEAL FROM THE DENIAL OF A

5    MOTION FOR PRELIMINARY INJUNCTION.  THE EVIDENCE IN THAT CASE

6    WAS, THE -- EXCUSE ME.  THE STANDARD OF REVIEW FOR THE COURT OF

7    APPEALS IS GOING TO BE WHETHER OR NOT THE LOWER COURT ABUSED

8    ITS DISCRETION.  THE COURT THERE DID FIND THAT -- THE TRIAL

9    COURT THERE FOUND THAT THE EVIDENCE WOULD BE SUFFICIENT TO

10   SUSTAIN THE LAW.  BUT AGAIN, ON APPEAL, THAT STANDARD ISN'T

11   VERY HARD FOR THE STATE TO PROTECT.

12         WHEREAS HERE, WE'RE ON MSJ.  WE'RE GOING TO BE

13   LOOKING AT ALL THE EVIDENCE AND DETERMINING WHETHER WE HAVE

14   SIMILAR OR SAME EVIDENCE AS SUBMITTED IN FYOCK.  I DON'T THINK

10:09:52 15  WE DO.  AND EVEN IF WE DID, THE STANDARD THAT WE'RE GOING TO BE

16   LOOKING AT HERE IS OF MUCH FULLER RECORD, AND I THINK THAT WE

17   HAVE SHOWN -- PLAINTIFFS HAVE SHOWN THAT THE STATE CANNOT

18   SUSTAIN ITS BURDEN, CANNOT FULFILL ITS BURDEN UNDER ANY LEVEL

19   OF SCRUTINY.

20         NONE OF THE EVIDENCE THAT THE STATE HAS PROVIDED,

21   NONE OF THE FACTUAL CLAIMS THEY'RE MAKING NOW, ARE REALLY ANY

22   DIFFERENT FROM THE CLAIMS THEY WERE MAKING IN SUPPORT OF THEIR

23   MPI.  WHEN IT COMES DOWN TO IT, THE STATE HAS CHOSEN THE

24   BROADEST POSSIBLE MEANS FOR FURTHERING ITS OBVIOUSLY COMPELLING

25   PUBLIC INTEREST AND PUBLIC SAFETY.  IT'S A FLAT BAN ON

10:10:38  1   LAW-ABIDING CITIZENS' ABILITY TO OWN WHAT WE BELIEVE ARE

2   PROTECTED MAGAZINES THAT ARE NECESSARY FOR THE PROPER FUNCTION

3   OF THEIR FIREARMS TO BE USED IN SELF-DEFENSE, AND BY CHOOSING

4   THAT MEANS, TAKING THEM NOT ONLY FROM CRIMINALS WHICH MAY BE

5   ONE WAY THE STATE CAN DO IT, THEY'RE CHOOSING TO TAKE THEM FROM

6   ALL PEOPLE, LAW-ABIDING CITIZENS, INCLUDING PEOPLE LIKE PATRICK

7   LOVETTE WHO'S OWNED THEM FOR 20-PLUS YEARS WITHOUT INCIDENT.

8           THE COURT:  HOW MANY PEOPLE HAS HE SHOT OR INJURED

9   WITH HIS GUNS?

10          MS. BARVIR:  AS FAR AS PLAINTIFF IS AWARE, NO ONE

11   EVER.  MR. LOVETTE IS A TRAINED -- CERTIFIED AND TRAINED

12   FIREARMS INSTRUCTOR.  HE'S VERY CAREFUL WITH HIS FIREARMS AND

13   HIS MAGAZINES.  HE USES THOSE MAGAZINES TO TRAIN OTHER

14   INDIVIDUALS IN THE CAREFUL AND SAFE, EFFICIENT USE OF FIREARMS

10:11:30  15   EQUIPPED WITH DETACHABLE MAGAZINES FOR USE IN SELF-DEFENSE AND

16   IN DEFENSE OF OTHERS.  HE'S NOT KNOWN TO HAVE HARMED ANYONE

17   WITH AIRED SHOTS OR ANYTHING LIKE THAT.

18          THE COURT:  YOU ALSO REPRESENT AN ORGANIZATION, DON'T

19   YOU?

20          MS. BARVIR:  CALIFORNIA RIFLE AND PISTOL ASSOCIATION,

21   YES, YOUR HONOR.

22          THE COURT:  HOW MANY OF YOUR MEMBERS HAVE SHOT OR

23   KILLED ANYONE OR INJURED ANYONE WITH THEIR WEAPONS?

24          MS. BARVIR:  I'M SORRY TO SAY I DON'T KNOW THE ANSWER

25   TO THAT.  BUT I WOULD ASSUME THAT IT'S VERY LOW.  WE HAVE NOT

10:11:56   1    BEEN -- THE CALIFORNIA RIFLE AND PISTOL ASSOCIATION HAS NOT

           2    BEEN, HAS NOT COME FORWARD TO SAY THAT'S EVER HAPPENED.  THE

           3    VAST MAJORITY OF MEMBERS AND SUPPORTERS OF CRPA ARE LAW-ABIDING

           4    CITIZENS WHO ARE SAFE WITH THEIR FIREARMS.  THEY PRACTICE

           5    REGULARLY IN THE SAFE AND EFFICIENT USE OF THEIR FIREARMS FOR

           6    SELF-DEFENSE AND HUNTING AND COMPETITION.  CRPA PROVIDES

           7    COMPETITIVE SHOOTING EVENTS WHERE THESE SORTS OF MAGAZINES ARE

           8    USED.  NO ONE HAS EVER BEEN HARMED IN THOSE EVENTS.  WHILE I

           9    DON'T KNOW THAT WE ESTABLISHED THAT IN THE EVIDENCE THAT'S

          10    BEFORE YOUR HONOR, THERE'S NOTHING TO SAY THAT -- THERE'S NO

          11    EVIDENCE OTHERWISE, EITHER.

          12            THE COURT:  I KEEP READING IN ALL THIS INFORMATION

          13    THAT THERE'S NO HUNTING USE FOR -- FIRST OF ALL, LET ME POINT

          14    OUT THAT A LOT OF WHAT WE'RE DEALING WITH HERE SORT OF SEEMS TO

10:12:59  15    IN A WAY MORPH WITH DISCUSSIONS ABOUT WEAPONS LIKE THE AR-15

          16    AND SO ON AND SO FORTH.  WHAT WE'RE REALLY TALKING ABOUT HERE

          17    IS WHAT IS DUBBED AS A LARGE CAPACITY MAGAZINE.  WE'RE NOT

          18    REALLY TALKING ABOUT AR-15S, ET CETERA.  BUT OBVIOUSLY, A LOT

          19    OF THE DISCUSSION OF ONE MERGES WITH THE OTHER.  THERE'S A LOT

          20    OF DISCUSSION IN HERE IN -- AND PARTICULARLY IN THE DEFENDANT'S

          21    FILINGS, THAT THESE WEAPONS ARE NOT USED -- LARGE CAPACITY,

          22    WHAT THEY CALL LARGE CAPACITY MAGAZINES ARE NOT USED FOR

          23    HUNTING.  NOW IS THAT TRUE?

          24            MS. BARVIR:  IT MAY NOT BE AS TRUE IN CALIFORNIA

          25    CONSIDERING THE ACCESS TO ACQUIRE SUCH MAGAZINES HAS BEEN

10:14:00    1    BARRED TO NEW PEOPLE SINCE 2000, BUT IT'S NOT TRUE -- AS THE

            2    COURT WAS CALLING THEM -- AR'S AND SUCH FIREARMS THAT ARE

            3    CUSTOMIZABLE ARE USED IN SOME SORTS OF HUNTING APPLICATIONS.  I

            4    KNOW THAT THERE'S PROBABLY SOME CONCERN THAT THERE'S HUNTING

            5    REGULATIONS IN CALIFORNIA WHERE CERTAIN TYPES OF BULLETS THAT

            6    MIGHT BE COMMON IN AR'S ARE NOT TO BE USED IN HUNTING BUT

            7    THAT'S --

            8            THE COURT:  SO SMALLER CALIBER.

            9            MS. BARVIR:  THEY'RE A SMALLER CALIBER --

           10            THE COURT:  FOR EXAMPLE, A RUGER M-14 WAS MODIFIED IN

           11    ORDER TO ALLOW A LARGER CALIBER BECAUSE ANYTHING LESS THAN 243

           12    CANNOT BE USED TO HUNT DEER.

           13            MS. BARVIR:  CORRECT.

           14            THE COURT:  SO IT'S NOT A CORRECT STATEMENT TO SAY

10:14:46   15    THAT LARGE CAPACITY MAGAZINES, AS THEY ARE DEFINED, ARE IN FACT

           16    NOT USED FOR HUNTING.

           17            MS. BARVIR:  THAT'S CORRECT, YOUR HONOR.

           18            THE COURT:  SO WHENEVER I SEE OR HEAR THAT, IT'S JUST

           19    BASICALLY AN UNSUPPORTED OPINION ON THE PART OF SOMEONE WHO

           20    SAYS THAT TO BE THE CASE.

           21            MS. BARVIR:  I THINK THAT'S RIGHT, YOUR HONOR.  I

           22    THINK THERE'S A LOT OF MISUNDERSTANDING ABOUT WHAT TYPES OF

           23    FIREARMS AND AMMUNITION AND AMMUNITION MAGAZINES, I'M SORRY,

           24    MIGHT BE NEEDED OR NECESSARY FOR SOMEONE TO GO HUNTING.  AND I

           25    THINK A LOT OF THAT TIME -- A LOT OF TIMES THAT COMES FROM

10:15:25   1    PEOPLE WHO ARE NOT FAMILIAR WITH THE SPORT.

2          ALSO, IF YOU NOTICE IN THE DECLARATION OF MRS.

3    VIRGINIA DUNCAN, IT'S NOT PARTICULARLY HUNTING, BUT SHE DOES DO

4    PREDATION MANAGEMENT, AND SHE'S REGULARLY DOING THIS SERVICE

5    FOR RANCHERS AND FARMERS IN SOUTHERN CALIFORNIA AND SAN DIEGO

6    COUNTY TO PROTECT THEIR LIVESTOCK AND THEIR PROPERTY FROM PACK

7    HUNTING ANIMALS.  IF THEY'VE SHOT ONE OR SHOOTING AT SEVERAL

8    AND MISS THEM, AND THEY'RE COMING AT THEM, IT'S A HARD TARGET.

9    A MOVING TARGET IS HARD TO ALWAYS HIT.

10          THE COURT:  YOU MEAN LIKE A COYOTE?

11          MS. BARVIR:  I THINK SHE SPECIFICALLY -- SHE

12    SPECIFICALLY GOES AFTER COYOTE, YES.

13          THE COURT:  EVER TRY TO SHOOT ONE?

14          MS. BARVIR:  I'VE NEVER TRIED TO SHOOT A COYOTE, YOUR

10:16:11   15   HONOR.  BUT IF THEY MISS, IF THERE'S MULTIPLE ANIMALS COMING AT

16    THEM, IT'S DANGEROUS TO THE LIVESTOCK AS WELL AS THE RANCHERS

17    AND FARMERS IF THEY'RE AROUND AND OF COURSE MS. DUNCAN AND HER

18    HUSBAND WHO DO THIS PREDATION WORK.

19          THE COURT:  BUT HUNTING, BY THE WAY, IS NOT SOMETHING

20    THAT'S PROTECTED BY HELLER.  A WEAPON THAT'S USED AND POSSESSED

21    FOR HUNTING IS NOT NECESSARILY PROTECTED BY HELLER.

22          MS. BARVIR:  I DON'T KNOW THAT IT'S NECESSARILY

23    PROTECTED BY HELLER.  WE HAVEN'T REALLY GOTTEN TO A DECISION

24    THAT REALLY GETS THERE, BUT HELLER IS VERY CLEAR THAT IT

25    PROTECTS FIREARMS THAT -- AND NOW WE KNOW AMMUNITION AND PARTS

```
10:16:47   1   THAT ARE USED IN LAWFUL PURPOSES.  WHILE SELF-DEFENSE IS THE

           2   CORE AS HELLER RECOGNIZES, HELLER ALSO RECOGNIZES THERE ARE

           3   OTHER LAWFUL PURPOSES, AND HUNTING IS DEFINITELY SOMETHING THAT

           4   HAS A LONG, LONG TRADITION IN THIS COUNTRY.  IT'S HOW PEOPLE

           5   SURVIVED BEFORE THE SUPERMARKET WAS REGULAR.  SO I DEFINITELY

           6   THINK HELLER WOULD TELL US THAT HUNTING IS A PROTECTED

           7   ACTIVITY, AND USING FIREARMS FOR HUNTING WOULD BE A PROTECTED

           8   ACTIVITY.  BUT YOU'RE RIGHT, IT DOESN'T LITERALLY COME OUT AND

           9   SAY HUNTING IS AS CORE AS SELF-DEFENSE.

          10            THE COURT:  LET ME ASK YOU A QUESTION:  THERE'S A LOT

          11   OF DISCUSSION ABOUT THE FACT THAT THERE'S NO EVIDENCE THAT WHAT

          12   ARE NOW KNOWN AS LARGE CAPACITY MAGAZINES ARE USED FOR

          13   SELF-DEFENSE.  IS THERE EVIDENCE?

          14            MS. BARVIR:  IS THERE EVIDENCE THAT THEY'RE USED FOR

10:17:43  15   SELF-DEFENSE?

          16            THE COURT:  THAT THEY HAVE BEEN USED.

          17            MS. BARVIR:  WELL, I'D START FIRST AND FOREMOST WITH

          18   THE STATE'S OWN EVIDENCE.  THEIR EXPERT WITNESS LUCY ALLEN HAS

          19   FOUND AT LEAST TWO IN HER STUDIES.  SO WHILE IT MAY BE RARE, WE

          20   DO KNOW THAT THIS DOES HAPPEN.  I THINK YOUR HONOR TALKED ABOUT

          21   THE STORY OF MRS. SUSAN GONZALEZ AND HER HUSBAND MIKE AND THE

          22   MPI RULING WHO HAD THREE ASSAILANTS COME ON THEM IN THE NIGHT

          23   AND SHE RAN OUT OF AMMUNITION.

          24            THE COURT:  CAN YOU IMAGINE WHAT MUST HAVE BEEN GOING

          25   THROUGH HER MIND WHEN SHE PULLED THE TRIGGER THE LAST TIME
```

10:18:19   1    KNOWING THERE WERE NO MORE ROUNDS IN HER WEAPON?

2              MS. BARVIR:  I'M SURE SHE THOUGHT SHE WAS GOING TO

3    DIE.  THE ASSAILANTS WERE STILL THERE.

4              THE COURT:  BUT THAT'S OKAY BECAUSE AFTER SHE WAS

5    KILLED LAW ENFORCEMENT WOULD COME IN AND SAY, OH, WE GOT

6    ANOTHER STATISTIC; WE'VE GOT SOMEONE THAT'S BEEN KILLED.

7    THAT'S SO SAD.  BUT LET'S MOVE ON TO THE NEXT CASE.

8              MS. BARVIR:  AND IF SHE WAS LIMITED TO 10 ROUNDS BY A

9    LAW LIKE IN CALIFORNIA, THAT WOULD DEFINITELY BE A CASE WHERE

10   WE DON'T HAVE AN EXAMPLE OF MORE THAN 10 ROUNDS BEING FIRED,

11   AND IT WASN'T AN EFFECTIVE USE OF SELF-DEFENSE.  SO THE STORIES

12   THAT THE STATE HAS COMPILED OR LOOKED AT AND, YOU KNOW, SOME OF

13   THE EXAMPLES THAT WE'VE GIVEN, ARE EXAMPLES OF EFFECTIVE

14   SELF-DEFENSE.  USUALLY, IT'S FEWER ROUNDS.  BUT WHEN YOU'RE

10:19:04  15   LIMITED TO LESS THAN 10 ROUNDS, THAT'S NECESSARILY GOING TO BE

16   THE CASE.

17              I ALSO WANT TO SAY A LITTLE BIT ABOUT THIS FOCUS ON

18   WHETHER OR NOT THE PLAINTIFFS NEED TO ESTABLISH THAT THERE ARE,

19   I DON'T KNOW, THERE'S SOME IMAGINARY THRESHOLD OF A NUMBER OF

20   CASES WHERE PEOPLE HAVE NEEDED TO AND ACTUALLY FIRED MORE THAN

21   10 ROUNDS IN SELF-DEFENSE.  THAT'S NOT THE STANDARD.  HELLER

22   DOESN'T TALK ABOUT A NEED TO EXERCISE THE RIGHT.  AND I DON'T

23   KNOW OF ANY CONSTITUTIONAL RIGHT CONTEXT WHERE THAT WOULD BE

24   APPROPRIATE IN ANY EVENT.  THE LAW DEPENDS -- EXCUSE ME,

25   THERE'S NO SUPPORT IN HELLER.  THERE'S NO SUPPORT IN ANY OF THE

10

10:19:46  1  OTHER CASES THAT I'M AWARE OF THAT WOULD SUGGEST YOU NEED TO

2  HAVE SOME NUMBER OF CASES WHERE 11 OR MORE ROUNDS ARE FIRED.

3  WHAT IS THE STANDARD IS, ARE THEY TYPICALLY POSSESSED FOR THESE

4  LAWFUL PURPOSES BY LAW-ABIDING CITIZENS?  SO THE REASON THAT

5  PEOPLE POSSESS THESE --

6              THE COURT:  WHAT'S THE EVIDENCE THAT THEY DON'T?

7              MS. BARVIR:  THAT THEY DON'T POSSESS THEM FOR LAWFUL

8  PURPOSES?  I DON'T THINK THERE ARE ANY.  THE CLAIM BY THE STATE

9  IS THAT THEY'RE NOT REGULARLY FIRED MORE THAN 10 TIMES.

10              THE COURT:  THANK GOODNESS.

11              MS. BARVIR:  NOT THAT PEOPLE DON'T KEEP THEM FOR THAT

12  PURPOSE; WHEREAS PLAINTIFFS HAVE SHOWN IN THE DECLARATIONS OF

13  EACH OF THE PLAINTIFFS WHY THEY'VE CHOSEN -- WHETHER OR NOT

14  THEY'RE RIGHT IN THEIR BELIEF THAT THEY MAY NEED THAT NUMBER OF

10:20:28  15  ROUNDS SOMEDAY TO FIGHT OFF AN ATTACKER, THAT'S WHY THEY CHOOSE

16  THEM.

17              THE COURT:  SO REFRESH MY RECOLLECTION.  SO WHY MIGHT

18  THEY NEED, SAY, 11 ROUNDS AS OPPOSED TO 10 ROUNDS?

19              MS. BARVIR:  SOME OF THE PLAINTIFFS HAVE TALKED ABOUT

20  WANTING TO KEEP OR KEEPING A MAGAZINE OVER 10 ROUNDS IN THERE

21  HOME BECAUSE OF THE POTENTIAL IF MULTIPLE ATTACKERS WERE TO

22  COME UPON THEM AND THEIR FAMILY IN THE HOME THEY WILL NOT HAVE

23  ENOUGH ROUNDS TO EFFECTIVELY NEUTRALIZE THE THREAT OF SO MANY

24  ASSAILANTS.  IF YOU THINK ABOUT IT, YOU'D HAVE TO BE A PRETTY

25  GOOD SHOT IF YOU HAVE FOUR PEOPLE COMING IN YOUR HOME AT NIGHT

```
10:21:10   1    IF YOU'RE LIMITED TO 10 ROUNDS.  YOU'RE AWAKENED, STARTLED IN

           2    THE MIDDLE OF THE NIGHT, STRAGGLING FOR A FIREARM THAT IS

           3    LIMITED TO 10 ROUNDS, AND THEN YOU SHOOT OFF THREE, HIT ONE; IF

           4    THESE ASSAILANTS ARE UNDER SOME SORT OF INFLUENCE OR SOMETHING

           5    LIKE THAT, THEY MAY NOT EVEN FEEL IT.  YOU HAVE TO BE A REALLY

           6    GOOD SHOT TO TAKE SOMEONE DOWN WITH ONE BULLET.

           7          THE COURT:  THE STATE MAKES THE ARGUMENT THAT, WELL,

           8    YOU KNOW, THERE'S AN EXCEPTION IN THIS LAW FOR LAW ENFORCEMENT

           9    BECAUSE LAW ENFORCEMENT IS TRAINED TO USE THESE WEAPONS.  LAW

          10    ENFORCEMENT ALSO IS TRAINED TO HOPEFULLY HIT WHAT THEY SHOOT

          11    AT, RIGHT?  AND THEY'RE ALSO TRAINED TO SHOOT AT TARGETS UNDER

          12    STRESSFUL CONDITIONS.  DO YOU AGREE WITH THAT?

          13          MS. BARVIR:  I AGREE WITH THAT, YOUR HONOR, YES.

          14          THE COURT:  BUT THE AVERAGE HOMEOWNER IS NOT.  THE

10:22:08  15    AVERAGE HOMEOWNER IS SLEEPING, HEARS A NOISE, WAKES UP, SEES OR

          16    HEARS SOMEONE OR SOME PEOPLE, AND THEN STARTS FIRING, RIGHT,

          17    PERHAPS?

          18          MS. BARVIR:  PERHAPS.  HOPEFULLY, THEY'VE BEEN

          19    TRAINED, AND I THINK MOST RESPONSIBLE GUN OWNERS ARE TRAINED IN

          20    THE USE OF FIREARMS.  BUT THEY'RE NOT AS EXPERIENCED AS LAW

          21    ENFORCEMENT ARE IN THE SUDDEN STRESS AND THE PHYSIOLOGICAL

          22    IMPACTS THAT CREATES ON SOMEONE'S BODY.

          23          THE COURT:  SO AS I WAS READING THIS, IT DAWNED ON ME

          24    THAT THE PERSON WHO ACTUALLY NEEDS THE LARGER CAPACITY

          25    MAGAZINES FOR SELF-DEFENSE IS THE CIVILIAN WHO DOESN'T GET TO
```

10:22:51   1    GO TO THE FIRING RANGE, YOU KNOW, THREE TIMES A YEAR OR FOUR

2    TIMES A YEAR; WHO DOESN'T GO THROUGH THE PROGRAMS, FOR EXAMPLE,

3    DOWNSTAIRS AT THE MARSHAL'S OFFICE WHERE THEY HAVE THE VARIOUS

4    SCENARIOS YOU GO THROUGH AND YOU GET TO IDENTIFY "DO I SHOOT OR

5    NOT SHOOT," RIGHT?  SO LAW ENFORCEMENT NEEDS FEWER ROUNDS

6    BECAUSE THEY HAVE MORE TRAINING THAN THE AVERAGE CIVILIAN WHO

7    IS AT HOME AND DOESN'T HAVE THAT CONSTANT KIND OF TRAINING.

8    DOES THAT MAKE SENSE TO YOU?

9          MS. BARVIR:  IT MAKES SENSE TO ME.  YOU WOULD THINK

10   THAT WOULD BE TRUE, BUT WE SEE PLENTY OF STORIES IN THE MEDIA

11   THESE DAYS WHERE THAT'S NOT THE CASE FOR POLICE OFFICERS.

12         THE COURT:  I UNDERSTAND, FACTUALLY.  I UNDERSTAND.

13   I HEAR YOU.  I HEAR YOU.  QUITE OFTEN -- BELIEVE ME, I SEE THE

14   CASES ALL THE TIME, AND THEY DO THE BEST THEY CAN, BUT I

10:23:53  15  OFTENTIMES WONDER, MAYBE WHAT THEY REALLY NEED IS HOWITZERS OR

16   LPG'S OR WHATEVER IN ORDER TO HIT WHAT THEY'RE SHOOTING AT.

17         MS. BARVIR:  I'D LIKE TO SAY ONE THING THOUGH ABOUT

18   THE STATE'S CONCERN TO WHAT YOUR HONOR IS SAYING ABOUT PEOPLE

19   WHO ARE NOT AS -- YOU DON'T HAVE TO FIRE THEIR WEAPON AS OFTEN

20   AS A POLICE OFFICER MIGHT, FOR INSTANCE.  SO A HOMEOWNER WHO

21   MIGHT HAVE TO SHOOT IN SELF-DEFENSE.  SO THE STATE IS CONCERNED

22   THAT THESE INDIVIDUALS, THEY ARE COMPLAINING THAT THEY NEED ALL

23   THESE BULLETS, AND THEY'RE GOING TO SPRAY FIRE AND THEY'RE

24   GOING TO HAVE ALL THESE STRAY BULLETS FIRING AROUND AND FAMILY

25   MEMBERS --

10:24:36   1              THE COURT:  HOW MANY TIMES HAS THAT HAPPENED?

2              MS. BARVIR:  THAT'S WHAT I WAS GOING TO SAY, YOUR

3    HONOR.  THEY DON'T HAVE EVIDENCE OF THAT HAPPENING; ALTHOUGH,

4    THEY CLAIM IT MIGHT.  SO I WANT TO MAKE THAT POINT VERY

5    CLEAR.

6              THE COURT:  SO THE CASE OF SELF-DEFENSE, WHEN IT

7    HASN'T HAPPENED, THE STATE SAYS, "SEE, YOU DON'T NEED IT

8    BECAUSE IT HASN'T HAPPENED," AND THEN WHEN THE ISSUE COMES UP

9    ABOUT SPRAYING OF BULLETS, THAT HASN'T HAPPENED, BUT THE STATE

10   SAYS, "TAKE OUR WORD FOR IT; THIS HAS OR WILL HAPPEN."

11             MS. BARVIR:  CORRECT.  AND ALSO, I THINK THAT LEADS

12   US ALSO TO CRIMINAL USE WHICH IS A MAJOR CONCERN AND POINT OF

13   CONTENTION OF THE STATE IN ITS BRIEFING WHICH IS TO SUGGEST

14   THAT CRIMINALS USE THESE AT DISPROPORTIONATE RATES.  I THINK

10:25:22   15   THEY SPOKE SPECIFICALLY AT SOME POINTS ON VIOLENCE AGAINST LAW

16   ENFORCEMENT OFFICERS AND OBVIOUSLY THE MASS SHOOTING EVENTS --

17             THE COURT:  I NOTED THAT IN A COUPLE OF INCIDENTS THE

18   STATE MENTIONS, THE WEAPONS THAT WERE ACTUALLY USED WERE

19   MACHINE GUNS.  FOR EXAMPLE, I THINK THE BIG BANK ROBBERY CASE

20   THAT ONE OF THE STATE'S EXPERTS RELIED ON, THE WEAPONS THAT

21   WERE BEING USED WERE AUTOMATIC WEAPONS WHICH I THINK HAD BEEN

22   BANNED FOR A LONG TIME.

23             MS. BARVIR:  EFFECTIVELY BANNED SINCE THE '80S.  AND

24   THEN, OF COURSE, WHEN YOU TALK ABOUT LAS VEGAS WHICH IS

25   DEFINITELY AN OUTLIER.

10:26:05    1          THE COURT:  I DON'T KNOW ANYTHING ABOUT LAS VEGAS.

            2    WE KNOW NOTHING ABOUT LAS VEGAS.  AND IF THE STATE HAS ANY

            3    RECORDS ON WHAT ACTUALLY HAPPENED IN LAS VEGAS, I'D LOVE TO SEE

            4    IT BECAUSE ALL I READ IS BASICALLY HEARSAY UPON HEARSAY UPON

            5    HEARSAY, AND I READ THAT MAYBE THIS GUY HAD 42 WEAPONS.

            6          MS. BARVIR:  THEY WERE MADE TO FIRE AUTOMATICALLY

            7    WITH A -- WITH WHAT WAS CALLED A BUMP STOCK, AT LEAST THAT'S

            8    WHAT'S BEING REPORTED, YES.  BUT WHEN YOU'RE TALKING ABOUT

            9    CRIMINAL USE GENERALLY, THE STATE WANTS TO SUGGEST THAT THESE

           10    TYPES OF MAGAZINES ARE NOT PROTECTED OR THEY'RE PARTICULARLY OR

           11    UNIQUELY DANGEROUS BECAUSE THEY'RE SO OFTEN USED IN CRIMES.

           12    BUT AGAIN, THE USE IN CRIME IS JUST AS -- IT'S JUST AS SIMILAR

           13    TO USE IN SELF-DEFENSE.  IT'S LIKE -- THEY'RE NOT SHOOTING THEM

           14    MORE THAN 10 ROUNDS NECESSARILY.  I THINK THE AVERAGE IS ABOUT

10:27:01   15    TWO JUST LIKE AN INDIVIDUAL USING IT IN SELF-DEFENSE.  THE

           16    STATE WANTS TO HAVE ITS CAKE, RIGHT, SAYING IT'S CRIMINAL USE

           17    JUST BECAUSE THESE FIREARMS, THESE MAGAZINES ARE SHOWING UP AT

           18    CRIME SCENES; BUT IT'S NOT SELF-DEFENSE USE IF YOU DON'T SHOOT

           19    IT MORE THAN 10 TIMES.  SO I THINK THAT'S AN ISSUE THAT I'D

           20    LIKE THE COURT TO CONSIDER AS WELL.

           21          THE COURT:  STATISTICALLY, STATISTICALLY, OUT OF ALL

           22    THE GUN CRIMES COMMITTED IN THE STATE OF CALIFORNIA -- LET'S

           23    JUST SAY THE LAST 10 YEARS -- HOW MANY OF THOSE HAVE INVOLVED

           24    LARGE CAPACITY MAGAZINES AS THEY'RE CURRENTLY DEFINED?

           25          MS. BARVIR:  I'M NOT ENTIRELY SURE. I CAN'T REMEMBER

10:27:49  1    OFF THE TOP OF MY HEAD.

         2           THE COURT:  I EXPECT THE STATE WOULD BE ABLE TO

         3    ANSWER THAT QUESTION.

         4           MS. BARVIR:  I HOPE SO.

         5           THE COURT:  THEY'LL HAVE THE ANSWER FOR ME AS TO HOW

         6    MANY GUN VIOLENCE CRIMES THERE HAVE BEEN AND STATISTICALLY --

         7    AND BY THE WAY, JUST SO EVERYBODY UNDERSTANDS, ANY SHOOTING,

         8    ANY SHOOTING IS TRAGIC.  IT'S TRAGIC.  JUST LIKE ANY DRUNK

         9    DRIVING DEATH IS TRAGIC.  RIGHT?  WE HAVE TO ACKNOWLEDGE

        10    THAT.

        11           MS. BARVIR:  YES.

        12           THE COURT:  WE WOULD HOPE IT WOULD NEVER HAPPEN.  BUT

        13    THAT'S NOT THE WAY THE REAL WORLD WORKS.

        14           MS. BARVIR:  CORRECT.

10:28:26 15           THE COURT:  SO NOW I HOPE THE STATE HAS THE

        16    STATISTICS FOR ME AS TO HOW MANY GUN VIOLENCE INSTANCES THERE

        17    HAVE BEEN IN THE LAST 10 YEARS AND HOW MANY OF THOSE HAVE BEEN

        18    COMMITTED WITH A WEAPON THAT HAD A LARGE CAPACITY MAGAZINE AND

        19    HOW MANY HAVE BEEN COMMITTED SINCE THE SALE AND TRANSFER OF

        20    LARGE CAPACITY MAGAZINES WERE BANNED EXCEPT FOR THE GRANDFATHER

        21    CLAUSE.  SO --

        22           MS. BARVIR:  I'D LIKE TO DIRECT THE COURT'S ATTENTION

        23    TO THE EXHIBIT ATTACHED TO THE BARVIR DECLARATION, MY

        24    DECLARATION, PROVIDED BY PROFESSOR MOODY.  THAT KIND OF, I

        25    THINK, SPEAKS TO WHAT THE STATE -- WHAT THE COURT IS LOOKING

10:29:09   1   FOR HERE.  WHILE I DON'T HAVE RAW NUMBERS OF THE NUMBER OF

2   INCIDENTS -- YOU KNOW, WHAT TOTAL GUN DEATHS THERE ARE, HOW

3   MANY GUN CRIMES THERE ARE AND SPECIFICALLY HOW MANY INVOLVE

4   MAGAZINES OVER 10 ROUNDS, BUT WHAT PROFESSOR MOODY'S WORK SHOWS

5   IS THAT THERE HASN'T BEEN A STATISTICALLY SIGNIFICANT IMPACT ON

6   ANY SORTS OF CRIME, GUN VIOLENCE GENERALLY, MURDERS OF LAW

7   ENFORCEMENT, MASS SHOOTINGS, MORE SPECIFICALLY IN CALIFORNIA.

8   SO THE FEDERAL BAN WHICH WE SPEAK ABOUT -- BOTH SIDES SPEAK

9   ABOUT A LOT IN THE EVIDENCE AND THE BRIEFING -- THE FEDERAL BAN

10   PAIRED WITH CALIFORNIA'S SINCE 2000 ACQUISITION BAN HAS NOT HAD

11   A STATISTICALLY SIGNIFICANT IMPACT ON GUN VIOLENCE.

12        THE STATE OBJECTS TO A LOT OF THAT CONTENT.  I'D LIKE

13   TO SAY ONE THING ABOUT THAT.  THE STATE CLAIMS IT'S NOT

14   REBUTTAL WITNESS TESTIMONY.  THE STATE CLAIMS THAT KOPER AND

10:30:02   15   KLAREVUS AND ALLEN, THEIR EXPERTS, ARE NOT SAYING THINGS ABOUT

16   GUN VIOLENCE IN CALIFORNIA AND MASS SHOOTINGS IN CALIFORNIA,

17   BUT WHAT THEY ARE EXPLICITLY OPINING ON, WHAT THOSE EXPERTS ARE

18   STATING IS THAT THEY BELIEVE THAT CAPACITY-BASED MAGAZINE

19   RESTRICTIONS COULD HAVE SOME IMPACT, COULD HELP ALLEVIATE MASS

20   SHOOTINGS, COULD BRING DOWN DEATH TOLLS, THINGS LIKE THAT.

21   PROFESSOR MOODY IS PROVIDING HIS STATISTICAL ANALYSIS THAT

22   SHOWS THAT THAT'S NOT TRUE.  SO I'D LIKE THE COURT TO TAKE A

23   LOOK AT THAT.

24        THE COURT:  CONCEPTUALLY, IT'S TRUE.  LOOK,

25   CONCEPTUALLY --

10:30:40   1          MS. BARVIR:  CONCEPTUALLY, ANYTHING IS POSSIBLE.

