1  XAVIER BECERRA
   Attorney General of California
2  State Bar No. 118517
   MARK R. BECKINGTON
3  Supervising Deputy Attorney General
   State Bar No. 126009
4  ANTHONY P. O'BRIEN
   Deputy Attorney General
5  State Bar No. 232650
   JOHN D. ECHEVERRIA
6  Deputy Attorney General
   State Bar No. 268843
7    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013
8    Telephone:  (213) 269-6249
     Fax:  (213) 897-5775
9    E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Attorney General*
10 *Xavier Becerra*

11              IN THE UNITED STATES DISTRICT COURT

12            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **VIRGINIA DUNCAN, RICHARD**          17-cv-1017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
17  **DAVID MARGUGLIO,**                  **DEFENDANT'S SUPPLEMENTAL**
    **CHRISTOPHER WADDELL, and**          **BRIEF IN OPPOSITION TO**
18  **CALIFORNIA RIFLE & PISTOL**         **PLAINTIFFS' MOTION FOR**
    **ASSOCIATION, INC., a California**   **SUMMARY JUDGMENT OR,**
    **corporation,**                      **ALTERNATIVELY, PARTIAL**
19                                        **SUMMARY JUDGMENT**

20                       Plaintiffs,      Date:        April 30, 2018
                                          Time:        10:30 a.m.
21              v.                        Judge:       Hon. Roger T. Benitez
                                          Courtroom:   5A
22  **XAVIER BECERRA, in his official**   Action Filed:  May 17, 2017
    **capacity as Attorney General of the**
23  **State of California; and DOES 1-10,**

24              Defendants.

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................. 3

I.    Large-Capacity Magazines Are Not Protected Under the Second Amendment. .................................................................................. 3

    A.    Large-Capacity Magazines Have Been Subject to Longstanding Regulation. .................................................. 3

    B.    Large-Capacity Magazines Are Most Suitable in Military Service. ............................................................................... 6

    C.    Large-Capacity Magazines Are Not Protected Under the Second Amendment Despite Its Original Purpose of Preserving the Militia. ........................................................ 10

        1.    Section 32310 Does Not Amount to Disarmament. ........ 11

        2.    The Original Purposes for Ratifying the Second Amendment Do Not Expand the Scope of the Second Amendment to Cover Large-Capacity Magazines. ............................................................ 12

II.    Section 32310 Satisfies Intermediate Scrutiny. .................................. 14

    A.    The Record Demonstrates that Section 32310 Is Substantially Related to Important Government Interests. ...... 15

        1.    LCMs Are Exceptionally Dangerous Firearm Accessories. ............................................................. 16

        2.    LCMs Are Disproportionately Used in Gun Violence. ................................................................ 18

        3.    Section 32310 Has the Potential to Reduce the Use of LCMs in Gun Crime. .................................. 19

        4.    Section 32310 Is Reasonably Tailored to the Government's Important Interests. ................................ 21

    B.    Plaintiffs' Counter Evidence Does Not Undermine the Constitutionality of Section 32310. .................................. 22

    C.    Slippery-Slope Concerns Cannot Invalidate Section 32310. ................................................................... 24

CONCLUSION ......................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page**

Cᴀsᴇs

*Bauer v. Becerra*
    858 F.3d 1216 (9th Cir. 2017) ............................................................... 14

*Caetano v. Massachusetts*
    136 S. Ct. 1027 (2016) ................................................................... 9, 13

*Chafin v. Chafin*
    568 U.S. 165 (2013) .......................................................................... 24

*Colo. Outfitters Ass'n v. Hickenlooper*
    24 F. Supp. 3d 1050 (D. Colo. 2014) ................................................ 23

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ...................................................................*passim*

*Friedman v. City of Highland Park, Ill.*
    784 F.3d 406 (7th Cir. 2015) ................................................... 9, 13, 15

*Fyock v. Sunnyvale*
    25 F. Supp. 3d 1267 (N.D. Cal. 2014) .............................................. 22

*Fyock v. Sunnyvale*
    779 F.3d 991 (9th Cir. 2015) .......................................................*passim*

*Heller v. District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011) ...................................................*passim*

*Jackson v. City & Cnty. of S.F.*
    746 F.3d 953 (9th Cir. 2014) .......................................................*passim*

*Kachalsky v. Cnty. of Westchester*
    701 F.3d 81 (2d Cir. 2012) ............................................................... 22

*Kolbe v. Hogan*
    849 F.3d 114 (4th Cir. 2017) (en banc) ........................................*passim*

*Martin v. Hunter's Lessee*
    14 U.S. 304 (1816) ............................................................................ 24

ii

*McDonald v. City of Chi., Ill.*
    561 U.S. 742 (2010) ............................................................... 10, 11, 14

*N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo*
    804 F.3d 242 (2d Cir. 2015) ................................................ 12, 15, 19, 25

*Panhandle Oil Co. v. Knox*
    277 U.S. 218 .................................................................................. 24

*Peruta v. Cty. of San Diego*
    824 F.3d 919 (9th Cir. 2016) (en banc) ........................................... 3

*S.F. Veteran Police Officers Ass'n v. City & Cnty. of S.F.*
    18 F. Supp. 3d 997 (N. D. Cal. 2014) ............................................. 15

*Silvester v. Harris*
    843 F.3d 816 (9th Cir. 2016) ............................................... 4, 5, 25

*Turner Broad. Sys., Inc. v. FCC*
    512 U.S. 622 (1994) ..................................................................... 16

*Turner Broad. Sys., Inc. v. FCC*
    520 U.S. 180 (1997) ..................................................................... 15

*United States v. Chovan*
    735 F.3d 1127 (9th Cir. 2013) ......................................................... 3

*United States v. Miller*
    307 U.S. 174 (1939) ............................................................ 8, 9, 10

*Wiese v. Becerra*
    263 F. Supp. 3d 986 (E.D. Cal. 2017) ............................................ 21

*Worman v. Healey*
    293 F. Supp. 3d 251 (D. Mass. 2018) ............................................... 7

**STATUTES**

California Statutes
    1933 Cal. Stat. 1170 ...................................................................... 5
    1965 Cal. Stat. 913 ........................................................................ 5

# TABLE OF AUTHORITIES
### (continued)

Page

California Penal Code
    § 16740(a) .................................................................................. 12
    § 32310 .................................................................................. *passim*
    § 32400 .................................................................................. 22
    § 32405 .................................................................................. 22
    § 32435 .................................................................................. 22
    § 32445 .................................................................................. 22

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. II .................................................................... *passim*

OTHER AUTHORITIES

Alan Blinder, *Waffle House Shooting Suspect Is in Custody, Nashville Police Say*, N.Y. Times, Apr. 23, 2018 .......................................... 17

Brent J. McIntosh, *The Revolutionary Second Amendment*, 51 Ala. L. Rev. 673 (2000) .......................................................................... 12, 13

Eric Ruben & Joseph Blocher, *From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 Duke L.J. 1433 (2018) .................................................................... 25

Frederick Schauer, *Slippery Slopes*, 99 Harv. L. Rev. 361 (1985) .......................... 24

Eugene Volokh, *The Mechanisms of the Slippery Slope*, 116 Harv. L. Rev. 1026 (2003) .................................................................... 25

