C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al.,<br><br>               Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>               Defendant. | Case No: 17-cv-1017-BEN-JLB<br><br>**PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date:    April 30, 2018<br>Hearing Time:   10:30 a.m.<br>Judge:          Hon. Roger T. Benitez<br>Courtroom:     5A |

# TABLE OF CONTENTS

**Page**

Table of Contents ...................................................................................... ii

Table of Authorities .................................................................................. iii

Introduction ............................................................................................... 1

Argument ................................................................................................... 1

I.   The Second Amendment Protects Magazines Over Ten Rounds ...................... 2

    A.   Magazines Over Ten Rounds Are Undisputedly in Common Use for Lawful Purposes ................................................................................ 2

    B.   *Heller*'s "Common Use" Test, Not *Kolbe*'s "Military Use" Test Drives Second Amendment Protection ................................................ 4

    C.   In Any Event, the State Has Not Proven that Magazines Over Ten Rounds Are "Most Useful in Military Service" ........................................ 6

II.  Under Heller's Simple Test, Section 32310 Is Constitutionally Suspect ........... 8

III. Section 32310 Is Invalid Under The Ninth Circuit's Tripartite Binary Test ..... 10

    A.   If the Court Selects a Level of Means-End Review, Strict Scrutiny Should Apply ...................................................................................... 11

    B.   Regardless, Section 32310 Fails Even Intermediate Scrutiny ................ 13

        1.   The State's magazine ban is not sufficiently tailored to achieve the state's interest. .......................................................................... 14

        2.   The State's evidence does not establish a reasonable fit between Section 32310 and the State's public safety interests. ................... 18

Conclusion ................................................................................................. 24

**Cases**

*44 Liquormart, Inc. v. Rhode Island,*
    517 U.S. 484 (1996) ......................................................................... 18

*Buckley v. Valeo,*
    424 U.S. 1 (1976) ............................................................................. 14

*Caetano v. Massachusetts,*
    --U.S.--, 136 S. Ct. 1027 (2016) ................................................... 4, 5

*City of Los Angeles v. Alameda Books, Inc.,*
    535 U.S. 425 (2002) ......................................................................... 15

*Clark v. Jeter,*
    486 U.S. 456 (1988) ......................................................................... 11

*Colo. Outfitters Ass'n v. Hickenlooper,*
    24 F. Supp. 3d 1050 (D. Colo. 2014) ............................................... 3

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .............................................................. *passim*

*Edenfield v. Fane,*
    507 U.S. 761 (1993) ......................................................................... 13

*Friedman v. City of Highland Park,*
    --U.S.--, 136 S. Ct. 447 (2015) ....................................................... 8

*Friedman v. City of Highland Park,*
    784 F.3d 406 (7th Cir. 2015) ....................................................... 2, 9

*Fyock v. City of Sunnyvale,*
    779 F.3d 991 (9th Cir. 2015) .................................................. 3, 4, 13

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ................................................... 3, 6

*Jackson v. City & Cty. of San Francisco,*
    746 F.3d 953 (9th Cir. 2014) .............................................. 1, 10, 14

*Kachalsky v. County of Westchester,*
    701 F.3d 81 (2d Cir. 2012) ............................................................. 17

*Kolbe v. Hogan,*
    849 F.3d 114 (4th Cir. 2017) (en banc) ..................................... *passim*

*Lorillard Tobacco Co. v. Reilly,*
    533 U.S. 525 (2001) ......................................................................... 18

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ................................................................. 14

*McCutcheon v. FEC*,
   134 S. Ct. 1434 (2014) ............................................................ 14

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ........................................................ *passim*

*N.Y. State Rifle & Pistol Ass'n v. Cuomo*,
   804 F.3d 242 (2d Cir. 2015) ...................................................... 3

*Obergefell v. Hodges*,
   --U.S.--,135 S. Ct. 2584 (2015) ............................................. 17

*Parker v. District of Columbia*,
   478 F.3d 370 (D.C. Cir. 2007) ................................................ 13

*Peruta v. County of San Diego*,
   824 F.3d 919 (9th Cir. 2016) ................................................... 10

*R.A.V. v. City of St. Paul*,
   505 U.S. 377 (1992) ................................................................ 13

*S.F. Veteran Police Officers Ass'n v. City of San Francisco*,
   18 F. Supp. 3d 997 (N.D. Cal. 2014) ........................................ 3

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973) ................................................................... 11

*Santa Monica Nativity Scenes Comm. v. City of Santa Monica*,
   784 F.3d 1286 (9th Cir. 2015) ................................................ 15

*Se. Promotions Ltd. v. Conrad*,
   420 U.S. 546 (1975) ............................................................... 16

*Silvester v. Harris*,
   843 F.3d 816 (9th Cir. 2016) .............................................. 10, 11

*Turner Broad. Sys. v. FCC*,
   512 U.S. 622 (1994) .......................................................... 17, 24

*United States v. Carter*,
   669 F.3d 411 (4th Cir. 2012) .................................................. 19

*United States v. Chester*,
   628 F.3d 673 (4th Cir. 2010) .................................................. 13

*United States v. Chovan*,
   735 F.3d 1127 (9th Cir. 2013) ....................................... 10, 11, 12, 13

*United States v. Miller*,
   307 U.S. 174 (1939) ................................................................. 4

TABLE OF AUTHORITIES

*Valle Del Sol Inc. v. Whiting*,
  709 F.3d 808 (9th Cir. 2013) ..................................................................... 18

*Vincenty v. Bloomberg*,
  476 F.3d 74 (2d Cir. 2007) ..................................................................... 9, 10

*Weise v. Becerra*,
  263 F. Supp. 3d 990-93 (E.D. Cal. 2017) ................................................. 3

*Worman v. Healey*,
  2018 WL 1663445 (D. Mass. Apr. 5, 2018) ............................. 3, 4, 5, 17

**Statutes**

California Penal Code § 32310 ................................................................ *passim*

**Other Authorities**

Chad Adams, *Complete Guide to 3-Gun Competition* 89 (2012) .................................. 3

International Practical Shooting Confederation, http://www.ipsc.org; ......................... 3

Sen. B. 1446, Reg. Sess. 205-2016 (Cal. 2016) ....................................... 7, 14

U.S. Const. XIV amend. ............................................................................. 2

U.S. Const. amend. I ................................................................................ 9, 14

U.S. Const. amend. II ........................................................................... *passim*

TABLE OF AUTHORITIES

**INTRODUCTION**

At the hearing on Plaintiffs' Motion for Summary Judgment, or Alternatively, Partial Summary Judgment, the Court expressed concerns about the proper analysis of constitutional challenges to laws, like California Penal Code section 32310, that bar the acquisition, possession, and use of firearms and firearm parts that the Second Amendment protects. It also expressed doubts that the State's evidence could prove the "fit" required under heightened scrutiny, for that evidence could provide the same justification for banning the possession of all but one gun with one round—a concept the state understandably resisted but could provide no real basis to reject. The Court thus ordered supplemental briefing, asking each party to lay out their Second Amendment claims and to address the issues raised at the hearing.

