C.D. Michel – SBN 144258
Sean A. Brady – SBN 262007
Anna M. Barvir – SBN 268728
Matthew D. Cubeiro – SBN 291519
MICHEL & ASSOCIATES, P.C.
180 E. Ocean Boulevard, Suite 200
Long Beach, CA 90802
Telephone: (562) 216-4444
Facsimile: (562) 216-4445
Email: abarvir@michellawyers.com

Attorneys for Plaintiffs

# IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al., <br><br>             Plaintiffs, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of the State of California, <br><br>             Defendant. | Case No: 17-cv-1017-BEN-JLB <br><br> **DECLARATION OF ANNA M. BARVIR IN SUPPORT OF PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT; EXHIBITS 89-92** |

1

# DECLARATION OF ANNA M. BARVIR

1.     I am an attorney at the law firm Michel & Associates, P.C., attorneys of record for Plaintiffs in this action. I am licensed to practice law before the United States District Court for the Southern District of California. I am also admitted to practice before the Eastern, Central, and Northern Districts of California, the courts of the state of California, the Supreme Court of the United States, and the D.C., Fourth, Ninth, and Tenth Circuit Courts of Appeals. I have personal knowledge of the facts set forth herein and, if called and sworn as a witness, could and would testify competently thereto.

2.     Attached hereto as **Exhibit 89** is a true and correct copy of a November 8, 2016 article from the Los Angeles Times, *California Voters Approve Gun Control Measure Proposition 63*, available at http://www.latimes.com/nation/politics/trailguide/la-na-election-day-2016-proposition-63-gun-control-1478280771-htmlstory.html (last visited, June 10, 2018).

3.     Attached hereto as **Exhibit 90** is a true and correct copy of excerpts from the February 3, 2014 deposition of Dr. Christopher S. Koper in the matter of *Tardy v. O'Malley*, United States District Court, District of Maryland, Case No. CCB-13-2841.

4.     On January 5, 2018, I, as counsel for Plaintiffs, deposed Defendant's designated expert in this matter, Dr. Christopher S. Koper. Attached hereto as **Exhibit 91** is a true and correct copy of excerpts from the transcript of Dr. Koper's deposition.

5.     Attached hereto as **Exhibit 92** is a true and correct copy of an October 26, 2016 article from the Sacramento Bee, *Prop. 63 Will Reduce Gun Violence and Send A Message to NRA*, available at http://www.sacbee.com/opinion/op-ed/soapbox/article110560432.html (last visited June 10, 2018).

/ / /

/ / /

I declare under penalty of perjury that the foregoing is true and correct. Executed within the United States on June 11, 2018.

_Anna M. Barvir_

Anna M. Barvir
Declarant

# EXHIBITS
## TABLE OF CONTENTS

| Exhibit | Description | Page(s) |
|---|---|---|
| 89 | November 8, 2016 article from the Los Angeles Times, *California Voters Approve Gun Control Measure Proposition 63* | 5-8 |
| 90 | Excerpts from the February 3, 2014 deposition of Dr. Christopher S. Koper in the matter of *Tardy v. O'Malley* | 9-22 |
| 91 | Excerpts from the January 5, 2018 deposition of Dr. Christopher S. Koper in this matter | 23-55 |
| 92 | October 26, 2016 article from the Sacramento Bee, *Prop. 63 Will Reduce Gun Violence and Send A Message to NRA* | 56-59 |

# EXHIBIT 89

Exhibit 89

5

ADVERTISEMENT



POLITICS

Election Day 2016 updates: Trump defeats Clinton to become next president of U.S.



276 POSTS

SENATE   HOUSE   L.A. RACES   CALIFORNIA RACES   PRESIDENT

CALIFORNIA PROPOSITIONS   L.A. PROPOSITIONS   VOTING ISSUES   EXIT POLLS

VOTER VOICES   ✖ CLEAR

↻ GO TO NEW POSTS

TOPICS

SUBSCRIBE
4 weeks for only 99¢

→] LOG IN

TRIAL OFFER | **4 weeks for 99¢**

By PATRICK MCGREEVY

# California voters approve gun control measure Proposition 63

Exhibit 89

6



Store managers Jamie Taflinger, left, and Kendyll Murray show customer Cornell Hall, of Highland, different types of ammo at the Get Loaded gun store in Grand Terrace. (Gina Ferazzi / Los Angeles Times)

Following a year marked by a series of mass shootings, voters on Tuesday approved Proposition 63, which toughens California's already strict gun control laws.

The initiative outlaws the possession of ammunition magazines that hold more than 10 rounds, requires background checks for people buying bullets, makes it a crime not to report lost or stolen guns, and provides a process for taking guns from people upon their conviction for a felony.

The measure was proposed by Lt. Gov. Gavin Newsom, who late Tuesday called the vote "historic progress to reduce gun violence."

"It was a repudiation of the National Rifle Assn. and the gun lobby. They lost badly," Newsom said in an interview. "It's a very important initiative because I think it's the beginning of a national debate on relinquishment (by felons) and ammunition background checks that will I think will have a very significant impact on reducing gun violence in this country."

During the campaign, Newsom argued more laws are needed to keep guns out of the hands of criminals and terrorists following a series of mass shootings in the United States.

Tuesday's vote came nearly a year after two terrorists killed 14 people in San Bernardino. The Proposition 63 campaign ads also cited a mass shooting at an Orlando nightclub that killed 49 people in June and the 2012 massacre that left 20 children and several educators dead at Sandy Hook Elementary School in Newtown, Conn.

Exhibit 89

7

The opposition, which includes the <u>National Rifle Assn.</u>, argued it would create a burden on gun owners but that criminals will find a way to get around the new law.

Opponents also said Newsom was using the ballot measure to raise his profile ahead of his campaign for governor in 2018.

"Prop. 63 is another attempt by Newsom and his 1%, elitist friends to attack law-abiding Californians," said Craig DeLuz, a spokesman for the Stop Prop 63 Committee. "They want to replace the 'War on Drugs' with 'The War on law-abiding gun owners' so they can continue locking up young black and Latino men."

