1  C.D. Michel – SBN 144258
   Sean A. Brady – SBN 262007
2  Anna M. Barvir – SBN 268728
   Matthew D. Cubeiro – SBN 291519
3  MICHEL & ASSOCIATES, P.C.
   180 E. Ocean Boulevard, Suite 200
4  Long Beach, CA 90802
5  Telephone: (562) 216-4444
   Facsimile: (562) 216-4445
6  Email: abarvir@michellawyers.com

7  Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| VIRGINIA DUNCAN, et al.,<br><br>      Plaintiffs,<br><br>v.<br><br>XAVIER BECERRA, in his official capacity as Attorney General of the State of California,<br><br>      Defendant. | Case No: 17-cv-1017-BEN-JLB<br><br>**PLAINTIFFS' COURT-ORDERED REPLY TO DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**<br><br>Hearing Date: April 30, 2018<br>Hearing Time: 10:30 a.m.<br>Judge: Hon. Roger T. Benitez<br>Courtroom: 5A |

# INTRODUCTION

The dissent in *Friedman v. City of Highland Park*, 784 F.3d 406 (7th Cir. 2015) aptly describes this case and the wrongheadedness of the state's argument:

> To be sure, . . . large capacity magazines are dangerous. But their ability to project large amounts of force accurately is exactly why they are an attractive means of self-defense. While most persons do not require extraordinary means to defend their homes, the fact remains that some do. Ultimately, it is up to the lawful gun owner and not the government to decide these matters. To limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government—a result directly contrary to our constitution and to our political tradition.

*Id.* at 413 (Manion, J., dissenting). The Court should heed Judge Manion's words and find that section 32310 does not comport with *Heller* or the constitution.

# ARGUMENT

## I. The Second Amendment Protects Magazines Over Ten Rounds

Few dictates from *Heller* are clearer than which types of arms come within the Second Amendment's scope. More than once, the Supreme Court clarified that the constitution protects arms "typically possessed by law-abiding citizens for lawful purposes" or those in "common use" for lawful purposes. *Heller*, 554 U.S. at 624-25. The state does not dispute that magazines are "arms" for Second Amendment purposes. *See* ECF No. 62 at 3-14. Nor does it overcome Plaintiffs' evidence that Americans commonly possess them for self-defense. *See id.* Given this evidence, and *Heller*'s clear instruction that the Second Amendment extends to arms in "common use," section 32310 restricts constitutionally protected conduct.

Hoping to avoid this conclusion, the state claims that the existence of four capacity-based restrictions and six machine-gun bans constitute "longstanding regulation" sufficient to strip these common magazines—overwhelmingly chosen for self-defense—of Second Amendment protection altogether. *Id.* at 4:6-6:11. The state also argues that section 32310 does not burden Second Amendment conduct because magazines over ten rounds are "most suitable in military service." *Id.* at

1

6:12-9:11. These claims are meritless.

### A. There Is No Longstanding History of Similar Laws

California's broad restriction does not "resemble prohibitions historically exempted from the Second Amendment." *Fyock v. Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015). "[L]arge-capacity magazines" have not been "the subject of longstanding, accepted regulation." *Id.* To the contrary, as this Court has recognized, there is simply no "evidence that magazine capacity restrictions have a historical pedigree." ECF No. 28 at 21. Whatever historical evidence there may be about capacity-based restrictions, it simply evidences no longstanding tradition.

Though firearms capable of holding more than ten rounds existed since at least the 1500s, there were no ammunition capacity restrictions "from the colonial period to the dawn of American independence on July 4, 1776, and through the ratification of the fourteenth Amendment." ECF No. 50-10, Ex. 12 at 307. Indeed, the first such laws were passed in 1927. *Id.* While laws adopted in the twentieth century *may* be part of a historical tradition, *Fyock*, 779 F.3d at 997, the laws cited here simply are not. Capacity regulation has been the exception, not the rule. For example, in 1927, Michigan and Rhode Island passed restrictions on firearms over 16 and 12 rounds, respectively. ECF No. 50-10, Ex. 12 at 304 (citing ECF No. 50-2, Ex. 69 at 11-12, Ex. 70 at 18). Ohio began licensing firearms over 18 rounds in 1933. ECF No. 50-10, Ex. 12 at 304 (citing ECF No. 50-2, Ex. 71 at 21). None of these laws set the limit as low as ten, and all were repealed. ECF No. 50-10, Ex. 12 at 304 (citing ECF No. 50-2, Exs. 73-75).

