1  XAVIER BECERRA
   Attorney General of California
2  State Bar No. 118517
   MARK R. BECKINGTON
3  Supervising Deputy Attorney General
   State Bar No. 126009
4  ANTHONY P. O'BRIEN
   Deputy Attorney General
5  State Bar No. 232650
   JOHN D. ECHEVERRIA
6  Deputy Attorney General
   State Bar No. 268843
7   300 South Spring Street, Suite 1702
    Los Angeles, CA  90013
8   Telephone:  (213) 269-6249
    Fax:  (213) 897-5775
9   E-mail:  John.Echeverria@doj.ca.gov
   *Attorneys for Defendant Attorney General*
10 *Xavier Becerra*

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16 **VIRGINIA DUNCAN, RICHARD**        17-cv-1017-BEN-JLB
   **LEWIS, PATRICK LOVETTE,**
   **DAVID MARGUGLIO,**              **DEFENDANT'S NOTICE OF**
17 **CHRISTOPHER WADDELL, and**      **SUPPLEMENTAL AUTHORITY**
   **CALIFORNIA RIFLE & PISTOL**
18 **ASSOCIATION, INC., a California**   Date:        April 30, 2018
   **corporation,**                    Time:        10:30 a.m.
19                                     Judge:       Hon. Roger T. Benitez
                        Plaintiffs,    Courtroom:   5A
20                                     Action Filed:  May 17, 2017
             **v.**
21

22 **XAVIER BECERRA, in his official**
   **capacity as Attorney General of the**
23 **State of California; and DOES 1-10,**

24                      Defendants.

25

26

27

28

1    TO THE COURT, ALL PARTIES, AND THEIR ATTORNEYS OF

2    RECORD:

3        Defendant Xavier Becerra ("Defendant") respectfully submits this notice of

4    supplemental authority.  On August 3, 2018, the United States Court of Appeals for

5    the Ninth Circuit issued opinions in *Pena v. Lindley*, Case No. 15-15449, and

6    *Gallinger v. Becerra*, Case No. 16-56125.  (True and correct copies of the *Pena* and

7    *Gallinger* opinions are annexed hereto as Exhibits 1 and 2, respectively.)

8        In *Pena*, the Ninth Circuit upheld provisions of the Unsafe Handgun Act (the

9    "UHA") that require new models of handguns to include certain safety features.  In

10   upholding the challenged provisions against the plaintiffs' Second Amendment and

11   equal protection challenges, the Ninth Circuit analyzed the proper application of

12   intermediate scrutiny in the Second Amendment context, including a discussion of

13   the level of "proof" required under intermediate scrutiny.  (*See* Ex. 1 at 13-32.)[1]

14   The opinion also includes a discussion of certain exemptions to the UHA, including

15   one for movie and television productions, under the Second Amendment and the

16   Equal Protection Clause.  (*See id.* at 21-22, 33-35.)  In this case, the

17   constitutionality of the exemptions to California's ban on large-capacity magazines

18   was raised in the briefing and during the hearing on Plaintiffs' motion for summary

19   judgment.  (*See, e.g.*, May 10, 2018 Tr. of Mot. Hr'g at 85:6-86:4 (discussing

20   *Silveira*); Dkt. No. 62 at 21:25-22:1.)

21       In *Gallinger*, the Ninth Circuit upheld an exemption to the Gun-Free School

22   Zone Act for honorably retired peace officers under the Equal Protection Clause

23   because the exemption promotes the safety of retired peace officers and the public

24   generally.  (Ex. 2 at 11-16.)  In upholding the exemption, the Ninth Circuit

25   distinguished *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), *abrogated on*

26   *other grounds by District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).  (Ex. 2

27           [1] Plaintiffs have provided notice of the Ninth Circuit's July 24, 2018 decision
     in *Young v. State of Hawaii*, Case No. 12-17808, which also includes a discussion

28   of intermediate scrutiny.  (Dkt. No. 67.)

at 9-12, 15-16.)  While *Silveira* invalidated an exemption for retired peace officers to carry *assault* weapons, the Ninth Circuit in *Gallinger* held "that permitting retired peace officers to carry *other* kinds of firearms on school grounds is sufficiently connected to the goal of ensuring such officers' safety to survive rational-basis review."  (Ex. 2 at 15.)  The constitutionality of the exemptions to California's ban on large-capacity magazines was raised in the briefing and during the hearing on Plaintiffs' motion for summary judgment, including a discussion of *Silveira*.  (*See, e.g.*, May 10, 2018 Tr. of Mot. Hr'g at 85:6-86:4 (discussing *Silveira*); Dkt. No. 62 at 21:25-22:1.)  The Ninth Circuit also cited favorably out-of-circuit authority, including the Fourth Circuit's decision in *Kolbe v. Hogan*, 849 F.3d 114, 120 (4th Cir. 2017) (en banc), concerning the dangers posed by large-capacity magazines.  (Ex. 2 at 13-14.)  Those decisions were cited frequently in the briefing and during the hearing on Plaintiffs' motion for summary judgment.

The *Pena* and *Gallinger* opinions were not available to Defendant during the briefing or hearing on Plaintiffs' motion for summary judgment, and they are relevant to the Court's evaluation of California's ban on large-capacity magazines, including the exemptions to the ban, in ruling on Plaintiffs' motion.

Dated:  August 6, 2018

Respectfully Submitted,

XAVIER BECERRA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ANTHONY P. O'BRIEN
Deputy Attorney General

/s/ John D. Echeverria

JOHN D. ECHEVERRIA
Deputy Attorney General
*Attorneys for Defendant Attorney General Xavier Becerra*

2

# EXHIBIT 1

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| IVAN PENA; ROY VARGAS; DONA CROSTON; BRETT THOMAS; SECOND AMENDMENT FOUNDATION, INC.; CALGUNS FOUNDATION, INC., *Plaintiffs-Appellants*, <br><br> v. <br><br> STEPHEN LINDLEY, Chief of the California Department of Justice Bureau of Firearms, *Defendant-Appellee.* | No. 15-15449 <br><br> D.C. No. 2:09-cv-01185-KJM-CKD <br><br><br> OPINION |

Appeal from the United States District Court
for the Eastern District of California
Kimberly J. Mueller, District Judge, Presiding

Argued and Submitted March 16, 2017
San Francisco, California

Filed August 3, 2018

Before: J. Clifford Wallace, M. Margaret McKeown,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge McKeown;
Partial Concurrence and Partial Dissent by Judge Bybee

# **SUMMARY**[*]

### **Civil Rights**

The panel affirmed the district court's summary judgment in favor of California in an action challenging three provisions of California's Unsafe Handgun Act.

California requires that new models of handguns meet certain criteria, and be listed on a handgun roster, before they may be offered for sale in the state.  Two provisions require that a handgun have a chamber load indicator and a magazine detachment mechanism, both of which are designed to limit accidental firearm discharges.  The third provision, adopted to aid law enforcement, requires new handguns to stamp microscopically the handgun's make, model, and serial number onto each fired shell casing.  Plaintiffs asserted that these three provisions have narrowed their ability to buy firearms in California, in violation of the Second Amendment, and that the handgun roster scheme imposes irrational exceptions, in violation of the Equal Protection Clause of the Fourteenth Amendment.

The panel held that it did not need to reach the question of whether the challenged provisions fell within the scope of the Second Amendment's right to bear arms because, even assuming coverage, the provisions passed constitutional muster.  Applying intermediate scrutiny, the panel held that the Act only regulates commercial sales, not possession, and does so in a way that does not impose a substantial burden on

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

purchasers. The panel held that the requirements for a chamber load indicator and a magazine detachment mechanism reasonably fit with California's interest in public safety. The panel further held that California had met its burden of showing that the microstamping requirement was reasonably tailored to address the substantial problem of untraceable bullets at crime scenes and the value of a reasonable means of identification. The panel rejected plaintiffs' claim that they have a constitutional right to purchase a particular handgun and their claim that the provisions violate the Equal Protection Clause.

Concurring in part and dissenting in part, Judge Bybee agreed that intermediate scrutiny applied to plaintiffs' Second Amendment challenge. Judge Bybee also agreed that there was a reasonable fit between the chamber load indicator and magazine detachment mechanism requirements and the State's substantial interest in enhancing public safety. Judge Bybee could not conclude, however, that the State was entitled to summary judgment on plaintiff's challenge to the microstamping requirement given the state's demanding testing protocol, which plaintiffs alleged acts as a prohibition on the commercial sale of new handguns in California. He would reverse the district court and remand for further proceedings.

**COUNSEL**

Alan Gura (argued), Gura & Possessky PLLC, Alexandria, Virginia; Donald E. J. Kilmer Jr., Law Offices of Donald Kilmer, San Jose, California; for Plaintiffs-Appellants.

Anthony R. Hakl (argued), Deputy Attorney General; Stepan A. Haytayan, Supervising Deputy Attorney General; Douglas J. Woods, Senior Assistant Attorney General; Office of the Attorney General, Sacramento, California; for Defendant-Appellee.

C.D. Michel and Clinton B. Monfort, Michel & Associates P.C., Long Beach, California, for Amici Curiae National Rifle Association of America Inc. and California Rifle and Pistol Association.

Lance A. Selfridge and Daniel C. DeCarl, Lewis Brisbois Bisgaard & Smith LLP, Los Angeles, California, for Amici Curiae National Shooting Sports Foundation Inc. and Sporting Arms and Ammunition Manufacturers' Institute Inc.

Grace R. DiLaura and David H. Fry, Munger Tolles & Olson LLP, San Francisco, California, for Amicus Curiae Law Center to Prevent Gun Violence.

Eric A. Krause, White & Case LLP, Palo Alto, California; Daniel Levin, White & Case LLP, Washington, D.C.; Jonathan Lowy, Brady Center to Prevent Gun Violence, Washington, D.C.; for Amicus Curiae Brady Center to Prevent Gun Violence.

Andrew Esbenshade, Amy E. Pomerantz, and Michael R. Leslie, Caldwell Leslie & Proctor PC, Los Angeles,

PENA V. LINDLEY                5

California, for Amicus Curiae Office of the Los Angeles City
Attorney.

Deepak Gupta and Jonathan E. Taylor, Gupta Wessler PLLC,
Washington, D.C.; J. Adam Skaggs and Mark Anthony
Frassetto, Everytown for Gun Safety, New York, New York;
for Amicus Curiae Everytown for Gun Safety.

## OPINION

McKEOWN, Circuit Judge:

Unsurprisingly, the Second Amendment says nothing
about modern technology adopted to prevent accidental
firearm discharges or trace handguns via serial numbers
microstamped onto fired shell casings. The question before
us is whether making specific commercial gun sales
contingent on incorporating these innovations violates the
constitution. This appeal stems from a challenge to three
provisions of California's Unsafe Handgun Act ("UHA").
For safety reasons, California requires that new models of
handguns meet certain criteria, and be listed on a handgun
roster, before they may be offered for sale in the state. Two
provisions require that a handgun have a chamber load
indicator and a magazine detachment mechanism, both of
which are designed to limit accidental firearm discharges.
The third provision, adopted to aid law enforcement, requires
new handguns to stamp microscopically the handgun's make,
model, and serial number onto each fired shell casing.

Ivan Pena, along with several other individuals and two
nonprofit organizations, the Second Amendment Foundation,
Inc. and the Calguns Foundation, Inc. (collectively,

"Purchasers"), challenge the constitutionality of the UHA. Purchasers argue that these three provisions have narrowed their ability to buy firearms in California, in violation of the Second Amendment, and that the handgun roster scheme imposes irrational exceptions, in violation of the Equal Protection Clause of the Fourteenth Amendment. We do not need to reach the question of whether these limitations fall within the scope of the Second Amendment's right to bear arms because, even assuming coverage, these provisions pass constitutional muster. The California law only regulates commercial sales, not possession, and does so in a way that does not impose a substantial burden on Purchasers. We reject Purchasers' claim that they have a constitutional right to purchase a particular handgun. Nor do the provisions violate the Equal Protection Clause. We affirm the district court's grant of summary judgment in favor of California.

## BACKGROUND

### I.  The Unsafe Handgun Act

As its name implies, California's Unsafe Handgun Act (UHA) seeks to reduce the number of firearm deaths in the state. The primary enforcement clause reads:

> A person in this state who manufactures or causes to be manufactured, imports into the state for sale, keeps for sale, offers or exposes for sale, gives, or lends an unsafe handgun shall be punished by imprisonment in a county jail not exceeding one year.

CAL. PENAL CODE § 32000(a).[1]   An "unsafe handgun" is
defined as "any pistol, revolver, or other firearm capable of
being concealed upon the person" and that does not have
certain safety devices, meet firing requirements, or satisfy
drop safety requirements.  *Id.* § 31910.

The UHA charges the California Department of Justice
("CDOJ") with maintaining a roster of all handgun models
that have been tested by a certified testing laboratory, "have
been determined not to be unsafe handguns," and may be sold
in the state.  *Id.* § 32015(a).[2]   Effectively, the Act presumes
all handguns are unsafe unless the CDOJ determines them
"not to be unsafe."   Handguns with purely cosmetic
differences (including a difference in finish, grip material,
and shape or texture of the grip) from a handgun already on
the roster need not meet these criteria.  *See id.* § 32030.

Over time, California has added new requirements for
inclusion on the roster.    Since 2007, new models of
semiautomatic pistols must be equipped with both a chamber
load indicator (CLI) and a magazine detachment mechanism
(MDM)—safety features designed to limit accidental
discharges that occur when someone mistakenly believes no
round is in the chamber.   *Id.* § 31910(b)(5).   A CLI is a
"device that plainly indicates that a cartridge is in the firing
chamber."   *Id.* § 16380.   An MDM is "a mechanism that
prevents a semiautomatic pistol that has a detachable
magazine from operating to strike the primer of ammunition

---

[1] Enacted in 1999, the UHA became effective in 2001.

[2] To add a handgun to the roster, a firearm manufacturer must pay a
fee so that the state may test the firearm against the statutory and
regulatory criteria.  *See* CAL. PENAL CODE § 32015(b).

in the firing chamber when a detachable magazine is not inserted in the semiautomatic pistol." *Id.* § 16900.

Since 2013, new models of semiautomatic pistols need to include a feature called "microstamping": each such pistol must imprint two sets of microscopic arrays of characters that identify the make, model, and serial number of the pistol onto the cartridge or shell casing of each fired round. *Id.* § 31910(b)(7).**[3]**   Designed to help solve crimes, microstamping provides law enforcement with identifying information about a handgun fired at a crime scene. *See Fiscal v. City & Cty. of S.F.*, 70 Cal. Rptr. 3d 324, 337 (Ct. App. 2008).

There are exceptions to these requirements.   Most significant, the required features are inapplicable to models of semiautomatic pistols that were "already listed on the roster" when such requirements became effective.   CAL. PENAL CODE § 31910(b)(5), (7). In addition, firearms sold to law enforcement officials and certain curios or relics (as defined in the *Code of Federal Regulations*) are exempt. CAL. PENAL CODE § 32000(b)(3), (4).   Pistols used in Olympic target shooting are exempt, *see id.* § 32105, as are certain single action revolvers and single shot pistols of either a certain age (a curio or relic made before 1900) or a certain size (greater than seven-and-a-half inches), *see id.* §§ 32000(b)(3), 32100. Other exemptions include firearms transferred between private parties, *see id.* § 32110(a),

---

**[3]** This requirement was set to begin in 2010, but did not become effective until 2013 because it was contingent on the CDOJ certifying "that the technology used to create the imprint is available to more than one manufacturer unencumbered by any patent restrictions." *Id.* § 31910(b)(7)(A).

firearms delivered for consignment sale or as collateral for a pawnbroker loan, *see id.* § 32110(f), and firearms used solely as props for video production, *see id.* § 32110(h).

## II. District Court Proceedings

Seeking to enjoin the state from enforcing the UHA, in 2009 Purchasers sued the Chief of the CDOJ Bureau of Firearms Stephen Lindley on two constitutional theories. Purchasers claimed that the CLI, MDM, and microstamping requirements restricted access to the firearms of their choice, in violation of the Second Amendment.[4]  Purchasers also claimed that the UHA's roster scheme transgressed the Equal Protection Clause of the Fourteenth Amendment by making irrational exceptions.

After cross-motions, briefing, and a hearing, the district court granted summary judgment to California.  Citing the Supreme Court's landmark decision in *District of Columbia v. Heller*, 554 U.S. 570 (2008), the district court characterized the UHA provisions as "laws imposing conditions or qualifications on the commercial sale of firearms," and thus concluded that the laws presumptively did not violate the Second Amendment.  The district court observed that the provisions were conditions on the sale of firearms, not

---

[4] Purchasers' theory is that handguns lacking CLI, MDM, and microstamping technology are in common lawful use throughout the United States and that prohibiting their sale in California violates the Second Amendment.  When the legislature amended the UHA to include these requirements, between eleven and fourteen percent of handguns in the United States were available with a CLI and MDM.  According to Purchasers, no handguns were available in the United States that met the microstamping requirements.  The record does not indicate whether and how these figures have changed over time.

prohibitions, and that Purchasers maintained access to nearly 1,000 types of firearms on the roster, all of which were approved for sale in California.  Purchasers' "[i]nsistence upon . . . particular" handguns, the court concluded, simply "f[e]ll outside the scope of the right to bear arms."

## Analysis

### I. SECOND AMENDMENT

#### A. The Supreme Court's *Heller* Framework

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. CONST. amend. II.  In *Heller*, the Supreme Court held that the Second Amendment protects an individual right to possess a "lawful firearm in the home operable for the purpose of immediate self-defense."  554 U.S. at 635.[5]

Whether the UHA violates Purchasers' Second Amendment rights is framed by a two-step inquiry established in *Heller*.  We first consider whether the Act "burdens conduct protected by the Second Amendment," and if it does, we "apply an appropriate level of scrutiny." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014).[6]

---

[5] The Second Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment.  *See McDonald v. Chicago*, 561 U.S. 742 (2010).

[6] Once the district court answered "no" to the first question, it never reached the second part of the analysis.

Whether a challenged law burdens conduct protected by the Second Amendment depends on "the historical understanding of the scope of the right," including "whether the challenged law falls within a well-defined and narrowly limited category of prohibitions that have been historically unprotected." *Jackson*, 746 F.3d at 960. In *Heller*, the Supreme Court set forth non-exhaustive categories of "presumptively lawful regulatory measures" that are presumed to be consistent with the historical scope of the Second Amendment:

> Although we do not undertake an exhaustive historical analysis today of the full scope of the Second Amendment, nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.

*Id.* at 626–27 & n.26. The Court, however, did not define the contours of these "presumptively lawful" categories. *See id.* at 635 ("[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when these exceptions come before us.").

In the decade since *Heller*, the courts of appeals have spilled considerable ink in trying to navigate the Supreme Court's framework. Perhaps that is why the Seventh Circuit observed, "[w]e do not think it profitable to parse these passages of *Heller* as if they contained an answer." *United*

*States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc). Our sister circuits have struggled to unpack the different meanings of "presumptively lawful." *See United States v. Marzzarella*, 614 F.3d 85, 91 (3d Cir. 2010) ("On the one hand, this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny."); *United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("It is unclear to us whether *Heller* was suggesting that 'longstanding prohibitions' such as these were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason."); *Heller v. District of Columbia* (*Heller II*), 670 F.3d 1244, 1253 (D.C. Cir. 2011) (citations omitted) ("*Heller* tells us 'longstanding' regulations are 'presumptively lawful,' that is, they are presumed not to burden conduct within the scope of the Second Amendment.").

