UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

VIRGINIA DUNCAN, et al.,

                                    Plaintiffs,

v.

XAVIER BECERRA, in his official
capacity as Attorney General of the State
of California,

                                    Defendant.

Case No.:  3:17cv1017-BEN (JLB)

**ORDER GRANTING PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT, DECLARING
CALIFORNIA PENAL CODE § 32310
UNCONSTITUTIONAL and
ENJOINING ENFORCEMENT**

   Individual liberty and freedom are *not* outmoded concepts.  "The judiciary is – and is often the only – protector of individual rights that are at the heart of our democracy." -- Senator Ted Kennedy, Senate Hearing on the Nomination of Robert Bork, 1987.[1]

## I.   INTRODUCTION

   As two masked and armed men broke in, Susan Gonzalez was shot in the chest. She made it back to her bedroom and found her husband's .22 caliber pistol.  Wasting the first rounds on warning shots, she then emptied the single pistol at one attacker. Unfortunately, now out of ammunition, she was shot again by the other armed attacker.

---

[1] Norma Vieira & Leonard Gross, *Supreme Court Appointments: Judge Bork and the Politicization of Senate Confirmations* 26 (Southern Illinois University Press 1998).

She was not able to re-load or use a second gun.  Both she and her husband were shot twice.  Forty-two bullets in all were fired.  The gunman fled from the house—but returned.  He put his gun to Susan Gonzalez's head and demanded the keys to the couple's truck.[2]

When three armed intruders carrying what look like semi-automatic pistols broke into the home of a single woman at 3:44 a.m., she dialed 911.  No answer.  Feng Zhu Chen, dressed in pajamas, held a phone in one hand and took up her pistol in the other and began shooting.  She fired numerous shots.  She had no place to carry an extra magazine and no way to reload because her left hand held the phone with which she was still trying to call 911.  After the shooting was over and two of the armed suspects got away and one lay dead, she did get through to the police.  The home security camera video is dramatic.[3]

A mother, Melinda Herman, and her nine-year-old twins were at home when an intruder broke in.  She and her twins retreated to an upstairs crawl space and hid.  Fortunately, she had a .38 caliber revolver.  She would need it.  The intruder worked his way upstairs, broke through a locked bedroom door and a locked bathroom door, and opened the crawl space door.  The family was cornered with no place to run.  He stood staring at her and her two children.  The mother shot six times, hitting the intruder five

---

[2] *Duncan v. Becerra*, 265 F. Supp. 3d 1106, 1130-31 (S.D. Cal. 2017) (citing *Jacksonville Times-Union*, July 18, 2000).

[3] Lindsey Bever, *Armed Intruders Kicked in the Door*, Washington Post (Sept. 24, 2016), https://www.washingtonpost.com/news/true-crime/wp/2016/09/24/armed-intruders-kicked-in-the-door-what-they-found-was-a-woman-opening-fire/?noredirect=on&utm_term=.80336ab1b09e; *see also YouTube*, https://youtu.be/ykiSTkmt5-w (last viewed Mar. 20, 2019); Habersham, Raisa, *Suspect Faces Murder Charge 18 Months After Homeowner Shot at Him, Intruders,* The Atlanta-Journal-Constitution (Mar. 30, 2018) https://www.ajc.com/news/crime--law/suspect-faces-murder-charge-months-after-homeowner-shot-him-intruders/W4CW5wFNFdU6QIEFo0CtGM (last visited Mar. 27, 2019).  Although this news account is not in the parties' exhibits, it is illustrative.

times, when she ran out of ammunition.  Though injured, the intruder was not incapacitated.  Fortunately, he decided to flee.[4]

## A.  A Need for Self-Defense

In one year in California (2017), a population of 39 million people endured 56,609 robberies, 105,391 aggravated assaults, and 95,942 residential burglaries.[5]  There were also 423 homicides in victims' residences.[6] There were no mass shootings in 2017. Nationally, the first study to assess the prevalence of defensive gun use estimated that there are 2.2 to 2.5 million defensive gun uses by civilians each year.  Of those, 340,000 to 400,000 defensive gun uses were situations where defenders believed that they had almost certainly saved a life by using the gun.[7] Citizens often use a gun to defend against criminal attack.  A Special Report by the U.S. Department of Justice, Bureau of Justice Statistics published in 2013, reported that between 2007 and 2011 "there were 235,700 victimizations where the victim used a firearm to threaten or attack an offender."[8] How many more instances are never reported to, or recorded by, authorities?  According to another U.S. Department of Justice, Bureau of Justice Statistics, Special Report, for each

---

[4] Robin Reese, *Georgia Mom Shoots Home Invader, Hiding With Her Children*, ABC News (Jan. 8, 2013), https://abcnews.go.com/US/georgia-mom-hiding-kids-shoots-intruder/story?id=18164812 (last viewed Mar. 22, 2019) (includes video and recording of 911 call).  Although this news account is not in the parties' exhibits, it is illustrative.
[5] Xavier Becerra, *Crime in California (2017)* and *Homicide in California (2017),* (https://openjustice.doj.ca.gov/resources/publications).  Under Rules of Evidence 201(b) courts may take judicial notice of some types of public records, including reports of administrative bodies.
[6] *Id.*
[7] *See* Gary Kleck & Marc Gertz, *Armed Resistance to Crime: The Prevalence and Nature of Self–Defense with a Gun,* 86 J. Crim. L. & Criminology 150, 164, 177 (1995) (cited in *Heller v. D.C. (Heller II)*, 670 F.3d 1244, 1262 (D.C. Cir. 2011).
[8] *See* Planty, Michael and Truman, Jennifer, *Firearm Violence, 1993-2011* (2013), at p.11 and Table 11  www.bjs.gov/content/pub/pdf/fv9311.pdf (last visited Mar. 19, 2019). Under Rules of Evidence 201(b) courts may take judicial notice of some types of public records, including reports of administrative bodies.

year between 2003 and 2007, an estimated 266,560 burglaries occurred during which a person at home became a victim of a violent crime or a "home invasion."[9]  "Households composed of single females with children had the highest rate of burglary while someone was at home."[10]  Of the burglaries by a stranger where violence occurred, the assailant was armed with a firearm in 73,000 instances annually (on average).[11]  During a burglary, rape or sexual assault occurred 6,387 times annually (on average), while a homicide occurred approximately 430 times annually (on average).[12]

Fortunately, the Second Amendment protects a person's right to keep and bear firearms.  The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  "As interpreted in recent years by the Supreme Court, the Second Amendment protects 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'"  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 676–77 (9th Cir. 2017), *cert. denied sub nom. Teixeira v. Alameda Cty.*, 138 S. Ct. 1988 (2018) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008)).  At the core of the Second Amendment is a citizen's right to have in his and her home for self-defense common firearms.  *Heller*, 554 U.S. at 629.  "[O]ur central holding in *Heller* [is] that the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home."  *McDonald v. City of Chicago*, 561 U.S. 742, 780 (2010).

---

[9] Catalano, Shannan, *Victimization During Household Burglary*, U.S. D.O.J., Bureau of Justice Statistics (Sept. 2010) https://www.bjs.gov/content/pub/pdf/vdhb.pdf  (last visited Mar. 28, 2019).  Under Rules of Evidence 201(b) courts may take judicial notice of some types of public records, including reports of administrative bodies.

[10] *Id*. at p.3.

[11] *Id*. at p.10.

[12] *Id.*

As evidenced by California's own crime statistics, the need to protect one's self and family from criminals in one's home has not abated no matter how hard they try. Law enforcement cannot protect everyone. "A police force in a free state cannot provide everyone with bodyguards. Indeed, while some think guns cause violent crime, others think that wide-spread possession of guns on balance reduces violent crime. None of these policy arguments on either side affects what the Second Amendment says, that our Constitution protects 'the right of the people to keep and bear Arms.'" *Silveira v. Lockyer*, 328 F.3d 567, 588 (9th Cir. 2003) (Kleinfeld, J., dissenting from denial of rehearing *en banc*). However, California citizens, like United States citizens everywhere, enjoy the right to defend themselves with a firearm, if they so choose. To protect the home and hearth, citizens most often choose a handgun, while some choose rifles or shotguns.

## B.  Are 10 Rounds Always Enough?

If a law-abiding, responsible citizen in California decides that a handgun or rifle with a magazine larger than 10 rounds is the best choice for defending her hearth and home, may the State deny the choice, declare the magazine a "nuisance," and jail the citizen for the crime of possession? The Attorney General says that is what voters want in hopes of preventing a rare, but horrible, mass shooting. The plaintiffs, who are also citizens and residents of California, say that while the goal of preventing mass shootings is laudable, banning the acquisition and possession of magazines holding more than 10 rounds is an unconstitutional experiment that poorly fits the goal. From a public policy perspective, the choices are difficult and complicated. People may cede liberty to their government in exchange for the promise of safety. Or government may gain compliance from its people by forcibly disarming all.[13] In the United States, the Second Amendment

---

[13]  *E.g.,* on November 10, 1938, the day after the horrific Night of Broken Glass, or *Kristallnacht*, the Nazis issued an order that "Jews may not henceforth buy or carry weapons," and those found in possession of arms "would be sent to concentration camps

takes the legislative experiment off the table.[14]  Regardless of current popularity, neither a legislature nor voters may trench on constitutional rights.  "An unconstitutional statute adopted by a dozen jurisdictions is no less unconstitutional by virtue of its popularity."  *Silveira*, 312 at 1091.

## C.  Mass Shooting vs. Common Crimes

When they occur, mass shootings are tragic.  Innocent lives are senselessly lost while other lives are scarred forever.  Communities are left shaken, frightened, and grieving.  The timeline of the tragedy, the events leading up to the shooting, and the repercussions on family and friends after the incident, fill the national media news cycle for days, weeks and years.  Who has not heard about the Newtown, Connecticut, mass shooting at Sandy Hook Elementary School, or the one at a high school in Parkland, Florida?  But an individual victim gets little, if any, media attention, and the attention he or she gets is local and short-lived.  For example, who has heard about the home invasion attack on Melinda Herman and her twin nine-year old daughters in Georgia only one month after the Sandy Hook incident?[15] Who has heard of the attacks on Ms. Zhu Chen

---

for twenty years." *First Anti-Jew Laws Issued, Possession of Arms*, New York Times (Nov. 11, 1938).

[14]  "To be sure, assault rifles and large capacity magazines are dangerous.  But their ability to project large amounts of force accurately is exactly why they are an attractive means of self-defense.  While most persons do not require extraordinary means to defend their homes, the fact remains that some do.  Ultimately, it is up to the lawful gun owner and not the government to decide these matters.  To limit self-defense to only those methods acceptable to the government is to effect an enormous transfer of authority from the citizens of this country to the government—a result directly contrary to our constitution and to our political tradition.  The rights contained in the Second Amendment are 'fundamental' and 'necessary to our system of ordered liberty.'  The government recognizes these rights; it does not confer them." *Friedman v. City of Highland Park*, 784 F.3d 406, 417-18 (7th Cir. 2015) (Manion, J., dissenting).

[15] Phillips, Rich, *Armed Mom Takes Down Home Invader*, CNN (Jan. 11, 2013) https://www.cnn.com/2013/01/10/us/home-invasion-gun-rights (includes video) (last visited Mar. 22, 2019).

or Ms. Gonzalez and her husband?[16] Are the lives of these victims worth any less than those lost in a mass shooting?  Would their deaths be any less tragic?  Unless there are a lot of individual victims together, the tragedy goes largely unnoticed.

That is why mass shootings can seem to be a common problem, but in fact, are exceedingly rare.  At the same time robberies, rapes, and murders of individuals are common, but draw little public notice.  As in the year 2017, in 2016 there were numerous robberies, rapes, and murders of individuals in California and no mass shootings.[17] Nevertheless, a gubernatorial candidate was successful in sponsoring a statewide ballot measure (Proposition 63).  Californians approved the proposition and added criminalization and dispossession elements to existing law prohibiting a citizen from acquiring and keeping a firearm magazine that is able to hold more than 10 rounds.  The State now defends the prohibition on magazines, asserting that mass shootings are an urgent problem and that restricting the size of magazines a citizen may possess is part of the solution.  Perhaps it is part of the solution.

Few would say that a 100 or 50-round rifle magazine in the hands of a murderer is a good idea.  Yet, the "solution" for preventing a mass shooting exacts a high toll on the everyday freedom of ordinary law-abiding citizens.  Many individual robberies, rapes, and shootings are not prevented by the State.  Unless a law-abiding individual has a firearm for his or her own defense, the police typically arrive after it is too late.  With rigor mortis setting in, they mark and bag the evidence, interview bystanders, and draw a chalk outline on the ground.  But the victim, nevertheless, is dead, or raped, or robbed, or traumatized.

As Watson County Sheriff Joe Chapman told CNN about Melinda Herman and her twin nine-year-old daughters in the attic (the third incident described above), "[h]ad it not

---

[16] *See* n.2-3, *supra*.
[17] Xavier Becerra, *Crime in California (2016)* and *Homicide in California (2016)*, (https://openjustice.doj.ca.gov/resources/publications).

turned out the way that it did, I would possibly be working a triple homicide, not having a clue as to who it is we're looking for."[18]  The Second Amendment protects the would-be American victim's freedom and liberty to take matters into one's own hands and protect one's self and family until help arrives.

**D.  California Law Makes it a Crime to Have More Than 10 Rounds**

For all firearms, California law allows only the acquisition and possession of magazines that hold ten rounds or less.[19]  Claiming that the *average* defensive use of a gun requires firing only 2.2 rounds, the State's voters and legislators have decided that a responsible, law-abiding citizen *needs* no more than ten rounds to protect one's self, family, home, and property.  "No one except trained law enforcement should be able to possess these dangerous ammunition magazines [which hold more than 10 rounds]." Proposition 63; *A.G.'s Oppo. to P's Motion for Summary Jgt.*, at 20 ("LCMs *are not necessary* to exercise 'the fundamental right of self defense in the home.'") (emphasis added); *A.G.'s Oppo. to P's Motion for Summary Jgt.*, at 21 ("There is simply no study or systematic data to suggest that LCMs are *necessary* for self-defense.") (emphasis added) (citations omitted).  Susan Gonzalez and her husband, the single woman awoken in the night, and the mother home alone with her nine-year-old twin daughters all needed to fire considerably more than 2.2 shots to protect themselves.[20]  In fact, Gonzalez and the mom of twins ran out of ammunition.

In other words, a Californian may have a pistol with a 10-round magazine in hopes of fighting off a home invasion robbery.  But if that Californian grabs a pistol containing a 17-round magazine, it is now the home-defending victim who commits a new crime.

---

[18] Phillips, Rich, *Armed Mom Takes Down Home Invader*, CNN (Jan. 11, 2013) https://www.cnn.com/2013/01/10/us/home-invasion-gun-rights (includes video) (last visited Mar. 22, 2019)

[19] There is an exception for "tubular" magazines which are typically found in lever action rifles.

[20] *See* n.2-4, *supra*.

That is because California law declares acquisition and possession of a magazine able to hold more than ten rounds (*i.e.,* a "large capacity magazine" or "LCM") a crime. *See* Cal. Penal Code § 32310;[21] § 16740.[22] For simple possession of a magazine holding

---

[21] Section 32310 states:

(a) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170.

(b) For purposes of this section, "manufacturing" includes both fabricating a magazine and assembling a magazine from a combination of parts, including, but not limited to, the body, spring, follower, and floor plate or end plate, to be a fully functioning large-capacity magazine.

(c) Except as provided in Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2, commencing July 1, 2017, any person in this state who possesses any large-capacity magazine, regardless of the date the magazine was acquired, is guilty of an infraction punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, or is guilty of a misdemeanor punishable by a fine not to exceed one hundred dollars ($100) per large-capacity magazine, by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

(d) Any person who may not lawfully possess a large-capacity magazine commencing July 1, 2017 shall, prior to July 1, 2017:

(1) Remove the large-capacity magazine from the state;

(2) Sell the large-capacity magazine to a licensed firearms dealer; or

(3) Surrender the large-capacity magazine to a law enforcement agency for destruction.

Cal. Penal Code § 32310 (2019)(West).

[22] Section 16740 states:

As used in this part, "large-capacity magazine" means any ammunition feeding device with the capacity to accept more than 10 rounds, but shall not be construed to include any of the following:

(a) A feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds.

(b) A .22 caliber tube ammunition feeding device.

(c) A tubular magazine that is contained in a lever-action firearm.

9

more than 10 rounds, the crime is an infraction under § 32310(c).  It is a much more serious crime to acquire a magazine holding more than 10-rounds in California by importing, buying, borrowing, receiving, or manufacturing.  These acts may be punished as a misdemeanor or a felony under § 32310(a) ("any person in this state who manufactures or causes to be manufactured, imports into the state, keeps for sale, or offers or exposes for sale, or who gives, lends, buys, or receives any large-capacity magazine is punishable by imprisonment in a county jail not exceeding one year or imprisonment pursuant to subdivision (h) of Section 1170").  Under the subsection's provision, "or imprisonment pursuant to subdivision (h) of Section 1170," punishment

_____

Cal. Penal Code § 16740 (2019)(West).

may be either a misdemeanor or a felony.[23] California's gun laws are lengthy and complicated.[24]   The statutes concerning magazines alone are not simple.[25]

---

[23] *See e.g., People v. Le Bleu*, 2018 Cal. App. Unpub. LEXIS 7851*1 (Nov. 13, 2018) ("count 5 charged him with felony receipt of a large-capacity magazine (Pen. Code, § 32310, subd. (a))."); *People v. Obrien*, 2018 Cal. App. Unpub. LEXIS 4992*1 (July 23, 2018) (based on handgun with 16 rounds of ammunition found under car seat, "[t]he People charged Obrien in a three-count felony complaint with . . . manufacturing, importing, keeping for sale, or giving or receiving a large capacity magazine (§ 32310, subd. (a))."); *People v. Rodriguez*, 2017 Cal. App. Unpub. LEXIS 5194*1 (July 26, 2017) ("Defendant Santino Rodriguez pleaded no contest to possessing a large-capacity magazine, a felony, and the trial court placed him on probation for three years."); *People v. Verches*, 2017 Cal. App. Unpub. LEXIS 3238*11-12 (May 9, 2017) (California resident who purchased three 30-round magazines at Nevada gun show and returned to California charged with felony importation of a large capacity magazine under former Cal. Pen. Code § 12020(a)(2)).

[24] In a dissent, Judge Tallman describes as "substantial" the burden imposed by the myriad anti-gun legislation in California and the decisions upholding the legislation. Judge Tallman notes, "Our cases continue to slowly carve away the fundamental right to keep and bear arms.  Today's decision further lacerates the Second Amendment, deepens the wound, and resembles the Death by a Thousand Cuts." *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 694 (9th Cir. 2017), *cert. denied sub nom. Teixeira v. Alameda Cty., Cal.*, 138 S. Ct. 1988 (2018).

[25] Here is an example of the way in which the state's firearm laws are so complex as to obfuscate the Second Amendment rights of a citizen who intends to abide by the law.  A person contemplating either returning home from an out-of-state hunting trip with a 30-round rifle magazine or who is considering buying, borrowing, or being given, or making his own 15-round handgun magazine, will have to do the following legal research.

 First, he or she must find and read § 32310.  Hardly a model of clarity, § 32310(a) begins with references to unnamed exceptions at "Article 2 (commencing with Section 32400) of this chapter and in Chapter 1 (commencing with Section 17700) of Division 2 of Title 2."  Once the reader finds the exceptions and determines that he or she is not excepted, he or she must still find the definition of a "large-capacity magazine," itself something of a misnomer.  Section 32310 is no help.  "Large-capacity magazines" are defined in a distant section of the Penal Code under § 16740 and defined in terms of an uncommonly small number of rounds (10).  *See* n.22, *supra*.  Having found § 16740, and now mentally equipped with the capacity-to-accept-more-than-10-rounds definition of a "large capacity magazine," the citizen reader can return to § 32310(c) and find that mere possession is unlawful and punishable as an increasingly severe infraction.

Unfortunately, he or she may incorrectly believe that criminal possession will be his or her only crime if the hunter brings a large capacity magazine back home from the hunting trip, because that is criminalized as "importing" under § 32310.

