ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendants Rob Bonta in his official capacity as Attorney General of the State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC.**, a California corporation,<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | 3:19-cv-1017-BEN-JLB<br><br>**DECLARATION OF ZACHARY SCHRAG IN SUPPORT OF DEFENDANT'S MOTION FOR RECONSIDERATION OF BRIEFING SCHEDULE SET FORTH IN ORDER SPREADING THE MANDATE AND CONTINUING THE PRELIMINARY INJUNCTION**<br><br>Date:  November 9, 2022<br>Time:  10:30 a.m.<br>Courtroom:  5A<br>Judge:  Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

# DECLARATION OF ZACHARY SCHRAG

Pursuant to 28 U.S.C. § 1746, I, Zachary Schrag, declare under penalty of perjury that the following is true and correct:

1. I am a professor of history at George Mason University. I have personal knowledge of the facts set forth in this declaration, and if called upon as a witness, I could and would testify competently as to those facts.

2. I have been retained by the California Department of Justice to render expert opinions in this case. I completed most of my work on this declaration without charge, and beginning on August 21, 2022, I have been compensated for my additional work on this declaration at a rate of $75 per hour.

## Background and Qualifications

3. In 2002 I earned my PhD in history at Columbia University. Since then I have been employed full-time as a history professor. In 2004 I joined the history faculty at George Mason University, where I now serve as a professor of history and as the director of the MA program in history. A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

4. I am the author of three books on the history of the United States: *The Great Society Subway: A History of the Washington Metro* (The Johns Hopkins University Press, 2006), *Ethical Imperialism: Institutional Review Boards and the Social Sciences, 1965-2009* (The Johns Hopkins University Press, 2010), and *The Fires of Philadelphia: Citizen-Soldiers, Nativists, and the 1844 Riots over the Soul of a Nation* (Pegasus Books, 2021), as well as multiple journal articles, book chapters, essays, and other publications on history.

5. I am also the author of *The Princeton Guide to Historical Research* (Princeton University Press, 2021), a peer-reviewed work that explains the methods used by historians to understand the past. To write that book, I examined other historians' practices, as well as drawing on my decades of experience conducting

my own research, teaching undergraduate and graduate courses on research methods, and supervising doctoral dissertations.

### The Historian's Role

6. I have read the Supreme Court's decision in *New York State Rifle & Pistol Association, Inc. v. Bruen*.[1]

7. As one who has taught and written about the process of historical research, I have been asked by the California Department of Justice to explain the work required to answer the difficult historical questions posed in *Bruen*. It is not my purpose in this declaration to determine the "Nation's historical tradition" of firearms regulation or to detail the tasks that might be required to fairly describe that tradition. Rather, I seek to explain in general the process of historical research, and the reasons that it is unpredictable, labor-intensive, and time-consuming.

### Questions

8. The *Bruen* opinion presents us with a general topic: the "Nation's historical tradition" of firearms regulation, including "historical analogies." Translating such a *topic* into a research *question* is the historian's most consequential task, and one of the most difficult.

9. A first task is to determine the geographical scope of a historical question. Any plan for historical research in response to post-*Bruen* litigation will need to determine the relevance of events outside of North America. Even within one continent, historians must make choices about geographical scope, for firearms have been at times regulated by local, colonial, state, federal, and Tribal bodies, and they have been controlled by non-state actors as well.

10. A second major task is to determine the chronological scope of an investigation. As part of any historical investigation of California's current laws, historians and lawyers would need to decide what periods of history they would like to explore.

---

[1] 597 U.S. __, 142 S. Ct. 2111, 2126 (2022).

11. The third and most important scoping choice concerns people. For centuries, most historical research posed questions about powerful men with official positions: monarchs, generals, and cabinet ministers. But generations of historians have worked to expand our understanding of the past by including other groups: artists and intellectuals, business leaders and engineers, women, workers, members of minority groups, and so forth. Conceivably, a history of firearms regulation could embrace not only the stories of legislators and jurists, but also firearms manufacturers, users, victims, advocates, and opponents.

**Sources**

12. Once historians have defined the questions they wish to answer, they must identify the sources they will use to do so.

