ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his
official capacity as Attorney General of the
State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants. | Case No. 17-cv-1017-BEN-JLB<br><br>**DEFENDANT'S SUPPLEMENTAL BRIEF IN RESPONSE TO THE COURT'S ORDER OF SEPTEMBER 26, 2022**<br><br>Courtroom:      5A<br>Judge:           Hon. Roger T. Benitez<br>Action Filed:   May 17, 2017 |

# TABLE OF CONTENTS

Page

Introduction ........................................................................................................ 1

Background ......................................................................................................... 4

    I.     California's Restrictions on Large-Capacity Magazines ...................... 4

    II.    Procedural History ............................................................................... 6

Argument ........................................................................................................... 8

    I.     Overview of *Bruen's* Text-and-History Standard for Analyzing
          Second Amendment Claims .................................................................. 8

    II.    Section 32310 Satisfies the Text-and-History Standard ................... 14

          A.    Plaintiffs Cannot Establish that Section 32310 Burdens
                 Conduct Protected by the Plain Text of the Second
                 Amendment .............................................................................. 14

               1.    Large-Capacity Magazines Are Not "Arms"
                       Protected by the Second Amendment Because They
                       Are Not Essential to the Use of Firearms ...................... 16

               2.    Additionally, Large-Capacity Magazines Are Not
                       Protected "Arms" Because They Are Not
                       Commonly Used for Self-Defense. ............................... 17

          B.    Section 32310's Restrictions on Large-Capacity
                 Magazines Are Consistent with the Nation's Traditions of
                 Firearms and Other Weapons Regulations ............................... 23

               1.    The Second Amendment Does Not Limit the
                       States' Police Powers to Address Public Safety
                       Threats as They Arise .................................................... 24

                 2.    Historical Regulations of Dangerous or Unusual
                       Weapons Are Ubiquitous in American History,
                       Including the Relevant Periods Surrounding the
                       Ratification of the Second and Fourteenth
                       Amendments .................................................................. 26

                     a.    The Attorney General Needs Only Show that
                           Section 32310 Is "Relevantly Similar" to the
                         Historical Tradition of Regulating Dangerous
                         or Unusual Weapons ........................................... 26

                     b.    Medieval and Pre-Founding English History ...... 34

                       c.    Colonial and Early National History:  Laws
                         Enacted Around the Time of the Ratification
                         of the Second Amendment .................................. 37

                     d.    Antebellum and Postbellum History: Laws
                         Enacted Around the Time of the Ratification
                         of the Fourteenth Amendment ............................ 41

                     e.    Twentieth Century History .................................. 47

i

**TABLE OF CONTENTS**
(continued)

Page

3.   The Historical Weapons Restrictions Are Relevantly Similar to Section 32310 .............................. 49

  a.   Comparable Burden .............................................. 50

  b.   Comparable Justification .................................... 53

III.   The Attorney General Objects to the Expedited Briefing Schedule of the Instant Remand Proceedings. ................................... 56

IV.   Plaintiffs' Takings Claim and Due Process Claim Fail because Section 323210 Does Not Effect a Taking. ......................... 60

V.   If This Court Finds that California's Restrictions on Large-Capacity Magazines Violate the Second Amendment, the Court Should Stay Enforcement of the Judgment Pending Appeal. ............. 61

Conclusion ............................................................................. 63

# TABLE OF AUTHORITIES

**Page**

CASES

*Andrews v. State*
    50 Tenn. 165 (1871) ................................................................... 43

*Ass'n of New Jersey Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*
    910 F.3d 106 (3d Cir. 2018) ........................................................ 60

*Aymette v. State*
    21 Tenn. 154 (1840) ................................................................... 42

*Buckingham v. United States*
    998 F.2d 735 (9th Cir. 1993) ...................................................... 58

*Caetano v. Massachusetts*
    577 U.S. 411 (2016) ........................................................... 10, 19

*Clark v. Cmty. for Creative Non-Violence*
    468 U.S. 288 (1984) ................................................................... 15

*Commodity Futures Trading Comm'n v. Bd. of Trade of City of Chicago*
    657 F.2d 124 (7th Cir. 1981) ...................................................... 57

*Defense Distribtued v. Bonta*
    No. 22-6200-GW-AGRx, 2022 WL 15524983 (C.D. Cal. Oct. 24, 2022) ........................................................................................ 15

*Defense Distributed v. Bonta*
    No. 22-6200-GW-AGRx, 2022 WL 15524977 (C.D. Cal. Oct. 21, 2022) ................................................................................. 15, 58

*Duncan v. Becerra*
    742 Fed. App'x 218 (9th Cir. 2018) ............................. 7, 18, 19, 23

*Duncan v. Becerra*
    970 F.3d 1133 (9th Cir. 2020) ...................................................... 7

*Duncan v. Becerra*
    988 F.3d 1209 (9th Cir. 2021) (en banc) ....................................... 7

iii

# TABLE OF AUTHORITIES
## (continued)

Page

*Duncan v. Bonta*
142 S. Ct. 2895 (2022) ...................................................................... 7

*Duncan v. Bonta*
No. 19-55376, 2022 WL 4393577 (9th Cir. Sept. 23, 2022) .............................. 7

*Duncan v. Bonta*
19 F.4th 1087 (9th Cir. 2021) ........................................... 20, 21, 22, 60

*Ezell v. City of Chicago*
651 F.3d 684 (7th Cir. 2011) ...................................................... 47

*Fed. Trade Comm'n v. Qualcomm Inc.*
935 F.3d 752 (9th Cir. 2019) ...................................................... 61

*Fouts v. Bonta*
561 F. Supp. 3d 941 (S.D. Cal. 2021) ............................................ 57

*Friedman v. City of Highland Park*
784 F.3d 406 (7th Cir. 2015) ................................................. *passim*

*Fyock v. City of Sunnyvale*
779 F.3d 991 (9th Cir. 2015) ...................................................... 16

*Greene v. Solano Cnty. Jail*
513 F.3d 982 (9th Cir. 2008) ...................................................... 57

*Hertz v. Bennett*
294 Ga. 62 (2013) ................................................................ 44

*Humane Soc'y of U.S. v. Gutierrez*
558 F.3d 896 (9th Cir. 2009) ...................................................... 61

*Jackson v. City & Cnty. of San Francisco*
746 F.3d 953 (9th Cir. 2014) ................................................. 9, 16

*Kennedy v. Bremerton Sch. Dist.*
142 S. Ct. 2407 (2021) ............................................................ 15

*Kolbe v. Hogan*
849 F.3d 114 (4th Cir. 2017) ........................................... 20, 21, 22, 24

iv

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Konigsberg v. State Bar of Cal.*
366 U.S. 36 (1961) ............................................................................. 25

*Maryland Shall Issue, Inc. v. Hogan*
963 F.3d 356 (4th Cir. 2020) ............................................................ 60

*McDonald v. City of Chicago*
561 U.S. 742 (2010) ....................................................................*passim*

*Miller v. Bonta*
542 F. Supp. 3d 1009 (S.D. Cal. 2001) ................................ 19, 23, 62

*Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*
No. 22-cv-501-BLF, __ F. Supp. 3d __ (N.D. Cal. Aug. 3, 2022) ............. 14, 49

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*
142 S. Ct. 2111 (2022) ................................................................*passim*

*Norse v. City of Santa Cruz*
629 F.3d 966 (9th Cir. 2010) ............................................................ 58

*Nunn v. State*
1 Ga. 243 (1846) ......................................................................... 43, 44

*Peruta v. Cty. of San Diego*
824 F.3d 919 (9th Cir. 2016) ...................................................... 35, 37

*Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*
662 F.2d 641 (9th Cir. 1981) ...................................................... 58, 60

*Portsmouth Square Inc. v. S'holders Protective Comm.*
770 F.2d 866 (9th Cir. 1985) ...................................................... 57, 58

*State v. Reid*
1 Ala. 612 (1840) .............................................................................. 44

*State v. Wilburn*
66 Tenn. 57 (1872) ........................................................................... 43

*United States v. Miller*
307 U.S. 174 (1939) ......................................................................... 23

v

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Wiese v. Becerra*
263 F. Supp. 3d 986 (E.D. Cal. 2018) ................................................. 5

*Wiese v. Becerra*
306 F. Supp. 3d 1190 (E.D. Cal. 2018) ............................................. 5

*Wilson v. State*
33 Ark. 557 (1878) ....................................................................... 43

*Worman v. Healey*
922 F.3d 26 (1st Cir. 2019) ........................................................ 20

*Young v. Hawaii*
992 F.3d 765 (9th Cir. 2021) ...................................................... 35

**CONSTITUTIONAL PROVISIONS**

United States Constitution
First Amendment ................................................... 15, 25, 41, 47
Second Amendment ...................................................... *passim*
Fourteenth Amendment ................................................ *passim*

Idaho Constitution of 1896 ............................................... 45

Utah Constitution of 1896 ............................................... 45

**STATUTES**

26 U.S.C. § 5841 ................................................................ 19

California Penal Code
§ 16740 ..................................................................... 6
§ 30515(a)(1)-(2) ......................................................... 6
§ 32310 ............................................................... *passim*
§ 32310(a) ............................................................ 4, 5
§ 32310(b) ................................................................ 4
§ 32310(c) ................................................................ 5
§ 32311 .................................................................... 4
§ 32390 .................................................................... 4
§§ 32400, 32405, 32406, 32435, 32440, 32445, 32450 ..................... 6

Defendant's Supplemental Brief in Response to Court Order of September 26, 2022
(17-cv-1017-BEN-JLB)

# TABLE OF AUTHORITIES
### (continued)

**Page**

California Stat.
    1549, § 1 ............................................................................................ 4
    1781, §§ 3, 3.5 .................................................................................... 4
    4035, § 6 ............................................................................................ 4
    5299, § 1 ............................................................................................ 4
    § 938 ................................................................................................ 48

1804 Ind. Acts 108 .............................................................................. 41

1905 Ind. Acts 677 .............................................................................. 41

1798 Ky. Acts 106 ......................................................................... 40, 41

1750 Mass. Acts 544, chap. 17, § 1 ............................................... 40, 41

1799 Miss. Laws 113 ........................................................................... 40

1804 Miss. Laws 90, § 4 ...................................................................... 41

Mich. Pub. Acts, 1927 – No. 372 ........................................................ 48

National Firearm Act of 1934 ................................................. 19, 31, 49

Ohio Gen. Code, 1933 – § 12819 ........................................................ 48

R.I. Pub. Acts, 1927 – Ch. 1052 ......................................................... 48

**COURT RULES**

Cal. Civil Rule 7.1(h) ............................................................................ 8

Fed. Rules of Civ. Proc.
    Rule 26(d)(4) ................................................................................... 58

**OTHER AUTHORITIES**

ATF, Firearms Commerce in the United States, Annual Statistical
    Update 2021, at 16 (2021), https://bit.ly/3y3krmI ............................ 19

Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and
    Lethality*, 55 U.C. Davis L. Rev. 2495 (2022) ................................. 27

Defendant's Supplemental Brief in Response to Court Order of September 26, 2022
(17-cv-1017-BEN-JLB)

# TABLE OF AUTHORITIES
### (continued)

**Page**

John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285 (1874)............................................34, 35

Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L. Rev. 139, 181 (2021)..............................................55, 56

*Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, *available at* https://bit.ly/3wfinEU ..........................................................62

Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE. ...............................................54

Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928) ...............................................49

Samuel L. Bray, *"Necessary and Proper" and "Cruel and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016)....................24

Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev. 261, 267 (2019)..............................................17

# INTRODUCTION

The Supreme Court's decision in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022), fundamentally altered the legal standard for evaluating Second Amendment challenges to firearms regulations.  Instead of the two-step framework that the Ninth Circuit and most other federal courts of appeals had adopted for resolving those claims, *Bruen* held that courts must apply a standard "rooted in the Second Amendment's text, as informed by history."  *Id.* at 2127.  Under this new "text-and-history" standard, courts must determine whether "the Second Amendment's plain text" protects the conduct in which the plaintiff wishes to engage, and if it does, then decide whether the regulation "is consistent with this Nation's historical tradition of firearm regulation."  *Id.* at 2126.  But, at the same time, the Court also made clear that the Second Amendment is not a "regulatory straightjacket."  *Id.* at 2133.  It does not prevent states from adopting a "'variety' of gun regulations," *id.* at 2162 (Kavanaugh, J., concurring), and "experiment[ing] with reasonable firearms regulations" to address threats to the public, *McDonald v. City of Chicago*, 561 U.S. 742, 785 (2010) (plurality opinion).

Under the Court's text-and-history standard, and consistent with the Supreme Court's Second Amendment precedents, California's restrictions on large-capacity magazines are a permissible exercise of the State's police powers that fully comport with the Second Amendment's text and history.  The Court should uphold the challenged provisions of California Penal Code section 32310 ("Section 32310"). [1]

---

[1] In support of Section 32310's constitutionality, the Attorney General relies on evidence in the existing record as well as the testimony presented in the additional declarations filed herewith: the Supplemental Declaration of Lucy P. Allen ("Suppl. Allen Decl."); the Declaration of Ryan Busse ("Busse Decl."); the Declaration of Saul Cornell ("Cornell Decl."); the Declaration of Dennis Baron ("Baron Decl."); the Supplemental Declaration of John J. Donohue ("Suppl. Donohue Decl."); the Declaration of Louis Klarevas ("Klarevas Decl."); the Declaration of Brennan Rivas ("Rivas Decl."); the Declaration of Randolph Roth ("Roth Decl."); the Declaration of Robert Spitzer ("Spitzer Decl."); and the

*First*, Plaintiffs cannot show that the plain text of the Second Amendment covers their proposed conduct of manufacturing, purchasing, importing, possessing, and carrying large-capacity magazines.  Under *Bruen*'s text-and-history standard, Plaintiffs must as a threshold matter demonstrate that the Second Amendment's protection for people keeping or bearing arms for self-defense covers their proposed conduct (*i.e.*, possessing large-capacity magazines). Plaintiffs in this case cannot meet that burden because (a) large-capacity magazines are not "Arms" for Second Amendment purposes because they are not essential for the operation of any firearm, and (b) even if large-capacity magazines were essential to the operation of a particular firearm, such magazines are not entitled to Second Amendment protection because they are not commonly used for self-defense.

*Second*, even if the plain text of the Second Amendment covers possession of large-capacity magazines, the Attorney General has satisfied his burden in demonstrating that California's restrictions on large-capacity magazines are "consistent with the Nation's historical tradition of firearm regulation."  *Bruen*, 142 S. Ct. at 2130.  In cases such as this one, where California's restrictions on large-capacity magazines were adopted in response to "dramatic technological changes," *id.* at 2132—the exponential increase in the lethality of firearms used with large-capacity magazines—and the "unprecedented societal concern[]," *id.*, that followed—mass shootings—*Bruen*'s admonition that the government is not required to identify a "historical *twin*" or "dead ringer" to justify a law is particularly apt.

Obviously, the Attorney General cannot identify restrictions identical to Section 32310 from 1791 or 1868, for the simple reason that large-capacity magazines did not yet exist at either time.  But that is not the Attorney General's

---

Declaration of Michael Vorenberg ("Vorenberg Decl.").  The Attorney General incorporates by reference herein the contents of those declarations.

burden.  Section 32310 is constitutional so long as it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors, and so long as the burdens of the modern and historical laws are "comparably justified." *Id*. at 2133.  That is the case here.

Throughout Anglo-American history, governments have adopted restrictions on "dangerous" or "unusual" weapons, *Heller*, 554 U.S. at 627, while allowing law-abiding residents to possess and acquire other firearms for self-defense purposes. Section 32310 is a part of that tradition.  The numerous restrictions enacted around the time that the Second and Fourteenth Amendments were ratified—such as restrictions on Bowie knives, blunt weapons, and trap guns—responded to existing technologies and threats to public safety confronting governments at the time of enactment, including concealable weapons that were used frequently in interpersonal assault and homicide.  And as weapons technologies changed after ratification of the Fourteenth Amendment, governments shifted focus to address those new threats to public safety.  This history provides ample analogues to California's restrictions on large-capacity magazines, which impose comparable, minimal burdens on the right to armed self-defense that are comparably justified.

*Third*, if the evidence in the record, including the additional evidence submitted with this brief, is insufficient to justify the constitutionality of the Section 32310, this Court should grant the pending Attorney General's pending Motion for Reconsideration, which would provide for supplemental expert discovery and an opportunity to respond to any new evidence submitted by Plaintiffs.

*Fourth*, this Court should enter judgment in the Attorney General's favor on Plaintiffs' takings and due processes claims because the Ninth Circuit en banc panel found that Plaintiffs had failed to make out those claims, and nothing in *Bruen* alters that conclusion.

*Finally*, if the Court is inclined to rule in Plaintiffs' favor, the Attorney General respectfully requests that the Court stay entry of judgment pending appeal.

