1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Defendant Rob Bonta in his*
   *official capacity as Attorney General of the*
8  *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                        CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**          Case No. 17-cv-1017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**
    **CHRISTOPHER WADDELL, and**         **DECLARATION OF DENNIS**
15  **CALIFORNIA RIFLE & PISTOL**        **BARON**
    **ASSOCIATION, INC., a California**
16  **corporation,**                     Courtroom:    5A
                                         Judge:        Hon. Roger T. Benitez
17                          Plaintiffs,  Action Filed:  May 17, 2017

18          v.

19
    **ROB BONTA, in his official capacity as**
20  **Attorney General of the State of**
    **California; and DOES 1-10,**
21
                            Defendants.
22

23

24

25

26

27

28

## DECLARATION OF DENNIS BARON

I, Dennis Baron, declare under penalty of perjury that the following is true and correct:

1.     I have been retained by the State of California to provide expert opinion and testimony regarding Corpus Linguistics research.  I am being compensated at a rate of $350 per hour.

2.     I have evaluated the historical use of the terms *arms* and *accoutrements* in order to show that large-capacity magazines (henceforth, LCMs), along with magazines in general, ammunition cases, cartridge cases or boxes, and other ammunition storage containers or devices are not *arms* but are part of the category known as *accoutrements* from the Founding Era through the period following the ratification of the Fourteenth Amendment.

## BACKGROUND AND QUALIFICATIONS

3.     I am a resident of Champaign, Illinois, and I am currently Professor Emeritus and Research Professor at the University of Illinois, where I have served as a member of both the Department of English and the Department of Linguistics since 1975. I served as Head of the Department of English for six years and before that as Director of Rhetoric at the university for 11 years. I earned my Ph.D. in English language and literature from the University of Michigan in 1971, with a dissertation on historical aspects of the English language from Old English to Present-Day English, and I continue to publish widely on matters of historical language use, and on topics related to language and law. I am a life member of the Linguistic Society of America, the American Dialect Society, and the Modern Language Association, as well as a member of the National Council of Teachers of English. I have held a Fulbright Fellowship (to France), a National Endowment for the Humanities Fellowship, for work on a book on language and law, and, most recently, a Guggenheim Fellowship, for work on my latest book on language and

1

law. I have also published books on language reform, on usage, and on gender in language.

4.      Most relevant for this report, I published two books on language and law: *The English-Only Question: An Official Language for Americans?* (Yale Univ. Press, 1990) and *You Can't Always Say What You Want: The Paradox of Free Speech* (Cambridge Univ. Press, January 2023). In addition, I served as lead author on what came to be called "the Linguists Brief" in *District of Columbia v. Heller* (2008), a brief cited both by J. Scalia in his opinion in the case, and by J. Stevens in his dissent. I was a co-author on another brief by professors of linguistics and corpus linguistics, in *New York State Rifle and Pistol Ass'n. v. Bruen* (No. 20-843, 2022), which J. Breyer cited in his dissent. In that dissent, J. Breyer also quoted directly from my essay "Corpus evidence and the meaning of 'bear arms'" (*Hastings Constitutional Law Quarterly*, 46.3: 2019). I have spoken about historical meaning and the Second Amendment at the Federalist Society at the Univ. of Chicago Law School, at the Neubauer Symposium on Historical Semantics at the Univ. of Chicago, at Brigham Young Univ. Law School, at Stanford University, and at the conference "*Heller* after Ten Years" at Hastings College of Law. I've also written opinion essays on historical meaning and the Second Amendment for the *Washington Post* and the *Los Angeles Times*. And I have submitted a declaration on behalf of the State of Rhode Island in *Ocean State Tactical, LLC, et al. v. State of Rhode Island* (Case No. 1:22-cv-00246-JJM-PAS) (D. R.I.). In the past twenty years I have been an expert consultant in perhaps a dozen cases involving document interpretation.

5.      My forthcoming essay, "Look It Up in Your *Funk and Wagnalls*: How Courts Define the Words of the Law," an analysis of how courts incorporate information from dictionaries and digitized corpora as they ascertain legal meaning, will appear in the next issue of the academic journal of the Dictionary Society of North America, *Dictionaries*.

2

6. This report is made based on my professional knowledge and expertise, and on my research using accepted scientific linguistic methodology in the field of Corpus Linguistics, the analysis of large digitized corpora consisting of many millions of words.

