1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his*
    *official capacity as Attorney General of the*
8   *State of California*

9           IN THE UNITED STATES DISTRICT COURT

10         FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                      CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**          Case No. 3:17-cv-01017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**
    **CHRISTOPHER WADDELL, and**          **COMPENDIUM OF WORKS**
15  **CALIFORNIA RIFLE & PISTOL**         **CITED IN SUPPLEMENTAL**
    **ASSOCIATION, INC., a California**   **DECLARATION OF ROBERT**
16  **corporation,**                      **SPITZER**

17                        Plaintiffs,     **VOLUME 1 OF 5**

18                                 v.     Courtroom:     5A
                                          Judge:         Hon. Roger T. Benitez
19                                        Action Filed:  May 17, 2017

20  **ROB BONTA, in his official capacity**
    **as Attorney General of the State of**
21  **California; and DOES 1-10,**

22                        Defendants.

23

24

25

26

27

28                                   1

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| **CALIFORNIA** | | |
| 1927 Cal. Stat. 938 | 15 n.34 | 003 |
| 1933 Cal. Stat. 1169 | 12 n.30 | 004-007 |
| **DISTRICT OF COLUMBIA** | | |
| Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 652 | 12 n.30 | 009-014 |
| Pub. Law 73-474, ch. 757, 48 Stat. 1236 (1934) | 9 n.23 | 015-020 |
| **HAWAII** | | |
| 1933 Haw. Sess. Laws 117 | 13 n.32 15 n.35 | 022-023 |
| **ILLINOIS** | | |
| 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2 | 12 n.30, 12 n.31 | 025-028 |
| **LOUISIANA** | | |
| Act of July 7, 1932, no. 80, 1932 La. Acts 336 | 12 n.30 | 030-034 |
| **MASSACHUSETTS** | | |
| 1927 Mass. Acts 413, 413-14 | 12 n.30 | 036-040 |
| **MICHIGAN** | | |
| Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888 | 12 n.30 | 042-049 |

2

| | | |
|---|---|---|
| Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929 | 12 n.30 | 050-053 |

**MINNESOTA**

| | | |
|---|---|---|
| Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232 | 12 n.30 | 055-058 |

**MISSOURI**

| | | |
|---|---|---|
| 1929 Mo. Laws 170 | 13 n.32 15 n.35 | 060-061 |

**NEW HAMPSHIRE**

| | | |
|---|---|---|
| N.H. Rev. Stat. § 159:16 | 36 n.124 | 063 |
| 2010 New Hampshire Laws Ch. 67 (H.B. 1665) | 36 n.124 | 064-067 |

**NEW JERSEY**

| | | |
|---|---|---|
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 37 n.127 | 069-070 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey 290 (1881). | 36 n.125 | 071 |
| 1920 N.J. Laws 67, ch. 31, § 9 | 12 n.30 | 072-082 |
| 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2 | 12 n.31 | 083-086 |

**NORTH CAROLINA**

| | | |
|---|---|---|
| 1917 N.C. Sess. Laws 309, ch. 209, § 1 | 12 n.30 | 088-089 |

**NORTH DAKOTA**

| | | |
|---|---|---|
| 1931 N.D. Laws 305-06, ch. 178, §§ 1-2 | 13 n.31 | 091-094 |

3

**OHIO**

| | | |
|---|---|---|
| Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189 | 12 n.30 | 096-097 |

**OREGON**

| | | |
|---|---|---|
| 1933 Or. Laws 488, §§ 72-201, 72-202, 72-207 | 13 n.31 | 099-102 |

**PENNSYLVANIA**

| | | |
|---|---|---|
| 1929 Pa. Laws 777, §1 | 13 n.31 | 104-106 |

**RHODE ISLAND**

| | | |
|---|---|---|
| 1927 R.I. Pub. Laws 256, 256 | 12 n.30 | 108-115 |

**SOUTH CAROLINA**

| | | |
|---|---|---|
| Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288 | 12 n.30 | 117-119 |

**SOUTH DAKOTA**

| | | |
|---|---|---|
| Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245 | 12 n.30 | 121-124 |

**TEXAS**

| | | |
|---|---|---|
| 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6 | 13 n.31 | 126-128 |

**UTAH**

| | | |
|---|---|---|
| 1901 Utah Laws 97-98, ch. 96, §§ 1-3 | 37 n.128 | 130-132 |

**VERMONT**

| | | |
|---|---|---|
| 1923 Vt. Public Acts, No. 130, § 1 | 13 n.31 | 134-135 |

4

| | | |
|---|---|---|
| **VIRGINIA** | | |
| Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137 | 12 n.30 | 137-141 |
| **WASHINGTON** | | |
| Wash. 1933 Sess. Laws 335 | 13 n.32 | 143-145 |
| **WISCONSIN** | | |
| 1933 Wis. Sess. Laws 245, § 164.01 | 13 n.31 | 147-151 |
| **BOOKS** | | |
| Derek Avery, Firearms 12 (Wordsworth Editions, 1995) | 7 n.14 | 173-175 |
| Virgil E. Baugh, Rendezvous at the Alamo 39-63 (University of Nebraska Press, 1985) | 29 n.96, 30 n.99 31 n.104 | 176-195 |
| Ryan Busse, Gunfight 12-15, 65 (Public Affairs, 2021) | 31 n.107 | 196-203 |
| Philip J. Cook & Kristin A. Goss, The Gun Debate 13 (Oxford University Press, 2d ed. 2020) | 9 n.22 | 204-208 |
| William C. Davis, Three Roads to the Alamo 164, 207-8, 582-83 (HarperCollins, 1998) | 29 n.95, 30 n.97, 30 n.99, 32 n.116 | 209-214 |
| Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979) | 26, n.89 | 932-935 |
| John Ellis, The Social History of the Machine Gun 13, 149-52 (Pantheon, 1975) | 6 n.10 19 n.51 | 215-223 |
| Norm Flayderman, Flayderman's Guide to Antique American Firearms 303-5, 683 (Gun Digest Books, 9th ed. 2007) | 20 n.55, 22 n.63 | 224-230 |
| Norm Flayderman, The Bowie Knife: Unsheathing an American Legend 25-64, 495-502 (Andrew Mowbray, 2004) | passim | 231-279 |

5

| | | |
|---|---|---|
| Louis A. Garavaglia and Charles G. Worman, Firearms of the American West, 1866-1894, at 129, 131 (University of New Mexico Press, 1985) | 26 n.87, 26 n.88 | 280-289 |
| Pamela Haag, The Gunning of America 24, 51-52, 56, 60, 65, 96, 353 (Basic Books, 2016) | passim | 290-305 |
| Lee Kennett and James LaVerne Anderson, The Gun in America 91, 112-13, 203 (Greenwood Press, 1975) | 6 n.12, 25 n.79 | 306-317 |
| Larry Koller, The Fireside Book of Guns 112, 154 (Simon and Schuster, 1959) | 23 n.71, 25 n.82 | 318-326 |
| Chris McNab, Firearms and American Law Enforcement Deadly Force 97-98 (Osprey Publishing, 2009) | 7 n.15 | 327-332 |
| James McPherson, Battle Cry of Freedom 475 (Oxford University Press, 1988) | 24 n.74 | 333-334 |
| Jack O'Connor, Complete Book of Rifles and Shotguns 42 (Harper & Row, 1961) | 27 n.92 | 335 |
| Phillip Peterson, Buyer's Guide to Assault Weapons 4-7 (Gun Digest Books, 2008) (as quoted in Robert Spitzer, The Gun Dilemma 29 (Oxford University Press, 2023)) | 28 n.94 | 336 |
| Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter That Changed America 3-5, 54, 136, 390, 401 (Scribner, 2021) | passim | 337-343 |
| Randolph Roth, American Homicide 180-183, 210-217, 218-219 (Belknap Press, 2012) | passim | 344-365 |
| Carl P. Russell, Guns on the Early Frontier 91 (University of Nebraska Press, 1957) | 20 n.56 | 366-367 |
| Robert J. Spitzer, The Politics of Gun Control 25-26, 195-196, 205-11 (Routledge, 8th ed. 2021) | 1 n.1 9 n.22 | 368-378 |
| Robert J. Spitzer, The Gun Dilemma 14-15, 30, 32-33 (Oxford University Press, 2023) | 4 n.4 11 n.29 | 379-389 |

6

| | | |
|---|---|---|
| Richard W. Stewart, American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917, at 367-68 (Washington, D.C.: Center of Military History, 2008) | 5 n.7 | 390-395 |
| Donald M. Snow and Dennis M. Drew, From Lexington to Desert Storm: War and Politics in the American Experience 127 (M.E. Sharpe, 1994) | 5 n.8 | 396-437 |
| Lewis Winant, Firearms Curiosa 8, 9, 36, 166, 168, 219-21 (Bonanza Books, 1955) | passim | 438-443 |
| Lewis Winant, Pepperbox Firearms 30, 32 (Greenberg Pub., 1952) | 23 n.70, 23 n.71 | 444-452 |
| **LAW REVIEWS AND JOURNALS** | | |
| David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany Law Review 849, 851, 852-54, 871-72 (2015) | 17 n.39, 20 n.54 | 454-489 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemporary Problems 55, 63-71 (2017) | 11 n.28, 27 n.90, 37 n.126 | 490-518 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838 | 31 n.110 | 520-521 |
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928) | 8 n.17 | 522-532 |
| S. Rep. No. 72-575, at 5-6 (1932) | 8 n.20 | 533-545 |

7

| | | |
|---|---|---|
| Firearms Commerce in the United States Annual Statistical Update 2020, United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, 15, https://www.atf.gov/file/149886/download | 9 n.22 | 555-568 |
| "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932). Pp. 3, 4, 36, 42, 45, 52 | 8 n.19 | 569-738 |

### NEWS ARTICLES

| | | |
|---|---|---|
| David Altheide, *The Cycle of Fear that Drives Assault Weapon Sales*, The Guardian, Mar. 2, 2013 | 31 n.107 | 740-745 |
| Bangor (Maine) Daily Whig, Oct. 27, 1870 | 37 n.129 | 746 |
| Rukmani Bhatia, "Guns, Lies, and Fear," American Progress, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear | 31 n.107 | 747-784 |
| Judson Hale, *When Lincoln Famously Used the Almanac*, Almanac.com, May 4, 2022 | 35 n.122 | 785-787 |
| Paul Richard Huard, *Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?*, The National Interest, Nov. 19, 2019 | 7 n.13 | 788-789 |
| John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, GUNS.com, March 15, 2011 | 21 n.59 | 790-794 |
| David Kopel, *The History of Magazines Holding 11 or More Rounds: Amicus Brief in 9th Circuit*, Wash. Post, May 29, 2014 | 21 n.57, 24 n.73 | 795-797 |
| Mike Markowitz, *The Girandoni Air Rifle*, DefenseMediaNetwork, May 14, 2013 | 21 n.58, 21 n.60 | 798-800 |
| *The Man Trap*, The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870 | 38 n.131 | 801 |

8

| | | |
|---|---|---|
| Christian Oord, *The Weapons of Bonnie & Clyde & the Guns That Stopped Them*, War History Online, Apr. 26, 2019 | 7 n.14 | 802-811 |
| Philip Schreier, *A Short History of the Semi-Automatic Firearm*, America's 1st Freedom, at 32-39, July 2022 | 23 n.68 | 812-818 |
| *Shot by a Trap-Gun*, South Bend Tribune, Feb. 11, 1891 | 38 n.132 | 819 |

### OTHER SOURCES

| | | |
|---|---|---|
| "Browning automatic rifle," Britannica, September 8, 2022 | 7 n.13 | 821 |
| Phil Bourjaily, Blast From the Past: Winchester Model 1905, Field & Stream, Jan. 11, 2019 | 26 n.86 | 822 |
| "Bowie Knife," Encyclopedia of Arkansas | 29 n.95 | 823-824 |
| Giffords Law Center, Assault Weapons | 3 n.2 | 825-835 |
| Giffords Law Center, Large Capacity Magazines | 4 n.4 | 836-852 |
| "Gatling Gun," History.com, Sept. 9, 2021 | 5 n.7 | 853-856 |
| Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," Oldwest, n.d., https://www.oldwest.org/bowie-knife-history | 30 n.99 | 857-862 |
| Robert Johnson and Geoffrey Ingersoll, It's Incredible How Much Guns Have Advanced Since The Second Amendment, Military & Defense, Dec. 17, 2012 | 26 n.86 | 863-868 |
| Ian McCollum, "Mannlicher 1885 Semiauto Rifle," Forgotten Weapons, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/ | 22 n.67 | 869-872 |
| How The Machine Gun Changed Combat During World War I, Norwich University Online, Oct. 15, 2020 | 5 n.8 | 873-875 |
| Matthew Moss, From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun, Military History Now, Jan. 16, 2015 | 6 n.9, 9 n.24 | 876-886 |

| | | |
|---|---|---|
| "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., Oct. 4-10, 1932 | 8 n.18 | 887-906 |
| Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" The National Interest, July 3, 2020, | 6 n.11 | 907-911 |
| "The Puckle Gun: Repeating Firepower in 1718," Dec. 25, 2016 | 20 n.52 | 912 |
| Uniform Law Commission, *About Us* | 8 n.16 | 913-914 |
| U.S. Census, Historical Population Change Data (1910-1920) | 16 n.38 | 915-917 |
| U.S. Census, National Population Totals and Components of Change: 2020-2021 | 3 n.3, 4 n.5 | 918-921 |
| "Billy Club," Merriam-Webster | 34 n.119 | 922-924 |
| "Bludgeon," Merriam-Webster | 33 n.118 | 925-928 |
| "Slungshot," https://military-history.fandom.com/wiki/Slungshot | 34 n.121 | 929-930 |

Compendium of Works Cited in Supplemental Declaration of Robert Spitzer
(3:17-cv-01017-BEN-JLB)

# HISTORICAL STATUTES

Compendium_Spitzer
Page 001

# CALIFORNIA

# 1927 Cal. Stat. 938, An Act to Prohibit the Possession of Machine Rifles, Machine Guns and Submachine Guns Capable of Automatically and Continuously Discharging Loaded Ammunition of any Caliber in which the Ammunition is Fed to Such Guns from or by Means of Clips, Disks, Drums, Belts or other Seperable Mechanical Device, and Providing a Penalty for Violation Thereof, ch. 552, §§ 1–2. | Duke Center for Firearms Law

§ 1. . . . [E]very person, firm or corporation, who within the State of California possesses any firearm of the kind commonly known as a machine gun shall be guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the state prison not to exceed three years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment. Provided, however that nothing in this act shall prohibit police departments and members thereof, sheriffs, and city marshals or the military or naval forces of this state or of the United States from possessing such firearms for official use in the discharge of their duties. § 2. The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.




DATE DOWNLOADED: Wed Oct 19 22:15:52 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1933 1169 .

ALWD 7th ed.
, , 1933 1169 .

Chicago 17th ed.
"," California - 50th Regular Session : 1169-1171

AGLC 4th ed.
'' California - 50th Regular Session 1169

OSCOLA 4th ed.
'' 1933 1169

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

substance or matter of any kind which is injurious to person or property, or is nauseous, sickening, irritating or offensive to any of the senses.

(2) It shall be unlawful to manufacture or prepare, or to possess any liquid, gaseous, or solid substance or matter of any kind which is injurious to person or property, or is nauseous, sickening, irritating or offensive, to any of the senses with intent to throw, drop, pour, deposit, release, discharge or expose the same in, upon or about any theater, restaurant, place of business, place of amusement, or any other place of public assemblage.

(3) Penalty. Any person violating any of the provisions hereof shall be punished by imprisonment in the county jail for not less than three months and not more than one year, or by a fine of not less than five hundred dollars and not more than two thousand dollars, or by both such fine and imprisonment. **Penalty.**

(4) Any person who, in violating any of the provisions of subdivision (1) of this section, wilfully employs or uses any liquid, gaseous or solid substance which may produce serious illness or permanent injury through being vaporized or otherwise disbursed in the air or who, in violating any of the provisions of subdivision (1) of this section, wilfully employs or uses any tear gas, mustard gas or any of the combinations or compounds thereof, or wilfully employs or uses acid or explosives, shall be guilty of a felony and shall be punished by imprisonment in the State prison for not less than one year and not more than five years. **Use of certain gases, etc.** **Penalty.**

## CHAPTER 450.

*An act to amend sections 1, 2, 3, 6, and 7 of an act entitled "An act regulating the sale, offering for sale, possession or transportation of machine rifles, machine guns and submachine guns, and providing a penalty for the violation thereof," approved May 16, 1927.* **Stats. 1927, p. 938, amended.**

[Approved by the Governor May 20, 1933.  In effect August 21, 1933.]

*The people of the State of California do enact as follows:*

SECTION 1.  Section 3 of the act cited in the title hereof is hereby amended to read as follows: **Stats. 1931, p. 2203.**

Sec. 3.  It shall be lawful for the Superintendent of the Division of Criminal Identification and Investigation of the Department of Penology to issue permits for the possession and transportation or possession or transportation of such machine guns, upon a showing satisfactory to him that good cause exists for the issuance thereof to the applicant for such permit; provided, that no permit shall be issued to a person who is under twenty-one years of age. **Permits re machine guns.**

**1170**  STATUTES OF CALIFORNIA  [Ch. 450

Stats. 1931,
p. 2203.

SEC. 2.   Section 1 of said act is hereby amended to read as follows:

Possession
or sale of
machine
guns.

Section 1.   On and after the date upon which this act takes effect every person, firm or corporation, who within the State of California sells, offers for sale, possesses or knowingly transports any firearms of the kind commonly known as a machine gun, except as herein prescribed, is guilty of a public offense and upon conviction thereof shall be punished by imprisonment in the State Prison not to exceed five years or by a fine not to exceed five thousand dollars or by both such fine and imprisonment.

Exceptions.

Provided, however, that nothing in this act contained shall prohibit the sale to, purchase by, or possession of such firearms by police departments and members thereof, sheriffs, and city marshals, or the military or naval forces of this State or of the United States for use in the discharge of their official duties.

Stats. 1927,
p. 938.

SEC. 3.   Section 2 of said act is hereby amended to read as follows:

Machine
gun defined.

Sec. 2.   The term machine gun as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns, or submachine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, discs, drums, belts or other separable mechanical device and all firearms which are automatically fed after each discharge from or by means of clips, discs, drums, belts or other separable mechanical device having a capacity greater than ten cartridges.

Stats. 1931,
p. 2203.

SEC. 4.   Section 6 of said act is hereby amended to read as follows:

Revocation
of permits.

Sec. 6.   Permits issued in accordance with this act may be revoked by the issuing authority at any time when it shall appear that the need for such firearms has ceased or that the holder of the permit has used such firearms for purposes other than those allowed by the permit or that the holder of the permit has not exercised great care in retaining custody of any weapons possessed under the permit.

Stats. 1931,
p. 2203.

SEC. 5.   Section 7 of said act is hereby amended to read as follows:

Licenses
to sell.

Sec. 7.   The Superintendent of the Division of Criminal Identification and Investigation of the Deartment of Penology may also grant licenses in a form to be prescribed by him effective for not more than one year from the date of issuance, to permit the sale at the place specified in the license of such firearm subject to all of the following conditions, upon breach of any of which the license shall be revoked:

Conditions.

1.   Such business shall be carried on only in the place designated in the license.

2.   Such license or a certified copy thereof must be displayed on the premises in a place where it may easily be read.

3. No such firearm shall be delivered to any person not authorized to receive the same under the provisions of this act.

4. A complete record must be kept of sales made under the authority of the license, showing the name and address of the purchaser, the descriptions and serial numbers of the weapons purchased, the number and date of issue of the purchaser's permit, if any, and the signature of the purchaser or purchasing agent. This record shall be open to the inspection of any peace officer or other person designated by the Superintendent of the Bureau of Criminal Identification and Investigation.

---

## CHAPTER 451.

*An act to amend section 4041.11 of the Political Code, relating to powers and duties of boards of supervisors.*

[Approved by the Governor May 20, 1933. In effect August 21, 1933.]

*The people of the State of California do enact as follows:*

SECTION 1. Section 4041.11 of the Political Code is hereby amended to read as follows: <sub>Stats. 1929, p. 1450.</sub>

4041.11. (1) Under such limitations and restrictions as are prescribed by law, and in addition to jurisdiction and powers otherwise conferred, the boards of supervisors, in their respective counties, shall have the jurisdiction and powers to maintain, regulate and govern public pounds, fix the limits within which animals shall not run at large, and appoint poundkeepers, who shall be paid out of the fines imposed and collected from the owners of impounded animals, and from no other source. <sub>Pounds, etc.</sub>

(2) To provide for the prevention of injuries to sheep by dogs, and to tax dogs and direct the application of the tax. <sub>Protection of sheep.</sub>

(3) To provide for the destruction of gophers, squirrels, other wild animals, noxious weeds, plant diseases, and insects injurious to fruit or fruit trees, or vines, or vegetable or plant life. <sub>Pests.</sub>

(4) To provide by ordinances, not in conflict with the general laws of the State, for the protection of fish and game, and may shorten the season for taking or killing of fish and game, within the dates fixed by the general State laws, but shall not lengthen the same. <sub>Protection of fish and game.</sub>

# DISTRICT OF COLUMBIA

Compendium_Spitzer
Page 008




DATE DOWNLOADED: Thu Oct 20 00:17:27 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
To control the possession, sale, transfer and use of pistols and other dangerous
weapons in the District of Columbia, to provide penalties, to prescribe rules of
evidence, and for other purposes., Public Law 72-275 / Chapter 465, 72 Congress. 47
Stat. 650 (1922-1933) (1932).

ALWD 7th ed.
To control the possession, sale, transfer and use of pistols and other dangerous
weapons in the District of Columbia, to provide penalties, to prescribe rules of
evidence, and for other purposes., Public Law 72-275 / Chapter 465, 72 Congress. 47
Stat. 650 (1922-1933) (1932).

APA 7th ed.
To control the possession, sale, transfer and use of pistols and other dangerous
weapons in the District of Columbia, to provide penalties, to prescribe rules of
evidence, and for other purposes., Public Law 72-275 Chapter 465, 72 Congress. 47
Stat. 650 (1922-1933) (1932).

Chicago 17th ed.
"Public Law 72-275 / Chapter 465, 72 Congress, Session 1, An Act: To control the
possession, sale, transfer and use of pistols and other dangerous weapons in the
District of Columbia, to provide penalties, to prescribe rules of evidence, and for
other purposes.," U.S. Statutes at Large 47 (1932): 650-654

McGill Guide 9th ed.
To control the possession, sale, transfer and use of pistols and other dangerous
weapons in the District of Columbia, to provide penalties, to prescribe rules of
evidence, and for other purposes., Public Law 72-275 / Chapter 465, 72 Congress. 47
Stat. 650 (1922-1933) (1932).

AGLC 4th ed.
To control the possession, sale, transfer and use of pistols and other dangerous
weapons in the District of Columbia, to provide penalties, to prescribe rules of
evidence, and for other purposes., Public Law 72-275 / Chapter 465, 72 Congress. 47
Stat. 650 (1922-1933) (1932)

MLA 9th ed.
To control the possession, sale, transfer and use of pistols and other dangerous
weapons in the District of Columbia, to provide penalties, to prescribe rules of
evidence, and for other purposes., Public Law 72-275 / Chapter 465, 72 Congress. 47
Stat. 650 (1922-1933) (1932). HeinOnline.

OSCOLA 4th ed.
To control the possession, sale, transfer and use of pistols and other dangerous
weapons in the District of Columbia, to provide penalties, to prescribe rules of
evidence, and for other purposes., Public Law 72-275 / Chapter 465, 72 Congress. 47
Stat. 650 (1922-1933) (1932).

States, for the purpose of having such communication delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to such addressee in the United States, and as a result thereof such communication is delivered by the post-office establishment of such foreign country to the post-office establishment of the United States and by it delivered to the address to which it is directed in the United States, then such person shall be punished in the same manner and to the same extent as provided in section 1 of this Act: *Provided*, That any person violating this section may be prosecuted either in the district into which such letter or other communication was carried by the United States mail for delivery according to the direction thereon, or in which it was caused to be delivered by the United States mail to the person to whom it was addressed.

*Punishment for.*
*Proviso.*
*Jurisdiction.*

Approved, July 8, 1932.

[CHAPTER 465.]

July 8, 1932.
[H. R. 8754.]
[Public, No. 275.]

AN ACT

To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes.

*Unauthorized use, etc., of pistols and other dangerous weapons in District of Columbia.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

DEFINITIONS

*Definitions.*

SECTION 1. " Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length.

*"Pistol."*

" Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

*" Sawed-off shotgun."*

" Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

*"Machine gun."*

" Person," as used in this Act, includes, individual, firm, association, or corporation.

*" Person."*

" Sell " and " purchase " and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

*"Sell" and "purchase," etc.*

" Crime of violence " as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, manslaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

*"Crime of violence."*

COMMITTING CRIME WHEN ARMED

*Committing crime of violence when armed. Punishment for.*

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the

Compendium_Spitzer
Page 010

crime, be punished by imprisonment for a term of not more than fifteen years; upon a fourth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for an additional period of not more than thirty years.

### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

Persons forbidden to possess certain firearms.

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

Convicted of a crime.

### CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

Illegally carrying, etc., dangerous weapon.

### EXCEPTIONS

Exceptions.

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

Law enforcement officers.

Army, Navy, or Marine Corps.

National Guard, etc., on duty.

Other organizations.

Carrying to places of assembly, etc.

Manufacturer, etc.

### ISSUE OF LICENSES TO CARRY

Licenses.

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

### SELLING TO MINORS AND OTHERS

*Selling to minors or others.*  SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

### TRANSFERS REGULATED

*Time, etc., provisions.*  SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded.   At the time of applying for the purchase *Register to be kept.* of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence.   The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the *Limitation.* other copy for six years.   No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the *Wholesale trade.* superintendent of police of the District of Columbia.   This section shall not apply to sales at wholesale to licensed dealers.

### DEALERS TO BE LICENSED

*Dealers to be licensed.*  SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawed-off shotgun, or blackjack without being licensed as hereinafter provided.   No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

### DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

*Conditions, etc., for issuing dealers' licenses. Ante, p. 558.*  SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity. No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale.

*Records.*

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence. One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside. No license to sell at retail shall be granted to anyone except as provided in this section.

*Display, etc., forbidden.*

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person, shall, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identity.

*False information or evidence forbidden.*

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun. Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

*Alteration, etc., of identification marks, prohibited.*

*Proviso.*
*Experimental work.*

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

*Toys, etc., excepted.*

### POSSESSION OF CERTAIN DANGEROUS WEAPONS

*Possession of certain dangerous weapons forbidden.*

SEC. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

*Proviso.*
*Exceptions.*

### PENALTIES

*Punishment for violations.*

SEC. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

### CONSTITUTIONALITY

*Invalidity of any provision not to affect remainder.*

SEC. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

### CERTAIN ACTS REPEALED

*Vol. 31, p. 1328, repealed.*

SEC. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

---

[CHAPTER 466.]

### JOINT RESOLUTION

*July 8, 1932.*
*[H. J. Res. 462.]*
*[Pub. Res., No. 35.]*

Making an appropriation to provide transportation to their homes for veterans of the World War temporarily quartered in the District of Columbia.

*World War veterans.*
*Appropriation for, to provide transportation from District of Columbia to their homes.*
*Post, p. 701.*

*Resolved by the Senate and House of Representatives of the United States of America in Congress assembled,* That to enable the Administrator of Veterans' Affairs, upon the request of any honorably discharged veteran of the World War, temporarily quartered in the District of Columbia, who is desirous of returning to his home, to provide such veteran with railroad transportation thereto prior to July 15, 1932, together with travel subsistence at the rate of 75 cents per day, there is hereby appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $100,000: *Provided,* That all amounts expended under this appropriation in behalf of any veteran shall constitute a lean without interest which, if not repaid to the United States, shall be deducted from any amounts payable to such veteran on his adjusted-service certificate.

*Proviso.*
*Credited as a loan.*

Approved, July 8, 1932.




DATE DOWNLOADED: Wed Oct 19 23:44:52 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof., Public Law 73-474 / Chapter 757, 73 Congress. 48 Stat. 1236 (1928-1934) (1934).

ALWD 7th ed.
To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof., Public Law 73-474 / Chapter 757, 73 Congress. 48 Stat. 1236 (1928-1934) (1934).

APA 7th ed.
To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof., Public Law 73-474 Chapter 757, 73 Congress. 48 Stat. 1236 (1928-1934) (1934).

Chicago 17th ed.
"Public Law 73-474 / Chapter 757, 73 Congress, Session 2, An Act: To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof.," U.S. Statutes at Large 48 (1934): 1236-1240

McGill Guide 9th ed.
To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof., Public Law 73-474 / Chapter 757, 73 Congress. 48 Stat. 1236 (1928-1934) (1934).

AGLC 4th ed.
To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof., Public Law 73-474 / Chapter 757, 73 Congress. 48 Stat. 1236 (1928-1934) (1934)

MLA 9th ed.
To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof., Public Law 73-474 / Chapter 757, 73 Congress. 48 Stat. 1236 (1928-1934) (1934). HeinOnline.

OSCOLA 4th ed.
To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof., Public Law

available to pay claims on account of any check, the amount of which has been included in any balance so covered into the surplus fund.

*Advances for land surveys.*
*U.S.C., title 43, sec. 863.*
SEC. 22. So much of the Act of August 18, 1894 (U.S.C., title 43, sec. 863), as authorizes the Governors of the States therein named to advance money from time to time for the survey of certain townships located within such States, which money shall be reimbursable, is hereby repealed.

*Moneys in U.S. court registries.*
SEC. 23. Moneys in, or payable into, the registry of any United States court, in the discretion of the court, may be deposited in official checking accounts with the Treasurer of the United States, subject to disbursement on order approved by the court.

*Survey of certain accounts to be made by Comptroller General.*
SEC. 24. The Comptroller General of the United States shall cause a survey to be made of all inactive and permanent appropriations and/or funds on the books of the Government and also funds in the official custody of officers and employees of the United States, in which the Government is financially concerned, for which no account-*Report to Congress.* ing is rendered to the General Accounting Office; and he shall submit to the Congress annually, in a special report, his recommendations for such changes in existing law relating thereto as, in his judgment, may be in the public interest.

*Existing provisions not affected.*
SEC. 25. The provisions of this Act shall not be construed to alter or amend any existing authorization for an appropriation.

*Saving clause.*
SEC. 26. All Acts and/or parts of Acts inconsistent or in conflict with the provisions of this Act are hereby repealed to the extent of such inconsistency or conflict.

*Short title.*
SEC. 27. The short title of this Act shall be the "Permanent Appropriation Repeal Act, 1934."

Approved, June 26, 1934.

---

[CHAPTER 757.]

**AN ACT**

*June 26, 1934.*
*[H.R. 9741.]*
*[Public, No. 474.]*
To provide for the taxation of manufacturers, importers, and dealers in certain firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof.

*Be it enacted by the Senate and House of Representatives of the*
*National Firearms Act.* *United States of America in Congress assembled,* That for the pur-
*Limitation of terms for purposes of Act.* poses of this Act—
*"Firearm."*
(a) The term "firearm" means a shotgun or rifle having a barrel of less than eighteen inches in length, or any other weapon, except a pistol or revolver, from which a shot is discharged by an explosive if such weapon is capable of being concealed on the person, or a machine gun, and includes a muffler or silencer for any firearm whether or not such firearm is included within the foregoing definition.

*"Machine gun."*
(b) The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

*"Person."*
(c) The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

*"Continental United States."*
(d) The term "continental United States" means the States of the United States and the District of Columbia.

*"Importer."*
(e) The term "importer" means any person who imports or brings firearms into the continental United States for sale.

*"Manufacturer."*
(f) The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms, or who otherwise produces therein any firearm for sale or disposition.

(g) The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term "dealer" shall include wholesalers, pawnbrokers, and dealers in used firearms. —"Dealer." / Exceptions.

(h) The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States (including the Philippine Islands), to any other State or to the District of Columbia. —"Interstate commerce."

(i) The term "Commissioner" means the Commissioner of Internal Revenue. —"Commissioner."

(j) The term "Secretary" means the Secretary of the Treasury. —"Secretary."

(k) The term "to transfer" or "transferred" shall include to sell, assign, pledge, lease, loan, give away, or otherwise dispose of. —"To transfer" or "transferred."

SEC. 2. (a) Within fifteen days after the effective date of this Act, or upon first engaging in business, and thereafter on or before the 1st day of July of each year, every importer, manufacturer, and dealer in firearms shall register with the collector of internal revenue for each district in which such business is to be carried on his name or style, principal place of business, and places of business in such district, and pay a special tax at the following rates: Importers or manufacturers, $500 a year; dealers, other than pawnbrokers, $200 a year; pawnbrokers, $300 a year. Where the tax is payable on the 1st day of July in any year it shall be computed for one year; where the tax is payable on any other day it shall be computed proportionately from the 1st day of the month in which the liability to the tax accrued to the 1st day of July following. —Registration requirements. / Taxes. / Fractional parts of year.

(b) It shall be unlawful for any person required to register under the provisions of this section to import, manufacture, or deal in firearms without having registered and paid the tax imposed by this section. —Failure to register and pay tax unlawful.

SEC. 3. (a) There shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 for each firearm, such tax to be paid by the transferor, and to be represented by appropriate stamps to be provided by the Commissioner, with the approval of the Secretary; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for. The tax imposed by this section shall be in addition to any import duty imposed on such firearm. —Transfer tax; stamps.

(b) All provisions of law (including those relating to special taxes, to the assessment, collection, remission, and refund of internal revenue taxes, to the engraving, issuance, sale, accountability, cancelation, and distribution of tax-paid stamps provided for in the internal-revenue laws, and to penalties) applicable with respect to the taxes imposed by section 1 of the Act of December 17, 1914, as amended (U.S.C., Supp. VII, title 26, secs. 1040 and 1383), and all other provisions of the internal-revenue laws shall, insofar as not inconsistent with the provisions of this Act, be applicable with respect to the taxes imposed by this Act. —Applicable administrative provisions of narcotic tax law to govern. Vol. 38, p. 785; Vol. 44, p. 92. U.S.C., Supp. VII, pp. 592, 644.

(c) Under such rules and regulations as the Commissioner, with the approval of the Secretary, may prescribe, and upon proof of the exportation of any firearm to any foreign country (whether exported as part of another article or not) with respect to which the transfer tax under this section has been paid by the manufacturer, the Commissioner shall refund to the manufacturer the amount of the tax so paid, or, if the manufacturer waives all claim for the amount to be refunded, the refund shall be made to the exporter. —Refund, if for exportation.

SEC. 4. (a) It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in —Unlawful transfers.

**1238**        73d CONGRESS.   SESS. II.   CH. 757.   JUNE 26, 1934.

blank in duplicate for that purpose by the Commissioner.   Such order shall identify the applicant by such means of identification as may be prescribed by regulations under this Act: *Provided*, That, if the applicant is an individual, such identification shall include fingerprints and a photograph thereof.

*Proviso.*
*Identification.*

(b)   The Commissioner, with the approval of the Secretary, shall cause suitable forms to be prepared for the purposes above mentioned, and shall cause the same to be distributed to collectors of internal revenue.

*Preparation and distribution of forms.*

(c)   Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner.   The original thereof with stamps affixed, shall be returned to the applicant.

*Identifying marks, etc., to be indicated in orders.*

(d)   No person shall transfer a firearm which has previously been transferred on or after the effective date of this Act, unless such person, in addition to complying with subsection (c), transfers therewith the stamp-affixed order provided for in this section for each such prior transfer, in compliance with such regulations as may be prescribed under this Act for proof of payment of all taxes on such firearms.

*Transferor to transfer stamp-affixed order for each prior transfer.*

(e)   If the transfer of a firearm is exempted from the provisions of this Act as provided in section 13 hereof, the person transferring such firearm shall notify the Commissioner of the name and address of the applicant, the number or other mark identifying such firearm, and the date of its transfer, and shall file with the Commissioner such documents in proof thereof as the Commissioner may by regulations prescribe.

*Notice to Commissioner of transfers exempted.*

(f)   Importers, manufacturers, and dealers who have registered and paid the tax as provided for in section 2(a) of this Act shall not be required to conform to the provisions of this section with respect to transactions in firearms with dealers or manufacturers if such dealers or manufacturers have registered and have paid such tax, but shall keep such records and make such reports regarding such transactions as may be prescribed by regulations under this Act.

*Registered importers, etc.*

SEC. 5. (a)   Within sixty days after the effective date of this Act every person possessing a firearm shall register, with the collector of the district in which he resides, the number or other mark identifying such firearm, together with his name, address, place where such firearm is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof: *Provided*, That no person shall be required to register under this section with respect to any firearm acquired after the effective date of, and in conformity with the provisions of, this Act.

*Possessors of firearms to register with collector within 60 days.*

*Proviso.*
*Acquisitions after effective date need not be registered.*

(b)   Whenever on trial for a violation of section 6 hereof the defendant is shown to have or to have had possession of such firearm at any time after such period of sixty days without having registered as required by this section, such possession shall create a presumption that such firearm came into the possession of the defendant subsequent to the effective date of this Act, but this presumption shall not be conclusive.

*Prosecutions.*
*Presumption raised by possession.*

SEC. 6.   It shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of section 3 or 4 of this Act.

*Unlawfully receiving or possessing.*

SEC. 7. (a)   Any firearm which has at any time been transferred in violation of the provisions of this Act shall be subject to seizure and

*Seizure and forfeiture.*

Compendium_Spitzer
Page 018

73d CONGRESS.   SESS. II.   CH. 757.   JUNE 26, 1934.           **1239**

forfeiture, and (except as provided in subsection (b)) all the provisions of internal-revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this Act, and the persons to whom this Act applies. *Provisions of internal-revenue laws extended.*

(b) In the case of the forfeiture of any firearm by reason of a violation of this Act: No notice of public sale shall be required; no such firearm shall be sold at public sale; if such firearm is in the possession of any officer of the United States except the Secretary, such officer shall deliver the firearm to the Secretary; and the Secretary may order such firearm destroyed or may sell such firearm to any State, Territory, or possession (including the Philippine Islands), or political subdivision thereof, or the District of Columbia, or retain it for the use of the Treasury Department or transfer it without charge to any Executive department or independent establishment of the Government for use by it. *Sale, etc., forbidden.* *Disposition of.*

SEC. 8. (a) Each manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner, such number or mark to be stamped or otherwise placed thereon in a manner approved by the Commissioner. *Identification marks.*

(b) It shall be unlawful for anyone to obliterate, remove, change, or alter such number or other identification mark. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of any firearm upon which such number or mark shall have been obliterated, removed, changed, or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury. *Obliteration, etc., unlawful.* *Possession of, deemed sufficient evidence for conviction.* *Exception.*

SEC. 9. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this Act as the Commissioner, with the approval of the Secretary, may by regulations require. *Importers, manufacturers, etc., required to keep records.*

SEC. 10. (a) No firearm shall be imported or brought into the United States or any territory under its control or jurisdiction (including the Philippine Islands), except that, under regulations prescribed by the Secretary, any firearm may be so imported or brought in when (1) the purpose thereof is shown to be lawful and (2) such firearm is unique or of a type which cannot be obtained within the United States or such territory. *Regulation of traffic in firearms in places under control of United States.*

(b) It shall be unlawful (1) fraudulently or knowingly to import or bring any firearm into the United States or any territory under its control or jurisdiction (including the Philippine Islands), in violation of the provisions of this Act; or (2) knowingly to assist in so doing; or (3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in, knowing the same to have been imported or brought in contrary to law. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury. *Unlawful acts.* *Fraudulent importations, possession, etc.* *Receiving, concealing, etc.* *Possession deemed sufficient evidence for conviction; exception.*

SEC. 11. It shall be unlawful for any person who is required to register as provided in section 5 hereof and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 4 hereof, to ship, carry, or deliver any firearm in interstate commerce. *Transportation in interstate commerce.*

1240      73d CONGRESS.   SESS. II.   CHS. 757, 758.   JUNE 26, 1934.

Rules, etc., to be prescribed.

SEC. 12. The Commissioner, with the approval of the Secretary, shall prescribe such rules and regulations as may be necessary for carrying the provisions of this Act into effect.

Transfers, when provisions not applicable.

SEC. 13. This Act shall not apply to the transfer of firearms (1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia; (2) to any peace officer or any Federal officer designated by regulations of the Commissioner; (3) to the transfer of any firearm which is unserviceable and which is transferred as a curiosity or ornament.

Penalty provision.

SEC. 14. Any person who violates or fails to comply with any of the requirements of this Act shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than five years, or both, in the discretion of the court.

Excise taxes.
Firearms herein defined exempt from.
Vol. 44, p. 93; Vol. 47, p. 264.
U.S.C., Supp. VII, p. 604.

SEC. 15. The taxes imposed by paragraph (a) of section 600 of the Revenue Act of 1926 (U.S.C., Supp. VII, title 26, sec. 1120) and by section 610 of the Revenue Act of 1932 (47 Stat. 169, 264), shall not apply to any firearm on which the tax provided by section 3 of this Act has been paid.

Saving clause.

SEC. 16. If any provision of this Act, or the application thereof to any person or circumstance, is held invalid, the remainder of the Act, and the application of such provision to other persons or circumstances, shall not be affected thereby.

Effective date.

SEC. 17. This Act shall take effect on the thirtieth day after the date of its enactment.

Citation of title.

SEC. 18. This Act may be cited as the "National Firearms Act."
Approved, June 26, 1934.

---

[CHAPTER 758.]

AN ACT

June 26, 1934.
[H.R. 9769.]
[Public, No. 475.]

To amend the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segregated mineral land in the Choctaw and Chickasaw Nations, Oklahoma, and for other purposes."

*Be it enacted by the Senate and House of Representatives of the*

Choctaw and Chickasaw Indians, Okla.
Vol. 46, p. 788.
Sales of coal and asphalt deposits authorized.

*United States of America in Congress assembled,* That the Act of June 19, 1930 (46 Stat. 788), entitled "An Act providing for the sale of the remainder of the coal and asphalt deposits in the segregated mineral land in the Choctaw and Chickasaw Nations, Oklahoma, and for other purposes", is hereby amended so as to permit the Secretary of the Interior, in his discretion, to sell under the provisions of said Act the coal and asphalt deposits referred to therein in tracts of less than nine hundred and sixty acres where such smaller tract or acreage adjoins a developed tract on which active mining operations are being conducted and is needed by the

*Proviso.*
Leases.

operator in further developing the existing mine: *Provided,* That where the sale of such smaller tract or acreage is not deemed advisable, the Secretary of the Interior may in his discretion, lease said tract under the same terms and conditions as developed tracts are

Vol. 47, p. 89.
Minimum tonnage requirement waived.

leased under the Act of April 21, 1932 (47 Stat. 88), with the exception that the minimum tonnage requirement contained therein is hereby waived as to leases on such small tracts.
Approved, June 26, 1934.

# HAWAII

" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

Search this website

# 1933 Haw. Special Sess. Laws 117, An Act . . . Regulating The Sale, Transfer And Possession Of Certain Firearms, Tear Gas And Ammunition: § 2.

Subject(s):

- Dangerous or Unusual Weapons (https://firearmslaw.duke.edu/subjects/dangerous-or-unusual-weapons/)

Jurisdiction(s):

- Hawaii (https://firearmslaw.duke.edu/jurisdictions/hawaii/)

Year(s):

- 1933 (https://firearmslaw.duke.edu/years/1933/)

Except as permitted under the provisions of this Act, no person, firm or corporation shall own, possess, sell, offer for sale or transport any firearm of the kind commonly known as a machine gun or any shell cartridge or bomb containing or capable of emitting tear gas or any other noxious gas. Provided, however, that nothing in this Act contained shall prohibit the sale to, purchase by, or possession of such firearms by any city and county, county, territorial or federal officer where such firearms are required for professional use in the discharge of his duties, nor to the transportation of such firearms for or on behalf of police departments and members thereof, sheriffs, or

the military or naval forces of this Territory or of the United States and "Provided, further that nothing in this Act shall prohibit police departments and members thereof, sheriffs, or the military or naval forces of the territory or of the United States from possessing or transporting such shells, cartridges or bombs for professional use in the discharge of their duties. "The term 'shell, cartridge or bomb', as used in this Act shall be construed to apply to and include all shells, cartridges, or bombs capable of being discharged or exploded through or by the use of percussion caps, fuses, electricity, or otherwise, when such discharge or explosion will cause or permit the release or emission of tear gases. The term 'machine gun' as used in this Act shall be construed to apply to and include machine rifles, machine guns and submachine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical device."

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPlIY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

# ILLINOIS

 

DATE DOWNLOADED: Wed Oct 19 10:20:58 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1931 1 .

ALWD 7th ed.
, , 1931 1 .

Chicago 17th ed.
"," Illinois - 57th General Assembly, Regular Biennial Session : 1-928

AGLC 4th ed.
'' Illinois - 57th General Assembly, Regular Biennial Session 1

OSCOLA 4th ed.
'' 1931 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

owner or by destroying it or disposing of it according to the laws of the State of Illinois. Any officer of the law violating the provisions of this section is guilty of a misdemeanor and subject to a fine of not less than $100 nor more than $500, or imprisonment in the county jail for not less than one month nor more than six months, or both such fine and imprisonment.

APPROVED July 3, 1931.                    (Smith-Hurd, p. 1030)

_____

### MACHINE GUNS.

| | | | |
|---|---|---|---|
| § 1. | Definitions. | § 4. | Register to be kept. |
| § 2. | Unlawful sale, possession, etc.— | § 5. | Penalties. |
| | Exceptions. | § 6. | Search warrants. |
| § 3. | Regulations for manufacturers and merchants. | § 7. | Committing crime when armed with machine gun—Penalty. |

(SENATE BILL No. 18. APPROVED JULY 2, 1931.)

AN ACT *to regulate the sale, possession and transportation of machine guns.*

*Be it enacted by the People of the State of Illinois, represented in the General Assembly:*

SECTION 1. For purposes of this Act the term "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device.

The term "manufacturer" shall apply to and include all persons manufacturing machine guns; and

The term "merchant" shall apply to and include all persons dealing with machine guns as merchandise.

§ 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that

1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns.

2. The provisions of this Act shall not apply to the Army, Navy, or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns.

3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics.

4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment,

Compendium_Spitzer
Page 026

transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value, and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers.

5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

§ 3. No manufacturer or merchant shall permit any machine gun to pass from his possession to the possesion of any person other than

1. A manufacturer or a merchant.

2. A common carrier for shipment to a manufacturer or merchant.

3. A duly authorized agent of the government of the United States, or of this State, acting in his official capacity.

4. A person authorized to purchase a machine gun under the provisions of exceptions 1 and 4 of section 2 of this Act.

Manufacturers or merchants shall not deliver a machine gun to any of the persons authorized to purchase such gun under the provisions of exceptions 1 and 4 of section 2 hereof, unless such person presents a written permit to purchase and possess a machine gun, signed by the sheriff of the county wherein such manufacturer or merchant has his place of business or delivers such machine gun. The manufacturer or merchant shall retain such permit and keep it on file in his place of business. Each sheriff shall keep a record of all such permits issued by him.

§ 4. Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun.

Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business, for inspection by such officer.

§ 5. Any manufacturer or merchant who

1. Passes possession of a machine gun to any person not authorized to purchase and/or possess such gun under the provisions hereof; or

2. Passes possession of a machine gun to a person authorized to purchase a machine gun under the provisions of exceptions 1 and 4 of section 2 of this Act, without first receiving the written permit of a sheriff, as herein required; or

3. Fails to keep an accurate register, as provided in section 4; or

4. Fails, or is unable to produce or account for a sheriff's permit

for each machine gun sold by him for which a permit is necessary under the provisions of section 3 hereof, upon conviction, shall be punished by imprisonment in the penitentiary for not less than one nor more than five years.

Any other person who sells, keeps or offers for sale, loans or gives away, purchases, possesses, carries or transports any machine gun within this State, except as authorized by this Act, upon conviction, shall be imprisoned in the penitentiary for not less than one nor more than ten years.

Whoever, having been convicted of murder, robbery, burglary or assault with intent to commit a felony, thereafter violates any of the provisions of this Act, upon conviction, shall be imprisoned in the penitentiary for not less than three nor more than ten years.

§ 6. Warrants to search any house or place and seize any machine gun possessed in violation of this Act, may issue in the same manner and under the same restrictions as is provided by law in the case of personal property stolen, and the court upon application of the State's attorney shall have jurisdiction to order any machine gun so illegally possessed and seized, delivered to any officer, department or agency of the State or political subdivision of the State authorized by this Act to possess machine guns or to order the same sold to any person authorized to possess the same the proceeds to be covered into the treasury of the county in which the violation occurred.

§ 7. Any person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with a machine gun shall be imprisoned in the penitentiary for his natural life, or for a term not less than five years.

APPROVED July 2, 1931.

---

### MOB VIOLENCE.

§ 1. Amends sections 4 and 5, Act of 1905.
§ 4. Damage by violence—Penalty — Action against municipality.

§ 5. Heirs of victims may recover from municipality.

(HOUSE BILL No. 974. APPROVED JULY 3, 1931.)

AN ACT to amend sections 4 and 5 of "An Act to suppress mob violence," approved May 16, 1905.

Be it enacted by the People of the State of Illinois, represented in the General Assembly:

SECTION 1. Sections 4 and 5 of "An Act to suppress mob violence," approved May 16, 1905, are amended to read as follows:

§ 4. Any person or persons composing a mob under the provisions of this Act, who shall by violence inflict material damage to the property or serious injury to the person of any other person upon the pretense of exercising correctional powers over such person or persons, by violence and without authority of law, shall be deemed guilty of a felony, and shall suffer imprisonment in the penitentiary not exceeding five years; and any person so suffering material damage to property or injury to person by a mob shall have an action against the county,

Compendium_Spitzer
Page 028

# LOUISIANA



DATE DOWNLOADED: Wed Oct 19 11:29:35 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1932 336 .

ALWD 7th ed.
, , 1932 336 .

Chicago 17th ed.
"," Louisiana - Regular Session, Extraordinary Sessions 1930 and 1931, Constitutional
Amendments - 1930 : 336-339

AGLC 4th ed.
'' Louisiana - Regular Session, Extraordinary Sessions 1930 and 1931, Constitutional
Amendments - 1930 336.

OSCOLA 4th ed.
'' 1932 336

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

336

Section 2. That all laws or parts of laws in conflict with or inconsistent with the provision of this Act be and the same are hereby repealed.

Approved by the Governor: July 7, 1932.

A true copy:

E. A. CONWAY,
Secretary of State.

---

ACT No. 79.

House Bill No. 753.                                                   By Mr. Bauer.

AN ACT

Authorizing the Louisiana Highway Commission, with the approval of the Governor, to sell, at public or private sale, automobile, trucks, tractors, engineering implements, road machinery, and, all other equipment owned by the Commission and not actually in use for any public purpose, or when the use to which the same was devoted, or the use for which the same was acquired, has in fact been abandoned or discontinued, and repealing all laws in conflict herewith.

Louisiana Highway Commission authorized to dispose of automobiles, trucks, tractors, etc.

Section 1. Be it enacted by the Legislature of Louisiana, That the Louisiana Highway Commission, with the approval of the Governor, is hereby authorized to sell and dispose of, at public or private sale, for such price and on such terms as it may deem best any automobiles, trucks, tractors, engineering implements, road machinery and all other equipment of whatsoever nature or kind, owned by the Commission and not actually used for any public purpose, or when the use to which the same was devoted or the use for which the same was acquired, has in fact been abandoned or discontinued.

Section 2. That all laws or parts of laws in conflict herewith be and the same are hereby repealed.

Approved by the Governor: July 7, 1932.

A true copy:

E. A. CONWAY,
Secretary of State.

---

ACT No. 80.

House Bill No. 424.                                          By Mr. Gilmore,
                                                                (By request).

AN ACT

To regulate the sale, possession and transportation of machine guns, and providing a penalty for a violation hereof; providing, further, that any one who has been

337

convicted of murder, robbery, burglary, or assault with intent to commit a felony, who violates any of the provisions of this Act, shall be guilty of a felony and punished as provided in this Act.

Section 1. Be it enacted by the Legislature of Louisiana, "That for the purpose of this Act the term "machine gun" applies to and include all firearms commonly known as machine rifles, machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device. *Definitions.*

The term "manufacturer" shall apply to and include all persons manufacturing machine guns;

The term "merchant" shall apply to and include all persons dealing with machine guns as merchandise.

Section 2. It is unlawful for any person to sell, keep or offer for sale, loan or give away, purchase, possess, carry or transport any machine gun within this State, except that: *Prohibiting the sale and possession of machine guns.*

1. Sheriffs, constables, marshals, police officers and other duly appointed peace officers may purchase, possess, carry and transport machine guns.

2. The provisions of this act shall not apply to the Army, Navy, or Marine Corps of the United States, the National Guard, and organizations authorized by law to purchase or receive machine guns from the United States, or from this State, and the members of such Corps, National Guard and organizations while on duty, may possess, carry and transport machine guns.

3. Persons, organizations or institutions possessing war relics may purchase and possess machine guns, which are relics of any war in which the United States was involved, may exhibit and carry such machine guns in the parades of any military organization, and may sell, offer to sell, loan or give such machine guns to other persons, organizations or institutions possessing war relics.

4. Guards or messengers employed by common carriers, banks and trust companies, and pay-roll guards or messengers may possess and carry machine guns while actually employed in and about the shipment, transportation or delivery, or in the guarding of any money, treasure, bullion, bonds or other thing of value and their employers may purchase or receive machine guns and keep them in their possession when such guns are not being used by such guards or messengers.

Compendium_Spitzer
Page 032

338

5. Manufacturers and merchants may sell, keep or offer for sale, loan or give away, purchase, possess and transport, machine guns, in the same manner as other merchandise except as hereinafter provided, and common carriers may possess and transport unloaded machine guns, as other merchandise.

In possession of manufacturers and merchants.

Section 3. No manufacturer or merchant shall permit any machine gun to pass from his possession to the possession of any person other than:

1. A manufacturer or a merchant.

2. A common carrier for shipment to a manufacturer or merchant.

3. A duly authorized agent of the government of the United States, or of this State, acting in his official capacity.

4. A person authorized to purchase a machine gun under the provisions of exceptions 1 and 4 of Section 2 of this Act.

Manufacturers or merchants shall not deliver a machine gun to any of the persons authorized to purchase such gun under the provisions of exceptions 1 and 4 of Section 2 hereof, unless such person presents a written permit to purchase and possess a machine gun, signed by the sheriff of the parish wherein such manufacturer or merchant has his place of business or delivers such machine gun. The manufacturer or merchant shall retain such permit and keep it on file in his place of business. Each sheriff shall keep a record of all such permits issued by him

Register to be kept by manufacturer and merchant.

Section 4. Every manufacturer or merchant shall keep a register of all machine guns manufactured or handled by him. This register shall show the date of the sale, loan, gift, delivery or receipt of any machine gun, the name, address and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received, and the purpose for which the person to whom the machine gun was sold, loaned, given or delivered, purchased or obtained said machine gun.

Upon demand, every manufacturer or merchant shall permit any sheriff or deputy sheriff, or any police officer to inspect his entire stock of machine guns, parts and supplies therefor, and shall produce the register herein required and all written permits to purchase or possess a machine gun, which he has retained and filed in his place of business, for inspection by such officers.

Section 5. Any manufacturer who:

Penalty for violation by manufacturer.

1. Passes possession of a machine gun to any person not authorized to purchase or possess such gun under the provisions hereof; or

Compendium_Spitzer
Page 033

339

2. Passes possession of a machine gun to a person author-ized to purchase a machine gun under the provisions of exceptions 1 and 4 of Section 2 of this Act. without first receiving the written permit of a sheriff, as herein re-quired; or

3. Fails to keep an accurate register, as provided in Sec-tion 4; or

4. Fails, or is unable to produce or account for a sheriff's permit for each machine gun sold by him for which a permit is necessary under the provisions of Section 3 hereof, shall be guilty of a felony, and upon conviction shall be punished by imprisonment in the State penitentiary at hard labor for not less than one nor more than five years.

Any person who sells, keeps or offers for sale, loans or gives away, purchases, possesses, carries or transports any machine gun within this State, except as authorized by this Act, shall be guilty of a felony, and upon conviction shall be imprisoned in the State Penitentiary, at hard labor, for not less than one nor more than ten years.

Section 6.   Whoever, having been convicted of murder, robbery, burglary or assault with intent to commit a felony, thereafter violates any of the provisions of this Act, shall be guilty of a felony, and upon conviction shall be impris-oned in the State Penitentiary, at hard labor, for not less than three nor more than ten years. <span>Penalty for com-mitting felony.</span>

Approved by the Governor: July 7, 1932.

A true copy:

E. A. CONWAY,
    Secretary of State.

---

### ACT No. 81.

House Bill No. 67.                         By Mr. Stich.

### AN ACT

To provide for the payment to any Judge of the Civil Dis-trict Court for the Parish of Orleans of two-thirds pay, when he shall retire from active service as a member of said Court as authorized by the provisions of Section 8 of Article VII of the Constitution of 1921, and to require the City of New Orleans to budget and appropriate such sums as may be necessary to comply with the provisions of this Act.

Section 1. Be it enacted by the Legislature of Louisiana, That whenever any Judge of the Civil District Court for the Parish of Orleans shall retire from active service as a member of said Court, as authorized by the provisions of Section 8 of Article VII of the Constitution of 1921, said <span>Pay for retired Judges of Civil Dis-trict Court for the the Parish of Orleans.</span>

Compendium_Spitzer
Page 034

# MASSACHUSETTS

 

DATE DOWNLOADED: Wed Oct 19 11:31:42 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1927 384 .

ALWD 7th ed.
, , 1927 384 .

Chicago 17th ed.
"," Massachusetts - General Court, Acts and Resolves : 384-418

AGLC 4th ed.
'' Massachusetts - General Court, Acts and Resolves 384

OSCOLA 4th ed.
'' 1927 384

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

vent the state treasurer from deducting at any time, from any moneys which may be due from the commonwealth to the delinquent city or town, the whole or any part of said tax, with the interest accrued thereon, which shall remain unpaid.                    *Approved April 27, 1927.*

*Deduction of tax from money due from commonwealth.*

---

An Act relative to the choice of a third member of the State Board of Retirement.

*Chap.*325

*Whereas,* The deferred operation of this act would in part defeat its purpose, therefore it is hereby declared to be an emergency law, necessary for the immediate preservation of the public convenience.

*Emergency preamble.*

*Be it enacted, etc., as follows:*

Chapter ten of the General Laws is hereby amended by striking out section eighteen and inserting in place thereof the following: — *Section 18.* There shall be a state board of retirement serving in the department, consisting of three members, one of whom shall be the state treasurer, ex officio, who shall be chairman, a second member elected by the state retirement association established under section two of chapter thirty-two from among their number in such manner as the commissioner of insurance may determine, and a third member chosen by the other two. If the third member is not so chosen within thirty days after the election of the second, the governor shall appoint the third member for a term of three years. Upon the expiration of the term of office of an elected, chosen or appointed member or in case of a vacancy in either of said offices, his successor shall be elected, chosen or appointed as aforesaid for three years.
                    *Approved April 27, 1927.*

*G. L. 10, § 18, amended.*

*State board of retirement, members, election.*

*Expirations and vacancies.*

---

An Act relative to machine guns and other firearms.

*Chap.*326

*Be it enacted, etc., as follows:*

Section 1. Chapter one hundred and forty of the General Laws, as amended in section one hundred and twenty-one by section one of chapter four hundred and eighty-five of the acts of nineteen hundred and twenty-two, is hereby further amended by striking out said section one hundred and twenty-one and inserting in place thereof the following: — *Section 121.* In sections one hundred and twenty-two to one hundred and twenty-nine, inclusive, "firearms" includes a pistol, revolver or other weapon of any description, loaded or unloaded, from which a shot or bullet can be discharged and of which the length of barrel, not including any revolving, detachable or magazine breech, does not exceed twelve inches, and a machine gun, irrespective of the length of the barrel. Any gun of small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired, either by gas action or recoil action,

*G. L. 140, § 121, etc., amended.*

*Definition of "firearms."*

*Definition of "machine gun."*

414                         ACTS, 1927. — CHAP. 326.

shall be deemed to be a machine gun for the purposes of
said sections, and of sections one hundred and thirty-one

Words "pur-
chase" and
"sale" to
include ex-
change, word
"purchaser" to
include ex-
changer, and
verbs "sell"
and "pur-
chase" to
include verb
exchange.
Sections not
applicable to
certain
firearms.
G. L. 140,
§ 123, etc.,
amended.

and one hundred and thirty-one B.   As used in this section
and in sections one hundred and twenty-two to one hundred
and thirty-one A, the words "purchase" and "sale" shall
include exchange, the word "purchaser" shall include
exchanger, and the verbs "sell" and "purchase", in their
different forms and tenses, shall include the verb exchange
in its appropriate form and tense.   Said sections one hun-
dred and twenty-two to one hundred and twenty-nine,
inclusive, shall not apply to antique firearms incapable
of use as firearms nor to sales of firearms at wholesale.

   SECTION 2.   Said chapter one hundred and forty, as
amended in section one hundred and twenty-three by section
four of said chapter four hundred and eighty-five, by section
one of chapter two hundred and eighty-four of the acts of
nineteen hundred and twenty-five and by section one of
chapter three hundred and ninety-five of the acts of nineteen
hundred and twenty-six, is hereby further amended by
striking out said section one hundred and twenty-three

Conditions of
licensee to
sell, rent or
lease certain
firearms.

and inserting in place thereof the following: — *Section 123*.
The license shall be expressed to be and shall be subject
to the following conditions: First, That the provisions in
regard to the nature of the license and the building in which
the business may be carried on under it shall be strictly
adhered to.   Second, That every licensee shall before
delivery of a firearm make or cause to be made a true entry
in a sales record book to be furnished by the licensing au-
thorities and to be kept for that purpose, specifying the
description of the firearm, the make, number, whether single
barrel, magazine, revolver, pin, rim or central fire, whether
sold, rented or leased, the date and hour of such delivery,
and shall, before delivery as aforesaid, require the purchaser,
renter or lessee personally to write in said sales record
book his full name, sex, residence and occupation.   The
said book shall be open at all times to the inspection of the
licensing authorities and of the police.   Third, That the
license or a copy thereof, certified by the recording officer of
the licensing authorities or by the clerk of the town by
which it is issued, shall be displayed on the premises in
a position where it can easily be read.   Fourth, That no
firearms shall be displayed in any outer window of said
premises or in any other place where they can readily be
seen from the outside.   Fifth, That the licensee shall, once
a week, send a copy of the record of sales, rentals and leases
made by him for the preceding seven days to the licensing
authorities and to the commissioner of public safety.   Sixth,
That every firearm shall be delivered securely wrapped and
fastened and shall be unloaded when delivered.   Seventh,
That no delivery of a pistol or revolver shall be made on
the day of application for the purchase, rental or lease
thereof, except to a person having a license to carry the

Acts, 1927. — Chap. 326.                    **415**

same issued under section one hundred and thirty-one. *Conditions of licenses to sell, rent or lease certain firearms.*
Eighth, That no pistol or revolver shall be sold, rented or leased to a person who has not a permit, then in force, to purchase, rent or lease the same issued under section one hundred and thirty-one A, and that no machine gun shall be sold, rented or leased to a person who has not a license to possess the same issued under section one hundred and thirty-one. Ninth, That upon a sale, rental or lease of a pistol or revolver, the licensee under section one hundred and twenty-two shall take up such permit and shall endorse upon it the time and place of said sale, rental or lease, and shall forthwith transmit the same to the commissioner of public safety, and that upon the sale, rental or lease of a machine gun shall endorse upon the license to possess the same the time and place of said sale, rental or lease, and shall forthwith transmit a notice thereof to said commissioner. Tenth, That this license shall be subject to forfeiture as provided in section one hundred and twenty-five for breach of any of its conditions, and that, if the licensee hereunder is convicted of a violation of any such condition, this license shall thereupon become void.

SECTION 3. Section one hundred and thirty-one of said *G. L. 140, § 131, etc., amended.* chapter one hundred and forty, as amended by section nine of said chapter four hundred and eighty-five and by section four of said chapter two hundred and eighty-four, is hereby further amended by inserting after the word "commonwealth" in the twelfth line the words: — or to possess therein a machine gun, — so as to read as follows: — *Section* *License to carry pistols or revolvers, or possess machine gun, issuance to certain persons, etc.* *131.* The justice of a court or a trial justice, the board of police or mayor of a city, the selectmen of a town, or the commissioner of public safety, or persons authorized by them, may, upon the application of any person residing or having a place of business within the jurisdiction of the person or body issuing the license, except an unnaturalized person, a person who has been convicted of a felony or of the unlawful use or sale of drugs or a minor other than one fifteen years of age or over in the employ of a bank, public utility corporation or business of a similar nature whose application is endorsed by his employer, issue a license to such applicant to carry a pistol or revolver in the commonwealth or to possess therein a machine gun, if it appears that he has good reason to fear an injury to his person or property or for any other proper purpose, and that he is a suitable person to be so licensed. Such license shall be *Duration of license.* issued for a term not to exceed one year, but may be for a less period, and all such licenses shall be revocable at the *Revocation.* will of the person or body issuing the same, who shall forthwith send written notice of such revocation to the commissioner of public safety. Said licenses shall be issued on *Form, etc.* forms furnished by said commissioner and a copy of every license so issued shall within one week after the granting thereof be sent to the said commissioner. Whoever issues *Penalty.*

Compendium_Spitzer
Page 039

416                ACTS, 1927. — CHAP. 326.

a license in violation of this section shall be punished by imprisonment for not less than six months nor more than two years in a jail or house of correction.

G. L. 140,
§ 131B, etc.,
amended.

SECTION 4. Section one hundred and thirty-one B of said chapter one hundred and forty, inserted by section three of said chapter three hundred and ninety-five, is hereby amended by striking out the word "or" where it occurs a second time in the second line and inserting in place thereof a comma and also by inserting after the word "revolver" in the same line the words: — or machine gun, —

Penalty for
loans of money
on pistol,
revolver or
machine gun.

so as to read as follows: — *Section 131B.* Whoever loans money secured by mortgage, deposit or pledge of a pistol, revolver or machine gun shall be punished by a fine of not more than five hundred dollars or by imprisonment for not more than one year, or by both.

G. L. 269,
§ 10, etc.,
amended.

SECTION 5. Section ten of chapter two hundred and sixty-nine of the General Laws, as amended by section one of chapter two hundred and forty-eight of the acts of nineteen hundred and twenty-three and by section five of said chapter two hundred and eighty-four, is hereby further amended by inserting after the word "unloaded" in the third line the words: — , or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty, — so as to read as follows: —

Penalty for
carrying
dangerous
weapons or
possessing
machine gun
without per-
mission, etc.

*Section 10.* Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, a pistol or revolver, loaded or unloaded, or possesses a machine gun as defined in section one hundred and twenty-one of chapter one hundred and forty, without permission under section one hundred and thirty-one of chapter one hundred and forty, or whoever so carries any stiletto, dagger, dirk knife, slung shot, metallic knuckles or sawed off shotgun, or whoever, when arrested upon a warrant for an alleged crime or when arrested while committing a crime or a breach or disturbance of the public peace, is armed with, or has on his person, or has on his person or under his control in a vehicle, a billy or dangerous weapon other than those herein mentioned, shall be punished by imprisonment for not less than six months nor more than two and one half years in a jail or house of correction or for not less than two and one half years nor more than five

Confiscation.

years in the state prison, and upon conviction the pistol or other article shall be confiscated by the commonwealth.

Forwarding to
commissioner
of public
safety, etc.

The pistol or article so confiscated shall, by the authority of the written order of the court or trial justice, be forwarded by common carrier to the commissioner of public safety, who, upon receipt of the same, shall notify said court or justice thereof. Said commissioner may sell or destroy the same, and, in case of a sale, after paying the cost of forwarding the article, shall pay over the net proceeds to the commonwealth.          *Approved April 27, 1927.*

Compendium_Spitzer
Page 040

# MICHIGAN




DATE DOWNLOADED: Wed Oct 19 11:34:22 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1927 887 .

ALWD 7th ed.
, , 1927 887 .

Chicago 17th ed.
"," Michigan - Public Acts, Regular Session : 887-893

AGLC 4th ed.
'' Michigan - Public Acts, Regular Session 887

OSCOLA 4th ed.
'' 1927 887

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

other purpose. Such persons shall hold office during the term of their employment by the state highway department but the authority herein vested shall cease upon the termination of such employment. The persons so appointed shall by reason of such appointment be members of the department of public safety during the terms of such appointment but shall serve without pay as members thereof.

Approved June 2, 1927.

---

[No. 372.]

AN ACT to regulate and license the selling, purchasing, possessing and carrying of certain firearms; to prohibit the buying, selling or carrying of certain firearms without a license therefor; to prohibit the possession of certain weapons and attachments; to prohibit the pawning of certain firearms; to prohibit the sale, offering for sale, or possession for the purpose of sale of written or printed matter containing any offer to sell or deliver certain firearms or devices within this state; to provide penalties for the violations of this act, and to repeal act number two hundred seventy-four of the public acts of nineteen hundred eleven, being sections fifteen thousand two hundred thirty-six, fifteen thousand two hundred thirty-seven, fifteen thousand two hundred thirty-eight, fifteen thousand two hundred thirty-nine, fifteen thousand two hundred forty, fifteen thousand two hundred forty-one, fifteen thousand two hundred forty-two, fifteen thousand two hundred forty-three, fifteen thousand two hundred forty-four, fifteen thousand two hundred forty-five and fifteen thousand two hundred forty-six of the compiled laws of nineteen hundred fifteen; act number three hundred thirteen of the public acts of nineteen hundred twenty-five; and section sixteen of chapter one hundred sixty-two of the revised statutes of eighteen hundred forty-six, being section fifteen thousand six hundred forty-one of the compiled laws of nineteen hundred fifteen.

*The People of the State of Michigan enact:*

SECTION 1. The word "pistol" as used in this act shall mean any firearm, loaded or unloaded, thirty inches or less in length. The word "purchaser" shall mean any person who receives a pistol from another by purchase, gift or loan. The word "seller" shall mean any person who sells, furnishes, loans or gives a pistol to another.   *Words defined.*

SEC. 2. No person shall purchase a pistol as defined in this act without first having obtained a license therefor as   *License before purchase.*

Compendium_Spitzer
Page 043

888                    PUBLIC ACTS, 1927—No. 372.

prescribed herein.  The commissioner or chief of police, or his duly authorized deputy, in incorporated cities or in incorporated villages having an organized department of police, and the sheriff, or his authorized deputy, in parts of the respective counties not included within incorporated cities or villages, are hereby authorized to issue licenses to purchase pistols to applicants residing within the respective territories herein mentioned.  No such license shall be granted to any person except he be nineteen years of age or over, and has resided in this state six months or more, and in no event shall such a license be issued to a person who has been convicted of a felony or adjudged insane in this state or elsewhere.  Applications for such licenses shall be signed by the applicant under oath upon forms provided by the commissioner of public safety.  Licenses to purchase pistols shall be executed in duplicate upon forms provided by the commissioner of public safety and shall be signed by the licensing authority.  One copy of such license shall be delivered to the applicant and the duplicate of such license shall be retained by such licensing authority as a permanent official record for a period of six years.  Such license shall be void unless used within ten days after the date of its issue.  Any person who shall sell to another any pistol as defined in this act without complying with the requirements of this section shall be guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or imprisonment in the county jail not more than ninety days, or both such fine and imprisonment in the discretion of the court.  Such license shall be signed in ink by the holder thereof in the presence of the person selling, loaning or giving a pistol to such licensee and shall thereupon be taken up by such person, signed by him in ink and shall be delivered or sent by registered mail within forty-eight hours to the commissioner of public safety.  The seller shall certify upon said license in the space provided therefor the name of the person to whom such pistol was delivered, the make, style, calibre and number of such pistol, and shall further certify that such purchaser signed his name on said license in the presence of the seller.  The provisions of this section shall not apply to the purchase of pistols from wholesalers by dealers regularly engaged in the business of selling pistols at retail, nor to the sale, barter or exchange of pistols kept solely as relics, souvenirs or curios.

To whom granted.

Executed in duplicate.

Misdemeanor; penalty.

Unlawful to manufacture, etc., certain firearms, etc.

Sec. 3.  It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading, or any muffler, silencer or device for deadening or muffling the sound of a discharged firearm, or any bomb or bombshell, or any blackjack, slung shot, billy, metallic knuckles, sandclub, sandbag or bludgeon.  Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand

Penalty for violation.

dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. The provisions of this section shall not apply, however, to any person, firm or corporation manufacturing firearms, explosives or munitions of war by virtue of any contracts with any department of the government of the United States, or with any foreign government, state, municipality or any subdivision thereof.

SEC. 4. Any person who, with intent to use the same unlawfully against the person of another, goes armed with a pistol or other firearm or dagger, dirk, razor, stiletto, or knife having a blade over three inches in length, or any other dangerous or deadly weapon or instrument, shall be guilty of a felony and on conviction thereof shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison for not more than five years, or by both such fine and imprisonment in the discretion of the court. <span>Felony, what deemed.</span> <span>Penalty.</span>

SEC. 5. No person shall carry a dagger, dirk, stiletto or other dangerous weapon except hunting knives adapted and carried as such, concealed on or about his person, or whether concealed or otherwise in any vehicle operated or occupied by him, except in his dwelling house or place of business or on other land possessed by him. No person shall carry a pistol concealed on or about his person, or, whether concealed or otherwise, in any vehicle operated or occupied by him, except in his dwelling house or place of business or on other land possessed by him, without a license therefor as herein provided. Any person violating the provisions of this section shall be guilty of a felony and upon conviction thereof shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison for not more than five years, or by both such fine and imprisonment in the discretion of the court. <span>Unlawful to carry, etc., dagger, etc.</span>

SEC. 6. The prosecuting attorney, the commissioner or chief of police and the commissioner of public safety or their respective authorized deputies in incorporated cities or in incorporated villages having an organized department of police, and the prosecuting attorney, the commissioner of public safety or their authorized deputies, and the sheriff, under-sheriff or chief deputy sheriff in parts of the respective counties not included within incorporated cities or villages shall constitute boards exclusively authorized to issue licenses to carry pistols concealed on the person to applicants residing within the respective territories herein mentioned. The county clerk of each county shall be clerk of such licensing boards, which boards shall be known in law as "The Concealed Weapon Licensing Board." No such license to carry a pistol concealed on the person shall be granted to any person except he be nineteen years of age or over and has resided in this state six months or over, and in no event shall such license be issued unless it appears that the applicant has good reason to fear injury to his person or property, or has <span>Concealed weapon licensing board.</span> <span>To whom license granted.</span>

Compendium_Spitzer
Page 045

other proper reasons, and that he is a suitable person to be so licensed, and in no event to a person who has been convicted of a felony or adjudged insane in this state or elsewhere. The prosecuting attorney shall be the chairman of the said board, which shall convene at least once in each calendar month and at such other times as they shall be called to convene by the chairman. Such licenses shall be issued only upon written application signed by the applicant and on his oath and upon forms provided by the commissioner of public safety. Such licenses shall issue only with the approval of a majority of said board and shall be executed in triplicate upon forms provided by the commissioner of public safety and shall be signed in the name of the concealed weapon licensing board by the county clerk and the seal of the circuit court affixed thereto. One copy of such license shall be delivered to the applicant, the duplicate of said license shall be retained by the county clerk as a permanent official record for a period of six years, and the triplicate of such license shall be forwarded to the commissioner of public safety who shall file and index licenses so received by him and keep the same as a permanent official record for a period of six years. Each license shall be issued for a definite period of not more than one year, to be stated in the license, and no renewal of such license shall be granted except upon the filing of a new application. Every license issued hereunder shall bear the imprint of the right thumb of the licensee, or, if that be not possible, of the left thumb or some other finger of such licensee. Such licensee shall carry such license upon his person at all times when he may be carrying a pistol concealed upon his person and shall display such license upon the request of any peace officer.

**Chairman of board.**

**Duration of license.**

**When license to expire.**
SEC. 7. All licenses heretofore issued in this state permitting a person to carry a pistol concealed upon his person shall expire at midnight, December thirty-one, nineteen hundred twenty-seven.

**When license revoked.**
SEC. 8. The licensing board herein created by section six may revoke any license issued by it upon receiving a certificate of any magistrate showing that such licensee has been convicted of violating any of the provisions of this act, or has been convicted of a felony. Such license may also be revoked whenever in the judgment of said board the reason for granting such license shall have ceased to exist, or whenever said board shall for any reasonable cause determine said licensee to be an unfit person to carry a pistol concealed upon his person. No such license shall be revoked except upon written complaint and then only after a hearing by said board, of which at least seven days' notice shall be given to the licensee either by personal service or by registered mail to his last known address. The clerk of said licensing board is hereby authorized to administer an oath to any person testifying before such board at any such hearing.

Compendium_Spitzer
Page 046

SEC. 9.  On or before the first day of November, nineteen hundred twenty-seven, any person within this state who owns or has in his possession a pistol as defined in this act, shall, if he reside in an incorporated city or an incorporated village having an organized police department, present such weapon for safety inspection to the commissioner or chief of police of such city or village; if such person reside in a part of the county not included within the corporate limits of such city or village he shall so present such pistol for safety inspection to the sheriff of such county.  Any person owning or coming into possession of a pistol after the first day of November, nineteen hundred twenty-seven, shall forthwith present such pistol for safety inspection in the manner provided in this section.  A certificate of inspection shall thereupon be issued in triplicate on a form provided by the commissioner of public safety, containing the name, age, address, description and signature of the person presenting such pistol for inspection, together with a full description thereof; the original of such certificate shall be delivered to the registrant; the duplicate thereof shall be mailed to the commissioner of public safety and filed and indexed by him and kept as a permanent official record for a period of six years, and the triplicate of such certificate shall be retained and filed in the office of said sheriff, or commissioner or chief of police, as the case may be.  The provisions of this section shall not apply to wholesale or retail dealers in firearms or to collections of pistols kept solely for the purpose of display, as relics, souvenirs, curios or antiques, nor to weapons heretofore registered under the provisions of section eleven of act number three hundred thirteen of the public acts of nineteen hundred twenty-five.  Any person who fails to comply with the provision of this section shall be guilty of a misdemeanor and shall be punished by a fine not exceeding one hundred dollars or imprisonment in the county jail not exceeding ninety days, or by both such fine and imprisonment in the discretion of the court.

*Safety inspection of weapons.*

*Certificate issued.*

SEC. 10.  No pawnbroker shall accept a pistol in pawn. Any person violating this section of this act shall be deemed guilty of a misdemeanor and upon conviction thereof shall be punished by a fine of not more than one hundred dollars or imprisonment in the county jail for not more than ninety days or by both such fine and imprisonment in the discretion of the court.

*Pistol not accepted in pawn.*

SEC. 11.  No person shall wilfully alter, remove or obliterate the name of the maker, model, manufacturer's number or other mark of identity of any pistol.  Possession of any such firearm upon which the number shall have been altered, removed or obliterated, shall be presumptive evidence that such possessor has altered, removed or obliterated the same.  Any person convicted under this section shall be punished by a fine not to exceed five hundred dollars or by imprisonment

*Alteration of pistol unlawful.*

in the state prison not to exceed two years or by both such fine and imprisonment in the discretion of the court.

**Exceptions to act.**

SEC. 12.    The provisions of section two, three, five and nine shall not apply to any peace officer of the state or any subdivision thereof who is regularly employed and paid by the state or such subdivision, or to any member of the army, navy or marine corps of the United States, or of organizations authorized by law to purchase or receive weapons from the United States or from this state, nor to the national guard or other duly authorized military organizations when on duty or drill, nor to the members thereof in going to or returning from their customary places of assembly or practice, nor to a person licensed to carry a pistol concealed upon his person issued by another state, nor to the regular and ordinary transportation of pistols as merchandise, or to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business, or in moving goods from one place of abode or business to another.

**When unlawfully possessed.**

SEC. 13.    When complaint shall be made on oath to any magistrate authorized to issue warrants in criminal cases that any pistol or other weapon or device mentioned in this act is unlawfully possessed or carried by any person, such magistrate shall, if he be satisfied that there is reasonable cause to believe the matters in said complaint be true, issue his warrant directed to any peace officer, commanding him to search the person or place described in such complaint, and if such pistol, weapon or device be there found, to seize and hold the same as evidence of a violation of this act.

**Forfeited to state.**

SEC. 14.    All pistols, weapons or devices carried or possessed contrary to this act are hereby declared forfeited to the state.

**Certain books, etc., unlawful to sell, etc.**

SEC. 15.    It shall be unlawful to sell or deliver within this state, or to offer or expose for sale, or to have in possession for the purpose of sale, any book, pamphlet, circular, magazine, newspaper or other form of written or printed matter offering to sell or deliver, or containing an offer to sell or deliver to any person within this state from any place without this state any pistol or any weapon or device mentioned in section three hereof.    The provisions of this section shall not apply to sales of or offers to sell pistols at wholesale to persons regularly engaged in the business of selling such pistols at wholesale or retail, nor to sales or offers to sell such pistols made or authorized by the United States government or any department or agency thereof.

**Penalty for violation.**

SEC. 16.    Any person violating the provisions of section fifteen of this act shall be deemed guilty of a misdemeanor, and upon conviction shall be punished by a fine not to exceed one hundred dollars or by imprisonment in the county jail not to exceed ninety days, or by both such fine and imprisonment in the discretion of the court.

Compendium_Spitzer
Page 048

SEC. 17. Act number two hundred seventy-four of the **Acts repealed.** public acts of nineteen hundred eleven, being sections fifteen thousand two hundred thirty-six, fifteen thousand two hundred thirty-seven, fifteen thousand two hundred thirty-eight, fifteen thousand two hundred thirty-nine, fifteen thousand two hundred forty, fifteen thousand two hundred forty-one, fifteen thousand two hundred forty-two, fifteen thousand two hundred forty-three, fifteen thousand two hundred forty-four, fifteen thousand two hundred forty-five and fifteen thousand two hundred forty-six of the compiled laws of nineteen hundred fifteen; act number three hundred thirteen of the public acts of nineteen hundred twenty-five; and section sixteen of chapter one hundred sixty-two of the revised statutes of eighteen hundred forty-six, being section fifteen thousand six hundred forty-one of the compiled laws of nineteen hundred fifteen, are hereby repealed: *Provided, however,* That any **Proviso.** proceedings pending under any of said sections herein repealed shall not be affected hereby but shall be concluded in accordance with the law of such repealed section or sections.

SEC. 18. This act is declared to be severable, and should **Saving clause.** any section hereof be hereafter declared unconstitutional or otherwise invalid, the remainder of the act shall not be affected thereby.

Approved June 2, 1927.

---

### [No. 373.]

AN ACT to amend section twenty-five of chapter thirty of act number three hundred fourteen of the public acts of nineteen hundred fifteen, entitled "An act to revise and consolidate the statutes relating to the organization and jurisdiction of the courts of this state; the powers and duties of such courts, and of the judges and other officers thereof; the forms of civil actions; the time within which civil actions and proceedings may be brought in said courts; pleading, evidence, practice and procedure in civil actions and proceedings in said courts; to provide remedies and penalties for the violation of certain provisions of this act; and to repeal all acts and parts of acts inconsistent with, or contravening any of the provisions of this act," being section thirteen thousand two hundred fifty-three of the compiled laws of nineteen hundred fifteen, as amended by act number two hundred forty-three of the public acts of nineteen hundred seventeen, and to add a new section thereto to stand as section thirty-one.

*The People of the State of Michigan enact:*

SECTION 1. Section twenty-five of chapter thirty of act **Section amended.** number three hundred fourteen of the public acts of nineteen



DATE DOWNLOADED: Wed Oct 19 11:36:42 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1929 527 .

ALWD 7th ed.
, , 1929 527 .

Chicago 17th ed.
"," Michigan - Public Acts, Regular Session : 527-529

AGLC 4th ed.
'' Michigan - Public Acts, Regular Session 527

OSCOLA 4th ed.
'' 1929 527

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

located on the property of the state of Michigan for the use
of the Michigan school for the deaf at such site or sites thereon
as shall be determined by the state institute commission,
which said money is hereby appropriated to the state admin-
istrative board for said uses and purposes.

This act is ordered to take immediate effect.

Approved May 20, 1929.

---

### [No. 206.]

AN ACT to amend the title and section three of act number
three hundred seventy-two of the public acts of nineteen
hundred twenty-seven, entitled "An act to regulate and
license the selling, purchasing, possessing and carrying of
certain firearms; to prohibit the buying, selling or carrying
of certain firearms without a license therefor; to prohibit
the possession of certain weapons and attachments; to pro-
hibit the pawning of certain firearms; to prohibit the sale,
offering for sale, or possession for the purpose of sale of
written or printed matter containing any offer to sell or
deliver certain firearms or devices within this state; to
provide penalties for the violations of this act, and to repeal
act number two hundred seventy-four of the public acts of
nineteen hundred eleven, being sections fifteen thousand
two hundred thirty-six, fifteen thousand two hundred thirty-
seven, fifteen thousand two hundred thirty-eight, fifteen
thousand two hundred thirty-nine, fifteen thousand two
hundred forty, fifteen thousand two hundred forty-one, fif-
teen thousand two hundred forty-two, fifteen thousand two
hundred forty-three, fifteen thousand two hundred forty-
four, fifteen thousand two hundred forty-five and fifteen
thousand two hundred forty-six of the compiled laws of
nineteen hundred fifteen; act number three hundred thir-
teen of the public acts of nineteen hundred twenty-five;
and section sixteen of chapter one hundred sixty-two of the
revised statutes of eighteen hundred forty-six, being section
fifteen thousand six hundred forty-one of the compiled
laws of nineteen hundred fifteen," and to add a new sec-
tion thereto to stand as section six-a.

#### The People of the State of Michigan enact:

SECTION 1. The title and section three of act number three **Title and**
hundred seventy-two of the public acts of nineteen hundred **section**
**amended.**
twenty-seven, entitled "An act to regulate and license the
selling, purchasing, possessing and carrying of certain fire-
arms; to prohibit the buying, selling or carrying of certain
firearms without a license therefor; to prohibit the possession

Compendium_Spitzer
Page 051

of certain weapons and attachments; to prohibit the pawning of certain firearms; to prohibit the sale, offering for sale, or possession for the purpose of sale of written or printed matter containing any offer to sell or deliver certain firearms or devices within this state; to provide penalties for the violations of this act, and to repeal act number two hundred seventy-four of the public acts of nineteen hundred eleven, being sections fifteen thousand two hundred thirty-six, fifteen thousand two hundred thirty-seven, fifteen thousand two hundred thirty-eight, fifteen thousand two hundred thirty-nine, fifteen thousand two hundred forty, fifteen thousand two hundred forty-one, fifteen thousand two hundred forty-two, fifteen thousand two hundred forty-three, fifteen thousand two hundred forty-four, fifteen thousand two hundred forty-five and fifteen thousand two hundred forty-six of the compiled laws of nineteen hundred fifteen; act number three hundred thirteen of the public acts of nineteen hundred twenty-five; and section sixteen of chapter one hundred sixty-two of the revised statutes of eighteen hundred forty-six, being section fifteen thousand six hundred forty-one of the compiled laws of nineteen hundred fifteen," are hereby amended and a new section to stand as section six-a is hereby added thereto, said amended title and section and added section to read as follows:

Section added.

### TITLE.

An Act to regulate and license the selling, purchasing, possessing and carrying of certain firearms; to prohibit the buying, selling or carrying of certain firearms without a license therefor; to prohibit the possession, manufacture or sale of certain weapons, including gas ejecting or emitting weapons, and attachments, except by certain persons licensed to manufacture, sell or possess any gas ejecting or emitting weapon, cartridge or device; to prohibit the pawning of certain firearms; to prohibit the sale, offering for sale, or possession for the purpose of sale of written or printed matter containing any offer to sell or deliver certain firearms or devices within this state; to provide penalties for the violations of this act, and to repeal act number two hundred seventy-four of the public acts of nineteen hundred eleven, being sections fifteen thousand two hundred thirty-six, fifteen thousand two hundred thirty-seven, fifteen thousand two hundred thirty-eight, fifteen thousand two hundred thirty-nine, fifteen thousand two hundred forty, fifteen thousand two hundred forty-one, fifteen thousand two hundred forty-two, fifteen thousand two hundred forty-three, fifteen thousand two hundred forty-four, fifteen thousand two hundred forty-five and fifteen thousand two hundred forty-six of the compiled laws of nineteen hundred fifteen; act number three hundred thirteen of the public acts of nineteen hundred twenty-five; and section sixteen of chapter one hundred sixty-two of the revised statutes

of eighteen hundred forty-six, being section fifteen thousand six hundred forty-one of the compiled laws of nineteen hundred fifteen.

SEC. 3. It shall be unlawful within this state to manufacture, sell, offer for sale or possess any machine gun or firearm which can be fired more than sixteen times without reloading or any muffler, silencer, or device for deadening or muffling the sound of a discharged firearm, or any bomb, or bomb shell, blackjack, slung shot, billy, metallic knuckles, sand club, sand bag, or bludgeon or any gas ejecting device, weapon, cartridge, container, or contrivance designed or equipped for or capable of ejecting any gas which will either temporarily or permanently disable, incapacitate, injure or harm any person with whom it comes in contact. Any person convicted of a violation of this section shall be guilty of a felony and shall be punished by a fine not exceeding one thousand dollars or imprisonment in the state prison not more than five years, or by both such fine and imprisonment in the discretion of the court. The provisions of this section shall not apply, however, to any person, firm or corporation manufacturing firearms, explosives or munitions of war by virtue of any contracts with any department of the government of the United States, or with any foreign government, state, municipality or any subdivision thereof, or to any person, firm or corporation licensed to manufacture, sell or possess any gas ejecting device, weapon, cartridge, container or contrivance above mentioned, under the provisions of section six-a hereof. *Unlawful to sell, etc., certain firearms, etc.*

*Penalty for violation.*

SEC. 6-a. Said concealed weapons licensing board may issue licenses to any bank, trust company, armored car company, railway company, express company, or other company, institution, copartnership or individual having in its, their, or his possession large sums of money or other valuables, authorizing such licensee to equip the premises or vehicles under its, their or his control with gas ejecting devices to be used solely for the purpose of protecting such premises or vehicles and the persons or property therein from criminal assaults. The commissioner of the department of public safety shall prescribe rules and regulations which shall govern the issuing of such licenses and the making of application therefor. Said concealed weapons licensing board may in its discretion also issue licenses to any company, copartnership or individual under such limitations and in accordance with such rules and regulations as the commissioner of the department of public safety shall prescribe, authorizing such corporation, copartnership or individual to manufacture or sell or both, any such gas ejecting or emitting weapons, cartridge or device to any person authorized by law to possess the same. *License, to whom issued.*

This act is ordered to take immediate effect.

Approved May 20, 1929.

# MINNESOTA




DATE DOWNLOADED: Wed Oct 19 11:41:02 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1933 231 .

ALWD 7th ed.
, , 1933 231 .

Chicago 17th ed.
"," Minnesota - Session Laws, 48th Session : 231-233

AGLC 4th ed.
'' Minnesota - Session Laws, 48th Session 231

OSCOLA 4th ed.
'' 1933 231

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

corrected thereby, and shall be certified by the proper officers of the municipality as to authorization and by an engineer or surveyor as to correctness, and the signatures of such persons shall be acknowledged in like manner as a deed.

Such plat or plats when so certified and acknowledged may be filed in the office of the register of deeds and the declaration thereon may be recorded at length in a "Book of Plat Certificates"; and when so filed and recorded such plat or plats and declaration together with the record thereof shall be prima facie evidence in all matters shown or stated therein as to the lands covered thereby.

This act shall not apply to a city whose charter provides for official supervision of plats by municipal officers, commission or board.

Approved April 10, 1933.

---

CHAPTER 189—H. F. No. 166

*An act to amend Mason's Minnesota Statutes of 1927, Section 7456, relating to renewal of corporate existence.*

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Publication of notices of renewal of corporate existence.**—That Mason's Minnesota Statutes of 1927, Section 7456, be amended so as to read as follows:

. "7456. No such resolution shall take effect until a duly certified copy thereof shall have been filed, recorded, and published in the same manner as its original certificate. *Provided, that in the case of a co-operative association, it shall not be necessary to publish said resolution.*"

Approved April 10, 1933.

---

CHAPTER 190—H. F. No. 189

*An act making it unlawful to use, own, possess, sell, control or transport a "machine gun", as hereinafter defined, and providing a penalty for the violation thereof.*

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Definitions.**—(a) Any firearm capable of loading or firing automatically, the magazine of which is capable of holding more than twelve cartridges, shall be a machine gun within the provisions of this Act.

(b) Any firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure; which said firearm shall have been changed, altered or modified to increase the magazine capacity from the original design as manufactured by the manufacturers thereof, or by the addition thereto of extra and/or longer grips or stocks to accomodate such extra capacity, or by the addition, modification and/or attachment thereto of any other device capable of increasing the magazine capacity thereof, shall be a machine gun within the provisions of this Act.

(c) A twenty-two caliber light sporting rifle, capable of firing continuously by continuous trigger pressure, shall be a machine gun within the provisions of this Act. But a twenty-two caliber light sporting rifle, capable of automatically reloading but firing separately by separate trigger pressure for each shot, shall not be a machine gun within the provisions of this Act and shall not be prohibited hereunder, whether having a magazine capacity of twelve cartridges or more. But if the same shall have been changed, altered, or modified, as prohibited in section one (b) hereof, then the same shall be a machine gun within the provisions of this Act.

Sec. 2. **Application.**—This Act shall not apply to sheriffs, coroners, constables, policemen or other peace officers, or to any warden, superintendent or head keeper of any prison, penitentiary, county jail or other institution for retention of any person convicted of or accused of crime, while engaged in the discharge of official duties, or to any public official engaged in the enforcement of law; nor to any person or association possessing a machine gun not useable as a weapon and possessed as a curiosity, ornament or keepsake; when such officers and persons and associations so excepted shall make and file with the Bureau of Criminal Apprehension of this state within 30 days after the passage of this Act, a written report showing the name and address of such person or association and the official title and position of such officers and showing a particular description of such machine gun now owned or possessed by them or shall make such report as to hereinafter acquired machine guns within 10 days of the acquisition thereof; nor to any person legally summoned to assist in making arrests or preserving peace, while said person so summoned is engaged in assisting such officer; nor shall this Act apply to the armed forces of the United States or of the State of Minnesota.

Sec. 3. **Machine guns prohibited.**—Any person who shall own, control, use, possess, sell or transport a machine gun, as herein defined, in violation of this Act, shall be guilty of a felony.

Approved April 10, 1933.

---

## CHAPTER 191—S. F. No. 336

*An act to amend Mason's Minnesota Statutes of 1927, Section 646 relating to claims against counties.*

Be it enacted by the Legislature of the State of Minnesota:

Section 1. **Claims against county—appeal.**—That Mason's Minnesota Statutes of 1927, Section 646, be amended to read as follows:

"646. When any claim against a county is disallowed by the board in whole or in part, a claimant may appeal from its decisions to the district court by causing a written notice of such appeal to be filed in the office of the auditor within fifteen days after *written notice mailed to said claimant by the county auditor showing the disallowance of said claim* and giving security for costs, to be approved by the auditor, who shall forthwith notify the county attorney thereof. When any claim against a county shall be allowed in whole or in part by such board, no order shall be issued in payment of the same or any part thereof until after fifteen days from date of the decision; and the county attorney may, on behalf and in the name of such county, appeal from such decision to the district court, by causing a written notice of such appeal to be filed in the office of the auditor within fifteen days after date of the decision appealed from; or any seven taxpayers of the county may in their own names appeal from such decision, to the district court by causing a written notice of appeal stating the grounds thereof to be filed in the office of the auditor within fifteen days after the date of the decision appealed from, and giving to the claimant security for his costs and disbursements to be approved by a judge of the district court; and thereafter no order shall be issued in payment of any such claim until a certified copy of the judgment of the court shall be filed in the office of the auditor. Upon the filing of such notice of appeal, the court shall acquire jurisdiction of the parties and of the subject matter, and may compel a return to be made as in the case of an appeal from a judgment of a justice of the peace.

Approved April 10, 1933.

# MISSOURI




DATE DOWNLOADED: Wed Oct 19 11:05:12 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1929 7 .

ALWD 7th ed.
, , 1929 7 .

Chicago 17th ed.
"," Missouri - 55th General Assembly, Regular Session : 7-462

AGLC 4th ed.
'' Missouri - 55th General Assembly, Regular Session 7.

OSCOLA 4th ed.
'' 1929 7

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# NEW HAMPSHIRE

170                   CRIMINAL PROCEDURE

[H. B. 498.]

### CRIMES AND PUNISHMENT: Prohibiting the Sale Delivery, Transportation, Possession or Control of Machine Rifles, Machine Guns and Sub-machine Guns, and Providing Penalty for Violation of Law.

AN ACT to prohibit the sale, delivery, transportation, possession or control of machine rifles, machine guns and sub-machine guns capable of automatically and continuously discharging loaded ammunition of any caliber in which the ammunition is fed to such guns from or by means of clips, disks, drums, belts or other separable mechanical devices and providing a penalty for violation thereof.

SECTION
1. Unlawful to sell, deliver, transport or have in possession any machine gun.

SECTION
2. The term "machine gun" defined.

*Be it enacted by the General Assembly of the State of Missouri, as follows:*

**Section 1. Unlawful to sell, deliver, transport or have in possession any machine gun.**—It shall be unlawful for any person to sell, deliver, transport, or have in actual possession or control any machine gun, or assist in, or cause the same to be done. Any person who violates this act shall be guilty of a felony and punished by imprisonment in the state penitentiary not less than two (2) nor more than thirty (30) years, or by a fine not to exceed five thousand dollars, or by both such fine and imprisonment. Provided, that nothing in this act shall prohibit the sale, delivery, or transportation to police departments or members thereof, sheriffs, city marshals or the military or naval forces of this state or of the United States, or the possession and transportation of such machine guns, for official use by the above named officers and military and naval forces in the discharge of their duties.

**Sec. 2. The term "machine gun" defined.**—The term "machine gun" as used in this act shall be construed to apply to and include all firearms known as machine rifles, machine guns or sub-machine guns capable of discharging automatically and continuously loaded ammunition of any caliber in which the ammunition is fed to such gun from or by means of clips, disks, drums, belts or other separable mechanical device.

Approved June 1, 1929.

---

[S. B. 438.]

### CRIMINAL PROCEDURE: Relating to Parole, Except for Certain Offenses.

AN ACT to repeal section 4157, article 18, chapter 25, of the Revised Statutes of Missouri, 1919, relating to parole, except for certain offenses; and, to enact a new section in lieu thereof to be known as section 4157, relating to the same subject.

SECTION
1. Repealing section 4157, article 18, chapter 25, Revised Statutes of Missouri, 1919, and enacting new section.

SECTION
4157. Parole may be given, except for certain offenses.

Compendium_Spitzer
Page 062

Revised Statutes Annotated of the State of New Hampshire
    Title XII. Public Safety and Welfare (Ch. 153 to 174) (Refs & Annos)
        Chapter 159. Pistols and Revolvers (Refs & Annos)

This section has been updated. Click here for the updated version.

N.H. Rev. Stat. § 159:16

159:16 Carrying or Selling Weapons.

Effective: [See Text Amendments] to May 17, 2010

Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any stiletto, switch knife, blackjack, dagger, dirk-knife, slung shot or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state.

Copyright © 2022 by the State of New Hampshire Office of the Director of Legislative Services and Thomson Reuters/West 2022.

N.H. Rev. Stat. § 159:16, NH ST § 159:16
Current through Chapter 345 of the 2022 Reg. Sess. Some statute sections may be more current, see credit for details.

End of Document

© 2022 Thomson Reuters. No claim to original U.S. Government Works.




DATE DOWNLOADED: Wed Oct 19 23:34:27 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
2010 75 .

ALWD 7th ed.
, , 2010 75 .

Chicago 17th ed.
"," New Hampshire - Regular Session and Special Session : 75-77


AGLC 4th ed.
'' New Hampshire - Regular Session and Special Session 75

OSCOLA 4th ed.
'' 2010 75

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

## CHAPTER 67 (HB 1665)

AN ACT RELATIVE TO THE PENALTY FOR CARRYING OR SELLING CERTAIN WEAPONS.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

**67:1 Pistols and Revolvers; Carrying or Selling Weapons.** Amend RSA 159:16 to read as follows:

**159:16 Carrying or Selling Weapons.** Whoever, except as provided by the laws of this state, sells, has in his possession with intent to sell, or carries on his person any blackjack, slung shot, or metallic knuckles shall be guilty of a misdemeanor; and such weapon or articles so carried by him shall be confiscated to the use of the state.

**67:2 Effective Date.** This act shall take effect upon its passage.

(Approved: May 18, 2010)
(Effective Date: May 18, 2010)

_____

## CHAPTER 68 (HB 1139)

AN ACT RELATIVE TO THE REGULATION OF PODIATRISTS BY THE BOARD OF PODIATRY.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

**68:1 Podiatry; Examination Requirement.** Amend RSA 315:2, I to read as follows:

I.  Any person admitted to practice podiatry in this state shall be required to pass a proctored examination given by the National Board of Podiatric Medical Examiners. The person shall be of good professional character. The person shall have graduated from a college of podiatry or podiatry medicine which is accredited by the American Podiatric Medical Association, and maintaining at that time a standard satisfactory to the board. No person who is not licensed as a podiatrist as provided by RSA 315:8 shall practice or attempt to practice podiatry in the state or call oneself or allow oneself to be called a "podiatrist" or a "podiatric surgeon" or designate or describe the person's occupation by the use of any words or letters to lead others to believe that the person is so licensed.

**68:2 Compensation of Board.** RSA 315:3 is repealed and reenacted to read as follows:

**315:3 Compensation.** The members of the board shall receive per diem compensation of $50 for meetings and other board activities requiring 2 or more hours in a 24–hour period, and shall be reimbursed for travel expenses incurred in connection with the work of the board.

**68:3 Examinations.** Amend RSA 315:7 to read as follows:

**315:7 Examinations.** Successful passage of a proctored National Board of Podiatric Medical Examiners test, parts I, II, and III is required. The board shall keep a record of examination results.

**68:4 License Renewal.** RSA 315:11 is repealed and reenacted to read as follows:

**315:11 License Renewal; Inactive Status.**

I. Every person licensed to practice under this chapter shall apply to the board on a biennial basis for renewal of license on forms provided by the board and shall pay a renewal fee as established in rules of the board. As a condition of renewal of license, each licensee shall show proof of having completed the continuing education units as required in rules adopted by the board.

II. If a person applies to the board for renewal of license by June 30 of the year in which the licensee's renewal is set to occur, the license shall not expire until the board has taken final action on the application for renewal. At least 20 days prior to the expiration of any license, the board shall cause a notice to be mailed to the licensee advising him or her of the expiration date and enclosing a blank renewal application form.

III. Upon the request of a person licensed by the board who is a member of any reserve component of the armed forces of the United States or the national guard and is called to active duty, the board shall place such person's license on inactive status. The license may be reactivated, after notification to the board, within one year of the person's release from active status by payment of the renewal fee and with proof of completion of the most current continuing education requirement unless still within the renewal period.

**68:5 Neglect to Renew; Reinstatement.** RSA 315:12 is repealed and reenacted to read as follows:

**315:12 Neglect to Renew.** Any licensee who fails to renew his or her license by June 30 of the year in which the licensee's renewal is set to occur, shall be required to pay double the renewal fee if paid within 90 days of the expiration date. Any failure, neglect, or refusal on the part of any person licensed by the board to renew the license as provided in RSA 315:11 or this section shall automatically result in the lapse of the license. Licenses lapsed under this section for nonpayment within 90 days shall not be reinstated except upon payment of a reinstatement fee as established in rules adopted by the board, and a showing of such evidence of professional competence as the board may reasonably require.

**68:6 Notice of Expiration.** Amend RSA 315:13 to read as follows:

**315:13 Notice of Expiration.** The secretary shall mail a notice to each holder of a license that has not been renewed within 90 days of the expiration date, advising him or her of the expiration of the license and the penalty of practicing podiatry without holding a license and the condition and terms upon which his or her license may be reinstated.

**68:7 New Section; Reinstatement.** Amend RSA 315 by inserting after section 13 the following new section:

**315:13–a Reinstatement.** Any person who has not renewed his or her license within 90 days of the expiration date shall only have his or her license restored upon the filing of a reinstatement application, accompanied by the reinstatement fee as established by the board, proof of satisfaction of continuing podiatric education requirements established by RSA 315:4, V, and such other evidence of professional competence as the board may reasonably require.

**68:8 Rulemaking; Continuing Education Requirements.** Amend RSA 315:4, V to read as follows:

V.   How a license shall be renewed, including the requirements for continuing education;

**68:9 Repeal.** The following are repealed:

I.   RSA 315:8, IV, relative to expiration and renewal of annual licenses.

II.   RSA 315:14, relative to list of licensees.

III.   RSA 315:4, XI, relative to rulemaking regarding matters of proper administration of the chapter.

**68:10 Rulemaking; Board of Podiatry.** Amend RSA 315:4, IX–X to read as follows:

IX.   The imposition of administrative fines authorized under RSA 315:9, III(f); and

X.   Information required by the board in its application procedures relative to the applicant's podiatric competence and professional conduct.

**68:11 Effective Date.** This act shall take effect 60 days after its passage.

(Approved: May 19, 2010)
(Effective Date: July 18, 2010)

————————

## CHAPTER 69 (HB 1211)

AN ACT RELATIVE TO SPECIAL MEETINGS IN TOWNS WITH OFFICIAL BALLOT TOWN MEET-
INGS.

*Be it Enacted by the Senate and House of Representatives in General Court convened:*

**69:1 New Paragraph; Use of Official Ballot.** Amend RSA 40:13 by inserting after paragraph XVI the following new paragraph:

XVII.   Notwithstanding any other provision of law, if the sole purpose of a special meeting is to consider the adoption, amendment, or repeal of a zoning ordinance, historic district ordinance, or building code pursuant to RSA 675, the meeting shall consist of only one session, which shall be for voting by official ballot on the proposed ordinance, code, amendment, or repeal. The warrant for the meeting shall be posted in accordance with RSA 39:5. This paragraph shall not apply to a special meeting for consideration of the adoption of an emergency temporary zoning and planning ordinance pursuant to RSA 675:4–a.

**69:2 Effective Date.** This act shall take effect 60 days after its passage.

(Approved: May 19, 2010)
(Effective Date: July 18, 2010)

————————

## CHAPTER 70 (HB 1214)

AN ACT RELATIVE TO THE GROUNDS FOR SUSPENDING OR REVOKING A FOSTER HOME
LICENSE.

# NEW JERSEY

# 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10.

|

And Whereas a most dangerous Method of setting Guns has too much prevailed in this Province, Be it Enacted by the Authority aforesaid, That if any Person or Persons within this Colony shall presume to set any loaded Gun in such Manner as that the same shall be intended to go off or discharge itself, or be discharged by any String, Rope, or other Contrivance, such Person or Persons shall forfeit and pay the Sum of Six Pounds; and on Non-ayment thereof shall be committed to the common Gaol of the County for Six Months.

# Charles Nettleton, Laws of the State of New-Jersey Page 25-26, Image 52-53 (1821) available at The Making of Modern Law: Primary Sources.

|

An Act for the Preservation of Deer, and other game, and to prevent trespassing with guns (Dec. 21, 1771): Whereas the laws heretofore passed in this colony, for the preservation of deer and other game, and to prevent trespassing with guns, traps, and dogs, have, by experience, been found insufficient to answer the salutory purposes thereby intended, therefore — § 1. Be it Enacted by the Governor, Council and General Assembly of this colony of New Jersey, and it is hereby enacted by the authority of the same, That if any person or persons shall presume, at any time after the publication hereof, to carry any gun on any lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he hath license or permission in writing from the owner or owners, or legal possessor, every such person so offending, and convicted thereof, either upon the view of any justice of the peace within this colony, or by the oath or affirmation of one or more witnesses, before any justice of the peace of either of the counties, cities, or towns corporate of this colony, in which the offender or offenders may be taken or reside, he or she, or they, shall for every offence, forfeit and pay to the owner of the soil, or his tenant in possession, the sum of forty shillings, with costs of suit; which forfeiture shall and may be sued for and recovered by the owner of the soil, or tenant in possession before any justice of the peace in this colony, for the use of such owner or tenant in possession.

# Charles Nettleton, Laws of the State of New-Jersey Page 26, Image 53 (1821) available at The Making of Modern Law: Primary Sources.

An Act for the Preservation of Deer, and other game, and to prevent trespassing with guns (1771), § 1. Be it Enacted by the Governor, Council and General Assembly of this colony of New Jersey, and it is hereby enacted by the authority of the same, That if any person or persons shall presume, at any time after the publication hereof, to carry any gun on any lands not his own, and for which the owner pays taxes, or is in his lawful possession, unless he hath license or permission in writing from the owner or owners, or legal possessor, every such person so offending, and convicted thereof, either upon the view of any justice of the peace within this colony, or by the oath or affirmation of one or more witnesses, before any justice of the peace of either of the counties, cities, or towns corporate of this colony, in which the offender or offenders may be taken or reside, he or she, or they, shall for every offence, forfeit and pay to the owner of the soil, or his tenant in possession, the sum of forty shillings, with costs of sit; which forfeiture shall and may be sued for and recovered by the owner of the soil, or tenant in possession before any justice of the peace in this colony, for the use of such owner or tenant in possession. . . § 3. And be it further enacted by the authority aforesaid, That if the person or persons offending against this act be non-residents of this colony, he or they shall forfeit and pay for every such offence, five pounds, and shall forfeit his or their gun or guns to any person or persons, who shall inform and prosecute the same to effect, before any justice of the peace in any county of this colony, wherein the offender or offenders may be taken or apprehended.

The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey Page 289-290; Image 293-294 (1881) available at The Making Of Modern Law: Primary Sources. | Duke Center for Firearms Law

An Act Against Wearing Swords, Etc. Whereas there hath been great complaint by the inhabitants of this Province, that several persons wearing swords, daggers, pistols, dirks, stilettoes, skeines, or any other unusual or unlawful weapons, by reason of which several persons in this Province, receive great abuses, and put in great fear and quarrels, and challenges made, to the great abuse of the inhabitants of this Province. . . And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol, skeines, stilettoes, daggers or dirks, or other unusual or unlawful weapons within this Province, upon penalty for the first offence five pounds, and to be committed by any justice of the peace, his warrant before whom proof thereof shall be made, who is hereby authorized to enquire of and proceed in the same, and keep in custody till he hath paid the said five pounds, one half to the public treasury for the use of this Province, and the other half to the informer: And if such person shall again offend against this law, he shall be in like manner committed upon proof thereof before any justice of the peace to the common jail, there to remain till the next sessions, and upon conviction thereof by verdict of twelve men, shall receive judgment to be in prison six month, and pay ten pounds for the use aforesaid. And be it further enacted by the authority aforesaid, that no planter shall ride or go armed with sword, pistol or dagger, upon the penalty of five pounds, to be levied as aforesaid, excepting all officers, civil and military, and soldiers while in actual service, as also all strangers, travelling upon their lawful occasions through this Province, behaving themselves peaceably.





DATE DOWNLOADED: Wed Oct 19 11:56:13 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1920 62 .

ALWD 7th ed.
, , 1920 62 .

Chicago 17th ed.
"," New Jersey - 144th Legislature, Regular Session and Additional Acts : 62-71

AGLC 4th ed.
'' New Jersey - 144th Legislature, Regular Session and Additional Acts 62

OSCOLA 4th ed.
'' 1920 62

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

62                    CHAPTERS 30 & 31, LAWS OF 1920.

*Reimburse-*
*ments.*

contract, for labor, freight and materials. The State
of New Jersey, or its agencies, and in the case of mu-
nicipalities, including boards of chosen freeholders as
aforesaid, shall have the power by resolution or ordi-
nance to reimburse and pay said contractor or con-
tractors such sums of money as may be shown by said
contractor or contractors to have been paid for labor,
freight and materials over and above the prices pre-
vailing for the same at the time of the making of such

*Source of*
*payments.*

contract.   Such payment shall be made out of any
moneys that may be available therefor, or from any
moneys appropriated or raised in any manner for the

*Emergent*
*payment.*

purposes of this act.   Any payment made under this
act shall be considered as an emergency payment.

3. Ths act shall take effect immediately.

Approved March 22, 1920.

---

## CHAPTER 31.

An Act to amend an act entitled "An act for the pro-
tection of certain kinds of birds, game and fish, to
regulate their method of capture, and provide open
and close seasons for such capture and possession"
(Revision of 1903), approved April fourteenth, one
thousand nine hundred and three.

BE IT ENACTED *by the Senate and General Assembly*
*of the State of New Jersey:*

*Section 1*
*amended.*

1. Section one of the act of which this act is amenda-
tory be and the same is hereby amended to read as
follows:

*Unlawful*
*to hunt cer-*
*tain game*
*except with*
*gun.*

1. It shall be unlawful to pursue, with intent to kill
or injure, or in any manner to attempt to take or in-
jure, and it shall also be unlawful to kill or destroy or
injure any anatidæ, commonly known as swans, geese,
brant and river and sea ducks; rallidæ, commonly

Compendium_Spitzer
Page 073

known as rails, gallinules, coots and mud-hens; limicolæ, commonly known as shore birds, surf snipe or bay snipe, among them being yellow legs, plovers, willets, sandpipers, dowitchers or robin snipe, brown backs, curlews, turnstones or calico backs, godwits or marlin, tattlers and woodcock; gallinæ, commonly known as wild turkeys, grouse, prairie chickens, pheasants, partridges and quails; and the species of icteridæ, commonly known as reed birds; or any hare, commonly known as rabbit; gray, black or fox squirrel; or any other game bird or game animal whatsoever, excepting in the manner usually known as hunting with a gun, the gun being not larger than ten guage and held at arm's length and fired from the shoulder without rest, and at such times as may be permitted in this act, under a penalty of twenty dollars for each offense. **Penalty.**

2. Section six of the act of which this act is amendatory be and the same is hereby amended to read as follows: **Section 6 amended.**

6. It shall be unlawful for any person hunting or gunning after geese, duck, or brant or other game birds to place the boat, sink-box or other vessel or construction in which such person may lie in wait to kill said geese, duck, brant or other game birds, at a distance of more than one hundred feet from ice, marsh or meadow, bar or bank, or heaped seaweed not covered with water; and it shall be unlawful for any person or persons, with intent to capture or kill geese, duck, brant, or other game birds to hunt after or pursue the same in any manner except between one-half hour before sunrise and sunset, under a penalty of twenty dollars for each offense. **Hunting web-footed wild fowl.**

**Penalty.**

3. Section seven of the act of which this act is amendatory be and the same is hereby amended to read as follows: **Section 7 amended.**

7. It shall be unlawful for any person to pursue any goose, duck, brant, or any kinds of game birds, whatsoever, or to shoot, or to shoot at, or kill, or wound the same from any boat or vessel propelled by any means other than by oars or paddles, or from any boat, vessel or other structure anchored or staked upon the waters of any of the bays, sounds, coves, ponds, **Pursuing web-footed wild fowl.**

Compendium_Spitzer
Page 074

64                    CHAPTER 31, LAWS OF 1920.

rivers, creeks or streams of the State at a greater distance than one hundred feet from ice, marsh or meadow, bar or bank, or heaped seaweed not covered with water, under a penalty of twenty dollars for each offense. It shall also be unlawful for any person while in an airplane, hydroplane or other device propelled in any manner through the air to pursue, shoot, shoot at, kill or injure any of the above-mentioned game birds, under a penalty of one hundred dollars for each offense.

**Penalty.**
**Using airplane unlawful.**

4. Section eight of the act of which this act is amendatory be and the same is hereby amended to read as follows:

**Penalty.**
**Section 8 amended.**

8. It shall be unlawful to capture, kill, injure, destroy or have in possession any quail, rabbit, hare, squirrel, raccoon, English or ring-neck pheasant, ruffed grouse, prairie chicken, wild turkey, Hungarian partridge, reed bird, wild swans, wood duck, wild geese, brant, wild ducks, rails or marsh hens, gallinules, coot (commonly known as crow duck), upland plover, black-bellied plover, golden plover, greater or lesser yellowlegs, willets, sandpipers, dowitchers or robin snipe, brown backs, curlews, turnstones or calico backs, godwits or marlin tattlers, Wilson snipe or jacksnipe, woodcock or any other birds commonly known as shore birds, surf snipe or bay snipe, except and unless an open season is prescribed therefor, and then only during the respective open seasons fixed by this section.

**Unlawful to have certain game in possession, etc., except in open season.**

The open season for wild geese, brant, wild ducks (except wood duck), coot, gallinules and Wilson snipe or jacksnipe, shall be from October sixteenth to January thirty-first, following, both days inclusive.

**Season for geese, ducks, etc.**

The open season for black-bellied and golden plovers and greater and lesser yellowlegs shall be from August sixteenth to November thirtieth following, both days inclusive.

**Season for plover, etc.**

The open season for Sora, marsh hen or mud hen and other rails (other than coot and gallinules) shall be from September first to November thirtieth following, both days inclusive.

**Season for marsh hen.**

The open season for woodcock shall be from October first to November thirtieth following, both days inclusive.

**Season for woodcock.**

Compendium_Spitzer
Page 075

CHAPTER 31, LAWS OF 1920.          65

The open season for reed birds shall be from September first to October thirtieth, both days inclusive. <span style="float:right">Season for reed birds.</span>

The open season for quail, rabbit, hare, squirrel, English or ring-neck pheasant, ruffed grouse, prairie chicken, wild turkey or Hungarian partridge shall be from November tenth to December fifteenth, both days inclusive. <span style="float:right">Season for quail, rabbits, pheasants, etc.</span>

The open season for raccoon shall be from October first to December fifteenth, both days inclusive. <span style="float:right">Season for raccoon.</span>

The birds and animals for which an open season is prescribed by this section may be possessed during the respective open seasons therefor and for the additional period of ten days immediately succeeding such open seasons. <span style="float:right">Time for possession.</span>

Any person violating any of the provisions of this section shall be liable to a penalty of twenty dollars for each bird or animal or part thereof unlawfully captured, killed, injured, destroyed or had in possession. <span style="float:right">Penalty.</span>

5. Section nine of the act of which· this act is amendatory be and the same is hereby amended to read as follows: <span style="float:right">Section 9 amended.</span>

9. It shall be unlawful to capture, kill, injure, destroy or have in possession in any one day more than ten quail, three English or ring-neck pheasants, three Hungarian partridge, six woodcock, three ruffed grouse, twenty-five in the aggregate of all kinds of duck (except wood duck), eight geese, eight brant, fifty Sora, fifty reed birds, twenty-five in the aggregate of all kinds of rails (except Sora), including marsh hens, coots and gallinules, fifteen in the aggregate of all kinds of black-bellied and golden plover and greater and lesser yellowlegs, twenty-five Wilson snipe or jacksnipe, or ten rabbits, under a penalty of twenty dollars for each bird or rabbit captured, killed, injured, destroyed or had in possession in excess of the number permitted by this section; *provided*, that nothing in this section contained shall apply to any proprietor of a hotel, restaurant or cafe having in possession at his or her hotel, restaurant or cafe at any time any game raised on licensed game preserves tagged or marked in accordance with law, or to any rabbit during the open <span style="float:right">Number of certain game that may be taken.</span> <span style="float:right">Penalty.</span> <span style="float:right">Proviso.</span>

Compendium_Spitzer
Page 076

66                     CHAPTER 31, LAWS OF 1920.

season permitted by law, and for a period of ten days immediately succeeding such open season.

**Section 10 amended.**
6. Section ten of the act of which this act is amendatory be and the same is hereby amended to read as follows:

**Unlawful sale of game.**
10. It shall be unlawful to sell, offer for sale or possess for sale within this State, whether killed within or without this State, any of the dead bodies, or parts thereof, of squirrels of all species, wild deer of all species, and the dead bodies or parts thereof of any dead game birds or song birds belonging to any species or subspecies native to this State, protected by law, or belonging to any family, any species or subspecies of which is native to this State and protected by law, whether taken within or without this State, under a **Penalty.** penalty of twenty dollars for each squirrel, wild deer or birds above mentioned, so sold, offered for sale or **Proviso.** possessed for sale as aforesaid; *provided, however,* that the carcasses of deer and the unplucked carcasses of mallard, black and wood ducks, Canada geese, ruffed grouse, squirrels, quail and pheasants of all species raised on licensed game preserves and properly tagged, and the unplucked carcasses of Scotch grouse, European black grouse, European black plover, red-legged partridge and Egyptian quail coming from a foreign country, which are properly tagged by the State authorities, may be sold at any time for food purposes.

**Section 11 amended.**
7. Section eleven of the act of which this act is amendatory be and the same is hereby amended to read as follows:

**Bringing game into State.**
11. Whenever by the laws of any other State or country it shall be lawful to take out of the confines of the said State or country any game, whether the same be fowl or animal, it shall be lawful to bring such game **Proviso.** within the State of New Jersey; *provided, however,* that nothing herein contained shall permit the sale or **Proviso.** exposure for sale of any such game; *provided,* that Belgian hare and jackrabbits legally killed in another State may be brought into this State at any time for **Penalty.** possession, sale and consumption. Any person violating the provisions of this section shall be liable to a

Compendium_Spitzer
Page 077

penalty of twenty dollars for each fowl or animal so sold or exposed for sale.

8. Section twelve of the act of which this act is amendatory be and the same is hereby amended to read as follows: *Section 12 amended.*

12. It shall be unlawful to capture, kill, injure or have in possession, living or dead, or attempt to capture, kill or injure, any wild or passenger pigeon, or for any person to destroy, attempt to destroy or interfere in any manner with the nest or eggs of any wild or passenger pigeon under a penalty of two hundred and fifty dollars for each offense. *Wild pigeons.* *Penalty.*

9. Section thirteen of the act of which this act is amendatory be and is hereby amended so as to read as follows: *Section 13 amended.*

13. It shall be unlawful to use in hunting fowl or animals of any kind any shotgun or rifle holding more than two cartridges at one time, or that may be fired more than twice without reloading, or to use any silencer on any gun, rifle or firearm when hunting for game or fowl, under a penalty of twenty dollars for each offense. *Gun.* *Penalty.*

10. Section fourteen of the act of which this act is amendatory be and the same is hereby amended so as to read as follows: *Section 14 amended.*

14. It shall be unlawful to sow, deposit or place any rye, wheat, oats or corn or other cereal, except wild celery and wild rice, in any of the salt or fresh waters of this State, or to cause the same to be done, for the purpose of luring, decoying or baiting any goose, duck, swan, brant or any kind of water wild fowl whatsoever, so that the same may be shot at, killed or captured while feeding or attempting to feed where any rye, wheat, oats or corn or other cereal, except wild celery or wild rice, is known to have been sown, deposited or placed in violation of this section, under a penalty of fifty dollars for each offense. *Luring with cereals.* *Penalty.*

11. Section fifteen of the act of which this act is amendatory be and the same is hereby amended so as to read as follows: *Section 15 amended.*

15. It shall be unlawful to shoot into any squirrel's nest at any time of the year, under a penalty of twenty dollars for each offense. *Penalty for shooting squirrel's nest.*

68                    CHAPTER 31, LAWS OF 1920.

12. Section sixteen of the act to which this act is amendatory be and the same is hereby amended so as to read as follows:

16. It shall be unlawful to hunt, kill or destroy, or attempt to hunt, kill or destroy, any hare or rabbit with ferrets under a penalty of fifty dollars for each offense.

13. Section nineteen of the act to which this act is amendatory be and the same is hereby amended to read as follows:

19. It shall be unlawful to take, catch or kill in any one day more than twenty-five trout, ten salmon or ten black bass, under a penalty of twenty dollars for each trout, salmon or black bass so taken, caught or killed in excess of the number permitted by this section.

14. Section twenty-one of the act of which this act is amendatory be and the same is hereby amended so as to read as follows:

21. It shall be unlawful for any person or persons while in an automobile to hunt for, pursue, shoot, shoot at, kill, capture, injure, or destroy any bird or animal in this State, or to hunt for, pursue, shoot, shoot at, kill, capture, injure or destroy any such bird or animal by the aid or use of any light or lights carried on or attached to any such automobile, under a penalty of fifty dollars for each offense.

15. Section twenty-two of the act of which this act is amendatory be and the same is hereby amended to read as follows:

22. It shall be unlawful to remove or attempt to remove from this State any animal or bird protected by the laws of this State except deer; *provided, however,* that this section shall not apply to common carriers carrying from beyond the confines of this State in unbroken packages to some point beyond the confines of this State any such protected animal or bird. Any person guilty of any violation of this section shall be liable to a penalty of twenty dollars for each animal or bird, removed or sought to be removed; *provided, however,* that this section shall not apply to English or ring-neck pheasants, mallard, black or wood ducks, Canada geese, ruffed grouse, rabbits, squirrels and quail, properly tagged, raised on game preserves, the owners or

lessees of which are duly licensed by the Board of Fish and Game Commissioners; *and further provided,* that a nonresident holding a nonresidents' and aliens' hunting and fishing license may, in any one day, remove from the State the number of animals or birds that may be taken under the laws of this State in one day by one person, but not more birds or animals may be removed by one person in one calendar week than the number that may be taken under the laws of this State in two days by one person; *provided, however,* that no removal shall be made except the birds or rabbits be exposed to open view.

Proviso.

Proviso.

16. Section thirty-eight of the act of which this act is amendatory be and is hereby amended to read as follows:

Section 38 amended.

38. Whenever in the act of which this act is amendatory the possession or sale of fowl or game is prohibited, reference is had equally to such fowl or game coming from without the State as to that taken within the State.

Law applies to game from without State.

17. The following acts are hereby repealed:

Sundry acts repealed.

A supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved March twenty-fifth, one thousand nine hundred and thirteen.

A supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved March twenty-fifth, one thousand nine hundred and thirteen.

A supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession," approved April fourteenth, one thousand nine hundred and three, approved April thirteenth, one thousand nine hundred and eight.

Supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved April fifteenth, one thousand nine hundred and eleven.

Supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved April twenty-seventh, one thousand nine hundred and eleven, approved April first, one thousand nine hundred and twelve.

A supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved April eighth, one thousand nine hundred and fifteen.

Supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, and to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved April seventh, one thousand nine hundred and eleven.

A supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved March twenty-eighth, one thousand nine hundred and twelve.

Supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thou-

sand nine hundred and three, approved April seventeenth, one thousand nine hundred and fourteen.

An act to prohibit the killing or pursuing of birds or animals by the aid or use of an automobile, approved February twenty-third, one thousand nine hundred and eighteen.

An act to prohibit the hunting of rabbits or hares with ferrets, approved April ninth, one thousand nine hundred and ten.

A supplement to an act entitled "An act for the protection of certain kinds of birds, game and fish, to regulate their method of capture, and provide open and close seasons for such capture and possession (Revision of 1903)," approved April fourteenth, one thousand nine hundred and three, approved March thirteenth, one thousand nine hundred and twelve.

An act for the protection of the wild or passenger pigeon, approved April ninth, one thousand nine hundred and ten.

18. This act shall take effect immediately.

Approved March 22, 1920.

---

## CHAPTER 32.

An Act to amend an act entitled "An act concerning counties," approved March fourth one thousand nine hundred and eighteen.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

1. Section eleven hundred twenty-eight, article eleven of the act entitled "An act concerning counties," approved March fourth, one thousand nine hundred and eighteen, be and the same is hereby amended to read as follows: *Section 1128 amended.*




DATE DOWNLOADED: Wed Oct 19 10:33:29 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1927 11 .

ALWD 7th ed.
, , 1927 11 .

Chicago 17th ed.
"," New Jersey - 151st Legislature : 11-900


AGLC 4th ed.
'' New Jersey - 151st Legislature 11

OSCOLA 4th ed.
'' 1927 11

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

180          CHAPTERS 93, 94 & 95, LAWS OF 1927.

vote of a majority of all of the members of such board of education.

2. This act shall take effect immediately.

Approved March 19, 1927.

---

## CHAPTER 94.

An Act to amend an act entitled "An act respecting conveyances" (Revision of 1898), approved June fourteen, eighteen hundred and ninety-eight.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

**Section 45 amended.**    1. Section forty-five of the act of which this act is amendatory be and the same is hereby amended so that the same shall read as follows:

**Records not to be removed.**    45. No record shall be removed, from the office in which it is kept, by writ of subpœna or otherwise, before any court, or for any purpose whatsoever, in or out of the county in which such record is kept, where **Transcript used.** a transcript thereof may be given in evidence.

2. This act shall take effect immediately.

Approved March 19, 1927.

---

## CHAPTER 95.

A Supplement to an act entitled "An act for the punishment of crimes" (Revision of 1898), approved June fourteenth, one thousand eight hundred and ninety-eight.

BE IT ENACTED *by the Senate and General Assembly of the State of New Jersey:*

**Machine gun defined.**    1. The term "machine gun or automatic rifle," as used in this act, shall be construed to mean any weapon, mechanism or instrument not requiring that the trigger

Compendium_Spitzer
Page 084

CHAPTER 95, LAWS OF 1927.          181

be pressed for each shot and having a reservoir, belt or other means of storing and carrying ammunition, which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

2. Any person who shall sell, give, loan, furnish or deliver any machine gun or automatic rifle to another person, or any person who shall purchase, have or possess any machine gun or automatic rifle, shall be guilty of a high misdemeanor; *provided*, the provisions of this section shall not apply to any person who has procured and possesses a license to purchase, have and possess a machine gun or automatic rifle as hereinafter provided for; nor to the authorized agents and servants of such licensee; or to the officers and members of any duly authorized military organization; nor to the officers and members of the police force of any municipality, nor to the officers and members of the State Police force; nor to any sheriff or undersheriff; nor to any prosecutor of the pleas, his assistants, detectives and employees. *[margin: Sale, etc., illegal.]* *[margin: Proviso: exceptions to act.]*

3. Any person who desires to purchase, have and possess a machine gun or automatic rifle may apply to a judge of the Court of Common Pleas of the county in which the applicant is a resident for a license to purchase, have and possess a machine gun or automatic rifle. Such application shall be in writing and shall state in detail the reasons why such person desires such license. Upon such application being presented to the judge, he shall refer the same to the sheriff of his county or to the chief police officer of the municipality in which said applicant resides, for his investigation and approval, and if said application is approved by the sheriff or by said chief police officer, said judge may, in his discretion, issue a license under his hand and the seal of his court to the applicant to purchase, have and possess a machine gun or automatic rifle, for his own protection and for the protection of his servants and employees. *[margin: License to procure machine gun.]* *[margin: Application.]* *[margin: Reference and approval of application.]* *[margin: Issue of license.]*

4. Upon the issuance of such license, the judge shall send or deliver the same to the county clerk of his county, who shall, in a book provided for that purpose, *[margin: Record of license, etc.]*

enter a record of said license, stating the date of its issuance and the name and address of the person to whom the same is issued. Upon such record being made, the county clerk shall deliver said license to the person to whom the same is issued.

**Banking institutions licensed.**

5. Upon the application of any bank or banking institution, trust company or building and loan association within this State, the judge of the Court of Common Pleas of the county in which the applicant is located shall issue to such bank or banking institution, trust company or building and loan association, a license to purchase and possess one or more machine guns or

**Use.**

automatic rifles for its own use and protection, and for the use and protection of its officers, servants and employees, which license shall be recorded by the county clerk as hereinbefore provided.

**Public utilities may be licensed.**

6. Upon the application of any railway company, canal company or steamboat company within this State, the judge of the Court of Common Pleas of any county within which said railway company, canal company or steamboat company operates, shall issue to such railway company, canal company or steamboat company a license to purchase and possess one or more machine guns or

**Use.**

automatic rifles for its own use and protection and for the use and protection of its officers, servants and employees, which license shall be recorded by the county clerk as hereinbefore provided.

7. This act shall take effect immediately.

Approved March 19, 1927.

# NORTH CAROLINA

" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)



# 1917 N.C. Sess. Laws 309, Pub. Local Laws, An Act to Regulate the Hunting of Quail in Harnett County, ch. 209, § 1.

## Subject(s):

- Hunting (https://firearmslaw.duke.edu/subjects/hunting/)

## Jurisdiction(s):

- North Carolina (https://firearmslaw.duke.edu/jurisdictions/north-carolina/)

## Year(s):

- 1917 (https://firearmslaw.duke.edu/years/1917/)

That the open season for hunting quail shall be from the first day of December to the fifteenth day of January following each succeeding year, and that it shall be unlawful to kill quail with any gun or guns that shoot over two times before reloading, and any person violating any of the provisions of this act shall be guilty of a misdemeanor.

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu
(mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu
(mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

# NORTH DAKOTA




DATE DOWNLOADED: Wed Oct 19 10:35:32 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1931 1 .

ALWD 7th ed.
, , 1931 1 .

Chicago 17th ed.
"," North Dakota - 22nd Session : 1-582

AGLC 4th ed.
'' North Dakota - 22nd Session 1

OSCOLA 4th ed.
'' 1931 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

## CHAPTER 177
### (H. B. No. 215—Steedsman and Aljets.)

#### PROCEDURE THRESHERS LIEN   .
An Act to amend and re-enact Chapter 156, Laws of 1929, relating to lien of threshers of grain.

*Be It Enacted by the Legislative Assembly of the State of North Dakota:*

§ 1.  Amendment.] That Chapter 156 Laws of 1929 be and the same is hereby amended and re-enacted to read as follows:

§ 6855.  Procedure to Obtain Lien.]  Any person entitled to a lien under this chapter shall within thirty days after the threshing or combine threshing and harvesting is completed, file in the office of the Register of Deeds of the county of which the grain was grown a statement in writing, verified by oath, showing the kind and quantity of grain threshed or combine threshed and harvested, the price agreed upon for threshing or combine threshing and harvesting the same, either by threshing machines or by combines, either by the acre, the bushel, the hour, or the day; or if no price has been agreed upon then the reasonable value, the name of the person for whom the threshing was done and a description of the land upon which the grain was grown. Unless the person entitled to the lien shall file such statement within the time aforesaid he shall be deemed to have waived his right thereto.

§ 2.  All acts or parts of acts in conflict herewith are hereby repealed.

Approved March 11, 1931.

# MACHINE GUNS

### CHAPTER 178
### (H. B. No. 194—Fitch and Indergaard.)

#### PROHIBITING POSSESSION, SALE AND USE OF MACHINE GUNS, BOMBS, ETC.
An Act to prohibit the possession, sale and use of machine guns, sub-machine guns or automatic rifles and defining the same and prohibiting the possession, sale and use of bombs loaded with explosives or poisonous or dangerous gases and providing exceptions and penalties.

*Be It Enacted by the Legislative Assembly of the State of North Dakota:*

§ 1.  The term "machine gun, sub-machine gun or automatic rifle" as used in this act shall be construed to mean a weapon, mechanism or instrument not requiring that the trigger be pressed for each shot and having a reservoir, belt or other means of storing

11

Compendium_Spitzer
Page 092

and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second.

§ 2.   Any person who shall sell, give, loan, furnish or deliver any machine gun, sub-machine gun, automatic rifle of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases to another person, or any person who shall purchase, have or possess any machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, shall be guilty of a felony and shall be punished by imprisonment in the state penitentiary not to exceed ten years, or by a fine of not more than three thousand dollars, or both. Provided, that the provisions of this act shall not apply to any person who has procured and possesses a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, as hereinafter provided for, nor to the authorized agents and servants of such licensee or to the officers and members of any duly authorized military organization, nor to the officers and members of the police force of any municipality, nor to any Sheriff, deputy sheriff, nor any other officer having police powers under the laws of the State.

§ 3.   Any person who desires to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases, may apply to a Judge of the District Court of the county in which the applicant is a resident for a license to purchase, sell, have or possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases. Such application shall be in writing and shall state in detail the reasons why such person desires such license. Upon such application being presented to the judge, he shall refer the same to the Sheriff of the county of the applicant's residence or to the chief police officer of the municipality in which said applicant resides for his investigation and approval, and if said application is approved by the Sheriff or by said police officer, said judge may in his discretion issue a license under his hand and the seal of his court to the applicant to purchase, have and possess a machine gun, sub-machine gun, automatic rifle, of a caliber larger than twenty-two, or bomb loaded with explosives or poisonous or dangerous gases for his own protection and for the protection of his servants and employes. Both the application and the license shall contain a description of the gun or rifle licensed which shall include the name of the manufacturer, the number and caliber, or, if the license is for a bomb, an accurate description thereof together with any identifying marks thereon.

Compendium_Spitzer
Page 093

§ 4.  The license shall be issued in duplicate and the duplicate copy thereof shall be forthwith by the judge sent to the State Superintendent of Criminal Identification at Bismarck, North Dakota, who shall file and preserve the same as a permanent record in his office.

Approved March 9, 1931.

# MARRIAGE

## CHAPTER 179
### (H. B. No. 204—Morgan.)

#### MARRIAGE AND MARRIAGE LICENSE

·An Act to amend and re-enact Section 4361, Compiled Laws of North Dakota for 1913, as amended by Chapter 160, Session Laws of 1929, relating to marriages and marriage licenses.

*Be It Enacted by the Legislative Assembly of the State of North Dakota:*

§ 1.  Amendment.]   That Section 4361 of the Compiled Laws of North Dakota for 1913, as amended by Chapter 160 of the Session Laws of 1929, be and the same is, hereby amended and re-enacted to read as follows:

§ 4361.  Who May Solemnize Marriages.  Licenses.]   Marriages may be solemnized by all judges of courts of record within their respective jurisdictions; by justices of the peace, within their respective jurisdictions; by ordained ministers of the gospel and priests of every church; by ministers of the gospel licensed by regular church bodies or denominations serving as pastors of churches; but marriages solemnized by the Society of Friends or Quakers, according to the form used in their meetings shall be valid. No person shall solemnize any marriage until the parties thereto shall produce a license, issued, except as hereinafter provided, by the County Judge of the county in which either of the contracting parties resides, or if such county is unorganized, of the county to which it is attached for judicial purposes. When a person authorized by law shall solemnize a marriage, he shall fill out and sign a certificate following the marriage license on the blank form prescribed by law giving his official title, or if a minister of the gospel or priest, the ecclesiastical body with which he is connected and return such license and certificate to the County Judge of the county where the license originally was issued, within thirty days thereafter. Such certificate shall be signed by two witnesses to the marriage ceremony in addition to the signature of the person who solemnized the marriage. Provided, that when a County Judge shall desire to have a license for his own marriage issued in the county of his residence he may request the County Judge of another county to act in his stead upon the application therefor, and thereupon such other County Judge shall have power

# OHIO

" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

Search this website

# 1933 Ohio Laws 189-90, Reg. Sess., An Act. . . Relative to the Sale and Possession of Machine Guns, § 1.

### Subject(s):

- Dangerous or Unusual Weapons (https://firearmslaw.duke.edu/subjects/dangerous-or-unusual-weapons/)

### Jurisdiction(s):

- Ohio (https://firearmslaw.duke.edu/jurisdictions/ohio/)

### Year(s):

- 1933 (https://firearmslaw.duke.edu/years/1933/)

That § 12819 of the General Code be supplemented . . . to read as follows:  Definitions. § 12819-3. For the purpose of this act, a machine gun, a light machine gun or a sub-machine gun shall be defined as any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading. Automatically as above used means that class of firearms which, while the trigger on the firearm is held back continues to fire successive shots. Semi-automatically means that class of firearm which discharges one shot only each time the trigger is pulled, no manual reloading operation being necessary between shots. Machine gun permit; application; bond or applicant; exceptions. § 12819-4. No person shall own, possess, transport, have custody of or use a machine gun, light machine gun or sub-machine gun, unless he first procures

a permit therefor from and at the direction of the adjutant general of Ohio, who shall keep a complete record of each permit so issued. A separate permit shall be obtained for each gun so owned, possessed or used. The adjutant general shall require each applicant for such permit to give an accurate description of such weapon, the name of the person from whom it was or is to be obtained, the name of the person or persons to have custody thereof and the place of residence of the applicant and custodian. Before obtaining such permit each applicant shall give bond to the state of Ohio, to be approved by the adjutant general in the sum of five thousand dollars, conditioned to save the public harmless by reason of any unlawful use of such weapon while under the control of such applicant or under the control of another with his consent; and any person injured by such improper use may have recourse on said bond. Provided, however, that this section shall not affect the right of the national guard of Ohio, sheriffs, regularly appointed police officers of incorporated cities and villages, regularly elected constables, wardens and guards of penitentiaries, jails, prisons, penal institutions or financial institutions maintaining their own police force and such special officers as are now or may be hereafter authorized by law to possess and use such weapons when on duty.  Any person who owns, possesses or has custody of a machine gun, light machine gun or sub-machine gun at the time when this section shall become effective, shall have thirty days thereafter in which to comply with the provisions of this section. Penalty for possession, transportation, etc., without permit. § 12819-5. Whoever owns, possesses, transports or has custody of or uses a machine gun, light machine gun or sub-machine gun without a permit, as provided by section 12819-4 of the General Code, or whoever having such permit, uses or consents to the use by another of such weapon in an unlawful manner, shall be guilty of a felony and upon conviction thereof, shall be imprisoned in the penitentiary not less than one nor more than ten years. [War trophies excepted].

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

# OREGON



DATE DOWNLOADED: Wed Oct 19 10:37:55 2022
SOURCE: Content Downloaded from *HeinOnline*


Citations:

Bluebook 21st ed.
1933 488 .

ALWD 7th ed.
, , 1933 488 .

Chicago 17th ed.
"," Oregon - 37th Legislative Assembly, Regular and Special Sessions : 488-490


AGLC 4th ed.
'' Oregon - 37th Legislative Assembly, Regular and Special Sessions 488

OSCOLA 4th ed.
'' 1933 488

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

to be made good out of the accident fund may be made only with the written approval of the commission. Defenses withdrawn by section 49-1819 from employers electing not to contribute under this act shall not be admissible in an action brought under this act against an employer.

Approved by the governor March 10, 1933.
Filed in the office of the secretary of state March 10, 1933.

## CHAPTER 315

### AN ACT

[H. B. 284]

To amend sections 72-201, 72-202, 72-207, Oregon Code 1930.

*Be It Enacted by the People of the State of Oregon:*

Section 1. That section 72-201, Oregon Code 1930, be and the same hereby is amended so as to read as follows:

Sec. 72-201. On and after the date upon which this act takes effect, any person who within the state of Oregon manufactures or causes to be manufactured or who imports into the state of Oregon or who keeps for sale or offers or exposes for sale or who gives, lends or possesses a pistol or revolver, or machine gun, otherwise than in accordance with the provisions of this act shall be guilty of a felony and, upon conviction thereof, shall be punishable by imprisonment in the state penitentiary for not more than five years.

Section 2. That section 72-202, Oregon Code 1930, be and the same hereby is amended so as to read as follows:

Sec. 72-202. On and after the date upon which this act takes effect no unnaturalized foreign-born person and no person who has been convicted of a felony against the person or property of another or against the government of the United States or of the state of Oregon or of any political subdivision thereof shall own or have in his possession or under his custody or control any pistol, revolver, or other firearm capable of being concealed upon the person, or machine gun. The terms "pistol," "revolver," and "firearms capable of being concealed upon the person," as used in this act, shall be construed to apply to and include all firearms having a barrel less than 12 inches in length. The word "machine gun" shall be construed to be a weapon of any description by whatever name known, loaded or unloaded, from which two or more shots may be fired by a single pressure upon the trigger device. Any person who shall violate the provisions of this section shall be guilty of a felony and, upon conviction thereof, be punishable by imprisonment in the state penitentiary for not less than one year nor for more than five years.

Section 3. That section 72-205, Oregon Code 1930, be and the same hereby is amended so as to read as follows:

Sec. 72-205. Except as otherwise provided in this act, it shall be unlawful for any person within this state to possess or have in his possession any machine gun, or to carry concealed upon his person or within any vehicle which is under his control or direction any pistol, revolver or other firearm capable of being concealed upon the person without having a license to carry such firearm, as hereinafter provided in section 8 hereof (Sec. 72-208, Oregon Code). Any person who violates the provisions of this section shall be guilty of a misdemeanor, and if he has been convicted previously of any felony, or of any crime made punishable by this act, he is guilty of a felony. This section shall not be construed to prohibit any citizen of the United States, over the age of 18 years, who resides or is temporarily sojourning within this state, and who is not within the excepted classes prescribed by section 2 hereof (Sec. 72-202, Oregon Code), from owning, possessing or keeping within his place of residence or place of business any pistol, revolver or other firearm capable of being concealed upon the person, and no permit or license to purchase, own, possess or keep any such firearm at his place of residence or place of business shall be required of any such citizen. Firearms carried openly in belt holsters shall not be deemed to be concealed within the meaning of this section.

Section 4. That section 72-207, Oregon Code 1930, be and the same hereby is amended so as to read as follows:

Sec. 72-207. The unlawful concealed carrying upon the person or within the vehicle of the carrier of any machine gun, pistol, revolver or other firearm capable of being concealed upon the person, is a nuisance. Any such weapons taken from the person or vehicle of any person unlawfully carrying the same are hereby declared to be nuisances, and shall be surrendered to the magistrate before whom said person shall be taken, except that in any city, county, town or other municipal corporation the same shall be surrendered to the head of the police force or police department thereof. The officers to whom the same may be so surrendered, except upon the certificate of a judge or a court of record, or of the district attorney of the county, that the preservation thereof is necessary or proper to the ends of justice, shall annually, between the first and tenth days of July, in each year, destroy or cause to be destroyed such weapons to such extent that the same shall become and be wholly and entirely ineffective and useless for the purpose for which it was [they were] manufactured; provided, however, that in the event any such weapon has been stolen and is thereafter recovered from the thief or his transferee the same shall not be destroyed but shall be restored to

the lawful owner thereof, as soon as its use as evidence has been served, upon his identification of the weapon and proof of ownership thereof; provided, that upon the certificate of a judge or of the district attorney that the ends of justice will be subserved thereby such weapon shall be preserved until the necessity for its use ceases.

Approved by the governor March 10, 1933.
Filed in the office of the secretary of state March 10, 1933.

---

## CHAPTER 316

### AN ACT

[H. B. 308]

Providing for injunctions, mandatory or otherwise, against the breach of and allowing the specific performance of certain classes of contracts for the sale or consignment of gasoline and of certain classes of leases on real property connected with or a part of such contracts.

*Be It Enacted by the People of the State of Oregon:*

Section 1. In the event of any breach or threatened breach of any contract providing for the sale or consignment of gasoline to be thereafter sold or distributed by the vendee or consignee at retail, which provides that only the gasoline sold, manufactured, distributed or marked by the vendor or consignor shall be sold by the vendee or consignee, either party to the contract shall be entitled either to an injunction, mandatory or otherwise, to prevent a further breach of such contract or to a decree of specific performance thereof, or to both. Pending the adjudication of such suit either party to the contract shall be entitled, in a proper case, either to a restraining order or to a preliminary injunction, mandatory or otherwise, or to both.

Section 2. In the event of any breach of any lease upon real property, which shall be a part of or in any way connected, directly or indirectly, with any contract within the purview of section 1 of this act, by any party who may be the vendor or consignor or vendee or consignee of gasoline covered by such contract to be thereafter sold or distributed at retail on such leased premises, the vendee or consignee or vendor or consignor of such gasoline shall be entitled either to an injunction, mandatory or otherwise, to prevent a further breach of the lease or to a decree of specific performance thereof, or to both. Pending the adjudication of such suit, the vendee or consignee or vendor or consignor shall be entitled, in a proper case, either to a restraining order to a preliminary injunction, mandatory or otherwise, against the vendor or consignor or vendee or consignee or to both.

Approved by the governor March 10, 1933.
Filed in the office of the secretary of state March 10, 1933.

Compendium_Spitzer
Page 102

# PENNSYLVANIA



DATE DOWNLOADED: Wed Oct 19 10:41:47 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1929 777 .

ALWD 7th ed.
, , 1929 777 .

Chicago 17th ed.
"," Pennsylvania - General Assembly, Regular Session : 777-778

AGLC 4th ed.
'' Pennsylvania - General Assembly, Regular Session 777.

OSCOLA 4th ed.
'' 1929 777

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

be exercised [jointly] *solely* by said [court of common pleas and] orphans' court.

APPROVED—The 25th day of April, A. D. 1929.

JOHN S. FISHER

## No. 328

## AN ACT

**Fixing the time when interest shall begin to run on the amounts fixed in reports of viewers for the taking, injury and destruction of property by the right of eminent domain.**

Section 1.  Be it enacted, &c., That the amount of damages allowed in a report of viewers for the taking, injury or destruction of property by the exercise of the right of eminent domain shall, as finally confirmed, bear interest at the rate of six per centum per annum from the date of the confirmation nisi of the report.

*Eminent domain. Allowance of interest.*

Section 2.  All acts and parts of acts inconsistent with the provisions of this act are hereby repealed.

*Repeal.*

APPROVED—The 25th day of April, A. D. 1929.

JOHN S. FISHER

## No. 329

## AN ACT

**Prohibiting the sale, giving away, transfer, purchasing, owning, possession and use of machine guns; providing penalties; and providing for certain exemptions, and the granting of permits by sheriffs to own and possess machine guns as relics.**

Section 1.  Be it enacted, &c., That the term "machine gun," as used in this act, shall mean any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

*Machine guns. Defined.*

Section 2.  It shall be unlawful for any person, copartnership, association or corporation to sell, or give, or transfer, any machine gun to any person, copartnership, association or corporation, within this Commonwealth; and it shall be unlawful for any person, copartnership, association, or corporation to purchase, own, or have in possession any machine gun.

*Unlawful to sell, give or transfer.*

*Unlawful to buy or possess.*

Any person violating any of the provisions of this section shall be guilty of a felony, and, on conviction thereof, shall be sentenced to pay a fine not exceeding one thousand dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding five years.

*Violations.*

Section 3.  Any person who shall commit, or attempt to commit, any crime within this Commonwealth, when armed with a machine gun, shall, upon conviction of

*Commission of crime with.*

such crime or attempt to commit such crime, in addition to the punishment for the crime for which he has been convicted, be sentenced to separate and solitary confinement at labor for a term not exceeding ten years. Such additional penalty of imprisonment shall commence upon the expiration or termination of the sentence imposed for the crime of which he stands convicted, and shall not run concurrently with such sentence.

**Additional sentence.**

**Exceptions.**
Section 4.   Nothing contained in this act shall prohibit the manufacture for, and sale of, machine guns to the military forces of the United States, or of the Commonwealth of Pennsylvania, or to any police department of this Commonwealth, or of any political subdivision thereof, nor to the purchase or possession of machine guns by such governments and departments; and nothing contained in this act shall prohibit any organization, branch, camp or post of veterans, or any veteran of any war in which the United States was engaged, from owning and possessing a machine gun as a relic, if a permit for such ownership or possession has been obtained from the sheriff of the county, which permit is at all times attached to such machine gun. The sheriffs of the several counties are hereby authorized, upon application and the payment of a fee of one dollar, to issue permits for the ownership and possession of machine guns by veteran and organizations, branches, camps or posts of veterans, upon production to the sheriff of such evidence as he may require that the organization, branch, camp or post is a bona fide organization of veterans, or that any such veteran applicant is a veteran of good moral character and reputation, and that the ownership and possession of such machine gun is actually desired as a relic.

**Effective date.**
Section 5.   This act shall take effect on the first day of September, one thousand nine hundred twenty-nine.

APPROVED—The 25th day of April, A. D. 1929.

JOHN S. FISHER

---

No. 330

AN ACT

To prohibit the possession or carrying of bombs, bombshells, explosive substances, or noxious liquid gases, or substances; and providing penalties.

**Crimes.**
Section 1.   Be it enacted, &c., That on or after the date upon which this act takes effect, any person, except a duly appointed or elected law enforcement officer, or a member of the army, navy, or marine corps of the United States, or of the National Guard, or organized reserves, who possesses or carries on or about his person or in a vehicle, a bomb, bombshell, except for blasting

**Possession of bombs or explosives.**

Compendium_Spitzer
Page 106

# RHODE ISLAND




DATE DOWNLOADED: Wed Oct 19 11:45:57 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1927 256 .

ALWD 7th ed.
, , 1927 256 .

Chicago 17th ed.
"," Rhode Island - General Assembly, January Session : 256-262

AGLC 4th ed.
'' Rhode Island - General Assembly, January Session 256

OSCOLA 4th ed.
'' 1927 256

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

256    JANUARY SESSION, 1927—CHAPTER 1052.

## CHAPTER 1052.

H 729 A
Approved
April 22, 1927.

AN ACT TO REGULATE THE POSSESSION OF FIREARMS.

*It is enacted by the General Assembly as follows:*

Certain words
and phrases,
how construed:

SECTION 1.  When used in this act the following words and phrases shall be construed as follows:

"Pistol."

"Pistol" shall include any pistol or revolver, and any shot gun, rifle or similar weapon with overall length less than twenty-six inches, but shall not include any pistol without a magazine or any pistol or revolver designed for the use of blank cartridges only.

"Machine
gun."

"Machine gun" shall include any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading.

"Firearm."

"Firearm" shall include any machine gun or pistol.

"Person."

"Person" shall include firm, association or corporation.

"Licensing
authorities."

"Licensing authorities" shall mean the board of police commissioners of a city or town where such board has been instituted, the chief of police or superintendent of police of other cities and towns having a regular organized police force, and in towns where there is no chief of police or superintendent of police it shall mean the town clerk who may issue licenses upon the recommendation of the town sergeant;

"Crime of
violence."

"Crime of violence" shall mean and include any of the following crimes or an attempt to commit any of the same, viz.: murder, manslaughter, rape, mayhem, assault or battery involving grave bodily injury, robbery, burglary, and breaking and entering.

"Sell."

"Sell" shall include let or hire, give, lend and transfer, and the word "purchase" shall include hire, accept and borrow, and the expression "purchasing" shall be construed accordingly."

"Purchase."

"Purchasing."

Compendium_Spitzer
Page 109

SEC. 2. If any person shall commit or attempt to commit a crime of violence when armed with or having available any firearm, he may in addition to the punishment provided for such crime of violence be punished as provided in this act. In the trial of a person for committing or attempting to commit a crime of violence the fact that he was armed with or had available a pistol without license to carry the same, or was armed with or had available a machine gun, shall be prima facie evidence of his intention to commit said crime of violence. *Additional punishment under this act.* *What to be prima facie evidence of intention to commit crime of violence.*

SEC. 3. No person who has been convicted in this state or elsewhere of a crime of violence shall purchase, own, carry or have in his possession or under his control any firearm. *Who to be denied firearms.*

SEC. 4. No person shall, without a license therefor, issued as provided in section six hereof, carry a pistol in any vehicle or concealed on or about his person, except in his dwelling house or place of business or on land possessed by him, and no person shall manufacture, sell, purchase or possess a machine gun except as otherwise provided in this act. *Carrying of pistol forbidden, except when.* *Machine gun.*

SEC. 5. The provisions of section four shall not apply to sheriffs, deputy sheriffs, the superintendent and members of the state police, prison or jail wardens or their deputies, members of the city or town police force or other duly appointed law enforcement officers, nor to members of the army, navy or marine corps of the United States, or of the national guard, when on duty, or of organizations by law authorized to purchase or receive firearms from the United States or this state, nor to officers or employees of the United States authorized by law to carry a concealed firearm, nor to duly authorized military organizations when on duty, nor to the members thereof when at or going to or from *Sec. 4 not to apply to whom.*

their customary places of assembly, nor to the regular and ordinary transportation of pistols as merchandise, nor to any person while carrying a pistol unloaded in a wrapper from the place of purchase to his home or place of business, or to a place of repair or back to his home or place of business, or in moving goods from one place or abode or business to another.

**License to carry concealed pistol may be issued, to whom, when and how.** SEC. 6. The licensing authorities of any city or town shall upon application of any person having a bona fide residence or place of business within such city or town, or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the authorities of any other state or subdivision of the United States, issue a license to such person to carry concealed upon his person a pistol within this state for not more than one year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property or has any other proper reason for carrying a pistol, and **License, form of.** that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the attorney-general and shall bear the fingerprint, name, address, description and signature of the licensee and the reason given for desiring a license. **Triplicate license, how disposed of.** The original thereof shall be delivered to the licensee, the duplicate shall within seven days be sent to the attorney-general and the triplicate shall be preserved for six years by the licensing authorities issuing said **Fee for license.** license. A fee of two dollars may be charged and shall be paid for each license, to the officer issuing the same. **Applicant for license to give bond.** Before issuing any such permit the applicant for the same shall be required to give bond to the city or town treasurer in the penal sum of three hundred dollars, with surety satisfactory to the authority issu-

ing such permit, to keep the peace and be of good behavior. Every such permit shall be valid for one year from the date when issued unless sooner revoked. The fee charged for the issuing of such license or permit shall be applied in accordance with the provisions of section thirty-three of chapter 401 of the general laws.

SEC. 7. The attorney-general may issue a permit to any banking institution doing business in this state or to any public carrier who is engaged in the business of transporting mail, money, securities or other valuables, to possess and use machine guns under such regulations as the attorney-general may prescribe.

*Attorney-general may issue permit to banking institutions, etc.*

SEC. 8. It shall be unlawful within this state to manufacture, sell, purchase or possess except for military or police purposes, any muffler, silencer or device for deadening or muffling the sound of a firearm when discharged.

*Muffler or silencer for firearm forbidden.*

SEC. 9. Any person, except a member of the state police, the sheriff or his deputies, or a member of the police force of any city or town, or a member of the army, navy, or marine corps of the United States, or of the national guard or organized reserves when on duty, who possesses, or carries on or about his person or in a vehicle, a bomb or bomb shell, except for blasting or other commercial use, or who, with intent to use the same unlawfully against the person or property of another, possesses or carries any explosive substance, or any noxious liquid, gas or substance, shall be guilty of a violation of this act and punished as hereinafter provided.

*Possession or carrying of bomb, explosive substance, or noxious liquid, gas, etc., forbidden.*

SEC. 10. No property right shall exist in any firearm unlawfully possessed, carried or used, and all such firearms are hereby declared to be nuisances and forfeited to the state. When such forfeited firearms shall be

*Certain firearms to be nuisances and forfeited. Disposition of forfeited firearms.*

260   JANUARY SESSION, 1927—CHAPTER 1052.

taken from any person, they shall be surrendered to the chief or superintendent of police in the city or town in which they are taken, or to the town sergeant of such town where there is no chief of police or superintendent. The officer to whom they are surrendered shall, except upon a certificate of a justice of the superior court or the attorney-general that the non-destruction thereof is necessary or proper to the ends of justice, proceed to destroy all such firearms at stated intervals of not more than one year. Provided, however, that if any such firearm shall be found to be the property of an innocent owner, it shall be returned to such owner if and when no longer needed for purposes of evidence.

**Giving of false information, etc., forbidden.** SEC. 11. No person shall in purchasing or otherwise securing delivery of a pistol or in applying for a license to carry the same, give false information or offer false evidence of his identity.

**Mark of identification not to be removed from firearm.** SEC. 12. No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any firearm. Possession of any firearm upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

**This act not to apply to antique firearms.** SEC. 13. This act shall not apply to antique firearms unsuitable for use nor to collections of firearms as curios, souvenirs, or for educational, scientific or any similar purposes without intent to use such firearms.

**Penalties for violation of the provisions of this act.** SEC. 14. Any violation of any provision of this act shall be punished by a fine of not more than one thousand dollars or imprisonment for not more than five years, or by both such fine and imprisonment.

JANUARY SESSION, 1927—CHAPTER 1052.    261

SEC. 15.  No negative allegation of any kind need be averred or proved in any complaint under this act and the carrying or use of any firearm contrary to the provisions of this act shall be evidence that the possession, carrying or use of any such firearm is unlawful, but the respondent in any such case may show any fact that would render the possession, or use, or carrying of such firearm lawful.

*Negative allegation need not be averred, etc.*

SEC. 16.  Every officer authorized to make an arrest may without complaint and warrant arrest any person who has in his possession any firearm whenever such officer has reasonable ground to suspect that such person possesses or is using or is carrying such firearm contrary to law.  Any person so arrested may be detained a reasonable time, not exceeding twenty-four hours, for the purpose of making an investigation concerning such person, but no person so arrested shall be detained longer than twenty-four hours without complaint being made against him before some proper court or justice.  If the officer making the arrest shall at any time within the said twenty-four hours satisfy himself that there is no ground for making a criminal complaint against such person, he shall thereupon be discharged from custody.

*Officer may arrest without complaint and warrant.*

*Person arrested may be detained not exceeding 24 hours.*

SEC. 17.  In the case of the conviction under this act of a person who is not a citizen of the United States, it shall be the duty of the clerk of the court in which such conviction is secured to certify the fact of such conviction to the proper officer of the United States government having supervision of the deportation of aliens.

*Conviction of alien to be certified to U. S. officer in charge of deportation.*

SEC. 18.  The provisions and penalties prescribed in this act shall take the place of the provisions and penalties of sections thirty-two to thirty-five inclusive of chapter 401 of the general laws in so far as such pro-

*Provisions and penalties of this act to be substituted for certain others provided by law.*

visions and penalties of said sections of said chapter 401 relate to the possession and carrying of air guns, pistols or firearms of any description, and upon the passage of this act said provisions and penalties of said sections in so far as they relate to air guns, pistols and firearms shall be repealed.

Certain pending legal proceedings not affected by this act.

SEC. 19.  No offense committed, or forfeiture incurred, under any law hereby amended and before the time when this act goes into effect, and no suit, prosecution or indictment pending at the time when this act goes into effect, for any offence committed or for the recovery of any fine or penalty or forfeiture incurred under any law hereby amended, shall be affected by the passage of this act, but, proceedings relating to the same shall be taken and continued as if this act had not been passed.

This act, how cited.

SEC. 20.  This act shall take effect upon its passage and may be cited as the Firearms Act.

## CHAPTER 1053.

H 779
Approved
April 22, 1927.

AN ACT IN AMENDMENT OF SECTION 17 OF CHAPTER 98 OF THE GENERAL LAWS, ENTITLED "MOTOR VEHICLES AND THE OPERATION THEREOF."

*It is enacted by the General Assembly as follows:*

Section 1.  Section 17 of chapter 98 of the general laws, entitled "Motor vehicles and the operation thereof," is hereby amended so as to read as follows:

Rules of the road for operation of motor vehicle.

"Sec. 17.  Upon approaching any person standing or walking in the traveled portion of any public highway, or a horse or any other draft animal being led, ridden or driven therein, or a crossing of intersecting public highways, or a bridge, or a sharp turn, or a curve, or a steep descent, and also in passing such

# SOUTH CAROLINA

" />



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

Search this website

# 1934 S.C. Acts 1288, An Act regulating the use and possession of Machine Guns: §§ 1 to 6.

### Subject(s):

- Dangerous or Unusual Weapons (https://firearmslaw.duke.edu/subjects/dangerous-or-unusual-weapons/)

### Jurisdiction(s):

- South Carolina (https://firearmslaw.duke.edu/jurisdictions/south-carolina/)

### Year(s):

- 1934 (https://firearmslaw.duke.edu/years/1934/)

§ 1. "Machine gun" defined. – Be it enacted by the General Assembly of the State of South Carolina: For the purposes of this Act the word "machine gun" applies to and includes all firearms commonly known as machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which the ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device. § 2. Transportation of Machine Gun. – It shall be unlawful for any person or persons in any manner to transport from one place to another in this State, or from any railroad company, or express company, or other common carrier, or any officer, agent or employee of any of them, or any other person acting in their behalf knowingly to ship or to transport form one place to another in this

State in any manner or by any means whatsoever, except as hereinafter provided, any firearm as described hereinabove or commonly known as a machine gun. § 3. Storing, Keeping, and/or Possessing Machine Gun. – It shall be unlawful for any person to store, keep, possess, or have in possession, or permit another to store, keep, possess, or have in possession, except as hereinafter provided, any firearm of the type defined above or commonly known as a machine gun. § 4. Selling, Renting or Giving away Machine Gun. – It shall be unlawful for any person to sell, rent, or give away, or be interested directly or indirectly, in the sale, renting or giving away, or otherwise disposing of any firearm of the type above described or commonly known as a machine gun. § 5. Exceptions – Register Machine Guns. – The provisions of this Act shall not apply to the army, navy or marine corps of the United States, the National Guard, and organizations authorized by law to purchase or received machine guns from the United States, or from this State, and the members of such corps. National Guard and organizations while on duty or at drill, may possess, carry and transport machine guns, and, Provided, further, That any peace officer of the State, counties or political sub-division thereof. State Constable, member of the Highway patrol, railway policemen, warden, superintendents, headkeeper or deputy of any State prison, penitentiary, workhouse, county jail, city jail, or other institution for detention of persons convicted or accused of crime, or held as witnesses in criminal cases, or persons on duty in the postal service of the United States, or common carrier while transporting direct to any police department, military or naval organization, or persons authorized by law to possess or use a machine gun, may possess machine guns when required in the performance of their duties, nor shall the provisions of this Act be construed to apply to machine guns kept for display as relics and which are rendered harmless and not useable. Within thirty days after the passage of this Act every person permitted by this Act to possess a machine gun or immediately after any person is elected to or appointed to any office or position which entitles such person to possess a machine gun, shall file on the office of the Secretary of State on a blank to be supplied by the Secretary of State on application therefor, an application to be properly sworn to, which shall be approved by the Sheriff of the county in which the applicant resides or has its principal place of business, which shall include the applicants name, residence and business address, description including sex, race, age weight, height, color of eyes, color of hair, whether or not ever charged or convicted of any crime, municipal, State or otherwise, and where, if so charged, and when same was disposed of. The applicant shall also give the description including the serial number and make the machine gun which he possesses or desires to possess. Thereupon the Secretary of State shall file such application in his office, registering such applicant togther with the information required in the application in a book or index to be kept for that purpose, and assign to him a number, an dissue to him a card which shall bear the signature of the applicant, and which he shall keep with him while he has such machine gun in his possession. Such registeration shall be made on the date application is received and filed iwth the Secretary of State, and shall expire on December 31, of the year in which said license is issued. § 6. Penalty – Any person violating any of the provisions of this Act shall be guilty of a felony, and, on conviction thereof shall be sentenced to pay a fine not exceeding One Thousand Dollars, and undergo imprisonment by separate or solitary confinement at labor not exceeding twenty (20) years.

-  (https://twitter.com/dukefirearmslaw)

-  (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)

Compendium_Spitzer
Page 118

- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)
Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

# SOUTH DAKOTA





DATE DOWNLOADED: Wed Oct 19 11:49:32 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1933 1 .

ALWD 7th ed.
, , 1933 1 .

Chicago 17th ed.
"," South Dakota - 23rd Legislative Session : 1-248

AGLC 4th ed.
'' South Dakota - 23rd Legislative Session 1

OSCOLA 4th ed.
'' 1933 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

If the witness is summoned to attend and testify in the criminal prosecution in this state he shall be tendered the sum of ten cents a mile for each mile by the ordinary traveled route to and from the court where the prosecution is pending and five dollars for each day that he is required to travel and attend as a witness. A witness who has appeared in accordance with the provisions of the summons shall not be required to remain within this state a longer period of time than the period mentioned in the certificate.

Section 3. EXEMPTION FROM ARREST AND SERVICE OF PROCESS. If a person comes into this state in obedience to a summons directing him to attend and testify in a criminal prosecution in this state he shall not while in this state pursuant to such summons be subject to arrest or the service of process, civil or criminal, in connection with matters which arose before his entrance into this state under the summons.

If a person passes through this state while going to another state in obedience to a summons to attend and testify in a criminal prosecution in that state or while returning therefrom, he shall not while so passing through this state be subject to arrest or the service of process, civil or criminal, in connection with matters which arose before his entrance into this state under the summons.

Section 4. UNIFORMITY OF INTERPRETATION. This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of the states which enact it.

Section 5. SHORT TITLE. This act may be cited as "Uniform Act to Secure the Attendance of Witnesses from Without the State in Criminal Cases."

Section 6. REPEAL. Chapter 158 of the Session Laws of South Dakota of 1923 is hereby repealed.

Approved February 28, 1933.

---

## CHAPTER 206

### (S. B. 165)

#### ENACTING UNIFORM MACHINE GUN ACT

AN ACT Entitled, An Act Relating to Machine Guns, and to Make Uniform the Law with Reference Thereto.

*Be It Enacted by the Legislature of the State of South Dakota:*

Section 1. DEFINITIONS. "Machine Gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device.

"Crime of Violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily

harm, robbery, burglary, housebreaking, breaking and entering, and larceny.

"Person" applies to and includes firm, partnership, association or corporation.

Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than twenty years.

Section 3. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not more than fifteen years.

Section 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose:

(a)   When the machine gun is on premises not owned or rented for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(b)   when in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(c)   when the machine gun is of the kind described in Section 8 and has not been registered as in said section required; or

(d)   when empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

Section 5. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

Section 6. EXCEPTIONS. Nothing contained in this act shall prohibit or interfere with

1.   the manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose;

2.   the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake;

3.   the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or large caliber, for a purpose manifestly not aggressive or offensive.

Section 7. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of

the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not more than five hundred dollars, or by imprisonment in the county jail, for not exceeding six months or by both such fine and imprisonment.

Section 8. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered in the office of the Secretary of State, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within 24 hours after its acquisition. Blanks for registration shall be prepared by the Secretary of State, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

Section 9. Warrant to search an house or place and seize any machine gun adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this act, may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the State's Attorney, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the state or a political subdivision thereof.

Section 10. If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

Section 11. UNIFORMITY OF INTERPRETATION. This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

Section 12. SHORT TITLE. This act may be cited as the Uniform Machine Gun Act.

Section 13. REPEAL. All acts or parts of acts which are in conflict with or inconsistent with the provisions of this act are hereby repealed.

Approved February 28, 1933.

# TEXAS

 

DATE DOWNLOADED: Wed Oct 19 10:39:48 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1933 219 .

ALWD 7th ed.
, , 1933 219 .

Chicago 17th ed.
"," Texas - 43rd Legislature, 1st Called Session; General and Special Laws : 219-220

AGLC 4th ed.
'' Texas - 43rd Legislature, 1st Called Session; General and Special Laws 219

OSCOLA 4th ed.
'' 1933 219

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

the said Rule is hereby suspended, and that this Act take effect and be in force from and after its passage, and it is so enacted.

[NOTE.—H. B. No. 45 passed the House by a vote of 109 yeas, 0 nays; passed the Senate by a vote of 29 yeas, 0 nays.]

Approved October 25, 1933.
Effective October 25, 1933.

————

## ANTI-MACHINE GUN LAW.

H. B. No. 64.]          CHAPTER 82.

An Act defining "machine gun" and "person"; making it an offense to possess or use machine guns; making it an offense to sell, lease, barter, give, exchange, trade or cause to be sold, leased, given, bartered, exchanged or traded a machine gun to any person; providing penalty for possessing machine gun; providing penalty for selling, leasing, bartering, giving, exchanging, trading or causing to be sold, leased, given, bartered, exchanged or traded a machine gun to any person; providing exceptions where machine guns are sold to the military forces or peace officers of the United States or any political subdivision thereof, and the transportation thereof; providing exceptions when the possession of machine guns for scientific purposes or possession of machine guns not usable as a weapon and possessed as a curiosity, ornament or keepsake, and possession of machine guns by officials or employees of the State Prison System; providing exceptions where machine guns are sold, leased, bartered, exchanged or given the Adjutant General of the State of Texas, the Sheriff of any county, the Chief of Police of a municipality, the purchasing agent for the Texas State Prison System; the military forces or peace officers of the United States, and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. Definition. "Machine gun" applies to and includes a weapon of any description by whatever name known, loaded or unloaded, from which more than five (5) shots or bullets may be automatically discharged from a magazine by a single functioning of the firing device.

"Person" applies to and includes firm, partnership, association or corporation.

SEC. 2. Whosoever shall possess or use a machine gun, as defined in Section 1, shall be guilty of a felony and upon conviction thereof, shall be confined in the State Penitentiary, for not less than two (2) nor more than ten (10) years.

SEC. 3. Whoever shall sell, lease, give, barter, exchange, or trade, or cause to be sold, leased, given, bartered, exchanged, or traded, a machine gun as hereinabove defined to any person shall be guilty of a felony and upon conviction thereof, shall be confined to the State Penitentiary, for not less than two (2) nor more than ten (10) years.

SEC. 4. Nothing contained in Section 2 of this Act shall prohibit or interfere with:

1. The possession of machine guns by the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose.

2. The possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake

3. The possession of machine guns by officials and employees of the Texas State Prison System.

SEC. 5. Nothing contained in this Act shall prohibit or interfere with the sale, lease, barter, exchange or gift of a machine gun as defined in this Act, or the transportation required for such purpose to the Adjutant General of the State of Texas, the duly qualified and commissioned Sheriff of a county in Texas, to a duly qualified and commissioned Chief of Police of any municipality within the State of Texas, the duly authorized purchasing agent for the Texas State Prison System, the military forces or peace officers of the United States.

SEC. 6. The fact that there are many gangsters purchasing machine guns in Texas, causing a menace to the citizenry of Texas, creates an emergency and imperative public necessity that the Constitutional Rule requiring bills to be read on three several days be suspended, and said Rule is hereby suspended, and this Act shall take effect and be in force from and after its passage, and it is so enacted.

[NOTE.—H. B. No. 64 passed the House by a vote of 121 yeas, 0 nays; passed the Senate by a vote of 30 yeas, 0 nays.]

Approved October 25, 1933.
Effective October 25, 1933.

————

## SALARIES OF COMMISSIONERS IN CERTAIN COUNTIES.

H. B. No. 88.|        CHAPTER 83.

An Act amending Article 2350, Chapter 44 of the Revised Civil Statutes of the State of Texas, 1925, as amended by Act of the Thirty-ninth Legislature, Regular Session, Chapter 135, Section 1; and as amended by Act of the Fortieth Legislature, Page 435, Chapter 490, Section 1; and as amended by Act of the Fortieth Legislature, First Called Session, Page 138, Chapter 46, Section 1; and as amended by House Bill Number 555, Chapter 216, Page 727, Acts of the Forty-third Legislature, Regular Session, relating to the salaries of County Commissioners in certain Counties; providing that if any part of this Act be declared unconstitutional it shall not affect any remaining part, and declaring an emergency.

*Be it enacted by the Legislature of the State of Texas:*

SECTION 1. That Article 2350, Chapter 44 of the Revised Civil Statutes of the State of Texas, 1925, as amended by Act

# UTAH



DATE DOWNLOADED: Wed Oct 19 11:23:22 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1901 1 .

ALWD 7th ed.
, , 1901 1 .

Chicago 17th ed.
"," Utah - 4th Legislature, Regular Session : 1-184

AGLC 4th ed.
'' Utah - 4th Legislature, Regular Session 1

OSCOLA 4th ed.
'' 1901 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

## CHAPTER 95.

### TEACHER'S EXAMINATION.

AN ACT amending section 1795 of the Revised Statutes of Utah, 1898, relating to teacher's examinations.

*Be it enacted by the Legislature of the State of Utah:*

That section 1795 of the Revised Statutes of Utah, 1898, be and the same is hereby amended to read as follows:

1795. **County board to hold teacher's examination each year.** The county board of examiners shall hold teacher's examinations during each year, at such times and under such rules as the state board of education may direct. If from the percentage of correct answers required by the rules and other evidences disclosed by the examination, including particularly the superintendent's knowledge and information of the candidate's experience and ability as a teacher, the applicant is found to be a person of good moral character, and to possess such knowledge and understanding, together with aptness to teach and govern, as will enable the applicant to teach successfully in the district schools of the state the various branches required by law, said board of examiners shall grant such applicant a certificate of qualification.

Approved this 14th day of March, 1901.

––––––––––

## CHAPTER 96.

### INFERNAL MACHINE.

AN ACT defining an infernal machine, and prescribing penalties for the construction or contrivance of the same, or having any such machine in possession, or delivering such machine to any person or common carrier, or sending the same through the mail, or throwing or placing the same where any person may be injured in his person or property, and providing where offenses against this act may be tried in case of such infernal machine being transmitted outside the county where delivered.

*Be it enacted by the Legislature of the State of Utah:*

SECTION 1. **Infernal machine defined.** That an infernal machine is any box, package, contrivance or apparatus, containing or arranged with an explosive or acid or poisonous or inflammable substance, chemical, or compound, or knife, or loaded pistol or gun or other dangerous or harmful weapon or thing, constructed, contrived or arranged so as to explode, ignite or throw forth its contents, or to strike with any of its parts, unexpectedly when moved, handled or open, or after the lapse of time, or under conditions, or in a manner calculated to endanger health, life, limb or property.

8

Sec. 2.   **Penalty for sending by mail or express.**   That every person who delivers, or causes to be delivered, to any express or railway company or other common carrier or to any person any infernal machine, knowing it to be such, without informing such common carrier or person of the nature thereof, or sends the same through the mail, or throws or places the same on or about the premises or property of another, or in any place where another may be injured thereby, in his person or property, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding twenty-five years.

Sec. 3.   **Penalty for constructing or having in possession.**   That every person who knowingly constructs or contrives any infernal machine, or with intent to injure another in his person or property, has any infernal machine in his possession, is guilty of a felony, and upon conviction thereof, shall be punished by imprisonment in the state prison for a term not exceeding five years.

Sec. 4.   **Where prosecuted in certain cases.**   That any person knowingly delivering any such infernal machine to any railway, express, or stage company, or to any person or company whatever for transmission to any person in another county may be prosecuted in the county in which he delivers the same, or the county to which the same is transmitted.

Sec. 5.   This act shall take effect upon approval.

Approved this 14th day of March, 1901.

---

## CHAPTER 97.

### VOTE OF THANKS TO SCOFIELD RELIEF COMMITTEE.

*Be it resolved, by the Governor and the House of Representatives of the State of Utah, the Senate concurring:*

That its vote of thanks be tendered to that committee appointed by his excellency, the Governor, viz.: J. T. Hammond, E. W. Wilson, Wm. F. Colton, Ezra Thompson, A. W. Carlson, A. L. Thomas, Wm. Iglehart, Mrs. O. J. Salisbury, Mrs. Geo. M. Downey, Mrs. A. R. Haywood, Lafayette Holbrook, John Jones, O. G. Kimball, and T. J. Parmely, in appreciation of the disinterested, conscientious, intelligent, and painstaking duties performed by them for the relief of the sufferers from the disaster which occurred in the mines of the Pleasant Valley Coal Co. at Scofield, Utah, May 1st, 1900.

*And be it further resolved,* that a vote of thanks by this House of Representatives and the Senate be extended to the sympathetic

# VERMONT




DATE DOWNLOADED: Wed Oct 19 10:46:55 2022
SOURCE: Content Downloaded from  *HeinOnline*

Citations:

Bluebook 21st ed.
1923 127 .

ALWD 7th ed.
, , 1923 127 .

Chicago 17th ed.
"," Vermont - 27th Biennial Session : 127-127

AGLC 4th ed.
'' Vermont - 27th Biennial Session 127

OSCOLA 4th ed.
'' 1923 127

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

SEC. 6403. *Unlawful devices.* A person, except as otherwise provided, who uses or has in his possession for use or who furnishes for another's use, for taking fish, a pound net, trap net, seine, snare, gill net, set net, fyke net, set line, fishing otter, trawl, grapple, spear, jack, jack light or electrical or other device for killing or stunning fish or who is found on any waters or the shores thereof or the islands therein, having in his possession any such device, shall be imprisoned not more than thirty days or fined one hundred dollars, or both. Possession of such a device within five hundred feet of such shores shall be presumptive evidence that the same has been unlawfully used. Such devices may be summarily seized and destroyed by any person.

SEC. 2. *Snaring prohibited, penalty.* A person who takes an animal by snaring, or who possesses a snare with intent to use the same shall be fined not more than fifty dollars nor less than twenty-five dollars.

SEC. 3. *Shooting from motor vehicle or logging train prohibited, penalty.* A person who from a motor vehicle or logging train takes quadrupeds or game birds by shooting shall be fined not more than fifty dollars nor less than ten dollars and five dollars additional for each quadruped or bird so taken.

Approved March 3, 1923.

## No. 130.—AN ACT TO PROHIBIT THE USE OF MACHINE GUNS AND AUTOMATIC RIFLES IN HUNTING.

[H. 144]

*It is hereby enacted by the General Assembly of the State of Vermont:*

SECTION 1. *Prohibition, penalty.* A person engaged in hunting for game who uses, carries, or has in his possession a machine gun of any kind or description, or an automatic rifle of military type with a magazine capacity of over six cartridges, shall be fined not more than five hundred dollars nor less than fifty dollars. The presence of such a firearm in a hunting camp shall be presumptive evidence that the possessor of such a firearm has violated the provisions of this section.

Approved March 22, 1923.

# VIRGINIA




DATE DOWNLOADED: Wed Oct 19 11:52:22 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1933-1934 137 .

ALWD 7th ed.
, , 1933-1934 137 .

Chicago 17th ed.
"," Virginia - Extra Session - 1933, Regular Session - 1934 : 137-140

AGLC 4th ed.
'' Virginia - Extra Session - 1933, Regular Session - 1934 137

OSCOLA 4th ed.
'' 1933-1934 137

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

CHAP. 95.—An ACT to empower the councils of cities and towns to release the
liability and liens for interest, penalties and accrued costs, or any part thereof,
on unpaid taxes due such cities and towns for any year or years to and in-
cluding 1933, provided such taxes are paid within one hundred and twenty
days after this act is in force.                           [H B 48]

Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, That the
councils of cities and towns are hereby empowered to release all persons,
firms, associations and corporations from all liability, for interest,
penalties and accrued costs on any taxes due such respective cities and
towns for any year or years prior to and including the year nineteen
hundred and thirty-three, that are unpaid at the time the ordinance re-
lieving same goes into effect, provided such unpaid taxes are paid such
cities or towns within one hundred and twenty days after the date this
act shall be in force.

2. That nothing in this act contained shall empower any such coun-
cil to release any liability for interest, penalties and accrued costs, or
any part thereof, on such unpaid taxes as are not paid within the one
hundred and twenty days aforesaid.

3. By reason of the necessity of immediately granting said councils
power to grant taxpayers the above relief, an emergency is declared to
exist, and this act shall be in force from its passage.

———————

CHAP. 96.—An ACT to define the term "machine gun"; to declare the use and
possession of a machine gun, for certain purposes, a crime and to prescribe
the punishment therefor; to require manufacturers, dealers and other persons,
with certain exemptions, in possession thereof, to register all machine guns
with the Secretary of the Commonwealth; to keep records of and report
transfers and sales to the said Secretary; to allow inspection of records and
of machine guns by peace officers; to provide for seizures and search war-
rants; to prescribe rules of evidence and presumptions; to provide penalties,
and to repeal all inconsistent acts.                       [S B 110]

Approved March 7, 1934

1. Be it enacted by the General Assembly of Virginia, as follows:
Section 1. Where used in this act:

(a) "Machine gun" applies to and includes a weapon of any descrip-
tion by whatever name known, loaded or unloaded, from which more
than seven shots or bullets may be rapidly, or automatically, or semi-
automatically discharged from a magazine, by a single function of the
firing device, and also applies to and includes weapons, loaded or un-
loaded, from which more than sixteen shots or bullets may be rapidly,
automatically, semi-automatically or otherwise discharged without re-
loading.

(b) "Crime of violence" applies to and includes any of the follow-
ing crimes or an attempt to commit any of the same, namely, murder,
manslaughter, kidnapping, rape, mayhem, assault with intent to maim,

Compendium_Spitzer
Page 138

ACTS OF ASSEMBLY [VA.

disable, disfigure or kill, robbery, burglary, housebreaking, breaking and entering, and larceny.

(c) "Person" applies to and includes firm, partnership, association or corporation.

Section 2. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by death or by imprisonment in the State penitentiary for a term of not less than twenty years.

Section 3. Unlawful possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the State penitentiary for a term of not less than ten years.

Section 4. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose:

(a) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(b) When in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(c) When the machine gun is of the kind described in section eight and has not been registered as in said section required; or

(d) When empty or loaded pistol shells of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber which have been or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

Section 5. The presence of a machine gun in any room, boat, or vehicle shall be *prima facie* evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

Section 6. Nothing contained in this act shall prohibit or interfere with

First. The manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the transportation required for that purpose. This act shall not apply to machine guns and automatic arms issued to the National Guard of Virginia by the United States or such arms used by the United States Army or Navy or in the hands of troops of the National Guards of other States or Territories of the United States passing through Virginia, or such arms as may be provided for the officers of the State Police or officers of penal institutions.

Second. The possession of a machine gun for scientific purposes, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake;

Third. The possession of a machine gun other than one adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber, for a purpose manifestly not aggressive or offensive.

Section 7. Every manufacturer or dealer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer or dealer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not less than one hundred dollars nor more than one thousand dollars.

Section 8. Every machine gun now in this State adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber shall be registered in the office of the Secretary of the Commonwealth on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within twenty-four hours after its acquisition. Blanks for registration shall be prepared by the Secretary of the Commonwealth, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The Secretary of the Commonwealth shall immediately upon registration required in this section furnish the registrant with a certificate of registration, which shall be kept by the registrant and produced by him upon demand by any peace officer. Failure to keep or produce such certificate for inspection shall be a misdemeanor and punishable by a fine of not less than five nor more than one thousand dollars, and any peace officer may, without warrant, seize the machine gun and apply for its confiscation as provided in section nine of this act. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

Section 9. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of thirty (thirty one-hundredths inch or seven and sixty-three one-hundredths millimeter) or larger caliber possessed in violation of this act may issue in the same manner and under the same restrictions as provided by law for stolen property, and any court of record, upon application of the Commonwealth's attorney, a police officer or conservator of the peace, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated and either destroyed or delivered to a peace officer of the State or a political subdivision thereof.

Section 10. If any provision of this act or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the act which can be given

Compendium_Spitzer
Page 140

effect without the invalid provision or application, and to this end the provisions of this act are declared to be severable.

Section 11. This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

Section 12. This act may be cited as the Uniform Machine Gun Act.

Section 13. All acts or parts of acts which are inconsistent with the provisions of this act are hereby repealed.

---

CHAP. 97.—An ACT to make effective the Constitutional provision to the effect that the General Assembly shall establish and maintain an efficient system of public free schools throughout the State, and to repeal all acts and parts of acts inconsistent with this act.                                      [S B 153]

Approved March 7, 1934

Whereas, section one hundred and twenty-nine of the Constitution of Virginia provides that "The General Assembly shall establish and maintain an efficient system of public free schools throughout the State," now, therefore,

1. Be it enacted by the General Assembly of Virginia, as follows:

Section 1. The school board of each and every school division in the State is hereby empowered and required to maintain the public free schools of such division for a period of at least eight months or one hundred and sixty teaching days in each school year. In order that each school division may have the funds necessary to enable the school board to maintain the elementary and high schools thereof for such minimum terms, it is hereby provided that when any county, city or town has legally complied with the existing laws with reference to local school levies, such school division or divisions shall be allotted out of the public school funds held in the treasury of the State for each group of twenty-five to forty pupils in average daily attendance, a sum equal to the amount to be derived by dividing said public school fund by the number of groups of twenty-five to forty pupils in average daily attendance in the State, depending upon the density of population, to be apportioned by the State Board of Education, as provided in section one hundred and thirty-five of the Constitution and in conformity with the provisions of the Code and of the Acts of the Assembly under such rules and regulations as may be set up by said State Board of Education.

Section 2. That in addition the counties and cities shall provide, from local school taxes, as provided in section one hundred and thirty-six of the Constitution of Virginia, for the supplementing of their instructional programs such amounts as will insure the services of properly prepared and effective teaching personnel, and to the degree that financial ability and community interest in education will permit; provided further, that the counties and cities shall provide, in keeping with the laws already existing, such funds as may be necessary for debt service, capital outlay, transportation, general operation and maintenance.

Compendium_Spitzer
Page 141

# WASHINGTON



DATE DOWNLOADED: Wed Oct 19 11:03:31 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1933 335 .

ALWD 7th ed.
, , 1933 335 .

Chicago 17th ed.
"," Washington - 23rd Legislature, Regular Session : 335-336

AGLC 4th ed.
'' Washington - 23rd Legislature, Regular Session 335

OSCOLA 4th ed.
'' 1933 335

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# CHAPTER 64.

[S. B. 223.]

### MACHINE GUNS.

An Act relating to machine guns, regulating the manufacture, possession, sale of machine guns and parts, and providing penalty for the violation thereof, and declaring an emergency.

*Be it enacted by the Legislature of the State of Washington:*

Section 1. That it shall be unlawful for any person to manufacture, own, buy, sell, loan, furnish, transport, or have in possession, or under control, any machine gun, or any part thereof capable of use or assembling or repairing any machine gun: *Provided, however,* That such limitation shall not apply to any peace officer in the discharge of official duty, or to any officer or member of the armed forces of the United States or the State of Washington.

Machine guns banned.

Officers.

Sec. 2. For the purpose of this act a machine gun is defined as any firearm or weapon known as a machine gun, mechanical rifle, submachine gun, and/or any other weapon, mechanism, or instrument not requiring that the trigger be pressed for each shot and having a reservoir clip, disc, drum, belt, or other separable mechanical device for storing, carrying, or supplying ammunition which can be loaded into such weapon, mechanism, or instrument, and fired therefrom at the rate of five or more shots per second.

Definition.

Sec. 3. Any person violating any of the provisions of this act shall be guilty of a felony.

Violation, felony.

Sec. 4. All machine guns, or parts thereof, illegally held or possessed are hereby declared to be contraband, and it shall be the duty of all peace officers, and/or any officer or member of the armed forces of the United States or the State of Wash-

Declared contraband.

336           SESSION LAWS, 1933.         [CH. 65.

Seizure.

ington, to seize said machine gun, or parts thereof, wherever and whenever found.

Effective immediately.

SEC. 5. This act is necessary for the immediate preservation of the public health and safety, and shall take effect immediately.

Passed the Senate February 10, 1933.
Passed the House February 23, 1933.
Approved by the Governor March 6, 1933.

---

## CHAPTER 65.

### [H. B. 263.]

#### EMERGENCY RELIEF BONDS.

AN ACT to relieve the people of the state from hardships and suffering caused by unemployment, through the agency of the emergency relief administration, creating a debt, authorizing the issuance and sale of state bonds, creating a sinking fund to be known as the "General Obligation Bonds of 1933 Retirement Fund" and allocating a portion of receipts in the motor vehicle fund thereto for the payment of interest and principal of said bonds, providing for a tax levy to cover any deficiency therein, making an appropriation therefrom, declaring an emergency and that the act shall take effect immediately.

*Be it enacted by the Legislature of the State of Washington:*

SECTION 1. *Preamble.*—World wide economic depression has brought about unemployment of and distress to the citizens of the state. Their savings and reserves are becoming depleted. Hunger marches. Discontent, social unrest and incipient

Insurrection.

insurrection exist. Acts of insurrection are occurring. The moral resistance of the people is lessening. Government itself is imperiled and must be protected and preserved. Sovereignty implies sacrifice and imposes duty. It looks only to the perpetuity of our institutions as defined in our constitutions and in the hearts of men. It measures in terms of peace, good order and the common good.

# WISCONSIN



DATE DOWNLOADED: Wed Oct 19 22:10:31 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
1931-1933 245 .

ALWD 7th ed.
, , 1931-1933 245 .

Chicago 17th ed.
"," Wisconsin - Special Session - 1931-1932; Biennial Session : 245-248

AGLC 4th ed.
'' Wisconsin - Special Session - 1931-1932; Biennial Session 245

OSCOLA 4th ed.
'' 1931-1933 245

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

LAWS OF WISCONSIN—Ch. 75-76.        245

No. 113, A.]                    [Published April 15, 1933.

## CHAPTER 75.

AN ACT to repeal subsection (2) and amend subsection (1) of
section 289.06 of the statutes, relating to filing of liens.

*The people of the state of Wisconsin, represented in senate and
assembly, do enact as follows:*

SECTION 1.   Subsection (2) of section 289.06 is repealed.

SECTION 2.   Subsection (1) of section 289.06 of the statutes is
amended to read: (289.06)  *  *  *   No lien hereby given shall
exist and no action to enforce the same shall be maintained unless
within sixty days in all cases provided for in section 289.02 and
within six months in all other cases from the date of the last
charge for performing such work and labor or of the furnishing of
such materials a claim for such lien shall be filed as hereinafter
provided in the office of the clerk of the circuit court of the county
in which the lands affected thereby lie and such action be brought
and summons and complaint filed within  *  *  *  *two* years
from such date  *  *  *  . *Such claim for lien may be filed and
docketed within such sixty days or within such six months, as the
case may be, notwithstanding the death of the owner of the prop-
erty affected thereby or the person with whom the original con-
tract was made, with like effect as if he were then living.*

SECTION 3.   This act shall take effect upon passage and publi-
cation.

Approved April 13, 1933.

No. 137, A.]                    [Published April 15, 1933.

## CHAPTER 76.

AN ACT to repeal section 340.695 of the statutes and to create
chapter 164, relating to machine guns and to make uniform the
law with reference thereto.

*The people of the state of Wisconsin, represented in senate and
assembly, do enact as follows:*

SECTION 1.   A chapter of the statutes is created to be num-
bered and to read:

CHAPTER 164.

UNIFORM MACHINE GUN ACT.

164.01  DEFINITIONS.  (a) "Machine gun" applies to and in-
cludes a weapon of any description by whatever name known from

which more than two shots or bullets may be discharged by a single function of the firing device.

(b) "Crime of violence" applies to and includes any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, kidnapping, rape, mayhem, assault to do great bodily harm, robbery, burglary, housebreaking, breaking and entering, and larceny.

(c) "Person" applies to and includes firm, partnership, association or corporation.

164.02 Use of machine gun is separate crime. Possession or use of a machine gun in the perpetration or attempted perpetration of a crime of violence is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than twenty years.

164.03 Possession for aggressive purpose. Possession or use of a machine gun for offensive or aggressive purpose is hereby declared to be a crime punishable by imprisonment in the state penitentiary for a term of not less than ten years.

164.04 Possession when presumed for aggressive purpose. Possession or use of a machine gun shall be presumed to be for offensive or aggressive purpose;

(1) When the machine gun is on premises not owned or rented, for bona fide permanent residence or business occupancy, by the person in whose possession the machine gun may be found; or

(2) When in the possession of, or used by, an unnaturalized foreign-born person, or a person who has been convicted of a crime of violence in any court of record, state or federal, of the United States of America, its territories or insular possessions; or

(3) When the machine gun is of the kind described in section 164.08 and has not been registered as in said section required; or

(4) When empty or loaded pistol shells of 30 (.30 in. or 7.63 mm.) or larger caliber which have been used or are susceptible of use in the machine gun are found in the immediate vicinity thereof.

164.05 Presumptions from presence of gun. The presence of a machine gun in any room, boat, or vehicle shall be evidence of the possession or use of the machine gun by each person occupying the room, boat, or vehicle where the weapon is found.

164.06 Exceptions. Nothing contained in this chapter shall prohibit or interfere with the manufacture for, and sale of, machine guns to the military forces or the peace officers of the United States or of any political subdivision thereof, or the trans-

portation required for that purpose; the possession of a machine gun for scientific purpose, or the possession of a machine gun not usable as a weapon and possessed as a curiosity, ornament, or keepsake; the possession of a machine gun other than one adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber, for a purpose manifestly not aggressive or offensive.

164.07 Manufacturer to register machine guns. Every manufacturer shall keep a register of all machine guns manufactured or handled by him. This register shall show the model and serial number, date of manufacture, sale, loan, gift, delivery or receipt, of every machine gun, the name, address, and occupation of the person to whom the machine gun was sold, loaned, given or delivered, or from whom it was received; and the purpose for which it was acquired by the person to whom the machine gun was sold, loaned, given or delivered, or from whom received. Upon demand every manufacturer shall permit any marshal, sheriff or police officer to inspect his entire stock of machine guns, parts, and supplies therefor, and shall produce the register, herein required, for inspection. A violation of any provision of this section shall be punishable by a fine of not less than one hundred dollars or more than five hundred dollars.

164.08 Owner to register machine gun. Every machine gun now in this state adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber shall be registered by the owner in the office of the secretary of state, on the effective date of this act, and annually thereafter. If acquired hereafter it shall be registered within twenty-four hours after its acquisition. Blanks for registration shall be prepared by the secretary of state, and furnished upon application. To comply with this section the application as filed must show the model and serial number of the gun, the name, address and occupation of the person in possession, and from whom and the purpose for which, the gun was acquired. The registration data shall not be subject to inspection by the public. Any person failing to register any gun as required by this section, shall be presumed to possess the same for offensive or aggressive purpose.

164.09 Warrant to search for machine gun. Warrant to search any house or place and seize any machine gun adapted to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger caliber possessed in violation of this chapter, may issue in the same manner and under the same restrictions as provided by law for stolen

property, and any court of record, upon application of the district attorney, shall have jurisdiction and power to order any machine gun, thus or otherwise legally seized, to be confiscated, and either destroyed or delivered to a peace officer of the state or a political subdivision thereof.

164.10 SEVERABILITY PROVISION. If any provision of this chapter or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or applications of the chapter which can be given effect without the invalid provision or application, and to this end the provisions of this chapter are declared to be severable.

164.11 UNIFORMITY OF INTERPRETATION. This chapter shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

SECTION 2.   Section 340.695 of the statutes is hereby repealed.

SECTION 3.   This act shall take effect thirty days after passage and publication.

Approved April 13, 1933.

---

No. 172, A.]                    [Published April 15, 1933.

### CHAPTER 77.

AN ACT to amend section 272.29 of the statutes, relating to the sale of personal property on execution.

*The people of the state of Wisconsin, represented in senate and assembly, do enact as follows:*

SECTION 1.   Section 272.29 of the statutes is amended to read: 272.29 NOTICE AND TIME AND TERMS OF SALE. No sale of any goods or chattels shall be made by virtue of any execution unless previous notice of such sale shall have been given twenty days successively by fastening up written or printed notices thereof in three public places of the town where such sale is to be had, specifying the time and place where the same is intended to be had, *provided that when any property seized on execution shall be likely to perish or depreciate in value before the expiration of the twenty day notice of sale hereinabove provided the court or a judge may by order direct the same to be sold in such manner and upon such terms as the best interests of the parties demand.* Every such sale shall be made at public vendue between the hour of nine o'clock in the forenoon and the setting of the sun, and no such property shall

UNIFORM MACHINE GUN ACT

Drafted by the

NATIONAL CONFERENCE OF COMMISSIONERS
ON UNIFORM STATE LAWS

and by it

APPROVED AND RECOMMENDED FOR ENACTMENT
IN ALL THE STATES

at its

FORTY-SECOND ANNUAL CONFERENCE
AT WASHINGTON, D. C.

OCTOBER 4-10, 1932

WITH
PREFATORY NOTE

APPROVED BY THE AMERICAN BAR ASSOCIATION AT ITS MEETING AT
WASHINGTON, D. C., OCTOBER 12-15, 1932


   The committee which acted for the National Conference of
Commissioners on Uniform State Laws in Preparing the Uniform
Machine Gun Act was as follows:

JOSEPH F. O'CONNELL, Boston, Mass., Chairman,
JAMES F. AILSHIE, Coeur d'Alene, Idaho, Chairman, Uniform Torts
and Criminal Law Acts Section,
WILLIAM M. HARGEST, Harrisburg, Pa., President, Ex-officio.
CHARLES V. IMLAY, Washington, D. C.,
CHARLES E. LANE, Cheyenne, Wyo.,
A. L. SCOTT, Pioche, Nev.,
HENRY UPSON SIMS, Birmingham, Ala.,
ROBERT S. STEVENS, Ithaca, N. Y.,
EDGAR K. THOMPSON, Charleston, S. C.,
W. H. WASHINGTON, Nashville, Tenn.

Copies of all Uniform Acts and other printed matter issued by the
Conference may be obtained from

JOHN H. VOORHEES, Secretary
North Dearborn St.
Chicago, IL


UNIFORM MACHINE GUN ACT

PREFATORY NOTE

   A special committee on a "Uniform Act to Regulate the Sale
and Possession of Firearms" was appointed at the Minneapolis
meeting of the National Conference of Commissioners on Uniform
State Laws in 1923.  The subject having been brought to the
attention of the Conference by the United States Revolver Asso-
ciation, it was quite natural that in its initial effort the
committee submitted an act, finally approved in 1930 at Chicago,
dealing solely with firearms of the revolver, pistol, or sawed-

Compendium_Spitzer
Page 152

off shot gun type, which might readily be concealed.

But during the interim prior to approval of that act, the
infant industry of racketeering grew to monstrous size, and with
it the automatic pistol replaced the revolver, to be in turn
displaced by a partly concealable type of machine gun-the
Thompson .45 inch caliber submachine gun becoming most popular,
equipped with either 100 or 50 shot drum magazine, or 20 shot
clip magazine, using the ordinary .45 Colt automatic pistol
cartridge.

In the 1930 report, it was stated the committee believed
unanimously that the Firearms Act should be confined entirely to
guns of the pistol type; reference to machine guns and other
offensive weapons was therefore eliminated from previous
tentative drafts, and the drafting of a separate act to cover the
machine gun was recommended.  In 1931, the committee presented a
supplementary report, submitting a first tentative draft of such
an act.  This draft was largely based upon the Pennsylvania Act
of 1929.  At the 1932 meeting of the National Conference at
Washington, D. C., the committee filed a second tentative draft,
fully annotated.  That the subject was considered of grave
importance by state legislatures was evidenced by the fact that
it had already merited action in sixteen states and the District
of Columbia.  Following a thorough study of the subject the
Conference thereupon put the act in final form and approved it,
and the act was subsequently approved by the American Bar
Association.  The act is intended not only to curb the use of the
machine gun, but to make it unwise for any civilian to possess
one of the objectionable type.

The act defines a machine gun so that it will exclude
automatic or semi-automatic sporting rifles or shotguns.

A "crime of violence" is defined as in the Uniform Firearms
Act, except that kidnapping is added.

Possession or use of a machine gun of any kind in the
perpetration or attempted perpetration of a crime of violence, is
declared to be a crime; following the similar provision in the
Uniform Firearms Act.  In this connection it may be proper to
again call attention to experience in England, where it is still
quite unusual to find crimes of violence committed by persons who
are armed, undoubtedly because in that country a person found
guilty of committing a crime of violence when armed receives, by
a mandatory provision of the law, an additional sentence.

It is believed that this act has "teeth" enough in it to
make it possible for the police departments throughout the nation
to meet the challenge of the gangsters and racketeers who have
been adopting the machine gun in criminal warfare.  Particular
attention is called to the fact that this act gives great aid to
the police in enforcing it by reason of the presumptions which
are made part of this proposed law.  Heretofore, the police have
been helpless in many instances, because it was legal to possess
a machine gun.  Under the provisions of the act, however, the
mere possession of a machine gun is presumed to be for offensive
and aggressive purposes, except as provided in the act, and the
exceptions are very limited.

Possession or use of a machine gun of any kind for offensive
or aggressive purpose is likewise declared to be a crime; and its
possession or use for such purpose is presumed if the gun is
found on premises not owned or rented for legitimate use by the
possessor or user of the gun, or if the gun is in possession of,

or used by, either an unnaturalized foreigner, or a person
previously convicted of a crime of violence.

    Possession for offensive or aggressive purpose is also
presumed if the machine gun is of the kind most commonly used by
criminals and has not been registered, or if shells adapted to
use in that particular weapon are found in the immediate
vicinity.  As stated above, the Thompson submachine gun, with
wooden butt-stock removed, using ordinary .45 caliber Colt
automatic pistol shells, is now used almost exclusively by
criminals in the United States.  Although these cartridges have a
limited range, the bullets have satisfactory "stopping" effect at
short range, and therefore answer the purpose of the gangster,
besides being easily purchased, at any hardware or sporting goods
store, without arousing suspicion.  It was at first intended to
make the presumption apply only to the .45 caliber guns and
cartridges; but lest criminals evade the law by using a smaller
caliber the act now specifies any pistol shell of caliber larger
than .30 inch, or its metric equivalent of 7.63 millimeters.
Few, if any, pistol cartridges are on the market exceeding .45
caliber, and no pistol cartridge of less than .30 caliber is made
with sufficient range and stopping power to answer the purpose of
the gangster.

    To overcome any danger of a presumption arising against one
who has legitimate use for a machine gun, such person need only
either avoid the use of ordinary pistol shells, or else use a
type of gun not readily transported or concealable.  There are
many such on the market, more effective for defensive purpose
than the Thompson submachine gun.

    The presumption contained in Section 5 is often found vital
to successful prosecution of criminals.

    The act requires manufacturers to keep a register of all
machine guns handled, but only for purpose of inspection by
police officers.  On the other hand, all machine guns of the
prohibited type (adapted to use pistol cartridges of .30 or
larger caliber) must be registered in the office of the secretary
of state, or other state official.  Any failure to register
raises the presumption of possession for offensive or aggressive
purpose.  The act further permits, in Section 9, search for, and
seizure of, machine guns of the prohibited type.

    If speedily adopted in a sufficient number of states, the
act will doubtless have a very beneficent effect, particularly
through its registration requirements.

    It was necessary to make this act supplementary to the
Uniform Firearms Act because of the technical difference in
describing firearms, as distinguished from the machine gun, and
it will help the administration of the law as to the use of
firearms to have this act separate and distinct, or at least
supplementary to whatever laws may already have been enacted with
reference to firearms.


                  UNIFORM MACHINE GUN ACT

AN ACT RELATING TO MACHINE GUNS, AND TO MAKE UNIFORM THE LAW WITH
REFERENCE THERETO.

(Be it Enacted ........

1    SECTION 1. (Definitions.) " Machine Gun " applies to and

Compendium_Spitzer
Page 154

2 includes a weapon of any description by whatever name known,
3 loaded or unloaded, from which more than five shots or bullets
4 may be rapidly, or automatically, or semi-automatically dis-
5 charged from a magazine, by a single function of the firing
6 device.

7     "Crime of Violence" applies to and includes any of the
8 following crimes or an attempt to commit any of the same,
9 namely, murder, manslaughter, kidnapping, rape, mayhem,
10 assault to do great bodily harm, robbery, burglary, housebreak-
11 ing, breaking and entering, and larceny.

(Note: Crimes here enumerated to be modified to suit local
definitions.)

12 "Person" applies to and includes firm, partnership, associa-
13 tion or corporation.

1     SECTION 2. Possession or use of a machine gun in the
2 perpetration or attempted perpetration of a crime of violence
3 is hereby declared to be a crime punishable by imprisonment
4 in the state penitentiary for a term of (not less than twenty
5 years).


1.   SECTION 3. Possession or use of a machine gun for offensive
2 or aggressive purpose is hereby declared to be a crime punish-
3 able by imprisonment in the state penitentiary for a term
4 of (not less than ten years).

1     SECTION 4. Possession or use of a machine gun shall be
2 presumed to be for offensive or aggressive purpose:
3    (a) when the machine gun is on premises not owned or
4 rented, for bona fide permanent residence or business occu-
5 pancy, by the person in whose possession the machine gun
6 may be found; or

7    (b) when in the possession of, or used by, an unnaturalized
8 foreign-born person, or a person who has been convicted of
9 a crime of violence in any court of record, state or federal, of
10 the United States of America, its territories or insular posses-
11 sions; or

12   (c) when the machine gun is of the kind described in
13 Section 8 and has not been registered as in said section re-
14 quired; or

15   (d) when empty or loaded pistol shells of 30 (.30 in. or
16 7.63 mm.) or larger caliber which have been or are susceptible
17 of use in the machine gun are found in the immediate vicinity
18 thereof.

1    SECTION 5. The presence of a machine gun in any room,
2 boat, or vehicle shall be evidence of the possession or use of
3 the machine gun by each person occupying the room, boat, or
4 vehicle where the weapon is found.

1    SECTION 6. (Exceptions.) Nothing contained in this act
2 shall prohibit or interfere with
3    1. the manufacture for, and sale of, machine guns to the
4 military forces or the peace officers of the United States or
5 of any political subdivision thereof, or the transportation re-
6 quired for that purpose;

7    2. the possession of a machine gun for scientific purpose, or

8 the possession of a machine gun not usable as a weapon and
9 possessed as a curiosity, ornament, or keepsake;

10   3. the possession of a machine gun other than one adapted to
11 use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger
12 caliber, for a purpose manifestly not aggressive or offensive.

1    SECTION 7. Every manufacturer shall keep a register of all
2 machine guns manufactured or handled by him. This register
3 shall show the model and serial number, date of manufacture,
4 sale, loan, gift, delivery or receipt, of every machine gun,
5 the name, address, and occupation of the person to whom the
6 machine gun was sold, loaned, given or delivered, or from
7 whom it was received; and the purpose for which it was ac-
8 quired by the person to whom the machine gun was sold,
9 loaned, given or delivered, or from whom received.  Upon demand
10 every manufacturer shall permit any marshal, sheriff or police
11 officer to inspect his entire stock of machine guns, parts, and
12 supplies therefor, and shall produce the register, herein re-
13 quired, for inspection.  A violation of any provision of this
14 section shall be punishable by a fine of (not less than . . .
15 hundred dollars).

1    SECTION 8. Every machine gun now in this state adapted
2 to use pistol cartridges of 30 (.30 in. or 7.63 mm.) or larger
3 caliber shall be registered in the office of the [secretary of
4 state], on the effective date of this act, and annually there
5 after.  If acquired hereafter it shall be registered within 24
6 hours after its acquisition. Blanks for registration shall be
7 prepared by the [secretary of state], and furnished upon appli-
8 cation.  To comply with this section the application as filed
9 must show the model and serial number of the gun, the name,
10 address and occupation of the person in possession, and from
11 whom and the purpose for which, the gun was acquired.  The
12 registration data shall not be subject to inspection by the
13 public.  Any person failing to register any gun as required
14 by this section, shall be presumed to possess the same for
15 offensive or aggressive purpose.

1    SECTION 9. Warrant to search any house or place and seize
2 any machine gun adapted to use pistol cartridges of 30 (.30 in.
3 or 7.63 mm.) or larger caliber possessed in violation of this
4 act, may issue in the same manner and under the same restric-
5 tions as provided by law for stolen property, and any court
6 of record, upon application of the (district attorney), shall
7 have jurisdiction and power to order any machine gun, thus
8 or otherwise legally seized, to be confiscated and either destroyed
9 or delivered to a peace officer of the state or a political sub-
10 division thereof.

1    SECTION 10. If any provision of this act or the application
2 thereof to any person or circumstances is held invalid, such
3 invalidity shall not affect other provisions or applications of
4 the act which can be given effect without the invalid provision
5 or application, and to this end the provisions of this act are
6 declared to be severable.

1    SECTION 11. (Uniformity of Interpretation.) This act shall
2 be so interpreted and construed as to effectuate its general
3 purpose to make uniform the law of those states which enact it.

1    SECTION 12. (Short Title.) This act may be cited as the
2 Uniform Machine Gun Act.

1    SECTION 13. (Repeal.) All acts or parts of acts which are

```
2 inconsistent with the provisions of this act are hereby
repealed.

1   SECTION 14. (Time of Taking Effect.) This act shall take
2 effect.........................................
```

NOTES TO UNIFORM MACHINE GUN ACT

NOTE TO SECTION I

MACHINE GUNS

Ark. Castle's supp. to Stat. 1931, s. 2804a et seq.
Describes machine gun as "any firearm of the type commonly known
as a machine gun."

Cal. Stat. 1927, ch. 552, s. 2.  Machine gun includes all
firearms "known as machine rifles, machine guns or submachine
guns capable of discharging automatically and continuously loaded
ammunition of any caliber in which the ammunition is fed to such
gun from or by means of clips, drums, belts, or other separable
mechanical device."

D. C. Pub. 275, 72nd Congress, approved July 8, 1932.
"Machine gun" means any firearm which shoots automatically or
semiautomatically more than twelve shots without reloading.

Ill. Cahill's 1931, ch. 38, s. 409.  Same as California
statute (supra) except gun must discharge "more than eight
cartridges successively without reloading" to be a machine gun.

Mass. Cum. Stat. 1929, ch. 140, s. 121. "Firearms" includes
machine guns irrespective of length of barrel, any gun of small
arm caliber designed for rapid fire and operated by a mechanism,
or any gun which operates automatically after the first shot has
been fired, either by gas action or recoil action.

Mich. See Section 3, infra.

Mo. Stat. 1932, s. 4427.  Machine gun includes all firearms
known as machine rifles, machine guns, or submachine guns capable
of discharging automatically and continuously loaded ammunition
of any caliber in which ammunition is fed to such guns from or by
means of clips, disks, drums, belt, or other separable mechanical
device.

N. J. Comp. Stat. 1925-30, s. 52-43R(1).  Machine gun or
automatic rifle means any weapon, mechanism or instrument not
requiring that the trigger be pressed for each shot and having a
reservoir, belt or other means of storing and carrying
ammunition, which can be loaded into the said weapon, mechanism
or instrument and fired therefrom at the rate of five or more
shots to the second.

N. Y. Laws 1931, ch. 792.  Machine gun is a weapon of any
description, irrespective of size, by whatever name known, loaded
or unloaded, from which a number of shots or bullets may be
rapidly or automatically discharged from a magazine with one
continuous pull of the trigger.

N. D. Laws 1931, ch. 178, s. 1. "Machine gun, sub-machine
gun or automatic rifle" is construed to mean a weapon, mechanism

or instrument not requiring that the trigger be pressed for each shot and "having a reservoir, belt or other means of storing and carrying ammunition which can be loaded into the said weapon, mechanism or instrument and fired therefrom at a rate of five or more shots to the second."

Pa. Laws 1929, Act 829, s. 1.  Machine gun means any firearm that fires two or more shots consecutively at a single function of the trigger or firing device.

R. I. Acts 1927, ch. 1052.  Machine gun "includes any weapon which shoots automatically and any weapon which shoots more than twelve shots semiautomatically without reloading."  Firearms includes "any machine gun pistol."

## CRIMES OF VIOLENCE

Note: This definition conforms very closely to the definition in the Uniform Fire Arms Act (Handbook 1930, p. 530) and will therefore be found in those jurisdictions where the Uniform Fire Arms Act, or parts thereof, has been adopted, e. g, Hawaii (Act 206, 1927, 6. 1); Pennsylvania (Assembly Bill 158, approved June 11, 1931); and District of Columbia (Pub. Law No. 275, 72d Congress, approved July 8, 1932).

## PERSONS

Note: This definition is practically identical with that in the Uniform Fire Arms Act (Handbook 1930, p. 588) and occurs generally in those jurisdictions which have adopted that act.

## DECISIONS

## MACHINE GUNS

Ia. An ordinary 15 shot, 22 short automatic rifle which has been made over so that it keeps shooting as long as the trigger is held back is a machine gun.  Op. Atty. Gen, May 7, 1931.

## NOTE TO SECTION 2

Ark. See s. 6, infra; also s. 3, infra.

Cal. Stat. 1931, ch. 1050, amending Stat. 1927, ch. 552. Sale of, offer to sell, possession of, or knowingly transporting machine guns, except as otherwise provided (see s. 6, infra) punishable by imprisonment not to exceed five years or by fine not exceeding $5,000.00, or both.

Del. Stat. 1931, ch. 249.  Possession of machine gun entirely prohibited except (see s. 6, infra).  Punishment, fine or/and imprisonment in discretion of court.

D. C. Pub. 275, 72d Congress, approved July 8, 1932. Committing crime of violence when armed or having readily available any firearm may be punished, in addition to punishment provided for the crime: by imprisonment not exceeding five years; upon second conviction, by imprisonment not exceeding ten years; upon third conviction, by imprisonment not exceeding fifteen years; upon fourth or subsequent conviction by imprisonment not exceeding thirty years.

Ill. Cahill's 1931, ch. 58, s. 409, subs. 7.  Person committing or attempting to commit arson, assault, burglary, kidnapping, larceny, rioting, or robbery while armed with machine

gun subject to imprisonment from five years to life.

Ind. Acts 1929, ch. 65.  Person over 16 years of age committing or attempting to commit rape, robbery, bank robbery, petit larceny, grand larceny while armed with machine gun, etc., or any person present and aiding or assisting while so armed is guilty of a separate felony in addition to other crimes named and is subject to imprisonment therefor from ten to twenty years.

N. J. Comp. Stat. 1925-30, s. 52-43R(2).  Identical with District of Columbia statute, supra, except as to the crimes enumerated, and penalty for fourth conviction is twenty years as a maximum, and the indictment must aver that the person was armed with such firearm.

N. Y. Laws 1931, ch. 791.  If any person while in the act of committing a felony, or attempting to commit a felony, or any person while in the act of committing a crime or attempting to commit a crime and being an occupant of a stolen automobile or an automobile carrying fictitious license plates, or an automobile which has been used in the commission of a crime or in an attempt to commit a crime, or in leaving the scene of a crime shall be armed with a machine gun or other dangerous weapon the punishment prescribed for the felony of which be is convicted shall be increased (1) by imprisonment from five to ten years; (2) upon second conviction, from ten to fifteen years; (3) upon third conviction, from fifteen to twenty years.  In no case shall such person punishable as above provided be put upon probation or have execution of sentence suspended.

Pa. Laws 1929, Act 329, s. 3.  Person who commits or attempts to commit any crime, when armed with a machine gun shall in addition to the punishment for the crime be sentenced to separate and solitary confinement at labor not exceeding ten years which shall not commence to run until the expiration of the sentence for said crime.

R. I. Acts 1927, ch. 1052, s. 2.  Contains practically identical provision.

Note: Laws not relating specifically to machine guns but referring generally to firearms, or dangerous or deadly weapons have achieved the same result in whole or in part in the following states:

Alaska, C. L. 1913, s. 1897; Ariz., Rev. Code 1928, s. 4723; Colo., Comp. Laws, 1921, s. 6698; Fla., Comp. Laws 1927, s. 7204; Ga., Penal Code, ss. 115, 115-1, 418, 504; Miss., Code 1930, s. 787; Mo., Stat. Anno. 1932, ss. 4031, 4032, 4033; Neb., Comp. Stat. 1929, ch. 28; N. C., Code 1931, s. 4267a; Ph. I., Penal Code 1930, Arts. 174, 250, 508; Tex., Comp. Stat. 1928, Arts. 1231, 1234, 1237, 1393, 1408; Vt., Pub. 1927, No. 127; Pub. 1919, No. 196; Wash., Pierce's Code 1929. s. 8699-1; Wis., Laws 1931, ch. 29.

NOTE TO SECTION 3

Ark. Castle's Supp. to Stat. 1931, s. 2804a et seq. Unlawful to keep, transport, store, possess, sell, or give away any machine gun.

Cal. See Section 2, supra.

D. C. Pub. 275, 72d Congress, approved July 8, 1932. Possession of machine guns forbidden.  See Section 6, infra, for

exceptions.

Ill. Cahill's 1931, ch. 38, s. 409.  Selling, keeping, offer
to sell, loan or give away, purchase, possess, carry or transport
machine guns unlawful except (see s. 6, infra).  Violation by
manufacturer is punishable by imprisonment from one to five
years.  Violation by any other person, one to ten years.  Person
having been previously convicted of murder, robbery, burglary, or
assault with intent to commit a felony will be punished for
violation of machine gun act by imprisonment from three to ten
years.

Ind. Burns Stat. 1929, ss. 2548.2, 3.  Whoever owns,
possesses, or controls a machine gun in an automobile, or in any
other way is subject to imprisonment from one to five years.
Whoever discharges, fires off, or operates any loaded machine gun
is subject to imprisonment from two to ten years.  But see
Section 6, infra.

Ia. Code 1931, ch. 564-B1.  Knowingly having possession or
control of machine gun prohibited; also any act with intent to
enable person, firm, etc., to obtain possession.  For exceptions
see Section 6, infra.  Punishment--if accused has a prior
conviction of felony, five years' imprisonment; if prior
conviction not established, three years' imprisonment; in all
cases a fine from $500.00 to $2,000.00.  Prior convictions must
be pleaded if relied upon.  Duly authenticated copy of judgment
of prior conviction shall be prima facie evidence of such
conviction.

Mass. Cum. Stat. 1929, ch. 140, s. 131.  Minors, unless
employed by bank, public utility corporation, or business of
similar nature and over fifteen years of age, unnaturalized
persons, persons convicted of felony, or unlawful use of drugs
cannot get a license to possess a machine gun. Cum. Stat. 1929,
ch. 269, s. 10.  Whoever possesses a machine gun without a
license is subject to imprisonment from six months to 2 1/2 years
in jail or house of correction, or 3 1/2 years to five years in
the state prison.

Mich. Acts 1931, ch. 37.  Whoever manufactures, sells,
offers to sell, or possesses any machine gun, which can be fired
more than sixteen times without reloading commits a felony and is
subject to imprisonment not exceeding five years or a fine not
exceeding $2,500.00.  Whoever sells, delivers, offers or exposes
for sale, or possesses for such sale any written or printed
matter offering or containing an offer to sell or deliver within
the state from without the state a machine gun commits a
misdemeanor.

Mo. Stat. Anno. 1932, s. 4426.  To sell, transport, deliver,
possess or have in control a machine gun or assist or cause these
things to be done is punishable by imprisonment from two to
thirty years, or by fine not exceeding $5,000.00, or both.

Nebr. Comp. Stat. 1929, ch. 28, ss. 1008, 1011, 1012.
Unlawful for any person, firm, or corporation to sell, cause to
be sold, or otherwise dispose of any machine gun, to any person
except (see Section 6, infra); violation is a misdemeanor
punishable by fine, from $1,000.00 to $10,000.00. Unlawful for
any person except (see Section 6, infra) to transport a machine
gun on any highway, or have in possession, for any unlawful
purpose. Violation subjects one to imprisonment from one to ten
years.

N. J. Comp. Stat. 1925-30, s. 52-43q(2).  To sell, give, loan, furnish, deliver, purchase, have, or possess any machine gun is a high misdemeanor except (see Section 6, infra).  Comp. Stat. 1925-30, s. 52-43r(1).  Pawnbroker shall not sell, or possess any machine gun; violation is a high misdemeanor.  Comp. Stat. 1925-30, s. 52-43r(4).  Person convicted of assault, robbery, larceny, burglary, breaking and entering shall not purchase, own or possess a machine gun.  Violation is punishable by imprisonment not exceeding five years.

N. Y. Cahill's 1931, ch. 41, s. 2187.  Person who attempts to use against another or carries or possesses a machine gun is guilty of a misdemeanor and if he has been convicted of any crime is guilty of felony.  Laws 1931, ch. 792.  Selling, keeping for sale, offering, giving, disposing of a machine gun is a felony except (see Section 6, infra).  Possession or use of machine gun is a felony.  Gilbert's Penal Laws, s. 1897, subs. 8.  Persons under sixteen years of age who have, carry or possess a machine gun, shall be guilty of juvenile delinquencies.

N. D. Laws 1931, ch. 178, s. 2.  Person who sells, gives, loans, or delivers a machine gun, etc., of a caliber larger than twenty-two, or person who shall purchase, have or possess any machine gun etc., of a larger caliber than twenty-two commits a felony, except (see Section 6, infra).

Pa. Laws 1929, Act 1929, s. 2.  Unlawful for any person, copartnership, association or corporation to sell, give, transfer, or purchase, own, have or possess any machine gun. Violation is punishable by a fine not exceeding $1,000.00, or imprisonment by separate or solitary confinement at hard labor not exceeding five years.

R. I. Acts 1927, ch. 1062, ss. 3, 4, 12.  No person convicted of crime of violence shall purchase, own, carry, possess or control any firearm.  No person shall manufacture, sell, purchase or possess a machine gun except (see Section 6, infra).  Changing, altering, removing or obliterating name of maker, model, manufacturer's number or other mark of identification on any firearm forbidden.

W. Va. Code 1932, Anno. s. 6060.  Unlawful to carry, transport, or possess any machine gun, submachine gun, or what is commonly known as a highpowered rifle, or any gun of a similar kind or character except on own premises leased for a fixed term, unless permit first obtained from superintendent of department of public safety, and approved by the governor, or a license is obtained from the circuit court as in the case of pistols.

Wis. Stat. 1931, s. 340.695.  Person who owns, uses or possesses a machine gun shall be punished by imprisonment from one to fifteen years, except (see Section 6, infra).

Note: Laws not relating specifically to machine guns but referring generally to firearms or dangerous or deadly weapons have achieved the same result in whole or in part in the following states:

Alaska, Comp. Laws 1913, ss. 1901, 1902, 1904; Ala., Code 1928, ss. 3300, 3301, 4043, 4045, 4047, 1397-140; Ariz. Rev. Code 1928, ss. 4615, 4726; Fla. Comp. Laws 1927, s. 7163; Ga., Penal Code, ss. 348, 349; Ida., Comp. Stat. 1919, ss. 8406, 8407, 8375, 8252; Ky., Carroll 1930, ss. 1308, 1242, 1166; La., Marr's Crim. Stat. p. 215; Kan., Rev. Stat. 1923, ss. 21-2411, 431; Me., Rev. Stat. 1930, ch. 142, ss.

```
    10, 13; Minn., Mason's 1927, ss. 10255, 10563, 10505, 10097,
    10314, 10290, 10291, 10413, 9921-2; Mont., Rev. Code 1921,
    ss. 11354, 11565, 11566; Nev. Comp. Laws 1927, ss. 10252,
    10095, 10121, 10292, 10293, 2300; N. H., Pub. 1926, ch. 376t
    s. 6; Ib., ch. 385, s. 4; N. M., Stat. 1929 ss. 35-340,
    3402, 3403, 3404, 3405, 3406; N. C., Code 1931, ss. 4213,
    4214, 4215, 4216, 4441, 2141B; Ohio, Code 1930, ss. 12817,
    12818, 12635, 12422; Okla., Stat. 1931, ss. 2584, 2589,
    2590, 2591, 2592, 2595; Ore. Laws 1931, ch. 370, ss. 64, 39-
    320; ch. 360, ss. 576, 215; Code 1930, ss. 72-113, 114, 101,
    103; 14-233, 231; Ph. I., Penal Code 1930, Arts. 408, 572,
    589, 526, 2691, 2692; P. R., Laws 1924, Act 14, ss. 1, 2;
    Rev. Stat. 1911, s. 5822; S. C. Code 1932, ss. 1119, 1120,
    1394, 255 (19); S. D., Comp. Laws 1929, ss. 4063, 4081,
    3955, 4393, 4394; Tenn., Code 1932, ss. 11007, 11008, 10799;
    Tex. Comp. Stat. 1928; Arts. 341, 329, 330, 326, 485, 474,
    338, 339, 340, 480, 334; Utah, Comp. Laws 1917, ss. 8495,
    2600; Vt. Pub. 1931, No. 164; Gen. Laws, ss. 6834, 6837,
    6841, 6842, 6846, 63847, 7000, 7099; Va. Code 1930 s. 4675
    (9) ; Wash., Pierce 1929, ss. 8836, 8827, 8838, 8839; Wyo.,
    Rev. Stat. 1931, ss. 32-309, 407, 408, 410.


                         NOTE TO SECTION 4

        N. J. Comp. Stat. 1925-30, s. 52-43R(3).  Fact that person
    committing or attempting to commit certain crimes (see Section 2,
    supra) was armed or had in his possession a machine gun without a
    license shall be prima facie evidence of his intention to commit
    said crime of violence.  Presence of a firearm in a vehicle is
    presumptive evidence of possession of all persons occupying or
    using the vehicle at the time.

        R. I. Acts 1927, ch. 1052.  Fact that person accused of
    committing or attempting to commit a crime of violence was armed
    with or had available a machine gun is prima facie evidence of
    intention to commit said crime of violence.  Possession of any
    firearm upon which any mark of identification has been changed,
    altered, removed, or obliterated shall be prima facie evidence
    that the possessor has altered, changed, removed or obliterated
    the same.

        Note: The same result is achieved by a general reference to
    firearms or dangerous or deadly weapons in Oregon, Code 1930, s.
    72-113.


                         NOTE TO SECTION 5

        Mass. Cum. Stat. 1921, ch. 140, s. 1.06.  Any placard, etc.,
    maintained in a vehicle, shop, stand, tenement, or place of
    common resort purporting to announce the keeping of firearms
    (machine guns) shall be prima facie evidence that firearms
    (machine guns) are kept for sale.

        Mich. See Section 9, infra.

        R. I. Acts 1927, ch. 1052, s. 15.  Negative allegations of
    any kind need not be averred or proved in any complaint under
    this act (Acts 1927, ch. 1052), and the carrying or use of any
    firearm, including machine guns, contrary to the provisions of
    this act shall be evidence that the possession, carrying or use
    of any such firearm is unlawful, but the respondent in any such
    case may show any fact that would render the possession, or use,
    or carrying of such firearm lawful.

        N. Y. Laws 1931, ch. 792.  Presence of machine gun in any
```

room, dwelling, structure or vehicle is presumptive evidence of
illegal possession by all persons therein, except (see Section 6,
infra).  Every person while carrying or possessing a weapon shall
carry with him license issued for such weapon and shall exhibit
same upon demand to any policeman, state trooper, or other peace
officer and failure to do so shall be presumptive evidence that
such person is not duly licensed and shall cause a forfeiture of
his license.

    Note: Laws referring to firearms, or dangerous or deadly
weapons have achieved the same result in whole or in part in the
following states:

    Minn, Mason's Stat. 1927; N. C., Code 1931, s. 4410.

                    NOTE TO SECTION 6

    Ark. Castle's Supp. to Stat. 1931, s. 2804a et seq.  Excepts
military authorities of state or nation, peace officers of state,
counties or political subdivisions in performance of their
duties.

    Calif. Stat. 1931, ch. 1050, amending 1927 Stat. ch. 552.
Excepts sale to, purchase, or possession of machine gun by any
city, county, state or federal officer where required for
official use, or transportation on behalf of police departments,
members thereof, sheriffs, city marshals, or military or naval
forces of state, or United States.  Superintendent of division of
criminal identification, etc., to issue permits for possession
and for transportation of machine guns upon good cause shown.
The permit shall be open to inspection.  The person or firm
receiving permit shall keep gun on person or at place where such
firearms are kept.  Permit may be revoked when need for machine
guns has ceased or holder of permit has used guns for purposes
other than allowed.  License may be granted for not more than a
year to sell machine guns, provided business of selling is
carried on only in place provided in permit, and license is
displayed on premises where it may be easily read and such
firearms are not delivered to any person not authorized to
receive same under the act.

    Del. Stat 1931, ch. 249.  State military forces or duly
authorized police departments permitted to have machine guns in
their possession.

    D. C. Pub. 275, 72d Congress, Approved July 8, 1932.
Excepts members of Army, Navy, or Marine Corps of the United
States, the National Guard, organized Reserves on duty, Post
Office Department or its employees on duty, marshals, sheriffs,
wardens, or their deputies, duly appointed law enforcement
officers, officers or employers duly authorized to carry weapons,
banking institutions, public carriers engaged in transporting
mail, money, securities, or other valuables, wholesale and retail
dealers licensed under Section 10 of the act.

    Ill. Cahill's 1921, ch. 38, s. 409.  All duly appointed
peace officers may purchase, carry, possess and transport machine
guns; also the U. S. Army, Navy, Marine Corp, National Guards,
organizations permitted by law to purchase and receive machine
guns from the United States; also persons, organizations,
institutions possessing machine guns as war relics, also guards,
messengers employed by common carriers, banks and trust companies
while employed in their duties and their employers may possess
them when not so employed; manufacturers and merchants may
possess, sell, etc., such guns.

Ind. Burns 1929, s. 2648.4.  Provisions set out, see section 2 supra, do not apply to members of military forces of United States, national guard of Indiana, when on duty or practicing, machine guns on display as relics which are harmless and not usable, and shall not apply to police or sheriff of the state in connection with their duties.

Ia. Code 1931, ch. 564-B1.  Exceptions referred to in Section 3, supra, are: Peace officers, members of national guard, persons in service of United States government, banks, provided their possession is in connection with official duties; relics unfit for use and which were in general use prior to November 11, 1918; persons or firms engaged or interested in improvement, invention, or manufacture of firearms; persons possessing by finding or summary seizure provided they deliver immediately to some peace officer of county where gun found.

Mass. Cum. Stat. 1929, ch. 140, ss. 131, 101.  License may be secured to possess machine gun to protect person or property or other proper person (see Section 3, supra, for persons who cannot secure license).

Mich. Acts. 1931, ch. 37.  Excepts person manufacturing by virtue of contract with United States government, any foreign government, municipality or subdivision thereof; peace officers of state, members of United States Army, Navy, or Marine Corps, or of organizations authorized to purchase or receive weapons from the United States or the state, or of the National Guard or other duly authorized military organizations when on duty or drill, or going to and from their customary places of assembly or practice, or to transportation as merchandise.

Mo. Stat. Anno. 1982, s. 4426.  Excepts sheriffs, city marshals, military and naval forces of state or United States, police departments and members thereof.

Neb. Comp. Stat. 1929, ch. 28, ss. 1008, 1011.  Excepts as to sale, etc., officers of the law, agents of the United States government, agents of law enforcement department of Nebraska. Excepts as to transportation or possession by officers of the law, soldiers of the United States Army, officers and enlisted men of the national guard of state.

N. J. Comp. Stat. 1925-30, ss. 52-43q2, 5, 6, 11.  Excepts (see Section 3, supra) person having license (see Section 8, infra) or his authorized agents, members of duly authorized military organizations, members of police force of any municipality, of state police force, sheriff or under-sheriff, prosecutor of the peace, his assistants, detectives and employees.  Upon application by banking institution, trust company, building and loan association, within state judge shall issue license to purchase and possess one or more machine guns for its own use and protection and the use and protection of its officers, servants and employees, to be recorded by the county clerk.  Railway, canal, and steamboat companies may get license for machine gun as aforesaid.  No person shall be prevented from carrying about his place of business or dwelling house or premises a firearm, or from carrying same from place of purchase to his dwelling house or place of business, or from dwelling place or place of business to place of repair to have repaired and return.

N. Y. Laws 1931, ch. 792.  Excepts manufacture, sale and shipment to police departments, sheriffs, policemen, other peace

officers, state prisons, penitentiaries and county jails,
military and naval organizations; also state police, warden,
superintendent, head keeper or deputy of state prison, peni-
tentiary workhouse, county jail, or other institution for
detention of persons convicted or accused of crime or held as
witnesses in criminal cases, persons in postal service of the
United States, common carriers while transporting machine guns to
any police department, military or naval organization or person
authorized by this section.

    N. D. Laws 1931, ch. 178, s. 2.  Excepts officers and
members of police force of any municipality and of a duly
authorized military organization, sheriff, deputy sheriff, any
other officer having police powers under laws of the state, any
person possessing a license or his authorized agents or servants.

    Pa. Laws 1929, Act 329, s. 4.  Excepts manufacture and sale
of machine guns to the military forces of the United States, or
of the state, or the latter's police department, or of its
political subdivisions, and excepts the purchase by said
government and departments; excepts any organization of veterans,
or any veteran of war of the United States owning or possessing a
machine gun as a relic if permit obtained from sheriff of county,
which permit is attached at all times to the gun.

    R. I. Acts 1927, ch. 1052, s. 6.  Excepts sheriffs, deputy
sheriffs, superintendent and member of state police, prison and
jail wardens or their deputies, members of city or town police
force, other duly appointed police, officers. members of Army,
Navy, or Marine Corps of United States, or National Guard, when
on duty, or organizations by law authorized to purchase or
receive arms from the United States, or the state, or duly
authorized military organizations when on duty or members thereof
at or going to or from their customary places of assembly.  Ib.,
s. 7, provides that the attorney-general may issue a permit to
any banking institution doing business in the state, or any
public carrier engaged in business of transporting mail, money,
securities or other valuables to possess and use machine guns
under regulations prescribed by the attorney-general.  Acts 1927,
ch. 1062, s. 13 excepts antique firearms unsuitable for use, and
collections of firearms as curios, souvenirs, and for
educational, scientific and similar purposes without intent to
use such firearms.

    W. Va. Code 1932, ss. 6045, 6046.  May carry any weapon,
including machine gun, on own premises, if in, good faith and not
for felonious purpose, without a license; same as to carrying
unloaded from place of purchase to home, or to place of repair
and back to home.  Express companies, as common carriers, have
absolute right to carry weapons, including machine guns, through
their employees, etc., who have custody of money and other
valuables provided the company executes a continuing bond in the
penalty of $30,000.00, the amount of recovery for breach of
conditions of bond shall not exceed $3,500.00 in any one case;
such bond shall be filed with the secretary of state.  Upon trial
for recovery of damage upon such bond, the burden of proof shall
be upon the express company to establish that the employee, etc.,
was not actually engaged in duties for the express company.
Railroad police officers have absolute right to carry weapons
provided the railroad company posts bond in penalty of
$10,000.00, otherwise practically the same as in case of express
companies.  Ib. s. 6047 excepts sheriffs, regular appointed
deputies who actually collect taxes, all constables, all
regularly appointed police officers, all jailers and game
protectors, members of department of public safety of the state,

provided they give bond in the penalty of $3,500.00.  Ib. ss.
6048, 6049 excepts posse authorized by Sheriff in emergency or
danger, no bond required.  Licenses may be revoked at any time
for sufficient cause by the circuit court granting the license,
the governor of the state, the superintendent of the department
of public safety.  Immediate notice of revocation shall be given
the licensee by registered mail, in person, or in same manner as
other notices are authorized by law to be served.

     Wis. Stat. 1931, s. 340.695.  Excepts police officers,
national guardsmen, sheriffs and their deputies, or any person or
organization possessing a machine gun received from the
government as a war trophy.

     Note: Laws referring to firearms, or dangerous or deadly
weapons have achieved the same result in whole or in part in the
following states:

         Ga., Penal Code, s. 328; Neb. Comp. Stat. 1929, ch. 28,
     ss. 1008, 1011; N. M., Stat. 1929, s. 35-3408; Okla., Stat.
     1931, s. 2586; Ore., Laws 1931, ch. 370, s. 64; P. R., Laws
     1924, Acts 14, s. 3; Tenn., Code 1932, s. 11012; Tex., Comp.
     Stat. 1928, Art. 496.


                    NOTE TO SECTION 7

     Cal. Stat. 1931, ch. 1050, amending 1927 Stat. ch. 552.
Complete record of sales must be kept by vendor showing name and
address of purchaser, his signature, and number and date of issue
of purchaser's permit.

     D. C. Pub. 275, 72d Congress, approved July 8, 1982, ss. 8,
9, 10.  Only persons licensed may sell machine guns.
Commissioners may grant licenses for one year to sell machine
guns at retail provided (1) business carried on in building
designated in license; (2) license, or copy thereof, displayed
where easily read on premises; (3) machine guns shall be sold
only to persons designated in Section 14 of act (see Section 6,
supra) ; (4) a record be kept in a book provided, the form to be
prescribed by the Commissioners of all machine guns in possession
of licensee, containing date of purchase, caliber, make, model,
and manufacturer's number of weapon and date of sale.  A record
in duplicate of all machine guns sold shall be kept in a book
kept for the purpose, the form prescribed by the Commissioners
and signed by the purchaser and person effecting sale, each in
presence of the other, containing date of sale, name, address,
occupation, color, and purchaser's place of birth, caliber, make,
model, manufacturer's number of weapon and purchaser's statement
that he has never been convicted of a crime of violence.

     Ill. Cahill's 1931, ch. 38, s. 409.  Manufacturer or
merchant can only pass possession of machine gun to manufacturer
or merchant, common carrier for shipment to manufacturer or
merchant, authorized agent of government in official capacity,
persons authorized to purchase under provisions of exceptions 1
and 4 of Section 2 of the act (see Section 6, supra), who have a
permit signed by sheriff of county where manufacturer or merchant
has place of business or delivers such gun.  They shall retain
the permit on file. 1b., subs. 4 of the Illinois act is
practically the same as this Section 7, except it does not
provide for keeping the model and serial number.

     Mass. Cum. Stat. 1929, ch. 140, s. 123.  License granted to
vendor on condition that he before delivery make a true entry in

said sales record book specifying description of gun, make,
number, whether single barrel, magazine, revolver, pin, rim or
central fire, whether sold, rented or leased, date and hour of
such delivery and that he state in said book his full name, sex,
residence and occupation.  Book to be open for inspection by
licensing authorities and the police at all times.  License to be
displayed on premises where easily seen, no firearms to be
displayed where easily seen from outside.  Copy of record of
sales, rentals, end leases made during preceding seven days to be
sent to licensing authority, each gun shall be delivered securely
wrapped, fastened and unloaded.  No machine gun to be sold to a
person who has not a license to possess.  Upon sale, etc., of
machine gun license vendor shall endorse thereon licensee,
vendee, etc., the place and time of sale, etc., and shall
transmit notice thereof to the commissioner of public safety.
Licenses expire April 30 of each year but may be granted during
April to take effect May 1 next ensuing.  License may be
forfeited on proof of violation of condition upon which granted.
If forfeited, licensee is disqualified for one year after
expiration of term of license.  Cum. Stat. 1927, ch. 140, ss.
127, 129.  Fine from $25.00 to $100.00 for giving false names.
Cum. Stat. 1929, ch. 140, s. 131B.  Loans secured by mortgage,
pledge, or deposit of machine gun are forbidden.

     N. J. Comp. Stat. 1925-30, s. 52-43r(6).  Manufacturer and
wholesale seller of machine guns shall be registered with the
Secretary of State and furnish him with such particulars as may
be prescribed by law for registration.  Secretary has discretion
to refuse registration; he shall furnish certificate of
registration to each person registered; he has power to revoke
registration if person registered no longer carries on his
business, or can no longer carry on business without danger to
public; person registered has right to hearing and appeal to
Supreme Court of state on question of revocation; person
registered may surrender registration.  Manufacturer and
wholesale dealer must keep detailed record of each firearm sold,
to include date of sale, name of purchaser, description of arm
and its serial number.  This information to be available to
police and other public officials.  Violation is a misdemeanor.
Comp. Stat. 1925-30, s. 52-43r(6).  No retail dealer shall sell,
expose for sale, or possess with intent to sell any machine gun
without being licensed.  Granting of license in discretion of
common pleas judge for one year provided (1) business carried on
in building designated in license; (2) license or copy thereof
displayed in conspicuous place; (3) no advertising of sale to be
displayed as to be seen from outside; (4) this clause deals with
pistols and revolvers only.  Sale of machine guns to minors under
eighteen years of age, person of unsound mind, drug addict,
person convicted of committing or attempting to commit assault,
robbery, larceny, burglary, breaking or entering prohibited and
violation is a misdemeanor.

     W. Va. Code Anno. 1932, s. 6051.  Unlawful to keep on
display to passersby any machine gun, etc.  Dealers licensed to
sell shall take name, address, age and general appearance of
purchaser, maker of gun, serial number and caliber, and report
information at once to superintendent of department of public
safety.  Unlawful to sell, rent, give, or lend to unnaturalized
person.

     Note: Transfer of firearms, deadly or dangerous weapons is
dealt with generally by regulation of sale of rather than
manufacture of weapons or firearms in following states:

          Ala., Code 1928, ss. 5542, 5446; Ariz., Rev. Code 1928,

```
        s. 4700; Ga., Penal Code ss. 1467-79, 201; Me., Rev. Stat.
        1930, ch. 129, s. 40; Ib., ch. 49, s. 47; Minn., Mason's
        1927, s. 10256; Mo. Stat. 1932, s. 4030; Ohio, Code 1930, s.
        12697; Ph. I., Penal Code, 1930, Art. 2690; P. R., Laws
        1924, Art. 14, ss. 3, 4, 12; Tenn., Code 1932, ss. 11009,
        11010; Tex., Comp. Stat. 1928.

                        NOTE TO SECTION 8

        Ark. Castle's Supp. to Stat. 1931, s. 9804d.  After April 1,
        1931, persons permitted by law to possess machine guns shall file
        with Secretary of State sworn application giving his name and
        address and serial number of machine gun, said Secretary to
        register such person in a book, assign a number and issue a card
        which applicant shall keep with him while the machine gun is in
        his possession.

        Cal. Stat. 1931, ch. 1060, amending 1927 Stat ch. 662.
        Applications for permits (see Section 6, supra) in writing shall
        state name, business address, business in which engaged and use
        to which machine gun to be put.  Applications shall be uniform
        throughout state.

        D. C. Pub. 276, 72d Congress, approved July 8, 1932.  One
        copy of record of sale (see Section 7, supra) shall be forwarded
        by mail within seven days of sale to superintendent of police and
        other copy retained by seller for six years.

        Ill. Cahill's 1951, ch. 38, s. 409.  Sheriff shall keep a
        record of all permits issued by him.

        Mass. Acts 1922, ch. 485, s. 3; Acts 1927, ch. 326, s. 1.
        Licensing authorities in any town authorized to grant licenses to
        persons to sell, rent or lease fire arms and fix fee therefor;
        licenses shall specify address where business carried on and is
        only valid as to that address.  Licenses shall be recorded.

        Mich. Acts 1931, ch. 37.  Vendor of firearms who fail to
        keep register with name, age, occupation and residence of
        purchaser together with number or other mark of identification,
        which register shall be open for inspection of peace officers at
        all times, shall be guilty of misdemeanor.

        N. J. Comp. Stat. 1925-30, s. 52-43q(3)(4).  To purchase,
        have or possess machine gun person applies to Judge of Court of
        Common Pleas of county in which he resides for license.  Judge
        refers application to sheriff of county or chief police officer
        of municipality, in which applicant resides, for investigation,
        and approval; if approved, judge may issue license in his
        discretion for protection of applicant or his servants and
        employees.  Upon issuance, the county clerk enters record of
        license in a book provided for the purpose, stating date of
        issuance and name and address of licensee; after record made,
        said clerk delivers license to licensee.

        N. Y. Laws 1931, ch. 762, ss. 9a, 10.  Police Commissioner
        of New York City may issue license only to resident of that city.
        Outside that city judge of court of record may issue license to
        resident of county in which the judge is located.  A qualified
        person principally engaged, or a merchant or storekeeper having
        his principal place of business in such city or county may be
        issued a license.  Expense of blank applications, licenses and
        records shall be charged against the county or City of New York
        as the case may be.  Forms shall be approved by the Police Com-
        missioner for New York City and by the State Superintendent of
```

Police for the counties.  License fee is fifty cents, collected by the judge or officer to be paid into the treasury of the county.  The application, if the license is granted, shall be filed in the city or county clerk's office, as the case may be, where the applicant resides and a duplicate copy shall be filed in the executive department, division of state police, within ten days after issuance of license.  The license shall specify the weapon for which issued and whether to be carried on person or on premises.  It expires the 1st of January, though it may be expressly limited to expire on an earlier date.  A householder may possess a weapon, unlimited as to time.  All licenses, however, may be revoked at any time by the police commissioner of New York City, or by a judge of a court of record in any county outside New York City.  A license with date of expiration thereon may be renewed and time of license extended pending disposition of application for renewal provided application made before date of expiration.  License shall specify place where licensee shall possess the weapon.  Each application for a license shall be accompanied by a photograph in duplicate of the applicant taken within thirty days of filing the application, one copy being attached to the license and the other to the application.  The officer to whom application is made shall ascertain before license is issued if applicant has been convicted of crime and shall cause fingerprints of such applicant, except householder, to be taken in duplicate; one copy shall remain on file in office of officer taking same, the other copy to be filed in office of executive department, division of state police within ten days after license issued.  Inspection of fingerprints not permitted except by peace officers, or upon order of a judge of a court of record on such notice, if any, to the person to whom the license was issued as the judge may determine.  Person convicted of illegally using, carrying or possessing a pistol or other dangerous weapon; making or possessing burglars' instruments; buying or receiving stolen property; unlawful entry of a building; aiding escape from prison; interfering with any person in any place by jostling against such person or unnecessarily crowding him or by placing a hand in the proximity of such person's pocket, pocketbook or handbag; unlawfully possessing or distributing habit-forming narcotics, drugs, shall not be en- titled to a license.  Gilbert's Penal Laws, 1931, s. 1897, subss. 11, 12.  A coupon shall be attached to each license which shall be removed and retained by person selling or otherwise providing the licensee with the weapon contemplated in the license.  Any person who provides another with a weapon except upon presentation, removal or retention of such coupon commits a misdemeanor.

    N. D. Laws 1931, ch. 178, ss. 3, 4.  Person may acquire license to purchase, sell, have, or possess a machine gun, etc., by application to the Judge of the District Court of the county in which the applicant resides.  Application shall be in writing and state in detail the reason why the license is desired.  The judge shall refer the application to the sheriff of the county or to the chief police officer of the municipality in which the applicant resides for investigation and approval.  If approved the judge in his discretion may issue a license.  The application and license shall both contain a description of the gun licensed, including name of manufacturer, number and caliber.  License shall be issued in duplicate, the duplicate to be filed in the office of State Superintendent of Criminal Identification.

    Pa. Laws 1929, Act 329, s. 4.  Sheriffs of the several counties authorized upon application and payment of a fee of one dollar to issue permits for ownership and possession of machine guns by veteran and organization of veterans upon production of

evidence that organization is a bona fide organization or the
veteran is of good moral character and reputation, and ownership
and possession is actually desired as a relic.

    W. Va. Code Anno. 1932, s. 6044.  To get license for
possessing a machine gun person must publish a notice in one
issue of newspaper published in county in which he resides,
setting forth his name, residence, and occupation, and that he
will apply to the circuit court of his county for such state
license.  After ten days' publication of the notice and at the
time stated in the notice the court may grant such license in the
following manner: Applicant shall file with the court his
application in writing, duly verified, showing (a) applicant is a
citizen of the United States; (b) is a bona fide resident of
state for one year and of the county sixty days; (c) that he is
over twenty-one years of age, of good moral character, of
temperate habits, not addicted to intoxicants, and never
convicted of felony or any offense involving use of weapons; (d)
purpose for which weapon desired, necessity therefor, and
counties in which license to be effective.  Court shall hear
evidence on matters stated in the application and all pertinent
matters, and if satisfied it may grant such license, upon payment
of license fee of twenty dollars to sheriff and file with clerk
of court a bond in penalty of $3,500.00, with good security,
signed by a responsible person, or by some surety company
authorized to do business in the state conditioned that the
applicant will not carry the weapon except in accordance with the
application and as authorized by the court, and that he will pay
all costs and damages accruing to any person by accidental
discharge or negligent, improper or illegal use of such weapons.
License good for one year, unless revoked and co-extensive with
counties as the court may designate in the order granting the
license.  Clerk of Circuit Court shall immediately furnish
superintendent of department of public safety a certified copy of
order of court granting license, for which clerk shall be paid a
fee of two dollars, taxed as costs in the proceeding.  Licenses
to railway police shall be co-extensive with state and deputy
sheriffs having license are permitted to carry weapons any place
while in performance of their duties.

    Note: Registration of firearms and dangerous or deadly
weapons is regulated by statutes which by construction cover
machine guns in the following states:

        N. C. Code 1931, s. 952-36; P. R., Laws 1924, Art, 14,
    s. 7.

                        NOTE TO SECTION 9

    Ark. Castle's Supp. to Stat. 1931, S. 2804a et seq.  Upon
conviction of illegal possession, etc. (see Section 6, supra) the
machine gun shall be confiscated and title thereof pass to the
political subdivision of the State making the capture.

    Ill. Cahill's 1931, ch. 38, s. 409, subs. 6.  Practically
same except delivery of gun shall be made to agency of state or
its political subdivision authorized to possess machine guns and
sale to person authorized to possess same may be ordered.

    Ia. 1931 Code, ch. 564-B1.  Peace officers to deliver
machine guns to sheriff who reports delivery to the district
court, which may enter summary order for destruction or such
order as necessary to preserve it for use as evidence.

    Mass. Cum. Stat. 1929, ch. 269, s. 10.  Upon conviction (see

Section 3, supra) machine gun shall be confiscated by the
commonwealth and upon written order of the court forwarded by
common carrier to the commissioner of public safety who may sell
or destroy same and in case of sale, after paying cost of
forwarding, pay over net proceeds to the commonwealth.

Mich. Acts 1931, ch. 37.  On complaint to magistrate that
machine gun is unlawfully possessed he shall upon reasonable
cause issue warrant to any peace officer, commanding him to
search person or place described and if found "seize and hold
same as evidence of violation of" chapter 37; (see other sections
herein).  Machine guns possessed contrary to chapter 37 are
"hereby" declared forfeited to the state.

R. I. Acts 1927, ch. 1062, ss. 10, 16.  Firearms, including
machine guns, are hereby declared to be nuisances and forfeited
to the state.  When taken from any person such firearms shall be
surrendered to superintendent or chief of police, or town
sergeant who shall destroy them at stated intervals of one year,
unless a justice of the superior court or the attorney-general
certifies that non-destruction is necessary or proper to the ends
of Justice.  Every officer may without complaint and warrant
arrest any person who possesses any firearm whenever such
"officer has reasonable ground to suspect that such person
possesses or is using or is carrying such firearm contrary to
law."  Any person so arrested may be detained 24 hours for
investigation without complaint being made against him.

W. Va. Code Anno. 1932, s. 6050.  Upon revocation of any
permit or if machine guns etc. are possessed etc. unlawfully the
department of public safety shall confiscate them and shall
safely store and keep same subject to the order of the governor.

Note: Laws referring to firearms, or dangerous or deadly
weapons have achieved the same result in part in the following
states:

Ala., Code 1928, s. 5499; Ariz., Rev. Code 1928, s.
5292; Fla., Comp. Laws 1927, s. 7205; Hawaii, Rev. Laws,
1925, s. 3974; Ida., Comp. Stat. 1919, s. 9328; Mont., Rev.
Code 1921, s. 11763; Nev., Comp. Laws 1929, ss. 10761, 2300,
2301; N. J., Comp. Stat. 1925-30, s. 52-432(16); N. D.,
Comp. Laws 1913, ss. 10578, 11096, 11149; Ph. I., Penal Code
1930, Art. 607; lb., s. 2692, p. 831; P. R., Laws 1924, Art.
14, ss. 9, 10; Tenn., Code 1932, ss. 11018, 11019, 11015;
Tex., Comp. Stat. 1928, Art. 487; Utah, Comp. Laws 1917, ss.
2600, 2601, 2602; Va., Code 1930, ss. 4578, 4675(9); Wyo.,
Rev. Stat. 1931, s. 34-411.

# BOOKS



A WORDSWORTH HANDBOOK

# *FIREARMS*

*Wordsworth Editions*

First published in England 1995 by
Wordsworth Editions Ltd
Cumberland House
Crib Street
Ware
Hertfordshire SG12 9ET

Copyright © Derek Avery 1995

Derek Avery has asserted his right
to be identified as the author of this work in accordance
with the Copyright, Designs and Patents Act 1988

All rights reserved. No part of this publication
may be reproduced, stored in a retrieval system,
or transmitted in any form or by any means,
electronic, mechanical, photocopying,
recording or otherwise,
without the prior permission in writing
of Superlaunch Ltd.

ISBN 1–85326–819–4

*Previous page: a member of the 15th Security
Police Squadron armed with an M16 rifle as
he observes aggressor forces from his bunker
during the air base guard defence exercise
Foal Eagle, Kansas Air Base, Republic of Korea,
November 1989*

*Right: members of the US Navy Ceremonial Guard
training platoon stand in formation with
M-1903 rifles and fixed bayonets, November 1985*

Designed and produced by Superlaunch Ltd
P O Box 207, Abingdon, Oxfordshire OX13 6TA, England
Text conversion and pagination by
August Filmsetting, St Helens, England
Colour separation, printing and binding in the
Czech Republic by Svoboda

## CONTENTS

Introduction  4

Rifles and Assault Rifles  5

Submachine Guns  37

Hand Guns  46

Machine Guns  63

Shotguns  87

Acknowledgments  96



rifle which used 7.62mm Czech ammunition. It was modified later to conform with Warsaw Pact standardisation is a Soviet $7.62 \times 39$mm round. Its correct designation was the 52/57, but it was immediately replaced by the Czech vz 58 assault rifle.

In America there were upgrades and variants of the US M1 carbine like the Universal 1000 and also the Universal Enforcer 3000, a carbine pistol. There were also the extremely lightweight Armalite AR 5, which was ordered in a limited number by the US Air Force as part of the survival kit for the flight crews.

### The automatic or assault rifle

The logical development of the light machine gun, the automatic rifle is both lighter and more compact, which does go hand in hand with a more compact and smaller ammunition. In common with the semi-automatic rifle, the first round is fed into the chamber manually, while the other rounds which are held in the clip or magazine are then fed and fired automatically, so long as the trigger is depressed. A mechanical selector makes it possible to have either full or semi-automatic fire, or even to fire a predetermined number of rounds in a single burst. The assault rifle is a derivative of the light machine gun, which had been effectively used by the Allies in both World Wars. In the First World War, the French supplied the Chauchat 1915 model light machine gun to their own troops, and then later to the US Army. The model fired 8mm Lebel rounds, and was later modified for the US troops as the CSRG, which fired the standard American .30-06 cartridge.

The US forces also had their own 353 Lewis gun, which like the Chauchat was heavy; it was also unreliable. In 1917 came the renowned Browning Automatic Rifle (BAR) which used a gas operated action, designed by John Moses Browning. The BAR had been rushed into production at the Winchester Repeating Arms Co, and proved an instant success in the field.

The BAR was also manufactured by Colt and marketed as the Colt Monitor, and by the Belgian company Fabrique Nationale (FN) Herstal. During the Second World War the BAR played its part in the recapturing of the Pacific Islands, in the hands of the US Marines, but no-one had taken the trouble to develop the BAR in a

similar fashion. It was not until the German Luftwaffe had a requirement for its new airborne troops that the FG.42 could be developed and brought into service, albeit on a limited scale. The FG.42 automatic rifle used a standard 7.9mm cartridge, and was capable of both individual and continuous fire.

The Germans had also developed the Mkb 42 by 1942, later known as the Sturmgewehr, which was perhaps the most important technical innovation in this field during the War. With improvements made by Hugo Schmeisser, it was developed into the MP .43, the MP .43/1, the MP .44 and the Stg 44, a very heavy duty gas operated carbine which used $7.9 \times 33$mm ammunition and was equally capable as semi-automatic or automatic.

The impressive fire power of the Sturmgewehr combined with its accuracy swung the advantage, as far as individual fire power was concerned, back in favour of Wehrmacht troops.

With depleted manufacturing facilities and a production rate of no more than 5,000 units per month, the Sturmgewehr had arrived too late for distribution to all of the German fighting forces. What it did do though, was to signify the first successful marriage between the rifle and the submachine gun. One further development made to the Mkb 42 before the end of the War was in the shape of the Stg 45M. An experiment carried out by Mauser in 1945, this used a new mechanism that did away with the gas operated system, using instead a delayed blow back system which was controlled by breech lock rollers.

With the conclusion of the Second World War, the Western powers had formed the North Atlantic Treaty Organisation (NATO), and this led to the standardisation of all of their weaponry.

A new reduced power type of ammunition, a 7mm or .28 cartridge, was proposed by the French, British and Belgians. However the USA, which still had large stockpiles of .30-06 calibre ammunition together with the facilities to produce much more, and which now effectively headed the NATO organisation, forced through an agreement that ratified the acceptance of a .30-06 cartridge which had minimal modifications to the casing only. The new standardisation had been accepted by member countries with the exception of France. The latter preferred its 7.5mm round, for which it held both stocks and the means of manu-

12

13



FALL OF THE ALAMO

Reproduced courtesy of the Library of Congress

Painted by T. Gentilz. The twice-repelled Mexican forces are shown beginning the final assault.

# Rendezvous at the Alamo

Highlights in the Lives of

BOWIE, CROCKETT, and TRAVIS

*by*

Virgil E. Baugh

*Foreword by Joseph Milton Nance*

University of Nebraska Press
Lincoln and London

976.403 B326r 1985

Baugh, Virgil E.

Rendezvous at the Alamo
: highlights in the

Copyright 1960 by Virgil E. Baugh
Foreword copyright 1985 by the University of Nebraska Press
All rights reserved
Manufactured in the United States of America

First Bison Book printing: 1985
Most recent printing indicated by the first digit below:
4 5 6 7 8 9 10

Library of Congress Cataloging in Publication Data
Baugh, Virgil E.
    Rendezvous at the Alamo.
    Reprint. Originally published: New York: Pageant
Press, 1960.
    "Bison book."
    Bibliography: p.
    Includes index.
    1. Pioneers—Texas—Biography.   2. Bowie, James,
d. 1836.   3. Crockett, Davy, 1786–1836.   4. Travis,
William Barret, 1809–1836.   5. Alamo (San Antonio, Tex.)
—Siege, 1836.   I. Title.
F390.B38   1985      976.4'03'0922      85-8570
ISBN 0-8032-1190-2
ISBN 0-8032-6074-1 (pbk.)

Reprinted by arrangement with the author

To

My

Mother

S.F. PUBLIC LIBRARY          3 1223 04070 5601



Bowie knife. This knife is almost identical to a dozen James Bowie had made as gifts. Length of knife 12-1/2 in., of blade 8 in. Width of blade 1-1/2 in.

*Courtesy of the Smithsonian Institution*

*chapter*
*4*

## The Bowie Knives — a Collective Invention

I HOPE the reader has guessed from the heading of this chapter that it is not a history of the origin of *the* Bowie knife, the one and only "original" or ancestor of all other Bowie knives. Nor is any attempt made here either to name its "inventor" and maker or to fix the time and place of its fabrication. Able investigators have tried to compile such histories, clinging stubbornly to the conviction that every invention must be originated and brought to fruition by one man. They will name their man, describe their knife and the exact circumstances of its creation, even if they have to ignore conflicting evidence to do so. As might be expected, there has been little unanimity in their conclusions.

The reasons for this disagreement among chroniclers of the knife are pretty obvious. The Bowies themselves, their descendants, and their contemporaries, upon whom the historian must depend for most of his facts, are themselves in wide disagreement. This is, without a doubt, one of those historic problems that only seem to recede further and further from solution with each rehashing. Is this not in itself symptomatic? The question "Did Francis Bacon really write the plays attributed to William Shakespeare?" is unanswerable for the same reasons: lack of evidence; too many conflicting stories, the authenticity of which can be neither proved nor disproved; and the impossibility of separating fact from legend. I do not want to add one more erroneous conclusion to those already made, but my research on the subject suggests strongly that there was actually no *one* original Bowie knife. Rather, it was a *collective invention*, going through various refinements and changes at the hands of a number of individuals at different times and in widely separated places, culmi-

39 —



*Courtesy of the Smithsonian Institution*

*Top:* Sheffield Bowie-type knife with scabbard. Owned by Henry Vincent Gerrodette while serving in the U.S. Navy during the Mexican War. The blade is stamped "E. K. Tryon Co. Phil Pa. Made in England."

*Bottom:* Sheffield Bowie-type knife with scabbard. Owned by Frank H. Root, U.S. Navy, during the Civil War. It was made by Alexander of Sheffield.

Bowie knife found on battle-field of Perryville, Kentucky, by a Union soldier during the Civil War.

*Courtesy of the Smithsonian Institution*



nating in what came to be known as the Bowie knife. Only at the end of that evolution had the main characteristics of the knife become sufficiently well fixed and the weapon widely enough accepted so that it began to have some uniformity of design, regardless of who manufactured it.

The Bowie knife really came into being as a result of a widely felt need. Knives have been part of the accouterment of settlers from our earliest history. Hunters, scouts, soldiers, farmers, trappers, and men in many other walks of life carried and used them for more than a hundred years before the advent of the Bowies. Such men, especially those on the frontier, had, in fact, long had knives made to order by blacksmiths to suit their individual needs. The Bowies were not alone in recognizing the untrustworthy character of firearms of the time. Anyone who used them constantly, as most men did, would have been aware of that. And every man carried a knife for general utility purposes and frequently a dagger as well. He must often have decried the limited usefulness of both pieces of cutlery and longed for some all-purpose knife that would be equal to any situation or purpose. To assert that this need was first felt by the Bowies is absurd. Of course, they were among the first to do something about it, but there is evidence that the earliest-known knife was designed for hunting and general use, not as a personal weapon. (See Rezin Bowie's letter quoted on p. 45.) But whatever else may be controversial in the saga of the Bowie knife, its origin is irretrievably linked with one or more of the Bowie boys and, possibly, with their father. Who of them shared in that origin, and to what extent, remain unanswerable questions. But the stories of that linkage, especially those concerning James, make good reading. Retelling them will not further befog an already befogged issue.

There are more stories connecting James with the origin of the knife than are found for any of the other Bowies. One of these was published in *DeBow's Review* in 1852. Allegedly based upon an interview given by John Bowie to some unidentified writer, it goes as follows:

He [James] had a hunting-knife made, which suited his fancy, by a common blacksmith named Snowden. In after years this knife became famous, owing to some very tragical occurrences which originated as follows: — About the year 1826, James became involved in the politi-

cal and party squabbles of the day, and his fiery impulsive nature caused him to enlist all his energies in the strife. At this time he resided in Alexandria [Louisiana], on the Red River, and in some of the momentary excitements of the day an altercation took place between him and the sheriff of Rapides Parish, a Mr. Norris Wright, during which Wright shot Bowie in his left breast, while he was unarmed; but had Wright not been rescued by his friends James would have killed him with his fists. This attack so enraged him that he had a neat leather scabbard made for his hunting-knife, and affirmed that he would wear it as long as he lived, which he did. About twelve months after this difficulty, or in September, 1827, the great duel took place at Natchez.[1]

Annie M. Bowie, a granddaughter of John Bowie, son of James, gave another version of this story that appeared in the *Galveston Daily News*.[2] Basing her account upon material obtained from "annals of my branch of the family," she stated that James had the knife made by Lovel H. Snowden, with the intention of using it to defend the rights of a widow who was about to be defrauded of a Spanish grant by certain planters. She implied that they were the same men against whom he employed the knife in the Sandbar affair. (See Chapter 5 for an account of this famous duel.)

There are other stories connecting James with the origin of the knife, but, even as to the main facts, they differ widely. One is that Bowie had the historic knife made by Snowden some time after the Sandbar fight.[3] Another is that the first knife was made for him by a cutler named Pedro in New Orleans. The broken-sword theory, propounded in an article in *Harper's Weekly* in August of 1861, was also given some credence. According to this account, James is supposed to have broken off his sword in a melée with some Mexicans and, having reground the end to a knife point, found it so practical a weapon for close-in fighting that he recommended it to others. This is probably one of the least likely theories of the knife's origin.[4]

If one had to pick his preference among the stories identifying James with the knife's creation, none has more appeal than the one included in an article written by Daniel Webster Jones, Governor of Arkansas from 1897 to 1901.[5] For drama, romance, and all of those convincing details that make for good reading, it can hardly be surpassed. According to Jones, a certain James Black, once a silversmith in Philadelphia, set up as a blacksmith and cutler to gentlemen in Washington, Arkansas, presumably before

1830, for in that year, so the story goes, James Bowie left with him a pattern for a knife and some verbal instructions for its manufacture. Black must have had some enthusiasm for the job because he made not only the knife Bowie ordered but another, modified from the pattern to suit his own ideas. Bowie is said to have expressed pleased preference for the smith's design over his own and bought it instead. *Ergo*, the Bowie knife! Black is supposed to have been the possessor of the "Damascus secret" of making steel, and the ironic sequel is that he was unable to realize his dearest wish to pass it on to Dr. Isaac N. Jones, benefactor of his old age, because of loss of memory at the critical moment.

The Arkansas model of the Bowie knife attained wide currency as "the Arkansas tooth-pick." As a matter of State pride, it could scarcely have been created elsewhere! But this account conflicts with all others placing the knife's creation at an earlier date.

There is also a story that James hammered out his first knife on a visit to Philadelphia. One cannot help but wonder if he was in touch with James Black before the cutler moved to the Southwest.

Another equally interesting tale is that the knife came into being in Gonzales, Texas. Its narrator, A. J. Sowell, relates, on the basis of family tradition, that James Bowie used to come through Gonzales frequently while he was in Texas, usually accompanied by a party of men, and that he and his men were frequently involved in fights with Indians. His story continues as follows:

In one of these fights Bowie made a thrust at an Indian when they were at close quarters, and his hand slipped over the blade of his butcher-knife, cutting him severely. This mishap suggested the idea of a guard between the blade and handle, and he determined to have one made that way. Accordingly, selecting a soft piece of wood, he made a pattern of the kind of knife he wanted, and the next time he went to Gonzales, he went to Mr. Sowell's shop, and showing him the pattern, asked him if he could make one like it. The old man said he thought he could; and selecting a good piece of steel, proceeded to shape one like the pattern, and after it was finished, presented it to Bowie for inspection. He was greatly pleased with it, and paid a handsome price for the knife. The old man then asked Bowie if he might name the knife. "Oh yes, Mr. Sowell, certainly," said Bowie, "give it a name." "Well then," said the old man, "I will name it in honor of you; we will call it the 'Bowie Knife.'"[6]

These are perhaps the most important accounts attributing "invention" of the Bowie knife to James, but an equal if not stronger case exists for his brother, Rezin, to whom some modern historians unequivocally assign responsibility for the weapon.[7] They rely mainly on a letter of Rezin to the *Planters' Advocate*, dated August 24, 1838. In it he sought to counteract the "slanderous comment on myself and family" in the newspapers and to attack specifically an alleged "History of the Bowie Knife" that had appeared in the *Baltimore Transcript*. One does not wonder that the author of the "History," who rebutted his accuser in the *Transcript* under date of September 17, 1838, signed himself only "P. Q." The threatening tone of Bowie's letter, coupled with knowledge of the Bowie proficiency with the knife, confirmed the wisdom of his anonymity! Here is what Rezin, Jr., wrote about the genesis of the knife and James's early acquisition of it:

The first Bowie knife was made by myself in the parish of Avoyelles, in this state, as a hunting knife, for which purpose, exclusively, it was used for many years. The length of the knife was nine and a quarter inches, its width one and a half inches, single edge, and blade not curved; so that "the correspondent" is as incorrect in his description as in his account of the origin of the "Bowie knife." The Baltimore correspondent must have been greatly misinformed respecting the manner in which Col. James Bowie first became possessed of this knife, or he must possess a very fertile imagination. The whole of his statement on this point is false. The following are the facts: Col. James Bowie had been shot by an individual with whom he was at variance; and as I presumed that a second attempt would be made by the same person to take his life, I gave him the knife to be used as occasion might require, as a defensive weapon. Sometime afterwards (and the only time the knife was ever used for any other purpose than that for which it was originally destined) it was resorted to by Colonel James Bowie, in a chance medley, or rough fight, between himself and certain other individuals with whom he was then inimical, and the knife was then used only as a defensive weapon, and not till he had been shot down — it was then the means of saving his life. [This is, of course, an obvious reference to the Sandbar affair.] The improvement in its fabrication, and the state of perfection which it has since acquired from experienced cutlers, was not brought about through any agency. I would here assert, also, that neither Col. James Bowie nor myself, at any period in our lives, ever had a duel with any person [whom]soever.[8]

This particular knife, as we shall see, little resembled the Bowie knife in its characteristic form; however, it is obvious that Rezin

Bowie considered it to be the original Bowie knife. He refers to the radical changes in it since this early knife was made. By these changes its value as a duelling weapon was greatly increased, and the knife had come more and more into disrepute, so much so that, before 1840, a number of states had passed laws forbidding its sale, possession, and use as a weapon. Rezin would be stung by this as well as by the many stories going around connecting his brother with some of the more grisly duels and knife fights. Here he is in effect disclaiming any responsibility for the knife's "perfection" and at the same time defending his brother's memory. One can hardly blame him for this, but if only a third of the stories of duels in which James was a principal are true, his last sentence needs a goodly amount of qualification!

An impressive number of Bowie descendants, some of them family historians and all having access either to family papers or to some other sources of information not generally available, went on record as naming Rezin Bowie, Jr., as originator of the knife. They were John S. Moore, a grandnephew of James Bowie; J. M. S. du Fosset; Lucy Leigh Bowie; and Walter Worthington Bowie.[9] All agreed on two main points: that Jesse Cliffe, the Bowie plantation blacksmith, made the knife from an old file and that it was eventually given to James for protection against his enemies, although Moore alone maintained that it was their father, Rezin Bowie, Sr., who presented it to him.

Attribution of the knife to Stephen Bowie is made only once and without convincing evidence being presented to support it.[10]

What did the Bowie knife look like? Again, the answer to that question depends upon what *stage* in its development is referred to. We have to go on descriptions for the early "originals" because none of them has survived, at least none that can be certainly identified. A few presentation knives are in existence, but in some cases it is unsatisfactory to try to deduce anything from them. A clear example of this is afforded by one of Rezin Bowie's knives, obviously commissioned as a gift. (See below, pp. 48-9.) The seeker after the "typical" Bowie knife has to postulate his own. This is at best an arbitrary task. So be it! Let us undertake it anyway.

We can begin by stating what others have postulated on the subject. A British traveler named Charles Hooton drew some pret-

ty sound conclusions from his brief observation of Bowie knives in Texas and elsewhere in the Southwest in the 1840's. He wrote as follows:

> It is made of various sizes; but the best, I may say, is about the length of a carving-knife — cast perfectly straight in the first instance, but greatly rounded at the end on the edge side; the upper edge at the end, for the length of about two inches, is ground into the small segment of a circle and rendered sharp; thus leaving an apparent curve of the knife, although in reality the upturned point is not higher than the line of the back. The back itself gradually increases in weight of metal as it approaches the hilt, on which a small guard is placed.[11]

After a brief analysis of the evolution of the blade as he saw it, Henry C. Mercer settled for three distinguishing points of the Bowie knife: the characteristic, broad main part of the blade, used for cutting, the curved two-edged point for stabbing, and the guard.[12] After stating that the specifications of the weapon are now impossible to determine, J. Frank Dobie, another historian, lists three other characteristics of what he calls the "ideal" knife: the superb quality of the steel used, the unaccustomed weight of the handle, and the over-all balance, adapting the knife well for throwing.[13] There have been other attempts to postulate the knife, but these are probably as close as anyone will come to accomplishing the impossible.

The above postulations or descriptions have purposely been quoted in preference to others because they ignore the actually unsolvable matter of dimensions, while at the same time describing what the typical Bowie knife *became*, and that, in my opinion, is what we mean when we refer to the genus. My own postulated knife, then, is simply a combination of the various characteristics listed by Hooton, Mercer, and Dobie. That is as close as anyone will *ever* come to it; i.e., what is most characteristic of the knife that came to be known as the Bowie knife. The design and details of individual knives, especially of the early ones, change from knife to knife. One might be able to locate a knife that is typical in the sense that it fits a postulated set of specifications, but he could hardly go beyond this. There is no "original" or "ancestor" of the Bowie knife simply because it actually was never formulated as such by anybody, even as to what became its main characteristics. It *evolved* in the public mind and through develop-

ment by cutlers. Rezin Bowie, Jr., complained of this "improvement" — where he was incorrect was in assuming that the knives being manufactured had any real connection with *his* original knife!

The reader will probably be interested in two knives, one of which allegedly belonged to Jim Bowie, the other made by a cutler for Rezin, Jr., who presented it to a friend. These knives, especially the one last mentioned, have unusual value among existing knives because of their apparent authenticity. The word "existing" needs some qualification, as neither knife's present whereabouts may be known.

The only mention I found of the knife once (allegedly) belonging to James is contained in a short article in an issue of the *Honey Grove Special* of unspecified date. The article was reprinted in 1889. The length of the blade — sixteen inches — is certainly not typical, but if the following account is true, the weapon had quite a history:

> There is a gentleman living in this city [May's Landing, N. J., the town from which the correspondent wrote] who has in his possession a knife once owned by Jim Bowie, which was given him by Juan Padillo, a man who left the Lafitte band of pirates to follow the fortunes of Bowie, and who is still living. The knife is of tempered steel, the blade sixteen inches long, with a steel guard and buckhorn handle. The handle is dressed smooth where the hand clasps it, and on one side is a silver plate, one and one-half inches long, set into the handle, on which is scratched, in rude characters, "Jim Bowie." On the steel guard of the knife, on the upper side, two notches have been cut with a file, which old Juan Padillo said were cut to mark the number of men Bowie had killed with the knife. On the lower side of the guard are three notches, which are said to represent the number of Indians scalped with the same knife. The knife was given by Bowie to Padillo while Bowie was a resident of San Augustine, Texas, and was presented by Padillo to its present owner in 1862, when the latter succeeded in recovering from the Comanches ten head of horses, which they had stolen from Padillo's ranch, thirty-five miles west of San Antonio. — *Honey Grove* (Tex.) *Special*.
>
> C. H. Carver.[14]

Unfortunately, one of the few authentic presentation knives of Rezin Bowie, Jr., does not completely fit his own description of the knife he claimed to have invented, and it certainly is not typical of our postulated knife. Both edges of the blade are sharpened

and curved for its full length, and it lacks the crescent-shaped upper edge at the point. It appears to resemble Rezin's "original" knife in length and width only, because he was specific in his letter in stating that the "blade [was] not curved."[15] Miss Lucy L. Bowie thus appears to be incorrect, at least insofar as this knife is concerned, in stating in a 1917 article that "it may be confidently accepted that the knives given by Col. Rezin Bowie to his friends were exact reproductions of the first one given to his brother."[16] Appearing in the article is a cut of this knife, with a detailed description of it and the name of its owner at that time, a Col. Washington Bowie, Jr.

The type of knife James may have been using in 1835 is much closer to our postulated typical knife. Miss Bowie's article, quoted above, also contains an illustration of a military Bowie knife with which he planned to equip the "Texas troops" — by whom she must have meant the Volunteers he commanded at the Alamo. She states that a knife like the one pictured was presented by James to a Don Augustine Barrera in 1835, and that in 1916 it was in the possession of his grandson, a Dr. Charles A. R. Campbell, of San Antonio.[17] She gives none of the dimensions of this knife.

One question frequently asked is whether James Bowie had a Bowie knife with him in the Alamo. Involving as it does some complex questions of the authenticity of some of the accounts of what went on during and after the siege, it cannot be gone into here; however, a number of accounts have it that his Bowie knife was found beside his corpse. In the account of James's invention of the knife, allegedly based upon an interview with his brother John, James is supposed to have "affirmed that he would wear it as long as he lived, which he did."[18] In the absence of evidence to the contrary, we can hardly assume otherwise. Being long accustomed to wear the knife, why would he have discarded it at a time when its need was most obvious? Also, if he regarded the weapon as important enough to include in the regular equipment of his men, it is unlikely that he would have failed to carry one himself.

The conclusions to which the evidence points are (1) that the Bowie knife was a collective "invention" in which the Bowies shared to an extent now difficult to determine; (2) that it was more an evolution than an invention, extending over a fairly long

RENDEZVOUS AT THE ALAMO — 50

period of time and to many widely separated places; (3) that there were so many people involved in the creation of the knife that it is vain to look for one originator or exclusive fabricator; and (4) that it is equally futile to try to select a single "original," "best," or "typical" knife. The evidence does not exist upon which one can base a positive determination of any of these matters. But many, including myself, have enjoyed the search for the answers.

But, after all, it is Bowie's employment of the knife that interests us most, whether we approve or disapprove of it. There is little doubt that he mastered the weapon to a degree achieved by no one else before or after him. To what degree it may have mastered *him,* the reader will have to decide for himself.



An "Arkansas Toothpick"

*chapter*
5

# Bowie Knives and Duelling Pistols

WHEN IS a duel not a duel? According to the terminology of Bowie's day, a fight could be a "free-for-all," a "fracas," a "medley," a "transaction," or a "difficulty." Just what the distinctions among them were, nobody now knows; perhaps they were rather nebulous at the time. They probably encompassed all common kinds of unscheduled personal conflict, with or without weapons. But the formal duel, usually fought with pistols, was the order of the day among "gentlemen." The code duello was printed in this country as early as 1836,[1] perhaps earlier, and supersensitivity of honor had been developed to a degree equal to that of the most punctilious European practitioner of the art.

But duelling was by no means universally accepted. There was much caustic editorial comment against it in newspapers of the early 1800's, continuing well past the half-century. The churches, the Masons, and other religious and secular groups opposed it; and laws prohibiting duelling had been passed in several states, including Texas, prior to 1840.[2] There was also considerable early support in Congress for similar Federal legislation.[3]

James Bowie probably had little use for the niceties of formal duelling. But, as we shall see, Rezin, Jr., was not entirely truthful when he insisted that neither he nor James had ever "had a duel with any person [whom]soever."[4] He must also have known that many of James's knife fights were gorier than most duels. Estimates of the number of men James killed in "non-military" encounters vary between fifteen and twenty; however, the seeker after cold-blooded killings is doomed to disappointment. More often than not, he fought to help a friend, to rescue somebody who was

51 —

Compendium_Spitzer
Page 184

being maltreated, or to bring about justice. Oddly enough, it appears to have been his good traits as often as his bad ones that got him into many encounters. And, undoubtedly, some of them can be blamed on the temper of the times.

Let us give the positive side of it first. Frontier conditions actually operated to cause a great many duels, apart from the unbridled passions and lawlessness that were then so common. Timothy Flint, writing in 1826, explained that adventurers and people of scant worth back home found they could carve a place for themselves by displacing men who had already attained public favor in frontier communities. One way of doing this was to kill them in duels or fights. The only qualifications necessary for this dangerous game were steady nerves and more than ordinary skill with weapons. According to Flint, men without education, character, or any of the other attributes of gentlemen except gentlemanly attire, were thus able, at least by tacit consent, "immediately [to] pass for men of honour and truth."[5] It was a case of people being afraid *not* to accept them, however false their pretensions.

It is easy *now* to disparage the "false ideas of honor" the code duello represented, but a man had to live among men, and the brutal truth is that, if he received a challenge and refused to accept it, he was branded a coward and thereafter treated with contempt.

James Bowie was widely known, with something less than complete accuracy, as the "inventor" of the Bowie knife. Few would deny that he was among its most skillful users. There is some evidence that he was sought out by bravos who wanted to test his mettle and, perhaps as much, their own, in somewhat the same way tyro gunmen picked fights with Wild Bill Hickok and other Western gunmen. Sometimes Bowie had to kill or be killed by these youngsters. There were also more expert knife wielders of the type who "had to be showed." A few of them lived on, if Bowie felt merciful at the time, but more of them undoubtedly paid for their bad judgment with their lives.

Bowie's good qualities that got him into trouble were his strong sense of fairness and justice; his generosity; his fidelity to his relatives and friends; his gallantry, both in the heroic sense and toward women; and his fearlessness. He was not, as asserted

by some, ready to seize a knife on the least provocation. More often than not, he shook hands and forgave, if a misunderstanding was explained or an apology made.

This brings us to his bad qualities. Once aroused, he had a fierce temper. He was, perhaps, oversensitive in matters involving his honor. He was capable of the bitterest hatred of an enemy, malignity so intense that it could be satisfied with nothing less than his life. In illustrating this last trait, it has been said, with perhaps some basis in fact, that he would attack an enemy anywhere, with any weapon at hand, and under almost any circumstances. He seemed unable to tolerate the presence of anyone inimical to him. Again, let us remember that some of his enemies were equally ruthless and passionate in their hatred of him and worked equally hard at trying to kill him!

Of the fights and duels of James Bowie only three can be dated certainly: his fight with Major Norris Wright in 1826, the noted Sandbar fight of 1827, and his knife fracas with "Bloody" John Sturdivant in 1829. The first two are linked together clearly, while the third is thought by a recent historian to have been an aftermath of the Sandbar affair.

Major Norris Wright was a neighbor of the Bowie boys against whom James had several grievances. The Bowies had once opposed him in a race for sheriff. He belonged to a faction competing with them in speculation in certain Louisiana lands, and he had been instrumental in preventing James from getting a loan from a bank of which he was a director.[6] Each was spoiling for a fight when, one day in 1826, they met accidentally on the street in Alexandria, Louisiana. Wright whipped out his pistol and fired at Bowie. One story has it that the ball struck and was deflected by a silver dollar in Bowie's breast pocket, and his life thus saved. Furious, Bowie drew and tried to fire his own pistol but it misfired — or he was unarmed, as others tell the tale. At any rate, he waded into Wright with his fists and, had friends not intervened, might have beaten him to death. The reader may recall that it was after this encounter that Rezin, Jr., allegedly presented him with the first Bowie knife as insurance against faulty firearms. If he did so, James would have needed little urging to take it, having had such a close call. Perhaps he sensed he might soon need it.

There is no version of the noted fight on the Vidalia Sandbar

that is correct in all details, but the one written by Walter Worth-ington Bowie, family historian, is as authoritative as any and briefer than most. He described the affray as follows:

The "Sandbar duel," as it was called, which took place on a little island in the Mississippi River opposite Natchez, September 19, 1827, has been more written of, perhaps, than any other of his [James's] numer-ous fights. . . . The following statement of that celebrated fight is based on a letter written two days after the duel by one of the participants, and an article in a Southern paper, published a short time after the occurrence. For many years a feud existed between two parties in the Parish of Rapides, on Red River [i.e., Samuel L. Wells and Dr. Thomas H. Maddox]. On one side was Col. James Bowie, Gen. Momfort Wells [the Bowie family historian undoubtedly meant to write here instead, Thomas Jefferson Wells], Samuel Wells, General [Samuel] Cuney, Dr. Cuney, and [George C.] McWhorter. On the other Dr. T. H. Maddox, of Charles County, Maryland; Maj. Morris [sic] Wright, of Baltimore; Col. Robert A. Crain, of Fauquier County, Virginia; Alfred and Ed-ward Cary Blanchard, of Norfolk, Virginia . . . ; and Dr. Denny com-posed the leaders of the two parties. Their quarrels finally resulted in arrangements for the fight on the Sandbar, the principals, however, being Dr. Maddox and Samuel L. Wells, the others as witnesses, sec-onds, and surgeons. After two ineffectual exchanges of shots, Wells and Maddox shook hands, but [General] Cuney stepped forward and said to Colonel Crain, "This is a good time to settle *our* difficulty"; Bowie and Wright also drew, and the firing became general. Crain killed Cuney and shot Bowie through the hip. Bowie drew his knife and rushed upon Colonel Crain. The latter, clubbing his empty pistol, dealt such a terrific blow upon Bowie's head as to bring him to his knees and break the weapon. Before the latter could recover he was seized by Dr. Maddox who held him down for some moments, but, collecting his strength, he hurled Maddox off just as Major Wright approached and fired at the wounded Bowie, who, steadying himself against a log, half buried in the sand, fired at Wright, the ball passing through the latter's body. Wright then drew a sword-cane, and rushing upon Bowie, exclaimed, "Damn you, you have killed me." Bowie met the attack, and, seizing his assailant, plunged his "bowie-knife" into his body, killing him instantly. At the same moment Edward Blanchard shot Bowie in the body, but had his arm shattered by a ball from [Thomas] Jefferson Wells.

This ended the fight, and Bowie was removed, as it was supposed, in a dying condition. Of the twelve men who took part in the affray, Wright and [General] Cuney were killed, Bowie, Crain, and Blanchard badly wounded; the remaining seven men escaping any serious injury. Colonel Crain, himself wounded, brought water for his adversary, Colonel Bowie. The latter politely thanked him, but remarked that

he did not think Crain had acted properly in firing upon him when he was exchanging shots with Maddox. In later years Bowie and Crain became reconciled, and, each having great respect for the other, re-mained friends until death.[7]

But Bowie's reconciliation with Colonel Crain was a long time in the future. His animosity endured, not only against Crain but, after the manner of feuds, against his friends. Among these friends — if indeed he could be called a friend of anybody — was one John (nicknamed "Bloody") Sturdivant, who operated sev-eral of the worst gambling and vice dens in Natchez-under-the-Hill, then the disreputable section of Natchez, Mississippi. He was a double murderer, an arsonist, and a counterfeiter.[8] He was, in short, just the kind of man Bowie detested, even if he had not been aligned with the opposition.

One night in 1829, when Bowie was in Natchez-under-the-Hill, he had an opportunity to tangle with Sturdivant, if he was looking for one. The story of that meeting and what he did are so per-fectly characteristic of him that it is hard to believe it is not true in every respect.

It seems that a Dr. William Lattimore, a wealthy neighboring planter and a warm friend of Bowie, sent his son to Natchez to dispose of the year's cotton crop, with instructions to bank the money. The boy, who was rather callow and probably a bit set up by being given all this responsibility, may have been looking for adventure. If he was, he found it. One of Sturdivant's "run-ners" accosted him and lured him into one of that ruffian's dives, where he treated him to several "shots" of strong liquor. After that, it was a pretty easy matter to entice him into a game of faro. The game probably looked simple enough to the boy's drink-be-fuddled mind, especially since he was allowed to win a few times. In a short time he was losing heavily, but he must have gone doggedly on, becoming more and more desperate in his attempts to recoup his losses, because he lost everything — how many thou-sands of dollars nobody now knows. Then Sturdivant or one of his bullies tossed him out into the muddy street, with a warning to keep his mouth shut about what had happened to him.

Bitter and ashamed of what he had done, young Lattimore may have indulged in a little unmanly weeping. Red-eyed, hopeless, he had the great good fortune to run into Bowie, whom he at

once recognized. He was desperate and Bowie was determined to get at the cause. With very little encouragement, Lattimore must have blurted out the whole story of his folly. Later, he found it necessary to identify himself.

"Lattimore!" exclaimed Bowie in surprise. "Doctor Will Lattimore's boy! You've shot up some since I saw you, and I guess you can't blame me for not knowing you, with all that mud on your face!"

Young Lattimore nodded shyly but returned Bowie's handshake with obvious relief. He felt better already.

Bowie shifted his pistol closer to his right hand and also checked to see that his knife was within easy reach. His face was grim with purpose as he turned toward the door of the dive. Lattimore must have swelled with pride over having acquired such a champion.

"You stick with me, boy, and we'll get your money back. I know any game in Sturdivant's dens is crooked, and I've handled his kind before. Come on!"

Lattimore, knowing Bowie's reputation, would not doubt that he could accomplish anything he set out to do. As the story goes, Bowie got into the faro game, and it did not take him long to spot the crooked dealer. He got up, stuck his knife into the table top, and said that he would use it on the next man who cheated. Although not a gambler, he was adept at cards, and in a few hours he had won back all that Lattimore had lost. He gave the money to him and sent him on his way, with a stern warning to eschew faro and stay out of the dives in Natchez-under-the-Hill, especially those run by "Bloody" Sturdivant.

But this was not the last Bowie saw of Sturdivant. The outlaw had bragged that, if he had been one of the participants in the Sandbar affair, he would have seen to it that Bowie was dead instead of just cut up. Bowie came back into the dive to give "Bloody" John the opportunity to make good his boast.

Sturdivant's desire to cut up Bowie must have been given an even keener edge when he considered the humiliation of being beaten at his own game. He knew Bowie's reputation with sharp cutlery, but he fancied himself as also quite a boy with a knife. So when Bowie returned, he left no doubt as to his bitterness and at once proposed a fight with knives, the left hands of the two

men to be tied together across a table. Bowie promptly accepted and, at the first stroke of his knife, disabled Sturdivant's right arm with a fearful cut. He magnanimously spared the outlaw's life, but Sturdivant's rancor toward him only festered and grew like a boil. The outlaw later hired three assassins to ambush and kill him. No details of the gory conclusion to the tale have survived, but Bowie is supposed to have eliminated all three of them "in his first fight using Black's knife."[9]

There are two other stories in which Bowie was the rescuer of victims of Mississippi river boat gamblers. The main events related in each are closely similar; however, one version, written by Major Ben C. Truman, gives the year as 1833, while an anonymous account reprinted from another newspaper in the *Democratic Telegraph and Texas Register* for June 20, 1850, dates the events in 1835 and identifies the crooked gambler Bowie had to fight, a detail omitted from the Truman narrative. In one story the river boat is the *Orleans*, in the other, the *Rob Roy*. As usual with Bowie yarns, you pay your penny and take your choice.

Major Truman stated that his account, which is the more realistic of the two, was based upon a "recent conversation with an old steamboatman [of] a reporter of the St. Louis *Republican*."[10] In the early 1830's, so he relates, organized bands of gamblers began to infest the river steamers. Members of this gentry made arrangements with barkeepers, hotel clerks, and others, mostly riffraff, to keep them informed of the movements of wealthy travelers. If a prospect boarded a river boat, every effort was made to inveigle him into one of the crooked games, where they could take his "roll" with at least a semblance of honesty. Failing in that, there were, of course, innumerable other ways, some considerably more direct, of separating him from his money.

In the summer of 1833 a young gentleman of Natchez, accompanied by his new bride, made an extended trip to the North and East, in the course of which he collected a large sum of money. He was spotted "by several of the gambling fraternity"[11] on the way back to Natchez, and they made every effort to get him into a game. He resisted them until he and his wife reached Pittsburgh, where they were to board another steamer for Louisville. There he succumbed.

The game was "20-card poker." It was played with only tens to

aces of the deck, and four was the maximum number of players. If three of them worked together they could easily force the other one to bid everything he had. Standard procedure was to let the "sucker" win several hands. So they did with the young traveler, who soon came to believe he knew the game as well as his pretended teachers. He was thus ripe for the picking when he boarded the *Orleans* at Louisville.

The game was resumed and, to be brief, he lost his shirt. Enter a "tall, straight, and dignified gentleman,"[12] in this instance Mr. James Bowie. According to the story, the wife tried repeatedly to get her husband away from the game, but he as stubbornly stuck it out until he had gone broke. When she was about to lose a battle to keep him from throwing himself into the river, Bowie intervened and, "with a grip of iron,"[13] pulled him back. He then exacted a promise from the young couple that they would stay in their cabin until he could set matters right.

Bowie used an old ruse to fool the gamblers as to his real purpose by asking for change for a hundred-dollar bill. He deliberately exposed a "well-filled Wallet"[14] in the process, and the gamblers at once took the bait, thinking they were about to fleece another victim. Needless to say, Bowie was setting his own trap. While he carefully watched their actions, he bet heavily and thus forced the trio to do likewise until, at last, there was a pot of about $100,000 on the table. He was noted for carrying a lot of money, and this time he must have been really well-heeled!

The following climax reads like something from a dime novel:

Whilst the betting was going on the stranger [Bowie] had kept his eye on the dealer and had . . . prevented any changing of cards. Toward the last he saw a card slipped by the dealer to the man who had made the blind, when, seizing him by the wrist with one hand, he drew a murderous looking knife with the other and forced the gambler to lay his cards on the table face down. All sprang to their feet and the stranger quietly said that when that hand was raised and it should be found to contain six cards, he would kill the owner; telling the other to show his cards, he threw down his own hand, which consisted of four kings and a ten spot. The baffled gambler, livid with rage and disappointment, swore that the stranger should fight him, demanding, with an oath, to know who he was anyway. Quietly, and as if in the presence of death, the stranger answered, "James Bowie." At the sound of that name two of the gamblers quailed, for they knew that the man who bore that name was a terror to even the bravest; but the third,

who had never heard of "James Bowie," demanded a duel at once. This was acceded to at once by Bowie, with a smile; pistols — derringers — were the weapons selected, the hurricane-roof the place, and the time at once. Sweeping the whole of the money into his hat, Bowie went to the room where the unhappy wife sat guarding her husband's uneasy slumbers, and, rapping on the door, he handed her, when she had opened it, the hat and its contents, telling her that if he did not come back, two thirds of the money was her husband's and the balance his own. Ascending to the hurricane-roof the principals were placed one upon the top of each wheel-house. This brought them about twelve yards apart, and each was exposed to the other from the knee up. The pistols were handed to them and the gambler's second gave the word, "one, two, three, fire, stop," uttered at intervals of one second each, and they were allowed to fire at any time between the utterance of the words one and stop. As "one" rang out in the clear morning air both raised their weapons, as "three" was heard the gambler's pistol rang out and before the sound had ceased and whilst the word "fire" was being uttered, Bowie's pistol sounded, and simultaneous with this sound the gambler fell, and giving a convulsive struggle rolled off the wheel-house into the river. Bowie coolly blew the smoke out of his pistol, shut down the pan . . . , and going down into the ladies' cabin obtained his hat and divided the money which it contained into three portions. Two of these he gave to the young wife and the other he kept, as it was his own money. Having awakened her husband, the fond wife showed him the money, and told him all she knew about the affair, not having heard of the duel. When the husband became acquainted with all the facts, his gratitude to his benefactor was deep and lasting. Not desiring to be made a hero of, Bowie, when the boat reached Rodney, determined to go ashore. . . .[15]

The reader may think Major Truman erred in stating that this duel was fought with "derringers," a term that now applies only to a small pocket pistol once carried as a reserve weapon. But contemporaneous with this duel there also existed a Deringer U. S. Pistol sometimes used in duels. This may be the type of "derringer" to which Truman referred.

In the anonymous account referred to, the scene of this fracas was the river boat *Rob Roy*, and the time "the evening of the 4th of June, 1835 . . . ." The leader of the gamblers was an overinsistent bully who had tried to persuade almost every man on board to join him at cards. Despite his huge size and fearsome mien, all his overtures failed until at last he ensnared a "wealthy young merchant of Natchez." One pictures this youth as timid, perhaps afraid to refuse the bigger man's invitation. In this version, there

were only two in the game, but it ran the same course, weeping, frantic wife and all, up to the point where the handsome stranger appeared, watching events imperturbably but always "with thin firm lips [that] wore a perpetual smile," even when the merchant lost his last $5,000, and he and his wife fainted and were "borne away insensible to the ladies' cabin."

Our anonymous imitator of the dime novelist went even further in his melodramatic account of what followed. The triumphant "hoarse laugh" of the villain had hardly died on his lips before Bowie challenged him to a game.

"I am James Bowie, of Texas . . . and you are John Laffite [sic!], a natural son of the old pirate!"

The gambler . . . asked in a firm tone:

"What game do you wish with me?"

"*Poker* first, and *pistols* afterwards, if you play foul," replied Bowie.

The amount on the table in this version was a mere $20,000, and Bowie raked it in, even though the gambler had four queens to his four jacks. The author claims only the slightest knowledge of the game of poker, but it would seem this was hardly according to Hoyle! Nor did it set at all well with the "natural son" of Jean Lafitte.

" 'To the hurricane deck, and let pistols be trumps . . . !' "

Bowie accepted his challenge and, once they had taken their places, even let the gambler fire first! When the smoke cleared away Bowie was minus "one of his golden locks," which had been snipped off by a ball; but he was much the better off of the two, for "the gambler was shot through the heart, and . . . tumbled into the river."[16] As in the Truman version, the young merchant and his wife got their money back and were dutifully grateful to Bowie.

Another of Bowie's fights was with a Spaniard who owned a plantation neighboring his on Bayou Terrebonne. The story is that this "haughty hidalgo" used every opportunity to annoy him with petty insults until Bowie could endure it no longer and so challenged him. As the one challenged, the Castilian could name the weapons. He chose knives, being possessed of a fine hunting knife with a long blade. For Bowie there was, of course, only one knife: "Old Bowie." They were to be naked to the waist and sit astride a "trestle," by which was meant, it is supposed, some kind of a

low bench, the legs of which were to be buried part-way in the ground. When the time for the fight came, Bowie's shorter blade evoked considerable scorn from his antagonist, who felt that he had a telling advantage. But he had to draw his longer-bladed weapon back before he could make a pass, and while he was doing so, Bowie made a quick forward thrust with his knife into his antagonist's abdomen, and, "drawing it quickly across, disembowelled the Spaniard in the twinkling of an eye."[17]

In another version of what is obviously the same anecdote, the left hands of the two men were tied together. Bowie killed his opponent with a single stab, "then, coolly cutting the cords that held them, he allowed the corpse of his adversary to sink to the ground."[18]

The following incident is also worth relating. It seems Bowie was riding across a plantation near Bayou Rapides when he saw a man cruelly beating his slave, whom he had tied to a tree. Jim dismounted, went over, calmly cut the cords binding the Negro, and set him free, and, some say, laid the whip over the owner's back. In any event, the other man flew into a rage, drew his pistol, and attempted to shoot Bowie. The pistol misfired and Jim closed with him, slashing his wrist with his knife so as almost to sever his hand. The injured man probably expected to be finished off; instead, Bowie calmly fashioned a tourniquet of his neckerchief to stanch the flow of blood, took him to the nearest doctor, and paid for medical attention. Added details are that Bowie gave himself up to the law, "purchased the slave at double his value, and gave him his freedom."[19] Whether these are just embellishments of an already good story, nobody knows.

Bowie is also supposed to have had numerous other knife fights under all sorts of circumstances, the most incredible being in a darkened cabin, with his and his opponent's buckskin breeches nailed to a log, there to stab it out to the death! He is said to have fought a "duel" with a creole who offered an insult to his friend, John James Audubon, although we have no details of this encounter.[20] He must also have fought at least one formal duel, if the following item from the *Jacksboro* (Texas) *Echo* of May 25, 1877, can be credited:

ONE OF BOWIE'S DUELS

At the appointed hour all parties were on the ground, Bowie, as

usual, very cool, the Spaniard very furious and excited. The Spaniard's second won the choice of position, which gave the second of Bowie the word. They were to stand back to back, rifles perpendicular, upward or downward — to wheel, as before stated. Here arose an instance of genius over routine. In the army the maneuvers are intended for regularity before time; but, in such cases as this, regularity was of no moment, but time was everything. When the Spaniard heard the word to "wheel," he, of course, executed it in true military style, in "three motions," but Bowie, whose whole life had been spent in depending upon himself, not regulating his movements by those of others, who had been compelled, in his warfare against Indians or in procuring game, to take every position, executed every change of body necessary for the occasion to insure success; instead of wheeling, as the Spaniard was doing, simply turned the body from the hips, or on the hips, holding the feet firm, which, of course, brought him around quicker than his antagonist, and enabled Bowie to fire first, and to drive his ball through the brain of his antagonist. This Bowie said any body could do if they only possessed the requisite nerve. — *Wilke's Spirit of the Times*.[21]

There are several anecdotes told about Bowie in which he relied upon his fists rather than upon weapons. His encounter with Major Norris Wright on the streets of Alexandria has already been described. He is said to have also had a fist fight with Edwin Forrest, the actor, over a girl in a gambling house — place, date, and outcome unspecified.[22]

On several other occasions Bowie's presence alone had a pacificating effect. One anecdote concerns his quieting an unruly congregation. A Methodist preacher, one of the first to be sent by his church to preach in Texas, related the incident from his own experience. He had just ridden up the Red River from Louisiana, thence into Texas, when he was overtaken on the trail by Bowie, whose identity he did not then know. He did notice, however, that his chance companion was intelligent and a thorough gentleman.

In a few days they reached a small town which, so it turned out, was a notorious refuge for outlaws. There being no church, the minister announced he would preach at the courthouse. That night the building was crowded with an all-male congregation. The moment the preacher tried to begin his sermon, however, there was braying, hooting, cat-calling, and all sorts of other vocal interference, so that it was impossible for him to continue. At this

point Bowie stood up and delivered himself of the following warning:

"Men, this man has come here to preach to you; you need preaching to, and I'll be d——d if he shan't preach to you! The next one that disturbs him shall fight me — my name is Jim Bowie."

The preacher is quoted as stating that, thereafter, "he never had a more respectful audience, such was the influence this man exercised over the minds of these desperate characters."[23]

Bowie once clashed with a bully on a stage coach. He was the "half-horse, half-alligator" type, and the cigar he was smoking became offensive to the other passengers, especially so to a young bride. Her husband politely requested him to put out the offending cheroot, but the bully refused. Bowie stood it as long as he could; then, holding the point of his knife under the smoker's nose, he made it very clear that if he did not throw the cigar out of the coach at once, he would use the knife to aerate his intestines. Looking at the cold blue of Bowie's blade and his even colder eyes, the bully turned green, ejected the cigar, remained discreetly quiet, and got off quickly at the next regular stop.[24]

There seem to be few stories of duelling in which Rezin Bowie, Jr., figured, and none were found in which he was a principal. He did act as a second to John T. Bowie, one of the Maryland branch of the family who moved to Natchez in the 1830's; but this duel was never fought because Colonel Nicholson, the other principal, got cold feet at the last minute and fled.[25]

I hope the reader finds assurance in the above rather long recital of Bowie's fights that he seldom fought without provocation and then only to help someone in distress or danger; that he was no more given to violence than most men of his day; and that the code he lived by was, if not that of every man, at least that of many of his class. I have also attempted to show the obvious embellishment of some of the stories of his encounters, at the risk of making them ludicrous. In doing so it is not my intention to ridicule James Bowie but rather the literary embroiderers who make the job of writing factual history and biography sometimes only difficult, at other times almost impossible.

*chapter*

5

## Citizen and Lawyer

THE DEPARTURE of Bradburn and his soldiers from Anahuac, so far from giving the war party a shot in the arm, had the opposite effect. Revolutionary activity thrives on resistance, even persecution, and now the enemy was removed. The hated anti-immigration law was repealed, and the zeal for collecting taxes and duties seemed momentarily to have gone out of the Mexican officials. People were comparatively prosperous. The climate was the kind in which the peace party could thrive, and its conservative viewpoint came to dominate. Even the imprisonment of Stephen Austin, soon to occur, did not arouse people to the point where they favored going to war to free him. Biding its time, the core of the war party remained true to its ideals, but it took little overt action during the 1833-34 period.

How Travis was chafed by the apathy of the conservative elements is revealed in his correspondence. He regarded himself as at least one of the leaders of the war party, and a fair case has been made for the thesis that he may have envisioned himself as a potential "George Washington of a new country."[1] Instead of playing a prominent role in the events of 1833 and 1834, however, he was compelled to sit on the sidelines while others garnered the glory.

The separation of Coahuila and Texas, which the Mexican Government had promised to bring about, now became a focal issue. In March and April 1833 a convention was held at San Felipe, to which such important men as Stephen Austin, Sam Houston, David G. Burnet, Branch T. Archer, and James B. Miller were delegates. A committee was appointed to draft a constitution, and the resulting document contained provisions for

— 160

such democratic rights as trial by jury, a free press, and direct suffrage; but it excluded religious liberty, which it was taken for granted the Mexican Government would never assent to, even though Santa Anna had recently been elected President on a platform including opposition to the Church party. Another committee, headed by David G. Burnet, drew up a memorial listing strong reasons for the separation of Texas from Coahuila. This committee appointed Stephen Austin, William H. Wharton, and Erasmo Seguin to present the memorial to the Mexican authorities.

For some reason only Austin went to Mexico City, but after waiting months for a reply to the memorial, he wrote despairingly to Texan officials that nothing could be expected from the Mexican Government, and he advised them to set up a separate Texan government, with or without its permission. This letter was seized as traitorous, and he was arrested and imprisoned in Mexico City. For the first fifteen months he was kept in solitary confinement. After innumerable delays — and he seems to have been held chiefly as a hostage for the continued good behavior of the Texans — he was released on July 13, 1835.

To pacify Austin and other Texans who were incensed over his imprisonment, Santa Anna made a few minor concessions to them and engaged in considerable democratic double talk in order to hide his real intentions. At the same time he was pushing with all speed his plot to make himself an absolute ruler. He proceeded to demolish the "republic" he had set up and to destroy every vestige of freedom. Also, with the same lack of foresight as his predecessor, he tried later to crush the revolutionists by force.

In Travis' diary there are a few references to his participation in the affairs of the *ayuntamiento* of San Felipe, the municipal corporation that governed the town. Its chief officer, the alcalde, was roughly equivalent to the mayor of an American town. He was at first disappointed that he was not asked to serve in a more important capacity than secretary to that body. He later changed his mind, as these excerpts from his diary indicate:

[Febr. 5, 1834]: . . . — I have been elected secretary of the Ayuntamiento — to-day — I think — I cannot accept —
[Febr. 6, 1834]: . . . accepted the office of Secretary of Ayuntamiento

& that body assigned me a salary of $400 for this year — Copied Reso-
lution of Ayuntamiento for Robertson —[2]

In other entries in his diary, covering the period from February 7,
1834, through June 1, 1834, he mentions copying out and certify-
ing acts and resolutions of the *ayuntamiento*, keeping its rec-
ords, arranging for meetings, and like matters. On April 27, 1834,
he records that he was "appointed a member of the central com-
mittee" and, on the following day, that he was one of the nom-
inees "recommended for political chief of the Department of
Brazos." These are the only other entries relating to his serving
in any political capacity.

As previously pointed out, Travis kept the diary largely for
convenience, as a sort of combined ledger and journal of his legal
and business activities. It is not a source book for his deepest
thoughts and preoccupations. It was only in letters to trusted
friends that he could express himself freely. Perhaps this is why
he mentions Austin's imprisonment in the diary, but nothing
about his participation in drawing up a petition asking for his
release.[3] But Austin was not released until July of 1835, so this
petition may have been drawn up after Travis terminated the
diary.

What kind of a lawyer was Travis? Unfortunately, it is only to
this diary that we can turn for an over-all picture of his legal
activities in Texas. But only brief references are made to most
of his cases, so the diary is actually of little practical use in this
connection. It is assumed that the court records of San Felipe
were destroyed along with the town, which, according to a note
in the front of the diary, was burned "by order of Genl Houston
in 1836."

Being the capital of Austin's colony, San Felipe offered good
opportunities to lawyers. Travis handled a wide variety of cases,
taking in what must have been considered high fees for those
times. He could hardly make a social call on a friend without
having legal business thrust upon him. Much property was
changing hands, and many of his cases involved settling up es-
tates. He wrote all sorts of legal documents, translating many
into Spanish or English for the alcalde.

It was not a lack of good lawyers that caused people to bid
for Travis' services. He had such eminent colleagues as Robert

M. Williamson, Thomas J. Chambers, Patrick C. and William
Jack, and Luke Lesassier. But he was popular in spite of the
competition, probably because he took all cases that came his
way and did almost everything else asked of him. But, young
as he was, he was also respected for his professional competence
by men in and out of the profession. It must have given him con-
siderable personal satisfaction, for example, that Col. Abner Kuy-
kendall asked him to take his son, J. Hampden Kuykendall, as
an apprentice when there were so many of his older and more
experienced colleagues to choose from. Young Kuykendall began
living with him on May 10, 1834, and before a month was out
his mentor was buying him shoes and clothes, taking him to the
doctor, and in general acting as a father to him. Under date of
June 18, 1834, Travis wrote in his diary

Old Abner Kuykendall dangerously stabbed by Clayton —

On the following day he noted that the old man was recuperat-
ing.[4] There the entries concerning Travis' relationship with both
men cease.

The diary does show, for the period it covers, that Travis oper-
ated his law office alone. Patrick C. Jack was no longer his law
partner. Actually, Jack did not settle in San Felipe until early
March of 1834, if the following entry is correct:

[March] 14th [1834] . . . — P. C. Jack has settled in San Felipe —[5]

The only mention in the diary of any professional collaboration
by the two men was made during the previous month. Under
date of February 19, 1834, Travis wrote that

. . . Jack requested me & Baker to attend to his cases —[6]

Jack may, of course, have had a law practice in San Felipe before
he moved. Travis refers to him often in his diary but nowhere in
such a way that it can even be inferred that he was his law part-
ner during their early residence in San Felipe.

One writer, Amelia Williams, maintained that Travis and Wil-
lis Nibbs established a law partnership shortly after Travis came
to San Felipe.[7] If so, the diary is singularly lacking in evidence
of it, for in it I could find no mention of Nibbs. This is peculiar
for several reasons. Travis, in common with other lawyers, was
constantly exchanging legal paper of some kind with his col-

leagues, lending them money or borrowing from them, and meeting them under all sorts of conditions. All of these matters he faithfully recorded, if there was any kind of professional, business, or even social relationship between them.

The two lawyers closest to Travis were Robert M. Williamson and Luke Lesassier. Besides being a close personal friend, Williamson thought enough of Travis to employ him professionally. Under date of June 16, 1834, Travis noted

> Williamson retained me in favor of his claim to Maylam's [Milam's?] Colony — & will give me a League of Land — & retains me to represent the Alabama Company about 11 League grants in case Robertson attacks them.[8]

Williamson had become alcalde of San Felipe on January 1, 1834, and could arrange to have Travis paid in land instead of money, a common practice. The two borrowed freely from each other. On March 20, 1834, Travis wrote that he sold him a bay horse for $100 in discharge of a note; on April 17 that the alcalde "fined me $5 — for contempt, etc."[9] If he felt any particular irritation over the fine, he kept it to himself.

Luke Lesassier, who served as alcalde prior to Williamson, was another close friend of Travis. The two were often in each other's company. The alcalde had power to appoint attorneys in certain kinds of cases, and he threw much legal business Travis' way. Travis was frequently at Lesassier's house, traveled with him, and on one occasion gave him a trifling present, which the alcalde returned in kind:

> [Nov.] 8th [1833] ... Gave Lesassier a looking glass — & he gave me one in return[10]

The following entry, under date of December 17, 1833, shows that, on at least one occasion, he and Lesassier collaborated on a case:

> Jesse H. Cartwright retained me & Lesassier to defend him against claim of his wife from whom he has separated.[11]

As far as I know, there is extant only one detailed account of a Travis court case, a case that one witness called a "farce." But four of Travis' distinguished professional colleagues were also involved, and, if the trial was somewhat of a legal fiasco, it

was not because of the incompetence of any of them. It was just that they might as well not have started the legal machinery at all. A clever amateur in the law pulled the rug out from under them, so there was nothing left to decide!

This trial and the events leading up to it were summarized by a Mrs. Dilue Harris from a journal kept by her father, Dr. Pleasant W. Rose, at whose farm the trial was held. According to Mrs. Harris the proceedings took place in April of 1834. Two neighbors, whom she designates as "Mr. A —— and Mr. M ——" got into an altercation when Mr. A —— accused Mr. M —— of branding (in effect, stealing) one of his yearling cattle. Mr. A —— then went to Harrisburg and put in a complaint against Mr. M —— to John W. Moore, the alcalde. The court that came to the Rose farm to try the case included Judge David G. Burnet, later elected first President of the Texas Republic, and Alcalde John Moore. The lawyers were William B. Travis, Patrick and William H. Jack, and Robert M. Williamson. A number of men, many of them interested or curious neighbors, congregated and camped on the farm. Travis must have been a personal friend of the Roses, for the account continues:

> Mr. W. B. Travis took supper with our family. He and several of the gentlemen from Harrisburg were going after the trial to San Felipe, and father decided to go with them. Mr. Travis said he would assist father to locate land. The land office was at that place, ... where all public business was transacted. ...
>
> The next day the men began to arrive early. ... Mr. M ——, the accused, was the first man on the ground, and by one o'clock there were twenty-five or thirty people present. Mr. Moses Shipman came early. ... He ... was horrified that one of the neighbors should be accused of stealing. He said that if M —— was found guilty he would be sent to Anahuac or San Antonio, and probably to Mexico to work in the silver mines. He said he would much rather have paid Mr. A —— for the yearling than to have a family left destitute in the neighborhood.
>
> ... The trial began at eleven o'clock, and the defendant plead not guilty. A —— proved that a yearling with M ——'s mark and brand was sucking his (A——'s) cow. W. B. Travis was attorney for M——, and Patrick Jack for A——. After argument on both sides, the jury pronounced the defendant guilty. W. B. Travis gave notice of an appeal. Judge Burnet granted the second hearing. Mr. Ben Fort Smith proposed to the court to adjourn till everybody present should have dinner. He got A—— to one side, bought the cow and yearling, sent A—— home, and when the case was called again there

was no evidence against M——. Mr. Smith claimed the cow and yearling. He said the branding had been done through a mistake and the defendant was discharged. Judge Burnet admonished him to be more careful in the future.... All the men in the neighborhood were rejoiced at the way it terminated.[12]

An amusing sequel to this was that Travis and Patrick Jack suggested that a dance be given to celebrate the happy ending, but Mrs. Harris' mother, who was of a strongly religious turn of mind, opposed their suggestion and said she would rather hear a sermon. A Mr. Woodruff, although Bibleless, was accordingly prevailed upon to preach. Afterward they sang some hymns. Thus were Travis' and Jack's and everyone else's desire to have a social good time frustrated by one determined woman.

Travis promised to send Mrs. Rose a Bible and the men went their various ways, he, Mr. Rose, and Mr. Williamson proceeding back to San Felipe. Travis could not find a Bible in San Felipe, but he sent the Rose girls a couple of religious books, as he noted in his diary under date of June 10, 1834:

Bo't two little books of J. B. Miller & sent to Dr. Rose's daughters —[13]

We have already had a glimpse of Travis the citizen and Travis the lawyer. But perhaps we might see what his much-neglected diary reveals about his personal life. It has already shown us that he was far from the lonely recluse, embittered against women because of his shattered marriage. But what about his social and private life, his interests, his pleasures, his tastes, and his hobbies? In a life about which we know relatively little, such matters assume an importance they would not otherwise have.



# The Cautious Diarist

Travis' DIARY has been shown to reveal his attitude toward women and that he was already thinking of remarrying before he and Rosanna were divorced. It also tells us something about his social life, his personal code and habits, his hobbies, and his interests.

What about his social life? According to his diary, it consisted mainly of calls on personal friends, an occasional visit to a saloon, attendance at fandangos or balls, and participation in religious services. Apparently he was the prime mover in some social events. On December 23, 1833, he wrote that he "...made arrangements for a Ball on a new plan — signed subscription &c. S. H. Jack is to write tickets — ."[1] Two days later, after attending the ball, he recorded: "Ball &c — fine enjoyment &c — ,"[2] while on the following day he wrote he had "Paid Ball Bill to Connell $2.50."[3] On December 26 his entry includes "Went to party to Major Lewis's — ."[4] On the 28th, it was "Miss Cummings &c went to party at Townsend's &c &c."[5] On the 31st he "— went to wedding of A. C. Westall & Miss E. Henrie —."[6] These were social events of the holiday season. He recorded no others until May 6, 1834, when he wrote that he had

Bot of Somerville $1. worth of sugar & coffee for fandango of C. B. Stewart, one gallon whiskey for Do. — Went to fandango, lost $1 — which I owe —[7]

If he spent a relatively small proportion of his time on social matters, it was not because he was antisocial. San Felipe was a small frontier town, where public social events were uncommon. Nor does the diary contain a complete account of his social activities. He referred to few matters that did not relate to his legal or

167 —

business activities, unless they involved some expenditure of money, or the contracting of a debt.

One facet of almost every man's social life on the frontier was the saloon. Probably no men except ministers and a few teetotalers completely eschewed this stronghold of male socialization. Travis mentioned none by name, and when he patronized one, he seems to have done but little drinking. He mentions buying whisky by the bottle or the drink only a few times, and beer, once. He sometimes played faro or monte and faithfully wrote down the sums won or lost. It is interesting to note that he lost most of the time. During the period of September 2, 1833, to June 7, 1834, the only time he mentions gambling to any extent, he won only three times. On September 21 he lost $27.25[8] and on November 7, $34.[9] His total winnings were about $25, his total losses about $120. Having read thus far in the diary, one cannot escape the conclusion that he was conservative in money matters. He was not the sort of man with whom gambling is a passion, or who would continue to play in the face of steady losses. In any event, the diary ends on June 26, 1834, so we shall never know whether or not he gave up the pastime permanently.

Another phase of business that came pretty close to gambling was horse trading. Travis constantly referred to it but, oddly enough, did not mention one of the commonest forms of frontier gambling, which was betting on horse races. He made a few trifling election bets, and here the known story of his "gambling" ends.

The diary also throws some interesting light upon Travis' religious life. He was brought up a "hard-shelled" Baptist, and it can be assumed that he remained one all his life; but he did not share the narrow-mindedness of many Protestants, who regarded the dominant Catholic Church with suspicion and distrust, although the Mexican law compelled the settlers to pay it a certain outward respect as the only authorized religion of the country. On October 30, 1833, Travis noted down "preaching &c"[10] — by which he undoubtedly meant he attended church services of some kind. This is confirmed in the entry for the 31st, where he wrote that he "Sent Parson David Kincad [Kincaid?] $2."[11] On June 14, 1834, he "Dined at Connell's with priest — &c,[12] and on Sunday, the 15th, "Lent Padre Jaen $2.00."[13] On the following day

he "Borrowed Cot of Connell for Padre Jaen who moved to my house —,"[14] and on June 17, he "Became responsible for Padre Jaen's board at Gay's ——."[15]

We have already noted that Travis procured and sent to Dr. Rose's daughters two small religious books, but he was unable to find a Bible for their mother in San Felipe. He may have been responsible for the distribution of considerable Sunday school literature among the colonists; if so, he does not record other examples. There is evidence, however, that he attended a Methodist camp meeting held west of the Trinity in September 1835.[16] He may have attended other such "protracted meetings."

In assessing Travis' acts of charity one should remember that the value of money in the 1830's was much higher than it is today. When he notes on May 3, 1834, that he "Bo't $5. worth in Huff's store & gave to Dearborn for charity,"[17] he actually gave goods that would probably cost several times as much today, even allowing for inflated frontier prices. All of his acts of kindness did not involve money. He often gave freely of his time, abilities, and sympathy. On September 6, 1833, for example, he sat up with a dying man and, after his death, went on to take care of the funeral arrangements.[18] He made many loans to friends, often with only their word as security, and as often borrowed on the same basis. If clients were in financial straits, he often waived legal fees. He mentions lending his kitchen, and once or twice his house, to friends. And he allowed destitute men to sleep in his office. Further, he acted as a purchaser and supplier of goods to innumerable people, often waiting a considerable period for payment, sometimes in vain. He served as go-between in all sorts of deals. He seemed available to anybody. He served Indians, colored, whites, and in a few instances, Mexicans. And, much as he distrusted Mexicans, there is no evidence that he did not want them to receive justice the same as anyone else.

There are some entries in his diary showing that Travis gave small sums of money to children. The following are some examples:

[Sept.] 1st [1833] . . . — gave Whitesides Boy 25 —[19]
[Sept.] 15th [1833] . . . — gave Dorthea, a little girl 6 1/4 —[20]
[Mar.] 5th [1834] Gave Boy 50 —[21]

# GUNFIGHT

My Battle Against the Industry
that Radicalized America

## RYAN BUSSE



**PUBLIC**AFFAIRS
NEW YORK

Copyright © 2021 by Ryan Busse

Cover design by Pete Garceau
Cover images © iStock/Getty Images
Cover copyright © 2021 by Hachette Book Group, Inc.

Hachette Book Group supports the right to free expression and the value of
copyright. The purpose of copyright is to encourage writers and artists to produce
the creative works that enrich our culture.

The scanning, uploading, and distribution of this book without permission is a theft
of the author's intellectual property. If you would like permission to use material from
the book (other than for review purposes), please contact permissions@hbgusa.com.
Thank you for your support of the author's rights.

PublicAffairs
Hachette Book Group
1290 Avenue of the Americas, New York, NY 10104
www.publicaffairsbooks.com
@Public_Affairs

Printed in the United States of America
First Edition: October 2021

Published by PublicAffairs, an imprint of Perseus Books, LLC, a subsidiary of
Hachette Book Group, Inc. The PublicAffairs name and logo is a trademark of
the Hachette Book Group.

The Hachette Speakers Bureau provides a wide range of authors for speaking events.
To find out more, go to www.hachettespeakersbureau.com or call (866) 376-6591.

The publisher is not responsible for websites (or their content) that are not owned
by the publisher.

To protect their privacy, the names of some individuals have been changed.

Print book interior design by Linda Mark.

Library of Congress Cataloging-in-Publication Data
Names: Busse, Ryan, author.
Title: Gunfight : my battle against the industry that radicalized America / Ryan Busse.
Description: First edition. | New York ; PublicAffairs, [2021] | Includes
   bibliographical references and index.
Identifiers: LCCN 2021012770 | ISBN 9781541768734 (hardcover) | ISBN
   9781541768727 (ebook)
Subjects: LCSH: Busse, Ryan. | Firearms industry and trade—Political aspects—
   United States. | Firearms industry and trade—Moral and ethical aspects—United
   States. | Firearms ownership—United States. | United States—Politics and
   government—1989– | United States—Social conditions—1980–
Classification: LCC HD9744.F553 U62355 2021 | DDC 338.4/762340973—dc23
LC record available at https://lccn.loc.gov/2021012770

ISBNs: 9781541768734 (hardcover), 9781541768727 (ebook)

LSC-C

Printing 1, 2021

3 1223 13334 9630

*For Sara*
*My earth person, my sky person*

pistol I saw that day was proof that I could do only so much in the face of a wave of radicalization. The industry I once loved and helped build was now almost unrecognizable to me.

Had the men who just confronted me known about my day job, they might have done a double take. The day before this protest I sat in my comfortable office, directing the sales of guns and marveling at the effects of an unprecedented sales boom. We started the day with an impromptu sales meeting. Allen, our longtime manager of sales operations, arrived at work, bursting through the door with his usual intensity.

"Just about everything in California is still shut down," he said. "People can't buy a hamburger, but damn, have you seen the pictures from Turner's?" He showed me the photo of long lines of customers waiting to get inside the gun store. "It's like Black Friday times five!"

"I mean, what does it say about our country that we've been hoarding toilet paper and guns?" he added. "NICS is going to be off the chart again!"

A federal law named after President Reagan's press secretary, who had been wounded in an assassination attempt, created the National Instant Criminal Background Check System (NICS) in 1998. The Brady Act mandated that all gun sales by licensed dealers require one of these checks before finalizing a gun sale. The initial purpose of the system was preventing criminals from purchasing guns, but it also served as the closest thing to an official record of gun sales in America. After some data adjustments, the firearms industry generally accepted that one NICS check equals one gun sold.

Each month, the federal Bureau of Alcohol, Tobacco, Firearms and Explosives reported NICS numbers for the previous month, and the gun industry dutifully studied and mined these data for indications about market trends. The NICS report for March 2020, when the COVID-19 virus shut down the world, contained five of the ten highest days ever recorded. More guns were sold on March 20 than on any other day in the history of the United States. As most of the country came to grips with the uncertainty of a global pandemic, gun retailers made 201,308 sales that day. Allen was right about the monthly totals as well. In fact, March 2020 was the largest gun-sales month *ever*, with nearly 2.4 million guns sold, averaging nearly eighty thousand sales per day—almost double the previous March record. April and May also produced record NICS numbers. Many of those guns were Kimbers.

"Booze!" another salesman piped up. "It's flying off the shelves too. I went to buy vodka last night, and they were out! Guns, toilet paper, and booze."

As I thought about so many guns flooding into a market of scared, toilet-paper-less, heavy-drinking Americans, I remembered an often-repeated truism about the industry: "The gun business is just like the booze business; it's pretty good when times are good, and it's fucking great when times are bad."

Times were, in fact, great for gun companies: unlike many economic sectors, guns were deemed essential. During the COVID-19 outbreak, President Trump had tipped his hat to the core of his political base with the proclamation to keep gun stores and gun companies open. The gun-manufacturing industry's trade group, the National Shooting Sports Foundation (NSSF), quickly thanked Trump for the "essential business" designation in a press release. "We are deeply appreciative to the Trump Administration and Department of Homeland Security for recognizing the vital role our industry fulfills in our nation," said Larry Keane, senior vice president and general counsel of the NSSF.[1]

As we wrapped up our sales meeting the day before the protests in my town, I sensed a national disaster on the horizon. It was June, and gun sales were still smashing records. Manufacturers cranked out guns at full capacity, producing nearly one hundred thousand of them per day. They still could not keep up with demand.

For years, the gun manufacturers and the NRA had used fear and conspiracy whenever gun sales sagged. The logical outcome was frightening, but when I warned others about this, I was met with stares from people whose fortunes were tied to the monetary benefits of more fear, more conspiracy. *This is the road map the NRA created. We are now a*

*country that profits from disaster. Fear and hate are the only new products our industry needs.*

Although many in the gun industry knew deep down that I was right, most executives did not want to believe it. Years earlier, just a few weeks before the 2016 election, I found myself at dinner with one of them. The gun industry revered Smith & Wesson's CEO, James Debney. Tall and handsome, with a closely cropped salt-and-pepper beard, Debney led an iconic company that boasted worldwide name recognition just a half step behind Coca-Cola. Despite being a wealthy Brit, he had mastered the part of a red-blooded regular American gun guy, and our industry embraced him with open arms.

Debney knew that part of his role required large, conspicuous contributions to the NRA, and his generous financial donations earned him the organization's coveted Golden Jacket (yes, it's an actual jacket).

Kimber's owner also had a Golden Jacket, which meant that he was part of the NRA's Golden Ring of Freedom. Like Debney, he had received the prize directly from the NRA's powerful leader, Wayne LaPierre, in a tightly orchestrated ceremony that stroked egos and encouraged more mega-donations. Kimber's own press release was blunt about it: "The NRA Golden Ring of Freedom is known for distinguishing the eminent leaders within the NRA who have donated in excess of one million dollars."[2]

As we swirled the last of our wine in crystal glasses, the conversation turned to politics. I asked Debney if it seemed contradictory that a CEO of a publicly held gun company was helping finance the presidential candidate whose victory would ensure a drop in business, resulting in a drastic loss in shareholder value. He paused. "You really think that if Trump is elected, gun sales will dive?" he asked in a crisp English accent.

I laughed as the wine kicked in. "James, people in this industry want to think all of this growth is due to business genius, but gun sales in this country are largely driven by irrational fear. For your entire tenure, you've operated under President Obama. Trust me, without a Black

president or some new conspiracy theory to rely on, sales are going to tank. You're cheering for Trump, and if he wins, your stock price will fall like a rock. You know that, right?"

He just stared at me for several seconds as he processed what I said and then quietly laughed. "I don't think you're correct about Trump. If he wins, it won't have much impact. But I do think that if Hillary wins, we'll have a brilliant four years!"

This was Debney's way of both ignoring and admitting the truth about the undeniable impacts of politics on gun sales. I had heard the same sort of thing from others, and I knew that no industry professional wanted to believe that the main driver of our business was anything but genius. But Debney's comment also exposed the fact that our industry was just fine with the indisputable sales benefits from a new Democratic administration. Over the years and through the election cycles, the trends were clear: gun sales tended to rise during times of tragedy under, and in anticipation of, Democratic presidents, and they tended to slump during Republican administrations.

Not long after Trump's surprise win, Debney experienced this for himself. His company lost more than $1 billion in value as fear dissipated and sales slumped. By 2019, journalists also hounded him with questions about the Smith & Wesson M&P15 rifle that was used to murder innocent high school students in Parkland, Florida. Encouraged by the power of a new social movement, the nation responded differently to the Florida tragedy. Journalists were more dogged; they poked at Debney's wealth and noted that he profited from guns used in mass shootings.[3]

And before the year was out, he had lost one of the most prestigious jobs in the industry.

When I heard of Debney's departure, I wondered if he wished that instead of funding Donald Trump's victory with Golden Jackets, he had contributed to the certainty of continued fear and a "brilliant four years" under Hillary Clinton.

Debney did not survive at Smith & Wesson long enough to experience what ended up being a delayed payoff from the NRA's hard-won Trump victory. By the middle of 2020, Donald Trump bucked the normal Republican gun downturn by using fear, riots, racial division, hate, protests, Twitter lies, politicization of science, a raging pandemic, intimidation, and guns to generate incredible sales that brought our industry roaring back to profitability. The ridiculous fear of a Black Democratic president had been replaced by the fear of radical leftists, marauding gangs, and even *neighbors* whose politics might be suspiciously progressive.

I detested everything about the Trump-driven boom, which meant that my entire livelihood was a contradiction. I had to make certain my company was successful. I knew if I was good at my job, I'd earn credibility and respect. This meant that I had a seat at the table in the places where decisions were made. I got to make whispered deals at cocktail parties. I had the rare opportunity to make sure that top industry leaders heard me, and they did. I got to speak truth to power, and I did. I had more clout than most when it came to speaking up for reason and common sense at a time when it was desperately needed. That also made me a royal pain in the ass. I expected to be fired on more than one occasion, but I made it hard for them because I always put big numbers on the bottom line. As long as I helped make Kimber profitable, I had a get-out-of-jail-free card in my pocket.

My family had watched me confront the industry's growing addiction to fear. They supported me as I found ways to challenge it. My activism angered the increasingly vocal crowd of tactical enthusiasts, many of whom were now using military weaponry to intimidate ordinary citizens and lawmakers across our country. These were the same men who formed the base of a growing market and who functioned as an army of industry enforcers.

On many evenings, Sara and I sat with our boys around the dinner table to explain the new calls from that growing army for me to be fired. On the difficult days after unspeakably horrible events such as Las Vegas,

Parkland, and El Paso, Sara dared to publicly speak up as a concerned mother and citizen; she offered empathy and shared frustration over social media with the victims of the mass shootings. When this happened, trolls who defined themselves by the power of their military weaponry stalked her online. They used our marriage to threaten our family and my job.

Other times I confided in my family as I saw overt racism and growing acceptance of conspiracy theories in the industry. Like me, our boys were frustrated by this because we knew dozens of gun owners like us who did not tolerate racism or believe in crazy conspiracies. Like them, we owned and used plenty of guns. But guns did not define us, nor did we embrace them as symbols of intimidation. I wanted my family to know I was different, that we weren't alone in holding this position when it came to guns, and that I was working to lead Kimber in a way that never lost sight of the principles the industry once insisted upon.

Our boys rightly sensed that mine was a tightwire act. For their sake, I tried not to seem too concerned, but they were worried. They had heard the after-dinner whispers between Sara and me as I bemoaned eventual and unavoidable impacts to our country and my livelihood.

As guns combined with heated national politics and then boiled over, most firearms executives I knew were celebrating. This upheaval was very, very good for gun sales. All of it—the fear, the racism, the hate, the militarism—sold guns. After years of trying to stay above it all, now I just wanted out.

The products of my industry, especially the AR-15, had become the most important political symbol for President Trump's base, maybe even a religious one. Many of the men at our protest wore the outline of the assault rifle on their hats and T-shirts, and those images sent a message of common faith. More powerful than even their flags, this symbol also let everyone else know that its bearers were armed with an efficient military killing machine, easily deployed when under threat, whether real or perceived.

In a nod to the overriding need for higher sales, I watched as the industry turned its back on safety instructors and hunters. They were marginalized and even given the pejorative nickname "Fudds" in a reference to the simpleton cartoon character Elmer Fudd.[4] The lessons and warnings that Fudds believed in were now just impediments to higher sales. Millions of people who recoiled from seeing Americans terrorized with the offensive use of guns, or people who still believed in safety, background checks, and decency, were forced into the shadows.

I am not one to live in shadows. I have never been that kind of person. While in the industry, I helped develop new sales models and create new markets. It was my job, my career. I was good at it. Pitching in to build the tools of political extremism was once part of my job too. But slowly, then far too quickly, those political requirements meant that the firearms industry was not just another slice of the US economy. It and I were part of something much larger: a powerful political machine radicalizing our nation.

In 1995 I was a young man, and I rushed into the industry, believing that it embodied wholesome parts of a country that valued and relied on guns but did so responsibly. Those were still the days of magazine covers featuring the warmth of father-son hunting trips. For years, my early assumptions seemed correct, but by 2000, things were changing, and the industry was being molded into a powerful political machine. By 2004, I came to terms with the disastrous potential of that machine, and I spent the remaining sixteen years of my career fighting it.

I fought for people like my father, who taught me to shoot on the ranch where I grew up. I stayed for the gun owners across the country who also embraced safety and reason. I refused to cede ground, and I still believe that the millions like me have the right to insist on our own reasonable approach.

I realize that many reading this book might disagree with the line I chose to walk for so long. I can appreciate how many Americans believe we'd be better off without *any* guns—not just with a system of reasonable regulations. Many of these people have lived and suffered in

ways I have not. I am a proud gun owner who hunts and shoots with his boys whenever I can, yet I share a common concern with these people who oppose guns because, like them, I'm worried about extremism and radicalization. I realize that a gun industry which mocks responsibility while celebrating armed extremism only strengthens the argument to end gun ownership. Millions like me know that the future of firearms ownership depends on responsibility, decency, and reason for the simple reason that the future of the democracy that grants us the right of gun ownership depends on the same things.

My story, like the story of our nation, is complex. To understand it all, we need to know the truth about how our country's fascination with guns and power forms the framework of our modern existence.

This is the inside story of an industry that changed America and of a gunrunner turned gunfighter who lived through it all.

legislation, and the nation's appetite for guns doubled to nearly twenty-one thousand per day. The sales increased when the NRA and the industry simply switched their name for the legislation to the simpler—and scarier—"Clinton gun ban."

Gun-rights organizations succeeded in helping to temper the bill's language, but at the end of the day the NRA could not stave off a bi-partisan surge in support of the law. In a final snub to the NRA, former presidents Carter, Ford, and even conservative icon Ronald Reagan sent a letter to all members of Congress urging them to "listen to the American public and to the law enforcement community":

> This is a matter of vital importance to the public safety. Although assault weapons account for less than 1% of the guns in circulation, they account for nearly 10% of the guns traced to crime. . . . While we recognize that assault weapon legislation will not stop all assault weapon crime, statistics prove that we can dry up the supply of these guns, making them less accessible to criminals.[3]

The letter worked. On September 13, 1994, the bill passed with a slim 52–48 majority in the Senate. Clinton wasted no time. His team rushed a ceremony at the White House, where he signed the bill into law that afternoon.

From that day forward, guns and magazines that were legal under the bill were termed "post-ban." Grandfathered guns that were now illegal to manufacture were called "pre-ban." The grandfather clause dictated that the pre-ban weapons could be owned and sold, just not manufactured. So for years, these pre-ban guns and high-capacity magazines commanded high prices at gun shows and in private sales.

That autumn day in the White House Rose Garden marked the turning point for our national politics. The NRA learned important and unforgettable lessons in this narrow defeat, reactions to which were so loud that a sleeping giant in US politics stirred awake. The organization

had fought hard, but not hard enough. It had chipped away at defectors, but it failed to demand 100 percent loyalty. It had used fear of loss, but not enough to convince elected officials that they would lose their seats to pissed-off and terrified single-issue voters. The NRA had criticized leaders who voted for the bill but did not *demonize* them. The organization linked the gun issue to other hot-button right-wing social issues, but not enough to sway the last few senators they needed. The NRA allowed debate on the merits of the law instead of using all-or-nothing arguments and wild conspiracy theories. It even allowed a beloved Republican former president to lobby against its cause. These were all important lessons for the organization to quickly correct. They were not errors the NRA would make again.

In the aftermath of its stinging loss, the NRA also found three reasons for celebration. The first was the elevation of Bill and Hillary Clinton, who turned out to be fundraising megastars for the NRA. From that day forward, any mention of the Clintons and their easily understood threat to freedom and guns resulted in ready cash and new memberships. The NRA would go back to that well time and again, eventually elevating Hillary Rodham Clinton to her own special fundraising category.

The second reason was a realization that fear of impending elections or legislation could be used to *explode* gun sales and NRA memberships. The NRA knew it could deploy this tactic at the slightest whisper of any anti-gun legislation or even a candidate who had been a community organizer in, say, Chicago.

The third reason for celebration was language slipped into the legislation in an attempt to garner enough Republican votes for passage. At the insistence of the NRA, negotiators added a sunset provision to the text, mandating the expiration of all components of the ban if a future president did not reenact the bill with a simple signature. Including that provision seemed safe. Back then, most Americans broadly accepted it. Even a New York real estate developer named Donald Trump weighed

in with support. As he said in 2000, "I generally oppose gun control, but I support the ban on assault weapons and I support a slightly longer waiting period to purchase a gun."[4]

At the time, statements like Trump's illustrated why no one could conceive of a political situation where a president would be foolish enough to publicly allow assault weapons back into everyday life. But no one could conceive of the political changes on the horizon or that George H. W. Bush's son, the same Texas governor who responded to the Luby's shooting by expanding gun rights in his own state, would be president on September 13, 2004, the date of the long-awaited sunset.

Reaction to the new legislation consumed every waking moment for members of the shooting industry. By the time I was taking orders from Greg Warne, the 1994 sales boom was long over. Many of the stores that cashed in during the run-up to the ban had gone out of business. I had not picked the best time to become a gunrunner. Keeping a company afloat was hard. Building a new one? Almost impossible.

There was no fear, no impending crisis, no legislation, and nothing to scare people into buying more guns. By the time I was working to be rookie of the year, gun sales in the country had been cut in half, dropping down to fewer than four million units per year.

The NRA used the difficulty in the gun business to convince gun companies and gun owners that Bill Clinton and his political party were starving and marginalizing them. This was the first effort by the NRA to create anger and a perception of aggrievement, and it worked. Exceptionally well.

This is when the NRA realized that it had to play a long game. Immediately after Clinton's 1994 legislative win, it began forming a strategic coalition with the religious Right. From that day forward, guns would be intertwined with other divisive political issues such as abortion, which resulted in religiously loyal single-issue voters. Twenty years later, America's first Black president would say that these aggrieved voters "clinged to their religion and guns," without necessarily realizing that his words only made the situation worse.

In November 1994, before either the NRA or Newt Gingrich had any idea that these voters would come to be labeled as "clingers," the confrontational House leader connected the social issues together and harnessed the firepower of the NRA to give Clinton a stinging defeat in the midterm elections. Just two months after Clinton signed the assault weapons ban, Republicans gained eight seats in the Senate and fifty-four in the House, retaking control of both chambers of Congress. This was the first visible sign that guns and the NRA were to be central in the nation's unfolding political upheaval.

As the feelings of aggrievement took hold, most people in the gun business believed that we were fighting a war being waged by Democrats who were directly targeting our industry. Like many young men itching to fight, I instinctively wanted to help win the battle. Without thinking too much about it, I found myself casually bad-mouthing President Clinton and often taking part in industry banter that labeled all gun-control legislation as evil. Politicians who supported it were even worse.

This was the same feeling of marginalization I remembered from my days growing up in flyover country. By the time I got to college, I had been ready to take on the liberals directly. I suppose that I was a gifted student, but I considered myself wise to the ploys of educators whom I had been warned about on the conservative talk radio that flowed freely in ranch trucks and tractors. I spoke up in classes and regularly played the role of devil's advocate. When given the opportunity, I expressed conservative opinions and stood up for kids like me who felt put upon and disrespected, completely oblivious to the fact that I had grown up with more opportunity and privilege than most.

My background and antipathy meant that I fit into the firearms industry perfectly. Just like ranch kids, gun people were disrespected and flown over, dismissed by faraway, pompous elitists who thought they knew better, and that created a lot of simmering anger. People like me were grappling for a unifying point of resistance, and guns fit the bill perfectly. Magnifying guns as symbols became the central project for

# THE GUN DEBATE

## WHAT EVERYONE NEEDS TO KNOW®

### 2nd Edition

## PHILIP J. COOK AND KRISTIN A. GOSS



OXFORD
UNIVERSITY PRESS

Copyrighted Material

Copyrighted Material

# OXFORD
### UNIVERSITY PRESS

Oxford University Press is a department of the University of Oxford. It furthers
the University's objective of excellence in research, scholarship, and education
by publishing worldwide. Oxford is a registered trade mark of Oxford University
Press in the UK and certain other countries.

"What Everyone Needs to Know" is a registered trademark of
Oxford University Press

Published in the United States of America by Oxford University Press
198 Madison Avenue, New York, NY 10016, United States of America.

© Oxford University Press 2020

All rights reserved. No part of this publication may be reproduced, stored in
a retrieval system, or transmitted, in any form or by any means, without the
prior permission in writing of Oxford University Press, or as expressly permitted
by law, by license, or under terms agreed with the appropriate reproduction
rights organization. Inquiries concerning reproduction outside the scope of the
above should be sent to the Rights Department, Oxford University Press, at the
address above.

You must not circulate this work in any other form
and you must impose this same condition on any acquirer.

CIP data is on file at the Library of Congress
Names: Cook, Philip J., 1946– author. | Goss, Kristin A., 1965–
Title: The gun debate : what everyone needs to know /
Philip J. Cook, Kristin A. Goss.
Description: 2nd edition. | New York : Oxford University Press, 2020. |
Series: What everyone needs to know® |
Revised edition of the authors' The gun debate, [2014] |
Includes bibliographical references and index.
Identifiers: LCCN 2019035359 (print) | LCCN 2019035360 (ebook) |
ISBN 9780190073466 (hardback) | ISBN 9780190073459 (paperback) |
ISBN 9780190073473 (updf) | ISBN 9780190073480 (epub)
Subjects: LCSH: Gun control—United States. | Firearms ownership—
United States. | Firearms—Law and legislation—United States.
Classification: LCC HV7436 .C657 2020 (print) | LCC HV7436 (ebook) |
DDC 363.330973—dc23
LC record available at https://lccn.loc.gov/2019035359
LC ebook record available at https://lccn.loc.gov/2019035360

1 3 5 7 9 8 6 4 2

Paperback printed by LSC Communications, United States of America
Hardback printed by Bridgeport National Bindery, Inc., United States of America

Copyrighted Material

Copyrighted Material

12   THE GUN DEBATE

semiautomatic rifle or pistol this sequence is automated, so that the shooter can fire as fast as he can pull the trigger—one round per trigger pull—until the magazine is emptied, at which point it can be removed and replaced with a fresh magazine. Finally, a fully automatic firearm fires continuously with a single pull of the trigger. Weapons of this sort are widely used by armies and rebel militias around the world. Interestingly, some standard infantry rifles of the US armed forces in the M16 family have a selective-fire option including a burst of three rounds for each trigger pull. That setting is designed to save ammunition in comparison with fully automatic fire and makes the weapon easier to control when used.

Finally, the diameter of the barrel is an important characteristic of firearms, since it determines the size of the cartridge—which in turn affects the damage done to the target. (The velocity and design of the bullet are also relevant to determining damage.) For rifles and handguns, the diameter of the barrel is denoted as the "caliber." The caliber is measured either in fractions of an inch (.22, .38, .45) or with the metric system in millimeters. Among the most popular sizes are the .38-caliber revolver and 9mm pistol, which are close to identical in diameter and ballistic performance.

Once again shotguns are a bit different. The diameter of a shotgun barrel is denoted by its "gauge" rather than caliber. The most common gauge is 12, which is equivalent to .729 caliber. Confusingly, a smaller diameter shotgun has a larger gauge: A 20-gauge shotgun is just .615 caliber, and a 410-gauge shotgun equates to .458 caliber. The basic physics of action and reaction explains why larger barrels and the larger ammunition that fits them cause a greater recoil when the gun is fired. A .22-caliber pistol or 20-gauge shotgun is easier to control than its larger counterpart because of less felt recoil.

Copyrighted Material

### Why Do Gun Owners Usually Have Several Guns?

By and large people say that the main reason they have handguns is for self-defense, while their long guns are primarily for hunting or target shooting. Those who are knowledgeable about guns and enjoy them may be motivated to keep a variety on hand. For self-defense they may want to keep handguns in several locations, with a relatively small pistol to carry concealed when they go out and larger, more powerful models to keep in the bedside table or next to the front door. For shooting woodchucks and other varmints on the farm, a .22 rifle is sufficient (and uses cheap ammunition), but for deer hunting a larger caliber weapon is needed. For bird hunting and skeet shooting, people keep one or more shotguns, which may also be deemed good weapons for self-defense. Different circumstances and purposes call for weapons of differing power, weight, accuracy, rapidity of fire, and so forth. And for some gun collectors, the utilitarian purposes are less important than the sheer fascination of these intricate machines.

As rural traditions have faded and self-defense uses become more prominent, the mix of guns sold in the United States has changed. Handguns have gained market share, from only 21% of all new guns in the 1950s to 36% in the 1970s to 42% in the 2000s. Since 2008, more than half of new gun shipments have been handguns.[32]

Handguns are also the weapon of choice for criminal use. About 75% of murders with firearms are committed with handguns, about the same as the percentage of suicides involving handguns.[33] During Prohibition both gangsters and law-enforcement officers used Thompson submachine guns (so-called Tommy guns), the "gun that made the 1920s roar."[34] Congress imposed strict regulations on such guns in 1934 with the National Firearms Act, so that criminal use of fully automatic weapons is uncommon in the United States.

Copyrighted Material

**14   THE GUN DEBATE**

### What Is an Assault Weapon?

An assault weapon is most commonly defined as a semiauto-
matic firearm with some of the features of a military firearm.
(An important difference is that a true military assault rifle, such
as the US Army's M4, can fire continuously or in bursts with a
single pull of the trigger.) An assault weapon has a detachable
magazine and other common features of military weapons,
such as a pistol grip, a folding stock, a bayonet mount, or a
flash suppressor. Most assault weapons are rifles, although
some pistols and shotguns qualify under some definitions. The
TEC 9 pistol and the Street Sweeper shotgun are prominent ex-
amples. One of the most popular assault weapons is the AR-15,
the civilian (semiautomatic) version of the US military's M16.
The National Shooting Sports Foundation has campaigned to
rebrand AR-15–style weapons as "modern sporting rifles."

In 1994 Congress adopted a ban on new assault weapons.
The operational definition for this somewhat vague term was
written into the law and included specific models but also
any models with specified characteristics that were deemed
problematic. Congress allowed the law to expire in 2004, but
several states have adopted bans on assault weapons—each
employing its own definition.

A closely related concern for lawmakers has been large-
capacity magazines, since they are thought to facilitate ram-
page shootings. The 1994 federal law (which expired in
2004) limited new magazines to 10 rounds.

### What Devices Are Available to Prevent Misuse?

Even in the hands of a well-intentioned adult, a firearm is a
dangerous weapon. There are more than 20,000 accidental
shootings each year, including about 500 fatalities.[35] People
who have no experience or training with guns may be ignorant
of safe practice when it comes to storage, carrying, loading and
unloading, cleaning, and lining up a target. (No state requires

Copyrighted Material

Books by William C. Davis

*The Cause Lost: Myths and Realities of the Confederacy*

*Civil War Journal*

*A Way Through the Wilderness: The Natchez Trace and
the Civilization of the Southern Frontier*

*"A Government of Our Own": The Making of the Confederacy*

*Jefferson Davis: The Man and His Hour*

*Diary of a Confederate Soldier*

*Touched by Fire (2 volumes)*

*The Image of War (6 volumes)*

*The Imperiled Union (2 volumes)*

*The Orphan Brigade: The Kentucky Confederates
Who Couldn't Go Home*

*Battle at Bull Run*

*Duel Between the First Ironclads*

*The Battle of New Market*

*Breckinridge: Statesman, Soldier, Symbol*

# THREE ROADS TO THE ALAMO

## THE LIVES AND FORTUNES OF DAVID CROCKETT, JAMES BOWIE, AND WILLIAM BARRET TRAVIS



## WILLIAM C. DAVIS



HarperCollins*Publishers*

976.4009 D299t

Davis, William C., 1946-

Three roads to the Alamo
: the lives and
c1998.

THREE ROADS TO THE ALAMO. Copyright © 1998 by William C. Davis. All rights reserved. Printed in the United States of America. No part of this book may be used or reproduced in any manner whatsoever without written permission except in the case of brief quotations embodied in critical articles and reviews. For information address HarperCollins Publishers, Inc., 10 East 53rd Street, New York, NY 10022.

HarperCollins books may be purchased for educational, business, or sales promotional use. For information please write: Special Markets Department, HarperCollins Publishers, Inc., 10 East 53rd Street, New York, NY 10022.

FIRST EDITION

Designed by Interrobang Design Studio
Endpaper maps copyright © 1998 by Anita Karl and Jim Kemp

Library of Congress Cataloging-in-Publication Data

Davis, William C., 1946–
    Three roads to the Alamo : the lives and fortunes of David Crockett,
James Bowie, and William Barret Travis / William C. Davis.—1st ed.
        p.   cm.
    Includes biographical references and index.
    ISBN 0-06-017334-3
    1. Pioneers—Texas—Biography.   2. Alamo (San Antonio, Tex.)—
Siege, 1836.   3. Crockett, David, 1786–1836.   4. Bowie, James
d. 1836.   5. Travis, William Barret, 1809–1836.   I. Title.
F390.D276   1998                                              97–43815
976.4'009'9—dc21

98 99 00 01 02 ❖/RRD 10 9 8 7 6 5 4 3 2

3 1223 04826 6143

We can no longer say there is nothing new under the sun. For this whole history of man is new. The great extent of our republic is new.

THOMAS JEFFERSON, 1801

What is the American, this new man? He is an American, who leaving behind him all his ancient prejudices and manners, receives new ones from the new mode of life he has embraced, the new government he obeys, and the new rank he holds. He becomes an American by being received in the broad lap of our great Alma Mater.

MICHEL-GUILLAUME-JEAN DE CRÈVECOEUR
(J. HECTOR ST. JOHN)
Letters from an American Farmer

Millions of men are all marching together toward the same point on the horizon; their languages, religions, and mores are different, but they have one common aim. They have been told that fortune is to be found somewhere toward the west, and they hasten to seek it.

ALEXIS DE TOCQUEVILLE, Democracy in America

wound. Moreover, the bullet may have been deflected by coins in his vest pocket, leaving little else than a very severe bruise and perhaps a fractured rib. It confined him to his room for a few days, but that was all. Out on the streets of Alexandria, Wright and his friends cooled down, and in any case sentiment ran against him for drawing and firing on a man who was initially unarmed. The *Louisiana Messenger* expressed one more time its outrage on the way men went about armed and so speedily resorted to dirks, knives, and pistols when anger exploded. Meanwhile, in his room at Bailey's, James Bowie nursed his pains and reflected bitterly on the unreliability of pistols and the fact that his cowardly foe lived only because the time it took to open his clasp knife with his teeth gave Wright's friends their opportunity. He resolved that he would never again lose those precious moments in a fight, nor would he allow his fondness for fine dress to leave him unarmed. He would make a leather scabbard for his hunting knife and keep it on his belt, and he told his brothers that he would "wear it as long as he lived." Having skirted the periphery of violence for so long, even threatening it on others, at last Bowie felt it himself. If ever there was a next time, he would be ready.[89]

<br/>

## 7

# CROCKETT

## 1829–1831

> *All his friends admit that he is somewhat eccentric, and that from a deficit in education, his stump speeches are not famous for polish and refinement—yet they are plain, forcible and generally respectful.*
>
> *Jackson Gazette,* AUGUST 15, 1829

At least one thing remained constant in David's life: He had to borrow seven hundred dollars to settle his accounts and get home from Washington.[1] At least some of the money he no doubt intended to apply to his reelection campaign, for no sooner did he set foot in Tennessee again than he took to the hustings, and this time somewhat on the defensive. He had failed to get his land bill through as he had boasted. Worse, the colleagues he had alienated in his own delegation now openly charged him with being the agent of the bill's death on the table. Somewhat disingenuously Crockett began trying to counter that charge with his constituents the very day of the tabling motion, sending an open letter for publication in which he argued that he had hoped that the death of the Polk version of the bill would have brought his colleagues around to his own. The fact was, of course, that events moved out of his control and left him looking very much like his own worst enemy, and by extension an enemy of the interests of the poor people of West Tennessee.[2]

Moreover, the only real accomplishment of his term in Congress had been getting a new postal route established in his district, a small achievement at best.[3] At least he did wisely keep his district advised of what he was doing, even when there was really nothing to tell, and in common with all representatives he took advantage of the free frank to send copies of his speeches—the printed, not spoken, versions—for circulation among his constituents.[4] On arriving in Weakley County



20. Where all roads led, and where Crockett, Bowie, and Travis finally met, and died. The earliest known photograph of the Alamo church, a daguerreotype taken prior to 1850, and showing clearly some of the damage done during the fortifying of the place, and the subsequent bombardment. (*Center for American History, University of Texas, Austin*)

## 9

## BOWIE

1827–1828

> *It was his habit to settle all difficulties without regard to time or place, and it was the same whether he met one or many.*
>
> WILLIAM H. SPARKS, 1881

Norris Wright's bullet gave James Bowie his first real encounter with mortality, though it would have been uncharacteristic of him to be sobered by his brush with death. If anything as he lay recuperating he thought only of finding his antagonist to finish the fight, and most likely without resort to the conventions of the *code duello*. He had no patience for a process so slow and deliberate as that. Bowie epitomized that species of American whom Tocqueville found "trusts fearlessly in his own powers, which seem to him sufficient for everything." He would wade into Wright at first sight wherever he found him, and that would be an end to it. Wisely, once he learned that Bowie lived, Norris Wright kept his distance for the next several months, but in a small frontier community like Rapides, inevitably they must meet again, and Bowie would be ready this time.

While in bed he determined to make that leather scabbard to wear on his belt, and when Rezin visited him after the fight, he brought something to fill it. Some years earlier at his Avoyelles plantation, Rezin had stood at his forge and fashioned a hunting knife, perhaps using an old file for iron stock. He hammered out a straight blade one and one-half inches wide and just over nine inches long, put it to a grinder to hone a keen edge on one side, and then added a crosspiece separating the handle from the blade. Not at all ornamental and entirely utilitarian, it showed the stains and wear of long use. But with a good edge it made a deadly weapon all the same, and now he gave it to James. In the next encounter with Wright, if there was one, his

brother would lose no precious time on a misfiring pistol or opening a clasp knife. When finally he arose to walk the streets of Alexandria once more, James Bowie wore his brother's knife at his belt, where it remained every day thereafter.[2]

Bowie had been lucky to survive Wright's bullet, but then James seemed charmed by good fortune, and as he recuperated his luck held elsewhere. Through a remarkable chain of misunderstandings and oversights—aided perhaps by a forged letter from Graham written by Bowie—George Davis went ahead and allowed the surveys of seven claims in Terrebonne on the Harper report. By April 1827 Bowie started registering transfers of the titles from the Martins to himself, and once he had the surveys in hand, he owned clear title to at least 17,600 acres. When an incensed Graham learned of the error, he could do nothing but start an investigation and threaten to ask President Adams himself to issue a special executive order to stop Bowie. And meanwhile, as usual, Bowie removed almost all of the original papers from land office files by showing a power of attorney from Robert Martin. His only slip was failing to do the same for the one claim on file for William Wilson.[3]

At the same time affairs looked bright for Bowie elsewhere. On January 28, 1827, old Reuben Kemper died at his home on the Calcasieu. That removed him, at least, as an obstacle to Bowie pursuing his supposed de la Français heirs' claim to forty thousand dollars or more due to Kemper from the government.[4] As for more immediate availability of money, prospects improved for everyone in the region that year. After the depression of the early 1820s, planters in the western parishes sought to shift capital control away from the usurious New Orleans banks. Finally, in its 1826 session, the legislature approved a charter for the Consolidated Association of the Planters of Louisiana. Since most farmers were land rich and cash poor, the Planters Bank, as it came to be called, pioneered in accepting land as collateral for loans. The original shareholders elected Hugh de la Vergne controller and sent him and an associate to New York and England securing two million dollars in investment capital, which they finally got from the house of Baring Brothers in London. Though Bowie was not an original shareholder, he soon became one. A planter acquired shares by pledging land, and shareholding in turn entitled him to apply for loans. Bowie used his newly

acquired Terrebonne property to gain him shares, and soon had need for a loan, as his spending habits had not changed.[5] With fall approaching he faced court action by Wilfred Dent for a $1,990 debt, and even his smooth tongue could not find a way to avoid confessing the validity of the judgment.[6] Thus he parlayed his fraudulently acquired land into a tool to work for him even before he found buyers.

On the horizon in Rapides, meanwhile, all the years of mounting frustration, resentment, jealousy, ambition, and more finally came to a head. Once more financial recession loomed. The wave of land speculation of the past several years left many overextended and indebted, their property, like the Martins', about to be seized in judgment. "The weight of debt must sooner or later force a change of owners of most of the property in the Parish," John Johnston warned his brother in July, "which will bear in its train distrust, hatred, malevolence, jealousy and all of the concomitant discord." This only exacerbated the personal animosities among the several factions in the parish, and now they gelled into two camps. On the one side stood the Wells brothers, chiefly Samuel and Montfort, and Bowie's old friend Warren Hall. General Cuny loosely allied with them as well, perhaps in part because of an $11,750 mortgage that he owed Montfort Wells.[7] On the other stood Robert Crain, Dr. Thomas Maddox, Alfred Blanchard, and Norris Wright. Chances were that by late summer of 1827 none of them knew the true origins of their feud. Crain and Cuny had a long-running disagreement.[8] The Wellses and Wright, of course, harbored grudges over recent and past elections. Hall and Wright were also enemies thanks to old insults and Hall's friendship for Bowie. Dr. Maddox, though long friendly with Samuel Wells, had recently been pulled by loyalties to his other friends, and Wright especially could be counted on to feed him poisoned information about his own antagonists. Bowie, of course, harbored his own feelings toward Wright.[9]

Ostensibly the final explosion began when friends on both sides urged the Wells brothers and Hall to meet Maddox, Wright, and Crain on the dueling field and finally settle their differences. The confrontations began when Montfort Wells and his second, Hall, met to fight Crain and his second, Wright. Rather than shoot, however, they shouted. Wells was so nearsighted that he demanded a distance of no more than ten paces between the duelists, but the two seconds, already

It was in that several inches of sharpened steel that lay the ultimate irony of Bowie to posterity. Innumerable legends made him, not Rezin, its designer, and the attachment of the family name to a weapon that caught public imagination ensured that the two would be inseparable. A big knife was practical, no mystery in that, and as more and more men came across the Mississippi to challenge the frontier, they needed one, more as a tool than a weapon. In 1834 a British visitor noted the growing craze for such knives—Rezin always said that others designed and made this new variety—and commented that they "got their name of Bowie knives from a conspicuous person of this fiery climate."[69] The next year they were being made in Boston and Cincinnati and elsewhere, and by 1841 James Black claimed to have made them in Arkansas. The year after Bowie's death, the Alabama legislature passed legislation decreeing that anyone carrying a Bowie knife who subsequently killed a person in a fight would be charged with premeditated murder. Mississippi prohibited it as a dueling weapon, and in 1838 Tennessee tried to ban its sale. By 1839 the name caught the imagination sufficiently that the Grenada, Mississippi, *Bulletin* changed its name to the *Bowie-knife*.[70] No one could ever say for certain just how the knife got its name, whether for Rezin who made the early prototype and apparently made others as gifts for friends, or for James, who only used it once in action. If James does deserve the credit, it is probably because after 1827 he was so often seen wearing the large knife at his belt, and that identified the blade with him.

That distinctive type of American frontier character was evolving from bumpkin and prankster, like Crockett and Mike Fink, toward a more sinister stereotype, surrounded by the ever-present danger and violence of the less civilized new West. At the same time a terrible weapon like a big knife seemed to symbolize the cold determination and occasional savage brutality of the new American, who in this generation would create aphorisms like "war to the knife, and the knife to the hilt." He was a far cry from Nimrod Wildfire, and unlike Crockett, there was no living man for the new icon's image to ride. The dead Bowie was perfect for this new folk hero, however. He was brave, he could be brutal, and he once killed a man with the big knife. That was enough. Ironically, he became ultimately the blade's most famous victim, for the rising legend attached to the knife and the mythology that

put it repeatedly in James's hand in duel after duel all but killed the memory of the historical James Bowie.

As the craze for the knives spread, his fame and growing legend spread with them, until both were suddenly superseded a generation later by a newer and vastly more deadly weapon, the repeating pistol. When the "six-gun" came, it created a whole new dimension for the frontier hero, and the knife went back to being a utilitarian instrument, and the Bowie legend stopped growing. Yet he lived on in a way, for behind the new revolvers there was still the essential man of violence—fearless, quick to fight, yet a defender of the weak. American mythology simply took the Bowie of the knife myth and put a gun in his hand. And still beneath the myths and fables lay something fundamental. They all turned on an undeniable truth. This was James Bowie of the Sandbar and the San Saba and more. Even if he had not done all those legendary deeds, few doubted that he could have done them. Unsaid in every bit of the Bowie lore was the implicit feeling that if only he had not been confined to his cot by cruel fate and illness that March morning, then Santa Anna and his army might *still* be trying to get into the Alamo.

Travis's friend and pupil Kuykendall, ever the suffering poet, wrote some verse about them in 1849, calling it "The Valiant Dead."

> The trumpet's voice and war's alarms
> Shall summon them no more to arms;
> In Valor's ranks they've left a space
> And in our hearts a vacant place:
> But Sleep evokes in solemn night
> Their radiant forms to Fancy's sight,
> And waking thought, to sadness wed,
> Dwells mutely on the valiant dead.
> High Bards shall sing their deathless deeds,
> And Freedom's pilgrims, clad in weeds,
> Oe'r their cold graves warm tears will shed
> And Heaven reward the valiant dead.[71]

It was not a particularly good poem, and verse would present no challenge to legend for custody of their memory. Neither would fact.

# THE SOCIAL HISTORY OF

# THE Machine Gun

*New foreword and bibliographical essay by*
*Edward C. Ezell, Smithsonian Institution*

The Johns Hopkins University Press   BALTIMORE

*John Ellis*



Richard Jordan
Gatling
(1818–1903) with
his .45 caliber
Model 1893
Bulldog model
Gatling gun.

Copyright © 1975 by John Ellis
Johns Hopkins Paperbacks edition copyright © 1986 by
The Johns Hopkins University Press
All rights reserved
Printed in the United States of America on acid-free paper

Published by arrangement with Pantheon Books, a division of
Random House, Inc.

Johns Hopkins Paperbacks edition published, 1986
9 8 7 6

The Johns Hopkins University Press
2715 North Charles Street
Baltimore, Maryland 21218-4363
www.press.jhu.edu

*Library of Congress Cataloging-in-Publication Data*
Ellis, John, 1945–
  The social history of the machine gun.
  Reprint. Originally published: New York: Pantheon Book, © 1975.
  Bibliography: p.
  Includes index.
  1. Machine-guns—History   2. Military history, Modern—19th cen-
tury.   3. Military history, Modern—20th century.   4. War and society.
5. Sociology, Military.   I. Title.
UF620.A2E38 1986        355.8´2424´09        86-45457
ISBN 0-8018-3358-2 (pbk.)

A catalog record for this book is available from the British Library.

The illustrations are reproduced by courtesy of the Armed Forces History
Division, National Museum of American History, Smithsonian Institution,
title page and page 27; Griffin and Co., pages 9 and 79; Illustrated News-
papers group, pages 21, 32, 46, 47, 60, 67, 81, 85, 86, 87, and 93; Browing,
page 41; Imperial War Museum, pages 59, 115, 117, and 119; The Tate
Gallery, page 112; Associated Press, pages 154, 156, 169, and 170; Homer
Dickens Foundation, pages 161 and 162; and the U.S. Department of
Defense, the General E                                            fairs, and
Fabrique Nationale, Be          31223145170370

took to muzzle-load each individual barrel. The advantages gained by the ability to deliver concentrated fire were nullified by the inability to maintain a sustained fire. Similarly, the guns were so unwieldy that it was almost impossible to manoeuvre them to positions on the battlefield where they might be most needed.

For hundreds of years in fact gunnery was a very crude and unreliable science. Up to the sixteenth century, for example, the actual firing of a gun depended upon the bringing of some form of fire, usually a slow match, into contact with the powder in the firing pan. After the sixteenth century the process was streamlined somewhat and made a little more reliable. From this date the initial ignition was achieved by striking together flint and roughened steel to produce a spark. Such flintlocks were the standard infantry arm until the invention of the percussion cap in 1807. In neither period was it technically feasible to produce a reliable gun that could produce either a concentrated or a sustained fire. In both cases such a gun would be bedevilled by the same problem of the prolonged loading period that had so detracted from the value of the organ guns. Similarly, the chronic unreliability of both loading methods would not guarantee any multi-barrel gun much more than a fifty per cent fire rate; whilst the combination of this same unreliability, the instability of many charges of gunpowder packed into one piece, and the possibility of serious flaws in the barrels due to crude casting techniques, could make any such gun a potential death trap for those called upon to fire it.

Even so, the very idea of being able to produce a gun that had a significantly superior firepower occasionally drove an inventor to the drawing board. Either from ignorance or blind faith each went to work thinking that for him at least the constraints of an as yet inadequate technology would count for nothing. One such visionary, in the sixteenth century; came to see Sir Francis Walsingham, then the Secretary of State. With him he had a letter that proclaimed that its bearer, a German, 'among other excellent qualities which he hath, can make an harquebus that shall contain balls or pellets of lead, all of which shall go off one after another, having once given fire, so that with one harquebus one may kill ten thieves or other enemies without recharging it.' In 1626 Charles I granted a patent to a certain William Drummond in Scotland. He had described his invention as being 'a machine in which a number of musket barrels are fastened together in such a manner as to allow one man to take the place of a hundred musketeers in battle.' The machine was to consist of fifty barrels mounted in a circular fashion. Not only would the gun be able to fire fifty rounds at

11



**No. 1** The Barrel of the Gun
**2** The Sett of Chambers charg'd put on ready for Firing
**3** The Screw upon which every Sett of Chambers play off and on
**4** A sett of Chambers ready charged to be klip'd on when the first Sett are pull'd off to be recharg'd
**5** The Crane to rise fall and Turn the Gun round
**6** The Curb to Level and fix the Guns
**7** The Screw to rise and fall it
**8** The Screw to take out the Crane when the Gun with the Trepeid is to be folded up
**9** The Trepied whereon it plays
**10** The Chain to prevent the Trepieds extending too far out
**11** The hooks to fix the Trepied and Unhook when the same is folded up in order to be carried with the Gun upon a Man's Shoulder
**12** The Tube wherein the Pivot of the Crane turns
**13** A Charge of Twenty Square Bullets
**14** A single Bullet
**15** The Front of the Chambers of a Gun for a Boat
**16** The plate of the Chambers of the Gun for a Ship shooting Square Bullets against Turks
**17** For Round Bullets against Christians
**18** A Single Square Chamber
**19** A Single round Chamber
**20** a single Bullet for a Boat
**21** The Mould for Casting Single Bullets

*Puckle's original patent*

12

once, but Drummond also envisaged it being able to fire several volleys before it needed reloading. For each barrel was to be loaded with one charge after another, each aligned with touch holes that ran all the way up the barrels. Each barrel was to be ignited again and again by moving up adjustable fuse-holding devices until they were in line with the touch-holes.

In 1663 there occurred a very remarkable theoretical breakthrough that anticipated by over two centuries one of the basic principles of later machine gun development. A man named Palmer presented a paper to the Royal Society in which he explored the possibilities of utilising the force of the recoil and the gases escaping along the barrel to load, discharge and reload the weapon. As he described it, it was a 'piece to shoot as fast as it could and yet be stopped at pleasure, and wherein the motion of the fire and the bullet within was made to charge the piece with powder and bullet, to prime it and to pull back the cock.' Unfortunately, in technical terms, Palmer was about two hundred years ahead of his time. Because the chambers of any gun at that time could not be properly bored, it would be impossible to effectively trap all the escaping gases. And until cartridges were made of a solid-drawn brass or copper case it was impossible to ensure that they were properly ejected. There is in fact no record of such a gun ever having been built. And a man so far ahead of his time would have been lucky if he managed to retain his membership of the Royal Society.

The next authenticated invention of any importance is described in a patent of May 1718, granted to one James Puckle. Therein it is recorded that: 'James Puckle of the City of London, Gentleman, hath at great expense invent "A Portable Gun or Machine called a Defence, that discharges so often and so many bullets, and can be so quickly loaded as renders it next to impossible to carry any ship by boarding."' The gun basically consisted of a barrel and a revolving chamber, each chamber being discharged at it was brought into alignment with the barrel. If several loaded sets of chambers were kept on hand a fairly sustained rate of fire could have been achieved. However, though Puckle's invention is of considerable interest as one of the first detailed examinations of the revolving chamber principle, it seems unlikely that he himself had much interest in merely advancing the cause of science. Puckle's own drawing on the patent is boldly headed with the following description of his 'Defence':

Defending KING GEORGE your COUNTRY and LAWES

13

in Defending YOURSELVES and PROTESTANT CAUSE

In his eagerness to defend his religious orthodoxy and patriotic zeal Puckle then seems to get rather carried away, for he goes on to fly in the face of technical possibilities. Thus his detachable chambers were to be of two types, the one containing round bullets to be fired against Christians and the other square bullets for use against the heathen Turks. Even were it remotely possible to fire square bullets in the first place, Puckle's design makes no provision for any change of barrel when switching from one type of ammunition to the other. A satirist of the time made a suitably scathing attack on Puckle's motives and technical ability:

> A rare invention to Destroy the Crowd
> Of Fools at home, instead of Foes abroad:
> Fear not, my Friends, this Terrible Machine,
> They're only Wounded that have Shares therein.

If Palmer's paper offered a fascinating preview of the technical aspects of the development of automatic fire, Puckle's promotional efforts had much in common with the dubious motives and methods of those later figures who tried to sell the now perfected machine gun to a sceptical market.

Even when advances in manufacturing technique had enabled men like Gatling, Maxim or Nordenfelt to produce reliable automatic weapons they found that the attitude of the world at large, particularly the military, had not advanced much beyond the derisive strictures of Puckle's anonymous critic. A few guns were brought by various countries during the nineteenth century, but the market was very limited. The manufacturers and their representatives were obliged to use decidedly shady means to ensure themselves at least a slice of the market. For most of them the idea of commercial success was of overriding importance, and they made few concessions to either patriotism or normal business ethics. The most cynical and blatant of these merchants of death was Zaharoff, who worked first for Nordenfelt and then for the amalgamated firm of Maxim-Nordenfelt. His early career was devoted to denigrating and actually sabotaging any rival machine guns, notably the Maxim. Later when faced with the prospect of actually having to sell the gun he had so assiduously slandered, he resorted to bribery as his most reliable technique. On top of this Zaharoff was one of the principal influences behind the late nineteenth-century arms race, in which carefully planted rumours and 'leaks' about other nation's military capacity forced governments to buy increasing numbers of weapons to keep ahead of their 'rivals'.

14

*Organ*



# VI *A Symbol of the Times*

> NICK: You . . . you swing wild, don't you?
> MARTHA: Hah!
> NICK: Just . . . anywhere.
> MARTHA: Hah! I'm a Gatling gun. Hahahahahahahahahaha!
> NICK: Aimless . . . butchery. Pointless.
>
> Edward Albee: *Who's Afraid of Virginia Woolf?*

After 1918 the machine gun ceased to make headlines as a military weapon. However, though it had lost its battlefield dominance, one particular version of it was destined to hit the headlines again on the streets of a supposedly peaceful world. For in the summer of 1918 the first working model of the Thompson sub-machine gun had appeared.

The gun had been designed by Colonel J.T.Thompson specifically as a weapon for trench warfare, and he dubbed it the 'trench broom', to be used in close-quarter combat when troops were trying to clear an enemy trench. In August 1916 he set up a special company, the Auto-Ordnance Corporation of New York, to develop the gun. But the war ended before it could be put into production, though half a million dollars had already been spent on it. Nevertheless Thompson tried to interest the military in his gun. Both the Army and the Marine Corps carried out tests in 1920 and 1921, but very few orders were made.

Indeed, throughout the 1920s and 1930s the record of the Auto-Ordnance Corporation was a very poor one. Basically no one had much need for sub-machine guns. After his

149

failure with the military Thompson tried all kinds of ploys to interest other groups in his weapon. First he tried the police. In 1922 the company offered a special cartridge containing bird-shot, which, it was claimed, 'would be useful to authorities in dealing out a lesser degree of punishment. They allow serious occasions and disorders to be handled by officers of the law in the most humane manner possible.' In May of that year the gun was demonstrated to police and journalists at Tenafly, New Jersey. It was predicted by the company, with some justification, that the weapon would 'reform or remove bandits instantly.'[1] A few sales were made to police forces in New York, Boston, San Francisco, and the states of Pennsylvania, Massachusetts, West Virginia, Connecticut and Michigan. But in most cases the guns were used not so much to deal with criminals as to intimidate striking workers. In 1920 one writer gleefully outlined their advantages in this respect:

> There would be no trouble whatever for one man firing the gun to sweep a street clear from curb to curb, but after all its greatest strength lies in its moral effect. Killing many of the common American sort of mob is unfortunate unless the right ones can be selected for slaughter. Mobs as a rule are composed of ten per cent vicious (the leaders) and ninety per cent fools. Wherefore the dispersing of the crowds without bloodshed is usually desirable. It would be a most vicious and determined aggregation that would stand up to the fire of one of the guns, after a couple of bursts had been fired over their heads.[2]

Thompson next turned his attention to the air force, and designed a two-man plane to which thirty Thompson guns were attached, all of them pointing downwards. The plane was supposed to move backwards and forwards across the area to be attacked rather in the manner of a crop-spraying plane. On its one and only trip the aircraft proved to be impossibly heavy, and when the guns were fired they all jammed on their own deluge of spent cartridges.

As a final resort Thompson even tried to interest private citizens in his weapon. The company's promotion literature envisaged ranchers using it, in the manner of an updated cowboy, and even private householders. As the historian of the Thompson puts it:

> A company that could fancy a cowboy mowing down bandits, or envision a householder pouring machine gun fire into his darkened dining-room in defence of the

150

family silver, might well have misjudged its markets. For the sub-machine gun was legally available to anyone, and lack of police and military interest made it by default a civilian weapon. And so it came to pass that the Thompson – manufactured in peacetime, sold on the commercial market – was, in a sense, a machine gun for the home.[3]

Commercially, then, the gun was a flop. And so it remained until the outbreak of the Second World War, when the British, and later the Americans, ordered these guns in their tens of thousands. But even had the Second World War never been fought it seems certain that the 'tommy gun'



## The Thompson Submachine Gun
### *The Most Effective Portable Fire Arm In Existence*

THE ideal weapon for the protection of large estates, ranches, plantations, etc. A combination machine gun and semi-automatic shoulder rifle in the form of a pistol. A compact, tremendously powerful, yet simply operated machine gun weighing only seven pounds and having only thirty parts. Full automatic, fired from the hip, 1,500 shots per minute. Semi-automatic, fitted with a stock and fired from the shoulder, 50 shots per minute. Magazines hold 50 and 100 cartridges.

THE Thompson Submachine Gun incorporates the simplicity and infallibility of a hand loaded weapon with the effectiveness of a machine gun. It is simple, safe, sturdy, and sure in action. In addition to its increasingly wide use for protection purposes by banks, industrial plants, railroads, mines, ranches, plantations, etc., it has been adopted by leading Police and Constabulary Forces, throughout the world and is unsurpassed for military purposes.

*Information and prices promptly supplied on request*

**AUTO-ORDNANCE CORPORATION**
302 Broadway   *Cable address: Autordco*   New York City

*A rather fanciful advert for the Thompson Gun 1922*

151

Compendium_Spitzer
Page 221

would still be just as familiar to us today. For, during the twenties and thirties, one group in America did take to the gun, ironically those very bandits whom the inventor had hoped to reform or remove. The gangsters of the Prohibition era went on to make the Thompson gun famous throughout the world, though Thompson himself never ceased to be appalled at the fact that his gun had fallen into such hands.

It was first used in organised gang warfare on 25 September 1925, when the Frank McErlane and 'Polack' Joe Saltis gang attacked members of the O'Donnell family in Chicago. From that day it became one of the gangsters' standard weapons, and though pistols, sawn-off shot-guns and bombs were also used quite frequently, for the public at large the 'tommy gun' was the *sine qua non* of the authentic hoodlum. *Collier*'s crime reporter was one of the first to be impressed, to say the least, by the gun's potential in the hands of the gangsters. It was, he said:

> The greatest aid to bigger and better business the criminal has discovered in this generation . . . a diabolical machine of death . . . the highest-powered instrument of destruction that has yet been placed at the convenience of the criminal element . . . an infernal machine . . . the diabolical acme of human ingenuity in man's effort to devise a mechanical contrivance with which to murder his neighbour.[4]

It seems likely that it was McErlane's use of the Thompson that persuaded Al Capone that he too would have to get hold of some. After three consecutive attacks by McErlane on the headquarters, cars and persons of assorted rival beer runners Capone began to realise that such a weapon had innumerable advantages. An American writer, in 1931, during the peak of the era of gang violence, outlined some of the advantages of such a weapon:

> The modern gunman being dependent upon his weapons as well as the line of approach has advanced in mechanical ingenuity considerably during the last ten years. It was Hymie Weiss who invented murder by motor, but the popularity of automobiles very soon gave prior place to the machine gun. In the early days of Prohibition it was no uncommon thing for a gangster to be wounded and picked up by the police or conveyed away by his friends. That kind of bungling has grown unpopular. By the use of a machine gun fatalities became more assured, even if they included a handful of the deceased's friends or a waiter.[5]

152

So, on 10 February 1926, Capone ordered three Thompson guns of his own. On 20 September he was given further reason to admire the potential of such weapons. On that day a motorcade laid on by Weiss, Capone's chief rival at the time, slowly drove past his headquarters at the Hawthorne Inn, in Cicero, and as each car drove past its occupants methodically raked the building with machine-gun fire. The first man to fire had actually used blanks, hoping presumably to draw Capone outside. Luckily for the gang leader one of his men immediately pushed him to the floor, and during the entire shoot-out, in which one thousand rounds were fired, no one was hurt. But the demonstration was not without its psychological impact. Speaking to a reporter friend afterwards, Capone said: 'That's the gun! Its got it over a sawed-off shotgun like the shotgun has it over an automatic. Put on a bigger drum and it will shoot well over a thousand. The trouble is they're hard to get.'[6] Some months later Capone felt it diplomatic to give rather different reasons for the adoption of the sub-machine gun. By this time he had become something of a hero to the American public, and he began to think that his seedy past needed a little conventional respectability. One of his favourite lines was to tell of his exploits with the American Expeditionary Force in France, during the First World War. In fact he had never got past the medical board, but this did not prevent him from dredging up fond wartime memories. Kenneth Allsop describes how he 'on occasions paid tribute to the American Army for planting the seed in his mind of the machine gun as a piece of business equipment. "The sergeant told me that one man with a machine gun was a master of fifty men with rifles and revolvers," he once told a reporter. "You know something? That guy was right." '[7]

But whatever the reasons for Capone's adoption of the machine gun, there is no doubt that he had learned the lesson well. Knowing that the Cicero motorcade had been laid on by Weiss, on 11 October, two Capone machine gunners chopped him down as he was crossing the street to go into a flower shop. From then on the 'tommy gun' was a regular feature of Capone's operations. He built up a small squad of professional assassins, led by 'Machine Gun' Jack McGurn, who were obliged to train rigorously in private gymnasiums and to practise periodically on machine-gun ranges situated in thinly populated parts of Illinois. At least one of these killers seems to have become a little too attached to his machine gun. This was James 'Fur' Sammons who 'was one of the most dangerous killers in bootlegging and labour racketeering. To him human life was of no value. When he was given a machine gun and sent out on a job of

153

murder, guards would be assigned to accompany *him*. It was their task to prevent him from taking pot-shots at pedestrians for amusement.'[8]

Another rival of Capone's was George 'Bugs' Moran, and it was this feud that provoked what is probably the most famous machine-gun incident of all time. On 14 February 1929, in the so-called St. Valentine's Day Massacre, seven of Moran's men were shot down with machine guns by two Capone killers. One of them was 'Machine Gun' McGurn, the other was Fred Burke, a killer specially imported for the job. Two of the seven killed had in fact tried to eliminate McGurn with a machine-gun attack of their own a little earlier. The revenge was ruthless. Disguised as policemen, the executioners lined the seven against a wall and methodically ran lines of bullets across their heads chests and stomachs. One of them, Frank Gusenberg, with fourteen



*The scene of the St. Valentines Day Massacre thirty years later*

154



The Leading Reference for Antique American Arms

# FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS
## ...and their values

**9th EDITION**

**Norm Flayderman**

• 4,000 Individually Priced Firearms • 1,800 Photos for Quick Reference • Coverage From Early-1700s to Early-1900s

Copyright

© 1977, 1980, 1983, 1987, 1990, 1994, 1998, 2001 and 2007 by E. Norman Flayderman

All rights reserved

Published by



**Gun Digest® Books**

*An imprint of F+W Media, Inc.*
**700 East State Street • Iola, WI 54990-0001**
**715-445-2214 • 888-457-2873**
*www.gundigestbook.com*

Our toll-free number to place an order or obtain a free catalog is (800) 258-0929.

All rights reserved. No portion of this publication may be reproduced or transmitted in any form or by any means, electronic or mechanical, including photocopy, recording, or any information storage and retrieval system, without permission in writing from the publisher, except by a reviewer who may quote brief passages in a critical article or review to be printed in a magazine or newspaper, or electronically transmitted on radio, television, or the Internet.

The views and opinions of the author expressed herein are not necessarily those of the publisher, and no responsibility for such views will be assumed.

All listings and prices have been checked for accuracy but the publisher cannot be responsible for any errors that may have occurred.

The opinions stated herein by the author as to the values of used firearms represent the views of the author and not necessarily those of the publisher. Obviously, the marketplace could yield different values for the subject firearms.

Library of Congress Control Number: 2006935760

ISBN 13: 978-0-89689-455-6
ISBN 10: 0-89689-455-X
eISBN: 978-1-44022-4-225

Designed by Patsy Howell and Donna Mummery
Edited by Ken Ramage

Printed in the United States of America

**5K-006** Values—Good **\$5,500** Fine **\$15,000**

*NOTE: Calibers for S&W and Volcanic Arms have been variously listed as 30 and 38 cal.*
*Correct sizes are 31 cal. and 41 cal. as shown.*

**Volcanic Lever Action Pistols and Carbines**

**Volcanic Lever Action Repeating Pistols and Carbines, by the Volcanic Repeating Arms Company.** In July of 1855, the Smith & Wesson name was changed to the Volcanic Repeating Arms Company, opening still another chapter in Winchester history. Business was carried on under the Volcanic name from 1855 to 1857, at which time it was reorganized as the New Haven Arms Company. Oliver F. Winchester, a successful manufacturer of clothing, became an increasingly active investor in the lever action arms, having first purchased stock in the Volcanic firm c. 1855. Smith and Wesson both dropped out of the enterprise c. 1855-56.

The breakdown of Volcanic arms is presented in the following model listings. All guns were of the same caliber, 41, and fired the patented, specially designed cartridges (though improved) of the Smith & Wesson type; magazines of integral structure, located beneath the barrel. The Volcanics began with serial 1, and have been observed marked in excess of the number 3000. Standard markings of all models, on the barrels: THE VOLCANIC/REPEATING ARMS CO./PATENT NEW HAVEN CONN/FEB 14, 1854. Marking variations are noted in these. Finish: Unfinished brass frames; the barrels blued. (Note: Engraved specimens, cut in a large, open scroll pattern, are often encountered. These arms command an added premium.)

**Lever Action Navy Pistol;** 6" barrel, 41 caliber, brass frame, flat-bottomed varnished walnut grip, rounded finger hole in the lever. VOLCANIC barrel markings as noted above. Quantity estimated 1,200:



*5K-007*

**5K-007** Values—Good **\$3,500** Fine **\$8,000**

**Lever Action Navy Pistol;** same as above but with 8" barrel. Quantity estimated 1,500:



*5K-008*

**5K-008** Values—Good **\$3,500** Fine **\$8,000**

(Note: Pistols as above fitted with shoulder stocks demand a premium.)

**Lever Action Navy Pistol;** as above but with 16" barrel, and attachable shoulder stock. Quantity estimated 300. Rare.

**Pistol:**
**5K-009** Values—Good **\$5,000** Fine **\$16,000**

**Pistol with Stock:**
**5K-010** Values—Good **\$8,500** Fine **\$22,500**

**Lever Action Carbine;** 41 caliber, barrel length of 16-1/2" utilizing left-over barrels from Navy Pistol. Long and straight, varnished walnut, buttstocks, with crescent type brass buttplate. VOLCANIC markings as noted above:

**16-1/2" barrel:**



*5K-011*

**5K-011** Values—Good **\$7,000** Fine **\$17,500**

**21" barrel** made only by New Haven Arms Co. (*q.v.*):

**5K-012**
**25" barrel** made only by New Haven Arms Co. (*q.v.*):
**5K-013**

---

### Volcanic Lever Action Pistols and Carbines by New Haven Arms Co.

**Volcanic Lever Action Repeating Pistols and Carbines, by the New Haven Arms Company.** Due to increasing financial pressures, the Volcanic firm was reorganized into the New Haven Arms Company, in April of 1857. However, Volcanic remained as the trade name for the lever action pistols and carbines. A key means of telling the "Volcanic Volcanics" from the "New Haven Arms Company Volcanics" is the omission of VOLCANIC marks and change to PATENT FEB. 14, 1854/NEW HAVEN,CONN. Marking variations are also noted in these.

The New Haven Arms Company's Volcanic production lasted from 1857 to 1860, and the breakdown of models is presented below. The cartridge type, magazine, and other basic features remained as on the "Volcanic Volcanics." Total manufactured of the New Haven Volcanics is estimated at about 3,300; serial numbering began with 1. Finish: Unfinished brass frames; the barrels blued. (Note: Engraved specimens, cut in a large, open scroll pattern, are often encountered. These arms command an added premium.) **Lever Action No. 1 Pocket Pistol;** 3-1/2" and 6" (Target type) barrels (scarce and will bring a premium), 31 caliber, small size brass frame, flat-bottomed varnished walnut grip, round finger hole in the lever. VOLCANIC barrel markings as on Volcanic Arms Company pistols, but including 1854 patent date and New Haven address:

**3-1/2" barrel.** Quantity estimated 850:



*5K-014*

**5K-014**  Values—Good **$2,750** Fine **$5,000**

**6" barrel.** Quantity estimated 225:



*5K-015*

**5K-015**  Values—Good **$3,250** Fine **$6,750**

**Lever Action No. 2 Navy Pistol;** 8" barrel, 41 caliber large size brass frame, flat-bottomed varnished walnut grip, round finger hole in lever. VOLCANIC barrel markings as above, including 1854 patent date and New Haven address. Quantity estimated 1,000:

**5K-016**  Values—Good **$3,750** Fine **$8,000**

**No. 2 Navy Pistol** identical above with 6" barrel. Quantity estimated 300:
**5K-016.5** Values—Good **$4,250**   Fine **$9,500**

**Lever Action Navy Pistol;** large frame model as above, but with 16" barrel, and attachable shoulder stock. Quantity unknown; extremely limited; very rare. Great caution should be exercised in acquiring this variant:

**Pistol:**
**5K-017**  Values—Good **$5,000** Fine **$15,000**

**Pistol with Stock:**
**5K-018**  Values—Good **$7,500** Fine **$22,500**

**Lever Action Carbine;** 41 caliber, barrel lengths of 16-1/2", 21", and 25". Large brass frame. Long and straight, varnished walnut, buttstocks with crescent type brass buttplate. Barrel markings as above, including 1854 patent date and New Haven address. Quantity estimated 1,000 for all three lengths:

**16-1/2" barrel:**



*5K-019*

**5K-019**  Values—Good **$7,000** Fine **$17,500**

**21" barrel:**



5K-020

**5K-020** Values—Good **$8,000** Fine **$24,000**

**25" Barrel:**



5K-021

**5K-021** Values—Good **$9,000** Fine **$27,500**

*See also Walch Revolver 7A-117*

## Henry Rifle

**Henry Rifle.** Made 1860-66; total quantity approximately 14,000. (overlap with model 1866).

44 rimfire caliber. Tubular magazine integral with the barrel, and located beneath it. 15 shots. 24" barrel length standard.

Oil stained walnut stocks. Blued finish; brass frames usually left plain.

Serial numbers overlap the Model 1866. Highest Henry range is about 14000. Major serial number location on the top of breech end of barrel; marked: HENRY'S PATENT. OCT. 16. 1860/ MANUFACT'D BY THE NEW HAVEN ARMS. CO. NEW HAVEN. CT.

The Henry Rifle was developed from the Volcanic, and was built around the new 44 rimfire cartridge. Both the new rifle and the cartridge were designed by B. Tyler Henry. A basic feature of the 44 rimfire was the use of a metallic casing, rather than the undependable self-contained powder, ball and primer bullet of the Volcanic. Loading continued to be from the muzzle end of the magazine. A distinctive identifying feature of the Henry is the lack of a forend, and the absence of a loading gate on either side of the frame. Made in relatively limited quantities, and a revolutionary weapon in Civil War service, the Henry is one of the major collector's items in the entire Winchester field. The model is difficult to obtain in fine condition and commands premium prices in all its variations. Quite a few company-size Union outfits, especially those from Kentucky, Illinois, Indiana and Missouri purchased at their own expense, and carried, Henry rifles. Much significant information on the development and history of this important rifle, its production, sale and usage by the military during the Civil War is found in *The Historic Henry Rifle* by W. Sword (q.v.).

**Iron Frame Model.** The most desirable Henry variation, featuring the frame of iron, rather than the standard brass. Rounded type iron buttplate at its heel; no lever latch; sporting style adjustable leaf rear sights. Quantity estimated 275. Serial number range 1 to 400:



5K-022
*Iron Frame Henry*

**5K-022** Values—Good **$30,000** Fine **$100,000**

**Early Brass Frame Model.** As above, but the frame and buttplate of brass. With or without lever latch. Serial numbers overlap iron frames. Total made about 1,500:



*9B-003*
*Style A*

**9B-003**  Values—Good **$1,650** Fine **$3,250**

**As above;** converted to percussion:

**9B-004**  Values—Good **$750** Fine **$1,150**

**Style B;** 41" barrel; lock is classic military pattern identical to that used by Perkins on his U.S. 1808 contract musket and obviously surplus from that contract. Stock patterned very closely after the British military musket, displaying classic "Brown Bess" features such as the notch at the forward edge of the comb and the broad relief plateau carving around barrel tang. Barrel unmarked. Lock with markings identical Type I above; dated 1818; other dates known:



*9B-005*
*Style B*

**9B-005**  Values—Good **$1,750** Fine **$3,250**

**As above;** converted to percussion:

**9B-006**  Values—Good **$750** Fine **$1,000**

**Deringer Flintlock Military Rifle**



*9B-007*

**Deringer Flintlock Military Rifle.** Made by Henry Deringer, Philadelphia, Pennsylvania, c. 1810-1820. Quantities unknown.

56 caliber, single shot; muzzleloader. 33" part octagon/part round barrel. Full walnut stock wedge fastened; lug for socket type bayonet on underside near muzzle.

Lock marked H. DERINGER/PHILA. Barrel markings indicating ownership and contract by the Commonwealth of Pennsylvania and appear at breech CP over a serial number and oval cartouche with P proof at breech. Stock also bears CP stamping near lock screw with matching serial number to barrel.

Brass furniture with trigger guard having tapered, pointed finials each end and rudimentary finger ridges just below the trigger bow; brass sideplate; three ramrod pipes; brass forend tip. The gun is quickly distinguished by its unique large patchbox with the finial in the outline/silhouette shape of the upper part of an eagle with its head turned to the left.

Very little recorded information about these arms and it is possible to encounter them with variations of lock and barrel markings. The patchbox seems to be unique to Henry Deringer. These arms were evidently made for private sale as well as for state contracts. Prices shown here are for martially marked specimens; those with no martial markings or apparent military usage or intention should be priced approximately twenty percent less:

**9B-007**  Values—Good **$4,000** Fine **$7,500**

**Same as above;** converted to percussion:

**9B-008**  Values—Good **$1,500** Fine **$3,750**

**Ellis-Jennings Repeating Flintlock Rifle**

**Ellis-Jennings Sliding Lock Repeating Flintlock Rifle.** Made by R. & J.D. Johnson, Middletown, Conn. 1829. Total quantity 520.

Unique, self priming, sliding lock with two distinct types adapted for either four shots or ten shots. The barrels accepting superposed loads. The individual touchholes for each load have swivel covers which also act to position and align the lock for the prior charge.

One of the great American military rarities and oddities. Reuben Ellis of Albany, New York, acting as agent and contractor, received a *Federal* contract for 520 of these unique arms patented by Isiah Jennings of New York City in 1821. The arms were specifically authorized for and delivered to the state of New York after Federal inspection.

About identical to the Model 1817 "Common Rifle" and utilizing many parts of that model. Many distinctive features on the rifle, including its lack of provision for a side-plate have proven this unique piece *not* to be an alteration of Model 1817.

36" barrel; 54 caliber rifled bore. Barrel and stock with U.S. proof and inspector initials. Unmarked lock closely similar to that used on Model 1826 pistol.

This identical, unique, Ellis-Jennings Sliding Lock Repeating Flintlock System is also known in an all brass (stock and barrel) breech-loading flintlock, 12-shot sporting rifle. (See Chapter 12-009.5 Jennings Rifle.)

**Four Shot Model** as delivered under contract:



*9B-009*

**9B-009** Values—Good **$12,000** Fine **$27,500**

Ten Shot Model; extremely rare, likely experimental only:



*9B-010*

*9B-010*

**9B-010** Values—Good **$25,000** Fine **$50,000**

### Flintlock Militia Musketoon

**Flintlock Militia Musketoon.** With lock of M.1826 Navy pistol, c. 1831; total produced unknown.

69 caliber smoothbore. Single shot muzzleloader. 24-5/8" round barrel, two barrel bands.

Brass mountings. Metal parts finished bright. Steel ramrod with button shaped end. Walnut stock of full length.

Lock markings: W.L.EVANS/V. FORGE, forward of the hammer; behind hammer, stamped vertically: 1831/USN with no markings on barrel or inspectors markings on stock.

Distinguishing features are the round trigger guard contour, the sweeping curve of the bottom contour of the buttstock and the saddle ring merely attached to a small eye-bolt screwed into the underside of the butt.

An enigma for collectors, no documentary, or other, evidence shows U.S. purchase. Most specimens seen have commercial, sporting type locks with various maker/dealer names. General low quality of workmanship (especially the flimsy eye bolt saddle ring) casts doubt on its purported mounted use. Likely intended for militia sale, collector is cautioned that there is little likelihood of U.S. Navy use or association:



*9B-011*

**9B-011** Values—Good **$425** Fine **$750**

### Jenks Flintlock Rifle

**Jenks Flintlock Rifle.** Made for William Jenks by the Chicopee Falls Company, Chicopee Falls, Massachusetts; c. 1838-39; total quantity estimated less than 100.

54 caliber. Single shot muzzleloader. 35-1/4" round barrel, semi-octagonal breech section; three barrel bands.

Iron mountings. All metal parts bright finished. Steel ramrod with trumpet shaped head.

Walnut stock.

Lockplate marking, behind hammer: CHICOPEE FALLS CO./MS (or CHICOPEE ARMS MFG. CO./MS.). Barrel marking at breech inspector's initials NWP or JH; beneath initials proofmark P, within circle. Inspector initials on left side of stock (opposite lock) and on comb near buttplate tang.

This extremely rare rifle is believed to have preceded the Jenks Flintlock Breech-Loading Carbine. It appears likely that production was in an attempt to interest



# The Bowie Knife

## *Unsheathing an American Legend*

*by*

## *Norm Flayderman*

*with a Foreword by James S. Hutchins
Historian Emeritus, National Museum of
American History, Smithsonian Institution*

McCracken Research Library

## – CHAPTER 2 –

# NINETEENTH CENTURY
### *America Learns about the Bowie Knife*

To gain an appreciation for how deep-rooted in American life the Bowie knife became, there is no better source than contemporary nineteenth century accounts. Reading these stories firsthand in their original form in newspapers, periodicals and other nineteenth century literature effectively reveals universal awareness of the knife. Clearly, the term *Bowie knife* had become part of the American language. More than a mere compilation of related passages, these stories disclose how the public construed that weapon and how that perception quickly went awry. Quite often mentioned in a prosaic, matter-of-fact manner, almost as a normal part of the landscape, it frequently achieved unrestrained, bloodcurdling heights. On that score, nothing may have changed in nearly two hundred years! The thirst for sensational stories and the relatively inadequate ability to satiate that appetite neither overexposed the knife nor desensitized the public's attraction as it might today. Colorful language and overstatements were the rule. The Bowie knife, however vague and imprecise its visualization, had captured the public's imagination.

### THE WORDS MAKE THEIR DEBUT

Exactly when *Bowie knife* first appeared in print has yet to come to light. The search for that date offered one of the more fascinating challenges in pursuing this story. As of this writing, 1835 is the earliest year documented. It is reasonably believed that earlier dates will eventually surface. As several makers and dealers were advertising Bowie knives for sale in 1835, it is logical to assume that by offering the availability of such cutlery by name, the public was already familiar with its terminology. Sometime during the eight-year interim between Bowie's use of the knife in the notorious 1827 "Sandbar Fight," (Chapter X) and those 1835 advertisements, the words appeared in print. They were sufficiently conspicuous to make a segment of the public aware that there was such a knife! Significantly, Jim Bowie was in fine fettle when that occurred.

Knives of all varieties and sizes were, of course, on the American scene long before *Bowie knife* arrived. They were just called by other names: belt knives, longknives, hunting knives, daggers, riflemen's knives, dirks, scalping knives, sheath knives and the very popular, all inclusive *butcher* knives. Self-defense knives and fighting knives were very much a part of everyday life. A contemporary account published by Charles F. Hoffman, in 1835, *A Winter in the West by a New Yorker,* describes a scene in a



*SILVER-MOUNTED GENTLEMAN'S PRESENTATION HUNTING KNIFE CIRCA 1780-1800. Although maker unknown, the distinctive silver star inlays and other features of the silver work and configuration of handle have been observed on similar specimens. 13½ inches overall. 9-inch tapered, single edge blade with 4½-inch sharpened false edge. Two deep fullers each side. Script letters "A\*O" engraved on obverse near edge below crossguard. All silver mounts. Tang of blade fastened under silver pommel cap. Inset both sides of the dark horn grips are two, five point, silver stars and a large, oval, silver plaque. Leather sheath; inscribed on the top throat in bold script "MOSES DAVID/TO/DAVID DAVID." Two swivel mounted silver carrying rings on top mount are still affixed by short chains to the original, pierced iron belt clip. Belt clip is much smaller size than that used for carrying swords and would appear designed specifically for a knife. Father and son, the "David's" were founders of the Bank of Montreal, with distinct American family relationships. Shown here with rare matched pair of silver-mounted, American-made flintlock greatcoat pistols circa 1760–70. Each marked "PERKIN, FECIT N. YORK."*

hotel bar in St. Louis. Reminiscing about an earlier Indian fight, the narrator mentions his "…leg knife…worn beneath the garter of the leggins [*sic*] and carried in addition to the larger knife which the Western hunter always wears in his girdle."



*EARLY AMERICAN KNIVES, PRE-BOWIE. (Left) Primitive American knife, typical of the late 18th, early 19th century. 17 inches overall with curved, double edged 11-inch blade; slightly oval in cross section. One-piece stag antler handle with crown intact. Short tang of blade fits to midpoint of antler handle; fastened with two large crosspins. (center) Unique example of what is conjectured a late 18th or early 19th century "Bowie" type knife displaying early usage of a clip point on its 9-inch, single edge blade. (Similar specimens viewed in American Knives (Peterson, 1958, figure 25). 14½ inches overall. 3½-inch sharpened false edge. Exceptional maker markings in a classic, deep sunken, rectangular hallmark with fancy serrated edges and large, relief name "PETERSON." Thick, heavy, one-piece, stag antler handle with blade tang fastened at the iron pommel cap. Wide iron ferrule with thick iron crossguard. Weight over 1 lb. (Right) Classic American, primitively made, all purpose utility or "belt knife." 12½ inches overall. 6½-inch, double edged, spear point blade widening towards tip; possibly fashioned from a file. Octagon shaped, one-piece, tiger striped, curly maple handle with pewter mounting. Illustrated with early American flintlock Kentucky rifle with sliding wood patchbox.*

*SILVER-MOUNTED AMERICAN KNIFE AND SHEATH CIRCA 1790-1810. 7-inch tapered, single edge blade with delicate fluting up to point where it merges into a 3" false edge. Fine quality silver crossguard and mounts; two-piece horn grips decoratively studded in circular designs; large oval, silver inlay in center, both sides. Tang of blade possibly fastened by pin through the bottom of the pommel cap. Matching silver sheath displaying the quality of a professional silversmith; narrow silver belt loop and two silver carry rings for chain suspension from belt. Family legend traces its history to ancestor Samuel McKinney, an Indian trader of St. Louis.*





*CALL THEM WHAT YOU WILL! WAR OF 1812 ERA, AMERICAN-MADE KNIVES/DIRKS/DAGGERS. (Left) Silver-mounted, presentation dirk, 14½ inches overall with 10½-inch tapered, single edge, spear point blade; two deep, narrow fullers both sides. Recurved silver crossguard and mounts. One-piece, dark horn handle with three large silver inlays each side; center obverse inlay engraved with large script monogram "W.M." Leather sheath with wide silver mounts; long narrow belt loop on throat. Inscribed in large script on top mount: "CAP. QUARY/TO LIEUT./COL. McMILLAN/17TH U.S.I." (Center) 15 inches overall with 10½-inch, straight, double edged, spear point blade; shallow fuller runs full length to tip. Two-piece, dark wood grips fastened by two thick, iron pins with iron grommets. Oval silver inlay each side; obverse with script monogram initials. Iron mounts and recurved crossguard. Leather sheath with silver mounts and larged engraved initials "J.A." Iron swivel carrying ring. (Right) Well constructed, silver-mounted American knife, circa 1800-1815. 13 inches overall. 9-inch single edge, tapered, spear point blade; single deep fuller both sides. Thin, elliptical, silver crossguard and silver mounts. Two-piece, oval, dark horn grips inlaid both sides with four strips of mother-of-pearl; large oval silver inlay, its center inset with pearl panel. Leather sheath with wide silver mounts; long narrow belt loop on reverse of throat and silver frog stud. Illustrated with American Infantry officer's oval crossbelt plate circa 1802-1812 and American Kentucky style flintlock pistol with silver-mounted, curly maple stock.*



*SILVER-HANDLED PRESENTATION AMERICAN DIRK CIRCA 1800-1830. Fine quality and obviously fashioned by a professional cutler or silversmith, 12 inches overall. 7½" double edged, spear point blade with median ridge/spine and unmarked ricasso. Entire handle is silver. Blade tang fastened by single iron pin on lower handle. Boldly inscribed vertically in large script along center of obverse: "C.R.W. to C.R.P." Matching silver sheath shaped to match spine and fashioned at throat to fit the thickened ricasso; silver belt clip. Shown with exceptional quality, relief carved and silver inlaid, Bedford County, Pennsylvania percussion "Kentucky" rifle c.1810 by Peter White, long considered the "Dean" of Bedford makers. This rifle, made for Moses Wright, is regarded as the finest Bedford County example known (Dillon, The Kentucky Rifle, plate 129).*

*The Bowie Knife: Unsheathing an American Legend*



*A PERPLEXING ENIGMA. On occasion considered among the earliest form of Bowie knife, this clip point, guardless Bowie may possibly vie for that title. Illustrated on page 17 Bowie Knives of the Ben Palmer Collection (q.v.) and Figure 39 American Knives (Peterson q.v.). It will likely date c.1820-1840, in that early development era. 14 inches overall with 9½-inch, single edge blade marked both on thick ricasso and parallel, near center of blade: "BEST." German silver mounts, with three pins fastening the white bone grips. Ruggedly made, weight near one pound. Leather sheath with german silver mounts. Illustrated with two rare American dueling broadsides in which William Noble "posts" Marcus Gilliam of Petersburg, Virginia on March 12, 1825, calling him a "liar, a base slanderer and a coward," tantamount to challenging him to a duel... and Gilliam's response of March 14, 1825 naming Noble "an unprincipled vagabond and scoundrel."*