ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his
official capacity as Attorney General of the
State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,** | Case No. 3:17-cv-01017-BEN-JLB |
| Plaintiffs, | **COMPENDIUM OF WORKS CITED IN SUPPLEMENTAL DECLARATION OF ROBERT SPITZER** |
| v. | **VOLUME 4 OF 5** |
| **ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,** | Courtroom:   5A<br>Judge:   Hon. Roger T. Benitez<br>Action Filed:   May 17, 2017 |
| Defendants. | |

## INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| **CALIFORNIA** | | |
| 1927 Cal. Stat. 938 | 15 n.34 | 003 |
| 1933 Cal. Stat. 1169 | 12 n.30 | 004-007 |
| **DISTRICT OF COLUMBIA** | | |
| Act of July 8, 1932, ch. 465, §§ 1, 8, 47 Stat. 650, 652 | 12 n.30 | 009-014 |
| Pub. Law 73-474, ch. 757, 48 Stat. 1236 (1934) | 9 n.23 | 015-020 |
| **HAWAII** | | |
| 1933 Haw. Sess. Laws 117 | 13 n.32 15 n.35 | 022-023 |
| **ILLINOIS** | | |
| 1931 Ill. Laws 452-53, An Act to Regulate the Sale, Possession and Transportation of Machine Guns, §§ 1-2 | 12 n.30, 12 n.31 | 025-028 |
| **LOUISIANA** | | |
| Act of July 7, 1932, no. 80, 1932 La. Acts 336 | 12 n.30 | 030-034 |
| **MASSACHUSETTS** | | |
| 1927 Mass. Acts 413, 413-14 | 12 n.30 | 036-040 |
| **MICHIGAN** | | |
| Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888 | 12 n.30 | 042-049 |

2

| | | |
|---|---|---|
| Mich. Pub. Acts 1929, Act No. 206, Sec. 3, Comp. Laws 1929 | 12 n.30 | 050-053 |
| **MINNESOTA** | | |
| Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232 | 12 n.30 | 055-058 |
| **MISSOURI** | | |
| 1929 Mo. Laws 170 | 13 n.32 15 n.35 | 060-061 |
| **NEW HAMPSHIRE** | | |
| N.H. Rev. Stat. § 159:16 | 36 n.124 | 063 |
| 2010 New Hampshire Laws Ch. 67 (H.B. 1665) | 36 n.124 | 064-067 |
| **NEW JERSEY** | | |
| 1763-1775 N.J. Laws 346, An Act for the Preservation of Deer and Other Game, and to Prevent Trespassing with Guns, ch. 539, § 10 | 37 n.127 | 069-070 |
| The Grants, Concessions, And Original Constitutions of The Province of New Jersey 290 (1881). | 36 n.125 | 071 |
| 1920 N.J. Laws 67, ch. 31, § 9 | 12 n.30 | 072-082 |
| 1927 N.J. Laws 180-81, A Supplement to an Act Entitled "An Act for the Punishment of Crimes," ch. 95, §§ 1-2 | 12 n.31 | 083-086 |
| **NORTH CAROLINA** | | |
| 1917 N.C. Sess. Laws 309, ch. 209, § 1 | 12 n.30 | 088-089 |
| **NORTH DAKOTA** | | |
| 1931 N.D. Laws 305-06, ch. 178, §§ 1-2 | 13 n.31 | 091-094 |

3

**OHIO**

| | | |
|---|---|---|
| Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189 | 12 n.30 | 096-097 |

**OREGON**

| | | |
|---|---|---|
| 1933 Or. Laws 488, §§ 72-201, 72-202, 72-207 | 13 n.31 | 099-102 |

**PENNSYLVANIA**

| | | |
|---|---|---|
| 1929 Pa. Laws 777, §1 | 13 n.31 | 104-106 |

**RHODE ISLAND**

| | | |
|---|---|---|
| 1927 R.I. Pub. Laws 256, 256 | 12 n.30 | 108-115 |

**SOUTH CAROLINA**

| | | |
|---|---|---|
| Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288 | 12 n.30 | 117-119 |

**SOUTH DAKOTA**

| | | |
|---|---|---|
| Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245 | 12 n.30 | 121-124 |

**TEXAS**

| | | |
|---|---|---|
| 1933 Tex. Gen. Laws 219-20, 1st Called Sess., An Act Defining "Machine Gun" and "Person"; Making It an Offense to Possess or Use Machine Guns. . . , ch. 82, §§ 1-4, § 6 | 13 n.31 | 126-128 |

**UTAH**

| | | |
|---|---|---|
| 1901 Utah Laws 97-98, ch. 96, §§ 1-3 | 37 n.128 | 130-132 |

**VERMONT**

| | | |
|---|---|---|
| 1923 Vt. Public Acts, No. 130, § 1 | 13 n.31 | 134-135 |

4

| | | |
|---|---|---|
| **VIRGINIA** | | |
| Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137 | 12 n.30 | 137-141 |
| **WASHINGTON** | | |
| Wash. 1933 Sess. Laws 335 | 13 n.32 | 143-145 |
| **WISCONSIN** | | |
| 1933 Wis. Sess. Laws 245, § 164.01 | 13 n.31 | 147-151 |
| **BOOKS** | | |
| Derek Avery, Firearms 12 (Wordsworth Editions, 1995) | 7 n.14 | 173-175 |
| Virgil E. Baugh, Rendezvous at the Alamo 39-63 (University of Nebraska Press, 1985) | 29 n.96, 30 n.99 31 n.104 | 176-195 |
| Ryan Busse, Gunfight 12-15, 65 (Public Affairs, 2021) | 31 n.107 | 196-203 |
| Philip J. Cook & Kristin A. Goss, The Gun Debate 13 (Oxford University Press, 2d ed. 2020) | 9 n.22 | 204-208 |
| William C. Davis, Three Roads to the Alamo 164, 207-8, 582-83 (HarperCollins, 1998) | 29 n.95, 30 n.97, 30 n.99, 32 n.116 | 209-214 |
| Dickson D. Bruce, *Violence and Culture in the Antebellum South* (Austin, TX: University of Texas Press, 1979) | 26, n.89 | 932-935 |
| John Ellis, The Social History of the Machine Gun 13, 149-52 (Pantheon, 1975) | 6 n.10 19 n.51 | 215-223 |
| Norm Flayderman, Flayderman's Guide to Antique American Firearms 303-5, 683 (Gun Digest Books, 9th ed. 2007) | 20 n.55, 22 n.63 | 224-230 |
| Norm Flayderman, The Bowie Knife: Unsheathing an American Legend 25-64, 495-502 (Andrew Mowbray, 2004) | passim | 231-279 |

5

| | | |
|---|---|---|
| Louis A. Garavaglia and Charles G. Worman, Firearms of the American West, 1866-1894, at 129, 131 (University of New Mexico Press, 1985) | 26 n.87, 26 n.88 | 280-289 |
| Pamela Haag, The Gunning of America 24, 51-52, 56, 60, 65, 96, 353 (Basic Books, 2016) | passim | 290-305 |
| Lee Kennett and James LaVerne Anderson, The Gun in America 91, 112-13, 203 (Greenwood Press, 1975) | 6 n.12, 25 n.79 | 306-317 |
| Larry Koller, The Fireside Book of Guns 112, 154 (Simon and Schuster, 1959) | 23 n.71, 25 n.82 | 318-326 |
| Chris McNab, Firearms and American Law Enforcement Deadly Force 97-98 (Osprey Publishing, 2009) | 7 n.15 | 327-332 |
| James McPherson, Battle Cry of Freedom 475 (Oxford University Press, 1988) | 24 n.74 | 333-334 |
| Jack O'Connor, Complete Book of Rifles and Shotguns 42 (Harper & Row, 1961) | 27 n.92 | 335 |
| Phillip Peterson, Buyer's Guide to Assault Weapons 4-7 (Gun Digest Books, 2008) (as quoted in Robert Spitzer, The Gun Dilemma 29 (Oxford University Press, 2023)) | 28 n.94 | 336 |
| Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter That Changed America 3-5, 54, 136, 390, 401 (Scribner, 2021) | passim | 337-343 |
| Randolph Roth, American Homicide 180-183, 210-217, 218-219 (Belknap Press, 2012) | passim | 344-365 |
| Carl P. Russell, Guns on the Early Frontier 91 (University of Nebraska Press, 1957) | 20 n.56 | 366-367 |
| Robert J. Spitzer, The Politics of Gun Control 25-26, 195-196, 205-11 (Routledge, 8th ed. 2021) | 1 n.1 9 n.22 | 368-378 |
| Robert J. Spitzer, The Gun Dilemma 14-15, 30, 32-33 (Oxford University Press, 2023) | 4 n.4 11 n.29 | 379-389 |

6

| | | |
|---|---|---|
| Richard W. Stewart, American Military History, Vol. I: The U.S. Army and the Forging of a Nation, 1775-1917, at 367-68 (Washington, D.C.: Center of Military History, 2008) | 5 n.7 | 390-395 |
| Donald M. Snow and Dennis M. Drew, From Lexington to Desert Storm: War and Politics in the American Experience 127 (M.E. Sharpe, 1994) | 5 n.8 | 396-437 |
| Lewis Winant, Firearms Curiosa 8, 9, 36, 166, 168, 219-21 (Bonanza Books, 1955) | passim | 438-443 |
| Lewis Winant, Pepperbox Firearms 30, 32 (Greenberg Pub., 1952) | 23 n.70, 23 n.71 | 444-452 |
| **LAW REVIEWS AND JOURNALS** | | |
| David Kopel, *The History of Firearm Magazines and Magazine Prohibitions*, 78 Albany Law Review 849, 851, 852-54, 871-72 (2015) | 17 n.39, 20 n.54 | 454-489 |
| Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 L. & Contemporary Problems 55, 63-71 (2017) | 11 n.28, 27 n.90, 37 n.126 | 490-518 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| H.R. 8, Joint Resolution Prohibiting Dueling, introduced March 5, 1838 | 31 n.110 | 520-521 |
| Report of Firearms Committee, 38th Conference Handbook of the National Conference on Uniform State Laws and Proceedings of the Annual Meeting 422-23 (1928) | 8 n.17 | 522-532 |
| S. Rep. No. 72-575, at 5-6 (1932) | 8 n.20 | 533-545 |

7

| | | |
|---|---|---|
| Firearms Commerce in the United States Annual Statistical Update 2020, United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives, 15, https://www.atf.gov/file/149886/download | 9 n.22 | 555-568 |
| "Hearings Before the Committee on Ways and Means, National Firearms Act, H.R. 9066," U.S. House of Representatives, April 16, 18, May 14, 15, and 16, 1934 (Washington, D.C.: GPO, 1934), 45; 47 Stat. 650, ch. 465, §§ 1, 14 (1932). Pp. 3, 4, 36, 42, 45, 52 | 8 n.19 | 569-738 |

**NEWS ARTICLES**

| | | |
|---|---|---|
| David Altheide, *The Cycle of Fear that Drives Assault Weapon Sales*, The Guardian, Mar. 2, 2013 | 31 n.107 | 740-745 |
| Bangor (Maine) Daily Whig, Oct. 27, 1870 | 37 n.129 | 746 |
| Rukmani Bhatia, "Guns, Lies, and Fear," American Progress, April 24, 2019, https://www.americanprogress.org/article/guns-lies-fear | 31 n.107 | 747-784 |
| Judson Hale, *When Lincoln Famously Used the Almanac*, Almanac.com, May 4, 2022 | 35 n.122 | 785-787 |
| Paul Richard Huard, *Browning Automatic Rifle: The Most Dangerous Machine Gun Ever?*, The National Interest, Nov. 19, 2019 | 7 n.13 | 788-789 |
| John Paul Jarvis, *The Girandoni Air Rifle: Deadly Under Pressure*, GUNS.com, March 15, 2011 | 21 n.59 | 790-794 |
| David Kopel, *The History of Magazines Holding 11 or More Rounds: Amicus Brief in 9th Circuit*, Wash. Post, May 29, 2014 | 21 n.57, 24 n.73 | 795-797 |
| Mike Markowitz, *The Girandoni Air Rifle*, DefenseMediaNetwork, May 14, 2013 | 21 n.58, 21 n.60 | 798-800 |
| *The Man Trap*, The Buffalo Commercial, Nov. 1, 1870; from the N.Y. Standard, Oct. 29, 1870 | 38 n.131 | 801 |

8

| | | |
|---|---|---|
| Christian Oord, *The Weapons of Bonnie & Clyde & the Guns That Stopped Them*, War History Online, Apr. 26, 2019 | 7 n.14 | 802-811 |
| Philip Schreier, *A Short History of the Semi-Automatic Firearm*, America's 1st Freedom, at 32-39, July 2022 | 23 n.68 | 812-818 |
| *Shot by a Trap-Gun*, South Bend Tribune, Feb. 11, 1891 | 38 n.132 | 819 |

OTHER SOURCES

| | | |
|---|---|---|
| "Browning automatic rifle," Britannica, September 8, 2022 | 7 n.13 | 821 |
| Phil Bourjaily, Blast From the Past: Winchester Model 1905, Field & Stream, Jan. 11, 2019 | 26 n.86 | 822 |
| "Bowie Knife," Encyclopedia of Arkansas | 29 n.95 | 823-824 |
| Giffords Law Center, Assault Weapons | 3 n.2 | 825-835 |
| Giffords Law Center, Large Capacity Magazines | 4 n.4 | 836-852 |
| "Gatling Gun," History.com, Sept. 9, 2021 | 5 n.7 | 853-856 |
| Karen Harris, "Bowie Knives: The Old West's Most Famous Blade," Oldwest, n.d., https://www.oldwest.org/bowie-knife-history | 30 n.99 | 857-862 |
| Robert Johnson and Geoffrey Ingersoll, It's Incredible How Much Guns Have Advanced Since The Second Amendment, Military & Defense, Dec. 17, 2012 | 26 n.86 | 863-868 |
| Ian McCollum, "Mannlicher 1885 Semiauto Rifle," Forgotten Weapons, May 6, 2015, https://www.forgottenweapons.com/mannlicher-1885-semiauto-rifle/ | 22 n.67 | 869-872 |
| How The Machine Gun Changed Combat During World War I, Norwich University Online, Oct. 15, 2020 | 5 n.8 | 873-875 |
| Matthew Moss, From Gangland to the Battlefield — 15 Amazing Facts About the Thompson Submachine Gun, Military History Now, Jan. 16, 2015 | 6 n.9, 9 n.24 | 876-886 |

9

| | | |
|---|---|---|
| "Uniform Machine Gun Act," National Conference of Commissioners on Uniform State Laws, Forty-Second Annual Conference, Washington, D.C., Oct. 4-10, 1932 | 8 n.18 | 887-906 |
| Peter Suciu, "The Thompson Submachine Gun: Made for the U.S. Postal Service?" The National Interest, July 3, 2020, | 6 n.11 | 907-911 |
| "The Puckle Gun: Repeating Firepower in 1718," Dec. 25, 2016 | 20 n.52 | 912 |
| Uniform Law Commission, *About Us* | 8 n.16 | 913-914 |
| U.S. Census, Historical Population Change Data (1910-1920) | 16 n.38 | 915-917 |
| U.S. Census, National Population Totals and Components of Change: 2020-2021 | 3 n.3, 4 n.5 | 918-921 |
| "Billy Club," Merriam-Webster | 34 n.119 | 922-924 |
| "Bludgeon," Merriam-Webster | 33 n.118 | 925-928 |
| "Slingshot," https://military-history.fandom.com/wiki/Slingshot | 34 n.121 | 929-930 |



Fig. 21 (*top*) Allen & Thurber, Grafton—6¾″ overall—six-shot—.31 caliber—serial #27.

Fig. 22 (*center*) Allen & Thurber, Norwich—8″ overall—six-shot—.33 caliber—serial #1.

Fig. 23 (*bottom*) Allen & Thurber, Norwich—9¼″ overall—six-shot—.36 caliber—serial #45.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

32           THE ALLEN PEPPERBOXES

hammer was placed directly in the line of sight.

With either a revolver or a pepperbox, it was a disconcerting but not uncommon experience to have all six barrels go off in unison. The partitions, placed between nipples to prevent fire from one barrel reaching another, were not always effective. The shield around the nipples was designed to prevent dislodging of caps and injury to nipples, as well as to protect against dampness and to minimize misfires. Some pepperbox users thought a nipple shield increased the danger of multiple explosions, because flame might be carried under it. The British and Continental makers were inclined to dispense with these enclosing shields. The absence of shields on some Allens is undoubtedly due to customer preference, but generally the shieldless Allens are those lacking the other refinements of shielded Allens. Since the best of the Worcester-era Allens have shields, it is assumed that Allen never believed the shield was a detriment.

Mark Twain showed a surer knowledge of firearms than students expect in fiction. In *Roughing It* there is the amusing tale of Bemis' shooting a tree-climbing buffalo with an Allen. In telling of his anger when his veracity was questioned, Bemis said, "I should have shot that long gangly lubber they called Hank if I could have done it without crippling six or seven other people—but of course I couldn't, the old Allen's so confounded comprehensive."

Duels were fought with all manner of firearms, but the rigidly supervised "affairs of honour" between men of high position were settled with costly weapons of high quality, designed especially for duelling. Men who settled their disputes with pepperboxes were unlikely to have their names long remembered. The only such duel I find recorded is a meeting between two ladies in Buffalo, New York. They used Allens, but the authorities stopped the duel by arresting the participants.

The Allens were made four-, five-, and six-shot, in barrel lengths from just under 3 inches to almost 6 inches, and in calibers from about .28 to .40, with the largest guns having the biggest bores. These largest ones were favored by the military. They were commonly called Dragoons and were usually fitted



Fig. 24 (*top*) Allen & Thurber, Worcester—9¼" overall—six-shot—.36 caliber—serial #96.          (GLODE M. REQUA COLLECTION.)

Fig. 25 (*center*) Allen & Thurber, Worcester—7¼" overall—six-shot—.31 caliber—serial #159.

Fig. 26 (*bottom*) Allen & Thurber, Worcester—7" overall—six-shot—.31 caliber—serial #82.

Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

with a spur on the trigger guard and sometimes with a belt hook.

Factory records of Allen models do not exist. The number of models of Allen pepperboxes may be considered as from perhaps twenty to upwards of one hundred, depending upon how minute are the modifications the student wishes to count as model changes. Allens examined only externally reveal many small differences: the shapes of the grips, the positions of plate screws and tension screws, the presence or absence of nipple shields and silver ornaments. In addition to the bar hammer type there is the concealed hammer type. And each of these types was made both with conventional triggers and with ring triggers.

The gun numbers are called serial numbers in the captions for the Allens illustrated here, but the numbers are not serials in the sense of indicating sequence of manufacture. The Allen stamped 27 was made before the one next pictured which is stamped 1. The one stamped 37 was made much later than the one stamped 90.

We know an Allen stamped "Worcester" is later than one stamped "Norwich," and that the latter is later than one stamped "Grafton." It is well not to attempt to date or place an Allen more accurately in the sequence, either by reference to one or two features of construction, or by the markings on barrel or hammer except in rare cases. (As far as I know, no Grafton Allen bears the patent date. A Norwich Allen that does not bear the patent date may be assumed to be very early in the Norwich period. Allen moved to Norwich in 1842, the year in which it became mandatory to mark a patented article with the year of the patent.) Allen's second patent, his first for a pepperbox, was #3998, granted in 1845. But Allen pepperboxes made after 1847 and embodying the 1845 features will be found stamped with the 1837 patent marking. The 1845 patent covered an improved method of mechanically turning the cylinder and also a feature of doubtful value that permitted using the weapon either single- or double-action. Figure 18 shows the Smithsonian Institution's patent model. The hammer has spurs to allow easy cocking for single-action use. Cocking this spur hammer did not rotate the cylinder, and this form of hammer


Digitized by Google

Original from
UNIVERSITY OF MICHIGAN

# LAW REVIEWS AND JOURNALS

# THE HISTORY OF FIREARM MAGAZINES AND MAGAZINE PROHIBITIONS

*David B. Kopel**

## I. INTRODUCTION

In recent years, the prohibition of firearms magazines has become an important topic of law and policy debate.  This article details the history of magazines and of magazine prohibition.  The article then applies the historical facts to the methodologies of leading cases that have looked to history to analyze the constitutionality of gun control laws.

Because ten rounds is an oft-proposed figure for magazine bans, Part II of the article provides the story of such magazines from the sixteenth century onward.  Although some people think that multi-shot guns did not appear until Samuel Colt invented the revolver in the 1830s, multi-shot guns predate Colonel Colt by over two centuries.[1]

Especially because the Supreme Court's decision in *District of Columbia v. Heller*[2] considers whether arms are "in common use" and are "typically possessed by law-abiding citizens for lawful purposes,"[3] the article also pays attention to whether and when particular guns and their magazines achieved mass-market success in the United States.  The first time a rifle with more than ten rounds of ammunition did so was in 1866,[4] and the first time a

---

    * Adjunct Professor of Advanced Constitutional Law, Denver University, Sturm College of Law.  Research Director, Independence Institute, Denver, Colorado.  Associate Policy Analyst, Cato Institute, Washington, D.C.  Professor Kopel is the author of fifteen books and over ninety scholarly journal articles, including the first law school textbook on the Second Amendment.  *See generally* NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY (2012).  Professor Kopel's website is http://www.davekopel.org.  The author would like to thank Joseph Greenlee and Noah Rauscher for research assistance.
    [1] *See* Clayton E. Cramer & Joseph Edward Olson, *Pistols, Crime, and Public Safety in Early America*, 44 WILLAMETTE L. REV. 699, 716 (2008).
    [2] District of Columbia v. Heller, 554 U.S. 570 (2008).
    [3] *Id.* at 624–25, 627.
    [4] *See infra* notes 50–55 and accompanying text.

handgun did so was in 1935.[5]

The detailed history of various firearms and their magazines stops in 1979—a year which is somewhat ancient in terms of the current gun control debate. Back in 1979, revolvers still far outsold semiautomatic handguns.[6] No one was trying to ban so-called assault weapons,[7] although such guns were already well established in the market.[8]

For the post-1979 period, Part II briefly explains how technological improvements in recent decades have fostered the continuing popularity of magazines holding more than ten rounds

Part III of the article describes the history of magazine prohibition in the United States. Such prohibitions are of recent vintage, with an important exception: during prohibition, Michigan, Rhode Island, and the District of Columbia banned some arms that could hold more than a certain number of rounds; Ohio required a special license for such guns.[9] The Michigan and Rhode Island bans were repealed decades ago; the Ohio licensing law was repealed in 2014, having previously been modified and interpreted so that it banned no magazines.[10] The District of Columbia ban, however, remains in force today, with some revisions.[11]

The Supreme Court's Second Amendment decisions in *District of Columbia v. Heller* and *McDonald v. Chicago*[12] paid careful

---

[5] *See infra* notes 102–03 and accompanying text.

[6] The U.S. manufacturing figures were compiled by the Bureau of Alcohol, Tobacco & Firearms. Although they were public documents, they were not made widely available in the 1970s. The following are the full-year production data by U.S. manufacturers. The figures do not include production for sale to the military. 1973: 452,232 pistols, 1,170,966 revolvers; 1974: 399,011 pistols, 1,495,861 revolvers; 1975: 455,267 pistols, 1,425,833 revolvers; 1976: 468,638 pistols, 1,425,407 revolvers; 1977: 440,387 pistols, 1,423,984 revolvers; 1978: 499,257 pistols, 1,458,013 revolvers; 1979: 637,067 pistols, 1,531,362 revolvers; 1980: 785,105 pistols, 1,586,149 revolvers. *Statistical Tabulation of Firearms Manufactured in the United States—and Firearms Exported—as Reported Yearly by Bureau of Alcohol, Tobacco and Firearms on ATF Form 4483-A*, AM. FIREARMS INDUSTRY (Nov. 1981) at 28–29.

[7] *See* David B. Kopel, *The Great Gun Control War of the Twentieth Century—and Its Lessons for Gun Laws Today*, 39 FORDHAM URB. L.J. 1527, 1578–79 (2012) (beginning of "assault weapon" issue in the mid- and late 1980s); L. Ingram, *Restricting of Assault-Type Guns Okd by Assembly Unit*, L.A. TIMES, Apr. 9, 1985, at 3.

[8] Below, this article describes many models of semi-automatic rifles introduced since 1927. *See infra* notes 82–101 and accompanying text. All of them have been labeled an "assault weapon" by one or more proposed bills. *See, e.g.*, LEGAL CMTY. AGAINST VIOLENCE, BANNING ASSAULT WEAPONS—A LEGAL PRIMER FOR STATE AND LOCAL ACTION 59–60 (2004), *available at* http://smartgunlaws.org/wp-content/uploads/2012/05/Banning_Assault_Weapons_A_Legal_Primer_8.05_entire.pdf (proposing a model assault weapons law).

[9] *See infra* notes 129–30, 134, 140 and accompanying text.

[10] *See infra* notes 131–33, 135–39 and accompanying text.

[11] *See infra* notes 140–45 and accompanying text.

[12] McDonald v. City of Chi., 561 U.S. 742 (2010).

2014/2015]        The History of Firearm Magazines              851

attention to history.   Several post-*Heller* lower court opinions in
Second Amendment cases have also examined history as part of
their consideration of the constitutionality of gun control statutes.
Part IV of this article examines the legality of magazine bans
according to the various historical standards that courts have
employed.

## II.  THE HISTORY OF MAGAZINES HOLDING MORE THAN TEN ROUNDS

In *District of Columbia v. Heller*, the Supreme Court ruled that
the District of Columbia's handgun ban was unconstitutional partly
because handguns are in "common use."[13]  The Second Amendment
protects arms that are "typically possessed by law-abiding citizens
for lawful purposes."[14]

Magazines of more than ten rounds are older than the United
States.[15]  Box magazines date from 1862.[16]  In terms of large-scale
commercial success, rifle magazines of more than ten rounds had
become popular by the time the Fourteenth Amendment was being
ratified.[17]   Handgun magazines of more than ten rounds would
become popular in the 1930s.[18]

### A. *Why Consumers Have Always Sought to Avoid Having to Reload During Defensive Gun Use*

When a firearm being used for defense is out of ammunition, the
defender no longer has a functional firearm.    The Second
Amendment, of course, guarantees the right to an *operable*
firearm.[19]  As the *Heller* Court explained, the Council of the District
of Columbia could not require that lawfully-possessed guns be kept
in an inoperable status (locked or disassembled) in the home,
because doing so negates their utility with respect to "the core
lawful purpose of self-defense."[20]

When the defender is reloading, the defender is especially
vulnerable to attack.  When ammunition is low but not exhausted
(e.g., two or three rounds remaining), that may be insufficient to

---

[13]  District of Columbia v. Heller, 554 U.S. 570, 627–29 (2008).
[14]  *Id.* at 625.
[15]  *See infra* notes 21–24 and accompanying text.
[16]  *See infra* note 65 and accompanying text.
[17]  *See infra* notes 43–55, 172–73 and accompanying text.
[18]  *See infra* notes 102–03 and accompanying text.
[19]  *See Heller*, 554 U.S. at 630, 635 (declaring the District of Columbia's requirement that
all firearms in the home be "rendered and kept inoperable at all times" as unconstitutional).
[20]  *Id.*

852                    Albany Law Review                    [Vol. 78.2

deter or control the threat, especially if the threat is posed by more than one criminal. If the victim is attacked by a gang of four large people, and a few shots cause the attackers to pause, the victim needs enough reserve ammunition in the firearm to make the attackers worry that even if they rush the victim all at once, the victim will have enough ammunition to knock each attacker down. When guns are fired defensively, it is unusual for a single hit to immediately disable an attacker.

Accordingly, from the outset of firearms manufacturing, one constant goal has been to design firearms able to fire more rounds without reloading.

To this end, manufacturers have experimented with various designs of firearms and magazines for centuries. While not all of these experiments were successful in terms of mass sales, they indicated the directions where firearms development was proceeding. The first experiments to gain widespread commercial success in the United States came around the middle of the nineteenth century.

### B. Magazines of Greater than Ten Rounds are More than Four Hundred Years Old

The first known firearm that was able to fire more than ten rounds without reloading was a sixteen-shooter created around 1580, using "superposed" loads (each round stacked on top of the other).[21] Multi-shot guns continued to develop in the next two centuries, with such guns first issued to the British army in 1658.[22] One early design was the eleven-round "Defence Gun," patented in 1718 by lawyer and inventor James Puckle.[23] It used eleven preloaded cylinders; each pull of the trigger fired one cylinder.[24]

As with First Amendment technology (such as televisions or websites), the Second Amendment is not limited to the technology that existed in 1791.[25] The *Heller* Court properly described such an asserted limit as "bordering on the frivolous."[26] But even if *Heller*

---

[21]  *See* LEWIS WINANT, FIREARMS CURIOSA 168–70 (2009); *A 16-Shot Wheel Lock*, AMERICA'S 1ST FREEDOM (June 2014), http://www.nrapublications.org/index.php/17739/a-16-shot-wheel-lock/ (NRA member magazine).

[22]  Cramer & Olson, *supra* note 1, at 716.

[23]  *Id.* at 716 & n.94.

[24]  *See id.* at 716–17; *This Day in History: May 15, 1718*, HISTORY, http://www.historychann el.com.au/classroom/day-in-history/600/defence-rapid-fire-gun-patented (last visited Feb. 21, 2015).

[25]  *Heller*, 544 U.S. at 582.

[26]  *Id.* ("Some have made the argument, bordering on the frivolous, that only those arms in

2014/2015]        The History of Firearm Magazines        853

had created such a rule, magazines of more than ten rounds are older than the Second Amendment.

At the time that the Second Amendment was being ratified, the state of the art for multi-shot guns was the Girandoni air rifle, with a twenty-two-shot magazine capacity.[27] Meriwether Lewis carried a Girandoni on the Lewis and Clark expedition.[28] At the time, air guns were ballistically equal to powder guns in terms of bullet size and velocity.[29] The .46 and .49 caliber Girandoni rifles were invented around 1779 for use in European armies and were employed by elite units.[30] One shot could penetrate a one-inch thick wood plank or take down an elk.[31]

### C. The Nineteenth Century Saw Broad Commercial Success for Magazines Holding More than Ten Rounds

Firearm technology progressed rapidly in the 1800s. Manufacturers were constantly attempting to produce reliable firearms with greater ammunition capacities for consumers. One notable step came in 1821 with the introduction of the Jennings multi-shot flintlock rifle, which, borrowing the superposed projectile design from centuries before, could fire twelve shots before reloading.[32]

Around the same time, pistol technology also advanced to permit more than ten shots being fired without reloading. "Pepperbox"

---

existence in the 18th century are protected by the Second Amendment. We do not interpret constitutional rights that way. Just as the First Amendment protects modern forms of communications, and the Fourth Amendment applies to modern forms of search, the Second Amendment extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." (citations omitted)).

[27] JIM SUPICA ET AL., TREASURES OF THE NRA NATIONAL FIREARMS MUSEUM 31 (2013).

[28] JIM GARRY, WEAPONS OF THE LEWIS & CLARK EXPEDITION 94 (2012).

[29] JOHN L. PLASTER, THE HISTORY OF SNIPING AND SHARPSHOOTING 69–70 (2008).

[30] See SUPICA ET AL., supra note 27, at 31.

[31] Id. The Lewis and Clark gun is on display at the National Rifle Association's Sporting Arms Museum in Springfield, Missouri. Mark Yost, The Story of Guns in America, WALL ST. J., Sept. 3, 2014, at D5.

[32] NORM FLAYDERMAN, FLAYDERMAN'S GUIDE TO ANTIQUE AMERICAN FIREARMS AND THEIR VALUES 683 (9th ed. 2007) [hereinafter FLAYDERMAN'S GUIDE]. According to James S. Hutchins, historian emeritus at the National Museum of American History, Smithsonian Institution, Mr. Flayderman has been a "revered expert in antique American arms and a vast range of other Americana for half a century . . . ." James S. Hutchins, Foreword to NORM FLAYDERMAN, THE BOWIE KNIFE: UNSHEATHING THE AMERICAN LEGEND 7 (2004). Mr. Flayderman has been appointed as historical consultant to the U.S. Army Museum, U.S. Marine Corps Museum, and the State of Connecticut's historic weapons collections. Andrea Valluzzo, E. Norman Flayderman, 84; Antique Arms Expert, ANTIQUES & ARTS WKLY. (July 2, 2013), http://test.antiquesandthearts.com/node/185567#.VMvRAGjF8YM.

pistols began to be produced in America in the 1830s.[33]  These pistols had multiple barrels that would fire sequentially.[34]  While the most common configurations were five or six shots,[35] some models had twelve independently-firing barrels,[36] and there were even models with eighteen or twenty-four independently-firing barrels.[37]  Pepperboxes were commercially successful and it took a number of years for Samuel Colt's revolvers (also invented in the 1830s) to surpass them in the marketplace.[38]

The 1830s through the 1850s saw a number of different firearm designs intended to increase ammunition capacity.  In 1838, the Bennett and Haviland Rifle was invented; it was a rifle version of the pepperbox, with twelve individual chambers that were manually rotated after each shot.[39]  This would bring a new chamber, preloaded with powder and shot, into the breach, ready to be fired.[40]  Alexander Hall and Colonel Parry W. Porter each created rifles with capacities greater than ten in the 1850s.[41]  Hall's design had a fifteen-shot rotating cylinder (similar to a revolver), while Porter's design used a thirty-eight-shot canister magazine.[42]

The great breakthrough, however, began with a collaboration of Daniel Wesson (of Smith and Wesson) and Oliver Winchester.  They produced the first metallic cartridge—containing the gunpowder, primer, and ammunition in a metallic case similar to modern ammunition.[43]  Furthermore, they invented a firearms mechanism that was well suited to the new metallic cartridge: the lever

---

[33] JACK DUNLAP, AMERICAN BRITISH & CONTINENTAL PEPPERBOX FIREARMS 16 (1964).

[34] LEWIS WINANT, PEPPERBOX FIREARMS 7 (1952).

[35] See, e.g., Pocektsize Allen and Thurber Pepperbox Revolver, ANTIQUE ARMS, http://aaawt .com/html/firearms/f102.html (last visited Feb. 21, 2015).

[36] DOE RUN LEAD COMPANY'S MUSEUM, CATALOGUE OF CONTENTS 66 (1912).

[37] DUNLAP, supra note 33, at 148–49, 167 (describing three European eighteen-shot models and one twenty-four-shot model); SUPICA ET AL., supra note 27, at 33 (describing the Marietta eighteen-shot model); WINANT, supra note 21, at 249–50 (describing a twenty-four-shot pepperbox).

[38] WINANT, supra note 34, at 28.

[39] FLAYDERMAN'S GUIDE, supra note 32, at 711.

[40] See id.

[41] Id. at 713, 716.

[42] Id.  The Porter Rifle was said to be able to fire up to sixty shots per minute.  Mary Moran, P.W. Porter, Inventor of the Porter Rifle, DEAD MEMPHIS TALKING (April 18, 2014), http://deadmemphistalking.blogspot.com/2014/04/pw-porter-inventor-of-porter-rifle.html (reprinting an article from New York Post).  About 1250 of these guns were produced.  S.P. Fjestad, What's It Worth? The Porter Rifle, FIELD & STREAM, http://www.fieldandstream.com/ articles/guns/rifles/2009/01/whats-it-worth-porter-rifle (last visited Feb. 21, 2015).

[43] See FLAYDERMAN'S GUIDE, supra note 32, at 303 ("The self-contained cartridge was a special type, the hollowed out conical bullet containing the powder, and backed by the primer."); HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 26–27 (1952).

2014/2015]          The History of Firearm Magazines          855

action.[44]  Their company, the Volcanic Repeating Arms Company, introduced the lever action rifle in 1855.[45]  This rifle had up to a thirty-round tubular magazine under the barrel that was operated by manipulating a lever on the bottom of the stock.[46]  The lever-action allowed a shooter to quickly expel spent cartridges and ready the firearm for additional shots.[47]  An 1859 advertisement bragged that the guns could be loaded and fire thirty shots in less than a minute.[48]  In 1862, the Volcanic evolved into the sixteen-round Henry lever action rifle, lauded for its defensive utility.[49]

The Henry rifle further evolved into the Winchester repeating rifle, and the market for these firearms greatly expanded with the first gun produced under the Winchester name.[50]  Winchester touted the Model 1866 for defense against "sudden attack either from robbers or Indians."[51]  According to advertising, the M1866 "can . . . be fired thirty times a minute,"[52] or with seventeen in the magazine and one in the chamber, "eighteen charges, which can be fired in nine seconds."[53]  The gun was a particularly big seller in the American West.[54]  There were over 170,000 Model 1866s produced.[55]

Next came the Winchester M1873, "[t]he gun that won the West."[56]  The Winchester M1873 and then the M1892 were lever actions holding ten to eleven rounds in tubular magazines.[57]  There were over 720,000 copies of the Winchester 1873 made from 1873 to

---

[44]  *See Smith & Wesson History*, SMITH & WESSON, http://www.smith-wesson.com/webapp/wcs/stores/servlet/Category4_750001_750051_757941_-1_757938_757812_image (last visited Feb. 21, 2015).

[45]  FLAYDERMAN'S GUIDE, *supra* note 32, at 304.

[46]  *Id.* at 303; WILLIAMSON, *supra* note 43, at 13.

[47]  WILLIAMSON, *supra* note 43, at 25.  Oliver Winchester had an ownership interest in Volcanic and acquired the company in 1857.  FLAYDERMAN'S GUIDE, *supra* note 32, at 300.

[48]  WILLIAMSON, *supra* note 43, at 25.

[49]  *See Id.*, at 28–31; Joseph Bilby, *The Guns of 1864*, AM. RIFLEMAN (May 5, 2014), http://www.americanrifleman.org/articles/2014/5/5/the-guns-of-1864/.  About 14,000 Henry rifles were sold in 1860–66.  FLAYDERMAN'S GUIDE, *supra* note 32, at 305.  The Henry Rifle is still in production today.  *See About Henry Repeating*, HENRY, http://www.henryrifles.com/about-henry-repeating/ (last visited Feb. 21, 2015).

[50]  *See* WILLIAMSON, *supra* note 43, at 49.

[51]  R.L. WILSON, WINCHESTER: AN AMERICAN LEGEND 32 (1991).

[52]  WILLIAMSON, *supra* note 43, at 49.

[53]  LOUIS A. GARAVAGLIA & CHARLES G. WORMAN, FIREARMS OF THE AMERICAN WEST 1866–1894, at 128 (1985).  The Winchester Model 1866 was produced until 1898.  FLAYDERMAN'S GUIDE, *supra* note 32, at 306.

[54]  WILSON, *supra* note 51, at 34.

[55]  FLAYDERMAN'S GUIDE, *supra* note 32, at 306.

[56]  *Model 1873 Short Rifle*, WINCHESTER REPEATING ARMS, http://www.winchesterguns.com/products/catalog/detail.asp?family=027C&mid=534200 (last visited Feb. 21, 2015).

[57]  *Id.*

856                          Albany Law Review                      [Vol. 78.2

1919.[58]  Over a million of the M1892 were manufactured from 1892 to 1941.[59]  The Italian company Uberti, which specializes in high-quality reproductions of western firearms, produces reproductions of all of the above Winchesters today.[60]  Another iconic rifle of the latter nineteenth century was the pump action Colt Lightning rifle, with a fifteen-round capacity.[61]

Manufactured in Maine, the Evans Repeating Rifle came on the market in 1873.[62]  The innovative rotary helical magazine in the buttstock held thirty-four rounds.[63]  It was commercially successful for a while, although not at Winchester's or Colt's levels.  Over 12,000 copies were produced.[64]

Meanwhile, the first handgun to use a detachable box magazine was the ten-round Jarre harmonica pistol, patented in 1862.[65]  In the 1890s, the box magazine would become common for handguns.[66]

Pin-fire revolvers with capacities of up to twenty or twenty-one entered the market in the 1850s;[67] they were produced for the next half-century, but were significantly more popular in Europe than in America.[68]  For revolvers with other firing mechanisms, there were some models with more than seventeen rounds.[69]  The twenty-round Josselyn belt-fed chain pistol was introduced in 1866, and various other chain pistols had even greater capacity.[70]  Chain pistols did not win much market share, perhaps in part because the large

---

[58] FLAYDERMAN'S GUIDE, *supra* note 32, at 307.  The Model 1873 was Pa Cartwright's gun on the 1959 to 1973 television series *Bonanza*. SUPICA ET AL., *supra* note 27, at 108.

[59] FLAYDERMAN'S GUIDE, *supra* note 32, at 311.  The Model 1892 was John Wayne's gun in many movies. SUPICA ET AL., *supra* note 27, at 109.

[60] 2014 STANDARD CATALOG OF FIREARMS: THE COLLECTOR'S PRICE & REFERENCE GUIDE, 1237 (Jerry Lee ed., 2013).  The 1995 edition of this annually-published guide was relied on by the court in *Kirkland v. District of Columbia*, 70 F.3d 629, 635 n.3 (D.C. Cir. 1995).

[61] The original Colt held up to fifteen rounds in calibers of .32–.20, .38–.40, and .44–.40. FLAYDERMAN'S GUIDE, *supra* note 32, at 122.  Uberti currently produces a modern replica of the Colt Lightning, medium frame model, of which 89,000 were produced between 1884 and 1902. *Id.*

[62] *Id.* at 694.

[63] DWIGHT B. DEMERITT, JR., MAINE MADE GUNS & THEIR MAKERS 293–95 (rev. ed. 1997); FLAYDERMAN'S GUIDE, *supra* note 32, at 694.  A later iteration of the rifle held twenty-five or twenty-eight rounds in the buttstock. DEMERITT, *supra*, at 301.  The American Society of Arms Collectors endorses the Demeritt book as "the definitive work for historians and collectors" of Maine guns. DEMERITT, *supra*, at vi.

[64] FLAYDERMAN'S GUIDE, *supra* note 32, at 694.

[65] WINANT, *supra* note 21, at 244–45.  The magazine stuck out horizontally from the side of the firing chamber, making the handgun difficult to carry in a holster, which perhaps explains why the gun never had mass success. SUPICA ET AL., *supra* note 27, at 33.

[66] *See infra* notes 72–77 and accompanying text.

[67] SUPICA ET AL., *supra* note 27, at 48–49; WINANT, *supra* note 21, at 67–70.

[68] SUPICA ET AL., *supra* note 27, at 49.

[69] *See, e.g.*, WINANT, *supra* note 21, at 62–63, 207–08.

[70] *Id.* at 204, 206.

2014/2015]          The History of Firearm Magazines          857

dangling chain was such an impediment to carrying the gun.[71]

The semiautomatic firearm and its detachable box magazine were invented before the turn of the century. It was the latest success in the centuries-old effort to improve the reliability and capacity of multi-shot guns.

In 1896, Germany's Mauser introduced the C96 "broomhandle" pistol, which remained in production until the late 1930s, selling nearly a million to civilians worldwide.[72] The most common configuration was in ten-round capacity, but there were a variety of models with capacities as low as six or as high as twenty.[73] The latter was the Cone Hammer pistol, with twenty-round box magazine.[74]

The Luger semiautomatic pistol was brought to the market in 1899 (although it is commonly known as the "1900").[75] Through many variants, it was very popular for both civilians and the military markets, and remained in production for nearly a century.[76] The most common magazines were seven or eight rounds, but there was also a thirty-two-round drum magazine.[77]

### D. Manufacturers in the Twentieth Century Continued The Trend of Increasing Ammunition Capacity and Reliability for Civilian Firearms.

The twentieth century saw improvements on the designs pioneered in the 1800s and expanding popularity for firearms with more than ten rounds.

---

[71] *See id.* at 205.

[72] JOHN W. BREATHED, JR. & JOSEPH J. SCHROEDER, JR., SYSTEM MAUSER, A PICTORIAL HISTORY OF THE MODEL 1896 SELF-LOADING PISTOL 272 (1967) (production of 1,150,000, of which "almost a million" were sold on the commercial, non-military market); *see* John Elliot, *A Sweeping History of the Mauser C96 Broomhandle Pistol*, GUNS.COM (Jan. 26, 2012), http://www.guns.com/2012/01/26/a-sweeping-history-of-the-mauser-c96-broomhandle-pistol/.

[73] 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 708–09.

[74] *Id.*; BREATHED & SCHROEDER, *supra* note 72, at 23, 30–31, 38–39, 54–55. At least between 1896 and 1905, Mauser's direct sales to the United States were small. *Id.* at 266–67.
Spain's Astra brought out its own versions of the Mauser, with several models having twenty-round magazines starting in 1928. *Id.* at 208. But these do not appear to have had much distribution in the United States. *Id.* at 266–67.

[75] *See* 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 650.

[76] Among the many models was the 1906 American Eagle. *Id.* at 653. George Luger's invention was licensed to many companies, including Mauser (Germany) and Vickers (England). *Id.* at 657–58. The gun was never manufactured under Luger's own name. *See id.* at 650–62.

[77] JEAN-NOËL MOURET, PISTOLS AND REVOLVERS 126–27 (1993); SUPICA ET AL., *supra* note 27, at 86.

858                          Albany Law Review                    [Vol. 78.2

Since the late 1890s, the Savage Arms Company has been one of the classic American firearms manufacturers.[78]   In 1911, the company introduced their bolt-action Model 1911, a twenty-shot repeater with a tubular magazine in .22 short caliber.[79]   The rifle was popular for boys and for shooting galleries.[80]

By the 1930s, American manufacturers such as Remington, Marlin, and Winchester were producing many tubular magazine rifles in .22 caliber.[81]   These firearms are classic rifles for "plinking" (casual target shooting), especially popular for young people.  Based on firearms catalogues from 1936 to 1971, there are over twenty such firearms models from major American manufacturers with magazines of sixteen to thirty rounds in one or more of the calibers.[82]

In 1927, the Auto Ordinance Company introduced their

---

[78]   *See Savage Arms History*, SAVAGE ARMS, http://www.savagearms.com/history/ (last visited Feb. 21, 2015).

[79]   JIM PERKINS, AMERICAN BOYS' RIFLES 1890–1945, at 191 (1976).

[80]   *Id.*  Similarly, the Remington Model 12B Gallery Special was introduced in 1910, with an optional extended magazine that held twenty-five .22 shorts.  ROY MARCOT, REMINGTON, "AMERICA'S OLDEST GUN MAKER" 149 (James W. Bequette & Joel J. Hutchcroft eds. 1998).

[81]   *See, e.g.*, 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 687–88, 870, 1343.

[82]   Models listed in the 1936 *Shooter's Bible* include; Remington Model 34 bolt action, Remington Model 121 slide action, Remington Model 341 bolt action, Stevens No. 71 slide action, Savage Model 5 bolt action, Stevens Model 76 semiauto, Stevens-Springfield Model 86 bolt action, Winchester Model 62 slide action, and Winchester Model 61 slide action.  STOGER ARMS CORP., SHOOTER'S BIBLE, 1936, at 108–09, 112, 123–24, 126–27, 140 (photo. reprint 1974).

Some additional models include: Stevens Model 87 bolt action, Remington 550 semiauto, Mossberg Model 46B bolt action, Mossberg Model 46M bolt action, Winchester Model 74 semiautomatic, Marlin 39 A lever action, and Marlin Model 81 DL bolt action.  BOB BROWNELL, 2 THE GUNSMITHS MART, 1949–1950, at 212, 214, 216, 218, 221 (2011) (reprinting article from *Hunting & Fishing*, Oct. 1948).

The 1959 annual edition of the *Shooter's Bible* adds the semiautomatic Savage Model 6 to the above list.  STOGER ARMS CORP., SHOOTER'S BIBLE, 1959, at 103 (1959).  For some of the models previously mentioned, *see id.* at 80, 87, 91, 101.

Histories of Savage and Stevens firearms include the following not listed above: Stevens No. 66 bolt action, Stevens Model 46 bolt action, Model 1914 slide action, Savage Model 29 slide action, Savage Model 29 G slide action.  JAY KIMMEL, SAVAGE AND STEVENS ARMS COLLECTOR'S HISTORY 35 (1990); BILL WEST, SAVAGE AND STEVENS ARMS, at 11—12, 13—8, 14—44, 15—10, 16—10 (1971).  Savage purchased Stevens in 1920.  *Savage Arms History*, *supra* note 78.

For use of the *Shooter's Bible* by the courts, see United States v. Olson, No. 94-30387, 1995 U.S. App. LEXIS 36973, at *1–2 (9th Cir. Dec. 15, 1995) (stating that the book was properly used as a source for a Bureau of Alcohol, Tobacco, and Firearms agent's expert opinion); United States v. Fisher, 353 F.2d 396, 399 (5th Cir. 1965) (Gewin, J., dissenting) (considering information in the book to determine whether the evidence relied on by the trial court was sufficient to justify the trial court's holding); Potter v. United States, 167 Ct. Cl. 28, 48 n.1 (Ct. Cl. 1964) (citing the book for the history of Gabilondo firearms); United States v. Precise Imports Corp., 458 F.2d 1376, 1377 (C.C.P.A. 1972) (reviewing the record produced at the trial court, which included pages from the 1967 edition of the book).

semiautomatic rifle that used thirty-round magazines.[83]   These rifles are still in production today.[84]

The M-1 carbine was invented for the citizen solider of World War II.[85]   Thereafter, the M-1 carbine became and has remained a popular rifle for civilians in America.[86]   The U.S. government's Civilian Marksmanship Program, created by Congress, put nearly a quarter million of these guns into the hands of law-abiding American citizens starting in 1963, at steeply-discounted prices.[87] Partly using surplus government parts, the Plainfield Machine Company, Iver Johnson, and more than a dozen other companies cumulatively manufactured over 200,000 for the civilian market, starting in the late 1950s.[88]   The standard magazines are fifteen and thirty rounds.[89]

The most popular rifle in American history is the AR-15 platform, a semiautomatic rifle with standard magazines of twenty or thirty rounds.[90]   The AR-15 was brought to the market in 1963, with a

---

[83] 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 84; *T1-C*, THOMPSON, www.auto-ordnance.com//firearms/thompson-t1-c.asp (last visited Feb. 21, 2015).

[84] *See T1-C*, *supra* note 83.

[85] *See* BRUCE N. CANFIELD, BRUCE CANFIELD'S COMPLETE GUIDE TO THE M1 GARAND AND THE M1 CARBINE 163 (1999).

[86] *See id.* at 163, 279 (noting high desirability and demand for the firearm after the war ended); *see also* Joseph P. Tartaro, *The Great Assault Weapon Hoax*, 20 U. DAYTON L. REV. 619, 622 (1995) ("[T]he M1 carbine [is] beloved by millions of war veterans, collectors, and recreational shooters.").

[87] CANFIELD, *supra* note 85, at 163; LARRY L. RUTH, 2 WAR BABY! COMES HOME: THE U.S. CALIBER .30 CARBINE 575 (R. Blake Stevens ed., 1993); *About the CMP*, CIV. MARKSMANSHIP PROGRAM, http://thecmp.org/about/ (last visited Feb. 21, 2015).

[88] *See* CANFIELD, *supra* note 85, at 163, 279 (noting the large quantity of surplus carbine parts and that firms created commercial carbines using these parts in the 1950s and 1960s). The largest producers were Plainfield's 112,000 from 1962 to 1978 and Iver Johnson's 96,700 from 1978 to 1992. *Post WWII Commercially Manufactured M1 Carbines (U.S.A.): Iver Johnson Arms*, M1CARBINESINC.COM, http://www.m1carbinesinc.com/carbine_ij.html (last visited Feb. 21, 2015); *Post WWII Commercially Manufactured M1 Carbines (U.S.A.): Plainfield Machine Co., Inc.*, M1CARBINESINC.COM., http://www.m1carbinesinc.com/carbine_pl ainfield.html (last visited Feb. 21, 2015). The U.S. Government sold 240,000 of its own surplus in 1963 into the Civilian Marksmanship Program. CANFIELD, *supra* note 85, at 163. Thereafter, the program (then known as "DCM"—Director of Civilian Marksmanship) sold M1s to Americans from the supply of World War II M1 carbines that had been exported to allied nations and subsequently returned to the United States when the allied nation switched to a newer type of rifle. *See* RUTH, *supra* note 87, at 575, 723. As of 2014, the Civilian Marksmanship Program's supply of carbines for sale has been exhausted. *M1 Carbine*, CIV. MARKSMANSHIP PROGRAM, http://www.thecmp.org/Sales/carbine.htm (last visited Feb. 21, 2015).

[89] RUTH, *supra* note 87, at 575.

[90] *See* NICHOLAS J. JOHNSON, DAVID B. KOPEL, GEORGE A. MOCSARY & MICHAEL P. O'SHEA, FIREARMS LAW AND THE SECOND AMENDMENT: REGULATION, RIGHTS, AND POLICY 12, 809 (2012) (noting the wide range of uses for the gun and its popularity). The "AR" stands for "ArmaLite Rifle." *Modern Sporting Rifle Facts*, NAT'L SHOOTING SPORTS FOUND., http://www. nssf.org/msr/facts.cfm (last visited Feb. 21, 2015). ArmaLite did the initial design work on

860                          Albany Law Review                       [Vol. 78.2

then-standard magazine of twenty; the thirty-round standard magazine was developed a few years later.[91]  The 1994 Supreme Court case *Staples v. United States*[92] described the AR-15 as "the civilian version of the military's M–16 rifle," and noted that many parts are interchangeable between the two guns.[93]  The crucial distinction, explained the Court, is that the AR-15 is like all other semiautomatic firearms in that it can fire "only one shot with each pull of the trigger."[94]  The Court pointed out that semiautomatic firearms "traditionally have been widely accepted as lawful possessions."[95]  So legally speaking, the semiautomatic AR-15 is the opposite of the M-16 machine gun: "[C]ertain categories of guns—no doubt including the machineguns, sawed-off shotguns, and artillery pieces that Congress has subjected to regulation— . . . have the same quasi-suspect character we attributed to owning hand grenades . . . .  But . . . guns falling outside those categories traditionally have been widely accepted as lawful possessions . . . ."[96]

By 1969, the AR-15 faced competition from the Armalite-180 (twenty-round optional magazine), the J&R 68 carbine (thirty rounds), and the Eagle Apache carbine (thirty rounds).[97]

Springfield Armory brought out the M1A semiautomatic rifle in 1974, with a twenty-round detachable box magazine.[98]  The next year, the Ruger Mini-14 rifle was introduced, with manufacturer-supplied standard five, ten, or twenty-round detachable magazines.[99]  Both the M1A and the Mini-14 are very popular to this day.[100]

the AR-15 before selling the rights to Colt's.  ARMALITE, INC., A HISTORICAL REVIEW OF ARMALITE 3 (Jan. 4, 2010), *available at* http://www.armalite.com/images/Library%5CHistory .pdf.

[91] PATRICK SWEENEY, THE GUN DIGEST BOOK OF THE AR-15, at 104 (2005).  About this time, the Cetme-Sport semiauto rifle with an optional twenty-round detachable box mag magazine came on the market.  GUN DIGEST 1968, at 335 (John T. Amber ed., 22nd Anniversary Deluxe ed. 1967).

[92] Staples v. United States, 511 U.S. 600 (1994).

[93] *Id.* at 603.

[94] *Id.* at 602 n.1, 603.

[95] *See id.* at 612.

[96] *See id.* at 611–12.

[97] *See* GUN DIGEST 1970, at 294 (John T. Amber ed., 24th Anniversary Deluxe ed. 1969).

[98] *See* 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 1102 (noting the twenty-round box magazine); *M1A Series*, SPRINGFIELD ARMORY, http://www.springfield-armory.com/m1a-series/ (last visited Feb. 21, 2015).

[99] 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 1173.

[100] *See* M1A Scout, *What is an M1A Rifle*, M1A RIFLES (July 2, 2009), http://www.m1arifles .com/tag/m14/; Shawn Skipper, *8 Things You Might Not Know About the Ruger Mini-14*, DAILY CALLER (June 3, 2014), http://dailycaller.com/2014/06/03/8-things-you-might-not-know-

2014/2015]          The History of Firearm Magazines          861

By 1979, all of the above guns were challenged in the American market by high-quality European imports such as the Belgian FN-FAL Competition rifle (optional twenty-round magazine), the German Heckler & Koch HK-91 and HK-93 rifles (twenty rounds), the Swiss SIG AMT rifle (twenty rounds), and the Finnish Valmet M-71S rifle (thirty rounds).[101]

Citizen firearms with detachable magazines holding more than ten rounds were not limited to rifles, however. In 1935, Browning introduced the Hi-Power pistol.[102] This handgun was sold with a thirteen-round detachable magazine and is still in production.[103]

In Europe, more so than in America, Browning had to compete against the Spanish Gabilondo twenty-round Plus Ultra, introduced in 1925.[104] Spain's Arostegui, Eulogio brought out the Azul—a semiautomatic with standard magazines of ten, twenty and thirty—in 1935.[105]

Browning's first notable American competition came with the 1964 introduction of the Plainfield Machine Company's "Enforcer," a pistol version of the M1 carbine with a thirty-round magazine.[106]

A tremendous commercial success was the Beretta model 92, a nine millimeter pistol with a sixteen-round magazine, which entered the market in 1976.[107] In various configurations (currently the Beretta 92F) the Beretta is one of the most popular of all modern handguns.[108] Browning introduced another popular handgun in 1977, the fourteen-round BDA (Browning Double Action).[109] Also coming on the market at this time were European handguns such as Austria's L.E.S. P-18 (eighteen rounds) and

---

about-the-ruger-mini-14/. Another gun introduced in 1976 also used magazines larger than fifteen. The Bingham company (from Norcross, Georgia) brought out the PPS 50 and AK-22, .22 caliber rifles with detachable magazines of fifty or twenty-nine rounds. 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 163. The PPS-50 is currently manufactured by Mitchell's Mausers. *See PPS-50/22*, MITCHELL'S MOUSERS, http://www.mauser.org/pps-50-22/ (last visited Feb. 21, 2015). That the gun is still in production four decades later is impressive, but the PPS-50 never became an all-American favorite as did the M1, AR-15, M1A and the Mini-14.

[101] GUN DIGEST 1980, at 319–21 (Ken Warner ed., 34th Anniversary Deluxe ed. 1979). Also on the market were the Commando Arms carbine (five, fifteen, thirty or ninety rounds), and the Wilkinson Terry carbine (thirty-one rounds). *Id.* at 319, 322.

[102] 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 182.

[103] *Id.* at 432–33.

[104] *See id.* at 465.

[105] *Id.* at 72; BREATHED & SCHROEDER, *supra* note 74, at 216–17.

[106] *See* GUN DIGEST 1965, at 229 (John T. Amber eds., 19th Anniversary Deluxe ed. 1964).

[107] 2014 STANDARD CATALOG OF FIREARMS, *supra* note 60, at 121.

[108] *Id.* at 122. In 1985 the M9 version of this pistol became the standard U.S. military issue sidearm. *Id.* at 124.

[109] *Id.* at 184.

862                    Albany Law Review                    [Vol. 78.2

Germany's Heckler & Koch VP 70Z (also eighteen rounds).[110]

### E. Magazines After 1979

We end this story in 1979, when Jimmy Carter was President,[111] the Bee Gees bestrode the AM radio Top 40,[112] Gaston Glock was manufacturing curtain rods in his garage,[113] Americans were watching *Love Boat* on broadcast television,[114] and people on the cutting edge of technology were adopting VisiCalc, the first spreadsheet program, run from huge floppy discs.[115]

Long before 1979, magazines of more than ten rounds had been well established in the mainstream of American gun ownership. Indeed, they had been so established before almost everyone alive in 1979 was born.

After 1979, technological improvements continued to foster the popularity of magazines holding more than ten rounds. First of all, there were improvements across the board in manufacturing, so that magazine springs became more reliable, particularly for magazines holding up to thirty rounds. This greatly reduced the risk of a misfeed. Reliability was also enhanced by improvements in shaping the magazines' "lips"—the angled wings at the top of the magazine which guide the next round of ammunition into the firing chamber.[116]

Magazines of all sizes benefited from increasing use of plastic polymers in manufacturing.[117] Today, many magazine walls are

---

[110] *See* GUN DIGEST 1980, *supra* note 101, at 297–98. L.E.S. was the American partner of Austria's Steyr. The following courts have relied on one of the annual issues of GUN DIGEST: Sturm, Ruger & Co. v. Arcadia Mach. & Tool, Inc., No. CV 85-8459 MRP, 1988 U.S. Dist. LEXIS 16451, at *3–4 (C.D. Cal. Nov. 4, 1988); A. Uberti & C. v. Leonardo, 892 P.2d 1354, 1364 (Ariz. 1995) (discussing how the inclusion of the defendant's guns in the *Gun Digest* established that defendant had sufficient minimum contacts with the state to satisfy personal jurisdiction); Couplin v. State, 378 A.2d 197, 202 n.2 (Md. Ct. Spec. App. 1977); Citizens for a Safer Cmty. v. City of Rochester, 627 N.Y.S.2d 193, 203 n.5 (Sup. Ct. 1994).

[111] JULIAN E. ZELIZER, JIMMY CARTER 3 (2010).

[112] *See* DAVID N. MEYER, THE BEE GEES: THE BIOGRAPHY 213–14 (2013).

[113] PAUL M. BARRETT, GLOCK: THE RISE OF AMERICA'S GUN 13–16 (2012).

[114] GAVIN MACLEOD & MARK DAGOSTINO, THIS IS YOUR CAPTAIN SPEAKING: MY FANTASTIC VOYAGE THROUGH HOLLYWOOD, FAITH & LIFE 138–39 (2013).

[115] *See, e.g.*, BOB DENTON, THE PC PIONEERS 97–100 (2d ed. 2014); ROBERT E. WILLIAMS & BRUCE J. TAYLOR, THE POWER OF: VISICALC (1981) (advising how to properly use the VisiCalc system and providing practice exercises on the system).

[116] *See generally* David Tong, *The Care, Feeding and Reliability of Semi-Automatic Pistols*, CHUCKHAWKS.COM, http://www.chuckhawks.com/care_reliability_autopistols.htm (last visited Feb. 21, 2015).

[117] *See, e.g.*, Tim Lau, *AR15/M16 Magazine Drop Test: Plastic Vs. Aluminum*, MODERN SERVICE WEAPONS, (Dec. 9, 2012), http://modernserviceweapons.com/?p=1072 (comparing the performance of plastic and aluminum magazines).

made from plastic, rather than metal.   Closer tolerances in manufacturing, lower costs, and increased durability have all improved magazine quality and reliability.

Likewise, the vast majority of magazines today have a removable baseplate (also known as a "foot plate").[118]   Removal of the baseplate allows the magazine to be disassembled for cleaning (e.g., removal of gunpowder residue) or repair (e.g., replacing a worn-out spring).[119]   The existence of a removable baseplate also makes it possible for consumers to add after-market extenders to a magazine.[120]   These extenders may simply increase the grip length (to better fit a particular consumer's hands), and they may also increase capacity by one, two, or three rounds.[121]   Thus, a consumer with a ten-round factory magazine can add a two-rounder extender to create a twelve-round magazine.

Most importantly, the double-stack magazine was perfected.   In some box magazines, the ammunition is contained in a single column.[122]   In the double-stack magazine, there are two columns of ammunition, side-by-side and touching.[123]   When the gun is used, the magazine will first reload a round from column A, then a round from column B, then from column A, and so on.[124]

The practical effect is this: for a handgun, a single stack magazine of seventeen rounds would stick out far below the bottom of the grip, making the gun unwieldy for carrying and holstering.   With a double-stack configuration, a seventeen-round magazine can fit inside a standard full-sized handgun grip.   The practical limitation of grip size (the size of the human hand) means that relatively larger capacity magazines are possible for relatively smaller cartridges.   Thus, a double-stack magazine for the midsize nine millimeter round might hold up to twenty or twenty-one rounds, whereas a double-stack for the thicker .45 ACP cartridge would hold

---

[118]  Michael Shain, Expert Report and Opinion at 5–6, Cooke v. Hickenlooper, No. 13-cv-01300-MSK-MJW (D. Colo. Aug. 1, 2013), available at http://coloradoguncase.org/Shain-report.pdf.   Kopel is counsel for the Colorado Sheriffs who are the plaintiffs in this case, which is currently on appeal to the Tenth Circuit.

[119]  See Mike Wood, 3 Simple Keys to Cleaning Your Pistol Magazines, POLICEONE.COM, July 11, 2014, http://www.policeone.com/Officer-Safety/articles/7358758-3-simple-keys-to-clea ning-your-pistol-magazines/.

[120]  Michael Shain, Expert Report and Opinion at 5–7, Cooke, No. 13-cv-01300-MSK-MJW.

[121]  See, e.g., Magazine Adapters, TOP GUN SUPPLY, http://www.topgunsupply.com/gun-acces sories-for-sale/magazine-adapters.html (last visited Feb. 19, 2014) (selling magazine adapters that increase capacity and/or increase grip length).

[122]  Magazines, Clips, and Speedloaders, FIREARMS ADVANTAGE, http://www.firearmsadvant age.com/magazines_clips_speedloaders.html (last visited Feb. 21, 2015).

[123]  Id.

[124]  Id.

no more than fifteen.

### III. THE HISTORY OF AMMUNITION CAPACITY BANS

An important factor in the consideration of the constitutionality of firearms laws is whether they are traditional and longstanding. For example, the *Heller* Court pointed out that "[f]ew laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."[125] The handgun ban was contrasted with "longstanding" guns controls, such as those prohibiting gun possession by felons or the mentally ill.[126] Following *Heller*, the Tenth Circuit has explained that Second Amendment cases must consider "the rarity of state enactments in determining whether they are constitutionally permissible."[127]

At the time the Second Amendment was adopted, there were no laws restricting ammunition capacity. This was not because all guns were single-shot. As detailed above, multi-shot guns predate the Second Amendment by about two hundred years, and Lewis and Clark carried a powerful twenty-two-round gun on their famous expedition.[128]

The first laws that restricted magazine capacity were enacted during the prohibition era, nearly a century and a half after the Second Amendment was adopted, and over half a century after the adoption of the Fourteenth Amendment. In 1927, Michigan prohibited "any machine gun or firearm which can be fired more than sixteen times without reloading."[129]  Also in 1927, Rhode Island banned "any weapon which shoots more than twelve shots semi-automatically without re-loading."[130]

The Michigan ban was repealed in 1959.[131]  That same year, the

---

[125] District of Columbia v. Heller, 554 U.S. 570, 629 (2008).

[126] *Id.* at 626, 629.

[127] Kerr v. Hickenlooper, 744 F.3d 1156, 1178 (10th Cir. 2014).

[128] *See supra* notes 21–31 and accompanying text.

[129] Act of June 2, 1927, No. 373, § 3, 1927 Mich. Public Acts 887, 888 (repealed 1959) ("It shall be unlawful within this state to manufacture, sell, offer for sale, or possess any machine gun or firearm which can be fired more than sixteen times without reloading . . . ."). In 1931, the provision was consolidated into section 224 of the Michigan Code.

[130] Act of Apr. 22, 1927, ch. 1052, §§ 1, 4, 1927 R.I. Acts & Resolves 256, 256–57 (amended 1959).

[131] Under the 1959 revision: "Any person who shall manufacture, sell, offer for sale or possess any machine gun or firearm which shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger . . . shall be guilty of a felony . . . ." Act of July 16, 1959, No. 175, sec. 1, § 224, 1959 Mich. Pub. Acts 249, 250. Michigan's current statute on machine guns contains very similar language. *See* MICH. COMP. LAWS SERV. § 750.224 (LexisNexis 2014) ("A person shall not manufacture, sell, offer

Rhode Island law was changed to fourteen shots, and .22 caliber rimfire guns were excluded.[132]   The Rhode Island ammunition capacity law was fully repealed in 1975.[133]

The two statutes applied only to firearms, with Rhode Island only for semiautomatics.  Neither statute covered a magazine that was not inserted in a firearm.

In 1933, Ohio began requiring a special permit for the possession or sale of a semiautomatic firearm with an ammunition capacity of greater than eighteen rounds.[134]  In 1971, during a recodification of the state criminal code, an exemption for .22 caliber was added, and for other calibers the limit was raised to thirty-two or more rounds.[135]

Significantly, the Ohio statute was interpreted to not ban the sale of any magazine or any gun, but to forbid the simultaneous purchase of a magazine and a compatible gun.[136]   (Of course purchase was allowed if one has the special permit.)[137]  With or without the permit, one could buy a sixty-round magazine in Ohio.[138]  The licensing law was fully repealed in 2014.[139]

---

for sale or possess . . . [a] machine gun or firearm that shoots or is designed to shoot automatically more than 1 shot without manual reloading, by a single function of the trigger.").

[132] Firearms Act, ch. 75, secs. 11-47-2, -8, 1959 R.I. Acts & Resolves 260, 260, 263 (amended 1975).

[133] This was accomplished by changing the Firearms Act's definition of "Machine gun" to mirror the federal definition:

[A]ny weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger.  The term shall also include the frame or receiver of any such weapon, any combination of parts designed and intended for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

Firearms Act, ch. 278, sec. 1, § 11-47-2, 1975 R.I Pub. Laws 738, 738–39, 742 (amended 1989).  Rhode Island's definition of machine gun was changed again in 1989.  Act of July 10, 1989, ch. 542, sec. 7, § 11-47-2, 1989 R.I. Pub. Laws. 1371, 1375–76 (codified at R.I. GEN. LAWS ANN. § 11-47-2 (West 2014)).

[134] Act of Apr. 8, 1933, No. 166, sec. 1, §§ 12819-3, -4, 1933 Ohio Laws 189, 189 (amended 1972).

[135] Act of Dec. 22, 1972, No. 511, sec. 1, § 2923.11, 1972 Ohio Laws 1866, 1963; OHIO REV. CODE ANN. § 2923.11 (LexisNexis 2014).

[136] *Ohio: Disclaimer*, BUDSGUNSHOP.COM (July. 11, 2014), http://www.budsgunshop.com/catalog/feeds/state_reg/ohio_restrictions.pdf.

[137] OHIO REV. CODE ANN. § 2923.17.

[138] *See, e.g., Surefire 60-Round High-Capacity Magazine MAG5-60,* GANDER MTN., http://www.gandermountain.com/modperl/product/details.cgi?pdesc=SureFire-60-Round-High-Capacity-Magazine-MAG5-60&i=447625 (last visited Feb. 21, 2015) (allowing online customers to arrange for pick-up of a SureFire 60-Round High-Capacity Magazine at any of nine Ohio stores).

[139] H.R. 234, 2013–2014 Leg., 130th Sess. § 2 (Ohio 2014) (enacted) (repealing relevant definition statute, and taking effect Mar. 23, 2015).

866                        Albany Law Review                   [Vol. 78.2

The only longstanding statute banning magazines is found in the District of Columbia.  In 1932, Congress passed a District of Columbia law prohibiting the possession of a firearm that "shoots automatically or semiautomatically more than twelve shots without reloading."[140]   In contrast, when Congress enacted the National Firearms Act of 1934 to impose stringent regulations on machine guns, it chose to impose no restrictions on magazines.[141]  When the District of Columbia achieved home rule in 1975,[142] the district council did not choose to repeal the law but instead promptly enacted the bans on handguns and on self-defense with any gun in the home,[143] which were later ruled unconstitutional by the Supreme Court in *Heller*.[144]  The District of Columbia interpreted the magazine law so that it outlawed all detachable magazines and all semiautomatic handguns.[145]   The District stands alone in its historical restriction of magazines.

The only widespread restriction on magazine capacity came in 1994 when Congress enacted a ban on new magazines holding more than ten rounds.[146]   The law was in effect until 2004, at which point Congress allowed it to sunset.[147]   The effects of this law were studied extensively in a series of U.S. Department of Justice reports authored by Doctor Christopher Koper and two others.  The final report, issued in 2004, concluded: "there has been no discernible reduction in the lethality and injuriousness of gun violence, based on indicators like the percentage of gun crimes resulting in death or the share of gunfire incidents resulting in injury . . . ."[148]   Further,

---

[140]   Act of July 8, 1932, Pub. L. No. 72-275, §§ 1, 8, 47 Stat. 650, 650, 652.

[141]   National Firearms Act, Pub. L. 73-474, 48 Stat. 1236 (1934).

[142]   *D.C. Home Rule*, COUNCIL D.C., http://dccouncil.us/pages/dc-home-rule (last visited Feb. 21, 2015).

[143]   *See* Firearms Control Regulations Act of 1975, No. 1-142, § 201, 23 D.C. Reg. 1091, 1097 (July 23, 1976).

[144]   *See supra* notes 13–14, 19–20 and accompanying text.

[145]   *See* VIVIAN S. CHU, DC GUN LAWS AND PROPOSED AMENDMENTS 5–6 (2011) ("Prior to Heller, the DC Code's definition of 'machine gun' included 'any firearm, which shoots, is designed to shoot or can be readily converted to shoot . . . semiautomatically, more than 12 shots without manual reloading.'  By virtue of this broad definition, any semiautomatic weapon that could shoot more than 12 shots without manual reloading, whether pistol, rifle, or shotgun, was deemed a 'machine gun,' and prohibited from being registered.  It appears that under the District's old definition, registration of a pistol was largely limited to revolvers." (quoting D.C. Code § 7-2501.01(10) (LexisNexis 2008))).

[146]   Violent Crime Control and Law Enforcement Act of 1994, Pub. L. 103-322, § 110103(a)–(b), 108 Stat. 1796, 1998–99.

[147]   § 110105, 108 Stat. at 2000.

[148]   CHRISTOPHER S. KOPER ET AL., AN UPDATED ASSESSMENT OF THE FEDERAL ASSAULT WEAPONS BAN: IMPACTS ON GUN MARKETS AND GUN VIOLENCE, 1994–2003, at 96 (2004), *available at* https://www.ncjrs.gov/pdffiles1/nij/grants/204431.pdf.

"the ban has not yet reduced the use of [such magazines] in crime . . . ."[149]  Doctor Koper noted also that state-level firearm bans have not had an impact on crime.[150]

In the modern era, only a few states have enacted magazine restrictions, starting with New Jersey's 1990 ban on magazines over fifteen rounds.[151]   That ban applies only to detachable box magazines for semiautomatic firearms.[152]   A couple years later, Hawaii banned handgun magazines over twenty rounds, and later reduced that to ten.[153]   Maryland in 1994 banned the sale or manufacture of magazines over twenty rounds; the ban did not affect possession, loans, acquisition, or importation.[154]   The Maryland limit was reduced to ten in 2013.[155]

In 1999 California banned the sale of magazines over ten rounds but allowed grandfathered possession, and New York did the same in 2000.[156] (Currently, large capacity magazine bans in Colorado, Connecticut, and Massachusetts also have grandfather provisions, while New Jersey, the District of Columbia, and Hawaii do not.)[157] In 2013 New York removed grandfathering and reduced the limit to seven.[158]  The seven-round limit was suspended shortly thereafter, since there are no seven-round magazines available for many guns.[159]   Instead, the legislature forbade owners of ten-round magazines to load more than seven rounds.[160]  This restriction was

---

[149]  *Id.* at 2.

[150]  *Id.* at 81 n.95.

[151]  Act of May 30, 1990, ch. 32, §§ 2C:39-1(y), -3(j), 1990 N.J. Laws 217, 221, 235 (codified at N.J. STAT. ANN. § 2C:39-1(y), -3(j) (West 2014)).

[152]  § 2C:39-1(y).   There is an exemption for certain competitive target shooters.   *Id.* § 2C:39-3(j).

[153]  Act of June 29, 1992, ch. 286, sec. 3. § 134-8, 1992 Haw. Sess. Laws 740, 742 (codified at HAW. REV. STAT. ANN. § 134-8 (LexisNexis 2014)).

[154]  Act of May 26, 1994, ch. 456, § 36H-5, 1994 Md. Laws 2119, 2165 (amended 2013).

[155]  *See* Firearm Safety Act of 2013, ch. 427, § 4-305, 2013 Md. Laws 4195, 4210 (codified at MD. CODE. ANN., CRIM. LAW § 4-305 (LexisNexis 2014)).

[156]  *See* Act of July 19, 1999, ch. 129, sec. 3, § 12020(a)(2), (c)(25), 1999 Cal. Stat. 1781, 1785, 1793 (repealed 2012); Act of Aug. 8, 2000, ch. 189, sec. 11, § 265.02(8), 2000 N.Y. Laws 2788, 2793 (amended 2013).

[157]  *Large Capacity Ammunition Magazines Policy Summary*, L. CENTER TO PREVENT GUN VIOLENCE (May 31, 2013), http://smartgunlaws.org/large-capacity-ammunition-magazines-pol icy-summary/; *see supra* notes 158, 165 and accompanying text.

[158]  Act of Jan. 15, 2013, ch. 1, secs. 38, 46-a, §§ 265.00.23, 265.36, 2013 N.Y. Laws 1, 16, 19 (codified at N.Y. PENAL LAW § 265.36 (McKinney 2014)).

[159]  Freeman Klopott, *Cuomo's 7-Bullet Limit to Be Suspended Indefinitely, Skelos Says*, BLOOMBERG (Mar. 24, 2013), http://www.bloomberg.com/news/2013-03-25/cuomo-s-7-bullet-li mit-to-be-suspended-indefinitely-skelos-says.html.

[160]  PENAL §§ 265.36–.37; OFFICE OF DIV. COUNSEL, GUIDE TO THE NEW YORK SAFE ACT FOR MEMBERS OF THE DIVISION OF STATE POLICE 7, 9 (2013), *available at* http://www.nypdcea. org/pdfs/NYSP_Safe_Act_Field_Guide.pdf.

868                          Albany Law Review                    [Vol. 78.2

declared to violate the Second Amendment in a federal district court decision.[161]   New York City outlaws rifle or shotgun magazines holding more than five rounds.[162]

Also in 2013, Colorado enacted a ban on magazines over fifteen rounds,[163] and Connecticut did the same for magazines over ten.[164] Both statutes allowed current owners to retain possession.[165]

Finally, one state has followed Ohio's former approach of magazine licensing, rather than prohibition.   In 1994, Massachusetts began requiring that possession and additional acquisitions of magazines over ten rounds be allowed only for citizens who have a "Class A" firearms license—which most Massachusetts gun owners have.[166]

## IV.  WHAT DOES THE HISTORY MEAN?

Given the history above, what does modern legal doctrine say about the permissibility of outlawing magazines, as in the so-called SAFE Act's ban on possession of magazines of more than ten rounds and loading more than seven rounds in a magazine, or New York City's ban on long gun magazines of more than five rounds?  What about bans in other states of more than ten rounds (Maryland, Connecticut, the District of Columbia, California, and Hawaii for handguns only) or more than fifteen rounds (New Jersey and Colorado)?

This Part analyzes these questions in light of Second Amendment

---

[161]  N.Y. State Rifle & Pistol Ass'n v. Cuomo, 990 F. Supp. 2d 349, 372–73 (W.D.N.Y. 2013).

[162]  N.Y.C., N.Y., ADMIN. CODE § 10-306(b) (2015).

[163]  Act of Mar. 20, 2013, ch. 48, sec. 1, §§ 18-12-301(2)(a)(I), -302(1), 2013 Colo. Sess. Laws 144, 144–45 (codified at COLO. REV. STAT. § 18-12-302(1) (2014)).

[164]  Act of April 4, 2013, P.A. 13-3, § 23, 2013 Conn. Acts 47, 66 (Reg. Sess.) (codified at CONN. GEN. STAT. ANN. § 53-202w (West 2015)).

[165]  COLO. REV. STAT. § 18-12-302(2) (permitting a person to maintain possession of a banned magazine if he/she owned it prior to the effective date of the law and maintained "continuous possession" thereafter); CONN. GEN. STAT. §§ 53-202w(e)(4), 53-202x(a)(1) (permitting a person to maintain possession of a banned magazine if he/she possessed it prior to the effective date of the law and declared it to the government).

[166]  MASS. GEN. LAWS ANN. ch. 140 §§ 121, 131a (West 2014) (allowing possession and acquisition of magazines manufactured before Sept. 1994 by anyone with a Class A license); Matt Carroll, *Snapshot: Gun Licenses Per 1,000, 2012*, BOSTON.COM, (Jan. 24, 2013), http://www.boston.com/yourtown/specials/snapshot/massachusetts_snapshot_gun_licenses_20 12 (showing the prevalence of Class A licenses in Massachusetts).  A 2014 bill enacted in Massachusetts eliminated the lower category of "Class B" firearms licenses, so presumably all licensed firearms owners in Massachusetts will be able to acquire magazines of more than ten rounds, albeit only magazines manufactured before 1995.  Act of Aug. 11, 2014, ch. 284, 2014 Mass. Acts, *available at* https://malegislature.gov/Laws/SessionLaws/Acts/ 2014/Chapter284.

2014/2015]          The History of Firearm Magazines                    869

precedents from the *Heller* Court and from subsequent cases that have relied at least in part on history and tradition in judging Second Amendment cases.

### A. The Crucial Years: 1789–1791 and 1866–1868

For original meaning of the Second Amendment, the most important times are when the Second Amendment was created and when the Fourteenth Amendment was created, since a core purpose of the latter amendment was to make the individual's Second Amendment right enforceable against state and local government.[167] Congress sent the Second Amendment to the states for ratification in 1789, and ratification was completed in 1791.[168] The Fourteenth Amendment was passed by Congress in 1866, and ratification by the states was completed in 1868.[169]

### 1. Magazines in 1789–1791 and 1866–1868

As of 1789 to 1791, multi-shot magazines had existed for two centuries, and a variety of models had come and gone.[170] The state-of-the-art gun between 1789 and 1791 was the twenty- or twenty-two-shot Girandoni air rifle, powerful enough to take down an elk with a single shot.[171]

By the time that the Fourteenth Amendment was introduced in Congress, firearms with magazines of over ten or fifteen rounds had been around for decades.[172] The best of these was the sixteen-shot Henry Rifle, introduced in 1861 with a fifteen-round magazine.[173] The Henry Rifle was commercially successful, but Winchester Model 1866, with its seventeen-round magazine, was massively successful.[174] So by the time ratification of the Fourteenth Amendment was completed in 1868, it was solidly established that firearms with seventeen-round magazines were in common use.

---

[167] *See, e.g.,* Ezell v. City of Chi., 651 F.3d 684, 702–03 (7th Cir. 2011).
[168] JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 90, at 218.
[169] *Id.* at 299.
[170] *See supra* Part II.B.
[171] *See supra* notes 27–31 and accompanying text.
[172] *See supra* notes 32–35 and accompanying text..
[173] RICHARD C. RATTENBURY, A LEGACY IN ARMS: AMERICAN FIREARM MANUFACTURE, DESIGN, AND ARTISTRY, 1800–1900, at 135 (2014); *see supra* note 49 and accompanying text.
[174] CLIFFORD R. CADWELL, GUNS OF THE LINCOLN COUNTY WAR 50 (2009); RATTENBURY, *supra* note 173, at 136; *supra* notes 55–55 and accompanying text.

2.  Magazine Prohibitions in 1789–1791 and 1866–1868

From the colonial period to the dawn of American independence on July 4, 1776, and through the ratification of the Fourteenth Amendment, there were no prohibitions on magazines.  Indeed, the first magazine prohibition did not appear until the alcohol prohibition era in 1927.[175]  Thus, the historical evidence of the key periods for original meaning strongly suggests that magazine bans are unconstitutional.

B.  *"Typically Possessed by Law-Abiding Citizens for Lawful Purposes" or "Dangerous and Unusual"?*

The Supreme Court's *Heller* decision distinguished two broad types of arms.  Some arms, such as handguns, are "typically possessed by law-abiding citizens for lawful purposes."[176]  These arms are also described by the Court as being "in common use."[177]  In contrast, some other arms are "dangerous and unusual."[178]  Examples provided by the Court were short-barreled shotguns or machine guns.[179]  The common, typical, arms possessed by law-abiding citizens are protected by the Second Amendment; the "dangerous and unusual" arms are not protected.[180]  By definition, "unusual" arms are not "in common use" or "typically possessed by law-abiding citizens for lawful purposes."[181]

The *Heller* Court did not expressly mandate that historical analysis be used when deciding whether an arm is typical or common or "dangerous and unusual."  The *Heller* Court approvingly quoted the 1939 Supreme Court decision *United States v. Miller*,[182] which had described the original meaning of the Second Amendment as protecting individually-owned firearms that were "in common use at the time."[183]  The *Miller* Court's 1939 decision did not extend Second Amendment protection to sawed-off

---

[175]  *See supra* notes 129–30 and accompanying text; *see also* Act of June 2, 1927, No. 372, § 3, 1927 Mich. Public Acts 887, 888–89 (repealed 1959) (regulating the possession of and carrying of certain firearms that were capable of firing sixteen shots without reloading).

[176]  *See id.* at 625, 629 (majority opinion).

[177]  *Id.* at 627 (quoting United States v. Miller, 307 U.S. 174, 179 (1939)).

[178]  *Heller*, 554 U.S. at 627.

[179]  *See id.* at 625, 627.

[180]  *See id.* at 627.

[181]  *See id.*

[182]  *Id.* (quoting *Miller*, 307 U.S. at 179).

[183]  *Heller*, 554 U.S. at 627 (quoting *Miller*, 307 U.S. at 179) (internal quotation marks omitted).

shotguns;[184] as *Heller* explained *Miller*, the *Miller* principle was that sawed-off shotguns are dangerous and unusual.[185]

To be precise, *Miller* did not formally rule that short shotguns are *not* Second Amendment arms; the Court simply reversed and remanded the district court's decision granting criminal defendant Miller's motion to quash his indictment.[186] The Supreme Court said that the suitability of sawed-off shotguns as Second Amendment arms was not a fact that was subject to "judicial notice."[187] Presumably the federal district court in Arkansas could have taken up the remanded case and then received evidence regarding what sawed-off shotguns are used for and how common they are. But Miller and his co-defendant Frank Layton had disappeared long before the case was decided by the Supreme Court.[188]

Regardless, subsequent courts, including the court in *Heller*, read *Miller* as affirmatively stating that sawed-off shotguns are not protected by the Second Amendment.[189]

Even though *Heller*'s "common" or "typical" versus "dangerous and unusual" dichotomy seems primarily concerned with contemporary uses of a given type of arm, history can still be useful. As detailed in Part II, magazines of more than ten rounds have been very commonly possessed in the United States since 1862.[190] Common sense tells us that the small percentage of the population who are violent gun criminals is not remotely large enough to explain the massive market for magazines of more than ten rounds that has existed since the mid-nineteenth century. We have more than a century and a half of history showing such magazines to be owned by many millions of law-abiding Americans.[191]

Thus, a court which today ruled that such magazines are "dangerous and unusual" would seem to have some burden of explaining how such magazines, after a century and a half of being

---

[184]  *Miller*, 307 U.S. at 178.
[185]  *Heller*, 554 U.S. at 625.
[186]  *Miller*, 307 U.S. at 177, 183.
[187]  *Id.* at 178. "Judicial notice" is when courts rely on facts that are not in the record of the case, but which are indisputably true. FED. R. EVID. 201. For example, they may be a subject of common knowledge (e.g., that in Arkansas, the sun is never visible in the sky at midnight) or can be ascertained from indisputable sources (e.g., that a particular section of the Code of Federal Regulations contains certain language). *See id.*
[188]  Brian L. Frye, *The Peculiar Story of* United States v. Miller, 3 N.Y.U J.L. & LIBERTY 48, 65–68 (2008). *The Peculiar Story of* United States v. Miller was cited by the Court in *Heller*. *Heller*, 554 U.S. at 623.
[189]  *Heller*, 554 U.S. at 621–22.
[190]  *See supra* Part II.
[191]  *See supra* Part II.

872                    Albany Law Review                   [Vol. 78.2

"in common use" and "typically possessed by law-abiding citizens for lawful purposes," became "dangerous and unusual" in the twenty-first century.

This is not possible. Today, magazines of more than ten rounds are more common than ever before.[192] They comprise about forty-seven percent of magazines currently possessed by Americans today.[193] The AR-15 rifle (introduced in 1963) is the most popular rifle in American history, with sales of several million;[194] its standard magazines are twenty or thirty rounds.[195]

## C. "Longstanding" Controls Versus "Few Laws in the History of Our Nation"

Just as *Heller* distinguishes types of arms (common or typical versus dangerous and unusual), *Heller* distinguishes types of arms-control laws. One type of arms controls are "longstanding," and these are "presumptively lawful."[196] Examples listed by *Heller* are bans on gun possession "by felons and the mentally ill," bans on carrying guns "in sensitive places such as schools and government buildings," and "conditions and qualifications on the commercial sale of arms."[197]

The *Heller* Court highlighted the unusual nature of the District of Columbia anti-gun laws:

> Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban. And some of those few have been struck down. In *Nunn v. State*, the Georgia Supreme Court struck down a prohibition on carrying pistols openly (even though it upheld a prohibition on carrying concealed weapons). In *Andrews v. State*, the Tennessee Supreme Court likewise held that a statute that forbade openly carrying a pistol "publicly or privately, without regard to time or place, or circumstances," violated

---

[192] *See* Fyock v. City of Sunnyvale, No. C-13-5807-RMW, 2014 U.S. Dist. LEXIS 29722, at *13 (N.D. Cal. Mar. 5, 2014) (agreeing with and incorporating affidavit from plaintiffs' expert that "whatever the actual number of such magazines in United States consumers' hands is, it is in the tens-of-millions, even under the most conservative estimates.").

[193] *Id.* ("Plaintiffs cite statistics showing that magazines having a capacity to accept more than ten rounds make up approximately 47 percent of all magazines owned.").

[194] PATRICK SWEENEY, THE GUN DIGEST BOOK OF THE AR-15, at 14 (2005); *see* Meghan Lisson, *Run on Guns: AR-15s Sales Soar*, CNBC (Apr. 25, 2013), http://www.cnbc.com/id/100673826.

[195] SWEENEY, *supra* note 194, at 99.

[196] District of Columbia v. Heller, 554 U.S. 570, 626, 627 n.26 (2008).

[197] *Id.* at 626–27.

the state constitutional provision (which the court equated with the Second Amendment). That was so even though the statute did not restrict the carrying of long guns.[198]

What was the history that led the Court to declare the handgun prohibition to be "unusual"—that is, to be the opposite of a traditional gun control that was presumptively constitutional? The District of Columbia handgun ban was enacted in 1975 and took effect in 1976.[199] Chicago enacted a similar ban in 1982, and a half-dozen Chicago suburbs followed suit during the 1980s.[200] In 1837, the Georgia legislature had enacted a handgun ban, but that was ruled unconstitutional on Second Amendment grounds by the unanimous Georgia Supreme Court in 1846.[201] In 1982 and 2005, San Francisco enacted handgun bans, but they were both ruled unlawful because of their plain violation of the California state preemption statute, which forbids localities to outlaw firearms which are permitted under state law.[202]

These are the facts under which the Supreme Court declared handgun bans to be suspiciously rare in America's history—at the other end of the spectrum from the presumptively constitutional "longstanding" controls.

The 1975 District of Columbia handgun ban was thirty-three years old when the Supreme Court decided *Heller* in 2008. This suggests that thirty-three years is not sufficient for a gun control to be considered "longstanding."

As detailed in Part III, the first of today's magazine bans was enacted by New Jersey in 1990, at fifteen rounds.[203] The first state-level ten-round ban did not take effect until California passed such

---

[198] *Id.* at 629 (citations omitted) (citing Nunn v. State, 1 Ga. 243, 251 (1846); Andrews v. State, 50 Tenn. 165, 187 (1871)); *see also Heller*, 554 U.S. at 629 ("A statute which, under the pretence of regulating, amounts to a destruction of the right, or which requires arms to be so borne as to render them wholly useless for the purpose of defence, would be clearly unconstitutional . . . ." (quoting State v. Reid, 1 Ala. 612, 616–17 (1840)) (internal quotation marks omitted)).

[199] Edward D. Jones, III, *The District of Columbia's "Firearms Control Regulations Act of 1975": The Toughest Handgun Control Law in the United States—Or Is It?*, 455 ANNALS AM. ACAD. POL. & SOC. SCI. 138, 139 (1981).

[200] *See* McDonald v. City of Chi., 561 U.S. 742, 749 (2010); Steve Chapman, *Chicago's Pointless Handgun Ban: City Gun Ordinances Proved to Be a Failure*, CHI. TRIB., Mar. 4, 2010, at C21.

[201] *Nunn*, 1 Ga. at 246, 251. The *Heller* Court cited this case with approval. *Heller*, 554 U.S. at 612.

[202] Fiscal v. City & Cnty. of S.F., 70 Cal. Rptr. 3d 324, 326, 341–42 (Ct. App. 2008); Doe v. City & Cnty. of S.F., 186 Cal Rptr. 380, 381 (Ct. App. 1982).

[203] *See supra* note 151–52 and accompanying text.

Kopel                                                                                      3/17/2015 11:41 AM

a law in 2000.[204] These statutes, and other post-1990 magazine bans, would not qualify as "longstanding."

Previously, three states and the District of Columbia had enacted some magazine restrictions during the alcohol prohibition era.[205] The District of Columbia ban, with modifications, is still in effect.[206] The Michigan and Rhode Island bans were repealed long ago.[207] The Ohio special licensing statute allowed the free purchase of any magazine, but required a permit to insert a magazine of thirty-two rounds or more into a firearm; the permit requirement was repealed in 2014.[208]  It is indisputable in the modern United States that magazines of up to thirty rounds for rifles and up to twenty rounds for handguns are standard equipment for many popular firearms.

Several post-*Heller* lower courts have conducted in-depth examinations of the history of particular gun control laws.  The next Part examines each of those cases and then applies their methodology to the historical facts of bans on magazines of more than five, seven, ten, and fifteen rounds.

### D. Lower-Court Decisions Applying History

#### 1. Ezell v. City of Chicago

After *McDonald v. City of Chicago* made it clear that the Second Amendment applies to municipal governments, the Chicago City Council relegalized handgun possession and outlawed all target ranges within city limits.[209]  Assessing the constitutionality of the ban, the Seventh Circuit used a two-step test, similar to analysis that is sometimes used in First Amendment cases: (1) Is the activity or item within the scope of the Second Amendment, as historically understood?  If the answer is "no," then the restrictive law does not violate the Second Amendment.[210]  (2) If the answer to the first question is "yes," then the court will apply some form of the heightened scrutiny.  The intensity of the scrutiny will depend on how close the restriction comes to affecting the core right of armed self-defense.[211]

---

[204]  *See supra* note 156 and accompanying text.
[205]  *See supra* notes 129–30, 134, 140 and accompanying text.
[206]  *See supra* notes 140–45 and accompanying text.
[207]  *See supra* notes 131, 133 and accompanying text.
[208]  *See supra* notes 135–39 and accompanying text.
[209]  Ezell v. City of Chi., 651 F.3d 684, 690–91 (7th Cir. 2011).
[210]  *Id.* at 702–03.
[211]  *Id.* at 703.

So the *Ezell* court began the step-one analysis by considering whether target practice was historically considered part of the Second Amendment right.[212]  Chicago had argued to the contrary, listing some eighteenth- and nineteenth-century state statutes and municipal ordinances restricting firearms discharge within city limits.[213]  The Seventh Circuit found almost all of the listed ordinances to be irrelevant.[214]  Many of them did not ban firearms discharge but simply required a permit.[215]  Others were plainly concerned with fire prevention, an issue that would not be a problem at a properly-designed modern range.[216]  Thus:

> Only two—a Baltimore statute from 1826 and an Ohio statute from 1831—flatly prohibited the discharge of firearms based on concerns unrelated to fire suppression, in contrast to the other regulatory laws we have mentioned. This falls far short of establishing that target practice is wholly outside the Second Amendment as it was understood when incorporated as a limitation on the States.[217]

So according to the Seventh Circuit, the historical example of repressive laws in one state and one city are insufficient to support the inference that the repressed activity is outside the scope of the Second Amendment.[218]  The historical basis of restrictions that would affect magazines over fifteen rounds is nearly as thin: two states with statutes enacted in 1927, and later repealed, plus the District of Columbia's 1932 law.[219]  As for imposing a ban for guns with magazines of more than ten rounds (or seven or five), there is *no* historical basis.

Thus, under the *Ezell* analysis, bans on magazines infringe the Second Amendment right as it was historically understood, and such bans must be analyzed under heightened scrutiny.

2.  *United States v. Rene E.*

In 2009, the First Circuit heard a Second Amendment challenge

---

[212] *Id.* at 704.
[213] *Id.* at 705–06.
[214] *Id.*
[215] *Id.* at 705.
[216] *Id.* at 706.
[217] *Id.* (quoting District of Columbia v. Heller, 554 U.S. 570, 632 (2008)); *see also Heller*, 554 U.S. at 632 ("[W]e would not stake our interpretation of the Second Amendment upon a single law . . . that contradicts the overwhelming weight of other evidence . . . .").
[218] *See Ezell*, 652 F.3d at 706.
[219] *See supra* notes 131, 133, 140 and accompanying text.

876                          Albany Law Review                    [Vol. 78.2

to a federal statute that restricted, but did not ban, handgun possession by juveniles.[220]   The federal statute was enacted in 1994,[221] and so of course was not "longstanding."[222]   The First Circuit looked at the history of state laws restricting juvenile handgun possession, to see if they were longstanding.[223]

The First Circuit found state or local restrictions on handgun transfers to juveniles and judicial decisions upholding such restrictions from Georgia (1911 case), Tennessee (1878 case),[224] Pennsylvania (1881 case),[225] Indiana (1884 case),[226] Kentucky (1888 case),[227] Alabama (1858 case),[228] Illinois (1917 case upholding a Chicago ordinance),[229] Kansas (1883 case allowing tort liability for transfer), and Minnesota (1918 case allowing tort liability for transfer).[230]

Thus, the First Circuit was able to point to six state statutes, all of them enacted well over a century previously.[231]   They were buttressed by one municipal ordinance and two cases allowing tort liability, both of these being nearly a century old.[232]

The history of magazine restrictions is considerably weaker than that of the juvenile handgun statutes analyzed in *Rene E.*  There were six statutes on juveniles, all of which were enacted before 1890, and one of which predated the Civil War.[233]  This is much more than the pair of state statutes on magazines dating from the late 1920s.

The *Rene E.* case does not attempt to quantify how many state statutes are necessary for a gun control to be longstanding; however, we can say that magazine restrictions fall well short of the historical foundation that the First Circuit relied on to uphold juvenile handgun restrictions.

While *Rene E.* and *Ezell* both used history, the particular way that they used it was different.  For *Rene E.*, history was mixed in

---

[220] 18 U.S.C. § 922(x)(2)–(3) (2013); United States v. Rene E., 583 F.3d 8, 16 (1st Cir. 2009).
[221] *Rene E.*, 583 F.3d at 12.
[222] *Id.*
[223] *Id.* at 14–15.
[224] State v. Callicutt, 69 Tenn. 714, 716–17 (1878).
[225] McMillan v. Steele, 119 A. 721, 722 (Pa. 1923).
[226] State v. Allen, 94 Ind. 441, 441 (1884).
[227] Tankersly v. Commonwealth, 9 S.W. 702, 703 (Ky. 1888).
[228] Coleman v. State, 32 Ala. 581, 582–83 (1858).
[229] Biffer v. Chicago, 116 N.E. 182, 184 (Ill. 1917).
[230] Schmidt v. Capital Candy Co., 166 N.W. 502, 503–04 (Minn. 1918).
[231] United States v. Rene E., 583 F.3d 8, 14–15 (1st Cir. 2009).
[232] *Id.*
[233] *Id.*

2014/2015]        The History of Firearm Magazines                877

with substantive analysis of the modern federal statute, which the
First Circuit praised for its "narrow scope" and "important
exceptions."[234]

For *Ezell*, history was just the first step.  *Ezell* used history to
determine that the range ban was not presumptively lawful; once
that question was answered, *Ezell* proceeded to analyze the ban
under heightened scrutiny.[235]

### 3.  *Heller II*

#### a.  *Majority Opinion*

In the 2008 case *District of Columbia v. Heller*, the Supreme
Court ruled that two District of Columbia ordinances violated the
Second Amendment: the handgun ban and the ban on the
requirement that any firearm in the home be kept locked or
disassembled and thus unusable for self-defense.[236]  Further, the
District of Columbia required a permit to carry a gun anywhere
(even from room to room in one's home)[237] and permits were never
granted; the Court ordered that plaintiff Dick Heller be granted a
permit.[238]

The Council of the District of Columbia responded by repealing all
three of the unconstitutional ordinances and enacting the most
severe gun control system in the United States.[239]  Dick Heller and
several other plaintiffs challenged the new ordinances in the case
known as *Heller II*.[240]

Using the two-step test, the District of Columbia Circuit majority
first examined whether any of the challenged provisions were
"longstanding."[241]  If so, then the provision would be held as not
violating the Second Amendment right, with no further analysis
needed.[242]

Regarding handgun registration, the majority identified statutes
from New York (1911), Illinois (1881), Georgia (1910), Oregon

---

[234] *Id*. at 11–16 ("[T]his law, with its narrow scope and its exceptions, does not offend the
Second Amendment.").  Exceptions include farm and ranch work as well as target shooting or
other activities under parental supervision.  18 U.S.C. § 922(x)(3)(A)(i)–(ii) (2013).
[235] Ezell v. City of Chi., 651 F.3d 684, 706 (7th Cir. 2011).
[236] District of Columbia v. Heller, 554 U.S. 570, 635 (2008).
[237] *Id*. at 574–75.
[238] *Id*. at 635.
[239] *See* Heller v. District of Columbia (*Heller II*), 670 F.3d 1244, 1248–49 (D.C. Cir. 2011).
[240] *Id*. at 1247.
[241] *Id*. at 1252–53.
[242] *See id*. at 1252.

878                        Albany Law Review                     [Vol. 78.2

(1917), and Michigan (1927).[243]   In addition, some jurisdictions required handgun buyers to provide information about themselves to retailers, but did not require that the retailer deliver the information to the government: California (1917), Territory of Hawaii (1927), and the District of Columbia (1932).[244] So "[i]n sum, the basic requirement to register a handgun is longstanding in American law, accepted for a century in diverse states and cities and now applicable to more than one fourth of the nation by population."[245]

The requirement that the government be provided with some basic information about persons acquiring handguns, in a manner that was "self-evidently de minimis" was therefore constitutional.[246] Seven states, with laws originating between 1881 and 1927, were apparently sufficiently numerous and "diverse" to qualify as "longstanding."

However, although de minimis registration of handguns was longstanding, many of the new District of Columbia requirements went beyond traditional de minimis systems.[247]  Further, "[t]hese early registration requirements, however, applied with only a few exceptions solely to handguns—that is, pistols and revolvers—and not to long guns.  Consequently, we hold the basic registration requirements are constitutional only as applied to handguns.  With respect to long guns they are novel, not historic."[248]  So the case was remanded to the district court for further fact-finding, since the District of Columbia government had provided the court with almost no information about whether the novel requirements passed heightened scrutiny by being narrowly tailored.[249]

The case had come to the District of Columbia Circuit following cross motions for summary judgment.[250]  While the circuit court decided that the novel registration requirements needed a more complete factual record, the panel also decided that the record contained enough information for a ruling on the merits of the District's ban on various semiautomatic rifles, which the district council labeled "assault weapons," and on the District's ban on

---

[243] *Id*. at 1253–54.
[244] *See id*. at 1254.
[245] *Id*.  The court listed seven states that today have handgun registration laws.  *Id*. at n.*.
[246] *Id*. at 1254–55.
[247] *Id*. at 1255.
[248] *Id*.
[249] *See id*. at 1247.
[250] *See id*.

magazines holding more than ten rounds.[251]

The District of Columbia Circuit majority stated "[w]e are not aware of evidence that prohibitions on either semi-automatic rifles or large-capacity magazines are longstanding and thereby deserving of a presumption of validity."[252]  In a footnote, the majority cited the 1927 Michigan magazine statute and the 1932 District of Columbia ordinance detailed in Part III of this article.[253]  There is no reason to think that the majority's determination on this point would change if the 1927 Rhode Island statute had also been cited.

Importantly, the majority did not suggest that the magazine bans enacted in 1990 or thereafter had any relevance to whether magazine bans are "longstanding."

Accordingly, the majority proceeded to analyze the rifle and magazine bans.   The majority provided two paragraphs of explanation of why the rifle ban passed intermediate scrutiny and one paragraph on why the magazine ban did so.[254]

Discussion of whether intermediate scrutiny was the correct standard, or whether magazine bans pass intermediate scrutiny, is beyond the scope of this article.   However, it does seem to appear that the District of Columbia Circuit would have acted more prudently by remanding the case for fact-finding in the district court.   To support the ban, the panel majority could only point to legislative testimony by a gun-prohibition lobbyist and by the District of Columbia police chief, plus a Department of Justice report on the 1994 to 2004 federal ban on such magazines.[255]  Notably, the panel majority did not address the report's finding that a ten-year nationwide ban had led to no discernible reduction in homicides, injuries, or the number of shots fired in crimes.[256]

### b. Dissent

A forceful dissent by Judge Brett Kavanaugh critiqued the majority's application of intermediate scrutiny.[257]  He argued that

---

[251] *Id.* at 1246, 1260, 1264.
[252] *Id.* at 1260.
[253] *Id.* at 1260 n.*.
[254] *Id.* at 1262–64.
[255] *Id.* at 1263–64.
[256] KOPER EL AL., *supra* note 148, at 92.
[257] *Heller II*, 670 F.3d at 1285 (Kavanaugh, J., dissenting) ("A ban on a class of arms is not an 'incidental' regulation.   It is equivalent to a ban on a category of speech.   Such restrictions on core enumerated constitutional protections are *not* subjected to mere intermediate scrutiny review.   The majority opinion here is in uncharted territory in suggesting that intermediate scrutiny can apply to an outright ban on possession of a class of weapons that have not

880                          Albany Law Review                    [Vol. 78.2

the majority's approach was necessarily incorrect, because its logic on banning semiautomatic rifles would allow a ban on all semiautomatic handguns—which constitute the vast majority of handguns produced today.[258]

More fundamentally, he argued that *Heller* does not tell courts to use tiered scrutiny to assess gun control laws.[259]  Rather, *Heller* looks to history and tradition.[260]  So gun controls that are well-grounded in history and tradition are constitutional; gun control laws which are not so grounded are unconstitutional.[261]

Using the standard of history and tradition, Judge Kavanaugh argued that the entire District of Columbia registration scheme was unconstitutional.[262]  Regarding de minimis handgun registration, the statutes cited by the majority were mostly record-keeping requirements for gun dealers, not centralized information collection by the government.[263]  The novel and much more onerous requirements of the District of Columbia registration system for all guns had no basis in history and tradition.[264]  For all firearms, any registration system beyond dealer record-keeping requirements was unconstitutional.[265]

Judge Kavanaugh examined the history of semiautomatic rifles and found them to be in common use for over a century and thus protected by the Second Amendment from prohibition.[266]  He did not have similar information on magazines and thus urged that the magazine issue be remanded for fact-finding.[267]  In light of the evidence on magazines that has been presented subsequent to the 2011 *Heller II* decision, Judge Kavanaugh's methodology

---

traditionally been banned.").

[258] *Id.* at 1285–86.

[259] *See id.* at 1282.

[260] *Id.* ("*Heller* was resolved in favor of categoricalism—with the categories defined by text, history, and tradition—and against balancing tests such as strict or intermediate scrutiny or reasonableness.").

[261] *See id.*

[262] *Id.* at 1286.

[263] *See id.* at 1292–93.

[264] *Id.* at 1294.

[265] *See id.*

[266] *See id.* at 1287 (citing JOHNSON, KOPEL, MOCSARY & O'SHEA, *supra* note 90, at 11).

[267] *Heller II*, 670 F.3d at 1296 n.20 (Kavanaugh, J., dissenting) ("The D.C. ban on magazines of more than 10 rounds requires analysis in the first instance by the District Court.  In order to apply *Heller*'s test to this prohibition, we must know whether magazines with more than 10 rounds have traditionally been banned and are not in common use.  The parties here did not brief that question in much detail.  Evidence presented to the District Court on the history and prevalence of magazines of more than 10 rounds would be helpful to the proper disposition of that issue under the *Heller* test.  Therefore, I would remand to the District Court for analysis of that issue.").

straightforwardly leads to the conclusion that the District of Columbia magazine ban is unconstitutional.[268]   The *Heller II* majority rightly recognized that magazine bans are not "longstanding,"[269] and this article has demonstrated that magazines of more than ten rounds have been a common part of the American tradition of firearms ownership since before the ratification of the Fourteenth Amendment in 1868.

### 4. *Silvester v. Harris*

Another decision carefully employing historical analysis is *Silvester v. Harris*,[270] from the United States District Court for the Eastern District of California.

A California statute requires that firearms purchasers wait ten days before they can take their gun home from the store.[271]   In California, background checks on firearms buyers are sometimes completed within minutes and sometimes can take a week or longer.[272]   Senior District Judge Anthony Ishii (appointed to the federal court in 1997 by President Clinton)[273] ruled the waiting period unconstitutional, to the extent that the waiting period lasted longer than the time required to complete the background check on a given buyer.[274]

Like the Seventh Circuit in *Ezell*, Judge Ishii looked to 1791 and 1868 as the crucial periods.[275]

California Attorney General Kamala Harris had directed the court to a book arguing that between 1790 and 1840 many Americans might have to travel for several days in order to buy a gun, so there was a de facto waiting period between the time a person decided to buy a gun and when a person could take possession of the gun.[276]   Judge Ishii held this irrelevant; the court's job was to consider the legality of government regulations that

---

[268] *See* Lindsay Colvin, Note, *History, Heller, and High-Capacity Magazines: What Is the Proper Standard of Review for Second Amendment Challenges?*, 41 FORDHAM URB. L.J. 1041, 1075–80 (2014).

[269] *Heller II*, 670 F.3d at 1260.

[270] Silvester v. Harris, No. 1:11–CV–2137 AWI SAB, 2014 U.S. Dist. LEXIS 118284 (E.D. Cal. Aug. 25, 2014).

[271] CAL. PENAL CODE §§ 26815(a), 27540(a) (West 2014).

[272] *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *82.

[273] *Chief District Court Judge Anthony W. Ishii*, U.S. DIST. COURT: E. DIST. OF CAL., http://www.caed.uscourts.gov/caed/staticOther/page_630.htm (last visited Feb. 21, 2015).

[274] *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *101–02.

[275] *Compare id.* at *30, *with* Ezell v. City of Chi., 651 F.3d 684, 702–03 (7th Cir. 2011).

[276] *Silvester*, 2014 U.S. Dist. LEXIS 118284, at *8–9.

882                          Albany Law Review                    [Vol. 78.2

might impede the exercise of a constitutional right and the book provided no evidence that government-imposed waiting periods for firearm purchases existed between 1790 and 1840.[277]

Another book explained that the first waiting period law was proposed in 1923—a one-day waiting period for handguns.[278]  The law was adopted in California and eventually by eight other states.[279]  This too was irrelevant, ruled the court, because it had nothing to do with 1791 or 1868.[280]

The court explained that "[i]t is Defendant's burden to show that the 10–day waiting period either falls outside the scope of Second Amendment protections as historically understood or fits within one of several categories of longstanding regulations that are presumptively lawful."[281]

The complete absence of evidence of waiting periods in 1791 and 1868 eliminated the first possibility.[282]  What about the question of whether waiting periods were "longstanding regulations that are presumptively lawful"?  The answer to this question is not confined to 1791 and 1868.

The court explained that "the concept of a 'longstanding and presumptively lawful regulation' is that the regulation has long been accepted and is rooted in history."[283]  California's 1923 statute did not come close.  Besides that, the California wait was only one day and only for retail handguns.[284]  Not until 1975 was the number of days extended to double digits and not until 1991 to long guns.[285]  Consistent with the unusual nature of waiting periods, only ten states and the District of Columbia today have a waiting period for at least some firearms.[286]

Thus, the court concluded that the plaintiffs' challenge had passed step one of the two-step test,[287]  and the court proceeded to apply heightened scrutiny.[288]  The court stated that it did not have to decide whether to use strict or intermediate scrutiny.[289]  The

---

[277] See id. at *9–10, *78.
[278] Id. at *11.
[279] Id.
[280] Id. at *11–12.
[281] Id. at *75.
[282] Id. at *75–76.
[283] Id. at *78 (citations omitted).
[284] Id. at *79.
[285] Id.
[286] Id. at *30.
[287] Id. at *75–76.
[288] Id. at *80.
[289] Id.

waiting period statute failed intermediate scrutiny, as applied to persons who already possessed a firearm (based on state registration data), and who passed the background check when purchasing an additional firearm.[290]   Therefore, *a fortiori*, the statute would fail strict scrutiny.   The court gave the state legislature 180 days to revise the statute so as to eliminate the post-background-check waiting period for persons who already have a gun.[291]   The plaintiffs had not challenged the waiting period as applied to first-time gun buyers, nor as to persons who had not yet passed the background check.[292]

## V. CONCLUSION

Rifle magazines holding more than ten or fifteen rounds have been common in the United States since the mid-nineteenth century.[293]  Handgun magazines over ten rounds have been common since 1935, and handgun magazines over fifteen have been common since the mid-1960s.[294]

Magazine prohibition has historically been rare.   There is *no* historical basis for a magazine limit of ten rounds or lower.   As for prohibitions with higher limits, there are only two examples, both of them from 1927, the outer edge of what courts have considered to be examples of state statutes that may be considered "longstanding": Michigan (enacted 1927, repealed 1959), Rhode Island (enacted 1927, loosened 1959, repealed 1975).[295]  Ohio formerly required a special permit to actually insert a magazine above a certain size into a firearm but never banned sales.[296]  (The original limit was eighteen rounds or more and later was thirty-two rounds or more.)[297]  As is often the case, the District of Columbia is the *sui generis* outlier, with its 1932 restriction still in effect today, with some modifications.[298]

Of all the courts that have examined history when ruling on gun control issues, no court has ever held that laws of two or three states plus one city are sufficient to establish a gun law as being

---

[290]  *Id.* at *90–91, 96–97.
[291]  *Id.* at *101–03.
[292]  *See id.* at *23–25.
[293]  *See supra* notes 43–64 and accompanying text.
[294]  *See supra* notes 102–06 and accompanying text.
[295]  *See supra* notes 130, 132–33 and accompanying text.
[296]  *See supra* notes 136–39 and accompanying text.
[297]  *See supra* notes 134–35 and accompanying text.
[298]  *See supra* notes 140–45 and accompanying text.

884                        Albany Law Review                    [Vol. 78.2

"longstanding" or part of American history and tradition. To the contrary, ammunition capacity limits are far outside the norm of the traditional exercise and regulation of Second Amendment rights. Not until California in 1999 did any state set a magazine limit as low as ten.[299]

What does this mean for modern legal analysis? Under judicial methods which hew closely to history and tradition, the historical absence (of limits of ten or less) or the extreme rarity (limits of fifteen or less) would be sufficient for any such modern limit to be ruled unconstitutional. Owning such magazines is very long-established manner in which the right to arms has historically been exercised in America.

Other courts perform a two-step test. Challengers to magazine limit laws should always pass step one, since magazine limits are not "longstanding."

As for step two—review under some form of heightened scrutiny—the Supreme Court taught in *Heller* that when the "severe restriction" of a "ban" has support from "[f]ew laws in the history of our Nation," the law's constitutionality is very doubtful. This was true for the prohibition of handguns, and it is also true for the prohibition of magazines holding more than five, seven, ten, or fifteen rounds.

---

[299] *See supra* note 156 and accompanying text.

# GUN LAW HISTORY IN THE UNITED STATES AND SECOND AMENDMENT RIGHTS

ROBERT J. SPITZER[*]

## I

## INTRODUCTION

In its important and controversial 2008 decision on the meaning of the Second Amendment, *District of Columbia v. Heller,*[1] the Supreme Court ruled that average citizens have a constitutional right to possess handguns for personal self-protection in the home.[2] Yet in establishing this right, the Court also made clear that the right was by no means unlimited, and that it was subject to an array of legal restrictions, including: "prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."[3] The Court also said that certain types of especially powerful weapons might be subject to regulation,[4] along with allowing laws regarding the safe storage of firearms.[5] Further, the Court referred repeatedly to gun laws that had existed earlier in American history as a justification for allowing similar contemporary laws,[6] even though the court, by its own admission, did not undertake its own "exhaustive historical analysis" of past laws.[7]

In so ruling, the Court brought to the fore and attached legal import to the history of gun laws. This development, when added to the desire to know our own history better, underscores the value of the study of gun laws in America. In recent years, new and important research and writing has chipped away at old

---

Copyright © 2017 by Robert J. Spitzer.

This article is also available online at http://lcp.law.duke.edu/.

[*] Robert J. Spitzer (Ph.D., Cornell University, 1980) is Distinguished Service Professor and Chair of the Political Science Department at SUNY Cortland. He is the author of fifteen books, including five on gun policy, most recently GUNS ACROSS AMERICA (Oxford University Press 2015).

1. District of Columbia v. Heller*, 554 U.S. 570 (2008).

2. *Id.* at 628–30, 635–36.

3. *Id.* at 626–27.

4. *See id.* at 623, 627 (citing United States v. Miller, 307 U.S. 174, 178 (1939)) (distinguishing validity of ban on short-barreled shotguns and noting that weapons protected were those used at time of ratification).

5. *See id.* at 632 (excluding gun-storage laws from scope of decision).

6. *See id.* at 626–27, 629 ("From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever and for whatever purpose.") (citation omitted).

7. *Id.* at 626.

myths to present a more accurate and pertinent sense of our gun past.[8] Researchers and authors including Saul Cornell, Alexander DeConde, Craig Whitney, and Adam Winkler have all published important work making clear that gun laws are by no means a contemporary phenomenon.[9] Yet even now, far too few understand or appreciate the fact that though gun possession is as old as America, so too are gun laws. But there's more: gun laws were not only ubiquitous, numbering in the thousands, but also spanned every conceivable category of regulation, from gun acquisition, sale, possession, transport, and use, including deprivation of use through outright confiscation, to hunting and recreational regulations, to registration and express gun bans. For example, the contemporary raging dispute over the regulation of some semi-automatic weapons that began in late 1980s was actually presaged seven decades earlier, when at least seven states banned such weapons entirely—a fact that seems to have been unknown to modern analysts until now. A vast newly compiled dataset of historical gun laws reveals that the first gun grabbers (as contemporary gun rights advocates like to label gun control proponents) were not Chablis-drinking liberals of the 1960s, but rum-guzzling pioneers dating to the 1600s.

This historical examination is especially relevant to the modern gun debate because, at its core, that debate is typically framed as a fierce, zero-sum struggle between supporters of stronger gun laws versus supporters of gun rights (who, of course, largely oppose stronger gun laws—or so it is said). The zero-sum quality of this struggle posits that a victory for one side is a loss for the other, and vice versa. Yet history tells a very different story—that, for the first 300 years of America's existence, gun laws and gun rights went hand-in-hand. It is only in recent decades, as the gun debate has become more politicized and more ideological that this relationship has been reframed as a zero-sum struggle.

The plethora of early gun laws herein described establish their prolific existence, but also validate the argument that gun rules and gun rights are by no means at odds. If the Supreme Court was indeed serious in saying that the provenance of gun regulations is relevant to the evaluation of contemporary laws, then this examination advances the Court's stated objective. The common

---

8. SAUL CORNELL, A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006); THE SECOND AMENDMENT ON TRIAL: CRITICAL ESSAYS ON DISTRICT OF COLUMBIA V. HELLER (Saul Cornell & Nathan Kozuskanich eds., 2013); CRAIG R. WHITNEY, LIVING WITH GUNS: A LIBERAL'S CASE FOR THE SECOND AMENDMENT (2012); ADAM WINKLER, GUNFIGHT: THE BATTLE OVER THE RIGHT TO BEAR ARMS IN AMERICA (2011).

9. CORNELL, *supra* note 8; ALEXANDER DECONDE, GUN VIOLENCE IN AMERICA: THE STRUGGLE FOR CONTROL (2001); WHITNEY, *supra* note 8; WINKLER, *supra* note 8. More than any other single scholar or writer, historian Saul Cornell has been most responsible for excavating the legal and social realities of the laws and practices related to guns in early America. In addition to many articles, Cornell has published a number of books on the subject including, WHOSE RIGHT TO BEAR ARMS DID THE SECOND AMENDMENT PROTECT? (2000), A WELL-REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA (2006), and THE SECOND AMENDMENT ON TRIAL, *supra* note 8. The first important serious treatment of early gun laws and history is LEE KENNETT & JAMES LAVERNE ANDERSON, THE GUN IN AMERICA: THE ORIGINS OF A NATIONAL DILEMMA (1975).

notions that gun laws are largely a function of modern, industrial (or post-industrial) America, that gun laws are incompatible with American history and its practices or values, and that gun laws fundamentally collide with American legal traditions or individual rights, are all patently false. Following this introduction in part I, part II establishes that gun laws are as old as the nation. Part III summarizes the different categories into which early gun laws are categorized, and the frequency distributions within each category divided into time periods from 1607 to 1934. Part IV examines illustrative laws within each category and considers their nature and consequences. Part V offers a brief conclusion.

Above and beyond the general ubiquity of gun regulations early in the country's history, the range of those regulations is punctuated by the most dramatic of those laws discussed in parts III and IV: measures that called for gun confiscation for myriad reasons including military necessity, failure to swear allegiance to the government, improper firearms storage, ownership of proscribed weapons, hunting law violations, and failure to pay taxes on guns. One may argue for or against the propriety of such measures, but one may no longer argue that they are the sole province of modern gun control advocates. Further, in the seventeenth century no less than in the twenty-first, an abiding concern underlying many, if not most, of these regulations is the protection of public safety by the government.

II

GUN LAWS ARE AS OLD AS THE NATION

The first formal legislative body created by European settlers in North America was convened in the Virginia colony on July 30, 1619, twelve years after the colony's establishment.[10] The first General Assembly of Virginia met in Jamestown where it deliberated for five days and enacted a series of measures to govern the fledgling colony.[11] Among its more than thirty enactments in those few days was a gun control law, which said "[t]hat no man do sell or give any Indians any piece, shot, or powder, or any other arms offensive or defensive, upon pain of being held a traitor to the colony and of being hanged as soon as the fact is proved, without all redemption."[12]

If a death sentence for providing Native Americans with firearms and ammunition seems a little draconian even by the standards of the day, it punctuated the degree of tension, suspicion, and confrontation that existed

---

10.  *First Legislative Assembly in America*, HISTORY.COM (2010), http://www.history.com/this-day-in-history/first-legislative-assembly-in-america [https://perma.cc/3T2G-W3DH] (last visited Dec. 21, 2016).

11.  *Laws Enacted By The First General Assembly of Virginia*, *in* COLONIAL ORIGINS OF THE AMERICAN CONSTITUTION 283 (Donald S. Lutz ed., 1998) (quoting 1 JOURNALS OF THE HOUSE OF BURGESSES OF VIRGINIA, 9–14 (H.R. McIlwaine & John P. Kennedy eds., 1905)).

12.  *Id.* at 287.

between the settlers and the indigenous population.[13] Other colonies adopted similar measures, although they were of limited effectiveness—not only because of the difficulty of monitoring arms trading in early America—but because such trading was highly profitable, was fed by traders from other nations, including the French and the Dutch, and because many Native Americans allied themselves with settlers against various foes.[14] Far from being an anomaly, this early gun law was just the beginning of gun regulations in early America.

## III

## THE ARC OF AMERICAN GUN LAWS

America's early governmental preoccupation with gun possession, storage, and regulation was tied to the overarching concern for public safety, even as it intruded into citizens' private gun ownership and habits. Symptomatic of this is the fact that colonial and state governments enacted over 600 laws pertaining specifically to militia regulation and related militia activities alone.[15] Yet militia-related laws hardly constituted the extent of gun regulation in America.

A recently researched and compiled listing of colonial and state gun laws spanning from America's founding up to 1934 (the year the first significant national gun law, the National Firearms Act, was enacted[16]), has recently become available.[17] It is by far the most comprehensive compilation to date. This far-reaching compilation process, conducted by lawyer and researcher Mark Anthony Frassetto, has become possible thanks to the ever-growing digitization of state law archives and other electronic sources of historical information about law, including HeinOnline Session Laws Library and the Yale Law School's Avalon Project, and also some digitized state session law archives. Aside from key-word electronic searches of these sources, Frassetto also consulted secondary sources to produce this prodigious list.[18]

The result is a compilation of nearly one thousand gun laws of every variety—with some exceptions, this list does not include militia laws, hunting regulations, laws pertaining to gunpowder storage, and laws against weapons firing.[19] Following Frassetto's method of organization, these laws are organized by category and summarized in Table 1. Within those categories, they are arrayed

---

13. This precarious dynamic is well chronicled in NATHANIEL PHILBRICK, MAYFLOWER: A STORY OF COURAGE, COMMUNITY AND WAR (2006).

14. KENNETT & ANDERSON, *supra* note 9, at 51–56.

15. Kevin M. Sweeney, *Firearms, Militias, and the Second Amendment*, *in* THE SECOND AMENDMENT ON TRIAL, *supra* note 8, at 310–11.

16. National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–5872 (2012)).

17. Mark Anthony Frassetto, Firearms and Weapons Legislation Up To The Early Twentieth Century (Jan. 15, 2013) (unpublished manuscript), https://ssrn.com/abstract=2200991 [https://perma.cc/YEY9-KEN8] . Unless otherwise noted, the citations to colonial and state gun laws found here are taken from this compilation.

18. *Id.*

19. *Id.*

by state alphabetically within four historical periods: 1607–1789 (the colonial and pre-modern-Constitution period); 1790–1867 (the pre-Fourteenth Amendment period); 1868–1899 (the post-Fourteenth Amendment period); and 1900–1934 (the twentieth century). Despite the admirable thoroughness of Frassetto's electronic database searches, he notes that his list cannot be considered definitive, owing to multiple spellings of common words and other glitches inherent in the nature of such searches.[20] Thus, his total list of laws is an underestimate of the actual universe of gun statutes—indeed, this article discusses a few early laws from Massachusetts in the 1600s that were not a part of Frassetto's list.[21]

**Table 1**

NUMBERS OF GUN LAWS IN THE STATES, AND NUMBERS OF STATE GUN LAWS, BY CATEGORIES, 1607–1934[22]

| LAW TYPE | 1607–1790 | 1791–1867 | 1868–1899 | 1900–1934 |
|---|---|---|---|---|
| Ban | 0 | 0 | 7 | 0 |
| Number of states | 0 | 0 | 5 | 0 |
| | | | | |
| Brandishing | 2 | 4 | 14 | 7 |
| Number of states | 2 | 3 | 13 | 7 |
| | | | | |
| Carry restriction | 5 | 31 | 48 | 21 |
| Number of states | 4 | 19 | 28 | 18 |
| | | | | |
| Dangerous weapons | 1 | 4 | 9 | 53 |
| Number of states | 1 | 4 | 8 | 35 |
| | | | | |
| Dueling | 3 | 7 | 3 | 0 |
| Number of states | 2 | 7 | 3 | 0 |
| | | | | |

---

20.  *Id.* at 2.

21.  I also conducted my own spot check of a few of the laws on Frassetto's list that are not included in this article, and found them to be, taken on the whole, accurate and correct.

22.  Source: Frassetto, *supra* note 17. Though the table is labeled "State" gun laws, it also includes laws enacted when the states were colonies, and some local/municipal laws. The full category titles of gun laws from Frassetto's paper are: Bans on Handguns/Total Bans on Firearms; Brandishing; Carrying Weapons; Dangerous or Unusual Weapons; Dueling; Felons, Foreigners and Others Deemed Dangerous By the State; Firing Weapons; Hunting; Manufacturing, Inspection and Sale of Gunpowder and Firearms; Militia Regulation; Possession by, Use of, and Sales to Minors and Others Deemed Irresponsible; Registration and Taxation; Race and Slavery Based Firearms Restrictions; Sensitive Areas and Sensitive Times; Sentence Enhancement for Use of Weapons; Storage.

| | | | |
|---|---|---|---|
| Felons, foreigners, etc. | 11 | 2 | 1 | 26 |
| Number of states | 5 | 2 | 1 | 19 |
| | | | | |
| Firing weapons | 19 | 17 | 19 | 22 |
| Number of states | 9 | 14 | 17 | 20 |
| | | | | |
| Hunting | 11 | 8 | 24 | 58 |
| Number of states | 8 | 5 | 21 | 43 |
| | | | | |
| Manufacturing, inspection | 2 | 11 | 11 | 22 |
| Number of states | 2 | 10 | 9 | 17 |
| | | | | |
| Militias | 23 | 15 | 2 | 0 |
| Number of states | 11 | 15 | 2 | 0 |
| | | | | |
| Minors, etc. | 0 | 2 | 15 | 21 |
| Number of states | 0 | 2 | 15 | 19 |
| | | | | |
| Registration, taxation | 3 | 8 | 12 | 18 |
| Number of states | 2 | 6 | 11 | 15 |
| | | | | |
| Race/slavery[23] | 5 | 18 | 0 | 0 |
| Number of states | 5 | 11 | 0 | 0 |
| | | | | |
| Sensitive areas, etc. | 11 | 23 | 30 | 35 |
| Number of states | 7 | 17 | 20 | 26 |
| | | | | |
| Sentencing enhancement | 3 | 3 | 5 | 12 |
| Number of states | 3 | 3 | 5 | 10 |
| | | | | |
| Storage | 2 | 7 | 2 | 0 |
| Number of states | 1 | 6 | 2 | 0 |

---

23. The small number of laws pertaining to slaves or race-based restrictions pertaining to guns is not meant to suggest that the legal regime in the pre–Civil War South was somehow not uniformly harsh, but rather reflects the fact that express statutory restrictions were not necessary in all places, given the South's uniformly oppressive system of slavery.

The types of gun laws span about every conceivable category. The two most common and prolific types of laws regulated hunting and militias—in fact, Frassetto noted in his compilation that he excluded from his list most hunting and militia laws, gunpowder storage laws, and laws against the firing of weapons, because there were simply too many of them. Those categories and some of those laws, however, are represented in the list provided here. Thousands of gun laws existed from the country's founding up to 1934.[24] The data presented here represents a subset of these thousands of laws. Notwithstanding Frassetto's exclusions, his full list includes over 800 laws.[25] The version of his list presented here is somewhat shorter, as it excludes state constitutional provisions, weapons laws that did not specifically mention firearms, and British laws from the early colonial period that Frassetto included. Thus, the list presented here includes about 760 laws.[26] These include colonial laws, laws of territories that later became states, and of course state laws. Generally speaking, most laws established jurisdiction-wide regulations, although some of the laws were more narrowly drawn to include only densely populated areas, such as cities and towns, or on occasion specifically named cities or counties. Each type of law warrants detailed attention.

Before examining these laws, one other question presents itself: were any of these laws challenged in court? If so, were these challenges based on claims of federal or state right to bear arms–type provisions? If so, what were the outcomes?

A perusal of nineteenth century litigation in state courts reveals that at least one type of gun law was subject to court challenge: those restricting concealed or open gun carrying. The outcomes of such challenges were summarized by a 1905 Kansas state court decision this way: "It has . . . been generally held that the Legislatures can regulate the mode of carrying deadly weapons, provided they are not such as are ordinarily used in civilized warfare [i.e. in a military context]. To this view," the court continued, "there is a notable exception in the early case of *Bliss v. Commonwealth,* 2 Litt. (Ky.) 90, 13 Am. Dec. 251 . . . . While this decision has frequently been referred to by the courts of other states, it has never been followed."[27] A Washington State court from 1907 offered the same verdict:

> Nearly all the states have enacted laws prohibiting the carrying of concealed weapons, and the validity of such laws has often been assailed, because denying to the citizen the right to bear arms; but we are not aware that such a contention has ever prevailed, except in the courts of the state of Kentucky [a reference to *Bliss*].[28]

---

24. *See* Frassetto, *supra* note 17 (compiling over 800 gun laws excluding the majority of the most common gun laws including hunting and militia laws, gunpowder storage laws, and laws against the firing of weapons).

25. *See id.*

26. A full summary list of the laws is available at ROBERT J. SPITZER, GUNS ACROSS AMERICA: RECONCILING GUN RULES AND RIGHTS 185–208 (2015).

27. City of Salina v. Blaksley, 83 P. 619, 620 (Kan. 1905) (citing Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822)).

28. State v. Gohl, 90 P. 259, 260 (Wash. 1907); *see also* District of Columbia v. Heller, 554 U.S. 570 (2008) (explaining that nineteenth-century courts typically upheld prohibitions on carrying a concealed

The *Bliss* case was the outlier in this state case law, although in one other case, *Nunn v. State*, the Georgia state court struck down a provision of a state gun carrying law that included restrictions on both concealed carry and open carry.[29] The court struck down only the open carry provision—the man convicted of violating this provision was apparently carrying a handgun openly, yet the law failed to list handguns among those weapons not to be openly carried, while it did list them among those not to be sold or carried concealed.[30]

The conclusions offered by state courts that restrictions on gun carrying were invariably upheld when challenged is punctuated by the fact that, as late as 1981, only two states of the union had loose, "shall issue" carry laws (meaning that the government is obligated to issue a carry license upon completion of proper paperwork, unless the applicant is a felon, mentally unbalanced, or a part of some other category of person prohibited from owning a gun), and one state had no system of permitting for gun carrying.[31] Nineteen states barred concealed gun carrying entirely, and twenty-eight states had "may issue" laws, where states have great discretion as to whether to issue carry permits.[32]

## IV

### CATEGORIES OF EARLY GUN LAWS

A. Gun Bans

A handful of laws established outright, categorical bans that criminalized the sale or exchange of firearms.[33] All were enacted in the post–Civil War era. Six of the seven state bans—in Arkansas,[34] Kansas,[35] Texas,[36] and three in Tennessee[37]—were of pistols. The seventh, from Wyoming, banned all firearms—both handguns and long guns—from "any city, town, or village."[38] Arkansas also banned any sale or transfer of pistols, except for those in military use.[39]

---

weapon).

29. Nunn v. State, 1 Ga. 243 (1846).

30. *Id.* at 246–47.

31. *Concealed Weapons Laws in America from 1981 to Today*, LAW CENTER TO PREVENT GUN VIOLENCE, at http://smartgunlaws.org/wp-content/uploads/2012/05/ccw-factsheet.pdf [https://perma.cc/5ZYV-HYSS].

32. SPITZER, *supra* note 26, at 113.

33. In some subsequent categories to be discussed, gun confiscation was sometimes the penalty for violations of law.

34. Act of Apr. 1, 1881, ch. XCVI, § 1, 1881 Ark. Acts 191, 191 (codified at ARK. CODE ANN. ch. 48 § 1498 (1894)).

35. Act of Mar. 13, 1872, ch. 100, § 62, 1872 Kan. Sess. Laws 210, 210 (codified at KAN. GEN. STAT. § 1003 (1901)).

36. Act of Apr. 12, 1871, ch. XXXIV, § 1, 1871 Tex. Gen. Laws 25, 25 (codified at 1879 Tex. Crim. Stat. 24).

37. Act of Mar. 26, 1879, ch. CLXXXVI, § 1, 1879 Tenn. Pub. Acts 231, 231; Act of June 11, 1870, ch. XIII, § 1, 1870 Tenn. Pub. Acts 28, 28; Act of Dec. 1, 1869, ch. XXII, § 2, 1870 Tenn. Pub. Acts 23, 23–24.

38. Act of Dec. 2, 1875, § 1, 1876 Wyo. Sess. Laws 352, 352.

39. Act of Apr. 1, 1881, ch. XCVI, 1881 Ark. Acts 191 (codified at ARK. CODE ANN. ch. 48 § 1498

Subsequent categories of gun laws also include specific bans on particular types of weapons, like automatic weapons, and on weapons accessories, like silencers. These laws, and a few to come, make clear that gun banning—while not common—was not the sole province of 1960s anti-gun liberals.

## B. Brandishing Laws

States also enacted brandishing laws, designed to criminalize the threatening use of the weapons named in these laws.[40] The prohibited behaviors were typically described as "exhibit[ing] any of said deadly weapons in a rude, angry or threatening manner,"[41] or with similar language. Some laws in the later 1800s also identified the prohibited behavior as "draw[ing] or threaten[ing] to use" such weapons.[42] These laws also generally included exemptions for the use of such weapons in personal self-defense or for military purposes.

## C. Gun Carry Restrictions

Carry restriction laws were widely enacted, spanning the entire historical period under examination. As early as 1686, New Jersey enacted a law against wearing weapons because they induced "great Fear and Quarrels."[43] Massachusetts followed in 1750.[44] In the late 1700s, North Carolina[45] and Virginia[46] passed similar laws.[47] In the 1800s, as interpersonal violence and gun carrying spread, thirty-eight states joined the list;[48] five more did so in the early

---

(1894)).

40. Generally, these laws covered pistols along with specific, named knives used for interpersonal violence, such as dirks, sword canes, stilettos, and Bowie knives, and weapons like a "slung shot," which was a hand weapon made up of a piece of metal or other weight attached to a strap or flexible handle.

41. Act of Sept. 30, 1867, § 1, 1867 Ariz. Sess. Laws 21, 21.

42. Act of Mar. 13, 1875, ch. XVII, § 1, 1875 Ind. Acts 62, 62 (Spec. Sess.).

43. Robert J. Spitzer, *Stand Your Ground Makes No Sense*, N.Y. TIMES (May 4, 2015), http://www.nytimes.com/2015/05/04/opinion/stand-your-ground-makes-no-sense.html [https://perma.cc/Z7NY-84UL] (quoting *An Act Against Wearing Swords, (1686)*, *in* THE GRANTS, CONCESSIONS, AND ORIGINAL CONSTITUTIONS OF THE PROVINCE OF NEW JERSEY, 289 (1758)).

44. Act of Feb. 14, 1750, ch. 17, § 1, 1750 Mass. Acts 544, 545.

45. FRANCOIS XAVIER MARTIN, A COLLECTION OF THE STATUTES OF THE PARLIAMENT OF ENGLAND IN FORCE IN THE STATE OF NORTH CAROLINA 60–61 (1792).

46. A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE 33 (Richmond, Augustine Davis 1794).

47. *See* Spitzer, *supra* note 43 (discussing these early laws).

48. Laws from 1800–1867: Alabama: An Act of Feb. 1, 1839, no. 77, § 1, 1838 Ala. Laws 67; Arkansas: ARK. REV. STAT. div. VIII, ch. XLIV, art. I, § 13 (1837); California: Act of Apr. 16, 1850, ch. 99, div. Eleventh, § 127, 1850 Cal. Stat. 229, 245; Colorado: Act of Aug. 14, 1862, 1862 Colo. Sess. Laws 56; Delaware: DEL. REV. CODE tit. fifteenth, § 13 (1852); District of Columbia: D.C. CODE REV. § 141–16 (1857); Georgia: Act of Dec. 25, 1837, 1837 Ga. Laws 90; Indiana: Act of Jan. 14, 1820, ch. XXIII, 1820 Ind. Acts 39; Kentucky: Act of Feb. 3, 1813, ch. 89, §1, 1812 Ky. Acts 100, 100–01; Louisiana: Act of Mar. 25, 1813, 1813 La. Acts 172, 172–73; Maine: ME. STAT. REV. tit. twelfth, ch. 169, § 16 (1840); Montana: Act of Jan. 11, 1865, 1864 Mont. Laws 355; New Mexico: Act of Jan. 14, 1853, 1852 N.M. Laws 67; Ohio: Act of Mar. 18, 1859, 1859 Ohio Laws 56; Oregon: OR. REV. STAT. ch. XVI, § 17 (1853); Pennsylvania: Act of Apr. 8, 1851, no. 239, § 4, 1851 Pa. Laws 381, 382; Tennessee: Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15, 15–16; Wisconsin: WIS. STAT. REV. tit. XXVII, ch. 176, §18 (1858). Laws from 1868–1899: Alaska: FRED F. BARKER, COMPILATION OF THE ACTS OF CONGRESS AND TREATIES RELATING

1900s.[49] Laws in the eighteenth century did not typically identify weapons concealment as criminal per se, but did restrict more general carrying of firearms, usually if done in crowded places, or groups of armed people. Among the earliest laws criminalizing the carrying of concealed weapons was that of Kentucky in 1813.[50] As with the brandishing laws, concealed carry laws normally targeted pistols as well as various knives, the chief feature of which was that they had long, thin blades that were favorites in interpersonal fights. Louisiana enacted a similar law that same year.[51] A particularly sharp comment on the intent behind such laws was expressed in Tennessee's 1837 law, which referred to "[e]ach and every person so degrading himself" by carrying pistols or other named weapons.[52] The preamble of Georgia's 1837 law began: "AN ACT to guard and protect the citizens of this State, against the unwarrantable and too prevalent use of deadly weapons."[53] Alabama's 1839 concealed carry law reflected similar antipathy to the practice it was prohibiting: "AN ACT To suppress the evil practice of carrying weapons secretly."[54] Concealed carry laws generally made exceptions for travelers passing through an area while armed.

These laws were enacted in most states of the union and all across the country, including territories. In nineteenth-century laws, the main emphasis was on prohibiting concealed carry, whereas early twentieth century laws generally

TO ALASKA FROM MARCH 30, 1867 TO MARCH 3, 1905, S. DOC. NO. 59-142 (1906); Arizona: Act of Mar. 18, 1889, no. 13, 1889 Ariz. Sess. Laws 16; Florida: Act of May 31, 1887, ch. 3777, no. 97, § 16 1887 Fla. Laws 181, 186; Illinois: Act of Apr. 16, 1881, 1881 Ill. Laws 73 (codified in 38 ILL. COMP. STAT. §54(d) (1882)); Kansas: KAN. STAT. ANN. ch. 19, art. 3, § 68 (1901); Maryland: Act of Feb. 26, 1872, ch. 42, 1872 Md. Laws 56; Michigan: Act of May 31, 1887, no. 129, 1887 Mich. Pub. Acts 144; Minnesota: MINN. STAT. ch. CIV, § 17 (1881) (as amended through 1878); Mississippi: Act of Feb. 28, 1878, ch. XLVI, § 1, 1878 Miss. Laws 175, 175; Missouri: Act of Mar. 3, 1873, art. III, § 15, 1873 Mo. Laws 322, 328; NEB. STAT. REV. pt. III, ch. V, § 25 (1881); New York: Act of Mar. 27, 1891, chap. 105, § 209, 1891 N.Y. Laws 127, 177; North Dakota: N.D. REV. CODE § 7313, N.D. PENAL CODE § 457 (1895); Oklahoma: Penal Code of the Territory of Oklahoma, ch. 25, art. 38, § 20, 1890 Okla. Sess. Laws 412, 476; Rhode Island: Act of May 3, 1893, ch. 1180, 1893 R.I. Pub. Laws 231; South Carolina: Act of Dec. 24, 1880, no. 362, § 1, 1880 S.C. Acts 448; South Dakota: S.D. REV. CODE, PENAL, ch. XXXVIII, § 457 (1883); Texas: Act of Aug. 12, 1870, ch. XLVI, 1870 Tex. Gen. Laws 63; Washington: WASH. REV. CODE ch. LXXIII, § 929 (1881); West Virginia: W. VA. CODE ch. CXLVIII, § 7 (1870); Wyoming: WYO. STAT. ch. LII, § 1 (1876).

49. Connecticut: Act of June 2, 1923, ch. 252, 1923 Conn. Pub. Acts 3707 (codified in II CONN. GEN. STAT. tit. 59, § 6219 (1930)); Hawaii: Act of Mar. 19, 1913, no. 22, 1913 Haw. Sess. Laws 25; Idaho: Act of Feb. 17, 1909, H.R. 62, 1909 Idaho Sess. Laws 6; Iowa: Act of Apr. 16, 1929, ch. 57, § 30, 1929 Iowa Acts 81, 90; Nebraska: Act of Mar. 27, 1901, ch. 16, § 129-LV, 1901 Neb. Laws 71, 141 (codified at NEB. REV. STAT. part I, ch. 14, art. I, § XXV (1901)).

50. This Kentucky law was struck down as a violation of the Kentucky state constitution in Bliss v. Commonwealth, 12 Ky. (2 Litt.) 90 (1822). The court's decision did not involve or touch on the federal Constitution's Second Amendment, but instead was based on Kentucky's more expansive right-to-bear-arms-type provision. *See id.* at 90–92. In addition, this ruling was an anomaly in that concealed carry laws were widely held as constitutional when challenged in other states. *See* ROBERT J. SPITZER, GUN CONTROL, 96–99 (2009) (noting that the *Bliss* case was an exception to the prevailing trend of upholding state gun carry restrictions).

51. Act of Mar. 25th, 1813, 1812 La. Acts 172.

52. Tennessee: Act of Oct. 19, 1821, ch. XIII, 1821 Tenn. Pub. Acts 15.

53. Act of Dec. 25, 1837, 1837 Ga. Laws 90. This was the law that was challenged in *Nunn v. State,* discussed *supra* in part III.

54. An Act of Feb. 1, 1839, no. 77, 1838 Ala. Laws 67.

Compendium_Spitzer
Page 499

applied to all carrying, whether concealed or open. Aside from hunting and militia laws, they were among the most common and widely accepted gun regulations to be found in our post-1789 history. These laws therefore pose an especially stark contrast with the contemporary American political movement—dating to the early 1980s—spreading the legality of concealed carry.[55]

Many southern states were among those seeking to curtail gun carrying, as well as the enactment of other laws pertaining to criminal uses of guns, which is attributable to the fact that "the Antebellum South was the most violent region in the new nation."[56] After the Civil War, the ravaged South again witnessed violence at rates greater than the rest of the country.[57] Thus, states with greater violence, in the form of greater gun violence, turned in part to stronger gun laws as a remedy.

These historical concealed carry laws also recognized what modern gun control advocates stress: that, among all firearms, handguns pose a unique danger to public safety. Even though there are twice as many long guns as handguns in America, and long guns are generally easier to obtain, about eighty percent of all gun crimes are committed with handguns because of their ease of use, concealability, and lethality.[58] Little stretch of the imagination is required to infer that the same trend existed in the nineteenth century as well.

Before considering other types of gun laws, it should be noted that concealed and open carry restrictions were common in the American western frontier during the nineteenth century in the so-called "Wild West." The truth of life in the Old West, and the actual role of guns in it, is known, but not well known. Axiomatic expressions such as "the guns that won the West"[59] and "arm[s] that opened the West and tamed the wild land"[60] still too often typify what in actuality is a romanticized and wildly exaggerated assessment of the importance of guns in the settling of the West.[61] Indeed, some have gone so far as to claim that "the American experiment was made possible by the gun."[62] But these characterizations ignore the central role of homesteaders, ranchers, miners,

---

55.   ROBERT J. SPITZER, THE POLITICS OF GUN CONTROL, 68–70 (6th ed., Paradigm Publishers 2015) (1995).

56.   Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 FORDHAM URB. L.J. 1695, 1716 (2012) (citing RANDOLPH ROTH, AMERICAN HOMICIDE (2009); ERIC H. MONKKONEN, MURDER IN NEW YORK CITY (2001); Joshua Stein, *Privatizing Violence: A Transformation in the Jurisprudence of Assault*, 30 LAW & HIST. REV. 423, 445 (2012)); *see generally* DICKSON D. BRUCE, JR., VIOLENCE AND CULTURE IN THE ANTEBELLUM SOUTH (1979).

57.   ROTH, *supra* note 56, at 180–249.

58.   SPITZER, *supra* note 55, at 54–55.

59.   JAMES WYCOFF, FAMOUS GUNS THAT WON THE WEST (1968).

60.   MARTIN RYWELL, THE GUN THAT SHAPED AMERICAN DESTINY (1957).

61.   RICHARD SHENKMAN, LEGENDS, LIES, AND CHERISHED MYTHS OF AMERICAN HISTORY 112 (1988).

62.   WYCOFF, *supra* note 59, at 5–6; *see also* RYWELL, *supra* note 60, at 4 (1957); JAMES B. TREFETHEN, AMERICANS AND THEIR GUNS: THE NATIONAL RIFLE ASSOCIATION STORY THROUGH NEARLY A CENTURY OF SERVICE TO THE NATION (James E. Serven ed., 1967); HAROLD F. WILLIAMSON, WINCHESTER: THE GUN THAT WON THE WEST 3 (1952).

Compendium_Spitzer
Page 500

tradesmen, businessmen, and other settlers across the western plains. The "taming" of the West was in fact an agricultural and commercial movement, attributable primarily to ranchers and farmers, not gun-slinging cowboys.[63] In fact, the six-shooter and rifle played relatively minor roles in the activities of all these groups—even the cowboys.[64] According to historian Richard Shenkman:

> The truth is many more people have died in Hollywood westerns than ever died on the real frontier . . . . In the real Dodge City, for instance, there were just five killings in 1878, the most homicidal year . . . . In the most violent year in Deadwood, South Dakota, only four people were killed. In the worst year in Tombstone, home of the shoot-out at the OK Corral, only five people were killed. The only reason the OK Corral shoot-out even became famous was that town boosters deliberately overplayed the drama to attract new settlers.[65]

Even in the most violence-prone western towns, vigilantism and lawlessness were only briefly tolerated. In his sweeping history of the West, historian Ray Allen Billington noted that local businesspeople and other leaders quickly pushed for town incorporation in order to establish local police forces, which were supported by taxes levied against local bars, gambling establishments, and houses of prostitution.[66] The prohibitions against carrying guns analyzed here were enforced, and there were few homicides.[67] The western-style shoot-outs glorified in countless books and movies were literally "unheard of."[68] In the most violent cow towns of the old West—Abilene, Caldwell, Dodge City, Ellsworth, and Wichita—a total of forty-five killings were recorded between 1870 and 1885, and only six of these killings were from six-shooters; sixteen killings were by police.[69] As cowboy experts Joe B. Frantz and Julian E. Choate observed, "the six-shooter has been credited with use entirely disproportionate with the facts."[70]

Even western outlaws illustrate the extent to which myth replaced fact with respect to guns and lawlessness. Many studies of the famed western outlaws demonstrate that "they were few, inconspicuous, and largely the invention of newspaper correspondents and fiction writers."[71] Moreover, "the western marshall [was] an unglamorous character who spent his time arresting drunks or rounding up stray dogs and almost never engaging in gun battles."[72] Most of the killing that took place on the frontier involved the wars between the U.S. Cavalry

---

63. LEWIS ATHERTON, THE CATTLE KINGS, xi, 31–42, 241–62 (1961).

64. PAMELA HAAG, THE GUNNING OF AMERICA: BUSINESS AND THE MAKING OF AMERICAN GUN CULTURE 353–55 (2016).

65. RICHARD SHENKMAN, LEGENDS, LIES, AND CHERISHED MYTHS OF AMERICAN HISTORY 112 (1988); *see also* ROBERT R. DYKSTRA, THE CATTLE TOWNS 112–48 (1968) (detailing the exaggerated nature of frontier West violence).

66. RAY ALLEN BILLINGTON, WESTWARD EXPANSION 587 (6th ed. abr. 1974).

67. JOE B. FRANTZ & JULIAN ERNEST CHOATE JR., THE AMERICAN COWBOY: THE MYTH AND THE REALITY 78 and *passim* (1955).

68. BILLINGTON, *supra* note 66, at 587.

69. *Id.*

70. FRANTZ & CHOATE JR., *supra* note 67, at 78.

71. BILLINGTON, *supra* note 66, at 587.

72. *Id.*; *see also* FRANK RICHARD PRASSAL, THE WESTERN PEACE OFFICER: A LEGACY OF LAW AND ORDER 22 (1972), and the numerous works cited by BILLINGTON, *supra* note 66.

Compendium_Spitzer
Page 501

and those Native Americans who rebelled against harsh and duplicitous treatment at the hands of whites.[73]

## D. Restrictions On Dangerous Or Unusual Weapons

States moved to enact laws restricting or barring certain dangerous or unusual weapons—also a subject that has contemporary reverberations. Such laws in the country's early decades were aimed in part at pistols and offensive knives, like most concealed carry laws, but also at the practice of rigging firearms to be fired with a string or similar method to discharge a weapon without an actual finger on the firearm trigger. Referred to as "gun traps," the earliest such law was enacted by New Jersey in 1771.[74] Some laws later referred to such weapons as "spring guns,"[75] "trap guns,"[76] and "infernal machines."[77]

The bulk of the laws that identified certain weapons as dangerous or unusual, however, appeared in the early 1900s, when most states moved aggressively to outlaw machine guns (usually meaning fully automatic weapons), sawed-off shotguns, pistols, weapons and mechanisms that allowed firearms to be fired a certain number of times rapidly without reloading, silencers, and air guns (which propels projectiles with compressed air rather than gun powder). The first state to enact an anti–machine gun law was West Virginia in 1925.[78] A number of states enacted anti–machine gun laws in 1927 alone—a year in which a concerted national push unfolded to regulate these and other gangster-type weapons. In all, at least twenty-eight states enacted anti–machine gun laws during this period.[79]

---

73. RICHARD W. STEWART, AMERICAN MILITARY HISTORY VOL. 1: THE UNITED STATES ARMY AND THE FORGING OF A NATION 321–40 (2005); W. EUGENE HOLLON, FRONTIER VIOLENCE: ANOTHER LOOK 124–45 (1974). Hollon notes that "of all the myths that refuse to die, the hardiest concerns the extent of the unmitigated bloodletting that occurred in the Western frontier during the closing decades of the nineteenth century." *Id.* at x.

74. Act of Dec. 21, 1771, ch. DXL, § 10, 1771 N.J. Laws 343, 346.

75. Act of Apr. 21, 1915, ch. 133, part II, §§17(c), 18, 1915 N.H. Laws 173, 180–81.

76. Act of Feb. 25, 1931, no. 58, 1931 S.C. Acts 78, 78.

77. *E.g.*, Act of Mar. 14, 1901, ch. 96, 1901 Utah Laws 97, 97.

78. Act of June 5, 1925, ch. 3, 1925 W. Va. Acts 24.

79. Act effective July 29, 1927, ch. 552, 1927 Cal. Stat. 938; Act of Feb. 25, 1931, ch. 249, 37 Del. Laws 813; Act of Apr. 27, 1933, no. 120, 1933 Haw. Sess. Laws 117; Act of July 2, 1931, 1931 Ill. Laws 452; Act of Mar. 27, 1927, ch. 156, 1927 Ind. Acts 469; Act of Apr. 19, ch. 234, 1927 Iowa Acts 201; Act of Nov. 28, 1933, ch. 62, 1933 Kan. Sess. Laws 76 (Spec. Sess.); Act of July 7, 1932, no. 80, 1932 La. Acts 336; Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413; Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231; Act of June 1, 1929, H.R. no. 498, 1929 Mo. Laws 170; Act of Apr. 29, 1929, ch. 190, 1929 Neb. Laws 673; Act of Mar. 19, 1927, ch. 95, 1927 N.J. Laws 180; Act of Apr. 15, 1931, ch. 435, 1931 N.Y. Laws 1033; Act of Mar. 9, 1931, ch. 178, 1931 N.D. Laws 305; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189; Act of Mar. 10, 1933, ch. 315, § 3, 1933 Or. Laws 488, 489; Act of Apr. 25, 1929, no. 329, 1929 Pa. Laws 777; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256; Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288; Uniform Machine Gun Act, ch. 206 §§ 1–5, 1933 S.D. Sess. Laws 245; Act of Oct. 25, 1933, ch. 82, 1933 Tex. Gen. & Spec. Laws 219; Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137; Act of Mar. 6, 1933, ch. 64, 1933 Wash. Sess. Laws 335; Act of June 5, 1925, 1925 W. Va. Acts 24 (Extraordinary Sess.); Act of May 28, 1929, ch. 132, 1929 Wis. Sess. Laws 157.

Texas, for example, defined machine guns in 1933 as those from which more than five bullets were automatically discharged "from a magazine by a single functioning of the firing device."[80]

The lesson here is significant both for its historical context and for the contemporary debate over the regulation of new or exotic gun technologies. In these instances, new laws were enacted not when these weapons were invented, but when they began to circulate widely in society. So, for example, fully automatic weapons, most famously the Tommy gun, became available for civilian purchase after World War I.[81] But it was only when ownership spread in the civilian population in the mid-to-late 1920s, and the gun became a preferred weapon for gangsters, that states moved to restrict them. The lesson of gun regulation history here is that new technologies bred new laws when circumstances warranted.

E. Semi-Automatic Gun Restrictions

Of particular relevance to the modern gun debate is the fact that at least seven, and as many as ten, state laws specifically restricted semi-automatic weapons—weapons that fire a round with each pull of the trigger without manual reloading[82]—anticipating by seven decades the semi-automatic assault weapons ban debates, and related efforts to restrict large capacity bullet magazines, from the 1990s to the present.

States with laws in this category typically combined fully automatic and semi-automatic weapons under a single definitional category.[83] A 1927 Rhode Island measure defined the prohibited "machine gun" to include "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading."[84] To compare, a 1927 Massachusetts law said: "Any gun or small arm calibre designed for rapid fire and operated by a mechanism, or any gun which operates automatically after the first shot has been fired . . . shall be deemed a machine gun . . . ."[85] Michigan's 1927 law prohibited machine guns or any other firearm if they fired more than sixteen times without reloading.[86] Minnesota's 1933 law outlawed "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure."[87] It went on to penalize the modification of weapons that were altered to accommodate such extra firing capacity.[88] Fully automatic .22 caliber "light sporting rifles" were

---

80. 1933 Tex. Gen. & Spec. Laws 219, 219.

81. NRA-ILA, *Fully-Automatic Firearms*, NRAILA.ORG, (July 29, 1999), https://www.nraila.org/articles/19990729/fully-automatic-firearms [https://perma.cc/NT68-ZEF6].

82. *See* Table 2.

83. *See* Table 2, laws of Mass., Mich., S.D., and Va.

84. 1927 R.I. Pub. Laws 256, 256.

85. 1927 Mass. Acts 413, 413–14.

86. Act of June 2, 1927, no. 372, 1927 Mich. Pub. Acts 887, 888.

87. Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232.

88. *Id.*

also considered machine guns under the law, but .22 caliber semi-automatic "light sporting rifles" were exempted.[89] Ohio also barred both fully automatic and semi-automatic weapons in a 1933 law, incorporating under the banned category any gun that "shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading."[90] The law defined semi-automatic weapons as those that fired one shot with each pull of the trigger.[91] South Dakota barred machine guns by defining them as weapons "from which more than five shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine . . . ."[92] Like several other states, Virginia outlawed weapons

> of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading.[93]

Aside from these seven states, another three included language that was ambiguous as to whether they extended prohibitions to semi-automatic as well as fully automatic weapons. Illinois enacted a 1931 law that prohibited "machine guns and sub-machine guns of any calibre whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices."[94] Louisiana's 1932 anti–machine gun law,[95] and South Carolina's 1934 law,[96] both defined machine guns in the same way using identical language, including the eight cartridge standard. In the case of these three laws, the word "automatically" would seem to refer to fully automatic firing, but when that wording is married with "discharging more than eight cartridges successively without reloading," it would seem to encompass semi-automatic firing as well.

Table 2 summarizes the key portions of the laws from these ten states. The lesson of the previous part also applies here: new technologies bred new restrictions. And who would have guessed that the fierce controversy over regulating semi-automatic assault weapons in the 1990s and 2000s was presaged by the successful, and at the time obviously uncontroversial, regulation of semi-automatic weapons in the 1920s and 1930s.

---

89.  *Id.*
90.  Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189.
91.  *Id.*
92.  Uniform Machine Gun Act, ch. 206, 1933 S.D. Sess. Laws 245, 245.
93.  Act of Mar. 7, 1934, ch. 96, 1934 Va. Acts 137, 137.
94.  Act of July 2, 1931, 1931 Ill. Laws 452, 452.
95.  Act of July 7, 1932, no. 80, 1932 La. Acts 336.
96.  Act of Mar. 2, 1934, no. 731, 1934 S.C. Acts 1288.

**Table 2**

STATE LAWS BARRING
SEMI-AUTOMATIC WEAPONS, 1927–1934[97]

| STATE AND YEAR | PROVISION OF LAW |
| --- | --- |
| Massachusetts 1927 | "rapid fire and operated by a mechanism" |
| Michigan 1927 | "any machine gun or firearm which can be fired more than sixteen times without reloading" |
| Minnesota 1933 | "[a]ny firearm capable of automatically reloading after each shot is fired, whether firing singly by separate trigger pressure or firing continuously by continuous trigger pressure." |
| Ohio 1933 | "any firearm which shoots automatically, or any firearm which shoots more than eighteen shots semi-automatically without reloading." |
| Rhode Island 1927 | "any weapon which shoots automatically and any weapon which shoots more than twelve shots semi-automatically without reloading." |
| South Dakota 1933 | "a weapon of any description . . . from which more than five shots or bullets may be rapidly or automatically, or semi-automatically discharged from a magazine." |
| Virginia 1933 | "a weapon of any description . . . from which more than seven shots or bullets may be rapidly, or automatically, or semi-automatically discharged from a magazine, by a single function of the firing device, and also applies to and includes weapons, loaded or unloaded, from which more than sixteen shots or bullets may be rapidly, automatically, semi-automatically, or otherwise discharged without reloading." |

97.  Source: Act of Apr. 27, 1927, ch. 326, 1927 Mass. Acts 413, 413; Act of June 2, 1927, No. 372, 1927 Mich. Pub. Acts 887, 888; Act of Apr. 10, 1933, ch. 190, 1933 Minn. Laws 231, 232; Act of Apr. 8, 1933, no. 64, 1933 Ohio Laws 189, 189; Act of Apr. 22, 1927, ch. 1052, 1927 R.I. Pub. Laws 256, 256; Uniform Machine Gun Act, ch. 206, § 1, 1933 S.D. Sess. Laws 245, 245; Act of Mar. 7, 1934, ch. 96, § 1, 1934 Va. Acts 137, 137; Act of July 2, 1931, § 1, 1931 Ill. Laws 452, 452; Act of July 7, 1932, no. 80, § 1, 1932 La. Acts 336, 337; Act of Mar. 2, 1934, no. 731, § 1, 1934 S.C. Acts 1288, 1288.

Compendium_Spitzer
Page 505

| **AMBIGUOUS STATE LAWS** | |
|---|---|
| Illinois 1931 | "machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical devices." |
| Louisiana 1932 | "machine rifles, machine guns and sub machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts, or other separable mechanical device." |
| South Carolina 1934 | "machine rifles, machine guns and sub-machine guns of any caliber whatsoever, capable of automatically discharging more than eight cartridges successively without reloading, in which ammunition is fed to such gun from or by means of clips, disks, belts or other separable mechanical device." |

F. Dueling Prohibitions

A well-known category of gun laws with ties to American history is the prohibition against dueling. Prominent public figures from early American history, including Alexander Hamilton and Andrew Jackson, found themselves in highly publicized duels.[98] Hamilton's longstanding political feud with fellow New York politician Aaron Burr ended when the two men dueled in New Jersey in 1804.[99] Hamilton died from his wounds, and Burr's political career never recovered.[100] Jackson engaged in several duels, and was even injured during one

---

98.   DON C. SEITZ, FAMOUS AMERICAN DUELS (1929).

99.   Burr was vice president at the time; New York barred dueling, so they traveled to the neighboring state. LIN-MANUEL MIRANDA, *"Blow Us All Away," "Your Obedient Servant," "The World Was Wide Enough,"* on HAMILTON: AN AMERICAN MUSICAL, ACT II, (Atlantic Records 2015).

100.   RON CHERNOW, ALEXANDER HAMILTON 704–05, 717–22 (2004).

in 1806.[101] Though not barred in every state, the practice declined in the North after the Hamilton–Burr duel, but persisted in the South until the mid-nineteenth century.[102]

### G. Felons, Foreigners, Others Considered Dangerous

Early gun laws aimed at preventing felons, foreigners, or others deemed dangerous from owning firearms focused on Native Americans, with at least five colonies enacting such laws[103]—including the 1619 Virginia law cited earlier.[104] The Massachusetts colony enacted a law in 1637 that required named individuals who expressed "opinions & revelations" that "seduced & led into dangerous errors many of the people" of New England to turn in all "guns, pistols, swords, powder, shot, & match," and it further barred them from "buy[ing] or borrow[ing]" any of the same until such time as the local court said otherwise.[105] If those disarmed admitted to their "seditious libel," they could have their weapons restored.[106] In the 1770s, Pennsylvania enacted a law to bar or strip guns from those who refused to swear loyalty to the new American government.[107] In fact, ten of the thirteen states had laws allowing the impressment—that is, taking—of privately held firearms during the Revolutionary War.[108] Massachusetts also enacted such a law in 1776, although it does not appear in Frassetto's list.[109] By the early 1900s, as anti-immigrant sentiment spread, many states enacted laws aimed at keeping guns from non-citizens, as well as the young, those who were inebriated, felons and other criminals, and non-state residents.

### H. Firing Location Restrictions

Concerns over the inherent harm and risk attendant to the firing of weapons near others spawned a steady stream of laws prohibiting such acts from the 1600s

---

101. SPITZER, *supra* note 26.

102. ROTH, *supra* note 56, at 181.

103. Act of May 9, 1723, 1723 Conn. Pub. Acts 292; Act of Mar. 31, 1639, 1639 N.J. Laws 18 *reprinted in* LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (Edmund Bailey O'Callaghan, ed., 1868); Act of Feb. 23, 1645, 1645 N.Y. Laws 47 *reprinted in* LAWS AND ORDINANCES OF NEW NETHERLAND, 1638–1674 (Edmund Bailey O'Callaghan ed., 1868); Pennsylvania Act of Oct. 22, 1763 *reprinted in* VI THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, 319 (James T. Mitchell & Henry Flanders eds., 1899); Virginia Act of Feb. 24, 1631, Act. XLVI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 173 (William Waller Henning ed., 1823).

104. *The Laws Enacted by the First General Assembly of Virginia*, *supra* note 11.

105. I RECORDS OF THE GOVERNOR AND COMPANY OF THE MASSACHUSETTS BAY IN NEW ENGLAND 211–12 (Nathaniel B. Shurtleff ed., 1853). This law was not among those appearing in Frassetto's list. *See* Frassetto, *supra* note 17.

106. RECORDS OF THE GOVERNOR, *supra* note 105, at 212.

107. Act of July 19, 1776, ch. DCCXXIX, IX THE STATUTES AT LARGE OF PENNSYLVANIA FROM 1682 TO 1801, 11 (1903).

108. WINKLER, *supra* note 8, at 113.

109. Saul Cornell & Nathan DeDino, *A Well Regulated Right*, 73 FORDHAM L. REV. 487, 507 (2004). The Massachusetts law is Act of March 14, 1776, ch. VII, 1776 Mass. Acts 31–36. *See* Frassetto, *supra* note 17.

through the early 1900s. Early such laws prohibited not only the firing of firearms in or near towns, but firing after dark, on Sundays, or near roads.[110] Early laws also punished firing that wasted gunpowder, or that occurred while under the influence of alcohol.[111] A North Carolina law from 1774 barred hunting by firelight at night, citing this concern in its preamble: "WHEREAS many Persons under Pretence of Hunting for Deer in the Night, by Fire Light, kill Horses and Cattle, to the Prejudice of the Owners thereof."[112] In the 1800s and 1900s, such laws were focused almost exclusively on firing in, around, or near towns or other populated areas or events.

I. Hunting Restrictions

Hunting laws are significant for the extent to which early ones reflect contemporary concerns. Though one imagines the America of the seventeenth to the nineteenth centuries as a nation little concerned—or not needing to be concerned—about matters related to wildlife management, safe hunting practices, or the like, these concerns are expressed early in American legislative histories, for example in the legislative history for the North Carolina night-time hunting law just quoted. Early hunting laws were aimed at those who hunted on private lands or in preserves, those who hunted certain types of game, most notably water fowl—often tied to prohibitions against hunting of such game from canoes, skiffs, or other water craft—and even the common deer.[113] For example, it comes as something of a revelation to note that Pennsylvania established a deer hunting season, penalizing out-of-season hunting, as early as 1721,[114] and North Carolina as early as 1768.[115] The penalty for violation of the North Carolina law was a fine of five pounds and "forfeiture of his gun."[116] Hunting even in this early period also sometimes required a license.[117] Similarly, laws in the 1800s also restricted what was by then termed "fire-hunting," hunting by firelight at night, poaching on private lands, and the use of certain restricted weapons, such as a "punt gun" or "swivel gun," defined as a smooth bored gun mounted on a swivel that fires a charge of shot to bring down water fowl, or any weapon not fired from the shoulder.[118] Measures were also enacted to protect certain game, to require

---

110.   Act of Oct. 1672, 1672 Conn. Pub. Acts 3; Act of Aug. 27, 1746, 1746 Mass. Acts 208; Act of Oct. 14, 1713, 1713 Mass. Acts 291; Act of Mar. 3, 1642, Act XXXV, 1642 Va. Acts 261.

111.   Though a 1655 Virginia law specifically exempted drunken firing at weddings and funerals! Act of March 10, 1655, Act XII, 1655 Va. Acts 401.

112.   This quote is from North Carolina's 1777 version of this law, Act of May 8, 1777, ch. XXI, 1777 N.C. Sess. Laws, 33, 33.

113.   9 Del. Laws 263; Act of Jan. 8, 1857, 1856 N.C. Sess. Laws 22; Act of April 1, 1853, ch 161, 1852 Va. Acts 133.

114.   Act of Aug. 26, 1721, ch. 3, 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI.

115.   Act of Dec. 5, 1768, ch. 13, 1768 N.C. Sess. Laws 168.

116.   *Id.* § 2, at 168–69.

117.   Act of Mar. 30, 1882, 1882 Md. Laws 257; Act of Aug. 26, 1721, ch. 3, 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI *reprinted in* III Mitchell & Flanders, *supra* note 103 at 254.

118.   14 Del. Laws 401; Act of Nov. 14, 1828, 1828 Fla. Laws 48, 75; Act of Sept. 21, 1882, 1880 Ga. Laws 142, 142; Act of Jan. 8, 1856, 1856 N.C. Sess. Laws 22, 22; Act of Apr. 20, 1874, 1874 Ohio Laws

licensing, and bar fishing "with any kind of gun."[119] In the twentieth century, in addition to the types of laws already mentioned, states barred hunting with silencers, from aircraft, by under-age persons, or with certain kinds of weapons— still including swivel guns, but now including automatic weapons.[120]

## J. Gun Manufacture, Inspection, Sale Restrictions

Gun laws also dealt broadly with manufacturing, inspection, and sale of weapons. Many of the laws in this category pertained to the manufacture, sale, transport, and storage of gunpowder. Gunpowder matters were of great concern because early firearms operated with the addition of loose gunpowder to serve as the igniting or explosive force to propel a projectile, so the two were inextricably linked.[121] But beyond the safety concerns about explosions or fires resulting from the mishandling of gunpowder, safety issues also led to other early regulations. In 1814, for example, Massachusetts required that all musket and pistol barrels manufactured in the state be first tested or "proved" to insure that they could withstand the firing process without rupturing.[122] Moreover, the law provided for a "person appointed according to the provisions of this act"—in other words, a state inspector—to oversee or conduct the testing.[123] This continued a long tradition in Massachusetts of giving local officials the power to survey, inspect, and even confiscate arms as needed. As early as 1642, "surveyors of arms" were empowered in colonial law to demand the delivery of gun powder and firearms from individuals in order for these items to be used in "times of danger."[124] New Hampshire created and appointed state gunpowder inspectors to examine every storage and manufacturing site.[125] Twentieth century laws extended safety regulations pertaining to gunpowder and other explosives; one state, South Carolina, prohibited the use of explosives to kill fish (hardly a sporting enterprise).[126]

---

147, 148; 1721 Pa. Laws 106, 1721 PA. STAT. ch. CCXLVI *reprinted in* III Mitchell & Flanders, *supra* note 103 at 254; Virginia Act of Mar. 2, 1642, Act. XI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 248, 248 (William Waller Henning, ed., 1823).

119.   Act of Dec. 23, 1878, no. 602, 1878 S.C. Acts 724, 724.

120.   Act of Apr. 4, 1931, ch. 97, 1931 Colo. Sess. Laws 399, 399–400; Act of Mar. 29, 1927, 1927 Del. Laws 516, 516; Act of Apr. 27, 1911, ch. 165, 1911 Del. Laws 322, 324; Act of May 10, 1901, 1901 Ill. Laws 212, 213; Act of Mar. 5, 1883, ch. CV, 1883 Kan. Sess. Laws 159, 159; Act of May 24, 1923, no. 228, § 704, 1923 Pa. Laws 359, 386.

121.   Act of May 29, 1771, 1771 Mass. Acts 597; Act of Nov. 23, 1715, no. 234, 1715 Mass. Acts 311; Act of Feb. 28, 1786, 1786 N.H. Laws 383.

122.   Act of Feb. 28, 1814, ch. CXCII, 1814 Mass. Acts 464, 464–65

123.   *Id.*

124.   RECORDS OF THE GOVERNOR, *supra* note 105, at 26. *See also* RECORDS OF THE GOVERNOR, *supra* note 105, at 31, 73–74, 84 for similar references. This law was not among those appearing in Frassetto's list. *See* Frassetto, *supra* note 17.

125.   Act of June 21, 1820, ch. XXV, 1820 N.H. Laws 274, 274–76.

126.   Act of Feb. 16, 1903, no. 82, 1903 S.C. Acts 124, 124–25.

Compendium_Spitzer
Page 509

## K. Firearms Sales

At least eight states regulated, barred, or licensed firearms sales. For example, Florida (1927),[127] Georgia (1902),[128] and North Carolina (1905)[129] gave localities the power to license, regulate, or even bar the commercial sale of firearms. In a 1917 law, New Hampshire required the licensing of gun dealers, requiring them to record the name, address, date of sale, amount paid, and date of the purchaser's permit for all who made gun purchases.[130] In turn, this information was passed to the local city or town clerk or county office, and "[t]he records thus filed shall at all times be open to the inspection of the police departments, or other public authorities."[131] New Jersey prohibited pawn brokers from selling or in any manner transferring any firearms.[132] New York established a registration system for all handgun sales—part of the 1911 law known as the Sullivan Law—which required gun owners to obtain a permit for ownership.[133] In a 1925 law, West Virginia barred the "public display" of any firearms for sale or rent, or ammunition. Gun dealers were also to be licensed, and were required to record the name, address, age "and general appearance of the purchaser," as well as all identifying information about the gun, which was then to be immediately reported to the superintendent of the local department of public safety.[134]

## L. Militia Laws

The militia laws that appear on this list represent one category of early gun laws that have been carefully studied elsewhere.[135] Not surprisingly, the laws here replicate what is now well known about the early-American militia system. Early laws confirmed the power of state governments to impress or take the firearms of citizens if needed. Militia-eligible men were typically required to obtain and maintain in working order the necessary combat-worthy firearm, at their own expense, along with the necessary accoutrements of powder, shot, and the like.[136] In Virginia in the early 1600s, men were required to bring their firearms to church for fear of Indian attacks.[137] In some states, laws stipulated when, where, and under what circumstances guns were to be loaded or unloaded.[138] In Maryland,

---

127. Act of June 6, 1927, ch. 12548, § 19(13), 1927 Fla. Laws 206, 212.

128. Act of Dec. 18, 1902, part III, tit. I, no. 192, § 16, 1902 Ga. Laws 427, 434–35.

129. Act of Mar. 6, 1905, ch. 188, § 6, 1905 N.C. Sess. Laws 545, 547.

130. Act of Apr. 19, 1917, ch. 185, 1917 N.H. Laws 727, 727–30.

131. *Id.* § 3, at 728.

132. Act of Mar. 30, 1927, ch. 321, § 1, 1927 N.J. Laws 742, 742.

133. Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 442, 444–45.

134. Act of June 5, 1925, ch. 3, § 7(b), 1925 W. Va. Acts 24, 32 (Extraordinary Sess.).

135. CORNELL, *supra* note 8; JOHN K. MAHON, THE AMERICAN MILITIA: DECADE OF DECISION 1789–1800 (1960); JOHN K. MAHON, HISTORY OF THE MILITIA AND THE NATIONAL GUARD (1983); H. RICHARD UVILLER & WILLIAM G. MERKEL, THE MILITIA AND THE RIGHT TO ARMS: HOW THE SECOND AMENDMENT FELL SILENT (2002).

136. The Uniform Militia Act of 1792, 1 U.S. Stat. 271.

137. Virginia Act of Feb. 24, 1631, Act LI, *reprinted in* I Henning, *supra* note 103, at 174.

138. Act of Mar. 16, 1877, 1877 Mo. Laws 298, 306; Act of Mar. 21, 1835, ch. 423, art. XI, 1835 Mo. Laws 512, 537; Act to Regulate the Militia, 1844 R.I. Pub. Laws 1, 16.

privates or non-commissioned officers who used their muskets for hunting were fined, according to a 1799 law.[139] These laws disappeared with the end of the old militia system in the mid-1800s.

## M. Gun Access By Minors And Irresponsible Others

Numerous laws restricting gun access by minors—minimum ownership ages ranged from twelve to twenty-one—or others deemed irresponsible arose in the late 1800s, becoming more common in the early 1900s. Some states added other barred categories, including convicts or those of poor moral character, those inebriated, and people of unsound mind.[140] In 1907, the then-territory of Arizona barred

> any constable or other peace officer . . . while under the influence of intoxicating liquor of any kind, to carry or have on his person a pistol, gun, or other firearm, or while so intoxicated to strike any person, or to strike any person with a pistol, gun or other firearm . . . .[141]

## N. Arms And Ammunition Trafficking

Arms and ammunition trafficking was also a concern as early as the seventeenth century, just as it is today. Various registration or taxation schemes sought to address this concern. For example, a 1652 New York law outlawed illegal trading of guns, gun powder, and lead by private individuals.[142] A 1631 Virginia law required the recording not only of all new arrivals to the colony, but also "of arms and munitions."[143] Twenty years later, Virginia required that "all ammunition, powder and arms, other than for private use shall be delivered up" to the government.[144] In the 1800s, three southern states imposed taxes on personally held firearms. Georgia in 1866 levied a tax of "one dollar a piece on every gun or pistol, musket or rifle over the number of three kept or owned on any plantation . . . ."[145] In 1867, Mississippi levied a tax of between $5 and $15

> upon every gun and pistol which may be in the possession of any person . . . which tax shall be payable at any time on demand, by the Sheriff, and if not so paid, it shall be the duty of the Sheriff to forthwith distrain [to seize property for money owed] and seize such gun or pistol, and sell the same for cash . . . .[146]

---

139. A Supplement to the Act, Entitled, An Act to Regulate and Discipline the Militia of this State, ch. 100, § 30, 1798 Md. Laws 69, 75.

140. Act of Mar. 5, 1907, ch. 16, 1907 Ariz. Sess. Laws 15; Act of Feb. 4, 1881, ch. 3285, 1881 Fla. Laws 87; Cook County Ordinance chap. 53 of Chicago (Ill.) Code of 1911.

141. Act of Mar. 5, 1907, ch. 16, § 1, 1907 Ariz. Sess. Laws 15, 15–16.

142. Ordinance of the Director and Council of New Netherland Against Illegal Trade in Powder, Lead and Gunds in New Netherland by Private Persons, 1652 N.Y. Laws 128.

143. Virginia Act of Feb. 27, 1631, Act LVI, *reprinted in* I Henning, *supra* note 103, at 174–75.

144. Articles at the Surrender of the Countrie of Virginia, Mar. 22, 1651, *reprinted in* I Henning, *supra*, note 103 at 365.

145. Act of Dec. 7, 1866, no. 41, § 1, 1866 Ga. Laws 27, 27–28.

146. Act of Feb. 7, 1867, ch. CCXLIX, § 1, 1867 Miss. Laws 327, 327.

In 1856 and 1858, North Carolina enacted taxes on pistols and other weapons "used or worn about the person."[147] An 1851 Rhode Island law taxed anyone who owned or kept a pistol or rifle shooting gallery in certain locations;[148] Louisiana and Mississippi did the same in 1870[149] and 1886, respectively.[150] Alabama imposed a tax on firearms dealers in 1898.[151] That same year, Florida required a license for anyone owning "a Winchester or repeating rifle," and further required the licensee to "give a bond running to the Governor of the State in the sum of one hundred dollars, conditioned on the proper and legitimate use of the gun with sureties to be approved by the county commissioners."[152] Hawaii licensed firearms for sporting purposes in 1870,[153] as did Wyoming in 1899,[154] and Georgia imposed a pistol dealers' tax in 1894.[155] Nebraska granted to city mayors the power to issue licenses to carry concealed weapons, adding mayoral discretion to "revoke any and all such licenses at his pleasure."[156]

O. Registration And Taxation

Registration and taxation laws were enacted with greater frequency beginning in the twentieth century. At least twelve states imposed various gun sales or dealer registration, regulation, taxation, or gun registration schemes.[157] The earliest applicable to purchasers of all firearms, was enacted in Michigan in 1913;[158] New York's 1911 Sullivan law applied to handguns only.[159] Michigan also mandated in 1927 that all pistols be presented by their owners "for safety inspection" to local officials, if they lived in an incorporated city or village.[160] Perhaps most remarkable was this sweeping law, enacted by Montana in 1918, titled "An Act providing for the registration of all fire arms and weapons and regulating the sale thereof":

---

147. Act of Feb. 16, 1859, ch. 25, sched. A, § 27(15), 1858 N.C. Sess. Laws 28, 35–36; Act of Feb. 2, 1857, ch. 34, § 23(4), 1856 N.C. Sess. Laws 28, 34.

148. Act of Jan. 20, 1851, § 2, 1851 R.I. Pub. Laws 9, 9.

149. Act of Mar. 16, 1870, no. 68, § 3, sixth, 1870 La. Acts 126, 127.

150. Act of Mar. 18, 1886, ch. II, § 1, 1886 Miss. Laws 12, 19.

151. Act of Feb, 23, 1899, no. 903, § 16, sixty-seventh, 1898 Ala. Acts 164, 190.

152. Act of June 2, 1893, ch. 4147, 1898 Fla. Laws 71, 71–72.

153. Act of July 18, 1870, ch. XX, 1870 Haw. Sess. Laws 26, 26.

154. Act of Feb. 15, 1899, ch. 19, § 14, 1899 Wyo. Sess. Laws 27, 32–33.

155. 1893–1894 Treasurer's Report, 1894 Ga. Laws 325, 326.

156. LINCOLN REV. ORD. ch. XIV, art. XVI, § 6 (Neb. 1895).

157. Act of June 19, 1931, ch. 1098, § 1, § 9, 1931 Cal. Stat. 2316, 2316–19; Act of June 2, 1923, ch. 252, 1923 Conn. Pub. Acts 3707; Act of Apr. 7, 1909, ch. 271, 25 Del. Laws 577; Ga. General Tax Act, no. 260, § 2, ninety-third, 1921 Ga. Laws 38, 65; Act of Jan. 9, 1934, act 26, 1933 Haw. Sess. Laws 35 (Spec. Sess.); Act of July 2, 1931, 1931 Ill. Laws 452; Act of May 7, 1913, ch. 250, 1913 Mich. Pub. Acts 472; MISS. CODE ch. 114, § 3887 (1906) (published in 1906 Miss. Laws 346, 367 (Spec. Sess.)); Act of Feb. 20, 1918, ch. 2, 1918 Mont. Laws 6 (Extraordinary Sess.); Act of Mar. 10, 1919, ch. 197, 1919 N.C. Sess. Laws 397; Act of Mar. 26, 1923, no. 11, § 11, 1923 S.C. Acts 12, 19–20; Act of Feb. 18, 1933, ch. 101, 1933 Wyo. Sess. Laws 117.

158. Act of May 7, 1913, No. 250, 1913 Mich. Pub. Acts 472.

159. Act of May 25, 1911, ch. 195, § 2, 1911 N.Y. Laws 442.

160. Act of June 2, 1927, no. 372, § 9, 1927 Mich. Pub. Acts 887, 891.

> Within thirty days from the passage and approval of this Act, every person within the State of Montana, who owns or has in his possession any fire arms or weapons, shall make a full, true, and complete verified report upon the form hereinafter provided to the sheriff of the County in which such person lives, of all fire arms and weapons which are owned or possessed by him or her or are in his or her control, and on sale or transfer into the possession of any other person such person shall immediately forward to the sheriff of the County in which such person lives the name and address of that purchaser and person into whose possession or control such fire arm or weapon was delivered.

> . . . .For the purpose of this Act a fire arm or weapon shall be deemed to be any revolver, pistol, shot gun, rifle, dirk, dagger, or sword.[161]

The remarkable sweep of this statewide gun registration scheme is exceeded only by its early provenance.

## P. Right To Bear Arms

In all of the nearly one thousand statutes examined in this analysis, only one referred to the right to bear arms—and it managed to misquote the Second Amendment; it is "the right *of* the people" not "the right *to* the people." In 1868, Oregon enacted "An Act To Protect The Owners Of Firearms":

> Whereas, the constitution of the United States, in article second of amendments to the constitution, declares that "the right to the people to keep and bear arms shall not be infringed;" and the constitution for the state of Oregon, in article first, section twenty-seven, declares that "the people shall have the right to bear arms for the defense of themselves and the state;" therefore, . . . .

> Section 1. Every white male citizen of this state above the age of sixteen years, shall be entitled to have, hold, and keep, for his own use and defense, the following firearms, to wit: Either or any one of the following named guns and one revolving pistol: a rifle, shot-gun (double or single barrel), yager [a heavy, muzzle-loading hunting rifle], or musket . . . .

> Section 2. No officer, civil or military, or other person, shall take from or demand of the owner any fire-arms mentioned in this act, except where the services of the owner are also required to keep the peace or defend the state.[162]

Even in this articulation of a specified right to guns, the law extends that right to "any one of the following,"[163] limiting citizens' gun rights both as to numbers of guns to be owned, and to the specified types. Here, indeed, is a "well-regulated right."[164]

## Q. Race And Slavery

The history of firearms regulations pertaining to race and slavery is surprising only in the relatively small number of written state restrictions. Yet that is not to suggest that the antebellum slavery regime was somehow less than uniformly oppressive. Two competing values shaped the relationship between slavery and guns. First, many sought to maintain some discretion regarding the arming of slaves. Early in the country's history, slave owners found it not only useful, but

---

161. Ch. 2, 1918 Mont. Laws 6–9.

162. Act of Oct. 24, 1868, 1868 Or. Laws 18, 18–19.

163. *Id.* at 18.

164. Cornell & DeDino, *supra* note 109.

necessary, to arm slaves in early conflicts with Native Americans. For example, during the bloody Yamasee War (1715–1717) in South Carolina, nearly half of the colonist militia forces deployed were slaves.[165] Later on, the practice of enrolling slaves or indentured servants in local militias was largely abandoned, especially as such forces were used to monitor the slave population.[166] In addition, individual slave owners also often wished to arm their slaves when hunting or traveling.[167] The second, opposing value was the overriding fear of slave rebellions. With so much of the population of the South composed of people in bondage, whites lived in constant fear of violent uprisings.[168] Part of the pathology of control extended to deterring and catching runaway slaves.[169] Finally, gun prohibitions often extended to free blacks as well, although some laws distinguished between those in bondage versus those who were free. For example, Virginia enacted a law in 1806 that permitted "every negro or mulatto" to own guns, as long as they were not slaves.[170] Most of the laws listed here either penalize slaves for gun hunting or gun carrying without their owners' authorization or presence. Others barred slave gun carrying entirely, or barred guns to free blacks or those of mixed race.

## R. Time And Place Restrictions

Probably the most common type of gun law in America today is that which restricts the use of firearms in sensitive areas and times. One would be hard-pressed to find a city, town, or village in the contemporary United States that does not have a law against the discharge of firearms within its jurisdiction. Indeed, such laws existed early in our history, some of which fell into previous categories. Early such laws barred firearms carrying and discharges in named or generic public places, communal gatherings, schools, entertainments, on Sundays, or election day, as well as laws enacted in the late 1700s and 1800s to bar firearms discharges in cemeteries (clearly a source of significant mischief), on or at trains or other public conveyances, near roads, churches, bridges, homes or other buildings, or state parks.[171]

---

165. JERRY COOPER, THE RISE OF THE NATIONAL GUARD 3 (1997); John Shy, *A New Look at the Colonial Militia*, 20 WM. & MARY Q. 175, 175–85 (1963) *reprinted in* A PEOPLE NUMEROUS AND ARMED: REFLECTIONS ON THE MILITARY STRUGGLE FOR AMERICAN INDEPENDENCE 31–38 (rev. ed. 1990).

166. Paul Finkelman, *The Living Constitution and the Second Amendment*, 37 CARDOZO L. REV. 623, 644 (2015).

167. 1 Del. Laws 104; 9 Del. Laws 552 (1843); Act of Oct. 1, 1804, 1804 Ind. Acts 107, 108; Act of Feb. 8, 1798, ch. LIV, 1798 Ky. Acts 105, 106; Act of Nov. 27, 1729, 1715–1755 N.C. Sess. Laws 35, 36.

168. Finkelman, *supra* note 166, at 644–45.

169. For more on early laws and practices regarding free blacks, slaves, and guns, see CORNELL, *supra* note 8, at 28–29; KENNETT & ANDERSON, *supra* note 9, at 49–51; WINKLER, *supra* note 8, at 115–16.

170. WINKLER, *supra* note 8, at 116.

171. Act of Sept. 30, 1867, 1867 Ariz. Sess. Laws 21, 21-22; Act of Oct. 1672, 1672–1714 Conn. Pub. Acts; 3 Del. Laws 326; 10 Del. Laws 9; Act of May 24, 1895, no. 436, 1895 Mich. Local Acts 591, 596; Act of Oct. 14, 1713, 1713 Mass. Acts 291; Act of June 28, 1823, ch. XXXIV, 1823 N.H. Laws 72, 73 Act of Dec. 31, 1665, 1665 N.Y. Laws 205; Act of Feb. 9, 1750, ch. CCCLXXXVIII, 1745-1759 Pa. Laws 208; Act

## S. Crime And Guns

The idea that those who commit crimes with guns should suffer a greater punishment is an old idea, but not one widely found during the period under study here. In 1783, Connecticut enacted a law that called for the death penalty for those who committed a burglary or robbery with a gun because it was seen to "clearly indicate their violent intentions."[172] By comparison, commission of the same crimes without a gun resulted in a whipping and jail time.[173] A 1788 Ohio (Northwest Territory) law increased the penalty and jail time for anyone convicted of breaking and entering with a dangerous weapon, including firearms.[174] Several states provided for enhanced sentences for crimes committed with firearms in the 1800s.[175] In the 1900s, extended sentences were meted out to those who used explosives or guns while committing crimes—sometimes machine guns or pistols were stipulated.[176]

## T. Storage Regulations

The final category of gun regulation pertains to storage regulations. Many early laws imposed storage restrictions on gunpowder, but similar rules sometimes extended to firearms as well. For example, Massachusetts enacted a 1782 law specifying that any loaded firearms "found in any Dwelling House, Out House, Stable, Barn, Store, Ware House, Shop, or other Building . . . shall be liable to be seized" by the "Firewards" of the town. If the storage was found to be improper by a court, the firearms were to "be adjudged forfeit, and be sold at public Auction."[177] Armories and gun houses were subject to regular inspection by the terms of an 1859 Connecticut law.[178] In 1919, Massachusetts passed a law to authorize the issuance of warrants for any complaint alleging that someone was keeping "an unreasonable number of rifles, shot guns, pistols, revolvers or other dangerous weapons, or that an unnecessary quantity of ammunition, is kept

---

of Dec. 24, 1774, ch. DCCCIII, 1759-1776 Pa. Laws 421; Act of Feb. 28, 1740, no. 692, 1731-43 S.C. Acts 162[i], 174; Act of Mar. 13, 1871, ch. VI, 1871 Tex. Spec. Laws 11, 14; Act of Aug. 12, 1870, ch. XLVI, 1870 Tex. Gen. Laws 63; Virginia Act of Mar. 10, 1655, Act XII, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 401, 401-02 (William Waller Henning ed., 1823); Virginia Act of Mar. 2, 1642, Act. XI, *reprinted in* I THE STATUTES AT LARGE; BEING A COLLECTION OF ALL THE LAWS OF VIRGINIA, FROM THE FIRST SESSION OF THE LEGISLATURE 248, 248 (William Waller Henning, ed., 1823); A COLLECTION OF ALL SUCH ACTS OF THE GENERAL ASSEMBLY OF VIRGINIA, OF A PUBLIC AND PERMANENT NATURE, AS ARE NOW IN FORCE 33 (Augustine Davis ed., 1794).

172.  Act of Oct. 9, 1783, 1783 Conn. Pub. Acts 633, 633.

173.  *Id.*

174.  Act of Sept. 6, 1788, ch. 2, 1788 Ohio Laws 6, 8.

175.  Act of Oct. 9, 1783, 1783 Conn. Acts 633; Florida Act of Aug. 6, 1888, chap. 1637; Act of Sept. 6, 1788, ch. II, 1788-1801 Ohio Laws 8; Act of Dec. 2, 1869, 1869 Wash. Sess. Laws 198, 203.

176.  Act of Apr. 3, 1907, ch. 151, 1907 Colo. Sess. Laws 334; Act of June 22, 1911, ch. 98, 1911 Conn. Pub. Acts 1357; Act of May 15, 1905, ch. 5411, 1905 Fla. Laws 87; Act of July 2, 1931, 1931 Ill. Laws 452; Act of Mar. 8, 1929, ch. 55, 1929 Ind. Acts 139.

177.  1782 Mass. Acts 119, ch. 46, § 1.

178.  Act of June 24, 1859, ch. LXXXII, § 7, 1859 Conn. Pub. Acts 61, 62.

or concealed for any unlawful purpose in a particular house or place . . . ."[179] If a court concluded that the possession was not justified, it could order the weapons and ammunition forfeited.[180]

<center>V</center>

## CONCLUSION: FIREARMS LAWS ARE AS AMERICAN AS GUN OWNERSHIP

Early gun laws were comprehensive, ubiquitous, and extensive. Taken together, they covered every conceivable dimension of gun acquisition, sale, possession, transport, and use, including deprivation of use through outright confiscation—not merely for the commission of serious crimes, but even for violation of hunting regulations. Given that the dark fear of contemporary gun rights enthusiasts is government confiscation of firearms, it bears noting that this survey of early gun laws included measures that invoked gun confiscation for a wide range of reasons or offenses including: military necessity; failure to swear a loyalty oath to the government; improper storage of firearms; improper possession of weapons legal to own under certain circumstances, including, but not limited to, possession of specific, named types of prohibited firearms—especially handguns and machine guns; violations of certain hunting laws; and failure to pay a gun tax.

Another category of gun regulation, remarkable in its own right, is the prohibition of semi-automatic weapons in up to ten states, summarized in Table 2. This important statutory prohibition, unknown until now, also has contemporary reverberations as precedent for the assault weapons ban debates in the 1990s and 2000s.[181]

In all of this lawmaking, there is, with the rarest exceptions, no suggestion that these laws infringed on anything related to any "right to bear arms"—remembering that the Second Amendment did not apply to the states until the Supreme Court so extended it in 2010[182]—be it the U.S. Constitution's Second Amendment or the various state constitutions' right-to-bear-arms-type provisions. Many state laws predated the modern state and federal constitutions, but there is no indication that subsequent state laws were somehow inhibited or stymied after the adoption of right to bear arms provisions, aside from facing occasional court challenges.[183] Many of these laws did, however, include two types of exemptions: those related to militia or military activities; and instances when individuals used firearms for justifiable personal self-defense. As Saul Cornell has noted, "the common-law right of individual self-defense"[184] was not only well

---

179.  Act of May 22, 1919, ch. 179, § 1, 1919 Mass. Acts 139, 139.

180.  *Id.*

181.  *See* SPITZER, *supra* note 26, at ch. 3 (analyzing the contemporary dispute over regulating semi-automatic assault weapons).

182.  McDonald v. City of Chicago, 561 U.S. 742 (2010).

183.  SPITZER, *supra* note 55, at 91, 91–136.

184.  CORNELL, *supra* note 8, at 21.

established long before codification of the right to bear arms in American constitutions; it existed independent of that right.[185]

Taken together, these sixteen—sometimes overlapping—categories of gun laws span a wide range. Some encompass anachronistic practices—like slavery, dueling, and old-style militias—that nevertheless reflect the scope of government power over the kinds of persons who could carry guns, the circumstances of gun carrying, criminal gun behavior, and military or defense exigencies. Others reflect the most basic efforts to improve safety, including laws that criminalized menacing behavior with guns (such as brandishing), the firing of weapons in populated areas, hunting laws, some of the laws related to manufacturing and inspection pertaining to firearms, laws restricting firearms access to minors, criminals, and those mentally incompetent, laws restricting firearms in sensitive areas or places, sentence enhancement laws, and storage laws.

Finally, some of the gun law categories represented more sophisticated, ambitious, or seemingly modern approaches to gun regulation. Dangerous weapons barred outright by laws enacted in the 1920s and early 1930s included automatic weapons like submachine guns. Congress moved to restrict access to such weapons nationwide in 1934.[186] Yet state laws also barred silencers, air guns, trap guns, and even semi-automatic weapons and the early equivalent of large capacity bullet magazines. While standards varied, some states barred weapons or mechanisms that could fire more than five, seven, eight, sixteen, or eighteen bullets without reloading. The concerns then were akin to those that motivated Congress to enact the Assault Weapons ban of 1994[187]: excessive firepower in the hands of civilians, and the related question of public safety. Beyond these laws are those that are essentially off the agenda in the contemporary political environment: registration and licensing laws, and significant, categorical gun bans.

Taking most of these gun law categories together, one overarching concern straddles them: the conviction that handguns represented a uniquely dangerous threat to societal interpersonal safety. Even though these laws were enacted long before the government or private researchers began to collect systematic data on gun violence, the carrying of pistols was seen as an activity largely confined to those who contemplated or committed crimes or other forms of interpersonal violence, and that therefore pistol carrying should be subject to stricter rules and standards, including in many instances prohibition. While gun control proponents continue to make the same arguments in modern America, those arguments carried more weight in the America of the 1600s through the early 1900s than they do today. The relationship between citizens and their governments with

---

185. Cornell, *supra* note 56, at 1703, 1707; *see also* SPITZER, *supra* note 26, at ch. 4; Nathan Kozuskanich, *Originalism in a Digital Age*, *in* THE SECOND AMENDMENT ON TRIAL, *supra* note 8, at 289–309.

186. National Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (codified as amended at I.R.C. §§ 5801–5872 (2012)).

187. SPITZER, *supra* note 55, at 149–55.

respect to guns contemplates a regulatory regime that bears little resemblance to the modern gun rights narrative of the past. Yes, there was lawlessness, rebellion, and rugged individualism. But the context was that of a governing framework where the state confined and defined lawful use of force by individuals.

Gun laws are as old as the country; more to the point, the *idea* of gun laws and regulation is as old as the country. The prevailing gun law movement in America in the last three decades toward the relaxing of gun restrictions—for example, the reduction of gun sale inspections, the shielding of manufacturers and dealers from criminal and civil liability, the rise of unregulated internet gun and ammunition sales—as well as the spread of concealed carry laws, the open carry movement, and most recently of "stand your ground" laws are not a return to the past. They are a refutation of America's past, and a determined march away from America's gun regulation tradition. And these changes have nothing to do with improving safety or security in society, but everything to do with politics.

# LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS

25th CONGRESS,
2d SESSION.

# H. R. 8.

MARCH 5, 1838.

Read the first time.

Mr. MORGAN submitted for the consideration of the House of Representatives the following joint resolution:

# RESOLUTION

Proposing an amendment to the constitution of the United States.

1    *Resolved by the Senate and House of Representatives*
2    *of the United States of America in Congress assembled,* (two-
3    thirds of both Houses concurring,) That the following amend-
4    ment to the constitution of the United States be proposed to
5    the Legislatures of the several States; which, when ratified
6    by the Legislatures of three-fourths of the States, shall be
7    valid, to all intents and purposes, as part of the constitution:
8        Congress shall have power to provide by law that no
9    person shall be capable of holding or being elected to any
10   post of profit or emolument, civil or military, legislative, ex-
11   ecutive, or judicial, under the Government of these United
12   States, who shall, after the passage of such law, fight a duel,
13   or send or accept a challenge to fight a duel, the probable
14   issue of which may be the death of the challenger or chal-
15   lenged, or who shall be a second to either party, or shall in
16   any way or manner aid or assist in such duel, or shall be
17   knowingly the bearer of such challenge or acceptance; but

2

18  no person shall be so disqualified by reason of his having,

19  prior to the passage of such law, fought such duel, or sent or

20  accepted such challenge, or been second in such duel, or

21  bearer of such challenge or acceptance.

### REPORT OF FIREARMS COMMITTEE

*To the National Conference of Commissioners on Uniform State Laws:*

The report of this committee at Buffalo last year showed that following the publication of the Uniform Firearms Act as approved by the Conference and the Bar Association at Denver in July, 1926, some objections raised by the Police Commissioner of New York City through Governor Whitman induced the Executive Committee of the Conference in January, 1927, to recommend to the Conference the withholding of the act from presentation to the states, and the recommitment of the matter to the Firearms Committee for further study and report. (Handbook, 1927, p. 866.) In view of this action of the Executive Committee of the Conference the Executive Committee of the American Bar Association took under reconsideration the approval of the act, this action being approved at the Buffalo meeting. (Bar Assn. Reports, No. 52, 1927, p. 223.)

The Firearms Committee reported at the Buffalo meeting, outlining its efforts to cooperate with the National Crime Commission, which through a subcommittee had drafted and presented to the legislatures the so-called Crime Commission Bill on the subject of firearms regulation. The text of this was printed in display with the text of the Uniform Act. It was pointed out that the Crimes Commission had taken the Uniform Act as the basis of its work, adopting a great deal of it, but with the addition of some new matters, and the change of some of the principles of the Uniform Act. (Handbook, 1927, pp. 866-914.) These matters were also adverted to by President Young in his opening address. (*Ibid.*, p. 453.) In accordance with the recommendations of the committee the Conference voted as follows (*Ibid.*, pp. 267-268, 914):

419

"1. That in accordance with action already taken by the Executive Committee the Uniform Firearms Act be withheld from presentation to the legislatures until further action of the Conference.

"2. That the committee on the Uniform Firearms Act be continued for the purpose of giving further consideration to the objections thereto, for further study of other proposed legislation, for further conferences with the committee of the National Crime Commission, and for further report as to whether or not it is desirable that the act be amended or retained in its present form, or as to what definite disposition should be made thereof."

With the Uniform Act thus back for consideration various meetings have been held during the year between members of the undersigned committee and members of the subcommittee of the National Crime Commission. The final joint meetings were in Washington on April 26-27, 1928, at which were present on behalf of your committee Judge Ailshie and Messrs. O'Connell and Imlay, and on behalf of the subcommittee of the Crime Commission General J. Weston Allen and Mr. J. E. Baum, of the American Bankers Association.

As a result of these meetings and the separate attention given to these matters by your own committee, both in personal conference in Washington, and in an exchange of views by letter, your committee has formulated a proposed revision, printed herewith, of the Uniform Act, incorporating some of the new matter of the Crime Commission Bill, but retaining the basic features of the Uniform Act. In notes accompanying each section, which should be studied in connection with the parallel references in the two acts as printed in last year's report (Handbook, 1927, pp. 878-889), an attempt has been made to indicate the changes. Some of the matters of major importance may be summarized as follows:

1. The revision incorporates the new matter of the Crime Commission Bill on machine guns. Most of the firearms legislation passed in the current year has been on the subject of machine guns, e. g., General Laws of California of 1927, Ch. 552; Acts and Resolves of Mass., 1927, Ch. 326; Mich. Public Acts of 1927, No. 372; N. J. Public Laws 1927, Ch. 95, p. 180. There has been recent legislation on the subject also in Iowa.

420

2. The revision retains the principle of forbidding the carrying of concealed weapons with strict regulations for identification, but does not require a license to purchase as does the Crime Commission Bill. This constitutes the basic difference between the two acts. Upon this point your committee and the subcommittee of the Crime Commission have been unable to agree.

3. The revision retains the method of the Uniform Act in providing a general penalty section (S. 19) rather than, as in the other act, placing penalty clauses within the various sections.

4. The revision, like the original act, does not fix mandatory sentences, the matter of sentences being left open for the exercise of discretion by the courts.

Upon the basic difference between the two acts mentioned above your committee has bestowed much careful thought. The form of regulation contained in the Uniform Act was adopted by the Conference advisedly. That form is consistent with the forms of regulation which have always obtained and now obtain in the states generally, as the analysis of the subject in the second report of this committee shows. (Handbook, 1925, pp. 854-898.) The system of license to purchase has been for many years the law of New York. It was adopted in Michigan in 1925, being reenacted in the 1927 act mentioned above; it was also adopted in Massachusetts in 1926. (Acts of 1926, Ch. 395.) Beyond those states it has not gone, so far as this committee is advised.

This committee reaffirms the position heretofore taken on this subject, that such a provision is not only out of line with legislative precedents and experience, but is unenforceable. It would make criminals out of law-abiding citizens, and would not be obeyed by the lawless.

A bill drawn very much along the lines of this proposed revision, was introduced into the United States Senate April 16, 1928, by Senator Capper (S. 4086, 70th Cong.) as a local law for the District of Columbia: the same bill was introduced into the House of Representatives a few days later by Representative Frederick J. Zihlman of Maryland, a member of the District of Columbia Committee (No. 13211). The bills are now under consideration before the respective Committees on the District of Columbia of the two houses.

421

Your committee presents this revision for the consideration of the Conference and recommends its adoption as an act which preserves the results achieved in the work heretofore done on the Uniform Act, and incorporates valuable new material from the Crime Commission Act.

<div align="center">Respectfully submitted,</div>

> JOSEPH F. O'CONNELL, *Chairman*,
> JAMES F. AILSHIE,
> CHARLES V. IMLAY,
> J. O. SETH,
> L. C. SPIETH,
> D. A. McDOUGAL,
> GEORGE B. MARTIN,
> HARRY L. CRAM.

## A UNIFORM ACT TO REGULATE THE SALE AND POSSESSION OF FIREARMS

AN ACT REGULATING THE SALE, TRANSFER AND POSSESSION OF CERTAIN FIREARMS, PRESCRIBING PENALTIES AND RULES OF EVIDENCE, AND TO MAKE UNIFORM THE LAW WITH REFERENCE THERETO

1  SECTION 1. (*Definitions*.) "Pistol," as used in this act,
2  means any firearm with a barrel less than twelve inches in
3  length.

4  "Machine gun," as used in this act, means any firearm
5  which shoots automatically and any firearm which shoots
6  more than twelve shots semi-automatically without reloading.

7  "Person," as used in this act, includes firm, association or
8  corporation.

9  "Sell" and "purchase" and the various derivatives of
10 such words, as used in this act, shall be construed to include
11 letting on hire, giving, lending, borrowing, and otherwise
12 transferring.

13 "Crime of violence," as used in this act, means any of the
14 following crimes or an attempt to commit any of the same,
15 namely: Murder, manslaughter, rape, mayhem, assault to do
16 great bodily harm, robbery, larceny, burglary, and house-
17 breaking.

<div align="center">422</div>

*Note:* The words "or revolver" are omitted in the first definition and at other places where they occur in the Uniform Act, as in the Crime Commission Act, for greater simplicity.

The new definition of "machine gun" is substantially that of the Crime Commission Act.

The new definitions of "person" and "sell and purchase" are substantially those of the Crime Commission Act.

1    SECTION 2.  (*Committing Crime When Armed.*)  If any
2  person shall commit a crime of violence when armed with or
3  having readily available any pistol or other firearm, he may
4  in addition to the punishment provided for the crime be
5  punished also as provided by this act.

*Note:* The words "or having readily available" and "or other firearm" are added from the Crime Commission Act.

1    SECTION 3.  (*Being Armed Prima Facie Evidence of Intent.*)  In the trial of a person for committing a crime of
2  *tent.*)  In the trial of a person for committing a crime of
3  violence the fact that he was armed or had readily available
4  a pistol, and had no license to carry the same, or was armed
5  with or had readily available any other firearm having a total
6  length of less than twenty-six inches, or any machine gun,
7  shall be *prima facie* evidence of his intention to commit such
8  crime of violence.

*Note:* The words "or had readily available" are added from the Crime Commission Act; the words "or was armed with, etc.," are adopted from that act, to include firearms longer than twelve inches capable of being concealed on the person and machine guns.

1    SECTION 4.  (*Persons Forbidden to Possess Certain Fire-*
2  *arms.*)  No person who has been convicted in this state or
3  elsewhere of a crime of violence shall own a pistol or have one
4  in his possession or under his control.

*Note:* This section is substantially the same as that of the original Uniform Act and of the Crime Commission Act, except that the latter specifies a punishment which in this proposed revision as in the original Uniform Act is left for a general section.

1    SECTION 5.  (*Carrying Pistol.*)  No person shall carry a
2  pistol in any vehicle or concealed on or about his person, ex-
3  cept in his dwelling house or place of business or on other

423

4   land possessed by him, without a license therefor issued as
5   hereinafter provided.

*Note:* This section is the same as that of the original Uniform Act
except that it incorporates the language of the corresponding Section 11
of the Crime Commission Act in making the prohibition against carrying
pistols in vehicles absolute.

1   SECTION 6. (*Exceptions.*) The provisions of the preced-
2   ing section shall not apply to marshals, sheriffs, prison or
3   jail wardens or their deputies, policemen or other duly ap-
4   pointed law-enforcement officers, or to members of the army,
5   navy, or marine corps of the United States or of the national
6   guard or organized reserves when on duty, or to the regu-
7   larly enrolled members of any organization duly authorized
8   to purchase or receive such weapons from the United States
9   or from this state, provided such members are at or are going
10  to or from their places of assembly or target practice, or to
11  officers or employees of the United States duly authorized to
12  carry a concealed pistol, or to any person engaged in the busi-
13  ness of manufacturing, repairing, or dealing in firearms or
14  the agent or representative of any such person having in his
15  possession, using, or carrying a pistol in the usual or ordinary
16  course of such business, or to any person while carrying a
17  pistol unloaded and in a secure wrapper from the place of
18  purchase to his home or place of business or to a place of
19  repair or back to his home or place of business or in moving
20  goods from one place of abode or business to another.

*Note:* This section remains the same as that of the original Uniform
Act with a few modifications introduced from the corresponding Section 12
of the Crime Commission Act.

1   SECTION 7. (*Issue of Licenses to Carry.*) [The justice
2   of a court of record, the chief of police of a city or town, and
3   the sheriff of a county or the persons authorized by any of
4   them] shall, upon the application of any person having a
5   bona fide residence or place of business within the jurisdic-
6   tion of said licensing authority or of any person having a
7   bona fide residence or place of business within the United
8   States and a license to carry a pistol concealed upon his per-
9   son issued by the lawful authorities of any state or subdivi-

424

10  sion of the United States, issue a license to such person to
11  carry a pistol within this state for not more than one year
12  from date of issue, if it appears that the applicant has good
13  reason to fear injury to his person or property or has any
14  other proper reason for carrying a pistol and that he is a
15  suitable person to be so licensed. The license shall be in tripli-
16  cate in form to be prescribed by the [Secretary of State] and
17  shall bear the name, address, description, photograph, and
18  signature of the licensee and the reason given for desiring a
19  license. The original thereof shall be delivered to the licensee,
20  the duplicate shall within seven days be sent by registered
21  mail to the [Secretary of State] and the triplicate shall be
22  preserved for six years by the authority issuing said license.

*Note:* This section remains substantially as in the original Uniform Act
and as in Section 10 of the Crime Commission Act.

1  SECTION 8.  (*Selling to Minors and Others.*)  No person
2  shall sell any pistol to a person who he has reasonable cause
3  to believe is not of sound mind, or is a drug addict, or is a
4  person who has been convicted in the District of Columbia or
5  elsewhere of a crime of violence, or, except when the relation
6  of parent and child or guardian and ward exists, is under
7  the age of eighteen years.

*Note:* This section has been expanded to include in addition to infants
the other disqualified persons named in the corresponding Section 7 of the
Crime Commission Act.

1  SECTION 9.  (*Transfers Regulated.*)  No seller shall de-
2  liver a pistol to the purchaser thereof until forty-eight hours
3  shall have elapsed from the time of the application for the
4  purchase thereof, and, when delivered, said pistol shall be
5  securely wrapped and shall be unloaded. At the time of ap-
6  plying for the purchase of a pistol the purchaser shall sign
7  in triplicate and deliver to the seller a statement containing
8  his full name, address, occupation, color, place of birth, the
9  date and hour of application, the caliber, make, model, and
10  manufacturer's number of the pistol to be purchased and a
11  statement that he has never been convicted in this state or
12  elsewhere of a crime of violence. The seller shall within six

425

13  hours after such application sign and attach his address and
14  forward by registered mail one copy of such statement to the
15  chief of police of the city or town or the sheriff of the county
16  of which the seller is a resident; the duplicate the seller shall
17  within seven days send with his signature and address to the
18  [Secretary of State]; the triplicate he shall retain for six
19  years. This section shall not apply to sales at wholesale.

*Note:* This section has been modified to require forty-eight instead of
twenty-four hours to elapse from the time of application till the time of
delivery of a weapon. A provision is also inserted for a more immediate
notice to the police.

1   SECTION 10.  (*Dealers to be Licensed.*)  No retail dealer
2   shall sell or expose for sale or have in his possession with in-
3   tent to sell any pistol without being licensed as hereinafter
4.  provided.

*Note:* This section remains in substance the same as in the original
Uniform Act except that with the new matters of definition adopted from
the Crime Commission Act it conforms in language to Section 6 thereof.

1   SECTION 11.  (*Dealers' Licenses, by Whom Granted and
2   Conditions Thereof.*)  The duly constituted licensing authori-
3   ties of any city, town, or political subdivision of this state
4   may grant licenses in form prescribed by the [Secretary of
5   State] effective for not more than one year from date of issue,
6   permitting the licensee to sell pistols at retail within this
7   state subject to the following conditions in addition to those
8   specified in Section 9 hereof, for breach of any of which the
9   license shall be subject to forfeiture and the licensee subject
10  to punishment as provided in this act:
11  1. The business shall be carried on only in the building
12  designated in the license.
13  2. The license or a copy thereof, certified by the issuing
14  authority, shall be displayed on the premises where it can
15  easily be read.
16  3. No pistol shall be sold (a) if the seller has reasonable
17  cause to believe that the purchaser is not of sound mind or
18  is a drug addict or has been convicted in this state or else-
19  where of a crime of violence or is under the age of eighteen

426

20 years, or (b) unless the purchaser is personally known to
21 the seller or shall present clear evidence of his identity.

22    4. A true record in triplicate shall be made of every pistol
23 sold, said record to be made in a book kept for the purpose,
24 the form of which may be prescribed by the [Secretary of
25 State] and shall be personally signed by the purchaser and
26 by the person effecting the sale, each in the presence of the
27 other, and shall contain the date of sale, the caliber, make,
28 model, and manufacturer's number of the weapon, the name,
29 address, occupation, color, and place of birth of the purchaser,
30 and a statement signed by the purchaser that he has never
31 been convicted in this state or elsewhere of a crime of vio-
32 lence. One copy of said record shall within six hours be sent
33 by registered mail to the chief of police of the city or town
34 or the sheriff of the county of which the dealer is a resident;
35 the duplicate the dealer shall within seven days send to the
36 [Secretary of State]; the triplicate the dealer shall retain for
37 six years.

38    5. No pistol or imitation thereof or placard advertising the
39 sale thereof shall be displayed in any part of said premises
40 where it can readily be seen from the outside.

41    No license to sell at retail shall be granted to anyone except
42 as provided in this section.

*Note:* This section remains substantially the same as the original
Section 11 and Section 6 of the Crime Commission Act, except that it
incorporates, like Section 9 hereof, a provision for a more immediate notice
by the dealer to the police.

1    SECTION 12.    (*False Information Forbidden.*) No person
2 shall, in purchasing a pistol or in applying for a license to
3 carry the same, give false information or offer false evidence
4 of his identity.

*Note:* This section remains practically the same as the same section in
the original Uniform Act and as Section 13 of the Crime Commission Act,
except that the latter makes special mention therein of 'a penalty.

1    SECTION 13.    (*Alteration of Identifying Marks Pro-*
2 *hibited.*) No person shall change, alter, remove, or obliterate
3 the name of the maker, model, manufacturer's number, or other
4 mark of identification on any pistol. Possession of any pistol

427

5  upon which any such mark shall have been changed, altered,
6  removed, or obliterated shall be *prima facie* evidence that the
7  possessor has changed, altered, removed, or obliterated the
8.  same.

*Note:* This section remains the same as in the original Uniform Act and in the corresponding Section 18 of the Crime Commission Act.

1    SECTION 14. (*Existing Licenses Revoked.*) All licenses
2  heretofore issued in this state permitting the carrying of
3  pistols shall expire at midnight of the ——— day of ———,
4  19—.

*Note:* This section remains the same as in the original Uniform Act and in Section 23 of the other act.

1    SECTION 15. (*Exceptions.*) This act shall not apply to
2  antique pistols unsuitable for use as firearms and possessed
3  as curiosities or ornaments.

*Note:* This section is the same in substance as in the original act, but it adopts from the corresponding Section 22 of the other act the words "and possessed as curiosities or ornaments."

1    SECTION 16. (*Pawning of Pistols Prohibited.*) No per-
2  son shall make any loan secured by mortgage, deposit, or
3  pledge of a pistol.

*Note:* This is a new section, adopting the substance of Section 8 of the Crime Commission Act.

1    SECTION 17. (*Machine Guns.*) No person shall possess
2  any machine gun. This section shall not apply to any foreign
3  government nor to members of the army, navy, or marine
4  corps of the United States, or of the national guard or organ-
5  ized reserves when on duty, nor to the Post Office Department
6  or its employees when on duty, nor to duly appointed law-
7  enforcement officers, nor to banking institutions established
8  under the laws of the United States, nor to public carriers
9  who are engaged in the business of transporting mail, money,
10  securities, or other valuables.

*Note:* This is a new section, incorporating the provisions of Sections 14 and 15 of the Crime Commission Act.

1    SECTION 18. (*Act Supersedes Local Laws.*) The provi-
2  sions of this act shall be effective and controlling throughout

428

3  this state, notwithstanding the provisions of any local law
4  or ordinance.

*Note:* This section remains the same as Section 16 of the original act and is the same in substance as Section 26 of the Crime Commission Act.

1  SECTION 19.  (*Penalties.*)  Any violation of any provi-
2  sion of this act shall constitute an offense punishable by a
3  fine of not more than [$——] or imprisonment for not more
4  than [———] or both, or by imprisonment in the peniten-
5  tiary for not less than [———] nor more than [———].

1  SECTION 20.  (*Constitutionality.*)  If any part of this act
2  is for any reason declared void, such invalidity shall not af-
3  fect the validity of the remaining portion of this act.

1  SECTION 21.  (*Short Title.*)  This act may be cited as
2  " Uniform Firearms Act."

1  SECTION 22.  (*Effective Date.*)  This act shall take effect
2  on the —— day of ———, 19—.

1  SECTION 23.  (*Certain Acts Repealed.*)  All laws or parts
2  of laws inconsistent herewith are hereby repealed.

*Note:* The above sections remain the same as Sections 17-21 in the original Uniform Act. Section 25 of the Crime Commission Act adopts Section 20. Section 24 of that act has a provision for a general penalty where none is otherwise specified, but as penalties are generally specified throughout the Crime Commission Act, Section 24 thereof differs from Section 19 hereof, which declares penalties for the whole act. This method was adopted advisedly by the Conference, as a more scientific way to deal with the subject of penalties.

429




DATE DOWNLOADED: Thu Oct 20 00:10:46 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
9488 1 (1932)   To control sale of firearms in District of Columbia

ALWD 7th ed.
, To control sale of firearms in District of Columbia, 1 (1931).

Chicago 17th ed.
"To control sale of firearms in District of Columbia," U.S. Congressional Serial Set
(1931): 1-12

McGill Guide 9th ed.
"To control sale of firearms in District of Columbia" [1931] 1.

AGLC 4th ed.
'To control sale of firearms in District of Columbia' [1931] U.S. Congressional
Serial Set 1

MLA 9th ed.
"To control sale of firearms in District of Columbia." U.S. Congressional Serial Set,
, 1931, pp. 1-12. HeinOnline.

OSCOLA 4th ed.
'To control sale of firearms in District of Columbia' (1931) 1

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from  uncorrected OCR text.

# Calendar No. 608

| 72D CONGRESS<br>*1st Session* | SENATE | REPORT<br>No. 575 |
| --- | --- | --- |

## TO CONTROL SALE OF FIREARMS IN THE DISTRICT OF COLUMBIA

---

APRIL 19, 1932.—Ordered to be printed

---

Mr. CAPPER, from the Committee on the District of Columbia, submitted the following

## REPORT

[To accompany H. R. 8754]

The Committee on the District of Columbia, to whom was referred the bill (H. R. 8754) to control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes, having considered the same, reports favorably thereon, and recommends that the bill do pass, with the following amendments:

On page 1, line 5, after the word "length", strike out the remainder of the paragraph and insert a period.

On page 1, after line 7, insert the following:

"'Sawed-off shotgun', as used in this act, means any shotgun with a barrel less than twenty inches in length."

On page 6, line 13, after the word "gun", insert a comma and the words "sawed-off shotgun".

On page 6, line 23, after the word "gun", insert the words "sawed-off shotgun".

On page 7, line 2, after the word "gun", insert the words "sawed-off shotgun".

On page 7, line 9, after the words "guns", insert the words "sawed-off shotguns".

On page 7, line 25, after the word "gun", insert a comma and the words "sawed-off shotgun".

On page 8, line 7, after the word "pistols", strike out the word "and", and insert a comma; in the same line, after the word "guns", insert the words "and sawed-off shotguns".

On page 8, line 13, after the word "gun", insert the words "sawed-off shotgun".

On page 9, line 11, after the word "gun", insert a comma and the words "sawed-off shotgun".

2    TO CONTROL SALE OF FIREARMS IN DISTRICT OF COLUMBIA

On page 9, line 17, after the word "pistol", strike out the word "or" and insert a comma; in the same line, after the word "gun", strike out the period, insert a comma and the words "or sawed-off shotgun" and a period.

On page 9, line 18, after the word "pistol", strike out the word "or" and insert a comma; in the same line, after the word "gun", insert a comma and the words "or sawed-off shotgun".

On page 10, line 12, after the word "guns", insert a comma and the words "sawed-off shotguns".

On page 10, line 13, after the word "by", strike out the words "any foreign government" and the comma immediately following.

### PURPOSE OF THE BILL

The intent of the proposed legislation is to provide a fair and effective control of the traffic in firearms in the District of Columbia.

The bill embraces a comprehensive program of such control, with six principal features. These are:

1. Regulation of the sale of pistols to the public, and of firearms and other weapons to law-enforcement officers, Government agencies, etc.

2. Licensing of dealers in firearms.

3. Licensing of persons to carry pistols.

4. Prohibiting possession of weapons for which there is no legitimate use.

5. Prohibiting possession of pistols by persons previously convicted of a crime of violence.

6. Imposition of penalties for commission of a crime while armed, in addition to the penalty for the crime.

### NEED FOR LEGISLATION

The need for firearms legislation has been recognized by public officials and the people of the District of Columbia for many years.

All types of deadly weapons are openly sold in the District with virtually no restrictions. The existing law regulating sale of dangerous weapons requires merely that a purchaser shall, at the time of purchase, give his name and address to the dealer, who communicates this information to the police, after the sale. The law is ineffective and invites evasion.

The police department has informed the committee that firearms were used in 686 crimes of violence in the 5-year period ending June 30, 1931.

The bill hereby reported is based on the uniform firearms act drafted by the national conference of commissioners on uniform State laws and approved by the American Bar Association, after many years' study of firearms legislation.

The bill has been studied and favorably reported on by the District Commissioners and numerous civic organizations. The committee knows of no objection to its enactment on the part of any Washingtonian.

### CONTROL OF PISTOL SALES

Under the terms of the bill, the prospective purchaser of a pistol is required to sign in duplicate and give to the dealer a statement

containing his name, address, occupation, and other pertinent information. The dealer is to give one copy of this application to the police within six hours. The sale can not be consummated, however, until 48 hours after the time of application.

The provision allows ample time for investigation of the applicant. It would prevent also the hasty and impulsive purchase of firearms for whatever purpose.

### POSSESSION OF REVOLVERS

The right of an individual to possess a pistol in his home, or on land belonging to him, is not distrubed by the bill.

The superintendent of police is empowered by the bill to issue licenses, valid for one year, to carry revolvers.

### PENALTIES FOR COMMITTING CRIMES OF VIOLENCE WHEN ARMED

The bill proposes the imposition of penalties for committing crimes of violence when armed. These penalties would be in addition to those already provided by law for such criminal offenses, and range from a maximum of five years' imprisonment for a first conviction to a maximum of 30 years for a fourth or subsequent conviction.

### VARIOUS RESTRICTIONS IMPOSED BY BILL

The bill prohibits—

Possession or ownership of a pistol by any person previously convicted of a crime of violence;

Unlicensed carrying of concealed weapons;

Sale of a pistol by any person in the District "to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence or, except when the relation of parent and child or guardian and ward exists, is under the age of 18 years;"

Open display by dealers of pistols or placards advertising the sale of pistols;

Giving of false information or offering false evidence of identity in purchase of firearms or in applying for a license to carry a pistol;

Alteration or obliteration of identifying marks on firearms;

Possession of any machine gun, sawed-off shotgun, blackjack, slung shot, sand club, sandbag, metal knuckles or any device for silencing or muffling the noise of firing any firearm.

### OTHER PROVISIONS

Exceptions are made by the bill to provide for the purchase and possession of firearms and other weapons by Government agencies, military organizations, persons entrusted with the care of valuables, law enforcement officers generally, licensed dealers, etc.

The procedure for licensing of dealers, and the keeping of stock and sale records by dealers, are provided also.

4    TO CONTROL SALE OF FIREARMS IN DISTRICT OF COLUMBIA

### AMENDMENTS

The committee gave extended consideration to a Senate bill identical to that hereby reported, differing only in one particular.

This exception lies in amendments made on the floor of the House so as to include sawed-off shotguns in the restrictive provisions of the act. The committee agrees that such weapons have no legitimate private use in the District of Columbia, and should not be sold to or possessed by the general public.

The committee therefore has amended the bill to define the term "sawed-off shotgun," and has inserted this term in a number of places throughout the bill to carry out the full intent of the House amendments.

### INDORSEMENTS

The committee held a public hearing on the proposed legislation, as embodied in the Senate bill (S. 2751), and discussed the House bill subsequent to its reference to the committee. No opposition to the bill was manifested at the hearing.

The enactment of this plan of firearms control is urged by the District Commissioners, the Federation of Citizens' Associations, the District of Columbia Department of the American Legion, the District Federation of Women's Clubs, the Washington Board of Trade, the National Rifle Association, the National Anti-Weapon Association, the Federal Bar Association, and numerous other clubs and associations.

There are appended hereto, as part of this report, the commissioners' report on the Senate bill, and sundry communications of interested organizations.

---

COMMISSIONERS OF THE DISTRICT OF COLUMBIA,
*Washington, January 26, 1932.*

Hon. ARTHUR CAPPER,
    *Chairman Committee on the District of Columbia,*
        *United States Senate, Washington, D. C.*

DEAR SIR: The Commissioners of the District of Columbia have the honor to recommend favorable action upon Senate bill 2751, Seventy-second Congress, first session, entitled "A bill to control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes," which you referred to them at your instance for report touching the merits of the bill and the propriety of its passage.

The bill has been carefully reviewed by representatives of the Washington Board of Trade, of the police department, and of the corporation counsel for the District, as well as by the commissioners, and all agree that its enactment would serve the need felt for the control of the possession, sale, transfer, and use of pistols and other dangerous weapons in the District.

Very truly yours,
                    L. H. REICHELDERFER,
            *President Board of Commissioners of the District of Columbia.*

---

FEDERATION OF CITIZENS' ASSOCIATIONS OF THE DISTRICT OF COLUMBIA,
                *Washington, D. C., February 6, 1932.*

Hon. ARTHUR CAPPER,
    *Chairman Committee on the District of Columbia,*
            *Senate Office Building, Washington, D. C.*

DEAR SENATOR CAPPER: At its meeting January 30, the Federation adopted a report of its committee on law and legislation approving Senate bill 2751 to

control the possession, sale, transfer, and use of pistols, etc., concluding with the following language:

"We not only favor the pending bill, but feel that it could be broadened with propriety to impose similar restrictions upon the sale of firearms generally regardless of barrel length."

Respectfully,

H. C. PHILLIPS,
*Corresponding Secretary.*

---

THE AMERICAN LEGION,
DEPARTMENT OF THE DISTRICT OF COLUMBIA,
*Washington, D C., February 6, 1932.*

Hon. ARTHUR CAPPER,
*Washington, D. C.*

SIR: Inclosed herewith is a copy of a resolution adopted by the American Legion, Department of the District of Columbia, at its last executive committee meeting held on Thursday, January 28, 1932.

Respectfully,

C. W. BROWNING,
*Department Adjutant.*

Whereas the safety of peaceful citizens of the District of Columbia demands that some restriction be placed upon the sale of firearms in the District of Columbia: Therefore be it

*Resolved,* That the executive committee of the Department of the District of Columbia, American Legion, approves the Capper firearms control bill, S. 2751, introduced in the Senate by Senator Capper, and commends its enactment by the Congress of the United States.

---

WASHINGTON BOARD OF TRADE,
*Washington, D. C., December 30, 1931.*

Senator ARTHUR CAPPER,
*Washington, D. C.*

DEAR SENATOR CAPPER: This is to notify you of the passage of the inclosed proposed firearms bill, unanimously by the public order committee and executive committee of the Washington Board of Trade.

Very truly yours,

ODELL S. SMITH,
*Chairman Public Order Committee.*

---

*Resolved,* That the District of Columbia Federation of Women's Clubs indorses S. 2751, introduced by Senator Capper to control the possession, sale, transfer and use of pistols and other dangerous weapons in the District of Columbia: And be it further

*Resolved,* That copies of this resolution be sent to the Senate and House Committees on the District of Columbia and to the Commissioners of the District of Columbia.

Presented to the District of Columbia Federation of Women's Clubs by the department of legislation.

EDITH L. PHELPS,
*Chairman of Legislation, Federation of Women's Clubs.*

Adopted January 25, 1932.

---

NATIONAL RIFLE ASSOCIATION OF AMERICA,
*Washington, D. C., April 18, 1932.*

Senator ARTHUR CAPPER,
*Washington D. C.*

MY DEAR SENATOR CAPPER: This letter is to inform you that the National Rifle Association is in thorough accord with the provisions of Senate bill 2751 and H. R. 8754. These bills are based upon what is known as the uniform firearms act, applicable to the District of Columbia. It is our earnest hope that your committee will speedily report the bill favorably to the Senate as it is our

**6**     TO CONTROL SALE OF FIREARMS IN DISTRICT OF COLUMBIA

desire this legislation be enacted for the District of Columbia, in which case it can then be used as a guide throughout the States of the Union, some seven or eight of which have already enacted similar legislation.

Very truly yours,

M. A. RECKORD,
*Executive Vice President.*

---

THE FEDERAL BAR ASSOCIATION,
*Washington, D. C., February 26, 1932.*

Hon. ARTHUR CAPPER,
*United States Senate.*

MY DEAR SENATOR CAPPER. The Federal Bar Association has considered the bill S. 2751 relating to the sale of firearms in the District of Columbia and has approved it.   This measure seems especially necessary at this time when thousands of visitors are expected to come to Washington in connection with the bicentennial celebration.   Numerous cases have recently been called to my attention in which crimes could not have been committed if there had been a proper regulation of the sale of arms in the District of Columbia.   Such restrictions prevail in England and many other countries and severe penalties are imposed upon those illegally in possession of firearms.   This Government should not lag behind the rest of the world in restricting the activities of its criminal element.

With appreciation of your interest in the matter and assurance of our hearty support of this measure, I am,

Very sincerely yours,

WILLIAM R. VALLANCE, *President.*

---

NORTHEAST WASHINGTON CITIZENS' ASSOCIATION,
*Washington, D. C., February 10, 1932.*

SENATE COMMITTEE ON THE DISTRICT OF COLUMBIA,
*Senate Office Building, Washington, D. C.*

GENTLEMEN: At the last meeting of our association held on February 8, 1932, the members indorsed Senate bill No. 2751, a bill regulating the sale and possession of firearms in the District of Columbia, with the following limitation:

"That an amendment be added which shall constitutionally prevent the importation of such firearms into the District by mail or otherwise except to licensed dealers or to the purchasing departments of the District of Columbia and Federal Governments."

Very truly yours,

JOSEPH NOTES,
*Secretary Northeast Washington Citizens' Association.*

---

SOUTHEAST WASHINGTON CITIZENS' ASSOCIATION (INC.),
*Washington, D. C., January 28, 1932.*

Hon. ARTHUR CAPPER,
*United States Senate, Washington, D. C.*

DEAR SENATOR: The Southeast Washington Citizens' Association (Inc.), at their meeting of January 26, 1932, adopted a resolution indorsing a firearms control act for the Nation's Capital.

It is earnestly hoped Congress will take early action on this question.

Yours very truly,

GEORGE C GLICK, *Secretary.*

---

MID-CITY CITIZENS' ASSOCIATION,
*Washington, D. C., January 29, 1931.*

Senator ARTHUR  CAPPER,
*Washington, D. C.*

DEAR SIR: I am pleased to inform you that at the last regular meeting of the Mid-City Citizens' Association it was voted to indorse the bill you have recently introduced which is known as S. 2751, to control the possession, sale, etc., of pistols and other dangerous weapons—the "fire arms" bill.

Respectfully,

M. E. SALSBURY, *Secretary.*

## TO CONTROL SALE OF FIREARMS IN DISTRICT OF COLUMBIA   7

WEST END CITIZENS' ASSOCIATION,
*Washington, D. C., February 18, 1932.*

Hon. ARTHUR C. CAPPER,
*Chairman Senate District Committee, Washington, D. C.*

DEAR SIR: At a recent meeting of the West End Citizens' Association the following resolution was unanimously adopted:

"*Resolved,* That the West End Citizens' Association endorse the firearms control act for the District of Columbia."

Sincerely yours,

DAVID BAPP, *Secretary.*

---

MOUNT PLEASANT CITIZENS' ASSOCIATION,
*Washington, D. C., February 24, 1932.*

Hon. ARTHUR CAPPER,
*United States Senate, Washington, D. C.*

MY DEAR SENATOR CAPPER: For your information and such use as you may deem proper, there is inclosed a copy of a resolution adopted by our association at its meeting on Saturday evening last.

Very truly yours,

JOHN DE LA MATER, *Secretary.*

Whereas the District of Columbia does not have an adequate law for the control of firearms and other dangerous weapons; and

Whereas Senator Arthur Capper and Representative Mary T. Norton have presented bills to their respective branches of Congress to control the possession, sale, transfer, and use of pistols and other dangerous weapons: Therefore be it

*Resolved,* That the Mount Pleasant Citizens' Association most highly commends Senator Capper and Representative Norton, and that it earnestly urges Congress to pass Senate bill No. 2751 and House bill No. 8754 at the earliest possible date; and be it further

*Resolved,* That copies of this resolution be sent to Hon. Arthur Capper, Hon. Mary T. Norton, the honorable Commissioners of the District of Columbia, and the Federation of Citizens' Associations.

Submitted by Earl E. Dillon, chairman committee on fire and police protection.

I hereby certify that the foregoing is a true copy of a resolution adopted by the Mount Pleasant Citizens' Association at its meeting on February 13, 1932.

JOHN DE LA MATER, *Secretary.*

---

MICHIGAN PARK CITIZENS ASSOCIATION,
*Washington, D. C., January 19, 1932.*

Hon. ARTHUR CAPPER,
*United States Senator.*

MY DEAR SENATOR CAPPER: I beg to acknowledge the receipt of a copy of your radio address dealing with the subject, A Firearms Control Act for the Nation's Capital. Your message was read to the meeting of the Michigan Park Citizens Association, held Wednesday evening, January 13, 1932, and I am pleased to inform you that the association indicated by proper resolution its entire accord and support with your bill, it being their opinion that the results to be obtained from your proposed legislation will have a good effect on this city.

Assuring you of the desire of our association to cooperate with you in your untiring efforts to improve conditions in this city, I am,

Very truly yours,

WM. A. KNERLAND, *Secretary.*

---

AMERICAN UNIVERSITY PARK CITIZENS' ASSOCIATION,
*Washington, D. C., February 13, 1932.*

Hon. ARTHUR CAPPER,
*Chairman District of Columbia Committee,*
*United States Senate, Washington, D. C.*

SIR: At its February meeting this association adopted the following resolution:

"*Resolved,* That the American University Park Citizens' Association indorses the act identified as the uniform firearms acts, Senate bill No. 2751, and urges its speedy enactment into law, providing, however, that an amendment be made to

**8**     TO CONTROL SALE OF FIREARMS IN DISTRICT OF COLUMBIA

said bill by the insertion, on page 5, line 10, after the word 'addict,' of the words 'or is an habitual drunkard,' or words to the same effect."

This association would be glad to see legislation on this subject extended in scope so as to include not only small firearms, which alone are included in Senate bill No. 2751, but firearms of whatever size or description. It refrains from proposing such an amendment to the present bill at this time, desiring to have the protection which this law will provide with the least possible delay. However, a future extension of the act to include larger weapons is respectfully recommended to the consideration of the Congress.

Very truly yours,

ELIZABETH L. McCOLLUM, *Secretary.*

Same letter to District Committee, House of Representatives.
Copy to Federation of Citizens' Associations of District of Columbia.

------

CITIZENS FORUM OF COLUMBIA HEIGHTS,
*Washington, D. C., February 18, 1932.*

Hon. ARTHUR CAPPER,
*United States Senate, Washington, D. C.*

DEAR MR. CAPPER: At the regular meeting of this forum, February 16, 1932, your bill (S. 2751) entitled "A bill to control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia," was given unanimous indorsement by the members of the association. A copy of the bill, with the indorsement of the forum, was ordered sent to the Federation of Citizens Associations.

Very sincerely yours,

H. V. MAYBEE, *Secretary.*

------

PROGRESSIVE CITIZENS ASSOCIATION OF GEORGETOWN,
*Washington, D. C., January 28, 1932.*

Hon. ARTHUR CAPPER,
*Committee of the District of Columbia,*
*United States Senate, Washington, D. C.*

DEAR SENATOR CAPPER: The Progressive Citizens' Association of Georgetown at the regular meeting held January 18, 1932, indorsed S. 2751 to control the possession, sale, transfer, and use of pistols, request you to add in section 7, line 12, "or habitual drunkards."

Senate bill 10 to extend the powers of the Commissioners of the District was not indorsed. A copy of the resolution passed by the organization is inclosed.

We are especially interested in S. 2172, to provide old-age securities for persons over 60 years of age residing in the District of Columbia.

Is there any thing we can do to assist in the passage of this bill, which we have already indorsed?

Sincerely yours,

(Mrs.) HELEN STAFFORD WHITTON.

------

WASHINGTON HIGHLANDS CITIZENS' ASSOCIATION.
*Washington, D. C., February 6, 1932.*

Hon. ARTHUR CAPPER,
*Chairman Committee on District of Columbia.*
*Senate Office Building, Washington, D. C.*

DEAR SENATOR CAPPER: I have been instructed by the Washington Highlands Citizens' Association, in regular meeting assembled, to inform you this association has gone on record as indorsing the bill you introduced in Congress for the regulation of the sale and possession of firearms in the District of Columbia.

We assure you we are grateful to you for this legislation, and feel it should be indorsed by all the people.

Very truly yours,

CARRIE L. DAVIDSON, *Secretary.*

TO CONTROL SALE OF FIREARMS IN DISTRICT OF COLUMBIA    **9**

NORTH CLEVELAND PARK CITIZENS' ASSOCIATION,
*Washington, D. C., February 3, 1932.*

Hon. ARTHUR CAPPER,
*Senate Office Building, Washington, D. C.*

DEAR SIR: Upon direction of the association, I am inclosing herewith a copy of a resolution recently adopted, in support of a measure in which you are interested.

I am sure this not only expresses the opinions of the members of this association but also that of the majority of our citizens.

Yours truly,

JOHN A. BRESNAHAN,
*Secretary.*

Resolution presented by Mr. John B. Dickman, jr., at the February 2, 1932, meeting of the North Cleveland Park Citizens' Association, and adopted by unanimous vote of the association on that date.

### A FIREARMS CONTROL ACT FOR THE NATIONS' CAPITAL

Whereas the indiscriminate sale of firearms has been an outstanding menace to the security and welfare of the citizens of the city of Washington, who for many years have memoralized the Congress of the United States for enactment of remedial legislation; and

Whereas the need for regulation of the sale of firearms was greater or more urgent on the record of recent law transgressions in which firearms played the principal part: Therefore be it

*Resolved,* That North Cleveland Park Citizens' Association, in regular meeting assembled, this 2d day of February, 1932, indorse the sentiments expressed by Senator Capper, of Kansas, in his address as a member of the Advisory Council of the National Antiweapon Association, December 16, 1931, and broadcasted on that date; and be it further

*Resolved,* That the officers of this association, in company with the committee on law and legislation, attend the meetings of the Senate on the District of Columbia when hearings are schedules on bills relating to the sale of firearms in the District of Columbia, that a copy of these resolutions be forwarded to Senator Capper, of Kansas.

---

NEWCOMB CLUB,
*Bethesda, Md., February 19, 1932*

Senator ARTHUR CAPPER,
*Senate Office Bldg., Washington, D. C.*

DEAR SIR: The Newcomb Club of Bethesda wishes to go on record as favoring your bill for the restriction of the sale of firearms in the District of Columbia.

Although we are located in Maryland, because of the proximity of Bethesda to the District we are directly affected by such legislation.

Sincerely,

(Mrs.) L. B. MAY M. JACKSON,
*Corresponding Secretary.*

---

THE AMERICAN LEGION,
*Washington, D. C., January 29, 1932.*

Hon. ARTHUR CAPPER,
*United States Senate, Washington, D. C.*

SIR: Victory Post, No. 4, of the American Legion of the Department of the District of Columbia in regular meeting on January 26, 1932, adopted unanimously the inclosed resolution.

Yours truly,

A. J. KEARNEY, *Adjutant.*

Whereas the safety of peaceful citizens of the District of Columbia demands that some restriction be placed upon the sale of firearms in the District of Columbia: Therefore be it

*Resolved,* That Victory Post No. 4 of the Department of the District of Columbia, American Legion, approves the Capper firearms control bill introduced in the Senate by Senator Capper and commends its enactment by the Congress of the United States.

S R—72—1—VOL 2——2

Compendium_Spitzer
Page 542

**10**    TO CONTROL SALE OF FIREARMS IN DISTRICT OF COLUMBIA

*Resolved,* That the Petworth Woman's Club indorses S. 2751, a bill introduced by Senator Capper to control the possession, sale, transfer, and use of pistois and other dangerous weapons in the District of Columbia, and that copies of this resolution be sent to the Senate and House Committees on the District of Columbia.

NATIONAL ANTI-WEAPON ASSOCIATION,
*March 2, 1932.*

Hon. ARTHUR CAPPER,
  *Chairman Committee on the District of Columbia,*
        *United States Senate, Washington, D. C.*

  DEAR SENATOR CAPPER: You are to be commended for the interest you have manifested in a firearms control law for the District of Columbia.

  The fact that Washington is completely lacking in the control and regulation of the sale of pistols and revolvers doubtless constitutes one of the most serious problems confronting the police to-day in the suppression of violent crimes.

  Not the least important provision of this pending legislation is the elementary safeguard it provides for children.

  When you consider that some 20 childhood fatalities resulting from shooting were reported in the local newspapers, as occurring in various parts of the United States during the one month of December, 1931, it would seem children can and do all too easily secure deadly weapons.

  Immediate passage by Congress of the firearms control bill would constitute not only a protective measure for children—it would be a constructive move for the general betterment of the Nation's capital city.

  Yours very truly,

E. R. GRANT, *President.*

METROPOLITAN POLICE DEPARTMENT,
*District of Columbia, March 8, 1922.*

Hon. ARTHUR CAPPER,
  *United States Senate, Washington, D. C.*

  MY DEAR SENATOR CAPPER: I am sending, for your information in connection with your firearms bill, the following data secured from our statistical bureau and information available to that bureau:

| In the District of Columbia | Total | Average per year |
|---|---|---|
| 1. Pistols sold during the 3 years ending June 30, 1931 | 10,171 | 3,390⅓ |
| 2. Crimes committed in which firearms were used during the 5 years ending June 30, 1931: | | |
| Murders | 132 | 26¼ |
| Manslaughter | 4 | ⅘ |
| Robberies | 982 | 196⅗ |
| Assault with dangerous weapon | 550 | 110 |
| 3. Number of cases of above in which shootings occurred | 686 | 137⅕ |

  I am informed that your bill is progressing nicely, which is very gratifying.

  Sincerely yours,

PELHAM D. GLASSFORD,
*Major and Superintendent.*

WHEATLEY PARENT-TEACHER ASSOCIATION,
*Washington, D. C., January 13, 1932.*

Hon. Senator ARTHUR CAPPER,
  *Chairman Senate District Committee,*
        *United States Senate, Washington, D. C.*

  MY DEAR SENATOR CAPPER: Having seen in the local papers and heard your talk over the radio to the effect that you have introduced a bill in Congress for the regulation of the sale of firearms in the District of Columbia, the Wheatley School Parent-Teacher Association takes this opportunity to inform you that at its last meeting the members unanimously voted to indorse your measure.

Compendium_Spitzer
Page 543

## TO CONTROL SALE OF FIREARMS IN DISTRICT OF COLUMBIA     11

It is evident from the frequent cases of shooting persons in this city, both malicious and accidental, that there should be a law preventing the sale of these deadly weapons so promiscuously.   It should not be possible for irresponsible persons or those bent on crime to walk into a store and without any formality purchase a pistol or other dangerous firearms.

There have been just recently several accidental shootings of small children, resulting either in the death or severe injury to the victims.   Such conditions should be made impossible by stringent law, and we feel that the passage of your bill will not only be of benefit to the present generation but also those to follow.

Ever mindful of your deep interest in the welfare of the residents of the District of Columbia, we are,

Most sincerely yours,

Mrs. KATHRYN B. SHILLING,
*Corresponding Secretary.*

O

# Firearms Commerce

# in the

# United States

## Annual Statistical Update

## 2020

**United States Department of Justice**
**Bureau of Alcohol, Tobacco, Firearms and Explosives**

# Exhibit 1.  Firearms Manufactured (1986-2018)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 662,973 | 761,414 | 970,507 | 641,482 | 4,558 | 3,040,934 |
| 1987 | 964,561 | 722,512 | 1,007,661 | 857,949 | 6,980 | 3,559,663 |
| 1988 | 1,101,011 | 754,744 | 1,144,707 | 928,070 | 35,345 | 3,963,877 |
| 1989 | 1,404,753 | 628,573 | 1,407,400 | 935,541 | 42,126 | 4,418,393 |
| 1990 | 1,371,427 | 470,495 | 1,211,664 | 848,948 | 57,434 | 3,959,968 |
| 1991 | 1,378,252 | 456,966 | 883,482 | 828,426 | 15,980 | 3,563,106 |
| 1992 | 1,669,537 | 469,413 | 1,001,833 | 1,018,204 | 16,849 | 4,175,836 |
| 1993 | 2,093,362 | 562,292 | 1,173,694 | 1,144,940 | 81,349 | 5,055,637 |
| 1994 | 2,004,298 | 586,450 | 1,316,607 | 1,254,926 | 10,936 | 5,173,217 |
| 1995 | 1,195,284 | 527,664 | 1,411,120 | 1,173,645 | 8,629 | 4,316,342 |
| 1996 | 987,528 | 498,944 | 1,424,315 | 925,732 | 17,920 | 3,854,439 |
| 1997 | 1,036,077 | 370,428 | 1,251,341 | 915,978 | 19,680 | 3,593,504 |
| 1998 | 960,365 | 324,390 | 1,535,690 | 868,639 | 24,506 | 3,713,590 |
| 1999 | 995,446 | 335,784 | 1,569,685 | 1,106,995 | 39,837 | 4,047,747 |
| 2000 | 962,901 | 318,960 | 1,583,042 | 898,442 | 30,196 | 3,793,541 |
| 2001 | 626,836 | 320,143 | 1,284,554 | 679,813 | 21,309 | 2,932,655 |
| 2002 | 741,514 | 347,070 | 1,515,286 | 741,325 | 21,700 | 3,366,895 |
| 2003 | 811,660 | 309,364 | 1,430,324 | 726,078 | 30,978 | 3,308,404 |
| 2004 | 728,511 | 294,099 | 1,325,138 | 731,769 | 19,508 | 3,099,025 |
| 2005 | 803,425 | 274,205 | 1,431,372 | 709,313 | 23,179 | 3,241,494 |
| 2006 | 1,021,260 | 385,069 | 1,496,505 | 714,618 | 35,872 | 3,653,324 |
| 2007 | 1,219,664 | 391,334 | 1,610,923 | 645,231 | 55,461 | 3,922,613 |
| 2008 | 1,609,381 | 431,753 | 1,734,536 | 630,710 | 92,564 | 4,498,944 |
| 2009 | 1,868,258 | 547,195 | 2,248,851 | 752,699 | 138,815 | 5,555,818 |
| 2010 | 2,258,450 | 558,927 | 1,830,556 | 743,378 | 67,929 | 5,459,240 |
| 2011 | 2,598,133 | 572,857 | 2,318,088 | 862,401 | 190,407 | 6,541,886 |
| 2012 | 3,487,883 | 667,357 | 3,168,206 | 949,010 | 306,154 | 8,578,610 |
| 2013 | 4,441,726 | 725,282 | 3,979,570 | 1,203,072 | 495,142 | 10,844,792 |
| 2014 | 3,633,454 | 744,047 | 3,379,549 | 935,411 | 358,165 | 9,050,626 |
| 2015 | 3,557,199 | 885,259 | 3,691,799 | 777,273 | 447,131 | 9,358,661 |
| 2016 | 4,720,075 | 856,291 | 4,239,335 | 848,617 | 833,123 | 11,497,441 |
| 2017 | 3,691,010 | 720,917 | 2,504,092 | 653,139 | 758,634 | 8,327,792 |
| 2018 | 3,881,158 | 664,835 | 2,880,536 | 536,126 | 1,089,973 | 9,052,628 |

Source: ATF's Annual Firearms Manufacturing and Exportation Report (AFMER).

[1]Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies. The report also includes firearms manufactured for export.

AFMER data is not published until one year after the close of the calendar year reporting period because the proprietary data furnished by filers is protected from immediate disclosure by the Trade Secrets Act.  For example, calendar year 2012 data was due to ATF by April 1, 2013, but not published until January 2014.



Exhibit 1a. Firearms Manufactured (1986-2018)

Compendium_Spitzer
Page 548

# Exhibit 2.  Firearms Manufacturers' Exports (1986 - 2018)

| Calendar Year | Pistols | Revolvers | Rifles | Shotguns | Misc. Firearms[1] | Total Firearms |
|---|---|---|---|---|---|---|
| 1986 | 16,511 | 104,571 | 37,224 | 58,943 | 199 | 217,448 |
| 1987 | 24,941 | 134,611 | 42,161 | 76,337 | 9,995 | 288,045 |
| 1988 | 32,570 | 99,289 | 53,896 | 68,699 | 2,728 | 257,182 |
| 1989 | 41,970 | 76,494 | 73,247 | 67,559 | 2,012 | 261,282 |
| 1990 | 73,398 | 106,820 | 71,834 | 104,250 | 5,323 | 361,625 |
| 1991 | 79,275 | 110,058 | 91,067 | 117,801 | 2,964 | 401,165 |
| 1992 | 76,824 | 113,178 | 90,015 | 119,127 | 4,647 | 403,791 |
| 1993 | 59,234 | 91,460 | 94,272 | 171,475 | 14,763 | 431,204 |
| 1994 | 93,959 | 78,935 | 81,835 | 146,524 | 3,220 | 404,473 |
| 1995 | 97,969 | 131,634 | 90,834 | 101,301 | 2,483 | 424,221 |
| 1996 | 64,126 | 90,068 | 74,557 | 97,191 | 6,055 | 331,997 |
| 1997 | 44,182 | 63,656 | 76,626 | 86,263 | 4,354 | 275,081 |
| 1998 | 29,537 | 15,788 | 65,807 | 89,699 | 2,513 | 203,344 |
| 1999 | 34,663 | 48,616 | 65,669 | 67,342 | 4,028 | 220,318 |
| 2000 | 28,636 | 48,130 | 49,642 | 35,087 | 11,132 | 172,627 |
| 2001 | 32,151 | 32,662 | 50,685 | 46,174 | 10,939 | 172,611 |
| 2002 | 22,555 | 34,187 | 60,644 | 31,897 | 1,473 | 150,756 |
| 2003 | 16,340 | 26,524 | 62,522 | 29,537 | 6,989 | 141,912 |
| 2004 | 14,959 | 24,122 | 62,403 | 31,025 | 7,411 | 139,920 |
| 2005 | 19,196 | 29,271 | 92,098 | 46,129 | 7,988 | 194,682 |
| 2006 | 144,779 | 28,120 | 102,829 | 57,771 | 34,022 | 367,521 |
| 2007 | 45,053 | 34,662 | 80,594 | 26,949 | 17,524 | 204,782 |
| 2008 | 54,030 | 28,205 | 104,544 | 41,186 | 523 | 228,488 |
| 2009 | 56,402 | 32,377 | 61,072 | 36,455 | 8,438 | 194,744 |
| 2010 | 80,041 | 25,286 | 76,518 | 43,361 | 16,771 | 241,977 |
| 2011 | 121,035 | 23,221 | 79,256 | 54,878 | 18,498 | 296,888 |
| 2012 | 128,313 | 19,643 | 81,355 | 42,858 | 15,385 | 287,554 |
| 2013 | 167,653 | 21,236 | 131,718 | 49,766 | 22,748 | 393,121 |
| 2014 | 126,316 | 25,521 | 207,934 | 60,377 | 784 | 420,932 |
| 2015 | 140,787 | 22,666 | 159,707 | 18,797 | 1,499 | 343,456 |
| 2016 | 172,408 | 24,587 | 147,044 | 24,668 | 8,111 | 376,818 |
| 2017 | 275,424 | 21,676 | 158,871 | 29,997 | 2,332 | 488,300 |
| 2018 | 333,266 | 21,498 | 165,573 | 27,774 | 6,126 | 554,237 |

Source:  ATF Annual Firearms Manufacturing and Exportation Report (AFMER).

[1]Miscellaneous firearms are any firearms not specifically categorized in any of the firearms categories defined on the ATF Form 5300.11 Annual Firearms Manufacturing and Exportation Report. (Examples of miscellaneous firearms would include pistol grip firearms, starter guns, and firearm frames and receivers.)

The AFMER report excludes production for the U.S. military but includes firearms purchased by domestic law enforcement agencies.

This exhibit does not include statistics related to the National Firearms Act (NFA).

3



4

# Exhibit 3.  Firearms Imports (1986 - 2019)

| Calendar Year | Shotguns | Rifles | Handguns | Total |
|---|---|---|---|---|
| 1986 | 201,000 | 269,000 | 231,000 | 701,000 |
| 1987 | 307,620 | 413,780 | 342,113 | 1,063,513 |
| 1988 | 372,008 | 282,640 | 621,620 | 1,276,268 |
| 1989 | 274,497 | 293,152 | 440,132 | 1,007,781 |
| 1990 | 191,787 | 203,505 | 448,517 | 843,809 |
| 1991 | 116,141 | 311,285 | 293,231 | 720,657 |
| 1992 | 441,933 | 1,423,189 | 981,588 | 2,846,710 |
| 1993 | 246,114 | 1,592,522 | 1,204,685 | 3,043,321 |
| 1994 | 117,866 | 847,868 | 915,168 | 1,880,902 |
| 1995 | 136,126 | 261,185 | 706,093 | 1,103,404 |
| 1996 | 128,456 | 262,568 | 490,554 | 881,578 |
| 1997 | 106,296 | 358,937 | 474,182 | 939,415 |
| 1998 | 219,387 | 248,742 | 531,681 | 999,810 |
| 1999 | 385,556 | 198,191 | 308,052 | 891,799 |
| 2000 | 331,985 | 298,894 | 465,903 | 1,096,782 |
| 2001 | 428,330 | 227,608 | 710,958 | 1,366,896 |
| 2002 | 379,755 | 507,637 | 741,845 | 1,629,237 |
| 2003 | 407,402 | 428,837 | 630,263 | 1,466,502 |
| 2004 | 507,050 | 564,953 | 838,856 | 1,910,859 |
| 2005 | 546,403 | 682,100 | 878,172 | 2,106,675 |
| 2006 | 606,820 | 659,393 | 1,166,309 | 2,432,522 |
| 2007 | 725,752 | 631,781 | 1,386,460 | 2,743,993 |
| 2008 | 535,960 | 602,364 | 1,468,062 | 2,606,386 |
| 2009 | 558,679 | 864,010 | 2,184,417 | 3,607,106 |
| 2010 | 509,913 | 547,449 | 1,782,585 | 2,839,947 |
| 2011 | 529,056 | 998,072 | 1,725,276 | 3,252,404 |
| 2012 | 973,465 | 1,243,924 | 2,627,201 | 4,844,590 |
| 2013 | 936,235 | 1,507,776 | 3,095,528 | 5,539,539 |
| 2014 | 648,339 | 791,892 | 2,185,037 | 3,625,268 |
| 2015 | 644,293 | 815,817 | 2,470,101 | 3,930,211 |
| 2016 | 736,482 | 729,452 | 3,671,837 | 5,137,771 |
| 2017 | 632,105 | 572,309 | 3,287,842 | 4,492,256 |
| 2018 | 713,931 | 652,031 | 2,939,889 | 4,305,851 |
| 2019 | 743,252 | 648,703 | 2,594,708 | 3,986,663 |

Source: ATF and United States International Trade Commission.

Statistics prior to 1992 are for fiscal years; 1992 is a transition year with five quarters.



Exhibit 3a. Firearms Imports (1986 - 2019)

6

# Exhibit 4.  Importation Applications (1986 - 2019)

| Fiscal Year | Licensed Importer | Military* | Other | Total |
|---|---|---|---|---|
| 1986 | 7,728 | 9,434 | 2,631 | 19,793 |
| 1987 | 7,833 | 8,059 | 2,130 | 18,022 |
| 1988 | 7,711 | 7,680 | 2,122 | 17,513 |
| 1989 | 7,950 | 8,293 | 2,194 | 18,437 |
| 1990 | 8,292 | 8,696 | 2,260 | 19,248 |
| 1991 | 8,098 | 10,973 | 2,412 | 21,483 |
| 1992 | 7,960 | 9,222 | 2,623 | 19,805 |
| 1993 | 7,591 | 6,282 | 2,585 | 16,458 |
| 1994 | 6,704 | 4,570 | 3,024 | 14,298 |
| 1995 | 5,267 | 2,834 | 2,548 | 10,649 |
| 1996 | 6,340 | 2,792 | 2,395 | 11,527 |
| 1997 | 8,288 | 2,069 | 1,395 | 11,752 |
| 1998 | 8,767 | 2,715 | 1,536 | 13,019 |
| 1999 | 9,505 | 2,235 | 1,036 | 12,776 |
| 2000 | 7,834 | 2,885 | 1,416 | 12,135 |
| 2001 | 9,639 | 3,984 | 1,569 | 15,192 |
| 2002 | 9,646 | 6,321 | 3,199 | 19,166 |
| 2003 | 8,160 | 2,264 | 2,081 | 12,505 |
| 2004 | 7,539 | 1,392 | 1,819 | 10,750 |
| 2005 | 7,539 | 1,320 | 1,746 | 10,605 |
| 2006 | 8,537 | 1,180 | 1,505 | 11,222 |
| 2007 | 8,004 | 1,081 | 1,236 | 10,321 |
| 2008 | 7,610 | 718 | 980 | 9,308 |
| 2009 | 7,967 | 504 | 970 | 9,441 |
| 2010 | 7,367 | 823 | 1,088 | 9,278 |
| 2011 | 7,647 | 641 | 959 | 9,247 |
| 2012 | 8,408 | 420 | 895 | 9,723 |
| 2013 | 9,964 | 319 | 597 | 10,880 |
| 2014 | 8,529 | 255 | 429 | 9,213 |
| 2015 | 6,078 | 318 | 897 | 7,293 |
| 2016 | 6,154 | 220 | 814 | 7,188 |
| 2017 | 5,859 | 309 | 685 | 6,853 |
| 2018 | 6,631 | 289 | 670 | 7,590 |
| 2019 | 7,040 | 380 | 711 | 8,131 |

Source: ATF Firearms and Explosives Import System (FEIS)

Import data excludes temporary permits issued to nonimmigrant aliens.

*Depicts ATF Form 6A Part 2 (5330.3C)

Effective April 8, 2014 Import permits are valid for two years.

7



**Exhibit 4a. Importation Applications (1986 - 2019)**

8

## Exhibit 5.  Firearms Imported into the United States by Country 2019

| | Handguns | Rifles | Shotguns | Total Firearms |
|---|---|---|---|---|
| Brazil | 695,584 | 74,537 | 57,851 | 827,972 |
| Austria | 811,574 | 7,537 | 145 | 819,256 |
| Turkey | 95,208 | 2,115 | 382,709 | 480,032 |
| Italy | 159,945 | 13,131 | 175,304 | 348,380 |
| Germany | 258,281 | 57,057 | 2,178 | 317,516 |
| Croatia | 185,241 | 183 | 295 | 185,719 |
| Czech Republic | 151,486 | 29,076 | 80 | 180,642 |
| Canada | 4,599 | 147,515 | 1,170 | 153,284 |
| China | 0 | 9,711 | 116,767 | 126,478 |
| Philippines | 93,612 | 8,974 | 100 | 102,686 |
| Japan | 1 | 77,327 | 828 | 78,156 |
| Spain | 566 | 58,544 | 601 | 59,711 |
| Belgium | 26,088 | 25,835 | 69 | 51,992 |
| Finland | 320 | 46,609 | 0 | 46,929 |
| Romania | 22,094 | 20,759 | 0 | 42,853 |
| Israel | 23,743 | 3,366 | 0 | 27,109 |
| Argentina | 25,625 | 0 | 0 | 25,625 |
| Portugal | 0 | 24,322 | 31 | 24,353 |
| United Kingdom | 42 | 17,317 | 4,477 | 21,836 |
| Switzerland | 15,445 | 2,849 | 4 | 18,298 |
| Serbia | 8938 | 4,029 | 0 | 12,967 |
| Poland | 5,937 | 4,342 | 0 | 10,279 |
| Russia | 0 | 4,620 | 182 | 4,802 |
| Ukraine | 0 | 3,200 | 0 | 3,200 |
| Sweden | 130 | 2,936 | 0 | 3,066 |
| Slovakia | 2,973 | 0 | 0 | 2,973 |
| Bulgaria | 592 | 1,500 | 0 | 2,092 |
| Hungary | 1,888 | 87 | 29 | 2,004 |
| Netherlands | 1,930 | 0 | 0 | 1,930 |
| Slovenia | 1,878 | 0 | 0 | 1,878 |
| France | 756 | 909 | 8 | 1,673 |
| Other[2] | 232 | 316 | 424 | 972 |
| Total | 2,594,708 | 648,703 | 743,252 | 3,986,663 |

[1]On May 26, 1994, the United States instituted a firearms imports embargo against China. Sporting shotguns, however, are exempt from the embargo.

[2]Imports of fewer than 1,000 per country.

Imports from Afghanistan, Belarus, Burma, China, Cuba, Democratic Republic of Congo, Haiti, Iran, Iraq, Libya, Mongolia, North Korea, Rwanda, Somalia Sudan, Syria, Unita (Angola), Vietnam, may include surplus military curio and relic firearms that were manufactured in these countries prior to becoming proscribed or embargoed and had been outside those proscribed countries for the preceding five years prior to import. Imports may also include those that obtained a waiver from the U.S. State Department.

Imports from Georgia, Kazakstan, Kyrgyzstan, Moldova, Russian Federation, Turkmenistan, Ukraine, Uzbekistan are limited to firearms enumerated on the Voluntary Restraint Agreement (VRA).



10

# Exhibit 6.  National Firearms Act Tax Revenues and Related Activities (1984 - 2019)

| Fiscal Year [1] | Occupational Tax Paid [2] | Transfer and Making Tax Paid | Enforcement Support [3] | |
|---|---|---|---|---|
| | | | Certifications | Records Checks |
| 1984 | $596,000 | $666,000 | 1,196 | 2,771 |
| 1985 | $606,000 | $594,000 | 921 | 3,682 |
| 1986 | $667,000 | $1,372,000 | 690 | 3,376 |
| 1987 | $869,000 | $1,576,000 | 575 | 4,135 |
| 1988 | $2,095,000 | $1,481,000 | 701 | 3,738 |
| 1989 | $1,560,000 | $1,527,000 | 1,196 | 6,128 |
| 1990 | $1,442,000 | $1,308,000 | 666 | 7,981 |
| 1991 | $1,556,000 | $1,210,000 | 764 | 7,857 |
| 1992 | $1,499,000 | $1,237,000 | 1,257 | 8,582 |
| 1993 | $1,493,000 | $1,264,000 | 1,024 | 7,230 |
| 1994 | $1,444,000 | $1,596,000 | 586 | 6,283 |
| 1995 | $1,007,000 | $1,311,000 | 882 | 5,677 |
| 1996 | $1,143,000 | $1,402,000 | 529 | 5,215 |
| 1997 | $1,284,000 | $1,630,000 | 488 | 4,395 |
| 1998 | $1,299,000 | $1,969,000 | 353 | 3,824 |
| 1999 | $1,330,000 | $2,422,000 | 345 | 3,994 |
| 2000 | $1,399,000 | $2,301,000 | 144 | 2,159 |
| 2001 | $1,456,000 | $2,800,000 | 402 | 5,156 |
| 2002 | $1,492,000 | $1,510,000 | 441 | 6,381 |
| 2003 | $1,758,000 | $2,699,000 | 401 | 6,597 |
| 2004 | $1,640,000 | $3,052,000 | 435 | 6,191 |
| 2005 | $1,659,000 | $2,810,000 | 447 | 6,218 |
| 2006 | $1,709,000 | $3,951,000 | 327 | 6,331 |
| 2007 | $1,815,000 | $4,890,000 | 530 | 7,468 |
| 2008 | $1,950,000 | $5,742,000 | 375 | 5,872 |
| 2009 | $2,125,000 | $7,971,000 | 418 | 5,736 |
| 2010 | $2,530,000 | $7,184,000 | 267 | 5,883 |
| 2011 | $2,952,000 | $9,576,000 | 287 | 6,313 |
| 2012 | $3,628,000 | $12,814,000 | 390 | 7,103 |
| 2013 | $4,294,000 | $18,182,000 | 501 | 7,138 |
| 2014 | $4,837,000 | $22,678,000 | 367 | 6,172 |
| 2015 | $5,417,000 | $32,462,000 | 338 | 5,650 |
| 2016 | $6,018,000 | $62,596,000 | 397 | 6,547 |
| 2017 | $6,371,000 | $22.972,000 | 469 | 6,749 |
| 2018 | $6,753,000 | $33,371,000 | 537 | 6,130 |
| 2019 | $7,014,000 | $37,285,000 | 447 | 5,426 |

Source:  ATF's National Firearms Registration and Transfer Record (NFRTR).

[1]Data from 1997 - 2000 were based on calendar year data.

[2]Special occupational tax revenues for FY 1990 - 1996 include collections made during the fiscal year for prior tax years. Importers, manufacturers, or dealers in NFA firearms are subject to a yearly occupational tax.

[3]ATF searches the NFRTR in support of criminal investigations and regulatory inspections in order to determine whether persons are legally in possession of NFA weapons and whether transfers are made lawfully.

Data from 2000-2010 for Certifications and Records Checks was corrected in the 2012 update.

Compendium_Spitzer
Page 557

## Exhibit 7. National Firearms Act Firearms Processed by Form Type (1990 - 2019)

| Calendar Year[1] | Application to Make NFA Firearms (ATF Form 1) | Manufactured and Imported (ATF Form 2) | Application for Tax Exempt Transfer Between Licensees (ATF Form 3) | Application for Taxpaid Transfer (ATF Form 4) | Application for Tax-Exempt Transfer[2] (ATF Form 5) | Exported (ATF Form 9) | Total[3] |
|---|---|---|---|---|---|---|---|
| 1990 | 399 | 66,084 | 23,149 | 7,024 | 54,959 | 21,725 | 173,340 |
| 1991 | 524 | 80,619 | 19,507 | 5,395 | 44,146 | 40,387 | 190,578 |
| 1992 | 351 | 107,313 | 26,352 | 6,541 | 45,390 | 22,120 | 208,067 |
| 1993 | 310 | 70,342 | 22,071 | 7,388 | 60,193 | 24,041 | 184,345 |
| 1994 | 1,076 | 97,665 | 27,950 | 7,600 | 67,580 | 34,242 | 236,113 |
| 1995 | 1,226 | 95,061 | 18,593 | 8,263 | 60,055 | 31,258 | 214,456 |
| 1996 | 1,174 | 103,511 | 16,931 | 6,418 | 72,395 | 40,439 | 240,868 |
| 1997 | 855 | 110,423 | 18,371 | 7,873 | 70,690 | 36,284 | 244,496 |
| 1998 | 1,093 | 141,101 | 27,921 | 10,181 | 93,135 | 40,221 | 313,652 |
| 1999 | 1,071 | 137,373 | 28,288 | 11,768 | 95,554 | 28,128 | 302,182 |
| 2000 | 1,334 | 141,763 | 23,335 | 11,246 | 96,234 | 28,672 | 302,584 |
| 2001 | 2,522 | 145,112 | 25,745 | 10,799 | 101,955 | 25,759 | 311,892 |
| 2002 | 1,173 | 162,321 | 25,042 | 10,686 | 92,986 | 47,597 | 339,805 |
| 2003 | 1,003 | 156,620 | 21,936 | 13,501 | 107,108 | 43,668 | 343,836 |
| 2004 | 980 | 83,483 | 20,026 | 14,635 | 54,675 | 19,425 | 193,224 |
| 2005 | 1,902 | 65,865 | 26,603 | 14,606 | 26,210 | 20,951 | 156,137 |
| 2006 | 2,610 | 188,134 | 51,290 | 20,534 | 100,458 | 42,175 | 405,201 |
| 2007 | 3,553 | 296,267 | 51,217 | 22,260 | 194,794 | 76,467 | 644,558 |
| 2008 | 4,583 | 424,743 | 71,404 | 26,917 | 183,271 | 206,411 | 917,329 |
| 2009 | 5,345 | 371,920 | 56,947 | 31,551 | 201,267 | 163,951 | 830,981 |
| 2010 | 5,169 | 296,375 | 58,875 | 33,059 | 189,449 | 136,335 | 719,262 |
| 2011 | 5,477 | 530,953 | 107,066 | 33,816 | 147,341 | 311,214 | 1,135,867 |
| 2012 | 7,886 | 484,928 | 149,762 | 52,490 | 170,561 | 219,700 | 1,085,327 |
| 2013 | 9,347 | 477,567 | 206,389 | 57,294 | 110,637 | 224,515 | 1,085,749 |
| 2014 | 22,380 | 591,388 | 262,342 | 107,921 | 138,204 | 248,109 | 1,370,344 |
| 2015 | 32,558 | 583,499 | 365,791 | 130,017 | 127,945 | 306,037 | 1,545,847 |
| 2016 | 49,985 | 1,066,812 | 571,840 | 133,911 | 152,264 | 555,397 | 2,530,209 |
| 2017 | 40,444 | 497,329 | 344,197 | 184,312 | 180,850 | 224,389 | 1,471,521 |
| 2018 | 21,580 | 545,700 | 355,114 | 128,324 | 169,258 | 318,387 | 1,538,363 |
| 2019 | 28,006 | 844,378 | 361,754 | 170,182 | 234,486 | 402,626 | 2,041,432 |

Source:  ATF's National Firearms Registration and Transfer Record (NFRTR).

[1]Data from 1990 - 1996 represent fiscal year.

[2]Firearms may be transferred to the U.S., State or local governments without the payment of a transfer tax. Further transfers of NFA firearms between licensees registered as importers, manufacturers, or dealers who have paid the special occupational tax are likewise exempt from transfer tax.

[3]Totals do not include ATF Form 5320.20 or ATF Form 10 because these do not relate to commercial transactions.

Compendium_Spitzer
Page 558



Exhibit 7a. National Firearms Act Firearms Processed
by Form Type (1990-2019)
0
200,000
400,000
600,000
800,000
1,000,000
1,200,000
1990
1991
1992
1993
1994
1995
1996
1997
1998
1999
2000
2001
2002
2003
2004
2005
2006
2007
2008
2009
2010
2011
2012
2013
2014
2015
2016
2017
2018
2019
Application to Make NFA Firearms (ATF Form 1)
Manufactured and Imported (ATF Form 2)
Application for Tax Exempt Transfer Between Licensees (ATF Form 3)
Application for Taxpaid Transfer (ATF Form 4)
Application for Tax-Exempt Transfer (ATF Form 5)
Exported (ATF Form 9)



Exhibit 7b. National Firearms Act Forms Processed by Fiscal Year (2002 - 2019)

| Fiscal Year | Forms Processed |
| --- | --- |
| 2002 | 41,937 |
| 2003 | 46,463 |
| 2004 | 46,978 |
| 2005 | 41,579 |
| 2006 | 57,783 |
| 2007 | 66,560 |
| 2008 | 72,808 |
| 2009 | 86,753 |
| 2010 | 91,949 |
| 2011 | 105,373 |
| 2012 | 137,649 |
| 2013 | 163,691 |
| 2014 | 236,290 |
| 2015 | 308,563 |
| 2016 | 379,410 |
| 2017 | 386,210 |
| 2018 | 322,692 |
| 2019 | 342,860 |

14

## Exhibit 8. National Firearms Act Registered Weapons by State (April 2020)

| State | Any Other Weapon[1] | Destructive Device[2] | Machinegun[3] | Silencer[4] | Short Barreled Rifle[5] | Short Barreled Shotgun[6] | Total |
|---|---|---|---|---|---|---|---|
| Alabama | 1,250 | 81,684 | 32,529 | 52,066 | 7,731 | 2,472 | 177,732 |
| Alaska | 336 | 5,912 | 1,718 | 11,287 | 2,705 | 1,497 | 23,455 |
| Arkansas | 661 | 60,632 | 5,664 | 30,804 | 4,627 | 1,253 | 103,641 |
| Arizona | 2,883 | 113,085 | 18,483 | 65,332 | 21,639 | 2,844 | 224,266 |
| California | 4,477 | 308,759 | 29,861 | 15,129 | 14,177 | 14,392 | 386,795 |
| Colorado | 1,063 | 52,502 | 7,520 | 51,615 | 11,383 | 1,998 | 126,081 |
| Connecticut | 982 | 14,100 | 39,888 | 15,174 | 4,050 | 1,084 | 75,278 |
| District of Columbia | 69 | 55,236 | 5,958 | 715 | 1,188 | 1,107 | 64,273 |
| Delaware | 41 | 3,527 | 537 | 405 | 420 | 635 | 5,565 |
| Florida | 3,980 | 256,059 | 47,130 | 136,251 | 43,543 | 10,115 | 497,078 |
| Georgia | 2,146 | 85,418 | 40,181 | 93,573 | 18,267 | 11,918 | 251,503 |
| Hawaii | 34 | 8,265 | 441 | 286 | 95 | 75 | 9,196 |
| Iowa | 907 | 17,697 | 8,804 | 15,939 | 2,127 | 1,139 | 46,613 |
| Idaho | 656 | 26,447 | 5,102 | 31,972 | 4,649 | 579 | 69,405 |
| Illinois | 1,032 | 109,537 | 30,492 | 3,203 | 4,213 | 1,735 | 150,212 |
| Indiana | 1,717 | 47,458 | 20,868 | 53,880 | 9,613 | 9,425 | 142,961 |
| Kansas | 740 | 25,404 | 3,876 | 24,358 | 5,214 | 1,191 | 60,783 |
| Kentucky | 1,158 | 34,708 | 17,903 | 37,590 | 5,886 | 2,060 | 99,305 |
| Louisiana | 642 | 58,249 | 7,188 | 51,398 | 7,997 | 1,960 | 127,434 |
| Massachusetts | 862 | 18,582 | 6,958 | 7,367 | 4,995 | 1,015 | 39,779 |
| Maryland | 1,098 | 60,140 | 29,586 | 25,466 | 6,578 | 3,899 | 126,767 |
| Maine | 592 | 3,700 | 5,152 | 5,989 | 2,731 | 531 | 18,695 |
| Michigan | 1,241 | 29,506 | 16,890 | 36,676 | 7,433 | 1,551 | 93,297 |
| Minnesota | 2,730 | 52,750 | 8,720 | 35,731 | 6,676 | 1,136 | 107,743 |
| Missouri | 1,502 | 36,839 | 10,160 | 38,500 | 8,972 | 2,855 | 98,828 |
| Mississippi | 514 | 28,692 | 4,699 | 29,331 | 4,745 | 1,053 | 69,034 |
| Montana | 454 | 4,795 | 2,422 | 17,001 | 2,218 | 577 | 27,467 |
| North Carolina | 1,029 | 103,068 | 15,779 | 58,432 | 14,547 | 3,382 | 196,237 |
| North Dakota | 208 | 3,565 | 1,626 | 16,934 | 1,727 | 305 | 24,365 |
| Nebraska | 787 | 7,889 | 2,356 | 19,026 | 3,099 | 878 | 34,035 |
| New Hampshire | 472 | 5,454 | 19,253 | 31,332 | 6,607 | 595 | 63,713 |
| New Jersey | 448 | 46,256 | 39,979 | 3,339 | 3,268 | 2,558 | 95,848 |
| New Mexico | 320 | 91,470 | 4,086 | 15,372 | 3,991 | 806 | 116,045 |
| Nevada | 1,384 | 43,546 | 16,385 | 29,828 | 10,885 | 2,970 | 104,998 |
| New York | 1,786 | 52,800 | 13,263 | 5,041 | 7,180 | 7,696 | 87,766 |
| Ohio | 2,028 | 89,228 | 21,870 | 54,649 | 13,253 | 6,450 | 187,478 |
| Oklahoma | 1,224 | 18,225 | 9,630 | 52,103 | 7,773 | 1,929 | 90,884 |
| Oregon | 1,651 | 26,158 | 6,653 | 38,843 | 8,201 | 1,635 | 83,141 |
| Pennsylvania | 2,443 | 197,382 | 20,626 | 66,260 | 17,433 | 13,714 | 317,858 |
| Rhode Island | 43 | 3,589 | 629 | 92 | 322 | 109 | 4,784 |
| South Carolina | 749 | 41,748 | 11,045 | 38,222 | 7,944 | 4,173 | 103,881 |
| South Dakota | 377 | 4,324 | 2,096 | 29,029 | 1,409 | 244 | 37,479 |
| Tennessee | 1,763 | 50,922 | 14,687 | 47,401 | 11,378 | 6,320 | 132,471 |
| Texas | 7,552 | 297,502 | 43,729 | 401,861 | 70,006 | 9,459 | 830,109 |
| Utah | 516 | 19,075 | 7,763 | 60,645 | 7,941 | 1,610 | 97,550 |
| Virginia | 3,024 | 241,180 | 42,761 | 71,688 | 23,482 | 8,811 | 390,946 |
| Vermont | 230 | 3,094 | 1,467 | 2,657 | 739 | 180 | 8,367 |
| Washington | 1,972 | 56,204 | 4,589 | 58,854 | 14,072 | 1,040 | 136,731 |
| Wisconsin | 820 | 34,560 | 8,292 | 31,075 | 7,089 | 1,400 | 83,236 |
| West Virginia | 474 | 21,997 | 7,309 | 11,198 | 2,582 | 1,179 | 44,739 |
| Wyoming | 325 | 121,151 | 1,940 | 11,781 | 1,732 | 417 | 137,346 |
| Other US Territories | 6 | 323 | 408 | 19 | 12 | 103 | 871 |
| Total | 65,398 | 3,180,393 | 726,951 | 2,042,719 | 460,544 | 158,059 | 6,634,064 |

Source:  ATF National Firearms Registration and Transfer Record (NFRTR).

15

[1] The term "any other weapon" means any weapon or device capable of being concealed on the person from which a shot can be discharged through the energy of an explosive, a pistol or revolver having a barrel with a smooth bore designed or redesigned to fire a fixed shotgun shell, weapons with combination shotgun and rifle barrels 12 inches or more, less than 18 inches in length, from which only a single discharge can be made from either barrel without manual reloading, and shall include any such weapon which may be readily restored to fire. Such term shall not include a pistol or a revolver having a rifled bore, or rifled bores, or weapons designed, made, or intended to be fired from the shoulder and not capable of firing fixed ammunition.

[2] Destructive device generally is defined as (a) Any explosive, incendiary, or poison gas (1) bomb, (2) grenade, (3) rocket having a propellant charge of more than 4 ounces, (4) missile having an explosive or incendiary charge of more than one-quarter ounce, (5) mine, or (6) device similar to any of the devices described in the preceding paragraphs of this definition; (b) any type of weapon (other than a shotgun or a shotgun shell which the Director finds is generally recognized as particularly suitable for sporting purposes) by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, and which has any barrel with a bore of more than one-half inch in diameter; and (c) any combination of parts either designed or intended for use in converting any device into any destructive device described in paragraph (a) or (b) of this section and from which a destructive device may be readily assembled. The term shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 4684(2), 4685, or 4686 of title 10, United States Code; or any other device which the Director finds is not likely to be used as a weapon, is an antique, or is a rifle which the owner intends to use solely for sporting, recreational, or cultural purposes.

[3] Machinegun is defined as any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

[4] Silencer is defined as any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for the use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication.

[5] Short-barreled rifle is defined as a rifle having one or more barrels less than 16 inches in length, and any weapon made from a rifle, whether by alteration, modification, or otherwise, if such weapon, as modified, has an overall length of less than 26 inches.

[6] Short-barreled shotgun is defined as a shotgun having one or more barrels less than 18 inches in length, and any weapon made from a shotgun, whether by alteration, modification, or otherwise, if such weapon as modified has an overall length of less than 26 inches.

16

## Exhibit 9. National Firearms Act Special Occupational Taxpayers by State
## Tax Year 2019

| State | Importers | Manufacturers | Dealers | Total |
|---|---|---|---|---|
| Alabama | 26 | 105 | 142 | 273 |
| Alaska | 0 | 28 | 63 | 91 |
| Arizona | 34 | 380 | 250 | 664 |
| Arkansas | 17 | 118 | 121 | 256 |
| California | 12 | 109 | 91 | 212 |
| Colorado | 6 | 144 | 223 | 373 |
| Connecticut | 4 | 80 | 61 | 145 |
| Delaware | 0 | 0 | 2 | 2 |
| District of Columbia | 1 | 0 | 0 | 1 |
| Florida | 63 | 461 | 518 | 1042 |
| Georgia | 11 | 176 | 319 | 506 |
| Hawaii | 0 | 0 | 1 | 1 |
| Idaho | 1 | 108 | 112 | 221 |
| Illinois | 10 | 89 | 40 | 139 |
| Indiana | 3 | 89 | 243 | 335 |
| Iowa | 1 | 57 | 95 | 153 |
| Kansas | 3 | 63 | 136 | 202 |
| Kentucky | 15 | 80 | 189 | 284 |
| Louisiana | 2 | 75 | 171 | 248 |
| Maine | 3 | 40 | 50 | 93 |
| Maryland | 9 | 76 | 92 | 177 |
| Massachusetts | 2 | 100 | 24 | 126 |
| Michigan | 10 | 113 | 238 | 361 |
| Minnesota | 14 | 99 | 167 | 280 |
| Mississippi | 8 | 70 | 122 | 200 |
| Missouri | 18 | 149 | 205 | 372 |
| Montana | 4 | 64 | 94 | 162 |
| Nebraska | 0 | 34 | 83 | 117 |
| Nevada | 13 | 150 | 83 | 246 |
| New Hampshire | 6 | 88 | 69 | 163 |
| New Jersey | 1 | 9 | 18 | 28 |
| New Mexico | 12 | 69 | 77 | 158 |
| New York | 2 | 77 | 24 | 103 |
| North Carolina | 1 | 199 | 335 | 535 |
| North Dakota | 1 | 10 | 60 | 71 |
| Ohio | 4 | 213 | 316 | 533 |
| Oklahoma | 1 | 116 | 166 | 283 |
| Oregon | 1 | 107 | 152 | 260 |
| Pennsylvania | 19 | 193 | 310 | 522 |
| Rhode Island | 1 | 0 | 1 | 2 |
| South Carolina | 10 | 97 | 110 | 217 |
| South Dakota | 0 | 27 | 81 | 108 |
| Tennessee | 6 | 115 | 260 | 381 |
| Texas | 40 | 684 | 985 | 1709 |
| Utah | 3 | 141 | 110 | 254 |
| Vermont | 4 | 22 | 23 | 49 |
| Virginia | 49 | 184 | 301 | 534 |
| Washington | 6 | 124 | 125 | 255 |
| West Virginia | 9 | 42 | 85 | 136 |
| Wisconsin | 2 | 103 | 191 | 296 |
| Wyoming | 2 | 39 | 72 | 113 |
| Total | 470 | 5,716 | 7,806 | 13,992 |

Source: ATF's National Firearms Act Special Occupational Tax Database (NSOT)

Numbers represent qualified premises locations.

17

## Exhibit 10.  Federal Firearms Licensees Total (1975-2019)

| Fiscal Year | Dealer | Pawn-broker | Collector | Manufacturer of | | Importer | Destructive Device | | | Total |
| | | | | Ammunition | Firearms | | Dealer | Manufacturer | Importer | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1975 | 146,429 | 2,813 | 5,211 | 6,668 | 364 | 403 | 9 | 23 | 7 | 161,927 |
| 1976 | 150,767 | 2,882 | 4,036 | 7,181 | 397 | 403 | 4 | 19 | 8 | 165,697 |
| 1977 | 157,463 | 2,943 | 4,446 | 7,761 | 408 | 419 | 6 | 28 | 10 | 173,484 |
| 1978 | 152,681 | 3,113 | 4,629 | 7,735 | 422 | 417 | 6 | 35 | 14 | 169,052 |
| 1979 | 153,861 | 3,388 | 4,975 | 8,055 | 459 | 426 | 7 | 33 | 12 | 171,216 |
| 1980 | 155,690 | 3,608 | 5,481 | 8,856 | 496 | 430 | 7 | 40 | 11 | 174,619 |
| 1981 | 168,301 | 4,308 | 6,490 | 10,067 | 540 | 519 | 7 | 44 | 20 | 190,296 |
| 1982 | 184,840 | 5,002 | 8,602 | 12,033 | 675 | 676 | 12 | 54 | 24 | 211,918 |
| 1983 | 200,342 | 5,388 | 9,859 | 13,318 | 788 | 795 | 16 | 71 | 36 | 230,613 |
| 1984 | 195,847 | 5,140 | 8,643 | 11,270 | 710 | 704 | 15 | 74 | 40 | 222,443 |
| 1985 | 219,366 | 6,207 | 9,599 | 11,818 | 778 | 881 | 15 | 85 | 45 | 248,794 |
| 1986 | 235,393 | 6,998 | 10,639 | 12,095 | 843 | 1,035 | 16 | 95 | 52 | 267,166 |
| 1987 | 230,888 | 7,316 | 11,094 | 10,613 | 852 | 1,084 | 16 | 101 | 58 | 262,022 |
| 1988 | 239,637 | 8,261 | 12,638 | 10,169 | 926 | 1,123 | 18 | 112 | 69 | 272,953 |
| 1989 | 231,442 | 8,626 | 13,536 | 8,345 | 922 | 989 | 21 | 110 | 72 | 264,063 |
| 1990 | 235,684 | 9,029 | 14,287 | 7,945 | 978 | 946 | 20 | 117 | 73 | 269,079 |
| 1991 | 241,706 | 9,625 | 15,143 | 7,470 | 1,059 | 901 | 17 | 120 | 75 | 276,116 |
| 1992 | 248,155 | 10,452 | 15,820 | 7,412 | 1,165 | 894 | 15 | 127 | 77 | 284,117 |
| 1993 | 246,984 | 10,958 | 16,635 | 6,947 | 1,256 | 924 | 15 | 128 | 78 | 283,925 |
| 1994 | 213,734 | 10,872 | 17,690 | 6,068 | 1,302 | 963 | 12 | 122 | 70 | 250,833 |
| 1995 | 158,240 | 10,155 | 16,354 | 4,459 | 1,242 | 842 | 14 | 118 | 71 | 191,495 |
| 1996 | 105,398 | 9,974 | 14,966 | 3,144 | 1,327 | 786 | 12 | 117 | 70 | 135,794 |
| 1997 | 79,285 | 9,956 | 13,512 | 2,451 | 1,414 | 733 | 13 | 118 | 72 | 107,554 |
| 1998 | 75,619 | 10,176 | 14,875 | 2,374 | 1,546 | 741 | 12 | 125 | 68 | 105,536 |
| 1999 | 71,290 | 10,035 | 17,763 | 2,247 | 1,639 | 755 | 11 | 127 | 75 | 103,942 |
| 2000 | 67,479 | 9,737 | 21,100 | 2,112 | 1,773 | 748 | 12 | 125 | 71 | 103,157 |
| 2001 | 63,845 | 9,199 | 25,145 | 1,950 | 1,841 | 730 | 14 | 117 | 72 | 102,913 |
| 2002 | 59,829 | 8,770 | 30,157 | 1,763 | 1,941 | 735 | 16 | 126 | 74 | 103,411 |
| 2003 | 57,492 | 8,521 | 33,406 | 1,693 | 2,046 | 719 | 16 | 130 | 82 | 104,105 |
| 2004 | 56,103 | 8,180 | 37,206 | 1,625 | 2,144 | 720 | 16 | 136 | 84 | 106,214 |
| 2005 | 53,833 | 7,809 | 40,073 | 1,502 | 2,272 | 696 | 15 | 145 | 87 | 106,432 |
| 2006 | 51,462 | 7,386 | 43,650 | 1,431 | 2,411 | 690 | 17 | 170 | 99 | 107,316 |
| 2007 | 49,221 | 6,966 | 47,690 | 1,399 | 2,668 | 686 | 23 | 174 | 106 | 108,933 |
| 2008 | 48,261 | 6,687 | 52,597 | 1,420 | 2,959 | 688 | 29 | 189 | 113 | 112,943 |
| 2009 | 47,509 | 6,675 | 55,046 | 1,511 | 3,543 | 735 | 34 | 215 | 127 | 115,395 |
| 2010 | 47,664 | 6,895 | 56,680 | 1,759 | 4,293 | 768 | 40 | 243 | 145 | 118,487 |
| 2011 | 48,676 | 7,075 | 59,227 | 1,895 | 5,441 | 811 | 42 | 259 | 161 | 123,587 |
| 2012 | 50,848 | 7,426 | 61,885 | 2,044 | 7,423 | 848 | 52 | 261 | 169 | 130,956 |
| 2013 | 54,026 | 7,810 | 64,449 | 2,353 | 9,094 | 998 | 57 | 273 | 184 | 139,244 |
| 2014 | 55,431 | 8,132 | 63,301 | 2,596 | 9,970 | 1,133 | 66 | 287 | 200 | 141,116 |
| 2015 | 56,181 | 8,152 | 60,652 | 2,603 | 10,498 | 1,152 | 66 | 315 | 221 | 139,840 |
| 2016 | 56,754 | 8,076 | 57,345 | 2,481 | 11,083 | 1,105 | 71 | 332 | 217 | 137,464 |
| 2017 | 56,638 | 7,871 | 55,588 | 2,259 | 11,946 | 1,110 | 78 | 357 | 234 | 136,081 |
| 2018 | 55,891 | 7,639 | 54,136 | 2,119 | 12,564 | 1,127 | 98 | 378 | 239 | 134,191 |
| 2019 | 53,924 | 7,341 | 52,446 | 1,910 | 13,044 | 1,109 | 129 | 391 | 252 | 130,546 |

Source:  ATF Federal Firearms Licensing Center, Federal Licensing System (FLS).  Data is based on active firearms licenses and related statistics as of the end of each fiscal year.

## Exhibit 11.  Federal Firearms Licensees by State 2019

| State | FFL Population |
|-------|---------------:|
| Alabama | 2,153 |
| Alaska | 848 |
| Arizona | 3,199 |
| Arkansas | 1,877 |
| California | 8,127 |
| Colorado | 2,933 |
| Connecticut | 1,760 |
| Delaware | 304 |
| District of Columbia | 30 |
| Florida | 6,936 |
| Georgia | 3,442 |
| Hawaii | 229 |
| Idaho | 1,467 |
| Illinois | 4,862 |
| Indiana | 2,754 |
| Iowa | 2,017 |
| Kansas | 1,757 |
| Kentucky | 2,246 |
| Louisiana | 1,986 |
| Maine | 888 |
| Maryland | 2,925 |
| Massachusetts | 4,006 |
| Michigan | 3,870 |
| Minnesota | 2,443 |
| Mississippi | 1,469 |
| Missouri | 4,362 |
| Montana | 1,487 |
| Nebraska | 1,120 |
| Nevada | 1,293 |
| New Hampshire | 1,161 |
| New Jersey | 482 |
| New Mexico | 1,042 |
| New York | 3,791 |
| North Carolina | 4,438 |
| North Dakota | 688 |
| Ohio | 4,434 |
| Oklahoma | 2,246 |
| Oregon | 2,183 |
| Pennsylvania | 6,106 |
| Rhode Island | 601 |
| South Carolina | 2,077 |
| South Dakota | 761 |
| Tennessee | 3,103 |
| Texas | 10,492 |
| Utah | 1,454 |
| Vermont | 527 |
| Virginia | 3,932 |
| Washington | 3,013 |
| West Virginia | 1,360 |
| Wisconsin | 2,894 |
| Wyoming | 854 |
| Other Territories | 117 |
| Total | 130,546 |

Source:  ATF, Federal Firearms Licensing Center, Firearms Licensing System.  Data is based on active firearms licenses and related statistics as of the end of the fiscal year.

19

## Exhibit 12.  Actions on Federal Firearms License Applications (1975 - 2019)

| Fiscal Year | Original Application | | | |
|---|---|---|---|---|
| | Processed | Denied | Withdrawn[1] | Abandoned[2] |
| 1975 | 29,183 | 150 | 1,651 | ... |
| 1976 | 29,511 | 209 | 2,077 | ... |
| 1977 | 32,560 | 216 | 1,645 | ... |
| 1978 | 29,531 | 151 | 1,015 | 414 |
| 1979 | 32,678 | 124 | 432 | 433 |
| 1980 | 36,052 | 96 | 601 | 661 |
| 1981 | 41,798 | 85 | 742 | 329 |
| 1982 | 44,745 | 52 | 580 | 370 |
| 1983 | 49,669 | 151 | 916 | 649 |
| 1984 | 39,321 | 98 | 706 | 833 |
| 1985 | 37,385 | 103 | 666 | 598 |
| 1986 | 42,842 | 299 | 698 | 452 |
| 1987 | 36,835 | 121 | 874 | 458 |
| 1988 | 32,724 | 30 | 506 | 315 |
| 1989 | 34,318 | 34 | 561 | 360 |
| 1990 | 34,336 | 46 | 893 | 404 |
| 1991 | 34,567 | 37 | 1,059 | 685 |
| 1992 | 37,085 | 57 | 1,337 | 611 |
| 1993 | 41,545 | 343 | 6,030 | 1,844 |
| 1994 | 25,393 | 136 | 4,480 | 3,917 |
| 1995 | 7,777 | 49 | 1,046 | 1,180 |
| 1996 | 8,461 | 58 | 1,061 | 629 |
| 1997 | 7,039 | 24 | 692 | 366 |
| 1998 | 7,090 | 19 | 621 | 352 |
| 1999 | 8,581 | 23 | 48 | 298 |
| 2000 | 10,698 | 6 | 447 | 91 |
| 2001 | 11,161 | 3 | 403 | 114 |
| 2002 | 16,100 | 13 | 468 | 175 |
| 2003 | 13,884 | 30 | 729 | 289 |
| 2004 | 12,953 | 18 | 572 | 235 |
| 2005 | 13,326 | 33 | 943 | 300 |
| 2006 | 13,757 | 35 | 898 | 234 |
| 2007 | 14,123 | 32 | 953 | 402 |
| 2008 | 15,434 | 21 | 1,030 | 291 |
| 2009 | 16,105 | 20 | 1,415 | 724 |
| 2010 | 16,930 | 32 | 1,467 | 380 |
| 2011 | 19,923 | 22 | 1,744 | 369 |
| 2012 | 20,977 | 28 | 2,252 | 358 |
| 2013 | 23,242 | 30 | 2,901 | 385 |
| 2014 | 17,816 | 27 | 2,192 | 444 |
| 2015 | 15,219 | 34 | 1,953 | 387 |
| 2016 | 15,853 | 16 | 2,165 | 307 |
| 2017 | 14,546 | 17 | 2,038 | 366 |
| 2018 | 14,054 | 17 | 1,913 | 377 |
| 2019 | 12,966 | 9 | 1,933 | 382 |

Source:  ATF

[1]An application can be withdrawn by an applicant at any time prior to the issuance of a license.

[2]If ATF cannot locate an applicant during an attempted application inspection or cannot obtain needed verification data, then the application will be abandoned.

20

## Exhibit 13. Federal Firearms Licensees and Compliance Inspections (FY 1975-2019)

| Fiscal Year | Inspections | Total Licensees | Percent Inspected | Licensed Business Entities[1] | Percent Inspected |
|---|---|---|---|---|---|
| 1975 | 10,944 | 161,927 | 6.7% | 156,716 | 7.0% |
| 1976 | 15,171 | 165,697 | 9.1% | 161,661 | 9.4% |
| 1977 | 19,741 | 173,484 | 11.3% | 169,038 | 11.7% |
| 1978 | 22,130 | 169,052 | 13.1% | 164,423 | 13.5% |
| 1979 | 14,744 | 171,216 | 8.6% | 166,241 | 8.9% |
| 1980 | 11,515 | 174,619 | 6.5% | 169,138 | 6.8% |
| 1981 | 11,035 | 190,296 | 5.7% | 183,806 | 6.0% |
| 1982 | 1,829 | 211,918 | 0.8% | 203,316 | 0.9% |
| 1983 | 2,662 | 230,613 | 1.1% | 220,754 | 1.2% |
| 1984 | 8,861 | 222,443 | 3.9% | 213,800 | 4.1% |
| 1985 | 9,527 | 248,794 | 3.8% | 239,195 | 4.0% |
| 1986 | 8,605 | 267,166 | 3.2% | 256,527 | 3.4% |
| 1987 | 8,049 | 262,022 | 3.1% | 250,928 | 3.2% |
| 1988 | 9,283 | 272,953 | 3.4% | 260,315 | 3.6% |
| 1989 | 7,142 | 264,063 | 2.7% | 250,527 | 2.9% |
| 1990 | 8,471 | 269,079 | 3.1% | 254,792 | 3.3% |
| 1991 | 8,258 | 276,116 | 3.0% | 260,973 | 3.2% |
| 1992 | 16,328 | 284,117 | 5.7% | 268,297 | 6.1% |
| 1993 | 22,330 | 283,925 | 7.9% | 267,290 | 8.4% |
| 1994 | 20,067 | 250,833 | 8.0% | 233,143 | 8.6% |
| 1995 | 13,141 | 191,495 | 7.0% | 171,577 | 7.7% |
| 1996 | 10,051 | 135,794 | 7.4% | 120,828 | 8.3% |
| 1997 | 5,925 | 107,554 | 5.5% | 94,042 | 6.3% |
| 1998 | 5,043 | 105,536 | 4.8% | 90,661 | 5.6% |
| 1999 | 9,004 | 103,942 | 8.7% | 86,179 | 10.4% |
| 2000 | 3,640 | 103,157 | 3.5% | 82,558 | 4.4% |
| 2001 | 3,677 | 102,913 | 3.6% | 77,768 | 4.7% |
| 2002 | 5,467 | 103,411 | 5.2% | 73,254 | 7.5% |
| 2003 | 5,170 | 104,105 | 4.9% | 70,699 | 7.3% |
| 2004 | 4,509 | 106,214 | 4.2% | 69,008 | 6.5% |
| 2005 | 5,189 | 106,432 | 4.9% | 66,359 | 7.8% |
| 2006 | 7,294 | 107,316 | 6.8% | 63,666 | 11.5% |
| 2007 | 10,141 | 108,933 | 9.3% | 61,243 | 16.6% |
| 2008 | 11,100 | 112,943 | 9.8% | 60,346 | 18.4% |
| 2009 | 11,375 | 115,395 | 9.9% | 60,349 | 18.8% |
| 2010 | 10,538 | 118,487 | 8.9% | 61,807 | 17.0% |
| 2011 | 13,159 | 123,587 | 10.6% | 64,360 | 20.4% |
| 2012 | 11,420 | 130,956 | 8.7% | 69,071 | 16.5% |
| 2013 | 10,516 | 139,244 | 7.6% | 74,795 | 14.1% |
| 2014 | 10,437 | 141,116 | 7.4% | 77,815 | 13.4% |
| 2015 | 8,696 | 139,840 | 6.3% | 79,188 | 11.0% |
| 2016 | 9,790 | 137,464 | 7.1% | 80,119 | 12.2% |
| 2017 | 11,009 | 136,081 | 8.1% | 80,493 | 13.7% |
| 2018 | 10,323 | 134,191 | 7.7% | 80,055 | 12.9% |
| 2019 | 13,079 | 130,546 | 10.0% | 78,100 | 16.7% |

Source: ATF

[1] Does not include Collector of Curio and Relics (Type 03)





DATE DOWNLOADED: Thu Oct 20 00:14:01 2022
SOURCE: Content Downloaded from *HeinOnline*

Citations:

Bluebook 21st ed.
i (1934) National firearms act. Hearings before the Committee on ways and means, House of representatives, Seventy-third Congress, second session, on H. R. 9066.

ALWD 7th ed.
. National firearms act. Hearings before the Committee on ways & means, House of representatives, Seventy-third Congress, second session, on H. R. 9066. (1934).

APA 7th ed.
(1934). National firearms act. Hearings before the Committee on ways and means, House of representatives, Seventy-third Congress, second session, on H. R. 9066. . .

Chicago 17th ed.
National firearms act. Hearings before the Committee on ways and means, House of representatives, Seventy-third Congress, second session, on H. R. 9066. . , .

McGill Guide 9th ed.
National firearms act. Hearings before the Committee on ways & means, House of representatives, Seventy-third Congress, second session, on H. R. 9066. (: ., 1934)

AGLC 4th ed.
National firearms act. Hearings before the Committee on ways and means, House of representatives, Seventy-third Congress, second session, on H. R. 9066. (., 1934

MLA 9th ed.
National firearms act. Hearings before the Committee on ways and means, House of representatives, Seventy-third Congress, second session, on H. R. 9066. . , .
HeinOnline.

OSCOLA 4th ed.
National firearms act. Hearings before the Committee on ways and means, House of representatives, Seventy-third Congress, second session, on H. R. 9066. . , .

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
   Conditions of the license agreement available at
   *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

# NATIONAL FIREARMS ACT

## HEARINGS

**BEFORE THE**

## COMMITTEE ON WAYS AND MEANS
## HOUSE OF REPRESENTATIVES

SEVENTY-THIRD CONGRESS
SECOND SESSION

ON

# H.R. 9066

APRIL 16, 18, AND MAY 14, 15, AND 16, 1934



UNITED STATES
GOVERNMENT PRINTING OFFICE
58278                WASHINGTON: 1934

Compendium_Spitzer
Page 569

## COMMITTEE ON WAYS AND MEANS

### HOUSE OF REPRESENTATIVES

ROBERT L. DOUGHTON, North Carolina, *Chairman*

| | |
|---|---|
| SAMUEL B. HILL, Washington | ALLEN T. TREADWAY, Massachusetts |
| THOMAS H. CULLEN, New York | ISAAC BACHARACH, New Jersey |
| CHRISTOPHER D. SULLIVAN, New York | FRANK CROWTHER, New York |
| MORGAN G. SANDERS, Texas | JAMES A. FREAR, Wisconsin |
| JOHN W. McCORMACK, Massachusetts | HAROLD KNUTSON, Minnesota |
| CLEMENT C. DICKINSON, Missouri | DANIEL R. REED, New York |
| DAVID J. LEWIS, Maryland | ROY O. WOODRUFF, Michigan |
| FRED M. VINSON, Kentucky | THOMAS A. JENKINS, Ohio |
| JERE COOPER, Tennessee | WILLIAM E. EVANS, California |
| ASHTON C. SHALLENBERGER, Nebraska | THOMAS C. COCHRAN, Pennsylvania |
| CHARLES WEST, Ohio | |
| JOHN W. BOEHNE, JR., Indiana | |
| JAMES V. McCLINTIC, Oklahoma | |
| CLAUDE A. FULLER, Arkansas | |

E. W. G. HUFFMAN, *Clerk*

II

Compendium_Spitzer
Page 570

# CONTENTS

Statements of—                                                                                            Page
    Allen, J. Weston, chairman National Anti-Crime Commission, New-
      ton, Mass_____ 102, 127
    Cummings, Hon. Homer S., Attorney General of the United States__     4
    Frederick, Karl T., president National Rifle Association of America_    38
    Gordon, Seth, president American Game Association _____ 81, 161
    Imlay, Charles V., representing the National Conference on Uniform
      Law_____ 67, 137
    Keenan, Hon. Joseph B., Assistant Attorney General, Department of
      Justice_____ 26, 64, 82, 86, 133, 161
    Nichols, Frank C., vice president Colt Patent Firearms Manufactur-
      ing Co_____   151
    Reckord, Hon. Milton A., adjutant general of the State of Maryland_ 33, 107
    Ryan, W. B., president Auto Ordnance Co_____    66
    Taylor, John Thomas, representing the American Legion_____    80

Compendium_Spitzer
Page 571

Compendium_Spitzer
Page 572

# NATIONAL FIREARMS ACT

---

**MONDAY, APRIL 16, 1934**

House of Representatives,
Committee on Ways and Means,
*Washington, D.C.*

The committee met at 10 a.m., Hon. Robert L. Doughton (chairman) presiding.

The CHAIRMAN. We have met this morning to consider several matters, one of which is H.R. 9066, to provide for the taxation of manufacturers, importers, and dealers in small arms and machine guns, and other weapons.

The Attorney General of the United States is here and I understand sponsors and is very much interested in this or in some similar legislation. We will be glad to have him proceed to explain the bill and make any statement with reference to it that he may deem proper.

[H.R. 9066, 73d Cong. 2d sess.]

A BILL To provide for the taxation of manufacturers, importers, and dealers in small firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for the purposes of this act the term "firearm" means a pistol, revolver, shotgun having a barrel less than sixteen inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun.

The term "machine gun" means any weapon designed to shoot automatically or semiautomatically twelve or more shots without reloading.

The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

The term "continental United States" means the States of the United States and the District of Columbia.

The term "importer" means any person who imports or brings firearms into he continental United States, for sale.

The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms, or who otherwise produces therein any firearm for sale or disposition.

The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term "dealer" shall include pawnbrokers and dealers in used firearms.

The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States (including the Philippine Islands), to any other State or Territory or District, or any insular possession of the United States (including the Philippine Islands).

SEC. 2. (a) Within fifteen days after the effective date of this act, or upon first engaging in business, and thereafter on or before the 1st day of July of each year, every importer, manufacturer, and dealer in firearms shall register with the collector of internal revenue for each district in which such business is to be carried on his name or style, principal place of business, and places of business in such district, and pay a special tax at the following rates: Importers or manufacturers, $___ a year; dealers, $___ a year. Where the tax is payable on the 1st day of July in any year it shall be computed for one year; where the tax is

i

**2**        NATIONAL FIREARMS ACT

payable on any other day it shall be computed proportionately from the 1st day of the month in which the liability to the tax accrued to the 1st day of July following.

(b) It shall be unlawful for any person required to register under the provisions of this section to import, manufacture, or deal in firearms without having registered and paid the tax imposed by this section.

(c) All laws (including penalties) relating to the assessment, collection, remission, and refund of special taxes, so far as applicable to and not inconsistent with the provisions of this act, are extended and made applicable to the taxes imposed by this section.

SEC. 3. (a) There shall be levied, collected, and paid upon firearms sold, assigned, transferred, given away, or otherwise disposed of in the continental United States a tax at the rate of $      per machine gun and $      per other firearm, such tax to be paid by the person so disposing thereof, and to be represented by appropriate stamps to be provided by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for. The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

(b) All provisions of law (including penalties) applicable with respect to the taxes imposed by section 800 of the Revenue Act of 1926 (U.S.C., Supp. VII, title 26, sec. 900) shall, insofar as not inconsistent with the provisions of this act, be applicable with respect to the taxes imposed by this section.

SEC. 4. (a) It shall be unlawful for any person to sell, assign, transfer, give away, or otherwise dispose of any firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank for that purpose by the Commissioner of Internal Revenue. Such order shall identify the applicant by his name, address, fingerprints, photograph, and such other means of identification as may be prescribed by regulations under this act. If the applicant is other than an individual, such application shall be made by an executive officer thereof.

(b) Every person disposing of any firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner of Internal Revenue. The original thereof, with stamps affixed, shall be returned to the applicant.

(c) No person shall sell, assign, transfer, give away, or otherwise dispose of a firearm which has previously been so disposed of (on or after the effective date of this act) unless such person, in addition to complying with subsection (b), transfers therewith the stamp-affixed order provided for in this section, for each such prior disposal, and complies with such other rules and regulations as may be imposed by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, for proof of payment of all taxes on such firearm.

SEC. 5. It shall be unlawful for any person to receive or possess any firearm which has at any time been disposed of in violation of section 3 or 4 of this act.

SEC. 6. Any firearm which has at any time been disposed of in violation of the provisions of this act shall be subject to seizure and forfeiture, and all the provisions of internal-revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this act, and the persons upon whom these taxes are imposed.

SEC. 7. Each manufacturer and importer of a firearm shall identify it with a number of other identification mark approved by the Commissioner of Internal Revenue, such number or mark to be stamped or otherwise placed thereon in a manner approved by such Commissioner.

SEC. 8. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this act as the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may by regulations require.

SEC. 9. (a) No firearms shall be imported or brought into the United States or any territory under its control or jurisdiction (including the Philippine Islands), except that, under regulations prescribed by the Secretary of the Treasury, any firearm may be so imported or brought in when (1) the purpose thereof is shown to be lawful and (2) such firearm is unique or of a type which cannot be obtained within the United States or such territory.

(b) It shall be unlawful (1) fraudulently or knowingly to import or bring any firearms into the United States or any territory under its control or jurisdiction,

NATIONAL FIREARMS ACT                                    **3**

in violation of the provisions of this act; or (2) knowingly to assist in so doing;
or (3) to receive, conceal, buy, sell, or in any manner facilitate the transportation,
concealment, or sale of any such firearm after being imported or brought in,
knowing the same to have been imported contrary to law.   Whenever on trial
for a violation of this section the defendant is shown to have or to have had pos-
session of such imported firearm, such possession shall be deemed sufficient
evidence to authorize conviction unless the defendant explains such possession to
the satisfaction of the jury.

SEC. 10. (a) It shall be unlawful for any person who has not first obtained a
permit as hereinafter provided, to send, ship, carry, or deliver any firearm in
interstate commerce.   Nothing contained in this section shall apply—

(1) To any manufacturer, importer, or dealer who has complied with the
provisions of section 2;

(2) To any person who has complied with the provisions of sections 3 and 4 in
respect to the firearm so sent, shipped, carried, or delivered by him;

(3) To a common carrier in the ordinary course of its business as a common
carrier;

(4) To an employee, acting within the scope of his employment, of any person
not violating this section;

(5) To a person who has lawfully obtained a license for such firearm from the
State, Territory, District, or possession to which such firearm is to be sent,
shipped, carried, or delivered;

(6) To any United States, State, county, municipal, District, Territorial, or
insular officer or official acting within the scope of his official duties.

(b) Application for such permit may be made to the Commissioner of Internal
Revenue at Washington or to such officers at such places as he may designate by
regulations to be prescribed by him, with the approval of the Secretary of the
Treasury, for the issuance of such permit.   Such regulations shall provide for a
written application containing the photograph and fingerprints of the applicant,
or employee, the serial number and description of the firearm to be transported,
and other information requested by the Commissioner of Internal Revenue or
his agent.

(c) Such permits shall be issued upon payment of a fee of $     , provided the
Commissioner of Internal Revenue is satisfied that the proposed transaction is
lawful.

(d) Any person found in possession of a firearm shall be presumed to have
transported such firearm in interstate commerce contrary to the provisions
hereof, unless such person has been a bona fide resident for a period of not less
than sixty days of the State wherein he is found in possession of such firearm,
or unless such person has in his possession a stamp-affixed order therefor required
by this act.   This presumption may be rebutted by competent evidence.

SEC. 11. The Commissioner of Internal Revenue, with the approval of the
Secretary of the Treasury, shall make all needful rules and regulations for carry-
ing the provisions of this act into effect.

SEC. 12. This act shall not apply to the sale, assignment. transfer, gift, or other
disposal of firearms (1) to the United States Government, any State, Territory,
or possession of the United States, or to any political subdivision thereof, or to
the District of Columbia; (2) to any peace officer or any Federal officer designated
by regulations of the Commissioner of Internal Revenue.

SEC. 13. Any person who violates or fails to comply with any of the require-
ments of this act shall, upon conviction, be fined not more than $     or be
imprisoned for not more than     years, or both, in the discretion of the court.

SEC. 14. The taxes imposed by paragraph (2) of section 600 of the Revenue
Act of 1926 (U.S.C., Supp. VII, title 26, sec. 1120) and by action 610 of the
Revenue Act of 1932 (47 Stat. 169, 264), shall not apply to any firearm on which
the tax provided by section 3 of this act has been paid.

SEC. 15. If any provision of this act, or the application thereof to any person
or circumstance, is held invalid, the remainder of the act, and the application
of such provision to other persons or circumstances, shall not be affected thereby.

SEC. 16. This act shall take effect on the sixtieth day after the date of its
enactment.

SEC. 17. This act may be cited as the "National Firearms Act."

**4**                    NATIONAL FIREARMS ACT

### STATEMENT OF HON. HOMER S. CUMMINGS, ATTORNEY GENERAL OF THE UNITED STATES

Attorney General CUMMINGS. Mr. Chairman and members of the committee, I do not think it is necessary to make any very elaborate statement, at least at the beginning.

This bill is a part of a program that has been formulated by the Department of Justice, following our experiences with the crime situation. I think it is a very essential part of it. There are pending before other committees, as of course you are aware, quite a number of bills which are designed to enable the Department of Justice to deal with what I think is generally recognized as a very serious national emergency.

All of these bills, as well as this bill, are predicated upon the proposition that there has developed in this country a situation which is far beyond the power of control of merely local authorities. All these bills have been drafted with an eye to constitutional limitations, and have been kept within a scope which indicates that there is no desire upon the part of the Department of Justice, or of anyone else, so far as I know, to take over any powers, or exert any administrative functions beyond those absolutely necessary to deal with this situation.

The development of late years of the predatory criminal who passes rapidly from State to State, has created a situation which is giving concern to all who are interested in law and order. We have gangs organized, as of course you all know, upon a Nation-wide basis and, on account of the shadowy area or twilight zone between State and Federal power, many of these very well instructed, very skillful, and highly intelligent criminals have found a certain refuge and safety in that zone, and there lies the heart of our problem—the roaming groups of predatory criminals who know, by experience, or because they have been instructed and advised, that they are safer if they pass quickly across a State line, leaving the scene of their crime in a high-powered car or by other means of quick transportation.

Now this situation, gentlemen, has become exceedingly serious. I stated in a moment of zeal on this question that there were more people in the underworld armed than there are in the Navy and the Army of the United States. I afterward sought to check up on the accuracy of my own statement. This proposition is, of course, somewhat difficult to calculate. Yet, on the basis of the records of crimes of violence which have been perpetrated, taken with our statistics of the number of persons in prisons for crimes of violence, and such other collateral data as it is possible to secure, I am prepared to say that the statement which I made was exceedingly conservative. It would be much fairer to say that there are more people in the underworld today armed with deadly weapons, in fact, twice as many, as there are in the Army and the Navy of the United States combined. In other words, roughly speaking, there are at least 500,000 of these people who are warring against society and who are carrying about with them or have available at hand, weapons of the most deadly character.

Mr. COOPER. Pardon me, General, but what was the number you estimated?

Attorney General CUMMINGS. A half a million. Now to deal with that situation, of course, requires thought and study and a serious, concerted program. Early last year the Department of Justice began

an earnest study of this problem. We have been at it for more than
a year, with some degree of success in our actual operations, and we
have, in addition to that, collected a lot of data and information of
one kind or another. Into the Department of Justice have flowed
thousands and thousands of letters offering suggestions as to how
to deal with this problem. The amount of public interest in this
effort to suppress crime is astounding. Unless you have been in
contact with it, perhaps you have not fully realized that, but we do;
because we are at the storm center of this activity.

Now, we have established in our Department an organization to
segregate this material, to separate out the worthless suggestions,
the extreme suggestions, the untenable propositions, and then
gradually to concentrate on a program that is constitutional, that is
reasonable, that does not invite local communities to relate their
problems to the Federal Government and burden the Federal Gov-
ernment unnecessarily with expenses, personnel, and all the things
that go with widened authority. At the same time, we have en-
deavored to provide the means for meeting this very real problem.

I have not the slightest pride of opinion in any of these bills—not
the least. I am interested only in the problem and how best to meet
it. If you gentlemen can improve these bills, or make them more
workable, or more useful, I am very happy to have you do that.
All that we have sought to do in this particular is to formulate these
bills and submit them to the Congress for its consideration.

Amongst the bills is, of course, the one that is before the committee
here today. This bill deals, I think it is fair to say, with one of the
most serious aspects of the crime situation, namely, the armed under-
world. How to deal with that was and is a difficult proposition. I
do not know that this bill meets it entirely to our satisfaction; I do
not know how it will work out. All I can say is that it is the result
of our best thought on the subject.

Now this bill is drastic in some respects—

The CHAIRMAN. General, would you care to complete your main
statement without interruption, or is it all right for members to ask
questions as you go along?

Attorney General CUMMINGS. Suppose I go along for a little while.
I do not mind interruptions, of course——

Mr. LEWIS. I would like to hear the general's statement first.

The CHAIRMAN. Suppose you complete your main statement and
then yield to questions.

Attorney General CUMMINGS. All right, Mr. Chairman. As I was
saying, I do not know exactly how this bill will work out. Nobody
can tell. We must feel our way through these big problems. But,
after all, it represents a lot of thought, and a lot of study.

Frankness compels me to say right at the outset that it is a drastic
bill, but we have eliminated a good many suggestions that were made
by people who are a little more enthusiastic about this than we are—I
mean enthusiastic about the possibility of curing everything by legis-
lation.

For instance, this bill does not touch in any way the owner, or
possessor, or dealer in the ordinary shotgun or rifle. There would
manifestly be a good deal of objection to any attempt to deal with
weapons of that kind. The sportsman who desires to go out and
shoot ducks, or the marksman who desires to go out and practice,

**6**                    NATIONAL FIREARMS ACT

perhaps wishing to pass from one State to another, would not like to be embarrassed, or troubled, or delayed by too much detail.   While there are arguments for including weapons of that kind, we do not advance that suggestion.

This bill deals, as the very first part of it indicates, with firearms, but defines "firearms" to mean a pistol, a revolver, a shotgun having a barrel less than 16 inches in length, or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun.   In the next paragraph it defines a machine gun as any weapon designed to shoot automatically, or semiautomatically, 12 or more shots without reloading.   The inquiries we have made of experts on the subject of the length of the barrel of sawed-off shotguns indicates the general belief amongst such people that 18 or even 20 inches would be a better maximum length than the 16 inches suggested in our bill.

A sawed-off shotgun is one of the most dangerous and deadly weapons.   A machine gun, of course, ought never to be in the hands of any private individual.   There is not the slightest excuse for it, not the least in the world, and we must, if we are going to be successful in this effort to suppress crime in America, take these machine guns out of the hands of the criminal class.

Now we proceed in this bill generally under two powers—one, the taxing power, and the other, the power to regulate interstate commerce.   The advantages of using the taxing power with respect to the identification of the weapons and the sale, and so forth, are quite manifest.   In the first place, there is already in existence a certain machinery for dealing with the collection of taxes of this kind, and these powers are being preserved in this particular act.   In addition to that, it is revenue-producing.   I presume that is the reason this bill is before this particular committee.   I suspect there ought to be enough revenue produced to cover at least the cost of administration and as much more as is necessary in the opinion of the committee to constitute an effective regulatory arrangement.

I am informed that, under existing law, there is an ad valorem 10-percent tax on pistols and revolvers and that this law produced $35,388 in the fiscal year 1933.   This existing law, if the pending bill should pass, will become inoperative so far as it imposes a tax on firearms included in the proposed legislation.   So we shall have to take into account the fact that with the passage of this bill there will disappear most if not all of that $35,000, but it will reappear in a larger measure under the taxing provisions and the licensing provisions that we would have in this act.

I do not think, gentlemen, that I can help very much in the details of this bill.   We have followed, where we could, the language of existing laws as to revenue terminology; and we have followed the Harrison Anti-Narcotic-Act in language so as to get the benefit of any possible interpretation that the courts may have made of that act.   We have given this bill the best study that we could, and we want your help.   We are very anxious to obtain its passage and, if there are any things that ought to be changed, or any features of it which ought to be improved, as I said before, we are only too happy to have it done.

Now that is really all I have to say, Mr. Chairman, unless there are some questions which some of the members desire to ask.

Mr. FREAR. General, I think every member of this committee who
has been a prosecuting officer at any time appreciates the work that
your Department has been doing, particularly on kidnaping and
matters of that kind, and I speak of that because I had for years a
near relation to police officials in St. Paul, and the difficulty of
getting prisoners over State lines has been emphasized in the past.
It was helpful, whether they were responsive or not. You have
great difficulty, of course, between Federal and State laws.

Attorney General CUMMINGS. Yes, sir.

Mr. FREAR. I notice in all of the work that has been done you
have been very helpful to the State authorities.

Attorney General CUMMINGS. Yes, sir.

Mr. FREAR. And I think we appreciate that. I was just wonder-
ing—you have not put a provision in here by means of which a man
like Dillinger who goes into police headquarters and gets vests and
arms—you have not provided anything in this bill that covers a
situation like that, and there is this suggestion: Those coats and those
vests, that are for armament and purely a matter of criminal use, if
this bill could be broadened in any way to cover those things—
whether your office had considered that.

Attorney General CUMMINGS. Let me answer your interrogatory,
Mr. Congressman, in two sections. First, with regard to reaching a
man like Dillinger: There is nothing specific in this act that deals
with that situation. There is pending, however, before the Judiciary
Committee of the House a bill making it an offense, a Federal offense,
to flee across a State line to escape prosecution for a felony and, if
that bill should be enacted, we would be able to reach criminals who
are passing rapidly from one State to another. The mere fact of
going across a State line for such a purpose would in itself be an
offense.

Now in regard to vests and other protective armament, the reason
we did not go into that, to be perfectly frank with you, sir, is because
we were not confident that the committees would go along with us.
There is a great deal of hesitancy in expanding the Federal powers
too much and these things that you mention were merely left out as
a matter of judgment. Now if the committee wants them in, it is
all right with me.

Mr. FREAR. I was wondering if it had been considered.

Attorney General CUMMINGS. It has been considered and left out
merely because I did not want to go before any committee and ask
for too much. I wanted to ask for all that I thought should be
granted to us. If they want to give us more in the way of power,
we shall try to discharge the duties which may be imposed upon us.
It was merely a matter of judgment whether we should ask for it.

Mr. FREAR. With an officer of the law trying to get a man who is
a desperate criminal, who is clothed with protective clothing, of
course the officer is at a disadvantage. It seems to me that there are
very few people who are innocent wearing clothes of that kind, even
for their own protection.

Attorney General CUMMINGS. That is true. The things that the
underworld do to camouflage their activities and protect their persons
are astounding. I do not know whether we have it here today, but
we have a photograph taken of a gangster's arsenal that would make
your blood run cold to ook at. Amongst other equipment found were

uniforms of police officers; uniforms of the Western Union Telegraph Co.'s delivery boys; and automobile license plates, manufactured by the gangsters themselves, which they use on their cars to divert suspicion. We are confronted, gentlemen, with a very serious problem, and if the committee, as our distinguished friend suggests, could devise a way of dealing with these armaments, these bullet-proof vests— there are various types of them—if that could be made a matter of prohibition under some theory that permits the Federal Government to handle it, this would be of great assistance. But there is some difficulty there, you see.

Mr. FREAR. I quite agree.

Attorney General CUMMINGS. It would be quite all right with me; but, of course, we have no inherent police powers to go into certain localities and deal with local crime. It is only when we can reach those things under the interstate commerce provision, or under the use of the mails, or by the power of taxation, that we can act.

Now, for instance, we are asking for amendments to the Lindbergh Kidnaping Act so as to make communication not only by letter, but also by radio, or telephone, or other means, by criminals demanding rewards—making that a Federal offense; we are trying to strengthen the law so as to plug up as many of those loopholes as possible.

Mr. FREAR. We all follow your work and I believe every member of the committee congratulates you on what you have been able to do.

Attorney General CUMMINGS. It is very gracious of you to say so, sir. I must say we are very much in earnest about it, working very hard with it, and there is a fine morale in the Department.

Mr. COOPER. Mr. Attorney General, I am thoroughly in sympathy with the purpose sought to be accomplished. I feel that the situation presented by you here is really a challenge to governmental authority and organized society and that we have to meet and solve this problem. Having such a profound respect for your views, I want to ask one or two questions in connection with this bill. I invite your attention to the language appearing at the top of page 7, beginning in line 3—

> * * * Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such imported firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury.

I would appreciate your legal opinion on that provision, as to whether the burden of proof is placed upon the defendant in the trial of the case, or whether it in any way affects his presumption of innocence, that we all recognize as being thrown around him as a protection.

Attorney General CUMMINGS. No, it does not shift the essential burden of proof on the trial, but it does, when once established, require an explanation by the defendant. And in formulating that particular language, we followed preceisely the language of a similar provision of the Narcotic Drug Act of February 9, 1909, chapter 100, as amended relating to the importation of narcotic drugs. That provision was upheld in the case of *Yee Hem* v. *United States*, 268 U.S., 178. We thought that if we followed the language of that act, inasmuch as the Supreme Court had passed on the language, it was safer for us so to do than to attempt to formulate language of our own.

Mr. Cooper. It was my mpression this provision was similar to the narcotic provision referred to by you, and that had been upheld.

Attorney General Cummings. That is it exactly.

Mr. Cooper. I thought, for the benefit of the record, that should appear specifically at this point.

Attorney General Cummings. That is quite true.

Mr. Cooper. Now just one or two other questions. I would be interested to get your opinion about meeting the problem with reference to arms already in the possession of the criminal element of the country. As you stated, it is your estimate there are some 500,000 of these firearms in the hands of the criminal element of the country now. Is it your thought that this bill would afford some effective means of meeting and dealing with that problem, where the arms are already in the possession of those criminals?

The Chairman. Mr. Cooper, I understood the General to state there were 500,000 of these underworld criminals who were armed; not 500,000 firearms.

Attorney General Cummings. Five hundred thousand individual⌐

Mr. Cooper. I am glad to have that cleared up.

Attorney General Cummings. One individual might have a dozen different types of armament.

Mr. Cooper. Yes. I realize that, of course; but I was wondering what your opinion would be as to the effectiveness of this measure in meeting the problem that is presented by this large number of weapons now being in possession of these criminals.

Attorney General Cummings. Well the only answer I can give to you, Mr. Cooper, is that I racked my brain to try to find some simple and effective manner of dealing with those already armed. This bill is in two parts. The first part, under the internal revenue measure, deals with weapons as they now are coming out of the factories, and it seemed to us that the establishment of a system for the tracing of the weapons from owner to owner by a certificate of title might also be attempted with reference to arms already in existence. If we can once make a start and begin with the manufacture and disposal so that each person hereafter obtaining a weapon of the prescribed type would have to show his title to it and the propriety of its possession, that is about all we can do with that part of the problem.

The other part of the problem is dealt with under the Interstate Commerce provision, which makes it an offense to carry in interstate commerce any of the weapons which are under the ban of the law, with certain exceptions. So if, for instance, Dillinger, or any other of those roving criminals, not having proper credentials, should carry a revolver, a pistol, a sawed-off shotgun, or machine gun, across a State line and we could demonstrate that fact, that of itself would be an offense, and the weapons would be forfeited. And that is the only way I can think of to handle this where the weapons are already in existence.

Mr. Cooper. I realize, of course, the difficulty involved and I had this thought in mind—which, of course, you will readily appreciate—that whatever legislation is reported will have to be sustained to a very great extent by the members of this committee in the debate in the House.

Attorney General Cummings. Yes, sir.

Mr. Cooper. And I am just trying to anticipate a few questions that I apprehend will be asked during that time.   And it occurred to me that was one veryi mportant thing to bear in mind, that is. the large number of these weapons that are already in the hands of the criminal element of the country, and whether or not it is your opinion that this bill affords an effective means of meeting that problem.

Attorney General Cummings. I think it is as far as I would be warranted in asking a committee to go at the present time.

Mr. Cooper. I see.

Attorney General Cummings. I think that it does two crucial things.   It deals with the tracing of these weapons if traded or transferred after this act goes into effect; it deals with the requirement of licensing if a person is to take any weapon across State lines.   And I am assuming in all this, of course, that the criminal elements are not going to obtain permits and they are not going to obtain licenses, and they are not going to be able to bring themselves within those protective requirements.   Therefore, when we capture one of those people, we have simply a plain question to propound to him—where is your license; where is your permit?   If he cannot show it, we have got him and his weapons and we do not have to go through an elaborate trial, with all kinds of complicated questions arising.   That is the theory of the bill.

Mr. Cooper. Then it is your thought that this bill presents the best method that the Department of Justice has been able to work out, in view of its long experience and intensive efforts along that line that have been made?

Attorney General Cummings. Bearing in mind our limitations of the constitutional character, bearing in mind our limitations to extend our power beyond the immediate requirements of the problem, this is our best thought on the subject.

Mr. Cooper. And this, as indicated by your opening remarks, is a very important part of your whole program?

Attorney General Cummings. Absolutely.

Mr. Cooper. For meeting the criminal situation now existing in the country.

Attorney General Cummings. Yes, Mr. Cooper.

Mr. Cooper. And is an important administrative measure?

Attorney General Cummings. Yes, sir.   I might add that the President has authorized me to say he was strongly in favor not only of this measure, but of all the other pending measures the Department of Justice has suggested.

Mr. Cooper. Now, then, one other phase of the matter if I may, please, and that is with reference to the taxes and penalties imposed by the bill.   Would you feel disposed to give us some idea as to what you think those taxes should be?   You have observed, of course, that the amounts are left blank in the bill.   I invite your attention to page 3, where there are some 4 blanks appearing on that page; page 8, where there is a blank with reference to the fine and the imprisonment to be imposed; page 9, where there is a blank.   Would you feel disposed to give us your views as to what would be the proper amounts to insert in those places?

Attorney General Cummings. Yes, sir.

Mr. Hill. Would you supplement that by asking for an estimate of the revenue which would be produced?

Mr. Cooper. Yes; I would be glad to have any estimate made of the amount to be yielded by this legislation.

Attorney General Cummings. Answering for the moment your question, Mr. Cooper. On page 3, line 5 of the bill, there is a special tax of blank dollars a year fixed upon importers or manufacturers, and an unnamed annual tax upon dealers. We hesitated to make any specific suggestions as to amount, because they are mere matters of opinion. But, for what it is worth, we would suggest that a tax on importers or manufacturers of $5,000 a year would be proper. There are only four basic manufacturers in the country, large manufacturers. I see no reason why it should not be $5,000 a year, and dealers $200 a year.

The Chairman. General, would you not include for the record the names of those four large manufacturers you referred to?

Attorney General Cummings. Yes; I will supply that.

Mr. Cooper. Then, on the bottom of page 3, General?

Attorney General Cummings. On the bottom of page 3, in line 23, there is the tax on firearms sold, and so forth. For machine guns, $200 and, any other firearms, $1.

Mr. Cooper. That is $200 in the first blank in line 23, and $1 in the second blank?

Attorney General Cummings. Yes. It rather penalizes the machine gun. Now in the next blank——

Mr. Woodruff. Mr. Attorney General, you suggest a tax of $200 on the sale of a machine gun. I understood a moment ago you said that those machine guns were manufactured almost exclusively by four different concerns.

Attorney General Cummings. Yes.

Mr. Woodruff. Now it seems to me that possibly it would have a somewhat wholesome effect upon these particular manufacturers to increase that substantially. They can not have much to say; they would not have much reason to complain if the tax were made much larger than that; because, as we know, machine guns are in the possession of practically all of the criminals in the country who desire them; the fact that they have them must be due, to some small extent at least, to either carelessness or worse on the part of the people who manufacture those guns. Is that a reasonable deduction?

Attorney General Cummings. Well let me say a few words on that if you will, sir.

Mr. Woodruff. I would be glad to hear you, General.

Attorney General Cummings. In the past, that has been true—the presence of machine guns in the hands of the criminal classes has been a reflection upon the manufacturers of those weapons.

Mr. Woodruff. It certainly has.

Attorney General Cummings. Now there is only one, really, the Colt Co., of Hartford, Conn.—my own State—I think that is the only manufacturer now of the type of machine gun used by gangsters and they have entered into a gentleman's agreement with the Department of Justice by which far greater care is now being taken in connection with the distribution of machine guns. Therefore I did not want to have it thought that they were entirely responsible.

Mr. Woodruff. I do not say "entirely".

Attorney General Cummings. They have been quite cooperative of late, sir, and I think it is because they have realized what a dreadful

thing it has been for those deadly and dangerous weapons to be in the hands of those criminals.

Mr. WOODRUFF. General, I do not charge them with the entire responsibility.

Attorney General CUMMINGS. No, sir.

Mr. WOODRUFF. But I did feel and do now feel they have been to a great extent responsible.

Attorney General CUMMINGS. You are quite right. Now you could put that higher if you wanted to, as far as I am concerned.

Mr. WOODRUFF. I would like to ask about the provision in the last paragraph on page 1——

Mr. COOPER. Mr. Chairman, I only yielded for a question.

Mr. WOODRUFF. Just before he leaves this, then I am through.

Mr. COOPER. My point is this, that I only yielded for one question and I would like to have in the record, in one place, about these taxes, and then we can go back and pick up these other matters. If the gentleman will pardon me, I prefer to keep this matter together in the record.

Now just one question, if I may, in reference to the suggestion offered by you as to the tax provided in line 23, on page 3: That is $200 per machine gun?

Attorney General CUMMINGS. Yes.

Mr. COOPER. In that connection, would you be prepared to give us some information as to the average cost of one of these machine guns?

Attorney General CUMMINGS. The cost now is about $200.

Mr. COOPER. That is, delivered to the purchaser?

Attorney General CUMMINGS. Yes, sir.

Mr. COOPER. Then the proposed tax of $200——

Attorney General CUMMINGS. Would be about a 100-percent tax.

Mr. COOPER. About a 100-percent tax?

Attorney General CUMMINGS. Yes, sir.

Mr. COOPER. Then pass on if you will, please, sir, to page 8 and give us your idea as to the amount of fee that should be imposed in the provision in line 15.

Attorney General CUMMINGS. In line 15, on page 8, I think a dollar for each permit is reasonable.

Mr. COOPER. Then on page 9, General, the amount of the fine and the length of the imprisonment.

Attorney General CUMMINGS. In line 14, the amount of fine, page 9, is suggested at $2,000, and the imprisonment, in line 15, not more than 5 years. I will supplement that by saying that that is the penalty that is prescribed in the Harrison Anti-narcotic Act and we were following that suggestion. The committee may think it is not sufficiently drastic.

Mr. COOPER. I thank you, General, and Mr. Chairman, I will be glad to yield the General back to the gentleman.

Mr. HILL. Did you want to ask him for an estimate of the revenue?

Mr. COOPER. I would be glad if you could give us your estimate of the revenue to be yielded from these various items suggested by you.

Attorney General CUMMINGS. Well it probably would approach $100,000.

Mr. COOPER. All of them together would approach, in your opinion, about $100,000 a year?

Attorney General CUMMINGS. Yes, sir.

Mr. McCLINTIC. Will you yield for a question in connection with that?

Mr. COOPER. Yes.

Mr. McCLINTIC. I would like to ask just one question. I am very much interested in this subject. What in your opinion would be the constitutionality of a provision added to this bill which would require registration, on the part of those who now own the type or class of weapons that are included in this bill?

Attorney General CUMMINGS. We were afraid of that, sir.

Mr. McCLINTIC. Afraid it would conflict with State laws?

Attorney General CUMMINGS. I am afraid it would be unconstitutional.

Mr. McCLINTIC. That is what I want to know.

Mr. COOPER. Now then, Mr. Chairman, I will be glad to yield back the gentleman to Mr. Woodruff.

The CHAIRMAN. I understand you are through now?

Mr. COOPER. Yes.

Mr. CULLEN. Pardon my suggestion, but my colleague Mr. Cooper understood, as he was collecting this data to have it assembled in one place in the record, that the $35,000 being collected now by the Government would be eliminated?

Mr. COOPER. Yes; I understood from the Attorney General it was his estimate—and I am having those figures checked now—that the present yield from the tax on revolvers, and so forth, is about $35,000 a year. And of course, as he suggested here, that would be eliminated if this new tax were imposed.

Mr. HILL. Will the gentleman yield for a question?

Mr. COOPER. Yes, sir.

Mr. HILL. Where is there in this bill a provision for the repeal of those taxes?

Attorney General CUMMINGS. Section 14, page 9, appears to be the place.

Mr. KNUTSON. General, would there be any objection, on page 1, line 4, after the word "shotgun" to add the words "or rifle" having a barrel less than 18 inches? The reason I ask that is I happen to come from a section of the State where deer hunting is a very popular pastime in the fall of the year and, of course, I would not like to pass any legislation to forbid or make it impossible for our people to keep arms that would permit them to hunt deer.

Attorney General CUMMINGS. Well, as long as it is not mentioned at all, it would not interfere at all.

Mr. KNUTSON. It seems to me that an 18-inch barrel would make this provision stronger than 16 inches, knowing what I do about firearms.

Attorney General CUMMINGS. Well, there is no objection as far as we are concerned to including rifles after the word "shotguns" if you desire.

Mr. KNUTSON. Why should we permit the manufacture, that is, permit the sale of the machine guns to any one outside of the several branches of the Government—for instance, the Federal Government, the sheriff's officers, and State constabularies?

Attorney General CUMMINGS. Well, there are other conceivable uses. For instance, in banking institutions, we want to protect the banks.

58278—34——2

**14**     NATIONAL FIREARMS ACT

Mr. KNUTSON. They could swear their guards at the banks in as deputy sheriffs, which would allow them to use machine guns.

Mr. SUMNERS of Texas. Pardon a suggestion, but is not this the answer, that this is a revenue measure and you have to make it possible at least in theory for these things to move in order to get internal revenue?

Attorney General CUMMINGS. That is the answer exactly.

Mr. SUMNERS of Texas. Mr. Attorney General, with the permission of the Chair, may I ask this one question: I notice you put in as the description of a machine gun a gun that will shoot automatically 12 or more shots without reloading. Would you anticipate the possibility, if this bill should be passed, of some unscrupulous manufacturer of these machine guns cutting it down to 11?

Attorney General CUMMINGS. No, sir; I do not think so.

Mr. SUMNERS of Texas. I do not know enough about it, but that possibility occurs to my mind.

Attorney General CUMMINGS. They are only made by the Colt people and the Colt people have been very cooperative of late and I would not believe for a moment that they would try to evade the law by any such device.

Mr. WOODRUFF. I will say, General, that the question raised by my friend from Texas, Mr. Sumners, is exactly the question that I wished to propound to you a moment ago. You say that the Colt Co. is the only one that manufactures machine guns?

Attorney General CUMMINGS. Yes, sir.

Mr. WOODRUFF. Are you sure about that?

Attorney General CUMMINGS. That is the submachine gun, the small kind—that is correct.

Mr. WOODRUFF. Well there are other machine guns, however, that are used?

Attorney General CUMMINGS. There are machine guns that sometimes get in by importation.

Mr. WOODRUFF. Is the Browning machine gun manufactured in this country?

Attorney General CUMMINGS. The same company, if I recall correctly, the Colt Co., manufactures the Browning gun. But the Browning gun is not easily transportable; it is a large, cumbersome weapon that would probably not be used by the criminal class. So that it is not absolutely necessary to bother with it.

Mr. WOODRUFF. I see. Will you indulge me, Mr. Chairman, if I make a short statement?

The CHAIRMAN. Go ahead.

Mr. WOODRUFF. I wish to say, General, that for the last 5 or 6 years I have had before the House a bill to do exactly what you are now proposing to do. I want to congratulate you on that. You can imagine the pleasure it gives me to know that at last the Department of Justice is recommending to the Congress legislation that will give the Federal Government authority over interstate crime.

Now I have addressed letters to every Attorney General for the last 5 or 6 years enclosing a copy of my bill, asking departmental approval of that bill. I think my friend from Texas, the Chairman of the Judiciary Committee, who is present, will bear me out when I say my bill has been before his committee during this period of time, and I recall I even addressed a communication to you, sir,

when you first became Attorney General of the United States, and
enclosed a copy of my bill.  And that last bill that I introduced at
the beginning of this Congress provided a penalty for any man flee-
ing across State lines who was accused of crime.  I am happy to
know you have such a bill as that before the Judiciary Committee.
I hope you will have much greater influence, though, with the very
honorable chairman of that committee than I have had in the past;
I hope you have more influence with the committee and that the
legislation gets out of that committee and before the Congress and
becomes a law in this session.

I believe we are engaged in a war against crime and I believe we
ought to bring up every element of strength we have to win that war.
Again, I congratulate you.

Attorney General CUMMINGS. I thank you most sincerely, Mr.
Congressman.

Mr. FULLER. General, as I understand from your statement, this
bill does not contemplate that private individuals will have to register
or have stamped their pistols that they now own.

Attorney General CUMMINGS. Not unless they sell them, or give
them away, or otherwise dispose of them.

Mr. FULLER. If they dispose of them, then they have to transfer
them with a bill of sale, or something of that kind?

Attorney General CUMMINGS. That is it.

Mr. FULLER. For instance, if a Member of Congress driving to
Washington would put a pistol in his car, he would have to have
that registered before he started, would he, and have it stamped?

Attorney General CUMMINGS. No, sir; in section 10, sir, subsection
5, page 7, prohibiting certain acts without a permit, it indicates that
it does not apply to a person who has legally obtained a license for
such firearm from the State, territory, district, or possession to which
such firearm is to be sent, shipped, carried, or delivered.  In other
words, if he has thus complied with the State law he is exempt under
the Federal law.

Mr. FULLER. But he would have to have some instrument to show
it and in most of the States, I imagine, they have no law to require
an owner of a pistol to show he is the owner of it.  There is no regis-
tration, for instance, in the State of Arkansas.  We had a law requir-
ing the registration of pistols and 1 year we did do that; but it was
so unpopular that at last the legislature repealed it.

Now, I have a pistol, say, in my home where I live and I inter-
pretate under this bill I cannot give that away, I cannot sell it, I
cannot dispose of it, without registering it or giving a bill of sale.

Attorney General CUMMINGS. That is correct.

Mr. FULLER. Nor can I carry it across a State line.

Mr. VINSON. Will the gentleman yield right at that point?

Mr. FULLER. Let him answer the question, first.

Attorney General CUMMINGS. You would not be required to have
a license or go through any other formalities except in the disposition
of the weapon to some one else.  And to go across a State line, you
would find yourself subject to no inconvenience whatsoever, if you
complied with the law of the place you were going to.

Mr. VINSON. Now, General, in that connection, the gentleman
from Arkansas (Mr. Fuller) referred to the State of Arkansas having

16                    NATIONAL FIREARMS ACT

no law granting permits to carry pistols. This subsection 5 of section
10, to which you refer, makes it necessary for you to have obtained a
license from the State, Territory, District, or possession to which such
firearm is to be sent, shipped, carried, or delivered. That does not
apply to the State from which the firearm is carried, as I read it.

Mr. HILL. That would apply to half a dozen different States.

Mr. VINSON. Yes; that applies to States into which the pistol or
revolver is to be carried.

Mr. HILL. Including the District of Columbia.

Mr. VINSON. And I do not think it is confined merely to sales;
because the language in section 10 refers to the sending, shipping,
carrying, or delivering of any firearms in interstate commerce.

Attorney General CUMMINGS. To what section are you referring
now?

Mr. VINSON. I am referring to the one you quoted, subsection 5
of section 10 on page 7 of the bill, at the bottom of the page.

Attorney General CUMMINGS. And what is the difficulty with it,
sir?

Mr. VINSON. Well it does not refer to the granting of a permit in
the State where the person lives and has his revolver legally. That
language refers to the securing of a permit from the State, Territory,
District, or possession in which the firearm is to be sent, shipped,
carried, or delivered.

Attorney General CUMMINGS. Yes, sir.

Mr. VINSON. Then you would have to get a permit, if you were in
Arkansas and coming to Washington, you would have to get a
permit in every State between Arkansas and the District of Colum-
bia, and in the District of Columbia; or you would be violating the
law. I would like for you to refer to subsection 5 of that section and
say if that is not true?

Attorney General CUMMINGS. If you are going from your home,
we will say, in some remote State, to Washington, D.C., it is not
contemplated you would have to have a permit from every inter-
mediate State.

Mr. VINSON. It is not a question of what is in contemplation; it is
a question of the language, General.

Attorney General CUMMINGS. If there is any doubt about it, you
may, of course, clear it up; I have no objection. That certainly was
not the purpose. It was the purpose not to compel a permit so long
as you complied with the law of the State to which you were going.

Mr. VINSON. That is right. The State to which you are going.

Attorney General CUMMINGS. I think it very clearly states that;
but if you have any doubt about it, clear it up.

Mr. VINSON. No; it does that. It states the State to which you
are going; but you, in answer to the query of the gentleman from
Arkansas, said it was a question of securing a permit in the State
where the party lives—in Arkansas, for instance, as he asks.

Attorney General CUMMINGS. Oh, well, you would not be expected
to obtain a permit from a State that does not issue them.

Mr. FULLER. But if you were going into a State that did require
a permit—for instance, I have to come through Missouri and Illinois,
and I would have to secure a permit from each one of those States.

Attorney General CUMMINGS. Oh, no. I do not think that would
be the fair interpretation.

Mr. FULLER. You do not mean that that is the intention of the law?

Attorney General CUMMINGS. Oh, no; and neither is it the language.

Mr. FULLER. And if the language of the law is such that it does require it, you would not have any objection to correcting it?

Attorney General CUMMINGS. Absolutely not.

Mr. FULLER. Would you have any objection to an officer of the law who has a warrant or is in pursuit of a criminal, carrying a weapon into another State? He has no time to stop and hesitate about getting a permit.

Attorney General CUMMINGS. That is included in the act.

Mr. FULLER. Where?

Attorney General CUMMINGS. Page 8, line 1——

Mr. FULLER. That keeps him from registering, but does not keep him from transporting.

Attorney General CUMMINGS. If you will look at page 8, line 1, section 6, you will find the act requiring a permit in interstate commerce does not apply to any United States, State, county, municipal, district, territorial or insular officer, or official acting within the scope of his official duties.

Mr. FULLER. Now is that for transportation, or is that for having a permit?

Attorney General CUMMINGS. Transportation.

Mr. VINSON. Now, General Cummings, let us assume you have a State officer and he goes out of his State, across the line, into another State: As soon as he crosses the line, he becomes a private citizen. Now would he be violating the provisions of this act if he had a pistol on him?

Attorney General CUMMINGS. I see the point you make—as to whether the language "within the scope of his duties" would be sufficient to protect him. Well it might be you could improve that language.

Mr. FULLER. Now you would have no exemption, as I understand—I have just hurriedly looked at this bill—for a sheriff, a man in the Department of Justice, one of your men, buying a machine gun and, as long as you have to combat those people, when the criminal has one, do you think they ought to be penalized by paying this exorbitant sum of $200 if a man is going out just to combat criminals?

Attorney General CUMMINGS. The answer is found on page 9, line 5, section 12, which exempts such officials.

Mr. FULLER. The question was asked you about the conclusive evidence of his guilt if a man did not have this permit, as provided by the narcotic law. As I understand, that is nothing more than the prevailing law in practically every State in the Union, and the old common law, that the possession of stolen goods is prima facie evidence of guilt; by the burden of proof in the entire case does not shift by reason of that law.

Attorney General CUMMINGS. That was the substance of the answer I thought I had given you; yes, sir.

Now some one asked me for the names of the manufacturers of weapons. The four concerns that are chiefly concerned in this matter are the Colt Manufacturing Co., of Hartford, Conn., Smith & Wesson,

**18**                      NATIONAL FIREARMS ACT

of Springfied, Mass., Harrington & Richardson, Gloucester, Mass., and Iver-Johnson, of Boston.

Mr. LEWIS. General, doubtless you have compared the homicidal statistics of this country with other countries like Great Britain.

Attorney General CUMMINGS. Yes.

Mr. LEWIS. Will you put them in the record, in connection with your statement?

Attorney General CUMMINGS. Would you like those statistics put in the record?

Mr. LEWIS. Yes.

Attorney General CUMMINGS. Then, with the permission of the chairman of the committee, I shall file a memorandum.

Mr. LEWIS. Do you recall what the comparison is, say, between Great Britain and the United States, in a general way?

Attorney General CUMMINGS. I could not speak off-hand on that, sir.

Mr. LEWIS. I have seen comparisons in which it was said that one city in the United States, not the largest, had more murders each year than the whole of Great Britain.

Attorney General CUMMINGS. I can submit the accurate figures on that; but I prefer to submit them after consultation of the records.

Mr. LEWIS. Now, in the study of this subject doubtless you have had under consideration the method of dealing with these deadly weapons in other countries—say Great Britain, France, Germany?

Attorney General CUMMINGS. Yes.

Mr. LEWIS. Would it be a matter of great difficulty to give the committee the benefit of a comparison of such methods of treatment?

Attorney General CUMMINGS. I suppose I could supply data on that subject; but from my own experience, my judgment is that we are apt to be mislead by statistics that have been compiled under different theories in an entirely different country, having very different problems. If you will permit me to recur to one of my favorite illustrations, take this situation, for instance: Take the Urschell kidnaping case. Urschell was kidnaped in Oklahoma; he was carried into a remote section of Texas; the demand for the ransom money came from Missouri, and there was already prepared a gang of confederates in Minnesota to make disposition of the ransom money.   There were other groups in 3 different additional States and our representatives had to travel in 16 States in rounding up those criminals.   But calculating only the 7 original States; exclusive of the additional States in which our representatives traveled, those 7 States have an area of about 683,000 square miles, and that 683,000 square miles superimposed upon the map of Europe would cover Germany, France, Italy, Austria, Denmark, Holland, Switzerland, England, Scotland, and Wales.

Now, that is our crime problem, gentlemen.   There is not anything comparable to it anywhere on the face of the globe.

Mr. LEWIS. What I have in mind mostly, General, is this: The theory of individual rights that is involved.   There is a disposition among certain persons to overstate their rights.   There is a provision in the Constitution, for example, about the right to carry firearms, and it would be helpful to me in reaching a judgment in supporting this bill to find just what restrictions a law-abiding citizen of Great

Britain and these other countries is willing to accept in the way of his duty to society.

Attorney General CUMMINGS. I will be very glad to supply all the information I can on that subject.

Mr. LEWIS. Now a very brief statement on this subject: Lawyer though I am, I have never quite understood how the laws of the various States have been reconciled with the provision in our Constitution denying the privilege to the legislature to take away the right to carry arms. Concealed-weapon laws, of course, are familiar in the various States; there is a legal theory upon which we prohibit the carrying of weapons—the smaller weapons.

Attorney General CUMMINGS. Of course we deal purely with concealable weapons. Machine guns, however, are not of that class. Do you have any doubt as to the power of the Government to deal with machine guns as they are transported in interstate commerce?

Mr. LEWIS. I hope the courts will find no doubt on a subject like this, General; but I was curious to know how we escaped that provision in the Constitution.

Attorney General CUMMINGS. Oh, we do not attempt to escape it. We are dealing with another power, namely, the power of taxation, and of regulation under the interstate commerce clause. You see, if we made a statute absolutely forbidding any human being to have a machine gun, you might say there is some constitutional question involved. But when you say "We will tax the machine gun" and when you say that "the absence of a license showing payment of the tax has been made indicates that a crime has been perpetrated", you are easily within the law.

Mr. LEWIS. In other words, it does not amount to prohibition, but allows of regulation.

Attorney General CUMMINGS. That is the idea. We have studied that very carefully.

Mr. LEWIS. Just one other question: If the bill were to require of a person now holding one of these weapons that in order to travel in another State with that pistol in his possession he should first have to get a Federal permit, would you not then have reached, in a very substantial way, those who now, hundreds of thousands, carry these small firearms?

Attorney General CUMMINGS. Why, there is a question of policy and there are a lot of people who think that would be too drastic; that it would reach too many innocent people who desire to carry weapons for what they think are proper purposes. Now I do not think it would be proper for me to go into it very deeply, but we have gone as far as we thought we could and yet find support for our propositions as a matter of policy.

There is one matter, Mr. Chairman, if you will pardon me, that I neglected to mention——

Mr. SUMNERS of Texas. General, with the permission of the Chairman, something has occurred to me.

The CHAIRMAN. Proceed.

Mr. SUMNERS of Texas. What do you think about the bullet-proof vests that are part of the equipment of these persons?

Attorney General CUMMINGS. That subject, Mr. Sumners, was brought up by one of the members of the committee.

20                    NATIONAL FIREARMS ACT

Mr. Sumner's of Texas. Then please excuse me.  Please dismiss it, and please do not cover it.

Attorney General Cummings. There is one other matter that I would like to draw to your attention, that I think you will approve of. The bill ought, in my judgment, at some appropriate spot, for instance as section 7 (b) on page 6—I would suggest that on page 6, line 1, section 7 be changed so that after section 7 the letter "a" be inserted and the present language be considered as paragraph (a), and then that a subsection (b) be added containing the following language:

(b) It shall be unlawful for anyone to obliterate, remove, change or alter such number or other identification mark.  Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of such firearm, upon which such number or mark shall have been obliterated, removed, changed or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

That, of course, speaks for itself.  We deal with criminals who will file off the numbers of the weapons so as to make it impossible to trace them, much as they do with automobiles now.

Mr. McClintic. The distinguished Attorney General has referred to the so-called "Urschel case", which was tried in the State of Oklahoma.  I want to say to the members of the committee it was my privilege to attend that trial.  The closing argument for the Government was made by the distinguished Assistant Attorney General who is here, Mr. Keenan.  It was handled in such an efficient manner that all of the citizens of my State deeply appreciate the able presentation and the fine results obtained in that particular instance.

Attorney General Cummings. On behalf of my associate, 1 extend thanks to you, Mr. Congressman.

Mr. Vinson. General Cummings, I want to read paragraph (d) of subsection 6, section 10:

Any person found in possession of a firearm shall be presumed to have transported such firearm in interstate commerce contrary to the provisions hereof, unless that person has been a bona fide resident for a period of not less than sixty days of the State wherein he is found in possession of such firearm, or unless such person has in his possession a stamp-affixed order therefor required by this Act. This presumption may be rebutted by competent evidence.

Now is there any provision in any Federal or State statute similar to that?

Attorney General Cummings. The case of *Mobile Railroad Co.* v. *Turnip Seed* (219 U.S. 35) discusses such a provision.  If you will glance at that case, you will find that it sustains the proposition that there may be a legislative presumption based on one fact followed by another fact.

Mr. Vinson. What sort of crime had been committed in the case to which you refer?

Attorney General Cummings. Suppose I send for the case, sir.

Mr. Vinson. I will say I am familiar in a general way with the rule of presumption that obtains relative to stolen goods and possession of narcotics, and possession of distilled spirits, and particularly with reference to State laws in regard to liquors.  But I never came in contact with anything that even looked like a presumption such as written here in this bill in that paragraph.

Attorney General Cummings. The answer is confession and avoidance.  There is not anything that specifically I can point to which is

similar to this particular provision.   This question arose in connection with a provision in another bill that we have pending, dealing with kidnaping, in which we raised a presumption that the person was transported in interstate commerce if not returned within 3 days. And when that was before the Senate committee, Senator Borah, who was very much interested in the matter, raised the same question that you have raised, sir, as to this general power to create such presumptions.   And at that time we sent for this case and read it over together and both reached the conclusion that it was a constitutional provision.   So, personally, I have no doubt that upon test it would be sustained.

Mr. VINSON. Of course I may reach that same conclusion; but, at the present time, I am just as far distant from such a conclusion as a person could be.

Attorney General CUMMINGS. Well the test is this, that it is only essential that there shall be some rational connection between the fact proved and the fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate.

Mr. VINSON. That provision there puts a citizen of the United States on trial, innocent, however, as he may be, and compels him to rebut by competent evidence something that is not part and parcel of the crime; that is, a 60 days' bona fide residence.

Attorney General CUMMINGS. Mr. Congressman, it is perfectly natural to look at this crime problem from two angles; one, the angle of the defendant who may get into trouble——

Mr. VINSON. I am looking at it from the angle of a law-abiding citizen.

Attorney General CUMMINGS. That is what I say, and I have no fear of the law-abiding citizen getting into trouble.   The other angle is that of the prosecuting agency who desires to stamp out criminal practices.

Now we are dealing with armed people, criminals, who have hide-outs in various spots.   They will stay in one place a little while and in another place a little while, and move about—always with arms; always with arms.   We have recently broken into places where criminals had recently left and found regular arsenals of machine guns, revolvers, pistols, clips, vests, and the Lord knows what.   Now this particular provision was calculated to enable us to have a case against people of that kind.   Your fear is that it might be used as an engine of oppression against some innocent citizen.

Mr. VINSON. Let me say to you, General, I have been on the prosecution end of the law myself and can view it from the prosecutor's side of the case and, so far as the purpose in the prevention or restraint of this crime wave is concerned, of course we are in complete accord. But we have had some recent experiences in regard to splendid purposes that have been written into the law.   I could refer you to the 5-and-10-year provision of the Jones Act.   Nobody questioned the purpose of those of us who voted for that legislation; but, when we got off in the coolness and calmness of retrospect, we had something there that I do not think any English speaking people had ever seen prior to that time, and I know have not seen since.

Attorney General CUMMINGS. I will leave that to the committee.

22                 NATIONAL FIREARMS ACT

Mr. FULLER. As I understand from this bill, if I had a pistol of my own and I wanted to sell it, or give it away, I would have to have a picture taken.

Attorney General CUMMINGS. Yes.

Mr. FULLER. And have to give my fingerprints?

Attorney General CUMMINGS. Yes, you would.

Mr. FULLER. Do not you think that will cause an awful revolt all over the United States amongst private citizens, that the Federal Government is taking too much authority?

Attorney General CUMMINGS. Just a moment. I misspoke myself. You would not have to give your fingerprints, or your picture. It would be the person who got the weapon.

Mr. FULLER. The man who got the weapon?

Attorney General CUMMINGS. The man who received the weapon.

Mr. FULLER. Well is he the one who would have to get the permit?

Attorney General CUMMINGS. Yes, he would have to get the permit.

Mr. FULLER. What about transporting? If I had to get a permit to transport, would not I have to have my fingerprints made and a photograph taken, in order to get that permit to transport?

Attorney General CUMMINGS. Yes, I believe you would.

Mr. FULLER. Now, another question: You know that naturally, outside in your private life, as a practitioner, there is more or less resentment on behalf of all law-abiding people to be regulated too much, especially about pistols. Would it in your opinion seriously injure the object and purpose of this bill if you would eliminate pistols and let us get as strong a law as possible for sawed-off shotguns and machine guns—the very thing you are trying to reach? That sentiment is reflected in Congress here. And it is no trouble for a criminal to get a pistol any time he wants it, even if you pass this law; but it would have a wholesome effect to stop him on these machine guns and sawed-off shotguns.

Attorney General CUMMINGS. Of course, the committee and the Congress will do as they please about this matter. I can only say what I think and I think it would be a terrible mistake to adopt any half-way measures about this. I think the sooner we get to the point where we are prepared to recognize the fact that the possession of deadly weapons must be regulated and checked, the better off we are going to be as a people.

Now, you say that it is easy for criminals to get weapons. I know it; but I want to make it easy to convict them when they have the weapons. That is the point of it. I do not expect criminals to comply with this law; I do not expect the underworld to be going around giving their fingerprints and getting permits to carry these weapons, but I want to be in a position, when I find such a person, to convict him because he has not complied.

Mr. FULLER. Of carrying the pistol or weapon, instead of the offense with which he is charged?

Mr. LEWIS. General, you were compelled, in the case of one outlaw, which the Department has convicted, to resort to prosecution under the income-tax law?

Attorney General CUMMINGS. That is Capone.

Mr. LEWIS. You were compelled to do that by utter lack of power to deal with a national outlaw.

Attorney General CUMMINGS. Yes.

NATIONAL FIREARMS ACT 23

Mr. Vinson. General, I have been handed the case of the *Mobile, Jackson & Kansas City Railroad* v. *Turnipseed*, 235 U.S., to which you refer. That case, briefly, is a civil case for tort, and in it I find the following language in regard to presumption. I quote from it:

> To enact legislation providing that proof of one fact shall constitute prima facie evidence of the main fact in issue, is to enact a rule of evidence and keep within the general powers of government. Statutes, National and State, dealing with such methods of proof in both civil and criminal cases, are found and decisions upholding them are numerous.

Now that is with respect to some part and parcel of the crime; for instance, the possession of stolen goods. There may be a proper legal presumption that goods that have been stolen, that are in the hands of the party charged with the crime, have come there illegally, and the State or Federal Government may make that possession a crime. But this presumption that is referred to in paragraph (d) of subsection 6 of section 10 deals with a man's residence—the question of whether a man has resided for 60 days within a State: There is no violation of law there; there is nothing that even squints of crime in a man's living in a State for 60 days, 6 months, or 6 years. And it just occurs to me that this particular decision might not be very strong authority for that contention.

Attorney General Cummings. We have a memorandum on that subject that I would be glad to submit.

Mr. Vinson. I would be very happy to see it.

Mr. Hill. General Cummings, the question has been asked as to how you are going to check up on or deal with these prohibited arms now in possession of the people. Now there is not any provision in this bill that I have found that deals with clips, for instance, for a machine gun. It occurs to me that probably to some extent you might check up on the possessors of machine guns by requiring some identification in the purchase of the clips to furnish the ammunition for those guns.

Attorney General Cummings. That is a very good suggestion, sir—very good.

Mr. Hill. I doubt whether it would be a very popular thing to carry that on to the matter of ammunition for pistols.

Attorney General Cummings. No.

Mr. Hill. And sawed-off shotguns, and things of that kind; but, as to machine guns, it might be a very desirable supplement to this bill.

Attorney General Cummings. I think that is a very good suggestion.

Mr. Lewis. Do they have a different type of cartridge?

Attorney General Cummings. They have special equipment to go into these machine guns. It is a highly specialized implement and ought not to be in the hands of any innocent person—I mean ought not to be in the hands of any person who is not properly entitled to have possession of it.

Mr. Hill. Now you are proceeding under two provisions of the Constitution as a basis for this legislation. One is the taxing power and the other is the regulation of interstate commerce.

Attorney General Cummings. Yes.

Mr. Hill. How far does the character of interstate commerce follow a firearm? For instance, with a gun that is imported, of course

that would be international commerce and would come under this provision; but take a domestic product.   A manufacturer ships a gun into another State from that in which it is manufactured.   It is in interstate commerce.   Now if the person receiving that gun, purchasing that gun, sells it to some other person within the same State as he is, does the interstate commerce character still obtain?

Attorney General CUMMINGS.  Well we would get that person, if he is a criminal, under the taxing provision.

Mr. HILL.  Under the excise tax?

Attorney General CUMMINGS.  Yes, sir.

Mr. HILL.  You would require the person selling the weapon to pay the tax?

Attorney General CUMMINGS.  Yes.

Mr. HILL.  And in all these cases, I take it, where arms are imported, they will pay the import duty?

Attorney General CUMMINGS.  Yes.

Mr. HILL.  And, in addition to that, would pay the excise or internal revenue tax?

Attorney General CUMMINGS.  I think it is so provided specifically.

Mr. HILL.  Under the internal revenue tax feature, you would reach the sale of a weapon sold in the State in which it is manufactured?

Attorney General CUMMINGS.  Yes.   There you are under the taxing power.

Mr. HILL.  Yes; I say, under the taxing power.

Attorney General CUMMINGS.  You see, we have to use both of those powers to solve this problem.

Mr. HILL.  Now, of course, this is a pretty drastic measure.   Nobody will question that for a moment.   And it may arouse some resentment among certain of our perfectly good law-abiding people. For instance, it requires, as has been suggested here, every person, regardless of whether he be a criminal or law-abiding, if he wants to transport one of these prohibited arms in interstate commerce, that he must first secure a permit.   And, to get that permit, he must furnish a photograph and fingerprints and other marks of identification.

Attorney General CUMMINGS.  That is unless he complies with the law of the State to which he is going.

Mr. HILL.  Yes.   Well, if that State does not have any requirements as to licenses or permits, then he would have to get the permit from the Commissioner of Internal Revenue?

Attorney General CUMMINGS.  If you wish, sir, to meet that situation, on page 7, section 10, line 21, where we exempt persons who have lawfully obtained a license for such firearm from the State, Territory, District, or possession to which such firearm is to be sent— if you are raising the question that that State may not require any license (there is no doubt as to what it means) you might say:

Who has complied with the laws respecting firearms in the State, Territory, District, or possession to which he is going.

It is fair enough when you come to analyze it, because every State has a right, I should think, to be protected against people going into the State in contravention of the laws thereof.

Mr. HILL.  There is no question but that the State has the power to impose a restriction and require certain regulations to be complied with; but if that State has not done that and the person, a per-

fectly good citizen, should carry a firearm into that State, he would of course have nothing to show he is there legally in possession of it; because the State law will not require a permit.

Attorney General CUMMINGS. He would never be convicted or arrested in the world.

Mr. HILL. But he would have nothing to show specifically to the Federal officer who arrested him for having a firearm.

Attorney General CUMMINGS. The law would not contemplate for a moment requiring a person to have something that does not exist. So I should say if you were in the State of Arkansas, for instance, or going there, if it requires no permit, you would not have even to attempt to get one.

Mr. HILL. But section 10, on page 7, reads—

> It shall be unlawful for any person who has not first obtained a permit as hereinafter provided, to send, ship, carry, or deliver any firearm in interstate commerce.

Then it goes on to say—

> * * * nothing contained in this section shall apply—

to the number of different provisions which follow.

Attorney General CUMMINGS. You can change that so that, instead of requiring a license, it would read, "complied with the law."

Mr. HILL. Well there is no law to be complied with. He has absolutely nothing to show; that is the point I am making. He has to get a permit from the Commissioner and has nothing to show from the State, and what is there to keep him from being arrested by a Federal official as having violated this law?

Attorney General CUMMINGS. If he wants to get a permit, that would protect him. He does not have to get it.

Mr. HILL. He has to comply with regulations prescribed by the Secretary of the Treasury, which might include fingerprints, photographs, and other marks of identification. I am just simply calling attention, to get it in the record, to what this bill does, because we are going to be asked a lot of questions about it.

Attorney General CUMMINGS. Well, I said at the outset, Mr. Chairman, and Mr. Congressman, that this was a drastic law, and the law-abiding people of this country have got to be prepared to go to some inconvenience in dealing with these deadly weapons. The thing is not an irrational request to make of the honest citizen who wants the criminal class stamped out.

Mr. DICKINSON. Just one question, General. On page 4, section 4, the first line, where it says, "It shall be unlawfor for any person", does the word "person" include a dealer? Is it intended to include a dealer; is it broad enough to cover a dealer?

Attorney General CUMMINGS. Yes, sir. On page 2, line 1, it says "The term 'person' includes a partnership, company, association, or corporation, as well as a natural person."

Mr. DICKINSON. You think that includes a dealer?

Attorney General CUMMINGS. Well, if the dealer is a partnership, or company, or association, or corporation, undoubtedly.

Mr. DICKINSON. That definition, then, must be taken into consideration with the other?

Attorney General CUMMINGS. Did you notice line 11, Mr. Congressman—"The term 'dealer' means any person not a manufacturer or

importer" and so on, and "The term 'dealer' shall include pawn-brokers and dealers in used firearms". I would like to put those people out of business, if I could.

Mr. DICKINSON. It is the dealer that I have been thinking about for years.

Attorney General CUMMINGS. Will you permit me to express my appreciation, Mr. Chairman, to yourself and these very courteous and attentive gentlemen who have been so patient with me? I thank you.

The CHAIRMAN. General, we appreciate your attendance and the information you have given the committee. I am sure the committee is very deeply interested in this proposed legislation, and we perhaps will want to confer with you later. We thank you very much, General.

(Thereupon an adjournment was taken until Wednesday, Apr. 18, 1934, at 10 a.m.)

(The following data was subsequently submitted for the record by Hon. Joseph B. Keenan, Assistant Attorney General, Department of Justice:)

MEMORANDUM FOR THE ATTORNEY GENERAL CONCERNING LEGALITY OF PRE-SUMPTIONS IN CRIMINAL STATUTES WHICH PLACE THE BURDEN OF PROOF UPON THE ACCUSED; PRESUMPTION, IN H.R. 9066, CONCERNING INTERSTATE TRANSPORTATION OF FIREARMS

Numerous decisions of Federal courts have established the rule that a pre-sumption in a Federal criminal statute is not unconstitutional if (1) the defendant is given a fair chance to make a defense to it; (2) there is some rational connection between the fact proved and the fact presumed by reason of the statute.

The rule now followed has been set forth by the United States Supreme Court—

"That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law, it is only essential that there shall be some rational connection between the fact proved and the fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate."

*Mobile, etc. R.R. Co.* v. *Turnipseed,* 219 U.S. 35; see also *Hawes* v. *Ga.,* 258 U.S. 1; *Brighton* v. *U.S.,* 7 F. (2d) 532; 43 Harvard Law Rev. 100; 38 Yale Law Rev. 1145; 27 Mich. Law Rev. 951.

Legislative presumptions which, in effect, place the burden of proof on the defendant, are attacked on two grounds; first, that they are a denial of due process, in that they deprive the accused of the presumption of innocence; second, that they are a violation of the constitutional provision against self-incrimination. The case of *Yee Hem* v. *United States,* 268 U.S. 178 (1924) embodies the answer of the Supreme Court of the United States to all these objections.

That case arose over the arrest of one Yee Hem who was found to be in posses-sion of and concealing a quantity of smoking opium. He was convicted of the offense of concealing a quantity of smoking opium after importation, with knowl-edge that it had been imported in violation of the act of February 9, 1909, c. 100, as amended. Section 1 of that act "prohibits the importation into the United States of opium in any form after April 1, 1909, except that opium and prepara-tions and derivatives thereof, other than smoking opium or opium prepared for smoking, may be imported for medicinal purposes only, under regulations pre-scribed by the Secretary of the Treasury. Section 2 provides, among other things, that if any person shall conceal or facilitate the concealment of such opium, etc., after importation, knowing the same to have been imported contrary to law, the offender shall be subject to fine or imprisonment or both. It further provides that whenever the defendant on trial is shown to have or to have had possession of such opium, etc., 'such possession shall be deemed sufficient evidence to au-thorize conviction unless the defendant shall explain the possession to the satis-faction of the jury.' Section 3 provides that on and after July 1, 1913, 'all smoking opium or opium prepared for smoking found within the United States shall be presumed to have been imported after the 1st day of April, 1909, and

the burden of proof shall be on the claimant or the accused to rebut such presumption' " (268 U.S. 178, 181).

The question was raised whether Congress had power to enact the provisions in respect to the presumptions arising from the unexplained possession of such opium and from its presence in this country after the time fixed by the statute. The case was appealed to the Supreme Court which, by unanimous opinion delivered by Justice Sutherland, upheld the validity of this presumption. The court quoted from the opinion of the Supreme Court, by Justice Lurton, in *Mobile, etc., R.R.* v. *Turnipseed* (219 U.S. 35, 42):

"The law of evidence is full of presumptions either of fact or law. The former are, of course, disputable, and the strength of any inference of one fact from proof of another depends upon the generality of the experience upon which it is founded.
\* \* \*

"Legislation providing that proof of one fact shall constitute prima facie evidence of the main fact in issue is but to enact a rule of evidence, and quite within the general power of Government. Statutes, National and State, dealing with such methods of proof in both civil and criminal cases abound, and the decisions upholding them are numerous. \* \* \*

"That a legislative presumption of one fact from evidence of another may not constitute a denial of due process of law or a denial of the equal protection of the law it is only essential that there shall be some rational connection between the fact proved and the ultimate fact presumed, and that the inference of one fact from proof of another shall not be so unreasonable as to be a purely arbitrary mandate. So, also, it must not, under guise of regulating the presentation of evidence, operate to preclude the party from the right to present his defense to the main fact thus presumed."

Justice Sutherland said that the legislative provisions assailed in this case satisfied the above requirements set forth in the *Turnipseed case* in respect to due process.

"They have been upheld against similar attacks, without exception so far as we are advised, by the lower Federal courts. (*Charley Toy* v. *United States*, 266 Fed. 326, 239; *Gee Woe* v. *United States*, 250 Fed. 428; *Ng Choy Fong* v. *United States*, 245 Fed. 305; *United States* v. *Yee Fing*, 222 Fed. 154; *United States* v. *Ah Hung*, 243 Fed. 762, 764.) We think it is not an illogical inference that opium, found in this country more than 4 years (in the present case, more than 14 years) after its importation had been prohibited, was unlawfully imported. Nor do we think the further provision, that possession of such opium in the absence of a satisfactory explanation shall create a presumption of guilt, is 'so unreasonable as to be a purely arbitrary mandate.' By universal sentiment, and settled policy as evidenced by State and local legislation for more than half a century, opium is an illegitimate commodity, the use of which, except as a medicinal agent, is rigidly condemned. Legitimate possession, unless for medicinal use, is so highly improbable that to say to any person who obtains the outlawed commodity, 'since you are bound to know that it cannot be brought into this country at all, except under regulation for medicinal use, you must at your peril ascertain and be prepared to show the facts and circumstances which rebut, or tend to rebut, the natural inference of unlawful importation, or your knowledge of it,' is not such an unreasonable requirement as to cause it to fall outside the constitutional power of Congress" (p. 184).

With respect to the argument that this legislative presumption deprives the accused of the presumption of innocence, the court said:

"Every accused person, of course, enters upon his trial clothed with the presumption of innocence. But that presumption may be overcome, not only by direct proof, but, in many cases, when the facts standing alone are not enough, by the additional weight of a countervailing legislative presumption. If the effect of the legislative act is to give to the facts from which the presumption is drawn an artificial value to some extent, it is no more than happens in respect of a great variety of presumptions not resting upon statute. (See *Dunlop* v. *United States*, 165 U.S. 486, 502–503; *Wilson* v. *United States*, 162 U.S. 613, 619.)"

Finally, the court denied the validity of defendant's argument that the presumption contravened the compulsory self-incrimination clause of the fifth amendment.

"The point that the practical effect of the statute creating the presumption is to compel the accused person to be a witness against himself may be put aside with slight discussion. The statute compels nothing. It does no more than to make possession of the prohibited article *prima facie* evidence of guilt. It leaves the accused entirely free to testify or not as he chooses. If the accused happens

NATIONAL FIREARMS ACT

to be the only repository of the facts necessary to negative the presumption arising
from his possession, that is a misfortune which the statute under review does not
create but which is inherent in the case.    The same situation might present itself
if there were no statutory presumption and a *prima facie* case of concealment with
knowledge of unlawful importation were made by the evidence.    The necessity
of an explanation by the accused would be quite as compelling in that case as in
this; but the constraint upon him to give testimony would arise there, as it arises
here, simply from the force of circumstances and not from any form of compulsion
forbidden by the Constitution" (p. 185).

In the bill H.R. 9066, which provides for the taxation and registration of manu-
facturers, importers, and dealers in small firearms and machine guns, and for the
taxation and regulation of the sale or other disposal of such weapons a presump-
tion is created that—

"Any person found in possession of a firearm shall be presumed to have trans-
ported such firearm in interstate commerce contrary to the provisions hereof,
unless such person has been a bona fide resident for a period of not less than
60 days of the State wherein he is found in possession of such firearm, or unless
such person has in his possession a stamp-affixed order therefor required by this
act."

It is believed that this presumption is reasonable in view of the provisions of
this act.    If the firearm has been obtained since the accused entered the State,
he should have a stamped-affixed order.    Therefore, if he has not been a bona
fide resident of the State for a period of more than 60 days, it is reasonable to
presume that he came into the State within that period and transported such
firearm with him.

                                                    JOHN W. BRABNER SMITH.
APRIL 17, 1934.

───────

### FIREARM LEGISLATION IN GREAT BRITAIN

The British Firearm Act (act of 10 and 11 Geo. 5, c. 43, Aug. 16, 1920), not only
is more rigorous and burdensome upon the inhabitants of Great Britain than the
proposed National Firearms Act, H.R. 9066, would be upon the American people,
but, considering all its provisions, it is more drastic than any present state legisla-
tion, including New York's "Sullivan law."

The British Act is based on regulating the sale, as well as the use and possession,
of every kind of firearm, and of the ammunition therefor.    Only those individuals
can obtain a firearm certificate who are approved by the local chief of police, with
certain exceptions such as law enforcement officials.    The certificate fee is ap-
proximately $25, it is good for but three years, and is revocable.    There is an
additional hunting license fee.

Dealers are rigidly supervised and must make reports of all sales of weapons or
ammunition within forty-eight hours.    Such sales can only be made to identified
certificate holders and must be pursuant to instructions in the certificates.    Pawn-
brokers cannot deal in firearms, and all manufacturers and repairmen are super-
vised.

A more extended review of this Act follows.    It is unnecessary to discuss the
infrequency of crimes committed with firearms in England, for repeated com-
parisons between such conditions there and in this country are becoming much too
unpleasant for the law-abiding American citizen.

### OUTLINE OF THE BRITISH FIREARM ACT

[Act of 10 and 11 Geo. 5 ch. 43, Aug. 16, 1920]

#### FIREARM CERTIFICATE

In England every person, with certain exceptions, must have a firearm certifi-
cate to purchase, possess, use or carry any firearm or ammunition.    Firearms
include "any lethal firearm or other weapon of any description from which any
shot, bullet or other missile can be discharged, or any part thereof".    It does not
include antiques or firearms possessed as trophies of any war, although no ammu-
nition may be purchased therefor.

Ammunition is defined to be ammunition for such firearms, and also includes
grenades, bombs and similar missiles, whether capable of use with a firearm or not,
and ingredients and components thereof.

The firearm certificate is granted by the chief of police of the district in which
the applicant resides, if the police officer is satisfied that the applicant has good

NATIONAL FIREARMS ACT                           **29**

reason for acquiring the certificate and that he can be permitted to have the fire-arm without danger to the public safety, and on payment of a prescribed fee, which is 5 pounds for the first period of 3 years and is renewable every 3 years for a fee of 2 pounds 6 shillings.

The certificate must also specify the nature and number of the firearm to which it relates, and the quantity of ammunition authorized to be purchased and to be held at any one time thereunder.

### QUALIFICATIONS TO CARRY ARMS AND OBTAIN CERTIFICATE

(1) A certificate shall not be granted to a person of intemperate habits or unsound mind, or who is for any other reason unfit to be intrusted with firearms.

(2) A single certificate may be issued to a rifle club or cadet corps, if approved by a Secretary of State, for firearms to be used solely for target practice or drill, and no fee is charged.

(3) Certain groups of officers and individuals need not obtain a certificate: Law enforcement officers in the performance of duty; gunsmiths or firearm dealers; firearm and ammunition testers; warehousemen, post-office officials on duty; persons accompanied by a certificate holder; butchers or others who use firearms only to kill animals; and rifle ranges which use rifles not over 23 caliber.

(4) Persons under 14 years of age shall not purchase, possess, use or carry firearms or ammunition.

(5) A person who has been sentenced for a term of 3 months or more for any crime shall not, during a period of 5 years from the date of his release, have in his possession, use or carry a firearm or ammunition.

### LIMITATIONS ON DEALERS

Pawnbrokers shall not take in pawn a firearm or ammunition, although where they have done so before the act, redemption thereof may be made if the redeemer holds a firearm certificate or is a registered dealer, and in such case a sale also may be made to authorized persons.

Dealers are to register with the chief of police of the district in which their business is.

Manufacture, sale, repair, test, proof, exposure for sale, or possession for sale, repair, etc., is forbidden without registration.

No sale shall be made to other than a registered dealer unless the purchaser produces a certificate authorizing him to purchase firearms or ammunition, nor shall a person repair, test or prove firearms or ammunition for other than dealers or certificate holders. All vendors must, within 48 hours after a sale, notify the chief of police who issued the certificate, of the sale, must keep a record of all transactions within 24 hours after they take place, and must demand sufficient particulars to identify the purchaser. Such dealers must allow an inspection by the chief of police and other officers, of all stock on hand.

### APPEAL FROM REFUSAL TO ISSUE LICENSES, ETC.

Appeal from the refusal of a chief of police to issue a firearm certificate or to vary it or to register a firearm dealer, and other appeals from administrative acts hereunder, may be taken to a court of summary jurisdiction.

### PENALTIES

(1) For not having a certificate, or purchasing ammunition in excess quantities etc., the British Firearms Act provides a penalty up to 3 months imprisonment with or without hard labor, and £50.

(2) Dealers failing to comply with provisions of the act, as by making false entries, refusing to allow police inspection of books, etc., may be penalized up to 3 months and £20. Also the registration privilege may be withdrawn and the stock of firearms and ammunition sold by court order.

### MISCELLANEOUS

(1) All hunters must also have a gun license which costs 10 shillings.

(2) The manufacture, possession, sale, purchase, transportation of weapons, designed to contain or to discharge noxious liquid, gas, etc., may be punished by imprisonment for not more than 2 years.

58278—34——3

30                    NATIONAL FIREARMS ACT

(3) Possessing a firearm or ammunition with intent to endanger or injure any person or property is a misdemeanor.

(4) Any secretary of state can by order prohibit the removal of firearms to places within or without the United Kingdom unless authorized by the chief of police under instructions contained in the order.

(5) Any constable is empowered to demand production of the firearm certificate by anyone whom he believes to be in possession of a firearm or ammunition. Upon failure to produce it, the firearm or ammunition may be seized and detained, and for failure to comply with officer's request for true name and address of the possessor, the latter is liable to arrest without warrant and to a penalty of £20.

(6) Any justice of the peace, on information on oath that there is reasonable grounds for suspecting an offense is being committed, may grant a search warrant to enter at any time, and by force if necessary, the premises named therein, and the searching officer may seize and detain all firearms and ammunition found therein and arrest without warrant any person reasonably suspected of having committed an offense under this act.

---

COMPARISON OF STATISTICS CONCERNING MURDER AND MANSLAUGHTER IN THE UNITED STATES AND CERTAIN FOREIGN COUNTRIES, 1920–31

The following tables indicate that far more crimes of murder and manslaughter, in proportion to the population, are committed annually in the United States than in the leading European countries.   In the year 1930, which is the last year for which comparative statistics are available, there was approximately one such crime per 11,000 of population in the United States, as compared with approximately one in 72,500 of population in France, approximately one in 46,000 of population in Germany, approximately one in 165,000 of population in Great Britain, and for the year 1928 (which is the last available record we have) approximately one in 40,000 of population in Italy.

Moreover, murder, for the period from 1920 to 1931, has been increasing in this country more rapidly than has the growth of population, whereas in all the leading European nations there has been a constant decrease in this form of crime.   In the year 1931 there were 569 known cases of murder or manslaughter in the city of New York, as compared with 287 in the entire country of Great Britain.   In the Borough of Manhattan, New York City, which is one of the 5 boroughs constituting the city, there were 333 homicides in the year 1931 as compared with 287 homicides in all of Great Britain for the same year.   The entire population of the city of New York is approximately 7,000,000.

*Homicide statistics for the United States and certain foreign countries*

[Latest comparative figures available]

I. United States, 1931: Murder and manslaughter_____   11, 160
   United States.   Division of Vital Statistics, Census Bureau of the United States Government.
II. France, 1930: Murder and manslaughter_____      562
   France.   Bureau de la statistique generale.   Annuaire statistique, 1932, p. 92.
III. Germany, 1931: Murder and manslaughter_____   1, 336
   Germany.   Statistisches reichsamt.   Statistisches Jahrbuch für das Deutsche Reich.   Berlin 1933, p. 45.
IV. Great Britain, 1931: Murder and manslaughter_____      287
   Great Britain.   Home department.   Criminal statistics, England and Wales, 1931.   London, 1933, p. 15.
V. Italy, 1928: Homicide and infanticide_____      988
   Italy.   Direzione generale della statistics.   Annuario statistico Italiano.   1930, p. 58.

NATIONAL FIREARMS ACT                    **31**

*Homicide statistics for the United States, and some foreign countries, 1920–31*

NOTE.—Crime statistics are not compiled under uniform categories in all countries; consequently comparisons should be made advisedly.
Time limitation and lack of official reports prevent inclusion of later figures in this tabulation.

| Year | United States [1] | France [2] | Germany [3] | Great Britain [4] | Italy [5] | New York City [6] |
|---|---|---|---|---|---|---|
| 1920 | 6,205 | 781 | 1,868 | 313 | 2,661 | 344 |
| 1921 | 7,545 | 759 | 1,641 | 251 | 2,750 | 307 |
| 1922 | 7,788 | 595 | 1,538 | 243 | 2,459 | 350 |
| 1923 | 7,878 | 439 | 1,604 | 259 | 1,851 | 303 |
| 1924 | 8,420 | (7) | 1,373 | 274 | 1,786 | 390 |
| 1925 | 8,893 | 479 | 1,429 | 318 | 1,758 | 356 |
| 1926 | 9,210 | 627 | 1,442 | 297 | 1,252 | 344 |
| 1927 | 9,470 | 581 | 1,300 | 293 | 1,141 | 372 |
| 1928 | 10,050 | 520 | 1,264 | 284 | 988 | 399 |
| 1929 | 9,909 | (7) | 1,176 | 311 | (8) | 426 |
| 1930 | 10,617 | 562 | 1,233 | 300 | (8) | 498 |
| 1931 | 11,160 | ---------- | 1,336 | 287 | (8) | 569 |
| Total | 107,145 | 5,343 | 17,204 | 3,430 | 16,646 | 4,658 |
| Years missing | 0 | 3 | 0 | 0 | 3 | 0 |

[1] Homicidal statistics of the Statistical Division, United States Government Census Bureau.
[2] France. Bureau de la statistique générale.  Annuaire statistique, 1924, p. 39—figures for 1920–22, inc.; 1927, p. 107—figures for 1923; 1928, p. 70—figures for 1925; 1929, p. 78—figures for 1926; 1930, p. 86—figures for 1927; 1931, p. 88—figures for 1928; 1932, p. 92—figures for 1930.
[3] Germany. Statistisches reichsamt.  Statistisches Jahrbuch für das Deutsche Reich, 1926, p. 33–34—figures for 1920; 1927, p. 37—figures for 1921–25, inc.; 1928, p. 55,—figures for 1926; 1929, p. 53—figures for 1927; 1930, p. 49—figures for 1928; 1931, p. 43—figures for 1929; 1932, p. 43—figures for 1930; 1933, p. 45—figures for 1931.
[4] Great Britain. Home department.  Criminal statistics, England and Wales, 1927, p. 27—figures for 1920–27, inc.; 1930, p. 15—figures for 1928–30, inc.; 1931, p. 15—figures for 1931.
[5] Italy. Direzione generale della statistics.  Annuario statistico Italiano, 1922–25, p. 35—figures for 1920–24, inc.; 1930, p. 58—figures for 1925–28, inc.
[6] World Almanac 1934 at page 476.
[7] Not found in subsequent yearbooks.
[8] Latest annual available in Library gave no figures later than 1928.

*Area of United States and European countries*

[Figures taken from World Almanac, 1934]

|  | *Square miles* |
|---|---|
| United States (continental) | 3,026,789 |
| France | 212,000 |
| Germany | 180,000 |
| Great Britain, including England, Irish Free State, Northern Ireland, Scotland, and Wales | 124,284 |
| Italy | 119,744 |

*Population of United States and European countries*

[Figures taken from World Almanac, 1934]

| United States (continent) (census 1930) | 122,775,046 |
|---|---|
| France (Census 1931) | 41,834,923 |
| Germany (Census 1933) | 65,300,000 |
| Great Britain, including England, Irish Free State, Northern Ireland, Scotland, and Wales (Census 1931) | 49,000,000 |
| Italy (Census 1931) | 41,176,671 |

# NATIONAL FIREARMS ACT

WEDNESDAY, APRIL 18, 1934

House of Representatives,
Committee on Ways and Means.

The committee met at 10 a.m., Hon. Robert L. Doughton (chairman) presiding.

The Chairman. The committee will be in order.

We shall continue this morning the hearings on H.R. 9066. We have with us this morning the adjutant general of the State of Maryland, whom we shall be glad to hear at this time.

General, will you please come forward and for the purposes of the record give your name, address, and the capacity in which you appear?

## STATEMENT OF ADJT. GEN. MILTON A. RECKORD, ADJUTANT GENERAL OF THE STATE OF MARYLAND, EXECUTIVE VICE PRESIDENT OF THE NATIONAL RIFLE ASSOCIATION OF AMERICA, WASHINGTON, D.C.

General Reckord. Mr. Chairman and gentlemen: My name is Gen. Milton A. Reckord. I am the adjutant general of Maryland and the executive officer of the National Rifle Association of America.

Mr. Dickinson. Will you please give us your address?

General Reckord. I have an address at the capitol in Annapolis, as the adjutant general of Maryland, and in the Barr Building, Washington, D.C., as the executive vice president of the National Rifle Association of America.

We have asked to be heard on H.R. 9066 because of the fact that for many years our association has been interested in legislation of this type.

The Chairman. What is your position with the National Rifle Association?

General Reckord. I am the executive officer, the executive vice president, the active head of the National Rifle Association.

Mr. Treadway. May I ask, Mr. Adjutant General, whether you are appearing as an official of that association or as adjutant general of your State? You seem to hold two positions. How are you appearing here, in what capacity?

General Reckord. I am appearing in both capacities.

Mr. Treadway. That is what I wanted to know. Thank you.

General Reckord. Because I am the chairman of the legislative committee of the Adjutants General Association of the United States.

The Chairman. In that connection, are you appearing in opposition to or in favor of the bill?

33

**34**        NATIONAL FIREARMS ACT

General RECKORD. We are in opposition to many of the provisions of this bill.

Mr. HILL. You are representing the State of Maryland as well as the National Rifle Association in this hearing?

General RECKORD. I cannot say that I am representing the State of Maryland, because I have not been directed by the Governor to come here to present the views of the State. I am representing the Association of Adjutants General of all of the States, as I am the chairman of the legislative committee of that body.

Mr. HILL. Have you been directed by that organization to appear here?

General RECKORD. Yes, sir.

The CHAIRMAN. You say you appear in the capacity of adjutant general of the State of Maryland?

General RECKORD. I am the adjutant general of the State of Maryland and chairman of the Legislation Committee of the Adjutants General Association.

The CHAIRMAN. I do not see the necessity of bringing that out unless you appear here in that capacity. Exactly in what capacity do you appear? Will you please state that again for the record?

General RECKORD. I appear here as the executive vice president, or the active head, of the National Rifle Association of America.

The CHAIRMAN. Then I understand that you represent a private organization.

General RECKORD. That is true.

The CHAIRMAN. And you do not appear here in any official governmental capacity?

General RECKORD. No, sir; I am not here in any official Government capacity.

Mr. WOODRUFF. I understood you to say, General, that you are appearing both as a representative of the National Rifle Association and the National Association of Adjutants General.

General RECKORD. Yes, sir.

Mr. WOODRUFF. May I suggest that you confirm what I am about to say, if you will, and that is that the adjutant general of a State is the executive officer of the Militia or the National Guard of that State.

General RECKORD. Yes, sir; that is correct.

Mr. WOODRUFF. So you are here as a representative of the National Guard of all the States?

General RECKORD. That is correct. I am chairman of the legislative committee of the adjutants general of all the States.

Mr. WOODRUFF. And you are appearing in a dual capacity, representing that organization and also representing the National Rifle Association, is that correct?

General RECKORD. That is correct.

Mr. FREAR. Did they take action recently authorizing you to appear in opposition to the bill?

General RECKORD. Only in an informal manner.

Mr. FREAR. In what manner?

General RECKORD. The president of the association told me that— that is General Immell——

Mr. FREAR. That is General Immell?

General RECKORD. That is General Immell, of Wisconsin, yes, sir.

The CHAIRMAN. But the organization has not met and considered this bill?

General RECKORD. No, sir.

The CHAIRMAN. Then this is your individual opposition rather than the opposition of your organization?

General RECKORD. No, sir.

Mr. WOODRUFF. General, I want to get this perfectly clear. I understood you to say a moment ago that you had been directed by the chief of your organization of adjutants general to appear here as the representative of that organization?

General RECKORD. That is correct.

Mr. WOODRUFF. To present the views of that organization as perhaps indicated to you by the president of the organization?

General RECKORD. Yes, sir; that is correct.

Mr. WOODRUFF. Then you are not speaking in your individual capacity; that is, if you are in opposition to any provision of this bill, it is not necessarily your individual opposition, but it is the opposition, as you understand it, of those organizations which you represent here?

General RECKORD. That is perfectly correct; yes, sir.

Mr. FREAR. General Immell is from my State and district I was just wondering whether he authorized you to appear for that organization, by letter or otherwise.

General RECKORD. Not by letter. But he was in town last week—— and he told me then to appear. I have been the legislative representative for a number of years. It was absolutely a verbal commitment.

Mr. FREAR. Let me ask you just one question, if I may. Would you prefer to have this bill rejected as it is now rather than passed?

General RECKORD. Yes, sir; very much prefer to have it rejected.

Mr. FREAR. I wanted to get your position, that was all.

Mr. TREADWAY. I do not want to interrupt your line of testimony, but in further answer to the question as to whether you had been asked officially to be here, or whether either one of your organizations had taken action on this bill, you rightly replied, no. Is not one reason for that the fact that this bill was introduced only April 11, which would not have given you time to communicate with the officials?

General RECKORD. That is the exact reason, because the Adjutants General met in convention here last week——

Mr. TREADWAY. And knew nothing about this?

General RECKORD. And knew nothing about this bill. Had they known about it I could easily have gotten a resolution directing me to come here in opposition to it.

Mr. TREADWAY. I think that explains it.

The CHAIRMAN. How do you know that, if they have not met?

General RECKORD. I beg your pardon?

The CHAIRMAN. How do you know that, if they have not expressed an opinion?

General RECKORD. Well, Mr. Chairman, I know it because I know those men, have known them for years. We all think more or less alike on the subject of firearms. There are so many provisions in

36                    NATIONAL FIREARMS ACT

this bill that are not good, in my humble judgment, that I am confident—maybe that would be a better expression—I am confident that had this bill been before the convention last Monday or Tuesday, I could have had such a commitment.

Mr. REED. These provisions to which you are opposed, have they appeared in other forms in other legislation introduced heretofore, in piecemeal fashion?

General RECKORD. Many of them have not appeared, to my knowledge, until probably 2 or 3 weeks ago when an unnumbered bill was heard in the Senate. That bill was heard before the Senate Judiciary Committee.

Mr. REED. Containing provisions that are in this bill and to which you object?

General RECKORD. Yes, sir; that was the first time we had ever seen those provisions.

Mr. REED. Has your organization in the past considered any of the features of this bill; or features that are contained in provisions of this bill?

General RECKORD. You mean——

Mr. REED. That now appear in this bill; have you discussed those matters in your conventions?

General RECKORD. Not these particular features in convention, because these features just appeared within the last, I should say 2 or 3 weeks or a month.

Mr. REED. I did not know but that perhaps some of these provisions that appear here now have been discussed pro and con in years gone by.

General RECKORD. Many of these features are new and have not been presented before.

May I take this opportunity, Mr. Chairman, to say that the association I represent is absolutely favorable to reasonable legislation. We are responsible for the uniform firearms act being enacted into law by you gentlemen in the District of Columbia. It is on the books now. We are not obstructionists in any way. We want to help you. We offered to help; we carried that offer to the office of the Attorney General of the United States. We thought we were going to be called into conference to work with him. Instead of that, we stumbled upon an unknown bill in the Senate of the United States. We just have not been heard. That is the reason we are asking an opportunity to be heard now.

The CHAIRMAN. In that connection, you say you are favorable to reasonable legislation at this time.

General RECKORD. Yes, sir.

The CHAIRMAN. Therefore you must recognize its importance or necessity. Having recognized that, what steps have you taken yourself to bring such legislation as that to the attention of Congress, if any?

General RECKORD. We conferred with Mr. Keenan, of the Attorney General's office, and we left him believing that we were going to be invited to sit in with the Attorney General, and to work with them in shaping some legislation to bring before Congress. We were surprised, therefore, when we learned legislation had been presented without any reference to us whatever.

The CHAIRMAN. Your organization has presented none?

General RECKORD. The only legislation we have presented to the Congress is what is known as the uniform firearms act, which was passed, and which is now the law of the District of Columbia.

The CHAIRMAN. That does not have any effect outside of the District of Columbia?

General RECKORD. No, sir; that does not. I merely mention that to show you and your committee that we are not here to obstruct the enactment of proper legislation. We want to help. We are against the crook and the racketeer the same as anyone else.

The CHAIRMAN. Who do you think would be in the best position to deal with legislation on this subject? What organization, what official body do you think is in best position to judge what legislation is necessary to deal with the subject matter set forth in this bill? Do you think there is any organization in the United States in a better position to determine that matter than the Department of Justice? I ask that in order that we may understand each other to start with.

General RECKORD. Mr. Chairman, I may be prejudiced, but if this bill is an example, then I do not think they have approached the subject properly.

Mr. TREADWAY. General Reckord, you said that you had been in consultation or contact with a representative of the Attorney General's office?

General RECKORD. Yes, sir.

Mr. TREADWAY. And in what way were you led to believe that your organization would be consulted before legislation were proposed?

General RECKORD. Mr. Treadway, we at our annual meeting held in Washington early in February invited the Attorney General to be present with us to talk upon the subject of fire-arms legislation, so that he would meet us, know who we were and whom we represented.

Mr. TREADWAY. You volunteered that invitation; that is, you were not asked to call in the Attorney General's department?

General RECKORD. No, sir; we did that.

Mr. TREADWAY. You did that of your own free will?

General RECKORD. Yes, sir. Mr. Cummings wrote and said he was sorry but, because of engagements, he could not attend, but would try to arrange to have Mr. Keenan attend. Mr. Keenan did attend, made an after-dinner talk to our body. We enjoyed having him with us and we arranged that evening for Mr. Karl Frederick, of New York, who is here today and is the president of our association——

Mr. TREADWAY. Which association?

General RECKORD. The National Rifle Association of America.

Mr. TREADWAY. I would like to get these associations separated distinctly.

General RECKORD. And myself, to meet with Mr. Keenan the following afternoon.

Mr. TREADWAY. This was in February?

General RECKORD. Yes, sir. We spent about, I would say, at least 3 hours Saturday afternoon with Mr. Keenan in his office discussing this problem; because it is a problem. It is a hard problem. We realize that. We discussed it with Mr. Keenan for 3 hours, and it was at that time that Mr. Keenan made the remark that he would

38                          NATIONAL FIREARMS ACT

prefer to go slowly and get proper legislation rather than to move rapidly and get something that was not just right.

He gave us every indication that he would confer with us and that we would be allowed to make suggestions and present the thought of our association. We were never given any further opportunity.

Mr. TREADWAY. This bill was introduced by Mr. Sumners, Chairman of the Committee on the Judiciary, marked "by request."

General RECKORD. Yes, sir.

Mr. TREADWAY. Do you know whether that request was Mr. Keenan's? Did Mr. Keenan prepare this bill, so far as you know, or are you not aware of that?

General RECKORD. If I may say so, may best knowledge is to the effect that it was prepared in the Attorney General's office; yes, sir.

Mr. TREADWAY. And if prepared in the Attorney General's office you feel confident that Mr. Keenan knew something about it?

General RECKORD. Well, Mr. Treadway, I know that it was prepared there and I know that Mr. Keenan knew all about it.

The CHAIRMAN. Will you now proceed to take up your objections one by one and explain them, with any suggestions that you have to offer?

General RECKORD. Mr. Doughton, if I may, I would like to present Mr. Karl Frederick, who is the President of the National Rifle Association of America. He is the vice president of the United States Revolver Association. He is a member of the Campfire Club. He is also a member of the New York Fish, Game, and Forest League and is vice president of the New York Conservation Council, Inc.; a former member of the Commission on Fire Arms Legislation of the National Crime Commission.

The CHAIRMAN. Mr. Frederick, will you please come forward and give your name and address to the reporter, for the record?

## STATEMENT OF KARL T. FREDERICK, PRESIDENT NATIONAL RIFLE ASSOCIATION OF AMERICA, 128 BROADWAY, NEW YORK CITY

Mr. FREDERICK. My name is Karl T. Frederick, 128 Broadway, New York.

I think the General has sufficiently indicated, unless some of you wish me to elaborate upon it, my representation and background.

I have been giving this subject of firearms regulation intense study and consideration over a period of 15 years, and the suggestions resulting from that study of mine and the people with whom I have been associated, such as the National Conference of Commissioners on Uniform Laws, have resulted in the adoption in many States of regulatory provisions suggested by us.

As General Reckord indicated, the national act for the District of Columbia is the uniform firearms act which was first drafted by me about 14 years ago, and which was, in that early time, brought to the attention of the National Conference of Commissioners of Uniform Laws, who appointed a subcommittee under the chairmanship of Mr. Imlay, who is here, and which gave about 7 years of study to the matter; which produced the most extensive and thoroughgoing investigation of the subject of firearms control that has ever been made by anybody in this country; and resulted, after successive

revisions, in the final form of the uniform act which has been, as I say, adopted by the Congress for the District of Columbia.

It is the law in Pennsylvania. It has been the law in California for many years. Portions of it are to be found in New York, New Jersey, Indiana, New Hampshire, and many other States.

This subject is a subject to which a large amount of careful and intensive thought has been given. I must, however, apologize to your committee if, as I anticipate, the remarks which I have to make with respect to this particular bill appear to be somewhat disconnected and not presented with the logical form with which I would otherwise desire to present them. The reason for that is that since I arrived this morning on the night train I have for the first time seen the bill. I have had earlier bills which were first presented in the Senate and I have had some typewritten notes with respect to some prospective contents of a bill which was supposed or expected shortly to appear in the House.

My consideration has, therefore, been almost wholly based upon that earlier and somewhat scrappy information which has come to me; because, as I say, this printed bill I have seen for the first time this morning.

As General Reckord said, we regret that we are forced to appear without having had an opportunity to completely formulate our views. We had expected that we would be, as he said, informed as to the proposals emanating concretely from the Attorney General's office. But, apart from the conference which I had with General Reckord and with Mr. Keenan about 2½ months ago, and apart from a courteous letter of acknowledgement of certain information which I sent to him about 6 weeks ago, I have had no information whatever with respect to their proposals from the Attorney General's office.

I will come immediately to certain concrete criticisms which I think should properly be made of this bill, and in the course of my remarks I shall be glad to attempt to answer any questions any of you desire to address to me, and I may from to time branch out a little bit into consideration of the more general features of such legislation which underlie the entire subject.

The first criticism that I have to make is on page 1, lines 8 to 10. The definition of the term "machine gun" I think is wholly inadequate and unsatisfactory. A gun which fires automatically or semi-automatically less than 12 shots is not under this definition a machine gun. And yet, in my opinion, it is in fact a machine gun and should be so classified.

The well-known Thompson submachine gun which has figured in the papers extensively; the so-called "Browning" automatic rifle or the Monitor rifle, which is a somewhat similar weapon designed for police use, are both in fact capable of being operated automatically and semi-automatically. The number of shots which they may discharge is dependent solely on the size or the content of the magazine and if you use those guns with magazines holding only 11 shots they would not be, within the terms of this bill, a machine gun.

Mr. WOODRUFF. Will you yield for a question there?

Mr. FREDERICK. Certainly.

Mr. WOODRUFF. As a matter of fact, the only thing that controls or limits the number of shots that an automatic rifle or shotgun can fire is the magazine itself, is it not?

Mr. FREDERICK. I think that is correct.

Mr. WOODRUFF. That is the only way in which you can limit the number of shots that can be fired. And it is a very simple matter, is it not, to change the magazine or the clip or whatever they use to hold these cartridges, to meet any restrictions, particularly restrictions such as are proposed in the paragraph at the bottom of the first page of this bill?

Mr. FREDERICK. In general, that is true. I propose, however, to suggest a definition of machine gun which I think obviates your objection.

Mr. WOODRUFF. I will say that my position is exactly the same as the gentleman's in regard to this paragraph. I am in perfect harmony with you on this.

Mr. FREDERICK. And which I venture to suggest will lay before you a more concrete definition of what is a machine gun.

Mr. FREAR. Will you please give it? That is what we are trying to get.

Mr. COOPER. Mr. Chairman, may I ask a question before the witness proceeds to do that?

The CHAIRMAN. Mr. Cooper.

Mr. COOPER. The guns to which you have referred, how many of those are now manufactured with the type of magazine mentioned by you, firing less than 12 shots?

Mr. FREDERICK. I cannot answer your question, I do not know. But I say that it would be a perfectly simple thing for smaller magazines to be prepared.

Mr. COOPER. I understand you say that it is possible for such type of weapon to be constructed, but I am asking you what the situation is now with reference to the manufacture and sale of the type of weapon to which you refer.

Mr. FREDERICK. I cannot answer that, because I do not know. The definition which I suggest is this:

A machine gun or submachine gun as used in this act means any firearm by whatever name known, loaded or unloaded, which shoots automatically more than one shot without manual reloading, by a single function of the trigger.

The distinguishing feature of a machine gun is that by a single pull of the trigger the gun continues to fire as long as there is any ammunition in the belt or in the magazine. Other guns require a separate pull of the trigger for every shot fired, and such guns are not properly designated as machine guns. A gun, however, which is capable of firing more than one shot by a single pull of the trigger, a single function of the trigger, is properly regarded, in my opinion, as a machine gun.

Mr. HILL. May I ask you a question there?

Mr. FREDERICK. Yes, sir.

Mr. HILL. Suppose your definition were adopted. Would it be practicable to manufacture a gun that would be classed either as an automatic or semiautomatically operated gun, even with more than one function of the trigger, and still answer the purpose, in a large way, of a machine gun which requires only one function of the trigger?

Mr. FREDERICK. I do not think so. For purposes of example, you may look at the automatic pistol which is the standard weapon of the United States Army. That has an automatic discharge of the empty cartridge and a reloading principle which is operated by the

force of the gas from the exploded cartridge. But with a single pull of the trigger only one shot is fired. You must release the trigger and pull it again for the second shot to be fired. You can keep firing that as fast as you can pull your trigger. But that is not properly a machine gun and in point of effectiveness any gun so operated will be very much less effective than one which pours out a stream of bullets with a single pull and as a perfect stream.

Mr. HILL. In one sense you are limiting the scope of this definition and in another you are broadening it. When you say that any weapon or any gun that will shoot more than once is a machine gun, you are broadening the definition. But when you say "one operation of the trigger" you may be limiting the definition as it is in this bill, as I see it, because this says nothing about what operation of the trigger is necessary to constitute the machine gun.

Mr. FREDERICK. If I understand your remark, Mr. Hill, I think that is quite true. I am including within the definition, however, everything that I think is a machine gun instead of including only those machine guns which fire 12 or more shots without reloading.

Mr. HILL. The point I am making is, why include in your definition the phrase, "with one function of the trigger"?

Mr. FREDERICK. Because that is the essence of a machine gun. Otherwise you have the ordinary repeating rifle. You have the ordinary shotgun which is in no sense and never has been thought of as a machine gun.

Mr. FREAR. You are attempting to cover more than is embodied in this bill?

Mr. FREDERICK. I am trying to bring within this everything that in my opinion should be included under the term "machine gun."

Mr. FREAR. That would be desirable.

Mr. FREDERICK. I should not like, if there is to be legislation with respect to machine guns, to have machine guns capable of firing up to 12 shots exempted from the operations of this bill.

Mr. COCHRAN. Mr. Frederick, under your proposed definition, would the Colt automatic pistol be a machine gun?

Mr. FREDERICK. No, sir. I do not think that in the eyes of any ballistic engineer it would be so regarded. I do not think it should be so regarded.

Mr. COCHRAN. Does not the Colt automatic pistol continue to shoot as long as you exert pressure upon the trigger?

Mr. FREDERICK. No, sir. It requires a separate pull of the trigger for every shot fired.

Mr. HILL. If the Colt automatic pistol could fire 12 times, would it be a machine gun under this definition in the bill?

Mr. FREDERICK. Under the definition as printed in the bill?

Mr. HILL. Yes.

Mr. FREDERICK. I do not know what the language means, "automatically or semiautomatically." The language is not, as I read it, and from my limited knowledge of firearms and ballistics—which has some scope, but I do not pretend to be a finished master in that; I am a lawyer, I am not a firearms manufacturer—I do not know what "automatically or semiautomatically" means. There are automatic features about the Colt pistol in the sense that when a shot is fired the action of the gas not only expels the bullet from one

NATIONAL FIREARMS ACT

end of the barrel, but it expels the empty shell from the other end, and it is so devised that upon the return of the carriage through a spring, it puts another shell in place of the old one. That is in a sense automatic, and that principle is found in machine guns. But that is not the distinguishing features of a machine gun.

Mr. FREAR. The question in my mind and I think in the majority of the committee is what we can do to aid in suppressing violations by such men as Dillinger and others. Do you think that by your proposed amendment you have aided in that result?

Mr. FREDERICK. I believe so.

Mr. FREAR. Then what is the purpose of any longer discussing that? Why not go on to something else?

Mr. FREDERICK. If none of you gentlemen desires to discuss that particular feature——

Mr. FREAR. You are a lawyer, you are not a firearms manufacturer, as you have said. Let us assume that we accept your proposed suggestion. I suggest that we pass it and get to the other serious questions that are involved in the bill.

Mr. FREDERICK. Another objection which appears to me to be serious is that there appears to be no distinction—I do not know what figures it is intended to insert on page 3 in the matter of taxes or licenses, but it would seem that it was intended to insert a single figure.

Mr. HILL. What line?

Mr. FREDERICK. I am speaking of line 5, page 3.

Mr. HILL. It has been suggested that in the first blank you insert $5,000 and in the second blank $200. That is only a suggestion.

Mr. FREDERICK. There is, as I see it, no provision made in the act for the jobber, who is the general distributor to dealers of pistols. It seems to me that from the little I know of the manner in which the business is conducted, because I have not and never have had any connection with the business of firearms—as I understand it, the jobber plays an essential part in the firearms business. I understand that it would be quite impossible for the manufacturer to pass upon the credit questions and the other matters which arise, as between the ultimate dealer and his supplier. It has suggested itself to my mind that one of the purposes of this bill was to destroy the jobber and to eliminate all but the largest and the wealthiest and the strongest individual dealers.

The CHAIRMAN. Do you mean dealers or manufacturers?

Mr. FREDERICK. I mean dealers. I think an annual fee of $200 a year will eliminate 95 percent of the dealers in pistols.

Mr. LEWIS. What is your definition of dealer? What does it include? Does it include the village storekeeper who sells pistols?

Mr. FREDERICK. Yes, sir.

Mr. HILL. The definition is on page 2, beginning with line 11:

The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term "dealer" shall include pawn brokers and dealers in used firearms.

That would include jobbers, I take it.

Mr. FREDERICK. It is possible, but the jobber does not fit very logically into the picture that is here defined.

Mr. FREAR. If we insert that, would that be sufficient to meet your objection? That is, after the words "pawn brokers and dealers" add

Mr. FREDERICK. I would have to examine the bill in order to give a really intelligent answer to your question.

Mr. FREAR. Can you give us a constructive amendment?

Mr. FREDERICK. I must again refer you to the fact that this is the first morning I have seen this particular bill, and I am not prepared to give you that particular suggestion. But I think that provision ought to be made for the jobber and I think that provision ought to be made so that this will not destroy 95 percent of the small dealers throughout the country.

Mr. FREAR. On what do you base that statement?

Mr. FREDERICK. A tax, I say, of $200 per year will eliminate 95 percent of the dealers, in my opinion.

Mr. FREAR. On what is your opinion based?

Mr. FREDERICK. My general experience and practical contact with dealers, and observation of those who deal in firearms and such things, over a good many years.

Mr. HILL. What figure would you suggest?

Mr. FREDERICK. That takes me into the purposes of this bill. This bill, as I see it, is intended to be a bill for the suppression of crime and is proposed to the United States Congress which ordinarily has no power in such matters, under the guise of a revenue raising bill.

Mr. FREAR. May I ask a question? Are you interested at all in arms manufacturing or anything like that?

Mr. FREDERICK. Not at all, in any way.

Mr. FREAR. They why not offer some constructive criticism? You are complaining about the character of the bill, suggesting what is behind it, the motives behind it, and so forth. Why not offer something constructive that will be helpful to us anywhere along the line?

Mr. FREDERICK. I am try to do so, as rapidly as I can.

Mr. FREAR. If you will read your record, you will find, I understand, that you are attacking the motives generally.

Mr. FREDERICK. Not at all.

I am saying that this bill, practically speaking, destroys the business in firearms of 95 percent of the dealers.

Mr. FREAR. Then why not recommend something, as Mr. Hill has suggested?

Mr. FREDERICK. I shall be glad to submit a recommendation in that respect, as soon as I have had a chance to examine it.

Mr. FREAR. Yes; but do not attack the motives for its introduction. We are not interested in that at this time.

Mr. FREDERICK. I think that the result of this provision here will be to deprive the rural inhabitant, the inhabitant of the small town, the inhabitant of the farm, of any opportunity to secure a weapon which he perhaps more than anyone else needs for his self-defense and protection. I think that it would be distinctly harmful to destroy the opportunity for self-defense of the ordinary man in the small community, where police forces are not adequate.

Mr. HILL. Just tell us how this bill does that.

Mr. FREDERICK. It does it in two or three ways, as I see it. In the first place, it requires Federal documents to be filled out, procured from Federal officials, before a pistol can be purchased. It requires

**44**                   NATIONAL FIREARMS ACT

that pistol to be purchased from a licensed dealer. Now, if the largest and most important and wealthiest dealers, those in the larger cities, are the only dealers to exist who can handle firearms, and if it is required to go to a Federal official who is not to be found readily in rural communities, in the country, in any except the larger communities—if they only are allowed to handle firearms, it seems to me that the practical result will be that the countryman absolutely will be unable, in a practical sense, to obtain any firearm.   There are so many impediments put in his way.   He will be unable to secure a weapon that he needs for his own defense and the defense of his home and family.

Mr. HILL. Do you have reference to the large license fee of $200 as suggested in line 5?

Mr. FREDERICK. I have at this moment, yes.

Mr. HILL. Suppose you made that fee $5, what would be the situation?

Mr. FREDERICK. I do not think that that would be as bad.   I think it would be somewhat serious, but I do not think it would be very serious.   I will tell you why I say that.   The uniform firearms act which we sponsored and which was adopted in Pennsylvania had a provision for $10 license fee for dealers in that State.   That law has been in effect in that State for 3 or 4 years.   I am told that the practical result is that most of the small dealers, country hardware merchants, and so forth, refuse to take out a license and pay $10, because they say it just is not worth it.   They sell maybe three or four guns a year and it is not worth $10 to get the privilege of selling three or four guns.   I think that any substantial license fee will destroy the small dealer in the small community.

Mr. HILL. That is, any appreciable license fee?

Mr. FREDERICK. Any appreciable license fee for dealers.

Mr. HILL. Would the requirement for a license itself do that?

Mr. FREDERICK. I do not think so.   I think if it were a negligible fee—and as I see it, inasmuch as I believe the main purpose behind this bill is a police purpose and not a revenue purpose, it seems to me that that charge should be made quite nominal; it should be made so small that you get actually the police result that you want, namely, the registration of the dealer and the issuance of a license to him, but that should not be made a burden to him in point of dollars and cents.

Mr. HILL. If that should be corrected—it is not really a correction, because there is no sum in there now; any amount that has been spoken of here is merely tentative.   There is no determination as to what that fee shall be.   But if we met the objection on that particular phase, you would be ready to pass on to something else, would you not?

Mr. FREDERICK. Yes.   I want to say one word with respect to the manufacturers.

Mr. COCHRAN. Mr. Chairman, before the witness gets to that, I desire to ask if he will at this point in his remarks insert a copy of the uniform firearms bill which his association has sponsored and which has been adopted in various States?

Mr. HILL. How voluminous is that document?

Mr. FREDERICK. It is about four pages.  It is practically the law as it stands in the District of Columbia.  I have a copy of it here. There are five pages.

The CHAIRMAN. Without objection, it will be inserted in the record.

Mr. FREDERICK. It is substantially the uniform act.

(The act referred to is as follows:)

[PUBLIC—NO. 275—72D CONGRESS]

[H. R. 8754]

AN ACT To control the possession, sale, transfer, and use of pistols and other dangerous weapons in the District of Columbia, to provide penalties, to prescribe rules of evidence, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### DEFINITIONS

SECTION 1. "Pistol," as used in this Act, means any firearm with a barrel less than twelve inches in length.

"Sawed-off shotgun," as used in this Act, means any shotgun with a barrel less than twenty inches in length.

"Machine gun," as used in this Act, means any firearm which shoots automatically or semiautomatically more than twelve shots without reloading.

"Person," as used in this Act, includes, individual, firm, association, or corporation.

"Sell" and "purchase" and the various derivatives of such words, as used in this Act, shall be construed to include letting on hire, giving, lending, borrowing, and otherwise transferring.

"Crime of violence" as used in this Act, means any of the following crimes, or an attempt to commit any of the same, namely: Murder, man slaughter, rape, mayhem, maliciously disfiguring another, abduction, kidnaping, burglary, housebreaking, larceny, any assault with intent to kill, commit rape, or robbery, assault with a dangerous weapon, or assault with intent to commit any offense punishable by imprisonment in the penitentiary.

### COMMITTING CRIME WHEN ARMED

SEC. 2. If any person shall commit a crime of violence in the District of Columbia when armed with or having readily available any pistol or other firearm, he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than five years; upon a second conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than ten years; upon a third conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonment for a term of not more than fifteen years; upon a forth or subsequent conviction for a crime of violence so committed he may, in addition to the punishment provided for the crime, be punished by imprisonement for an additional period of not more than thirty years.

### PERSONS FORBIDDEN TO POSSESS CERTAIN FIREARMS

SEC. 3. No person who has been convicted in the District of Columbia or elsewhere of a crime of violence shall own or have in his possession a pistol, within the District of Columbia.

### CARRYING CONCEALED WEAPONS

SEC. 4. No person shall within the District of Columbia carry concealed on or about his person, except in his dwelling house or place of business or on other land possessed by him, a pistol, without a license therefor issued as hereinafter provided, or any deadly or dangerous weapon.

### EXCEPTIONS

SEC. 5. The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens, or their deputies, policemen or other duly appointed law-enforcement officers, or to members of the Army, Navy, or Marine Corps of

58278—34——4

**46**                    NATIONAL FIREARMS ACT

the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms, or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving goods from one place of abode or business to another.

### ISSUE OF LICENSES TO CARRY

SEC. 6. The superintendent of police of the District of Columbia may, upon the application of any person having a bona fide residence or place of business within the District of Columbia or of any person having a bona fide residence or place of business within the United States and a license to carry a pistol concealed upon his person issued by the lawful authorities of any State or subdivision of the United States, issue a license to such person to carry a pistol within the District of Columbia for not more than one year from date of issue, if it appears that the applicant has good reason to fear injury to his person or property or has any other proper reason for carrying a pistol and that he is a suitable person to be so licensed. The license shall be in duplicate, in form to be prescribed by the Commissioners of the District of Columbia and shall bear the name, address, description, photograph, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, and the duplicate shall be retained by the superintendent of police of the District of Columbia and preserved in his office for six years.

### SELLING TO MINORS AND OTHERS

SEC. 7. No person shall within the District of Columbia sell any pistol to a person who he has reasonable cause to believe is not of sound mind, or is a drug addict, or is a person who has been convicted in the District of Columbia or elsewhere of a crime of violence, except when the relation of parent and child or guardian and ward exists, is under the age of eighteen years.

### TRANSFERS REGULATED

SEC. 8. No seller shall within the District of Columbia deliver a pistol to the purchaser thereof until forty-eight hours shall have elapsed from the time of the application for the purchase thereof, except in the case of sales to marshals, sheriffs, prison or jail wardens or their deputies, policemen, or other duly appointed law-enforcement officers, and, when delivered, said pistol shall be securely wrapped and shall be unloaded.   At the time of applying for the purchase of a pistol the purchaser shall sign in duplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in the District of Columbia or elsewhere of a crime of violence.   The seller shall, within six hours after such application, sign and attach his address and deliver one copy to such person or persons as the superintendent of police of the District of Columbia may designate, and shall retain the other copy for six years.   No machingun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.   This section shall not apply to sales at wholesale to licensed dealers.

### DEALERS TO BE LICENSED

SEC. 9. No retail dealer shall within the District of Columbia sell or expose for sale or have in his possession with intent to sell, any pistol, machine gun, sawedoff shotgun, or blackjack without being licensed as hereinafter provided.   No wholesale dealer shall, within the District of Columbia, sell, or have in his possession with intent to sell, to any person other than a licensed dealer, any pistol, machine gun, sawed-off shotgun, or blackjack.

### DEALERS' LICENSES, BY WHOM GRANTED AND CONDITIONS THEREOF

SEC. 10. The Commissioners of the District of Columbia may, in their discretion, grant licenses and may prescribe the form thereof, effective for not more than one year from date of issue, permitting the licensee to sell pistols, machine guns, sawed-off shotguns, and blackjacks at retail within the District of Columbia subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be subject to forfeiture and the licensee subject to punishment as provided in this Act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can be easily read.

3. No pistol shall be sold (a) if the seller has reasonable cause to believe that the purchaser is not of sound mind or is a drug addict or has been convicted in the District of Columbia or elsewhere of a crime of violence or is under the age of eighteen years, and (b) unless the purchaser is personally known to the seller or shall present clear evidence of his identity.   No machine gun, sawed-off shotgun, or blackjack shall be sold to any person other than the persons designated in section 14 hereof as entitled to possess the same, and then only after permission to make such sale has been obtained from the superintendent of police of the District of Columbia.

4. A true record shall be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners, of all pistols, machine guns, and sawed-off shotguns in the possession of the licensee, which said record shall contain the date of purchase, the caliber, make, model, and manufacturer's number of the weapon, to which shall be added, when sold, the date of sale.

5. A true record in duplicate shall be made of every pistol, machine gun, sawed-off shotgun, and blackjack sold, said record to be made in a book kept for the purpose, the form of which may be prescribed by the Commissioners of the District of Columbia and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other and shall contain the date of sale, the name, address, occupation, color, and place of birth of the purchaser, and, so far as applicable, the caliber, make, model, and manufacturer's number of the weapon, and a statement signed by the purchaser that he has never been convicted in the District of Columbia or elsewhere of a crime of violence.   One copy of said record shall, within seven days, be forwarded by mail to the superintendent of police of the District of Columbia and the other copy retained by the seller for six years.

6. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of said premises where it can readily be seen from the outside.   No license to sell at retail shall be granted to anyone except as provided in this section.

### FALSE INFORMATION FORBIDDEN

SEC. 11. No person, in purchasing a pistol or in applying for a license to carry the same, or in purchasing a machine gun, sawed-off shotgun, or blackjack within the District of Columbia, give false information or offer false evidence of his identify.

### ALTERATION OF IDENTIFYING MARKS PROHIBITED

SEC. 12. No person shall within the District of Columbia change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark or identification on any pistol, machine gun, or sawed-off shotgun.   Possession of any pistol, machine gun, or sawed-off shotgun upon which any such mark shall have been changed, altered, removed, or obliterated shall be prima facie evidence that the possessor has changed, altered, removed, or obliterated the same within the District of Columbia: *Provided, however,* That nothing contained in this section shall apply to any officer or agent of any of the departments of the United States or the District of Columbia engaged in experimental work.

### EXCEPTIONS

SEC. 13. This Act shall not apply to toy or antique pistols unsuitable for use as firearms.

48                         NATIONAL FIREARMS ACT

### POSSESSION OF CERTAIN DANGEROUS WEAPONS

Sec. 14. No person shall within the District of Columbia possess any machine gun, sawed-off shotgun, or any instrument or weapon of the kind commonly known as a blackjack, slung shot, sand club, sandbag, or metal knuckles, nor any instrument, attachment, or appliance for causing the firing of any firearm to be silent or intended to lessen or muffle the noise of the firing of any firearms: *Provided, however,* That machine guns, or sawed-off shotguns, and blackjacks may be possessed by the members of the Army, Navy, or Marine Corps of the United States, the National Guard, or Organized Reserves when on duty, the Post Office Department or its employees when on duty, marshals, sheriffs, prison or jail wardens, or their deputies, policemen, or other duly appointed law-enforcement officers, officers or employees of the United States duly authorized to carry such weapons, banking institutions, public carriers who are engaged in the business of transporting mail, money, securities, or other valuables, wholesale dealers and retail dealers licensed under section 10 of this Act.

### PENALTIES

Sec. 15. Any violation of any provision of this Act for which no penalty is specifically provided shall be punished by a fine of not more than $1,000 or imprisonment for not more than one year, or both.

### CONSTITUTIONALITY

Sec. 16. If any part of this Act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this Act.

### CERTAIN ACTS REPEALED

Sec. 17. The following sections of the Code of Law for the District of Columbia, 1919, namely, sections 855, 856, and 857, and all other Acts or parts of Acts inconsistent herewith, are hereby repealed.

Approved, July 8, 1932.

The CHAIRMAN. In what sense is the possession of a pistol essential to the self-defense of people who live in rural communities, as you have stated? Do you mean it is essential to the self-defense of an individual who is out on the highway, or in his home? In what sense is a pistol essential to the self-defense of an individual who lives in a rural community? Why is not a rifle or a shotgun, the possession of which would not be prohibited under this act, sufficient for the self-defense of an individual or an individual's home? In what sense did you mean that? You know, most of the States have laws against carrying concealed weapons.

Mr. FREDERICK. Exactly. I think those are quite proper laws and are the only effective laws.

The CHAIRMAN. Then it can be that you are referring only to the possession of a pistol in the home.

Mr. FREDERICK. No; because many people do find occasion to carry pistols, and do so under license.

The CHAIRMAN. That would not necessarily be a matter of self-defense, would it?

Mr. FREDERICK. Oh, yes, in many, many instances.

The CHAIRMAN. I never heard of it.

Mr. FREDERICK. I have heard of it in hundreds of instances.

Mr. FREAR. My experience is that the average person who carries a revolver is not one who lives in a rural district, but in New York or Chicago and such places that Dillinger and men of his type are found.

Mr. McCormack. All of those fellows are country-born boys. They do not come from the big cities. I understand that most of them are country boys originally.

Mr. Frear. The man against whom we are trying to legislate is Dillinger and men of his type.

Mr. Frederick. If there is any feasible way of getting that type of man, I would like to know it.

Mr. Frear. We are trying to. In all of your experience in these matters, have you drawn a bill which had for its purpose that end?

Mr. Frederick. I have spent 15 years studying the subject and I have worked with the National Crime Commission. One of the results of my work has been a contribution toward the uniform act which, in my opinion, has made——

Mr. Frear. Have you put it in force in New York?

Mr. Frederick. I have tried to.

Mr. Frear. We are trying to put some law into effect.

Mr. Frederick. Several of the provisions have been adopted in the law of New York. I have conducted campaigns for two successive years——

Mr. Frear. You said your experience covered 15 years.

Mr. Frederick. I said that in New York State I have conducted campaigns in support of bills which I have caused to be introduced in the legislature.

Mr. Frear. We do not want to have to wait 15 years more, do we?

Mr. Frederick. Mr. Chairman, in respect to the manufacturer, the manufacturer's license is $5,000 a year, and that must refer solely to the big manufacturers, of whom there are four or five in this country. There are smaller manufacturers who would be put out of business completely by any such tax as $5,000 a year and yet who perform an extremely useful function, when looked at from a certain standpoint.

Mr. Frear. Could we not base that on the amount of sales?

Mr. Frederick. Yes, I think that could be quite easily done. I am referring to the makers of handmade pistol barrels, of whom there are a number in this country. They make the finest and highest type of target weapons that are to be found and they do it entirely by hand; I mean, with a hand lathe. Their guns have been used for 25 years in both the National and the International shooting competition. I have myself been a member of five or six international pistol teams and in every one of those I have used hand-made guns, hand-made barrels, because they were a little bit finer than any others that could be bought in my opinion.

Every one of those barrels was made by a man who is a past master of that field of ballistics, and who can, in my opinion, make a finer barrel than any manufacturer in the business.

The Chairman. Does he make the entire gun or just the barrel?

Mr. Frederick. He makes the barrel.

The Chairman. He would not come under the provisions of this bill, would he?

Mr. Frederick. I do not know. He is a manufacturer. He goes over the whole gun, revises the trigger pull, changes the hammer and does a lot of things to it.

The CHAIRMAN. But he is not a manufacturer of a gun. He assembles the parts and puts them together. He is not a manufacturer, is he?

Mr. FREDERICK. I suspect that he is.

The CHAIRMAN. I suspect that he is not. I do not see how he can be considered a manufacturer of a gun if he only makes the barrel.

Mr. FREDERICK. He might buy the action from one man. If he made the barrel and then put it together with the other parts, he would be a manufacturer of that gun, just as much as a man who bought automobile wheels from one place and a wiring system from another and a motor from another manufacturer and assembled them and sold them under his name—he would be a manufacturer.

The CHAIRMAN. If he bought all the parts and assembled them and sold the finished gun, I suppose he would be a manufacturer.

Mr. KNUTSON. This man to whom you refer, does he assemble the gun?

Mr. FREDERICK. He will take a gun, take off the old barrel and make a new barrel, put it on, make over the hammer, make over the trigger pull, make over the spring and do a variety of other things with it, so that the gun, you might say, was a reassembled gun after he was through with it.

Mr. KNUTSON. What we would call a rebuilt gun.

Mr. FREDERICK. It really is, I should say so.

Mr. KNUTSON. And you think he would be a manufacturer?

Mr. FREDERICK. I suspect that he would be a manufacturer within the terms of this act.

Mr. HILL. Assuming he is a manufacturer, of course in a small way so far as output is concerned, there has been a suggestion made here that the situation might be met by a graduated tax, depending upon the volume of the output.

Mr. FREDERICK. I think so.

Mr. HILL. If that can be done, the objection you make there does not go to the principle of the legislation, but simply to the particular provision as to license.

Mr. FREDERICK. That is quite true.

Mr. HILL. Your objection, then, is not to the principle, but simply to the prohibitive tax?

Mr. FREDERICK. It is to the prohibitive nature of the tax.

Mr. HILL. So that if we met that by a graduated tax on the manufacturer, your objection would be satisfied?

Mr. FREDERICK. I think so. I have no objection—to put it this way—to the principle of a Federal license designed not to destroy, but to secure a police registration of both manufacturers and dealers.

Mr. HILL. I think the committee would be very much interested in your directing our attention to the real objections to the bill. Of course, the suggestions you are making now are helpful.

The CHAIRMAN. May I ask, how long would it take you, if it were feasible, to prepare a bill better than you think the pending bill is, and one that would accomplish the purpose we have in mind, for the protection of society, to reach the end the Department of Justice has in mind, and submit it to the committee? That would be constructive, that would be practical, that would be helpful.

Mr. FREDERICK. In my opinion, the useful results which can be accomplished by firearms legislation are extremely limited.

The CHAIRMAN. That means that there is little ground left upon which to legislate or very little necessity for legislation, that there is little to be accomplished by it?   Is that your view?   I am not arguing with you, you understand.   I just want to understand your viewpoint.

Mr. FREDERICK. In my opinion, there is a small area in which legislation which is useful in its results can be prepared.

The CHAIRMAN. Why not submit a bill to us that in your judgment would accomplish all that is possible to accomplish or practical to accomplish along that line?

Mr. FREDERICK. I should be very glad to submit a written memorandum containing some concrete suggestions.

Mr. KNUTSON. Let me ask you a question right at that point.   Do you know of many illicit manufacturers of firearms?   I think I read in the paper last evening a statement to the effect that the Department of Justice had seized an arsenal largely made up of guns manufactured illicitly, or unregistered, however they term them.

Mr. FREDERICK. I do not know of any illicit manufacturers.

Mr. LEWIS. Why should there be any illicit manufacturers in the absence of all law that now prevails in this field?

Mr. FREDERICK. I did not quite get your question.

Mr. LEWIS. I cannot fancy the motive for illicit manufacture of these things when we are almost without any laws on the subject whatever.

Mr. FREDERICK. I may say that a gun is a very easy thing to make, that a third-class automobile mechanic can make a pistol which will do deadly work, and can do it in an afternoon with the materials which he can find in any automobile shop.   And I can say that it has been done time and time and time again.

Mr. LEWIS. What makes it illicit?

Mr. FREDERICK. I suppose what makes it illicit is the purpose for which such guns are made.   If it is not against the law to make a gun, then there is nothing illicit in connection with it.   But when such a gun is manufactured in a State prison and is used by an inmate for the purpose of perpetrating his escape from jail, I think that is illicit manufacture, and such guns have been made in prison, in prison machine shops.

Mr. FREAR. It turns on the motive?

Mr. FREDERICK. Yes; it turns on the motive.

Mr. FREAR. How are you going to determine that in advance?

Mr. FREDERICK. I do not know of any way in which you can get at that.   I am simply saying that the actual manufacture of pistols is an easy thing.   It is not the extraordinarily complicated trick which many people think.   In the same way ammunition can be easily made or easily procured.

Mr. COOPER. Mr. Frederick, I understood you to say that you drafted the act which was passed for the District of Columbia?

Mr. FREDERICK. I drafted the original act about 1922 and worked with the National Conference of Commissioners on uniform laws in making successive revisions and improvements of that act up until the time of the final adoption of their redraft of it.   This act in the District of Columbia has a few minor changes from that standard form and I participated in the preparation of those changes.   I do not want to say that I personally did it, because I did not.   I helped.

Mr. COOPER. The act passed for the District of Columbia was at least in part the product of your effort?

Mr. FREDERICK. I helped from the beginning.

Mr. COOPER. And had your complete approval?

Mr. FREDERICK. Yes, sir.  And I helped from the very beginning.

Mr. COOPER. I understood you to criticize the definition of machine guns contained in the pending bill.  I invite your attention to this provision of the District of Columbia Act, under the heading "definitions."

"Machine gun", as used in this act, means any firearm which shoots automatically or semi-automatically more than 12 shots without reloading.

Then I invite your attention to the provision of the pending bill as to the definition of a machine gun.

The term "machine gun" means any weapon designed to shoot automatically or semiautomatically 12 or more shots without reloading.

I will ask you to kindly point out to the committee the difference between those two definitions.

Mr. FREDERICK. I take it there is no essential difference.  I may, however, answer what I take to be your suggested criticism, by saying that the uniform Firearms Act related exclusively to pistols and it had not any provisions whatever relating to machine guns which we regarded as proper subject for separate legislation; that this provision in the District of Columbia Act was added at the request of the police forces here in the District of Columbia.  I had no part in the preparation of that definition or that part of the act, and I would not regard it as a proper definition of a machine gun.

Mr. COOPER. And yet that definition is contained in the act which you say had your approval.

Mr. FREDERICK. As a whole, it had my approval; certainly.

Mr. COOPER. And that was the definition that met your approval at the time the District of Columbia Act was passed by Congress, and it contains essentially the same definition as is contained in the pending bill?

Mr. FREDERICK. Quite true.  My approval of that act was a general approval, of course, and I may very well have had one or two mental reservations as to minor portions of it.  But as a whole I approved the act.

Mr. COOPER. Passing on to other phases of this bill, will you please point out the other objectionable features that you have, briefly, and without elaborating to such great extent?  Just point out to us what you think the additional objectionable features are to the pending bill.

Mr. FREDERICK. The bill makes no provision whatever for an exception of antique or obsolete weapons.  I happen, and there are thousands of other people who happen, to be the owner of obsolete weapons.  They are pistols within the definition of this act.  Theoretically, they might be used, but I have never heard of one being used in the perpetration of a crime.  They are found in the museums and in the collections of private collectors.  You cannot imagine a hold-up man using a flintlock, or a wheel-lock pistol.

Mr. LEWIS. How far back would you go in point of time to draw the line between antique and present-day weapons?

Mr. FREDERICK. I would say that we should except obsolete or antique pistols possessed as curiosities or ornaments.

Compendium_Spitzer
Page 624

I think there should be an exemption relating to such collections, and I may suggest that if I had, as I have, 300 or 400 or 500 such old weapons, and if I happened to move my residence to New Jersey, under this bill I would have to get a separate license for every one of those 300 or 400 or 500 weapons, in order to legally transport them to New Jersey.

The CHAIRMAN. If that were taken care of, would that remove your objection?

Mr. FREDERICK. I may remind you that the busines of numbering weapons is a modern device and it is not found in the older weapons. It is impossible in the case of many of the older weapons to comply with the terms of this bill by giving the descriptive numbers. I have dozens and hundreds of weapons and I cannot tell who made them. There are no distinguishing marks upon them. They were made by hand up until a little more than a hundred years ago.

Mr. DICKINSON. I will ask you whether or not this bill interferes in any way with the right of a person to keep and bear arms or his right to be secure in his person against unreasonable search; in other words, do you believe this bill is unconstitutional or that it violates any constitutional provision?

Mr. FREDERICK. I have not given it any study from that point of view. I will be glad to submit in writing my views on that subject, but I do think it is a subject which deserves serious thought.

Mr. DICKINSON. My mind is running along the lines that it is constitutional.

Mr. McCORMACK. You have been living with this legislation or following this type of legislation for quite a number of years.

Mr. FREDERICK. Yes; I have.

Mr. McCORMACK. The fact that you have not considered the constitutional aspect would be pretty powerful evidence, so far as I am concerned, that you did not think that question was involved.

Mr. FREDERICK. No; I would not say that, because my view has been that the United States has no jurisdiction to attack this problem directly. I think that under the Constitution the United States has no jurisdiction to legislate in a police sense with respect to firearms. I think that is exclusively a matter for State regulation, and I think that the only possible way in which the United States can legislate is through its taxing power, which is an indirect method of approach, through its control over interstate commerce, which was perfectly proper, and through control over importations. I have not considered the indirect method of approach as being one which was to be seriously considered until the bill began to be talked about.

Mr. McCORMACK. You would not seriously consider that there was any constitutional question involved in this bill, would you?

Mr. FREDERICK. I think this bill goes pretty far for a revenue bill in the direction of setting up what are essentially police regulations.

Mr. McCORMACK. Congress possesses the power, if it is required, to exercise the taxing power for the regulation of social purposes.

Mr. FREDERICK. I know, and it has been frequently exercised, and I suppose that Congress can pass, under its taxing power, what are in effect regulatory statutes, as it has in many instances, such as the acts relating to oleomargarine and other things.

Mr. McCORMACK. I quite agree with you. The thought in my mind was the fact you had not considered the constitutional phase, and

being the student you are, and following this particular type of legis-
lation as closely as you have, it would be a powerful piece of evidence,
and at least I would draw the inference, that you did not think the
question was seriously involved.

Mr. FREDERICK. I may say that approached as a taxing proposition
I am personally of the opinion, as a lawyer, that Congress may legis-
late in the way of taxing certain transactions with respect to firearms.
That, I think, is clear.

Mr. LEWIS. Mr. Frederick, the automobile is a dangerous, even a
deadly instrument, but never intentionally a deadly instrument, of
course. States uniformly have taken notice of the danger to the
innocent pedestrian and others involved in the use of the automobile.
They have set up around the privilege of its ownership and operation
a complete regulatory system consistent with reasonable rights to
the use of the automobile. Approaching the subject of firearms,
would you not consider that society is under the same duty to protect
the innocent that it is with regard to the automobile and that with a
view to the attainment of that result, the person who wishes the privi-
lege of bearing firearms should submit to the same regulations as
rigid as the automobile owner and driver is required to accept?

Mr. FREDERICK. You have raised a very interesting analogy, one
which, to my mind, has a very decided bearing upon the practica-
bility and the desirability of this type of legislation. Automobiles
are a much more essential instrument of crime than pistols. Any
police officer will tell you that. They are much more dangerous to
ordinary life, because they kill approximately 30,000 people a year.
The extent, so far as I know, to which the Government, or the Con-
gress, has attempted to legislate is with respect to the transportation
in interstate commerce of stolen vehicles, which apparently has
accomplished very useful results. The rest of the legislation is left
to the States, and in its effect and in its mode of enforcement, it is a
wholly reasonable and suitable approach, because, if I want a license
for my car I can get it in 20 minutes, by complying with certain
definite and well-known regulations.

Mr. LEWIS. And qualifying.

Mr. FREDERICK. And qualifying, yes, sir. I do not have to prove
I am a driver in order to get an automobile license. I do in order to
get a personal driver's license, of course. Complying with the re-
gulations, I get that automatically, as a matter of course. If I want
a pistol license, and I have had one for a number of years in New
York, it takes me 6 weeks to 4 months to get that license, and it
costs me an enormous amount of personal bother and trouble. The
difficulty in a sense is in the manner of administration and we know
that that which is oppressive can be put into the administration
much more effectively than into the law; it is the way the thing
works. I have no objection, personally, to having my fingerprints
taken, because my own fingerprints have been taken many times,
but I do object to being singled out with the criminal element and
having my fingerprints taken and put in the Bureau of Criminal
Identification because I like to use a pistol or because I may need
one for self-defense, whereas automobile owners are not fingerprinted
and are, as a class, a much more criminal body, from the standpoint
of percentage, than pistol licensees.

The CHAIRMAN. Do you make that statement seriously?

Mr. FREDERICK. Yes, sir.

The CHAIRMAN. That the ordinary man who owns and operates an automobile is more likely to be a criminal than the man who arms himself?

Mr. FREDERICK. You have not kept the sharp lines of distinction.

The CHAIRMAN. They are too sharp for me to grasp.

Mr. FREDERICK. I said pistol licensees, those who have gone to the trouble of securing a license to carry weapons, are a most law-abiding body, and the perpetration of a crime by such a licensee is almost unknown.

The CHAIRMAN. That has no analogy to your first statement.

Mr. FREDERICK. It is not by any means unknown for a person with an automobile license to commit a crime or to use that automobile in the perpetration of a crime.

The CHAIRMAN. But you say that the man who buys a pistol is much more likely to be a law-abiding citizen. On what do you base that statement? Have you any statistics upon which to base that, or is it a guess? My guess is as good as yours, but if you have any statistics we would like to have them.

Mr. FREDERICK. There are no statistics on these matters but I have tried my best to get such information as is available from the New York City police and from the records of other police authorities and from the State police, and my statement that automobiles are much more essential to crime than pistols is a statement that has been made to me by numbers of high police officials and I say that in licensing automobiles no such degree of care is taken as is exercised in giving licenses to carry pistols.

The CHAIRMAN. Then, if I understand you correctly, instead of further limiting or restricting the traffic in pistols, machine guns, and deadly weapons used by the criminals and racketeers, you object to the restrictions which now exist? I understood you to say that it is too difficult to secure a license to carry a pistol; that it takes 4 months to comply with the law, and I understand your position is that instead of having further restrictions and limitations, you think the restrictions are already too harsh?

Mr. FREDERICK. I think they are, so far as my experience goes in New York State, and I am referring to the New York statutes.

Mr. MCCORMACK. You made an interesting remark in response to one of Mr. Lewis' questions when you said that weapons and automobiles are an interesting analogy. You recognize the clear line of distinction and demarcation between a weapon and an automobile, so far as its being inherently dangerous is concerned?

Mr. FREDERICK. I think the automobile is dangerous.

Mr. MCCORMACK. I understand it is dangerous if it is negligibly operated. Would not the interesting analogy be more between a pistol and dope peddling? Would not that be a closer link than the link-up of a pistol with an automobile?

Mr. FREDERICK. I do not think so.

Mr. MCCORMACK. The use of dope is recognized by mankind as inherently harmful to the human being.

Mr. FREDERICK. Except as prescribed by physicians.

Mr. MCCORMACK. That is the exception but, as a general rule, it is recognized as inherently dangerous. The same applies to weapons; they are recognized as inherently dangerous.

Mr. FREDERICK. I do not think so.

Mr. McCORMACK. What do people buy weapons for?

Mr. FREDERICK. People buy weapons for several purposes; one is for the protection of the person or property.

Mr. McCORMACK. That class of people have no fear about reasonable license requirements.

Mr. FREDERICK. Not reasonable requirements.

Mr. McCORMACK. They have no fear of reasonable regulations as to licenses, if the weapons are necessary to meet a challenge to organized society.

Mr. FREDERICK. They buy pistols also to use for the purpose of training, in the event of military necessity.

Mr. McCORMACK. Those persons need not fear reasonable regulations.

Mr. FREDERICK. I beg your pardon?

Mr. McCORMACK. Those persons need have no fear of reasonable regulations.

Mr. FREDERICK. I think our difference may turn entirely upon what is reasonable.

Mr. McCORMACK. You are not opposed to regulation?

Mr. FREDERICK. Not at all; I have advocated it.

Mr. McCORMACK. You are not opposed to a Federal bill?

Mr. FREDERICK. Provided the bill will accomplish useful results in the suppression of crime, I am heartily in favor of it.

Mr. McCORMACK. You have given two groups who buy pistols.

Mr. FREDERICK. Another group is those who indulge in the use of pistols in connection with sports.

Mr. McCORMACK. That group need not fear any proper regulation.

Mr. FREDERICK. Any difference that we may have, and I do not know whether we have any, turns on the question of what is reasonable.

Mr. McCORMACK. I agree with you; you and I have a meeting of the minds on that.   What other group is interested?

Mr. FREDERICK. At the moment I do not think of any.

Mr. McCORMACK. Then there is the criminal group.

Mr. FREDERICK. Yes; and that is the one group we are after.

Mr. McCORMACK. That is the only group who would object to regulations.

Mr. FREDERICK. Yes; and it is the only group that has never been touched.

Mr. LEWIS. In your study of the State regulatory systems have you found that they provide that men who have been convicted of crime shall not have licenses?

Mr. FREDERICK. They have, and that is a provision of the uniform bill.

Mr. FREAR. We have spent about an hour and a half on this matter and we have gotten only to page 3.   We want your objections to the bill.   All this discussion is very interesting, but why not point out the difficulties in the bill?

Mr. FREDERICK. I am afraid that merely running over a brief list of objections is not going to accomplish much.

Mr. FREAR. Do you not want to be heard by the committee?

Mr. FREDERICK. I am anxious to be heard.

Mr. FREAR. Can you point out, without interruption, the provisions to which you object?

Mr. FREDERICK. In my opinion, the provision for fingerprints will not accomplish what is desired.

Mr. FREAR. Suppose we strike that out.

Mr. FREDERICK. I would like to mention that the bill relates to the taking of fingerprints and refers to corporations, associations, and partnerships. I do not know how the fingerprint of any officer of such an association or corporation can have value.

Mr. FREAR. Admitting your answer is correct, that is not serious. What is your next objection?

Mr. FREDERICK. I am quite concerned about the amount which is suggested on page 8, line 15, for a permit to transport in interstate commerce.

Mr. FREAR. What would you recommend for that?

Mr. FREDERICK. I think, inasmuch as I deem the primary purpose of this bill to be purely regulatory that that ought not to be burdensome. I should make it as nominal as possible. It seems to me that 25 cents is ample.

Mr. FREAR. Or 15 cents.

Mr. FREDERICK. Fifteen cents or 10 cents, or anything which will not prevent compliance with it because of its burdensome nature.

Mr. FREAR. What is next?

Mr. FREDERICK. There is no provision in the act covering the situation of an owner of a weapon who loses this stamped order. As I see the operation of the bill, it will mean this: When a manufacturer sells a weapon to a jobber, he gives a stamped order; when the jobber sells the weapon to the retailer, assuming we still allow jobbers to exist, he gives a second order together with the first. When the dealer sells to the buyer, he gives the third order and the two previous ones, and the buyer gets the gun and three pieces of paper. It is essential to him, in order to keep out of jail, to keep those together.

Mr. FREAR. How would you suggest having but one piece of paper?

Mr. FREDERICK. I think the only piece useful is a piece of paper where the transfer takes place between two persons, one of whom is not a licensed dealer. In other words, if I, as a private individual, sell a gun to a friend, a piece of paper is necessary there. Where a dealer sells to me as a buyer, a piece of paper should be useful. I do not think a string of prior papers are of value, running from the manufacturer who may be required to keep records. In the second place, when, as a matter of human experience, the owner of a gun is going to lose papers, they are going to get mislaid, they are going to get burned up, if he cannot turn them up when required to do so he is liable to go to jail. I think there ought to be a simple method of obtaining a copy of that paper from the authorities with whom the original was filed.

Mr. FREAR. We might attach a number plate to the pistol like we do to the automobile, as small as is necessary, and have that be evidence of the privilege of transfer. You only want one?

Mr. FREDERICK. I think the owner ought to be able to get one if it is lost. I think that machinery ought to be made simple. If not, in the actual operation, you are going to create criminals.

Mr. FREAR. What is the next objection?

58                   NATIONAL FIREARMS ACT

Mr. FREDERICK. On page 7 it says:

Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such imported firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury.

Mr. FREAR. That is taken from the other act.

Mr. FREDERICK. I do not understand why it should be necessary for such a person to go to trial.

Mr. FREAR. You think that language is too loose?

Mr. FREDERICK. Too loose and too drastic.

Mr. FREAR. You might write a substitute; we want your suggestions.

Mr. FREDERICK. I am skipping around somewhat, as I am sorry I have to do.  On page 7, section 10, I do not know what that language "nothing contained in this section shall apply to any manufacturer, importer, or dealer who has complied with the provisions of section 2", means.  I suppose that means that he has taken out a license.

Mr. FREAR. That is satisfactory as far as it goes?

Mr. FREDERICK. I should like very much to have the privilege of submitting some suggestions in writing, if I may.

The CHAIRMAN. Without objection, you may do so.

Mr. DICKINSON. Let me say that I have received numerous telegrams asking me to support legislation along the lines of the recommendations of the National Rifle Association.  Your line of thought is in accord with the things advocated by the National Rifle Association?

Mr. FREDERICK. I am president of the National Rifle Association and I think I correctly voice its views.

Mr. DICKINSON. Your purpose is to submit to this committee recommendations desired by the National Rifle Association in connection with this bill?

Mr. FREDERICK. Among the other organizations whose views I voice.

The CHAIRMAN. When may we have your written suggestions?

Mr. FREDERICK. I will get at it this afternoon and try and let you have it as quickly as I can.  As a lawyer, I know that the drafting of legislation is an extremely difficult job.  You have to do a lot of checking, and it is a difficult piece of work.

Mr. HILL. When you do that, do not forget that we are after the gangster.

Mr. FREDERICK. You have put your finger on it.  My general objections to most of the regulatory provisions are proposed with that in view.  I am just as much against the gangster as any man. I am just as much interested in seeing him suppressed, but I do not believe that we should burn down the barn in order to destroy the rats.  I am in favor of some more skillful method of getting the rats without destroying the barn.  In my opinion, most of the proposals the regulation of firearms, although ostensibly and properly aimed at the crook, do not reach the crook at all, but they do reach the honest man.  In my opinion, the forces which are opposed to crime consist of two general bodies; one is the organized police and the second is the unorganized victims, the great mass of unorganized law-abiding citizens, and if you destroy the effective opposition of either one of those, you are inevitably going to increase crime, because as you

destroy the forces of resistance in the human body to disease, you are
going to increase disease. So, by destroying the resistance of any
body which is opposed to crime, you are going to increase crime.
I think we should be careful in considering the actual operation of
regulatory measures to make sure that they do not hamstring the
law-abiding citizen in his opposition to the crook.

Mr. KNUTSON. There is no opposition on the part of the victims?

Mr. FREDERICK. It is not a 100 percent effective. Of course, the
right of self-defense is still a useful thing.

Mr. KNUTSON. It is a right, but an ineffective right under the
present situation.

Mr. FREDERICK. I would be interested to show you a collection
which I have made of newspaper clippings indicating the effective
use of firearms in self-defense, as a protection against the perpetration
of crime. Because of arguments which have been advanced by those
who are against the use of guns, I have made it my business to clip
from newspapers passing over my desk such cases as I run across of
effective self-defense with pistols, most of them pistols. I have a
scrap book two thirds full and I can show you dozens and hundred
of cases happening every year.

Mr. FREAR. How many in this room have pistols in their pockets
for self-defense?

Mr. FREDERICK. I doubt if any have.

Mr. FREAR. I doubt, unless a man anticipates danger, that he is
going to carry a pistol. You have looked after the clippings of the
man who has used a revolver in self-defense. How many men carry
revolvers? What percentage of men carry revolvers?

Mr. HILL. Quite a few traveling in automobiles.

Mr. FREDERICK. There are a good many.

Mr. FREAR. I am asking under present conditions.

Mr. FREDERICK. I have never believed in the general practice of
carrying weapons. I seldom carry one. I have when I felt it was
desirable to do so for my own protection. I know that applies in
most of the instances where guns are used effectively in self-defense
or in places of business and in the home. I do not believe in the
general promiscuous toting of guns. I think it should be sharply
restricted and only under licenses.

The CHAIRMAN. When did your association decide to call on Con-
gress for legislation dealing with this subject? Judge Dickinson refers
to telegrams urging him to support such legislation. When did you
determine to come before Congress and ask for such legislation as
you now have in mind?

Mr. FREDERICK. I do not understand that our association has
decided to urge any national legislation by Congress, and if the tele-
grams or messages which may have come to Judge Dickinson indicate
that the senders believe that we are sponsoring some particular bill
in Congress, or intend to do so, they are based on a misapprehension.

The CHAIRMAN. Your only interest in the matter is created by the
introduction and consideration of this bill? If it were not for this
bill you would not be here, nor would you be taking any interest in
the matter or bringing it to our attention; am I right?

Mr. FREDERICK. In our opinion, little of value can be accomplished
by Federal legislation on this point.

Mr. KNUTSON. Is it your thought to submit a substitute measure for H.R. 9066 and at the same time not infringe unnecessarily on the rights of law-abiding citizens?

Mr. FREDERICK. As I say, I have grave doubts as to the effectiveness of any such legislation.

Mr. HILL. You concede there is a necessity for something. In politics we have an old saying that you cannot beat somebody with nobody. You cannot hope to defeat or materially alter the legislation unless you submit to the committee something that is better or that will better attain the object that this legislation seeks to accomplish.

Mr. FREDERICK. I must differ with you in principle upon one point. I do not believe that Congress or the people back home want us to attempt miracles. In my opinion, based upon a rather extensive experience with this subject and study of it, very little of practical value can be accomplished by Federal legislation on the point.

Mr. HILL. I take it then that it is your opinion that the criminal is going to get firearms regardless of any laws.

Mr. FREDERICK. I think that is the opinion of any person who has knowledge of the subject. In most instances, the guns are stolen. They are not gotten through legitimate channels. Dillinger stole his guns. I have a half-dozen cases where guns have been used in prisons to effect a break; we have had that in New York, and all over the country. If you cannot keep guns out of the hands of criminals in jails, I do not see how you can keep them out of the hands of criminals walking about on the public highways.

The CHAIRMAN. If that be true, then the laws of the various States of the Union dealing with the subject, are not accomplishing a good purpose because they do not put them all out of business?

Mr. FREDERICK. I do not take that view of it at all. I believe in regulatory methods. I think that makes it desirable that any such regulations imposed should not impose undue hardships on the law-abiding citizens and that they should not obstruct him in the right of self-defense, but that they should be directed exclusively, so far as possible, to suppressing the criminal use, or punishing the criminal use of weapons.

The CHAIRMAN. You spoke of your experience, which we realize is valuable and extensive, in dealing with this matter. This bill contemplates the suppression of crime and the protection of law-abiding citizens. Do you consider that your experience and your knowledge of this subject is superior to that of the Department of Justice? Do you consider that your experience puts you in a better position to say what is necessary to accomplish the suppression of crime than the Department of Justice?

Mr. FREDERICK. I hesitate to set myself up in any comparative sense, because I recognize the prestige of the Department of Justice.

The CHAIRMAN. You recognize also their experience in dealing with this subject?

Mr. FREDERICK. Their experience, I think, has been comparatively recent. I think I may truthfully say this, and I think Mr. Keenan would agree with me, that I have given much more study to the problem of firearms regulations, extending over a longer period of time and going into far greater detail, than any man or all of the men in the Department of Justice.

NATIONAL FIREARMS ACT                                 **61**

The CHAIRMAN. Has your experience been with the sole purpose of dealing with crime?

Mr. FREDERICK. I have never been a prosecuting attorney.

The CHAIRMAN. One of the purposes of the Department of Justice is to deal with crime.

Mr. FREDERICK. I have approached it as a citizen interested in the public welfare, and the subject of crime has been a matter I have been deeply interested in ever since my college days, 30 years ago.

Mr. HILL. You expressed the opinion that perhaps any legislation would not be effective to keep firearms out of the hands of the criminal element.

Mr. FREDERICK. I am quite sure we cannot do that.

Mr. HILL. Assuming that is correct, and I am sure a great many might agree with you, if the firearms are found in the possession of the criminal element, and they cannot, under the provisions of this act, or of some similar legislation, show that they are in lawful possession of those firearms, would that not be a weapon in the hands of the Department of Justice in enabling them to hold those criminals until further investigation might be made of the crime?

Mr. FREDERICK. I think so, and I made this suggestion to Mr. Keenan $2\frac{1}{2}$ months ago, that whenever a weapon, a firearm of any kind, and I would not limit it to pistols—I would say rifles or shotguns—is found in the hands of any person who has been convicted of a crime of violence, because there are many crimes which have nothing to do with the use of firearms and that is why I make the distinction; and I think he suggested that we add to that any person who is a fugitive from justice—that mere possession of such a weapon should be prima facie evidence of its transportation in interstate commerce, and that transportation in interstate commerce of weapons by those people be made a crime.

Mr. HILL. What do you do with a man who has never been convicted of a crime although he may be a criminal?

Mr. FREDERICK. I do not know of any way in which you can catch all the dirt in the stream no matter what kind of a skimmer you may use.

Mr. HILL. It is conceivable that some of the most desperate gangsters may never have been convicted because we have been unable to get the evidence.

Mr. FREDERICK. That will sometimes happen.

Mr. HILL. It might frequently happen.

Mr. FREDERICK. I suppose so, because there is a first time for every criminal. I do not know how you can get at that; if he is found carrying a gun, and it is in violation of the State law, that is a State matter; I do not see how it is practical, without doing an injustice to the much greater body of law-abiding citizens to form a statute—and I have not yet been able to think of any way—which would be effective in such a case as you put.

Mr. HILL. I take it that your objection to this character of legislation is that the restrictions which it would impose upon the law-abiding citizen in the matter of firearms outweigh the advantages which might be gained in the hunting down and catching of the criminal.

Mr. FREDERICK. In general, I think it is best for the public interest.

58278—34——5

Mr. FREAR. This suggestion has been made: Do you appear here representing any private manufacturing companies or anyone interested in the manufacture of firearms?

Mr. FREDERICK. You mean in the commercial sense?

Mr. FREAR. Yes, in a commercial sense.

Mr. FREDERICK. None whatever, nor have I ever been.

Mr. FREAR. And no compensation is being paid you?

Mr. FREDERICK. No, sir.

Mr. FREAR. I am glad to hear that, and I think you are entitled to have that in the record at this time.

Mr. FREDERICK. I have never, directly or indirectly, been interested commercially in firearms. I am engaged in the private practice of law. I have not anyone, among my clients, nor have I ever had anyone engaged in such enterprises. My expenses here and back and such incidental expenses as I incur are borne by the National Rifle Association of which I am president. Prior to 2 years ago, when they paid some expenses that I incurred in this connection, I bore all of my expenses out of my personal pocket, and no one has ever paid me anything for my services. I am entirely voluntary and this and other service has been a service pro bono publico. I might refer, if I may, to one more point.

Mr. McCORMACK. Who comprises the National Rifle Association?

Mr. FREDERICK. The National Rifle Association is an incorporated body organized, I think, in 1871. It comprises amateur rifle shooting in the United States and it is organized for the purpose of promoting small-arms practice; it works with the War Department, and, in conjunction with the War Department, until the depression, it conducted national matches for which the National Congress appropriated $500,000. It is composed of individual members and of affiliate groups, that is, shooting clubs, etc. Our membership runs into the hundreds of thousands all over the country.

Mr. DICKINSON. I have a telegram, not from my own section, that indicates that it is sent by members of some hunting association.

Mr. FREDERICK. I may say that I am also interested in the subject of conservation of forests and wild life. I know the sportsmen of the country feel as I do.

Mr. McCORMACK. How did they know you were appearing before the committee today?

Mr. FREDERICK. How did those organizations with which I am connected know it?

Mr. McCORMACK. I am not criticizing; I am glad to have you appear before the committee, as I like to hear from those who are shooting at the bill. I value your contribution, whether I agree with you wholly or not at all. I am curious to know how these people knew that you were appearing here today.

Mr. FREDERICK. I have no idea. There is a bill in the Senate which was proposed by the so-called "racketeering committee." I think it was proposed quite a long time ago. There has been a good deal of general excitement with respect to that bill. I do not know whether that is in any way responsible.

Mr. HILL. I have a telegram from the Pacific coast, received this morning, signed by a number of persons, which says:

We urge you to give all possible consideration to recommendations proposed by National Rifle Association in connect on with H.R. 9066 at committee meeting Wednesday morning.

Evidently they know that this hearing is taking place this morning.

General Reckord. I am responsible for that information going out. Two days ago, when the chairman advised me of this hearing, I advised a number of people by wire that a hearing would be held on this bill.

Mr. McCormack. Did these people know that he was coming here?

General Reckord. I do not know.

Mr. Hill. It is propaganda, then?

General Reckord. No.

Mr. McCormack. Do intelligent people in this country send telegrams on a subject they know nothing about?

General Reckord. I think you will find they know a great deal about it. They do not know anything about the particular bill, because the bill has been printed less than a week. We never saw the bill ourselves, until 2 or 3 days ago.

Mr. Crowther. For 2 months or more I have been receiving some telegrams, and a great many letters from rifle associations and gun clubs. One comes from a large association connected with the General Electric Co. They all relate to this general subject and refer to the McLeod bill, the Copeland bill, the Hartley bill, and so forth, and comment on them. So, it would appear that it is not a new matter before the gun clubs, because I know for at least 2 months I have been receiving letters and telegrams, and some lengthy letters, in which they have given the matter great thought and consideration, and they express the hope that this legislation designed to reach the criminal might not take such form as to place an undue burden on rifle clubs.

Mr. Dickinson. It looks like the telegram which I received from Branson is from the South, where they do hunting; it is signed by 15 or 20 individuals; it must have been some rifle organization.

Mr. McCormack. Have you had hearings on similar legislation before the Judiciary Committee?

General Reckord. There was a hearing, but we were not advised nor did we attend. I think the Attorney General appeared in person and Mr. Keenan also. Answering the gentleman's question, there was a Copeland bill which was introduced possibly 2 months ago.

Mr. Crowther. And a McLeod bill and a Hartley bill.

The Chairman. That does not account for this stream of telegrams in the last day or two.

General Reckord. The only person who could possibly be responsible would be myself and after you told me you were giving us a hearing today——

Mr. McCormack (interposing). You have contacted such as you could and wired the members of the association?

General Reckord. In each State, or practically every State, we have a State rifle association, and we advised a number of those people that the hearing would be held today. Nothing was said about Mr. Frederick or any particular individual being present.

Mr. McCormack. Did you ask them to wire in here?

General Reckord. I do not recall the exact language of the telegram; I would say yes, probably we did, or intimated that a wire to Mr. Lewis—I wrote Mr. Lewis myself, because he is from the Sixth District and I particularly requested him to be present.

Mr. McCormack. Did you wire the people telling them what the recommendations were going to be to the committee?

General Reckord. No, except that the legislation is bad.

Mr. McCormack. And they blindly followed it?

General Reckord. I would not say blindly.

Mr. McCormack. They certainly had no information as to what the recommendations were to be.

General Reckord. They could not possibly have the information.

Mr. McCormack. They did not know when they sent the wires in what the association was going to recommend?

General Reckord. Except that we were going to recommend legislation.

Mr. McCormack. Nobody interrupted you. I am going to conclude, not as a result of my friend's staetment, but because I have finished.

The Chairman. The Chair would like to make an observation. We have been in session 2 hours which is as long as the Department of Justice had the other day. It is requested that they have time for one witness to make a brief statement before this session adjourns today. If you are not going to conclude, we will have to come back.

Mr. Frederick. I shall be glad to conclude with one more observation.

The Chairman. We are very pressed for time, as we have other matters to consider.

Mr. Frederick. It seems to me that any provision regarding a permit such as that contained in section 10, page 7, to transport a weapon in interstate commerce should call for a permit good indefinitely, because it is in the nature of a restriction and I take it that is about the only purpose of it. If I should go to Camp Perry or Seagirt, or any other place where the pistol matches are held, it would be a veritable nuisance for me to get a permit to get there, and once there, to get home; it would be a nuisance to go to the country and be required to get a permit, and then be required to get another when you come back at the end of the summer. It seems to me that once a man has registered his weapon, and it is known that he has lawfully obtained a permit to transport it, that it should be good indefinitely, so far as he is concerned, and so far as the particular gun is concerned. I thank you for the privilege of appearing before you.

Mr. Lewis. Mr. Keenan has stated that he would like to be heard for a few minutes.

The Chairman. We cannot stay in session more than 15 minutes.

## STATEMENT OF JOSEPH B. KEENAN, ASSISTANT ATTORNEY GENERAL

Mr. Keenan. I will take less than 5 minutes. So that there will be no misunderstanding and that the record will be clear, the Department of Justice was not aware of any agreement, implied or otherwise, to hear further from Mr. Frederick or General Reckord, inasmuch as approximately 4 hours were devoted to hearing the analysis of the uniform bill which was advocated by them and their views as to what would or would not constitute unreasonable and unduly burdensome restrictions upon the obtaining of firearms. The view of the Depart-

ment, briefly, was this: That the Department represented all of the
people of the country, in response to demands that came in for a long
period of time requesting that some effort be made to form some type
of Federal legislation to curb the sale of firearms.   At the beginning
it was recognized that no criminal would go to the expense of taking
the steps necessary to comply with the regulations.

We cannot over-emphasize our views that we hope to get some good
from this bill in its present form or some modified form.   As Mr.
Frederick stated to me in my office, and as it appears in the record, he
spent 15 years of his life in the study of firearms legislation, and he
said in the record that none of this legislation had ever reached or
touched the criminal, and we approached it from that standpoint.
We are fully alive to the grave possibility that we will not keep the
criminal from getting firearms, but we do hope to make it a simple
matter, when we do apprehend the criminals with firearms, that they
will not be able to put up vague alibis and the usual ruses, but that
it will be a simple method to put them behind the bars when they
violate these regulations.

One word more.   We discussed pretty generally the basic prin-
ciples behind this legislation more than 2½ months ago with General
Reckord and Mr. Frederick, on the 20th day of February there were
introduced two bills in the Senate, by Senator Ashurst, Senate Nos.
2844 and 2840, and I think General Reckord will admit that he had
knowledge of the introduction of these bills shortly after they were
introduced.

General RECKORD. Of those two.

Mr. KEENAN. And both of those bills are combined in this one bill,
and there are no changes, excepting combining them in one bill, at
the request of Senator Ashurst.   So, if there is any suggestion that
the Department of Justice has been unfair, and that these matters
have not been known to those representing the rifle association, I say
an examination of the Senate bills, and the present bill will show the
present bill to be a composite unit of those two bills, with their basic
principles.

Further, with no disrespect intended, we feel in the Department of
Justice that we represent the people of the country who demand that
some effort be made to reach the firearms evil.   We have a tremen-
dous amount of data and correspondence coming into our office.   We
have had meetings with the International Chiefs of Police Associa-
tion of America, that represents the chiefs of police of practically
every city in the United States of any size, and they have approved
of this legislation.   They have asked us for it.   We have conferred
with an executive committee that came from all parts of the United
States to call upon the Attorney General and discuss it.   Approxi-
mately 2 or 3 weeks ago General Reckord came into the Department
and I was occupied, and Mr. Smith, my assistant, discussed with him
the firearms legislation.   At that time, it is my understanding, that
General Reckord said that he would work with us if pistols and
revolvers were excluded and that Mr. Frederick would work with us
if we eliminated the registration feature.   We did not see the problem
eye to eye.   We think every possible opportunity has been given to
them.   We think that those who have spent their lives in collecting
a tremendous amount of data, and Mr. Frederick, who is the best
shot in America, and the Olympic champion of America, might have

a view off to the left or to the right, whereas we who are more or less in the center, and who are not experts and have not given the same amount of study would be in a better position to say what is the fair thing to do to eliminate the evil that unquestionably exists with the least burdensome provisions to effect some legislation that would mean something. We had no more meetings with Mr. Frederick and we thought we should draw the bill and submit it to this honorable committee and to the Congress.

We have requested and we have received some figures on the homicides in this country as compared with Great Britain and other countries, which we shall ask leave to submit for the record.

In closing, we cannot overemphasize o ı position that we believe that an earnest effort should be made by some governmental body to reach the crook and to try to disarm him. We have a witness here, and we are going to try to save all the time possible. I think this gentleman can throw some light on what might be expected from this legislation, particularly with reference to machine guns.

Mr. SHALLENBERGER. Did I understand you to say that you would give the committee data on crime in Great Britain as compared with this country?

Mr. KEENAN. That is true.

Mr. SHALLENBERGER. I would like to have that for the record.

Mr. COOPER. Let us hear the other witness to whom he has referred.

## STATEMENT OF W. B. RYAN, PRESIDENT OF THE AUTO ORDNANCE CO.

The CHAIRMAN. Do you appear as representing the Department of Justice?

Mr. RYAN. I am president of the Auto Ordnance Co., which own the patent rights to the Thompson submachine guns.

We have studied the bill fairly carefully and we believe that the provisions of it will materially aid in the disarming of the criminal. The policies of the company itself have been exactly those as embodied in the pending bill for a number of years, and we feel that the restrictions in the sale and the taxes to be imposed will eventually result in the disarming, as far as submachine guns are concerned, certainly of all criminals who now have them.

Mr. COOPER. I understood you to say, Mr. Ryan, that your company owns the patents for the Thompson submachine gun.

Mr. RYAN. Yes, sir.

Mr. COOPER. And you are engaged in the manufacture of these weapons?

Mr. RYAN. No, sir; we do not manufacture.

Mr. COOPER. You own the patent rights?

Mr. RYAN. We own the patents.

Mr. COOPER. How many companies in the United States manufacture machine guns used by the gangsters or criminals today?

Mr. RYAN. As far as I know, there is only one company which actually manufactures the small type machine guns, the Colts Firearms Co., who manufacture for us, and they also manufacture a small gun called the "Monitor", a gun of their own.

Mr. COOPER. It is the small type machine gun referred to by you that the criminal element or so-called "gangster" uses?

Mr. RYAN. Yes.

Mr. COOPER. And the Colts Co. manufactures that type of weapon and you own the patent rights on it?

Mr. RYAN. That is right, sir.

Mr. COOPER. Do you believe that this bill will aid in keeping machine guns out of the hands of gangsters and the criminal element?

Mr. RYAN. I do; yes, sir.

Mr. COOPER. Is there any possibility of such guns as these being imported into this country?

Mr. RYAN. There are two types of guns made in Europe which are being imported, I am told, in some quantities into South America and I have heard that they are being brought in here. That I cannot substantiate.

Mr. COOPER. Is it your opinion that this type of legislation would prevent that?

Mr. RYAN. It is; yes, sir.

Mr. COOPER. Are there any small-arms manufacturers that are covered by such arms as are contemplated under this bill, that would be seriously affected by the manufacturers' tax, in your opinion?

Mr. RYAN. Not so far as I know. I know of nobody else making them. I cannot answer for the other types of firearms.

Mr. COOPER. Then, is it your opinion, as one familiar with and interested in the manufacture of this type of weapon, that this pending bill would be desirable and beneficial in attempting to meet the problem that we recognize exists in this country?

Mr. RYAN. It is.

Mr. SHALLENBERGER. Is there any country that arms its soldiers with this type of gun?

Mr. RYAN. Yes, sir; the United States Army.

Mr. SHALLENBERGER. And the peace officers of this country are armed with that gun?

Mr. RYAN. A great many are.

Mr. SHALLENBERGER. Do you know if Great Britain arms police officers with machine guns?

Mr. RYAN. Not this gun.

Mr. SHALLENBERGER. With any kind of machine guns?

Mr. RYAN. I do not know that, sir.

The CHAIRMAN. Are you through with your statement?

Mr. RYAN. Yes, sir.

The CHAIRMAN. We thank you very much.

## STATEMENT OF CHARLES V. IMLAY, MEMBER OF THE NATIONAL CONFERENCE OF COMMISSIONERS ON UNIFORM LAWS, 1416 F STREET, WASHINGTON, D.C.

The CHAIRMAN. Please give your name and address.

Mr. IMLAY. Charles V. Imlay. I am a member of the National Conference of Commissioners on Uniform State Laws, and my address is Washington, D.C.

My connection, Mr. Chairman, and members of the committee, with the National Conference of Commissioners on Uniform State Laws is as a representative on that body of the District of Columbia.

Compendium_Spitzer
Page 639

68                    NATIONAL FIREARMS ACT

The body has been for some 43 or 44 years meeting annually, drafting
and proposing to the States for adoption so-called uniform State
laws, being represented generally by two or three commissioners from
each of the States.

Some 11 years ago, as one of the members of that body, I was
designated chairman of a committee on a uniform firearms act and
that work was completed in 1930 with the drafting of the so-called
uniform firearms act.  You will understand that while a member of
that conference, I am not here with any resolution from the confer-
ence; I am speaking as a private person from experience gained in that
work over a period of about 11 years on firearms legislation.  I after-
ward acted as a member of the committee on the so-called uniform
machine gun act, which was completed and promulgated by the
conference in its 1933 session.

Very briefly, my own personal objection to the form of legislation
in this proposed bill is that it proceeds by a plan of requiring a license
to purchase which we saw fit to abandon in the uniform act after a
comparison of legislation during the entire history of this country in
the various States of the Union we approached the subject, as one
must always approach the subject of any uniform State statute, on
the assumption that you must take what is the traditional form of
legislation that has stood the test of experience and proceed on that.
As to the course of that work and the course of observations I made in
connection with it, I think I would like to file with the committee as
an extension of my remarks, so to speak, the official draft of the uni-
form firearms act, upon which was modeled that act that has been
referred to as the act for the District of Columbia.  I should like to
file also some observations I made in connection with the District of
Columbia act in the summer of 1932 when it was before this Congress,
in the Federal Bar Association Journal at page 22.

The CHAIRMAN. How many pages does that cover?

Mr. IMLAY. There are several pages.

The CHAIRMAN. Have you several copies which you could file with
the committee?

Mr. IMLAY. I have the one copy.  At the time of the reaffirmation
of the uniform firearms act in the summer of 1930, I prepared for the
American Bar Association Journal an article in which I summarized
all of the State legislation upon the subject, and which is contained in
the American Association Journal of December 1930, on pages 799
to 801, and those pages I will also separate and leave with the commit-
tee as part of the record.

The CHAIRMAN. Without objection that may go in the record.

Mr. IMLAY. If the time comes, Mr. Chairman, when more oppor-
tunity is afforded to discuss these matters, then I should like at that
time an opportunity to discuss them from the standpoint, as I see it,
of this act following the history of firearms legislation in this country
and being unworkable on that account.

(The documents referred to are as follows:)

UNIFORM FIREARMS ACT

Drafted by the National Conference of Commissioners on Uniform State Laws,
and by it approved and recommended for enactment in all the States at its
Fortieth Annual Conference at Chicago, Ill., August 11 to 16, 1930, with ex-
planatory statement.  Approved by the American Bar Association at its meeting
at Chicago, Ill., August 20–23, 1930.

NATIONAL FIREARMS ACT                                          **69**

The committee which acted for the National Conference of Commissioners on Uniform State Laws in preparing the uniform firearms act was as follows: Joseph F. O'Connell, Boston, Mass., chairman; James F. Ailshie, Cœur d'Alene, Idaho, chairman, uniform torts and criminal law acts section; Jesse A. Miller, Des Moines, Iowa, president, ex-officio; Charles V. Imlay, Washington, D.C.; Charles E. Lane, Cheyenne, Wyo.; George B. Martin, Catlettsburg, Ky.; A. L. Scott, Pioche, Nev.; and Julian O. Seth, Santa Fe, N. Mex.

Copies of all uniform acts and other printed matter issued by the conference may be obtained from John H. Voorhees, secretary, 1140 North Dearborn Street, Chicago, Ill.

An Act Regulating the Sale, Transfer, and Possession of Certain Firearms, Prescribing Penalties and Rules of Evidence, and to Make Uniform the Law with Reference Thereto

Section 1. *Definitions.*—"Pistol," as used in this act, means any firearm with barrel less than 12 inches in length.

"Crime of Violence," as used in this act, means any of the following crimes or an attempt to commit any of the same, namely, murder, manslaughter, rape, mayhem, assault to do great bodily harm, robbery, burglary [housebreaking, breaking and entering, kidnapping and larceny].[1]

"Person," as used in this act, includes firm, partnership, association, or corporation.

Sec. 2. *Committing crime when armed.*—If any person shall commit or attempt to commit a crime of violence when armed with a pistol, he may in addition to the punishment provided for the crime, be punished also as provided by this act.

Sec. 3. *Being armed prima facie evidence of intent.*—In the trial of a person for committing or attempting to commit a crime of violence, the fact that he was armed with a pistol and had no license to carry the same shall be *prima facie* evidence of his intention to commit said crime of violence.

Sec. 4. *Certain persons forbidden to possess arms.*—No person who has been convicted in this State or elsewhere of a crime of violence, shall own a pistol or have one in his possession or under his control.

Sec. 5. *Carrying pistol.*—No person shall carry a pistol in any vehicle or concealed on or about his person, except in his place of abode or fixed place of business, without a license therefor as hereinafter provided.

Sec. 6. *Exception.*—The provisions of the preceding section shall not apply to marshals, sheriffs, prison or jail wardens or their deputies, policemen or other law-enforcement officers, or to members of the Army, Navy, or Marine Corps of the United States or of the National Guard or Organized Reserves when on duty, or to the regularly enrolled members of any organization duly authorized to purchase or receive such weapons from the United States or from this State, provided such members are at or are going to or from their places of assembly or target practice, or to officers or employees of the United States duly authorized to carry a concealed pistol, or to any person engaged in the business of manufacturing, repairing, or dealing in firearms or the agent or representative of any such person having in his possession, using, or carrying a pistol in the usual or ordinary course of such business, or to any person while carrying a pistol unloaded and in a secure wrapper from the place of purchase to his home or place of business or to a place of repair or back to his home or place of business or in moving from one place of abode or business to another.

Sec. 7. *Issue of licenses to carry.*—The judge of a court of record, the chief of police of a municipality, the sheriff of a county, may upon the application of any person issue a license to such person to carry a pistol in a vehicle or concealed on or about his person within this State for not more than 1 year from date of issue, if it appears that the applicant has good reason to fear an injury to his person or property, or has any other proper reason for carrying a pistol, and that he is a suitable person to be so licensed. The license shall be in triplicate, in form to be prescribed by the secretary of State, and shall bear the name, address, description, and signature of the licensee and the reason given for desiring a license. The original thereof shall be delivered to the licensee, the duplicate shall within [7 days] be sent by registered mail to the [secretary of State] and the triplicate shall be preserved for 6 years, by the authority issuing said license. The fee for issuing such license shall be $——— which fee shall be paid into the [——————— treasury].

[1] Crimes here enumerated to be modified to suit local definitions.

Sec. 8. *Delivery to minors and others forbidden.*—No person shall deliver a pistol to any person under the age of 18 or to one, who he has reasonable cause to believe has been convicted of a crime of violence, or is a drug addict, an habitual drunkard, or of unsound mind.

Sec. 9. *Sales regulated.*—No seller shall deliver a pistol to the purchaser thereof until 48 hours shall have elapsed from the time of the application for the purchase thereof, and, when delivered, said pistol shall be securely wrapped and shall be unloaded.   At the time of applying for the purchase of a pistol the purchaser shall sign in triplicate and deliver to the seller a statement containing his full name, address, occupation, color, place of birth, the date and hour of application, the caliber, make, model, and manufacturer's number of the pistol to be purchased and a statement that he has never been convicted in this State or elsewhere of a crime of violence.   The seller shall within 6 hours after such application, sign and attach his address and forward by registered mail one copy of such statement to the chief of police of the municipality or the sheriff of the county of which the seller is a resident; the duplicate duly signed by the seller shall within 7 days be sent by him with his address to the [secretary of State]; the triplicate he shall retain for 6 years.   This section shall not apply to sales at wholesale.

Sec. 19. *Dealers to be licensed.*—No retail dealer shall sell or otherwise transfer, or expose for sale or transfer, or have in his possession with intent to sell, or otherwise transfer, any pistol without being licensed as hereinafter provided.

Sec. 11. *Dealers' licenses, by whom granted and conditions thereof.*—The duly constituted licensing authorities of any city, town, or political subdivision of this State may grant licenses in forms prescribed by the [secretary of State] effective for not more than 1 year from date of issue, permitting the licensee to sell pistols at retail within this State subject to the following conditions in addition to those specified in section 9 hereof, for breach of any of which the license shall be forfeited and the licensee subject to punishment as provided in this act.

1. The business shall be carried on only in the building designated in the license.

2. The license or a copy thereof, certified by the issuing authority, shall be displayed on the premises where it can easily be read.

3. No pistol shall be sold (*a*) in violation of any provision of this act, nor (*b*) shall a pistol be sold under any circumstances unless the purchaser is personally known to the seller or shall present clear evidence of his identity.

4. A true record in triplicate shall be made of every pistol sold, in a book kept for the purpose, the form of which may be prescribed by the [secretary of State] and shall be personally signed by the purchaser and by the person effecting the sale, each in the presence of the other, and shall contain the date of sale, the caliber, make, model and manufacturers' number of the weapon, the name, address, occupation, color, and place of birth of the purchaser, and a statement signed by the purchaser that he has never been convicted in this State or elsewhere of a crime of violence.   One copy shall within 6 hours be sent by registered mail to the chief of police of the municipality or the sheriff of the county of which the dealer is a resident; the duplicate the dealer shall within 7 days send to the [secretary of State]; the triplicate the dealer shall retain for 6 years.

5. No pistol or imitation thereof or placard advertising the sale thereof shall be displayed in any part of any premises where it can readily be seen from the outside.

The fee for issuing said license shall be $_____ which fee shall be paid into the [_____ treasury].

Sec. 12. *Certain transfers forbidden.*—No person shall make any loan secured by a mortgage, deposit, or pledge of a pistol; nor shall any person lend or give a pistol to another or otherwise deliver a pistol contrary to the provisions of this act.

Sec. 13. *False information forbidden.*—No person shall, in purchasing or otherwise securing delivery of a pistol or in applying for a license to carry the same, give false information or offer false evidence of his identity.

Sec. 14. *Alteration of identifying marks prohibited.*—No person shall change, alter, remove, or obliterate the name of the maker, model, manufacturer's number, or other mark of identification on any pistol.   Possession of any pistol upon which any such mark shall have been changed, altered, removed, or obliterated, shall be prima facie evidence that the possessor has changed, altered, removed or obliterated the same.

Sec. 15. *Existing licenses revoked.*—All licenses heretofore issued within this state permitting the carrying of pistols concealed upon the person shall expire at midnight of the _____ day of _____, 19__.

SEC. 16. *Exceptions.*—This act shall not apply to antique pistols unsuitable for use as firearms and possessed as curiosities or ornaments.

SEC. 17. *Penalties.*—Any violation of any provision of this act constitutes an offense punishable by [a fine of not more than [$_____] or imprisonment for not more than [_____] or both, or by imprisonment in the penitentiary for not less than [_____], nor more than [_____]].

SEC. 18. *Constitutionality.*—[If any part of this act is for any reason declared void, such invalidity shall not affect the validity of the remaining portions of this act.]

SEC. 19. *Short title.*—This act may be cited as the "Uniform Firearms Act."

SEC. 20. *Uniform interpretation.*—This act shall be so interpreted and construed as to effectuate its general purpose to make uniform the law of those states which enact it.

SEC. 21. *Effective date.*—This act shall take effect on the _____ day of _____, 19___.

SEC. 22. *Certain acts repealed.*—All laws or parts of laws inconsistent herewith are hereby repealed.

### EXPLANATORY STATEMENT REGARDING UNIFORM FIREARMS ACT

The National Conference of Commissioners on Uniform State Laws is composed of commissioners appointed by legislative or executive authority from the States, the District of Columbia, the Territory of Alaska, the Territory of Hawaii, and the insular possessions of the United States. The organization meeting was held at Saratoga, N. Y., in August 1892; and annual meetings have been regularly held since that time, immediately preceding the meetings of the American Bar Association. The purpose of the organization, as its name imports, is to promote uniformity of legislation on subjects of common interest throughout the United States. Proposed acts are carefully drawn by special committees of trained lawyers, assisted by experts in many instances, and are printed, distributed, and discussed in the conference at more than one annual session. When finally approved by the conference, the uniform acts are submitted to the American Bar Association and recommended for general adoption throughout the jurisdiction of the United States. Each uniform act is thus the fruit of one or more tentative drafts submitted to the criticism of the Commissioners in annual conference and of the American Bar Association, and represents the experience and judgment of a select body of lawyers chosen from every part of the United States.

### RELATION OF ACT TO PAST AND RECENT FIREARMS LEGISLATION

The conference at its fortieth annual meeting held at Chicago, August 11–16, 1930, approved the Uniform Firearms Act and voted that it be recommended to the States for adoption. On August 21 the American Bar Association, meeting at the same place, approved the act. This was in effect a second approval of the subject-matter by both bodies, inasmuch as the conference and bar association had at a previous meeting held at Denver, Colo., in July 1926, approved an act in substantially the same form. The matter was, however, after the Denver meeting taken under reconsideration by both bodies and for that reason temporarily withdrawn from State legislatures. After 4 additional years of reconsideration the principles of the former draft have been reaffirmed in the new draft and that new draft with only a few changes from the former draft is now recommended to the States for adoption.

When the subject-matter of the act was first brought to the attention of the National Conference at Minneapolis in August 1923, much had already been accomplished in the direction of uniform firearms legislation by the United States Revolver Association, a disinterested noncommercial organization of marksmen. Its legislative committee had drafted a uniform law which had already been adopted with some few changes by North Dakota, and New Hampshire. California had also adopted it with some qualifications and additions. The law was thereafter adopted in Indiana in 1925, and much of its subject-matter was enacted in the Oregon, West Virginia, and Michigan acts of the same year. The extent to which the revolver association act had thus already gained ground as well as the intrinsic merits of that act induced the committee of the conference to select it as the model of the draft of the uniform act approved by the conference in 1926. During these 4 years in which the subject-matter has been under reconsideration and prior to the final approval by the conference and the bar association in 1930, the substance and form of the act has gained additional recognition. Much of its text has been incorporated in recent acts in Massachusetts, Michigan, New Jer-

sey, and Rhode Island, and to a very great extent in a 1927 act of Hawaii.   The
act with some minor changes was adopted by the United States House of Repre-
sentatives in 1929, too late, however, to reach the Senate.   With some changes it
again passed the House early in 1930, and at the end of that year is still pending in
the Senate.

It is believed that the favor thus already shown to the principles of the act is
due to recognition by the various State legislatures of the necessity of uniform
legislation on the subject of small firearms, and the soundness of the principles of
regulation embodied in the act.   These principles are believed to be consonant
with legislative precedent and practical experience, and superior to minority
views reflected in some past legislation and in a few recent enactments.   For
example, the uniform act adopts the principle of a strict regulation of the sale and
purchase of pistols at the same time that it rejects the comparatively rare pro-
vision of a license to purchase, on the theory that the securing of a pistol by a
householder as a legitimate means of defense should not be made difficult.   The
principle of license to purchase was for a long time limited to New York where it
was first adopted in 1888.   It has in recent years received recognition in Mass-
sachusetts, Michigan, New Jersey, and Hawaii, and has been approached in West
Virginia and perhaps one or two other places.   But beyond that the theory of
license to purchase has not been recognized.   The uniform act also rejects such
extreme theories of regulation as that embodied in the Arkansas law of 1923,
requiring a State-wide registration of pistols, which principle, though repealed
subsequently in Arkansas, has more recently found some recognition in the
Michigan act of 1927, and is approached by the Virginia act of 1926.

It will be noted that the act deals with pistols and revolvers only.   The con-
ference after careful consideration decided to confine the act to small arms of
this nature as a subject by itself, leaving the matter of other dangerous weapons
of not legitimate use to be regulated in separate acts.

### GENERAL PRINCIPLES OF ACT

The general principles embodied in the act may be summarized as follows:

1. Without making it difficult for a law-abiding citizen to secure arms for the
protection of his home, as by the inconvenient requirements of a license to pur-
chase, the act seeks by strict regulation of dealers, identification of purchasers,
and strict licensing of those who carry concealed firearms, to keep such weapons
out of the hand of criminals and other prohibited classes.

2. A heavier penalty is provided for a crime of violence by one who is armed,
whether legally or not, and the possession of a pistol by a criminal is made prima
facie evidence of intent.

3. The universal principle is adopted as in all State statutes forbidding the
carrying of concealed weapons with a complete enumeration of classes of excepted
persons and without sufficient exceptions to suit special circumstances.   It pro-
hibits carrying pistols in a vehicle whether concealed or not.

4. The act forbids the possession under any circumstances of pistols by per-
sons who have committed crimes of violence as defined by the act.

5. The general principle of forbidding the transfer of pistols to minors is in-
cluded.

6. A detailed method of identification is provided in the case of sales by
private persons and transfers by dealers, requiring licenses of dealers.

7. A complete system is set up for granting licenses to carry concealed weapons
in cases where the character of the applicants and emergencies justify the same.

8. The provisions of the act are made effective by prohibitions against the
giving of false information by purchasers and applicants for licenses, and the
alteration of identification marks on weapons.

9. Pawning pistols or trading in them by way of mortgage is forbidden.

10. A general penalty provision is contained in the act with terms of imprison-
ment and amounts of fines left blank so as to suit the needs of the particular
State enacting the law.

In general, it is submitted that the proposed uniform act embodies sound forms
of regulation which have stood the test of experience in this country and that it
embodies such new ideas as have been presented from time to time by individuals
and organizations working in the same subject matter.   Thus at the same time
that it preserves the traditional methods of firearms' regulation it takes advantage
of enlightened experience of recent years.   It comes as near, it is believed, as it
is possible to come in meeting the two divergent views of a too drastic regulation
on the one hand and a too liberal lack of regulation on the other.

NATIONAL FIREARMS ACT                           **73**

COMMENTS ON INDIVIDUAL SECTIONS

Section 1. A "pistol" is defined as a firearm with barrel less than 12 inches in length, in accordance with definitions already prevailing in State statutes. It thus includes a revolver or any small firearm capable of being concealed on the person. Other kinds of dangerous weapons are not included. "Crime of violence", which is used in numerous places in the act, is defined to cover such crimes as are ordinarily committed with the aid of firearms.

Section 2. An additional penalty is provided for persons committing crimes of violence when armed. This provision is found, not only in recent enactments following the revolver association act, but in other States, some of long standing.

Section 3. The fact that a criminal is armed with a pistol without license is deemed prima facie evidence of his intention to commit the crime of violence with which he is charged. This provision is also found not only in those States which have followed the revolver association act, but in a number of other States.

Section 4. One convicted of a crime of violence is absolutely forbidden to own or possess a pistol or revolver. This provision also has numerous precedents in existing State legislation and is useful in keeping firearms out of the hands of criminals.

Section 5. This sections forbids the carrying of concealed weapons and is similar to provisions prevailing in practically every jurisdiction in this country. It adopts the modern theory of making the prohibition extend not only to weapons concealed on the person but also weapons carried in vehicles whether concealed or not. It is intended thus to remove the easy method by which a criminal on being pursued may transfer a weapon from his pocket to a concealed place in a vehicle.

Section 6. This section enumerates all the classes of persons who, it seems, should be excepted from the provisions of section 5, the list being adopted after a comparison of persons named in existing State statutes. The exception of a concealed weapon in a dwelling house or place of business is contained in the preceding section: This section extends the exceptions to cases where the weapon may be in process of being carried for mere purposes of legitimate transfer or for repair.

Section 7. This section defines the method for application and issuance of licenses to carry concealed weapons and for the preservation of the record of the same. It is in line with existing provisions. No bond provision has been added because it is believed that, if a proper showing is made on the part of the applicant as to character and necessity, the bond provision should not be introduced to make the obtaining of the license difficult and burdensome.

Section 8. The provisions of this section forbidding the delivery of a weapon to a minor, a criminal, or incompetent, are similar to those now generally prevailing. The age of 18 years named in the section has been deemed more desirable than the younger age named in a number of statutes and the higher age named in some. It is believed that in ordinary instances youths will be of sufficient maturity at 18, and that the naming of a higher age might make it impossible to deliver weapons to mature youths who might need them.

Section 9. The provision of this section forbidding a seller to transfer on the day of purchase is intended to avoid the sale of a firearm to a person in a fit of passion. The section further requires identification of purchaser and weapon and the preservation of this identification.

Section 10. This section requires a license of dealers and is in line with existing statutes.

Section 11. This section constitutes the conditions under which licenses will be granted to dealers and for the breach of which such licenses will be forfeited. These conditions are in line with all modern legislation on the subject and constitute the chief safeguard against firearms coming into the possession of undesirables.

Section 12. This section in prohibiting a loan of a pistol secured by any of the methods mentioned is intended primarily to prohibit dealing in pistols by pawnbrokers.

Section 13. This section prohibits the giving of false information in purchasing a firearm or in applying for a license to carry the same. The principles of the section have been adopted not only by those States adopting the revolver association act, but by a number of other States.

Section 14. This section, also designed to preserve the identification of weapons in connection with transfers, forbids the changing of identifying marks and provides that the possession of pistols from which such identifying marks have

**74**                     NATIONAL FIREARMS ACT

been obliterated shall be prima facie evidence that the possessor has changed the
same.   It has been adopted by all States which have enacted the revolver asso-
ciation act.

Section 15.  This section revokes all existing licenses on a date to be inserted
by the enacting State.

Section 16.  This section is designed to remove from the operation of the act
firearms that are kept merely as curiosities.  It has been adopted already in
those States which have passed the revolver association act.

Section 17.  This is the general section which provides penalties for violations
of the various provisions of the act.  The amounts of fines and the lengths of
imprisonment are left blank so that these may be fixed according to the needs
and usages of the particular State.  This section is so framed as to be applicable
to different State definitions of misdemeanors and felonies.  A general penalty
section has been thought more scientific than the naming of penalties in connec-
tion with specific sections.

Section 18.  This section is intended to avoid the invalidity of the entire act
by a judicial holding that a particular part is unconstitutional.  It has been
included by the conference as one of its model sections contained in most uniform
acts.

Section 19.  This section, in accordance with the practice of the conference,
provides for a short designation of the act to avoid the longer definition at the
beginning.  In the selection of the words "Uniform Firearms Act", the definite
article "the" has been omitted in order to reduce the short title to its smallest
terms.

Section 20.  This section is the usual section in uniform acts embodying the
legislative intent that the act shall be so interpreted as to make uniform the laws
of the States.

Section 21.  This section is the usual section found in uniform acts providing
for an effective date.

Section 22.  This section is the usual section in uniform acts and contained in
the revolver association act, repealing existing laws inconsistent with the uniform
act.

---

THE CAPPER FIREARMS BILL—ITS RELATION TO THE UNIFORM FIREARMS ACT

[By Charles V. Imlay, Vice president National Conference of Commissioners on Uniform State Laws
in the Federal Bar Association Journal, March 1932]

The bill recently introduced by Senator Capper in the United States Senate to
control the possession and transfer of firearms and other dangerous weapons in
the District of Columbia [1] is intended to replace the very inadequate laws upon
that subject now prevailing and to supply for the District for the first time a
thorough and sane system of regulating traffic in firearms, in particular small
arms capable of being concealed on the person, with which the bill is chiefly
concerned.  The bill has the endorsement of the Commissioners of the District
of Columbia and of a number of influential organizations which have studied its
provisions.  It is very similar to a bill which passed the House of Representatives
in 1929 but which failed to get consideration by the Senate that year because of
the short time remaining in the legislative session.[2]

The present Senate bill and the former House bill are with some additions and
minor changes the Uniform Firearms Act promulgated by the National Con-
ference of Commissioners on Uniform State Laws, first in 1926 and upon recon-
sideration again in 1930, upon each occasion receiving the approval of the Ameri-
can Bar Association.

### EXISTING DISTRICT LAWS

The present laws of the District of Columbia [3] are as follows:

One is forbidden under a penalty of a fine of $50 or imprisonment for not more
than a year or both, to carry a weapon "concealed about his person" (no mention
being made of a vehicle), or openly with intent unlawfully to use the same; with
exceptions in case of necessary arms for the Army, Navy, police, and some others.
Exceptions are also made of carrying weapons concealed in a dwelling house and
to and from a place of purchase or repair.  A license to carry concealed weapons

[1] S. 2751, 72d Cong., 1st sess., Jan. 7, 1932, a bill to control the possession, sale, transfer, and use of pistols
and other dangerous weapons in the District of Columbia, to provide penalties, or prescribe rules of evidence
and for other purposes.
[2] H.R. 13211, 70th Cong., 2d sess.
[3] D.C. Code 1929, title 6, ch. 4, ss. 114-116.

Compendium_Spitzer
Page 646

may be granted for cause by judges of the police court upon the furnishing of a bond by the applicant. Weapons taken from persons convicted under the provisions of law may be confiscated by the judge. Selling dangerous weapons to minors is prohibited (no mention being made of incompetents, criminals or drug addicts). A dealer in weapons must obtain a license and furnish a bond. He must keep a written register, open to inspection by the police, of purchasers and weapons.

### SUMMARY OF CAPPER BILL

The proposed law as regards pistols provides in the main as follows:

The carrying in a vehicle or concealed on the person (except in the home or place of business) of a pistol (defined as any firearm with barrel less than 12 inches in length) is forbidden to all except law officers and certain others and those specially licensed under rigorous safeguards, and except under certain conditions as going to and from a place of repair. A crime of violence committed by one armed with a pistol carries a further penalty in addition to that prescribed for the crime, graduated from the first to the fourth or subsequent offense from maxima of 5 to 30 years. The fact that one charged with such crime is armed without a license is prima facie evidence of intention to commit the crime.

Possession of pistols by those convicted of crimes of violence is forbidden and delivery of pistols is forbidden to such convicts, drug addicts and incompetents, as well as to minors under the age of 18.

Delivery under sales may be made only after 48 hours from application to the seller, during which interval a complete record of the intending purchaser and the weapon is sent to the police. Dealers are subject to rigorous requirements as conditions for licenses to sell. Among other things the purchaser must be personally known to the seller or furnish clear evidence of his identity. No sales may be made to the prohibited classes mentioned above.

Penalties are provided for giving false information in connection with a purchase of a pistol and altering the identifying marks thereof. Provision is made for licenses to be issued by the superintendent of police for carrying pistols concealed, for cause.

In addition to the regulations mentioned above with reference to pistols, as to which a legitimate use is recognized, certain other dangerous weapons are, with a few exceptions, entirely proscribed. These are the machine gun, tear-gas gun, or tear-gas bomb, or any instrument or weapon of the kind commonly known as a black jack, sling shot, billy, sand club, sandbag, metal knuckles, or a firearms silencer. The exceptions are made in the case of machine guns and several other of the contraband weapons named in favor of the Army and Navy, the police, and certain other individuals and organizations.,

### UNIFORM FIREARMS ACT

The National Conference of Commissioners on Uniform State Laws began its work in 1923 upon a request made of it to frame a uniform law which might be adopted by all the States for the purpose primarily of eliminating the evil of the purchase of firearms in States where regulation was lax with the consequent nullification of the stricter laws of other States. A study was made of statutes on the subject prevailing in this country and the history of the matter of firearms regulation. It was found that all State constitutions as well as the Federal Constitution[4] guarantee the right to have and bear arms. It was found that practically without exception all jurisdictions interdict the carrying of concealed weapons.

Thus it might be said that all jurisdictions recognize a legitimate and illegitimate use of arms. This is a proposition that firearms reformers sometimes lose sight of. Colonel Goddard[5] has referred to the "time when the rifle hung over every mantel, and the pistol held an honorable place as a secondary weapon of defense and offense." An attempt then to control the illegitimate use of the firearm must not overlook its legitimate use.

The legitimate uses of the pistol and other firearms have been summarized by Mr. Frederick,[6] one of the legal and technical advisers to the conference, as follows:

"1. By the police, secret service, and other law-enforcement officers.

"2. By the Army, Navy, Marine Corps, National Guard, and Organized Reserves.

---

[4] Amendment II.
[5] This Pistol Bogey, Calvin Goddard, Am. Jour. Police Science, vol. 1, no. 2, March-April 1930.
[6] Karl T. Frederick, Pistol Regulation—Its Principles and History, reprinted from The American Rifleman, issues of December 1930 to July 1931.

"3. By bank guards and bank employees, express and mail agents, watchmen, messengers, and others similarly employed.

"4. By target-shooters and marksmen.

"5. By householders for the protection of the home, a use which now as in the past is large and important."

### UNSOUND METHODS OF REGULATION

The conference found existing in the State of New York the Sullivan law which for many years had required as it does now a purchaser to secure a license to purchase, under somewhat burdensome requirements, e.g., the filing of a photograph by the purchaser and his submission to finger-printing. That law, however, has not prevented the increase in New York of crimes of violence committed with firearms, as Mr. Frederick conclusively shows.[7] While similar laws have recently been passed in Massachusetts, West Virginia, New Jersey, Michigan, and in Hawaii, this method of regulation has not found extensive adoption. It was believed by the conference that such a regulation is unworkable and leads to a system of pistol bootlegging. It puts a burden on the legitimate purchaser and does not keep the pistol out of the hands of the criminal. It was for that reason not embodied in the Uniform Firearms Act and is not therefore a part of the Capper bill.

### MEAN BETWEEN TOO LOOSE AND TOO DRASTIC REGULATION

Through rejecting what was believed to be the unsound system of regulation in the Sullivan law and laws modeled thereon the draftsmen of the Uniform Act sought to incorporate therein the sound principles of rigid regulation that were finding their way into the statute law of the States. Much of this had been brought into the proposed Uniform Act drafted by the United States Revolver Association, which act had already been passed in 1923 in New Hampshire and North Dakota and formed the basis of the California law of the same year. Thus, at the same time that the draftsmen of the Uniform Act preserved the traditional methods of firearms regulation which had stood the test of time in this country, they took advantage of enlightened experience of recent years. The Capper bill may therefore be said, as may be said of the Uniform Act upon which it is based, to come as near as possible in meeting the two divergent views of a too drastic regulation on the one hand, and a too liberal lack of regulation on the other. Like the Uniform Act it makes for uniformity of legislation by incorporating within its terms provisions that will receive acceptance generally. And it is obvious that uniformity cannot be secured in State legislation unless there is a basic agreement among the States on the principles underlying a proposed uniform law.

### PRINCIPLES OF CAPPER BILL ALREADY EXTENSIVELY ADOPTED

Attention has already been called to the fact that the proposed new legislation was already in effect in California, New Hampshire, and North Dakota, when the conference began its work in 1923. It was thereafter enacted in Indiana in 1925. After the first approval by the conference in 1926 the Uniform Act, except for the license to purchase feature, was adopted by Hawaii in 1927. Since the second approval in 1930 the Uniform Act has been adopted in Pennsylvania.[8] Many of its provisions have been enacted into the statute law of other States. It may therefore be said that the provisions of the Capper bill have already received extensive acceptance elsewhere. It is believed that the favor already won for this type of legislation will increase and that the enactment of the Capper bill by Congress as a local law for the District of Columbia will place the District in the class of progressive jurisdictions on this subject.

---

### UNIFORM FIREARMS ACT REAFFIRMED

[By Charles V. Imlay, member of Committee on Uniform Firearms Act of Commissioners on Uniform State Laws in the American Bar Association Journal]

The Uniform Firearms Act, one of several acts adopted by the National Conference of Commissioners on Uniform State Laws at its sessions in Chicago,

---

[7] Pistol Regulation, *supra*, p. 34;

NATIONAL FIREARMS ACT                    **77**

August 11–16 and approved by the American Bar Association in its session there
August 21, is in substance and in form almost identical with a former draft
adopted by the conference and approved by the bar association at their respective
sessions at Denver in July 1926. The intervening 4 years have been employed
in a full reconsideration by the conference of certain controversial features (to
which reference will be made) which had prompted the bar association likewise
to reconsider its approval of the former drafts.

The final draft with only a few departures from the former, which has been
reviewed before in this Journal,[1] may be summarized in its important provisions
as follows:

"The carrying in a vehicle or concealed on the person of a pistol (defined as
any firearm with barrel less than 12 inches in length) is forbidden to all except
law officers and certain others and those specially licensed under rigorous safe-
guards. A crime of violence committed by one armed with a pistol carries a
further penalty in addition to that prescribed for the crime. The fact that one
charged with such crime is armed without a license is prima facie evidence of
intention to commit the crime.

"Delivery of pistols is forbidden to convicts, drug addicts, habitual drunkards,
and incompetents, as well as to minors under the age of 18. The first class are
forbidden to possess pistols.

"Sales may be made only after 48 hours from application to the seller, during
which interval a complete record of the intending purchaser is sent to the police.
Dealers are subject to rigorous requirements as conditions for licenses to sell.
Among other things the purchaser must be personally known to the seller. No
sales may be made to the prohibited classes mentioned above.

"Pawning pistols is forbidden. So also are giving false information in connec-
tion with a purchase of a pistol and altering the identifying marks thereof. A
general penalty section provides punishments for violations of these provisions
as well as for the violation of other provisions of the act."

OBJECTIONS TO 1926 DRAFT

The subject matter of a Firearms Act was first brought to the attention of the
conference at its Minneapolis meeting in 1923 in the form of a model law
drafted by the United States Revolver Association, the substance of which had
already been enacted in the California, North Dakota, and New Hampshire
acts of that year. (It was thereafter enacted in the Indiana Act of 1925.) It
was because of the favor with which the model law had already been received
that the conference adhered so closely to it in the Denver draft of 1926 and has
done so also in the new draft. But notwithstanding the momentum already
gained for the uniform act by the previous adoption of the model law and the
endorsement of the conference and bar association, the act immediately upon
its promulgation late in 1926 was severely criticized in some quarters as not
being sufficiently drastic. These criticisms were in the main from law-enforce-
ment officers, notably Mr. G. V. McLaughlin, the police commissioner of New
York City. The criticisms were presented in full to the conference by its com-
mittee at the Buffalo meeting in 1927.[2] The objections thus made prompted
the conference and in turn the bar association to withdraw the act temporarily
for reconsideration.[3] Another reason for reconsideration was the fact that the
matter of firearms legislation was being considered by the National Crime
Commission which early in 1927 produced an act which incorporated most of
the uniform act but departed therefrom in some important particulars, notably
in the requirement of a license to purchase. (It also introduced the new matter
of machine guns.)

During the 4 years intervening between the two drafts there have been frequent
conferences between committees of the National Crime Commission and the
conference. The criticisms of the act and the suggestions made by the Crime
Commission have been carefully considered and have in some instances influenced
the redraft in substance and form. In this reconsideration all recent statutes
and judicial decisions have been compiled and printed in elaborate annotations
in the committee report to the Chicago conference.

One criticism was that the definition of pistol should not be confined to "any
firearm with a barrel less than 12 inches in length." But this is the definition
prevailing in a great many States, indicating that the legislation refers to small
firearms. The definition has therefore been retained. It was said that the

[1] American Bar Association Journal, vol. XII, pp. 767–769.
[2] Handbook Nat. Conf. Commissioners on Uniform State Laws, 1927, pp. 866–877.
[3] Ibid. p. 866; A.B.A. Reports, vol. 52, 1927, p. 223.

58278—34——6

additional penalty for crimes committed while one is armed should not be con-
fined to "crimes of violence" like murder, manslaughter, etc., as defined in the
act, but extended to cover crimes of other kinds. It was thought, however,
that the provision should be made applicable to those crimes mentioned in the
act because they are those in which the pistol specifically figures. For the same
reason the Conference has seen fit to interdict the sale of the pistol only to con-
victs of that class, as against the contention that it should be interdicted to all
who have committed any crime. This is on the theory that the pistol has a
legitimate use to a householder and should not be prohibited to him without
sufficient cause.

The objection of Commissioner McLaughlin that the Denver draft fell short
of the requirements in merely forbidding so far as a vehicle is concerned the carry-
ing of a pistol "concealed" was admitted to be sound. And the committee of
the conference was more persuaded to admit this objection because the crime
commission had in its draft forbidden the carrying by any person of a pistol
"in any vehicle" without a license, that is, whether concealed or unconcealed.
The final draft of the Uniform Act therefore contains a similar provision. This
prevents the possibility, as Commissioner McLaughlin points out, of criminals
placing pistols on the floor of automobiles and contending that they are not
concealed.

The objection raised by others that the act did not proceed on the theory of
prohibiting manufacture and sale of pistols, which seems at one time to have
received at least the tacit assent of the bar association,[4] could not be admitted
because it is opposed in principle to all theories of regulation heretofore prevailing.
There never has been any serious effort made to enact legislation prohibiting
the manufacture and sale of pistols. The nearest approach to this was a bill
commonly known as the Shields bill introduced in the United States Senate on
April 25, 1921,[5] which was intended to restrict the manufacture of firearms to
weapons of standard Army and Navy makes. The bill failed of passage. This
legislation has of course frequently been directed against contraband weapons
that have no legitimate use in the hands of private citizens, e.g., recent statutes
against the manufacture and possession of machine guns.[6]

### LICENSE TO CARRY—NOT LICENSE TO PURCHASE

The objection most strongly urged against the Uniform Firearms Act has
come from those who have favored the theory of the license to purchase which
has been rejected by the conference in both drafts. It was pointed out in the
review in this Journal of the former act that New York had long stood virtually
alone in favoring the theory of regulation by license to purchase under the so-called
"Sullivan law," first enacted in 1888, and now existing there with certain amend-
ments. It was also pointed out that Massachusetts had recently enacted a law
along the same line,[7] and that a statute of West Virginia of 1925 seemed to ap-
proach the principle.[8] Since that review the States of Michigan[9] and New Jersey
have enacted legislation requiring a license to purchase.[10] Such a provision is
also contained in the act of the Hawaii Legislature hereafter mentioned. Beyond
that, so far as the committee is advised, the principle has not prevailed; the rank
and file of the States in this country are opposed to it. (An Oregon law of 1913
requiring a license to purchase has been superseded by a law modeled closely on
the Uniform Act.[11]) It was on this principle that the committee of the conference
was unable to reach an agreement with the committee of the Crime Commission
which in its draft incorporated the theory of a license to purchase.

In rejecting the theory of the license to purchase the conference has not only
adhered to what has always been the prevailing form of legislation in this country,
but to what this committee has considered to be the common sense of pistol
regulation. The requirement of a license to purchase with its consequent incon-
venience and notoriety of such things as photographs and thumb prints, in
accordance with the method prevailing under the Sullivan law in New York,
subjects the law-abiding citizen to hardship and inconvenience, and thus renders

4 Reports A.B.A., vol. XLVII, 1922, pp. 424–432, 430.
5 67th Cong., 1st sess. S. 1184.
6 Gen. Laws Cal. 1927, ch. 552; acts, etc. Mass. 1927, ch. 326; Mich. Pub. acts 1927, no. 372; N.J. Pub.
L. 1927, ch.95, p. 180.
7 Mass. Gen. L., ch. 395, act May 29, 1926.
8 W.Va. laws 1925, ch. 95, act Apr. 23, 1925, amending S. 7, ch. 148, Code W.Va.
9 Mich. Pub. Acts 1927, no. 374, s. 2; Comp. Laws Mich., ss. 7164 (70), 7164 (74).
10 N.J. laws 1927, ch. 321, s. 6.
11 Oregon laws, 1921–27 Supp., ch. 3, s. 9.

more difficult his obtaining a pistol for the legitimate purpose of the defense of the home and at the same time does not keep the pistol out of the hands of the criminal. For he will not obey the law, but will obtain his pistol under any circumstance. He does not stop at purchasing, like the respectable citizen, but will resort to thefts of pistols, pistol bootlegging, and for lack of anything else resort to the sawed-off shotgun.

Several drafts of the revised Uniform Act during these 4 years of reconsideration, e.g., the draft presented at Seattle in 1928 [12] and that at Memphis in 1929,[13] had embodied additional material with reference to machine guns, as had been done in the crime commission bill. An act adhering closely to the 1928–29 drafts and embodying provisions with reference to machine guns intended as a local law for the District of Columbia had passed the United States House of Representatives [14] in the spring of 1929 but failed of passage in the Senate. It was considered, however, by the committee best to confine the Uniform Act, as the Denver draft of 1926 had been confined, to pistols, inasmuch as the regulation of small firearms constituted a subject in itself. The matter of the regulation of the possession and sale of machine guns and other highly dangerous weapons of that nature has been committed by the conference to its committee on firearms for the purpose of a report at the session which will be held in Atlantic City in September 1931. In this intervening year this subject will therefore receive the careful attention of the committee.

#### MEAN BETWEEN TOO LOOSE AND TOO DRASTIC REGULATION

The attention of the committee was directed to legislation of the kind known as the "Esmond Wales bill" or "Baumes bill",[15] the text of which was presented by the committee to the conference in one of its reports. This proposed law and others of the same type have been before the New York legislature a number of times but have never been passed. They go so far as to require a license to possess a pistol and to effectuate that purpose would require a State-wide registration. An Arkansas act of March 16, 1923, so providing, was repealed 2 years later as unworkable.[16] Such a provision in a Michigan act of May 26, 1925, was however included in the most recent Michigan act of 1927 mentioned above.[17] (The requirements of the Virginia Code Supplement of 1926, S. 2324a, imposing an annual tax on pistols approaches the registration provisions.) No record has been found of similar legislative attempts elsewhere. Such proposals are entirely out of line with recognized legislative precedents and could not receive general adoption by State legislatures.

It will be noted that most of the adverse criticism to which reference has been made proceeds upon the theory that the law in its provisions is too mild. On the other hand almost at the same time that the criticisms mentioned above were forthcoming from the chief of police of New York City the Uniform Act of 1926, having passed both legislatures of the State of Arizona, was vetoed by Gov. George W. P. Hunt in a veto message of March 4, 1927, in which he discusses the act as a serious invasion of personal liberties.[18] He classes it with the New York legislation on the subject, and argues that it is entirely too drastic. This is in line with numerous arguments advanced from time to time in presentations of the matter before the National Conference, many members taking the point of view that the law was too drastic. (This was the point of a venerable member of the conference in casting the vote of his state against the law in the recent Chicago conference.) This illustrates very well the fact that ideas upon the subject of firearms legislation take many different turns, varying from the extreme view put forward sometimes by law enforcement officers that firearms in the possession of ordinary citizens are useless, to the other extreme view sometimes advocated that persons should be permitted to arm *ad libitum*. Between these two sharply contrasting extremes the committee of the conference has sought to

[12] Handbook 1928, pp. 422–429.
[13] Handbook 1929, pp. 350–355.
[14] 70th Cong., 2d sess., H. R. 13211.
[15] Handbook 1927, pp. 907–913.
[16] Arkansas acts 1925, Act No. 351, p. 1047.
[17] v. Note 9.
[12] Handbook 1928, pp. 422–429.
[13] Handbook 1929, pp. 350–355.
[14] 70th Cong., 2d sess., H. R. 13211.
[15] Handbook 1927, pp. 907–913.
[16] Arkansas acts 1925, Act. No. 351, p. 1047.
[17] v. Note 9.
[18] Handbook 1927, p. 867; Veto Messages, State House Phoenix, Ariz., Mar. 19, 1927, pp. 11–16.

find and a middle ground that will be consistent with traditional forms of regulation in use in this country.

It is the belief of the committee that the proposed Uniform Act embodies sound forms of regulation which have stood the test of experience in this country, and that it embodies such new ideas as have been presented from time to time including those advanced by Commissioner McLaughlin, the National Crime Commission, and other organizations working along this line.   Thus, at the same time that it preserves the traditional methods of firearms regulation it takes advantage of enlightened experience of recent years.   It comes as near, in the opinion of the committee, as it is possible to come in meeting the two divergent views of a too drastic regulation on the one hand, and a too liberal lack of regulation on the other.

It is interesting to note that in the recent legislation mentioned in Massachusetts and Michigan, the language of a number of sections of the Uniform Act has been adopted.   A Rhode Island act of 1927 has incorporated a number of sections verbatim.[19]   The legislature of Hawaii in 1927 adopted most of the sections of the act verbatim.[20]   Thus the principles and the form of the act, already well advanced in the legislatures prior to the beginning of the undertaking by the conference in 1923, have gained appreciably in State enactments during the four years that the matter has been under reconsideration.   It is believed that this favor already won will continue and that the act, with its recent reaffimation by conference and the bar association, will have a favorable reception throughout the country as a whole.

## STATEMENT OF JOHN THOMAS TAYLOR, REPRESENTING THE AMERICAN LEGION

Mr. TAYLOR. My name is John Thomas Taylor and I represent the American Legion.   I should like to present a resolution which the National Convention of the American Legion at Chicago adopted in considering this subject.   I would like to read the resolution, if I may [reading]:

*Be it resolved,* That the American Legion recommends that the Congress of the United States and the legislatures of the several States pass legislation toward the end that the sale of machine guns, submachine guns, and lethal weapons be regulated and controlled, and that the owners and holders and purchasers of such weapons be regulated and controlled, and that the owners and holders and purchasers of such weapons and their respective transfer be registered with the proper public authorities, and that the possession of machine guns, submachine guns, and lethal weapons be restricted to the organized military forces and law enforcement authorities of the United States and of the several States.

Mr. Chairman, and members of the committee, you will note that this refers to machine guns, submachine guns, and lethal weapons. We are in full accord with the Department of Justice on this matter and we will lend every aid we can in carrying it out.   However, we are in this position: So far as the small weapons are concerned, the pistol or revolver, we do not want legislation to be enacted which will in fact not reach the criminal, against whom the legislation is directed, but will reach the great mass of law-abiding citizens who are interested in having revolvers and pistols of their own as a protection.   That is our interest.   It is evident that everybody is in accord for the necessity of legislation of this character, and we hope that when it is drafted it will reach the man it is after—the criminal—himself, and not the great body of law-abiding citizens.   We hope there will not be another Volstead Act, with the smuggling of the small arms, because the criminal is going to get his unless you go after him.   I know you gentlemen will bring out that type of legislation.

[19] R.I. ch. 1052, Laws 1927.
[20] Hawaii, Laws 1927, act 206.

The Chairman. The Chair would like to suggest that in view of the statements made, that you confer with the Department of Justice. You are all going to the same destination.

Mr. Taylor. We certainly are.

## STATEMENT OF SETH GORDON, PRESIDENT AMERICAN GAME ASSOCIATION, INVESTMENT BUILDING, WASHINGTON, D.C.

Mr. Gordon. My name is Seth Gordon; I am president of the American Game Association with offices in Washington. I will take about a minute. The 6,000,000 sportsmen in the United States are quite perturbed about the possible effect of this piece of legislation. I am sure that I voice their sentiment when I say that every one of those 6,000,000 would like to see legislation that will control and absolutely regulate the possession of the machine gun and submachine gun, but when you go beyond that you are going to infringe upon the traditional rights of the sportsmen of America who have stood behind this country in time of need. Every time we have had trouble they have come to front more quickly than any other class of people. I think you do not need to pass any legislation so drastic as this bill is in its present form but that it should be restricted to machine guns.

Mr. Shallenberger. How about sawed-off shotguns?

Mr. Gordon. If you can find a way to regulate them, I am in favor of it. When you go into pistols and sidearms that sportsmen carry on their hunting trips and require them every time they cross a State line to get a permit in order to do it, there will be 6,000,000 sportsmen opposed to it.

The Chairman. What excuse or what justification is there for anyone having a sawed-off shotgun?

Mr. Gordon. None. If you will permit one observation, there is some question about how far you ought to go when you say sawed-off shotgun. When you speak about a gun shorter than 18 inches or 20 or 22 inches, that is one thing. If you include a gun which happens to have the end of the barrel blown off because someone got snow or mud in it, and the barrels are cut off and they continue to use it, as they do in the country, it is another thing. You have to be careful when you say sawed-off shotgun so that you do not include a gun which is still useful——

General Reckord. We believe that the machine gun, submachine gun, sawed-off shotgun, and dangerous and deadly weapons could all be included in any kind of a bill, and no matter how drastic, we will support it. If you will give us an opportunity to sit down and discuss this matter, we believe we can present two or three bills that will cover this situation nearly as well, because it is a hard problem, and it will be aimed at the crook, the man we all want, but it will not hamstring and injure or interfere with the rights or the prerogatives of the honest citizen. We are sincere; we will work with your subcommittee, or with the Attorney General, if given an opportunity, and we ask the opportunity. We believe this is bad legislation and that it is unnecessarily burdensome on honest citizens and that it will no more reach the crook than any legislation heretofore. If we only have the opportunity to present our views——

Mr. Cooper. The Assistant Attorney General stated that you had several hours with him.

82                    NATIONAL FIREARMS ACT

.General RECKORD. Yes, sir.

Mr. COOPER. You have had something like an hour today; how much longer is it going to take to be prepared to offer your definite and specific suggestions in meeting the problems?

General RECKORD. I might present specific recommendations by Monday of the coming week.

The CHAIRMAN. The Chair would like to make this observation: In view of the statement just made by the adjutant general of the State of Maryland, who has expressed an interest in going as far as the Government can go by legislation to accomplish the purposes which are intended to be accomplished, I suggest that an effort be made with the Department of Justice to see if he can work out something along the line of an agreement whereby the committee can have the benefit of your judgment.

General RECKORD. I will be glad to do that.

Mr. KEENAN. General Reckord, Mr. Smith tells me, stated that he could not hope to reach an agreement with us as long as we wanted to regulate pistols.   I would like to know if that is still your position?

General RECKORD. No; that never has been.

Mr. KEENAN. There was evidently a misunderstanding.

General RECKORD. I went to Mr. Smith because I could not see Mr. Keenan, and Mr. Smith can correct me if I am wrong; Mr. Smith, when I suggested some legislation that we would propose if given an opportunity, Mr. Smith told me the Attorney General and Mr. Keenan had made up their minds and would not accept the suggestion.

The CHAIRMAN. We will now adjourn.

(Thereupon, at 12:30 p.m., the committee adjourned.)

C

# NATIONAL FIREARMS ACT ·

---

**MONDAY, MAY 14, 1934**

House of Representatives,
Committee on Ways and Means,
*Washington, D.C.*

The committee met at 10 a.m., Hon. Robert L. Doughton (chairman) presiding.

The Chairman. I suggest that Mr. Keenan proceed with his explanation of this draft, as he did in connection with the original bill.

Mr. Vinson. It occurs to me that it might be well to insert in the record this amended draft.

The Chairman. Without objection, it will be inserted.

Mr. Vinson. I think the heading, H.R. 9066, should be stricken out and that it should be shown that this draft is being considered as a substitute measure.

(The committee had under consideration the following draft bill:)

A BILL To provide for the taxation of manufacturers, importers, and dealers in small firearms and machine guns, to tax the sale or other disposal of such weapons, and to restrict importation and regulate interstate transportation thereof

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That for the purposes of this act the term "firearm" means a pistol or revolver of more than .22 caliber rim fire, a shotgun or rifle having a barrel less than 18 inches in length, or any other firearm capable of being concealed on the person, a firearm muffler or firearm silencer, or a machine gun.

The term "machine gun" means any weapon which shoots, or is designed to shoot, automatically or semiautomatically, more than one shot, without manual reloading, by a single function of the trigger.

The term "person" includes a partnership, company, association, or corporation, as well as a natural person.

The term "continental United States" means the States of the United States and the District of Columbia.

The term "importer" means any person who imports or brings firearms into the continental United States, for sale.

The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms, or who otherwise produces therein any firearm for sale or disposition.

The term "dealer" means any person not a manufacturer or importer engaged within the continental United States in the business of selling firearms. The term "dealer" shall include wholesalers, pawnbrokers, and dealers in used firearms.

The term "interstate commerce" means transportation from any State or Territory or District, or any insular possession of the United States (including the Philippine Islands), to any other State or to the District of Columbia.

The term "Commissioner" means the Commissioner of Internal Revenue.

The term "Secretary" means the Secretary of the Treasury.

The term "to transfer" or "transferred" shall include to sell, assign, pledge, lease, loan, give away, or otherwise dispose of.

Sec. 2. (a) Within fifteen days after the effective date of this Act, or upon first engaging in business, and thereafter on or before the 1st day of July of each year, every importer, manufacturer, and dealer in firearms shall register

83

Compendium_Spitzer
Page 655

84                          NATIONAL FIREARMS ACT

with the collector of internal revenue for each district in which such business is to be carried on, his name or style, principal place of business, and places of business in such district, and pay a special tax at the following rates: Importers or manufacturers, $1,000 a year; dealers, other than pawnbrokers, $200 a year; pawnbrokers, $300 a year.   Where the tax is payable on the 1st day of July in any year it shall be computed for one year; where the tax is payable on any other day it shall be computed proportionately from the 1st day of the month in which the liability to the tax accrued to the 1st day of July following.

(b)  It shall be unlawful for any person required to register under the provisions of this section to import, manufacture, or deal in firearms without having registered and paid the tax imposed by this section.

Sec. 3.  (a)  There shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 per machine gun and $1 per other firearm, such tax to be paid by the person so disposing thereof, and to be represented by appropriate stamps to be provided by the Commissioner, with the approval of the Secretary; and the stamps herein provided shall be affixed to the order for such firearm, hereinafter provided for.   The tax imposed by this section shall be in addition to any import duty imposed on such firearm.

(b)  All provisions of law (including those relating to special taxes, to the assessments, collection, remission, and refund of internal-revenue taxes; to the engraving, issuance, sale, accountability, cancelation, and distribution of tax-paid stamps provided for in the internal revenue laws, and to penalties) applicable with respect to the taxes imposed by section 1 of the Act of December 17, 1914, as amended (U.S.C., Supp. VII, title 26, secs. 1040 and 1383), and all other provisions of the internal revenue laws shall, insofar as not inconsistent with the provisions of this Act be applicable with respect to the taxes imposed by this Act.

Sec. 4.  (a)  It shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank in duplicate form that purpose by the Commissioner.   Such order shall identify the applicant by such means of identification as may be prescribed by regulations under this Act: *Provided*, That, if the applicant is an individual, such identification shall include fingerprints thereof.

(b)  The Commissioner, with the approval of the Secretary, shall cause suitable forms to be prepared for the purposes above mentioned, and shall cause the same to be distributed to collectors of internal revenue, to post offices, and to such associations, designated by the Commissioner, as, in good faith, are organized for the purpose of, and are engaged in, target shooting or hunging.

(c)  Every person so transferring a firearm shall set forth in each copy of such order the manufacturer's number or other mark identifying such firearm, and shall forward a copy of such order to the Commissioner.   The original thereof with stamps affixed, shall be returned to the applicant.

(d)  No person shall transfer a firearm which has previously been transferred on or after the effective date of this Act, unless such person, in addition to complying with subsection (b), transfers therewith the stamp-affixed order provided for in this section for each such prior disposal, in compliance with such regulations as may be prescribed under this Act for proof of payment of all taxes on such firearms.

(e)  If the transfer of a firearm is exempted from the provisions of this Act as provided in section 13 hereof, the person transferring such firearm shall notify the Commissioner of the name and address of the applicant, the number or other mark identifying such firearm, and the date of its disposal, and shall file with the Commissioner such documents in proof thereof as the Commissioner may by regulations prescribe.

(f)  Importers, manufacturers, and dealers who have registered and paid the tax as provided for in section 2 (a) of this Act shall not be required to conform to the provisions of this section with respect to transactions in firearms with dealers, but shall keep such records and make such reports regarding such transactions as may be prescribed by regulations under this Act.

Sec. 5.  (a)  Within four months after the effective date of this Act every person possessing a firearm shall register, with the collector of the district in which he resides, the number or other mark identifying such firearm, together with his name, address, place where such weapon is usually kept, and place of business or employment, and, if such person is other than a natural person, the name and home address of an executive officer thereof: *Provided*, That no person shall be required to register under this section with respect to any firearm acquired after the effective date of, and in conformity with the provisions of, this Act.

NATIONAL FIREARMS ACT                    **85**

(b) Whenever on trial for a violation of section 6 hereof the defendant is shown to have or to have had possession of such firearm at any time after such period of four months without having registered as required by this section, such possession shall create a presumption that such firearm came into the possession of the defendant subsequent to the effective date of this Act, but this presumption shall not be conclusive.

SEC. 6. t shall be unlawful for any person to receive or possess any firearm which has at any time been transferred in violation of sections 3 and 4 of this Act.

SEC. 7. Any firearm which has at any time been transferred in violation of the provisions of this Act shall be subject to seizure and forfeiture, and all the provisions of internal-revenue laws relating to searches, seizures, and forfeiture of unstamped articles are extended to and made to apply to the articles taxed under this Act, and the persons to whom this Act applies.

SEC. 8 (a) Each manufacturer and importer of a firearm shall identify it with a number or other identification mark approved by the Commissioner, such number or mark to be stamped or otherwise placed thereon in a manner approved by the Commissioner.

(b) It shall be unlawful for anyone to obliterate, remove, change, or alter such number or other identification mark. Whenever on trial for a violation of this subsection the defendant is shown to have or to have had possession of such firearm upon which such number or mark shall have been obliterated, removed, changed or altered, such possession shall be deemed sufficient evidence to authorize conviction, unless the defendant explains such possession to the satisfaction of the jury.

SEC. 9. Importers, manufacturers, and dealers shall keep such books and records and render such returns in relation to the transactions in firearms specified in this Act as the Commissioner, with the approval of the Secretary, may by regulations require.

SEC. 10. (a) No firearms shall be imported or brought into the United States or any Territory under its control or jurisdiction (including the Philippine Islands), except that, under regulations prescribed by the Secretary, any arearm may be so imported or brought in when (1) the purpose thereof is shown to be lawful and (2) such firearm is unique or of a type which cannot be obtained within the United States or such Territory.

(b) It shall be unlawful (1) fraudulently or knowingly to import or bring any firearm into the United States or any Terriroty under its control or jurisdiction, in violation of the provisions of this Act; or (2) knowingly to assist in so doing; or (3) to receive, conceal, buy, sell, or in any manner facilitate the transportation, concealment, or sale of any such firearm after being imported or brought in, knowing the same to have been imported contrary to law. Whenever on trial for a violation of this section the defendant is shown to have or to have had possession of such imported firearm, such possession shall be deemed sufficient evidence to authorize conviction unless the defendant explains such possession to the satisfaction of the jury.

SEC. 11. It shall be unlawful for any person who is required to register as provided in section 5 hereof and who shall not have so registered, or any other person who has not in his possession a stamp-affixed order as provided in section 4 hereof, to ship, carry, or deliver any firearm in interstate commerce: *Provided,* That a person may ship, carry, or deliver a firearm in interstate commerce if such person had such firearm in his possession prior to the effective date of this Act and notifies the Commissioner thereof by affidavit within two days prior to such shipment, carriage, or delivery, setting forth in such affidavit his address, the number or other mark identifying such weapon, and the place to which it is to be transported.

SEC. 12. The Commissioner, with the approval of the Secretary, shall make all needful rules and regulations for carrying the provisions of this Act into effect.

SEC. 13. This Act shall not apply to the transfer of firearms (1) to the United States Government, any State, Territory, or possession of the United States, or to any political subdivision thereof, or to the District of Columbia; (2) to any peace officer or any Federal officer designated by regulations of the Commissioner; (3) to the transfer of any firearm which is unserviceable and which is transferred as a curiosity or ornament.

SEC. 14. Any person who violates or fails to comply with any of the requirements of this Act, except section 5, shall, upon conviction, be fined not more than $2,000 or be imprisoned for not more than 5 years, or both, in the discretion of the court.

86                         NATIONAL FIREARMS ACT

Sec. 15. The taxes imposed by paragraph (a) of section 600 of the Revenue
Act of 1926 (U.S.C., Supp. VII, title 26, sec. 1120) and by section 610 of the
Revenue Act of 1932 (47 Stat. 169, 264), shall not apply to any firearm on which
the tax provided by section 3 of this Act has been paid.

Sec. 16. If any provision of this Act, or the application thereof to any person
or circumstance, is held invalid, the remainder of the Act, and the application
of such provision to other persons or circumstances, shall not be affected thereby.

Sec. 17. This Act shall take effect on the sixtieth day after the date of its
enactment.

Sec. 18. This Act may be cited as the "National Firearms Act."

## STATEMENT OF JOSEPH B. KEENAN, ASSISTANT ATTORNEY GENERAL

The Chairman. Mr. Keenan, you may proceed with your state-
ment.

Mr. Keenan. The bill has been read, and I desire to proceed to
point out the changes made in this substitute measure.

The Chairman. Do you prefer to answer questions as you go
along, or do you wish to complete your statement and then answer
questions?

Mr. Keenan. I am willing to answer the questions as I go along.

Mr. Treadway. As a matter of record, will you please tell the
stenographer your official position.

Mr. Keenan. Joseph B. Keenan, Assistant Attorney General, in
charge of the Criminal Division, appearing on behalf of the Depart-
ment of Justice.

Mr. Treadway. There is one other suggestion, before the gentle-
man begins; why offer any comparison with the original draft?
Evidently that is superseded, and what interest is there in the original
draft? We do not care how much you compromised with somebody.
We can tell by the bill what you are aiming at.

Mr. Hill. We have had an explanation of the bill which was
introduced, and we would like to know what the modifications are.

Mr. Keenan. I think perhaps I would be overstating it in saying
that it is an entirely new bill. I think it follows the old bill with
a few certain changes that I believe to be important. Before going
into the details of the changes of the bill, I would like to make a
statement of what I consider to be the essential changes. As you
will recall, the bill as originally drafted exercised two powers, one
under the taxation clause and the other under the commerce clause.
Under the bill as now submitted, it follows the theory of taxation
all the way through, and it contains this one affirmative change of
extreme importance in that it calls for a registration of all firearms
within a prescribed period. This new provision does not, however,
require fingerprinting, which has been considered to be the objection-
able feature of identification.

Mr. Fuller. It does.

Mr. Keenan. It does not include fingerprinting of the arms now
in existence.

Mr. Fuller. I had the other impression.

Mr. Keenan. Let me make this clear: In the old act we had no
provision for registration of existing possessed firearms. In this act
we have, but it only requires the name, address, and the occupation
of the possessor. It does not require identification by fingerprinting
or photographing.

Mr. TREADWAY. In connection with that, I would like to call attention to the proviso under section 4 (a), "Provided, that, if the applicant is an individual, such identification shall include fingerprints thereof."

Mr. KEENAN. That has to do only with those firearms specified herein, that are acquired after the effective date of this act.

Mr. TREADWAY. All you eliminate is fingerprinting of owners of old firearms?

Mr. KEENAN. That is correct.

Mr. TREADWAY. If I went into a store today and showed that I was a responsible person for the ownership of a pistol, then I would be fingerprinted as owning that pistol?

Mr. KEENAN. That is correct.

Mr. VINSON. The gentleman from Massachusetts speaks of eliminating fingerprints. It is not a question of eliminating fingerprints, because under the original draft, H.R. 9066, you were not required to register firearms owned by private persons.

Mr. KEENAN. That is true.

Mr. VINSON. It is not a question of eliminating fingerprinting and photographs; that was not required under the old bill.

Mr. KEENAN. That is right.

Mr. VINSON. As to those weapons now owned, is it not the taxation power which provides the basis for requiring the registration of the firearms now owned and possessed?

Mr. KEENAN. Yes. In executing or administering the taxation provision it is important to be able to identify arms to see which possessors have paid taxes and which firearms have been taxed and which have not.

Mr. VINSON. What is the penalty for violating section 5?

Mr. KEENAN. There is no penalty at all.

Mr. KNUTSON. In order to expedite matters, will you tell us just what sort of arms this legislation is aimed at, and what arms are exempt from the provisions of this act, or will you come to that later?

Mr. KEENAN. I will do that now. This act affects all firearms with the exception of .22 caliber rim fire pistols, and rifles and shotguns having a barrel longer than 16 inches.

Mr. KNUTSON. Sixteen or eighteen inches?

Mr. KEENAN. Eighteen inches.

Mr. KNUTSON. It exempts those?

Mr. KEENAN. Yes, it exempts those.

The CHAIRMAN. If a dealer only dealt in the firearms not included in this act, would he be subject to this tax? If he only dealt in shot guns and rifles having a barrel more than 18 inches in length and .22 caliber rim fire revolvers, would he be subject to this tax?

Mr. KEENAN. Are you talking about a manufacturer or dealer or both?

The CHAIRMAN. Both.

Mr. KEENAN. The term "manufacturer" means any person who is engaged within the continental United States in the manufacture of firearms or who otherwise produces therein any firearm for sale or disposition, but firearm, as defined, exempts the classes I have mentioned before. I think the answer would be "no."

Mr. WOODRUFF. According to your definitions, would a hardware merchant who dealt in shotguns and rifles, the barrels of which were

18 inches long or longer, and who did not deal in machine guns or
rifles or shotguns with barrels shorter than 18 inches, have to pay the
$200 tax?

Mr. KEENAN. I think not.

Mr. WOODRUFF. What is your definition of a dealer?

Mr. KEENAN. On page 2 the bill states, "The term 'dealer' means
any person not a manufacturer or importer engaged within the con-
tinental United States in the business of selling firearms."

Mr. WOODRUFF. Would the term "firearms" include all those that
had barrels 18 inches long or longer?

Mr. KEENAN. For the purposes of this act the definition of the
term "firearm" is a pistol or revolver of more than .22 caliber rim fire,
a shotgun or rifle having a barrel less than 18 inches in length, or any
other firearm capable of being concealed on the person.

Mr. WOODRUFF. Where are you reading?

Mr. KEENAN. The first paragraph of the first page of the act.
"Or any other firearm capable of being concealed on the person, a
firearm muffler or firearm silencer, or a machine gun." Therefore,
shotguns or rifles with barrels over 18 inches in length are not included.

Answering the question, I would say quite clearly that such dealers
would not be required to pay the tax.

Mr. WOODRUFF. And any dealer dealing in revolvers of more than
.22 caliber or automatic pistols of greater caliber would come under
the provisions of the act?

Mr. KEENAN. Precisely, yes.

Mr. KNUTSON. Suppose a dealer, at the time this act is passed, has
3 or 4 shotguns or 3 or 4 rifles which he has carried over from last
season.   Would it be all right to allow him to declare that fact with
the collector?   He could not turn them in as the manufacturer would
not take them back.

Mr. KEENAN. In the instance you cite, it is assumed that the barrels
on these rifles and shotguns will be over 18 inches in length.

Mr. KNUTSON. He has in his possession when this act goes into
effect those shotguns and rifles.   In order to sell those two or three,
he would have to take out a license?

Mr. KEENAN. Assuming the shotguns and rifles have barrels 18
inches or more in length, and are not sawed off, they are not covered
by this act.

Mr. WOODRUFF. The sawed-off shotguns are those on which the
barrels have been sawed off after leaving the manufacturer and after
leaving the dealer.

Mr. MCCLINTIC. In the first paragraph you say a pistol or revolver
of more than 22 caliber rim fire; is there any probability of the two
words "rim fire" causing confusion, taking into consideration that
pistols of greater caliber are all cap fire or center fire?   Is the term
"rim fire" necessary?   Would not 22 caliber be sufficient?

Mr. KEENAN. We adopted that provision at the suggestion of the
National Rifle Association, as being the definition that would exclude
from the provisions of this act the typical target gun that had no real
value as a gangster weapon.   I think perhaps General Reckord will
be better able to answer that than I can.

Mr. MCCLINTIC. A center-fire cartridge might be excluded if you
specifically refer to rim fire 22 caliber.

Mr. KEENAN. It would be excluded, I am informed.

Mr. McClintic. If they are excluded, then you would exclude a lot of pistols that you want to include.

Mr. Keenan. We would want to, but we feel if we get more than the 22 calibers under the provisions of the act we would be accomplishing a great deal.

Mr. Hill. Would you understand that pistols or revolvers of not more than 22 caliber, whether center fire or rim fire are exempt from this definition?

Mr. Keenan. I would think not.

Mr. McClintic. It seems to me that the two words "rim fire" ought to come out, because you would be liable to exclude center fire.

Mr. Keenan. I am not particularly interested in that. That was adopted from a provision requested by the National Rifle Association. If the Congressman would permit, I would rather those questions be addressed to the proponents of that provision.

Mr. Hill. Under this definition, if a dealer sells a revolver that fires a center fire cartridge of any caliber, he would come under the provisions of paragraph 1 of the act as a dealer in firearms.

Mr. Keenan. If the revolver is more than 22 caliber rim fire, I think the answer would be yes.

Mr. McClintic. Suppose it is more than 22 and center fire?

Mr. Keenan. I think it would plainly come within the provisions of the act.

Mr. Cooper. I have one question on that. Is this determined by the character of the cartridge fired or the type of gun that fires the cartridge? What I am getting at is this: Will not a 22 rifle fire a rim-fire or center-fire cartridge just the same?

Mr. Keenan. We are referring to pistols or revolvers only.

Mr. Cooper. What I am getting at is this: Is the gun itself so made and designed that it will only fire rim-fire cartridges, or will it also fire center-fire cartridges?

Mr. Keenan. I would prefer to have that question answered by the experts who have requested us to include this language.

Mr. Woodruff. I will say that a rifle designed for rim-fire cartridges will fire rim-fire cartridges and no others. A rifle designed to fire center-fire cartridges, I am not sure whether it will fire rim-fire cartridges or not, but I do not believe it will.

Mr. Cooper. Is it the type of cartridge fired that controls, or is it the gun?

Mr. Keenan. I understand it is the gun; General Reckord tells me it is the gun.

Mr. McClintic. The thought comes to me that if we leave those two words in, "rim-fire", manufacturers might change the firing pin or change the cartridge and make that particular rifle in the future so that it will fire center-fire cartridges. If you take those two words out, it will refer to revolvers of more than 22 caliber.

Mr. Keenan. I do not think we would have any objection to that.

Mr. Woodruff. There are some high-powered 22-caliber rifles, not of a type for target practice.

Mr. Vinson. This provision only refers to pistols and revolvers.

Mr. Lewis. What is the reason for excepting pistols of 22 caliber? What kind of a pistol is that?

Mr. Keenan. It is the 22-caliber rim fire, used for target practice.

Mr. Lewis. As pistols are they deadly?

Mr. KEENAN. They are deadly, but they are not so formidable as the heavier caliber, and this is a concession, if it may be so termed, to those who have a hobby of target shooting, following the suggestions that we attempt to get together on a bill.

Mr. LEWIS. Would a 22-caliber pistol be used for target practice? It is readily concealed on the person and is deadly.   Could it be used for target practice?

Mr. KEENAN. The rim fire; yes.   This is the message that comes to us from the representatives of the sportsmen and those who have a hobby of using pistols as well as rifles for target practice.   It has been represented that while this weapon is technically a deadly weapon, it is not a formidable one, compared to the other arms found on the gangster today.

Mr. LEWIS. Is it required to be registered under the new provision?

Mr. KEENAN. It would not be required to be registered.

Mr. TREADWAY. May I ask a question?   I want to get at two things; first, what present regulation or law is there applicable to the ownership of deadly weapons such as we have described here?   I would like to know what the present regulation is in connection with those weapons.   I would like also to know, when you speak of getting together with somebody, whether that included any business enterprises, manufacturers, etc., who have up to now been allowed to manufacture these goods under certain restrictions.   Have they been consulted at all?

Mr. KEENAN. Yes.

Mr. TREADWAY. I mean the folks you are endeavoring to put out of business.   There are two separate questions; I would like to have you handle them separately.

Mr. KEENAN. I assume the Congressman has reference to Federal laws.

Mr. TREADWAY. I assume that is all we can discuss.

Mr. KEENAN. I know of no regulations except the present ad valorem tax of 10 percent on sales.   Other than through the matter of taxation, I do not believe that there is any regulation I know of by the Federal law.

Mr. TREADWAY. You are laying emphasis on the Federal law.   As a side matter, there are State regulations?

Mr. KEENAN. Oh, yes.   Of course, it is a very broad subject, if we go into the details of different forms of firearms regulation.   We have the Sullivan law in New York, typical of the law with teeth.   We have the so-called "uniform pistol law" adopted by 14 or 15 States. That has been presented to the committee, without an opportunity being given to all the members for adequate examination.   Answering the second part of the question, I have had a conference with the representative of the Colt Co., which is the largest domestic manufacturer.   I think the Colt Co., the Remington Arms Co., Smith & Wesson, and Iver Johnson are the only manufacturers of pistols. When you talk to the Colt Co., I think you are talking to the company that manufactures and sells the great bulk of firearms, the greater proportion of pistols in this country.   The machine-gun people were represented here at the last session of this committee.   I am not representing to this committee that this bill as drafted and submitted received the approval of the Colt Co.   I do say that an earnest effort was made to get together.   The representative of the Colt Co. is here

now, and he seemed to be interested in lowering the tax upon manu-
facturers.   We have suggested  cutting the manufacturers' tax from
$5,000 to $1,000.   The manufacture of pistols and revolvers is not a
profitable part of the firearms industry.   It is in red ink, as far as the
manufacture and sale of small firearms are concerned.

Mr. KNUTSON. Do you not think $200 tax on a small dealer is too
much?

Mr KEENAN  The question asked is whether a tax of $200 on the
small dealer is not excessive.   I am inclined to take this position, as
far as the Department of Justice is concerned: Whatever amount of
money meets the approval of this committee in the taxing of the
dealer meets our approval.

Mr. WOODRUFF. As a matter of fact, the purpose of taxing is for
control only.   That is the primary purpose; that is the medium through
which we hope, constitutionally, to take charge of this situation, is
it not?

Mr. KEENAN. Also the desirability of getting control of firearms
away from pawnbrokers.

Mr. WOODRUFF. I understand.   I say again that the primary pur-
pose of putting the tax item in this bill is constitutionally to take
charge of this situation?

Mr. KEENAN. If that question is asked——

Mr. WOODRUFF (continuing). Whether applied to pawnbrokers or
anybody else?

Mr. KEENAN. That question is asked directly, and I have to answer
frankly; yes.

Mr. WOODRUFF. The amount of tax is not important?

Mr. KEENAN. The amount of tax is not important except from this
standpoint; it would be desirable to have the sale of guns in the hands
of as few people as possible as a matter of efficiency to keep track of
these weapons and see whether they are sold to the wrong people.

Mr. WOODRUFF. That is a debatable question, and I say that be-
cause I come from a district rather sparsely settled, and the merchants
doing business in the various small towns in my district, who handle
these firearms as described by this bill, who have a desire to supply
peaceable law-abiding citizens with a means to defend themselves
could not possibly pay that $200 a year.

Mr. KEENAN. Our position is that we would like to see as high a
tax as is now suggested.   We recede from that; for practical purposes
we are willing to fix the tax at any amount the committee sees fit.
That is one of the points that we agreed with the Colt Co. on; they
were the representatives of the general manufacturers and were also
interested in their dealers, since they have no sales organization of
their own.

Mr. WOODRUFF. My point is this: So far as the Constitution of the
United States is concerned, the Department of Justice is just as safe
with a tax of $10 as it would be with a tax of $200?

Mr. KEENAN. I think there is no question about that.

Mr. McCLINTIC. If I read this bill right, the manufacturer who only
makes shotguns is not subject to the tax.

Mr. KEENAN That is right.

Mr. McCLINTIC. And neither would be the dealer, unless he sells
pistols and these short rifles and shotguns.   It would leave shotguns
and rifles with barrels greater than 18 inches out of the picture.

Mr. KEENAN. They are out from beginning to end and never were in it.

Mr. TREADWAY. Do you feel that this finger printing, as a matter of identification, is essential?

Mr. KEENAN. I think it is of great importance. What is, and what is not essential——

Mr. TREADWAY (interposing). You provide for registration, his name, and all that sort of thing, from the purchaser, and on top of that you want to fingerprint him.

Mr. KEENAN. Our position is this: The firearm today is causing a great deal of destruction and death in our land. We think anyone who wants to procure a firearm of the nature described in this legislation ought to be willing to go to that trouble to make his contribution to the safety of the other people. We have not had any telegrams sent to this committee; we have not attempted to generate any propaganda. We have received literally thousands of letters from women's organizations and other public-spirited organizations asking that something be done about the firearms evil, and we submit, that even though it is a little trouble to have fingerprints taken, we believe it is not too great a donation to make to the general safety of the public.

The CHAIRMAN. Do you believe that the criminal classes will comply with that provision?

Mr. KEENAN. We do not.

The CHAIRMAN. Those who obey the law will, of course, comply, but the criminal classes will not do so.

Mr. KEENAN. We have recognized that from the beginning. We do not believe that this bill will disarm the hardened gangster, nor do we believe that it will prevent him from obtaining firearms. We do believe that it will permit effective and adequate prosecution, and take that man out of circulation when he does not comply. We think it will be much more difficult to do that if we do not have this means of identification. We are cognizant of the fact that those who oppose this type of legislation all make the argument that this is going to stop the good citizens from getting firearms, but that the crook is going to get them. We do not agree to the first premise. We are inclined to agree as far as the hardened criminal is concerned, but we think those who make the assertion fail to take into consideration that the hardened criminal was not always a hardened criminal. He was once a youngster, and he bought or got a gun, and he learned to use the gun at the time when he was not a hardened criminal. Probably the young boy who is now faced with no penalty for possessing a firearm, if there is a penalty, might think once or twice before he runs afoul of the Federal laws.

Mr. FULLER. I have a very high-class gentleman who is in my home. At one time he was recognized as the expert pistol shot of the world. He has a pistol of every make in the world, and he owns over 10,000 pistols now. For instance, if some notorious gangster had a pistol he would go and buy it. He has that collection of pistols, and he has exhibited it at world fairs and State fairs. Under this bill, as I see it, he would be required to stamp and register each one and pay a dollar for each.

Mr. KEENAN. He registers them, but he pays no tax on them.

Mr. FULLER. For each firearm he pays a dollar.

Mr. KEENAN. The Congressman is asking about that feature of the registration law?

Mr. FULLER. I want to know how it affects that man.   He will have to register each and every one, and he will have to have each and every one stamped, and then he will have to pay a dollar each for the registration.

Mr. KEENAN. I do not think that is unreasonable, because some enterprising gangster might learn about those pistols and might go and equip himself.   We would like to know who owns those.   He would pay no tax on them.

Mr. FULLER. Section 3 states that there shall be levied, collected, and paid upon firearms transferred a tax of $1.

Mr. KEENAN. He just registers them.   The registration feature is confined to giving information, such as the name, address, and occupation of the possessor of such firearms as are enumerated in this act.   There is no penalty for its violation.   There is no cost for registration.   That gentleman who owns 10,000 firearms might be put to considerable trouble, but he would be able to hire a clerk to do that for him, in all probability.

Mr. WOODRUFF. There is something said about the difficulties of fingerprinting.   Having been fingerprinted a number of times in my life, for a very worthy purpose, I am prepared to say that the proposition of fingerprinting is a very simple one.   Any dealer in firearms could have a fingerprinting outfit, and when you buy firearms all you have to do is to put your hand on a flat stone with a little ink on it and transfer it to a piece of paper.   There is no difficulty of any kind whatsoever in connection with that phase, and there will be none, if this act becomes law.

Mr. KEENAN. Every postmaster today has that equipment in connection with the Postal Savings System and we have not heard any complaint.

Mr. WOODRUFF. Every dealer should have that equipment; it is inexpensive and of no trouble.

Mr. VINSON. The photographing of the applicant has been stricken out.

Mr. KEENAN. That is right.

Mr. VINSON. Mr. Keenan, when Mr. Cummings, the Attorney General, was testifying on the original bill the question was raised as to paragraph (d), subsection 6 of section 10, which dealt with the presumption of residence.   As I understand, that presumption is out of the bill?

Mr. KEENAN. That presumption is out; yes.

Mr. VINSON. In fact, the entire interstate commerce basis is withdrawn from the bill?

Mr. KEENAN. The permit, as such.   Of course, I have not come to that part yet, but it is made unlawful for anyone to transport any firearm described in this act in interstate commerce unless he has registered, as provided under the registration clause, the existing firearms, or unless he has complied with the provisions, that is, the fingerprinting, and so forth, relative to acquiring firearms after the passage of the act.

Mr. VINSON. I think you stated originally that H.R. 9066, as introduced on April 11 of this year, had as its foundation taxation and interstate commerce, but that the interstate commerce feature had

Compendium_Spitzer
Page 665

94                              NATIONAL FIREARMS ACT

been withdrawn and that it was presented purely with the taxation feature.

Mr. KEENAN. I meant by that statement, that now you are not required to get a permit to bring a firearm from one State to another. You are required to register all existing arms, and you are required to observe all the formalities for the purchase of arms described in the act, after its passage.

Mr. VINSON. Now you are requiring that all existing firearms be registered?

Mr. KEENAN. Under that act.

Mr. VINSON. Under that act. Under section 5 of the substitute, it is provided that all firearms now possessed shall be registered; that is correct, is it not?

Mr. KEENAN. Yes.

Mr. VINSON. But, as you have stated, there is no penalty attached for failure to register such firearms?

Mr. KEENAN. Yes.

Mr. VINSON. Is the main purpose which actuated you in providing for registration of existing firearms to provide the basis for the presumption that appears in paragraph (b) of section 5?

Mr. KEENAN. I would rather say this, Congressman, that the purpose of section 5 is to aid those charged with the administration of this act in determining whether or not taxes had been paid on firearms that should be taxed.

Mr. VINSON. When you fail to have a penalty for nonregistration of firearms, I am in thorough accord with that thought in the bill.

Mr. KENNAN. I would assume so.

Mr. VINSON. It seems to me that the only purpose that you could have in providing for registrations of firearms now owned and possessed would be to permit this presumption in paragraph (b) of section 5, that whenever a defendant "is shown to have or to have had possession of such firearm at any time after such period of 4 months without having registered as required by this section, such possession shall create a presumption that such firearm came into the possession of the defendant subsequent to the effective date of this Act, but this presumption shall not be conclusive."

Mr. KEENAN. The purpose is to determine whether or not a gun in a certain instance was purchased before or after the passage of this act, to determine whether or not the tax has been properly paid upon it. We also propose to attempt to determine who possesses firearms and where the firearms are, so we can make a start on this proposition. In my opinion, it will take a long time to control this traffic adequately.

Mr. VINSON. Do you think that there will be any affirmative benefit to the Department of Justice in knowing the names and addresses of citizens of this country who report and register a pistol or revolver that they now legally own?

Mr. KEENAN. Not directly; no.

Mr. VINSON. The crook or gangster will not register that weapon?

Mr. KEENAN. We believe not.

Mr. VINSON. The law-abiding citizen will, if he knows about this provision; if it is called to his attention, he will so register that firearm, but it seems to me that the only purpose here in requiring this registration is to use the registration as the basis for this presumption which will certainly be of benefit to you in the trial of a man accused of having

in his possession a firearm that is not registered.   Is there no other purpose behind the requirement that all firearms now owned shall be registered?

Mr. KEENAN. There is this additional purpose, Mr. Vinson.   I think it is not sufficiently emphasized that a good many of these pistols of the classifications described are stolen, not alone from armories and commercial dealers, but also those who possess firearms as individuals. We think it will help us to have such matters reported.   It will help to have a record of the owners.

Mr. VINSON. "To have such matters reported"; what do you mean by that?

Mr. KEENAN. When reports are made of a gun being stolen, we will have that fact brought to the attention of the police.   People will be more careful of the use of firearms.   They will realize that it means something to them to have a gun, if they have to account for it.   We think, too, that it is a good thing to make this start.   It may take many, many years before we make real headway in the control of firearms.

Mr. VINSON. As I understand paragraph (b), section 5, after the expiration of the 4-month period, after the time this would become a law, if a person were caught with a firearm, coming within the purview of the act, without that firearm having been registered, there is a legal presumption set up that such firearm came into his possession more than 4 months after the enactment of this law.

Mr. KEENAN. That is correct.

Mr. VINSON. That presumption may be rebutted?

Mr. KEENAN. That may be rebutted, yes.

Mr. VINSON. It is not a conclusive presumption; it is prima facie?

Mr. KEENAN. Yes.

Mr. McCLINTIC. What would be the maximum penalty that could apply for carrying that firearm from one State to another?

Mr. KEENAN. The penalty is that within the discretion of the court. Conceivably, a tremendous injustice might be done to a man carrying a gun across State lines who had in his possession a gun which had not been registered as required; he would be subject to the full penalty provided in the act.

Mr. HILL. You have defined "firearm" in the first paragraph of the new draft of the bill.   When the word "firearm" is used in this bill, does it refer back to that definition, and is it confined to the terms of that definition?

Mr. KEENAN. We take it that all the way through, for the purposes of this act, the term "firearm" means what the definition states. We have used the term "firearm" and we have not used any other language, confining its meaning to that which it would have under the definition as set forth in the first paragraph.   I have assumed there is no question that having defined the term "firearm," wherever it is used thereafter in the act, it would be restricted to the limitations of that definition.

Mr. HILL. A shotgun with a barrel of 18 inches or more would not be a firearm?

Mr. KEENAN. It would not.

Mr. HILL. A rifle of 18 inches or more would not be a firearm under this definition?

Mr. KEENAN. It would not.

Mr. HILL. It is hard to use the word "firearm" without referring to the definition to know what are the firearms not included in the definition. As to such firearms, used in the generally accepted sense of the term, that do not come within the definition of firearm, as defined in the act, no registration is required, and no restriction is imposed on carrying such a weapon from one State to another?

Mr. KEENAN. You mean as long as they are over 18 inches?

Mr. HILL. As long as they do not come within the definition of "firearm" in the act.

Mr. KEENAN. That is right; yes, sir.

Mr. HILL. There is perfect freedom, the same as now exists, as to the possession and use of guns, under this bill, so long as they do not come within the definition of "firearm," as set forth in the bill?

Mr. WOODRUFF. There is no limitation whatsoever as to the use of sporting arms.

Mr. KEENAN. None at all, unless you call a Colt .45 a sporting arm.

Mr. REED. What I see in this bill is, and it is brought out quite clearly by Mr. Vinson's questions, that when you require the registration and fingerprinting, it enables you as a prosecutor to take the man who has not complied with the law and raise the presumption against him in the prosecution.

Mr. KEENAN. That is true. I forgot to state, and I think I should have, that if by chance a person who possessed firearms does not register them within the prescribed period of 4 months and desires to carry them into another State, he may have them registered after the 4-month period, and if he does register them within that time, then he carries them as though they were registered prior thereto.

Mr. LEWIS. Is it not true that nearly all of the States have passed laws against all kinds of concealed weapons?

Mr. KEENAN. I believe that to be true.

Mr. LEWIS. That evinces a purpose on the part of the State to require notice to the public, publicity with regard to the carrying and the possession of small weapons?

Mr. KEENAN. That is right.

Mr. LEWIS. The suggestion occurs to me that in requiring them to register, we are only effecting the purposes of these laws in the States against carrying concealed weapons. Will not they be as completely concealed as if there were no registration.

Mr. KEENAN. I think the bill would be helpful in obtaining auxiliary facts, to aid the States.

Mr. FULLER. As I understand, if any person should sell, assign, pledge, lease, loan, or give away a pistol, that he would be liable to a fine not exceeding $2,000, or imprisonment not exceeding 5 years, or both.

Mr. KEENAN. Unless the provisions have been complied with with respect to that firearm, yes. If you are going to regulat the transfer at all, it seems to me it must be——

Mr. FULLER (interposing). If he had failed to obtain a permit and pay a dollar for the loan or gift or pledge or assignment, he would be guilty of that penalty?

Mr. KEENAN. He would invoke that penalty, yes. Otherwise, the effects of the bill would be emasculated. If you exempt gifts, and

you try the gangster for having the gun, he will interpose with great facility, as the past has shown, the same kind of an alibi that he has always been able to cook up. You will find somebody who has made a gift to him.

Mr. FULLER. Do you think under the terms of this bill it would prohibit an administrator or executor from transferring any of these weapons?

Mr. KEENAN. I think so but, Mr. Fuller, we expect to find some element and some degree of common sense in the Federal judges and in the prosecutors.

Mr. McCLINTIC. Referring back to section 1, on the subject of pistols, if you transposed the language, it would say " a rim-fire pistol greater than a .22 caliber." That would exclude the center fire pistols of larger caliber. It seems to me that some attention ought to be paid to that language so as to clarify it in such way as to eliminate the element of doubt.

Mr. KEENAN. I would be glad to take a note of that.

Mr. McCLINTIC. You are referring to the particular kind of pistols.

Mr. KEENAN. I am frank to say, with reference to that particular provision, we have followed the language suggested by our good friends, the National Rifle Association, and those representing sporting men, General Record, and Mr. Frederick, and the others who have followed this legislation for some fifteen-odd years, and we have taken their definition and their language as to the .22-caliber rim fire, just as we adopted the language as to the machine gun. We do not want to exclude from the provisions of this act any other pistol over the .22 caliber.

Mr. McCLINTIC. If you leave the language as it is written, I am afraid you do not do that.

Mr. HILL. One question relative to the definition of machine guns. There is a distinction between an auto-loading and automatic gun, I take it?

Mr. KEENAN. I think so.

Mr. HILL. An automatic gun is one that fires without pulling the trigger more than once. An auto-loading might not be an automatic. An auto-loading gun might not be an automatic gun; for instance, you have these small rifles, the .22-caliber rifles which are are auto-loading, but you have to pull the trigger each time to fire them. That is not a machine gun.

Mr. KEENAN. A machine gun is one that shoots more than one shot without manual reloading, by a single function of the trigger. If it comes within the provision of that, it would be a machine gun.

Mr. HILL. If you have to have more than one function of the trigger, it is not automatic.

Mr. KEENAN. That is right.

Mr. HILL. I know in these small rifles, when you fire by pulling the trigger they reload automatically, but they do not automatically fire again unless you pull the trigger.

Mr. KEENAN. I appreciate the distinction.

Mr. HILL. That is not a machine gun under this definition.

Mr. KEENAN. No.

Mr. VINSON. I am still thinking about the firearm that is now owned and possessed legally, and referring to the supplemental statement that you made while Mr. Reed of New York was interrogating

.

you, that such a weapon could be transported in interstate commerce
without being a violation of law, I find, on looking into that section,
which is section 11 of the substitute bill, that before that man may
transfer the firearm which he now owns and possesses legally in inter-
state commerce, he has to take the matter up with the commissioner,
notify him by affidavit, within 2 days prior to such shipment, carriage
or delivery, setting forth in such affidavit his address, the number or
other mark identifying such weapon, and the place to which it is to
be transported.   In other words, this citizen has not violated the
law in the purchase or the possession of this firearm, but if he trans-
ports it, he does.   He may possess it legally by registering it.

Mr. KEENAN. May I ask a question there?   You are referring to a
class of those who possess guns not registered as required by this act?

Mr. VINSON. Yes.   That gentleman gets a penalty for such pos-
session of the weapon and he will be guilty of a violation of the law if
he transports that weapon in interstate commerce.

Mr. KEENAN. Yes.

Mr. VINSON. If he lives on one bank of a river and was within the
law in the possession of this firearm and failed to register it, there is
no penalty attached, but if he moves to the other side of the river, then
he has violated the law in that he has transported the weapon in inter-
state commerce, unless he makes an affidavit and sends it to the com-
missioner and tells him all about it.

Mr. KEENAN. That is right.

Mr. VINSON. What is the penalty for that violation?   A fine of not
more than $2,000 or imprisonment of not more than 5 years, or both,
in the discretion of the court?

Mr. KEENAN. Those are the maximum penalties provided gener-
ally, and he comes within that provision.   We have been hoping that
the Federal judge or the prosecutor would look into those matters and
exercise common sense.

Mr. VINSON. I understand the common-sense theory, but you
would not rely upon the whims of Federal judges in the 48 States, nor
prosecutors.

Mr. KEENAN. It must be admitted that that would permit, under
some circumstances, a very severe penalty for what was at least not
intended to be a violation of the law.   It is a stringent provision, I
think you will admit.

Mr. VINSON. Assuming that section 11 were stricken out, would
that be vital to the purpose of the Department of Justice?   We have
paragraph (b) in section 5 with reference to the presumption.

Mr. KEENAN. Will the Congressman please put that question
again?

Mr. VINSON. I am asking whether the abolition of that language,
the elimination of it, which sets up and makes illegal what ordinarily
would be a lawful act, the transportation of something which he has
in his possession legally, from one State to another.   Would that
vitally affect the purposes behind the bill?

Mr. KEENAN. I think so, for this reason: If you take that out,
you might as well take out the registration provision entirely.

Mr. VINSON. Not the registration provision.

Mr. KEENAN. I will withdraw that statement.   It would still leave
the presumption of those found with the firearm, without affecting
the registration, if the weapon was procured before the act went into

effect. I am inclined to think we could afford to give way on that; there is a good deal to what the Congressman says with reference to eliminating that provision. I do not think it would vitally affect the act, answering the question categorically.

Mr. HILL. I suggest that Mr. Keenan started out to give the main differences in the bill.

The CHAIRMAN. He may proceed.

Mr. KEENAN. I think we have, in the course of the questioning, touched upon every important element of this act, as we have gone along. I think I can briefly state that we have changed the preceding act by a definition of machine gun, which already has been brought up for some detailed discussion.

Mr. HILL. In that connection, there was a suggestion made here in the previous session of the committee that you might consider the matter of requiring the registration of clips for machine guns. You have not done anything about that?

Mr. KEENAN. There has been nothing done on that.

Mr. HILL. You also referred to metal vests.

Mr. KEENAN. That might go in another bill.

Mr. HILL. You do not think machine-gun clips belong in this bill?

Mr. KEENAN. I think it could be included. We had thought of handling machine-gun clips and metal vests in a commerce clause in another bill.

Mr. HILL. Do you think machine-gun clips should come in here?

Mr. KEENAN. I think they should.

Mr. HILL. Where would they come?

Mr. KEENAN. I suppose it would have to come in the definition, in the first clause, as part of the firearms. We would have to change the act considerably to include as firearms machine-gun clips.

Mr. HILL. Do you think them of sufficient importance to be included here?

Mr. KEENAN. I do not think so. I think if we had control of the arms themselves for the purpose we want, that it will not be of any tremendous assistance in following the ammunition.

Mr. HILL. A gangster might be in lawful possession of a machine gun, and yet he must have ammunition for that gun. You might trace the ammunition to him and thereby contribute toward his identification as the operator of the machine gun.

Mr. KEENAN. You can readily tell if the ammunition was of such a nature as to be designed for machine guns. We have been working to get a bill otherwise acceptable to the various groups of the community interested therein, and we had not considered that seriously up to this time.

Mr. FREAR. In the substitute bill, you have left in revolvers, pistols, and all that?

Mr. KEENAN. Yes.

Mr. FREAR. The protests were directed toward those, largely.

Mr. KEENAN. We will have a few words from General Allen about the matter of protests. We dislike to get into that subject about the protests, because we find that communications have been sent out from Washington by the National Rifle Association, in effect asking the members to bombard this committee with objections and showing a rather definite knowledge of the terms of the act as originally drawn, and making some representations which, we regret to say, we

**100**                    NATIONAL FIREARMS ACT

think are not in accordance with the facts of the case. We will have those to show the committee, if it is interested. I imagine the Congressman has not been here before today.

Mr. FREAR. I was here at the previous session, but have not been here today.

Mr. KEENAN. We have discussed the matter of pistols. They are left in, excepting the .22-caliber rim fire pistol. The suggestion was made that they ought to be excluded, not being a deadly weapon as compared with the other calibered pistols and weapons included.

Mr. TREADWAY. You are dealing with the small firearms exactly under the same conditions as you are the machine guns, are you not? There is no different treatment, according to the danger of the article involved?

Mr. KEENAN. That is true; they will both kill.

Mr. TREADWAY. Isn't a machine gun a very much more dangerous weapon to have in the hands of a gangster? You can do a lot more work with a machine gun than with an ordinary revolver?

Mr. KEENAN. There is no doubt that it is more dangerous.

Mr. TREADWAY. What benefit is there in allowing machine guns to be legally recognized at all? Why not exclude them from manufacture?

Mr. KEENAN. We have not the power to do that under the Constitution of the United States. Can the Congressman suggest under what theory we could prohibit the manufacture of machine guns?

Mr. TREADWAY. You could prohibit anybody from owning them.

Mr. KEENAN. I do not think we can prohibit anybody from owning them. I do not think that power resides in Congress.

Mr. TREADWAY. It would be like the control of a deadly poison, I suppose.

Mr. KEENAN. That is controlled.

Mr. TREADWAY. Yes; that is controlled.

Mr. KEENAN. We have tried meticulously to follow the Harrison Act, passed by the Congress, and the decisions under that act. We have this strong analogy to poison, but the poison only kills the person who takes it, while the gun is designed to kill others.

Mr. TREADWAY. That would afford a basis of argument. Could you not make a relative difference between the dangerous types, according to how dangerous they are?

Mr. KEENAN. In the penalty for their transportation?

Mr. TREADWAY. Or in the control of them.

Mr. KEENAN. I suppose that could be done. The idea would be to increase the penalty for carrying machine guns, or decrease it for carrying guns not so deadly as machine guns?

Mr. TREADWAY. Whenever we hear of these terrible raids, the machine guns are the ones which do the most damage, are they not?

Mr. KEENAN. Yes; we usually find the machine gun, but we always find a half dozen or 8 or 10 Colt automatics or some easily concealable firearm.

Mr. TREADWAY. That is a matter of convenience, is it not?

Mr. KEENAN. It is a matter of convenience. If the Congressman would permit me to suggest, in addition to the machine gun, the modern gangster is not technically well equipped if he does not have several concealable small arms for use instantly.

Mr. TREADWAY. How large is a machine gun? How conspicuous must it be for a person to carry it around?

Mr. KEENAN. I have seen a lot of them.

Mr. TREADWAY. It would be about how long?

Mr. KEENAN. About 2 or 2½ feet in length.

Mr. TREADWAY. How large are they? What would they weigh?

Mr. KEENAN. It has a bulky stock; I would say it is 4 or 5 or 6 inches across and it has a drum.

Mr. TREADWAY. What would it weigh?

Mr. KEENAN. I cannot answer that.

Mr. TREADWAY. It is very inconvenient for a man to conceal?

Mr. KEENAN. They have concealed them in golf bags recently. You may remember reading that Dillinger recently went to be treated for a gunshot wound by Dr. Mortenson, head of the Minnesota State Welfare Department. At that time Dillinger's companion had a machine gun sticking out from his coat, which, many people thought, should have indicated that he was dealing with a gangster. It was difficult to conceal the gun.

Mr. TREADWAY. You do not feel that there is any way in which a more severe penalty could be imposed against the machine gun, either its purchase, sale, or possession, than any other kind of a dangerous weapon?

Mr. KEENAN. I think that is an excellent suggestion. I think it might be regulated in the penalty.

Mr. HILL. Sections 3 (a) of the substitute bill provides that there shall be levied, collected, and paid upon firearms transferred in the continental United States a tax at the rate of $200 per machine gun and $1 per other firearm. There is a discrimination there in the size of the tax.

Mr. KEENAN. There is. I still think there is a great deal to what the Congressman says about the penalty for carrying a machine gun. I do not think life imprisonment would be too much.

Mr. TREADWAY. I cannot see what a machine gun would be for unless it was for breaking the law. It is not an article for protection. For instance, if you or I had a permit to have a revolver in our home, that is for our defense. I cannot see where a machine gun can be used in a legitimate way.

Mr. KEENAN. The revolver and pistol are designed to kill some being and so is the machine gun. It is a matter of which kills the more effectively. That is why we are asking the committee to consider what may seem to be drastic regulation of all firearms. I have stated about all of the important points with the exception of matters such as antiques.

The CHAIRMAN. The wooden pistol seems to have been used with great effect.

Mr. KEENAN. The wooden pistol might have great effect with people with wooden heads.

Mr. FULLER. What would you think of a law which prohibits the manufacture or sale of pistols to any person except the Government or an officer of the law?

Mr. KEENAN. I think that would be an excellent provision if the Congress had power to enact such legislation. We think it would be a good thing. The way that can be attacked, naturally, is by some action of the State assemblies.

Mr. FULLER. We could enact a law declaring it a felony to sell them.

Mr. KEENAN. I do not think that power resides in the Congress. The Federal Government has no police powers.

Mr. FULLER. It could require them to be registered and pay them full value and then destroy the weapons.

Mr. KEENAN. I do not think that power resides in Congress.

Mr. VINSON. It is because of that lack of power that you appear in support of the bill to do something indirectly through the taxing power which you cannot do directly under the police power?

Mr. KEENAN. I would rather answer that we are following the Harrison Act, and the opinions of the Supreme Court.

Mr. VINSON. In other words, you are advocating the creation of a new felony in the failure to register a firearm acquired subsequent to the enactment of the law, with a fine of not more than $2,000 or imprisonment of not more than 5 years or both.

Mr. KEENAN. That is right.

Mr. VINSON. Under the taxing power of the Constitution.

Mr. KEENAN. Yes, following the Harrison Narcotic Act; that is right.

## STATEMENT OF J. WESTON ALLEN, CHAIRMAN NATIONAL CRIME COMMISSION, NEWTON, MASS.

The CHAIRMAN. Please give your name and whom you represent.

Mr. ALLEN. My name is J. Weston Allen, and my residence is Newton, Mass. I am a practicing lawyer in Boston. I was Attorney General of Massachusetts when Calvin Coolidge was Governor, and I am appearing here as chairman of the National Crime Commission, under the aegis of the Department of Justice, because the National Crime Commission has, during a period extending back to 1896, been directly interested in the problem of the adequate control of firearms, both under Federal and State legislation.

The National Crime Commission was established as a voluntary association on the initiative of Judge Gary at the time that the problem of crime was disturbing the country, and in 1927 the National Crime Commission appointed a special committee to draft a firearms bill which might be submitted to the States. At that time, there had been a uniform firearms bill recommended by the Commissioners on uniform laws, which organization has been going forward for a quarter of a century, and that bill has been approved by the American Bar Association and has been submitted to the States. It aroused so much opposition; protests came from so many States to the National Crime Commission, that the adoption of that bill by the States would be a reactionary measure that would take the teeth out of existing law in so many of the States, that the National Crime Commission asked me if I would organize a committee which would study the question with a view of making suggestions as to a uniform law to be submitted to the States which would have more efficient power to control the situation.

The personnel of that committee which carried on the study and made the draft of the bill was carefully selected to represent all the interests which were concerned. When the Commission accepted the responsibility of forming such a committee, it named three repre-

sentatives: August Vollmer, chief of police of Berkeley, Calif., who
was a recognized authority on police problems; Philip S. Van Dise,
former colonel of the United States Army during the World War and
who achieved a reputation as a prosecuting attorney of the city and
county of Denver; and myself.   Later, the Honorable Ogden L. Mills,
who was in Congress, consented to act in an advisory capacity on
Federal legislation.   Hon. George M. Napier, attorney general of
Georgia and president of the Association of States Attorneys General
named as representatives of his association, at the request of the
Commission, the Honorable Jay R. Benton, attorney general of Massa-
chusetts; the Honorable H. L. Eckern, attorney general of Wisconsin,
and O. S. Spillman, attorney general of Nebraska.

At our request, the Secretary of War designated Brig. Gen. Colden
L. Ruggles, chief of the Ordnance Department, Washington, D.C.,
to serve on the committee in an advisory capacity.   The American
Bankers' Association, which is deeply concerned, designated James
B. Baum, deputy manager, to represent that body.

The National Rifle Association and the United States Revolver
Association selected Mr. Charles T. Frederick to serve on the com-
mittee for both associations.   Mr. Frederick, I understand, has been
before your committee, and he has stated, and correctly stated, that
he was largely the author of the bill which has been approved by the
commissioners on uniform laws.

The Remington-Arms Co., Inc., Iver Johnson Arms & Cycle Works
the Harrington & Richardson Arms Co., Smith & Wesson, Inc., and
Colt's Patent Firearms Co., which comprise the leading manufac-
turers of firearms in this country, agreed on Mr. S. M. Stone, president
of Colt's Patent Firearms Co., as their official representative on the
committee.   That committee met in New York City; we had sessions
in which the question was fully taken up, and from that time on, the
National Crime Commission has followed legislation, both Federal
and State with respect to this subject.

Concerning the bill in question, during the few minutes which are
assigned to me, I wish to speak on the question of fingerprinting and
the importance of having section 5 in the bill, which provides for
registration, and if I have time, to refer to the arguments that this
legislation will take the protection away from the home and will
not prevent the gangster from getting guns, which is one of the
arguments, and the other argument that it interfers with honest
sport in rifle ranges and in hunting.

With regard to section 5, gentlemen, there will never be efficient
control of firearms in this country until State and Federal legislation
succeed in securing, in some form, registration of firearms which are
possessed by the people in the United States.   That is, until we can
have that information the police and all those who believe in the
adequate control of firearms are at a disadvantage.   This bill provides
in a most admirable way for this registration.   It provides for no
penalty; it simply in effect says to the citizen, "you should and must
register your firearms so that we can know with regard to where the
firearms are in this country."   Of course, all firearms that are not
effective for use are eliminated.   All shotguns and rifles are eliminated.
The only thing that the citizen is asked to register are firearms that
fall within those classes.   Why?   One reason is that when you get a

Compendium_Spitzer
Page 675

**104**                    NATIONAL FIREARMS ACT

criminal and he has a firearm, it is important to find out where he got that firearm, and when, as time goes on, we are able to get a reasonable degree of registration, the important question which comes up first, in getting information with regard to criminal activitiy is, where did he get the firearm, will be capable of more prompt solution. It does not handicap anyone at all to merely register the fact that they have these firearms, provided they are serviceable firearms. The effect will be in a small nnumber of years, and as time goes on, all modern firearms, such as criminals must have, will be registered.   As for the purpose of this law, which provides for the registration of all firearms sold hereafter, as you supplement it by the registration of firearms now in existence, you will soon have something we have never had before, an efficient means of locating firearms.

Mr. HILL. How are you going to enforce the requirement for registration?

Mr. ALLEN. You are not going to enforce it by penalty.   If a man has firearms and does not register them until he wants to transport them, you do not know.   With every year, you are going to get more registrations.   It is because this bill seeks to be reasonable that it does not put a penalty on a person who does not register.

With regard to fingerprinting; when we prepared a uniform law which was submitted to the States, the only objection that was made finally by Mr. Frederick, representing the associations, and by Mr. Stone, representing the manufacturers, was the fingerprinting; they did not want fingerprinting.   The War Department at that time said that they did not want to impose any requirement which would seriously handicap manufacturers.   The vote was something like nine to three in favor of fingerprinting at that time, but in order to meet the wishes of the manufacturers and the associations, I telegraphed all members of the committee, after the meeting, and got their permission to omit fingerprinting from that bill.   In spite of that, they went in and opposed the bill in every State I know of, where it was introduced.   I went to Maine to be heard on the bill.   Somebody spoke against it and objected to fingerprinting and talked about rifle ranges.   I asked what his business was and he said a salesman.   I asked what he sold and he objected.   He finally stated that he represented the Remington Arms Co.   With respect to fingerprinting, the time is coming, and I think most of us will live to see it, when fingerprinting will be recognized as essential for every citizen.   They are fingerprinting babies in hospitals, in all the leading hospitals. In Argentina, where fingerprinting is required, the percentage of persons who die and are buried in unknown graves, is nil, where in this country they are not able to identify a great many people, and there are large numbers of people buried, because of that, without being known.

In Massachusetts, we have had fingerprinting, as a requirement in the registration of firearms since before 1907, when this bill was passed.   New York has it in the Sullivan Act, and New Jersey has recently adopted it.   Commissioner McLachlin of New York, and Mr. Wilson of Massachusetts, and practically every police commissioner in this country will state that they believe fingerprinting is essential.   Recently in Massachusetts we have called for fingerprinting of all taxi drivers.   None one can drive a taxi without being fingerprinted, and there is no difficulty.   The sentimental idea back of the

objection to fingerprinting is that they think it is like being photographed for the rogues gallery, and that is passing so rapidly that there is no longer any reason to prevent the only efficient means of identification. I know of no one who does not represent the manufacturers or associations who, today, object to fingerprinting as the only means of identification.

With respect to the statement that is everywhere heard whenever these matters come before the legislature, that you are going to take the pistol away from the innocent man, you are going to deprive him from protecting his home, but you are never going to get the guns away from the criminal element, they are unreasonable and foolish enough to say that we are not going to keep the gun from the criminal; but, gentlemen, this country has not yet come to realize how much can be done to make the possession of a gun by a criminal a very serious thing for him, and the provisions in this bill, supplemented by provisions in State legislation, are going to make it a means of putting the criminal behind the bars where he cannot be a gunman any more, provided you will pass such regulations in this bill to make possession of the firearms by the man who has not complied with the law a criminal offense. Of course, the gunman is not going to register. That is the reason why the registration is useful; the gunman could not register, because he is known in the underworld, but even if you cannot prove he has committed an act of violence, if he owns a gun you can put him away for 5 years, and unless he has a wooden pistol, he will not make trouble for 5 years.

A pistol will be found in an automobile and there will be three gunmen there who will say that they do not own it. We have provided in Massachusetts that a pistol found in an automobile is in constructive possession of the man driving that automobile, and we stopped that loophole.

If you will register guns, and the gunmen cannot register, and if you will make these provisions in the Federal law which will fortify our State legislation with respect to the control of firearms, you will go a long way to make it hot for the criminal to be caught with a gun. You are not going to keep the criminal from having a gun, but when he has it, you will catch him and then you will send him away. You cannot do it now. In my opinion, the most valuable service this bill will render will be in putting teeth into every State law which we have in all 48 States, which are endeavoring to meet the problem of the criminal being in possession of a gun.

With respect to protecting a man in his home. Gentlemen, if you want to protect your wife and children aren't you going to be willing to register your gun? If you want this kind of a gun included here, if you are not willing to do this, you do not appreciate the tremendous importance of having those lawfully in possession of guns known to be lawfully in possession of guns, in order to get at those who are not lawfully in possession of guns.

The late William McAdoo, of New York, who was an authority during his lifetime on this problem, in a letter written to Mr. Wickersham stated that he had argued and would continue to argue that if all the law-abiding people of the city of New York were crack shots and were armed with two revolvers apiece, that it would not stop armed robbery and murder with firearms. The fact that the police in England do not carry firearms, and the fact that the chiefs of

106          NATIONAL FIREARMS ACT

police of cities like Mr. Mulready think it would be better if the
police were not armed with pistols or revolvers shows how little there
is to the argument that the private citizen is going to be protected
by revolvers.

Sometime ago we had a bank robbery on Beacon Street in Boston
in broad daylight, and the policeman outside went into the bank
with his gun.  They took his gun away from him and they then
had one more gun than they had before.  Someone has said that he
would rather be a live coward than a dead hero.  There are some
men who would.  The whole recent discussion of bank robberies is
due to the fact that there is no way of beating the gunmen who plan
such a robbery, when they are armed with machine guns, by shooting
them down, because they have the jump; they have selected the
time, etc.  The theory is a policeman should not go in where there
is a bank robbery going on; he should stay outside and shoot them
down as they come out.  You are not going to prevent the tremendous
criminal wave of robberies, hold-ups, and so forth, by arming our
policemen with guns.

The CHAIRMAN. Assuming that it is true, and I believe it is true,
that there is a comparatively small percentage of homes ever entered
by burglars, if the occupant feels more comfortable and safer by
having a gun; if it relieves him to some extent and gives him a sense
of security, why should not he be permitted to have it, for the mental
relief it affords?

Mr. ALLEN. If he feels safer, he should be willing to register it.
There may come a time when I will want a gun in my home.  I am
perfectly willing to register it.

The CHAIRMAN. Have you about concluded your statement?

Mr. ALLEN. There is more I had expected to say.

The CHAIRMAN. You can extend your remarks in the record, or if
you have further thoughts to present you may continue for a few
minutes in the morning at 10 o'clock.

Mr. ALLEN. If I stay over, may I have 5 minutes more in the
morning?

The CHAIRMAN. Yes.  We will now adjourn until tomorrow at
10 o'clock.

(Thereupon, at 12:20, the committee adjourned until tomorrow,
May 15, 1934, at 10 a.m.)

# NATIONAL FIREARMS ACT

**TUESDAY, MAY 15, 1934**

House of Representatives,
Committee on Ways and Means,
*Washington, D.C.*

The committee met at 10 a.m., Hon. Robert L. Doughton (chairman) presiding.

The Chairman. The committee will please be in order.

When we recessed yesterday General Allen, of Massachusetts, was testifying but had not completed his statement. If he is present and ready to resume, we should be pleased to hear him at this time.

Mr. Keenan. Mr. Chairman, General Allen is not here. I would suggest, if there is anybody from the Rifle Association present, the committee might hear him in the interest of saving time.

The Chairman. Very well. We will hear General Reckord.

## STATEMENT OF MAJ. GEN. MILTON A. RECKORD

General Reckord. Mr. Chairman and gentlemen, with your permission I should like to make a statement which will take only a few moments and then answer any questions, if that is satisfactory.

The Chairman. That will be satisfactory, General.

General Reckord. Thank you, sir. We understand and have understood from the beginning the difficulties with which the office of the Attorney General is confronted in reaching the crooks and the gangsters. We are sincere when we say that we want to assist in every reasonable way.

The Attorney General himself at the committee hearing on April 16, said:

The development of late years of the predatory criminal who passes rapidly from State to State has created a situation which is giving concern to all who are interested in law and order.  *  *  *  There lies the heart of our problem. The roaming groups of predatory criminals who know  *  *  *  that they are safer if they pass quickly across the State line, leaving the scene of the crime in a high-powered car or by other means of quick transportation.

Later in his testimony the Attorney General said:

Now we are dealing with armed people, criminals who have hide-outs in various spots. They will stay in one place a little while and in another place a little while and then move about, always with arms.

At another place in his testimony, in response to a question by Mr. Frear, General Cummings said:

With regard to reaching a man like Dillinger, there is nothing specific in this act that deals with that situation. There is pending, however, before the Judiciary Committee of the House a bill making it a Federal offense to flee across the state line to escape prosecution for a felony, and if that bill should be enacted we

107

would be able to reach criminals who are passing rapidly from one State to another.

I have made these references to the Attorney General's testimony because they have very immediate bearing on the question of this bill we are now considering—H.R. 9066. It has been the thought of our Association that effective legislation must be aimed directly at the criminal. It is the desire of all of us to apply the maximum pressure on people like Dillinger.

The Attorney General made the point very clear, with which we are in hearty accord: That the criminals with whom the Department of Justice may properly concern itself are the roving type, moving constantly across state boundaries.

The bill to which the Attorney General had reference as being in the Judiciary Committee of the House at the time of this statement on April 16 was Senate bill 2253. This bill, if passed, the Attorney General said, would strike directly at Dillinger and others of his kind. The bill was passed by the House last week and as I believe reported in agreement to the Senate by the Senate conferees on Friday or Saturday of last week.

S. 2253 makes it unlawful for any person to flee from one State into another with intent to avoid prosecution for murder, kidnaping, burglary, robbery, assault with a dangerous weapon and certain other crimes of a felonious type, and provides a penalty of not more than $5,000 or imprisonment for not longer than 5 years or both, for violations. This bill is a direct attack and an easily enforcible attack on the criminal use of firearms because in a very large proportion of the cases in which the Department of Justice needs to be called in, the criminals move continuou  ly across State boundaries.

S. 2080 provides that anyone killing any United States marshal or deputy agent of the Department of Justice, Post Office inspector, Secret Service operative, officer, or enlisted man of the Coast Guard, or any employee of any United States penal or correctional institution, or who shall forcibly resist, intimidate, or interfere with any such employee of the United States while engaged in the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than 3 years. This bill is also a direct attack, and a proper Federal attack on the criminal use of firearms.

S. 2573 provides that any person who conveys or causes to be conveyed into any Federal penal or correctional institution or who aids or assists in such conveyance or who conspires with any other person or persons to so convey any firearm, weapon, or explosive into the prison shall be punished by imprisonment for a period of not more than 10 years. This is another direct attack at the criminal use of firearms which through the provisions concerning connivance will give the Federal officers wide powers of arrest and conviction.

S. 2841 provides that anyone who by force and violence or by putting in fear feloniously takes or attempts to take any property or money or any other thing of value which is in the custody, control, management or possession of any member bank of the Federal Reserve System, or any banking institution organized under the laws of the United States, shall be fined not more than $5,000 or imprisoned not more than 20 years and further provides that if a dangerous weapon is used he shall be fined from $1,000 to $10,000 or imprisoned 5 to 25 years. The act further provides that anyone

who has committed the offense as defined in the act and in avoiding
or attempting to avoid apprehension or in freeing himself or attempt-
ing to free himself of confinement for such offense, kills or kidnaps
any person, he shall be punished by imprisonment for not less
than 10 years, or by death if the verdict of the jury shall so direct.
This is certainly a direct, concrete, enforcible law, striking directly at
the criminal use of firearms in an extremely broad manner, because
practically all criminals depend on bank robberies of the type defined
in the act to maintain themselves in funds.  The penalties provided
are more severe than those provided in the proposed H.R. 9066 and
the act has the additional advantage of including all dangerous
weapons.

The National Rifle Association considers the above bills as sane,
reasonable and effective approaches to the problem of the use of
firearms by criminals.  When these bills are considered in conjunction
with S. 2249, prohibiting the interstate communication of extortion
messages, S. 2252, forbidding the interstate transportation of kid-
naped persons, S. 2460, concerning the extension of the Statute of
Limitations in certain cases, S. 2845, extending the provisions of the
national motor vehicle theft act to other stolen property, and H.R.
9476 empowering agents of the Justice Department to make arrests
without warrants for felonies, we believe that the major portion of
the criminal element, armed and otherwise, in this country, who may
be properly considered as coming within the jurisdiction of the Fed-
eral police, will be completely covered.

We feel that if H.R. 9066 is amended so as to be applicable in all
of its provisions to machine guns only and is further amended as
suggested by our association to bring within the Federal jurisdiction
the interstate transportation of firearms of any type by previously
convicted felons and to prohibit the interstate transportation and
pawning of stolen firearms of any type, no further Federal legislation
concerning firearms will be necessary.

We can pledge the whole-hearted support and cooperation of the
sportsmen in this country with the agents of the Government in the
apprehension and conviction of criminals under the laws above men-
tioned and under H.R. 9066 if amended as we request.  We do not
believe that the general inconvenience, the resentment in many cases,
against unnecessary Federal supervision which would be caused by
the registration requirement of H.R. 9066 will add anything worth
while to the Federal police jurisdiction insofar as the actual suppres-
sion of crime is concerned.

The Attorney General in a syndicated newspaper article under
date as late as April 29 indicated that H.R. 9066 was intended to
cover machine guns.  The Attorney General was quoted as saying
that the intention of the Department of Justice and the needs of the
Department were "expressed by a series of bills now before Congress,
with the endorsement of this Department.  The first in order may
not be so important in the long run as some of the others, but we need
it in order to meet an immediate emergency.  It is the one having
to do with machine guns."  The Attorney General described the
provisions of this bill to considerable length, mentioning the tax
provisions and the licensing provisions for manufacturers, dealers and
consumers.  He then briefly described the provisions of the other
bills which have already been placed before the Senate and the

58278—34——8

House.   But at no point did General Cummings refer to the ordinary pistol and revolvers.   It would appear from this nationally broadcast statement that the Attorney General himself did not consider the pistol and revolver provisions of this act as being of any great importance.

It may be of interest to the members of the committee to know that only a week ago, at the request of Mr. Hoover's bureau in the Department of Justice, our association furnished that Bureau with a list of men, all sportsmen and members of the National Rifle Association and all trained rifle and pistol shots, offering them as volunteers to work with Mr. Hoover's special agents, instructing them in the proper use of the pistols and revolvers issued them by the Department.   The local police could not in most cases train the agents of the Department who are charged with the duty of shooting it out with John Dillinger and others of his kind, because the police in most cases do not themselves know very much about marksmanship.   In this emergency, as in 1918, the Government of the United States has turned to the civilian shooters organized under the National Rifle Association to furnish instructors and teach marksmanship in the case of a National emergency.   I mention this as an indication of the value of arming and training our average reputable citizens instead of discouraging and restricting their armament and proper training.   I also mention it as additional proof, if the committee needs any additional proof of the earnest desire of our association to cooperate in every practicable way in the suppression of armed criminal activities in this country.

The amendments which we now propose to H.R. 9066 are accordingly to eliminate pistols and revolvers entirely from the bill, confining it to machine guns, sawed-off shot guns and mufflers or silencers and not otherwise changing the bill except to strike out section 10, the interstate transportation section, substituting therefor the following language:

SEC. 10 (a).  Whoever shall transport or cause to be transported in interstate or foreign commerce any firearm theretofore stolen or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been so stolen or taken or whoever not being a common carrier, shall so send or transport, or attempt to send or transport, or cause to be sent or transported any such firearm, under such circumstances as should put him upon inquiry whether the same had been so stolen or taken, without making reasonable inquiry in good faith to ascertain the fact, shall be punished by a fine of not more than $10,000 or by imprisonment of not more than 10 years or both.

Mr. COOPER. Mr. Chairman, if I may interrupt for just a moment; it is proposed to strike out section 10 (a)?

General RECKORD. Yes, sir.

Mr. COOPER. I understood you to say that that related to the interstate transportation of firearms.   It strikes me that section 10 (a) of the new draft relates to importation.

General RECKORD. I am speaking of the old draft.

Mr. COOPER. I understood you to refer to the new draft.

General RECKORD. I am referring to the old draft, H.R. 9066. The new draft as presented yesterday had no number.

Mr. COOPER. The new draft has a number, the same number as the old bill, H.R. 9066.

Mr. TREADWAY. The new draft, of course, has not yet been introduced, so it does not have a number.

NATIONAL FIREARMS ACT        **111**

Mr. Cooper. I am making no criticism, but I wanted to keep the record clear.

General Reckord. I want it to be clear, too. I was speaking of the printed bill.

Mr. Cooper. What you are suggesting there, then, is in relation to the interstate transportation and not to importation?

General Reckord. That is right.

Mr. Fuller. Your redraft touches the transportation of sawed-off shotguns, silencers, and machine guns——

General Reckord. Yes, sir.

Mr. Fuller. Only?

General Reckord. Yes, sir.

Mr. Fuller. Why do you insert the language "knowing the same to have been so stolen"? Why do you not make it altogether prohibitive?

General Reckord. We are willing to make it so broad that this section would refer to all firearms, all guns. We are perfectly willing, if a gun is stolen, that that be used against the man who steals it.

Mr. Fuller. You are covering the only section that seeks to reach the man who transports a machine gun, are you not?

General Reckord. No. My language, Mr. Congressman, says all firearms.

Mr. Fuller. All firearms?

General Reckord. Yes, sir.

Mr. Fuller. I think the operation of the law should be more severe on the man who carries the sawed-off shotgun or machine gun than on the man who carries merely a pistol.

General Reckord. We are willing to go as far as the committee wishes to go on that.

Mr. Fuller. If a man is carrying that type of weapon, if he is not an officer, he ought to be taken into custody anyway, because we know that he is carrying it for an unlawful purpose; I am referring to such a weapon as a sawed-off shotgun or machine gun, or a silencer.

General Reckord. We agree with that.

Mr. Fuller. We cannot compare those with a pistol.

General Reckord. Whatever the committee desires on that, we will be in accord with the judgment of the committee.

Mr. Fuller. You would have no objection to putting those in different categories?

General Reckord. No, sir. I think the language that I use here was prepared by the office of the Attorney General after we had had one of our conferences, and we accepted that language.

The Chairman. Have you completed your main statement, General Reckord?

General Reckord. Not quite.

The Chairman. May I say to the members of the committee that the witness has requested that he be allowed to complete his statement before being asked questions.

Mr. Fuller. I beg the gentleman's pardon. I was not here when he started.

General Reckord. In section 10 (b) we suggest a paragraph that would cover the pawning of stolen firearms. We suggest the following:

(b) Whoever shall receive, conceal, store, barter, sell, dispose of, or pledge or accept as security for a loan any firearm moving in or which is a part of interstate

or foreign commerce and which, while so moving or constituting such part, had been stolen or taken feloniously by fraud or with intent to steal or purloin, knowing the same to have been so stolen or taken; or whoever shall receive, conceal, store, barter, sell, dispose of, or pledge or accept as security for a loan, any such firearm, under such circumstances as should put him upon inquiry whether the same had been so stolen or taken, without reasonable inquiry in good faith to ascertain the fact, shall be punished by a fine of not more than $10,000 or by imprisonment of not more than 10 years or both.

(c) 1. It shall be unlawful for any person who has been convicted of a crime of violence in a court of competent jurisdiction of the United States or of any State, Territory, or the District of Columbia, or of any insular possession of the United States (including the Philippine Islands) to send, ship, carry, or deliver any firearm in interstate commerce.

(c) 2. Any such person found in possession of a firearm shall be presumed to have transported such firearm in interstate commerce contrary to the provisions hereof, unless such person has been a bona fide resident for a period of not less than 60 days of the State wherein he is found in possession of such firearm, or has in his possession a stamp-affixed order therefor indicating that it has been purchased in such State.

This language that we have suggested here is language that was prepared in the office of the Attorney General as substitute language, but later was not used.

Mr. VINSON. And that the Attorney General's office has stated that they have not submitted it to go into the bill.

General RECKORD. They did not submit it yesterday.

Mr. VINSON. In other words, referring to the memorandum that they submitted at the former hearing, after they thought about the constitutional rights of citizens and the laws of presumption, they could not find anything that squinted at such a presumption as was contained in that language, and so they were willing to leave it out.

General RECKORD. They did leave it out, Mr. Congressman.

Mr. VINSON. And you want to put it back in?

General RECKORD. We are suggesting that H.R. 9066 as printed——

Mr. VINSON. I am asking if you want that language, that presumption in regard to residence, in?

General RECKORD. I think this would be much better than the language of the bill as presented yesterday.

Mr. VINSON. Are you a lawyer?

General RECKORD. No, sir.

This language will, like the bills already passed, strike directly at the criminal without the round-about method of trying to get the criminal through the honest citizen.

I would like to say that during our initial conference with Mr. Keenan this amendment to section 10 was tentatively agreed upon, but subsequent developments, I believe, in the Treasury Department caused the Department of Justice to withdraw its tentative approval of the above language, substituting the requirement discussed yesterday that all citizens now owning pistols and revolvers be required to register them or to file an affidavit with the Commissioner of Internal Revenue before shipping or carrying the gun into another State.

I would also like to say that immediately following our hearing before this committee on April 18, we did confer with Mr. Keenan and reached what appeared to be a substantial accord in several directions concerning the registration and identification methods provided in the original draft of the bill. Subsequently, however, several changes were suggested, I believe, by the Treasury Depart-

NATIONAL FIREARMS ACT                    113

ment which required a rather extensive redrafting of the measure in the form as presented to the committee yesterday by Mr. Keenan. Mr. Smith, of Mr. Keenan's office, made a conscientious effort to keep us advised of these numerous changes and corrections, and we did our best to keep up with them.   But it was not until yesterday, when the revised draft was presented by Mr. Keenan, that we had a clear picture of the changes that were to be proposed.   I do not say this in any criticism of Mr. Smith or Mr. Keenan, but merely to indicate to the committee something of the difficulty which we have had in trying to keep abreast of what we were supposed to discuss at this committee hearing.   We do feel, however, that the recent action of the House in approving the Senate bills above referred to has so completely changed the picture and has so materially broadened the power of the Department of Justice to take jurisdiction over practically the entire armed criminal class in this country that attempts to reach a compromise on the pistol and revolver provisions of H.R. 9066 are no longer necessary.

We feel that if this bill is limited to machine guns and sawed off shotguns, except for the interstate transportation by criminals clause, the Congress will have done all that can be done to assist the States in the suppression of felonies.

In closing, I would like to say for the purposes of the record that Mr. Keenan yesterday stated that the Department of Justice was in receipt of numerous requests, notably from women's organizations, requesting antifirearms legislation.   At the same time, he seemed to feel that the receipt by Members of Congress of communications from members of men's organizations opposing this same type of legislation constituted propaganda.   We have endeavored to keep the members of our association advised as to the progress of the various bills proposed which would affect the use and carrying of firearms. We believe that this is both our privilege and our duty to our members. We do not consider that it is unethical nor that such action constitutes insidious propaganda.

We want the record to be perfectly clear on this point—that we feel it is quite as proper for members of men's organizations to honestly and openly oppose antifirearms legislation of this character as it is for women's organizations to propose such legislation.

In Judge Allen's statement he raised some question as to the value of a pistol or revolver in the hands of the private citizen in case of a hold-up.   The committee may be interested to know that in the city of Chicago in 1932, 63 hold-up men and burglars were killed by gunfire.   Of that number, 26, or approximately 40 percent, were killed by armed citizens.   In 1933, 71 thugs were killed in Chicago, of which number 33, or pretty nearly 50 percent, were killed by armed citizens.   These figures, of course, have no reference to gang killings, but to the killing of bandits during attempted hold-ups or burglaries.   In the past 3 years there have been reported to us, through the medium of newspaper clippings and personal letters, several hundred cases in which attempted burglaries and hold-ups have been frustrated by the fact that the citizen against whom the felony was attempted, or a passer-by, was armed.

We do not favor promiscuous gun-toting, but it is a fact which cannot be refuted that a pistol or revolver in the hands of a man or

woman who knows how to use it is one thing which makes the smallest man or the weakest woman the equal of the burliest thug.

That is the position of the association which I represent and that is the reason we are here opposing the proposal with respect to pistols and revolvers. We believe, if your committee will weigh carefully the bills that have already been passed—at least I understand that the conferees have agreed on them and they will shortly be signed—if you will take all those bills that I have enumerated, you will find that you have covered the hoodlum, the racketeer and the crook.

We think in every way that the Attorney General's office has stated that they wish to cover that particular element, you will find it covered by the language of those bills.

In addition, if you will add machine guns, we think you need and they need nothing more.

That is our position. I shall be glad, if I can, to answer any question with respect to the details of the bill.

Mr. HILL. I understand you have given the numbers of these bills in your statement?

General RECKORD. Yes, sir; I did.

The CHAIRMAN. You speak of a law to prevent criminals from fleeing after the crime, and that such legislation is pending before Congress, or has been reported in a bill out of the Senate. You say that has your approval. Is that correct?

General RECKORD. Yes, sir.

The CHAIRMAN. As I understand, one of the chief purposes of this bill as proposed by the Department of Justice is to prevent the commission of the crime; instead of dealing with a criminal fleeing from the scene of the crime, which you seem to accentuate, the Department is trying through the control of the use of firearms and the restriction of the use of firearms, to prevent the commission of the crime. There is a great difference between dealing with a man who has committed a crime and drafting a law to make more difficult the commission of the crime.

General RECKORD. I do not see how that would be reached by this proposal, Mr. Chairman. The Attorney General has never made a statement like that to me.

The CHAIRMAN. I may be in error, but——

General RECKORD. If I may refresh your mind——

The CHAIRMAN. It was my impression that——

General RECKORD. Only yesterday Mr. Keenan made the statement right here that this new proposal they knew would not get the crook. The crook would not obey the law, but the honest citizen would obey the law. Therefore they could come in—I probably did not use just the correct language there—but what I understood Mr. Keenan to say was this: That they realize that when you pass this bill the honest citizen would obey it and therefore when they caught the crook they would be able to take care of him under the provisions of this bill, because he had not complied with its requirements.

Now, we say, and I honestly believe, if you gentlemen will study the two principal bills among those which I named, you will find that they have the power now under the new legislation to do just what they are attempting to do here. We are in accord with that. We do not believe, Mr. Chairman and gentlemen, that there is any justification for discommoding hundreds of thousands—and there

NATIONAL FIREARMS ACT                    115

are that many—honest citizens and sportsmen who honestly possess and rightfully possess a pistol and a revolver.

Mr. VINSON. General, I do not understand that in those bills that were reported out of the Judiciary Committee, the anticrime bills, a felony is created when a law-abiding citizen has a revolver in his possession.

General RECKORD. No, sir; not in any of those.   We are in accord with those bills.

Mr. VINSON. You say that the same thing is done here?

General RECKORD. No, sir; not the same thing.

Mr. VINSON. That is, attempted to be done here?

General RECKORD. No, sir; I do not mean to say that.   I say the Department of Justice through those bills reaches the men that they say they are trying to reach under this bill.   Therefore, this bill is not necessary.

Mr. VINSON. So far as Federal legislation is concerned, this bill is probably the first ever presented making it a felony for a citizen to have in his possession a pistol.

General RECKORD. Yes, sir.   But you did not understand my point.

Mr. VINSON. I think I understood you.

General RECKORD. This bill, we believe, is unnecessary because of the fact that they already have under the new legislation all the law they will need in order to reach the crook.

Mr. FULLER. There is nothing in the new law about buying, carrying, or possessing machine guns and sawed-off shotguns?

General RECKORD. That is true.   But we are willing that you amend it.   We do not care how severe you make H.R. 9066—and it is a very severe bill now.   We do not care how severe you make it, if you will strike three words out of the bill.

Mr. COOPER. Why do you say that this bill is not necessary if you agree that that ought to be done?

General RECKORD. We say this bill is not necessary in its present language.   At the same moment we also say that we are glad to go along with them on machine guns, dangerous weapons, sawed-off shotguns, as far as they want to go, whether it is necessary or not.

Mr. FULLER. But eliminating pistols?

General RECKORD. Pistols and revolvers.

Now, if you want to amend the printed bill in the first section by striking out three words, "pistols and revolvers" we will go along with it, even though we do not believe it is necessary.

Mr. FULLER. Have you a copy of your suggested amendments to section 10?

General RECKORD. I may be able to find some copies.   I am sure they can be gotten for you.

Mr. TREADWAY. I understood you to say—and you now seem to be confirming it—that you support this bill, H.R. 9066, insofar as it applies to machine guns?

General RECKORD. Yes, sir.

Mr. TREADWAY. And you say that if we strike out three words, so far as you are concerned, the bill is satisfactory.   I assume that those three words are——

General RECKORD. Pistols and revolvers.

Mr. TREADWAY. Let us locate them. They are in line 4; "pistol, revolver, shotgun"—are those the three words? It seems to me you should strike out more than three words.

General RECKORD. No, sir; Mr. Treadway.

Mr. TREADWAY. Just what do you want to strike out?

General RECKORD. Just let me answer it in an intelligent way, Mr. Treadway. Following that you have the language "shotgun having a barrel less than 18 inches in length." We would leave that in the bill. That is a dangerous weapon.

Mr. TREADWAY. What is the third word in addition to "pistol" and "revolver?"

General RECKORD. We would take out the words "a pistol, revolver."

Mr. TREADWAY. Then you are not striking out three words.

General RECKORD. I said three words. I thought when I was referring to the bill that the language read "pistol and revolver."

Mr. TREADWAY. Then the language as you would have it would be that "For the purposes of this act the term 'firearm' means a shotgun having a barrel less than 18 inches in length or any other firearm capable of being concealed on the person, a muffler or silencer therefor, or a machine gun."

General RECKORD. Yes, sir; that is correct.

Mr. TREADWAY. So that the words to which you are really referring are, as I have said, "pistol" and "revolver"?

General RECKORD. That is correct.

Mr. VINSON. In that connection you could not leave in there "or any other firearm capable of being concealed on the person" because that would include pistol or revolver, if it is your intention to strike out pistol or revolver.

General RECKORD. I think that point is well taken. The language there would have to be changed.

Mr. TREADWAY. You have covered in general your objection to H.R. 9066?

General RECKORD. Yes, sir.

Mr. TREADWAY. And any suggested changes and amendments would, of course, be left to our drafting force anyway?

General RECKORD. Yes, sir.

Mr. TREADWAY. You would approve the general purposes of H.R. 9066, provided those two words were stricken out and whatever else might be necessary to harmonize the rest of the bill; is that correct?

General RECKORD. Yes, sir; that is correct.

Mr. TREADWAY. That being the case, and inasmuch as you say that the nine judiciary bills, so called, cover all of the requirements sought to be covered by this bill, except that touching machine guns, if those bills are not already law, why not insert "machine guns" in some one of those bills and not go to all the bother of trying to pass such a long bill as this, that has objectionable features to people other than yourselves?

General RECKORD. That would be very acceptable to us. We are not offering this bill. That would be, we think, a most satisfactory way of covering the situation.

Mr. TREADWAY. Have you not tried to conform with the views of the Department of Justice? You testified here some time ago, I

remember, as to efforts that had been made to harmonize the various conflicting interests here.

General RECKORD. Yes, sir, we have tried. We have found it rather difficult, though, and I do not mean that in a spirit of criticism at all. But we have found this, that whenever we go over to the Department of Justice—and we have always been ready and willing to go at any time—we find that Mr. Keenan who is handling this matter is very busy. And he is a busy man, we realize that.

Mr. TREADWAY. I do not doubt that at all, because they must all be very busy to keep up with this alphabetical procession that is under way.

General RECKORD. I agree with you, but——

Mr. TREADWAY. They cannot help but be busy.

General RECKORD. We have found him busy, and then we deal with Mr. Smith.

Mr. TREADWAY. Right at that point, Mr. Keenan has been here for 2 days. You say you cannot reach Mr. Keenan on account of his being so busy with other matters. He is right here now. Let me ask Mr. Keenan, Mr. Chairman, what there is in H.R. 9066 that his Department is asking Congress to pass, other than the reference to machine guns, that is not contained in the other bills that have been referred to.

Let me put it a little differently, and ask this question: Do you agree with the present witness that the nine judiciary bills, so-called, take care of the situation so far as the authority of your Department to reach gangsters the best you can by legislation, if included in those bills were a direct reference to machine guns?

Mr. KEENAN. We do not.

Mr. TREADWAY. Why?

Mr. KEENAN. Because we find in every case where we get a gangster he has not alone a machine gun, but he has the latest and finest developed pistols and revolvers with which they can kill as well as they can with a machine gun. It would be very helpful, of course—tremendously so—to get rid of machine guns. But we do not believe that the job can be done unless we make it expensive for the gangster to have the highly improved, dangerous weapon, either the pistol or the revolver.

Mr. TREADWAY. Mr. Keenan, as to the matter of expense, I do not think I can go along with you on your argument at all. The gangster is going to raid a bank and he might kill somebody trying to get to the money in the bank, but he is trying to get thousands and thousands of dollars. You could not make a pistol expensive enough so that he could not afford to get it. The matter of dollars and cents would not be important to him. If he is a high-grade gangster, such as seems to be operating around these days, he is not going to be deterred by the price of the pistol.

Mr. KEENAN. We do not want our position misstated in this record by any of the witnesses who appear before the committee. We admit frankly from our experience that we do not believe this or any other bill can deter at the present time the hardened criminal and the gangster from procuring any type of weapon, including machine guns. But we do believe that over a period of time—and we believe it will be a long hard row—we can start at the beginning and take an inven-

118                NATIONAL FIREARMS ACT

tory and find out who have these pistols, and in the meantime make it very expensive to be found in possession of a pistol.

For example, if I may tell this committee very briefly our experience in trying probably the worst mob in this country. They had at least one man with just as bad a record as Dillinger. That was Schaeffer of the Touhy mob which included Banghard and Kator, recently convicted in Chicago, in Cook County, and sentenced to 99 years in prison. They were found on the highway, four of them, in an automobile. They had rifles, they had rope, they had all of the kidnaping paraphernalia, the tape, all ready for the job. They had five or six automatics, but no machine guns.

At the time that we found them they had no machine guns with them, but undoubtedly in a cache some place they did have machine guns that they could get. But it was shocking to the people in that court room when those pistols were brought out and laid on the table and a bag of ammunition that was so heavy it would be difficult to carry in your arms, that there was no Federal law under which they could be prosecuted for transporting those pistols, those deadly weapons, this moving arsenal, literally.

I heard a great many people, including Federal Court judges and some of the prominent writers of the country who happened to be at that trial, express themselves that way.

There was no way they could be effectively prosecuted. It might be interesting to know that one of the men was not connected with this crime in Chicago, the Factor kidnaping, and the only thing they could do with him was to send him back to Wisconsin to be tried on a charge involving a maximum sentence of 1 year, because he was found in that State in the possession of some firearms.

Mr. TREADWAY. What I am trying to do is to help you parties to get together.

Mr. KEENAN. Since you have asked the question, I would like to make this statement for the record. I have listened patiently and earnestly to General Reckord, and I say most respectfully, so far as the Attorney General of the United States and his position in connection with this legislation is concerned, it is not necessary for Mr. Reckord by deduction or otherwise to interpret what the position of the Attorney General of the United States is in reference to this bill. It is already stated in the record before the committee. I am here as his representative, duly authorized by him to say that he considers this bill a very important part of the program of the Department of Justice to do its full part. Perhaps we are wrong, but this is the result of our study.

Mr. TREADWAY. Just one more question in connection with some matters that you brought up in illustration.

With these nine judiciary bills which have been referred to, will you then have covered the cases that you have cited as illustrating the need of this legislation?

Mr. KEENAN. Not one of them.

Mr. TREADWAY. You would not have covered them?

Mr. KEENAN. In not one of them, particularly the glaring instance that I speak of, in which the Touhy mob was concerned, who were found in the automobile. They were obviously bent upon crime, they were not hunting, they were not shooting.

Mr. TREADWAY. It seems to me we are getting somewhere now. That is contrary to the statement made by the present witness that the nine judiciary bills will cover what you want covered.

Mr. KEENAN. With all due respect to the witness, we think we are able to interpret our own position a little better than he is.

Mr. TREADWAY. I was just trying to see whether the conflicting elements could be harmonized.   Apparently they do not agree.

General RECKORD. No; we do not, Mr. Treadway.

Mr. VINSON. For the purpose of the record, there is nothing now to prevent the State of Illinois, where these men were found with these rifles and revolvers, from making it a penalty punishable with death to carry a revolver, is there?

Mr. KEENAN. I suppose that is within their police power; that is, there would be no restriction on a sovereignty to pass a law with respect to anything that affected the public welfare of that sovereignty.

Mr. VINSON. Even to the extent of inflicting the death penalty?

Mr. KEENAN. I do not think there would be anything unlawful there.   It is interesting to know, Mr. Vinson, that in reading the report of the Crime Commission, meetings of which were held in Washington—and of which General Allen was chairman; and some of the most distinguished men of the country attended—one of the first things that I remember reading was that at that time the State of Illinois through its legislature had refused to pass an act making it unlawful to possess machine guns without a permit.   Even though they have the power, they do not do those things always.

Mr. McCLINTIC. I would like to ask the witness a question.   If I understand your position correctly, you are interested in pistol clubs; and I take it you are interested in the subject of pistol marksmanship?

General RECKORD. That is correct; yes, sir.

Mr. McCLINTIC. If that is true, could there not be found some way whereby a duly organized pistol club could have exemptions to the extent that this legislation would not necessarily apply to them?

General RECKORD. Mr. McClintic, I shall be delighted to answer that question.   The fact is that in conference with Mr. Keenan's office we thought we had reached a conclusion, and although we did not want it, because we did not want members of our association to be exempted as such over and above any other honest citizen—we really did not want it—we agreed to accept it and we thought they were going to bring that down as one of the new provisions yesterday. We were surprised when it was not in there.

Mr. McCLINTIC. In other words, your organization does not desire to take the position that the rights of all the public should be subjugated in some such manner that you would have a special privilege that they would not have?

General RECKORD. That is correct.   That is our honest position. We do not want any privileges for the members of our association that are not given to all other honest citizens.   But yet when I told Mr. Keenan that, he got angry and said we were not willing to accept any responsibility.

Mr. McCLINTIC. If we were to place a provision in this bill which would allow duly recognized and properly organized pistol clubs to carry on those functions in which you are particularly interested, and

then exclude all others—thus making the law applicable only to those having these weapons with criminal intent——

Mr. VINSON. Will the gentleman yield there?

Mr. McCLINTIC. I yield.

Mr. VINSON. What status has a duly organized pistol club over that of a law abiding citizen?

Mr. McCLINTIC. The point I had in mind——

Mr. VINSON. In regard to possession of that which now it is legal to possess, such as a pistol or a revolver?

Mr. McCLINTIC. The point I had in mind is this.  It seems to me the public interest is so much greater, when it comes to protecting life, that some regulation ought to be put into effect concerning pistols and the carrying of pistols and the registration of pistols.

Mr. VINSON. If that were stricken from the bill, it would take care of what the General has in mind.

Mr. McCLINTIC. I do not think you can properly put into effect a law against crime unless you deal with pistols, because a thousand criminals will use pistols where one will use a machine gun.

Mr. VINSON. Mr. McClintic, listening to this argument in regard to making it a felony to have a pistol, my mind reverts back to felonies that were set up in Russia at the time when the Czar was the ruler of Russia.  I imagine that the Czar and his department of justice had the most splendid purpose in mind when they picked up a Russian citizen and tried that Russian citizen on some trivial offense and then transported him to Siberia when, as a matter of fact, what they were trying to get at was a conspiracy against the Czar.  They justified the punishment and that method of dealing it out by saying that the end justified the means.

Mr. McCLINTIC. I do not think that is comparable to the situation that exists in this country.

Mr. VINSON. I rather imagine that that describes the mental processes of the people over there when they sent their citizens to Siberia for the commission of a criminal offense of one kind when they could not get the evidence to convict them for the offense which they were really trying to reach.

Mr. McCLINTIC. It is my thought that inasmuch as the gentleman is interested in pistol organizations and the perfection of marksmanship, and so forth, it ought to be possible to agree upon some provision whereby those organizations would not be penalized by the proposed legislation.

General RECKORD. Mr. McClintic, answering your question, we are willing to accept some such provision, although it is our best judgment not to have it.  We did agree to do that in an effort to get together.  We did agree to accept that amendment.  Then the Attorney General, for some reason, did not include it in the bill.

Mr. McCLINTIC. This committee has the jurisdiction and we can work out something of that kind to deal with the subject of pistols in that way.

General RECKORD. Please have it in the record that we are not asking any such privilege for the members of our association.

Mr. McCLINTIC. But I think your association ought to have some kind of privilege in regard to the use of pistols for purposes of marksmanship.  But I do not think the word "pistol" should be eliminated from this proposed legislation.

NATIONAL FIREARMS ACT  **121**

Mr. Cooper. Let us see if we can get to something tangible as to where you stand on this matter. A considerable part of your statement has been more or less general in nature. I have no criticism nor have I disposition to discredit you at all. Let us see if we can get down to something that we can take hold of in dealing with this subject. What is your understanding as to the provisions of this new bill with reference to owners of pistols and revolvers?

General Reckord. We think it is very bad in that respect.

Mr. Cooper. I did not ask for your opinion about the bill. I asked for you to please tell me what your conception of the application of this bill was to pistols and revolvers.

General Reckord. My conception? I hardly know how to answer you.

Mr. Cooper. What do you understand the bill does, in so far as a man owning a pistol or revolver is concerned?

General Reckord. It makes the man do things that any honest citizen is not going to be able to do. One of the provisions provides that if a pistol is sold a dozen times, every time it is sold—and I am speaking of the new draft—a bill of sale, a stamped bill of sale must go along with it, and the last man who buys it, every time you find him with the pistol on him, he has to have nine bills of sale in his pocket. It is a silly provision.

Mr. Cooper. Does not the bill provide that the owner of a revolver or pistol shall register it?

General Reckord. Yes, sir.

Mr. Cooper. If he does that, isn't that all he has to do?

General Reckord. The owner of a revolver prior to the enactment of this law, within 4 months thereafter must register.

Mr. Cooper. That is what I am talking about.

General Reckord. When he sells that pistol, then he comes within the other provisions of the act. He could not give it away. Under this bill, if I lived next door to a good friend of mine, and I had unexpectedly a large amount of money in my house and no revolver, I could not walk next door and borrow his pistol for the night. If I did I would be subject to a fine of $2,000 or imprisonment for 5 years or both. We say that is too severe and we should not hamstring honest citizens that way.

Mr. Cooper. What other criticisms do you have?

General Reckord. We severely criticize the registration provision. If you will permit, I will refer to the first hearing on H.R. 9066, which, I think, was in executive session and the Attorney General was before you himself, and Mr. McClintic asked this question.

I would like to ask just one question. I am very much interested in this subject and what in your opinion, would be the constitutionality of a provision added to this bill which would require registration on the part of those who now own the class or type of weapons that are included in this bill?

Mr. Cummings. We were afraid of that, sir.
Mr. McClintic. Afraid it would conflict with State laws?
Mr. Cummings. I am afraid it would be unconstitutional.

Mr. Keenan. What page is that?

General Reckord. That is page 13, the top of the page. I am not a lawyer, but there is the Attorney General speaking.

Mr. VINSON. It seems to me that when they failed to put a penalty in this substitute bill for the failure to register, that is another way of making it harder to test the constitutionality of it.

General RECKORD. There is no question about it.

Mr. VINSON. Then, not having the penalty, and not being able to test the constitutionality, they get a presumption under paragraph (b) of section 5 in the substitute bill, as I recall it, in regard to the time when the man became possessed of it.

Mr. HILL. I asked yesterday how you would enforce the requirement for registration with no penalty. What would happen to an owner of a pistol or revolver for failure to register under the provisions of this act?

General RECKORD. This would happen, as I read the bill; if I am incorrect I want to be corrected. As I read the bill, if a man failed to register; assume he lived in Baltimore and he was hurriedly called to Washington and wanted to bring a pistol with him which he had not registered. He could not bring that pistol into Washington on a trip, no matter how much he needed it.

Mr. VINSON. Unless he violated the law.

General RECKORD. Unless he violated the law and became amenable to the fine and imprisonment.

Mr. HILL. So long as he did not cross the State line he would not violate the law.

General RECKORD. That is a smooth way they are trying to get that in in connection with transportation; they are trying to get that in which the Attorney General himself said he believed was unconstitutional. They put that in; they say within 4 months you must register, but there is no penalty if you fail to register, and they then go on, if you cross the State border and have not registered, then you may register within 48 hours prior to crossing the State border. Suppose you do not have time; 48 hours is 2 days; suppose you have to cross in a hurry, then you are a lawbreaker. I am just as sincere about this as I can be.

Mr. HILL. So long as you do not go out of the State, you will not be violating any law by not registering.

General RECKORD. That is true. You will violate a provision which they say is unconstitutional. If you sell the pistol, then you must come within the purview of the other section.

Mr. HILL. Of the taxing section?

General RECKORD. Yes. This bill is a subterfuge. They are trying to get crooks in a round-about way. They started out by building the bill on the Narcotic Act. No honest citizen should have narcotics. Basically, a pistol or revolver is not dangerous; it is only dangerous in the hands of the crook; it is not dangerous in the hands of the honest citizen.

Mr. DICKINSON. You say that the Attorney General concluded that that provision was unconstitutional. Did he not say he feared it was unconstitutional, and has not the Department of Justice now concluded that it is not unconstitutional?

General RECKORD. I have not heard them say that, but this is the language.

Mr. KEENAN. The Attorney General said, "I am afraid it would be unconstitutional."

NATIONAL FIREARMS ACT                    **123**

Mr. Dickinson. He did not say positively that it was unconstitutional.   Having included it in the substitute bill, has not the Department of Justice concluded that it is not in violation of the Constitution?

General Reckord. I cannot answer for them; they are here.

Mr. Dickinson. I was calling attention to the fact that the Attorney General did not state that it was unconstitutional, but that he feared it was unconstitutional.   Upon further investigation, and having included it in this bill, would not you say that they have reached the conclusion that it is not unconstitutional?

General Reckord. No, sir.

Mr. Hill. The real effect of this registration requirement is to make it unlawful, without registration, to transport a pistol or revolver or other firearm across State lines?

General Reckord. I think the real reason is to attempt to get the registration.   As I understand it, they would like to have every firearm in the United States registered.

Mr. Hill. Of course, if you registered voluntarily, that would be fine from the standpoint of the Department of Justice.   If you do not do it, there is no way they can force you to do it.

General Reckord. No, sir.

Mr. Hill. If you fail to register and then transport the firearm across the State line, you are violating the law.

General Reckord. Yes; you are violating the law.   I will tell you, gentlemen, if you pass this legislation, I will come back in 5 years and I know you will agree with me that it is going to be another Volstead Act.   The honest citizens are not going to be bothered with such restrictions.   They won't obey the law and you are going to legislate 15 million sportsmen into criminals; you are going to make criminals of them with the stroke of the President's pen.

Mr. Hill. It is not a very onerous operation to register a pistol.

General Reckord. You must remember that when they started out with this bill, it was a much worse bill than it is now, and they have whittled it away and whittled it away because of the objections, and if we have time enough, not in this session, but if we have time enough and carry the bill over until next January, and if they will allow us to work honestly and earnestly to reach a conclusion, we will do it.

Mr. Hill. It is a difference of opinion as to whether that might not emasculate the bill, so far as its utility is concerned.

General Reckord. Yes, but the committee has that responsibility; that is for the committee.

The Chairman. It is no great hardship for any honest citizen to register a pistol if he needs it for a legitimate purpose.   And, so far as I can see, that is the only weapon.   He does not want to trade it; he does not want it as a matter of barter and sale; he wants it as a matter of protection.   If he is a sportsman, he wants it for whatever use he may have for it along that line.   In view of the present very serious condition with regard to the criminal situation, the racketeers, bank robbers, kidnapers, and so forth, isn't it incumbent upon the law-abiding citizens for them to be willing to surrender some minor privilege, something that does not impose any considerable hardship upon them, for the general good?   I cannot understand, if the Department of Justice thinks it is necessary for the protection of society to put a

Compendium_Spitzer
Page 695

**124**                NATIONAL FIREARMS ACT

limitation upon the ownership of a weapon such as is proposed here, why I should stand up and say that that is too much trouble, notwithstanding it is an attempt to protect someone's life, notwithstanding it may protect someone from being kidnaped, and notwithstanding it may prevent some bank robberies.   Yet it is argued that on the great broad principle of personal liberty, I am not going to register the pistol.   I think you misconceive the spirit of cooperation of the American people.   If this is the answer, and I do not know whether it will answer the purpose or not, but I cannot believe that the law-abiding citizens and the true sportsmen would hesitate going to that inconvenience if it would accomplish the desired results.   I think that point has been much overdrawn.

General RECKORD. That was never presented until yesterday; the registration of the pistol now in existence was never presented until yesterday.   Along with it is this provision that every time a pistol is sold a bill of sale must go along; no matter how many times it is sold, all of those bills of sale must accompany it.

Mr. LEWIS. Would not that be true of an automobile?

General RECKORD. No, sir; the last one is all they carry.   The last is all they need to carry here.   Then they come along with fingerprinting.

The CHAIRMAN. If that requirement were eliminated, would you object to the bill?

General RECKORD. That would help.

The CHAIRMAN. I understand you object to anything relating to pistols?

General RECKORD. The bill is bad, in our judgment.   We do not believe it will help to get the criminal.

Mr. SHALLENBERGER. As I recall your statement, you do not object to its including machine guns and sawed-off shotguns?

General RECKORD. Yes, we will go along on machine guns and sawed-off shotguns.

Mr. SHALLENBERGER. I want to know why you object to including automatic pistols.   After all, this little machine gun is only an improvement on the automatic pistol; it shoots more times, but it has the same ability and kills in the same way.   I ran a bank for 20 years, and I would as soon be shot by a machine gun as an automatic pistol.   If you abolish the machine gun and leave the gangster to get the automatic pistol and give him two, he is just as dangerous as if he had the automatic machine gun, which is more or less of an intimidating weapon.   I cannot understand why you object to the automatic pistol.

General RECKORD. We believe that it is covered by one or two other bills already passed.

Mr. SHALLENBERGER. The Department of Justice would like to have every firearm in the United States registered.

General RECKORD. Yes.

Mr. SHALLENBERGER. Isn't this the way toward which we are working in many cases?   Nobody can fish in my State without getting a license.   No one can hunt, even with a shotgun or a rifle, unless he has it registered.   I have observed that when we begin this idea of getting control of certain things by registration that those who are affected by it at first object.   The fisherman did and the hunters did, when we began to require licenses of them.   I ask if

you do not think it would be really a fine thing for every firearm which could be used to take human life and in committing robberies and other crimes, to be registered so we would know where they are in the United States?

General RECKORD. I do not think it would do a bit of good. The reason you have not had objection with respect to fishing licenses is because that money is taken and used to raise fish which are thrown into the streams about that long [indicating] so that fishermen get something for their money.

Mr. SHALLENBERGER. It is to prevent the violation of certain rules of law and this is for the same purpose. I just wanted to ask you that question to satisfy myself. In my judgment, it would be the best thing that could happen, so far as the regulation of firearms, and their use by criminals, to have the ownership and the location of those firearms found out. I will say this: The Government of the United States, when we had control in the Philippine Islands, introduced a policy of trying to promote order there, and we had the Philippine Constabulary for that purpose. The captain of one of those organizations was from my home town and he told me that the best regulation which they had, in order to stop sniping and the shooting of Americans by the Insurectos and those who were engaged in that business, which is something like our present day robbers and bandits, when they installed—I do not presume they passed any law—but by declaration or edict they installed the practice of requiring every person with an implement of death to have it recorded, so they knew where those things were.

General RECKORD. I am in accord with that.

Mr. SHALLENBERGER. That was a very essential thing in controlling the killing of Americans in the Philippines. That is the purpose, as I view it, of this act. Its purpose is to find out, as soon as we can, where these implements of death are located. As the Chairman has said, it seems to me that the good American citizen will be willing to go through the formality of having his gun recorded, and that he will not object to doing so. In connection with this idea of recording the registration of transfers, you can go through many lines of business where it was not required before, so this principle which it is now proposed to incorporate in this bill is along the line of a good many other requirements in connection with the business of this country. A record is required of every transfer made of anything which it is essential to have recorded.

General RECKORD. I do not think you will find anything as severe as this.

Mr. SHALLENBERGER. This makes it a crime not to record a transfer; it is a little different.

Mr. VINSON. Governor Shallenberger refers to the fact that we have fishing licenses. That is under a State law. We have no Federal law requiring licenses to be taken out to permit a person to fish. We have comparable laws in regard to the regulation of weapons in various States, penal statutes concerning weapons, but we have, as yet, no Federal law with reference to a pistol or a revolver. Now, I think the question answers itself. Is there a man on this committee, however fine it might be, who would support a bill that would make it a crime to fish without a Federal license? It is the Federal control feature.

58278—34——9

Mr. HILL. How about the duck stamp law?

Mr. VINSON. What is the duck stamp law?

Mr. SHALLENBERGER. We have some analogous Federal laws.

Mr. VINSON. I remember, in the 10 years that the migratory bird legislation has come before the Congress of the United States, every effort made to place a tax or to require the folks who live out in the districts, and who happen to vote—and that is something quite important—to pay a tax or to secure a license in order to kill migratory birds that are under the control and supervision and subject to regulation by Congress, those efforts have died ignominous deaths.   There is no law on the books requiring a Federal permit before you can hunt.

Mr. McCLINTIC. The gentleman has laid great stress upon the necessity for registering a pistol every time it is sold.   I have lived in a section of the country where a pistol was a part of every man's equipment, for a great many years, and I venture to assert that I never heard of 5 pistols, in 30 years, ever being sold.   Does the gentleman have in mind any instances where individuals sold pistols to others?

General RECKORD. Answering the Congressman's question, my association publishes a magazine, and I venture to say that there are three pages of advertisements, little squibs, about rifles and pistols in that magazine every month, where one man wants to sell and another wants to buy.

Mr. McCLINTIC. There might be a few instances where they would want to sell rifles, but the different individuals do not sell pistols.

General RECKORD. Out in your country a man would buy a pistol and keep it all his life.

Mr. McCLINTIC. That is a mountain made out of a mole hill.

General RECKORD. Let me point out this: When the Attorney General came here with the bill in the first place, it provided that every time a man in your country wanted to buy a pistol, he had to throw his leg over his horse and go a hundred miles or so to the office of the collector of internal revenue to get a stamp; ride a hundred miles to get a dollar stamp to put on that pistol.

Mr. McCLINTIC. You mean that was in the original draft?

General RECKORD. I say to you, that if it had not been for our opposition to the ridiculous features of this bill—I won't say ridiculous—I will correct that—if it were not for opposition to the very severe features of this bill, as applied to the honest citizen, these changes would not have been made.

Mr. COOPER. I do not know that that statement is justified.

General RECKORD. That they would not have been made?

Mr. COOPER. You realize that the members of the committee were all present, and we may have done some of the things which you have pointed out as being objectionable.

General RECKORD. I agree.

Mr. McCLINTIC. If your pistol organizations, which are organized for the purpose of promoting marksmanship, are excluded, you do not have a leg to stand on.   There is nothing to the argument about selling pistols.

Mr. DICKINSON. Would there not be rules and regulations adopted by which a deputy could be named so the citizens desiring to register their weapons would not have to go anywhere, except possibly to the courthouse?

General RECKORD. Those amendments have been made.   They
were not in the original.

Mr. LEWIS. This question is addressed generally to those helping
the committee.   Does anyone know the statistics of homicides in
the United States and other countries?   I have a vague recollection
of figures like 20,000, which were due probably not only to acts
of the gangsters, but to acts of people who have pistols in their
pockets and who use them when they are drunk and so on, and those
homicides would not have resulted if some kind of restraint had been
applied in connection with the possession of pistols, such as the
restraint which is applied in the most disciplinary way to the driver
of the automobile.

Mr. KEENAN. I have a memorandum which was submitted to the
clerk.   We got the statistics gathered from the latest sources avail-
able and I think the clerk has a memorandum of them.   The memo-
randum was handed in.

General RECKORD. I will be glad to answer such other questions
as the committee may desire to ask.   I would like for Mr. Imlay
to be heard.   If he can be heard now, I will appreciate it.

Mr. TREADWAY. General Allen is here and he has not completed
his statement.

Mr. COOPER. When we adjourned yesterday, we promised General
Allen 5 minutes more.

General RECKORD. I do not want to take that from him.

The CHAIRMAN. We will let him conclude his statement.   We
thank you for your appearance and the testimony you have given
the committee.

General RECKORD. Before the general makes his statement, may
I say that in his testimony of yesterday, I think he made a mistake
in connection with one matter as to fingerprinting in Massachusetts.
I wired for information and I have a telegram reading as follows:
"Present Massachusetts law does not require fingerprints for pur-
chase of revolvers or pistols."   I thought he would probably want to
correct the record to that extent.

## STATEMENT OF J. WESTON ALLEN (Continued)

Mr. ALLEN. Mr. Chairman and gentlemen of the committee, the
discussion which has just intervened with respect to registration hits
at one of the fundamentals in this bill, which makes it serviceable
in reaching the gangster.   It has been said that I was chairman of
the conference here in Washington where this matter was covered.
At that time, Mr. Newton D. Baker was chairman.   He was chair-
man at the time of drafting this bill.   I would like to have your
committee know the membership of the executive committee of the
National Crime Commission, which was composed of Hon. Newton
D. Baker, Richard Washburn Child, F. Trubee Davidson, E. A.
Alderman, of the University of Virginia; Mrs. Richard Derby, a
daughter of the late former President Roosevelt; Gen. James A. Breen,
Hugh Franey, representing labor; Herbert S. Hadley, Charles E.
Hughes, Samuel Lewisohn, Frank O. Lowden, Samuel McRoberts,
and the assistant to the chairman was Colonel Howe, who is secre-
tary to the President.   Colonel Howe was assistant to the chairman
from the time it was organized until recently, when his duties made

128                    NATIONAL FIREARMS ACT

it necessary for him to give up that work.   It was with Colonel
Howe that we organized this committee which drafted the law that
I referred to yesterday.
    The nub of the whole situation with respect to registration has
been met by what has been said by the chairman and by you, Gov-
ernor, and by Mr. Hill, at the previous hearing, when Mr. Frederick
was on the stand.   I want to read a question that was asked by Mr.
Hill of Mr. Frederick.   Mr. Hill said:

> You expressed the opinion that perhaps any legislation would not be effective
> to keep firearms out of the hands of the criminal element.
>     Mr. FREDERICK. I am quite sure we cannot do that.
>     Mr. HILL. Assuming that is correct, and I am sure a great many might agree
> with you, if the firearms are found in the possession of the criminal element, and
> they cannot, under the provisions of this act, or of some similar legislation,
> show that they are in lawful possession of those firearms, would that not be a
> weapon in the hands of the Department of Justice in enabling them to hold those
> criminals until further investigation might be made of the crime?
>     Mr. FREDERICK. I think so, and I made this suggestion to Mr. Keenan two
> and a half months ago, that whenever a weapon, a firearm of any kind, and I
> would not limit it to pistols—I would say rifles or shotguns—is found in the hands
> of any person who has been convicted of a crime of violence, because there are
> many crimes which have nothing to do with the use of firearms, and that is why
> I make the distinction; and I think he suggested that we add to that that any person
> who is a fugitive from justice—that mere possession of such a weapon should be
> prima facie evidence of its transportation in interstate commerce, and that
> transportation in interstate commerce of weapons by those people be made a
> crime.

    Mr. VINSON. Have you any such limit as that in either the original
bill or the substitute?
    Mr. ALLEN. The bill before you now?
    Mr. VINSON. Yes, either in the original bill or the substitute; is
that thought in either one of the bills?
    Mr. ALLEN. That it must be a person who has been convicted?
    Mr. VINSON. Yes.
    Mr. ALLEN. No, sir.   I am coming to that point.   Gentlemen,
this is just the trouble, when you limit it to a person who has been
convicted of a crime, because a very large number of these gunmen
in my State, and in every State, have not got a record at the present
time.   As Mr. Treadway is well aware, we have a murder trial going
on now, of the Millens, who committed a brutal bank robbery and
theater robbery in Massachusetts.   Where were those men taken?
In New York, and they were armed, and they had no criminal record,
and they did not have machine guns on their persons.   They were
armed with these automatics.
    Mr. TREADWAY. Would it not be well to add that there were two
dress suitcases filled with arms and ammunition, which were found at
the Union Station in Washington?
    Mr. ALLEN. Yes; after they were taken, there was a regular arsenal
of firearms found in the Union Station in Washington.   Not one of
them had a criminal record.
    Mr. VINSON. Are they on trial now?
    Mr. ALLEN. Yes.
    Mr. VINSON. For what?
    Mr. ALLEN. For murder.
    Mr. VINSON. What is the penalty for murder in Massachusetts?
    Mr. ALLEN. We give the death penalty.

Mr. VINSON. That is quite a severe penalty, and if they are guilty of that crime, society will not be menaced with them any longer. This law would not affect their condition any.

Mr. KEENAN. Suppose they are acquitted?

Mr. ALLEN. We were fortunate in getting confessions from them. It is admitted that that whole series of robberies was so cleverly brought about that without their admissions, it would be a very difficult thing to convict them.   What we want to get, when we find a firearm in the hands of a man who is a gunman or criminal, we do not want to wait until he has been convicted before you can reach him for carrying these weapons.

The CHAIRMAN. Right there, you would have something to hold him on, until you made a further investigation, if you found him with firearms, contrary to law?

Mr. ALLEN. Yes, sir; but if we can have the right to register guns, so that a man who has unregistered guns is thereby guilty of a felony, you are going to put, in my opinion, more gunmen and gansters in jail than by anything that this committee can do.   I have read the other bills by the Department of Justice, and I agree with the Attorney General, in his opinion, that this situation is not met by the other bills.

Many letters have been received by Congressman; they have spoken to me since I came to Washington.   Many letters have been received from men who have written as sportsmen, and articles have appeared in the newspapers with respect to hunting being imperiled just because Dillinger bags a few sheriffs.   I want to call the attention of the committee to the fact that letters were sent out by the National Rifle Association of America, in which it was stated that the officers in Washington will do all they can, but that—

A personal letter or telegram of yourself and every sportsman in America objecting to the bill is necessary if we are to wage a successful fight.   With your help we killed the Copeland bill, but the committee thinks this one, H.R. 9066 is going to be harder to kill.

Then, in another résumé of this bill, it was said that all of the restrictions which are proposed in House bill 9066, aimed at the pistol and revolver are almost worthless, as far as providing any real Federal control of firearms is concerned, that all guns, shotguns, and rifles, as well as pistols and revolvers, must be included in the Federal statute if it is to serve any useful purpose.   "If not included, House bill 9066 is not worth the paper it is printed on, as a crime preventive measure.   If they are included, the honest sportsmen in this country will rise up in arms as they did over the Copeland bill."   It is also said that the bill is undoubtedly presented in its present form, because there are fewer owners of pistols and revolvers than there are of shotguns and it is hoped in that way to get the law passed, and that once on the books the Attorney General can go to the next Congress and say that the firearms bill needs a slight amendment so it can be made to include any firearm and that—

Few Congressmen will have time to notice it and within a year after the passage of House bill 9066 every rifle and shotgun owner in the country will find himself paying a special tax and having himself fingerprinted and photographed for the Federal rogues gallery every time he buys or sells a gun of any description.

Mr. HILL. Who is that from?

130                    NATIONAL FIREARMS ACT

Mr. ALLEN. The author of the letter is here, and it was signed by the National Rifle Association of America, home office Barr Building, Washington, D.C.

Mr. COOPER. Who signed the letter?

Mr. ALLEN. It is signed "Fraternally, National Rifle Association, C. B. Lister, Secretary-Treasurer."

Gentlemen, for 15 years I have followed, on behalf of the National Crime Commission, the legislation in which we sought to obtain reasonable regulation of firearms, and I wish to say to this committee that in all that 15 years I have never known the American Bar Association, the Commission on Uniform Laws, the National Crime Commission, or the Attorney General's Office to ever suggest that they were going to do just what it is said here the Attorney General will slip over, and that is, reach rifles and shotguns. It is not necessary; the rifle and shotgun are not concealed weapons. I can say that I believe that the good faith of the Attorney General's Office is involved when it is said that this merely a stepping stone to interfere with the sportsman's honest and proper use of shotguns and firearms.

The press release was sent out by the National Rifle Association which caused news articles to be published over the country, under date of April 30. That press release was sent out by the National Rifle Association and it said, among other things:

But the Attorney General   *   *   *   has had introduced a bill which   *   *   * proposes to give almost dictatorial control to an official of the Government in Washington whose training has nothing whatever to do with this phase of governmental activity.

Gentlemen, as a matter of fact, power to enforce this act is given to the Secretary of the Treasury and his under-official, the Commissioner of Internal Revenue.

Mr. HILL. Are you reading from the release?

Mr. ALLEN. This is my statement. Their statement was that it was giving dictatorial control to an official of the Government whose training has nothing whatever to do with this phase of governmental activity. I am saying to the committee that the Treasury Department is more capable and better experienced in carrying out the provisions of this act than is any other department of the Government. All internal revenue laws are enforced by revenue agents of the Treasury Department. All customs laws are enforced by officials of the Treasury Department. The regulation of narcotic drugs is in this Department, and so is the Secret Service. The means and methods of registration of dealers and individuals in connection with occupational taxes and sales taxes is properly and peculiarly within the knowledge of this Department of the Government.

The next statement in this press release is:

Under the provisions of the Sumners bill, present owners of the types of guns to which the bill applies would have to obtain the permission of the revenue collector to ship or sell a gun and register their fingerprints and photographs and pay a tax.

This is a plain misstatement. Permission of the revenue collectors is not necessary either to ship, sell, or buy a firearm. If a gun upon which the transfer tax has not been paid is shipped in interstate commerce, it would be necessary to obtain a permit from any of the persons designated by the Commissioner of Internal Revenue to issue permits, but such permit must be granted to everyone if the proposed

transportation is lawful.  Moreover, persons who sell or otherwise dispose of a gun are not required to register their fingerprints and photographs.

Mr. VINSON. You say that under H.R. 9066, you would not be required to make an application to the Commissioner of Internal Revenue before you could sell, assign, transfer, give away or otherwise dispose of a firearm, except on application form issued in blank for that purpose by the Commissioner of Internal Revenue, and in such application it would be necessary for you to be identified by name, address, fingerprints, photograph, and such other means of identification as may be prescribed.

Mr. ALLEN. You make application to the Commissioner of Internal Revenue.

Mr. VINSON. I understood you to say that the statement in the press release was inaccurate in regard to the photograph and fingerprinting.  I am reading from the bill, which in section 4, page 4, which requires you to make this application and to be identified by fingerprints and photographs, so certainly the gentleman is in error when he says that statement in the press release was inaccurate.

Mr. ALLEN. The statement said that permission must be obtained.

Mr. VINSON. That is what this says; it says it cannot be done—

except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank for that purpose by the Commissioner of Internal Revenue.

Mr. ALLEN. The permission runs to the Commissioner.  That is true of most of the regulations, where you make application; you do not make application to the local man.

Then the press release said, "Under the bill, there is no right of appeal from the decision of the Commissioner of Internal Revenue should the permit be refused."  Those of us who are lawyers know that there is, of course, a right of appeal from the decision of the Commissioner in this case, just as there is in any other case where the Commissioner is delegated with a discretionary power.

Then the release said, "A citizen owning a gun before the act went into effect would be subject to arrest, his gun would be confiscated, and he would have to accept the notoriety, pay the costs of legal counsel, and lose the time from his business to prove to the satisfaction of a jury in Federal Court that he had not obtained the gun illegally."

The only instance where a citizen owning a gun before the act went into effect would be subject to arrest, and so forth, would be under the interstate transportation provision if he should be arrested for having transported the weapon in interstate commerce and if it should be proved that he had not been a resident of the State for 60 days.  Moreover, this presumption would not apply if he had lawfully purchased the gun after the act went into effect.  Even this provision concerning interstate transportation without a permit has been removed from the bill.  Then it says:

Mr. Lister points to the rank injustice the Sumners bill would impose upon farmers, ranchers, and homesteaders not living within a reasonable distance of an internal revenue bureau office.  The bill provides that all purchasers of the firearms mentioned in the act be required to get an order from internal-revenue agents allowing a purchase to be made.

Compendium_Spitzer
Page 703

132                    NATIONAL FIREARMS ACT

The act merely provides that before a gun can be purchased a form must be filled out and presented to the person who sells the weapon. These forms, as well as the revenue stamps, will be available at any post office or at any internal-revenue office, and quantities may be obtained by any shooting association or sporting-goods dealer by merely making the request.

It further says, "Fingerprinting, photographing, and the expense of a revenue-tax stamp are included in the provisions of the bill."

Although a revenue-tax stamp is required, this press release fails to state that the present tax on the sale of firearms is repealed.

Mr. LEWIS. I have here the figures with respect to homicides in the United States as compared with other countries. For the year 1928 there were 10,050 homicides in the United States; in France, 520; in Germany, with half of our population, 1,264; in Great Britain, with one third of our population, 284; in Italy, with about one third of our population, 988. The method of treatment in Great Britain of this small-arms subject is of interest to me and may be to others who read the record. In England every person, with certain exceptions, must have a firearms certificate to purchase, possess, use, or carry a firearm or ammunition. The term "firearms", includes any lethal firearm, or other weapon of any description from which any shot, bullet, or other missile can be discharged, or any part thereof. It does not include antiques or firearms possessed as trophies of any war, although no ammunition may be purchased therefor. Ammunition is defined to be ammunition for such firearms, and it also includes grenades, bombs, and similar missiles; the firearm certificate is granted by the chief of police in the district in which the applicant resides, if the police officer is satisfied that the applicant has good reason for acquiring the certificate, and that he can be permitted to have the firearm without danger to the public safety, and upon payment of a prescribed fee, which is 5 pounds for the first period of 3 years, and it is renewable every 3 years for 2 pounds 6 shillings. There is much more to the statute, but that is sufficient to set up the comparison I have in view as to homicides in our country and in other countries and as to the character of legislation Great Britain has found it desirable to enact in an endeavor to control this homicide tendency.

Mr. ALLEN. In that connection, there are two things that will very greatly reduce the enormous number of homicides in this country. I believe one of them is the registration of firearms. In England, as you see, the provisions are very severe, compared with what the Attorney General is suggesting in this bill. In England, it is nearly $25 for the first 3 years. The other matter is a matter for the States. When you can get a provision that requires 48 hours or any greater time between the time when the person purchases the gun and the time when it is delivered, and that is the law in numerous States now, you thereby prevent a very large number of suicides, voluntary homicides, because in many, many suicides, where people go and buy a gun, if there is a delay of 48 hours before delivery, the insurance companies say that it will greatly lessen the number of suicides.

The CHAIRMAN. We thank you, General, for your appearance and the testimony you have given the committee. General Keenan, how much more time would you require?

Mr. KEENAN. I will not require very much more time.

The CHAIRMAN. We will have another session tomorrow, if that is agreeable.

General RECKORD. In view of the reading into the minutes of certain data which came from our office by General Allen, may I be permitted to extend my remarks by reading into the minutes certain other data?

The CHAIRMAN. Without objection, you may do so. The Chair desires to state that we will have another session tomorrow, and it is our purpose to close the hearings tomorrow.

General RECKORD. We shall not need over an hour, unless the committee takes up our time in asking questions.

Mr. KEENAN. I have a brief statement I would like to make at this time, and that is, we have no desire to enter into a controversial subject. Each and every provision that has been submitted to this committee has received study from the Department of Justice and the approval of the Attorney General. In appearing before this committee, at the very beginning, the Attorney General stated that we were, to some extent, feeling our way about in attempting to grapple with a tremendously important problem. We had suggestions from one of the members of this committee with reference to the advisability, if practical, of a registration feature. It was following his suggestion that we had a conference with the other branches of the Government. I would not have the committee under the impression that the Department of Justice submitted a bill for this committee's consideration without investigating, within the time permitted, the matters of law involved therein. For example, with reference to the matter of registration of firearms, recourse was had to the practice followed under the Harrison Act which we have attempted to follow generally, in the taxation features. There we find that although the provision with reference to existing drugs was not specified in the act itself, regulations were promulgated by the Treasury Department which required certain memoranda to be inscribed as a record upon the article sold, on the boxes and containers, which the Treasury Department felt was a reasonable regulation looking toward the collection of the tax upon the article.

We have no decisions of the Supreme Court that we are able to find to guide us, but we believe the sound principle of law to be that a provision for registration of all firearms would be constitutional if it be attempted and considered to be a reasonable regulation, and a reasonable protective step taken by the law enforcement agency to collect the tax provided in the main body of the act. I may say, from such inquiry as we have made, we have been unable to find that that regulation has been attacked in any court of this country up to this time, which afforded us some reason to believe that a similar regulation with reference to the registration of firearms, might receive and probably will receive official sanction as the exercise of constitutional power, and with the provision, if you please, that our act provides that if any portion thereof is found to be unconstitutional, it will not invalidate the entire act.

Mr. VINSON. There is quite a difference in the application of the law, as I see it, to a firearm now owned and possessed legally, with reference to registration, and the power to cause registration of firearms acquired subsequent to the effective date of the act, which

compels the payment of the tax; under your bill, you do not require payment of the tax on the firearm now possessed?

Mr. KEENAN. That is right.  I do not think we would have such power.

Mr. VINSON. Your power under the taxing statute would apply to those weapons, but I cannot see by any stretch of imagination how you go back and apply the taxing power as a basis for registration, when there is no tax applied on those weapons that are now possessed and are required to be registered.

Mr. KEENAN. Of course, all such firearms referred to in this act are taxable upon transfer.

Mr. VINSON. I understand that.

Mr. KEENAN. It might be that it would be held to be constitutional, as a proper provision to determine the identity and ownership of the firearm, so that when they were transferred a proper check-up could be made.

Mr. VINSON. It might be you could require the tax on the transfer. What I am speaking of is, under the taxing power, when you have to pay a dollar for the transfer, that you require registration, and then I cannot see how you use the taxing power to require registration when no tax is involved.

Mr. KEENAN. There is no tax involved then, but there would be in the future.

Mr. VINSON. If the registration applied as of the time when the tax accrued, there might be some argument for it, but for the life of me, seriously, I cannot see how you are going to use the taxing power to require registration of an article that does not require the payment of the tax.

Mr. HILL. Would it not be used in determining whether or not the particular firearm was subject to the tax?

Mr. KEENAN. That is the precise point.

Mr. VINSON. That does not determine it; that is a fact; whether the firearm is taxable or not is a fact.  When you establish that fact, if you do establish the fact that the man owned it before the effective date of the act, then there is no tax.

Mr. KEENAN. Mr. Vinson, using the same analogy in connection with the drugs, the Federal Government had absolutely no control over the drugs that existed at the time the Harrison Act became law.

Mr. VINSON. Of course, I think there is quite a difference.

Mr. KEENAN. Respectfully, I do not see the difference in the analogy.  They require certain things to be done under penalty, but you do not have the matter subject to taxation.  Referring again to the British law, they have no difficulty; they do not have the same constitutional limitations and constitutional questions that we have. I said that I would only take a minute, and I do not want to impose upon the committee, but the point I am trying to make is we are struggling with a difficult problem, with limited powers of the Federal Government.  It is what we believe to be a growing need for some Federal legislation, and the inspiration for which we received, not from bureaucratic members of a centralized government, if such there be, but from the international police chiefs of this country, the largest organization of its kind, which includes in its membership practically every police chief in the country.

Mr. VINSON. They did not ask for the registration of weapons?

Mr. KEENAN. They asked for it at the beginning. The Attorney General was inclined to believe that the same thing could be arrived at through using the taxing power, under the sales tax provision and under the commerce and transportation clauses, and it was due to the suggestion of registration made in this committee that we attempted to work out something which we respectfully still believe would have a good chance to pass the test. If it would not, it would not invalidate the act in its entirety.

Mr. VINSON. How would you make that test? Under the language of the bill, how would you make the test?

Mr. KEENAN. I suppose the test would arrive, in case a man possessed a firearm described in the act, and prior to the effective date of the act, he attempted to transfer it in interstate commerce; that would be one way.

Mr. VINSON. I thought you agreed yesterday that section 11 could very well come out.

Mr. KEENAN. It could come out, because, as I interpret the act, any man who is found in possession of a firearm after the 4 months period, there would be a presumption that he acquired it after the effective date of the act. Then, if we attempt to apply the act, we have found the man in possession of the firearm; it was not identified; he did not have the stamp on it; then he would be subject to arrest and indictment and when he came before the court you could, I suppose, test the sufficiency of the indictment.

Mr. VINSON. You have two propositions; you have a line drawn as to when he acquired it, whether he acquired it before or after the effective date of the act. It may be constitutional; I have not, of course, investigated it exhaustively. It may be constitutional under the taxing power, to make it an offense for him to fail to register the weapon after the effective date of the act. It becomes a fact for the jury to determine, when he procured it. If they say he is guilty, the court can say that it was on the basis that he acquired it after the effective date of the act. I cannot see how you are going to test the constitutionality as it affects the registration of the weapon prior to the effective date of the act.

Mr. HILL. Is there any general penal provision in the statute that would apply to a failure to register a weapon, under the provisions of this proposed act?

Mr. KEENAN. There is no general penal provision.

Mr. HILL. Is there any general penal provision?

Mr. KEENAN. Under the act, it is not a violation of the act; there is no penalty provided, and it is not a violation.

Mr. HILL. In some cases, where you require a man to do a certain thing, he may be covered under some general penal provision if he does not do it.

Mr. KEENAN. It is not in this act, as I interpret it.

Mr. HILL. It is either true that the Federal Government has the power to require it or it does not have the power.

Mr. KEENAN. That is correct.

Mr. HILL. Why do you not put something in there to enforce that legislation?

Mr. KEENAN. Really, what we are after is the crook who has not registered, and we do not believe he is going to register.

Mr. HILL. The law-abiding citizen probably might not register; what are you going to do if he does not register?

Mr. KEENAN. If the law-abiding citizen does not register, and does not get into any kind of difficulty that would cause him to come to the notice of the police, and there are not going to be snooping squads going around from house to house to see who does and who does not possess arms; this is a practical piece of legislation.

Mr. VINSON. You get the benefit under section 5, paragraph (b), in regard to the presumption.

Mr. KEENAN. The presumption is applied to the gangster.

Mr. VINSON. That presumption is there, but that does not touch the question of whether it is a good thing or a bad thing; that does not touch the constitutional power.

Mr. KEENAN. It all comes to this point; I am almost tempted to say, even at the eleventh hour, that it is quite evident there is a good deal of difference of opinion in the committee as to whether there should be fingerprinting, or anything that might be considered a burdensome regulation. I hope, if we are going to do anything this session, it might be considered whether or not it will be practical to eliminate fingerprints, and whether or not general registration would receive more sympathetic hearing from some members of the committee than attempting to obtain fingerprinting legislation. We feel there is an urgent need to do something. Our practical experience causes us to believe that you are not going to solve the problem of the roving gangster and apprehend him and put him away before he kills people if you strike at the machine gun only, the crook is clever; he is enterprising and he is going back to his very effective Colt and other .45 automatics, if he is restricted.

The CHAIRMAN. We will adjourn until 10 o'clock tomorrow morning.

(Thereupon, at 12:20 p.m. an adjournment was taken until tomorrow, May 16, 1934, at 10 a.m.)

•

# NATIONAL FIREARMS ACT

**WEDNESDAY, MAY 16, 1934**

)

House of Representatives,
Committee on Ways and Means,
*Washington, D.C.*

The committee met at 10 a.m., Hon. Samuel B. Hill presiding.

Mr. Hill. General Record, you may proceed with your witnesses, either yourself or anyone else you may designate.

General Reckord. Congressman Hill, we would like this morning to have the committee hear Mr. Imlay, who is an attorney with offices in the District of Columbia, and who has had long experience with the matter of firearms legislation as a member of the American Bar Association. His experience is such that we believe he can bring out some points in connection with this proposed legislation which have not been brought out up to this time.

Mr. Hill. The committee will be very glad to hear Mr. Imlay.

## STATEMENT OF CHARLES V. IMLAY, WASHINGTON, D.C.

Mr. Imlay. I appreciate the privilege of making a statement this morning, but please let me ask your indulgence, however, because of a cold that has somewhat interfered with my hearing passages, and if you will bear with me and let me make my statement, I shall be glad to answer any questions then.

Mr. Hill. Please give your name, address, and the capacity in which you appear.

Mr. Imlay. My name is Charles V. Imlay; my profession is attorney at law, and my study of firearms legislation has been in connection with my membership in the National Conference of Commissioners on Uniform State Laws. That conference is composed of two or more representatives from each of the various States, which meets annually under the name of the National Conference of Commissioners on Uniform State Laws, and it has been engaged for some 45 years in preparing and recommending to the States for adoption, various uniform State laws. It is affiliated with the American Bar Association, although distinct from it, and the American Bar Association functions through it, receiving from it, in the first instance, before it acts upon them, any proposed uniform State laws.

My membership in that conference was the occasion for my giving a study, which has now lasted for some 11 or 12 years, on this subject of firearms legislation. When we began that study some 11 years ago we were told that it was impossible; that there could be no such thing as a uniform firearms law; that we would fail just as the

137

conference had failed in a uniform divorce law.  Its conspicuous success with the commercial acts is known to everybody; but when we approached the matter we sought first to find just what the existing laws in the various States are on firearms legislation, and we found that it is a matter in which State control has progressed to completeness in practically all of the States, and we found that it has always been assumed that it was a matter of State regulation, as distinguished from Federal regulation.

The traditional form of firearms legislation has been to recognize the legitimacy of the possession of certain weapons, to forbid the carrying of concealed weapons, and in those States in which progress had been made in the way of regulation, the effort had been made to follow closely the identity of weapons and the identity of purchasers, and taking those as the bases, this uniform firearms act which has been referred to a good many times, and which I introduced in the record when I first spoke here 2 weeks ago, was passed to embody those features.

Now, Mr. Allen, who spoke at considerable length yesterday and the day before, brought to your attention the work that was done by the National Crime Commission, and he told you how the National Crime Commission took up this work, but I am not sure that Mr. Allen emphasized the fact that the National Crime Commission in its work proceeded on the theory of a State law and State control and State regulation.  We never heard from the Crime Commission in the direction of a Federal law.  We worked with the Crime Commission, and when this uniform act that is spoken of was first passed by the National Conference, approved by the bar association in Denver, in 1926, when it was recalled from the legislature, it was not, as Mr. Allen says, because it received universal opposition; it was because the new president of the American bar association requested that it be withdrawn for further consideration.  The fact of the matter was that the only opposition that came from it was the opposite of the opposition that Mr. Allen pointed out.  The Governor of Arizona thought it was too drastic, and that is the peculiarly controversial nature of all firearms regulation.  One man will tell you it is too drastic and one will tell you it is too liberal.

What the National Crime Commission sought to do in their draft of a proposed uniform act was to take the uniform act that had come out of the National Conference and the Bar Association; take its provisions almost 95 percent in toto, and then incorporate in it the New York theory of the Sullivan Law, which, so far as I know, has met acceptance in only three or four States of the Union—New Jersey, Massachusetts, and probably one or two others.  They proposed a State law, and this is the first time, in the presentation of this bill before this committee, that anyone has ever sought to say that this very difficult matter could be handled by Federal law, and with all deference to the Attorney General and his able assistant, and to Mr. Allen, and to all others who have advocated this proposed Federal law, I wish to say that my experience of 11 years in the study of this subject makes me think that it is impossible to regulate it by Federal law.

First of all, Mr. Keenan says that he has the analogy of the Harrison Act, and that that analogy is very close.  I was looking over the Harrison Act again last night, to verify some of my study of that sub-

ject. The Harrison Act attempts to set up a system of licensing dealers, and then a system by which purchases from dealers are made by means of an order which establishes identification, but when we have found that as the analogy, then the analogy stops, because when you get by the dealer who purchases from the manufacturer, we will say, as you get down to the patient, the patient does not get the drug on an order, but he gets the drug because his physician prescribes it for him, and you have, therefore, an entirely different subject matter.

If you were to try to find exact analogy between the Harrison Act and its system of regulation and apply it to firearms regulation, you would have to introduce a second story in this structure, and you would have to find a place where a particular potentate, like a doctor of medicine, says, "Now, having satisfied the law in the purchase of a firearm, I am the dispenser; I am going to dispense the firearm to A and B and C and D", and so forth, so that the normal necessity for the possession of the pistol can be satisfied by somebody that administers the law according to his superior knowledge.

Taking the regulation in the Harrison Act, as far as it goes, it started out in 1914 under conditions where there was no fully developed State regulation in existence in this country, and the experience from 1914 to date, over the period of 20 years, has demonstrated the fact that it does not succeed by itself and that it cannot succeed by itself, and that was demonstrated so fully some 5 or 6 years ago to the officials of the Bureau of Narcotics in the Treasury Department. that they found it necessary to formulate and propose a so-called "uniform narcotic drug act" for the States, and that so-called "narcotic drug act" formulated by them for the States, was brought before the National Conference of Commissioners on Uniform State Laws, by them promulgated, approved by the Bar Association at its meeting in this city 2 years ago, in 1932, recommended to the States, and thus far has been adopted by eight States in the short period from 1932 to date, and is on the point of being adopted by one or two others, and I venture to predict that within 2 more years it will be the law of practically every jurisdiction in the United States, which means, I submit, that the Harrison Narcotic Act, a Federal act, by itself cannot succeed but must depend upon a rigid, careful, and conscientious enforcement of a State law on the subject.

The reason why you can administer a State law, and this proposed narcotic act does in fact duplicate the provisions of the Harrison Act, is that your method of enforcement is immediate and in the hands of citizens that are right there to do it, and supported by the public sentiment of all the people in the community.

Some mention was made yesterday and the day before about fishermen's licenses. The fisherman's license has been enforced so well against nonresidents because the nonresident is a bright and shining mark when he comes to fish in the stream or lake of a community. I went 2 years ago into the extreme southwestern county of your State, Mr. Chairman, and there in that beautiful Lake Santeelah I fished, and when I got my license to fish, because I tried to obey the law of the State, expensive as it was, I had to pay $5 to fish for one day, and I did not catch any fish. It is now 25 cents.

The CHAIRMAN. You will have to go back some time and get your $5 worth.

Compendium_Spitzer

Page 711

Mr. IMLAY. What I did was to go to the country store and there the keeper of the store gave me a receipt for my $5 and the additional 40 cents which the United States charges me, and he gave me a receipt in the name of the game warden.

Let us imagine that you would attempt here to erect a national fishing-license system, and you would get that same storekeeper to administer it for you. You would have an exact duplicate of what you are trying to do here, in saying that alongside of the system of regulations in the States that now exists, with reference to firearms, a system of regulation which has gained ground under the influence of the uniform act which requires an application that fully identifies the applicant and that furnishes to the police the information as to who it is that is applying for the pistol and requires the lapse of 48 hours before the pistol can be got. Now, let us suppose that we erect an entirely different and distinct system of regulation by the United States. According to sections 3 and 4 here, in which we have the dealer license, in which we provide for the order and for the stamps, are we going to ask the States to withdraw?

When the Volstead Act began to be unpopular and irksome, some of the States withdrew State control, and I believe said somewhat hypocritically that they were withdrawing State control because Federal control was sufficient. Now, I venture to say that if you were to erect an elaborate system of United States or Federal control like this, either you are going to have a troublesome duplication of State and national control or you are going to ask the State to withdraw. Now, if you get a picture of this form of regulation, you can see just what it means. Section 4 of the act——

Mr. HILL. Of the original act or the redraft?

Mr. IMLAY. I am speaking of the revised draft. Section 4 of the revised draft says that it shall be unlawful for any person to transfer a firearm except in pursuance of a written order from the person seeking to obtain such article, on an application form issued in blank, in duplicate, for that purpose by the commissioner. In one of these remote counties of which we were speaking a moment ago, let us imagine two householders situated close by; let us imagine one of them coming to the other and asking for a perfectly legitimate purpose the loan of a rifle or a shotgun. Those are not affected by this act, but let us suppose that he asks for the loan of a pistol, which, I believe, is recognized as perfectly legitimate when it is kept by a householder in his house. The owner will naturally loan it to him, and if he takes it in his hand he is violating the Federal law because he has not the order and the stamps, and the pistol has been transferred, because, if you look back at the definition of the word "transfer" you will find that it means to sell, to lease, to loan, and you have a man committing a crime by a perfectly natural, normal act of borrowing a pistol from his neighbor.

Mr. TREADWAY. Would you mind an interruption?

Mr. IMLAY. No.

Mr. TREADWAY. The reason I want to interrupt there was to see whether you are starting with a good premise in that you say that if this neighbor went to an adjoining house it would be natural that the owner of the pistol should loan it to him. As a neighborly act, that is true, but have you not overlooked the fact that if the neighbor has that pistol in his possession, if this bill should become law, he must,

under the conditions under which he has it, have it registered.   In other words, this fact of registration would be absolute knowledge to him whereby he should see that he should get in line with respect to that pistol.  Do I make myself clear?

Mr. IMLAY. Yes, your statement is clear.

Mr. TREADWAY. What is your reaction to that viewpoint?

Mr. IMLAY. Your statement is clear, but yet if we assume that it was registered or was not registered, whether it is registered or not, the loan of it under those circumstances is a violation of the law.

Mr. TREADWAY. Absolutely.

Mr. IMLAY. And you have precisely the same unhappy condition that you had under the Volstead Act., where liquors were contraband, and where any transfer of the liquor necessitates either a violation of the law or a very elaborate system of espionage and control.

I had occasion about 2 years ago to sell a drug store in this District at public auction, and we had a few quarts of gin and a few quarts of whisky in that drug store.   Three or four inspectors from the Prohibition Unit were there, and they were as tender about that gin and whisky as a mother would be about a 2-week-old infant.   They stood around for hours, and they finally relieved us of embarrassment by taking it to the storage rooms of the Prohibition Unit.   You have set up a system of Federal espionage, Federal visitation, and you have made a criminal of a man who borrows a pistol of his neighbor, unless he goes through this system.   Even under the most rigid system of licensing automobiles or titling automobiles, there is no difficulty in borrowing an automobile.   If the analogy of the automobile-title system is sound, then this system of registration ought to be pliable enough to get away from the necessity of violating the law if you hand a man a pistol to examine and give his opinion on.

Mr. MCCORMACK. From a practical angle, do you place pistols and automobiles in the same category?   Let us get at this from a practical point of view.   Looking at it from a practical standpoint. do you put a gun and an automobile in the same category, and do you put a gun and liquor in the same category?

Mr. IMLAY. No; I do not.   I think the gun is a dangerous instrument.

Mr. MCCORMACK. It is inherently dangerous, is it not?   A gun is dangerous from the beginning, is it not?

Mr. IMLAY. A gun is dangerous; a pistol is dangerous.   I do not want to give the committee the impression that I am rabid on this subject in either direction.

Mr. MCCORMACK. I am not conveying my state of mind.   My state of mind is open; I want to listen to all the evidence and I would like to get your state of mind as to whether or not you want me, as a member of this committee, to seriously consider the argument that guns and automobiles are in the same category, so far as borrowing is concerned, from a practical angle.   We will eliminate the theoretical side.

Mr. IMLAY. Practically, borrowing a pistol is more dangerous than borrowing an automobile.

Mr. MCCORMACK. Suppose you and I are close, intimate friends. If I went and asked you to borrow your automobile for a while you would probably have no hesitancy in saying, "Go ahead and take it," if you knew I had a license to drive.   Suppose I asked you to borrow

58278—34——10

a gun; would you loan it to me with the same state of mind that you would loan an automobile?

Mr. IMLAY. If I knew you.

Mr. McCORMACK. You are a remarkable man. I would not loan a gun to my best friend without an explanation from him as to what he wanted it for.

Mr. IMLAY. I will add that qualification; I will go along with you on that qualification, that I would want to know what he wanted it for.

Mr. McCORMACK. And there would be a lot of other mental strings attached to the loan of the gun.

Mr. IMLAY. Yes.

Mr. McCORMACK. We are human beings, and I think we are practical men. Taking the angle of prohibition which you spoke about. You talked about the public state of mind. You addressed that argument to the committee to indicate the public state of mind with reference to prohibition and the fact that theoretically, under this bill, the same conditions might exist. That is the purpose of your argument?

Mr. IMLAY. Yes; that is it.

Mr. McCORMACK. It all rests upon what the public state of mind was and might be?

Mr. IMLAY. Yes.

Mr. McCORMACK. Do you think the public state of mind would be the same with reference to regulating the sale, or eliminating the sale or transfer for a consideration for commercial purposes of firearms, as that which revolted against what I on many occasions termed the impractical inequities of prohibition?

Mr. IMLAY. I do. I think the public state of mind will be the same.

Mr. McCORMACK. You think that I, as an average citizen, when I read in the paper of somebody borrowing a gun from "John Jones", of his being arrested because he had not complied with the law, that I am going to have that same feeling of revolt that I had when the prohibition law was on the statute books?

Mr. IMLAY. I am not sure that you individually will have.

Mr. McCORMACK. I am talking about the average man.

Mr. IMLAY. I am sure the average man will.

Mr. McCORMACK. That is all I consider myself, the average man.

Mr. IMLAY. I think when you get into that remote county of North Carolina, or you get into a remote county of any other State, you are going to find that feeling.

Mr. McCORMACK. Prohibition never bothered North Carolina or any other of those States. They had their liquor all during prohibition, although it bothered certain other sections of the country. Those things have a practical way of adjusting themselves.

Mr. IMLAY. When you get into the remote sections of any one of our States, you are going to find a great aversion to the Government's coming in there and controlling them on those things.

Mr. McCORMACK. Again, to get your state of mind, are you opposed to any kind of Federal regulation of firearms?

Mr. IMLAY. I am opposed to Federal regulation of firearms, other than a form of regulation that stops where the Mann Act stops.

Compendium_Spitzer
Page 714

Mr. McCormack. I am not arguing with you. Do not think because I ask questions, that I am arguing with you. I want to get your state of mind to the extent that it will enable me to obtain evidence so that I may form an opinion. You are not opposing a regulation of some kind?

Mr. Imlay. I am not opposed to a form of Federal regulation that stops where the Mann Act stops, confining itself to interstate commerce, or which goes as far as some of the acts passed in the State prohibition history, which were in aid of the State, an act which would make it unlawful to transport weapons that would be in violation of State laws on the subject.

May I refer for a moment to the matter of registration, because I do not want to take too much time. I have set forth some of these views in the record, in those articles which I had printed there.

Section 5 provides for a registration of these types of weapons, including revolvers. Now, if we were to assume that everybody in the United States would come forward and register his weapon, I would say go to it, and I would be with this legislation heart and soul. I am not affiliated with the National Rifle Association and I am not affiliated with the arms manufacturers. I have never had a retainer from any of them. I am not affiliated with any organization on this subject. On the other hand, I am connected with this organization which, in a disinterested way, has sought to learn what the State law on the subject is, and to look at it impartially from a disinterested standpoint of formulating and recommending to the States a uniform law on the subject, and we looked at this matter of firearms registration, and we considered it very carefully.

Another one of the things that surprised me in Mr. Allen's statement is that he advocated this registration provision, because the draft of a proposed law formulated by the National Crime Commission did not contain any registration feature, and I looked at the draft of the act last night again to verify that fact. The first time I ever heard Mr. Allen, and I have heard him for a good many years, say anything about registration was when he stood here and talked to you gentlemen about registration and talked of it as something which, in the words of St. Paul, was a thing to be hoped for. In other words, everybody is not going to come forward and register his gun. We hope that some of them will, so we incorporate section no. 5 without any penalty attached to it, and we hope that more and more of them will come forward and register their guns, so that as each year rolls by we will have more and more registered guns.

Mr. Vinson. What is the purpose of the registration of the guns now owned?

Mr. Imlay. The purpose of registration is, in their minds, frankly, a police measure.

Mr. Vinson. What would it effectuate? The registration is for the purpose of determining ownership, and the time when the party owns it. In other words, their claim is with regard to registering revolvers and pistols now owned, that if they catch a man with a pistol and it is not registered, it is hard for them to determine whether it was acquired subsequent to the effective date of the act or prior thereto. Do not all revolvers and pistols have factory numbers that determine when they came from the factory or when they were manufactured?

Mr. IMLAY. Yes.

Mr. VINSON. Would not that show whether the gun had been acquired subsequent to the effective date of the act?

Mr. IMLAY. Yes; and to that extent it operates. To the extent that they find somebody with a contraband weapon, not registered, the act succeeds.

Mr. VINSON. Could not they find that without requiring this anti-constitutional measure to be inserted in the bill?

Mr. IMLAY. It can be accomplished under a State law better than under a national law.

Mr. VINSON. I know, but even under this law could not the district attorney, without much trouble, ascertain from the factory when that gun was manufactured?

Mr. IMLAY. Absolutely.

Mr. VINSON. Certainly a person could not have had it before it was manufactured.

Mr. IMLAY. The system of identification from the factory, or identification in connection with purchase, is fully effective.

Mr. VINSON. I am speaking about the pistols and revolvers that are now owned, before the effective date of the act. I think I can see a line between pistols and guns now owned and those acquired subsequent to the effective date of the act.

Mr. IMLAY. Yes; it can be ascertained, Mr. Congressman. It can be ascertained by that process, that does not have the effect of creating a great body of law-breakers, who do not take the time or the trouble to register their pistols.

Mr. VINSON. And it can be ascertained without Congress enacting what might be an anticonstitutional provision?

Mr. IMLAY. Yes. The registration feature has been tried and has failed, and I should invite your attention particularly, Mr. Vinson, to page 79 of volume 2 of the record, where I have pointed out that the Arkansas law passed in 1923 requiring a State-wide registration was abolished the following year as being unworkable, and there on page 79 of volume no. 2 of the record I have cited the act of 1923 in Arkansas, and I have cited the act of 1924 in which the registration feature was abolished. . Frankly the registration feature was intended to affect a certain class of lawless persons whose pistols they wanted to have registered, but those people did not come forward. It did not reach those people, and then, on the other side, there were a great many people who, from indifference, stubbornness, or obstinacy, which was the same attitude manifested toward the Volstead Act, refused to register their guns, and 2 years later I happened to be in Detroit, where the National Conference was meeting, and we were discussing these things, and this registration feature, and one of the leading citizens of that State which had passed the registration feature that year, in the spring of 1925, said: "Today is the day when we are supposed to register our pistols. I am not going to register mine." Michigan still has that registration feature. I have not followed it closely since 1925. It was reenacted in the act of 1927, but I venture to say that you can go to Detroit or to any other city or town in Michigan and you can find countless weapons which are not registered.

The CHAIRMAN. Are you opposed to the principle of registration, either by the State or the Federal Government?

Mr. IMLAY. I am opposed to the form of registration, either by the State or Federal Government, that consists in requiring everybody to come forward and register a pistol. It is unworkable; it did not work in Arkansas, and they repealed it in Arkansas.

Mr. DICKINSON. What reason did he give for not registering?

Mr. IMLAY. He is a bad citizen; he is a good lawyer and a man of means, and I do not justify him. It is bad citizenship; it is bad citizenship whether it is a violation of the Volstead Act or a violation of the Firearms Registration Act.

Mr. COOPER. How many States of the Union now have the State registration requirement?

Mr. IMLAY. None, except Michigan, and, I believe, Wisconsin.

Mr. COOPER. You say the act in Michigan was repealed about a year after it was enacted?

Mr. IMLAY. Yes.

Mr. COOPER. You cite the instance of one citizen who, you say, is not a good citizen, from the State of Michigan who declined to register his pistol?

Mr. IMLAY. Yes.

Mr. COOPER. Does the conversation which you had with one man control your conclusions or your views on this proposed legislation?

Mr. IMLAY. I did not understand.

Mr. COOPER. Does that conversation which you had with one man control and influence your views on this whole subject matter?

Mr. IMLAY. No. I was told that was the general attitude of rebellion.

Mr. COOPER. Have you been to the State of Arkansas?

Mr. IMLAY. I have been there since, but I rely, not so much upon being there, but upon talking with men familiar with this subject.

Mr. COOPER. Have you made any considerable investigation of the sentiment down there on that matter?

Mr. IMLAY. I am relying upon what was told me by my fellow commissioners from the State of Arkansas, upon their knowledge, what they knew.

Mr. COOPER. Is this man with whom you had the conversation, whom you spoke of, one of the commissioners?

Mr. IMLAY. Yes.

Mr. COOPER. And you say he is a bad citizen?

Mr. IMLAY. Yes.

Mr. COOPER. I have been interested in your observation relative to the Mann Act, with reference to the interstate question involved here. Would you object to a reasonable restriction on the interstate transportation of pistols?

Mr. IMLAY. Formulated in this way; yes.

Mr. COOPER. And you would object to any reasonable restriction on the interstate transportation of pistols?

Mr. IMLAY. I would not, Mr. Cooper. I would be willing to see an act passed that would declare that when the pistol in the original package has crossed the State line it becomes local intrastate commerce and is subject to local regulation.

Mr. COOPER. Do you think your rather theoretical views of the treatment of the subject would work out very satisfactorily?

Compendium_Spitzer
Page 717

Mr. IMLAY. Mr. Cooper, I am just bold enough to say I think my views are not theoretical but practical, for this reason: That I believe I am talking about a system of regulation that is traditional in this country, and has existed for 150 years. It is only within recent years that there has been any attempt to make any exact identification of the purchases, and many States, following the theory of the uniform act, or, in some few States, following the theory of the Sullivan Act, have proceeded by that system of regulation. Now, if an Act of Congress were to declare that when the pistol crosses the State boundary it then ceases to be in the jurisdiction of Congress, but is in the jurisdiction of the State, then the State of New York could apply the Sullivan Act, or the State of Maryland could apply their system of regulation, or the State of Pennsylvania could apply the uniform act, or the District of Columbia could apply the uniform act. I think you were here when I spoke of the Harrison Act.

Mr. COOPER. Yes.

Mr. IMLAY. You would have what they have today in the Harrison Act; you would have the State and the Nation working together on the thing.

Mr. COOPER. Do you contemplate that the State authorities and the Federal authorities will not work together under this proposal?

Mr. IMLAY. Not if there is duplication.

Mr. COOPER. Did I understand you to say that although the Federal Government passed the Harrison Narcotic Act, that then the various States of the Union had to pass a similar or identical act to that?

Mr. IMLAY. Yes.

Mr. COOPER. Is not that the type of cooperation and working together that might be reasonably expected under legislation of this type?

Mr. IMLAY. In those local narcotic acts, the State law will ultimately supersede the national act.

Mr. COOPER. I respectfully submit that you are in error on that.

Mr. IMLAY. Perhaps I am.

Mr. COOPER. From my experience and observation, that is not the result at all.

Mr. IMLAY. I will not contend with you on that.

Mr. COOPER. It is my experience in the courts, although my State has an antinarcotic act, as I recall, patterned after the Harrison Act, still offenders are constantly arraigned before the Federal court. If your knowledge of this subject matter is gained from your experience under that act, I am afraid you are not making the contribution here that you would like to make and that we would like to have you make.

Mr. IMLAY. It will rest with your judgment and the judgment of your colleagues as to whether I have or have not made a contribution. I am wrong in using the word "supersede." Let me qualify that; let me qualify the entire statement by saying the Uniform State Law is only 2 years old, so my answer is rather a prediction than the statement of a fact. What I anticipate is that the conviction on the part of the officers in the Narcotics Bureau that they needed the help of a State law, which caused them to draft it, and has brought about the enactment of a State law, will mean that they will rely very heavily upon State control. Now what I anticipate, and I may be wrong,