1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7  Attorneys for Defendant Rob Bonta in his
   official capacity as Attorney General of the
8  State of California

9            IN THE UNITED STATES DISTRICT COURT

10          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                      CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**         Case No. 3:17-cv-01017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**
    **CHRISTOPHER WADDELL, and**         **COMPENDIUM OF WORKS**
15  **CALIFORNIA RIFLE & PISTOL**        **CITED IN DECLARATION OF**
    **ASSOCIATION, INC., a California**  **BRENNAN RIVAS**
16  **corporation,**
                                         **VOLUME 2 OF 6**
17                         Plaintiffs,
                                         Courtroom:    5A
18          **v.**                       Judge:        Hon. Roger T. Benitez
                                         Action Filed: May 17, 2017
19
    **ROB BONTA, in his official capacity**
20  **as Attorney General of the State of**
    **California; and DOES 1-10,**
21
                           Defendants.
22

23

24

25

26

27
                              1
28

## INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1 | 7 n.10 | 002-004 |
| 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1 | 8 n.12 | 005-007 |
| General Laws of Texas, ch. XXXIV, §1 (1871) | 15 n.31 | 008-011 |
| 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1 | 7 n.10 | 012-020 |
| 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1 | 9 n.15 | 021-023 |
| 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 | 8 n.13 | 024-026 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 9 n.16 | 027-029 |
| Acts of the General Assembly of the State of Georgia (1894) | 6 n.7 | 030-042 |
| An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907) | 6 n.8 | 043-053 |

| **BOOKS**[1] | | |
|---|---|---|
| Patrick Charles, Armed in America 152 (2018) | 9 n.17 | 055-058 |
| Randolph Roth, American Homicide 184, 185, 297-326, 386-388, 411-434 (Cambridge: Belknap Press of Harvard University Press, 2009) | 4 n.3, 5 n.4 | 059-092 |
| R. L. Wilson, The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present, at 173 (New York: Simon & Schuster, 1979) | 11 n.23 | 093-095 |
| Martin Rywell, Colt Guns 66-67, 84-93 (Harriman, TN: Pioneer Press, 1953) | 11 n.23 | 096-104 |
| Sears, Roebuck, and Co. Catalog No. 107, at 365-67 (1898) | 3 n.2, 13 n.27 | 105-112 |
| The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) | 12 n.25 | 113-117 |
| Thomas Henshaw, The History of Winchester Firearms, 1866-1992 (Clinton, NJ: Winchester Press, 1993), 13-19, 23-24, 41, 61 | 16 n.32, 16 n.33, 16 n.34, 17 n.37, 18 n.44 | 498-504 |

---

[1] The Declaration of Brennan Rivas cites certain books (in their entirety) as supplemental references, rather than as direct support for any particular statement in her declaration or as a specific basis for her opinions. *See* Rivas Decl. ¶¶ 10 n.1, 19 n.23, 23 n.30. Accordingly, they are not included here. These books are: Graham Smith, Civil War Weapons (New York: Chartwell, 2011); Jack Coggins, Arms and Equipment of the Civil War (New York: Fairfax Press, 1982); Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter that Changed America (New York: Scribner, 2020); Joseph G. Bilby, Civil War Firearms: Their Historical Background and Tactical Use (Conshohcken, PA: Combined Books, 1996); and Ken Bauman, Arming the Suckers: A Compilation of Illinois Civil War Weapons (Dayton, OH: Morningside House, 1989).

3

| | | |
|---|---|---|
| Frank C. Barnes & Stan Skinner, Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges 11th ed. (Iola, WI: Gun Digest Books, 2009), 96-97 | 16 n.33 | 505-508 |
| William S. Brophy, Marlin Firearms: A History of the Guns and the Company that Made Them (Harrisburg, PA: Stackpole Books, 1989), 300-301, 307-307 | 17 n.38, 17 n.39, 18 n.41 | 509-513 |

### LAW REVIEWS AND JOURNALS

| | | |
|---|---|---|
| Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, at 161-62 (PhD diss., Texas Christian University, 2019) | 6 n.8 | 119-349 |
| Mark Anthony Frassetto, *The Myth of Open Carry*, 55 U.C. Davis L. Rev. 2515, 2518-19 (June 2022) | 11 n.22 | 350-379 |
| Robert Leider, *Our Non-originalist Right to Bear Arms*, 89 Ind. L. Rev. 1587, 1619-20 (2014) | 13 n.28 | 380-446 |
| Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason Univ. Civil Rights L.J. 67, 74-75 (Summer 1991) | 13 n.28, 14 n.29 | 447-480 |

### NEWS ARTICLES

| | | |
|---|---|---|
| "Crime in the South," *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, at 2 | 10 n.18 | 482-483 |
| Daily Arkansas Gazette (Little Rock, Arkansas), January 7, 1883, at 4 | 10 n.20, 10 n.21 | 484 |
| Daily Arkansas Gazette (Little Rock, Arkansas), May 13, 1883, at 4 | 10 n.20, 11 n.22 | 485 |
| Katelyn Brown, "Armed to the Teeth," Military Images 33, no. 4 (Autumn 2015), at 32-36 | 14 n.30 | 486-490 |

4

| | | |
|---|---|---|
| Newport News (Newport, Arkansas), quoted in Daily Arkansas Gazette (Little Rock, Arkansas), April 27, 1875, at 2 | 10 n.19 | 491 |

## Iver Johnson. Small Frame Automatic Revolver.



The Iver Johnson Automatic Safety Hammer Revolver, doubleaction, self-cocking, 5-shot, 11-oz. weight, 3-inch barrel, finely nickel plated, neatly finished. Every one warranted. 32-caliber, center-fire, Smith & Wesson cartridges.

No. 34424 Each .................................. $2.90
No. 34425 32-caliber, 3¼ inch barrel, weight 14 ounces. Each .................................. $2.90
No. 34426 4-inch, either 32 or 38-caliber ... 3.30
No. 34427 5-inch, either 32 or 38-caliber ... 3.65
Postage, extra, 22 cents.



REGULAR HAMMER.

AUTOMATIC.

The above illustration shows you the Hopkins & Allen shell ejecting, double action, self cocking revolver. Very finest forged steel barrels and cylinders, in all respects the best material and finish, guaranteed accurate, safe and reliable, nickel plated, rubber stock. A high grade revolver at a heretofore unheard-of price.

No. 34462 32-caliber, 5-shot, 12-oz., 3-inch barrel. Our price .................................. $2.90
Postage, extra, 17 cents.
No. 34463 38-caliber, 5-shot, 17-oz., 3¼-in. barrel. Our price .................................. $2.90
Postage, extra, 19 cents.
No. 34464 22-caliber, rim-fire, 7-shot, 12-oz., 3-in. barrel. Our price .................................. $2.90
Postage, extra, 16 cents.
We can furnish these revolvers in blued finish when so desired, at 30 cents extra.

## Hopkins & Allen Double Action Revolver for $1.65.



The above illustration engraved from a photograph shows you the double action, self cocking revolver nickel plated rubber stock, finely finished, accurate and reliable, rifled barrels, weight 16 oz., a thoroughly first-class arm.

No. 34468 32-caliber, 3-in. barrel, our price. $1.65
No. 34469 38-caliber, 3-in. barrel, our price. 1.65
Postage, extra, 19 cents.

## Iver Johnson Hammerless Automatic Revolver.



The above illustrated revolver is the celebrated Iver Johnson Automatic hammerless double action; high grade finish, fine adjustments. Its trigger locking device makes it one of the safest revolvers to carry in the pocket. Automatic self-ejector, rebounding lock, safety trigger locking device, chambered cylinder, fluted barrel, nickel plated, 32-caliber, Smith & Wesson small frame, 5-shot, weighs 13 oz., length of barrel 3 inches; a revolver that retails at from $7.00 to $10.00.

No. 34430 Our special price .................. $3.55
No. 34431 Or 38-caliber .................. 3.55
Postage, extra, 19 cents.
Our revolvers are all new stock, of the latest models. Beware of old styles and imitations.

## Hopkins & Allen Acme Hammerless Double Action Self Cocking Revolver for $2.35.

The above illustration shows you the Hopkins & Allen double action self cocking rebounding lock, safety trigger locking device, chambered cylinder; safe, reliable and accurate, a regular $5.00 revolver.

No. 34434 32-caliber, 5-shot, weighs 11 oz., 2⅞-inch octagon barrel.
Our price .................................. $2.35
Postage, extra, 19 cents.

## The Hopkins & Allen Automatic Shell Ejecting Folding Hammer Revolver for $3.20.



With Folding Hammer

AUTOMATIC.

The above illustration, engraved from a photograph, gives you an idea of the appearance of this revolver.

No. 34472 Hopkins & Allen automatic shell ejecting, center-fire, double action, self cocking, folding hammer revolver, 32-caliber, 3-inch barrel, or 38-caliber, 3¼-inch barrel, nickel plated, fancy rubber stock, finely made and accurate, 5-shot, 17 oz. Our price .................................. $3.20
Postage, extra, 21 cents.
No. 34473 Same revolver as above, only 32 or 38-caliber, Smith & Wesson, blued finish .... $3.50
Postage, extra, 21 cents.
No. 34475 Hopkins & Allen Revolver, same as above, except 5½-inch barrel, nickel plated, rubber stock, 38-caliber, weight 19 oz. .... $3.55
Postage, extra, 23 cents.

## Stevens' New Model.



No. 34480 Stevens' Single Shot Pistol. Tip-up barrel, plated finish, 3½-inch barrel, 22-caliber only, rim-fire. No better material got in rifles. A fine target pistol. Price .................................. $2.15
Postage, extra, 12 cents.

## Stevens' Target Pistol.



No. 34482 The Celebrated Stevens' Target Pistol, the best pistol made for fine, close shooting. It has fine blued barrel, nickel plated frame, rosewood stock, 6-inch tip-up barrel; fitted with fine target sights, 22-caliber, rim-fire. Shoots either 22 long or short cartridges. Our price .................................. $4.50
Postage, extra, 17 cents.

## Remington Derringers.

When you order revolvers sent by mail, postage must always be included.



No. 34495 Remington Double Derringer, 41-caliber, rim-fire, checkered nickel frame; length of barrels, 3 inches; length over all, 5 inches; nickel plated or blued. Price .................................. $4.55
Postage, extra, 16 cents.

## Our $4.10 Frontier Revolver.

THIS FRONTIER REVOLVER is offered as the BEST strong shooting arm made at a medium low price.

THERE ARE MANY CHEAP IMITATIONS but this is the genuine MILLS 44-CALIBER FRONTIER GUN, worth a dozen of the cheaper makes, and such a revolver as was never before offered for so little money.

THIS MILLS FRONTIER has been advanced in price but our contract is such that we got the old price throughout the year, and shall continue furnishing them at $4.10.



No. 34498 The best revolver for the money for frontier use.
This large, strong shooting and well-finished revolver retails everywhere at from $8.00 to $10.00, 5½-inch barrel, 6-shooter, fine engraved rubber stock, 44-caliber, central-fire, full nickel plated.
This revolver is adapted to 44-caliber Winchester cartridges, so that a person having a rifle need not change ammunition, but can use the same cartridges in both. Weight, 35 oz.
Our price .................................. $4.10
Postage, extra, 35 cents

## Colt's Revolvers.

The same terms on Colt's revolvers, C. O. D. to any-one anywhere, subject to examination, on receipt of $1.00. Examine them at the express office, and if found satisfactory, pay our price and express charges, less the $1.00 sent with your order, otherwise pay nothing. Besides, we will ship any Colt's pocket revolver, by registered mail, postage paid, on receipt of 25c extra to pay postage.



COLT'S NEW POCKET 32 CALIBRE.

No. 34500

Description: Colt's New Pocket Revolver, 32-caliber, centre-fire, adapted to long and short C. F, cartridges, double action, self cocking, jointless solid frame with simultaneous extractor. Weight about 16 oz., nickel plated, as desired.
No. 34500 ... 3½-inch barrel .... $10.00
Postage, extra, 18 cents, open mail

NOTICE—Owing to the heavy advance in prices on Revolvers at the different factories and which are liable to go much higher, OUR PRICES ARE SUBJECT TO CHANGE WITHOUT NOTICE. Place your orders early, while our present stock lasts, as these prices apply only to stock on hand.

HOPKINS & ALLEN MFG. CO.

ACME HAMMERLESS.

## Colt's Army Model 1894.

C. O. D. to anyone on receipt of $1.00, balance payable at express office.



COLT'S ARMY

33 & 41 CALIBRES.

No. 34505 Colt's New Army Model, 1894. Description: Double action, self cocking, jointless solid frame, with simultaneous ejector. Weight, 2 lbs., 6-shooter, 38 or 41-caliber, length of barrel, 4½ or 6 inches, as desired. Blued or nickel plated, as desired. Our special price ............$12.00
Postage, extra, 40 cents.

## Colt's New Navy, Made by the Colt's Patent Fire Arms Co., Hartford, Conn.

This revolver has been adopted by the U. S. navy, and every one has to pass a rigid inspection.



COLT'S NEW NAVY 38 & 41 CALIBRES.

Colt's New Navy double action, self cocking, automatic shell ejecting revolver, rubber stock, beautifully finished, first material, length about 12¼ inches; 6-shooter; weight, 2 pounds. C.O.D. to anyone, $1.00 in advance, balance payable at express office.

COLT'S NEW NAVY. 38 & 41 CALIBRES.

Nickel plated or blued, as desired. 4½ or 6-inch barrels, as you desire; 38 or 41-caliber, as desired.
No. 34501 Price..............................$12.00
Postage, extra, 40 cents.

## Colt's Single Action Army, Frontier and Target Revolver.



WORTH $18.00
Our Price $12.00

C. O. D. to anyone, $1.00 in advance, balance payable at express office.

Single action, 6-shooter, rubber stock, solid frame, the best quality and finish, absolutely perfect and accurate in every detail. Barrel 7½ inches; length 12¾ inches; 44, 41 or 45-caliber, as desired. Blued.
No. 34515 Our special price................$12.00
Postage, extra, 44 cents.

## The Genuine Smith & Wesson Revolvers.

Terms: C. O. D. to anyone on receipt of $1.00, balance to be paid at express office.



