1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    Supervising Deputy Attorney General
3   ROBERT L. MEYERHOFF
    Deputy Attorney General
4   State Bar No. 298196
      300 South Spring Street, Suite 1702
5     Los Angeles, CA  90013-1230
      Telephone:  (213) 269-6177
6     Fax:  (916) 731-2144
      E-mail:  Robert.Meyerhoff@doj.ca.gov
7   *Attorneys for Defendant Rob Bonta in his
    official capacity as Attorney General of the*
8   *State of California*

9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                            CIVIL DIVISION

12

13   **VIRGINIA DUNCAN, RICHARD**          Case No. 3:17-cv-01017-BEN-JLB
     **LEWIS, PATRICK LOVETTE,**
14   **DAVID MARGUGLIO,**
     **CHRISTOPHER WADDELL, and**          **COMPENDIUM OF WORKS**
15   **CALIFORNIA RIFLE & PISTOL**          **CITED IN DECLARATION OF**
     **ASSOCIATION, INC., a California**    **BRENNAN RIVAS**
16   **corporation,**
                                            **VOLUME 3 OF 6**
17                         Plaintiffs,
                                            Courtroom:    5A
18         **v.**                           Judge:        Hon. Roger T. Benitez
                                            Action Filed:  May 17, 2017
19
     **ROB BONTA, in his official capacity**
20   **as Attorney General of the State of**
     **California; and DOES 1-10,**
21
                           Defendants.
22

23

24

25

26

27

28                                            1

## <u>INDEX</u>

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1 | 7 n.10 | 002-004 |
| 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1 | 8 n.12 | 005-007 |
| General Laws of Texas, ch. XXXIV, §1 (1871) | 15 n.31 | 008-011 |
| 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1 | 7 n.10 | 012-020 |
| 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1 | 9 n.15 | 021-023 |
| 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 | 8 n.13 | 024-026 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 9 n.16 | 027-029 |
| Acts of the General Assembly of the State of Georgia (1894) | 6 n.7 | 030-042 |
| An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907) | 6 n.8 | 043-053 |

Compendium of Works Cited in Declaration of Brennan Rivas
(3:17-cv-01017-BEN-JLB)

| **Books**[1] | | |
|---|---|---|
| Patrick Charles, Armed in America 152 (2018) | 9 n.17 | 055-058 |
| Randolph Roth, American Homicide 184, 185, 297-326, 386-388, 411-434 (Cambridge: Belknap Press of Harvard University Press, 2009) | 4 n.3, 5 n.4 | 059-092 |
| R. L. Wilson, The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present, at 173 (New York: Simon & Schuster, 1979) | 11 n.23 | 093-095 |
| Martin Rywell, Colt Guns 66-67, 84-93 (Harriman, TN: Pioneer Press, 1953) | 11 n.23 | 096-104 |
| Sears, Roebuck, and Co. Catalog No. 107, at 365-67 (1898) | 3 n.2, 13 n.27 | 105-112 |
| The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) | 12 n.25 | 113-117 |
| Thomas Henshaw, The History of Winchester Firearms, 1866-1992 (Clinton, NJ: Winchester Press, 1993), 13-19, 23-24, 41, 61 | 16 n.32, 16 n.33, 16 n.34, 17 n.37, 18 n.44 | 498-504 |

---

[1] The Declaration of Brennan Rivas cites certain books (in their entirety) as supplemental references, rather than as direct support for any particular statement in her declaration or as a specific basis for her opinions.  *See* Rivas Decl. ¶¶ 10 n.1, 19 n.23, 23 n.30.  Accordingly, they are not included here.  These books are:  Graham Smith, Civil War Weapons (New York: Chartwell, 2011); Jack Coggins, Arms and Equipment of the Civil War (New York: Fairfax Press, 1982); Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter that Changed America (New York: Scribner, 2020); Joseph G. Bilby, Civil War Firearms: Their Historical Background and Tactical Use (Conshohocken, PA: Combined Books, 1996); and Ken Bauman, Arming the Suckers: A Compilation of Illinois Civil War Weapons (Dayton, OH: Morningside House, 1989).

3

| | | |
|---|---|---|
| Frank C. Barnes & Stan Skinner, Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges 11th ed. (Iola, WI: Gun Digest Books, 2009), 96-97 | 16 n.33 | 505-508 |
| William S. Brophy, Marlin Firearms: A History of the Guns and the Company that Made Them (Harrisburg, PA: Stackpole Books, 1989), 300-301, 307-307 | 17 n.38, 17 n.39, 18 n.41 | 509-513 |

**LAW REVIEWS AND JOURNALS**

| | | |
|---|---|---|
| Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, at 161-62 (PhD diss., Texas Christian University, 2019) | 6 n.8 | 119-349 |
| Mark Anthony Frassetto, *The Myth of Open Carry*, 55 U.C. Davis L. Rev. 2515, 2518-19 (June 2022) | 11 n.22 | 350-379 |
| Robert Leider, *Our Non-originalist Right to Bear Arms*, 89 Ind. L. Rev. 1587, 1619-20 (2014) | 13 n.28 | 380-446 |
| Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason Univ. Civil Rights L.J. 67, 74-75 (Summer 1991) | 13 n.28, 14 n.29 | 447-480 |

**NEWS ARTICLES**

| | | |
|---|---|---|
| "Crime in the South," *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, at 2 | 10 n.18 | 482-483 |
| Daily Arkansas Gazette (Little Rock, Arkansas), January 7, 1883, at 4 | 10 n.20, 10 n.21 | 484 |
| Daily Arkansas Gazette (Little Rock, Arkansas), May 13, 1883, at 4 | 10 n.20, 11 n.22 | 485 |
| Katelyn Brown, "Armed to the Teeth," Military Images 33, no. 4 (Autumn 2015), at 32-36 | 14 n.30 | 486-490 |

4

| | | |
|---|---|---|
| Newport News (Newport, Arkansas), quoted in Daily Arkansas Gazette (Little Rock, Arkansas), April 27, 1875, at 2 | 10 n.19 | 491 |

5

Proceedings at the convention revealed deep political divisions among Texans, with especially dangerous discord among the state's Unionists. Governor Hamilton intended to build a new base of political power from the Unionism forged by Sam Houston's 1859 gubernatorial campaign, middle class anti-secessionism as expressed by James W. Throckmorton in 1861, and the wartime loyalty to the federal government that was prevalent in West Texas.[7] Hamilton's position was a difficult one for three reasons. First, he was personally unpopular. A reputation for heavy drinking followed him throughout his political career and his Southern credentials were thrown into doubt when he delivered fiery abolitionist speeches to Northern audiences during the war.[8] Second, Texas Unionists disagreed about important issues, like the legal rights of freedmen and the proper treatment of prewar Unionists who nevertheless aided the Confederacy.[9] With the Unionists bickering among themselves, secessionists at the convention held the deciding votes. Third, the Johnson administration had pressured Hamilton to call a convention before he could unify these disparate factions into one party.

The divisions among the various groups of Unionists at the convention foreshadowed the political differences among Texans throughout the Reconstruction period. Whether the idea came from a desire to appease Congressional Republicans or from sincere belief, a substantial group emerged in support of legal equality between the races. They called themselves the Union Party

---

[7] When Throckmorton cast his vote against the Secession Ordinance in 1861, spectators in the capitol gallery denounced him. He responded with a remark that has since become famous for its brevity and its sense of foreboding. "When the rabble hiss, well may patriots tremble." Quoted in Randolph B. Cambell, *Gone to Texas: A History of the Lone Star State* (2nd ed., New York: Oxford University Press, 2012), 241.

[8] On Hamilton, see *Handbook of Texas Online*, James A. Marten, "Hamilton, Andrew Jackson," accessed September 17, 2018, http://www.tshaonline.org/handbook/online/articles/fha33.

[9] Even among antebellum Unionists like Throckmorton, participation in the Confederate cause was common. In fact, a large number of state senators elected during the height of Republican power in the state (1868-1872) had served the Confederate cause in some way or other. See Patsy McDonald Spaw, *The Texas Senate, Volume II: Civil War to the Eve of Reform, 1861-1889* (Austin: University of Texas Press, 1999), 87-113. On Throckmorton, see Kenneth Wayne Howell, *Texas Confederate, Reconstruction Governor: James Webb Throckmorton* (College Station: Texas A&M University Press, 2008); *Handbook of Texas Online*, David Minor, "Throckmorton, James Webb," accessed August 09, 2018, http://www.tshaonline.org/handbook/online/articles/fth36.

and coalesced around Hamilton and Elisha M. Pease, a Connecticut-born lawyer and veteran of the Texas War of Independence.[10] They tended to have the support of the unwavering wartime Unionists, whose primary concern was increasing their own political strength at the expense of the prewar Unionists who had sold out to support the Confederacy; this conflict was as much about geography as it was about vindication, with residents of the western counties resentful of the continued power of the largely pro-Confederate central and eastern counties. On the other side of the Unionist spectrum was the Throckmorton faction, whose ranks were filled by reluctant Confederates seeking to limit the freedom of black Texans and preserve their power in spite of their wartime activities. The Throckmorton faction became even more formidable when it received the support of John Hancock, a wartime Unionist with strong connections to the national leadership of the Democratic Party. His insider information led him to believe, correctly, that the Johnson administration would not force the Southern states to grant the kind of civil and political rights to freedmen that the Republican Party was demanding. For this reason, he gave his support to the Throckmorton camp, which took the name Conservative Union Party. The secessionists at the constitutional convention saw the Conservative Unionists as the lesser of two evils and tilted the balance of power in their favor. Overlapping policy goals about race and maintaining entrenched patterns of political power underwrote this coalition, which dominated Texas politics between 1866 and 1868.[11]

The first task for Texans was to elect a new civil government, filling every office from governor and state senators to judges and even county sheriffs. In their campaign, the

---

[10] On Pease, see *Handbook of Texas Online*, Roger A. Griffin, "Pease, Elisha Marshall," accessed October 22, 2018, http://www.tshaonline.org/handbook/online/articles/fpe08.

[11] On the political landscape during Presidential Reconstruction, see Moneyhon, *Texas after the Civil War*, 38-43; Carl Moneyhon, *Republicanism in Reconstruction Texas* (Austin: University of Texas Press, 1980), 21-41; Campbell, *Gone to Texas*, 270-271; Ramsdell, *Reconstruction in Texas*, 86-90, 108-110, 114-115.

Conservative Unionists made the purported "radicalism" of Hamilton's Union Party the primary electoral issue. In doing so, they astutely connected Unionists to the Radical Republicans in Congress and bestowed upon their policies a derogatory label that stuck throughout Reconstruction. Throckmorton handily defeated Pease in the gubernatorial election. Support for the Union Party did not reach east of the Colorado River, a fact that crippled Pease's campaign.[12] Furthermore, the secessionists assured Throckmorton's victory by declining to run their own candidate and turning out for the Conservative Union ticket. The fate of other state-level campaigns mirrored the governor's race, with a victorious fusion between secessionists and Conservative Unionists throughout much of the state. Throckmorton oversaw this tenuous alliance, which came to be known as the Conservative faction. Winners of state House and Senate elections formed the Eleventh Legislature, which met from August to November of 1866. Shortly after the overwhelmingly Conservative body met, Johnson declared "a state of peace between Texas and the United States," which only boosted Throckmorton's popularity.[13] Operating under the assumption that the Lone Star State had satisfied the terms of Presidential Reconstruction, legislators set about their work with a sense of confidence that the worst was over and further federal intervention was unlikely or unconstitutional.

An issue of central importance to all Texans in 1866 was bringing an end to the lawlessness that had plagued the state since the end of the war. Texans might have been in agreement about the problem of violence but arriving at a consensus about its root causes and remedies was another matter. Historians have pinpointed a number of factors contributing to lawlessness during Reconstruction, such as race hatred, wounded pride, loss of confidence in

---

[12] This trend has been mapped well by Carl Moneyhon. See Moneyhon, *Republicanism in Reconstruction Texas*, 48.
[13] George P. Sanger, ed., *Statutes at Large*, Acts of the Thirty-ninth Congress, Vol. 14 (Boston: Little, Brown, & Company, 1868), 814-817.

local institutions, and the dislocations of war.[14] Texans of the late 1860s, however, identified the causes of violent crime based on firsthand experiences. Those who consistently opposed the Confederacy saw the problem in purely political terms. Strongest in the counties west of the Colorado River, they claimed that their countrymen persecuted them mercilessly during the war only to find themselves "committed to the protection of the rebels" after it was over. Wartime Unionists remained locked out of political power by Johnson's policies, vulnerable to the statewide pro-Confederate majority.[15] Freedmen also endured violence at the hands of former Confederates and their supporters. Whether their persecutors were former masters convinced of their right "to *whip the nigger*"[16] or poor whites who subjected them to incessant "petty and contemptible persecutions,"[17] the plight of the freedmen was lamentable indeed. After emancipation Texas freedmen succeeded in obtaining weapons for self-defense, though white neighbors confiscated them whenever possible.[18] Their only allies were the wartime Unionists and federal soldiers so despised by the Texans who had retaken control of the state government. Those Texans, the Conservative majority represented by Throckmorton and the Eleventh Legislature, believed that lawlessness emanated from altogether different sources. The true culprits, in their eyes, were common criminals, irresponsible freedmen, and Union soldiers. Conservatives were correct that its position on the fringe of organized, Anglo American society

---

[14] Texas historians have debated the underlying causes of racial violence during the 1860s. Barry Crouch and James Smallwood have emphasized economic motivations for white-on-black violence, while Gregg Cantrell has demonstrated the centrality of politics. See Barry Crouch, "A Spirit of Lawlessness: White Violence; Texas Blacks, 1865-1868," *Journal of Social History* 18, no. 2 (Winter 1984): 217-232; James M. Smallwood, *Time of Hope, Time of Despair: Black Texans during Reconstruction* (Port Washington, NY: Kennikat Press, 1981); Gregg Cantrell, "Racial Violence and Reconstruction Politics, 1867-1868," *Southwestern Historical Quarterly* 93 (Jan. 1990): 333-355. See also George C. Rable, *But There Was No Peace: The Role of Violence in the Politics of Reconstruction* (Athens: University of Georgia Press, 1984); Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863-1877* (New York: Harper & Row, 1988), 119-123, 342-343.
[15] Memorial on Behalf of the Citizens of Western Texas, H. Mis. Doc. No. 35-42 (1867).
[16] S. Rep. No. 41-42, pt. 1 at 266 (1872).
[17] Benjamin C. Truman, S. Ex. Doc. No. 43-39 at 10 (1866).
[18] Truman, S. Ex. Doc. No. 43-39 at 8-9 (1866).

made Texas a popular destination for deserters and outlaws during the war, with the northern and western border regions especially hard hit by gangs and desperadoes.[19] They, albeit much less persuasively, claimed that freedmen posed a greater danger to one another than did white Texans.[20] But the quandary of freedmen struggling to adjust to their new situation was a serious one. A Freedmen's Bureau agent sympathetic to them still described some as "idle and worthless, and showed no disposition to work, and were wandering about the country utterly demoralized, and were plundering and stealing indiscriminately from the citizens."[21] According to Conservatives, the freedmen would be treated better if the Freedmen's Bureau and its federal garrisons would stop their "interfering." Throckmorton held Union soldiers solely responsible for a series of violent attacks and reprisals in Brenham, and he called the Freedmen's Bureau an agency that "unjustly inflicted" punishments upon citizens who "have but little chance to assert or prove their innocence."[22]

The Texans who held the political reins found themselves in a position to address postbellum violence based upon their perception of the problem. Their approach revolved around reducing the number of arms circulating in public by disarming criminals and freedmen.

---

[19] There is a rich literature on the gangs, outlaws, and feuding vigilantes of Northeast Texas. See Crouch, Peacock, and Smallwood, *Murder and Mayhem*; Donaly E. Brice and Barry A. Crouch, *Cullen Montgomery Baker: Reconstruction Desperado* (Baton Rouge: Louisiana State University Press, 1987); Chuck Parsons, *A Lawless Breed: John Wesley Hardin, Texas Reconstruction, and Violence in the Wild West* (Denton: University of North Texas Press, 2013).

