1    ROB BONTA
     Attorney General of California
2    MARK R. BECKINGTON
     Supervising Deputy Attorney General
3    ROBERT L. MEYERHOFF
     Deputy Attorney General
4    State Bar No. 298196
       300 South Spring Street, Suite 1702
5      Los Angeles, CA  90013-1230
       Telephone:  (213) 269-6177
6      Fax:  (916) 731-2144
       E-mail:  Robert.Meyerhoff@doj.ca.gov
7    *Attorneys for Defendant Rob Bonta in his*
     *official capacity as Attorney General of the*
8    *State of California*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                      CIVIL DIVISION

12

13   **VIRGINIA DUNCAN, RICHARD**        Case No. 3:17-cv-01017-BEN-JLB
     **LEWIS, PATRICK LOVETTE,**
14   **DAVID MARGUGLIO,**
     **CHRISTOPHER WADDELL, and**        **COMPENDIUM OF WORKS**
15   **CALIFORNIA RIFLE & PISTOL**       **CITED IN DECLARATION OF**
     **ASSOCIATION, INC., a California** **BRENNAN RIVAS**
16   **corporation,**
                                         **VOLUME 6 OF 6**
17                        Plaintiffs,
                                         Courtroom:    5A
18          v.                           Judge:        Hon. Roger T. Benitez
                                         Action Filed:  May 17, 2017
19
     **ROB BONTA, in his official capacity**
20   **as Attorney General of the State of**
     **California; and DOES 1-10,**
21
                          Defendants.
22

23

24

25

26

27

28
                              1

# INDEX

| Works | Decl. Page | Compendium Page |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 1869-1870 Tenn. Pub. Acts, 2d. Sess., An Act to Preserve the Peace and Prevent Homicide, ch. 13, § 1 | 7 n.10 | 002-004 |
| 1871 Tenn. Pub. Acts 81, An Act to Preserve the Peace and to Prevent Homicide, ch. 90, § 1 | 8 n.12 | 005-007 |
| General Laws of Texas, ch. XXXIV, §1 (1871) | 15 n.31 | 008-011 |
| 1874-1875 Acts of Ark., An Act to Prohibit the Carrying of Side-Arms, and Other Deadly Weapons, at p. 155, § 1 | 7 n.10 | 012-020 |
| 1879 Tenn. Pub. Act 135-36, An Act to Prevent the Sale of Pistols, chap. 96, § 1 | 9 n.15 | 021-023 |
| 1881 Ark. Acts 191, An Act to Preserve the Public Peace and Prevent Crime, chap. XCVI, § 1-2 | 8 n.13 | 024-026 |
| Acts of the General Assembly of Arkansas, No. 96 § 3 (1881) | 9 n.16 | 027-029 |
| Acts of the General Assembly of the State of Georgia (1894) | 6 n.7 | 030-042 |
| An Act providing for the levy and collection of an occupation tax . . ., General Laws of Texas, §XVIII (1907) | 6 n.8 | 043-053 |

| **BOOKS**[1] | | |
|---|---|---|
| Patrick Charles, Armed in America 152 (2018) | 9 n.17 | 055-058 |
| Randolph Roth, American Homicide 184, 185, 297-326, 386-388, 411-434 (Cambridge: Belknap Press of Harvard University Press, 2009) | 4 n.3, 5 n.4 | 059-092 |
| R. L. Wilson, The Colt Heritage: The Official History of Colt Firearms from 1836 to the Present, at 173 (New York: Simon & Schuster, 1979) | 11 n.23 | 093-095 |
| Martin Rywell, Colt Guns 66-67, 84-93 (Harriman, TN: Pioneer Press, 1953) | 11 n.23 | 096-104 |
| Sears, Roebuck, and Co. Catalog No. 107, at 365-67 (1898) | 3 n.2, 13 n.27 | 105-112 |
| The Pistol as a Weapon of Defence in the House and on the Road: How to Choose It and How to Use It 23 (1875) | 12 n.25 | 113-117 |
| Thomas Henshaw, The History of Winchester Firearms, 1866-1992 (Clinton, NJ: Winchester Press, 1993), 13-19, 23-24, 41, 61 | 16 n.32, 16 n.33, 16 n.34, 17 n.37, 18 n.44 | 498-504 |

---

[1] The Declaration of Brennan Rivas cites certain books (in their entirety) as supplemental references, rather than as direct support for any particular statement in her declaration or as a specific basis for her opinions. *See* Rivas Decl. ¶¶ 10 n.1, 19 n.23, 23 n.30.  Accordingly, they are not included here.  These books are:  Graham Smith, Civil War Weapons (New York: Chartwell, 2011); Jack Coggins, Arms and Equipment of the Civil War (New York: Fairfax Press, 1982); Jim Rasenberger, Revolver: Sam Colt and the Six-Shooter that Changed America (New York: Scribner, 2020); Joseph G. Bilby, Civil War Firearms: Their Historical Background and Tactical Use (Conshohcken, PA: Combined Books, 1996); and Ken Bauman, Arming the Suckers: A Compilation of Illinois Civil War Weapons (Dayton, OH: Morningside House, 1989).

| | | | |
|---|---|---|---|
| Frank C. Barnes & Stan Skinner, Cartridges of the World: A Complete and Illustrated Reference for over 1500 Cartridges 11th ed. (Iola, WI: Gun Digest Books, 2009), 96-97 | 16 n.33 | 505-508 |
| William S. Brophy, Marlin Firearms: A History of the Guns and the Company that Made Them (Harrisburg, PA: Stackpole Books, 1989), 300-301, 307-307 | 17 n.38, 17 n.39, 18 n.41 | 509-513 |
| **LAW REVIEWS AND JOURNALS** | | |
| Brennan Gardner Rivas, The Deadly Weapon Laws of Texas: Regulating Guns, Knives, and Knuckles in the Lone Star State, 1836-1930, at 161-62 (PhD diss., Texas Christian University, 2019) | 6 n.8 | 119-349 |
| Mark Anthony Frassetto, *The Myth of Open Carry*, 55 U.C. Davis L. Rev. 2515, 2518-19 (June 2022) | 11 n.22 | 350-379 |
| Robert Leider, *Our Non-originalist Right to Bear Arms*, 89 Ind. L. Rev. 1587, 1619-20 (2014) | 13 n.28 | 380-446 |
| Stefan B. Tahmassebi, *Gun Control and Racism*, 2 Geo. Mason Univ. Civil Rights L.J. 67, 74-75 (Summer 1991) | 13 n.28, 14 n.29 | 447-480 |
| **NEWS ARTICLES** | | |
| "Crime in the South," *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, at 2 | 10 n.18 | 482-483 |
| Daily Arkansas Gazette (Little Rock, Arkansas), January 7, 1883, at 4 | 10 n.20, 10 n.21 | 484 |
| Daily Arkansas Gazette (Little Rock, Arkansas), May 13, 1883, at 4 | 10 n.20, 11 n.22 | 485 |
| Katelyn Brown, "Armed to the Teeth," Military Images 33, no. 4 (Autumn 2015), at 32-36 | 14 n.30 | 486-490 |

4

| | | |
|---|---|---|
| Newport News (Newport, Arkansas), quoted in Daily Arkansas Gazette (Little Rock, Arkansas), April 27, 1875, at 2 | 10 n.19 | 491 |

5

The framers of the Civil Rights Act of 1866 argued that the issue of the right to keep and bear arms by the newly freed slaves was of vital importance, since, as Senator Trimball noted from a report from Vicksburg, Mississippi, "[n]early all the dissatisfaction that now exists among the freedmen is caused by the abusive conduct of this militia," meaning the white state militia. He continued, stating that rather than to restore order, the state militia would typically "hang some freedmen or search negro houses for arms."[17] Representative Henry J. Raymond (R., N.Y.) explained that the rights of citizenship entitled the freedmen to all the rights of United States citizens: "He has a defined status: he has a country and a home; a right to defend himself and his wife and children; a right to bear arms . . . ."[18] Senator William Salisbury (D., Del.) added that "[i]n most of the southern States, there has existed a law of the State based upon and founded in its police power, which declares that free negroes shall not have the possession of firearms or ammunition. This bill proposes to take away from the States this police power."[19]

Within three years of the adoption of the fourteenth amendment in 1868, Congress was considering legislation to suppress the Ku Klux Klan. In a report on violence in the South, Representative Benjamin F. Butler (R., Mass.) stated that the right to keep arms was necessary for protection not only against the state militia but also against local law enforcement agencies. He noted instances of "armed confederates" terrorizing the negro, and "in many counties they have preceded their outrages upon him by disarming him, in violation of his right as a citizen to 'keep and bear arms' which the Constitution expressly says shall never be infringed."[20]

The anti-KKK bill, introduced as "an act to protect loyal and peaceful citizens in the South," was originally introduced to the House Judiciary Committee with the following provision:

> That whoever shall, without due process of law, by violence, intimidation, or threats, take away or deprive any citizen of the United States of any arms or weapons he may have in his house or possession for the defense of his person, family, or property, shall be deemed guilty of a larceny thereof, and be punished as provided in this act for a felony.[21]

---

[17] CONG. GLOBE, 39th Cong., 1st Sess. 941 (1866).
[18] *Id.* at 1266.
[19] *Id.* at 478.
[20] H.R. REP. NO. 37, 41st Cong., 3rd Sess. 3 (1871).
[21] CONG. GLOBE, 42nd Cong., 1st Sess. 174 (1871).

Representative Butler explained the purpose of this provision:

> Section 8 is intended to enforce the well-known constitutional provision guaranteeing the right in the citizen to 'keep and bear arms,' . . . . This provision seemed to your committee to be necessary, because they had observed that, before these midnight marauders made attacks upon peaceful citizens, there were very many instances in the South where the sheriff of the county had preceded them and taken away the arms of their victims. This was especially noticeable in Union County, where all the negro population were disarmed by the sheriff only a few months ago under the order of the judge . . . ; and then, the sheriff having disarmed the citizens, the five hundred masked men rode at night and murdered and otherwise maltreated the ten persons who were there in jail in that county.[22]

When the Judiciary Committee later reported this bill as H.R. No. 320, the above section was deleted, apparently because the proscription extended to simple individual larceny over which Congress was perceived at that time to have no constitutional authority and because the conspiratorial action involved in the disarming of blacks would be covered by more general provisions of the bill.[23]

However, concern remained over the disarming of blacks in the South. Senator John Sherman (R., Ohio) stated that "[w]herever the negro population preponderates, there they [the KKK] hold their sway, for a few determined men . . . can carry terror among ignorant negroes . . . without arms, equipment, or discipline."[24] Senator Adelbert Ames (R., Miss.) noted that the right to keep and bear arms was a necessary condition for the right of free speech, stating that "[i]n some counties it was impossible to advocate Republican principles, those attempting it being hunted like wild beasts; in others, the speakers had to be armed and supported by not a few friends."[25]

Even after the passage of the Civil Rights Act and the fourteenth amendment, Southern states continued in their effort to disarm blacks. Some Southern states reacted to the federal acts by conceiving a means to the same end: banning a particular class of firearms, in this case cheap handguns, which were the only firearms the poverty-stricken freedmen could afford.

---

[22] H.R. REP. No. 37, 41st Cong., 3rd Sess. 7-8 (1871).
[23] Halbrook, *supra* note 9, at 26.
[24] CONG. GLOBE, 42nd Cong., 1st Sess. 154 (1871).
[25] *Id.* at 196.

Small pistols selling for as little as 50 or 60 cents became available in the 1870's and '80's, and since they could be afforded by recently emancipated blacks and poor whites (whom agrarian agitators of the time were encouraging to ally for economic and political purposes), these guns constituted a significant threat to a southern establishment interested in maintaining the traditional class structure.[26]

In the very first legislative session after white supremacists regained control of the Tennessee legislature in 1870, that state set the earliest Southern post-war pattern of legal restrictions by enacting a ban on the carrying, "publicly or privately," of, among other things, the "belt or pocket pistol or revolver."[27] In 1879, the General Assembly of Tennessee banned the sale of any pistols other than "army or navy" model revolvers.[28] This law effectively limited handgun ownership to whites, many of whom already possessed these Civil War service revolvers, or to those who could afford to purchase these more expensive firearms. These military firearms were among the best made and most expensive on the market, and were beyond the means of most blacks and laboring white people. The Ku Klux Klan was not inconvenienced since its organization in Tennessee had long since acquired its guns, many of which were such surplus army/navy model revolvers. Neither were company strongmen and professional strike breakers disarmed, whose weapons were supplied by their corporate employers.[29]

In 1881, Arkansas followed Tennessee's law by enacting a virtually identical "Saturday Night Special Law,"[30] which again was used to disarm blacks. Instead of formal legislation, Mississippi, Florida and other deep South states simply continued to enforce the pre-emancipation statutes forbidding blacks to possess arms, in violation of the fourteenth amendment.[31]

A different route was taken in Alabama, Texas, and Virginia: there, exorbitant business or transaction taxes were imposed in order

---

[26] Tonso, *Gun Control: White Man's Law*, REASON, Dec. 1985, at 23-25.

[27] Andrews v. State, 50 Tenn. (3 Heisk.) 165, 172 (1871) (citing "An Act to Preserve the Peace and Prevent Homicide").

[28] State v. Burgoyne, 75 Tenn. 173, 174 (1881) (citing "An Act to Prevent the Sale of Pistols").

[29] Kates, *Toward A History of Handgun Prohibition in the United States* in RESTRICTING HANDGUNS: THE LIBERAL SKEPTICS SPEAK OUT 14 (D. Kates ed. 1979).

[30] Dabbs v. State, 39 Ark. 353 (1882).

[31] *Id*. at 23.

to price handguns out of the reach of blacks and poor whites. An article in Virginia's official university law review called for a "prohibitive tax . . . on the privilege" of selling handguns as a way of disarming "the son of Ham", whose

> cowardly practice of 'toting' guns has been one of the most fruitful sources of crime . . . . Let a Negro board a railroad train with a quart of mean whiskey and a pistol in his grip and the chances are that there will be a murder, or at least a row, before he alights.[32]

Often systems were emplaced where retailers would report to local authorities whenever blacks purchased firearms or ammunition. The sheriff would then arrest the purchaser and confiscate the firearm, which would either be destroyed or turned over to the local Klan or a white militia.[33] Mississippi legislated this system by enacting the first registration law for retailers in 1906, requiring retailers to maintain records of all pistol and pistol ammunition sales, and to make such available for inspection on demand.[34]

In *United States v. Cruikshank*,[35] a case often cited as controlling law by Handgun Control, Incorporated and other anti-gun organizations,[36] the United States Supreme Court upheld the Klan's repressive actions against blacks in the South. The case involved two men "of African descent and persons of color" who had their weapons confiscated by more than 100 Klansmen in Louisiana. The indictment in *Cruikshank* charged, *inter alia*, a conspiracy by Klansmen to prevent blacks from exercising their civil rights, including the right of assembly and the right to keep and bear arms for lawful purposes. The Court held that because such rights, including free speech and the right to keep and bear arms, existed independently of the Constitution, and the first and second amendments guaranteed only that such rights shall not be infringed by the federal government, the federal government had no power to punish a violation of such rights by private individuals or the states. The fourteenth amendment offered no relief, the Court held, because the case involved a private conspiracy and not state action. The Court stated that the aggrieved citizens could seek

---

[32] Comment, *Carrying Concealed Weapons*, 15 VA. L. REG. 391, 391-92 (1909).

