ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his
official capacity as Attorney General of the
State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**<br><br>Plaintiffs,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants | Case No. 3:17-cv-01017-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF MICHAEL VORENBERG**<br><br>**VOLUME 1 OF 11**<br><br>Courtroom:     5A<br>Judge:         Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

1

1

## INDEX

| Works | Decl. Page. | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 14 U.S. Statutes 487, Chap 170, Sec. 6 (Approved March 2, 1867). | 19 n.21 | 0010-0014 |
| 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A.) | 56–57 n.85 | 0015 |
| Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006. | 56–57 n.85 | 0016-0019 |
| Texas Session Laws, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26. | 51 n.75 | 0020 |
| **BOOKS** | | |
| Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4. | 15 n.19 | 0026-0028 |
| William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67. | 19 n.20 | 0029-0032 |
| Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52. | 35 n.47 | 0033-0038 |
| Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97. | 36 n.50, 56 n.84 | 0039-0041 |

2

| | | |
|---|---|---|
| Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863-1877 (New York: Harper and Row, 1988), xxvii. | 4 n.2 | 0042-0044 |
| Jim Garry, *Weapons of the Lewis and Clark Expedition* (Norman, Okla.: Arthur H. Clark, 2012), 94 | 8 n.5 | 729-730 |
| Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12. | 33 n.40 | 0045-0059 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016) 65-81, 90, 109-42, 177-202, 353-68. | *passim* | 0060-0096; 731-766 |
| Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299, 340. | 33 n.40, 33 n.41 | 0097-0104 |
| Robert Held, *The Belton Systems, 1758 and 1784-86: America's First Repeating Firearms* (Lincoln, R.I.: Andrew Mowbray, 1986), 33-39 | 8 n.6 | 767-775 |
| W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71. | 23 n.28 | 0105-0108 |
| John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. | 10 n.7, 14 n.18, 28 n.32 | 0109-0217 |
| Harold L. Peterson, *Arms and Armor in Colonial America (New York: Bramhall House*, 1956), 215-17 | 7 n.3 | 776-780 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans*, 1805-1889 (Baton Rouge: Louisiana State University Press, 1996), 130-31; 155-156 | 42 n.59, 45 n.61 | 0218-0222 |

3

| | | |
|---|---|---|
| James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 5-106, 112 | 19 n.21, 22 n.27 | 0223-0281 |
| Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119. | 20 n.23 | 0282-0359 |
| Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33, 69-70. | 21 n.24, 22 n.26, 38 n.53, 42 n.59 | 0360-0397 |
| W. H. B. Smith, *Gas, Air and Spring Guns of the World* (Harrisburg, Penn.: Military Service Publishing Company, 1957). 30 | 7 n.4 | 781-783 |
| C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49. | 30 n.35 | 0398-0424 |
| Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70 | 47 n.65 | 0425-0428 |
| Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88 | 24 n.29, 27 n.31 | 0429-0446 |
| Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93 | 47 n.65 | 0447-0452 |
| Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38, 42-44, 178 | 12 n.13 | 0453-0464 |

4

| | | |
|---|---|---|
| Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996, 75, 79-80, 140-41, 170-171 | 38 n.53, 40 n.56, 41 n.57, 41 n.58, 49 n.70 | 0465-0476 |
| **LAW REVIEWS AND JOURNALS** | | |
| Clayton E. Cramer, Nicholas J. Johnson, and George A. Mocsary, "'This Right is Not Allowed by Governments That Are Afraid of the People': The Public Meaning of the Second Amendment when the Fourteenth Amendment was Ratified," *George Mason Law Review*, 17 (2010), 823-863, esp. 852-863 | 21 n.25 | 785-824 |
| Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. | 36 n.50 | 0478-0481 |
| David Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998) | 54 n.81 | 0482-0488 |
| Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," Arkansas Historical Quarterly, 64 (Winter 2005), 356-58. | 20 n.22 | 0489-0495 |
| Allan Robert Purcell, *"The History of the Texas Militia, 1835-1903"* (Ph.D. diss., University of Texas, Austin, 1981), 221-27 | 21 n.24 | 0496-0505 |
| Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," Law and History Review, 26 (Spring, 2008), pp. 1-56. | 56–57 n.85 | 0506-0562 |
| Jerrell H. Shofner, "Florida Courts and the Disputed   Election of 1876," Florida Historical Quarterly, 48 (July 1969), 26-46. | 48 n.66 | 0563-0584 |

5

| | | |
|---|---|---|
| Otis A. Singletary, "The Texas Militia During Reconstruction," Southwestern Historical Quarterly, 60 (July 1956), 25-28. | 21 n.24 | 0585-0598 |
| S.K. Wier, The Firearms of the Lewis and Clark Expedition (2010) | 8 n.5 | 825-836 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in Annual Report of the Adjutant General of the State of Louisiana, for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39. | 55 n.83 | 0600-0604 |
| 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172. | 13 n.16, 14 n.17 | 0605-0611 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), U.S. Congressional Serial Set (1871), p. 467; and vol. 4 (South Carolina,), p. 767. | 49 n.69 | 0612-0616 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama) U.S. Congressional Serial Set (1871), pp. 414-15. | 51 n.74 | 0617-0619 |
| 46th Cong., 2nd sess., S. Rep. 693, pt. 2 "Investigation of Causes of Migration of Negroes from Southern to Northern States," U.S. Congressional Serial Set (1879-88), p. 357. | 51 n.76 | 0620-0621 |
| J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), U.S. Congressional Serial Set (1871), pp. 289-90 | 50 n.73 | 0622-0627 |

Compendium of Works Cited in Declaration of Michael Vorenberg
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| General Orders, No. 101, May 30, 1865, The War of the Rebellion (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43). | 14 n.17 | 0628-0630 |
| "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95. | 30 n.36 | 0631-0633 |
| Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, 4086-87 (March 24, 1871), 4089-90, 4090-92, 4092-93, 4093-4095. | 26 n.30 | 0634-0644 |
| James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, Opinions of the Attorney General, 11:208–09. | 19 n.20 | 0645-0652 |
| Testimony of William Murrell, Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521. | 49 n.68 | 0653-0656 |
| **NEWS ARTICLES** | | |
| Army and Navy Journal, June 1, 1867, p. 350 | 32 n.38 | 0658-0059 |
| Bismarck Tri-Weekly Tribune (Dakota Territory), June 29, 1877, p. 4. | 29 n.33 | 0660 |
| Charleston News, Oct. 17, 1870, p. 2 | 40 n.55 | 0661-0663 |
| Chicago Daily Inter Ocean, January 12, 1877, p. 1 | 49 n.67 | 0664 |
| Chicago Daily Tribune, July 23, 1876, p. 4. | 34 n.43 | 0665 |
| Chicago Daily Tribune, April 15, 1878, p. 4. | 34 n.44 | 0666 |

7

| | | |
|---|---|---|
| "The Reds," Chicago Daily Tribune, March 23, 1879, p. 7. | 52 n.78 | 0667 |
| Georgia Weekly Telegraph and Georgia Journal & Messenger, April 5, 1870, pp. 4, 8. | 46 n.62 | 0668-0669 |
| "Lovejoy," "Letter from Africa," Fayette County Herald (Washington, Ohio), Dec. 21, 1871, p.2. | 31 n.37 | 0670-0678 |
| David Kopel, "The History of Magazines holding 11 or more rounds," Washington Post, May 29, 2014. | 28 n.32 | 0679 |
| New Orleans Republican, June 13, 1873, p. 1 | 44 n.60 | 0680 |
| New Orleans Republican, March 13, 1877, p. 2. | 49 n.67 | 0681-0683 |
| "Breech-Loading Arms," New York Herald, Oct. 12, 1866, p. 4. | 34 n.46 | 0684 |
| "A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877, p. 4. | 35 n.48 | 0685-0687 |
| Ouachita Telegraph, October 24, 1873, p 1. | 44 n.60 | 0688 |
| "Henry's Sporting Rifle," in Wilkes' Spirit of the Times: The American Gentleman's Newspaper, March 24, 1866, p. 59. | 36 n.49 | 0689 |
| "Another Battle," The Opelousas Journal, Aug. 29, 1873, p. 3. | 47 n.64 | 0690-0691 |
| The Forest Republican (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4. | 37 n.52 | 0692 |
| The Weekly Democratic Statesman (Austin, Texas), August 24, 1871, p. 2. | 46 n.63 | 0693-0694 |
| Washington Evening Star, Aug. 16, 1869, p. 1. | 39 n.54 | 0695 |
| *Wyoming Leader* (March 16, April 21, May 8, 1868, always p. 4). | 29 n.33 | 0696 |

8

| OTHER SOURCES | | |
|---|---|---|
| James Bown and Son's Illustrated Catalogue and Price List, 29th annual ed. (Pittsburgh, Penn., 1877), 33. | 37 n.51 | 0698-0700 |
| David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). | 28 n.32 | 0701-0702 |
| National Museum of American History, Collections, Belton Repeating Flintlock Fusil | 8 n.6 | 838-841 |
| "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3. | 28 n.32 | 0703-0707 |
| Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoorproduction-serial-numbers.htm. | 28 n.32 | 0708-0715 |
| Guncite.com, Second Amendment State Decisions, Feb. 24, 2013. | 54 n.79 | 0716-0727 |

Compendium of Works Cited in Declaration of Michael Vorenberg
(3:17-cv-01017-BEN-JLB)

# HISTORICAL STATUTES

NOTE:

Vorenberg declaration, footnote 17, has a typographical error.

The relevant citation to the statute reads as follows:

14 U.S. Statutes 487, Chap 70, Sec. 6 (Approved March 2, 1867)

Instead, "Chap. 70" should read as "Chap. 170"

The relevant statute follows

BY AUTHORITY OF CONGRESS.

THE

# Statutes at Large, Treaties,

AND

# PROCLAMATIONS,

OF THE

# UNITED STATES OF AMERICA.

FROM

DECEMBER, 1865, TO MARCH, 1867.

Arranged in Chronological Order and carefully collated with the Originals at Washington.

WITH

REFERENCES TO THE MATTER OF EACH ACT AND TO THE SUBSEQUENT ACTS ON THE SAME SUBJECT.

EDITED BY

GEORGE P. SANGER,

COUNSELLOR AT LAW.

The rights and interest of the United States in the stereotype plates from which this work is printed are hereby recognised, acknowledged, and declared by the publishers, according to the provisions of the joint resolution of Congress, passed March 3, 1845.

VOL. XIV.

BOSTON:
LITTLE, BROWN, AND COMPANY
1868.

shall be levied but once within one year, and when paid by such ship, vessel, or steamer, no further tonnage tax shall be collected within one year from the date of such payment.

Sec. 34. *And be it further enacted,* That all acts or parts of acts inconsistent with this act, and all acts and parts of acts imposing any tax upon advertisements, or the gross receipts of toll-roads, are hereby repealed : *Provided,* That this act shall not be construed to affect any act done, right accrued, or penalty incurred, under former acts, but every such right is hereby saved ; and all suits and prosecutions for acts already done in violation of any former act or acts of Congress relating to the subjects embraced in this act may be commenced or proceeded with in like manner as if this act had not been passed ; and all penal clauses and provisions in existing laws relating to the subjects embraced in this act shall be deemed applicable thereto.

Approved, March 2, 1867.

<div style="text-align:right">

Tax on adver-
tisements and
gross receipts
of toll-roads re-
pealed
Inconsistent
acts repealed.

Saving clause.

</div>

————

CHAP. CLXX.— *An Act making Appropriations for the Support of the Army for the Year ending June thirtieth, eighteen hundred and sixty-eight, and for other Purposes.*

<div style="text-align:right">March 2, 1867.</div>

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the following sums be, and the same are hereby, appropriated, out of any money in the treasury not otherwise appropriated, for the support of the army for the year ending the thirtieth of June, eighteen hundred and sixty-eight :—

For expenses of recruiting, transportation of recruits, and compensation to citizen surgeons for medical attendance, three hundred thousand dollars.

For pay of the army, fourteen million seven hundred and fifty-seven thousand nine hundred and fifty-two dollars.

For commutation of officers' subsistence, two million two hundred and twenty-eight thousand nine hundred and eighty-two dollars.

For commutation of forage for officers' horses, one hundred and four thousand six hundred dollars.

For payments in lieu of clothing for officers' servants, two hundred and seventy-six thousand nine hundred and seventy-eight dollars.

For payments to discharged soldiers for clothing not drawn, two hundred thousand dollars.

For contingencies of the army, one hundred thousand dollars.

For artificial limbs for soldiers and seamen, seventy thousand dollars.

For army medical museum, ten thousand dollars.

For medical works for library of surgeon-general's office, ten thousand dollars.

For expenses of commanding-general's office, ten thousand dollars.

*For Repairs and Improvements of Armories and Arsenals.* — For arsenal and armory at Rock Island, Illinois, six hundred and eighty-six thousand five hundred dollars.

For the erection of a bridge at Rock Island, Illinois, as recommended by the chief of ordnance, two hundred thousand dollars: *Provided,* That the ownership of said bridge shall be and remain in the United States, and the Rock Island and Pacific Railroad Company shall have the right of way over said bridge for all purposes of transit across the island and river, upon the condition that the said company shall, before any money is expended by the government, agree to pay and shall secure to the United States, first, half the cost of said bridge ; and, second, half the expenses of keeping said bridge in repair, and upon guaranteeing said conditions to the satisfaction of the Secretary of War, by contract or otherwise, the said company shall have the free use of said bridge for purposes of transit, but without any claim to ownership thereof.

<div style="text-align:right">

Army appro-
priation.

Recruiting
and pay of citi-
zen surgeons.

Pay.

Commutation
of subsistence
and forage.

Payments in
lieu of clothing.

Contingencies.
Artificial
limbs.
Medical mu-
seum.
Medical works

Commanding-
general's office
Armories and
arsenals.
Rock Island.
Bridge at Rock
Island.
Proviso.

</div>

Watervliet arsenal.

For Watervliet arsenal, West Troy, New York, thirty-eight thousand two hundred dollars.

Ordnance service.

For current expenses of the ordnance service, three hundred thousand dollars.

Arsenals. Allegheny;

For Allegheny arsenal, Pittsburg, Pennsylvania, thirty-four thousand dollars.

Champlain;

For Champlain arsenal at Vergennes, Vermont, eight hundred dollars.

Columbus;

For Columbus arsenal, Columbus, Ohio, one hundred and thirty-nine thousand six hundred and twenty-five dollars.

Fort Monroe;

For Fort Monroe arsenal, Old Point Comfort, Virginia, six thousand dollars.

Fort Union;

For Fort Union arsenal, Fort Union, New Mexico, ten thousand dollars.

Frankford;

For Frankford arsenal, Bridesburg, Pennsylvania, thirty thousand dollars.

Kennebec;

For Kennebec arsenal, Augusta, Maine, one thousand five hundred and twenty-five dollars.

Indianapolis;

For Indianapolis arsenal, Indianapolis, Indiana, one hundred and sixty-nine thousand six hundred and twenty-five dollars.

Leavenworth;

For Leavenworth arsenal, Leavenworth, Kansas, fifteen thousand dollars.

New York;

For New York arsenal, Governor's Island, New York, one thousand two hundred dollars.

Pikesville;

For Pikesville arsenal, Pikesville, Maryland, eight hundred dollars.

Saint Louis;

For Saint Louis arsenal, Saint Louis, Missouri, sixty-five thousand dollars.

Washington;

For Washington arsenal, Washington, District of Columbia, fifty thousand dollars.

Watertown.

For Watertown arsenal, Watertown, Massachusetts, twenty-one thousand six hundred and sixty-seven dollars.

Purchase of Willard Sears estate

Land in South Boston may be sold.

For the purchase of the Willard Sears estate, adjoining the Watertown arsenal grounds, forty-nine thousand and seven hundred dollars, or so much thereof as may be necessary; and the Secretary of War is hereby authorized to sell at public auction a lot of land belonging to the United States situated in South Boston, if, in his opinion, the same is not needed for the public service, and pay the proceeds thereof into the treasury.

Bureau of refugees, freedmen, and abandoned lands

*Bureau of Refugees, Freedmen, and Abandoned Lands.* — For salaries of assistant commissioners, sub-assistant commissioners, and agents, one hundred and forty-seven thousand five hundred dollars.

Salaries.

For salaries of clerks, eighty-two thousand eight hundred dollars.

Stationery and printing

For stationery and printing, sixty-three thousand dollars.

Quarters and fuel

For quarters and fuel, two hundred thousand dollars.

Commissary stores

For commissary stores, one million five hundred thousand dollars.

Medical department.

For medical department, five hundred thousand dollars.

Transportation.

For transportation, eight hundred thousand dollars.

School superintendents.

For school superintendents, twenty-five thousand dollars.

Schools and asylums

For buildings for schools and asylums, including construction, rental, and repairs, five hundred thousand dollars.

Telegraphing and postage.

Certain educational institutions.

Limit to pay of certain agents or clerks.

For telegraphing and postage, eighteen thousand dollars : *Provided,* That the commissioner be hereby authorized to apply any balance on hand, at this date, of the Refugees and Freedmen's Fund, accounted for in his last annual report, to aid educational institutions actually incorporated for loyal refugees and freedmen : *And provided further,* That no agent or clerk not heretofore authorized by law shall receive a monthly allowance exceeding the sum of two hundred dollars.

General of the army, headquarters of, orders, &c.

Sec. 2. *And be it further enacted,* That the head-quarters of the General of the army of the United States shall be at the city of Washington, and all orders and instructions relating to military operations issued by the President or Secretary of War shall be issued through the

General of the army, and, in case of his inability, through the next in rank. The General of the army shall not be removed, suspended; or relieved from command, or assigned to duty elsewhere than at said head-quarters, except at his own request, without the previous approval of the Senate; and any orders or instructions relating to military operations issued contrary to the requirements of this section shall be null and void; and any officer who shall issue orders or instructions contrary to the provisions of this section shall be deemed guilty of a misdemeanor in office; and any officer of the army who shall transmit, convey, or obey any orders or instructions so issued contrary to the provisions of this section, knowing that such orders were so issued, shall be liable to imprisonment for not less than two nor more than twenty years, upon conviction thereof in any court of competent jurisdiction.

*General of the army not to be removed, withdrawn, &c.*

*Penalty for issuing orders contrary hereto.*

SEC. 3. *And be it further enacted*, That section three of the joint resolution ·relative to appointments to the military academy, approved June sixteen, eighteen hundred and sixty-six, be, and the same is hereby repealed.

*Repeal of section three of resolution relating to appointments to military academy.*
*Ante, p. 359.*

SEC. 4. *And be it further enacted*, That the sum of one hundred and fifty thousand dollars be, and the same is hereby, appropriated out of any moneys in the treasury not otherwise appropriated, to be disbursed by the Secretary of War, in the erection of fire-proof buildings at or near the city of Jeffersonville, in the State of Indiana, to be used as storehouses for government property.

*Fire-proof buildings in Jeffersonville, Indiana.*

SEC. 5. *And be it further enacted*, That it shall be the duty of the officers of the army and navy, and of the Freedmen's Bureau, to prohibit and prevent whipping or maiming of the person, as a punishment for any crime, misdemeanor, or offence, by any pretended civil or military authority in any State lately in rebellion until the civil government of such State shall have been restored, and shall have been recognized by the Congress of the United States.

