ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his*
*official capacity as Attorney General of the*
*State of California*

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants | Case No. 3:17-cv-01017-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF MICHAEL VORENBERG**<br><br>**VOLUME 6 OF 11**<br><br>Courtroom:    5A<br>Judge:          Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

1

## INDEX

| Works | Decl. Page. | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 14 U.S. Statutes 487, Chap 170, Sec. 6 (Approved March 2, 1867). | 19 n.21 | 0010-0014 |
| 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A.) | 56–57 n.85 | 0015 |
| Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006. | 56–57 n.85 | 0016-0019 |
| Texas Session Laws, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26. | 51 n.75 | 0020 |
| **BOOKS** | | |
| Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4. | 15 n.19 | 0026-0028 |
| William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67. | 19 n.20 | 0029-0032 |
| Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52. | 35 n.47 | 0033-0038 |
| Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97. | 36 n.50, 56 n.84 | 0039-0041 |

Compendium of Works Cited in Declaration of Michael Vorenberg
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863-1877 (New York: Harper and Row, 1988), xxvii. | 4 n.2 | 0042-0044 |
| Jim Garry, *Weapons of the Lewis and Clark Expedition* (Norman, Okla.: Arthur H. Clark, 2012), 94 | 8 n.5 | 729-730 |
| Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12. | 33 n.40 | 0045-0059 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016) 65-81, 90, 109-42, 177-202, 353-68. | *passim* | 0060-0096; 731-766 |
| Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299, 340. | 33 n.40, 33 n.41 | 0097-0104 |
| Robert Held, *The Belton Systems, 1758 and 1784-86: America's First Repeating Firearms* (Lincoln, R.I.: Andrew Mowbray, 1986), 33-39 | 8 n.6 | 767-775 |
| W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71. | 23 n.28 | 0105-0108 |
| John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. | 10 n.7, 14 n.18, 28 n.32 | 0109-0217 |
| Harold L. Peterson, *Arms and Armor in Colonial America* (New York: Bramhall House, 1956), 215-17 | 7 n.3 | 776-780 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans*, 1805-1889 (Baton Rouge: Louisiana State University Press, 1996), 130-31; 155-156 | 42 n.59, 45 n.61 | 0218-0222 |

3

| | | |
|---|---|---|
| James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 5-106, 112 | 19 n.21, 22 n.27 | 0223-0281 |
| Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119. | 20 n.23 | 0282-0359 |
| Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33, 69-70. | 21 n.24, 22 n.26, 38 n.53, 42 n.59 | 0360-0397 |
| W. H. B. Smith, *Gas, Air and Spring Guns of the World* (Harrisburg, Penn.: Military Service Publishing Company, 1957). 30 | 7 n.4 | 781-783 |
| C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49. | 30 n.35 | 0398-0424 |
| Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70 | 47 n.65 | 0425-0428 |
| Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88 | 24 n.29, 27 n.31 | 0429-0446 |
| Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93 | 47 n.65 | 0447-0452 |
| Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38, 42-44, 178 | 12 n.13 | 0453-0464 |

4

| | | |
|---|---|---|
| Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996, 75, 79-80, 140-41, 170-171 | 38 n.53, 40 n.56, 41 n.57, 41 n.58, 49 n.70 | 0465-0476 |
| **LAW REVIEWS AND JOURNALS** | | |
| Clayton E. Cramer, Nicholas J. Johnson, and George A. Mocsary, "'This Right is Not Allowed by Governments That Are Afraid of the People': The Public Meaning of the Second Amendment when the Fourteenth Amendment was Ratified," *George Mason Law Review*, 17 (2010), 823-863, esp. 852-863 | 21 n.25 | 785-824 |
| Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. | 36 n.50 | 0478-0481 |
| David Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998) | 54 n.81 | 0482-0488 |
| Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," Arkansas Historical Quarterly, 64 (Winter 2005), 356-58. | 20 n.22 | 0489-0495 |
| Allan Robert Purcell, *"The History of the Texas Militia, 1835-1903"* (Ph.D. diss., University of Texas, Austin, 1981), 221-27 | 21 n.24 | 0496-0505 |
| Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," Law and History Review, 26 (Spring, 2008), pp. 1-56. | 56–57 n.85 | 0506-0562 |
| Jerrell H. Shofner, "Florida Courts and the Disputed   Election of 1876," Florida Historical Quarterly, 48 (July 1969), 26-46. | 48 n.66 | 0563-0584 |

5

| | | |
|---|---|---|
| Otis A. Singletary, "The Texas Militia During Reconstruction," Southwestern Historical Quarterly, 60 (July 1956), 25-28. | 21 n.24 | 0585-0598 |
| S.K. Wier, The Firearms of the Lewis and Clark Expedition (2010) | 8 n.5 | 825-836 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in Annual Report of the Adjutant General of the State of Louisiana, for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39. | 55 n.83 | 0600-0604 |
| 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172. | 13 n.16, 14 n.17 | 0605-0611 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), U.S. Congressional Serial Set (1871), p. 467; and vol. 4 (South Carolina,), p. 767. | 49 n.69 | 0612-0616 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama) U.S. Congressional Serial Set (1871), pp. 414-15. | 51 n.74 | 0617-0619 |
| 46th Cong., 2nd sess., S. Rep. 693, pt. 2 "Investigation of Causes of Migration of Negroes from Southern to Northern States," U.S. Congressional Serial Set (1879-88), p. 357. | 51 n.76 | 0620-0621 |
| J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), U.S. Congressional Serial Set (1871), pp. 289-90 | 50 n.73 | 0622-0627 |

6

| | | |
|---|---|---|
| General Orders, No. 101, May 30, 1865, The War of the Rebellion (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43). | 14 n.17 | 0628-0630 |
| "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95. | 30 n.36 | 0631-0633 |
| Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, 4086-87 (March 24, 1871), 4089-90, 4090-92, 4092-93, 4093-4095. | 26 n.30 | 0634-0644 |
| James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, Opinions of the Attorney General, 11:208–09. | 19 n.20 | 0645-0652 |
| Testimony of William Murrell, Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521. | 49 n.68 | 0653-0656 |
| **NEWS ARTICLES** | | |
| Army and Navy Journal, June 1, 1867, p. 350 | 32 n.38 | 0658-0059 |
| Bismarck Tri-Weekly Tribune (Dakota Territory), June 29, 1877, p. 4. | 29 n.33 | 0660 |
| Charleston News, Oct. 17, 1870, p. 2 | 40 n.55 | 0661-0663 |
| Chicago Daily Inter Ocean, January 12, 1877, p. 1 | 49 n.67 | 0664 |
| Chicago Daily Tribune, July 23, 1876, p. 4. | 34 n.43 | 0665 |
| Chicago Daily Tribune, April 15, 1878, p. 4. | 34 n.44 | 0666 |

7

| | | |
|---|---|---|
| "The Reds," Chicago Daily Tribune, March 23, 1879, p. 7. | 52 n.78 | 0667 |
| Georgia Weekly Telegraph and Georgia Journal & Messenger, April 5, 1870, pp. 4, 8. | 46 n.62 | 0668-0669 |
| "Lovejoy," "Letter from Africa," Fayette County Herald (Washington, Ohio), Dec. 21, 1871, p.2. | 31 n.37 | 0670-0678 |
| David Kopel, "The History of Magazines holding 11 or more rounds," Washington Post, May 29, 2014. | 28 n.32 | 0679 |
| New Orleans Republican, June 13, 1873, p. 1 | 44 n.60 | 0680 |
| New Orleans Republican, March 13, 1877, p. 2. | 49 n.67 | 0681-0683 |
| "Breech-Loading Arms," New York Herald, Oct. 12, 1866, p. 4. | 34 n.46 | 0684 |
| "A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877, p. 4. | 35 n.48 | 0685-0687 |
| Ouachita Telegraph, October 24, 1873, p 1. | 44 n.60 | 0688 |
| "Henry's Sporting Rifle," in Wilkes' Spirit of the Times: The American Gentleman's Newspaper, March 24, 1866, p. 59. | 36 n.49 | 0689 |
| "Another Battle," The Opelousas Journal, Aug. 29, 1873, p. 3. | 47 n.64 | 0690-0691 |
| The Forest Republican (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4. | 37 n.52 | 0692 |
| The Weekly Democratic Statesman (Austin, Texas), August 24, 1871, p. 2. | 46 n.63 | 0693-0694 |
| Washington Evening Star, Aug. 16, 1869, p. 1. | 39 n.54 | 0695 |
| *Wyoming Leader* (March 16, April 21, May 8, 1868, always p. 4). | 29 n.33 | 0696 |

8

| OTHER SOURCES | | |
|---|---|---|
| James Bown and Son's Illustrated Catalogue and Price List, 29th annual ed. (Pittsburgh, Penn., 1877), 33. | 37 n.51 | 0698-0700 |
| David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). | 28 n.32 | 0701-0702 |
| National Museum of American History, Collections, Belton Repeating Flintlock Fusil | 8 n.6 | 838-841 |
| "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3. | 28 n.32 | 0703-0707 |
| Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoorproduction-serial-numbers.htm. | 28 n.32 | 0708-0715 |
| Guncite.com, Second Amendment State Decisions, Feb. 24, 2013. | 54 n.79 | 0716-0727 |

9

that the militia could be deployed only after two-thirds of a county's civil authorities requested aid, and that the militia would be forbidden to assemble around polling places. Both amendments were defeated by a straight party vote. To further delay the bill's passage, Conservatives read a petition from Rutherford County stating that the residents there opposed the creation of any militia force. In the end, however, Cate's bill passed fifteen to seven.[32]

William J. Smith eagerly received the senate militia bill and moved its adoption in lieu of all other house versions. Successfully thwarting Conservative efforts to debate the merits of this new bill, the Radicals effected its passage, but only after the addition of a crucial amendment, presented by "bloodshed" James Doughty no less, which stipulated that "the militia is not to be armed until actually called up." On February 19, the house passed this latest militia bill forty-one to twenty-five. It became law the next day when the senate concurred with the newly amended bill, twenty-two to one, and the governor affixed his signature. Ignoring the many legislative objections, the *Daily Press and Times* cheered the "Union Phalanx" that brought the "loyal militia" into being. The Brownlow "regime" of Tennessee finally had at its disposal what could properly be described a Radical army.[33]

The final version of the militia law, An Act to Organize and Equip a State Guard, was short and to the point, containing only three sections. The militia force was to be known as the Tennessee State Guard and was to be "composed of loyal men." The governor was to serve as commander-in-chief. Each congressional district was permitted one or more regiments to operate in accordance with U.S. Army regulations. Given that there were eight districts in Tennessee and that an army regiment consisted of about one thousand men, the act authorized Governor Brownlow to raise at least eight thousand men.[34]

After weeks of heated debate, months of anti-Radical lawlessness and rumors of a second civil war, and almost two years of experimentation with alternative approaches to law enforcement, the Radicals of Tennessee had conceived a military force, the State Guard, that they hoped would finally bring peace and make Reconstruction work. The time involved reflects remarkable forbearance by the Radicals. To be sure, through the franchise laws, they implemented a hard Reconstruction policy toward the ex-Confederates, but they refrained, for as long as possible, from resorting to a standing army to enforce this policy. The process of enacting the militia act reveals that Governor Brownlow was

not the sole power within the Radical party. Historian Robert H. White unfairly characterizes the Radical legislators as "a bunch of trained seals" who did whatever Brownlow ordered. But White overlooks the important role of several Radical leaders. In the house, William J. Smith, a former Civil War general, was a key figure behind the militia bill. Similarly, in the senate, Alfred M. Cate, another war veteran, helped make the State Guard a reality. These men were not dupes of the governor but confident, ambitious men with a Reconstruction vision of their own. At the end of February 1867, they had done their part. Now the party needed to find men who were militarily competent and politically reliable to command and serve in this new Radical army.[35]

# Chapter 2

※

## MOBILIZING THE STATE GUARD

FOLLOWING PASSAGE OF THE MILITIA ACT, RADICALS MET IN convention at Nashville on February 22, 1867, to prepare formally for the upcoming campaign. At this convention, the Radical party apparatus assumed full shape. Leonidas C. Houk, a leading East Tennessee Radical, fired up the gathering with a rousing speech. He warned the ex-Confederates not to interfere with the election or "we will get the Militia after you and whip you into the ranks of law and order, and execute you if necessary." Reminding his listeners of Confederate oppression during the Civil War, Houk closed his address with a firm promise that "red-hand rebels shall not rule." In keeping with such rhetoric, the delegates passed a platform resolution that reflected how the militia act instilled new confidence among the rank and file. Resolution No. 5 read: "Lawless violence, reckless disregard of the rights of person and property, murder, assassination, arson and kindred crime, must be put down by the strong arm of power, and be made to feel that law is indeed a terror to evil doers." To ensure the continued success of Radicalism, the convention unanimously nominated William G. Brownlow for reelection as governor.[1]

Inspired by the convention proceedings, Governor Brownlow threw down his executive gauntlet with a bellicose proclamation on February 25 stating his intention to mobilize the State Guard. He declared that the recent trend of lawlessness "*must* and *shall* cease," and that "the

present State Government of Tennessee . . . will be sustained and preserved, despite all the efforts of disappointed traitors." Urging the citizens to obey the laws and keep the peace, he assured them that "prudent and experienced men will be placed in charge of the State Guard" and that militia units would be deployed only in selected counties. Although he claimed the State Guard was apolitical, Brownlow stated that "the number of troops called into active service will be increased or diminished as the good or bad conduct of the people shall be developed." "Old Proc," as the anti-Radicals often called Brownlow, had spoken.[2]

The boldness of the proclamation was indicative of the new, revolutionary momentum of Radical Reconstruction. On the same day, Brownlow signed into law the third franchise act, bestowing suffrage on the freedmen. For the first time in southern history, black men enjoyed the unqualified right to vote. In anticipation of this event, Radical leaders had already moved to mobilize, register, and indoctrinate the approximately forty thousand new black voters. The political vehicle by which these tasks were accomplished was the Union League. Formed by northerners during the war as a means of orchestrating support for the Union, this organization made an easy transition into a peacetime political club. In 1867, hundreds of Union League chapters sprouted over the state enrolling most white Radicals and thousands of freedmen. The secret meetings and political activities of this organization, known also as the Loyal League and the Radical League, alarmed many whites among the anti-Radical forces. Angry ex-Confederates in Wilson County, for example, posted warnings in February that they would kill any "Yankee" (i.e., white Radical) and burn out any freedman who engaged in political activity. To such men, in addition to imposing military tyranny, the Radicals had now perverted white supremacy by ushering in the "nightmare of the South": racial equality via the Union League.[3]

The provisions of the both the militia act and the Franchise Act of 1867 elicited a belligerent Conservative response. Referring to the militia act, in particular, as "that monster of iniquity," the *Fayetteville Observer* contended that, through armed force, Governor Brownlow would "execute the Franchise Act in defiance of any decision the Supreme Court might make on the subject." Other organs claimed that the militia act was simply a ploy to gain favor with the North by portraying ex-Confederates as bandits. The *Union and Dispatch*, citing "despicable demagoguery" on the part of the Radicals as the moving force behind the militia and black

suffrage laws, desperately exhorted its readers: "*Radicalism must be hurled from power.*" The *Pulaski Citizen* unleashed a similarly damning assessment of this latest example of Radical Reconstruction: "Thus that immaculate conclave of scoundrels at the capital are drawing the cords more closely about our necks." To this newspaper, the State Guard and its eventual inclusion of black militiamen represented the end of white supremacy and an insult to southern honor. The *Citizen* sarcastically suggested that Tennessee be renamed "Miscegenia."[4]

Perhaps mindful of this anti-Radical outcry, many Tennessee politicians hoped that the militia would not have to be called into service. On March 1, the members of the general assembly unanimously resolved to petition General Thomas for military support in the upcoming election. One Conservative confided to President Johnson that no military force was needed at all but that he hoped that U.S. troops could at least keep Brownlow's militia of "thieves" from despoiling the state. The *Union and Dispatch* echoed such sentiments: "Of the two armies, we should infinitely prefer those of the regular service." Brownlow dutifully requested Thomas's cooperation in deploying troops to any county that proved unruly. General Thomas agreed to help preserve order but reminded Brownlow that since Tennessee was now back in the Union, "the laws can be enforced therein by proper civil authority." Accordingly, he stressed that his men would "act as aids only . . . and not assume control." Moreover, Thomas placed numerous constraints on his units, insisting that his troops would move only after a specific instance of disorder had been reported and corroborated by the civil authorities and only after a strict chain of command had been established between such authorities and the regular officer in charge. Although sympathetic to the Radicals' plight, Thomas was essentially telling Brownlow to use his own resources to enforce his own laws.[5]

