1  ROB BONTA
   Attorney General of California
2  MARK R. BECKINGTON
   Supervising Deputy Attorney General
3  ROBERT L. MEYERHOFF
   Deputy Attorney General
4  State Bar No. 298196
     300 South Spring Street, Suite 1702
5    Los Angeles, CA  90013-1230
     Telephone:  (213) 269-6177
6    Fax:  (916) 731-2144
     E-mail:  Robert.Meyerhoff@doj.ca.gov
7  *Attorneys for Defendant Rob Bonta in his*
   *official capacity as Attorney General of the*
8  *State of California*

9                    IN THE UNITED STATES DISTRICT COURT

10                  FOR THE SOUTHERN DISTRICT OF CALIFORNIA

11                               CIVIL DIVISION

12

13  **VIRGINIA DUNCAN, RICHARD**        Case No. 3:17-cv-01017-BEN-JLB
    **LEWIS, PATRICK LOVETTE,**
14  **DAVID MARGUGLIO,**                 **COMPENDIUM OF WORKS**
    **CHRISTOPHER WADDELL, and**        **CITED IN DECLARATION OF**
15  **CALIFORNIA RIFLE & PISTOL**        **MICHAEL VORENBERG**
    **ASSOCIATION, INC., a California**
16  **corporation,**                     **VOLUME 9 OF 11**

17                        Plaintiffs,   Courtroom:    5A
                                         Judge:        Hon. Roger T. Benitez
18           v.                          Action Filed: May 17, 2017

19
    **ROB BONTA, in his official capacity**
20  **as Attorney General of the State of**
    **California; and DOES 1-10,**
21
                           Defendants
22

23

24

25

26

27

28                                         1

1

**INDEX**

2

3

| Works | Decl. Page. | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 14 U.S. Statutes 487, Chap 170, Sec. 6 (Approved March 2, 1867). | 19 n.21 | 0010-0014 |
| 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A.) | 56–57 n.85 | 0015 |
| Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006. | 56–57 n.85 | 0016-0019 |
| Texas Session Laws, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26. | 51 n.75 | 0020 |
| **BOOKS** | | |
| Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4. | 15 n.19 | 0026-0028 |
| William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67. | 19 n.20 | 0029-0032 |
| Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52. | 35 n.47 | 0033-0038 |
| Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97. | 36 n.50, 56 n.84 | 0039-0041 |

4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

2

| | | |
|---|---|---|
| Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863-1877 (New York: Harper and Row, 1988), xxvii. | 4 n.2 | 0042-0044 |
| Jim Garry, *Weapons of the Lewis and Clark Expedition* (Norman, Okla.: Arthur H. Clark, 2012), 94 | 8 n.5 | 729-730 |
| Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12. | 33 n.40 | 0045-0059 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016) 65-81, 90, 109-42, 177-202, 353-68. | *passim* | 0060-0096; 731-766 |
| Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299, 340. | 33 n.40, 33 n.41 | 0097-0104 |
| Robert Held, *The Belton Systems, 1758 and 1784-86: America's First Repeating Firearms* (Lincoln, R.I.: Andrew Mowbray, 1986), 33-39 | 8 n.6 | 767-775 |
| W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71. | 23 n.28 | 0105-0108 |
| John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. | 10 n.7, 14 n.18, 28 n.32 | 0109-0217 |
| Harold L. Peterson, *Arms and Armor in Colonial America (New York: Bramhall House*, 1956), 215-17 | 7 n.3 | 776-780 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans*, 1805-1889 (Baton Rouge: Louisiana State University Press, 1996), 130-31; 155-156 | 42 n.59, 45 n.61 | 0218-0222 |

3

| | | |
|---|---|---|
| James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 5-106, 112 | 19 n.21, 22 n.27 | 0223-0281 |
| Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119. | 20 n.23 | 0282-0359 |
| Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33, 69-70. | 21 n.24, 22 n.26, 38 n.53, 42 n.59 | 0360-0397 |
| W. H. B. Smith, *Gas, Air and Spring Guns of the World* (Harrisburg, Penn.: Military Service Publishing Company, 1957). 30 | 7 n.4 | 781-783 |
| C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49. | 30 n.35 | 0398-0424 |
| Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70 | 47 n.65 | 0425-0428 |
| Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88 | 24 n.29, 27 n.31 | 0429-0446 |
| Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93 | 47 n.65 | 0447-0452 |
| Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38, 42-44, 178 | 12 n.13 | 0453-0464 |

4

| | | |
|---|---|---|
| Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996, 75, 79-80, 140-41, 170-171 | 38 n.53, 40 n.56, 41 n.57, 41 n.58, 49 n.70 | 0465-0476 |
| **LAW REVIEWS AND JOURNALS** | | |
| Clayton E. Cramer, Nicholas J. Johnson, and George A. Mocsary, "'This Right is Not Allowed by Governments That Are Afraid of the People': The Public Meaning of the Second Amendment when the Fourteenth Amendment was Ratified," *George Mason Law Review*, 17 (2010), 823-863, esp. 852-863 | 21 n.25 | 785-824 |
| Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. | 36 n.50 | 0478-0481 |
| David Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998) | 54 n.81 | 0482-0488 |
| Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," Arkansas Historical Quarterly, 64 (Winter 2005), 356-58. | 20 n.22 | 0489-0495 |
| Allan Robert Purcell, *The History of the Texas Militia, 1835-1903*" (Ph.D. diss., University of Texas, Austin, 1981), 221-27 | 21 n.24 | 0496-0505 |
| Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," Law and History Review, 26 (Spring, 2008), pp. 1-56. | 56–57 n.85 | 0506-0562 |
| Jerrell H. Shofner, "Florida Courts and the Disputed Election of 1876," Florida Historical Quarterly, 48 (July 1969), 26-46. | 48 n.66 | 0563-0584 |

5

| | | |
|---|---|---|
| Otis A. Singletary, "The Texas Militia During Reconstruction," Southwestern Historical Quarterly, 60 (July 1956), 25-28. | 21 n.24 | 0585-0598 |
| S.K. Wier, The Firearms of the Lewis and Clark Expedition (2010) | 8 n.5 | 825-836 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in Annual Report of the Adjutant General of the State of Louisiana, for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39. | 55 n.83 | 0600-0604 |
| 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172. | 13 n.16, 14 n.17 | 0605-0611 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), U.S. Congressional Serial Set (1871), p. 467; and vol. 4 (South Carolina,), p. 767. | 49 n.69 | 0612-0616 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama) U.S. Congressional Serial Set (1871), pp. 414-15. | 51 n.74 | 0617-0619 |
| 46th Cong., 2nd sess., S. Rep. 693, pt. 2 "Investigation of Causes of Migration of Negroes from Southern to Northern States," U.S. Congressional Serial Set (1879-88), p. 357. | 51 n.76 | 0620-0621 |
| J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), U.S. Congressional Serial Set (1871), pp. 289-90 | 50 n.73 | 0622-0627 |

6

| | | | |
|---|---|---|---|
| General Orders, No. 101, May 30, 1865, The War of the Rebellion (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43). | 14 n.17 | 0628-0630 | |
| "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95. | 30 n.36 | 0631-0633 | |
| Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, 4086-87 (March 24, 1871), 4089-90, 4090-92, 4092-93, 4093-4095. | 26 n.30 | 0634-0644 | |
| James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, Opinions of the Attorney General, 11:208–09. | 19 n.20 | 0645-0652 | |
| Testimony of William Murrell, Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521. | 49 n.68 | 0653-0656 | |

**NEWS ARTICLES**

| | | | |
|---|---|---|---|
| Army and Navy Journal, June 1, 1867, p. 350 | 32 n.38 | 0658-0059 | |
| Bismarck Tri-Weekly Tribune (Dakota Territory), June 29, 1877, p. 4. | 29 n.33 | 0660 | |
| Charleston News, Oct. 17, 1870, p. 2 | 40 n.55 | 0661-0663 | |
| Chicago Daily Inter Ocean, January 12, 1877, p. 1 | 49 n.67 | 0664 | |
| Chicago Daily Tribune, July 23, 1876, p. 4. | 34 n.43 | 0665 | |
| Chicago Daily Tribune, April 15, 1878, p. 4. | 34 n.44 | 0666 | |

7

| | | |
|---|---|---|
| "The Reds," Chicago Daily Tribune, March 23, 1879, p. 7. | 52 n.78 | 0667 |
| Georgia Weekly Telegraph and Georgia Journal & Messenger, April 5, 1870, pp. 4, 8. | 46 n.62 | 0668-0669 |
| "Lovejoy," "Letter from Africa," Fayette County Herald (Washington, Ohio), Dec. 21, 1871, p.2. | 31 n.37 | 0670-0678 |
| David Kopel, "The History of Magazines holding 11 or more rounds," Washington Post, May 29, 2014. | 28 n.32 | 0679 |
| New Orleans Republican, June 13, 1873, p. 1 | 44 n.60 | 0680 |
| New Orleans Republican, March 13, 1877, p. 2. | 49 n.67 | 0681-0683 |
| "Breech-Loading Arms," New York Herald, Oct. 12, 1866, p. 4. | 34 n.46 | 0684 |
| "A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877, p. 4. | 35 n.48 | 0685-0687 |
| Ouachita Telegraph, October 24, 1873, p 1. | 44 n.60 | 0688 |
| "Henry's Sporting Rifle," in Wilkes' Spirit of the Times: The American Gentleman's Newspaper, March 24, 1866, p. 59. | 36 n.49 | 0689 |
| "Another Battle," The Opelousas Journal, Aug. 29, 1873, p. 3. | 47 n.64 | 0690-0691 |
| The Forest Republican (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4. | 37 n.52 | 0692 |
| The Weekly Democratic Statesman (Austin, Texas), August 24, 1871, p. 2. | 46 n.63 | 0693-0694 |
| Washington Evening Star, Aug. 16, 1869, p. 1. | 39 n.54 | 0695 |
| *Wyoming Leader* (March 16, April 21, May 8, 1868, always p. 4). | 29 n.33 | 0696 |

8

| OTHER SOURCES | | |
|---|---|---|
| James Bown and Son's Illustrated Catalogue and Price List, 29th annual ed. (Pittsburgh, Penn., 1877), 33. | 37 n.51 | 0698-0700 |
| David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). | 28 n.32 | 0701-0702 |
| National Museum of American History, Collections, Belton Repeating Flintlock Fusil | 8 n.6 | 838-841 |
| "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3. | 28 n.32 | 0703-0707 |
| Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoorproduction-serial-numbers.htm. | 28 n.32 | 0708-0715 |
| Guncite.com, Second Amendment State Decisions, Feb. 24, 2013. | 54 n.79 | 0716-0727 |

9

dealers in France and Germany. Shortly thereafter some orders began to come in from Prussia, which were especially welcome because exchange rates happened to be favorable.

One of the most exciting of the personal experiences published in the 1863 catalog concerned James M. Wilson, later to become a captain in the Kentucky Cavalry. The account of his adventure, which was reproduced in Cleveland's well known book, *Hints to Riflemen,* tells how Wilson, "an unconditional Union man, living in a strongly disloyal section of Kentucky," had been threatened by his neighbors.

In consequence of this, Capt. Wilson had fitted up a log crib across the road from his front door as a sort of arsenal, where he had his Henry Rifle, Colt's Revolver, etc. One day, while at home dining with his family, seven mounted guerillas rode up, dismounted and burst into his dining room and commenced firing upon him with revolvers. The attack was so sudden that the first shot struck a glass of water his wife was raising to her lips, breaking the glass. Several other shots were fired without effect, when Capt. Wilson sprang to his feet, exclaiming, "For God's sake, gentlemen, if you wish to murder me, do not do it at my own table in the presence of my family."

This caused a parley, resulting in their consent that he might go out doors to be shot. The moment he reached his front door he sprang for his cover, and his assailants commenced firing at him. Several shots passed through his hat, and more through his clothing, but none took effect upon his person. He thus reached his cover and seized his Henry Rifle, turned upon his foes, and in five shots killed five of them; the other two sprung for their horses. As the sixth man threw his hand over the pommel of his saddle, the sixth shot took off four of his fingers; notwithstanding this he got into his saddle, but the seventh shot killed him; then starting out, Capt. Wilson killed the seventh man with the eighth shot.

In consequence of this feat the State of Kentucky armed his Company with the Henry Rifle.

One of the most colorful tributes to the effectiveness of the Henry rifle came from the Southern soldiers themselves. Sawyer tells how "Major Claudman of the 1st D.C. Cavalry, in a letter to Mr. Winchester, said that when he was held in Libby Prison he often heard the enemy discuss the merits of the Henry rifles and he heard one of them say, 'Give us anything but that damned Yankee rifle that can be loaded on Sunday and fired all the week.' " [10]

In *Letters from Lee's Army* there is the sober comment: "We never did secure the Winchester [Henry] whose repeating qualities made the enemy's cavalry so formidable towards the end of the war." [11]

*Operations during the War Period*

In the absence of large Government contracts, Winchester was unable or unwilling to take the risk of expanding the Company's facilities beyond the physical limit imposed by the location of the plant, which remained at 9 Artizan Street, until after 1865.[12] To John W. Brown, of Columbus, Ohio, who had suggested that the organization might move into larger quarters, Winchester replied on May 4, 1863: "We shall go into an Armory, as you have in your eye, but we must creep a little longer. By and by we hope to walk and then we shall soon be in a position to drive." Eventually he was able to make good his prediction, but not until after the war was over.

38

Operations as a result remained on a relatively small scale. The average



*Plant of New Haven Arms Company in 1859*

39

The Company made other experiments with ammunition, and in January 1863 reported "an improved cartridge with the powder compressed, by which the power is much increased."

Rising costs of labor and materials also contributed to management problems. As early as October 1862, Winchester explained an increase in prices: "Lead, copper, and steel have advanced 50% within a short time. Our ammunition *costs* us $12 per 1,000. We shall stand this for awhile in hopes of a decline; but if costs advance more, or continue on at the present high prices for any considerable length of time, we shall have to advance the price of ammunition. It is very annoying to us, as it must be to others, to be constantly changing prices; but with the state of the market we have no choice, as we are not safe in guaranteeing the price today to be the price tomorrow." The following month he noted " . . . the immense increase in the costs (gunsmiths to whom we used to pay $2 per day, are now getting $4.50), has made it imperative on us to sustain our prices firmly to save us from loss, if not ruin."

Winchester was especially interested in the performance of the Company's products and in correcting any faults that users experienced. The Henry rifle did, in fact, develop two weaknesses. One was a tendency for the firing pin to break, attributed by Winchester to pulling the trigger without ammunition in the chamber; the other defect arose when the magazine became dented. To one captain he wrote: "I regret that the metal in the breech pin should have failed in so many of the guns furnished your company. We have used the greatest care to have them perfect and of the best material. It is the weak point in the rifle, the most important we have yet discovered, but it is easily [corrected] and shall be remedied in the next lot, which we are now commencing." In the same letter he cautioned against pushing up the plunger in the magazine and letting it fly back against the cartridges, as this damaged the magazine and prevented the ammunition from feeding back into the breech.

While Winchester was receptive to suggestions about improving the Company's products, there were limits to the amount of changes that could be undertaken. As he noted to one correspondent, all the improvements the latter had suggested could be made, for example: " . . . increasing the length of the barrel and breech, and adding globe, telescopic or other sights; but all or any of these alterations would require time and expense, which, in the present scarcity of hands, and the hurried demand for our rifle, we can not possibly give in to at present."

In spite of being forced to sell largely to non-Government markets, the New Haven Arms Company emerged from the war period with a greatly improved financial position and prepared to adapt its operations to meet the contingencies of postwar adjustments. Virtually bankrupt in 1860, the net worth of the concern was approximately $354,000 at the end of 1866 (*see Appendix G-1*). The dealer contacts made during these years gave the Company the nucleus of an established marketing organization to carry on its postwar commercial business. Furthermore, certain of the features of the rifle, such as the smaller caliber and the rapid fire, which had only limited attractions for the military authorities, became increasingly popular among hunters and frontiersmen.

These were important considerations for an arms and ammunition manufac-

*Position of the Company in 1866*

41

turer during the postwar years. With the end of hostilities, the industry as a whole
was greatly overexpanded. Foreign purchases took up some of the slack in military
demand for a few years, until those countries built up their own small-arms pro-
duction facilities. But this demand was not sufficient to support the entire industry
and a large number of firms went into receivership. Those that survived did so by
adapting and diversifying their production.[14]

The New Haven Arms Company was not immune to the sudden slackening
of business that followed the end of the Civil War. Partial sales figures indicate
that only 470 guns were sold during the last quarter of 1865 and the first half of
1866. During the same period only 672,000 cartridges were marketed. A continu-
ation of these conditions could have been embarrassing to the Company, for the
balance sheet indicates that a considerable portion of the assets was made up of
inventory and the cash position was low.

Winchester, however, was not discouraged by the outlook for the future.
Over the preceding nine years he had learned a great deal about guns and ammu-
nition and their manufacture. Early in 1865 he began laying plans for expanding
operations by applying to the Connecticut Legislature for a new corporate charter.
In July of that year the State Assembly granted a charter for the Henry Repeating
Arms Company with permission to carry on business either in New Haven or
Bridgeport. Capital stock was set at $500,000 (par value $100 per share) with a
provision that this figure might be increased to $1,000,000. No attempt was made
during 1865 to re-form the organization under the new charter, but in 1866 Win-
chester sold his share of the shirt business to his partner, John M. Davies, which
freed him to devote full attention to firearms production.[15] He also moved to identify
the organization with his own name, by getting the Legislature in 1866 to change
the title of the new corporation to the Winchester Repeating Arms Company.[16]

Meanwhile Winchester's growing stature in the community was reflected in
the fact that he served as Lieutenant Governor of Connecticut for the term 1866-
1867. Thereafter he was commonly addressed as "Governor Winchester" by his
friends and business associates.

*The Henry Rifle
in the West*

Two incidents, involving the use of the Henry rifle in 1865 and 1866, offer
a prologue to the subsequent tremendous popularity of the Winchester repeaters
in the West.

The first of these came late in 1865 and marked one of the earliest experi-
ences of the Indians of the Rocky Mountains area with the deadly effect of a
repeating firearm. For nearly two hundred and fifty years there had been more or
less continuous conflict between red and white men armed with single-shot guns.
The chief and most effective tactic of the Indians was to maneuver within charging
distance of an opponent and tempt him to fire by offering one of their number as
a target. The brave involved, unless he was disabled, and his companions would
then rush in and overwhelm their white adversary before he could reload his
firearm.

How the Blackfoot Indians of Montana tried this same maneuver against
two prospectors armed with Henry rifles was told by one of the white participants
to Paul B. Jenkins many years later. The two white men were former Union sol-
diers who had kept the Henry rifles issued to them just before being mustered out.
They began mining borax in the heart of the Blackfoot Indian country, knowing

42

it was only a matter of time before the Indians would attempt to wipe them out. As retold by Jenkins,

One morning the two young ex-soldiers had hardly begun the day's operations when they saw the enemy approaching in force and knew that they were in for it. Some forty warriors dismounted at a distance, approached to nearly gun range, lay down in the grass and began deliberately to creep in, spreading out to surround their supposedly doomed victims. Once in range, some began to expose themselves for an instant, bobbing up in the hope of drawing a desperate bullet, but always doing so two at a time in the hope of getting the guns of both whites empty simultaneously. One of the youths caught the idea from the fact that two Indians always showed themselves at the same instant, and said to his companion: "As soon as they get near enough, we'll fire together. They'll rush us the moment we both fire; and then'll be the time for you and me to do some shooting!"

It happened precisely as he foresaw. With full magazines they agreed to bring on the decisive charge. At the word of one, both fired as two warriors showed themselves above the grass for an instant; and the moment that the two flashes and puffs of smoke were seen simultaneously the whole band of Blackfeet sprang to their feet and dashed yelling in on their supposed temporarily unarmed and helpless victims. But those two guns kept on firing! Shot after shot kept pouring from the guns over the low log breast-work, and to the indescribable horror of the warriors who considered themselves already victorious, man after man of their number fell shrieking or silent in the prairie grass as the deadly and unheard-of continuous firing blazed steadily at them; and that at a range so short, chosen for the final dash to close quarters, that few if any of the young riflemen's bullets missed. To halt, to wheel and dash madly away in any direction to escape the ceaseless fire, were moves of but an instant; but as they fled the guns kept at them, and only a few escaped unhit. Reloading their magazines the youths sprang from their rude barbette and ended the desperate work by leaving alive no wounded victims. Indeed, for the effect of the thing, they riddled every corpse with innumerable bullets and dragged the whole number to a heap at a distance beyond rifle range of their fort, that the survivors might return and contemplate the fatal results of their terrible encounter with weapons that obviously appeared never to need to be reloaded at all.

From that day no other attack was ever made upon that pair. Not only were they thereafter immune, but the one of them I later knew told me that passing Indian bands would make wide detours to avoid even the neighborhood of their cabin; or, on meeting one of them, would rush off to a distance for fear of coming into any proximity with the awful magic of death that they had so terribly exhibited. Once, he told me, meeting an Indian whom he had reason to believe to have been one of the survivors of the fight, the brave, with a face of horror exclaimed, "Spirit guns! Spirit guns!" and was off as fast as his pony could gallop.[17]

The second incident involved a brush between "the law" and some stage-coach robbers. Neill C. Wilson, in his book, *Treasure Express: Epic Days of the Wells Fargo,* tells how the stagecoach carrying a large shipment of cash was held up and robbed by three armed bandits near Nevada City one May day in 1866. Steve Venard, the former town marshal of Nevada City, did not join the posse that set out after the robbers but, armed with his Henry rifle, picked up the trail at the point of the robbery and followed it into a steep and rocky canyon to a point where his way was barred by a waterfall. To let Wilson continue the story:

Climbing doggedly with feet, knees, and one hand, Steve Venard reached the top of this fall. A half-shattered log led to the base of the islet. The man-tracker advanced over

**43**

the bridge, stepped ashore around a granite block, and came full on Jack Williams' ghost. The ghost was cocking and leveling a long .44 revolver.

Williams and Venard sighted each other at the same instant. And at the instant, Venard's rifle leaped to his shoulder. Also, at the instant, Venard saw Finn, alias Kerrigan, drawing bead on him from the summit of the islet.

No time to change targets. Venard drilled Jack Williams' ghost directly and speedily through the heart. A flip of trigger-guard and another half-ounce cone of lead was in firing position, just where Tyler Henry had once pledged Mr. Winchester it would be. The second shot, dispatched before echo of the first had caromed off the cliffs, sped upward and spattered on the canyon wall, having entered Finn's skull below the right eye and toured his skull en route. A scramble for the top of the islet proved the third bandit vanished. Venard kicked leaves over the Wells Fargo buckskin bag which lay beside Finn's body, took new bearings on the ravine that still mounted by big, wet terraces in front of him, and set up its eastern face.

Bandit Number Three was doubling and twisting like a hare along the steep brush-covered hillside. Venard's rapid shot all but nipped him. The quarry turned at bay, full of fight, as its dust spurted in his face. The next shot out of the pursuing Henry explored his heart, sent his spirit winging and his person crashing downhill into the canyon.

The rest of the posse found Venard sitting on the buckskin bag, communing with his plain old, well oiled rifle. The odds had been three to one and the three had been under cover while he had advanced in the open; each adversary in that one high-blazing instant had held fair bead on him; yet here they were. Three dead men, two of them still clutching cocked revolvers, and one live deputy. But—four expended bullets. The Henry must be getting old. Steve Venard was regretful.

The stage had been robbed at 4:30 a.m. It now was noon. The treasure was back in express company keeping by two p.m.

The governor of California commissioned Venard a lieutenant colonel of militia "for meritorious services in the field," and the express company made over to him its $3,000 reward money and, with considerable celerity, a brand new, suitably inscribed sixteen-shot Henry. It had become fixed policy with the express management, when a man showed himself adept at gunning bandits, to present him with a fine rifle and its hearty compliments.[18]

44

sales that carried through the following year, but beginning in 1909 and continuing through 1914, the yearly total of guns sold averaged over 290,000.

To a very considerable extent this expansion of Winchester's sales paralleled the growth of the entire firearms industry. No exact comparisons can be made as the Census did not report physical production, and combined pistols and revolvers in reporting the value of the industry's products during these years. The combined figure reported for 1889 was $2.92 million, for 1899 $5.45 million, for 1909 $8.06 million, and for 1914 $10.54 million.

Judged by these and other data, Winchester was in about the same relative position in the firearms industry in 1914 as it had been in 1890. Even so, it would be a mistake to assume that the growth necessary to maintain this position would have come without any attempt on the part of the Company to push sales. According to Emerson's well-known observation, the world will beat a path to the door of the most skillful manufacturer. Experience seems to show, however, that quality alone may be insufficient to build and maintain customer interest. The well-worn paths are much more likely to lead to establishments whose products are brought frequently and forcibly to the attention of the public.

In any event, there was no tendency on the part of the Winchester management to test the validity of Emerson's generalization after 1890, even though by that date the reputation of the Company's products was based solidly upon their performance. An increasing amount of attention was given to keeping the "paths" to the New Haven establishment clear and in good repair. The Company's emissaries were sent out, charged with the responsibility of seeing that the public was well acquainted with the virtues and qualities of Winchester guns and ammunition.

*Marketing Organization*

With the increased emphasis on selling, the principal marketing channels were undisturbed; merchandise being sold to jobbers or wholesalers who in turn distributed to retailers, but the marketing organization was gradually elaborated and expanded during the succeeding twenty-five years.

This expansion was reflected in the personnel of the management and an expansion of the group. From 1890 to 1900, Hooper continued to be responsible for sales. Sometime during this period the general supervision of the sales force was put under the direction of Irby Bennett (no relation to T. G. Bennett), general agent for the Company in Memphis, Tennessee. In 1897 William R. Clark was made advertising manager.

Hooper resigned in 1900 and Hodson was elected vice president and treasurer. To take over Hooper's work on sales, Harrie S. Leonard was appointed assistant treasurer. Shortly thereafter, the supervision of salesmen was transferred to New Haven, and around 1907 a sales manager, Seneca G. Lewis, was appointed.

*Raising the Profit Margin on Guns*

For a number of years after 1890 the Company seems to have been concerned with raising the low-profit margins on guns that had come about during the 1881-89 period. There were several alternatives open to the management. The situation might have been remedied simply by raising list prices, without changing the rebate and discount pattern. Such a move would have no doubt increased prices to the final purchasers. On this point the officials were apparently con-

**177**

vinced that many of their customers would either be unwilling or unable to pay higher prices, or that other concerns would not raise their prices correspondingly and would take away a considerable amount of business. With two exceptions, therefore, list prices were unchanged during the twenty-five years beginning in 1890.

A greater amount of sales at the same price would, of course, increase total profits even with a low margin per gun. As already noted, sales did in fact increase remarkably during the period, but not until after 1897. With or without increased sales, profit margins could also be increased by cutting manufacturing costs. Insofar as contract rates are an index, production costs were lowered, the index falling about 31 per cent between 1890 and 1904. (*See Appendix J-5.*)

Finally profits could be raised by cutting trade discounts and rebates to jobbers. This the Company was able to do. The jobbers' mark-ups were cut approximately in half during the period; an indication, in part at least, of how desirable the jobbers and retailers felt it was to handle the Winchester gun line. (In the absence of general information on jobbers' discounts and rebates in other fields during the period it is not possible to determine whether the margins on Winchester products were out of line.)

This lowering of jobbers' margins involved the risk that the big jobbing houses, which the Company was especially anxious to keep, would withdraw their business. The jobbers were presumably compensated to some extent after 1897 by an increased volume of business, but there were complaints that mark-ups were too narrow to be profitable. Winchester apparently lost a few of its accounts, but seems to have been able to replace them without serious difficulty without changing the jobbers' margins.

*Price-Cutting*

While Winchester was interested in keeping prices to the dealers and customers reasonably low, it was insistent that prices should not go below established or conventional levels. For this reason the management moved vigorously to prevent price-cutting that began on a serious scale after 1900. By this date jobber margins had been substantially reduced and while the Company believed that these discounts and rebates gave both the jobbers and dealers a reasonable profit margin, it realized that such margins had to be protected if jobber and dealer loyalty were to be maintained. The Company also wished to avoid giving the public the idea that its products could be bought at cut prices.

One source of price-cutting came from firms which, because of the prestige of Winchester firearms and ammunition, used them as "loss leaders" to attract customers. The other source of price-cutting came from the mail-order houses, especially Sears Roebuck & Company, which followed a policy of selling merchandise whenever possible at prices that were generally below those quoted by retail dealers.

Prior to about 1904 Sears Roebuck had observed Winchester's price policies on guns, merely challenging price competition, and in the case of the Model 86 rifle, offering a cleaning rod free with every purchase. In 1901, referring to the Winchester firearms, the mail-order house stated in its catalog: "We would be glad and perfectly willing to sell this line at lower prices, but the manufacturer restricts the selling prices and would not supply us with goods if we were to sell below these printed prices. These prices are guaranteed to be as low as offered

178

by any reliable dealers in the United States, and should you be offered these goods lower by any dealer you would confer a great favor by advising us, in order to give us an opportunity of adjusting the prices."

In 1904 Sears Roebuck took the first step toward cutting prices by offering a Winchester take-down shotgun as a premium for every $300 worth of goods purchased from the mail-order house. T. G. Bennett took quick action and on November 26 of that year wrote the Company's sales force and the trade stating that because of this plan, all quotations on guns had been withdrawn from Sears Roebuck and that the Company had cancelled all orders.

This action by Winchester evidently affected the Sears Roebuck stock quite promptly because the latter concern wrote to one customer on November 23, explaining: "The reason our stock is exhausted and that we are unable to state definitely when we can again furnish the firearms ordered by you is partly due to the fact that the Winchester Repeating Arms Co., has deemed it advisable to discontinue selling us owing to the fact that they consider our profit sharing plan . . . as being a cut on their line of goods. . . . Our profit sharing plan has created so much disturbance and agitation among dealers that the Winchester Repeating Arms Co. . . . has considered it advisable to sacrifice our business to further the interests of the other dealers who are almost universally in favor of large profits and opposed to a profit sharing plan similar to ours . . . Understand, it is not our intention to cease selling Winchester goods . . . We will continue to sell them but . . . we are compelled to receive our supplies from sources other than direct from the factory." [2]

Sears Roebuck accepted Winchester's challenge by quoting the Company's guns in its catalog for 1905 at prices below the restricted retail levels set by the Company. For example, the Winchester standard Model 1897 repeating shotgun, restricted to a minimum retail price of $18 by the Company, was offered for $15.50. At the same time Sears Roebuck stated in its catalog: "While we will gladly furnish this Winchester Repeater for only $15.50, since we can furnish you the celebrated Take Down Model Marlin Repeating Shotgun, a gun we consider worth $10.00 more, for only 55 cents additional, only $16.05, if you want a repeating shotgun we would advise by all means you order the Take Down Marlin Repeater."

Sears Roebuck resorted to various devices in order to obtain Winchester guns. Fred Biffar, manager of the Sears gun department, who appears to have taken the chief responsibility in the contest, established at least two dummy concerns, the Clinton Hardware Company of Chicago, and the Model Sporting Goods Company of Evansville, Indiana, and through them purchased guns.

Biffar was able to get some of his suppliers of other merchandise to order guns for him and in some instances, European houses received orders which were reshipped unopened to Sears Roebuck. Certain retail dealers were offered a five per cent premium for Winchester guns, being instructed to be sure to display Winchester guns in their windows and appear to be doing an over-the-counter business for the benefit of the local jobbing houses. To conceal the identity of suppliers, the serial numbers on guns were filed off.

Winchester was able to cut off supplies to the mail-order house in various ways. Dealers who were discovered selling to Sears Roebuck were prohibited from purchasing Winchester goods. The Company formalized and increased the rebates

**179**



# STATE OF REBELLION

## RECONSTRUCTION IN SOUTH CAROLINA

RICHARD ZUCZEK

UNIVERSITY OF SOUTH CAROLINA PRESS

Copyright © 1996 University of South Carolina

Published in Columbia, South Carolina, by the
University of South Carolina Press

Manufactured in the United States of America

00  99  98  97  96      5  4  3  2  1

Library of Congress Cataloging-in-Publication Data

Zuczek, Richard, 1966–
    State of rebellion : reconstruction in South Carolina / Richard
Zuczek.
        p.   cm.
    Includes bibliographical references and index.
    ISBN 1–57003–105–3
    1. South Carolina—Politics and government—1865–1950.
    2. Reconstruction—South Carolina.  I. Title.
F274.Z83  1996
975.704—dc20

                                        95–50219

To my par
*Stanley and Jan*
who supplied

and to my
*Etsuko*
who made sure I did

F274
Z83
1996

blacks were killed and several wounded; no white casualties were reported.[58] On St. Helena, Laura M. Towne wrote in her diary that "it is so dangerous for a negro to go about, especially with the United States Uniform on, that orders are out that no more will be allowed to go to recover their families and bring them here. . . ."[59]

Despite this, whites argued that black troops were the real danger, and their presence would incite newly freed blacks to murder and riot. As usual, white Carolinians believed themselves to be the only force capable of controlling blacks, and so—as at other times—they took matters into their own hands. In an ominous letter, Henry Ravenel commented on the "better & more orderly spirit" among Cooper River blacks since the "presence of our Scouts & the summary executions of a few of the ring leaders." Ravenel offered chilling advice, that "the conduct of our Scouts should be no child's play, no taking up and whipping. . . . [Leaders] should be quietly disposed of. The mystery of disappearance has more awe in it, than any amount of punishment which is seen or known."[60] In Kingstree a "citizen's committee" whipped freedpeople and expelled Northern teachers as protection against an "imminent uprising."[61]

Fear of race war intensified as the 1865 Christmas season approached. Tensions had been building since the surrender, and in October an uprising in Jamaica (in which thirteen whites were killed) added fuel to white fears.[62] To this add the coming of Christmas, which had been the one holiday on which masters allowed their slaves some liberty to celebrate. Now whites feared the undisciplined spirit could overtake their former slaves, and blood would flow.