2          THE COURT:  AND I READ THESE THINGS, AND IT'S ALMOST

3   LIKE THEY CUT AND PASTE FROM EACH OTHER.  IT'S LIKE -- IT'S

4   KIND OF LIKE PLAYING THE GAME WE PLAYED AS KIDS, TELEPHONE, YOU

5   KNOW, AND THEY JUST KEEP REPEATING THE SAME THING OVER AND

6   OVER.  I DON'T NEED AN EXPERT TO TELL ME THAT IF A WEAPON HAS

7   30 ROUNDS THAT IT CARRIES WITH IT THE POTENTIAL OF KILLING 30

8   PEOPLE, AND IF A WEAPON HAS 10 ROUNDS IT HAS THE POTENTIAL OF

9   KILLING 10 PEOPLE.  YOU DON'T HAVE TO BE A ROCKET SCIENTIST TO

10   FIGURE THAT OUT, OF COURSE.  AND IF YOU HAVE A GUN THAT HOLDS

11   ONE ROUND, RIGHT, IT HAS THE POTENTIAL FOR KILLING ONE PERSON.

12   RIGHT?

13          MS. BARVIR:  CORRECT.  BUT WHAT COMES FROM THAT IS,

14   AS HAS BEEN SHOWN WITH MOST MASS SHOOTINGS WHERE THERE ARE

10:31:38   15   LARGER DEATH COUNTS AND MORE MEDIA ATTENTION, THESE PEOPLE THAT

16   ARE COMMITTING THESE HEINOUS ACTS ARE NOT DOING IT WITH ONE GUN

17   WITH SIX ROUNDS OR 10 ROUNDS OR 30 ROUNDS.  THEY'RE DOING IT

18   WITH MULTIPLE FIREARMS AND/OR MULTIPLE MAGAZINES.  SO WHAT YOU

19   HAVE TO LOOK AT IS:  CAN RESTRICTING LAW-ABIDING CITIZENS TO 10

20   ROUNDS PER MAGAZINE IMPACT MASS SHOOTINGS AND VIOLENCE AGAINST

21   LAW ENFORCEMENT TO SUCH AN EXTENT BECAUSE OF HOW LONG IT TAKES

22   TO CHANGE A MAGAZINE OR JUST PICK UP A NEW FIREARM?  THAT'S

23   KIND OF THE ISSUE.  YES, IF YOU HAVE ONE GUN WITH 30 ROUNDS IN

24   IT, YOU COULD POTENTIALLY HIT MORE THAN ONE GUN WITH 10 ROUNDS

25   IN IT, BUT THAT'S NOT HOW THESE EVENTS WORK OUT IN THE REAL

```
10:32:19   1   WORLD, AND I THINK THE EVIDENCE LAYS THAT OUT.

           2               THE COURT:  LET ME ASK YOU ABOUT THE SAN BERNARDINO

           3   SHOOTING.  WHAT WEAPON WAS USED IN THAT SHOOTING?  DO YOU KNOW?

           4               MS. BARVIR:  I DO, BUT I DON'T OFF THE TOP OF MY

           5   HEAD.  I'M SORRY, YOUR HONOR.

           6               THE COURT:  DOES THE STATE KNOW?

           7               MR. ECHEVERRIA:  IT'S MY UNDERSTANDING THAT THEY WERE

           8   AR PLATFORM MODELS.

           9               THE COURT:  WHAT CAPACITY MAGAZINE?

          10               MR. ECHEVERRIA:  I BELIEVE THEY WERE 30 ROUND

          11   MAGAZINES, YOUR HONOR.

          12               THE COURT:  WHERE DID THEY GET THEM?

          13               MR. ECHEVERRIA:  I DO NOT KNOW.

          14               THE COURT:  DID THEY BUY THEM HERE IN CALIFORNIA?

10:32:47  15               MR. ECHEVERRIA:  UNLIKELY.

          16               THE COURT:  SO THEY BROUGHT THEM FROM OUT OF STATE?

          17               MR. ECHEVERRIA:  I DON'T KNOW FOR SURE, YOUR HONOR,

          18   BUT THAT'S A FAIR ASSUMPTION.

          19               THE COURT:  OKAY.  ALL RIGHT.  GREAT.  THANKS.  I

          20   APPRECIATE YOUR CANDIDNESS.

          21               MS. BARVIR:  I BELIEVE DR. KLECK TALKS ABOUT THAT

          22   INSTANCE IN HIS EXPERT REPORT, YOUR HONOR.

          23               THE COURT:  AS I SAID, I READ ALL THIS, AND I WISH I

          24   COULD REMEMBER IT ALL, BUT I CAN'T.  I JUST CAN'T.  SO OUR

          25   RECOLLECTION IS THE SAN BERNARDINO MASS SHOOTING WHICH IS THE
```

```
10:33:15    1   ONE IN CALIFORNIA WHICH BASICALLY IS, I BELIEVE, THE LAST THAT

            2   WE HAD WAS BY SOMEONE -- AND THAT WAS A TERRORIST CASE, AS I

            3   RECALL.  IT WAS THE HUSBAND AND WIFE WHO WERE --

            4           MS. BARVIR:  THAT'S WHAT THE REPORTS SHOWED, YES,

            5   YOUR HONOR.

            6           THE COURT:  AND THEY PURCHASED THE GUNS OUT OF

            7   STATE.

            8           MS. BARVIR:  AND THEY DIDN'T HAVE THEM BEFORE THE

            9   2000 LAW WENT INTO EFFECT.  SO THEY COULDN'T HAVE ACQUIRED THEM

           10   LEGALLY, YES, YOUR HONOR.

           11           THE COURT:  SO REGARDLESS, SO HERE WE HAVE A LAW

           12   THAT'S IN EFFECT.  AND THE LAW SAYS YOU CAN'T BUY, TRANSFER,

           13   POSSESS UNLESS YOU OWNED IT BEFORE A CERTAIN DATE.  AND THESE

           14   PEOPLE WHO WANTED TO KILL PEOPLE, GOT THEIR HANDS ON THESE GUNS

10:34:06   15   AND NOT WITHSTANDING THE LAW THAT WE HAD, THEY WENT AHEAD AND

           16   KILLED ALL THESE PEOPLE.  RIGHT?

           17           MS. BARVIR:  CORRECT.

           18           THE COURT:  THAT'S MY RECOLLECTION OF WHAT I READ IN

           19   THERE.  OKAY.  GOOD.  SO?

           20           MS. BARVIR:  ONE THING I WANTED TO SAY -- WE'RE

           21   TALKING A BIT ABOUT THE STATE, WHETHER OR NOT IT CAN ESTABLISH

           22   THAT THE LAW IS LIKELY TO HAVE SOME TYPE OF MATERIAL EFFECT,

           23   RIGHT?  AND THAT MIGHT BE HARD FOR THE COURT TO GRAPPLE WITH AT

           24   THIS MSJ STAGE.  THERE'S THE STATE SAYING, WELL, SURE, IT COULD

           25   POTENTIALLY IMPACT THIS TYPE OF VIOLENT CRIME AND THE --
```

```
10:34:45    1              THE COURT:  HOW WOULD A TRIAL -- HOW WOULD A TRIAL --

            2              MS. BARVIR:  DO ANYTHING MORE?

            3              THE COURT:  -- YES, DO ANYTHING MORE?

            4              MS. BARVIR:  I THINK THAT'S A GOOD QUESTION.  WE

            5    COULD POTENTIALLY SEE THE -- THE COURT COULD SEE THE EXPERTS

            6    AND WHO IS POTENTIALLY MORE AWARE.  WE COULD PLAY IT OUT FOR

            7    THE COURT.  WE'VE DONE IT IN DEPOSITIONS.  SO I DON'T KNOW THAT

            8    COULD DO A WHOLE LOT MORE FOR YOU.

            9              THE COURT:  I READ THE EXCERPTS OF DEPOSITIONS THAT

           10    WERE FILED, BY THE WAY.

           11              MS. BARVIR:  BUT EVEN IF THE COURT DID GRAPPLE WITH

           12    WHETHER OR NOT WE COULD HANDLE THIS AT MSJ, WHICH WE BELIEVE

           13    YOU CAN BASED ON THE EVIDENCE THAT HAS BEEN PUT FORTH THAT

           14    ISN'T LIKELY TO MATERIALLY AFFECT THESE TYPES OF GUN VIOLENCE,

10:35:28   15    WHAT IT COMES DOWN TO IS THERE'S NO FIT HERE.  THE STATE HAS

           16    CHOSEN THE BROADEST POSSIBLE MEANS.  STRIPPING MAGAZINES

           17    NECESSARY FOR -- USED FOR SELF-DEFENSE, OWNED FOR SELF-DEFENSE

           18    AND OTHER LAWFUL PURPOSES BY LAW-ABIDING CITIZENS, TAKING THEM

           19    FROM THEIR HANDS AND THEIR HOMES SO THEY CAN PREVENT CRIMINAL

           20    MISUSE.  HELLER TELLS US THAT'S INAPPROPRIATE.  THE FIT IS NOT

           21    APPROPRIATE HERE.  THIS ISN'T A QUESTION OF EXPERTS FIGHTING

           22    WHETHER OR NOT THE FIT IS APPROPRIATE, AND THE LEGISLATURE IS

           23    ENTITLED TO NO DEFERENCE ABOUT WHETHER THE FIT IS APPROPRIATE.

           24    THE COURT HAS THE POWER TO MAKE THAT DECISION.  IT'S A LEGAL

           25    QUESTION.
```

```
10:36:04    1              THE COURT:  IT'S INTERESTING YOU SHOULD MENTION THAT

            2    BECAUSE IN THE KOLBE CASE, THERE'S SOMETHING THAT REALLY

            3    PUZZLED ME.  AND BY THE WAY, I THINK IT WAS IN THE WORMAN

            4    DECISION AS WELL WHICH, BY THE WAY, I KNOW JUDGE YOUNG

            5    SOMEWHAT.  I RESPECT HIM HIGHLY.  HE WAS THE FELLOW WHO

            6    MASTERMINDED OR MANAGED ALL THE TOBACCO CASES, IF I'M NOT

            7    MISTAKEN, AND I THINK HE DID A WONDERFUL JOB IN THAT REGARD.  I

            8    DISAGREE WITH HIS OPINION FOR VARIOUS RESPECTS.  BUT ONE OF THE

            9    THINGS THAT HE TALKED ABOUT AND KOLBE TALKS ABOUT THAT YOU JUST

           10    MENTIONED -- IN THE KOLBE CASE, AT PAGE 140, IT SAYS, QUOTE:

           11    IT IS THE LEGISLATURE'S JOB, NOT OURS, TO WEIGH CONFLICTING

           12    EVIDENCE AND MAKE POLICY JUDGMENTS, AND WE MUST ACCORD

           13    SUBSTANTIAL DEFERENCE TO THE PREDICTIVE JUDGMENTS OF THE

           14    LEGISLATURE.  AND THAT COMES FROM KOLBE AND THEN IT'S REPEATED

10:37:19   15    IN THE WORMAN DECISION.

           16              BUT AS A GOOD FRIEND OF MINE LIKES TO SAY, THAT ARROW

           17    LEFT THE BOW A LONG TIME AGO.  IT CAUSES ME TO THINK ABOUT SOME

           18    THINGS.  TELL ME WHAT YOU THINK ABOUT IT.  SO BROWN VERSUS

           19    BOARD OF EDUCATION, THE LEGISLATURE SAT DOWN, HEARD EVIDENCE,

           20    MADE POLICY DECISIONS, AND THEY SAID SEPARATE BUT EQUAL IS

           21    OKAY.  THEY MADE A POLICY DECISION AFTER HEARING THE EVIDENCE,

           22    AND THANK GOD ALONG COMES THE SUPREME COURT THAT SAYS, SORRY,

           23    THIS IS PROTECTED BY THE BILL OF RIGHTS, YOU'RE WRONG, AND WE

           24    HAD BROWN.  THANK GOODNESS.  RIGHT?

           25              ROE VERSUS WADE, THE LEGISLATURE MADE A DECISION
```

```
10:38:22   1   CURTAILING ABORTION.  THEY MADE A POLICY DECISION.  ALONG COMES
           2   THE SUPREME COURT AND SAYS, WRONG.  NOW IN THE ROE VERSUS WADE,
           3   THEY HAD TO FIRST FIND THERE WAS A RIGHT TO PRIVACY WHICH --
           4   I'M NOT DISAGREEING WITH THE RESULT.  I'M JUST SIMPLY SAYING I
           5   READ THE CONSTITUTION.  I KEEP A COPY OF IT BY MY CHAIR WHERE I
           6   LOOK AT IT EVERY NOW AND THEN WHENEVER I SEE SOMETHING IN THE
           7   NEWS.  SO I LOOK AT IT QUITE OFTEN.  I'VE TRIED TO FIND THE
           8   WORD "PRIVACY" IN THERE.  I CAN'T FIND IT.  I'VE TRIED TO FIND
           9   THE WORD "ABORTION."  I CAN'T FIND IT.  SO THE SUPREME COURT
          10   SAID:  NOT WITHSTANDING THE FACT YOU MAY HAVE MADE CERTAIN
          11   POLICY DECISION, IT VIOLATES THE CONSTITUTION.  RIGHT?
          12         MS. BARVIR:  CORRECT.
          13         THE COURT:  RECENTLY, AND PERHAPS THE STATE CAN
          14   ENLIGHTEN ME ON THIS, A CASE THAT I KNOW REASONABLY WELL,
10:39:26  15   LAWRENCE VERSUS TEXAS, RIGHT? THE TEXAS LEGISLATURE SAID THERE
          16   WAS AN ACT PROHIBITING SODOMY.  RIGHT?  THEY MADE POLICY
          17   DECISIONS.  SUPREME COURT SAID: NO, IT VIOLATES THE
          18   CONSTITUTION.  ALONG COMES OBERGEFELL, PROPOSITION 8.  NOW I'M
          19   SURE THE STATE REMEMBERS THIS QUITE WELL.  THERE WAS A VOTE BY
          20   THE PEOPLE OF THE STATE OF CALIFORNIA.  54 OR 56 PERCENT VOTED
          21   AND SAID THE DEFINITION OF A MARRIAGE IS A MARRIAGE BETWEEN A
          22   MAN AND A WOMAN.  RIGHT?  ALONG COMES THE SUPREME COURT THAT
          23   SAYS:  WRONG, THIS IS BEYOND YOUR POLICY-MAKING POWERS.  THIS
          24   IS PROTECTED.  IT IS PROTECTED BY SOMETHING CALLED THE BILL OF
          25   RIGHTS.
```

10:40:25    1            SO I'M HAVING A HARD TIME UNDERSTANDING, AND TRUST

2    ME, I HAVE LOOKED AT THIS, AND WHEN I SEE JUDGE YOUNG, WHO I

3    RESPECT, TALK ABOUT DEMOCRACY, AND I READ ABOUT THE KOLBE CASE,

4    AND WE'RE SAYING, WAIT A MINUTE, WAIT A MINUTE, THESE ARE

5    POLICY DECISIONS, AND I SAY TO MYSELF, WAIT, THAT ARROW LEFT

6    BOW A LONG TIME AGO.  IF IT'S SOMETHING THAT'S PROTECTED BY THE

7    BILL OF RIGHTS, THE STATE DOESN'T HAVE THE LIBERTY TO MAKE

8    THESE POLICY DECISIONS.  YOU JUST CAN'T.  SO I'M HAVING A HARD

9    TIME TRYING TO FIGURE OUT -- AND I KNOW THE STATE IS GOING TO

10    ENLIGHTEN ME WHEN ITS TURN COMES UP, TO TELL ME WHEN IS IT A

11    POLICY DECISION AND WHEN IS IT NOT A POLICY DECISION.  WHEN

12    DOES THE COURT HAVE THE ABILITY TO SAY, ENOUGH IS ENOUGH; THIS

13    IS PROTECTED BY THE BILL OF RIGHTS, AND NO MATTER HOW WISE YOU

14    MAY THINK YOUR POLICY IS, IT JUST CAN'T PASS MUSTER.  WHAT DO

10:41:40    15    YOU THINK?

16            MS. BARVIR:  I THINK I WANT TO GO BACK TO THAT PHRASE

17    "PREDICTIVE JUDGMENTS."  STATES AND CITIES THAT ARE TRYING TO

18    DEFEND GUN CONTROL LAWS THAT ARE BEING CHALLENGED ON SECOND

19    AMENDMENT GROUNDS REGULARLY RESORT TO THIS LANGUAGE.  AND THE

20    HONORABLE JUDGES WHO WROTE THE WORMAN AND KOLBE OPINIONS -- YOU

21    KNOW, THE PREDICTIVE JUDGMENT LANGUAGE COMES FROM SUPREME COURT

22    CASE LAW, BUT I THINK THEY TAKE IT TOO FAR.  I THINK WHAT THE

23    CASE LAW IS REALLY CLEAR ABOUT IS, YES, THE LEGISLATURE IS

24    ENTITLED TO SOME DEFERENCE WHEN IT COMES TO, DO WE HAVE A

25    COMPELLING INTEREST?  MAYBE EVEN IF THEY REASONABLY THOUGHT THE

10:42:20  1    LAW COULD BE EFFECTIVE.  WHAT THEY DON'T GET THIS BROAD

2    DEFERENCE TO, WHAT THE JUDICIAL BRANCH HAS THE RESPONSIBILITY

3    TO LOOK AT, IS WHETHER OR NOT THE FIT IS APPROPRIATE, WHETHER

4    IT REALLY IS LIKELY TO ADVANCE THE INTERESTS THAT ARE BEING

5    STATED OR --

6              THE COURT:  HOW DO WE DECIDE THAT FIT?  SO THAT

7    ASSUMES SOMETHING LESS THAN STRICT SCRUTINY, RIGHT?  SO WE'RE

8    NOW INTO A HEIGHTENED SCRUTINY BUT MORE THAN RATIONAL BASIS,

9    BUT HOW DO WE DECIDE WHAT IS A REASONABLE FIT AND WHO DECIDES

10   IT?

11             MS. BARVIR:  YOU KNOW, OBVIOUSLY, THE LEGISLATURE IS

12   GOING TO MAKE ITS DECISION FIRST.  BUT IT'S THE RESPONSIBILITY

13   OF THE JUDICIARY TO MAKE SURE THAT THE DECISIONS THEY'VE MADE

14   ARE IN LINE WITH THE CONSTITUTION.  ALL THOSE CASES THAT YOUR

10:43:15  15   HONOR JUST SPOKE OF ARE EXAMPLES OF THE JUDICIARY UPHOLDING ITS

16   POWER AND AUTHORITY AND RESPONSIBILITY TO PROTECT THE

17   CONSTITUTION, THE RIGHTS OF THE MINORITIES, FROM MOB RULE.  I

18   THINK IT'S DEFINITELY A HARD QUESTION, BUT IT'S SOMETHING THAT

19   THE COURT IS GOING TO HAVE TO GRAPPLE WITH BUT --

20             THE COURT:  IT KIND OF CUTS TO THE CHASE.  WHEN I

21   LOOK AT THIS CASE, IT CUTS TO THE CHASE.  THE CHASE IS, WHO

22   MAKES THE DECISION AND ON WHAT BASIS DO WE MAKE THE DECISION?

23   RIGHT?  AND THE GROUP THINK IS, WELL, AS LONG AS WE KNOW THESE

24   THINGS ARE DANGEROUS, WE'RE GOING TO ALLOW IT; WE'RE GOING TO

25   ALLOW RESTRICTIONS ON IT.  RIGHT?  EXCEPT FOR HELLER AND

10:44:14  1    CAETANO, RIGHT?  BUT AS JUDGES, WE'RE EXPECTED TO EXERCISE OUR

2    OWN INDEPENDENT THINKING.

3              MS. BARVIR:  CORRECT.

4              THE COURT:  BUT MY QUESTION THAT YOU PROBABLY CANNOT

5    ANSWER, AND I DON'T THINK THE STATE WILL BE ABLE TO ANSWER FOR

6    ME EITHER, IS:  HOW DO WE MAKE THE DECISION OF HOW FAR CAN WE

7    ALLOW THE STATE TO INTERFERE WITH WHAT IS AT LEAST ARGUABLY

8    PROTECTED BY THE SECOND AMENDMENT?  AND SO I NEED YOUR HELP.

9              MS. BARVIR:  I RESPECT THAT YOUR HONOR IS

10   CONSIDERING, LIKE, HOW FAR CAN THEY GO.  THERE ARE LOTS OF

11   CASES THAT HAVE MADE IT THROUGH THE PIPELINE AND THAT ARE

12   KNOCKING ON THE SUPREME COURT'S DOOR ASKING HOW FAR CAN THE

13   STATE GO.  BUT WHAT WE HAVE HERE IS, AGAIN, THE BROADEST

14   POSSIBLE MEANS.  IF THE COURT FINDS THAT POSSESSION AND/OR

10:45:22 15   ACQUISITION OF MAGAZINES OVER 10 ROUNDS IS PROTECTED BY THE

16   CONSTITUTION, HELLER IS VERY CLEAR, YOU SIMPLY CANNOT BAN IT.

17             THE COURT:  WHAT DO I LOOK TO TO DECIDE WHETHER OR

18   NOT A MAGAZINE IS BY ITSELF AN ARM THAT IS PROTECTED BY THE

19   SECOND AMENDMENT?

20             MS. BARVIR:  I THINK IN THE NINTH CIRCUIT YOU'RE

21   GOING TO LOOK AT JACKSON AND TO RECOGNIZE FROM THE NINTH

22   CIRCUIT'S DECISION THERE THAT WE'RE NOT LIMITED TO FIREARMS.

23   WE'RE ALSO PROTECTING THE RIGHTS OF THOSE THINGS THAT ARE

24   NECESSARY TO MAKE OUR FIREARMS USABLE AND EFFECTIVE.  AND THAT

25   MEANS AMMUNITION.  IT MEANS PARTS THAT ARE NECESSARY TO THE

10:46:04   1   OPERATION.  AS THE EVIDENCE AND THE BRIEFING FROM PLAINTIFF

           2   SHOW, DETACHABLE MAGAZINES ARE NECESSARY TO THE FUNCTION OF ALL

           3   THOSE FIREARMS THAT REQUIRE THEIR USE.

           4            THE COURT:  BUT THEY'RE NOT BANNING ALL MAGAZINES.

           5            MS. BARVIR:  THAT'S CORRECT, YOUR HONOR.

           6            THE COURT:  SO SAY, FOR EXAMPLE, A GLOCK 17 WHERE YOU

           7   CAN USE A 10-ROUND MAGAZINE, RIGHT?

           8            MS. BARVIR:  YES.

           9            THE COURT:  OKAY.  SO THEY'RE NOT COMPLETELY BANNING

          10   ALL MAGAZINES.  IF THEY WERE, IT WOULD BE ONE STORY.  BUT

          11   THEY'RE NOT.  SO HOW DO YOU RESPOND TO THAT?

          12            MS. BARVIR:  I THINK I HAVE A FEW RESPONSES.  FIRST,

          13   JUST SAYING THAT THEY'RE NOT BANNING EVERY SINGLE MAGAZINE KIND

          14   OF TAKES US BACK TO HELLER.  THEY WEREN'T BANNING ALL TYPES OF

10:46:50  15   FIREARMS EITHER IN THE DISTRICT OF COLUMBIA.

          16            THE COURT:  BUT THEY WERE BANNING ALL HANDGUNS.

          17            MS. BARVIR:  ALL HANDGUNS, YEAH.  BUT THE COURT TELLS

          18   US JUST BECAUSE THERE'S AN OPTION TO USE SOMETHING ELSE ISN'T

          19   ENOUGH TO PROTECT THE RIGHT.  SINCE MAGAZINES, AT LEAST 15 TO

          20   17 ROUNDS FOR HANDGUNS AND 24 TO 30 ROUNDS FOR RIFLES, ARE

          21   COMMONLY POSSESSED BY LAWFUL PURPOSES BY LAW-ABIDING CITIZENS,

          22   THEY'RE PROTECTED.  YOU CAN'T HAVE THE STATE COME BACK AND SAY,

          23   WELL, JUST BECAUSE YOU CAN USE 10 ROUNDS OR FEWER AND THEY'RE

          24   AVAILABLE, THAT'S NOT A JUDGMENT THAT THE STATE CAN MAKE WHEN

          25   THESE TYPES OF ARMS ARE PROTECTED BY THE CONSTITUTION.  SO THAT

10:47:28  1  WOULD BE MY RESPONSE.  AND ADDITIONALLY, EXCUSE ME --

        2              THE COURT:  YOU LOST YOUR TRAIN OF THOUGHT.

        3              MS. BARVIR:  LOST MY TRAIN OF THOUGHT.  I'M SORRY.

        4              THE COURT:  LET ME INTERRUPT YOU WITH ONE OF MY

        5  QUESTIONS.  IN READING KOLBE, I WAS A LITTLE CONFUSED BECAUSE

        6  IN ONE PART THEY TALK ABOUT AR'S BEING POSSESSED BY ONLY ONE

        7  PERCENT OF THE POPULATION.  SO WHAT THEY WERE TRYING TO DO IN

        8  THE KOLBE OPINION IS TO ESSENTIALLY EXPLAIN THAT THEY WERE NOT

        9  IN COMMON USE.  BUT THEN IN ANOTHER PART OF KOLBE THEY SAID --

       10  AGAIN, KEEPING IN MIND THAT A LOT OF THIS IS SORT OF MERGING OR

       11  BLENDING IN WITH THE OTHER -- IT SAYS:  THE PLAINTIFF'S

       12  EVIDENCE REFLECTS THAT SINCE IT WAS FIRST MARKETED TO THE

       13  PUBLIC IN 1963, THE AR-15 HAS BECOME THE MOST POPULAR CIVILIAN

       14  RIFLE DESIGNED IN AMERICA AND IS MADE IN MANY VARIATIONS BY

10:48:56 15  MANY COMPANIES.

       16              SO I WAS A LITTLE CONFUSED WHEN I WAS READING KOLBE.

       17  ON THE ONE HAND THEY SAY, WELL, THEY'RE ONLY OWNED BY ONE

       18  PERCENT OF THE POPULATION.  AND THEN THEY SAID, BUT IT'S BECOME

       19  THE MOST POPULAR CIVILIAN RIFLE DESIGNED IN AMERICA.  I WAS A

       20  LITTLE CONFUSED BY THAT.  DO YOU HAVE ANY NUMBERS ON HOW

       21  POPULAR ARE WEAPONS IN CALIFORNIA THAT USE MAGAZINES OF MORE

       22  THAN 10 ROUNDS?

       23              MS. BARVIR:  THE EVIDENCE I THINK WOULD COME FROM --

       24  A LOT OF THE EVIDENCE OBVIOUSLY IS DEALING WITH THE UBIQUITY OF

       25  THE MAGAZINES OVER 10 ROUNDS THEMSELVES.  BUT THE EVIDENCE THAT

10:49:46   1  GOT US TO THOSE NUMBERS I THINK WE HAVE ESTIMATES BETWEEN 100

           2  AND 115 MILLION MAGAZINES OVER 10 ROUNDS IN THE UNITED STATES

           3  THROUGHOUT THE MARKET.

           4            THE COURT:  DO YOU HAVE ANY NUMBERS FOR CALIFORNIA?

           5            MS. BARVIR:  DON'T HAVE DIRECT NUMBERS FOR

           6  CALIFORNIA.  I THINK IT'S FAIR TO CONCEDE THAT THEY'RE GOING TO

           7  BE LOWER CONSIDERING THE STATE HAS BANNED THEIR ACQUISITION AND

           8  MANUFACTURE SINCE 2010 -- I MEAN, 2000.  OBVIOUSLY, THAT

           9  DOESN'T MAKE IT RIGHT.  WHAT YOU'RE DOING IS SORT OF MAKING IT

          10  A CIRCULAR ARGUMENT.  THEY'RE NOT IN USE IN CALIFORNIA BECAUSE

          11  WE BANNED THEM 20 YEARS AGO.  THAT'S NOT THE WAY THE RIGHTS

          12  WORK.  SO THE NUMBERS THAT WE'RE LOOKING AT ARE GOING TO BE THE

          13  MILLIONS THAT ARE IN THE HANDS OF PEOPLE THROUGHOUT THE

          14  COUNTRY.

10:50:34  15            I THINK YOU'LL SEE THAT AR'S ARE QUITE POPULAR IN

          16  CALIFORNIA THOUGH.  THERE'S A LOT OF RESTRICTION ON THEIR USE.

          17  REGISTRATION IS REQUIRED FOR MANY TYPES.  BUT THEY'RE STILL

          18  VERY POPULAR, AND THOSE NUMBERS, AGAIN, THEY'RE GOING TO BE

          19  COMING FROM THE NATIONWIDE LOOKING, NATIONWIDE VIEWPOINT.  BUT

          20  THE WORK OF THE PLAINTIFF'S EXPERT FROM THE NATIONAL TRAINING

          21  SPORTS FOUNDATION KIND OF TALKS ABOUT THAT.  THEY LOOKED AT THE

          22  NUMBERS OF HOW MANY PEOPLE HAD THE TYPES OF RIFLE PLATFORMS

          23  THAT WOULD ACCEPT LARGE CAPACITY MAGAZINES TO THEN MAKE THE

          24  ESTIMATES OF NUMBERS OF LARGE CAPACITY MAGAZINES IN THE

          25  COUNTRY.  SO THAT'S THE BEST I CAN DO FOR YOU, YOUR HONOR, ON

10:51:14   1    NUMBERS OF AW'S IN THE STATE AND IN THE COUNTRY.

2         SO I THINK GOING BACK TO KOLBE, THERE'S DEFINITELY

3    SOME CONFUSING BITS ABOUT THAT.  IT'S HARD TO KIND OF SUGGEST

4    THAT, YOU KNOW, WELL, MAYBE IT'S ONLY ONE PERCENT OF THE U.S.

5    POPULATION, BUT IT'S THE MOST COMMON MODERN FIREARM ON THE

6    MARKET.  BUT IT'S NOT NECESSARILY CONTRADICTORY.  ONE PERCENT

7    IN THIS COUNTRY, THAT'S STILL A WHOLE LOT OF PEOPLE.  AND THE

8    FACT THAT THE PEOPLE THAT DO OWN GUNS OVERWHELMINGLY CHOOSE

9    THOSE TYPES OF FIREARMS, AND NOW THE LARGE CAPACITY MAGAZINES

10    THAT GO WITH THEM, THAT'S WHAT MAKES THEM IN COMMON USE.  IT'S

11    NOT RAW NUMBERS NECESSARILY.  OBVIOUSLY, WE HAVE A HUNDRED

12    MILLION OF THEM, OF MAGAZINES OVER 10 ROUNDS IN THE COUNTRY.

13    THAT'S A RAW NUMBER.  THAT'S VERY HIGH UNDER ANY MEASURE.  BUT

14    IF YOU'RE LOOKING AT AW'S AND THE KOLBE COURT IS SAYING IT'S

10:52:06   15    ONLY ONE PERCENT, WELL, BUT THERE'S STILL THAT ONE PERCENT IS

16    CHOOSING THAT TYPE OF FIREARM, AND IT'S THE MOST POPULAR.  I

17    DON'T NECESSARILY THINK THEY'RE CONTRADICTORY STATEMENTS.

18         THE COURT:  LET ME ASK YOU ABOUT ANOTHER STATEMENT IN

19    KOLBE.  I KNOW THE STATE RELIED ON KOLBE A LOT.  SO I READ THE

20    MAJORITY OPINION.  THERE'S AN INTERESTING STATEMENT IN THERE

21    THAT I THINK IS A LITTLE PUZZLING TO ME.  MAYBE YOU CAN EXPLAIN

22    IT TO ME.  BUT IT SAYS:  THE BANNED LARGE CAPACITY MAGAZINES

23    ARE PARTICULARLY DESIGNED AND MOST SUITABLE FOR MILITARY AND

24    LAW ENFORCEMENT APPLICATIONS, NOTING THAT LARGE CAPACITY

25    MAGAZINES ARE MEANT TO PROVIDE SOLDIERS WITH A LARGE AMMUNITION

10:53:00   1    SUPPLY AND THE ABILITY TO RELOAD RAPIDLY.

           2              I HAVE A BIT OF A PROBLEM WITH THAT STATEMENT BECAUSE

           3    PRIOR TO THAT IT SAYS: SIMPLY PUT, AR-15 TYPE RIFLES ARE,

           4    QUOTE, LIKE M-16 RIFLES.  SO BY DEFINITION, WHEN YOU READ THAT,

           5    WHEN I READ IT, AND I UNDERSTAND I'M NOT THE BRIGHTEST LIGHT

           6    BULB IN THE BUILDING, BUT WHEN I READ THAT, IT TELLS ME THAT

           7    M-16S AND AR-15S ARE NOT THE SAME.  THE M-16 IS A MILITARY

           8    WEAPON.

           9              MS. BARVIR:  THAT'S CORRECT.

          10              THE COURT:  AR-15 IS NOT A MILITARY WEAPON.

          11              MS. BARVIR:  IT'S A CIVILIAN WEAPON.

          12              THE COURT:  IT MAY HAVE -- IN FACT, THAT'S EXACTLY

          13    RIGHT.  IN FACT, KOLBE SPECIFICALLY SAYS THAT.  IT MAY HAVE

          14    BEEN DESIGNED AFTER A MILITARY WEAPON, BUT IT DIFFERS IN THE

10:53:55  15    MILITARY WEAPON IN VARIOUS REGARDS.  RIGHT?