Eugene Volokh, Are Laws Limiting Magazine Capacity to 10 Rounds Constitutional?, The Volokh Conspiracy, Mar. 6, 2014

**INTRODUCTION**

Plaintiffs are not entitled to judgment on their Second Amendment claim.[1] Under the Ninth Circuit's two-step analysis for Second Amendment claims, which asks (1) "whether the challenged law burdens conduct protected by the Second Amendment," and (2) if so, whether the law satisfies the applicable level of scrutiny, *Fyock v. Sunnyvale*, 779 F.3d 991, 996 (9th Cir. 2015) (quoting *United States v. Chovan*, 735 F.3d 1127, 1136 (9th Cir. 2013)), Plaintiffs' Second Amendment claim fails at the first step. Large-capacity magazines ("LCMs") fall outside the historical scope of the Second Amendment because they have been subject to longstanding regulation, and "[w]hatever their other potential uses," LCMs are "unquestionably most useful in military service." *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017) (en banc), *cert. denied*, 138 S. Ct. 469 (2017). The Second Amendment's original purpose of, *inter alia*, preserving the citizens' militia as a safeguard against government overreach, *see District of Columbia v. Heller*, 554 U.S. 570, 599 (2008); Hearing Tr. at 120:14-122:7, does not undermine the conclusion that LCMs fall outside of its historical scope. The Supreme Court has made clear that the Second Amendment does not protect civilian access to military-grade firearms and accessories merely because they may be useful, or even necessary, in contemporary militia service. *Heller*, 554 U.S. at 624-25, 627.

Even if LCMs are entitled to some degree of Second Amendment protection, Section 32310 satisfies the applicable level of scrutiny—intermediate scrutiny—at

---

[1] At the conclusion of the May 10, 2018 hearing on Plaintiffs' Motion, the Court requested supplemental briefing on Plaintiffs' Second Amendment claim, including responses to the Court's observations concerning the historical purposes of the Second Amendment and the application and limits of intermediate scrutiny in the context of magazine-capacity restrictions. *See* May 10, 2018 Tr. of Mot. Hr'g ("Hearing Tr.") at 123:24-124:7. Therefore, this supplemental brief is focused solely on the constitutionality of California Penal Code Section 32310 under the Second Amendment. Capitalized terms used but not defined herein shall be given the same meaning ascribed to them in Defendant's Opposition to Plaintiffs' Motion for Summary Judgment or, Alternatively, Partial Summary Judgment (the "Opposition" or "Opp'n") (Dkt. No. 53).

1

the second step of the Court's analysis.  Section 32310 is substantially related, and reasonably tailored, to the State's important governmental interests in preventing public mass shootings and gun violence against law enforcement and, critically, in mitigating the lethality of such incidents in the tragic event that they occur.  The State's evidence, including empirical studies of mass shootings and the expert opinions of Dr. Christopher Koper, John Donohue, and Lucy Allen, is substantially identical to the evidence presented in support of the LCM-possession ban at issue in *Fyock v. Sunnyvale*, which the Ninth Circuit characterized as "precisely the type of evidence that [the government] was permitted to rely upon to substantiate its interest" and to demonstrate a reasonable fit "under the lens of intermediate scrutiny."  *Fyock*, 779 F.3d at 1001.

A 10-round magazine-capacity limit is plainly constitutional, as the Ninth Circuit indicated in *Fyock*, 779 F.3d at 1000-01, and as every court has held on the merits, *see, e.g.*, *Heller v. District of Columbia*, 670 F.3d 1244, 1260-64 (D.C. Cir. 2011) ("*Heller II*").  This Court's concern that upholding a 10-round limit in this case may lead to more onerous capacity-based restrictions in the future—*e.g.*, a slippery slope resulting in "people [being] allowed to own one gun with one round of ammunition," Hearing Tr. at 123:9-14—can be addressed under the existing two-step Second Amendment framework if a future restriction amounts to a severe burden on the core Second Amendment right.  In any event, the fact that some future, hypothetical limitation on magazine capacity may raise constitutional concerns does not undermine the validity of an otherwise constitutional law.

For these reasons, and those discussed in Defendant's Opposition, Section 32310 does not violate the Second Amendment.

**ARGUMENT**

**I.** **LARGE-CAPACITY MAGAZINES ARE NOT PROTECTED UNDER THE SECOND AMENDMENT.**

The Second Amendment provides, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. The prefatory clause of the Second Amendment declares the historical purpose of the Second Amendment (*i.e.*, why it was ratified in 1791), while the operative clause secures the right to keep and bear arms (*i.e.*, the right that is protected today). *Heller*, 554 U.S. at 577. Notwithstanding the prefatory clause's statement of purpose, the operative clause protects a right to keep and bear arms in common use for lawful purposes like self-defense. *Heller*, 554 U.S. at 627; *Chovan*, 735 F.3d at 1133. It is not "a right to keep and carry any weapon whatsoever in any matter whatsoever and for whatever purpose." *Heller*, 554 U.S. at 626. Nor is it a right "to carry arms for *any sort* of confrontation." *Id.* at 595; *see also Peruta v. Cty. of San Diego*, 824 F.3d 919, 928 (9th Cir. 2016) (en banc) ("The Court in *Heller* was careful to limit the scope of its holding."), *cert. denied sub nom. Peruta v. California*, 137 S. Ct. 1995 (2017). At the first step of the Court's Second Amendment analysis, Section 32310 does not "burden[] conduct that was within the scope of the Second Amendment as historically understood." *Chovan*, 735 F.3d at 1134 (quoting *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010)).

**A.** **Large-Capacity Magazines Have Been Subject to Longstanding Regulation.**

Plaintiffs' Second Amendment claim fails at the first step of the Court's analysis because firearms with heightened capacities have been subject to longstanding regulation since the 1920s. *See Fyock*, 779 F.3d at 997 (noting that LCM possession ban would be presumptively lawful at step one of the Second Amendment framework "if the record contain[s] evidence that large-capacity

3

magazines have been the subject of longstanding, accepted regulation"). In *Fyock*, the Ninth Circuit observed that, "[a]lthough not from the founding era, these early twentieth century regulations might nevertheless demonstrate a history of longstanding regulation if their historical prevalence and significance is properly developed in the record." *Id.*

The record in this case reflects that firearms have been regulated on the basis of firing capacity since the 1920s. *See* Pls.' Mem of P. & A. in Supp. of Pls.' Mot. for Summ. J. or, Alternatively, Partial Summ. J. ("Pls.' Mem.") (Dkt. No. 50-1) at 10:15-12:8; Opp'n at 4:19-5:18; Br. of Amicus Curiae Law Center to Prevent Gun Violence in Supp. of Def.'s Opp'n to Pls.' Mot. for a Prelim. Inj. (Dkt. No. 16) at 18:20-21:10; Br. of Amicus Curiae Everytown for Gun Safety in Supp. of Def.'s Opp'n to Pls.' Mot. for Summ. J. or, Alternatively, Partial Summ. J. ("Everytown *Amicus*") (Dkt. 56) at 5:19-7:17. These early twentieth century regulations are "longstanding" even though they "cannot boast a precise founding-era analogue." *Fyock*, 779 F.3d at 997 (quoting *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012)); *see also Silvester v. Harris*, 843 F.3d 816, 831 (9th Cir. 2016) (Thomas, J., concurring) (noting that firearm restrictions "need not mirror limits that were on the books in 1791" (quoting *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010))). And they are also longstanding even though they were adopted by relatively few jurisdictions. *See id.* (noting that "waiting-period statutes have existed in *several* states since the 1920s" and citing just three jurisdictions as evidence of longstanding regulation (emphasis added)).