Plaintiffs submit this brief in response to the Court's request.

**ARGUMENT**

The Second Amendment provides that "the right of the people to keep and bear Arms, shall not be infringed." U.S. Const., amend. II; *see McDonald v. City of Chicago*, 561 U.S. 742, 790-91 (2010) (plurality). Nearly a decade ago, the Supreme Court made clear that the Second Amendment "confers an individual right" that belongs to "the people"—a term that "unambiguously refers to all members of the political community," except those subject to certain "longstanding prohibitions" on the exercise of the right, such as "felons and the mentally ill." *District of Columbia v. Heller*, 554 U.S. 570, 580, 622, 626-27 (2008). The right belongs to all "law-abiding, responsible citizens," and it protects those arms "typically possessed by law-abiding citizens for lawful purposes." *Id.* at 625, 635. The right necessarily extends to ammunition and firearm accessories such as magazines, for "without bullets, the right to bear arms would be meaningless." *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014).

Subject to limited exceptions not applicable to Plaintiffs, California has banned the acquisition, possession, and (effectively) use of magazines capable of holding

PLS.' SUPPLEMENTAL BRIEF ISO MOTION FOR SUMMARY JUDGMENT

more than 10 rounds. Cal. Penal. Code § 32310. Such magazines are wildly popular for lawful purposes, including perhaps above all, self-defense. By prohibiting a class of arms that are undisputedly in common use by law-abiding citizens for lawful purposes, section 32310 violates the Second Amendment rights of Californians. The law is "directly at odds with the central holdings of *Heller* and *McDonald*: that the Second Amendment protects a personal right to keep arms for lawful purposes, most notably for self-defense within the home." *Friedman v. City of Highland Park*, 784 F.3d 406, 412-13 (7th Cir. 2015) (Manion, J., dissenting).

## I. THE SECOND AMENDMENT PROTECTS MAGAZINES OVER TEN ROUNDS

### A. Magazines Over Ten Rounds Are Undisputedly in Common Use for Lawful Purposes

Unsurprisingly, the state does not dispute Plaintiffs' evidence-based claims that magazines over ten rounds fall within the scope of the Second Amendment. The state does not argue that magazines are not "arms." *Compare* Mot. 7:10-8:15, *with* Opp'n at 2:13-4:16, 11:5-13:9. It does not dispute that magazines "are essential to the operation of almost all pistols and many rifles." *Compare* Mot. 8:5-6 (citing Barvir Decl., Ex. 7 at 245-47, Ex. 8 at 253-55, Ex. 9 at 262), *with* Opp'n at 2:13-3:11, 11:5. It does not dispute that magazines over ten rounds are popular, that tens of millions are in the hands of American citizens, or that they are lawful in 43 states and under federal law.[1] And while the state claims that violent criminals are attracted to magazines over ten

---

[1] *Compare* Mot. 9:4-8 (citing Barvir Decl., Ex. 1 at 23, 26 (explaining that magazines over ten rounds "account[] for approximately 115 million or approximately half of all magazines owned"), Ex. 2 at 30-32, Ex. 12 at 295 (stating that rifle magazines over ten rounds were popular by the ratification of the Fourteenth Amendment, and that handgun magazines over ten rounds became popular by the 1930s), Ex. 56 at 821, 823 ("The most popular police handgun in America, the Glock, is also *hugely popular for home and personal defense*." The Glock 17 holds 17 rounds in its "standard magazine." The "standard" Glock 22 magazine holds 15.) (emphasis added), Ex. 58 at 846, 848 (recognizing that tens of millions of LCMs were Americans' hands by 1994, and that "4.8 million LCMs were approved for commercial sale (as opposed to law enforcement uses) from 1994 through 2000" alone), 9:19-21; *with* Opp'n at 2:21, 13:6.

rounds, it hardly disputes Plaintiffs' evidence that such magazines are *overwhelmingly* possessed for lawful purposes, including self-defense and competitive shooting. *Compare* Mot. 10:1-14 (citing Barvir Decl., Ex. 1 at 22-23, Ex. 2 at 30-33, Ex. 12 at 295-97, Ex. 33, Ex. 34; Duncan Decl. ¶ 6; Lovette Decl. ¶¶ 6-7, 10; Marguglio Decl. ¶ 6; Waddell Decl. ¶ 6; Travis Decl. ¶¶ 6-8, 10, International Practical Shooting Confederation, http://www.ipsc.org; Chad Adams, *Complete Guide to 3-Gun Competition* 89 (2012)); *with* Opp'n 2:21, 11:5. Indeed, it has no response to the common-sense notion that "the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for [LCMs] that has existed since the mid-nineteenth century." Mot. 10:11-14 (quoting Barvir Decl., Ex. 12 at 308-09).

As this Court held before, these facts establish that the prohibited magazines are entitled to Second Amendment protection. Order Granting Prelim. Inj. 19:3-16. The Ninth Circuit "agreed with" another court's holding that, considering comparable evidence, LCM bans likely implicate the Second Amendment. *Fyock v. City of Sunnyvale*, 779 F.3d 991, 999 (9th Cir. 2015). And nearly every other court to consider the issue has reached the same conclusion. *See, e.g.*, *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 255 (2d Cir. 2015) (finding that bans on magazines over ten rounds implicate Second Amendment conduct); *Weise v. Becerra*, 263 F. Supp. 3d 990-93 (E.D. Cal. 2017) (same); *Colo. Outfitters Ass'n v. Hickenlooper*, 24 F. Supp. 3d 1050, (D. Colo. 2014) (same), *vacated and remanded for lack of standing*, 823 F.3d 537 (10th Cir. 2016); *S.F. Veteran Police Officers Ass'n v. City of San Francisco*, 18 F. Supp. 3d 997 (N.D. Cal. 2014) (assuming, but not deciding, that magazines over ten rounds are entitled to some level of protection); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("*Heller II*") (same); *but see Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc); *Worman v. Healey*, 2018 WL 1663445 (D. Mass. Apr. 5, 2018).

The Court therefore, has every reason to find that the Second Amendment

PLS.' SUPPLEMENTAL BRIEF ISO MOTION FOR SUMMARY JUDGMENT

extends to common magazines over ten rounds. As explained below, it certainly need not hold that such magazines lack a military pedigree before confirming its earlier ruling that they deserve Second Amendment shelter.