With the NRA focusing more of its resources in other states where gun control had more opposition, the campaign against Proposition 63 was outspent. Supporters raised close to $4.5 million, while opponents were able to raise about $868,000.

| READ LESS |
| --- |

ADVERTISEMENT

Nov. 8, 2016, 11:09 p.m.                                                                         🐦  📘  ➤

By DAVID MONTERO

# "Millions" fear their liberties will be threatened under a Trump administration, McMullin warns

Exhibit 89

8

# EXHIBIT 90

Exhibit 90

9

## In The Matter Of:

*Shawn J. Tardy, et al. vs.*
*Martin J. O'Malley, et al.*

---

*Christopher S. Koper, Ph.D.*
*Vol. 1*
*February 3, 2014*

---

*Gore Brothers Reporting & Videoconferencing*
*20 South Charles Street, Suite 901*
*Baltimore, MD 21201*
*410-837-3027*
*www.gorebrothers.com*



**Since 1961 - Serving MD, DC & VA - Worldwide**

**Min-U-Script® with Word Index**

Exhibit 90

10

1          IN THE UNITED STATES DISTRICT COURT

2              FOR THE DISTRICT OF MARYLAND

3                   (Northern Division)

4

5   SHAWN J. TARDY, et al.

6              Plaintiffs            Case No.

7   vs.                             1:13-cv-02841-CCB

8   MARTIN J. O'MALLEY, et al.

9              Defendants

10  _____/

11

12          The deposition of CHRISTOPHER S. KOPER,

13  PH.D. was held on Monday, February 3, 2014, commencing

14  at 1:48 p.m., at George Mason University, Research

15  Hall, 4400 University Drive, Fairfax, Virginia 22030,

16  before Amanda J. Curtiss,  CSR, Notary Public.

17

18

19

20

21  REPORTED BY:  Amanda J. Curtiss, CSR

1    APPEARANCES:

2

3              ON BEHALF OF THE PLAINTIFFS:

4              JOHN PARKER SWEENEY, ESQUIRE

5              JAMES W. PORTER, III, ESQUIRE

6              MARC A. NARDONE, ESQUIRE

7                   Bradley, Arant, Boult, Cummings, LLP

8                   1615 L Street, NW, Suite 1350

9                   Washington, DC 20036

10                  Telephone: 202-719-8216

11                  Facsimile: 202-719-8316

12                  Email: jsweeney@babc.com

13

14             ON BEHALF OF DEFENDANT, MARTIN J. O'MALLEY:

15             MATTHEW J. FADER, ESQUIRE

16                  Maryland Office of the General Attorney

17                  200 Saint Paul Place, 20th Floor

18                  Baltimore, Maryland 21201

19                  Telephone: 410-576-7906

20                  Facsimile: 410-576-6955

21                  Email: mfader@oag.state.md.us

1          MR. SWEENEY:  All right.  Let's pull out

2  the 2004 article.  Let's mark this as the next exhibit.

3  I think we're finally at five.

4          (Koper Exhibit 5 was marked for

5  identification.)

6              (Off the record.)

7  BY MR. SWEENEY:

8      Q     Let's go back on the record.

9          On page 81 of your 2004 report that we've

10  marked as Koper Exhibit 5, you state your conclusions

11  with respect to the effect of the assault weapon and

12  large capacity magazine federal ban; correct?

13      A     Are you referring to the first full

14  paragraph?

15      Q     Yes, I am.

16      A     That's a partial statement of it, yes.

17      Q     All right.  And you state there quote,

18  "Because offenders can substitute non-banned guns and

19  small magazines for banned AWs and LCMs," meaning

20  assault weapons and large capacity magazines?

21      A     Correct.

1  Q    "There is not a clear rationale for

2  expecting the ban to reduce assaults and robberies with

3  guns." Am I reading that correctly?

4  A    Yes.

5  Q    And that correctly and accurately state

6  your conclusion with respect to the impact on

7  firearm-related crime of the federal ban on assault

8  weapons and large capacity magazines; correct?

9  A    That's a partial statement of it.

10  Q    All right. But -- but accurate in and of

11  itself?

12  A    Yes.

13  Q    Okay. And when you say you would not

14  expect the assault weapon or large capacity magazine

15  ban to reduce assaults with guns, that would include

16  assaults leading to homicides; correct?

17  A    Not exactly. What I'm saying here is I

18  don't expect the overall level of assaultive violence

19  with guns to change whether or not these guns and

20  magazines are available, but what I am hypothesizing is

21  that changes in the use of these guns and magazines

1   could affect the share of attacks that involve -- that
2   result in injuries or deaths.
3        Q       But -- but they -- you would not expect a
4   ban on assault weapons or large capacity magazines to
5   actually reduce the number of firearm-related assaults
6   or robberies; correct?
7        A       Correct.
8        Q       And you would not expect a ban on assault
9   weapons or large capacity magazines to reduce
10  firearm-related home invasions; correct?
11       A       No.  Correct, I mean.
12       Q       And you wouldn't expect a ban on assault
13  weapons or large capacity magazines to reduce the
14  number of firearms assaults on police officers;
15  correct?
16       A       Correct.  That's fair enough.
17       Q       On note 95 on that page, you address I
18  believe state bans on assault weapons in which you say,
19  "A few studies suggest that state-level assault weapon
20  bans have not reduced crime."  Am I reading that
21  correct?

1    Q    All right.  And are you aware of anyone

2  else's data with respect to studying the impact of the

3  federal ban on assault weapons and large capacity

4  magazines that reached a conclusion different from the

5  conclusion that you state here?

6    A    No.

7    Q    Would you agree with me that the government

8  interest to be served by the federal assault weapon ban

9  and large capacity magazine ban was the reduction of

10  firearm-related violence; correct?

11    A    You could view it that way or you could

12  view it more specifically as trying to get a reduction

13  in shootings in incidents with high numbers of shots

14  fired.  And so, you know, again, I tended to view --

15  judge this more specifically in terms of effects on gun

16  injuries and gun deaths.  As I noted in the report,

17  given the trends in use of assault weapons and large

18  capacity magazines that had been observed to that

19  point, I felt it was actually premature to make any

20  definitive conclusions about the ban's effects on gun

21  deaths and injuries.  I felt that the effects of the

1    ban were still unfolding at that time and might still

2    take a while to fully unfold.

3        Q    Isn't it true that as you sit here today,

4    you cannot conclude with a reasonable degree of

5    scientific probability that the federal ban on assault

6    weapons and large capacity magazines reduced crimes

7    related to guns?

8        A    Correct.

9        Q    And it didn't reduce the number of deaths

10   or injuries caused by guns either; correct?