At the federal level, Congress passed the only nationwide restriction in 1994. ECF No. 50-2, Ex. 76 at 51-54. It lasted only ten years and lapsed because it accomplished little. ECF No. 50-18, Ex. 58 at 865. The '90s also saw the first statewide ban of the modern era: New Jersey's 15-round restriction. ECF No. 50-1 at 11:21-24 (citing ECF No. 50-2, Ex. 77 at 79). Just six states followed suit. ECF No. 50-1 at 3:24-28; ECF No. 50-2, Exs. 79-86. Each under 30 years old, these laws

are hardly "longstanding." *See Heller*, 554 U.S. at 635 (overturning a 33-year-old law).

Thus, the District of Columbia, which first restricted firearms capable of discharging 12 or more rounds without reloading in 1932, stands alone as the only jurisdiction with a longstanding restriction on ammunition capacity. ECF No. 50-10, Ex. 12 at 305 (citing ECF No. 50-2, Ex. 78 at 82). But even that law is of dubious significance. For, as *Heller* held, "we would not stake our interpretation of the Second Amendment upon a single law, in effect in a single city." 554 U.S. at 632.

The state cites six other states with Prohibition-era laws, claiming they restricted firearms based on their ammunition capacity. ECF No. 62 at 4:27-5:10. But these laws were *machine gun bans*; they regulated magazine capacity only in the context of fully automatic firearms.[1] And the South Dakota and Virginia laws did not ban firearms based on their capacity at all. They merely banned their use in the commission of violent crimes or for offensive purposes. ECF No. 53-1, Ex. A at 4, Ex. B at 9. These laws are not remotely like the state's flat ban on common magazines over ten rounds possessed for use in *any* firearm for *any* purpose. They provide no historical basis for excluding common handgun and rifle magazines from the Second Amendment's protection.

What's more, no court has held that history supports capacity-based magazine restrictions. Indeed, nearly every court addressing the issue has held that magazine bans like section 32310 likely *do* implicate the Second Amendment. ECF No. 63 at 3:15-25. And even the two courts that withheld protection did not hoist their flag on limited historical regulation. *See Kolbe v. Hogan*, 849 F.3d 114, 144 (4th Cir. 2017)

---

[1] The state explains that the South Dakota and Virginia laws "applied explicitly to semiautomatic firearms," suggesting that the laws were not machine gun bans at all. ECF No. 62 at 5:10-11 (citing ECF No. 53-1, Ex. A at 3, Ex. B at 8). While the word "semiautomatic" does appear in these definitions, it does not apply to semiautomatics as we understand them today. For the definitions refer to "semiautomatics" that expel many rounds "by a single function of the firing device"—that is, *automatic* firearms. ECF No. 53-1, Ex. A at 3, Ex. B at 8.

3
PLAINTIFFS' REPLY TO DEFENDANT'S SUPPLEMENTAL BRIEF
17cv1017

(en banc); *Worman v. Healey*, 293 F. Supp. 3d 251, 266 (D. Mass. Apr. 5, 3018).

Again, the state has pointed to a single historical law still in effect, three repealed statutes from the early twentieth century, a handful of irrelevant machine gun laws from the same period, and several statutes barely 30 years old. Only the most deferential view of "longstanding" could accommodate such scant evidence. This Court should not be the first to withhold constitutional protection of common magazines possessed for self-defense on such flimsy grounds.

### B. *Heller*'s "Common Use" Test, Not *Kolbe*'s "Military Use" Test Governs Which Arms the Second Amendment Protects

The state also asks the Court to uphold section 32310 under the "most useful in military service" test set forth in *Kolbe* and *Worman*, ECF No. 62 at 6:12-7:2— two out-of-circuit cases that ignore Supreme Court precedent. Again, *Heller* is clear that arms that Americans commonly own for lawful purposes qualify for Second Amendment protection. 554 U.S. 570 at 624-625; *accord Fyock*, 779 F.3d at 998. *Heller* is also clear that arms not typically possessed for lawful purposes do not qualify. 554 U.S. 570 at 627. It is *not* clear from *Heller* that the government may ban arms because they are "most suitable for military purposes"—whatever that means. To be sure, while *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1028 (2016), clarified that military utility is not a predicate for protection, it did *it* hold that it excludes a weapon from protection. *These* are the binding rules.

The *Kolbe* majority, and now the state, complain that *Heller*'s "common use" test is too difficult to apply and, on that basis, reject it altogether. *Kolbe*, 849 F.3d at 135-36; ECF No. 62 at 7:18-24. Then, they seize upon *Heller*'s passing reference to weapons "like 'M-16 rifles' " to propose a novel test. *Kolbe*, 849 F.3d at 136; ECF No. 62 at 7:18-24. Crafting a rule that would justify banning arms simply because they are useful to the military, while gutting "common use," is dishonest at best.