Our circuit similarly has strained to interpret the phrase "conditions and qualifications on the commercial sale of arms." Viewing that language as "sufficiently opaque" to "rely[] on it alone," we instead conducted a full textual and historical review of the scope of the Second Amendment in a recent challenge. *Teixeira v. Cty. Of Alameda*, 873 F.3d 670, 683 (9th Cir. 2017) (en banc).

The opaqueness of the presumption of legality for "conditions and qualifications on the commercial sale of arms" likely explains why we and other courts often have assumed without deciding that a regulation does burden conduct protected by the Second Amendment rather than

parse whether the law falls into that exception. In these cases, the court avoided having to define the contours of the commercial sales category because it assumed the Second Amendment applied and upheld the restriction under the appropriate level of constitutional scrutiny.**[7]**

We, too, follow this well-trodden and "judicious course." *Wollard v. Gallagher*, 712 F.3d 865, 876 (4th Cir. 2013). We assume without deciding that the challenged UHA provisions burden conduct protected by the Second Amendment because we conclude that the statute is constitutional irrespective of that determination. By making this assumption, we bypass the constitutional obstacle course of defining the parameters of the Second Amendment's individual right in the context of commercial sales. Thus, we have no occasion to engage with the dissent's extensive exegesis on this point.

## B. Determination of the Appropriate Level of Scrutiny

Because we assume that the UHA implicates Purchasers' right to bear arms, our next task is to determine the appropriate level of scrutiny for review of the California requirements. Purchasers stump for strict scrutiny while California invites intermediate, at most.

---

**[7]** *See Silvester v. Harris*, 843 F.3d 816, 827–29 (9th Cir. 2016) (assuming a ten-day waiting period on the purchase of a firearm burdened conduct protected by the Second Amendment and applying intermediate scrutiny); *Wilson v. Lynch*, 835 F.3d 1083, 1092 (9th Cir. 2016) (applying intermediate scrutiny to a regulation prohibiting possessors of medical marijuana card from buying firearms), *cert. denied*, 137 S. Ct. 1396 (2017); *cf. Jackson*, 746 F.3d at 967–68 (applying intermediate scrutiny to a ban on the sale of hollow-point ammunition).

Our post-*Heller* decisions generally have applied intermediate scrutiny to firearms regulations. *See Silvester*, 843 F.3d at 822 (upholding a ten-day waiting period on the sale of firearms to those who already own one); *Wilson*, 835 F.3d at 1092 (upholding ban on possession by holders of state medical marijuana cards); *Fyock*, 779 F.3d at 1000–01 (refusing to preliminarily enjoin an ordinance banning possession of high-capacity magazines); *Jackson*, 746 F.3d at 966, 970 (upholding ordinances requiring firearms to be stored in a locked container when not carried on the person and forbidding the purchase of hollow-point ammunition); *United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013) (upholding a ban on firearm possession by people convicted of domestic violence).

Which level of scrutiny to apply depends on "how close the law comes to the core of the Second Amendment right" and "the severity of the law's burden on the right." *Id.* at 1138. We strictly scrutinize a "law that implicates the core of the Second Amendment right and severely burdens that right." *Silvester*, 843 F.3d at 821. Otherwise, we apply intermediate scrutiny if the law "does not implicate the core Second Amendment right *or* does not place a substantial burden on that right." *Fyock*, 779 F.3d at 998–99.

Consistent with our threshold decision not to assess whether the California restrictions fall within the Second Amendment, we need not answer conclusively whether the UHA's restrictions implicate the core Second Amendment right of "self defense of the home." *Silvester*, 843 F.3d at 821 (citing *Heller*, 554 U.S. at 628–29). Because the restrictions do not substantially burden any such right, intermediate scrutiny is appropriate.

At the outset, it is important to understand what the statute does and does not do vis-à-vis handguns, the "quintessential self-defense weapon." *Heller*, 554 U.S. at 629. Moving forward, the statute limits commercial sales of new models of semiautomatic pistols to those with the CLI, MDM, and microstamping protections. Importantly, the UHA "grandfathers" hundreds of handgun models on the approved guns roster that do not meet the new requirements. The statute does not restrict *possession* of handguns in the home or elsewhere (with or without CLI, MDM, and microstamping features). The statute also includes a number of exemptions. For example, the statute does not affect the sale of off-roster existing handguns in private sales transactions. Nor are out-of-state sales regulated.

In weighing the severity of the burden, we are guided by a longstanding distinction between laws that regulate the manner in which individuals may exercise their Second Amendment right, and laws that amount to a total prohibition of the right. *See Chovan*, 735 F.3d at 1138; *accord Heller II*, 670 F.3d at 1251–58 (reasoning that gun-registration requirements do not severely burden the Second Amendment because they do not "prevent[] an individual from possessing a firearm in his home or elsewhere"); *Marzzarella*, 614 F.3d at 97 (distinguishing between a law requiring handguns to bear original serial numbers, and *Heller*'s law prohibiting the possession of handguns). The UHA is of the former variety—regulation of the manner of use, not possession—and thus affects Second Amendment rights less severely. *See Silvester*, 843 F.3d at 827 ("[L]aws which regulate only the '*manner* in which persons may exercise their Second Amendment rights' are less burdensome than those which bar firearm possession completely." (citation omitted)).

The CLI, MDM, and microstamping requirements place almost no burden on the physical exercise of Second Amendment rights.   There is no evidence that CLIs or microstamping interferes with the functioning of any arms. Although MDMs might prevent a gun from firing at will, it is likely a rare occurrence when someone has time to put a round from outside a magazine in the chamber without inserting the magazine itself.  CLIs and MDMs are designed to make the handgun owner aware of when there is ammunition in the chamber.  That feature not only prevents accidental discharges—which itself protects "hearth and home"—but also informs the owner when the gun is loaded so that the weapon may be fired in self-defense.

Perhaps recognizing the absence of a physical burden, Purchasers assert a substantial burden because the UHA precludes them from buying in California the majority of Smith & Wesson's handguns, two of Ruger's most popular models, and the fourth generation of Glocks.  But being unable to purchase a subset of semiautomatic weapons, without more, does not significantly burden the right to self-defense in the home.  *See Heller*, 554 U.S. at 626 ("[T]he Second Amendment right is not unlimited. . . . [T]he right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose.").

Indeed, all of the plaintiffs admit that they are able to buy an operable handgun suitable for self-defense—just not the exact gun they want.  Purchasers have adduced little evidence that the handguns unavailable for purchase in California are materially more effective for self-defense than handguns

currently for sale in the state.**[8]** *See Jackson*, 746 F.3d at 968 (looking at self-defense effectiveness during this inquiry).**[9]** Contrary to Purchasers' assertion, the severity of the burden is not "obvious[]."

Any burden on the right is lessened by the UHA's exceptions, which allow for the purchase of firearms that do not have the CLI, MDM, and microstamping features. *See Chovan*, 735 F.3d at 1138 (holding that a "substantial[]

---

**[8]** The evidence is slim. One Purchaser was born without a right arm and wishes to buy a Glock with an ambidextrous magazine release, which is better suited for left-handed people. A similar Glock model is listed on the CDOJ roster, except it does not include the ambidextrous release. Apparently, the CDOJ determined that the ambidextrous release was not purely a cosmetic change and declined to list the model without going through its testing and registration protocols. Two others wish to purchase handguns not on the roster. A fourth wishes to purchase a firearm that is on the roster, but in a different color. Apparently, the manufacturer has not yet paid the fee to submit that change to the CDOJ to see if the gun can be listed as cosmetically "similar" to the model already on the roster.

**[9]** Purchasers point to the declining number of handguns listed on the roster. At the end of 2013, the CDOJ's handgun roster contained 1,273 handguns and 883 semiautomatics. As of oral argument in March 2017, it contained 744 handguns and 496 semiautomatics. *Roster of Handguns Certified for Sale*, CAL. DEP'T JUST., http://certguns.doj.ca.gov (last visited Mar. 2, 2017). But simply showing that the number of entries on the roster has decreased does not tell us much about whether the availability of handguns has declined in a way *relevant* to the Second Amendment. It is not the number of handguns on the roster that matters, it is the impact on self-defense in the home. Some handguns might not be on the roster for the simple reason that they have not been submitted to DOJ for testing for reasons wholly unrelated to CLIs, MDMs, and microstamping. And, handguns could have fallen off the list simply because no one paid the fee to keep them on. The mere fact of a declining number of rostered handguns does not satisfy Purchasers' obligation to show a substantial burden.

burden[] . . . is lightened by . . . exceptions"). For example, Purchasers may buy handguns without the three features if such firearms are grandfathered on the roster, and may buy off-roster handguns in private transactions.   There is no evidence in the record that the hundreds of firearms available for purchase are inadequate for self-defense. *See Decastro*, 682 F.3d at 168 ("[A] law that regulates the availability of firearms is not a substantial burden on the right to keep and bear arms if adequate alternatives remain for law-abiding citizens to acquire a firearm for self-defense.").

Because the UHA does not effect a substantial burden, we conclude that intermediate scrutiny is adequate to protect the claimed Second Amendment rights at issue here.

## C.  Application of Intermediate Scrutiny to the UHA Provisions

Intermediate scrutiny requires (1) a significant, substantial, or important government objective, and (2) a "reasonable fit" between the challenged law and the asserted objective. *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 965 (9th Cir. 2014).  The government must show that the regulation "promotes a 'substantial government interest that would be achieved less effectively absent the regulation,'" but not necessarily that the chosen regulation is the "least restrictive means" of achieving the government's interest. *Fyock*, 779 F.3d at 1000 (quoting *Chovan*, 735 F.3d at 1139).

When considering California's justifications for the statute, we do not impose an "unnecessarily rigid burden of proof," and we allow California to rely on any material "reasonably believed to be relevant" to substantiate its interests in gun safety and crime prevention. *Mahoney v.*

*Sessions*, 871 F.3d 873, 881 (9th Cir. 2017).   Hence, our analysis of whether there is a "reasonable fit between the government's stated objective and the regulation" considers "the legislative history of the enactment as well as studies in the record or cited in pertinent case law."  *Fyock*, 779 F.3d at 1000 (9th Cir. 2015) (internal citations marks omitted).

It is important to note that we are weighing a legislative judgment, not evidence in a criminal trial.     Because legislatures are "not obligated, when enacting [their] statutes, to make a record of the type that an administrative agency or court does to accommodate judicial review," we should not conflate legislative findings with "evidence" in the technical sense.  *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1199 (9th Cir. 2013) (en banc) (internal citations and quotation marks omitted).

Nor do we substitute our own policy judgment for that of the legislature.  *Id.*  When policy disagreements exist in the form of conflicting legislative "evidence," we "owe [the legislature's] findings deference in part because the institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions."  *Turner Broad. Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997) (internal citations and quotation marks omitted); *see also id.* ("In reviewing the constitutionality of a statute, courts must accord substantial deference to the predictive judgments of Congress." (internal quotation marks omitted)). "It is not our function to appraise the wisdom of [California's] decision to require" new semiautomatic gun models manufactured in-state to incorporate new technology; instead, the state "must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 52

(1986).  These principles apply equally to benchmarking the efficacy as well as the technological feasibility of the regulations. Therefore, in the face of policy disagreements, or even conflicting legislative evidence, "we must allow the government to select among reasonable alternatives in its policy decisions." *Peruta v. Cty. of San Diego*, 824 F.3d 919, 944 (9th Cir. 2016) (en banc) (Graber, J., concurring), *cert. denied*, 137 S. Ct. 1995 (2017); *accord Kachalsky v. Cty. of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012) ("It is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments.").

Our role is not to re-litigate a policy disagreement that the California legislature already settled, and we lack the means to resolve that dispute.  Fortunately, that is not our task.  *See City of Renton*, 475 U.S. at 51–52.  And, as required by precedent, California's evidence "fairly support[ed]" its conclusions. *Jackson*, 746 F.3d at 969.

### 1.  The CLI and MDM Requirements

There is no doubt that the governmental safety interests identified for the CLI and MDM requirements are substantial. California represents that the legislature's goal in requiring CLIs and MDMs "was targeting the connection between cheaply made, unsafe handguns and injuries to firearms operators and crime."  These interests are undoubtedly adequate. *See*, *e.g.*, *Schenck v. Pro-Choice Network of W. N.Y.*, 519 U.S. 357, 376 (1997); *Jackson*, 746 F.3d at 965–66; *see also Silvester*, 843 F.3d at 827 ("[The statute at issue] has . . . the objective of promoting safety and reducing gun violence.  The parties agree that these objectives are important.  The first step is undisputedly satisfied.").

The CLI and MDM requirements also reasonably fit with California's interest in public safety. A CLI lets someone know that a gun is loaded without even having to pick it up to check; it acts as a red flag for those handling the gun who may have forgotten that it was loaded. An MDM prevents a firearm from shooting unless a magazine is inserted. Without an MDM, a magazine-equipped pistol can be fired if there is a bullet in the chamber, even if the magazine has not been inserted.

In one sense then, an MDM disables a gun capable of providing self-defense. But the practical effect strikes us as a rare instance. Because it is more likely that people will associate firearms that have magazines with loaded firearms and firearms that do not have magazines with unloaded firearms, the legislature could reasonably predict that the MDM could prevent accidental discharges of the weapon. The legislative judgment that preventing cases of accidental discharge outweighs the need for discharging a gun without the magazine in place is reasonable. The legislative history cites studies confirming this common-sense conclusion. Purchasers do not provide any reliable evidence that these studies are incorrect or that CLIs or MDMs will clearly thwart, rather than advance, California's goal of saving lives by preventing accidental discharges. The fit between the prevention of accidental discharges and the requiring of CLIs and MDMs on not-yet-rostered handguns is a reasonable one.

Purchasers argue that the UHA's requirements have "nothing to do with consumer safety" because the UHA "exempts specially-favored individuals whose safety is no less important[] [and] mandates alleged 'safety' features that California instructs consumers to ignore as unreliable." Purchasers point to exemptions in the UHA for law

enforcement, entertainment industry-related props, intra-family transfers, and private-party transfers. *See*, *e.g.*, CAL. PENAL CODE §§ 32000(b)(4) (law enforcement), 32110(a) (private party transfer), 32110(h) (entertainment industry props), 27875 (intra-family transfers). Although Purchasers are correct that these groups are exempt from the UHA, that underinclusiveness does not doom the MDM and CLI requirements under intermediate scrutiny. *See Minority Television Project*, 736 F.3d at 1204 ("Unlike strict scrutiny, intermediate scrutiny does not require that the means . . . be the least restrictive."). The exceptions are not so pervasive or without basis as to make the fit unreasonable.

Purchasers further fault the UHA because "not every aspect of the roster obviously advances the state's regulatory interest." Purchasers argue that once a gun has been deemed "safe" and put on the roster and then falls off the roster for administrative reasons, California has no interest in deeming it "unsafe." We do not agree. Although purely administrative reasons may not have anything to do with a weapon's performance and safety—just as not having a current driver's license is not proof that the driver is not a safe driver—we will not interfere with the orderly administration of California's roster. We are not here to order California to re-list weapons where the manufacturers or importers have otherwise failed to comply with California law.

Purchasers also argue that California "teaches consumers to disregard [CLIs] and [MDMs], [so] requiring handguns to have these features actually impedes the state's safety interests." Amicus briefs filed in support of Purchasers add that the regulations, by encouraging people to look for or rely on a CLI or a MDM, respectively, "inevitably discourage[]

individuals from *actually checking* to see whether a firearm is loaded."  This, *amici* tell us, "may increase the likelihood of an unintentional discharge."  We disagree.  California does not instruct consumers to disregard CLIs and MDMs. Instead, the regulations simply mean that consumers should not rely entirely on them or assume that just because a magazine is out or the CLI is not popped up, the weapon is incapable of being dangerous.  "Treat all guns as if they are loaded," California tells gun-owners.  That is just good, old-fashioned common sense.  *Cf. United States v. Carona*, 660 F.3d 360, 368–69 (9th Cir. 2011) ("That some wear a belt and suspenders does not prove the inadequacy of either to hold up the pants, but only the cautious nature of the person wearing the pants." (citation omitted)).

We conclude that the CLI and MDM regulations pass intermediate scrutiny.  *See Draper v. Healey*, 98 F. Supp. 3d 77, 85 (D. Mass. 2015) (holding that Massachusetts' CLI and MDM regulations pass "any standard of scrutiny"), *aff'd on other grounds*, 827 F.3d 1 (1st Cir. 2016).

## 2.  The Microstamping Requirement

The UHA's microstamping requirement also passes constitutional muster under intermediate scrutiny.  Purchasers acknowledge that California's two stated objectives for the microstamping requirement—public safety and crime prevention—are substantial government interests.  Countless cases support this concession.  *See*, *e.g.*, *Schenck*, 519 U.S. at 376 (public safety); *United States v. Salerno*, 481 U.S. 739, 750 (1987) (crime prevention).  More specifically, "preserving the ability of law enforcement to conduct serial number tracing—effectuated by limiting the availability of untraceable firearms—constitutes a substantial or important

interest." *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010). Serial number tracing "enabl[es] law enforcement to gather vital information about recovered firearms." *Id.* The same logic applies to recovered bullets, and counsels the conclusion that limiting the availability of untraceable bullets serves a substantial government interest.

California also has established a "reasonable fit" between these substantial interests and the microstamping requirement.    The legislative history supporting the microstamping provision describes California's "enormous and diverse" problem regarding unsolved homicides committed with handguns. In approximately 45 percent of all homicides in California, no arrests are made because police lack the needed evidence, and more than 60 percent of the homicides in California are committed with handguns. According to the legislative history, microstamping would "provide rapid leads in the first crucial hours after a homicide" because police could match a bullet found at a crime scene with the registered owner.    This data is particularly critical in drive-by-shootings, the legislature observes, where the only evidence at the crime scene may be spent cartridges.   California is dealing with a real-world problem and has crafted a real-world solution.

The California legislature considered and rejected other, more intrusive solutions to combat the unsolved homicide-by-handgun problem.  The legislature found that microstamping technology improved the accuracy of ballistic identification "without requiring the manpower and expense associated with the creation and maintenance of a ballistic image database containing millions of images." Purchasers do not suggest a less invasive approach to curbing unsolved handgun homicides.

Instead, Purchasers contest California's evidence that microstamping will address the problem *effectively*. California presented evidence that existing microstamping technology is accurate 96 percent of the time. Purchasers caution that the microstamping technology is not as reliable as California claims. The standard does not demand that California's solution be a perfect one. At the time it considered this provision, the California legislature weighed competing evidence on effectiveness before enacting the statute. California's evidence need only "fairly support[]" its conclusions. *Jackson*, 746 F.3d at 969. California has gone well beyond this threshold requirement.