And § 32310(a) also covers buying, receiving, and making his or her own large capacity magazine.  Even if the citizen realizes that he or she commits a crime by importing, buying, receiving, or manufacturing a large capacity magazine, the citizen will probably read § 32310(a) as punishing these crimes as misdemeanors.  However, the careful reader who follows up on the odd reference to section (h) of § 1170 may understand that these offenses may also be punished as felonies.  Section 1170(h)(1) states, "[e]xcept as provided in paragraph (3), a felony punishable pursuant to this subdivision where the term is not specified in the underlying offense shall be punishable by a term of imprisonment in the county jail for 16 months, or two or three years."  California refers to such crimes that may be punished as either felonies or misdemeanors as "wobblers."  And is the citizen wrong to think that simply *loaning* a large capacity magazine *is* lawful under § 32415?  Section 32415, titled *Loan of lawfully possessed large-capacity magazine between two individuals; application of Section 32310*, states,

> Section 32310 does not apply to the loan of a lawfully possessed large-capacity magazine between two individuals if all of the following conditions are met: (a) The person being loaned the large-capacity magazine is not prohibited by Chapter 1 (commencing with Section 29610), Chapter 2 (commencing with Section 29800), or Chapter 3 (commencing with Section 29900) of Division 9 of this title or Section 8100 or 8103 of the Welfare and Institutions Code from possessing firearms or ammunition[; and]  (b) The loan of the large-capacity magazine occurs at a place or location where the possession of the large-capacity magazine is not otherwise prohibited, and the person who lends the large-capacity magazine remains in the accessible vicinity of the person to whom the large-capacity magazine is loaned.

It is enough to make an angel swear.  Suffice it to say that either the law-abiding hunter returning home with a 30-round rifle magazine, or the resident that receives from another a 15-round pistol magazine, or the enthusiast who makes a 12-round magazine out of a 10-round magazine, may be charged not with a minor infraction but with a felony.  And perhaps not ironically, conviction as a felon carries with it the complete forfeiture of Second Amendment rights for a lifetime.  For Second Amendment rights, statutory complexity of this sort extirpates as it obfuscates.  And in the doing, it violates a person's constitutional right to due process.  "[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application violates the first essential of due process of law."  *Connally v. General Const. Co.*, 269 U.S. 385, 391 (1926); *see also United States v. Lanier*, 520 U.S. 259, 266 (1997) (quoting *Connally*).

Absent from these provisions is any qualifying language: *all* forms of possession by ordinary citizens are summarily criminalized.  For example, the statutes make no distinction between possessing and storing a 15-round magazine at home (a reasonable non-threatening act) and carrying a rifle with a 100-round magazine while sitting outside a movie theatre or school (a potentially threatening and suspicious act).  Each constitutes criminal possession and is prohibited outright.  *C.f.*, *Friedman v. City of Highland Park*, 784 F.3d 406, 417 (7th Cir. 2015) (Manion, J., dissenting) ("Notably absent from this provision is any qualifying language: *all* forms of possession are summarily prohibited. Other laws notwithstanding, the ordinance makes no distinction between storing large-capacity magazines in a locked safe at home and carrying a loaded assault rifle while walking down Main Street.  Both constitute 'possession' and are prohibited outright.").  According to the U.S. Supreme Court's reasoning, acquiring, possessing, or storing a commonly-owned 15-round magazine at home for self-defense is protected at the core of the Second Amendment.  Possessing a loaded 100-round rifle and magazine in a crowded public area may not be.

All Californians, like all citizens of the United States, have a fundamental Constitutional right to keep and bear common and dangerous arms.  The nation's Founders used arms for self-protection, for the common defense, for hunting food, and as a check against tyranny.  *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 686 (9th Cir. 2017)

---

Unfortunately, firearm regulations are often complex and prolix.  For example, U.S. House of Representative Steve Scalise, R-La., remarked that a hunter would need to bring along an attorney to make sure the hunter did not accidently commit a felony under recently proposed federal legislation.  According to PBS News Hour, Scalise said, "'What it would do is make criminals out of law-abiding citizens . . . . If you go hunting with a friend and your friend wants to borrow your rifle, you better bring your attorney with you because depending on what you do with that gun you may be a felon if you loan it to him.'"  Matthew Daly, *Gun control legislation pass House, but faces dim prospects in Senate,* PBS News Hour, https://www.pbs.org/newshour/politics/gun-control-legislation-pass-house-but-faces-dim-prospects-in-senate (last visited Mar. 1, 2019).

(en banc) ("[T]he right to bear arms, under both earlier English law and American law at the time the Second Amendment was adopted, was understood to confer a right upon individuals to have and use weapons for the purpose of self-protection, at least in the home."), and ("The British embargo and the colonists' reaction to it suggest . . . the Founders were aware of the need to preserve citizen *access* to firearms in light of the risk that a strong government would use its power to disarm the people.  Like the British right to bear arms, the right declared in the Second Amendment of the U.S. Constitution was thus 'meant to be a strong moral check against the usurpation and arbitrary power of rulers, and as a necessary and efficient means of regaining rights when temporarily overturned by usurpation.'") (citations omitted).

Today, self-protection is most important.  In the future, the common defense may once again be most important.  Constitutional rights stand through time holding fast through the ebb and flow of current controversy.  Needing a solution to a current law enforcement difficulty cannot be justification for ignoring the Bill of Rights as bad policy.   Bad political ideas cannot be stopped by criminalizing bad political speech.  Crime waves cannot be broken with warrantless searches and unreasonable seizures.  Neither can the government response to a few mad men with guns and ammunition be a law that turns millions of responsible, law-abiding people trying to protect themselves into criminals.  Yet, this is the effect of California's large-capacity magazine law.

## II.    PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

Plaintiffs have challenged California's firearm magazine law as being unconstitutional.  They now move for summary judgment.  The standards for evaluating a motion for summary judgment are well known and have changed little since discussed by the U.S. Supreme Court thirty years ago in a trilogy of cases (*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)).  The standards need not be repeated here.

**A. The Second Amendment**

Plaintiffs contend that there is no genuine dispute that the Second Amendment to the United States Constitution protects the individual right of every law-abiding citizen to acquire, possess, and keep common firearms and their common magazines holding more than 10 rounds – magazines which are typically possessed for lawful purposes.  Plaintiffs also contend that the state of California has not carried its burden to demonstrate a reasonable fit between the flat ban on such magazines and its important interests in public safety.  Plaintiffs contend that the state's magazine ban thus cannot survive constitutionally-required heightened scrutiny and they are entitled to declaratory and injunctive relief as a matter of law.  Plaintiffs are correct.

### 1. The Supreme Court's Simple Heller Test

In *Heller,* the U.S. Supreme Court provided a simple Second Amendment test in crystal clear language.  It is a test that anyone can understand.  The right to keep and bear arms is a right enjoyed by law-abiding citizens to have arms that are not unusual "in common use" "for lawful purposes like self-defense."  *District of Columbia v. Heller*, 554 U.S. 570, 624 (2008); *Heller v. District of Columbia ("Heller II")*, 670 F.3d 1244, 1271 (2011) (Kavanaugh, J., dissenting) ("In my view, *Heller* and *McDonald* leave little doubt that courts are to assess gun bans and regulations based on text, history, and tradition, not by a balancing test such as strict or intermediate scrutiny.").  It is a hardware test.  Is the firearm hardware commonly owned?  Is the hardware commonly owned by law-abiding citizens?  Is the hardware owned by those citizens for lawful purposes?  If the answers are "yes," the test is over.  The hardware is protected.

Millions of ammunition magazines able to hold more than 10 rounds are in common use by law-abiding responsible citizens for lawful uses like self-defense.  This is enough to decide that a magazine able to hold more than 10 rounds passes the *Heller* test and is protected by the Second Amendment.  The simple test applies because a magazine is an essential mechanical part of a firearm.  The size limit directly impairs one's ability to defend one's self.

1    Neither magazines, nor rounds of ammunition, nor triggers, nor barrels are

2 specifically mentioned in the Second Amendment.  Neither are they mentioned in *Heller*.

3 But without a right to keep and bear triggers, or barrels, or ammunition and the

4 magazines that hold ammunition, the Second Amendment right would be meaningless.

5 *Fyock v. City of Sunnyvale*, 779 F.3d 991, 998 (9th Cir. 2015) ("[T]o the extent that

6 certain firearms capable of use with a magazine—*e.g.*, certain semi-automatic

7 handguns—are commonly possessed by law-abiding citizens for lawful purposes, our

8 case law supports the conclusion that there must also be some corollary, albeit not

9 unfettered, right to possess the magazines necessary to render those firearms operable.");

10 *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("We

11 recognized in *Jackson* that, although the Second Amendment 'does not explicitly protect

12 ammunition, [but] without bullets, the right to bear arms would be meaningless.'  *Jackson*

13 thus held that 'the right to possess firearms for protection implies a corresponding right'

14 to obtain the bullets necessary to use them.") (citations omitted); *see also Ass'n of N.J.*

15 *Rifle & Pistol Clubs v. A.G. N.J.,* 910 F.3d 106, 116 (3rd Cir. 2018) ("The law challenged

16 here regulates magazines, and so the question is whether a magazine is an arm under the

17 Second Amendment.  The answer is yes.  A magazine is a device that holds cartridges or

18 ammunition.  Regulations that eliminate 'a person's ability to obtain or use ammunition

19 could thereby make it impossible to use firearms for their core purpose.'  Because

20 magazines feed ammunition into certain guns, and ammunition is necessary for such a

21 gun to function as intended, magazines are 'arms' within the meaning of the Second

22 Amendment.") (citations omitted).  Consequently, the same analytical approach ought to

23 be applied to both firearms and the ammunition magazines designed to make firearms

24 function.

25    Under the simple test of *Heller*, California's § 32310 directly infringes Second

26 Amendment rights.  It directly infringes by broadly prohibiting common firearms and

27 their common magazines holding more than 10 rounds, because they are not unusual and

28 are commonly used by responsible, law-abiding citizens for lawful purposes such as self-

defense.  And "that is all that is needed for citizens to have a right under the Second Amendment to keep such weapons."  *Friedman v. City of Highland Park*, 136 S. Ct. 447, 449 (2015) (Justices Thomas and Scalia dissenting from denial of certiorari) (commenting on what *Heller*'s test requires).  Although it may be argued that a 100-round, or a 50-round, or possibly even a 30-round magazine may not pass the *Heller* hardware test, because they are "unusual," the State has proffered no credible evidence that would support such a finding.  Using the simple *Heller* test, a decision about firearm hardware regulations could end right here.

This is not to say the simple *Heller* test will apply to non-hardware firearm regulations such as gun store zoning laws,[26] or firearm serial number requirements.[27]  *Cf. Ass'n of N.J. Rifle & Pistol Clubs v. A.G. N.J.*, 910 F.3d 106, 127 (3rd Cir. 2018) (Bibas, J., dissenting) ("Not every gun law impairs self-defense.  Our precedent applies intermediate scrutiny to laws that do not affect weapons' function, like serial-number requirements.  But for laws that do impair self-defense, strict scrutiny is apt.").

### 2. Commonality

Magazines holding more than 10 rounds are used for self-defense by law-abiding citizens.  And they are common.[28]  Lawful in at least 41 states and under federal law, these magazines number in the millions.  Plaintiff's Exh. 1 (James Curcuruto Report), at 3 ("There are at least *one hundred million* magazines of a capacity of more than ten rounds in possession of American citizens, commonly used for various lawful purposes

---

[26] *Teixeira,* 873 F.3d at 670.

[27] *United States v. Marzzarella*, 614 F.3d 85, 101 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 958 (2011) ("[W]e hesitate to say Marzzarella's possession of an unmarked firearm [without a serial number] in his home is unprotected conduct.  But because § 922(k) would pass muster under either intermediate scrutiny or strict scrutiny, Marzzarella's conviction must stand.").

[28] Some magazine sizes are, no doubt, more common than others.  While neither party spends time on it, it is safe to say that 100-round and 75-round magazines are not nearly as common as 30-round rifle magazines and 15-round pistol magazines.

including, but not limited to, recreational and competitive target shooting, home defense, collecting and hunting.") (emphasis added); Plaintiff's Exh. 2 (Stephen Helsley Report), at 5 ("The result of almost four decades of sales to law enforcement and civilian clients is millions of semiautomatic pistols with a magazine capacity of more than ten rounds and likely *multiple millions* of magazines for them.") (emphasis added); *Fyock,* 779 F.3d at 998 ("[W]e cannot say that the district court abused its discretion by inferring from the evidence of record that, at a minimum, magazines are in common use.  And, to the extent that certain firearms capable of use with a magazine — e.g., certain semi-automatic handguns — are commonly possessed by law-abiding citizens for lawful purposes, our case law supports the conclusion that there must also be some corollary, albeit not unfettered, right to possess the magazines necessary to render those firearms operable."); *Ass'n of N.J. Rifle & Pistol Clubs,* 910 F.3d at 116 ("The record shows that *millions of magazines* are owned, often come factory standard with semi-automatic weapons, are typically possessed by law-abiding citizens for hunting, pest-control, and occasionally self-defense and there is no longstanding history of LCM regulation.") (citations omitted) (emphasis added); *NYSR&PA v. Cuomo*, 804 F.3d 242, 255-57 (2nd Cir. 2015) (noting large-capacity magazines are "in common use" as the term is used in *Heller* based on even the most conservative estimates); *Heller v. District of Columbia*, 670 F.3d 1244, 1261 (D.C. Cir. 2011) ("We think it clear enough in the record that . . . magazines holding more than ten rounds are indeed in 'common use'. . . . As for magazines, fully 18 percent of all firearms owned by civilians in 1994 were equipped with magazines holding more than ten rounds, and approximately 4.7 million more such magazines were imported into the United States between 1995 and 2000.  *There may well be some capacity above which magazines are not in common use but*, if so, the record is devoid of evidence as to what that capacity is; in any event, *that capacity surely is not ten*.") (emphasis added); *cf. Hollis v. Lynch*, 827 F.3d 436, 449 (5th Cir. 2016) (noting imprecision of the term "common" by applying the Supreme Court test in *Caetano* of 200,000 stun guns owned and legal in 45 states being "common"); *Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1195

n.3 (E.D. Cal. 2018) ("[T]he court holds that California's large capacity magazine ban burdens conduct protected by the Second Amendment because these magazines are commonly possessed by law-abiding citizens for lawful purposes . . . ."); *Ass'n of N.J. Rifle & Pistol Clubs v. Grewal*, 2018 U.S. Dist. LEXIS 167698, at *32-33 (D. N.J. Sep. 28, 2018) ("[T]he Court is satisfied, based on the record presented, that magazines holding more than ten rounds are in common use and, therefore, entitled to Second Amendment protection."); *compare United States v. McCartney*, 357 F. App'x 73, 76 (9th Cir. 2009) ("Silencers, grenades, and directional mines are not 'typically possessed by law-abiding citizens for lawful purposes,' and are less common than either short-barreled shotguns or machine guns.  The weapons involved in this case therefore are not protected by the Second Amendment.") (citations omitted).

The Attorney General argues, even so, that it is permissible to ban common handguns with common magazines holding more than 10 rounds because the possession of firearms with *other* smaller magazines is allowed.[29]  But *Heller* says, "[i]t is no answer to say . . . that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed."  554 U.S. at 629; *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1033 (2016) (Alito, J., and Thomas, J., concurring) ("But the right to bear other weapons is 'no answer' to a ban on the possession of protected arms.").  *Heller* says, "It is enough . . . that the American people have considered the handgun to be the quintessential self-defense weapon." *Id.*  California's complete prohibition of common handguns with commonly-sized magazines able to hold more

---

[29] California is now in the unique position of being able to say that many firearms are currently sold with magazines holding 10 rounds or less because it banned selling firearms with larger magazines 20 years ago; since that time the marketplace has adapted. Neither party addresses the larger question of whether a state may infringe on a constitutional right, and then argue that alternatives exist because the marketplace has adjusted over time.  The question is not answered here.

19

than 10 rounds is invalid.[30]  "A weapon may not be banned unless it is *both* dangerous *and* unusual."  *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J., and Thomas, J., concurring) (emphasis in original).

To the extent that magazines holding more than 10 rounds may be less common within California, it would likely be the result of the State long criminalizing the buying, selling, importing, and manufacturing of these magazines.  Saying that large capacity magazines are uncommon because they have been banned for so long is something of a tautology.  It cannot be used as constitutional support for further banning.  *See Friedman v. City of Highland Park, Illinois*, 784 F.3d 406, 409 (7th Cir. 2015) ("Yet it would be absurd to say that the reason why a particular weapon can be banned is that there is a statute banning it, so that it isn't commonly used.  A law's existence can't be the source of its own constitutional validity.").

Since the 1980s, one of the most popular handguns in America has been the Glock 17 pistol, which is designed for, and typically sold with, a 17-round magazine.  One of the most popular youth rifles in America over the last 60 years has been the Ruger 10/22.  Six million have been sold since it was introduced in 1964.  It is designed to use magazines manufactured by Ruger in a variety of sizes: 10-round, 15-round, and 25-round.  Over the last three decades, one of the most popular civilian rifles in America is the much maligned AR-15 style rifle.  Manufactured with various characteristics by numerous companies, it is estimated that more than five million have been bought since the 1980s.  These rifles are typically sold with 30-round magazines.  These commonly-

---

[30] "There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot easily be redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police.  Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."  *Heller*, 554 U.S. at 629.

owned guns with commonly-sized magazines are protected by the Second Amendment and *Helle*r's simple test for responsible, law-abiding citizens to use for target practice, hunting, and defense.

### 3. Lethality is Not the Test

Some say that the use of "large capacity magazines" increases the lethality of gun violence. They point out that when large capacity magazines are used in mass shootings, more shots are fired, more people are wounded, and more wounds are fatal than in other mass shootings.[31] That may or may not be true. Certainly, a gun when abused is lethal. A gun holding more than 10 rounds is lethal to more people than a gun holding less than 10 rounds, but it is not constitutionally decisive. Nothing in the Second Amendment makes lethality a factor to consider because a gun's lethality, or dangerousness, is assumed. The Second Amendment does not exist to protect the right to bear down pillows and foam baseball bats. It protects guns and every gun is dangerous. "If *Heller* tells us anything, it is that firearms cannot be categorically prohibited just because they are dangerous." *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1031 (2016) (Alito, J. and Thomas, J., concurring); *Maloney v. Singas*, 2018 U.S. Dist. LEXIS 211546 *19 (E.D.N.Y. Dec. 14, 2018) (striking down 1974 ban on possession of dangerous nunchaku in violation of the Second Amendment and quoting *Caetano*). "[T]he relative dangerousness of a weapon is irrelevant when the weapon belongs to a class of arms commonly used for lawful purposes." *Id.*

California law presently permits the lethality of a gun with a 10-round magazine. In other words, a gun with an 11-round magazine or a 15-round magazine is apparently too lethal to be possessed by a law-abiding citizen. A gun with a 10-round magazine is not. Missing is a constitutionally-permissible standard for testing acceptable lethality. The Attorney General offers no objective standard. *Heller* sets out a commonality

---

[31] *See generally*, DX-3 Revised Expert Report of Dr. Louis Klarevas.

standard that can be applied to magazine hardware: is the size of the magazine "common"?  If so, the size is constitutionally-protected.

If the "too lethal" standard is followed to its logical conclusion, the government may dictate in the future that a magazine of eight rounds is too lethal.  And after that, it may dictate that a gun with a magazine holding three rounds is too lethal since a person usually fires only 2.2 rounds in self-defense.  This stepped-down approach may continue[32] until the time comes when government declares that only guns holding a single round are sufficiently lacking in lethality that they are both "safe" to possess *and* powerful enough to provide a means of self-defense.[33]

---

[32] Constitutional rights would become meaningless if states could obliterate them by enacting incrementally more burdensome restrictions while arguing that a reviewing court must evaluate each restriction by itself when determining its constitutionality. *Peruta v. Cty. of San Diego*, 824 F.3d 919, 953 (9th Cir. 2016) (Callahan, J., dissenting).

[33] Artificial limits will eventually lead to disarmament.  It is an insidious plan to disarm the populace and it depends on for its success a subjective standard of "necessary" lethality.  It does not take the imagination of Jules Verne to predict that if all magazines over 10 rounds are somehow eliminated from California, the next mass shooting will be accomplished with guns holding only 10 rounds.  To reduce gun violence, the state will close the newly christened 10-round "loophole" and use it as a justification to outlaw magazines holding more than 7 rounds. The legislature will determine that no more than 7 rounds are "necessary."  Then the next mass shooting will be accomplished with guns holding 7 rounds.  To reduce the new gun violence, the state will close the 7-round "loophole" and outlaw magazines holding more than 5 rounds determining that no more than 5 rounds is "necessary."   And so it goes, until the only lawful firearm law-abiding responsible citizens will be permitted to possess is a single-shot handgun.  Or perhaps, one gun, but no ammunition.  Or ammunition issued only to persons deemed trustworthy.
    This is not baseless speculation or scare-mongering.  One need only look at New Jersey and New York.  In the 1990's, New Jersey instituted a prohibition on what it would label "large capacity ammunition magazines."  These were defined as magazines able to hold more than 15 rounds.  Slipping down the slope, last year, New Jersey lowered the capacity of permissible magazines from 15 to 10 rounds.  *See* Firearms, 2018 N.J. Sess. Law Serv. Ch. 39 (ASSEMBLY No. 2761) (WEST).  At least one bill had been offered that would have reduced the allowed capacity to only five rounds.  (*See* New Jersey Senate Bill No. 798, introduced in the 2018 Session, amending N.J.S. 2C:39-1(y)

As a matter of public policy, people can debate who makes the decision about how much lethality a citizen can possess.  As policy, the State says a law-abiding, responsible person needs only 10 rounds.  If you judge for yourself that you will need more than 10 rounds, however, the crime is yours.  And, too bad if you complied with the law but needed 11 rounds to stop an attacker, or a group of attackers, or a mob.  Now, you are dead.  By living a law-abiding, responsible life, you have just become another "gun violence" statistic.  And your statistic may be used to justify further restrictions on gun lethality for future law-abiding citizens.