13. The first step is to read existing scholarship, also known as secondary sources. Historians use a range of tools to determine what others have written. Bibliographic databases, published book reviews, and databases with the full text of journal articles are good places to start. Historians will often seek help at this stage from other scholars, including librarians. They will also read the footnotes of any scholarship they consult, leading to a lengthening chain of citation.[2] Existing scholarship will answer many questions, refine others, and pose new ones. In order to expand our understanding of the past, historians go beyond that scholarship and explore primary sources: documents or other material created by participants in or witnesses to the events one wishes to study.

14. Legal historians and courts are appropriately interested in statutory and case law. An act of legislation or a court order records a decision, but not necessarily the reasoning behind that decision. To be sure, legislative debates, accompanying reports, and court opinions sometimes help us understand the reason for a decision, but we often must look to unofficial sources as well. For example, to

---

[2] Alexandra Chassanoff, "Historians and the Use of Primary Source Materials in the Digital Age," *American Archivist* 76 (September 2013): 460.

1   understand how New York and Massachusetts developed their immigration policy
2   in the 1850s (then mostly a state, rather than federal, responsibility), Hidetaka
3   Hirota considers not only the actions of courts and legislatures, but also the actions
4   of immigration officials, shipmasters, immigration officials, guardians of the poor,
5   foreign consuls and immigrants themselves. To do so, he consulted many published
6   statutes and court opinions from various years and states, which he then
7   contextualized using official reports, newspapers, and some archival papers, such as
8   the records of the mayor of New York City.[3] All of this helps us understand why
9   the legislatures passed the statutes they did.

10         15.   Even then, we must do more to understand the effect of those statutes
11   on the lives of Americans, and their enforcement not only by agents of the state but
12   also by community norms. Historians have demonstrated that both state and federal
13   governments have relied on voluntary compliance or coercion, and the aid of non-
14   state actors, to achieve their ends. To understand how, for example, conscription
15   functioned in the world wars, we must look beyond the statute books and published
16   regulations to newspapers, journals, institutional histories, soldiers' letters, and
17   even the lyrics of popular songs.[4] In my own work, I cite two examples of firearms
18   regulation that took place not in the statehouse, but on the street. On May 7, 1844,
19   the day after a lethal riot, the mayor of Philadelphia noticed a man at a rally sitting
20   on a double-barreled gun and ordered a police officer to confiscate it, though it was
21   later returned. Two months later, the sheriff of Philadelphia County led a search of
22   a Catholic church, during which he confiscated a great many more arms of various

---

[3] Hidetaka Hirota, *Expelling the Poor: Atlantic Seaboard States and the Nineteenth-Century Origins of American Immigration Policy* (Oxford University Press, 2017), chapter 3.
[4] Christopher Capozzola, *Uncle Sam Wants You: World War I and the Making of the Modern American Citizen*, 1 edition (New York; Oxford: Oxford University Press, 2010), chapter 4; James T. Sparrow, *Warfare State: World War II Americans and the Age of Big Government* (New York: Oxford University Press, 2011), chapter 6.

types.[5] These events eventually featured in criminal cases that were reported in newspapers, months after the confiscations, suggesting the need to look beyond the statutes to understand how Americans understood state police power.[6]

16. In *The Princeton Guide to Historical Research*, I take two chapters, totaling fifty pages, to simply list the many types of sources commonly used by historians, so I will not try to repeat that here. Briefly put, historians rely primarily on textual sources, which may exist as books, serials, government documents, unpublished manuscripts, or other formats. In addition, they sweep in non-textual sources, such as quantitative data, maps, photographs, images, and physical artifacts. These non-textual sources could be of interest in exploring the differences among various kinds of urban spaces or the physical attributes of firearms and the wounds they inflict, both of which may be significant to firearms regulation.

17. Because the sources a historian consults depends on the questions they seek to answer, I cannot say in advance what kinds of sources a government might explore to determine whether its laws conform to "this Nation's historical tradition." What I can say is that choosing those sources will be a weighty and time-consuming task.