1  This Court entered a stay pending appeal of its earlier judgment, and a similar stay

2  would be warranted in this case because, at a minimum, serious questions exist

3  going to the merits of this case, irreparable harm will likely be suffered in the

4  absence of a stay, the balance of equities would tip in favor of a stay, and a stay

5  would be in the public interest.

6      In sum, in light of currently available historical evidence and the evidence

7  previously adduced in discovery, this Court should hold that California's

8  restrictions on large-capacity magazines do not violate the Second Amendment.

9  Alternatively, if this Court is not prepared to enter judgment in the Attorney

10 General's favor on the existing record though, it should grant the Attorney

11 General's pending Motion for Reconsideration.

12                          **BACKGROUND**

13 **I.    CALIFORNIA'S RESTRICTIONS ON LARGE-CAPACITY MAGAZINES**

14     In 2000, California prohibited the manufacture, importation, sale, keeping for

15 sale, offering or exposing for sale, giving, and lending of any large-capacity

16 magazines.  *See* 1999 Cal. Stat. 1781, §§ 3, 3.5 (S.B. 23) (now codified at Cal.

17 Penal Code § 32310(a)).  The Legislature enhanced these restrictions over time.

18 *See, e.g.*, 2010 Cal. Stat. 4035, § 6 (S.B. 1080) (codified at Cal. Penal Code

19 § 32390) (declaring unlawfully possessed large-capacity magazines to be a

20 "nuisance," subject to confiscation and summary destruction); 2013 Cal. Stat. 5299,

21 § 1 (A.B. 48) (amending Cal. Penal Code § 32310(a)) (extending restrictions to the

22 purchase or receipt of large-capacity magazines); 2013 Cal. Stat. 5299, § 1

23 (A.B. 48) (codified at Cal. Penal Code §§ 32310(b), 32311) (prohibiting, *inter alia*,

24 the manufacture and sale of large-capacity magazine conversion kits).

25     On July 1, 2016, the Legislature enacted Senate Bill 1446 to prohibit the

26 possession of large-capacity magazines—both new and previously grandfathered

27 large-capacity magazines—beginning on July 1, 2017.  2016 Cal. Stat. 1549, § 1

28 (S.B. 1446).  Several months later, on November 8, 2016, the people of California

1    enacted Proposition 63, the Safety for All Act of 2016, which, among other things,

2    also prohibited the possession of all large-capacity magazines beginning on July 1,

3    2017.  *See* Echeverria Decl., Exh. 27 (Dkt. 53-10), at 983-1011.  Proposition 63's

4    amendments to California's large-capacity magazine restrictions largely mirrored

5    Senate Bill 1446, but eliminated certain exemptions to the possession restrictions

6    and enhanced the penalties for unlawful possession.  *Id.* at Exh. 42 (Dkt. 53-12), at

7    1448.[2]

8        Section 32310(a) provides that "any person in this state who manufactures or

9    causes to be manufactured, imports into the state, keeps for sale, or offers or

10   exposes for sale, or who gives, lends, buys, or receives" a large-capacity magazine

11   is guilty of a misdemeanor or a felony.  Cal. Penal Code § 32310(a).  Section

12   32310(c), added by Proposition 63, provides that the possession of a large-capacity

13   magazine on or after July 1, 2017, is an infraction or a misdemeanor punishable by

14   a fine not to exceed $100 per large-capacity magazine or imprisonment in a county

15   jail not to exceed one year, or both.  Cal. Penal Code § 32310(c).  Section 32310(d),

16   also added by Proposition 63, addresses previously grandfathered large-capacity

17   magazines, providing that anyone not authorized to possess large-capacity

18   magazines must, before July 1, 2017, (1) remove the large-capacity magazine from

19   the state, (2) sell the large-capacity magazine to a licensed firearms dealer, or (3)

20   surrender the large-capacity magazine to law enforcement for destruction.  *Id.* §

21   32310(d).  Alternatively, an owner of a large-capacity magazine may permanently

22   modify the magazine "so that it cannot accommodate more than 10 rounds."  *Id.* §

23   16740(a); *see also id.* § 32425 (exempting from Section 32310 the "giving of any

24   [large-capacity magazine] to . . . a gunsmith, for the purposes of . . . modification of

25   _____

26   [2] Because Proposition 63's amendments were enacted after Senate Bill 1446,
     they are the governing provisions.  *See Wiese v. Becerra*, 263 F. Supp. 3d 986, 997
     (E.D. Cal. 2018) (citing *People v. Bustamante*, 57 Cal. App. 4th 693, 701 (2d Dist.

27   1997)); *accord Wiese v. Becerra*, 306 F. Supp. 3d 1190, 1200 (E.D. Cal. 2018)
     (same).  Accordingly, references to Section 32310 and related statutes in this brief

28   are to the statutes as amended by Proposition 63.

that [large-capacity magazine]").  As amended, Section 32310 does not apply to, *inter alia*, any federal, state, or local law enforcement agencies, any sworn peace officers who are authorized to carry a firearm in the course and scope of their official duties, any honorably retired sworn peace officers or federal law enforcement officers who were authorized to carry a firearm in the course and scope of their official duties, any entity that operates an armored vehicle business or any authorized employee of that business, the manufacture of large-capacity magazines for law enforcement, government agencies, or the military, the loan of a large-capacity magazine for use solely as a prop in film production, or any holder of a special weapons permit for limited purposes. Cal. Penal Code §§ 32400, 32405, 32406, 32435, 32440, 32445, 32450.

The term "large-capacity magazine" is itself defined in Section 16740 of the Penal Code as "any ammunition feeding device with the capacity to accept more than 10 rounds," but excludes (a) a "feeding device that has been permanently altered so that it cannot accommodate more than 10 rounds," (b) a ".22 caliber tube ammunition feeding device," and (c) a "tubular magazine that is contained in a lever-action firearm." *Id.*

## II.  PROCEDURAL HISTORY

On May 17, 2017, less than two months before Section 32310(c) and (d) were to come into effect, Plaintiffs filed suit against the Attorney General. Dkt. No. 1 (Compl.).  The complaint asserts that Section 32310, in its entirety, violates the Second Amendment and that the possession restrictions codified at Section 32310(c) and (d) also violate the Takings Clause and the Due Process Clause.  *Id.* at ¶¶ 64-76.

Plaintiffs filed a motion for a preliminary injunction to enjoin enforcement of the newly-enacted restrictions on large-capacity magazine possession.  Dkt. 6.  On June 29, 2017, this Court issued a preliminary injunction, enjoining enforcement of section 32310(c) and (d).  Dkt. 28.  A divided Ninth Circuit panel affirmed the

1  preliminary injunction in an unpublished memorandum. *Duncan v. Becerra*, 742
2  Fed. App'x 218, 221-22 (9th Cir. 2018).

3      On March 5, 2018, while the interlocutory appeal was pending, Plaintiffs filed
4  a motion for summary judgment on all claims. Dkt. 50. The Attorney General
5  opposed the motion. Dkt. 53. After full briefing and oral argument, on March 29,
6  2019, this Court issued an order granting Plaintiffs' motion for summary judgment,
7  and entered judgment in favor of Plaintiffs. Dkt. 87. The Attorney General timely
8  appealed that order and judgment on April 4, 2019. Dkt. 96.

9      On August 14, 2020, a three-judge panel of the Ninth Circuit affirmed the
10  Court's order and judgment. *Duncan v. Becerra*, 970 F.3d 1133 (9th Cir. 2020).
11  However, the Ninth Circuit sitting en banc reversed this Court's order and
12  judgment and remanded the case with instructions to enter judgment in the Attorney
13  General's favor. *Duncan v. Becerra*, 988 F.3d 1209, 1210 (9th Cir. 2021) (en
14  banc), *vacated*, 142 S. Ct. 2895 (2022). Plaintiffs filed a petition for writ of
15  certiorari, and on June 30, 2022, the Supreme Court granted the petition, vacated
16  the Ninth Circuit's judgment, and remanded the case to the Ninth Circuit for
17  "further consideration in light of" *Bruen*. *Duncan v. Bonta*, 142 S. Ct. 2895 (2022).

18      After remand from the Supreme Court, the Ninth Circuit directed the parties to
19  "file supplemental briefs on the effect of *Bruen* on this appeal, including whether
20  the en banc panel should remand this case to the district court for further
21  proceedings in the first instance." 9th Cir. Dkt. 202 (Aug. 2, 2022). The Attorney
22  General argued that the case should be remanded to this Court to develop a more
23  comprehensive record responsive to *Bruen*, and after considering briefs from the
24  parties and amici, the Ninth Circuit adopted the course proposed by the Attorney
25  General and remanded the case to this Court for further proceedings consistent with
26  *Bruen*. *Duncan v. Bonta*, No. 19-55376, 2022 WL 4393577 (9th Cir. Sept. 23,
27  2022). Thereafter, on September 26, 2022, this Court entered an order spreading
28  the mandate and continuing the injunction in place. Dkt. 111. In that Order, the

7

1   Court provided that the Attorney General "shall file any additional briefing that is

2   necessary to decide this case in light of *Bruen* within 45 days of this Order," that

3   Plaintiffs "shall file any responsive briefing within 21 days thereafter," and that the

4   Court will then "decide the case on the briefs and the prior record or schedule

5   additional hearings." *Id.* at 2.[3]

6        On October 12, 2022, the Attorney General filed a Motion for Reconsideration

7   (Dkt. 112) seeking an extended briefing schedule for the instant briefing, as well as

8   an ex parte application to shorten the time for the Court to hear the motion (Dkt.

9   113).  Plaintiffs opposed the Motion for Reconsideration (*see* Dkt. 114), and the

10   Attorney General filed his reply in support of the Motion for Reconsideration (Dkt.

11   115).  On November 7, 2022, the Court set a status conference in this case for

12   December 12, 2022 (Dkt. 116).

13

## ARGUMENT

14

15  **I.   OVERVIEW OF *BRUEN*'S TEXT-AND-HISTORY STANDARD FOR ANALYZING SECOND AMENDMENT CLAIMS**

16        In *Bruen*, the Supreme Court addressed the constitutionality of New York's

17   requirement that individuals show "proper cause" as a condition of securing a

18   license to carry a firearm in public.  142 S. Ct. at 2123.  Before turning to the

19   merits, the Court announced a new methodology for analyzing Second Amendment

20   claims.  It recognized that lower courts had "coalesced around a 'two-step'

21   framework for analyzing Second Amendment challenges that combines history with

22   means-end scrutiny." *Id.* at 2125.  At the first step of that approach, the

23   government could "justify its regulation by 'establish[ing] that the challenged law

24   regulates activity falling outside the scope of the [Second Amendment] right as

25   originally understood.'" *Id.* at 2126 (citation omitted).  If that inquiry showed that

26   

27

28

[3] [3] The September 26, 2022 Order did not impose any page limits on the supplemental or responsive briefs.  In addition, the local rules do not prescribe any page limitations in connection with the briefs required under the September 26 Order.  *See* S.D. Cal. Civil Rule 7.1(h) (setting page limits on briefs in support of or in opposition to a motion).

1  the regulation did not burden conduct protected by the Second Amendment, lower

2  courts would uphold the regulation without further analysis. *Id.* Otherwise, courts

3  would proceed to the second step, asking "how close[ly] the law c[ame] to the core

4  of the Second Amendment right and the severity of the law's burden on that right,"

5  and applying intermediate scrutiny unless the law severely burdened the "'core'

6  Second Amendment right" of self-defense in the home, in which case strict scrutiny

7  applied. *Id.*; *Jackson v. City & Cnty. of San Francisco*, 746 F.3d 953, 960 (9th Cir.

8  2014) (same).

9       The Supreme Court in *Bruen* declined to adopt the two-step approach. *See*

10  142 S. Ct. at 2126. The Court explained that its earlier decisions in *Heller* and

11  *McDonald*, 561 U.S. 742, "do not support applying means-end scrutiny in the

12  Second Amendment context." *Id.* at 2126–27. It then announced a new standard

13  for analyzing Second Amendment claims that is "centered on constitutional text and

14  history." *Id.* at 2128–29. Under this text-and-history approach,

15       When the Second Amendment's plain text covers an individual's
16       conduct, the Constitution presumptively protects that conduct. The
         government must then justify its regulation by demonstrating that it
17       is consistent with the Nation's historical tradition of firearm
18       regulation.

19  *Id.* at 2129–30.

20

21       Applying that test to the case before it, the Court held that New York's

22  "proper cause" requirement was inconsistent with the Second Amendment's text

23  and history, and therefore unconstitutional. *Id.* at 2134–56. New York defined

24  "proper cause" as a showing of "special need for self-protection distinguishable

25  from that of the general community." *Id.* at 2123. This was a "demanding"

26  standard, *id.*, and made it "virtually impossible for most New Yorkers" "to carry a

27  gun outside the home for self-defense," *id.* at 2156 (Alito, J., concurring). The

28  Supreme Court had "little difficulty" concluding that the "plain text" of the Second

9

Amendment protected the course of conduct that the *Bruen* plaintiffs wished to engage in—"carry[ing] handguns publicly for self-defense"—reasoning that the term "'bear' naturally encompasses public carry." *Id.* at 2134.[4] The Court explained that because "self-defense is 'the *central component*' of the [Second Amendment] right itself," and because "[m]any Americans hazard greater danger outside the home than in it," it would make "little sense" to confine that right to the home. *Id.* at 2135.

Because the plain text of the Second Amendment covered the *Bruen* plaintiffs' proposed course of conduct, the burden then shifted to the government to show that the prohibition was consistent with an accepted tradition of firearm regulation. 142 S. Ct. at 2135.  The Court categorized the government's historical evidence into different historical periods: (1) medieval to early modern England, (2) the American colonies and the early Republic, (3) antebellum America, (4) postbellum America and Reconstruction, and (5) the late 19th and early 20th centuries.  *Id.* at 2135–36.  Given that the historical evidence is used to determine the scope of the Second Amendment as it existed at the time of ratification—and remains to this day—"not all history is equal," and the Court focused on the historical evidence from the period surrounding the ratification of the Second and Fourteenth Amendments.  *Id.* at 2136.[5]

---

[4] No party in *Bruen* disputed that the "ordinary, law-abiding, adult citizens" who were plaintiffs in the case were "part of 'the people' whom the Second Amendment protects."  *Bruen*, 142 S. Ct. at 2134.  And no party disputed that the handguns that the plaintiffs sought to carry in public were in "common use" for self-defense and thus qualified as protected "Arms."  *Id.* (citing *Heller*, 554 U.S. at 627, and *Caetano v. Massachusetts*, 577 U.S. 411, 411–412 (2016)).

[5] The Court suggested that historical evidence long predating ratification may be relevant, however, if it "survived to become our Founders' law" and is consistent with the traditions during the relevant historical period.  *Bruen*, 142 S. Ct. at 2136.  Similarly, evidence from long after ratification of the Fourteenth Amendment, though less probative of the original understanding of the scope of the right, may

After conducting a lengthy survey of "the Anglo-American history of public carry," the Court held that New York had failed to justify its proper-cause requirement. *Id.* at 2156. The Court concluded that this history showed that the Second Amendment guaranteed a right to bear "commonly used arms" in public, "subject to certain reasonable, well-defined restrictions," which had not historically included a requirement that "law-abiding, responsible citizens . . . 'demonstrate a special need for self-protection distinguishable from that of the general community' in order to carry arms in public.'" *Id.* (citation omitted).

While *Bruen* announced a new standard for analyzing Second Amendment claims, it also made clear that governments may continue to adopt reasonable gun safety regulations. The Court recognized that the Second Amendment is not a "regulatory straightjacket." *Bruen*, 142 S. Ct. at 2133. Nor does it protect a right to "keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* at 2128 (quoting *Heller*, 554 U.S. at 626). Indeed, as Justice Alito explained, *Bruen*'s majority opinion did not "decide anything about the kinds of weapons that people may possess." 142 S. Ct. at 2157 (Alito, J., concurring).