**OPINIONS**

**I.   SUMMARY OF CONCLUSIONS**

7. Historical evidence from a number of large textual databases, or corpora, shows that during the Founding Era and the Reconstruction Era, *arms* is used as a general term for weapons (typically swords, knives, rifles, and pistols), but *arms* does not include ammunition, ammunition containers, flints, scabbards, holsters, armor, or shields, which are included in the category *accoutrements*. Nor does *arms* refer to *parts* of weapons, for example the trigger of a gun, the hilt of a sword, the cartridge box or magazine which holds the bullets. Instead, when this additional equipment is mentioned, we find phrases like *arms and ammunition; arms and accoutrements;* or *arms, ammunition, and accoutrements*. A phrase like *arms and accoutrements* is frequently used in military contexts to distinguish weaponry from the rest of a soldier or militia member's kit, or equipment. For example, militia requirements often specify that soldiers have certain *arms* (pistols, swords, rifles, according to their rank) as well as certain *accoutrements* or equipment (including horses, saddles, cartridge cases or boxes, scabbards, flints, and so on). When the term *accoutrements* occurs alone, as *in the accoutrements of a soldier*, it may include both arms and accessories. But when the word *arms* occurs alone, as it does in the Second Amendment, for example, it does not include these accessories. And when *arms and accoutrements* occurs as a phrase, there is a clear distinction made between weapons and the soldier's accessories.

8. Militia regulations in the Founding Era often specified the types of arms required for officers and troops (for example, pistols and/or swords for the officers; rifles for the lower ranks). And they often specified, separately, the

different accessories that officers and the rank and file soldiers were also required to have.

## II.   THEORY AND METHODOLOGY

9.   Corpus linguistics as a field developed in the late 1960s, when scholars began using computer programs to analyze large bodies of digitized text. Initial work in corpus linguistics did not typically involve legal issues. Literary scholars developed computerized concordances to the works of Shakespeare, Milton, and other major English writers. Scholars plotted the frequency of words and phrases in order to develop a picture of an author's style, and to determine authorship of a particular work when the provenance was in doubt. Soon, in addition to solving literary mysteries, the methodologies developed by corpus linguists were successfully applied in a number of criminal cases in the US and in England involving, for example, the authorship of a ransom note or an email.

10.   Lexicographers, who began compiling large analog databases of text in the late 19th century, began to digitize their libraries of paper data and to add to that material, assembling computerized databases of historical and contemporary text and, more recently, of spoken language as well, in order to arrive at more precise definitions of the multiple senses of words and phrases.

11.   As a graduate student at the Univ. of Michigan in 1970, I coded analog texts from the *Oxford English Dictionary* files to help build the computerized database for the Dictionary of Early Modern English, the period from 1500–1800 that is particularly relevant to the language of the Founding Era. Today, major dictionaries like the *Oxford English Dictionary* and the Merriam-Webster suite of dictionaries rely on public databases of oral and written language, as well as their own proprietary databases, in order to revise older definitions and to track the spread of new words and meanings. The great dictionary makers of Europe use similar databases in their own work.

12.   Over the past twenty years, Legal Corpus Linguistics (LCL) has developed as a subset of Corpus Linguistics. LCL involves the analysis of digitized corpora of current and historical English to establish meaning—often referred to as Original Public Meaning (OPM)—in statutes and in the Constitution. The promise of LCL attracted jurists as well as scholars with a specific interest in language and law. In *Muscarello v. United States* (524 US 125 1998), a case which held that "a person who knowingly possesses and conveys firearms in a vehicle, including in its glove compartment or truck, can be deemed to be within the scope of the statutory phrase 'carries a firearm,'" J. Breyer searched two computerized newspaper databases (Lexis/Nexis for the *New York Times* and Westlaw, for "US News") to clarify the meaning of the words *carry*, *vehicle*, and *weapon*. In her dissent, J. Ginsburg expressed skepticism that either dictionary evidence, or Breyer's innovative newspaper searches, were useful in determining what Congress intended by the verb *carry* in the law in question. Her critique did not deter courts from performing other computerized data searches to determine legal meaning. In 2012, Judge Richard Posner, then Chief Judge of the Seventh Circuit, was perhaps the first jurist to use a general internet search in order to determine a word's meaning in a statute. Not satisfied with the dictionary definition that the government relied on in the case before him, Posner ran a Google search to confirm that the word *harbor* in the Immigration Act of 1917 does not mean 'shelter,' as the government claimed, but rather 'hide, conceal from view,' as he felt it must mean in the context of the statute (*United States v. Costello*, 2012). Subsequent research by trained corpus linguists pointed out that a more-structured internet search revealed that *harbor* can indeed mean 'provide shelter' as well as the narrower sense, 'hide someone from the authorities.' But in the context of the Immigration Act, *harbor* appears alongside other terms involving secret, illegal activity, and so even though, using more rigorous parameter's showed that Posner's Google search may have been flawed, his understanding of the word *in context* seems clearly to be correct.