Description: Warranted, genuine Smith & Wesson. Manufactured by Smith & Wesson, Springfield, Mass. Self cocking, double action, automatic shell extractor, fine rubber stock, full nickel plated or blued, as desired.
If to be sent by mail, send cash in full and 25 cents extra to pay postage; registered mail, 33 cents.
Our special prices are as follows:
No. 34525 32-caliber, 5-shot,3 and 3½-inch barrel, best double action............... $9.95
No. 34526 32-caliber, 5-shot, 6-inch barrel, best double action............... 11.00
No. 34528 38-caliber, 5-shot, 3½-inch barrel, best double action............... 10.95
No. 34529 38-caliber, 5-shot, 4-inch barrel, best double action............... 11.25
No. 34530 38-caliber, 5-shot, 5-inch barrel, best double action............... 11.45
No. 34531 38-caliber, 5-shot, 6-inch barrel, best double action............... 11.95
No. 34532 44-caliber, Winchester, 5-shot, cartridge, 4-inch barrel, best double action. 13.00
No. 34533 S. & W. 44-caliber, 5-shot, 6 or 6½-inch barrel, chambered for either 44 Winchester centre-fire, or 44 S. & W. Russian model cartridges. Price............... 13.75
Extra for ivory stock, 32 or 38-caliber............ 1.50
Extra for ivory stock, 44-caliber............ 2.50
Extra for pearl stock, 32 or 38-caliber............ 1.25
Extra for pearl stock, 44-caliber............ 4.00
Postage, extra, 10 cents.

## Colt's Double Action Revolver.

C. O. D. to anyone, $1.00 in advance, balance payable at express office.



COLT'S DOUBLE ACTION, 38 & 41 CALIBRES.

No. 34509 Colt's Double Action, sliding ejector. Every one warranted, 38 or 41-caliber, 6-shooter, center-fire, nickel plated or blued, as desired, 4½-inch barrel. Postage, extra, 40c. Our special price......$11.00

## Colt's Army Double Action Revolver.

Sent to anyone C. O. D., subject to examination, on receipt of $1.00, balance payable at express office.



COLT'S ARMY DOUBLE ACTION .44 & 45 CALIBRES.

Colt's Double Action 44 and 45-caliber. Every one warranted. Made by the Colt's Patent Fire Arms Co., Hartford, Conn. Colt's revolver, army size, case hardened, rubber stock with sliding spring ejector. Blued. Barrels 4½, 5¼ or 7½ inches long, as desired. 44 and 45-caliber 6-shooter.
No. 34512 Price..............................$13.00
Postage, extra, 44 cents.

BE SURE to read and follow the information and instructions we give in the front pages of this catalogue on "How to Order," "How to Send Money" and "How to Have Goods Shipped."

## Smith & Wesson Hammerless Revolvers.

TERMS: C. O. D. to anyone on receipt of $1.00 balance to be paid at express office.



DESCRIPTION:

GENUINE.... SMITH & WESSON.

Made by Smith & Wesson, Springfield, Mass. Latest type.

New Model, Hammerless, Automatic Shell Ejector, Patent Safety Catch, Self Cocking Rebounding Locks, Double Action . . . .

If to be sent by mail, send cash in full and 25 cents extra to pay postage.
Registered mail, 33 cents.

Full Nickel-plated or Blued, as desired.

Our Special Prices.
No. 34538 32-caliber, 3 or 3½-inch barrel......$10.90
No. 34539 38-caliber, 3½-inch barrel......11.95
No. 34540 38-caliber, 4-inch barrel......12.25
No. 34541 38-caliber, 5-inch barrel......12.50
No. 34542 38-caliber, 6-inch barrel......13.00

## Parts for Shotguns.

These parts are for Foreign make guns, and as no two of these are made alike, it is necessary to have the old part here in order to fit it properly.
If your lock is out of order, better send it to us, and we will fix it. Send money enough to cover expense, and save delay. If there is any left over, we will return it to you.



No. 34560 Bar Locks for Muzzle Loaders. Each....$1.30 Postage 6c

No. 34561 Back action, Muzzle Loader Locks. Each....74c Postage 6c

No. 34562 Rifle Bar Lock for Muzzle Loader. Each......$1.25 Postage 6c
No. 34563 Hammers for Breech loaders, not fitted, from 20c to $1.00 according to finish and quality. Postage 4c

No. 34565 Finished Hammers for Breech loaders, from $1.50 to $2.50, according to labor required.
Postage, extra, 4 cents.
In ordering send old hammer as a model as no two hammers fit same gun.
No. 34568 Main Springs for Muzzle Loaders, any style not fitted, each............30c
No. 34569 Main Springs for Muzzle Loaders, fitted, each, 60c to.... (Postage, extra, 2c)....$1.50
Send old spring as a model.
No. 34570 Hook Tumblers, for back or front-action locks; not fitted. (Postage, extra, 2c) 30c
No. 34571 Swivel Tumblers, for back or front-action locks; not fitted. (Postage, extra, 2c). 30c
No. 34572 Bar Rebounding Swivel Tumblers, not fitted; from 45c to 80c; according to style.
Postage, extra, 2 cents.
If you will send your old part we can fit Tumblers at from $1.25 to $2.25; according to labor required.
No. 34573 Malleable Iron Triggers, fitted, $1.00
No. 34574 Top Lever Springs, fitted; from 60c to $1.50; according to labor required.
No. 34575 Top Snap Lever, fitted............$1.65
No. 34576 Side Snap Lever fitted............1.80
No. 34577 Extractors, fitted............2.50
No. 34578 Plungers, for Zulu gun............40
No. 34579 Plunger Spring, for Zulu gun.....07
No. 34580 Firing Pins for guns, fitted......60
No. 34581 Firing Pins for guns; not fitted from............40c
No. 34582 Firing Pin Spring............$0.08
No. 34583 Muzzle Loading Gun Tubes..10 to .25
No. 34584 Musket Tubes............05
No. 34585 Tumbler Pins............05
No. 34586 Swivels............09
No. 34587 Rubber Butt Plates............75
Postage, extra, 2 to 6 cents.

## Parts of Rifles.

No. 34595 Flobert Hammer, Remington action, not finished.50c
No. 34596 Flobert Hammer, Warrant action, not finished ...50c
No. 34597 Breech Block, Warrant action, not finished......75c
Postage, extra, 4 cents.
No. 34600 Remington Breech Block, not finished......40c
No. 34601 Triggers for Flobert Rifles, not finished....25c
Postage, extra, 3 cents.




No. 34595 for Flobert Rifles

No. 34600

No. 34605 Extractor, Remington action, not finished......25c
No. 34606 Main Spring, for Flobert Rifle, not finished......30c
Postage, extra, 2 cents.

No. 34605

No. 34610 Trigger Spring, all models Flobert.15c
Postage, extra, 2 cents.

Send in your old parts and we will make new ones to fit at lowest possible price. Be sure to send money enough and if there is any left over we will return it.
When sending parts be sure to mark your name plainly and wrap securely and write us at once.
We are prepared to do your repairing at very reasonable rates. Send your gun to us if you want it put in first-class order. We guarantee satisfaction. Guns restocked at from $8.00 to $15.00 according to finish, wood, etc., etc.
We carry a full line of repairs for Winchester, Colt, Marlin and other rifles, revolvers, etc., and would be pleased to quote prices. Send your old parts and we will quote you lowest prices.

Compendium, Rivas
Page 110



Compendium, Rivas
Page 111



# THE PISTOL

### AS A

## WEAPON OF DEFENCE

## IN THE HOUSE AND ON THE ROAD.

*HOW TO CHOOSE IT AND HOW TO USE IT.*



"KNOWLEDGE IS POWER."

NEW YORK:

THE INDUSTRIAL PUBLICATION COMPANY.

1875.

Digitized by Google

HARVARD UNIVERSITY

Compendium_Rivas

Page 113

SG2155.16

HARVARD COLLEGE LIBRARY
GIFT OF
CHARLES H. TAYLOR
NOV 20 1923

Entered according to Act of Congress, in the year 1875, by THE INDUSTRIAL PUBLICATION COMPANY, in the office of the Librarian of Congress, Washington, D. C.

Generated on 2022-10-18 20:28 GMT / https://hdl.handle.net/2027/hvd.hn5rr7
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

HARVARD UNIVERSITY

gun to feel the effects of his wound.   In the well known case of Bill Poole, who was shot in the heart with a small bullet, the wounded man walked about without assistance, and lived some days after receiving the fatal shot.   And in the Crimean war, it was noticeable that, on several occasions, Russians who had been wounded with small revolver bullets, inflicted serious injury, and in many cases death, upon their assailants, though they themselves afterwards died of their wounds.   We are willing to grant that if great skill be exercised and the small bullet be sent to a vital and sensitive part, it may prove instantly fatal. It happened to us on one occasion to be a witness of a suicide in a railroad car.   A young man shot himself in the head, just over the right ear, with a small revolver, carrying a bullet 22-100ths of an inch in diameter.   The ball penetrated the skull, traversed a large extent of the brain, and produced almost instantaneous insensibility.   Death ensued in less than three minutes.   But the skill and the opportunity to place the bullet so effectively are not to be presupposed in ordinary cases, and it may be safely affirmed that the only sure method of inflicting a *disabling* wound, though not necessarily a fatal one, lies in the use of a heavy bullet, and, consequently, of a pistol with a very large bore.

The facts and principles which we have just stated, are sufficient to enable any one to select a pistol suited to the purposes for which he requires it.   Many manufacturers turn out pistols which are specially adapted to particular purposes.   Thus we have the so-called "navy" revolvers, "house" pistols, "police" pistols, "pocket" pistols, etc. These, however, either embody merely the personal views of the manufacturer, or are modeled after some long-known style. Thus, the navy revolvers are all about the same weight and size, and this term has in fact come to designate a pistol of certain dimensions.   On the other hand every pistol

Digitized by Google

Original from
HARVARD UNIVERSITY

Generated on 2022-10-18 20:29 GMT / https://hdl.handle.net/2027/hvd.hn5rr7
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

ᴐf large bore is called a Deringer, although it may differ very materially from the original style of pistol turned out by the famous maker of that name. In some cases, the manufacturers have shown great good sense and thorough knowledge in devising pistols for special ends. Most of the police pistols of the different manufacturers are admirable models for pocket pistols, and the house pistol brought out some years ago by the Colt Arms Company, and rendered famous by the fact that it was the pistol used by Stokes in the murder of Fisk, can hardly be excelled for the special purpose for which it is intended

In many instances, the purchaser of a pistol will prefer to sacrifice certain qualities, so as to avoid concomitant evils. Thus, for pocket purposes, a large ball will frequently be given up for the sake of portability and compactness. In such cases, the only remedy is to make this small ball more effective by bringing greater skill to bear, and this can to a great extent be accomplished.

In every case, however, the purchaser should see that his weapon is well made, in other words, that it is good of its kind. Those who have abundant means, but who are not good judges of mechanical work, can easily make themselves secure in this respect by purchasing a first-class weapon by a respectable maker. No pistol made by the Colt Arms Company, Smith & Wesson, the Remingtons, and similar houses, will fail to give satisfaction, provided the model that is chosen is suited to the requirements of the purchaser. The workmanship at least will be first rate. But it unfortunately happens that many pistols which bear the name of Colt were never made in Hartford. Over and over again, we have seen exposed for sale in New York, pistols of the poorest workmanship, stamped with the name of Colt. It is needless to say that they were frauds. One accustomed to handling good fire-arms finds no difficulty in detecting such cheats. The point in

Generated on 2022-10-18 20:29 GMT / https://hdl.handle.net/2027/hvd.hn5rr7
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

1017-BEN-JLB   Document 122-1   Filed 11/10/22   PageID.105 65

which they show their counterfeit character most clearly is the working of the lock, and we would almost pledge ourselves to distinguish between the real and the imitation by simply listening to the click of the sear in the tumbler, and without ever seeing or handling the weapons at all. In a well made pistol, the sear falls into its notch with a clear, musical sound and with oily smoothness; in a coarsely made article, this sound becomes a grating thud. Such coarse pistols may do for rough hands, and for those who could use a club as well as a pistol, but it would be difficult to learn to shoot well with them since that delicate sympathy, which ought always to exist between hand and eye, becomes utterly unattainable with such badly made weapons.

## AMMUNITION.

The ammunition required for all pistols consists of three distinct parts: 1, the projectile or bullet; 2, the propelling power or powder; and 3, the igniting agent, which may be a flint, pill, percussion cap, or some similar device. In pistols using loose powder and ball, it is all-important that good and suitable powder be selected, and that the ball be well made and of proper size and form.

At the present day it is an easy matter to procure good powder. Several establishments in the United States turn out an article that is unexceptionable, and even the most ordinary article will stand all the tests that were deemed essential a few years ago, and will, with charges of moderate weight, send a bullet with all the force that is requisite. There are, therefore, only two points which demand the attention of the user of a pistol, and these are the state in which it leaves the weapon, and its power to remain in good condition in the barrel. The latter

Generated on 2022-10-18 20:30 GMT / https://hdl.handle.net/2027/hvd.hn5rr7
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google                    Original from
                                       HARVARD UNIVERSITY

# LAW REVIEWS AND JOURNALS

THE DEADLY WEAPON LAWS OF TEXAS: REGULATING GUNS, KNIVES, AND

KNUCKLES IN THE LONE STAR STATE, 1836-1930

by

BRENNAN GARDNER RIVAS

Bachelor of Arts, 2010
Oklahoma State University
Stillwater, Oklahoma

Master of Arts, 2013
Texas Christian University
Fort Worth, Texas

Submitted to the graduate faculty of
AddRan College of Liberal Arts
Texas Christian University
in partial fulfillment of the requirements
for the degree of

Doctor of Philosophy

May 2019

THE DEADLY WEAPON LAWS OF TEXAS:
REGULATING GUNS, KNIVES, & KNUCKLES IN THE LONE STAR STATE, 1836-1930

By

Brennan Gardner Rivas

Thesis approved:

Gregg Cantrell
Major Professor

Alan Gallay

Rebecca Sharpless

Todd M Kerstetter

Peter Worthing
For the College of Liberal Arts

Copyright by
Brennan Nicole Rivas
2019

ACKNOWLEDGMENTS

Undertaking this task of researching and writing a dissertation has been the most difficult and rewarding of my life. In pursuing my goal of obtaining a terminal degree, I have received tremendous assistance from others, particularly Gregg Cantrell, my dissertation advisor. Alan Gallay reviewed early chapter drafts and participated greatly in the construction of the final product. The remaining members of my dissertation committee, Rebecca Sharpless and Todd Kerstetter, provided much-needed advice and support in this project and throughout my graduate career at TCU. Other professors and scholars I wish to thank include Randolph B. Campbell, Stephanie Cole, William Meier, and Kara Dixon Vuic.