[20] The Foreign Relations Committee report can be found at *House Journal* (1866), 528-533. Union General and Assistant Commissioner of the Texas Freedmen's Bureau Joseph Kiddoo described the racial animus toward freedmen in a letter to General Oliver O. Howard dated August 8, 1866. When his allegations were made public, the legislature responded with a committee report intended to embarrass Kiddoo and defend Texan honor. The fact of white violence toward freedmen in Texas has been proved by historians and nineteenth-century commentators. State and federal reports from the Reconstruction era were often biased against pro-Confederate whites, but the general accuracy of their accusations has been accepted by recent historians. See Moneyhon, *Texas after the Civil War*, 35-37, 209. National and state legislatures commissioned investigations of racial violence in the South and Texas with the assumption that such endeavors would contribute to a solution. See S. Rep. No. 41-42 (1872); Condition of Affairs in Texas, H. Ex. Doc. No. 61-39 (1867); Report of Comm. on Lawlessness and Crime, *Journal of the Reconstruction Convention, which met at Austin, Texas, 1868-1869* (Austin: Tracy, Siemering & Co., 1870), 193-203.

[21] Report of W. E. Strong, January 1, 1866, in S. Ex. Doc. No. 27-39 at 82 (1866).

[22] *House Journal* (1866), 795.

Throckmorton acknowledged that the state constitution guaranteed to every citizen the right "to keep and bear arms in lawful defence of himself or the State," but he thought it a right "most wretchedly abused." His solution was a tax upon weapons carried in public, except in frontier counties and for travelers. The Conservatives clearly saw a correlation between lawfulness and financial means because the governor declared that "any person who felt constrained to wear a weapon, of this sort, for his personal protection, would not think it a hardship to pay the tax." The bad element, defined by Throckmorton as "men and boys, vagabonds and vagrants" presumably could not afford to pay the tax. His word choice is revealing because the latter three categories, "boys, vagabonds and vagrants," denoted recklessness and delinquency—males lacking the honor that came with rootedness, family, work, and maturity. White Texans generally lumped freedmen into this group, too. Emancipated men tried to establish themselves as heads of households worthy of manly honor in a patriarchal society, but white Southerners laughed or raged at their pretensions.[23] One Conservative described them in terms similar to vagabonds, declaring that freedmen "wander about now subject to all the temptations to vice," and "are universally supplied with firearms and other weapons."[24] The "men" within Throckmorton's definition likely referred to the desperadoes whose problem was not so much a lack of manliness as their malicious use of it.

The governor's tax proposal was a way to disarm the bad element without disarming law-abiding citizens. It was conservative in the sense that it retained the antebellum acceptance of armed self-protection as an inherent part of manly behavior, but in a larger sense it marked a dramatic departure from the past. A Conservative governor, who spoke for the majority of white Texans, saw the unregulated right to bear arms as a dangerous habit rather than a positive

---

[23] Edwards, *Gendered Strife and Confusion*.
[24] Address of Gov. James W. Throckmorton, *House Journal* (1866), 530.

patrimony. This shift in thinking opened the door to an expansion of state police power via regulation of the right to bear arms. Throckmorton believed that a tax could achieve the goal of a deadly weapons prohibition without technically violating the individual rights protected by the state constitution. In other words, the state legislature could use its authority to tax with the intention of policing behavior rather than raising revenue.[25] This amounted to an improvisational expansion of police power through a practice known as *surrogacy*, which involves a government "using a power explicitly granted . . . to expand its authority into forbidden legislative terrain." This term applies primarily to the slow, piecemeal growth of federal government power throughout American history, but Throckmorton's approach to deadly weapons reveals its presence in the postbellum expansion of state-level police power, too.[26]

A number of state legislators agreed with Throckmorton and responded by supporting bills that taxed or otherwise regulated deadly weapons. Five such bills were introduced, though none garnered enough support to become law.[27] One of these bills followed Throckmorton's outline, and a look at its history shows us why a tax on the wearing of deadly weapons in public was not achievable in 1866.[28] The bill was introduced by Robert H. Guinn, a veteran state senator from Cherokee County in East Texas who had long supported weapon regulation.[29] In Guinn's scheme, anyone wanting "to carry about his person any weapon whatever" in public would have to apply for a license and post a bond. The license cost five dollars and could only be issued by the local county court. This was no small sum in the mid-nineteenth century, especially

---

[25] *House Journal* (1866), 199-200.
[26] Gerstle contends that surrogacy, privatization, and exemption were the three main strategies used to grow federal government power in an improvisational way throughout American history. See Gerstle, *Liberty and Coercion*, 5-9.
[27] Of these five bills, a record of only one survives. See Senate Bill 14, 11th Leg., Reg. sess. (1866), TSLAC. For the introduction of each bill, see *House Journal* (1866), 65, 246, 879; *Senate Journal* (1866), 31, 240.
[28] Senate Bill 14 (1866), TSLAC.
[29] Robert H. Guinn introduced a concealed weapons ban back in 1855 during the height of the anti-concealed weapons movement. See ch. 1.

in rural, cash-poor areas like much of Texas. If the license fee was not enough to elicit opposition, the stipulation that applicants post one thousand dollars bond certainly was. When the House Judiciary Committee reported on the bill, the only revision requested was the elimination of the bond requirement.[30] The Senate did not take up Guinn's bill for engrossment before the session ended, but the House debated amendments on a tax-based bill similar to it. Members of the House had trouble translating Throckmorton's suggestion into law because they disagreed about every detail. The first problem was whether rifles and shotguns ought to be subject to tax. There had long been (and remains) a distinction between hunting weapons impossible to conceal, and smaller, concealable weapons more conducive to interpersonal conflict. The anti-concealed weapons movement of the antebellum era targeted smaller weapons for regulation because they could be hidden and provide a pugilist with a surprise advantage in a fight. But the House in 1866 refused to exempt rifles and shotguns, even those "borne by troops, either State or Federal, while in service." A representative from East Texas tried to exempt any gun "whose owner obtains one-third of his meat rations by the use of such gun," but even this went down to defeat.[31] The amount to be collected was also a controversial topic, with supporters of flat rates for all firearms versus proponents of scaled rates for six-shooters, five-shooters, and single-shot pistols.

In the end, tax-based bills like Guinn's failed because they threatened to disarm too many Texans. The vast majority of Texan men would have been unable to cough up the money for licensing, and the *right* to bear arms in Texas would become the *privilege* of the wealthy. Taking

---

[30] For the progress of SB 14, see *Senate Journal* (1866), 240, 316. See also Senate Bill 14 (1866), TSLAC.

[31] This cohort, led by the bill's sponsor, Jabez Giddings of Washington County, went to great lengths to ensure that they formed a majority during the session in question. The amendment to exempt military service weapons was withdrawn before it could be put to a vote, presumably meaning that the bill, if passed, would apply to Union soldiers stationed in Texas. Thus it is possible that majority insisting on retention of rifles and shotguns within the bill's purview included those honestly seeking to reduce firearms in circulation alongside others who saw it as a way to annoy Union troops. The text of this bill is no longer extant. *House Journal* (1866), 879-881.

weapons out of hands deemed irresponsible by the governing majority was one thing—the legislature had passed some firearm regulations that targeted specifically freedmen and rowdies; taking them away from law-abiding white men was an altogether different matter.[32] It was unacceptable to disarm the family protectors and war veterans whose manliness was besieged by defeat and occupation.[33] In Texas and throughout the South, the levers of government were controlled by pro-Confederate men seeking to restore the old, antebellum order. Domination of the public sphere through the force of arms was necessary for that task. Communities that totally suppressed or unconditionally permitted deadly weapons in the public sphere put black and white men on an equal footing in violation of the antebellum social rules.

In a decentralized, localized way, Southerners almost at once began implementing a strategy of restoration that entailed disarming and dominating freedmen. In Kentucky, soldiers of the US Colored Troops had their weapons confiscated and were "threatened with *shooting* for going to their old homes and . . . families."[34] Incidents reported by Freedmen's Bureau agents tell of white men going about at night, stealing weapons from black men, and using their superior arms to terrorize black families. One agent in Mississippi described these as young men believed by locals to be "gallant" and "honorable."[35] Similar groups formed in Texas around the same time.[36] An Arkansas man worried over the future of freedmen living in the Red River basin,

---

[32] The legislation referred to includes a prohibition against discharging firearms "on, or across, any public square, street, or alley, or in any city or town in this State," which passed quickly through the legislature with little comment. The only people subject to the accompanying fine (anything up to one hundred dollars) were those who actually posed a danger to the community by engaging in irresponsible behavior. The second group targeted for legislation in 1866 was freedmen, through the law requiring tenants to receive permission from landlords to keep or carry weapons (see ch. 1). See also *Senate Journal* (1866), 462, 505, 603, 610, 627, 642; Gammel (comp.), *Gammel's Laws*, 5:1128.

[33] On the Civil War as a gender crisis, see LeAnn Whites, *The Civil War as a Crisis in Gender: August, Georgia, 1860-1890* (Athens: University of Georgia Press, 1995).

[34] S. Ex. Doc. No. 27-39 at 7-11, 70 (1866).

[35] Carl Schurz, S. Ex. Doc. No. 2-39 at 68-70 (1865).

[36] Secret, extralegal, vigilante groups formed throughout Texas as early as 1865. They sought to "patrol" or otherwise intimidate freedmen. It is likely that they, like their Mississippi counterparts, sometimes disarmed

saying that "Our people's wrath over defeat would be poured upon the heads of the helpless ones once their slaves."[37] The Bureau's Inspector General reported that cruelty toward freedmen was worse in Texas than anywhere else he had seen, and most white Texans "seem to take every opportunity to vent their rage and hatred upon the blacks."[38] The honor culture so prevalent throughout the South, including Texas, demanded lethal violence to protect the home, avenge wrongs, and enforce black dependence. In the antebellum era, white men carried out these activities through the use of weapons for dueling, defending, and punishing; the white men seeking to restore the antebellum socio-cultural order did not want to sacrifice the unfettered access to weapons necessary for carrying out their goal.

Texas Conservatives found the Johnson administration altogether sympathetic and generous toward them. As Texas planters became more convinced of the importance of disarming black laborers, the state's political elites became increasingly confident in its feasibility. The 1866 cotton crop fell short of projections, tempting employers to withhold wages owed to black workers. The freedmen responded by doing whatever they could to recover the money owed to them.[39] In some areas the local Freedman's Bureau agent could arbitrate in a labor dispute, but throughout much of the state the Bureau was not a viable option.[40] There simply were not enough agents, and many of those stationed in Texas were harassed by antagonistic local officials.[41] Freedman had to solve problems on their own by accepting

---

freedmen who owned weapons. See James Smallwood, "When the Klan Rode: White Terror in Reconstruction Texas," *Journal of the West* 25 (October 1986): 4-13.
[37] S. Ex. Doc. No. 27-39 at 28 (1866).
[38] S. Ex. Doc. No. 27-39 at 82-83 (1866).
[39] Moneyhon, *Texas after the Civil War*, 64-65.
[40] Christopher B. Bean, *Too Great a Burden to Bear: The Struggle and Failure of the Freedmen's Bureau in Texas* (New York: Fordham University Press, 2016), 114.
[41] On the harassment and even arrest of Bureau agents, see Bean, *Too Great a Burden to Bear*, 52-58.

mistreatment or confronting employers.[42] Conveniently for planters, freedmen had a hard time using weapons in these confrontations because the Eleventh Legislature had just passed a law forbidding tenants from keeping firearms without the permission of their landlords.[43] Those who still owned weapons sometimes feared to use them lest they be confiscated. Blacks in Harrison County in far East Texas were so persecuted by local whites that through 1866 they dared not carry arms in self-defense or seek justice in civil courts.[44] Though their ordeal may have been extreme, it is safe to conclude that most Texas freedmen experienced some degree of such oppression. For white, landowning planters, disempowering the laboring class by confiscating their weapons provided the twin benefits of an advantage in disputes over wages and a reaffirmation of white dominance in the working relationship and the public sphere.[45] What is more, white Texans had every reason to think that they would be allowed to disarm, defraud, and mistreat freedmen with impunity. The leniency of the Johnson administration had lulled many Southerners into a false sense of security about the reconstruction process.

Confident that they had unwavering support from the Johnson administration, northern Democrats, and moderate Republicans, the Texas Conservatives followed in the footsteps of their southern neighbors and antagonized the Radical Republicans in the US Congress. The Eleventh Legislature passed a Black Code, rejected the Fourteenth Amendment, and sent ardent secessionists to represent them in Washington, DC. In their denunciation of the proposed

---

[42] Randolph B. Campbell, *Grass-Roots Reconstruction in Texas, 1865-1880* (Baton Rouge: Louisiana State University Press, 1997), 111; Moneyhon, *Texas after the Civil War*, 56; Bean, *Too Great a Burden to Bear*, 63-79.
[43] Gammel (comp.), *Gammel's Laws*, 5:1008.
[44] Campbell, *Grass-Roots Reconstruction in Texas*, 111.
[45] Christopher Bean has cataloged the cases taken to Freedmen's Bureau courts during the tenure of the organization's court system in Texas, 1865-1866. Over 60% of cases (amounting to 4,439 of 6,794 cases total) involved economic disputes. The numbers demonstrate just how much of the Bureau's time and resources went to instituting free labor in Texas, but they also reveal the inadequacy of the Bureau to redress the grievances of all emancipated Texans. There were certainly more than the 165 violent incidents dealt with by the Freedman's Bureau between 1866 and 1870. In those cases, the accused faced prosecution in civil courts that overwhelmingly favored white defendants, or escaped justice altogether. See Bean, *Too Great a Burden to Bear*, 71-73.

Fourteenth Amendment, the Texas legislature effectively defended the passage of a series of laws that, taken together, comprised the state's Black Code. To admit black men to the "privileges and immunities of white citizens," like voting and bearing arms in the militia, seemed to them a violation of the US Constitution and contrary to "the common instincts of our nature." If the legislators proved their "manly spirit" by rejecting the amendment, they furthered the same goal by brazenly sending to the national capital an entire delegation unable to take the Ironclad Oath required of federal officials.[46] The most odious of these men in the eyes of Republicans was Oran M. Roberts. He had presided over the Secession Convention in 1861, joined the Confederate army, and served as a recruiter for the cause.[47] While in the national capital, Roberts authored a letter to Congress criticizing the Republicans' refusal to seat members of the Texas delegation as an indignity to the state and a violation of constitutional rule.[48] The Republican majority in Congress was outraged by the unrepentant attitude on display by Roberts and the Texas delegation. Despite their confidence in the Johnson administration's support, the would-be senators and representatives returned home with no accomplishments save further provoking the Republicans who controlled Congress.[49] Shortly after Roberts's departure, Congress passed the first Reconstruction Act and articles of impeachment against Andrew Johnson. This initiated a transition from Presidential to Congressional Reconstruction that involved a tremendous increase in federal intervention, and ultimately a substantial expansion of state police power.

---

[46] *House Journal* (1866), 577-583.

[47] Roberts also authored the decision in *Cockrum v. State* (1859) that white men enjoyed an "unrestricted" right to bear arms in Texas. On Roberts, see *Handbook of Texas Online*, Ford Dixon, "Roberts, Oran Milo," accessed August 09, 2018, http://www.tshaonline.org/handbook/online/articles/fro18.

[48] For Roberts's address, along with his commentary and recollections, see O. M. Roberts, "The Experiences of an Unrecognized Senator," *The Quarterly of the Texas State Historical Association* 12, no. 2 (October 1908): 87-147.

[49] Roberts believed that he had not only Johnson's support, but that of William Seward. See Roberts, "Experiences of an Unrecognized Senator," 98, 129-130.