[33] Kates, *supra* note 29, at 14.

[34] *Id.*

[35] 92 U.S. 542 (1875).

[36] *See* Henigan, *The Right to Be Armed: A Constitutional Illusion*, 8 SAN FRAN. BARRISTER L.J. 11, 13 (Dec. 1989).

protection and redress only from the state government of Louisiana and not from the federal government.[37]

The *Cruikshank* decision signaled the end of reconstruction. "Firearms in the Reconstruction South provided a means of political power for many. They were the symbols of the new freedom for blacks . . . . In the end, white southerners triumphed and the blacks were effectually disarmed."[38]

It was not just the newly freed blacks in the South who were disarmed through discriminatory legislation which denied them the ability to defend their life and property, and kept them in a servile position, but also other "undesirable" white elements which were targeted by gun control laws.

At the end of the 19th century, Southern states began formalizing firearms restrictions in response to an increased concern about firearms ownership by certain whites, such as agrarian agitators and labor organizers. In 1893, Alabama, and in 1907, Texas, began imposing extremely heavy business and/or transaction taxes on handgun sales in order to resurrect economic barriers to ownership. South Carolina, in 1902, banned all pistol sales except to sheriffs and their special deputies, which included company strongmen and the KKK.[39]

The Supreme Court of North Carolina, in striking down a local statute which prohibited the open carrying of firearms without a permit in Forsyth County, stated:

> To exclude all pistols, however, is not a regulation, but a prohibition, of arms which come under the designation of arms which the people are entitled to bear. This is not an idle or an obsolete guaranty, for there are still localities, not necessary to mention, where great corporations, under the guise of detective agents or private police, terrorize their employees by armed force. If the people are forbidden to carry the only arms within their means, among them pistols, they will be completely at the mercy of these great plutocratic organizations.[40]

## B.  Gun Control in the North

In the Northeast, the period from the 1870's to the mid-1930's was characterized by strong xenophobic reactions to Eastern and

---

[37] *Cruikshank*, 92 U.S. at 553-54.
[38] L. KENNETT & J. L. ANDERSON, *supra* note 5, at 155.
[39] Kates, *supra* note 29, at 15.
[40] State v. Kerner, 181 N.C. 574, 578, 107 S.E. 222, 225 (1921).

Southern European immigrants. Armed robbery in particular was associated with the racial stereotype in the public mind of the East and South European immigrant as lazy and inclined to violence. Furthermore, these immigrants were associated with the concept of the foreign-born anarchist. The fear and suspicion of these "undesirable" immigrants, together with a desire to disarm labor organizers, led to a concerted campaign by local and national business associations and organizations such as the Immigration Restriction League and the American Protective Association, for the enactment of a flat ban on the ownership of firearms, or at least handguns, by aliens.[41] In 1911, New York enacted the Sullivan law.[42] "Of proven success in dealing with political dissidents in Central European countries, this system made handgun ownership illegal for anyone without a police permit."[43] The New York City Police Department thereby acquired the official and wholly arbitrary authority to deny or permit the possession of handguns; which the department used in its effort to disarm the city's Italian population. The Sullivan law was designed to

> strike hardest at the foreign-born element . . . . As early as 1903 the authorities had begun to cancel pistol permits in the Italian sections of the city. This was followed by a state law of 1905 which made it illegal for aliens to possess firearms 'in any public place'. This provision was retained in the Sullivan law.[44]

Conservative business associations, through a nationwide handgun prohibition campaign endorsing the Sullivan-type law concept, were responsible for enacting police permit requirements in Arkansas, Hawaii, Michigan, Missouri, New Jersey, North Carolina and Oregon, between 1911 and 1934. The then conservative institutions of the New York Times and the American Bar Association supported this campaign. By fueling a spreading fear of armed robbery, these business interests were able to push for restrictive gun laws that were really aimed at the disarmament of labor organizations and agrarian agitators. (Of course, in the Northeast, it was commonly supposed that such groups were, in any event, largely composed of, or led by foreigners of alien political persuasions.)[45]

---

[41] Kates, *supra* note 29, at 15-16.
[42] N.Y. PENAL LAW § 1897 (Consol. 1909) (amended 1911).
[43] Kates, *supra* note 29, at 15.
[44] L. KENNETT & J. L. ANDERSON, *supra* note 5, at 177-78.
[45] Kates, *supra* note 29, at 15-20.

Canada also adopted a handgun permit law in 1919, partly in response to a recently crushed general strike which was erroneously believed to have been engineered and led by foreigners. Legislators remarked about the absurdity of allowing firearms ownership to those who "bring their bad habits, notions, and vicious practices into this country."[46]

Most of the American handgun ownership restrictions adopted between 1901 and 1934 followed on the heels of highly publicized incidents involving the incipient black civil rights movement, foreign-born radicals or labor agitators. In 1934, Hawaii, and in 1930 Oregon, passed gun control statutes in response to labor organizing efforts in the Port of Honolulu and the Oregon lumber mills. Michigan's version of the Sullivan law was enacted in the aftermath of the trial of Dr. Ossian Sweet, a black civil rights leader. Dr. Sweet, had moved into an all white neighborhood and had been indicted for murder for shooting one of a white mob that had attacked his house while Detroit police looked on. A Missouri permit law was enacted in the aftermath of a highly publicized St. Louis race riot.[47]

After World War I, a generation of young blacks, often led by veterans familiar with firearms and willing to fight for the equal treatment that they had received in other lands, began to assert their civil rights. In reaction, the Klan again became a major force in the South in the 1910's and 1920's. Often public authorities stood by while murders, beatings and lynchings were openly perpetrated upon helpless black citizens. And once again, firearms legislation in Alabama, Arkansas, Mississippi, Missouri, Tennessee and Texas made sure that the victims of the Klan's violence were unarmed and did not possess the ability to defend themselves, while at the same time cloaking the specially deputized Klansmen in the safety of their monopoly of arms.

The resurgence of the Klan was neither limited to the South geographically, nor to blacks racially. The Klan was present in force in southern New Jersey, Illinois, Indiana, Michigan and Oregon. All of these states enacted either handgun permit laws or laws barring alien handgun possession between 1913 and 1934. The Klan targeted not only blacks, but also Catholics, Jews, labor radicals, and the foreign-born; and these people also ran the risk of falling victim to lynch mobs

---

[46] *Id.* at 18.
[47] *Id.* at 18-19.

or other more clandestine attacks, often after the victims had been disarmed by state or local authorities.[48]

Furthermore, such violence against political, racial, religious or alien minorities was not perpetrated by the Klan alone. As noted, national and local business associations campaigned for the Sullivan law while also taking part in a concerted effort to destroy emerging labor unions. These associations engaged in a systematic campaign of drastic wage decreases, lockouts, imported strike breakers, surveillance, harassment, blacklisting, and physical attacks upon trade unionists, often carried out with the acquiescence or active support of political authorities. For instance, in Bixby, Arizona, 221 alleged labor radicals were rounded up by a posse and forcefully deported from the state. A 1901 Arizona law barred the carrying of handguns within city limits. That carrying ban was enforced to disarm the deportees but was not applied to the posse.[49]

## C. Gun Control and Native Americans

The history of firearms prohibitions in regard to native Americans presents a parallel example of the use of gun control to oppress and, in this case, to exterminate a non-white ethnic group. Though many legal restrictions against blacks in respect to firearms were abolished, at least facially, during Reconstruction, the sale of firearms to Indians often remained prohibited. Federal law prohibited the sale of arms and munitions to "hostile" Indians.[50] Idaho prohibited the sale or provision of firearms and ammunition to "any Indian."[51]

Usually the disarmament of Indians was quickly followed by the impostion of oppressive measures or even murder and wholesale massacres. "Since the Army had taken from the Sioux their weapons and horses, the alternative to capitulation to the government's demands was starvation."[52]

On December 28, 1890, the 7th Cavalry was escorting this group [350 Indians] to the government headquarters on the Pine Ridge reservation. After

---

[48] *Id.* 19-20.
[49] *Id.* at 20.
[50] *See, e.g.* 17 Stat. 457 (1873).
[51] 1879 Idaho Sess. Laws 31.
[52] Sioux Nation of Indians v. United States, 601 F.2d 1157, 1166 (Ct. Cl. 1979).

camping overnight along Wounded Knee creek about 15 miles from the head-quarters, the Indians were called together on the morning of December 29th, surrounded by troops and told to surrender their rifles. Gun and cannon fire broke out, and many fleeing Indians died huddling in a ravine.[53]

Federal government restrictions on the sale of firearms to Indians were only abolished in 1979.[54]

## II.   CURRENT GUN CONTROL EFFORTS: A LEGACY OF RACISM

Behind current gun control efforts often lurks the remnant of an old American prejudice, that the lower classes and minorities are not to be trusted with firearms. The bias originated in the post-antebellum South for political reasons and may have changed its form, but it still exists. Today the thought remains: if you let the poor, and especially the black poor, have guns, they will commit crimes with them. Even noted anti-gun activists have admitted this. In his book *The Saturday Night Special*, anti-gun journalist Robert Sherrill frankly admitted that the Gun Control Act of 1968 was "passed not to control guns but to control Blacks."[55] Barry Bruce-Briggs, in *The Public Interest*, stated that "it is difficult to escape the conclusion that the 'Saturday Night Special' is emphasized because it is cheap and it is being sold to a particular class of people. The name is sufficient evidence. The reference is to 'Niggertown Saturday Night.'"[56]

Even today firearms regulations target minorities or other unpopular groups. For instance, present Massachusetts law still makes possession of guns by aliens a criminal offense.[57] Present federal statutes make it a felony for one dishonorably discharged, or having renounced American citizenship to purchase or possess a firearm.[58] This federal statute is surely a punitive measure against those who have trespassed certain norms of acceptable behavior even though there is no indication of violent criminal tendencies.

The worst abuses at present occur under the mantel of facially neutral laws that are, however, enforced in a discriminatory manner.

---

[53] Washington Post, Dec. 28, 1990, at A6, col. 1.
[54] Washington Post, Jan. 6, 1979, at A11, col. 1.
[55] R. SHERRILL, THE SATURDAY NIGHT SPECIAL 280 (1972).
[56] Bruce-Briggs, *The Great American Gun War*, 45 PUB. INTEREST 37, 50 (1976).
[57] MASS. GEN. LAWS ANN. ch. 140, § 131 H (1991).
[58] 18 U.S.C.A. § 922(g) (West 1990).

In many jurisdictions which require a discretionary gun permit, police departments have wide discretion in issuing a permit, and those departments unfavorable to gun ownership, or to the race, politics, or appearance of a particular applicant frequently maximize obstructions to such persons while favored individuals and groups experience no difficulty in the granting of a permit.[59] In St. Louis

> permits are automatically denied . . . to wives who don't have their husband's permission, homosexuals, and non-voters . . . . As one of my students recently learned, a personal 'interview' is now required for every St. Louis application. After many delays, he finally got to see the sheriff - who looked at him only long enough to see that he wasn't black, yelled 'he's alright' to the permit secretary, and left.[60]

Although legislatures insist that permits are necessary for a variety of reasons, such arbitrary issuance of gun licenses should not be tolerated.

Permit systems which vest wide discretion in public or police officials have been used on numerous occasions to stymie civil rights efforts. In 1969, the U.S. Supreme Court held unconstitutional a provision in the General Code of Birmingham which made it an offense to participate in any "parade or procession or other public demonstration" without first obtaining a permit from the City Commission.[61] The case arose out of a march in Birmingham by "52 people, all Negroes . . . led . . . by three Negro ministers . . . to protest the alleged denial of civil rights to Negroes in the City of Birmingham."[62] The marchers were arrested by the Birmingham Police for violating the above-noted law. Not surprisingly, the record revealed that this facially neutral law "had been applied in a discriminatory fashion" by the authorities.[63] Petitioner had in fact attempted to acquire a permit on a number of occasions which had been refused each and every time. "The petitioner was clearly given to understand that under no circumstances would he and his group be permitted to demonstrate in Birmingham."[64]

---

[59] Hardy & Chotiner, *The Potential for Civil Liberties Violations in the Enforcement of Handgun Prohibitions* in RESTRICTING HANDGUNS: THE LIBERAL SKEPTICS SPEAK OUT, *supra* note 29, at 209-10; Tonso, *supra* note 26, at 24.

[60] Kates, *On Reducing Violence or Liberty*, 1976 CIV. LIBERTIES REV. 56.

[61] Shuttlesworth v. City of Birmingham, 394 U.S. 147, 148 (1969).

[62] *Id.*

[63] *Id.* at 150.

[64] *Id.* at 158.

Compendium_Rivas
Page 461

New York's infamous Sullivan law, originally enacted to disarm Southern and Eastern European immigrants who were considered racially inferior and religiously and idealogically suspect, continues to be enforced in a racist and elitist fashion "as the police seldom grant hand gun permits to any but the wealthy or politically influential."[65]

> New York City permits are issued only to the very wealthy, the politically powerful, and the socially elite. Permits are also issued to: private guard services employed by the very wealthy, the banks, and the great corporations; to ward heelers and political influence peddlers; and (on payment of a suitable sum) to reputable 'soldiers' of the Mafia . . . .[66]

If such permit schemes are to be employed at all, they should be implemented on a non-discriminatory basis.

Although it may seem ironic, New York's leading handgun prohibitionists, extremely well-off people who live and work in high security communities and receive the best police protection possible, lecture those citizens in high crime areas to give up the means to protect their family on the grounds that handguns are useless and dangerous; useless and dangerous except, of course, to people like themselves who have the political influence to secure a permit.

> A beautiful example of this hypocritical elitism is the fact that while the New York Times often editorializes against the private possession of handguns, the publisher of that newspaper, Arthur Ochs Sulzberger, has a hard-to-get permit to own and carry a handgun. Another such permit is held by the husband of Dr. Joyce Brothers, the pop psychologist who has claimed that firearms ownership is indicative of male sexual inadequacy.[67]

Thus, while the New York Times has editorialized that "the urban handgun offers no benefits,"[68] its publisher, apparently deserving of more rights and protection than other citizens,

> is among the few privileged to possess a New York City permit to carry one at all times . . . . Although such permits are officially available only on a showing of 'unique need' to carry a defensive weapon, the list of permit

---

[65] Tonso, *supra* note 26, at 24.
[66] Kates, *Introduction,* in Restricting Handguns: The Liberal Skeptics Speak Out, *supra* note 29, at 5.
[67] Tonso, *supra* note 26, at 24.
[68] N.Y. Times, May 6, 1983, at A30, col. 1.

holders is composed of people noted more for their political influence than
for their residence in high crime areas.[69]

Other well-known gun prohibition advocates with such permits in-
cluded Nelson Rockefeller and John Lindsey.[70]

This dichotomy has, however, become the hallmark of the gun
prohibition movement. The most dedicated and vociferous gun pro-
hibition proponents are urban or suburban, upper-middle-class whites
who know little or nothing about firearms and their legitimate uses.
These elitists are often motivated in their gun control effort by the
perceived need to save those less educated and affluent urban dwellers
on the other side of town from themselves, as the "uneducated" latter
are, in the "educated" former's mind, incapable of the same level of
responsibility. Many of these elitists also show a class-based disdain
towards those whom they view as the main defenders of the right to
possess firearms for legitimate purposes. Governor Cuomo, for in-
stance, attacked those opposed to New York's mandatory seat belt law
as "NRA hunters who drink beer, don't vote, and lie to their wives
about where they were all weekend."[71]

## A.  By Prohibiting the Possession of Firearms, the State Discriminates Against Minority and Poor Citizens

The obvious effect of gun bans and prohibitions is to deny law-
abiding citizens access to firearms for the defense of themselves and
their families. That effect is doubly discriminatory because the poor,
and especially the black poor, are the primary victims of crime and
in many areas lack the political power to command as much police
protection as richer neighborhoods. Of course, present gun prohibi-
tions make possession of firearms illegal in the hands of the entire
population of the affected political subdivision, for all races and re-
ligions, and the rich and the poor alike. Yes - and the law, in its ma-
jestic equality, "forbids rich and poor alike to sleep under bridges,
to beg in the streets, and to steal bread."[72] Those living in well-off,
police protected neighborhoods are less likely to "sleep under bridges,
to beg in the streets" or to need a firearm for self-protection.