*Whipping or maiming, as a punishment for crime, forbidden in, &c. until, &c.*

SEC. 6. *And be it further enacted*, That all militia forces now organized or in service in either of the States of Virginia, North Carolina, South Carolina, Georgia, Florida, Alabama, Louisiana, Mississippi, and Texas, be forthwith disbanded, and that the further organization, arming, or calling into service of the said militia forces, or any part thereof, is hereby prohibited under any circumstances whatever, until the same shall be authorized by Congress.

*Militia forces organized or in service in certain rebel States to be disbanded, and their further organization prohibited.*

SEC. 7. *And be it further enacted*, That the paymaster-general be authorized to pay under such regulations as the Secretary of War shall prescribe in addition to the amount received by them, for the travel[1]ing expenses of such California and Nevada volunteers as were discharged in New Mexico, Arizona, or Utah, and at·points distant from the place or places of enlistment, such proportionate sum according to the distance travel[1]ed as have been paid to the troops of other States similarly situated, and such amount as shall be necessary to pay the same is hereby appropriated out of any moneys in the treasury not otherwise appropriated.

*Payment of travelling expenses of certain California and Nevada volunteers.*

*Appropriation.*

APPROVED, March 2, 1867.

CHAP. CLXXI — *An Act making Appropriations for the Construction, Preservation, and Repairs of certain Fortifications and other Works of Defence for the fiscal Year ending June thirtieth, eighteen hundred and sixty-eight.*

*March 2, 1867.*

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the following sums be, and they are hereby, appropriated, out of any money in the treasury not otherwise appropriated, for the construction, preservation, and repair of certain fortifications and other works of defence for the year ending the thirtieth of June, eighteen hundred and sixty-eight : —

For Fort Scammel, Portland, Maine, fifty thousand dollars.

*Appropriations for fortifications and other works of defence.*

*Appropriation for Fort Scammel.*

Case 3:17-cv-01017-BEN-JLB   Document 123   Filed 11/10/22   PageID.10945   Page 16 of 58



## § 331. Federal aid for State governments

Whenever there is an insurrection in any State against its government, the President may, upon the request of its legislature or of its governor if the legislature cannot be convened, call into Federal service such of the militia of the other States, in the number requested by that State, and use such of the armed forces, as he considers necessary to suppress the insurrection.

(Aug. 10, 1956, ch. 1041, 70A Stat. 15.)

### HISTORICAL AND REVISION NOTES

| Revised section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 331 .......... | 50:201. | R.S. 5297. |

The words "armed forces" are substituted for the words "land or naval forces of the United States". The word "governor" is substituted for the word "executive". The word "may" is substituted for the words "It shall be lawful * * * to". The words "into Federal service" are substituted for the word "forth" for uniformity and clarity.

## § 332. Use of militia and armed forces to enforce Federal authority

Whenever the President considers that unlawful obstructions, combinations, or assemblages, or rebellion against the authority of the United States, make it impracticable to enforce the laws of the United States in any State by the ordinary course of judicial proceedings, he may call into Federal service such of the militia of any State, and use such of the armed forces, as he considers necessary to enforce those laws or to suppress the rebellion.

(Aug. 10, 1956, ch. 1041, 70A Stat. 15; Pub. L. 109–163, div. A, title X, § 1057(a)(2), Jan. 6, 2006, 119 Stat. 3440.)

### HISTORICAL AND REVISION NOTES

| Revised section | Source (U.S. Code) | Source (Statutes at Large) |
|---|---|---|
| 332 .......... | 50:202. | R.S. 5298. |

50:202 (last 22 words) is omitted as surplusage. The words "armed forces" are substituted for the words "land and naval forces of the United States". The words "call into Federal service such of the militia" are substituted for the words "call forth the militia of any or all the States" for clarity and uniformity. The word "may" is substituted for the words "it shall be lawful". The words "faithful execution of the" and "in whatever State or Territory thereof the laws of the United States may be forcibly opposed" are omitted as surplusage.

### DERIVATION

Act July 29, 1861, ch. 25, § 1, 12 Stat. 281.

### AMENDMENTS

2006—Pub. L. 109–163 struck out "or Territory" after "in any State".

EX. ORD. NO. 10730. ASSISTANCE FOR REMOVAL OF AN OBSTRUCTION OF JUSTICE WITHIN THE STATE OF ARKANSAS

Ex. Ord. No. 10730, Sept. 24, 1957, 22 F.R. 7628, authorized the Secretary of Defense to order into the active military service of the United States units of the National Guard of the United States and of the Air National Guard of the United States within the State of Arkansas for an indefinite period and until relieved by appropriate orders in order to enforce any orders of the United States District Court for the Eastern District of Arkansas for the removal of obstructions to justice in respect to enrollment and attendance at public schools in the Little Rock School District, Little Rock, Arkansas; authorized the Secretary of Defense to also use the armed forces of the United States to enforce such orders of the district court; and authorized the Secretary of Defense to delegate his authority to the Secretary of the Army or the Secretary of the Air Force.

EX. ORD. NO. 11053. ASSISTANCE FOR REMOVAL OF UNLAWFUL OBSTRUCTIONS OF JUSTICE IN THE STATE OF MISSISSIPPI

Ex. Ord. No. 11053, Sept. 30, 1962, 27 F.R. 9681, authorized the Secretary of Defense to call into the active military service of the United States units of the Army National Guard and of the Air National Guard of the State of Mississippi for an indefinite period and until relieved by appropriate orders in order to enforce all orders of the United States District Court for the Southern District of Mississippi and of the United States Court of Appeals for the Fifth Circuit for the removal of obstructions to justice in the State of Mississippi; authorized the Secretary of Defense to also use the armed forces of the United States to enforce such court orders; and authorized the Secretary of Defense to delegate his authority to the Secretary of the Army or the Secretary of the Air Force.

EX. ORD. NO. 11111. ASSISTANCE FOR REMOVAL OF OBSTRUCTIONS OF JUSTICE AND SUPPRESSION OF UNLAWFUL COMBINATIONS WITHIN THE STATE OF ALABAMA

Ex. Ord. No. 11111, June 11, 1963, 28 F.R. 5709, authorized the Secretary of Defense to call into the active military service of the United States units of the Army National Guard and of the Air National Guard of the State of Alabama for an indefinite period and until relieved by appropriate orders in order to enforce the laws of the United States within that State and the orders of the United States District Court for the Northern District of Alabama, to remove obstructions to justice, and to suppress unlawful assemblies, conspiracies, and domestic violence which oppose the laws of the United States or impede the course of justice under those laws within that State; authorized the Secretary of Defense to also use the armed forces of the United States for such purposes; and authorized the Secretary of Defense to delegate his authority to the Secretary of the Army or the Secretary of the Air Force.

EX. ORD. NO. 11118. ASSISTANCE FOR REMOVAL OF UNLAWFUL OBSTRUCTIONS OF JUSTICE IN THE STATE OF ALABAMA

Ex. Ord. No. 11118, Sept. 10, 1963, 28 F.R. 9863, authorized the Secretary of Defense to call into the active military service of the United States units of the Army National Guard and the Air National Guard of the State of Alabama for an indefinite period and until relieved by appropriate orders in order to enforce the laws of the United States and any orders of United States Courts relating to the enrollment and attendance of students in public schools in the State of Alabama and to suppress unlawful assemblies, conspiracies, and domestic violence which oppose the law or impede the course of justice under the law within that State; authorized the Secretary of Defense to also use the armed forces of the United States for such purposes; and authorized the Secretary of Defense to delegate his authority to the Secretary of the Army or the Secretary of the Air Force.

## § 333. Interference with State and Federal law

The President, by using the militia or the armed forces, or both, or by any other means, shall take such measures as he considers nec-



119 STAT. 3136      PUBLIC LAW 109–163—JAN. 6, 2006

Public Law 109–163
109th Congress

## An Act

Jan. 6, 2006
[H.R. 1815]

To authorize appropriations for fiscal year 2006 for military activities of the Department of Defense, for military construction, and for defense activities of the Department of Energy, to prescribe military personnel strengths for such fiscal year, and for other purposes.

National Defense
Authorization
Act for Fiscal
Year 2006.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SECTION 1. SHORT TITLE.

This Act may be cited as the "National Defense Authorization Act for Fiscal Year 2006".

### SEC. 2. ORGANIZATION OF ACT INTO DIVISIONS; TABLE OF CONTENTS.

(a) DIVISIONS.—This Act is organized into three divisions as follows:

(1) Division A—Department of Defense Authorizations.
(2) Division B—Military Construction Authorizations.
(3) Division C—Department of Energy National Security Authorizations and Other Authorizations.

(b) TABLE OF CONTENTS.—The table of contents for this Act is as follows:

Sec. 1. Short title.
Sec. 2. Organization of Act into divisions; table of contents.
Sec. 3. Congressional defense committees.

#### DIVISION A—DEPARTMENT OF DEFENSE AUTHORIZATIONS

#### TITLE I—PROCUREMENT

##### SUBTITLE A—AUTHORIZATION OF APPROPRIATIONS

Sec. 101. Army.
Sec. 102. Navy and Marine Corps.
Sec. 103. Air Force.
Sec. 104. Defense-wide activities.

##### SUBTITLE B—ARMY PROGRAMS

Sec. 111. Multiyear procurement authority for utility helicopters.
Sec. 112. Multiyear procurement authority for modernized target acquisition designation sight/pilot night vision sensors for AH–64 Apache attack helicopters.
Sec. 113. Multiyear procurement authority for conversion of AH–64A Apache attack helicopters to the AH–64D Block II configuration.
Sec. 114. Acquisition strategy for tactical wheeled vehicle programs.
Sec. 115. Report on Army Modular Force Initiative.

##### SUBTITLE C—NAVY PROGRAMS

Sec. 121. Virginia-class submarine program.
Sec. 122. LHA Replacement (LHA(R)) amphibious assault ship program.
Sec. 123. Cost limitation for next-generation destroyer program.
Sec. 124. Littoral Combat Ship (LCS) program.
Sec. 125. Prohibition on acquisition of next-generation destroyer through a single shipyard.

'discarded military munitions', and" and inserting "In this sub-section, the terms 'discarded military munitions' and".

(8) Section 2773a(a) is amended by inserting "by" after "incorrect payment made" in the first sentence.

(9) Section 2801(d) is amended by striking "sections 2830 and 2835" and inserting "sections 2830, 2835, and 2836 of this chapter".

(10) Section 2881a(f) is amended by striking "Notwith-standing section 2885 of this title, the" and inserting "The".

(11) Section 3084 is amended by striking the semicolon in the section heading and inserting a colon.

(d) RONALD W. REAGAN NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2005.—Section 1105(h) of the Ronald W. Reagan National Defense Authorization Act for Fiscal Year 2005 (Public Law 108–375; 118 Stat. 2075) is amended by striking "(21 U.S.C." and inserting "(20 U.S.C.".

10 USC 2192 note.

(e) BOB STUMP NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 2003.—The Bob Stump National Defense Authoriza-tion Act for Fiscal Year 2003 (Public Law 107–314) is amended as follows:

10 USC 2302 note.

(1) Section 314 (116 Stat. 2508) is amended—

(A) in subsection (d), by striking "(40 U.S.C." and inserting "(42 U.S.C."; and

(B) in subsection (e)(2), by striking "(40 U.S.C." and inserting "(42 U.S.C.".

10 USC 3702.

(2) Section 635(a) (116 Stat. 2574) is amended by inserting "the first place it appears" after "by striking 'a claim'".

(f) NATIONAL DEFENSE AUTHORIZATION ACT FOR FISCAL YEAR 1994.—Section 1605(a)(4) of the National Defense Authorization Act for Fiscal Year 1994 (22 U.S.C. 2751 note) is amended by striking "Logisitics" in the first sentence and inserting "Logistics".

(g) TITLE 38, UNITED STATES CODE.—Section 8111(b)(1) of title 38, United States Code, is amended by inserting "of 1993" after "the Government Performance and Results Act".

## SEC. 1057. DELETION OF OBSOLETE DEFINITIONS IN TITLES 10 AND 32, UNITED STATES CODE.

(a) DELETING OBSOLETE DEFINITION OF "TERRITORY" IN TITLE 10.—Title 10, United States Code, is amended as follows:

(1) Section 101(a) is amended by striking paragraph (2).

(2) The following sections are amended by striking the terms "Territory or", "or Territory", "a Territorial Department,", "or a Territory", "Territory and", "its Territories,", and "and Territories" each place they appear: sections 101(a)(3), 332, 822, 1072, 1103, 2671, 3037, 5148, 8037, 8074, 12204, and 12642.

(3) The following sections are amended by striking the terms "Territory," and "Territories," each place they appear: sections 849, 858, 888, 2668, 2669, 7545, and 9773.

(4) Section 808 is amended by striking "Territory, Common-wealth, or possession," and inserting "Commonwealth, posses-sion,".

(5) The following sections are amended by striking "Terri-tories, Commonwealths, or possessions" each place it appears and inserting "Commonwealths or possessions": sections 847, 2734, 4778, 5986, 7652, 7653, and 12406.

(6) The following sections are amended by striking "Territories, Commonwealths, and possessions" each place it appears and inserting "Commonwealths and possessions": sections 846, 3062, 3074, 4747, 4778, 8062, and 9778.

(7) Section 312 is amended by striking "States and Territories, and Puerto Rico" and inserting "States, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands".

(8) Section 335 is amended by striking "the unincorporated territories of".

(9) Sections 4301 and 9301 are amended by striking "State or Territory, Puerto Rico, or the District of Columbia" each place it appears and inserting "State, the Commonwealth of Puerto Rico, the District of Columbia, Guam, or the Virgin Islands".

(10) Sections 4685 and 9685 are amended by striking "State or Territory concerned" each place it appears and inserting "State concerned or Guam or the Virgin Islands" and by striking "State and Territorial" each place it appears and inserting "State, Guam, and the Virgin Islands".

(11) Section 7851 is amended by striking "States, the Territories, and the District of Columbia" and inserting "States, the District of Columbia, Guam, and the Virgin Islands".

(12) Section 7854 is amended by striking "any State, any Territory, or the District of Columbia" and inserting "any State, the District of Columbia, Guam, or the Virgin Islands".

(b) DELETING OBSOLETE DEFINITION OF "TERRITORY" IN TITLE 32.—Title 32, United States Code, is amended as follows:

(1) Paragraph (1) of section 101 is amended to read as follows:

"(1) For purposes of other laws relating to the militia, the National Guard, the Army National Guard of the United States, and the Air National Guard of the United States, the term 'Territory' includes Guam and the Virgin Islands.".

(2) Sections 103, 104(c), 314, 315, 708(d), and 711 are amended by striking "State and Territory, Puerto Rico, and the District of Columbia" and "State or Territory, Puerto Rico, and the District of Columbia" each place they appear and inserting "State, the Commonwealth of Puerto Rico, the District of Columbia, Guam, and the Virgin Islands".

(3) Sections 104(d), 107, 109, 503, 703, 704, 710, and 712 are amended by striking "State or Territory, Puerto Rico, or the District of Columbia" and "State or Territory, Puerto Rico, the Virgin Islands or the District of Columbia" each place they appear and inserting "State, the Commonwealth of Puerto Rico, the District of Columbia, Guam, or the Virgin Islands".

(4) Sections 104(a), 505, 702(a), and 708(a) are amended by striking "State or Territory and Puerto Rico", "State or Territory or Puerto Rico", and "State or Territory, Puerto Rico" each place they appear and inserting "State, the Commonwealth of Puerto Rico, Guam, and the Virgin Islands".

(5) Section 324 is amended by striking "State or Territory of whose National Guard he is a member, or by the laws of Puerto Rico, or the District of Columbia, if he is a member of its National Guard" and inserting "State of whose National Guard he is a member, or by the laws of the Commonwealth of Puerto Rico, or the District of Columbia, Guam, or the Virgin Islands, whose National Guard he is a member".

119 STAT. 3442          PUBLIC LAW 109–163—JAN. 6, 2006

(6) Section 325 is amended by striking "State or Territory, or of Puerto Rico" and "State or Territory or Puerto Rico" each place they appear and inserting "State, or of the Commonwealth of Puerto Rico, Guam, or the Virgin Islands".

(7) Sections 326, 327, and 501 are amended by striking "States and Territories, Puerto Rico, and the District of Columbia" each place it appears and inserting "States, the Commonwealth of Puerto Rico, the District of Columbia, Guam, and the Virgin Islands".

**SEC. 1058. SUPPORT FOR YOUTH ORGANIZATIONS.**

5 USC 301 note.

(a) YOUTH ORGANIZATION DEFINED.—In this section, the term "youth organization" means—
(1) the Boy Scouts of America;
(2) the Girl Scouts of the United States of America;
(3) the Boys Clubs of America;
(4) the Girls Clubs of America;
(5) the Young Men's Christian Association;
(6) the Young Women's Christian Association;
(7) the Civil Air Patrol;
(8) the United States Olympic Committee;
(9) the Special Olympics;
(10) Campfire USA;
(11) the Young Marines;
(12) the Naval Sea Cadets Corps;
(13) 4–H Clubs;
(14) the Police Athletic League;
(15) Big Brothers—Big Sisters of America;
(16) National Guard Challenge Program; and
(17) any other organization designated by the President as an organization that is primarily intended to—
(A) serve individuals under the age of 21 years;
(B) provide training in citizenship, leadership, physical fitness, service to community, and teamwork; and
(C) promote the development of character and ethical and moral values.

5 USC 301 note.

(b) SUPPORT FOR YOUTH ORGANIZATIONS.—
(1) CONTINUATION OF SUPPORT.—No Federal law (including any rule, regulation, directive, instruction, or order) shall be construed to limit any Federal agency from providing any form of support for a youth organization (including the Boy Scouts of America or any group officially affiliated with the Boy Scouts of America) that would result in that Federal agency providing less support to that youth organization (or any similar organization chartered under the chapter of title 36, United States Code, relating to that youth organization) than was provided during the preceding fiscal year to that youth organization. This paragraph shall be subject to the availability of appropriations.

(2) YOUTH ORGANIZATIONS THAT CEASE TO EXIST.—Paragraph (1) shall not apply to any youth organization that ceases to exist.

(3) WAIVERS.—The head of a Federal agency may waive the application of paragraph (1) to a youth organization with respect to each conviction or investigation described under subparagraph (A) or (B) for a period of not more than two fiscal years if—

Case 3:17-cv-01017-BEN-JLB   Document 123   Filed 11/10/22   PageID.10950   Page 21 of 58

# TESTIMONY

TAKEN BY

## THE JOINT SELECT COMMITTEE

TO INQUIRE INTO

# THE CONDITION OF AFFAIRS

IN

## THE LATE INSURRECTIONARY STATES.

# ALABAMA.

VOLUME I.

WASHINGTON:
GOVERNMENT PRINTING OFFICE.
1872.

Compendium_Vorenberg
Page 020

discussed matters of difference in a proper way, which appealed to the people to adopt the policy of the republican party, because it was best for them and for the development of the country. I have heard persons speak of those speeches afterward and compliment them for fairness, and for exhibiting the right sort of spirit; they have said they have no objection to speeches of that sort. But when a demagogue or a mischievous man goes South in order to stir up the passions of the negro population, and to grasp political power that he may harass, oppress, and rob the people, they do not want that sort of freedom of speech, nor do they want men of that sort among them.

*Question.* Do you think a man of that sort, who would make speeches odious to the people, would be in danger as regards his personal safety ?

*Answer.* Well, sir, if a man were to go there and make an incendiary speech and excite the passions of the negroes to acts of outrage and violence, I do not know that he could do so with impunity.