Undeterred by General Thomas's understandable reservations about involving federal troops in a civil election, the governor committed to a state military buildup. On March 6, in accordance with the militia act, Brownlow issued his official call, known as General Order No. 1, for volunteer militia companies. Prospective company commanders would hold the rank of captain. These captains were authorized to enlist one hundred men for three-year terms "unless sooner discharged." Each company was permitted twenty-five mounted personnel. Two lieutenants would be elected by each company. All personnel, prior to muster, were required to

24

25

take a franchise oath, one that required them to swear unconditional allegiance to the United States and swear that they had never voluntarily supported the Confederacy. After organizing, each company was to report to Nashville in order to draw equipment and arms. Under these instructions, a completed State Guard company would ideally have three officers, thirteen noncommissioned officers, and eighty-four privates.[6]

The Radical faithful throughout the state responded enthusiastically to Brownlow's call-up. Many prospective commanders emphasized politics and duty as their primary reasons for requesting a commission. East Tennessean Newton T. Beal went straight to the point: "Wishing the Radical Union Party to have every advantage of the Law is why I apply." John T. Rushing informed Governor Brownlow that the militia call-up "kindled anew the patriotic fire" within him, and that a commission in the State Guard would allow him "to live and die a soldier." Russ B. Davis of Warren County plainly stated that he would "proudly command anything you may give me." Other applicants stressed endemic lawlessness in their counties as reasons for wanting a commission. C. Underwood of Weakley begged for a commission lest the county fall to the "Rebills." He further stated, "If I was to Diclair for Brownlow in Company I Don't Believe I would Live 5 minuts." To Underwood, the militia mobilization was imperative, "the sooner the better." Robert Galbraith of Bedford County warned that "under the teachings of the *infamous traitor* Andy our section is beginning to assume the same aspect and attitude that it had in 1861 & 2 and I desire to be in a condition to combat Rebels, Copperheads, [and] Conservatives." John Enoch of Hickman County wanted to serve in order to "quell the riots that spring up." He believed a thirty-man company would suffice. William Bunker of Polk County promised Governor Brownlow that he would "hold in check the Treasonable portion" and "keep them from overthrowing your State government." With evident zeal, he added, "I would love very much to be one of its defenders. . . . Do not think that it is for money that I would enter your State Guard . . . but the love I have for my birth right."[7]

Whether motivated by partisanship or self-preservation, over sixty requests to form a militia company crossed the adjutant general's desk between March and June (twenty-seven from East Tennessee, twenty-four from Middle, and ten from West, with one from Kentucky). One Hawkins County Unionist, taking the militia act's passage for granted, requested permission to raise a company as early as February 2. James P.

Brownlow, the adjutant general and the governor's son, diligently went about administering the militia call-up (with his cousin Samuel Hunt serving as assistant). He sent all newly commissioned militia captains a copy of General Order No. 1, along with several blank muster rolls and morning reports with instructions to complete all forms in triplicate. He also ordered commanders to "proceed with as little delay as possible" in organizing their companies. Only when the adjutant general was satisfied with the paperwork would the unit be mustered into service.[8]

The difference between what Adjutant General Brownlow expected and what he often got made for some annoying administrative snarls. One prospective captain announced that he was recruiting volunteers although he did not have a signed commission, while twelve other men quit shortly after receiving their commissions. One such captain, W. O. White, explained that he had decided to run for the Tennessee General Assembly instead. Others, such as James M. Dickerson, cited personal or business reasons for their resignations. Although each applicant typically displayed a strong desire to raise a company, the actual work involved may have proved too taxing for many of them. Not lacking for volunteers, Brownlow gave their commissions to other worthy candidates, but company letter designations fluctuated throughout the spring as the adjutant general's office untangled the organizational jumble.[9]

Not surprisingly, the adjutant general's office expanded to meet the administrative challenge. To assist him in organizing the militia, James P. Brownlow commissioned William T. Cate and David M. Nelson to serve as mustering officers, both at the rank of colonel. Cate was the brother of Radical state senator Alfred M. Cate, one of the important architects of the militia act. The two brothers displayed their fierce Unionism early in the Civil War as participants in the Unionist bridge-burning operation of November 1861. W. T. Cate helped destroy two railroad bridges near Chattanooga. He spent the rest of the war in various irregular capacities for the army. Nelson, son of prominent East Tennessee Unionist T. A. R. Nelson, spent the war, in turn, as an artillery officer and a staff officer. The twenty-three-year-old Nelson hailed from Bradley County, where he pursued law. Both colonels greatly facilitated the militia call-up. Cate would supervise the swearing in of six companies, Nelson eleven.[10]

While the adjutant general mustered the volunteer companies, the quartermaster general provided logistical support. Horace H. Thomas, a

26

27



James P. Brownlow, 1863–64. Courtesy of McClung Historical Collection.

carpetbagger who also served as Governor Brownlow's private secretary, headed the quartermaster department. Assisting him was Capt. Albert E. Boone, a twenty-two-year-old from Benton County whom an associate described as "a gentleman familiarly acquainted with the [logistics] business." This reputed experience would prove invaluable, for unlike the U.S. Army quartermaster, the Tennessee quartermaster was responsible for ordnance, commissariat, and transportation, as well as uniforms and camp gear. Moreover, the Tennessee quartermaster was essentially starting from scratch: the state possessed virtually no military equipment. Throughout the spring, Thomas negotiated food contracts with various

Nashville distributors and uniform contracts with clothing warehouses in Cincinnati. In the meantime, company commanders were authorized either to make purchases locally using state vouchers or to forage, compensating private property owners as needed. Many companies also obtained supplies from sutlers, opportunistic vendors who followed the militia units from one campsite to the next.[11]

Although Thomas and Boone did their best, they were initially unprepared for the large-scale militia buildup. In ordering only thirty tents at the beginning of the mobilization, for instance, Thomas seriously underestimated the State Guard's campground needs. Even if the tents were Sibleys, a common Civil War tent that could accommodate twelve to twenty men, the requested number would not have provided shelter for more than five or six companies. The acquisition of uniforms also proved problematic and time consuming. State Guardsmen were supposed to be clothed in blue uniforms, complete with shoes, hats, and haversacks, but the quartermaster had to purchase these items from northern warehouses at a cost of more than sixteen dollars per uniform. Until these shipments arrived, many volunteer companies spent their first weeks on duty drilling in civilian clothes, albeit blue jeans in many cases. Supply delays left many units not only without uniforms but also without blankets. "Destitute" was a word commonly used by captains to describe their soldiers during the mobilization period.[12]

The importance of food, clothing, and shelter notwithstanding, the quartermaster's top priority in the first weeks of mobilization was ensuring an adequate supply of munitions. In this matter, it enjoyed quick and complete success. The Brownlow administration hoped that the federal government would furnish weaponry from its large stockpile of wartime armaments. As early as May 1866, in the wake of the Memphis race riot, the general assembly petitioned Washington, DC, for "five thousand stand of arms," a request that was ignored at the time. With the militia call-up of 1867, Brownlow tried again, asking the secretary of war for two thousand rifles. He justified this request by rightly stating that Tennessee's prewar arsenal had been "stolen by rebels in 1861." In the meantime, Horace Thomas looked into the purchase of firearms. He considered buying breech-loading carbines from a Philadelphia dealer, while a gun manufacturer in Connecticut offered to sell the state any number of rifles "cheaper than the same quality could bought elsewhere." In the end, the War Department agreed to make available as many as

10,000 rifles, free of charge, from its depots in Indiana and Michigan. On April 10, the first shipment—348 rifles, with accouterments, and over fifty-six thousand rounds of ammunition—arrived in Nashville. Denied permission to store these armaments in the federal garrison's Ash Barracks, the quartermaster converted the Nashville courthouse into a temporary magazine.[13]

As they mustered, the majority of militia companies were armed with what turned out to be used Enfield rifled muskets. This weapon had been a favorite during the Civil War, particularly among Confederate soldiers. With its .577 caliber, the eight-pound Enfield was powerful but not overly weighty. Throughout the spring and summer, the quartermaster received and distributed crate loads of Enfields, along with enough ammunition to equip each volunteer with at least sixty rounds. Thanks to the federal government's generous loan, the State Guard was always able to outgun its opponents throughout the Reconstruction years.[14]

Conservatives were dismayed by the growing reality of a standing army. Fanning the fires of anti-Radicalism, John Baxter, a virulent opponent of Brownlow, decried the mobilization of "8000 men in a time of peace." Addressing the state's anti-Radical majority, he explained that the militia would be "paid by taxes to be gathered from you and I." All the while, Baxter asserted that "a formidable military power is being organized, in violation of the constitution . . . for no other purpose than to control elections." The *Union and Dispatch* offered a similarly gloomy forecast: "It is evident that a terrible convulsion is anticipated. . . . A pall, terribly dark and threatening, hangs over the destiny of our people." As the militia units began to form, the *Republican Banner* predicted that the State Guard would cost the taxpayers $5–10 million annually, the free use of the federal arsenal notwithstanding. Some Conservatives found solace in the hope that assembling eight thousand men would prove too difficult for the Brownlow administration. The *Pulaski Citizen*, cognizant of ex-Confederate power in Giles County, smugly asked, "Who is to be captain of the militia in this county?" A local Radical took up the challenge and applied for a State Guard commission. Although this man purportedly had "extensive influence among the loyal men of Giles," he failed to raise a company. A similar result occurred in Marshall County.[15]

Such setbacks, however, appear to have been the exception rather than rule. The pool of militia applications was so large that Governor Brownlow expressed confidence in mobilizing a sizable State Guard. "I

find no trouble in raising companies," he informed the people through one of his many proclamations. But it was never his intention to muster into service the entire force that was potentially at his disposal. When two would-be captains from Carroll and Marion counties informed the adjutant general's office that they could easily raise local units for the State Guard, the administration replied that it had found sufficient manpower elsewhere. Overall, the widespread response to the March call-up must have heartened Radicals everywhere.[16]

Eventually, the Tennessee State Guard would consist of twenty-one companies in two full regiments of ten companies and a third regiment with one company. More than eighteen hundred men enlisted. Most units came from East Tennessee, but all sections were represented. Moreover, Governor Brownlow, faithful to his new, if uneasy, alliance with black voters, encouraged the involvement of blacks in the militia. Seven companies contained black troopers, one of which was commanded entirely by black officers.

The first company raised under the new militia act was an all-white unit from DeKalb County. Twenty-four-year-old Joseph H. Blackburn served as its captain. Blackburn possessed excellent Radical credentials. At eighteen he enlisted in the Fifth Tennessee Cavalry (Union) and, despite his youth, was immediately elected a company commander. His war record was impressive. Serving mostly in Middle Tennessee, because "he knew the country perfectly," Blackburn participated in the Murfreesboro campaign and in numerous skirmishes with the troops of such Confederate cavalry raiders as John Hunt Morgan and Joseph Wheeler. He was wounded on more than one occasion and suffered the loss of his brother, Charley, who was killed in action in 1863. Known for riding into battle with a plume in his hat, Blackburn was praised for his "daring and efficient conduct" when on the attack and for his "stubborn and desperate resistance" when on the defensive. At the battle of Nashville, Blackburn, then a colonel commanding the Fourth Tennessee Mounted Infantry (Union), was instrumental in cutting off the retreat of some Confederate units attempting to escape toward East Tennessee. He finished the war clearing guerrilla bands out of Middle Tennessee, operations that led to his capture of the infamous Champ Ferguson, a Rebel guerrilla leader subsequently executed for wartime atrocities.[17]

Blackburn gained a small measure of notoriety among ex-Confederates shortly after the war when he paid an unfriendly visit on



Joseph H. Blackburn, 1870. Courtesy of McClung Historical Collection.

Confederate general Wheeler. Wheeler had just been released as a prisoner of war and was staying in a Nashville hotel when Blackburn, accompanied by a comrade, knocked at Wheeler's door. A brief altercation followed, including an apparent accusation that Wheeler had pillaged the homes of Middle Tennessee Unionists. At this point, Blackburn commenced beating the Confederate veteran about the head with "a club of considerable dimensions." A bloodied Wheeler staved off the assault and subsequently protested what he considered an

attempt on his life. Blackburn received a stern letter of reprimand from Gen. George H. Thomas, but the incident only enhanced the young colonel's reputation among DeKalb County Unionists.[18]

Back home in Liberty, Tennessee, Blackburn joined the Republican party and pursued a career in law, but devoted much of his time to running his five-hundred-acre farm and raising his family. He was among the first to respond to Brownlow's March mobilization. Local ex-Confederates, reportedly veterans of Champ Ferguson's outfit, tried to thwart Blackburn's efforts by circulating a death list of prominent county Radicals. The circular promised a reward of four thousand dollars for the assassination of Blackburn. Undaunted, Blackburn recruited seventy-five men (later augmented to ninety-five) in a matter of weeks and mustered his company on April 1. In accordance with the militia act, two lieutenants were elected; both proved good choices. 1st Lt. William L. Hathaway, age twenty-five, had served in the war with Blackburn as one of his officers. He, too, displayed courage and ability on the battlefield. During a conventional engagement, Hathaway helped drive a Confederate unit from a ridge-line position as part of a general advance through Middle Tennessee. During a counterguerrilla operation, he personally killed Pomp Kersey, a DeKalb County Confederate and leader of a "gang of bushwhackers." 2nd Lt. William F. Cravens, age twenty-nine, had served as a private in Blackburn's Civil War regiment. Both lieutenants were DeKalb County farmers, as were most of this unit's enlisted men. Overall, the rank and file were middle- to lower-middle-class family men averaging twenty-four years of age.[19]

A month after the muster of Blackburn's unit, a second company from Middle Tennessee formed. The man in command was William O. Rickman, a thirty-three-year-old farmer from Franklin County. Wartime and Reconstruction experiences help explain Rickman's die-hard Radicalism. He spent the Civil War commanding a company in the same regiment as Blackburn. But while Blackburn was engaged in some of the more glamorous aspects of the war, Rickman was assigned mostly to antiguerrilla operations. Toward the end of the war, he received orders to pursue a band of Confederates who refused to surrender. The harsh and explicit terms of this assignment, namely to "exterminate" and "show no quarter," may have permanently colored his view of ex-Confederates. These punitive activities came back to haunt him after the war. In February 1867, a large band of ex-Confederates surrounded his farm,

plundered his smokehouse, and destroyed various produce and farm equipment. All the while, Rickman single-handedly defended his home and family with steady fire from a Henry rifle. Rickman embellished the encounter for journalists, putting the number of attackers at several hundred "desperadoes." A skeptical *Union and Dispatch* sarcastically quipped, "Why don't Old Brownlow get four of five more 'cool and courageous' Rickmans and garrison the State?" Exaggeration or not, this episode undoubtedly contributed to Rickman's decision to raise a company for the State Guard only a few weeks after the incident.[20]

Whereas Blackburn raised a company from a single county, Rickman recruited volunteers from five—Bedford, Coffee, Franklin, Lincoln, and Marshall. Moreover, while Blackburn's recruitment was relatively painless and quick, Rickman's proved frustrating. He assured the adjutant general that he did not lack for recruits, but he noted growing ex-Confederate interference with his activities. For some time, local Unionists had been complaining of a "lawless band" of ex-Confederates who were acting "quite belligerent . . . making heavy threats." Many of Rickman's recruits reported being harassed, with some allegedly driven from their homes, by these "Rebel Gurilers." Accordingly, Rickman requested permission to establish a fortified encampment near Tullahoma in Franklin County and to muster and equip volunteers as he recruited. The adjutant general denied this request, probably because adequate ordnance was unavailable at that time. Perhaps desperate to increase his strength, Rickman refused to release one Private Tucker whose father claimed that the boy, being only seventeen, was too young to serve. Rickman accepted the boy's claim of being twenty years old and told the father to go home. Further complications arose in April when Rickman reported he was in bad health and needed at least one commissioned officer to assist him. Assistant Adjutant General Samuel Hunt arrived at the end of the month and helped Rickman complete his organization. On May 1, seventy-one white men were officially sworn into service.[21]