Again, private and state action complemented each other. While Cadawaller Jones of Rock Hill urged neighbors to create "an armed police organization before Christmas," Provisional Governor Benjamin F. Perry instructed the General Assembly to reorganize the state militia to guard against "insurrection and domestic violence."[63] On November 4 the "Committee on the Military" suggested creating "an organized, armed military force" to control the freed slaves, as they had "become so thoroughly contaminated with false notions as to their rights. . . ." The committee also advised the assembly to "keep on duty . . . a number of white mounted troops . . . sufficient to protect the country . . . until the Militia shall be perfected."[64] Reports filtered in as districts organized paramilitary units. In November, for instance, Edgefield reported that three companies had formed, all composed of veterans and led by "gentlemen." On January 10, 1866, the legislature named former Major General Martin W. Gary of Edgefield commander of the state militia—a man who would play a similar, less legal role just a decade later.[65]

20

## IV

In October of 1865, an alarmed Wendell Phillips spoke on "The South Victorious," warning that the South was reemerging with "the same theories, with the same men to work them, and the same element to work them with. . . ."[66] Indeed, by December, as most white Carolinians saw it, their task was nearly complete. The state had (more or less) complied with Johnson's federal requirements, a new government had been established, and new regulations and structures had been developed to insure white dominance and security. Carolina whites were well on their way to regaining total control of their society.

Similar developments across the South presented Congress with a dilemma. Should it go along with President Johnson, reunion, and reconstruction Southern-style, or should it scrap nine months of work, and quite possibly its relations with the South and President Johnson, and start from scratch?[67] Congress convened in the fall of 1865 and assessed the extent of the South's defeat—its submissiveness, its willingness to change, its repentant behavior—and the decision came easily. Along with those from other Southern states, South Carolina's representatives to the august body in Washington found a cool welcome waiting, as Congress exercised its prerogative and refused to seat the Southern congressmen. The event caused traveler-journalist Whitelaw Reid to reflect back on secession. The fatal error of the North in 1860, he believed, was a failure to take South Carolina seriously. Following Congress's rejection, Reid warned the North to use caution, for a "majority" of Southerners saw the rebuff "as a studied, brutal insult to a beaten and helpless enemy."[68] Another phase began in this struggle for Southern rights, and Carolinians would soon show that they were neither beaten nor helpless.

## Notes

1. Richard Henry Dana, quoted in Michael Les Benedict, *The Fruits of Victory: Alternatives in Restoring the Union, 1865–1877* (Philadelphia: J. B. Lippincott, 1975), 98.

2. See Eric L. McKitrick, *Andrew Johnson and Reconstruction* (Chicago: University of Chicago Press, 1960), 91–92; Eric Foner, *Reconstruction, 1863–1877: America's Unfinished Revolution* (New York: Harper and Row, 1988), 183; Dan T. Carter, *When the War Was Over: The Failure of Self-Reconstruction in the South, 1865–1867* (Baton Rouge: Louisiana State University Press, 1985), 25.

3. *The Private Journal of Henry William Ravenel, 1859–1887*, ed. Arney Robinson Childs (Columbia: University of South Carolina Press, 1947), 254; John

21

Bureau of Refugees, Freedmen and Abandoned Lands, to Brigadier General C. H. Howard, chief of staff, December 4, 1865, RG94, MC619, Reel 505, NA.

47. Brevet Major General Rufus Saxton to Commissioner O. O. Howard, December 19, 1865, RG105, MC752, Reel 24, NA.

48. Saxton to O. O. Howard, January 15, 1866, RG105, MC752, Reel 24, NA.

49. Quoted by Schurz in *The Condition of the South*, 18; Kirkland, "Federal Troops in the South Atlantic States," 34.

50. F. M. Montell to O. D. Kinsman, January [?], 1866, RG94, MC619, Reel 505, NA.

51. Brown's band was so notorious that Governor James Orr, who succeeded Provisional Governor B. F. Perry, offered a reward of three hundred dollars for every member of Brown's gang captured. See DeForest, *A Union Officer in the Reconstruction*, 14–21.

52. Ames, *From a New England Woman's Diary*, 7, 13.

53. Andrews, *The South since the War*, 28.

54. Schurz, in *The Condition of the South*, 20.

55. Wade Hampton broadside on "A True Policy for the Restoration of the South," to President Andrew Johnson, August 25, 1866, Hampton Family Papers, SCL.

56. Childs, ed., *The Private Journal of Henry W. Ravenel*, 246.

57. Robert A. Pringle to W. R. Johnson, August 19, 1865, Robert A. Pringle Papers, SCLRR, Duke.

58. H. A. Johnson to "Samuel," September 9, 1865, Hannibal A. Johnson Papers, SHC/UNC; *Charleston Daily News*, August 29, 1865.

59. Rupert Sargent Holland, ed., *Letters and Diary of Laura M. Towne, Written from the Sea Islands of South Carolina, 1862–1884* (Cambridge: Riverside Press, 1912; New York: Negro Universities Press, 1969), 167–68.

60. Childs, ed., *The Private Journal of Henry W. Ravenel*, 223.

61. *Nation*, November 23, 1865; quoted in Carter, *When the War Was Over*, 193–94.

62. The uprising in Jamaica was not related to the stresses of emancipation, as slavery had ended there in the 1830s. However, this fact mattered little to the Southern press, which capitalized on the story and exaggerated greatly the destruction done and the scope of the insurrection. For example, see the *Edgefield Advertiser*, November 29, 1865; and Carter, *When the War Was Over*, 200–1. For the "scare" itself see Dan T. Carter, "The Anatomy of Fear: The Christmas Day Insurrection Scare of 1865," in *Journal of Southern History* 42 (August 1976): 345–64.

63. Cadawaller Jones to A. B. Springs, December 6, 1865, in Box 9, Folder 150, Springs Family Papers, SHC/UNC; Williamson, *After Slavery*, 251.

64. South Carolina General Assembly, *Reports and Resolutions of the General Assembly of the State of South Carolina, Session of 1864–1865* (Columbia, S.C.: Julian A. Shelby, 1866), SCL.

65. *Edgefield Advertiser*, November 15 and December 6, 1865, January 10,

1866. For the constitution of one such militia unit, and a list of its forty-five members, see Folder 29, Iredell Jones Papers, SCL.

66. Wendell Phillips, quoted in James M. McPherson, *The Struggle for Equality: Abolitionists and the Negro in the Civil War and Reconstruction* (Princeton: Princeton University Press, 1964), 335.

67. Benedict, *Fruits of Victory*, 16–18. As Eric McKitrick has argued, one cannot speak of "Radicals" yet, for Congress had not been in session, and no real ideology, plan, or policy existed to compete with Johnson's. See *Andrew Johnson and Reconstruction*, 55–64. Another view is expressed in Henry Thompson's pro–South Carolina argument that the refusal to seat the representatives was all part of plot to overthrow Johnson; the reaction to the codes was merely an excuse to act against the president's program. See Henry T. Thompson, *Ousting the Carpet-bagger from South Carolina* (Columbia, S.C.: R. L. Bryan, 1926; New York: Negro Universities Press, 1969), 20–21.

68. Whitelaw Reid, *After the War: A Tour of the Southern States, 1865–1866* (Cincinnati: Moore, Wilstach and Baldwin, 1866; New York: Harper and Row, 1965), 445.

wary, for "today we are welcomed by those who have always declared that we were not fit to occupy a position entrusted to us." "It behooves us to be careful of these men," Elliott advised, "whether they come in the name of the Democrats, Conservatives, or Citizen's Party."[33] Speaking two years later, black state Supreme Court Justice Jonathan J. Wright explained that the Union Reform party found meager support among freedmen "because we so highly prize our liberty." Wright admitted that there was "corruption in the Republican party," but believed that the Union Reform party would bring about "the destruction of our liberties, which we value higher than life." Justice Wright quoted the Union Reform platform, which embraced "local self-government, with impartial suffrage, [to] guard the rights of all citizens more securely than any centralized power," and "a return to the . . . constitutional limitation of power." In other words, according to Wright, the platform was "let us alone and permit us to do as we choose," the classic battle cry of South Carolina.[34]

The "regular" Republican party faced other threats as well, for conservative whites never seemed at a loss for schemes. Soon after the Union Reform convention, state constables informed Governor Scott that several hard-line conservatives had suddenly taken an interest in joining the "regular" Republican party. Scott's agents were suspicious and warned the governor to avoid letting them into the party. According to one officer in Columbia, such men were planted by the conservatives "to bring Democratic influence to bear on our nomination." One aspirant was described as being a "Ku-Klux," a "violent, outrageous and insulting" individual who had drawn a knife on a constable during the 1868 campaign.[35] Government agents also learned that state Democrats had hired Northern blacks of questionable character to win over the freedmen. B. F. Whittemore alerted Scott from Washington that one George Natter "is a dangerous man so watch out for him." Natter was headed to South Carolina "to work in the interest of the Union Reform Party" and was bringing thirteen hundred dollars to aid his efforts.[36]

It was also clear that terrorism would again play a role in Carolina politics. As whites began to implement their strategy of intimidating Republicans, government officials were buried under a deluge complaints and requests for help. The constable in Newberry, James Leahy, reported to Chief Constable John B. Hubbard that bands of well-armed whites were indeed threatening blacks but had declared that "they would begin by killing all the damned white Republicans first."[37] S. A. Swails in Kingstree claimed, "you cannot speak without a guard if you are a Republican, I see plainly that the Reformers wish to raise a row. . . ."[38] Some Republicans, such as James Bonsall, decided that caution was the better part of valor; after suffering numerous visits and one attack, Bonsall with-

drew from the local race in Union County. Tension there continued, and Bonsall feared that "we will have trouble here, I am confident," for conservatives were well armed—one arsenal at a depot was even under guard—but Republicans were not.[39]

Indeed, despite the official proclamations about creating a formidable militia, whites continued to win the arms race. Where Republicans were beset with divisions, corruption, and delay, conservatives were organized and unified. Deputy Constable J. W. Anderson warned Chief Constable Hubbard that "the Democrats . . . say they intend to organize all over the State against Scott's militia. I have it from good authority that whites are receiving guns through the merchants and are secretly organizing."[40] J. A. Jackson also reported that the "Democrats are organizing companies, I hear, in several counties against the militia." Jackson warned Hubbard that former Confederates "are working on the quiet to fool us all, and are getting guns all the time. . . ."[41] Deputy Constable Benjamin Yocum also notified Hubbard that "the opposite party make no secret of thier [sic] intention of arming against our militia."[42] In September, Chief Constable Hubbard received news from Union that a "regular company" of men had left for Laurens after hearing rumors of black rowdiness. One officer reported that whites had been receiving guns for some time; just recently a local business had "received a very large invoice of pistols and guns—so large that it does not look all right."[43] A month later J. P. Wharton informed Hubbard that a shipment of guns was making its way across Newberry.[44] From Chester came a report that "there are Winchester rifles being received here almost every day, but in such a way as they cannot be easily detected." Buyers went North, and then shipped guns into the state "in packages of dry goods." "The people are very well supplied with them now," a constable in Chester said; "they are playing a pretty smart game. . . ."[45]

As had occurred with the franchise, the effort to protect blacks and Republicans through the militia fostered, rather than deterred, white aggression. An escalation of sorts resulted, for as white aggression intensified, so too did interest in the state militia. New companies appeared in the up-country, where violence was most prevalent and state constables less numerous (they were concentrated around larger towns). Militia proliferation in 1870 was astounding; three new units appeared in York County, three each in Fairfield, Chester, Union, and Spartanburg, and several other piedmont counties added one or two each. E. L. Mann reported nine companies in Abbeville alone, and Laurens had eight.[46] In response the conservative *Unionville Times* in Union County declared "In Peace Prepare for War!" The governor, the paper suggested, would not be "happy until he has brought about a collision of the races." Therefore, "it

would be our surest policy to hold ourselves prepared to accommodate him to the utmost of his desire."[47] Republican Isaac Witherspoon believed that Carolinians saw arming the blacks "as a declaration of war between the races."[48] Conservative W. R. Robertson of Winnsboro told A. B. Springs that the "stupid leading darkies are determined to provoke a conflict with the white race." His advice was to "meet it promptly and *terribly* to make the issue short and quick." "We should," explained Robertson, "by all means let *them* inaugurate the movement, and when they do we should strike fast and quick, and can soon settle it."[49]

A case in point took place in Laurens County in September, when whites moved against local militia companies. In the town of Clinton, a minor disturbance—probably instigated deliberately by whites—provided the excuse for town whites to call for help from surrounding paramilitary companies. When news spread that conservative "clubs" were coming to suppress the riot, black militia companies responded, and within hours three hundred blacks and over one thousand whites converged on the town. The whites were better organized and equipped, and they quickly cut off the towns of Clinton and nearby Laurensville, the county seat. Wagons loaded with guns and ammunition arrived shortly after the men, and reports circulated that more men and munitions were on the way.[50]

News of the riot quickly reached Columbia, and Chief Constable Hubbard sent Deputy Constable Henry Wilson to investigate. What he found shocked and frightened him. On his way to Clinton, Wilson discovered "all roads leading to and from the Railroad, and all the stations on the line of the road . . . a distance of about twenty-five miles, guarded by armed bodies of white men." Stealing his way into Clinton, he realized the town was in the possession of between eight hundred and one thousand armed whites, many of whom were mounted. Moving on to Laurensville, Wilson noted armed white patrols in the streets, and saw a wagonload of guns roll in. Sneaking around behind a store (no doubt thankful he was white), Wilson saw men opening crates of new Winchester rifles and handing them out to eager whites.[51]

The extent and sophistication of white organization convinced Wilson that state authorities faced more than just a crime wave. The constable claimed that the men in Clinton "came in organized companies from the Counties of Abbeville, Union, Spartanburg, and Newberry." He noted a structure of command and the smooth operation that came only with experience and discipline; a guard posted on one road said he was positioned there "by the man in command at Clinton." Women whom Wilson questioned told him their husbands and sons "had all been *or-dered off* to Clinton to the war." Their purpose was similarly well thought-out; at both Clinton and Laurensville, whites ordered blacks to hand over

80

their militia guns and disband their companies. As Wilson concluded, "this in no mere disturbance of the peace . . . it is a complete military organization, armed and equipped for the purpose of defying the Laws and menacing the authorities of the State."[52]

Wilson's report capped a series of investigations carried out under Hubbard and prompted the Chief Constable to warn the governor about imminent war. "I am satisfied," Hubbard informed Governor Scott, "that a complete organization exists from the Savannah river to Chester, a distance of nearly two-hundred miles in length, and embracing and including all the counties above Edgefield, and that its object is to intimidate Republican voters on Election day and if necessary murder leading Republicans." Hubbard even reported that "large numbers of the citizens of Georgia and North Carolina are employed . . . with the object of voting and aiding in this organization."[53]

Hubbard hoped Governor Scott would convince the federal government to take a more active role in the state. Indeed in 1870 the federal government had seemed to take a renewed interest in protecting suffrage. On May 31, Congress had passed the Enforcement Act, designed to discourage fraud at the upcoming fall elections. Under the act, it became a federal offense to bribe a voter or to punish any voter because of his voting behavior. The law made it a felony to conspire or to go in disguise for the purpose of infringing upon a citizen's voting rights, and authorized the president to use the military to enforce its provisions. Overseeing these measures was the new Department of Justice, which formally came into being in June of 1870, under the direction of the U.S. attorney general.[54]

Unfortunately these developments had little impact on the terrorism in South Carolina. Less than a month after its inception, the Justice Department got a new director, Amos Tappan Akerman, an advocate of stronger civil rights enforcement in the South. The enthusiastic enforcer from Georgia found himself hamstrung by strict budgets, cabinet infighting, a conservative administration, and even more conservative laws. Nor was the military ready to assist in law enforcement. General Henry Halleck, commanding the sprawling Division of the South, told his officers to avoid intervention in civil affairs. Any marshal asking for assistance must present a court order declaring he was unable to call on civilians to execute his *posse comitatus*. Halleck believed such "embarrassing" duties "can hardly be said to legitimately belong to the military service."[55] Even the Enforcement Act passed in May left much to be desired; a bulk of the expenditures and most of the marshals went to the North during the campaign and election. As Allen Trelease has observed, the law's effect on Southern violence was "wholly negligible."[56]

Left to confront what amounted to armed insurrection, state Repub-

81

35. P. Connell to Scott, June [n.d.], 1870, in Box 5, Folder 3, Robert K. Scott Papers, OHS.

36. B. F. Whitemore to Scott, June 17, 1870, in Box 5, Folder 5, Robert K. Scott Papers, OHS.

37. James Leahy to John B. Hubbard, August 16, 1870, in Box 1, Folder 10, Chief Constables' Letterbooks, SCDAH; emphasis in original.

38. S. A. Swails to Hubbard, August 23, 1870, and August 27, 1870, in Box 1, Folder 11, Chief Constables' Letterbooks, SCDAH.

39. J. Bonsall to Hubbard, August 28, 1870, in Box 1, Folder 11, Chief Constables' Letterbooks, SCDAH.

40. J. W. Anderson to Hubbard, June 25, 1870, in *Report on Public Frauds*, 9:26.

41. J. A. Jackson to Hubbard, July 3, 1870, in *Report on Public Frauds*, 9:27.

42. Benjamin Yocum to Hubbard, September 2, 1870, in *Report on Public Frauds*, 9:26.

43. J. C. Bonsall to Hubbard, September 19, 1870, in *Report on Public Frauds*, 9:28.

44. J. P. Wharton to Hubbard, October 7, 1870, in *Report on Public Frauds*, 9:28.

45. John Burke to Hubbard, October 10, 1870, in *Report on Public Frauds*, 9:27–28.

46. Reynolds, *Reconstruction in South Carolina*, 137; Thompson, *Ousting the Carpetbagger*, 47; E. L. Mann to Scott, June 13, 1870, in Box 5, Folder 3, Robert K. Scott Papers, OHS.

47. *Unionville Times*, n.d.; quoted in the *Edgefield Advertiser*, September 15, 1870.

48. Isaac Witherspoon, quoted in *KKK Report* 5:1515.

49. W. R. Robertson to A. B. Springs, August 23, 1870, in Box 12, Folder 201, Springs Family Papers, SHC/UNC; emphasis in original.

50. *KKK Report* 5:1304–05, 1329–30; Trelease, *White Terror*, 350–51.

51. Henry Wilson to John B. Hubbard, September 21, 1870, in Box 1, Folder 12, Chief Constables' Letterbooks, SCDAH.

52. Wilson to Hubbard, September 21, 1870; emphasis in original. Even a month later, armed bands continued to patrol Laurens County. In October, James Leahy in Newberry even reported refugees coming in from the stricken county; they told of an attack on a black church that left fifteen blacks dead or wounded. See James Leahy to Hubbard, October 24, 1870, in Box 1, Folder 14, Chief Constables' Letterbooks, SCDAH.

53. Hubbard to Robert K. Scott, September 21, 1870, in Box 1, Folder 12, Chief Constables' Letterbooks, SCDAH.

54. "An Act to Enforce the Right of the Citizens of the United States to Vote in the Several States of the Union, and for Other Purposes," in *Statutes at Large of the United States of America, 1789–1873*, vol. 16 (Washington, D.C.: Government Printing Office, 1870), chap. 114.

55. General Henry Halleck, "Report on Division of the South," in *Annual Report of the Secretary of War for 1870*, 41st Cong., 3d sess., H. Doc. 1 (Serial 1446), 37–38.

56. Trelease, *White Terror*, 385–86. See also William S. McFeely, *Grant: A Biography* (New York: W. W. Norton, 1981), 362–65; and Gillette, *Retreat from Reconstruction*, 45–51.

57. William N. Taft to John B. Hubbard, October 10, 1870, printed in *Report on Public Frauds*, 9:61.

58. O. C. Folger to Hubbard, October 13, 1870, in Box 1, Folder 13, Chief Constables' Letterbooks, SCDAH.

59. Robert K. Scott to E. W. Seibals, September 30, 1870, in Box 6, Folder 1, Robert K. Scott Papers, OHS; Edward King, *The Great South* (Hartford, Conn.: American Publishing, 1875; Arno Press, 1969), 457; Alonzo Ransier to Scott, October 15, 1870, in Box 6, Folder 2, Robert K. Scott Papers, OHS.

60. Lamson, *The Glorious Failure*, 109–15; *Papers in the Case of Isaac G. McKissick vs. A. S. Wallace*, 42d Cong., 2d sess., H. Doc. 48 (Serial 1525), passim; *Papers in the Case of Christopher C. Bowen vs. Robert C. DeLarge*, 42d Cong., 2d sess., H. Doc. 37 (Serial 1525), 10–25, 30, 36–38; "George" to Robert Scott, October 20, 1870, in Box 6, Folder 2, Robert K. Scott Papers, OHS.

61. Swinney, *Suppressing the Ku Klux Klan*, 207–8.

62. Lamson, *The Glorious Failure*, 109–15; *Edgefield Advertiser*, December 1, 1870.

63. Robert Scott, in Box 6, Folder 5, Robert K. Scott Papers, OHS.


Compendium_Vorenberg
Page 471

The proliferation of armed, all-white clubs in a campaign year had state Republicans clamoring for protection. On September 3, Republican congressman Robert M. Wallace wrote to Attorney General George Williams about attempts to "excite the people" and incite a "war of races" in South Carolina. Wallace claimed that clubs held themselves "ready for any emergency, and such language among a people who are easily excited to rashness has a comprehensive meaning." The congressman predicted that "outrages will be committed which will intimidate men from going to the polls, [but] it will be made to appear . . . that the poor victims were breathing death and destruction to the white race and that politics had no connection with it."[20] The next day Lewis Cass Carpenter, the editor of the *Columbia Daily Union*, corroborated Wallace's story: rifle clubs were drilling "day and night . . . with the thermometer in the nineties," and an outbreak was imminent.[21]

Conservative whites were either better informed than Republicans knew, or they excelled at anticipating Republican moves. The day *before* Wallace's letter arrived, the attorney general received word from the Columbia Board of Trade that "agitators" were stirring up trouble among blacks. The letter mentioned once such troublemaker by name—"R. M. Wallace." The board assured Williams that all was calm in the city and that rifle clubs were "not military organizations in any sense," but were "merely social, for the purpose of training our young men in the use of arms which, by the Constitution of the United States, they are entitled to bear."[22]

With whites mobilizing for war and federal soldiers few and far between, Republican authorities decided they had no choice but to reorganize the defunct state militia. The new militia system was not a revitalized version of the one under Governor Robert K. Scott; in some ways it was far worse. In 1873 the General Assembly began reviewing its programs, and by the spring of 1874, new companies appeared across the state. Again the whole system was noxious to whites, who supported with their taxing former slaves. Exacerbating the problem was the act of February 20, 1874, "Providing for the Granting of Certain Charters," which created a parallel militia by allowing "groups of men" to apply to the clerk of the court in any county for a charter for a military organization.[23]

In the spring of 1874, blacks flocked to both "militias," eager to prove their loyalty, protect their homes, and in the case of the regular militia, pick up a paycheck. Only five days after the act's passage, Adjutant and Inspector General Henry Purvis told Governor Moses of the "alarming" number of companies applying for charters and requesting state arms. The legislature insisted that state arms be furnished even to the unofficial

140

companies. Purvis notified Moses that it was impossible to arm them all, since the militia department had barely enough guns for the regular militia (yet by his annual report in October, Purvis counted 627 Winchesters and over 22,000 cartridges "in the hands of sundry persons," his term for the "independent" militia units).[24] Purvis also questioned the sudden growth of the regular militia, especially the need for a whole new regiment in Beaufort and cavalry units in Edgefield.[25] He reported to the governor that the militia expansion, which increased the size of the force to nearly eighteen regiments by the summer of 1874, would soon bankrupt his department.[26]

As in 1870 and 1871, the struggle for control of the Palmetto State turned bloody as white forces moved against black militia units. An outbreak in August seemed to indicate that the federal government would continue to remain aloof. A white club seized control of Georgetown, set several buildings afire, shot into homes, and even attacked the stagecoach of the U.S. Mail. When the town's intendant applied to the commanding officer at Charleston for assistance, the officer refused, stating it was a matter "for the state authorities."[27] Perhaps emboldened by this, whites on the opposite side of the state confronted their local militia. In Ridge Spring, not far from the Georgia border, a group of black militiamen refused a white company's order to stop drilling, and soon "three of four hundred men armed and equipped" rode into town, "carrying terror wherever they went." Arson and bloodshed followed, but, according to Lewis Cass Carpenter, whites pointed toward a threatened "negro insurrection" to excuse the "deeds of blood committed" by the whites.[28]

Fortunately for some blacks and white Republicans, there were a few military officers in the state who acted without waiting for orders. Such was the case in the end of August, when federal troops intervened in Edgefield to prevent a bloodbath. By late August, 1874, whites had had enough of the drilling of Ned Tennant's militia company, and showed their displeasure by shooting into his house one evening. The "First Ned Tennant Riot" erupted when Tennant sent his emergency signal, the loud beating of his drum. Militiamen rushed to Tennant's house on Glover's Plantation, while fearful locals—white and black—rushed to Edgefield Court House to alert the federal officer there.

Without orders—in fact technically in violation of them—Lieutenant Matthew Leahy set out for the plantation with a small detachment. On the way Leahy met a large armed band of whites who informed him that "everything was settled" with Tennant. Luckily, Leahy insisted on his own inspection, which revealed that nothing was yet settled. Upon arrival the officer discovered between seventy and eighty blacks facing over three hundred whites. Acting quickly, Leahy interposed his detachment between

141

## Notes

1. *Report of the Joint Investigating Committee on Public Frauds and the Election of John J. Patterson to the U.S. Senate.* (Columbia, S.C.: Calvo and Patton, State Printers, 1878) 2:7–8, 13, 25–28; hereafter cited as *Report on Public Frauds.*

2. *Report on Public Frauds* 3:6–7.

3. Edward King, *The Great South* (Hartford, Conn.: American Publishing, 1875; Arno Press, 1969), 457.

4. Paul Hamilton Hayne to "Mrs. Preston," January 13, 1873, in Box 3, Folder 1, Paul Hamilton Hayne Papers, Special Collections Library Research Room, Perkins Library, Duke University, Durham, N.C. (hereafter SCLRR, Duke); emphasis in original.

5. See Stephen Meats and Edwin Arnold, eds., *The Writings of Benjamin F. Perry: Volume I: Essays, Public Letters, and Speeches* (Spartanburg, S.C.: Reprint Company, 1980), 1:419–23.

6. *Charleston News and Courier,* February 21, 1874; clipping in Folder 65, Martin Witherspoon Gary Papers, South Caroliniana Library, University of South Carolina, Columbia, S.C. (hereafter SCL).

7. Martin W. Gary, quoted in William Arthur Sheppard, *Red Shirts Remembered: Southern Brigadiers of the Reconstruction Period* (Atlanta: Ruralist Press, 1940), 15–16.

8. *Charleston News and Courier,* February 21, 1874.

9. *Charleston News and Courier,* February 21, 1874.

10. *Constitutionalist,* April 7, 1874; clipping in Folder 65, Martin Witherspoon Gary Papers, SCL; emphasis in original.

11. Ulysses S. Grant, quoted in *Columbia Daily Union-Herald,* March 31, 1874.

12. Irvine C. Walker, *Carolina Rifle Club, July 30, 1869,* in *Pamphlets: Reconstruction in South Carolina, Democratic and Republican, 1869–1880* (n.d., n.p.), 3, 16, 19, 21, 27.

13. *Edgefield Advertiser,* November 21, 1872; Orville Vernon Burton, "Race and Reconstruction: Edgefield County, South Carolina," *Journal of Social History* 12 (Fall 1978): 40.

14. See Francis Butler Simkins, *The Tillman Movement in South Carolina* (Durham: Duke University Press, 1926), 58.

15. For instance, on March 7, 1873, the *News and Courier* contained news about the activities of the Sumter Rifle Club, the German Rifle Club, the Irish Rifle Club, and the Palmetto Guards. Not at all unique, this was typical of the large number of clubs and the attention constantly paid them.

16. D. E. Huger-Smith, *A Charlestonian's Recollections, 1846–1913* (Charleston, S.C.: Walker, Evans, and Cogswell, 1950), 140.

17. "Constitution and Bye-Laws [sic]," Records of the Sally Rifles Club, SCL.

18. "Minutes and Pictures," August 24, 1874, Records of the Governor's Guards/Richland Rifle Club, SCL. The Governor's Guards had existed in the antebellum period, but died out during Reconstruction. The company was reestablished in 1878, and then the Richland Rifles assumed its title. This collection includes material through 1879, and so bears the dual heading. See also *Constitution and Rules of the Richland Rifle Club, Columbia, S.C.*(Columbia, S.C.: Williams Sloane, 1874), SCL-BD; and "Minute Book," September 18, 1874, Records of the Georgetown Rifle Guards Club, SCL.

19. "Minute Book," August 20 and September 18, 1874, Records of the Georgetown Rifle Guards Club, SCL.

20. Robert M. Wallace to George Williams, September 3, 1874, in Record Group 60, Microcopy 947, Reel 2, National Archives, Washington, D.C. (hereafter RG, MC, Reel, NA).

21. Lewis Cass Carpenter to Williams, September 4, 1874, RG60, MC947, Reel 2, NA.

22. Board of Trade of Columbia, S.C. to Williams, September 2, 1874, RG60, MC947, Reel 2, NA.

23. Henry W. Purvis, the state adjutant and inspector general, warned that having armed bodies "entirely separate and not under the control of the laws that govern the militia" was "injurious to the perfection and good government of military bodies, and also one of the most dangerous elements of good and safe society." His protests fell on deaf ears, however, and the party approached the campaign with a two-tier militia defense. See "Annual Report of the Adjutant and Inspector General," in "Reports for 1870/1874," Military Affairs File, South Carolina Department of Archives and History, Columbia, S.C. (hereafter SCDAH).

24. Henry Purvis to Franklin Moses, February 24, 1874, in Box 6, Folder 35, Governor Moses Papers, SCDAH; "Annual Report of the Adjutant and Inspector General," Military Affairs File, SCDAH.

25. Purvis, entries for May 28, October 17, and December 3, 1874, in Letterbook, Records of the Office of the Adjutant and Inspector General, SCDAH.

26. Purvis to Franklin Moses, March 23, 1874, in Box 7, Folder 4, Governor Moses Papers, SCDAH.

27. *Annual Report of the Secretary of War for 1874,* 43d Cong., 2d sess., H. Doc. 1 (Serial 1635), 47.

28. Lewis Cass Carpenter to Ulysses S. Grant, August 26, 1874, RG60, MC947, Reel 2, NA.

29. Lieutenant Matthew Leahy to the assistant adjutant general, Department of the South, September 1, 1874, RG94, MC666, Reel 170, NA. Leahy's report is reproduced in the *Annual Report of the Secretary of War for 1874,* 49–50. Future governor Benjamin Ryan "Pitchfork Ben" Tillman was a member of the Sweetwater Sabre Club, which participated in the "riot." His account is useful for its social and ethnic commentaries, but contains many factual inaccuracies. For instance, Tillman places the riot in July 1874, but it actually occurred at the end of August and into September. See Benjamin Ryan Tillman, "Autobiography," 3–7, SCL.

30. Matthew Leahy to the assistant adjutant general, Department of the South, September 16, 1874, RG94, MC666, Reel 170, NA.

31. Josephus Woodruff, diary entries for August 2 and 17, and September 10, 1874, Josephus Woodruff Diary, SCLRR, Duke.

32. Thomas Holt, *Black over White: Negro Political Leadership in South Carolina during Reconstruction* (Urbana: University of Illinois Press, 1977), 177–78; Francis W. Dawson to "Wife," August 2 and 29, September 3, 8, and 13, 1874, Francis Warrington Dawson Papers, SCLRR, Duke.

33. William M. Heath to George Williams, October 24, 1874, RG60, MC947, Reel 2, NA.

34. Francis W. Dawson, quoted in Joel Williamson, *After Slavery: The Negro in South Carolina during Reconstruction, 1861–1877* (Chapel Hill: University of North Carolina Press, 1965), 400.