          16              MS. BARVIR:  CORRECT.

          17              THE COURT:  SO IF AN AR-15 USES A MAGAZINE THAT HOLDS

          18    MORE THAN 10 ROUNDS, BUT IT WAS NOT DESIGNED FOR MILITARY USE,

          19    IT WAS DESIGNED FOR CIVILIAN USE, IT DOESN'T REALLY HOLD.  THE

          20    MAGAZINES ARE NOT MEANT TO PROVIDE SOLDIERS WITH A LARGE AMOUNT

          21    OF AMMUNITION, IT IS DESIGNED TO PROVIDE THE HOLDER OF THE

          22    WEAPON -- NOT A SOLDIER, BUT THE HOLDER OF THE WEAPON WHICH

          23    PRESUMPTIVELY IS A CIVILIAN -- WITH A LARGE AMMUNITION SUPPLY,

          24    RIGHT?

          25              MS. BARVIR:  CORRECT.

```
10:54:37   1              THE COURT:  IT SEEMS SO CLEAR TO ME.

           2              MS. BARVIR:  IT IS PRETTY CLEAR, YOUR HONOR.  BUT

           3    EVEN IF IT WERE A MILITARY FIREARM AND EVEN IF LARGE CAPACITY

           4    MAGAZINES WERE MADE TO GIVE SOLDIERS ACCESS TO LARGE AMOUNTS OF

           5    AMMUNITION, WHICH I DON'T THINK THE EVIDENCE BEARS OUT THAT THE

           6    STATE'S PROVIDED -- THEY REALLY JUST CITE KOLBE AND WORMAN FOR

           7    SUCH A PROPOSITION -- EVEN IF THAT WERE TRUE, THE SECOND

           8    AMENDMENT EXPLICITLY TALKS ABOUT MILITIA SERVICE SO --

           9              THE COURT:  THAT GETS US INTO A WHOLE DIFFERENT

          10    ARENA.

          11              MS. BARVIR:  THAT'S TRUE.

          12              THE COURT:  THAT GETS US INTO A WHOLE DIFFERENT ARENA

          13    WHICH IS A QUAGMIRE THAT WE'RE GOING TO, I GUESS, PERHAPS WE'RE

          14    GOING TO EXPLORE.  BUT I HAVE A VERY DIFFICULT TIME.  I DON'T

10:55:39  15    SEE ANYTHING IN HELLER THAT SAYS THAT MILITARY EQUIPMENT IS NOT

          16    PROTECTED.  IT DOESN'T SAY THAT AT ALL.

          17              MS. BARVIR:  YOU'RE NOT MISSING ANYTHING.  IT DOESN'T

          18    SAY THAT.  IT TALKS ABOUT --

          19              THE COURT:  SO AS I SAID, I'M NOT THE BRIGHTEST LIGHT

          20    BULB IN THE BUILDING, BUT WHY IS IT THAT ALL THE OTHER COURTS,

          21    LIKE KOLBE, FOR EXAMPLE, SAY OTHERWISE?  BECAUSE ALL I READ WAS

          22    THAT JUSTICE SCALIA POSED A RHETORICAL DEVICE BY WHICH HE

          23    CREATED A STRAW MAN ONLY TO BE ABLE TO KNOCK DOWN THE STRAW MAN

          24    FURTHER ON IN HIS ARGUMENT; BUT NOWHERE IN THAT ARGUMENT DOES

          25    HE SAY, FOR EXAMPLE, THAT M-16S ARE BANNED OR PROHIBITED.  DO
```

```
10:56:24    1   YOU KNOW WHERE IN HELLER I MIGHT FIND THAT LANGUAGE?

            2            MS. BARVIR:  YOU WON'T FIND THAT LANGUAGE.

            3            THE COURT:  THEN HOW IS IT THE PEOPLE KEEP REPEATING

            4   THIS?  I KEEP READING IT, AND I KEEP THINKING, YOU KNOW, THIS

            5   IS LIKE ALICE IN WONDERLAND.  I DON'T UNDERSTAND.  WHERE DOES

            6   THIS COME FROM?

            7            MS. BARVIR:  HAVING PRACTICED THIS TYPE OF LAW FOR A

            8   WHILE, I HAVE MY ASSUMPTIONS.  BUT I THINK WHAT WE'VE SEEN

            9   HAPPEN IS THIS TAKING FROM HELLER THE DANGEROUS-AND-UNUSUAL

           10   LANGUAGE AND TURNING IT INTO UNUSUALLY-DANGEROUS LANGUAGE.  ALL

           11   FIREARMS ARE GOING TO BE DANGEROUS BUT IT MEANS THEY HAVE TO BE

           12   UNUSUAL.  AND THEN THEY PUT THAT TOGETHER WITH THE APPROVAL

           13   THAT HELLER GIVES TO MILLER ABOUT SAWED-OFF SHOTGUNS, THEN THEY

           14   LUMP A BUNCH OF FIREARMS IN AND SAY, WELL, NOT ALL FIREARMS ARE

10:57:15   15   PROTECTED.  SO IT JUST KIND OF TURNED INTO THIS --

           16            THE COURT:  BUT MILLER SPECIFICALLY, MILLER

           17   SPECIFICALLY SAYS THAT WEAPONS THAT ARE USED FOR WARFARE ARE

           18   PROTECTED.

           19            MS. BARVIR:  THAT'S CORRECT.

           20            THE COURT:  RIGHT?

           21            MS. BARVIR:  RIGHT.  AND THEY FOUND THAT SAWED-OFF

           22   SHOTGUNS ARE NOT PARTICULARLY USEFUL IN WARFARE SO THEY COULD

           23   BE BANNED.

           24            THE COURT:  WHICH INTERESTINGLY WOULD PROBABLY BE

           25   VERY USEFUL FOR SELF-DEFENSE; IF YOU WOKE UP IN THE MIDDLE OF
```

```
10:57:42    1    THE NIGHT, AND YOU HAD SOMEONE BREAK IN YOUR HOUSE, YOU

            2    WOULDN'T HAVE TO WORRY ABOUT THE BULLET GOING THROUGH THAT WALL

            3    AND THAT WALL AND GOING TO THE NEIGHBOR'S HOUSE AND HITTING

            4    SOMEONE, RIGHT?  YOU WOULDN'T HAVE TO WORRY ABOUT AIM.  SO

            5    PROBABLY A SAWED-OFF SHOTGUN WOULD PROBABLY BE GOOD FOR

            6    SELF-DEFENSE AT HOME, BUT YET, WE CAN'T HAVE THEM, RIGHT?

            7              MS. BARVIR:  THAT'S TRUE.

            8              THE COURT:  BUT MILLER SAID THAT WEAPONS BECAUSE --

            9    THE WHOLE REASON FOR THE SECOND AMENDMENT WAS SO THAT IF WE

           10    WERE REQUIRED TO DEFEND OURSELVES FROM ENEMIES, FOREIGN OR

           11    DOMESTIC, IT WOULD CALL UPON THE CITIZENRY -- THE FARMERS, THE

           12    BLACKSMITHS, THE TEACHERS, THE LAWYERS, THE DOCTORS -- TO PICK

           13    UP WHATEVER THEY HAD AND TO GO OUT AND DEFEND THE FREE STATE.

           14    RIGHT?

10:58:34   15              MS. BARVIR:  CORRECT.

           16              THE COURT:  AND MILLER SAID -- AND MILLER SAID THAT

           17    THOSE WEAPONS ARE, IN FACT, PROTECTED.  NOW PRACTICALLY

           18    SPEAKING, I THINK WE ALL UNDERSTAND WHAT'S GOING ON.  NONE OF

           19    US -- I SHOULDN'T SAY "NONE OF US."  GENERALITIES ARE NOT GOOD.

           20    BUT I THINK WE CAN ALL AGREE THAT NONE OF US WOULD LIKE TO SEE

           21    OUR NEXT-DOOR NEIGHBOR OWN A SHOULDER-FIRED STINGER MISSILE OR

           22    BAZOOKA OR HAND-GRENADE.  ALTHOUGH, UNDER THE SECOND AMENDMENT,

           23    IF YOU READ IT AND READ ITS REASON FOR ITS EXISTENCE, THAT

           24    WOULD PROBABLY BE OKAY.

           25              SO IT SEEMS TO ME THAT THIS WHOLE IDEA THAT THESE --
```

```
10:59:20    1    SO THE IDEA THAT BECAUSE LARGE -- REMEMBER WE USED TO TALK

            2    ABOUT HIGH-CAPACITY MAGAZINES?  NOW WE CHANGED THE

            3    TERMINOLOGY.

            4         MS. BARVIR:  THAT HAPPENS A LOT.

            5         THE COURT:  SO NOW IT'S LARGE CAPACITY MAGAZINES.  SO

            6    LARGE CAPACITY MAGAZINES ARE FOR MILITARY USE.  BUT THEY'RE

            7    PROHIBITED BY HELLER BECAUSE HELLER PROHIBITS WEAPONS THAT ARE

            8    USED FOR MILITARY USE.  BUT I DON'T READ THAT IN HELLER.  I

            9    JUST DON'T READ IT.  I DON'T SEE IT.  I DON'T KNOW WHERE IT IS.

           10    BUT I KEEP SEEING CASES THAT SAY THAT OVER AND OVER AND OVER

           11    AGAIN.

           12         MS. BARVIR:  LUCKILY, YOU'RE NOT GOING TO FIND THAT

           13    FROM THE NINTH CIRCUIT TELLING YOU THAT YOU NEED TO FOLLOW THAT

           14    PRECEDENT.  HELLER IS GOING TO BE ON POINT HERE.  THESE ARE

11:00:06   15    USED BY LAW-ABIDING CITIZENS FOR SELF-DEFENSE REGARDLESS OF

           16    THEIR USE IN MILITARY FUNCTIONS.  IT'S NOT THE STANDARD.  WE'RE

           17    LOOKING AT LAW-ABIDING CITIZENS, AND THEY USE THEM.  THE

           18    EVIDENCE BEARS THAT OUT.  THEY'RE PROTECTED.

           19         THE COURT:  WHAT ABOUT A HUNDRED ROUND MAGAZINE?

           20         MS. BARVIR:  THAT'S AN INTERESTING QUESTION.  YOU

           21    MIGHT EVIDENCE THAT THOSE ARE UNUSUAL.  THEY DON'T SHOW UP VERY

           22    OFTEN.  BUT THAT'S NOT WHAT WE'RE TALKING ABOUT, RIGHT?  WE'RE

           23    TALKING ABOUT 11 ROUNDS, 15 ROUNDS, 17 ROUNDS.

           24         THE COURT:  NO, WE'RE NOT.  WE'RE TALKING ABOUT

           25    ANYTHING OVER 10 ROUNDS.
```

```
11:00:36    1            MS. BARVIR:  THAT'S TRUE.  BUT WHEN THE STATE HAS
            2    DECIDED TO ARBITRARILY CUT IT OFF AT 10 -- SO YES, IT'S GOING
            3    TO PULL IN THOSE 100-ROUND DRUMS, BUT IT REALLY IS GOING AFTER
            4    WHAT IS COMMON.  WHAT THE EVIDENCE SHOWS IS COMMON, THE 15 TO
            5    17, THE 24 TO 30.
            6            THE COURT:  THAT'S WHY I ASKED YOU EARLIER ABOUT WHO
            7    ACTUALLY MAKES THE DECISION AND BASED ON WHAT?  HOW FAR DO WE
            8    ALLOW THE STATE TO GO IN INTERFERING WITH AN ARGUABLY CLEAR
            9    SECOND AMENDMENT BECAUSE I TAKE IT WHAT YOU'RE SAYING IS THE
           10    EVIDENCE SHOWS THAT A 100-ROUND MAGAZINE IS NOT COMMON.
           11            MS. BARVIR:  THERE'S NO EVIDENCE ABOUT 100-ROUND
           12    MAGAZINES REALLY AT ALL.  THEY TALK ABOUT THEM.  THEY WANT TO
           13    POINT TO THAT BOOGIE MAN, BUT THERE'S NO EVIDENCE ABOUT HOW
           14    COMMON OR UNCOMMON THEY ARE.  THAT MIGHT BE A CASE FOR ANOTHER
11:01:24   15    DAY.  IF THE STATE DECIDES TO SAY 75 TO 100 ROUNDS IS A LARGE
           16    CAPACITY MAGAZINE, THEN THE SIDES WOULD HAVE TO FIGHT IT OUT,
           17    IS THERE EVIDENCE THAT THOSE ARE IN COMMON USE AND AS SUCH
           18    PROTECTED.  HERE, THERE IS NO EVIDENCE THAT THEY ARE OR NOT.
           19            THE COURT:  AND I CERTAINLY DON'T HAVE THE ABILITY,
           20    OR DO I, TO MAKE THE DECISION TO WANT AN INJUNCTION THAT WOULD
           21    RESTRAIN THE STATE FROM ENFORCING THE STATUTE WITH REGARDS TO A
           22    MAGAZINE THAT EXCEEDS OR THAT IS LESS THAN 30 ROUNDS, FOR
           23    EXAMPLE; IT'S AN ALL OR NOTHING PROPOSITION FOR ME, RIGHT?
           24            MS. BARVIR:  AT THIS POINT, YES, BECAUSE THE STATE
           25    HAS DECIDED THAT IT'S 10 ROUNDS.  SO THEY HAVE TAKEN IN ALL OF
```

11:02:13   1   THE COMMONLY AND UNCOMMONLY POSSESSED MAGAZINES.  SO THE COURT

           2   HAS TO STRIKE IT OR UPHOLD IT BASED ON WHAT THE THE LAW SAYS.

           3   IF THE COURT'S DECISION IS BASED ON, WELL, WE KNOW 30 ROUNDS IS

           4   COMMON AND WE KNOW 15 AND 17 ROUNDS AND 11 ROUNDS ARE COMMON,

           5   THEN THE STATE COULD OSTENSIBLY GO BACK AND PASS SOMETHING THAT

           6   SAYS, OKAY, 75 ROUNDS, 50 ROUNDS, SOMETHING LIKE THAT, AND THEN

           7   THERE COULD POTENTIALLY BE ANOTHER COURT FIGHT IN ANOTHER DAY.

           8   SO THE COURT WOULD HAVE TO SUSTAIN -- UPHOLD THE LAW OR STRIKE

           9   IT DOWN IN ITS ENTIRETY.  I DON'T THINK THE COURT HAS THE

          10   ABILITY TO REWRITE THE LAW TO SAY, WELL, YOU CAN BAN MAGAZINES

          11   OVER 50 ROUNDS.  EXCUSE ME, YOUR HONOR.

          12          THE COURT:  IT'S OKAY. DO YOU NEED WATER?

          13          (PAUSE IN THE PROCEEDINGS.)

          14          THE COURT:  SO LET ME ASK YOU:  NOW YOU CONCEDE, DO

11:03:40  15   YOU NOT, THAT ANY GUN IS DANGEROUS?

          16          MS. BARVIR:  OF COURSE.  THEY'RE DESIGNED TO

          17   NEUTRALIZE THREAT, TO KILL ANIMALS; YES, A GUN IS GOING TO BE

          18   DANGEROUS.

          19          THE COURT:  YOUR ARGUMENT IS THAT THESE LARGE

          20   CAPACITY MAGAZINES ARE NOT UNUSUAL.

          21          MS. BARVIR:  THAT'S CORRECT.

          22          THE COURT:  AND UNDER HELLER, IF IT'S A -- IN ORDER

          23   FOR IT TO BE NOT PROTECTED, IT HAS TO BE DANGEROUS AND UNUSUAL

          24   AND NOT POSSESSED BY NORMAL -- THAT'S NOT QUITE THE LANGUAGE.

          25          MS. BARVIR:  LAW ABIDING.

11:04:37   1          THE COURT:  I WAS GOING TO SAY NORMAL, LAW-ABIDING

         2    CITIZENS.  RIGHT?

         3          MS. BARVIR:  THAT'S CORRECT.  THAT'S OUR POSITION.

         4          THE COURT:  AND YOUR POSITION IS THAT LARGE CAPACITY,

         5    AT LEAST SOME LARGE CAPACITY MAGAZINES, ALTHOUGH THEY MAY BE

         6    DANGEROUS, THEY'RE NOT UNUSUAL, AND THEY ARE COMMONLY USED BY

         7    LAW-ABIDING CITIZENS.

         8          MS. BARVIR:  CORRECT.  FOR LAWFUL PURPOSE, YES.

         9          THE COURT:  SO FOR THAT REASON, YOU BELIEVE I SHOULD

        10    GRANT SUMMARY JUDGMENT.

        11          MS. BARVIR:  THAT'S CORRECT.

        12          THE COURT:  OKAY.  DO YOU HAVE ANYTHING ELSE YOU

        13    WANTED TO TELL ME?

        14          MS. BARVIR:  I THINK I'VE HIT EVERYTHING.  THANK YOU,

11:05:25  15    YOUR HONOR.

        16          THE COURT:  ALL RIGHT.  LET'S HEAR FROM THE STATE.

        17          MR. ECHEVERRIA:  GOOD MORNING, YOUR HONOR.

        18          THE COURT:  GOOD MORNING.

        19          MR. ECHEVERRIA:  JOHN ECHEVERRIA FOR THE ATTORNEY

        20    GENERAL.  I'D LIKE TO BEGIN BY ADDRESSING WHAT APPEARS TO BE A

        21    FUNDAMENTAL PUZZLE THAT THIS COURT IS GRAPPLING WITH.  AND THAT

        22    IS, WHO MAKES THE POLICY DECISION, AND WHAT IS THE ROLE OF THE

        23    COURT IN EVALUATING THAT POLICY DECISION TO ENSURE THAT THERE'S

        24    A REASONABLE FIT BECAUSE THE COURT DOES HAVE A SIGNIFICANT ROLE

        25    TO PLAY IN THAT PROCESS.  AND THE COURT REFERENCED BROWN VERSUS

11:06:07  1    THE BOARD OF EDUCATION, LAWRENCE VERSUS TEXAS, OBERGEFELL.

        2    THERE'S MANY OTHER DECISIONS, AS THE COURT KNOWS, IN WHICH THE

        3    JUDICIARY HAS TAKEN A FAIRLY ACTIVE ROLE IN MONITORING THE

        4    PUBLIC'S POLICY DECISIONS TO ENSURE THAT CONSTITUTIONAL

        5    LIBERTIES ARE NOT INFRINGED.

        6              IN THE CONTEXT OF THE SECOND AMENDMENT AND IN THE

        7    CONTEXT OF THE FIRST AMENDMENT, IN THE CONTEXT OF ABORTION

        8    RIGHTS, AND THERE ARE OTHER ISSUES, STRICT SCRUTINY IS NOT

        9    ALWAYS THE STANDARD.  WITH RESPECT TO SOME CONSTITUTIONAL

       10    RIGHTS, A LOWER STANDARD OF SCRUTINY IS AFFORDED, AND THE

       11    COURTS WILL NOT TAKE A DEEP DIVE IN REEVALUATING THE EVIDENCE

       12    AND WILL NOT SUBJECT THE PEOPLE'S DECISION TO A MICROSCOPIC

       13    EVALUATION, AND THAT IS THE CASE WITH RESPECT TO LARGE CAPACITY

       14    MAGAZINES UNDER THE SECOND AMENDMENT.  THE REASON WHY THE KOLBE

11:07:10 15    COURT AND THE WORMAN COURT WITH JUDGE YOUNG SAID THAT THESE

       16    ISSUES ARE MATTERS OF PUBLIC DEBATE, AND THERE IS A VIGOROUS

       17    DEBATE HAPPENING OUTSIDE THIS COURTHOUSE, AS YOUR HONOR IS

       18    AWARE.

       19              THE COURT:  YOU'LL CONCEDE, COUNSEL, WON'T YOU, THAT

       20    A LOT OF THE DEBATE IS BEING DRIVEN BY THE FACT THAT, OF

       21    COURSE, ANY TIME ONE OF THESE SHOOTINGS OCCUR, IT'S TRAGIC.

       22    TRAGIC.

       23              MR. ECHEVERRIA:  ABSOLUTELY.

       24              THE COURT:  YOU'D LIKEWISE CONCEDE THAT

       25    UNFORTUNATELY, AND PERHAPS UNDERSTANDABLY, THERE'S A LOT OF

11:07:53   1   EMOTION THAT'S DRIVEN AND CREATED AS A RESULT OF THESE TRAGIC

         2   EVENTS; RIGHT?

         3           MR. ECHEVERRIA:  I WOULD CONCEDE THAT PUBLIC MASS

         4   SHOOTINGS ARE TERRIBLY TRAUMATIC NOT JUST FOR THE VICTIMS BUT

         5   FOR THE COMMUNITIES AND PEOPLE ALL OVER THE COUNTRY GIVEN THE

         6   MEDIA ATTENTION THAT THEY ENGENDER.

         7           THE COURT:  BUT STATISTICALLY, YOU'D AGREE THAT IN

         8   PROPORTION TO ALL OF THE OTHER CAUSES FOR PEOPLE DYING, RIGHT

         9   -- SO FOR EXAMPLE, PEOPLE WHO ARE KILLED AS A RESULT OF DRUNK

        10   DRIVERS --

        11           MR. ECHEVERRIA:  OR FOR JUST DRIVING.

        12           THE COURT:  WELL, JUST DRUNK DRIVING, FOR EXAMPLE,

        13   THAT THE NUMBER IS QUITE SMALL STATISTICALLY; RIGHT?

        14           MR. ECHEVERRIA:  UH-HUH.

11:08:42  15           THE COURT:  YES.

        16           MR. ECHEVERRIA:  YES, YOUR HONOR.

        17           THE COURT:  AND IN FACT, THE SAME WOULD BE TRUE WITH

        18   REGARDS TO ALL GUN VIOLENCE, IF YOU TAKE THE PROPORTION

        19   STATISTICALLY OF THE NUMBER OF PEOPLE WHO ARE ACTUALLY KILLED

        20   OR INJURED AS A RESULT OF THESE, QUOTE, LARGE CAPACITY

        21   MAGAZINES, THEY'RE REALLY STATISTICALLY INSIGNIFICANT WITH

        22   REGARDS TO ALL THE OTHER PEOPLE WHO ARE KILLED AND INJURED AS A

        23   RESULT OF GUNS.  AGREED?

        24           MR. ECHEVERRIA:  I WOULD NOT CHARACTERIZE IT AS

        25   STATISTICALLY INSIGNIFICANT.  THEY ARE RELATIVELY RARE EVENTS,

```
11:09:16   1   THE PUBLIC MASS SHOOTINGS, OR GUN VIOLENCE IN GENERAL.

           2           THE COURT:  I'VE LOOKED AT THE EVIDENCE.  I SEE A

           3   VERY, VERY SMALL NUMBER COMPARED TO THE TOTAL NUMBER OF GUN

           4   DEATHS, AS I READ AND I LOOK.  HUGE.  PEOPLE KILLED WITH OTHER

           5   WEAPONS, REVOLVERS, FOR EXAMPLE.  SO IT'S REALLY STATISTICALLY

           6   VERY, VERY SMALL.  BUT WHAT DRIVES, UNDERSTANDABLY, IS THAT WHO

           7   WANTS TO SEE CHILDREN, YOU KNOW, KILLED AND MASSACRED, RIGHT?

           8   WHO WANTS TO SEE LAW ENFORCEMENT SHOT?  NOBODY DOES.  RIGHT?

           9           MR. ECHEVERRIA:  ABSOLUTELY.

          10           THE COURT:  BUT THE PROBLEM IS -- BUT YOU'RE NOT

          11   REALLY SOLVING THE PROBLEM BY ENACTING THIS LEGISLATION, ARE

          12   YOU?

          13           MR. ECHEVERRIA:  IF BY "THE PROBLEM" THE COURT IS

          14   REFERRING TO GUN VIOLENCE IN GENERAL, IS THAT WHAT YOUR HONOR

11:10:20  15   IS REFERRING TO?

          16           THE COURT:  YES.

          17           MR. ECHEVERRIA:  THAT'S NOT THE PRIMARY OBJECTIVE OF

          18   BANNING LARGE CAPACITY --

          19           THE COURT:  FINE.  LET ME GET TO THE SECONDARY

          20   OBJECTIVE.  THE SECONDARY OBJECTIVE IS TO STOP MASS

          21   SHOOTINGS.

          22           MR. ECHEVERRIA:  THAT'S PART OF IT.  IT'S TO ALSO

          23   MITIGATE THE LETHALITY OF PUBLIC MASS SHOOTINGS WHEN THEY DO

          24   OCCUR AND TO ALSO MITIGATE THE LETHALITY OF GUN VIOLENCE

          25   AGAINST LAW ENFORCEMENT BECAUSE OF THE PARTICULARLY DANGEROUS
```

41

11:10:51  1    NATURE OF LARGE CAPACITY MAGAZINES.

2         THE COURT:  BUT I READ YOUR EXPERT'S DECLARATIONS,

3    AND I DON'T REALLY SEE ANYTHING IN THERE THAT INDICATES THAT,

4    YOU KNOW, POLICE DEPARTMENTS ARE UNDER CONSTANT THREATENED

5    ATTACK BY MASS SHOOTINGS.  YES, IT DOES HAPPEN.  JUST LIKE LOTS

6    OF OTHER THINGS HAPPEN.  BUT I DIDN'T SEE ANYTHING IN THERE

7    WHERE THERE'S SOME INCREDIBLE, YOU KNOW, UP-TICK IN THE NUMBER

8    OF POLICE OFFICERS THAT ARE BEING ASSAULTED BY THESE WEAPONS.

9    CAN YOU REFER ME TO SOMETHING IN YOUR EVIDENCE THAT SHOWS?

10         MR. ECHEVERRIA:  ABSOLUTELY, YOUR HONOR.  WHILE THE

11   NUMBERS MAY BE RELATIVELY SMALL IN TERMS OF GUN VIOLENCE

12   AGAINST LAW ENFORCEMENT PERSONNEL, DR. KOPER IN HIS EXPERT

13   REPORT THAT THE ATTORNEY GENERAL HAS SUBMITTED EXPLAINS HOW 41

14   PERCENT OF CRIME GUNS THAT WERE USED IN MURDERS OF LAW

11:11:46 15   ENFORCEMENT HAD LARGE CAPACITY MAGAZINES AND THAT IS UNDISPUTED

16   EVIDENCE.  THE PLAINTIFFS DO NOT DISPUTE THE EXPERT OPINIONS OR

17   THE EVIDENCE UNDERLYING THOSE OPINIONS THAT LARGE CAPACITY

18   MAGAZINES ARE USED DISPROPORTIONATELY IN THE MURDER OF LAW

19   ENFORCEMENT.  AND EVEN IF --

20         THE COURT:  SO LET ME TELL YOU WHAT I DID NOT SEE;

21   AND THAT IS, THAT IF THE SIZE OF THE MAGAZINE WAS REDUCED FROM

22   17 TO 10 THE ASSAULTS ON OFFICERS BY WEAPONS THAT USE MAGAZINES

23   WOULD BE ANY LESS.

24         MR. ECHEVERRIA:  THE STATE DOES NOT HAVE TO PRESENT

25   EVIDENCE THAT WOULD PROVE THAT A LARGE CAPACITY MAGAZINE BAN

```
11:12:50   1   LIKE THE ONE CALIFORNIA HAS ENACTED WOULD IN FACT REDUCE THE
           2   NUMBERS OF DEATHS OF LAW ENFORCEMENT BECAUSE INTERMEDIATE
           3   SCRUTINY IS THE APPLICABLE LEVEL OF SCRUTINY.  AND THIS IS
           4   SOMETHING THAT PLAINTIFFS WOULD HAVE TO CONCEDE UNDER FYOCK AND
           5   AS EVERY SINGLE -- FOUR CIRCUIT COURTS AND NUMEROUS DISTRICT
           6   COURTS, INCLUDING THE EASTERN DISTRICT OF CALIFORNIA, THEY'VE
           7   ALL CONCLUDED THAT RESTRICTIONS OF MAGAZINE CAPACITIES ARE
           8   SUBJECT TO INTERMEDIATE SCRUTINY.
           9           THE COURT:  FINE.  I'LL GRANT YOU THAT.  THAT'S THE
          10   STANDARD.  BUT MY QUESTION TO YOU IS -- FINE.  SO WE HAVE TO
          11   FIGURE OUT THIS REASONABLE FIT, RIGHT?
          12           MR. ECHEVERRIA:  RIGHT.
          13           THE COURT:  SO TELL ME WHY IT'S A REASONABLE FIT.
          14           MR. ECHEVERRIA:  SO WHEN INTERMEDIATE SCRUTINY
11:13:37  15   APPLIES, THERE'S VARIOUS RULES THIS COURT HAS TO FOLLOW AND ONE
          16   OF THEM IS THE SUBSTANTIAL DEFERENCE THAT'S AFFORDED TO THE
          17   PREDICTIVE JUDGMENTS OF THE LEGISLATURE.  AND WITH RESPECT TO
          18   THE POSSESSION BAN THAT WAS ENACTED IN 2016 WITH PROPOSITION
          19   63, SUBSTANTIAL DEFERENCE TO THE PREDICTIVE JUDGMENTS OF THE
          20   PEOPLE IS ALSO DUE.  SO THE COURT HAS TO LOOK AT THE EVIDENCE
          21   THAT THE ATTORNEY GENERAL HAS PRESENTED.
          22           THE COURT:  WHICH IS?
          23           MR. ECHEVERRIA:  A SUBSTANTIAL PORTION OF THE PILE OF
          24   DOCUMENTS ON YOUR HONOR'S DESK, I'M SURE.
          25           THE COURT:  BUT THEY BASICALLY ALL SAY THE SAME
```

11:14:09    1   THING, COUNSEL.  I READ THEM OVER AND OVER AGAIN, AND THEY ALL

            2   BASICALLY SAY THE SAME THING.  THEY SAY THE MORE ROUNDS THAT

            3   YOU CAN FIRE THROUGH A GUN, THE MORE LIKELY IT IS THAT PEOPLE

            4   ARE GOING TO BE INJURED AND ARE GOING TO BE KILLED.  YOU DON'T

            5   HAVE TO HAVE AN EXPERT -- YOU GIVE ME 20 EXPERTS WHO SAY THE

            6   SAME THING, AND I SAY TO YOU, YOU'RE JUST NEEDLESSLY KILLING

            7   TREES TO CREATE PAPER.  OF COURSE, YOU KNOW THAT.  I KNOW THAT.

            8   YOU KNOW THAT.  WE ALL KNOW THAT.  JUST LIKE WE ALL KNOW THAT

            9   GUNS ARE DANGEROUS.  YOU AGREE THAT GUNS IS A DANGEROUS THING.

           10   RIGHT?

           11            MR. ECHEVERRIA:  ABSOLUTELY.

           12            THE COURT:  BUT GUESS WHAT?  LOTS OF PEOPLE OWN THEM.

           13   LOTS OF PEOPLE USE THEM.  IN FACT, THEY'RE PROTECTED BY THE

           14   SECOND AMENDMENT.  SO THE QUESTION BECOMES:  HOW DO WE DECIDE

11:14:59   15   WHAT IS A REASONABLE FIT?  HOW DO WE DECIDE THAT?  YOU SAY I

           16   HAVE TO GIVE SUBSTANTIAL DEFERENCE TO THE LEGISLATURE.  FINE.

           17   I'LL GIVE THEM SUBSTANTIAL DEFERENCE, BUT I'M NOT GIVING THEM

           18   ALL DEFERENCE.

           19            MR. ECHEVERRIA:  ABSOLUTELY NOT.  THAT WOULD BE

           20   RATIONAL BASIS, AND THIS IS NOT RATIONAL BASIS.  UNDER

           21   INTERMEDIATE SCRUTINY, THE GOVERNMENT HAS THE BURDEN OF

           22   DEFENDING THE LAW.  NOT THE PLAINTIFF.  AND THE COURT WOULDN'T

           23   HAVE ANY ROLE IN TRYING TO HELP THE GOVERNMENT IN DEFENDING THE

           24   LAW, UNLIKE IN RATIONAL BASIS SCRUTINY.

           25            BUT UNDER INTERMEDIATE SCRUTINY, THE COURT LOOKS TO

11:15:36  1    ENSURE THAT THERE IS SUBSTANTIAL EVIDENCE JUSTIFYING THE LAW

          2    AND THAT ON THE BASIS OF THAT SUBSTANTIAL EVIDENCE, THAT THE

          3    PEOPLE HAVE MADE RATIONAL INFERENCES FROM THAT EVIDENCE.  AND

          4    THE EVIDENCE THAT WE HAVE PRESENTED TO YOUR HONOR WITH THE

          5    DECLARATION OF LUCY ALLEN, THE DECLARATION OF PROFESSOR

          6    DONOHUE, THE DECLARATION OF CHRISTOPHER KOPER, AND THE NUMEROUS

          7    EMPIRICAL STUDIES AND ARTICLES SHOWING THAT NOT ONLY DO LARGE

          8    CAPACITY MAGAZINES ENABLE SHOOTERS TO FIRE MORE ROUNDS IN A

          9    GIVEN PERIOD OF TIME, BUT THEY'RE USED -- THEY'RE PREVALENT

         10    PUBLIC MASS SHOOTINGS, AS LUCY ALLEN'S EXPERT REPORT SETS

         11    FORTH.

         12              THE COURT:  I LOOKED AT SOME OF THAT.  SO FOR

         13    EXAMPLE -- BY THE WAY, LET ME POINT OUT THAT IN MY ORDER THAT I

         14    PREVIOUSLY ISSUED GRANTING THE PRELIMINARY INJUNCTION WAS -- I

11:16:39 15    DIDN'T SEE ANYTHING IN YOUR STACK OF DOCUMENTS THAT REFUTED MY

         16    SPECIFIC FACT FINDING AS TO SOME OF THE MASS SHOOTINGS THAT HAD

         17    BEEN ALLUDED TO IN AT LEAST ONE OF THE REPORTS THAT WAS

         18    SUBMITTED.  IT WOULD SEEM TO BE PRETTY CLEAR TO ME FROM THE

         19    GET-GO WAS THAT IN THESE MASS SHOOTINGS VERY OFTEN -- AND I

         20    THINK IT'S EVEN SUPPORTED BY A LOT OF THIS THAT YOU HAVE HERE

         21    -- THERE WERE WEAPONS THAT WERE USED THAT WERE NOT HIGH

         22    CAPACITY MAGAZINES.  SHOTGUNS, FOR EXAMPLE.  IN MANY OF THEM,

         23    THEY USE MACHINE GUNS OR FULLY AUTOMATIC WEAPONS.  RIGHT?

         24              MR. ECHEVERRIA:  THAT'S CORRECT.  AND THOSE ARE OFTEN

         25    IN CONJUNCTION WITH LARGE CAPACITY MAGAZINES WHICH MAKE THE

11:17:42  1    ASSAULT WEAPONS EVEN MORE DEADLY.

2         THE COURT:  WELL -- SO DEFINE FOR ME AN ASSAULT

3    WEAPON.

4         MR. ECHEVERRIA:  THE CALIFORNIA PENAL CODE HAS

5    MULTIPLE CATEGORIES AND DEFINITIONS.

6         THE COURT:  I KNOW.  I KNOW.  BUT YOU KNOW WHAT?  AS

7    I SAID TO YOUR COLLEAGUE WHEN SHE WAS HERE, I'VE TRIED READING.

8    I'VE TRIED READING.

9         MR. ECHEVERRIA:  I UNDERSTAND.

10        THE COURT:  AND I GUARANTEE YOU THAT IF I WANTED TO

11   TRIP YOU UP TODAY, I COULD PROBABLY DO IT, EVEN THOUGH YOU'RE

12   AN EXPERT IN THE FIELD.  I GUARANTEE THAT YOU DON'T KNOW.

13        MR. ECHEVERRIA:  I WOULDN'T SAY EXPERT, BUT YOU CAN

14   ASK ANY QUESTION THAT YOU LIKE OF ME.

11:18:20  15        THE COURT:  SO DEFINE FOR ME AN ASSAULT WEAPON.

16        MR. ECHEVERRIA:  SO WITH RESPECT TO -- THE STATE OF

17   CALIFORNIA HAS ACTED INCREMENTALLY IN PROHIBITING VERY

18   DANGEROUS ASSAULT RIFLES.

19        THE COURT:  WHAT IS AN ASSAULT RIFLE?

20        MR. ECHEVERRIA:  I'M GETTING TO THAT ANSWER, YOUR

21   HONOR.

22        THE COURT:  I'M SORRY.

23        MR. ECHEVERRIA:  THE STATE IS ALLOWED TO ACT

24   INCREMENTALLY IN ADDRESSING ISSUES OF PUBLIC CONCERN.  SO THE

25   STATE FIRST HAD DIFFERENT ROSTERS OF FIREARMS BY MAKE AND MODEL

11:18:50    1    AND BANNED THOSE.  AND WHEN GUN MANUFACTURERS STARTED MAKING

            2    COPIES OR CHANGING THEM AND MAKING MINOR TWEAKS TO THEIR

            3    DESIGNS TO GET OUT OF THE BAN, THE STATE OF CALIFORNIA ENACTED

            4    THE CATEGORY THREE BAN WHICH DEFINES AN ASSAULT WEAPON ON THE

            5    BASIS OF CERTAIN CHARACTERISTICS OR FEATURES.  SO THE

            6    PREREQUISITE TO QUALIFY AS AN ASSAULT WEAPON IS FOR THE FIREARM

            7    TO HAVE THE CAPABILITY TO ACCEPT A DETACHABLE MAGAZINE AND IF

            8    IT HAS --

            9            THE COURT:  SO ANY WEAPON -- LET ME SEE IF I

           10    UNDERSTAND WHAT YOU'RE SAYING.  SO SAY, FOR EXAMPLE, A MINI-14

           11    THAT HAS A DETACHABLE MAGAZINE THAT HOLDS 7 ROUNDS.  THAT'S AN

           12    ASSAULT WEAPON OR ASSAULT RIFLE?

           13            MR. ECHEVERRIA:  NOT NECESSARILY, YOUR HONOR.

           14            THE COURT:  NO.  OKAY.

11:19:39   15            MR. ECHEVERRIA:  SO THE FEATURE-BASED TEST REQUIRES

           16    THAT THE FIREARM NOT HAVE A FIXED MAGAZINE.  SO IF IT CAN

           17    ACCEPT A DETACHABLE MAGAZINE, THAT'S THE FIRST STEP.  THEN YOU

           18    WOULD LOOK AT A MENU OF OTHER FEATURES, AND IF THE FIREARM HAS

           19    ONE OF THOSE OTHER FEATURES IN ADDITION TO ACCEPTING A

           20    DETACHABLE MAGAZINE, THEN IT WOULD QUALIFY AS AN ASSAULT

           21    WEAPON.  THOSE ADDITIONAL FEATURES WOULD BE FLASH SUPPRESSORS,

           22    TELESCOPIC STOCKS, PISTOL GRIP, TWO PISTOL GRIPS; THERE MAY BE

           23    OTHER FEATURES.  I DIDN'T READ THE ASSAULT RIFLE BAN THIS

           24    MORNING.

           25            THE COURT:  FLASH SUPPRESSORS.

11:20:22   1           MR. ECHEVERRIA:  YES.