In 1932, the U.S. Congress enacted a ban in the District of Columbia on weapons capable of firing 12 rounds or more without reloading. *See* Opp'n at 12:11-15. As Plaintiffs acknowledge, the District of Columbia is a "jurisdiction with an arguably longstanding restriction on magazine capacity." Pls.' Mem. at 12:1-3. One year after the federal government enacted the D.C. ban, California

enacted its own capacity-based restrictions in 1933 when it amended the Machine Gun Law of 1927 to apply to "all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device *having a capacity of greater than ten cartridges*." 1933 Cal. Stat. 1170, § 3 (emphasis added) (codified at former Penal Code § 12200); *see also* Everytown *Amicus* at 6:18-7:1.[2]

Other jurisdictions have even limited firing capacity to fewer than 10 rounds of ammunition: South Dakota (five rounds), Virginia (seven rounds), Illinois (eight rounds), Louisiana (eight rounds), and South Carolina (eight rounds). *See* Opp'n at 4:27-5:12. Of these jurisdictions, the South Dakota and Virginia restrictions applied explicitly to semiautomatic firearms, while the Illinois, Louisiana, and South Carolina restrictions were ambiguous as to whether they applied only to automatic firearms. *See* DX-25 (excerpts of Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017) ("Spitzer Article")) at 903-04 (tables of state laws barring semiautomatic weapons from 1927-1934). Even if these restrictions were later repealed, they confirm that the Second Amendment was not historically understood to protect firearms with heightened firing capacities.

Statutes imposing higher limits on firing capacity (*e.g.*, Michigan, Rhode Island, Ohio, and the District of Columbia) or firing-capacity restrictions in the context of machine-gun bans are also relevant. In demonstrating that LCMs have been subject to longstanding regulation, the State is not required to cite a precise 10-round limitation on magazines used only in semiautomatic weapons. *See Silvester*, 843 F.3d at 831-32 (Thomas, J., concurring) (citing waiting-period

---

[2] The text of the 1933 amendment to the Machine Gun Law is available at http://clerk.assembly.ca.gov/sites/clerk.assembly.ca.gov/files/archive/Statutes/1933/33Vol1_Chapters.pdf#page=2. In 1965, the reference to firing capacity in former Penal Code § 12200 was removed to conform California's definition of "machine gun" with the federal definition at that time. 1965 Cal. Stat. 913, § 1 (codified at former Penal Code § 12200).

statutes enacted in the 1920s and founding-era laws restricting the storage of gun powder as evidence that 10-day waiting period "is a longstanding regulatory measure").  All of the firing-capacity statutes in the record confirm that firing capacity, and not just the rate of fire, made certain firearms exceptionally dangerous.  Like Section 32310, these capacity-based restrictions were enacted in response to the criminal use of firearms with heightened capacities.  DX-25 (Spitzer Article) at 901 (noting that machine-gun bans were enacted "only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters").

Accordingly, LCMs are not protected under the Second Amendment because they have been subject to longstanding regulation.

### B.  Large-Capacity Magazines Are Most Suitable in Military Service.

Section 32310 does not burden conduct protected by the Second Amendment for the additional reason that they are most suitable for military use and have no reasonable self-defense purpose.  Even if some Second Amendment protection is afforded to firearm magazines generally, *cf. Jackson v. City & Cnty. of S.F.*, 746 F.3d 953, 967-68 (9th Cir. 2014), such protection would not apply to magazines of *any* capacity, *see Fyock*, 779 F.3d at 998 ("[O]ur case law supports the conclusion that there must also be some corollary, *albeit not unfettered*, right to possess the magazines necessary to render [certain] firearms operable." (emphasis added)).  Magazines with capacities in excess of 10 rounds "are most useful in military service" and thus "may be banned."  *Heller*, 554 U.S. at 627; *Kolbe*, 849 F.3d at 136 & n.10 ("[T]he *Heller* Court plainly pronounced that 'weapons that are most useful in military service—M-16 rifles and the like—may be banned' without infringement upon the Second Amendment right." (quoting *Heller*, 554 U.S. at

627)); *accord Worman v. Healey*, 293 F. Supp. 3d 251, 265-66 (D. Mass. 2018) (Young, J.).[3]

LCMs are most useful in military service because they were "meant to 'provide[] soldiers with a large ammunition supply and the ability to reload rapidly'" and thus "enable a shooter to hit 'multiple human targets very rapidly'; 'contribute to the unique function of any assault weapon to deliver extraordinary firepower'; and are a 'uniquely military feature[].'" *Kolbe*, 849 F.3d at 137 (citations omitted).[4] Prior to the Federal Ban, the federal government deemed LCMs to be military accessories without legitimate self-defense or sporting uses. *See, e.g.*, DX-12 (Dep't of the Treasury, *Report and Recommendation of the ATF Working Group on the Importability of Certain Semiautomatic Rifles* (1989)) at 540 ("[L]arge capacity magazines are indicative of military firearms. While detachable magazines are not limited to military firearms, most traditional semiautomatic sporting firearms, designed to accommodate a detachable magazine, have a relatively small magazine capacity."); DX-13 (Dep't of the Treasury, *Study on the Sporting Suitability of Modified Semiautomatic Assault Rifles* (1998)) at 558 (referring to "large capacity *military* magazines" (emphasis added)). Conversely,

---

[3] LCMs fall outside the historical scope of the Second Amendment even if they are not "dangerous and unusual." In holding that LCMs are most useful in military service, the Fourth Circuit did not evaluate whether LCMs are "dangerous *and* unusual" or "dangerous *or* unusual." *Kolbe*, 849 F.3d at 135-36; *see also id.* at 131 n.9 ("Although the *Heller* Court invoked Blackstone for the proposition that 'dangerous and unusual' weapons have historically been prohibited, Blackstone referred to the crime of carrying 'dangerous *or* unusual weapons.'" (quoting 4 Blackstone 148-49 (1769))). "'[T]he [*Heller*] Court did not elaborate on what being 'dangerous and unusual' entails," and thus the Fourth Circuit determined that it would be "prudent and appropriate to simply rely on the Court's clear pronouncement that there is no constitutional protection for weapons that are . . . 'most useful in military service,' without needlessly endeavoring to define the parameters of 'dangerous and unusual weapons.'" *Id.* at 136 n.10.

[4] Certain firearms and accessories may have been developed initially for use on the battlefield but may be equally, if not more, useful for self-defense purposes and thus protected under the Second Amendment. While the handgun is useful in military service, it has been deemed "the quintessential self-defense weapon." *Heller*, 554 U.S. at 629. LCMs, by contrast, were developed for military use, *see* PX-2 (Helsley Report) at 31-32 (discussing transition of LCMs from military to law enforcement to civilians), and have little self-defense utility.