## B. *Heller*'s "Common Use" Test, Not *Kolbe*'s "Military Use" Test Drives Second Amendment Protection

The state asks this Court to not simply ignore the weight of Plaintiffs' evidence establishing that magazines over ten rounds are in "common use" for lawful purposes, but to ignore *Heller*'s "common use test" altogether. Opp'n 11:5-26. Relying on two out-of-circuit decisions, the state urges this Court to adopt the novel position that the Second Amendment excludes arms that are "most useful in military service." Opp'n 11:19-22 (quoting *Kolbe*, 849 F.3d at 137), 11:23-25 (citing *Worman*, 2018 WL 1663445 at *10). Few courts, including the Ninth Circuit, have embraced that outlier position—and for good reason. Supreme Court precedent forecloses it.

First, *Heller* is clear that the starting (and ending) point for determining which arms the Second Amendment protects is not whether they are "useful in military service," but whether they are in "common use" for lawful purposes. *Heller*, 554 U.S. at 624-25; *accord Fyock*, 779 F.3d at 998. *Heller* defined the scope of the Second Amendment's coverage of specific arms, holding that "the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." 554 U.S. at 582. The only exception the Court announced was for arms not "typically possessed by law-abiding citizens." *Id.* at 625, 627 (applying the "common use" test derived from *United States v. Miller*, 307 U.S. 174 (1939)). Whether arms that meet these standards are also useful to the military is beside the point.

Second, in *Caetano v. Massachusetts*, --U.S.--, 136 S. Ct. 1027 (2016), the Supreme Court reversed a decision upholding a ban on stun guns, which the lower court had held to be outside the Second Amendment's scope. *Id.* at 1027-28. The Court confirmed that "*Heller* rejected the proposition 'that *only* those weapons useful

in warfare are protected.' " *Id.* at 1028 (quoting *Heller*, 554 U.S. at 624-25) (emphasis added). Far from holding that military utility excludes any given arm from constitutional protection, the Court simply held that it is not a necessary condition for that protection, *Caetano*, 136 S. Ct. at 1028. Surely, the Court's recognition that the right to bear arms protects not "*only*" military arms contemplates that at least some military arms come within the scope of the right. *Id.* (quoting *Heller*, 554 U.S. at 624-25). Otherwise, "the Court would have had no reason to caution against the assumption that the Second Amendment protects only weapons useful in military operations." *Kolbe*, 849 F.3d at 157 (Traxler, J., dissenting).

The *Kolbe* and *Worman* courts' contrary contention is foreclosed not only by Supreme Court precedent, but also by the text of the Constitution itself. That the military might also find some arms useful can hardly suffice to place them beyond the scope of an amendment designed, in part, to ensure the existence of "[a] well regulated Militia." U.S. Const., amend. II. It defies common sense (and the plain intent of the Second Amendment's prefatory clause) to claim that usefulness for military purposes suffices to remove arms from the Amendment's protections. While the militia was not expected to muster with tanks, they were surely expected to muster with individual arms useful for military service. And today there are countless guns, knives, and other arms that, because of their superior utility and function for self-defense, are commonly possessed by *both the American public and the armed forces*.

What's more, by excluding all magazines over ten rounds from the Second Amendment's scope, the *Kolbe* court's application of its "most useful in military service" standard is exposed as a freestanding test that subjects the Second Amendment to the whims of individual judges. That is, application of this test to a capacity-based magazine ban underscores both the test's subjectivity and its propensity to exclude protected arms. *Kolbe*, 849 F.3d at 156-57 (Traxler, J., dissenting). If the Second Amendment protects magazines of at least some capacity, as the State conceded at the hearing, Tr. 49:18-21, May 10, 2018, what are the limiting

principles for determining the threshold number of rounds that makes a magazine "most useful in military service," thereby stripping it of constitutional protection? Why is that number not 24, or 15—or 7, for that matter? What makes a magazine of 11 rounds "most useful to the military," while those with ten are not? *Kolbe* doesn't say. It merely lists some characteristics that make the items attractive to the military, and decrees that they are "most suitable for military and law enforcement." 849 F.3d at 137. Indeed, *Kolbe* lacks any limit on what arms courts may find unprotected under its test—threatening to "remove nearly *all* firearms from Second Amendment protection as nearly all firearms can be useful in military service." *Id.* at 157 (Traxler, J., dissenting).

Ultimately, *Kolbe*'s test boils down to whether a judge believes the military (and apparently law enforcement) could use an arm because it has features the military might find useful. This subjective test yields results counter to both Supreme Court precedent and the very text of the Second Amendment. In contrast, *Heller*'s "common use" test is easy to apply here. As the D.C. Circuit found, "[t]here may well be some capacity above which magazines are not in common use but . . . that capacity surely is not ten." *Heller II*, 670 F.3d at 1262.

## C.     In Any Event, the State Has Not Proven that Magazines Over Ten Rounds Are "Most Useful in Military Service"

Even if military-utility did weigh against Second Amendment protection, which it does not, the state's meager evidence does not *prove* that magazines over **ten** rounds are "most useful in military service."

First, the state cites two reports that, at first blush, suggest that "large capacity magazines" are military arms. Opp'n 11:13-14 (citing Echeverria Decl., Ex. 12 at 540, Ex. 13 at 557-58). But both reports were assuming that a "large capacity magazine" is one with a capacity of *20 to 30 rounds, not 11*. Echeverria Decl., Ex. 12 at 540, ¶1.a. ("large capacity magazine, e.g., 20-30 rounds"), Ex. 13 at 557-58 (discussing with approval the report attached as Defendant's Exhibit 12). So neither report supports a

6

claim that "large capacity magazines," *as California law defines them*, are most useful in military applications.

The state also cites the uninformed, unsupported *opinion* of the author of Senate Bill 1446 that LCMs are not for hunting or target shooting, but for military purposes. Opp'n 11:14-15 (citing Echeverria Decl., Ex. 14 at 684). It follows with the *opinion* of Los Angeles Police Chief Charlie Beck that "30-round magazines" transform a gun "into a weapon of mass death rather than a home-protection-type device." *Id.* (quoting Echeverria Decl., Ex. 29 at 1291). Police Chief Beck's statement provides no support for the state's "military use" claim—nor does it relate to magazines with capacities as low as 11 rounds, which the state also bans.

Finally, the state cites the *Final Report of the Sandy Hook Advisory Commission*, which found that magazines over ten rounds "pose[] a distinct threat to safety in private settings as well as places of assembly." Opp'n 11:14-16 (quoting Echeverria Decl., Ex. 28 at 1097). Once again, the state's evidence does not even suggest that magazines over ten rounds are most useful to the military.

In the end, the state relies on just a single, out-of-circuit decision that magazines over ten rounds are "unquestionably most useful in military service." Opp'n 11:19-23 (quoting *Kolbe*, 849 F.3d at 137).[2] But even that opinion rests on the thinnest of factual reeds. Compare the state's astounding lack of evidence that magazines over ten rounds are "most useful in military service" with the clear weight of Plaintiffs' evidence proving not only that Americans widely possess and use magazines over ten rounds, but they largely do so for lawful purposes, including self-defense. Barvir Decl., Ex. 1 at 21-23. Section 32310's magazine ban undeniably restricts Second Amendment conduct.