11       A    Correct.

12       Q    Returning to your report for a moment,

13   Professor.  I lost my copy of.

14            On paragraph five at the top of page two

15   you say, "Based on my research, I found, among other

16   things, that assault pistols" --

17       A    I'm sorry.  Could you clarify for me?

18       Q    I'm sorry.  Page two.

19       A    Page two.  Got you.

20       Q    Paragraph five.

21       A    Uh-huh.

1      Q      Under "Summary of Findings."

2      A      Okay.

3      Q      You state, "Based on my research, I found,

4   among other things, that assault pistols are used

5   disproportionately in crime in general, and that

6   assault weapons more broadly were disproportionately

7   used in murder and other serious crimes in some

8   available data sources," correct?

9      A      Yes.

10     Q      Let's see if we can pull that apart so I

11  can understand what you're saying here.  Now, how do

12  you define assault pistols?

13     A      Handguns that have the military style

14  features qualifying as assault weapons.

15     Q      And would you agree with me that they

16  became popularly used by criminals in connection with

17  the so-called crack epidemic of the 1980s?

18     A      I don't know that I can make a statement

19  that specific.  I can say that, I mean, there are

20  statistics in the report on how widely they were used

21  in crime.  Generally assault weapons accounted for a

1  which one might try to infer that, but the case, yeah,

2  it's not as clear.  It's fair to say.

3  BY MR. SWEENEY:

4      Q      Now, in paragraph eight of your report, you

5  state in the second sentence that Maryland's

6  recently-enacted ban on assault weapons and large

7  capacity magazines has the quote "potential" close

8  quote to accomplish a couple of things; correct?

9      A      Yes.  Okay.

10     Q      Now, when you say potential, I'm trying to

11 understand what you mean here.  Would you agree with me

12 that any law would have the potential to produce a

13 benefit?

14             MR. FADER:  Objection.

15             THE WITNESS:  Might depend on -- on what it

16 is.  In this case, you know, I'm saying potential based

17 largely on my studies of the federal assault weapons

18 ban and what -- what we found there.

19 BY MR. SWEENEY:

20     Q      Can you state with a reasonable degree of

21 scientific probability that the ban on assault weapons

1   and large capacity magazines in Maryland will reduce

2   the number of crimes committed with assault weapons and

3   other firearms with large capacity magazines?

4        A     I can't put a probability on that.  You

5   know, all I can say is based on the experience with the

6   federal assault weapons ban, that there are grounds for

7   believing that the Maryland law could achieve that in

8   extrapolating from the results of the federal study.

9   Otherwise, one has to actually study the implementation

10  of the Maryland law to begin putting, you know,

11  probabilities on it and measuring those effects.

12       Q     All right.  Can you say to a reasonable

13  degree of scientific probability that the ban on

14  assault weapons and large capacity magazines in

15  Maryland will reduce the number of shots fired in gun

16  crimes?

17       A     Not sure what you mean by a reasonable

18  probability 'cause I just I can't put a probability on

19  it and tell you how likely it is to occur.

20       Q     Can you say to a reasonable degree of

21  scientific probability that the Maryland ban on assault

1 weapons and large capacity magazines will reduce the

2 number of gunshot victims in such crimes?

3     A    Again, same answer. I can't state it with

4 an exact probability at this time.

5     Q    And if I ask you the same question with

6 respect to number four, reduce the number of wounds per

7 gunshot victim, and five, reduce the lethality of

8 gunshot injuries when they do occur, and six, reduce

9 the substantial societal costs that flow from

10 shootings, would your answer be the same?

11     A    Yes.

12     Q    Okay. Now, the Maryland law does not

13 prohibit all semi-automatic firearms; correct?

14     A    Correct.

15     Q    And criminals can substitute semi-automatic

16 firearms that aren't banned; correct?

17     A    Those and other guns.

18     Q    Right. And isn't that variable something

19 that you can't control and one of the reasons why you

20 can't say to any probability whether or not the ban

21 will accomplish the six items that you state in

1  paragraph eight of your report?

2           MR. FADER:  Objection.

3           THE WITNESS:  In principle, the

4  substitution of non-banned guns and magazines has the

5  potential to lessen the lethality and injuriousness of

6  gun attack incidents.  So I wouldn't say that the

7  Maryland ban is going to reduce the rate of gun crime,

8  but what I am saying is there's a possibility it could

9  reduce shots fired, people hit, wounds inflicted, those

10 sorts of things in attacks that -- that happen.

11 BY MR. SWEENEY:

12     Q     If a particular banned assault rifle, a

13 Colt AR-15, can readily be substituted with a Colt AR

14 HBAR, isn't the ban unlikely to have any significant

15 impact on the use of assault rifles in crime?

16     A     Well, that one particular instance, it

17 seems that the policy makers for whatever reason have

18 allowed one similar variation of the AR-15 to still be

19 legal.  I don't know what all the considerations were

20 in doing that.  I suppose it was part of political

21 bargaining.  But it does raise the possibility that

# EXHIBIT 91

Exhibit 91

23

1              UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF CALIFORNIA

3      ------------------------------x

4    VIRGINIA DUNCAN, et al.,

5                    Plaintiffs,

6            v.                      Case No.

7    XAVIER BECERRA, in his          17-cv-1017-BEN-JLB

8    official capacity as Attorney

9    General of the State of

10    California,

11                    Defendant.

12    ------------------------------x

13

14

15      DEPOSITION OF CHRISTOPHER S. KOPER, PH.D.

16                  Washington, D.C.

17               Friday, January 5, 2018

18

19

20

21    Reported by:

22    Michele E. Eddy, CRR, RPR, CLR

23    JOB NO. 135559

24

25

Exhibit 91

1    the 1990s, and gun crime dropped very

2    substantially throughout the 1990s.  But we

3    wanted to be careful in not necessarily

4    attributing that to the assault weapons ban.

5    There were a lot of factors that could be

6    driving down gun crime.

7          And what seemed -- what has always

8    seemed most logical to me is that a law like

9    this will be most likely to not necessarily

10    affect the level of gun crime, because people

11    who can't get assault weapons or high-capacity

12    magazines can still commit crime with other

13    guns and magazines, but what it can do is

14    reduce the likelihood that those gun crimes

15    result in injuries and deaths by forcing

16    offenders to use other sorts of weapons.

17          So that's why we looked at a lot of

18    the particular types of measures that we were

19    trying to emphasize in those reports rather

20    than just, you know, saying, well, gun crime

21    went down, you know, during the 1990s, and

22    trying to attribute that to the ban.  That

23    would be more theoretically ambiguous, and it's

24    just harder to do.  There are a lot of

25    different factors that could be affecting gun

Exhibit 91

1  crime during that time.