It is undeniable that the technological gap between the arms of the American revolutionaries and their English adversaries was virtually non-existent, while the gap between weapons commonly owned by American civilians and our military

4
PLAINTIFFS' REPLY TO DEFENDANT'S SUPPLEMENTAL BRIEF
17cv1017

today could hardly be more pronounced. So we tolerate the growing chasm between the prefatory and operative clauses. But it defies both common sense and the text of the Second Amendment to claim that military utility forecloses Second Amendment protection. If it could, the state could simply purchase the right out of existence.

What *Kolbe* and the state ignore is that "M-16 rifles and the like" are not "typically possessed by law-abiding citizens" today. *Heller*, 554 U.S. at 625, 627. While *Heller*'s reference to arms "most suitable for military purposes" might exclude weapons like "Gatling guns, mortars, [or] bazookas . . . , no one could claim these items were ever commonly possessed for lawful purposes. Indeed, such 'M-16 rifles and the like' are outside the Second Amendment because they 'are highly unusual in society at large.' " *Kolbe*, 849 F.3d at 156 (Traxler, J., dissenting) (quoting *Heller*, 554 U.S. at 627),

Perhaps the worst aspect of the *Kolbe* and *Worman* decisions is their failure to articulate any principles for evaluating what makes an item most useful for military service. ECF No. 63 at 5:21-6:14. At the extremes, perhaps this makes sense. A belt-fed machine gun capable of firing 1200 rounds per minute versus a semi-automatic handgun makes an easy comparison. But a magazine of 10 rounds versus a magazine of 15 invites the sort of ad hoc judicial law-making that courts must resist indulging.

Regardless, even if *Kolbe*'s military use test were appropriate, the state's evidence does not support its argument. First, the state cites two federal reports finding that "large capacity magazines" are military arms that serve no sporting purpose. ECF No. 62 at 7:8-17 (citing ECF No. 53-7, Ex. 12 at 540, Ex. 13 at 557-58). Setting aside that these reports focus on sporting uses and ignore the core right of self-defense, neither report stands for the state's claim that magazines over ten rounds are military grade. That is because *both* define "large capacity magazines" as those capable of holding 20 to 30 rounds. No. 53-7, Ex. 12 at 540, Ex. 13 at 557-58). So even the state's most convincing evidence contradicts its own position that 11 is

5
PLAINTIFFS' REPLY TO DEFENDANT'S SUPPLEMENTAL BRIEF
17cv1017

the threshold for military use.

Similarly, Police Chief Charlie Beck's opinion that "30-round magazines" pose a threat does not explain why a ten-round capacity ceiling is proper; nor does it support a claim that such magazines are useful in military service. ECF No. 63 at 7:5-10 (citing ECF No 53-11, Ex. 29 at 1291). Finally, the Sandy Hook report's "finding" that magazines over ten rounds pose a threat to safety self-evidently does not explain why such magazines are most useful to the military. *Id.* at 7:11-15 (citing ECF No. 53-10, Ex. 28 at 1097).

With no real evidence offered in support of its "military use" argument, the Court should not hesitate to ignore the aberrant Second Amendment analysis from *Kolbe* and *Worman* that the state seeks to advance.

## II. The State's Extreme Magazine Ban Cannot Survive Heightened Scrutiny

### A. The State Continues to Mischaracterize Its Burden Under Heightened Scrutiny and Demands Undue Deference

Under heightened review, a challenged law is *presumed* unconstitutional, and the state bears the burden of justifying the law's constitutionality. *See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). Under intermediate scrutiny, this requires the state to prove a "reasonable fit" or "substantial relationship" between the law and an important government objective. *United States v. Chovan*, 735 F.3d 1127, 1136, 1139 (9th Cir. 2013). This ensures that the encroachment on liberty is "not more extensive than necessary" to serve the government's interest. *Valle Del Sol Inc. v. Whiting*, 709 F.3d 808, 816 (9th Cir. 2013).

The state contends, however, that its burden is satisfied by the mere presentation of any evidence that plausibly suggests its law could achieve the government's stated goals. This is in no sense a heightened standard of review. Instead, the state pays lip service to the rigors of intermediate scrutiny. It contends that the separation of powers mandates a level of deference that essentially forecloses meaningful judicial review, so long as the state can produce some

6
PLAINTIFFS' REPLY TO DEFENDANT'S SUPPLEMENTAL BRIEF
17cv1017

evidence supporting its gun control laws. Wrong. That is rational basis review—a level of scrutiny that *Heller* undeniably forecloses. 554 U.S. at 628, n.27. While it is true that intermediate scrutiny is more forgiving than strict scrutiny, it is not functionally indistinguishable from rational basis.