Purchasers also argue that microstamping is impracticable.**[10]** Although this case involves the Purchasers, not the manufacturers, the Purchasers cloak their argument in the language of the producers. The reality is not that manufacturers cannot meet the standard but rather that they have chosen not to. Purchasers offered evidence that gun manufacturers have not "produced a functioning, commercially available semiautomatic pistol" equipped with the microstamping technology and they "have no plans to attempt to do so." The declarations offered are "lacking in details," as the dissent candidly notes, and rest on conclusory language, such as "appears infeasible" or "cannot practically implement." Simply because no gun manufacturer is "even

---

**[10]** The California Supreme Court recently ordered judgment in favor of California in a challenge brought to invalidate the UHA as "impossible" to comply with under state law, observing that the plaintiffs had not "petitioned for a writ of mandate against the [California] Department of Justice for improperly certifying the availability of dual placement microstamping technology." *Nat'l Shooting Sports Found., Inc. v. State*, No. S239397, 2018 WL 3150950, at \*4 (Cal. June 28, 2018).

considering trying" to implement the technology, it does not follow that microstamping is technologically infeasible.

Notably, the parties agree that semiautomatic handguns are not subject to the microstamping requirement and are grandfathered as long as the manufacturer continues to pay a roster fee and the firearms do not fail a retest. We thus find it odd, indeed, that the manufacturers indirectly assert a right to sell new models of—modern—semiautomatic handguns, but refuse to modernize their firearms by installing microstamping features. We need not accept wholesale that manufacturers will decline to implement this new public safety technology in the face of California's evidence that the technology is available and that compliance is feasible.[11]

It is ironic that Purchasers filed a cross-motion for summary judgment, agreeing with California that "[t]his case's essential facts are not in dispute." As Purchasers lay out in their cross-motion:

---

[11] The argument here echoes a similar one made for decades about airbags. *See Chrysler Corp. v. Dep't of Transp.*, 472 F.2d 659 (6th Cir. 1972) ("The petitioners next contend that Standard 208 is not practicable because airbag technology is not, at present, developed to the point where airbags can be installed in all presently manufactured cars."); Frank Waters, *Air Bag Litigation: Plaintiffs, Start Your Engines*, 13 Pepp. L. Rev. 4 (1986) ("There is mounting concern that because automobile manufacturers and governmental agencies have not been successful in paving the way toward air bag installation, consumers may never receive the benefit of this lifesaving device."); Nat'l Highway Traffic Safety Admin., *Airbags*, available at http://www.nhtsa.gov/equipment/air-bags ("In 25 years—from 1987 to 2012—frontal air bags saved 39,976 lives."). As with that debate, it may be that protests about technical ability to comply reflect a reluctance to comply.

> Defendant admits that no handguns for sale in
> the United States have the microstamping
> technology required by California's roster
> law. No firearms manufacturer has submitted
> any microstamping-compliant handguns, and
> Defendant has no information as to whether
> any manufacturer will ever produce
> microstamping handguns. Accordingly, the
> microstamping requirement imposes a de
> facto ban on the sale of all new semiautomatic
> handgun models in California.

For Purchasers, it is enough that manufacturers say that they
will not and "cannot" comply. But that begs the question of
the deference we provide to California's lawmakers, who
made a considered judgment.

California's evidence carries the day in the legislative
context. The state produced evidence that compliance with
the microstamping requirement is "technologically possible"
and would cost an incremental $3.00 to $10.00 per gun. By
2008, the inventor of microstamping had publicly tested the
technology with local police departments across the country.
In those tests, he gave microstamping-equipped firearms and
cartridges to local range officers so that they could observe
the stamped cartridges and extract their codes. Overall, the
technology was publicly tested seven times with seven
different police departments, including in Sacramento and
Los Angeles before the law was enacted. In addition to this
critical evidence, the legislature considered studies showing
that microstamping technology generally works.

Throughout the legislative process and in this litigation,
the state has reasonably relied on Todd Lizotte, the inventor

of microstamping.  For over fifteen years, Lizotte has shared his expertise by testifying before state legislative committees, conducting public tests, and contributing to articles that appear in law enforcement periodicals, technical journals, and newspapers.  During consideration of the UHA, Lizotte answered technical questions from the drafting committee, and the legislative history contains multiple references to Lizotte and his company, NanoMark Technologies.  Given his extensive firsthand knowledge, it is significant that Lizotte concluded that "20 years of development, testing and public demonstrations show that microstamping can be implemented," that "[p]rinting two separate codes on the firing pin is feasible," and that "it is possible for firearm manufacturers to implement microstamping technology contemplated by the California legislation."

The judgment California made about technological feasibility is no less predictive than the judgment on efficacy.  In both cases, the legislators reviewed the record, including conflicting testimony.  We cannot countenance the dissent's effort to draw an artificial distinction and hold California to a standard never before imposed.  The dissent suggests that California must produce specific evidence of compliance with its own microstamping requirement in a "laboratory."  But the state need not don lab coats, equip semiautomatic firearms with microstamping technology, and test the technological feasibility results itself.  That is far too exacting a standard of "proof" in the context of intermediate legislative scrutiny.  *See City of Renton*, 475 U.S. at 52.  In effect, the dissent would transform the state into a gun manufacturer.  Instead, California may "predict[]" as a policy judgment that gun manufacturers are capable of outfitting firearms with "available" technology when experts state that compliance is technologically "feasible."  *Turner*, 520 U.S. 16 at 195.

Reliance on experts is particularly understandable here, since a government "considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously." *Alameda Books*, 535 U.S. at 439–40 (O'Connor, J., announcing the judgment of the court).

California's microstamping requirement is the first of its kind, an "experimental" solution "to admittedly serious problems." *City of Renton*, 475 U.S. at 52. The microstamping requirement only became effective after the CDOJ certified that the technology "is available to more than one manufacturer unencumbered by any patent restrictions." It bears noting that a second microstamping law became effective this year, in the District of Columbia. *See* D.C. Code Ann. §§ 7-2504.08; 7-2505.03. The District initially set its applicability date "in order to incorporate best practices learned from California's experience" and "to allow the model being developed in California to be refined." District of Columbia Committee Report, B. 18-963 (2010). As Justice Brandeis famously wrote, "a single courageous state may, if its citizens choose, *serve as* a laboratory," and "try novel [legislative] experiments." *New State Ice Co. v. Liebmann*, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting) (emphasis added). But we have never forced an experimenting state to prove its policymaking judgment with scientific precision, especially when expert opinion supports the decision.

Even if microstamping proves technologically infeasible or ineffective, the UHA authorizes an alternative process: The California Attorney General "may also approve a method of equal or greater reliability and effectiveness in identifying the specific serial number of a firearm from spent cartridge

casings discharged by that firearm than that which is set forth
in this paragraph."  CAL. PENAL CODE § 31910(b)(7)(B).**12**

Microstamping or an authorized alternative may indeed
"represent[] an important advance in the techniques used by
law enforcement to serve legitimate police concerns."  *See
Maryland v. King*, 133 S. Ct. 1958, 1975 (2013).  In *King*, the
Supreme Court justified additional Fourth Amendment
intrusion because of DNA technology's promise in serving
"important" identification interests:

> DNA identification is an advanced technique
> superior to fingerprinting in many ways, so
> much so that to insist on fingerprints as the
> norm would make little sense to either the
> forensic expert or a layperson. The additional
> intrusion upon the arrestee's privacy beyond
> that associated with fingerprinting is not
> significant . . .  and DNA is a markedly more
> accurate form of identifying arrestees.

*Id.* at 1976.  The Court held that DNA identification secured
by swabbing the inside of an arrestee's cheek is "no more
than an extension of methods of identification long used in
dealing with persons under arrest" and so did not violate the
Fourth  Amendment's  protection  against  unreasonable
searches.  *Id.* at 1977 (internal citation omitted).

Similarly, microstamping is an extension of identification
methods long used in imprinting serial numbers on guns.  The
Third  Circuit  upheld  under  heightened  scrutiny  a  statute

---

**12** Such alternative method must also be "unencumbered by any patent
restrictions."  *Id.*

punishing receipt or possession of any firearm on which the manufacturer's serial number was removed, obliterated, or altered. *See Marzzarella*, 614 F.3d at 98–99.  The court held that "[r]egulating the possession of unmarked firearms . . . fits closely with the interest in ensuring the traceability of weapons," and so 18 U.S.C. § 922(k) survives intermediate scrutiny.  *Id.* at 99.**[13]**

During consideration of the UHA, the California legislature considered microstamping to be a modification on the federal serial number law upheld by the Third Circuit. As in *King*, any additional constitutional intrusion beyond requiring serial numbers is "not significant" and justified by "scientific advancements."  133 S. Ct. at 1975–76.  Indeed, "new technology will only further improve" microstamping's effectiveness.  *Id.* at 1977.

We are not convinced that the microstamping requirement impinges any further on Second Amendment rights than the serial number law approved in *Marzzarella*.   That law punishes receipt or possession—in addition to sale or transfer—of any firearm on which the manufacturer's serial number was removed, obliterated, or altered.  614 F.3d at 88 n.1 (citing 18 U.S.C. § 922(k)).  California law does not go so far—it does not ban possession or use of guns manufactured without microstamping features.  Instead, the UHA sanctions only someone who "manufactures," "imports into the state for sale," "keeps for sale," "offers or exposes for sale," or "gives

---

**[13]** 18 U.S.C. § 922(k) makes it "unlawful for any person knowingly to transport, ship, or receive . . . any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered or to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered."

or lends an unsafe handgun."  CAL. PENAL CODE § 32000(a).
The microstamping restrictions on commercial manufacture
and sale implicate the rights of gun owners far less than laws
directly punishing the possession of handguns.  *See D.C. v.
Heller*, 554 U.S. 570, 627 (2008); *Teixeira v. Cty. of
Alameda*, 2017 WL 4509038, at \*8 (9th Cir. Oct. 10, 2017)
(en banc) ("[G]un buyers have no right to have a gun store in
a particular location, at least as long as their access is not
meaningfully constrained.").  In addition, the law at issue in
*Marzzarella* applies to "any firearm" that once had a serial
number.  The microstamping provision, however, regulates
only new models of semiautomatic weapons offered for sale
in California after May 2013.

California is entitled to "a reasonable opportunity to
experiment with solutions to admittedly serious problems."
*City of Renton*, 475 U.S. at 52.    The microstamping
requirement need not be "the least restrictive means of"
reducing the number of unsolved handgun homicides.
*Jackson*, 746 F.3d at 966.  California has met its burden to
show that microstamping is reasonably tailored to address the
substantial problem of untraceable bullets at crime scenes and
the value of a reasonable means of identification.
Accordingly, the requirement passes intermediate scrutiny.

## II. EQUAL PROTECTION CLAUSE

Purchasers also claim that the UHA's three requirements
violate the Equal Protection Clause of the Fourteenth
Amendment.  We disagree.  To the extent that the Equal
Protection challenge is based on the Second Amendment's
fundamental right to bear arms and the disparate treatment of
groups in exercising that right, as recognized by *McDonald*,
that challenge is subsumed in the Second Amendment inquiry

above.  *See Orin v. Barclay*, 272 F.3d 1207, 1213 (9th Cir. 2001) (treating an "equal protection claim as subsumed by, and co-extensive with, his First Amendment claim").

Purchasers do not allege that they are part of any suspect or quasi-suspect class.**[14]**  "[A] statutory classification [that treats similarly situated persons differently] that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993); *see Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995) (requiring, as a prerequisite, that there be a "similarly situated" class of persons (citation omitted)).  Thus, the regulations need do no more than "bear[] a rational relation to some legitimate end." *Romer v. Evans*, 517 U.S. 620, 631 (1996).  Purchasers "have the burden 'to negative every conceivable basis which might support it,'" and each basis will be afforded a "strong presumption of validity." *FCC*, 508 U.S. at 314–15.  But Purchasers have failed to carry that burden and demonstrate that any of the differences in treatment by the UHA challenged here lack a rational basis.

Purchasers challenge the UHA's exceptions for sales to sworn members of law enforcement agencies, sales of curios

---

**[14]** Purchasers allege that the UHA discriminates "on the basis of state residence" and this "normally triggers strict scrutiny."  But because Purchasers pursue this line of reasoning no further—and, in fact, admit that strict scrutiny has not been used when laws discriminate against *in-state* residents as opposed to out-of-state residents—it is forfeited. *See Greenwood v. FAA*, 28 F.3d 971, 977 (9th Cir. 1994) (refusing to manufacture arguments for an appellant who made bare assertions in an opening brief).

and relics, and use in movie and television productions. *See* CAL. PENAL CODE §§ 32000(b)(3), (4), 32110(h). But we have already said that "[i]t is manifestly rational for at least most categories of peace officers to possess and use firearms more potent than those available to the rest of the populace in order to maintain public safety." *Silveira v. Lockyer*, 312 F.3d 1052, 1089 (9th Cir. 2003), *abrogated on other grounds by Heller*, 544 U.S. 570. Purchasers point out that the UHA's exception does not limit law enforcement officers to use of their weapons only during "official duties." Even so, the legislature could rationally conclude that because law enforcement officers receive extensive training and are expected to respond to emergencies even when off duty, such safety provisions might not be necessary for them. That is a rational explanation.

Purchasers' challenge to the exceptions for curios and relics and weapons used in film and television also have a rational justification. The curios-and-relics provision grandfathers "[f]irearms which are of special interest to collectors by reason of some quality other than is associated with firearms intended for sporting use or as offensive or defensive weapons." 27 C.F.R. § 478.11, para. Curios or Relics; *see* CAL. PENAL CODE § 32000(b)(3) (incorporating the federal definition found at 27 C.F.R. § 478.11). These include firearms more than fifty years old, "curios or relics of museum interest," and firearms valuable because they are "novel, rare, bizarre, [or associated with] some historical figure, period, or event." 27 C.F.R. § 478.11, para. Curios or Relics, subsec. (a)–(c). Because collectors hold these weapons for reasons other than "as offensive or defensive weapons," the exemption is a rational one. Similarly, the video-production exemption is rational because those weapons, one anticipates, are not intended to be used for live

fire. The fit of these exemptions may not be perfect—and we express no view how these exceptions might fare under more exacting standards of scrutiny—but it is sufficient to satisfy rational basis scrutiny.

For the foregoing reasons, we affirm the district court's grant of summary judgment in favor of California.

**AFFIRMED.**

BYBEE, Circuit Judge, concurring in part and dissenting in part:

Under California's Unsafe Handgun Act (UHA), any new semiautomatic handguns commercially sold in the state must be equipped with three technical features: a chamber load indicator (CLI), a magazine detachment mechanism (MDM), and microstamping.**[1]** CAL. PENAL CODE §§ 32000(a), 31910(b)(1)–(7). For the reasons explained in the majority opinion, I agree that intermediate scrutiny applies to Plaintiffs' Second Amendment challenge. I also agree that there is a reasonable fit between the CLI and MDM requirements and the State's substantial interest in enhancing public safety. *See United States v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013) ("[T]he intermediate scrutiny standard . . . require[s] (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted

---

**[1]** The UHA exempts from these three requirements any handguns that were "already listed on the roster" of approved handguns before the requirements were enacted. *See* CAL. PENAL CODE § 31910(b)(5)–(7)(A).

objective."). Both mechanisms help prevent accidental handgun discharges by decreasing the likelihood that a person will mistakenly believe that the firing chamber is empty. I therefore join these portions of the majority opinion.**[2]**

I part company with the majority, however, over the microstamping provision.**[3]** Plaintiffs have raised two different points. First, they argue that the mechanism for stamping cartridge casings can be disabled by the owner, thus undoing the benefits of microstamping. The State and its *amici* emphasize that microstamping is a proven technology and that, even if some owners disable the microstamping mechanism, it will aid the police in solving crimes. They urge us to defer to the California legislature's judgment on the overall usefulness of microstamping. The majority agrees. Pointing to "evidence that the technology is available," Maj. Op. at 26; *see also id.* at 27–28, the majority concludes that "California has gone well beyond [the]

---

**[2]** I also join the majority opinion in concluding that the three provisions do not violate the Equal Protection Clause.

**[3]** Microstamping is a mechanism that can imprint a cartridge casing "with a microscopic array of characters that identify the make, model, and serial number of the pistol" that fired the round. CAL. PENAL CODE § 31910(b)(7)(A). Microstamping involves laser micromachining alphanumeric characters linked to a handgun's make, model, and serial number onto a handgun's interior surfaces. Once a microstamped surface, such as the tip of the firing pin or the breech face, impacts the cartridge casing after the handgun is fired, that surface will imprint the casing with its identifying characters. If the police discover a spent casing from a microstamped handgun at a crime scene, they can examine it under a microscope and, *in theory*, discover legibly-imprinted characters. A simple database search would reveal who last registered the handgun that ejected the casing. The police would then have an important lead in their investigation.

threshold requirement" of showing that its evidence "fairly support[s] its conclusion," *id.* at 25 (citation omitted).  If the efficacy of microstamping as an aid to police forensics were the only issue before us, I would join the majority in its entirety; this is a policy question well-suited to legislative prediction.  And even if microstamping is not a perfect solution, California is entitled to see whether microstamping will aid police in solving crime.

But Plaintiffs raise a second argument, one that the majority largely ignores.  Plaintiffs argue that the testing protocol adopted by the California Department of Justice ("CDOJ") in its regulations is so demanding that no gun manufacturer can meet it.  Plaintiffs have come forward with evidence that no new handguns being sold in the United States can satisfy CDOJ's testing protocol and, therefore, no new handguns qualify for California's approved-as-safe roster.  The State argues that the technology is available, and that the manufacturers are just unwilling to submit to California's requirements.  This is an argument we cannot resolve on this record.  So far as we can tell from the meager record before us, no one—including CDOJ—has ever tested any weapon against California's protocol to see whether it is technologically feasible.  Plaintiffs claim that the microstamping requirement acts as a prohibition on the commercial sale of new handguns in California.  On the record before us, I cannot conclude that the State is entitled to summary judgment on Plaintiffs' challenge to the microstamping requirement, and that means that we must take Plaintiffs' Second Amendment claims seriously.

Under the appropriate Second Amendment analysis, I cannot conclude that there is a reasonable fit between CDOJ's microstamping requirement and the legislature's object in

solving handgun crimes. The result of CDOJ's restrictive testing protocol is undisputed: since at least 2013, no new handguns have been sold commercially in California, and that means that no guns were sold with the microstamping feature. That fact has an important secondary effect—it means that no new handguns are being sold commercially with the MDM and CLI safety features either.[4]

The consequence is obvious. Today, no one in California can purchase handguns that have the safety features the legislature thought critical for saving lives, nor can any Californian purchase guns with the microstamping feature the legislature thought important to assist police. The only guns commercially sold in California are grandfathered from these provisions. This is a totally perverse result. If the legislature (or CDOJ, seeking to implement the legislature's instructions) has adopted safety requirements that no gun manufacturer can satisfy, then the legislature has effectively banned the sale of new handguns in California. The effect of this result on our intermediate-scrutiny analysis is clear: the fit between California's interest in solving handgun crimes and the microstamping requirement would not only fail to be reasonable, it would be non-existent. The requirement would severely restrict what handguns Californians can purchase without advancing the State's interest in solving handgun crimes—or any government interest—one iota.