### 4. Conclusion Under Heller Test

In *Heller*, the Supreme Court held that the Second Amendment protects an individual right to possess a "lawful firearm in the home operable for the purpose of immediate self-defense.'"  *Pena v. Lindley*, 898 F.3d 969, 975 (9th Cir. 2018), *pet'n for cert. filed* (1/3/19) (quoting *Heller*, 554 U.S. at 635).  "The Court also wrote that the amendment 'surely elevates above all other interests the right of *law-abiding*, *responsible*

definition of large capacity magazine from 15 to 5 rounds.)  Less than a decade ago, sliding down the slope ahead of its neighbor, New York prohibited magazines able to hold more than 10 rounds *and* prohibited citizens from filling those magazines with more than 7 rounds (*i.e.,* a seven round load limit).  "New York determined that only magazines containing seven rounds or fewer can be safely possessed."  *New York State Rifle & Pistol Ass'n v. Cuomo*, 804 F.3d 242, 264 (2nd Cir. 2015) (declaring unconstitutional New York seven round load limit).

Other than the commonality test, there should be no restriction on how many rounds in a magazine a citizen may use for self-defense or to bring for use in a militia.  Otherwise, what the Founders sought to avoid will be accomplished in our lifetime.  "The problem the Founders sought to avoid was a disarmed populace.  At the margins, the Second Amendment can be read various ways in various cases, but there is no way this Amendment, designed to assure an armed population, can be read to allow government to disarm the population."  *Silveira v. Lockyer*, 328 F.3d 567, 588 (9th Cir. 2003) (Kozinski, J., dissenting).

*citizens* to use arms in defense of hearth and home.'" *United States v. Torres*, 911 F.3d 1253, 1259 (9th Cir. 2019) (quoting *Heller*, 554 U.S. at 635).

California's law prohibiting acquisition and possession of magazines able to hold any more than 10 rounds places a severe restriction on the core right of self-defense of the home such that it amounts to a destruction of the right and is unconstitutional under any level of scrutiny. *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 961 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 2799 (2015) ("A law that imposes such a severe restriction on the core right of self-defense that it 'amounts to a destruction of the Second Amendment right,' is unconstitutional under any level of scrutiny.") (citing *Heller*, 554 U.S. at 629); *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016), *cert. denied*, 138 S. Ct. 945 (2018) ("A law that imposes such a severe restriction on the fundamental right of self defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny.") (citation omitted). The criminalization of a citizen's acquisition and possession of magazines able to hold more than 10 rounds hits directly at the core of the right of self-defense in the home. It is a complete ban on acquisition. It is a complete ban on possession. It is a ban applicable to all ordinary law-abiding responsible citizens. It is a ban on possession that applies inside a home and outside a home.[34]

---

[34] "Possession" is a broad concept in California criminal law. Possession may be actual or constructive. "[Possession] does not require that a person be armed or that the weapon [ ] be within a person's immediate vicinity." *In re Charles G.*, 14 Cal. App. 5th 945, 951 (Ct. App. 2017), *as modified* (Aug. 31, 2017) (citations omitted). "Rather, it encompasses having a weapon in one's bedroom or home or another location under his or her control, even when the individual is not present at the location." *Id.*; *People v. Douglas*, No. B281579, 2019 WL 621284, at *4 (Cal. Ct. App. Feb. 13, 2019) (male defendant had constructive possession of box of ammunition in bedroom dresser drawer where men's clothing was found mixed with girlfriend's clothing); *People v. Osuna*, 225 Cal. App. 4th 1020, 1029 (2014), *disapproved on other grounds, People v. Frierson*, 4 Cal. 5th 225 (2017) ("A defendant possesses a weapon when it is under his dominion and control. A defendant has actual possession when the weapon is in his immediate

California's ban goes farther than did the District of Columbia's ordinance in *Heller*. With respect to long guns, in the *Heller* case, while a citizen was required to keep his or her self-defense firearm inoperable, he or she could still possess the rifle – yet it failed the simple *Heller* test. *Jackson v. City & Cty. of San Francisco*, 135 S. Ct. 2799 (2015) (Thomas, J., dissenting from denial of certiorari) ("Less than a decade ago, we explained that an ordinance requiring firearms in the home to be kept inoperable, without an exception for self-defense, conflicted with the Second Amendment because it "made it impossible for citizens to use their firearms for the core lawful purpose of self-defense.") (citing *Heller*). A government regulation that allowed a person to acquire an arm and allowed a person to possess the arm still failed the *Heller* test. California's law, which neither allows acquisition, nor possession, nor operation, in the home for self-defense must also fail the *Heller* test.

The California ban leaves no room for an ordinary citizen to acquire, keep, or bear a larger capacity magazine for self-defense. There are no permitted alternative means to possess a firearm holding more than 10 rounds for self-defense, regardless of the threat. *Compare, e.g., Wilson v. Lynch*, 835 F.3d 1083, 1093 (9th Cir. 2016) (18 U.S.C. § 922(d)(3) prohibition on selling firearm to marijuana card holder was not severe burden on core Second Amendment rights because the bar applied to "only the sale of firearms to Wilson — not her *possession* of firearms") (emphasis added); *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013) (describing *Heller II*'s reasoning that the District of Columbia's gun registration requirements were not a severe burden because they do not prevent an individual from *possessing* a firearm in his home or elsewhere). Simply put,

---

possession or control. He has constructive possession when the weapon, while not in his actual possession, is nonetheless under his dominion and control, either directly or through others."). The concept of constructive possession of a firearm can also be found in federal criminal law. *See e.g., United States v. Schrag*, 542 F. App'x 583, 584 (9th Cir. 2013) (defendant had constructive possession of wife's pistol found on top of refrigerator in the home in violation of probation condition).

§ 32310's ban on common magazines able to hold more than 10 rounds flunks the simple *Heller* test.  Because it flunks the *Heller* test, there is no need to apply some lower level of scrutiny.  *Cf. Wrenn v. D.C.*, 864 F.3d 650, 666 (D.C. Cir. 2017) ("*Heller I*'s categorical approach is appropriate here even though our previous cases have always applied tiers of scrutiny to gun laws.").

In addition to their usefulness for self-defense in the home, of course, larger capacity magazines are also lawful arms from home with which militia members would report for duty.  Consequently, possession of a larger capacity magazine is also categorically protected by the Second Amendment under *United States v. Miller,* 307 U.S. 174 (1939).  "*Miller* and *Heller* recognized that militia members traditionally reported for duty carrying 'the sorts of lawful weapons that they possessed at home,' and that the Second Amendment therefore protects such weapons as a class, regardless of any particular weapon's suitability for military use.'" *Caetano v. Massachusetts*, 136 S. Ct. 1027, 1032 (2016) (Alito, J., concurring) (citations omitted).

## B.  The Historical Prohibitions Exception

The State argues that the *Heller* test is a non-issue because the *Heller* test does not apply to historically-accepted prohibitions on Second Amendment rights.  Large capacity magazines have been the subject of regulations since the 1930s according to the State.  Based on this view of history, the State asserts that magazine capacity regulations are historically accepted laws beyond the reach of the Second Amendment.  If its historical research is accurate, the State would have an argument.  "At the first step of the inquiry, 'determining the scope of the Second Amendment's protections requires a textual and historical analysis of the amendment.'" *Teixeira v. Cty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017), *cert. denied sub nom. Teixeira v. Alameda Cty., Cal.*, 138 S. Ct. 1988 (2018) (citation omitted).  Courts ask whether the challenged law "falls within a 'well-defined and narrowly limited' category of prohibitions 'that have been historically unprotected,'" *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 960 (9th Cir. 2014) *cert. denied*, 135 S. Ct. 2799 (2015) (citations omitted).  "To determine whether a challenged

1    law falls outside the historical scope of the Second Amendment, we ask whether the
2    regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, or
3    whether the record includes persuasive historical evidence establishing that the regulation
4    at issue imposes prohibitions that fall outside the historical scope of the Second
5    Amendment." *Id.* (citations omitted).

6         History shows, however, restrictions on the possession of firearm magazines of any
7    size have no historical pedigree.  To begin with the regulation at issue, Cal. Penal Code
8    § 32310, applies to detachable magazines.  The detachable magazine was invented in the
9    late 19th Century.  "In 1879, Remington introduced the first 'modern' detachable rifle
10   magazine.  In the 1890s, semiautomatic pistols with detachable magazines followed.
11   During WWI, detachable magazines with capacities of 25 to 32-rounds were introduced."
12   Plaintiff's Exh. 2 (Stephen Helsley Report), at 4.

13        The oldest statute limiting the permissible size of a detachable firearm magazine, on
14   the other hand, is quite young.  In 1990, New Jersey introduced the first ban on detachable
15   magazines, banning magazines holding more than 15 rounds.  N.J.S. 2C:39 (1990).  Eight
16   other states eventually followed.  The federal government first regulated detachable
17   magazines in 1994.  The federal statute addressed magazines holding more than 10 rounds
18   but lapsed in 2004 and has not been replaced.

19        To sum up, then, while detachable firearm magazines have been common for a
20   century, government regulation of the size of a magazine is a recent phenomenon and still
21   unregulated in four-fifths of the states.  The record is empty of the persuasive historical
22   evidence needed to place a magazine ban outside the ambit of the Second Amendment.
23   Thus, it can be seen that California's prohibition on detachable ammunition magazines
24   larger than 10 rounds is a type of prohibition that has not been historically accommodated
25   by the Second Amendment.

26        Faced with a dearth of magazine capacity restrictions older than 1990, the Attorney
27   General pivots and tries a different route.  He argues that the historical prohibition question
28   is not one of detachable magazine size, but instead is a question of firearm "firing-

capacity."   With this change of terms and shift of direction, the Attorney General contends that firearm firing-capacity restrictions have been subject to longstanding regulation dating back to the 1920s.  Yet, even his new focus falters under a close look at the historical record.

First, firearms with a firing-capacity of more than 10 rounds existed long before the 1920s.  Plaintiff's Exh. 2 (Stephen Helsley Report), at 4 ("Firearms with a capacity exceeding10-rounds date to the 'dawn of firearms.'  In the late-l5th Century, Leonardo Da Vinci designed a 33-shot weapon.  In the late 17th Century, Michele Lorenzoni designed a practical repeating flintlock rifle . . . .  Perhaps the most famous rifle in American history is the one used by Lewis and Clark on their 'Corps of Discovery" expedition between 1803 and 1806—the magazine for which held twenty-two .46 caliber balls.  Rifles with fixed magazines holding 15-rounds were widely used in the American Civil War.  During that same period, revolvers with a capacity of 20-rounds were available but enjoyed limited popularity because they were so ungainly.").  Yet, despite the existence of arms with large firing-capacity during the time of the adoption of the Second Amendment, more than a century passed before a firing-capacity law was passed.

It is interesting to note that during the Nation's founding era, states enacted regulations for the formation and maintenance of citizen militias.  Three such statutes are described in *United States v. Miller*, 307 U.S. 174 (1939).  Rather than restricting firing capacity, they required firing capacity.  These statutes required citizens to equip themselves with arms and a minimum quantity of ammunition for those arms.  None placed an upper limit of 10-rounds, as § 32310 does.  Far from it.  Each imposed a floor of at least 20-rounds. *Id.* at 180-83 (Massachusetts law of 1649 required carrying "twenty bullets," while New York 1786 law required "a Box therein to contain no less than Twenty-four Cartridges," and Virginia law of 1785 required a cartridge box and "four pounds of lead, including twenty blind cartridges").  In 1776, Paul Revere's Minutemen (a special group of the Massachusetts militia) were required to have ready 30 bullets and gunpowder.  These early American citizen militia laws suggest that, contrary to the idea of a firing-capacity

upper limit on the number of rounds a citizen was permitted to keep with one's arms, there was an obligation that citizens would have at least 20 rounds available for immediate use. Simply put, there were no upper limits; there were floors and the floors were well above 10 rounds.

The Attorney General makes no mention of the founding-era militia firing-capacity minimum requirements. Instead he focuses on a handful of Thompson machine gun-era statutes. In 1927, Michigan passed a restriction on firearms with a firing-capacity over 16 rounds. Rhode Island restricted arms with a firing-capacity over 12 rounds. Ohio began licensing firearms with a firing-capacity over 18 rounds in 1933. All were repealed. The District of Columbia first restricted firearms with a firing-capacity of 12 or more rounds in 1932. None of these laws set the limit as low as ten.

The Attorney General names five additional states that enacted firing-capacity restrictions in the 1930s with capacity limits less than 10 rounds. But he is not entirely accurate. His first example is not an example, at all. For his first example, he says that, "[i]n 1933, South Dakota banned any 'weapon from which more than *five shots* or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine [by a single function of the firing device].'" Def's Oppo. (4/9/18) at 4 (emphasis in original). Actually, this was not a ban. This was South Dakota's definition of a machine gun. S.D. Ch. 206 (S.B. 165) *Enacting Uniform Machine Gun Act*, § 1 (1933), Exh. A to Def.'s Request for Judicial Notice (filed 4/9/18) ("'Machine Gun' applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device."). In fact, the statute did not ban machine guns. The statute did not criminalize mere possession (except by a felon or by an unnaturalized foreign-born person). Unlike Cal. Penal Code § 32310, the South Dakota statute criminalized possession or use of a machine gun only "for offensive or aggressive purpose," (Ch. 206 § 3), and added a harsh penalty for use during a crime of violence. Ch. 206 § 2. Specifically excepted from the regulation was possession of a

machine gun for defensive purposes.  Ch. 206 § 6(3) ("Nothing contained in this act shall prohibit or interfere with the possession of a machine gun . . . for a purpose manifestly not aggressive or offensive.").   The 1933 South Dakota statute protected a law-abiding citizen's right to possess a machine gun with a firing-capacity over five rounds for self-defense and defense of home and family and any other purpose not manifestly aggressive or offensive.  California's § 32310, in contrast, criminalizes for all reasons possession of a magazine holding more than 10 rounds.  So much for the first example.

The Attorney General's second example of a longstanding firing-capacity prohibition is a Virginia ban enacted in 1934.  However, like the first South Dakota example, the second example is not an example, at all.  The Attorney General describes the law as a ban on firearms that discharge seven rounds rapidly.  It is not ban.  It also defines "machine gun."[35]  It criminalizes the offensive/aggressive possession of a machine gun[36] and it imposes a death penalty for possessing/using a machine gun in the perpetration of a crime of violence.[37]  However, most importantly, like the 1933 South Dakota statute, the 1934 Virginia statute protected a law-abiding citizen's right to possess a machine gun for self-defense and defense of home and family and any other purpose not manifestly

---

[35] "'Machine gun' applies to and includes a weapon . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons . . . from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically or otherwise discharged without reloading."  Virginia Ch. 96, § 1(a) (1934), Ex. B to Def.'s Request for Judicial Notice (filed 4/9/18).

[36] "Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime. . . ."  Virginia Ch. 96, § 3 (1934), Ex. B to Def.'s Request for Judicial Notice (filed 4/9/18).

[37] "Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment . . . ."  Virginia Ch. 96, § 2 (1934), Ex. B to Def.'s Request for Judicial Notice (filed 4/9/18).

aggressive or offensive.[38]   As discussed above, California's § 32310, in criminalizing possession of magazines holding more than 10 rounds, makes no distinction between use for an offensive purpose and use for a defensive purpose.  So much for the second example.

The Attorney General's final three examples are state machine gun bans.  The first cited is an Illinois enactment (in 1931) described as, "An Act to Regulate the Sale, Possession and Transportation of Machine Guns."  Ex. C to Def.'s Request for Judicial Notice (filed 4/9/18).  Louisiana enacted (in 1932) Act No. 80, the second cited, which likewise was passed "to regulate the sale, possession and transportation of machine guns." Ex. D to Def.'s Request for Judicial Notice (filed 4/9/18).  The third cited example is like the first two.  It is an Act passed by the South Carolina legislature in 1934 titled, An Act Regulating the Use and Possession of Machine Guns.  Ex. E to Def.'s Request for Judicial Notice (filed 4/9/18).  These three statutes are examples of machine gun bans that are prohibited because of their ability to continuously fire rounds with a single trigger pull, rather than their overall firing-capacity.

Machine guns[39] have been subject to federal regulation since the enactment of the National Firearms Act of 1934.  *See Sonzinsky v. United States*, 300 U.S. 506, 511-12

---

[38] "Nothing contained in this act shall prohibit or interfere with . . . The possession of a machine gun . . . for a purpose manifestly not aggressive or offensive."  Virginia Ch. 96, §6(Third) (1934), Ex. B to Def.'s Request for Judicial Notice (filed 4/9/18).

[39] The Supreme Court knows the difference between the fully automatic military machine gun M-16 rifle, and the civilian semi-automatic AR-15 rifle.  *See Staples v. United States*, 511 U.S. 600, 603 (1994) ("The AR-15 is the civilian version of the military's M-16 rifle, and is, unless modified, a semiautomatic weapon.  The M-16, in contrast, is a selective fire rifle that allows the operator, by rotating a selector switch, to choose semiautomatic or automatic fire."); *but see Kolbe v. Hogan*, 849 F.3d 114, 136 (4th Cir. 2017) ("Although an M16 rifle is capable of fully automatic fire and the AR-15 is limited to semiautomatic fire, their rates of fire (two seconds and as little as five seconds, respectively, to empty a thirty-round magazine) are nearly identical.  Moreover, in many situations, the semiautomatic fire of an AR-15 is more accurate and lethal than the automatic fire of an M16.  Otherwise, the AR-15 shares the military features — the very

(1937) ("The term 'firearm' is defined by § 1 [of the National Firearms Act] as meaning a shotgun or a rifle having a barrel less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive, if capable of being concealed on the person, *or a machine gun*. . . .") (emphasis added).  Since machine guns are not typically possessed by law-abiding citizens for lawful purposes, they are not protected by the Second Amendment.  *Heller*, 554 U.S. at 625; *Friedman v. City of Highland Park*, 784 F.3d 406, 408 (7th Cir. 2015) (*Heller* observed, "state militias, when called to service, often had asked members to come armed with the sort of weapons that were 'in common use at the time' and it thought these kinds of weapons (which have changed over the years) are protected by the Second Amendment in private hands, while military-grade weapons (the sort that would be in a militia's armory), such as machine guns, and weapons especially attractive to criminals, such as short-barreled shotguns, are not.").  Because machine guns, like grenades and shoulder-fired rocket launchers, are not commonly possessed by law-abiding citizens for lawful purposes, they are specific arms that fall outside the safe harbor of the Second Amendment.  Consequently, these machine gun statutes cited by the Attorney General do not stand as proof of long-standing prohibitions on the firing-capacity of Second Amendment-protected commonly possessed firearms.

To reiterate, the earliest regulation of a detachable ammunition magazine limit occurred in New Jersey in 1990 and limited the number of rounds to a maximum of 15.  The earliest federal restriction on a detachable magazine was enacted in 1994, limited the maximum number of rounds to 10, and expired after ten years.  As to the Attorney General's alternate argument about "firing-capacity," the earliest firing-capacity regulation appeared in the 1920s and 1930s in three states (Michigan, Rhode Island, and Ohio) and affected firearms able to fire more than 18, 16, or 12 rounds, depending on the state.  No

---

qualities and characteristics — that make the M16 a devastating and lethal weapon of war.").

regulation on "firing-capacity" set a limit as low as California's 10-round limit.  Each was repealed and thus not longstanding.  Two more states (North Dakota and Virginia) defined a machine gun.  Interestingly, while penalizing machine gun use when purposed for aggressive or offensive use, both states also protected citizen machine gun possession for defensive use or any other use that was not manifestly aggressive or offensive.  Three other states (Illinois, Louisiana, and South Carolina) simply defined and banned machine guns altogether.  The District of Columbia appears to be the single jurisdiction where a firing-capacity restriction has been in place since the 1930s.  Even there, the limit was not as low as California's limit of 10 rounds.