## Access

18. Having identified the kinds of sources they are seeking, historians must figure out how to access them. The digitization of primary sources has sped up research a good deal, but the process is still time-consuming. The electronic databases developed in the past quarter century are amazing but also seductively easy. In recent years, journalists have made embarrassing missteps by failing to

---

[5] Zachary M. Schrag, *The Fires of Philadelphia: Citizen-Soldiers, Nativists, and the 1844 Riots over the Soul of a Nation* (New York: Pegasus, 2021), 114, 207.
[6] Alexander Elkins, "'At Once Judge, Jury, and Executioner': Rioting and Policing in Philadelphia, 1838-1964," *Bulletin of the German Historical Institute* 54 (Spring 2014): 67–90; Gary Gerstle, *Liberty and Coercion: The Paradox of American Government from the Founding to the Present* (Princeton University Press, 2017), chapter 2.

consider the ways that a simple text search can yield profoundly misleading results, if one fails to consider the ways that terminology shifts over time.[7]

19. Moreover, to thoroughly understand an event or debate, one may need to run the same search across numerous sources in parallel, including newspaper databases, digitized books, laws, and other documents.

20. To explore nineteenth-century newspapers from a single state, one may need to consult multiple commercial databases, each of which offers different holdings, and requires different query formats for a search. For example, to study antebellum Pennsylvania, I consulted digitized Pennsylvania newspapers in at least seven databases.[8] For each, one may need to enter multiple, related terms. For instance, a search for "shotguns" in one decade might not turn up any, if people of that period referred to such weapons as "fowling pieces." Having found that term in one database, one might return to search for it in all the others.

21. These digital databases rely on computerized, optical character recognition, usually performed not on original print copies but rather on often blotchy microfilm. Because of the small typefaces and cramped layouts of eighteenth- and nineteenth-century texts, this is a highly unreliable process; a historian searching for a particular keyword may get fewer than half of the relevant results. As Tim Hitchcock has written of one digitized collection of eighteenth-century newspapers, "52 per cent of the Burney Collection and a similar proportion of other resources are entirely unfindable, and as importantly it will always be the same 52 per cent, determined by typeface, layout, bleed through and a host of other factors no one has thoroughly investigated. If you want to use these materials to

---

[7] Karin Wulf, "What Naomi Wolf and Cokie Roberts Teach Us about the Need for Historians," *Washington Post*, June 11, 2019; Lauren MacIvor Thompson, "Women Have Always Had Abortions," *New York Times*, December 13, 2019.

[8] This includes America's Historical Newspapers, Chronicling America, GenealogyBank.com, Newspapers.com, Nineteenth Century U.S. Newspapers, Pennsylvania Historic Newspapers, and the Villanova Digital Library. Additional titles do not existing in digital form, so I consulted them on microfilm or in the original print. And titles from other states and countries required additional database searches.

trace tabular data, or advertisements that include graphical elements, or any text normally represented in italics, you are largely out of luck." A historian must spend time comparing results to page images in order to understand what results are and are not showing up, and to devise search strategies to compensate.

22. And digitized sources represent only a small fraction of the available evidence. While digitization projects, such as Google Books and HathiTrust, have made it easier than ever to access texts published before 1923, they do not cover all publications, and they typically offer only glimpses of works that may still be protected by copyright. And they do not sweep in the bulk of non-textual sources, such as maps, artworks, and photographs, though other databases may reproduce these.

23. The most time-consuming form of historical research is archival research, which refers to the examination of original documents preserved by specialized institutions. As noted above, Hirota explored city, state, and federal archives (as well as some in the United Kingdom) to document official actions and deliberations not recorded in published sources. Other historians use official archives to demonstrate how a law operated in practice. To show how white assailants of Black victims "could act beyond the law," Adam Malka cites a pardon record in the Maryland State Archives.[9] On a larger scale, our current understanding of Reconstruction depends in part on the letters to Southern governors that Eric Foner first read in the 1970s. As he has explained, those letters had been stuffed in boxes for a century, and many of them were "total junk." But scattered among the total junk were accounts of the actual operations of Reconstruction governments.[10]

---

[9] Adam Malka, *The Men of Mobtown: Policing Baltimore in the Age of Slavery and Emancipation*, Illustrated edition (University of North Carolina Press, 2018), 170.
[10] Eric Foner, "Black History and the Reconstruction Era," *Souls* 8 (2006): 198.