Moreover, Justice Kavanaugh—joined by Chief Justice Roberts—wrote separately to underscore the "limits of the Court's decision." *Bruen*, 142 S. Ct. at 2161 (Kavanaugh, J., concurring). Justice Kavanaugh also reiterated the majority's view that the Second Amendment is not a "regulatory straightjacket," *id.* (quoting *Bruen*, 142 S. Ct. at 2133), and *Heller*'s observation that "the Second Amendment

---

still confirm the scope of that right if consistent with the text of the Second Amendment and the regulatory traditions at the time of ratification. *Id.* at 2137 ("[P]ost-ratification adoption or acceptance of laws that are *inconsistent* with the original meaning of the constitutional text obviously cannot overcome or alter that text." (quoting *Heller v. District of Columbia*, 670, F.3d 1244, 1274 n.6 (D.C. Cir. 2011) (Kavanaugh, J., dissenting))).

allows a 'variety' of gun regulations," *id.* at 2162 (quoting *Heller*, 554 U.S. at 636).[6] In particular, Justice Kavanaugh emphasized that that the "presumptively lawful measures" that *Heller* identified—including "longstanding prohibitions on the possession of firearms by felons and the mentally ill," laws "forbidding the carrying of firearms in sensitive places," laws "imposing conditions and qualifications on the commercial sale of arms," and laws prohibiting the keeping and carrying of "dangerous and unusual weapons"—remained constitutional, and that this was not an "exhaustive" list. *Id.* at 2162 (quoting *Heller*, 554 U.S. at 626–27, 627 n.26).[7]

Beyond these general observations, *Bruen* also provided more specific guidance on how lower courts should scrutinize Second Amendment claims under its new approach. As a threshold issue, *Bruen* directs courts to assess whether the "Second Amendment's plain text covers an individual's conduct," *Bruen*, 142 S. Ct. at 2126—*i.e.*, whether the regulation at issue prevents any "people" from "keep[ing]" or "bear[ing]" "Arms" for lawful purposes, U.S. Const. amend. II. The Constitution "presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126.

If a challenged restriction regulates conduct protected by the "plain text" of the Second Amendment, *Bruen* then directs the government to justify its regulation by showing that the law is "consistent with this Nation's historical tradition of

---

[6] These observations are consistent with the Court's assurances that "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." *McDonald*, 561 U.S. at 785 (plurality opinion) (quotation marks and citation omitted).

[7] *See also Bruen*, 142 S. Ct. at 2157 (Alito, J., concurring) ("Our holding decides nothing about who may lawfully possess a firearm or the requirements that must be met to buy a gun. Nor does it decide anything about the kinds of weapons that people may possess. Nor have we disturbed anything that we said in *Heller* or *McDonald* . . . about restrictions that may be imposed on the possession or carrying of guns."); *accord McDonald*, 561 U.S. at 785 (plurality opinion) (the Second Amendment "by no means eliminates" state and local governments' "ability to devise solutions to social problems that suit local needs and values").

firearm regulation." *Bruen*, 142 S. Ct. at 2126.  And while the Court recognized that the historical analysis conducted at the first step of the two-step approach that lower courts had adopted for analyzing Second Amendment claims was "broadly consistent with *Heller*," *id.* at 2127, it clarified how that analysis should proceed in important respects.  In some cases, the Court explained, this historical inquiry will be "fairly straightforward," such as when a challenged law addresses a "general societal problem that has persisted since the 18th century."  *Id.* at 2131.  But in others—particularly those where the challenged laws address "unprecedented societal concerns or dramatic technological changes"—the Court recognized that this historical analysis requires a "more nuanced approach."  *Id.* at 2132.

To justify regulations of that sort, *Bruen* held that governments are not required to identify a "historical *twin*," and need only identify a "well-established and representative historical *analogue*."  142 S. Ct. at 2133 (emphasis in original). Thus, a modern-day regulation need not be a "dead ringer for historical precursors" to pass constitutional muster.  *Id.*  Instead, in evaluating whether a "historical regulation is a proper analogue for a distinctly modern firearm regulation," *Bruen* directs courts to determine whether the two regulations are "'relevantly similar.'" *Id.* at 2132 (quoting C. Sunstein, *On Analogical Reasoning*, 106 Harv. L. Rev. 741, 773 (1993)).  The Court identified "two metrics" by which regulations must be "relevantly similar under the Second Amendment": "how and why the regulations burden a law-abiding citizen's right to armed self-defense."  *Id.* at 2133.  The Court explained that those dimensions are especially important because "'individual self-defense is "the *central component*" of the Second Amendment right.'"  *Id.* (quoting *McDonald*, 561 U.S. at 767, and *Heller*, 554 U.S. at 599).  After *Bruen*, a modern regulation that restricts conduct protected by the plain text of the Second Amendment is constitutional if it "impose[s] a comparable burden on the right of armed self-defense" as its historical predecessors that is "comparably justified."  *Id.*

## II.   SECTION 32310 SATISFIES THE TEXT-AND-HISTORY STANDARD

California's restrictions on large-capacity magazines are constitutional at both stages of the text-and-history standard.  First, Plaintiffs' facial challenge to Section 32310 fails at the threshold inquiry because they cannot demonstrate that the "plain text" of the law covers their proposed course of conduct of acquiring, possessing, and bearing large-capacity magazines because (a) they are not bearable "Arms" within the meaning of the Second Amendment as originally understood, given that they are not essential to the operation of actual firearms and thus would not have been considered "Arms" in 1791 or 1868, and (b) they are not protected "Arms" because they are not "commonly used" for self-defense.  *Bruen*, 142 U.S. at 2138.  Second, even if large-capacity magazines were considered "Arms," Section 32310 is constitutional because it imposes a comparable burden on the right of armed self-defense as the historical analogues identified herein and is comparably justified to the regulatory burdens imposed by those historical analogues.

### A.   Plaintiffs Cannot Establish that Section 32310 Burdens Conduct Protected by the Plain Text of the Second Amendment

Plaintiffs cannot demonstrate that Section 32310 burdens any conduct covered by the plain text of the Second Amendment.  Under the text-and-history standard for adjudicating Second Amendment claims, the party challenging a restriction under the Second Amendment must first demonstrate that the law regulates conduct protected by the "plain text" of the Second Amendment.  *Bruen*, 142 S. Ct. at 2126; *accord id.* at 2130, 2135.  The Second Amendment "presumptively protects that conduct" only if covered by the plain terms of the amendment.  *Id.* at 2126; *see also id.* at 2129–30 (same).  To establish that the plain text applies, a plaintiff must demonstrate that each of the "textual elements" of the Second Amendment's operative clause covers the proposed course of conduct.  *Id.* at 2134 (quoting *Heller*, 554 U.S. at 592); *see also Nat'l Ass'n for Gun Rights, Inc. v. City of San Jose*, No. 22-cv-501-BLF, __ F. Supp. 3d __, 2022 WL 3083715, at *8 (N.D. Cal.

14

Aug. 3, 2022) ("If the conduct at issue is covered by the text of the Second
Amendment, the burden then *shifts* to the government to show why the regulation is
consistent with the Nation's historical tradition of firearm regulation" (emphasis
added)); *Defense Distributed v. Bonta*, No. 22-6200-GW-AGRx, 2022 WL
15524977, at *3 n.5 (C.D. Cal. Oct. 21, 2022) (explaining that *Bruen* requires
"plain-text analysis *first*, *then* history *if necessary*").[8]  *Bruen* makes clear that a
party challenging a law under the Second Amendment (and not the government)
bears this threshold, textual burden.  *See Bruen*, 142 S. Ct. at 2134 (noting that the
government "d[id] not dispute" that the plain text of the Second Amendment
covered the plaintiffs' proposed conduct).

The Supreme Court's assignment of this burden to plaintiffs is consistent with
how the Supreme Court "protect[s] other constitutional rights."  *Bruen*, 142 S. Ct.
at 2130.  As explained in *Bruen*, in free speech cases under the First Amendment,
"to which *Heller* repeatedly compared the right to keep and bear arms," the
government bears the burden of justifying its actions only "[w]hen the Government
restricts speech."  *Id.* at 2130 (quotation marks and citation omitted).  Plaintiffs who
assert free speech claims are "oblig[ed]" to "demonstrate that the First Amendment
even applies" to the "assertedly expressive conduct" in which they wish to engage.
*Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984).  And
when scrutinizing free exercise claims, the Court first asks whether the plaintiff has
shown that the government "has burdened his sincere religious practice pursuant to
a policy that is not 'neutral' or 'generally applicable.'"  *Kennedy v. Bremerton Sch.
Dist.*, 142 S. Ct. 2407, 2421–22 (2021).  "Should a plaintiff make a showing like
that," the burden then shifts to the government to justify its action.  *Id.* at 2422.
*Bruen* holds that this approach applies in the Second Amendment context.

---

[8] The district court in *Defense Distributed* adopted its tentative ruling and
denied the plaintiff's motion for a preliminary injunction.  *Defense Distribtued v.
Bonta*, No. 22-6200-GW-AGRx, 2022 WL 15524983, at *1 (C.D. Cal. Oct. 24,
2022).

15

Under this approach, therefore, in any Second Amendment case, the plaintiff has the burden of establishing that the challenged law regulates protected "Arms." U.S. Const. amend. II.  Whether a particular instrument, device, or weapon is protected by the Second Amendment's plain text involves an examination of whether it is a "bearable arm[]" at all, *Bruen* 142 S. Ct. at 2132, and, if so, whether it is "commonly used" for self-defense purposes, *id.* at 2134.[9]

**1.  Large-Capacity Magazines Are Not "Arms" Protected by the Second Amendment Because They Are Not Essential to the Use of Firearms**

Large-capacity magazines are not "Arms" that may be protected by the Second Amendment because they would not have been understood as such in 1791 or 1868, given that they are not essential to the use of firearms.  The Ninth Circuit has held that in addition to protecting certain weapons and firearms, the Second Amendment's "right to possess firearms for protection [also] implies a corresponding right" to obtain the items "necessary to use" those firearms.  *Jackson v. City & Cnty. of San Francisco*, 746 F.3d at 967; *see also Fyock v. City of Sunnyvale*, 779 F.3d 991, 997 (9th Cir. 2015) ("[T]here must also be some corollary, albeit not unfettered, right to possess the magazines *necessary to render those firearms operable*." (emphasis added).  In this case, however, the magazines restricted by Section 32310 are not necessary to use firearms.  Busse Decl., ¶ 7 ("[A]ll firearms that can accept a large-capacity magazine can also accept a

---

[9] The common use inquiry occurs at the textual stage of the text-and-history standard.  In *Bruen*, the Court situated the "common use" inquiry in the textual stage of its analysis, rather than the historical stage at which the government bears the burden.  *Id.* at 2134.  Before turning to whether the plain text of the Second Amendment covered the plaintiffs' proposed course of conduct of carrying (*i.e.*, "bearing") handguns in public for self-defense, the Court confirmed that the plaintiffs were "part of 'the People' whom the Second Amendment protects and that "handguns are weapons 'in common use' today for self-defense."  *Id.* (citing *Heller*, 554 U.S. at 627, and *Caetano v. Massachusetts*, 577 U.S. 411, 411-12 (2016)).

1  magazine that holds 10 or fewer rounds and function precisely as intended."); *id.* at

2  ¶ 9 ("[A] large capacity magazine is not a required component for a firearm to

3  operate.").[10]

4      The distinction between "Arms" entitled to Second Amendment protection on

5  the one hand and those non-essential items on the other hand existed, and would

6  have been widely understood, in 1791 and 1868. This understanding is made clear

7  through corpus linguistics, a field that examines patterns in the meaning and usage

8  of words in large databases of text (referred to in the field as "corpora"). *See*

9  Thomas R. Lee & James C. Phillips, *Data-Driven Originalism*, 167 U. Pa. L. Rev.

10  261, 267 (2019). These corpora contain digitized and searchable compilations of

11  real-world sources, including books, newspapers, speeches, and transcripts, "drawn

12  from a particular speech community" during particular times in history. *Id.* at 290.

13  Based on relevant corpus linguistics data, large-capacity magazines would not have

14  fallen within the historical meaning of the term "arms," but rather would have been

15  considered "accoutrements," a term used during the relevant periods to refer to

16  "ancillary equipment associated with soldiering, or service in the military." Barron

17  Decl., ¶ 25.

18      Because such magazines are not necessary for the operation of any firearm,

19  they would not have been considered "Arms" protected by the Second Amendment

20  in 1791 or 1868. Thus, Plaintiffs' challenge to Section 32310 necessarily fails.

21
22          **2.**    **Additionally, Large-Capacity Magazines Are Not Protected "Arms" Because They Are Not Commonly Used for Self-Defense.**

23      In addition to not being bearable "Arms" because they are not essential to the

24  use of firearms, large-capacity magazines also do not constitute "Arms" protected

25  by the Second Amendment because they are not commonly used for self-defense.

26

27          [10] To be sure, some type of magazine is essential to the use of many handguns. But there is no evidence in this record—and plaintiffs have introduced

28  none—that a magazine *capable of firing more than 10 rounds without reloading* is necessary to the function of any modern firearm,

17

As the Supreme Court has explained, the Second Amendment protects "'instruments that constitute bearable arms'" that "facilitate armed self-defense." *Bruen*, 142 S. Ct. at 2132 (quoting *Heller*, 554 U.S. at 582).

In *Bruen*, *McDonald*, and *Heller*, the Supreme Court held out "individual self-defense" as "'the *central component*' of the Second Amendment right." *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767, in turn quoting *Heller*, 554 U.S. at 599). And while the Court in those three cases invalidated strict laws that effectively precluded most law-abiding citizens from possessing or carrying all handguns—"the quintessential self-defense weapon," *Bruen*, 142 S. Ct. at 2143 (quoting *Heller*, 554 U.S. at 629)—the Court made clear that "the right secured by the Second Amendment is not unlimited" and does not extend to "a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose," *id.* at 2128 (quoting *Heller*, 554 U.S. at 626). On the contrary, the Second Amendment protects only those weapons that are "'in common use at the time' *for lawful purposes like self defense*." *Heller*, 554 U.S. at 624 (emphasis added) (quoting *United States v. Miller*, 307 U.S. 174, 179 (1939)); *see also Bruen*, 142 S. Ct. at 2135 (referencing whether the subject "weapons [are] 'in common use' today for self-defense" (quoting *Heller*, 554 U.S. at 627)). This "important limitation on the right to keep and carry arms," recognized in *Heller*, remains a critical limitation on the Second Amendment following *Bruen*. *See id.* at 2162 (Kavanaugh, J., concurring).

In neither *Heller* nor *Bruen* did the Court find that the Second Amendment's protections were grounded in the need to bear arms for militia service, *Duncan*, 366 F. Supp. 3d at 1142, or as a "check against tyranny," *id.* at 1149. In fact, *Bruen* repeatedly confirms that self-defense (and not militia or military service) is the "central component" of the right protected by the Second Amendment. *Bruen*, 142 S. Ct. at 2133 (quoting *McDonald*, 561 U.S. at 767); *see also id.* at 2125 (noting that *Heller* and *McDonald* "held that the Second and Fourteenth Amendments

18

protect an individual right to keep and bear arms for self-defense"); *id.* at 2128 (same).

And as *Bruen* make clear, the test for Second Amendment protection of a particular weapon is common *use*, not common *ownership*.  *See* 142 S. Ct. at 2138 (referring to "commonly *used* firearms for self-defense" (emphasis added)); *id.* at 2142 n.12 (finding that pocket pistols were "commonly *used* at least by the founding" (emphasis added)); *id.* at 2143 (noting that certain belt and hip pistols "were commonly *used* for lawful purposes in the 1600s" (emphasis added)); *id.* at 2156 (describing the "right to bear commonly *used* arms in public subject to certain reasonable, well-defined restrictions" (emphasis added)); *accord Heller*, 554 U.S. at 636 (holding that the government could not impose an "absolute prohibition of handguns held *and used* for self-defense" (emphasis added)).

In other words, a firearm being "commonly owned" "for lawful purposes," *Duncan*, 366 F. Supp. 3d at 1142, is not enough.  And the phrase "in common use" as used in *Bruen*, *Heller*, and *McDonald* does not simply refer to a weapon's prevalence in society, or the quantities manufactured or sold. [11]  In addition to the

---

[11] This Court has stated that the Supreme Court implied that 200,000 stun guns were sufficient to show "common ownership and receive constitutional protection," *Miller*, 542 F. Supp. 3d at 1023 (citing *Caetano*, 577 U.S. at 420 (Alito, J., concurring)), but that figure cannot be sufficient.  There are more than 700,000 machine guns registered in the United States.  *See* ATF, Firearms Commerce in the United States, Annual Statistical Update 2021, at 16 (2021), https://bit.ly/3y3krmI.  Since enactment of the National Firearms Act ("NFA") of 1934, machine guns have been heavily regulated by the federal government, imposing special taxes on the making or transfer of firearms regulated under the NFA and requiring any machine guns in lawful possession to be registered with the U.S. Secretary of the Treasury in the National Firearm Registration and Transfer Record registry.  26 U.S.C. § 5841; https://bit.ly/3CdReXd.  Even though there are more registered machine guns than the number of stun guns discussed in Justice Alito's concurrence in *Caetano*, the Supreme Court has indicated that machine guns are not protected by the Second Amendment because they are not "in common use."  *Heller*, 554 U.S. at 627.  Accordingly, numbers alone are not driving the

Defendant's Supplemental Brief in Response to Court Order of September 26, 2022
(17-cv-1017-BEN-JLB)

prevalence of the weapon in society—which remains relevant, because in order to be commonly used, the weapon must also be commonly possessed—courts must consider the suitability of the weapon and the actual use of the weapon for self-defense.  *See Duncan v. Bonta*, 19 F.4th 1087, 1105 (9th Cir. 2021), *cert. granted*, *judgment vacated*, 142 S. Ct. 2895 (2022), *and vacated and remanded*, 49 F.4th 1228 (9th Cir. 2022) (Berzon, J., concurring) ("Notably, however, *Heller* focused not just on the prevalence of a weapon, but on the primary use or purpose of that weapon."); *see also Heller*, 554 U.S. at 629 (explaining the "reasons that a citizen may prefer a handgun for home defense," including that handguns are easier to store in a location that is readily accessible in an emergency, are easier to lift and aim than a long gun, and can be used with a single hand while the other hand dials the police).