13.   More principled, scientific database searches soon followed, and in 2018 Judge Thomas Lee, of the Utah Supreme Court, a long-time champion of corpus linguistics, together with the legal scholar Stephen Mouritsen, published "Judging Ordinary Meaning" (*Yale Law Journal* 127), summarizing the latest research in corpus linguistics and championing LCL as a way to determine ordinary meaning, and more specifically, OPM, with more clarity. Jurists over the past few years have found that in several cases, LCL proves more useful than the period dictionaries (for example, the dictionaries of Samuel Johnson and Noah Webster) that courts have often relied on to determine historical meaning. LCL often supplements the historical interpretations found in older dictionaries and in the *Oxford English Dictionary*, as well, allowing a more precise interpretation of historical text data.

14.   In addition to the publication of several significant law review articles by experts in the field of corpus linguistics, there have been several conferences on Legal Corpus Linguistics in the past few years, and a number of continuing-education seminars on LCL are now offered for judges and lawyers. As a result, Corpus Linguistics has drawn increased attention from the courts, including recent mentions in decisions in the Sixth, Seventh, and Ninth Circuits, as well as a comment by J. Alito in his concurrence in *Facebook v. Duguid* (2021), where he suggested that LCL may one day provide a useful alternative to the canons of interpretation. Over the past decade, LCL has become an important tool in helping to determine original public meaning when such meaning is in doubt.

15.   Several large databases have come online in the past few years that facilitate LCL research. They have proved invaluable to me in compiling this report. Brigham Young University's Center for Law and Corpus Linguistics sponsors the Corpus of Founding Era American English (COFEA), with more than 126,000 texts, comprising close to 137 million words, covering the years 1760–1799. BYU's Corpus of Early Modern English (COEME), covering the years 1475–1800, contains over 40,000 texts and 1.1 billion words. For the nineteenth

century, the Corpus of Historical American English (COHA), which was initially developed at BYU as well but is now independent of that institution, currently contains 475 million words of text from 1820–2020. The size of these databases continues to grow as more works are digitized, coded, and added to the corpora.

16.   Critics of LCL have complained that databases like COFEA and COEME contain only texts written by "elites," whose language may differ from that of "ordinary people" who do not write at all, or who for various reasons do not write texts likely to be included in the available corpora. It is certainly the case that many printed books and periodicals, along with documents like the Constitution, its amendments, and state and federal statutes, tend to be written by educated specialists and professional writers, and although ordinary people are expected to understand the language of the Constitution, the Declaration of Independence, and other founding documents, as well as the laws that govern the nation, such texts typically require specialized knowledge. A reading-difficulty formula like the commonly-used Flesch-Kincaid scale suggests that the Declaration of Independence and the Constitution require a fifteenth-grade reading level, while according to one comprehensive study, *Adult Literacy in America* (US Department of Education, 1993), the average American today tends to have a seventh-grade reading level.

17.   In order to counter any "elite" bias that may be found in databases like COFEA, COEME, and COHA, I rely as well on five digitized newspaper databases covering the period 1750–1900, focusing for this report on the Founding Era and on the period of Reconstruction after the passage of the Fourteenth Amendment. Print technology remained relatively static between the 1450s, when printing presses first appeared in Europe, and the early 19th century, when the Industrial Revolution drastically changed print technology. The first printing press was adapted by Gutenberg from the design of the traditional wine press, and printing was a slow and labor intensive process. As a result, newspapers in the founding era were small,

1  averaging four to eight pages. Publication was less frequent as well. Papers tended
2  to appear weekly or semi-weekly, rather than daily. Even so, newspapers in the
3  Founding Era and later, during Reconstruction, provided average Americans with
4  their principal access to all the critical events and documents of their time, along
5  with coverage of local and international news. Even though newspaper subscribers
6  tended to be "elites," newspaper content was widely shared by word-of-mouth:
7  ultimately, most Americans in the Founding Era, including those who would be
8  classified as illiterate or poorly educated by today's standards, got their news from
9  newspapers.