The completion of this dissertation was made possible in part by the generosity of Marine Lance Cpl. Benjamin W. Schmidt and his family. I wish to thank Dr. David and Mrs. Teresa Schmidt for raising an honorable young man who became a brave American soldier. Their ongoing support of the TCU history department and its emerging scholars is an honor which has not gone unnoticed.

I have also become indebted to many archivists and civil servants who have aided me in locating and accessing records that were crucial to this dissertation. These include Brenda McClurkin with UT-Arlington Library Special Collections, alongside Tonia Wood and Laura Saegert at the Texas State Library and Archives Commission. I would also like to thank Kerry McGuire at the McLennan County Archives. Public officials in Fayette County provided unparalleled assistance, including Judge Ed Janecka, District Clerk Linda Svrcek, and County Clerk Julie Karstedt.

Finally, I would like to thank my husband, Alexis Rivas, for his support and patience while I worked on this project. I also wish to thank my parents, Randy and Vicky Gardner, for instilling in me a love of learning and a passion for history.

TABLE OF CONTENTS

Acknowledgments…………………………………………………………………...ii

List of Figures……………………………………………………………………….iv

I. Introduction………………………………………………………………..1

II. Weapon Regulations in Texas, 1836-1866………………………………………9

III. A New Era of Gun Regulation in Texas, 1866-1873………………………………..41

IV. "The Proper Costume of a Gentleman": Courts & Constitutionality

from *English* to *Miller*…………………………………………………83

V. "The Revolver Must Go": Regulating Deadly Weapons, 1887-1918………………………124

VI. Enforcing the Pistol Law in Texas, 1870-1930……………………………………164

VII. Conclusion……………………………………………………………196

Bibliography………………………………………………………………207

Vita

Abstract

Compendium_Rivas
Page 123

## LIST OF FIGURES

1. Fig. 1.1—Bowie knife and sheath……………………………………………………………11

2. Fig. 1.2—Twentieth-century rendition of Arkansas toothpick………………………………11

3. Fig. 2.1—Map of House Democratic votes on HB 297, 1870………………………………..72

4. Fig. 2.2—Map of House votes on HB 115, 1871……………………………………………..78

5. Fig. 4.1—"Toy Pistol Playground"………………………………………………………133

6. Fig. 4.2—Map of House votes in support of HB 47, 1905…………………………………153

7. Fig. 5.1—Indictments against deadly weapon violators, 1870-1910………………………...173

8. Fig. 5.2—Deadly weapon cases in justice and county courts, Fayette County, 1890-1905…175

9. Fig. 5.3—Average total cost for guilty defendants, Fayette Justice Court, 1876-1904……..178

10. Fig. 5.4—Average total cost for guilty defendants, McLennan County Court, 1876-1930………………………………………………………………………………178

11. Fig. 5.5—Penalties for Hispanic violators, 1905-1932……………………………………..181

12. Fig. 5.6—Fayette County census data, 1870-1920…………………………………………192

13. Fig. 5.7—McLennan County census data, 1870-1920……………………………………..192

14. Fig. 5.8—Fayette County violators, 1870-1879……………………………………………192

15. Fig. 5.9—Fayette County violators, 1870-1930……………………………………………193

16. Fig. 5.10—McLennan County Hispanic and Black/Mulatto Violators, 1870-1930……….195

iv

# Introduction

In 1994 the Republican Party cemented its dominance in Texas politics with George W. Bush's gubernatorial victory over the Democratic incumbent Ann Richards. A tangential yet emotionally stirring issue in the campaign involved allowing the carrying of concealed handguns, something that had been illegal in Texas for more than a century. Richards had taken a strong stand against loosening the state's tough gun laws, but Bush promised to sign any bill on the subject passed by the legislature. His position echoed the de-regulatory character of the Reagan-era Republican Party and resonated with many conservative Texans, especially in rural counties. Shortly after Bush's inauguration, the legislature allowed law-abiding residents who passed the requisite training class to obtain state-issued permits to carry concealed handguns. Since that time, the legislature has continued to relax state firearm regulations culminating in the 2015 vote to allow the open carrying of handguns for license-holders.

The 1995 Texas concealed-carry law may seem at first glance like the common-sense removal of an intrusive or unpopular regulation. The stereotype of Texas as a gun-lover's paradise only reinforces this assumption. But this event in the Bush gubernatorial administration marks a significant departure from the past. In fact, the Texas tradition of regulating deadly weapons reached back to the antebellum period and remained popular among the electorate for most of the state's history. The purpose of this book is to separate the gun-toting myth from this regulatory reality.

Much of the scholarship on the history of American firearm regulations has had severe drawbacks in terms of its accuracy, tone, and reception. Our current political debate over gun laws and gun rights has produced partisan scholars who use history as a bully pulpit and skeptical readers who refuse to accept inconvenient facts about the past. Both afflictions hinder a

1

proper understanding of firearms and their regulation in American history. The early twenty-first century controversy over *Arming America* by Michael A. Bellesiles stands as a testament to this ugly impasse between politically engaged historians and the general public. Though recent works on weapons and violence have generated less media attention than that, many have fallen into the same pattern of partisanship and policy advocacy. This exacerbates popular anti-intellectualism and contributes to the further deterioration of our civil discourse.[1]

The well-intentioned yet politically motivated historians who have written about weapon laws do not bear sole responsibility for the state of their academic field today. Another important component has been the production of explicitly partisan material for the consumption of policymakers and jurists. Publications abound from think-tanks and policy centers, the vast majority of which subjugate the study of the past to the desires of the present. These articles, pamphlets, and books show little concern for understanding holistically the views and customs about weapons held by our ancestors; instead, they present the mere facts of gun ownership or government regulation of guns as justification for one or another modern policy. Though both sides of the aisle in American politics employ this tactic, the right has done so far more forcefully and effectively. Right-leaning legal and policy scholars have constructed a "gun rights" outlook that limits discussion exclusively to the Second Amendment, condemns firearm regulations as relics of a racist past, and posits a negative correlation between guns and violent

---

[1] Michael A. Bellesiles, *Arming America: The Origins of a National Gun Culture* (New York: Knopf, 2000); Alexander DeConde, *Gun Violence in America: The Struggle for Control* (Boston: Northeastern University Press, 2001); Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016); Caroline Light, *Stand Your Ground: A History of America's Love Affair with Lethal Self-Defense* (Boston: Beacon Press, 2017). The trend is not isolated to works related to gun culture and gun control, as evidenced by Lisa McGirr, *The War on Alcohol: Prohibition and the Rise of the American State* (New York: W.W. Norton, 2015).

crime. Though the legal analysis may be sound, these publications rely upon faulty interpretations of the past and their biases undermine their persuasiveness.[2]

The controversial and partisan nature of scholarship pertaining to gun regulations is not the field's only problem. Another is the overwhelming focus upon national narratives and constitutionalism to the exclusion of all else. Many historians and policymakers alike would have the American public believe that the only words of consequence pertaining to gun laws are those of the Second Amendment: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."[3] One side claims this sentence as an unrestricted constitutional right to own and use all manner of weapons, while the other interprets it as a right to collective self-defense. Both perspectives ignore the longstanding, important role of state and municipal governments in regulating the behaviors of their residents. The even-handed analyses that do acknowledge the long history of state restrictions often do so without fully exploring the reasons why the nation's founders vested such authority in local rather than national institutions. For these authors, the existence of colonial, state, or municipal firearm laws justifies their occupation of a nebulous "middle ground" between the opposing camps arguing over the Second Amendment's meaning and history. The problem with this position, however, is that the longstanding coexistence of state-level weapon regulations with the Second Amendment has had more to do with the founding generation's views about federalism than firearms. Losing sight of state-level regulations and authority has

---

[2] Right-leaning Cato Institute has a webpage dedicated to posting and circulating articles about gun control. See https://www.cato.org/research/gun-control. On the left, the Center for American Progress dedicates a page to articles about gun violence. See https://www.americanprogress.org/tag/gun-violence/. John R. Lott, Jr., *More Guns, Less Crime: Understanding Crime and Gun Control Laws* (Chicago: University of Chicago Press, 1998); David B. Kopel, *The Truth about Gun Control* (New York: Encounter Books, 2013); Clayton E. Cramer, *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* (Nashville, TN: Nelson Current, 2006); Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866-1876* (Westport, CT: Praeger, 1998).

[3] U.S. Const. amend. II.

been detrimental to the study of gun regulations and their history because the statutes in question, particularly those targeted by gun-rights lobbyists since the 1970s, are those enacted by the states.[4]

The matrix of partisan scholarship and Second Amendment myopia has obscured the changing relationship of our American ancestors to their firearms, and to their state governments. At the time of our country's founding, intellectuals drew a distinction between *bearing* arms and simply *carrying* them. A man bearing arms was one fulfilling his civic, manly duty to protect his family and community from invaders or criminals. American men bore arms on a regular basis as members of local militia units that performed various functions for the community. These included well-known actions like fighting in wars and putting down rebellions alongside the less glamorous activities of law enforcement, slave patrol, and killing animals that threatened the harvest. Prior to professional policing, deputized and armed citizens played a crucial role in the apprehension of fugitives, the incarceration of criminals, and the operation of local courts. If bearing arms in service to the community was a custom imbued with meaning for early American men, the mere act of carrying weapons was not. Knives, firearms, and dangerous tools were ubiquitous in the eighteenth and nineteenth centuries. Men of all stripes carried them regularly, or even daily, for the purposes of hunting, self-defense, and dueling. Such activities did not connote the same civic duty and social significance that bearing arms did because they were private and non-noteworthy matters.[5]

---

[4] Winkler posits a "middle ground in which gun rights and laws providing for public safety from gun violence can coexist." Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (New York: W.W. Norton, 2011). See also Patrick J. Charles, *Armed in America: A History of Gun Rights from Colonial Militias to Concealed Carry* (New York: Prometheus Books, 2018); Robert J. Spitzer, "Gun Law History in the United States and Second Amendment Rights," *Law and Contemporary Problems* 80, no. 2 (2017): 55-83; Duke University Repository of Historical Gun Laws, https://law.duke.edu/gunlaws/.

[5] Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (Oxford: Oxford University Press, 2006), 3-7, 13-18.

4

As important as the distinction between bearing arms and carrying them is the difference between *arms* and *deadly weapons*. As the nineteenth century progressed, Americans began to separate those weapons used for interpersonal violence from those borne for martial purposes. Militiamen used muskets, rifles, cavalry sidearms, sabers, and even cannon. Laws rarely curtailed access to these weapons of war or restricted their presence in the public sphere (the primary exception being those designed to limit the access of slaves and Indians to firearms). Militia units kept armories and even obtained arms and ammunition from their state governments. Shotguns, important for hunters, received similar exemption from regulation or proscription. Nineteenth-century Americans tended to see revolvers, bowie knives, sword canes, and brass knuckles in a completely different light. These were instruments of interpersonal violence often concealable beneath a coat or in a pocket—they were *deadly weapons*. When state legislatures began prohibiting concealed weapons in the early nineteenth century and enacting comprehensive weapon bans after the Civil War, they specifically targeted these deadly weapons rather than rifles or muskets.

Misunderstanding the relationship between early Americans and their firearms has resulted in widespread ignorance of the power wielded by state governments over the use of weapons throughout American history. This prerogative was rooted in a concept that William Blackstone called "public police." He defined it as, "the due regulation and domestic order of the kingdom: whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behaviour to the rules of propriety, good neighbourhood, and good manners; and to be decent, industrious, and inoffensive in their respective stations."[6] After the Revolution, this intertwined responsibility for the common weal and authority over the

---

[6] William Blackstone, *Commentaries on the Laws of England*, 4 vols. (Oxford: Oxford, 1765-1769), 4:13.

citizenry did not disappear. It became vested within the state governments and took on the name *police power*. Under the auspices of police power, nineteenth-century state governments enacted all manner of regulations upon the behavior of their residents, including laws pertaining to carrying or concealing deadly weapons and the sale or gift of them to untrustworthy persons. The importance of state governments in regulating firearms and other deadly weapons for the common good requires us to rethink the history of gun control in terms of state rather than federal power.[7]

A state-level survey of laws pertaining to the use, sale, and carrying of weapons promises to shed new light upon Americans' views of these devices and their regulation by democratic institutions. The states and territories that embraced weapon regulation statutes most wholeheartedly were those of the American South during the antebellum period and the American West during the postbellum period. A good case study, then, must exemplify both regions in order to explain why their residents became supporters of gun laws.  High rates of interpersonal violence during the early nineteenth century prompted the southern states to make use of their police power insofar as it related to weapons. Between 1800 and 1840, these governments enacted non-comprehensive regulations that prohibited certain modes of carrying weapons, outlawed some activities that required their use, and prevented suspect persons from having them at all. By 1840 white men in much of the South were legally prohibited from concealing knives and pistols under their clothing and participating in duels, while black men had tightly restricted access to arms. During and after the Civil War era, the fast-growing states of the trans-Mississippi West started passing comprehensive laws that prohibited carrying any type of deadly weapon with few exceptions. From Minnesota to Arizona, and Indian Territory to

---

[7] Gary Gerstle, *Liberty and Coercion: The Paradox of American Government from the Founding to the Present* (Princeton: Princeton University Press, 2015), 2-4, 59-61.