When the Republicans in Congress took the helm of Reconstruction, dramatic changes occurred in Texas and throughout the South. Congress required the states of the former Confederacy to start the reconstruction process over again; those readmitted to the rights and privileges of statehood under Johnson reverted to their previous status outside the Union. This meant that all Southern state governments, including that of Texas, lost their legitimacy in the eyes of the federal government. A second round of constitution-writing and elections was necessary to secure the readmission of each rebel state. Congress required that these new constitutions ratify the Fourteenth Amendment and commit to some degree of political participation for black men. Until this process was complete, the lands of the former Confederacy and their acting governments became subordinated to military oversight by Union generals. Texas and Louisiana became the Fifth Military District under the leadership of Major General Philip Sheridan in New Orleans. Sheridan began exercising his authority over Texas rather quickly, removing Throckmorton from office in the summer of 1867 and installing the defeated Unionist, Pease, in his stead. Sheridan's subordinate in charge of Texas was General Charles Griffin, though he died unexpectedly after only a few months into his assignment. Griffin's time in Texas may have been brief, but he used it to great effect. He began collecting a list of suitably loyal potential office-holders throughout the state and grew the Freedman's Bureau staff to its largest size in Texas. Removal of disloyal state and local officials began under Griffin and continued under his replacement, General Joseph J. Reynolds.[50]

The effects of the Reconstruction Acts upon the besieged Unionists and freedmen in Texas were remarkable. The larger troop strength provided them greater security in politics and the public sphere. The number of Freedmen's Bureau offices and garrisons increased, allowing

---

[50] Moneyhon, *Republicanism in Reconstruction Texas*, 67-69; Moneyhon, *Texas after the Civil War*, 77.

more black Texans to redress their grievances in the more friendly Bureau courts. But it was in

realm of politics that the most significant changes occurred. With a limited number of former

Confederates disfranchised, and a large number expressing their opposition by declining to vote,

the wartime Unionists and freedmen found themselves poised to dominate politics despite being

a numerical minority. To capitalize on this advantage and build a solid foundation for northern-

style oppositional politics in a state long dominated by the Democratic party, the Texas Unionists

formed themselves into a state Republican party. The overwhelming support for Conservatives in

Texas (estimated by West Texas Unionists at five-to-one) meant that the Texas Republican party

would necessarily be biracial. Thus, their first goal was to register black voters so that

Republicans could control the next constitutional convention. To further this endeavor,

Republicans established the Union League, or Loyal League, and began organizing chapters

across the state. These chapters reported to a state-level president, but they focused primarily on

local problems. Union League rank-and-file members, many of them freedmen, asserted black

freedom in many locales by forming militia companies and drilling together. Such displays of

martial power sent a message to white residents that their black neighbors would no longer be

persecuted with impunity; they also provided much-needed organization for black men to protect

themselves so that they could register as voters and cast their ballots.[51] The strategy succeeded,

and Republicans registered black voters in surprisingly high numbers.[52]

   Black men adopting traditionally "manly" behaviors, like bearing arms in public, forming

themselves into militias, and casting ballots empowered them in ways that white Texans found

---

[51] Moneyhon, *Texas after the Civil War*, 73-75.
[52] Approximately 89% of eligible black men registered to vote in 1867, while only about 50% of eligible whites did. See Moneyhon, *Texas after the Civil War*, 81-82.

disturbing.[53] Even Northerners, many of whom held the US Colored Troops in high esteem, still vehemently opposed black suffrage. The empowerment of black men became a hallmark of Radical Republican policies during the late 1860s and early 1870s. Radicals believed that the only way to rescue the South from its "backward" socio-economic system was to incubate free labor there. Free labor, the rallying cry of the early Republican Party, assumed the dignity of working men and could not countenance the idea of multiple classes of workers, some more elevated than others. Such a system undermined the dignity of work and the idea that hardworking men could move from the ranks of the landless to the propertied. The party that had come around to the idea of black soldiers eventually came around to the idea of black suffrage, too. This transition reached its climax in 1869 when Congress initiated the ratification of the Fifteenth Amendment.[54]

Unsurprisingly, the elevation of black men as heads of families, voters, potential jurors, officials, militiamen, and politicians—in other words, treating them as *men*—elicited the wrath of most white Texans, indeed of most white Southerners.[55] These Texans cast about for any and every possible way to kill the Republican party in the state and prevent the looming prospect of black equality. The intensification of military intervention in 1867 eliminated their scheme to use civil government to minimize the revolutionary potential of Reconstruction. Sheriffs, judges, and magistrates who exonerated the perpetrators of white-on-black violence were threatened with removal from office and even prosecution in military courts. The altered situation called for a new approach, one that did not rely so heavily on the actions of local officials. Reducing voter registration and voter turnout promised to cast a deep shadow of illegitimacy upon the next

---

[53] On this subject, see Carole Emberton, *Beyond Redemption: Race, Violence, and the American South after the Civil War* (Chicago: University of Chicago Press, 2013).
[54] Eric Foner, *The Fiery Trial: Abraham Lincoln and American Slavery* (New York: W.W. Norton, 2010).
[55] Edwards, *Gendered Strife and Confusion*, 184-217.

constitutional convention and perhaps force the hand of Congressional Republicans to ease up on Texas Conservatives. For this reason, white men in large numbers opted not to register to vote in the winter of 1867 to 1868. The corollary to their non-registration was to prevent black men from registering, too. They tried to accomplish this through intimidation and violence, turning the years 1867 and 1868 into some of the bloodiest in Texas history.[56]

The Confederate sympathizers of Texas, in lockstep with their counterparts across the rest of the South, began waging a campaign of localized violence to suppress black voting and snuff out the proverbial "light of freedom" that black Texans were beginning to enjoy. The ultimate goal of this campaign was to restore the world to the way it was before the Civil War. That antebellum world was ordered and organized around patriarchs—elite white men who protected their households, led their communities, and controlled domestic (i.e., state) politics. In the same way that over-educated women "unsexed" themselves in the minds of nineteenth-century Americans, so the elevation of black men at the expense of the traditional Southern elite "unsexed" these men to some degree. For this reason, the violence undertaken in response was ritualistic, purgative, and male-centric.[57] The Ku Klux Klan, which spread throughout the South like wildfire in 1867, best epitomized this ritualistic violence.

Klan groups acted as a paramilitary arm of the pro-Confederate, Conservative political coalition, but their penchant for costumes and symbolically charged actions reveals a deeper, quasi-religious dimension to their activities. For many white men, including the "gallant" ones in Mississippi, nocturnal raids against "insolent" freedmen and "riotous" black gatherings were nothing new. Instead, the innovation came in the form of costumes, language, and style that were

---

[56] Moneyhon, *Texas after the Civil War*, 59; Cantrell, "Racial Violence and Reconstruction Politics," 344-352. For an example in McLennan County, see Campbell, *Grass-Roots Reconstruction in Texas*, 169.
[57] Wyatt-Brown, *Southern Honor*, 454.

pregnant with meaning. Klan costumes covered many white faces that had unabashedly attacked freedmen in the recent past because the subordination of Southern civil governments to military rule revoked the license they had enjoyed previously. Whipping, threats, and beating were clearly meant to reaffirm white dominance through physical violence. Disarming freedmen and invading their homes stripped black men of the power they claimed as citizens and protectors. The freedmen, no longer protected within white households as slaves, found themselves vulnerable to a form of intimidation and social control that had historically been reserved for poor whites. This charivari tradition involved costume, ritual, and performance to police the boundaries of acceptable social engagement. Now that blacks existed independently of white masters, those pushing beyond their "place" as a laboring underclass became targets of charivari-esque Klan behavior. Many, possibly most, Klan victims emerged from the experience alive. The usual purpose of the Klan was not to kill, but to intimidate, and to do so without being held accountable by civil or military authorities. Klan activities in the coastal and deep South have been better documented than those in Texas, but the evidence from states like South Carolina, Florida, and Mississippi is instructive. Klan attacks often began with a group of masked men barging into a freedman's home and taking control of it and its inhabitants through the force of arms.[58] Klansmen undermined the manliness of a victim by controlling him and his family within

---

[58] Hundreds of examples of Klan encounters were collected by Congress in the early 1870s and compiled into a thirteen-volume collection called *The Condition of Affairs in the Late Insurrectionary States*. The volume containing the majority and minority reports (pt. 1) addresses Texas, with the two groups disagreeing as to whether the Klan actually existed in Texas. Texas scholars have shown that the Klan existed in the Lone Star State, thus vindicating the majority report's claims. There are separate volumes containing the full testimony of witnesses from six states (NC, SC, GA, FL, AL, and MS), so Klan activities in those states are taken here as representative of the Klan in other states. See S. Rep. No. 41-42, pt. 1 at 266 (1872).

the home.[59] In order for the Klan's mission to work, white men had to outgun the freedmen, meaning that black men's weapons had to be stolen or neutralized.[60]

Though the state's first Klan group formed in 1866, white Texans did not embrace the idea with much enthusiasm until 1868. This rise corresponded to increased political tension as Texans went to the polls and the Democratic Party returned to state politics.[61] Texas Democrats included the Throckmorton-Roberts coalition of Conservatives, alongside some disillusioned Republicans calling themselves Conservative Reconstructionists.[62] The "Kluxers" of many counties tried to force freedmen to vote Democratic or prevent them from voting at all. Texas freedmen told of Klansmen who "kilt some niggers who wouldn't vote Democrat,"[63] and scared them out of voting "cause them Ku Kluxers was allus at the votin' places."[64] A freedman named Tom Holland summarized the situation well when he said, "If the Negro wanted to vote the Ku Kluxers was right there to keep him from votin'. Negroes was 'fraid to git out and try to 'xert they freedom."[65] Despite this campaign of localized terrorism, described by some historians as a

---

[59] For an example in Texas, see "Testimony of William Hamilton," *Federal Writers Project: Slave Narrative Project*, Texas, Vol. 16 (pt. 2), 108. Hamilton said, "It am allus after dark when dey comes to de house and catches de man and whups him for nothin'. Dey has de power, and it am done for to show dey has de power. It gits so bad round dere, dat de menfolks allus eats supper befo' dark and takes a blanket and goes to de woods for to sleep."
[60] For the general history of the Ku Klux Klan, see Allen W. Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Reconstruction* (New York: Harper & Row, 1971). For the Klan in Texas, see James M. Smallwood, "When the Klan Rode: White Terror in Reconstruction Texas," *Journal of the West* 25 (October 1986): 4-13. Klan violence as restorative of threatened white manhood is a common and well-accepted interpretation. See Elaine Frantz Parsons, "Midnight Rangers: Costumes and Performance in the Reconstruction-Era Ku Klux Klan," *Journal of American History* 92 (December 2005), 811-836, 828. Parsons goes to great lengths to explain their use of "inversion" by donning feminine clothing, ultimately attributing it to the "carnivalesque" tradition similar to charivari. A simpler explanation would be that "inverted" dress was fitting for a world turned upside down. Regarding the Klan's use of ritual and the purgative effects of their activities, see Wyatt-Brown, *Southern Honor*, 453-456, 460.
[61] The year 1868 marked the high point for politically motivated violence and Klan activity in Texas. See Cantrell, "Racial Violence and Reconstruction Politics in Texas," 342; Smallwood, "When the Klan Rode," 6-10.
[62] On the reintroduction of the Democratic Party in 1868 and its composition, see Moneyhon, *Republicanism in Reconstruction Texas*, 76-77.
[63] "Testimony of Agatha Babino," *Slave Narrative Project*, Texas, (pt. 1), 38.
[64] "Testimony of Eli Davison," *Slave Narrative Project*, Texas (pt. 1), 297.
[65] "Testimony of Tom Holland," *Slave Narrative Project*, Texas (pt. 2), 147.

mass conspiracy, many thousands of Texas freedman turned out to vote.[66] Black men living in counties with a federal garrison were much more difficult to intimidate than those living outside the protection of Union soldiers.[67] The Republicans, still overrepresented in the electorate, managed to control the constitutional convention, and state politics through the early 1870s.

The Republican delegates to the constitutional convention tended toward infighting and factionalism, but they found unity in addressing the problem of violent crime.[68] A special committee investigating "lawlessness and crime" cataloged the murders, attacks, and sprees committed with racial or political motives. They found 939 homicides between 1865 and the summer of 1868, and a disproportionate number of them were freedmen killed by white hands.[69] Another committee argued that the epidemic of violence, which had worsened over the past year, rendered fair and impartial elections impossible until at least 1869. This was an effort to circumvent elections that Republicans feared losing due to intimidation of black voters, and it ultimately failed. In spite of that, the information gathered and published in the attempt only strengthened the party's claim that Democrats embraced violence to have their way. Included in the committee's statement was the annual report of General Reynolds, which told of the rise of the Ku Klux Klan, conspiracies to intimidate freedman voters, and declared that "the civil law

---

[66] On KKK as a mass conspiracy, see Trelease, *White Terror*. James M. Smallwood argues persuasively that Klan activities in Texas fit within Trelease's definition. Smallwood, "When the Klan Rode," 12.

[67] For examples of federal soldiers protecting black voters and the integrity of elections in 1868 and 1869, see Campbell, *Grass-Roots Reconstruction*, 120, 154-155.

[68] Republicans broke into four competing factions during the Reconstruction Convention in 1868-1869, and in 1868 the party itself divided into two competing wings. Edmund J. Davis and George T. Ruby headed a coalition of West Texas Unionists and the Union League (dominated by freedmen) called the Radical Republicans, while Elisha M. Pease and A. J. Hamilton represented the proponents of a party based primarily on white participation called Conservative Republicans. See Moneyhon, *Republicanism in Reconstruction Texas*, 96-98.

[69] *Journal of the Reconstruction Convention* (1868-1869), 193-203, 194. White and black Texans were murdered in about equal numbers, which is itself a dramatic overrepresentation of the state's African American population, which constituted about 30% of the state overall. To make matters worse, the overwhelming majority of freedman deaths were committed by whites (373 of 429), yet only ten white deaths came at the hands of freedmen.

east of the Trinity river is almost a dead letter."[70] The "frightful story of blood" contained within the pages of these two reports became the evidentiary foundation for a Republican law-and-order platform in upcoming elections.[71] Republican politicians, especially the supporters of convention president and gubernatorial prospect Edmund J. Davis, felt threatened by their political enemies and did all in their power to protect themselves and their voters. Members of the convention were so concerned about becoming a special target that they worried about "the custom of carrying concealed weapons [which] is openly indulged in by spectators and others who visit this Convention, in the lobbies and elsewhere."[72] For this reason, they passed a resolution banning all deadly weapons in the statehouse and authorizing the sergeant-at-arms to arrest all violators.

The delegates overwhelmingly supported limitations upon the right to bear arms, not only in special circumstances like their own, but across the state. The new constitution protected the right of every person (not just citizens) "to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."[73] The addition of a proviso authorizing legislative regulation may seem like a slight alteration, but it actually amounted to a dramatic increase in the state's police power over its residents. Never before had a Texas constitution clearly delegated such authority to the legislature, and never before had state politicians agreed that such a delegation was permissible. In 1845, when a number of lawmakers tried to insert just such a proviso into the Texas constitution, an opposition arose claiming that legislative regulation would violate the sovereign rights of free men and citizens. The delegates

---

[70] See Report and Declaration of Special Committee on the condition of the State concerning elections, in *Journal of the Reconstruction Convention* (1868-1869), 107-115.
[71] *Journal of the Reconstruction Convention* (1868-1869), 194.
[72] *Journal of the Reconstruction Convention* (1868-1869), 248. Stephen Halbrook has stated that the resolution targeted the delegates themselves for disarmament, but that they continued to carry weapons into the debate chamber; this claim misconstrues the intent of the delegates and the purpose of the resolution, which was to protect them from armed spectators and visitors. See Halbrook, "The Right to Bear Arms in Texas," 654-658.
[73] Tex. Const. of 1869, art. I, § XIII.

in the 1868-1869 convention rejected that argument. This alteration represented a victory for two groups: those who, like Throckmorton, wanted an end to the unregulated right to bear arms; and those who, like the Radical Republicans, supported transformational changes to the state that broadened the scope of its authority.[74] The problem of violent crime was so severe, and so intertwined with "the evil practice of carrying private or concealed weapons about the person,"[75] as to merit an augmentation of the state's police power. Though the Reconstruction program of the Radical Republicans in the US Congress forced states to respect many federal rights and guarantees like due process, equal suffrage, and birthright citizenship, it did not extend to the incorporation of the Bill of Rights by the states.[76] The Eleventh Legislature cited the prospect of such incorporation in their rejection of the Fourteenth Amendment in 1866, but their fears proved baseless because Republicans never pressed the issue. Whatever the reasons for the policy, it saved Texas Republicans from being beholden to the strictures of the Second Amendment that inevitably would have protected gun-toting rowdies, criminals, outlaws, and other perpetrators of political or racial violence from the supervisory eye of state government.[77]

---

[74] Gerstle contrasts the desire among Americans to carry out transformational changes to American federal law and governance, versus the improvisational reality. He claims that historians like Richard Bensel have been similarly drawn to the idea of a specific moment or crisis that "transformed" the role of the federal government in American life. Here I make deliberate use of his transformational versus improvisational dichotomy, with the caveat that Texas during Reconstruction gave life to both approaches in its political discussions about weapon regulations. See Gerstle, *Liberty and Coercion*, 91-93. See also Richard Bensel, *Yankee Leviathan: The Origins of Central State Authority in America, 1859-1877* (New York: Cambridge University Press, 1991).

[75] Quoted statements made by W. R. Fayle of Harris County. See *Journal of the Reconstruction Convention* (1868-1869), 152.

[76] See Gerstle, *Liberty and Coercion*, 82-86.