---

[69] Kates, *supra* note 15, at 208.
[70] *Id.*
[71] Syracuse Post-Standard, Apr. 4, 1985, at A5.
[72] A. FRANCE, THE RED LILY, *quoted in* B. EVANS, DICTIONARY OF QUOTATIONS (1968).

As noted, blacks, especially poor blacks, are disproportionately the victims of crime, and the situation for households headed by black women is particularly difficult. In 1977, more than half of black families had a woman head of household. A 1983 report by the U.S. Department of Labor states that

> among families maintained by a woman, the poverty rate for blacks was 51%, compared with 24% for their white counterparts in 1977 . . . . Families maintained by a woman with no husband present have compromised an increasing proportion of both black families and white families in poverty; however, families maintained by a woman have become an overwhelming majority only among poor black families . . . . About 60% of the 7.7 million blacks below the poverty line in 1977 were living in families maintained by a black woman.[73]

The problems of these women are far more than merely economic. National figures indicate that a black female in the median female age range of 25-34, is about twice as likely to be robbed or raped as her white counterpart. She is also three times as likely to be the victim of an aggravated assault.[74]

In the final analysis, victims must protect themselves and their families or property from criminal attack at the moment the criminal strikes. The need for the ability to defend oneself, family and property, is much more critical in the poor and minority neighborhoods ravaged by crime and without adequate police protection.[75]

However, these citizens who are most likely to be victims have no right to demand or even expect police protection. Courts have consistently ruled "that there is no constitutional right to be protected by the state against being murdered by criminals or madmen."[76] Furthermore, courts have ruled that the police have no duty to protect the individual citizen, absent facts establishing a special relationship between the authority and the person assaulted.[77]

---

[73] U.S. Dept. of Labor, *Time of Change; 1983 Handbook on Women Workers* 118 BULL. 298 (1983).

[74] *Id.* at 90. *See* U.S. STATISTICAL ABSTRACT 444 (1983).

[75] McClain, *Firearms Ownership, Gun Control Attitudes and Neighborhood Environments*, 5 LAW & POL'Y Q. 299, 301 (July 1983); Kates, *Handgun Control: Prohibition Revisited*, INQUIRY, Dec. 5, 1977, at 21.

[76] Bowers v. DeVito, 686 F.2d 616, 618 (7th Cir. 1982). *See also* Calogrides v. City of Mobile, 475 So.2d 560 (Ala. 1985); Simpson's Food Fair v. City of Evansville, 149 Ind. App. 387, 272 N.E. 2d 871 (1971); Huey v. Town of Cicero, 41 Ill.2d 361, 243 N.E.2d 214 (1968).

[77] DeShaney v. Winnebago County Dep't of Social Serv., 109 S.Ct. 998, 1004 (1989);

The fundamental civil rights regarding the enjoyment of life, liberty and property, the right of self-defense and the right to keep and bear arms, are merely empty promises if a legislature is allowed to restrict the means by which one can protect oneself and one's family. Furthermore, this constitutional deprivation discriminates against the poor and minority citizen who is more exposed to the acts of criminal violence and who is less protected by the state.

## B. Civilian Ownership of Firearms is an Important Deterrent to Criminal Activity

The role of the armed private citizens in deterring crime is significant. Firearms are frequently used against criminals by civilians. In fact, civilians shoot many more criminals than police do. In 1981, there were an estimated 1,266 excusable self-defense or justifiable homicides by civilians using guns against criminals. Furthermore, estimates show that there were approximately 8,600 non-fatal justifiable or excusable woundings of criminals by armed civilians during the same year.[78] By comparison, police officers nationwide killed only 388 felons in 1981.[79]

However, the shooting of criminals represents only a small minority of the defensive uses of firearms by civilians. Most civilian defensive uses involve only the use of a gun to threaten, apprehend, fire a warning shot, or shoot at a criminal without the actual killing or wounding of the felon. A 1978 national survey found that seven percent of the households in the United States reported that a member of the household had at one time or another used a gun of some kind for self-protection against another person, excluding military or police experiences.[80] In other words, out of the 77 million U.S. households in 1978, over five million households reported having used a firearm

---

South v. Maryland, 59 U.S. 396 (1855); Ashburn v. Anne Arundel County, 360 Md. 617, 510 A.2d 1078 (1986); Everton v. Willard, 468 So.2d 936 (Fla. 1985); Morgan v. District of Columbia, 468 A.2d 1306 (D.C. App. 1983) (en banc); Weiner v. Metrop. Transp. Auth., 55 N.Y.2d 175, 433 N.E.2d 124, 448 N.Y.S.2d 141 (1982); Davidson v. City of Westminster, 32 Cal.3d 197, 649 P.2d 894, 185 Cal. Rptr. 252 (1982); Warren v. District of Columbia, 444 A.2d 1 (D.C. App. 1981) (en banc); Freitas v. Honolulu, 58 Haw. 587, 574 P.2d 529 (1978).

[78] Kleck, *Policy Lessons from Recent Gun Control Research*, 49 LAW & CONTEMP. PROBS. 35, 44 (1986).

[79] *Id.* (citing 1983 FBI SUPP. HOMICIDE REPT.)

[80] DECISION/MAKING/INFORMATION, *Attitudes of the American Electorate towards Gun Control*, (1978).

for self-defense purposes at one time or another. A 1986 poll sponsored by the now defunct National Alliance Against Violence, an anti-gun organization, found that six percent of the adults interviewed replied ''yes'' to the question of whether in the past five years they, or a member of their household, had used a *handgun*, even if it was not fired, for self-protection or for the protection of property at home, work, or elsewhere, excluding military service or police work.[81] It is estimated that between 1976 and 1981 there occurred *per year* 645,000 defensive uses of handguns alone by civilians.[82] Firearms of all types are estimated to have been used by civilians for defensive purposes about 1,000,000 times a year during that time period.[83]

Victimization surveys indicate that for both robbery and assaults, the crime was less likely to be completed against victims, and victims were less likely to be injured, when such victims resisted with a gun, compared to victims who did not resist.[84] A study compiled by the U.S. Department of Justice, noted that where guns or knives are used for protection by potential rape victims, the rape was completed only three percent of the time as opposed to a completion rate of thirty-two percent for rapes where no guns or knives were used by the victim.[85]

The use of firearms by civilians to defend themselves, their families and their property, against criminals is very well-known to criminals and profoundly affects criminals' behavior, often deterring them from committing certain crimes. In a 1983 study of criminals and firearms sponsored by the U.S. Department of Justice, Professors James D. Wright and Peter H. Rossi interviewed over 1800 prison inmates in ten states. Fifty-seven percent of those felons agreed that ''most criminals are more worried about meeting an armed victim then they are about running into the police''; fifty-six percent agreed that ''a criminal is not going to mess around with a victim he knows is armed with a gun;'' seventy-four percent agreed that ''one reason burglars avoid houses when people are at home is that they fear being shot''; and fifty-eight percent agreed that ''a store owner who is known to

---

[81] Kleck, *Crime Control Through the Private Use of Armed Force*, 35 Soc. PROBS. 1, 2 (Feb. 1988) (citing Peter D. Hart Research Associates, Inc. (Garin 1986)).

[82] *Id.*

[83] *Id.* at 4.

[84] Kleck & Bordua, *The Factual Foundations for Certain Key Assumptions of Gun Control*, 5 LAW & POL'Y Q. 271, 280-91 (1983).

[85] U.S. Dept. of Justice, *Rape Victimization in 26 American Cities*, 1979 LAW ENFORCEMENT ASSISTANCE ADMIN. 31.

keep a gun on the premises is not going to get robbed very often."[86]

The Justice Department study on felons confirmed the results of the general population surveys regarding the frequent defensive use of firearms by civilians against criminals. The study's findings indicate that thirty-seven percent of criminals admitted to being personally confronted by civilian victims armed with guns and thirty-four percent admitted to having personally been scared off, shot at, wounded or captured by an armed civilian victim.[87]

The felon's perception of the risk of encountering an armed civilian affects the felon's criminal behavior. The Justice Department survey found that forty percent of felons admitted that they had at one time or another decided not to commit a crime because they knew or believed that the intended civilian victim carried a gun.[88]

Furthermore, an analysis of highly publicized incidents of gun training programs or of an armed populous, also suggests that civilian gun ownership can affect the frequency of various crimes. In response to an increase in rapes, the Orlando City Police Department introduced a gun training program for women in 1966. The city experienced an eighty-eight percent drop in the rape rate the following year, eventhough rape had been on the increase in Orlando, in Florida, and in the United States as a whole at the time the program was introduced. However, there were no similar drops in rape rates in the surrounding areas and the drop in Orlando was far in excess of any one year changes in previous rape rates.[89] Similar results have occurred in regard to other gun training programs; producing a decrease of armed robbery in Hyland Park, Michigan, of drug store robberies in New Orleans, Louisiana, and of grocery store robberies in Detroit, Michigan. In Kennesaw, Georgia, as a result of a highly publicized city ordinance requiring household gun ownership, burglaries dropped eighty-nine pecent in the seven months immediately after passage of such ordinance, compared to the same period in the previous year.[90] To the extent the homeowners of a neighborhood or community are known to be well-armed, the presence of firearms will deter crime.[91]

---

[86] J. WRIGHT & P. ROSSI, ARMED AND CONSIDERED DANGEROUS: A SURVEY OF FELONS AND THEIR FIREARMS 146 (1986).

[87] *Id.* at 155.

[88] *Id.*

[89] Kleck, *supra* note 74, at 47.

[90] *Id.*

[91] Kleck & Bordum, *supra* note 80, at 201.

Reducing gun ownership among law-abiding citizens will do almost nothing to reduce violent crime directly, since such behavior is virtually nonexistent among persons without previous records of serious violence and criminal behavior. The assumption of many middle and upper class whites that the common murderer is the common poor and minority citizen (especially the poor black citizen) is false. The Eisenhower Commission determined that 74.7% of those persons arrested between 1964 and 1967 for criminal homicide had a record of previous arrests for "a major violent crime or burglary."[92]

Reducing gun ownership among law-abiding citizens may significantly reduce the deterrent effect of widespread civilian gun ownership on criminals, particularly in regards to such crimes as residential burglaries and commercial robberies. Of course, this effect will be most widely felt among the poor and minority citizens who live in crime-ridden areas without adequate police protection. It must also be noted that in many instances in the past, and even at this time, the security forces of the state not only fail to provide protection to these deprived citizens but are, in fact, used to oppress those citizens.

One should not forget that the National Guard was used by Governor Faubus of Arkansas in an attempt to prevent the desegregation of public schools. Notably, Little Rock's Central High School was placed "off limits" to black students.[93] In September of 1989, Hurricane Hugo hit the U.S. Virgin Islands. Because of restrictive gun control laws the law-abiding citizens of the various islands were unable to protect themselves and their property from looters in the aftermath of the damage done by Hurricane Hugo. In fact, among the few non-military/police who were able to protect their property were certain shopping malls who posted guards with firearms on their roofs. As the local police refused to stop looting and even took part in the looting, National Guard troops were mobilized in the area, including the island of St. Croix. However, such troops, instead of restoring order, reportedly joined police and others in the looting of homes and private property. Those later arrested for looting included a police captain and a bank vice-president.[94]

---

[92] *Id.* at 293.

[93] Cooper v. Aaron, 358 U.S. 1,9 (1958).

[94] L. A. Times, Dec. 17, 1989, at A30, col. 1.; *St. Croix Struggling Back to Normal After Hugo's Devastation*, Assoc. Press, Dec. 13, 1989; *V.I.: Paradise to Powder Keg*, Gannet News Serv., Nov. 13, 1989.

The fact is that in an imperfect world the servants of the state, including law enforcement authorities and the military, have also committed outrages. For instance, on May 13, 1985 Philadelphia police, in a violent confrontaton with an extremist group in a residential area, fired 10,000 rounds of heavy caliber ammunition, dropped a bomb from a helicopter, killed eleven people, including five children, and destroyed an entire neighborhood, making 250 or so persons homeless.[95] Another example is the My Lai massacre, committed by American troops, of unarmed Vietnamese villagers including women and children.[96] Even our highest guardians of justice are not immune from corruption; Chicago's Operation Greylord resulted in the conviction of fifteen judges on corruption charges which included the taking of bribes to throw cases before such judges.[97] Most recently, this country has been stunned by the videotaped beating of an unarmed, subdued and handcuffed black motorist by a group of Los Angeles Police Department officers. This incident seems to be an aberration only in that it was recorded on videotape. In fact, police midconduct is so common as to warrant the existence of a specialized law reporter.[98] Nevertheless, the military, police and security forces of the state are always exempted from gun control laws which are designed to disarm the citizen.

In striking down a gun control law, the Supreme Court of North Carolina, in *State v. Kerner*, referred to the right to keep and bear arms as "a sacred right based upon the experience of the ages in order that the people may be accustomed to bear arms and ready to use them for protection of their liberties or their country when occasion serves."[99] This was a right of "the ordinary private citizen" as it was "the common people, . . . accustomed to the use of arms" who had fought and won the revolution.[100] Such right did not depend on the organized militia but, in fact, existed in part to provide people a defense against such organized militias: "In our own state, in 1870, when Kirk's militia was turned loose and the writ of habeas corpus was suspended, it would have been fatal if our people had been deprived of the right

---

[95] Brown, *Foreword to the Report of the Philadelphia Special Investigation Commission*, 59 TEMP. L.Q. 267, 268 (1986).

[96] Calley v. Callaway, 519 F.2d 184 (5th Cir. 1975) (en banc), *cert. denied*, 425 U.S. 911 (1976).

[97] *Greylord Parole*, Nat'l. L.J., Nov. 20, 1989, at 6.

[98] *See* POLICE MISCONDUCT & CIV. RTS. L. REP. by Clark Boardman Co., Ltd.

[99] 181 N.C. 574, 575, 107 S.E. 222, 223 (1921).