*Question.* Suppose he did not excite any one to acts of outrage and violence, but made a bitter republican speech, would his personal safety be endangered ?

*Answer.* I have no idea it would be. In times of high political excitement there are always in the meetings of the people individuals who become excited from some cause or other—liquor or something else—reckless men, who will offer an indignity to a speaker. But that was done before the war as well as since.

By Mr. BLAIR:

*Question.* You spoke of a presentment made by a grand jury of your county ?

*Answer.* Yes, sir; I have cut from a Montgomery paper and have here an extract from the general presentment of the grand jury that was charged by the judge of the city court. The extract is as follows :

"After a careful and diligent inquiry of those who have been before our body, without regard to race, color, or previous condition, from the different sections of the county, we are with great pleasure enabled to report the total absence of any hostility between the races, and cannot hear of the least disturbance on account of former condition or present political opinions, but find all classes of law-abiding citizens living in peace, quiet, and harmony. After the most careful and diligent investigation, we have been unable to find anything resembling an organized band of lawless persons."

By Mr. BECK:

*Question.* I understood you as saying that your people believe the Ku-Klux bill, so called, to be a measure levelled at the people of the South more particularly ?

*Answer.* Yes, sir.

*Question.* The chairman asked you whether or not its only effect was not to punish men who commit outrages in disguise. Do you not understand that it does a great deal more than that by seizing upon whole communities in certain circumstances and putting them under the power of the President, depriving them, in the particular district where outrages are committed, of the right of trial by jury and other rights secured by the Constitution, whether the citizens generally have had any participation in the outrages or not ? Do you not understand that it deprives whole communities of their rights, because of the acts of a few bad men whom they cannot control ?

*Answer.* Yes, sir; it puts the whole people under the ban of military power for the misconduct of a few individuals.

*Question.* The community generally being as much opposed to the acts of those individuals as the men who framed the law ?

*Answer.* Yes, sir.

*Question.* And believing that measure to be aimed especially at the Southern States, your people object to that character of legislation ?

*Answer.* Yes, sir.

---

WASHINGTON, D. C., *July* 7, 1871.

JOSEPH H. SPEED sworn and examined.

By the CHAIRMAN, (Mr. POLAND:)

*Question.* Where do you reside ?

*Answer.* In Marion, Perry County, Alabama

*Question.* How long have you lived there ?

*Answer.* Since 1858.

*Question.* Where did you live previous to that time ?

*Answer.* I was born and educated in Virginia; lived for some time in North Carolina, and then removed to Alabama.

Compendium_Vorenberg
Page 021

*Question.* You have always lived in the South?

*Answer.* Yes, sir; I was never out of the South until after the war.

*Question.* What is your business?

*Answer.* I am now register and master of the chancery court of our district.

*Question.* What was formerly your business?

*Answer.* I was a teacher, up to the breaking out of the war; I was teaching when the war began.

*Question.* During the war were you connected with the rebellion?

*Answer.* I was an officer in the confederate army from nearly the beginning of the war.

*Question.* Did you serve during the whole war?

*Answer.* I served until I was appointed by the governor of my State as agent for the State at the Virginia Salt-Works. Salt became very scarce in the South; we had it manufactured; and I was appointed by the governor of the State as special agent for the State at those works, which were in Washington County, Southwestern Virginia.

*Question.* With what political party did you act before the war?

*Answer.* I was a whig, or acted with the party opposed to the democratic party immediately before the war. I supported Bell and Everett in 1860. My first presidential vote was cast then. In the constitutional convention of Alabama, in 1867, I was a member from my county. In that convention I opposed the disfranchisement of my people. The convention, in the article on the elective franchise, adopted a provision disfranchising from voting all who were disfranchised from holding office under the fourteenth amendment. I opposed that proposition in convention, entered my protest against it on the journal of the convention, and opposed the ratification of the constitution before the people on that account.

*Question.* What have been your political connections since the war?

*Answer.* I have been affiliating with the republican party since that time. I should say that the legislature of my State, which was republican, removed, at its first session after the admission of the State, all disfranchisement. I should not have acted with the republican party but for that. The legislature came to precisely the same ground that I had occupied in the convention. From that day on, I have coöperated with the republican party.

*Question.* Did you marry in Virginia?

*Answer.* I married twice in Alabama, in the county where I reside.

*Question.* Do the relatives of your wife reside there?

*Answer.* Yes, sir; the relatives of both my wives.

*Question.* What we wish to ascertain is the condition of things in your vicinity, and in your State so far as you know, in relation to the enforcement of the laws for the protection of person and property. We wish to know whether the laws are so enforced that person and property are protected, or whether there are acts of violence done to person and property, and especially whether such acts are done by bodies of men in disguise. Go on and state generally your views in relation to that question.

*Answer.* My county has been up to the present year perfectly peaceful.

*Question.* The county in which you live?

*Answer.* Yes, sir. Our last State election was as orderly and quiet as any I ever saw held. During the progress of the election I was sitting in company with some friends who differed with me in politics, and we remarked that we had never witnessed a more quiet election. I do not think there was any more disorder or any more noise during that election than there is in this room at this time. That was in November, 1870—the last State election. I speak of my own county, the county in which I reside.

*Question.* What county?

*Answer.* Perry County—just on the border of the cane-brake county. We held an election for State senator in January; I will not be positive as to the day, but my recollection is, it was about the 25th of January. There had been a resignation of our State senator. For some little time previous, and perhaps just after, there were bodies of men riding through the streets of the town at night in disguise. I must say I did not see these men. I reside on the outskirts of the town, on my little farm of eighty acres; my residence is not in the business part of the town. But there is no doubt at all about those men having been there. I heard it spoken of by many persons who saw them. There was no violence done. I was informed by a man who was formerly my slave (for I was a slaveholder) that the men rode in the direction of my house, and in the direction of the houses of some other officers of the county. But they did not molest us at all; and I did not know of the matter until the next day. They did no violence at that time at all.

*Question.* Was that previous to the election you spoke of?

*Answer.* It was a short time before—perhaps one, or two, or three nights before. My recollection is that they were in town two or three times just before the election, and just after; I know they were there once or twice before the election.

*Question.* About how numerous a body?

*Answer.* A body of twenty or twenty-five men on horseback, as I was informed. That

was the first I knew of the appearance in our county of bodies of disguised men—what we term "Ku-Klux." That was the first I knew of them from any reliable information. There was a negro in jail in my county on a charge of murder. He has never been tried. A body of disguised men came to the jail to take him out; they did not say what they wanted with him. The jailer, who was a man of some will and personal courage, had his father-in-law with him, and they were armed—one with a double-barrel shot gun, and the other with a Winchester rifle. They told the men in disguise, speaking to them from the window, that if they attempted to come in they would fire on them and would be enabled to kill several of them before they could get in. The men desisted from their attempt to take that negro.

*Question.* How large a body of men was that?

*Answer.* There were about twenty-five—not less than that number.

*Question.* In disguise?

*Answer.* Yes, sir; in disguise.

*Question.* The supposition was not that they wanted to rescue the negro, but that they wanted to take him out for some other purpose?

*Answer.* They wanted to take him out to punish him. He had struck a white man who had died from the blow.

*Question.* Perhaps we may as well inquire as to the circumstances of that case. What were they, so far as you know?

*Answer.* I never had any conversation with the gentleman who was struck, and who died from the blow. The negro man who gave the blow came to me, and I asked him in regard to it, as well as others. The gentleman at whose house he lived came to me also and told me the circumstances, as he understood them. They were detailed by this negro man and by his wife. It appeared that they were walking on the street about sundown, he and his wife. She was a washerwoman and had a basket of clothes, either on her arm or on her head; as they passed, the basket touched a gentleman named Stillings; the pavement was narrow, not much wider than this table, [about four feet.] She and her husband stated that Mr. Stillings pushed her violently from the sidewalk and struck her. The negro man remonstrated with him, and asked him why he did it Mr. Stillings stooped to pick a brick from the pavement——

*Question.* Did he say anything?

*Answer.* Yes, sir; he said that no negro should crowd him on the sidewalk. Perhaps he accompanied the remark with an oath, though I will not say as to the oath. When he did that, the negro man jerked a paling from the fence and struck him on the side of his neck and head, just below the base of his brain; he was insensible for some little time, and was taken up and carried home. My recollection is that this occurred on Friday or Saturday about night. On Monday Mr. Stillings was on the street; but he afterward became worse and died from the results of the blow, after, I suppose, nearly a month.

*Question.* Was this colored man arrested in the first place for the assault?

*Answer.* Yes, sir, he was arrested, carried before the mayor, and required to give bonds in $100. The acting mayor, who was a democrat, fixed that amount of bail for his appearance. The man appeared at the time designated.

*Question.* At that time it was supposed that the injury to Stillings was small?

*Answer.* It was supposed that it was not serious.

*Question.* But he did eventually, in about a month, die from that blow?

*Answer.* In several weeks, I think about a month.

*Question.* And then this colored man was arrested and put in jail?

*Answer.* Yes, sir, he was put in jail on a charge of murder.

*Question.* What time was that?

*Answer.* I think it was in the month of March last that the striking occurred; that is my recollection. These disguised men came to take the man from jail, during the session of our circuit court, which began the latter part of March or the first of April.

*Question.* Then it was not very long after he was first confined on this charge of murder?

*Answer.* These men came very soon after he was confined.

*Question.* The jailer made such resistance that they went away?

*Answer.* Yes, sir. The jailer told them he would fire upon them if they endeavored to break into the jail; that he would not surrender the keys.

*Question.* Was the colored man removed to some other place?

*Answer.* He was removed to Selma.

*Question.* Is he still in jail?

*Answer.* He is still in jail in Selma.

*Question.* Go on and state any other instances of the appearance of disguised men, and what they have done in your county since they first appeared there last winter.

*Answer.* About May, a colored man by the name of Isaac Hall was taken out and whipped.

*Question.* Where did he live?

*Answer.* In my county.

Compendium_Vorenberg
Page 023

*Question.* How far from your place?

*Answer.* Between fifteen and twenty miles. I will state here in regard to 'all the whippings which I shall speak of, that, though I heard of them soon after their occurrence, I got more explicit information from the representative in the legislature from my county, after I was summoned to appear here. When I received an order to come to this place, it was just before the meeting of the board of regents of the State University, of which I am a member.

*Question.* Were you required to attend that meeting?

*Answer.* Yes, sir; it was my duty to attend there. It was a very important meeting of the regents. While I was there I told this man, who is a colored man named Alexander Curtis, to get this information and give it to me.

*Question.* He is a representative in your legislature?

*Answer.* Yes, sir. He is a man of unusual intelligence for a colored man; and his character for veracity and integrity is as good as that of any man I know of in the county. I think that all persons of all parties would give him that character. He and I talked over these cases. I have mentioned the first case, that of Isaac Hall, who was taken out and whipped about the 1st of May. The cause for which he was whipped, as this colored representative in his examination found out, was that he was an active republican.

*Question:* Was there any charge of misconduct against him?
*Answer.* None that I heard.

By Mr. BECK:

*Question.* Did this colored man pretend to know these facts himself, or did he gather them second-hand?

*Answer.* He was not present when the whippings occurred. He either saw the parties or persons who had seen the parties who were whipped.

By the CHAIRMAN, (Mr. POLAND:)

*Question.* You heard of these cases by report?

*Answer.* I heard of them immediately on their occurrence.

*Question.* And you sent this man to get the particulars about each of these cases?

*Answer.* Yes, sir; I got him to secure for me the particulars. There is no sort of question—it is just as certain as that I sit on this chair—that those occurrences took place.

*Question.* Was Hall severely beaten?

*Answer.* Not severely, so far as I know. I do not know the extent of the beating. I presume it was not very severe. The next case was that of Alfred Darling, a colored man, who was beaten in February for the same cause; and he was very terribly beaten. In this case I received information, also, from the senator from Hale County, which is just west of the county of Perry, having been made from a portion of it. The senator from Hale lives near the edge of Perry.

*Question.* And near this man who was beaten?

*Answer.* Yes, sir. He told me he saw this man Darling himself, and that he was very terribly beaten.

*Question.* Why was that done?

*Answer.* There was no charge against him so far as I know, and I have been unable to hear of any. I asked Mr. Johnson, the senator from Hale, who is a white man, and he said he knew of none.

*Question.* Did you understand from what you learned that these men who did this act alleged any reason for doing it?

*Answer.* Nothing that I heard. I will say that as to the character of this man, Alfred Darling, I inquired of persons who lived in his neighborhood—white men who are democrats—and they represented him to be a good man, as having a better character than colored men generally have.

*Question.* And you never heard in any way of any allegation against him?

*Answer.* I have heard no allegation against him. The next case is that of Monie Hartley and her son, who were shot about the middle of April.

*Question.* Do you mean that they were killed?

*Answer.* No, sir; they were both shot and wounded.

*Question.* How far from your place did that happen?

*Answer.* I think about fifteen miles.

*Question.* Was this done by a body of disguised men?

*Answer.* It was done by a body of men who are supposed to have been the same body that were in Marion, my town. My information is, that it occurred the morning after the appearance of these men in Marion. It occurred early in the morning.

*Question.* Do you understand why this was done, whether there was any charge against these persons who were shot?

*Answer.* There was no charge whatever, that I know or have heard.

*Question.* Do you know anything as to the character of this woman and her son?

# BOOKS

# THE COLLECTED WORKS OF
# ABRAHAM LINCOLN

## THE ABRAHAM LINCOLN ASSOCIATION
### SPRINGFIELD, ILLINOIS

# VIII

ROY P. BASLER, *EDITOR*

MARION DOLORES PRATT AND LLOYD A. DUNLAP

*ASSISTANT EDITORS*



RUTGERS UNIVERSITY PRESS
NEW BRUNSWICK, NEW JERSEY

COPYRIGHT 1953 BY

THE ABRAHAM LINCOLN ASSOCIATION

THE HISTORY BOOK CLUB EDITION

COMPOSED IN INTERTYPE WAVERLEY
BY H. WOLFF BOOK MANUFACTURING COMPANY, NEW YORK CITY,
PRINTED BY MURRAY PRINTING COMPANY, FORGE VILLAGE, MASSACHUSETTS,
AND BOUND BY THE HADDON CRAFTSMEN, SCRANTON, PENNSYLVANIA

TITLE PAGE WOOD ENGRAVING BY STANLEY RICE
DESIGN BY P. J. CONKWRIGHT

## APRIL 11, 1865

it. As appears to me that question has not been, nor yet is, a practically material one, and that any discussion of it, while it thus remains practically immaterial, could have no effect other than the mischievous one of dividing our friends. As yet, whatever it may hereafter become, that question is bad, as the basis of a controversy, and good for nothing at all—a merely pernicious abstraction.

We all agree that the seceded States, so called, are out of their proper practical relation with the Union; and that the sole object of the government, civil and military, in regard to those States is to again get them into that proper practical relation. I believe it is not only possible, but in fact, easier, to do this, without deciding, or even considering, whether these states have even been out of the Union, than with it. Finding themselves safely at home, it would be utterly immaterial whether they had ever been abroad. Let us all join in doing the acts necessary to restoring the proper practical relations between these states and the Union; and each forever after, innocently indulge his own opinion whether, in doing the acts, he brought the States from without, into the Union, or only gave them proper assistance, they never having been out of it.

The amount of constituency, so to to [sic] speak, on which the new Louisiana government rests, would be more satisfactory to all, if it contained fifty, thirty, or even twenty thousand, instead of only about twelve thousand, as it does. It is also unsatisfactory to some that the elective franchise is not given to the colored man. I would myself prefer that it were now conferred on the very intelligent, and on those who serve our cause as soldiers. Still the question is not whether the Louisiana government, as it stands, is quite all that is desirable. The question is "Will it be wiser to take it as it is, and help to improve it; or to reject, and disperse it?" "Can Louisiana be brought into proper practical relation with the Union *sooner* by *sustaining*, or by *discarding* her new State Government?"

Some twelve thousand voters in the heretofore slave-state of Louisiana have sworn allegiance to the Union, assumed to be the rightful political power of the State, held elections, organized a State government, adopted a free-state constitution, giving the benefit of public schools equally to black and white, and empowering the Legislature to confer the elective franchise upon the colored man. Their Legislature has already voted to ratify the constitutional amendment recently passed by Congress, abolishing slavery throughout the nation. These twelve thousand persons are

[ 403 ]

Compendium_Vorenberg
Page 028

# THE RECORD OF

# MURDERS

## AND

# OUTRAGES

### Racial Violence and the
### FIGHT OVER TRUTH
### at the Dawn of Reconstruction

# WILLIAM A. BLAIR

THE UNIVERSITY OF NORTH CAROLINA PRESS

*Chapel Hill*

© 2021 William A. Blair

Designed by Jamison Cockerham
Set in Arno, Scala Sans, Cutright, and Irby
by codeMantra

Cover illustration: *Scenes in Memphis, during the Riot,* by Alfred R. Waud. From *Harper's Weekly,* May 26, 1866. Courtesy Library of Congress.

*Manufactured in the United States of America*

The University of North Carolina Press has been a member of the Green Press Initiative since 2003.

LIBRARY OF CONGRESS CATALOGING-IN-PUBLICATION DATA
Names: Blair, William Alan, author.
Title: The record of murders and outrages : racial violence and the fight over truth at the dawn of Reconstruction / William A. Blair.
Other titles: Civil War America (Series)
Description: Chapel Hill : University of North Carolina Press, [2021] | Series: Civil War America | Includes bibliographical references and index.
Identifiers: LCCN 2021003506 | ISBN 9781469663449 (cloth ; alk. paper) | ISBN 9781469663456 (paperback ; alk. paper) | ISBN 9781469663463 (ebook)
Subjects: LCSH: United States. Bureau of Refugees, Freedmen, and Abandoned Lands—Records and correspondence. | Freedmen—Southern States—History—19th century—Sources. | African Americans—Violence against—Southern States—Sources. | Reconstruction (U.S. history, 1865–1877)—Public opinion. | United States—Race relations—History—19th century. | United States—Politics and government—1865–1877.
Classification: LCC E185.2 .B55 2021 | DDC 973.8—dc23
LC record available at https://lccn.loc.gov/2021003506

such as Henry Highland Garnet and John Mercer Langston, the latter the president of the National Equal Rights League that had lobbied for the Fourteenth Amendment and Black suffrage. Southern critics defamed the speakers as a whole as "political pilgrims." They portrayed Wilson and the rest of the "vagabond fanatics" as worried that too much peace existed in the South and that Blacks and whites might vote together. Consequently, the interlopers needed to stir up trouble when calm supposedly prevailed.[29]

Before Congress adjourned, Wilson and his colleagues took an additional step to protect Black and white loyalists from intimidation. At the end of a military appropriations bill, Wilson added a section that disbanded the militias in the former Confederate states. These were not the paramilitary groups, sometimes called regulators, that operated ad hoc in the South but organized units sanctioned by state governments. As early as 1865, officers in Mississippi reported that the state militiamen went house to house to search Black people for arms, which they then confiscated. This was done ostensibly to recover weapons issued by the U.S. and Confederate governments during the war, but the militia carried out a far more extensive campaign of seizure by taking revolvers, shotguns, and other hunting weapons, designed to curtail African Americans' ability to secure subsistence and to defend themselves. The assistant commissioner of the Freedmen's Bureau in charge of the Southern District of Mississippi confronted the militia leaders, reporting, "We had quite a spirited discussion on the subject in which I claimed that a freedman has as much right to own a shotgun as any citizen of Mississippi; and that they violated the law if they deprived him of his property."[30]

The Freedmen's Bureau again supplied information to Congress, indicating that the practice continued—and in more states than Mississippi. Wilson had asked the bureau specifically for this evidence. Brev. Brig. Gen. James Thomas, an assistant to Commissioner Howard, provided extracts from reports of the assistant commissioners throughout the South about the organization of militias. The material led to the inescapable conclusion that they contained the potential to become pervasive.[31] Gen. Daniel Sickles in charge of South Carolina had prevented the organization of fifty regiments

in his department. Wilson understood the danger of these groups, warning that the members "in nearly all cases are rebels." The men forming these units refused to carry the U.S. flag. "They are hostile organizations," Wilson said, "officered generally by men who have been in the rebellion."[32]

Wilson's effort stumbled briefly; phrasing in his first draft of the military appropriations bill called not only for disbanding the militia but also for disarming its members. This sparked criticism from a host of legislators, including sympathetic ones, who considered it an unconstitutional attack on the right to bear arms. To get his bill through, Wilson dropped the wording. The members of the militia had to disband, but the individuals retained their weapons. While eliminating a military organization hostile to freedpeople, the action left guns in the hands of people inclined to use them and irritated by the belief that federal power had wrongly forced them to stand down.[33]

Wilson traveled into the South in early April, confident that the Republican Congress had done its best to secure the safety of loyalists and that it had taken consequential steps toward supplying greater power to Black men for their own protection. He began with a speech at Petersburg, Virginia, on April 4. The receptions there and at Richmond encouraged him to make a more extensive journey, which he began mid-month. Lasting through early May, his itinerary carried him through Virginia, North Carolina, South Carolina, Georgia, Alabama, and Louisiana.[34] A majority of the crowds—sometimes estimated at around 5,000—consisted of African Americans. The white people who turned out tended to be Republicans, although some rebels attended and, at some point, even delivered speeches to try to counter the senator's message.[35]

Petersburg set the tone. Wilson delivered a speech that was surprisingly conciliatory, given that he self-identified as a Radical. But he was a forgiving man by nature. He stated that the war was caused by thirty years of conflict over human slavery. "On the one hand was a system of slavery, and on the other of freedom." For this, he said, the North shared the blame. Anticipating a stance that evolved over the next decades, he even commended Southerners for their bravery

11. "Murder of Union Soldiers," 3–4.