The election of lieutenants did not please Captain Rickman. In a close vote, only twenty-seven-year-old Jordan C. Holt received a majority. Acting 1st Sgt. G. W. Farnum believed that Holt, a small farmer from Bedford, was incompetent and he refused to serve under him. When Rickman ignored his request for a direct appointment to first lieutenant, Farnum protested to the adjutant general but received no relief. Instead, a falling out occurred between Farnum and Rickman, and

before the month was out, Farnum quit, apparently without reprisal. Farnum's assessment of Holt ultimately proved accurate. Following a violent clash with local ex-Confederates at the end of May, Holt resigned his commission and returned to the ranks as a private, admitting his unfitness for the job. Rather than hold another election, Rickman elevated a trusted noncommissioned officer, John J. Mankin, to the first lieutenancy. The forty-two-year-old Mankin had served the U.S. Army as a scout and then enjoyed relative prosperity after the war as a farmer raising a large family. Rickman and Mankin worked well together and, with this harmony at the top, the company increased its strength to ninety-two enlisted personnel during June. Adjutant General Brownlow retroactively approved the selection of Mankin, however irregular its manner, and Rickman's company was fully functional two months before the state election.[22]

Rounding out the white militia companies from Middle Tennessee was one commanded by William S. Stuart, a resident of Putnam County. Only twenty-two years old, Stuart secured his commission thanks to the efforts of eighteen fellow Putnam residents who petitioned the governor on Stuart's behalf shortly after the mobilization proclamation. A former corporal (in Blackburn's regiment) during the Civil War, Stuart went about his recruitment duties with great purpose. Like Rickman, Stuart drew volunteers from five counties—Putnam, Smith, Van Buren, Warren, and White. Also like Rickman, he encountered obstacles. Stuart notified Nashville that a pronounced contempt for the militia act pervaded the entire region. He described one group of local ex-Confederates as the "worst men [who] threaten & carry arms & kepp the country in a confusion." Some would-be recruits feared that they would be "murdered some night" if they joined the militia. Others stated a willingness to serve but insisted on assurances of timely pay and a promise that they would be home for the autumn harvest (the militia act's stipulation of a three-year term was a disincentive to these men). Stuart further complained that local Rebels were falsely taking the required enlistment oath in an attempt to undermine his efforts. Adjutant General Brownlow warned Stuart that ex-Confederates throughout the state were perverting the concept of loyalty oaths, yet he urged Stuart to protect the integrity of the militia oath. Taking the adjutant general's concerns to heart, Stuart threatened scores of ex-Confederates with arrest if they persisted in defying his duty to raise a

militia company. On April 11, Stuart made good his threat when he forcibly arrested two men in Sparta for an alleged breach of the peace. Anti-Radical residents in White County, one of Stuart's recruitment areas, lodged a complaint against the beleaguered militia officer after witnessing his heavy-handed methods. The petitioners resented what they called "military rule" and insisted that all was quiet in their county. They recommended Stuart's immediate replacement by an officer of their choosing.[23]

Stuart was not replaced but completed his organization on June 1, mustering in a small company of forty-eight men at Cookeville. By the end of the month, however, the unit's strength increased to eighty-six, at which point Stuart conducted officer elections and gained the services of two lieutenants. Edmund D. Pennington, age forty-one, became Stuart's first lieutenant. Pennington, a former Civil War captain from Carthage (Smith County), was described by his many friends as a "true man . . . a fighting man." David C. Patton, age thirty, became the second lieutenant. He had served as a private in Captain Blackburn's company in the Fifth Tennessee Cavalry (Union). For unspecified reasons, however, Patton would resign before the August election.[24]

During these same weeks, two companies of State Guard formed in West Tennessee. Despite the sizable black populace in the west, only one of these companies contained black militiamen. The region was heavily ex-Confederate and the adjutant general may have judged the enlistment of large numbers of blacks too risky. Unfortunately, white Unionists were few in number and still on edge following the assassination of Senator Case only a few months earlier; assembling sufficient volunteers for the militia posed a tremendous challenge. Moreover, ineffective law enforcement, as evidenced by the widespread intimidation of blacks by white regulators, made the peaceable registration of black voters nearly impossible.[25]

Conservative newspapers mocked Radical efforts to organize militia companies in the west, predicting that they would find few volunteers. Nonetheless, twenty-six-year-old John T. Robeson of Carroll County, formerly a captain in the Seventh Tennessee Cavalry (Union), embraced the opportunity to serve his state and his party in what promised to be an exciting peacetime military capacity. Anti-Radicals in Gibson denounced Robeson's activities, claiming that all was peaceful in their county. Elsewhere, however, Rebel intimidation of freedmen and white

Unionists increased as Robeson went about his duties. In neighboring Weakley County, for instance, nightriders fired on the home of a Republican official. Brownlow supporters in nearby Obion County received similar treatment at the hands of a vigilante band led by an "infamous villain" named Tom Hooks. A local Unionist opined that "any man attempting to raise a company here without protection would do it at the risk of his life." These obstacles notwithstanding, Robeson persevered, drawing on four counties for men—Carroll, Gibson, Obion, and Weakley. Like Rickman, Robeson took just about any loyal white man he could get, but unlike Rickman, he acquiesced when one irate father insisted on having his underage son's enlistment invalidated. Although he prematurely reported his command's readiness in mid-March (perhaps to receive arms and equipment with which to fend off Rebel assailants), Robeson did officially muster his all-white company, sixty-five strong, on May 8 at Huntingdon (Carroll County). Robeson continued recruiting, however, and increased his company strength to seventy-six within a month after muster. Both of his lieutenants hailed from Weakley County and both had served as privates during the war: 1st Lt. Charles B. Simpson, age twenty-five, and 2nd Lt. William G. Fuller.[26]

While Robeson was successful in raising an all-white militia company in West Tennessee, William C. Holt of Gibson County was not. A forty-nine-year-old farmer and a Civil War captain, Holt recruited volunteers from Gibson and Obion counties and even enlisted a few men from East Tennessee. Adjutant General Brownlow appears to have wrongly assumed that Holt would enlist more men. One of Holt's soldiers, Moses H. Kinman, a future lieutenant in the State Guard, claimed he could easily help his commander recruit seventy-five men. A former Union cavalry private, the thirty-one-year-old Kinman was one of the Obion County deputy sheriffs wounded by the outlaw Farris at the time Senator Case was murdered. Although the muster roll for this unit is cursory and ambiguous, it indicates that while Holt may have held a genuine commission, he recruited only thirty-three men, not enough for a separate State Guard company.[27]

Sometime in July, the adjutant general merged Holt's partial command with Captain Robeson's recently mustered company. Coupled with his ongoing recruitment efforts, this decision swelled the manpower under Robeson to at least 110, but it produced an awkward command situation, for Holt retained his commission. Thus, two captains ran the

unit that would become Company E, First Tennessee State Guard. The adjutant general recognized Robeson as the overall commander (and would formalize this appointment with an eventual promotion to major after the election), while Holt either ran the day-to-day affairs of the newly combined company or served in a detached capacity with the men he had recruited. Neither Robeson nor Holt was ever quite satisfied with this peculiar arrangement, and events would demonstrate that the relationship between these two officers was one of rivalry. A perturbed Robeson tried throughout the campaign to gain a commission for his brother, Jeptha, but these efforts came to naught.[28]

The other militia unit formed in West Tennessee appears to have been racially mixed. On July 5, George Hamilton, who was white, mustered sixty-four men into service at Purdy in McNairy County. Information on this unit is sketchy, but census data confirm that at least three of these men were black. Ever since Brownlow's March proclamation, McNairy Radicals had begged the executive to take "speedy action in recruiting" a militia company in their county for the purpose of protecting free speech, among other liberties. Hamilton, a cavalry private during the Civil War, found recruitment slow and frustrating but managed to find an adequate number of men from McNairy and neighboring Hardin and Humphreys counties. Perhaps because of its size, the company elected only one lieutenant, Thomas Randolph, a former sergeant in the Sixth Tennessee Cavalry (Union).[29]

The Brownlow administration could not have been surprised at the dearth of white Radical manpower in West Tennessee, but it was apparently reluctant to employ blacks in the State Guard. Nevertheless, the governor was counting on the region's many blacks to help him win the August election. He was concerned, however, that the large number of ex-Confederates in the region would both intimidate these black voters and attempt to vote illegally themselves. To make matters worse, Brownlow's rival gubernatorial candidate, Emerson Etheridge, was a native of Weakley County. Although the governor would show no hesitation in deploying militia companies from East Tennessee to the west, the administration would have preferred a stronger local show of force.

The majority of the Tennessee State Guard's companies came from East Tennessee. Radical strength in this section was great and none of the twelve eventual company commanders had any difficulty in recruiting volunteers. One of the first companies of East Tennessee militia

came from Bradley County and was commanded by Judge K. Clingan. Known as a "brave and gallant officer," Clingan had served as a company commander in the Fifth Tennessee Infantry (Union) in the early part of the Civil War. He later commanded a battery of six-pounders and participated in operations to capture Chattanooga. Gen. William S. Rosecrans commended Clingan for his "meritorious services" and placed him on the Army of the Cumberland's elite Roll of Honor, one of only ten officers from Tennessee so recognized.[30]

J. K. Clingan was the son of Alexander A. Clingan, a wealthy farmer and longtime sheriff of Bradley County. Family connections likely helped the younger Clingan win election to complete the term of Jesse Gaut in the Thirty-fourth General Assembly. Although a confirmed Unionist and Republican, Clingan was not an unconditional Radical. His family had maintained cordial relations with local Confederates during the war, and in the assembly, while ultimately voting for all major Radical legislation, particularly black suffrage, Clingan demonstrated that he was his own man. He initially opposed the Metropolitan Police Act, especially its centralization of power over Hamilton, a county neighboring his home in Bradley. He supported amendments to this controversial law that moderated executive influence. Similarly, during the controversy over the state's ratification of the Fourteenth Amendment, Clingan joined five other legislators in formally protesting the assembly's extralegal method of ratification. Finally, he resisted William J. Smith's efforts to push through the militia bill before the issue had received what Clingan considered adequate debate. He did vote aye in the end.[31]

Declining to run for a second term, the twenty-nine-year-old Clingan instead offered his services to the new State Guard that he had helped bring into existence. His conscientious devotion to constitutional procedures apparently did not earn the governor's wrath; the adjutant general's office commissioned him at the end of April. Captain Clingan went about recruiting his company with great alacrity, despite the loud threats of R. M. Edwards, a local Conservative, who howled, "If Gov. Brownlow dare call out any portion of the militia, the people . . . [will] rise and wrench their arms from their hands and *exterminate* them." On May 4, Clingan reported the election of his lieutenants—Robert A. Armstrong, age twenty-nine, and George W. Kelley, both enlisted men during the Civil War—and announced that his ninety-two volunteers (drawn from Bradley, Hamilton, McMinn, and Polk counties) were ready for muster.[32]

It was at this point that Clingan's otherwise smooth organizational effort suffered a needless complication. The mustering officer, Col. David M. Nelson, arrived and attended a local church service as Clingan readied his men for the swearing in ceremony. Something in the sermon offended Nelson and he publicly denounced the preacher for expressing treason in the pulpit. Local ex-Confederates then levied a lawsuit for slander against Nelson, who would not be acquitted of the charge until September. This awkward incident notwithstanding, Clingan's company mustered in Cleveland on May 11.[33]

Throughout May, Governor Brownlow, convalescing in Knoxville, personally involved himself in the organization of four militia companies. These four would muster within two weeks of one another. The first was Robert L. Hall's company of 109 white recruits from Knox County (a few came from Blount). Although there is no concrete evidence that either the twenty-eight-year-old Hall or his first lieutenant, Robert G. Miner, had served in the Civil War, Radical newspapers referred to them as veterans. The unit's second lieutenant, twenty-two-year-old Isaac H. Watson, had been a noncommissioned officer in the Fifth Tennessee Infantry (Union). Regardless of his military credentials, Captain Hall appears to have been a good organizer. His company was applauded, by Conservatives no less, for its impressive military bearing during muster.[34]

Another company that Brownlow took a special interest in was Shadrick T. Harris's all-white unit from Jefferson County. "Shade" Harris brought a unique perspective to his command. Like many other State Guard commanders, Harris had served as an officer during the Civil War, but his experience was markedly different from that of his colleagues. Conscripted by the Confederacy in 1862, he escaped to Union lines before reporting for duty. After a few months of service with the Third Tennessee Cavalry (Union), he was captured in January 1863, tried by Confederate military authorities for desertion, and sentenced to be shot. Jefferson Davis commuted the sentence, but Harris spent the next twenty-five months as a prisoner of war, much of it confined in "heavy chains" in South Carolina. According to an escaped Union officer, Harris was poorly treated, having "all the indignities heaped upon him by his brutal captors." Federal officials, moved by his plight, negotiated a prisoner exchange in March 1865, although Confederate officials steadfastly regarded Harris a criminal, not a soldier worthy of such consideration.[35]

After the Confederacy's defeat, Harris, described as "a zealous, high-spirited and gallant officer," returned to East Tennessee in an unforgiving mood. The prison shackles had so warped his legs that he limped about on the sides of his feet. In the summer of 1865, Harris assaulted an ex-Confederate named William Beard on the streets of Knoxville. Apparently, Beard had abused Harris while the latter was briefly imprisoned in Knoxville and had tried to summarily execute Harris after a failed escape attempt. Shaped by such an unusual wartime ordeal, "Shade" was just the kind of Radical the Brownlow government could count on. And Harris came through for his government, raising a company of 112 men from Jefferson and Cocke counties and gaining the services of two capable lieutenants. 1st Lt. Edwin R. Hall, age twenty-eight, was one of the few carpetbaggers among the State Guard's officer corps. And his military experience was quite varied: participation in the battle of Gettysburg as a private with the Twelfth Vermont Infantry; counterguerrilla operations in East Tennessee as a sergeant with the Tenth Michigan Cavalry; and service as a lieutenant in the First U.S. Colored Artillery (Heavy). Mustered out in 1866, Hall settled down in East Tennessee. Harris's other lieutenant, John W. Roberts, age twenty-two, had served as a private in the Sixth Tennessee Infantry (Union).[36]

On June 1, Harris mustered in his command at Dandridge (Jefferson County). Many of the men were small farmers and most of them were quite young. The average age of the recruits was twenty-one, and sixty-two of them were teenagers. A Conservative newspaper correspondent watched Harris's muster with disgust. "A harder looking gang I never saw in my life," he wrote. The correspondent criticized the company's youth and inexperience, and contended that the rank and file habitually harassed local blacks. This observer claimed—perhaps wishfully—that most of these militiamen were "opposed to Brownlow."[37]

The rapid recruitment of militia companies under Brownlow's supervision continued with the commissioning of James R. Evans of Claiborne County. The twenty-one-year-old Evans was a former noncommissioned officer in the Fourth Tennessee Cavalry (Union). A man of substantial wealth (he was worth nineteen thousand dollars in 1870), Evans presumably had a talent for organization and leadership. Operating out of Tazewell, Evans happily informed the adjutant general, "My boys are anxious," and he promised that he would have his company ready by April 15. This promise was not kept, for although Evans

steadily recruited volunteers from Claiborne and neighboring Grainger County, he encountered considerable local opposition. Ex-Confederates made a habit of gathering outside of Evans's recruitment office and heckling prospective recruits. Evans twice extended his self-appointed muster deadline, citing growing "Rebel and Copperhead" interference. On one occasion, an alarmed Evans reported that an ex-Confederate had burst into the town firing a pistol and "swearing he was going to kill me." On another, ex-Confederates caused a disturbance when they blocked the efforts of "colored people" to register for the upcoming election. Adding to the tension was a rumor that Rebels from Grainger intended to burn railroad bridges to inhibit the deployment of Evans's men. Although he reassured the state government that Claiborne was loyal and would vote Radical, Evans insisted that unless it was provided with arms, his unit would be compelled to depart Tazewell.[38]

By mid-May, Evans's company had attained the impressive strength of one hundred men, but for the sake of civic peace he transferred the unit from Tazewell to Morristown in Grainger County. The young militia captain, however, could not resist a parting shot. En route to Morristown, his unarmed column marched past some road workers who were evidently anti-Radical. When Evans called on the workers to give a cheer for Brownlow, they refused. Evans's men then "arrested" the workers and herded them down the road for a few miles before releasing them. Local Conservatives were not amused by these militia antics and complained to President Johnson. Once in Morristown, Evans's official muster passed off without incident on June 3. His all-white company elected as first lieutenant forty-six-year-old John N. Ellis, a well-to-do farmer who had served as an officer in the Third Tennessee Infantry (Union). James A. England, age twenty-two, a corporal in Ellis's wartime company, became second lieutenant. Difficulties notwithstanding, Evans was one of the few militia commanders to raise a full-strength company.[39]