35. Eric Foner, *Reconstruction, 1863–1877: America's Unfinished Revolution* (New York: Harper and Row, 1988), 543; Francis Butler Simkins and Robert Hilliard Woody, *South Carolina during Reconstruction* (Chapel Hill: University of North Carolina Press, 1932), 471. For a complete list of the nominations, including those for national and local offices, see John S. Reynolds, *Reconstruction in South Carolina, 1865–1877* (Columbia, S.C.: State Company, 1905), 276–85.

36. Foner, *Reconstruction: America's Unfinished Revolution*, 543; Simkins and Woody, *South Carolina during Reconstruction*, 471–73.

37. *Charleston News and Courier*, September 17, October 9 and 10, 1874; Simkins and Woody, *South Carolina during Reconstruction*, 471–73.

38. Reynolds, *Reconstruction in South Carolina*, 270.

39. George Williams to William W. Belknap, September 30, 1874, RG94, MC666, Reel 170, NA.

40. B. L. Brisbane to Williams, September 22, 1874, RG60, MC947, Reel 2, NA.

41. Robert M. Wallace to Williams, September 18, 1874, RG60, MC947, Reel 2, NA.

42. J. G. Winnsmith to Ulysses S. Grant, October 5, 1874, RG60, MC947, Reel 2, NA.

43. William M. Heath to George Williams, October 24, 1874, RG60, MC947, Reel 2, NA.

44. Originally in the *Edgefield Advertiser*, reprinted in the *Columbia Daily Union-Herald*, October 29, 1874; clipping in Martin Witherspoon Gary Papers, Folder 65, SCL.

45. Tillman, "Autobiography," 7, SCL; Burton, "Race and Reconstruction," *Journal of Social History* 12 (Fall 1978): 42.

46. Robert Wallace Shand, Robert Wallace Shand Journal, 148, SCL.

47. Lieutenant John Anderson to the assistant adjutant general, Department of the South, November 4, 1874, RG94, MC666, Reel 172, NA. County officers wrote to Anderson's superiors in support of his action and warned against removing any troops from the area, for "serious disturbances would follow." See "County Officers of Laurens County" to [unknown, but eventually endorsed by the adjutant general of the Department of the South and Major General Irwin McDowell], November 5, 1874, RG94, MC666, Reel 171, NA.

48. *Message of the President Transmitting Statements on the Use of the Army in Certain of the Southern States*, 44th Cong., 2d sess., H. Doc. 30 (Serial 1755), 71.

49. Captain R. Morris to the assistant adjutant general, Department of the South, November 22, 23, and 25, 1874, RG94, MC666, Reel 172, NA.

50. Tillman, "Autobiography," 7, SCL.

51. Simkins and Woody, *South Carolina during Reconstruction*, 473; Alrutheus Ambush Taylor, *The Negro in South Carolina during the Reconstruction* (Washington, D.C.: n.p., 1924; New York: AMS Press, 1971), 211–12.

52. William Gillette, *Retreat from Reconstruction, 1869–1879* (Baton Rouge: Louisiana State University Press, 1979), 189, 247.

53. Foner, *Reconstruction: America's Unfinished Revolution*, 524, 528.

54. Gillette, *Retreat from Reconstruction*, 246, 250, 252–54.

55. George C. Rable, *But There Was No Peace: The Role of Violence in the Politics of Reconstruction* (Athens: University of Georgia Press, 1984), 121.

56. Belton O'Neal Townsend ("A South Carolinian"), "The Political Condition of South Carolina," *Atlantic Monthly* 39 (1877): 182.

57. Tillman, "Autobiography," 8–10, SCL; Burton, "Race and Reconstruction," *Journal of Social History* 12 (Fall 1978): 42.

58. Reynolds, *Reconstruction in South Carolina*, 301–2. No evidence exists that the rifle clubs disbanded; fourteen months later, Orville Vernon Burton estimated, no less than thirty such clubs existed in Edgefield County alone. See Reynolds, "Race and Reconstruction," *Journal of Social History* 12 (Fall 1978): 42. See also Walter Allen, *Governor Chamberlain's Administration in South Carolina: A Chapter of Reconstruction in the Southern States* (New York: G. P. Putnam's Sons, 1888), 68–69. Allen's work, while suffering from some of the flaws typical of its period, is nonetheless a gold mine for primary evidence on Chamberlain's administration; scores of letters, messages, declarations, and military orders are reprinted there.

59. Daniel H. Chamberlain to George Williams, January 27, 1875, RG60, MC947, Reel 2, NA; William Belknap to Major General McDowell, February 3, 1875, RG94, MC666, Reel 173, NA; Williams to Chamberlain, February 2, 1875, RG60, MC699, Reel 15, NA.

60. General Assembly of South Carolina to Ulysses S. Grant, February 20, 1875, RG60, MC947, Reel 2, NA.

61. Foner, *Reconstruction: America's Unfinished Revolution*, 554–55.

62. For an interesting discussion of "laissez-faire" and its impact on Reconstruction, see Michael Les Benedict, "Reform Republicans and the Retreat from Reconstruction," in *The Facts of Reconstruction: Essays in Honor of John Hope Franklin*, ed. Eric Anderson and Alfred A. Moss (Baton Rouge: Louisiana State University Press, 1991), 53–77.

63. *Spartanburg Herald*, September 29, 1875.

64. *Spartanburg Herald*, September 1, 1875.

65. *Spartanburg Herald*, September 15, 1875; Foner, *Reconstruction: America's Unfinished Revolution*, 558–63.

66. *Spartanburg Herald*, September 22, 1875.

67. Foner, *Reconstruction: America's Unfinished Revolution*, 558–62; William S. McFeely, *Grant: A Biography* (New York: W. W. Norton, 1981), 421–22.

68. *Spartanburg Herald*, December 11, 1875.

Compendium_Vorenberg
Page 474

Richardson Miles, created a "very efficient force available in a moment."[62] The rifle clubs even adopted a uniform, another symbol of the organization and uniformity of purpose: the infamous "red shirt" of dyed red flannel, which became synonymous with Carolina rifle clubs in general.[63]

As the Democratic army grew, Republicans became more desperate. District Attorney David Corbin informed Attorney General Alphonso B. Taft that the Ku Klux Klan "was not, consequently broken up in these counties, or so punished as to destroy it." Corbin claimed "these Ku-Klux Klans have reorganized under the names of *rifle clubs* and have entered upon and intend to pursue the purposes and general plans of 1871 and 1872 of the old organizations."[64] U.S. Marshal R. B. Wallace wrote to Taft a week later, telling him that "combinations are rapidly forming . . . [which will] prevent the republicans of this and other counties from casting their full strength in the presidential election. . . ." According to Wallace, white leaders "openly declare that they intend to carry the coming election, and ostracize and threaten all leading men of the republican party." "I warn you," Wallace told his superior, "that there is certain danger ahead, and a liberal supply of U.S. Troops can alone prevent mobocracy and bloodshed."[65]

Considering the lack of federal response in other Southern states, most Republican officials realized that federal help was unlikely. As always, options were few. A well-organized, well-trained militia force did not exist; the black militia was poorly trained and even more poorly led. Nor did Governor Chamberlain try to create any auxiliary forces for the election. James P. Low, the state's chief constable of Charleston, suggested creating a "Special Force" that would "insure the preservation of the peace during the excitement likely to prevail here during the next three months." But the city's mayor, George Cunningham, opposed the idea on financial grounds, proposing instead that federal troops be called in should trouble occur; despite the unlikelihood of federal assistance, Chamberlain concurred.[66]

Instead, the administration opted for ill-conceived measures that bespoke its impotence. Lacking adequate time to prepare a security force, Chamberlain distributed state guns and ammunition in a haphazard manner to any Republican who asked. Some arms went to state officials, such as Henry E. Hendricks, Charleston's chief of police.[67] Many more, however, went to citizens' groups and Republican political clubs.[68] The *Charleston News and Courier* charged that at least 10,000 guns were in the hands of private individuals, many of whom belonged to "companies not organized as required by law."[69]

Although Democrats complained about the number of guns in Republican (and mostly black) hands, they neglected to comment on the

surprising number of guns that seemed to disappear from the books. Republicans would badger the governor or the adjutant general for arms, only to have them intercepted en route. In one case, whites at a Newberry railroad depot opened a box marked "Agricultural Implements" and found a stack of Remington rifles (which they of course confiscated).[70] Guns earmarked for the Aiken County militia somehow found their way into white hands and were taken to Augusta for storage![71] In nearby Edgefield, Sheriff James Richardson awoke one morning to find that a band of men had locked his deputy in a cell and taken some two or three hundred militia guns from storage (this was an altogether too frequent occurrence in that county).[72]

While the rifle clubs were well armed—sometimes with Republicans' guns—some Democratic leaders were hesitant to risk the "Gary approach," choosing instead to walk a fine line between latent aggression and actual violence. With the explosion in the number of gun clubs and the Hamburg massacre, the *Charleston News and Courier* reprinted articles from outside South Carolina warning that violence could prove counterproductive. The *Richmond Dispatch* declared that such incidents "bode no good to the Democratic party." The *New York Herald* went further, stating that "these southern white madmen resolved to elect Hayes and Wheeler . . . [since] one or two Hamburg riots will settle the business." The *News and Courier* added that "the Hamburg regulators are murderers in a double sense: They stabbed the State in the back, while killing their suppliant prisoners."[73]

With the conservative army growing and tensions running high, Wade Hampton and others tried to prevent bloodshed—and the reaction it might bring. Early in the campaign Johnson Hagood circulated a rumor that Hampton would quit if rifle clubs initiated violence. Alexander Haskell, chair of the state Democratic central committee, met often with county representatives, imploring them to avoid violence; such strength was for appearances only. The executive committee of Barnwell followed suit, declaring that "rioting before or at the polls, or race collisions brought about by the whites are deemed almost insane folly."[74] Even C. Irvine Walker of the Carolina Rifle Club agreed with the decision. Although "in a square fight the Whites could easily have cleaned them out," Walker believed it "an eminently wise policy" for the gun clubs "to avoid, if possible, any race trouble. . . ."[75] The *Charleston Journal of Commerce* concurred, warning Democrats to "avoid being led into any collisions. . . ."[76]

Hampton's policy of "bloodless coercion" relied on "presence" and the flexing of white muscle to intimidate Republicans. As with more violent methods, the gun clubs were at the center of Hampton's approach. One popular "bloodless" tactic was the "division of time." Democratic

Garibaldi's Red Shirts in the Italian conflict a few years earlier. The originator is even more of a mystery, but while Alfred Williams claims it first appeared in Newberry, the best evidence points toward Aiken and posits its genesis in the Sweetwater Sabre Club, after the Hamburg riot. See Williams, "Eyewitness to 1876," November 14, 1926, SCL; clipping of article entitled "Red Shirt Revolution" (no source, but dated 1911), located in Scrapbook, in Conway, Black, and Davis Family Papers, SCL.

64. David Corbin to Alphonso B. Taft, August 21, 1876, RG60, MC947, Reel 2, NA; emphasis in original. Reprinted in *Message from the President Transmitting Statements*, 44th Cong., 2d sess., H. Doc. 30 (Serial 1755), 96–97.

65. R. B. Wallace to Taft, August 25, 1876, RG60, MC947, Reel 2, NA.

66. James P. Low to Daniel Chamberlain, September 7, 1876, in Box 14, Folder 25, and September 12, 1876, in Box 14, Folder 30, Governor Chamberlain Papers, SCDAH.

67. H. E. Hendricks to Chamberlain, September 12, 1876, in Box 14, Folder 30, Governor Chamberlain Papers, SCDAH.

68. For examples of the haphazard distribution of guns, see D. R. Edwards to Chamberlain, October 12, 1876, in Box 15, Folder 9, and James G. Varn to Chamberlain, September 20, 1876, in Box 14, Folder 35, Governor Chamberlain Papers, SCDAH.

69. *Charleston News and Courier*, October 11, 1876.

70. *Charleston Journal of Commerce*, August 16, 1876, SCL; Williams, "Eyewitness to 1876," September 5, 1926, SCL.

71. Frank Arum, trial justice, Aiken County, to Daniel Chamberlain, September 8, 1876, in Box 14, Folder 27, Governor Chamberlain Papers, SCDAH.

72. James Richardson to Chamberlain, October 11, 1876, in Box 15, Folder 9, and Richardson to Chamberlain, September 14, 1876, in Box 15, Folder 10, Governor Chamberlain Papers, SCDAH; *Spartanburg Herald*, October 18, 1876.

73. *Richmond Dispatch*, n.d., and *New York Herald*, n.d.; quoted in the *Charleston News and Courier*, July 13, 1876.

74. "South Carolina in 1876," 537, 985.

75. Walker, *Carolina Rifle Club*, in *Pamphlets: Reconstruction in South Carolina*, 69.

76. *Charleston Journal of Commerce*, August 31, 1876, SCL.

77. Robert Wallace Shand Journal, 149–50, SCL.

78. Richardson Miles to William Porcher Miles, August 26, 1876, in Box 5, Folder 63, William Porcher Miles Papers, SHC/UNC.

79. Williams, "Eyewitness to 1876," August 29, 1926, SCL.

80. Daniel Chamberlain, quoted in "South Carolina in 1876," 24.

81. For details on the meetings, see the *Edgefield Advertiser*, August 17, 1876; *Charleston News and Courier*, August 14 and 15, 1876; Sheppard, *Red Shirts Remembered*, 94–108; Williams, "Eyewitness to 1876," August 29 and September 12, 1926, SCL.

82. Williams, "Eyewitness to 1876," October 3, 1926, SCL.

83. Thomas Pinckney Lowndes, "Reminiscences," 118–19, in Box 2, Folder 21, William Lowndes Papers, SHC/UNC.

84. A. S. Wallace to Secretary of War J. D. Cameron, October 12, 1876, RG94, MC666, Reel 298, NA. For other complaints about gun clubs and the need for federal assistance, see James Strain to Daniel Chamberlain, September 7, 1876, in Box 14, Folder 25, SCDAH, and R. A. Cummings to Chamberlain, October 20, 1876, in Box 15, Folder 12, Governor Chamberlain Papers, SCDAH.

85. Lizzie Geiger to William Leaphart, August 15, 1876, Folder 2, Lizzie Geiger Papers, SCL; *Spartanburg Herald*, August 23, 1876.

86. *Charleston News and Courier*, October 17, 1876.

87. Williams, "Eyewitness to 1876," January 2, 1927, SCL.

88. *Charleston News and Courier*, September 18, October 2 and 3, 1876.

89. *Charleston News and Courier*, October 20, 1876; Williams, "Eyewitness to 1876," January 16, 1927, SCL.

90. "Eyewitness to 1876," January 2, 1927.

91. "Eyewitness to 1876," February 6, 1927.

92. James Conner to "Wife," October 10, 1876, in Box 6, Hampton Family Papers, SCL.

93. Conner to "Wife," October 10, 1876.

94. Conner to "Wife," October 31, 1876.

95. "Colored Citizens of Laurens" to Daniel Chamberlain, August 22, 1876, in Box 14, Folder 8, Governor Chamberlain Papers, SCDAH; emphasis in original.

96. John Gardner to Chamberlain, August 25, 1876, in Box 14, Folder 10, and George Wadell to Chamberlain, September 4, 1876, in Box 14, Folder 2, Governor Chamberlain Papers, SCDAH; Joseph Clark to Congressman A. S. Wallace, September 6, 1876, RG60, MC947, Reel 2, NA.

97. Williams, "Eyewitness to 1876," October 10, 1926, SCL; *Charleston News and Courier*, September 7, 1876; *Spartanburg Herald*, September 13, 1876.

98. Theodore Barker, quoted in *Charleston Journal of Commerce*, September 8, 1876; emphasis in original.

99. Walker, *Carolina Rifle Club*, in *Pamphlets: Reconstruction in South Carolina*, 60–61, 64, 67.

100. H. N. Bonney to Daniel Chamberlain, September 7, 1876, in Box 14, Folder 25, Governor Chamberlain Papers, SCDAH.

101. "Republicans of Midway [Barnwell County]" to Daniel Chamberlain, September 20, 1876, in Box 14, Folder 35, Governor Chamberlain Papers, SCDAH.

102. "Colored Citizens of Blacksville" to Chamberlain, September 28, 1876, Box 14, Folder 40, Governor Chamberlain Papers, SCDAH.

103. Arney Robinson Childs, ed., *The Private Journal of Henry William Ravenel, 1859–1887* (Columbia: University of South Carolina Press, 1947), 381.

104. *Annual Report of the Secretary of War for 1876*, 44th Cong., 2d sess., H. Doc. 1, pt. 2 (Serial 1742), 81–82; General William T. Sherman to General Winfield S. Hancock, August 17, 1876, RG94, MC666, Reel 298, NA.

105. Wade Hampton, quoted in Harry Wilcox Pfanz, "Soldiering in the South during the Reconstruction Period, 1865–1877" (Ph.D. diss., Ohio State University, 1958), 553.

106. *Army and Navy Journal*, November 4, 1876, 200.

# LAW REVIEWS AND JOURNALS

THE UNIVERSITY OF CHICAGO

MANHOOD, CITIZENSHIP, AND THE FORMATION
OF THE NATIONAL GUARDS, ILLINOIS, 1870–1917

A DISSERTATION SUBMITTED TO
THE FACULTY OF THE DIVISION OF THE SOCIAL SCIENCES
IN CANDIDACY FOR THE DEGREE OF
DOCTOR OF PHILOSOPHY

DEPARTMENT OF HISTORY

BY
ELEANOR L. HANNAH

CHICAGO, ILLINOIS
AUGUST 1997

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

UMI Number: 9800600

UMI Microform 9800600
Copyright 1997, by UMI Company. All rights reserved.

This microform edition is protected against unauthorized
copying under Title 17, United States Code.

**UMI**
300 North Zeeb Road
Ann Arbor, MI 48103

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Case 3:17-cv-01017-BEN-JLB Document 123-8 Filed 11/10/22 PageID.11482 Page 34 of
107

15

were mustered into the Union and Confederate armies via their state militia systems were
mustered out of the federal service and out of the services of their respective states
simultaneously. At the end of the process of mustering out and demobilizing state
regiments, most states were left without any officially recognized active state troops. The
history of state military forces might well have ended there in 1865–66, with state
regiments empty and no new military threat in sight to re-energize citizen interest in state
militias except in the defeated southern states. In the south, militias were initially allowed,
and were promptly filled by Confederate army veterans, right down to the worn uniforms.
Radical Reconstruction eliminated those and allowed for the formation of colored militias.
This provoked further racial violence as private "rifle companies" sprang up across the
south to combat the perceived threat of armed Black Americans. Eventually the defeated
southern states were denied the authority to establish militias at all until their constitutions
received Congressional approval. Once that happened the militias once again became a
place to revive memories of the lost cause.[15] Outside the south most state governments
were uninterested in funding any military structure at all, whether universal militia or
volunteer.[16]

And yet, in the early 1870s, volunteer militias reemerged across the northern states.
Some outfits retained the name of a volunteer company established before the war, though
this was common mostly among the long established units of the older seaboard cities. For
the most part, the volunteer companies of the 1870s and 1880s were new institutions
without pre-war histories. While at first the new companies modeled themselves after
antebellum volunteer militias, they quickly discarded those models in favor of new

---

[15]Hill, 99–121; Mahon, 108–111.

[16]The two notable exceptions were New York and Connecticut, both of which had begun to
rationalize their large state militia systems before the Civil War and continued development, albeit slowly,
even during this period of slacking interest and enthusiasm. See Mahon.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

Compendium_Vorenberg
Page 480

16

organizational forms at both the state and the national level. By the early 1880s the state
militias, or as they were increasingly called, the National Guards, had over 80,000
members across the country and well organized lobbies seeking increases in both their state
and federal funds. In 1898 the National Guards were the organizational framework for the
volunteer troops raised to fight the Spanish American war and by 1914 constituted a
federally supported reserve military force prepared to face overseas engagements. In 1917
the National Guards were mobilized to form the nucleus of the American Expeditionary
Force sent to Europe to aid the allies in concluding the first World War.

The volunteer militia had wide appeal among native-born men. The volunteer
militia was both familiar and flexible, and as an institution it appealed to men of
dramatically different backgrounds living widely disparate lives from the 1870s through the
turn of the century. For example, in 1874 the Adjutant General of Illinois noted that "at
the present time there is being organized in Chicago a regiment composed of the elite of the
city, which, from indications, will become a permanent organization."[17] Within the year
the officers of the 1st Regiment Illinois State Militia were sworn into state service and the
elite regiment began its illustrious, and exclusive, career. Several existing Chicago-based
companies immediately applied for membership in this new regiment but, "it was not
thought expedient to receive any old commissioned company."[18] Ten months later the
members of the 1st changed their policy to admit the "Ellsworth Zouaves" to the regiment.
This company was already composed of wealthy men, which may have made them more

[17] *Biennial Report of the Adjutant General of Illinois, Transmitted to the Governor and
Commander-in-Chief. For 1873 and 1874* (Springfield, IL: 1874), 32.

[18] Holdridge O. Collins, *History of the Illinois National Guard, From the Organization of the First
Regiment in September, 1874, to the Enactment of the Military Code in May, 1879* (Chicago: Black &
Beach, 1884), 1–9.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

**The Second Amendment in the nineteenth century**
Kopel, David B
*Brigham Young University Law Review;* 1998; 1998, 4; ProQuest One Business
pg. 1359

G:\COWP51\LAWREV\1998-4\FINAL\KOP-FIN.WPD          Dec. 1, 1998

# The Second Amendment in the Nineteenth Century

## David B. Kopel[*]

I. INTRODUCTION .................................. 1362

II. THE EARLY GIANTS: TUCKER, RAWLE, AND STORY ...... 1370
   A. St. George Tucker: The American Blackstone ...... 1370
      1. Tucker's background ...................... 1370
      2. The central role of Tucker's American Blackstone 1371
      3. Tucker on the right to arms in Blackstone ..... 1373
      4. Tucker's appendix on the American Constitution 1375
      5. Tucker's exposition of the Second Amendment .. 1377
   B. Houston v. Moore ........................... 1379
   C. William Rawle ............................. 1384
   D. Joseph Story ............................... 1388
      1. The Second Amendment in Story's Commentaries 1389
      2. The Second Amendment in Story's Familiar
        Exposition ............................... 1393
      3. The federal militia powers in Story's
        Commentaries ........................... 1396
   E. Other Pre-1850 Sources ...................... 1397
      1. Henry St. George Tucker .................. 1397
      2. Benjamin Oliver ......................... 1399
      3. James Bayard ........................... 1400
      4. Francis Lieber .......................... 1402
      5. Elliot's Debates ......................... 1404
      6. Webster's Dictionary ..................... 1404

   * Adjunct Professor of Law, New York University Law School, 1998; Research
Director, Independence Institute, Golden, Colorado. J.D., 1985, University of Michigan;
B.A. in History 1982, Brown University. I would like to thank Jim Winchester, J.D., for
outstanding research assistance. Valuable aid was also provided by Paul Blackman,
David Caplan, Clayton Cramer, Brannon Denning, Robert Dowlut, Mark Fuller, Richard
Griffiths, Stephen Halbrook, Scott Hattrup, Charles B. Kates, Don Kates, Jerry &
Dolores Kopel, Nelson Lund, Joseph Olson, Daniel Polsby, Glenn Harlan Reynolds, Doug
Spittler, William Van Alstyne, Eugene Volokh, and the Cincinnati Law Library
Association.

1359

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

1360   BRIGHAM YOUNG UNIVERSITY LAW REVIEW  [1998

III. STATE CONSTITUTIONS AND CASE LAW . . . . . . . . . . . . . .   1409
    A. State Constitutions . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1409
    B. State Case Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1415
        1. Tennessee . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1416
        2. Arkansas  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1422
        3. Georgia  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1425
        4. Louisiana . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1427
        5. North Carolina  . . . . . . . . . . . . . . . . . . . . . . . . . .   1428
        6. Texas  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1429
        7. Illinois  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1431
        8. West Virginia . . . . . . . . . . . . . . . . . . . . . . . . . . .   1432
        9. State case law summary . . . . . . . . . . . . . . . . . . .   1432

IV. ANTEBELLUM YEARS AND THE CIVIL WAR . . . . . . . . . . . .   1433
    A. Dred Scott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1433
    B. The Human Rights Advocates . . . . . . . . . . . . . . . . . .   1435
        1. Lysander Spooner . . . . . . . . . . . . . . . . . . . . . . . .   1436
        2. Joel Tiffany . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1440
    C. Bloody Kansas  . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1441
    D. The Civil War . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1444

V. RECONSTRUCTION AND LABOR UNREST  . . . . . . . . . . . . . .   1447
    A. Congress, Civil Rights, and the Fourteenth
      Amendment  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1447
        1. The Freedmen's Bureau  . . . . . . . . . . . . . . . . . . .   1447
        2. Southern representation in Congress . . . . . . . . . .   1449
        3. Civil Rights Bill  . . . . . . . . . . . . . . . . . . . . . . . .   1450
        4. Anti-KKK Act . . . . . . . . . . . . . . . . . . . . . . . . . .   1451
        5. Fourteenth Amendment  . . . . . . . . . . . . . . . . . . .   1451
        6. Civil Rights Act of 1875  . . . . . . . . . . . . . . . . . .   1453
        7. Summary of Congressional policy . . . . . . . . . . . .   1453
    B. Cruishank . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1454
    C. Presser  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1459

VI. COMMENTARY FROM THE LATE 19TH CENTURY: COOLEY
    AND OTHERS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1461
    A. Thomas Cooley . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1461
        1. A Treatise on Constitutional Limitations . . . . . .   1462
        2. The General Principles of Constitutional Law . .   1464
    B. The Lesser Commentators . . . . . . . . . . . . . . . . . . . . .   1468
        1. Joel Tiffany . . . . . . . . . . . . . . . . . . . . . . . . . . . .   1469

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

1359]  SECOND AMENDMENT IN THE 19TH CENTURY 1361

    2. Timothy Farrar ........................... 1470
    3. George W. Paschal ........................ 1472
    4. Joel Bishop .............................. 1474
    5. John Norton Pomeroy ..................... 1476
    6. Oliver Wendell Holmes, Jr., and James Kent ... 1479
    7. Editions of Blackstone ..................... 1482
    8. Theophilus Parsons ....................... 1483
    9. A foreigner's vantage: von Holst ............. 1484
    10. John Hare ............................. 1485
    11. George Ticknor Curtis ................... 1486
    12. John C. Ordronaux ...................... 1488
    13. Samuel Freeman Miller and J.C. Bancroft Davis 1490
    14. Henry Campbell Black ................... 1493
    15. George S. Boutwell ...................... 1494
    16. James Schouler ......................... 1496
    17. Home schooling ......................... 1498
    18. Civics manuals for youth ................. 1498
    19. John Randolph Tucker ................... 1501
  C. Law Review Articles ......................... 1503
  D. Summary of the Late Nineteenth Century
    Commentators ............................. 1505

VII. FIN-DE-SIÈCLE AND BEYOND .................... 1506
  A. The Supreme Court ........................ 1506
    1. Miller v. Texas ......................... 150o
    2. Robertson v. Baldwin .................... 1509
  B. The Collective Right Establishes a Footing:
    Salina v. Blaksley ......................... 1510
  C. Late Twentieth Century Commentators ......... 1512
    1. Some thoughts about David Williams ........ 1512
    2. Some thoughts about Carl Bogus ........... 1515
  D. Firearms Policy for the Twenty-first Century ...... 1530
    1. Who is protected by the Second Amendment? ... 1530
    2. Does the Second Amendment limit the states? .. 1530
    3. What kind of "arms"? ..................... 1531
    4. Can the carrying of weapons be controlled? .... 1535
    5. Repealing or ignoring the Second Amendment .. 1536
    6. The First Amendment ..................... 1538
    7. The illegality of most federal gun laws ........ 1541

VIII. CONCLUSION ................................ 1544

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

1418   BRIGHAM YOUNG UNIVERSITY LAW REVIEW [1998

After the Civil War, the Tennessee Supreme Court decided another case, *Andrews v. State*, which elaborated on the principles of *Aymette*, and which, like *Aymette*, was widely cited in other states.[210] The Tennessee legislature had banned the carrying of certain weapons—concealed or openly—and several defendants charged with violation of the law argued that the law violated the Second Amendment and the Tennessee Constitution. The summary of the briefs at the beginning of the case shows that, regarding the Second Amendment, the Attorney General simply replied that the Second Amendment was not enforceable against the states.[211] In oral argument, apparently, the Attorney General went further, arguing that the Second Amendment and the Tennessee state constitutional right to arms were meant to protect a "political right."[212]

Citing *Barron v. Baltimore*,[213] the *Andrews* court held that the Second Amendment was inapplicable to the states.[214] But the Court construed the Tennessee provision and the Second Amendment together, finding "that, necessarily, the same rights, and for similar reasons, were being provided for and protected in both the Federal and State Constitutions . . . ."[215] The court's construction of the state and federal right to arms is worth quoting at length, because it is a perfect example of the dominant line of nineteenth-century case law on the right to arms, expressing several principles:

> 1. The purpose of the right is to secure a militia, which is a foundation of a free society.

---

Tennessee right, the Second Amendment language was broad enough to include other purposes, such as self-defense. *See* 1 BLACKSTONE, *supra* note 14, app. at 300. The *Aymette* court's theory that concealed carry was not within the scope of the arms right was predicated on reasoning that a militia-man would never carry concealed. But while concealed carry might be of no use to someone engaged in the "common defence," concealed carry could be quite useful for personal defense. Thus *Aymette*, and the cases from other states which cite to *Aymette*, may be on shaky ground to the extent that the other state cases involve constitutional provisions worded more broadly than Tennessee's.

210. *See* Andrews v. State, 50 Tenn. (3 Heisk.) 165 (1871).
211. *See id.* at 168.
212. *Id.* at 170.
213. Barron v. Baltimore, 32 U.S. (7 Pet.) 243 (1833).
214. *See Andrews*, 50 Tenn. at 173-75.
215. *Id.* at 177.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

1359] SECOND AMENDMENT IN THE 19TH CENTURY 1419

> 2. To make possible a militia, all persons have the right to purchase, use, practice with, and carry weapons for all non-nefarious purposes.
>
> 3. The right only includes the type of arms used by a militia (e.g., rifles and swords) and does not include non-militia type weapons allegedly favored by criminals (e.g., concealable knives).

As the court wrote:

> It was the efficiency of the people as soldiers, when called into actual service for the security of the State, as one end; and in order to this [sic], they were to be allowed to *keep* arms. What, then, is involved in this right of keeping arms? It necessarily involves the right to purchase and use them in such a way as is usual, or to keep them for the ordinary purposes to which they are adapted; and as they are to be kept, evidently with a view that the citizens making up the yeomanry of the land, the body of the militia, shall become familiar with their use in times of peace, that they may the more efficiently use them in times of war; then the right to keep arms for this purpose involves the right to practice their use, in order to attain to this efficiency. The right and use are guaranteed to the citizen, to be exercised and enjoyed in time of peace, in subordination to the general ends of civil society; but, as a right, to be maintained in all its fullness.
>
> The right to keep arms, necessarily involves the right to purchase them, to keep them in a state of efficiency for use, and to purchase and provide ammunition suitable for such arms, and to keep them in repair. And clearly for this purpose [sic], a man would have the right to carry them to and from his home, and no one could claim that the Legislature had the right to punish him for it, without violating this clause of the Constitution.
>
> But farther than this, it must be held, that the right to keep arms, involves, necessarily, the right to use such arms for all the ordinary purposes, and in all the ordinary modes usual in the country, and to which arms are adapted, limited by the duties of a good citizen in times of peace . . . .
>
> . . . .
>
> What, then, is he protected in the right to keep and thus use? Not every thing that may be useful for offense or defense; but what may properly be included or understood under the title of arms, taken in connection with the fact that the citizen is to keep them, as a citizen. . . . [W]e would hold, that the rifle

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

## 1420  BRIGHAM YOUNG UNIVERSITY LAW REVIEW  [1998

of all descriptions, the shot gun, the musket, and repeater, are such arms . . . .[216]

The Attorney General, however, had argued "that the right to keep and bear arms is a political, not a civil right."[217] Under existing Tennessee doctrine, rights classified as "political" (such as voting) were subject to limitless legislative restriction, while rights classified as "civil" were not.[218] The Tennessee court responded that the Attorney General

fails to distinguish between the nature of the right to keep, and its necessary incidents, and the right to bear arms for the common defense. Bearing arms for the common defense may well be held to be a political right, or for protection and maintenance of such rights, intended to be guaranteed; but the right to *keep* them, with all that is implied fairly as an incident to this right, is a private individual right, guaranteed to the citizen, not the soldier.[219]

---

216.  *Id.* at 178-79. A "repeater" is "any firearm capable of firing more than one shot without having to be reloaded manually." R.A. STEINDLER, STEINDLER'S NEW FIREARMS DICTIONARY 213 (1985); *see also* 2 THE NEW SHORTER OXFORD ENGLISH DICTIONARY 2548 (3d ed. 1993) (defining "repeater" as "[a] firearm which fires several shots without reloading," and explaining that this usage first appeared in the middle nineteenth century).