2           THE COURT:  GRENADE THROWERS.

3           MR. ECHEVERRIA:  GRENADE.

4           THE COURT:  OF COURSE, EVERYBODY -- I'M SURE THAT ALL

5  OF THE PLAINTIFFS PROBABLY HAVE SOME WEAPON THAT POSSESSES A --

6  HAS A GRENADE THROWER, RIGHT?

7           MR. ECHEVERRIA:  I WOULD MAKE NO REPRESENTATION ABOUT

8  THAT, YOUR HONOR.

9           THE COURT:  OF COURSE YOU WOULDN'T BECAUSE IT WOULD

10  BE FOOLISH.  NOBODY HAS THAT KIND OF A WEAPON.  BUT IN ANY

11  EVENT, GETTING BACK TO MY POINT -- I WAS TRYING TO LEAD YOU

12  DOWN THIS --

13          MR. ECHEVERRIA:  I'M FIGURING OUT HOW TO GET BACK TO

14  LARGE CAPACITY MAGAZINES.  BUT I'D LIKE TO NOTE, YOUR HONOR,

11:20:58 15  THAT THE CALIFORNIA RIFLE AND PISTOL ASSOCIATION, WHICH IS THE

16  INSTITUTIONAL PLAINTIFF IN THIS CASE, THEY HAVE CHALLENGED

17  CALIFORNIA'S ASSAULT WEAPONS BAN, AND THAT CASE IS RUPP,

18  R-U-P-P, VERSUS BECERRA, AND IT'S CURRENTLY PENDING IN THE

19  CENTRAL DISTRICT OF CALIFORNIA.  AND JUST YESTERDAY, JUDGE

20  STATON GRANTED THE ATTORNEY GENERAL'S MOTION TO DISMISS AND

21  DENIED A MOTION FOR PRELIMINARY INJUNCTION BROUGHT BY THE CRPA,

22  AND IT DID SO ON -- IN EVALUATING VERY SIMILAR ARGUMENTS THAT

23  ARE BEING PRESENTED TO YOUR HONOR IN THIS CASE CHALLENGING THE

24  LARGE CAPACITY MAGAZINES BAN.

25          JUDGE STATON DETERMINED THAT ASSAULT WEAPONS, EVEN

11:21:41  1  ASSUMING THAT THEY ARE PROTECTED BY THE SECOND AMENDMENT,

2  THAT'S STEP ONE OF THE ANALYSIS, INTERMEDIATE SCRUTINY APPLIES

3  AND THE EVIDENCE SUBMITTED BY THE ATTORNEY GENERAL DEMONSTRATED

4  THAT THERE'S NO LIKELIHOOD OF SUCCESS ON THE MERITS OF THE CRPA

5  PREVAILING ON THEIR SECOND AMENDMENT CLAIM AND JUDGE STATON

6  ALSO DISMISSED WITH PREJUDICE THE CRPA'S TAKING CLAIM AND

7  SUBSTANTIVE DUE PROCESS CLAIM TO THE ASSAULT WEAPONS BAN.  I

8  THINK JUDGE STATON'S WELL-REASONED ORDER PROVIDES ADDITIONAL

9  SUPPORT FOR THE ATTORNEY GENERAL'S POSITION THAT EVEN IF THE

10  SECOND AMENDMENT PROTECTS SOME MAGAZINE CAPACITY, IN THIS

11  CASE --

12          THE COURT:  WHY WOULDN'T IT?  WHY WOULDN'T IT?

13          MR. ECHEVERRIA:  WELL, IT'S NOT THE STATE'S POSITION

14  THAT IT WOULD NOT.  IT WOULD --

11:22:32 15          THE COURT:  I'M TROUBLED BY THAT ARGUMENT.  WHY WOULD

16  IT NOT?  WHY WOULD THE SECOND AMENDMENT NOT PROTECT THE

17  MAGAZINE?

18          MR. ECHEVERRIA:  THE STATE'S POSITION IS THAT THERE

19  IS LIKELY SECOND AMENDMENT PROTECTION TO MAGAZINES BECAUSE THE

20  NINTH CIRCUIT IN JACKSON MADE CLEAR THAT THERE IS SOME SECOND

21  AMENDMENT PROTECTION TO AMMUNITION, OTHERWISE --

22          THE COURT:  I THOUGHT THAT WAS THE CASE.  SO I

23  THOUGHT YOU JUST TOLD ME THAT JUDGE STATON FOUND THAT THERE WAS

24  NO SECOND --

25          MR. ECHEVERRIA:  NO.  NO.  JUDGE STATON ASSUMED THAT

```
11:23:09    1    THERE IS SECOND AMENDMENT PROTECTION FOR ASSAULT WEAPONS.

            2              THE COURT:  I MISUNDERSTOOD YOU.  I APOLOGIZE.

            3              MR. ECHEVERRIA:  SO YOUR HONOR, IN RULING ON THIS

            4    MOTION FOR SUMMARY JUDGMENT, CAN SKIP STEP ONE AND AVOID ALL

            5    THE DEBATE ABOUT COMMON USE AND MILLER AND WHETHER SECOND

            6    AMENDMENT PROTECTION IS AFFORDED TO LARGE CAPACITY MAGAZINES,

            7    AND THE COURT CAN BYPASS THE LINE IN HELLER THAT WAS QUOTED AND

            8    RELIED UPON IN KOLBE AND IN WORMAN THAT WEAPONS THAT ARE MOST

            9    SUITABLE FOR MILITARY APPLICATION LIKE M-16S AND SIMILAR

           10    WEAPONS MAY BE BANNED.  JUST REALLY QUICKLY YOUR HONOR BECAUSE

           11    YOUR HONOR ASKED THE PLAINTIFFS WHERE IN HELLER THE SUPREME

           12    COURT SAID THAT, I'D LIKE TO READ THAT PORTION INTO THE RECORD

           13    FOR YOUR HONOR.

           14              THE COURT:  WOULD YOU?

11:23:58   15              MR. ECHEVERRIA:  IT'S ON PAGE 627 OF THE HELLER

           16    DECISION.  I PRINTED OUT FOUR PAGES PER SHEET.  SO I'M TRYING

           17    TO SAVE TREES.  IT MIGHT BE DIFFICULT TO READ.

           18              THE COURT:  IT'S OKAY.  ALL RIGHT.

           19              MR. ECHEVERRIA:  IT MAY BE OBJECTED --

           20              THE COURT:  YES, THAT'S EXACTLY WHERE I THOUGHT YOU'D

           21    GO.  THAT'S A RHETORICAL DEVICE.

           22              MR. ECHEVERRIA:  CAN I READ ON?

           23              THE COURT:  NO.  I READ IT.  I KNOW EXACTLY WHERE

           24    YOU'RE READING FROM.  THAT'S A RHETORICAL DEVICE.  HE CREATED A

           25    STRAW MAN.  THEN HE KNOCKED DOWN THE STRAW MAN.  BUT TELL ME IN
```

11:24:30   1   THERE SOMEWHERE WHERE THE OPINION SAYS THAT MILITARY WEAPONS

           2   ARE NOT PROTECTED.

           3           MR. ECHEVERRIA:  IT'S LATER IN THAT PARAGRAPH.  I

           4   DON'T VIEW THAT AS A STRAW MAN.  I DON'T KNOW WHY YOU'RE

           5   READING --

           6           THE COURT:  BECAUSE BASICALLY WHAT HE WAS SAYING WAS

           7   YOU HAVE TO FIND A WAY TO CONNECT THE PREFATORY CLAUSE TO THE

           8   SUBSEQUENT CLAUSE, AND WHAT HE WAS SAYING WAS, OKAY, FINE, SO

           9   YOU OBJECT AND YOU SAY THAT THESE WEAPONS ARE OF MILITARY USE,

          10   THAT THEY HAVE TO BE OF MILITARY USE BECAUSE THE PREFATORY

          11   CLAUSE IS TALKING ABOUT A MILITIA; AND BECAUSE IT'S TALKING

          12   ABOUT A MILITIA, ONE MIGHT ARGUE THAT THE WEAPONS THAT ARE

          13   PROTECTED ARE THOSE THAT WOULD BE USED BY MILITIA AND ARE

          14   THEREFORE OF MILITARY TYPE.  BUT THEN HE GOES ON TO SAY:  BUT

11:25:28  15   IT DOESN'T MATTER, IT DOESN'T MATTER BECAUSE WHAT MATTERS IS

          16   THAT IN MILITIA, THEY'RE CALLED UPON TO BRING WHATEVER WEAPONS

          17   THEY HAD AND THAT INCLUDES WEAPONS THAT WOULD NORMALLY BE USED

          18   FOR THE DEFENSE OF THE HEARTH AND THE HOME.  THAT'S WHAT HE

          19   SAID.

          20           MR. ECHEVERRIA:  BUT JUSTICE SCALIA WENT ON TO SAY

          21   THAT JUST BECAUSE A WEAPON MAY BE USEFUL IN MILITIA SERVICE OR

          22   MILITARY SERVICE, IT'S NOT NECESSARILY PROTECTED.

          23           THE COURT:  THAT'S RIGHT.  THAT'S EXACTLY WHAT HE

          24   SAID.  SO FOR EXAMPLE, WHAT HE WAS SAYING WAS JUST BECAUSE YOU

          25   MAY HAVE A BAZOOKA WHICH WOULD BE USEFUL FOR MILITARY PURPOSES,

```
11:26:13   1   IT DOES NOT MEAN IT'S PROTECTED.  AND WHY?  "A," IT'S

           2   DANGEROUS.  ALL GUNS ARE DANGEROUS.  AND "B," IT'S UNUSUAL, AND

           3   NOT COMMONLY POSSESSED BY LAW-ABIDING CITIZENS OR LAW-ABIDING

           4   PURPOSES.  RIGHT?  THAT'S WHAT HE WAS SAYING.  HE WASN'T SAYING

           5   THAT BECAUSE SOMETHING WAS DESIGNED FOR MILITARY PURPOSE IT

           6   THEREFORE BECOMES UNPROTECTED.  I'VE READ THAT MANY, MANY, MANY

           7   TIMES.  AND YOU KNOW, AGAIN, I ACKNOWLEDGE I DIDN'T GO TO

           8   HARVARD.

           9           MR. ECHEVERRIA:  I DIDN'T EITHER, YOUR HONOR.

          10           THE COURT:  I'M NOT THE BRIGHTEST LIGHT BULB IN THE

          11   BUILDING.  BUT I READ THAT, AND I UNDERSTAND WHAT IT SAYS.  IT

          12   SAYS SIMPLY BECAUSE IT WAS DESIGNED FOR MILITARY USE DOESN'T

          13   MEAN THAT IT'S PROTECTED.

          14           AGAIN, I READ KOLBE, AND I READ ALL THESE OTHER

11:27:09  15   CASES, BUT I THINK PERHAPS THE BEST -- SINCE WE'RE ON THE

          16   SUBJECT -- WHO BEST TO TELL ME WHAT THEY SAID IN AN OPINION

          17   THAN THE PERSON WHO WROTE THE OPINION OR THE COURT WHO WROTE

          18   THE OPINION.  DON'T YOU AGREE?  KOLBE IS WONDERFUL.  IT'S A

          19   FOURTH CIRCUIT.  BUT IT'S NOT THE SUPREME COURT.

          20           MR. ECHEVERRIA:  IT'S NOT THE SUPREME COURT, AND IT'S

          21   NOT BINDING ON YOUR HONOR, AS YOUR HONOR IS AWARE.  RIGHT.

          22   IT'S PERSUASIVE AUTHORITY.

          23           THE COURT:  HELP ME WITH THIS, SINCE YOU BROUGHT UP

          24   THE SUBJECT.

          25           MR. ECHEVERRIA:  SURE.
```

```
11:27:48   1        THE COURT:  LET'S LOOK LIKE AT CAETANO VERSUS

           2   MASSACHUSETTS.  THAT'S A SUPREME COURT CASE.  THE SUPREME

           3   COURT.  THE SUPREME COURT SAID THE FOLLOWING.  IT SAID:

           4   FINALLY, THE COURT USED A, QUOTE, A CONTEMPORARY LENS, END OF

           5   QUOTE, AND FOUND, QUOTE, NOTHING IN THE RECORD TO SUGGEST THAT,

           6   BRACKETS, STUN GUNS, END OF BRACKETS, ARE READILY ADAPTABLE TO

           7   USE IN THE MILITARY.  CITATION OMITTED.  BUT HELLER REJECTED

           8   THE PROPOSITION, QUOTE, THAT ONLY THOSE WEAPONS USEFUL IN

           9   WARFARE ARE PROTECTED.

          10        SO THE SUPREME COURT SAYS, WHAT WE SAID IN HELLER WAS

          11   THAT IT'S NOT JUST WEAPONS THAT ARE USEFUL IN WARFARE THAT ARE

          12   PROTECTED.  IT INCLUDES OTHER WEAPONS INCLUDING STUN GUNS, AND

          13   THAT'S HOW CAETANO WAS DECIDED.  SO I MEAN, LOOK, I LIKE

          14   READING THE LAW.  I LOVE READING OPINIONS.  I LIKE TRYING TO

11:28:54  15   FIGURE OUT WHAT WAS IN THE PEOPLE'S MINDS WHEN THEY WROTE THE

          16   OPINIONS.  BUT I JUST DON'T SEE THE ARGUMENT THAT THE SUPREME

          17   COURT SAID THAT MILITARY STYLE WEAPONS ARE FORBIDDEN, ARE NOT

          18   PROTECTED BY THE SECOND AMENDMENT.  THAT'S NOT WHAT THEY SAID.

          19   WHAT THEY SAID WAS SOME WEAPONS THAT ARE USEFUL PERHAPS BY THE

          20   MILITIA ARE NOT PROTECTED.  THAT'S WHAT THEY SAID.  DO YOU

          21   DISAGREE WITH WHAT I JUST READ TO YOU?

          22        MR. ECHEVERRIA:  MY READING OF CAETANO IS THAT THE

          23   MASSACHUSETTS HIGH COURT COMMITTED LEGAL ERROR BY CONCLUDING

          24   THAT STUN GUNS -- PARDON ME -- ARE NOT PROTECTED BY THE SECOND

          25   AMENDMENT.
```

11:29:39   1              THE COURT:  BECAUSE?

         2              MR. ECHEVERRIA:  BECAUSE THEY WERE NOT IN EXISTENCE

         3    AT THE TIME OF RATIFICATION, AND THE SUPREME COURT CLARIFIED

         4    THAT COMMON USE AT THE TIME IS NOT REFERRING TO IN COMMON USE

         5    IN 1789 OR --

         6              THE COURT:  THAT'S ONE OF THE ISSUES THEY TALKED

         7    ABOUT.

         8              MR. ECHEVERRIA:  SURE.  BUT THE MAIN REASON WHY STUN

         9    GUNS ARE PROTECTED BY THE SECOND AMENDMENT AND WHY THE

        10    MASSACHUSETTS HIGH COURT COMMITTED ERROR IS BECAUSE THEY'RE IN

        11    COMMON USE FOR SELF-DEFENSE.

        12              THE COURT:  I UNDERSTAND.  I GOT YOU.  BUT I WAS

        13    TRYING -- I WAS TRYING TO FIGURE OUT WHAT THAT LANGUAGE SAYS

        14    WHEN IT SAYS -- BECAUSE OBVIOUSLY WHEN THEY WROTE THIS THEY

11:30:21  15    MUST HAVE MEANT TO SAY SOMETHING, OTHERWISE THEY WEREN'T GOING

        16    TO WASTE THE INK AND THE PAPER.  IT SAID:  BUT HELLER REJECTED

        17    THE PROPOSITION THAT ONLY THOSE WEAPONS USEFUL IN WARFARE ARE

        18    PROTECTED.

        19              NOW CORRECT ME IF I'M WRONG, BUT THE WAY I READ THAT

        20    IS IT'S SAYING THAT NOT ONLY ARE WEAPONS USEFUL IN WARFARE

        21    PROTECTED, BUT THERE ARE OTHER WEAPONS LIKEWISE PROTECTED SUCH

        22    AS STUN GUNS.

        23              MR. ECHEVERRIA:  RIGHT.  THERE ARE OTHER WEAPONS THAT

        24    MAY NOT RELATE TO THE PREFATORY CLAUSE OF MILITIA SERVICE;

        25    RIGHT, YOUR HONOR?

11:30:57  1          THE COURT:  WE AGREE.  SO THE POINT IS THAT I THINK

          2   THAT HELLER DOES NOT SAY -- ANYWHERE, ANYWHERE IN HELLER DOES

          3   IT SAY THAT BECAUSE A WEAPON MAY BE DESIGNED TO BE LIKE A

          4   MILITARY-STYLE WEAPON THAT IT'S NOT PROTECTED BY THE SECOND

          5   AMENDMENT.  IT DOESN'T SAY THAT ANYWHERE IN THERE.

          6          MR. ECHEVERRIA:  SO IN CAETANO, THE COURT MADE CLEAR

          7   THAT THE OPERATIVE CLAUSE OF THE SECOND AMENDMENT EXTENDS TO

          8   OTHER WEAPONS THAT MAY NOT HAVE HAD A RELATION TO MILITIA

          9   SERVICE.  BUT IT DOESN'T NECESSARILY MEAN THAT ALL WEAPONS THAT

         10   ARE USEFUL IN MILITIA SERVICE ARE ALSO --

         11          THE COURT:  I'LL GRANT YOU THAT.  I'LL GRANT YOU

         12   THAT.  BUT MILLER SAYS SOMETHING DIFFERENT.

         13          MR. ECHEVERRIA:  WELL, MILLER'S HOLDING IS ACTUALLY

         14   COUCHED IN NEGATIVE LANGUAGE.

11:31:42 15          THE COURT:  I KNOW.

         16          MR. ECHEVERRIA:  WHERE THE SUPREME COURT SAID THAT

         17   WEAPONS NOT SUITABLE FOR MILITIA SERVICE ARE NOT PROTECTED.

         18   BUT THE COROLLARY ARE NOT NECESSARILY THE CASE, THAT ALL

         19   WEAPONS THAT ARE USEFUL ARE PROTECTED.

         20          THE COURT:  I UNDERSTAND.  LOOK, THERE'S NOBODY HERE

         21   THAT'S GOING TO ARGUE, INCLUDING ME, THAT POSSESSION OF A

         22   BAZOOKA OR A SHOULDER-FIRED MISSILE WHICH WOULD BE USEFUL IN

         23   THE MILITIA --

         24          MR. ECHEVERRIA:  PRESENT DAY MILITIA SERVICE, RIGHT?

         25          THE COURT:  YES.  IT COULD BE USEFUL, BUT YOU KNOW,

```
11:32:14   1   WHO IS GOING TO POSSIBLY -- NO, I'M NOT GOING TO FIND THAT, AND

           2   I DON'T THINK ANY COURT WOULD AGREE.  ALTHOUGH, IF YOU REALLY

           3   READ THE SECOND AMENDMENT, IT PROBABLY COULD.  I SUPPOSE YOU

           4   COULD CARRY AROUND A DIRTY BOMB IN A SUITCASE IN TODAY'S DAY

           5   AND AGE, BUT NOBODY IN THEIR RIGHT MIND IS GOING TO ARGUE THAT.

           6   BUT THAT TAKES US TO THE BASIC QUESTION, THE QUESTION THAT I

           7   ASKED AT THE VERY BEGINNING, WHICH IS HOW DO WE MAKE THE

           8   DECISION, HOW DO WE DECIDE WHAT THAT REASONABLE FIT IS?

           9           WE'VE AGREED THAT MACHINE GUNS, THEY'RE BANNED, AND

          10   PROBABLY THERE'S A REASONABLE FIT BETWEEN THE STATE'S INTEREST

          11   AND THE LEGISLATION.  WE'VE AGREED.  WE'VE AGREED THAT THE

          12   SECOND AMENDMENT DOES NOT PROTECT MY HAVING A BAZOOKA OR HAND

          13   GRENADE OR SHOULDER-FIRED MISSILE.  BUT WHAT ABOUT THE REST OF

          14   THE POTENTIAL WEAPONS COVERED BY THE SECOND AMENDMENT LIKE THE

11:33:28  15   ONES WE'RE ARGUING ABOUT HERE?

          16           MR. ECHEVERRIA:  100 ROUND DRUM MAGAZINES, FOR

          17   EXAMPLE.

          18           THE COURT:  WELL, EXACTLY.  SO ONE COULD ARGUE THAT

          19   IF I HAD THE POWER THAT I COULD SAY, OKAY, ANYTHING OVER 30

          20   ROUNDS, BANNED.  ANYTHING LESS THAN 30 ROUNDS, NOT BANNED.  BUT

          21   NOBODY DIED AND MADE ME GOD -- KING YET.  SO I CAN'T DO THAT.

          22   SO THE QUESTION IS -- AND I ASKED YOUR COLLEAGUE WHEN SHE WAS

          23   HERE AND I HOPE YOU'LL BE ABLE TO ASK THE QUESTION FOR ME.  I

          24   THINK IT CUTS TO THE CHASE.  SO WE BAN MACHINE GUNS -- BY THE

          25   WAY, MANY OF THE INCIDENTS THAT ARE REPORTED IN YOUR EXPERT'S
```

11:34:21  1   EVIDENCE INVOLVED MACHINE GUNS OR AUTOMATIC WEAPONS, BY THE

2   WAY  -- SO WE BAN MACHINE GUNS.  WE'VE NOW BANNED THE SALE AND

3   TRANSFER OF ASSAULT WEAPONS.  WE BANNED THE SALE AND TRANSFER

4   OF THESE LARGE CAPACITY MAGAZINES.  BUT NOW WE COME ALONG AND

5   WE SAY NOT ONLY HAVE WE BANNED THE SALE OR TRANSFER, WE'RE

6   GOING TO CAUSE PEOPLE WHO ARE OTHERWISE LAW-ABIDING CITIZENS

7   WHO POSSESS THESE FOR WHATEVER INTEREST THEY MAY POSSESS THEM,

8   WHETHER IT BE FOR SPORTING OR FOR SELF-DEFENSE, WE'RE GOING TO

9   CAUSE YOU TO SURRENDER THESE.  EVEN THOUGH YOU'VE DONE NOTHING

10   WRONG, WE'RE GOING TO CAUSE YOU TO SURRENDER THESE, OR YOU'RE

11   GOING TO BECOME A CRIMINAL.

12            MR. ECHEVERRIA:  THAT'S NOT WHAT THE LAW PROVIDES,

13   YOUR HONOR.

14            THE COURT:  WHAT DOES IT PROVIDE?

11:35:19 15            MR. ECHEVERRIA:  SO WHEN THE PEOPLE OF CALIFORNIA

16   ENACTED PROPOSITION 63 THEY CLOSED A LOOPHOLE THAT MADE

17   ENFORCEMENT OF THE EXISTING LARGE CAPACITY MAGAZINE

18   RESTRICTIONS THAT YOUR HONOR REFERRED TO MORE DIFFICULT TO

19   ENFORCE BECAUSE LARGE CAPACITY MAGAZINES, UNLIKE FIREARMS,

20   DON'T BEAR UNIQUE IDENTIFYING NUMBERS.  SO WHEN LAW ENFORCEMENT

21   COMES ACROSS A LARGE CAPACITY MAGAZINE, IT'S VERY DIFFICULT FOR

22   THEM TO DETERMINE THAT THIS LARGE CAPACITY MAGAZINE WAS NOT

23   GRANDFATHERED IN UNDER THE PRIOR LAW.  AND THE PEOPLE CLOSED

24   THAT LOOPHOLE NOT TO JUST ENABLE THE MORE EFFECTIVE ENFORCEMENT

25   OF THE EXISTING RESTRICTIONS BUT BECAUSE LARGE CAPACITY

11:36:01   1   MAGAZINES CAN BE STOLEN.  THE ATTORNEY GENERAL HAS PRESENTED

         2   EVIDENCE THAT --

         3          THE COURT:  DID THEY THINK OF THAT -- DIDN'T THE

         4   LEGISLATURE THINK ABOUT THAT WHEN THEY ORIGINALLY PASSED

         5   LEGISLATION BANNING THE SALE, TRANSFER, OR WHAT?  DID THEY FALL

         6   ASLEEP AT THE SWITCH OR --

         7          MR. ECHEVERRIA:  PRESUMABLY, BUT THE LEGISLATURE

         8   WASN'T REQUIRED IN 2000 TO ENACT A PERFECTLY COMPREHENSIVE LAW.

         9   THE LEGISLATURE IS ENTITLED TO ACT INCREMENTALLY AND TO

        10   EXPERIMENT.  AND EXPERIMENTATION --

        11          THE COURT:  INCREMENTALLY CAN ALSO DRIVE YOU TO THE

        12   POINT WHERE YOU COMPLETELY EXTINGUISHED OR DESTROYED THE SECOND

        13   AMENDMENT.

        14          MR. ECHEVERRIA:  IN THAT CASE, IF THE LEGISLATURE OR

11:36:55  15   THE PEOPLE WENT TOO FAR AND COMPLETELY EVISCERATED A SECOND

        16   AMENDMENT PROTECTION, THEN THE COURT WOULD STEP IN, POSSIBLY

        17   UNDER HELLER, SAY THIS WAS A POLICY CHOICE OFF THE TABLE.

        18   THAT'S NOT WHAT THE POSSESSION BAN DID.

        19          THE COURT:  DO YOU SEE -- WHEN I SAID I WANTED TO CUT

        20   TO THE CHASE, THAT'S WHERE WE ARE.  THAT'S WHERE WE ARE.  SO

        21   WHAT WOULD JUSTIFY THE COURT SAYING:  YOU'VE GONE TOO FAR?

        22          MR. ECHEVERRIA:  THE COURT SHOULD NOT SAY THAT WITH

        23   RESPECT TO A LARGE CAPACITY MAGAZINE BAN.  NO COURT HAS.

        24          THE COURT:  I HEAR YOU.  I HEAR YOU.  BUT YOU'RE NOT

        25   ANSWERING MY QUESTION BECAUSE MY QUESTION IS:  WHEN AND HOW

11:37:38  1  WILL THE COURT MAKE THE DECISION THAT THE STATE HAS GONE TOO

2  FAR?

3          MR. ECHEVERRIA:  WHEN THE STATE FAILS TO PRESENT

4  SUBSTANTIAL EVIDENCE.

5          THE COURT:  WHAT WOULD THE SUBSTANTIAL EVIDENCE BE?

6          MR. ECHEVERRIA:  EXACTLY WHAT THE ATTORNEY GENERAL

7  HAS PRESENTED TO YOUR HONOR IN THIS CASE.  I UNDERSTAND THAT IN

8  ORDERING THE PRELIMINARY INJUNCTION THE COURT DISTINGUISHED THE

9  RECORD IN FYOCK VERSUS SUNNYVALE FROM THE RECORD THAT THE

10  ATTORNEY GENERAL PRESENTED IN OPPOSITION TO THE MOTION FOR

11  PRELIMINARY INJUNCTION.  BUT THAT WAS JUST NOT ACCURATE.  THE

12  RECORDS WERE SUBSTANTIALLY SIMILAR.

13          THE COURT:  BUT WHAT THE COURT WAS HOLDING IN FYOCK

14  WAS VERY DIFFERENT.  I DON'T WANT TO GO THERE.  I DON'T WANT TO

11:38:22  15  GO THERE.  LET ME JUST AGAIN GET BACK TO -- LET'S CUT TO THE

16  CHASE.  LET'S UNDERSTAND SOMETHING.  A GUN IS A DANGEROUS

17  THING.  SO IS A KNIFE.  YOU KNOW IN LONDON THEY HAVE A BAN ON

18  KNIVES.  THEY DON'T HAVE GUNS.  BUT NOW THEY BANNED KNIVES.  SO

19  MAYBE NEXT WEEK THEY'LL BAN PRESSURE COOKERS.  I DON'T KNOW.

20  BUT THE FACT IS THAT A GUN IS A DANGEROUS THING.  IF IT'S

21  MISUSED, IT'S DANGEROUS.  IF IT'S NOT MISUSED, IT'S A PERFECTLY

22  VALID TOOL FOR PLEASURE AND SELF-DEFENSE.

23          NOW, I ASKED YOUR COLLEAGUE THIS QUESTION LAST TIME

24  SHE WAS HERE.  HOPEFULLY, YOU'LL BE ABLE TO ANSWER IT BECAUSE I

25  SUSPECT YOU READ THE TRANSCRIPT AND HAVE ANSWERS TO ALL MY

11:39:08   1    QUESTIONS.

          2              MR. ECHEVERRIA:  HOPEFULLY.

          3              THE COURT:  SO WHAT'S GOING ON IS THAT SOME MASS

          4    SHOOTINGS THAT OCCUR THERE ARE PEOPLE THAT ARE USING MAGAZINES

          5    THAT ARE LABELED AS LARGE CAPACITY MAGAZINES, ANYTHING OVER 10

          6    ROUNDS.

          7              MR. ECHEVERRIA:  OVER A MAJORITY OF PUBLIC MASS

          8    SHOOTINGS.  NOT JUST SOME.

          9              THE COURT:  NOW TOMORROW I'M GOING TO ISSUE A DECREE.

         10    THE DECREE IS THAT ANYONE WHO HAS A MAGAZINE OF MORE THAN 10

         11    ROUNDS HAS TO GET RID OF THEM.  TURN THEM IN.  "A," IT'S NOT

         12    GOING TO STOP PEOPLE LIKE THE SAN BERNARDINO SHOOTERS FROM

         13    ENGAGING IN MASS SHOOTINGS.  YOU KNOW THAT, AND I KNOW THAT.

         14    RIGHT?

11:39:56  15              MR. ECHEVERRIA:  CRIMINALS WILL ALWAYS EXIST, YOUR

         16    HONOR.

         17              THE COURT:  EXACTLY.

         18              MR. ECHEVERRIA:  THAT DOESN'T MEAN THE STATE IS

         19    FORBIDDEN FROM TRYING TO MAKE IT MORE DIFFICULT FOR INDIVIDUALS

         20    TO OBTAIN THOSE DANGEROUS MAGAZINES.

         21              THE COURT:  I GOT YOU.  I UNDERSTAND.

         22              THE COURT:  THEN WE'RE GOING TO GET TO -- I WAVE MY

         23    MAGIC WAND.  I MAKE ALL THE MAGAZINES WITH MORE THAN 10 ROUNDS

         24    GO AWAY.  THEY WENT AWAY.  THEN THE NEXT PERSON WHO IS DERANGED

         25    OR DECIDES THAT HE OR SHE WANTS TO FOR WHATEVER REASON KILL

11:40:33   1   PEOPLE, THEY'RE PROBABLY GOING TO USE A GUN THAT HAS A MAGAZINE

         2   THAT HOLDS 10 ROUNDS.  AND THE NEXT PERSON THAT COMMITS A MASS

         3   SHOOTING IS GOING TO USE A WEAPON THAT CONTAINS 10 ROUNDS.  AND

         4   THE NEXT PERSON AFTER THAT IS GOING TO USE A WEAPON THAT

         5   CONTAINS A MAGAZINE THAT HOLDS 10 ROUNDS.

         6        NOW ALONG IS GOING TO COME THE STATE, AND THE STATE

         7   IS GOING TO USE THE VERY SAME TYPE OF EVIDENCE THAT THE STATE

         8   HAS USED IN THIS CASE, AND THEY'RE GOING TO COME IN AND THEY'RE

         9   GOING TO SAY, LOOK, JUDGE, POLICE OFFICERS ARE BEING ASSAULTED

        10   ALL THE TIME WITH THESE WEAPONS THAT HOLD 10 ROUNDS, AND THEY

        11   WILL BECOME THE NEW LARGE CAPACITY MAGAZINE.  AND THE STATE

        12   WILL SAY, JUDGE, WE HAVE TO TAKE THESE OFF THE STREETS BECAUSE

        13   LAW ENFORCEMENT OFFICERS ARE BEING ASSAULTED WITH THESE AND

        14   PEOPLE ARE BEING KILLED, AND YOU KNOW, GUESS WHAT, YOU ONLY

11:41:39  15   NEED 2.2 ROUNDS FOR SELF-DEFENSE.

        16        OKAY.  NOW WHAT?  I HAVE ESSENTIALLY THE SAME

        17   SITUATION I HAVE TODAY ONLY YOU WILL BE ARGUING THAT SOMETHING

        18   WHICH IS 10 ROUNDS IS A LARGE CAPACITY MAGAZINE THAT OUGHT TO

        19   BE BANNED, AND THE LEGISLATURE HAS MADE ITS POLICY DECISION AND

        20   I SHOULD DEFER TO IT, AND SECOND AMENDMENT BE DAMNED.  RIGHT?

        21        MR. ECHEVERRIA:  I'M NOT GOING TO PREDICT WHAT THE

        22   LEGISLATURE --

        23        THE COURT:  WELL, I AM BECAUSE WHEN YOU LOOK AT THE

        24   INCREMENTAL WAY THAT WE HAVE BEEN ADDRESSING THE SECOND

        25   AMENDMENT, LOGIC AND REASON TELLS US THAT THAT'S EXACTLY WHAT'S

11:42:30   1   GOING TO HAPPEN.  THEN YOU'RE GOING TO SAY -- THE STATE IS

           2   GOING TO COME IN AND SAY, YOU KNOW WHAT, WE GOT TO GET RID OF

           3   10-ROUND MAGAZINES SO WE'RE GOING TO GO TO 7.  THEN JUDGE

           4   BENITEZ IS GOING TO COME ALONG AND SAY, GUESS WHAT, I'M GOING

           5   TO HAVE YOU GET RID OF THE 10-ROUND MAGAZINES; YOU CAN'T HAVE A

           6   MAGAZINE THAT'S MORE THAN 7 ROUNDS.  AND THEN THE NEXT MASS

           7   SHOOTER IS GOING TO USE A WEAPON THAT KILLS WITH A 7-ROUND

           8   MAGAZINE, AND THEN THE NEXT PERSON AFTER THAT IS GOING TO USE A

           9   7-ROUND MAGAZINE, AND THE NEXT PERSON AFTER THAT IS GOING TO

          10   USE A 7-ROUND MAGAZINE.

          11        THEN THE STATE IS GOING TO COME AND SAY, LOOK, JUDGE,

          12   LAW ENFORCEMENT IS BEING ASSAULTED WITH THESE 7-ROUND

          13   MAGAZINES, AND PEOPLE ARE BEING KILLED IN MASS SHOOTINGS WITH

          14   7-ROUND MAGAZINES.  WE GOT TO BAN 7-ROUND MAGAZINES.  YOU CAN

11:43:26  15   SEE WHERE THIS IS GOING TO PROGRESS, AND THIS IS WHY I WAS

          16   ASKING YOU THE QUESTION BECAUSE IT'S A TOUGH QUESTION.  IT'S

          17   NOT AN EASY QUESTION.  IT'S NOT AN EASY QUESTION FOR ME.  IT

          18   SHOULD NOT BE AN EASY QUESTION FOR ANYONE.  BUT MY QUESTION IS:

          19   AT WHAT POINT IN TIME, WHERE, WHEN, BECAUSE THE EVIDENCE IS NOT

          20   GOING TO CHANGE.  THERE'S GOING TO BE PEOPLE THAT ARE GOING TO

          21   BE KILLED.  THERE'S GOING TO BE PEOPLE THAT ARE GOING TO BE

          22   INJURED.  THERE'S GOING TO BE POLICE OFFICERS THAT ARE GOING TO

          23   BE ASSAULTED WHETHER IT BE WITH A 10-ROUND MAGAZINE OR 7-ROUND

          24   MAGAZINE OR 5-ROUND MAGAZINE.  AND IF WE GET DOWN TO THE 2.2

          25   NUMBER THAT KEEPS SURFACING -- BY THE WAY, I CAN'T WAIT TO SEE

| | |
|---|---|
| 11:44:08 | 1 |
THE POINT 2.  A DERRINGER WILL HOLD 2, BUT THE POINT 2, I CAN'T
WAIT TO SEE WHAT THAT WEAPON IS GOING TO LOOK LIKE.  BUT WHEN
YOU GET DOWN TO 2.2 ROUNDS, SOMEONE IS GOING TO SAY, LOOK, FOR
SELF-DEFENSE, YOU ONLY NEED ONE ROUND.  THAT'S ALL YOU NEED.
IF YOU'RE A GOOD SHOT, AND YOU PUT THE SHOT CENTER MASS, YOU
GOT THE PERSON.  THAT'S ALL YOU NEED.  AND YOU'RE GOING TO COME
IN AND SAY, LOOK, JUDGE, LAW ENFORCEMENT OFFICERS ARE BEING
ASSAULTED WITH THESE DERRINGERS THAT USE TWO ROUNDS, AND PEOPLE
ARE BEING KILLED BY PEOPLE USING DERRINGERS WITH TWO ROUNDS.
THEN GUESS WHAT?  AS THE EVIDENCE SHOWS, AND YOU KNOW IT, AND I
KNOW IT, IN A LARGE NUMBER OF THESE MASS SHOOTINGS, THE SHOOTER
HAS MORE THAN ONE WEAPON.  RIGHT?

           MR. ECHEVERRIA:  THAT'S CORRECT.