7

the record confirms that LCMs have little (if any) utility in self-defense scenarios. *See* DX-1 (Expert Report of Lucy P. Allen ("Allen Report")) at 10-15 (finding that, on average, approximately 2 rounds are fired in self-defense); *accord Fyock*, 779 F.3d at 1000 (noting that the *Fyock* record "contained studies indicating that most defensive gun use incidents involved fewer than ten rounds of ammunition").

The very qualities that make LCMs uniquely dangerous and thus constitutionally regulable under intermediate scrutiny, *see* Section II.A.1, *infra*, render them most useful in military service. In *Heller*, the Supreme Court made clear that weapons most useful in military service may be banned. *Heller*, 554 U.S. at 627. The Court framed the issue in the form of an if-then hypothetical: "It may be objected that if weapons that are most useful in military service . . . may be banned, then the Second Amendment right is completely detached from the prefatory clause." *Id.* While the Court used an if-then hypothetical to frame the potential objection, *see* Hearing Tr. at 50:20-25 (describing this sentence as a "rhetorical device" and a "straw man"), the Court affirmed that military-style weapons may be banned by clarifying that the consequence is of no constitutional concern because the "degree of fit between the prefatory clause and the protected right" is not relevant to defining the scope of the right. *Heller*, 554 U.S. at 627. In other words, weapons that are most useful in military service may be banned irrespective of the prefatory clause.

This interpretation is consistent with the *Heller* Court's treatment of *United States v. Miller*, 307 U.S. 174 (1939). In *Miller*, the Court held that the Second Amendment did not protect a right to keep and bear a short-barreled shotgun "[i]n the absence of any evidence tending to show that possession or use of a [short-barreled shotgun] at this time has some *reasonable relationship to the preservation or efficiency of a well regulated militia*." *Miller*, 307 U.S. at 178 (emphasis added); *see also id.* ("Certainly it is not within judicial notice that this weapon is any part of the *ordinary military equipment* or that its use could contribute to the common

defense." (emphasis added)). In rejecting the argument that the Second Amendment protects only weapons that are reasonably related to militia service— the argument made by proponents of the collective right interpretation rejected by the majority in *Heller*—the *Heller* Court clarified that *Miller* merely stands for the proposition that the Second Amendment "extends only to certain types of weapons," *Heller*, 554 U.S. at 623, and that it "does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes," *id.* at 625.

The Court made clear that firearms may fall outside the scope of the Second Amendment right notwithstanding *Miller*'s reference to firearms that bear "some reasonable relationship to the preservation or efficiency of a well regulated militia" or are "part of the ordinary military equipment." *Heller*, 554 U.S. at 624-25. The Court stated that it "would be a startling reading of [*Miller*]" to conclude that "only those weapons useful in warfare are protected" because, if that were the holding of *Miller*, that "would mean that the National Firearms Act's restrictions on machineguns (not challenged in *Miller*) might be unconstitutional, machineguns being useful in warfare in 1939." *Id.* at 624; *see also Caetano v. Massachusetts*, 136 S. Ct. 1027, 1028 (2016) (noting that "*Heller* rejected the proposition 'that only those weapons useful in warfare are protected'" (citation omitted)).[5] Thus, even under *Miller*, machine guns are not protected under the Second Amendment, even if they are useful in warfare or militia service. *See Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 408 (7th Cir. 2015) ("*Heller* deemed a ban on private possession of machine guns to be *obviously* valid." (quoting *Heller*, 554 U.S. at 624) (emphasis added)). The Court characterized *Miller*'s reference to "ordinary military equipment" as merely referring to "arms 'in common use at the time' for

---

[5] The Court found this reading of *Miller* to be startling not because it would exclude from Second Amendment protection weapons that may *also* be commonly used for self-defense (*i.e.*, that the Second Amendment does not "only" protect military weapons), *see* Hearing Tr. at 53:10-13, but because such a reading would extend Second Amendment protection to military weapons in addition to weapons commonly used for self-defense, *Heller*, 554 U.S. at 624.

lawful purposes like self-defense," because those were the types of arms that able-bodied men were expected to bring to militia service at the time of ratification. *Heller*, 554 U.S. at 624 ("We think that *Miller*'s 'ordinary military equipment' language must be read in tandem with what comes after: '[O]rdinarily when called for [militia] service [able-bodied] men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time.'" (quoting *Miller*, 307 U.S. at 179)).[6] Therefore, neither *Heller* nor *Miller* extend Second Amendment protection to weapons most suitable for military purposes, even if those weapons would be necessary to serve effectively in a militia today.

Because LCMs are most useful in military service, they are not protected by the Second Amendment, and Plaintiffs' Second Amendment claim fails.

### C. Large-Capacity Magazines Are Not Protected Under the Second Amendment Despite Its Original Purpose of Preserving the Militia.

According to *Heller*, the Second Amendment was ratified to preserve a "well regulated Militia," which was "necessary to the security of a free State" because the militia, among other things, ensured that "able-bodied men of [the] nation [were] trained in arms and organized" and thus "better able to resist tyranny." *Heller*, 554 U.S. at 597-98. The founders were concerned that the new government might attempt to disarm political opposition, as English kings had between the Restoration and the Glorious Revolution and in the years preceding the Revolutionary War. *See Heller*, 554 U.S. at 593-94; *McDonald v. City of Chi., Ill.*, 561 U.S. 742, 768-69 (2010). The Second Amendment was ratified in the context of this history to

---

[6] While this Court has suggested that *Miller* may have extended Second Amendment protection to weapons useful in militia service, *see* Prelim. Inj. Order at 14:13-22 ("*Miller* implies that possession by a law-abiding citizen of a weapon that could be part of the ordinary military equipment for a militia member, or that would contribute to the common defense, is protected by the Second Amendment."); *id.* at 38:8-15 (suggesting that 100-round drum magazine "may be the type of weapon that would be protected by the Second Amendment for militia use under *Miller*"), *Heller* made clear that the usefulness of a firearm in present-day militia service is irrelevant to whether it is protected by the Second Amendment.

ensure that the citizens' militia would not be disarmed.  *See id.* at 770; Hearing Tr. at 120:14-122:7.  Section 32310 does not offend this original purpose and, in any event, the original purpose for enacting the Second Amendment does not define its scope.

### 1. Section 32310 Does Not Amount to Disarmament.

The Second Amendment codified a right to keep and bear arms, in part, to address "the threat that the new Federal Government would destroy the citizens' militia by taking away their arms."  *Heller*, 554 U.S. at 599.  But Section 32310 does not, by its terms or in conjunction with any other provision of the Penal Code, disarm anyone.  Section 32310 does not limit the number of magazines capable of holding 10 rounds or less that Californians may lawfully possess for self-defense.  *See Fyock*, 779 F.3d at 999 (noting that LCM possession ban "restricts possession of only a subset of magazines that are over a certain capacity" and that "[i]t does not restrict the possession of magazines in general such that it would render any lawfully possessed firearms inoperable, nor does it restrict the number of magazines that an individual may possess").  At most, firing-capacity restrictions regulate the *manner* in which individuals may exercise their Second Amendment rights.  *See Jackson*, 746 F.3d at 961.  Thus, as every court to have considered LCMs bans has concluded, LCM bans do not amount to disarmament.  *Fyock*, 779 F.3d at 999 (agreeing with the D.C. Circuit that LCM bans do not pose a severe burden on the core Second Amendment right); *Heller II*, 670 F.3d at 1262 (concluding that "prohibition of . . . large-capacity magazines *does not effectively disarm individuals*" (emphasis added)); *Kolbe*, 849 F.3d at 138 ("The FSA bans only certain military-style weapons and detachable magazines, leaving citizens free to protect themselves with a plethora of other firearms and ammunition.").