/ / /

---

[2] The state also claims the *Kolbe* court found that magazines over ten rounds "are designed to 'kill[] or disable[] the enemy' on the battlefield." Opp'n 11:19-23 (quoting *Kolbe*, 849 F.3d at 137). It did not. *Kolbe* held that "*assault weapons*" were designed for that purpose. 849 F.3d at 137.

## II. UNDER HELLER'S SIMPLE TEST, SECTION 32310 IS CONSTITUTIONALLY SUSPECT

In *Heller*, the Supreme Court established a straight-forward "common use test" for addressing arms bans. Simply put, the government cannot prohibit arms that are "typically possessed by law-abiding citizens for lawful purposes." *Heller*, 554 U.S. at 625, 627. As this Court recognized in granting Plaintiffs' Motion for Preliminary Injunction, under *Heller*, this case is a simple one. Order Granting Prelim. Inj. 19:3-7. As explained above, Americans own millions of magazines over ten rounds, and most do so for lawful purposes, including self-defense. *Id.* Under the precedents of the Supreme Court, " 'that is all that is needed for citizens to have a right under the Second Amendment to keep' " them. *Id.* (quoting *Friedman v. City of Highland Park*, --U.S.--, 136 S. Ct. 447, 449 (2015) (Thomas & Scalia, JJ., dissenting from denial of certiorari)). "[A] complete prohibition on their use is invalid." *Heller*, 554 U.S. at 629.

The state may counter that, because section 32310 does not ban *all* detachable magazines and because magazines capable of holding ten rounds or fewer remain available, the law does not constitute a "complete prohibition," making *Heller*'s "simple test" inapposite. The Court understandably alluded to this concern at the hearing. Tr. 27:9-11. But *Heller* struck a prohibition on handguns, which law-abiding citizens commonly possess for self-defense, *even though other firearms remained lawful*. 554 U.S. at 629, 636. As the Court there held, "[i]t is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Id.* at 629. It is likewise "no answer to say" that California may ban magazines over ten rounds so long as other magazines are available.

Indeed, *Heller* recognizes and protects a principle at the heart of the Second Amendment—that the *individual* retains the right to choose from among common arms those that they believe will best protect their families and themselves. *See id.* at 629. Yes, "the ultimate decision for what constitutes the most effective means of

defending one's home, family, and property resides in individual citizens and *not in the government*." *Friedman*, 784 F.3d at 413 (7th Cir. 2015) (Manion, J., dissenting) (emphasis added) (citing *Heller*, 554 U.S. at 635; *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010)). "The extent of danger—real or imagined—that a citizen faces at home is a matter only that person can assess in full." *Id.* It is not the place of the government to substitute its judgment for that of the People.

Here, there are many reasons a citizen might choose a magazine over ten rounds for self-defense. They may genuinely believe that access to more ammunition in a single magazine makes neutralizing an attacker more likely. They may fear that the physiological effects of stress may impact their accuracy, requiring more bullets in a self-defense emergency. They may understand that, if faced with several home-invaders, they may need access to more than 10 rounds. They may fear that "[n]ervousness and anxiety, lighting conditions, the presence of physical obstacles . . . , and the mechanics of retreat are all factors" will alter their "ability to reload . . . quickly during a home invasion." *Kolbe*, 849 F.3d at 162 (Traxler, J., dissenting). Or they could have a disability making quick, effective magazine changes difficult or impossible. Whatever their reasons, good, law-abiding people often choose and possess magazines over ten rounds for self-defense. Thus, the government simply cannot ban them. *Heller*, 554 U.S. at 629.

To be sure, D.C. banned all handguns, and not just a subset of them, but *Vincenty v. Bloomberg*, 476 F.3d 74 (2d Cir. 2007) reflects why the same reasoning applies. There, plaintiffs brought a First Amendment challenge to New York City's anti-graffiti law, prohibiting the possession of broad-tipped indelible markers and spray paint by adults under 21. *Id.* at 76. A panel of the Second District (including now-Justice Sotomayor) remained "unpersuaded" by the government's argument that young artists could use various types of *unregulated* markers or paints. *Id.* at 88. For the plaintiffs had declared that they chose the restricted items for their lawful, artistic expression because such items allowed them to achieve effects "not equally available

PLS.' SUPPLEMENTAL BRIEF ISO MOTION FOR SUMMARY JUDGMENT

from paints applied with a brush." *Id.* By restricting plaintiffs' possession of markers and paints necessary for their lawful expressive purposes, New York went too far. *Id.* As in *Heller*, it was "no answer to say," that a ban on broad-tipped markers is valid because fine-tipped markers are available. 554 U.S. at 629.

Here too, Plaintiffs have declared that they possess or seek to possess magazines over ten rounds for purely *lawful* purposes. Duncan Decl. ¶ 6; Lovette Decl. ¶ 4; Marguglio Decl. ¶ 6; Waddell Decl. ¶ 6; Travis Decl. ¶¶ 4-8. They have also declared that they, like countless other Americans who own such magazines, do so because they believe they will protect them in a self-defense emergency in ways not necessarily achievable with reduced-capacity magazines. Duncan Decl. ¶ 6; Lovette Decl. ¶ 6; Marguglio Decl. ¶ 6; Waddell Decl. ¶ 6; Travis Decl. ¶¶ 6-8. As in *Heller* and *Vincenty*, the state has gone too far.

## III. SECTION 32310 IS INVALID UNDER THE NINTH CIRCUIT'S TRIPARTITE BINARY TEST

When assessing a Second Amendment challenge, the Ninth Circuit uses what this Court called a "tripartite binary test with a sliding scale and a reasonable fit." Order Granting Prelim. Inj. 17. While the test is exceedingly complex in practice, *id.* at 18, it is essentially a two-part analysis. *See United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013). In short, the Court should (1) consider "whether the challenged law burdens conduct protected by the Second Amendment," and if it does, (2) apply an appropriate level of scrutiny." *Id.* at 1136.

The first step looks to the *historical understanding* of the Second Amendment's scope. *Jackson v. City & County of San Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (internal citations and quotations omitted). "Laws restricting conduct that can be traced to the founding era and are historically understood to fall outside of the Second Amendment's scope may be upheld without further analysis." *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) (citing *Peruta v. County of San Diego*, 824 F.3d 919 (9th Cir. 2016)). On the other hand, if the conduct falls within the historical

understanding of the right, the Court may proceed to the second step.

At step two, the Court selects the applicable level of heightened scrutiny. In making this determination, courts consider "(1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right." *Chovan*, 735 F.3d at 1127 (internal citations and quotations omitted). "The result is a sliding scale." *Silvester*, 843 F.3d at 821; *see also* Order Granting Prelim. Inj. 22. If the law "imposes such a severe restriction . . .that it amounts to a destruction of the Second Amendment right," it is "unconstitutional "under any level of scrutiny." *Id.* "A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny." *Chovan*, 735 F.3d at 1138. Otherwise, intermediate scrutiny applies. *Silvester*, 843 F.3d at 821.