2      Q      Why would forcing criminal assailants

3  to use other sorts of weapons drive -- make a

4  criminal attack less lethal or less injurious?

5      A      The notion is that attackers with

6  assault weapons and high-capacity magazines

7  will, on average, fire higher numbers of shots.

8  And when you have higher numbers of shots being

9  fired in gun attacks, you'll have a greater

10 likelihood of deaths or injuries stemming from

11 those attacks.

12     Q      Possibly.

13            But what if they, instead of going to

14 reduced-capacity firearms, use airplanes or

15 Molotov cocktails or trucks going down New York

16 City streets?

17     A      Well, those are different ways that I

18 suppose someone can try to commit mass casualty

19 events.  But I guess I would also look at it

20 this way.  We have restrictions in federal law

21 on things like destructive devices and machine

22 guns that have long been outlawed and -- or

23 heavily regulated.  And that's because of their

24 capacity to inflict mass casualty incidents.

25            Well, despite that, we still have

Exhibit 91

1          So the government is within its

2     power, I guess you're saying to me, to regulate

3     those kinds of weapons.

4          A     To regulate particular types of

5     weaponry that appear to be particularly

6     dangerous, or there is the wording still in the

7     Heller decision about the types of weaponry the

8     government might still regulate.

9               MS. BARVIR:  Can we go off the

10        record.

11             (A brief recess was taken.)

12             MS. BARVIR:  Go back on the record.

13             Before we broke, I was going to enter

14        this new report into evidence as Exhibit 4.

15        (Exhibit 4 was marked for identification.)

16   BY MS. BARVIR:

17        Q     Can you identify this document for

18   me.

19        A     Yes.  This is an article that I wrote

20   with Darren Reedy back in -- published it back

21   in 2003.  It was looking at the outcomes of

22   attacks -- or contrasting the outcomes of

23   attacks involving semiautomatic pistols and

24   revolvers.

25        Q     So you recognize this document.

Exhibit 91

27

1     A     Yes.

2     Q     I'm sorry, what were you studying in

3     this 2003 report?

4     A     So we were comparing handgun attacks

5     involving semiautomatic pistols to those

6     involving revolvers in terms of their outcomes,

7     looking at things like shots fired, number of

8     people hit, number of wounds inflicted per

9     victim.

10     Q     Can you describe your conclusions in

11     this briefly.

12     A     Sure.  In this study we found that

13     attacks involving semiautomatic weapons, on

14     average, resulted in more shots fired, and, on

15     average, they resulted in more people hit than

16     did attacks with revolvers.

17     Q     Thank you.

18          The first page of the document that's

19     titled -- labeled 151, in the "Conclusion," can

20     you read the first sentence for me.

21     A     "The findings provide limited

22     evidence that recent growth in the production

23     and use of pistols has contributed to higher

24     levels of gunshot victimizations.  However,

25     available data did not permit an assessment of

1    whether the association between gun types and

2    assault outcomes are mediated by

3    characteristics of incidents and actors."

4         Q     Thank you.

5              The first bit says "limited

6    evidence."  In what way was it limited?

7         A     I guess in the sense that it was --

8    in some respects, it's kind of indirect

9    evidence.  So we're looking at this, and we're

10   saying, okay, attacks with pistols result in

11   more shots fired and more people hit.  So, by

12   extension, that suggests that this -- that

13   recent growth in the use of pistols over the

14   last few decades preceding this study had

15   likely contributed to growth in gunshot

16   victimizations.

17        Q     Okay.

18              So am I correct in understanding this

19   study was about the use of semiautomatic

20   pistols without regard to whether LCMs were

21   used?

22        A     Correct.  We could not measure that

23   exactly.

24        Q     Why is that?

25        A     The gun information was often

Exhibit 91

Page 59

1    limited.  Sometimes in the case files it just

2    said that it was a semiautomatic weapon, and it

3    didn't have the exact make and model or

4    magazine capacity.

5        Q    Is it fair to say that you're telling

6    me that there was insufficient data regarding

7    the use of LCMs to draw strong conclusions

8    regarding magazine capacity in this study?

9            MR. ZELIDON-ZEPEDA:  Objection.

10   Misstates the testimony.

11       A    We could not look specifically at

12   cases involving LCMs and test them against

13   others, but, by extension, the results

14   certainly have implications for use of LCMs

15   because we can expect that some -- that, in

16   general, these semiautomatics are going to have

17   higher ammunition capacities and that some

18   share of them -- we don't know exactly what

19   share, but that some share involved

20   high-capacity guns.

21       Q    Okay.

22            At the bottom of page 152, the first

23   column under "Methods," that last sentence

24   says, "The lack of specific gun model

25   information precluded precise measurement of

Exhibit 91

30

1    ammunition capacity for all but a very small

2    number of gunfire incidents."

3         Do you see that?

4    A    Yes.

5    Q    Do you know what the very small

6    number was offhand?

7    A    No.

8    Q    Is it accurate to say that a finding

9    of the 2003 study was that while pistol cases

10   involving more shots fired, they were not

11   significantly more likely to result in injury,

12   fatal or nonfatal, than were revolver cases?

13   A    If you're focusing on that specific

14   measure, what was the likelihood that the case

15   resulted in someone getting hit, I don't think

16   there was a difference there.

17   Q    The words that I'm gathering from --

18   it's on page 153.  Let's see if we can find it

19   so we're all under the same understanding here.

20   Yes, I think it's right under figure 2 there.

21   "Although pistol cases involved higher numbers

22   of shots, they were not significantly more

23   likely."  Right?

24   A    Okay.  Yes.

25   Q    Are you referencing statistically

Exhibit 91

31

1     A    "However, the key mechanism for a

2  semiautomatic weaponry effect is the number of

3  wounds; that is, does the higher number of

4  shots fired in pistol cases increase the

5  likelihood that gunshot victims will suffer

6  multiple wounds, thereby making it more likely

7  that victims will die?"

8     Q    You're posing the question of whether

9  a higher number of shots fired in pistol cases

10  increases the likelihood that victims will

11  suffer multiple wounds, making it more likely

12  they would die.  Correct?

13     A    Right.  That's one mechanism for a

14  semiautomatic effect.  So it could affect the

15  number of people wounded, or it could affect

16  the number who have multiple wounds.