It is also true that the state's evidence need only "fairly support [its] rationale" in enacting the challenged law. *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 438 (2002) (plurality). But "fair support" requires the legislature to make "reasonable" judgments "based on *substantial* evidence." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 666 (1994) (plurality) (emphasis added). It is the judiciary's responsibility to evaluate the evidence and decide whether the legislature has done so. *Id.* at 666-68 (granting legislative deference but reversing judgment because Congress had not presented substantial evidence in support of its claims). Otherwise, constitutional protections would rise and fall at the whims of the majority.

The state also contends that even if the lethality of magazines over ten rounds were an open question, this would "be insufficient to discredit [the state's] reasonable conclusions" under intermediate scrutiny. ECF No. 62 at 23:7-8 (citing *Jackson v. City and County of San Francisco*, 746 F.3d 953, 969 (9th Cir. 2014). This argument exposes the state's greatest misunderstanding of its burden here. The state appears to claim that, under intermediate scrutiny, if it reasonably believes that magazines over ten rounds enhance the lethality of mass shootings, the Court must accept its conclusions and uphold the law.[2] But if the government restricts fundamental rights to "prevent anticipated harms, it must do more than simply 'posit the existence of the disease sought to be cured.' It must demonstrate that the recited

---

[2] The state is also raising an improper "tie goes to the state" argument. By claiming that, if the evidence is unclear, courts should defer to the legislature, the state ignores that the burden is on the *government* under heightened review. It also suggests that courts should defer to the power of the government rather than the rights of the People. This cannot be what the Framers intended.

harms are real . . . and that the regulation will in fact alleviate these harms in a *direct and material way.*" *Turner*, 512 U.S. at 664 (citation omitted) (emphasis added); *see also Los Angeles v. Pref. Commc'ns, Inc.*, 476 U.S. 488, 496 (1986) ("This Court may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity"). So even if the state is right that the use of "large capacity magazines" enhances the lethality of some crimes, the state must still show that the law will alleviate that harm and will not burden "substantially more [protected conduct] than is necessary." *Turner*, 511 U.S. at 664-65. As explained below, the state has proven neither.

By demanding blind deference to the "predictive judgments" of the legislature, the state ultimately asks this Court to abdicate its role. The Court should reject that invitation. Just as courts have done for generations when "policy choices" have threatened the exercise of fundamental rights. ECF No. 61 at 22:18-24:8; *see, e.g.*, *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954); *Roe v. Wade*, 410 U.S. 113 (1973); *Lawrence v. Texas*, 539 U.S. 558 (2003); *Obergefell v. Hodges*, 576 U.S. -- (2016)).

### B. The State Has Not Proven that Section 32310 Is Substantially Related to Its Public Safety Interests

Contrary to the state's protestations, even under intermediate scrutiny, the government must prove its "restriction will in fact alleviate" its public safety concerns. *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001). "[M]ere speculation" is insufficient. *Id.* Yet the best endorsement the state's most qualified expert, Dr. Christopher Koper, can muster is that section 32310 has "the potential" to promote public safety. ECF 50-8, Ex. 5 at 194:17-23. Koper's opinion, however, does not comport with his own findings. ECF No. 50-8, Ex. 3 at 68; *see also* ECF No. 57-1, Ex. 87 at 30; ECF No. 63-1, Ex. 90 at 17:9-11. Ex. 91 at 49:11-15, 49:20-50:2, 53:12-54:4. Nor does it fit with expert findings that federal and state magazine restrictions had *no significant effect* on gun violence in California. ECF No. 50-8, Ex. 4 at 109-15. Lacking evidence that section 32310 is likely to reduce the lethality

gun crimes, the state provides the Court with mere speculation that it *could*.

Likewise, the state's claim that limiting the magazine capacity will require mass shooters to pause more often, creating windows for escape or defensive attack, is pure conjecture. Stories that this has *ever* happened are uncorroborated. ECF No. 57 at 6:8-20 (citing ECF No. 50-8, Ex. 3 at 57). In fact, because mass shooters almost always use "multiple guns or multiple magazines (usually both)," ECF No. 50-8, Ex. 3 at 63, any pause prompted by a magazine change would be insignificant at best, *id.*, Ex. 3 at 57-60, 63; see also ECF No. 57-1, Ex. 88 at 49-51. Certainly, the two to four seconds it takes to change magazines does not perceptibly slow the rate of fire or provide additional time for victims to escape. ECF No. 50-8, Ex. 3 at 57-60, 62-63; ECF No. 57-1, Ex. 88 at 40-42. The state's claims otherwise are baseless.