---

[4] Some guns with CLIs and MDMs might have been approved before the microstamping requirement went into effect. Neither party has provided figures on how many handgun models on the UHA roster are equipped with CLIs and MDMs. But given the scarcity of these features nationwide, the vast majority of the handguns on the roster likely lack these safety features.

This result would surely violate the Second Amendment and therefore cries for a more searching inquiry than the majority has provided us.  Here is how I will proceed.  In Part I, I demonstrate that there is a conflict in the evidence as to whether any manufacturer can comply with California's testing protocol.   The majority confronts neither the conflicting evidence nor the possibility that California has effectively banned the commercial sale of all new handguns. It instead concludes—in a cursory fashion—that we must defer to the State because its legislature weighed the evidence of microstamping's technological feasibility.  Maj. Op. at 24. But as I discuss in Part II, the majority is in error both as a matter of law and fact.  This deference is only appropriate for a legislative body's predictive policy decisions—i.e., how effectively a law will advance the government's stated interest.    In contrast, Plaintiffs' challenge to CDOJ's microstamping protocol presents a more fundamental question of technological feasibility, one the legislature did not and, in fact, could not have addressed because it did not have the testing protocol before it.

These defects reveal why, at step 2 of our Second Amendment inquiry, we cannot conclude on summary judgment that there is a reasonable fit between the microstamping requirement and the State's goal in solving handgun crimes.  But this disposition requires returning to step 1 and deciding whether the microstamping requirement burdens conduct protected under the Second Amendment—a point the majority assumed without deciding.  I believe we must address the point rather than assume it.  I thus conclude in Part III by discussing why the microstamping requirement is not, as the district court held, presumptively valid as a "law[] imposing conditions and qualifications on the commercial sale of arms," *District of Columbia v. Heller*,

554 U.S. 570, 626–27 (2008), and requires the application of heightened scrutiny.  I would reverse the district court and remand for further proceedings.

If all of this feels complicated and backwards, welcome to the strange world of the Second Amendment.

I

The critical factual question raised by Plaintiffs is whether any handgun is capable of satisfying the testing protocol for microstamping set out in the UHA and its regulations.    Plaintiffs' challenge to the microstamping requirement is not over whether the technology *generally* works.  There can be little doubt that microstamped handguns are  capable  of  imprinting  a  cartridge  casing  with alphanumeric  characters,  and  the  technology's  inventor attests to having publicly tested the technology with police departments across the country.  Plaintiffs have quibbled around the edges about the usefulness of microstamping, but even  the  studies  that  Plaintiffs  cite  demonstrate  the technology's general application.  *See, e.g.*, David Howitt et al.,  WHAT  MICRO  SERIALIZED  FIRING  PINS  CAN  ADD  TO IDENTIFICATION  IN  FORENSIC  SCIENCE,  at  31–40  (2008); George G. Krivosta, *Nanotag$^{TM}$ Markings from Another Perspective*, 38 AFTE J. 41, 43 (2006).  The degree to which microstamping will in practice aid police investigations is not my concern.  My sole interest is the conflicting evidence over whether CDOJ's testing protocol can be satisfied by any gun manufacturer.  Because the majority has not addressed these requirements,  I will discuss the statute and its accompanying regulations and then address the evidence in the record.

A

In order to qualify for the UHA's approved-as-safe roster, a handgun model must undergo testing by a state-certified laboratory. CAL. PENAL CODE § 32010(a)–(b); 11 CAL. CODE REGS. § 4059(a). The manufacturer must "provide[] three handguns of the make and model for which certification is sought," and the lab must fire 600 rounds from each handgun. CAL. PENAL CODE § 31905(a)–(b). To ensure that the handgun model is capable of legibly microstamping the cartridge casings, the lab must fire 2 rounds from each handgun before the 600-round test, as well as 2 rounds after the test. 11 CAL. CODE REGS. § 4060(e)–(g). These 4 casings per handgun are the only casings the lab examines. *Id*. § 4060(h). Using a "stereo zoom microscope," the lab must verify that (1) "the pistol has transferred an imprint or etching in at least two places on each cartridge casing" and that (2) "the pistol's complete FIN can be identified from the one or more etchings on each cartridge casing . . . ." *Id*. § 4060(h)(1). The "FIN" is the firearm identification number, which must "consist of at least eight, but no more than 12, unique alpha and/or numeric characters that must begin with the manufacturer's" identifying code. Id. § 4049(j). This test is conducted on all three handguns of the model submitted for certification. *Id*. § 4060(h)(3). The lab may certify that the model is microstamping compliant only if the examiner can identify the complete FIN from all twelve of the cartridge casings collected for testing.[5] *Id*.

Plaintiffs and their *amici* raise two specific objections to these requirements. First, they argue that microstamping

---

[5] Four cartridge casings are collected from each of the three handguns submitted, for a total of twelve casings examined.

technology is incapable of legibly imprinting casings consistently enough to ensure that all twelve casings are imprinted with the *complete* FIN.  Second, Plaintiffs contend that no handgun can satisfy the requirement that each casing be imprinted "in at least two places . . . ."  *See id*. § 4060(h)(1); *see also* CAL. PENAL CODE § 31910(b)(7)(A). They assert that, while a handgun's firing pin can sometimes successfully imprint a casing, the other internal surfaces—e.g., the breech face, extractor, ejector—are incapable of *ever* imprinting legible characters.

Plaintiffs cite to studies and declarations in support of these troubling assertions.  I will address this evidence momentarily, but the critical take-away is this:  contrary to the majority's assertion, Maj. Op. at 27–29, there is no indication in the brief legislative history included in the record before us that the state legislature, in enacting the UHA, considered either of these two impediments to certifying handguns as microstamping compliant.  With regard to the examination of the twelve casings, the legislature could not have directly considered whether manufacturers could comply with this testing standard because CDOJ promulgated the regulation *after* the legislature amended the UHA to include the microstamping requirement.  Similarly there is almost no mention in the legislative history of the dual-imprint requirement[6] and no evidence that the legislature addressed whether a surface other than the firing pin could legibly imprint cartridge

---

[6] This is not to say that the dual-imprint requirement was heedlessly added to the UHA or its regulations. The legislature originally considered a single-imprint requirement. It appears the legislature included the dual-imprint requirement to prevent criminals from circumventing microstamping by replacing or defacing a handgun's firing pin.

casings.  Simply stated, the California legislature did not consider the concerns raised by Plaintiffs, to which I now turn.

B

Plaintiffs rely principally on declarations from industry representatives and academic studies.  Their most detailed declaration comes from Lawrence Keane, who is the Secretary and General Counsel to the Sporting Arms and Ammunition Manufacturers' Institute ("SAAMI") and Senior Vice President, Assistant Secretary, and General Counsel to the National Shooting Sport Foundation ("NSSF"). According to Keane, NSSF is a trade association for the firearms industry, while SAAMI is an ANSI-accredited standards development organization for the industry's test methods, definitive proof loads, and ammunition performance standards.  Keane states:

> To date, I am not aware of a single handgun manufacturer worldwide that has produced a functioning, commercially available semiautomatic pistol designed and equipped with "a microscopic array of characters that identify the make, model, and serial number of the pistol" etched or otherwise imprinted in two or more places on the interior surface of internal working parts of the pistol, and that are transferred by imprinting on "each cartridge case when the firearm is fired." I am unaware of any handgun manufacturer who has attempted, or is even considering trying, to design and equip a semiautomatic pistol incorporating this technology.  NSSF

> and SAAMI handgun manufacturers have
> informed me and stated publicly that they
> cannot comply with California's
> microstamping requirements and have no
> plans to attempt to do so. The reason is
> simple, microstamping does not work.

He further states that various "[i]ndependent, peer-reviewed studies, including ones by the inventor of microstamping, Todd Lizotte, have confirmed that firearm microstamping is unproven and unreliable to perform in the manner that the UHA requires." According to Keane, "[b]ecause the microstamping requirement cannot be complied with, it is currently preventing scores of manufacturers, distributors and retailers from selling many semi-automatic pistol models in the State of California that are widely available in more or less every other state of the Union, because any such sales would subject them to criminal prosecution." More specifically, he states that "[microstamping] certainly cannot produce the required markings at two locations on the cartridge case, as required by the law." He repeats that "[b]ecause the microstamping requirement cannot be complied with," manufacturers are not planning to sell in California. These "[c]ompanies have actually stopped doing business in California because of that requirement, not because they wished to cease operations there." He concludes that the microstamping requirement "constitute[s] a de facto ban on handguns in California . . . ."

Plaintiffs also provided declarations from two CEOs, Michael Fifer of Sturm, Ruger & Co., and James Debney of Smith & Wesson Corp. Their declarations are nearly identical, although Debney provides more detail. Fifer states that "Ruger believes that California's microstamping

regulations make compliance impossible. Quite simply, the state law requires the technology to perform at a level that Ruger cannot practically implement and, to our knowledge, has never been achieved by any manufacturer." Debney states that "Smith & Wesson does not believe it is possible currently to comply with California's microstamping regulations. Quite simply, the state law requires the technology to perform at a level that it cannot . . . . As it appears infeasible to comply with the CA DOJ microstamping regulations, Smith & Wesson does not have the ability or plans to incorporate microstamping in its semi-automatic handguns . . . ." He adds that Smith & Wesson currently produces California-compliant handguns and will continue to do so "as long as we do not make any changes to them," because any changes Smith & Wesson makes would require CDOJ to test the weapons to keep them on the approved-as-safe roster.

In addition, Plaintiffs and their declarants cite to several studies regarding microstamping's technological feasability. One of the most insightful pieces of evidence is a 2013 study, in which Lizotte is listed as a co-author. *See* T. Grieve et al., *Gear Code Extraction from Microstamped Cartridges*, 45 AFTE J. 64 (2013). The study acknowledges that the alphanumeric characters microstamped on a casing can become "deformed, or partially removed due to the firing and cartridge ejection process . . . ." *Id*. at 64. Indeed, the study focuses on the viability of additionally microstamping casings with a "circular gear code" as a failsafe "that could either fill in any gaps in a distorted alpha-numeric code, or be used to replicate the code if the alpha-numeric identifier *is entirely illegible*." *Id*. at 64–65 (emphasis added). The study acknowledges that characters can become distorted when the primer is "struck twice"—presumably by the firing pin—and

consequently smeared. *Id*. at 68. It also notes that "[d]ouble strikes were especially prevalent in" one of the handgun models tested, *id.*, which indicates that a handgun's ability to satisfy the UHA's testing protocol may rely more on its make and model than on the progression of microstamping technology.

Similarly, microstamping's effectiveness appears to have almost as much to do with the type of ammunition used as it does with any other factor addressed so far. *Id*. at 70 ("Lacquered cartridges . . . posed problems during the optical and SEM evaluations, especially for the Hi-Point cartridges as it interfered with the transfer of the identifiers and the gear code."); *see also* L.S. Chumbley et al., *Clarity of Microstamped Identifiers as a Function of Primer Hardness and Type of Firearm Action*, 44 AFTE J. 145, 153 (2012) ("[F]urther study is necessary before any definitive statements can be made concerning the effect of ammunition type. However, it is clear that the presence of lacquer is of paramount importance in identifier transfer.").[7] Finally, the 2013 study also acknowledges that the ability to identify characters imprinted on a casing may depend on the use of a scanning electron microscope. Grieve, *supra*, at 68. As I discuss immediately below, this equipment is not currently permitted under the UHA's testing protocol and the use of only an optical microscope is unaccounted for in the State's evidence.

The State relies solely on a declaration from microstamping's inventor, Todd Lizotte. Mostly notably, Lizotte describes a "stress test" he performed in 2007 with a Smith & Wesson .40 caliber handgun, which he equipped

---

[7] Lizotte is also listed as a co-author of this 2012 study.

with a microstamped firing pin that he designed to work with that specific handgun model.  Lizotte attests that, after firing over 2,500 rounds, "all eight microstamped digits from the firing pin were legible 97% of the time," while "breech face markings transferred to cartridge casings were legible 96% of the time."  He further represents that,"[b]etween firing pin and breech face markings, all eight microstamped digits were identifiable in all cases."

These results are undeniably impressive, but they do not directly assuage the concerns regarding the UHA's testing requirements because it is not clear that Lizotte's 2007 stress test would satisfy California's testing protocol, which did not even become effective until 2011.   There are several problems.

Although Lizotte reports a perfect rate of legibility when combining characters imprinted on casings by both the firing pin and breech face, there is a subtle but important caveat to this result:  he identifies the imprinted characters through the use of both "optical microscopy and scanning electron microscopy techniques . . . ."  The UHA's regulations, however, prescribe the use of only a "stereo zoom microscope"—i.e., an optical microscope.  11 CAL. CODE REGS. § 4060(h)(1); *see also id*. § 4052(b)(1)(A).  In other words, Lizotte's declaration never explains how often imprints are legible using only the equipment allowed for in the microstamping protocol.    Certainly handgun manufacturers and consumers would have reason for concern if these rates are relatively low.  And this may very well be the case, as Lizotte has emphasized the importance of scanning electron microscopy in identifying imprinted characters.  In countering the results of a study critical of

microstamping's technological feasibility,**[8]** Lizotte asserted
"that the results [the study] observed would have been
different, and the markings would have been 'fully legible,'
if a more sophisticated method had been used to read the
markings known as, 'Scanning Electron Microscopy (SEM)
. . . .'"

Moreover, it is unclear from Lizotte's declaration whether
the modified handgun he used in the stress test imprinted
*each* casing with two sets of microstamped characters.  He
does not state how often the breech face made an imprint, but
only how many imprints were legible.  Because each of the
twelve casings examined during CDOJ's certification
procedure must be imprinted "in at least two places," a low
rate of breech-face imprints would also be troubling.

In highlighting these informational deficits, it is not my
intention to be critical of Lizotte's work.  He appears to be a
responsible inventor and advocate who has placed his
technology in the public domain in order to encourage
microstamping's adoption.  But the State, in defending its
implementation of a novel handgun restriction against a
Second Amendment challenge, has relied solely on Lizotte's
nine-page declaration, which is not fully responsive to the
concerns raised by Plaintiffs.

The majority does not even mention any of this evidence.
Rather, it offers a back-of-the-hand dismissal by concluding
that "[t]he reality is" that gun manufacturers are merely

---

**[8]** *See* Krivosta, *supra*, at 43 (testing microstamping in ten different
handguns and concluding that "[t]he overall ratio of Satisfactory to
Unsatisfactory impressions [imprinted on the casings] was 54 to 46").

unwilling to comply with the microstamping requirement.**⁹**
*See* Maj. Op. at 25.  The majority claims that the failure to
produce a complying handgun is not evidence "that
microstamping is technology infeasible."  Maj. Op. at 25–26.
But Ruger's CEO attests that California's "law requires the
technology to perform at a level that Ruger cannot practically
implement and, to [his] knowledge, has never been achieved
by any manufacturer."  I do not see how the majority gets to
decide at summary judgment what "the reality is" when there
is conflicting evidence in the record.  While the declarations
are certainly lacking in detail, they should not be construed so
narrowly—especially considering that it is the State that bears
the burden under intermediate scrutiny of proving that its law
passes constitutional muster.  After all, the State does not
attempt to explain why gun manufacturers would forgo the
opportunity of selling their new generations of handguns in
a major market like California.

---

**⁹** The majority's conclusion that manufacturers are unwilling, not
unable, to comply with California's testing protocol is the subject of
debate between two *amici.*  NSSF/SAAMI point to the Keane Declaration.
They explain that the dual-imprint requirement came about because the
legislature was concerned that a firing pin could be easily altered by the
weapon's owner.  They represent that the statute and regulations require
a 100 percent success rate, which is beyond what any testing has shown.
The Los Angeles City Attorney argues that NSSF/SAAMI "cherry-
pick[ed] the facts they like, and mischaracteriz[ed] or omitt[ed] those they
do not."  In the end, the L.A. City Attorney relies exclusively on Lizotte's
declaration, and concludes that "it is not that manufacturers *can't* comply
with the UHA's microstamping requirement.  It is that they *won't*."

    The majority just sided with the State in this debate.  We don't get to
do that at summary judgment.  Nor, as I discuss in the next section, do we
have to side with the State out of deference to the legislature.

The majority also summarily asserts that this suit has been brought by gun purchasers rather than gun manufacturers, implying that the inability of the latter to comply with the UHA is somehow irrelevant to Plaintiffs' inability to purchase handguns. *See* Maj. Op. at 25. But Plaintiffs have not claimed that gun manufacturers have a right under the Second Amendment to *produce* the guns of the manufacturer's choice. *See Teixeira v. County of Alameda*, 873 F.3d 670, 681 (9th Cir. 2017) (en banc) (rejecting a gun seller's argument "that, independent of the rights of his potential customers [to acquire firearms], the Second Amendment grants him a right to *sell* firearms"), *cert. denied*, 138 S. Ct. 1988 (2018). Rather, Plaintiffs' claim is based solely on their own inability to purchase handguns.

Taken together, Plaintiffs' evidence is impossible to reconcile with Lizotte's declaration, which portrays microstamping as nearly infallible. We cannot assume that microstamping can satisfy the UHA's testing protocol.[10] In any other context, this conflict in the evidence would render this case inappropriate for decision on summary judgment. The district court was well aware of these factual disputes. Instead of resolving them, the court held that the commercial

---

[10] The majority finds that California produced evidence that microstamping is technologically feasible and would cost between \$3 and \$10 per handgun, citing Lizotte's demonstrations of microstamping with police departments. Maj. Op. at 27–28. But the majority stubbornly refuses to acknowledge the problem. As stated above, there can be little doubt that microstamped handguns are generally capable of imprinting a cartridge casing with alphanumeric characters. But there is conflict in the evidence before us whether *any* handgun can satisfy California's microstamping testing protocol. The problem is not the legislation, but the *regulations* that implement the microstamping requirement. A testing protocol that cannot be satisfied is effectively a ban.

sales exception—which I discuss at length below—meant that the Second Amendment does not even apply to Plaintiffs' claims.  The majority declines to affirm the district court on the grounds on which the court based its decision, assumes the Second Amendment applies, and then decides the factual conflict for itself.  We should have sent this case back to the district court to resolve these factual issues.

C

The majority raises other arguments in defense of its decision to uphold the microstamping requirement in the face of conflicting evidence.  These rationales are unavailing and, in large part, inapposite.

The majority highlights aspects of the UHA that, in its view, offset Plaintiffs' central contention that the requirement effectively bans the sale of new handguns.  It cites, for instance, the fact that "[t]he microstamping requirement only became effective after the CDOJ certified that the technology 'is available to more than one manufacturer unencumbered by any patent restrictions.'"  Maj. Op. at 29.  If the majority is implying that this certification has any bearing on the issue before us, this assertion is wide of the mark.  The certification was required by the legislature to ensure that manufacturers had legal access to the technology; the certification was about patent rights, not technological feasibility.  CAL. PENAL CODE § 31910(b)(7)(A).  As the State recently conceded before the California Supreme Court, "this certification confirms the lack of any patent restrictions on the imprinting technology,

not the availability of the technology itself."**11** *Nat'l Shooting Sports Found., Inc. v. State*, No. S239397, 2018 WL 3150950, at \*1, slip op. at 2 (Cal. June 28, 2018).   The absence of patent restrictions resulted from Lizotte generously placing his technology in "the public domain . . . free of royalty."