On this record, there is no longstanding historically-accepted prohibition on detachable magazines of any capacity.  *Ass'n of N.J. Rifle & Pistol Clubs v. A.G. N.J.*, 910 F.3d 106, n.18 (3rd Cir. 2018) ("LCMs were not regulated until the 1920s, but most of those laws were invalidated by the 1970s.  The federal LCM ban was enacted in 1994, but it expired in 2004.  While a lack of longstanding history does not mean that the regulation is unlawful, the lack of such a history deprives us of reliance on *Heller'*s presumption that such regulation is lawful.") (citations omitted); *Heller v. D.C.*, 670 F.3d 1244, 1260 (D.C. Cir. 2011) ("We are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity.").

Moreover, there is no longstanding historically-accepted prohibition on firearms according to their "firing-capacity" except in the case of automatic fire machine guns.  On the other hand, there is an indication that founding-era state regulations, rather than restricting ammunition possession, mandated citizens of militia age to equip themselves with ready ammunition in amounts of at least 20 rounds.

## C.  The Heightened Scrutiny Test

### 1. Failing the Simple *Heller* Test

Section 32310 runs afoul of the Second Amendment under the simple *Heller* test. It fails the *Heller* test because it criminalizes a law-abiding citizen's possession of a

common magazine that is used for lawful purposes and prohibits its use for self-defense in and around the home.  It strikes at the core of the inalienable Constitutional right and disenfranchises approximately 39 million state residents.

This conclusion should not be considered groundbreaking.  It is simply a straightforward application of constitutional law to an experimental governmental overreach that goes far beyond traditional boundaries of reasonable gun regulation.  That § 32310 was not challenged earlier is due in part to the Ninth Circuit's pre-*Heller* understanding that an individual lacked Second Amendment rights and thus lacked Article III standing to challenge gun regulations.  *See Silveira v. Lockyer,* 312 F.3d 1052, 1066–67 (9th Cir. 2002), *as amended* (Jan. 27, 2003) ("Because we hold that the Second Amendment does not provide an individual right to own or possess guns or other firearms, plaintiffs lack standing to challenge the [California Assault Weapons Control Act].").  That was the state of the law when California passed its first iteration of § 32310[40] with a grandfather clause now called a "loophole" permitting citizens to keep and possess magazines able to hold more than 10 rounds.[41]  The lack of an earlier constitutional challenge was also due to the recency of the Supreme Court's decision that the Second Amendment applies to the states.  *See McDonald v. City of Chicago*, 561 U.S. 742, 784-85 (2010) ("Under our precedents, if a Bill of Rights guarantee is fundamental from an American perspective . . . that guarantee is fully binding on the States . . . .").  In other words, when California began experimenting with its larger-capacity magazine ban less than twenty years ago, it appeared that the Second Amendment conferred no rights on individual citizens and did not apply to the states, and that an individual lacked Article III standing in federal court to challenge the ban.  During that time, California passed more and more gun regulations, constricting individual rights further and further, to the point where state undercover agents surveil California residents attending out-of-state

---

[40] Former § 12020 was re-codified at § 32310, effective Jan. 1, 2012.
[41] The grandfather clause is now described by the State as a loophole.

gun shows, obtain search warrants for their homes, and prosecute those returning with a few thirty-round magazines.  *See e.g., People v. Verches*, 2017 WL 1880968 (Cal. Ct. App. May 9, 2017) (California resident convicted of marijuana possession and importing three large-capacity magazines purchased at a Reno, Nevada gun show and placed on three years formal felony probation).

The magazine ban arbitrarily selects 10 rounds as the magazine capacity over which possession is unlawful.  The magazine ban admits no exceptions, beyond those for law enforcement officers, armored truck guards, and movie stars.  The ban does not distinguish between citizens living in densely populated areas and sparsely populated areas of the state.  The ban does not distinguish between citizens who have already experienced home invasion robberies, are currently threatened by neighborhood burglary activity, and those who have never been threatened.  The ban does not distinguish between the senior citizen, the single parent, and the troubled and angry high school drop-out.  Most importantly, the ban does not distinguish between possession in and around one's home, and possession in or around outdoor concerts, baseball fields, or school yards.  The ban on magazines that hold more than 10 rounds amounts to a prohibition on an entire class of "arms" that is overwhelmingly chosen by American citizens for the lawful purpose of self-defense.  The prohibition extends to one's home where the need to defend self, family, and property is most acute.  And like the ban struck down in *Helle*r, the California ban threatens citizens, not with a minor fine, but a substantial criminal penalty.  *Heller*, 554 U.S. at 634 ("The District law, by contrast, far from imposing a minor fine, threatens citizens with a year in prison (five years for a second violation) for even obtaining a gun in the first place.  See D. C. Code § 7-2507.06.").  "If a law burdens conduct protected by the Second Amendment . . . *Heller* mandates some level of heightened scrutiny."  *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 982 (2018).  Under any level of heightened scrutiny, the ban fails constitutional muster.

### 2. The Tripartite Binary Test with a Sliding Scale and a Reasonable Fit

Beyond the simple *Heller* test, for a Second Amendment question, the Ninth Circuit uses what might be called a tripartite binary test with a sliding scale and a reasonable fit.  In other words, there are three different two-part tests, after which the sliding scale of scrutiny is selected.  Most courts select intermediate scrutiny in the end.  Intermediate scrutiny, in turn, looks for a "reasonable fit."  It is an overly complex analysis that people of ordinary intelligence cannot be expected to understand.  It is the wrong standard.  But the statute fails anyhow.

#### a. burden & scrutiny

First, a court must evaluate the burden and then apply the correct scrutiny.  *United States v. Torres*, 911 F.3d 1253, 1258 (9th Cir. 2019); *Jackson*, 746 F.3d at 960 (citing *United States v. Chovan*, 735 F.3d 1127, 1136-37 (9th Cir. 2013)).  "This two-step inquiry: '(1) asks whether the challenged law burdens conduct protected by the Second Amendment; and (2) if so, directs courts to apply an appropriate level of scrutiny.'"  *Bauer v. Becerra*, 858 F.3d 1216, 1221 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 982 (2018) (quoting *Jackson*, 746 F.3d at 960).  As discussed, § 32310 burdens conduct protected by the Second Amendment.

#### b. presumptively lawful or historical regulation

In determining whether a given regulation falls within the scope of the Second Amendment under the first step of this inquiry, another two-step test is used.  "[W]e ask whether the regulation is one of the 'presumptively lawful regulatory measures' identified in *Heller*, or whether the record includes persuasive historical evidence establishing that the regulation at issue imposes prohibitions that fall outside the historical scope of the Second Amendment."  *Id.* (citations omitted).  If the regulation is presumptively lawful, the inquiry ends.  Likewise, if the regulation is a historically approved prohibition not offensive to the Second Amendment, the inquiry ends.

Section 32310 fails both parts of the test.  A complete ban on ammunition magazines of any size is not one of the presumptively lawful regulatory measures

identified in *Heller*. As discussed, neither is there any evidence that magazine capacity restrictions have a historical pedigree.

### c. closeness to the core and severity of the burden

If the constitutional inquiry may continue, then the correct level of scrutiny must be selected. For that selection a third two-step evaluation is required. The first step measures how close the statute hits at the core of the Second Amendment right. The second step measures how severe the statute burdens the Second Amendment right. "Because *Heller* did not specify a particular level of scrutiny for all Second Amendment challenges, courts determine the appropriate level by considering '(1) how close the challenged law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on that right.'" *Bauer v. Becerra*, 858 F3d 1216, 1222 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 982 (2018) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). *Fyock v. City of Sunnydale*, 779 F.3d 991, 999 (9th Cir. 2015), recognized that a regulation restricting law-abiding citizens from possessing large-capacity magazines within their homes hits at the core of the Second Amendment. *Fyock* said, "[b]ecause Measure C restricts the ability of law abiding citizens to possess large capacity magazines within their homes for the purpose of self-defense, we agree with the district court that Measure C may implicate the core of the Second Amendment." *Id.; Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1278 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ("[T]he court concludes that the Sunnyvale law burdens conduct near the core of the Second Amendment right."). "No one doubts that under *Heller I* this core protection covers the right of a law-abiding citizen to keep in the home common firearms for self-defense." *Wrenn v. D.C.*, 864 F.3d 650, 657 (D.C. Cir. 2017).[42]

---

[42] And the core may extend beyond the home. "[W]e conclude: the individual right to carry common firearms beyond the home for self-defense—even in densely populated

*Heller* says the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of their home. 554 U.S. at 635. Guided by this understanding, for selecting the appropriate level of judicial scrutiny, the Ninth Circuit uses a sliding scale. "[O]ur test for the appropriate level of scrutiny amounts to 'a sliding scale.'" *Silvester*, 843 F.3d at 821. "A law that imposes such a severe restriction on the fundamental right of self-defense of the home that it amounts to a destruction of the Second Amendment right is unconstitutional under any level of scrutiny." *Bauer v. Becerra*, 858 F3d 1216, 1222 (9th Cir. 2017), *cert. denied,* 138 S. Ct. 982 (2018) (quoting *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016)). This is the case here.

### d.  the sliding scale of scrutiny – strict scrutiny

Further down the scale, a law that implicates the core of the Second Amendment right and severely burdens that right warrants *strict scrutiny*. *Pena v. Lindley*, 898 F.3d 969, 977 (9th Cir. 2018) ("We strictly scrutinize a 'law that implicates the core of the Second Amendment right and severely burdens that right.'") (citation omitted). Even if § 32310's complete ban did not amount to a destruction of Second Amendment rights, it would still merit the application of strict scrutiny. A law like § 32310 that prevents a law-abiding citizen from obtaining a firearm with enough rounds to defend self, family, and property in and around the home certainly implicates the core of the Second Amendment. When a person has fired the permitted 10 rounds and the danger persists, a statute limiting magazine size to only 10 rounds severely burdens that core right to self-defense.

A complete ban on a 100-round or 50-round magazine may be a mild burden. An annual limit on the number of larger capacity magazines that a citizen may purchase might place a moderate burden. A serial number requirement for the future manufacturing, importing, or selling of larger capacity magazines would not be a severe

─────────────────────

areas, even for those lacking special self-defense needs—falls within the core of the Second Amendment's protections." *Wrenn v. D.C.*, 864 F.3d 650, 661 (D.C. Cir. 2017).

burden.  Requiring a background check for purchasers of larger-capacity magazines may or may not be a severe burden.  *See e.g., Heller II,* 670 F.3d at 1258 (reasoning that the District of Columbia's gun registration requirements were not a severe burden because they do not prevent an individual from possessing a firearm in his home).

But California's ban is far-reaching, absolute, and permanent.  The ban on acquisition and possession on magazines able to hold more than 10 rounds, together with the substantial criminal penalties threatening a law-abiding, responsible, citizen who desires such magazines to protect hearth and home, imposes a burden on the constitutional right that this Court judges as severe.  *Cf. Peruta v. Cty. of San Diego*, 824 F.3d 919, 950 (9th Cir. 2016) (en banc) (Callahan, J., dissenting) (courts should consider Second Amendment challenges to firearm restrictions in context to ensure the restrictions are not "tantamount to complete bans on the Second Amendment right to bear arms outside the home for self-defense"), *cert. denied*, 137 S. Ct. 1995 (2017).

Some have said that the burden is minor because there are other choices.  *E.g., Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1278 (N.D. Cal. 2014), *aff'd sub nom. Fyock v. Sunnyvale*, 779 F.3d 991 (9th Cir. 2015) ("Individuals have countless other handgun and magazine options to exercise their Second Amendment rights . . . Accordingly, a prohibition on possession of magazines having a capacity to accept more than ten rounds applies only the most minor burden on the Second Amendment.").  But describing as minor, the burden on responsible, law-abiding citizens who may not possess a 15-round magazine for self-defense because there are other arms permitted with 10 or fewer rounds, is like saying that when government closes a Mormon church it is a minor burden because next door there is a Baptist church or a Hindu temple.  Indeed, *Heller* itself rejected this mode of reasoning: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.,* long guns) is allowed."  554 U.S. at 629; *see also Parker v. District of Columbia,* 478 F.3d 370, 400 (D.C. Cir. 2007) ("The District contends that since it only bans one type of firearm, 'residents still have access to hundreds more,' and thus its prohibition

does not implicate the Second Amendment because it does not threaten total disarmament.  We think that argument frivolous.  It could be similarly contended that all firearms may be banned so long as sabers were permitted."), *aff'd sub nom. Heller,* 554 U.S. at 570.

Others have acknowledged that the burden on a citizen may be severe but consider it a worthwhile tradeoff.  *San Francisco Veteran Police Officers Ass'n v. City & Cty. of San Francisco*, 18 F. Supp. 3d 997, 1005 (N.D. Cal. 2014) ("Nonetheless, in those rare cases, to deprive the citizen of more than ten shots may lead to his or her own death.  Let this point be conceded.").  In a peaceful society, a 10-round limit may not be severe.  When thousands of people are rioting, as happened in Los Angeles in 1992, or more recently with Antifa members in Berkeley in 2017, a 10-round limit for self-defense is a severe burden.  When a group of armed burglars break into a citizen's home at night, and the homeowner in pajamas must choose between using their left hand to grab either a telephone, a flashlight, or an extra 10-round magazine, the burden is severe.  When one is far from help in a sparsely populated part of the state, and law enforcement may not be able to respond in a timely manner, the burden of a 10-round limit is severe.  When a major earthquake causes power outages, gas and water line ruptures, collapsed bridges and buildings, and chaos, the burden of a 10-round magazine limit is severe.  When food distribution channels are disrupted and sustenance becomes scarce while criminals run rampant, the burden of a 10-round magazine limit is severe.  Surely, the rights protected by the Second Amendment are not to be trimmed away as unnecessary because today's litigation happens during the best of times.  It may be the best of times in Sunnyvale; it may be the worst of times in Bombay Beach or Potrero.  California's ban covers the entire state at all times.

While *Chovan* instructs that the level of scrutiny depends on closeness to the core and "the severity of the law's burden," it offers no guide to evaluating the burden.  *United States v. Chovan*, 735 F.3d 1127, 1138 (9th Cir. 2013).  In *Jackson*, the burden of a regulation was not severe.  *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 964

(9th Cir. 2014) ("Section 4512 does not impose the sort of severe burden that requires the higher level of scrutiny.").  In *Jackson*, the court found that the ordinance did not substantially prevent law-abiding citizens from using firearms to defend themselves in the home because it only regulated storage when not carrying them.  *Id.*  Consequently, the court found that the requirement did not impose a severe burden because, "San Franciscans are not required to secure their handguns while carrying them on their person." *Id.*  In contrast, § 32310 imposes a complete ban on the acquisition and possession of a magazine able to hold more than 10 rounds.  It is a crime whether a person is keeping and carrying the magazine for self-defense in the home, while using it for target practice to maintain proficiency, while brandishing it to protect property from rioters, or when needing it for hunting dangerous animals.  Strict scrutiny applies.[43]

The State argues that the Ninth Circuit has already determined as a matter of law that intermediate scrutiny applies to large-capacity magazine bans, citing *Fyock*, 779 F.3d at 999.  Def.'s Oppo. to Plaintiff's Mot. for Summary Judgment, at 14.  Not so.  In the context of an appeal from a preliminary injunction ruling, *Fyock* decided whether the

---

[43] Strict scrutiny is also called for in the context of an armed defense of hearth and home because a person's privacy interests are protected by the Constitution.  The protection for one's privacy may be near its zenith in the home.  Other privacy invasions in the home are subjected to strict scrutiny.  "This enactment involves . . . a most fundamental aspect of 'liberty,' the privacy of the home in its most basic sense, and it is this which requires that the statute be subjected to 'strict scrutiny.'" *Poe v. Ullman*, 367 U.S. 497, 548 (1961) (applying strict scrutiny to a Connecticut contraceptive criminal statute).  "The Fourth and Fifth Amendments were described . . . as protection against all governmental invasions 'of the sanctity of a man's home and the privacies of life.'  We recently referred . . . to the Fourth Amendment as creating a 'right to privacy, no less important than any other right carefully and particularly reserved to the people.'" *Griswold v. Connecticut*, 381 U.S. 479, 484–85 (1965) (applying strict scrutiny to contraceptive law) (citations omitted).  Just as we would not allow "the police to search the sacred precincts of the marital bedrooms for telltale signs of the use of contraceptives," (*id.*), we should not allow the police to search the private environs of law-abiding, responsible citizens for self-defense magazines that the State deems too large and dangerous.

district court had abused its discretion.  The district court made a preliminary judgment that the burden was not severe from Sunnyvale's large capacity magazine ban.  The district court used its discretion and declined to issue a preliminary injunction.  *Fyock* decided that the district court had not abused its discretion.  Specifically, the *Fyock* court concluded, "For these reasons, there was no abuse of discretion in finding that the impact Measure C may have on the core Second Amendment right is not severe and that intermediate scrutiny is warranted."  *Id.  Fyock*'s conclusion about the severity of Sunnyvale's large-capacity magazine ban was fact-bound.  It did not announce as a matter of law that magazine capacity bans of any kind never impose a severe burden on Second Amendment rights.  Nor could it.  Even the least searching form of heightened scrutiny (*i.e.,* intermediate scrutiny) requires the government to establish a reasonable fit.

That the assessment of Sunnyvale's ban was fact-bound is illustrated by its immediately preceding sentence, where the *Fyock* court noted the Sunnyvale ban permitted possession of large-capacity magazines for use with some firearms.  *Id.* ("To the extent that a lawfully possessed firearm could not function with a lower capacity magazine, Measure C contains an exception that would allow possession of a large-capacity magazine for use with that firearm.") (citing Sunnyvale, Cal. Muni. Code § 9.44.050(c)(8)).  It also imposed a minor penalty and did not make an exception for movie props or retired police officers.  As this Court reads it, *Fyock* did not decide that all magazine bans merit only intermediate scrutiny.

Section 32310's wide ranging ban with its acquisition-possession-criminalization components exacts a severe price on a citizen's freedom to defend the home.  Consequently, § 32310 merits strict judicial scrutiny.  "A law that implicates the core of the Second Amendment right and severely burdens that right warrants strict scrutiny."  *Silvester v. Harris*, 843 F.3d 816, 821 (9th Cir. 2016) (citing *Chovan*, 735 F.3d at 1138); *compare United States v. Torres*, 911 F.3d 1253, 1262 (9th Cir. 2019) (finding federal ban on firearm possession by an alien while in the United States is not a severe burden because alien may remove himself from the ban by acquiring lawful immigration status);

*and Mahoney v. Sessions*, 871 F.3d 873, 879 (9th Cir. 2017), *cert. denied sub nom. Mahoney v. City of Seattle, Wash.*, 138 S. Ct. 1441 (2018) (holding that a city policy regulating the use of department-issued firearms while police officers are *on duty* is not a severe Second Amendment burden).

Strict scrutiny requires the Government to prove that the restriction on a constitutional right furthers a compelling interest and is narrowly tailored to achieve that interest. *Mance v. Sessions*, 896 F.3d 699, 705-06 (5th Cir. 2018), *pet'n for cert. filed* (Nov. 19, 2018) (applying strict scrutiny in Second Amendment case). California's ban on magazines able to hold more than 10 rounds fails strict scrutiny. The State has not offered a compelling interest for the ban, arguing that intermediate scrutiny should be the test. If preventing mass shootings is the state's interest, it is not at all clear that it would be compelling since such events are exceedingly rare. If the state's interest is in forcing a "pause" during a mass shooting for a shooter to be apprehended, those events are even more rare.

More certain, however, is that the ban is not narrowly tailored or the least restrictive means of achieving these interests. Instead it is a categorical ban on acquisition and possession for all law-abiding, responsible, ordinary citizens. Categorical bans are the opposite of narrowly tailored bans. The § 32310 ban on possession applies to areas in the state where large groups gather and where no one gathers. It applies to young persons with long rap sheets and to old persons with no rap sheets. It applies to draft dodgers and to those who have served our country. It applies to those who would have 1000 large magazines for a conflagration and to those who would have one large magazine for self-defense. It applies to perpetrators as well as it applies to those who have been victims. It applies to magazines holding large, powerful rounds and to magazines holding small, more-impotent rounds. It applies to rifles with bump-stocks and pistols for purses.

Section 32310 is not narrowly tailored; it is not tailored at all. It fits like a burlap bag. It is a single-dimensional, prophylactic, blanket thrown across the population of the

state.  As such, § 32310 fails strict scrutiny and violates the Second Amendment.  *Cf.*
*Mance v. Sessions*, 896 F.3d 390, 405 (5th Cir. 2018) (Ho, J., dissenting from denial of
rehearing *en banc*) ("The ban on interstate handgun sales fails strict scrutiny.  After all, a
categorical ban is precisely the opposite of a narrowly tailored regulation.  It applies to all
citizens, not just dangerous persons.  Instead of requiring citizens to comply with state
law, it forbids them from even trying.  Nor has the Government demonstrated why it
needs a categorical ban to ensure compliance with state handgun laws.  Put simply, the
way to require compliance with state handgun laws is to require compliance with state
handgun laws.").