24. Unpublished unofficial sources also show us how previous generations of Americans, including those without official positions, understood the rules—official or not—that governed their lives. For example, Rosemarie Zagarri combines both unpublished and published personal letters to understand women's roles in the politics of the early republic.[11] Lisa Tolbert relies on letters and diaries—as well as the testimony given in a murder trial—to understand how white women, white men, and enslaved Black men navigated similar urban spaces very differently, and gives us a far more complete understanding than would print sources created by and for white men alone.[12] My own understanding of the antebellum militia benefited greatly from reading the unpublished diary of Colonel Augustus Pleasonton, preserved by the Historical Society of Pennsylvania. Elizabeth Kelly Gray recently described how she and her students are transcribing *Memoirs of a Thief*, a manuscript written about 1800, which could give new insight to the working of criminal justice in the years after the passage of the Bill of Rights.[13]

25. Just locating archival sources is a task in itself, for archival sources often reside in unexpected places. For example, one might expect the work of a federal body to be preserved in the U.S. National Archives, an institution specifically created to preserve materials created by the federal government. In fact, as the Archives explains, it only preserves between 1 and 3 percent of those materials, so historians must often look elsewhere to trace even a federal story.[14] To understand the work of the National Commission for the Protection of Human

---

[11] Rosemarie Zagarri, *Revolutionary Backlash: Women and Politics in the Early American Republic* (University of Pennsylvania Press, 2011).
[12] Lisa C. Tolbert, *Constructing Townscapes: Space and Society in Antebellum Tennessee* (Chapel Hill: The University of North Carolina Press, 1999), chapters 4-6.
[13] "Lesson Plan: Primary Documents as Material Culture: Encouraging Students to See a Source from All Sides," *The Panorama* (blog), August 17, 2022, http://thepanorama.shear.org/2022/08/17/lesson-plan-primary-documents-as-material-culture-encouraging-students-to-see-a-source-from-all-sides/.
[14] "What Is the National Archives and Records Administration?," National Archives, August 15, 2016, https://www.archives.gov/about.

Subjects of Biomedical and Behavioral Research, for example, I had to spend long hours at the Bioethics Research Library at Georgetown University, which preserves materials prepared for the commission's meetings. I also traveled to the Graduate Theological Union in California to review additional materials deposited there by one of the commission members. In both cases, private institutions are preserving public records. While this example concerns a federal body, I have faced the same challenges at the state and local level.

26. As the above example suggests, relevant materials on a single topic may be scattered from coast to coast. Thanks to the work of countless archivists and networks, such as OCLC, Inc., identifying relevant collections may now be easier than ever before, though finding the right search terms remains an iterative process. But accessing archival materials is not simple. These materials do not circulate, so a researcher must travel to the archive, or hire a local assistant. Many reading rooms are open for limited hours. The Library of Virginia, for example, which holds the official records of the Commonwealth has an Archives Research Room that is open only twenty-six hours most weeks.[15]

27. Most significantly, archival research often resembles panning for gold—seeking the glint of treasure amid much larger volumes of worthless dirt. A box of documents may have a single page of relevant material, or none at all, or duplicates of material one has already seen, which can be even worse than finding nothing since they consume the time needed to check that they are, in fact, duplicates. Handwriting may be hard to decipher. Bound volumes may be missing pages, or runs of serials may be missing issues. Historians try work around such gaps by finding comparable information elsewhere, but this takes additional time.

28. In some cases, historians make copies of the materials they find—downloading electronic versions, or scanning or photographing printed materials.

---

[15] "Library of Virginia Visitors Guide," accessed August 3, 2022, https://www.lva.virginia.gov/about/visit.asp.

For collaborative work, citation-management systems such as Zotero can help groups share resources. But this is still preliminary to the more important work of reading and analyzing the material they have gathered.

**Findings**

29. Having gained access to the sources one will consult, the next step is to read them (or, in the case of non-textual sources, to view, listen to, or otherwise extract information from them). And while historians are experimenting with computer-aided methods of analysis, to a large extent they still rely on the time-consuming work of thorough reading.[16] This takes time.

30. A major challenge in this process is to identify patterns that emerge from the evidence, and to devise interpretations that best fit the available facts. Historians seek to understand complexity, considering both the major trends of a period and important exceptions.