The alternative of assessing "common use" based on mere prevalence in society would be circular.  *See Duncan*, 19 F.4th at 1126 (Berzon, J., concurring); *Kolbe*, 849 F.3d at 141–42 (noting that "the *Heller* majority said nothing to confirm that it was sponsoring the popularity test"); *Worman v. Healey*, 922 F.3d 26, 35 n.5 (1st Cir. 2019) (noting that "measuring 'common use' by the sheer number of weapons lawfully owned is somewhat illogical" (citing *Friedman v. City of Highland Park*, 784 F.3d 406, 409 (7th Cir. 2015))).  Under a mere popularity test, if the federal restriction on automatic weapons were repealed, and just one populous state did not prohibit their sale, and some (unspecified) amount of those weapons were sold, fully automatic M-16 rifles could qualify for Second Amendment protection such that governments could no longer ban them.  Such an outcome would flatly contradict the Supreme Court's observation that the M-16 "may be banned" and that a contrary view, in which fully automatic machine guns are

---

Court's determinations that certain weapons are or are not protected by the Second Amendment.

protected by the Second Amendment, would be "startling." *See Heller*, 554 U.S. at 624, 627; *see also Kolbe*, 849 F.3d at 141 (under a popularity test, manufacturers would need only "flood[] . . . the market prior to any governmental prohibition in order to ensure it constitutional protection").

Turning to the applicable analysis (*i.e.*, common use), the evidence submitted in this case in the form of two separate recent datasets establish large-capacity magazines are not commonly used in self-defense. First, an analysis of incidents reported in the NRA Armed Citizens database compiled from January 2011 through May 2017 reveal that it is rare for individuals to defend themselves using more than ten rounds; on average, only 2.2 shots were fired by defenders. Supp. Allen Decl., ¶ 10. Moreover, that same analysis found that more than 10 bullets were fired in only 2 out of 736 self-defense incidents in the United States. *Id*. And in those two incidents, there is no evidence that the shooter used a large-capacity magazine, rather than reloading or using another firearm. *See Duncan*, 19 F.4th at 1105 (finding that the record below did not disclose whether "the added benefit of a large-capacity magazine—being able to fire more than ten bullets in rapid succession—has ever been realized in self-defense in the home"). The second analysis involved an analysis of published news stories. Supp. Allen Decl., ¶¶ 13-14. That analysis revealed a similar number of average shots per incident of self-defense (*i.e.*, 2.34). *Id*. at ¶ 18. And it further found that in 97.3% of incidents the defender fired 5 or fewer shots, and that there were no incidents where the defender was reported to have fired more than 10 bullets. *Id*. at ¶ 19.

These statistics should be unsurprising, given that large-capacity magazines are unsuitable for self-defense. Indeed, as the Ninth Circuit and others have recognized, large-capacity magazines serve specific combat-oriented functions and are not needed or suitable for self-defense. *See Duncan*, 19 F.4th at 1105 ("Evidence supports the common-sense conclusion that the benefits of a large-capacity magazine are most helpful to a soldier: 'the use of large-capacity

1   magazines results in more gunshots fired, results in more gunshot wounds per

2   victim, and increases the lethality of gunshot injuries.'" (quoting *Fyock*, 779 F.3d at

3   1000)); *see also Kolbe*, 849 F.3d at 137 ("Large-capacity magazines enable a

4   shooter to hit 'multiple human targets very rapidly.'"); *NYSRPA*, 804 F.3d at 263–

5   64 ("Like assault weapons, large-capacity magazines result in 'more shots fired,

6   persons wounded, and wounds per victim than do other gun attacks.'" (quoting

7   *Heller II*, 670 F.3d at 1263)).

8       Courts have recognized that a weapon's similarity to a weapon commonly

9   used in the military is a permissible basis for prohibiting that weapon for civilian

10  use.  In *Heller*, the Court made clear that "M-16 rifles and the like"—"weapons that

11  are most useful in military service"—"may be banned."  *Heller*, 554 U.S. at 627.

12  Courts have extended *Heller*'s observation that fully automatic weapons may be

13  banned to weapons equipped with large-capacity magazines, reasoning that these

14  latter firearms are "like" automatic firearms.  *See, e.g.*, *Kolbe*, 849 F.3d at 136

15  ("Because the banned assault weapons and large-capacity magazines are 'like' 'M-

16  16 rifles'—'weapons that are most useful in military service'—they are among

17  those arms that the Second Amendment does not shield" (citing *Heller*, 554 U.S. at

18  627).  Indeed, before *Bruen*, an en banc panel of the Ninth Circuit in this matter

19  commented that this analogy to military use has "significant merit" when applied to

20  large-capacity magazines, because such magazines are likely "most useful in

21  military service" due to their limited "lawful, civilian benefits" and "significant

22  benefits in a military setting."  *Duncan*, 19 F.4th at 1102.  And nothing in *Bruen*

23  suggests that *Heller*'s view that weapons most useful in military service, like the

24  M-16, may be banned.  It is thus difficult to square the suggestion that "weapons

25  most useful for military service" are entitled to Second Amendment protection,

26  *Duncan*, 366 F.Supp.3d at 1173-74, with *Heller* and now *Bruen*'s view of the

27  Second Amendment.

28

Although the Second Amendment's prefatory clause references a "well-regulated Militia," U.S. Const. amend. II, *Heller* made clear that the operative clause protects a right to armed self-defense, notwithstanding the language used in *United States v. Miller* discussing whether the short-barreled shotgun in that case "is any part of the ordinary military equipment or that its use could contribute to the common defense." *Heller*, 554 U.S. at 622 (quoting *United States v. Miller*, 307 U.S. at 178).[12]  The *Heller* Court explained that this phrase must be read in conjunction with *Miller*'s subsequent observation that members of the militia "were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *Id.* at 625 (quoting *United States v. Miller*, 307 U.S. at 179). Those weapons were "arms 'in common use at the time' for lawful purposes like self-defense." *Id.*  Because short-barreled shotguns were "not typically possessed by law-abiding citizens for lawful purposes," they were held to not be protected by the Second Amendment—not because they were not useful in military or militia service. *Id.*  "*Heller* understood [*United States v.*] *Miller*" to allow states "to decide when civilians can possess military-grade firearms, so as to have them available when the militia is called to duty." *Friedman*, 784 F.3d at 410.

Thus, because large-capacity magazines are not commonly used for self-defense, those magazines are not entitled to Second Amendment protection.

**B.    Section 32310's Restrictions on Large-Capacity Magazines Are Consistent with the Nation's Traditions of Firearms and Other Weapons Regulations**

Under the text-and-history standard, the government must justify a firearms regulation if the regulation burdens conduct protected by the plain text of the Second Amendment.  Even if Plaintiffs could meet their threshold burden, Section

---

[12] The *Heller* Court cautioned against over-reading *United States v. Miller*, as "the case did not even purport to be a thorough examination of the Second Amendment." *Heller*, 554 U.S. at 623.

1    32310's restrictions on large-capacity magazines are consistent with the Nation's

2    tradition of regulating "dangerous [or] unusual weapons." *Bruen*, 142 S. Ct. at

3    2128 (quoting *Heller*, 554 U.S. at 627).[13]  As explained below, governments have

4    enacted restrictions on certain weapons and accoutrements deemed to be

5    susceptible to criminal misuse and to pose significant dangers to the public

6    provided that law-abiding citizens retained access to other arms for effective self-

7    defense throughout our Nation's history, including around the time that the Second

8    and Fourteenth Amendments were ratified.

9

                    **1.    The Second Amendment Does Not Limit the States' Police**
10                  **Powers to Address Public Safety Threats as They Arise**

11          The Second Amendment is not absolute.  Since the founding and even earlier,

12    governments have exercised broad police powers to limit access to and use of

13    certain types of weapons deemed to be especially dangerous.  As historian Saul

14

15          [13] While *Heller* and *McDonald* refer to prohibitions on "dangerous and
      unusual weapons," Blackstone refers to the crime of carrying 'dangerous *or* unusual
16    weapons.'" *Kolbe*, 849 F.3d at 131 n.9 (quoting 4 Blackstone 148–49 (1769)).
      Notably, laws enacted to regulate the possession and carrying of dangerous
17    weapons characterize those weapons in different ways.  *See Bruen*, 142 S. Ct. at
      2143 (noting that the 1686 New Jersey concealed weapons restriction applied to the
18    carrying of "dangerous or *unlawful* weapons" (emphasis added)); *id.* at 2144
      (describing 1801 Tennessee statute prohibiting any person from "privately
19    carry[ing] any dirk, large knife, pistol or *any other dangerous weapon*, to the fear or
      terror of any person" (emphasis added).  The Supreme Court has not explained the
20    meaning of the phrase "dangerous and unusual" as it relates to weapons, or
      suggested that the phrase imposes rigid requirements on governments attempting to
21    regulate such weapons. In any event, it appears that the phrase is a hendiadys—a
      figure of speech like "cruel and unusual" and "necessary and proper," which
22    involve "two terms, separated by a conjunction, [that] are melded together to form a
23    single complex expression." Samuel L. Bray, *"Necessary and Proper" and "Cruel
      and Unusual": Hendiadys in the Constitution*, 102 Va. L. Rev. 687, 695 (2016); *see
24    also* Cornell Decl. ¶ 9 n.9.  If viewed as such, "dangerous and unusual" would be
      read as "unusually dangerous," which as explained herein, large-capacity
25    magazines are.

26

27

28

1    Cornell explains, the "dominant understanding of the Second Amendment and its

2    state constitutional analogues at the time of their adoption in the Founding period

3    forged an indissoluble link between the right to keep and bear arms with the goal of

4    preserving the peace."  Cornell Decl., ¶ 9.  Government regulation is permitted,

5    even though the text of the Second Amendment provides an "unqualified

6    command" that the right to keep and bear arms "shall not be infringed."  *Bruen*, 142

7    S. Ct. at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10

8    (1961).  *Bruen*'s quotation from *Konigsberg* makes clear that even unqualified

9    commands concerning the inviolability of constitutional rights, such as the

10   provision that the freedoms of speech and association must not be "abridg[ed],"

11   U.S. Const. amend. I, should not be given "a literal reading."  *Konigsberg*, 366 U.S.

12   at 49.  As with the First Amendment, the Second Amendment is not to be read

13   literally.  "The provisions of the Constitution are not mathematical formulas," but

14   rather are "organic living institutions transplanted from English soil" and their

15   significance is determined "by considering their origin and the line of their growth."

16   *Id.* (quotation marks and citation omitted).

17          Unlike the First Amendment, courts have only just begun to explore the

18   historical origins of the right to keep and bear arms and to define its precise scope

19   and exceptions.  *See Heller*, 554 U.S. at 625–26 (noting that it should not be

20   surprising that it took the Court so long to decide a Second Amendment case, given

21   that the Court first decided a First Amendment case in 1931).  The history of the

22   Second Amendment demonstrates that governments enjoyed robust police powers

23   to regulate weapons—including who may possess them, where they may be

24   possessed, and what weapons may be possessed and used.  Historical regulations on

25   the right to keep and bear arms show that Section 32310's restrictions on magazines

26   configured to hold more than ten rounds is consistent with the scope of that right as

27   it was historically defined (and fixed in time).

28

### 2. Historical Regulations of Dangerous or Unusual Weapons Are Ubiquitous in American History, Including the Relevant Periods Surrounding the Ratification of the Second and Fourteenth Amendments

As explained below, the Attorney General need only show that Section 32310 has relevantly similar historical analogies. That burden is easily met in this case, as relevantly similarly regulations on dangerous or unusual weapons exist throughout American history, including at the Founding and in the period immediately following the Civil War.

### a. The Attorney General Needs Only Show that Section 32310 Is "Relevantly Similar" to the Historical Tradition of Regulating Dangerous or Unusual Weapons

As discussed above, *Bruen* does not require the Attorney General to identify a "historical twin" or "dead ringer" for Section 32310. 142 S. Ct. at 2133 (emphasis omitted). That is because the law addresses "unprecedented societal concerns" and "dramatic technological changes." *Id.* at 2132. Magazines of the type restricted by Section 32310 did not exist when the Second or Fourteenth Amendments were ratified, and Section 32310 addresses threats to public safety that had not yet emerged at that time, including mass shootings and violence against law enforcement using firearms. *See* Roth Decl., ¶¶ 16-17 (discussing the technical limitations of muzzle-loading firearms and the infrequent use of firearms in homicide during the founding); Spitzer Decl., ¶¶ 18–30 (discussing differences in 19th century and the 20th century firearms technologies); Rivas Decl., ¶ 27 (describing the technological limitations of 19th century firearms capable of firing multiple rounds from a single magazine). As Judge Easterbrook explained in *Friedman*,

> The features prohibited by [the assault weapons] ordinance were not common in 1791. Most guns available then could not fire more than one shot without being reloaded; revolvers with rotating cylinders weren't widely available until the early 19th century. Semi-automatic guns and large-capacity magazines are more recent developments. Barrel shrouds,

26

which make guns easier to operate even if they overheat, are also new; slow-loading guns available in 1791 did not overheat. And muzzle breaks, which prevent a gun's barrel from rising in recoil, are an early 20th century innovation.

*Friedman*, 784 F.3d at 410.

Indeed, innovative research into the relative lethality of firearm hardware underscores just how "dramatic" the technological innovation has been with respect to firearms since the ratification of the Second and Fourteenth Amendments. *Bruen*, 142 S. Ct. at 2132. Colonel Trevor N. Dupuy, a senior U.S. Army officer during World War II, devised an index for the military of the relative "theoretical lethality" of various weapons, which measures the number of people who could be killed in one hour by a particular weapon. *See* Darrell A.H. Miller & Jennifer Tucker, *Common, Use, Lineage, and Lethality*, 55 U.C. Davis L. Rev. 2495, 2508 (2022). For example, according to Colonel Dupuy's research, firearms available at the time of the founding—flintlock muzzleloaders capable of firing spherical musket balls—had a Theoretical Lethality Index ("TLI") of 43. *Id.* at 2508. After the ratification of the Fourteenth Amendment, there was a "quantum jump in lethality" with the development and deployment of the mounted Maxim machine gun (1883) and the bolt-action Springfield rifle equipped with ammunition magazines (1903). *Id.* at 2507. The TLI of the Springfield Model 1903 rifle was 495, and the TLI of the World War I machine gun was a staggering 3,463. *Id.* at 2508. Though Colonel Dupuy's research did not report a specific TLI for the modern AR-15 (a weapon capable of accepting a large-capacity magazine), the TLI of such weapons would be "exponentially more lethal than the flintlock musket of the Founder's era" or the rifles used in the mid-1800s if modern semiautomatic weapons are situated "anywhere near the Maxim machine gun." *Id.* at 2508 n.73.

This increased lethality analysis of modern semi-automatic weapons applies with equal, if not greater, force to large-capacity magazines. The evidence shows

casualties are higher in mass shootings that involved semiautomatic weapons with large-capacity magazines than in other mass shootings.  Supp. Allen Decl., ¶ 27.  In fact, based on an analysis of mass shootings from 1982 to 2019, the average number of fatalities and injuries that result from mass shootings involving semiautomatic weapons with large-capacity magazines is three times the number in mass shootings not involving weapons with such magazines.  *Id.*; *see also id.* at ¶ 29 & n.39 (citing a 2016 article from Gary Kleck showing that there were an average of 21 fatalities or injuries in mass shootings involving large-capacity magazines versus 8 for those without for mass shootings between 1994 and 2013); Klarevas Supp. Decl., ¶¶ 12-13 (noting that 100 percent of mass shootings resulting in 14 or more deaths since 2004 involved large-capacity magazines holding more than 10 bullets).