10  18.   The invention of the steam engine in the 19th century, along with growth
11  of paper mills that facilitated the production from wood pulp of large and
12  inexpensive rolls of newsprint, led to a revolution in print technology. This led to
13  an explosion in the size of newspapers and the frequency of their publication, to the
14  point where, at their height, papers in big cities were publishing several editions a
15  day. This growth in newspapers, along with a substantial increase in periodical and
16  book production, paralleled a growth in literacy in the US and Europe that tracked
17  the industrial revolution and the subsequent rise in universal public education. By
18  the end of the Civil War, there were more readers than ever, and they demanded
19  more reading material.

20  19.   As for the question of "elites," as the principal means of communicating
21  news and information, the newspapers of the 18th and 19th centuries embodied
22  much of the language of the "ordinary people" who read them. Newspapers also
23  provide researchers with more data for the 19th century than a corpus like COHA,
24  which covers the same period but tends to focus on literary and specialized texts
25  rather than material for the general reader.

26  20.   Since the 1960s, database compilers have been able to track
27  contemporary spoken English more successfully, though for obvious reasons, none
28  of the databases for the Founding Era and for the post-Civil War period cover the

1   spoken language of Americans. Although scholars can reconstruct some of that oral
2   language, we are always doing so through the lens of print versions purporting to
3   represent or comment on ordinary speech.

4       21.   The newspaper databases I have examined are Readex Historical
5   American Newspapers; Chronicling America (newspapers digitized by the Library
6   of Congress); the British Newspaper Archive (digitized by the British Library); and
7   two private subscription services, newspapers.com and newspaperarchive.com. For
8   this report, newspapers.com provides the most-complete picture of the language of
9   the Founding Era newspapers as well as the ordinary language of the later 19th
10  century.

11      22.   All the databases contain some duplicates. COFEA and COEME digitize
12  multiple editions of the same work; and the newspaper databases contain a number
13  of duplicate stories because, particularly in the period of newspaper growth during
14  the 19th century—in an age before the wire services and syndication appeared, and
15  before the larger papers began to set up news bureaus in key areas around the
16  country and around the world—newspapers routinely printed each other's stories,
17  sometimes acknowledging their source and sometimes not. Still, the databases often
18  offer more insight into the meaning of words and phrases than simply going to a
19  dictionary. Jurists from Learned Hand to Felix Frankfurter to Frank Easterbrook
20  and Richard Posner have warned their colleagues not to make a fortress of the
21  dictionary. The corpora are by necessity incomplete. LCL doesn't replace
22  dictionary look-ups, but it does provide an important supplement to them.

23  **III.   THE MEANING OF ARMS AND ACCOUTREMENTS IN THE DATABASES**

24      23.   I was asked to look at the meaning of *arms* and *accoutrements*, along
25  with the phrase *arms* and *accoutrements,* current in the Founding Era and during
26  the period immediately following the adoption of the Fourteenth Amendment,
27  focusing on whether the word *accoutrements* may be considered analogous to the
28  present-day use of the term *magazine* in reference to firearms.

24.   In the eighteenth and nineteenth centuries, *magazine* was a word that meant 'storehouse, depot.' A *magazine* was a place, often a building or warehouse, to store goods and supplies. When used in a military sense, a *magazine* was a designated area for storing gunpowder, and as such, it was subject to strict regulation: because gunpowder was an explosive substance, some towns banned or heavily regulated the storage of gunpowder within city limits. The term *magazine* was not used to refer to the compartment of a gun containing bullets until late in the nineteenth century, and the term was relatively rare until the 1920s. Before that time, bullets were kept in *cartridge boxes* or *cartridge cases*, and these bullet storage containers were part of the general category of military *accoutrements*, not *arms*.

25.   The data on *accoutrements* suggest that the analogous LCMs are not *arms*, but *accoutrements*, the ancillary equipment associated with soldiering, or service in the military. *Cartridges, cartridge boxes* and later, *magazines*, are not arms in and of themselves.