Idaho, Americans on the fringe of Anglo settlement voiced support for gun laws that promised to preserve the peace and prevent crime.[8]

Of those few states which straddle both South and West, Texas offers the best state-level survey. The political leaders and early settlers of the Lone Star State were Anglo-American southerners who strongly identified with their section; yet the residents of the western counties had more in common with the American West, subject as they were to Indian raids, lack of transportation, and an abundance of underutilized natural resources. Antebellum Texans prohibited dueling, mounted an anti-concealed-weapon movement, and debated state policy pertaining to slaves' and Indians' access to firearms. In the postbellum period, Texans were among the first to champion comprehensive weapon regulations that criminalized the carrying of deadly weapons in most circumstances. By the early twentieth century, Texas lawmakers began exploring new ways to indirectly pressure gun-toters to leave their pistols at home. The diversity of the state's geography and demography add to its desirability as a case study. Inequitable enforcement of weapon regulations could have been used to harass African Americans, Hispanics, and the politically powerful enclaves of European immigrants.

The chapters that follow illuminate the long history of firearm and weapon laws in Texas. These began during the Republic period of the 1830s and 1840s with overtly discriminatory restrictions upon providing arms to suspicious or untrustworthy persons. The earliest prohibited selling or trading arms and ammunition to Indians, and the 1840 slave code began a tradition of limiting slaves' access to weapons that postbellum leaders tried to apply to black freedmen. The

---

[8] Randolph Roth, *American Homicide* (Cambridge: Belknap Press of Harvard University Press, 2009), 180-181; Clayton E. Cramer, *Concealed Weapons Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (Westport, CT: Praeger, 1999); Donald Curtis Brown, "The Great Gun-Toting Controversy, 1869-1910: The Old West Gun Culture and Public Shootings," (PhD diss., Tulane University, 1983). According to Roth, American cities retained low rates of homicide until the 1840s, but high rates of homicide plagued the Southern states throughout much of the eighteenth and nineteenth centuries.

legislature in Austin first enacted race-neutral gun laws, those which we might consider "modern" like our own, during Reconstruction as part of an effort to reduce crime and protect vulnerable minorities from intimidation by former Confederates. In the late nineteenth and early twentieth centuries, Texans from all corners of the state participated in what can only be called a gun control movement seeking to disarm almost everyone—even cowboys. As Texas became a destination for more and better-capitalized business investment, a rising middle class rejected gun-toting as an uncivilized behavior not suitable for respectable men. Widespread support for the deadly weapon laws of Texas remained throughout much of the twentieth century. The final chapter in this story is the erosion of that support in the latter twentieth century, much of it premised upon antipathy toward federal gun legislation and a selective memory of the state's past.

Chapter 1
Weapon Regulations in Texas, 1836-1866

The fundamental concept underlying regulation of weapons, whether in Texas or elsewhere, is the belief that limiting access to them safeguards the community by reducing crime. The legality of laws restricting access to or use of weapons varies depending upon the system of government in place. The concept of *police power* authorized American state governments (and their colonial predecessors) to pass such laws for the common good, but the Bill of Rights prevented the national government from doing the same. In Texas, where a Spanish legal heritage left an indelible mark and the liberal-republican values of the American Revolution inspired the founding documents of the Republic in 1836, the question of police power is a tricky one. The Mexican government certainly wielded something along the lines of police power, restricting the wearing of weapons in public by disgraced Spanish *criollos* after independence in 1822.[1] When Tejanos and Texians joined forces to throw off *centralista* rule, they embraced the limited government and unassailable individual rights of liberal political theory. Insofar as weapons were concerned, the authors of the constitution of the Republic of Texas chose to restrict their police power. In fact, the Republic's version of the American Second Amendment forthrightly declared that citizens had the right to bear arms both for national defense and personal self-defense—a unity of two purposes that is not explicit in the Second Amendment and was not articulated by the United States Supreme Court until 2008.[2]

---

[1] "Decree No. 38," 27 November 1827, Saltillo; in H. P. N. Gammel, comp., *Gammel's Laws of Texas*, vol. 1 (Austin: Gammel Book Company, 1898), 204-205. (Hereafter, all subsequent citations of this and other editions of *Gammel's Laws of Texas* will be cited as "Gammel, (comp.), *Gammel's Laws*" followed by the volume and page numbers.

[2] Rep. of Tex. Const. of 1836. The text from the 1836 constitution states: "Every citizen shall have the right to bear arms in defence of himself and the Republic." The Second Amendment's application to personal self-defense was articulated by the US Supreme Court in *District of Columbia v. Heller*, 554 U.S. 570 (2008).

The reason for the Texan interpretation of the right to bear arms as one encompassing both national defense and self-defense likely emanates from the perilous environment of the region during the eighteenth and nineteenth centuries. Early settlers in what is now Texas lived in a time and place filled with opportunities for violent confrontations with soldiers, Indians, wild animals and one another. Relations between Spanish (and later Mexican) officials and Indian leaders were tense at best, and often deadly. The introduction of Anglo American, Protestant settlers under the *empresario* system of the 1820s and early 1830s added yet another group to Texas, one whose desired mode of subsistence (commercial agriculture) put them at odds with ranching Tejanos and raiding Comanches. Farmers and ranchers routinely fell prey to Native American war parties and came to know the dangers of frontier living. The successive military engagements within the borders of Texas from the 1820s to the 1840s left many residents familiar with invasion and occupation. These invasions, along with the daily threat of Indian raids and animal attacks, made Texas a dangerous and violent place to live in comparison to larger population centers in Mexico and the United States.

In a perilous environment like early Texas, weapons were a necessity. Muskets and rifles pulled double-duty by enabling men to hunt as well as protect their communities through service in a militia or posse. Pistols had long been used for activities ranging from dueling to self-defense, though they became more common after the introduction of the Colt revolver in the 1840s. The go-to weapon for personal self-defense, though, was a large 8½ to 12½ inch blade known as the Bowie knife. Texas immigrant Jim Bowie made the knife famous after he used it to great effect in a duel known as the Sandbar Fight.[3] These large knives were quite dependable in a

---

[3] Kevin Dougherty, *Weapons of Mississippi* (Oxford: University of Mississippi Press, 2010), 40-41; *Handbook of Texas Online*, William R. Williamson, "Bowie Knife," accessed January 25, 2018, http://www.tshaonline.org/handbook/online/articles/lnb01.

scrape because, unlike the single-shot pistols of the time, they did not need to be reloaded.

Similar weapons included the Arkansas toothpick, a sharply tapered blade of similar length, and the "Spanish stiletto" or *narvaja*, a slightly shorter folding or switchblade knife (see Figs. 1.1, 1.2).

Fig. 1.1. Bowie knife and sheath, physical object, Date Unknown; (texashistory.unt.edu/ark:/67531/metapth30343/: accessed January 25, 2018), University of North Texas Libraries, The Portal to Texas History, texashistory.unt.edu; crediting Star of the Republic Museum



Fig. 1.2. 20th century rendition of Arkansas Toothpick; made by Jimmy Lile; 1970; Historic Arkansas Museum, Knife Gallery (http://www.historicarkansas.org/collections/knife-arkansas-toothpick accessed January 25, 2018).



11

Though Texas citizens remained insulated from government interference with their right to bear arms, they faced penalties for committing certain weapon-related crimes. The Republic of Texas Congress continued the policies of the preceding Spanish and Mexican governments by restricting the arms trade between settlers and Native Americans. The Spanish prohibited the trading of high-quality weapons to Indians in the eighteenth century, and the Mexican state of Coahuila y Texas reaffirmed the illegality of trading arms to Indians in 1834.[4] The Republic of Texas endured (and at times exacerbated) conflicts with nearby Native Americans for the duration of its decade-long existence. The primary political division within the young republic, between the supporters of Sam Houston and those of Mirabeau Lamar, revolved around rival Indian policies—with the former urging cooperation and peace, and the latter seeking conquest and extermination. Texans found themselves in a unique predicament: unable to fully defend their southern border from Mexican incursions, and simultaneously incapable of preventing Indian raids upon their livestock and people. Their situation was made worse by the thousands of migrants making their way across the Mississippi River, all of whom needed livestock and labor. These migrants included white settlers seeking their fortune in cotton cultivation, as well as the thousands of Native Americans forcibly relocated under the federal policy of Indian Removal. Horses and people captured in Texas often ended up in one or another US-authorized trading posts on the north side of the Red River, in Indian Territory. The Americans running the posts frequently traded in stolen horses, but they generally sought to ransom white captives (a distinction that may have been unclear to Comanches and others who nonetheless rode away having been paid to turn over a hostage).

---

[4] "Decree No. 278," 19 April 1834, Monclova; in Gammel (comp.), *Gammel's Laws*, 1:380-381; Pekka Hämäläinen, *The Comanche Empire* (New Haven: Yale University Press, 2008), 72-73.

The most famous of these Red River trading posts was that of Holland Coffee, a Kentuckian who set up his operation first in Fort Smith, Arkansas before moving west to Indian Territory and finally into Texas in the late 1830s. Coffee was well-acquainted with the customs, languages, and leaders of tribes in the Southwest and traded with them frequently, likely exchanging whiskey, ammunition, and guns for captives, horses, and livestock. Coffee's license from the American Office of Indian Affairs meant that, as long as he remained in Indian Territory, Texans could do no more than complain about his actions. In 1835, Jim Bowie specifically requested that local officials in Nacogdoches investigate Coffee's practices, but war prevented anything from being done. Traders like Coffee found themselves between a rock and a hard place during the Texan war for independence; they hoped to continue their lucrative trade with trans-Mississippi Indians but went up against new competition from Mexican agents hoping to enlist Native Americans against the rebels in Texas.[5] When Coffee moved to Texas in 1837, his reputation as a wartime arms dealer to hostile tribes prompted the Texas Congress to investigate him. Congressmen questioned him under oath but could not convict him of any wrongdoing (and actually reimbursed him for ransoms paid to free white hostages brought to his post). Despite his transition from life on the fringes of society to landed respectability, Coffee's critics continued to accuse him of engaging in illegal Indian trade. One account claims that as late as 1840 he still traded in goods and captives stolen by Comanches, Cherokees, and Kickapoos.[6] A few years later, Jim Bowie had his posthumous revenge—his namesake knife dealt a fatal blow to Coffee during an argument that turned deadly.[7]

---

[5] Grant Foreman, *Pioneer Days in the Early Southwest* (1926; repr., Lincoln: University of Nebraska Press, 1994), 234.
[6] William Physick Zuber, *My Eighty Years in Texas* (Austin: University of Texas Press, 1971), 107-111.
[7] Audry J. and Glenna Middlebrooks, "Coffee of Red River" *Southwestern Historical Quarterly* 69, no 2 (October 1965), 161. On Holland Coffee, see also David R. Jennys, "Holland Coffee: Fur Trader on the Red River," *The Museum of the Fur Trade Quarterly* 29, no. 3 (Fall 1993): 1-9; Larry O'Dell, "Coffee's Post," *The Encyclopedia of Oklahoma History and Culture*, www.okhistory.org (accessed January 25, 2018); *Handbook of Texas Online*, Morris

Laws regulating trade with American Indians might have placed weapons and ammunition on a prohibited list, but they do not qualify as "gun laws" as we understand them today. Numerous scholars of Native American history consistently remind us that they were separate, independent polities that often controlled vast swaths of land nominally claimed by European or American powers. Governments usually exert some control over international trade and prohibit it entirely between their people and their enemies. Within this context, it only makes sense that Texans (along with Spaniards, Mexicans, Britons, and Americans) tried to keep a watchful eye on their Indian traders and prevent potential enemies from obtaining weapons of war. That being said, these common-sense regulations intervened in the affairs of traders and threatened their livelihoods by prohibiting them from providing the very goods that tribes wanted most: arms, ammunition, and alcohol. The risk to their businesses surely tempted them to break the law, as Holland Coffee may very well have done while simultaneously serving in the Texas legislature. The kind of fearless, individualistic, and self-sufficient men who made their fortunes through trapping and trading quite possibly looked with disdain upon distant governing bodies with little or no actual power along the frontier.[8]

The actions of unscrupulous traders posed an existential threat to Texans during the 1830s by providing arms to Indian raiding parties, but it was the way in which Coffee died, not his mode of making money, that posed a more persistent problem in the young republic. The frequency with which residents resorted to violence to settle their disputes led Southern states to enact the nation's first "gun control" laws as part of an effort to reduce these deadly encounters.

---

L. Britton, "Coffee, Holland," accessed January 25, 2018, http://www.tshaonline.org/handbook/online/articles/fco12.

[8] Though scholarship on masculinity among frontiersmen is sparse, the conclusions of Amy S. Greenberg indicate that the aggressive masculinity behind Manifest Destiny is best represented through filibustering campaigns; filibusterers were motivated by self-interest and lacked respect for government policies, much like frontier traders seem to have done. See Amy S. Greenberg, *Manifest Manhood and the Antebellum American Empire* (New York: Cambridge University Press, 2005), 33, 148-152.

14

Brawls, duels, affrays, and street-fights were a common occurrence throughout the South and Southwest in the century following American independence; in fact, homicide rates on the old southwestern frontier did not begin to decline until the 1930s.[9] As the market economy spread into frontier areas in the early nineteenth century, the boatmen transporting goods up and down the Mississippi River found trouble wherever they stopped along the way. Whiskey and cards led to many a fight, and minds clouded by John Barleycorn were all the more willing to win by reaching into a pocket for a hidden knife or pistol. Kentucky and Louisiana responded in 1813 by banning concealed weapons. Indiana followed suit in 1816, followed by Alabama, Georgia, and Virginia in the 1820s and 1830s. In 1821, Tennessee barred certain weapons from the public sphere altogether. The distinction between regulating the right to bear arms by prohibiting *concealed* weapons and removing the right to bear arms by prohibiting all *concealable* weapons became an important one in Texas. Tennessee became the first state to make this leap when the legislature forbade the carrying of any "dirk, sword cane, French knife, Spanish stiletto, belt or pocket pistol" concealed or openly. Persons found in possession of illicit or hidden weapons typically received a hefty fine, but those carrying or using weapons in the commission of another crime (like burglary or assault) went to the penitentiary.[10]

States banning concealed weapons had several important similarities. Each was experiencing rapid population growth and the establishment of commercial agriculture. Between 1800 and 1820, Tennessee's population quadrupled, while Alabama's population rose by more

---

[9] Roth, *American Homicide*, 341.