[77] Legal historian Laura Edwards has said, "Ultimately, the integration of a formerly enslaved population into the polity required changes in the basic relations between the federal government and the states, as well as the legal status of all citizens, regardless of race." See Edwards, "The Civil War and Reconstruction," 327. On incorporation, see Gerstle, *Liberty and Coercion*, 84-85; Elizabeth Dale, "Criminal Justice in the United States," in *The Cambridge History of Law in America: Volume II*, eds. Grossberg and Tomlins, 139-140. On incorporation and the Second Amendment, see Carole Emberton, "The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South," *Stanford Law and Policy Review* 17 (2006): 615-634; Leslie Friedman Goldstein, "The Specter of the Second Amendment: Rereading *Slaughterhouse* and *Cruikshank*," *Studies in American Political Development* 21 (Fall 2007): 131-148.

With the approval of the new constitution and the successful election of a new civil government, Texans found themselves back on the road to readmission to the Union. The happy event took place in the spring of 1870 with the words "the said State of Texas is entitled to representation in the Congress of the United States."[78] As federal intervention and the protection of Union soldiers and Bureau agents waned, the law-and-order platform of the ascendant Republican party became increasingly important. The leader of the Radical wing of the Republicans, Edmund J. Davis, won election to the governor's office and quickly outlined his vision for restoring peace and tranquility across the state. The problem posed by local majorities willing to harass, intimidate, and assault racial or political minorities could only be resolved by increasing the police presence of the state government. There were two ways in which such a presence could be invigorated: reorganization of a loyal militia, and creation of a police force with statewide jurisdiction.

A militia, composed as it was of regular citizens, posed a special problem because a majority of Texas residents opposed the Republican party and black suffrage. Davis confronted this dilemma by pushing for an elite National Guard within the militia loyal to himself, and greater gubernatorial control over deploying the force and placing lawless areas under martial law. There was no doubt that all Texas lawmakers supported a reorganization of the militia—the Indian problem still lingering along the frontier ensured that; but the fear of executive tyranny, such an important component in the American political tradition, threatened to derail the project. Davis's skeptics received no reassurance from his request to form a State Police force, either. To ensure the fair and equal enforcement of the laws everywhere, he called for a police system "embracing the whole State under one head, and that the police of the different cities, the sheriffs

---

[78] Sanger, ed., *Statutes at Large*, Acts of the Thirty-ninth Congress, Vol. 26 (1871), 80-81.

and their deputies and constables, be made a part of that general police, to act in concert with it,
and to be subject to the orders of the chief." Davis envisioned the force to be like the Texas
Rangers in the sense of having statewide jurisdiction, but it was to be focused on the arrest of
criminals and the supervision of local law enforcement, rather than concerned with the Indian
question. An Adjutant General would oversee both the militia and State Police organizations.
The final piece of this three-tiered law-and-order platform was arms regulation. Davis reminded
the legislators that they enjoyed a newfound control over the "privilege" of bearing arms and he
asked them to pass restrictions "calculated to prevent the abuse of it." His justification hearkened
back to Throckmorton's in 1866: "There is no doubt that to the universal habit of carrying arms
is largely to be attributed the frequency of homicides in this State."[79] Politics aside, both men
drew the conclusion that the disease of lawlessness could not be cured without removing small
weapons from circulation in public; they also agreed that the state government had the *authority
to pass* and the *capability to enforce* such laws.

A number of Republican lawmakers heeded Davis's call by introducing bills and
resolutions on the subject of regulating weapons. A representative from South Texas, L. B.
Camp, was the first House member to act. Camp had spent many years in northeast Texas
(Upshur County) but moved west in the 1850s. Like Throckmorton, he voted against the
Ordinance of Secession, but diverged from the former governor by refusing to support the
Confederacy for the duration of the war. Rather than introduce his own bill, Camp's idea was to
have the House Judiciary Committee draft one. That committee had a solid Republican majority,
four of whom were fellow Radicals. His resolution described "the custom of carrying deadly
weapons upon the person" as "demoralizing in its effects, and . . . the fruitful source of many of

---

[79] *House Journal*, (1870), 17-31, 18, 19.

the crimes which have stained our fair name abroad."[80] The House ultimately adopted the Camp Resolution by an overwhelming margin of 76:2.[81] Not content to allow the Judiciary Committee all the fun, three other Radicals introduced bills "to levy a tax on fire arms," "to prohibit the carrying of six-shooters and other revolving pistols," and to ban "the carrying of pistols, bowie knives, and daggers."[82] The Judiciary Committee did not support the tax-based bill, but the other two formed a foundation for its response to the Camp Resolution. That response came in the form of a substitute for the two bills, to be called HB 297, "an act to suppress the carrying of deadly weapons except in case of self-defense, or lawful defense of the State."[83]

The Judiciary Committee's recommendation stands as one of the toughest, most comprehensive weapon regulation bills ever introduced in the Texas statehouse. The bill broke with tradition in a number of ways. First, it used specific language to define "deadly weapons." Banned arms included "any pistol, dirk, sword in a cane, spear, bowie knife or any other knives manufactured and sold for the purpose of offense and defense." Second, the bill did not limit its scope only to concealed weapons, instead criminalizing "any person having or carrying about his person" any of the aforementioned articles. This was an important innovation that outlawed certain ways of carrying a particular kind of weapon. The bill did not apply to rifles, muskets, or shotguns; nor did it prohibit people from keeping weapons in their bags, wagons, or luggage. Long guns were virtually impossible to conceal, and weapons stowed away were much less likely to be used in an altercation than those carried on the hip. There were a few exceptions to

---

[80] *House Journal* (1870), 44.
[81] The only nay votes were H. C. Ellis, a Democrat from Wood County, and George H. Slaughter, a Radical Republican from Smith County. Slaughter became the Twelfth Legislature's strongest opponent of arms regulation in the House. See *House Journal* (1870), 90-91.
[82] See *House Journal* (1870), 50, 61. In order from first to last these bills are HB 9 (Sheriff, Fort Bend-RA), HB 10 (Grothaus, DeWitt-RA), and HB 35 (Dorris, Caldwell-RA). Bill files for HB 9 and HB 10 are no longer extant. House Bill 35, 12the Leg., 1st Called sess. (1870), TSLAC.
[83] *House Journal* (1870), 750, 391, 418.

the extensive reach of HB 297, but even those were limited or complicated. The most obvious of these included carrying a prohibited weapon "for the lawful defense of the State, or as a peace officer" or within any "frontier county and liable to incursions of hostile Indians." The more convoluted exemptions involved bearing arms in self-defense or while traveling. A person arrested for violating the weapons ban could, *ex post facto*, justify his action by showing "that he was in danger of an attack . . . that such danger was immediate and pressing, and was of such a nature as to alarm a person of ordinary courage." But the exemption disappeared if "this danger had its origin in a difficulty first commenced by the accused." Slightly simpler was the dispensation offered to people heading to Mexico, Indian Territory, or frontier counties of Texas. These travelers most certainly needed deadly weapons for self-defense, and HB 297 acknowledged that fact. But the bill required them to inform their local court clerk in advance and pay him fifty cents for a special license stamped with the seal of the district court. This was a cumbersome and expensive requirement that promised to tax not only the clerk's time, but the traveler's patience. HB 297 also made it expensive to appeal a guilty judgment and summarily fired any peace officer who failed to enforce it.[84]

By creating the draconian HB 297, the Judiciary Committee went in a direction that Camp did not expect. As soon as the House took up the bill for engrossment and amendments, he moved for a postponement. When the time finally arrived to return to the subject, Camp introduced a substitute bill. He was joined in his opposition to HB 297 by an East Texas representative named George Slaughter, a fellow Radical Republican. Slaughter had cast one of the two votes against the Camp Resolution in the opening days of the session, so his alliance

---

[84] Law officers could be dismissed not only on a grand jury indictment, but merely on information presented to any magistrate. This is startlingly low evidentiary threshold for such a severe penalty, suggesting that it provided a way for besieged Republicans to replace the many sheriffs and constables who refused arrest white attackers and Klan groups. See House Bill 297, 12th Leg., 1st Called sess. (1870) TSLAC.

with Camp was one of convenience. Where Camp disliked the particular bill, Slaughter

disagreed with the entire project. The ultimate cause of his hostility toward arms regulation is

unknown, but it may have stemmed from the fact that he held public office as a newcomer and

Radical in a particularly troubled part of the state. In the summer of 1867 he arrived in Smith

County as a protégé of George W. Whitmore, who represented East Texas in the US Congress.

Slaughter quickly became a local officeholder and eventually rose to the rank of vice-president

of the Texas Union League. He was firmly tied to the Union League in political matters, so his

rejection of a measure intended to protect freedmen is mysterious. There are two possible

reasons for his divergence from fellow Radicals. First, he may have found his sidearm a great

comfort in a town experiencing what the local Bureau agent called "open warfare."[85] Second, he

represented East Texas, a region where whites' hatred of African Americans drove many a

Republican into the arms of the Democratic Party; Slaughter could have participated in the

Union League out of political savvy rather than sincerity.[86] Camp and Slaughter worked together

to have the House appoint a special committee to review HB 297 alongside the Camp substitute

and hammer out a compromise. The Republicans controlled the committee with three Radicals,

one moderate Republican, one Democrat, and two men of unknown affiliation.[87] The

compromise bill they presented to the House members the next day was HB 297 minus the

---

[85] Barbara Leah Clayton, "The Lone Star Conspiracy: Racial Violence and Ku Klux Klan Terror in Post-Civil War Texas, 1865-1877" (master's thesis, Ok. State Univ., 1979), 43-48. https://shareok.org/bitstream/handle/11244/15795/Thesis-1986-C622l.pdf?sequence=1.

[86] Moneyhon, *Republicanism in Reconstruction Texas*, 157-158, 245. Outside of Moneyhon's contribution on the subject, very little information exists on Slaughter and his politics. His political mentor, George Whitmore, was part of the Radical Davis-Ruby faction comprised primarily of West Texans and blacks. It is intriguing that the East Texans Whitmore and Slaughter would ally with the Davis-Ruby group rather than the James and Webster Flanagan faction committed to commercial development in East Texas. On the factions within the party, see Moneyhon, *Republicanism in Reconstruction Texas*, 83-86, 250-252. On Whitmore as a pro-Davis Radical, see *Handbook of Texas Online*, Randolph B. Campbell, "Whitmore, George Washington," accessed August 08, 2018, http://www.tshaonline.org/handbook/online/articles/fwh43.

[87] Members were Burnet (R), Williams, Locke, Cooper (RA), McLean (D), Hawkins and Moore (Unknown)

licensing requirement for armed travelers.[88] The details of Camp's opposition to HB 297 remains unknown, but removing the cumbersome licensing section ended up being sufficient to earn his support.

When House members dedicated themselves to amending and passing this groundbreaking measure, they made the bill so stringent as to be abortive. Additions like giving half the assessed fine to the informant or placing even greater restrictions upon people carrying weapons for self-defense might have been popular in the lower chamber, but they would not likely meet with Senate approval. For this reason, HB 297 as amended by the House stood no chance of becoming law. Notwithstanding this political folly, the representatives voted overwhelmingly in favor of its passage with even thirteen Democrats supporting it. These delegates represented North and Northeast Texas, where outlaw gangs, Klan groups, and other criminals made violence an everyday occurrence and a serious problem. The Republicans voted as a bloc and even Slaughter toed the party line. The nay votes came mostly from Democrats who lived in or near the frontier counties still subject to Indian attacks (see Fig. 2.1).

---

[88] Camp's substitute bill is not extant, so the substance of his opposition to HB 297 remains a matter of speculation. On the history of HB 297, see *House Journal* (1870), 391, 418, 475, 480.

Fig. 2.1. Map of Democratic votes on HB 297, 1870.



■ Democratic vote for HB 297

■ Democratic vote against HB 297

Despite the time and political pressure expended by House Republicans on HB 297, their endeavor went down as a failure. Their counterparts in the Senate crafted a much simpler bill that actually became law. Senator Ebenezer Dohoney, a Democrat from Northeast Texas, introduced a complicated bill similar to HB 297 that died at the hands of the Judiciary Committee—complex policies that involved special licensing processes did not meet with

72

senatorial approval.[89] Constructing the perfect bill that did just enough disarming to reduce crime without trampling on constitutional rights began with a recommendation by Mijamin Priest, a Radical from Rusk County in East Texas.[90] The main thrust of his bill represented a position capable of garnering strong bipartisan support in both chambers. In fact, the very same text appeared in the amended HB 297 as its third section. Priest's bill simply made it a misdemeanor to "have about his person" deadly weapons in certain specified locations. "A bowie knife, dirk or butcher knife, or firearms, whether known as a six-shooter, gun, or pistol of any kind" could not be taken to "any church or religious assembly, any school room . . ., social party . . ., or to any election precinct on the day or days of any election." The most significant aspect of the bill was its clarity in proscribing certain kinds of weapons (which included long guns) from specific locations. A policy like this promised to allow local officials to enforce it without the burden of special licenses and exemptions. If a man felt threatened he could carry a pistol, as long as he did not take it to events that could become riotous. Similarly, black Texans could gather together for worship, parties, and educational meetings as long as they did not take weapons with them. The kinds of locations and events protected by the law were the very ones that most frequently became targets of Klan or other white vigilante violence.

Priest was in a position to personally usher his bill through the Senate Judiciary Committee because he served as its chairman. Still, the committee's substantial Democratic presence required him to accept alterations and support a substitute bill. A controversial second section of Priest's original bill required a direct tax of five dollars on "every five shooter, six shooter or other pistol or firearms of any name or description kept for use to be carried about the person." Though the verbiage is clumsy and vague, Priest did not intend this tax to apply to long

---

[89] Senate Bill 57, 12th Leg., 1st Called sess. (1870), TSLAC; *Senate Journal* (1870), 76-77.
[90] On Priest, see Spaw, *The Texas Senate*, 108-109.

guns. These larger, heavier firearms could not be "carried about the person" in the same way that a pistol could. Not only was this tax quite expensive (a pistol cost anywhere from ten to twenty dollars, so it was a quarter or more of the item's value), it required the statewide registration of all small firearms. The only time something like this had been considered before was in 1861 when the House considered creating an inventory of firearms that could be put into military service. If such a survey was politically impossible during wartime, it stands to reason that it remained unfeasible afterward. Priest's registration idea died in his own committee, so he recommended the passage of a substitute bill that eliminated the offending section.[91]

Priest's bill, labeled SB 20, quickly passed through the Senate because of a little-known controversy that erupted in the summer of 1870. As Davis might have anticipated, a cohort of lawmakers took issue with the centralization of gubernatorial power inherent in the militia and State Police laws. Most of these lawmakers were Democrats whose antipathy toward Davis motivated them as much as their political principles, but some Republicans joined their ranks. As early as 1868, Texas Republicans began dividing into two competing factions. Radical Republicans aligned with Davis and tended to support the political goals of West Texas and freedmen. Conservative Republicans rallied around A. J. Hamilton and Pease and were known for their opposition to the complex *ab initio* cause out of concern that it would hinder railroad development. Conservative Republicans tended to hail from East and Central Texas, and they sometimes found common ground with Democrats on racial matters.[92] An important segment of the Conservative Republican coalition was a collection of East Texas delegates organized around the father-son duo of James and Webster Flanagan. The younger Flanagan held a seat in the state

---

[91] House Bill 129, 9th Leg., Reg. sess. (1861-1862), TSLAC. Senate Bill 20, 12th Leg., 1st Called sess. (1870), TSLAC; *Senate Journal* (1870), 61, 97-98; Gammel (comp.), *Gammel's Laws*, 5:237.
[92] On the divisions among Republicans, see Moneyhon, *Republicanism in Reconstruction Texas*, 96-98, 107-108.

senate and pursued his section's interests from there. His impeccable Republican credentials and strong political connections turned him into the leader of these anti-Davis critics who marched out of the senate chamber to prevent a quorum and stall debate on the militia bill. The sergeant-at-arms forced "the bolters" back into the chamber, but most of them were placed under arrest for violating the rules of the senate. For about three weeks, these nine senators were prohibited from participating in deliberations.[93] What machinations remained open to the vocal minority of anti-Davis senators in a Radical-dominated legislature evaporated with the absence of so many men. A whole host of Republican measures passed rapidly through the chamber with little or no amendment. These included the militia bill, the State Police bill, and even SB 20.[94]

At this point, after the senate's passage of SB 20, and after the return of the arrested Democrats, Matthew Gaines stood up and asked his fellow senators to consider the arms regulation proposed by the House (HB 297). Gaines was one of the eleven African Americans in the Twelfth Legislature and a notable Republican leader in the black-majority Washington County. As one of the few political spokesmen for the state's freedmen, Gaines preferred HB 297 because it prohibited the carrying of weapons in public with very limited exceptions; banning weapons from certain events and locations simply was not good enough to protect black Texans. For the supporters of a tougher bill, the everyday carrying of weapons for self-defense still permitted by SB 20 created an atmosphere of distrust that abetted violence and intimidation. In a show of Radical Republican solidarity and power, the senate suspended the rules to read HB 297 and sent it to the Judiciary Committee. A few days later Mijamin Priest reported to his

---

[93] Spaw, *The Texas Senate*, 123-126; Moneyhon, *Republicanism in Reconstruction Texas*, 91, 139-142. Flanagan worked out a Deal with the Davis faction to trade passage of a bill friendly to the Southern Pacific in exchange for the Militia bill. Upon the advice of his cabinet, Davis vetoed the Southern Pacific bill out of concern for the state budget, further alienating Flanagan and his allies. On Flanagan, see Spaw, *The Texas Senate*, 97-100.
[94] *Senate Journal* (1870), 307-308, 320-321.

fellows that his committee supported the goal of HB 297 but did not have the time to consider it in detail. The senate did not take up the issue again before the end of the session.