[100] *Id.* at 577, 107 S.E. at 224.

CIVIL RIGHTS LAW JOURNAL

to bear arms and had been unable to oppose an effective front to the usurpation.''[101]

The disarmament of citizens by the Nazis both in Germany and in occupied territories, of Palestinian citizens by the Israeli military in Gaza and the West Bank, of black South Africans by the apartheid government of South Africa, of East European citizens after World War II by the newly installed communist governments and recently of Lithuanian and Georgian citizens by the Soviet central government, were, among many others, the first steps on a road to oppression.

For instance, after their takeover of the German government, the Nazis acted vigorously to confiscate ''weapons still remaining in the hands of people inimical to the state.''[102] The 1938 ''Law of Weapons'' denied firearms licenses to gypsies, persons deprived of their civil rights, under police surveillance, or otherwise politically suspect.[103] Unarmed Jews, specifically forbidden to possess firearms and not benefited by governmental protection, were left defenseless against official and unofficial violence against them. Subsequently, when German and other Jews in occupied territories were forced into ghettos, intense individual and collective punishment was meted out when a Jew was found in possession of firearms.[104] Nazi occupation forces ordered the submission of privately owned firearms to authorities and carried out confiscation searches.[105]

South Africa has a long history of racially directed gun control laws.[106] In present-day South Africa, the Arms and Ammunition Act of 1937 has been used to restrict the ownership of firearms to whites.[107] In fact, South Africa can be credited with having run ''one of the world's most effective gun control campaigns.''[108] The list of gun control efforts and laws used to oppress certain ethnic or minority groups

---

[101] *Id.*

[102] LIBRARY OF CONGRESS, GUN CONTROL LAWS IN FOREIGN COUNTRIES 80 (1976) (citing E. KUNZE, DAS WAFFENRECHT IM DEUTSCHEN REICH 2 (5th ed. Berlin 1930).

[103] *Federal Firearms Legislation: Hearings Before The Subcomm. to Investigate Juvenile Delinquency of the U.S. Senate Committee on the Judiciary*, 90th Cong., 2nd Sess. 491-93 (1968) [hereinafter *Senate Hearings*].

[104] Trunk, *The Attitude of the Judenrats to the Problems of Armed Resistance Against the Nazis*, in JEWISH RESISTANCE DURING THE HOLOCAUST 202-27 (1971).

[105] *Senate Hearings, supra* note 94, at 488; R. LEMKIN, AXIS RULE IN OCCUPIED EUROPE: LAWS OF OCCUPATION, ANALYSIS OF GOVERNMENT, PROPOSALS FOR REDRESS 163, 318, 422-566 (1944).

[106] A. SACHS, JUSTICE IN SOUTH AFRICA 70 (1973).

[107] P. VAN DEN BERGHE, SOUTH AFRICA: A STUDY IN CONFLICT 126 (1965).

[108] Washington Post, Jan. 13, 1977, at A20, col. 1.

Compendium_Rivas
Page 470

GUN CONTROL

or entire peoples by occupying powers or their own despotic governments is too long to recount here. Further, testimony provided by the Library of Congress concluded that a "totalitarian society, and particularly a totalitarian society occupying a country against its will, simply cannot permit the private possession of weapons to any great extent . . . ."[109]

It need not necessarily be the state that actively oppresses a minority or those expressing diverse political or social views; often state authorities need only to refuse protection to such groups, thus allowing vigilantes to perform the actual violence and oppression against these groups. Although governmental officials may be politically unable to oppress controversial political or social views, covert withdrawal of police protection could expose such groups to a violent response by such organizations as the KKK.

Civil rights attorney Don B. Kates noted:

> As a civil rights worker in a Southern state during the early 1960's, I found that the possession of firearms for self-defense was almost universally endorsed by the black community, for it could not depend on police protection from the KKK . . . . The black lawyer for whom I principally worked . . . attributed the relative quiescence of the Klan to the fact that the black community was so heavily armed . . . .
>
> What might have happened to civil rights workers if there had been strict gun control in the South is exemplified in the 1969 machine gunning of several hundred marchers by right wing extremists in Mexico City. Both the possession of automatic weapons and the act of murder are as strictly forbidden by law in Mexico as they are in the U.S. Nevertheless, the police made no arrests - either on the scene or when the attackers later invaded the hospitals to finish off the wounded . . . .
>
> During the civil rights turmoil in the South, Klan violence was bad enough; it would have been worse with gun control. It was only because black neighborhoods were full of people who had guns and could fight back that the Klan didn't shoot up civil rights meetings or terrorize blacks by shooting at random from cars. Moreover, civil rights workers' access to firearms for self-defense often caused Southern police to preserve the peace as they would not have done if only the Ku Kluxers had been armed . . . .
>
> In the 1950's and early 1960's . . . over a hundred civil rights workers were murdered while the federal government would do nothing to offend

---

[109] *Senate Hearings, supra* note 94, at 488; A. SACHS, *supra* note 97, at 70.

the South's all-white electorate. Under strict gun control the slaughter would have been immeasurably worse, since we could not have defended ourselves. The movement would have collapsed, just as it did during Reconstruction when the army was withdrawn, leaving the blacks (who had no firearms) to the mercy of the Klan.

Nor is police refusal to protect the unpopular confined to the South. The inaction of New York State Police when Paul Robeson's Peekskill concert was mobbed, and of the New York City, Boston, and Oakland (California) police when hardhats and Hell's Angels attacked peace marchers, are only the most famous examples. Any reader of black newspapers knows how Northern police react when mobs attack blacks who move into all-white neighborhoods.[110]

It is folly and arrogant to believe that government in America has always been and will always be the benign protector of civil rights. The history of the treatment of blacks, Indians and other minorities substantiates this assertion. To believe that unjust governmental actions may never occur again in the future is the height of folly. Who can assure what American government will be like 50, 100 or 200 years from now, what powers it will have amassed, who will control it, and what its aims will be. At the beginning of the 20th century, few people would have suspected that a nation considered by many to be the most cultured, advanced and civilized would elect to power a homicidal maniac and allow him to seize total control of every institution in the country and every facet of the community; a man who maltreated, gassed and otherwise murdered millions of people based on their racial and ethnic background. Furthermore, if it is contended that because of some quality in the American citizen and his/her government such events could never take place in this country (an arrogant assumption at best, and a patently false assumption in light of past treatment of blacks, Indians and other minorities), then the contention that we must guard our other civil rights against possible abuse by this "forever benign" government rings false.

How can it be asserted that there is a real need to guard against governmental infringements regarding the first amendment, because any infringement, even one merely prohibiting the burning of the American flag, can lead down a slippery slope at the bottom of which

---

[110] Kates & Salter, *The Necessity of Access to Firearms by Dissenters and Minorities When Government is Unwilling or Unable to Protect*, in RESTRICTING HANDGUNS: THE LIBERAL SKEPTICS SPEAK OUT, *supra* note 29, at 186-90.

our free speech rights may be entirely muzzled, and then, on the other
hand, dismiss out of hand the possibility that government may at some
point become authoritarian and use its monopoly of force to oppress
its citizens.

## III.  THE ENFORCEMENT OF GUN PROHIBITIONS SPUR INCREASED CIVIL LIBERTIES VIOLATIONS, ESPECIALLY IN REGARD TO BLACKS AND OTHER MINORITIES.

Constitutional protections, other than those afforded by the right
to keep and bear arms, have been and are threatened by the enforce-
ment of restrictive firearms laws. The enforcement of present firearms
controls accounts for a large number of citizen and police interactions,
particularly in those jurisdictions in which the purchase or possession
of certain firearms are prohibited. In 1976, American police forces
made no less than 121,722 arrests for the illegal carrying or possession
of weapons.[111] In 1988, 144,568 such arrests were made nationwide.[112]

The most common and, perhaps, the primary means of enforcing
present firearms laws are illegal searches by the police. A former Ohio
prosecutor has stated that in his opinion fifty to seventy-five percent
of all weapon arrests resulted from questionable, if not clearly illegal,
searches.[113] A study of Detroit criminal cases found that eighty-five
percent of concealed weapons carrying cases that were dismissed, were
dismissed due to the illegality of the search. This number far exceeded
even the fifty-seven percent for narcotics dismissals, in which illegal
searches are frequent.[114] A study of Chicago criminal cases found that
motions to suppress for illegal evidence were filed in thirty-six percent
of all weapons charges; sixty-two percent of such motions were granted
by the court.[115] A Chicago judge presiding over a court devoted solely
to gun law violations has stated:

> The primary area of contest in most gun cases is in the area of search and
> seizure . . . . Constitutional search and seizure issues are probably more reg-

---

[111] FBI, 1976 CRIME IN THE UNITED STATES 181.

[112] FBI, 1988 UNIFORM CRIME REPORTS 172.

[113] *Federal Firearms Legislation: Hearings Before the Subcomm. on Crime of the House
Judiciary Committee*, 94th Cong., 1st Sess. pt. 4, at 1589 (1975) [hereinafter *House Hearings*].

[114] Note, *Some Observations on the Disposition of CCW cases in Detroit*, 74 MICH. L.
REV. 614, 620-21 (1976).

[115] Critique, *On the Limitations of Empirical Evaluation of the Exclusionary Rule*, 69
NW. U.L. REV. 740, 750 (1974).

Compendium_Rivas
Page 473

ularly argued in this court than anywhere in America . . . . More than half these contested cases begin with the motion to suppress . . . these arguments dispose of more contested matters than any other.[116]

Therefore, in efforts to curb the number of concealed weapons and the amound of drug trafficking, fourth amendment rights were frequently violated.

These suppression hearing figures represent only a tiny fraction of the actual number of illegal searches that take place in the enforcement of current gun laws. It must be noted that a suppression hearing occurs only when the illegal search has actually produced a firearm, and the citizen has been charged for some offense based on such evidence. If the illegal search did not turn up a firearm, no criminal case would have resulted in which a suppression motion would have been filed by the defendant. However, an illegal search and the violation of the constitutional rights of a completely innocent person would have occurred nonetheless. The American Civil Liberties Union has noted that the St. Louis police department, in the mid-1970's, made more than 25,000 illegal searches "on the theory that any black, driving a late model car has an illegal gun." However, these searches produced only 117 firearms.[117]

In light of these facts, many of the proponents of gun control have commented on the need to restrict other constitutionally guaranteed rights in order to enforce gun control or prohibition laws. Federal Appellate Judge Malcolm Wilkey published an editorial in the Wall Street Journal in 1977, urging that the Supreme Court abandon the exclusionary rule. "The exclusionary rule has made unenforceable the gun control laws we have and will make ineffective any stricter controls which might be devised . . . . Unless a police officer has 'probable cause' to make a reasonable search, nothing found during the search . . . can be introduced as evidence."[118] That same year, Police Inspector John Domm published a guest editorial in the Detroit Free Press, calling for a "reinterpretation" of the fourth amendment to allow police to assault strategically located streets, round up pedestrians en masse, and herd them through portable, airport-type gun detection machines.[119] In a book by two prominent gun prohibitionists,

---

[116] *House Hearings, supra* note 104, pt. 2, at 508 (testimony of Judge D. Shields).
[117] Kates, *Handgun Control: Prohibition Revisited,* INQUIRY, Dec. 5, 1977, at 23.
[118] Wall Street J., Oct. 7, 1977, at 14.
[119] Detroit Free Press, Jan. 26, 1977, at 4.

published in 1970, Norville Morris and Gordon Hawkins stated flatly that "there can be no right to privacy in regard to armament."[120]

However, statistics and past history show that many millions of otherwise law-abiding Americans would not heed any gun ban, either prohibiting semiautomatic firearms or handguns. This should be plain to anyone who considers it in light of the traditional American attitude towards guns and traditional American reactions to the banning of any commodity deeply valued by a substantial portion of the public. One should consider America's past experience with liquor prohibition and the present experience with drug prohibition. Furthermore, in many urban neighborhoods, especially those of poor blacks and other minorities, the possession of a firearm for self-defense is a necessity in light of the fact that adequate police protection is rarely if ever provided for these citizens.

Federal and state authorities in 1975 estimated that there were two million illegal handguns among the population of New York City. This number amounted to only 500,000 less handguns than the estimated number of legally owned handguns in California at that time and represented a significantly higher rate of handgun ownership than existed in the nation as a whole in 1975.[121] In a 1975 national poll, some ninety-two percent of the respondents estimated that fifty percent or more of handgun owners would defy a confiscation law.[122]

Even registration laws as opposed to outright bans, measure a high percentage of noncompliance among the citizenry. In 1968, Illinois passed a firearm owner registration law. The Chicago Police estimated the rate of noncompliance at over two thirds. Statewide noncompliance was estimated at three fourths. In 1976, Cleveland city authorities estimated the rate of compliance with Cleveland's new handgun registration law at less than twelve percent.[123] Considering the fact that eighty-eight percent of handgun owners in Cleveland would not comply even with a registration law, the effectiveness of the "assault" gun ban ordinance enacted on February 17, 1989 must be seriously questioned. Regarding that law (which actually banned no assault guns, such as fully automatic firearms, but did ban virtually

---

[120] N. MORRIS & G. HAWKINS, THE HONEST POLITICIAN'S GUIDE TO CRIME CONTROL 69 (1970).

[121] N. Y. Times, Mar. 2, 1975, at 1, col. 5 (estimate by BATF); N. Y. Post, Oct. 7, 1975, at 5, col. 3 (estimate by Manhattan District Attorney).

[122] 121 CONG. REC. S189, 1 (daily ed. Dec. 19, 1975).

[123] Kates, *supra* note 108, at 20 n.1.

CIVIL RIGHTS LAW JOURNAL [Vol. 2:1

all semiautomatic firearms), Lt. Martin Flass of the Cleveland Police Department stated in August of 1990 that "to the best of our knowledge, no assault weapon was voluntarily turned over to the the Cleveland Police Department . . . considering the value that these weapons have, it certainly was doubtful individuals would willingly relinquish one."[124]

In response to New Jersey's "assault weapon" ban, prohibiting the mere possession of many semiautomatic firearms, only eighty-eight of the 300,000 or more affected weapons in New Jersey had been registered as of November, 1990. No weapons had been surrendered to the police and only seven had been rendered inoperable.[125] As of November 28, 1990, only 5,150 guns of the estimated 300,000 semiautomatic firearms banned by the May 1989 California "Assault Gun" law had been registered as required with the California State Department of Justice.[126] These results suggest that the majority of otherwise law-abiding citizens will not obey a gun prohibition law; much less criminals, who will disregard such laws anyway. It is ludicrous to believe that those who will rob, rape and murder will turn in their firearms or any other weapons they may possess to the police or be deterred from using them again by the addition of yet another gun control law to the 20,000 plus that are already in effect in the United States.[127]

Average citizens will generally keep their firearm in their home or business. Very few citizens habitually carry firearms. Clearly neither stop and frisk laws, streetside general searches, nor gun detection devices as advocated by the prohibitionists, would be able to enforce any gun prohibition. A serious attempt to enforce a gun prohibition would require an immense number of searches of residential and business premises. Thus, necessity would dictate that enforcement must involve intrusions into residences where firearms ownership is suspected. Furthermore, the bulk of these intrusions will be directed against racial minorities, whose possession of arms the enforcing authorities may view as far more dangerous than illegal arms possession by other groups. As civil liberties attorney Kates has observed,

---

[124] *Cleveland Reports No Assault Guns Turned In*, GUN WEEK, Aug. 10, 1990, at 2.