12. "Murder of Union Soldiers," 5.

13. "Murder of Union Soldiers," 7–8.

14. *Detroit Tribune*, March 1, 1867.

15. *United States Statutes at Large*, 39th Cong., 2nd sess. (1867), 14:428–29; Beverly Wilson Palmer and Holly Byers Ochoa, eds., *The Selected Papers of Thaddeus Stevens*, 2 vols. (Pittsburgh: University of Pittsburgh Press, 1997–98), 2:253–54.

16. *Congressional Globe*, 1386.

17. *Congressional Globe*, 1375–76. The incidents mentioned by Wilson in the *Globe* appear in Texas Murders and Outrages, reel 32, M831, RG 105, BRFAL, NA.

18. *Flake's Weekly Galveston Bulletin*, March 6, 1867. Wilson's report is published on p. 5; the editor's comment on p. 4. Also see *Cincinnati Daily Gazette*, February 23, 1867.

19. *Cincinnati Daily Gazette*, February 23, 1867; *Flake's Weekly Galveston Bulletin*, March 6, 1867; *Washington (Pa.) Reporter*, March 6, 1867; *National Aegis*, March 9, 1867; Benjamin Burks Kendrick, *Journal of the Joint Committee of Fifteen on Reconstruction, 39th Congress, 1865–1867* (New York: Columbia University, 1914), 383.

20. *Congressional Globe*, 1377.

21. Brevet Brig. Genl. Samuel Thomas to Headquarters, March 9, 1867, Louisiana Murders and Outrages, images 269–305, 270 (quotation), reel 34, M1027, RG 105, BRFAL, NA. Also see the Freedmen's Bureau Online, accessed August 2, 2010, www.freedmensbureau.com/louisiana/outrages/outrages4.htm.

22. *Congressional Globe*, 1441.

23. *Congressional Globe*, 1466.

24. *Congressional Globe*, 1565; Kendrick, *Journal of the Joint Committee*, 383.

25. *Congressional Globe*, 1567.

26. Historian John A. Carpenter has offered a similar assessment. See his *Sword and Olive Branch: Oliver Otis Howard* (Pittsburgh: University of Pittsburgh Press, 1964), 130.

27. *Congressional Globe*, 1633.

28. See, for instance, *New York World*, March 21, 1867.

29. See, for example, the *Alexandria Gazette*, April 16, 1867 (political pilgrims); and *Macon Weekly Telegraph*, May 24, 1867 (vagabond fanatics). Speakers listed as heading into the South included Congressman William D. Kelley of Pennsylvania, Congressman Benjamin Butler of Massachusetts, and Senators James W. Nye and William M. Stewart of Nevada. For some of the African American speakers, see *Richmond Whig*, May 3, 1867.

30. Lt. J. M. Babcock to Major George D. Reynolds County of Claiborne, Port Gibson, December 20, 1865, images 621–12, reel 32, M1907, Mississippi, RG 105, BRFAL, NA. For a description of the militia danger in Mississippi, see John T. Trowbridge, *The Desolate South, 1865–1866: A Picture of the Battlefields and of the Devastated Confederacy* (Boston: Little, Brown and Company, 1956),

197–98. On militias in the South, see Carole Emberton, *Beyond Redemption: Race, Violence, and the American South after the Civil War* (Chicago: University of Chicago Press, 2013), 87–92, and her article "The Limits of Incorporation: Violence, Gun Rights, and Gun Regulation in the Reconstruction South," *Stanford Law and Policy Review* 17 (May 2006): 618–21.

31. James Thomas, Bvt. Brig. General, to the Hon. Henry Wilson, Washington, January 4, 1867, image 67, reel 3, M742, RG 105, BRFAL, NA.

32. *Congressional Globe*, 1577.

33. *Congressional Globe*, 1848, 1849. Also see Stephen P. Halbrook, *Freedmen, the Fourteenth Amendment, and the Right to Bear Arms, 1866–1876* (Westport, Conn.: Greenwood, 1998), 68–69; and Mark Wahlgren Summers, *A Dangerous Stir: Fear, Paranoia, and the Making of Reconstruction* (Chapel Hill: University of North Carolina Press, 2009), 154–55.

34. Henry Wilson, *History of the Reconstruction Measures of the Thirty-Ninth and Fortieth Congresses, 1865–68* (Hartford, Conn.: Hartford Publishing Company, 1868), 381–84.

35. For a sampling, see *New York Herald*, May 1 and May 13, 1867; *Cincinnati Daily Gazette*, May 23, 1867; *Boston Daily Advertiser*, April 6, 1867; and *New York Tribune*, April 20, 1867.

36. *Boston Daily Journal*, April 8, 1867; *Albany Evening Journal*, April 26, 1867 (apostle of moderation).

37. *Macon Weekly Telegraph*, April 26, 1867; *Richmond Whig*, April 5, 1867.

38. *Providence Evening Press*, April 15, 1867.

39. *Detroit Tribune*, May 24, 1867.

40. *New York World*, October 22, 1867.

41. Michael Les Benedict, "The Rout of Radicalism: Republicans and the Elections of 1867," *Civil War History* 18 (December 1972): 341–43; Foner, *Reconstruction*, 314–16.

42. *Evening Argus* (Rock Island, Ill.), May 15, 1867.

43. *New York World*, October 8, 1867.

44. *Columbian Register* (New Haven, Conn.), March 9, 1867.

45. The most widely circulated account by the Associated Press came from a correspondent for the *New York Herald* who sat next to Kelley during the disturbance. See *New York Herald*, May 15, 1867. Also see the *Daily National Intelligencer*, May 16, 1867. One white Southern witness wrote President Johnson that the riot was triggered by horses of the Fifteenth Infantry that became frightened and started to run through the crowd, making people think there was a riot. See Joseph H. Geiger to Dear Sir, May 15, 1867, in *The Papers of Andrew Johnson: Volume 12, February–August 1867*, ed. Paul H. Bergeron (Knoxville: University of Tennessee Press, 1994), 270–71.

46. William A. Russ Jr., "Registration and Disfranchisement under Radical Reconstruction," *Mississippi Valley Historical Review* 21 (September 1934): 176.

47. *United States Statutes at Large*, 15:2–4. The oath required the person to swear he had not voluntarily borne arms against the United States or given aid

Compendium_Vorenberg
Page 032

# 1877: *Year of Violence*

BY

Robert V. Bruce



Elephant Paperbacks
Ivan R. Dee, Inc., Publisher, Chicago

1877: YEAR OF VIOLENCE. Copyright © 1959 by the Bobbs-Merrill Company, renewal copyright © 1987 by Robert V. Bruce. This book was originally published in 1959 and is here reprinted by arrangement with the author.

First ELEPHANT PAPERBACK edition published 1989 by Ivan R. Dee, Inc., 1169 South Plymouth Court, Chicago 60605. Manufactured in the United States of America.

ISBN 0-929587-05-7

fight back with chairs and table legs; but this only incited the police to open up with pistol fire, wounding many of the cabinet-makers and killing at least one. Most of those who fled were hurt in jumping from windows or clubbed by waiting police who lined the stairs. "Sometimes, in the confusion," reported the *Chicago Times*, the victims "would lie struggling, kicking and cursing, a most unsavory mess, piled five or six deep, upon the stairs." Outside, Sergeant Brennan fired his pistol indiscriminately at passers-by and at men emerging from the hall. At last the Second Regiment charged up the street with bayonets leveled and drove everyone in the neighborhood indoors, including women and children.[*]

While all this went on, crowds in the Burlington yards stoned and fired on the ten-thirty Dubuque express and derailed the incoming Mendota accommodation. Passengers from the latter stole safely away on foot while the thirsty mob "irrigated their nasty thoraxes" with the contents of milkcans found in one car. Later that day a mob of boys stoned out all the windows in the Burlington's freight house and tried to tear off the slate roof. Some passenger service continued through the day, but little or no freight moved.

All that afternoon, Halsted Street swarmed with thousands of people, most of them in knots of 100 or more. Police and mounted militia patrols harried them indefatigably. Now and then came brief, ugly little scuffles, some of which lengthened the list of dead and wounded. Often a crowd would scatter at the approach of a mounted patrol, then reassemble as the troop cantered past. Half of the First National Guard Regiment and several hundred regular and special police established a base near Twelfth and Halsted, whence detachments now and then sallied out to points of real or rumored violence. At three o'clock the police and cavalry broke up a mob on Canal Street, two or three rioters being badly, perhaps mortally wounded.

Amid all the street fighting, Chicago's factories were not forgotten by the mobs. At the stockyards and the gasworks, mobs forced the officials to sign papers promising to raise wages to $2 a day for the next eighteen months. The officials signed cheerfully, knowing the pledges to be unenforceable. Lake vessels swung at anchor

[*] In a test case months afterward, the Harmonia Joiners preferred charges against the police for this attack. Declaring the meeting to have been orderly and legal and the police action a "criminal riot," Judge William K. McAllister fined Sergeants Brennan and Householder, the leaders, six cents each.

for lack of dock workers. Mobs swept through the lumberyards; and even after they passed, the lumberyard workers refused to return to their jobs—the strike there, at least, was voluntary. Some factories, previously closed, managed to reopen. Internal Revenue Collector Harvey, in the name of the United States government, took the distilleries under his wing on grounds that the government had a lien for taxes on the products thereof; and G.A.R. men armed with wagon spokes, if not bung starters, assumed the job of guarding them. But the tanneries on "Goose Island," the rolling mills and, indeed, every factory from Chicago Avenue to North Avenue, stood idle. Though the McCormick Works had not been bothered by the mob, its manager decided that "being through all the work on the fifty," it might as well stop "to clean up & take account of stock."

Turbulence lingered into Thursday night. At dusk police charged and scattered a Goose Island crowd. Later on, harassed by stones and pistol shots, the Second Regiment fired a couple of random volleys at the dark switchyards below their bivouac on the Halsted Street viaduct. Thick clouds hid the moon, and people still roamed the streets apprehensively, startled by an occasional shot. In the Exposition Building the undaunted Theodore Thomas led a grimly Wagnerian program, including the *Flying Dutchman* overture, the "Bacchanale" from *Tannhäuser*, "Siegfried's Death" from *Götterdämmerung*, and the "Ride of the Valkyries," now and then augmented by the hoofbeats of passing patrols. A vague sense of imminent calamity still hung in the air, and one of the Burlington's detectives reported talk in the mob of burning freight depots and roundhouses. Some thought the whole city would be put to the torch.

Yet more and more signs appeared that the crisis had passed. Afternoon trains from the West had brought six companies of the Ninth United States Infantry and two more companies of the Twenty-second, all of them rugged veterans of the late campaigns against the Sioux and the Cheyenne. Colonel Drum put them at the mayor's disposal at once. On Kinzie Street a gang of young hoodlums stoned a detachment of the Twenty-second until one soldier, hit by a pebble, turned and fired his Henry rifle reprovingly at the miscreant. He missed, perhaps intentionally, but the course of the bullet was later traced through two frame saloons and into a third building. That pacified the crowd, and at five o'clock Colonel Drum

was able to inform the anxious War Department that the regulars had not engaged the mob, had merely guarded property and were at the moment resting in their quarters.

Dejected prisoners accumulated in the police stations, while their hosts remained "full of war," roused by the day's successes to "the highest pitch of excitement." All day long volunteer "specials" streamed into police headquarters and were sworn; by nightfall there were said to be 5,000 on duty. The old Ninety-sixth Illinois had a reunion under arms—Remington breechloaders—and even the Board of Trade drummed up 100 volunteers for its own patrol. City Hall furnished the best barometer. Thickly infested for three days past by the curious, the fearful and the meddlesome, its dark, low-ceilinged corridors by eight o'clock in the evening heard only the purposeful tread of incoming and outgoing messengers and "specials." Chicagoans seemed to agree with Vice-President Ackerman of the Illinois Central. "If we get through without a fire," he wrote that night, "I think the backbone of the movement is broken."

Broken—but at what a price! The people who had made a mob took time now in the warm night to sit on doorsteps and gather at corners along Halsted Street, weighing the cost. "John Weinert, aged 19, living on South Canal Street, shot and instantly killed . . . J. Wallace aged about 18, instantly killed . . . A man whose name was not learned, living on Archer Avenue, shot through the lungs and died almost immediately of hemorrhage . . . Joseph Cooley, shot through the head and killed . . . Edward Phillips, aged about 17 years, was shot dead in the morning and taken to the morgue, where he now lies . . . Harry Collins, shot in the thigh; a dangerous wound which may result in amputation. . . ." The list ran on. At least eighteen men and boys, some of them mere onlookers, were dead, and scores were wounded. This is a minimum; many others were carried off by companions and never reported.

Did the movement actually have a "backbone," that is to say leadership, organization, a concrete program? For a time Van Patten and the Workingmen's Party had struggled to meet that need. But the police cut short the party's development before it passed the gristle stage. Frank Norbock, leader of the party's Bohemian section, was shot through the head and instantly killed at the corner of Sixteenth and Canal Thursday morning. Otherwise, in the explosion of Thursday the word "Communist" appeared in the press

only as a casual epithet. A *Post* reporter looked in on the *Vorbote* office that afternoon and found everything quiet. No more meetings were planned at present. "We don't think it advisable," said his informant. The mob remained invertebrate.

There was one great city, however, where the Workingmen's Party held the center of the stage from first to last; and that was Chicago's long-time rival, St. Louis.

The Great Strike found St. Louis as vulnerable as its northern competitor. Sprawled along eighteen miles of Mississippi shore opposite Illinois, the city still hoped to catch and pass Chicago as the commercial center of the Midwest. Though steamboats, some of them palatial, lined St. Louis levees, the great days of river traffic had passed. Industrial smoke now hung in the sky like a banner proclaiming the city's new allegiance. Flour mills, smelting works, rolling mills, foundries, packing houses, machine shops, lead, zinc and sugar refineries gave work to a growing proportion of the city's 300,000 people. Breweries were especially plentiful, the concomitant of a large German population.

As a distributing center, St. Louis was making up through its railroads for what it had lost by the decline of steamboating. The great Eads bridge, an engineering milestone completed in 1874, shifted St. Louis' commercial polarity from a north-south to an east-west axis. The city became a gateway of trade, with a large population of transients. Now, in July 1877, these gains became dangers. The strike impulse was bound to reach St. Louis via one railroad line or another; and when it did, it would be felt. Beginning with the Missouri Pacific, most of the St. Louis roads had gone along with the spring fashion of low-cut wages. The Ohio & Mississippi's cut rankled most, for a costly strike in 1876 had wrung from the management a promise of no further slashes. The promise had been broken as of July 16. O. & M. brakemen charged that their earnings now averaged $30 a month, just enough to buy them meals at a quarter apiece and a twenty-five cent lodging. The company claimed that pay averaged $42. Forty-two or thirty, it was clear that faith had not been kept.

The railroad men were not alone in their distress. Far back in old French days the region had been nicknamed *"Pain Court"*—"short of bread"—and there were grounds in 1877 for reviving the title. The

1877: YEAR OF VIOLENCE

urer of the W.P.U.S., Labor Collection (U.S. MSS. 2A), Wisconsin Historical Society.

## CHAPTER 12

230 (Cincinnati): McCabe, pp. 370-371.

231 (dynamite): Lafcadio Hearn's description is quoted in Burbank, p. 5. Vivian, pp. 190-191.

231 (violence): *Cincinnati Enquirer*, 7/23/77, 7/24/77. *Cincinnati Commercial*, 7/23/77, 7/24/77.

231 (good): *Idem.*

232 (sixteen): *Boston Globe*, 7/25/77.

232 (matter): All quotations are from the issues of 7/23/77. The "prominent official" is quoted in the *Philadelphia Times*, 7/24/77.

233 (find): *Ibid.*, 7/24/77, 7/25/77, 7/26/77. *Labor Standard*, 8/4/77.

233 (present): *Philadelphia Times*, 7/27/77, 7/30/77. *Philadelphia Telegraph*, 7/27/77. McClure, II, 458-459.

234 (closets, luckier, notified, Chicago): Bessie Louise Pierce, *A History of Chicago* (4 vols., New York, 1937-1957), III, 11-12, 20, 22-23, 33, 52-53, 55, 59, 234, 237-240, 243n, 516.

235 (English): David M. Behen, "The Chicago Labor Movement, 1873-1896: Its Philosophical Bases" (unpublished Ph.D. dissertation, University of Chicago, 1953), p. 70n. Photograph of Philip Van Patten in Labadie Collection. Howard H. Quint, *The Forging of American Socialism* (Columbia, S. C., 1953), p. 19.

235 (occasions): Lucy E. Parsons, *Life of Albert R. Parsons* (Chicago, 1889), pp. xv-xvi, 6-11.

236 (strikers): *Chicago Daily News*, 7/20/77, 7/22/77. Charles H. Dennis, *Victor Lawson* (Chicago, 1935), pp. 41-43.

236 (district): *Chicago Post*, 7/23/77. Pierce, III, 245-246.

237 (here): *Chicago Post*, 7/21/77. *Railroad Gazette*, IX (5/18/77), 225. In Burlington Archives: W. B. Strong to C. E. Perkins, 2:42 P.M., 7/22/77, CBQ 3.1; Perkins' return from Nebraska is noted in an office memorandum book, CBQ, 32.6:1877.