The last company that Brownlow took a personal interest in raising was an all-white outfit under Silas L. Chambers. The twenty-nine-year-old Chambers was a merchant from Huntsville (Scott County) and had served as a first sergeant in the Second Tennessee Infantry (Union). Commissioned in April, Chambers drew on four counties—Anderson, Campbell, Morgan, and Scott—for recruits and soon had over one hundred men ready to enlist. Unfortunately, he experienced an embarrassing, and tragic, setback. When he and Col. D. M. Nelson attempted to

muster the company in Huntsville on April 25, a "general melee" broke out among the recruits over the election of lieutenants. More than a dozen men were injured and one died. The incident prompted a Conservative correspondent to comment that "there is no telling what bad whiskey and Radicalism may do." Such blunt sarcasm was in some respects apt, for Chambers had a strong taste for whiskey, a vice that would cause problems during the campaign. The company reformed on May 15 with two ostensibly acceptable lieutenants: James W. Newport, age twenty-three, an enlisted veteran of Tennessee's wartime Civil Guards and a postwar farm laborer, and Alvin Parker, age eighteen, a wartime private and postwar farmhand. The unit then marched to Clinton (Anderson County) to muster. There, the town's anti-Radicals spread a rumor that the militia had arrived to supplant the civil court with its own military court. Chambers, however, was struggling to hold his own command together. On June 10, the day of official muster, 23 recruits were listed as "absent-without-leave" and eventually branded as deserters. Four more men deserted within the week. One Conservative derided Chambers's men as "the verry trash of the earth." In the end, only 83 of the original 106 volunteers were mustered into service.[40]

Brownlow may have busied himself with the administrative details of several militia companies, but most East Tennessee companies formed without his help. One was George W. Kirk's company from Greene County. Few other company commanders in the State Guard possessed as extensive a Civil War record as Kirk. Enlisting as a private, Kirk soon gained company command in the Eighth Tennessee Cavalry (Union). Most of his service took place in East Tennessee and western North Carolina, areas wracked by guerrilla warfare. There, Kirk helped "pilot" Unionists to a Federal recruitment center at Camp Dick Robinson, Kentucky. In 1864, he was commissioned to raise a regiment of loyal mountaineers and conduct raids into Confederate-held territory. In the process, he became a skilled guerrilla fighter. His most spectacular success came in June 1864, when his raiding party destroyed a Confederate supply depot at Camp Vance, North Carolina, and captured 277 enemy soldiers. He made several other forays into North Carolina, earning praise from Gen. John M. Schofield for the "gallant and successful manner" of his operations.[41]

Confederate authorities had regarded Kirk as a "renegade" whose commission was little more than a letter of marque. Confederate officers

from North Carolina claimed that his unit was composed of deserters, Indians, and freedmen, and that Kirk himself was a "notorious tory and traitor, vagabond and scoundrel." As the war came to a close, Kirk, with a brevet colonelcy, was ordered to clear the mountains of Confederates. His orders contained the same harsh instructions to "exterminate" guerrillas that Captain Rickman received in Middle Tennessee. Kirk apparently did his job well, killing over one hundred Rebels and capturing an elusive guerrilla leader named Palmer. In the process, he allowed his men undue freedom to plunder. Federal authorities complained of his "excesses" and finally terminated his command in May 1865.[42]

After the war, "Colonel" Kirk became a thoroughgoing Radical. Governor Brownlow was anxious to gain the "valuable" services and "matchless heroism" of this twenty-eight-year-old Greene County Unionist. As the campaign of 1867 approached, Kirk publicly welcomed a showdown with the ex-Confederates: "If nothing else will do the rebels and copperheads but a fight, I say give it to them on all sides." Such audacity pleased Radicals and attracted many recruits from Greene County and its neighbors, Hawkins and Washington. On June 6, Kirk's company was mustered into service. In all, Kirk commanded eighty-five men, many of whom were barely out of their teens (the average age was 19.3 years). Francis Kirk, age 18, possibly a relative, was elected first lieutenant. Henry C. Sanders, a 22-year-old veteran of the Fourth Tennessee Mounted Infantry (Union), served as second lieutenant. In the days leading up to the activation of this militia company, a Radical newspaper confidently boasted that "Rebels and their despicable and despised sympathizers must 'lay low' when Col. Kirk comes round."[43]

From Roane County came a small company of State Guard under Joseph M. Alexander, age twenty-three. Although Roane was a mostly Unionist county, Alexander suffered for his loyalty during the Civil War. During the first year of the war, he worked quietly in his father's general store in Loudon. In 1862 and 1863, however, he and his family were "molested in every conceivable way" by Confederate occupation forces. On one occasion, Rebel soldiers ransacked the elder Alexander's store. On another, they raided the Alexander home, where the intruders and occupants "had quite a fight." While his brother was conscripted into the Confederate army, Joseph avoided taking up arms and instead operated as a civilian informant for the Union army during Gen. Ambrose Burnside's occupation of the region. Evidently ready to serve

in a military capacity in 1867, Alexander applied for a militia captaincy and assured the Brownlow administration of his patriotic devotion to the Radical cause: "I am making arrangements to protect the Loyal people of this dear old State of East Tennessee who sent forth her sons to protect the flag that we are supporters of." Commissioned in June, he recruited fifty-four men (drawn from McMinn and Monroe counties as well as Roane), and on July 6 his company was mustered into service. His only lieutenant was a man named E. R. Brown.[44]

The most eastern of the State Guard companies was Kemp Murphy's outfit from Johnson County. Murphy had been a nineteen-year-old delegate to the Greeneville Convention in 1861 and later served in the Fourth Tennessee Infantry (Union) as a private. At 25, he mustered his seventy-two white volunteers into service on July 19, a fortnight before the election. Like many of the other companies, Murphy's was basically made up of boys: 20.2 was the average age in his unit. His first lieutenant was William C. Arnold, a subsistence farmer in his early twenties who had been a first sergeant during the Civil War. His second lieutenant was Joseph A. Grace, age 26, who had been a private during the war. The two lieutenants had served together in the Thirteenth Tennessee Cavalry (Union).[45]

In the final week of the gubernatorial campaign, Governor Brownlow authorized the creation of two more white companies from East Tennessee. Little is known about these officers and men. William N. Purdy, age thirty-four, organized a half-strength company (fifty men) from Monroe County on July 22. A former hospital steward, Purdy commanded alone; he had no lieutenants. On July 26, twenty-one-year-old A. M. Clapp, a Knox County farmer, hastily mustered into service an indeterminate number of men from Grainger, Hawkins, Jefferson, and Knox counties. The company roster lists two lieutenants, R. M. Stone and twenty-year-old James S. Clapp, but only forty-one enlisted men are on the muster roll. Probably, there were more men in this unit.[46]

The majority of the Tennessee State Guard was white. Significantly, however, seven militia companies contained blacks, including the previously discussed West Tennessee company under George Hamilton. Having enfranchised the freedmen, the Brownlow administration saw no reason not to employ them as militiamen. Presumably, the Radicals hoped that the black electorate would respond to the political campaign more enthusiastically knowing some of their own were in the ranks of

44

45

the State Guard. Several commission seekers informed the state government of their willingness to organize and command a black company. One applicant used political alliteration to make his case: "Lincoln, Liberty, Law, Loyal, League." Nevertheless, the decision to recruit black militiamen was controversial and not taken lightly. White southerners had long trembled at the idea of blacks with guns. The praiseworthy performance of black Civil War soldiers (twenty thousand of whom came from Tennessee) did not allay these white supremacist concerns. Anti-Radical whites blamed black soldiers for the Memphis race riot. Other incidents, such as a shout-out between white youths and black troops in Montgomery County on Christmas Day 1865, only exacerbated race relations. In the aftermath of the Civil War, President Johnson urged General Thomas to exercise tight control over his black soldiers in Tennessee: "In the event of an insurrection it is feared that the colored troops, so great in number, could not be controlled." Thomas dismissed such concerns as unfounded, but Governor Brownlow also worried about the possibility of race war, although he may have privately delighted at the prospect of covering West Tennessee with black troops. In the end, he prudently kept black numbers in the militia small.[47]

The first blacks to join the State Guard came from Washington County. They would serve in a racially mixed company under white officers, most notably George E. Grisham, who issued a call for militia volunteers shortly after receiving his commission in April. At thirty-three years of age, Grisham was a rising star among the Radicals of East Tennessee and a seemingly good choice to command black militiamen. During the Civil War, he served as a company commander in the Eighth Tennessee Cavalry (Union) and later as a staff officer under Maj. Gen. Alvan C. Gillem. Local ex-Confederates tried to disparage his character by claiming he was a Confederate deserter, but Grisham served the Union with distinction. Following the war, he became the postmaster of Jonesboro, but his primary activity was running his newspaper, the *Jonesboro Union Flag*. Initially a moderate in politics, Grisham grew enamored with Brownlow's leadership and his news organ became increasingly radical. In October 1865, Grisham ran unsuccessfully for an open seat in the Tennessee General Assembly. His simple platform called for public education, compensation for Unionists, and tax reforms. Throughout his campaign, Grisham denounced the ex-Confederates. To him, Reconstruction meant "Union construction and Rebel destruction."

The following year, Grisham coauthored a petition to Radical leader L. C. Houk that urged an uncompromising stance toward the growing anti-Radical forces in the state: "We must fight the enemies of our country, and fight them everywhere and in every way. We are on the tower watching and must do all we can to save ourselves." County conservatives, dismayed by such hard-line sentiments, persuaded President Johnson to remove Grisham from his postmaster position. Local ex-Confederates employed more violent measures. In October 1866, two attempts were made to burn the office of the *Union Flag* to the ground, both while the printing staff was on duty.[48]

Grisham eagerly responded to Governor Brownlow's militia proclamation. When applying for his commission, Grisham oddly requested assignment to the Middle Tennessee county of Franklin in order "to keep the Rebs straight [and] hold that line of communication open for yours." As he recruited loyal volunteers, the energetic Grisham helped get Washington County on a solid political footing. He was instrumental in forming Union Leagues throughout the county, and he served as secretary to the county's Radical nominating convention. In the process, Grisham described the upcoming political campaign in do-or-die terms: "The man that does not understand that this State is to remain under the control and management of *its friends at any cost or sacrifice*, is certainly too far behind the times. . . . The Radicals will rule this State peaceably, if they can; forcibly, if they must." Conservatives were appalled at such militancy and regarded Grisham's commission in the State Guard as a prime example of partisan politics—a militia captain, Radical politician, and newspaper editor rolled into one.[49]

On April 13, Grisham reported that company of approximately 114 men was fully organized. About half of Grisham's command was black, quite likely members of the new Washington County Union Leagues. Additionally, many of these men claimed to have served in colored regiments during the war. How blacks voted in the election for lieutenants is unknown, but both junior officers were white men. 1st Lt. Nelson McLaughlin, age forty, was a well-respected Washington County farmer. Additionally, McLaughlin was a veteran of both the Mexican and Civil Wars, serving in the latter as a company commander alongside Grisham in the Eighth Tennessee Cavalry (Union). The twenty-one-year-old Joseph A. February won the second lieutenancy. Affectionately referred to as "Jo," February was a veteran of the Fourth



George E. Grisham, 1864–65. Courtesy of Tennessee State Museum Collection.

Tennessee Infantry (Union). In the forthcoming campaign, Grisham usually commanded the black contingent of his company, while McLaughlin often commanded the whites on detached assignments.[50]

Using his printing office as a command center, Grisham issued orders through the *Union Flag* for his recruits to muster on May 1: "Every volunteer is required to be punctually present." The swearing-in ceremony was a prominent part of a grand political rally in Jonesboro that included speeches by various Radical politicos, all of whom denounced President Johnson. Some three thousand people attended, including Governor Brownlow. At the end of the day, Grisham's company led a parade procession through the streets amid great cheering. "The measured tread of the soldiery, the bristling array of gleaming bayonets, and the martial music of fife and drum" entertained the crowd. Fellow militia officer George W. Kirk served as marshal. One Radical correspondent expressed delight over the mustering of Grisham's company: "They again go forth to protect Union men from the violence of resuscitated treason." The next day, Grisham's unit deployed to the East Tennessee county of Sullivan, most of whose residents had supported the Confederacy during the war and defied the Radicals afterward. The duty was temporary and the mission was simply to "regulate these bad men."[51]

Not long after Grisham's unit embarked on its first assignment for the State Guard a second mixed militia company began forming in East Tennessee. The officer in charge was John L. Kirk of Greene County. It is unclear whether John Kirk was related to George Kirk, but both came from Greene County and served together as company commanders in the Eighth Tennessee Cavalry (Union). Like G. W. Kirk and Grisham before him, J. L. Kirk recruited volunteers from Greene and Washington counties, land rich in Radical manpower. On June 6, he mustered his 68 recruits (race ratio unknown) who then elected two white lieutenants: David E. Burchfield and Joseph S. Lawrence, the latter a veteran enlisted man. Several weeks later, while deployed in Montgomery County in Middle Tennessee, Kirk apparently recruited another 61 men. Many of these new volunteers were black. Moreover, his command added a third lieutenant, Page McKinney, about whom little is known. Overall, by the time of the election, Captain Kirk appears to have commanded as many as 129 men.[52]

While the two "Negro" militia companies from East Tennessee were racially mixed and under white officers, four companies from Middle

49

Tennessee were virtually all black. At the end of March, Thompson McKinley, a thirty-five-year-old white Radical from Sumner County, was commissioned explicitly "to organize a company of Colored Troops" as a reward for black loyalty and as a means of self-protection in that strife-ridden part of the state. One of the few carpetbaggers in the State Guard, McKinley was an unsavory character to many Sumner County whites. The Conservative press described him as "a dirty trickster" and a "second Brownlow," while former guerrilla leader Ellis Harper "vowed his intention to blow Mr. T. McKinley's d—d brains out." In addition to becoming a militia captain, McKinley was the county's commissioner of registration and he ran as the county's Radical candidate for the Tennessee General Assembly in 1867. He may also have been involved in the formation of a Union League in Gallatin. Conservatives believed his performance as registrar was crooked and self-serving and that his political aspiration was wholly dependent on black votes. They understandably protested his acceptance of a captaincy in the State Guard, a position that would allow him considerable control over the polling places, as a flagrant conflict of interest. Moreover, they insisted that Sumner was safe and peaceful, and they resented the arming of blacks in their midst. Memories of Union occupation in 1865, when black soldiers allegedly committed several felonies, including rape, haunted this white community.[53]

Undaunted by local animus, Thompson McKinley accepted the dual role of candidate and captain and proceeded to assemble his command. Ex-Confederates hampered recruitment, just as they had disrupted an election for constable of Gallatin in February, but McKinley and his fellow Radicals were assured by the Brownlow administration that "the disregard of law evinced by many of the people of Sumner Co. may invite some very unpleasant consequences in the future." McKinley's command would give this threat genuine punch. He mustered in one hundred black volunteers on June 10 in Gallatin. Many of these men may have served in the Fourteenth U.S. Colored Infantry, which formed in Sumner in 1863. The average age of the enlistees was 22.3, but the company roster reflects a couple of irregularities. One soldier is listed as 16 years of age, and one of the unit's sergeants is listed as 14.[54]

Although no one appears to have objected to McKinley's recruitment of adolescents, many black volunteers challenged the captain's decision to appoint white lieutenants instead of conducting an election. Led by 1st Sgt. Nelson Turner, the enlisted men flatly refused to serve

under McKinley's choice for first lieutenant, a reputedly unsavory fellow named George Weaver. They did agree, however, to serve under McKinley's other appointee, Lt. I. N. Phillips. Phillips was a twenty-two-year-old schoolteacher from Vermont and was apparently well liked by the men and by Sumner's black community. In 1866, the Freedmen's Bureau sponsored his journey to Sumner County, where Phillips became an education superintendent and later an active member in the Gallatin Union League.[55]

Governor Brownlow took a bold step toward racial equality in the State Guard when he commissioned James H. Sumner to command an all-black company. A free, native black before the war, and an active Nashville Radical and saloon keeper after the war, the twenty-seven-year-old Sumner was the only black captain in the State Guard. As a result, he endured particularly scathing scrutiny from Conservative newspapers. The *Pulaski Citizen* mocked Sumner's commission, claiming that "he now carries [it] in his breeches pocket" in order to be ready to prove his title to a skeptical world. The *Union and Dispatch* dismissed Sumner as a "mere civilian" while extolling the virtues of a Conservative black veteran, Joseph Williams, a man who campaigned with the Conservative Emerson Etheridge in 1867. This newspaper challenged Brownlow to commission Williams. Brownlow, of course, did not commission Williams, but Sumner did engage his Conservative counterpart in debate during the campaign.[56]

Conservatives predicted that Sumner would fail to recruit enough men for a company. They were wrong. Sumner organized one of the largest companies in the State Guard, 113 black men drawn from Davidson and Williamson counties, and mustered them into service on June 27. The average age of his command was 24.2 years. His lieutenants were George Sumner, age 23 (relation to James unknown), a veteran of the Fifty-first U.S. Colored Infantry, and 24-year-old Henry H. Mitchell, who also served in the U.S. Colored Troops.[57]