217.  *Andrews*, 50 Tenn. at 182.

218.  State v. Staten, 46 Tenn. (6 Cold.) 233, 277, 279 (1869) (Shackleford, J., concurring). The state court explained:

The right of suffrage being a political, and not a natural or inherent right, the sovereign power has the right to restrict or enlarge the privilege. . . .

. . . The one [the right to follow a profession] is an inherent and natural right, and [the right to vote], a political right or privilege, a trust delegated. The first falls directly within the prohibitions of the Constitution of the United States; the other is a trust, subject to be revoked by the sovereign will.

*Id.* at 277-79. *Ridley v. Sherbrook*, 43 Tenn. (3 Cold.) 569, 576-77 (1866), is also instructive of this distinction:

The elective franchise is not an inalienable right or privilege, but a political right, conferred, limited, or withheld, at the pleasure of the people, acting in their sovereign capacity.

. . . .

These [rights to follow a profession or calling] are civil rights, and inalienable, and of which he cannot be deprived by the people of the State. But a political right stands upon a very different principle; it is a political privilege or grant, that may be extended or recalled, at the will of the sovereign power.

*Id.*

219.  *Andrews*, 50 Tenn. at 182.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

1359] SECOND AMENDMENT IN THE 19TH CENTURY 1421

The court then quoted at length from Justice Story's treatise on constitutional law:[220]

> We cite this passage as throwing light upon what was intended to be guaranteed to the people of the States, against the power of the Federal Legislature, and at the same time, as showing clearly what is the meaning of our own Constitution . . . . So that, the meaning of the one, will give us an understanding of the purpose of the other.
> The passage from Story, shows clearly that this right was intended, as we have maintained in this opinion, and was guaranteed to, and to be exercised and enjoyed by the citizen as such, and not by him as a soldier, or in defense solely of his political rights.[221]

The court quoted additional material from Justice Story and shared his worries about the neglect of the militia. The court also quoted the earlier Tennessee case, *Aymette* v. *State*,[222] and its invention of the "civilized warfare" test for determining the types of arms constitutionally protected.[223]

The Tennessee statute had forbidden the concealed carrying of, among other small weapons, any "pocket pistol."[224] The Tennessee Supreme Court ruled that whether the defendant's revolver was a weapon—the "skill in the use of which will add to the efficiency of the soldier"—was a matter for decision at trial, based on the evidence.[225] The instant statute was clearly unconstitutional, however, because it forbade all carrying, rather than just concealed carry.[226]

A concurring and dissenting opinion argued for a broader rule than the majority, not limiting the type of arms to "civilized warfare" weapons and allowing only the "regulation" of concealed carry, but not its prohibition.[227]

---

220. *See id.* at 183; *see also supra* notes 112, 114 and accompanying text.

221. *Id.* at 183-84.

222. 21 Tenn. (2 Hum.) 154 (1840).

223. *See Andrews*, 50 Tenn. at 184-85 (quoting Amyette v. State, 21 Tenn. (2 Hum.) 154 (1840)).

224. *Id.* at 186.

225. *Id.* at 187. This formulation closely prefigured the U.S. Supreme Court's handling of a challenge to a federal law prohibiting unregistered possession of short shotguns; the Court sent the case back to trial court to determine if short shotguns were militia-type weapons. *See* United States v. Miller, 307 U.S. 174, 178-83 (1939).

226. *See Andrews*, 50 Tenn. at 187-88.

227. *See id.* at 193-95.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.



Localism and the Creation of a State Police in Arkansas

Author(s): Michael G. Lindsey

Source: *The Arkansas Historical Quarterly*, Winter, 2005, Vol. 64, No. 4 (Winter, 2005), pp. 353–380

Published by: Arkansas Historical Association

Stable URL: https://www.jstor.org/stable/40023349

REFERENCES
Linked references are available on JSTOR for this article:
https://www.jstor.org/stable/40023349?seq=1&cid=pdf-reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms



*Arkansas Historical Association* is collaborating with JSTOR to digitize, preserve and extend access to *The Arkansas Historical Quarterly*

# Localism and the Creation of a State Police in Arkansas

### MICHAEL G. LINDSEY

EFFORTS TO CREATE STATE POLICE FORCES in the United States during the first four decades of the twentieth century faced a number of practical and ideological obstacles. This proved especially true in the South where state governments tended to be poorer than their northern counterparts and thus less able to afford the cost of such a force. A more important factor working against the creation of state police forces was the South's traditional preference for local control. This preference for localism, or, as Edward Ayers more precisely described it, "localistic republicanism," opposed any attempts, no matter how noble minded, to invest an outside entity with authority over community affairs.[1] The clearest expression of Arkansans' longstanding desire for local control can be seen in the 1874 state constitution, which has been described by one scholar of Arkansas politics as "specifically designed to protect citizens from possible oppression by their own state government." "Pervasive distrust of government," Diane Blair said, "is expressed in almost every section of the 1874 document."[2] The document, for example, sharply limited the governor's power to appoint officials and allowed his vetoes to be overridden by a simple majority, while rendering the legislature a part-time institution with strictly limited taxing authority. With a constitution that marginalized state government, power and influence fell to local elites who wielded a

---

[1] William A. Link, *The Paradox of Southern Progressivism, 1880-1930* (Chapel Hill: University of North Carolina Press, 1992), 9; Edward L. Ayers, *Vengeance and Justice: Crime and Punishment in the 19th Century American South* (New York: Oxford University Press, 1984), 252.

[2] Diane D. Blair, *Arkansas Politics and Government: Do the People Rule?* (Lincoln: University of Nebraska Press, 1988), 122.

---

Michael G. Lindsey holds a master's degree in history from the University of Arkansas, Fayetteville. This essay won the Arkansas Historical Association's Violet B. Gingles Award for 2005.

THE ARKANSAS HISTORICAL QUARTERLY
VOL. LXIV, NO. 4, WINTER 2005

This content downloaded from
128.148.254.57 on Thu, 15 Sep 2022 13:23:39 UTC
All use subject to https://about.jstor.org/terms

354        ARKANSAS HISTORICAL QUARTERLY

significant amount of control over elected officials at the local and state levels.[3]

That Arkansans proved particularly stubborn in their adherence to lo-calistic republicanism is suggested by the fact that Arkansas remained one of the few states without a statewide law enforcement agency in January 1935. Tracing the repeated efforts to create a state police force shows just how deep this ideology ran, even though such a body, like many other Progressive-era agencies, had the potential to provide numerous benefits for the state's residents. The ultimate success of the state police move-ment, therefore, represented a significant turning point, both symbolic and actual, in Arkansans' understanding of state government and its role in their daily lives.

As 1935 dawned, few obvious signs existed that Arkansans' suspi-cion of a statewide police force would be overcome, especially consider-ing the dire financial straits in which many of the state's residents found themselves. Arkansas had never been a rich state and the decline of cotton prices in the 1920s coupled with the advent of the Great Depression in 1929 led to economic and social disaster by the early 1930s. The outlook for impoverished Arkansans darkened even further in late 1934 when the Federal Emergency Relief Administration threatened to cut off all federal assistance to more than 400,000 people within the state unless the legis-lature committed $1.5 million in matching funds by March 1935.[4]

While resolving the state's financial crisis and locating matching funds were the most pressing issues facing the governor and the legisla-ture as the fiftieth session of the General Assembly gathered in January 1935, another matter promised to generate a tremendous amount of state-wide interest and debate: the attempt to repeal prohibition within the state. For Gov. J. M. Futrell, the issues of state finance, liquor, and the creation of a state police force were tightly intertwined. Legalizing the consump-tion, manufacturing, and transportation of alcohol had the potential to provide a tremendous inflow of new revenue through the levying of ex-cise taxes, avoiding the political damage that a property tax increase could inflict. Yet Futrell clearly doubted the state had the means to adequately regulate such a system. He also recognized the current legal system's de-ficiencies in adequately and impartially enforcing state laws and argued

[3]Ben F. Johnson III, *Arkansas in Modern America: 1930-1999* (Fayetteville: Univer-sity of Arkansas Press, 2000), 7.

[4]David E. Rison, "Arkansas During the Great Depression" (Ph.D. diss., University of California at Los Angeles, 1974), 95-103; C. Calvin Smith, "Junius Marion Futrell, 1933-1937," in *The Governors of Arkansas: Essays in Political Biography*, 2nd edition, ed. Tim-othy P. Donovan, Willard B. Gatewood, and Jeannie M. Whayne (Fayetteville: University of Arkansas Press, 1995), 185-189.

This content downloaded from
128.148.254.57 on Thu, 15 Sep 2022 13:23:39 UTC
All use subject to https://about.jstor.org/terms

This content downloaded from
128.148.254.57 on Thu, 15 Sep 2022 13:23:39 UTC
All use subject to https://about.jstor.org/terms



The original thirteen members of the Arkansas State Police along with Gov. J. M. Futrell (bottom row, second from left) and the state police commissioners. *Courtesy Arkansas State Police.*

356          ARKANSAS HISTORICAL QUARTERLY

that the best way to correct them was through the creation of a state police force. He told one supporter, "There are some sheriffs who are trustworthy—some of them are not. The Government agents will advise you that in many counties they cannot hope to capture a still if the sheriff of the county is wise to his plan."[5] Futrell was decidedly conservative, but the sort of agency he proposed would clearly tip the balance of power in Arkansas from counties and cities to the state. While centralizing power within the state government had the potential to make the enforcement of laws more efficient, effective, and equal, it met fierce opposition from many Arkansans who clung protectively to their core belief in localistic republicanism.

Prior to 1935, the means and methods of law enforcement in Arkansas had remained fairly true to the state's Old South roots. Except in rare instances, local officials and citizens took responsibility for policing their own communities and maintaining their own standards of law and order. Most often the local political and economic elites within a county acted as the ultimate arbiters of law and justice, either officially through an elected sheriff or unofficially through a vigilante group or lynch mob. These vehicles of "justice" squared with the republicanism that first found a voice in America through the writings and speeches of the fledgling nation's revolutionary leaders and that saw the centralization of power as the first step to corruption and the destruction of men's independence. Any sort of standing force, whether a professional army or a uniformed police agency, symbolized a potential agent of oppression, and, thus, these early patriots discouraged their formation.[6]

A few minor encroachments on localized law and ad hoc enforcement had occurred by the time of the Civil War. The opening of a state penitentiary in 1841 centralized the housing of the state's convicts while, in theory at least, improving care and conditions for prisoners. Also, the city of Little Rock had created Arkansas's first standing police force in 1859. This new agency's uniformed officers engaged in regular patrols to "preserve order, peace, quiet, and enforce the laws and ordinances throughout the city."[7] Yet, even Arkansas's violent descent into lawlessness follow-

---

[5] J. M. Futrell to S. L. Cook, April 15, 1935, Futrell Papers, Arkansas History Commission, Little Rock.

[6] Bernard Bailyn, *The Ideological Origins of the American Revolution*, enlarged ed. (Cambridge: Belknap Press of Harvard University Press, 1992), 323-331; Gordon S. Wood, *The Creation of the American Republic, 1776-1787* (Chapel Hill: University of North Carolina Press, 1969), 46-90; David Ralph Johnson, *American Law Enforcement: A History* (St. Louis: Forum Press, 1981), 9.

[7] "Ordinance No. 129–City of Little Rock, 1859," *Arkansas Gazette* (Little Rock), May 14, 1859.

This content downloaded from
128.148.254.57 on Thu, 15 Sep 2022 13:23:39 UTC
All use subject to https://about.jstor.org/terms

Case 3:17-cv-01017-BEN-JLB   Document 123-8   Filed 11/10/22   PageID.11496   Page 48 of
107

ing the Civil War proved insufficient to convince many of the state's pol-
iticians that law enforcement should be centralized within a state agency.
The best way to stop violence and lawlessness, according to the *Arkansas
Gazette*, was for citizens to take responsibility for bringing the offenders
to justice: "whoever willfully fails to do this is scarcely entitled to the re-
ciprocal benefit of protection."[8] Such a solution is classically republican.
The onus of enforcement is placed upon the community instead of a
strong, central law agency.

   Not everyone agreed with the *Arkansas Gazette*, but those who advo-
cated a different course were almost as hated by the old-guard elite as the
"vicious and desperate characters" that roamed post-Civil War Arkansas.
By allying with the newly freed slaves, the white Republicans elected dur-
ing the Reconstruction period in Arkansas elicited the undying hatred of
most planters and many yeoman farmers. The fact that Reconstruction
Republicans were outnumbered in many places necessitated a centralized
approach to law and order because communities could not be relied upon
to protect the lives, property, and interests of unionists and former slaves
where white conservatives were in a majority. In an effort to combat the
political and racial violence sweeping the state in 1868, Gov. Powell
Clayton established a state militia and declared martial law in those coun-
ties deemed to be most threatened by the terror tactics of an organization
newly emergent in Arkansas, the Ku Klux Klan. What followed became
known as the "Militia War" as these citizen soldiers campaigned through-
out the state fighting a number of pitched battles with Klansmen. While
the efforts of the state militia reduced the influence of the Klan in Arkan-
sas, the Militia War stirred widespread complaints that the governor's
forces were brutalizing the citizenry and flouting due process.[9]

   The first proposal for a state police force emerged in the aftermath of
the Militia War. During the 1873 legislative session, Pulaski County rep-
resentative Joseph Murphy introduced House Bill 211, which sought a
"more efficient administration of criminal laws of the state; the apprehen-
sion and arrest of criminals; and the establishment of a metropolitan po-
lice district of the state of Arkansas."[10] The plan divided Arkansas into

   [8]*Arkansas Gazette*, December 6, 1865.

   [9]Allen Trelease, *White Terror: The Ku Klux Klan Conspiracy and Southern Recon-
struction* (New York: Harper & Row, 1971), 149-154; Thomas A. DeBlack, *With Fire and
Sword: Arkansas, 1861-1874* (Fayetteville: University of Arkansas Press, 2003), 191-200;
William H. Burnside, *The Honorable Powell Clayton* (Conway: University of Central
Arkansas Press, 1991), 28-36; Randy Finley, *From Slavery to Uncertain Freedom: The
Freedmen's Bureau in Arkansas, 1865-1869* (Fayetteville: University of Arkansas Press,
1996), 141-156.

   [10]*Arkansas Gazette*, March 5, 1873.

This content downloaded from
128.148.254.57 on Thu, 15 Sep 2022 13:23:39 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 494

Case 3:17-cv-01017-BEN-JLB Document 123-8 Filed 11/10/22 PageID.11497 Page 49 of 107

two districts: the city of Little Rock and the rest of the state, with each district having a separate organization of officers, sergeants, and captains. The police officers would hold all the law enforcement powers that a constable or a sheriff had, but their jurisdiction would extend throughout the state. A superintendent, appointed by the governor to a four-year term, would oversee day-to-day operations of both districts. A three-member commission composed of the governor, the state treasurer, and the superintendent would provide administrative oversight. To foot the annual cost of $40,000, the state would levy a one-tenth of one percent tax on real and personal property.[11]

Despite the vehement objections of the *Arkansas Gazette*, which called the proposed agency "odious" and "pernicious . . . to every municipal and state interest in every respect," the Republican-dominated House of Representatives looked like it would pass the measure. It emerged from the Judiciary Committee with a do-pass recommendation and came up for a vote on the House floor on March 22, but Democrats were strong enough to force a two-week delay.[12] The bill came up again in early April, sparking a heated debate over its implications and cost. Supporters pointed to a rash of politically-motivated violence in Pope and Hempstead Counties. The failure to punish the offenders and the Democrats' refusal to support the calling out of the state militia combined to produce virtual anarchy in those two locations. Eastern Arkansas representative V. M. McGehee loudly supported the bill and questioned its opponents, saying, "How can they oppose it when it gives protection to every citizen of the state, or are they in favor of riots and bloodshed?"[13]

The opposition remained unmoved by McGehee's plea, arguing that he was exaggerating the extent of criminal activity. C. E. Berry, representing a western Arkansas district, cut to the heart of the matter by saying the bill "strikes directly at the liberties of the people." Rep. George Latta, whose district stretched from Scott to Grant Counties, voiced his concerns over the effectiveness of such an organization before arguing that the bill had been improperly amended after it left the Judiciary Committee and therefore should be sent back to the Engrossment Committee. The House complied. With just a few weeks left in the 1873 session, the bill never made it back to the House floor.[14]

[11] Ibid.; Arkansas legislative journal, April 3, 1873, Arkansas Secretary of State Office, State Capitol, Little Rock; *Little Rock Republican,* April 3, 1873.

[12] *Arkansas Gazette*, March 22, 1873.

[13] Ibid., April 3, 1873.

[14] Ibid.; Arkansas legislative journal, April 3, 1873.

This content downloaded from
128.148.254.57 on Thu, 15 Sep 2022 13:23:39 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 495

8128677

PURCELL, ALLAN ROBERT

THE HISTORY OF THE TEXAS MILITIA, 1835-1903

*The University of Texas at Austin* PH.D. 1981

University
 Microfilms
International 300 N. Zeeb Road, Ann Arbor, MI 48106

Copyright 1981

by

Purcell, Allan Robert

All Rights Reserved

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

© Copyright

by

Allan Robert Purcell

1981

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

THE HISTORY OF THE TEXAS MILITIA, 1835-1903

by

Allan Robert Purcell, B.A., M.A.

DISSERTATION

Presented to the Faculty of the Graduate School of

The University of Texas at Austin

in Partial Fulfillment

of the Requirements

for the Degree of

DOCTOR OF PHILOSOPHY

THE UNIVERSITY OF TEXAS AT AUSTIN

August, 1981

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

221

to act in "extreme emergencies."

Senator Theodore Hertzberg introduced the militia bill in May and moved that it be read by caption only and referred to the Committee on Militia. The Democrats objected and demanded the reading of the entire bill, before it was sent to a committee. Outvoted on this resolution, they next tried to have the bill referred to the Committee on State Affairs which had a much more conservative membership and therefore might bottle up this repugnant legislation. Democrat J. P. Douglas argued that before the militia bill went to any committee, the State Affairs Committee ought to investigate the need for such legislation. Finally the Senate voted fourteen to ten to have Secretary of State J. P. Newcomb investigate the need for such a bill.[45]  This delaying tactic was the best the Democrats could do, and obstructed passage of the bill for a month.

In the House of Representatives the bill

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

222

had an easier time. George H. Slaughter, a leading
supporter of the measure ridiculed the Democrats for
labeling the legislation "unconstitutional" since
these same men "spent the best days and years of
their existence in the most gigantic rebellion
which history records to overthrow and destroy the
Constitution."[46] Speaker of the House Ira H. Evans
ended the discussion by pressing for adoption of
the bill "in the name of the thousands of widows and
orphans, who have been made such by the Ku Klux [ sic]
of Texas."[47] The bill passed the House of Represen-
tatives fifty-three to twenty-two on May 20, 1870.

Senate Bill No. 33 "An Act to provide for
the enrollment of the militia, the organization and
discipline of the State Guards, and for public de-
fense." received its second reading on June 15. Con-
servative Republican J. W. Flanagan introduced a sub-
stitute measure which would have prohibited the gov-
ernor from declaring martial law without local con-
sent. The Senate resumed the debate on June 20
with many House members listening to the speeches.
Elizabeth Davis, the governor's wife, with several
other women was "working the floor" on the Senate

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

223

encouraging "lukewarm Republicans" to support Senator Hertzberg's legislation.[48]   June 21 saw both Governor and Mrs. Davis working the floor with her "female lobby staff."  The crucial vote came on the Flanagan substitute, which failed by a single vote, fifteen to fourteen.  Conservatives claimed two moderate Republicans, "Mills and Pettit sold out to female charms."[49]  Next followed the vote on the Davis backed bill but before it occurred twelve senators left the floor of the Senate and locked themselves inside an adjoining room.  The Chair ordered the Sergeant-at-Arms to bring back the senators whose absence prevented a quorum.  Instead, the twelve senators held the Sergeant-at-Arms a prisoner in their room.  The presiding officer now had "to empower by warrant" three assistant sergeants-at-arms to rescue the principle Sergeant-at-Arms.  The three went and returned with the twelve senators and the Sergeant-at-Arms.  The twelve senators were placed under arrest and stripped of their voting privileges for three weeks.  However the Chair remitted the punishment for four of the senators so they could make a quorum and the militia bill passed fifteen to

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

224

five.  Seven of the eight senators regained their
voting privileges within three weeks but the eighth
E. L. Alford was expelled for forcibly prohibiting
the Sergeant-at-Arms from carrying out his orders.[50]
In late July the Senate overturned Alford's expul-
sion fifteen to twelve.

        Davis got the bill he wanted.  It provided
"That all able-bodied male citizens between the ages
of eighteen (18) and forty-five (45) years, residing
in the State,...shall be subject to military duty."
Exempted were Federal Army and Navy officers, mini-
sters, professors and school teachers, judges and
justices of the peace, veterans of five years active
service in the militia, and state policemen.  It
further reinforced the constitutional provisions by
proclaiming "The Governor of the State shall be
commander-in-chief of all military forces of this
State, which shall consist of two classes, viz:  the
State Guard of Texas and the Reserve Militia."[51]
The State Guards consisted of "all male persons" be-
tween eighteen and forty-five" who shall voluntarily
enroll and uniform themselves for service therein."
Members of this organization held their "uniform,

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

225

horse and equipments...free from all suite, dis-
tresses, executions, or sales for debt or payment
of taxes."  Clearly Davis did not want any local
judicial or executive authorities to disarm his
troops by judicial proceedings, legal or otherwise.

The more inactive branch of the service or
"Reserve Militia" consisted of "all such persons li-
able to military duty as have not enrolled in the
State Guard."[52]  In terms of administrative struc-
ture "the State Guard and Reserve Militia may be
organized into companies, regiments, brigades and
divisions, in the same manner as the army of the
United States."[53]

The Governor had the power to "appoint one
adjutant general with the rank of colonel, who shall
do and perform all duties of adjutant general,...
quartermaster and commissary general...and inspector
general.[54]  Clearly the actual day-to-day operations
of the militia rested in the hands of this officer
and if the governor made a bad appointment, the mili-
tia might suffer.  On June 24, 1870 Davis appointed
James Davidson a Federal infantry captain in the
Civil War with previous service in the British Army.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

226

The bill included provision for a commuta-
tion fee, allowing "all persons liable to serve in
the Reserve Militia of the State" to "avoid such
service by paying...the sum of ($15) fifteen dollars,
...each year."[55]  The legislature subsequently re-
duced the tax from $15 to $5 on April 12, 1871.[56]

Finally the bill reinstated the governor's
power to declare martial law.  Section 26 stated it
was "the duty of the Governor...whenever in his
opinion the enforcement of the law of this State is
obstructed,...by combinations of lawless men too
strong for the control of local authorities, to de-
clare such county or counties under martial law."
Following this declaration of martial law "the Gover-
nor shall call out such part of the State Guard or
Reserve Militia or State Police as may in his opinion
be necessary to the suppression of disorder."  In
addition and perhaps even more galling to the affect-
ed citizens the "expense of maintaining the State
Guard or Reserve Militia, called into active service
under this section, may in whole or in part, at the
discretion of the Governor, be assessed upon the peo-
ple of the county or counties where the laws are sus-

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

227

pended."  In those areas where the governor declared
martial law, the militia act gave the governor
authority "to provide for the trial and punishment
of offenders:...and prescribe all necessary regu-
lations for the formation and government of courts
martial and military commissions."[57]

Without question this legislation extend-
ed the power of the governor beyond its former bound-
aries, especially in peacetime.  The governor posses-
sed the power to single-handedly declare martial law,
thus suspending civil power and law, order whatever
militiamen he deemed necessary into the area, force
the inhabitants to pay the cost of this process,
and then establish military tribunals to try offend-
ers.  These powers clearly surpassed the peace time
powers of any chief executive, including the presi-
dent.  This legislation made the militia a potential-
ly powerful weapon in the hands of an ambitious
governor.  However this potential remained a threat
on paper only.

A law "to establish a State Police, and
provide for the regulation and government of the
same" became law on July 1, 1870.  This law estab-

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America

Author(s): Gautham Rao

Source: *Law and History Review*, Spring, 2008, Vol. 26, No. 1 (Spring, 2008), pp. 1-56

Published by: American Society for Legal History

Stable URL: https://www.jstor.org/stable/27641535

REFERENCES
Linked references are available on JSTOR for this article:
https://www.jstor.org/stable/27641535?seq=1&cid=pdf-
reference#references_tab_contents
You may need to log in to JSTOR to access the linked references.

JSTOR is a not-for-profit service that helps scholars, researchers, and students discover, use, and build upon a wide range of content in a trusted digital archive. We use information technology and tools to increase productivity and facilitate new forms of scholarship. For more information about JSTOR, please contact support@jstor.org.

Your use of the JSTOR archive indicates your acceptance of the Terms & Conditions of Use, available at https://about.jstor.org/terms

 is collaborating with JSTOR to digitize, preserve and extend access to *Law and History Review*

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

# The Federal *Posse Comitatus* Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America

GAUTHAM RAO

> The master has a right to call upon the State and the people . . . as loyal citizens to the Constitution and the Laws of the United States, as bound, whenever requested, to assist him; and to deliver up the slave. . . . I say it is binding. It is binding upon every good and loyal citizen.
>
> Robert J. Brent,
> Attorney General of Maryland (1852)

> "My policy" has prov'd a sham,
> And I, myself, am little less'
> For both are futile as a d—n,
> And justly scouted by Congress.
>
> Zedekiah Comitatus (pseud.),
> *Reconstruction on "My Policy"* (1866)

**Gautham Rao** is a doctoral candidate in history at the University of Chicago, where he is writing a dissertation on the state and the marketplace in the early American republic. He wishes to thank Kathleen Neils Conzen, Amy Dru Stanley, Nerissa Hamilton-vom Baur, Joanna Grisinger, Grant Madsen, James Sparrow, Tracy Steffes, Martin Tuohy, Kyle Volk, and especially William J. Novak for comments and suggestions on earlier versions of this article. Thomas Adams, Al Brophy, Harold Forsythe, Robert Gordon, Nishi Gupta, Daniel Hamilton, Roman Hoyos, Linda Kerber, Alison Lefkovitz, Jonathan Levy, Jed Shugerman, Timothy Stewart-Winter, and Michael Vorenberg deserve thanks for comments on later versions. The author also thanks David S. Tanenhaus and the anonymous referees for *Law and History Review*. Portions of this article were presented at the University of Chicago's American Political History Workshop (October 2004) and the American Society for Legal History Annual Conference (November 2005 and November 2007).

*Law and History Review* Spring 2008, Vol. 26, No. 1
© 2008 by the Board of Trustees of the University of Illinois

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

2                    *Law and History Review,* Spring 2008

> The great problem between man and master . . . is to be solved
> at last by the American spirit of fair-play. Here lies the hope of
> the future.
>
>                          Wilfred M. Peck, "Townsend Prize Oration,"
>                                *Yale Law Journal* 3 (1893): 28.

In antebellum America, as in pre-industrial England, it was commonplace
to witness civilians accompanying sheriffs and justices, scouring the coun-
tryside in search of scoundrels, scalawags, and other law-breakers. These
civilians were the *posse comitatus,* or uncompensated, temporarily depu-
tized citizens assisting law enforcement officers.[1] At its core, the *posse
comitatus* was a compulsory institution. Prior to the advent of centralized
police forces, sheriffs and others compelled citizens to serve "in the name
of the state" to execute arrests, level public nuisances, and keep the peace,
"upon pain of fine and imprisonment."[2] Despite its coercive character,
though, the *posse* was widely understood as one among many compulsory
duties that protected the "public welfare."[3] Americans heeded the call to
serve in local *posses,* explained jurist Edward Livingston, because of com-
munal "ties of property, of family, of love of country and of liberty." Such
civic obligations, wrote Alexis de Tocqueville in 1835, illustrated why
Americans had such a pressing "interest in . . . arresting the guilty man."
At once coercive and communitarian, lamented Henry David Thoreau, the
*posse comitatus* exemplified how those that "serve the state . . . with their
bodies," were "commonly esteemed good citizens."[4]

1. Joseph R. Nolan and Jacqueline M. Nolan-Haley, ed., *Black's Law Dictionary with
Pronunciations,* 6th ed. (St. Paul: West Publishing Co., 1990), 1162. William Blackstone,
*Commentaries on the Laws of England,* vol. 1, *Of the Rights of Persons,* ed. Stanley N. Katz
(1765; Chicago: University of Chicago Press, 1979), 339.

2. Henry Potter, *The Office and Duty of a Justice of the Peace: And a Guide to Sheriffs,
Coroners, Clerks, Constables, and other Civil Officers . . .* (Raleigh: J. Gales, 1816), 243–44.
Only "clergymen, and sick, lame, or impotent persons," could avoid such service. For all
other adults, "freemen or servants" alike, the summons to attend to the *posse comitatus* was
a legally binding command to serve the will of the state.

3. The power "to compel the service of the citizenry" was part and parcel of the per-
vasive "common law vision of a well-regulated society" that dominated state and local
governance in nineteenth-century America. William J. Novak, *The People's Welfare: Law
and Regulation in Nineteenth-Century America* (Chapel Hill: University of North Carolina
Press, 1996), 57, 42.

4. Edward Livingston, *A System of Penal Law for the State of Louisiana . . .* (Philadelphia:
James Kay, 1833), 210. The *posse comitatus* was the preliminary level of community law
enforcement, failing which, the state turned to the militia. Through the *posse comitatus,* locali-
ties called for citizens to be civilians primarily, and law enforcers on occasion, just as, in the
words of Associate Justice James McReynolds, state militia requirements called for citizens
to be "civilians primarily, soldiers occasionally." *Miller v. United States,* 307 U.S. 174, 178

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

States and localities exercised this power over persons with little apparent difficulty. But as the story of Castner Hanway illustrates, the federal government's assertion of the very same form of compulsion proved deeply problematic. In the early hours of September 11, 1851, Castner Hanway happened upon Deputy U.S. Marshal Henry Kline, who was in pursuit of fugitive slaves outside Christiana, Pennsylvania. Kline displayed his warrant to Hanway and then "called upon him in the name of the United States" to join a *posse comitatus* to "assist him in making the arrests." But Hanway wanted "nothing to do with it." He "would not assist." A surprised Kline persisted: under the Fugitive Slave Law of 1850, "all good citizens are hereby commanded to aid and assist . . . whenever their services may be required." To Kline's display of authority, Hanway responded that he "didn't care for that Act of Congress." Months later, Castner Hanway stood trial for treason. The prosecution alleged that by refusing to assist a United States officer, Hanway had shirked his "duty as an American citizen."[5]

How can we make sense of Hanway's actions? It was immediately clear that the *posse comitatus* "in the name of the United States" lacked the obligatory power of its counterpart, "in the name of the state." Enoch Harlan, a witness on Hanway's behalf, was asked by the federal prosecutor whether he was a "man who will by every obligation put upon him, abide by those obligations?" "I believe myself to be a loyal citizen," began Harlan. But "there were some duties which the laws of our country might impose upon me which I could not conscientiously perform." The federal government lacked the requisite political legitimacy to force individuals into service. In stark contrast to the robust local powers to coerce allegiance for the public good, federal power appeared altogether abstract, lacking any meaningful incentives to compel obedience.[6]

---

(May 15, 1939). Alexis de Tocqueville, *Democracy in America,* trans. J. P. Mayer (1835, 1840; New York: Perennial Classics, 2000), 95–96. Henry David Thoreau, *On the Duty of Civil Disobedience* (1849; Chicago: Charles H. Kerr Publishing Company, 1989), 5.

5. James J. Robbins, ed., *Report of the Trial of Castner Hanway for Treason . . .* (Philadelphia: King & Baird, 1852), 48. For other accounts of the incident, see: Paul Finkelman, "The Treason Trial of Castner Hanway," in *American Political Trials,* ed. Michael R. Belknap (Westport, Conn.: Greenwood Press, 1994), 79–100. Thomas P. Slaughter, *Bloody Dawn: The Christiana Riot and Racial Violence in the Antebellum North* (New York: Oxford University Press, 1991); The Fugitive Slave Law of 1850, *U.S. Statutes at Large* 9 (1850): 462, 463 [hereafter, Fugitive Slave Law of 1850].