           THE COURT:  THEY USUALLY COME IN WITH MANY WEAPONS.
AND SO NOW THE ARGUMENT IS GOING TO COME AND THE STATE IS GOING
TO COME IN AND THE STATE IS GOING TO SAY, LOOK, JUDGE, WE NEED
TO PASS A LAW, AND THE LAW IS YOU CAN'T OWN MORE THAN -- PICK A
NUMBER -- 10 GUNS BECAUSE IF YOU GOT MORE THAN 10 GUNS, THE
CHANCES ARE YOU'RE GOING TO KILL AND INJURE MORE PEOPLE,
ASSAULT MORE LAW ENFORCEMENT OFFICERS AND SO ON.  WE'RE GOING
TO GET DOWN, DOING THE SAME PROGRESSION, UNTIL WE'RE AT THE
POINT WHERE YOU HAVE MAYBE ONE GUN WITH ONE ROUND, AND YOU
BETTER HOPE TO HECK THAT WHOEVER IS BREAKING INTO YOUR HOUSE TO
RAPE YOUR WIFE OR RAPE YOUR DAUGHTER THAT YOU CAN HIT HIM OR
HER WITH THAT ONE ROUND AND HIT HIM CENTER MASS.  IT'S A

11:45:49  1  DIFFICULT QUESTION, BUT WHAT I'M ASKING YOU IS WHY THE 10

2  ROUNDS, AND WHY DO I HAVE TO GIVE SUBSTANTIAL WEIGHT TO THE

3  LEGISLATURE, AND WOULD I DO THE SAME THING IF THEY SAID 7?

4  WOULD I DO THE SAME THING IF THEY SAID 5?

5        MR. ECHEVERRIA:  SURE.  THE QUESTION THE COURT IS

6  ASKING IS HOW LOW CAN THE STATE GO, AND THE COURT IS CONCERNED

7  ABOUT RULING ON A SLIPPERY SLOPE AND POTENTIALLY PAVING THE WAY

8  TO MORE REGULATION OF MAGAZINES OR A REGULATION OF --

9        THE COURT:  WE'RE ALREADY THERE.  IT'S JUST A

10  QUESTION OF:  DO WE STOP THE SLIDE, AND IF SO, WHEN DO WE STOP

11  THE SLIDE?

12        MR. ECHEVERRIA:  THIS IS NOT THE CASE TO STOP THE

13  SLIDE.

14        THE COURT:  WHY NOT?  BUT LOOK --

11:46:36  15        MR. ECHEVERRIA:  BECAUSE --

16        THE COURT:  -- APPOINTED TO BE INDEPENDENT THINKERS,

17  NOT TO FOLLOW THE CROWD OR THE HERD.  SO MY QUESTION IS WHY?

18  WHY WOULD I NOT UPHOLD THE 10-ROUND BAN?  WHY WOULD I NOT

19  UPHOLD A 7-ROUND BAN?  WHY WOULD I NOT UPHOLD A 5-ROUND BAN?

20  WHY WOULD I NOT UPHOLD A MORE THAN 10 GUNS BAN?

21        MR. ECHEVERRIA:  IN THE SECOND CIRCUIT'S, THE

22  NEW YORK CASE INVOLVING NEW YORK'S LARGE CAPACITY MAGAZINE BAN,

23  THE SECOND CIRCUIT AT THE SAME TIME UPHELD THE BAN ON LARGE

24  CAPACITY MAGAZINES DEFINED AS MORE THAN 10 ROUNDS WHILE ON THE

25  SAME RECORD STRIKING DOWN THE 7-ROUND LOAD LIMIT.  SO IN THAT

11:47:19   1    CASE, THE COURT HAD CONCERNS.  THE COURT FELT THAT 7 ROUNDS WAS

2    TOO LOW.  I THINK THE LOWER YOU GET -- THE CLOSER YOU GET TO

3    THE NUMBER OF ROUNDS THAT HAVE TRADITIONALLY BEEN USED IN

4    REVOLVERS WHICH HAVE HISTORICALLY BEEN THE QUINTESSENTIAL

5    DEFENSE WEAPON, I THINK YOU START TO HAVE MORE CONSTITUTIONAL

6    CONCERNS.

7           THE COURT:  I'M SORRY.  I UNDERSTAND YOUR POINT.  BUT

8    THAT'S REALLY SHEER SPECULATION ON YOUR PART.  THAT ACTUALLY IS

9    ASKING ME TO PREDICT.  I UNDERSTAND THE 7 ROUND THING.  BUT

10   TRUST ME, 10 YEARS FROM NOW, 20 YEARS FROM NOW, THAT ALSO WILL

11   BE DISAPPEARING.  7 ROUNDS WILL ALSO BE DISAPPEARING.  THAT'S

12   NOT THE QUESTION.  THE QUESTION IS:  HOW DO I MAKE THAT

13   DECISION?  WHO SAID 10 ROUNDS?  WHO SAID 7 ROUNDS?  WHO SAID 5

14   ROUNDS?  AND ON WHAT EVIDENCE AM I MAKING THE DECISION TO

11:48:17   15   DECIDE WHETHER, YES, 10 ROUNDS IS AN APPROPRIATE LEVEL, 7

16   ROUNDS, 5 ROUNDS, BECAUSE THE EVIDENCE THAT YOU HAVE PRESENTED

17   TO ME IN THIS WHOLE STACK OF -- IF I WAS IN YOUR SHOES -- I

18   WASN'T THE GREATEST LAWYER IN TOWN, I ASSURE YOU, BUT I COULD

19   MAKE THE VERY SAME ARGUMENT FOR A BAN OF 10-ROUND MAGAZINES,

20   7-ROUND MAGAZINES, 5-ROUND MAGAZINES.  I COULD GET DOWN TO THE

21   2.2.  I COULD GET DOWN TO THE ONE GUN WITH ONE ROUND.  NOW,

22   DEPENDING ON HOW MANY MASS SHOOTINGS THERE HAVE BEEN WOULD

23   DEPEND ON HOW MANY JUDGES WOULD BE INCLINED TO GO ALONG WITH ME

24   AND FIND THAT, IN FACT, MY PROPOSED BAN WOULD PASS

25   CONSTITUTIONAL MUSTER.  I JUST --

```
11:49:12   1            MR. ECHEVERRIA:  THE ATTORNEY GENERAL'S ANSWER IS
           2   THAT THE COURT CANNOT UNDER INTERMEDIATE SCRUTINY INVALIDATE
           3   THE CURRENT LARGE CAPACITY MAGAZINE BAN BECAUSE OF THE COURT'S
           4   PREDICTION OF HOW THE LEGISLATURE OR THE PEOPLE WILL ACT IN THE
           5   FUTURE.  INTERMEDIATE SCRUTINY ACCORDS THE STATES SIGNIFICANT
           6   LEVERAGE IN EXPERIMENTING WITH DIFFERENT BANS.  THE STATE OF
           7   COLORADO, FOR EXAMPLE, HAVE A 15-ROUND BAN.  THEY HAVE A
           8   DIFFERENT ONE.  THE FEDERAL ASSAULT WEAPONS BAN WAS A 10-ROUND
           9   BAN.  THE NUMBER THAT SEEMS TO BE INVOLVED IN MOST STATE AND
          10   MUNICIPAL LARGE CAPACITY MAGAZINE BANS IS MORE THAN 10 ROUNDS
          11   OF AMMUNITION --
          12            THE COURT:  BUT YOU KNOW WHAT, THERE ARE NINE STATES
          13   -- I KNOW JUDGE YOUNG CITED JUSTICE SCALIA IN A CASE THAT I'M
          14   PRETTY FAMILIAR.  AND IN THAT CASE, AS I RECALL, THE SUPREME
11:50:18  15   COURT MADE ITS DECISION BY STATISTICAL ANALYSIS.  IT FOUND THAT
          16   THERE WERE MORE STATES THAT RULED ONE WAY ON AN ISSUE THAN
          17   OTHER STATES.  SO ESSENTIALLY, THE SUPREME COURT FOUND THAT
          18   BECAUSE THE MAJORITY OF THE STATES WENT ONE WAY, THEY WOULD
          19   RULE THE WAY THEY DID.  NOW, IN THIS CASE, THERE ARE NINE
          20   STATES, INCLUDING D.C., THAT HAVE PASSED THESE LARGE CAPACITY
          21   MAGAZINES LAWS.
          22            MR. ECHEVERRIA:  I BELIEVE THE NUMBER IS NOW 10.  THE
          23   STATE OF VERMONT ON APRIL 11TH ENACTED ITS OWN LARGE CAPACITY
          24   MAGAZINE, AND THAT'S HARDLY A GUN CONTROL STATE, AS YOUR HONOR
          25   IS AWARE.
```

11:51:05   1          THE COURT:  THAT'S 10 OUT OF 50.  AND MAY I POINT OUT

2     TO YOU THAT SEVERAL OF THOSE STATES, AT LEAST 2, HAVE A

3     15-ROUND LIMIT.  AND ILLINOIS -- IF YOU CAN FIGURE OUT

4     ILLINOIS, YOU'RE WAY SMARTER THAN I AM BECAUSE -- NOW ILLINOIS

5     SEEMS TO HAVE MADE WHAT I THINK IS PERHAPS A COMMON SENSE

6     DECISION TO ALLOW THE RURAL AREAS WHERE YOU CAN POSSESS A

7     WEAPON WITH 35 ROUNDS BUT IN OTHER AREAS 10 ROUNDS.

8          MR. ECHEVERRIA:  SURE.

9          THE COURT:  SO THEY FOUND THAT IN THE RURAL AREAS YOU

10    CAN POSSESS A WEAPON THAT HAD A MAGAZINE OF 35 ROUNDS.  THAT

11    SEEMS TO BE A LAW THAT IS NOT A BROAD BRUSH.  IT DOESN'T PAINT

12    WITH A BROAD BRUSH.  IT ACTUALLY SEEMS TO HAVE MADE AN ATTEMPT

13    TO ADDRESS REALITY AS OPPOSED TO SOME THEORETICAL ABSTRACT

14    CONCEPT THAT SOMEONE CAME UP WITH, SOME ARBITRARY NUMBER THAT

11:52:12  15    THEY PICKED OUT OF THE AIR.  BECAUSE THERE'S NOTHING IN THIS

16    EVIDENCE, BY THE WAY, THAT I CAN SEE THAT INDICATES THAT, YOU

17    KNOW, IF YOU HAD A MAGAZINE OF 11 ROUNDS, ANYTHING WOULD CHANGE

18    FROM 10 ROUNDS OR EVEN IF YOU HAD 15 ROUNDS THAT THE OUTCOME OR

19    THE SAFETY OF THE PEOPLE WOULD BE ANY GREATER, OR 20 ROUNDS, OR

20    30 ROUNDS.

21          MR. ECHEVERRIA:  THE STATE HAS PRESENTED EVIDENCE

22    THAT BANS ON CAPACITY SIZE, WHETHER IT BE A BAN ON MAGAZINES

23    OVER 20 ROUNDS, 15 ROUNDS, THEY INCREASE THE FREQUENCY OF THESE

24    PAUSES IN PUBLIC MASS SHOOTINGS.  AND EVEN IF IT'S JUST A

25    MATTER OF SECONDS, THOSE SECONDS TRANSLATE INTO LIVES.

11:52:59   1          THE COURT:  BUT THERE'S CONFLICTING TESTIMONY --

        2          MR. ECHEVERRIA:  AND IF THERE'S CONFLICTING

        3   TESTIMONY, THE MOTION FOR SUMMARY JUDGMENT MUST BE DENIED.

        4          THE COURT:  NO BECAUSE IT HAS TO BE CREDIBLE.  THE

        5   EVIDENCE THAT'S PRESENTED TO ME HAS TO BE CREDIBLE EVIDENCE.

        6   EVIDENCE THAT'S --

        7          MR. ECHEVERRIA:  THE COURT CANNOT MAKE CREDIBILITY

        8   DETERMINATIONS ON A MOTION FOR SUMMARY JUDGMENT.

        9          THE COURT:  BUT IT HAS TO BE RELIABLE.  IT HAS TO BE

       10   ADMISSIBLE.  AND SOMEBODY'S OPINION ABOUT WHAT HAPPENED WITHOUT

       11   SUBSTANTIAL JUSTIFICATION FOR IT, I DON'T HAVE TO RELY ON IT.

       12          MR. ECHEVERRIA:  IT'S NOT AN OPINION THAT SEVERAL

       13   CHILDREN AT SANDY HOOK WERE ABLE TO ESCAPE DURING THE CRITICAL

       14   PAUSES OF THAT SHOOTING.

11:53:43  15          THE COURT:  WE'RE BACK TO THE SAME POINT, COUNSEL,

       16   WHICH IS, AND IF YOU HAD A MAGAZINE OF 7 ROUNDS, THE PERSON

       17   WOULD HAVE TO LOAD, RELOAD MORE OFTEN WHICH WOULD GIVE SOMEBODY

       18   A CHANCE TO ESCAPE OR TO ATTACK HIM.  AND IF YOU GOT DOWN TO 5

       19   ROUNDS, THE SAME THING APPLIES.

       20          MR. ECHEVERRIA:  OR BANNING FIREARMS IN GENERAL, THEN

       21   THERE WOULD BE NO MASS SHOOTINGS.

       22          THE COURT:  I THINK THAT'S THE ULTIMATE --

       23          MR. ECHEVERRIA:  THAT MAY BE THE COURT'S CONCERN.

       24   BUT HERE, UNDER INTERMEDIATE SCRUTINY, AS THE NINTH CIRCUIT

       25   REPEATEDLY EMPHASIZED, THE PEOPLE'S PREDICTIVE JUDGMENTS ARE

11:54:23   1    AFFORDED SUBSTANTIAL DEFERENCE.

2              THE COURT:  BUT NOT SO LONG AS IT INTERFERES WITH A

3    CONSTITUTIONALLY PROTECTED RIGHT, AND THE CONSTITUTIONALLY

4    PROTECTED RIGHT AS SET FORTH IN HELLER IS THAT UNLESS IT'S A

5    DANGEROUS AND UNUSUAL WEAPON THAT'S NOT COMMONLY POSSESSED BY

6    LAW-ABIDING CITIZENS FOR THE PROTECTION OF THE HEARTH AND THE

7    HOME, THAT IT IS PROTECTED.  AND SO YOU CAN MAKE THE ARGUMENT

8    THAT A GUN IS A DANGEROUS THING; YOU CAN MAKE THE ARGUMENT THAT

9    THE MORE ROUNDS YOU FIRE FROM IT THE MORE PEOPLE ARE GOING TO

10   BE INJURED AND THE MORE PEOPLE ARE GOING TO BE KILLED.  BUT

11   HELLER BASICALLY SAYS TO YOU IT DOESN'T MATTER BECAUSE AS LONG

12   AS IT IS NOT A DANGEROUS AND UNUSUAL WEAPON WHICH IS BEING USED

13   BY, IN COMMON USE BY LAW-ABIDING CITIZENS FOR THE PROTECTION OF

14   THE HEARTH AND THE HOME, THAT'S IT.  EVERYTHING ELSE IS OFF THE

11:55:23  15   TABLE.

16             MR. ECHEVERRIA:  THAT'S NOT WHAT HELLER SAID, YOUR

17   HONOR.

18             THE COURT:  WELL --

19             MR. ECHEVERRIA:  AND THE NINTH CIRCUIT IN CHOVAN, IN

20   JACKSON, SYLVESTER, REPEATEDLY, THE NINTH CIRCUIT HAS STATED

21   THAT THAT'S NOT THE SOLE INQUIRY.  THE TWO QUESTIONS THAT THE

22   COURT PRESENTED ON ITS ORDER ON THE PRELIMINARY INJUNCTION

23   MOTION DEALT EXCLUSIVELY WITH WHETHER LARGE CAPACITY MAGAZINES

24   ARE IN COMMON USE FOR LAWFUL PURPOSES AND WHETHER THEY'RE

25   USEFUL FOR MILITIA SERVICE.  BUT THOSE QUESTIONS ONLY FOCUS ON

```
11:55:52   1   THE FIRST STEP OF THE SECOND AMENDMENT INQUIRY.  AND THE
           2   ATTORNEY GENERAL CAN -- WE CAN ASSUME THAT SURE, LET'S ASSUME
           3   THAT IS TRUE.  BUT THEN WE HAVE TO DETERMINE -- THEN THE COURT
           4   HAS TO DETERMINE WHAT LEVEL OF SCRUTINY APPLIES, EVEN IF LARGE
           5   CAPACITY MAGAZINES ARE IN COMMON USE, EVEN IF THEY ARE
           6   PROTECTED UNDER THE SECOND AMENDMENT.
           7            THERE'S A RIGHT TO AN ABORTION, BUT THAT DOESN'T MEAN
           8   THAT THE STATES ARE PROHIBITED FROM IMPOSING ANY RESTRICTIONS
           9   ON ABORTIONS.  IT'S AN UNDUE BURDEN STANDARD.  IN THE FIRST
          10   AMENDMENT CONTEXT, IF IT'S NOT CONTENT-BASED PURE POLITICAL
          11   SPEECH, IF IT'S COMMERCIAL SPEECH, THEN SOME LOWER STANDARD OF
          12   SCRUTINY APPLIES.  SO EVEN IF THERE IS FIRST AMENDMENT
          13   PROTECTION, THERE'S STILL SOME LEEWAY FOR THE STATES TO
          14   EXPERIMENT IN TRYING TO ENACT COMMON SENSE REGULATIONS.
11:56:43  15            THE COURT:  THAT'S WHAT I WAS TRYING TO GET AT, AND
          16   YOU JUST SAID SOME THINGS THAT ARE VERY DIFFICULT FOR ME WHICH
          17   WERE, NUMBER ONE, YOU USED THE WORDS "COMMON SENSE," NUMBER
          18   ONE.  AND NUMBER TWO, THAT THERE'S "LEEWAY."  BUT LEEWAY
          19   IMPLIES THAT JUST SIMPLY BECAUSE THE STATE SAYS THIS IS SO THAT
          20   THE COURT IN INTERPRETING WHAT IS ALLOWABLE UNDER THE SECOND
          21   AMENDMENT, THAT THE COURT MUST SIMPLY ROLL OVER AND SAY, YEAH,
          22   THE STATE DECIDED AND SO IT IS.  THEY HAVE LEEWAY.  BUT NOT
          23   UNFETTERED LEEWAY.
          24            MR. ECHEVERRIA:  THAT'S RIGHT.
          25            THE COURT:  SO WHAT NOBODY HAS YET ANSWERED FOR ME IS
```

11:57:30  1   WHY 10?  WHY NOT 7?  WHY NOT 5?  WHY NOT 3?  WHY NOT 2?  DO YOU

2   SEE WHAT I'M GETTING AT?

3        MR. ECHEVERRIA:  I'LL TELL YOU WHY, YOUR HONOR,

4   BECAUSE UNDER INTERMEDIATE SCRUTINY, THE FIT DOESN'T HAVE TO BE

5   PERFECT.

6        THE COURT:  BUT IT HAS TO BE REASONABLE.

7        MR. ECHEVERRIA:  EXACTLY.  THAT'S WHERE COMMON SENSE

8   COMES INTO PLAY.

9        THE COURT:  BUT 7, IS 7 REASONABLE?

10       MR. ECHEVERRIA:  WELL, THAT'S NOT THE DECISION THAT

11  THE PEOPLE OF CALIFORNIA AND THE LEGISLATURE BEFORE IT DECIDED

12  TO ENACT.  THAT'S JUST NOT THE ISSUE BEFORE THE COURT.  THE

13  PEOPLE DREW A LINE AROUND 10.

14       THE COURT:  WHAT IF I SAID THAT, NO, A 30-ROUND

11:58:11 15  MAGAZINE PROHIBITION WOULD BE REASONABLE BUT NOT 10?

16       MR. ECHEVERRIA:  THE COURT IS -- CAN'T SAY THAT UNDER

17  INTERMEDIATE SCRUTINY BASED ON THE EVIDENCE WE PRESENTED, BASED

18  UPON WHAT APPEARS TO BE THE COURT'S AGREEMENT THAT THE MORE

19  ROUNDS YOU HAVE THE MORE SHOTS YOU CAN FIRE WITHOUT RELOADING,

20  AND THE PEOPLE HAVE DRAWN THE LINE, THE SAME LINE THAT CONGRESS

21  DREW WHEN IT ENACTED THE FEDERAL ASSAULT WEAPONS BAN, THE SAME

22  LINE THAT MOST STATES THAT HAVE ENACTED LARGE CAPACITY MAGAZINE

23  RESTRICTIONS HAVE DRAWN.

24       THE COURT:  ALL 9 OF THEM, 10?

25       MR. ECHEVERRIA:  SOME HAVE 15.  BUT UNDER

11:58:48  1   INTERMEDIATE SCRUTINY, THE STATES ARE ALLOWED TO EXPERIMENT.

2           THE COURT:  SO WHAT I'M ASKING YOU IS -- SO THERE'S

3   10 ALTOGETHER.  THREE OF THOSE 10 DON'T USE 10 AS THE BASIS,

4   RIGHT?

5           MR. ECHEVERRIA:  THE STATES CAN DISAGREE, RIGHT.

6           THE COURT:  OKAY.  BUT THAT GETS US BACK TO WHERE WE

7   ARE WHICH IS, SO IF THE STATE SAYS SEVEN, DO I HAVE TO JUST

8   BITE MY LIP AND SAY, OKAY, THE STATE SAID SEVEN, SO I MUST FIND

9   THAT'S A REASONABLE FIT?

10           MR. ECHEVERRIA:  WE'RE NOT ASKING THE COURT TO BITE

11   ITS LIP.  WE'RE NOT ASKING THE COURT TO JUST SIT BACK AND LET

12   THE PEOPLE AND THE LEGISLATURE ENACT WHATEVER FIREARM

13   RESTRICTIONS THEY WANT TO WILLY-NILLY.  THAT'S NOT OUR

14   POSITION.  THE STATE HAS PRESENTED EVIDENCE THAT THE COURT

11:59:40  15   APPEARS TO AGREE WITH AND THE PLAINTIFFS DON'T DISPUTE, THAT

16   LARGE CAPACITY MAGAZINES ENABLE SHOOTERS TO FIRE MORE ROUNDS.

17   THE STATE ALSO PRESENTED EVIDENCE THAT THESE ARE USED IN MANY

18   PUBLIC MASS SHOOTINGS, OVER A MAJORITY OF THEM.

19           OUT OF THE LAST 10 MOST DEADLY PUBLIC MASS SHOOTINGS,

20   9 OUT OF 10 HAVE INVOLVED LARGE CAPACITY MAGAZINES.  THE STATE

21   HAS PRESENTED EVIDENCE THAT THE MORE INJURIES AN INDIVIDUAL

22   SUFFERS, THE MORE LIKELY THEY WILL DIE.  DR. KOPER'S EXPERT

23   REPORT INDICATES THAT THE NUMBER IS AROUND 60 PERCENT INCREASE

24   IN LIKELIHOOD OF FATALITY.

25           THE COURT:  LET ME SHIFT THE FOCUS TO SOMETHING ELSE.

12:00:28   1   SO THE STATUTE MAKES SEVERAL EXCEPTIONS, ONE OF WHICH I KIND OF

2   HAD FUN WITH YOUR COLLEAGUE THE LAST TIME SHE WAS HERE ABOUT

3   THE MOVIE INDUSTRY.  OF COURSE, THAT EXCEPTION IS THERE BECAUSE

4   OF MONEY; RIGHT?  THAT'S THE REASON WHY THAT EXCEPTION IS THERE

5   BECAUSE THE MOVIE INDUSTRY IS BIG IN CALIFORNIA.  A LOT OF TAX

6   REVENUE IS GENERATED.

7           MR. ECHEVERRIA:  A LOT OF JOBS.

8           THE COURT:  YES, A LOT OF JOBS.  SO WE'RE GOING TO

9   EXEMPT MOVIE PEOPLE AND SAY YOU CAN POSSESS THESE MAGAZINES;

10   IT'S OKAY.  I'M HAVING A HARD TIME --

11           MR. ECHEVERRIA:  THEY CAN ONLY USE THOSE MAGAZINES IF

12   THEY'RE USED AS PROPS.  THEY WOULD NOT BE LOADED LARGE CAPACITY

13   MAGAZINES.  IT'S NOT AN EXCEPTION THAT ALLOWS ACTORS TO WALK

14   AROUND WITH LARGE CAPACITY MAGAZINES, YOUR HONOR.  THAT'S JUST

12:01:18   15   NOT WHAT THAT EXCEPTION PROVIDES.

16           THE COURT:  I DIDN'T READ THAT IN THERE, BUT LET'S

17   ASSUME THAT TO BE THE CASE.  OF COURSE, SOMEONE WHO GOES POSTAL

18   WHO WORKS ON A MOVIE SET WOULD KNOW THERE'S A LAW THAT SAYS I

19   CAN'T PUT AMMO IN THIS MAGAZINE, AND THEN GO OUT AND DO A MASS

20   SHOOTING; RIGHT?

21           MR. ECHEVERRIA:  IT'S POSSIBLE, BUT THE FIT DOESN'T

22   HAVE TO BE PERFECT.

23           THE COURT:  OF COURSE IT DOESN'T HAVE TO BE PERFECT.

24   SO IN YOUR EVIDENCE YOU TALKED ABOUT THERE'S AN EXCEPTION.  THE

25   EXCEPTION IS FOR LAW ENFORCEMENT OFFICERS, AND I HAVE NOTHING

12:01:49   1   BUT RESPECT FOR LAW ENFORCEMENT OFFICERS TO BEGIN WITH.  I

2   THINK THEY'RE GREATLY UNDER-PAID, UNDER-RESPECTED.  BUT IN

3   HERE, THEY TALK ABOUT THE FACT THAT LAW ENFORCEMENT OFFICERS

4   SHOULD BE ALLOWED TO CONTINUE TO OWN THESE WEAPONS BECAUSE THEY

5   HAVE GREATER TRAINING AND EXPERIENCE.

6           MR. ECHEVERRIA:  THAT WOULDN'T BE THE ONLY REASON.

7           THE COURT:  WELL, THAT'S ONE OF THE REASONS.  IT'S

8   SAID OVER AND OVER AND OVER AGAIN BY YOUR EXPERTS INCLUDING I

9   THINK IT WAS THE L.A. SHERIFF HIMSELF.

10           MR. ECHEVERRIA:  KEN JAMES.

11           THE COURT:  WAS IT HIM WHO TALKED ABOUT IN A PEACEFUL

12   SOCIETY THERE'S NO NEED FOR -- YEAH.  OF COURSE, AS WE WERE

13   DISCUSSING THIS IN CHAMBERS, WE THOUGHT, WELL, IF WE HAD A

14   PEACEFUL SOCIETY, WE WOULDN'T NEED LAW ENFORCEMENT TO BEGIN

12:02:49   15   WITH.  BUT EVEN IN LONDON WHERE GUNS ARE BANNED, PERIOD -- SO

16   LET ME ASK YOU THIS:  WHAT TRAINING DO LAW ENFORCEMENT OFFICERS

17   GET?  BEFORE I DO THAT, LET ME ASK YOU THIS:  TELL ME WHAT IS A

18   LAW ENFORCEMENT OFFICER THAT'S EXEMPTED FROM THIS LARGE

19   CAPACITY MAGAZINE RESTRICTION.  WOULD MY COURTROOM SECURITY

20   OFFICER BE EXEMPTED?

21           MR. ECHEVERRIA:  I DON'T KNOW IF YOUR SECURITY

22   OFFICER WOULD BE EXEMPTED.

23           THE COURT:  THE FELLOW FROM THE FEDERAL PROTECTIVE

24   SERVICES AT THE GATE COMING INTO OUR PARKING AREA, WOULD HE OR

25   SHE BE PROTECTED?

```
12:03:38    1           MR. ECHEVERRIA:  IT'S POSSIBLE.  I HAVEN'T LOOKED AT

            2   THE STATUTE CLOSELY.

            3           THE COURT:  BUT YOU'RE REPRESENTING THE STATE.

            4           MR. ECHEVERRIA:  I AM.

            5           THE COURT:  SO YOU DON'T KNOW?  YOU CAN'T TELL ME?

            6           MR. ECHEVERRIA:  I CAN REFER TO SECTION 830 OF THE

            7   PENAL CODE THAT DEFINES THE DIFFERENT CATEGORIES OF SWORN PEACE

            8   OFFICERS WHO WOULD BE EXEMPT FROM THE LARGE CAPACITY MAGAZINE

            9   BAN.  I'D BE HAPPY TO.  I DON'T HAVE THAT PARTICULAR SECTION

           10   HANDY WITH ME AT THE HEARING TODAY.

           11           THE COURT:  WOULD I BE EXEMPTED?  IF I FELT THAT I

           12   NEEDED TO HAVE, FOR EXAMPLE, A GLOCK 17, WHICH I DON'T HAVE

           13   ONE, BUT IF I FELT I NEEDED TO HAVE ONE IN ORDER TO PROTECT

           14   MYSELF FROM -- AS YOU KNOW, THERE'S VARIOUS PEOPLE WHO VERY

12:04:23   15   OFTEN DISAGREE WITH OPINIONS AND DECISIONS THAT I MAKE.  IF I

           16   FELT I NEEDED TO HAVE A GLOCK  17 TO PROTECT MYSELF, WOULD I BE

           17   EXEMPTED UNDER THAT SECTION?

           18           MR. ECHEVERRIA:  I DON'T BELIEVE THAT FEDERAL JUDGES

           19   ARE PEACE OFFICERS, YOUR HONOR, AND I DON'T THINK THERE'S AN

           20   -- THERE'S NOT AN EXCEPTION IN THE STATUTE FOR JUDGES, NO.

           21           THE COURT:  SO WHAT'S THE RATIONALE, IF YOU WILL, FOR

           22   NOT EXEMPTING ME OR MY COURTROOM SECURITY OFFICER OR THE PERSON

           23   WHO IS OUT IN THE STREET PROTECTING THE GATE, BUT PROTECTING

           24   OTHER LAW ENFORCEMENT OFFICERS?  WHAT'S THE RATIONALE FOR THAT?

           25           MR. ECHEVERRIA:  I'M NOT SAYING THAT SECURITY
```

```
12:05:08    1   PERSONNEL GUARDING THE COURTHOUSE ARE NOT EXEMPTED FROM THE

            2   STATUTE.  I'D HAVE TO DOUBLE CHECK FOR YOUR HONOR.  THEY VERY

            3   WELL MAY BE EXEMPTED FROM THE STATUTE.  WITH RESPECT TO YOUR

            4   HONOR AND OTHER INDIVIDUALS WHO MAY HAVE A HEIGHTENED

            5   SELF-DEFENSE NEED, AS I WOULD ACKNOWLEDGE -- LAW ENFORCEMENT

            6   PERSONNEL ARE OFTEN CALLED UPON TO SERVE WARRANTS.  THEY OFTEN

            7   HAVE TO ENGAGE IN SUSTAINED GUNFIGHTS WITH CRIMINALS, LIKE IN

            8   THE SAN FRANCISCO EXAMPLE THAT YOUR HONOR MENTIONED DURING THE

            9   DISCUSSION WITH PLAINTIFF'S COUNSEL.  SO LAW ENFORCEMENT HAVE

           10   PARTICULAR DUTIES AND OFTEN CERTAIN SITUATIONS THAT REQUIRE

           11   SUSTAINED FIREPOWER IN ORDER TO FULFILL THEIR DUTIES TO PUBLIC

           12   SAFETY.

           13           THE COURT:  I BELIEVE THE EXEMPTION COVERS THEM, FOR

           14   EXAMPLE, IF I AM NOT MISTAKEN, WHEN THEY'RE OFF-DUTY.

12:06:07   15           MR. ECHEVERRIA:  WHEN LAW ENFORCEMENT OFFICERS ARE

           16   OFF-DUTY, THEY STILL HAVE OBLIGATIONS TO PROTECT THE PUBLIC.

           17   IN THE NINTH CIRCUIT SILVEIRA CASE, THE OFF-DUTY EXCEPTION FROM

           18   THE ASSAULT WEAPONS CONTROL ACT WAS UPHELD UNDER THE EQUAL

           19   PROTECTION CLAUSE.

           20           THE COURT:  I THINK IT COVERS THEM WHEN THEY'RE

           21   RETIRED.

           22           MR. ECHEVERRIA:  THE CALIFORNIA'S LARGE CAPACITY

           23   MAGAZINE BAN?

           24           THE COURT:  YES.

           25           MR. ECHEVERRIA:  IT DOES, HONORABLY RETIRED PEACE
```

12:06:33   1   OFFICERS NOT JUST ANY RETIRED PEACE OFFICER.

2          THE COURT:  SO IF YOU'RE RETIRED, YOU'RE NO LONGER

3   OFF-DUTY OR ON-DUTY, YOU CAN STILL POSSESS THESE LARGE CAPACITY

4   MAGAZINES.  BUT I, ON THE OTHER HAND, AS AN ACTIVE SITTING

5   JUDGE, I'M NOT ALLOWED TO POSSESS A LARGE CAPACITY MAGAZINE.

6   IS THAT WHAT YOU'RE SAYING?

7          MR. ECHEVERRIA:  THE LEGISLATURE ESTABLISHED AN

8   EXCEPTION FOR HONORABLY RETIRED PEACE OFFICERS AND THAT

9   EXCEPTION WOULD BE EVALUATED UNDER RATIONAL BASIS, AND THERE

10   ARE SEVERAL RATIONAL BASES THAT WOULD JUSTIFY AN EXCEPTION FOR

11   HONORABLY RETIRED PEACE OFFICERS.

12          THE COURT:  LIKE WHAT?

13          MR. ECHEVERRIA:  GENERALLY, THEIR INCREASED LEVEL OF

14   TRAINING.

12:07:16   15          THE COURT:  LET'S TALK ABOUT THAT FOR JUST A

16   SECOND.

17          MR. ECHEVERRIA:  SURE.

18          THE COURT:  I NOTED THAT THERE'S NO EXCEPTION FOR

19   MEMBERS OF THE ARMED FORCES.

20          MR. ECHEVERRIA:  THAT'S NOT TRUE, YOUR HONOR.

21          THE COURT:  WHERE DO I FIND IT?

22          MR. ECHEVERRIA:  IT'S IN SECTION 32400.  IT'S ONE OF

23   THE EXCEPTIONS.  CAN I STEP AWAY FOR A MOMENT, YOUR HONOR?

24          THE COURT:  SURE.  MAYBE I MISSED SOMETHING.

25          MR. ECHEVERRIA:  IN PENAL CODE SECTION 32440, THERE'S

12:08:25  1   AN EXCEPTION FOR THE MANUFACTURE OF LARGE CAPACITY MAGAZINES

2   FOR EXPORT OR FOR SALE TO GOVERNMENT AGENCIES OR THE MILITARY

3   PURSUANT TO APPLICABLE FEDERAL REGULATIONS.

4           THE COURT:  I UNDERSTAND THAT.  THAT'S NOT WHAT I WAS

5   GETTING AT.  WHAT I WAS GETTING AT IS, YOU GOT A MEMBER OF SEAL

6   TEAM 6; THE MEMBER OF SEAL TEAM 6 IS AT HOME.  IS THERE AN

7   EXCEPTION THAT ALLOWS THAT MEMBER OF SEAL TEAM 6 TO HAVE AN

8   AR-15 WITH A MORE THAN 10-ROUND MAGAZINE?

9           MR. ECHEVERRIA:  I DON'T KNOW IF THERE'S AN EXCEPTION

10   TO THE ASSAULT WEAPONS BAN FOR OFF-DUTY MILITARY PERSONNEL.

11           THE COURT:  HOW ABOUT THE MAGAZINES?  IS THERE AN

12   EXCEPTION FOR THAT SEAL TEAM 6 MEMBER HAVING A HIGH CAPACITY

13   MAGAZINE?

14           MR. ECHEVERRIA:  I DO NOT KNOW IF THERE WOULD BE AN

12:09:26  15   EXCEPTION FOR OFF-DUTY MILITARY SERVICE MEMBER.

16           THE COURT:  WHAT ABOUT A NATIONAL GUARD MEMBER, WHEN

17   THEY GO HOME AT NIGHT?  IS THERE AN EXCEPTION THAT COVERS THEM?

18           MR. ECHEVERRIA:  I DON'T KNOW, YOUR HONOR.

19           THE COURT:  THE ANSWER IS NO.  THERE IS NONE.

20           THE COURT:  SO MY QUESTION -- WHICH I THINK IS A

21   PRETTY OBVIOUS QUESTION -- SO YOU HAVE A RETIRED POLICE

22   OFFICER.  BY THE WAY, I'M NOT SAYING THEY SHOULD NOT.  I'M JUST

23   TRYING TO MAKE SENSE OF THIS LEGISLATION, THE SAFETY FOR ALL

24   ACT.  SO YOU GOT PEOPLE WHO ARE MEMBERS OF THE NATIONAL GUARD,

25   MEMBERS WHO ARE -- PEOPLE WHO ARE MEMBERS OF THE MARINE CORPS,

12:10:21  1    PEOPLE WHO ARE MEMBERS OF THE ARMY, THE NAVY, THE AIR FORCE.