Nor does the ban on possession in Section 32310(c), as applied to current owners of previously grandfathered LCMs, amount to disarmament.  Such individuals are permitted to maintain possession of grandfathered LCMs so long as

they permanently modify them to hold no more than 10 rounds, which would allow them to use those magazines for lawful purposes including self-defense. § 16740(a). Notably, the *Fyock* case concerned a possession ban that largely mirrors Section 32310(c) and (d), *see Fyock*, 779 F.3d at 994-95 (providing an overview of the Sunnyvale ordinance and its disposal options). Even in the context of that possession ban, the Ninth Circuit refused to characterize the capacity restrictions as disarmament. *Id.* at 999. Similarly, the Second Circuit applied intermediate scrutiny to New York's ban on the possession of LCMs, even though (like Proposition 63) the challenged statute eliminated a grandfather clause for LCMs; New York law had previously exempted LCMs manufactured before 1994 from the LCM ban. *See N.Y.S. Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 249 (2d Cir. 2015) ("*NYSRPA*") (discussing grandfathering under prior law), *cert. denied sub nom. Shew v. Malloy*, 136 S. Ct. 2486 (2016). Because Section 32310 does not amount to disarmament, it is consistent with the original purposes of the ratification of the Second Amendment.

**2. The Original Purposes for Ratifying the Second Amendment Do Not Expand the Scope of the Second Amendment to Cover Large-Capacity Magazines.**

The original purpose of the Second Amendment was to, *inter alia*, preserve a citizens' militia and protect against government tyranny. *See Heller*, 554 U.S. at 599 ("It was understood across the political spectrum that the right [to keep and bear arms] helped to secure the ideal of a citizen militia, which might be necessary to oppose an oppressive military force if the constitutional order broke down."); Brent J. McIntosh, *The Revolutionary Second Amendment*, 51 Ala. L. Rev. 673, 674 (2000) ("The right to bear arms, subsequently enshrined in the Bill of Rights, was intended to check potential abuses by a tyrannical government armed with such a standing army."). Nevertheless, that original purpose does not expand the scope of the Second Amendment to protect civilian access to military-grade weaponry such

as LCMs, even if such magazines might be useful, or indeed necessary, for effective militia service today. *See* Section I.B, *supra*.

At the time of the founding, members of the militia would bring "the sorts of lawful weapons that they possessed at home to militia duty," but today the types of arms commonly possessed for lawful purposes like self-defense are not necessarily the same types of weapons used in the military, giving rise to an increasing gap between the prefatory clause's statement of purpose and the right secured by the Second Amendment. *Heller*, 554 U.S. at 627 (acknowledging "the fact that modern developments have limited the degree of fit between the prefatory clause and the protected right" because "no amount of small arms could be useful against modern-day bombers and tanks"); *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) ("*Heller* acknowledged that advances in military technology might render many commonly owned weapons ineffective in warfare."); *Friedman*, 784 F.3d at 408 ("[The *Heller* Court] observed that state militias, when called to service, often had asked members to come armed with the sort of weapons that were 'in common use at the time' and it thought these kinds of weapons (which have changed over the years) are protected by the Second Amendment in private hands, while military-grade weapons (the sort that would be in a militia's armory), such as machine guns, and weapons especially attractive to criminals, such as short-barreled shotguns, are not."). Advances in firearm technology and military doctrine have reduced the ability of the Second Amendment to fulfill its original purpose, *see* McIntosh, *supra*, at 712 ("[T]he modern world witnessed a terrifying revolution in the means of waging war . . . . For the first time, the same defensive arms presupposed by an individual right of self-defense could not also reserve to the people the collective ability to overthrow an abusive government."), but that reality does not mean that the Second Amendment right expanded to keep pace with those changes, *see Heller*, 554 U.S. at 578 (noting that a prefatory clause's statement of purpose "does not limit or expand the scope of the operative clause").

13

The Second Amendment endures to this day, as it was originally conceived, as an individual right to bear arms in common use for lawful purposes like self-defense. *McDonald*, 561 U.S. at 770 ("By the 1850's, the perceived threat that had prompted the inclusion of the Second Amendment in the Bill of Rights—the fear that the National Government would disarm the universal militia—had largely faded as a popular concern, but the right to keep and bear arms was highly valued for purposes of self-defense."). Thus, despite its military origins, the Second Amendment permits the banning of "weapons that are most useful in military service." *Heller*, 554 U.S. at 627. The Second Amendment does not protect arms simply because they may be useful in present-day militia service, or indeed necessary to resist a tyrannical government. *Id.* Accordingly, the history of the ratification of the Second Amendment and the reasons for its inclusion in the Bill of Rights do not undermine the conclusion that LCMs fall outside the scope of the Second Amendment at the first step of the Court's analysis.

## II.   SECTION 32310 SATISFIES INTERMEDIATE SCRUTINY.

If the Court finds that LCMs fall within the scope of the Second Amendment, it must assess Section 32310 under the appropriate level of scrutiny, which would be intermediate scrutiny, not strict scrutiny.[7] *See Fyock*, 779 F.3d at 999. The Ninth Circuit has determined as a matter of law that intermediate scrutiny applies to LCM bans like Section 32310 because "the prohibition of . . . large-capacity magazines does not effectively disarm individuals or substantially affect their ability to defend themselves." *Fyock*, 779 F.3d at 999 (quoting *Heller II*, 670 F.3d at 1262). Because Section 32310 does not impose a severe burden on any core Second Amendment right, intermediate scrutiny applies here.

---

[7] The Court is free to assume, without deciding, that LCMs are entitled to some level of Second Amendment protection at the first step of the Court's Second Amendment analysis if it finds that Section 32310 satisfies intermediate scrutiny at the second step. *See Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017).

14

Under intermediate scrutiny, the record in this case compels a finding that Section 32310 is substantially related, and reasonably tailored, to important government interests, which "would be achieved less effectively absent the regulation." *Fyock*, 779 F.3d at 1000 (quotation omitted). Indeed, every court to have considered the constitutionality of LCM bans on the merits has concluded that a ban on LCMs satisfies intermediate scrutiny. *See, e.g.*, *NYSRPA*, 804 F.3d at 263-64; *Heller II*, 670 F.3d at 1260-64; *Kolbe*, 849 F.3d at 130-41. *But see Friedman*, 784 F.3d at 410 (upholding municipal LCM ban without determining what level of scrutiny applies). There is nothing materially different in Section 32310 or the present record to distinguish this case from those cases. *See, e.g.*, *S.F. Veteran Police Officers Ass'n v. City & Cnty. of S.F.*, 18 F. Supp. 3d 997, 1003 (N. D. Cal. 2014) (Alsup, J.) (upholding municipal LCM ban based on declarations of Dr. Christopher Koper and Lucy Allen). Consistent with the overwhelming weight of authority, Section 32310 satisfies intermediate scrutiny, and Plaintiffs are not entitled to judgment as a matter of law on their Second Amendment claim.