Restricting magazines that law-abiding citizens often select for in-home self-defense, the state's magazine ban restricts conduct at the Second Amendment's core. What's more, the law imposes a flat ban on this core Second Amendment conduct. The burden could hardly be more severe. Thus, section 32310 is subject to nothing less than strict scrutiny. But regardless, it cannot survive even the more lenient intermediate scrutiny.

**A. If the Court Selects a Level of Means-End Review, Strict Scrutiny Should Apply**

When a law interferes with "fundamental constitutional rights," it generally is subject to "strict judicial scrutiny." *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16 (1973); *see also, e.g.*, *Clark v. Jeter*, 486 U.S. 456, 461 (1988). In *McDonald*, the Supreme Court confirmed the right to keep and bear arms is fundamental, and it silenced any claim that the right should not be afforded the same status as other fundamental rights. 561 U.S. at 778. In short, strict scrutiny is the "default" standard for reviewing laws that affect fundamental rights—and the right to arms is no exception. Should this Court resort to means-end scrutiny, strict scrutiny must apply. Faithful application of the Ninth Circuit's test above confirms this.

Ownership of magazines over ten rounds is within the core protection of the Second Amendment. As described above, there is insurmountable evidence that the Second Amendment extends to these magazines because Americans widely own these magazines for lawful purposes. *See supra*, Part I, at 7. What's more, they possess them for the *core* lawful purpose of in-home self-defense. "Once [the court] determine[s] that a given weapon is covered by the Second Amendment, then obviously the in-home possession of that weapon for self-defense is core Second Amendment conduct." *Kolbe*, 849 F.3d at 160 (Traxler, J., dissenting).

What's more, the burden the state imposes on core conduct here is particularly severe. It does not simply regulate "the manner in which" Plaintiffs may exercise their rights, *Chovan*, 735 F.3d at 1138, but directly bans the possession and use of constitutionally protected arms by forcing Plaintiffs to remove them from their homes—under threat of criminal penalty. The state tries to minimize the severity of this burden, reasoning that magazines over ten rounds are unnecessary for self-defense and that citizens may exercise their rights with smaller magazines. Opp'n 20:23-28; 21:1-17; Tr. 80:4-5, 87:16-22. That reasoning is fundamentally flawed.

First, it improperly focuses on the burden section 32310 imposes on Plaintiffs' broader right to self-defense. While self-defense certainly is a key component of the right to arms, the Second Amendment also enshrines a related, but distinct, right to keep and bear those common arms law-abiding citizens select for that lawful purpose (and others). *Heller*, 554 U.S. at 624-25. Plaintiffs seek to vindicate their right to possess and use constitutionally protected magazines for self-defense in their homes. A complete ban on that conduct is a severe burden by any measure.

Second, the state's argument highlights the inherent problem with judicial approval of bans on "subsets" of protected arms, which by their nature leave alternative arms available for self-defense and would always warrant only intermediate scrutiny. Taking that analysis to its natural conclusion, only total bans on all arms would trigger strict scrutiny because otherwise alternative avenues for self-

defense will always remain. But *Heller* expressly rejects the rationale that the government may ban protected arms so long as others are available. 554 U.S. at 629; *accord Parker v. District of Columbia*, 478 F.3d 370, 400 (D.C. Cir. 2007) (rejecting as "frivolous" the argument that access to other firearms could save a handgun ban" and noting that "[i]t could be similarly contended that all firearms may be banned so long as sabers were permitted").

In sum, by banning the acquisition and possession of magazines over ten rounds, section 32310 "restricts rather than regulates; it addresses conduct occurring inside the home; and it directly touches self-defense concerns in the home. [It] imposes dramatic limitations on the core protections guaranteed by the Second Amendment and [thus]. . . requires the court to apply strict scrutiny." *Kolbe*, 849 F.3d at 161 (Traxler, J., dissenting). Plaintiffs do, however, recognize that the Ninth Circuit's decision in *Fyock* may require application of intermediate scrutiny. No matter. Section 32310 cannot survive that more forgiving test either.

## B.     Regardless, Section 32310 Fails Even Intermediate Scrutiny

Under heightened scrutiny, a challenged law is *presumed* unconstitutional, and the government bears the burden of justifying it. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) (holding that content-based speech regulations are presumptively invalid); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010) ("unless the conduct at issue is not protected by the Second Amendment at all, the government bears the burden of justifying the constitutional validity of the law"). The Ninth Circuit has held that, under intermediated scrutiny, a law is constitutional only if there is a "reasonable fit" or a "substantial relationship" between the challenged law and a "significant, substantial, or important' government interest. *Chovan*, 735 F.3d at 1136, 1139; *see also Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993) (holding that the law must be "substantially related" to an import government interest). The challenged law need not be the least restrictive means, but is should be "closely drawn" to achieve its objectives without "unnecessary abridgment" of constitutionally protected

conduct. *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456-57 (2014) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)); *see Jackson*, 746 F.3d at 961 (noting that Second Amendment heightened scrutiny is "guided by First Amendment principles").

In adopting Proposition 63, the People stated that their intention behind the law was to prevent a specific category of criminal-misuse of "large-capacity magazines"—mass shootings. While in passing Senate Bill 1446, the Legislature sought to make the pre-existing ban on magazines over ten rounds easier to enforce—thereby promoting the public safety interests that those earlier magazine restrictions sought to achieve.[3] While the government concededly has an important interest in promoting public safety and preventing crime, *see, e.g.*, *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 768 (1994), the state must still prove that the ban is sufficiently related to advancing those interests before the state may restrict its citizens' constitutional rights. The state has failed this burden. Plaintiffs are entitled to judgment as a matter of law.

### 1. The State's magazine ban is not sufficiently tailored to achieve the state's interest.

The state has failed to support its claim that its outright ban on possession is substantially related or appropriately tailored to the state's asserted interests in preventing mass shootings and gun violence. The state advances two primary arguments in support of its possession ban—mass shooters often use the prohibited magazines and, relatedly, criminals might misuse the magazines—but each claim is wrong as a legal matter and in all events factually unsubstantiated.

First, as a legal matter, the Second Amendment does not tolerate banning constitutionally protected arms because they may often be involved in some crimes, even serious ones. In *Heller*, the District of Columbia tried to justify its handgun ban claiming handguns were involved in most firearm-related homicides in the United States. 554 U.S. at 696 (Breyer, J., dissenting) (collecting statistics). Despite the

---

[3] Barvir Suppl. Decl., Ex. 89 at 6-8, Ex. 92, at 57-59; Echeverria Decl., Ex. 14 at 684.