17     Q    Right.

18          What was your conclusion?

19     A    In this particular study, we did not

20  find that there is a significant difference

21  between the two sets of cases.  I think the

22  actual number of wounds per victim was very

23  similar for the two groups.  I think the

24  proportion that had multiple wounds might have

25  actually been a little higher for the

Exhibit 91

32

1  semiautomatic cases, but for this particular

2  sample, number of gunshot wounds per victim was

3  not a key factor.

4      Q    Can you read the last sentence of

5  that paragraph for me.

6      A    "However, neither of these

7  differences"?

8      Q    "Therefore."

9      A    "Therefore, we would not expect

10  victims shot with pistols to die more

11  frequently than victims shot with revolvers,

12  holding gun caliber, wound location, the

13  victim's physical condition, and other relevant

14  factors constant."

15      Q    Remind me, which type of handgun can

16  accept attachable magazines, including LCMs,

17  pistols --

18      A    Pistols.

19      Q    I'm sorry, what was your answer?

20      A    Pistols.

21      Q    Thank you.

22      A    Sorry.

23      Q    So from this study, do you have any

24  way of determining whether LCMs were used in

25  the pistol cases studied in 2003?

Exhibit 91

1      A      I cannot say for sure how many did,

2   but it is likely -- in fact, I should say we

3   know that some did.  There were some cases in

4   the data where, yeah, we were able to make that

5   determination, just not enough to do a separate

6   analysis with those.

7            But it's reasonable to infer that,

8   you know, some number of these semiautomatic

9   pistol cases would have involved large-capacity

10  magazines, and we did find a number of attacks

11  that involved more than ten shots fired.

12     Q      You just don't know how many for sure

13  involved magazines over ten rounds?

14     A      That's correct.

15     Q      Okay.

16            You can't say -- so is it fair to say

17  that you can't say from this research that LCMs

18  weren't used in a majority of pistol cases you

19  studied?

20     A      I'm sorry, say that again.

21     Q      The double negative made it really

22  difficult.

23            Can you say from this research that

24  LCMs were not used in a majority of the pistol

25  cases you studied in 2003?

Exhibit 91

34

1    A    I can't say that for sure.  You're

2  saying that LCMs were not used in the majority.

3  That's what you're asking?

4    Q    I think that's what I'm asking.

5    A    I doubt that LCMs were used in a

6  majority of these cases, but I can't say for

7  sure.

8    Q    Why do you doubt that?

9    A    Because I've never -- in different

10  gun samples that I've looked at, I've never

11  seen -- well, I should correct that.  In much

12  of the time when you look at general samples of

13  guns used in crime, you don't see LCM firearms

14  generally accounting for the majority of the

15  semiautomatic weapons.

16    Q    What is a percentage you would

17  usually see?

18    A    Back around that time, around the

19  time that this work was being done, estimates

20  suggested, and, you know, and different data

21  sources, anywhere from, I think -- and I talk

22  about this in the 2004 report -- anywhere from,

23  like, 16 percent to 25 percent.  Recently I'm

24  seeing higher numbers than that, but back at

25  that time that's where it was.

Exhibit 91

1      Q    But you can't be sure.

2      A    Cannot be sure, no.

3      Q    Is it fair to say that based on the

4  data of this study that pistols equipped with

5  LCMs could actually be less likely to produce

6  deaths than revolvers?

7          MR. ZELIDON-ZEPEDA:  Objection.

8  Incomplete hypothetical.

9      A    I mean, I would have to look.  I

10  don't know for sure.

11     Q    Can you, using this data, support the

12  statement that gunshot injury incidents

13  involving LCMs were more likely to produce

14  death than those with revolvers?

15         MR. ZELIDON-ZEPEDA:  Same objection.

16     A    Yeah, I can't be entirely certain.

17  It's a reasonable extrapolation from the data,

18  but I can't say that for sure.

19     Q    How about the statement that gunshot

20  injury incidents involving LCMs were more

21  likely to produce death than those without

22  LCMs?

23         MR. ZELIDON-ZEPEDA:  Same objection.

24     A    Again, you would have to look more

25  closely at the data.  It could be that even

Exhibit 91
36

1    though the semiautomatic cases overall were not

2    more likely to produce multiple -- higher

3    numbers of wounds, if you were able to focus

4    specifically on the LCM cases, maybe you would

5    see that.  It's hard to know.

6        Q    But you couldn't do that.

7        A    Couldn't do that.

8        Q    Earlier you had alluded to finding

9    some number of incidents where more than ten

10   shots were fired.  I've seen approximations

11   around 5 percent.  Does that sound right?

12       A    No.  It depends on how you count,

13   whether you're counting incidents or whether

14   you're counting victims.  So we found that 2

15   and a half to 3 percent of the gunfire

16   incidents involved more than ten shots fired.

17   They accounted for 4 to 5 percent of the

18   victims in the sample.

19       Q    Thank you for that clarification.

20            How many incidents did you find where

21   more than ten shots were fired?

22       A    You have to look at table 1 to see

23   this.

24       Q    Page 154?

25       A    Yes.

Exhibit 91

1     Q     You're going to have to help me with

2 this.

3     A     So it's six by the minimum estimate.

4 Two, three, four, five, six.  If you go by --

5     Q     Where do you see that?

6     A     Table 1, in the first column, under

7 "Minimum Estimates," and you have "Pistol

8 Incidents" and then --

9     Q     "Shots fired, ten or more," so you

10 count up the 11, 12, 13.  Is that right?

11     A     Yes.  So six by the minimum estimates

12 or, let's see, one, two, three, four, five,

13 six -- or seven by the maximum.

14     Q     Is the maximum the number in the

15 parentheses, or where is -- oh, on the other

16 side of the table.

17     A     Right.

18     Q     Thank you.

19     A     Yes, on the other side of the table.

20     Q     Sorry.

21           So six or seven.

22           Out of how many incidents total that

23 you were looking at this sample?

24     A     So there were 165 pistol incidents.

25 Actually, I should say two.  I shouldn't forget

Exhibit 91

1   the revolver cases.  They were in there, too.

2       Q    And that adds the 71?

3       A    Yes.

4       Q    What is that number?

5       A    Yes, so 71 revolver incidents.

6       Q    And 165 pistol?

7       A    Yes.

8       Q    Was that 236?  That's the number I

9   get.  I think that's right.

10       So 6 out of 165 incidents with

11  semiautomatics involved more than ten shots

12  fired.

13       A    Yes.

14       Q    That's roughly 3.6 percent?

15       A    Yes, 3.6 to 4 if you go with the

16  maximum incidents.

17       Q    Thank you.

18       Can you explain to me why you focused

19  on crime with more than ten shots fired here?