Ultimately, the state *again* presents the Court with "a potpourri of news pieces, State-generated documents, conflicting definitions of ['large capacity magazine' and] 'mass shooting,' amorphous harms to be avoided, and a homogenous mass of horrible crimes in jurisdictions near and far for which large capacity magazines were not the cause." ECF No. 28 at 23:28-24:5. At best, the state presents some evidence of correlation between the use of "large capacity magazines" and the injuriousness of certain crimes. But mere evidence of the "disease sought to be cured" is not the standard by which we measure laws restricting fundamental rights. *Turner*, 512 U.S. at 664. That would swallow the Second Amendment and negate *Heller*'s acknowledgement that all firearms pose some risk of danger—even those protected by the constitution.

Even if the state could prove that section 32310 will meaningfully affect public safety, it must still establish that the law is "closely drawn to avoid unnecessary abridgment" of constitutional rights. *McCutcheon v. FEC*, 134 S. Ct. 1434, 1456. That is, the government must prove that its means do not burden the right "substantially more" than "necessary to further [its important] interest." *Turner*, 520 U.S. at 214. Here, the state has not met its burden—and it cannot.

Subject to limited exceptions not applicable to Plaintiffs, section 32310 broadly prohibits the acquisition, possession, and use of common magazines over ten rounds. Even people who have lawfully owned them for decades must forfeit ownership under threat of criminal penalty. The state seeks to justify its draconian law by claiming that it "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." ECF No. 62 at 22:4-5. This reasoning, however, evades the state's duty to prove that its flat ban is reasonably tailored. And it provides no response to the fact that California's over inclusive "experiment" violates the well-established principle that "a free society prefers to punish the few who abuse [their] rights . . . than to throttle them and all others beforehand." *Se. Promotions Lmtd. v. Conrad*, 420 U.S. 546, 559 (1975).

Finally, it is no answer to say that prohibiting magazines over ten rounds is narrowly tailored simply because smaller magazines remain available. The state ignores that, while rare, self-defense emergencies requiring more than ten rounds do occur. Section 32310 deprives those faced with such a threat, of their right to be armed and ready for self-defense. While the right to self-defense does not guarantee the right to *succeed*, it does guarantee the right to own an operable firearm, suitable for effective self-defense in the home. Section 32310 places a devastating asterisk on that right. *See* ECF No. 61 at 102:1-11.

On the record here "[section] 32310 is not a reasonable fit. It hardly fits at all. It appears [instead] . . . to be a haphazard solution likely to have no effect on an exceedingly rare problem, while at the same time burdening the constitutional rights of other California law-abiding responsible citizen-owners of gun magazines holding more than [ten] rounds." ECF No. 28 at 33:1-6. The Court should thus granted Plaintiffs' motion, declare the law invalid and permanently enjoin its enforcement.

Dated: June 21, 2018　　　　　　　　　　　**MICHEL & ASSOCIATES, P.C.**

　　　　　　　　　　　　　　　　　　　　　/s/Anna M. Barvir
　　　　　　　　　　　　　　　　　　　　　Anna M. Barvir
　　　　　　　　　　　　　　　　　　　　　Email: abarvir@michellawyers.com
　　　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs

# CERTIFICATE OF SERVICE

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

Case Name: *Duncan, et al. v. Becerra*
Case No.: 17-cv-1017-BEN-JLB

IT IS HEREBY CERTIFIED THAT:

I, the undersigned, declare under penalty of perjury that I am a citizen of the United States over 18 years of age. My business address is 180 East Ocean Boulevard, Suite 200 Long Beach, CA 90802. I am not a party to the above-entitled action.

I have caused service of the following documents, described as:

**PLAINTIFFS' COURT-ORDERED REPLY TO DEFENDANT'S SUPPLEMENTAL BRIEF IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT OR, ALTERNATIVELY, PARTIAL SUMMARY JUDGMENT**

on the following parties by electronically filing the foregoing on June 21, 2018, with the Clerk of the District Court using its ECF System, which electronically notifies them.

| | |
|---|---|
| John D. Echeverria | Anthony P. O'Brien |
| Deputy Attorney General | Deputy Attorney General |
| john.echeverria@doj.ca.gov | anthony.obrien@doj.ca.gov |
| 300 South Spring Street, Suite 1702 | 1300 I Street, Suite 125 |
| Los Angeles, CA 90013 | Sacramento, CA 95814 |

I declare under penalty of perjury that the foregoing is true and correct. Executed on June 21, 2018, at Long Beach, CA.

/s/Laura Palmerin
Laura Palmerin