The majority similarly relies on the fact that, even if microstamping proves to be technologically infeasible, the UHA authorizes the California Attorney General to "approve a method of equal or greater reliability and effectiveness in identifying the specific serial number of a firearm from spent cartridge casings . . . ."   Maj. Op. at 29–30 (quoting CAL. PENAL CODE § 31910(b)(7)(B)).   So what is this replacement technology?   Who knows?   The State has not represented that it knows of a microstamping alternative even at the

---

**11** This concession was made in the context of a state-law challenge to the microstamping requirement by NSSF, an *amicus* in this case. Although NSSF claimed (as it does here) that the dual-imprint requirement is impossible to comply with, the California Supreme Court had no cause to address this technical question.   *See Nat'l Shooting Sports Found.*, 2018 WL 3150950, at \*1–2.   Rather, "[t]he sole dispute" was whether a California court could invalidate the microstamping requirement "on the basis of Civil Code section 3531's declaration that '[t]he law never requires impossibilities.'"   *Id*. at \*2 (alteration in original).   Because the challenge was decided below at the pleading stage, the California Supreme Court "assume[d] that complying with the [microstamping requirement] is impossible . . . ."   *Id*.   The court's decision addressed only a matter of state statutory interpretation and therefore has no bearing on the question before us.   Nor should we draw any inference from the fact that—as the majority points out—NSSF did not challenge the propriety of CDOJ's certification of "the availability of dual placement microstamping technology . . . ."   *Id*. at \*4; *see also* Maj. Op. at 25 n.10.   Again, the absence of a patent encumbrance says nothing about the technology's feasibility.

conceptual stage, and the majority has wisely declined to speculate on this point.

The majority also misleadingly states that "semiautomatic handguns are not subject to the microstamping requirement and are grandfathered as long as the manufacturer continues to pay a roster fee and the firearms do not fail a retest." Maj. Op. at 26. But semiautomatic handguns that were not listed on the UHA roster *before* the microstamping requirement took effect are expressly subject to the requirement. *See* CAL. PENAL CODE § 31910(b)(7)(A). If the majority is asserting that the availability of grandfathered handguns in California affects the application of intermediate scrutiny, then this too is incorrect. That Plaintiffs can commercially purchase older-model handguns says nothing about whether there is a reasonable fit between the microstamping requirement— which Plaintiffs claim effectively bans *new* handgun sales—and the State's interest in solving handgun crimes. If the requirement is impossible to comply with, then as discussed above, it imposes a burden without advancing any state interest. Similarly, the fact that the UHA does not altogether ban possession of non-microstamped handguns does not squarely address the application of intermediate scrutiny; it only means that California has not banned the sale of *all* handguns—new and old—in violation of *Heller*.

Moreover, contrary to the majority's assertion, the Third Circuit's decision in *United States v. Marzzarella*, 614 F.3d 85 (3d Cir. 2010), bears little resemblance to this case. Maj. Op. at 31–32. There, the Third Circuit rejected a Second Amendment challenge to a federal criminal statute prohibiting "possession of a firearm with an obliterated serial number . . . ." *Marzzarella*, 614 F.3d at 88. The court reasoned that "preserving the ability of law enforcement to

conduct serial number tracing—effectuated by limiting the availability of untraceable firearms—constitutes a substantial or important interest." *Id*. at 98.  Here, however, there is no disputing that microstamping's potential ability to aid the police in solving handgun crimes presents a substantial interest.  *Marzzarella* did not address anything remotely analogous to the question of technological feasibility presented in this case and is therefore inapposite.

The majority similarly justifies its unfounded confidence in the ability of manufacturers to comply with the microstamping requirement by citing to other areas of law that have little relevance to this case.  The challenge before us "echoes a similar one made for decades about airbags," the majority announces.  Maj. Op. at 26 n.11.  We as readers, however, are left to suss out how regulations concerning automobile safety standards compare to testing requirements that will potentially curtail a fundamental right to possess handguns.  The analogy is pretty far afield.  The majority also perplexingly attempts to analogize to the Fourth Amendment.  Maj. Op. at 30 (citing *Maryland v. King*, 133 S. Ct. 1958 (2013)).  But the challenge before us presents the inverse of the Fourth Amendment paradigm, in which the more advanced certain technologies become the more likely it is that they can be used to encroach upon our constitutional rights.  *See, e.g.*, *Kyllo v. United States*, 533 U.S. 27 (2001).  Here, by contrast, it is the lack of assurance that microstamping technology can perform at the levels required under California law that prevents us from concluding that the requirement passes constitutional muster.

\* \* \*

In sum, there is a plain conflict in the evidence that in any other context would preclude summary judgment. Indeed, the district court in this case requested additional briefing on the factual questions and then decided that summary judgment was appropriate under one of *Heller*'s exceptions—an error that I address in Part III. Pressing fearlessly where the district court declined to go, the majority does not address the conflict in evidence in any degree of granularity. Instead, it asserts that we must defer to the California legislature's conclusion that microstamping is technologically feasible because the legislature "weighed competing evidence on effectiveness before enacting the statute." Maj. Op. 25. But as I show in the next section, such deference is inapplicable to the question of whether gun manufacturers can comply with the UHA and its testing requirements and is unwarranted in this case given the impediments to compliance that the legislature failed to consider.

## II

The majority thinks it has an answer to why, in light of the conflict in evidence, we can grant summary judgment. In the majority's view, we must defer to the legislature's own judgment on microstamping's technological feasability. Maj. Op. at 25, 28–29. With respect, the majority is wrong, both as a matter of law and fact. I address first the general principles, then discuss how we have applied these principles in Second Amendment cases, and why these principles do not apply to the arguments Plaintiffs have made in this case.

## A

When applying heightened scrutiny, we defer to a legislative body's predictive policy judgments. Although

there is seldom a dispute that the government's interest in an objective is substantial, these goals are often stated in the abstract.  After all, who could genuinely dispute that enhancing public safety and solving handgun crimes are important interests?  *See Chovan*, 735 F.3d at 1139 ("It is self-evident that the government interest of preventing domestic gun violence is important.").  But a legislature "must do more than simply 'posit the existence of the disease sought to be cured.'"  *Turner Broad. Sys., Inc. v. FCC* (*Turner I*), 512 U.S. 622, 664 (1994) (plurality opinion) (quoting *Quincy Cable TV, Inc. v. FCC*, 768 F.2d 1434, 1455 (D.C. Cir. 1985)).  It "must demonstrate that the recited harms are real, not merely conjectural, and that the [law at issue] will in fact alleviate these harms in a direct and material way."  *Id*.  Accordingly, a legislature must have a basis for believing that it is necessary to enact "X"-law in order to prevent "Z"-harm.

In *Turner I*, for instance, the Supreme Court reviewed the constitutionality of a federal requirement that cable operators "carry the signals of a specified number of local broadcast television stations"—a policy aimed at advancing Congress' stated interest in "promoting the widespread dissemination of information" and "fair competition . . . ."  *Id.* at 640, 662*.* The so-called "must-carry rules" (X-law) were premised on the proposition that, absent federal intervention, cable operators would refuse to voluntarily carry the signals from broadcast stations, thus forcing them out of business (Z-harm).  *Id*. at 666.

In addressing Plaintiffs' challenge to this proposition and the supporting studies, the Court began from the premise "that courts must accord substantial deference to the predictive judgments of Congress."  *Id.* at 665.  "Sound

policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical support may be unavailable." *Id*. Deference to such policymaking stems in part from the reality that legislative bodies are "far better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon" complex issues. *Id*. at 665–66 (quoting *Walters v. Nat'l Ass'n of Radiation Survivors*, 473 U.S. 305, 330 n.12 (1985)); *see also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 440 (2002) (plurality opinion) (applying this same rationale to a local government).

Similarly, when a legislature attempts to redress a harm, it must forecast the *effect* of its remedial law—I will call this "Y." Means-end scrutiny thus inevitably invokes questions of the law's *efficacy* in advancing the government's stated interest. The parties often present competing evidence, such as social-science studies and economics forecasts, on whether X-law will have Y-effect, which is aimed at redressing Z-harm in order to advance the government's interest. *See, e.g.*, *Alameda Books*, 535 U.S. at 429, 435–36 (addressing the parties dispute regarding whether a police-department report supported the city council's conclusion that prohibiting "the establishment . . . of more than one adult entertainment business in the same building" would advance the city's interest in mitigating the secondary effects these businesses cause, such as increased crime).

We may defer to these types of predictive policy judgments, even when they touch on protected constitutional rights. *See id*. at 440 (citing *Turner I*, 512 U.S. at 655–56). Indeed, the Supreme Court has admonished on multiple occasions that the legislature "must be allowed a reasonable

opportunity to experiment with solutions to admittedly serious problems." *City of Renton v. Playtime Theatres, Inc*., 475 U.S. 41, 52 (1986); *see also Alameda Books*, 535 U.S. at 439. While a legislature may have empirical data to support its predictions, a policy's efficacy is *not* something that can be tested in a laboratory; rather, a legislature must implement a law and assess over time whether it had the desired remedial effect. *See Alameda Books*, 535 U.S. at 439–40 ("A municipality considering an innovative solution may not have data that could demonstrate the efficacy of its proposal because the solution would, by definition, not have been implemented previously.").

## B

It should therefore come as no surprise that deference to legislative policy judgments has played a role in several of our post-*Heller* Second Amendment decisions. Applying intermediate scrutiny, we have upheld city ordinances banning large-capacity magazines, *Fyock v. Sunnyvale*, 779 F.3d 991, 1000–01 (9th Cir. 2015), banning hollow-point rounds, *Jackson v. City & County of San Francisco*, 746 F.3d 953, 969–70 (9th Cir. 2014), and requiring residents to either store their handguns in an approved locked container or disable them with a trigger lock, *id*. at 958, 965–66. We were able to conclude that each of these laws advanced their intended interest in enhancing public safety based, in part, on the fact that the city councils had relied on relevant studies and made legislative findings.[12]  *Fyock*, 779 F.3d at 1000

---

[12] None of this is to say that legislative bodies are "obligated, when enacting [laws], to make a record of the type that an administrative agency or court does to accommodate judicial review." *Turner I*, 512 U.S. at 666. But as discussed below, courts must still ascertain whether a legislature,

("Sunnyvale also presented evidence that large-capacity magazines are disproportionately used in mass shootings as well as crimes against law enforcement, and it presented studies showing that a reduction in the number of large-capacity magazines in circulation may decrease the use of such magazines in gun crimes."); *Jackson* 746 F.3d at 965, 969; *see also Peruta v. County of San Diego*, 824 F.3d 919, 944 (9th Cir. 2016) (en banc) (Graber, J., concurring) ("[S]ocial scientists disagree about the practical effect of modest restrictions on concealed carry of firearms.  In the face of that disagreement, and in the face of inconclusive evidence, we must allow the government to select among reasonable alternatives in its policy decisions.").[13]

This brings me to the appropriate role for legislative deference in this case.  Recall that Plaintiffs actually raised two challenges to microstamping.  *See supra* pp. 36–37. Although I have focused on Plaintiffs' challenge to the microstamping requirement based on its technological feasibility, they first raised the question of microstamping's

---

"in formulating its judgments, . . . has drawn reasonable inferences based on substantial evidence." *Id*.

[13] Our sister circuits have applied legislative deference in similar Second Amendment challenges. *See, e.g.*, *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 261 (2d Cir. 2015) ("We remain mindful that, '[i]n the context of firearm regulation, the legislature is "far better equipped than the judiciary" to make sensitive public policy judgments (within constitutional limits) concerning the dangers in carrying firearms and the manner to combat those risks.'" (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 97 (2d Cir. 2012))); *Drake v. Filko*, 724 F.3d 426, 437 (3d Cir. 2013) ("The predictive judgment of New Jersey's legislators is that limiting the issuance of permits to carry a handgun in public to only those who can show a 'justifiable need' will further its substantial interest in public safety.").

efficacy in aiding police investigations.  Plaintiffs contend
that criminals can easily defeat the technology by either
replacing a handgun's firing pin—a fairly common and
inexpensive procedure—or obliterating its characters with
sandpaper.  And even if a microstamped handgun did
successfully imprint the cartridge casings from the rounds
fired during a crime, Plaintiffs assert that it is only the utterly
careless criminal who fails to pick up his casings before
fleeing the scene.  The brief legislative history of the
microstamping requirement demonstrates that these precise
arguments were made before the legislature, which evidently
found them unpersuasive.

Perhaps Plaintiffs are correct, and microstamping will do
little to solve handgun crimes.  But it is not our role to second
guess the legislature's predictive judgment that
microstamping will solve at least some crimes.  Indeed, the
technology need not result in the police making arrests in
every case in order for the microstamping requirement to
have a reasonable fit.  This is thus precisely the type of
dispute over whether X-law will have Y-effect that will
prevent Z-harm that is entitled to legislative deference.  And
as the majority notes, the "legislature considered and rejected
other, more intrusive solutions" to solving handgun crimes.
Maj. Op. at 24.  We must therefore "allow the government to
select among reasonable alternatives in its policy decisions."
*Peruta*, 824 F.3d at 944 (Graber, J., concurring).  Faced with
an alarmingly-high number of unsolved handgun-based
homicides per year,[14] California "must be allowed a

---

[14] Plaintiffs concede that solving handgun crimes is an important
government interest.  Indeed, in presenting the microstamping amendment
to the UHA before the California legislature, the legislation's author cited
the fact that nearly 60 percent of the approximately 2400 homicides in the

reasonable opportunity to experiment with solutions to [an] admittedly serious problem[]." *Renton*, 475 U.S. at 52. I agree with the majority on this point.

When the majority notes that the parties dispute whether microstamping will "effectively" address this problem, it fails to distinguish between the issues of efficacy in solving crime and the separate issue of technological feasibility. *See* Maj. Op. at 25–26. The majority summarily cites to the principles of legislative deference laid out above to conclude that we must defer to California with respect to *both* the efficacy of microstamping to aid police *and* the question of whether manufacturers can produce handguns that satisfy the testing protocol. The former question is a predictive judgment about policy and should earn our deference; the latter is a judgment of scientifically-verifiable fact—a question of whether gun manufacturers, importers, and sellers can even comply with the law—and is not entitled to the same deference.

The majority counters that this is "an artificial distinction" and that I seek to "hold California to a standard never before imposed." Maj. Op. at 28. But this assertion fails to take into account that Plaintiffs' challenge to the microstamping provision raises a novel question. The majority does not cite—nor was I able to discover—any case in which the public's ability to exercise a constitutional right was dependent on the technological feasibility of a requirement imposed by the government. Rather than

---

state each year are committed with handguns. No arrests are made in nearly 45 percent of homicide cases. Had Plaintiffs contested the need for some form of remedial action, this evidence would have been more than sufficient to demonstrate that the harm California seeks to redress is "real, not merely conjectural . . . ." *Turner I*, 512 U.S. at 664.

proceed with caution through this unchartered terrain, the majority presses forward by relying solely on the concept of legislative deference. Indeed, the majority declines to even pause and question whether the rationales discussed above for deferring to a legislative body's policy judgments are applicable to the question before us. They are not.

Indeed, the technological feasibility of microstamping is just not comparable, for example, to questions of how effective a zoning ordinance will be in combating the secondary effects of adult entertainment. *See Renton*, 475 U.S. at 52 ("We also find no constitutional defect in the method chosen by Renton to further its substantial interests. Cities may regulate adult theaters by dispersing them, as in Detroit, or by effectively concentrating them, as in Renton."). Nor can we properly compare the question before us to our prior Second Amendment cases, which similarly hinged on what can fairly be described as policy disputes. *See, e.g.*, *Fyock*, 779 F.3d at 1000–01 (acknowledging the existence of competing evidence regarding whether high-capacity magazines are conducive for self-defense rather than crime); *see also Peruta*, 824 F.3d at 944 (Graber, J., concurring) ("To be sure, we recognize the existence of studies and data challenging the relationship between handgun ownership by lawful citizens and violent crime. . . . It is the legislature's job, not ours, to weigh conflicting evidence and make policy judgments." (quoting *Kachalsky v. County of Westchester*, 701 F.3d 81, 99 (2d Cir. 2012))).

In contrast, the question of technological feasibility—in the sense of whether a manufacturer can satisfy the testing protocol—is one that can be readily answered in a laboratory. As discussed above, the UHA already requires gun manufacturers to submit handguns they wish to sell in

California to a State-certified laboratory, which tests compliance with the CLI, MDM, and microstamping requirements.   CAL. PENAL CODE § 32010(a).   If microstamping technology is feasible and as reliable as the State believes it to be, there is no purpose for relying on predictive judgment. The State could simply demonstrate and certify that popular brands of modern handguns, once modified with microstamped interior surfaces, will legibly imprint cartridge casings in two places with their identifying information—and can do so at rate of consistency that will satisfy the State's testing protocol.**[15]**

The majority objects to this invitation, arguing that it would essentially "transform [California] into a gun manufacturer." Maj. Op. at 28. But the State has already interjected itself into the granularity of this issue by *setting* (through CDOJ regulations) the technical UHA compliance requirements and certifying private laboratories to certify handgun compliance. It is not an onerous burden for the State to counter Plaintiffs' central contention that no handgun can satisfy the testing protocol by simply testing a single handgun. This is especially true in light of the fundamental right at stake.

One final note on legislative deference. The majority fails to acknowledge that even though predictive policy judgments "are entitled to substantial deference"—where appropriately

---

**[15]** While the State may counter this invitation by pointing to the purported unwillingness of gun manufacturers to comply with the microstamping requirement, the State's own evidence indicates that components such as the firing pin and breech face can be microstamped and tested without a manufacturer's participation. Indeed, Lizotte's stress test involved a handgun he modified with microstamped interior surfaces.

applied—they are not "insulated from meaningful judicial review altogether." *Turner I*, 512 U.S. at 666. "On the contrary, [the Supreme Court has] stressed in First Amendment cases that the deference afforded to legislative findings does 'not foreclose . . . independent judgment of the facts bearing on an issue of constitutional law.'" *Id*. (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 129 (1989)). While "not a license to reweigh the evidence *de novo*," *id*., courts are obliged "to assure that, in formulating its judgments, [a legislature] has drawn reasonable inferences based on substantial evidence," *Turner Broad. Sys., Inc. v. FCC* (*Turner II*), 520 U.S. 180, 195 (1997) (quoting *Turner I*, 512 U.S. at 666); *see also Alameda Books*, 535 U.S. at 438 ("This is not to say that a municipality can get away with shoddy data or reasoning. The municipality's evidence must fairly support the municipality's rationale for its ordinance.").