### e. intermediate scrutiny

Even under the lowest formulation of heightened scrutiny, intermediate scrutiny,
Section § 32310 fails because it is not a reasonable fit.  *Cf. Morris v. U.S. Army Corps of
Engineers*, 990 F. Supp. 2d 1082, 1087 (D. Idaho 2014) (banning firearm with
ammunition in camping tents imposed *severe burden calling for strict scrutiny but
unconstitutional even under intermediate scrutiny*).  Where a restriction "does not
'severely burden' or even meaningfully impact the core of the Second Amendment right,
. . . intermediate scrutiny is . . . appropriate."  *Bauer v. Becerra*, 858 F.3d 1216, 1222 (9th
Cir. 2017), *cert. denied,* 138 S. Ct. 982, 200 L. Ed. 2d 249 (2018) (citing *Silvester v.
Harris*, 843 F.3d 816, 821 (9th Cir. 2016) and *United States v. Chovan*, 735 F.3d 1127,
1138 (9th Cir. 2013)) (applying intermediate scrutiny to California's $19 DROS fee).
The State argues as a foregone conclusion that intermediate scrutiny is the correct point
on the sliding scale for a regulation on magazines.  According to the State, *Fyock*'s
approval of "intermediate scrutiny" is controlling, and other courts have applied
intermediate scrutiny to regulations on large capacity magazines. As discussed, *supra*,
*Fyock* held that the district court did not abuse its discretion in finding Sunnyvale's
magazine capacity restriction did not have a severe impact.  779 F.3d at 999.  That
approach was consistent with past cases analyzing the appropriate level of scrutiny under
the second step of *Heller*, as the Ninth Circuit has typically applied intermediate scrutiny

1   – especially for non-hardware Second Amendment cases.  *See e.g.*, *Silvester*, 843 F.3d at

2   823 (applying intermediate scrutiny to ten-day waiting period for the purchase of

3   firearms); *Jackson v. City & Cty. of San Francisco*, 746 F.3d 953, 968 (9th Cir. 2014)

4   (applying intermediate scrutiny to mandatory handgun storage procedures in homes and

5   banning the sale of hollow-point ammunition in San Francisco); *Chovan*, 735 F.3d at

6   1138 (applying intermediate scrutiny to prohibition on domestic violence misdemeanants

7   possessing firearms).  But it is the wrong standard to apply here.

8                        *i. tailoring required: "a reasonable fit"*

9          To pass intermediate scrutiny, a statute must still be a reasonable fit.  "Our

10  intermediate scrutiny test under the Second Amendment requires that (1) the

11  government's stated objective . . . be significant, substantial, or important; and (2) there .

12  . . be a 'reasonable fit' between the challenged regulation and the asserted objective."

13  *Silvester*, 843 F.3d at 821–22 (quoting *Chovan*, 735 F.3d at 1139).

14         For intermediate scrutiny "the burden of justification is demanding and it rests

15  entirely on the State."  *Tyler v. Hillsdale County Sheriff's Dept.*, 837 F. 3d 678, 694 (6th

16  Cir. 2016) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996) (considering the

17  constitutionality of 18 U.S.C. § 922(g)(4)'s permanent gun ban for person previously

18  treated for mental illness).

19                        *ii. four important California interests*

20         In this case, the Attorney General identifies four State interests or objectives.  Each

21  is important.  The State interests are: (1) protecting citizens from gun violence; (2)

22  protecting law enforcement from gun violence; (3) protecting the public safety (which is

23  like protecting citizens and law enforcement from gun violence); and (4) preventing

24  crime.  *See* Oppo. at 9; 17-18.  The question then becomes, whether § 32310's ban on

25  acquisition and possession of firearm magazines holding more than 10 rounds is a

26  reasonable fit for achieving these important goals.  This Court finds on the evidentiary

27  record before it that § 32310—the prohibition on magazines able to hold more than 10

28

rounds and the acquisition-possession-criminalization components of § 32310—is not a reasonable fit.

The Attorney General says that empirical evidence is not required to shoulder his burden.  Oppo. at 19.  He says that the required substantial evidence demonstrating a reasonable fit can take other, softer forms such as "history, consensus, and simple common sense," as well as "correlation evidence" and even simply "intuition."  Oppo. at 19-20.  Intuition?  If this variety of softer "evidence" were enough, all firearm restrictions except an outright ban on all firearms would survive review.  Yet, as the Second Circuit cautioned, "on intermediate scrutiny review, the state cannot 'get away with shoddy data or reasoning.'  To survive intermediate scrutiny, the defendants must show '*reasonable* inferences based on *substantial* evidence' that the statutes are substantially related to the governmental interest."  *New York State Rifle & Pistol Ass'n, Inc. v. Cuomo*, 804 F.3d 242, 264 (2d Cir. 2015), *cert. denied sub nom.*, *Shew v. Malloy*, 136 S. Ct. 2486 (2016) (citations omitted) (emphasis in original) (striking down New York State's 7-round magazine limit).  When considering whether to approve a state experiment that has, and will, irrevocably harm law-abiding responsible citizens who want for lawful purposes to have common firearms and common magazines that hold more than 10 rounds, this Court declines to rely on anything beyond hard facts and reasonable inferences drawn from convincing analysis amounting to substantial evidence based on relevant and accurate data sets.

### iii.  the State's evidence

The State's theoretical and empirical evidence is not persuasive.  Why 10 rounds as a limit?  The State has no answer.  Why is there no thought given to possession in and around a home?  It is inconclusive at best.  In fact, it is reasonable to infer, based on the State's own evidence, that a right to possess magazines that hold more than 10 rounds may promote self-defense – especially in the home – as well as being ordinarily useful for a citizen's militia use.  California must provide more than a rational basis to justify its sweeping ban.  *See e.g., Moore v. Madigan*, 702 F.3d 933, 942 (7th Cir. 2012) ("Illinois

had to provide us with more than merely a rational basis for believing that its uniquely sweeping ban [on carrying guns in public] is justified by an increase in public safety.  It has failed to meet this burden.").

Mass shootings are tragic.  But they are rare events.  And of these rare events, many are committed without large capacity magazines.  For example, in the two high school incidents in 2018 one assailant used a shotgun and a .38 revolver (at Santa Fe High School, Santa Fe, Texas) while the other used an AR-15-style rifle but with 10-round magazines (at Stoneman Douglas High School in Parkland, Florida).  In the attack at the Capital Gazette newspaper (Annapolis, Maryland), 5 people were killed and 2 injured by an assailant with a shotgun and smoke grenades.  The Attorney General has not supplemented the record with a police report of the single mass shooting in California last year (at the Borderline Bar and Grill in Thousand Oaks, California).  However, press reports indicate the shooter used a legally purchased pistol with an "extended" magazine.[44]  Another report said seven 30-round magazines were found at the scene.[45] Eighteen years of a state ban on acquiring large-capacity magazines did not prevent the assailant from obtaining and using the banned devices.  The news pieces do not report witnesses describing a "critical pause" when the shooter re-loaded.  And the stories do not say where or how the 30-round magazines were acquired.

The findings from the Mayors Against Illegal Guns survey 2009-2013 (AG Exhibit 17), were addressed in the Order of June 28, 2017.  *See also, AG Oppo. To Mot PI*, Gordon Declaration Exh. 59.  The observations are still true.  "To sum up, of the 92 mass killings occurring across the 50 states between 2013 and 2009, only ten occurred in

---

[44] Aarthun, Sarah and Adone, Dakin, *What We Know About the Shooting at Borderline Bar & Grill*, CNN (Nov. 9, 2018) https://www.cnn.com/2018/11/08/us/thousand-oaks-bar-shooting-what-we-know/index.html (last visited Mar. 26, 2019).
[45] *Authorities Describe 'Confusion And Chaos' at Borderline Bar Shooting in California,* NPR (Nov. 28, 2018) https://www.npr.org/2018/11/28/671353612/no-motive-yet-found-for-mass-shooting-at-borderline-bar-and-grill (last visited Mar. 26, 2019).

California.  Of those ten, the criminalization and dispossession requirements of § 32310 would have had no effect on eight of the shootings, and only marginal good effects had it been in effect at the time of the remaining two shootings.  On this evidence, § 32310 is not a reasonable fit.  It hardly fits at all.  It appears on this record to be a haphazard solution likely to have no effect on an exceedingly rare problem, while at the same time burdening the Constitutional rights of many other California law-abiding responsible citizen-owners of gun magazines holding more than 10 rounds."

In opposition to the motion for summary judgment, the state attempts to bolster the data from the Mayors' survey with a Mother Jones Magazine 36-year survey of mass shootings from 1982 to 2018.  See *Oppo. to MSJ* Exhibit 16.[46]  The Mother Jones

_____

[46] This Court has observed that the quality of the evidence relied on by the State is remarkably thin.  The State's reliance and the State's experts' reliance on compilations such as the Mother Jones Magazine survey is an example.  The survey is found in the Attorney General's Opposition to Plaintiff's Motion for Summary Judgment at Exhibit 37.  It purports to be a survey of mass shootings.  It does not indicate how its data is selected, or assembled, or tested.  It is unaccompanied by any declaration as to its accuracy.  It is probably not peer-reviewed.  It has no widely-accepted reputation for objectivity.  While it might be something that an expert considers in forming an admissible opinion, the survey by itself would be inadmissible under the normal rules of evidence.

The State says that the survey "has been cited favorably in numerous cases," citing three decisions.  *Id*. at n. 13.  Of the three cases listed, however, the survey is not mentioned at all in one case, mentioned only as something an expert relied on in the second case, and mentioned only in passing as "exhaustive" but without analysis in the third.  On the other hand, after the Attorney General's brief was filed, the Third Circuit noted issues with the Mother Jones Magazine survey, remarking, "Mother Jones has changed it definition of a mass shooting over time, setting a different minimum number of fatalities or shooters, and may have omitted a significant number of mass shooting incidents."  *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Attorney Gen. New Jersey*, 910 F.3d 106, 113 (3d Cir. 2018); see also *Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Grewal*, No. 317CV10507PGSLHG, 2018 WL 4688345, at *5 (D.N.J. Sept. 28, 2018) (state's expert Lucy Allen admitted that the Mother Jones survey omitted 40% of mass shooting cases).

findings are even less convincing than those from the Mayors' survey.  Mother Jones Magazine lists 98 mass shooting events in the last 36 years.  This is an average of 2.72 events per year in the entire United States.  Of the 98 events over the last 36 years, 17 took place in California.  This is an average of one event every two years in the most populous state in the nation.

According to data from this 36-year survey of mass shootings, California's prohibition on magazines holding more than 10 rounds would have done nothing to keep a shooter from shooting more than 10 rounds.  That is because normally the perpetrator brings multiple weapons.[47]  The more weapons, the greater the firepower and the greater

_____

In another case about prison conditions, a Mother Jones Magazine article was stricken as inadmissible for purposes of summary judgment, which is how such writings would usually be treated.  See *Aaron v. Keith*, No. 1:13-CV-02867, 2017 WL 663209, at *2 (W.D. La. Feb. 14, 2017) (striking a Mother Jones article from the record and remarking, "[t]he case law is consistent: newspaper articles are hearsay and do not constitute competent summary judgment evidence.").

[47]  For example each of the following incidents involved multiple firearms: (1) Yountville 3/9/18: shotgun and rifle; (2) Rancho Tehema 11/14/17: two illegally modified rifles; (3) San Francisco 6/14/17: two pistols, one with 30-round magazine stolen in Utah (per http://www.foxnews.com/us/2017/06/24/police-ups-shooter-in-san-francisco-armed-with-stolen-guns.html); (4) Fresno 4/18/17: one revolver; (5) San Bernardino 12/2/15: (terrorists) two rifles, two pistols, and a bomb; (6) Santa Barbara 5/23/14: three pistols and two hunting knives; (7) Alturas 2/20/14: two handguns and a butcher knife; (8) Santa Monica 6/7/13: pistol, rifle assembled from parts, bag of magazines, and vest (per http://www.scpr.org/news/2013/06/09/37636/police-look-for-motive-in-santa-monica-shooting-on/); (9) Oakland 4/2/12: one pistol (with four 10-round magazines, per https://www.mercurynews.com/2012/04/04/oakland-university-shooting-one-goh-charged-with-seven-counts-of-murder-may-be-eligible-for-death-penalty/); (10) Seal Beach 10/12/11: two pistols and a revolver; (11) Goleta 1/30/06: one pistol (shooter lived in New Mexico where pistol and 15-round magazine were legally purchased, per https://www.independent.com/news/2013/jan/31/goleta-postal-murders/); (12) Orange 12/18/97: one rifle (actually a rifle, shotgun, and handgun, per LA Times article at http://articles.latimes.com/1997/dec/19/news/mn-172 ); (13) San Francisco 7/11/93: three pistols; (14) Olivehurst 5/1/92: sawed-off rifle and a shotgun; (15) Stockton 1/17/89: rifle and pistol; (16) Sunnyvale 2/16/88: two pistols, two revolvers, two shotguns, and a rifle; (17) San Ysidro 7/18/84: one pistol, one rifle, and a shotgun.

the potential for casualties.  In 14 of the 17 California mass shooting events, multiple weapons were brought.  For example, in the 1988 mass shooting event in Sunnyvale, the shooter brought two pistols, two revolvers, two shotguns, and a bolt action rifle (all obtained legally).  No large capacity magazines were used.   *See* AG Exh.16, at 736[48]; DX-10 at 517 (Appendix B, Case No.91).

California's large capacity magazine prohibition also had no effect on the three single weapon mass shooting events.  In the Fresno event in April 2017, a revolver was used.  For those unschooled on firearms, a revolver does not use a magazine of any size. In the next mass shooting event in Oakland in April 2012, the shooter used a pistol with four California-legal 10-round magazines.  In the third mass shooting event in Goleta in January 2006, the shooter did use a pistol with a 15-round magazine.[49]  However, the shooter resided in New Mexico.  She purchased the firearm and its 15-round magazine legally in New Mexico.  She then traveled into California to Goleta to the postal facility where she had been employed three years prior.  By 2006, California already prohibited a person from bringing into the state a large capacity magazine, but it did not prevent the Goleta tragedy from taking place.

In fact, only three of the 17 California mass shooting events reported in the Mother Jones 36-year survey featured a large capacity magazine used by the shooter.  One is the Goleta event described above where the magazine was legally purchased in another state and illegally brought into California.  The second event is like the Goleta event.  In San Francisco June 2017, a perpetrator used two pistols, both stolen.  One pistol had a 30-round magazine.[50]  This firearm was reported stolen in Utah and must have been illegally

---

[48] The Mother Jones survey does not say that large capacity magazines were used.

[49] The Mother Jones survey does not say that large capacity magazines were used, however newspapers reported a 15-round magazine was found.  See https://www.independent.com/news/2013/jan/31/goleta-postal-murders/.

[50] See http://www.foxnews.com/us/2017/06/24/police-ups-shooter-in-san-francisco-armed-with-stolen-guns (last visited Mar. 26, 2019).

imported into California.[51]  The other pistol had been reported stolen in California, but news reports do not mention a large capacity magazine.[52]  It bears noting that California's large capacity magazine prohibition did not prevent these mass shootings.

The third event is the Santa Monica June 2013 event where the shooter was armed with multiple firearms and 40 large-capacity magazines.  As the Court pointed out in its earlier order, in the Santa Monica incident, the shooter brought multiple firearms.  He used an AR-15, a revolver, and 3 zip guns.  He reportedly possessed forty 30-round magazines.  He killed five victims.  The survey notes that the AR-15 and the illegal magazines may have been illegally imported from outside of California.  Receiving and importing magazines holding any more than 10 rounds was already unlawful under California law at the time of the Santa Monica tragedy.  In that instance, criminalizing possession of magazines holding any more than 10 rounds likely would not have provided any additional protection from gun violence for citizens or police officers.  Nor would it have prevented the crime.

To summarize, the 36-year survey of mass shootings by Mother Jones magazine put forth by the AG as evidence of the State's need for § 32310, undercuts its own argument.  The AG's evidence demonstrates that mass shootings in California are rare, and its criminalization of large capacity magazine acquisition and possession has had no effect on reducing the number of shots a perpetrator can fire.  The only effect of § 32310 is to make criminals of California's 39 million law-abiding citizens who want to have ready for their self-defense a firearm with more than 10 rounds.

Some would say that this straight up reading and evaluation of the State's main evidence places "too high [an] evidentiary burden for the state.'"  *Duncan v. Becerra*, 742 F. App'x 218, 223 (9th Cir. 2018) (dissent).  They would say that "the question is not whether the state's evidence satisfies the district court's subjective standard of

---

[51] *Id.*
[52] *Id.*

empiricism." *Id.*  These voices would not test the state's evidence.  They would not require the same rigor a judge usually employs to test the accuracy and persuasiveness of a party's evidence.  Once the state offers any evidence, the evidence would simply be accepted and deemed sufficient to prove the reasonableness of the fit of the regulation for state's experimental solution.

For example, according to this view, the Mayors' survey "easily satisfies" the state's evidentiary burden.  *Id.*  It can be said that the Mother Jones Magazine survey does meet the very low standard of "relevant."  But relevant evidence does not mean persuasive, substantial, or admissible evidence.  That a survey of news articles collected by a biased interest group shows that out of 98 examples, not a single shooter was limited to 10 shots while § 32310 was in effect (or would have been limited to 10 shots if had § 32310 been in effect), is not substantial or persuasive evidence of § 32310's reasonable fit.  Certainly, the evidence need not be perfect or overwhelming.  But for a statute that trenches on a constitutional right, the state's explanation for such a law needs to have some enduring substance or gravitas, like the Liberty Bell.

Where did this idea come from, the idea that a court is *required* to fully credit evidence only "reasonably believed to be relevant?"  *Fyock*, 779 F.3d at 1000.  Or the critique that a court errs by employing a "subjective standard of undefined empirical robustness."  *Duncan*, 742 F. App'x at 224 (dissent).  *Pena v. Lindley*, 898 F.3d 969 (9th Cir. 2018) (*pet'n for cert. filed*) advances this soft approach.  "We do not impose an unnecessarily rigid burden of proof."  *Id.* at 979.  We allow California to rely on any material reasonably believed to be relevant to substantiate its interests."  *Id.*  "We are weighing a legislative judgment, not evidence in a criminal trial."  *Id.*  "We should not conflate legislative findings with 'evidence' in the technical sense."  *Id.*  But, when did we jettison Senator Kennedy's observation and become deferential, if not submissive, to the State when it comes to protecting constitutional rights?

This is federal court.  The Attorney General has submitted two unofficial surveys to prove mass shootings are a problem made worse by firearm magazines holding more

than 10 rounds.  Do the surveys pass the Federal Rule of Evidence Rule 403 test for relevance?  Yes.  Are the surveys admissible under Federal Rule of Evidence Rule 802?  No.  They are double or triple hearsay.  No foundation has been laid.  No authentication attempted.  Are they reliable?  No.  Are they anything more than a selected compilation of news articles – articles which are themselves inadmissible?  No.  Are the compilers likely to be biased?  Yes.[53]

Where are the actual police investigation reports?  The Attorney General, California's top law enforcement officer, has not submitted a single official police report of a shooting.  Instead, the Attorney General relies on news articles and interest group surveys.  Federal Constitutional rights are being subjected to litigation by inference about whether a pistol or a rifle in a news story might have had an ammunition magazine that held more than 10 rounds.  This is not conflating legislative findings with evidence in the technical sense.  This is simply evaluating the empirical robustness of evidence in the same objective way used every day by judges everywhere.  Perhaps this is one more

_____

[53] The organization that published the Mayors' survey changed its name to Everytown for Gun Safety.  Everytown for Gun Safety keeps a running tally of school shootings.  A Washington Post piece noted that "Everytown has long inflated its total by including incidents of gunfire that are not really school shootings."  The Washington Post identified an example of an Everytown shooting incident.  There a 31-year old man committed suicide outside an elementary school that had been closed for seven months.  "There were no teachers.  There were no students."  *See* John Woodward Cox and Steven Rich, *No, There Haven't Been 18 School Shootings in 2018 - That Number is Flat Wrong,* Wash. Post (Feb. 15, 2018) https://www.washingtonpost.com/local/no-there-havent-been-18-school-shooting-in-2018-that-number-is-flat-wrong/2018/02/15/65b6cf72-1264-11e8-8ea1-c1d91fcec3fe_story.html?noredirect=on&utm_term=.4100e2398fa0 (last visited Mar. 26, 2019).

The U.S. Department of Education does no better.  It reported nearly 240 school-related shootings in 2015-2016.  But NPR did an investigation and could confirm only 11 incidents.  *See* Kamenetz, Anya, Arnold, Alexis, and Cardinali, Emily, *The School Shootings That Weren't,* NPR Morning Edition (Aug. 27, 2018), https://www.npr.org/sections/ed/2018/08/27/640323347/the-school-shootings-that-werent (last visited mar. 26, 2019).