31. Another key task is to read evidence critically, rather than taking sources at face value. Historians understand that people create sources with an agenda, whether they are trying to win votes, sell a product or service, persuade loved ones to act in a certain way, gather information, or to craft and artistic rendering of the world around them. To divine such agendas, historians consider the intended audience, and the explicit or implicit messages a source conveys. They consider a source's credibility, its stylistic nuances, and the context in which it was created. And they compare sources to one another, especially looking for evidence of change or continuity over time.

32. All of this takes time, and collaborative work only adds to the burden, since it requires the coordination of efforts, the sharing of drafts, and eventually the compilation of multiple documents into a single, coherent format. Since an investigation of the relevant historical traditions of firearms regulation will likely

---

[16] Mats Fridlund, Mila Oiva, and Petri Paju, eds., *Digital Histories: Emergent Approaches within the New Digital History* (Helsinki University Press, 2020); Robert A. Caro, *Working* (Knopf Doubleday Publishing Group, 2019), 11.

require collaboration of multiple scholars with distinct approaches and expertise, we can expect any report to go through multiple iterations before it is ready to be shared with a court.

**Timing**

33. As Justice Breyer's dissent in *Bruen* notes, historians have worked hard to provide amicus briefs for cases headed to the Supreme Court, but the *Bruen* majority imposes novel tasks on lower courts and litigants and, by extension, the historians who might assist them.

34. To answer the questions raised by *Bruen* will require attention to a wider range of sources than those typically found in legal databases. Again, a historian would start with the existing scholarship, to learn what other historians have already found about a given topic and what sources they used to develop those findings. To build on that work, they would dive into primary sources, including print and digital sources, and perhaps archival manuscript sources as well. And the entire process is iterative. Just as a footnote in a scholarly source can lead one to a primary source, so might reading a primary source spark questions—Who is this person? What is the event being referred to here?—that are best answered by a return to published scholarship.

35. I estimate that I write roughly 100 - 125 words of finished product per hour of research and writing, so that each thousand words of finished research (not including footnotes) would require between eight and ten hours. Thus, a 7,500-word essay might be expected to take about 75 hours to write, possibly parceled out among a team of historians. That estimate (which does not include preliminary work to identify source materials), is complicated by the possible need to conduct different kinds of historical research to meet the new approach suggested by *Bruen*, which could require more primary-source research than is typical, which generally takes longer to complete than research using secondary sources.

36. On top of this, most historians with PhDs work as professors, whose schedules are determined by their teaching duties.[17] The best time for them to be able to contribute their expertise would be between semesters: December, January, and the summer months. A deadline in the middle of a fall or spring semester risks depriving the court of their best work.

## Conclusion

37. History is for everyone. Asking what choices in the past led to our present circumstances is a basic human characteristic, and we all share stories of ourselves, our families, our communities, and our countries. At the same time, the most reliable histories require methodical investigation of the sort taught most frequently in graduate programs in history. Historians must craft worthy research questions that they will refine as they proceed, assess existing scholarship on a subject, identify and access primary sources that can help answer their questions, read those sources with care and curiosity, and report their findings in clear prose. Each step takes patience, deliberation, and a willingness to go down paths that may turn out to be dead ends. To do their best work, historians cannot be rushed.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 6, 2022, at Fairfax, Virginia.

_____
Zachary M. Schrag

---

[17] Emily Swafford and Dylan Ruediger, "Every Historian Counts," *Perspectives on History*, September 2019.

# CERTIFICATE OF SERVICE

Case Name:   **Duncan, et al. v. Bonta**              No.   **3:17-cv-01017-BEN-JLB**

I hereby certify that on October 12, 2022, I electronically filed the following documents with the Clerk of the Court by using the CM/ECF system:

**DECLARATION OF ZACHARY SCHRAG IN SUPPORT OF MOTION FOR RECONSIDERATION OF BRIEFING SCHEDULE SET FORTH IN ORDER SPREADING THE MANDATE AND CONTINUING THE PRELIMINARY INJUNCTION**

I certify that **all** participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on October 12, 2022, at Los Angeles, California.

| Robert Leslie Meyerhoff | *Robert M* |
|---|---|
| Declarant | Signature |