And notwithstanding Plaintiffs' assertions to the contrary, large-capacity magazines such as those restricted by Section 32310 did not exist at the Founding or in 1868. Oft-cited examples of large-capacity magazines which supposedly existed at or near the time of the founding "would best be described as exotic," Cornell Decl., ¶ 37, and existed only in very small numbers and only exclusively in Europe, Vorenberg Decl., ¶ 16.  For one such example, the "Cookson" or "Hill" model, which was based on the "Lorenzoni system" established in Europe in the 1600s, only single gun of this type, an 11-shot rifle, definitively existed in early America.  *Id.* at ¶ 17.  And according to one expert, because the slightest defect in these weapons would lead to an explosion, they required perfect construction by "fine craftsmen," and thus could have only been acquired by "wealthy sportsmen." *Id.*

A second such example, the Girardoni (or Girandoni) air rifle, could hold at least 20 rounds.  *Id.* at ¶ 18.  But the Girardoni was manufactured exclusively in Europe, and most were manufactured as a custom-order for the Austrian army, who demanded the weapons be manufactured in secret so as to maintain a military

28

advantage. *Id*. No Girardoni is known to have appeared in America prior to 1800. *Id*.; *see also* Cornell Decl., ¶ 38 (noting that the Girardoni was a commercial failure whose existence is absent from the relevant historical records); Spitzer Decl., ¶ 22 (describing the Girardoni as "expensive, fragile, and complex," and as "impractical on the battlefield, and even more so for civilian use"). The Girardoni was only one of the thirty to forty firearms brought on the Lewis and Clark expedition, and far from being used for self-defense or hunting, it was used only to impress Native Americans the expedition encountered. Vorenberg Decl., ¶ 18. Far from showing that large-capacity magazines were commonly used for self-defense at the time of founding, the Girardoni's presence on the Lewis and Clark expedition (and its use to impress Native Americans with advanced technology) merely demonstrated how unusual the Girardoni would have been to Americans in 1791.

A final example, the "Belton," fares no better in establishing that large-capacity technology similar to that regulated by Section 32310 was present at the founding. The Belton was owned by Joseph Belton, who almost certainly purchased the nine-shot repeating gun in England in 1758. *Id*. at ¶ 19. During the American Revolution, Belton petitioned the Continental Congress of an order of 100 similar weapons to be delivered by Belton, but Congress cancelled the order because of the extraordinary expense Belton demanded. *Id*. (noting that one expert on the Belton concluded that of those 100 guns, "none was ever made").

Similarly, those few nineteenth-century magazines capable of storing more than ten rounds of ammunition at a time bear little meaningful resemblance to the large-capacity magazines restricted by Section 32310. Those nineteenth-century magazines were not usually detachable (which made for slower reloading time), or were designed for large, military-grade firearms that were not capable of being used or carried for personal use. Rivas Decl., ¶ 26. For example, one magazine capable of holding multiple rounds was a fixed, tubular magazine, *id*. at ¶ 27, while another such magazine required the user to engage the lever action to discharge the spent

29

1    shell and load a fresh cartridge from the magazine into the chamber, and when all

2    rounds had been expended, required the user to individually load cartridges back

3    into the magazine by inserting them through the loading port. *Id*.

4         In addition, it is not simply that the technology of large-capacity magazine

5    which facilitated this greatly increased lethality did not exist until recent times. It is

6    that large-capacity magazines were an esoteric accessory with limited commercial

7    appeal until very recently (*i.e.*, within the past two to three decades). This very

8    recent emergence of large-capacity magazines in a numerically significant sense is

9    relevant for Second Amendment purposes because government regulation of

10   firearm technologies only occurs when the technologies circulate sufficiently in

11   society and spill over into criminal and other harmful uses. *See* Spitzer Decl., ¶ 15.

12   In 1955, of the 290 firearms available for purchase in the civilian market, only two

13   were sold with large capacity magazines (*i.e.*, less than 1%). Klaveras Supp. Decl.,

14   ¶ 16 & tbl. 2. Ten years later, in 1965, only 3 out of 510 firearms (*i.e.*, less than

15   1%) available on the commercial market were sold with large-capacity magazines.

16   *Id*. In 1975, only 14 out of 834 firearms available on the commercial market (less

17   than 2%) were sold with large-capacity magazines. *Id*. In 1985, still only 5% of

18   firearms available on the commercial market were sold with large-capacity

19   magazines, and that number only grew to 7% by 1995. *Id*.; *see also* Rivas Decl., ¶

20   33 ("[D]uring most of the twentieth century standard clip/box magazine sizes

21   usually ranged from 3 to 7 rounds."); Rivas Decl., ¶ 32 (noting that Winchester, one

22   of the most popular firearm brands, did not begin selling magazines capable of

23   holding more than 10 rounds to civilians until 1996). These statistics align with the

24   standard practice in the gun industry until the mid-2000s of not displaying large-

25   capacity magazines at trade shows or at industry-sponsored shooting events. Busse

26   Decl., ¶ 6.

27        Moreover, the primary threat to public safety that Section 32310 seeks to

28   address—namely, mass shootings—is an "unprecedented societal concern," *Bruen*,

1  142 S. Ct. at 2132, that did not emerge until well into the twentieth century.  From

2  the colonial period into the early 20th century, mass murder occurred in the United

3  States, but typically as a group activity, because technological limitations impaired

4  the ability of a single person to commit mass murder.  Roth Decl., ¶ 40.  Mass

5  shootings by individual gunmen are a modern phenomenon.  Spitzer Decl., ¶ 1;

6  Roth Decl., ¶ 53 (describing how the problem of mass shootings "is a modern

7  phenomenon" and that "[t]he danger [semiautomatic weapons] pose is intrinsically

8  different from past weaponry").  While mass murder has existed throughout the

9  history of the country, mass-casualty incidents could only be orchestrated by

10  *groups* of individuals due to technological limitations.  Roth Decl., ¶ 40.  But the

11  "character of mass murder began to change" in the late 19th and early 20th

12  centuries, with the development of new technologies, including the ability of

13  gunmen to use firearms with magazines carrying more than ten rounds, like the

14  Tommy Gun.  *Id.* at ¶ 43.  These new deadlier weapons and larger magazines

15  enabled individuals to wreak havoc on communities.  In testifying before the U.S.

16  Congress on an early draft of what became the National Firearm Act of 1934, which

17  initially proposed restricting both fully automatic and semiautomatic firearms,

18  Attorney General Homer Cummings expressed concern about the spread of these

19  "deadly weapons" and their use by criminals "warring against society."  Spitzer

20  Decl., ¶ 8; *see also id.* at ¶ 4 (describing transition of automatic weapons from

21  military use to civilian circulation and their use in highly publicized killings, such

22  as the St. Valentine's Day massacre in 1929).  Simply put, firearms that could shoot

23  faster and be equipped with larger magazines were materially different from

24  firearms technology widely available at the founding or during the 1860s, and they

25  contributed to the rise in gun violence in the 1900s and the mass shootings

26  confronting American communities today.

27      The data bear this out.  For shootings involving ten or more victims killed, no

28  such incidents reportedly occurred in the country's history until after World War II.

Klarevas Suppl. Decl., ¶ 10.  And when they did begin to occur in 1949, they occurred relatively infrequently, with a cluster of incidents in the early 1980s, followed by a lull while the federal assault weapon ban was in effect, and then followed by a spike in the average rate of occurrence—since the expiration of the federal assault weapons ban in 2004, there have been 20 double-digit-fatality mass shootings out of the 30 identified throughout American history.  *See* Klarevas Supp. Decl., tbl. 1.  The number of double-digit mass shootings increased dramatically in the period before and after the federal assault weapons law.  *Id.* at ¶ 12 & tbl.1.

Because Section 32310 addresses dramatic advances in firearms capacity and unprecedented social problems, a "more nuanced" analogical approach is required here.  *Bruen*, 142 S. Ct. at 2132.  To determine whether the Section 32310's prohibition on large capacity magazines is constitutional, the Court must "reason[] by analogy" and determine whether Section 32310 is "'relevantly similar'" to its historical predecessors.  *Id.*  That, in turn, requires an analysis of whether Section 32310 imposes "comparable burden[s] on the right to armed self-defense" and whether the modern and historic laws are "comparably justified."  *Id.* at 2133.[14]

---

[14] This case, which involves restrictions on only magazines configured to accept more than ten rounds, is thus fundamentally distinguishable from *Heller*, which involved a "flat ban" on the possession of handguns in the home.  *Bruen*, 142 S. Ct. at 2131.  The "perceived social problem" addressed by the District of Columbia's law— namely, "firearm violence in densely populated communities"— existed at the time of the ratification of the Second Amendment.  *Id.*  The historical analysis in that case was "straightforward."  *Id.*  Similarly, in *Bruen*, the Court required very close analogues to New York's ban on public-carry for most law-abiding citizens, because "New York's proper-cause requirement concerns the same alleged social problem address in *Heller*:  'handgun violence,' primarily in 'urban area[s].'"  *Id.*  In those cases, the Court required a "*distinctly similar* historical regulation," and because "earlier generations addressed the [same] societal problem" "through materially different means," *id.* at 2131—in the case of *Bruen*, by regulating the carrying of certain weapons with "evil intent or malice" instead of prohibiting public carry in all cases, *id.* at 2141—those historical approaches "could be evidence that a modern regulation is unconstitutional," *id.* at 2131 (emphasis

To that end, the Supreme Court has already recognized that governments have had the power to regulate "dangerous [or] unusual weapons" since at least the time of Blackstone. *Heller*, 554 U.S. at 627 (citing 4 Blackstone 148–49 (1769)). These restrictions are "'relevantly similar'" across both dimensions that *Bruen* directs are the "central considerations when engaging in an analogical inquiry." *Bruen*, 142 S. Ct. at 2132–33 (quotation marks and emphasis omitted). Like prior restrictions on certain dangerous or unusual weapons, Section 32310 prohibits the manufacture, sale, possession, and acquisition of only large-capacity magazines, while allowing law-abiding residents to access and use other magazines. And from pre-founding England to the early 20th century, governments in England and the United States restricted access to weapons that were especially likely to be used for criminal purposes and those that were especially dangerous to the general population. These restrictions include prohibitions of certain, specified weapons in pre-founding England, the colonial era and the early national period surrounding the ratification of the Second Amendment, and ante- and postbellum America surrounding the ratification of the Fourteenth Amendment. Spitzer Decl., ¶¶ 2, 15.

These laws evidence a pattern of regulation that continued into the twentieth century, when governments first confronted the dangers of semiautomatic weapons and their use by criminals, resulting in the regulation of automatic and semiautomatic weapons and firearms that utilize ammunition feeding devices in the 1920s and 1930s. Those laws, in turn, were early precursors to efforts to regulate large-capacity magazines, after they began to be used in mass shootings in the 1980s and 1990s. And across each time period, governments adopted these restrictions *not* when new firearms technologies were first conceived or invented, but instead only once new firearms technologies began to circulate widely in

_____

added).

society and spill over into criminal use, presenting public safety concerns that governments attempt to address through their police powers.  Spitzer Decl., ¶ 15.

As explained below, this history shows that governments have been able to adopt laws like the Section 32310 consistent with the Second Amendment—restricting particular weapons and configurations thereof posing a danger to society and that were especially likely to be used by criminals, so long as the restriction did not destroy the right to armed self-defense by leaving available other weapons for constitutionally protected uses.  *See* John Forrest Dillon, *The Right to Keep and Bear Arms for Public and Private Defence*, 1 Cent. L. J. 259, 285 (1874) ("It would seem to follow that while society may regulate this right . . . so as to promote the safety and good of its members, yet any law which should attempt to take it away, or materially abridge it, would be the grossest and odious form of tyranny."); *id.* at 287 ("On the one hand . . . society cannot justly require the individual to surrender and lay aside the means of self-protection in seasons of personal danger . . . . On the other hand, the peace of society and the safety of peaceable citizens plead loudly for protection against the evils which result from permitting other citizens to go armed with dangerous weapons, and the utmost that the law can hope to do is to strike some sort of balance between these apparently conflicting rights.").[15]

### b.    Medieval and Pre-Founding English History

The Second Amendment codified a pre-existing right "inherited from our English ancestors," *Bruen*, 142 S. Ct. at 2127 (quoting *Heller*, 554 U.S. at 599), and thus restrictions on that right recognized under English law prior to the founding of the United States are relevant in understanding the scope of the inherited right.

---

[15] Additional historical research may uncover additional laws or traditions of regulation that are analogous to Section 32310.  *See infra* pp. 58-59 (explaining why additional research is necessary before this court can render judgment).  But in light of the ubiquity of dangerous weapons laws during the 18th and 19th centuries, large-capacity magazine restrictions are "analogous enough to pass constitutional muster."  *Bruen*, 142 S. Ct. at 2118.

Article VII of the English Bill of Rights of 1689, "the 'predecessor to our Second Amendment,'" *id.* at 2141 (quoting *Heller*, 554 U.S. at 593), guaranteed the "Protestants . . . may have Arms for their Defence suitable to their Conditions, *and as allowed by Law*," *id.* (quoting 1 Wm. & Mary ch. 2, § 7) (emphasis added). Among other things, the plain text of the English Bill of Rights incorporated the ability of government to "allow[]" (and disallow) individuals from having certain "Arms" for their defense. *See id.*

This right was recognized by Blackstone as the "fifth and last auxiliary right." 1 Blackstone ch. 1 (1769). According to Blackstone, the auxiliary rights were "subordinate rights" "declared, ascertained and protected by the dead letter of the laws" and "barriers to protect and maintain inviolate the three great and primary rights, of personal security, personal liberty, and private property." *Id.* The fifth auxiliary right of English subjects was "that of having arms for their defence, suitable to their condition and degree, and *such as are allowed by law*." *Id.* (emphasis added).[16] Blackstone went on to explain that this right was "a public allowance, under *due restrictions*, of the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression." *Id.* (emphasis added). Accordingly, Blackstone recognized that the right to keep and bear arms was subject to "due restrictions." *See Young v. Hawaii*, 992 F.3d 765, 793 (9th Cir. 2021) (en banc) (noting that the English Bill of Rights "recognized that even the right of self-defense could be curtailed by government action 'as allowed by law'"), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111.

Consistent with this conception of an auxiliary right that could be qualified by concerns over threats to public safety and order, for hundreds of years English

---

[16] Blackstone's use of the word "such" refers to the types of arms that subjects were free to have.

monarchs had the power to identify certain arms that subjects could not possess or carry. *See Peruta v. Cnty. of San Diego*, 824 F.3d 919, 930–31 (9th Cir. 2016) (en banc) (reviewing English prohibitions on the carrying of certain arms in the 16th and 17th centuries), *abrogated on other grounds by Bruen*, 142 S. Ct. 211. For example, in 1541, under Henry VIII, Parliament enacted a statute prohibiting the "use or ke[eping] in his or their houses or elsewhere any Crosbowe handgun hagbutt or demy hake." 33 Hen. 8, ch. 6 § 1 at 832 (1541).[17] Henry VIII was concerned about safety issues associated with the particular prohibited weapons; the prohibition targeted "little short handguns" and "little haquebuts," which were a source of "great peril and continual feare and danger of the kings loving subjects." Patrick J. Charles, Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry 62 (2018) (quotation marks and citation omitted). Notwithstanding these dangers, Henry VIII's prohibition exempted lords living within twelve miles of the Scottish border, allowing those lords to keep and bear those weapons to defend the border. *See* 33 Hen. VIII, ch. 6 § 18 at 835. But in recognition of the dangers posed by these weapons, and as a way to promote peace between England and Scotland, James I repealed this limited exception and prohibited all subjects from possessing those listed weapons, in 1607. 4 Jac. I, ch. 1 (1606).[18] As explained by Granville Sharp, a "particularly important source" on the English Bill of Rights, whose account was discussed in *Heller*:

---

[17] Hagbutts and demy-hakes referred to arquebuses. *See* Somerset Record Society, Vol. XX, at 332 (1904).

[18] And before Henry VIII prohibited the possession of crossbows and handguns, Richard II prohibited the possession of the launcegay, a 10–12-foot-long lightweight lance. *Bruen*, 142 S. Ct. at 2140 (citing 7 Rich. 2, ch. 13 (1383), *and* 20 Rich. 2, ch. 1 (1396)). Launcegays "were generally worn or carried only when one intended to engage in lawful combat or . . . to breach the peace." *Id.* Because large-capacity magazines, unlike handguns, are also most suitable for military use, *see supra* at pp. 21-22, the restrictions on launcegays remains relevant.

36

[The] latter expression, '*as allowed by law*,' respects the limitations in the above-mentioned act of 33 Hen. VIII, c. 6, which restrain the use of *some particular sort of arms*, meaning only such arms as were liable to be *concealed*, or otherwise favour the designs of murderers . . . .

*Peruta*, 824 F.3d at 932.

Accordingly, the pre-existing right inherited from England and incorporated into the Second Amendment expressly permitted government regulation of particular weapons that threatened public safety and order, as demonstrated by the restrictions on crossbows and short pistols in the 16th and 17th centuries.