26.   The *Oxford English Dictionary* (OED), the standard dictionary of the English language compiled on historical principles, defines *accoutrements* as, items of apparel; (more generally) additional pieces of dress or equipment, trappings; (Military) the outfit of a soldier other than weapons and garments. [*OED* online, s.v. *accoutrement*; the *OED* and the corpus evidence make clear that *accoutrements* typically occurs as a plural.]

27.   *Accoutrements* in its non-military sense typically refers to specialized clothing—that associated with certain professions (for example, clerical robes) or suitable for fancy-dress occasions (ball gowns, tuxes, and other formal attire). But the military sense of *accoutrements* generally refers not to uniforms or to weaponry, but to other military accessories worn or carried by soldiers. The example given to illustrate this second, military, sense is from the Duke of Wellington's dispatches in 1813: "In order to collect the wounded and their arms and accoutrements." Here

10

Wellington, recognized by all as a consummate soldier who would soon defeat Napoleon at the Battle of Waterloo in 1815, makes a clear distinction between *arms* and *accoutrements*.

28.   The term *accoutrement-maker*, though not defined separately by the *OED*, is illustrated with examples referring to a manufacturer of military accessories rather than arms; and the term *accoutrement shop* has this 1831 example where guns and accoutrements are differentiated: "The crowd was so great in the Rue de Richelieu, . . . especially about the gunsmiths and accoutrement shops in the vicinity of the Palais Royal." [*United Service Jrnl*. i. 325]

29.   The *OED* definitions are instructive. But in order to determine more specifically what the term *accoutrements* refers to, I consulted two digitized historical databases, or corpora. A COFEA database search for the occurrence *accoutrements* within 6 words of *arms* returned 873 hits (including a small number of duplicates). A similar search of COEME returned 126 hits, the earliest from 1656. I determined that the two search terms, *arms* and *accoutrements*, often appear together as a single phrase, *arms and accoutrements*, typically in military contexts having to do with an army or militia unit. *Accoutrements* often occurs in a list alongside, but separate from, ammunition: *arms, accoutrements, (and) ammunition,* though when *ammunition* is not listed separately, the term *accoutrements* will generally include *ammunition. Accoutrements* sometimes occurs in a list alongside *clothing*, suggesting it may not always include uniforms (this finding informs the *OED* definition: military equipment other than arms and uniforms). But occasionally, *accoutrements* may include items classified as part of a uniform (influenced, most likely, by the general, nonmilitary sense of *accoutrements*, where the term usually refers to clothing associated with particular professions or activities). In sum, in the vast majority of examples, *accoutrements* functions as a catch-all term for military equipment *separate* from, and not including, *arms*.

11

30.   But English usage is never simple. As linguists often say, "all grammars leak"—which is to say, there are always a few counterexamples in the data. The existence of counterexamples does not invalidate the data or undercut an interpretation: it simply shows that although the users of a language share a common sense of what words and grammatical constructions mean, variation in meaning and usage is a necessary aspect of all human language. It is not surprising, then, that rarely, in COFEA, *accoutrements* does encompass *arms*, as it does in this example:

> A few years since, some boys, equipped in mock military
> *accoutrements*, such as paper-caps, paper-belts, wooden swords,
> &c. were beating up for recruits in Parliament-street, Boston. [*The*
> *American jest book*: Part I[-II], 1789; emphasis added; here military
> accoutrements includes toy swords.]

31.   This cite from 1776 refers to guns and *other* military accoutrements, implying, too, that arms may be a subcategory of *accoutrements*:

> [He] shall be provided with a fire arm and other military accoutrements
> provided by the militia law.

32.   But besides a handful of exceptions, in literally hundreds and hundreds of cases, *arms* and *accoutrements* are treated as separate items of military gear. Here are some typical examples from the Founding Era:

> **1776**: Fire arms and accoutrements
> **1780**: arms, ammunition, accoutrements, drums and fifes in
> possession of the respective regiments.
> **1795**: you will march . . . with arms and accoutrements in good order.
> If any volunteer should want arms and ammunition, bring them
> forward, and they shall be supplied as well as possible. [COEME;
> the other examples are from COFEA]
> **1798**: To hold his powder and his ball, his gun, accoutrements

and all . . . [This example rhymes because it's from a poem,
indicating that the idiomatic phrase arms and accoutrements has
become part of the general language available not just to military
specialists but also to poets and novelists.]