[10] The 1821 law provided for a five dollar fine for each offense, and a later statute (1838) called for a harsher sentence for homicides committed with knives. 1821 Tenn. Pub. Acts 15-16, An Act to Prevent the Wearing of Dangerous and Unlawful Weapons, ch. 13; 1837-1838 Tenn. Pub. Acts 201, An Act to Suppress the Sale and Use of Bowie Knives and Arkansas Tooth Picks in the State, ch. 137, § 4. https://law.duke.edu/gunlaws/. On Tennessee's 1838 laws regarding concealed weapons, see Cramer, *Concealed Weapons Laws*, 105-112.

15

than 300 percent from 1800 to 1840.[11] As farmers brought ever more land into cultivation, they frequently moved beyond the reach of government institutions. Sparse population and a lack of roads made it tough to enforce the law in frontier areas. Judges had difficulty traveling their circuits, and criminals could easily tax the resources of county sheriffs. Without roads, post offices, resident judges, or access to state officials, farmers of these rural regions felt forgotten or taken advantage of by politicians in the capital. This absence of government authority in rural areas produced skepticism and disdain about the effectiveness of the law to settle interpersonal disputes.[12] States passing prohibitions against concealed weapons also tended to be slaveholding, Southern states. The lone exception is Indiana, a state initially settled by Southerners that often defies regional trends.[13] Scholars have long suspected that exposure to the brutality of slavery made Southerners a more violent group of people than their Northern counterparts.[14] No doubt the expectation of Southern men to periodically be brutal and unforgiving toward slaves played an important role in justifying extralegal violence like brawls and duels. A final commonality among the states in question is the uncertainty with which middling farmers saw their futures. Despite rapid settlement and population growth, the agricultural regions of the South had a stifled middle class, stuck between a fabulously wealthy planter elite and a desperately impoverished class of poor whites.[15]

---

[11]United States Census of Population and Housing. *United States Resident Population by State: 1790 – 1850*. https://www.census.gov/prod/www/decennial.html.

[12] Roth, *American Homicide*, 220-224.

[13] Roth, *American Homicide*, 219; Cramer, *Concealed Weapons Laws*, 77-78.

[14] David T. Courtwright, *Violent Land: Single Men and Social Disorder from the Frontier to the Inner City* (Cambridge: Harvard University Press, 1996), 30; Edward L. Ayers, *Vengeance and Justice: Crime and Punishment in the 19th Century American South* (New York: Oxford University Press, 1984), 9-33; Roth, *American Homicide*, 180; Cramer, *Concealed Weapons Laws*, 18-22.

[15] On the importance of economic uncertainty in the post-Revolutionary South, see Roth, *American Homicide*, 186-187. Texas scholar William Ransom Hogan also draws a correlation between economic turmoil and interpersonal violence. See William Ransom Hogan, *The Texas Republic: A Social and Economic History* (Norman: University of Oklahoma Press, 1946), 289.

In its early years as a republic and American state, Texas met these conditions. Emigrants "gone to Texas" uprooted themselves from every Southern state (and even a few Northern ones, too). They took with them the desire to become prosperous through commercial farming, especially cotton cultivation. Young men-on-the-make flocked to Texas seeking wealth, wartime glory, and a role in the establishment of a new republic. When financial shortfalls prompted President Sam Houston to disband army volunteer units, some disgruntled soldiers took to terrorizing residents in nearby towns. A Baptist minister in Washington County (then the seat of government) told of their Sabbath drunkenness and gambling.[16] With relatively few marriageable women, startlingly weak church institutions, and a dearth of government officials, there was little in Texas to prevent rowdy young men from doing as they pleased. Lawlessness was especially problematic in the boomtown of Houston, the settlements along the lower Brazos and Colorado Rivers, and East Texas. One chronicler claimed that "it is considered unsafe to walk through the Streets of the Principal Towns without being armed."[17] Gamblers abounded, and the unruly element within Texas towns often harassed law-abiding residents into violent confrontations. Proponents of law and order responded by forming vigilance committees and acquitting their upstanding neighbors when taken to trial over a "difficulty" that culminated in a ruffian's death. Some counties did not receive organized courts or judicial districts until 1838, while East Texas devolved into a small-scale civil war known as the Regulator-Moderator War.[18] Speaking of East Texas in the early 1840s, Sam Houston allegedly said, "I think it advisable to declare [them]… free and independent governments, and let them fight it out."[19]

---

[16] Jesse Guy Smith, *Heroes of the Saddle Bags: A History of Christian Denominations in the Republic of Texas* (San Antonio: The Naylor Company, 1951), 74-75.
[17] Quoted in Joseph William Schmitz, *Texas Culture in the Days of the Republic, 1836-1846* (San Antonio: The Naylor Company, 1960), 80.
[18] Hogan, *The Texas Republic*, 274, 262-263, 274-275, 258.
[19] Quoted in *Handbook of Texas Online*, Gilbert M. Cuthbertson, "Regulator-Moderator War," accessed January 16, 2018, http://www.tshaonline.org/handbook/online/articles/jcr01.

Conditions in Texas were ripe for the enactment of a concealed weapons law, and there was a vocal movement in favor of such legislation. Beginning in 1838, some Texans bemoaned the human cost of crimes "solely attributable to unbridled passions and the practice of wearing concealed weapons."[20] Events in Houston in 1838 fueled this reformist zeal. An argument between two gamblers ended with one, J. C. Quick, killing the other, while a similar dispute between two soldiers left Mandrid Wood dead at the hands of David Jones. The condemned men waited in Houston's newly constructed jail—a weakly guarded palisade—to be rescued by supporters or executed by the law.[21] Some two thousand Texans turned out to witness the republic's first executions for murder, with one spectator praising his countrymen's willingness to "prosecute to the tomb those who . . . perpetrate deeds of Hell." This anonymous contributor spoke for a large number of his fellow Texans who patted themselves on the back for contradicting their nation's reputation as a place where "cold-blooded, malicious murder might be perpetrated without the fear of a condemnation of the law or public feeling." The successful prosecution of Quick and Jones was proof of the republic's civilization, as well as the "moral worth" of its recent immigrants.[22]

If the legal system was strong enough to obtain justice against Quick and Jones, and reduce crime in fast-growing Houston, then a prohibition against concealed weapons could bring similar relief and progress to every corner of Texas. One writer praised Tennessee, whose prohibitions of gambling, grogshops, and concealed weapons were thought to have contributed to "the lessening of crime, and vast improvement in the morals of her once thoughtless and deluded

---

[20] "Execution," *Telegraph and Texas Register* (Houston, TX), March 31, 1838.
[21] On the Quick and Jones cases, see B. H. Carroll, *Standard History of Houston Texas from a Study of the Original Sources* (Knoxville: H. W. Crew & Co., 1912); Hogan, *The Texas Republic*, 261.
[22] "Execution," *Telegraph and Texas Register*.

18

sons."[23] In 1839 a Congressman representing Fayette County in central Texas introduced a bill to do that very thing. James S. Lester's "Act to prevent persons from carrying concealed deadly weapons" easily passed through the House without debate or amendment. Its supporters in the Senate featured men from across the republic, especially East Texas; but they did not have the numbers or the time to push the bill through the upper chamber. The legislative session ended shortly after Lester's bill made its way to the Senate, and the issue remained dormant for about a decade.[24]

Debate among Texans over a concealed weapons ban continued in the 1840s but took place within the halls of the Constitutional Convention of 1845 rather than the legislature. With Texas's entry into the Union that year, Texas politicians had to write a new constitution that conformed to the laws of the United States. There was no question that they would retain a state guarantee for the liberty of bearing arms, but a number of delegates sought to curtail that right as it had existed during the Republic period. William B. Ochiltree, the most successful Whig politician in Texas, suggested a right to keep and bear arms "for their common defense, provided that the Legislature shall have the right to pass laws prohibiting the carrying of deadly weapons secretly." Ochiltree's language represented a sharp break from the past for two reasons: it authorized legislative regulation against concealed weapons; and it removed the explicit inclusion of personal self-defense within the right to bear arms. Ochiltree's suggestion immediately alienated delegates who thought it went too far and simultaneously aroused the opposition of delegates who believed it did not go far enough. Lemuel Evans of north Texas,

---

[23] "A Few Thoughts," *Telegraph and Texas Register* (Houston, TX), October 27, 1838. Reprinted from *Mobile (AL) Chronicle*.
[24] See *Journal of the House of Representatives of the Republic of Texas*, 3d Cong., Reg. Sess. (1838), 325; *Journal of the Senate of the Republic of Texas*, 3d Cong., Reg. Sess. (1838), 126. (Hereafter, all subsequent citations of this and other editions of *Journal of the House of Representatives of the Republic of Texas*, *Journal of the Senate of the Republic of Texas*, *Journal of the House of Representatives of the State of Texas*, and *Journal of the Senate of the State of Texas* will be cited as *"House Journal"* or *"Senate Journal"* with the year following in parentheses).

19

Joseph L. Hogg of east Texas, and John Hemphill of central Texas fell into the latter category because they wanted the legislature empowered to prohibit the carrying of any deadly weapon within the public sphere, whether openly or concealed. Evans and Hogg concerned themselves with the practicality of Ochiltree's proposal, which would endanger the common good by permitting people to openly carry Bowie knives and other "deadly weapons" in public. Ochiltree's response, rooted in the conception of individual rights that is the hallmark of classical liberalism, was that a man "was not to be prevented from carrying them if he thought it necessary." Prohibiting concealed weapons was a reasonable exercise of state police power for the commonweal, but leaving the door open to full disarmament violated certain inalienable rights of free men. Robert E. B. Baylor, representative from Fayette County and associate justice of the Texas Supreme Court, echoed Ochiltree's liberal sentiments and reminded the delegates that the high court of Kentucky (his home state) had overturned a concealed weapons ban. That court decided that any restriction whatsoever upon the right to bear arms was unconstitutional, "for if it [the legislature] had the right to proscribe one mode of wearing arms, it had the right to proscribe another, and thus it might finally defeat the great end and object." Baylor's reference to Kentucky was not merely a counterpoint to Ochiltree, who had mentioned the "supreme tribunals" of Alabama; he cast doubt upon the willingness of Texas Supreme Court justices to recognize the legislature's authority to regulate the wearing of weapons no matter what the constitution said. Judge Baylor had transformed the discussion from one about language to one about legal theory and political philosophy. The Texas constitution could not confer upon the legislature rights that inhered within free persons. Put another way, the police power of the state did not extend to the right of citizens to wear, carry, or keep weapons.

John Hemphill, sitting chief justice of the Texas Supreme Court, rose to meet Baylor on the plain of legal theory and political philosophy. His interpretation of the right to bear arms aligns with what historian Saul Cornell has called the "civic" sense, which emphasized the obligation of the citizenry to take up arms as a militia when called upon or when tyrannized by a government. English common law already guaranteed the individual the right of "self-preservation" against lethal attacks, non-lethal beatings, and assaults upon "his reputation or good name."[25] Moreover, those under attack held the inalienable right to having arms "such as are allowed by law" to defend themselves. In a country subscribing to the common law (as the United States did following independence), this natural right to self-defense could not be revoked by a government and was altogether separate from the right to bear arms as enshrined within the American Bill of Rights, Republic of Texas Declaration of Rights, and numerous American state constitutions. Hemphill stated: "The object of inserting a declaration that the people shall have a right to bear arms is, that they may be well armed for the public defence; it is in order that the law regulating the militia be kept up. It is not a supposition which can arise in a country where common law prevails, that it is necessary to bear arms for protection against fellow citizens." According to Hemphill, his opponents were wrong to consider the right to bear arms an obstacle to legislative regulation of the wearing and carrying of deadly weapons in public during peacetime. Any interpretation of common law adopting the view of Baylor or Ochiltree, that the right to arms for self-preservation encompassed the freedom to accoutre oneself with weapons at all times, had taken personal liberty to an antisocial extreme. Interestingly, Hemphill recommended that the convention adopt the language of the Second Amendment verbatim—he understood that right in the civic sense rather than the individual sense of Baylor and the twenty-

---

[25] Blackstone, *Commentaries*, 1:1.

first century US Supreme Court.[26] The convention temporarily adopted the US Second Amendment in lieu of Ochiltree's original recommendation, but Hogg, Hemphill, Evans, and another north Texan named Gustavus Everts could not rally enough delegates to their cause. An unrestricted, individual right to bear arms as was present during the days of the Republic continued into the era Texas statehood when a majority of convention delegates voted that "Every citizen shall have the right to keep and bear arms in defence of himself and of the State."[27]

Baylor's view had won the day in 1845, but the supporters of a concealed weapons ban considered the debate about legislative regulation far from over. A total of five bills received attention between 1851 and 1859, most of them introduced by representatives from East Texas. Two sponsors came from Cherokee County, and one each from Lamar, Rusk, and Galveston Counties. The popularity of concealed weapons legislation in East Texas may have arisen from the relative strength of Protestant denominations there. East and Northeast Texas were fertile areas for Baptist, Methodist, and Cumberland Presbyterian revivals during the 1830s and 1840s, and their relative proximity to the United States left them with stronger denominational ties than elsewhere in Texas.[28] A disproportionately high number of outlaws and desperadoes may also have been a factor, especially for those politicians representing counties along the Red River that suffered longer than most from lawlessness and feuds. Accounts of murders and deaths filled the pages of newspapers in Northeast Texas; one front page from Red River County in 1851 carried

---

[26] On the debate over the right to bear arms in the Texas Constitutional Convention of 1845, see F. M. Weeks, reporter, *Debates of the Texas Convention* (Houston: J. W. Cruger, 1846), 311-312. The debate is quoted at length in Stephen P. Halbrook, "The Right to Bear Arms in Texas: The Intent of the Framers of the Bills of Rights." 41 *Baylor Law Review*, 629-88 (1989), 640-645. For a summary of the debate emphasizing the competition between the civic sense and individual sense of the right to bear arms, see Cornell, *A Well-Regulated Militia*, 160-161.
[27] Tex. Const. of 1845, art. I §13.
[28] Supporters of Lester's original 1839 bill also tended to come from Texas's eastern counties. Protestant missionaries, regardless of denomination, tended to arrive overland via East Texas, giving that region stronger evangelical church organizations. See Smith, *Heroes of the Saddle-bags.*

news of two brawls-turned-deadly, two cold-blooded murders, a story about a dying woman, a poem called "A Dying Boy," and a "solemn thought" about the gravity of human interactions.[29]