Even though the Senate lacked the time and political will to enact a stringent arms regulation law in 1870, the passage of SB 20 by the House marked a new departure for the state in terms of gun control. This first significant curtailment of the right to bear arms in Texas went into effect in October of 1870, just three months before the regular session of the Twelfth Legislature (January to May, 1871). During closing weeks of 1870, the Republican majority of the legislators decided to strengthen the law-and-order platform of the Davis administration. The State Police and militia laws received attention, as did the deadly weapons regulation. The intervening months had highlighted the shortcomings of these laws which, despite representing an unparalleled consolidation of state government power, did not go as far as Davis wanted. The militia and State Police were only partially organized due to a lack of funding; there were not enough state policemen, so Davis asked for the appointment of a reserve corps of "special" policemen in each county who could respond in an emergency; the law "forbidding weapons in public spaces" was insufficient to quell the violence and needed to be strengthened.[95] The pro-Davis Radicals in the legislature followed the governor's instructions, but in doing so alienated moderates and set the stage for the collapse of Reconstruction and statewide Republicanism in 1874.

All the action involved in amending the weapons regulation law took place in the House. The most important contributors in that chamber were Francis Gray Franks, William Sheriff, and Frederick Grothaus, all Radical Republicans. They represented counties along the Gulf Coast and hailed from Wharton, Fort Bend, and DeWitt Counties, respectively—all places with sizeable

---

[95] *Senate Journal*, (1871), 30-33.

black populations. Each of the proposed bills followed the basic design of HB 297 by prohibiting the carrying of certain specified weapons "about the person," but the House Judiciary Committee considered Grothaus's, HB 115, "best calculated to secure the end sought to be attained."[96] The committee did not specify the shortcomings of the other two bills, but Franks's was weak and poorly written and Sheriff's retained some of the requirements that House members had removed from the abortive HB 297 at the previous session.[97] Even though the House had passed over their bills, Sheriff and Franks joined the ranks of the Grothaus bill's supporters. The House had specified a particular day to consider Grothaus's HB 115, but when that day arrived the debate became exceedingly contentious. Thirty members absented themselves, making the bill's supporters struggle to achieve a quorum and carry on regular business. A critical mass of lawmakers, mostly Democrats alongside George Slaughter, obstructed the bill's passage at every turn. They offered outlandish amendments sure to kill it, like a recommendation that violation be upgraded to a felony and carry at least one year in the penitentiary; they tried to overturn the quorum present and adjourn the House; they relied upon complicated rules to keep the debate going endlessly so that the bill's supporters would surrender. On each count the champions of HB 115, about sixty members, held their ground and pushed the bill along. It helped their cause that the Speaker of the House, Ira H. Evans, represented a staunchly Republican district and was an ally of Davis (see Fig. 2.2).[98]

---

[96] *House Journal* (1871), 443-444.
[97] Sheriff's bill kept the cumbersome licensing requirement for travelers.
[98] The entire day of March 9, 1871 was spent debating this bill in the House. See *House Journal* (1871), 523-533.

Fig. 2.2. House votes on HB 115, 1871.



■ Vote for HB 115
■ Vote against HB 115
■ Votes split on HB 115

Grothaus and his allies fashioned HB 115 in the image of its predecessor, HB 297, with some important differences. HB 115 prohibited "carrying on or about his person, saddle, or in his saddle bags any pistol, dirk, dagger, slung-shot, sword-cane, spear, brass knuckles, bowie-knife, or any other kind of knife manufactured or sold for the purposes of offense or defense." The forms of carrying as well as the list of prohibited weapons were much more expansive than before, indicating that the lawmakers sought to address ambiguities present in the preceding law. They removed the monetary incentive to inform on neighbors violating the law; it promised

78

better enforcement, but at the expense of county coffers desperately seeking money for infrastructure improvements. The Senate made sure to add a proviso explicitly stating what types of "civil officers" would be exempted, and under what conditions. Exemption from HB 115 only applied to police, militiamen, sheriffs, and revenue and civil officers "while engaged in the discharge of their official duties." But they added new exemptions, such as one for travelers (regardless of their destination), one for residents of frontier counties, and one for anyone "fearing an unlawful attack on his person" that is "immediate and pressing." The penalty entailed forfeiture of the weapon and a fine from twenty-five to one hundred dollars, and repeat offenders could be sentenced to jail time in addition to the fine. Interestingly, the full text of SB 20 (the law already on the books and being superseded) remained within this new bill. Taking the aforementioned deadly weapons "or other fire arm" to certain events or places was a misdemeanor punishable by a much heftier fine of fifty to five hundred dollars. Appealing a guilty verdict was costly, requiring a bond of at least two hundred dollars. Money from fines, bonds, and even the sale or auction of forfeited deadly weapons had to be allocated to "repair and maintenance of public roads." Finally, any magistrate or officer who failed to properly enforce this law faced dismissal, prosecution, and a fine of up to five hundred dollars.[99]

This bill became the 1871 Texas deadly weapon ban—one of the first comprehensive arms control laws in American history. In their bid to protect African Americans and nurture free labor in the South, Texas Republicans ended up championing a measure capable of dramatically changing the way men dressed and behaved in public.[100] No longer could they carry a pistol on

---

[99] Gammel (comp.), *Gammel's Laws*, 6:927; *House Journal* (1871), 443-444, 523-533; House Bill 115, 12th Leg., Reg. sess. (1871), TSLAC.

[100] Some scholars have mistakenly attributed the gun laws of the Reconstruction era to the racist sentiments held by Confederate sympathizers. In fact, these comprehensive weapons regulations tended to be enacted by Republican governments in the states of the former Confederacy. Examples of scholarship that ascribe exclusive authorship of early gun laws to racism, Democrats, and former Confederates include Kevin Yuill, " 'Better Die Fighting against Injustice than to Die Like a Dog': African-Americans and Guns, 1866-1941," in *A Cultural History of Firearms in*

the hip, or a bowie knife on the belt; no longer could they resort to ad hoc duels or knife fights to settle their scores—fisticuffs would have to do. Like any law, it proved impossible to fully enforce, but supporters still sang its praises. One reporter lamented that some reputable men continued the old practice of settling scores "at the muzzle of a six-shooter." He went on to say that "no commentary is needed, to convince good men, not only of the wisdom of the law prohibiting the carrying of firearms, and other deadly weapons, but also of the necessity of its rigid enforcement."[101] Near the end of his term in office, Davis acknowledged the weapon ban as an important measure "for the preservation of the peace" which had a "most happy effect" upon the state. The victory was not merely one of restraint and law over passion and disorder; it was a strategic political victory for the Republicans. One Republican commentator summed up his party's sentiment well when he said, "The Democrats are sullen and angry because the firearm bill has robbed rowdies of their six-shooters, their bowie knives and their sword canes; let us continue to disarm rowdies and murderers, to stop bloody affrays, and to thus oppose the Democracy."[102]

Forcing Texans to leave their weapons at home remained a controversial policy that contributed to the erosion of Davis's support among Texas Republicans. Moderates from within his own wing of the party became disenchanted with Davis because of his promotion of executive power, and many defected to the Conservative Republicans. Though Davis was well within his rights when he declared martial law in three separate Texas counties between 1871

---

the *Age of Empire*, eds. Karen Jones, Giacomo Macola, and David Welch (New York: Routledge, 2013), 211-229. Nineteenth-century Southerners recognized the correlation between weapon regulations and Republican governments: "It has been the policy of the Radicals in some of the other States, to disarm the people while overrunning the country, with a mercenary soldiery; how far this effort will be made in Texas, will be determined to some extent, by the provisions of that act supported by the administration, on the subject of wearing deadly weapons." *Tri-Weekly State Gazette* (Austin, TX), March 15, 1871.
[101] "The District Court," *San Antonio Daily Express* (San Antonio, TX) April 2, 1871.
[102] "A Good Lesson," *Houston Daily Union* (Houston, TX), June 30, 1871.

and 1873, doing so alienated many voters. White Texans, even many Republicans, perceived these declarations as affronts to white honor and violations of white supremacy. Each came in response to a racially charged riot or shootout, and those usually began with black State Police officers trying to make white men follow the law. The most outrageous occurred in Limestone County in 1871 when a black State Policeman named Mitch Cotton ended up in a shootout after demanding that a white man abide by the deadly weapon law. The consequences for Davis and local Republicans proved catastrophic, with several deaths and a Democratic electoral victory through fraud and intimidation.[103] Criminalizing what many people considered the "normal" manly behavior of carrying a weapon made it easy for Davis's detractors to portray him as a loathsome tyrant. Democrats and Conservative Republicans met together in 1871 trying to form an anti-Davis coalition. The two groups remained too far apart to form a political alliance, but they found much common ground in decrying high taxes and bemoaning that "the people have been disarmed throughout the State, notwithstanding their constitutional right 'to keep and bear arms'."[104] But their concern was not limited to the disarming of the people; such disarmament only posed a threat to their liberty because the hated State Police and State Guard, associated with Davis and falsely presumed to be staffed by freedmen, "are armed, and lord it over the land, while the citizen dare not . . . bear arms to defend himself."[105] Lockean liberalism was at play here, but so was a white male chauvinism that could not countenance the trappings of manly authority in black hands. Senator Gaines had identified this sentiment the previous year when he

---

[103] Barry A. Crouch, *The Governor's Hounds: The Texas State Police, 1870-1873* (Austin: University of Texas Press, 2011), 93-115; Reginald G. Jayne, "Martial Law in Reconstruction Texas" (master's thesis, Sam Houston State Univ., 2005), 59-82; Moneyhon, *Texas after the Civil War*, 142-143; Campbell, *Gone to Texas*, 281.
[104] Note that they referred here to the Texas Constitution of 1869, not the US Constitution. Again, the "incorporation" of the Bill of Rights to make it apply to state governments had not yet taken place.
[105] This is the Tax-Payers Convention. On the meeting, see *Handbook of Texas Online*, Carl H. Moneyhon, "Tax-Payers' Convention," accessed August 02, 2018, http://www.tshaonline.org/handbook/online/articles/vft01. Quotation from S. Rep. No. 42-41, pt. 1 at 426 (1872).

claimed that "the idea of gentlemen of my color being armed and riding around after desperadoes" was the root of white opposition to the State Police and militia bills.[106]

The momentum of the Texas Democrats surged as they scored victories in elections for state offices and the US Congress. By 1873, Democrats controlled the state legislature and looked forward to inaugurating a Democratic governor-elect, Richard Coke. Davis hoped for the intervention of the Grant administration to nullify the results and preserve his administration, but the national party had grown tired of reconstructing the South. The embattled governor insisted on finishing out his term in office, but armed Coke supporters forced his resignation in January 1874. Thus ended the Republican control over state government, and for all intents and purposes, ended Reconstruction in Texas.

Slowly but surely, one by one, Texas county governments returned to the Democratic fold over the next decade or so. Democrats in the Thirteenth Legislature swiftly dismantled Davis's law-and-order platform by curtailing the governor's authority over the militia and disbanding the State Police. Interestingly, despite the hue and cry against it, the 1871 weapon ban stayed in place. Lawmakers found it much less threatening once its detested enforcers had been eliminated. No doubt they, like the US congressmen writing in 1872, recognized that the situation in Texas had improved over the past few years. Yes, their world had proverbially "turned upside down" during the revolution that was Republican rule between 1868 and 1873; but that enemy had been defeated and his inventions either destroyed or turned to Democratic ends. The ubiquitous violence so prevalent in the South and Old Southwest during antebellum years exploded in the aftermath of the war, but a combination of innovative legal changes and a

---

[106] *State Journal Appendix: Containing Official Report of the Debates and Proceedings of the Twelfth Legislature of the State of Texas* (Austin: Tracy, Siemering, & Co., 1870), 82. Quoted in Moneyhon, *Republicanism in Reconstruction Texas*, 139.

strong executive branch had restored some semblance of order during the Davis administration. The "tyranny and lawlessness which was, before the war, open and unrestrained" had been rechanneled and concentrated into isolated, localized episodes of extreme violence. This transition made for a South characterized by "more general order and peace . . . than before the war," though the violent episodes became steadily more brutal and reached the point of becoming sacred rituals within white communities.[107] I speak here of the forms of ritualized racial violence that we categorize under the heading of lynching—occasions when town-dwelling, be-suited men could release the "fearsome passion" that had been expected of their antebellum slaveholding forefathers. The generalized, low-level violence that invariably followed gun-toters was on its way out, to be replaced by the concentrated, high-level violence of local "wars," large-scale shootouts, riots, and lynching. How that process unfolded is the subject of the following chapters.

---

[107] The majority report of the Joint Select Committee to inquire into the condition of affairs in the late insurrectionary states declared: "It is the general testimony of old citizens of the South that, notwithstanding the conspiracy known as the Ku Klux Klan, there is more general order and peace in the South than before the war; while this may surprise those familiar with the recent disorders, and unfamiliar with southern society before the war, we deem the statement not extravagant, for the conspiracy appears to us an attempt to exercise in localities, in despite of law, that tyranny and lawlessness which was, before the war, open and unrestrained, and more general, if not so cruel. We should remember how common it was to scourge colored men, and how perilous for northern citizens or southern emancipationists to be found in the Gulf States. How freely the revolver and the knife were used in the renconter or the duel." See S. Rep. No. 42-41, pt. 1 at 271 (1872).

Chapter 3
"The Proper Costume of a Gentleman": Courts & Constitutionality from *English* to *Miller*

History textbooks mark the end of Reconstruction in 1877, when Republican Rutherford

B. Hayes took office and, by way of an agreement reached with Democrats the previous year,

ordered the last of the Union soldiers in the former Confederacy to stand down. The Hayes-

Tilden Agreement ended an electoral crisis, but more importantly, acceded to political reality in

the South: Democrats had larger numbers and were better organized than Republicans, and their

often ruthless tactics had long since delivered much of the South to the Democracy. This process,

referred to as Redemption, took place in Texas beginning in 1872. By 1874, Democrats had

regained control of the state legislature, the governor's office, and a host of county governments.

Some counties stayed in Republican hands a while longer, but Texas was well on its way to

becoming a one-party state.

The self-professed Redeemers expressed their goals and explained their actions in martial

terms. For this reason, disarming black men and disqualifying them from military service

became important battles to be fought and won at any cost. Political culture of the day

intertwined manhood, martial service, and citizenship into a complex web that had previously

been the exclusive domain of white men. The elevation of black men to legal equality, political

participation, and the bearing of arms as citizen-soldiers was an affront to most white men, even

those sympathetic to parts of the Republican platform.[1] Higher taxes, scandals, and the

consolidation of executive power did not help Edmund J. Davis's cause, but the root of the issue

was race—in the end, white racial solidarity trumped all other considerations among the majority

---

[1] For a review of the "citizen-soldier" concept and its connection to the bearing of arms in martial sense, see Cornell, *A Well-Regulated Militia*, 3-7, 13-18.

of Texas voters.[2] Restoring white men to their previously held status as the socio-political elite was accomplished via the degradation of black men. Their voting rights were not taken away quite yet, but they found themselves purged from militias, disarmed, and suddenly vulnerable to the white, Democratic majority in Texas. One of the first acts pursued by the Redeemer government was to replace the militia law that Republicans had worked so hard to pass, and to empower the adjutant general to collect state arms that had been distributed to militia units. In this manner, the biracial and black militia companies formed to protect Republican voters by going toe-to-toe with white paramilitary groups were disarmed, disbanded, and disempowered. Democrats followed up this legislation by authorizing the formation of dozens of rifle companies, all of which received state-supplied weapons and ammunition. Bearing arms in defense of the state reverted to a privilege for white men only.[3]

The popular images that later generations of white Americans held about the "redemption" of the South from the slough of racial equality reinforced this connection between white triumph and black disarmament. In his novel *The Clansman*, North Carolina author Thomas Dixon wrote a denouement in which the local black militia members laid their arms at the feet of the white Klan that defeated them.[4] The scene was also portrayed in the film version, *The Birth of a Nation*. These symbolically laden images could also revolve around white leagues, which were armed groups that emerged in the mid- and late-1870s, after masked terrorism

---

[2] On Davis and his political difficulties, see Carl Moneyhon, *Edmund J. Davis of Texas: Civil War General, Republican Leader, Reconstruction Governor* (Fort Worth: TCU Press, 2010).