[125] Masters, *Assault Gun Compliance Law*, Asbury Park Press, Dec. 1, 1990, at 1.

[126] Washington Post, Nov. 29, 1990, at A27, col 1.

[127] J. WRIGHT, P. ROSSI & K. DALY, WEAPONS, CRIME AND VIOLENCE IN AMERICA 244 (1983).

Compendium_Rivas
Page 476

when laws are difficult to enforce, 'enforcement becomes progressively hap-
hazard until the last of the laws are used only against those who are un-
popular with the police.' Of course minorities, especially minorities who don't
'know their place', aren't likely to be popular with the police, and those very
minorities, in the face of police indifference or perhaps even antagonism,
may be the most inclined to look to guns for protection - guns that they can't
acquire legally and that place them in jeopardy if possessed illegally. While
the intent of such laws may not be racist, their effect most certainly is.[128]

Given the potential discriminatory application of gun bans, and the
grave consequences of such enforcement schemes, legislatures should
not pass such statutes.

Civil rights standards are already bearing the repercussions of the
actions of overzealous gun prohibitionists. Take for instance the de-
velopment of a new and lesser standard of constitutional protection
in regard to tenants in public housing facilities.

Recently the U.S. District Court for the Eastern District of Vir-
ginia upheld a ban imposed by the Richmond Housing Authority on
the possession of all firearms, whether operable or not, in public hous-
ing projects.[129] The Richmond Tenants Organization had challenged
the ban, arguing that such requirement had made the city's 14,000
public housing residents second-class citizens. The judge did strike a
lease provision banning "weapons of any type" because such could
include kitchen knives or anything else that could be used as a weapon.
(Also struck from the lease were provisions that caused tenants to lose
the lease if they committed misdemeanor drug or alcohol violations
away from the public housing area.)[130] Richard Gentry, Executive Di-
rector of the Richmond Redevelopment and Housing Authority stated
that "it has never been our intent nor will it ever be to conduct raids
on residents or to hassle our residents." Mr. Gentry also noted that
firearms are banned in public housing projects in Chicago.[131]

Starting in late 1988, the Chicago Housing Authority (CHA) and
the Chicago Police Department (CPD) enacted and enforced an of-
ficial policy, Operation Clean Sweep, which applied to all housing
units owned and operated by the CHA. The purpose of Operation

---

[128] Tonso, *supra* note 26, at 25.

[129] *Richmond Tenants Org. v. Richmond Dev. & Hous. Auth.*, No. C.A. 3:90CV00576
(E.D.Va. Dec. 3, 1990).

[130] *Id.*

[131] Washington Post, Dec. 8, 1990, at F1, col 1.

CIVIL RIGHTS LAW JOURNAL            [Vol. 2:1

Clean Sweep was the confiscation of firearms and illegal narcotics. Operation Clean Sweep consisted of an official policy of systematic, warrantless searches of all CHA housing units in Chicago, and also of a visitor exclusion policy severely limiting the right of CHA tenants to associate in their residence with family members and other guests.[132]

The warrantless search policy consisted of indiscriminate random sweep searches of the CHA tenants' residences, any furniture and personal effects found therein, and searches of any residents and guests in the CHA buildings. Such searches were conducted on a building by building basis, without a warning and without probable cause or reasonable articulate suspicion of any crime by any specific person in any specific home. The homes of the CHA tenants were entered whether or not they were present. Persons found on such premises were detained and searched, while the apartment was searched, including all enclosed areas, personal effects, bureau drawers, clothes, closets, mattresses, kitchen cabinets, refrigerators, freezers, and medicine cabinets. The CPD officers and CHA officials used metal detectors in order to discover firearms. CHA tenants who objected or attempted to interfere with these warrantless searches were arrested.[133]

While such searches were occurring, all persons who were not on the lease were ejected from the building. Following the search of each building, the police closed the unit to all visitors for forty-eight hours. After the initial forty-eight hour period passed, tenants were allowed to have visitors only from the morning until 12:00 a.m. and were not allowed to have overnight guests. Tenants were forced to sign in and out of the building and, upon entering the building, had to produce to the police officers or CHA officials photograph identification. Relatives, including children and grandchildren, were not allowed to stay over, even on holidays.[134]

Of course all of the CHA tenants were poor, and the vast majority of them were hispanic or black. Once again, the very same police and

---

[132] The ACLU filed a lawsuit seeking declaratory and injunctive relief on behalf of the CHA tenants against the enforcement of Operation Clean Sweep. The complaint was filed in the United States District Court for the Northern District of Illinois, Eastern Division, on December 16, 1988 as Case No. 88C10566 and is styled as *Rose Summeries, et al. v. Chicago Housing Authority, et al.* A consent decree was entered on November 30, 1989 in which the CHA and CPD agreed to abide by certain standards and in which the scope and purposes of such "emergency housing inspections" were limited.

[133] Complaint, *Summeries v. Chicago Hous. Auth.*, at 7-8.

[134] *Id.*

security forces that were supposedly in existence to protect citizens were used to harass, intimidate, and deprive the residents of CHA of their constitutional rights. And once again, oppressive firearms laws were used to facilitate the deprivation of the constitutional rights of those minorities.

## CONCLUSION

The history of gun control in the United States has been one of discrimination, oppression, and arbitrary enforcement. Although the purported legislative intent behind gun control statutes was to decrease crime and violence and thereby ensure public safety, the primary purpose was to keep blacks, immigrants, and native Americans in check. If, as the white establishment believed, blacks and other minorities generally could not be trusted, they certainly could not be trusted with arms and ammunition. Those in power wielded gun control laws in efforts to preserve their monopoly on the instruments of force.

To argue against gun control, such as discriminatory permit schemes, is not to assert that every man and woman should arm themselves before leaving for work in the morning. However, if citizens decide to purchase a gun for whatever reasons and continue to be subjected to permit laws, they have the right to be treated in a non-discriminatory manner.

By prohibiting the possession of firearms, the state discriminates against minority and poor citizens. In the final analysis, citizens must protect themselves and their families and homes. The need for self-defense is far more critical in the poor and minority neighborhoods ravaged by crime and without adequate police protection. Enforcing gun prohibitions, furthermore, will only lead to vast increases in civil liberties violations, including illegal searches and seizures. Unfortunately, the tenants of the Richmond and Chicago housing projects have become second class citizens; their rights to defend themselves and to be free from warrantless searches have been circumscribed. These excesses and other policies and statutes which unduly infringe upon second and fourth amendment rights should not be tolerated by courts or a free citizenry.

Compendium_Rivas
Page 480

# NEWS ARTICLES

"Crime in the South," *Arkansas Democrat* (Little Rock, Arkansas), June 7, 1879, 2 (https://www.newspapers.com/image/legacy/144787413/?terms=%22lawlessness%22&match=1, last accessed Oct. 18, 2022)



### CRIME IN THE SOUTH.

The terrible condition of society in the South—our lawlessness and bloody-mindedness, are; themes upon which many extreme papers of the North delight to dwell. Two rival papers of Cincinnati and Louisville have been delighting their numerous readers for the last few weeks with the criminal recorder of their respective States, and the picture of bloody scenes in Kentucky, as they are portrayed by the Cincinnati Commercial, and the murders, arsons and seductions of Ohio as described by the Courier-Journal, are fearful to contemplate. This style of argument may be highly satisfactory to these papers, but there is little good in it in the way of suppressing crime in either State.

It is unquestionably true that there is crime in the South and a great deal of it.

There is much of it too that goes unpunished. The pistol, the knife, the shotgun and the bludgeon too

often do their bloody work. But what is true of the South is also true of the North. There the pistol, the knife, the razor and the deadly drug do the same deadly work. There is less reason for crime in the North than in the south. There the foundations of society have not been upheaved as in our section—there governments have not suffered those shocks and violent convulsions which have been so fatal to law and order in the South. There the blighting effects of military rule and afterwards the rule of the enfranchised negroes and a handful of whites have never been experienced. The wonder is that there is not ten times the violence and crime in the South.

It is almost a miracle that 4,000,000 of negroes could be suddenly turned loose upon society with all their ignorance—with passions and prejudices sharpened and intensified by the sudden boon of freedom—without almost countless instances of violence and bloodshed. The whites impoverished and stung by defeat—the negroes set free to live with them as neighbors, invested with the ballot, and given the power to control the little remaining property of their former masters—the bare statement of these conditions is enough to show the natural and inevitable results. That there has been no more crime is a splendid tribute to the moderation of both races, and a high testimonial to their regard for law.

We are appalled sometimes at the frequency of thefts, arsons, rapes, murders and assassinations in our own section. Happily for the South as our local governments become more stable and society settles down to its normal conditions, these occurrences grow less and less frequent. With a rigid and impartial execution of the law, on all offences, a public sentiment that demands punishment for all infractions of the law, the condition of our society will still continue to improve. Compared with the five years immediately following the war the diminution in crime and violence has been most remarkable. Compared with the Northern States and taking into account the past and present relations of the two races in the South, the people of that section who complain so much of our lawlessness have no cause for self gratulation. But there is need—imminent, urgent need—in all sections of our country and among all classes, races and conditions, for a sentiment bold and aggressive that will at all times demand as the price of peace and order and the well being of society, the rigid enforcement of all laws. However little we may suffer from a just and impartial comparison with other sections, however truthfully we could commend to others the removal of the "beam," there is more of good to our section and to the common country in a resolute determination to uphold all laws looking to the peace and good order of society. We can better subserve the true interests of the State by persistent efforts to lessen crime and lawlessness which everywhere exists to excess than by making comparisons favorable to ourselves.

*Daily Arkansas Gazette* (Little Rock, Arkansas), January 7, 1883, 4
(https://www.newspapers.com/image/legacy/131014447/?terms=%22deadly%20weapons%22&match=1, last accessed Oct. 18, 2022)



**DEADLY WEAPONS.**

Judge Quarles, of Nashville, Tennessee, has announced from the bench that "after a certain time" he intends fining all persons $50 each, and adding a sixty days' jail sentence, on conviction of carrying deadly weapons. This is the course adopted by Judge Horrigan, of Memphis, and on appeal the supreme court of Tennessee affirmed the validity of the law. As a result few persons carry deadly weapons in Shelby county. The danger is too great; for the law is enforced rigidly, the prison sentence being suspended only in extreme cases. It is never remitted; and men who for years converted themselves into walking arsenals discover that they can pursue their ordinary vocations without fear that they may at any moment be called upon to defend their persons against assault.

The evils flowing from carrying deadly weapons cannot be materially decreased by fines alone. Imprisonment also is necessary, and in every state the laws should make both fine and imprisonment the penalty.

*Daily Arkansas Gazette* (Little Rock, Arkansas), May 13, 1883, 4 (https://www.newspapers.com/image/legacy/131023278/?terms=%22deadly%20weapons%22&match=1 , last accessed Oct. 18, 2022)

## MEN WHO CARRY DEADLY WEAPONS.

Davidson county, Tennessee, has a new criminal court judge, Allen by name, who was elected in the belief that he would impartially enforce the law. In his charge to the grand jury the other day he declared "it would make no difference of how high degree a man was, if he was convicted before him of carrying a pistol he would have to go to jail as well as pay a fine, and it simply came down to this: if he was bound to carry a pistol he was bound to go to jail. That only ruffians carried pistols and it gave them an unfair advantage over other citizens." By rigid enforcement of the law against deadly weapons in Shelby county, Tennessee, the late Judge L. B. Horrigan rendered the hip pocket useless as an arsenal. It was soon regarded more dangerous to carry a deadly weapon than to go unarmed. Consequently, the pistol and bowie-knife disappeared. The Arkansas statutes contain a law providing imprisonment as one penalty for carrying deadly weapons. Thus far the courts have not taught the classes ever ready to shoot or stab on the slightest provocation that for such as they the prison doors yawn. These classes have not learned that wholesome dread of the law necessary for their enforced good behavior. It is certainly time to begin their elementary instruction, and the judge who possesses the courage to do that which Horrigan did, and to which Judge Allen stands voluntarily pledged, will speedily find himself honored among men.

**Armed to the Teeth?**
Brown, Katelyn Case 3:17-cv-01017-BEN-JLB   Document 122-5   Filed 11/10/22   PageID.10902   Page 40 of
*Military Images;* Autumn 2015; 33, 4; ProQuest                                                              67
pg. 32



**MULTIPLE WEAPONS**
Props: VERY LIKELY

Details: A Union soldier is fully loaded with three revolvers, two Bowie knives and a Springfield rifle musket. The number of weapons would have been extremely cumbersome and impractical, especially on campaign.

*Ninth-plate tintype by an anonymous photographer. Liljenquist Family Collection, Library of Congress.*

# Armed to the Teeth?

**The Use of Prop Weapons in Civil War Studio Photography**

By KATELYN BROWN

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.



**"JEFF DAVIS AND THE SOUTH!" SIGN**
Prop: YES

**Details:** Henry Augustus Moore, a private in Company F of the 15th Mississippi Infantry, poses with a placard that leaves no doubt where his loyalties lie. Prop signs are rare in period photographs. The artillery short sword he holds may also be a prop.

*Sixth-plate ambrotype by an anonymous photographer. Liljenquist Family Collection, Library of Congress.*

Few people would dispute the accepted fact that battlefield photographers of the Civil War sometimes included props—even human beings—in their photographs.

Alexander Gardner famously moved corpses in his photographs at Gettysburg, and Thomas C. Roche posed his black assistant in several shots around Petersburg. As this was common practice in the field, who is to say that the studio portrait of the fierce-looking Civil Warrior armed to the teeth did not include props? While obvious instances of props used in the studio exist, such as the sign that proclaims "Jeff Davis and the South!" seen in several photographs in the Liljenquist Collection at the Library of Congress, a more challenging question to analyze involves the use of weapons as props.

Although virtually no literary evidence has come to light proving the use of weapons as props in the studio, one can reasonably conclude that they were employed.

Though a few collectors dismiss the concept of prop weapons as purely urban legend, some portraits appear to incorporate them. One example is the Bowie knife. These knives would have been practical for little more than hand-to-hand combat. Other instances include men armed with five or six guns, which would have proved too cumbersome to carry into a fight.

Still, further sources suggest that big knives and multiple guns were not necessarily props. Considerable evidence exists that whole regiments of volunteers in New England were gifted revolvers and knives by grateful hometown residents before they marched off to war. One can imagine that these fighting implements might have been carried into photographers' studios.

Once these soldiers were trained and embarked on active campaigns however, they quickly learned to pitch to the wayside all unnecessary items with little tangible value. This may have included knives and revolvers. Some had no choice: In several New England regiments, according to Ron Field in his forthcoming book *Rally Round the Flag*, the rank and file was ordered to turn in knives and revolvers, which were then stored in a safe place presumably to be returned at some later date.

Despite the added weight and questionable military value, it is also likely that some soldiers hung onto their knives and guns. Those who did use their weapons typically carried their knives in sheaths, and revolvers in a holster or with a cord attached to the stock and carried in a breast pocket. Portraits that show soldiers accoutered with sheaths, holsters and cords suggest that they are not props.