237 (city): Pierce, III, 247. AGO, Ltrs. Rec'd., 1877, #4212. *Annual Report of the Division of the Missouri for 1877*, printed copy in Sherman MSS., p. 2.

238 (night): *Chicago Post*, 7/23/77.

238 (police): Pierce, III, 246-247. *Chicago Post*, 7/24/77.

239 (receding): W. Strong to C. Perkins, 12:47 A.M., 7/24/77, CBQ 33 1870 2.1, in Burlington Archives.

239, 240 (Burlington, older, easily): *Chicago Times*, 7/25/77.

240 (day): *Idem. Chicago Post*, 7/24/77.

240 (idleness): *Idem.*

241 (boys): *Chicago Times*, 7/25/77.

241 (captains): *Chicago Post*, 7/24/77. *Chicago Times*, 7/25/77.

241 (him): AGO, Ltrs. Rec'd., 1877, #4299, 4306, 4312.

242 (duty): *Chicago Times*, 7/25/77. J. Seymour Curry, *Chicago: Its History and Builders* (4 vols., Chicago, 1912), II, 298.

242 (forefront): Parsons, pp. 11-13.

243 (crowd): *Chicago Daily News*, 7/24/77. *Chicago Times*, 7/25/77.

243 (committee, silver, completely): *Idem.*

244 (temper): *Chicago Post*, 7/25/77. *Chicago Times*, 7/26/77. Pierce, III, 249.

244 (strength): *Chicago Times*, 7/26/77. In Burlington Archives: W. Strong to C. Perkins, 10:46 A.M., 12:12 P.M., 4:58 P.M., CBQ 33 1870 3.1; R. Harris to J. Griswold, 7/25/77, CBQ B1.5 Box 31. C. Perkins to J. Forbes, 8/2/77, Letterbook 3, pp. 391-393, in Cunningham-Overton Collection.

245 (custody): *Chicago Times*, 7/26/77.

245 (evening): Pierce, III, 250. *Chicago Times*, 7/26/77. AGO, Ltrs. Rec'd., 1877, #4690.

246 (dead): *Chicago Times*, 7/26/77. *Chicago Daily News*, 7/26/77.

247 (rioters): *Chicago Times*, 7/26/77.

247 (rioters): *Idem.* AGO, Ltrs. Rec'd., 1877, #4341, 4352, 4509 (enclosures 28, 44, 45).

248 (Vicksburg): *Chicago Times*, 7/27/77. *Chicago Post*, 7/26/77. W. Ackerman to W. Osborn, 7/26/77, in Ill. Cent. Archives.

248 (again): *Chicago Daily News*, 7/26/77. *Chicago Post*, 7/27/77. *Chicago Times*, 7/27/77.

249 (afternoon): *Chicago Post*, 7/26/77. *Chicago Times*, 7/27/77.

249 (erupted): *Chicago Post*, 7/26/77. *Chicago Daily News*, 7/26/77. *Chicago Times*, 7/27/77.

250 (children): *Idem. Chicago Post*, 7/26/77. *Chicago Inter Ocean*, 4/25/79, 4/26/79, 5/6/79. Pierce, III, 253n.

250 (moved, wounded): *Chicago Post*, 7/27/77. *Chicago Times*, 7/27/77.

251 (stock): *Chicago Daily News*, 7/26/77. *Chicago Post*, 7/26/77. *Chicago Times*, 7/27/77. F. Matthews to C. McCormick, 7/27/77, in Cyrus McCormick MSS., Wisconsin Historical Society.

251 (torch): *Chicago Post*, 7/26/77. *Chicago Times*, 7/27/77. John Moses and Joseph Kirkland, eds., *The History of Chicago* (2 vols., Chicago, 1895), I, 766. W. Strong to C. Perkins, 3:40 P.M., 7/26/77, in Burlington Archives.

NOTES

252 (quarters): *Chicago Times*, 7/27/77. AGO, Ltrs. Rec'd., 1877, #4412, 4509 (enclosure 40).

252 (broken): *Chicago Times*, 7/27/77. W. Ackerman to W. Osborn, 7/26/77, in Ill. Cent. Archives.

252 (reported): *Chicago Times*, 7/27/77. Pierce, III, 251.

253 (invertebrate): *Chicago Post*, 7/26/77. *Chicago Times*, 7/27/77.

253 (population): Burbank, pp. 1-2, 8.

253 (kept): *Ibid.*, pp. 2, 8, 45. *St. Louis Times*, 7/22/77.

254 (mid-July, embryo, starvation): Burbank, pp. 1, 3-4, 7, 33-34, 40-41, 54.

255 (business): James Harrison Wilson, *Under the Old Flag* (2 vols., New York, 1912), II, 381-383, 389-400, 542. In James Harrison Wilson MSS.: J. Wilson to J. Schiff, 7/19/77; J. Wilson to J. Boyle, 9/6/77.

255 (be): J. Wilson to C. Schurz, 7/22/77, in Schurz MSS.

256 (allies): *St. Louis Times*, 7/23/77. Burbank, p. 46.

256 (Cheers): *St. Louis Times*, 7/23/77. Burbank, pp. 47, 50.

256 (often): *Ibid.*, pp. 51, 176, 217.

257 (necessary): *St. Louis Times*, 7/23/77. Burbank, p. 53. J. Wilson to C. Schurz, 7/22/77, in Schurz MSS. AGO, Ltrs. Rec'd., 1877, #4250.

257, 258 (thereafter, all): *St. Louis Times*, 7/24/77. Burbank, pp. 61-66.

258 (hours): J. Schiff to J. Wilson, 7/24/77, in Wilson MSS. *St. Louis Times*, 7/24/77. AGO, Ltrs. Rec'd., 1877, #4264, 8135 (enclosure 84).

258 (punishment): Burbank, p. 61.

259 (for): *St. Louis Times*, 7/24/77. Burbank, pp. 68-69.

259, 260 (strikers, trains): *St. Louis Times*, 7/25/77. Burbank, pp. 78, 81.

260 (themselves): J. Wilson to C. Schurz, 7/24/77, in Schurz MSS. AGO, Ltrs. Rec'd., 1877, #4300.

260 (stage): *St. Louis Times*, 7/25/77. Burbank, p. 77.

260 (any): *Ibid.*, p. 83. Hillquit, p. 202.

260 (age): *St. Louis Times*, 7/25/77.

## CHAPTER 13

261 (England): Boston & Maine Railroad, *Annual Report for 1877*, p. 8.

262 (this): *Arkansas Gazette*, 7/27/77. *Raleigh Observer*, 7/24/77.

262 (days): *Arkansas Gazette*, 7/24/77, 7/26/77, 7/27/77, 7/31/77, 7/30/77.

262 (direction): Burbank, p. 101. *New Orleans Times*, 7/19/77, 7/28/77, 7/30/77.

262 (work): *Savannah News*, 7/26/77, 7/27/77, 7/28/77. *Charleston News and Courier*, 7/28/77.

263 (rioters): *New Orleans Times*, 7/25/77, 7/30/77. *Charleston News and Courier*, 7/24/77, 7/25/77.

263 (rule): *Galveston News*, 7/17/77, 7/24/77 to 8/5/77 passim.

264 (town): *Louisville Courier-Journal*, 7/25/77. *Louisville Commercial*, 7/24/77, 7/25/77.

265 (First): *Louisville Courier-Journal*, 7/25/77. *Louisville Commercial*, 7/25/77. Alpheus T. Mason, *Brandeis: A Free Man's Life* (New York, 1946), pp. 47-48.

265 (week): *Louisville Commercial*, 7/26/77, 7/27/77, 7/28/77. Mason, *Brandeis*, p. 48.

266 (order): Northern Pacific Railroad, *Annual Report for 1877*, p. 3. *Wyandott Herald*, 7/26/77. Missouri, Kansas & Texas Railroad, *Annual Report for 1877*, pp. 19, 46.

266 (property): *Omaha Republican*, 7/19/77 to 7/26/77 passim. AGO, Ltrs. Rec'd., 1877, #8131.

266 (cracker): *Rocky Mountain News*, 7/27/77.

267 (monopoly): John S. Hittell, *A History of the City of San Francisco* (San Francisco, 1878), pp. 422-424. Hubert H. Bancroft, *History of the Pacific States of North America* (39 vols., San Francisco, 1882-1891), XIX, 351-352. Oscar Lewis, *The Big Four* (New York, 1938), p. 365.

267 (pay): Nevins, *Emergence*, pp. 150-152, 375.

267 (onslaught): *San Francisco Call*, 7/23/77.

267 (authorities): *Ibid.*, 7/23/77, 7/24/77. H. Linderman to J. Sherman, 8/4/77, in Sherman MSS. Ira B. Cross, *A History of the Labor Movement in California* (Berkeley, 1935), p. 88.

268 (quietly): *San Francisco Bulletin*, 7/24/77. *San Francisco Call*, 7/24/77.

268 (order): *Ibid.*, 7/24/77, 7/25/77.

269 (ruins): *San Francisco Bulletin*, 7/25/77. *San Francisco Call*, 7/25/77, 7/26/77.

269, 270 (soon, generally): *San Francisco Bulletin*, 7/26/77. *San Francisco Call*, 7/26/77.

270 (fire): *Ibid.*, 7/26/77. *San Francisco Bulletin*, 7/26/77.

270 (normal): *San Francisco Call*, 7/27/77.

271 (elsewhere): *Detroit News*, 7/23/77, 7/24/77, 7/25/77, 7/26/77. AGO, Ltrs. Rec'd., 1877, #4298. Harlow, p. 238.

271 (case): *Detroit News*, 7/26/77. Michigan Central Railroad, *Annual Report for 1877*, p. 6. The Lehigh Valley Railroad Superintendent's 1877 report furnishes another example of the contradiction.

# A WELL-REGULATED MILITIA

## THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA

SAUL CORNELL

OXFORD
UNIVERSITY PRESS
2006

*Cruikshank* recast the Second Amendment's scope, reframing it in narrow states' rights terms. This legal narrowing of the ambit of the right to bear arms by the courts was followed by an equally profound change in the definition of the militia under federal law. As the century drew to a close, the issue of how to reform the militia and make it an effective fighting force for the modern age was vigorously debated. At the dawn of the new century, Congress took up the task of militia reform with renewed energy. Dissatisfied with the organization and effectiveness of the militia, Congress set about to reshape the nature of this venerable institution. The two key pieces of federal legislation were the Dick Act of 1903 and the National Defense Act of 1916. The Dick Act created an organized Militia, the National Guard, and the Reserve Militia. This new system was subsequently redefined by the National Defense Act as the National Guard and the Unorganized Militia. Taken together these two statutes effectively nationalized the function and control of the militia. By wresting control of the militia from the states, these acts had the practical effect of draining the Second Amendment of much of its remaining force. Although the Second Amendment was understood to be a restraint on the power of Congress to disarm the militia, the new National Guard was clearly a creature of the federal government.

The changes in the militia were part of a broader shift in American attitudes toward the ideal of an armed citizenry. In colonial America the law required that most white male citizens bear arms in the militia. The reorganization of militia into the modern National Guard prompted a more wide-ranging debate over the value of military training for civilians. One critic not only proclaimed his opposition to "making military training compulsory," but also went on to argue that "it is entirely adverse to the spirit and principles of the Constitution." This view seemed to turn the traditional conception of the militia on its head. The idea of the citizen soldier was no longer the minuteman, but the National Guardsman. Mandatory military training for the civilian population was no longer cast as the necessary means of instilling

virtue in the citizenry, but a means of corrupting individuals. Requiring citizens to obtain military training was deemed too Prussian and militaristic. This was nearly the opposite of the view championed during the Founding era. The most astute observers of this profound shift in American attitudes recognized that it represented a break with the past but accepted that times had simply changed. As one legal scholar noted, "The day is past when a group of hardy pioneer citizens could defend their rights by a few muskets or homemade pikes."[59]

## THE MODERN GUN CONTROL DEBATE AND THE EMERGENCE OF THE COLLECTIVE RIGHTS THEORY

On a pleasant August day in 1910, William J. Gaynor, mayor of New York, waved good-bye to friends and supporters aboard a cruise ship docked along the Hudson River. A noted reformer who had vowed to clean up city hall politics, Gaynor was looking forward to a much-deserved vacation. The calm of the moment was shattered when a disgruntled city employee wielding a pistol rushed out of the crowd of well-wishers and shot Gaynor. Although he had been seriously injured, the mayor survived the failed assassination attempt, which shocked the city and gave additional impetus for those eager to enact more stringent firearms regulations. Within a year's time another noted city politician, Timothy "Big Tim" Sullivan, had persuaded the New York State legislature to enact the most wide-ranging gun control statute in American history. The Sullivan law not only regulated the right to carry firearms, but also severely restricted the possession of firearms in one's home and business. The law also instituted a license requirement for the ownership of handguns. Gun owners protested the law. Although a few challenges invoked the authority of the Second Amendment, these were easily dismissed in light of the holding in *Cruikshank.* The *New York Times* editorialized on this theme,

militia; see Daniel J. McKenna, "The Right to Keep and Bear Arms," *Marquette Law Review* 12 (1927–28): 138–49.

59. S. T. Ansell, "Legal and Historical Aspects of the Militia," *Yale Law Journal* 26 (1916–17): 471–80; H. Richard Uviller and William G. Merkel, *The Militia and the Right to Arms: Or, How the Second Amendment Fell Silent* (Durham, N.C., 2002); "Dr. Cadman on Military Training in the Schools," in Lamar T. Beman, ed., *Military Training Compulsory in Schools and College* (New York, 1926) 132.

60. *New York Times*, August 10, 1910; *New York Times*, August 31, 1911. For a general discussion of this event and its connection to the adoption of the Sullivan law, see Alexander DeConde, *Gun Violence in America: The Struggle for Control* (Boston, 2001). Larmar T. Beman, ed., *Outlawing the Pistol* (New York, 1926).

61. Lucillus A. Emery, "The Constitutional Right to Keep and Bear Arms," *Harvard Law Review* 28 (1914–15): 473–77. Emery asserted that states might even regulate the way militia weapons were carried in the open and not merely nonmilitary weapons carried outside of the context of militia service. To support this claim he cited *Presser v. Illinois*, 116 U.S. 264, a case that built on the legacy of *Cruikshank* and upheld an Illinois statute that prohibited citizens from parading with arms. Emery's formulation of the right to bear arms was picked up by a number of subsequent commentators; see McKenna, "The Right to Keep and Bear Arms"; John Brabner-Smith, "Firearm Regulation," *Law and Contemporary Problems* 1 (1933–34): 400–414; cited for authority in a commentary on the constitutionality of the National Firearms Act, "Notes and Comments," *Cornell Law Quarterly* 21 (1935–36): 106–7; and cited by the government in the most important twentieth-century Second Amendment case, *U.S. v. Miller*, see Brief of the United States, *U.S. v. Miller*, 307 U.S. 174 (1939) (No. 696) at 4–5; *U.S. v. Miller*, 307 U.S. 174 (1939) (No. 696).

62. Emery, "Constitutional Right to Keep and Bear Arms," 473, 476–77; although Emery did not cite *Salina v. Blaksley*, 72 Kan. 230 (1905), the Kansas Supreme Court had used a similar formulation of the right to bear arms a decade earlier, describing this right as one that "refers to the people as a collective body." One measure of Emery's influence may be found in an essay written by the eminent Harvard Law professor Zechariah Chafee, Jr. Following Emery's lead, Chafee concluded that "unlike the neighboring amendments, this clause safeguards individual rights very little and relates mainly to our federal scheme of government." Chafee went on to note that "the Second Amendment is thus concerned with the militia and army clauses in the original constitution"; Chafee, "Right to Bear Arms," *Encyclopedia of the Social Sciences* (New York, 1930), 2: 209–10. For another good illustration of Emery's influence, see Brabner-Smith, "Firearm Regulation," 411.

63. McKenna, "The Right to Keep and Bear Arms."

64. DeConde, *Gun Violence in America*; Osha Grey Davidson, *The NRA and the Battle for Gun Control* (New York, 1993); Robert J. Spitzer, *The Politics of Gun Control*, 3rd ed. (Washington, D.C., 2004).

65. For a brief overview of the case, see DeConde, *Gun Violence in America*. A number of modern individual rights scholars have attempted to reinterpret *Miller* as being either agnostic on the individual rights question or even supportive

of an individual right; see Brannon P. Denning, "Can the Simple Cite Be Trusted? Lower Court Interpretations of *United States v. Miller* [59 S. Ct. 816 (1939)] and the Second Amendment," *Cumberland Law Review* 26 (1995/96): 961–1004. Brannon P. Denning and Glenn H Reynolds, "Telling *Miller*'s Tale: A Reply to David Yassky," *Law and Contemporary Problems* 65 (2002): 113–23; Eugene Volokh et al., "The Second Amendment as Teaching Tool in Constitutional Law Classes," *Journal of Legal Education* 48 (1998): 591–614. For a critique of these revisionist arguments about *Miller*, see Mathew S. Nosanchuk, "The Embarrassing Interpretation of the Second Amendment," *Northern Kentucky Law Review* 29 (2002): 705–803. While *Miller* did not use this language, no contemporary commentator read the interpretation as asserting an individual rights view of the amendment.

66. Brief of the United States, *U.S. v. Miller*, 307 U.S. 174 (1939) (No. 696) at 4–5, 21, 16. *U.S. v. Miller*, 307 U.S. 174 (1939) (No. 696); *U.S. v. Miller*, 26 F. Supp 1002 (W.D. Ark 1939), rev'd, 307 U.S. 174.

67. "Supreme Court Bars Sawed-Off Shotgun: Denies Constitution Gives Right to Carry This Weapon," *New York Times*, May 16, 1939. It is impossible to say why the Court accepted the conclusion of the government's brief without adopting its language. Some modern gun rights scholars have read the failure to employ this nomenclature as evidence that the Court either embraced or was agnostic on the individual rights character of the amendment. Such a view rests on a false dichotomy which assumes that the Second Amendment protects an individual right or a collective right. Actually, the Court's argument was entirely consistent with the dominant civic paradigm of the Second Amendment that defined mainstream constitutional commentary for most of the nineteenth century. The Court's language placed it closer to antebellum jurisprudence than it did to *Cruikshank* and the line of cases descended from it. For a critique of the fallacy of false dichotomous questions in the Second Amendment debate, see Saul Cornell, "A New Paradigm for the Second Amendment," *Law and History Review* 22 (2004): 161–67.

68. *United States v. Miller*, 307 U.S. 174.

69. The modern revisionist view that Miller supported an individual rights view was explicitly rejected when the First Circuit Court of Appeals took up the Second Amendment three years later in *Cases v. U.S.*, 131 F.2d 916, 1st Cir (1942), cert denied, 319 U.S. 770 (1943). Two larger historical contexts are important in thinking about the Court's state of mind when deciding this case. First, the Court was mindful of the rise of organized crime, a social ill that had prompted passage of the first federal gun control laws. Second, growing concerns about Hitler's aggression in Europe sensitized the Court to the need for providing future flexibility regarding the militia's composition and range of armaments. To gain some sense of the way the Nazi threat loomed in contemporary thought, one need only look at the May 16, 1939, issue of the *New York Times*, which reported the *Miller* decision. For some sense of the level of anxiety see in particular the following two articles: "Nazi Inquiry in Quebec: Fascist Bodies in Province Are Also Investigated" and "German Fort Line Held Impregnable: Hitler Continues His Tour of 'West Wall.'"