Sumner's company remained stationed at Nashville for several days after muster and became the target of Conservative abuse. The anti-Radical press branded these militiamen a "band of cut-throats," while the white community ostracized Captain Sumner. In one telling incident, Sumner boarded a Nashville streetcar while in uniform, but was told by the driver that he had to leave. When he refused, the white passengers got off in protest. Sumner then got off himself, but when the

driver then called the white passengers to return, Sumner hopped back on. Again the passengers left, and after a brief standoff, the driver reluctantly transported Sumner, the lone passenger, to his destination. A Conservative correspondent concluded that "it was the intention of this militiaman to provoke a difficulty, no doubt."[58]

The last two black militia companies and the last two companies recruited in 1867 were both from the Nashville area. Philip J. Flemming (white) mustered sixty blacks from Williamson County on July 29, likely from the politically active Union League of the county seat, Franklin. Michael Houston, a white officer, mustered ninety-one blacks from Davidson County on July 30. At least one of his two lieutenants was black and a veteran: 1st Lt. Alexander Gleaves, age thirty-five, served as a sergeant in the Thirteenth U.S. Colored Infantry, a unit that saw intense action at the battle of Nashville. Houston's second lieutenant was John S. Durham. Described by the anti-Radical press as "a certain Tueton," Durham appears to have been a German American. If true, then Gleaves's seniority may mark one of the first instances in American military history where a white man served under a black. Both of these companies, about which little is known, were organized a few days before the August election.[59]

In all, twenty-one companies of State Guard were mustered into service between April 1 and July 30, 1867 (see Appendix A). Many units failed to attain the 100 men desired by Brownlow, but all were considered fit for duty. Two companies came from West Tennessee, one white and one mixed, totaling 175 men. Seven came from Middle Tennessee, three white and four black, totaling about 707 men (366 blacks, plus as many as 61 more who joined John Kirk's East Tennessee command). Twelve companies were organized in East Tennessee, ten white and two mixed, totaling at least 993 men (A. M. Clapp's extant muster roll seems incomplete). Due to lack of information on the racial makeup of the companies of George Grisham, John Kirk, and George Hamilton, the exact figures on black personnel are estimates only. Sources indicate that about half of Grisham's 114 militiamen were black (about 57 men). Kirk recruited blacks from East Tennessee and more while stationed in Montgomery County. If half of his original 68 enlisted volunteers were black (34 men), then approximately 91 blacks from East Tennessee served in the State Guard. Using the same methodology for Hamilton's company of 64 men, it can be estimated that 32 black militiamen came from West Tennessee.



Tennessee State Guard muster points in 1867.

52

Overall, at least 1,875 men (not counting staff personnel) served in the Tennessee State Guard of 1867: between 1,331 and 1,392 whites and between 483 and 544 blacks. Thus, some 25 to 29 percent of the State Guardsmen were black, most of them from Middle Tennessee.

There has been a good deal of misinformation in the scholarship on the Tennessee State Guard, which the above statistics should help correct. E. Merton Coulter claims that there were nineteen companies comprising fifteen hundred men. Allen Trelease states that there were only twelve comprising nine hundred men. James Patton and Robert White correctly report twenty-one companies, but offer no specific figures on manpower. With regard to race ratios, Coulter and Thomas Alexander state that the units raised and stationed in Middle and West Tennessee were mostly black. While this is true, these scholars neglect to address the overwhelmingly white companies from East Tennessee. Allen Trelease rightly asserts that the State Guard throughout Tennessee was mostly white, but, like Coulter and Alexander, he is vague about exact numbers. Robert White erroneously insists that black militiamen were in the majority. Otis Singletary, who acknowledges that the Tennessee militia was racially mixed, notes that the fixation, during and since Reconstruction, on "Negro militia" overlooks the significant role native whites played in upholding the Republican party and reflects "the longstanding Southern [white] indifference to logic when considering questions involving race."[60]

Sixty-one men served as company officers in the State Guard, four of whom were black. At least forty-four of these men (72 percent) possessed Civil War experience, all in the Union army, sixteen as officers. Moreover, fifteen company commanders were veterans, nine as officers. Several militia officers, such as Blackburn, Hathaway, Rickman, G. W. Kirk, and E. R. Hall, were skilled in antiguerrilla fighting, a useful talent given the persistence of ex-Confederate lawlessness in rural areas. The average age of the officer corps was 27.5 years. Additionally, 1870 census data on twenty-two company officers suggest that these militia leaders were for the most part married farmers with children whose property value averaged more than three thousand dollars. Overall, the officers of the State Guard were battle-hardened, vigorous, mature men. Furthermore, their settled, moderately prosperous status militated against politically reckless conduct, an important consideration in the volatile election atmosphere of 1867.

In general, this State Guard officer corps represents a fair profile of the Radical mindset. They joined because the party and its Reconstruction program were important to them and because they believed that the survival of both were at stake in 1867. Such political partisanship, however, was tempered by a military devotion to duty. While the backgrounds of William Rickman and Shadrack Harris suggest a potential for vindictiveness, the background of Judge Clingan reveals a preference for moderation. And despite the Rebel-bashing rhetoric of such captains as George Grisham and G. W. Kirk, the State Guard was hardly an instrument of repression, at least during the mobilization phase. In fact, the reverse was often the case in Middle and West Tennessee, where many prospective militiamen found themselves assailed by an angry ex-Confederate populace. Nevertheless, the State Guard officers, through their public recruitment activities, acted in effect as political agents and helped invigorate the white and black supporters of Radicalism at the grass-roots level. As the campaign unfolded, the Brownlow administration was confident that it had assembled a militia leadership that was both dedicated to the Radical cause and professional enough to uphold the law and prevent open warfare.

The political proclivities of the 1,816 enlisted men are less clear and for the most part can only be assumed. Many of the rank and file were Union Army veterans, but a substantial number were teenagers who never served in any regular military forces. Interestingly, considering that they were members of an organization designed in part to protect the ballot box, hundreds of militiamen were under the legal voting age of twenty-one. The socioeconomic status is hard to determine, but many were small farmers who presumably had lived in Unionist households during the war. Why they joined the State Guard is unclear. They probably wanted to help Radicalism triumph, and a few no doubt saw the uniform as an opportunity to exact revenge, but many may have simply wanted a steady monthly wage. Black recruits, in particular, believed that service in the militia (like service in the Union army) would grant them the power and respect needed to secure their new status as citizens. Lastly, many volunteers may have enlisted simply for adventure. Sociologist Eric Hoffer argues that in the aftermath of great struggles, many of the youths who missed out on the conflict eagerly seek equivalent experiences. For those Unionists too young to fight against the Confederacy, the State Guard promised a measure of martial glory.[61]

Compendium_Vorenberg
Page 312

By the beginning of June 1867, the Tennessee State Guard consisted of twelve companies already deployed, with several others in the process of mustering. At this point, Governor Brownlow believed it was time for an overall militia field commander. On June 7, he placed Joseph A. Cooper in charge with the rank of brigadier general. It proved an excellent choice. Cooper was a dedicated Radical and, as a veteran of the Mexican War and the Civil War, a distinguished military officer. Like most other leading Radicals, he was from East Tennessee. He was a respectable and relatively prosperous farmer with a large family. During the secession crisis, he attended the Greeneville Convention as Campbell County's lone delegate. Throughout the proceedings, he maintained a hawkish stance toward the Confederacy, and at the convention's close, he was one of the first Tennessee Unionists to raise volunteers for the Federal army. He rose quickly through the ranks, ending the war with a brevet major generalship. He fought in some of the western theater's grimmest battles: Murfreesboro, Lookout Mountain, Resaca (where his brigade suffered 30 percent casualties), and Nashville. In this last battle, Cooper's division helped crush the left flank of Gen. John B. Hood's besieging Confederate army.[62]

General Cooper never received any formal military training, but was, by all accounts, a natural leader. Contemporaries noted his "modest" yet "imperious" style of leadership. During Hood's campaign, for example, Cooper was anxious to link his detached unit with General Thomas's command at Nashville. Marching through the night, he reportedly "forced a countryman who knew all the roads to guide him under penalty of death in case of betrayal." Discipline and training were his constant priorities, and Cooper expected his men to face such wartime trials as poor supply, inadequate pay, and miserable camp conditions with stoic calm. Years after the war, at a reunion, Cooper gave his men laconic praise: "All that I am, you made me, by obeying my orders."[63]

A Whig before the war, Cooper was one of the 521 Unionists who gathered at Nashville in January 1865 to restore civil government to the state. Like many other Unionists, he initially applauded President Andrew Johnson's Reconstruction policies. In a letter to the president, Cooper expressed his support of Johnson's plan for Reconstruction but pointed out that "the rebels are verry bold and defiant." He then related to the president the essence of his political views: "I still hold to the old doctrin the Union the constitution the enforement of the law." He soon



Joseph A. Cooper, 1865. From Miller's *Photographic History of the Civil War*.

gravitated into the Radical fold, however. When Brownlow and the Radical party broke with Johnson over his increasing obstruction of congressional Reconstruction and his alignment with Conservative Democrats, Cooper followed suit. East Tennessee Conservatives noted with alarm Cooper's public denunciations of Johnson. One observer described Cooper as "one of [Johnson's] most violent enemies" and urged his dismissal as Knoxville's collector of internal revenue. When Cooper's friends warned him that his employment was in jeopardy, the general reportedly boasted, "I will split rails . . . sooner than desert the Union party . . . and turn rebel." Cooper shortly thereafter lost his post and its annual salary of four thousand dollars.[64]

The tempo of political events in Tennessee seemed to excite Cooper. After moving his family to Knox County, he entered politics. Unfortunately, in seeking nomination for Congress in 1865 and 1867,

he was defeated by the politically savvy Horace Maynard. Although he had a "sharp, quick voice," Cooper lacked the oratorical skills of his opponent as well as his political experience. Perhaps dejected, Cooper declined calls to run for the general assembly.[65]

Out of a job and frustrated in his bid for elected office, the forty-four-year-old Cooper probably welcomed the opportunity to serve as commander of the newly created Tennessee State Guard. It would mark a return to an environment where he had previously enjoyed success and prestige. And it would reunite him with many of the officers he had commanded. Radical newspapers hailed his appointment, describing Cooper as "brave as a lion" and "preeminently the officer for the post." The *Knoxville Whig*, in particular, interpreted his failed political career in a positive light, declaring that "Gen. Cooper has shown himself unwilling to sacrifice the good of the cause to his personal ambition." Most Conservative newspapers withheld their judgment of Cooper at the time, but the *Republican Banner* did tersely note that the new militia general "may prove as good a cat's paw as the next." Given the political stakes involved, as well as Governor Brownlow's manifest decline in health, the campaign of 1867 posed a challenging test of Cooper's leadership skills.[66]

On June 19, General Cooper established his headquarters in Nashville and completed the organization of his staff, which included colonels Cate and Nelson, and his newly appointed aide-de-camp, 1st Lt. Larken B. Gamble, yet another Civil War officer. Gamble helped muster in the final companies during the closing weeks of the campaign. On Governor Brownlow's recommendation, Cooper also accepted the services of Dr. Fredrick W. Sparling as the chief surgeon of the State Guard.[67]

At the beginning of July, Cooper helped ameliorate the State Guard's early difficulties with supply. He instructed company commanders to pay closer attention to proper procedure (i.e., army regulations) and to cooperate more closely with the quartermaster. For several weeks, many officers had unwittingly contributed to their own supply deficiencies through their ignorance of, or indifference to, logistical matters. For example, Capt. James Evans neglected to keep an inventory of his supplies, while Capt. George Grisham lost copies of his requisitions during a movement. Capt. William Rickman occasionally failed to report his voucher purchases, while Capt. Joseph Blackburn submitted vouchers with mathematical errors. And Capt. Robert Hall apparently entrusted his unit's supply to "an old Q. M." named J. K. Woodard, an agent not affiliated with

the Quartermaster Department. Virtually all of these men at one time or another forgot to sign the appropriate forms for goods requested or received. With General Cooper's help, however, supply improved, and as the numerous transactions recorded in the State Guard's ledger indicate, each company eventually received everything it needed.[68]

With his staff organized and the militia's supply problems presumably solved, General Cooper formalized the structure of the State Guard and finalized the company letter designations that had fluctuated during the mobilization period (see Appendix A). Perhaps by intention, the two full regiments had an equal number of companies from each section of the state. Oddly, the State Guard of 1867 never had any regimental commanders; all company commanders reported directly to either Cooper or the adjutant general. Less than a week before the election, Cooper informed the adjutant general that the State Guard was ready and that no new companies were being formed. All the while, Cooper judiciously deployed his twenty-one companies so as to cover as many potentially troublesome counties as his relatively small force would permit.[69]

The mobilization of Tennessee's Radical army had taken much time and effort, but the product was satisfying. Comprised of nearly two thousand men under seasoned leadership, the State Guard served as the spearhead of a Radical party that claimed approximately forty thousand white Unionists and about as many newly enfranchised freedmen. Pitted against this array of Radical power was an indeterminate number of legal and illegal Conservative voters (perhaps twenty thousand) and over eighty thousand disfranchised ex-Confederates. Franchise restrictions notwithstanding, the anti-Radical forces fully intended to defy "Brownlowism." The performance of the Tennessee State Guard would largely determine whether law and order or civil strife prevailed during the campaign.

# Chapter 3

## THE OPENING SHOTS OF THE CAMPAIGN OF 1867

ANTI-RADICALS THROUGHOUT TENNESSEE WERE ALARMED BY THE creation of "Brownlow's Melish." The *Union and Dispatch* declared that the State Guard had transformed Tennessee into a "military republic, a government founded on mock elections, and supported only by the sword." A few days after Governor Brownlow promulgated his General Order No. 1, twenty-four Conservative members of the Tennessee General Assembly issued a call for "a Convention of all who oppose the tendencies and ruinous policy and practices of the dominant party." Declaring that they were "deeply impressed with the dangers which imperil our beloved country," these men demanded the formation of a Conservative Unionist Party and the nomination of a full slate of candidates to run against the Radicals.[1]

On April 16, Conservative delegates gathered in Nashville, formulated a platform, and nominated a candidate for governor. Notable among the party's resolutions was a promise to restore the suffrage to those disfranchised by the Brownlow administration. The convention also denounced the State Guard: "The establishment of a standing army in our state in times of peace, is a flagrant and dangerous encroachment on the rights and liberties of the citizens, violent and oppressive to the taxpayers, and evidently designed to over-awe the voters at the ballot-box." For governor, the convention selected Henry Emerson Etheridge,

Compendium_Vorenberg
Page 315

a powerful stump speaker, as the man best suited to enter the political arena against Brownlow.[2]

The forty-eight-year-old Etheridge was a prominent Conservative Unionist from Weakley County in West Tennessee. Vilified by the Confederacy for staying loyal to the Union, he later incurred the wrath of both the Republican party for opposing emancipation (he was a former slaveholder) and the Tennessee Radicals for opposing the franchise acts, especially black suffrage. In 1865, he was briefly arrested for sedition against the Brownlow government, although the charges were subsequently dropped. In May 1867, as gubernatorial candidate, he condemned the Tennessee State Guard, particularly the arming of black militiamen, and claimed that one of its main functions was to force freedmen into the Radical-controlled Union Leagues. At one point, he allegedly declared that anyone encouraging black citizenship should be shot. Nevertheless, he officially urged his followers to refrain from violence. His racism notwithstanding, Etheridge predicted that he would defeat the incumbent Brownlow by winning over the new black electorate.[3]

Etheridge opened his canvass of the state on May 11 with a speech in Union City in Obion County, only miles from the site of Senator Almon Case's assassination. Given the strong anti-Radical feeling in West Tennessee, Etheridge rightly expected large receptions at each of his stops in that part of the state. Most of his summer campaigning, however, was in Middle and East Tennessee. His speeches were pure billingsgate, with "Brownlowism" the target. In his efforts to convert blacks to his banner, Etheridge added Joseph E. Williams, a Conservative black war veteran, to his speaking tour. Etheridge's dubious tactic of portraying Brownlow's racism as worse than his own, however, earned little black applause. Governor Brownlow, no amateur when it came to mudslinging rhetoric, was too ill to participate personally in the canvass. However, several leading Radicals, such as Samuel Arnell, William B. Stokes, L. C. Houk, and Horace Maynard, made a point of attending Etheridge's meetings and "dividing time" whenever possible.[4]