6. Robbins, *Report of the Trial of Castner Hanway,* 145–46. See Robert H. Wiebe's familiar sketch of nineteenth-century America, *The Search for Order, 1877–1920* (New York: Hill & Wang, 1967), xiii–xiv. On the rudimentary character of antebellum nationalism, see Melinda Lawson, *Patriot Fires: Forging a New American Nationalism in the Civil War North* (Lawrence: University Press of Kansas, 2002), 4–7. In this sense, the antebellum federal government bore little resemblance to the characteristics of the "modern" state. Writes Max Weber, "Today, however,

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 509

4                     *Law and History Review,* Spring 2008

As important as the tenuousness of federal power, though, was the issue
of slavery. Castner Hanway refused to join the federal marshal's *posse co-
mitatus* because he wanted no part of any law, or any government power,
that consigned men to lives of slavery. But servitude problematized both
the ends and the means of the federal *posse comitatus.* Warned Hanway's
counsel, even "threats of the gallows" could not "make active slave catch-
ers of any respectable men." "You may crowd your prisons with men," he
continued, but "*you cannot compel*" northerners into such service. Thus,
it was not simply that this federal *posse comitatus* ultimately benefited
slavery. Instead, Hanway rejected federal power over him because it would
"compel" him to defy his beliefs. For Hanway, that is, there was something
about this power over persons that itself suggested a condition of servitude
to the federal state.[7]

For the South, however, this federal power to raise a *posse comitatus*
was precisely necessary to guarantee their property rights over fugitive
slaves throughout the Union. For decades, slaveholders complained of
the North's unwillingness to assist, and willingness to obstruct, efforts to
reclaim runaways north of the Mason-Dixon. With the Fugitive Slave Law
of 1850, slaveholders secured a national system to redress their grievances.
In 1850, though, federal law enforcement was but a sliver of its modern
counterpart.[8] Even as the federal presence penetrated the continent, warned
Jacksonian John Barton Derby in 1829, "no man in the country ever feels
its direct action." For Chief Justice Roger Taney, the overwhelming lack
of federal marshals and courts meant that it would be "ineffectual and de-
lusive" to rely on federal power to enforce the Fugitive Slave Law.[9] After

---

we have to say that a state is a human community that (successfully) claims the *monopoly of
the legitimate use of physical force* within a given territory." In the modern state, "obedience is
determined by highly robust motives of fear and hope—fear of the vengeance of magical pow-
ers of the power-holder, hope for reward in this world or in the beyond—and besides all this,
by interests of the most varied sort." Max Weber, "Politics as a Vocation," in *From Max Weber:
Essays in Sociology,* ed. H. H. Gerth and C. Wright Mills (New York: Oxford University Press,
1947), 78–79 [emphasis added]. See also, Benedict Anderson, *Imagined Communities: Reflec-
tions on the Origin and Spread of Nationalism* (New York: Verso Books, 1991).

7. Robbins, *Report of the Trial of Castner Hanway,* 181, 182 [emphasis added].

8. Max Edling, *A Revolution in Favor of Government: Origins of the U.S. Constitution
and the Making of the American State* (Oxford: Oxford University Press, 2003), 6–10.

9. John Barton Derby (1829) quoted in Richard R. John, *Spreading the News: The Ameri-
can Postal System from Franklin to Morse* (Cambridge: Harvard University Press, 1995),
5. *Prigg v. Pennsylvania,* 41 U.S. 539 at 630–31 (1842). Antebellum federal administrative
capacities are discussed in detail in: Malcolm J. Rohrbough, *The Land Office Business: The
Settlement and Administration of American Public Lands, 1789–1837* (New York: Oxford
University Press, 1968); John, *Spreading the News;* Daniel Preston, "Administration and
Reform of the U.S. Patent Office, 1790–1836," *Journal of the Early Republic* 5 (1985):

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

some brief talk of "an army that would have to be stationed in every town
and county," though, slaveholders and their doughface allies settled upon
the federal *posse comitatus* doctrine.

"Every good citizen of the United States," promulgated the Fugitive
Slave Law of 1850, had a "binding" obligation, "when summoned," to
"aid in executing that process." In the language of political institutions,
the *posse comitatus* was clearly a clever structural remedy to the federal
government's traditionally deficient manpower. But there were surely other
reasons for the doctrine. After all, the South's law of fugitive slaves had
long maintained, "it is the duty of every good citizen, who finds a slave
at large . . . to deliver him to the nearest justice of the peace, for commit-
ment." Thus, a national duty to assist in the recovery of fugitive slaves
imposed the legal norms of slave society on free states. The federal *posse
comitatus* would, quite literally, compel the North to accept the legitimacy
of slavery. In this way, the federal *posse comitatus* doctrine was a blueprint
of the South's vision for a truly slaveholding republic.[10]

As Castner Hanway's tribulations suggest, though, the apparent connec-
tions between southern slavery and the federal *posse comitatus* doctrine
quickly caused trouble. Abolitionists found it impossible to differentiate
service in the federal *posse comitatus* from service to southern slaveholders.
Even those that did not believe the federal government was at the beck and
call of "the slave power" worried about the consequences of unhesitatingly
obeying federal compulsion. Was not compulsory service against one's will
the essence of slavery? What was to prevent them from becoming slaves
in the service of their governmental masters?

Contemplating federal compulsion in terms of slavery continued during
the Civil War. Conscription, the compulsory transformation of citizens
into soldiers, proved particularly thorny. Although most acknowledged the
"military necessity" of raising armies, conscripts themselves were left to
ponder the difference between mandatory, compulsory military service and
a condition of servitude. Such issues persisted well into Reconstruction,
where the federal government used the bayonet—military forces as a *posse
comitatus*—to compel truculent southerners to accept a radical paradigm of
freedom and equality. For their part, white southerners protested, as aboli-
tionists had in the 1850s, that they had become nothing less than slaves to
the federal state. The subsequent repudiation of the federal *posse comitatus*

---

331–53. The function and significance of federal customs service in antebellum America is
the subject of my forthcoming dissertation, "Visible Hands: Customhouses, Law, Capitalism,
and the Mercantile State of the Early Republic."

10. Robert J. Brent, quoted in Robbins, ed., *Trial of Castner Hanway,* 196. Fugitive Slave
Law of 1850 at 463. *Randal v. State,* 12 Miss (4 S. & M.) 349 at 351 (1845).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

doctrine thus symbolized not only the immediate failures of Reconstruction, but also the demise of a program of federal power owing its origins to the oppositional politics of slavery and freedom. For a public weary of decades of debating the meaning of servitude and emancipation, and on the verge of ensconcing a conservative socio-legal order, the statutory death of the *posse comitatus* was no doubt a convenient way to bury the persistent, and frequently interconnected, questions of slavery, government compulsion, and individual rights.

This article studies the federal *posse comitatus* doctrine, the federal government's power to compel the service of individuals, to examine how the prism of slavery redefined the relationship between individuals and the federal state in mid-nineteenth century America. It traces a lengthy intellectual contest over the legitimacy of federal compulsion that suggests new perspectives on the meaning of slavery and federal power in mid-nineteenth century America. Scholarly discussions of government power over persons typically emphasize the modern abstraction of government power, such as the complexities of contractual obligations, administrative battles between individual and bureau, and the reach of centralized social policies.[11] But the story of the *posse comitatus* doctrine suggests a foundational relationship between slavery and the federal government's techniques of coercing free individuals.[12] This early practice of federal power has eluded students of

11. See, e.g., Edward S. Corwin, "The Basic Doctrine of American Constitutional Law," *Michigan Law Review* 12 (1914): 247–76; Arthur F. McEvoy, "Freedom of Contract, Labor, and the Administrative State," *The State and Freedom of Contract*, ed. Harry N. Scheiber (Palo Alto: Stanford University Press, 1998). A similarly formidable literature exists on the administrative power over persons, e.g., John Dickinson, *Administrative Justice and the Supremacy of Law in the United States* (Cambridge: Harvard University Press, 1927); Ernst Freund, *Administrative Powers over Persons and Property: A Comparative Survey* (Chicago: University of Chicago Press, 1928); Willard J. Hurst, *Law and the Conditions of Freedom in the Nineteenth-Century United States* (Madison: University of Wisconsin Press, 1967); Morton J. Horwitz, *The Transformation of American Law, 1870–1960: The Crisis of Legal Orthodoxy* (Cambridge: Harvard University Press, 1992), esp. 213–46. Also notable is the sizeable body of scholarship on government regulation of speech in the modern state. See, for instance, Owen M. Fiss, *The Irony of Free Speech* (Cambridge: Harvard University Press, 1996). On the compass of American social policy in the late nineteenth century, see, e.g., Theda Skocpol, *Protecting Soldiers and Mothers: The Political Origins of Social Policy in the United States* (Cambridge: Belknap Press of Harvard University Press, 1992); Daniel T. Rodgers, *Atlantic Crossings: Social Politics in a Progressive Age* (Cambridge: Belknap Press of Harvard University Press, 1998).

12. The federal *posse comitatus* receives limited attention in the highly developed literature on the Fugitive Slave Law of 1850. Stanley W. Campbell, *The Slave Catchers: Enforcement of the Fugitive Slave Law, 1850–1860* (1968; Chapel Hill: University of North Carolina Press, 1970); Allen Johnson, "The Constitutionality of the Fugitive Slave Acts," *Yale Law Journal* 31 (1921–1922): 161–82; Leonard W. Levy, "Sims' Case: The Fugitive Slave Law in Boston

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

federal governance, who have just begun to take stock of American slavery as a wellspring of federal policy. The history of the federal *posse comitatus* doctrine, on the other hand, illustrates how the conflict between slavery and freedom transformed the theory and practice of federal power in the Civil War era.[13]

Throughout the world, of course, it had always seemed problematic for government to stake a claim over the individual's body and volition.[14]

---

in 1851," *Journal of Negro History* 35 (1950): 39–74; Anthony J. Sebok, "Judging the Fugitive Slave Acts," *Yale Law Journal* 100 (1991): 1835–54. A more comprehensive treatment is Jacobus tenBroek, *Equal Under Law* (1951; New York: Collier Books, 1965), 57–65.

13. There are several studies relating slavery to political development, constitutional law, tax doctrines, and other aspects of federal governance. See Robin Einhorn, *American Slavery, American Taxation* (Chicago: University of Chicago Press, 2006), esp. 117–250; David F. Ericson, "The Federal Government and Slavery: Following the Money Trail," *Studies in American Political Development* 19 (2005): 105–16; Donald E. Fehrenbacher, *The Slaveholding Republic: An Account of the United States Government's Relations to Slavery* (New York: Oxford University Press, 2001); Paul Finkelman, *Slavery and the Founders: Race and Liberty in the Age of Jefferson* (Armonk, N.Y.: M. E. Sharpe, 1996). Discussions of the antebellum American state suggest that common law rule and party politics produced a nationally decentralized state of "courts and parties." Stephen Skowronek, *Building a New American State: The Expansion of National Administrative Capacities, 1877–1920* (New York: Cambridge University Press, 1982), 23. A powerful critique of this perspective is Richard R. John, "Governmental Institutions as Agents of Change: Rethinking American Political Development in the Early Republic, 1787–1835," *Studies in American Political Development* 11 (1997): 347–80.

14. State-sponsored forced labor systems figured greatly in pre-capitalist and colonial states. Frederick Cooper, "Conditions Analogous to Slavery: Imperialism and Free Labor Ideology in Africa," *Beyond Slavery: Explorations of Race, Labor, and Citizenship in Postemancipatory Societies*, ed. Frederick Cooper, Rebecca C. Scott, and Thomas Holt (Chapel Hill: University of North Carolina University Press, 2000), 107–49; Michael Mann, *The Sources of Social Power*, vol. 1, *A History of Power from the Beginning to A.D. 1760* (New York: Cambridge University Press, 1986), 130–42; Fernand Braudel, *Civilization and Capitalism, 15th–18th Century*, vol. 2, *The Wheels of Commerce*, trans. Sian Reynolds (New York: Harper & Row, 1979), 514–19; Eric Wolf, *Europe and the People Without History* (Berkeley: University of California Press, 1982), 24–72. In mercantilist Europe, the press gang was perhaps the most prominent—and problematic—mode of state coercion to maximize citizens' labor. Peter Linebaugh, *The London Hanged: Crime and Civil Society in the Eighteenth Century* (New York: Verso, 2003), 67–68; Marcus Rediker, *Between the Devil and the Deep Blue Sea: Merchant Seamen, Pirates, and the Anglo-American Maritime World, 1700–1750* (New York: Cambridge University Press, 1997), 251–53. Military compulsion, discussed in the final section of this essay, has also received historical attention. Meyer Kestnbaum, "Citizen-Soldiers, National Service, and the Mass Army: The Birth of Conscription in Revolutionary Europe and North America," *Comparative Study of Conscription in the Armed Forces*, ed. Lars Mjøset et al. (New York: JAI, 2002), 117–44; Emmanuel LeRoy Ladurie and Nicole Benageau, "The Conscripts of 1868," in *The Territory of the Historian*, ed. Emmanuel Le Roy Ladurie (Hassocks, Sussex: The Harvester Press, 1979), 33–75; Rachel Barker, *Conscience, Government and War: Conscientious Objectors*

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

The moral propriety and instrumental rationality of this compulsion would
provoke metaphysical and historical soul-searching far into the future.[15]
Yet, in the United States, the history of national power typically suggests
a teleology of social progress. By identifying a material and intellectual
nexus between slavery and federal compulsion, on the other hand, this
essay suggests a moral ambivalence beneath the rise of federal power. As
Edmund Morgan has argued, American slavery and American freedom
were inherently connected from the very beginning of the republic. Slavery
and national compulsion, this essay argues, share a similar, foundational
relationship.[16]

Indeed, in mid-nineteenth century America, as slavery necessitated the
institutional expansion of federal power over persons, it was simultane-
ously the frame of reference for contemplating this power. Thus, the fed-
eral *posse comitatus* doctrine and the growth of national power owed as
much to the antebellum politics of American slavery as to the well-known
icons—the Civil Rights Acts and Reconstruction Amendments—of post-
bellum American freedom.[17] From 1850 to 1878, the federal government
expanded its coercive power over individuals, in order to safeguard na-
tional property rights for slaveholders, emancipate millions of enslaved

*in Great Britain, 1939–1945* (New York: Routledge & Kegan Paul, 1982). Political scien-
tists and sociologists have also undertaken to determine the significance of compulsion and
consent as a fundamental aspect of modernity. See, e.g., Margaret Levi, *Consent, Dissent,
and Patriotism* (New York: Cambridge University Press, 1997); Pierre Birnbaum, "The
State and Mobilisation for War," in *States and Collective Action,* trans. Martin Thom (New
York: Cambridge University Press, 1988), 55–66; Don Herzog, *Happy Slaves: A Critique
of Consent Theory* (Chicago: University of Chicago Press, 1989); Anthony Giddens, *The
Nation-State and Violence* (Cambridge: Policy Press, 1985).

15. Karl Marx, Max Weber, and Michel Foucault (among others) shared a fascination with
the shift from pre-modern forms of direct personal domination to more abstract categories
of social domination during modernity. Marx, *The German Ideology: Part I,* in *The Marx-
Engels Reader,* ed. Robert C. Tucker (New York: W. W. Norton & Co., 1978), 147–200;
Weber, *The Protestant Ethic and the Spirit of Capitalism* (New York: Routledge, 1992),
69–92, 160–83; Michel Foucault, *Discipline and Punish: The Birth of the Prison,* trans.
Alan Sheridan (New York: Vintage Books, 1992).

16. Edmund S. Morgan, *American Slavery, American Freedom: The Ordeal of Colonial
Virginia* (New York: W. W. Norton & Co., 1975).

17. Paul Finkelman, Sanford Levinson, and Derrick Bell maintain that slavery was central,
rather than anomalous, to American legal development. Paul Finkelman, "The Centrality
of Slavery in American Legal Development," in *Slavery and the Law,* ed. Paul Finkelman
(Madison: Madison House, 1997), 3–26; Sanford Levinson, "Slavery in the Canon of Con-
stitutional Law," *Chicago-Kent Law Review* 68 (1993): 1087–1111; Derrick Bell, *And We Are
Not Saved: The Elusive Quest for Racial Justice* (New York: Free Press, 1992). Similarly,
in *The Slaveholding Republic,* Don E. Fehrenbacher rightly suggests that the antebellum
polity was defined by the problem of slavery.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Case 3:17-cv-01017-BEN-JLB   Document 123-8   Filed 11/10/22   PageID.11517   Page 69 of
107

African-Americans, and enforce the doctrine of formal equality. In short,
like the marketplace, the rise of the federal state wrought contradictory
but congruous forces of liberation and compulsion upon the individual.[18]

After a description of the *posse*'s early origins, this article studies how
southern slaveholders developed the *posse comitatus* doctrine to fashion
a federal state of their liking. The abolitionist critique of this "overseer
state" is the subject of the third section. Next, it explores how the Union
and Confederacy drew upon the *posse comitatus* doctrine to expand the
federal state's coercive powers over citizens. The essay concludes with the
fate of the doctrine during Reconstruction. Through the Posse Comitatus
Act of 1878, the readmitted south struck down the most poignant symbol
of slavery, compulsion, and statecraft, thus guaranteeing its permanence
in the fabric of national governance.

## I. The Local *Posse* and the Moral Economy of the Public Good

During the reign of Edward I (1285), when England was still in an "infant
state of society," explains Patrick Colquhoun's Georgian treatise, royal of-
ficials initiated the "ancient practice" of commandeering private persons
to "discover criminal persons flying from justice." This practice, known
alternatively as the "hue and cry" and *jurata ad arma* during the thirteenth
century, would eventually become the *posse comitatus*. Over time, authori-
ties repeatedly used the *posse* to subdue seemingly ubiquitous countryside
mobs. To quell these affrays, for instance, the Riot Act of 1714 commanded
"all his Majesty's Subjects of Age and Ability" to lend their assistance to
the local sheriff.[19]

18. This characteristic of market relations is discussed by Karl Polanyi, *The Great Trans-
formation: The Political and Economic Origins of Our Time* (1944; Boston: Beacon Press,
2002), 257–68; Amy Dru Stanley, *From Bondage to Contract: Wage Labor, Marriage and
the Market in the Age of Slave Emancipation* (New York: Cambridge University Press, 1998).
Notably, Willard Hurst and Joseph Schumpeter argue that law brought similar forces to bear
on the market. For Hurst, legal regulation in the nineteenth century generated a "release
of energy" that anchored American economic development. In Schumpeter's famous for-
mulation, "creative destruction" worked much the same. Hurst, *Law and the Conditions of
Freedom*, Joseph A. Schumpeter, *Capitalism, Socialism, and Democracy* (New York: Harper
and Brothers, 1947), 81–86. William J. Novak, "Law, Capitalism, and the Liberal State: The
Historical Sociology of James Willard Hurst," *Law and History Review* 18 (2000): 129.

19. Patrick Colquhoun, *A Treatise on the Police of the Metropolis . . .* (London: J. Maw-
man, 1800), 389. Riot Act, 1 Geo. 1, stat. 2, c. 5 (1714), quoted in David E. Engdahl,
"Soldiers, Riots, and Revolution: The Law and History of Military Troops in Civil Dis-
orders," *Iowa Law Review* 57 (1971): 16. Alan Harding, *A Social History of English Law*
(Gloucester, Mass: Peter Smith, 1973), 60; Blackstone, *Commentaries*, 1:362; Anon., "The

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

By the Industrial Revolution, however, England shunned the *posse co-
mitatus* for large, centralized police forces.[20] But the *posse* had found a
home in the North American colonies where mobbing remained all the rage.
Despite the innumerable structures of authority in the colonies—household,
church, town, county, colony, and crown—the first Americans were a truly
riotous bunch.[21] In its migration to America, however, colonists transformed
the *posse comitatus* from an instrument of royal prerogative to an institution
of local self-governance. As Pauline Maier has argued, sheriffs and oth-
ers that demanded the *posse comitatus* were "virtually helpless," because
those commanded to serve in the *posse* were often "the same persons who
participated in extra-legal uprisings." In other words, the colonists' ability
to shift from law-breakers to law-enforcers, and vice versa, ensured that
the *posse comitatus,* no matter its hierarchical origins, functioned through,
rather than upon, the local popular will.[22]

The colonists' control of the *posse comitatus*—of the legal means of
coercion—all but precipitated the American Revolution. As Lord North put
it, the British authorities had previously been reliant upon "the *posse Comi-
tatus* [sic]; and when it is considered . . . that the *posse* are the very people
who have committed all these riots, little obedience . . . is to be expected
from them." All that remained was for the British "to force obedience to
the laws," for, he concluded, "our regulations here are of no import, if you
have nobody in that country to give them force." To "force obedience," as

Office of Lord Lieutenant and His Deputies," *Law Magazine & Law Review Quarterly; or
Quarterly Journal of Jurisprudence* 14, no. 50 (1862–1863): 50. Common law decisions
restricting the use of military force in civilian law enforcement were especially important
to the development of the *posse comitatus.* Engdahl, "Soldiers, Riots, and Revolution,"
8–17.

20. In particular, rapid urbanization apparently rendered the *posse comitatus* increasingly
anachronistic in England. Leon Radzinowicz, *A History of English Criminal Law and Its
Administration from 1750* (London: Stevens & Sons Limited, 1956), 2:28; Harding, *Social
History of English Law,* 270; Colquhoun, *Treatise on the Police of the Metropolis,* 389.

21. On the colonists' propensity to riot, see Pauline Maier, *From Resistance to Revolution:
Colonial Radicals and the Development of American Opposition to Britain, 1765–1776*
(1972; New York: W. W. Norton & Co., 1991), 3–48; Daniel J. Hulsebosch, *Constitut-
ing Empire: New York and the Transformation of Constitutionalism in the Atlantic World,
1664–1830* (Chapel Hill: University of North Carolina Press, 2000); Rediker, *Between the
Devil and the Deep Blue Sea,* 205–53; Paul A. Gilje, *Rioting in America* (Bloomington:
Indiana University Press, 1996), 12–59. For a summary of the different layers of governance
in colonial America, see, among others, Bernard Bailyn, *Origins of American Politics* (New
York: Vintage Books, 1969); Jack P. Greene, *Peripheries and Center: Constitutional De-
velopment in the Extended Polities of the British Empire and the United States, 1607–1788*
(Athens: University of Georgia Press, 1986).

22. Maier, *From Resistance to Revolution,* 16–17. Bradley Chapin, *Criminal Justice in
Colonial America, 1606–1660* (Athens: University of Georgia Press, 1983), 31, 96.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 516

Lord North counseled, Parliament turned to "the military power." And thus the stage was set for a revolutionary encounter between an invading army, seeking to impose what North would call "the constitution of coercion," and the colonists, accustomed as they were to the principle of "disciplined collective coercion."[23]

After the Revolution, the *posse comitatus* remained a pillar of local self-governance throughout the young nation. The few individuals that refused the command to serve, for instance, met with sharp rebukes. Explained Chancellor Kent in *Coyles v. Hurtin* (1813), "every man is bound to be aiding and assisting, upon order or summons . . . and is punishable if he refuses." Such severity was required because it was simply not possible for officers to "be actually present in every place where power might be wanting." To deny sheriffs the *posse comitatus* would result in "great inconvenience and danger to the administration of justice." The Supreme Court of Pennsylvania struck a similar tone in 1840: "acquiescence in the laws is the duty of every citizen; and in a government of laws, such as ours emphatically is, it is the duty of every citizen to aid in their execution."[24] The *posse comitatus* was crucial to preserving the "government of laws."

In fact, as a vital tool for enforcing the state's vaunted powers to protect the citizenry's health, safety, and property, the *posse* was central to the broader project of protecting "the public good."[25] Dueling, disruptive quarrels, eavesdropping, the keeping of pigs, disorderly houses, elements "injurious to the health of a neighborhood," obstructions of "highways, bridges, and publick rivers," inquests, indecency, illegal fishing, squatting, gaming—all of these public crimes and problems justified sheriffs, constables, selectmen, jailers, bailiffs, and coroners to assemble the *posse co-*

23. Lord North, quoted in John Phillip Reid, *In Defiance of the Law: The Standing-Army Controversy, the Two Constitutions, and the Coming of the American Revolution* (Chapel Hill: University of North Carolina Press, 1981), 231, 232, 230. Maier, *From Resistance to Revolution*, 280. Notably, Reid argues that Revolutionary "mobs," such as the group of colonists that participated in "the Boston Massacre," were actually a "constitutional *posse Comitatus,*" which was attempting to police the unconstitutional use of the military against civilians. Reid, *In Defiance of the Law,* 229, 228.

24. *Coyles v. Hurtin,* 10 Johns. 85 at 89 (1813). *Comfort v. Commonwealth,* 5 Whart. 437 at 439–40 (1840). See also, *Avery v. Seely,* 3 Watts & Serg. 494 at 498 (1841); John Stephen, *Summary of the Criminal Law* (Philadelphia: J. S. Littell, 1840), 29.

25. States enjoyed broad latitude to guard the health and safety of their citizens. Wrote Chief Justice John Marshall in *Brown v. Maryland,* 25 U.S. (12 Wheat.) 425 at 443–44 (1827): "The power to direct the removal of gunpowder is a branch of the police power, which unquestionably remains, and ought to remain, with the States. . . .The removal or destruction of infectious or unsound articles is, undoubtedly, an exercise of that power, and forms an express exception to the prohibition we are considering." On the state police power generally, see Novak, *The People's Welfare,* 13–17.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

*mitatus.*[26] In this way, the implementation of common law police doctrines of nuisance, carriers, inns, public ways, public health, and especially riot, depended upon the *posse comitatus.*[27] In times of public tumult, declared one treatise, "it is not left to the choice or will of the subject . . . to attend to the call of the magistrate, as they think proper." On the other hand, the citizen had a "*bounden duty* . . . to perform *to the utmost of his ability,*" "to suppress any tumultuous assembly." Such was "the duty of every good citizen."[28]

It was also notable that the *posse comitatus* was typically uncompensated. As Justice John Kennedy of the Pennsylvania Supreme Court ruled in *Avery v. Seely* (1841), the "citizens of the county" are "bound, at the call of the sheriff," to serve as a *posse comitatus,* "without any compensation or allowance being made for it," and "without any reward being prescribed for . . . doing so." To labor for the state, "without compensation," "allowance," or "reward" thus bore out the claims of Edward Livingston and Alexis de Tocqueville that Americans willingly participated in *posses* due to communal "ties of property, of family, of love of country and of liberty." No doubt, as the same court decided three years later, the "ties of property" and "liberty" were paramount: without the *posse comitatus,* "our liberty would be but a name, and our lives and property insecure." The citizen served the state to protect the public's liberty and property. Rather than monetary compensation, the citizen could rest assured that his own "liberty and property" was subject to the same protection.[29]

---

26. Mordecai M'Kinney, *The United States Constitutional Manual . . .* (Harrisburg, Penn.: Hickock & Cantine, 1845), 261; Nathan Dane, *A General Abridgment and Digest of American Law . . .* (Boston: Cummings, Hilliard & Co., 1823–1829), 2:352; John Milton Niles, *The Connecticut Civil Officer: In Three Parts . . .* (Hartford, Conn.: Huntington & Hopkins, 1823), 214; Isaac Goodwin, *New England Sheriff, or, Digest of the Duties of Civil Officers . . .* (Worcester: Dorr and Howland, 1830), 76; Charles W. Hartshorn, *New England Sheriff: Being a Digest of the Laws of Massachusetts Relating to Sheriffs, Jailers, Coroners, and Constables . . .* (Worcester: W. Lazell, 1844), 123; Baron Robert Henley Eden, *A Treatise on the Law of Injunctions* (New-York: Gould, Banks, 1839), 197–98; John H. B. Latrobe, *The Justices' Practice Under the Laws of Maryland: Including the Duties of a Constable . . .* (Baltimore: F. Lucas, Jr., 1840), 260–63, 274.

27. Novak, *The People's Welfare,* 49. *Reed v. Bias,* 8 Watts & Serg., 189 at 191 (1844). See also, *Extradition of Fugitives from Service,* 6 Op. Atty. Gen. 466 (1854); Edward R. Olcott and Henry M. Spofford, *The Louisiana Magistrate* (New Orleans: Published for the Authors, 1848), 208; Stephen, *Summary of the Criminal Law,* 46; M'Kinney, *The United States Constitutional Manual,* 260.

28. John Frederick Archbold, *A Complete Practical Treatise on Criminal Procedure, Pleading, and Evidence . . .* (New York: Banks, Gould, 1853), 589, n. 2. Archbold claims that this arose from *Case of Fries,* 9 F. Cas. 826 at 923 (1799).

29. *Avery v. Seely* at 498. Livingston, *A System of Penal Law for the State of Louisiana,* 210. *Reed v. Bias* at 191. Here the development of the *posse comitatus* paralleled uncom-

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 518

*The Federal* Posse Comitatus *Doctrine*          13

In the American south, the problem of fugitive slaves magnified the exchange of individual service in the *posse comitatus,* for the public protection of private interests.[30] The mystery of fugitive slaves, suggested the poet James Russell Lowell in 1845, was that they could "convert themselves from chattels into men," undoing their condition of servitude, by "simply changing their geographical position." Indeed, "property on two feet," in Mary Chestnut's parlance, highlighted the essential contradiction of classifying human beings as chattel property.[31] They "struck the hardest blow" against the institution of slavery by interrupting the master's "uncontrolled authority over the body," the basis of the master-slave relations of social domination.[32] In the southern political economy of slavery, moreover, fugitive slaves were the ultimate liability: the complete loss of capital and its future profitability. From the inception of American slavery, slaveholders thus used public and private law to protect the basis of their society.[33]

---

pensated takings of property for the public good. Through the *damnum absque injuria* doctrine, the states immunized themselves from suits pertaining to public works programs and emergency measures. As the U.S. Supreme Court decided in *Smith v. Corporation of Washington* (1857), when "agents of the public" completed "a duty imposed on them by law," any incidental damage to private citizens deserved no "recompense." As with the *posse comitatus,* "private interests must yield to public accommodation." *Smith v. Corporation of Washington,* 61 U.S. (20 How.) 135 at 148 (1857). See also, Novak, *People's Welfare,* 128–31.

30. It should be noted that in addition to its use to police slaves, the *posse comitatus* was also used in the South for the same purposes—nuisances, riots, etc.—as it was in the North. Howell Cobb, *Analysis of the Statutes of Georgia: In General Use, With the Forms and Precedents Necessary to their Practical Operation . . .* (New York: E. O. Jenkins, 1846), 475; James Smith, *Civil Practice in the Court of Pleas and Quarter Sessions of North Carolina: In Ordinary Cases* (Raleigh; New York: A. S. Gould, 1846), 10.

31. James Russell Lowell, "The Thirty Fugitives and Their Two Hundred Pursuers," *Christian Reflector* 8 (1845): 118. Mary Chesnut, *Mary Chesnut's Civil War,* ed. C. Vann Woodward (New Haven: Yale University Press, 1981), 407.

32. Eugene D. Genovese, *Roll, Jordan, Roll: The World the Slaves Made* (New York: Vintage Books, 1976), 648, 657. *State v. Mann,* 13 N.C. 263 at 266 (1829). Genovese holds out Judge Ruffin's dictum as the exemplar of the southern judicial "logic of slavery" that immunized the master-slave relationship from any interference. Genovese, *Roll, Jordan, Roll,* 35–36. Generally, see, Mark V. Tushnet, *Slave Law in the American South:* State v. Mann *in History and Literature* (Lawrence: University Press of Kansas, 2003), 30–37, 139–46.

33. "'The legal relation of master and slave' is what the Slave Code declares it to be. And it is nothing else," writes William Goodell in the opening lines of *The American Slave Code in Theory and Practice . . .* (London: Clarke, Beeton, 1853), 1. For general studies on the centrality of slavery to southern private law, see Thomas D. Morris, *Southern Slavery and the Law, 1619–1860* (Chapel Hill: University of North Carolina University Press, 1996); Tushnet, *Slave Law in the American South,* esp. 30–37, 139–146; Helen Tunnicliff Catterall, ed., *Judicial Cases Concerning American Slavery and the Negro,* 4 vols. (New York: Negro Universities Press, 1968).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

*Law and History Review,* Spring 2008

As Sally Hadden has shown, the South's use of law and law enforcement to police slaves explicitly "evokes" the basic idea of the *posse comitatus,* as a society staked its welfare on its ability to compel private citizens to execute public services. Hadden explains how southern counties and cities compelled locals to prevent slave escapes and insurrection.[34] Cumulatively known as "the negro law," such practices of police much depended on the watchful eyes and compulsory assistance of white citizens. It was "*the duty of every good citizen*" finding a slave at large," ruled the Mississippi Supreme Court in 1845, to "deliver him to the nearest justices of the peace." This duty, ruled the same court a decade later, was as much a private duty to one's fellow slaveholders, as it was a public duty to guarantee "the safety of the community itself." After all, lurking fugitive slaves could lead to slave revolts, the antebellum south's "greatest nightmare."[35]

The South's law of fugitive slaves thus rested upon the basic principle of the *posse comitatus:* the public good, or in this case, the continuity of the planter class's economic and political domination, demanded the active, mandatory participation of the citizenry to apprehend fugitive slaves. Concluded James Kent in his *Commentaries,* amongst "such combustible materials," the South's expectation of "unceasing vigilance" was wholly understandable. In its "dual power" of socio-legal domination over its slaves, the South's mandatory vigilance united its two monopolies of violence—the practices of the plantation, and the doctrines of the state law—to create a peculiarly effective police regime.[36]

34. Sally M. Hadden, *Slave Patrols: Law and Violence in Virginia and the Carolinas* (Cambridge: Harvard University Press, 2001), 3, 41–104, esp. 50–60. Even though class conflict between wealthy planters and poor whites much debilitated the slave patrol system, it remained a formidable aspect of the South's slave police.