        2    THEY'RE TREATED AS CRIMINALS IF THEY IN FACT OWN ONE OF THESE

        3    LARGE CAPACITY MAGAZINES THAT JUST A FEW YEARS AGO WE TOLD THEM

        4    THEY COULD POSSESS.  IT WAS FINE.  YOU CAN POSSESS THESE

        5    THINGS. YOU JUST CAN'T BUY, SELL OR TRANSFER THEM.  BUT NOW, IF

        6    THEY DON'T TURN THEM IN, YOU'RE A CRIMINAL.

        7         I WAS TRYING TO FIGURE OUT -- I WAS TRYING TO MAKE

        8    SENSE OF THIS, AND I WAS ASKING MYSELF -- YOU'RE A LAW

        9    ENFORCEMENT OFFICER OUT OF THE BIG CITY.  I'LL PICK A BIG CITY

        10   OUT OF THE AIR.  NEEDLES, CALIFORNIA.  WHAT ARE THE ODDS THAT

        11   YOU WOULD HAVE BETTER TRAINING IN THE USE OF -- AGAIN, I'LL GO

        12   TO THE AR-15.  THIS IS NOT ABOUT THE AR-15.  BUT WHAT ARE THE

        13   ODDS THAT YOU WOULD HAVE BETTER TRAINING ABOUT THE USE OF AN

        14   AR-15 WHEN YOU ARE A POLICE OFFICER IN THE CITY OF NEEDLES THAN

12:11:31  15   YOU WOULD BE IF YOU WERE A SERVING MEMBER OF SEAL TEAM 6 WHILE

        16   YOU'RE AT HOME?

        17        MR. ECHEVERRIA:  YOUR HONOR MAY THINK THAT THERE'S NO

        18   EVIDENCE IN THE RECORD ABOUT THIS, BUT YOUR HONOR MAY THINK,

        19   AND REASONABLY SO, THAT SERVICEMEN AND WOMEN HAVE SIGNIFICANT

        20   TRAINING IN THE USE AND OPERATION AND SAFE STORAGE OF FIREARMS

        21   INCLUDING ASSAULT WEAPONS, BUT UNDER RATIONAL BASIS --

        22        THE COURT:  BUT THIS LEGISLATION, JUST WITH A BROAD

        23   BRUSH, BASICALLY SAYS, TOO BAD, SO SAD.  SO YOU'RE HONORABLY

        24   SERVING OUR COUNTRY, BUT YOUR WIFE, YOUR DAUGHTER, YOURSELF AT

        25   HOME, YOU CAN'T POSSESS ONE OF THESE LARGE CAPACITY MAGAZINES

12:12:23  1  FOR SELF-DEFENSE.  YOU'VE NEVER KILLED ANYONE, NEVER INJURED

         2  ANYONE, EXCEPT FOR PERHAPS IN THE FIELD OF BATTLE.  BUT HERE

         3  YOU'RE LIMITED TO 10 ROUNDS.

         4          MR. ECHEVERRIA:  YOU CAN HAVE ANY NUMBER OF 10-ROUND

         5  MAGAZINES AT YOUR DISPOSAL FOR SELF-DEFENSE PURPOSES, YES.

         6          THE COURT:  BUT IF YOU'RE IN THE MOVIE INDUSTRY, YOU

         7  CAN HAVE A 15-ROUND, 30-ROUND, 100-ROUND MAGAZINE.

         8          MR. ECHEVERRIA:  TO USE AS A PROP IN FILMING.

         9          THE COURT:  I GOT YOU.  IF YOU'RE A RETIRED POLICE

        10  OFFICER, YOU'RE 80 YEARS OLD, YOU CAN HAVE ONE OF THESE

        11  MAGAZINES, AND IT'S NOT FOR A PROP.  YOU CAN ACTUALLY HAVE ONE

        12  OF THESE MAGAZINES, AND YOU CAN HAVE IT LOADED WITH AMMUNITION.

        13  RIGHT?

        14          MR. ECHEVERRIA:  YES.

12:13:13 15          THE COURT:  BUT IF YOU'RE A SERVING MEMBER OF ONE OF

        16  THE ARMED FORCES WHERE YOU'VE BEEN TRAINED ON HOW TO USE THESE

        17  THINGS, AND YOU'VE PROBABLY USED THEM A WHOLE LOT MORE THAN A

        18  SHERIFF DEPUTY IN PODUNK COUNTY, DOES THAT MAKE ANY SENSE TO

        19  YOU?

        20          MR. ECHEVERRIA:  UNDER RATIONAL BASIS, THE FIT

        21  DOESN'T HAVE TO BE PERFECT.  IT CAN BE OVERINCLUSIVE,

        22  UNDERINCLUSIVE, AND THE PEOPLE OF CALIFORNIA AND THE

        23  LEGISLATURE COULD HAVE CONCLUDED THAT HONORABLY RETIRED PEACE

        24  OFFICERS GENERALLY HAVE MORE TRAINING.  THEY HAVE TO COMPLY

        25  WITH THE POST STANDARDS.  THEY HAVE CONTINUOUS TRAINING WHILE

12:13:59   1   EMPLOYED IN LAW ENFORCEMENT AND THEY --

           2           THE COURT:  LET ME ASK YOU ABOUT THAT FOR JUST A

           3   SECOND.  SO TELL ME ABOUT THE TRAINING THAT LAW ENFORCEMENT GET

           4   IN USING A WEAPON THAT HOLDS MORE THAN 10 ROUNDS.  WHAT KIND OF

           5   TRAINING DO THEY GET BECAUSE I WAS LOOKING AT THIS AND I WAS

           6   TRYING TO FIGURE IT OUT?

           7           MR. ECHEVERRIA:  THERE'S NO EVIDENCE IN THE RECORD

           8   ABOUT THE TRAINING OF HONORABLY RETIRED PEACE OFFICERS.

           9           THE COURT:  NO, ANY -- THEY TALK ABOUT POLICE

          10   OFFICERS.  THEY TALK ABOUT HOW POLICE OFFICERS ARE TRAINED TO

          11   USE THESE WEAPONS, AND I READ ABOUT THAT.

          12           MR. ECHEVERRIA:  THE PARTICULAR ARGUMENT WE WERE

          13   MAKING ABOUT POLICE OFFICERS ACTIVE DUTY OR ACTIVELY SERVING

          14   LAW ENFORCEMENT PERSONNEL IS THE TYPES OF CONFRONTATIONS THAT

12:14:49  15   THEY ENTER INTO AND THE NEED FOR LARGE CAPACITY MAGAZINES.

          16           THE COURT:  I'M SORRY.  I DISAGREE WITH YOU.  THERE'S

          17   A LOT OF MENTION IN HERE, AND I'M NOT GOING TO TAKE THE TIME

          18   NOW TO FIND IT, BUT THERE'S A LOT OF MENTION IN HERE AND A LOT

          19   OF YOUR EXPERTS THAT TALK ABOUT THE FACT THAT THEY HAVE

          20   TRAINING.

          21           MR. ECHEVERRIA:  ABSOLUTELY.

          22           THE COURT:  OKAY.  SO YOU CONCEDE THAT.  ALL RIGHT.

          23   NOW SO LET ME ASK YOU ABOUT THIS BECAUSE THAT'S -- YOU RAISE

          24   IT, AND SINCE YOU RAISE IT, I'M QUESTIONING YOU ON IT.  OKAY.

          25   BY THE WAY, LET ME KNOW IF YOU NEED A BREAK.  I APOLOGIZE FOR

12:15:23   1   GOING SO LONG.

2              MR. ECHEVERRIA:  IT'S OKAY.

3              THE COURT:  WHAT KIND OF TRAINING DOES A POLICE

4    OFFICER GET IN USING THESE WEAPONS WITH A MAGAZINE OF MORE THAN

5    10 ROUNDS?  WHAT DOES THAT TRAINING CONSIST OF, DO YOU KNOW?

6              MR. ECHEVERRIA:  AGAIN, THERE'S NO PARTICULAR

7    EVIDENCE IN THE RECORD.  IN GENERAL, I KNOW THAT LAW

8    ENFORCEMENT PERSONNEL HAVE TO GO THROUGH THE ACADEMY.

9              THE COURT:  WHAT DO THEY DO AT THE ACADEMY?

10             MR. ECHEVERRIA:  SO THERE'S TRAINING REQUIREMENTS

11   THAT ARE ESTABLISHED BY THE PEACE OFFICERS' STANDARDS AND

12   TRAINING COMMISSION POST.

13             THE COURT:  WITH REGARDS TO THE WEAPONS.  LET'S

14   FORGET ABOUT THE LAW AND ADVISAL OF RIGHTS AND ALL THAT.  LET'S

12:16:08  15   TALK ABOUT THE WEAPONS.  SO WHAT KIND OF TRAINING DOES A LAW

16   ENFORCEMENT GET WITH REGARDS TO A WEAPON THAT USES A LARGE

17   CAPACITY MAGAZINE?

18             MR. ECHEVERRIA:  IN GENERAL, AGAIN, I DON'T HAVE THE

19   EVIDENCE, AND THE EVIDENCE IS NOT IN THE RECORD, BUT IN

20   GENERAL, LAW ENFORCEMENT PERSONNEL NEED TO BE QUALIFIED IN THE

21   USE OF PARTICULAR FIREARMS.

22             THE COURT:  WHAT DOES THAT MEAN?

23             MR. ECHEVERRIA:  SO TO QUALIFY, IT'S MY UNDERSTANDING

24   THAT THEY HAVE TO DEMONSTRATE PROFICIENCY.

25             THE COURT:  IN WHAT?

12:16:40    1          MR. ECHEVERRIA:  IN THE USE OF THE FIREARM.

            2          THE COURT:  WHICH MEANS WHAT?

            3          MR. ECHEVERRIA:  BEING ABLE TO FIRE ACCURATELY, BEING

            4   ABLE TO ASSEMBLE AND DISASSEMBLE, STUFF LIKE THAT.  AND I'M

            5   SURE THERE WOULD BE TRAINING ON HOW TO SAFELY STORE A FIREARM.

            6   I KNOW FOR LAW ENFORCEMENT PERSONNEL LOSING A SIDEARM IS A VERY

            7   BAD THING.  SO THERE ARE A LOT OF SAFETY MEASURES IN PLACE TO

            8   TRAIN LAW ENFORCEMENT ON HOW TO SAFELY STORE THEIR FIREARMS.

            9          THE COURT:  OKAY.  AS YOU PROBABLY KNOW, I'M SOMEWHAT

           10   FAMILIAR WITH FIREARMS.  SO YOU HAVE A YOUNG BOY OR YOUNG GIRL

           11   WHO WANTS TO GO HUNTING, AND THEY GO THROUGH A JUNIOR HUNTING

           12   COURSE AND THEY TEACH HIM THE VERY SAME THING THAT THAT OFFICER

           13   LEARNS WHEN HE OR SHE GOES TO THE POLICE ACADEMY.  EVERY GUN IS

           14   LOADED.  MUZZLE CONTROL.  HOW TO STORE IT.  HOW TO TAKE CARE OF

12:17:48   15   IT.  HOW TO MAINTAIN IT.  HOW TO CLEAN IT.  HOW NOT TO POINT IT

           16   AT SOMEONE AND TO KNOW WHEREVER YOU'RE POINTING IT THERE MAY BE

           17   SOMEONE THERE OR SOMETHING THAT YOU MAY INJURE.  OKAY?

           18          MR. ECHEVERRIA:  YES.

           19          THE COURT:  SO IN OTHER WORDS, THE DIFFERENCE BETWEEN

           20   THE TRAINING THAT A POLICE OFFICER GETS WITH A 30-ROUND

           21   MAGAZINE AND AN AR-15 REALLY IS NO DIFFERENT THAN THE TRAINING

           22   THAT YOU GIVE TO A JUNIOR HUNTER WHO IS LEARNING HOW TO OR IS

           23   TRYING TO GET A HUNTING LICENSE, WITH THE EXCEPTION THAT THE

           24   OFFICER IS GOING TO GO TO THE RANGE AND IS GOING TO SHOOT MORE

           25   ROUNDS, AND AS YOU POINTED OUT EARLY ON, THEY LEARN HOW TO BE

12:18:34  1  MORE ACCURATE WITH A WEAPON.  RIGHT?

2         MR. ECHEVERRIA:  YES.

3         THE COURT:  OKAY.

4         MR. ECHEVERRIA:  ALTHOUGH, I WOULD NOT CONCEDE THAT

5  THEIR TRAINING WOULD BE THE SAME.  I WOULDN'T GO THAT FAR, YOUR

6  HONOR.

7         THE COURT:  THERE'S NOTHING IN THE RECORD THAT

8  INDICATES -- THERE'S JUST THIS CONCLUSION.  THERE'S JUST THIS

9  DISCUSSION THAT THEIR TRAINING IS BETTER.  IT'S BETTER THAN

10  SEAL TEAM 6 GETS.  IT'S BETTER THAN THE NATIONAL GUARD GETS.

11  IT'S BETTER THAN THE ARMY GETS.  THE FACT IS THAT A WEAPON IS A

12  WEAPON.  A FIREARM IS A FIREARM, AND EVERYBODY LEARNS THE SAME

13  THING, AND THE ONLY THING THEY LEARN WHEN THEY'RE PEACE

14  OFFICERS IS THEY LEARN THE FOLLOWING:  THEY LEARN TO GO TO

12:19:27 15  SCHOOL, AND THEY LEARN TO HOPEFULLY IDENTIFY WHEN TO SHOOT AND

16  WHEN NOT TO SHOOT, AND TO SHOOT AND TO SHOOT ACCURATELY.

17         MR. ECHEVERRIA:  I KNOW THAT LAW ENFORCEMENT ARE

18  TRAINED IN SHOOT-DON'T-SHOOT SCENARIOS.  I DON'T KNOW THAT

19  HYPOTHETICAL INDIVIDUAL WHO IS TRAINED IN THE USE OF A FIREARM

20  WOULD ALSO HAVE SIMILAR NO-SHOOT TRAINING.

21         THE COURT:  I WILL CONCEDE THAT.  BUT CERTAINLY

22  PEOPLE IN THE ARMED FORCES GET THAT SAME TRAINING BECAUSE YOU

23  KNOW FULL WELL AS I DO THAT A MEMBER OF THE ARMED FORCES WHO

24  SHOOTS A CIVILIAN FACES SOME PRETTY TOUGH CONSEQUENCES.  SO

25  THEY LEARN AS WELL, SHOOT-DON'T-SHOOT.  BUT MY BASIC POINT WAS

12:20:23   1   BASICALLY THIS:  WHAT IS THE DIFFERENCE IN THE TRAINING THAT

           2   LAW ENFORCEMENT OFFICERS WOULD GET, WHETHER THEY WERE USING A

           3   WEAPON THAT HAS A 30-ROUND MAGAZINE OR A 10-ROUND MAGAZINE?

           4          MR. ECHEVERRIA:  I DON'T KNOW THAT THERE ARE

           5   DIFFERENT TRAINING PROTOCOLS --

           6          THE COURT:  THERE ARE NOT.  ABSOLUTELY NONE.  SO MY

           7   QUESTION IS WHEN IN THE STACK OF EVIDENCE THAT I SEE HERE THEY

           8   SAY, WELL, OFFICERS SHOULD BE ALLOWED TO HAVE THESE BECAUSE

           9   THEY HAVE GREATER TRAINING, I ASK MYSELF:  GREATER TRAINING

          10   THEN, ARE YOU KIDDING ME, THAN A MEMBER OF THE SEAL TEAM 6

          11   GROUP?  ARE YOU KIDDING ME?  GREATER TRAINING THAN A MEMBER OF

          12   THE NATIONAL GUARD?  ARE YOU KIDDING ME?  ARE YOU TELLING ME

          13   THAT A RETIRED POLICE OFFICER HAS BETTER SKILLS, BETTER

          14   TRAINING THAN A RETIRED SEAL TEAM SIX MEMBER?  ARE YOU TELLING

12:21:35  15   ME THAT BECAUSE OF THIS SOMEHOW OR ANOTHER ALL OF THESE OTHER

          16   PEOPLE THAT HAVE HONORABLY SERVED THIS COUNTRY AND PUT THEIR

          17   LIVES ON THE LINE -- MANY OF THEM HAVE LOST LEGS, ARMS, SO ON

          18   -- BUT YOU CAN'T POSSESS A MAGAZINE THAT HAS MORE THAN 10

          19   ROUNDS.

          20          BUT WE'RE GOING TO MAKE THIS EXCEPTION.  THE

          21   EXCEPTION IS THAT IF YOU WORK FOR THE MOVIE INDUSTRY, YOU CAN

          22   HAVE IT.  IF YOU'RE A RETIRED POLICE OFFICER, YOU CAN HAVE IT.

          23   AND WHAT I'M TRYING TO DO IS I'M TRYING TO FIGURE OUT -- YOU

          24   USED THE WORD COMMON SENSE EARLIER ON, AND I'M TRYING TO FIGURE

          25   OUT WHERE IS THE COMMON SENSE IN THAT ONE.  I KNOW JUDGE

```
12:22:17   1   REINHARDT ONCE MADE A SIMILAR ARGUMENT IN ANOTHER CASE, AND I

           2   AGREE WITH HIM.

           3          MR. ECHEVERRIA:  WOULD THAT BE SILVEIRA?

           4          THE COURT:  I BELIEVE IT IS.  MY QUESTION IS: IF

           5   YOU'RE TRYING TO PROTECT THE PUBLIC, IF THIS IS REALLY WHAT

           6   YOU'RE TRYING TO DO, DON'T YOU PROTECT THE PUBLIC JUST AS WELL

           7   BY HAVING A MEMBER OF SEAL TEAM 6 WHO HAS, FOR EXAMPLE, A GLOCK

           8   17 THAT HE'S WALKING AROUND WITH IN THE EVENT THERE HAPPENS TO

           9   BE -- FOR EXAMPLE, WHO IS THE CONGRESSMAN THAT WAS SHOT BY THE

          10   FELLOW --

          11          MR. ECHEVERRIA:  CONGRESSMAN SCALISE.

          12          THE COURT:  YEAH, SCALISE; YOU HAPPEN TO HAVE A

          13   MEMBER OF THE SEAL TEAM SIX WHO HAS A GLOCK 17 IN HIS POCKET,

          14   HE MIGHT BE ABLE TO STOP THAT KIND OF SHOOTING, RIGHT?

12:23:12  15          MR. ECHEVERRIA:  THAT'S A POLICY CHOICE FOR THE

          16   PEOPLE TO DIVIDE THROUGH DEMOCRACY.  THERE ARE IMPORTANT

          17   SEPARATION OF POWERS, PRINCIPLES, THAT ARE VINDICATED BY THE

          18   APPLICATION OF INTERMEDIATE SCRUTINY TO THIS KIND OF GUN

          19   CONTROL LEGISLATION.  IT --

          20          THE COURT:  CAN YOU THINK OF AN EXAMPLE WHERE THE

          21   STATE HAS EVER SAID IN CONNECTION WITH TRYING TO DEFEND

          22   LEGISLATION THAT WAS PASSED THAT WOULD GIVE THE GOVERNMENT

          23   POWER WHERE THE STATE COMES IN AND SAID, YOU KNOW, WE DON'T

          24   HAVE THE POWER TO DO THIS; WE DON'T HAVE THE AUTHORITY TO DO

          25   THIS; WE DON'T HAVE THE DISCRETION TO DO THIS.
```

12:23:51    1          MR. ECHEVERRIA:  AGAIN, THIS IS NOT IN THE RECORD AND

            2     THIS IS FAR OUTSIDE THE BOUNDS OF THIS LITIGATION, BUT -- AND

            3     I'M ON TOTALLY FAMILIAR WITH THE DETAILS -- BUT IT'S MY

            4     UNDERSTANDING THAT WITH THE ENACTMENT OF PROPOSITION 8, THE

            5     GOVERNMENT DECIDED IT WASN'T GOING TO BE DEFENDING PROPOSITION

            6     8 --

            7          THE COURT:  THAT'S ABSOLUTELY TRUE.

            8          MR. ECHEVERRIA:  SO THAT WAS A SITUATION WHERE THE

            9     GOVERNMENT DISAGREED WITH THE ENACTMENT OF THE PEOPLE BECAUSE

           10     OF ITS PERCEPTION, RIGHTFULLY SO, THAT IT VIOLATED THE

           11     CONSTITUTION.  SO THAT WOULD BE AN EXAMPLE.

           12          THE COURT:  OKAY.  GOT YOU.

           13          MR. ECHEVERRIA:  I'D ALSO LIKE TO CLARIFY:  I KNOW

           14     THAT YOUR HONOR CHARACTERIZED CALIFORNIA'S POSSESSION BAN AS

12:24:32   15     DISARMAMENT AND AS A POLICY CHOICE THAT WAS OFF THE TABLE AND

           16     WAS CONSTITUTIONALLY SUSPECT.  AND I WOULD LIKE TO JUST CLARIFY

           17     THAT CALIFORNIA'S POSSESSION BAN DOES NOT DISARM ANYBODY.

           18     INDIVIDUALS ARE STILL PERMITTED TO POSSESS AS MANY MAGAZINES

           19     THAT ARE CALIFORNIA COMPLIANT AS THEY WISH AND CAN, AT LEAST

           20     WITH RESPECT TO THE LARGE CAPACITY MAGAZINE BAN, CAN HAVE AS

           21     MANY WEAPONS AS THEY CAN LAWFULLY POSSESS TO EXERCISE THEIR

           22     SELF-DEFENSE RIGHTS.

           23          THERE ARE NUMEROUS OPTIONS FOR COMPLYING WITH

           24     CALIFORNIA'S POSSESSION BAN.  IF YOUR HONOR HAD NOT ENJOINED

           25     THE STATUTE ON JULY 1ST, IT WOULDN'T HAVE AUTOMATICALLY

```
12:25:21    1    RENDERED ALL INDIVIDUALS WHO OWNED GRANDFATHERED LCM'S
            2    CRIMINALS.  THERE WERE DISPOSAL OPTIONS THAT THE OWNERS COULD
            3    COMPLY WITH INCLUDING STORING THEM OUT OF STATE, SELLING THEM
            4    TO AN FFL, FEDERALLY FIREARMS LICENSE DEALER.  ONE OF THE
            5    EXCEPTIONS THAT SEEMS TO BE LOST IN THE DISCUSSION ABOUT THE
            6    POSSESSION BAN IS THE DEFINITION OF A LARGE CAPACITY MAGAZINE
            7    IN PENAL CODE SECTION 16740 WHICH IN SUBDIVISION A TAKES OUT
            8    FROM THE DEFINITION OF LARGE CAPACITY MAGAZINES, LARGE CAPACITY
            9    MAGAZINES THAT HAVE BEEN PERMANENTLY MODIFIED.
           10         SO WITH THE PERMANENT MODIFICATION OPTION, SOMEONE
           11    WHO OWNS A GRANDFATHERED LCM CAN TAKE IT TO A GUNSMITH, AND A
           12    GUNSMITH HAS AN EXCEPTION IN THE POSSESSION BAN, TO MODIFY A
           13    LARGE CAPACITY MAGAZINE SO THAT IT CAN HOLD NO MORE THAN 10
           14    ROUNDS OF AMMUNITION.  IN THAT CASE, THE OWNER KEEPS POSSESSION
12:26:23   15    AND KEEPS TITLE OF THEIR MAGAZINE, AND THEY CAN STILL USE THAT
           16    MAGAZINE IN SELF-DEFENSE OR FOR ANY OTHER LAWFUL PURPOSE THAT
           17    THEY MAY DESIRE.
           18         THE COURT:  IF YOU WERE A WOMAN AND YOU WERE AT HOME
           19    -- I'M USING A WOMAN BECAUSE THERE WAS A CASE THAT I CAN'T
           20    REMEMBER THE --
           21         MR. ECHEVERRIA:  SUSAN GONZALEZ.
           22         THE COURT:  YEAH.  AND YOU'RE AT HOME AND YOU'RE BY
           23    YOURSELF AND SOME PEOPLE BREAK IN YOUR HOUSE, OR YOU HAVE YOUR
           24    DAUGHTER OR CHILD WITH YOU AND SOME PEOPLE BREAK INTO YOUR
           25    HOUSE, AND YOU KNOW THEY'RE NOT GOING TO DO YOU ANY GOOD.
```

| | |
|---|---|
| 12:27:14 | 1 |

THEY'RE EITHER GOING TO RAPE OR KILL YOU OR BOTH.

2      MR. ECHEVERRIA:  OR TRY.

3      THE COURT:  OR TRY.  AND YOU HAVE YOUR GLOCK 17 WITH

4  A PERMANENTLY MODIFIED MAGAZINE THAT ONLY HOLDS 10 ROUNDS, AND

5  YOU FIRED ALL 10 ROUNDS BECAUSE YOU'RE SCARED.  YOU HAVEN'T

6  BEEN TRAINED TO HIT WHAT YOU'RE SHOOTING AT, BUT YOU'RE TRYING

7  TO PROTECT YOURSELF OR YOUR DAUGHTER, AND YOU FIRE ALL 10

8  ROUNDS, AND THOSE PEOPLE ARE STILL COMING AT YOU.  ARE YOU OR

9  ARE YOU NOT DISARMED AT THAT POINT IN TIME?

10      MR. ECHEVERRIA:  YOU CAN HAVE ANY NUMBER OF MAGAZINES

11  ON YOUR POSSESSION.

12      THE COURT:  WHAT IS SHE GOING TO DO, COUNSEL,

13  REALISTICALLY?  REALISTICALLY.  LET'S BE REAL.

14      MR. ECHEVERRIA:  THIS IS SPECULATION, YOUR HONOR.

12:28:30  15      THE COURT:  THIS IS NOT SPECULATION.  THIS IS NO MORE

16  SPECULATION THAN TO SAY THAT BECAUSE IF YOU HAVE A LOT OF

17  MAGAZINES OUT THERE THERE'S GOING TO BE A LOT OF PEOPLE THAT

18  ARE KILLED.  YES, THERE ARE GOING TO BE PEOPLE THAT ARE

19  PROBABLY GOING TO BE INJURED AND KILLED BECAUSE OF THE FACT

20  THAT THERE ARE GUNS.  BUT IF YOU HAVE SOMEONE WHO HAS FIRED ALL

21  10 ROUNDS, AND THEY GET TO THE 11TH ROUND, AND THEY PULL THE

22  TRIGGER AND ALL THAT HAPPENS IS "CLICK," THEY ARE EFFECTIVELY

23  DISARMED.  YES, IT IS TRUE THAT IF THEY HAPPEN TO CARRY AROUND

24  WITH THEM 20 10-ROUND MAGAZINES WITH THEM, ASSUMING THAT THEY

25  HAVE THE TIME, AND OF COURSE AS THE EVIDENCE SHOWS, PEOPLE ARE

```
12:29:10    1    NERVOUS, RIGHT, AND PERHAPS THEY JUST WOKE UP, AND THEY'RE NOT

            2    GOING TO BE AS LIKELY TO BE ABLE TO CHANGE THE MAGAZINE AS

            3    QUICKLY AS THEY WOULD IF THEY HAD THAT GLOCK 17 WITH 17 ROUNDS

            4    IN THE MAGAZINE.  SO WHEN YOU GET TO THAT 11TH ROUND, YOU'RE

            5    ESSENTIALLY DISARMED.

            6            MR. ECHEVERRIA:  I WOULD DISAGREE WITH THAT

            7    CHARACTERIZATION, YOUR HONOR.  IT IS NOT DISARMAMENT.  THEY HAD

            8    A FIREARM IN THEIR POSSESSION.  THEY WERE ABLE TO USE A

            9    MAGAZINE THAT HELD LIVE AMMUNITION UP TO 10 ROUNDS.  THEY COULD

           10    HAVE AS MANY MAGAZINES ON THEIR PERSON.  TO ME, THAT IS ARMED.

           11    THE PLAINTIFFS HAVE PRESENTED NO EVIDENCE TO SUBSTANTIATE THIS

           12    TYPE OF SPECULATION IN THE STATE OF CALIFORNIA.  THEY PRESENTED

           13    NO CASES IN WHICH ANYONE IN THE STATE OF CALIFORNIA HAS BEEN

           14    PREVENTED FROM EFFECTIVELY DEFENDING THEMSELVES NOT

12:30:06   15    WITHSTANDING THE EXISTING LARGE CAPACITY MAGAZINE BAN AND THE

           16    MODIFICATION OPTION.

           17            THE COURT:  DOES THE STATE KEEP THOSE KIND OF

           18    STATISTICS?

           19            MR. ECHEVERRIA:  I DON'T KNOW THAT THE STATE HAS THAT

           20    INFORMATION --

           21            THE COURT:  YOU DON'T.  YOU DON'T.  BECAUSE THE

           22    EVIDENCE, IN FACT, AS I READ IT IS THAT THE STATE DOESN'T KEEP

           23    THAT KIND OF INFORMATION.  SO WE DON'T KNOW WHETHER IT HAS

           24    HAPPENED OR HASN'T HAPPENED.

           25            MR. ECHEVERRIA:  WHAT WE DO KNOW --
```

12:30:31   1         THE COURT:  AND THE ENTITY THAT HAS THE BEST ABILITY

2    TO TELL US WHETHER OR NOT THAT HAS HAPPENED OR HAS NOT HAPPENED

3    WOULD BE THE STATE.  BUT YOU DON'T HAVE ANY RECORDS TO THAT

4    EFFECT.

5         MR. ECHEVERRIA:  THE ATTORNEY GENERAL HAS PRESENTED

6    EVIDENCE, AS YOUR HONOR KNOWS, THAT SHOWS THAT ON AVERAGE FAR

7    LESS THAN 10 ROUNDS OF AMMUNITION ARE USED IN SELF-DEFENSE.

8         THE COURT:  BUT AVERAGE IS 2.2.

9         MR. ECHEVERRIA:  AND OFTEN ZERO.  OFTEN THE MERE

10   BRANDISHING OF THE FIREARM --

11        THE COURT:  SURE.  AND IF YOU THROW THE GUN AT

12   SOMEONE, THAT MIGHT VERY WELL WORK.

13        MR. ECHEVERRIA:  I DON'T KNOW THAT WOULD WORK BECAUSE

14   YOU'D BE DISARMING YOURSELF --

12:31:03  15        THE COURT:  I WOULDN'T WANT MY WIFE OR DAUGHTER TO

16   HAVE TO DEPEND ON A WEAPON THAT SHOOTS 2.2 BULLETS.  SO THE

17   POINT I'M MAKING TO YOU IS, LOOK, RIGHT NOW IT IS PERFECTLY

18   LEGAL FOR SOMEONE TO POSSESS A GLOCK 17 WITH A 17-ROUND

19   MAGAZINE AND USE IT FOR SELF-DEFENSE IN THEIR HOME IF THEY HAVE

20   TO.  HOPEFULLY, THEY NEVER WOULD HAVE TO, BUT THEY CAN.  BUT

21   ONCE YOU TAKE AWAY THAT 7 ROUNDS, AND NOW YOU'RE DOWN TO 10

22   ROUNDS, YOU BETTER HOPE AND PRAY THAT YOU HIT WHATEVER IT IS

23   YOU'RE SHOOTING WITH THOSE 10 ROUNDS.

24        NOW WHY SHOULD THE GOVERNMENT BE SO ARROGANT AS TO

25   TELL A LAW-ABIDING CITIZEN, SOMEONE WHO HAS NOT VIOLATED THE

12:31:50   1   LAW IN ANY WAY, HAS NOT SHOT ANYONE, HAS NOT INJURED ANYONE,

2   WHY SHOULD THE GOVERNMENT BE SO ARROGANT AS TO TELL THAT WOMAN:

3   YOU KNOW WHAT, TOO BAD, SO SAD.  IF YOU HAD 17 ROUNDS, YOU

4   MIGHT HAVE BEEN ABLE TO STOP THE ASSAILANT, BUT YOU ONLY HAD

5   10.  AND NOW YOU'VE BEEN RAPED, AND NOW YOU'RE DEAD, AND WE'RE

6   SO SORRY.  BUT YOU KNOW, THAT'S JUST THE WAY LIFE GOES.

7           ISN'T THAT REALLY WHERE YOU ARE?

8           MR. ECHEVERRIA:  THE DECLARATION OF LUCY ALLEN

9   DEMONSTRATES THAT ON AVERAGE 71 PERCENT OF PUBLIC MASS

10   SHOOTINGS INVOLVE INDIVIDUALS WHO LAWFULLY ACQUIRED THEIR

11   FIREARMS AND MAGAZINE ACCESSORIES.  THE STATE IS NOT SAYING

12   THAT ANY PARTICULAR INDIVIDUALS ARE DANGEROUS.  THE STATE IS

13   SAYING THAT LARGE CAPACITY MAGAZINES ARE DANGEROUS AND PEOPLE

14   CAN --

12:32:45   15           THE COURT:  BUT NOT IF THEY'RE POSSESSED BY RETIRED

16   LAW ENFORCEMENT POLICE OFFICERS, 80-YEAR-OLD POLICE OFFICERS

17   WHO MAY BE SUFFERING FROM MACULAR DEGENERATION AND WHO --

18           MR. ECHEVERRIA:  I COMPLETELY UNDERSTAND YOUR HONOR

19   DISAGREES WITH THE LINES THAT HAVE BEEN DRAWN BY THE PEOPLE.  I

20   COMPLETELY UNDERSTAND.  OR AT LEAST THAT'S WHAT IT SEEMS TO BE

21   THE CASE TODAY.  BUT UNDER INTERMEDIATE SCRUTINY, IT'S NOT YOUR

22   HONOR'S ROLE TO REDRAW THOSE LINES OR INVALIDATE A STATUTE

23   COMPLETELY BECAUSE YOU DON'T THINK THE LINES ARE PERFECT.

24   THAT'S FOR THE DEMOCRATIC PROCESS.

25           THE COURT:  SO IF THE DEMOCRATIC PROCESS RESULTED IN

12:33:24  1   A DECISION THAT YOU COULD NOT HOLD A MAGAZINE THAT HELD MORE

2   THAN 7 ROUNDS?

3            MR. ECHEVERRIA:   THEN THE STATE STARTS GETTING INTO

4   PROBLEMATIC TERRITORY FROM A CONSTITUTIONAL PERSPECTIVE.   THE

5   NEW YORK -- THE SECOND CIRCUIT INVALIDATED THE 7-ROUND LOAD

6   LIMIT.   ONE OF THE REASONS WHY IS THERE JUST AREN'T MANY

7   7-ROUND MAGAZINES THAT ARE READILY AVAILABLE.   THE REASON WHY

8   THE STATE OF NEW YORK ENACTED A 10-ROUND MAGAZINE CAPACITY

9   RESTRICTION IS THAT THOSE CAPACITY SIZES ARE READILY AVAILABLE

10   AND SOLD THROUGHOUT THE COUNTRY, BUT THERE AREN'T MANY 7-ROUND

11   MAGAZINES.

12            I'D ALSO LIKE TO NOTE THAT IN THE CASE OF SUSAN

13   GONZALEZ -- THAT WAS A CASE IN FLORIDA NOT IN THE STATE OF

14   CALIFORNIA -- EVEN AFTER SUSAN GONZALEZ HAD HER INCIDENT, SHE

12:34:07  15   WENT OUT AND BOUGHT A FIREARM.   IT WAS A 5-ROUND REVOLVER.   SHE

16   DID NOT GO OUT AND GET A LARGE CAPACITY MAGAZINE EVEN THOUGH

17   THOSE ARE AVAILABLE IN THE STATE OF FLORIDA.   SO WHAT WE HAVE

18   HERE IS THE COURT HAS LEGITIMATE CONCERNS ABOUT INDIVIDUALS

19   BEING ABLE TO PROTECT THEMSELVES, BUT IT'S BASED ON

20   SPECULATION.   IT'S BASED ON "WHAT IF" SCENARIOS.   BUT THE

21   PEOPLE OF CALIFORNIA WERE CONFRONTED WITH DATA, DATA SHOWING

22   THAT IN A MAJORITY OF PUBLIC MASS SHOOTINGS, LARGE CAPACITY

23   MAGAZINES ARE USED; AND WHEN THEY'RE USED, THE FATALITY AND

24   INJURY RATES ARE MUCH LARGER THAN WHEN 10 ROUNDS OR LESS ARE

25   USED IN THOSE PUBLIC MASS SHOOTINGS.   THAT WAS ALSO SET FORTH

12:34:50  1    IN THE DECLARATION OF LUCY ALLEN.