### A. The Record Demonstrates that Section 32310 Is Substantially Related to Important Government Interests.

Under intermediate scrutiny, the Court does not presume that a challenged statute is unconstitutional, but rather must "accord substantial deference to the predictive judgments of [the legislature or the people]." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 195 (1997). The government bears the burden of persuasion, but is entitled to "rely on any evidence 'reasonably believed to be relevant'" to substantiate its interest and demonstrate a reasonable fit. *Jackson*, 746 F.3d at 969 (quoting *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51-52 (1986)). Additionally, the government may rely on "the legislative history of the enactment as well as studies in the record or cited in pertinent case law." *Id.* at 966 (citing *Chovan*, 735 F.3d at 1140). While the government may not rely on "facially

implausible legislative findings," its evidence need only "fairly support [its] rationale" in enacting the challenged measure. *Id.* (quoting *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality)). The Court's limited role under intermediate scrutiny is to "assure that, in formulating its judgments, [the government] has drawn reasonable inferences based on substantial evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (plurality). The State has amply met its burden under intermediate scrutiny.

### 1. LCMs Are Exceptionally Dangerous Firearm Accessories.

LCMs are uniquely dangerous because they enable a shooter to fire more rounds in a given period of time, which results in more shots fired, more victims wounded, more wounds per victim, and more fatalities. *Kolbe*, 849 F.3d at 137 (noting that LCMs enable a shooter to hit "multiple human targets very rapidly" and "contribute to the unique function of any assault weapon to deliver extraordinary firepower" (quotation omitted)).[8] Dr. Koper testified to this fact, while noting that "victims who receive more than one gunshot wound are substantially more likely to die than victims who receive only one wound." DX-4 (Expert Report of Dr. Christopher S. Koper ("Koper Report")) at 125:13-20. Plaintiffs' experts agreed. *See, e.g.*, DX-7 (Deposition Transcript of Carlisle Moody ("Moody Dep.")) at 472:14-473:17 (testifying that "[f]irearms fitted with large capacity magazines . . . can also result in more rounds fired and more homicides in general than similar firearms with smaller magazines"). Another of Defendant's experts, Lucy Allen, demonstrated that public mass shootings

---

[8] Even when used defensively, a firearm equipped with an LCM poses a danger to innocent bystanders, especially in the hands of an untrained civilian. *See Fyock*, 779 F.3d at 1001 (noting that "defenders using large-capacity magazines are likely to 'keep firing until all bullets have been expended, which poses grave risks to others in the household, passersby, and bystanders'" (quoting *Heller II*, 670 F.3d at 1263-64)); *Kolbe*, 849 F.3d at 127 ("Even in the hands of law-abiding citizens, large-capacity magazines are particularly dangerous. . . . [W]hen inadequately trained civilians fire weapons equipped with large-capacity magazines, they tend to fire more rounds than necessary and thus endanger more bystanders.").

involving LCMs result in an average of 31 fatalities and injuries compared to an average of 9 for public mass shootings without LCMs, based on aggregated data from *Mother Jones*'s and the Citizens' Crime Commission of New York's compilations of public mass shootings. DX-10 (Deposition of Lucy P. Allen ("Allen Dep."), Ex. 7, ¶ 24) at 514-15. Similarly, the Mayors Against Illegal Guns' study of mass shootings between January 2009 and September 2013 found that LCMs and assault weapons, which are often used together, resulted in 151% more people being shot and 63% more deaths than shootings not involving assault weapons or LCMs. DX-17 (Mayors Against Illegal Guns, *Analysis of Recent Mass Shootings* (2013), at 3) at 740. Indeed, Plaintiffs' expert, Gary Kleck, conceded that "large capacity magazines are . . . relatively more likely to show up in cases with larger numbers of victims." DX-8 (Deposition of Gary Kleck ("Kleck Dep.")) at 486:2-5.

One reason why LCMs enhance the lethality of public mass shootings is that they reduce the frequency of reloading or weapon changes, "depriving victims and law enforcement officers of opportunities to escape or overwhelm the shooters while they reload their weapons." *Kolbe*, 849 F.3d at 127; *see also Heller II*, 670 F.3d at 1264 (noting the "critical benefit to law enforcement" of each "2 or 3 second pause" in mass shootings when criminals have to reload). During the Sandy Hook shooting, for instance, nine children were able to escape while the shooter reloaded his rifle, DX-3 (Expert Report of Dr. Louis Klarevas) at 82:14-83:1, and during the Las Vegas shooting, victims "use[d] the pauses in firing . . . to flee the deadly venue before more shots were fired," DX-2 (Expert Rebuttal Report of John J. Donohue, ¶ 23) at 42.[9] Even if a gunman is able to reload a magazine quickly or switch to another weapon after expending a magazine, these pauses can save lives.

---

[9] During the recent mass shooting at a Waffle House in Nashville, Tennessee, a customer "wrestled the rifle away from [the shooter] while he was reloading." Alan Blinder, *Waffle House Shooting Suspect Is in Custody, Nashville Police Say*, N.Y. Times, Apr. 23, 2018, *available at*

In recommending a ban on the possession of LCMs, the commission that examined the Sandy Hook school shooting reported that "[i]t was the consensus of the Commission that firearm lethality [is] *directly correlated to capacity*, a correlation borne out not only in Sandy Hook Elementary School, but in other violent confrontations in and beyond Connecticut." DX-28 (Sandy Hook Advisory Comm'n, Final Report of the Sandy Hook Advisory Commission 67 (2015)) at 1099 (emphasis added). And in enacting Proposition 63, the people of California found that "[m]ilitary-style large-capacity ammunition magazines . . . significantly increase a shooter's ability to kill a lot of people in a short amount of time." DX-27 (The Safety for All Act of 2016, § 2(11)) at 984. The record thus demonstrates that LCMs are uniquely dangerous firearm accessories.

## 2. LCMs Are Disproportionately Used in Gun Violence.

LCMs are disproportionately used in mass shootings and violence against police. *See* DX-20 (Violence Policy Center, *High-Capacity Ammunition Magazines Are the Common Thread Running Through Most Mass Shootings in the United States* (2018)) at 799-807 (cataloguing mass shootings involving LCMs from 1980 to 2017). Using the most current data in the record, Lucy Allen determined that LCMs "were used in the majority of mass shootings since 1982 regardless of how mass shootings with unknown magazine capacity are treated": 65% of public mass shootings with known capacity involved LCMs, and 56% of public mass shootings involved LCMs even if it is assumed that shootings with unknown magazine capacity did not involve LCMs. DX-10 (Allen Dep., Ex. 7, ¶ 22) at 514. Mass shooters often use LCMs to commit their crimes precisely because they inflict maximum damage on as many people as possible. DX-4 (Koper Report) at 125:21-23 (noting evidence "that assault weapons are more

https://www.nytimes.com/2018/04/23/us/waffle-house-shooting-nashville.html. Although there is no indication that this shooting involved an LCM, it is yet another example of the "critical pause" saving lives when a shooter is forced to reload.

attractive to criminals, due to the weapons' military-style features and particularly large magazines"); DX-8 (Kleck Dep.) at 491:6-8 (shooters may acquire LCMs "[b]ecause of the belief, accurate or not, that they can [inflict] more harm if they can fire large numbers of rounds without reloading").