PLS.' SUPPLEMENTAL BRIEF ISO MOTION FOR SUMMARY JUDGMENT

17cv1017

government's clear and compelling interest in preventing homicides, the Supreme Court held that a ban on possession of those protected arms by law-abiding citizens lacks the required fit to that goal "[u]nder any of the standards of scrutiny." *Id.* at 628-29 (majority opinion).

*Heller* similarly rejected the argument that protected arms may be prohibited simply because criminals might misuse them. Again, there, the government argued that handguns made up a significant majority of all stolen guns and that they were overwhelmingly used in violent crimes. *Id.* at 698 (Breyer, J., dissenting). But despite the government's clear interest in keeping handguns out of the hands of criminals and unauthorized users, the Supreme Court rejected that argument, too, concluding that a ban on possession by law-abiding citizens is not reasonably tailored to prevent misuse by criminals. *Id.* at 628-29 (majority opinion).[4]

The Supreme Court's approach in *Heller* follows a long history of rejecting the notion that the government may ban constitutionally protected activity because that activity could lead to abuses. In *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425 (2002) (plurality), for example, the Supreme Court made clear that a challenged law cannot survive intermediate scrutiny if it directly targets constitutionally protected conduct to cure the potentially undesirable side effects of that conduct. *Id.* at 445. Similarly, in *Santa Monica Nativity Scenes Committee v. City of Santa Monica*, 784 F.3d 1286 (9th Cir. 2015), the Ninth Circuit held that "[i]f speech provokes wrongful acts on the part of hecklers, *the government must deal with those wrongful acts directly*; it may not avoid doing so by suppressing the speech." *Id.* at 1292-93 (emphasis added). That extreme degree of prophylaxis is incompatible with the decision to give the activity constitutional protection. California's overinclusive approach violates the basic principle that "a free society prefers to punish the few who

---

[4] Moreover, California's retrospective possession ban is a particularly poor fit for invocation of a criminal misuse interest because compliance with the confiscatory aspect of the ban requires the kind of voluntary action that only a law-abiding citizen would undertake.

PLS.' SUPPLEMENTAL BRIEF ISO MOTION FOR SUMMARY JUDGMENT

17cv1017

abuse [their] rights . . . after they break the law than to throttle them and all others beforehand." *Se. Promotions Ltd. v. Conrad*, 420 U.S. 546, 559 (1975).

Here, the state seeks to decrease the lethality of mass shooting events, Tr. 41:22-23, a laudable goal to be sure. But the means it has chosen to accomplish that goal—a broad ban on the acquisition and possession of all magazines over ten rounds—encompasses far too much protected conduct to meet even intermediate scrutiny.[5] The state directly targets the acquisition, possession, and otherwise lawful use of magazines over ten rounds in hopes that reducing their availability (to law-abiding citizens) will reduce their availability to mass shooters. The target of section 32310, then, is not simply the statistically rare mass shooting, but the mere possession of constitutionally protected arms by the law-abiding. The state's rationale, while conceptually logical, is simply out of step with the way we treat fundamental rights.

As the Court seemed to recognize at the hearing, however, lower courts have routinely strayed from the Supreme Court's teachings about fundamental rights when faced with gun control measures that they intend to uphold. Tr. 22:18-24:15. In the wake of the courts' reticence to expand *Heller* beyond its narrow facts and their eagerness to sustain nearly any sort of gun control short of a flat ban on firearms, a consistent theme has emerged—"substantial deference" to the will of legislative majorities. *See, e.g.*, *Kolbe*, 849 F.3d at 140. That deference has often held even when granting it has singled out the right to bear arms for especially unfavorable treatment in conflict with *McDonald*'s admonishment against treating the Second Amendment

---

[5] Interestingly, section 32310 is simultaneously both too *over*inclusive and too *under*inclusive to achieve lawfully its public safety interests. As this Court rightly noted, the state's ban includes a litany of exceptions that authorize the possession and use of magazines over ten rounds by some members of the public. Tr. 73:1. These exceptions include, for example, one for possession by members of the film industry. Cal. Penal Code § 32445. The state reminds us that this exception does not allow filmmakers to load their magazines. Tr. 73:1-6. But that is beside the point. The mere possession of these magazines creates the very risk of theft and potential unlawful use the state cites in claiming it must take them from law-abiding members of society at large. So while the state seemingly has an important justification for widely banning magazines over ten rounds, it suddenly disappears when favored groups of citizens enter the picture.

PLS.' SUPPLEMENTAL BRIEF ISO MOTION FOR SUMMARY JUDGMENT

17cv1017

as a "second-class right." *See, e.g.*, *Kolbe*, 849 F.3d at 140; *Worman*, 2018 WL 1663445, at \*15 (D. Mass. Apr. 5, 2018); *but see McDonald*, 561 U.S. at 780.

Naturally, the state implores this Court to follow that trend. Insisting that section 32310 must be upheld, the state claims the Court lacks the authority to disturb the "predictive judgments" of the legislature. Tr. 43:17-19, 68:25, 106:19; Opp'n 15:24-25. But the legislature is not entitled to trample on the constitutionally protected rights of the People under the cover of "substantial deference." *Kolbe*, 849 F.3d at 140. A legislature's laws are not edicts. They must pass constitutional muster under the applicable standard of review. As the Supreme Court recently explained in *Obergefell v. Hodges*, --U.S.--,135 S. Ct. 2584 (2015), "when the rights of persons are violated, the Constitution *requires* redress by the courts, [despite] the more general value of democratic decision-making." *Id.* at 2605 (internal quotation marks and citation omitted).

While it is not the role of a court to replace the considered judgment of the legislature with its own, that does not mean it must (or even should) rubber stamp whatever the legislature decrees. That would be rational basis review, masquerading as intermediate scrutiny. So to answer the Court's important questioning about how "we decide what is a reasonable fit and who decides it," Tr. 25:9-10, 25:20-26:8, 36:6-10, 44:12-18, it is ultimately the Court's role to "assure that, in formulating its judgments, [the legislature] has drawn reasonable inferences *based on substantial evidence*." *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 666 (1994); *see also Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012). This necessarily requires courts to consider carefully the government's evidence and make an *independent* judgment about the reasonableness of the inferences drawn from it. As discussed below, there is nothing reasonable about the inferences the state has made.

/ / /

/ / /

/ / /

## 2. The State's evidence does not establish a reasonable fit between Section 32310 and the State's public safety interests.