20       A    We didn't actually highlight that

21  particular issue in this article.  In this

22  article we were just focusing on the issue of

23  semiautomatics versus revolvers.  It was in my

24  later 2004 assault weapons report that I drew

25  more attention to this particular issue because

Exhibit 91

1    it seemed very relevant to assessing what sorts

2    of effects bans on large-capacity magazines

3    might have on gunshot victimizations.

4        Q    So you did more focus on the ten

5    shots -- you had a finding in 2003 that there

6    were a small number of events where more than

7    ten shots were fired, but you didn't really

8    study that and really study the ten shots until

9    2004.  Is that what you're saying to me?

10        A    Yes.  I don't believe that I

11   highlighted it in this particular article.  It

12   was an issue that I highlighted more in the

13   2004 DOJ report.

14        Q    I think that's correct, yes.  Thank

15   you.

16             But, in any event, 2004, 2003, why

17   are we focusing on ten shots fired in our

18   research?

19        A    Well, because that's the limit on --

20   typical limit on magazine capacity.  It

21   certainly was under the federal law and under

22   many state laws.

23             So one way to gauge the potential

24   effects that restrictions on LCMs -- sorry,

25   large-capacity magazines -- sometimes I'll slip

Exhibit 91

40

1    into LCMs.

2        Q    That's fine.

3        A    One way to gauge the potential

4    effects of that sort of law is to look at how

5    frequently more than ten shots are fired in gun

6    attacks and try to assess how many gunshot

7    victimizations stem from those attacks.

8        Q    But what is so special about ten?

9    Like why do you suppose the government set the

10   number at ten?

11            MR. ZELIDON-ZEPEDA:  Objection.

12       Calls for speculation.  Lacks foundation.

13       A    Yes, I mean, I don't know why they

14   would necessarily have picked ten as the limit.

15   Certainly you could -- from a prevention

16   perspective, you could argue for a lower limit.

17   They would have a greater effect.  But ten has

18   been where a lot of people have settled.  I

19   assume that reflects kind of the give-and-take

20   of the political process so that was where they

21   set it.  If that answers your question.

22       Q    Perfectly.  Thank you.

23            Have you done any research that

24   segregates different magazine capacities?  For

25   instance, have you studied the differences in

1     outcomes maybe between ten rounds -- what about

2     11 rounds, 15, 17, 27, 30, 50?

3        A    No, I don't think so.  Especially if

4     you're asking if I looked at attacks, say, with

5     a gun that has a 20-round magazine versus those

6     where I know it was a seven-round or something,

7     no.

8        Q    Or 27 versus 11, 10.

9        Do you know of anyone who has done

10     that kind of research?

11        A    I don't think I've seen anything like

12     that, to my knowledge.

13        Q    So sitting here today, can you state

14     with any reasonable degree of certainty that

15     it's the addition of that 11th round that makes

16     a difference and not, say, the 15th?

17        MR. ZELIDON-ZEPEDA:  Objection.

18     Vague.

19        A    My logic in focusing here is to look

20     at how often -- if you're going to restrict

21     magazines at ten rounds, how often could that

22     make a difference, how often could that prevent

23     people from firing a higher number of shots.

24     If you're getting at the notion of like looking

25     at these sorts of attacks and determining how

1    often, say, a person was hit by an 11th shot as

2    opposed to a 15th shot or something along those

3    lines, I haven't seen anything like that.

4    People haven't dug in that far.

5        Q    Or even -- that could be one way of

6    looking at it, I suppose, but also using -- I

7    don't know if there's a way to show what the

8    magazine capacities were above ten rounds, if

9    there's any way to -- has anyone researched,

10    like, what are the numbers over 11, what are

11    the numbers over 15, what are the numbers over

12    17, et cetera.

13        A    I mean, other than showing here, you

14    know, how many cases involved, you know, say

15    like 11 or 15 or what have you, no, I don't

16    think there's -- I don't think there's been

17    much more detail than that.  I don't know what

18    things you might see if you fished around in

19    the numbers.

20        The general principle is that more

21    shots fired seems to be associated with more

22    victims hit, more wounds.  But beyond that, I

23    don't know if anyone has gotten into those

24    types of specifics that you mentioned.

25        Q    So to the extent that your research

Exhibit 91

1  and what seems to be out there is aggregating

2  all incidents involving magazines over ten

3  rounds, without any distinction as the

4  capacities grow, would it be true like that you

5  would just increase your numbers of gun

6  incidents and shots fired, et cetera, if you

7  keep going down, if you change the definition

8  to, say, five rounds or six rounds?

9      A     Yes, one would expect that if you did

10  that, if you went down to lower limits, that,

11  yeah, you could prevent even more -- have more

12  of a preventive effect on number of shots fired

13  in victimizations.

14      Q     And your research would capture more

15  crimes that would fit the bill of an LCM crime.

16      A     Yes.

17      Q     All right.  I would like to discuss

18  your 2004 Baltimore Sun editorial,

19  "Disassembling the assault gun ban."

20      A     Okay.

21          MS. BARVIR:  We'll mark that.

22      (Exhibit 5 was marked for identification.)

23      Q     I was able to get this off the

24  Internet.  It's not the one that -- it's not

25  like a court copy, but I hope we can agree that

Exhibit 91

1     A    Yes.

2     Q    Which we can't -- we haven't been

3 able to establish that certainly that will be

4 the case, or to a reasonable degree of

5 certainty.

6     A    We don't yet have any data showing us

7 that, yes, that happened.

8     Q    "That happened" being the LCM ban had

9 an impact on gun crime?

10    A    Right, right.

11    Q    Move to page 81.

12      The last full paragraph before the

13 9.1 break summarizes another finding.  "Because

14 offenders can substitute non-banned guns and

15 small magazines for banned AWs and LCMs, there

16 is not clear rationale for expecting the ban to

17 reduce assaults and robberies with guns."

18    A    Correct.

19    Q    That's right?

20      Does that statement in your 2004

21 report correctly and accurately state your

22 conclusion with regard to the impact on

23 firearm-related crime, the federal ban?

24    A    Yes, that's my view, that

25 restrictions like this are not likely to affect

Exhibit 91

1    number of people killed, what is the number.

2    Sometimes two people differentiate between

3    different categories of mass shooting events,

4    like those that occur in a public place versus

5    all of them.