Even if legislative deference, in the abstract, applied to the question of technological feasability, its application would be unwarranted in this case. As demonstrated above, the California legislature failed to adequately consider the impediments to complying with the microstamping requirement and its testing protocol. And contrary to the majority's assertion, there is little indication in the record before us that the legislature relied on Lizotte's expertise in debating whether to enact the requirement. *See* Maj. Op. at 27–28. I can find no reference in the legislative history to Lizotte's stress test discussed above or the public displays of microstamping's application cited in his declaration. As far as I can tell, Lizotte never testified before the state legislature nor submitted any materials to them other than a press release. The only direct reference to him in the legislative history involves staff members of a legislative committee soliciting his brief response to one of the studies critical of

microstamping. *See supra* note 8. These deficiencies are glaring, and I cannot conclude that the legislature relied on substantial evidence in determining that microstamping is technologically feasible—even before considering the contrary evidence.

Surprisingly—and perhaps telling—the State has failed to address on appeal Plaintiffs' concerns regarding whether manufacturers can successfully implement microstamping. The majority attempts to fill this void by relying on a form of deference that is inapplicable to the question of whether gun manufacturers can comply with the UHA's testing protocol. Given the conflict of evidence on this very point, the majority should not conclude that the microstamping requirement survives intermediate scrutiny.

### III

My analysis thus far has addressed only step 2 of our Second Amendment framework: the application of the appropriate level of scrutiny. *See Jackson*, 746 F.3d at 960. The majority avoids step 1 by assuming without deciding that the CLI, MDM, and microstamping requirements "burden[] conduct protected by the Second Amendment . . . ." *Id*. (quoting *Chovan*, 735 F.3d at 1136); *see* Maj. Op. at 13–14. Because a state can also prevail on a Second Amendment claim at step 1 by establishing that the Amendment is not implicated, skipping this step is appropriate only when the state prevails at step 2 by establishing that the law at issue survives application of the appropriate level of scrutiny. Stated otherwise, a court *must* engage in the step 1 inquiry if the law would fail to pass constitutional muster at step 2. Thus, in order for me to conclude that we should reverse and remand as to the microstamping requirement, I must address

the threshold question of whether microstamping implicates the Second Amendment. This analysis requires addressing the district court's conclusion that the UHA is "presumptively lawful" because it is a "law[] imposing conditions and qualifications on the commercial sale of arms." *Heller*, 554 U.S. at 626–27 & n.26.

The majority—which will soon appear prophetic—states that courts "have spilled considerable ink" addressing this precise issue. Maj. Op. at 11. What follows, I fear, is no exception. I first trace the development of Second Amendment precedent post-*Heller* and offer a roadmap to deciding what conduct falls outside of the Second Amendment's protection. I conclude by applying this roadmap to the microstamping requirement.

### A

Because the Second Amendment "codified a *pre-existing* right," its protections encompass "the historical understanding of the scope of the right." *Heller*, 554 U.S. at 592, 625. The scope of the Second Amendment may be defined not only by what was historically protected, but also by what the government was historically permitted to regulate. We have said that the first question we must answer in a Second Amendment challenge is "whether the challenged law falls within a 'well-defined and narrowly limited' category of prohibitions 'that have been historically unprotected.'" *Jackson*, 746 F.3d at 960 (quoting *Brown v. Entm't Merchs. Ass'n*, 564 U.S. 786, 791–92 (2011)).

In *Heller*, the Supreme Court identified three categories of regulatory measures that we may presume to be consistent with the historical scope of the Second Amendment:

> Although we do not undertake an exhaustive
> historical analysis today of the full scope of
> the Second Amendment, nothing in our
> opinion should be taken to cast doubt on
> longstanding [1] prohibitions on the
> possession of firearms by felons and the
> mentally ill, or [2] laws forbidding the
> carrying of firearms in sensitive places such
> as schools and government buildings, or
> [3] laws imposing conditions and
> qualifications on the commercial sale of arms.

*Heller*, 554 U.S. at 626–27. The Court, however, did not elaborate on these enumerated categories, their intricacies, or their justifications, and instead left that for another time. *See id.* at 635 ("[T]here will be time enough to expound upon the historical justifications for the exceptions we have mentioned if and when these exceptions come before us."); *see also McDonald v. City of Chicago*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as [quoting the three enumerated categories]. We repeat those assurances here."). It added that "these presumptively lawful regulatory measures" were only examples and not an exhaustive list. *Heller*, 554 U.S. at 626 n.26.[16]

---

[16] To these three categories of laws, the Court added that the "Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes . . . ." *Heller*, 554 U.S. at 625 (citing *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see id.* at 627 (acknowledging that the Second Amendment incorporates the "historical tradition of prohibiting the carrying of 'dangerous and unusual weapons'" (quoting 4 WILLIAM BLACKSTONE, COMMENTARIES 148–49 (1769))).

Because *Heller*'s examples of longstanding or historical exceptions to the Second Amendment are not exclusive, we have said that regulations that fall *outside the enumerated* categories are immune from further Second Amendment inquiry only if the government has come forward with "persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical [protection] of the Second Amendment." *Jackson*, 746 F.3d at 960. A regulation "does not burden conduct protected by the Second Amendment if the record contain[s] evidence that [the subjects of the regulation] have been the subject of longstanding, accepted regulation . . . ." *Fyock*, 779 F.3d at 997. These "longstanding, accepted regulations" may come from the early-twentieth century and need not trace their roots back to the Founding, so long as their "historical prevalence and significance is properly developed in the record." *Id.*; *see also Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 185, 196 (5th Cir. 2012) ("*Heller* demonstrates that a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue."); *United States v. Skoien*, 614 F.3d 638, 641 (7th Cir. 2010) (en banc) ("[W]e do take from *Heller* the message that exclusions need not mirror limits that were on the books in 1791."). We recently upheld a state restriction on concealed weapons under this standard. *Peruta*, 824 F.3d at 939 (upholding a concealed carry permit system based on historical evidence of such regulations going back to the thirteenth century).

How we treat the *enumerated* categories is, surprisingly, a more difficult question. *See United States v. Booker*, 644 F.3d 12, 23 (1st Cir. 2011) ("The full significance of these pronouncements is far from self-evident."); *see also Skoien*, 614 F.3d at 640 ("We do not think it profitable to

parse these passages of *Heller* as if they contained an answer
. . . ."). There are two important questions that must be
answered about these enumerated categories. First, does
"presumptively lawful" mean "conclusively lawful"? That is,
is a law falling within these three categories subject to a
rebuttable or an irrebuttable presumption of lawfulness?
Second, what is the scope of each of these categories? In this
case, in which California has argued that the challenged
restrictions are "conditions and qualifications on the
commercial sale of arms," what does that phrase mean? The
stakes are significant: we have suggested that gun restrictions
falling within these three enumerated categories are to the
Second Amendment what libel, obscenity, and fighting words
are to the First Amendment: categories that are not covered
at all by the Amendment. *See Jackson*, 746 F.3d at 960; *cf.
United States v. Alvarez*, 567 U.S. 709, 717–18 (2012); *New
York v. Ferber*, 458 U.S. 747, 763 (1982). If California's
microstamping restriction falls within one of these
categories—and either the presumption of lawfulness is
irrebuttable or Plaintiffs have failed to rebut the
presumption—the Second Amendment does not apply and the
case should end at step 1.

1

We have not had occasion to decide what "presumptively
lawful" means in this context, but I think that if a regulation
is *presumptively* lawful, then that is a starting point; that I
might begin from the premise that the regulation is lawful,
but am open to being persuaded otherwise. It is contrary to
my instincts to read "presumptively lawful" as "conclusively

lawful." Nevertheless, the answer has proven elusive, as the circuits have splintered over the question.**[17]**

The Third Circuit was the first court of appeals to address this interpretative problem. It explained the problem, and the choices, as follows:

> [T]he phrase 'presumptively lawful' could have different meanings under newly enunciated Second Amendment doctrine. On the one hand, this language could be read to suggest the identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment. On the other hand, it may suggest the restrictions are presumptively lawful because they pass muster under any standard of scrutiny.

*Marzzarella*, 614 F.3d at 91; *accord United States v. Chester*, 628 F.3d 673, 679 (4th Cir. 2010) ("It is unclear to us whether *Heller* was suggesting that 'longstanding prohibitions' such as these were historically understood to be valid limitations on the right to bear arms or did not violate the Second Amendment for some other reason."). Although the Third Circuit considered "[b]oth readings [to be] reasonable interpretations," it thought "the better reading, based on the text and the structure of *Heller*, is the former—in other words, that these longstanding limitations are exceptions to the right to bear arms." *Marzzarella*,

---

**[17]** The cases have been helpfully compiled in David B. Kopel & Joseph G.S. Greenlee, *The Federal Circuits' Second Amendment Doctrines*, 61 ST. LOUIS L.J. 193, 214–26 (2017).

614 F.3d at 91. In a subsequent decision, however, the Third Circuit rejected a facial challenge to a statute as presumptively regulating unprotected conduct, but held that the presumption could be rebuttable in the context of an as-applied challenge. *United States v. Barton*, 633 F.3d 168, 172–73 (3d Cir. 2011) ("By describing the felon disarmament ban as 'presumptively' lawful, the Supreme Court implied that the presumption may be rebutted." (citation omitted)), *overruled on other grounds by Binderup v. Att'y Gen.*, 836 F.3d 336, 348–51 (3d Cir. 2016) (en banc) (disagreeing over what a challenger needs to show to rebut the presumption for an as-applied challenge).

Moreover, as if this were not confusing enough, in *Marzzarella*, the Third Circuit elsewhere suggested that it might have to take one approach with respect to disqualified persons and sensitive places, and a different approach with respect to commercial regulations. As the court explained, in contrast to "prohibitions" on certain persons and "laws forbidding" carrying firearms in sensitive places,

> [c]ommercial regulations on the sale of firearms do not fall outside the scope of the Second Amendment . . . . In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*.

*Marzzarella*, 614 F.3d at 92 n.8; *see also id.* at 92 (noting that "the Second Amendment affords no protection for the possession of dangerous and unusual weapons, possession by felons and the mentally ill, and the carrying of weapons in certain sensitive places" but omitting "conditions and qualifications on the commercial sale of arms" from the list). If I have read the Third Circuit's precedent correctly, it regards facial challenges to laws prohibiting possession of guns by felons and the mentally disabled and to laws forbidding the possession of guns in sensitive places to be not just "presumptively lawful," but lawful and thus outside of further Second Amendment scrutiny. It permits, however, as-applied challenges to such laws. With respect to conditions and qualifications on commercial sale, though, the Third Circuit has said it will not apply an irrebuttable presumption to anything arguably within the category, but rather it will depend on the "nature and extent of the imposed condition." *Id.* at 92 n.8.

The Fifth Circuit sort of sided with the Third Circuit, but (like the Third Circuit) with a qualification. It agreed that it was

> difficult to map *Heller*'s "longstanding," "presumptively lawful regulatory measures" onto [the] two-step framework. It is difficult to discern whether "longstanding prohibitions on the possession of firearms by felons and the mentally ill, . . . or laws imposing conditions and qualifications on the commercial sale of arms," by virtue of their presumptive validity, either (i) presumptively fail to burden conduct protected by the Second Amendment, or (ii) presumptively

> trigger and pass constitutional muster under a
> lenient level of scrutiny.

*Nat'l Rifle Ass'n*, 700 F.3d at 196 (second alteration in
original) (citations omitted). The court concluded: "For now,
we state that a longstanding, presumptively lawful regulatory
measure . . . would likely fall outside the ambit of the Second
Amendment; that is, such a measure would likely be upheld
at step one of our framework." *Id.* Thus, the Fifth Circuit
appeared to agree that the presumption was irrebuttable, but
qualified it by stating that such a regulation, if longstanding,
"would *likely* be upheld at step one" because it "would *likely*
fall outside" the scope of the Second Amendment. Two
"likely's" in one sentence strongly suggests that the phrase
"presumptively lawful" is more a mindset than a rule.

The D.C. Circuit simply found "presumptively lawful" to
mean that a law carries a presumption that can be rebutted:
"*Heller* tells us 'longstanding' regulations are 'presumptively
lawful'; that is, they are presumed not to burden conduct
within the scope of the Second Amendment." *Heller v.
District of Columbia* (*Heller II*), 670 F.3d 1244, 1253 (D.C.
Cir. 2011) (citation omitted). It then explained that

> [t]his is a reasonable presumption because a
> regulation that is "longstanding," which
> necessarily means it has long been accepted
> by the public, is not likely to burden a
> constitutional right; concomitantly the
> activities covered by a longstanding
> regulation are presumptively not protected
> from regulation by the Second Amendment.
> A plaintiff may rebut this presumption by
> showing the regulation does have more than a

> de minimis effect upon his right. . . . We
> uphold the requirement of mere registration
> because it is longstanding, hence
> "presumptively lawful," and the presumption
> stands unrebutted.

*Id.*; *accord Bonidy v. U.S. Postal Serv.*, 790 F.3d 1121, 1129
(10th Cir. 2015) (Tymkovich, J., concurring in part and
dissenting in part) ("It is a close call, but Bonidy has on
balance not rebutted that presumption."); *Peterson v.
Martinez*, 707 F.3d 1197, 1218 n.1 (10th Cir. 2013) (Lucero,
J., concurring) ("A plaintiff may rebut the resumption of
validity by showing that the regulation at issue has 'more than
a de minimis effect upon his right.'" (quoting *Heller II*,
670 F.3d at 1253)).

I think that the most natural reading of "presumptively
lawful" is exactly what it says: a law within the enumerated
categories carries a presumption of lawfulness. But it must
be a presumption that is subject to rebuttal. The Supreme
Court introduced the enumerated categories with the
assumption that these restrictions are "longstanding." *Heller*,
554 U.S. at 626. I agree with the D.C. Circuit that restrictions
within these categories that are longstanding are more likely
outside the scope of the Second Amendment. *See Heller II*,
670 F.3d at 1253; *see also Jackson*, 746 F.3d at 960; *Chovan*,
735 F.3d at 1137. At the very least, a plaintiff who has
identified a restriction that is not longstanding has the
opportunity to demonstrate how it affects his Second
Amendment rights.

2

In *Jackson*, we observed that *Heller*'s enumerated categories, like categories of nonprotected speech, are "well-defined and narrowly limited." 746 F.3d at 960 (quoting *Brown*, 564 U.S. at 791); *cf. Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942) ("There are certain well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem."). Elsewhere, the Supreme Court has described categories of nonprotected speech such as libel, obscenity, and fighting words as "historic and traditional categories long familiar to the [public]." *United States v. Stevens*, 559 U.S. 460, 468 (2010). Two of the three enumerated categories—"prohibitions on the possession of firearms by felons and the mentally ill" and "laws forbidding the carrying of firearms in sensitive places"—seem to fit well in the class of "well-defined," "narrowly limited," "historic," and long familiar."[18]

---

[18] We have had little difficulty upholding restrictions that fall into these two categories. For example, when a felon challenged a state's ban on his possession of firearms, we simply repeated *Heller*'s language and upheld the ban. *See Wilson v. Lynch*, 835 F.3d 1083, 1091 (9th Cir. 2016) (noting that if a person falls into one of the exceptions for being a felon or mentally ill, "her claims would fail categorically" and thus the only outlet is challenging whether she is, in fact, a felon or mentally ill), *cert. denied*, 137 S. Ct. 1396 (2017); *see also United States v. Phillips*, 827 F.3d 1171, 1174 (9th Cir. 2016); *Van der Hule v. Holder*, 759 F.3d 1043, 1050–51 (9th Cir. 2014); *United States v. Vongxay*, 594 F.3d 1111, 1115 (9th Cir. 2010). The same is true with respect to challenges to prohibitions on gun possession in a "sensitive area," such as a federal building. *See Bonidy*, 790 F.3d at 1125–26. In these cases, whether a law bans the possession of a firearm by a felon, or in a federal building, is a relatively simple

The phrase "conditions and qualifications on the commercial sale of arms," however, is not so familiar, narrow, or well defined.  Indeed, we recently wrote that "[t]he language in *Heller* regarding the regulation of 'the commercial sale of arms,' . . . is sufficiently opaque with regard to that issue that, rather than relying on it alone . . . , we conduct a full textual and historical review [to determine if the regulation passes Second Amendment scrutiny]." *Teixeira*, 873 F.3d at 682–83.  This opaqueness probably explains why in several cases we have assumed without deciding that a given regulation burdened conduct protected by the Second Amendment in the face of an argument that it fell into this sales exception.  In each case we avoided having to parse the category by upholding the restriction under intermediate scrutiny.  *ee Silvester v. Harris*, 843 F.3d 816, 827–29 (9th Cir. 2016) (assuming a ten-day waiting period on the purchase of a firearm burdened conduct protected by the Second Amendment and applying intermediate scrutiny); Wilson v. Lynch, 835 F.3d 1083, 1092 (9th Cir. 2016) (applying intermediate scrutiny to a regulation prohibiting possessors of medical marijuana card from buying firearms); *cf. Jackson*, 746 F.3d at 967–68 (applying intermediate scrutiny to a ban on the sale of hollow-point ammunition).  In fact, so far as I can tell, neither we nor any other circuit court has held that a given regulation was exempt from Second Amendment inquiry because it was a condition and qualification on the commercial sale of arms.  *Cf. Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring) (applying the categorical-exemption approach without citing cases having done the same).

---

inquiry.  *Cf. United States v. Henry*, 688 F.3d 637, 640 (9th Cir. 2012) (upholding a ban on machine guns as qualifying as "dangerous and unusual weapons").

Because the category is not self-explanatory, I have to start from a slightly different premise: the Supreme Court in *Heller* could not have meant that anything that *could* be *characterized* as a condition and qualification on the commercial sale of firearms is immune from more searching Second Amendment scrutiny. *See Marzzarella*, 614 F.3d at 92 n.8. Take, for example, a law saying that a condition for the commercial sale of firearms is that sales may take place only between 11 p.m. and midnight, on Tuesdays. Or a law imposing a $1,000,000 point-of-sale tax on the purchase of firearms for self-defense (presumably, to fund firearms training and education). Even though these restrictions can be characterized as "conditions and qualifications on the commercial sale of arms," we would have to find such restrictions inconsistent with the "scope of the Second Amendment." After *Heller*, it seems clear that challenges to these laws would easily overcome any presumption of lawfulness.

So what constitutes a condition and qualification on commercial sales? I know of no accepted or common understanding of this phrase. At a minimum, the Court must have meant that rules of general applicability do not violate the Second Amendment just because they place conditions on commercial sales, including sales of handguns used for self-defense. Fire codes, sales taxes, and commercial licenses are ordinary conditions on commercial sales generally. *See Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 581 (1983) ("It is beyond dispute that the States and the Federal Government can subject newspapers to generally applicable economic regulations without creating constitutional problems."). As part of the cost of doing business, such regulations may raise the cost of commercial sales, a cost that is typically passed on to the

consumer. The fact that such costs of doing business raise the costs of goods and may affect the willingness of consumers to purchase the goods does not, for that reason, violate the Second Amendment—no more than taxes collected on the sales of religious materials restrict Free Exercise rights under the First Amendment. *Tex. Monthly, Inc. v. Bullock*, 489 U.S. 1, 17–20 (1989) (rejecting the argument that an exemption from sales tax for religious publications was compelled by the Free Exercise Clause); *see Tony & Susan Alamo Found. v. Sec'y of Labor*, 471 U.S. 290, 303 (1985) ("It is virtually self-evident that the Free Exercise Clause does not require an exemption from a governmental program unless, at a minimum, inclusion in the program actually burdens the claimant's freedom to exercise religious rights."); *see also Bowen v. Roy*, 476 U.S. 693 (1986) (upholding requirement that a welfare recipient obtain a social security number against a Free Exercise Clause challenge); *United States v. Lee*, 455 U.S. 252 (1982) (upholding the imposition of social security taxes against a Free Exercise Clause challenge). We accept such restrictions on our rights—including our fundamental rights to speak, publish, and exercise our religion—because laws of general applicability cover a broad range of activities and, hence, must have broad, popular acceptance and support.