1    reason why the Second Amendment has been described as "the Rodney Dangerfield of

2    the Bill of Rights." *Mance v. Sessions*, 896 F.3d 390, 396 (5th Cir. 2018) (Willett, J.,

3    dissenting).  Obeisance to *Heller* and the Second Amendment is offered and then given

4    *Emeritus* status, all while its strength is being sapped from a lack of exercise.

5        According to *Pena*, "[w]e do not substitute our own policy judgment for that of the

6    legislature," protests the Attorney General.  *Pena*, 898 F.3d at 979.  "We owe the

7    legislature's findings deference," says the State.  *Id.*  This case is not about weak-kneed

8    choice between competing policy judgments.  Deference in the sphere of pure political

9    policy is understandable.  But that is not this case.

10       This case is about a muscular constitutional right and whether a state can impinge

11   and imprison its citizens for exercising that right.  This case is about whether a state

12   objective is possibly important enough to justify the impingement.  The problem with

13   according deference to the state legislature in this kind of a case, as in the *Turner*

14   *Broadcasting* approach, is that it is exactly the approach promoted by dissenting Justice

15   Breyer and *rejected* by the Supreme Court's majority in *Heller*.[54]  Yet, *Turner* deference

16   arguments live on like legal zombies lurching through Second Amendment jurisprudence.

17       Even with deference, meaningful review is required.  "Although we do accord

18   substantial deference to the predictive judgments of the legislature when conducting

19   intermediate scrutiny, the State is not thereby insulated from meaningful judicial review."

20

21   _____

22   [54] In his dissent, Justice Breyer made the ultimately-rejected deference argument clear:
23   "There is no cause here to depart from the standard set forth in *Turner,* for the District's
     decision represents the kind of empirically based judgment that legislatures, not courts,
24   are best suited to make.  In fact, deference to legislative judgment seems particularly
25   appropriate here, where the judgment has been made by a local legislature, with
     particular knowledge of local problems and insight into appropriate local solutions.
26   Different localities may seek to solve similar problems in different ways, and a 'city must
27   be allowed a reasonable opportunity to experiment with solutions to admittedly serious
     problems.'"  *District of Columbia v. Heller*, 554 U.S. 570, 704-05 (2008) (Breyer, J.,
28   dissenting) (citations omitted).

*Heller v. District of Columbia*, 670 F.3d 1244, 1259 (D.C. Cir. 2011) (quoting *Turner II*, 520 U.S. at 195 & *Turner I*, 512 U.S. at 666) (internal quotations omitted)).  Quite the contrary, a court must determine whether the legislature has "based its conclusions upon substantial evidence."  *Turner II*, 520 U.S. at 196.  Despite whatever deference is owed, the State still bears the burden "affirmatively [to] establish the reasonable fit we require." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989).  Simply noting that a study has been offered and experts have opined, is an inadequate application of intermediate scrutiny, even when according deference to the predictive judgment of a legislature.  *Turner* itself shows why.  There, the Supreme Court extensively analyzed over the course of *twenty pages* the empirical evidence cited by the government, and only then concluded that the government's policy was grounded on reasonable factual findings supported by evidence that is substantial for a legislative determination."  *See Turner II*, 520 U.S. at 196-224.

There is another problem with according deference in this case.  Strictly put, this case in not solely about legislative judgments because § 32310(c) and (d) are the products of a ballot proposition.  No federal court has deferred to the terms of a state ballot proposition where the proposition trenches on a federal constitutional right:

> As one court stated, no court has accorded legislative deference to ballot drafters.   Legislatures receive deference because they are better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon complex and dynamic issues.  Because the referendum process does not invoke the same type of searching fact finding, a referendum's fact finding does not "justify deference."

*Vivid Entm't, LLC v. Fielding*, 965 F. Supp. 2d 1113, 1127 (C.D. Cal. 2013), *aff'd*, 774 F.3d 566 (9th Cir. 2014) (citations and internal quotations omitted); *see also California Prolife Council Political Action Comm. v. Scully*, 989 F. Supp. 1282, 1299 (E.D. Cal.1998), *aff'd*, 164 F.3d 1189 (9th Cir. 1999) ("Because the referendum process does not invoke the same type of searching fact finding, a referendum's fact finding does not justify deference.").  The initiative process inherently lacks the indicia of careful debate

that would counsel deference.  *Carver v. Nixon*, 72 F.3d 633, 645 (8th Cir. 1995) (process of legislative enactment includes deliberation, compromise and amendment, providing substantial reasons for deference that do not exist with respect to ballot measures); *Yniguez v. Arizonans for Official English,* 69 F.3d 920, 945 (9th Cir. 1995), *vacated on other grounds*, 520 U.S. 43 (1997) (deference normally accorded legislative findings does not apply with same force when First Amendment rights are at stake; in addition, because measure was a ballot initiative, it was not subjected to extensive hearings or considered legislative analysis before passage); *Daggett v. Webster*, No. 98-223-B-H, 1999 WL 33117158, at *1 (D. Me. May 18, 1999) (no court has given legislative deference to a ballot proposition).

In this case, as in *Scully*, California argues that *Turner Broadcasting* requires deference be given to the predictive judgments embodied in its statute.  The *Scully* court rejected the approach.  It reasoned persuasively:

> [T]he deference formulation, however, ignores the context of the quotation which requires federal courts to "accord substantial deference to the predictive judgments of Congress."  Thus, the deference recognized in *Turner* is the consequence, at least in part, of the constitutional delegation of legislative power to a coordinate branch of government, a factor not present in the instant case.  Of course, this is not to say that the predictive judgments of state legislatures are not entitled to due weight.  It would seem odd, however, that this court would be required to give greater deference to the implied predictive judgments of a state's legislation than the state's own courts would.  In this regard, California courts accord deference to the predictive judgments of their legislature on a sliding scale, according significant deference to economic judgments, but employing "greater judicial scrutiny" "when an enactment intrudes upon a constitutional right."  It is of course true that deference in the federal courts is not simply a function of the separation of powers doctrine.  It also rests upon the legislative branch being "better equipped than the judiciary to 'amass and evaluate the vast amounts of data' bearing upon . . . complex and dynamic" issues.  Once again, given that the statutes at bar are the product of the initiative process, their adoption did not enjoy the fact gathering and evaluation process which in part justifies deference.  In any event, the deference federal courts accord legislative predictive judgments "does not mean . . . that they are insulated from meaningful judicial review altogether.  On the contrary, we have stressed in First Amendment cases that the deference

afforded to legislative findings does 'not foreclose our independent judgment of the facts bearing on an issue of constitutional law.'" Thus, courts are obligated to "assure that, in formulating its judgments, Congress has drawn reasonable inferences, based on substantial evidence."

*California Prolife Council Political Action Comm*, 989 F. Supp. at 1299 (citations omitted). The 2016 amendments to § 32310 were added by ballot measure and are owed no legislative deference by this Court. The remaining part of § 32310 is the product of ordinary legislation. Impinging on a federal constitutional right as it does, it is not insulated from meaningful judicial review.

The legislative deference doctrine fits better where the subject is technical and complicated. One example is the regulation of elections. *See Nixon v. Shrink Missouri Gov't PAC*, 528 U.S. 377, 402–03 (2000) ("Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments—at least where that deference does not risk such constitutional evils as, say, permitting incumbents to insulate themselves from effective electoral challenge."). Another is the regulation of public broadcast media. *Columbia Broadcasting System, Inc. v. Democratic National Committee,* 412 U.S. 94, 103 (1973) ("That is not to say we 'defer' to the judgment of the Congress and the Commission on a constitutional question, or that we would hesitate to invoke the Constitution should we determine that the Commission has not fulfilled its task with appropriate sensitivity to the interests in free expression. The point is, rather, that when we face a complex problem with many hard questions and few easy answers we do well to pay careful attention to how the other branches of Government have addressed the same problem."). Even in these areas of deference, federal courts do not swallow whole a state's legislative judgment.

Instead, a court must resolve such a challenge by an analytical process that parallels its work in ordinary litigation. It must first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate. It then must identify and evaluate the precise interests put forward by the State as justifications for the

57

1
2
3

> burden imposed by its rule.  In passing judgment, the Court must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights.

4   *Anderson v. Celebrezze*, 460 U.S. 780, 789–90 (1983).  From broadcasting regulation

5   comes another example of deference.  Even so, deference there does not mean merely

6   observant acquiescence when First Amendment rights are concerned.  "That Congress'

7   predictive judgments are entitled to substantial deference does not mean, however, that

8   they are insulated from meaningful judicial review altogether.  On the contrary, we have

9   stressed in First Amendment cases that the deference afforded to legislative findings does

10  'not foreclose our independent judgment of the facts bearing on an issue of constitutional

11  law.'"  *Sable Communications of Cal., Inc. v. FCC,* 492 U.S. 115, 129 (1989).  Threats to

12  Second Amendment rights ought to be treated with at least the same rigor.

13      The Attorney General argues that the state "must be allowed a reasonable

14  opportunity to experiment with solutions to admittedly serious problems."  This notion

15  was first expressed in *Young v. American Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976).

16  The context was a city zoning choice from a different era about where to permit adult

17  theaters.  Wrote the Court, "[i]t is not our function to appraise the wisdom of its decision

18  to require adult theaters to be separated rather than concentrated in the same areas."  *Id.*

19  "Since what is ultimately at stake is nothing more than a limitation on the place where

20  adult films may be exhibited" and "few of us would march our sons and daughters off to

21  war to preserve the citizen's right to see 'Specified Sexual Activities' exhibited in the

22  theaters of our choice," the Court accorded the city authority to experiment.  *Id.*  That is

23  not comparable to the deadly serious question of whether the state may experiment with a

24  low 10-round limit on the number of shots a person may have in her pistol for protection.

25  In any event, should courts be so deferential when the State chooses to experiment with

26  other constitutionally protected rights?

27      The notion of permitting a city to experiment with zoning decisions about the

28  unwanted secondary effects of adult commercial enterprises, was repeated in *City of*

*Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52 (1986), and echoed in *Jackson v. City and County of San Francisco*, 746 F.3d 953, 969 (9th Cir. 2014) (approving a city ban on sales of hollow point ammunition). *Jackson* was a Second Amendment case that reasoned that a city prohibition affected "only the sale of hollow-point ammunition within San Francisco, not the use or possession of such bullets" and concluded, "[s]uch a sales prohibition burdens the core right of keeping firearms for self-defense only indirectly, because Jackson is not precluded from using the hollow-point bullets in her home if she purchases such ammunition outside of San Francisco's jurisdiction." The *Jackson* hollow-point ordinance is far different than California's § 32310. Under § 32310, no person may use a magazine holding more than 10-rounds for self-defense in her home even if she purchases it outside of the state. Instead, she will become a criminal subject to arrest, prosecution, conviction, and incarceration. This kind of government experimentation, the Second Amendment flatly prohibits.

No case has held that intermediate scrutiny would permit a state to impinge even slightly on the Second Amendment right by employing a known failed experiment. Congress tried for a decade the nationwide experiment of prohibiting large capacity magazines. It failed. California has continued the failed experiment for another decade and now suggests that it may continue to do so *ad infinitum* without demonstrating success. That makes no sense.

### iv.  the important interests of the State

The state has important interests. Public safety. Preventing gun violence. Keeping our police safe. At this level of generality, these interests can justify any law and virtually any restriction. Imagine the crimes that could be solved without the Fourth Amendment. The state could search for evidence of a crime anywhere on a whim. Without the First Amendment, the state could better police the internet. The state could protect its citizens from child pornography, sex trafficking, and radical terrorists. The state could limit internet use by its law-abiding citizens to, say, 10 hours a day or 10 websites a day. Perhaps it could put an end to Facebook cyberbullying.

The Attorney General articulates four important objectives to justify this new statutory bludgeon. They all swing at reducing "gun violence." The bludgeon swings to knock large capacity magazines out of the hands of criminals. If the bludgeon does not work, then the criminals still clinging to their large capacity magazines will be thrown in jail while the magazines are destroyed as a public nuisance. The problem is the bludgeon indiscriminately hammers all that is in its path. Here, it also hammers magazines out of the hands of long time law-abiding citizens. It hammers the 15–round magazine as well as the 100–round drum. And it throws the law-abiding, self-defending citizen who continues to possess a magazine able to hold more than 10 rounds into the same jail cell as the criminal. Gun violence to carry out crime is horrendous and should be condemned by all and punished harshly. Defensive gun violence may be the only way a law-abiding citizen can avoid becoming a victim. The right to keep and bear arms is not the only constitutional right that has controversial public safety implications. All of the constitutional provisions that impose restrictions on law enforcement and on the prosecution of crimes fall into the same category. *McDonald v. City of Chicago, Ill.*, 561 U.S. 742, 783 (2010).

### v. an ungainly "fit"

"[T]he next question in our intermediate scrutiny analysis is whether the law is 'narrowly tailored to further that substantial government interest.' . . . As the Supreme Court succinctly noted in a commercial speech case, narrow tailoring requires 'a fit between the legislature's ends and the means chosen to accomplish those ends.'" *Minority Television Project, Inc. v. F.C.C.*, 736 F.3d 1192, 1204 (9th Cir. 2013) (*quoting Bd. of Tr. of the State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989)).

The "fit" of § 32310 is, at best, ungainly and very loose. That is all that it takes to conclude that the statute is unconstitutional. The fit is like that of a father's long raincoat on a little girl for Halloween. The problem of mass shootings is very small. The state's "solution" is a triple extra-large and its untailored drape covers all the law-abiding and responsible of its 39 million citizens. Some of the exceptions make the "fit" even worse.

For example, § 32310 makes an exception for retired peace officers, but not for CCW holders or honorably discharged members of the armed forces.  There is no evidence that a retired peace officer has better firearms training.[55]  And in any event, for whatever training they receive, does it matter that they are trained to use a 10-round magazine, a 15-round magazine, a 30-round magazine, and if so, what is the difference?  The State does not provide any insight.  Another example is the exception for movie props.  Why in the interest of public safety does the movie industry need to use a genuine large capacity magazine for a prop?  Is it too far-fetched to require the Hollywood creators of Mickey Mouse, Jaws, and Star Wars, to use a non-working magazine in place of a genuine large capacity magazine?  Most importantly by far, however, is that the cloak of the law needs at least some arm holes to fit.  It has none because it ignores the fact that magazines holding more than 10 rounds are commonly possessed by law-abiding, responsible citizens, and it affords no room for these citizens to defend their homes against attack.

A reasonable fit to protect citizens and law enforcement from gun violence and crime, in a state with numerous military bases and service men and service women, would surely permit the honorably discharged member of the U.S. Armed Forces who has lawfully maintained a magazine holding more than 10 rounds for more than twenty years to continue to keep and use his or her magazine.  These citizens are perhaps the best among us.  They have volunteered to serve and have served and sacrificed to protect our country.  They have been specially trained to expertly use firearms in a conflict.  They have proven their good citizenship by years of lawfully keeping firearms as civilians.

---

[55] A similar exception for retired police officers permitting possession and use of otherwise banned assault weapons in California, was declared unconstitutional in *Silveira v. Lockyer*, 312 F.3d 1052, 1091 (9th Cir. 2002) ("We thus can discern no legitimate state interest in permitting retired peace officers to possess and use for their personal pleasure military-style weapons.  Rather, the retired officer's exception arbitrarily and unreasonably affords a privilege to one group of individuals that is denied to others, including plaintiffs.").

What possibly better citizen candidates to protect the public against violent gun-toting criminals.

Similarly, a reasonable fit  would surely make an exception for a Department of Justice-vetted, privately-trained, citizen to whom the local sheriff has granted a permit to carry a concealed weapon, and who owns a weapon with a magazine holding more than 10 rounds.  California's statute does not except such proven, law-abiding, trustworthy, gun-owning individuals.  Quite the opposite.  Under the statute, all these individuals will be subject to criminal prosecution, should they not dispossess themselves of magazines holding more than 10 rounds.

Ten years of a federal ban on large-capacity magazines did not stop mass shootings nationally.  Twenty years of a California ban on large capacity magazines have not stopped mass shootings in California.  Section 32310 is a failed policy experiment that has not achieved its goal.  But it has daily trenched on the federal Constitutional right of self-defense for millions of its citizens.  On the full record presented by the Attorney General, and evidence upon which there is no genuine issue, whatever the fit might be, it is not a reasonable fit.

### *vi. irony*

Perhaps the irony of § 32310 escapes notice.  The reason for the adoption of the Second Amendment was to protect the citizens of the new nation from the power of an oppressive state.  The anti-federalists were worried about the risk of oppression by a standing army.  The colonies had witnessed the standing army of England marching through Lexington to Concord, Massachusetts, on a mission to seize the arms and gunpowder of the militia and the Minutemen—an attack that ignited the Revolutionary war.  With Colonists still hurting from the wounds of war, the Second Amendment guaranteed the rights of new American citizens to protect themselves from oppressors foreign and domestic.  So, now it is ironic that the State whittles away at the right of its citizens to defend themselves from the possible oppression of their State.

### vii.  turning the Constitution upside down

In the year 2000, California started its "experiment" in banning magazines holding more than 10-rounds.  The statute included a grandfather clause permitting lawful owners of larger magazines to keep them.  *See Senate Committee Rpt (Perata) SB 23 (Mar. 1999)*, ("The purpose of this bill is to make all but the possession of 'large-capacity magazines' a crime punishable as an alternative misdemeanor/felony ('wobbler')"; "The bill would make it a crime to do anything with detachable large capacity magazines after January 1, 2000 – except possess and personally use them – punishable as a misdemeanor/felony."; "One could still possess those magazines after January 1, 2000.").[56]  Relying at least in part on the State's representation, law-abiding citizens did not object.  Time passed.  Now, these still law-abiding owners of larger magazines are told that the grandfather clause is a dangerous "loophole" that needs closing.   Section 2.12 of Proposition 63 declared, "Today, California law prohibits the manufacture, importation and sale of military-style, large capacity ammunition magazines, but does not prohibit the general public from possessing them.  *We should close that loophole.*  No one except trained law enforcement should be able to possess these dangerous ammunition magazines."  (Emphasis added.)   Plaintiffs who have kept their own larger capacity magazines since 1999, and now face criminal sanctions for continuing to possess them, no doubt feel they have been misled or tricked by their lawmakers.

The Attorney General explains that the grandfathering provision made the prior version of § 32310 very difficult to enforce.  Because large capacity magazines lack identifying marks, law enforcement officers are not able to tell the difference between grandfathered magazines and more recently smuggled, or manufactured, illegal

---

[56] http://leginfo.legislature.ca.gov/faces/billAnalysisClient.xhtml (last visited March 12, 2019).

magazines.[57]  Consequently, explains the Attorney General, "the possession loophole in Section 32310 undermined existing LCM restrictions."  Def.'s Oppo. to Ps' MSJ, at 7.  In an analogous First Amendment case, the Supreme Court called this approach turning the Constitution upside down. The Court explained:

> We confronted a similar issue in *Ashcroft v. Free Speech Coalition,* 535 U.S. 234 (2002), in which the Government argued that virtual images of child pornography were difficult to distinguish from real images.  The Government's solution was "to prohibit both kinds of images."  We rejected the argument that "protected speech may be banned as a means to ban unprotected speech," concluding that it "turns the First Amendment upside down."  As we explained: "The Government may not suppress lawful speech as the means to suppress unlawful speech.  Protected speech does not become unprotected merely because it resembles the latter.  The Constitution requires the reverse."

*Federal Election Comm'n v. Wisconsin Right to Life, Inc.*, 551 U.S. 449, 474–75 (2007) (finding issues advocacy may not be suppressed even though it is sometimes difficult to distinguish it from advocacy for the election or defeat of a candidate which may be regulated).  The analog is that the State may not now ban lawfully-kept large capacity magazines owned since 1999 as a means to ban large capacity magazines unlawfully manufactured or imported after January 1, 2000.  Lawful arms do not become unprotected merely because they resemble unlawful arms.  "The Government's proposed prophylaxis – to protect against the violations of the few, we must burden the constitutional rights of the many – turns the Second Amendment on its head.  Our Founders crafted a Constitution to promote the liberty of the individual, not the convenience of the Government."  *Mance v. Sessions*, 896 F.3d 390, 405 (5th Cir. 2018) (Ho, J., dissenting from denial of rehearing en banc), *pet'n for cert. filed* (Nov. 21, 2018).

---

[57] California could have addressed this concern by requiring a serial number on manufactured or imported large capacity magazines, as did the federal law.  *See e.g.,* 27 C.F.R. § 478.92(c)(1) ("Each person who manufactures or imports any large capacity ammunition feeding device manufactured after September 13, 1994, shall legibly identify each such device with a serial number.").