### c.   Colonial and Early National History:  Laws Enacted Around the Time of the Ratification of the Second Amendment

During the colonial period and through the Founding, colonial and state governments imposed regulations on firearms hardware and accessories and other weapons deemed to pose threats to public safety.  Indeed, "[g]un safety regulation was commonplace in the American colonies from their earliest days."  Adam Winkler, Gunfight 115 (2011).  Governments in the early years of our nation faced significant threats to public safety, and "[w]hen public safety demanded that gun owners do something"—including actions that would impair their ability to have arms at the ready for self-defense—"the government was recognized to have the authority to make them do it."  *Id.*  In the colonial era, governments imposed several types of restrictions on the ability to keep firearms and firearm accessories inside the home, by regulating dangerous conditions, uses, or configurations.  In doing so, these governments did not believe they were eliminating the ability of colonists to defend themselves with arms.  *See id* at 113.

First, during the colonial period and at the founding, governments heavily regulated guns and gunpowder, both to ensure the readiness of the militia, and to protect the public from harm.  In particular, governments regulated the storage of gunpowder inside the home.  Laws required gunpowder to be stored on the top

floor of a building and permitted government officials to remove it when necessary to prevent explosions and to transfer the powder to the public magazine.  *See* Cornell Decl., ¶¶ 41, 45.  Under these gun powder storage laws, individuals were not free to stockpile as much gunpowder as they may have wished—or felt necessary for self-protection—nor could they keep the gunpowder in the home in any manner that they wished.[19]

"When public safety demanded it, the founding fathers were willing to go even further," by prohibiting individuals from keeping loaded firearms inside the home."  Winkler, *supra*, at 117.  In 1783, Massachusetts enacted a law prohibiting storing a loaded weapon in the home, "a firearms safety law that recognized that the unintended discharge of firearms posed a serious threat to life and limb."  Cornell Decl., ¶ 41.  Given how "time-consuming the loading of a gun was in those days," this restriction "imposed a significant burden on one's ability to have a functional firearm available for self-defense inside the home," and yet "there is no record of anyone's complaining that this law infringed the people's right to keep and bear arms."  Winkler, *supra*, at 117.  Even though this law was enacted to prevent accidental explosions and fires, rather than intentional harm with a loaded firearm, "the lesson remains the same: pressing safety concerns led Bostonians to effectively ban loaded weapons from any building in the city."  *Id.*

Second, during the colonial period, states began to enact restrictions on "trap guns," laws that proliferated in the 19th century.  *See* Spitzer Decl., ¶¶ 50–53, & Ex. F.  A trap gun was a firearm that was configured in a way to fire remotely (without the user operating the firearm), typically by rigging the firearm to be fired by a string or wire when tripped.  Spitzer Decl., ¶ 50.  Trap guns were used to hunt

---

[19] Maine also enacted a law in 1821, authorizing town officials to enter any building to search for gun powder.  Cornell Decl., ¶ 45 (citing 1821 Me. Laws 98, An Act for the Prevention of Damage by Fire, and the Safe Keeping of Gun Powder, chap. 25, § 5).

38

wildlife and to protect personal or commercial property.  *Id.*  In 1771, New Jersey was the first colony to prohibit trap guns, noting that they represented "a most dangerous Method of setting Guns [that] has too much prevailed in this Province." *Id.* (quoting 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.).  Just as Massachusetts prohibited the storage of loaded guns inside the home to prevent accidental harm, trap gun laws regulated the manner in which firearms could be kept and configured to protect the public from harm.  Restrictions on trap guns that originated during the colonial period were enacted due to the threat posed to innocent life.  *Id.*

Third, colonial governments enacted various prohibitions on the "carrying of dangerous [or] unusual weapons," "a fact [that the Court] already acknowledged in *Heller*."  *Bruen*, 142 S. Ct. at 2143; *see also* Spitzer Decl., Ex. E.  Some of those restrictions specified particular weapons that could not be carried.  For example, New Jersey (1686) enacted restrictions on the carrying of concealable weapons in public, prohibiting any person "privately to wear any pocket pistol, skeins, stilettoes, daggers or dirks, or other unusual or unlawful weapons."  *See* Spitzer Decl., Ex. E (citing The Grants, Concessions, And Original Constitutions of The Province of New Jersey (1881)); *see also Bruen*, 142 S. Ct. at 2143 (discussing the 1686 New Jersey restrictions on the carrying of "dangerous or unlawful weapons").  These restrictions on "dangerous or unlawful" weapons were adopted because the weapons induced "great fear and quarrels."  Spitzer Decl., ¶ 49.  Notably, this law "did not apply to all pistols, let alone all firearms," *Bruen*, 142 S. Ct. at 2143, leaving other arms available to carry for self-defense.  And shortly after ratification of the Second Amendment in 1791, states enacted restrictions on the carrying of concealable weapons.  Virginia, for instance, enacted a law in 1794 that prohibited the carrying of certain concealable weapons.  Spitzer Decl., Ex. B.  Some of these dangerous weapons laws restricted certain weapons by name, including

"bludgeons" (the earliest enacted in 1799) and "clubs" (seven laws enacted in the 1600s–1700s).  Spitzer Decl., ¶¶ 41, 43; *see also id.*, Ex. E.[20]

Fourth, the Conductor Generalis—a founding-era guide for justices of the peace, sheriffs, and constables that relied heavily on the 1791 treatise of William Hawkins on English law—provided that an "affray" was a public offense and that there may be an affray "where there is no actual violence," such as "where a man arms himself with dangerous and unusual weapons, in such a manner as will naturally cause a terror to the people."[21]

These colonial- and founding-era enactments demonstrated that the right to keep and bear arms was tempered by the government's ability to regulate dangerous or unusual weapons to promote public-safety interests.  And the governments enacting these laws did not see themselves as eliminating the ability of individuals to use arms for self-defense, even if they made it marginally more difficult or less efficient in doing so.

---

[20] The anti-club laws enacted in the 18th century and earlier focused on the carrying of clubs by certain groups of prohibited persons, *see* 1798 Ky. Acts 106; 1799 Miss. Laws 113, A Law for the Regulation of Slaves; The Colonial Laws of New York from the Year 1664 to the Revolution, Including the Charters to the Duke of York, the Commissions and Instructions to Colonial Governors, the Dukes Laws, the Laws of the Dongan and Leisler Assemblies, the Charters of Albany and New York and the Acts of the Colonial Legislatures from 1691 to 1775 at 687 (1894), or in gatherings of groups of people in public, *see* An Act to Prevent Routs, Riots, and Tumultuous Assemblies, and the Evil Consequences Thereof, reprinted in Cumberland Gazette (Portland, Me.), Nov. 17, 1786, at 1; 1750 Mass. Acts 544, An Act for Preventing and Suppressing of Riots, Routs And Unlawful Assemblies, chap. 17, § 1.

[21] The Conductor Generalis: Or, the Office, Duty, and Authority of Justices of the Peace, High-Sheriffs, Under-Sheriffs, Coroners, Constables, Gaolers, Jury-Men, and Overseers of the Poor, and also The Office of Clerks of Assize, and of the Peace, &c. Albany, 1794, at 26.

1

2

### d. Antebellum and Postbellum History: Laws Enacted Around the Time of the Ratification of the Fourteenth Amendment

3    During the antebellum and postbellum period, around the time that the

4  Fourteenth Amendment was ratified, numerous states restricted particular weapons

5  deemed to be particularly dangerous or susceptible to criminal misuse.  As

6  homicide rates increased in the South in the early 1800s, states began restricting the

7  carrying of certain concealable weapons.  *See* Roth Decl., ¶ 24; Spitzer Decl., ¶ 30;

8  Rivas Decl., ¶ 13–25.  Throughout the 1800s, states enacted a range of laws

9  restricting the carrying of blunt weapons:  12 states restricted "bludgeons"; 14

10  states restricted "billies"; seven states restricted "clubs"[22]; 43 states restricted

11  "slungshots"; six states restricted "sandbags"; and 12 states broadly restricted any

12  concealed weapon.  *See* Spitzer Decl., Ex. C.  Many of these laws were enacted

13  shortly before and after the ratification of the Fourteenth Amendment.  *Id.*

14    In addition to prohibiting concealable, blunt weapons—which are dangerous

15  weapons used mainly for criminal mischief—49 states (all except for New

16  Hampshire) enacted restrictions on Bowie knives and other "fighting knives" in the

17  19th century, including around the time that the Fourteenth Amendment was

18  ratified.  *See* Spitzer Decl., ¶ 39 & Ex. C.  Most of these restrictions targeted the

19  carrying of such knives, though Iowa banned their possession, along with the

20

21  _____

[22] These 19th century laws generally prohibited slaves from carrying clubs, *see* Slaves, in Laws of the Arkansas Territory 521 (J. Steele & J. M'Campbell, Eds.,

22  1835); 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, § 4; 1798 Ky. Acts 106; 1804 Miss. Laws 90, An Act Respecting Slaves, § 4; Collection of All

23  Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index. To Which are Prefixed the

24  Declaration of Rights, and Constitution, or Form of Government Page 187, Image 195 (1803), or prohibited the throwing of clubs at trains or railroad, *see* 1855 Ind.

25  Acts 153, An Act To Provide For The Punishment Of Persons Interfering With Trains or Railroads, chap. 79, § 1; the Revised Statutes of Indiana: Containing,

26  Also, the United States and Indiana Constitutions and an Appendix of Historical Documents (1881); 1905 Ind. Acts 677.

27

28

41

possession of other "dangerous or deadly weapon[s]," in 1887.  *See id.*, Ex. E at 24.
The Bowie knife arose to prominence in the 1830s, as a distinctive long-bladed,
single-edged knife with a hand guard.  Spitzer Decl., ¶ 36.  These knives were
associated with brawling and other interpersonal violence.  As a grand jury in 1834
observed, people young and old armed themselves with fighting knives "under the
specious pretence of protecting themselves against insult, when in fact being so
armed they frequently insult others with impunity . . . [and] we so often hear of the
stabbing shooting & murdering [of] so many of our citizens."  *Id.* (citation omitted).
The Bowie knife became notorious in the 1830s, with "most of the American public
[being] well aware of the Bowie knife."  *Id.* at ¶ 37.  And this negative reputation
fueled greater demand for the weapon.  *Id.*  In *Aymette v. State*, 21 Tenn. 154
(1840), the Tennessee Supreme Court upheld a conviction for carrying a concealed
Bowie knife, noting that the weapons proscribed under the applicable statute,
including the Bowie knife, "are usually employed in private broils, and which are
efficient only in the hands of the robber and the assassin."  *Id.* at 158.  The court
also indicated that the state had "a right to prohibit the wearing or keeping [of]
weapons dangerous to the peace and safety of the citizens, and which are not usual
in civilized warfare, or would not contribute to the common defence."  *Id.* at 159.[23]

The proliferation of dangerous weapons laws was not limited to blunt weapons
and fighting knives.  Many state laws enacted during this time also included
revolvers and pistols in their lists of proscribed weapons.  *See* Roth Decl., ¶ 26
(discussing restrictions on the carrying of certain concealable weapons in Kentucky,
Louisiana, Indiana, Georgia, and Virginia between 1813 and 1838).  These laws
aimed to curb the use of concealable weapons that exacerbated rising homicide

---

[23] The *Heller* Court viewed *Aymette*'s reading of the Second Amendment as
"odd" and inconsistent with the right recognized in *Heller*.  *Heller*, 554 U.S. at 613.
Nevertheless, *Aymette* articulates Tennessee's reasons for prohibiting the carrying
of Bowie knives and other dangerous weapons.

1    rates in the South and its borderlands.  *Id.*  Later, in the 1870s, Arkansas and

2    Tennessee adopted restrictions on the public carrying of pistols, along with

3    regulations on dealers selling pistols.  Rivas Decl., ¶ 15.  These attempts to regulate

4    pistols were invalidated by the state courts for being overly broad in prohibiting the

5    keeping and carrying of all pistols in public.  *See Andrews v. State*, 50 Tenn. 165

6    (1871); *Wilson v. State*, 33 Ark. 557 (1878).  In *Andrews*, the Tennessee Supreme

7    Court struck down a law prohibiting the carrying of any pistol "publicly or

8    privately, without regard to time or place, or circumstances."  50 Tenn. at 187.  In

9    response, in 1871, Tennessee amended the statute to exempt the carrying of "an

10   army pistol, or such as are commonly carried and used in the United States army" if

11   the weapon was carried "only in his hands."  *State v. Wilburn*, 66 Tenn. 57, 61

12   (1872).  This exception applied to military officers, police, and persons on a

13   journey.  *Id.*  The purpose of Tennessee's law was "to preserve the peace and to

14   prevent homicide."  *Id.*  The Tennessee Supreme Court upheld the revised law as

15   "clearly constitutional" under the state constitution, which expressly empowered

16   the legislature "to regulate the wearing of arms, with a view to prevent crime."  *Id.*

17        Similarly, after the Arkansas Supreme Court invalidated the state's carry

18   restrictions on pistols, dirks, butcher or bowie knives, swords or spears in a cane,

19   brass or metal knuckles, or razors on the ground that the prohibition on the public

20   carry of pistols was too broad—it prohibited any "citizen from wearing or carrying

21   a war arm," which the court viewed as an "unwarranted restriction upon his

22   constitutional right to keep and bear arms."  *Andrews*, 50 Tenn. at 187.  In response,

23   consistent with Tennessee's approach, Arkansas amended the statute to permit the

24   carry of army and navy pistols carried only in the hand.  Acts of the General

25   Assembly of Arkansas, No. 96 § 3 (1881); *see also* Rivas Decl., ¶ 17.[24]

26        [24] *Nunn v. State*, 1 Ga. 243 (1846), invalidated a Georgia law that broadly
27   prohibited the wearing or carrying of pistols, without distinguishing between open
     and concealed carry.  *Bruen*, 142 S. Ct. at 2147.  According to *Nunn*, the state could
28

1   Tennessee's and Arkansas' narrow exceptions for certain types of pistols reflect the

2   states' determined efforts to "curtail as much as possible the carrying of [the listed

3   dangerous] weapons in public spaces so that a person would only do so in the event

4   of a real emergency."  Rivas Decl., ¶ 17.

5         The Tennessee and Arkansas experiences demonstrate that the states retained

6   broad police powers to regulate the use of certain enumerated concealable weapons,

7   based on public safety concerns, while carving out exceptions for larger military

8   weapons.  *See Bruen*, 142 S. Ct. at 2147 n.20 (noting that the "Arkansas Supreme

9   Court would later adopt Tennessee's approach, which tolerated the prohibition of

10  all public carry of handguns except for military-style revolvers").  Though the

11  Supreme Court has since clarified that the Second Amendment protects the right to

12  keep and bear arms "in common use" for self-defense (rather than military use),

13  these cases illustrate that governments could prohibit certain weapons so long as

14  constitutionally protected weapons remained available.

15        While antebellum state-court decisions "evidence[d] a consensus view that

16  States could not altogether prohibit the public carry of 'arms' protected by the

17  Second Amendment or state analogues," *Bruen*, 142 S. Ct. at 2147, these decisions

18  demonstrate that states retained broad police powers, notwithstanding the Second

19  Amendment and its state analogues, to regulate particular weapons.  As explained

20  in one of the most important early American firearms cases, *State v. Reid*, 1 Ala.

21  612 (1840), the Second Amendment left "with the Legislature the authority to adopt

22  such regulations of police, as may be dictated by the safety of the people and the

23  advancement of public morals."  *Id.* at 616.  The dangerous weapons laws that

24  _____

25  not prohibit both open and concealed carry of pistols consistent with the Second

26  Amendment.  *Id.*  But critically, *Nunn* "was never intended to hold that men,
    women, and children had some inherent right to keep and carry arms or weapons *of*

27  *every description*."  *Hertz v. Bennett*, 294 Ga. 62, 68 (2013) (emphasis added)

28  (quotation marks and citation omitted).

proliferated before and after the ratification of the Fourteenth Amendment provide substantial historical support for Section 32310's restrictions on large capacity magazines, which do not restrict possession of any firearm and leave other magazines available for lawful self-defense and thus do not destroy the right protected by the Second Amendment. *See infra* pp. 34-47.

When the Fourteenth Amendment was ratified, the people at that time understood the critical role that the state police powers would play in protecting the public from harm. For example, state constitutions adopted during Reconstruction expressly linked the right to keep and bear arms to the state's authority to regulate arms: "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the government, under such regulations as the Legislature may prescribe." Cornell Decl., ¶ 49 (quoting Tex. Const. of 1868, art. I, § 13); *see also id.* at 22 n.73 (describing similar constitutional provisions in the Idaho Constitution of 1896 and the Utah Constitution of 1896).

During the Reconstruction, positive law was not the only means through which governments regulated dangerous weapons. During this period, the federal government regulated access to particularly dangerous weapons, including repeating rifles that began to circulate in the postbellum period. *See* Vorenberg Decl., ¶¶ 7-10. Following the Civil War, Henry and Winchester lever-action repeating rifles were the most lethal, large-capacity firearms of their day. *Id.* at ¶¶ 21-22. These weapons came to be associated with the military and law enforcement, not individual self-defense, and their circulation remained low, with few documented instances of possession by civilians. *Id.* at ¶¶ 21-25, 47, 96–97.