33.   A second COFEA search, for *accoutrements* alone, returned 1,235 hits.
COEME yields 771 hits. These searches add a number of non-military contexts,
where accoutrements refers to religious gear (robes, mitres, and so on) as well as
other sorts of fancy or special clothing. These non-military examples do not
reference weapons, ammunition, or other military equipment.

34.   I supplemented my COFEA search with a search of the newspaper
database, newspapers.com, for the Founding Era period, 1750–1800. The
newspaper databases do not permit the kind of collocate searches that COFEA,
COEME, and COHA allow. Entering two search terms returns results in which
either one or both terms occur on the same page, though not necessarily in the same
sentence, or even in the same article, and not necessarily as linked terms. There are
1,392 hits for *accoutrements*. There are 692 matches for the exact phrases *arms and
accoutrements*.

35.   Here's a mid-18th century British example from the newspapers.com
corpus where *arms* and *accoutrements* are separate categories, as is *ammunition*:

36.   This Militia shall receive their Arms, Accoutrements, and
Ammunition from the Ordnance. *Derby Mercury*, 1756.

37.   Similarly, there's this "ploughshares into swords" example of a
Cambridge University library to be converted to a military barracks:

[T]he new Building intended for a publick Library . . . may be
converted into a Barrack, and be supplied with Provisions, Arms,
and Accoutrements, at the Expence of the University. 1756

38.   A search of the Readex database of America's Historical Newspapers
returns 3,103 hits from 1750–1800; and 2,036 hits from 1868–1880. This early

13

example from the colonial period appeared in the **Boston Evening Post** in 1750. It

distinguishes *arms* from uniforms, accoutrements, and other military equipment:

> All Gentlemen Volunteers [in Nova Scotia] . . . shall be completely
>
> Cloathed in blue Broad Cloth, receive Arms, Accoutrements, Provisions,
>
> and all other Things necessary for a Gentleman Ranger.

39.   This cite from the *Pittsburgh Gazette* in 1789 reflects a clear sense that

arms and accoutrements are distinct categories in the new nation as well:

> The militia . . . must be considered as the palladium of our security . . . .
>
> The formation and discipline of the militia of the continent should be
>
> absolutely uniform; and that the same species of arms, accoutrements, and
>
> military apparatus, should be introduced in every part of the United States.

40.   The text of a bill in Congress to establish a uniform militia appeared in

the *New York Journal*, in 1790. It confirms the Founding-Era sense that *arms*,

*ammunition*, and *accoutrements* make up distinct and separate elements of a

soldier's kit:

> There shall be appointed an adjutant general for each state . . . whose duty
>
> it shall be to . . . report[] the actual situation of their arms, accoutrements,
>
> and ammunition. . . Every non-commissioned officer or private . . . for
>
> appearing at such meeting or rendezvous without his arms, ammunition, or
>
> accoutrements, as directed by this act, shall pay the sum of twenty-five
>
> cents.

41.   And this cite from 1868 clearly distinguishes what counts as arms, and

what counts, separately, as accoutrements:

> At Watertown Arsenal, Massachusetts . . . the following Arms, &c., will
>
> be sold:10,699 rifled and smooth-bore Muskets . . . ; 261 Carbines . . . ; 305
>
> Sabres . . . ; lot of cavalry accoutrements, consisting of Bayonet Scabbards,
>
> Cap Pouches, Cartridge Boxes, Gun Slings, Waist Belts, &c."

42.   The newspaper data parallels that of COFEA: the phrase *arms and*

14

*accoutrements* is almost always military. The phrase sometimes occurs alongside *ammunition* as a separate list item. *Accoutrements*, when it appears alone, is a more general term, used both for military and other gear, though in non-military contexts it is more directed toward clothing rather than 'equipment' (priests' robes, ministerial garb, fancy ball gowns, badges of office), as is also indicated in the *OED* citations. In non-military contexts, *accoutrements* carries the suggestion of ceremonial gear, and less commonly, nonmilitary tools of the trade.