The proposed concealed weapons laws of the 1850s generated much more opposition in the legislature than Lester's 1839 bill had. Not one passed a chamber without comment, amendment, or substitution. Opponents of a concealed weapons law claimed that the bills introduced were "reiterations of existing law" or "impolitic."[30] Of these five bills, the one that came closest to actual passage was introduced in 1855 by Cherokee County's Robert H. Guinn, a member of the state Senate who held his seat until 1871.[31] The Senate Judiciary Committee substituted his bill but passed a prohibition of carrying concealed weapons; the House Judiciary Committee, however, did not support the idea and had it postponed indefinitely. The following year, however, Texas lawmakers agreed to punish homicides perpetrated with a dagger or Bowie knife more severely than others. For many years the Bowie knife had been "the weapon most in vogue" throughout Texas, so making an example of blade-wielding murderers promised the results of a concealed weapons prohibition without the political fallout.[32]

The year 1859 saw the end of the anti-concealed weapons movement in Texas. John Hemphill's common-law defense of legislative regulation over deadly weapons had been voided by the enactment of the state's first penal code in 1856. Moreover, Hemphill departed the state's high court for the halls of the US Senate in 1859, leaving the Texas Supreme Court under the leadership of Oran M. Roberts. Shortly after this transition, the court heard the appeal of John Cockrum, a man convicted of manslaughter using a Bowie knife; due to the law about homicide-

---

[29] See *Northern Standard* (Clarksville, TX), May 3, 1851.
[30] Quotations from *Senate Journal* (1853), 2: 34; and *House Journal* (1859), 87. For introductions or first mentions of the proposed bills, see *House Journal* (1851), 97; *House Journal* (1853), 53; *House Journal* (1855), 31; *Senate Journal* (1855), 56; *House Journal* (1859.), 75.
[31] *Senate Journal* (1855), 56, 65, 105, 129, 132, 137; *House Journal* (1855), 153, 210, 235.
[32] Quoted in Schmitz, *Texas Culture*, 80.

23

by-blade, he was to receive the same punishment as a conviction for murder—life in solitary confinement. His attorney argued that harsher penalties for knife killings unjustly deprived poor men of their right to bear arms in self-defense. The court upheld Cockrum's conviction and harsh sentencing, but in doing so yielded only the narrowest ground to the legislature to exercise any power over the right of Texas citizens to bear arms. The legislature held the sovereign authority to discourage the use of an "exceeding destructive weapon" like the Bowie knife because it was "almost certain to produce death, when used offensively." But the right of the citizen to bear arms was "absolute," delegated individually to each citizen "from the sovereign convention of the people that framed the state government"; it was "above the law, and independent of the law-making power."[33] This judicial precedent crippled the Texas movement against concealed weapons. At the 1859 legislative session, a representative from Lamar County named Eli Shelton gave the cause one last hurrah. He called upon the House Judiciary Committee to draft a bill outlawing concealed weapons, but the Committee (surely aware of the *Cockrum* decision) refused.[34]

The kinds of disorderly brawls that men like Shelton, Lester, and Hogg had tried to reduce by way of a concealed weapons ban constituted only part of the violence problem in Texas. Had they succeeded in their endeavors, they would have discovered, as other states before them, that prohibitions against concealed weapons did not noticeably reduce crime or homicide. Anecdotal evidence at times points to such laws as great successes, but historical analysis proves just the opposite. Concealed weapons bans were not effective because they treated a symptom rather than its root cause. Rendering heated confrontations just a bit less deadly is a far cry from taking action to reduce the likelihood of such encounters in the first place. Socio-economic

---

[33] *Cockrum v. Texas*, 24 Tex. 394 (1859).
[34] *House Journal* (1859), 75, 87, 111.

instability remained in the South, as did the institution of slavery and skepticism about the interference of government with the customs of its citizens.[35] Prohibitions against hidden weapons proved almost impossible to enforce; as a result, states frequently turned to the same solution that Texans had in 1856 by exacting harsher penalties upon offenders who used certain weapons in commission of a crime.[36]

Brawls, affrays, and street-fights were symptomatic of a larger honor culture present in Southern and Southwestern states. Disorderly, spur-of-the-moment confrontations were merely a variation of the quintessential Southern form of extralegal violence—the duel. This adaptation of the medieval "trial by combat" arrived on American shores during the Revolution and remained popular in Southern states well into the nineteenth century.[37] Duels were highly ritualized and expected to conform as much as possible to custom or prescribed rules; the upper classes in the antebellum South treated duels as part of their cultural domain, but Southerners of all stripes participated in them as principals, seconds, or spectators. American notions of equality and democracy opened this high-brow method of avenging one's honor to the more modest segments of the population. In their own way, even the brawls and affrays of poor or young men can be interpreted as efforts to emulate their social superiors.[38] The duel wielded cultural force in the antebellum South because it promised a route to preserve one's honor, and because it dramatized the unique combination of fearsome passion and respectable civility expected of the governing

---

[35] Roth, *American Homicide*, 218-220.

[36] These laws can be easily accessed through the Duke University Repository of Historical Gun Laws, a searchable database. Southern states identified in the database include Maryland (1809), Alabama (1837), Mississippi (1837), and Tennessee (1838). They were joined by Illinois (1845), California (1853), Washington (1854), and Nebraska (1858). https://law.duke.edu/gunlaws/

[37] Historian Randolph Roth, echoing Bertram Wyatt-Brown, states that dueling fell out of favor in Northern states after the Hamilton-Burr duel of 1804. Northern states nonetheless took the time to officially prohibit dueling much later, beginning with Pennsylvania (1810), Michigan (1816), New Jersey, Maine, and Connecticut in the 1820s, and Ohio and Rhode Island in the 1830s. See Bertram Wyatt-Brown, *Southern Honor: Ethics and Behavior in the Old South* (New York: Oxford University Press, 1982), 20; and Roth, *American Homicide*, 181.

[38] Wyatt-Brown, *Southern Honor*, 350-361.

class of slaveholders.[39] The propensity toward settling disagreements through combat might have been socially acceptable in the South, but it elicited sharp criticism from Northerners, clergymen, and evangelical Southerners. Anti-dueling efforts received strong support and succeeded in passing legislation in Kentucky (1800), Georgia (1816), Louisiana (1828), Tennessee (1836), and Mississippi (1837). Owning dueling pistols or swords was not illegal but state governments were intervening in the lives of the elite men who participated in duels by limiting what they were permitted to do with their weapons, even on their own property.

Texas joined the anti-dueling chorus in 1836, when the newborn republic declared that any duelist's death would be treated as murder.[40] Like concealed weapons laws, this approach did not attack the root cause of Southern violence, encouraging instead a mere reduction in lethality. It was largely ineffective, and juries frequently acquitted defendants rather than convict them of first-degree murder.[41] Jury nullification like this was more common that we might imagine because the reigning honor culture permitted armed toughs to bully otherwise law-abiding citizens into deadly encounters by assaulting their reputations.[42] But in 1840 the Texas Congress officially prohibited dueling of any kind. Unusually, the legislators prefaced their bill with an explanation for its passage. They said that dueling arose "from a false sense of honor" and was "a relic of an ignorant and barbarous age, justified neither by the precepts of morality, nor the dictates of reason." Participants in a duel would thenceforth be tried in district court and subject to a fine of one thousand dollars and one year in prison; those who took the life of an opponent received these penalties in addition to those of manslaughter. Anyone convicted under

---

[39] Roth speaks quite eloquently on this subject. See Roth, *American Homicide*, 214.
[40] *Telegraph and Texas Register* (Houston, TX) January 11, 1837.
[41] Hogan, *The Texas Republic*, 289-290.
[42] Southern satirist Joseph G. Baldwin published a fictitious account of one such encounter where the bully in question received his just reward for cajoling a neighbor into a duel. See Joseph G. Baldwin, *The Flush Times of Alabama and Mississippi; A Series of Sketches* (New York: D. Appleton, 1853), 192-196.

26

the auspices of the "act to suppress duelling" was forever barred from serving in public office.[43] Though the new law played a role in reducing the frequency of dueling in Texas, it was an imperfect solution that even its supporters occasionally ignored. Five duels besmirched the halls of the Republic of Texas Congress, one of which involved a former Speaker of the House whose signature was attached to the 1840 anti-dueling law.[44] During the constitutional convention of 1845, delegates wrote into the constitution a requirement that no man may serve the state in any capacity if he had participated in a duel.[45] This stipulation was repeated in the three subsequent state constitutions, including the one presently in force.[46]

  The anti-dueling law constituted the most substantial antebellum limitation placed upon the rights of citizens to use, keep, carry, and wear deadly weapons, though it was not particularly effective. The classical liberalism which informed the political philosophy of so many Texas politicians, and indeed a sizeable wing of the Democratic Party, prevented the state government from regulating an inherent, inalienable right of Texas citizens to bear arms. The non-citizen residents of Texas, however, were another matter. We have seen how the Republic and later state governments tried to keep weapons out of the hands of hostile American Indians. But the group that experienced the most limited access to weapons in antebellum Texas was, unsurprisingly, the black population of the state. Slaves and "free persons of color" inhabited a "peculiar position" in Texas society because they were legal persons, yet not citizens. What is more, the free status of the latter provided them few benefits under Texas law. Under the 1856 penal code, slaves and free persons of color were "deemed to stand upon terms of equality," meaning that

---

[43] "Act to Suppress Duelling," in Gammel (comp.), *Gammel's Laws*, 2:332-334.
[44] Hogan, *The Texas Republic*, 289-290, 271-273.
[45] Tex. Const. of 1845, art. VII, §1, §5.
[46] Tex. Const. of 1861, art. VII, §1, §5; Tex. Const. of 1866, art. VII, §1, §5; Tex. Const. of 1869, art. XII, §1, §3; Tex. Const. of 1876, art. XVI, §1, §4.

both faced similarly severe consequences for offenses committed against whites. Both groups experienced a shared vulnerability to painful and degrading corporal punishments from which white residents and citizens were immune.[47] The situation for slaves and free persons of color in Texas and the South aligns with the assertion that "in the laws of states and municipalities, those most frequently targeted for surveillance, punishment, and reform were members of suspect groups."[48] Slaves and free blacks endured the full brunt of the state's police power over the right to restrict the use weapons for about thirty-five years before white Texans ever experienced a substantial restriction upon their right to keep and carry weapons in public.

From the earliest introduction of slavery to the English North American colonies in the seventeenth century, bondsmen could be armed by their masters. Weapons were used for hunting as well as self-defense and protection of the plantation from wild animals or intruders. Colonial-era masters overseeing the clearing of land and construction of homes had to rely upon their slaves in a manner unlike their nineteenth-century counterparts. For this reason, the earliest laws regarding bondsmen and weapons provided that slaves be armed *conditionally*, with the permission or even supervision of a master or other suitable white person.[49] In 1664, New York's legislature prohibited slaves from carrying or using any weapon "but in the presence and by the direction of his her or their Master or Mistress, and in their own ground."[50] New Jersey passed a

---

[47] Slaves inhabited the most peculiar position of all because they could at times be considered legal "persons" sometimes, and legal "property" at others. For instance, the Texas Penal Code of 1856 held that, "a slave . . . when tried for a penal offense, is in law a person," but drew a sharp distinction between offenses committed against "slave property" and those against "property other than slaves." See *Penal Code of the State of Texas* (Galveston: The News Office, 1856), x, 158, 161, 162-164.

[48] Gerstle, *Liberty and Coercion*, 64.

[49] The earliest law, from Virginia in 1639, is the subject of a lengthy discourse in T. H. Breen and Stephen Innes, *Myne Owne Ground: Race and Freedom on Virginia's Eastern Shore, 1640-1676* (Oxford: Oxford University Press, 1980), 25-27. The authors contend that the law was "related more directly to taxation than domestic security" and thus not intended to disarm slaves. The full text of the law can be found in Virginia Assembly, "Acts of the General Assembly, Jan. 6, 1639-40," *William and Mary Quarterly* 4, no. 3 (July 1924), 147.

[50] *The Colonial Laws Of New York From The Year 1664 To The Revolution*, (1894), 687.

similar statute in 1694 when, due to slaves' alleged killing of swine in the woods, leaders decided that slaves could not take firearms or dogs into the woods unless the master or his white agent "be with the said slave."[51] These conditional arming restrictions reached the South in the eighteenth century, meaning that prior to that time, planters did not need or expect the legislature to intervene on the subject. Conditional arming regulations were enacted by the legislatures of Maryland (1715), North Carolina (1729), South Carolina (1740), Georgia (1768), Virginia (1792), and Delaware (1798). Text of the laws reveals that planters were concerned about slaves hunting illegally and carrying weapons on Sundays, both of which were serious problems in the colonial South. Shooting a hog was costly to the animal's owner and harmful to the property upon which it was shot, while white Southerners feared slave revolts during Sunday morning worship services. Legislators resisted an outright ban upon bondsmen carrying weapons because such a prohibition would be detrimental to many masters. Slaveholding farms and plantations near backcountry areas received special exemptions from these laws because of the threat posed by predatory animals or other enemies. Masters needed their slaves to protect the plantation or farm. Exemptions also permitted bondsmen to supplement their rations (or perhaps bring home meat for the entire household) by hunting wild game. A blanket prohibition would render this crucial activity illegal—another regulation that non-elite and backcountry planters could not afford. This trend of permitting slaves to use weapons according to their masters' wishes continued into the nineteenth century, not to be reevaluated until the 1840s.[52]

---

[51] *The Grants, Concessions, And Original Constitutions Of The Province Of New Jersey* (1881), 341.