[3] A few black militia units remained throughout the late nineteenth century. However, they were used in ceremonial capacity rather than deployed in a martial capacity. On Redemption as a restoration of white manhood, see Emberton, *Beyond Redemption*; for gender analysis of the Civil War era more generally, see Whites, *The Civil War as a Crisis in Gender*; Nina Silber, *The Romance of Reunion: Northerners and the South, 1865-1900* (Chapel Hill: University of North Carolina Press, 1993); Nancy Bercaw, *Gendered Freedom: Race, Rights, and the Politics of Household in the Delta, 1861-1875* (Gainesville: University of Florida Press, 2003).

[4] Thomas Dixon, *The Clansman: An Historical Romance of the Ku Klux Klan* (New York: Grosset & Dunlap, 1905), 340-341.

became a crime punishable by federal rather than state courts. In the early twentieth century, writers like Thomas Nelson Page celebrated the honorable and patriotic white men who "overthrew" the corrupt governments imposing "negro domination" during Reconstruction. The intersection of manhood, martial service, and citizenship was the very heart of the racial tensions within the former Confederacy during the waning years of Reconstruction. None other than William A. Dunning identified "the crux of the race issue" as the black militia units perceived to be tyrannizing white Democrats. "Respectable whites would not serve with the blacks in the militia; the Republican state governments would not . . . exclude the blacks from the military service; the mere suggestion of employing the blacks alone in such service turned every white into practically a sympathizer with the Ku Klux." There is no doubt that the claims made by freedmen upon Southern society, their embrace of what historian Carole Emberton has called "martial manhood," drove white Southerners to their violent mode of Redemption. This remembrance of the collapse of Reconstruction as one of physical and metaphorical restoration of white manhood resonated with Southern audiences because it was largely true.[5]

In the decade or so following their electoral triumph in 1874, Texas Democrats worked hard to shore up their political power. They repealed most of Davis's legislative accomplishments, harried the Republican Party to insignificance, and dramatically reduced state expenditures (and therefore taxes). While placing their political and fiscal houses in order, they got their physical house in order, too. The legislature spent a tremendous amount of time overseeing the financing and construction of a new state capitol, a process that took over a decade. The single-mindedness of Democrats to undo politically and fiscally what had been done

---

[5] Thomas Nelson Page, *The Negro: The Southerner's Problem* (New York: Charles Scribner's Sons, 1904); William A. Dunning, "The Undoing of Reconstruction," in *Essays on the Civil War and Reconstruction and Related Topics* (1897; repr., New York: The Macmillan Company, 1904), 357; Emberton, *Beyond Redemption*, 103-105.

during the Davis administration left them lacking the will or the popular mandate to amend or otherwise pay attention to the deadly weapons ban. Some efforts were made to repeal it, and a few amendatory bills were introduced, but none became law; attention remained focused elsewhere. The only notable legislative event on the subject was the passage of a new state constitution in 1876. It not only retained a right to bear arms but continued the legislature's authority to regulate "the wearing of arms" so long as those requirements were undertaken "with a view to prevent crime."[6] It was no minor irony that the Democrats who had complained about their disarmament by the "tyrannical" Davis took a crucial step in perpetuating strict gun control laws in Texas.

In their effort to consolidate their power statewide, Democrats encountered a difficult obstacle in the shape of reform-minded groups. The Patrons of Husbandry (called Grangers) and later Greenbackers threatened party unity, and in the case of the Greenbackers, pursued a fusion ticket with Republicans that posed the prospect of interracial solidarity. The agrarian reformers of Texas, and the southern and western states more generally, have received a great deal of scholarly attention (deservedly so); but calls for reform reached beyond economic issues to embrace legal ones, too.[7] Just like the economic reformers who proposed innovative policies to improve middle class life in the South and West, legal reformers looked for ways to improve the administration of justice in Texas in order to make the state safe for investment and demographic

---

[6] Tex. Const. of 1876, art. I, § 23. "Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime."

[7] Notable works on agrarian reform movements during the late-nineteenth century include Charles Postel, *The Populist Vision* (New York: Oxford University Press, 2007); Lawrence Goodwyn, *Democratic Promise: The Populist Moment in America* (New York: Oxford University Press, 1976); Elizabeth Sanders, *The Roots of Reform: Farmers, Workers, and the American State, 1877-1917* (Chicago: University of Chicago Press, 1999); Gretchen Ritter, *Goldbugs and Greenbacks: The Antimonopoly Tradition and the Politics of Finance in America* (New York: Cambridge University Press, 1997). Postel, especially, addresses some of the larger social goals of these reform groups, but they are almost universally studied separately from more mundane movements, like legal reform.

growth. The culmination of this movement was the adoption of a new penal code in 1879, and again in 1895. Within this context of legal reform and legislative preoccupation with other matters, the appellate judges of Texas found themselves poised to flesh out the meaning, intent, and constitutionality of the deadly weapons ban. Their decisions shed light upon some of the most significant and intriguing aspects of late nineteenth-century jurisprudence, including the scope of the Fourteenth Amendment and the treatment of male lethal violence under the law. The legal history of "the pistol law" during the two decades after its passage also shows us the federally approved accumulation of state power, and an altogether different view of the Second Amendment than the one we are familiar with.[8]

*     *     *

The first and most significant issue about the deadly weapons ban to be addressed by the Texas Supreme Court was its constitutionality. In light of the state's recent insertion of legislative regulation upon the right to bear arms, this seemed like a simple question with a straightforward answer. Nonetheless, as is customary in American jurisprudence, a case worked its way to the highest court in order to test the validity of the act, indeed the validity of the constitution's authorization for legislative regulation. That case was *English v. State of Texas* (1872).[9]

The Texas court system was as much a victim of socio-political upheaval in the 1860s and 1870s as the state legislature. The Civil War led many courts from the municipal level up to the state supreme court to suspend regular business. The general chaos following surrender meant that the judicial system as a whole did not begin operating properly until 1866, and even

---

[8] On the general political landscape in Texas following Reconstruction, See Campbell, *Gone to Texas*, 304-320; Patrick G. Williams, *Beyond Redemption: Texas Democrats after Reconstruction* (College Station: Texas A&M University Press, 2007); Alwyn Barr, *Reconstruction to Reform: Texas Politics, 1876-1901* (Austin: University of Texas Press, 1971; Seymour V. Connor, *Texas: A History* (New York: Thomas Y. Crowell Company, 1971), 275-282.
[9] *English v. State of Texas*, 35 Tex. 473 (1872).

then judges at all levels faced a backlog of cases. An attitude of intransigence on the part of the James W. Throckmorton faction then in control of the state prompted federal intervention, as was discussed in the previous chapter. That intervention reached into the judicial system, and a number of Texas judges were removed from office as an "impediment to Reconstruction."[10] The entire Texas Supreme Court was dissolved, to be replaced by military appointees.[11] This short-lived Military Court headed up the state judiciary from 1867 to 1870 before the new constitution of 1869 provided for a constitutionally sanctioned court system. That system involved a Texas Supreme Court made up of three justices appointed by the governor and subject to senatorial approval. This Reconstruction Court, often referred to as the Semicolon Court, heard the first appeals arising from the deadly weapons ban, including *English v. State*.[12]

The prohibition against knives and pistols in public places went into effect in the autumn of 1871. There is no way to know how many violators were arrested by law enforcement officials during its first few weeks, but a sufficient number appealed their guilty verdicts to merit the consolidation of three appeals into one decision. William English carried an out-of-repair pistol in town one day while he was drunk; worshippers in church one morning saw the handle of a butcher knife showing in the waistband of William Daniels's pants; the particulars of G. W. Carter's offense remain unknown because the court did not receive a brief on his behalf. The attorney arguing the appellant's case was a man named Reuben A. Reeves, who later became a judge of the Texas Supreme Court. Reeves's case rested upon several claims about the deadly weapons ban. First, he claimed that it violated the Second Amendment to the US Constitution;

---

[10] These judges included Reuben A. Reeves, Robert S. Gould, and John Ireland, each of whom later won appointment or election to the Texas Supreme Court.
[11] Richard Coke, Oran M. Roberts, and George Fleming Moore were among the judges of the dissolved high court. Coke, upon winning the governorship, named Roberts and Moore to a reconfigured state supreme court. Roberts went on to be governor, too.
[12] On the Texas Supreme Court, see James L. Haley, *The Texas Supreme Court: A Narrative History, 1836-1986* (Austin: University of Texas Press, 2013).

second, it violated the Texas Constitution of 1869; third, it deprived Texans of customary rights such as self-defense. Writing for the court, justice Moses Walker, an Ohio native and Union veteran, disagreed profoundly with each of Reeves's arguments.[13]

In his defense of the law against the Second Amendment claim, Walker made an interesting argument. Jurists up to this point in American history generally agreed that the Bill of Rights protected Americans from interference by the *national* government, on the part of the US Congress or the president. Those rights did not protect citizens from interference on the part of their own *state* governments. Civil rights were a state matter, generally guaranteed by a bill of rights within each state constitution. Walker gave a nod to this sharp division of power between the state and national sovereignties but immediately admitted that the right to bear arms was one of the few enumerated in the Bill of Rights that did "bind both the state and national legislatures." This was a direct quotation of Joel Prentiss Bishop, a leading jurist of the time. Walker concurred with Bishop that the Second Amendment had some role to play in protecting the right of all Americans to bear arms, but only in a strictly martial sense. As Bishop put it: "The [Second Amendment] provision protects only the right to 'keep' such 'arms' as are used for purposes of war, in distinction from those which are employed in quarrels and broils . . . . In like manner, the right to 'bear' arms refers merely to the military way of using them, not to their use for bravado or affray." The kind of weapons protected included: muskets, bayonets, sabres, cavalry pistols, artillery, and side arms. The weapons named in the ban, however, "belong to no military vocabulary," and calling the "instruments" prohibited in the statute "proper or necessary

---

[13] Walker has been labeled by some scholars as the most successful "carpetbagger" in Texas. Born in Ohio, Walker became involved in Texas politics after serving the Freedmen's Bureau as an officer in the Union Army. He sought election to the US Congress as part of the Texas delegation, but lost. On Walker, see Haley, *Texas Supreme Court*, 81-82; *Handbook of Texas Online*, Randolph B. Campbell, "Walker, Moses B.," accessed October 09, 2018, http://www.tshaonline.org/handbook/online/articles/fwa21.

arms of a 'well-regulated militia' is simply ridiculous." Walker went on to condemn Reeve's appeal to the Second Amendment in the most forceful way possible: "No kind of travesty, however subtle or ingenious could so misconstrue this provision of the constitution of the United States, as to make it cover and protect that pernicious vice, from which so many murders, assassinations, and deadly assaults have sprung, and which it was doubtless the intention of the legislature to punish and prohibit."[14]

Walker declared the law in harmony with the state constitution, too. The bill of rights within that document stated that "Every person shall have the right to keep and bear arms, in the lawful defence of himself or the State, under such regulations as the Legislature may prescribe."[15] The idea that the weapons ban could possibly contravene this constitutional guarantee seemed preposterous to Walker and elicited a vehement response: "We confess it appears to us little short of ridiculous, that any one should claim the right to carry upon his person any of the mischievous devices inhibited by the statute, into a peaceable public assembly. . . . The history of our whole country but too well justifies the enactment of such laws."[16]

Though Walker only gave cursory attention to the third claim (that the weapons ban deprived Texans of customary rights), his position remains important to understanding the purpose, intent, and justification of gun laws in Texas and elsewhere at this time. He relied upon the police power vested in the state government to defend the deadly weapons ban, and indeed all regulations that advanced "the happiness and well being of the people." The court held that "whatever conduct offends against public morals or public decency comes within the range of legislative authority." This expansive view of police power aligned with the opinion composed

---

[14] *English v. State of Texas*, 35 Tex. 473 (1872).
[15] Tex. Const. of 1869, art. I, §XIII.
[16] *English v. State of Texas* (1872).

by United States Supreme Court Justice Samuel F. Miller in *Slaughterhouse Cases* the following year.

The 5-4 majority in that case protected a state-chartered corporation given a monopoly over all animal slaughtering in the area surrounding New Orleans. The state of Louisiana was responsible for the health and safety of its residents and therefore had the authority to enact any regulation necessary to achieve that end, including the formation of a corporation with special privileges. Miller said, "Upon [police power] depends the security of social order, the life and health of the citizen, the comfort of an existence in a thickly populated community, the enjoyment of private social life, and the beneficial use of property." The plaintiffs, a group of butchers inconvenienced by the new law, relied upon the anti-monopoly tradition of England to make their case, but Miller dismissed their claim. In England, monopolies had been granted by the monarch "in derogation of the rights of his subjects . . . in which the people were unrepresented, and their interests uncared for." The situation in Louisiana was altogether different because the members creating the monopoly were the duly elected representatives of the people. Since the early days of the republic, the states—those "laboratories of democracy"— had wielded all power necessary to provide for the common weal in accordance with the sensibilities of the voters. Thus the butchers of Louisiana who had brought the cases needed legislative rather than judicial redress.[17]

The decision in *Slaughterhouse Cases* firmly reestablished state police power against the centralizing tendencies of much of the Republicans' legislative accomplishments.[18] In fact, Miller's concluding words underscored the importance of maintaining the proper "balance between State and Federal power," which had been envisioned by the nation's founders. This

---

[17] *Slaughterhouse Cases*, 83 U.S. 36 (1873).
[18] Gerstle, *Liberty and Coercion*, 278-282.

reaffirmation marked an important event in postbellum jurisprudence because the enemies of the Republicans had long raised the specter national supremacy over the states as the ultimate source of their opposition. After the US Supreme Court clearly declared that states had the right to enact any "police regulation" for the common good, including forming a monopoly corporation, it became less important for states to claim that power themselves. For this reason, the second case addressing the constitutionality of the Texas deadly weapons ban sidestepped the subject of state police power.

In the waning days of 1873, Texas's Reconstruction Court handed down a controversial decision that nullified the results of the recent gubernatorial election in which Democrat Richard Coke defeated Republican Edmund J. Davis. The court technically made the correct decision, which hinged upon the placement of a semicolon in the state constitution's section outlining procedures for gubernatorial elections. The pro-Republican outcome of the case led many Texas Democrats to believe that the state's highest court had rendered a partisan opinion. Davis had appointed all three members of the court, and they shared political interests. Armed paramilitary forces rendered moot this infamous "Semicolon Case" (*Ex parte Rodriguez*) when they physically removed Davis from the governor's office. The court's decision seemed to substantiate every negative claim made by Democrats against their Republican opponents, particularly the charge that they were undemocratic tyrants more interested in imposing their will than listening to the people. For this reason, Coke, a former member of the state's high court, promised to restore power to the people, the voters, and the democratic majority. The legislature, friendly to Coke, paved the way for him to appoint an entirely new court by passing an amendment to the state constitution. In 1874, the Texas Supreme Court became a five-man body appointed by the governor and subject to senatorial approval. Coke's appointees represented the

will of the people as expressed in the recent election—although fraud undoubtedly marred the results of that contest. This Redeemer Court included the last of the judicial appointees in Texas; voters began electing judges under the new state constitution in 1876, and it has been that way ever since.[19]

The Redeemer Court, which claimed Oran M. Roberts as its chief and Reuben A. Reeves as one of its associate judges, took another stab at the constitutionality of "the pistol law."[20] The case was *State of Texas v. Duke* (1875), in which a black man named George Duke was arrested for carrying a pistol but succeeded in having the indictment quashed on a technicality. The attorney representing the state sought to have the technicality overruled and the indictment vindicated so that Duke could face prosecution.[21] Ultimately, the court determined that the technicality should stand, and that the case should be dismissed. The points at issue in *Duke* did not directly involve constitutionality, yet the judges ventured onto the subject. That they sought out the constitutional question indicates their desire to adjust the precedent that had been set in *English*.