Muskets can be difficult to judge based on appearance alone. Some authorities suggest that the presence or a lack of a strap is significant: Those with straps were more likely to be weapons carried by the soldiers, and those without may have been props because they were cumbersome to carry without them. Others are dismissive of straps because they were only for convenience on the march, and even then, soldiers may have found it easier to carry the musket or rest it on a shoulder.

Another suggestive use of weapons as props includes images of privates that posed with officer swords or obsolete weapons. In his *Photography and the American Civil War*, Jeff Rosenheim features a portrait of Pvt. George M. Harper of Company A, "Cutt's Battery," 11th Battalion, Georgia Volunteer Artillery. Highlighting his poorly fitted jacket, the crooked pin on his kepi and militia officer's sword, Rosenheim concludes, "Everything the soldier wears or holds is a prop lent to him



**OBSOLETE SWORD**
Prop: YES

**Details:** The militia officer's sword held by George M. Harper of the 11th Battalion, Georgia Volunteer Artillery, clearly does not belong to him.

*Sixth-plate ambrotype by an anonymous photographer. David W. Vaughan collection.*

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

Compendium_Rivas
Page 487

**Armed to the Teeth?**

by a buddy or the photographer."

The location and time period of a portrait is also important when considering the possibility of a weapon as a prop. Small photography studios likely had little spare money to buy very many prop weapons. The large studios however, would have been able to advertise the availability of props to draw in customers who had a desire to look fierce. At the beginning of the war, when patriotic fervor ran high, soldiers would have wanted to send portraits home to their families. According to Field, "early war regiments often received some elements of uniform and clothing before they got their weapons and accouterments. It would make perfect sense for a hometown photographer to acquire a pistol, sword or saber to help make his military customers look more battle-ready."

Civil War photograph collector and Curator at the West Point Museum, Mike McAfee, also referenced a probable use of a weapon as a prop in a portrait of a volunteer from 1861, wearing a New York state militia jacket with a Hall rifle, an obsolete weapon at that time. McAfee observed that, "it was the photographer's and not the soldier's weapon." He strongly encourages anyone who studies portraits that can be linked to a specific regiment to learn which standard-issue weapons and other equipment the soldier received upon his enlistment. In this way, prop weapons can be separated from authentic arms.

This desire to appear menacing in a photograph appears among the writings by the soldiers. The idea of having their picture taken delighted many soldiers, particularly as the occasion provided a chance to show off their new uniforms and equipment. William Wiley of the 77th Illinois Infantry wrote of the soldiers' excitement during trips to town to have their pictures taken "with acoutraments and musket in hand in the atitude of attention and a revolver and a big knife [in] our belts." While Wiley's remark does not answer the question of props or not props, it does suggest that the soldier would go to great lengths to appear military.

> **"Though a few collectors dismiss the concept of prop weapons as purely urban legend, some portraits appear to incorporate them."**





**HOLSTERED REVOLVER**
**Prop: NO**

**Details:** A captain in the 43rd Battalion Virginia Cavalry, or Col. John Singleton Mosby's Rangers, Julian Prosser Lee appears dressed and equipped for active campaigning.

*Carte de visite by Daniel and David Bendann of Baltimore, Md. The late William A. Turner collection.*

**REVOLVER TUCKED INTO BELT**
**Prop: LIKELY**

**Details:** Capt. A. Boyd Hutchison of Company C, 49th Pennsylvania Infantry, left, stands at attention with a revolver prominently tucked into his waist belt. Its conspicuous location coupled with the lack of a holster suggests it did not belong to him. The same may be true for Albert Crockett, a private in Company E of the 30th Maine Infantry. The sword held by Crockett makes it even more likely that the revolver is a prop, as an edged weapon was not standard issue to infantry rank and file.

*Cartes de visite by anonymous photographers. Ronald S. Coddington collection.*

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

The family of Pvt. Chandler B. Gillam, of the 28th New York Infantry, requested that he have his picture taken with "his gun and other military fixings." Gillam did not possess a gun, and so was unable to send his likeness home. Such writings illustrate how profitable it would have been for photographers to have weapons on hand. If they did, the soldiers of Wiley's regiment could have piled themselves high with weapons, and Chandler Gillam would not have disappointed his family.

Profitability was also a key factor for Civil War photographers. According to collector David W. Vaughan, photographers at that time "perceived themselves as artists but were first and foremost entrepreneurs," and would have sought to make money through quality portraits. Just as with the backdrops in studios and staged scenes in the battlefield, the photographer's goal was an image that combined artistry and drama. The use of prop weapons in the studio would have added flair, and contributed positively in both a monetary and artistic way.

While weapons clearly enhanced the portraits, no definitive evidence exists that photographers supplied arms. Research has not yielded any photographer records or soldier accounts that include information regarding a specific instance where a photographer kept weapons on hand as props. A possibility always exists that the soldiers simply brought their own knives, pistols and swords. They may also have borrowed weapons from each other. Nevertheless, prop weapons were used in at least a few studios. This may not have been a common practice, but it is probable that a clever photographer, with an artistic eye and the spirit of an entrepreneur, employed this tactic with their patriotic, battle-ready customers. ∎

*Thanks to photograph collectors Rick Carlile, Ron Field, Mike Medhurst, Robert York, Mike McAfee, David W. Vaughan and Rick Brown who supplied their insight and knowledge on this subject.*

**References:** Ellen C. Collier, *Letters of a Civil War Soldier;* David Lowe and Philip Shiman, "Substitute for a Corpse," *Civil War Times* 49 (2010); Jeffrey L. Rosenheim, *Photography and the American Civil War;* Terrence J. Winschel, ed., *The Civil War Diary of a Common Soldier: William Wiley of the 77th Illinois Infantry.*

**Katelyn Brown** is a senior at Christopher Newport University majoring in American Studies and Economics. She has held archival internships working with historic photographs at the U.S. Department of State and The Mariners' Museum.





**OBSOLETE, NON-ISSUE GUN**
**Prop:** YES

**Details:** The antiquated Hall rifle held by this private attired in a New York State militia jacket is clearly a photographer's prop.

*Carte de visite by A.P. Hart of Elmira, N.Y. Michael J. McAfee collection.*

**SHEATHED KNIFE IN BELT**
**Prop:** NO

**Details:** The sheath that holds this Union soldier's knife, left, is clipped to his waist belt, a strong indicator that the soldier carried or intended to carry it with him in the field. His revolver, by contrast, appears not to have a holster. It may be hidden from view or perhaps carried in a pocket. It is also possible that the revolver may have not belonged to him.

*Sixth-plate tintype by an anonymous photographer. Brian Boeve collection.*

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**Armed to the Teeth?**

## MUSKET SLING
**Prop: NOT LIKELY**

**Details:** A private from the 64th New York Infantry sits with his musket resting against his shoulder. Authorities are divided on whether or not the presence of the sling on his musket is indicative of a prop. In this case, his other equipment, which includes a knapsack and blanket, haversack, canteen and a cartridge box with eagle plate, suggests that in fact the musket is his own. Research into the types of weapons issued to this regiment indicates that his musket is likely a Belgian rifle carried by some companies for a brief period early in the war.

*Sixth-plate tintype by an anonymous photographer. Mike Shoemaker collection.*







## REVOLVER IN HAND
**Prop: UNCERTAIN**

**Details:** The Yankee sergeant, far left, may have been gifted the revolver he holds. If it belonged to him, the lack of a holster suggests he might have left the gun behind before he marched off to war. However, it is possible he may have carried it in a coat pocket. The private, left, who holds his cocked revolver may have also stored his in a pocket. The presence of a second revolver in a holster secured to his waist belt suggests that he owned both guns.

*Eighth-plate and sixth-plate tintypes by anonymous photographers. Liljenquist Family Collection, Library of Congress.*

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

*Newport News* (Newport, Arkansas), quoted in *Daily Arkansas Gazette* (Little Rock, Arkansas), April 27, 1875, 2 (https://www.newspapers.com/image/legacy/131011624/?terms=%22deadly%20weapons%22&match=1, last accessed Oct. 18, 2022)

## STACK ARMS.

On the 6th of May, A. D. 1875, the law prohibiting the wearing or carrying of side arms, such as pistols, knives, sword canes and any other deadly weapons, goes into effect, and we have the word of the governor and promise of our able and efficient prosecuting attorney, that this law will be rigidly enforced, and those who violate its provisions punished to the extent of the law. This, in our opinion, is about the best law that has ever been enacted in this state. Such a statute, if it had been passed and made a law in 1836, when Arkansas was first made a state, would have saved the lives of thousands of good men, who have fallen victims to the vice of carrying deadly weapons, or from the results and natural consequences thereof. About the most disgusting picture we meet is that of a great brawny, brawling, strapping, fussy fellow, with great ugly pistols strapped across his rump, as if that portion of his body was disorderly, and must needs be kept under guard and constant subordination. We frequently have seen these sons of thunder strutting around as though they were in the perils of Five Points, or were hunting panthers in the jungles of Florida. We hope now we have seen the last of this class. Remember the day, May 6, 1875. Stack your arms and go to work.—[Newport News.

Good advice this. It is time the practice of carrying deadly weapons was stopped, and the officers should make it their duty to see that this law is rigidly enforced. Nothing has given Arkansas such unenviable notoriety as this practice of her citizens. The moral weight of every community should assist in a rigorous prosecution of all parties violating this law. The practice of great overgrown parties carrying six shooters belted around their bodies, with bowie knives thrown in, is one that should and will be stopped if the officers only do their duty. "Stack arms," boys.

# OTHER SOURCES



(https://firearmslaw.duke.edu)



(https://law.duke.edu/)

| Search this website |  |

# Search the Repository

Welcome to the Repository of Historical Gun Laws, a searchable database of gun laws from the medieval age to 1776 in England and from the colonial era to the middle of the twentieth century in the United States. This Repository is intended as a resource for scholars and practitioners interested in historical laws concerning firearms and other similar weapons. Although the Repository seeks to be substantial, it is not comprehensive. Conscientious users of this Repository should supplement their results with further legal and historical research.

Questions or comments about the repository can be sent to the following email: firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu).

Search

Search by Keyword

Subjects

**Brandishing  (51)**
**Carrying Weapons  (288)**
**Dangerous or Unusual Weapons  (115)**
**Dueling  (38)**

Year Law was Published

| All Years |
|---|

Jurisdictions

☐ **Alabama (33)**

☐ **Alaska (2)**

☐ **Arizona (17)**

☐ **Arkansas (20)**

☐ **California (33)**

☐ **Colorado (19)**

☐ **Connecticut (40)**

☐ **Delaware (41)**

☐ **English Law (22)**

☐ **Florida (35)**

☐ **Georgia (48)**

☐ **Hawaii (33)**

☐ **Idaho (22)**

☐ **Illinois (37)**

☐ **Indiana (39)**

☐ **Iowa (36)**

☐ **Kansas (19)**

☐ **Kentucky (32)**

☐ **Louisiana (33)**

☐ **Maine (22)**

☐ **Maryland (40)**

☐ **Massachusetts (65)**

☐ **Michigan (36)**

☐ **Minnesota (23)**

☐ **Mississippi (34)**

☐ **Missouri (38)**

☐ **Montana (17)**

- ☐ **Nebraska (20)**
- ☐ **Nevada (12)**
- ☐ **New Hampshire (26)**
- ☐ **New Jersey (52)**
- ☐ **New Mexico (16)**
- ☐ **New York (65)**
- ☐ **North Carolina (45)**
- ☐ **North Dakota (24)**
- ☐ **Ohio (41)**
- ☐ **Oklahoma (19)**
- ☐ **Oregon (36)**
- ☐ **Pennsylvania (69)**
- ☐ **Private Colleges and Universities (0)**
- ☐ **Rhode Island (41)**
- ☐ **South Carolina (27)**
- ☐ **South Dakota (15)**
- ☐ **Tennessee (50)**
- ☐ **Texas (45)**
- ☐ **Utah (21)**
- ☐ **Vermont (23)**
- ☐ **Virginia (57)**
- ☐ **Washington (39)**
- ☐ **Washington, D.C. (1)**
- ☐ **West Virginia (20)**
- ☐ **Wisconsin (35)**
- ☐ **Wyoming (24)**

All Cities ⌄

Submit

Reset

## In This Section

- Search the Repository (https://firearmslaw.duke.edu/repository/search-the-repository/)
- How to Use the Repository (https://firearmslaw.duke.edu/repository/how-to-use-the-repository/)
- About the Repository (https://firearmslaw.duke.edu/repository/about-the-repository/)
- Copyright & Reuse (https://firearmslaw.duke.edu/repository/copyright-reuse/)

-  (https://twitter.com/dukefirearmslaw)

- (https://www.youtube.com/playlist?list=PLPllY2puNnqYUNnmXwbGnQFKMSaLSVDoq)

- Home (https://firearmslaw.duke.edu/)
- About (https://firearmslaw.duke.edu/about/)
- Blog (https://firearmslaw.duke.edu/secondthoughts/)
- Videos (https://firearmslaw.duke.edu/videos/)
- Events (https://firearmslaw.duke.edu/events/)
- Repository of Historical Gun Laws (https://firearmslaw.duke.edu/repository/)
- Teaching Resources (https://firearmslaw.duke.edu/teaching-resources/)
- Conferences (https://firearmslaw.duke.edu/conferences/)

Duke Center for Firearms Law | 210 Science Drive, Durham, NC 27708 | firearmslaw@law.duke.edu (mailto:firearmslaw@law.duke.edu)

Questions or comments about the Repository of Historical Gun Laws can be sent to gunlaws@law.duke.edu (mailto:gunlaws@law.duke.edu).

Copyright © 2022. All rights reserved. Website designed by Addicott Web (https://www.wordpress-web-designer-raleigh.com/).

# BOOKS



*Thomas Henshaw*

# THE HISTORY OF WINCHESTER FIREARMS

## 1866–1992

*Sixth Edition Updated*

To open the gun, lift the hammer to full cock and push forward the firing pin, pulling back the action slide.

The M/93 was the first shotgun with a sliding forearm used by Winchester.

## GENERAL SPECIFICATIONS OF THE M/93 SHOTGUN

| | |
|---|---|
| TYPE | Slide action repeating shotgun, hammer, tubular magazine, solid frame. |
| STYLES | Standard style only. |
| BARRELS | Made of rolled steel. |
| | 30-inch and 32-inch, full choke. 30-inch full choke was standard. |
| | Modified choke or cylinder bore barrels were furnished on special order. |
| | Damascus 3 blade and 4 blade barrels were furnished at additional cost. |
| MAGAZINE | Tubular magazine, holding 5 shells. |
| CHAMBER | 12 gauge, 2⅝-inch shell only. |
| STOCK | Plain wood, not checkered, pistol grip (English type), hard rubber butt plate. |
| | Also furnished in fancy wood, checkered or not checkered, special dimension stocks; etc., at extra cost. |
| SLIDE HANDLE | Plain wood, rounded with semi-circular notches. |
| WEIGHT | Standard 12 gauge, 30-inch—about 7¾ lbs. |
| SERIAL NUMBERS | M/93 shotguns were serially numbered from 1 up. Located on underside of receiver near forward end. |

The manufacture of this model was discontinued in 1897. About 34,050 were made.