# RECONSTRUCTION

## *America's Unfinished Revolution*

## 1863 ★ 1877

## ERIC FONER

### ILLUSTRATED



**HARPER & ROW, PUBLISHERS, New York**

Grand Rapids, Philadelphia, St. Louis, San Francisco
London, Singapore, Sydney, Tokyo, Toronto

A hardcover edition of this book was published in 1988 by Harper & Row, Publishers.

RECONSTRUCTION. Copyright © 1988 by Eric Foner. All rights reserved. Printed in the United States of America. No part of this book may be used or reproduced in any manner whatsoever without written permission except in the case of brief quotations embodied in critical articles and reviews. For information address Harper & Row, Publishers, 10 East 53rd Street, New York, N.Y. 10022.

First PERENNIAL LIBRARY edition published 1989.

The map that appears on page 126 is adapted from Sam Hilliard, *The Atlas of Antebellum Southern Agriculture,* by permission of Louisiana State University Press. Copyright © 1984 by Louisiana State University Press.

Library of Congress Cataloging-in-Publication Data

Foner, Eric.
    Reconstruction, 1863–1877.

    "Perennial Library."
    (New American Nation series)
    Bibliography: p.
    Includes index.
    1. Reconstruction. 2. United States—Politics and government—1865–1877.
3. Afro-Americans—History—1863–1877. I. Title.
E668.F66 1989        973.8        87-45615
ISBN 0-06-015851-4        88 89 90 91 92 RRD 10 9 8 7 6 5 4 3 2 1
ISBN 0-06-091453-X (pbk.)        91 92 93 RRD 10 9 8 7 6

value, of transcending the present compartmentalization of historical study into "social" and "political" components, and of historical writing into "narrative" and "analytical" modes. Some practitioners of the "new" history have expressed fear that the very notion of "synthesis" suggests a return to the excessively broad generalizations and narrow political focus of an earlier era.[11] This is not my intention. Rather, my aim is to view the period as a whole, integrating the social, political, and economic aspects of Reconstruction into a coherent, analytical narrative.

Like nearly every aspect of the period, the chronological definition of Reconstruction remains open to dispute. I have chosen the conventional date of 1877 to close this account (with a brief look at the New South that followed), because although the process of social change did not abruptly end in that year, the fall of the South's last Republican governments and the removal of federal troops from a role in regional politics marked a definitive turning point in American history. My opening is more unusual, for the book begins not in 1865 (or, as others would insist, in 1861), but with the Emancipation Proclamation of 1863. I do this to emphasize the Proclamation's importance in uniting two major themes of this study—grass-roots black activity and the newly empowered national state—and to indicate that Reconstruction was not merely a specific time period, but the beginning of an extended historical process: the adjustment of American society to the end of slavery. The destruction of the central institution of antebellum Southern life permanently transformed the war's character, and produced far-reaching conflicts and debates over the role former slaves and their descendants would play in American life and the meaning of the freedom they had acquired. These were the questions on which Reconstruction persistently turned.

Over a century ago, prodded by the demands of four million men and women just emerging from slavery, Americans made their first attempt to live up to the noble professions of their political creed—something few societies have ever done. The effort produced a sweeping redefinition of the nation's public life and a violent reaction that ultimately destroyed much, but by no means all, of what had been accomplished. From the enforcement of the rights of citizens to the stubborn problems of economic and racial justice, the issues central to Reconstruction are as old as the American republic, and as contemporary as the inequalities that still afflict our society.

11. Eric H. Monkkonen, "The Dangers of Synthesis," *AHR*, 91 (December 1986), 1146–57.

Compendium_Vorenberg
Page 044

# Nez Perce Summer, 1877

## THE U.S. ARMY AND THE NEE-ME-POO CRISIS

BY Jerome A. Greene

FOREWORD BY
Alvin M. Josephy, Jr.

MONTANA
HISTORICAL
SOCIETY
PRESS

Helena

DEC 1 2 2000
970.3
G 811n

COVER DESIGN BY Kathryn Fehlig
BOOK DESIGN BY Arrow Graphics, Missoula
TYPESET IN Janson and Baker Signet
PRINTED BY Thomson-Shore, Inc., Dexter, Michigan

Royalties earned from this book go to support the programs of Nez Perce National Historical Park.

Copyright © 2000 by Montana Historical Society Press,
P.O. Box 201201, Helena, Montana 59620-1201. All rights reserved.

00 01 02 03 04 05 06 07 08 09 10 11     10 9 8 7 6 5 4 3 2 1

ISBN 0-917298-68-3

LIBRARY OF CONGRESS CATALOGING-IN-PUBLICATION DATA

Greene, Jerome A.
    Nez Perce summer, 1877 : the U.S. Army and the Nee-Me-Poo crisis / by Jerome A. Greene.
      p.  cm.
Includes bibliographical references and index.
ISBN 0-917298-68-3 (cloth ; alk. paper)
1. Nez Percé Indians—Wars, 1877. 2. Big Hole, Battle of the, 1877 3. Nez Percé Indians—History—19th century. 4. Nez Percé Indians—Government relations. I. Title.

E83.877.G74   2000
973.8'3—dc21
                                                                    00-032934
                                                                    CIP

Compendium_Vorenberg
Page 046

General Howard promptly convened a meeting with Monteith, Inspector Erwin C. Watkins of the Bureau of Indian Affairs, and Captain Perry at Fort Lapwai. Howard directed Perry to ready his two companies to advance to Mount Idaho to relieve the citizens there. Simultaneously, Monteith sent out some friendly Nez Perces, ostensibly to bring in White Bird and Joseph, but more realistically to seek confirmation of the deaths. He then directed the agent at Kamiah to move his family and employees down to the Lapwai Agency. Later that day, news came from Mount Idaho that more whites had been killed. "We want arms and ammunition and help at once. Don't delay a moment," said the message. In answer, Perry's troops, outfitted with three days' rations in their saddlebags and enough for five more carried by pack mules, moved out at eight that evening accompanied by Nez Perce scouts from the agency. Through an aide dispatched to the telegraph at Walla Walla, Howard ordered up the two cavalry companies stationed at Wallowa Valley and the infantry at Fort Walla Walla. Howard then sent a dispatch to Major Wood at Portland requesting the concentration of more troops and supplies at Lewiston. He notified General McDowell of the situation, requested authority to hire more scouts, and closed reassuringly with, "Think we shall make short work of it."[14]

When Captain Perry rode out of Fort Lapwai, his fighting strength consisted of Companies F and H, First Cavalry, 103 men strong. In composition, the two companies more or less typified the enlisted ranks in 1877, many of them foreigners of diverse vocational background, including some recent recruits who were inexperienced in military matters, particularly in such basic cavalry requisites as riding and shooting.[15] Well outfitted for the work ahead, each man wore the issue black campaign hat (or perhaps a civilian-style hat), regulation blue army fatigue uniform, leather gauntlets and boots, and a loaded cartridge belt. Prescribed equipment included a tin canteen, haversack, shelter tent, saddlebags, and a leather carbine sling, and his weapons, consisting of the Model 1873 Springfield .45-caliber single-shot carbine and a holstered Model 1873 Colt .45 revolver.

The officers with the command were all veterans with western service. Connecticut-born Perry, age thirty-six, had been with the First Cavalry since the Civil War and possessed considerable experience of the Northwest Indian frontier. He had most recently participated in California's Modoc War of 1873, where he was wounded, and he owned

two brevets for distinguished Indian wars service. Perry personally commanded Company F. His subordinate officer was First Lieutenant Edward R. Theller, attached from the Twenty-first Infantry at Fort Lapwai. Theller was from Vermont and had served with the California volunteers during the Civil War and with Perry during the Modoc campaign. Company H was commanded by Captain Joel G. Trimble, who, like Perry, had seen service with the First Cavalry since the Civil War. Trimble had fought at Gettysburg, Cold Harbor, and Five Forks, and he had been twice wounded in action. His second-in-command was forty-one-year-old First Lieutenant William R. Parnell, an Irish immigrant and veteran of European wars, including the famous charge of the six hundred at Balaclava. He had served with the New York cavalry during the Civil War before joining the regulars and gaining extensive experience under George Crook in Oregon and Idaho during the late 1860s.[16]

The troops traveled all night along the muddy Lewiston–Mount Idaho road, moving part of the way with skirmishers and flankers advanced to counter a surprise attack by the warriors. They reached Cottonwood and Norton's Ranch at about 10:00 A.M. on the sixteenth. After breakfasting there, they proceeded across the rolling Camas Prairie toward Mount Idaho, ascertaining from the smoldering haystacks and ranch buildings they spotted en route that they were entering the zone of conflict. Approaching Grangeville at sundown, they passed by Norton's abandoned wagon and dead horses. At Grangeville, frightened armed citizens presented Perry with details of the outbreak, informing him that a large body of Nez Perces had passed by on the prairie that morning headed in the direction of White Bird Creek on the Salmon. The troops bivouacked in a field, intending to go on to the vicinity of the attacks next day. That plan was scuttled after a delegation of townspeople convinced Perry of the necessity of moving forward and punishing the tribesmen before they crossed the Salmon. At 9:00 P.M., a trumpeter sounded "Boots and Saddles," and the cavalrymen made preparations for a night march. Eleven citizens volunteered to accompany the troops as guides, and all got underway by 10:00 P.M.[17]

For three hours, the soldiers groped south-southwest along the road toward White Bird Canyon, passing en route near Tolo Lake to assure that the Nez Perces had left that area. At about 1:00 A.M., they crested the rise leading into the canyon, the troopers halting to rest and await daylight. About 4:00 A.M., as dawn peeked over the eastern horizon, Perry

ordered the march resumed and the cavalrymen started down through a steep and narrow gorge, traversing an old wagon road that led directly into White Bird Canyon. It was Sunday, June 17, and the soldiers moved forward with Company F leading the way in a column of twos, followed by Company H in identical order. Garbed in greatcoats, their carbines and revolvers at the ready, the command traced its way for several miles along a dry creek bed, occasionally skirting around undergrowth and generally paralleling the gradually widening canyon in its descent. Soon the soldiers encountered a woman and two children taking refuge in a ravine. The woman was Mrs. Isabella Benedict, whose husband had been killed by the warriors. Her four-year-old daughter had a broken arm. She told the soldiers that many tribesmen had passed down the canyon during the night.

The men gave the Benedicts food from their haversacks and a blanket, then moved down the grade, soon bearing into a broad valley several hundred yards wide, almost surrealistic in its grandeur and described as "rolling prairie . . . dotted here and there with wave-like swells."[18] The rising hillocks formed a perpendicular ridge dominating the distant front, while a long, rolling ridge paralleled the soldiers' left, beyond which White Bird Creek angled in toward the Salmon, several thousand feet below. One hundred yards in front rode Lieutenant Theller and an advance guard of eight men from Company F, while the citizens and several Nez Perce scouts from Lapwai Agency, riding on either side, served as flankers. In the increasing daylight, Theller's men, now moving up a gentle incline to the ridge in front, could discern an immense pony herd and, beyond that, distant warriors moving toward them. One of the volunteers recalled seeing loose stock running all about. "It was in the breeding season and stallions were fighting, mares squealing, etc., and the noise of all this made many of our horses hard to manage, so that many of the men were badly excited before the fighting began."[19]

The Nez Perce village, containing some thirty lodges with approximately sixty warriors, was hidden from the soldiers' view and strung out along the bottomland of White Bird Creek a short distance from its confluence with the Salmon. Nee-Me-Poo accounts of the battle state that scouts from White Bird's camp had reported the soldiers' advance from Grangeville, and that a party of six warriors, intent on protecting the camp, initially approached them under a flag of truce. But one of the volunteers with the advance—later reported to be Arthur



"Scene of Perry's Battle on Whitebird Creek, June 27th [17] 1877." INSET DRAWING IN FLETCHER, "DEPARTMENT OF COLUMBIA MAP"

Chapman—opened fire on them, thus precipitating the battle. As many as sixty-five warriors participated in the ensuing combat, many of them armed with repeating rifles, muzzleloading rifles and muskets, and pistols, but also with bows and arrows. Principal Nez Perce leaders present were White Bird, Ollokot, and Lepeet Hessemdooks (Two Moon), the latter leading the opening attack on the citizens at the left of Perry's line, but Toohoolhoolzote and Joseph also took part. Many of the Nez Perce men were worn out from having participated in an all-night spree after consuming whiskey captured in the raiding on Camas Prairie.[20]

When the first shots were fired, Captain Perry hurried Company F forward, moving it left front into line adjoining Lieutenant Theller's right. On Perry's direction, Captain Trimble moved Company H into line on Perry's right. Continuing forward, the troops passed to a point just below, or south of, the perpendicular ridge overlooking the valley and the Nez Perce camp. The terrain to the right of the line rose steadily for two hundred yards, then climbed sharply to a rocky plateau. To the left of the position occupied by Company F lay a large swale through which ran the wagon road the troops had used. Theller's men and several citizen volunteers now commanded the swale. Farther left, a dominating knoll projected, and there the remaining volunteers stationed themselves, prolonging Perry's line and effectually constituting the left



THE BATTLE OF WHITE BIRD CANYON
JUNE 17, 1877

flank. In sum, as the fighting commenced, the whole command with their horses was spread out, precariously exposed along the ridge with no troops in reserve.

Some Nez Perces, moving forward out of the camp at the mouth of White Bird Creek, ascended the sloping canyon bottom to a long, low ridge fronting Perry's command. From behind this ridge, they opened a sporadic fire that knocked some cavalrymen from their saddles and halted Perry's advance.[21] Dismounting, the soldiers sent their horses into the swale on their left and partly behind the volunteers' knoll, then deployed into skirmish formation and returned fire on the warriors. On the left, the volunteers came under sustained fire from warriors hidden behind the bank of White Bird Creek, and within minutes at least one citizen, Herman A. Faxon, had been wounded, causing them all to fall back and leaving the flank vulnerable. Civilian Theodore D. Swarts recalled that "Indians were all around. One Ind[ian] ran out of the brush [near the creek] and called to me 'Stop, stop' (so he could get a shot at me), but I did not stop & he fired two shots, missing me."[22] The warriors now raked the entire length of Perry's line with a blistering enfilade, threatening them from front, left, and rear. Their gunfire took telling effect, and within minutes many of the soldiers unilaterally broke formation to regain their frightened horses, some of which—in their kicking and plunging—were yanking free of their holders and scattering over the field.

Somewhere at the beginning of the growing melee, one of Perry's trumpeters fell dead and the other lost his trumpet, and Perry found it impossible to signal his commands. Further complicating things, many of the Nez Perces' ponies tore over the landscape, kicking up a blinding dust and causing further confusion. More soldiers began falling back in great disorder. "Both companies were by this time mixed in together," wrote Sergeant McCarthy of the withdrawal, "each man occupying any vacant space in the line."[23] As Perry's left collapsed, however, he started the men in his segment to the rear, ultimately gravitating toward the rising plateau on the right. He later wrote, "the men on the left, seeing the citizens in full retreat and the Indians occupying their places and the right falling back in obedience to orders, were seized with a panic that was uncontrollable, and then the whole right of the line, seeing the mad rush for horses on the left, also gave way and the panic became general."[24] "The retreat started from here pell mell," remembered one

Compendium_Vorenberg
Page 049

participant, "soldiers, civilians, and friendly Indians together and all in confusion."[25] Much ammunition was wasted, and more was lost in the saddlebags of the horses stampeded by the warriors.

Thus, the retirement began. "No sooner would one squad halt and face about, than the other, just placed in position, would be gone."[26] To check the warriors, Captain Trimble directed two detachments to the ridge directly behind, or north of, the perpendicular ridge, while his main force pulled back several hundred yards. Other troops took to the right to counter tribesmen in the ravines at the rear of the line. Sergeant McCarthy commanded the right advance squad consisting of six or seven men. Both detachments mounted the ridge, several men serving as sharpshooters as the others held their horses. McCarthy described the action:

> Looking towards the Indian camp nearly half a mile below on the left front, we could see them swarming out of the brush and occupying the round knolls in our front or riding under the cover of them in the direction already pursued by the others by our right flank. We commenced firing but the distance was so great that we could not do much execution and they slipped past our right. . . . Word was passed to us to mount and join the line for a charge, but before we all got back, the order was countermanded and we again advanced to the bluffs, dismounted and opened fire wherever we could see Indians. . . . Looking back towards the line I could see the men firing from their horses' backs, and they appeared half the time enveloped in the smoke of their own guns.[27]

Soon the warriors passed the right and left flanks of the two squads, momentarily exposing the soldiers to an assault from the rear. Orders now came for them to fall back and rejoin the retreating command, and McCarthy's men did so, finally reaching Lieutenant Parnell, who was trying to rally some mounted soldiers to help with the wounded and dismounted. Together, the men made a stand, then Parnell dashed to the rear after telling McCarthy he would bring help. But none came, and the sergeant recalled that the wounded soldiers, "paralyzed with fear or exhausted with fatigue . . . were killed unresistingly before our eyes."[28] When McCarthy at last pulled back and rejoined Parnell, the officer told him, "I could not bring you help, sergeant. You see how everything is going." Parnell and about ten troopers—all that remained alive on the field—withdrew up the narrow defile toward the head of the canyon, all the time firing at the warriors still pressing their front.