Governor Brownlow was incensed by the nomination of Etheridge, claiming that it "was not made in the expectation of electing him, but to produce mischief." Branding Etheridge a disloyal demagogue, he warned the Conservatives through one of his proclamations that "wherever . . . violent speeches are made, inflaming the bad passions of bad men, I deem it my duty to station troops." Though insisting that he had no intention

of suppressing free speech, he did "not conceive it to be the duty of the State Guards to stand quietly by and hear any man excite the mob spirit." Alarmed by this threatening language, East Tennessean John P. Holtsinger asked the governor whether the Conservative party would be permitted to canvass the state "without being overawed or intimidated by the State troops." In reply, Brownlow assured all Conservatives that "however severe the speakers may be, no State Guards will be allowed to interrupt them, or be upheld in doing so." Nonetheless, the governor reiterated his desire to maintain law and order: "If bad men, from disloyal motives, shall venture to deliver incendiary speeches, and advise the overthrow of the State government by mob violence, I should think the State Guards . . . greatly at fault to tolerate such men."[5]

Given the tenor of Brownlow's comments and his "extreme activity" in organizing his Radical army, distrustful Conservatives feared Brownlow would use any anti-Radical speech or meeting as a justification to cover the state with militia. The *Fayetteville Observer,* in a sensational editorial titled "Brownlow Counselling Murder," declared that a Radical victory at the polls was possible only through the "bullying intimidation of that 'loyal militia.'" To anti-Radicals from Henry County, the mobilization of the militia "look[s] like preparations for another war." The editor of this county's principal newspaper, the *Paris Intelligencer,* believed that the militia would quash free speech and prevent an honest election. "Brownlow had better declare himself King," this paper exclaimed. "If you want Peace, vote for Etheridge—if you prefer to go to war, then vote for Brownlow." In a letter to President Johnson, Conservative John C. Gaut presented a similarly frightening picture of oppression. Defining "Brownlowism" as "despicable tyranny," Gaut informed Johnson that the governor had perverted democracy while "organizing his militia & arming them . . . as fast as he can." According to Gaut, "Brownlow and faction intend to carry the August elections, by force, and intimidation." He beseeched the president "to take charge of Brownlow's malitia."[6]

These anti-Radical statements expressed fears, not reality, for at the time they were uttered, barely half a dozen companies of State Guard had been mustered into service, and only a few had been deployed. Far from terrorizing the state, these units were drawing equipment and training within the confines of their encampments (when not fending off hostile ex-Confederates in West and Middle Tennessee). Governor Brownlow

had made it clear to his militia officers that they were to conduct themselves and employ their commands in accordance with U.S. Army regulations. To this end, Capt. J. K. Clingan, shortly after mustering in his Company D, First Regiment, requested a copy of Hardee's drill manual, *Rifle and Light Infantry Tactics*. Like his fellow company commanders, Clingan wanted to instill a modicum of discipline and uniformity among his men before undertaking his mission. While the anti-Radical press was portraying the militia as a band of armed thugs, the State Guard leadership was taking time to transform its raw recruits into trained soldiers who would obey orders during the forthcoming political battles.[7]

Although the suppression of Rebel vigilantism would rank high as a militia priority, the Brownlow administration's most immediate concern in the spring of 1867 was the registration of black voters, whose numbers were crucial for Radical success at the polls. Unfortunately, registration difficulties occurred throughout the state. Anderson H. Walker, the registrar of Weakley County, bluntly informed the governor that "it will be dangerous to attempt to register voters in this county without some protection." Similar complaints came from Sumner County, where ex-Confederates were obtaining phony certificates; from Perry County, where "villainous Rebel papers" were warning blacks not to register; from Bedford County, where the poll books were "wickedly stolen" by unidentified thieves; and from Stewart County, where Registrar Russell A. Salisbury felt compelled to reregister all eligible voters in an effort to make sure he certified only loyal men. Such reports led the governor's office to conclude that "in counties where the disloyal element is largely in the majority all sorts of obstacles are placed in the way of colored men being properly registered." Reminding these correspondents that "the office of Registrar is really the most important one politically," the executive department urged them to execute their duties faithfully and await the deployment of the State Guard.[8]

No single, complete mission statement for the State Guard of 1867 exists, but its task, as suggested by the militia act and various executive proclamations and general orders, was apparently threefold. First, the State Guard was to preserve the integrity of the electoral process through the rigid enforcement of the franchise acts. To this end, militia commanders were instructed to assist county registrars in compiling rosters of loyal voters and then protecting the polling sites on election day to prevent interference or illegal voting. (Arguments against the

constitutionality of disfranchisement are thus irrelevant in judging the State Guard. The organization was duty-bound to enforce laws, not interpret them.) Second, the State Guard was to defend the lives and property of the recently enfranchised freedmen, whose right to vote was an affront to the ex-Confederate majority, which could not vote. Radical whites in West and Middle Tennessee, where the loyalty of local sheriffs was often suspect, also required protection. Third, the State Guard was to ensure that no anti-Radical conspiracies or insurrections threatened the state. Accordingly, company commanders were authorized to patrol the hinterlands of counties with strong Rebel sympathies and to monitor the Conservative canvass of the state. In this respect, the State Guard would serve as a super-sized constabulary. Indubitably, the State Guard was also a partisan, political army, whose broader Reconstruction mission, as enunciated by Horace Maynard, was "bringing the unruly opposers of Radicalism to terms."[9]

The nature of the State Guard's mission, coupled with the animosity of the ex-Confederate populace toward Radicalism, required that the new company commanders carry out their assignments as if they were occupying enemy territory. The anti-Radicals closely watched militia movements throughout the campaign, anticipating, even hoping for, a flagrant abuse of power that would confirm their allegations that the State Guard was nothing more than an instrument of military oppression. They would not have to wait long. Toward the end of May and into June 1867, the activities of six companies of the First Regiment—Rickman (Company H), Blackburn (Company A), Clingan (Company D), Robeson (Company E), Grisham (Company B), and Evans (Company I)—would stir up controversy in all three sections of the state. Although some of their activities would tarnish the Radical campaign, their performance was precisely the show of force that the Brownlow administration wanted from its Radical army.

Capt. William O. Rickman's initial area of operations was Franklin County in Middle Tennessee. In 1861, Franklin whites had voted unanimously for secession. In 1867, the county was, according to one local Radical, a den for the "Hell Hounds of Rebellion." These "hell hounds" were reportedly ordering blacks who had registered to vote to leave the region or face some terrible reprisal. This ex-Confederate activity likely explains why no Union League formed in Franklin and why the Freedmen's Bureau agent in neighboring Bedford County rarely visited.

Compendium_Vorenberg
Page 317

The few white Radicals in the county feared to campaign openly for their party lest they be shot down by "midnight assassins." Efforts to form a local Radical defense force fell short due to lack of weaponry. Captain Rickman moved aggressively to rectify the situation.[10]

Shortly after muster on May 1, Rickman established a base of operations, Camp New Hope, in the Franklin countryside. This encampment was eleven miles from the county seat, Winchester, the "Rebel City." On May 10, Rickman issued a proclamation "to the Citizens of Franklin and adjoining counties" acknowledging the "great excitement" that his deployment had caused but reminding his readers of his lawful mission to preserve order. "No citizen that is obeying the laws of Tennessee will be molested by my command, but protected regardless of past political sentiments." Noting that "parts of this county are overrun by robbers and assassins," he expressed his disappointment that these criminals, in addition to receiving aid and comfort from the citizenry, were seen as heroes for having fought against the Union. Rickman explained that his intention was "to bring to justice all violators of the law" and vowed that "as long as these outlaws are allowed to run at large . . . you will have the Tennessee State Guard."[11]

Anti-Radicals were appalled by the "vile slander" of Rickman's proclamation. The *Fayetteville Observer* protested that Rickman's statements were more applicable to the Radical stronghold of East Tennessee than to the peaceful citizens of Middle Tennessee. Nevertheless, Rickman soon commenced a series of mounted patrols throughout the county. One such patrol reported that several "rebel villains" in Winchester carried sidearms in public and that the townspeople displayed open contempt for the militia. Demonstrating sound tactical judgment, Rickman tried to dissuade the adjutant general from dividing Company H into small squads to be stationed in the county's towns and villages. He reasoned that by keeping his infantry together in a central location he could respond to crises more effectively and protect his troops from ambush. Moreover, by staying in the countryside, Rickman believed that he could keep the ex-Confederates in the dark about his activities. Although sympathetic to Rickman's concerns, Adjutant General Brownlow ordered him to post a twenty-man detachment in Winchester. A recent Radical meeting in that town, attended by many blacks, had been disrupted by "an armed mob." Moreover, Registrar Daniel E. Davenport complained that he was heckled whenever he left

his office. The adjutant general felt that a display of strength was needed to encourage these local Radicals.[12]

Toward the end of May, after about two weeks of deployment, Rickman sensed that the county's "hell hounds" were preparing for a showdown. On May 21, a white Radical was murdered near his home. Rickman sent out a mounted detachment in a fruitless pursuit of the killer. A few days later, a black man was "brutally shot down" for no apparent reason. Rickman learned that the perpetrators were all members of a band of ex-Confederate outlaws under former guerrilla leader Joe Rodgers. It was the expressed intention of this group "*to clean out* Rickman's command." On May 25, in a preemptive move, Rickman ordered Lt. Jordan Holt to search the homes of all suspected members of Rodgers's outfit and confiscate their firearms.[13]

Lieutenant Holt carried out his orders enthusiastically. Over the next few days, his mounted detachment moved from residence to residence and confiscated several weapons. In the process, however, Company H overstepped the bounds of its authority. In several instances, Holt's men needlessly insulted the family members of the accused and, in some cases, allegedly threatened to kill the adult males. When the militia arrived at the home of Dr. J. J. Abernathy, a well-respected citizen whose association with Rodgers's band was never established, the doctor insisted on seeing a search warrant. Lieutenant Holt reportedly put his hands on his holsters and said, "This is my authority." Later, at the home of ex-Confederate E. H. Poe, the militiamen encountered an armed Mrs. Poe and her intoxicated fifteen-year-old son. When the younger Poe brazenly threatened to kill Captain Rickman, Holt's men wrested the rifle from Mrs. Poe and then arrested her son. Lieutenant Holt then returned to camp on May 28, leaving the Franklin countryside in an uproar.[14]

Although Registrar Davenport worried that Holt's recklessness would undermine his efforts to get out the Radical vote, Captain Rickman seemed satisfied with the dragnet. As for prisoner Poe, Rickman did not take seriously the teenager's threats and, after talking "very kindly" to him, sent the boy home. Rickman did, however, take seriously some intelligence he had received during Holt's absence. One of his scouts, Pvt. Samuel Heath, in searching for his bolted horse, had struck up a conversation with a local man named James Brown. Brown foolishly confided in Heath his membership in Rodgers's "company of bushwhackers," and he

identified a James Simmons as a fellow member. Brown further boasted that he "had never surrendered" and regaled Heath with his wartime exploits, including the killing of two Union soldiers, whose bones apparently still lay nearby. Rickman acted decisively on this fresh information, making plans to apprehend both Brown and Simmons.[15]

In the early morning hours of May 29, an infantry squad marched to the home of Simmons, while Lieutenant Holt and a cavalry squad raced to Brown's. Holt was under orders to compel Brown to disclose the location of "his graveyard." Simmons caught wind of the raid, and managed to evade the infantry squad, which fired on him as he fled into the woods. Brown was not so lucky. Holt's men arrested him, but at this point tragedy occurred. While leading his captors toward the grave site of the Union soldiers, Brown reportedly "broke and run" toward a ravine but was shot fatally through the head before he could escape. Captain Rickman matter-of-factly related the particulars to Adjutant General Brownlow, his letter beginning, "I have the honor to report that my men this morning killed a man by the name of James Brown."[16]

The killing of Brown and the general conduct of Company H on May 25–29 sparked an outcry against the Brownlow administration. Over the next several days, the residents of Franklin held anti-Radical rallies. Led by Arthur S. Colyar, a former member of the Confederate Congress, Franklin whites drew up a list of grievances against the State Guard. The somewhat exaggerated petition accused Rickman's company of having, "in a most violent manner," conducted illegal searches and seizures; of having frightened women and children; of having jeopardized the economic prosperity of the county; of having arrested Poe, "an inoffensive boy," trying him by drum-head court, and sentencing him to be shot; and of having murdered James Brown, "a peaceable, quiet citizen . . . in a most heartless and cruel manner." In short, as the *Union and Dispatch* declared, Rickman had instigated a "Reign of Terror." The Winchester petition, which was transmitted to President Johnson, concluded with a warning aimed at the Brownlow administration: "If the depredations of this militia are continued . . . we recommend that the people combine and protect themselves."[17]

The rabidly anti-Radical *Republican Banner* devoted space in ten of its issues to the militia in Franklin. Every local white seemed to have an exciting story to tell about Lieutenant Holt's rampage and the Brown killing. Mixing fact with fiction, they all related a tale of "pillage and

violence unrestrained." Some accounts stressed that several militiamen were Franklin natives who exploited their uniform to exact revenge on their secessionist neighbors. Others elaborated on the manner in which Brown was killed, until his death took on grotesque proportions. It was stated that the militia took Brown "into the woods, tied him to a tree with thongs of bark and literally riddled his body with balls." In all, nearly twenty affidavits were printed for public consumption. The *Banner* damned the Radicals: "The blood of poor Brown is on the hands of every man who voted for the militia bill." Surprisingly, despite the propaganda capital of Brown's death, Etheridge rarely mentioned the incident in his stump speeches.[18]

As the Conservative press built Brown's death into "the worst, unprovoked, dastardly and cruel murder ever perpetrated in the country," Radical editors engaged in damage control. They predictably portrayed the anti-Radical newspaper versions as gross exaggerations. They further denounced the Winchester petition as "inflammatory," an irresponsible call for "armed resistance against the state authorities." Captain Rickman himself dismissed the Winchester accusations as sheer hyperbole: "This County is full of Bushwhackers, and if wee go to arest one of them thare is a big hue and Cry rased by the Rebels." Determined to continue his mission, he arrested six more men in the days following Brown's death, presumably members of Rodgers's band, and turned them over to the civil authorities.[19]

The outcry over the killing of Brown prompted two official investigations into the conduct of Company H. Assistant Adjutant General Samuel Hunt represented the state of Tennessee, and Gen. William D. Whipple represented the federal authorities. On most matters, Hunt and Whipple were in agreement. Both men acknowledged ex-Confederate animosity as a mitigating circumstance for all of the alleged militia transgressions. Furthermore, both rejected the charge that Poe was unfairly tried and nearly executed. Poe, it was noted, later stated that Captain Rickman "had treated him well." Overall, Rickman was judged a capable officer (Hunt especially expressed confidence in his leadership). However, both reports cited instances of "bad conduct." Hunt stated that "some of the men . . . have been imprudent . . . and guilty of trespasses, which they were not guaranteed in doing." Whipple was more critical, particularly in his evaluation of Holt's performance. He chastised the militia lieutenant for excessive use of force. He also noted that the cavalry squad under Holt

prevented Brown's father from participating in the trek to the grave site. To Whipple, this fact "is perhaps sufficient to excite suspicion of intent to murder on the part of the militia." In the end, however, both investigations exonerated Captain Rickman and his men of any major wrongdoing. Whipple, in particular, expressed satisfaction that both Rickman and Holt regretted the whole affair; he saw no reason for any federal intervention. Department commander Gen. George H. Thomas endorsed his subordinate's findings and explained to President Johnson that "the terror among the people of Franklin County . . . is very much magnified for political purposes." As for the killing of Brown, Thomas assured the president that "there is no danger whatever of a repetition of a similar offence."[20]

As the story unfolded, Captain Rickman, unflappable in the face of anti-Radical criticism, privately expressed disappointment in Holt. He rebuked his lieutenant for harassing Dr. Abernathy and for not exercising tighter control over his men during the arrests of Poe and Brown. The reprimands and the stress of command proved too much for Holt; he resigned his commission of his own volition and returned to ranks as a private. Sgt. John Mankin replaced him as first lieutenant. In mid-June, Rickman reported, "I have got my men under tolerable good discipline."[21]

While the investigations were underway, Governor Brownlow announced that he was placing Rickman under arrest and that the captain would stand trial for his misdeeds. This arrest, however, never occurred, and the Conservative press depicted Brownlow's order as a hoax. "We have heard of no arrests," exclaimed the *Union and Dispatch,* "no dismissal of [Rickman] from the State service." In fact, later in June, Rickman was seen "swaggering through the streets" of Nashville. These newspapers further ridiculed the "official" investigations, claiming that Samuel Hunt "hunted" evidence only from the militia while ignoring the *Republican Banner*'s large collection of affidavits. Rather than arresting Rickman, the executive department transferred his company to Marshall County. Franklin, however, was not spared the presence of a militia force. At the secret urging of General Whipple, who advised "against backing down" in the face of anti-Radical opposition, the adjutant general deployed Capt. George W. Kirk's newly mustered militia company from East Tennessee to Franklin.[22]