35. John Belton O'Neall, *The Negro Law of South Carolina* . . . (Columbia, S.C.: J. G. Bowman, 1848), 16, 24, 49. *Randal v. State* at 351 [emphasis added]. *Thompson v. Young,* 30 Miss. 17 at 18 (1855). See also, *Morton v. Bradley,* 30 Ala. 683 at 693–95 (1857); Baron de Carondolet, *Digest of the Laws of Louisiana* (June 1, 1795), reprinted in U.S. Congress, *Digest of the Laws of Louisiana,* 8th Cong., 1st sess., 1803, Serial Set 37 *American State Papers, Miscellaneous,* 381. John Hope Franklin, *The Militant South, 1800–1861* (1956; Urbana: University of Illinois Press, 2002), 76. See also, Herbert Aptheker, *American Negro Slave Revolts* (New York: Columbia University Press, 1943).

36. James Kent, *Commentaries on American Law* (New York: O. Halstead, 1826–1830; New York: Da Capo Press, 1971), 2:254. Kent's reference to the slave population as "combustible materials" echoes Chief Justice John Marshall's discussion of the state police power's legitimate reach over gunpowder caches in *Brown v. Maryland.* See above, note 26. Indeed, in *Elliot v. Gibson,* 49 Ky (10 B. Mon) 438 at 443–44 (1850), the Kentucky Court of Appeals would liken the fugitive slave to "a nuisance injurious to the community." The Virginia Supreme Court, in *Baker v. Wise,* 57 Va. (16 Gratt.) 139 at 195, 197 (1861), upheld the inspection of coastwise vessels on the grounds that when "any species of property . . . becomes the source of peculiar or extraordinary danger to the community," the state enjoyed the right to "adopt such regulations of police" to prevent "the threatened mischief." The *Baker* court very consciously

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

In the north and south, then, the *posse comitatus* was a ubiquitous institution for the maintenance of public order. Citizens willingly submitted to serving the state without compensation in exchange for the protection of their liberty and property—especially their slave property. As an institution of state and local law, the *posse comitatus* was a legalistic moral economy in which citizens' compulsory service protected local communities and private interests alike. As the quixotic Joel Barlow concluded in his uncompleted *magnum opus,* with the writ of habeas corpus, the jury trial, and the system of checks and balances, the *posse comitatus* was "the real foundation of our own system."[37]

## II. "Emergency" Powers: Federal Power over Persons, 1788–1850

Yet, the principle of compulsory service that was so deeply embedded in the fabric of state and local governance was almost altogether lacking at the federal level. To be sure, the success of the constitutional revolution of 1787 required a drastic expansion of federal authority. And in theory, this power acted directly on persons rather than on the states. Especially in times of mass insubordination, insurrection, and outright rebellion, federal power to compel obedience sprang to life. Yet the intellectual and practical framework for this federal compulsion was, rather than the exigencies of everyday governance, the exceptionality of "emergency" or extreme situations.

Just how, precisely, the federal government would go about enforcing national law was a tricky question in postcolonial America.[38] For the architects of the republic, this was as much a geographical question as it was one of

---

cited to the U.S. Supreme Court's decision in *Smith v. Turner,* 48 U.S. (7 How.) 283 at 319 (1849), a classic discussion of state police power over the supposedly threatening populations of paupers, vagrants, and immigrants. Genovese, *Roll, Jordan, Roll,* 45–47.

37. Joel Barlow, "The March of This Government," in Christine M. Lizanich, "'The March of This Government': Joel Barlow's Unwritten History of the United States," *William and Mary Quarterly* 33 (1976): 325–26. As Barlow suggests, compulsory jury service was considered in a similar light as the *posse comitatus.* See also, Tocqueville, *Democracy in America,* 729; Nancy J. King, "Juror Delinquency in Criminal Trials in America, 1796–1996," *Michigan Law Review* 94 (1996): 2675–85; *Kansas City v. Whipple,* 136 Mo. 475 at 483 (1896).

38. Edling, *A Revolution in Favor of Government.* Jack Rakove identifies the point during the Constitutional Convention at which "it was evident that the authority of the national government would depend on judicial enforcement." Crossing this Rubicon meant that the federal judiciary would require its own enforcement mechanisms. Rakove, *Original Meanings: Politics and Ideas in the Making of the Constitution* (New York: Vintage Books, 1997), 173. Dwight F. Henderson, *Courts for a New Nation* (Washington, D.C.: Public Affairs Press, 1971), 5. More generally, see Martin Shapiro, *Courts: A Comparative and Political Analysis* (Chicago: University of Chicago Press, 1981), 78.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

*Law and History Review,* Spring 2008

politics. According to Alexander Hamilton in *Federalist* 27, if the federal
government operated "at a distance and out of sight," it would fail "to interest
the sensations of the people." In a confederacy that lacked a sense of its own
nationhood, he continued, "there can be no sanction for the laws but force."
On the other hand, if the federal government maintained an institutional pres-
ence within the states, "the authority of the Union and the affections of the
citizens towards it will be strengthened." For Hamilton, civic involvement in
the federal state was necessary because "the more it circulates through those
channels and currents in which the passions of mankind naturally flow, the
less it will require the aid of the violent and perilous expedients of compul-
sion." By distributing lower federal courts, and other offices, throughout the
country, then, the founders envisioned that federal law would be enforced,
not by "perilous expedients of compulsion," but rather, through "the ordinary
magistracy . . . in the execution of the laws."[39]

But what, precisely, was meant by this preferred form of compulsion?
Hamilton suggested a system with two layers. There was, as he implied
above, the political culture of "public opinion" that would motivate people
to obey the law. "In addition," though, Hamilton claimed that the federal
government, like the states, had "the power to call to its assistance and
support the resources of the whole Union." Here, then, was the origin of
the federal *posse comitatus.* It was "absurd," Hamilton wrote in *Federalist*
29, to believe that officers of the federal government lacked the power to
command "the assistance of the citizens" where such force was necessary.
Thus, the Judiciary Act of 1789 explicitly granted federal marshals "power
to command all necessary assistance in the execution of his duty."[40]

The vehemence with which the founders asserted the federal government's
enforcement powers, though, was in stark contrast to the early practices
of federal power.[41] As several scholars have noted, the first federal courts

39. Alexander Hamilton, *Federalist* 27, in *The Federalist Papers,* 203. Engdahl, "Soldiers,
Riots, and Revolution," 35–42. See also Gordon Wood, *Creation of the American Republic,*
305.

40. Alexander Hamilton, *Federalist* 29, in *The Federalist Papers,* 209, 183. On the sig-
nificance of public opinion in early national politics, see Joanne B. Freeman, *Affairs of
Honor: National Politics in the New Republic* (New Haven: Yale University Press, 2001),
90–91. The Judiciary Act of 1789, 1 *U.S. Statutes at Large* 73, 87 (1789). See also, Alfred
Conkling, *Treatise on the Organization, Jurisdiction, and Practices of the Courts of the
United States . . .* (Albany: D. Packard & Co., 1830), 110; The Process Acts of 1792 and
1828, 1 *U.S. Statutes at Large* 275 (1792), 3 *U.S. Statutes at Large* 278 (1828); *United
States v. Fenwick,* 25 F. Cas. 1062 at 1064 (1836). In *Beers v. Haughton,* 34 U.S. (9 Pet.)
329 at 359–60 (1835), Joseph Story identifies a "doctrine" in which lower federal "courts
may, by their rules . . . alter the . . . effect and operation of the process, whether *mesne* or
final, and the modes of proceeding under it."

41. G. Edward White locates the persistence of the early theory of federal judicial power

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 522

frequently had empty dockets. Even though this would change by the early
nineteenth century, the great majority of cases that came before the lower
federal courts required little in the way of execution.[42] In the general con-
stitutional order of the early republic, the lower federal courts played but a
peripheral role in an era dominated by the ascendancy of the common law
and state judiciaries.[43]

   Peripheral though it may have been, the federal judiciary, and the com-
pulsion it wrought, literally held together the union during times of insur-
rectionary crisis. "Whenever the laws of the United States shall be opposed,
or the execution thereof obstructed in any state," declared the federal Call-
ing Forth Act of 1795, "by combinations too powerful to be suppressed
. . . by the powers vested in the marshals," the president possessed the
power to commandeer "the militia of such state, or of any other state or
states," to "cause the laws to be duly executed."[44] Through this act and its
later brethren, the federal government drew upon military power to serve
as the "posse cometatus of the Marshall [sic]" to compel large groups of
citizens—western Pennsylvanians in the 1790s; Aaron Burr and his banditti

---

in the Marshall Court's assertions of federal supremacy. See White, "Recovering Coterminous Power Theory: The Lost Dimension of Marshall Court Sovereignty Cases," *Origins of the Federal Judiciary: Essays on the Judiciary Act of 1789,* ed. Maeva Marcus (New York: Oxford University Press, 1982), 66–101.

   42. Mary K. Bonsteel Tachau, *Federal Courts in the Early Republic: Kentucky, 1789–1816* (Princeton: Princeton University Press, 1978), 21, 176. See also, Henderson, *Courts for a New Nation,* 87, 112–13, 119, 120–121; Henderson, *Congress, Courts, and Criminals: The Development of Federal Criminal Law, 1801–1829* (Westport, Conn.: Greenwood Press, 1985); Kathryn Preyer, "Jurisdiction to Punish: Federal Authority, Federalism and the Common Law of Crimes in the Early Republic," *Law and History Review* 4 (1986): 223–65; William R. Casto, "The Origins of Federal Admiralty Jurisdiction in an Age of Privateers, Smugglers, and Pirates," *American Journal of Legal History* 37 (1993): 117–57.

   43. The dominance of state and local common law is the theme of Novak, *People's Welfare;* Peter Karsten, *Heart Versus Head: Judge-Made Law in Nineteenth-Century America* (Chapel Hill: University of North Carolina Press, 1977); Morton J. Horwitz, *The Transformation of American Law, 1780–1860* (Cambridge: Harvard University Press, 1977); Willard J. Hurst, *Law and Economic Growth: The Legal History of the Lumber Industry in Wisconsin, 1836–1915* (Cambridge: The Belknap Press of Harvard University Press, 1964).

   44. 1 *U.S. Statutes at Large* 424 at 425 (1795). See also, the Calling Forth Act of 1792, 1 *U.S. Statutes at Large* 264 (1792), and the so-called Force Act of 1833, 4 *U.S. Statutes at Large* 634 (1833). For a summary of this legislation, see Engdahl, "Solders, Riots, and Revolution," 42–49. Dwight Henderson concludes his study of the early federal courts thusly: "If the establishment of the Federal courts had to be justified on the basis of the volume of cases tried, the inferior courts should never have been established. . . . The presence of the federal courts, however, greatly strengthened the national government, particularly through enforcement of the revenue laws." Henderson, *Courts for a New Nation,* 134.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

in 1807; South Carolinian nullifiers in 1832; revolutionary Mormons in 1857—to obey federal law.[45]

The very exceptional nature of this use of federal compulsion necessitated a subordinate order of federal coercion. The president's calling forth of the *posse comitatus,* opined Joseph Story, was not a request but "an order," "a command of a military nature," requiring of militiamen nothing less than "prompt and unhesitating obedience." But Story's primary interest in *Martin v. Mott* (1827) was not to create a federal compulsion over its own servicemen. On the other hand, *Mott,* like *Houston v. Moore* (1820), concerned the federal government's power to commandeer *state militiamen* into federal service. The distinction illustrated how, theories of federal power notwithstanding, federal compulsion remained mediated by more substantively powerful institutions. In the latter case, Story rooted the president's power over the militias in the fact that "every *citizen of a state* owes a double allegiance" to "both the State and the United States." In fact, Story had employed smoke and mirrors. The federal government's power of compulsion hinged on some allegiance of the subject, but that allegiance itself was of the third order, rooted in the foundational compulsion the states wielded over "every citizen of a state," to say nothing of the obligations "of a military nature" that militiamen owed their outfits.[46]

In short, federal power over persons, as it related to the instruments and objects of compulsion, was meant only for the "sudden emergencies" that transcended the law enforcement capacities of the states.[47] In the throes of

45. Andrew Jackson to Martin Van Buren, January 13, 1833, quoted in William W. Freehling, *Prelude to Civil War: The Nullification Controversy in South Carolina, 1816–1836* (New York: Harper & Row, 1965), 279. On the federal use of military *posses,* see Robert W. Coakley, *The Role of Federal Military Forces in Domestic Disorders, 1789–1878* (Washington, D.C.: Center for Military History, 1988); Frederick T. Wilson, *Federal Aid in Domestic Disturbances, 1787–1903* (New York: Arno Press, 1969); Richard D. Poll and Ralph W. Hansen, "'Buchanan's Blunder': The Utah War, 1857–1858," *Military Affairs* 25, no. 3, Part 1 (1961): 121–31; Charles Fairman, *The Law of Martial Rule* (Chicago: Callaghan and Company, 1930).

46. *Martin v. Mott,* 25 U.S. (12 Wheat.) 19 at 27, 20–21 (1827). See also, *Houston v. Moore,* 18 U.S. (6 Wheat.) 1 at 44 (1820). In 1827, southern political-economist Thomas Cooper, entrenched in the vortex of Nullification politics, declared that even under federal command, state forces "are regarded as the militia of the States severally." Thomas Cooper, *Dr. Cooper on the Tariff* (Charleston: s.n., 1827), 21. Generally, see Akhil Reed Amar, "Of Sovereignty and Federalism," *Yale Law Journal* 96 (1987): 1495–96; David P. Currie, *The Constitution in the Supreme Court: The First Hundred Years, 1798–1888* (Chicago: University of Chicago Press, 1985), 108–10, 185.

47. As Michael Mann argues, the use of military force in domestic affairs differentiates "geopolitical wars," waged on the basis of political economy, from "domestic repression," utilized to maintain law and order. For Mann, the latter is the origin of centralized

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

revolutionary ideology, some Americans had believed that the occasional revolutionary movement energized democratic tendencies. But after the Fries Rebellion of 1799, the federalist Timothy Pickering proffered a reinterpretation: " . . . punishment of such high handed offenders were essential to ensure future obedience to the laws, or the exertions of our best citizens to suppress future insurrections." In this sense, the occasional insurrection, bringing as it did the sporadic use of federal compulsion, would fetch "obedience for years to come."[48]

In 1849, Justice Levi Woodbury summarized the distribution of powers over persons between the several states and the federal government. In his treatise-like dissent in *Luther v. Borden,* Woodbury wrote that "the States have succeeded well, thus far,—over half a century,—in suppressing domestic violence . . . with the aid of the militia . . . by help of the *posse comitatus* . . . dispersed all opposition." It was only, "if civil process . . . should fail," that the "general government" would supply "additional force."[49] Just months later, federal Judge Humphrey Howe Leavitt of the Circuit Court of Ohio dispelled any remaining doubts about the nature and character of this exceptional federal power. In *Driskell v. Parish,* a jury was asked to determine the innocence or guilt of parties that had remained "merely passive" as authorities, clothed with the power of law, pursued a federal fugitive. In his charge, Leavitt reminded the jurors that the federal statute in question "imposes no obligation on any one to aid in the recaption." "To recognize such an obligation," he went on to suggest, "would be monstrous."[50]

---

municipal police forces. Mann, *Sources of Social Power,* vol. 2, *The Rise of Classes and Nation-States* (New York: Cambridge University Press, 1993), 410–11. Scholars would be well advised to exercise caution in using this characterization of limited federal power over persons as a springboard for theorizing about some antebellum "nightwatchman" state. There is simply too much scholarship (cited in part, above, at notes 9, 14, 26, and 40) on the antebellum state to sustain this characterization. Moreover, my assessment of federal power over persons is derived from a comparison of far more developed powers at the state and local level. Only a conscious disregard for this analytical framework, and the weighty scholarship on American governance, would permit the development of a theory of an antebellum "nightwatchman" state. See Richard R. John's introduction to *Ruling Passions: Political Economy in Nineteenth-Century America,* ed. Richard R. John (University Park: Pennsylvania State University Press, 2006), 1–20; Novak, *The People's Welfare,* 238–48; Brian Balogh, "The State of the State Among Historians," *Social Science History* 27 (2003): 455–63.

48. Timothy Pickering, quoted in Henderson, *Courts for a New Nation,* 129.

49. *Luther v. Borden,* 48 U.S. (7 How.) 1 at 75–76 (1849). See Currie, *Constitution in the Supreme Court,* 252–57.

50. *Driskell v. Parish,* 7 F. Cas. 1095 at 1099 (1849).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

20                    *Law and History Review*, Spring 2008

### III. Transforming Federal Compulsion:
### The Fugitive Slave Crisis, 1850–1860

In *Driskell v. Parish,* the fugitive Judge Leavitt spoke of was a fugitive slave; the statute he interpreted was the Fugitive Slave Law of 1793. How, then, did the notion of a federal obligation for citizens to aid in the recapture of fugitive slaves, deemed "monstrous" by Judge Leavitt in 1849, become legitimate just a year later? During the intervening months, the politics of slavery necessitated a fundamental reevaluation and reconfiguration of federal power over persons. Two problems in particular—the North's Personal Liberty Laws and the Supreme Court's decision in *Prigg v. Pennsylvania* (1842)—left the South in a seemingly intractable position. On the one hand, the North was resolutely unwilling to assist slaveholders with their fugitive slaves. On the other hand, while the South turned to the federal government for redress, they reckoned with highly limited federal law enforcement machinery. The Fugitive Slave Law of 1850, and the federal *posse comitatus* doctrine in particular, thus attempted to kill two birds with one, very transformative stone. To be sure, compelling the citizenry to serve as federal law enforcement was an innovative method to heighten state capacity. Underlying this compulsion, though, was a deeper and darker motive: as the law would force northerners to assist, it would coerce them to accept the legitimacy of slavery. Here lay legal and political blueprints for the South's vision for a truly slaveholding republic.

For the South, of course, the interstate flight of slaves was a longstanding grievance. "Mason & Dixon's Line," commented Dr. Samuel Cartwright, was "a mere air line, without wall or guard." No matter the strength of their own, internal apparatus for apprehending runaways, it had long been understood that slavery could exist only by positive law.[51] Thus, George Mason and his fellow slaveholding "founding fathers" secured the Constitution's Fugitive Slave Clause, (Art. IV, §2). As elaborated by the Fugitive Slave Law of 1793, the Clause required that state law enforcement "deliver up"

51. Samuel A. Cartwright, "Report on the Diseases and Physical Peculiarities of the Negro Race," *New Orleans Medical and Surgical Journal* 7 (1851): 707. That slavery was a creature of positive law received its most familiar elaboration by British jurist Lord Mansfield in *Somerset's Case.* According to Mansfield, slavery could exist under "only positive law," and, therefore, when a slave moved beyond that positive law's jurisdiction, he ceased to be a slave. *Somerset v. Stewart,* Lofft 1, 98 Eng. Rep. 499 (1772). On the details and import of *Somerset,* see George Van Cleve, "*Somerset's Case* and Its Antecedents in Imperial Perspective," *Law and History Review* 24 (2006): 601–47; William M. Wiecek, "*Somerset:* Lord Mansfield and the Legitimacy of Slavery in the Anglo-American World," *University of Chicago Law Review* 42 (1974–1975): 86–146; David Brion Davis, *The Problem of Slavery in the Age of Revolution, 1770–1823* (Ithaca: Cornell University Press, 1975; New York: Oxford University Press, 1999), 480–82.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 526

fugitive slaves to pursuant slaveholders.[52] And until the 1830s, explained
Francis Bowen in *The North American Review,* "We . . . never heard that
the enforcement . . . of this act created any ill-feeling, or gave rise to any
disorder or opposition." But during the 1830s, Bowen continued, abolition-
ists' legal "agitation against slavery" effectively paralyzed the 1793 law.[53]
Most troublesome were 'Personal Liberty Laws,' that prohibited state and
local officials from taking any part in fugitive slave cases.[54] Until 1842,
abolitionists' successful strategy of using state law to hinder the 1793 law
appeared to have secured a major, and permanent, blow against slavery.
Without the cooperation of the free states' local police apparatus, slave-
holders had little chance to successfully reclaim a fugitive slave.[55]

But it was only with the *Prigg v. Pennsylvania* (1842), that the basic
framework for policing fugitive slaves shifted from considerations of state
to national power. Essentially, *Prigg* weighed the constitutionality of the

52. *U.S. Constitution,* art. 4, sec. 2 (repealed 1865). On the history of the Fugitive Slave
Clause, see Paul Finkelman, "Story Telling on the Supreme Court: *Prigg v. Pennsylvania*
and Justice Joseph Story's Judicial Nationalism," *The Supreme Court Review* 1994 (1994):
260–63. Fugitive Slave Law of 1793, 1 *U.S. Statutes at Large* 302 at 302–5 (1793). Finkel-
man, "The Kidnapping of John Davis and the Adoption of the Fugitive Slave Law of 1793,"
*Journal of Southern History* 56 (1990): 410. Slaveholders brought apprehended runaways
before any court or "magistrate of a county, city or town corporate, wherein such seizure
or arrest shall be made." Once the slaveholder produced proof that the seized person was,
in fact, a runaway slave, the judge or magistrate issued a certificate of removal, authorizing
the slaveholder to rendition the fugitive back to the South.

53. Francis Bowen, *North American Review Index* 71 (1850): 261. The same chronology
can be found in *Charge to Grand Jury—Fugitive Slave Law,* 30 F. Cas. 1007 at 1009 (1851);
Thomas R. R. Cobb, *An Inquiry into the Law of Negro Slavery in the United States of America*
. . . (Philadelphia: T. & J. W. Johnson, 1858), 222. There were abortive attempts in 1796, 1801,
1817, and 1822 to enact new fugitive slave legislation. Joseph F. Nogee, "The Prigg Case and
Fugitive Slavery, 1842–1850: Part I," *Journal of Negro History* 39 (1954): 187.

54. In fact, the dozens of northern Personal Liberty Laws included more than prohibi-
tions on state officials from assisting in fugitive slave cases. The laws sometimes went as
far as to prohibit the use of state jails for fugitive slaves. More importantly, they also set
forth procedures for jury trials for fugitives, rather than the summary process prescribed
by the Fugitive Slave Laws. Occasionally, the laws also posited an appellate procedure for
fugitive cases. These topics are closely studied in Thomas Morris's masterful, *Free Men All:
The Personal Liberty Laws of the North, 1780–1861* (Baltimore: Johns Hopkins University
Press, 1966).

55. And such knowledge, the logic went, was as much a disincentive for slaveholders to
attempt recaption as it was an incentive for slaves to seek refuge in free states. U.S. Con-
gress, Senate, *Resolutions of the Legislature of Kentucky, in favor of the passage of a law
by Congress to enable citizens of slaveholding States to recover slaves escaping into the
non slaveholding states,* 30th Cong., 1st sess., 1847, Serial Set 511, Senate Misdoc. 19, 15.
Reminisced Virginia's Thomas Bayly in 1850, "The inefficiency of the former law greatly
encouraged negroes to attempt an escape." Thomas H. Bayly, *Circular of Thomas H. Bayly,
of Virginia, To his Constituents* (Washington, D.C.: Congressional Globe Office, 1850), 7.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Personal Liberty Law: did the states have the power to legislate as to the mechanism for seizing and reclaiming runaways? Certainly not, ruled Justice Joseph Story and a highly fractured bench. But Story took the matter a step further. It was not simply that the states could not hinder slaveowners' right of recapture. Rather, it was that the federal government possessed exclusive jurisdiction over fugitive slaves in free states. And since these would be *federal* laws, "the states . . . cannot be compelled to enforce them."[56] As *Prigg* absolved the states of any enforcement burden, then, it forced slaveholders to drastically reframe their approach to the problem of fugitive slaves. Where the South had previously sought to compel the states to enforce fugitive slave legislation, they would now, for better or worse, be forced to rely on the federal government for assistance.

In 1842, though, it was hard to imagine an effective federally administered fugitive slave law. The state law enforcement apparatus—with its justices of the peace, constabulary, night watch, sheriffs, and others—deeply interpenetrated almost every aspect of American society. Federal law enforcement, on the other hand, consisted exclusively of the meager detachment of U.S. Marshals and their deputies assigned to the few federal courts throughout the country.[57] How could the federal government secure slaveholders' property rights with such a deficiency of manpower? Forced to join Story's opinion in striking down the Personal Liberty Laws, Justice Peter Daniel and Chief Justice Taney eviscerated the notion that the federal government possessed any such capability. A splenetic Daniel noted that "the inconsiderable number of federal officers . . . and their frequent remoteness from the theatre of action" would effectively "defeat" the slaveholder's "right of property." The lack of federal manpower and its "very distant" locale, thundered the Chief Justice, went "to show how ineffectual and delusive" the 1793 law was "if state authority is forbidden to come to its aid."[58]

56. *Prigg v. Pennsylvania* at 615. Paul Finkelman argues that, "Story's primary goal in *Prigg* was to enhance the power in the national government," if even "at the expense of civil liberties, fundamental notions of due process, and accepted concepts of antebellum federalism." Finkelman, "Story Telling on the Supreme Court," 249.

57. On the transformation of local police regimes in nineteenth-century America, see, e.g., Allen Steinberg, *The Transformation of Criminal Justice: Philadelphia, 1800–1880* (Chapel Hill: University of North Carolina Press, 1989); Roger Lane, *Policing the City: Boston, 1822–1885* (Cambridge: Harvard University Press, 1967); Eric H. Monkkonen, "History of Urban Police," *Crime and Justice* 15 (1992): 547–80. On the history of the U.S. marshals in the early republic, see Frederick S. Calhoun, *The Lawmen: United States Marshals and their Deputies, 1789–1989* (Washington: Smithsonian Institution Press, 1990), 12–15; Leonard D. White, *The Federalists: A Study in Administrative History* (New York: MacMillan Books, 1948), 259, 365, 412.

58. *Prigg v. Pennsylvania* at 656–57. William M. Wiecek, "Slavery and Abolition before the United States Supreme Court, 1820–1860," *Journal of American History* 65 (1978): 73–74. *Prigg v. Pennsylvania* at 630–31.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 528

As the political voices of southern slavery contemplated a federally enforced fugitive slave law, then, they faced the reality of relying on a negligible and disparate federal police. Accordingly, preliminary drafts of new legislation sought to maximize the federal government's existing power by appropriating *all* federal officials, law enforcement or otherwise, to apprehend fugitive slaves.[59] For one thing, slaveholders might enjoy a better opportunity to reclaim their slaves if a federal "judge, commissioner, clerk, marshal, postmaster, or collector [of customs]" could issue process. Senator Andrew Butler of South Carolina also proposed other creative ways to extract the most utility from existing federal institutions. If no marshal was to be found to execute a warrant, any federal official could simply "appoint some fit and discreet person, who shall be willing to *act as marshal,*" more proximate to what Justice Daniel called the "theatre of action." Similarly, if a marshal or "acting marshal" lacked sufficient manpower to execute a fugitive slave warrant, Senator Butler's bill "authorized and required" him "to employ so many persons as he may deem necessary." Butler's first bill thus worked with the federal government's existing resources to address the dilemma of state capacity.[60]

Importantly, by early 1850, Butler and his co-sponsor, Virginia's Senator James Mason fully acknowledged the revolutionary course of this project in statecraft. It was an odd proposition, remarked Mason, that clerks, and especially postmasters, should assume such powers. But "if the law is to be effectual," he continued, "you must provide officers to execute it at almost every cross-road, in all the counties of the offending States." Only "officers of the Federal Government" would suffice. For Mason, the sole alternative to harnessing the power of postmasters, customs officials, and clerks, was to "create a new batch, and pay them adequate salaries, to be located at every point, in every county of the non-slaveholding States." It was a simple choice: either completely mobilize the federal government's existing resources, or create a "new batch" of federal fugitive slave police.[61]

A simple choice, perhaps, but, for even Mason and Butler, it quickly appeared a false one. In 1848, Butler warned that he "had not complete confidence in the efficacy" of his bill. Two years later Mason worried that even with the new provisions, a federal fugitive slave law would become "merely illusory." The problem, they realized, was not simply that the federal

59. *Senate Reports,* 30th Cong., 1st sess., 1847–48, report no. 143; *Congressional Globe,* 30th Cong., 1st sess., December 10, 1847, 51.

60. Andrew Butler, quoted in United States Congress, *To provide for more effectual execution of 3d clause of 2d section of 4th article of constitution of United States,* 31st Cong., 1st sess., Serial Set 565, Senate Rep. 12, 13, 15 [hereafter, Butler Report].

61. *Congressional Globe,* 31st Cong., 1st Sess., January 28, 1850, 235, 236. Postmasters were the most numerous and most widely dispersed federal officials in antebellum America. Richard R. John, *Spreading the News,* 112–68.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

government lacked the resources to adequately enforce the law. Theirs was, in fact, a classic—perhaps *the* classic—conundrum of law enforcement. "No law can be carried into effect," explained James Mason, "unless it is sustained and supported by the loyalty of the people to whom it is directed." By early 1850, then, the architects of the second Fugitive Slave Law had combined their interest in quantitatively increasing federal capacity with approaches to coerce the citizenry to "sustain and support" the law.[62]

For slaveholders, this was no doubt a vexing dilemma. Southerners themselves shared a common understanding that fugitive slaves threatened the very foundations of their society. It was "undoubtedly for the public good, and therefore, a matter of public policy," declared the Kentucky Supreme Court in 1847, "that runaway slaves be re-taken and placed in subjection to their proper owners." But "in the non-slaveholding States," acknowledged the same court, there was "an odium . . . visited upon those of their citizens who engaged in the apprehending of fugitives from other States."[63] As Justice McLean dissented in *Prigg,* how was it possible "to protect the rights of the slaveholder against the states opposed to these rights" if "the effective power is in the hands of those on whom it is to operate"? It was, indeed, a question of power. If there was not power enough within the ideas of "comity and respect" to compel northerners to recognize slavery's legitimacy, the South then required something more. As David Brion Davis concludes, all that remained for the South, was "only the law of force."[64]

Butler and Mason introduced this "law of force" on January 31, 1850. Much of the law went to creating "partly judicial and partly administrative" officials, U.S. Commissioners, to expedite fugitive slave cases in the federal courts.[65] As to the matter of enforcement, the 1850 law turned

62. Butler Report, 15. *Congressional Globe,* 31st Cong., 1st sess., January 28, 1850, 233.
63. *Miller v. Porter,* 47 Ky. (8 B. Mon.) 282 at 238 (1847). *Elliot v. Gibson* at 442. As the Kentucky Court of Appeals noted in the latter, the state also offered pecuniary rewards "to induce" northerners "to consult their own interests, regardless of the public sentiment around them." See also, "Act of February 9, 1819," reprinted in Joseph Tate, ed., *A Digest of the Laws of Virginia . . .* (Richmond: Shepherd and Pollard, 1823), 509.
64. *Prigg v. Pennsylvania* at 662. Cobb, *Inquiry into the Law of Negro Slavery,* 224–25. Davis, *Problem of Slavery in the Age of Revolution,* 522.
65. The phrase is Massachusetts Chief Justice Lemuel Shaw's, *Thomas Sims's Case,* 61 Mass. (7 Cush.) 285 at 302–3 (1851). According to Charles A. Lindquist, Congress created the office of U.S. Commissioners in 1812 to accommodate the increasingly variegated roles of state and federal judiciaries. By the 1830s, Lindquist argues, the federal courts had relinquished many of their previous appropriations of state jails and local courts. In this sense, Lindquist suggests, the U.S. Commissioners were federal justices of the peace. In 1842, circuit court commissioners gained "all the powers that any justice of the peace" possessed in the state judiciaries. Charles A. Lindquist, "The Origin and Development of the United States Commissioner System," *American Journal of Legal History* 14 (1970): 7–9. 1 *U.S. Statutes at Large* 680 (1812); 2 *U.S. Statutes at Large* 517 (1842).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

again to the U.S. Marshals. The new bill placed no enforcement burdens on customs officials, postmasters, and clerks. Instead, where and *"when needed,"* commissioners and marshals would "summon and call to their aid the bystanders, or *posse comitatus* of the proper county." Here, then, lay the *via media* between James Mason's suggestion of federal officers "at every point, in every county," and the South's system of "unceasing vigilance." Indeed, what was so institutionally innovative about the Fugitive Slave Law of 1850 was the notion that citizens themselves would do the work of the federal state.[66]

Was it sufficient, though, to clothe marshals with the power to summon the *posse comitatus*? Mason and Butler also included a legal foundation that, they believed, would animate this institution. This was the federal *posse comitatus* doctrine: "All good citizens are hereby commanded to aid and assist in the prompt and efficient execution of this law, whenever their services may be required as aforesaid for that purpose." This single sentence betrayed a vital assumption about the nature of the federal state and its relations to the American people. If the United States "commanded" its "good citizens" at any moment "whenever their services may be required," then the nation possessed the power to compel persons to assist it. This assertion of constant, inexorable federal power over persons was a far cry from exceptional, "emergency" powers to subdue insurrection. On the other hand, what distinguished this assertion of power was its decidedly *un*exceptional nature: no matter where or when it so desired, the federal government could command the assistance of its citizens.[67]

The flip side of the doctrine dealt, not with government capability, but with obligations of citizens to obey the federal state. The political objects of this power of compulsion were not soldiers; they were not even state militia. Nor did the doctrine make use of Justice Johnson's *Houston v. Moore* formulation that "every citizen of a state owes a double allegiance to both the State and the United States." The simple fact was that these very distinctions that had previously delimited federal power no longer bore much importance. "All good citizens" were to obey, and, presumably, it was the fact of their submission to federal power that so constituted them as "good citizens."