2         THE NINTH CIRCUIT IN FYOCK VERSUS SUNNYVALE SAID THAT

3    THE DECLARATION OF LUCY ALLEN, THE DECLARATION OF PROFESSOR

4    DONOHUE, THE EMPIRICAL EVIDENCE THAT THE STATE HAS PROVIDED,

5    INCLUDING THE MAYORS AGAINST ILLEGAL GUNS STUDY, THAT THAT IS

6    THE, QUOTE, UNQUOTE, PRECISE TYPE OF EVIDENCE THAT THE STATE

7    CAN RELY ON TO SUBSTANTIATE ITS INTEREST AND TO SHOW A

8    REASONABLE FIT.

9         THE COURT:  BUT WASN'T THAT THE STUDY THAT I --

10        MR. ECHEVERRIA:  IT WAS.

11        THE COURT:  -- ESSENTIALLY DISSECTED, AND I'VE YET TO

12   HEAR ANYBODY -- I'VE YET TO HEAR ANYONE TELL ME WHY I WAS WRONG

13   IN MY DISSECTING THAT STUDY.

14        MR. ECHEVERRIA:  WELL, THE NUMBERS THAT YOUR HONOR

12:35:37 15   IDENTIFIED IN YOUR 12-PAGE DISSECTION OF THE MAYORS AGAINST

16   ILLEGAL GUNS STUDY WERE NOT NECESSARILY ERRONEOUS.  I DO THINK

17   SOME OF THE ASSUMPTIONS WERE WRONG.

18        THE COURT:  WELL, THEY'RE ALL ACCURATE.  EVERYTHING I

19   SAID IN THERE WAS ACCURATE.

20        MR. ECHEVERRIA:  SO IF THERE WAS A MASS SHOOTING THAT

21   DOESN'T HAVE THE CAPACITY NUMBER, IT'S NOT ACCURATE TO ASSUME

22   THAT A LARGE CAPACITY MAGAZINE WAS NOT USED IN THAT SHOOTING.

23        THE COURT:  IS IT ACCURATE TO ASSUME THAT IT WAS?

24        MR. ECHEVERRIA:  THE EVERYTOWN AMICUS BRIEF THAT WAS

25   FILED IN OPPOSITION TO PLAINTIFFS MOTION, AND EVERYTOWN IS THE

12:36:13   1   SUCCESSOR ORGANIZATION TO THE MAYORS AGAINST ILLEGAL GUNS, THEY

2   SET FORTH WHY SOME OF THE FACTUAL ASSUMPTIONS YOUR HONOR MADE

3   WERE INCORRECT.  BUT STILL, UNDER INTERMEDIATE SCRUTINY, IT'S

4   NOT THE COURT'S ROLE TO DISSECT THIS TYPE OF EVIDENCE.  THE

5   COURT DISMISSED MANY MASS SHOOTINGS THAT OCCURRED OUTSIDE THE

6   STATE OF CALIFORNIA, AND UNDER INTERMEDIATE SCRUTINY, THE

7   PEOPLE AND THE LEGISLATURE ARE ENTITLED TO LOOK AT ANY EVIDENCE

8   REASONABLY BELIEVED TO BE RELEVANT TO THE ISSUE AT HAND AND

9   LOOKING AT OTHER JURISDICTIONS TO SEE WHAT THEIR EXPERIENCES

10   ARE AND HOW EFFECTIVE THEIR GUN SAFETY LEGISLATION HAS BEEN.

11          THIS IS THE KIND OF SYSTEM THAT OUR CONSTITUTIONAL

12   DEMOCRACY WAS ESTABLISHED TO BRING FORTH TO ALLOW STATES TO

13   EXPERIMENT WITH PUBLIC SAFETY LEGISLATION TO TACKLE THESE

14   ISSUES OF PUBLIC CONCERN.  I CAN THINK OF FEW OTHER ISSUES

12:37:12   15   OTHER THAN PUBLIC MASS SHOOTINGS AND THE MURDER OF LAW

16   ENFORCEMENT PERSONNEL THAT ARE MORE COMPELLING FOR THE PEOPLE

17   OF CALIFORNIA TO BE CONCERNED WITH.  SO EVEN IF PUBLIC MASS

18   SHOOTINGS AND MURDERS OF LAW ENFORCEMENT ARE RELATIVELY RARE

19   EVENTS --

20          THE COURT:  I CAN NAME A FEW.  ABOUT THE SAME TIME WE

21   PASSED THIS LAW, WE ALSO PASSED A RECREATIONAL MARIJUANA USE

22   LAW WHICH NOT ONLY VIOLATES FEDERAL LAW, I MIGHT POINT OUT, BUT

23   I'M WILLING TO BET YOU DOLLARS TO DOUGHNUTS, AND I DON'T THINK

24   YOU'D DISAGREE, SIR, THAT THERE ARE PEOPLE WHO HAVE ALREADY

25   BEEN KILLED, MAIMED, INJURED AS A RESULT OF SOMEONE SITTING IN

```
12:37:51   1    THEIR LIVING ROOM SMOKING A JOINT, AND THEN GOT IN THEIR CAR

           2    AND DROVE THEIR CAR AND KILLED, MAIMED OR INJURED PEOPLE.

           3              MR. ECHEVERRIA:  I'LL MAKE NO REPRESENTATIONS ABOUT

           4    THAT.  I DON'T KNOW ANYTHING ABOUT THAT.

           5              THE COURT:  WELL, YOU CAN USE YOUR COMMON SENSE THAT

           6    YOU REFERRED TO EARLIER.  AND YOU KNOW, FOR EXAMPLE, ALCOHOL,

           7    WE CAN BAN ALCOHOL.  THERE'S NO CONSTITUTIONAL PROTECTION TO

           8    THE CONSUMPTION OF ALCOHOL.  AND WE KNOW FOR A FACT, WE KNOW

           9    FOR A FACT, WE DON'T HAVE TO GUESS, THAT EVERY YEAR THERE'S

          10    MANY, MANY MORE PEOPLE KILLED AND INJURED AS A RESULT OF PEOPLE

          11    DRIVING AFTER HAVING CONSUMED ALCOHOL.  WE DON'T BAN ALCOHOL,

          12    BUT IT'S NOT PROTECTED.

          13              MR. ECHEVERRIA:  YOUR HONOR MAY THINK THERE'S MORE

          14    PRESSING CONCERNS, BUT THE PEOPLE CAN DECIDE THAT.

12:38:42  15              THE COURT:  WHEN YOU TELL ME THAT THE STATE HAS NO

          16    GREATER INTEREST --

          17              MR. ECHEVERRIA:  I DIDN'T SAY THAT, YOUR HONOR.

          18              THE COURT:  I THOUGHT THAT'S WHAT YOU SAID.  MAYBE I

          19    MISUNDERSTOOD.

          20              MR. ECHEVERRIA:  I SAID FEW OTHER ISSUES.  SO I'M NOT

          21    RULING OUT THAT THERE ARE OTHER ISSUES THAT ARE IMPORTANT.  THE

          22    PEOPLE OF CALIFORNIA AND THE LEGISLATURE CAN WALK AND CHEW GUM.

          23    THEY CAN TACKLE MULTIPLE ISSUES IN DIFFERENT WAYS.  THAT'S HOW

          24    DEMOCRACY WORKS.  BUT UNDER INTERMEDIATE SCRUTINY, THIS COURT'S

          25    ROLE IS TO MERELY DETERMINE WHETHER THERE'S SUBSTANTIAL
```

| | |
|---|---|
| 12:39:09 | 1 |

EVIDENCE, AND THAT'S A SUBSTANTIAL PILE OF PAPER, THAT INVOLVES

RELEVANT EVIDENCE CONCERNING THE USE OF LARGE CAPACITY

MAGAZINES IN PUBLIC MASS SHOOTINGS AND VIOLENCE AGAINST LAW

ENFORCEMENT WHICH DEPRIVE INNOCENT CITIZENS AND LAW ENFORCEMENT

OF THE CRITICAL PAUSES TO INTERVENE.  THERE'S EVIDENCE THAT THE

POSSESSION BAN WAS NEEDED TO CLOSE THE POSSESSION LOOPHOLE.

IN THE EXPERT REPORT OF DR. KOPER, HE RECOUNTED THE

EXPERIENCE WITH THE FEDERAL ASSAULT WEAPONS BAN WHICH WAS IN

PLACE IN 1994 TO 2004, AND HE SHOWED THAT THAT BAN LED TO A

REDUCTION IN THE USE OF LARGE CAPACITY MAGAZINES AND GUN CRIME

AND --

THE COURT:  I READ HIS REPORT AND ACTUALLY EVERYTHING

THAT I READ THAT HE SAYS IS BASICALLY INCONCLUSIVE.  WHAT HE

SAYS IS ALL INCONCLUSIVE.  IN FACT, IF I'M NOT MISTAKEN --

LOOK, I DON'T WANT TO ARGUE WITH YOU, BUT MY UNDERSTANDING IS

THAT HE SAYS -- I CAN PROBABLY FIND IT HERE.

MR. ECHEVERRIA:  THE 2004 STUDY?  HE WAS ONE OF THE

AUTHORS OF THE FEDERALLY COMMISSIONED STUDY OF THE FEDERAL

ASSAULT WEAPONS BAN.

THE COURT:  HE SAID IT MAY HAVE HAD AN IMPACT, AND I

THINK HE SAID THAT PERHAPS IF WE ALLOWED MORE TIME WE MIGHT

HAVE SEEN A REDUCTION; BUT AS IT STANDS RIGHT NOW, EVERYTHING

THAT HE SAYS IS INCONCLUSIVE.  HE SAYS WE DON'T KNOW.  WE DON'T

KNOW WHAT THE EFFECT WAS.

MR. ECHEVERRIA:  THAT WOULD BE THE EFFECT ON GUN

12:40:36   1   CRIME GENERALLY.  BUT WHAT WE DID SEE AND WHAT DR. KOPER

           2   TESTIFIES TO IN HIS EXPERT REPORT IS THAT THE USE OF LARGE

           3   CAPACITY MAGAZINES DECREASED BASED ON THE WASHINGTON POST STUDY

           4   OF THE STATE OF VIRGINIA.  AND THEN AFTER THE LAPSING OF THE

           5   FEDERAL ASSAULT WEAPONS BAN UNTIL 2010, THE NUMBERS OF LARGE

           6   CAPACITY MAGAZINE EQUIPPED FIREARMS USED IN GUN CRIME DOUBLED

           7   TO 20 PERCENT.  SO THAT SHOWS THAT LARGE CAPACITY MAGAZINE

           8   RESTRICTIONS, WHEN THEY'RE IN PLACE, WORK.  IN REMOVING LARGE

           9   CAPACITY MAGAZINES FROM CIRCULATION AND IN THE USE OF VIOLENCE

          10   AGAINST LAW ENFORCEMENT AND IN PUBLIC MASS SHOOTINGS, AND IN

          11   GENERAL, GUN CRIME.

          12           AND THE POSSESSION BAN IS EVEN MORE EFFECTIVE IN THE

          13   STATE OF CALIFORNIA BECAUSE THE FEDERAL BAN HAD A SIMILAR

          14   GRANDFATHER PROVISION, RIGHT, THAT INDIVIDUALS WHO OWNED LARGE

12:41:32  15   CAPACITY MAGAZINES BEFORE 1994 WERE ALLOWED TO CONTINUE THEIR

          16   POSSESSION OF THOSE MAGAZINES.  BUT UNDER THE FEDERAL LAW, THEY

          17   WERE ALSO ALLOWED TO TRANSFER THEM.  THAT'S SOMETHING THAT

          18   SP-23 DID NOT ALLOW.  SO LARGE CAPACITY MAGAZINES WERE BEING

          19   CIRCULATED THROUGHOUT THE COUNTRY.  ADDITIONALLY, I THINK IT

          20   WAS 25 TO 50 MILLION LARGE CAPACITY MAGAZINES WERE

          21   GRANDFATHERED IN UNDER THE FEDERAL ASSAULT WEAPONS BAN, AND

          22   MANY MORE GRANDFATHERED LCM'S WERE IMPORTED INTO THE COUNTRY

          23   DURING THE FEDERAL ASSAULT WEAPONS BAN.

          24           SO CALIFORNIA LOOKED AT WHAT HAPPENED WITH THE

          25   FEDERAL BAN AND IMPROVED IT, AND THEY CONTINUED TO IMPROVE IT

12:42:11   1   IN 2016 BY CLOSING THE POSSESSION LOOPHOLE.  WE HAVE EVIDENCE

2   IN THE RECORD WITH THE DECLARATION OF BLAKE GRAHAM THAT SHOWS

3   THAT THE POSSESSION BAN IS NECESSARY TO EFFECTIVELY ENFORCE

4   CALIFORNIA'S EXISTING LARGE CAPACITY MAGAZINES RESTRICTION.

5          THE COURT:  I SAW IN ONE OF THE DECLARATIONS WHERE

6   THE NUMBER, THE NUMBER OF -- LET ME SEE IF I CAN FIND IT.  JUST

7   A SECOND.  I HOPE I CAN FIND IT.  I WON'T BE ABLE TO PUT MY

8   FINGER ON IT.  BUT I SAW A SIGNIFICANT REDUCTION.  I THINK THE

9   NUMBER I REMEMBER IS 264 OF THE NUMBER OF -- WELL, I BETTER NOT

10   SAY BECAUSE I'M NOT ABSOLUTELY CERTAIN.  I'D HAVE TO LOOK AT IT

11   BEFORE I ISSUE MY DECISION.

12          ANYWAY, LISTEN, MY STAFF HAS BEEN GOING NONSTOP NOW

13   FOR A LITTLE OVER TWO HOURS.  WE'RE GOING TO TALK A BREAK.

14   WE'LL COME BACK.  TAKE A LITTLE BREAK AND COME BACK AT 1:00.

12:43:57   15   AND THEN I'M GOING TO GIVE YOU 10 MORE MINUTES IF YOU NEED IT

16   TO TELL ME WHATEVER ELSE YOU WANT ME TO HEAR, AND THEN I'M

17   GOING TO GIVE THE PLAINTIFF AN OPPORTUNITY TO CLOSE.  AND THEN

18   WE'RE GOING TO CALL IT.  WE'RE GOING TO BE DONE BY 2:00.  SO

19   ALL RIGHT.  WE'LL BE IN RECESS UNTIL 1:00.  THANK YOU.

20          ALL COUNSEL:  THANK YOU, YOUR HONOR.

21          (RECESS.)

22          THE COURT:  ALL RIGHT.  MR. ECHEVERRIA, AS I TOLD

23   YOU, I'D GIVE YOU 10 MINUTES IF THERE WAS ANYTHING ELSE YOU

24   WANTED TO ADDRESS.  I KNOW I PEPPERED YOU WITH QUESTIONS, AND

25   YOU SO FAR HELD YOUR OWN.

13:01:18   1                    MR. ECHEVERRIA:  THERE'S STILL TIME, YOUR HONOR.

           2                    THE COURT:  STILL TIME FOR IT?

           3                    MR. ECHEVERRIA:  YEAH, I'LL TRY NOT TO TAKE TOO MUCH

           4     OF THE COURT'S TIME.

           5                    THE COURT:  IT'S ALL RIGHT.  IT'S AN IMPORTANT ISSUE.

           6     I TOOK THE TIME AND ASKED QUESTIONS BECAUSE I BELIEVE IT'S AN

           7     IMPORTANT ISSUE.

           8                    MR. ECHEVERRIA:  THE ATTORNEY GENERAL APPRECIATES

           9     THAT.  I'D LIKE TO NOTE SOME POINTS ABOUT THE SECOND AMENDMENT

          10     CLAIM.  I'D LIKE TO NOTE FOR THE COURT THAT THE FYOCK CASE

          11     INVOLVING THE SUNNYVALE ORDINANCE WAS A POSSESSION BAN THAT WAS

          12     VERY SIMILAR TO WHAT CALIFORNIA DID ON A STATEWIDE BASIS IN

          13     ENACTING PROPOSITION 63.

          14                    THE COURT:  CAN I ASK YOU A QUESTION WITH REGARDS TO

13:01:57  15     THE FYOCK CASE?

          16                    MR. ECHEVERRIA:  SURE.

          17                    THE COURT:  DO YOU THINK IT MAKES ANY DIFFERENCE THAT

          18     THE FYOCK CASE INVOLVED A CITY, A HIGHLY-POPULATED CITY, WHERE

          19     LAW ENFORCEMENT, FOR EXAMPLE, WOULD BE ABLE TO RESPOND PERHAPS

          20     ON SHORT NOTICE?  I KNOW THERE'S LACK OF EVIDENCE IN THE RECORD

          21     AS TO HOW MANY RAPES, ASSAULTS, ATTEMPTED MURDERS OR MURDERS

          22     THE STATE HAS BEEN ABLE TO PREVENT OVER THE YEARS.  I DIDN'T

          23     SEE ANY STATISTICS ON THAT.  SO WHAT WE REALLY DO KNOW -- WHAT

          24     WE KNOW IS THAT GENERALLY LAW ENFORCEMENT IS REACTIVE.  THAT

          25     LAW ENFORCEMENT WILL SHOW UP ONCE A PROBLEM HAS BEGAN.

13:02:46  1          NOW IN THE SUNNYVALE CASE, THAT'S A CITY WHERE LAW

2  ENFORCEMENT, AT LEAST IN THEORY, SHOULD BE ABLE TO RESPOND

3  RATHER QUICKLY TO AN INCIDENT.  SOMEONE BREAKS INTO A WOMAN'S

4  HOUSE, THE WOMAN PICKS UP THE PHONE, CALLS 9-1-1, HOPEFULLY LAW

5  ENFORCEMENT WOULD BE THERE QUICKLY.  THAT'S TO BE CONTRASTED,

6  FOR EXAMPLE, FROM SOME OF THE MORE RURAL AREAS WHERE SOMETIMES

7  IT TAKES 15 MINUTES OR MORE FOR LAW ENFORCEMENT TO ARRIVE.  DO

8  YOU THINK THAT MAKES A DIFFERENCE?

9          MR. ECHEVERRIA:  WELL, THE NINTH CIRCUIT DIDN'T

10  DISCUSS THAT POINT IN ITS DECISION.

11          THE COURT:  DO YOU THINK THAT MAKES A DIFFERENCE?

12          MR. ECHEVERRIA:  DO I, PERSONALLY?

13          THE COURT:  YEAH, DO YOU?

14          MR. ECHEVERRIA:  NOT GIVEN THE CONTEXT OF THE LARGE

13:03:34  15  CAPACITY MAGAZINE BAN BECAUSE SOMEONE WHO LIVES IN A RURAL

16  COMMUNITY CAN HAVE ACCESS TO AS MANY MAGAZINES AS THEY FEEL

17  THEY NEED.

18          THE COURT:  YOU RAISE THAT, AND SO THAT'S AN

19  INTERESTING POINT THAT YOU RAISE BECAUSE YOU SAID THAT BY

20  REDUCING THE NUMBER OF ROUNDS A MAGAZINE CAN HOLD TO 10, THE

21  EVIDENCE IN THE RECORD SHOWS THAT THAT WOULD GIVE SOMEONE AN

22  OPPORTUNITY EITHER TO ESCAPE OR TO TAKE DOWN THE ASSAILANT.

23          MR. ECHEVERRIA:  OR HIDE.

24          THE COURT:  OR HIDE.  NOW IF YOU'RE THE WOMAN WHO IS

25  HIDING IN THE CLOSET, AND THERE'S THREE ASSAILANTS WHO HAVE

13:04:33   1   BROKEN INTO THE HOUSE, AND YOU FIRED ALL 10 SHOTS, YOU MAY HAVE

           2   20 OR 30 MAGAZINES THAT HOLD 10 ROUNDS WITH YOU, BUT NOW THAT

           3   INDIVIDUAL HAS TO TAKE THE TIME, AGAIN ASSUMING THAT HE OR SHE

           4   IS NOT SO NERVOUS AND SHAKING AND STRESSED OUT, AND THAT

           5   INDIVIDUAL HAS TO TAKE THE TIME TO CHANGE THE MAGAZINE.  DOES

           6   THAT NOT RENDER THAT PERSON MORE VULNERABLE TO THOSE ASSAILANTS

           7   THAT HAVE BROKEN INTO HER HOUSE?  IN OTHER WORDS, NOW SHE HAS

           8   TO TAKE THE SAME AMOUNT OF TIME THAT IT TAKES WHEN THE

           9   ASSAILANT WITH A 10-ROUND MAGAZINE NEEDS TO REMOVE THE MAGAZINE

          10   AND PUT A NEW MAGAZINE IN, THAT GIVES PEOPLE A CHANCE TO RUN,

          11   HIDE OR TO BE TAKEN DOWN.

          12           MR. ECHEVERRIA:  I SEE WHAT YOU'RE SAYING, YOUR

          13   HONOR.

          14           THE COURT:  THAT SAME TIME INTERVAL WORKS TO THE

13:05:28  15   DETRIMENT TO THE WOMAN NOW FACING THESE THREE ASSAILANTS,

          16   RIGHT?  DO YOU AGREE WITH THAT?

          17           MR. ECHEVERRIA:  WELL, THE CRITICAL PAUSE THAT THE

          18   STATE EMPHASIZES IN JUSTIFYING THE LARGE CAPACITY MAGAZINE BAN,

          19   WHAT YOUR HONOR IS SAYING, AS FAR AS I UNDERSTAND, IS THAT

          20   THERE WOULD ALSO BE A PAUSE IF SOMEONE IS CONFINED TO HAVING A

          21   10-ROUND MAGAZINE TO RELOAD THEIR MAGAZINE; IS THAT WHAT YOU'RE

          22   YOU'RE ASKING?

          23           THE COURT:  THAT'S EXACTLY WHAT I WAS ASKING.

          24           MR. ECHEVERRIA:  SO THE INFERENCE CAN CUT BOTH WAYS.

          25   PROFESSOR EUGENE VOLOKH AT UCLA LAW SCHOOL WROTE A BLOG POST

13:05:56   1    ABOUT THIS ON THE WASHINGTON POST ABOUT HOW THE INFERENCES CAN

           2    CUT BOTH WAYS.

           3               THE COURT:  WHAT DO YOU MEAN?

           4               MR. ECHEVERRIA:  SO WHERE THE STATE SAYS THAT LARGE

           5    CAPACITY MAGAZINES ARE SO DANGEROUS BECAUSE THEY CAN BE USED TO

           6    KILL MANY PEOPLE IN A SHORT PERIOD OF TIME, THAT SAME ARGUMENT

           7    COULD BE USED TO JUSTIFY A LARGE CAPACITY MAGAZINE BECAUSE

           8    SOMEONE COULD SHOOT MORE ROUNDS AND DEFEND THEMSELVES MORE

           9    EFFECTIVELY.

          10               THE COURT:  RIGHT.

          11               MR. ECHEVERRIA:  ALTHOUGH, I WOULD NOTE, AS NOTED IN

          12    HELLER TOO AND NOTED IN FYOCK, THAT SPRAYING ROUNDS IN

          13    SELF-DEFENSE CAN INJURE INNOCENT BYSTANDERS ESPECIALLY WHERE,

          14    AS YOUR COURT SUGGESTED, THEY MAY HAVE LESS TRAINING AND BE

13:06:36  15    LESS ACCURATE.  AND THE EXPERT REPORT OF STEPHEN HELSLEY

          16    INDICATES THAT WITH MOST SHOOTINGS, MOST SHOOTINGS INVOLVE A

          17    LOT OF MISSING, AND THOSE MISSED SHOTS CAN INJURE PEOPLE,

          18    INNOCENT PEOPLE.

          19               BUT WHERE THE INFERENCE CUTS BOTH WAYS, THE STATE HAS

          20    EVIDENCE THAT LARGE CAPACITY MAGAZINES UNDERMINE THE CRITICAL

          21    PAUSES FOR INNOCENT VICTIMS TO SEEK COVER, ESCAPE OR INTERVENE

          22    AND THERE'S SPECULATION ON THE OTHER HAND THAT SOME

          23    HYPOTHETICAL PERSON MAY NEED AN 11TH ROUND AT THAT VERY MOMENT

          24    TO PROTECT THEMSELVES.  AND WHERE THERE ARE THESE COMPETING

          25    INFERENCES, IT'S NOT THE PROVINCE OF THE JUDICIARY TO REWEIGH

13:07:19   1   THOSE INFERENCES AND REWEIGH THE EVIDENCE UNDER INTERMEDIATE

2   SCRUTINY.   UNDER STRICT SCRUTINY, SURE; THEN THE JUDICIAL ROLE

3   IS MUCH MORE ACTIVE AND MUCH MORE SCRUTINIZING.   IF THE BAN IS

4   A CATEGORICAL BAN SIMILAR TO HELLER OF A QUINTESSENTIAL

5   SELF-DEFENSE FIREARM, THEN THAT WOULD BE INVALID UNDER ANY

6   LEVEL OF SCRUTINY.   IT WOULD BE CATEGORICALLY INVALID UNDER

7   HELLER.

8           BUT HERE WE HAVE COMPETING INFERENCES, AND WE HAVE

9   SUBSTANTIAL EVIDENCE ON THE STATE SIDE, AND IT WAS WITHIN THE

10   POWER OF THE PEOPLE OF CALIFORNIA TO CLOSE THE POSSESSION

11   LOOPHOLE AND ENACT PROPOSITION 63, AND THERE'S NOTHING

12   UNCONSTITUTIONAL ABOUT THAT.   IN THE SECOND CIRCUIT, THE NYSRPA

13   CASE, WHICH INVOLVED THE NEW YORK LARGE CAPACITY MAGAZINE BAN

14   AND THE SAFE ACT, THE PREVIOUS RESTRICTIONS GRANDFATHERED IN

13:08:16   15   LARGE CAPACITY MAGAZINES THAT WERE OWNED BEFORE THE YEAR 1994.

16   AND THE LAW THAT WAS BEING CHALLENGED IN THE SECOND CIRCUIT

17   CASE DID AWAY WITH THAT GRANDFATHERING.   SO IT'S VERY SIMILAR

18   TO THE TYPE OF POSSESSION RESTRICTIONS THAT WERE ENACTED IN

19   PROPOSITION 63.

20           THE COURT:   TO BE CONTRASTED WITH KOLBE.   KOLBE, FOR

21   EXAMPLE, DEALT WITH LEGISLATION THAT PRESERVED, THAT DID

22   INCLUDE A GRANDFATHER CLAUSE.

23           MR. ECHEVERRIA:   SIMILAR TO WHAT CALIFORNIA DID WITH

24   SP-23 IN 2000.

25           THE COURT:   RIGHT.

13:08:45  1         MR. ECHEVERRIA:  AGAIN, STATES CAN APPROACH THIS

2    COMPELLING ISSUE IN DIFFERENT WAYS AND LEARN FROM EACH OTHER IN

3    TRYING TO ENACT PUBLIC SAFETY LEGISLATION.  I'D ALSO LIKE TO

4    NOTE WITH RESPECT TO WEIGHING OF THE EVIDENCE AND HOW THE

5    PEOPLE HAVE THE POWER TO WEIGH THE EVIDENCE AND NOT THE COURT

6    WHEN INTERMEDIATE SCRUTINY APPLIES WHICH IS THE CASE HERE.  I'D

7    LIKE TO POINT THE COURT TO THE JACKSON CASE.

8         IN JACKSON, THE NINTH CIRCUIT WAS EVALUATING A

9    MUNICIPAL RESTRICTION ON HOLLOW POINT AMMUNITION WHICH THE CITY

10   AND COUNTY OF SAN FRANCISCO DETERMINED TO BE MORE DANGEROUS

11   THAN STANDARD AMMUNITION.  AND THE NINTH CIRCUIT WAS LOOKING AT

12   THE EVIDENCE THAT WAS BEFORE THE DISTRICT COURT AND CONCLUDED

13   THAT THE PLAINTIFF'S COUNTER-EVIDENCE MERELY SUGGESTED THAT THE

14   CITY'S EVIDENCE WAS QUOTE, UNQUOTE, BAD SCIENCE AND AT MOST

13:09:42  15   THERE'S AN OPEN QUESTION ABOUT WHETHER HOLLOW POINT AMMUNITION

16   IS MORE DANGEROUS.

17        BUT WHEN THERE'S AN OPEN QUESTION, WHEN THERE'S

18   EVIDENCE ON BOTH SIDES, WHEN THERE ARE COMPETING INFERENCES,

19   THE LEGISLATURE AND THE PEOPLE HAVE THE POWER TO DRAW THE LINES

20   AND TO EXPERIMENT.  AND THE INTERMEDIATE SCRUTINY STANDARD

21   PRESERVES IMPORTANT SEPARATION OF POWER PRINCIPALS THAT I WOULD

22   IMPLORE THE COURT TO BE MINDFUL OF.

23        THE COURT:  SINCE I KNOW YOU'RE REALLY KNOWLEDGEABLE

24   ABOUT THIS, BUT CAN YOU NAME FOR ME A FEW CASES OTHER THAN

25   HELLER WHERE THE COURTS HAVE EVER FOUND IN FAVOR OF NOT

13:10:31    1    RESTRICTING THE SECOND AMENDMENT RIGHTS OF PEOPLE?

           2              MR. ECHEVERRIA:  I CAN, BUT THEY WERE REVERSED.

           3              THE COURT:  SO TO MAKE A LONG STORY SHORT, IT WOULD

           4    SEEM THAT SHORT OF HELLER, THERE'S A JUDICIAL ANTIPATHY TOWARDS

           5    PROTECTION OF THE SECOND AMENDMENT.  SO ANY TIME THAT COURTS

           6    RULE AGAINST A STATE, IN CONNECTION WITH FIREARM LAWS OR

           7    REGULATIONS, THE STATE WINS.

           8              MR. ECHEVERRIA:  I WOULDN'T SAY IT'S ANTIPATHY.  I'D

           9    SAY IT'S AN APPLICATION OF INTERMEDIATE SCRUTINY AS

          10    INTERMEDIATE SCRUTINY IS UNDERSTOOD UNDER TURNER BROADCASTING

          11    AND OTHER SUPREME COURT PRECEDENTS.  IT'S JUST HOW INTERMEDIATE

          12    SCRUTINY WORKS.  I UNDERSTAND THAT THERE ARE MANY PEOPLE IN THE

          13    STATE OF CALIFORNIA WHO DON'T THINK LARGE CAPACITY MAGAZINE

          14    RESTRICTIONS ARE EFFECTIVE AND WHO THINK THEY ACTUALLY DO NEED

13:11:45   15    LARGE CAPACITY MAGAZINES.  I'M SURE THERE'S MANY MEMBERS OF THE

          16    JUDICIARY WHO HAVE DIFFERENCES OF OPINION ABOUT THE WISDOM OF

          17    THIS GUN CONTROL MEASURE OR THAT GUN CONTROL MEASURE.

          18              BUT UNDER INTERMEDIATE SCRUTINY, SUBSTANTIAL

          19    DEFERENCE IS AFFORDED TO THE PREDICTIVE JUDGMENTS OF THE

          20    LEGISLATURE AND THE PEOPLE.  SO IT SHOULD NOT BE SURPRISING

          21    THAT THE JUDICIAL OUTCOME OF, AT LEAST SO FAR, CONSTITUTIONAL

          22    CHALLENGES TO GUN SAFETY LEGISLATION HAVE NOT BEEN SUCCESSFUL

          23    FOR THE PLAINTIFFS.  I THINK THAT ONLY SUPPORTS THE ATTORNEY

          24    GENERAL'S POSITION THAT INTERMEDIATE SCRUTINY APPLYING HERE

          25    SUPPORTS A FINDING THAT THE SECOND AMENDMENT IS NOT VIOLATED BY

13:12:23   1    THE LARGE CAPACITY MAGAZINE BAN.

2          UNLESS YOUR HONOR HAS ANY FURTHER QUESTIONS ABOUT THE

3    SECOND AMENDMENT, I'D LIKE TO TOUCH ON THE OTHER TWO CLAIMS

4    THAT ARE AT ISSUE VERY BRIEFLY.  THEY HAVE BEEN BRIEFED.

5    REGARDING THE TAKINGS CLAIM, THE SUPREME COURT IN HORNE MADE A

6    DISTINCTION BETWEEN REAL ESTATE AND PERSONAL PROPERTY.  IT'S A

7    DISTINCTION THAT WAS OBSERVED IN THE LUCAS CASE.  AND WHAT THE

8    COURT IN HORNE HELD IS THAT WHEN IT COMES TO A PHYSICAL

9    OCCUPATION OF PRIVATE POSSESSIONS, THERE'S A TAKING REQUIRING

10   JUST COMPENSATION.

11         THE LARGE CAPACITY MAGAZINE BAN HERE IS NOT A

12   PHYSICAL OCCUPATION OF ANY OF THE PLAINTIFFS' OR ANYONE ELSE'S

13   LARGE CAPACITY MAGAZINES BECAUSE THEY CAN DISPOSE OF THEM IN

14   MANY WAYS AND MODIFY THEIR MAGAZINES AND RETAIN TITLE, AND THE

13:13:19  15   COURT IN HORNE MADE CLEAR THAT WITH RESPECT TO REGULATORY

16   TAKINGS, PRIVATE PROPERTY AND -- PRIVATE REAL PROPERTY AND

17   OTHER POSSESSIONS OR CHATTELS ARE TREATED DIFFERENTLY IN A

18   REGULATORY TAKINGS CONTEXT.  AND THIS IS NEITHER A PHYSICAL

19   TAKING NOR A REGULATORY TAKING, AND IT'S NOT A REGULATORY

20   TAKING BECAUSE THE VALUE OF THE LARGE CAPACITY MAGAZINES THAT

21   WERE GRANDFATHERED IS STILL RETAINED.  THEY CAN SELL THEM.

22   THEY CAN KEEP THEM AND MOVE THEM OUT OF STATE.

23         THE COURT:  BUT IF THERE'S NO MARKET FOR THEM.

24         MR. ECHEVERRIA:  THERE IS A MARKET FOR LARGE CAPACITY

25   MAGAZINES OUTSIDE OF THE STATE OF CALIFORNIA.

13:14:01   1           THE COURT:  CAN YOU SHIP AND SELL A LARGE CAPACITY

2    MAGAZINE OUT OF THE STATE OF CALIFORNIA?

3           MR. ECHEVERRIA:  I DON'T KNOW WHAT THE MECHANISM

4    WOULD BE FOR INTERSTATE SALES OF LARGE CAPACITY MAGAZINES.

5           THE COURT:  IF I WAS LOOKING TO BUY A CAR AND I KNEW

6    YOU HAD TO SELL THE CAR, WHAT ARE THE ODDS THAT I WOULD PAY YOU

7    FAIR MARKET VALUE FOR THAT CAR IF I KNEW YOU HAD TO SELL THE

8    CAR.

9           MR. ECHEVERRIA:  YOU MIGHT SELL IT FOR LESS.

10          THE COURT:  NO, YOU WOULD SELL IT FOR LESS, A LOT

11   LESS.

12          MR. ECHEVERRIA:  BUT THAT IS STILL NOT A REGULATORY

13   TAKING, YOUR HONOR.  THE REGULATORY TAKING'S JURISPRUDENCE

14   INDICATES THAT THE REDUCTION IN VALUE HAS TO BE BASICALLY

13:14:41  15   COMPLETE.

16          THE COURT:  YOU MEAN NO VALUE.  IS THERE ANY EVIDENCE

17   THERE WOULD BE ANY VALUE TO THESE MAGAZINES IF THEY --

18          MR. ECHEVERRIA:  WELL, THE PLAINTIFFS BEAR THE BURDEN

19   ON THEIR TAKINGS CLAIM AND THEIR DUE PROCESS CLAIM ON A MOTION

20   FOR SUMMARY JUDGMENT, AND THEY'VE PRESENTED NO EVIDENCE.  AND

21   THEIR BRIEFING DIDN'T REALLY ADDRESS THE REGULATORY TAKINGS

22   ARGUMENT MUCH.  I THINK THERE WAS A FOOTNOTE THAT MENTIONED A

23   REGULATORY TAKING.

24          AND AGAIN, I REITERATE THAT THE EASTERN DISTRICT OF

25   CALIFORNIA WIESE VERSUS BECERRA, JUDGE SHUBB GRANTED A MOTION

13:15:15   1    TO DISMISS AND DENIED A MOTION FOR PRELIMINARY INJUNCTION ON A

2    VERY SIMILAR TAKINGS THEORY TO CALIFORNIA'S POSSESSION BAN.

3    AND JUST YESTERDAY IN RUPP VERSUS BECERRA, JUDGE STATON IN THE

4    CENTRAL DISTRICT GRANTED A MOTION TO DISMISS A VERY SIMILAR

5    TAKINGS THEORY WITH RESPECT TO ASSAULT WEAPONS THAT WERE UNABLE

6    TO BE REGISTERED UNDER THE NEW ASSAULT WEAPONS RESTRICTIONS.

7         SO JUST TO CONCLUDE ON THE TAKINGS, SECTION 32310

8    SUBDIVISION C AND D, DO NOT AFFECT THE TAKING.  THEY WERE

9    LEGITIMATE EXERCISE OF THE STATE'S POLICE POWER IN BANNING

10   DANGEROUS FIREARMS THAT HAD BEEN DECLARED, AS YOUR HONOR

11   OBSERVED IN YOUR ORDER ON THE PRELIMINARY INJUNCTION, HAD BEEN

12   DECLARED A PUBLIC NUISANCE SUBJECT TO SEIZURE AND CONFISCATION

13   BY LAW ENFORCEMENT.

14         AND FINALLY, WITH RESPECT TO THE SUBSTANTIVE DUE

13:16:08  15   PROCESS CLAIM, THERE IS NO MERIT TO THE CLAIM THAT THE

16   POSSESSION BAN VIOLATES ANY SUBSTANTIVE DUE PROCESS RIGHTS AS

17   THE ATTORNEY GENERAL HAS LAID OUT IN ITS BRIEFING.  A RATIONAL

18   BASIS SCRUTINY EFFECTIVELY APPLIES TO A SUBSTANTIVE DUE PROCESS

19   ANALYSIS, AND HERE, THE STATE HAS PRESENTED A SIGNIFICANT AND

20   SUBSTANTIAL AND IMPORTANT GOVERNMENT INTEREST, WE'D SAY A

21   COMPELLING GOVERNMENT INTEREST -- IN THE PREVENTION AND

22   MITIGATION OF PUBLIC MASS SHOOTINGS AND VIOLENCE AGAINST LAW

23   ENFORCEMENT, AND CLOSING THE POSSESSION LOOPHOLE IS RATIONALLY

24   RELATED TO THAT INTEREST BECAUSE IT HELPS LAW ENFORCEMENT

25   ENFORCE EXISTING LARGE CAPACITY MAGAZINE RESTRICTIONS.  AND

13:16:49   1  THAT WAS SET FORTH IN BLAKE GRAHAM'S DECLARATION.