LCMs are also disproportionately used in gun violence against law enforcement. *See Kolbe*, 849 F.3d at 127 (citing "study [that] determined that assault weapons . . . were used in 16% of the murders of on-duty law enforcement officers in 1994, and that large-capacity magazines were used in 31%-41% of those murders"); DX-4 (Koper Report) at 143:21-22 ("For the period of 2009 through 2013, LCM firearms constituted 41% of guns used in murders of police, with annual estimates ranging from 35% to 48%."). The record reflects that LCMs are also widely used in gun crime, not just public mass shootings and the murder of law enforcement. Before the Federal Ban, "guns with LCMs were used in roughly 13-26% of most gun crimes." *Id.* at 130:6-12. And more recent data indicates that "LCM firearms generally accounted for 22-36% of crime guns, with some estimates upwards of 40% for cases involving shootings." *See id.* at 143:13-15. Therefore, the evidence indicates that LCMs are used frequently in public mass shootings and gun crime against law enforcement.

### 3. Section 32310 Has the Potential to Reduce the Use of LCMs in Gun Crime.

The connection between Section 32310 and the State's important government interests is clear: banning LCMs will reduce the number of LCMs in circulation over time and, thus, reduce the prevalence of LCMs in public mass shootings and violence against law enforcement. Dr. Koper testified that "California's LCM ban has the potential to prevent and limit shootings, particularly those involving high numbers of shots and victims, and thus is likely to advance California's interests in protecting its populace from the dangers of such shootings." DX-4 (Koper Report) at 124:13-16; *see also NYSRPA*, 804 F.3d at 264 (crediting Dr. Koper's expert

19

opinion that "it is 'particularly' the ban on large-capacity magazines that has the greatest 'potential to prevent and limit shootings in the state over the long-run'" (footnote omitted)).  In a more recent article, Dr. Koper reviewed the results of a study of high-volume gun crime and explained that "[a] policy implication from this study is that restrictions on LCMs may have greater potential for preventing gunshot [victimizations] than has been previously estimated, especially in urban areas where gun violence is most concentrated."  DX-33 (Christopher S. Koper et al., *Gunshot Victimisations Resulting from High-Volume Gunfire Incidents in Minneapolis: Findings and Policy Implications*, Injury Prevention, Feb. 24, 2018) at 1375-76.

A comprehensive study of the effect of the Federal Ban supports the conclusion that Section 32310 has the potential to reduce the prevalence of LCMs in mass murder.  While the use of LCMs initially remained steady or increased after the Federal Ban went into effect—due in large part to the millions of grandfathered and imported magazines exempted under the Federal Ban—LCM use in crime appeared to be decreasing by the early 2000s, DX-4 (Koper Report) at 140:7-11, and "those effects were still unfolding when the ban expired in 2004," *id.* at 141:5-6.  An investigation by the *Washington Post*, using more current data on the use of LCMs in crime in Virginia, found that, while the Federal Ban was in effect, crime guns equipped with LCMs that were recovered by police declined from between 13% to 16% in 1994 (before the Federal Ban) to a low of 9% by 2004 (the year that the Federal Ban expired), only to climb to 20% by 2010 (just six years later).  *Id.* at 140:12-19.  Section 32310, which is far more robust than the Federal Ban in eliminating grandfathered LCMs, can reasonably be expected to be more effective in reducing LCM use and its consequent harms.  *Id.* at 147:24-148:2.

### 4. Section 32310 Is Reasonably Tailored to the Government's Important Interests.

To survive intermediate scrutiny, the State is not required to demonstrate that Section 32310 "is the least restrictive means of achieving its interest." *Fyock*, 779 F.3d at 1001; *Wiese v. Becerra*, 263 F. Supp. 3d 986 (E.D. Cal. 2017) (Schubb, J.) ("Defendants are not required to show a perfect fit . . . ."). Instead, the State is required to show only that Section 32310 "promotes a 'substantial government interest that would be achieved less effectively absent the regulation.'" *Fyock*, 779 F.3d at 1000 (quoting *Colacurcio v. City of Kent*, 163 F.3d 545, 553 (9th Cir. 1998)). The State has met this burden.

The record indicates that the objectives of Section 32310 would be achieved less effectively absent the LCM ban, particularly the possession ban enacted by Proposition 63. *See* Graham Decl. (Dkt. No. 53-2), ¶¶ 31-32 (discussing the difficulty of enforcing pre-Proposition 63 LCM restrictions without a ban on possession due to the "challenges in identifying legally possessed [grandfathered] magazines"); *accord Wiese*, 263 F. Supp. 3d at 993 (noting that "[t]he prior ban did not prohibit possession, and there was no way for law enforcement to determine which magazines were 'grandfathered' and which were illegally transferred or modified to accept more than ten rounds after January 1, 2000").

Moreover, a limit of 10 rounds is reasonable because it does not severely impair any self-defense interest, as demonstrated by, among other things, Lucy Allen's study of defensive-gun uses. DX-1 (Allen Report) at 10-15 (finding that, on average, two rounds are fired in self-defense); *see also Heller II*, 670 F.3d at 1262 ("[T]he plaintiffs present hardly any evidence that . . . magazines holding more than ten rounds are well-suited to or preferred for the purpose of self-defense or sport."). The exceptions contained in Section 32400 *et seq.* demonstrate that the LCM ban is reasonably tailored to the rationale for the ban, by exempting individuals who may require LCMs in the performance of their official duties or

who may face heightened risks to their safety. *See, e.g.*, §§ 32400, 32405, 32435.[10] Reasonable minds may disagree about the propriety of some of the exemptions or urge the adoption of others, but under intermediate scrutiny, the fit need not be perfect; the government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *Jackson*, 746 F.3d at 969-70 (citation omitted).

**B.    Plaintiffs' Counter Evidence Does Not Undermine the Constitutionality of Section 32310.**

The evidence submitted by the State in defense of Section 32310 is "precisely the type of evidence that [the government is] permitted to rely upon to substantiate its interest" and to demonstrate a reasonable fit "under the lens of intermediate scrutiny." *Fyock*, 779 F.3d at 1001 (citations omitted).  Plaintiffs' counter evidence, on the other hand, does not undermine the law's constitutionality.[11]

Under intermediate scrutiny, even when the record contains conflicting evidence, "[i]t is the legislature's job, not [the court's], to weigh conflicting evidence and make policy judgments." *Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012).[12]  For example, in *Jackson*, the Ninth Circuit found that the plaintiffs failed to establish a likelihood of success on their Second Amendment

[10] The exemption for the film and television industry does not undermine the reasonableness of the fit between Section 32310 and the State's important interests because that exception permits only a *loan* of an LCM "for use *solely* as a *prop* for a motion picture, television, or video production." § 32445 (emphasis added).