The fit requirement seeks to ensure that the encroachment on liberty is "not more extensive than necessary" to serve the government's professed interest. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 816 (9th Cir. 2013). To that end, it requires the state to establish that its chosen restriction advances its interest "to a material degree." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (plurality). The state's "burden is not satisfied by mere speculation or conjecture." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). The state instead must establish that its chosen restriction "will in fact alleviate" the "harms it recites." *Id.* At the very least, it should not be able to get away with ignoring substantial expert evidence that it has not, and likely, "will [*not*] in fact alleviate" the "harms it recites." *Id.* As the state explained at the hearing, "[w]hen the state fails to present substantial evidence," the court must overturn the law. Tr. 59:3-4 (in response to this Court's questioning how courts decide if the government "has gone too far"). Here, the state has "fail[ed] to present substantial evidence," *id.*, to justify barring all law-abiding citizens from engaging in conduct protected by the Second Amendment. It has "gone too far." *Id.* at 59:1-2. *Now*, is the time to exit the slippery slope toward the obliteration of the right to arms. *Now*, is the time for the Court to say "enough is enough." *Id.* at 24:12.

As the Court noted, the state's evidence is little more than a parade of experts (and non-experts) repeating the tautology that "the more rounds that you can fire through a gun, the more likely it is that people are going to be injured and are going to be killed." Tr. 43:25-44:8; *see* Opp'n 16:24-17:7 (citing *Kolbe*, 849 F.3d at 137; Echeverria Decl., Ex. 4 at 125, Ex. 7 at 472-73, Ex. 8 at 487, Ex. 9 at 498-201, Ex. 10 at 509, Ex. 14 at 684, Ex. 18 at 780, Ex. 27 at 984, Ex. 30 at 1299-300; Graham Decl. ¶¶ 16-18); *but see* Barvir Suppl. Decl., Ex. 91 at 33:9-14. ("[W]e would not expect victims shot with pistols to die more frequently than victims shot with revolvers, holding gun caliber, would location, the victim's physical condition, and other

PLS.' SUPPLEMENTAL BRIEF ISO MOTION FOR SUMMARY JUDGMENT

17cv1017

relevant factors constant."); *and compare* Echeverria Decl., Ex. 30 at 1299-300 (Koper's 2008 report claiming that firearms equipped with large capacity magazines "tend to result in more shots fired, more persons wounded, and more wounds per victim"), *with* Barvir Suppl. Decl., Ex. 91 at 29:18-23 (explaining that the 2008 report did not mention the magazine capacity of pistols studied because researchers "could not measure" whether large capacity magazines were used in the cases studied).

The state then tries to prop up its flimsy case with the personal opinions of politicians, law enforcement leaders, and social scientists that capacity-based magazine restrictions could *potentially* have some impact on mass shootings and crimes against law enforcement. *See, e.g.*, Echeverria Decl., Ex. 2 at 38 (concluding that section 32310 could decrease the lethality of mass shootings, relying not on independent research, but on long quotes of others' personal opinions on magazine bans), Ex. 11 at 530-531 (discussing Klarevas' *belief* that capacity-based magazine restrictions might help potential victims survive mass shootings), Ex. 15 at 693 (Professor Lawrence Tribe claims that magazine restrictions do not violate the right arms, but create new "parameters of responsible gun ownership"), Ex. 21 at 811 (referring to a poll showing that a majority of Americans support restrictions on the sale of "high-capacity magazines), Ex. 29 at 1291 (Police Chief Charlie Beck lends support to magazine restrictions, referencing 30-round magazines). This "evidence" is little more than opinion, supposition, and anecdote, wrapped in a cloak of credibility created by the positions of trust these law enforcement officers, professors, and commentators hold. Such conclusory statements hold little weight when considering whether the state has met it burden under heightened review. *United States v. Carter*, 669 F.3d 411, 418 (4th Cir. 2012). The Court should give them little weight here.

Finally, the state introduces some evidence to support the logical claim that getting rid of as many magazines over ten rounds as possible will result in fewer criminals using them, *see* Barvir Suppl. Decl., Ex. 91 at 25:7-16—which would help

the state if its goal was simply to have fewer LCMs show up at crime scenes.[6] But that is not why the People enacted section 32310. They passed it to curb gun violence—to decrease the lethality of mass shootings, more specifically. Tr. 41:23; Barvir Suppl. Decl., Ex. 89 at 7, Ex. 92 at 57-59 As the evidence shows, however, bans on "large capacity magazines" have already proven largely ineffective at addressing their goal.

Dr. Koper, the state's only expert to have analyzed the effect of the decade-long federal ban on magazines over ten rounds, found that "[t]here is not a clear rationale for expecting the ban to reduce assaults and robberies with guns." *Id.*, Ex. 91 at 45:15-17. Koper now claims that he believes that California's magazine ban could have some effect on gun violence, Barvir Decl., Ex. 5 at 172:26, and that the "[p]ercentage of violent crimes resulting in death, that's something that might *conceivably* be driven down by assault weapon, LCM restrictions," Barvir Suppl. Decl., Ex. 91 at 47:2-15 (emphasis added). But *anything* is "conceivable." Koper's current "beliefs" are simply unsupported by the research—including his own.

Koper confirmed as much in his deposition, admitting that he cannot conclude to a reasonable degree of probability that the federal ban reduced crimes related to guns overall. *Id.*, Ex. 91 at 53:12-54:3; *see also id.*, Ex. 90 at 14:1-12, 17:4-8 (same). He has also confirmed that the federal ban "didn't reduce the number of deaths or

---

[6] As an aside, claims that magazines over ten rounds are "disproportionately" used in crime are wildly overstated. Industry estimates show that about half of all magazines in America have capacities greater than ten. Barvir Decl., Ex. 1 at 23. But "when you look at general samples of guns used in crime, you don't see LCM firearms generally accounting for the majority of the semiautomatics weapons" used. Barvir Suppl. Decl., Ex. 91 at 35:9-15.

Indeed, the presence of firearms equipped with magazines over ten rounds in anywhere from 35% to 48% of murders of police, specifically, is hardly remarkable. Opp'n 18 (citing Echeverria Decl., Ex. 4 at 143). It simply reflects the fact that such magazines come standard with the most popular handguns on the market. It does not prove they are any more lethal than other types of firearms—especially with no evidence that those crimes involved more than ten shots fired. Most crimes involve only 3-4 rounds. Echeverria Decl., Ex. 30 at 1396; *see also* Barvir Suppl. Decl., Ex. 91 at 37:21-38:16 (of 165 shootings analyzed in 2003, only 6 or 7 involved more than ten shots fired). As a result, it is not clear that the crimes committed against law enforcement required the used of magazines over ten rounds or were in any way affected by their use.

PLS.' SUPPLEMENTAL BRIEF ISO MOTION FOR SUMMARY JUDGMENT

17cv1017

injuries caused by guns either." *Id.*, Ex. 90 at 17:9-11; *see also id.*, Ex. 91 at 49:11-15 (same). More to the point, Koper admitted that there has been "no discernible reduction in the lethality and injuriousness of gun violence" because of the federal ban. *Id.*, Ex. 91 at 49:20-50:1-2; *see also id.*, Ex. 91 at 53:12-54:4. And he admitted that he is aware of no other expert that has come to a different conclusion. *Id.*, Ex. 91 at 51:15-24; *see also id.*, Ex. 90 at 16:1-6 (same).