6              In the latest study that my

7    colleagues and I did, the 2017 paper, we just

8    tried to look broadly at incidents involving

9    four or more people murdered, and we just used

10   that broad definition in the latest study.  But

11   there is no agreed-upon standard to use.

12        Q    So throughout your report it might

13   mean different things depending on whose work

14   or what opinions you're making and what

15   research you were -- or data you were looking

16   at.  Is that accurate?

17        A    Yes.

18        Q    Is there anything in your 2004 report

19   that analyzes the impact of the federal ban on

20   homicide rates?

21        A    On the homicide rate specifically,

22   no.  We did do some descriptive analyses

23   looking at some different indicators reflecting

24   the injuriousness and/or lethality of gun

25   violence during that period.

1      Q      What did those analyses say?

2      A      There are a number of different

3  measures one might look at.  Figure 9.1 on page

4  82, for example, "Percentage of violent gun

5  crimes resulting in death," that's something

6  that might conceivably be driven down by

7  assault weapons, LCM restrictions.  On later

8  pages later in this chapter -- let me see here,

9  I'll go back.  Figure 9.3 on page 94,

10  "Percentage of gunshot victimizations resulting

11  in death," figure 9.4 on page 96, "Percentage

12  of gunfire cases resulting in gunshot

13  victimizations," that wouldn't be specific to

14  deaths.  That's just people getting shot or

15  injured per case, but ... let's see.

16          There are some other -- table 9.4 has

17  some other measures that we considered and

18  looked at, like victims per gun homicide

19  incident.  That's in table 9.4.  That's also

20  specific to homicides.  Some of the other

21  measures we look at in table 4 get into things

22  like wounds, wounds per victim.

23      Q      You're saying these are all sorts of

24  analyses -- all sorts of trends that can be

25  driven down by an LCM ban or an AW ban?

Exhibit 91

47

1      A      Yes.

2      Q      What is your basis by saying that?

3  Why do you think that?

4      A      If the assault weapons or

5  large-capacity magazine restrictions result in

6  fewer people getting shot per gun crime, so if

7  they don't affect the number of gun crimes and

8  the number of assaults but they make those

9  assaults less likely to result in injury or

10  death, then these are some of the types of

11  measures that might help to reveal that and

12  show that over time.

13      Q      Is there any statewide data that

14  would show, in states that have these types of

15  bans, that that's actually happening?

16      A      I don't think so.  Well, you could

17  look at certain things at the state level.  You

18  could look at the ratio of, say, gun murders to

19  nonfatal gun crimes.  Unfortunately, it's --

20  I'm not aware of any estimates, state-level

21  estimates on shootings.  You would probably

22  have to go into lots of jurisdictions and try

23  to collect these sorts of data from local

24  police agency records and look at it in

25  different places.

Exhibit 91

48

1    Q    I have one more quote I want to ask

2  you about on page 196 in the summary.  I guess

3  it's a summary of yet another set of findings.

4  Correct?

5    A    Yes.

6    Q    Can you read for me the third

7  sentence.

8    A    "Therefore" -- starting with

9  "Therefore"?

10    Q    Yes.

11    A    "Therefore, we cannot clearly credit

12  the ban with any of the nation's recent drop in

13  gun violence.

14    Q    Is that still your opinion today?

15    A    Yes.

16    Q    Based on the federal ban's impact --

17  the research you did in 2004?

18    A    Yes.

19    Q    Can you read the next sentence.

20    A    "And, indeed, there's been no

21  discernible reduction in the lethality and

22  injuriousness of gun violence, based on

23  indicators like the percentage of gun crimes

24  resulting in death or the share of gunfire

25  incidents resulting in injury, as we might have

1     expected had the ban reduced crimes with both

2     assault weapons and large-capacity magazines."

3         Q      So you're telling me that you think,

4     from all these figures and tables that we just

5     went through, those are the sorts of things

6     that could go down with an LCM ban or an AW

7     ban, but you didn't see that happening during

8     the time the federal ban was in effect?

9         A      No, because use of large-capacity

10    magazines have remained high for at least

11    through the late 1990s and into the very early

12    2000s.

13        Q      LCM use remained high?

14        A      Yes. It remained high or rising

15    through the late 1990s. There were indications

16    it was starting to come down a little bit by

17    the early 2000s, but they had not yet gone down

18    below preban levels, and that was as far as I

19    could go with the data I had at that time.

20        Q      They remained high through the late

21    '90s, started to go down, I'm sorry, did you

22    say in the early 2000s?

23        A      It looked like, once we got into the

24    early 2000s, that maybe they were starting to

25    go down, but I was seeing kind of -- there's

1    limited data, and I was seeing mixed

2    indications.  So I couldn't really conclude at

3    that time, based on what was available, that

4    LCM use had declined.

5         Q     What was the trend in the violent

6    crime rates at that time?

7         A     They were going down.

8         Q     They were going down.

9               What about gun homicide rates?

10        A     That was going down.

11        Q     What about the number of deaths in

12   gun crime?

13        A     Yes, gun deaths were going down.

14        Q     Okay.

15              Do you know of anyone else who has

16   studied the impact of the federal ban and

17   reached different conclusions than you have?

18        A     No.  I did mention in my expert

19   report, I think, at least one other study, one

20   other recent econometric study that had looked

21   at the -- it was evaluating the effects of the

22   assault weapon bans on gun murder, and I think

23   that one also didn't find an effect from the

24   federal law.

25        Q     So you're saying they agreed with --

1  intermediate outcome of decreasing the number

2  of assault weapons or LCMs that were appearing

3  in crime was really -- that's kind of the

4  extent of what your research found in 2004?

5      A     That was the key finding, was that --

6      Q     The key, thank you.

7      A     That there were mixed -- that there

8  were mixed trends there.  The use of assault

9  weapons had gone down, but looking more broadly

10  at use of all high-capacity weapons, that those

11  had not yet gone down at the time that I

12  finished the study.

13      Q     And you also didn't find the more

14  distal -- is that the word you used -- outcome

15  of --

16      A     Uh-hmm.

17      Q     -- actually affecting crime rates --

18  gun violent crime rates, gun murders -- I'm

19  sorry.

20      A     Yes, gun murders and gun injuries,

21  correct.

22      Q     What would you say is the ultimate

23  outcome that the federal ban was trying to

24  effect?

25      A     Ultimately, the goal was to reduce

1    crimes committed with high-capacity

2    semiautomatic -- well, assault weapons and

3    other high-capacity semiautomatic weapons to,

4    in the long run, reduce shootings and deaths

5    stemming from the use of those weapons.