The analogy to the First Amendment begins to break down, however, once we move beyond rules of general applicability. In the First Amendment context, laws that single out certain kinds of speech or religion are subject to strict judicial scrutiny. *See, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 413 (1989); *Minneapolis Star*, 460 U.S. at 582–83. The courts have been vigilant even when a law appears to be one of general applicability, but in fact has singled out a particular religion, *see Church of the Lukumi Babalu Aye, Inc. v. City of*

*Hialeah*, 508 U.S. 520 (1993); *Larson v. Valente*, 456 U.S. 228 (1982), or a point of view or a mode of expression, *see Ark. Writers' Project, Inc. v. Ragland*, 481 U.S. 221 (1987).

It is thus harder to know what to do with the "conditions and qualifications on the commercial sale of arms" category once we get to arms-sales-specific restrictions. There are surely some restrictions that, to return to our First Amendment analogy, are the equivalent of time, place, and manner restrictions. *See United States v. Decastro*, 682 F.3d 160, 165 (2d Cir. 2012) (characterizing commercial-sale restrictions as time, place, and manner restrictions). These might include zoning restrictions, *see Teixeira*, 873 F.3d at 673, and other health and safety rules imposed on a commercial site that are unique to arms sales, *see Nordyke v. King*, 681 F.3d 1041 (9th Cir. 2012) (en banc). These restrictions might also be abused—think of my example of a law restricting commercial sales to one hour on Tuesdays—but such restrictions, if reasonable, are *presumptively* lawful, and any plaintiff bringing a Second Amendment challenge will bear the burden of rebutting the presumption. These restrictions go to *where* and *when* such commercial sales can take place.[19]  *See generally* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda*, 56 UCLA L. REV. 1443 (2009).

---

[19] Other point-of-sale restrictions such as background checks and waiting periods are better characterized as regulations in support of *who* may lawfully possess (much less purchase) firearms. Such restrictions are conveniently enforced at the point of sale but are more easily defended as restrictions on "the possession of firearms by felons and the mentally ill." *Heller*, 554 U.S. at 626.

The question of *what* can be sold to qualified buyers at an appropriate location and time comes much closer to the core of the Second Amendment. The law at issue in *Heller* banned all *possession* of handguns in the District of Columbia, but I think it obvious that D.C. could not have taken the intermediate step of banning all *sales* of handguns in the District. *See Marzzarella*, 614 F.3d at 92 n.8. To return, yet again, to the language of the First Amendment, what may be sold (to anyone) fairly goes to the content of the Second Amendment right to acquire the arms that we may keep and bear for our defense. A law that permits only the commercial sale of water pistols and Nerf guns is not what the Second Amendment guaranteed.

Admittedly, I have no particularly good solution to defining what is and what is not a condition and qualification on commercial sales. As with the term "regulate Commerce" in the Constitution, U.S. CONST. art. I, § 8, cl. 3, the phrase "conditions and qualifications on the commercial sale of arms" is impressively capacious and difficult to cabin. *See Gonzales v. Raich*, 545 U.S. 1, 15–16 (2005) (noting that our interpretations have "evolved over time"). But the Court's generous treatment of "Commerce" in Article I goes to the regulatory powers entrusted to Congress, one of the core powers Congress was given to knit together the union following the Articles of Confederation. *See id.* at 16 ("The Commerce Clause emerged as the Framers' response to the central problem giving rise to the Constitution itself: the absence of any federal commerce power under the Articles of Confederation."). By contrast, giving "commercial sale" a similarly broad construction here would serve to restrict rights guaranteed by the Bill of Rights. I am reluctant to give the term such a broad construction. Moreover, I am left with the strong impression that *Heller* did not exempt from Second

Amendment scrutiny *any* condition and qualification on firearm ownership that might be enforced at the point of sale.

In my view, the better approach to the conditions and qualifications on commercial sale category is that taken by the D.C. Circuit in *Heller II*. We should apply the presumption of lawfulness to a longstanding regulation of commercial sales of arms. The plaintiff would be able to "rebut this presumption by showing the regulation does have more than a de minimis effect upon his [Second Amendment] right." *Heller II*, 670 F.3d at 1253. This proposed framework would capture the spirit of *Heller*. It places little burden on the government to show that its regulations are longstanding. *See United States v. Greeno*, 679 F.3d 510, 518 (6th Cir. 2012) (requiring the government to "demonstrate[] that the challenged statute 'regulates activity falling outside the [historic] scope of the Second Amendment'" with more than "inconclusive" or ambiguous evidence (quoting *Ezell v. City of Chicago*, 651 F.3d 684, 702–03 (7th Cir. 2011))). At the same time, it gives the plaintiff an opportunity to show that the regulations substantially infringe Second Amendment rights. The closer the regulations get to the core of the Second Amendment, the less willing we should be to deem them "presumptively lawful" and outside the scope of the Second Amendment. Where the presumption is rebutted, the government would have to defend its regulation under an appropriate level of scrutiny.

B

With this understanding of what the step 1 inquiry entails, I now turn to the question of whether the microstamping requirement burdens conduct protected by the Second Amendment. The State makes two arguments. Its primary

contention is that the microstamping requirement is presumptively lawful as a condition and qualification on the commercial sale of arms.  Alternatively, the State claims that the requirement, even if not a condition on commercial sales, is still outside the scope of the Second Amendment because it is a "longstanding, accepted regulation." *Fyock*, 779 F.3d at 997; *see also Jackson*, 746 F.3d at 960.  I address each argument in turn.

1

As is evident from my discussion above, not everything that the State enforces at the point of sale should be deemed a condition and qualification on the commercial sale of arms. I conclude that zoning and commercial licensing requirements are the kind of time, place, and manner restrictions governing the when and where in commercial sales that may be presumptively valid as conditions and qualifications on the commercial sale of arms.  Beyond that, things get complicated, and whether restrictions on commercial sales of firearms fall entirely outside the scope of the Second Amendment will depend on the nature of the restriction.

The microstamping requirement is not a condition California imposes on time, place, or manner of sale, but on the kinds of handguns Californians may purchase.  It is true that the restriction is generally enforced at the point of sale, but that, as I have explained, is not a complete answer to Plaintiffs' complaints.    Plaintiffs argue that the microstamping requirement restricts the supply of weapons available in the first place—and that surely is a burden on the right of self-defense.

I am thus unwilling to assume that California's restriction on the types of arms that can be sold commercially is so plainly a condition and qualification that it is "presumptively lawful" and thus immune from any Second Amendment inquiry.  Whatever the contours of the commercial sales category, *Heller* cannot mean that the State can ban the sales of arms—whether it does so directly or indirectly by imposing conditions on features that commercially sold firearms must possess.  Accordingly, I cannot conclude that the microstamping requirement falls within the commercial sales exception.

2

In the alternative, the State claims that there is "historical precedent for California's Unsafe Handgun Act."  I construe this discussion of history as an attempt to recognize a new category of presumptively lawful regulatory measures under *Heller*.  *See Heller*, 554 U.S. at 627 n.26.  In such an inquiry, the burden lies with the State.  *See Ezell*, 651 F.3d at 702–03.  Moreover, historical exceptions must not be described at an "inappropriately high level of generality—akin to saying that because the government traditionally could prohibit defamation, it can also prohibit speech criticizing government officials."  *Heller II*, 670 F.3d at 1294 (Kavanaugh, J., dissenting).

The State claims that microstamping has a historical provenance because police have long used ballistic testing of fired rounds to determine which gun, and type of gun, the round came from.  But this historical evidence is inadequate for the State's purpose.  The history of ballistic testing merely shows that the police have examined bullets and casings for distinctive markings inadvertently left by the barrels.  This is

a history of forensics, not a history of the laws regulating firearms.  The State has supplied no evidence that rifling was done for the purpose of identifying the weapon, or that this inadvertent consequence of gun manufacturing was required by law.

Alternatively, the State argues that microstamping is similar to the longstanding requirement that weapons have a serial number.  Federal law has required serial numbers on firearms since 1934, and the courts have upheld these requirements post-*Heller*.  The Third Circuit in *Marzzarella* observed that requiring serial numbers was a longstanding rule that had nothing to do with the gun's utility:  "[T]he presence of a serial number does not impair the use or functioning of a weapon in any way . . . .  With or without a serial number, a pistol is still a pistol."  614 F.3d at 94.  Thus, the Third Circuit concluded, any burden would be "*de minimis*."  *Id*.  In other words, the only possible reason anyone would want an unmarked firearm is for illegal purposes, and that would fall outside the bounds of *Heller*'s emphasis on the Second Amendment protecting law-abiding citizens.  *Id.* at 95.  *Marzzarella* does not help the State at this point in the analysis, however, because the Third Circuit declined to adopt the government's claim that the serial number requirement did not impair Second Amendment rights.  Instead, the court concluded that the law passed muster under either heightened or strict scrutiny.  *Id.*; *see also id.* at 97–99 (applying heightened scrutiny); *id.* at 99–101 (applying strict scrutiny).  In other words, the case supporting the State's best historical example does not support the State's claim that its requirement falls outside the scope of the Second Amendment.

From the State's argument, I garner that there is at least a ninety-year history of requiring that newly-manufactured guns be imprinted with a serial number on some portion of the weapon in accordance with a process in place since the Industrial Revolution and that doing so does not affect the gun's utility. In other words, there is a history of imposing a restriction that burdens nothing except for someone's desire to act unlawfully. Even assuming that microstamping is just a variation on the serial number requirement, the State's history is not sufficient to persuade me that there should exist a new class of laws immune from Second Amendment inquiry, particularly when Plaintiffs allege that they cannot satisfy the microstamping requirement. That is far greater than a "*de minimis*" burden. *Marzzarella*, 614 F.3d at 94.

Accordingly, the district court erred in holding that, at step 1, the microstamping requirement does not burden conduct protected by the Second Amendment. Because I additionally conclude that granting summary judgment in favor of the State on the microstamping requirement is improper at step 2, I respectfully dissent as to this claim.

\* \* \*

"I will not add to this long paper by an apology for its length. If I am wrong, there can be no good apology; and if I am right, none is necessary." Pet. for Reh'g, *Hickman v. McCurdy*, 30 Ky. (7 J.J. Marsh) 555, 573 (1832), 1832 WL 2229, at \*12.

**EXHIBIT 2**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JORDAN GALLINGER; BRIAN HILL; BROOKE HILL; CRAIG DELUZ; SCOTT DIPMAN; ALBERT DUNCAN; TRACEY GRAHAM; LISA JANG; DENNIS SERBU; MICHAEL VEREDAS; FIREARMS POLICY FOUNDATION; FIREARMS POLICY COALITION; MADISON SOCIETY FOUNDATION; THE CALGUNS FOUNDATION, *Plaintiffs-Appellants*, <br><br> v. <br><br> XAVIER BECERRA, in his official capacity as Attorney General of California, *Defendant-Appellee.* | No. 16-56125 <br><br> D.C. No. 2:16-cv-02572-BRO-AFM <br><br><br> OPINION |

Appeal from the United States District Court
for the Central District of California
Beverly Reid O'Connell, District Judge, Presiding

Argued and Submitted February 7, 2018
Pasadena, California

Filed August 3, 2018

Before:  M. Margaret McKeown,[*] William A. Fletcher,
and John B. Owens, Circuit Judges.

Opinion by Judge Owens

**SUMMARY**[**]

**Civil Rights**

The panel affirmed the district court's dismissal of an
action challenging California's 2015 amendment, Senate
Bill 707, to its Gun-Free School Zone Act.

In 1994, the California Legislature enacted the Gun-Free
School Zone Act, which banned the possession of firearms
on school grounds and within school zones (the area within
1,000 feet of school grounds).  The Act exempted two
groups: (1) individuals licensed to carry a concealed firearm
under California law; and (2) retired peace officers
authorized to carry a loaded firearm.  In 2015, the
Legislature passed Senate Bill 707, which preserved the
retired-officer exception for firearm possession on school
grounds, as well as within school zones, but prohibited
concealed carry weapon holders from possessing a firearm
on school grounds.  Plaintiffs alleged that Senate Bill 707

_____

[*] Judge McKeown was drawn to replace Judge Reinhardt on the
panel following his death. Ninth Circuit General Order 3.2h. Judge
McKeown has read the briefs, reviewed the record, and listened to oral
argument.

[**] This summary constitutes no part of the opinion of the court. It
has been prepared by court staff for the convenience of the reader.

violated the Equal Protection Clause of the Fourteenth
Amendment because it treated concealed weapon permit
holders differently from retired peace officers.

The panel first rejected plaintiff's argument that *Silveira
v. Lockyer*, controlled the outcome.  In *Silveira*, the court
held that the provision of California's Assault Weapons
Control Act exempting retired peace officers from a
statewide ban on assault weapons violated the Equal
Protection Clause. 312 F.3d 1052, 1089-92 (9th Cir. 2002),
*abrogated on other grounds by District of Columbia v.
Heller*, 554 U.S. 570, 626 (2008).  The panel held that there
was a meaningful difference between the conduct regulated
by the Assault Weapons Control Act and Senate Bill 707.
The panel held that permitting retired peace officers to carry
firearms other than assault weapons on school grounds was
sufficiently connected to the goal of ensuring such officers'
safety and public safety to survive rational-basis review.

The panel also rejected plaintiff's contention that Senate
Bill 707 violates the Equal Protection Clause because it was
enacted to favor a politically powerful group and to disfavor
a politically unpopular one.  The panel held that plaintiffs
failed to plausibly allege that the Legislature enacted Senate
Bill 707 to harm concealed carry permit holders.

**COUNSEL**

Stephen M. Duvernay (argued) and Bradley A. Benbrook,
Benbrook Law Group PC, Sacramento, California, for
Plaintiffs-Appellants.

John D. Echevarria (argued), Deputy Attorney General;
Mark R. Beckington, Supervising Deputy Attorney General;

Marc LeForestier, Acting Senior Assistant Attorney General; Xavier Becerra, Attorney General; Office of the Attorney General, Los Angeles, California; for Defendant-Appellee.

Ilya Shapiro and Thomas Berry, Cato Institute, Washington, D.C., for Amicus Curiae Cato Institute.

---

## OPINION

OWENS, Circuit Judge:

Plaintiffs-Appellants ("Plaintiffs"), individuals with permits to carry concealed weapons (and interested organizations), appeal from the dismissal of their challenge to California's 2015 amendment to its Gun-Free School Zone Act. We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

## I. FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A. California's Gun-Free School Zone Act of 1995 and Senate Bill 707

In 1994, the California Legislature ("the Legislature") enacted the Gun-Free School Zone Act, which banned the possession of firearms on school grounds and within school zones (the area within 1,000 feet of school grounds). Gun-Free School Zone Act of 1995, sec. 1, § 626.9(b), (e)(1), 1994 Cal. Stat. 6191, 6191–92. The Act exempted two groups: (1) individuals licensed to carry a concealed firearm under California law ("CCW permit holders"); and (2) "retired peace officer[s] . . . authorized to carry a loaded

firearm" ("retired peace officers").   § 626.9(l)–(m), 1994
Cal. Stat. at 6193.

In 2015, the Legislature considered an amendment to the
Gun-Free School Zone Act, Senate Bill 707 ("SB 707"), that
would give school officials control "of who, if anyone,"
could bring firearms onto their campuses.   *See* Cal. S.
Comm. on Pub. Safety, Analysis of S.B. 707, 2015–2016
Reg. Sess., at 5 (Apr. 13, 2015). SB 707, sponsored by State
Senator Lois Wolk, was introduced in response to the
"disturbing increase in the number of active shooter
incidents on . . . campuses across the country" and the
"alarming number of sexual assaults on college and
university campuses." *Id.* Recognizing that "some gun
rights proponents in other states ha[d] sponsored legislation
to increase the opportunity for students and teachers to bring
firearms on school campuses with CCWs, claiming this will
deter" sexual assaults and active shooters, Senator Wolk
highlighted research "indicat[ing] that bringing more
firearms on campus will lead to more campus violence and
increase the danger to students and others on campus." *Id.*
Senator Wolk thus introduced SB 707 to "ensure that
students and parents who expect a campus to be safe and
'gun free' can be confident that their expectation is being
met." *Id.*

In returning control over firearm possession to school
officials, the version of SB 707 that Senator Wolk originally
introduced would have eliminated the Gun-Free School
Zone Act's exception authorizing CCW permit holders and
retired peace officers to carry firearms "on school grounds,"
though it would have retained the exceptions authorizing
both groups to carry firearms "within school zones." *Id.*; *see
also* S.B. 707, sec. 1, § 626.9(c)(5)–(6), (l), (o), 2015–2016
Reg. Sess. (Cal. 2015) (as introduced).

But after substantial opposition from law enforcement organizations,**[1]** the Legislature passed a revised version of SB 707 that preserved the retired-officer exception for firearm possession on school grounds, as well as within school zones.**[2]** *See* Cal. Assemb. Comm. on Pub. Safety, Analysis of S.B. 707, 2015–2016 Reg. Sess., at 1 (July 13, 2015). Under the version of SB 707 that took effect, CCW permit holders could possess a firearm within school zones, but not on school grounds.**[3]** *See* Act of Oct. 10, 2015, sec. 1, § 626.9(b), (c)(5), 2015 Cal. Stat. 5689, 5690–92.

---

**[1]** We **GRANT** Plaintiffs' motion for judicial notice, which contains, among other documents, pre-amendment letters of opposition from law-enforcement organizations. *See Arce v. Douglas*, 793 F.3d 968, 978 n.4 (9th Cir. 2015).

**[2]** To qualify under this exception, a peace officer must be honorably retired from service and must obtain an endorsement from the agency from which he retired stating that the officer should be permitted to carry a concealed weapon. Cal. Penal Code § 626.9(o)(1) (2018); *see also id.* § 25455(a)–(c). In addition to retired sheriffs, sheriff's deputies, and municipal-police officers, the retired-officer exception covers certain retired employees of, among other agencies, the California Departments of (1) Fish and Game; (2) Parks and Recreation; and (3) Forestry and Fire Protection, as well as marshals who served at the California State Fair and retired federal agents. *Id.* § 626.9(o)(1); *see also id.* §§ 25450(a), 830.1(a), 830.2(e)–(i).

**[3]** The version of SB 707 enacted in 2015 allowed individuals to possess firearms on school grounds with the written permission of a school-district superintendent, his or her designee, or an equivalent school authority. Act of Oct. 10, 2015, sec. 1, § 626.9(b), 2015 Cal. Stat. 5689, 5690–92. The Gun-Free School Zone Act has since been amended by Assembly Bill 424, which eliminated the authority of school officials to provide such permission. *See* Act of Oct. 14, 2017, sec. 1, § 626.9(b), 2017 Cal. Stat. 5950, 5950 (codified at Cal. Penal Code § 626.9(b) (2018)). This amendment does not change our analysis.