### viii. other arguments

### (1). uniquely dangerous?

The State argues that magazines able to hold more than 10 rounds are uniquely dangerous because they enable a shooter to fire more rounds in a given period, resulting in more shots fired, more victims wounded, more wounds per victim, and more fatalities. Actually, many larger capacity magazines are not uniquely dangerous because they are not much larger. For example, a 12 or 15-round magazine is commonly owned and only slightly larger than the permitted 10-round magazines and enables a shooter to fire slightly more rounds, resulting only sometimes in slightly more rounds fired, or slightly more victims wounded, or slightly more wounds per victim, or slightly more fatalities. Conversely, a 12 or 15-round magazine may be the slight, but saving, difference needed for an overwhelmed homeowner trying to protect herself from a group of attacking invaders. The State may be correct that a 100-round magazine is uniquely dangerous.

The State relies on expert witness, Professor Louis Klarevas. Professor Klarevas says that banning large capacity magazines will reduce violence and force shooters to take a critical pause. *See* DX-3. However, in a piece by Professor Klarevas dated 2011, he offers that the Tucson shooting would have likely still happened with a ban on high capacity magazines. He wrote, "But, even if . . . the federal government were to ban extended clips, the sad fact is that the Tucson shooting likely still would have happened . . . . Moreover, even if Loughner showed up with a six-bullet revolver as opposed to a 30-round Glock, he likely still would have shot people. What's more, a person set on inflicting mass casualties will get around any clip prohibitions by having additional clips on his person (as Loughner did anyway) or by carrying more than one fully loaded weapon."[58]

---

[58] Klarevas, Louis, *Closing the Gap*, The New Republic (Jan. 13, 2011), https://newrepublic.com/article/81410/us-gun-law-reform-tucson (las visited May 1, 2018).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### (2.)  Kolbe v. Hogan

The State rests much of its argument on the decision in *Kolbe v. Hogan*, 849 F.3d 114, 137 (4th Cir. 2017) (en banc), *cert. denied,* 138 S. Ct. 469 (2017).  The State cites *Kolbe's* observation that large capacity magazines enable a shooter to hit "multiple human targets very rapidly" and "contribute to the unique function of any assault weapon to deliver extraordinary firepower."  Considering this, *Kolbe* found that assault weapons and large capacity magazines are military weapons, and that military weapons are not protected by the Second Amendment.  It is interesting to note, that the Maryland statute at issue in that case did not ban the possession of a large capacity magazine.  *Id.* at 123 ("The [Firearm Safety Act] does not ban the possession of a large-capacity magazine.").

*Kolbe* concluded that large capacity magazines were beyond the protection of the Second Amendment.  *Id.* at 137.  The court reached that conclusion based on the thought that such magazines are "most useful" in military service.  *Id.*  That large capacity magazines are useful in military service, there is no doubt.  But the fact that they may be useful, or even "most useful," for military purposes does not nullify their usefulness for law-abiding responsible citizens.  It is the fact that they are commonly-possessed by these citizens for lawful purposes that places them directly beneath the umbrella of the Second Amendment.  *Kolbe*'s decision that large capacity magazines are outside the ambit of the Second Amendment is an outlier and unpersuasive.  Beyond this, this Court is unpersuaded by *Kolbe*'s interpretation of *Miller* finding that weapons most useful for military service are not protected.  The dissenting *Kolbe* judges persuasively pointed out that the approach turns Supreme Court precedent upside down.  *Id.* at 156-57 (Traxler, Niemeyer, Shedd, and Agee, Js., dissenting) ("Under [that] analysis, a settler's musket, the only weapon he would likely own and bring to militia service, would be most useful in military service—undoubtedly a weapon of war—and therefore not protected by the Second Amendment.  This analysis turns *Heller* on its head.").

### (3.)  Dr. Christopher S. Koper

The State relies on an expert, Dr. Christopher S. Koper.[59]  Dr. Koper, in turn, relies in part on an analysis performed by a graduate student.  DX-4 at 131.  The graduate student, in turn, relies on a collection of data by Mother Jones Magazine from 1982 through 2012.  *Id.*  The resulting master's thesis is unpublished and unavailable.  *Id.* at n.12.  Dr. Koper also relies on studies in localities outside of California from the 1990s for which he notes that the "findings may not generalize well to other locations and the current timeframe."  *Id.* at n. 14.  He describes some of this evidence as "tentative."  *Id.* at 133.  Dr. Koper concedes that he knows of no studies on the effects on gun violence of California's ban on assault weapons in 1989 and the ban on larger magazines in 2000.  *Id.* at n. 15.  He notes that "it is difficult to assess trends in LCM use because of limited information."  *Id.* at 137.  Specifically, Dr. Koper notes the paucity of solid data on the

--------------------------

[59] The Attorney General relies on expert reports of Christopher S. Koper, Lucy Allen, John J. Donohue, Louis Klarevas, and Daniel W. Webster.  Each of the reports lacks an authenticating declaration.  Under Rule 56(c)(4), "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Each of these expert reports fail to comply in several respects.  First, the reports are not signed under penalty of perjury.  Second, no person certifies that the statements are true and correct.  Third, none of the reports are accompanied by any separate sworn declaration, an alternative mechanism that courts have found to satisfy Rule 56(c)'s functional concerns.  *See, e.g., Am. Federation of Musicians of United States and Canada v. Paramount Pictures Corp.*, 2017 WL 4290742 (9th Cir. Sep. 10, 2018) (finding an unsworn expert report accompanied by the expert's sworn declaration satisfied the functional concerns behind Rule 56(c)(4)).

The Court has reviewed other courts' decisions on similar facts and concludes that these unsworn expert reports do not qualify for an exception, particularly because of those courts that accepted unsworn expert reports the reports otherwise satisfied Rule 56(c)'s requirements.  For example, in *Single Chip Systems Corp. v. Intermec IP Corp.*, 2006 WL 4660129 (S.D. Cal. Nov. 6, 2006), the district court admitted unsworn expert reports where the reports stated in their introductions "that the contents were made on personal knowledge, that the facts would be admissible in evidence, and that the affiants [we]re competent to testify to the information contained herein."  *Id.* at *6.

1   use of large capacity magazines.  He explains, "[a]ssessing trends in LCM use is much

2   more difficult because there was, and is, no national data source on crimes with LCMs,

3   and few local jurisdictions maintain this sort of information." *Id.* at 139.  He notes,

4   "there is little evidence on how state LCM bans affect the availability and use of LCMs

5   over time." *Id.* at n. 29.  He states, "[p]erhaps most importantly, to the best of my

6   knowledge, there have not been any studies examining the effects of LCM laws that ban

7   LCMs without grandfathering, as done by the new California statute.  Hence, these

8   studies have limited value in assessing the potential effectiveness of California's new

9   law." *Id.*  Finally, Dr. Koper acknowledges that while he does have an opinion, it is *not*

10  based on a study of § 32310.  He explains, "I have not undertaken any study or analysis

11  of this law." *Id.* at 146.

12                      **(4.)  Daniel W. Webster**

13          The State also relies on the expert report of Daniel W. Webster, a professor of

14  health policy and management. *See* DX-18 at 775.  Professor Webster also has an

15  opinion, but foundational data is vaporous.  For example, Webster notes that,

16  "[u]nfortunately, data to more definitively determine the connections between

17  ammunition capacity and gun violence outcomes—the number of shots fired, the rate of

18  fire, the number of victims, the number of wounds per victims, lethality of woundings—

19  have not been collected in any population." *Id.* at 780-81.  For his own analysis, Webster

20  relies, in part, on Dr. Koper's re-analysis, of his graduate student's analysis, of Mother

21  Jones Magazine's collection of shooting incidents. *Id*. at 780 ("Similarly, Professor

22  Christopher Koper's re-analysis of his student's data from Mother Jones magazine's

23  study of public mass murders with firearm. . . .").  Webster also acknowledges the

24  paucity of data-based analysis regarding mass shootings.  He admits, "[a]lthough no

25  formal, sophisticated analyses of the data on mass shootings in public places by lone

26  shooters for the period 1982-2012 collected by Mother Jones magazine has been

27  performed to my knowledge, a temporal pattern can be discerned that is consistent with a

28  hypothesized protective effect of the federal assault weapon and LCM ban and a harmful

effect of the expiration of that ban." *Id.* at 787-88.  He also says, "[t]o date, there are no studies that have examined separately the effects of an assault weapons ban, on the one hand, and a LCM ban, on the other hand . . . ." *Id.* at 790.  Webster opines that a magazine limit lower than 10 rounds could be justified. *Id.* at 791.

### (5.) John J. Donohue

The State also relies on the expert report of John J. Donohue, a professor of law at Stanford Law School. *See* DX-2.  According to his report in this case, he also prepared an expert report in the *Fyock* case. *Id.* at ¶ 6.  Some of his observations should be discounted.  Professor Donohue reports that national surveys "consistently find a persistent decline in household gun ownership," describing a 2013 report from the Pew Research Center. *Id.* at ¶ 14 and n.5.  He describes this as reliable social science data. *Id.* at ¶ 15.  The Court reviewed the Pew Research piece he cited.  The first sentence notes the absence of definitive data, cautioning that, "[t]here is no definitive data source from the government or elsewhere" on gun ownership rates.[60] It says that surveys provide conflicting results.  In the paragraph directly following the portion quoted in Professor Donohue's expert report, the Pew Research report describes a Gallup Organization survey.  That survey concludes not that there has been a persistent decline, but rather that the gun ownership rate of 43% is "the same as it was 40 years earlier."[61]

Professor Donohue also opines that private individuals, unlike police officers, "only need to scare off criminals (or hold them off until the police arrive)." *Id.* at ¶ 21.  This is obviously a generalization.  The generalization would not have been true for Susan Gonzalez or the mother of twins whose assailants were not scared off despite each victim emptying her gun. *See* n.2 & 4, *supra*.  Instead of "holding them off till the police

---

[60] Pew Research Center, *Why Own a Gun? Protection is Now Top Reason, Section 3: Gun Ownership trends and Demographics* (Mar. 12, 2013) http://www.people-press.org/2013/03/12/section-3-gun-ownership-trends-and-demographics (last visited Apr. 30, 2018), at 1.
[61] *Id.* at 2.

arrived," the only assailants remaining at the scene when the police arrived in any of the three incidents described above was a fatally-wounded assailant.  Professor Donohue again generalizes in his conclusion opining that a 10-round magazine "is sufficient" and higher capacity magazines are "not required"  for defending one's home.  Dx-2 at 9. Again, generalizations like these are no more than generalizations, and personal, not expert, opinions.  Yet, for such an important context as the defense of self and loved ones, generalizations are dangerous.  Relying on generalizations like these may lead to a thousand underreported tragedies for law-abiding citizen victims who were supposed to need only 2.2 rounds and no more than 10 rounds to scare off criminal assailants.

### (6.)  Carlisle Moody

The State provides the deposition testimony of Carlisle Moody, a professor, who opines that, "[f]irearms fitted with large capacity magazines can be used to cause death and injury in public shooting incidents, and can also result in more rounds fired and more homicides in general than similar firearms with smaller magazines," but concedes this conclusion is simply theoretical.  DX-7 at 472-73 (Q.  And what is the basis for that statement?  How did you arrive at that conclusion?  A.  Just theoretically.").  Furthermore, the same can be said of a 10-round magazine versus a 7-round magazine, or a 7-round magazine versus a 2-round Derringer.

### (7.)  Sandy Hook commission

The State relies on the report of a commission reviewing the Sandy Hook shooting. DX-28.  However, it misquotes the commission's findings, saying "[d]ue to their lethality, LCMs 'pose a distinct threat to safety in private settings as well as places of assembly."  Def. Opposition to Plaintiff's Motion for Summary Judgment at 11.  What was reported is, "[t]he Commission found that certain types of ammunition and magazines that were readily available at the time it issued its Interim Report posed a distinct threat to safety in private settings as well as in places of assembly."  *Id.* at 1097. The commission goes on to recommend a ban on armor-piercing and incendiary bullets (a good idea) as well as large-capacity magazines (without specifying size).  *Id.*

**(8.)  large magazines not characteristically used for home?**

The State asserts that large capacity magazines are not "weapons of the type characteristically used to protect the home," citing *Hightower v. City of Boston*, 693 F.3d 61, 71 (1st Cir. 2012).  *Hightower* was unconcerned with magazine size.  Instead, it was a regulatory challenge brought by a former law enforcement officer whose permit to carry a revolver was revoked.  Any inference to be drawn about magazines from the one-half sentence quoted is dicta.  There is no convincing evidence that magazines holding more than 10 rounds are not characteristically used to protect one's home.  The large numbers in circulation and human nature suggests otherwise.  "The right to bear arms enables one to possess not only the means to defend oneself but also the self-confidence—and psychic comfort—that comes with knowing one could protect oneself if necessary." *Grace v. District of Columbia*, 187 F.Supp.3d 124, 150 (D.D.C. 2016).

**(9.)  large magazines cause collateral damage?**

The State argues that where a larger capacity magazine-equipped firearm is used in lawful self-defense, the magazines can cause collateral damage and injury when civilians fire more rounds than necessary, thereby endangering themselves and bystanders.  Yet, one of the State's experts, Lucy P. Allen, opines that defenders average only 2.3 shots per defensive incident and that no one has shot more than 10 rounds in defense.[62]  This implies that on average, a magazine able to hold more than 10 rounds in the hands of a citizen firing in self-defense, will not cause any additional collateral damage and will not increase any danger to themselves or bystanders.  State expert John J. Donahue goes farther and opines that private individuals only need to "brandish" a gun to scare off criminals.  So, the notion that a stray round may penetrate a wall does not translate into

---

[62] Gary Kleck testified that no one has researched the question of whether defensive gun use requires more than 10 rounds.  Nevertheless, violent crimes where victims face multiple offenders are commonplace and it requires more than one round to shoot one attacker.  DX-8 at 490.

any greater risk of bystander injury when a large capacity magazine is used by a defender since it will likely be used only for brandishing or for the average 2.3 shots. Even safer may be a large capacity magazine on an AR-15 type of rifle as it is likely to be more persuasive when brandished at criminal assailants than would a five-shot revolver. It is worth noting that in evaluating the strength of the government's fear of bystander injury, the State has not identified one incident where a bystander was hurt from a citizen's defensive gun use, much less a defensive use of a gun with a high capacity magazine. The worrisome scenario is improbable and hypothetical.

### (10.) mass shooters prefer large magazines?

The State argues that mass shooters often use large capacity magazines precisely because they inflict maximum damage on as many people as possible. Perhaps this is true. There are no police investigative reports provided recounting a mass shooter's answer to the question: why select a large-capacity magazine. More importantly, many mass shooters do not select large capacity magazines, at all. The two incidents involving mass shootings at public high schools in 2018 are good examples. Instead of a pistol or rifle and large-capacity magazines, a shotgun and a revolver were the firearms selected by the mass shooter during the 2018 incident at Santa Fe High School in Galveston, Texas.[63] Also rejecting large capacity magazines last year, the shooter in the Parkland, Florida, high school mass shooting carried 150 rounds in 10-round magazines.[64]

Further undercutting the government's fear is the opinion of expert Gary Kleck, who says that mass shooters who do choose a high capacity magazine are mistaken in

---

[63] https://www.usatoday.com/story/news/2018/05/19/texas-school-shooting-timeline-how-30-minute-attack-unfolded/625913002/ (last visited Mar. 13, 2019).

[64] McCardle, Mairead, *Report: Parkland Shooter Did Not Use High-Capacity Magazines*, National Review (Mar. 1, 2018) https://www.nationalreview.com/2018/03/report-parkland-shooter-did-not-use-high-capacity-magazines/ (last visited Mar. 22, 2019) ("The 19-year-old school shooter who killed 17 in Florida on Valentine's Day had 150 rounds of ammunition in 10-round magazines. Larger ones would not fit in his bag, Florida state senator Lauren Book revealed.").

thinking it will enable them to cause more harm. "Right. They can do everything that that mass shooter might want to do if they had 10-round magazines rather than 30-round magazines. There's a difference between hypothetical potential and the reality of mass shootings . . ." DX-8 at 492.

### (11.) disproportionately used against police?

The State argues that large-capacity magazines are disproportionately used against police, citing an undated, unsigned, document created by an organization named the Violence Policy Center (DX-20 at 799-807). Def. Opposition to Plaintiff's Motion for Summary Judgment, at 18. The document says nothing about violence against police. Elsewhere, the State itself notes that between 2009 and 2013, large-capacity magazine firearms constituted less than half of the guns used in murders against police (41%). See DX-4 at 143. In the FBI's 2016 report on law enforcement officers killed and assaulted, the average number of rounds fired by a criminal at a police officer was 9.1. Since 2007, the average number of rounds fired has never exceeded 10, and for seven of the years the average was under 7.[65] In other words, regardless of the magazine size used by a criminal shooting at a police officer, the average number of rounds fired is 10 or less, suggesting that criminalizing possession of a magazine holding more than 10 will have no effect (on average).

The statistical average of 9.1 rounds fired is consistent with a declaration of Phan Ngo, Director of the Sunnyvale Department of Public Safety. In his declaration, Ngo states that as a Deputy Chief at the San Jose Police Department he oversaw a 2016 shooting of a police officer. He stated that "the suspect fired 9 rounds at the officers,

---

[65] FBI 2016 Law Enforcement Officers Killed & Assaulted, at Table 18, https://ucr.fbi.gov/leoka/2016/tables/table-18.xls (last visited Mar. 19, 2019). Under Rules of Evidence 201(b) courts may take judicial notice of some types of public records, including reports of administrative bodies.

with an AR pistol type, semi-automatic weapon."[66]  Ngo goes on to state that "also recovered at the scene was a Mag Pro 30 clip (large capacity magazine) that still had 21 [] rounds in the clip."[67]  Fortunately, none of the officers were injured.

### (12.)  the critical "pause"

The State argues that smaller magazines create a "critical pause" in the shooting of a mass killer.  "The prohibition of LCMs helps create a "critical pause" that has been proven to give victims an opportunity to hide, escape, or disable a shooter."  Def. Oppo., at 19.  This may be the case for attackers.  On the other hand, from the perspective of a victim trying to defend her home and family, the time required to re-load a pistol after the tenth shot might be called a "lethal pause," as it typically takes a victim much longer to re-load (if they can do it at all) than a perpetrator planning an attack.  In other words, the re-loading "pause" the State seeks in hopes of stopping a mass shooter, also tends to create an even more dangerous time for every victim who must try to defend herself with a small-capacity magazine. The need to re-load and the lengthy pause that comes with banning all but small-capacity magazines is especially unforgiving for victims who are disabled, or who have arthritis, or who are trying to hold a phone in their off-hand while attempting to call for police help.  The good that a re-loading pause might do in the extremely rare mass shooting incident is vastly outweighed by the harm visited on manifold law-abiding, citizen-victims who must also pause while under attack.  This blanket ban without any tailoring to these types of needs goes to show § 32310's lack of reasonable fit.

---

[66] Declaration of Chief  Phan Ngo, in support of Amici Curiae the City and County of San Francisco, the City of Los Angeles, and the City of Sunnyvale, at para. 7, filed Oct. 19, 2017, in *Duncan v. Becerra*, Ninth Circuit Appeal No 17-56081 (docket 29).
[67] *Id.*

### (13.)  *Turner's* requirement

Lastly, the State argues that it is not required to prove that § 32310 will eliminate or reduce gun violence or mass shootings, or that there is scientific consensus as to the optimal way to reduce the dangerous impact of large-capacity magazines, or that § 32310 will not be circumvented by criminals.  All that must be shown, it contends, is that the State "has drawn reasonable inferences based on substantial evidence," citing *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 666 (1994).  Def. Oppo., at n. 14.

Even *Turner* does not expect a judicial milquetoast naivete, but a muscular "meaningful review" and independent judgment of the facts.  Remember, the *Turner* Court returned the case to the district court because of an inadequate record.  *E.g., id.* at 667-68 ("The paucity of evidence . . . is not the only deficiency in this record.  Also lacking are any findings concerning the actual effects . . . [and] the record fails to provide any judicial findings concerning the availability and efficacy of 'constitutionally acceptable less restrictive means' of achieving the Government's asserted interests."); *id.* at 673 (Blackmun, J., concurring) ("Justice Kennedy asks the three-judge panel to take additional evidence on such matters as whether the must-carry provisions really respond to threatened harms to broadcasters [and] whether §§ 4–5 'will in fact alleviate these harms in a direct and material way.'").  Congress had set out numerous "unusually detailed statutory findings" within the Act being reviewed.  *Id.* at 646.  These "legislative facts" were the product of three years of congressional hearings.  *Id.* at 632.  It was in this unusual context in which the Court said that the predictive judgments of Congress are entitled to substantial deference.