The end of the Civil War introduced a period of military occupation of formerly Confederate states. State militias, the U.S. army, and even the president (as commander-in-chief of the army) worked to prevent access to firearms by insurrectionary groups, such as through executive orders to surrender their arms, using private intelligence to identify and confiscate arms shipments. *Id.* at ¶¶ 49-

50.  After the U.S.'s humiliating defeat at the Battle of Little Big Horn by troops of Plains Indians armed with Winchesters, *id.* at ¶¶ 63-64, the U.S. army banned trade of repeating rifles to Native Americans, while law enforcement targeted for arrest traders who violated this policy, *id.* at ¶ 64.  Thus, even where no state statute expressly banned possession of high-capacity firearms, state officials acted to restrict their ownership and use through other means.  This de facto regulation of repeating rifles effectively controlled the use and circulation of these weapons, *see id.* at ¶ 8, reducing any need for legislative responses to the threats that they posed to public safety and post-war efforts to unify the country.  This regulation also coincided with other legislative efforts to restrict the carrying of certain concealable weapons that were uniquely susceptible to criminal use, did not have legitimate self-defense uses, and posed a significant threat to public safety at that time.

Laws restricting particular concealable weapons in the 1800s were enacted during a period that corresponded with dramatic societal changes following the Civil War and the development of new firearms technologies.  *See* Roth Decl., ¶ 28 (describing rise in homicide rates nationwide in the 1840s and 1850s, which "spiked even higher" during the Civil War and postbellum period).  The society that ratified the Fourteenth Amendment, during this period of intense social and technological change, was different than the generation that ratified the Second Amendment.  *See* Cornell Decl., ¶ 48.  The nature of government regulation of firearms and other weapons during that time is particularly relevant to understanding the scope of the right incorporated through the Fourteenth Amendment.  As noted in *Bruen*, the Second Amendment was made applicable to the states not in 1791, but in 1868, with the ratification of the Fourteenth Amendment.  *Bruen*, 143 S. Ct. at 2138.

The Court in *Bruen* did not have occasion to resolve whether courts should "primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" because, with respect to the law

challenged in *Bruen*, "the public understanding of the right to keep and bear arms in both 1791 and 1868 was, for all relevant purposes, the same with respect to public carry." *Id.* Nevertheless, the Court did survey numerous statutes and cases from the antebellum and postbellum periods in assessing the scope of the right. And at least one federal circuit court has focused on the public understanding of the right as it existed in 1868. *See Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) ("*McDonald* confirms that when state- or local-government action is challenged, the focus of the original-meaning inquiry is carried forward in time; the Second Amendment's scope as a limitation on the States depends on how the right was understood *when the Fourteenth Amendment was ratified*." (emphasis added). Restrictions on dangerous weapons were enacted throughout American history, and robust government regulation of arms was incorporated into the pre-existing right inherited from pre-founding England. But the antebellum and postbellum period has particular importance because the Fourteenth Amendment was ratified around that time and the framers of that amendment were confronting new challenges and public needs.

### e.    Twentieth Century History

Although *Bruen* re-focuses the historical analysis on the periods surrounding the ratification of the Second and Fourteenth Amendments, laws enacted during the early 20th century are also instructive and provide additional support for the constitutionality of Section 32310. In *Bruen*, the Court discounted the probative value of public carry laws from the 20th century because they "contradict[ed] earlier evidence" from periods closer to the ratification of the amendments, 142 S. Ct. at 2153 n.28, but here numerous early 20th century laws are consistent with the earlier historical analogues. In the early 20th century, state governments began regulating automatic and semiautomatic firearms and firearms capable of receiving ammunition from an ammunition feeding device when those weapons began to be used in gun violence by organized crime. *See* Spitzer Decl., ¶ 4 (describing the St.

47

1    Valentine's Day Massacre).  These restrictions presaged the large-capacity

2    magazine restrictions enacted in the late 20th century when those magazines began

3    to be used frequently in mass shootings.

4        Several state restricted semiautomatic weapons capable of firing a certain

5    number of rounds repeatedly without reloading:  Michigan, Rhode Island, and Ohio

6    enacted restrictions on semiautomatic weapons capable of firing sixteen, twelve,

7    and eighteen shots, respectively, without reloading.  Mich. Public Acts, 1927 – No.

8    372; R.I. Public Acts, 1927 – Ch. 1052; Ohio General Code, 1933 – § 12819.

9    Additionally, in 1932, Congress enacted a twelve-shot restriction on semiautomatic

10   weapons in the District of Columbia.  Pub. L. No. 275, 1932 – 72d Cong., Sess. I,

11   chs. 465, 466.  Notably, the National Rifle Association endorsed the District of

12   Columbia semiautomatic firing capacity law, stating that "it is our desire [that] this

13   legislation be enacted for the District of Columbia, in which case it can then be

14   used as a guide throughout the states of the Union."  S. Rep. No. 72-575, at 5–6

15   (1932); *see also* Spitzer Decl., ¶ 6.

16       Moreover, continuing historical research has uncovered additional early 20th-

17   century laws regulating automatic and semiautomatic weapons, including

18   restrictions on firearms capable of firing a certain number of rounds or capable of

19   receiving ammunition from an ammunition feeding device.  *See* Spitzer Decl.,

20   ¶¶ 12–14 & Ex. D.  Thirteen states enacted restrictions on semiautomatic or fully

21   automatic firearms capable of firing a certain number of rounds without reloading;

22   eight states regulated fully automatic weapons, defined as a firearm capable of

23   firing a certain number of rounds without reloading or accepting an ammunition

24   feeding device; and four states restricted all guns that could receive any type of

25   ammunition feeding mechanism or round feeding device and fire them continuously

26   in a fully automatic manner, including a 1927 California law.  *See* Spitzer Decl.,

27   ¶¶ 13–14; 1927 Cal. Stat. 938.  Although these were state laws, there were attempts

28   to nationalize these restrictions.  In 1928, the National Conference of

Commissioners on Uniform State Laws, adopted a model law prohibiting the possession of "any firearm which shoots more than twelve shots semi-automatically without reloading."[25]  And finally, in 1934, Congress passed the National Firearms Act, significantly restricting fully automatic weapons.  An earlier draft of the legislation included restrictions on semiautomatic weapons, and in testifying before Congress on that version of the bill, former U.S. Attorney General Homer Cummings testified that the goal of the bill was to undermine the ability of "people in the underworld today armed with deadly weapons."  Spitzer Decl., ¶ 8.  In the end, the National Firearms Act restricted only fully automatic weapons.  *Id.* at ¶ 9.

These early 20th century firearm regulations followed the same regulatory pattern of state and federal restrictions on large-capacity magazines in the late 20th century after the rise in mass shootings.  *See* Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemporary Problems 55 (2017), 68-69 (noting that assault weapons regulations were "presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s").  These laws were also similar to the regulatory approaches to addressing the prevalence of concealable weapons in crime and homicide before the 20th century and even before the founding.  *See supra* at pp. 34-47.

### 3.   The Historical Weapons Restrictions Are Relevantly Similar to Section 32310

Section 32310's modern restrictions on large-capacity magazines are relevantly similar to the historical analogues.  *Bruen* explained that a modern law is relevantly similar to a historical analogue if they are comparable in two respects: "how and why the regulations burden a law-abiding citizen's right to armed self-

---

[25] Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422–23 (1928).

defense." *Bruen*, 142 S. Ct. at 2133.  Section 32310 imposes a burden comparable to the historical analogues discussed above, and it is comparably justified in promoting public-safety goals.

### a.   Comparable Burden

Section 32310 imposes a comparable burden on the right to armed self-defense as the historical analogues, because it restricts only highly "dangerous" or "unusual" items, *Heller*, 554 —large-capacity magazines—leaving law-abiding citizens access to a range of other magazines to exercise their right to armed self-defense.  Unlike burdens on free speech, which would be onerous if certain types of expression were outlawed, the Second Amendment does not protect a right to any particular arm, but instead protects a more general right to armed self-defense.  *See Bruen*, 142 S. Ct. at 2118; *see also Heller*, 554 U.S. at 603.  Section 32310 does not impose a significant burden on the right to armed self-defense because there are myriad of magazines still available for every legal firearm.  Busse Decl., ¶¶ 7, 12.

In addition to protecting the public from mass shootings, Section 32310 does not infringe on the right of people to use a firearm for self-defense both in public and in the home.  Section 32310 "gives householders adequate means of defense" *Friedman*, 784 F.3d at 411, *i.e.*, magazines that hold 10 or less rounds.  The minimal burdens of Section 32310 on the right to armed defense are comparable to, or even less than, than the burdens imposed on that right by the historical analogues for three different reasons.

*First*, the dangerous weapons laws enacted throughout American history did not prohibit the carrying of all weapons for self-defense.  Rather, they targeted certain technological firearm advancements uniquely susceptible to criminal use and associated with rising homicide rates at the time.  *See supra* at pp. 34-49.  They also ensured that individuals retained access to firearms to use for constitutionally protected purposes.  Tennessee and Arkansas, for example, banned the public carrying of a range of knives, blunt weapons, and pistols, with an exception for

1  large army and navy pistols so long as they were carried openly in the hand,

2  reducing the burden on the right.  *See* Rivas Decl., ¶ 20.

3      *Second*, the prohibitions on trap guns enacted since the founding regulated

4  only the manner in which firearms could be configured, such as attaching a trip

5  wire to a rifle, and did not prevent gun owners from using those firearms for self-

6  defense.  Like the trap gun laws, Section 32310 still permits them to possess and

7  use the underlying weapons with magazines that are capable of, and indeed most

8  suitable for, self-defense.  *See supra* at pp. 38-39.

9      *Third*, the gunpowder and firearm storage laws enacted during the colonial and

10  founding periods imposed a burden on the ability of individuals to use firearms for

11  self-defense, by limiting the amount of gunpowder that may be kept in the home

12  and where it may be kept.  *See supra* at pp. 37-38.  Massachusetts went even further

13  by prohibiting the possession of loaded firearms inside the home.  *See supra* at pp.

14  38-39.  Nevertheless, no one viewed these laws as preventing gun owners from

15  keeping and bearing arms for self-defense.  Section 32310 is less burdensome than

16  these laws, because it does not limit the amount of ammunition that may be kept or

17  the manner in which firearms (or ammunition) may be stored in the home.

18      This minimal burden imposed by Section 32310 and its historical analogues—

19  restricting only the most dangerous of magazines—stands in stark contrast to the

20  burden imposed by the laws at issue in *Heller*, *McDonald*, and *Bruen*, which were

21  found to effectively destroy the right to armed self-defense inside and outside the

22  home.  The historical laws distinguished in *Bruen* were not comparably

23  burdensome because those laws permitted public carry in certain circumstances,

24  whereas the law in *Bruen* did not.  *See Bruen*, 142 S. Ct. at 2150 ("None of the

25  [antebellum] historical limitations on the right to bear arms approach New York's

26  proper-cause requirement because none operated to prevent law-abiding citizens

27  with ordinary self-defense needs from carrying arms in public for that purpose.").

28

1    Nor does it matter that many of the historical laws relied upon in this case

2    regulated the carrying of certain weapons, instead of prohibiting their possession

3    altogether.  Indeed, *Heller* makes clear that laws prohibiting the *possession* of

4    especially dangerous weapons (like machine guns) is "fairly supported by the

5    historical tradition of prohibiting the *carrying* of 'dangerous [or] unusual

6    weapons.'"  554 U.S. at 627 (emphasis added).  Moreover, many states did prohibit

7    possession of those weapons, or imposed sales taxes that made it very difficult to

8    acquire them.  *See* Spitzer Decl., ¶ 39; Rivas Decl., ¶¶ 15, 18.  And there are

9    historically grounded explanations for why states regulated weapons differently in

10   the past.  Since 1791—and even since 1868—American society has become

11   increasingly urbanized and has seen its population swell, demographic changes that

12   have diminished social trust and required more restrictive laws to protect the public.

13   *See* Charles, *supra*, at 141 ("Needless to say, as the population of the United States

14   continued to grow, the small communal aspect of many American towns, localities,

15   and cities began to disintegrate, and would have required state and local

16   governments to adopt more tangible forms of restricting armed carriage."); Cornell

17   Decl., ¶ 27 ("[T]here was no comparable societal ill to the modern gun violence

18   problem for Americans to solve in the era of the Second Amendment.  A

19   combination of factors, including the nature of firearms technology and the realities

20   of living life in small, face-to-face, and mostly homogenous rural communities that

21   typified many parts of early America, militated against the development of such a

22   problem.").  Nothing in *Bruen* suggests that the historical analogues must have

23   selected the same mode of regulation (*e.g.*, possession ban or carry restriction), so

24   long as the burdens on the right to armed self-defense are comparable.  *See Bruen*,

25   142 S. Ct. at 2132 ("[C]ases implicating unprecedented societal concerns or

26   dramatic technological changes . . . require a more nuanced approach.").

27       In any event, laws that regulate the carrying of certain dangerous weapons not

28   suitable for self-defense are sufficiently analogous to laws prohibiting the

1    possession of those weapons, as both impose a slight burden on the right to armed

2    self-defense.

3         As explained above, *see supra* at pp. 5-6, magazines of 10 rounds or fewer

4    remain legal in the State of California; it is only the most dangerous of which that

5    impose the largest burden on public safety that are restricted.  Cal. Penal Code §

6    32310.  Magazines with ten or less rounds are sufficient alternatives for self-

7    defense outside and inside the home (*see* Supp. Allen Decl., ¶ 10 (detailing the

8    paucity of examples of an incident of self-defense involving the discharge of more

9    than 10 rounds)) and impose at most, a minimal burden on the right to self-

10   defense—significantly less than its historical analogues (Spitzer, ¶¶ 39, 40, 53

11   (detailing restrictions on trap guns, bowie knives, and blunt weapons).  And Section

12   32310 does not make any firearms inoperable for purposes of self-defense, because

13   all firearms that can use large capacity magazines can accept a magazine with fewer

14   than 10 rounds and function precisely as intended.  Busse Decl., ¶ 7.  Thus,

15   prohibitions on the carrying of certain dangerous weapons impose a comparable (if

16   not lesser) burden on the right to armed self-defense to prohibitions on the

17   possession of those weapons.

18              **b.    Comparable Justification**

19        In addition to imposing a comparable, minimal burden on the right to armed-

20   self-defense, Section 32310 has a comparable justification to the historical

21   analogues: protecting the public from the increasing danger of gun violence and

22   mass injury.  More specifically, like its historical predecessors, Section 32310

23   regulates an item that is especially dangerous to the public's safety and especially

24   likely to be used for criminal purposes.

25        Of the thirteen most recent mass shootings in America, large-capacity

26   magazines were used in all but one. Klarevas Supp. Decl., tbl. 1.  Accounting for all

27   mass shootings in the United States until 2022, 76% of all double-digit-fatality

28   mass shootings (involving 10 or more fatalities not including the shooter) involved

the use of large-capacity magazines (23/30), as have all but 1 of the 13 most recent such shootings. *Id*. And 100% of mass shootings involving more than 14 fatalities throughout U.S. history involved large-capacity magazines capable of holding more than 10 rounds. *Id*.

The evidence also shows that large capacity magazine restrictions like Section 32310 are effective in reducing the frequency and lethality of mass shootings. States that enacted restrictions on assault weapons and large-capacity magazines experience fewer mass shootings and, when they occur, fewer deaths and injuries in those shootings. Klaveras Decl. (Dkt. 53-4), at 88 (finding that, *inter alia*, from 1990-2017, "jurisdictions that had LCM bans in effect experienc[ed] drastically fewer deaths per capita than those areas which did not regulate LCMs"); *id*. (finding that states with large-capacity magazine bans "experience[ed] far fewer gun massacres per capita"). This is consistent with the Nation's experience before, during, and after the federal assault weapons ban—mass shootings and fatalities in mass shootings declined during the decade in which the federal ban was in effect, and spiked once the ban was lifted in 2004. *Id*. at 85-86. And according to a 2017 New York Times survey of 32 current or former academics in criminology, public health, and law, among the measures deemed "most effective in dealing with the mass shooting epidemic" in the United States was a restriction like the Section 32310, and "[t]he evidence in support of a ban has grown tragically stronger since then."[26]

These justifications—protecting people from gun violence, and targeting weapons likely to be used for criminal purposes—accord with the justifications of firearms restrictions through Anglo-American history in at least three ways. *First*, the dangerous weapons laws enacted throughout American history addressed

---

[26] Philip J. Cook, *Regulating Assault Weapons and Large-Capacity Magazines for Ammunition*, 328 J. Am. Med. Ass'n 1191, 1192 (2022), https://bit.ly/3eaZZcE.