43.   It's clear that *arms and accoutrements* was, during the 18th and 19th centuries, a common military phrase, in both England and America. English often yokes terms commonly found together into idiomatic pairings, sometimes called binomials, like *bacon and eggs*, *salt and pepper*, or, in a legal context, *assault and battery* or *breaking and entering*. Such pairs take on the characteristics of a formula, and often appear in the same order (this order may be dictated by logical succession of events, or it may be random). *Eggs and bacon* is rarer than *bacon and eggs*. And it would be unusual to find *battery and assault*. Such ordered pairs are called "irreversible binomials," though there's nothing but custom (as in *salt and pepper*) and sometimes logic (as in breaking and entering) to prevent anyone from reversing the order.

44.   The word *accoutrements* typically occurs in a list after *arms* (more rarely, it may occur before *arms* as well), and it is typically a separate category from *arms* (though not always, as the above examples show).

45.   There are over 47,000 citations in newspapers.com for *arms* or *accoutrements* in the period 1868–1900, and 15,799 cites for the exact phrase *arms and accoutrements*. Examining a selection of the 15,799 citations of the phrase confirms that both in England and the US, *arms* and *accoutrements* are separate categories. Here is one example from Gloucestershire, in England, dated 1868:

[A] letter was received from the Home Secretary, pointing out the danger

of permitting an accumulation of arms and accoutrements to take place in prisons, and requesting, if there were any arms or munitions of war stored in the prison, that they should be removed to the nearest military depot.

46.   A similar cite from Iowa in 1868: "Persons having in their possession any arms, accoutrements or ammunition belonging to the State, are requested to return the same at once to the Adjutant General, as proper places have been provided by the State for the safe keeping of all such property."

47.   And this, from Stroudsburg, PA, also 1868: "More than half of the Seventh Cavalry (Custer's) decamped with their horses, arms, and accoutrements, and probably made their way to the gold regions of Colorado and Montana."

48.   The circa-1868 data confirmed the Founding Era data that *accoutrements* is primarily a military term, and that when *accoutrements* co-occurs with *arms*, the terms refer to separate categories of equipment.

49.   One final note on *accoutrements*. The U.S. Supreme Court's recent decision in *New York State Rifle and Pistol Association v. Bruen* (No. 20-843, 2022) references *North Carolina v. Huntley* (25 N.C. 418, 1843), a decision by the North Carolina Supreme Court affirming Huntley's conviction for carrying a shotgun illegally "to the terror of the people," as forbidden by the Statute of Northampton in 1328. In that decision, the Court states, A gun is an 'unusual weapon,' wherewith to be armed and clad. No man amongst us carries it about with him, as one of his everyday accoutrements—as a part of his dress.

50.   In the citation above, *accoutrements* does not refer to weaponry, but to the more general category of 'everyday attire, or clothing.' It may be normal to wear a shirt, or a belt, or shoes, but it's not normal, the Court is saying, to wear a gun in North Carolina in 1843. It's legal—the Court agrees—to carry a gun for any lawful purpose, "either of business or amusement"—but it's not *normal* or typical to do so. In affirming Huntley's conviction, the Court noted that his purpose in carrying a shotgun was not a legal one.

16

**IV.  SOME HISTORICAL NOTES ON THE USE OF THE WORD MAGAZINE**

51.   Since the technology of arms and ammunition was changing by the mid-nineteenth century, I also searched for new uses of the term magazine in relation to *arms* and *accoutrements*. With advances in the design and manufacture of guns and ammunition, by the mid-nineteenth century, the term *magazine* starts to appear in the sense 'ammunition container' (replacing the earlier *cartridge box* or *cartridge case*). According to the *OED*, in the 18th and early 19th centuries, magazine referred generally to 'a storehouse,' and in military contexts it referred specifically to a storehouse for gunpowder. (The sense of 'storehouse' also led to the use of *magazine* to refer by the 18th century to a print publication containing a variety of articles, and its sense of 'depot, warehouse,' is cognate with the French word *magasin*, 'a shop or store').

52.   Although most uses of the word *magazine* still refer to printed periodicals, during the 19th century, one sense of the term *magazine* narrows, referring more and more to an 'ammunition container,' a primary sense of the word in reference to firearms today. The *OED* defines sense IV b. of *magazine* as "A container or (detachable) receptacle in a repeating rifle, machine-gun, etc., containing a supply of cartridges which are fed automatically to the breech," with the earliest citation in this sense from 1868, the time period that marks the ratification of the Fourteenth Amendment and so is relevant to this LCL analysis.