[52] It is worth noting that some scholars have interpreted antebellum laws as strict prohibitions against slaves carrying or using weapons, and a conscious policy on the part of slaveholding governments to keep them disarmed. The facts do not support this interpretation, and the consistent inclusion of exemptions for slaves on the frontier, whose masters had permitted them, or had obtained a special license, clearly shows that at least some slaves carried and used weapons throughout the antebellum period. On this historiographical trend, see Breen and Innes, *Myne Owne Ground*, 24-27. For an example of this interpretation in Texas scholarship, see Halbrook, "The Right to Bear Arms in Texas," 645. Halbrook claims that Texas was "remarkably unlike most other Southern states," and "no one in Texas, regardless of race, was denied the right to possess or carry arms in any manner." Texas was, in fact,

A movement toward stricter laws governing slaves' access to and use of weapons began in the post-1840 period. The chronology makes Texas an interesting case study because the Republic of Texas passed its Slave Code that very year. The Texas Congress declared "no slave in this Republic shall carry a gun or other deadly weapon without the written consent of his master, mistress or overseer."[53] Like their counterparts in other American slaveholding states, Texans believed that masters' property rights entitled them to give weapons to their slaves if necessary. Following longstanding custom among other slaveholding states, the Texas Slave Code provided that unpermitted weapons found in the hands of bondsmen could be confiscated by the person discovering the crime. Despite the relative stringency of the Slave Code's provision, Texas legislators enacted stricter laws and even toyed with the idea of prohibiting masters from arming their slaves under any circumstances. This movement was strongest in the counties of East and Central Texas, where slaves formed a substantial portion of the population and Indian raids no longer threatened residents.

The Texas legislature debated six bills between 1843 and 1856 that proposed further curtailing or altogether prohibiting slaves' access to deadly weapons. Those bills seeking an outright ban faced tough opposition from representatives of the more northerly and westerly counties. The cotton culture took root in these regions, but Indian raids and predatory animals still threatened. In 1850, movement supporters achieved a victory when they passed an amendment to the Slave Code limiting masters' power to arm their bondsmen off the plantation. The law declared that any master or employer "who shall, knowingly, permit any slave… to carry firearms of any description, or other deadly weapons" beyond the boundaries of his own

---

remarkably similar to most other Southern states by permitting the conditional arming of slaves and remaining unwilling to prohibit masters' arming them altogether.

[53] "An Act Concerning Slaves," in Gammel (comp.), *Gammel's Laws*, 2:345-346.

property would be guilty of a crime. Offenders received a sizeable fine, along with court costs and seizure of the weapon; the worst part of the punishment was reserved for the slave permitted to carry the weapon—he or she received no fewer than thirty-nine lashes.[54] The legislature had used its police power to interfere with the property rights of slaveholders by curtailing their authority to arm their bondsmen. Interestingly, this law underwent substantial revision just six years later when the legislature restored a great deal of authority to slave owners. After 1856, slaves had to obtain a permit to carry a weapon at any time, even on the master's property; but, masters regained the authority to arm their slaves off-plantation, as long as the slave was "accompanied by his owner, employer, or some white person." The masters themselves were no longer subject to criminal action should they choose to arm their slaves in public. This shift restored to masters the authority that they lost in 1850, indicating that Texans disapproved of the increased police power of the state over slaveholding citizens. Though the law did not specify a punishment for offending slaves, their penalty remained thirty-nine lashes.[55]

What Texans discovered in the 1850s, they might have learned by looking at the history of Mississippi. That state similarly passed an exceedingly strict law that curtailed masters' authority to arm their slaves. As with Texas, the Mississippi legislature amended the law just a few years later, giving greater leeway to masters to permit their slaves to carry weapons.[56] Texans came to the same conclusion as their Mississippi neighbors, but they stand out as an example of legislators' growing interest in curtailing property rights in the name of public safety. The debate over conditionally arming or fully disarming slaves was fundamentally about

---

[54] The law called for slaves in violation to receive at least thirty-nine lashes, and no more than fifty; masters were fined anywhere between twenty-five and one hundred dollars. "An Act Concerning Slaves," in Gammel (comp.), *Gammel's Laws*, 2:345-346.

[55] The Texas Penal Code of 1856 specified "whipping," which "shall in all cases be construed to mean thirty-nine lashes" unless otherwise specified. See *Texas Penal Code* (1856), 163.

[56] 1799 Miss. Laws 113, A Law For The Regulation Of Slaves; 1804 Miss. Laws 90-91, An Act Respecting Slaves, §4.

property rights. Where did the master's authority end and the police power of the state begin? The "peculiar position" of those trapped within the South's peculiar institution turned debates such as this one into flashpoints in a larger battle over sovereignty between state legislatures and their citizens.

American political tradition had held that state legislatures were the best expressions of popular sovereignty. These governing bodies were highly representative (in most cases) and jurists believed them to be responsive to the will of the people. Americans needed protection from a faraway, potentially tyrannical national government, but they needed no such protection from their own state governments. Unhappy majorities within a state could easily reverse bad policies, and unhappy minorities could move elsewhere. But this optimistic view of state government was, in a sense, more wishful thinking than reality. Those closely connected to the organs of state government could use their influence to draw ever more power into a governing structure that they led. In antebellum Texas, elite planters dominated state and local government, meaning that efforts to expand the state's police power over slaveholders came from them. The supporters of tougher restrictions upon slaveholders' conditional arming of their bondsmen came primarily from the eastern coastal plains of Texas, where the slave-based plantation culture was strongest. Sponsors of bills to further curtail the prerogative of masters to arm their own slaves tended to be wealthy planters who represented Washington, Bastrop, Brazoria, Burleson, Bowie,

and Nacogdoches Counties.[57] Their proposed bills include the two mentioned above (the 1850 and 1856 amendments, which became law), along with six others that did not pass.[58]

A second category of bills also represents an effort to place the arming of slaves under greater legislative control: proposals to create special patrols to police the enslaved population of each county. The supporters of such "police bills" desired a militia law that would turn the militia into an armed guard for the county's slaveholders. State citizens falling within a specified age range were already forced to register for militia service, but these proposals would have required them to spend a great deal of time serving on slave patrols and increased their responsibilities while serving. One of the requirements added to the patrol's list of duties was to enforce the conditional arming of slaves by checking them for weapons and meting out punishment for those carrying arms illegally. Most of these bills emerged in the early 1840s and failed because they mandated draconian punishments for slaves caught by the patrol, as well as for "defaulters" who failed to muster for patrol duty. Though the bills failed, the home counties of their supporters illustrate that the wealthy, elite planters of the eastern Gulf Coast supported not only tougher enforcement of the Slave Code, but a greater degree of state police power

---

[57] These sponsors were: George W. Barnett (Washington), John Caldwell (Bastrop), Stephen W. Perkins (Brazoria), Guy M. Bryan (Brazoria), James Shaw (Burleson), Hardin Runnels (Bowie), and William Ochiltree (Nacogdoches). The sponsors of two bills remain unknown. Barnett and Ochiltree were the only known sponsor outside the class of elite planters; still, both were members of the professional class with strong political connections in Texas. See *Handbook of Texas Online*, Walter L. Buenger, "Whig Party," accessed June 07, 2018, http://www.tshaonline.org/handbook/online/articles/waw01; and *Handbook of Texas Online*, L. W. Kemp, "George Washington Barnett," accessed June 07, 2018, http://www.tshaonline.org/handbook/online/articles/fba71.

[58] Though the text of most of these bills is no longer extant, what information remains suggests that the 1850 law was the culmination of several years' worth of effort on the part of a cohort of lawmakers. Four of five legislatures between 1843 and 1850 saw bills to curtail the conditional arming of slaves, but supporters of the measure did not rally enough votes to enact it until 1850. Only one of the four bills leading up to the 1850 amendment to the Slave Code remains. The three lost bills shared similar titles (bills to prohibit or prevent slaves from carrying fire-arms) and were introduced between 1843 and 1847. The extant bill prior to 1850 resembles the 1850 amendment, with the only significant difference being its attempt to draw "free negroes or mulattoes" within its purview. See House Bill, File No. 55, 3d Leg., Reg. sess. (1849), Texas State Library and Archives Commission (TSLAC); *House Journal* (1849), 371, 394. The 1856 amendment was not controversial and passed rather quickly, while a proposal for the full disarmament of slaves received fleeting attention in the Senate during the Civil War. *Senate Journal* (1856), 394; *Senate Journal* (1864), 18.

wielded over Texas citizens.[59] For the good and safety of the community, men of all ages and incomes had be coerced into patrol service (an unpopular assignment) and used to secure the slave property of the wealthy. An exchange between legislators in 1842 was especially telling, with an opponent of a slave patrol bill saying that slaveholders should take responsibility for their own bondsmen. He declared "if [masters] were required to be answerable for the damages committed by [slaves], there would be little need of patrols under such a law as this."[60] The sentiment that slave policing was the responsibility of masters was widespread, for an amendment exempting non-slaveholders from service was ultimately adopted and killed the bill.[61]

The question of arming slaves became a controversial one in Texas because of the competing claims of authority over them leveled by the state government and the slave masters. One considered them as legal persons subject to state regulation, while the other considered them legal property immune from state intervention. The position of free blacks, on the other hand, was not at all controversial in antebellum Texas. In fact, free blacks across the South endured even more circumscribed access to arms than did slaves. Indiana, predominantly settled by Southerners, prohibited all non-white persons from carrying weapons without exception.[62] In Mississippi, where masters could arm their slaves when necessary, no free "negro or mulatto" was allowed to keep weapons.[63] These states represented an extreme in the early nineteenth century, and until the political tension over slavery reached its boiling point in the post-1840

---

[59] Sponsors of these draconian patrol bills were: Cullen C. Arnett (Liberty), Gustavus A. Parker (Fort Bend), John M. Lewis (Montgomery), and James W. McDade (Washington).
[60] *House Journal* (1841), 395-396.
[61] House Bill, File No. 2668, 6th Cong., Reg. sess. (1842), TSLAC.
[62] 1804 Ind. Acts 108, A Law Entitled a Law Respecting Slaves, §4.
[63] 1799 Miss. Laws 113, A Law For The Regulation Of Slaves.

Compendium_Rivas
Page 158

period, most Southern states permitted free blacks to at least own weapons, albeit under repressive and degrading conditions.

In most Southern states, free blacks could only own and carry arms by license from a local justice of the peace. Requirements for obtaining a license could be cumbersome, with Delaware requiring five white sponsors to attest to the applicant's good character.[64] In most cases, licenses had to be renewed annually, and punishment for violation entailed seizure of the weapon along with a public whipping. Restrictions placed upon free blacks became ever more stringent in the antebellum period. As tension over slavery mounted, Southern legislatures responded by further curtailing free blacks' access to arms. Since its territorial phase, Missouri had permitted free black householders to own a gun, but lawmakers removed the exemption in 1854 and required them to use the licensing process.[65] Beginning in 1840, North Carolina required free blacks to obtain a license in order to "wear, or carry about his or her person, or keep in his or her house" a deadly weapon.[66] The state legislature removed this option in 1860, leaving free blacks with absolutely no way to legally possess arms. Violation resulted in a minimum fifty-dollar fine—an extraordinarily high amount for such a marginalized segment of society.[67] In 1850, Kentucky forbade all "negro" persons from keeping or carrying guns or deadly weapons, specifically excluding free blacks from legally owning weapons. An earlier law had disarmed all non-white persons, but assumed that every "negro" or "mulatto" person was a slave. The new law demanded lashes for offending slaves (as its predecessor had done) and a

---

[64] 1832 Del. Laws 208, A Supplement to an Act to Prevent the Use of Firearms by Free Negroes and Free Mulattoes, and for Other Purposes, chap. 176, § 1.
[65] Henry S. Geyer, *A Digest of the Laws of Missouri Territory* (1818), 374; 1854 Mo. Laws 1094, An Act Concerning Free Negros and Mulattoes, ch. 114, §2-3.
[66] James Iredell, *A Digested Manual of the Acts of the General Assembly of North Carolina, from the Year 1838 to the Year 1846*, (1847), 73.
[67] 1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, §1.

five dollar fine for offending free blacks, and there were no exceptions to the rule.[68] The state most aggressive in its laws against armed free blacks was Delaware. In 1843, that state declared that free blacks could not possess or carry arms under any circumstances, and twenty years later decided that those in violation who could not pay the fine would be "sold" for up to seven years.[69] Clearly, most Southerners feared the consequences of armed free blacks much more so than armed slaves.

Texas did not match the ferocity of these states in its laws regarding free blacks, probably because there were so few free blacks that they posed no real threat to whites. Upon independence from Mexico, Texas lawmakers declared that free blacks were not citizens and needed to leave the fledgling republic, but some applied for special permission to stay on the grounds that they had served honorably against Santa Anna's army. Those allowed to stay had no restrictions placed upon their right to bear arms for self-defense but they were forbidden from joining militia companies and thus unable to bear arms in defense of the republic. In 1849, James Shaw, a planter from Burleson County in Central Texas, introduced a bill to prohibit free blacks and slaves from carrying weapons. The bill passed the House but died in the Senate, presumably for the same reason that other attempts to disarm slaves had: its effects upon slaveholders were inconvenient and costly.

---

[68] The 1798 law said "No negro, mulatto, or Indian whatsoever, shall keep or carry…" This leaves open the possibility that free blacks were excluded from firearm and weapon ownership all along, but such an interpretation renders the 1850 alteration redundant. It is more likely that the 1798 law was intended to apply to slaves, probably because few or no free blacks lived in Kentucky at that time. The 1850 law, then, closed the existing (or potential) loophole for free black Kentuckians to keep and carry weapons. 1798 Ky. Acts 106, §5; 1851 Ky. Acts 296, Of Dealing With Slaves and Suffering Them to go at Large, §12.

[69] Collection of All Such Acts of the General Assembly of Virginia, of a Public and Permanent Nature, as Are Now in Force; with a New and Complete Index, To Which are Prefixed the Declaration of Rights, and Constitution, or Form of Government, 187, Image 195 (1803) available at *The Making of Modern Law: Primary Sources*; 1860-1861 N.C. Sess. Laws 68, Pub. Laws, An Act to Amend Chapter 107, Section 66, of the Revised Code, Relating to Free Negroes Having Arms, ch. 34, §1.