The Redeemer Court concurred with the Reconstruction Court in holding that the law did not violate either the US or Texas Constitutions but differed in some important respects. First, the new court did not claim police power to justify the enactment of the law. Judge Robert Gould wrote the opinion for the court and stated, "We are not called on to lay down general rules,

---

[19] Haley, *Texas Supreme Court*, 83-89; Moneyon, *Texas after the Civil War*, 194-199.
[20] Haley, *Texas Supreme Court*, 88-90.
[21] *State of Texas v. Duke* 42 Tex. 455 (1874). The technicality in question was whether an indictment must "negative" (negate, or rule out) the exceptions to the law. In other words, did the indictment itself need to state that the violator was not a peace officer, or had no reason to fear a lethal attack, or was not traveling at the time of the offense. Custom regarding this law in its first several years of enforcement had not required the indictment to negative the exceptions, but the court in *Duke* reversed that opinion. This reversal made it incumbent upon grand juries to ascertain whether a legitimate defense existed *before* they granted an indictment. This policy likely advantaged violators whose cases went to a grand jury over those who faced summary charges in a municipal, justice, or county court.

94

prescribing how far legislative regulation may be extended, without trespassing on the rights of the citizen." Without defining the limits of legislative authority, Gould declared the deadly weapons ban "a legitimate and highly proper regulation." This sidestepping of the police power issue indicates agreement with the decision in *English*, and a recognition that cases like *Slaughterhouse* rendered the repetition of it unnecessary. Second, Gould's opinion altered the court's position on the kinds of "arms" protected by the state constitution. Where Walker had limited the scope of the guarantee to weapons used for militia purposes, Gould understood the term "in a more comprehensive sense" that included "arms as are commonly kept . . . and appropriate for open and manly use in self-defense."[22]

The third and final departure from the Reconstruction Court's decision in *English* is so consequential as to deserve a more detailed analysis. The Redeemer Court forthrightly declared that the Second Amendment and the entire Bill of Rights "were intended to be limitations upon the power of the government of the thirteen States, and not on the powers of the State governments." Moreover, despite Walker's prior quotation of Bishop to the contrary, such separation of powers "has been long regarded as the settled construction." This statement rejected an important jurisprudential concept, called incorporation, which relates to the first section of the Fourteenth Amendment. The relevant passage says, "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."[23] The idea behind

---

[22] This is a significant distinction because Gould intimated that sticking with the *English* ruling might place common weapons (like shotguns, rifles, and pistols) beyond the scope of constitutional protection. Anyone who follows the contemporary gun debates knows the gravity of that problem: a weapon not protected constitutionally could possibly be subject to confiscation or some other unwanted governmental interference.
[23] U.S. Const. amend. XIV.

incorporation is that one or all of these three clauses (Privileges and Immunities, Due Process, and Equal Protection) effectively *incorporate* the Bill of Rights onto the state governments.

The architects of the Fourteenth Amendment, a cohort of northern Republicans, undoubtedly intended it to make the state governments beholden to the Bill of Rights just as the national government was. There has been much scholarly debate over the question of whether the American people understood their intention, but the Texas politicians who rejected the Fourteenth Amendment in 1866 certainly did.[24] Recall that Throckmorton's faction of Conservatives (most of whom had previously been, and later reverted to being, Democrats) controlled the state apparatus immediately following the Civil War. Members of the legislature grounded their opposition to the proposed Fourteenth Amendment in the claim that "there is scarcely any limit to the power sought to be transferred by this section from the States to the United States." They clearly understood that the first section of the amendment signaled *at a minimum* incorporation of the Bill of Rights onto the states: "Its object is . . . under the color of generality, to declare negroes to be citizens of the several States, and as such entitled to all 'the privileges and immunities' of white citizens; in these privileges would be embraced the exercise

---

[24] There is a rich field of literature on the subject of incorporation, beginning with William Winslow Crosskey, Charles Fairman, and Raoul Berger in the mid-twentieth century. More recent scholarship on the subject includes Michael Kent Curtis, *No State Shall Abridge: The Fourteenth Amendment and the Bill of Rights* (Durham: Duke University Press, 1986); Akhil Reed Amar, *The Bill of Rights: Creation and Reconstruction* (New Haven: Yale University Press, 1998). A revisionist interpretation has arisen from Bryan H. Wildenthal that the framers of the Amendment intended incorporation, and that Miller's *Slaughterhouse* opinion actually represented a "compromise" between radical incorporationists and anti-incorporationists that bound the state governments to respect the Bill of Rights. His is joined by Gerard Magliocca, Kevin Newsom, and Leslie Friedman Goldstein. See Goldstein, "The Specter of the Second Amendment"; Bryan H. Wildenthal, "The Lost Compromise: Reassessing the Early Understanding in Courts and Congress on Incorporation of the Bill of Rights in the Fourteenth Amendment," *Ohio State Law Journal* 61, no. 3 (2000): 1051-1174; Gerard N. Magliocca, "Why Did the Incorporation of the Bill of Rights Fail in the Late Nineteenth Century?" *Minnesota Law Review* 94, no. 1 (2009): 102-139; Kevin Christopher Newsom, "Setting Incorporationism Straight: A Reinterpretation of the *Slaughterhouse Cases*," *Yale Law Journal* 109, no. 4 (2000): 643-744; An even-handed reply to the revisionists has come from George C. Thomas and is the best introduction to the dispute. George C. Thomas, III, "The Riddle of the Fourteenth Amendment: A Response to Professor Wildenthal," *Ohio State Law Journal* 68, no. 6 (2007): 1627-1657.

of suffrage at the polls, participation in jury duty in all cases, bearing arms in the militia, and other matters which need not here be enumerated."[25]

Regardless of the intentions of its framers or the impressions of its detractors, the Fourteenth Amendment did not effect incorporation—the US Supreme Court made sure of it.[26] A series of cases in the early and mid-1870s raised the prospect of incorporation, and in each case the court skirted the subject or rejected it outright.[27] Justice Miller's opinion in *Slaughterhouse Cases* (1873) has become notorious and widely reviled as the one that started the court on the path of effectively nullifying the Fourteenth Amendment. This understanding of the case, however, has been challenged by a cadre of exceptionally sharp legal scholars who claim that Miller actually intended the amendment to incorporate the Bill of Rights, just no civil rights or civic privileges beyond that. But in the end, both sides of that debate must accede to the fact that *Slaughterhouse*, even if it did not reject incorporation outright, certainly circumscribed its potential effects. Many scholars have read this with a skeptical eye and decided that the overwhelmingly Republican court of the 1870s was in fact secretly plotting the demise of Reconstruction. This is an exceedingly cynical, and therefore unsatisfactory, interpretation of the historical record.[28] One alternative is the aforementioned thesis that *Slaughterhouse* represented

---

[25] *House Journal* (1866), 577-583.

[26] To this day, certain guarantees listed in the Bill of Rights remain unincorporated. Those incorporated rights have been made so via the Due Process Clause of the Fourteenth Amendment, while the Privileges and Immunities Clause is all but irrelevant. The only case decided on the basis of the Privileges and Immunities Clause of the Fourteenth Amendment is *Saenz v. Roe*, 526 U.S. 489 (1999). The subsequent cases include: *Walker v. Sauvinet*, 92 U.S. 90 (1876) and *U.S. v. Cruikshank*, 92 U.S. 542 (1876).

[27] These cases include: *Slaughterhouse Cases*; *Walker v. Sauvinet*; *U.S. v. Cruikshank*; *Twitchell v. Commonwealth* 74 U.S. 321 (1868); *Edwards v. Elliott*, 88 U.S. 532 (1874); *U.S. v. Avery*, 13 Wall. 251 (1872).

[28] Leslie Friedman Goldstein similarly doubts the idea that Republican, antislavery judges would conspire to overthrow Reconstruction. To adhere to this view requires accepting a number of inconsistencies, like Miller's antislavery background and strong defense of the Reconstruction Amendments, and the court's defense of black voting rights in cases arising from the election of 1876. See Goldstein, "The Specter of the Second Amendment," 136-144. On the unfortunate consequences of overly cynical interpretation, see Rita Felski, *The Limits of Critique* (Chicago: University of Chicago Press, 2015).

a compromise position between the two extremes of non-incorporation on the one hand, and the utter hollowing out of state sovereignty on the other.[29]

Another compelling alternative to the traditional view of *Slaughterhouse* hinges upon the Second Amendment. This position holds that a fear of incorporating the Second Amendment led Miller and the court majority to pump the brakes on the whole incorporation project. While a cursory look at this scenario might prompt an observer to ascribe to Justice Miller the same lousy motivations so proudly displayed by Texas Conservatives back in 1866, this interpretation would have us do the opposite. The Republican state governments in the former Confederacy desperately needed to retain police power over the right to bear arms so that they could put down armed paramilitaries like the Klan and white leagues. Incorporating the Second Amendment threatened to empower those terroristic insurgencies and further weaken the very governments seeking to carry out the vision of the Republican Party as encapsulated within the Reconstruction Amendments (XIII, XIV, and XV). Shortly before hearing arguments for *Slaughterhouse*, the US Supreme Court confronted the grim reality of pursuing incorporation, even when limited to the Bill of Rights. In one of the cases arising from the Ku Klux Klan trials in South Carolina, a Klansman defendant claimed that the Fourteenth Amendment guaranteed to armed militia groups like his (unofficial though they were) the right to bear arms as citizens of the Palmetto State and the United States.[30] The court successfully sidestepped the issue, but *Slaughterhouse*, coming

---

[29] Wildenthal, "The Lost Compromise." See also Goldstein, "The Specter of the Second Amendment," 134. Goldstein cites the scholarship of Michael Les Benedict, which argues that the preservation of federalism motivated the US Supreme Court opinions that curtailed the scope of the Fourteenth Amendment. See Michael Les Benedict, "Preserving Federalism: Reconstruction and the Waite Court," *The Supreme Court Review* (1978): 39-79.
[30] Goldstein, "The Specter of the Second Amendment," 137-138 at n. 32.

swift on that case's heels, offered an opportunity to circumscribe incorporation for the security of Southern governments in a decision untarnished by issues of race and Reconstruction.[31]

Whatever the motivations of Miller in his vague, noncommittal stance on incorporation in *Slaughterhouse*, the fact is that soon thereafter the court rendered an explicit decision on incorporation, at least insofar as it pertained to the right to bear arms. The case *U.S. v. Cruikshank* (1875) sounded the death knell for the idea. It arose from the Colfax Massacre in Louisiana, in which competing black and white armed militias entered into a pitched battle over control of the town of Colfax. The white forces won the day but soon came under fire from federal troops. Afterward, dozens of the "redeemers" faced indictment and prosecution in federal court for violating the civil rights of local freedmen. The few who received guilty verdicts appealed and made their way up to the US Supreme Court. This is another of the detested Reconstruction era cases because it favored the defendants and clipped the wings of the Fourteenth Amendment. Writing for a unanimous court, Chief Justice Morrison Waite unambiguously rejected the idea that "bearing arms for a lawful purpose" was a constitutionally protected right of US citizens. "This is not a right granted by the Constitution. Neither is it in any manner dependent upon that instrument for its existence. . . . This is one of the amendments that has no other effect than to restrict the powers of the national government, leaving the people to look for their protection against any violation by their fellow citizens . . . to what is called . . . 'powers which relate to merely municipal legislation, or what was, perhaps, more properly called internal police.'"[32]

---

[31] An illuminating excerpt from Goldstein's argument holds: "It is at least *plausible* that the Court found it more seemly to indicate vaguely that the Bill of Rights had not been incorporated against the states, and then later to find other ways to protect rights of peaceable assembly." Goldstein, "The Specter of the Second Amendment," 146.
[32] Quotation from *The City of New York v. Miln* in *U.S. v. Cruikshank*.

In fact, respect for state police power formed an underlying theme in the *Cruikshank* opinion, much as it had in *Slaughterhouse* just a few years earlier. The justices feared the repercussions of removing so much authority from the states and placing it within federal jurisdiction. Such was not the intention of the nation's founders, nor was it in harmony with existing jurisprudence. Waite reviewed the basic tenets of federalism, the division of powers between two sovereign layers of government. Referring to the national government, Waite wrote, "Within the scope of its powers, as enumerated and defined, it is supreme, and above the States; but beyond, it has no existence. . . . The Government of the United States is one of delegated powers alone. Its authority is defined and limited by the Constitution. All powers not granted to it by that instrument are reserved to the States or the people." Here was a repudiation of the incorporation argument as a violation of state police power. It is important to note that the state government receiving this reaffirmation of its authority was the Republican one of Louisiana, led at that time by William P. Kellogg. The US Supreme Court refused to accept responsibility for protecting the right of black Louisianans to "bear arms for any lawful purpose" and by doing so circumvented any similar claim by white league members. In a roundabout way, then, *Slaughterhouse* and *Cruikshank* bolstered the authority of besieged Republican governments; the problem was that they often lacked the power and legitimacy to act on that authority.

The *Slaughterhouse* and *Cruikshank* decisions received attention from the leading men of Texas, a class whose ranks overflowed with trained lawyers. Several influential papers carried updates on *Cruikshank*, in particular.[33] Surely the perspective of a Southern Democrat was that the decisions supported the forces seeking the economic improvement and metaphorical

---

[33] Texas commentators well understood the implications of *Cruikshank* in terms of reaffirming state police power. See, for example, "Reserved Rights," *Galveston Daily News* (Galveston, TX), April 7, 1875. The case received substantial coverage in "The Negroes are Arming" and "The Grant Parish Prisoners," *Weekly Democratic Statesman* (Austin, TX) June 18, 1874.

"redemption" of the former Confederacy. State governments still retained all the powers that they held prior to the Fourteenth Amendment, prior to the Reconstruction Acts, indeed prior the Civil War—save legally sanctioning slavery. As long as the state *governments* avoided racially motivated discrimination and oppression, the national government would refrain from interference. Thus state courts regained jurisdiction over the vast majority of criminal cases, including conspiracies to suppress voting—a crime that the US Congress had attempted to place within federal jurisdiction. If the US Supreme Court justices believed that they had protected the Republican governments of the South, they were sorely mistaken. Just as the deadly weapons ban, originally a shield for Republican voters, became a tool of their oppression under the Redeemers, so the swollen view of state police power became a liability for all Southern Republicans once those governments fell into the hands of Democrats. Groups of private citizens (Democrats) could intimidate black voters and, if caught, face prosecution in friendly (Democratic-controlled) state courts rather than federal ones. The Fourteenth Amendment and the whole host of Reconstruction-era legislation did not apply because individuals committed the racially discriminatory crime, not the state.

This series of state and federal cases from *English* to *Cruikshank* set a firm precedent that the government of Texas had the authority both to protect the right to bear arms and to regulate that right. The new constitution of 1876 carried on this tradition, and few constitutionality claims made their way to the appellate courts in Texas.[34] That new constitution altered the makeup of the state judiciary in significant ways. First, all appellate judges became subject to popular elections and held six-year terms. Second, the jurisdiction of criminal appeals cases changed.

---

[34] The 1876 constitution, discussed in greater detail in the following chapter, declared that: "Every citizen shall have the right to keep and bear arms in the lawful defense of himself or the State; but the Legislature shall have power by law to regulate the wearing of arms with a view to prevent crime." Texas Const. of 1876, art. I §XXIII.

The Texas Supreme Court limited itself solely to civil cases appealed from District Court, while a new Court of Appeals heard all criminal appeals, alongside civil appeals arising from County Court. Lawmakers created this new appellate jurisdiction to assist the state's highest court with its caseload, which faced a two-year backlog. The revised judiciary worked for about twenty years but the problem of overcrowded dockets remained and ultimately prompted a constitutional amendment to create an appellate court exclusively dedicated to criminal cases. That body, the Court of Criminal Appeals, became the court of last resort for all criminal appeals and remains so today.[35]

The Court of Appeals (and later Court of Criminal Appeals) heard few arguments against the constitutionality of the deadly weapons ban. One case, from 1878, took issue with the law's requirement that convicted violators surrender the weapon in question. The attorney general argued that forfeiture formed a significant part of the ban's crime-prevention power. Losing one's property, especially if it were valuable, acted as an incentive to abide by the law. The court, however, disagreed. "While [the legislature] has the power to regulate the wearing of arms, it has not the power by legislation to take a citizen's arms away from him." Thus ended forfeiture as part of the penalty.[36] Shortly after this, an intriguing case wended its way to the Court of Appeals. A defendant arrested for carrying a pistol argued that having the weapon upon his person did not place him "beyond the constitutional privilege." The court found this defense so weak that its response consisted of "We think it did."[37]

The constitutionality of the pistol law came under examination one final time in the nineteenth century, but by the US Supreme Court rather than a state court. The case *Miller v.*

---

[35] Texas Const. of 1876, art. III; Haley, *Texas Supreme Court*, 91; *Handbook of Texas Online*, Paul Womack, "Judiciary," accessed October 19, 2018, http://www.tshaonline.org/handbook/online/articles/jzj01.
[36] *Jennings v. State of Texas*, 5 Tex. Cr. App. 298 (1878).
[37] *Lewis v. State of Texas*, 7 Tex. Cr. App. 567. (1880).