### Special Note

The Model 1893 shotgun was not an entirely satisfactory model. Mechanical weakness developed with the use of shells loaded with smokeless powders. Consequently the model was withdrawn from the market, revamped, and reissued later as the Winchester Model 1897 shotgun.

The Model 1893 was followed by the Winchester Model 1894 rifle and was succeeded by the Winchester Model 1897 shotgun.

# MODEL 1894 REPEATING RIFLE



*38. MODEL 1894 RIFLE, TAKEDOWN*

[38]



59.  MODEL 1894 RIFLE, HALF MAGAZINE

60.  MODEL 1894 CARBINE, EARLY STYLE

60A.  MODEL 1894 MUSKET WITH TRIANGULAR BAYONET
(EXPERIMENTAL ONLY)

60B.  MODEL 1894 MUSKET WITH SABER BAYONET
(EXPERIMENTAL ONLY)

61.  MODEL 1894 CARBINE (CURRENT STYLE)

62.  MODEL 1894 ANTIQUE CARBINE (CURRENT STYLE)

[59]

Compendium_Rivas
Page 500



62a. *MODEL 1994 CLASSIC*

62b. *MODEL 94 XTR CARBINE (1979)*

62c. *ONE-OF-ONE-THOUSAND MODEL 94*

62d. *BIG BORE 94 XTR*

62e. *MODEL 94 TRAPPER*

With the development of successful smokeless powder for use in metallic cartridges, Winchester purchased U. S. Patent 524,702, granted to John M. Browning on August 21, 1894, for a lever action repeating rifle. This new model was announced in the November 1894 catalog as the Winchester Repeating Rifle Model 1894. The introductory words in this announcement were:

> We believe that no repeating rifle system ever made will appeal to the eye and understanding of the rifleman as this will and that use will continue to warrant first impressions.

These were prophetic words. This lever action model soon became famous throughout the world. With but few minor changes in its construction, it has been manufactured continuously, in various styles, for over seventy years.

The Model 1894 was the first lever action repeating rifle model placed on the market that was designed especially for cartridges loaded with smokeless powder. The new smokeless powder calibers were being developed for the new rifle, but there was a delay. So Winchester first announced the Model 1894, in solid frame style, chambered for the popular 32-40 and 38-55

[40]

black powder cartridges. Plain and fancy sporting rifles were manufactured with 26-inch octagon or round barrel, as well as in carbine style with 20-inch round barrel.

Factory records show that the first delivery of Model 1894 rifles to warehouse stock was made on October 20, 1894.

The two brand new, strictly smokeless cartridges, the 25-35 Winchester and the 30-30 Winchester, were included in the August 1895 catalog, with chamberings in a sporting model having a 26-inch round nickel steel barrel. This was Winchester's first listing of nickel steel barrels as standard equipment.

## GENERAL SPECIFICATIONS OF THE M/94 RIFLE

| | |
|---|---|
| TYPE | Lever action repeating rifle, hammer, tubular magazine, solid frame and takedown. Carbines were made in solid frame only. Takedown style was announced in February 1895. |
| STYLES | Sporting Rifle. Fancy Sporting Rifle. Extra Light Weight Rifle. Carbine. Elaborately ornamented M/94s were also furnished at special prices. |
| BARRELS | Sporting Rifle, 26-inch, round, octagon, or ½ octagon. Extra Light Weight Rifle (1897 to 1918), 22-inch or 26-inch, round. Carbine, 20-inch, round. Extra length barrels up to 36-inch were furnished at extra cost until March 1908, when this practice was discontinued. Barrels of less than 20 inches were also furnished. |
| MAGAZINES | 1/2, 2/3, and full length tubular magazines were furnished. Magazine capacities: Sporting Rifle, full magazine—8 cartridges. Sporting Rifle, takedown, ½ magazine—4 cartridges. Extra Light Weight Rifle, ½ magazine—3 cartridges. Carbine, full magazine—6 cartridges. Carbine, ½ magazine—4 cartridges. |
| TRIGGER | Plain type was standard. Set triggers were furnished as special. |
| CHAMBERS | 32-40 and 38-55, November 1894. 25-35 Winchester and 30-30 Winchester, August 1895. 32 Winchester Special, June 1902. 44 Magnum, January 1967. 375 Winchester, September 1979. |
| STOCKS | Sporting Rifle, rifle type butt, pistol grip or straight grip, stock and forearm of plain walnut. Fancy Sporting Rifle, rifle type butt, pistol grip, fancy wood, checkered. Extra Light Weight Rifle, shotgun butt, straight grip. Fancy wood was special. Carbine, carbine type butt (changed to shotgun type butt stock in April 1937), straight grip. Extras such as shotgun butt stock with either metal or rubber butt plate, special dimension stock, straight or pistol grip were also furnished at extra cost. |
| SIGHTS | Dovetail front, open rear. Various type sights were supplied as extras. A front ramp sight base for M/94 carbines was authorized on Sept. 25, 1931. |
| WEIGHTS | Sporting Rifle, 26-inch round barrel, full magazine—7¼ to 7¾ lbs. Fancy Sporting Rifle, 26-inch octagon barrel, full magazine—7½ to 7¾ lbs. Extra Light Weight Rifle, 22-inch round barrel, half magazine—7 to 7¼ lbs. Carbine, 20-inch round barrel, full magazine—5¾ to 6¼ lbs. |
| SERIAL NUMBERS | M/94s are serially numbered, from 1 up, on the underside of the receiver near the forward end. |

[41]

Copyrighted material

The addition of the new, specially developed smokeless powder cartridges—the 25-35 Winchester and the 30-30 Winchester—in a specially designed new rifle model having a nickel steel barrel, was a radical development because smokeless powders were then in their infancy and nickel steel barrels were new as standard equipment. Prior to this addition, the only rifle furnished by Winchester for use with smokeless powder was the Single Shot model chambered for the 30-40 U. S. Army (30-40 Krag), the cartridge used in the Krag-Jorgensen, bolt action, repeating rifle that had been adopted by the United States Army.

The Winchester Model 1894 has been called the "Klondike Model" probably because of its popularity in the Klondike Gold Rush of 1898.

The Model 1894 never had casehardened receivers as standard. However, according to early records a small number were casehardened. From 1916 until 1963, levers were listed as casehardened, and hammers by this process from 1916 to 1934. The sling (saddle) ring was omitted in 1925.

Manufacture of all M/94 rifles and the 25-35 Winchester caliber carbine was discontinued in 1936. Carbines chambered for the 30 Winchester (30-30) and for the 32 Winchester Special cartridge were continued in the line. The 25-35 Winchester was reinstated in 1940 and discontinued in 1950.

The Model 1894 was the first sporting gun to pass the 1,000,000 mark. The millionth 94, chambered for the 30-30 Winchester cartridge and appropriately engraved, was presented in 1927 to President Calvin Coolidge. The 1½ millionth Model 94 was presented to President Harry S. Truman on May 8, 1948. The 2 millionth was presented to President Dwight Eisenhower in 1953. The 2½ millionth 94 was assembled in 1961.

In 1964, to commemorate the 70th year of production of the Model 94, a variation of the carbine was introduced in 30-30 caliber only. It has a casehardened receiver with scroll decoration, brass saddle ring, and brass-plated spring cover.

In January 1967, Winchester announced that the Model 94 would be made in a "Classic" version, reflecting some of the popular specifications incorporated or brought back in the Centennial '66 Commemorative of the previous year. The Model 94 Classic came in both rifle (26-inch barrel) and carbine (20-inch barrel) models. The Classic model features octagonal barrels, steel butt plates, semi-fancy American walnut stocks, old-fashioned front sights and scroll work on the receiver. It was chambered for 30-30 Winchester only and was last listed in 1970. A saddle ring was packed with the gun. It was introduced as a milestone in the company's history as production passed 3,000,000 for the Model 94 since 1894.

Also in 1967, the Model 94 Magnum carbine, chambered for eleven 44 Magnum cartridges (including one in chamber), was first listed in the catalog, but distribution did not take place until September 1968 because of production difficulties. Although the magnum version was not listed in the 1968 catalog, it was again listed in 1969 through 1971 and finally dropped in 1972. The 32 Winchester Special was last listed in 1973.

The standard Model 94 was renovated and a number of improvements incorporated in its design in 1971. A new steel carrier of sturdier design replaced the earlier lighter-weight carrier, providing smoother, more positive feeding of cartridges from magazine to chamber. Improved linkage, achieved through a redesigned lever camming slot, resulted in easier and more rapid lever action. A new improved loading port cover was added to facilitate more rapid loading of cartridges.

In 1978, the model 94 XTR carbine, an upgraded version of the world's most popular sporting rifle, was added to the line. The Model 94 XTR has a deep blue, highly polished finish on all external metal parts and cut checkering like that available on higher-priced Winchester guns. Both the forearm and the buttstock are of American walnut, checkered and highlighted with a satin finish that helps shield the wood against weather and hard use. The Model 94 Standard and the Model 94 Antique, featuring decorative scrollwork on a marbled receiver, a brass-plated loading gate, and classic saddle ring, were also offered in 1980.

In 1979, a limited issue, highly engraved Model 94 carbine, the "One-Of-One-Thousand," was

[42]

introduced for serious European collectors. The stock and forearm have a hand-rubbed oil finish and are hand checkered. The left side of the receiver is engraved with the Winchester Horse 'n' Rider logo with gold border: the right side shows a stag roaring over a dead stag, with gold border. The barrel and muzzle bands are gold. The barrel carries two inscriptions in gold inlay: "Winchester" on the left side and "One-Of-One-Thousand" on the top. The words "One-Of-One-Thousand" also appear in gold inlay on the buttplate. Only 250 of these guns were made. Serial numbers end in 000 and there is no prefix. The gun also carries an Italian serial number. Each One-Of-One-Thousand receiver is signed "Bottega C. Giovanelli."

Also in 1979, the Big Bore 94 XTR carbine, a new version of the most popular lever-action center fire rifle ever produced, was introduced. The new caliber carbine handles 375 Winchester cartridge, a new, larger caliber designed for added knockdown power on woods game of the whitetail deer class or larger.

Outwardly, the Big Bore 94 XTR carbine has the same traditional configuration as its 30-30 caliber counterpart. However, the side panels of the steel forged receiver have been shortened to strengthen the locking area behind the bolt to accommodate the more potent 375 Winchester cartridge. The trigger and hammer mechanism in the lower tang assemble employ a coil spring rather than a leaf spring, reducing the levering force and resulting in smoother operating action. All of the gun's exposed metal parts have the highly polished, durable XTR finish. The American walnut stock and forearm feature fine-line-cut checkering as well as the new Winchester XTR wood finish. The stock is fitted with a classic red, solid-rubber recoil pad with a black spacer.

Equipped with a hooded metal ramp front sight and a semi-buckhorn rear sight, the gun has a right hand, one-turn-in-12-inch rate of twist. With an overall length of 37-¾ inches, the Big Bore weighs approximately 6-⅛ pounds. It magazine has a capacity of six cartridges.

In 1979, a Winchester Model 94 carbine in 30-30 caliber bearing serial number 3,500,000 was sold at auction in Las Vegas for $18,000.00. The price is believed to be a record for a factory-new Winchester center fire rifle.

In 1980, a new short-barreled Trapper version of the Model 94 in 30-30 caliber was added to the line. The Model 94 Trapper, named for its 16-inch barrel that was a favored length among woodsmen around the turn of the century, offers the time-proven features of the standard Model 94, plus being even faster-handling and lighter in weight. With an overall length of 33-¾ inches, the Trapper weighs approximately 6-⅛ lbs. It has a blade front sight and its full length magazine tube holds five cartridges.

As of January 1980, more than 4,700,000 Model 94 rifles and carbines had been manufactured in Winchester's New Haven plant.

The Model 1894 is unquestionably the most successful center fire lever action model ever produced by Winchester.

The Model 1894 rifle was followed by the Winchester Model 1895 rifle, and was succeeded in 1924 by a revamped rifle, the Winchester Model 55. The Model 1894 Carbine is still in production.

Since the sale of the New Haven Arms plant to U.S. Repeating Arms Company in mid 1981 several changes have been made to the Model 94 and it has been chambered for additional calibers.

MAJOR CHANGES:

    1983 — The angle eject receiver was introduced.
    1984 — A hammer block system was incorporated.
    1992 — Cross bolt hammer stop was introduced.

CHAMBERS:

| | |
|---|---|
| 1983 — 307 Winchester | 1985 — 45 Colt |
| — 356 Winchester | 1986 — 44-40 Winchester |
| 1984 — 38-55 Winchester | 1991 — 44 S&W Special |
| — 7x30 Waters | 1992 — 357 Magnum |
| — 444 Marlin | |

Other changes include model variations with laminated hardwood stocks and forearms such as Model 94 Win-Tuff™ introduced in 1987. Trapper Model with large hoop lever in 1984 and changed to standard lever in 1985. Wrangler Model in 1985 with large hoop lever and roll engraved receiver in 1985 and discontinued in 1986.

Ranger Series with hardwood stock and forearm in 1985.

See pages 267 and 268 for additional information and photos.

# CARTRIDGES OF THE WORLD

**A COMPLETE AND ILLUSTRATED REFERENCE FOR OVER 1500 CARTRIDGES**

## 11th Edition

By Frank C. Barnes / Edited by Stan Skinner

©1965, 1969, 1972, 1980, 1985, 1989, 1993, 1997, 2000, 2003, 2006 by
Frank C. Barnes and
Krause Publications, Inc.

Published by



**Gun Digest Books**

*An imprint of F+W Publications*
700 East State Street • Iola, WI 54990-0001
715-445-2214 • 888-457-2873
*www.gunlistonline.com*

Our toll-free number to place an order or obtain a free catalog is 800-258-0929.

All rights reserved.
No portion of this publication may be reproduced or transmitted in any form or by any means,
electronic or mechanical, including photocopy, recording, or any information storage and retrieval system,
without permission in writing from the publisher, except by a reviewer who may quote brief passages in a critical
article or review to be printed in a magazine or newspaper, or electronically transmitted on radio, television, or the Internet.

Library of Congress Catalog Number: 2005906863
ISBN 13: 978-0-89689-297-2
ISBN 10: 0-89689-297-2

1st Edition: 1965
2nd Edtion: 1969
3rd Edition: 1972
4th Edition: 1980
5th Edition: 1985
6th Edition: 1989
7th Edition: 1993
8th Edition: 1997
9th Edition: 2000
10th Edition: 2003
11th Edition: 2006

Designed by Patsy Howell
Edited by Ken Ramage

Printed in the United States of America

Chapter 2



# 44-40 Winchester
# (44 WCF, 44 Winchester)

**Historical Notes** This was the original cartridge for the famous Winchester Model 1873 lever-action repeating rifle. By 1878, Colt began offering revolvers in 44-40 caliber. At one time or another, just about every American arms manufacturer has offered some kind of gun chambered for this cartridge. The Colt-Burgess lever-action rifle of 1883 was made for the 44-40 and so was the 1885 Colt Lightning pump-action rifle. The Remington Model 14 1/2 pump-action used it, as did the Winchester 92 and Marlin 94, both lever-action repeaters. Most of the single-shot rifles made in the United States had a 44-40 model at one time or another. In Spain, there was a copy of the Winchester Model 92 in 44-40 caliber manufactured for police and civil guard use. No American-made rifles have chambered the round since 1937, but Colt revolvers retained it until 1942. Several foreign-made replicas of the Henry Carbine and the Winchester Model 66 and 73 are currently available in 44-40, as are new revolvers.