While all of this occurred, the citizens started back up the road, apparently for part of the time following Parnell. Volunteer Swarts remembered getting wounded in the retreat:

> I ran onto an Ind[ian] hidden behind a rock directly in my front. I wheeled my horse to the right & he & I fired both at the same instant at a distance apart of about 8 or 10 ft. He shot me in the hip and I shot him through the body. . . . We went back by way of the old "grade," which comes off the mountain a little to the south of the present [1915] stage road.[29]

All the while, Perry, Trimble, and Parnell tried desperately to maintain order in the retreating command. When Perry appealed to Lieutenant Theller to control the men, the lieutenant assembled a body of men and tried to effect an orderly withdrawal. But Theller apparently lost control of himself and at last retreated wildly back up the trail, where he was cut off and killed with seven other men.[30] Trimble, meantime, retired diagonally up the rocky plateau with the several men who had been defending the bluffs on the right. Perry, following, was unable to halt him on reaching the summit. Seeing the command disintegrating about him, Parnell continued his own withdrawal directly over the back road. "I saw it would be suicidal to attempt to reach the bluffs . . . [where Perry had gone], so we slowly retreated up the ravine, holding the Indians in check from knoll to knoll."[31] The climb proved excruciating, the soldiers without horses facing warriors closing on front and flanks. One senior sergeant fought a long-range duel with a warrior before the latter's round finally dropped the soldier.[32] As Parnell's troops passed to the head of the canyon, the troops again encountered Mrs. Benedict and her children. Wrote citizen William Coram: "Having caught a riderless soldier's horse, I now put her on it and two of us took the two children. The little 4 ½ yr-old girl got on behind a civilian & put her hands in his coat pockets & in that way hung on. The little baby about a year old I lashed onto my back with its mother's shawl, like a pappoose, & fetched her to Mount Idaho." While surmounting the divide, Mrs. Benedict's horse stumbled, throwing her to the ground. She fled into the brush, where the Nez Perces found her. Later released unharmed, she walked most of the way into Mount Idaho.[33]

Perry's company continued to retire up the rocky plateau without discipline. En route, Perry became dismounted, adding to his difficulty

in controlling his men. Nevertheless, Parnell completed his withdrawal and soon joined Perry's company, now but twenty men strong. Together they faced the Nez Perce marksmen still in pursuit. While surmounting a ravine, Perry's men again stampeded. Two miles to the rear, at Henry C. Johnson's abandoned ranch, Parnell found them sheltered in position behind a rocky knoll. The warriors followed, attacking in front and on the right flank. Perry and Parnell organized their men into a thin skirmish line and began retreating slowly, periodically halting to fire at the Nez Perces. Once, the warriors tried to drive the troops into a deep canyon, but Perry directed volleys of gunfire against them, ruining the attempt. Finally, as they approached Mount Idaho, the Nez Perces pulled back, ending the fight after approximately two and one-half hours. A party of armed citizens reached the troops and accompanied them into the town. It was shortly before 9:00 A.M., and the troops had been gone less than ten hours. "Men and horses were completely exhausted," recalled Parnell. "We had been on the move ever since Friday, and without sleep for two nights."[34]

Moving on to Grangeville, Perry and Parnell found the volunteers, who had retreated rapidly from the canyon and reached the settlement several hours earlier. They also found Captain Trimble and some of the men who had made their way back.[35] Together, the officers took roll call and assessed their losses, which were severe. A tally made several days later noted that, besides Lieutenant Theller, twenty men of Company F and thirteen of Company H had been killed, while but a single man from each company was wounded.[36] (Two of the Mount Idaho volunteers had also been wounded.) Sergeant McCarthy, who had been cut off and left behind during the retreat with Parnell, miraculously escaped detection by the Nez Perces and hiked back into Grangeville two days later.[37] In addition to personnel losses, the troops reported many Springfield carbines and revolvers, with ammunition, lost and abandoned to the tribesmen. Although unknown to the soldiers at the time, Nez Perce casualties at White Bird Canyon amounted to only two or three wounded. None had been killed.[38]

The White Bird Canyon fight almost instantly became the subject of controversy regarding the soldiers' performance and the leadership exhibited by Captain Perry. In the weeks that followed, General Howard sympathized with Perry's management of the battle, but described it as a "rout . . . , a kind of Bull Run on a small scale."[39] Sergeant McCarthy summarized the deficiencies of the combat:

Many of the guns choked with broken shells, the guns being rusty and foul. We were in no fit condition to go to White Bird on the night of the 16th. We had been in the saddle nearly 24 hours and men and horses were tired and in bad shape for a fight. To cap the matter, we were marched into a deep cañon and to a country strange to us, and familiar to the enemy. If there was any plan of attack, I never heard of it. The troops were formed in line and about a third advanced in squads and the remainder very soon afterwards retreated in column up a ridge and out of the canon. The detached advanced squads, each acting independently and extended over considerable ground, were attacked in detail and scattered and scarcely any escaped out of the cañon. . . . Many of these men could have been saved if the retreat of the main column had not been so rapid.[40]

The Mount Idaho volunteers also came under criticism for having largely evacuated their position at the first shooting.[41] The post-battle assessment would continue for years, with most debate centering on Perry's leadership, the problem of numerical inferiority when one-fourth of a cavalry command had to hold horses, and the dearth of training that hurt the soldiers at White Bird Canyon and further demoralized them afterwards. "The explanation . . . is simply that the men had not been drilled, could not manage their horses, and knew little of the use of their arms," wrote one critic.[42] Persistent criticism of Perry's performance, principally at White Bird Canyon, but also at the later engagements at Cottonwood and Clearwater, led to his request for courts of inquiry, which themselves generated controversy but found Perry's conduct acceptable under the circumstances. Despite this cloud, in later years Perry and Parnell received brevet promotions for their service at White Bird Canyon, and Theller won posthumous notice "for brave and soldierly conduct" in the events resulting in his death.[43]

Three days after the debacle in White Bird Canyon, Perry and his command, accompanied by a contingent of citizens, reconnoitered out of Grangeville toward the battlefield, but went only as far as the head of the canyon. No Indians were seen. The troops rested at Henry C. Johnson's ranch, the place where they had stopped on their retreat on the seventeenth, then passed back into Grangeville. That evening, the first medical personnel arrived from Fort Lapwai. General Howard had learned of Perry's debacle on the afternoon of June 17. One of the first reports came from two Company F soldiers, Corporal Charles W. Fuller and Private John White, who had fled at the opening of the battle,

proceedings of which were evidently not transcribed, Joseph indicated his intention of surrendering his own band and himself, leaving to others to decide the respective fates of the other Nee-Me-Poo. He later related that "General Miles said to me in plain words, 'If you will come out and give up your arms, I will spare your lives and send you to your reservation.'"[108] White Bird did not attend, but reportedly concurred with Joseph's decision to surrender, sending word that "What Joseph does is all right; I have nothing to say."[109] Yellow Wolf, who apparently was not present at this council, mentioned some minor perturbation of Howard and said that, after the officers promised to provide food and supplies to the people, the leaders and commanders shook hands all around. Joseph said, "Now we understand these words, and will go with General Miles." At 11:00 A.M., October 5, Joseph's negotiated surrender was thus complete.[110]

At midafternoon, in formal consummation of the agreement, Joseph mounted a pony and, closely surrounded on either side by five men afoot who clung to his person and spoke softly yet intently to him, slowly rode out of the Nez Perce entrenchments. In appearance, according to Wood,

> His scalp-lock was tied with otter fur. The rest of his hair hung in a thick plait on each side of his head. He wore buckskin leggings and a gray woolen shawl, through which were the marks of four or five bullets. . . . His forehead and wrist were also scratched by bullets.[111]

His hands were crossed on the pommel of his saddle, his Winchester carbine straddling his knees, and his head hanging down. Contemporary observers said that Joseph rode up a hill. Quite logically, he passed across the creek bottom to the west side of the bluff opposite the south end of the camp, then ascended the slightly rising tableland adjoining the west side of the coulee through which Carter's assault party had come on September 30. This rise is between the south bluff and that adjacent on the west where the Hotchkiss gun stood. The site, while not far from that presently designated for the formal surrender, is furthermore shielded from known warrior positions to the northwest and would have been within the protective encirclement of the army line situated back from the edges of the bluffs.[112] Probably there, Miles and Howard stood waiting to receive him.[113] It was 2:20 P.M., according to Lieutenant Wood.[114] On his approach, Joseph sat upright, then gracefully dismounted before the senior officers, who were accompanied by Lieutenants Wood, Long, and Howard, besides the interpreter, Arthur



*Heinmot Tooyalakekt, or Chief Joseph, was photographed by John H. Fouch at Tongue River Cantonment shortly after the arrival of the Nez Perce prisoners on October 23, three weeks following the surrender at Bear's Paw battlefield.*
NATIONAL ANTHROPOLOGICAL ARCHIVES, SMITHSONIAN INSTITUTION, WASHINGTON, D.C.

Chapman, and an unidentified enlisted orderly. Some distance away, a courier stood by his horse, bridle in hand.[115] The other warriors and headmen fell back as Joseph raised his head, walked forward, and "with an impulsive gesture" extended his Winchester carbine to General Howard.[116] The general, true to his word, stepped back and motioned the Nez Perce leader over to Miles, who received the gun.[117] It is not certain if he uttered any statement, although Howard told a newspaperman that Joseph had said, doubtless in his own language: "From where the sun stands, forever and ever, I will never fight again."[118] Wood remembered: "Those present shook hands with Joseph, whose worn and anxious face lighted with a sad smile as silently he took each offered hand. Presently turning away, he walked to the tent provided for him." Howard and Miles, riding on either side, accompanied Joseph to the rear, where Lieutenant Wood took charge of him.[119] The chief was described as "in great distress" over the whereabouts of his daughter, who had escaped at the time of the initial attack. "He was afraid she would perish from the cold, as she had on very little clothing at the time," related Tilton.[120] Then, almost randomly, probably as they concluded that capitulation was the only alternative, other groups of Nez Perces came filing out of the pits to turn in their weapons in an impromptu demonstration that lasted until dusk. Wrote a witness: "The other chiefs and their companions who had followed Joseph into the camp performed the same ceremony. . . . In reversing their weapons [they] gave a significance to the act easily appreciated by the veterans who were silent witnesses of it."[121]

During the remainder of the day, sixty-seven warriors and an unspecified number of noncombatants had turned themselves in. Besides Nez Perces, they included the Palouses of Husis Kute. Howard retorn, and their ponies, such as they were, were thin and lame."[122] By called the "forlorn procession" as "covered with dirt, their clothing was dark, not all of the people ensconced in the earthworks had committed to surrender, and the military lines were maintained through the night.[123] Nonetheless, that evening Miles prepared a dispatch for delivery to General Terry:

We have had our usual success. We made a very direct and rapid march across the country, and after a severe engagement, and being kept under fire for three [sic] days, the hostile camp of Nez Perces, under Chief Joseph, surrendered at two o'clock to-day.[124]

Not all of the people chose to follow Joseph's course, however. At least seventy of the tribesmen had managed to escape Miles's investment on September 30 in the opening moments of the attack. Most of them had eluded the Second Cavalry pursuit and continued north toward the British possessions. And during the course of the siege, under the cover of darkness other bodies of tribesmen, probably numbering as many as one hundred—sometimes including whole families—had managed to penetrate the military cordon and escape. Now, in the hours following Joseph's surrender, White Bird and many other people chose to attempt to escape and drive for Canada and what they hoped would be freedom and a reunion with those friends and relatives who had gotten away earlier.[125] At about 9:00 P.M., aided by darkness, White Bird's party, perhaps as many as fifty people, quietly made its way north along the Snake Creek bottom, somehow eluding the attention of the army pickets, and headed toward Milk River and beyond.[126] The next morning, the chief not having appeared, Howard and Miles visited the Nez Perce entrenchments to find him and there learned of his departure.[127] Howard, oblivious to the nature of Nee-Me-Poo societal dynamics, considered White Bird's escape, "after the terms of surrender had been agreed upon," a violation of the accord.[128] As Yellow Wolf later explained, "All who wanted to surrender took their guns to General Miles and gave them up. Those who did not want to surrender, kept their guns. The surrender was just for those who did not longer want to fight. Joseph spoke only for his own band, what they wanted to do."[129]

Early Saturday, Miles and Howard sent word to Sturgis and Mason to halt and await the arrival of the command "at the first good camp."[130] Miles also prepared a report describing his movements and the battle for filing with department headquarters.[131] Through the morning of October 6, more of the people came in, and Miles's final tally—including small parties of Nez Perces who were picked up by ranging troops over the next two weeks—totaled 448.[132] The prisoners included several wounded Nez Perces who were taken to the hospital for treatment by Doctors Tilton and Gardner.[133] "A few wounded Indians came to our camp last night," wrote Tilton, "but it was too late to attend to them. More are brought this morning and the urgent cases attended to—balls extracted and broken bones put in splints."[134] Wagons were sent to the mountains to get more poles for constructing litters and travois.[135] Miles also directed that his battalion and company commanders ensure sufficient quantities

June 18, 1877; Howard, "Nez Perces Campaign of 1877," July 11, 1878; and Thian, *Notes Illustrating the Military Geography*, 26, 56.

2. Howard, "Report," 599.

3. McCarthy, Diary, June 4, 12, and 14, 1877. Internal references suggest that this "diary" was prepared many years—possibly decades—later, probably from a diary kept on the march.

4. The letter was from Loyal P. Brown and had been mistakenly dated June 15. C. E. S. Wood, "Journal." This daily journal appears to be an official account of the campaign composed and kept by Wood at the behest of General Howard.

5. These figures are from Francis Haines, "Chief Joseph," 7. See also Josephy, *Nez Perce Indians*, 511; McWhorter, *Hear Me*, 177–86; and McDermott, *Forlorn Hope*, 81 n. 8.

6. Yellow Bull, Interview, BYU; Camp Manuscript Field Notes, 540, Camp Papers, LBNM; Lott, Interview; Lee Rhodes, "Chief Joseph's Leadership," 99–100; McWhorter, *Hear Me*, 181–83, 265; Josephy, *Nez Perce Indians*, 374 n. 527; Francis Haines, *Nez Perces*, 16, 262–63; and Mark Brown, "Joseph Legend," 56.

7. There are several scenarios regarding the challenge to Shore Crossing that precipitated the outbreak. See Josephy, *Nez Perce Indians*, 512–13. Shore Crossing reportedly did not drink alcohol. Otis Halfmoon, communication with author, Nez Perce National Historical Park, Spalding, Idaho, November 16, 1995.

8. The accounts of the Tolo Lake gathering and initial attacks on the Salmon River settlers often are imprecise and disagree on many details, and particularly the chronology of events. This reconstruction is based on information in Josephy, *Nez Perce Indians*, 511–14; McDermott, *Forlorn Hope*, 3–12; Francis Haines, *Nez Perces*, 217–19; McWhorter, *Hear Me*, 175–77, 188–96; MacDonald, "Nez Perces," 234–36; Yellow Bull account in Curtis, *North American Indian*, 8:164–65; "Story of Kawownonilpilp," Diram, *Hundredth Anniversary of the Nez Perce War*; Slickpoo and Walker, *Noon Nee-Me-Poo*, 184; Trafzer and Scheureman, *Chief Joseph's Allies*, 10–12; Camp Manuscript Field Notes, 142–44, 149, 169, Camp Papers, LBNM; Riley, "Nez Perce Struggle," 41; Lebain, Interview, IU; and Elizabeth Wilson, "Outbreak of the Nez Perce War." Tolo Lake is named for Too-lah, or Aleblemot, a Nez Perce woman who aided the settlers on Slate Creek by riding to the mining community of Florence for help during the first days of the conflict. Robert Bailey, *River of No Return*, 252–53, 255. At her death, Tolo was buried in Red Rock Canyon, where the American Legion Auxiliary erected a memorial at her grave in 1939. Elsensohn, *Pioneer Days in Idaho County*, 1:281–82.

9. The treatment of Walsh and Osborn is substantiated in McCarthy, Diary, June 26, 1877.

10. Norton, "True Story," 99; Howard, "Nez Perces Campaign of 1877," July 4, 1878; Portland *Morning Oregonian*, June 19, July 4, 1877; Lewiston *Morning Tribune*, June 19, 1877; Rowton, Interview; Fenn, Interview; Francis Haines, *Nez Perces*, 219–20; Elsensohn, *Pioneer Days in Idaho County*, 1:114–17, 131, 280–82; Robert Bailey, *River of No Return*, 254–60; and Bosler, Reminiscence. See also "Statement of Mrs. W. W. Bowman." For the most comprehensive and well-documented telling of the attacks on the Salmon, see McDermott, *Forlorn Hope*, 3–43. The controversy surrounding the demise of Mrs. Manuel and her daughter is treated at length in ibid., 157–60.

11. The attack on the Norton party was one of the most publicized episodes

of the evolving conflict. For details, see Nez Perce Campaign—1877, Wilmot Papers; "Victim of Nez Perces Tells Story of Indian Atrocities," *Winners of the West*, February 15, 1926; Adkison, *Nez Perce Indian War*, 21–25, 36–39, 43–44; Elsensohn, *Pioneer Days in Idaho County*, 1:297–300; Arnold, *Indian Wars of Idaho*, 154–61; and, especially, McDermott, *Forlorn Hope*, 27–32, 41–42. The rape of Mrs. Chamberlin is attested to in James Chamberlin claim (John's father), no. 8632, entry 700, Claim for Indian Depredations, U.S. Bureau of Indian Affairs.

12. Adkison, *Nez Perce Indian War*, 44. See Clay, "Report of Indian depredations"; Drum, "Report . . . Indian depredations." Settlers claimed to have lost 280 horses, 941 cattle, 20 sheep, and 174 hogs either killed, stolen, or lost during the initial outbreak, for a total value of $73,186.81. One of those submitting a claim for livestock was Lawrence Ott. "He is the man, who murdered an Indian near Slate Creek, about three years ago," wrote Captain William F. Drum, "and has not lived on his Ranch until quite recently. He may have lost some stock but I would recommend that this claim be suspended, until Ott can prove that he has not run off more Indian stock than would pay his claim if it were a good one. It is believed that he has been engaged in that business." Drum, "Report . . . Indian depredations."

13. This explanation of the Nez Perces' behavior is adapted from a thesis cogently expressed, with regard to the Delaware Indians, in Weslager, *Delaware Indians*, 230; and, with regard to the Northern Cheyenne Indians, in Powers, "Northern Cheyenne Trek," 10–11, 31–32 n. 29.

14. Howard, "Report," 600–601; "Report of the General of the Army," November 7, 1877, in Secretary of War, *Report . . . 1877*, 9; McCarthy, Diary, June 15, 1877; C. E. S. Wood, "Journal," June 15, 1877; Captain Melville C. Wilkinson letter in *Army and Navy Journal*, August 18, 1877; Howard, "Nez Perces Campaign of 1877," June 27, 1878; Redfield, "Reminiscences of Francis M. Redfield," 70; Thompson, "Summer of '77," 12–13; John P. Schorr to L. V. McWhorter, May 20, 1926, McWhorter Papers; John Carpenter, *Sword and Olive Branch*, 249; McDermott, *Forlorn Hope*, 49–54. One citizen wired President Rutherford B. Hayes directly, urging him to send Brigadier General George Crook to the scene of the outbreak. Crook, regarded as one of the leading Indian fighters in the army, had conducted operations against other Northwest tribes in previous years. Thomas Donaldson to Hayes, June 21, 1877, item 3565, roll 336, Nez Perce War Papers.

At the outset, Howard exhibited an abysmal ignorance of the complexities and intricacies involved in the outbreak, as well as of Nee-Me-Poo tribal band dynamics, in ascribing the outbreak to the premeditation of thirteen "thieving desperadoes of White Bird's band" who had terrorized the countryside for years. See marginal notations by Major General Irvin McDowell in "Copies of letters and telegrams."

15. For further background on Companies F and H, see McDermott, *Forlorn Hope*, 59–68. For specifics of period army clothing and equipment, see McChristian, *U.S. Army in the West*; and Steffen, *The Frontier*.

16. Biographical data on Perry, Theller, Trimble, and Parnell is variously from *Records of Living Officers of the United States Army*, 103, 160, 430; Powell, *Powell's Records*, 447–48, 457, 602; and Heitman, *Historical Register and Dictionary*, 1:771, 785, 952, 970. See also McDermott, *Forlorn Hope*, 57–68. An obituary of Theller is in Boise, Idaho *Tri-Weekly Statesman*, June 23, 1877.

17. The names of the eleven citizen volunteers were as follows: Herman A. Faxon, Frank A. Fenn, Vincent Tullis, William B. Bloomer, John W. (Jack) Rainey,

John O. Barber, George M. Shearer, William Coram, Charles L. Crooks, Theodore D. Swarts, and Arthur I. ("Ad") Chapman. Another citizen, Asa Jones, started with the troops, but was unarmed and returned to Mount Idaho. Walter M. Camp to Swarts, August 7, 1915, folder 2, box 2, Camp Papers, BYU; Swarts to Camp, January 21, 1917, folder 3, box 2, ibid.; Swarts, Interview.

18. New York *Herald*, September 10, 1877, quoted in Parnell, "Nez Perce Indian War," 373. Parnell's account was republished with several additions and modifications in Parnell, "Battle of White Bird Cañon."