In contrast to affairs in Franklin, the militia activities of Capt. Joseph H. Blackburn in DeKalb, a few counties to the north, drew very few headlines. In accomplishing his mission, Captain Blackburn preferred a less confrontational approach than Rickman. For several weeks

after mustering in his Company A on April 1, Blackburn methodically helped solidify Radical control over DeKalb County. In this task, he was greatly assisted by his first lieutenant, William L. Hathaway, who was also sheriff of the county. Although DeKalb had a majority for secession in 1861, more than 40 percent of the voters rejected it. Many of these Unionists had served in the Federal army, and most of those who did so embraced the Republican party after the war. In an effort to mobilize this significant white Radical strength, Blackburn sponsored efforts to raise two additional State Guard companies from DeKalb. He and fellow militia captain, William S. Stuart (Company K) of neighboring Putnam County, even suggested to the adjutant general that their separate commands be combined into a super-company under Blackburn. The state government disapproved the raising of additional companies from DeKalb, but was nevertheless grateful to Blackburn for his contributions in transforming the county into a Radical stronghold where racial violence and ex-Confederate agitation were minimal.[23]

Blackburn's command was unique in that it was essentially a cavalry company. While many State Guard captains were fortunate to have a full mounted section of twenty-five men (as authorized in General Order No. 1), over sixty men in Company A were mounted. This advantage in mobility enabled Blackburn to project militia power into all counties adjacent to DeKalb: Cannon, Putnam, Smith, Warren, White, and Wilson. Throughout May and June, using the DeKalb towns of Alexandria and then Liberty as his headquarters, Blackburn dispatched squad-sized detachments (ten to twelve men) to such towns as Lebanon (Wilson County), Sparta (White County), and McMinnville (Warren County). This last county was particularly troublesome to the Radicals. In early June, Registrar William Baker discovered that several dozen ex-Confederates possessed bogus voting certificates. When he initiated a complete reregistration of the county, anti-Radicals resisted his efforts. Baker beseeched the governor: "A detachment of the State Guard is urgently needed . . . not only to insure a safe and correct reregistration . . . but also to protect the persons and lives of loyal citizens from conservative and rebel violence. . . . Without military protection there is danger of an outbreak, which may result in the killing of some of our best citizens." On June 21, Blackburn sent 2nd Lt. William Cravens with fifteen soldiers to assist Baker.[24]

Although an implacable foe of the rebellion during the Civil War, Blackburn was commended, by Conservatives no less, for his moderation

as a militia captain. When White County residents protested Captain Stuart's peremptory treatment of local troublemakers (he had forcibly arrested two ex-Confederates in April), Blackburn played the peacemaker. He first persuaded Stuart to tone down his pugnacity and then assured local whites that the militia was not an enemy but merely a law enforcer. Stuart, who had served as a noncommissioned officer under Blackburn during the war, appears to have deferred to his former commander without resentment. Blackburn's Reconstruction diplomacy may have been effective because of his wartime reputation for ruthlessness toward Confederate guerrillas. On one occasion during the war, he was alleged to have tortured and hanged one White County Confederate for withholding information about enemy movements, and on another to have summarily executed two guerrillas after his murder. Adding to his fearsome persona was a rumor, reported by the *Republican Banner,* that Blackburn's Company A had killed eleven ex-Confederates since its muster. For Captain Blackburn, the mere threat of force seems to have been effective.[25]

In addition to neutralizing anti-Radical opposition in DeKalb and the surrounding area, Captain Blackburn served as a bodyguard for William B. Stokes, Radical candidate for Congress. Stokes apparently feared assassination, ex-Confederates having earlier in the year advertised a reward of five thousand dollars for his murder. As he stumped the Third Congressional District, Stokes called on Blackburn to provide security, a service few other Radical candidates enjoyed. Blackburn could hardly refuse his old commander (he had served under Stokes in the Fifth Tennessee Cavalry, Union). As a result, a portion of Company A frequently accompanied Stokes during his canvass. In one instance, Blackburn's men not only protected Stokes's life but also defended his honor. On June 22, during a joint political debate in Lebanon (Wilson County), a Conservative speaker implied that Stokes was either a coward or a woman. Incensed by this insult, Lieutenant Hathaway, "who had come to protect William B.'s precious person," moved to strike the offender. In self-defense, the man produced a pistol and fired at Hathaway, missing the militia officer but hitting a black onlooker in the leg. A general scuffle ensued, but Captain Blackburn barked out some commands and quickly restored order. The shooter was disarmed and "pitched headlong" out of the speaking hall, though he was not arrested. The *Republican Banner* reported that the affray had left Stokes "pale as death."[26]

Early militia activities in West Tennessee lacked the drama of Rickman's experience in Franklin and Blackburn's in Wilson, but they too proved controversial. On or about May 22, Capt. Judge K. Clingan, commanding Company D, deployed to Haywood County in response to a recent disturbance. Haywood had been a hotbed of secession in 1861, with 87 percent of the electorate voting to leave the Union. In 1867, the white populace was no less opposed to Radical Reconstruction. On May 13, a group of "young white men" broke up a Radical rally in Brownsville, the county seat. According to reports, when the several hundred blacks in attendance commenced cheering for Governor Brownlow, the youths dispersed the crowd with pistol fire. Radicals referred to the perpetrators as "Etheridge's guerrillas" and intimated a connection between the incident and the Conservative gubernatorial candidate's concurrent stump speech in neighboring Gibson County and his speech in Haywood scheduled for May 15. Whether this was true or not, it was clear that protecting blacks in West Tennessee was going to be a difficult task for the Brownlow administration.[27]

Company D had no sooner set up camp on the Brownsville fairgrounds than it became the target of anti-Radical abuse. Ex-Confederates mocked Clingan's men as a "lazy, shiftless class who hang around the groggeries of small county towns." Some of the citizens tried to get the militiamen to make bets on who would win the election. One Conservative newspaper even portrayed the militiamen as Negrophobes who devoted most of their time to disrupting black meetings, harassing black men, and making "indecent advances to colored women." This source claimed that one of Clingan's soldiers had killed a black man in East Tennessee "and would just as lieve as not kill another one." The Radical press countered these aspersions, describing Clingan's troops as "quiet, civil men [who] are commended by all good citizens in the county." The militia officers themselves urged the residents to promptly report any misconduct by their soldiers.[28]

Captain Clingan ignored the propaganda battles. Instead, he spent the first few days in Brownsville drilling his men and planning security for a second Radical meeting scheduled for May 28–29. These dates appear to have been cursed for the Tennessee State Guard, for as Rickman clashed with former Confederates in Franklin, Clingan earned notoriety of his own in Haywood. The militia's performance during the convention started out well enough. When a large body of armed blacks arrived, probably in anticipation of another row with local whites,

Clingan calmly informed them that his unit would keep order "and that their services were not required." The following day, Clingan closed all liquor establishments during the convention's closing ceremonies. Thanks to Company D, Haywood's second Radical rally passed off quietly.[29]

Unfortunately for the Radicals, an incident outside the convention hall tarnished the day's success. An elderly ex-Confederate approached some militiamen and promised them horses, clothing, money, and sanctuary if they would desert "the d—d militia." One enlisted man did accept the offer and absconded. On learning of the matter, Clingan arrested the old man, charged him with willful interference, and implemented a bizarre punishment. He "ordered the gentleman to be ridden upon a rail through the town of Brownsville." In a letter to the *Union and Dispatch*, Clingan justified his action on the grounds that he had a duty to protect his men, and that he believed the punishment would deter other residents from future attempts to induce desertion. He declared that "if any other man, Radical, Conservative, or Rebel, is found guilty of the same offence, he may expect to receive what we think is just."[30]

The incident lacked the explosiveness of the Brown affair in Franklin, but Conservatives still tried to exploit it as another example of "Brownlowism." Decrying the "absolutism of military power," the *Union and Dispatch* objected to the fact that the old man in question had received no trial, only the summary infliction of "gross cruelties." Local people claimed the old man was simply trying to persuade his sons, who had apparently joined the militia, to come back home. Clingan firmly denied this last assertion, stating that none of his men were kin to the perpetrator. Conservatives demanded an investigation into the "Dare Devil Doings of the Brownlow Melish" in Haywood, but the executive branch took no action.[31]

In the weeks following the rail-riding incident, Haywood was quiet and orderly. In mid-June, Captain Clingan reported that he and his men had settled into a comfortable routine of peacekeeping. While mounted detachments regularly patrolled the countryside, Clingan oversaw the formation of a Union League in Brownsville, one largely run by blacks. Noting that "the boys are . . . very well pleased and enjoying themselves," the militia captain reiterated his commitment to drill: "Our discipline is as severe as practicable for recruits." For exercise, the men often wrestled and sometimes challenged the officers to a friendly match. Clingan, manifestly proud of his company, noted, "I can say without boasting that

the men of this command can not be excelled in trying to do what is right and what they think is their duty." They evidently did their duty well, for during a visit through the county in early July, Tennessee secretary of state A. J. Fletcher found Haywood "a perfect blaze of enthusiasm for Brownlow."[32]

This favorable assessment notwithstanding, some of Clingan's men were unhappy with life in the State Guard. Pvt. James Kelley, for instance, penned a petition to the governor complaining about the poor supply of food: "We have never had a change in diet, which you know is contrary to the laws of hygiene, nature, and Army regulations. We draw meal, bacon, sugar, and coffee . . . all of which is deficient in quantity and inferior in quality." Foraging for chickens and other foodstuffs helped offset some shortages, but mess in Company D apparently left much to be desired. Illness or injury dampened the enthusiasm of other volunteers. When fifteen-year-old Cpl. Charles Fry became sick, he used his mother's influence to gain a discharge. Pvt. Joseph H. Bailes, who accidentally shot himself in the hand, and at least four other enlisted men were not as lucky as Fry. They spent most of their time in the militia laid up in makeshift field hospitals.[33]

On June 16, a squad of regular army troops marched into Brownsville, evidently at the behest some of Haywood's citizens. These petitioners claimed that the officers of Company D had threatened to "lynch those who offend them." According to Clingan, the "rebels rejoiced exceedingly when the U.S. troops arrived." After their arrival, he added, these ex-Confederates became "considerably bolder." Clingan considered his further presence in Haywood superfluous now that federal troops had appeared. General Cooper, having recently assumed command of the State Guard, agreed and ordered Company D to neighboring Madison County, a decision that not only projected power into that troublesome region but also avoided potential clashes over authority in Haywood. As his men prepared to march out of Brownsville on June 19, Clingan noted with amusement how several ex-Confederates heckled his men from afar, boasting that any one of them "could whip any three of Brownlow's militia." The ex-Confederates had had a month to put their claim to the test, but the militia departed with injuries to none (except the "old man").[34]

Madison whites would come to resent Clingan's command as much as those of Haywood, but militia captain John T. Robeson welcomed the

presence of his compatriot from East Tennessee. Prior to Clingan's arrival, Robeson's Company E had constituted the only Radical force in the entire western section of the state (save the Memphis Metropolitan Police). Robeson's principal area of operations was the northwest corner of Tennessee (Dyer, Gibson, Obion, and Weakley counties). With the exception of Weakley, which boasted six chapters of the Union League, this region was overwhelmingly ex-Confederate. Toward the end of May, Captain Robeson moved his company into Obion County and set up camp in Troy, the site of Senator Almon Case's assassination. On June 15, he relocated to Union City, in part to counter the political effects of Etheridge's inaugural campaign speech, but more importantly to take advantage of the town's railroad nexus.[35]

Robeson was dismayed to find that the Radical party was virtually nonexistent in Obion and Dyer. His arrival did encourage local Radicals, but loyal whites were scarce and the freedmen were politically inactive. Robeson did have a valuable ally in James W. Tarkington, the sheriff of Dyer County and "a strong Radical," but the county registrars appear to have done little to enroll blacks as voters. The militia captain further discovered that there had been no Freedmen's Bureau agent in Obion or Dyer for some time. Under the circumstances, Robeson realized that he was going to have to assume political leadership. In mid-June, he organized a chapter of the Union League in Obion County and "initiated quite a number of men both white and black." Presumably, he also took steps to get them registered to vote. Proud of his initiatives, Robeson assured the adjutant general that Obion blacks would all vote the Radical ticket, and he predicted Brownlow would take the county by a three-to-one margin. His confidence in the freedmen notwithstanding, Robeson closed one of his reports with an ominous forecast: "I look for trouble on the day of the election."[36]

Robeson had good reason to be worried about election difficulties. Obion's ex-Confederates harassed his men daily. "The Rebs are very bitter," he observed the day after his arrival in Union City. When they were not trying to induce the militiamen to desert, the "Rebs" tried unsuccessfully to incite conflict between Company E and a small detachment of federal troops stationed in Obion. On one occasion, while Robeson was scouting the area around Obionville (along the Mississippi River), four militiamen, including a corporal, did desert the Union City encampment. Evidently, some ex-Confederates falsely told them that the army was

going to arrest all members of the State Guard. Robeson reprimanded 1st Lt. Charles B. Simpson for being inattentive in his absence. Two of the deserters eventually returned, and thereafter desertion in Company E was infrequent. Robeson informed State Guard headquarters that all was "write" with his command and that discipline was "Good."[37]

Toward the end of June, Captain Robeson became concerned about a rumor of a planned insurrection in West Tennessee. A Rebel named Day was reportedly organizing and arming a band of five hundred men with which to combat the militia. Day vowed that if he and his men were prevented from voting on election day, they would seize control "by the Bayonet." Robeson refused "to be alarmed by the threats of Johnnie Reb," but he requested more men and horses so that he could better patrol the open country and thereby "ceep the Rebs and the bad men quiete." Until the end of June, when General Cooper deployed reinforcements to northwest Tennessee, Robeson defended the Radical banner alone in that part of the state. Nevertheless, he was optimistic: "I intend to take a Straightforward course. My men shall respect every citizen and I expect the same in return."[38]

As the militia companies stationed in Middle and West Tennessee subdued the opposition with varying degrees of success, two companies in East Tennessee earned their own peculiar notoriety. Following the festivities of his unit's muster in Jonesboro on May 1, Capt. George E. Grisham transported his oversized Company B (115 men) to Sullivan County. Tucked away in the remote northeast corner of the state, along the Virginia border, Sullivan was one of the few East Tennessee counties to vote for secession in 1861 (by over 70 percent). These isolated ex-Confederates banded together tightly. Conservatives were perplexed by the Governor's decision to station militia in Sullivan, but according to local Radicals, "most of the rebel desperadoes of this section have taken refuge in [the Sullivan vicinity], and occasionally make raids on our farmers, and take their fine horses." Prior to his deployment, Grisham appears to have sent "spies" into Sullivan. From these individuals, he discovered that the white populace was ready to "rise up against him to a man" if he overstepped his authority. This intelligence notwithstanding, Grisham, who reportedly described Sullivan as "the worst Rebel hole in the State," established a firm presence there during the first weeks of May 1867. He and part of his command camped in Bristol, while 1st Lt. Nelson McLaughlin led a detachment to Kingsport.[39]

About half of the men in Company B were black and this unit's deployment to Sullivan County marked the first use of "Negro militia" in the Reconstruction South. The significance of the occasion was not missed by the anti-Radical press, which scowled at this experiment in racial equality. The *Republican Banner* circulated a story about the "boisterous" behavior of Grisham's black recruits during the unit's movement by rail. At some point on the journey, four black militiamen supposedly forced their way into a passenger car, "made themselves very obnoxious to the lady passengers," and bullied the white conductor with a bayonet, all the while shouting, "Brownlow!"[40]

Sullivan whites vilified Grisham's men as "the meanest negroes in the country and the meanest of the poor white trash of East Tennessee," but the unit's performance in Sullivan proved more humorous than repressive. After informing Registrar A. C. Shipley of his arrival, Grisham began his "perfect reign of terror" on May 27. Inexplicably, Grisham involved himself in a domestic dispute. Evidently, a recently divorced local woman came to his encampment with a complaint that her former husband had seized their seven-month-old daughter and forbade her any contact with the child. Grisham decided to hold a hearing in his camp and ordered three Bristol magistrates to attend and help him arbitrate the case. Conservatives sarcastically commended "the valiant" Grisham for calling on local authorities for assistance, but proclaimed that his "uncivil" action was "without precedent in legal or military history."[41]