That the radical nature of the *posse comitatus* doctrine's transformation of federal power over persons—from emergency to routine; from *de*

66. The 1850 law explicitly addressed the fear Andrew Butler expressed in 1848 that federal marshals in free states would be "reluctant" to enforce a federal fugitive slave law. Section 5 of the 1850 law imposed a $1000 fine on any marshal who "refuse to receive" or otherwise fail to execute process under the law. Butler Report, 15. *Congressional Globe,* 31st Cong., 1st Sess., January 31, 1850, 271; Fugitive Slave Law of 1850, 9 *U.S. Statutes at Large* 462.

67. *Congressional Globe,* 31st Cong., 1st Sess., January 31, 1850, 271.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

26          *Law and History Review,* Spring 2008

*facto* to *de jure;* from sporadic to ubiquitous—lurked beneath the political "compromise of 1850" was all the more remarkable. But this was not the first time the South's forward-looking agenda, frequently mistaken for frightened self-preservationist politics, hoodwinked the North into such "compromises." In the past, though, the South had bartered on geographical and representational terms alone, trading away slavery in the northwest for the west in 1787; Maine and the Midwest for Missouri and the Deep South in 1820.[68] By 1850, with covetous northern eyes fixated on California, the South had quietly changed the game altogether. To be sure, the geographical and territorial questions provided great fodder for the South to maintain its aggrieved-minority bluster about states rights. In the meantime, however, the South had trained its sights on loftier goals. With the Fugitive Slave Law and the power to enforce it, declared Henry Clay to his fellow Kentuckians in November, 1850, "we have the constitution, the law, and the clear right on our side."[69]

## IV. "Conditions Analogous to Slavery": Abolitionists and the *Posse Comitatus*

Likely, neither Clay nor Mason nor Butler could have imagined the success of the Fugitive Slave Law of 1850. According to Randolph Campbell, slaveowners enjoyed about an 80 percent success rate reclaiming fugitive slaves in free states from 1850 to 1860. Emboldened by the new law, slaveholders successfully pursued fugitives in previously impregnable abolitionist strongholds such as Boston, Cleveland, and upstate New York. In less divisive climes, professional slave-catchers colluded with U.S. Marshals to seize suspected fugitives, sometimes en masse. Throughout the country,

68. Holman Hamilton, *Prologue to Conflict: The Crisis and Compromise of 1850* (Lexington: The University Press of Kentucky, 1967), 189. On the earlier compromises, see Staughton Lynd, "The Compromise of 1787," *Political Science Quarterly* 81 (1966): 225–50. Howard A. Ohline, "Republicanism and Slavery: Origins of the Three-Fifths Clause in the United States Convention," *William and Mary Quarterly* 28 (1971): 566–67. Adam Rothman, *Slave Country: American Expansionism and the Origins of the Deep South* (Cambridge: Harvard University Press, 2005), 214–16.

69. Henry Clay, Speech to the General Assembly of Kentucky, November 15, 1850, in *The Papers of Henry Clay,* ed. Melba Porter Hay (Lexington: University Press of Kentucky, 1991), 10:850. As Don E. Fehrenbacher notes, during the 1840s, southern political leaders began to look upon the sectional conflict in increasingly constitutional, as opposed to geographical terms. By securing national guarantees and protection for slavery, the South could perform an end-run around previous compromises that limited slavery to the South alone. Fehrenbacher, *Slavery, Law, and Politics: The Dred Scott Case in Historical Perspective* (New York: Oxford University Press, 1981), 68–69, 84–85.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

it had become commonplace to witness federal marshals and their "posses
making arrests."[70]

For several decades, abolitionists had denounced the South's ambitious
planter class bent on the incremental nationalization of the plantation mode
of production. For abolitionists, the federal *posse comitatus* doctrine was tan-
gible evidence of the continued ascendancy of the southern "slave power."[71]
But they also detected a fundamental reorientation of the power relations
between their old constitutional and political antagonists. Now clothed with
the power to command the assistance of citizens to capture fugitive slaves,
southern planters could compel northerners into service. In the north, the
prospect of assisting slavery under duress or force suggested a condition
little different from slavery itself.

The abolitionists' encounter with the federal *posse comitatus* began—not
unlike earlier critics of standing armies, censorship, and taxation, and more
recent opponents of eminent domain, firearms regulation, and electronic
surveillance—with a hoary hypothetical quandary: what if federal power
acted specifically upon *you*? Milwaukee Congregationalist William DeLoss
Love put the matter this way. At the stroke of midnight, a fugitive slave,
with "the bloodhounds . . . on his track," knocks at "your door." Almost
immediately, "the slave-hunter comes. He has found his prey." Now, "you
are called to assist. If you now obey the law," you will "thrust him into
cruel slavery," with "no end but death." "Will you return him to it? Will
you obey god or man?"[72]

In this contest between the individual's personal belief and the authority
of federal law, explained Reverend Rufus W. Clark of Albany, the individual
faced powerful, but different, coercive forces. Government compulsion—
"the officer, who commands me to aid him"—faced off against individual
conscience: "I have been taught to believe that man could not hold as
property his fellow man." For Clark, salvation required flouting the forces
of government and law. He could "endure the penalty" in a court of law,
"but no *earthly power can compel me,* or any other man," to commit "trea-

70. Campbell, *Slave Catchers,* 207. Jonathan Katz, *Resistance at Christiana: The Fugitive
Slave Rebellion, Christiana, Pennsylvania, September 11, 1851, A Documentary Account*
(New York: Thomas Y. Cromwell Company, 1974), 72, 123, 125, 128. I have borrowed the
section heading from Frederick Cooper, "Conditions Analogous to Slavery," 107–49.

71. By the 1840s, abolitionists honed their critique of the slave power on the movement to
annex Cuba and extend slavery into the territories. Leonard L. Richards, *The Slave Power:
The Free North and Southern Domination, 1780–1860* (Baton Rouge: Louisiana State Uni-
versity Press, 2000), 4; David Brion Davis, *The Slave Power Conspiracy and the Paranoid
Style* (Baton Rouge: Louisiana State University Press, 1969), 7, 18.

72. William Deloss Love, *Obedience to Rules—The Duty and Its Limitations . . .* (New
Haven: Storer & Stone, 1851), 13–14.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

son against conscience, against humanity, against justice, against God." In this moral standoff, ecumenical imperatives trumped the federal state's "earthly power" to "compel."[73]

Moreover, by personalizing the possibility of serving in the *posse comitatus,* abolitionists understood their individual politics within a perceived global struggle between slavery and freedom. Explained a Pawtucket clergyman, contemplating compulsion in this manner made the global crisis "as apparent as it is real." On this higher plane, repudiating the *posse comitatus* constituted a substantive contribution to the destruction of slavery. But the converse was also true. In executing the Fugitive Slave Law, wrote Horace Mann, the federal marshal "consents to play pimp and pander to this bawd of American Slavery." When the marshal summoned the *posse comitatus,* then, the citizens of free states became an extension of the slave power. Thus the *posse comitatus* "transform[sic] men . . . to bloodhounds."[74] Worse yet, according to Minister R. D. Williams, the federal *posse comitatus* "demands us at the bidding of the slave-catcher." This was understood literally. Slave-catchers were a particularly reviled set of characters in the North, subject to any number of ideological, religious, and class criticisms.[75] Others, like the Reverend Joseph P. Thompson, saw no difference between doing "the bid-

73. Rufus W. Clark, *Conscience and Law. A Discourse Preached in the North Church, Portsmouth, New Hampshire, on Fast Day, April 3, 1851* (Boston: Tappan & Whittemore, 1851), 22 [emphasis added].

74. Horace Mann, *Horace Mann's Letters on the Extension of Slavery into California and New Mexico: And on the Duty of Congress to Provide the Trial by Jury for Alleged Fugitive Slaves* (Washington, D.C.: Buell & Blanchard, 1850), 5. Ezra S. Gannett, *A Discourse Preached in the Meetinghouse, in Boston, on Sunday, June 11, 1854* (Boston: Crosby, Nichols & Company, 1854), 19.

75. According to A. D. Williams, abolitionists reserved "utter loathing and disgust" for slave-catchers because they unified the most degrading effects of slavery on southern society. A. D. Williams, *The Fugitive Slave Law: A Discourse: Delivered in the Free-Will Baptist Meeting House in Pawtucket, Mass., December 8th, 1850* (Providence: I. Amsbury, 1851), 21. Through the lens of the North's ascendant free labor ideology, slave-catchers were the polar opposite of the virtuous, ascetic individual "whose work was directly involved in the production of goods." Slavery degraded labor itself, producing not only "the slave's ignorance and lack of incentive," but also an oligarchic planter class and the "laboring white's poverty, degradation, and lack of social mobility." Eric Foner, *Free Soil, Free Labor, Free Men: The Ideology of the Republican Party Before the Civil War* (New York: Oxford University Press, 1970), 15, 50. As for the classist and nativist criticisms of slave-catchers, consider the following excerpts from Richard Henry Dana's *Journal.* Slave-catchers were "foreigners," "lasy [sic] hounds . . . lounging all day out of the windows . . . but ready to shoot down good men." These were "such a set of debauched, vulgar, outlawish fellows I never beheld." They were the "lowest villains in the community, keepers of brothels, bullies, blacklegs, convicts, fire-lighters, &c." Richard Henry Dana (June 2, 1854), *The Journal of Richard Henry Dana, Jr.,* ed. Robert F. Lucid (Cambridge: Belknap Press of Harvard University Press, 1968), 2:630, 629.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 534

Case 3:17-cv-01017-BEN-JLB   Document 123-8   Filed 11/10/22   PageID.11537   Page 89 of
107

ding" of a slave-catcher and being compelled "to act *as a slave catcher*."[76] Having "made no compact to be a slave hunter," abolitionists nonetheless confronted a dangerous, coercive force that transformed them into "ready participants in upholding a system which we abhor."[77]

Abolitionists thus refused to extricate the legal institution of the federal *posse comitatus* from the social and economic ends it ultimately served. But many abolitionists simultaneously maintained that the federal *posse comitatus,* independent from the influence of any slave power, indicated the ascendancy of an unjustly powerful federal state. As Gerrit Smith concluded, arming federal officers with such powers was "a doctrine leading to centralization, consolidation, and the subversion of the rights of the States."[78] As a matter of ideological convenience, the abolitionist critique of the Fugitive Slave Law was as focused on national governance as it was on American slavery.

Rather appropriately, the abolitionists' quantitative evidence of this federal leviathan, the supposed proliferation of U.S. Commissioners, was deeply unconvincing. Numerically, the slaveholders "army of new officials" was indeed quite paltry.[79] But the military analogy made much more sense as a qualitative transformation of federal power. In a few notorious instances, the federal government called on military forces to fill the ranks of the *posse.* According to polemicist Samuel Johnson, this revealed "that the Federal Government stands before us unmasked . . . and growing rapidly into a centralized despotism, resting on military force." Robert Rantoul, Jr., similarly interpreted the Fugitive Slave Law as the beginning of "the constant increase of power of the general government, culminating in national

76. Williams, *The Fugitive Slave Law: A Discourse,* 21. Joseph P. Thompson, *The Fugitive Slave Law Tried by the Old and New Testaments* (1850), cited in Stephen Middleton, "The Fugitive Slave Crisis in Cincinnati, 1850–1860: Resistance, Enforcement, and Black Refugees," *Journal of Negro History* 72 (1987): 24 [emphasis added].

77. Gannett, *A Discourse* . . . (Boston: Crosby, Nichols & Company, 1854), 19.

78. Anon., *Trial of Henry W. Allen, U.S. Deputy Marshal, For Kidnapping with Arguments of Counsel* . . . (Syracuse: Power Press of the Daily Journal Office, 1852), 31.

79. Edward L. Pierce, *Remarks of Edward L. Pierce, Before the Committee of the Legislature of Massachusetts* . . . (Boston: Stacy & Richardson, 1861), 31. See also, Lysander Spooner, *A Defence for Fugitive Slaves, Against the Acts of Congress of February 12, 1793, and September 18, 1850* (Boston: Bela Marsh, 1850), 11. Only a year earlier, however, the Treasury Department counted only thirty-three commissioners in this meager "army." Of the thirty-three commissioners in 1860, though, key stops on the Underground Railroad—e.g., Buffalo, Chillicothe, Cleveland, Chicago, and Indianapolis—possessed well over 50 percent. "Commissioners of the United States Courts, 1860," in U.S. Congress, *Receipts and expenditures,* 36th Cong., 2nd sess., 1860, Serial Set 1096, House Exdoc. 12, 128. Charles Lindquist dates the actual quantitative growth of U.S. Commissioners to Reconstruction. Lindquist, "The Origin and Development of the United States Commissioner System," 8–9.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

"increase of taxation" and a "large standing army." For Walt Whitman, the sight of a federal marshal's *posse comitatus,* "with foot and dragoons," marked the defeat of the American Revolution. "Look, all orderly citizens," directed Whitman. After close to a century, it was time to "Dig out King George's Coffin," for in America, "the crown is come to its own, and more than its own."[80]

But slavery could not long remain outside this discussion. In fact, slavery was the point of convergence between abolitionists' twofold critique of the *posse comitatus* as icons of national power and the slave power. Concluded Richard Henry Dana, "the fearful slave power" exerted "such entire control of the Union" so as to transform a courthouse into "a slave pen." Fellow Bostonian Theodore Parker confirmed that "military rule" in Boston demanded "that we may serve the spirit of slavery." Such instances, together with the South's political dalliance with nationalist militarism, pushed Samuel Freeman Clark to conclude: "The slaveholders . . . have a vision in their mind of a powerful military State, of which slavery shall be the basis." Centralized, concentrated, and despotic regimes, argued the abolitionists, began and ended in slavery.[81]

Such a despotic government in the image of slavery, abolitionists maintained, had a transformative effect on the citizenry. According to Rufus Clark, the federal *posse comitatus,* the Fugitive Slave Law, and the federal government more broadly, sought "silent submission." The federal *posse comitatus* threatened to transform the sentient, thoughtful citizen into an unfeeling, unthinking, automaton. "If, when called upon to lay hands upon a fellow man, and drag him back to his chains and toil and degradation," queried Clark, then what became of the citizen? Attending to "such a villainous act" with "alacrity," without sensing "the throbbings of conscience," and warding off "humanity and Christianity within us," meant that "we are all slaves, and it becomes us to look to our own chains." As the federal *posse comitatus* transformed free citizens into slaves, "our enthusiastic boastings of freedom" became "a mere phantasm," and "our Declaration of Independence a satire

80. Samuel Johnson, *The Crisis of Freedom. A Sermon, Preached at the Free Church, in Lynn, On Sunday, June 11, 1854* (Boston: Crosby, Nichols & Co., 1854), 9. Robert Rantoul, Jr., "The Fugitive Slave Law," Grand Mass Convention, Lynn, April 3, 1851, in *Memoirs, Speeches and Writings of Robert Rantoul, Jr.,* ed. Luther Hamilton (Boston: John P. Jewett, 1854), 741–42. Walt Whitman, "A Boston Ballad" (1854), in *Leaves of Grass* (1855; New York: Bantam Books, 1983), 214–16.

81. Samuel Freeman Clark, *Secession, Concession, or Self-Possession: Which?* (Boston: Walker, Wise, and Company, 1861), 9. According to John Hope Franklin, there was ample southern rhetoric to justify Clark's premonition. Many in the South used the Mexican War to trumpet an ascendant "martial spirit," which culminated in the militarist tenor of secessionist politics. Franklin, *The Militant South,* 9–10.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Case 3:17-cv-01017-BEN-JLB Document 123-8 Filed 11/10/22 PageID.11539 Page 91 of 107

*The Federal* Posse Comitatus *Doctrine*     31

upon American liberty." No matter the sectional politics or new doctrines of
power, for abolitionists like Clark, the federal power over persons embodied
in the *posse comitatus* made free men into slaves.[82]

Thus, abolitionists argued that the very government created to guarantee
the freedom of man sought to render them as slaves, for no less a cause
than the perpetuation of the slave system. The institution and socio-political
purpose of the federal government's *posse comitatus,* that is, were one and
the same. Here, then, appeared the specter of a dual system of slavery. In the
South, slave owners used "stripes and starvation" to guarantee the slave's
"spirit may be broken to her will." The federal *posse comitatus* threatened
a potentially more insidious brand of slavery. In the north, claimed Samuel
Johnson, "southern plantation whips were not needed." On the other hand,
"Northern 'law and order' served as well." Between the slaveowner and
the federal government, queried Johnson, "Where is the difference? Are
not the last agents as effective as the first?" And between the slave and the
northern citizen, "which was the more abject slave"?[83] For Josiah Quincy,
"the fugitive-slave obligation" made the situation of the northern man, "in
one respect, worse than that of slavery." Not even the southern slave "can
be compelled, even by his master, to cut the throat or blow out the brains of
his brother Negro." For the North, though, with "the fugitive-slave obliga-
tion," there was not a "militia-man who may not be compelled tomorrow
to cut the throat or blow out the brains of a fellow-citizen, at the will of
the basest Southern slaveholder."[84]

For abolitionists, then, the duty to assist in the federal *posse comitatus*
not only made citizens into slaves. More important, the *posse comitatus*
indicated that the federal state itself had been reconfigured "in the very
image of Slavery." The federal government now asserted a power to control
"our pulses and command them to cease beating"; to command men either
to act or "to stand still." The federal command to assist, in short, placed
governmental "fetters" upon "our limbs." Concluded William Whitcomb,
the federal government and its "new Fugitive law" would "enslave you
and me as well as the black man—it will make slaves out of us all. Talk
not of the Free States! There are none such now."[85]

82. Clark, *Conscience and Law,* 8, 25.

83. Johnson, *The Crisis of Freedom,* 18.

84. Josiah Quincy, Sr., *Speech Delivered by Hon. Josiah Quincy, Sr. Before the Whig State
Convention, Assembled at the Music Hall, Boston. Aug. 16, 1854* (Boston: John Wilson &
Son, 1854), 6.

85. Johnson, *The Crisis of Freedom,* 9. Jacob R. Shipherd, ed., *History of the Oberlin-
Wellington Rescue* (New York: Sheldon and Company, 1859), 62. William Charles Whitcomb,
*A Discourse on the Recapture of Fugitive Slaves, Delivered at Stoneham, Mass., November
3, 1850* (Boston: Charles C. P. Moody, 1850), 8.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 537

32          *Law and History Review*, Spring 2008

## V. Creating Federal Autonomy:
## Legitimizing Federal Compulsion, 1850–1860

As abolitionists juxtaposed the *posse comitatus* with slavery, they threat-ened to subvert the legitimacy of the Fugitive Slave Law of 1850 and the South's vision of a new constitutional order. In response, slaveholders and their allies sought an alternative paradigm to legitimize the expansion of federal power over persons. That paradigm would be freedom or, more precisely, that American citizens had to submit to the *posse comitatus* in order to maintain the orderly, well-regulated society required for a free nation. The federal government, as the states had for so many decades, now compelled individuals to guard the health and safety of its denizens. What appeared to abolitionists as a form of servitude was, for their opponents, a standard for inclusion in the national polity. These arguments, replete with appeals to comprehensive notions of national jurisdiction and citizenship, suggested that federal power itself had been transformed. The elaboration of the federal *posse comitatus* doctrine during the 1850s thus signaled the existence of a ubiquitous federal power over persons that reached every individual within the Union.

But the first task was to subvert the abolitionists' claims that the *posse comitatus* was inherently connected to slavery. As U.S. Attorney General Caleb Cushing explained,

> the *posse comitatus* to aid the officer of the law in the execution of his duty is in the service of the Government, *not* in the service of the individual who sues out the process of the law to have the justice of the nation administered to him, which administration is of the duty of the Government.

For Cushing, the *posse* man was, simply, "in the service of the Govern-ment." It was a neat division of cause and effect that isolated the *posse comitatus* as *mere* legal process. True enough, a slaveholder "sues out the process of the law." But "administration . . . of the duty" put the matter in the hands of "the Government." The *posse comitatus*, then, was no ap-pendage of the slave power; it was an institution whose sole purpose was to guarantee "the execution of the laws of the land."[86]

But defenders of the Fugitive Slave Law also faced the delicate task of infusing the *posse comitatus*, supposedly a simple legal institution devoid of political and moral content, with some coercive claims upon the American people. To do so, jurists claimed that the constitutionality of a law implied its execution. While the Supreme Court would not explicitly uphold the Fugitive Slave Law until *Ableman v. Booth* (1859), it was clear long before

86. *Extradition of Fugitives from Service,* at 466.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

that the Fugitive Slave Law of 1850 and the federal *posse comitatus* was
the law of the land.[87] Thus, argued District Judge Peleg Sprague, heeding
the federal command for assistance was nothing more or less than "a plain
legal duty."[88] Men might disapprove of laws, wrote Justus Omstead, but
laws were laws, and "are entitled to the respect and obedience of every true
American citizen." Justice Samuel Nelson put the matter more forcefully.
"It is a law," he informed a New York jury, "which every citizen is bound
to obey."[89]

In fact, anchoring the duty to serve in the federal *posse comitatus* in the
obligations of American "citizens" built upon a concomitant shift in the
legal understanding of national citizenship. For New York Assemblyman
Theophilus Callicot, "citizen" meant, "we are Americans as well as New
Yorkers—that we are law-abiding citizens of the United States as well as
of the State of New York." This twofold citizenship, hoped Callicot, would
create "ready obedience to the federal law." More importantly, however,
others identified an independent notion of national citizenship that im-
posed positive duties on national citizens. Where Justice Johnson had, in
*Houston v. Moore* (1820), claimed that "every citizen *of a State* owes a
double allegiance" to "both the State and the United States," George F.
Kettel wrote in 1851 that "every *American citizen* is bound by a double
obligation," first to "the nation," and then to his conscience. In Kettel's
revision of the *Houston* formulation, the "American citizen" is detached
from any moorings to the individual states.[90]

Similarly, in the 1852 fugitive slave case *Moore v. Illinois,* Judge Grier
noted "every citizen of the United States is also a citizen of a State or ter-

87. In April 1851, Justice Samuel Nelson, on circuit duty in New York City, reminded
a grand jury that the federal "posse comitatus, or power of the county," was a "duty of the
citizens thus called to aid . . . in the execution of the process." Continued Justice Nelson,
such power was "essential to enforce obedience." Only with a "strong hand, if necessary,"
could federal authority subdue "all disaffection, disorder, insubordination, or resistance."
*Charge to Grand Jury—Fugitive Slave Law,* 30 F. Cas. 1007 at 1009, 1011. In *Ableman v.
Booth,* as Chief Justice Roger Taney chastised the maverick Wisconsin Supreme Court for
nullifying the 1850 law, he noted the marshal's duty to "call to his aid any force that might
be necessary to maintain the authority of law against illegal interference." *Ableman v. Booth,*
62 U.S. (21 How) 506 at 524 (1859). See also, the Eastern District of Pennsylvania District
Court case, *United States v. Buck,* 24 F. Cas. 1289 at 1292 (1860).

88. *Charge to Grand Jury—Fugitive Slave Law,* 30 F. Cas. 1015 at 1016 (1851).

89. Justus T. Omstead, *The Duty of Obedience to Existing Powers and Laws in Civil
Government* (Muscatine: D. L. Cossitt, 1851), 18. *Charge to Grand Jury—Fugitive Slave
Law,* 30 F. Cas. 1007 at 1011 (1851).

90. Theophilus Callicot, *Speech of Hon. Theophilus C. Callicot, of Kings, Against the
Personal Liberty Bill, In Assembly, March 14, 1860* (Albany: Comstock & Cassidy, 1860), 4.
*Houston v. Moore* at 44. George F. Kettell, *A Sermon on the Duty of Citizens, With Respect
to the Fugitive Slave Law* (White Plains: Eastern State Journal, 1851), 8.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

ritory." At all times, then, citizens "owed allegiance to two sovereigns." The capstone of this reasoning came, of course, in Chief Justice Taney's *Dred Scott* (1856) opinion. "It does not by any means imply," explained Taney, that "a citizen of a State" "must be a citizen of the United States." Not only were state and national citizenship distinct, they were inherently unrelated. The United States, as a sovereign nation, exercised "powers over the citizen strictly defined, and limited by the Constitution." In this way, *Dred Scott* legitimated, rather than bestowed, a new notion of national citizenship.[91]

So armed, proponents of the Fugitive Slave Law painted service in the *posse comitatus* as a crucial duty owed to the nation. Explained Henry Clay, the Fugitive Slave Law of 1850 "extends to every man in the Union." Furthermore, the law "devolves upon" the citizen "the obligation to assist in the recovery of a fugitive slave from labor." If a citizen was "present when the owner of a slave is about to assert his rights," then "every man present, whether officer . . . or private individual, is bound to assist in the executing of the laws of *their* country."[92] For a "citizen of the republic," commented Roger Taney in 1859, "it certainly can be no humiliation . . . to yield a ready obedience to the laws as administered by the constituted authorities." Such obedience, in fact, was "among his first and highest duties as a citizen, because government cannot exist without it." And for those abolitionists that cited problems of conscience, District Judge Grier of Pennsylvania offered a variation upon an unfortunate platitude of our time: love it—nay, obey it—or leave it. The constitution and the Fugitive Slave Law were "binding on the conscience of every good citizen," and "those who are unwilling to acknowledge the obligations which the law of the land imposes upon them should migrate to Canada," or elsewhere, where "*institutions* do not infringe upon their tender conscience."[93]

But defining "good citizens" through duty owed the nation was much more than normative rhetoric. In fact, such language explicitly invoked the duties of citizens, under the common law of officers, to "keep the peace." Like the vaunted police powers in the name of citizens' health and safety,

91. *Moore v. Illinois*, 55 U.S. (14 How.) 13 at 20 (1852). *Scott v. Sandford*, 60 U.S. 393, 404 at 449 (1856). The concept of national citizenship that emerged from the debate over the federal *posse comitatus* parallels Howard Schweber's argument that public duties, and not the modern notion of individual rights, underscored the creation of American citizenship. Schweber, *The Creation of American Common Law, 1850–1880: Technology, Politics, and the Construction of Citizenship* (New York: Cambridge University Press, 2004).

92. Henry Clay, *Congressional Globe*, 31st Congress, Appendix, February 6, 1850, 122 [emphasis added].

93. *Ableman v. Booth* at 525. See also, *United States v. Hanway*, 16 F. Cas. 105 at 123 (1851). *Oliver v. Kauffman*, 8 F. Cas. 657 at 661 (1850) [emphasis added].

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 540

Case 3:17-cv-01017-BEN-JLB  Document 123-8  Filed 11/10/22  PageID.11543  Page 95 of 107

the common law granted sheriffs and constables the power to call on the *posse comitatus* during riots, affrays, and insurrections to "apprehend disturbers of the public tranquility."[94] The common law doctrine that civil disturbances threatened "liberty" and "property" served to heighten the stakes of the citizenry's obligation to serve the state. At common law, "it is not left to the choice or will of the subject . . . to attend to the call of the magistrate, as they think proper." On the other hand, in times of crisis, the citizen had a "*bounden duty . . .* to perform *to the utmost of his ability,*" "to suppress any tumultuous assembly." In Great Britain, it was precisely such obedience that rendered a citizen "a good subject." In the late antebellum United States, though, this was "the duty of every good citizen."[95]

That such common law doctrines of public welfare and orderliness were the bulwark of the federal government's asserted power over persons suggested the existence, if not of a national police power, then of a national policing power. The federal *posse comitatus* doctrine, after all, implied "a power of self-preservation," as Chief Justice Taney had defined the state police powers in *The Passenger Cases* (1849). And in its routine exercise, this federal power also was directed at the individual citizen.[96] Yet the most telling reach of this new federal power over persons was its reconfiguration of the older mode of "emergency" federal powers to subdue insurrections. There were a few occasions, most notably the Shadrach and Sims cases in Boston, where President Millard Fillmore called out military force, in keeping with the lengthy tradition of federal intervention in times of insurrection. But for Fillmore, the use of military rather than civilian force to aid in law enforcement failed to change the fundamental nature "of the cometatus [sic]." Military force, that is, was to be understood as "the army as citizens."[97]

94. *Reed v. Bias* at 191.

95. Lord C. J. Tindal, *Charge to the Bristol Grand Jury* (1832, 5 C. & P. 262), quoted in Archbold, *A Complete Practical Treatise on Criminal Procedure, Pleading, and Evidence* . . . , 589, n. 1 [emphasis in original].

96. *Smith v. Turner* at 470. "Police power was the ability of a state or locality to enact and enforce public laws regulating or even destroying private right, interest, liberty, or property for the common good (i.e., for the public safety, comfort, welfare, morals, or health)." Novak, *People's Welfare,* 13. Since about 1870, scholars have debated whether or not the commerce clause of the constitution furnishes the federal government with a federal police power. Paul Fuller, "Is There a Federal Police Power?" *Columbia Law Review* 4 (1904): 563–88. In *United States v. DeWitt,* 76 U.S. (9 Wall.) 41 (1869) and *Hammer v. Dagenhart,* 247 U.S. 251 (1918) the Chase and White courts, respectively, struck down the notion of a federal police power built upon the commerce clause.

97. Millard Fillmore to Daniel Webster, October 23, 1850; Millard Fillmore to Daniel Webster, October 28, 1850; both in *The Papers of Daniel Webster: Correspondence,* ed. Charles M. Wiltse et al. (Hanover: Prepared for Dartmouth College by the University Press of New England, 1986), 7:163–64, and 7:172, respectively. Story's characterization came in *Martin v. Mott* at 27, 20–21.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 541

This was an important distinction to make. As a matter of law, it turned on the incorporation of the British Mansfield Doctrine, under which soldiers served in the *posse comitatus,* "not as soldiers, but as citizens." This elaboration of the powers set forth in the Fugitive Slave Law of 1850 received its strongest pronouncement in Attorney General Caleb Cushing's 1854 opinion concerning "extradition of fugitives from service." "The *posse comitatus,*" wrote Cushing, "comprises every person in the district or county above the age of fifteen years, whatever may be their occupation, whether civilians or . . . the military of all denominations." The composition of "military bodies, under the immediate command of their own officers," he concluded, "does not in any way wise affect their legal character. They are still the *posse comitatus.*" Through the Mansfield Doctrine, the Federal Government brought what had been previously "emergency" powers within the broader rubric of the *posse comitatus* doctrine. No longer was the presidential power to suppress insurrection, as Joseph Story had put it in *Martin v. Mott* (1827) exclusively "of a military nature."[98] On the other hand, its characteristic exceptionality had been folded into an increasingly routine federal power over persons.