2          ADDITIONALLY, THE POSSESSION BAN ON LARGE CAPACITY

3  MAGAZINE BANS IS NOT RETROACTIVE.  I KNOW THE PLAINTIFF IS

4  TRYING TO CHARACTERIZE THIS IS A RETROACTIVE STATUTE.  BUT IT

5  IS NOT RETROACTIVE.  IT PROSPECTIVELY CRIMINALIZES CONDUCT

6  WHERE INDIVIDUALS DECIDE NOT TO DISPOSE OF THEIR LARGE CAPACITY

7  MAGAZINES OR MODIFY THEM.  ONLY THEN WILL ANY OF THE

8  INDIVIDUALS WHO OWN GRANDFATHERED LARGE CAPACITY MAGAZINES BE

9  SUBJECT TO CRIMINAL PENALTIES.  SO THERE'S NO RETROACTIVE

10  EFFECT IMPOSED ON THEM UNDER THE POSSESSION BAN.

11          THE COURT:  WHEN THE ORIGINAL BAN WAS PASSED, WHEN

12  WAS THAT?  IN 2000?

13          MR. ECHEVERRIA:  2000.

14          THE COURT:  IN 2000.  IF THE CITIZENS OF THE STATE IN

13:17:49  15  2000 HAD BEEN TOLD THAT THIS LAW IS GOING TO BECOME EFFECTIVE,

16  IT'S NOT GOING TO HAVE A GRANDFATHER CLAUSE, WE'RE NOT GOING TO

17  ALLOW YOU TO KEEP THAT WHICH YOU ALREADY HAVE, WE'RE GOING TO

18  MAKE YOU DISPOSSESS YOURSELF OF IT --

19          MR. ECHEVERRIA:  OR MODIFY IT.

20          THE COURT:  -- OR MODIFY IT, DO YOU THINK THAT THE

21  REACTION TO THE LAW MIGHT HAVE BEEN DIFFERENT?

22          MR. ECHEVERRIA:  I DON'T KNOW.  I CAN'T PREDICT --

23          THE COURT:  WHY DO YOU THINK THEY PUT THE GRANDFATHER

24  CLAUSE IN, IN THE FIRST PLACE?

25          MR. ECHEVERRIA:  IT WAS LIKELY A POLITICAL

13:18:45  1    COMPROMISE.  THAT'S WHAT HAPPENS WITH --

        2         THE COURT:  WHAT'S A POLITICAL COMPROMISE?  WHAT'S

        3    THE POINT OF THE POLITICAL COMPROMISE?  TO GARNER SUPPORT?

        4         MR. ECHEVERRIA:  YEAH, TO HELP PASS THE LAW, TO BUILD

        5    COALITIONS.

        6         THE COURT:  SO IN ESSENCE, WHAT HAPPENED WAS IN 2000

        7    PEOPLE WERE ESSENTIALLY MISLEAD INTO SUPPORTING A LAW THAT

        8    LATER ON, A FEW YEARS LATER, THE STATE WOULD SAY, WELL, NOW WE

        9    GOT THIS PASSED, THIS IS GREAT, BUT NOW WE'RE GOING TO TAKE

       10    AWAY THE GRANDFATHER CLAUSE.

       11         MR. ECHEVERRIA:  I WOULD DEFINITELY NOT AGREE WITH

       12    YOUR HONOR'S CHARACTERIZATION THAT ANY PARTICULAR LEGISLATORS

       13    WHO WERE MISLEAD IN THE ENACTMENT OF SP-23.  BACK IN THE YEAR

       14    2000, THERE WERE PUBLIC MASS SHOOTINGS THAT LED TO THE PUBLIC

13:19:39 15    OUTCRY, THAT LED TO THE FEDERAL ASSAULT WEAPONS BAN AND LED TO

       16    CALIFORNIA'S ENACTMENT OF SP-23; BUT OVER THE PAST 15 TO 16

       17    YEARS, THERE'S BEEN EVEN MORE PUBLIC MASS SHOOTINGS INVOLVING

       18    LARGE CAPACITY MAGAZINES.  SO EVEN IF THE COMPROMISE WOULD HAVE

       19    NOT BEEN POSSIBLE BACK IN 2000, THE FACTS HAVE CHANGED AND

       20    CIRCUMSTANCES HAVE CHANGED AND OVER 60 PERCENT OF THE

       21    CALIFORNIA ELECTORATE VOTED FOR PROPOSITION 63.  THAT'S HOW

       22    DEMOCRACY WORKS.  THAT'S HOW INCREMENTAL LEGISLATION HAPPENS.

       23         THE COURT:  OKAY.

       24         MR. ECHEVERRIA:  SO THE ATTORNEY GENERAL WOULD URGE

       25    YOUR HONOR TO DENY THE MOTION FOR SUMMARY JUDGMENT AND THE

13:20:23   1   MOTION FOR PARTIAL SUMMARY JUDGMENT.  THE LARGE CAPACITY

2   MAGAZINE BAN AND THE POSSESSION BAN IS CONSTITUTIONAL.  THEY'RE

3   NOT ENTITLED TO JUDGMENT AS A MATTER OF LAW, AND AT A MINIMUM,

4   THEY'RE ISSUES FOR TRIAL, AND THIS COURT MUST DENY THE MOTION

5   FOR SUMMARY JUDGMENT AT THIS STAGE.

6           THE COURT:  NOW IT'S KIND OF INTERESTING.  I NOTED

7   THAT THE GOVERNMENT -- THE GOVERNMENT, I'M SORRY -- THE STATE

8   DID NOT FILE A MOTION FOR SUMMARY JUDGMENT.

9           MR. ECHEVERRIA:  THAT'S CORRECT, YOUR HONOR.

10           THE COURT:  OKAY.

11           MR. ECHEVERRIA:  THE ATTORNEY GENERAL --

12           THE COURT:  SO I ASSUME THAT YOU WOULD CONCEDE THEN,

13   THAT BASED ON THE STATE OF THE EVIDENCE, THAT GIVEN THAT THE

14   STATE HAS NOT FILED A MOTION FOR SUMMARY JUDGMENT IN ITS FAVOR,

13:21:17  15   THAT IF I WERE TO DENY THE MOTION FOR SUMMARY JUDGMENT THAT'S

16   PRESENTLY BEING GRANTED, MY PRELIMINARY INJUNCTION ORDER WOULD

17   CONTINUE TO REMAIN IN EFFECT, AND WE WOULD NEXT MOVE FORWARD TO

18   SOME SORT OF TRIAL OR EVIDENTIARY HEARING; CORRECT?

19           MR. ECHEVERRIA:  THAT'S MY UNDERSTANDING OF WHAT

20   WOULD HAPPEN, YOUR HONOR.  THE STATE DID NOT MOVE TO SUMMARY

21   JUDGMENT.  SO IF THE COURT DENIES THE MOTION FOR SUMMARY

22   JUDGMENT, THE CASE WOULD PROCEED, AND THE PRELIMINARY

23   INJUNCTION WOULD REMAIN IN EFFECT ABSENT SOME OTHER ACTION FROM

24   A HIGHER COURT.

25           THE COURT:  ABSENT THE COURT OF APPEALS TELLING ME

13:21:52   1   THAT I'M ALL WET.  I GOT IT.  THEY WOULD USE MUCH BETTER

2   LANGUAGE THAN THAT.  I THINK THEIR LANGUAGE WOULD BE A LITTLE

3   DIFFERENT.

4            MR. ECHEVERRIA:  ABSOLUTELY.

5            THE COURT:  ALL RIGHT.  THANK YOU.

6            MR. ECHEVERRIA:  THANK YOU, YOUR HONOR.

7            THE COURT:  ALL RIGHT.  SO I'VE PEPPERED

8   MR. ECHEVERRIA ENOUGH.  LET'S SEE IF MAYBE I CAN GIVE YOU EQUAL

9   OPPORTUNITY.

10            MS. BARVIR:  JUST PLEASE REMEMBER I'M WEARING HEELS.

11   SO IT'S A LITTLE HARDER FOR ME TO STAND HERE QUITE AS LONG AS

12   MY OPPOSING COUNSEL.  ANYWAY, I JUST WANT TO SAY A FEW THINGS

13   AND KIND OF IN RESPONSE TO THE DISCUSSION THAT WE JUST HEARD

14   AND TO CLOSE UP FOR A LITTLE BIT.

13:22:30  15            I THINK THE FIRST THING I WANT TO MENTION IS THAT I

16   THINK IT WAS REALLY CLEAR THAT THE STATE IS CLAIMING OVER AND

17   OVER AGAIN -- IT'S ASKING THIS COURT TO APPLY INTERMEDIATE

18   SCRUTINY, THAT, YOU KNOW, IT'S NOT RATIONAL BASIS REVIEW, WE'RE

19   LOOKING AT INTERMEDIATE SCRUTINY HERE.

20            BUT SITTING HERE TODAY, IT SOUNDS MORE LIKE THEY'RE

21   SEEKING A TOOTHLESS FORM OF INTERMEDIATE SCRUTINY, MORE AKIN TO

22   RATIONAL BASIS REVIEW, ONE WHERE IT'S ASKING THIS COURT TO

23   AFFORD SUBSTANTIAL DEFERENCE TO THESE PREDICTIVE JUDGMENTS,

24   THESE POLICY JUDGMENTS THAT THE LEGISLATURE AND THE PEOPLE MADE

25   IN PROP 63 AND THE TWIN BILLS THAT WENT THROUGH THE LEGISLATURE

13:23:09  1    AND SEEMINGLY ASKING THE COURT TO VIEW ITS EVIDENCE WITH AN

2    UNCRITICAL EYE.  BUT THIS IS A REALLY IMPORTANT CASE, YOUR

3    HONOR.  THIS IS --

4              THE COURT:  THAT DOESN'T CHANGE HOW I VIEW THE

5    EVIDENCE.

6              MS. BARVIR:  I THINK THAT'S RIGHT.  I THINK THE STATE

7    IS ASKING YOU TO KIND OF ACCEPT WHAT IT'S PUT FORWARD AND WHAT

8    IT'S SAYING HERE TODAY.  BUT WHEN YOU REALLY LOOK WITH A

9    CRITICAL EYE AT THE EVIDENCE THAT'S PRESENTED BY THE STATE, IT

10   DOES NOT BEAR OUT THE FAIR RELATIONSHIP THAT IS REQUIRED UNDER

11   INTERMEDIATE SCRUTINY FOR THE LAW TO BE DEEMED

12   CONSTITUTIONAL.

13             THE COURT:  LOOK, ALMOST EVERY COURT -- NOT ALMOST --

14   EVERY COURT THAT HAS LOOKED AT THIS ISSUE HAVE ALL BASICALLY

13:23:58  15   SAID IT'S CONSTITUTIONAL.  IT PASSES SCRUTINY, THE INTERMEDIATE

16   SCRUTINY TEST.  WHAT MAKES THIS ANY DIFFERENT?  WHY SHOULD I

17   SWIM UP AGAINST -- RUN AGAINST THE HEARD, IF YOU WILL?  WHAT IS

18   IT ABOUT THIS CASE AND THE STATE OF THE EVIDENCE IN THIS CASE

19   THAT MAKES IT ANY DIFFERENT THAN OTHER CASES?

20             MS. BARVIR:  WELL, I THINK FIRST AND FOREMOST, IN

21   THIS CIRCUIT WE DON'T HAVE A FINAL JUDGMENT FROM A COURT OF

22   APPEALS FROM THE NINTH CIRCUIT THAT'S BASED ON MSJ THAT'S BASED

23   ON ALL THE EVIDENCE --

24             THE COURT:  DO YOU THINK THE OUTCOME IS GOING TO BE

25   ANY DIFFERENT?

114

13:24:48   1          MS. BARVIR:  IN THE NINTH?

2          THE COURT:  YES.

3          MS. BARVIR:  IT DEPENDS ON THE PANEL I GUESS.  I

4  DON'T KNOW.  WE'LL SEE.  I HOPE THE ANSWER WOULD BE DIFFERENT

5  BECAUSE I THINK A JUDGE WHO'S LOOKING AT THIS INDEPENDENTLY CAN

6  REVIEW THE EVIDENCE AND REALLY SEE THAT NONE OF THOSE CASES

7  HAVE SHOWN ANYTHING THAT'S DIFFERENT HERE.  THEY'VE JUST COME

8  TO A POTENTIALLY POLITICAL DECISION.  ULTIMATELY, WE HAVE HERE,

9  COMING FROM HELLER, IS THAT WHEN WE'RE TALKING ABOUT FIREARMS

10  THAT ARE COMMONLY PROTECTED BY LAW-ABIDING CITIZENS -- THAT IS,

11  THAT THEY ARE WITHIN THE SCOPE OF THE SECOND AMENDMENT -- THERE

12  ARE THINGS THAT THE STATE CAN DO.  BUT FLATLY BANNING THE

13  ACQUISITION AND POSSESSION OF THEM IS A POLICY JUDGMENT THAT'S

14  OFF THE TABLE.  THAT COMES FROM HELLER.

13:25:26  15          THE COURT:  WE'RE ALREADY PAST THE ACQUISITION.

16  THAT'S BEING CHALLENGED SOMEWHERE ELSE APPARENTLY.  WE'RE NOW

17  TALKING ABOUT POSSESSION.

18          MS. BARVIR:  THAT'S BEING CHALLENGED HERE AS WELL,

19  YOUR HONOR.  REMEMBER, AT THE MPI STAGE, THE PLAINTIFFS ONLY

20  CHALLENGED THE POSSESSION BAN BECAUSE IT WAS THE ONE THAT WAS

21  ABOUT TO GO INTO EFFECT.  THERE WAS THE IRREPARABLE HARM --

22          THE COURT:  OKAY.  OKAY.  GOT IT.

23          MS. BARVIR:  SO YES, THE ACQUISITION IS PART OF THIS

24  DISCUSSION.  IT'S COMPLETELY FLATLY BANNING THE USE OF THESE

25  PROTECTED ITEMS BY THE HAND -- IN THE HANDS AND HOMES OF

13:25:58   1    LAW-ABIDING CITIZENS.  THAT IS A POLICY JUDGMENT THAT IS NOT

           2    ENTITLED TO THE SUBSTANTIAL DEFERENCE THAT THE STATE IS ASKING

           3    FOR HERE.

           4              THE COURT:  AND WHY NOT?

           5              MS. BARVIR:  WHAT'S THAT?

           6              THE COURT:  AND WHY NOT?

           7              MS. BARVIR:  BECAUSE IT'S NOT LIKE -- THE STATE HAD

           8    MENTIONED A CASE LIKE CHOVAN WHERE WE WERE TALKING ABOUT

           9    WHETHER OR NOT A -- I THINK IT WAS A MISDEMEANANT, DOMESTIC

          10    VIOLENT MISDEMEANANT COULD GET HIS FIREARMS RIGHTS BACK.  THOSE

          11    KINDS OF THINGS, THESE REGULATIONS, THESE RESTRICTIONS ON

          12    CERTAIN TYPES OF PEOPLE, NOT LAW-ABIDING CITIZENS AND OTHER

          13    CASES LIKE THAT.  BUT WHAT WE'RE TALKING ABOUT HERE IS A CASE

          14    OF A FLAT BAN ON WHAT PLAINTIFFS ARGUE IS PROTECTED ARMS, THESE

13:26:36  15    MAGAZINES OVER 10 ROUNDS.

          16              AND JUST LIKE THE COURT IN HELLER DID, BY FINDING

          17    THAT IT WAS A POLICY JUDGMENT TAKEN OFF THE TABLE FOR THE

          18    DISTRICT OF COLUMBIA TO BAR HANDGUNS EVEN THOUGH THEY'RE MORE

          19    THAN 80 PERCENT OF THE TIME USED BY CRIMINALS WHEN THEY'RE

          20    COMMITTING THEIR CRIMES, THAT IS NOT A DECISION -- THAT DOESN'T

          21    COME INTO PLAY.  WHAT MATTERS IS THAT THEY'RE USED

          22    OVERWHELMINGLY BY THE LAW ABIDING.  YOU JUST CAN'T BAN THEM.

          23    THE STATE DOESN'T HAVE THE POWER TO SAY, WELL, THERE'S THIS

          24    OTHER THING OVER HERE YOU CAN USE THAT MIGHT BE APPROPRIATE IN

          25    SELF-DEFENSE OR MIGHT BE ENOUGH IN SELF-DEFENSE; SO WE CAN

13:27:13  1  PREVENT YOU FROM USING SOMETHING YOU'VE CHOSEN AND IS WIDELY

2  CHOSEN BY PEOPLE IN THIS COUNTRY FOR SELF-DEFENSE.

3          I CAN'T EXPLAIN WHY COURTS ARE FINDING SOMETHING

4  COMPLETELY CONTRARY TO THAT BECAUSE HELLER IS CRYSTAL CLEAR ON

5  THIS POINT.  UNLESS YOUR HONOR HAS ANY MORE QUESTIONS ABOUT THE

6  SECOND AMENDMENT, I'D LIKE TO TALK BRIEFLY ABOUT THE TAKINGS

7  CLAIM AND WHAT HAPPENED IN RUPP YESTERDAY, AND OF COURSE,

8  WIESE.  MAY I?

9          THE COURT:  YEAH, GO AHEAD.  I GOT SOMETHING I WANT

10  TO ASK YOU ABOUT THE SECOND AMENDMENT, BUT RIGHT NOW IT JUST

11  SUDDENLY SLIPPED MY MIND.

12          MS. BARVIR:  WE CAN GO BACK, OF COURSE.  IT'S UP TO

13  YOU.  YOU HEARD COUNSEL TALKING ABOUT THE DECISION THAT CAME

14  DOWN IN RUPP YESTERDAY.  OF COURSE, THAT DEALT WITH ASSAULT

13:27:59  15  WEAPONS REGISTRATION AND THE STATE'S NEXT GENERATION OF ASSAULT

16  WEAPONS REGULATIONS.  I THINK IT'S REALLY IMPORTANT AGAIN TO

17  RECOGNIZE THAT THE SECOND AMENDMENT CLAIM WAS ONLY ON A MOTION

18  FOR PRELIMINARY INJUNCTION.  SO ON THE RECORD AS IT STOOD, IT

19  WASN'T CLEAR THAT PLAINTIFFS HAD MET THEIR BURDEN, BUT THAT'S

20  NOT BEEN DECIDED FINALLY AT THIS POINT.

21          WHEN IT COMES TO THE MOTION TO DISMISS ON THE TAKINGS

22  CLAIM, WHICH HAD TO DO WITH THE -- THE DOJ'S REQUIREMENT THAT

23  PEOPLE BE ABLE TO ESTABLISH I THINK IT WAS THE DATE AND SOURCE

24  OF WHEN THEY ACQUIRED THE FIREARM AND WHERE THEY ACQUIRED IT

25  FROM -- THE ASSAULT WEAPON -- THE COURT FOUND IT WAS NOT A

13:28:43  1    TAKING.  BUT THE ANALYSIS THAT THE COURT PRESENTED IN RUPP JUST

        2    LIKE IN WEIS WHICH WAS HANDED DOWN JUST A LITTLE BIT BEFORE

        3    THIS COURT ISSUED ITS OPINION ON OUR MOTION FOR PRELIMINARY

        4    INJUNCTION IN JUNE 2017 IS THE EXACT OPPOSITE LEGAL CONCLUSION

        5    THAT THIS COURT MADE IN 2017 AS TO THE TAKINGS CLAIM IN THIS

        6    CASE.

        7                THERE'S BEEN NO NEW LEGAL DISCUSSION THAT THE STATE

        8    HAS PUT FORWARD AND NO NEW FACTUAL EVIDENCE THAT EITHER SIDE

        9    HAS PUT FORWARD THAT SHOULD CHANGE WHAT THIS COURT FOUND ALMOST

       10    A YEAR AGO.  I THINK THE TAKINGS CLAIM IS A CLEAR FLAT LEGAL

       11    QUESTION.  IT'S VERY CLEAR THAT THIS IS THE QUINTESSENTIAL

       12    PHYSICAL TAKING.  THE NINTH CIRCUIT IN RICHMOND ELKS HALL TELLS

       13    US THAT A PHYSICAL TAKING CAN IN FACT OCCUR WHEN THE GOVERNMENT

       14    ITSELF DOES NOT TAKE PHYSICAL POSSESSION OR TITLE OR EVEN USE

13:29:28 15    OF THE PROPERTY.  WHAT WE'RE TALKING ABOUT IS WHETHER OR NOT

       16    IT'S BEING -- IF THE TAKING OF THE PROPERTY IS FURTHERING A

       17    PUBLIC PURPOSE, AND THAT'S FROM THE U.S. SUPREME COURT CASE

       18    HAWAII HOUSING AUTHORITY.

       19                AS TO THIS IDEA THAT BECAUSE IT'S AN EXERCISE OF THE

       20    POLICE POWER THE STATE IS ABLE TO EFFECT A TAKING WITHOUT

       21    COMPENSATION, THAT'S DEMONSTRATIVELY WRONG.  THE SUPREME COURT

       22    CASES, LAREDO AND LUCAS TELL US OTHERWISE.

       23                THE COURT:  I'M SORRY.  WHAT WAS THAT CASE?

       24                MS. BARVIR:  LAREDO AND LUCAS, I BELIEVE.

       25                THE COURT:  YEAH.  ALL RIGHT.

13:30:03   1            MS. BARVIR:  SO AND IN ALL EVENTS, PLAINTIFF LOVETTE

           2   WHO IS THE REMAINING PLAINTIFF WHO CURRENTLY OWNS LARGE

           3   CAPACITY MAGAZINES AND UNTOLD NUMBERS OF MEMBERS OF THE

           4   CALIFORNIA RIFLE AND PISTOL ASSOCIATION ARE ENTITLED TO JUST

           5   COMPENSATION FOR THEIR DISPOSSESSION OF THESE PARTICULAR

           6   PROTECTED ARMS.  THE AG DOES NOT DISPUTE THAT THE GOVERNMENT

           7   MUST PAY IF THERE'S A PHYSICAL TAKING.  32310 DOES NOT PROVIDE

           8   FOR ANYTHING, LET ALONE ON JUST COMPENSATION; AND AGAIN, THE

           9   ABILITY TO SELL TO A THIRD PARTY WHEN THE MARKET HAS BEEN

          10   ARTIFICIALLY DESTROYED IS NOT SUFFICIENT TO ENSURE JUST

          11   COMPENSATION IN OR EVEN OUTSIDE OF THE STATE.

          12            AND ALSO, ASIDE FROM OUTSIDE OF THE STATE, EVEN IF

          13   IT'S AN AVAILABLE AVENUE TO SELL OUTSIDE OF THE STATE, IT'S NOT

          14   APPROPRIATE TO SAY THAT THE STATE SHOULD BE ABLE TO RELY ON THE

13:30:51  15   PERMISSIVE LAWS OF OTHER JURISDICTIONS, NEARBY JURISDICTIONS IN

          16   OTHER STATES, TO JUSTIFY ITS OWN PHYSICAL TAKING WITHOUT

          17   COMPENSATION.

          18            WITH THAT SAID, I WOULD LIKE TO ASK THE COURT IF IT

          19   HAS ANY OTHER QUESTIONS.  I'M HAPPY TO ANSWER THEM.  IF NOT, I

          20   WOULD ASK THIS COURT TO REVIEW THE EVIDENCE ONCE MORE, GRANT

          21   PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, AT LEAST IN THE

          22   ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT ON THE DUE PROCESS AND

          23   TAKINGS CLAIMS.

          24            THE COURT:  OKAY.  LET ME -- THANK YOU. I THANK YOU

          25   BOTH.  BY THE WAY, I THINK YOU BOTH HAVE DONE A WONDERFUL JOB.

13:31:31   1   MR. ECHEVERRIA, YOU STOOD UP TO MY WHIP-SAWING YOU FOR A LONG

2   PERIOD OF TIME THIS MORNING, AND I REALLY, REALLY APPRECIATE

3   IT.   IT'S A SERIOUS CASE, SOME SERIOUS ISSUES.   I THINK I CAN

4   ANSWER THE QUESTION OF WHY IT IS THAT JUDGES ALMOST ALWAYS

5   UPHOLD THE STATE'S RESTRICTIONS.   WHO WANTS TO BE THE JUDGE

6   WHO -- BY THE WAY, I CAN TELL YOU THAT I RECEIVE MAIL REGULARLY

7   -- WELL, NOT SO MUCH ANYMORE -- PEOPLE TELLING ME THE BLOOD OF

8   THESE CHILDREN WILL BE ON YOUR HANDS AND COMMENTS LIKE THAT.

9   WHO WANTS TO BE THE JUDGE WHO ALLOWS PEOPLE TO CONTINUE TO OWN

10   LARGE CAPACITY MAGAZINES OR ASSAULT WEAPONS OR MACHINE GUNS OR

11   WHATEVER WHO WAKES UP IN THE MORNING AND FINDS OUT THAT SOME

12   OTHER DERANGED PERSON OR SOME TERRORIST HAS KILLED A BUNCH OF

13   YOUNG KIDS OR INNOCENT CHILDREN.

14           MY CONCERN, MY CONCERN IS THIS:   THE BILL OF RIGHTS

13:32:42   15   WASN'T ADOPTED BECAUSE THERE WAS SOME PEOPLE SITTING IN SOME

16   THEORETICAL ROOM SOMEWHERE STROKING THEIR CHIN AND GOING:

17   WELL, I'M GOING TO THINK BIG THOUGHTS TODAY.   AND YEAH, I GOT

18   AN IDEA.   HEY, I TELL YOU WHAT.   LET'S DO THIS.   LET'S PASS AN

19   AMENDMENT THAT SAYS THAT THE GOVERNMENT WILL NOT DISARM THE

20   POPULATION.   YEAH, THAT'S A GOOD IDEA.

21           THAT'S NOT WHY IT HAPPENED AT ALL.   IT HAPPENED

22   BECAUSE THESE PEOPLE HAD JUST LIVED, THEY HAD JUST LIVED

23   THROUGH AN EXPERIENCE WHERE THE GOVERNMENT, THE VERY GOVERNMENT

24   -- MR. ECHEVERRIA, YOU'RE HERE REPRESENTING THE STATE -- THE

25   VERY GOVERNMENT THAT WAS SUPPOSED TO PROTECT ITS CITIZENS WAS

13:33:39    1    IN FACT ABUSING ITS CITIZENS, AND IT WAS DOING IT ALL UNDER THE

            2    PRETENSE OF LAW.

            3            TAKE, FOR EXAMPLE, THE FOURTH AMENDMENT.  THE FOURTH

            4    AMENDMENT, THEY WERE USING SOMETHING CALLED THE WRIT OF

            5    ASSISTANCE IN ORDER TO COME INTO PEOPLE'S HOUSE WITHOUT

            6    PROBABLE CAUSE AND TO SEARCH AND ARREST AND HAUL PEOPLE AWAY.

            7    PEOPLE VERY OFTEN FORGET THAT THE FIRST BATTLE OF THE

            8    REVOLUTIONARY WAR WAS FOUGHT ON APRIL -- I BELIEVE IT WAS APRIL

            9    19TH, 1775.  AND IT WAS FOUGHT, WHY?  BECAUSE THE GOVERNMENT

           10    DECIDED IT WAS GOING TO DISARM, IN THE INTEREST OF THE PUBLIC,

           11    IT WAS GOING TO DISARM THE PUBLIC, THE COLONISTS.  AND THEY

           12    MARCHED UPON LEXINGTON AND CONCORD TO DISARM THE POPULATION.

           13            AND SO WHEN THEY WERE DRAFTING THE BILL OF RIGHTS,

           14    THESE PEOPLE WHO HAD JUST LIVED THROUGH THIS EXPERIENCE -- THIS

13:34:41   15    WASN'T THEORETICAL.  IT WASN'T HYPOTHETICAL.  IT WASN'T SOME

           16    BIG THINK TANK MOVEMENT.  THEY LIVED THROUGH THIS, AND THEY

           17    DECIDED, YOU KNOW, THERE'S CERTAIN THINGS THAT WE WANT TO TELL

           18    THE GOVERNMENT THAT THEY CANNOT DO.  YOU CAN DO A LOT OF

           19    THINGS.  YOU CAN TELL PEOPLE YOU CAN'T DRIVE CARS WITH TINTED

           20    WINDOWS.  YOU CAN TELL PEOPLE THAT YOU HAVE TO HAVE A GFCI IN

           21    YOUR BATHROOM AND EVERY OTHER 20 FEET.  YOU CAN TELL ME YOU

           22    MUST WEAR A SEATBELT.  NONE OF THOSE THINGS ARE PROTECTED BY

           23    THE BILL OF RIGHTS.

           24            BUT THE PEOPLE WHO FOUNDED THIS COUNTRY -- WHO IN MY

           25    OPINION WERE SOME OF THE SMARTEST PEOPLE EVER ON THE FACE OF

13:35:33   1   THE PLANET -- CAME UP WITH THIS IDEA, CAME UP WITH THIS

2   EXPERIMENT, AND THEY WERE VERY MUCH AFRAID, VERY MUCH AFRAID

3   THAT THEY MIGHT PERHAPS BE FACING IN THE FUTURE THE VERY SAME

4   THING THEY JUST LIVED THROUGH, AND THEY DIDN'T WANT THAT TO

5   HAPPEN.  THEY DID NOT WANT TO THE GOVERNMENT TO TELL THEM WHAT

6   THEY COULD DO AND WHAT THEY COULD NOT DO WITH REGARDS TO

7   CERTAIN THINGS.

8         NOW WE UNDERSTAND, REALLY, WE UNDERSTAND, OF COURSE,

9   THAT IN THE REAL WORLD, YOU CAN'T HAVE A FIRST AMENDMENT

10   WITHOUT RESTRICTIONS, AND YOU CAN'T HAVE A FOURTH AMENDMENT

11   WITHOUT RESTRICTIONS.  BUT JUST THINK ABOUT HOW MANY LIVES

12   COULD BE SAVED IF WE SIMPLY SAID:  FOURTH AMENDMENT, THAT'S A

13   NICE THOUGHT, BUT YOU KNOW WHAT, WE'RE JUST NOT GOING TO.

14   THERE'S A GREATER PUBLIC INTEREST IN ALLOWING LAW ENFORCEMENT

13:36:31   15   TO BARGE INTO PEOPLE'S HOUSE AND SEARCH THEIR HOUSES WITHOUT

16   PROBABLE CAUSE.  FIFTH AMENDMENT.  THINK OF HOW MANY MORE

17   CRIMES COULD BE SOLVED, HOW MANY PEOPLE COULD BE SAVED IF WE

18   COULD COERCE CONFESSIONS FROM PEOPLE.  YEAH, FIFTH AMENDMENT,

19   YOU KNOW, IT'S A GREAT IDEA, BUT THE PUBLIC INTEREST OUTWEIGHS

20   PEOPLE HAVING THE RIGHT TO NOT INCRIMINATE THEMSELVES.

21         SO I THINK THIS IS VERY, VERY DIFFICULT BECAUSE WHO

22   WANTS TO SEE CHILDREN BEING SHOT AND KILLED OR OTHER PEOPLE

23   BEING SHOT OR LAW ENFORCEMENT BEING SHOT.  BUT SIMPLY BECAUSE

24   WE DON'T WANT THAT TO HAPPEN DOESN'T MEAN THAT THE STATE GETS

25   TO HAVE ITS WAY HOWEVER IT WANTS, WHENEVER IT WANTS, UNDER SOME

13:37:26   1   RUBRIC THAT, WELL, YOU KNOW, IT'S A REASONABLE FIT.  BECAUSE,

           2   AS I ASKED MR. ECHEVERRIA OVER AND OVER AND OVER AGAIN, WHEN IS

           3   IT NOT A REASONABLE FIT?  HOW DO WE MAKE THAT DECISION?

           4            AND MY QUESTION IS: ARE WE NOT THERE?  LOOK AT ALL OF

           5   THE LAWS, ALL OF THE REGULATIONS.  I'VE LOOKED AT ALL THIS

           6   EVIDENCE, AND FRANKLY, WITH ALL OF THE GUN LAWS THAT WE HAVE,

           7   AND WE HAVE MANY, MANY, MANY, MANY, HAVE WE REALLY DONE

           8   ANYTHING AT ALL TO SOLVE THE GUN VIOLENCE PROBLEM IN THE UNITED

           9   STATES?  AND THE ANSWER IS NO.  NO.  WE JUST KEEP WHITTLING

          10   AWAY AT THE SECOND AMENDMENT, KEEP WHITTLING AWAY, WHITTLING

          11   AWAY UNTIL EVENTUALLY WE'LL GET TO THE POINT WHERE WE'LL BE

          12   WHERE PEOPLE ARE ALLOWED TO OWN ONE GUN WITH ONE ROUND OF

          13   AMMUNITION BECAUSE ANYTHING ELSE BEYOND THAT WILL BE A

          14   REASONABLE FIT.

13:38:35  15            THOSE ARE MY PRELIMINARY THOUGHTS.  BUT I'M NOT FIXED

          16   ON THAT.  WHAT I'D LIKE FOR YOU TO DO -- AND AGAIN, I THINK YOU

          17   BOTH HAVE DONE A WONDERFUL JOB REPRESENTING YOUR RESPECTIVE

          18   POSITIONS AND ANSWERING MY QUESTIONS.  BUT WHAT I'D LIKE FOR

          19   YOU TO DO IS I'D LIKE FOR YOU TO FILE -- YOU SORT OF HEARD MY

          20   CONCERNS.  AND YOU HEARD -- YOU OBVIOUSLY KNOW THE THINGS THAT

          21   TROUBLE ME.  YOU KNOW THE THINGS THAT MR. ECHEVERRIA HAS NOW

          22   ARGUED TO ME AND THE EVIDENCE THEY'VE ARGUED.  MR. ECHEVERRIA

          23   KNOWS YOUR POSITION.

          24            I'D LIKE FOR YOU TO, WITHIN THE NEXT 30 DAYS, TO FILE

          25   A BRIEF BRIEF.  I DON'T WANT TO DECIMATE ANY MORE SMALL

```
13:39:36   1   FORESTS.  OKAY?  IF YOU CAN KEEP IT DOWN TO 25 PAGES OR LESS,
           2   SUMMARIZE YOUR POSITION, TRY TO ANSWER SOME OF MY QUESTIONS IF
           3   YOU CAN, CITATIONS TO CASES AND SPECIFIC CITATIONS TOO.  SO
           4   DON'T JUST TELL ME, DX 29.  TELL ME, DX 29, LINE 5 THROUGH 17
           5   OR WHATEVER SO I CAN GO BACK AND LOOK AT IT AND TRY AND SEE
           6   WHETHER OR NOT IT ACTUALLY SUPPORTS WHAT IT IS THAT YOU'RE
           7   SAYING.
           8           IF YOU CAN DO THAT WITHIN THE NEXT 30 DAYS, AND THEN
           9   I'LL GIVE YOU 10 DAYS TO FILE A RESPONSE TO EACH OTHER'S.
          10   OKAY.  AND THEN I'M GOING TO TAKE THE MATTER UNDER SUBMISSION,
          11   AND THEN I'LL DECIDE ONE WAY OR THE OTHER.  UNLESS EITHER ONE
          12   OF YOU HAVE ANYTHING ELSE YOU WISH TO OFFER, I THANK YOU BOTH
          13   FOR PRESENTING YOUR CASES AS WELL AS YOU HAVE.  AND AGAIN, I
          14   UNDERSTAND IT'S A DIFFICULT, IT'S A DIFFICULT CHOICE.  BUT I
13:40:57  15   GUESS THAT'S WHAT THEY PAY ME THE BIG BUCKS FOR.  RIGHT?  SO
          16   I'LL DO MY BEST AND THEN OF COURSE --
          17           MR. ECHEVERRIA:  ONE CLARIFYING QUESTION, YOUR
          18   HONOR.
          19           THE COURT:  SURE.
          20           MR. ECHEVERRIA:  FOR THE SUPPLEMENTAL BRIEFING, IS
          21   THIS GOING TO BE FOCUSED EXCLUSIVELY ON THE SECOND AMENDMENT
          22   CLAIM?  I GOT THE IMPRESSION THAT IS THE CASE.
          23           THE COURT:  I THINK SO.  I THINK IT'S A DIFFICULT  --
          24   THE OTHER ISSUE, AS EVIDENCED BY THE AMOUNT OF TIME THAT YOU
          25   BOTH SPENT ON THE OTHER ISSUE, I THINK THE SECOND AMENDMENT
```

13:41:26  1   ISSUE IS THE MOST DIFFICULT ISSUE.  SO I WOULD PREFER THAT YOU

2   DO THAT.

3           MR. ECHEVERRIA:  ABSOLUTELY.

4           THE COURT:  ALL RIGHT.  IS THERE ANYTHING ELSE?

5           MS. BARVIR:  I DON'T HAVE ANYTHING.

6           THE COURT:  ANY QUESTIONS?

7           MR. ECHEVERRIA:  NO, YOUR HONOR.

8           THE COURT:  IF NOT, THANK YOU VERY MUCH.  YOU ALL

9   TAKE CARE.  THIS HEARING IS CONCLUDED.

10           (MATTER CONCLUDED.)

11               C-E-R-T-I-F-I-C-A-T-I-O-N

12

13          I HEREBY CERTIFY THAT I AM A DULY APPOINTED, QUALIFIED
AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED STATES
14   DISTRICT COURT; THAT THE FOREGOING IS A TRUE AND CORRECT
TRANSCRIPT OF THE PROCEEDINGS HAD IN THE AFOREMENTIONED CAUSE;
15   THAT SAID TRANSCRIPT IS A TRUE AND CORRECT TRANSCRIPTION OF MY
STENOGRAPHIC NOTES; AND THAT THE FORMAT USED HEREIN COMPLIES
16   WITH THE RULES AND REQUIREMENTS OF THE UNITED STATES JUDICIAL
CONFERENCE.

17          DATED: MAY 16, 2018, AT SAN DIEGO, CALIFORNIA.

18

19              /S/ JULIET Y. EICHENLAUB
                  JULIET Y. EICHENLAUB, RPR, CSR
20              OFFICIAL COURT REPORTER
                  CERTIFIED SHORTHAND REPORTER NO. 12084

21

22

23

24

25