[11] In fact, the *Fyock* record contained much of the same counter evidence submitted by Plaintiffs in support of their Motion in this case, including expert declarations of James Curcuruto and Stephen Helsley. *Compare* Declarations of Stephen Helsley & James Curcuruto, *Fyock v. Sunnyvale*, 25 F. Supp. 3d 1267 (N.D. Cal. 2014) (N.D. Cal. No. 13-cv-05807-PJH) (Dkt. Nos. 12, 13), *with* PX-1 (Curcuruto Report), PX-2 (Helsley Report).

[12] The fact that reasonable people may disagree about the wisdom of LCM bans does not render Section 32310 unconstitutional. *See* Eugene Volokh, Are Laws Limiting Magazine Capacity to 10 Rounds Constitutional?, The Volokh Conspiracy, Mar. 6, 2014 (noting that "even if bans on magazines with more than 10 rounds are unwise, not all unwise restrictions are unconstitutional"), *available at* https://www.washingtonpost.com/news/volokh-conspiracy/wp/2014/03/06/are-laws-limiting-magazine-capacity-to-10-rounds-constitutional.

challenge to San Francisco's municipal ban on hollow-point ammunition. The legislative findings in the ordinance explained that hollow-point ammunition is designed to increase damage upon impact, but the plaintiffs argued that these legislative findings were based on "bad science and erroneous assumptions" and that hollow-point ammunition is not more lethal than other types of ammunition. *Jackson*, 746 F.3d at 969. The court found that the plaintiffs' "evidence suggests that the lethality of hollow-point bullets is an *open question*, which is insufficient to discredit San Francisco's reasonable conclusions" under intermediate scrutiny. *Id.* (emphasis added). As in *Jackson*, Plaintiffs' evidence here seeks to counter the State's evidence that LCMs are more dangerous than smaller magazines, but even if that dispute were an "open question" (it is not), intermediate scrutiny permits the Legislature and the People—and not the judiciary—to answer that question and adopt a policy based on "any evidence 'reasonably believed to be relevant.'" *Id.*

Under intermediate scrutiny, it is up to the legislative branch to weigh the evidence and competing inferences from the evidence. *Jackson*, 746 F.3d at 969-70 (noting that the government "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems"). This vindicates important separation-of-powers principles. *See Kolbe*, 849 F.3d at 140 ("The judgment made by the [legislature] in enacting the [LCM ban] is precisely the type of judgment that legislatures are allowed to make without second-guessing by a court."); *Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, 1055 (D. Colo. 2014) ("In crafting gun control laws, it is the role of the legislature to carefully examine each of these concerns, to weigh them against each other, and to create social policy in the form of legislation (or, indeed, to elect not to do so). When the constitutionality of a state law is challenged, however, a court does not engage in the same process. . . . The limited role of the court grows out of the separation of powers among the executive, legislative, and judicial branches of government."), *vacated and remanded for lack of standing*, 823 F.3d 537 (10th

23

Cir. 2016).  In applying intermediate scrutiny, this Court should defer to the

Legislature's and the People's weighing of the evidence in enacting Section 32310.

### C.    Slippery-Slope Concerns Cannot Invalidate Section 32310.

At the May 10 hearing, the Court expressed a concern that Section 32310 may

lead to a slippery slope of more onerous firearm restrictions, such as limiting

individuals to "one gun with one round of ammunition."  Hearing Tr. at 123:9-14;

*see also* Prelim. Inj. Order at 40:14-42:10.  To the extent that the Court is

concerned that some future law may violate the Second Amendment, such slippery-

slope concerns do not undermine the validity of Section 32310.  *See* Frederick

Schauer, *Slippery Slopes*, 99 Harv. L. Rev. 361, 368-69 (1985) ("As a start we can

say that a slippery slope argument necessarily contains the *implicit concession* that

the proposed resolution of the instant case is not itself troublesome.  By focusing on

the consequences for future cases, we implicitly concede that this instance is itself

innocuous, or perhaps even desirable.").  Under Article III, the Court focuses on the

constitutionality of the law at issue in the case, not the possibility of its future abuse

or extension.  *See Martin v. Hunter's Lessee*, 14 U.S. 304, 345 (1816) ("It is always

a doubtful course, to argue against the use or existence of a power, from the

possibility of its abuse."); *Panhandle Oil Co. v. Knox*, 277 U.S. 218, 223 (Holmes,

J., dissenting) ("The power to tax is not the power to destroy while this Court

sits."); *see also Chafin v. Chafin*, 568 U.S. 165, 171 (2013) (noting that Article III

restricts jurisdiction to actual "cases and controversies" and that "[f]ederal courts

may not 'decide questions that cannot affect the rights of litigants in the case before

them' or give 'opinion[s] advising what the law would be upon a hypothetical state

of facts'" (citations omitted)).

Even if Section 32310 would, in fact, increase the likelihood of lower

magazine-capacity restrictions in the future, the existing two-step Second

Amendment framework can address such concerns, even under intermediate

scrutiny.[13]  *See NYSRPA*, 804 F.3d at 264 (holding that the government failed to present "sufficient evidence that a seven-round load limit would best protect public safety" under intermediate scrutiny); *see also* Eric Ruben & Joseph Blocher, *From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 Duke L.J. 1433, 1496 (2018) (reviewing Second Amendment decisions and concluding that, "[c]ontrary to the common assertion, application of intermediate scrutiny has not invariably been fatal to Second Amendment claims"). Perhaps some future, hypothetical magazine-capacity restriction may go too far in burdening the core Second Amendment right, in which case more exacting scrutiny may apply.  *See Silvester*, 843 F.3d at 821 ("A law that implicates the core of the Second Amendment right and *severely burdens* that right warrants strict scrutiny." (emphasis added)).  But here, the undisputed evidence in the record and the overwhelming weight of authority demonstrate that a 10-round limit does not go too far.  Thus, the Court should uphold the capacity restriction presently before it— Section 32310—under intermediate scrutiny.

## CONCLUSION

For these reasons, and those discussed in Defendant's Opposition, Section 32310 does not violate the Second Amendment, and the Court should deny Plaintiffs' Motion.

---

[13] It is far from clear that Section 32310 is susceptible to slippery-slope criticism because the law may make it *less likely* that lower capacity restrictions would be implemented.  *See* Eugene Volokh, *The Mechanisms of the Slippery Slope*, 116 Harv. L. Rev. 1026, 1034 (2003) (examining the mechanisms of slippery slopes and observing that "there are of course mechanisms that may work in the opposite direction, so that decision A may under some political conditions make decision B less likely").

1  Dated:  June 11, 2018                    Respectfully Submitted,

2                                            XAVIER BECERRA
                                             Attorney General of California
3                                            MARK R. BECKINGTON
                                             Supervising Deputy Attorney General
4                                            ANTHONY P. O'BRIEN
                                             Deputy Attorney General
5

6                                            /s/ John D. Echeverria
7

8                                            JOHN D. ECHEVERRIA
                                             Deputy Attorney General
9                                            *Attorneys for Defendant Attorney
                                             General Xavier Becerra*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

Case Name: **Duncan, Virginia et al v. Xavier Becerra**     No.     **17-cv-1017-BEN-JLB**

I hereby certify that on <u>June 11, 2018,</u> I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>June 11, 2018,</u> at Los Angeles, California.


| | |
|---|---|
| Beth Capulong | *[signature]* |
| Declarant | Signature |

SA2017107272
62855457.docx