Koper's research on the effect of both federal and state capacity-based magazine restrictions is supported by the finding of other social scientists, including those of Plaintiffs' experts. In 2016, for example, Plaintiffs' expert, Professor Gary Kleck, published an article discussing the possible link between large capacity magazine use and mass shootings. Barvir Decl., Ex. 60 at 904-924. He concluded that possession of such magazines has little, if any, effect on these crimes. *Id.* at 922. Indeed, he found "there is little sound affirmative empirical bases expecting that fewer people would be killed or injured if LCM bans were enacted." *Id.*

Similarly, Professor Carlisle Moody has conducted a detailed statistical analysis of the effect of the federal ban and California's acquisition ban on violent crime. *Id.*, Ex. 4 at 109-115. He found *no statistically significant* reduction of the various subsets of violent crime he studied, including mass shootings, assaults on law enforcement officers, and others. *Id.*, Ex. 4 at 110 (finding that "neither the state nor the federal LCM ban had any significant effect on the violent crime rate"); *id.*, Ex. 4 at 110-11 (finding that the federal ban had "no significant effect" on California's murder rate); *id.*, Ex. 4 at 112 (finding that "[t]here is no significant effect of either the state or the federal LCM ban on the gun homicide rate"); *id.*, Ex. 4 at 113 (finding that "[t]here is no significant effect of either the federal or the state LCM ban on the number of mass shooting deaths in California"); *id.* (finding that "[t]here is no significant effect of either the federal or the state LCM ban on the number of incidents of mass shootings in California"); *id.*, Ex. 4 at 115 (finding that "[n]either the state ban nor the national ban had any significant effect on the number of police officers killed in the line of

duty in California"); *id.* (summarizing statistical findings).

In the end, based on the empirical evidence available, the state *cannot* state, to a reasonable degree of probability, that section 32310 will significantly reduce:

1. The number of crimes committed with firearms with large capacity magazines;

2. The numbers of shots fired in gun crimes;

3. The number of gunshot victims in gun crimes;

4. The number of wounds per gunshot victim;

5. The lethality of gunshot injuries when they do occur; or

6. The substantial societal costs that flow from shootings.

*Compare* Barvir Suppl. Decl., Ex. 90 at 19:20-21:21, *with* Barvir Decl., Ex. 5 at 172-73. The state's wishful thinking to the contrary is simply insufficient to justify California's ban on common magazines over ten rounds under intermediate scrutiny.

What's more, and perhaps most important, is that *none* of the evidence the state provides establishes why it has selected "ten" as the number at which detachable magazines become too dangerous for anyone, including law-abiding citizens, to use. That is, the social science research that the state relies on does not even try to establish the capacities of the magazines used in the mass shootings and other gun crimes studied. *See* Barvir Suppl. Decl., Ex. 91 at 39:10-41:21. In fact, none of the evidence proves that any magazines as low as 11 rounds are used, with any regularity, in these events. Perhaps because no one has deigned to determine whether and to what extent firearms become deadlier with each round added. *Id.*, Ex. 91 at 42:8-12 Rather, researchers look for reports that a "large-capacity magazine" was used, regardless of the reporter's understanding of what constitutes a "large-capacity magazine," and bundle all such events together. So really, it could be that magazines between 11 rounds and 15 (or 17 or 19 or 24) are not responsible for the ills that the state recites at all. We just don't know. But what we do know is that the state's evidence does not establish otherwise. Ultimately, ten seems to be just an arbitrary number, emerging

PLS.' SUPPLEMENTAL BRIEF ISO MOTION FOR SUMMARY JUDGMENT

from the result of the "give-and-take" of the political process, *id.*, Ex. 91 at 36:8-21, rather than empirical evidence about such magazines.

And as the Court highlighted during the summary judgment hearing, the result of relying on this evidence to prove the fit required under intermediate scrutiny is the destruction of the right. Tr. 122:23-25; 124:1-14. Because if this evidence is enough to establish that the state can ban magazines over tens rounds without constitutional moment, there is no principled basis on which future courts could stop the slide all the way to one gun or one bullet. Surely, if it is enough to say that lots of mass shooters use magazines over ten rounds and some people could potentially escape during a pause to reload—the evidence would be *even* stronger. For even *more* mass shootings would involve "large capacity magazines" and even *more* people could potentially escape if the state chose later to define "large capacity magazines" as those with fewer than seven rounds (or five or two).

Again, the state claims—as it must—that it is asking this Court to apply intermediate scrutiny, but what it really seeks is intermediate scrutiny in name only. Rather, the state champions a toothless form of heightened review that is more like rational basis review. Repeatedly demanding "substantial deference" to the policy judgments of the legislature and to the "democratic process," Tr. 43:16, 43:19, 69:1, 92:24, 106:18; Opp'n 15:24-25, the state expects this Court to view its evidence with a most uncritical eye. But upon an appropriately closer inspection, the state's justification for its magazine ban falls far short. Recall, the state's own expert admitted that he cannot, from his research, determine that capacity-based magazine restrictions would have any statistically significant effect on violent crime. In fact, he has revealed that he could not conclude that the federal magazine ban reduced gun crime, generally, or that it reduced the number of deaths or injuries caused by guns, more specifically. All are results the state would have the Court believe likely, contrary to the record evidence by both Dr. Koper and Plaintiffs' experts that they are not.

In short, the state's justifications for its ban on magazines over ten rounds are simply not based on "reasonable inferences based on substantial evidence." *Turner Broad. Sys.*, 512 U.S. at 666. Section 32310 thus cannot meet intermediate scrutiny. This Court should declare the law invalid and enjoin its enforcement permanently.

## CONCLUSION

For these reasons and those also addressed in Plaintiffs' moving papers, Plaintiffs urge this Court to grant their Motion for Summary Judgment or, Alternatively, Partial Summary Judgment.

Dated: June 11, 2018

MICHEL & ASSOCIATES, P.C.

/s/ Anna M. Barvir
Anna M. Barvir
Email: abarvir@michellawyers.com
Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

     I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

     I have caused service of the following documents, described as:

**PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

on the following parties by electronically filing the foregoing on June 11, 2018, with the Clerk of the District Court using its ECF System, which electronically notifies them.

| | |
|---|---|
| John D. Echeverria | Anthony P. O'Brien |
| Deputy Attorney General | Deputy Attorney General |
| john.echeverria@doj.ca.gov | anthony.obrien@doj.ca.gov |
| 300 South Spring Street, Suite 1702 | 1300 I Street, Suite 125 |
| Los Angeles, CA 90013 | Sacramento, CA 95814 |

     I declare under penalty of perjury that the foregoing is true and correct. Executed on June 11, 2018, at Long Beach, CA.

/s/Laura Palmerin
Laura Palmerin