6        Q    So it sounded like the intermediate

7    outcome would have been reducing the crimes

8    using the LCMs and/or assault weapons so that

9    you can get to the more distal outcome of

10   reducing shootings and deaths.

11       A    Yes.

12       Q    As you sit here today, can you

13   conclude with any reasonable degree of

14   scientific probability that the federal ban

15   actually reduced crimes related to guns?

16       A    Crimes related to guns?

17       Q    Gun crime.

18       A    Gun crime?  No, I wouldn't.  I would

19   not say that it affected the rate of gun crime.

20       Q    Can you say with a reasonable degree

21   of scientific probability that the federal ban

22   reduced the number of injuries caused by guns?

23       A    I can't say that during the time that

24   it was in effect, based on the data that I

25   have.

Exhibit 91

53

1     Q    What about the number of deaths

2  caused by guns?

3     A    No.

4     Q    I think we're good with this for now.

5     A    Let me -- there is one thing I should

6  qualify, though, which is that I made that

7  conclusion based on the data that I studied,

8  which went only up through the very early part

9  of the 2000s.  If there is other data that came

10  out more recently suggesting that the ban was

11  making more of a dent in use of overall

12  high-capacity, semiautomatic weaponry by the

13  very end, very late period, like '03 and '04,

14  based on The Washington Post's study of LCM

15  trends in Virginia, that does raise the

16  possibility that maybe it was having a little

17  bit more of a desired effect by that very late

18  period, but that was just something that I

19  didn't -- wasn't within the scope of my study.

20     MS. BARVIR:  I'm going to mark this

21    as Exhibit 7.

22   (Exhibit 7 was marked for identification.)

23     Q    Do you recognize this document?

24     A    Yes.

25     Q    Can you describe it for me.

Exhibit 91

54

1    A    It was a book chapter that I wrote in

2    2013 that summarized the results from my 2004

3    DOJ report.

4    Q    Again, this was not based on new or

5    original research on the federal ban, but it

6    was more like a summary of the findings and

7    what happened in the year 2004.  Correct?

8    A    Yes, that's correct.  I had done no

9    additional analysis here.  I did report on a

10   few other things that were relevant that had

11   come out since then, but I didn't do any -- had

12   not done any further research on the issue.

13   Q    Was The Washington Post data that you

14   were referring, was that done -- was that

15   involved in this at all?

16   A    I did mention it.

17   Q    You did mention it.  Okay.  Thank

18   you.

19        I'll just keep this for safekeeping

20   for now.

21        Finally, because we've talked about

22   it a few times, I would like to enter your 2017

23   report.  I don't have any questions on it at

24   this time.  And that's Exhibit 8.

25   (Exhibit 8 was marked for identification.)

# EXHIBIT 92

Exhibit 92
56



**SOAPBOX**

# Prop. 63 will reduce gun violence and send a message to NRA

**BY GAVIN NEWSOM**
*Special to The Bee*

October 26, 2016 02:10 PM
Updated October 28, 2016 09:16 AM

It shouldn't feel normal, and it shouldn't feel familiar when we hear about yet another horrific mass shooting.

We've seen the headlines so many times that we risk forgetting what they truly mean: loss, pain and unspeakable sadness. And we can never let the incessant bad news about gun violence lull us into a sense of helplessness and hopelessness.

We can and must do more to save more people – and Proposition 63 is part of that effort.

ADVERTISING

Exhibit 92
57



Replay

Learn more

From 2004 to 2014, more than 1.1 million Americans were killed or seriously injured by guns, including more than 99,000 children and more than 100,000 Californians. More than 32,000 Americans are killed by guns each year.

**Today's top news by email**

The local news you need to start your day

Enter Email Address

I'm not a robot
reCAPTCHA
Privacy - Terms

SIGN UP

We need to make a change. I sat in horror after the school shooting in Newtown, Conn., and thought: We have to take action now.

Then, more mass shootings, more lives lost. A father wished his daughter well as she headed back to the University of California, Santa Barbara, only to find out she had been shot and killed in front of her sorority.

A group of friends went out for a fun night at a club in Orlando that quickly turned into a nightmare. Most of the daily violence and tragedies don't make the news, but each and every shooting has its own heartbreaking story.

Then, I heard something that struck me directly: We are all answerable, all of us. I began to ask myself what I could do, and what the American people could do, to get our government to change these laws and to save lives.

So I reached out to the Law Center to Prevent Gun Violence and together we crafted Proposition 63, the Safety for All Act, on the November ballot.

Proposition 63 represents a historic and unprecedented chance for California voters to stand up to the National Rifle Association and bring about bold change.

The measure would ensure that people banned from owning guns do not possess them and require the reporting of lost and stolen guns. It would also require information sharing with our federal system on people prohibited from owning weapons, prohibit the possession of large-capacity military-style magazines and treat ammunition sales as gun sales – all to keep guns and ammo out of the wrong hands.

California has been leading for decades through the passage of smart gun laws, and we know for a fact that they work.

Exhibit 92

58

So let's do more and save more lives. We are not innocent bystanders. Proposition 63 will reduce gun violence.

*Gavin Newsom is lieutenant governor of California and chief proponent of Proposition 63. He wrote this viewpoint on behalf of the Yes on Prop. 63 campaign and can be contacted at gavin@gavinnewsom.com.*

### RELATED STORIES FROM SACRAMENTO BEE



Prop. 63 would complicate gun laws and hamper law enforcement



Which way will you vote? Pro, con arguments on ballot measures could help you decide



What you need to know about California's 17 ballot measures



California's gun control initiative would toughen already-strict laws

Barbra Streisand endorses California gun control initiative

Exhibit 92
59

## CERTIFICATE OF SERVICE

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**DECLARATION OF ANNA M. BARVIR IN SUPPORT OF PLAINTIFFS' COURT-ORDERED SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT; EXHIBITS 89-92**

on the following parties by electronically filing the foregoing on June 11, 2018, with the Clerk of the District Court using its ECF System, which electronically notifies them.

| | |
|---|---|
| John D. Echeverria | Mr. Anthony P. O'Brien |
| Deputy Attorney General | Deputy Attorney General |
| john.echeverria@doj.ca.gov | anthony.obrien@doj.ca.gov |
| 300 South Spring Street, Suite 1702 | 1300 I Street, Suite 125 |
| Los Angeles, CA 90013 | Sacramento, CA 95814 |

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 11, 2018, at Long Beach, CA.

/s/Laura Palmerin
Laura Palmerin