### B. This Lawsuit

In 2016, Plaintiffs filed suit, arguing that SB 707's differential treatment of CCW permit holders and retired peace officers lacked a rational basis and thereby violated the Equal Protection Clause of the Fourteenth Amendment. The district court rejected that argument. While it agreed that the CCW permit holders and retired peace officers were "similarly situated" for constitutional purposes, the district court reasoned that the Legislature had a rational basis for treating retired peace officers differently on school grounds—unlike CCW permit holders, they risked facing enemies made during their law-enforcement careers, and this need for self-protection did not end when officers stepped on campus.   "Therefore," the district court concluded, "allowing retired peace officers an exemption from the general ban of carrying concealed weapons on school property is rationally related to the legitimate state interest of ensuring their protection."

The district court also rejected Plaintiffs' Equal Protection argument that the Legislature impermissibly favored retired peace officers over "unpopular" civilian gun owners.   Relying on *U.S. Department of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973), the district court reasoned that "[a]bsent evidence of explicit legislative intent to cause harm to civilian gun owners," Plaintiffs could not make out an Equal Protection violation.

Plaintiffs timely appealed.

## II. STANDARD OF REVIEW

We review de novo a district court's grant of a motion to dismiss. *See Mahoney v. Sessions*, 871 F.3d 873, 877 (9th Cir. 2017).   We take all factual allegations set forth in the

complaint as true and construe them in the light most favorable to the plaintiffs. *Id.* "Conclusory allegations of law," however, "are insufficient to defeat a motion to dismiss." *Id.* (citation omitted).

## III.   DISCUSSION

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (citing *Plyler v. Doe*, 457 U.S. 202, 216 (1982)).

In analyzing Equal Protection claims, our "first step . . . is to identify the state's classification of groups." *Country Classic Dairies, Inc. v. Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988). Once we have identified a classified group, we look for a control group, *Freeman v. City of Santa Ana*, 68 F.3d 1180, 1187 (9th Cir. 1995), composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policy, *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017). If the two groups are similarly situated, we determine the appropriate level of scrutiny and then apply it. *Id.* at 969.

Here, retired peace officers are the classified group, and Plaintiffs argue that CCW permit holders are the control group that is similarly situated to retired peace officers for purposes of scrutinizing SB 707. The State counters that retired peace officers and CCW permit holders are not similarly situated and would have us deny Plaintiffs' Equal Protection claim at this step. But we need not answer this question because, even assuming that the two groups are

similarly situated, we hold that SB 707 does not violate the Equal Protection Clause, given the applicable level of scrutiny. *See Nader v. Cronin*, 620 F.3d 1214, 1218–19 (9th Cir. 2010) (declining to address whether two groups are similarly situated because the classification was rationally related to a legitimate governmental interest).

The parties agree that rational-basis review is the appropriate standard: SB 707 implicates neither a suspect classification nor a fundamental right. *See Nordyke v. King*, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc); *see also McDonald v. City of Chi.*, 561 U.S. 742, 786 (2010) ("We made it clear in *Heller* that our holding did not cast doubt on such longstanding regulatory measures as . . . 'laws forbidding the carrying of firearms in sensitive places such as schools . . . .'" (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). The parties also agree on the basic formulation of rational-basis review—that "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *City of Cleburne*, 473 U.S. at 440 (citations omitted). But their agreement ends there.

Plaintiffs argue that our decision in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), *abrogated on other grounds by Heller*, 554 U.S. 570, requires that we deviate from the traditional application of rational-basis review by limiting the range of legitimate governmental interests available to sustain the classification drawn by SB 707. In *Silveira*, we held that the provision of California's Assault Weapons Control Act ("AWCA") exempting retired peace officers from a statewide ban on assault weapons violated the Equal

Protection Clause.**4**  *Id.* at 1089–92.  In applying rational-basis review to this law, we noted that "the retired officers' exception [was] contrary to the legislative goals of the AWCA."  *Id.* at 1091.  According to Plaintiffs, this and similar language in *Silveira* requires that we "scrutinize the connection, if any, between the goal of a legislative act and the way in which individuals are classified in order to achieve that goal," rather than consider *any* legitimate governmental interest in creating the classification.  Further, Plaintiffs contend, the Legislature's stated purpose in enacting SB 707 was to reduce the number of guns on school grounds, so, if we are to uphold the legislation, we must find the retired-officer exception—which would presumably increase the number of guns on campuses—rationally related to this specific goal.  We disagree.

In reviewing the AWCA's retired-officer exception, the *Silveira* court noted that the classification was "wholly unconnected to *any* legitimate state interest," *id.* at 1091 (emphasis added), and recognized its duty to "identify *any* hypothetical rational basis for the exception," *id.* at 1090. And if this language from *Silveira* did not persuade us to consider reasons for the classification beyond the Legislature's stated purpose for SB 707, the Supreme Court has made clear that we should.  *See, e.g.*, *Heller v. Doe ex rel. Doe*, 509 U.S. 312, 320 (1993) ("[A] classification must

---

**4** More specifically, *Silveira* struck down a provision of the AWCA that allowed designated California agencies to sell or transfer assault weapons to sworn peace officers upon an officer's retirement.  312 F.3d at 1090–92.  In 2010, the California Attorney General's Office issued an opinion concluding, in light of *Silveira*, that the AWCA also precludes retired peace officers who had purchased and registered assault weapons as active-duty officers from possessing those weapons in their retirement.  *See* Opinion No. 09-901, 93 Ops. Cal. Atty. Gen. 130 (Dec. 31, 2010).

be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis *for the classification*." (emphasis added) (internal quotation marks omitted)); *Moreno*, 413 U.S. at 534 (explaining that because the "challenged statutory classification . . . is clearly irrelevant to the stated purposes of the Act," it "must rationally further some legitimate governmental interest other than those specifically stated in the congressional 'declaration of policy'" in order "to be sustained").

In applying rational-basis review, we thus find ourselves free to consider any "legitimate governmental interest" the State has in permitting retired peace officers to carry firearms on school grounds. *Moreno*, 413 U.S. at 534. The State claims two such interests: (1) the protection of retired peace officers and (2) public safety. Plaintiffs contest the validity of both.

First, Plaintiffs argue that the classification is both too broad and too narrow to be rationally related to retired-officer and public safety: It is too broad in that it includes many desk officers who have never carried or needed a firearm, and it is too narrow in that it leaves out people who have real and dangerous enemies. But this type of reasoning runs contrary to the Supreme Court's clear precedent upholding classifications that are "to some extent both underinclusive and overinclusive" under rational-basis review. *Vance v. Bradley*, 440 U.S. 93, 108 (1979). "[I]n a case like this perfection is by no means required." *Id.* (citations omitted); *see also United States v. Thornton*, 901 F.2d 738, 740 (9th Cir. 1990).

Second, Plaintiffs argue that *Silveira* forecloses victory for the State. Because we purportedly considered all possible reasons for the retired-officer exception in *Silveira*,

*see* 312 F.3d at 1091, Plaintiffs contend that in so doing we necessarily held that a classification permitting retired peace officers to carry *any* kind of firearm on school grounds cannot be rationally related to retired-officer or public safety. Plaintiffs' argument requires a logical leap that we decline to take.

The legislation at issue in *Silveira* was the AWCA, a law that bans the possession of assault weapons anywhere in the state without a permit.**[5]**  *Id.* at 1057.  *Silveira* tells us that exempting retired peace officers from that state-wide general ban and permitting them to carry *assault weapons* on school grounds is not rationally related to permissible legislative goals, including retired officer or public safety.  At the same time, *Silveira* says nothing about the rational relationship between permissible legislative goals and SB 707's classification permitting retired peace officers to carry *other kinds of firearms* on school grounds.**[6]**  Nor should it.

There is a meaningful difference between the conduct regulated by the AWCA and SB 707.  This is true for the commonsense reason that assault weapons are more dangerous than other kinds of firearms.  The particular danger posed by assault weapons motivated the Legislature to enact the AWCA in 1989.  *See Silveira*, 312 F.3d at 1057 (citing Roberti-Roos Assault Weapons Control Act of 1989, sec. 3, § 12275.5, 1989 Cal. Stat. 60, 64 (codified as amended at Cal. Penal Code § 30505(a))).    More specifically, it was the "random shooting" that year by an

---

**[5]** The AWCA defines "assault weapon" both by reference to specific makes and models, *see* Cal. Penal Code § 30510, and certain generic characteristics, *see id.* § 30515.  *See also id.* § 16200.

**[6]** SB 707 defines "firearm" by reference to California Penal Code § 16520(a)–(d).  *See* Cal. Penal Code § 626.9(e)(2).

2e25bf27c3a1007a

individual with an AK-47 semi-automatic weapon that left five children dead, as well as one teacher and twenty-nine children wounded, at a California elementary school. *Id.*

Nearly thirty years later, these same dangers persist. Evidenced by the mass shootings perpetrated by individuals with military-style rifles and detachable magazines in Newtown, Connecticut; Aurora, Colorado; San Bernardino, California; Orlando, Florida; Binghamton, New York; Tucson, Arizona; and Las Vegas, Nevada, among others, these dangers have moved other state and local legislatures to enact their own bans on assault weapons and detachable large-capacity magazines in more recent years. *See, e.g.*, *Kolbe v. Hogan*, 849 F.3d 114, 120 (4th Cir. 2017) (en banc) (upholding Maryland's Firearm Safety Act); *N.Y. State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 249–51, 261–64 (2d Cir. 2015) (upholding prohibitions on assault weapons and large-capacity magazines in New York's Secure Ammunition and Firearms Enforcement Act and Connecticut's Act Concerning Gun Violence Prevention and Children's Safety); *Friedman v. City of Highland Park*, 784 F.3d 406, 407, 412 (7th Cir. 2015) (upholding City of Highland Park's ordinance prohibiting possession of assault weapons and large-capacity magazines); *Heller v. District of Columbia*, 670 F.3d 1244, 1263–64, 1269 (D.C. Cir. 2011) (upholding District of Columbia's Firearms Registration Amendment Act). As the Fourth Circuit recognized in upholding Maryland's ban on such arms in *Kolbe*, when "assault weapons and large-capacity magazines are used, more shots are fired and more fatalities and injuries result than when shooters use other firearms and magazines."[7]

---

[7] The legislation at issue in *Kolbe*, Maryland's Firearm Safety Act, contained an exemption permitting retired officers to carry assault weapons that was challenged under the Equal Protection Clause.

*Kolbe*, 849 F.3d at 127; *see also Friedman*, 784 F.3d at 409 ("We know . . . that semi-automatic guns with large-capacity magazines enable shooters to fire bullets faster than handguns equipped with smaller magazines.").

The exceptional lethality of such arms was not the Fourth Circuit's only reason for upholding the legislature's ban in *Kolbe*. The court also highlighted a "lack of evidence that the banned assault weapons and large-capacity magazines are well-suited to self-defense." *Kolbe*, 849 F.3d at 127; *see also Heller*, 670 F.3d at 1262 (citing Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self-Defense with a Gun*, 86 J. Crim. L. & Criminology 150, 177 (1995), for the "finding that of 340,000 to 400,000 instances of defensive gun use in which the defenders believed the use of a gun had saved a life, 240,000 to 300,000 involved handguns"). This is consistent with the Supreme Court's *Heller* decision, which recognized that "handguns are the most popular weapon chosen by Americans for self-defense." 554 U.S. at 629. In short, while the inherent risks that accompany carrying assault weapons for self-defense or public-safety purposes may outweigh any increased benefits to a retired officer's or the public's safety, the same need not be true for other kinds of firearms.

---

849 F.3d at 146. The Fourth Circuit upheld the exemption, concluding that retired officers and the general public are not "similarly situated . . . with respect to the banned assault weapons and large-capacity magazines." *Id.* at 147. In so doing, the Fourth Circuit acknowledged its split from *Silveira*. *See id.* at 147 n.18. Because we hold that the classification in SB 707 is rationally related to legitimate governmental interests, we need not and do not address whether CCW permit holders are similarly situated to retired peace officers for purposes of SB 707.

And when we consider the distinction between assault weapons and other firearms through the lens of rational-basis review, we easily conclude that *Silveira* does not control the outcome here.  To survive rational-basis review, the "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational."  *City of Cleburne*, 473 U.S. at 446.  A classification will be upheld, however, when "the statute is rationally related to a legitimate interest."  *Id.* at 440.

With regard to retired-officer safety, in *Silveira* we held that permitting retired peace officers to carry *assault weapons* was too attenuated from the goal of ensuring their safety.  Here, we hold that permitting retired peace officers to carry *other* kinds of firearms on school grounds is sufficiently connected to the goal of ensuring such officers' safety to survive rational-basis review.  In so doing, we refuse to second-guess the Legislature's determination that (1) retired peace officers are at a heightened risk of danger based on their previous exposure to crime, and (2) allowing them to carry firearms other than assault weapons on school grounds mitigates that risk and increases officer safety.

This brings us to the second reason the State advances for upholding this classification: public safety.  While *Silveira* recognized that the Legislature's interest in public safety was too attenuated from the retired-officer classification in the context of assault weapons, *see* 312 F.3d at 1091, here we hold that the Legislature's interest in public safety is sufficiently connected to permitting retired peace officers to carry other kinds of firearms on school grounds.  As the State argues, the Legislature is free to conclude that retired peace officers, as a class, are more skilled in the use of firearms due to the extensive training in the safe storage and operation of firearms that law enforcement personnel

receive.  And as the California College and University Police
Chiefs Association argued in opposing the original version
of SB 707 that applied the school-grounds ban equally to
retired peace officers, their training further permits the
Legislature's conclusion that retired peace officers offer "a
distinct asset in [the] ability to carry out" the mission of
campus safety.  *See* Cal. S. Comm. on Pub. Safety, Analysis
of S.B. 707, 2015–2016 Reg. Sess., at 6 (Apr. 13, 2015).
Accordingly, the Legislature may legitimately decide to
authorize retired peace officers, and retired peace officers
alone, to carry firearms other than assault weapons on school
grounds.

Finally, we turn to Plaintiffs' argument that SB 707
violates the Equal Protection Clause because it was enacted
to "favor[] a politically powerful group and to disfavor a
politically-unpopular one."  Plaintiffs, as well as the Cato
Institute as amicus curiae, argue that the district court erred
in holding that Plaintiffs could not establish a violation of
the Equal Protection Clause because they failed to present
"evidence of explicit legislative intent to cause harm to
civilian gun owners."  It is true that animus need not be
explicit in the legislative history for a plaintiff to establish
impermissible intent.  *See City of Cleburne*, 473 U.S. at 447–
50.   At the same time, we do not credit conclusory
allegations of law that are unsupported by specific factual
allegations.  *See Mahoney*, 871 F.3d at 877.

Here, Plaintiffs have not made any factual allegations to
support their theory of "impermissible animus."  *Animal
Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1200 (9th Cir.
2018) (citation omitted).  They rely on SB 707's legislative
history, as well as letters and newspaper articles of which we
have  taken  judicial  notice,  to  demonstrate  that  the
Legislature  retained  the  retired-officer  exception  as  the

result of "political pressure," after "potent lobbying efforts by the law enforcement community." Undeniably, this record demonstrates that the retired-officer exception was a product of lobbying efforts by law-enforcement organizations. But the right to lobby is constitutionally protected. *Cf. Regan v. Taxation With Representation of Washington*, 461 U.S. 540, 545 (1983). A plaintiff cannot establish invidious discrimination by merely alleging that a legislature responded to such efforts, and, not surprisingly, Plaintiffs fail to cite any authority to the contrary.**[8]**

Accommodating one interest group is not equivalent to intentionally harming another. *Moreno* and *City of Cleburne*, the two cases upon which Plaintiffs rely, make this distinction clear. In *Moreno*, the Supreme Court held that a classification making federal food stamps available to households of related persons but not to households of unrelated persons violated the equal-protection component of the Fifth Amendment's Due Process Clause because the legislative history revealed Congress's purpose "to prevent socalled 'hippies' and 'hippie communes' from participating in the food stamp program." 413 U.S. at 534 (citation omitted). Similarly, in *City of Cleburne*, the Court found that a municipal zoning ordinance requiring special-use permits for the operation of a group home for the intellectually disabled violated the Equal Protection Clause

---

**[8]** Plaintiffs do not allege that the lobbying efforts by law-enforcement agencies advocated harming CCW permit holders. We do not suggest that legislatures may legitimately give effect to lobbying efforts that advocate harming another interest group. *See City of Cleburne*, 473 U.S. at 448 ("[T]he City may not avoid the strictures of [the Equal Protection] Clause by deferring to the wishes or objections of some fraction of the body politic."); *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

because the permitting requirement "appear[ed] to rest on an irrational prejudice against" and "negative attitudes, or fear," about those with special needs.  473 U.S. at 448, 450. "[B]are [legislative] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Moreno*, 413 U.S. at 534.

In asserting that the Legislature exempted retired peace officers from the school-grounds firearm ban due to "potent lobbying efforts by the law enforcement community," Plaintiffs have not plausibly alleged that the Legislature enacted SB 707 to harm CCW permit holders.  Accordingly, we do not find that "impermissible animus toward an unpopular group prompted the statute's enactment." *Animal Legal Def. Fund*, 878 F.3d at 1200 (citation omitted).

In any event, we have already concluded that the classification at issue serves legitimate state interests in retired-officer and public safety.  This conclusion, on its own, prevents Plaintiffs from succeeding on their Equal Protection claim.**[9]** *See id.* ("[A] court may strike down [a] statute under the Equal Protection Clause if the statute serves no legitimate governmental purpose *and* if impermissible animus toward an unpopular group prompted the statute's

---

**[9]** A plaintiff arguing that impermissible animus motivated a legislature's enactment of a law typically asks that we "apply a 'more searching' application of rational basis review" if we agree that the law was enacted, at least in part, "to harm an unpopular group." *Animal Legal Def. Fund*, 878 F.3d at 1200 (quoting *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring in the judgment)).  Here, Plaintiffs did not argue for a more searching rational-basis review based on their animus argument, and, regardless, we find that SB 707 was not enacted to harm CCW permit holders.  Ordinary rational-basis review is thus appropriate.

enactment." (citations and internal quotation marks omitted)).

We therefore affirm the district court.**10**

**AFFIRMED.**

---

**10** The district court did not abuse its discretion in dismissing Plaintiffs' complaint with prejudice. Plaintiffs cannot set forth facts that will establish an Equal Protection violation given the deferential nature of rational-basis review. Amendment would therefore be futile.

# CERTIFICATE OF SERVICE

Case Name: **Duncan, Virginia et al v. Xavier Becerra**        Case No.: **17-cv-1017-BEN-JLB**

I hereby certify that on <u>August 6, 2018</u>, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DEFENDANT'S NOTICE OF SUPPLEMENTAL AUTHORITY**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>August 6, 2018</u>, at Los Angeles, California.

|  Colby Luong  |  /s/ Colby Luong  |
|:---:|:---:|
| Declarant | Signature |

SA2017107272
53020274.docx