No similar unusually detailed congressional findings or predictive judgments after years of hearings are present in the case of California Penal Code § 32310.  On the contrary, the 2016 criminalization and dispossession amendments added in § 32310 (c) and (d) were not the product of legislative action, at all.  These were, instead, the product of a complicated state referendum question known as Proposition 63.  *Cf. Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 994–95 (N.D. Cal. 2010), *aff'd sub nom. Perry v.*

75

*Brown*, 671 F.3d 1052 (9th Cir. 2012), and *aff'd sub nom. Perry v. Brown*, 671 F.3d 1052 (9th Cir. 2012) ("That the majority of California voters supported Proposition 8 is irrelevant, as 'fundamental rights may not be submitted to a vote; they depend on the outcome of no elections.'").  To the extent one could argue that federal courts owe some judicial deference to the judgment of a state legislature (as opposed to deference to a co-equal branch of the U.S. Congress), in passing the longer-standing part of § 32310, the 1999 California legislature was more concerned with defining assault weapons and judged the possession of a large capacity magazine should remain lawful.

### (14.) *Turner*-style deference rejected in *Heller*

*Turner*-style deference for Second Amendment review was specifically argued for by Justice Breyer and rejected by the Court in *Heller*.  *See e.g., Heller v. D.C.*, 670 F.3d 1244, 1280 (D.C. Cir. 2011) (Kavanaugh, J., dissenting) ("It is ironic, moreover, that Justice Breyer's dissent explicitly advocated an approach based on *Turner Broadcasting*; that the *Heller* majority flatly rejected that *Turner Broadcasting*-based approach; and that the majority opinion here nonetheless turns around and relies expressly and repeatedly on *Turner Broadcasting*.").

### (15.)  even *Turner* requires tailoring for a reasonable fit

Even under *Turner*'s intermediate scrutiny, a reasonable fit requires tailoring, and a broad prophylactic ban on acquisition or possession of all magazines holding more than 10 rounds for all ordinary, law-biding, responsible citizens is not tailored at all.  *Turner*, 512 U.S. at 682–83 (O'Connor, J., concurring in part and dissenting in part) ("A regulation is not 'narrowly tailored'—even under the more lenient [standard applicable to content-neutral restrictions]—where . . . a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals. . . . "Broad prophylactic rules in the area of free expression are suspect.  Precision of regulation must be the touchstone . . . .").  The State notes that Vermont enacted a recent prohibition on magazines holding more than 10 rounds for rifles or 15 rounds for a handgun.  Def.'s Response to Plaintiffs' Supp. Brief, at n. 2.  Vermont's regulation evidences more

tailoring than does § 32310 and makes room for a home owner to have 15 rounds (50% more) for defense.

### (16.) "10" appears to be an arbitrary number

So, how did California arrive at the notion that any firearm magazine size greater than a 10-round magazine is unacceptable?  It appears to be an arbitrary judgment.  The Attorney General says it is not.  Def's Response to Plaintiffs' Supp. Brief, at 9.  He notes that other large-capacity magazine bans and the former federal ban settled on 10 rounds.  The State does not, however, say why California (or any jurisdiction, for that matter) place the limit at 10.  One author surmised from a comparison, that California lawmakers simply "borrowed the large-capacity magazine ban from the federal moratorium."  Stricker, Brent W., *Gun Control 2000: Reducing the Firepower*, 31 McGeorge L. Rev. 293, 301.  The State notes a 10-round limit was included in its firing-capacity legislation prohibiting machine guns in 1933.  The significance of 10 rounds, however, is not addressed.  Larger magazines were not commonplace in 1933.  By 1999, when California first banned the sale, manufacturing, and importation of magazines able to hold more than 10-rounds (in former § 12020(a)(2)), larger magazines numbered in the millions.

While the State's more recent legislation imposing a ban on magazines able to hold more than 10 rounds (§32310(b), 2016 Cal. Legis. Serv. Ch. 58 (S.B. 1446) (WEST)) was superseded by Proposition 63's passage, the Attorney General does not identify any of the legislative discussions bearing on the 10-round limit.  The 1994 federal ban with its 10-round limit lapsed in 2004.  Federal law has no limit on permissible magazine size.  In U.S. Sentencing Guidelines for firearm offenses (§2K2.1(a)) and the comments thereunder, a "large capacity magazine" is defined for purposes of sentencing as a magazine "that could accept more than 15 rounds of ammunition."  *See* § 2K2.1 comment n.2 (2018); *United States v. Cherry*, 855 F.3d 813, 815 (7th Cir. 2017) (describing same); *United States v. Henry*, 819 F.3d 856, 867 (6th Cir. 2016) (same).

 The State argues only that it is not required to explain why it has selected 10 as the number.  Def's Response to Plaintiffs' Supp. Brief, at 9-10.  Perhaps not.  But the 10-

round limit appears to be arbitrary.  A reasoned explanation or a considered judgment would tend to demonstrate why the "fit" of a total ban on magazines larger than 10-rounds is reasonable or how the ban is narrowly tailored.  Perhaps it is an unintentional legacy from the 1930s when generally larger detachable magazines were rare, our military's popular WW I Colt .45 M1911 pistol held a magazine holding 7-8 rounds, and otherwise 5 or 6 shot revolvers ruled.  Surly, *Turner* deference does not mean a federal court is relegated to rubber-stamping a broad-based arbitrary incursion on a constitutional right founded on speculative line-drawing and without any sign of tailoring for fit.

### (17.)  *Fyock v. Sunnyvale*

So, what about the *Fyock* decision.  *Fyock*, like the Ninth Circuit decision in this case, are both appeals from preliminary injunction requests.  Preliminary injunction appeals are reviewed narrowly.  *Compare Fyock,* 779 F.3d at 995 ("As we have previously noted, there are limitations to interlocutory appeals of this nature given the narrow scope of our review:  In some cases, parties appeal orders granting or denying motions for preliminary injunctions in order to ascertain the views of the appellate court on the merits of the litigation, but . . . due to the limited scope of our review . . . our disposition of appeals from most preliminary injunctions may provide little guidance as to the appropriate disposition on the merits."), *with Duncan v. Becerra*, 742 F. App'x 218, 220 (9th Cir. 2018) ("We do not 'determine the ultimate merits,' but rather 'determine only whether the district court correctly distilled the applicable rules of law and exercised permissible discretion in applying those rules to the facts at hand.'"). Preliminary injunction motions typically present complicated legal and factual questions on an abbreviated time frame.  Orders are not final.  Appellate review does not go to the merits but to whether the district court properly exercised judicial discretion or made a clear error of judgment.  *DISH Network Corp. v. F.C.C.*, 653 F.3d 771, 776 (9th Cir. 2011) ("The grant or denial of a preliminary injunction lies within the discretion of the district court and we may reverse a district court only where it relied on an erroneous legal premise or abused its discretion.").

A preliminary injunction decision is a fact-bound decision.  *Fyock* concerned a city ordinance covering only residents of Sunnyvale, California.  This case concerns a state-wide statute.  The Sunnyvale ordinance carved out exceptions for nine categories, including category eight ("Any person lawfully in possession of a firearm that the person obtained prior to January 1, 2000, if no magazine that holds fewer than 10 rounds of ammunition is compatible with the firearm and the person possesses the large-capacity magazine solely for use with that firearm.").  *Fyock v. City of Sunnyvale*, 25 F. Supp. 3d 1267, 1272 (N.D. Cal. 2014).  The state statute § 32310 includes no exception like Sunnyvale's category eight.  The Sunnyvale ordinance required non-exempt persons to, *inter alia*, remove their large capacity magazines from the City of Sunnyvale.  *Id.*  The state statute § 32310 requires non-exempt persons to remove their large-capacity magazines from California.  The City of Sunnyvale is a small, populous, municipality with uniquely-trained public safety officers.  The State of California is one of the largest states in the Union and includes everything from areas where populations are small and far from emergency services to the second largest city in the United States.

The district court in *Fyock*, found that " magazines having a capacity to accept more than ten rounds are in common use, and are therefore not dangerous and unusual."  *Fyock,*  25 F. Supp. 3d 1267 at 1275.  The district court found that it does not matter whether large capacity magazines are commonly used for self-defense explaining, "Second Amendment rights do not depend on how often the magazines are used.  Indeed, the standard is whether the prohibited magazines are 'typically *possessed* by law-abiding citizens for lawful purposes,' not whether the magazines are often *used* for self-defense."  *Id.* at 1276.  The district court found that if few people require a particular firearm for self-defense, that should be a cause for celebration, not a reason to place large capacity magazines beyond Second Amendment protection.  *Id.* ("The fact that few people 'will require a particular firearm to effectively defend themselves,'. . .  should be celebrated, and not seen as a reason to except magazines having a capacity to accept more than ten rounds from Second Amendment protection.").  The district court found that the large

1   capacity magazines qualify as "arms" for purposes of the Second Amendment.  *Id.*  The
2   district court concluded that the Sunnyvale ordinance banned conduct that is protected by
3   the Second Amendment.  *Id.* at 1277.  These are all points with which this Court agrees.

4        The divergence of opinion comes with the selection of the level of heightened
5   scrutiny required.  Like this Court's conclusion about § 32310, the district court in *Fyock*
6   found that the Sunnyvale ordinance burdens conduct near the core of the Second
7   Amendment right.  *Id.* at 1278.  But the district court in *Fyock* judged the burden of the
8   Sunnyvale ordinance to be minor and applied intermediate scrutiny and found the fit of
9   the ordinance to be reasonable.  *Id.* at 1278-79.  This Court, on the other hand, has
10  considered the burden of the state statute on all the citizens of the state, finds the burden
11  to be severe, and even under intermediate scrutiny, a reasonable fit to be lacking.  These
12  are ultimately informed judgment calls.  The district court's *Fyock* judgment was
13  preliminary.  This Court's judgment is no longer preliminary.  If this judgment is
14  appealed, the Court of Appeals will have the opportunity to rule *on the merits*, for the
15  first time.

16       California Penal Code § 32310 unconstitutionally impinges on the Second
17  Amendment rights of law-abiding responsible ordinary citizens who would like to
18  acquire and possess for lawful purposes firearm magazines able to hold more than 10
19  rounds.  Section 32310 is a complete ban that fails the simple Supreme Court test of
20  *Heller.*  Alternatively, § 32310 strikes at the core of the Second Amendment right of self-
21  defense and severely burdens that right, triggering strict scrutiny.  Because the statute
22  imposes a broad prophylactic ban that is the opposite of a regulation using the least
23  restrictive means to achieve a compelling interest, § 32310 fails constitutional muster
24  under the test of strict scrutiny.  Finally, even under the modest and forgiving standard of
25  intermediate scrutiny, § 32310 is a poor fit to accomplish the State's important interests.
26  It hardly fits at all.  Therefore, this statute fails intermediate scrutiny.  While, it may be
27  possible to fashion a restriction on uncommonly large magazines that is tailored to the
28  manifold local contexts present across the entire state so as to achieve a reasonable fit,

here, the bottom line is clear.  The State has not carried its burden to justify the restrictions on firearm magazines protected by the Second Amendment based on the undisputed material facts in evidence.  That is not to be lamented.  It ought to provide re-assurance.  To borrow a phrase, "[j]ust as it is the 'proudest boast of our free speech jurisprudence' that we protect speech that we hate, [and] . . . the proudest boast of our free exercise jurisprudence that we protect religious beliefs that we find offensive," it is the proudest boast of our Second Amendment jurisprudence that we protect a citizen's right to keep and bear arms that are dangerous and formidable.  *See Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719, 1737 (2018).

### III.    The Takings Clause

Plaintiffs also contend that the State's confiscatory and retrospective ban on the possession of magazines over ten rounds without government compensation constitutes an unconstitutional taking.  "For centuries, the primary meaning of "keep" has been "to retain possession of."  There is only one straightforward interpretation of "keep" in the Second Amendment, and that is that "the people" have the right to retain possession of arms, subject to reasonable regulation and restrictions."  *Silveira v. Lockyer*, 328 F.3d 567, 573 (9th Cir. 2003) (Kleinfeld, J., dissenting from denial of rehearing en banc).  The Attorney General asserts that, when the government acts pursuant to its police power to protect the safety, health, and general welfare of the public, a prohibition on possession of property declared to be a public nuisance is not a physical taking.  *See* Oppo. at 22, (citing *Chicago, B. & Q. Railway Co. v. Illinois*, 200 U.S. 561, 593–594 (1906) and *Akins v. United States,* 82 Fed. Cl. 619, 622 (2008)).  The Attorney General then cites a few courts that have rejected Takings Clause challenges to laws banning the possession of dangerous weapons.  *See* Oppo. at 23 (citing *Akins*, 82 Fed. Cl. at 623–24 (restrictions on manufacture and sale of machine guns not a taking) and *Gun South, Inc. v. Brady*, 877 F.2d 858, 869 (11th Cir. 1989) (temporary suspension on importation of assault weapons not a taking)).

California has deemed large-capacity magazines to be a nuisance.  *See* Cal. Pen. Code § 32390.  That designation is dubious.  The Supreme Court recognized a decade before *Heller*, "[g]uns in general are not 'deleterious devices or products or obnoxious waste materials.'"  *Staples v. United States*, 511 U.S. 600, 610 (1994) (citation omitted).  Casting a common sized firearm magazine able to hold more than 10 rounds as a nuisance, as a way around the Second Amendment, is like banning a book as a nuisance, as a way around the First Amendment.  It conjures up images from Ray Bradbury's novel, *Fahrenheit 451*, of firemen setting books on fire, or in this case policemen setting magazines on fire.

Plaintiffs remonstrate that the law's forced, uncompensated, physical dispossession of magazines holding more than 10 rounds as an exercise of its "police power" cannot be defended.  Supreme Court precedent casts doubt on the State's contrary theory that an exercise of the police power can never constitute a physical taking.  In *Loretto*, the Supreme Court held that a law requiring physical occupation of private property was both "within the State's police power" *and* an unconstitutional physical taking.  *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).  The Court explained that whether a law amounts to a physical taking is "a separate question" from whether the state has the police power to enact the law.  *Id.* at 425–26 ("It is a separate question, however, whether an otherwise valid regulation so frustrates property rights that compensation must be paid.  We conclude that a permanent physical occupation authorized by government is a taking without regard to the public interests that it may serve.").  In a similar vein, the Supreme Court holds that a law enacted pursuant to the state's "police powers to enjoin a property owner from activities akin to public nuisances" is not immune from scrutiny under the regulatory takings doctrine.  *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1020–27 (1992).  The Court reasoned that it was true "*[a] fortiori*" that the "legislature's recitation of a noxious-use justification cannot be the basis for departing from our categorical rule that total regulatory takings must be compensated."  *Id.* at 1026.

1      Recently, the Supreme Court summarized some of the fundamental principles of

2  takings law in *Murr v. Wisconsin*, 137 S. Ct. 1933 (2017).  "The Takings Clause of the

3  Fifth Amendment provides that private property shall not be taken for public use, without

4  just compensation.  The Clause is made applicable to the States through the Fourteenth

5  Amendment.  As this Court has recognized, the plain language of the Takings Clause

6  requires the payment of compensation whenever the government acquires private

7  property for a public purpose, but it does not address in specific terms the imposition of

8  regulatory burdens on private property."  *Id.* at 1942 (quotations and citations omitted).

9  *Murr* notes that almost a century ago, the Court held that "while property may be

10  regulated to a certain extent, if regulation goes too far it will be recognized as a taking."

11  *Id.* (quoting *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922)).

12      Takings jurisprudence is flexible.  There are however, two guides set out by *Murr*

13  for detecting when government regulation is so burdensome that it constitutes a taking.

14  "First, with certain qualifications a regulation which denies all economically beneficial or

15  productive use of land will require compensation under the Takings Clause.  Second,

16  when a regulation impedes the use of property without depriving the owner of all

17  economically beneficial use, a taking still may be found based on a complex of factors,

18  including (1) the economic impact of the regulation on the claimant; (2) the extent to

19  which the regulation has interfered with distinct investment-backed expectations; and (3)

20  the character of the governmental action."  *Murr*, 137 S. Ct. at 1938 (citations and

21  quotation marks omitted).  "[A] physical *appropriation* of property g[ives] rise to a *per se*

22  taking, without regard to other factors."  *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2427

23  (2015).

24      The dispossession requirement of § 32310(c) & (d) imposes a rare hybrid taking.

25  Subsection (d)(3) is a type of physical appropriation of property in that it forces owners

26  of large capacity magazines to "surrender" them to a law enforcement agency "for

27  destruction."  Thus, (d)(3) forces a *per se* taking requiring just compensation.  But there

28  are two other choices.  Subsection (d)(2) forces the owner to sell his magazines to a

firearms dealer.  It is a fair guess that the fair market value of a large capacity magazine I the shadow of a statute that criminalizes commerce and possession in the State of California, will be near zero.  Of course, the parties spend little time debating the future fair market value for to-be-relinquished magazines.  Subsection (d)(1) forces the owner to "remove" their large capacity magazines "from the state," without specifying a method or supplying a place.  This choice obviously requires a place to which the magazines may be lawfully removed.  In other words, (d)(1) relies on other states, in contrast to California, which permit importation and ownership of large capacity magazines.  With the typical retail cost of a magazine running between $20 and $50, the associated costs of removal and storage and retrieval may render the process costlier than the fair market value (if there is any) of the magazine itself.  Whatever stick of ownership is left in the magazine-owner's "bundle of sticks," it is the short stick.

Here, California will deprive Plaintiffs not just of the *use* of their property, but of *possession*, one of the most essential sticks in the bundle of property rights.  Of course, a taking of one stick is not necessarily a taking of the whole bundle.  *Murr*, 137 S. Ct. at 1952 (Roberts, C.J., dissenting) ("Where an owner possesses a full 'bundle' of property rights, the destruction of one strand of the bundle is not a taking, because the aggregate must be viewed in its entirety.").  Nevertheless, whatever expectations people may have regarding property regulations, they "do not expect their property, real or personal, to be actually occupied or taken away."  *Horne*, 135 S. Ct. at 2427.  Thus, whatever might be the State's authority to ban the sale or use of magazines over 10 rounds, the Takings Clause prevents it from compelling the physical dispossession of such lawfully-acquired private property without just compensation.

## IV.   CONCLUSION

Magazines holding more than 10 rounds are "arms."  California Penal Code Section 32310, as amended by Proposition 63, burdens the core of the Second Amendment by criminalizing the acquisition and possession of these magazines that are commonly held by law-abiding citizens for defense of self, home, and state.  The

regulation is neither presumptively legal nor longstanding. The statute hits at the center of the Second Amendment and its burden is severe. When the simple test of *Heller* is applied, a test that persons of common intelligence can understand, the statute fails and is an unconstitutional abridgment. It criminalizes the otherwise lawful acquisition and possession of common magazines holding more than 10 rounds – magazines that law-abiding responsible citizens would choose for self-defense at home. It also fails the strict scrutiny test because the statute is not narrowly tailored – it is not tailored at all. Even under the more forgiving test of intermediate scrutiny, the statute fails because it is not a reasonable fit. It is not a reasonable fit because, among other things, it prohibits law-abiding concealed carry weapon permit holders and law-abiding U.S Armed Forces veterans from acquiring magazines and instead forces them to dispossess themselves of lawfully-owned gun magazines that hold more than 10 rounds or suffer criminal penalties. Finally, subsections (c) and (d) of § 32310 impose an unconstitutional taking without compensation upon Plaintiffs and all those who lawfully possess magazines able to hold more than 10 rounds.[68]

Accordingly, based upon the law and the evidence, upon which there is no genuine issue, and for the reasons stated in this opinion, Plaintiffs' motion for summary judgment is granted.[69] California Penal Code § 32310 is hereby declared to be unconstitutional in its entirety and shall be enjoined.

---

[68] This declaration concerns the current version of § 32310. But similar constitutional defects can be found in the prior iterations of the statute. The Court's declaration does not affect the definition of a large-capacity magazine where it is used in other parts of California's Penal Code to define gun-related crimes and to enhance penalties.

[69] The Attorney General asks the Court to take judicial notice of exhibits A through Q which are copies of statutes and ordinances from various jurisdictions. (Dkt. No. 53-1.) The request is granted. The Attorney General objects to various declarations submitted by Plaintiffs. (Dkt. No. 53-13.) Those objections are overruled. Plaintiffs object to various declaration and exhibits submitted by the Attorney General. (Dkt. No. 57-2.) Those objections are overruled.

This decision is a freedom calculus decided long ago by Colonists who cherished individual freedom more than the subservient security of a British ruler.  The freedom they fought for was not free of cost then, and it is not free now.

**IT IS HEREBY ORDERED** that:

1.  Defendant Attorney General Xavier Becerra, and his officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with him, and those duly sworn state peace officers and federal law enforcement officers who gain knowledge of this injunction order, or know of the existence of this injunction order, are enjoined from enforcing California Penal Code section 32310.

2.  Defendant Becerra shall provide, by personal service or otherwise, actual notice of this order to all law enforcement personnel who are responsible for implementing or enforcing the enjoined statute.  The government shall file a declaration establishing proof of such notice.

DATED: March 29, 2019

HON. ROGER T. BENITEZ
United States District Judge

3:17cv1017-BEN (JLB)