1  myriad firearms and other weapons that contributed to interpersonal violence and

2  rising homicide rates.  They were justified by a similar goal of preventing violence

3  in society by targeting on those weapons that are especially likely to be used for

4  criminal purposes but are rarely used for lawful purposes like self-defense.  *See,*

5  *e.g.*, Spitzer Decl., ¶ 46; Rivas Decl., ¶ 13; Supp. Donohue Decl., ¶¶ 28-29

6  (discussing threats of political violence).  As with these dangerous weapons laws,

7  Section 32310 promotes public safety interests, by reducing the incidence and

8  lethality of mass shootings.  *See* Supp. Klarevas Decl., tbl. 1 (detailing that large-

9  capacity magazines have been used in 100% of mass shootings involving 20 or

10  more fatalities (excluding the shooter)).

11      *Second*, Section 32310 is justified in a manner comparable to colonial and

12  founding era safe storage laws, which—like Section 32310—were adopted in

13  response to "pressing safety concerns," which "led [founding-era Americans] to

14  effectively ban loaded weapons from any building in [Boston]" and to tightly

15  regulate the storage of gunpowder—which was essential to operate a musket—

16  inside the home.  Winkler, *supra*, at 117.

17      And *third*, historical laws traced to England and the founding era prohibiting

18  the carrying of dangerous or unusual arms to the "terror of the people" promote

19  similar goals as Section 32310—namely, protecting the public's sense of security

20  and safety.  *See* Joseph Blocher & Reva B. Siegel, *When Guns Threaten the Public*

21  *Sphere: A New Account of Public Safety Regulation Under* Heller, 116 Nw. U. L.

22  Rev. 139, 181 (2021) (noting that in addition to the victims of gun violence who are

23  shot or killed, millions are "harmed by the *threat* of violence," including children

24  "who must endure active-shooter drills (which themselves can be terrifying

25  events)").  Government efforts to reduce the availability of particular weapons that

26  are prominently associated with the current epidemic of mass shootings further

27  similar public-safety interests as historical laws governing affrays.  The government

28  has an "interest not only in preventing physical injuries, but also in promoting the

kind of security necessary for individuals, families, and communities to flourish." *Id.* at 198; *see also Friedman*, 784 F.3d at 412 (noting the benefit of the assault weapon restrictions in "increas[ing] the public's sense of safety").

Section 32310's restrictions on large-capacity magazines—magazines that feature prominently in mass shootings—are justified by similar public safety interests that have historically been understood to justify the exercise of police powers in regulating the possession, use, and storage of firearms and other dangerous weapons and accessories.

### III.  THE ATTORNEY GENERAL OBJECTS TO THE EXPEDITED BRIEFING SCHEDULE OF THE INSTANT REMAND PROCEEDINGS.

The existing record amply supports the constitutionality of Section 32310. Nevertheless, the Attorney General objects to the current expedited briefing schedule.  The current briefing schedule and procedural posture prejudices the Attorney General by depriving him of an adequate opportunity (a) to prepare a record that *Bruen* requires, and (b) respond to evidence Plaintiffs put forth in their responsive brief.  The Ninth Circuit remanded this matter for "further proceedings consistent with the United States Supreme Court's decision in [*Bruen*]."  9th Cir. Dkt. 215.  Where, as here, the challenged law addresses "unprecedented societal concerns or dramatic technological changes," *Bruen* recognized that its text-and-history analysis requires a "more nuanced approach."  142 S. Ct. at 2132.  The expedited nature of the proceedings on remand threaten to impair the Attorney General's ability to develop a complete historical record, given the breadth and complexity of the historical analysis that *Bruen* now requires.  If the existing record (including the evidence submitted in support of this brief) is insufficient to justify the constitutionality of California's restrictions on large-capacity magazines, the Attorney General respectfully requests that his pending Motion for Reconsideration be granted so that he may conduct formal expert discovery to develop a more comprehensive record responsive to *Bruen*.

56

1    Following remand, this Court issued an order directing the Attorney General
2    to file "any additional briefing that is necessary to decide this case in light of *Bruen*
3    within 45 days."  Dkt. 111.  The Attorney General sought reconsideration of the
4    Court's order and entry of a new schedule that would involve a three-month
5    discovery period, followed by the filing of supplemental briefs in an ordered
6    briefing sequence (*i.e.*, opening brief, responsive brief, and reply brief).  Dkt. 112-1
7    at 18–19.  This proposal would have provided time for the Attorney General's
8    experts—as well as Plaintiffs'—to conduct original research and analysis to address
9    *Bruen*'s text-and-history standard, prepare expert reports, and undergo depositions.
10   To support this request, the Attorney General submitted a declaration from research
11   historian Zachary Schrag explaining the complexities of the general process of
12   conducting historical research that would be undertaken by the Attorney General's
13   experts.  Dkt. 112-2 (Schrag Decl.); *see also Fouts v. Bonta*, 561 F. Supp. 3d 941,
14   950 (S.D. Cal. 2021), vacated *by Fouts v. Bonta*, (9th Cir. Sept. 22, 2022)
15   ("[H]istory is the work of historians rather than judges.").

16   The Court has not ruled on Attorney General's Motion for Reconsideration,
17   and thus the Attorney General is following the current expedited timetable which
18   lacks any opportunity to respond to evidence in Plaintiffs' supplemental response
19   brief.  If this briefing results in a grant of judgment sua sponte, the lack of formal
20   discovery will have deprived all parties of a "full and fair opportunity to ventilate
21   the issues" involved in the post-*Bruen* analysis.  *Greene v. Solano Cnty. Jail*, 513
22   F.3d 982, 990 (9th Cir. 2008); *see also Commodity Futures Trading Comm'n v. Bd.*
23   *of Trade of City of Chicago*, 657 F.2d 124, 128 (7th Cir. 1981).

24   A district court may issue summary judgment on its own motion only under
25   "certain limited circumstances."  *Portsmouth Square Inc. v. S'holders Protective*
26   *Comm.*, 770 F.2d 866, 869 (9th Cir. 1985).  These circumstances, include, at a
27   minimum, no less advance notice than the parties would be entitled on a Rule 56
28   motion (including Local Rule 7.e.1, generally requiring 28 days' notice of

motions). *See Norse v. City of Santa Cruz*, 629 F.3d 966, 972 (9th Cir. 2010). But "[r]easonable notice" encompasses more than strict compliance with the summary judgment notice period; it also "implies adequate time to develop the facts on which the litigant will depend to oppose summary judgment." *Portsmouth Square*, 770 F.2d at 869; *Buckingham v. United States*, 998 F.2d 735, 742 (9th Cir. 1993) (A litigant must be given "reasonable notice" that "the sufficiency of his or her claim will be in issue"—which requires "adequate time to develop the facts on which the litigant will depend to oppose summary judgment."'"). This includes time to take formal discovery and develop expert evidence. *See Portland Retail Druggists Ass'n v. Kaiser Found. Health Plan*, 662 F.2d 641, 645–46 (9th Cir. 1981) (holding parties received reasonable notice where trial court allowed three-month discovery period prior to ruling on dispositive motion). As the advisory committee to the 1970 amendments to the Federal Rules of Civil Procedure noted, "[a] prohibition against discovery of information held by expert witnesses produces in acute form the very evils that discovery has been created to prevent." Fed. R. Civ. P. 26(d)(4), advisory committee's notes to 1970 amendment (explaining that barring expert discovery frustrates its goals of "narrowing issues" and facilitating "effective rebuttal").

Despite working diligently since this case was remanded, there remain areas of inquiry relevant to *Bruen*'s text-and-history standard that the Attorney General has not yet able to explore fully, including a deeper canvass of historical state and municipal laws and additional primary-source research to further understand and contextualize the Nation's traditions of firearms regulation and the regulation of other weapons. *See Defense Distributed*, 2022 WL 15524977, at *5 n.9 ("There is no possibility this Court would expect [the California Attorney General] to be able to present the type of historical analysis conducted in *Bruen* on 31 days' notice (or even 54 days' notice)."). In order to discern the nation's historical traditions, the Attorney General and his experts consulted the available text of historical state and

58

local laws. But there are many other primary source materials that contextualize those laws and how they were understood and enforced, such as official reports, manuscripts, newspaper articles, and archival records. *See* Dkt. 112-2 (Schrag Decl.), ¶¶ 14, 23. A historical analysis of primary source materials can also identify historical traditions of restricting the availability and use of dangerous weapons through non-statutory means, such control by the U.S. military, state militias, and local law enforcement on possessing and transporting Winchester repeating rifles during Reconstruction. *See* Vorenberg Decl., ¶ 8. In time allotted to prepare this supplemental brief, the Attorney General and his experts has been able to consult a limited number of primary sources to develop evidence, but this work could be expanded across time periods and to include other types of dangerous weapons. And given limited time, the Attorney General's experts have conducted research using widely available electronic databases, *see* Vorenberg Decl., ¶¶ 13-15 ("Research Materials and Methodology" section), or by leveraging primary sources identified in prior historical research, *see, e.g.*, Spitzer Decl., ¶ 37 (discussion of Flayderman Bowie knife research). Of course, not all primary source materials are digitized, and even those that are can prove difficult to search. Dkt. 112-2 (Schrag Decl.), ¶¶ 18–22. With additional time, the Attorney General's experts would be able to expand the scope of their research to include additional archival and unpublished sources. Dkt. 112-2 (Schrag Decl.), ¶¶ 23–28.

Because there is no formal pretrial schedule for post-remand proceedings, the parties have not been required to disclose the experts on whose testimony they plan to rely. Under the Court's existing order, the Attorney General has no opportunity to rebut any new evidence submitted in support of the opposing party's supplemental brief. Without knowing what evidence Plaintiffs plan to submit, the Attorney General cannot predict in what specific ways the inability to conduct depositions (much less respond in the form of reply brief to that evidence) will prejudice their ability to defend this case. But the absence of opportunity to take

1  formal discovery itself implies that there has been a lack of adequate opportunity to
2  develop facts.  *Cf. Portland Retail Druggists Ass'n*, 662 F.2d at 645–46.

3       Accordingly, if the Court is not prepared to find that California's restrictions
4  on large-capacity magazines are constitutional based on the existing record, it
5  should grant the Attorney General's pending Motion for Reconsideration.

6
7  **IV.  PLAINTIFFS' TAKINGS CLAIM AND DUE PROCESS CLAIM FAIL BECAUSE SECTION 323210 DOES NOT EFFECT A TAKING.**

8       This Court's September 26, 2022 Order required the Attorney General to "file
9  any additional briefing that is necessary to decide this case in light of *Bruen* within
10 45 days of this Order."  Dkt. 111 at 2.  The *en banc* panel previously held that
11 Plaintiffs failed to make out a takings claim because (a) Section 32310 plainly does
12 not deprive an owner of a large-capacity magazine of "all economically beneficial
13 use of the property" and Plaintiffs introduced no evidence to the contrary, (b)
14 Plaintiffs failed to proffer evidence of the "economic impact of the regulation on,"
15 or the "investment-backed expectations" of, any owner of a large-capacity
16 magazine, and (c) Section 32310 does not effect a physical taking.  *Duncan v.*
17 *Bonta*, 19 F.4th at 1112.  The *en banc* panel further decided that because
18 "Plaintiffs' due process claim essentially restates the takings claim," it failed for the
19 same reasons.  *Id*. at 1098.  Nothing in the *Bruen* decision expressly or implicitly
20 questions the *en banc* panel's holdings on Plaintiffs' Takings and Due Process
21 Claims in this case or similar decisions by other Circuits.  *See Ass'n of New Jersey*
22 *Rifle & Pistol Clubs, Inc. v. Att'y Gen. New Jersey*, 910 F.3d 106, 124 (3d Cir.
23 2018), *abrogated on other grounds by Bruen*, 142 S. Ct. 2111 (2022) (rejecting a
24 takings claim related to New Jersey's restrictions on large-capacity magazines);
25 *Maryland Shall Issue, Inc. v. Hogan*, 963 F.3d 356, 359 (4th Cir. 2020) (rejecting a
26 takings claim related to a Maryland statute banning "rapid fire trigger activators").
27 As such, this Court should enter judgment in the Attorney General's favor on those
28 claims.

## V. IF THIS COURT FINDS THAT CALIFORNIA'S RESTRICTIONS ON LARGE-CAPACITY MAGAZINES VIOLATE THE SECOND AMENDMENT, THE COURT SHOULD STAY ENFORCEMENT OF THE JUDGMENT PENDING APPEAL.

If the Court is inclined to enter judgment holding that Section 32310 violates the Second Amendment, the Attorney General respectfully requests that the Court stay enforcement of any such judgment pending appeal. All four factors that courts consider in evaluating a request to stay pending appeal weigh in favor of the Attorney General's request for a stay. *See Humane Soc'y of U.S. v. Gutierrez*, 558 F.3d 896, 896 (9th Cir. 2009) ("A party seeking a stay must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of relief, [3] that the balance of equities tip in his favor, and [4] that a stay is in the public interest." (citing *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008))).  On the first factor, the party seeking the stay "need not demonstrate that it is more likely than not they will win on the merits," but rather must show only "a reasonable probability" or "fair prospect" of success.  *Fed. Trade Comm'n v. Qualcomm Inc.*, 935 F.3d 752, 755 (9th Cir. 2019) (granting partial stay of injunction pending appeal where the party seeking a stay showed "the presence of serious questions on the merits of the district court's determination").

*First*, the Attorney General meets the serious questions going to the merits of the Second Amendment claim on appeal. Regardless of the outcome, this case will be among the first opportunities for the Ninth Circuit (or any other Circuit) to address the constitutionality of large-capacity magazine restrictions post-*Bruen*. At a minimum, this case presents a serious and novel question in the Ninth Circuit, and thus satisfies the first factor for a stay pending appeal where, as here, the equities tip strongly in favor of granting a stay.

*Second*, absent a stay, the Attorney General and the State of California will be irreparably injured as a matter of law. Large-capacity magazines have been illegal to manufacture, import, keep or offer for sale, give, or lend in California since

2000; if the Court were to enter judgment in Plaintiffs' favor, individuals who have been prevented from acquiring large-capacity magazines for nearly twenty years will be able to lawfully acquire them.  And significant numbers of large-capacity magazines could come into the State, effectively defeating the purpose of the law even if it were later upheld on appeal.  Matthew Green, *Gun Groups: More Than a Million High-Capacity Magazines Flooded California During Weeklong Ban Suspension*, KQED.org, Apr. 12, 2019, *available at* https://bit.ly/3wfinEU. Additionally, the Attorney General suffers irreparable harm when a duly enacted law is enjoined from enforcement during an appeal if the law is ultimately sustained.

    *Third*, the balance of harms favors the Attorney General. While a stay will delay the relief that Plaintiffs seek in this action, acquisition of large-capacity magazines has been unlawful for nearly two decades; any additional delay pending appeal would be comparatively minor and would preserve the status quo until this matter is finally resolved. While any delay in the enjoyment of a constitutional right will involve a burden to those who wish to exercise it, if a judgment issued by this Court in Plaintiffs' favor is affirmed on appeal, any such burden would be relatively modest in comparison to the substantial burden that will be imposed on the State if the acquisition of new large-capacity magazines is permitted during the appeal.

    *Fourth*, the public interest strongly favors staying any judgment pending appeal. A stay pending appeal will preserve the status quo involving an important public-safety law that has been in effect for nearly two decades while the Ninth Circuit considers this complex Second Amendment challenge. The Court's Judgment, if not stayed pending appeal, will disrupt the State's efforts to protect the public and law enforcement.

    As this Court has previously found in the Second Amendment context, where a case "involves serious questions going to the merits," a stay is in the public interest while any appeal proceeds. *Miller v. Bonta*, 542 F. Supp. 3d 1009, 1069

1   (S.D. Cal. 2001), *vacated*, No. 21-55608, 2022 WL 3095986, at *1 (9th Cir. Aug. 1,

2   2022).

3                                    **CONCLUSION**

4          For the reasons set forth herein, California's restrictions on large-capacity

5   magazines comport with the Second Amendment. To the extent this Court finds

6   that the existing record does not support that conclusion, it should grant the

7   Attorney General's pending motion for reconsideration.  In the event this Court

8   finds that the restrictions violate the Second Amendment, it should stay

9   enforcement of any judgment pending appeal.

10

11  Dated:  November 10, 2022                Respectfully submitted,

12                                           ROB BONTA
                                             Attorney General of California
13                                           MARK R. BECKINGTON
                                             Supervising Deputy Attorney General
14

15                                           *s/ Robert L. Meyerhoff*

16
                                             ROBERT L. MEYERHOFF
17                                           Deputy Attorney General

18                                           *Attorneys for Defendant Rob Bonta in*
                                             *his official capacity as Attorney*
19                                           *General of the State of California*

20

21

22

23

24

25

26

27

28