53.   COFEA and COEME do not cover the period past 1800. COHA, which does have 19th century coverage, turns up only a handful of uses of *magazine* in collocation with bullets, guns, rifles, or weapons, none of them before the 1890s. Most COHA cites refer to print magazines; a smaller number from 1820–1880 refer to gunpowder storehouses. Searching the word *magazine* in newspapers.com results in more than 3.3 million hits, the vast majority of them also referring to print journals. *Magazines* meaning 'devices for holding bullets' form only a very small subset of these citations. It took some thirty to forty years for the 'bullet holder'

17

1    sense of the word *magazine* to become more common, and even then, text

2    references to ammunition magazines often appear, not in general discourse, but in

3    legislation restricting their size or use.

4    54.   Most militia laws and regulations from the Founding Era specify

5    minimum requirements for soldiers' weapons, ammunition, and accoutrements.

6    Most laws regulating weapons in the mid-19th century restrict or ban specific kinds

7    of weapons, often enumerating them, sometimes in terms we find colorful today but

8    which were common at the time (Arkansas toothpicks, Bowie knives, slung shots,

9    swords in canes, pistols capable of being concealed in a pocket). Occasionally these

10   laws further identified such weapons as those used by "brawlers," thieves, robbers,

11   or others bent on illegal activities. Other weapons restrictions follow the English

12   tradition of limiting possession of weapons by social class, nationality, or race.

13   55.   Although militia laws do specify weapons and other required

14   accoutrements or pieces of military equipment, including horses for the officers,

15   those laws that prohibit certain kinds of weapons during the two critical periods

16   (1789–1810; 1868–1880) do not single out *parts* of weapons. Here is one

17   exception, from a 1776 Maryland statute: "Resolved, that no muskets or rifles,

18   except by the owner thereof on his removal to reside out of this province, or any

19   gun barrels, gun locks, or bayonets, be carried out of his province, without the leave

20   of the council of safety for the time being." [1776 Md. Laws 146].

21   56.   I surveyed the gun regulations in the Duke Historical Database from the

22   early medieval period through 1885 to see what terminology was used. None of the

23   laws that prohibit weapons, aside from the Maryland statute above, specifies a gun

24   part or ammunition case or accoutrements of any kind. Although many present a list

25   of banned or prohibited weapons—usually without defining them [the assumption

26   is that the reader knows what they refer to], none of the laws mention cartridge

27   boxes, bullets, barrels, or other parts of any weapons.

28

57.   Later, however, in the decades after the introduction of *magazines* as 'carriers or holders of bullets,' laws and regulations against their nonmilitary use started to appear. Here's a 1919 Maine law banning guns with loaded magazines: No person shall have a rifle or shotgun, either loaded or with a cartridge in the magazine thereof, in or on any motor vehicle while the same is upon any highway or in the fields or forests.

58.   Laws banning *machine guns* or firearms with *magazines* capable of firing multiple times without reloading appear in Vermont (1923), Rhode Island (1927), and Massachusetts (1927), among other states. Rhode Island's law bans magazines which fire automatically or which hold more than twelve rounds: "machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

59.   A 1933 Texas law bans "machine guns" capable of firing "more than five (5) shots or bullets."

60.   Finally, the Federal Firearms Act of 1934, which introduced a nationwide system of taxes, fees, and registration requirements for the transfer of certain types of guns, specifies in great detail the nature of the "firearms" covered by the statute, including their barrel length and type of firing mechanisms: "(a) The term 'firearm' means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition."

61.   The Act also provides a specific definition of "machine gun": "(b) The term 'machine gun' means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger." [48 Stat. 1236. 73rd Congress, 2nd Session, Ch. 757, HR 9741].

## V.   CONCLUSION

62.   In effect, then, *accoutrements*, when it occurs alone, in a specifically military context, may function as a general term that includes *arms*, though it does not always include arms. In non-military contexts this does not apply: the *accoutrements* suitable for the clergy or the office worker *do not* normally include weaponry.

63.   But there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.

64.   In addition, 'bullet holders,' whether they are called *cartridge cases*, *magazines*, or simply, *machine guns*, both automatic and semi-automatic, regularly appear in legislation specifying or limiting their size or, in some cases, banning them outright.

65.   To repeat, there is no data that I have found showing that *arms* includes *accoutrements*, *magazines*, or any other *parts* of weapons.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 7, 2022, at Champaign, IL.


_____
Dennis Baron