The increasing repression of free blacks and slaves leading up to the Civil War sheds light on the actions of Southern states in the immediate aftermath of the war. As emancipation created a large free black population across the South, white Southerners believed that they had reason to fear. Freedom suddenly gave male ex-slaves, often derided by whites as "boys" regardless of their age, the power to be men by defending themselves and their families with arms.[70] Just as the Confederate treatment of US Colored Troops represented Southern antipathy toward black masculinity, so did the disarming of freedmen during Presidential Reconstruction. The practice of owning and bearing weapons for defense of home and country was an important part of nineteenth-century masculinity, and one that many Southern white men had no intention of extending to freedmen. Many Confederate soldiers in Texas refused to participate in surrender ceremonies, instead absconding with the arms and ammunition provided for them during the war. They, along with other white men, used their firearms to conduct a reign of terror over freedmen that included stealing their weapons. Reports of violence against former slaves filled the letters of military officers and the pages of congressional journals. Lieutenant Colonel H. S. Hall testified before the Joint Committee on Reconstruction that freedmen and unionists were harassed and persecuted with impunity in 1865. That year, local magistrates put together patrols to preempt rumored black insurrections; the posse members usually consisted of "the most reckless and desperate men" who sought out black residences and "took everything in the shape of arms" from them.[71] The connection between armed white men and violence against blacks was so strong and incontrovertible that Union troops disarmed local residents. In Brenham,

---

[70] See Laura F. Edwards, *Gendered Strife and Confusion: The Political Culture of Reconstruction* (Urbana: University of Illinois Press, 1997), 46-47; Amy Dru Stanley, *From Bondage to Contract: Wage Labor, Marriage, and the Market in the Age of Slave Emancipation* (New York: Cambridge University Press, 1998), 47-50; Laura E. Free, *Suffrage Reconstructed: Gender, Race, and Voting Rights in the Civil War Era* (Ithaca: Cornell University Press, 2015), 87-88.
[71] Report of Joint Committee on Reconstruction, Part IV, 49-50.

occupation forces confiscated all "army guns" upon their arrival, and since that time "citizens have not been since either permitted to keep or carry arms of that kind."[72]

As more Union soldiers spread across the South, reports like those of Lt. Col. Hall made extralegal tactics more of a risk than they were before. The Black Codes filled this gap, giving Southerners the mask of state law to continue their restoration of the status quo antebellum—the forced labor and submission of black people. These codes, enacted throughout the former Confederacy between 1865 and 1867, often included measures designed to disarm freedmen or prevent them from gaining access to deadly weapons. Louisiana forbade tenants from keeping firearms without the consent of their landlords, and St. Landry Parish near New Orleans went a step further by declaring that "no negro who is not in the military service shall be allowed to carry fire-arms…without the special written permission of his employers."[73] Mississippi law declared that "no freedman, free Negro, or mulatto not in the military service of the United States government, and not licensed so to do by the board of police of his or her county, shall keep or carry firearms of any kind, or any ammunition, dirk, or Bowie knife."[74] These laws clearly resuscitated the common Southern practice of conditionally arming black men, subject to the authorization of their employers (white elites) or a local judge. The states enacting Black Codes earliest were forthright in stating that the laws applied only to "freedmen, free Negroes, and mulattos" but the Northern outrage at their blatant racism prompted late-comers, like Texas, to create Codes that gave some semblance of racial neutrality. Though Texas civil rights and education laws made specific mention of racial distinctions, an assortment of other laws passed

---

[72] *House Journal* (1866), 1019.
[73] Germaine A. Reed, "Race Legislation in Louisiana, 1864-1920," *Louisiana History: The Journal of the Louisiana Historical Association* 6, no. 4 (Autumn 1965), 380; "An Ordinance Relative to the Police of Negroes Recently Emancipated within the Parish of St. Landry," S. Ex. Doc. No. 2-35 at 93 (1865).
[74] *Laws of the State of Mississippi Passed at the Regular Session of the Mississippi Legislature* (Jackson: J.J. Shannon & Co., 1866), 163. f

at the same time were also part of the Code. These included statutes regulating contracts, apprenticeships, vagrancy, and even freedmen's right to bear arms.[75]

The 1866 "Act to prohibit the carrying of Fire-Arms on premises or plantations of any citizen without the consent of the owner" appeared to apply to all Texans equally, but actually affected freedmen to a much greater degree than white Texans.[76] The law originated in the state Senate with a resolution asking the Judiciary Committee to present legislation that would end the "great nuisance" of "the carrying of deadly weapons by boys and freedmen (especially pistols)."[77] The bill garnered so much support in the Senate and the House that it suffered no debate or amendment. A strong supporter in the House, Mordello Munson, had been an outspoken secessionist and ardent defender of slavery.[78] The law declared that a property owner had to give his permission for others to carry firearms onto his property, though persons discharging military or legal duties received an exemption. The penalty for violation entailed a fine ranging from one to ten dollars, or confinement to the county jail for one to ten days, or both. Property ownership was the key concept in the law; hardly any free blacks owned property in 1866, and most lived in old slave quarters on someone else's property. Thus, the "great nuisance" of pistol-toting freedmen could be resolved by landlords, who had the authority to

---

[75] For discussion of Mississippi black code and its overt disarming of freedmen, see Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms*, 2–3. On the Texas Black Code, see Barry A. Crouch, " 'All the Vile Passions': The Texas Black Code of 1866," *Southwestern Historical Quarterly* 97 (July 1993): 12–34; Carl Moneyhon, *Texas after the Civil War: The Struggle of Reconstruction* (College Station: Texas A&M University Press, 2004), 60–61; Charles W. Ramsdell, *Reconstruction in Texas* (New York: Columbia University Press, 1910), 122–125.

[76] The semblance of racial neutrality did not fool everyone at the time, but some scholars have chosen to take the legislature at its word. For example, see William L. Richter, *Overreached on All Sides: The Freedmen's Bureau Administrators in Texas, 1865-1868* (College Station: Texas A&M University Press, 1991), 95; and Halbrook, "The Right to Bear Arms in Texas," 652.

[77] *Senate Journal* (1866), 31.

[78] Munson introduced an identical bill in the House, but it received no attention because the Senate's bill arrived in the House shortly thereafter. See *House Journal* (1866), 63. On Munson, see *Handbook of Texas Online*, Stephanie P. Niemeyer, "Munson, Mordello Stephen," accessed January 25, 2018, http://www.tshaonline.org/handbook/online/articles/fmu42.

forbid their tenants from owning firearms. Like other Black Codes, the Slave Codes before them, and antebellum policies toward free blacks, this 1866 law prohibited black men from owning weapons unless they had permission from an authorized white person. It marked a continuity with the antebellum period rather than a point of departure.[79] The status of slaves might have changed, and emancipation may have whetted their appetite for real freedom; but in terms of bearing arms for self-defense, freedmen in 1866 found themselves just where they had been as slaves—outgunned.

---

[79] Not all scholars have come to this conclusion. Stephen Halbrook has stated that the 1866 "Act to prohibit the carrying of Fire-Arms on premises or plantations of any citizen without the consent of the owner" was the state's first gun control law. Not only does this statement overlook the dozens of antebellum statutes pertaining to the ownership and use of weapons, but ignores the clear parallels between the 1866 law's potential consequences for freedmen and the situation of slaves prior to emancipation. See Halbrook, "The Right to Bear Arms in Texas," 653-654.

Chapter 2
A New Era of Gun Regulation in Texas, 1866-1873

In February 1872, a special US Congressional committee issued its report on lawlessness and the Ku Klux Klan in the states of the former Confederacy. Its evidence-gathering focused on the Atlantic Coast and Deep South, where freedmen constituted a large portion of the overall population and racial violence was ubiquitous. Notably absent from the committee's report was similarly detailed coverage of the situation in the trans-Mississippi West, including Texas. Yes, some information on the Lone Star State and its neighbors made its way into the report, but nothing like the in-depth investigations of South Carolina, Georgia, and Alabama. In fact, the committee admitted that "in Mississippi, Arkansas, and Texas the general condition of society is better than ever before."[1] In order for this statement to be true, the Old Southwest must have undergone tremendous socio-cultural change between 1865 and 1872. The road leading from honor culture and backcountry chaos to respect for the rule of law and civil government was a dark one that has eluded many commentators over the years.

Most histories of Reconstruction emphasize the general lawlessness and racial violence that characterized Southern life in the decade or so following the Civil War. Republican governments in the former Confederacy rose up amid endemic violence, and armed conflict often played a major role in their fall. But what this story misses is the success of Republican governments in quelling (at least temporarily) violence and making contributions to the maintenance of law and order that far outlasted their time in office. In other words, the "unfinished revolution" of Reconstruction was in some ways a successful and permanent one. The story of gun regulation in Texas during Reconstruction, inextricably intertwined with issues

---

[1] Joint Select Comm. on Affairs in Late Insurrectionary States, S. Rep. No. 41-42, pt. 1 at 271 (1872).

of race and violence, illustrates this point. Republican politicians during Reconstruction enacted the first comprehensive regulation curtailing the right to bear arms in Texas. When Democrats retook control of the state government in 1873-1874, they attested to the soundness of their predecessors' policy by retaining a law that prohibited the carrying of all "deadly weapons" in public. Under this label Texas politicians classed all manner of small, handheld, concealable weapons, including pistols, knives, sword-canes, brass knuckles, and even spears. During Reconstruction, carrying a "deadly weapon" either openly or concealed constituted a violation of the law with few exceptions.

This weapons ban, enacted in two parts during 1870 and 1871, was revolutionary in three ways. First, it lowered the threshold of criminal activity so that persons posing a threat could be neutralized before any real violence occurred. A law with this capability promised to reduce tension in Texas communities while protecting the Republicans who feared violence at the hands of their Democratic political enemies. Second, the strict regulation of the right to bear arms constituted a significant extension of the police power of the State of Texas. When Texas entered the Union in 1845, most Texans adhered to the political philosophy that the state legislature lacked the authority to regulate this important right. All of this changed by 1870. Finally, an embargo against the carrying of deadly weapons outside the home was an attempt to alter the way Texan men comported themselves in the public sphere. Some men only became accustomed to including deadly weapons in their everyday wardrobe due to the recent dislocations of war, but the habit was firmly entrenched and socially acceptable during the antebellum period. This weapon ban, impossible to perfectly enforce, still forced Texans to remove the pistols and knives from their waistbands or risk arrest, trial, and a hefty fine. Its emergence during Reconstruction exemplifies the legal revolution of that era, when the realities of emancipation gave birth to a

number of legal innovations that restructured the relationship between citizen and state; the Texas deadly weapon law was one such innovation whose aim was to change the boundaries of acceptable male social behavior.[2]

*      *      *

In the immediate aftermath of the Civil War, local governance in Texas almost completely broke down. In late spring 1865, Confederate soldiers heard about the landing of Union troops under Major General Philip Sheridan in Galveston. It was only a matter of time until Union forces pushed northward from the Rio Grande Valley, and inland from the Gulf Coast to occupy the state. Many soldiers simply abandoned their posts to go home or flee the country, often stopping along the way to loot armories and harass the citizenry.[3] The flight of high-ranking state officials to Mexico, combined with the arrival of Union forces in the state capital threw the government into disarray. As pro-Confederate communities braced themselves for occupation, some among them still clung to the belief that slaveowners would be reimbursed for their emancipated chattel property, or that the Emancipation Proclamation would be overturned. These Texans, laboring under an illusion, tried to force freedmen to remain in slavery well into the summer of 1865.[4] A severe labor shortage prompted cotton farmers to outbid one another for freedmen's wages, making coercion an increasingly difficult and

---

[2] Legal historian Laura Edwards puts it this way: "The Civil War forced the nation to confront slavery. The implications of that confrontation reached beyond the status of former slaves to transform law and legal institutions in ways that affected all the nation's citizens." See Laura F. Edwards, "The Civil War and Reconstruction," in *The Cambridge History of Law in America: Volume II, The Long Nineteenth Century (1789-1920)*, eds. Michael Grossberg and Christopher Tomlins (New York: Cambridge University Press, 2008), 315.

[3] On the immediate postbellum "break up," see Brad R. Clampitt, "The Breakup: The Collapse of the Confederate Trans-Mississippi Army in Texas, 1865," *Southwestern Historical Quarterly* 108 (April 2005): 498-534; William L. Richter, *The Army in Texas during Reconstruction, 1865-1870* (College Station: Texas A&M University Press, 1987), 13; Barry A. Crouch, Larry Peacock, and James M. Smallwood, *Murder and Mayhem: The War of Reconstruction in Texas* (College Station: Texas A&M University Press, 2003), 10-11; Ramsdell, *Reconstruction in Texas*, 27-51.

[4] Ramsdell, *Reconstruction in Texas*, 57; S. Rep. No. 41-42, pt. 1 at 269 (1872).

desperate strategy for securing workers.[5] As harvesting season approached, Union forces and Freedmen's Bureau agents made their way ever deeper into the state, setting up garrisons and offices to oversee labor practices and contracts.

President Andrew Johnson had appointed Andrew J. Hamilton, a wartime Unionist and experienced politician, as the provisional governor of Texas. He directed the reorganization of civil government in the Lone Star State while Union troops fanned out to enforce the Emancipation Proclamation and establish Freedmen's Bureau offices. In late 1865, Hamilton announced elections for a convention to amend the state constitution in light of emancipation and the Confederate defeat. Due to Johnson's lenient Reconstruction policies, most former Confederates were eligible to vote or stand for election to this convention because those not included in his general amnesty received individual pardons upon application. For this reason, the convention and the government created under the auspices of its new constitution were quite sympathetic to the Confederate cause. Confederate veterans were prominent among the delegates, but far more problematic was the strong representation of secessionists. Most of the men charged with repealing the Ordinance of Secession had advocated its passage five years earlier. Unsurprisingly, the convention did not ratify the Thirteenth Amendment abolishing slavery, nor did its constitution guarantee freedmen equality before the law.[6] The Texas Constitution of 1866 hardly represented the kind of conciliatory gesture expected by Northern Republicans, but it won the approval of Texas voters as well as the charitable Johnson administration and went into effect.

---

[5] Moneyhon, *Texas after the Civil War*, 23-25.
[6] The Texas Constitution of 1866 dealt with freedmen in Article VIII, and went no further than saying that they "shall be protected in their rights of person and property by appropriate legislation." Rights specifically protected were rights to contract, bring suit, own and dispose of property, be held accountable to prosecution, and testify in court. See Tex. Const. of 1866, art. VII.

44