*Texas* originated in Dallas, Texas in 1892. A white man named Franklin P. Miller spent a number of weeks or months subject to harassment by local Dallas police officers.[38] The officers gave him a hard time because Miller was rumored to be involved in an intimate relationship with his African American live-in cook. A neighbor even testified that he had seen Miller "with a nigger child in his arms and a pistol in his other hand."[39] Miller claimed that the terrible treatment he received at the hands of neighbors and police drove him to purchase a pistol for self-protection. One day, Miller took to the streets with his pistol and vowed revenge upon the two "blue coated sons-of-bitches" who patrolled his section of town.[40] The policemen heard about it afterward and decided to arrest him the next morning for unlawfully carrying a pistol. A shootout erupted when they went to his house, and one of the officers died in the fracas. Miller claimed self-defense, that they fired first; the surviving policeman testified the opposite, that Miller preemptively shot at them. Miller was arrested on the charge of first-degree murder and became infamous throughout Texas as a cop-killer.

Miller's case is a complex one in which he made numerous claims on appeal. These included the assertion that being arrested without a warrant was unconstitutional, that the judge in his case improperly charged the jury, and that he was unfairly denied a continuance and change of venue. At no point did his attorneys argue to a Texas court that the deadly weapons ban violated the Second Amendment. It was not until Miller's attorneys appealed from the Texas Court of Criminal Appeals to the US Supreme Court that they made a case for the unconstitutionality of the deadly weapons ban. This was a fatal mistake because the federal

---

[38] Cynthia Leonardatos, David B. Kopel, and Stephen P. Halbrook, "*Miller versus Texas*: Police Violence, Race Relations, Capital Punishment, and Gun-Toting in Texas in the Nineteenth Century—and Today," *Journal of Law and Policy Review* 9 (2001): 737-766.
[39] *Miller v. State of Texas*, 32 Tex. Cr. App. 319, 329 (1893).
[40] *Miller v. State of Texas* (1893).

justices could not decide a case based on argumentation that was not presented at the court of original jurisdiction. Still, they repeated the settled law from *Cruikshank*, that the Second Amendment "operate[s] only upon the federal power, and [has] no reference whatever to proceedings in state courts."[41] *Miller v. Texas* became the last word on the constitutionality of the Texas deadly weapons ban, and the US Supreme Court did not hear any Second Amendment arguments for another fifty years (in a case that is, confusingly, also named *Miller*). In that case, *U.S. v. Miller* (1939), the regulations being reviewed were federal, and the justices maintained their opinion that the regulation of a right was not tantamount to the negation of it.[42]

Though the jurisprudence pertaining to the pistol law repeatedly upheld its constitutionality, such consistency on other legal issues arising from the law proved impossible. Vexatious questions perennially pestered the court throughout the late-nineteenth century, among them: Who exactly is a "traveler" exempted by the law? Who specifically is a "peace officer," and may he carry a weapon when off-duty? What does it mean to carry a weapon "about the person"? Just how important is the intent of the violator? The justices charged with hearing criminal appeals provided answers to these questions during the first two decades of the deadly weapons ban's existence, though they were subject to change.

A legal issue that quickly garnered the attention of appellate judges was the problem of carrying a pistol to or from a point of sale. None of the exemptions to the deadly weapons ban provided security for persons transporting a pistol home from a sale or repair, or while

---

[41] *Miller v. State of Texas*, (1893); *Miller v. Texas*, 153 U.S. 535 (1894).

[42] *U.S. v. Miller*, 307 U.S. 174 (1939). Cynthia Leonardatos, David B. Kopel, and Stephen P. Halbrook have collaborated on an article pertaining to *Miller v. Texas* and determined that the US Supreme Court did not see the incorporation issue as settled law in 1894. They argue that the procedural errors made by the appellant, Miller, foreclosed consideration of a topic that the court would have been interested in adjudicating. Fascinating though their interpretation may be, a straightforward reading of *Miller* demonstrates the court's clear reaffirmation of anti-incorporation precedent in cases like *Cruikshank* and *Twitchell*. See Leonardatos, Kopel, and Halbrook, "*Miller versus Texas*," 763-764.

purchasing ammunition. Some of the lower level judges and juries employed what we might call a textualist approach to enforcement of this law by convicting men who had done nothing more than this. Two cases in particular stand out in this regard: *Christian v. State of Texas* and *Waddell v. State of Texas*.[43] In the former, William Christian entered into a deal with his neighbor to purchase a pistol from him. As he walked across the street to his home with the newly acquired weapon, he was arrested for unlawfully carrying it. A jury convicted him because, technically, he did not fall within any of the exemptions (not being a traveler, peace officer, militiaman in service, resident of frontier county, etc.). In the latter case, C. W. Waddell purchased a pair of pistols and carried them to another store to buy ammunition for them. He then took them to his home fifteen miles away, only to be arrested later for breaking the pistol law.

In both of these cases the appellate court scolded the lower-court judges for permitting the law to be enforced in such an unfair way. Moses Walker of the pro-Republican Reconstruction Court wrote the *Waddell* opinion and declared that the arrest amounted to a violation of Waddell's constitutional right to keep a weapon for the defense of his family. Waddell never intended to break the law, and his actions "did not constitute a violation of the spirit of the law regulating the keeping and bearing of deadly weapons." The intention of the legislature also became an important element in the case. The goal of the lawmakers was "to suppress the absurd and vicious practice" of carrying deadly weapons, not to unjustly fine law-abiding citizens. Walker warned that "if wrong constructions are placed upon this act, and absurd and vexatious prosecutions . . . are tolerated and entertained by the courts, the law itself must become unpopular, even odious to a free people." This would be "a great public misfortune" for

---

[43] *Christian v. State of Texas*, 37 Tex. 475 (1873); *Waddell v. State of Texas*, 37 Tex. 354 (1873).

Texans because the deadly weapons ban "is wise and salutary." The opinion in *Christian*, written by another of the Reconstruction Court justices, similarly emphasized the intent of the legislature. "The object of the statute," he said, "is to prohibit the carrying of deadly weapons for unlawful purposes." Lawmakers could not have intended to make the mere purchase of a pistol a criminal act, therefore "we are inclined to look upon this case as a frivolous prosecution." The Court of Appeals reaffirmed this position in 1886 by holding that "the transportation of a pistol home from the place of purchase, whether loaded or unloaded, does not constitute the offense of unlawfully carrying a pistol."[44]

There were some limits, however, to the court's leniency. In a series of cases pertaining to hunting and slaughtering livestock, the court rejected the idea that pistols were proper hunting weapons. In the last of these, decided in 1877, the defendant argued that the prior cases ruling out pistols as hunting weapons ought not apply to him because his hunting weapon was broken at the time of the offense. He carried a pistol, hung from his saddle horn, so that he could slaughter a yearling that was grazing some miles distant. Unlike the previous defendants, who merely *chose* to hunt with pistols rather than rifles, he was *compelled* to use one due to circumstances beyond his control. Despite his best efforts, and his desire to abide by the spirit of the law, the court decided against him. "We do not believe that the legislature ever intended that so extended an interpretation should be put upon this law as is claimed by defendant's counsel. . . . If the legislature intended to allow every man to carry a pistol about . . . whenever he thought a necessity for it existed, how easy would it have been" for them to say so in the text of the act![45]

As might be expected, defendants and their lawyers sought out any and every possible loophole in the deadly weapons ban to overturn legitimate convictions. Most of the time

---

[44] *West v. State of Texas*, 21 Tex. Cr. App. 427 (1886).
[45] *Reynolds v. State of Texas*, 1 Tex. Cr. App. 616 (1877).

appellate judges, whether appointed to the Reconstruction or Redeemer Courts, or elected to the Court of Appeals, found ways to dismiss these technical problems and sustain jury verdicts.[46] One important precedent set very early in the pistol law's history was a broad definition of carrying a weapon "about the person." This phrase seems simple at first glance, but in the hands of attorneys it sometimes became uncertain and confusing. The most telling example occurred shortly after the law went into effect. In 1872, the indictment in a case stated that the defendant did "have on his person" a pistol. The defense counsel argued that "having" and "carrying" are two different things, so the conviction should be reversed. The court disagreed: "To have a weapon upon the person is, in contemplation of the law, to carry it."[47]

Other ambiguities arose over holding or carrying pistols. A man named John Baker was convicted for fetching his brother's pistol from the barn. The brother, Julius Baker, was engaged in an ugly domestic dispute with his wife and her family, who jointly owned the property where the event took place. More than likely, the in-law landowners had John arrested as a way of pressuring Julius to return family papers and give up custody of his daughter. In a family kerfuffle like this one, the influence of one party involved could be enough to secure a dubious conviction in a local court; the Baker brothers intelligently appealed, claiming that the mere retrieval of a pistol on someone else's behalf is not illegal. The court agreed and reversed the judgment.[48] In a similar case, the appellate court overturned the conviction of a young man who

---

[46] See, for example *Jenkins v. State of Texas*, 36 Tex. 638 (1872). The defendant was arrested for carrying a pistol some weeks after the law went into effect, but the judge, not paying close enough attention, included in his charge to the jury instructions that the defendant could be convicted for any violation of the law committed in the past year. Of course, the law went into effect only a few weeks prior, so what he described would have amounted to *ex post facto* prosecution. The defendant tried to claim that this slip-up on the judge's part justified a reversal, but Walker disagreed. The issue was moot because the crime for which he was arrested occurred *after* the law went into effect, and the indictment said as much. However, as the nineteenth century drew to a close, reversals on technicalities became more common.

[47] *State of Texas v. Carter*, 36 Tex. 89 (1872).

[48] *Baker v. State of Texas*, 28 Tex. Cr. App. 5 (1889).

simply picked up a pistol lying on a table in front of him. He did not own it, nor did he carry it with him or use it in a threatening manner. "Such handling of the pistol was perhaps through mere idle curiosity, and without any intent whatever to violate the law. It would be a perversion of reason and justice, it seems to us, to hold that the law intends that punishment shall be visited upon an act of this character."[49]

Just as "about the person," "having," "holding," and "carrying" caused ample confusion in Texas courts, so too did "traveler." The deadly weapons ban failed to provide a definition for this term, which foisted a serious problem onto the judiciary. In one of the cases previously mentioned, *Waddell* (1873), the court defined it as a person "living remote from their county seats or market towns, where a day's journey going and coming is required, and where often, from the necessities of business, even a portion of the night is used."[50] But between 1871 and 1879, Texas travelers had to follow strict rules about how and where they could stow their deadly weapons while on the road. The text of the law exempted travelers who carried knives or pistols "with their baggage." Those in wagons or buggies could keep pistols within arm's reach, but not in their hands. Horseback riders were not permitted to carry a pistol in a hip holster, on the saddle, or in their saddlebags. The passage of the Penal Code of 1879 changed these somewhat draconian rules for travelers because the phrase "in the baggage" was dropped from the text.[51]

---

[49] *Brooks v. State of Texas*, 15 Tex. Cr. App. 88 (1883).

[50] *Waddell v. State of Texas* (1872).

[51] The 1871 deadly weapons ban originally prohibited the carrying of specified weapons, with certain exceptions. Some of these exceptions, including the one for travelers, came in the form of a proviso: "provided that this section shall not be so construed as to prohibit . . . persons traveling in the State from keeping or carrying arms with their baggage." The law was transmuted into the Penal Code under Articles 318, 319, and 320 of Chapter 4, Title IX. There, all exemptions were grouped together in Article 319: "The preceding article shall not apply to . . . persons traveling . . . ." The requirement that those travelers keep their deadly weapons stowed away in the baggage disappeared. See Tex. Penal Code §319 (1879). The relevant cases are: *Maxwell v. State of Texas*, 38 Tex. 156 (1873); *Woodward v. State of Texas*, 5 Tex. Cr. App. 295 (1878); *Lewis v. State of Texas*, 2 Tex. Cr. App. 26 (1877). The *Lewis* decision received some abuse from Stephen P. Halbrook, who called it "contradictory" for affirming both

In the post-1879 era, the court was frustratingly inconsistent in its treatment of appellants claiming the traveler's exemption. A man named J. O. Darby had his appeal rejected even though he carried a pistol while traveling overnight to the county seat. He clearly fell within the definition constructed years earlier, yet the court rejected his claim outright.[52] Now that travelers were allowed to carry weapons "about the person," all manner of contemptible behavior suddenly became legal. In one case, a named Jeff Cathey drove two neighbors home from dropping off cotton in the nearest market town. Having just concluded the sale of his crop, he imbibed a few drinks at the local saloon and bought a bottle of whiskey to enjoy on the way home. While driving the wagon, he became drunk and unable to find the bottle. Enraged, he pulled out a pistol and accused his passengers of stealing his whiskey. In years gone by, the court likely would have affirmed his conviction, but in 1887 the opposite happened. "It is not here made an offense to carry a pistol in a wagon; and we do not think the lifting of the pistol as stated, and the holding of it for a few seconds, constitute the offense of carrying a pistol on or about the person."[53] For the bewildered passengers, the encounter was surely more substantial than their neighbor briefly "lifting" a pistol in their presence. Darby's and Cathey's cases seem like products of wildly different courts, but they were handed down the very same year.

Odd judgments like these arose from the lack of specificity in the text of the penal code. The judges had unfettered authority to use their own discretion in assessing whether a traveling claim was valid or not. The case that got the court closest to settling this point was *Stilly v. State of Texas* (1889). J. S. Stilly was accompanying his family back to Texas from Indian Territory

---

the prohibition against travelers carrying arms and the constitutionally guaranteed right to keep and bear arms. What Halbrook's analysis lacks is an understanding of the difference between *carrying* arms and *bearing* them. On this important distinction and its relevance to the militia and citizen-soldier traditions, see Saul Cornell, *A Well-Regulated Militia*, 3-7, 13-18. See also Halbrook, "The Right to Bear Arms in Texas," 668-669.

[52] *Darby v. State of Texas*, 23 Tex. Cr. App. 407 (1887).

[53] *Cathey v. State of Texas*, 23 Tex. Cr. App. 492 (1887).

and stopped near the Red River overnight, in Gainesville. Looking for a bit of fun after what had likely been a boring journey, he decided to visit a gaming hall. But there was bad blood between Stilly and another man living there, so the former decided to keep his pistol on him even while carousing about town. Unsurprisingly, he was arrested and the Court of Appeals affirmed his conviction. But *Stilly* helped the court set a strong precedent that outlined the limits of the traveler exemption.[54] Deadly weapons were allowed for people traveling long distances, outside their home counties, over multiple nights. These travelers could carry their arms as desired on the road and while conducting legitimate business in towns along the way, but that protection ceased when their pursuits switched from business to pleasure.[55]

Without a doubt, the most troublesome of the perennial questions involved the peace officer exemption. The original law permitted a hodge-podge assortment of public officials to carry weapons: policemen, sheriffs and their deputies, constables, town marshals, justices of the peace, as well as civil and revenue officers "while engaged in the discharge of their official duties." This final category was subject to interpretation, and ended up embracing district and county attorneys, prison guards, and even postal employees. These officials could carry prohibited weapons as long as they did so while on the job. For example, the case of A. L. Carmichael in 1881 established a precedent that penitentiary guards fell within the exemption for civil officials. Moreover, guards contracted by lessees to oversee convict laborers were included in this category.[56] But seven years later, the appeal of another guard was dismissed because he was not on duty at the time he carried his pistol. Instead, he used it to intimidate townspeople and

---

[54] *Stilly v. State of Texas*, 27 Tex. Cr. App. 445 (1889).
[55] Other cases involving the traveler exemption include *Shelton v. State of Texas*, 27 Tex. Cr. App. 443 (1889); *Price v. State of Texas*, 34 Tex. Cr. App. 102 (1895).
[56] *Carmichael v. State of Texas*, 11 Tex. Cr. App. 27 (1881).