Winchester once loaded a 217-grain bullet in two separate headstamps: 44 C.L.M.R., for the Colt Lightning Magazine Rifle, and 44-40 for Marlin rifles. They also offered a 34-grain blackpowder load behind a 115-grain bullet for the Marble Game Getter rifle, which was headstamped 44 G.G.

**General Comments** The 44-40 is one of the all-time great American cartridges. It is said that it has killed more game, large

and small, and more people, good and bad, than any other commercial cartridge ever developed. In its original blackpowder loading, it was the first effective combination cartridge that could be used interchangeably in rifle or revolver, and was a great favorite in the early days of the American West.

With proper handloads used in strong rifles, the 44-40 can safely propel the 200-grain jacketed bullet at 1,800 fps. Compared to the standard 30-30 load with a 170-grain bullet at about 2,100 fps, this is a superior combination against deer at short range. It was once offered in a high-velocity loading specifically designed to take advantage of the Model 92 Winchester's strength. Like many other high-velocity loadings of yesteryear, it had to be discontinued because certain types just insisted on chambering anything that would fit in whatever gun was at hand. The 44-40 became obsolete in the revolver with the advent of the 357 and 44 Magnums, and in the rifle by the 30-30 and similar cartridges that have a flatter trajectory at ranges beyond 100 yards. Present factory loads by Remington and Winchester are intended for revolvers and it is necessary to handload in order to get top performance from the rifle. Many 44-40 rifles have been rebarreled for the 44 Magnum. The rise of Cowboy Action Shooting has rekindled the 44-40's popularity.

### 44-40 Winchester Loading Data and Factory Ballistics

| Bullet (grains/type) | Powder | Grains | Velocity | Energy | Source/Comments |
|---|---|---|---|---|---|
| 180 SP | 2400 | 18 | 1250 | 625 | Hornady |
| 180 SP | SR4756 | 11 | 1150 | 529 | Hornady |
| 180 SP | 2400 | 16.5 | 1000 | 400 | Hornady |
| 180 SP | Unique | 10.4 | 1150 | 529 | Hornady |
| 200 SP | IMR 4227 | 20 | 1100 | 537 | Hornady |
| 200 SP | 2400 | 15.3 | 1000 | 444 | Hornady |
| 200 SP | Unique | 9.5 | 1050 | 490 | Hornady |
| 200 SP | FL | | 1190 | 629 | Factory load |



Uberti Iron Frame Henry

.065″   40°
.525″   .4711″   .4571″   .443″
.928″
1.017″
1.305″

Compendium_Rivas
Page 507

# 45-70 Government (45-70-330/45-70-350/ 45-70-405/45-70-500)



**Historical Notes** Adopted by the U.S. military in 1873 with the single shot "Trapdoor" Springfield rifle, this continued as the official service cartridge for 19 years. It was replaced in 1892 by the 30-40 Krag. The 45-70 Government was also a popular cartridge for sporting use and many repeating and single-shot rifles were chambered for it — the Remington rolling block, Remington-Keene, Remington-Lee, Marlin Model 81, Winchester Model 86 and Hotchkiss, plus many others. Though the Krag officially replaced the 45-70 in 1892, all volunteer Spanish-American War regiments — with the reported sole exception being Teddy Roosevelt's Rough Riders — were equipped with the Trapdoor 45-70. Many state militias were armed with the 45-70 Springfields well beyond 1900. American companies dropped the 45-70 as a rifle chambering in the early 1930s. However, it has staged a major comeback in popularity, and currently Marlin, Ruger and Browning chamber rifles for the 45-70. Winchester once loaded many versions of the basic 45-70 case with different bullet weights, shapes and blackpowder charges. They also loaded one variant of the 45-70-405 Winchester load expressly for the Marlin 1881 lever-action rifle. It featured a differently shaped 405-grain bullet and was headstamped 45-70 Mar.

**General Comments** "Old soldiers never die," and apparently neither do old military cartridges. The 45-70 has been with us for more than 125 years and is still very much alive. As a short-range cartridge for anything from deer to grizzly bear, the 45-70 will hold its own with most of our more modern developments. Its greatest fault is the curved trajectory that makes it difficult to place shots beyond 150 yards with any certainty. Unfortunately, the U.S. Springfield and most of the other blackpowder rifles won't stand pressures over 25,000 psi or so. This prevents using heavy loads of smokeless powder. In late Model 86 Winchester or other smokeless powder rifles, the 45-70 can be loaded to deliver very impressive performance on the heaviest species of big game. Winchester, Remington, Federal, Cor-Bon and Buffalo Bore offer 45-70 ammunition.

## 45-70 U.S. Government Loading Data and Factory Ballistics

| Bullet (grains/type) | Powder | Grains | Velocity | Energy | Source/Comments |
|---|---|---|---|---|---|
| 300 HP | IMR 4198 | 34 | 1400 | 1306 | Hornady, Sierra |
| 300 HP | IMR 4227 | 29 | 1400 | 1306 | Hornady, Sierra |
| 300 HP | IMR 3031 | 43 | 1400 | 1306 | Hornady |
| 300 HP | SR 4759 | 27 | 1400 | 1306 | Hornady |
| **Loads for Modern Smokeless Powder Rifles Only** | | | | | |
| 300 HP | IMR 4198 | 46 | 2000 | 2665 | Hornady |
| 300 HP | IMR 4227 | 43 | 2100 | 2938 | Sierra |
| 350 Hornady JFP | H4198 | 54.0 | 2191 | 3730 | Hodgdon |
| 400 SP | H4198 | 50.5 | 2002 | 3555 | Hodgdon |
| 400 SP | IMR 3031 | 54 | 1800 | 2878 | Speer |
| 300 SP | FL | | 1880 | 2355 | Factory load |
| 405 SP | FL | | 1330 | 1590 | Factory load |



# MARLIN FIREARMS

## A History of the Guns and the Company that Made Them

Lt. Col. William S. Brophy, USAR, Ret.

Stackpole Books

Copyright © 1989 by Lt. Col. William S. Brophy, USAR, Ret.

Published by
STACKPOLE BOOKS
5067 Ritter Road
Mechanicsburg, PA 17055

All rights reserved, including the right to reproduce this book or
portions thereof in any form or by any means, electronic or mechanical,
including photocopying, recording, or by any information storage and
retrieval system, without permission in writing from the publisher
All inquiries should be addressed to Stackpole Books, 5067 Ritter
Road, Mechanicsburg, Pennsylvania 17055

Printed in the United States of America

10  9  8  7  6

## OTHER BOOKS BY THE AUTHOR

*L.C. Smith Shotguns*
*The Krag Rifle*
*Specifications and Plans of the L.C. Smith Shotgun*
*Springfield Armory Annual Reports 1901-1948*
*The Springfield 1903 Rifles*

*Photographs in this book, unless otherwise noted, are by the author.*

The Marlin Firearms Company, the writer, and the publisher
accept no responsibility for any injury or death as a result of
the use of any information in this book. All of the details
furnished here are for historical purposes and are not to be
used for the purpose of handloading or manufacture of am-
munition.

**Library of Congress Cataloging-in-Publication Data**
Brophy, William S.
    Marlin Firearms : a history of the guns and the company that made
them / William S. Brophy.
        p.   cm.
    Bibliography: p.
    ISBN 0-8117-0877-2
    1. Marlin Firearms Company—History.  2. Firearms industry and
trade—Connecticut—History.  I. Title.
TS533.3.C8B76   1989
338.7'683'09'097468—dc19
                                                88-38768
                                                CIP

# Semiautomatic Rifles

## DESCRIPTIVE SUMMARIES

### Caliber .22

A few years after Frank Kenna, Sr., acquired The Marlin Firearms Company, he introduced a new type of mechanism that the company had not yet manufactured in a sporting firearm. Remington, Winchester, and others had marketed blowback, semiautomatic (autoloading) rifles for many years. Up to 1930, Marlin had only made prototypes of autoloaders similar to the ones others already had on the market. In 1931, Marlin did introduce a new caliber .22 semiautomatic that had a clip magazine. Called the Model 50, the new rifle was the first in a long line of semiautomatic .22s that became the most popular .22s in the world. The sequence of the models and variations of each model produced by Marlin from 1931 to 1988 has been as follows:

| Dates | Model | Type |
|---|---|---|
| 1931–1935 | Model 50 | clip magazine |
| 1936–1940 | Model A1 | clip magazine |
| 1941–1946 | Model A1C | clip magazine |
| 1941–1946 | Model A1DL | clip magazine |
| 1948–1961 | Model 89C | clip magazine |
| 1948–1956 | Model 88C | tubular magazine in butt |
| 1953–1956 | Model 88DL | tubular magazine in butt |
| 1957–1959 | Model 98 | tubular magazine in butt |
| 1959–1960 | Model 99 | tubular magazine |
| 1960–1964 | Model 99DL | tubular magazine |
| 1961–1978 | Model 99C | tubular magazine |
| 1962–1965 | Model 989 | clip magazine |

| Dates | Model | Type |
|---|---|---|
| 1964–1978 | Model 99M1 | tubular magazine |
| 1965–1978 | Model 989M2 | clip magazine |
| 1968–1970 | Model 49 | tubular magazine |
| 1975–1978 | Model 49DL | tubular magazine |
| 1979 | Model 40 | tubular magazine |
| 1960–1982 | Model 60G and Model 60 Glenfield | tubular magazine |
| 1983 to date | Model 60 Marlin | tubular magazine |
| 1968 | Model 65 Glenfield | tubular magazine |
| 1967 to date | Model 70 Glenfield | clip magazine |
| 1967 to date | Model 75 Glenfield | tubular magazine |
| 1983 to date | Model 70 Marlin | clip magazine |
| 1979 to date | Model 990 | tubular magazine |
| 1979 to date | Model 995 | clip magazine |
| 1986 to date | Model 70P | "Papoose" clip magazine |
| 1986 to date | Model 70HC | 25-shot clip magazine |

**Model 50, Caliber .22, Autoloading Rifle (1931–1935).** The Model 50 rifle was described by Marlin as follows:

> There is something fascinating about shooting an autoloading rifle that grows on you the more the gun is used. No grasp handle to operate but simply hold your aim with rifle to shoulder and pull the trigger.

300

Compendium_Rivas
Page 511

Semiautomatic Rifles



*Model 50 autoloading .22 rifle.*

# JUST OUT — NEW MARLIN

**MODEL 50**
Price $16.85
Extra Clips $1.00 Each

**For Regular and High Speed .22 Ammunition**
Model 50 is a .22 caliber bolt action autoloading rifle for the
regular .22 caliber long rifle ammunition. Six shots. 22-inch
round barrel. Nicely shaped and finished one piece pistol grip
butt-stock. Rubber butt plate. Rocky mountain rear and ivory
bead front sights. Positive trigger safety.

# 22 CALIBER AUTOLOADING RIFLE

The most fascinating rifle to shoot. Simply hold your aim with rifle to shoulder and pull the trigger. Six
shots just as fast as you can operate the trigger. Just the rifle for shooting rabbits, squirrels, and for snap shoot-
ing. Ideal for trappers and a wonderful companion to take along on your vacation. Nothing like it to have in
the home and on the farm.

*Marlin 1932 ad for the Model 50 rifle.*

Simple Construction – This rifle is so constructed that it
can be used continuously without cleaning the action, but if
it becomes necessary to do this the action being so simple in
construction can be taken apart in a few moments with the
aid of only a screwdriver. There is no separate hammer, firing
pin or carrier in this rifle as these parts are built into a one
piece action block. Practically nothing to get out of order or
break – all parts are made of Special Steel, guaranteeing long
life.

Barrel – Bored and rifled to give the same accuracy for
which Marlin Rifles have long been famous.

This latest addition to the Marlin line is a worthy achieve-
ment and a gun anyone would always feel proud to own.

The catalog's specifications for the new rifle were as follows:

A .22 caliber bolt action autoloading rifle; for regular long
rifle and new high speed loads: 6 shots, 22-inch round barrel;
weight about 5 pounds; nicely shaped and finished one piece
pistol grip butt-stock; rubber buttplate, Rocky Mountain
rear and ivory bead front sights. Positive trigger safety.

For regular .22 caliber long rifle cartridges and adjustable
for the new high speed loads by fitting a simple balancing
block that is furnished with each rifle which can be put in by
anyone outside of the factory in a few moments with the use
of only a screwdriver.

The lowest priced .22 caliber autoloading rifle and the best
value ever offered. A real Marlin barrel and a rifle built
throughout with real Marlin quality and workmanship at an
unusually low price.

When equipped with the Marlin No. 22 rear peep sight, the
Model 50 was identified as the Model 50E. Otherwise there
was no difference between the two.

The unique feature of this blow-back-operated autoloader



*Model and caliber markings on Model 50 rifle.*

Compendium_Rivas
Page 512

five shots. Automatic side ejection, positive sear lock safety, easy to take-down for cleaning and oiling, red and green safety dots tell shooter fire and safe position of safety button. Low sighting plane for 'scope mounting, chrome-plated cocking handle spur, stock and forearm of seasoned walnut, 24" round tapered blued-steel barrel, hooded ramp front sight with bead and Rocky Mountain type rear sight, overall length 45 inches; weight about 6¼ pounds.

Note that now the magazine is listed as 5-shot, two magazines are furnished with each rifle, and the barrel is 24 inches long.

The 1957 catalog describes the Model 89C as having a 12-shot magazine, a 22-in. barrel and a Bishop-style stock. The text was as follows:

Auto-loading 12-shot clip magazine .22 caliber long rifle automatic. 22 inch round tapered blued steel barrel, crowned muzzle. Open rear sight, ramp front sight with detachable hood. Bishop style stock. Finest quality walnut. Shoots all forms of standard .22 caliber long rifle ammunition, greased

or waxed, regular or high velocity, without adjustment. Easy to take-down for cleaning and oiling. Positive sear lock safety. Red and green safety dots tell fire position of rifle. Solid top receiver, automatic side ejection. Special new finish on receiver. Pistol grip. Receiver dovetail grooved for tip-off mounts and top-mounts. Overall length 42"; weight about 6 pounds depending on density of wood.

The prices of the Model 89C were as follows:

| Year | Price |
|---|---|
| 1953-1954 | $27.95 |
| 1955 | 30.70 |
| 1956 | 34.70 |
| 1957-1959 | 37.95 |
| 1960-1961 | 39.95 |

**Model 98, Caliber .22, Semiautomatic Rifle (1957–1959).** The Model 98 was an attempt to put new life in the Model 88 rifle by changing the tubular magazine in the buttstock to one that



*Model 89C rifle with 7-shot magazine.*



*Model 89C rifle with 12-shot magazine.*



*Model 89C rifle with 12-shot magazine and Bishop-style stock.*