19. Swarts, Interview.

20. While this account of the battle draws heavily from the military record, the following Nez Perce sources were consulted: "Story of Kawownonilpilp"; Lehain, Interview, IU; "Incidents of the Nez Perce War," in Curtis, *North American Indian*, 8:165; MacDonald, "Nez Perces," 236–37; Redfield, "Reminiscences of Francis M. Redfield," 72–73; Francis Haines, *Nez Perces*, 223–28; Francis Haines, "Chief Joseph," 2–3. McWhorter, *Hear Me*, 236, stated that the Nez Perces had surveilled Perry's advance from the time his troops left Cottonwood Ranch. See, in ibid., the accounts of Husis Owyeen (Wounded Head), 239–41; Two Moon, 244–48; Weyahwahtsitskan, 248–49; Tipyahlahnah (Roaring Eagle), 251–52 n; Chelooyeen (Bow and Arrow Case), 53–54; and Kowtoliks, 255. See also McWhorter, *Yellow Wolf*, 54–64; Josephy, *Nez Perce Indians*, 523–26; and McDermott, *Forlorn Hope*, passim, which does an excellent job of integrating Nez Perce testimony.

21. Sergeant Michael McCarthy claimed that the first soldier killed in the Battle of White Bird Canyon, as well as in the conflict generally known as the Nez Perce War, fell at this point. He was Corporal Roman D. Lee, of Company H, First Cavalry. "He was shot in body, . . . and when lifted from his horse to the ground, in confusion, wandered down towards indian [sic] camp. We found the body 3 weeks afterwards, very close to indian camp lying in a dry gulley. Some of the boys wanted to stop and bury it, [and] I gave them permission to fall out, but the comdr was in a hurry and had them recalled to the command." McCarthy, Scrapbook.

22. Swarts, Interview.

23. McCarthy, Diary, June 17, 1877.

24. Perry, "Battle of White Bird Cañon," 116.

25. Coram, Interview.

26. Perry, "Battle of White Bird Cañon," 116.

27. McCarthy, Diary, June 17, 1877.

28. Ibid.

29. Swarts, Interview. Frank A. Fenn claimed that Swarts's wound was self-inflicted. "I . . . assisted him in extinguishing the fire that had been started in his clothing by the discharge." Some of the civilians veered to the right off Parnell's route, instead going up the ridges farther east of the road until they struck a stock trail, which they followed up and over the mountain and onto the prairie, well ahead of the other civilians and the troops. Fenn to Camp, September 19, 1915, folder 2, box 2, Camp Papers, BYU.

30. Years later, Volunteer Frank Fenn reported on Theller's movement: "To Lieut. Theller I believe is due the credit for saving the greater number of those who escaped. I personally heard Captain Perry appeal to Theller to try to stop the headlong flight of the men and I was one of a party of ten or twelve who responded to Theller's call for a stand just south of the point where the road crosses

the long ridge. . . . By the time the head of the retreating soldiers reached this point with Theller was coming up the ridge in considerable numbers. . . . The effect that the Indian advance was thoroughly checked and the Indian column was turned down the hill to the east. At the bottom of this hill on that side the canyon is quite brushy and there the Indians took shelter but kept moving up the canyon in a course generally parallel with the road. After thus checking the Indians, Theller very quietly directed his men to take to the road again with the view of getting ahead of the Indians a second time and in that way cover the retreat as well as possible. He explained briefly to the men just what he wished to do and it was in the carrying out of that intention that he and the most of his party was killed about a half mile farther up the road. When Theller ordered his party to resume the movement along the road I left them. . . [and joined some other civilians going out via an old stock trail]." Fenn to Camp, September 19, 1915, folder 2, box 2, Camp Papers, BYU.

31. Parnell, "Nez Perce Indian War," 370. Parnell's singular movement drew plaudits in the press: "There is no doubt but the Indians would have pursued and massacred every one of the command were it not for the bravery and determined pluck of Lieutenant Parnell. . . . This officer, gathering a few men around him, occupied knolls here and there after gaining the high ground, and so vigorous and effective was the fire poured into the victorious Indians that they (the Indians) did not deem it prudent to come within range, but instead circled to the right and left, when Lieutenant Parnell would so change his position as to again check them. This, of course, gave the rest of the troops time to get far enough to the rear to organize and prepare for defense, which they did." New York *Herald*, September 10, 1877.

32. Frank Fenn witnessed this brief action. Years later he described the trooper as "an old, gray headed sergeant, one who had, no doubt, passed through many campaigns against hostile Indians." Fenn noted that a memorial shaft raised at the battlefield in the 1920s marked the spot where the sergeant had died. *Winners of the West*, December 30, 1925. Another White Bird Canyon veteran, John P. Schorr, identified the man as Sergeant Patrick Gunn, of Company F, First Cavalry, "gray headed and on his fourth enlistment" when killed. *Winners of the West*, March 15, 1926.

33. Coram, Interview. An Indian named Wounded Head found Mrs. Benedict and protected her before permitting her to go on her way. See "Wounded Head's Narrative," in McWhorter, *Hear Me*, 239–41.

34. Parnell, "Nez Perce Indian War," 372. Besides those quoted above, this account of the Battle of White Bird Canyon incorporates material from the following sources: Howard, "Report," 602; McCarthy, "Journal," 8–12; Kirkwood, "The Nez Perce Indian War," August 17, 1950; Wilmot, "White Bird"; Frank L. Powers to Camp, November 24, 1913, Ellison Collection; Howard, "Nez Perces Campaign of 1877," July 11, 18, 1878; Francis Haines, *Nez Perces*, 255–60; Carroll, *Papers of the Order of Indian Wars*, 217–18; Howard, *My Life and Experiences*, 283–86; and Beyer and Keydel, *Deeds of Valor*, 2:239–44. The most comprehensive treatment of the entire affair, and on which this account has significantly depended, appears in McDermott, *Forlorn Hope*. This book also contains pertinent excerpts from the transcript of Perry's Court of Inquiry of 1878–79.

35. Perry thought that Trimble had deserted him during the retreat, while Trimble questioned many of Perry's actions during the encounter. Despite courts of inquiry, the issues between the men were never settled. See McDermott, *Forlorn Hope*, 96–98, 165–76, and passim.

36. "Report of Casualties"; and "Report of the Surgeon-General," in Secretary of War, *Report . . . 1877*, 359. For names of the army killed and wounded, see Appendix A. Volunteer Swarts, who later homesteaded on the battlefield, described the army fatalities and their locations on the field: "The first man killed was a soldier whose horse ran away and carried him about half way between the 'fort' [rocky hill where most of the soldiers were stationed at the start of the battle] and the hill where we civilians were [on the left of the line]. He ran into Inds [sic] and was killed. The next killed were five soldiers in a group, just to west of present stage road [1915] about ½ mile N.E. of the 'fort.' Another body lay in the road perhaps ½ mile further on, and another on the hillside a little S.E. of where I was shot. Another body was tied in the top of a thorn tree that stands by the mail box in front of my house [1915]. (The privates had been cut from this body and stuck above my house in a thorn gulch in S.W. ¼ or N.E. ¼ Sec. 25 Twp [Township] 29N lay Lieut. Theller and 7 bodies, probably having tried to make a stand (three of these bodies and one of the group of 5, above referred to, are still there, not being found when the bodies were removed). Up on the top of the hill were two more bodies. I think that all or nearly all of these bodies were of dismounted men, who either lost their horses by not cinching their saddles before retreating or who lost their horses through the excitement of their horseholders, who let them go when the stampede started. Some half dozen of the soldiers went back bareback by losing saddles. . . . My house stands at about the center of the strip of fighting ground, the principle part of which is comprised in E ½ of Sec. 36 Twp 29N Range 1 E. Boise Meridian." Swarts, Interview.

37. For details of McCarthy's remarkable escape, see McCarthy, Diary, June 17–19, 1877 (reprinted in McDermott, *Forlorn Hope*, 106–7). Twenty years later, in November, 1897, McCarthy received a Medal of Honor for his performance at White Bird Canyon. The citation, erroneous to some degree, read: "Was detailed with six men to hold a commanding position, and held it with great gallantry until the troops fell back. He then fought his way through the Indians, rejoined a portion of his command, and continued the fight in retreat. He had two horses shot under him, and was captured, but escaped and reported for duty after 3 days' hiding and wandering in the mountains." *The Medal of Honor*, 224. See also the account featuring McCarthy in Beyer and Keydel, *Deeds of Valor*, 2:240–44. Lieutenant Parnell also received a Medal of Honor in 1897 for his service at White Bird Canyon. *The Medal of Honor*, 230.

38. Nez Perce casualties are discussed in McWhorter, *Hear Me*, 253–56; and McWhorter, *Yellow Wolf*, 60. See Appendix B.

39. Howard, "Nez Perces Campaign of 1877," July 18, 1878.

40. McCarthy, "Journal," 18–19.

41. On this point, Howard's aide, First Lieutenant Charles E. S. Wood, wrote in 1918: "The volunteers fled and were never seen or heard of again. . . . Joseph has told me of this. Perry and Parnell told me of it. . . . It was a notorious fact known to every survivor and within three [nine] days I helped bury the dead and

there was not a civilian among them." Wood to C. J. Brosnan, January 7, 1918, in *The Bookmark*, a ca. 1940 publication of the University of Idaho Library, Brosnan Collection.

42. "Summary of Reports . . . Non-Effectiveness," 8, 13.

43. *U.S. Army Gallantry and Meritorious Conduct*, 75. As late as 1913, White Bird Canyon survivor Frank L. Powers, a private in H Company during the fight, described it as "the worst managed affair I was ever in." Powers to Camp, November 24, 1913, Ellison Collection.

44. Possibly the first report of the fight was that of a friendly Nez Perce that was received at Fort Lapwai at 1:00 P.M. on June 17. It read: "Last evening the troops left Idaho City [sic] and went to Chapman's Ranch and there toward Salmon River and slept there a little. Near the river they met a small party of Indians who began an attack of the troops. The troops advanced their force and one half went to the right and the other to the left to surround the Indians. The Indians attacked the one party and drove them back, but the other came to their assistance and held the ground. Two horse of the officers were killed, and up to the time of the Indians [illeg.] having no success, but some of the soldiers horses were stampeded. Joseph is in command of the Indians and in the fight." "Statement of Indian." Other messages announcing the action came out of Mount Idaho after 9:00 A.M. June 17, but must have reached Fort Lapwai considerably later that day. See Portland *Daily Oregonian*, June 21, 1877.

45. Howard, "Nez Perces Campaign of 1877," August 22, 1878.

46. McCarthy, Diary, June 20, 21, 22, 23, 1877; C. E. S. Wood, "Journal," June 23, 1877; Howard, "Report," 602; "Report of the General of the Army," November 7, 1877, in Secretary of War, *Report . . . 1877*, 9; McDowell to General William T. Sherman, telegram, June 20, 1877, item 3505, roll 336, Nez Perce War Papers; *Army and Navy Journal*, June 30, 1877; Howard, "Nez Perces Campaign of 1877," August 1, 1878; New York *Herald*, September 10, 1877; and John Carpenter, "General Howard," 134. For Trimble's movement to Slate Creek, see Parnell, "Salmon River Expedition," 127–30. Providing rare contemporary insight into the emotions of soldiers bound for the front during an Indian campaign, Second Lieutenant Charles E. S. Wood jotted the following impressions in his notebook as Howard's troops entered the zone of the outbreak: "Nearing the field, peculiar nervous feelings of going to death, [and] shrinking from the exposure; about desire to be out of the expedition. Old soldiers [feel] the same way. Each fright more dreaded than the last. The desire to investigate immortality, thoughts on death, inability to change the morals and tenor of life and thought; each one's expectation that *he* will escape." C. E. S. Wood, "Notes on Nez Perces Expedition," June 23, 1877.

47. Harry Bailey, "An Infantry Second Lieutenant." The body was that of Sergeant Patrick Gunn. McDermott, *Forlorn Hope*, 122.

48. Howard, "Nez Perces Campaign of 1877," September 5, 1878; Kirkwood, "The Nez Perce Indian War," August 17, 1950; and Brimlow, "Nez Perce War Diary," 28. Some bodies were strewn over the back trail three or four miles from the battlefield, the men having been shot from their horses during the retreat. Howard to Assistant Adjutant General, Division of the Pacific, June 26, 1877, item 4026, roll 336, Nez Perce War Papers. For details of the deployment of troops in approaching and securing the battlefield, see C. E. S. Wood, "Journal,"

stood by Gen. Howard and Col. Miles who had also been walking about talking
What message the Indians brought no one ever knew but Gen. Howard, Col.
Miles, Arthur Chapman, Old George and Capt. John. After a fairly short consul-
tation, the two old Indian messengers were sent back. . . . I wish to emphasize the
the negotiations between Joseph's camp and General Howard with Col. Miles on
the hilltop were carried on entirely by Old George and Capt. John, always as a
couple, going back and forth, bringing messages to Howard and Miles which no
one heard but Howard, Miles and Chapman, the interpreter, and taking replies
which also no one heard but these three. So the day progressed." Wood, draft of
letter account to Lyman, January 17, 1939, C. E. S. Wood Collection.

105. Howard indicated in his report that "Joseph sent the following reply"
which constituted his "speech." Howard, "Report," 630. Captain John was identi-
fied by Lieutenant Wood as the speaker in *Harper's Weekly*, November 17, 1877.
Major Mason (not present, but a confidante to Howard) later reported that Joseph's
statement was given to Captain John in response to Howard's offer of "good terms."
Omaha *Herald*, March 15, 1883. For succinct background studies on Wood (1852–
1944), see "Men and Women"; and, especially, Bingham, *Charles Erskine Scott Wood*.
Regarding the "speech," Wood later claimed that "no one was interested to take
it. Oscar Long, Miles['s] adjutant, was there to take it down but did not. No one
was told to take it down. I was not told. The speeches of Indians were not consid-
ered important. I took it for my own benefit as a literary item." Park City *Park
Record*, March 16, 1944.

106. This is the version of the statement "taken verbatim on the spot" by
Wood and subsequently published in *Harper's Weekly*, November 17, 1877, and in
Howard, "Supplementary Report," 630. The earliest *published* version of the state-
ment appeared in the Bismarck *Tri-Weekly Tribune*, October 26, 1877, with slight
variations from that published in Howard's report. Notably, the *Tribune* version
spelled the chief's name "Ta-hool-hool-shoot," and it contained the following dif-
ferences: "he who leads the young men," "may be freezing to death," and "I want
time to look for my children." (Four other and slightly different renderings by
Wood of the address are in, respectively, C. E. S. Wood, "Chief Joseph, the Nez-
Perce," 141, (1884); Wood to Moorfield Storey, May 27, 1895, published in *Or-
egon Inn-Side News*, 1 (November-December, 1947), 5–6, copy in the C. E. S.
Wood Collection; C. E. S. Wood, "Pursuit and Capture," 330, (ca. 1935); and
Wood to C. J. Brosnan, January 7, 1918, p. 236, in *The Bookmark*, a ca. 194[illegible]
publication of the University of Idaho Library, Brosnan Collection. In 1939, after
considerable reflection, Wood revised the last line of Joseph's "speech" to: "Joseph
will fight no more forever." Wood, draft of letter account to Lyman, January 17,
1939, C. E. S. Wood Collection. The original penciled note was turned over to
the War Department and subsequently lost, according to Wood in C. E. S. Wood,
"Pursuit and Capture," 331. His wife insinuated that Miles had there destroyed it.
Sara Bard Field to McWhorter, July 2, 1935, folder 35, McWhorter Papers. For
analysis and discussion of the four variations of the speech purported to have origi-
nated with Wood, see Aoki, *Nez Perce Texts*, 120–23 (a fifth with minor punctua-
tion differences is in C. E. S. Wood, "Famous Indians," 439); and Aoki, "Chief
Joseph's Words." Aoki concluded that the "speech" was indeed a message that was
likely embellished upon by Wood, who had literary interests (and became a lead-
ing writer during the early twentieth century) and, as such, does not exemplify

American Indian oratory. Aoki also believed that the reminiscence of Yellow Wolf
regarding the discussion preceding the surrender signified that the Nez Perces be-
lieved they were agreeing to only a cease-fire. Aoki, "Chief Joseph's Words," 20–21.
Given the condition of the people, this was unlikely; besides, technically, a truce was
already in place. For various Nee-Me-Poo language translations from English, see
Aoki, *Nez Perce Texts*, 123–25; John Thomas to Camp, April 15, 1912, item 27,
Ellison Collection; Camp Manuscript Field Notes, Nez Perce Indian Wars 1, 141,
Camp Papers, LBNM; and notes by Starr J. Maxwell and Samuel Morris of Lapwai,
January 20, 1913, ibid., 147. See also Mark Brown, "Joseph Myth," 14–17.

107. Kelly, "Capture of Nez Perces."

108. Joseph [Heinmot Tooyalakekt], "An Indian's Views," 429. Joseph added:
"General Miles had promised that we might return to our own country with what
stock we had left. I thought we could start again."

109. Howard, "Report," 630.

110. McWhorter, *Yellow Wolf*, 224–26; McWhorter, *Hear Me*, 496; and Hill
recollection in Curtis, *North American Indian*, 8:172. This time is given in Thomas
M. Woodruff, Letter. Miles wrote his wife that Chief Joseph surrendered "this
morning." Miles to Mary Miles, October 5, 1877, quoted in Virginia Johnson,
*Unregimented General*, 206. However, in his somewhat unreliable Miles, *Personal
Recollections*, 275, Miles stated that Joseph surrendered at 10:00 A.M., but described
the formal surrender, which occurred later, as depicted below. Afterwards, there
was talk that Joseph had asked for and received help from a force of soldiers in
searching for his lost daughter. Cheyenne *Daily Leader*, December 6, 1877. She, in
fact, had escaped before the initial battle on the thirtieth and had reached Canada.

111. C. E. S. Wood, "Chief Joseph, the Nez-Perce," 142. In later years,
Wood variously remembered that Joseph's hair was braided on either side of his
face and tied with fur, that he wore a woolen shirt—either gray or army blue, he
thought—a blanket, probably gray with a black stripe, and buckskin moccasins
and fringed leggings. Wood to McWhorter, January 31, 1936, quoted in
McWhorter, *Hear Me*, 498; Wood, draft of letter account to Lyman, January 17,
1939, C. E. S. Wood Collection; and Park City *Park Record*, March 16, 1944. In
*Harper's Weekly*, November 17, 1877, Wood reported that Joseph's clothes bore so
many bullet holes that "Colonel Miles begged his shirt as a curiosity."

112. Author's field notes, August 27, 1995.

113. Wood, in *Harper's Weekly*, November 17, 1877, stated that the party
came "up the hill," a reference repeated in C. E. S. Wood, "Chief Joseph, the Nez-
Perce," 141. In 1895, Wood repeated his view that "Joseph came up to the crest of
the hill, upon which stood Gen. Howard, Gen. Miles, an interpreter [Chapman]
and myself." Wood to Storey, May 27, 1895, published in *Oregon Inn-Side News*,
1 (November-December, 1947), 5–6, copy in the C. E. S. Wood Collection. In
C. E. S. Wood, "Pursuit and Capture," ca. 1935, Wood said that the Nez Perces
"came from the ravine below, up to the knoll on which we were standing" (329).
See also the repeated references to the site in Wood, draft of letter account to
Lyman, January 17, 1939, C. E. S. Wood Collection. And in a letter written de-
cades after the event to Howard's son, Wood said that Joseph's party "approached
us on the little hill." Wood to Howard, February 20, 1942, folder 34, McWhorter
Papers. This site is at variance with that advanced by McWhorter in the 1930s,
based upon the statements of Charles A. Smith, who had been a teamster with