The ruling in the child custody hearing is unknown, but one of the magistrates, J. S. Shangle, was infuriated by the whole affair. In a letter to President Johnson, he denounced the State Guard as a "rag-tag-&-bob-tail-militia" and accused Captain Grisham of suppressing free discussion of politics in the county. Anti-Radical newspapers tried to corroborate Shangle's statement but presented nothing more than vague references to various "depredations." A visiting northern correspondent refuted the libel and insisted that Company B behaved with "perfect decency, propriety and order." Although this observer admitted that Grisham "did make rather a fool of himself" by getting involved in a domestic dispute, he considered the militia captain a "peaceable, good-natured, sensible fellow."[42]

Company B performed its mission without further controversy until the beginning of July, when Captain Grisham got involved in another dispute. On July 1, county Radicals and Conservatives held a joint political discussion in Blountville. Grisham provided security and everything went smoothly. According to the *Union and Dispatch,* however, in the course of the day, two black militiamen accosted a local black named Billy Murray and reprimanded him for addressing a local white as "Massa." Dragging him before Grisham, who seemed to enjoy his self-appointed role as provost marshal, the black militiamen further dressed down the defendant: "You are a pretty d—n fool to be calling a white rascal master; don't you know that's treason?" Grisham reportedly fined the hapless Murray ten dollars. His judicial misadventures aside, Grisham apparently did a good job of neutralizing local ex-Confederate vigilantism. Later in July, Governor Brownlow felt comfortable in permitting Company B's redeployment to Middle Tennessee. Sullivan whites expressed elation when the "Brownlow-Grisham Melish" departed after two months of occupation.[43]

The State Guard was active elsewhere in East Tennessee as well. In the first week of June 1867, Capt. James R. Evans of Company I was planning for an imminent assignment in Claiborne County, one similar to Grisham's in Sullivan. Although Claiborne cast a majority vote against secession in 1861, the county had recently become a haven for ex-Confederate guerrillas. At the end of May, Evans had been forced by local animus to leave Claiborne before mustering in his men, but he was looking forward to a second crack at the county's "bushwhackers." His opening shot of the campaign, however, was not aimed at bushwhackers but at Governor Brownlow's archrival, Emerson Etheridge. Mustered into service at Morristown in Grainger County on June 3, Evans's company barely had time to draw equipment and get some rudimentary training before the Etheridge cavalcade arrived on June 8. Morristown was the sixth of eight campaign stops in East Tennessee for the Conservative gubernatorial candidate (who was on the first of two swings through the heart of Tennessee Radicalism). Having heard that some anti-Radicals had caused a disturbance during Etheridge's stop in Greeneville on June 3, Evans decided he would forestall any similar outbreaks by posting Company I conspicuously near the Morristown festivities.[44]

The Conservative rally at Morristown was held in a church, but there was nothing reverent about Etheridge's speech there. Radicals, led by Judge L. C. Houk, showed up at the church and requested a division of time with Etheridge, but the Conservative candidate refused. Houk and his followers then moved to a nearby grove, "yelling and howling" all the way, and held an outdoor meeting. The proximity of the

antagonists led to some heckling and a few cases of fisticuffs. Into this volatile atmosphere marched Company I, in full military array. According to the Conservatives, Captain Evans deployed his company into a line of battle just outside the church and ordered his men to "fix bayonets." Not surprisingly, as one eyewitness explained, "this caused a panic among the people inside, who feared they were going to be shot into and the meeting broken up." All the while, Etheridge coolly continued his excoriation of "Radicalism." Company I did not attack and the day passed without incident.[45]

Conservatives added Evans's conduct at Morristown to a growing list of complaints against the State Guard. A petition to Andrew Johnson claimed that the episode proved that the militia was "engaged in overawing, insulting, and oppressing the people." Characterizing all militia companies, not just Company I, as "lawless bands of armed men," the petitioners further declared that the State Guard made a free canvass of the state impossible. John Williams, a Conservative from Knoxville, described the situation as desperate and implored the president for help: "If this Militia is not disbanded, or sent out there will be actual war in East Tennesse. . . . We cannot much longer submit to Brownlowism. . . . For *Gods sake* come to our relief, & spare an effusion of blood."[46]

This outcry prompted another federal investigation into militia affairs, this one headed by Col. Alfred L. Hough. When questioned, Captain Evans denied having threatened the Conservatives in the church in any way. He stressed that he stationed his men visibly in the area of both party rallies, and he further insisted that "the presence of the militia had prevented a riot." Conservatives reiterated the material cited in their petition, but admitted to Colonel Hough that Captain Evans exercised firm control over his men at all times. On further inquiry, Hough determined that many of the complaints about militia "outrages" in East Tennessee were unfounded. In addition to absolving Evans of any serious misconduct, Hough dismissed Captain Grisham's improprieties in Sullivan as "small grievances." He further discovered that most Conservatives had "only praise and compliments" for the conduct of Capt. Robert L. Hall's recently mustered Company C, which was stationed in Knoxville (possibly as a bodyguard for Governor Brownlow).[47]

The day after his Morristown demonstration, Captain Evans marched his command to Claiborne County. Evidently, while he was monitoring the Conservatives in Grainger County, a band of mounted ex-Confederates had "made a rush into Tazewell," where they threatened

local Radicals and warned blacks not to register. For the rest of June and into July, the "vigorous, active and efficient men" of Company I endeavored to keep the peace in yet another county Governor Brownlow had labeled "rebellious."[48]

While stationed in Claiborne, Company I discovered the limitations of supplying itself through the voucher system. Charged with procuring victuals, Lt. John Ellis could find only one general store willing to do business with his company. Anti-Radical merchants either refused to sell goods to him or demanded cash payments, often at inflated prices. The one friendly merchant proved unable to meet Company I's daily food requirements. Fortunately, as the summer wore on, Nashville grocers began delivering commissary goods in sufficient quantities to satisfy most company commanders. W. W. Totten & Brothers ultimately became the State Guard's largest food distributor, providing about one-third of the militia's subsistence before the deployment ended. Totten not only shipped a variety of foodstuffs, but also regularly furnished such basic items as tobacco, candles, and soap. In the process, the dealer grossed over eighteen thousand dollars from its business with the State Guard.[49]

Many scholars of Reconstruction in Tennessee readily accept the Conservative claim that the State Guard repeatedly disrupted Emerson Etheridge's canvass of the state. In actuality, the only direct encounter between Etheridge and the State Guard occurred at Morristown on June 8. Militia recruitment was well underway when Conservatives established their gubernatorial candidate's campaign itinerary. Inevitably, many of Etheridge's campaign stops, especially in East Tennessee, were also State Guard muster points. Militiamen, armed or otherwise, were undoubtedly in the vicinity of several of his speeches, but with the exception of Captain Evans's men, they generally gave Etheridge a wide berth. When he spoke in Greeneville on June 3, over 150 militia recruits were gathering to form two companies of State Guard (those of the two Kirks), but they in no way interfered with the Conservative rally. Far from wanting to suppress a free canvass, Radical leaders welcomed all opportunities to spar with the combative Etheridge. When the *Knoxville Whig* claimed that Horace Maynard "literally demolished" Etheridge in a rare face-to-face debate at Greeneville, it meant through the power of oratory, not through the discharge of militia gunfire.[50]

By mid-June, Radicals throughout the state were fed up with the criticism of their "loyal militia." When the ex-Confederate *Republican Banner* speculated about whether the newly appointed Gen. Joseph A.

Cooper intended to start burning homes and shutting down the press, the Radicals replied vehemently. Andrew J. Fletcher, Tennessee's secretary of state, went on the stump to justify the call for a State Guard. "It is a matter of profound regret," he explained, "that a necessity should exist for the active organization of the militia . . . but the responsibility rests . . . upon the turbulent leaders of the rebel party in this State." Similarly, the *Daily Press and Times* placed the blame for a standing army squarely on the Conservatives: "If a thousand quiet rebel sympathizers in any county choose to let fifty violent rebels commit outrages, they must not be surprised to see a company of militia sent to bring the ruffians into subjection." Finally, the *Knoxville Whig* defended the record of the militia captains: "No soldiers were ever in Tennessee, Union or rebel, who were kept under as strict discipline as the State Guard." To this newspaper, the only legitimate charge that the anti-Radicals could bring against the militia was the killing of "the notorious guerrilla, Brown."[51]

For all of the anti-Radical criticism, the Brownlow administration had imposed its authority over the state with a relatively small militia force. Although fifteen units were officially in the field by July 1, from the beginning of May to the end of June, the Radical army of Tennessee basically consisted of six companies. As they awaited the deployment of their brethren officers, Captains Rickman, Blackburn, Clingan, Robeson, Grisham, and Evans interpreted and executed the mission of the State Guard in a variety of ways. A common denominator in the experiences of the six men was boldness. Timidity in the face of the numerically superior anti-Radicals, who were going to howl in protest over any use of force, might actually have invited trouble. From Rickman's punitive operations in Franklin County to Evans's martial display in Morristown, these six commanders proclaimed to those ex-Confederates who dared test its resolve that the militia was a force to be reckoned with. In the process, through such accomplishments as Blackburn's establishment of Radical hegemony around DeKalb and Robeson's development of a party apparatus in Obion, the State Guard helped get the campaign off to a strong start for the Brownlow administration.

Unfortunately for the Radicals, there were instances when the State Guard crossed the boundary between reasonable and unwarranted force. However gratifying his domineering presence in Franklin must have been for the Radicals, Captain Rickman was arguably too aggressive.

Franklin whites were not pacified by his tactics; they only became more enraged. To a lesser extent, Captains Clingan and Grisham also exceeded their authority. Clingan hardly followed due process in riding a Haywood resident on a rail. And Grisham certainly had no business extending his jurisdiction into domestic affairs. Moreover, Evans's drill and ceremony during the Morristown rally was certainly designed to "over-awe" the Conservatives (although in the end it proved ineffectual). To its credit, the Brownlow administration tried to rein in the worst abuses, acceding to two federal investigations, but missteps were made and controversy was unavoidable.

The State Guard's somewhat inconsistent application of force early in the campaign may be attributable, in part, to an inchoate chain of command. Although the militia captains usually maintained regular communications with headquarters, the executive branch could often offer them only perfunctory instructions. Governor Brownlow was virtually bedridden in Knoxville, while Adjutant General James P. Brownlow was distracted by the ongoing militia mobilization. In addition to directing the efforts of those units already deployed (in all three sections of the state, no less), the adjutant general was supervising the organization of almost a dozen new companies, and overseeing the procurement of arms and supplies for them all. To be sure, Governor Brownlow ameliorated these command difficulties when he appointed General Cooper to manage the State Guard on June 7, but Cooper would not appreciably affect militia operations until the latter half of the month. In the meantime, the militia captains operated largely on their own initiative. With the exception of Rickman, who must bear the ultimate responsibility for his company's temporary breakdown in discipline, the captains applied force responsibly as well as effectively.

Such were the opening shots of the campaign of 1867, which historian Philip M. Hamer describes as "probably the most bitterly contested one in the history of Tennessee." For the Radicals, it was certainly an auspicious start, and one that boded ill for the Conservatives. By July, with General Cooper coordinating the efforts of three times the number of State Guard companies that had operated in May and June, the Radicals were ready for the final stage of the campaign and confident of victory.[52]

# Chapter 4

## THE STATE GUARD IN FULL BLAST

IF THE POLITICAL CAMPAIGN OF 1867 RESEMBLED A MILITARY skirmish in May and June, it took on the character of an all-out war in July. With more than one thousand militiamen in the field at the beginning of the month and several hundred more mustering into service, the Tennessee State Guard was rapidly taking on formidable size. Earlier in June, the *Republican Banner* expressed the attitude of many anti-Radicals when it wailed, "We have now a standing army in full blast." Brig. Gen. Joseph A. Cooper deployed this "standing army" with great alacrity, concentrating his forces in Middle and West Tennessee. Throughout the final month of the campaign, he steadily reinforced companies already in those sections with most of the units raised in East Tennessee and with the newly mustered and highly controversial all-black companies of Middle Tennessee. After a Radical meeting in Nashville toward the end of June, at which Cooper reportedly exclaimed, "I am the organ of the Radical Party," Conservatives accused him of taking on the mien of a modern-day Caesar. Conservatives further claimed that the "Generalissimo" had threatened to shut down what he termed the "rebel sheets"—the anti-Radical press. Daniel A. Carpenter, a disgruntled Conservative from East Tennessee, told Andrew Johnson that he was not going to submit to the Radicals' military tyranny. He ominously informed the president, "There is plenty of

Enfield rifles scattered through this country. . . . If you cant help us we will help our selves."[1]

Many white Tennesseans shared Carpenter's rage. In response to the growing militia power, and in an effort to infuse additional vigor into its canvass, the Conservative party launched a bold political counterattack. During the last week of June, party chairman John C. Gaut issued a provocative circular, one that exploited an apparent loophole in the 1867 Franchise Act. Gaut contended that while Brownlow's commissioners controlled voter registration in the counties, they did not have exclusive control over the appointment of election judges. Accordingly, Gaut urged county authorities (most of whom in Middle and West Tennessee were Conservatives) to take speedy action: "Do not fail to appoint Judges in all the precincts." In doing so, the Conservatives clearly hoped to have some influence over how votes were cast.[2]

On July 1, an enraged Governor Brownlow moved to crush what he considered a blatant attempt to circumvent the 1867 Franchise Act. He condemned Gaut and his "audacious authors" for their "false and rebellious construction" of the franchise clause pertaining to election officials, an interpretation the governor insisted demonstrated a "wicked and revolutionary purpose." Proclaiming that his registrars had absolute control over all aspects of the election, he warned the county officials to ignore the Gaut circular or find "themselves liable to be punished." He closed his proclamation with another threat: "Order must be maintained, and the law executed, if it require that I shall call into the field the whole available force at my command to do so."[3]

Conservatives were indignant at this gubernatorial fulmination and pressed ahead in their defiance of "Brownlowism." Chairman Gaut publicly defended his circular and criticized Brownlow's "extraordinary" proclamation as one designed "to incite his militia and partisans to acts of lawless violence and bloodshed." In this he was echoing President Johnson, who had stated, in a recent interview with the *Cincinnati Commercial,* that "BROWNLOW's militia would provoke riot and bloodshed." On July 4, the Conservative Executive Committee of Middle Tennessee issued aggressive marching orders. The committee compared the current political "crisis" to that of 1861 but encouraged its followers to show no fear in the face of "a mercenary militia of outlaws." Though ordering the people to obey the laws and refrain from violence, the committee unveiled a compelling, and lawful, campaign strategy. While all

Conservatives who could take the franchise oath were instructed to vote, even the disfranchised were enlisted into the service of the party. Ex-Confederates were asked to attend party rallies and be present on election day as a show of white, anti-Radical solidarity. Additionally, the committee promoted social ostracism of Radical voters and urged its followers to "induce those [blacks] within your influence to withdraw from the treasonable [Union] leagues." Conservative leaders assured the white majority that "Brownlow and his militia . . . dare not confront a determined people."[4]

On July 5, Governor Brownlow again demanded that the Conservatives desist in their efforts to subvert the Franchise Act of 1867. He ordered "all officers commanding the State Guards . . . to arrest the said John C. Gaut, or any of his committee or agents wherever found, if they shall persist in their effort to defeat the execution of the laws." The Radical press reflected the governor's exasperation with the Conservatives. The *Daily Press and Times* marveled at Gaut's "sophistry" while the *Whig* castigated the Conservatives for their "blind" alignment with the ex-Confederates. Brownlow's tactics gained a significant victory for his administration. Chairman Gaut instructed his party to concede the franchise question and devote its energies to other campaign matters. For his part, Gaut made the cost of the State Guard his new political issue. At a Conservative rally later in July, he warned his listeners that the force then mustered would cost at least $1 million, "with chickens, roasting ears and watermelons, to boot."[5]

In addition to combating the Conservatives' legal challenge, the Brownlow administration warily monitored the developing ex-Confederate paramilitary movement. Throughout the summer of 1867, former Confederate general Albert Pike of Memphis called on Tennessee whites to "arm and organize" against the Radicals and the State Guard. "Are a few ragamuffins and a mob of miscreants," he asked, "to overawe and ride over a whole state?" He urged the formation of so-called Civic Guard companies of "sixty or eighty men." In doing so, he probably had the Ku Klux Klan in mind as a ready source of manpower. Though largely confined to Giles County for most of 1866, the Klan began expanding its operations in the spring of 1867. Distinguishing the Klan from the many other bands of ex-Confederate vigilantes is often difficult, but most scholars agree that at about the time the Conservative party convention met in April, delegates from the Giles Klan and