But most of Cushing's opinion was a history of the legal development of the federal *posse comitatus* doctrine. Beginning with numerous American and British common law powers of arrest under which sheriffs, constables, and other states or local officers could call upon the *posse comitatus,* Cushing concluded of federal law enforcement: "the law affords ample means to the officer to execute all lawful precepts to him directed." As he reiterated the common law origins of the federal policing power, Cushing—perhaps realizing the actual novelty of his position—also turned to another set of authorities. The Judiciary Act of 1789, he claimed, granted the marshal the *same* power "to command all necessary assistance in the execution of his duty." With this statutory foundation, Cushing argued, the federal government *had always* possessed the same power to compel its citizens' as did the states. The events of the previous five years—the Fugitive Slave Law of 1850 and the propagation of the *posse comitatus* doctrine—simply roused dormant federal powers over persons. "There was no absolute need . . . [for] the act of 1850," he proclaimed, "to introduce a clause to autho-

98. Lord Mansfield, quoted in Engdahl, "Soldiers, Riots, and Revolution," 34. *Martin v. Mott* at 27, 20–21 (1827). On the Mansfield Doctrine, see Engdahl, "The New Civil Disobedience Regulations: The Threat of Military Intervention," *Indiana Law Journal* 49 (1973–1974): 588–97. It has recently been suggested that Cushing in fact intended to discard the Mansfield Doctrine. Charles Doyle, "The Posse Comitatus Act and Related Matters: The Use of the Military to Execute Civilian Law," in *The Posse Comitatus Act and Related Matters: Current Issues and Background,* ed. Jennifer Elsea and Charles Doyle (Hauppauge, N.Y.: Novinka Books, 2004), 4.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 542

rize them to command all requisite assistance." The Fugitive Slave Law
of 1850, accordingly, was "declaratory merely."[99]

Cushing was no doubt correct that the Fugitive Slave Law of 1850 awak-
ened a federal power over persons. But his suggestion that this power had
always been available was a semantic distinction aimed at legitimizing the
federal *posse comitatus* by appeal to legal tradition. Under this logic, it was
the sanctity of the Union itself that offered the most compelling justification
for submission to federal compulsion. As a Democratic pamphleteer informed
"the Whigs of Pennsylvania" in 1851, it was his hope that "the great major-
ity of the people revere the Constitution, and are prepared to perform with
cordial alacrity all the duties which it enjoins." If this was not the case, "then
is the Union, for every salutary purpose, already at an end." Unless the North
was prepared to push aside its objections and physically assist slaveholders
in search of fugitive slaves, the Union would collapse. But what would it
take to guarantee the Union's survival? Justice Samuel Nelson thundered,
"if any one supposes that this Union can be preserved," after "one section of
it" had bucked their duties under the nation's "fundamental law," then "he is
laboring under a delusion." Northerners *had* to accept "abject submission"
and "a stern adherence" to the Fugitive Slave Law.[100]

There simply was no alternative. If it could not rely upon "the attendance
and aid of the 'posse comitatus,'" petitioned the Maryland legislature, the
Fugitive Slave Law of 1850 would be "impotent." It was thus "impera-
tively necessary" for Congress to "render the act efficient and operative."
However the federal government would coerce the North to obey, the time
was gone, warned District Judge Peleg Sprague, in which "the Criminal
Code" was administered with "mildness and forbearance." So high were
the stakes that federal power must become "sternly inflexsible [sic]." "To
preserve this government," concluded Sprague, "it is necessary that its laws
be faithfully executed, and you are now called upon, under the highest
sanction, to aid in this indispensable work."[101]

### VI. Necessary Compulsion:
### The *Posse Comitatus* Doctrine and the Civil War

As sectionalism gave way to war, the old battle lines changed. Republicans
and their fellow travelers, so recently vocal opponents of federal power,

99. 6 Op. Atty Gen. 466 (1854).

100. Anon., *A Word to the Whigs of Pennsylvania* (Philadelphia: s.n., 1851). *Charge to
Grand Jury—Fugitive Slave Law,* 30 F. Cas. 1007 at 1012 (1851).

101. Resolution of the Maryland Legislature, quoted in *Brooklyn Eagle,* May 28, 1852,
2. *Charge to Grand Jury—Fugitive Slave Law,* 30 F. Cas. 1015 at 1015–16 (1851).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

strove to "abandon the machinery of obstruction, and take up that of co-
ercion [sic]!" Similarly, the Confederates turned their attention to defending
their new republic. But as the North and South searched for techniques to
forcibly transform individuals into soldiers, the problem of conscription
picked up where the debate over the federal *posse comitatus* doctrine had
left off. In a war to determine the legitimacy of slavery, even the mantra
of "government necessity" would not dislodge slavery as the frame of
reference for contemplating government compulsion.[102]

Understandably, the novelty of secession and war militated against un-
derstanding the Civil War as anything but completely unprecedented. To
influential William Whiting, it was necessary to shelve the old "body of
laws regulating the rights, liabilities, and duties of citizens, in time of
public tranquility," in favor of the "hitherto unused powers . . . to regulate
the rights, liabilities, and duties of citizens in time of war." And the Union
and Confederacy did in fact launch the most massive wartime mobilization
programs in history. Neither institutionally nor conceptually, though, were
these programs the result of spontaneous generation. Thus, when it came
to appropriating citizens' labor, and expropriating their property, in the
name of the greater good, the *posse comitatus* doctrine was a handy tool
to legitimize the ever-magnified notion of government compulsion.[103]

At a conceptual level, the federal *posse comitatus* doctrine provided Presi-
dent Abraham Lincoln with a useful metaphor to make sense of the Civil
War. Lincoln's strategic refusal to accept the legitimacy of the Confederacy
rendered secession as a grand, concerted attempt to hinder execution of
federal law.[104] Neither did "the proportion and duration of the struggle,"
ruled the Supreme Court in *Hickman v. Jones* (1869), change the character

102. Nathaniel Banks, quoted in *Brooklyn Eagle*, January 9, 1861. The Confederacy
granted federal marshals "the power to command a *posse comitatus* in the execution of his
duty." An Act to Establish the Judicial Courts of the Confederate States of America, March
16, 1861, *The Statutes At Large of the Confederate States of America . . .* (Richmond: R.
M. Smith, 1864), 76.

103. William Whiting, *The War Powers of the President . . .* , quoted in *The Constitution
and the Nation: The Civil War and American Constitutionalism, 1830–1890*, ed. Christopher
Waldrep and Lynne Curry (New York: Peter Lang, 2003), 130. On Lincoln's use of metaphors
as a war strategy, see James McPherson, "How Lincoln Won the War with Metaphors," in
*Abraham Lincoln and the Second American Revolution* (New York: Oxford University Press,
1990), 93–112.

104. James G. Randall, *Constitutional Problems Under Lincoln* (New York: D. Appleton and
Company, 1926); Amicus [pseud.], *The Rebel States, the President and Congress: Reconstruc-
tion, and the Executive Power of Pardon* (New York: E. S. Dodge & Co., 1866). I owe this
reading of Lincoln's strategy in part to Jeremi Suri's Comment on the Plenary Session, "The
Bush Doctrine: A New Departure in American Foreign Policy?" Policy History Conference,
June 1, 2006, Charlottesville, Virginia. To be sure, Lincoln's mass of force was much more
an army than a *posse comitatus*. But conceiving of federal force as the latter did have real
consequences in early military policy. Lincoln and his staff initially sought to inspire Southern

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 544

of this "insurrection." It was no different than "the insurrection of a county
or smaller municipal territory against the State to which it belonged."[105] Thus,
noted Attorney General Edward Bates, just as a court officer would "call out
the whole power of the county to enforce their judgments," the president
utilized "force" to ensure "'that the laws be faithfully executed.'" For a few
observers, though, was a troublesome framework. Perhaps Lincoln's rather
anticlimactic theory of the war as a police action would fail to muster ad-
equate enthusiasm for the North to prevail. Wrote Jacob Thompson in the
*Brooklyn Eagle,* "we never shall be able to carry on war upon the theory that
there is no war." To ensure "we have power adequate to every emergency,"
it was necessary to "get beyond the *posse comitatus.*"[106]

Thompson, though, need not have worried. The Lincoln Administration
and its allies launched an unprecedented effort to capture and convince
northern hearts and minds of the dire necessity of the fight.[107] As Ohio
District Judge Humphrey Leavitt wrote, victory was possible if and only if
"every American citizen" lent "a hearty support of all proper means for the
restoration of the Union." In 1849 Leavitt had proclaimed it "monstrous"
to identify an "obligation" for citizens to aid federal law enforcement. But
in 1863, Leavitt now argued that "imminent peril" to the nation required
that "every American citizen" lend "a hearty support of all proper means
for the restoration of the Union." Such "hearty support" consisted foremost
of outright submission to "the stringent *doctrine of military necessity.*" In
such trying times, individual consciences were "not to be put in competi-
tion with the preservation of the life of the nation." In this way, the war,
and its concomitant "doctrine of military necessity," literally justified the
federal government's appeals for the citizen's obedience.[108]

---

Unionists to revolt and displace the Confederacy. Like a *posse comitatus,* this "substantial body
of loyal citizens," as Herman Belz phrases it, was expected to aid authorities in upholding
federal law. Belz, *Reconstructing the Union: Theory and Policy During the Civil War* (Ithaca:
Cornell University Press, 1969), 135, 44.

105. *Hickman v. Jones,* 76 U.S. (9 Wall.) 197 at 200 (1869).

106. York (pseud.), "Question of Belligerent Rights," *New York Times,* August 27, 1861,
2. After the war, Jacob Thompson again expressed concern that Lincoln's police action
strategy minimized the dramatic character of the conflict. If the grand United States military
was nothing other than "a huge posse Comitatus," then the "mighty war" appeared to be a
mere "tragical farce." *Brooklyn Eagle* (New York), May 22, 1865, 2.

107. In fact, there was plenty of wartime propaganda to go around, especially relating
to efforts to vilify the Democratic Party. Frank Freidel, "The Loyal Publication Society: A
Pro-Union Propaganda Agency," *Mississippi Valley Historical Review* 26 (1939): 359–76;
George Winston Smith, "Broadsides for Freedom: Civil War Propaganda in New England,"
*New England Quarterly* 21 (1948), 291–312; T. Harry Williams, "Voters in Blue: The Citizen
Soldiers of the Civil War," *Mississippi Valley Historical Review* 31.2 (1944), 187–204.

108. *Ex Parte Vallandigham,* 28 F. Cas. 874 at 922–24 (1863). *Driskell v. Parish* at 1099.
In 1863, the *New York Times* claimed that, "it is absurd to say that there is any locality . . .

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 545

*Law and History Review,* Spring 2008

But the highest imperative of the "doctrine of military necessity" was
manpower. "Every citizen *owes* his country military service," argued the
military leadership.[109] Or put another way, it was hoped that by capturing
the citizen's heart and mind, his body would follow. In the end, though, the
Lincoln administration turned to conscription, or compelling men to serve
the state as soldiers, to fill out the Union ranks. The 1863 Conscription Act
posited that "all able-bodied male citizens . . . between the ages of twenty
and forty-five years" were legally bound "to perform military duty in the
service of the United States when called out by the President."[110] In scope
and scale, this obligation to militarily serve the nation far transcended the
peacetime requirement of assisting federal marshals. But it was, like the
federal *posse comitatus,* a federal command for assistance over the citi-
zenry. Magnitude aside, the central difference was that where the peacetime
*posse* sought out all "good citizens," the wartime state staked its coercive
claim over "able bodied male citizens."[111]

To what degree, however, did conscripts "feel" this compulsion? Why
men fought in the Civil War, and what precisely they fought for, has been
the subject of some fascination. Nationalism, patriotism, and local status, at
different times and places, each motivated civilians to become soldiers.[112]

where this war power might not, *if necessary,* assert itself. The sole limitation everywhere
is the necessity." "War Powers—The Duties of the Executive and of the People," *New York
Times,* June 8, 1863, 4. As the war concluded, the Supreme Court curtailed the federal asser-
tion of military jurisdiction over citizens. Most notably, in *Ex Parte Milligan,* the Court held
that, even in wartime, civilians charged with crimes must be tried under the civil jurisdiction
whenever available. Even so, Justice Davis noted: "But Congress was obliged to enact severe
laws to meet the crisis; and as our highest civil duty is to serve our country when in danger,
the late war has proved that rigorous laws, when necessary, will be *cheerfully obeyed by a
patriotic people,* struggling to preserve the rich blessings of a free government." *Ex Parte
Milligan,* 71 U.S. (4 Wall.) 2 at 130 (1866) [emphasis added].

109. U.S. Congress, House, *Final Report Made to the Secretary of War, by the Provost
Marshal General . . .* , 39th Cong., 1st sess., 1866, Serial Set 1251, 1251 H.exdoc.1/23,
11.

110. 12 *U.S. Statutes at Large* 731 (March 3, 1863). See James W. Geary, *We Need Men:
The Union Draft in the Civil War* (Dekalb: Northern Illinois University, 1991).

111. By the end of the war, the North had mobilized over two million soldiers. Geary, *We
Need Men,* 81. Notably, even the initial, state-operated militia conscriptions were understood
in the language of the *posse comitatus.* Proclaimed the Wisconsin legislature in 1861: "In case
a call shall be made by the President of the United States upon this state, to aid in maintaining
the union and the supremacy of the laws, or to suppress rebellion or insurrection, or to repel
invasion within the United States, the governor is hereby authorized, and it shall be his duty,
to take such measures as in his judgment shall provide in the speediest and most efficient
manner for responding . . . " Fred Albert Shannon, *The Organization and Administration of
the Union Army, 1861–1865* (Cleveland: Arthur H. Clark Co., 1928), 1:23.

112. James M. McPherson, *For Cause and Comrades: Why Men Fought in the Civil War*
(New York: Oxford University Press, 1997); Mark Snell, *Union Soldiers and the Northern*

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 546

But conscription was, and remains, an inherently coercive procedure. As Michael Les Benedict writes, ordinary northerners faced a national power that "could pluck a young farmer from his home and family and put him in uniform." And if obedience was not forthcoming, evaders faced "a federal, military provost marshal and . . . a national, military court." Through conscription, federal power over persons penetrated virtually every corner of the Union.[113]

And yet, no small number of northerners resisted the concept that the federal government could compel them to serve the state. The general problem was the relationship of government compulsion to southern slavery. For some, conscription itself seemed to be a condition of bondage. One draft evader begged federal officials to "set me and my men free from the war." And Arkansas Governor Henry Rector protested the severity of conscription on the grounds that his citizens "were freemen, not slaves."[114] For the working class in particular, the situation was yet more complicated. Submission to conscription meant sacrificing life and limb for the purpose of emancipating would-be competition in the labor market. Thus the targets of draft-related violence were free blacks, conscription offices and officials, and selected icons of capital. For some draft rioters, the continued existence of southern slavery seemed an altogether preferable option than submitting to federal claims over their bodies.[115]

---

*Home Front: Wartime Experiences, Postwar Adjustments,* ed. Paul A. Cimbala and Randall M. Miller (New York: Fordham University Press, 2002), 69–118, esp. 76–81; Kenneth H. Wheeler, "Local Autonomy and Civil War Resistance: Holmes County, Ohio," *Civil War History* 45 (June 1999): 147–59.

113. Michael Les Benedict, *The Fruits of Victory: Alternatives in Restoring the Union, 1865–1877* (1975; Lanham, Md.: University Press of America, 1986), 12. Geary, *We Need Men,* 68. Iver Bernstein, *The New York City Draft Riots: Their Significance for American Society and Politics in the Age of the Civil War* (New York: Oxford University Press, 1990). 8.

114. Strickland to Colonel Smith, n.d., quoted in Ella Lonn, *Desertion During the Civil War* (New York: The Century Co., 1928), 86. Governor Henry M. Rector, quoted in Shannon, *The Organization and Administration of the Union Army,* 1:33. David Montgomery explains that "the major grievances which sparked labor protest were all related to the growing power and centralization of government," but even despite commonalities with "old-line" Democrats, labor was not necessarily aligned with the Copperheads. Montgomery, *Beyond Equality: Labor and the Radical Republicans, 1862–1872* (1967; Urbana: University of Illinois Press, 1981), 102.

115. Montgomery, *Beyond Equality,* 91, 102–5. Bernstein, *New York City Draft Riots,* 111–24; James M. McPherson, ed., *Anti-Negro Riots in the North, 1863* (New York: Arno Press, 1969), 1–24. James Geary cautiously estimates that the majority of draft-evaders (men that "failed to report") were "unskilled workers." Geary, *We Need Men,* 100. According to Eric Foner, the Draft Riots were "a wholesale assault upon all the symbols of the new order being created by the Republican party and the Civil War." Eric Foner, *Reconstruction: America's Unfinished Revolution, 1863–1877* (New York: Harper & Row, 1988), 32.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Ironically, northern draft resistance prompted some observers to wonder
whether the federal government's heightened powers over persons had
gone too far. In the wake of the New York City draft riots of 1863, the
*New York Times* questioned if it had been "a great mistake" to leave the
city "so stripped of its military defenders" that it "could not command the
means for its protection." In *Kneedler v. Lane,* the Pennsylvania Supreme
Court entertained the same doubts. If conscription transformed all men into
soldiers, localities would suffer the loss of "the civil authorities, and back
of them the posse comitatus." As a result, "the States will be reduced . . .
to mere counties," and "the citizen of the State must look to the Federal
Government for the enforcement of all his domestic rights." As the *Knee-
dler* majority suggested, the emerging federal powers appeared not only
to threaten to usurp local law enforcement, but also to render irrelevant
the tradition of local self-government.[116]

Concerns about the extent of federal compulsion were certainly not limited
to the North. In Confederate Georgia, the Supreme Court worried that com-
pulsory military service "'to the last man'" infringed upon "the sovereignty
of the States." With the state's manpower at the service of the Confederacy,
"what becomes," asked the Court, of the state's "police force; where their
Sheriff's posse-comitatus?"[117] In the Confederacy, however, even such osten-
sible juridical questions of federalism related to a broader conflict between
slavery and government power over persons. Throughout the course of its
existence, the Confederacy struggled to develop a policy that balanced three,

116. *New York Times,* July 14, 1863, 4. *Kneedler v. Lane,* 3 Grant 465 at 484–85 (1863).
A few months later the court reversed itself and submitted Pennsylvania to the conscription
law. Where the Court had previously worried about *state* capacity, it now framed the con-
scription question in terms of *federal* power. It was the federal government's duty "to protect
[Pennsylvania] against invasion, and against domestic violence if her posse comitatus fail."
*Kneedler v. Lane,* 3 Grant 523 at 544 (1864). See J. Norman Heath, "Exposing the Second
Amendment: Federal Preemption of State Militia Legislation," *University of Detroit Mercy
Law Review* 79 (2001): 54–55. On draft resistance in Pennsylvania, see Grace Palladino,
*Another Civil War: Labor, Capital, and the State in the Anthracite Regions of Pennsylvania,
1840–1868* (Urbana: University of Illinois Press, 1990).

117. *Barber v. Irwin,* 34 Ga. 27, 37 (1864). The Georgia high court upheld the law, as
did its counterparts in six other Confederate states. See William L. Shaw, "The Confederate
Conscription and Exemption Acts," *American Journal of Legal History* 6 (1962): 368–405,
esp. 394–96. As Paul D. Escott explains, this was the culmination of a lengthy feud be-
tween Georgia Governor Joe Brown and C.S.A. President Jefferson Davis. Paul D. Escott,
*Military Necessity: Civil-Military Relations in the Confederacy* (Westport, Conn.: Praeger
Security International, 2006), 33–36. George Frederickson argues that the southern states'
unwillingness to centralize their military resources had dire strategic consequences. Freder-
ickson, "Blue Over Gray," in *A Nation Divided: Problems and Issues of the Civil War and
Reconstruction,* ed. George M. Frederickson (Minneapolis: Burgess Publishing Company,
1975), 69–70.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

often competing elements: the wartime goal of preserving the institution of slavery; the administrative reality of raising a sufficient fighting force; and the requirement of adequate force to oversee the plantation economy and the slaves that made it work.

The second element, conscription, was the key to the others. Even more so than in the North, conspicuous shortfalls in manpower and resources required the most "stringent legislation to compel the citizen to do his duty to the State and country." Indeed, as Richard Bensel has demonstrated, such exigencies demanded that the Confederacy construct a "Southern Leviathan" to prevent its "subjugation" at the hands of the North. Through conscription, the Confederate state introduced "a new degree of control and coercion over the civilian population."[118] As in the North, though, these techniques struck some as inherently problematic. Wrote one southerner, compelling "*free citizens* of the state from their homes to camps for instruction *against their will,* to be trained *to fight for liberty,*" was simply "absurd." Regulations requiring free white men to display government passports for internal transportation seemed equally unfair. Under this degree of coercion, according to Tennessee politician William Brownlow, it was hard not to feel "like some [N]egro slave."[119]

The selective nature of conscription made matters worse. In order to guarantee the functionality of the plantation economy—and to prevent slave revolts—the southern conscription system exempted overseers "of plantations of fifteen field hands" or more from compulsory military ser-

118. John J. Pettus, Governor of Mississippi, "Governor's Message," December 20, 1862, reprinted in Mississippi Legislature, *Journal of the House of Representatives of the State of Mississippi, December Session 1862, and November Session of 1863* (Jackson, Miss.: Cooper & Kimball Steam Printers and Binders, 1864), 10. Richard F. Bensel, *Yankee Leviathan: The Origins of Central State Authority in America, 1859–1877* (New York: Cambridge University Press, 1990), 135–38. See also, Bensel, "Southern Leviathan: The Development of Central State Authority in the Confederate States of America," *Studies in American Political Development* 2 (1987): 68–136; Escott, *Military Necessity,* 73; Mark Neely, *Southern Rights: Political Prisoners and the Myth of Confederate Constitutionalism* (Charlottesville: University of Virginia Press, 1999), 11–28. On the fear of "subjugation" at the hands of the North, see Keith S. Bohannon, "'Witness the Redemption of the Army': Reenlistments in the Confederate Army of Tennessee, January–March, 1864," in *Inside the Confederate Nation: Essays in Honor of Emory M. Thomas,* ed. Lesley J. Gordon and John C. Inscoe (Baton Rouge: Louisiana State University Press, 2005), 113; James L. Roark, *Masters Without Slaves: Southern Plantations in the Civil War and Reconstruction* (New York: W. W. Norton & Co., 1977), 32.

119. W. W. Holden, quoted in Carleton Beals, *War Within a War: The Confederacy Against Itself* (New York: Chilton Books, 1965), 62. William G. Brownlow, quoted in Escott, *Military Necessity,* 87 [emphasis added]. Escott, *Military Necessity,* 84, 28. The Union also weighed the expediency of a passport system, but ultimately discarded the program due to its apparent unconstitutionality. Geary, *We Need Men,* 39.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 549

Case 3:17-cv-01017-BEN-JLB Document 123-8 Filed 11/10/22 PageID.11552 Page 104 of
107

44        *Law and History Review,* Spring 2008

vice. These men, it was argued, were "more useful to the country in the
pursuits of agriculture than in the military service." In the South's Her-
renvolk oligarchy, the exemption of overseers only magnified existing class
animosity between poor white non-slaveholders and the planter class. Were
poor white conscripts forfeiting their freedom to fight for the planters'
bottom line, or for some greater good? The exemption of overseers from
military service certainly suggested the former.[120] If poor whites believed
that the Confederacy fought "for negro property," wrote one newsman,
"then no father or mother would give a son's life for all the blacks on the
continent." Thus it was imperative to make Conscription "acceptable to
the People," a task that was ably undertaken by Joe Brown, the prickly
Governor of Georgia. Brown rejected "the policy that would compel *all
our men* to go to the military," because it was necessary to "make supplies
for our troops under arms and their families at home, or we must fail."[121]

The overseer-slave relationship also seems a useful metaphor for under-
standing the Confederacy's policies toward deserters. As the horrors of war
became apparent, wrote one southerner, "white men are weary of the toils
and dangers . . . and begin to think that as soldiers are veriest slaves." Such
sentiments, intermingled with homesickness and seasonal economic con-
cerns, caused rampant desertion in the Confederate ranks. Halfway through
the war, hemorrhaging troops and rapidly giving ground to the Union, the
Confederacy turned to "force" to reign in deserters. While the "Home Guard"
units held standing orders to arrest deserters, the Confederacy detached rov-
ing, armed patrols, replete with bloodhounds, for "deserter-hunting." Indeed,

120. Confederate States of America, Bureau of Conscription, *Circular No. 6* (Columbia,
S.C., s.n., 1864), 4, 8. It was apparent from the outset that poor white conscripts "were
distinctly out of sympathy with the cause of slavery as the foundation stone on which was
built the prestige of their proud neighbors of the lowlands. . . . " Lonn, *Desertion During the
Civil War,* 4. The Newspaper Man [Louis J. Dupré], *Fagots from the Campfire* (Washington,
D.C.: Emily Thornton Charles & Co., 1881), 92. Writes Katherine E. Giuffre, the overseer
exemption clause "is considered to be the key factor in turning the mountain counties' [of
North Carolina] initial enthusiasm for the war into hostility toward the Confederacy." Giuf-
fre, "First in Flight: Desertion as Politics in the North Carolina Confederate Army," *Social
Science History* 21 (1997): 249. According to Steven Hahn, the drain of manpower in the
South did indeed have an adverse effect upon the South's slave police. By 1864, the cumu-
lative effect of the Emancipation Proclamation, coupled with "a rebellion of slaves against
the authority of their masters," left "the status quo antebellum . . . beyond resurrection."
Hahn, *A Nation under Our Feet: Black Political Struggles in the Rural South from Slavery
to the Great Migration* (Cambridge: Harvard University Press, 2005), 89.

121. Governor Henry T. Clark of North Carolina, quoted in Giuffre, "First in Flight,"
246. Joseph E. Brown, *Message of His Excellency Joseph E. Brown, to the Extra Session of
the Legislature* . . . (Milledgeville, Ga.: Boughton, Nisbet, Barnes & Moore, 1864), 14. See
also, Bessie Martin, *A Rich Man's War, A Poor Man's Fight: Desertion of Alabama Troops
from the Confederate Army* (1932; Tuscaloosa: University of Alabama Press, 2003).

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Case 3:17-cv-01017-BEN-JLB   Document 123-8   Filed 11/10/22   PageID.11553   Page 105 of
107

as Ella Lonn suggests, "it is not to be wondered at that old method of tracking down slaves with bloodhounds should have been used against deserters." The slave patrol, itself an exemplar of the local *posse comitatus,* had been transformed to serve the Confederate state in much the same way that the Fugitive Slave Law had the antebellum federal state.[122]

There was one final consequence that attended the Confederacy's inter-related crises of compulsion, desertion, and war powers. As defeat appeared over the horizon, Confederate leaders acknowledged the failure of their conscription program. Even the old tactic of race-baiting—"the threat of racial cataclysm"—had not sufficiently quelled the discontent of the non-slaveholding classes. With neither carrot nor stick of much use, Jefferson Davis and others considered perhaps the ultimate form of compulsion: the conscription of slaves. But was this as much the assertion of a fed-eral power over property as it was over persons—a "taking" as much as conscription?[123] The Confederacy, began Davis, had "frequently claimed" slaves, "viewed merely as property," and within "the relation of the slave to the master," to construct garrisons. But soldiering was an altogether dif-ferent enterprise than construction, requiring "loyalty and zeal." Luckily, continued Davis, "the slave . . . bears another relation to the state—that of a person," and for soldiering, "it would seem proper to acquire for the public service the entire property in the labor of the slave."[124]

But, as many planters wondered, did the employment of a slave as "a person" alter the slave's chattel status? Or in terms of political economy, could planters receive compensation for the impressments/conscription of slaves? Beneath these questions was the basic relationship between soldiering and freedom, between the citizen and the state. Thus, Davis suggested that in the event of conscripting slaves, the Confederacy would purchase "the entire property in the service of a slave" from the owner. The Confederacy would then decide, "by what tenure he should be held." For Davis, the slave could "remain in servitude"; become emancipated upon entering the mili-

122. Lonn, *Desertion during the Civil War,* 77. *Daily Bulletin,* (n.d.) 1861, quoted in Dupré, *Fagots from the Campfire,* 92. Hadden, *Slave Patrols,* 167–202.

123. In fact, the Confederacy had earlier implemented an "impressments" policy that allowed the expropriation of wartime victuals in exchange for future repayment. Plant-ers' discontent with the impressments policy was as vehement as the poor white critique of impressments. Escott, *Military Necessity,* 29; Curtis Arthur Amlund, *Federalism in the Southern Confederacy* (Washington, D.C.: Public Affairs Press, 1966), 107–9.

124. State legislation authorized the impressments of slaves for the construction of war-time public works throughout the war. Earlier national legislation permitted impressments of slaves for ancillary roles in military camps. Bernard H. Nelson, "Confederate Slave Impressment Legislation, 1861–1865," *Journal of Negro History* 31 (1946): 400. Jefferson Davis, Message of November 7, 1864, reprinted in Jefferson Davis, *The Rise and Fall of the Confederate Government* (New York: Thomas Yoseloff, 1958), 1:515–16.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

Compendium_Vorenberg
Page 551

tary; or receive freedom "as a reward for faithful service." Davis favored the latter, for it would provide "a double motive for zealous duty."[125] It was a truly remarkable *camera obscura:* slaves required incentives to serve the state, whereas compulsion alone was considered sufficient to constitute white soldiers. For so many that had been compelled to serve under the *posse comitatus* principle, forced labor for the state threatened to make them slaves. But for the slaveholding republic itself, slave emancipation appeared to be a prerequisite for creating political subjects that the state could command through its power over persons. Such, it seems, was the complex meaning of federal compulsion as the curtains fell on the Civil War.[126]

### VII. Compulsion and Servitude: The *Posse Comitatus* and Reconstruction

During the Civil War, acknowledged Charles Sumner, "the form of the State being changed the State is no longer the same." Indeed it was not. And just as federal power over persons had fueled the destruction of slavery, so it would be used to enforce the Radical Republican program of equality and freedom. Having carved the South into military districts, the federal government routinely "commanded the assistance" of loyal citizens to compel white and black southerners to accept emancipation. As Ohio Congressman James A. Garfield argued, the goal of Reconstruction was for the federal government to "lay the heavy hand of military authority upon these Rebel communities," to "plant liberty on the ruins of slavery."[127] As in the past, however, this regime of federal power evoked resistance. Just as abolitionists, poor whites in the South, and urban laborers in the north, had resisted federal compulsion to serve the state, unrepentant former Confederates challenged the legitimacy

125. Davis, *The Rise and Fall of the Confederate Government,* 1:515–16.

126. It was no less perplexing to slaves, at least according to one account: "My master offers me my freedom if I will take up arms, but I have a family . . . and he does not offer to free them; and we have come to the conclusion that there is no use in fighting for our freedom when any one of our children . . . are to be made slaves." James Lindsay Smith, *Autobiography of James L. Smith* . . . (Norwich: Bulletin Company, 1881), 116. Hahn, *A Nation under Our Feet,* 88–89.

127. Charles Sumner, *Security and Reconciliation: Propositions and Arguments on the Reorganization of the Rebel States* (Boston: George C. Rand & Avery, 1865), 18. James A. Garfield, quoted in McPherson, *Abraham Lincoln and the Second American Revolution,* 5. "Our grand aim," proclaimed Representative Isaac Newton Arnold of Illinois, is that "the grand edifice of American constitutional government is to rise on a broader, firmer, more solid foundation, the basis of universal liberty." *Reconstruction: Liberty the Corner-Stone, and Lincoln the Architect; Speech of Hon. Isaac N. Arnold of Illinois* (Washington, D.C.: Lemuel Towers, 1864), 3.

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms

of federal power over persons. As a political contest, Reconstruction thus became "a struggle for and against compulsion."[128]

To be sure, Reconstruction heralded "a bold new assertion of federal power," rooted in "a new nationalistic or centralizing tendency in government."[129] The Thirteenth and Fourteenth Amendments, the Civil Rights Acts of 1866, the Reconstruction Acts of 1867, and the Ku Klux Klan Act of 1871 heralded "a revolutionary change in American constitutionalism" by granting citizens "federally enforceable guarantees for the protection of their civil rights." As Robert Kaczorowski has shown, at the heart of this transformation lay the principle that the federal government would protect civil rights where state and local authorities could not, or would not, do so.[130]

What was precisely revolutionary about this program of power, however, was not its means but its ends. After all, through the Fugitive Slave Law of 1850, while admittedly on a much smaller scale, the federal government protected constitutionally sanctioned property rights within hostile states and localities. And even as freedom supplanted slavery as the underlying rationale for generating federal power, the implementation of freedom would rely upon a familiar paradigm of enforcement. To transform emancipated slaves into American citizens, the Freedmen's Bureau relied upon officers who had the power to command the assistance of "any military officer." The Enforcement Act of 1867 permitted federal officials to use "a sufficient military force to enable such officer to perform his duties and enforce his authority." The Civil Rights Act of 1866, the Enforcement Acts (1870, 1871), and the Ku Klux Klan Act of 1871 each provided that federal marshals "shall have the authority to summon and call to their aid the bystanders or posse Comitatus." And it was not necessary to discuss these provisions "in detail." After all, explained Lyman Trumbull, "most of them are copied from the late fugitive slave act, adopted in 1850."[131]

128. Joel Parker, *The Three Powers of Government* (New York: Hurd and Houghton, 1869), 62–63. Parker, a critic of Reconstruction, notes that the Radical program aimed above all at reconstituting the freedman as a national citizen: "They were seeking to force upon those States a radical change of their institutions, not in relation to the alleged cause of the war only, but in relation to certain rights of their citizens," which typically were "acted on as matters properly within the control of the States . . . over which the government of the United States has no control, except by usurpation." Sidney Andrews, *The South Since the Civil War* . . . (Boston, 1866), quoted in Michael Les Benedict, *Fruits of Victory,* 16. Generally, see David Donald, *The Politics of Reconstruction, 1863–1867* (1965; Cambridge: Harvard University Press, 1984), 53–82.

129. Everette Swinney, *Suppressing the Ku Klux Klan: The Enforcement of the Reconstruction Amendments* (New York: Garland Publishing, 1987), 118.

130. Robert J. Kaczorowski, "To Begin the Nation Anew: Congress, Citizenship, and Civil Rights after the Civil War," *American Historical Review* 92 (1987): 47, 53.

131. See, e.g., The Civil Rights Act of 1866, 14 *U.S. Statutes at Large* 27 at 28 (1866);

This content downloaded from
130.182.4.15 on Tue, 18 Oct 2022 21:18:51 UTC
All use subject to https://about.jstor.org/terms