ROB BONTA
Attorney General of California
MARK R. BECKINGTON
Supervising Deputy Attorney General
ROBERT L. MEYERHOFF
Deputy Attorney General
State Bar No. 298196
  300 South Spring Street, Suite 1702
  Los Angeles, CA  90013-1230
  Telephone:  (213) 269-6177
  Fax:  (916) 731-2144
  E-mail:  Robert.Meyerhoff@doj.ca.gov
*Attorneys for Defendant Rob Bonta in his*
*official capacity as Attorney General of the*
*State of California*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

## CIVIL DIVISION

| | |
|---|---|
| **VIRGINIA DUNCAN, RICHARD LEWIS, PATRICK LOVETTE, DAVID MARGUGLIO, CHRISTOPHER WADDELL, and CALIFORNIA RIFLE & PISTOL ASSOCIATION, INC., a California corporation,**<br><br>Plaintiffs,<br><br>**v.**<br><br>**ROB BONTA, in his official capacity as Attorney General of the State of California; and DOES 1-10,**<br><br>Defendants | Case No. 3:17-cv-01017-BEN-JLB<br><br>**COMPENDIUM OF WORKS CITED IN DECLARATION OF MICHAEL VORENBERG**<br><br>**VOLUME 11 OF 11**<br><br>Courtroom:     5A<br>Judge:          Hon. Roger T. Benitez<br>Action Filed:  May 17, 2017 |

1

# INDEX

| Works | Decl. Page. | Compendium Page No. |
|---|---|---|
| **HISTORICAL STATUTES** | | |
| 14 U.S. Statutes 487, Chap 170, Sec. 6 (Approved March 2, 1867). | 19 n.21 | 0010-0014 |
| 10 U.S.C. 332 (Aug. 10, 1956, ch. 1041, 70A.) | 56–57 n.85 | 0015 |
| Pub. L. 109–163, div. A, title X, §1057(a)(2), Jan. 6, 2006. | 56–57 n.85 | 0016-0019 |
| Texas Session Laws, 13th Legislature, Regular Session, General Laws, chap. 187 (March 28, 1873), pp. 225-26. | 51 n.75 | 0020 |
| **BOOKS** | | |
| Roy P. Basler, ed., *Collected Works of Abraham Lincoln* (New Brunswick, N.J.: Rutgers University Press, 1953), 8:403-4. | 15 n.19 | 0026-0028 |
| William A. Blair, *The Record of Murders and Outrages: Racial Violence and the Fight Over Truth at the Dawn of Reconstruction* (Chapel Hill: University of North Carolina Press, 2021), 66-67. | 19 n.20 | 0029-0032 |
| Robert V. Bruce, *1877: Year of Violence* (1959; repr., Chicago: Quadrangle Books, 1970), 251-52. | 35 n.47 | 0033-0038 |
| Saul Cornell, *A Well-Regulated Militia: The Founding Fathers and the Origins of Gun Control in America* (New York: Oxford University Press, 2006), 196-97. | 36 n.50, 56 n.84 | 0039-0041 |

Compendium of Works Cited in Declaration of Michael Vorenberg
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| Eric Foner, *Reconstruction: America's Unfinished Revolution*, 1863-1877 (New York: Harper and Row, 1988), xxvii. | 4 n.2 | 0042-0044 |
| Jim Garry, *Weapons of the Lewis and Clark Expedition* (Norman, Okla.: Arthur H. Clark, 2012), 94 | 8 n.5 | 729-730 |
| Jerome A. Greene, *Nez Perce Summer, 1877: The U.S. Army and the Nee-Me-Poo* (Helena: Montana Society Press, 2001), 34-42, 310-12. | 33 n.40 | 0045-0059 |
| Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* (New York: Basic Books, 2016) 65-81, 90, 109-42, 177-202, 353-68. | *passim* | 0060-0096; 731-766 |
| Pekka Hämäläinen, *Lakota America: A New History of Indigenous Power* (New Haven, Conn.: Yale University Press, 2019), 299, 340. | 33 n.40, 33 n.41 | 0097-0104 |
| Robert Held, *The Belton Systems, 1758 and 1784-86: America's First Repeating Firearms* (Lincoln, R.I.: Andrew Mowbray, 1986), 33-39 | 8 n.6 | 767-775 |
| W. S. Neidhardt, *Fenianism in North America* (University Park: The Pennsylvania State University Press, 1975), 71. | 23 n.28 | 0105-0108 |
| John E. Parsons, *The First Winchester: The Story of the 1866 Repeating Rifle* (New York: Morrow, 1955), 48, 85, 88, 103, 116, 123. | 10 n.7, 14 n.18, 28 n.32 | 0109-0217 |
| Harold L. Peterson, *Arms and Armor in Colonial America (New York: Bramhall House*, 1956), 215-17 | 7 n.3 | 776-780 |
| Dennis C. Rousey, *Policing the Southern City: New Orleans*, 1805-1889 (Baton Rouge: Louisiana State University Press, 1996), 130-31; 155-156 | 42 n.59, 45 n.61 | 0218-0222 |

Compendium of Works Cited in Declaration of Michael Vorenberg
(3:17-cv-01017-BEN-JLB)

| | | |
|---|---|---|
| James E. Sefton, *The United States Army and Reconstruction*, 1865-1877 (Baton Rouge: Louisiana State University Press, 1967), 5-106, 112 | 19 n.21, 22 n.27 | 0223-0281 |
| Ben H. Severance, *Tennessee's Radical Army: The State Guard and Its Role in Reconstruction*, 1867-1869 (Knoxville: University Press of Tennessee, 2005), 1-119. | 20 n.23 | 0282-0359 |
| Otis A. Singletary, *Negro Militia and Reconstruction* (Austin: University of Texas Press, 1957), 3-33, 69-70. | 21 n.24, 22 n.26, 38 n.53, 42 n.59 | 0360-0397 |
| W. H. B. Smith, *Gas, Air and Spring Guns of the World* (Harrisburg, Penn.: Military Service Publishing Company, 1957). 30 | 7 n.4 | 781-783 |
| C. L. Sonnichsen, *I'll Die Before I'll Run: The Story of the Great Feuds of Texas* (1951; 2nd ed., New York: Devin-Adair, 1962), 125-49. | 30 n.35 | 0398-0424 |
| Robert M. Utley, *Lone Star Justice: The First Century of the Texas Rangers* (New York: Oxford University Press, 2002), 169-70 | 47 n.65 | 0425-0428 |
| Michael Vorenberg, "The 1866 Civil Rights Act and the Beginning of Military Reconstruction," in Christian Samito, ed., *The Greatest and the Grandest Act: The Civil Rights Act of 1866 from Reconstruction to Today* (Carbondale, Ill.: Southern Illinois University Press, 2018), 60-88 | 24 n.29, 27 n.31 | 0429-0446 |
| Walter Prescott Webb, *The Texas Rangers: A Century of Frontier Defense* (1935; 2nd ed., Austin: University of Texas Press, 1965), 292-93 | 47 n.65 | 0447-0452 |
| Harold F. Williamson, *Winchester: The Gun That Won the West* (Washington, D.C.: Combat Forces Press, 1952), 38, 42-44, 178 | 12 n.13 | 0453-0464 |

4

| | | |
|---|---|---|
| Richard Zuczek, *State of Rebellion: Reconstruction in South Carolina* (Columbia: University of South Carolina Press, 1996, 75, 79-80, 140-41, 170-171 | 38 n.53, 40 n.56, 41 n.57, 41 n.58, 49 n.70 | 0465-0476 |
| **LAW REVIEWS AND JOURNALS** | | |
| Clayton E. Cramer, Nicholas J. Johnson, and George A. Mocsary, "'This Right is Not Allowed by Governments That Are Afraid of the People': The Public Meaning of the Second Amendment when the Fourteenth Amendment was Ratified," *George Mason Law Review*, 17 (2010), 823-863, esp. 852-863 | 21 n.25 | 785-824 |
| Eleanor L. Hannah, "Manhood, Citizenship, and the Formation of the National Guards, Illinois, 1870-1917" (Ph.D. diss, University of Chicago, 1997), 15-16. | 36 n.50 | 0478-0481 |
| David Kopel, "The Second Amendment in the 19th Century," B.Y.U. L. Rev. 1359, 1418-21 (1998) | 54 n.81 | 0482-0488 |
| Michael G. Lindsey, "Localism and the Creation of a State Police in Arkansas," Arkansas Historical Quarterly, 64 (Winter 2005), 356-58. | 20 n.22 | 0489-0495 |
| Allan Robert Purcell, *The History of the Texas Militia, 1835-1903*" (Ph.D. diss., University of Texas, Austin, 1981), 221-27 | 21 n.24 | 0496-0505 |
| Gautham Rao, "The Federal "Posse Comitatus" Doctrine: Slavery, Compulsion, and Statecraft in Mid-Nineteenth-Century America," Law and History Review, 26 (Spring, 2008), pp. 1-56. | 56–57 n.85 | 0506-0562 |
| Jerrell H. Shofner, "Florida Courts and the Disputed   Election of 1876," Florida Historical Quarterly, 48 (July 1969), 26-46. | 48 n.66 | 0563-0584 |

| | | |
|---|---|---|
| Otis A. Singletary, "The Texas Militia During Reconstruction," Southwestern Historical Quarterly, 60 (July 1956), 25-28. | 21 n.24 | 0585-0598 |
| S.K. Wier, The Firearms of the Lewis and Clark Expedition (2010) | 8 n.5 | 825-836 |
| **LEGISLATIVE MATERIALS AND GOVERNMENT RECORDS** | | |
| Adjutant General James Longstreet, General Orders No. 16, New Orleans, July 19, 1870, in Annual Report of the Adjutant General of the State of Louisiana, for the Year Ending December 31, 1870 (New Orleans, A.L. Lee, 1871), p. 39. | 55 n.83 | 0600-0604 |
| 42nd Cong., 2nd sess., S. Doc. 183, "Sale of Ordnance Stores," U.S. Congressional Serial Set (1871), pp. 167-172. | 13 n.16, 14 n.17 | 0605-0611 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 3 (South Carolina), U.S. Congressional Serial Set (1871), p. 467; and vol. 4 (South Carolina,), p. 767. | 49 n.69 | 0612-0616 |
| 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 8 (Alabama) U.S. Congressional Serial Set (1871), pp. 414-15. | 51 n.74 | 0617-0619 |
| 46th Cong., 2nd sess., S. Rep. 693, pt. 2 "Investigation of Causes of Migration of Negroes from Southern to Northern States," U.S. Congressional Serial Set (1879-88), p. 357. | 51 n.76 | 0620-0621 |
| J. Q. Dickinson to "Hamilton," in 42nd Cong., 2nd sess., "Affairs in Insurrectionary States," vol. 13 (Florida), U.S. Congressional Serial Set (1871), pp. 289-90 | 50 n.73 | 0622-0627 |

| | | |
|---|---|---|
| General Orders, No. 101, May 30, 1865, The War of the Rebellion (Washington, D.C.: Government Printing Office, 1880-1901), ser. 3, vol. 5, p. 43). | 14 n.17 | 0628-0630 |
| "Penitentiary Report" to Legislative Assembly, September 1868 (Salem, Oregon: W. A. McPherson, 1868), pp. 94-95. | 30 n.36 | 0631-0633 |
| Proclamations of President Ulysses S. Grant, in James Richardson, ed., *A Compilation of the Messages and Papers of the Presidents* (New York: Bureau of National Literature, 1897), vol. 9, 4086-87 (March 24, 1871), 4089-90, 4090-92, 4092-93, 4093-4095. | 26 n.30 | 0634-0644 |
| James Speed, "Surrender of the Rebel Army of Northern Virginia," April 22, 1865, Opinions of the Attorney General, 11:208–09. | 19 n.20 | 0645-0652 |
| Testimony of William Murrell, Report and Testimony of the Select Committee to Investigate the Causes of the Removal of the Negroes from the Southern States to the Northern States (Washington, D.C.: Government Printing Office, 1880), pt. 2, p. 521. | 49 n.68 | 0653-0656 |
| **NEWS ARTICLES** | | |
| Army and Navy Journal, June 1, 1867, p. 350 | 32 n.38 | 0658-0059 |
| Bismarck Tri-Weekly Tribune (Dakota Territory), June 29, 1877, p. 4. | 29 n.33 | 0660 |
| Charleston News, Oct. 17, 1870, p. 2 | 40 n.55 | 0661-0663 |
| Chicago Daily Inter Ocean, January 12, 1877, p. 1 | 49 n.67 | 0664 |
| Chicago Daily Tribune, July 23, 1876, p. 4. | 34 n.43 | 0665 |
| Chicago Daily Tribune, April 15, 1878, p. 4. | 34 n.44 | 0666 |

7

| | | |
|---|---|---|
| "The Reds," Chicago Daily Tribune, March 23, 1879, p. 7. | 52 n.78 | 0667 |
| Georgia Weekly Telegraph and Georgia Journal & Messenger, April 5, 1870, pp. 4, 8. | 46 n.62 | 0668-0669 |
| "Lovejoy," "Letter from Africa," Fayette County Herald (Washington, Ohio), Dec. 21, 1871, p.2. | 31 n.37 | 0670-0678 |
| David Kopel, "The History of Magazines holding 11 or more rounds," Washington Post, May 29, 2014. | 28 n.32 | 0679 |
| New Orleans Republican, June 13, 1873, p. 1 | 44 n.60 | 0680 |
| New Orleans Republican, March 13, 1877, p. 2. | 49 n.67 | 0681-0683 |
| "Breech-Loading Arms," New York Herald, Oct. 12, 1866, p. 4. | 34 n.46 | 0684 |
| "A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877, p. 4. | 35 n.48 | 0685-0687 |
| Ouachita Telegraph, October 24, 1873, p 1. | 44 n.60 | 0688 |
| "Henry's Sporting Rifle," in Wilkes' Spirit of the Times: The American Gentleman's Newspaper, March 24, 1866, p. 59. | 36 n.49 | 0689 |
| "Another Battle," The Opelousas Journal, Aug. 29, 1873, p. 3. | 47 n.64 | 0690-0691 |
| The Forest Republican (Tionesta, Pennsylvania), Oct. 3, 1877, p. 4. | 37 n.52 | 0692 |
| The Weekly Democratic Statesman (Austin, Texas), August 24, 1871, p. 2. | 46 n.63 | 0693-0694 |
| Washington Evening Star, Aug. 16, 1869, p. 1. | 39 n.54 | 0695 |
| *Wyoming Leader* (March 16, April 21, May 8, 1868, always p. 4). | 29 n.33 | 0696 |

8

| **OTHER SOURCES** | | |
|---|---|---|
| James Bown and Son's Illustrated Catalogue and Price List, 29th annual ed. (Pittsburgh, Penn., 1877), 33. | 37 n.51 | 0698-0700 |
| David B. Kopel and John Parker Sweeney, "Amici Curiae Brief for the Center for Constitutional Jurisprudence and Gun Owners of California in Support of Plaintiffs-Appellants and Supporting Reversal," 2014 WL 2445166 (9th Cir.). | 28 n.32 | 0701-0702 |
| National Museum of American History, Collections, Belton Repeating Flintlock Fusil | 8 n.6 | 838-841 |
| "Serial Number Ranges for Springfield Armory-Manufactured Military Firearms," http://npshistory.com/publications/spar/serial-nos.pdf, pp. 1-3. | 28 n.32 | 0703-0707 |
| Springfield Armory U.S. National Park Website: https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoorproduction-serial-numbers.htm. | 28 n.32 | 0708-0715 |
| Guncite.com, Second Amendment State Decisions, Feb. 24, 2013. | 54 n.79 | 0716-0727 |

Compendium of Works Cited in Declaration of Michael Vorenberg
(3:17-cv-01017-BEN-JLB)

## June 1, 1867.

roads and telegraphs would owe their existence and continuity to our magnanimity and to the plethora and willingness to be bled of the purses which supported them, we would keep the country in a healthy state of excitement, the country would continue to appropriate, the Bureau would continue to prosper, agents and superintendents would continue to "retire comfortably," and we would no longer be subjected to the restraints and interference 'of prying, meddlesome, officious soldiers, whose very calling eminently unfits them for any mission of philanthropy or peace.

In closing, I trust you will admit we have done our work well for the last few years, and that we deserve more consideration at the hands of the Bureau, which is our friend. In spite of its shortcomings we still cling to it, and bespeak for it your influence in the next effort to transfer it to the War Department. Let not the War Department get hold of us, for then we can no longer rob, murder and burn, or indulge in other exciting and congenial pursuits; and though we may get what is honestly our own, the hands of the soldiers will be untied, and instead of affording us playthings for our women, a practice school for our young warriors, and a jest for our braves and chiefs, they will become a terror to our tribes, and the conservators of law, order, and civilization.

RED CLOUD.
Chief of Sioux, Cheyennes, etc.
CAMP ON TONGUE RIVER, D. T., March 31, 1867.

*Bismarck Tri-Weekly Tribune* (Dakota Territory), June 29, 1877, p. 4.





*Charleston News* (Charleston, S.C.), October 17, 1870, page 2



### An Honest Radical.

The Hon. B. Odell Duncan, the United States Consul at Naples, sums up, in a letter to Judge Orr, printed on Saturday, the cogent reasons why "the good and true of "both parties" should unite to effect a reform in the corrupt administration of the government of the State. Mr. Duncan is a native South Carolinian, who was already a Republican when the fiercest Radicals of to-day were "unrepentant rebels;" and, with the candor which caused him to proclaim, years ago, his attachment to Republicanism, he now points out the evils which should induce all respectable people to side with the party of Reform.

Mr. Duncan deems it an insult to the honest, intelligent colored man to suppose that he will support the party of corruption and extravagance, against another party which, according to Judge Orr, is equally Republican, and is in favor of reform. There is no principle at stake affecting the rights of the colored race, as there was in 1867 and 1868. If there were, every colored man would, of course, vote unflinchingly to maintain his rights. But these principles have been settled beyond the power of any State to modify them, and are accepted as final by all. There is no issue except Reform, and Mr. Duncan thinks it very reasonable to expect a large number of the most honest and intelligent colored men to vote in favor of the Reform candidates. What he *thinks*, we *know!*

Any process of reform to be accomplished by joining the party needing reformation, would be both slow and difficult. There is no instance on record of a party reforming itself, and reforms are generally effected just as the Reformers in South Carolina now propose. Virginia, Chicago and other places have been relieved from misrule, as South Carolina hopes to be, by a combination of the respectable people to defeat the public enemy.

Nor could the canvass, even if unsuc-

Nor could the canvass, even if unsuccessful, prove an injury to the State. It tends to instruct the colored people, to lower the tone of the arch-robbers, to strengthen the better elements of the party, to obtain, at least, a legislative strength sufficient to expose fraud and protect the treasury.

Mr. Duncan thinks that the danger of serious troubles growing out of Governor Scott's Winchester Rifle tactics must be met sooner or later, and just as well *sooner*. The fomenters of discord must learn that lawlessness on their part is as much a crime as on the part of simple individuals. Furthermore, Mr. Duncan says that he believes that in Judge Carpenter the State would have *an able and honest Governor*, and that, under the Reform government, there would be more educational progress, more security, and less discord than under the present administration. This brings Mr. Duncan to his conclusion, which he states in these words: "I am a Republican, and "expect to remain so. But I do not consider "it my duty as a Republican to vote for men "I am convinced are corrupt, merely because "they can claim the regular party nomina- "tion, more especially when the party is led "by Whittemore."

The Republicanism of Mr. Duncan is unimpeached and unimpeachable. In the face of the sound logic of so honorable a man, how can any industrious and intelligent Republican venture to vote for Ransier and for Scott?

———————————

WE ENTREAT THE UPPER AND MIDDLE COUNTIES TO WORK FOR REFORM UNTIL THEIR SINEWS CRACK. CHARLESTON AND THE WHOLE SEABOARD WILL DO ITS DUTY.

———————————

*Chicago Daily Inter-Ocean*, January 12, 1877, page 1

[note: Vorenberg declaration, footnote 61, had a typographical error recording his article mistakenly at page 2 instead of page 1]



VOL. V. NO. 252.                    CHICAGO, FRIDAY MORNING, JANUARY 12, 1877.

Page 1:

## PRECARIOUS.

The Situation in New Orleans Still Very Critical.

The White League Disposed to Resist the Orders from Washington.

Pretender Nicholls' Minions Busy Swearing In So-called Police and Militia.

So That in the Event of Hayes Being Declared President the Army Will Be Insufficient to Disperse Them.

Noble Words from the Governor of Kansas Relative to the Situation.

Vice President-elect Wheeler Pays a Visit to President-elect Hayes.

What the Latter Says on the Situation.

LOUISIANA.
THE SITUATION.
Special Telegram to The Inter Ocean.]
NEW ORLEANS, La., Jan. 11.—The situation

LOUISIANA.
THE SITUATION.
Special Telegram to The Inter Ocean.]
NEW ORLEANS, La., Jan. 11.—The situation is growing hourly more precarious. The pretender, Nicholls, keeps 500 White Leaguers, fully armed with Winchester rifles and bayonets fixed, on continuous duty at the Supreme Court Rooms. Squads of the White League guard all the offices captured from the State Government, and his appointees are busy swearing in so-called police and militia. It was decided by the Democratic White League leaders to-day that every member of the party in the city should be sworn in, either as police or militia, so as to raise from 15,000 to 20,000 men by the 4th of March, and that then, even if Hayes became President, he could not send an army sufficiently strong to disperse them, and that they would not lay down their arms to any force inferior in numbers to themselves. Even the air is filled with the ring of

THE NEW REBELLION against not only the State but the National Government. Orders have gone from their headquarters here to seize all the parish offices throughout the State, notwithstanding Secretary Cameron's order Tuesday afternoon to General Augur to disperse all lawless armed combinations, and Nicholls' promise to disband them. Not only do they remain in possession of the courts and police stations, but this morning the late pretender, McEnery, appointed by Nicholls to the Recordership of Mortgages, advanced with Captain McGloin's armed White League company which captured the City Hall in September, 1874, upon that office and

VIOLENTLY EJECTED the old and legal incumbents, and then proceeded to the Third Municipal Court, and of of armis expelled the old and legal judge (Sisson).

*Chicago Daily Tribune*, July 23, 1867, p. 4

# The Tribune.

## TERMS OF SUBSCRIPTION.

PAYABLE IN ADVANCE—POSTAGE PREPAID AT THIS OFFICE.

Daily Edition, postpaid, 1 year......................$12.00
Parts of a year, per month.............................. 1.00
Mailed to any address four weeks for............... 1.00
Sunday Edition: Literary and Religious Double
   Sheet................................................... 3.00
Tri-Weekly, postpaid, 1 year........................... 6.00
Parts of a year, per month.............................. .50

### WEEKLY EDITION, POSTPAID.

One copy, per year..................................... $ 1.50
Club of five............................................. 6.00
Club of twenty......................................... 20.00

Postage prepaid.

Specimen copies sent free.

To prevent delay and mistakes, be sure and give Post-Office address in full, including State and County.

Remittances may be made either by draft, express, Post-Office order, or in registered letters, at our risk.

### TERMS TO CITY SUBSCRIBERS.

Daily, delivered, Sunday excepted. 25 cents per week.
Daily, delivered, Sunday included. 30 cents per week
Address          THE TRIBUNE COMPANY,
   Corner Madison and Dearborn-sts., Chicago, Ill.

The trading-boats that annually come down the Missouri from Fort Peck in their cargoes of thousands of buffalo-robes carry the explanation of how it comes that the Indians are better armed than the troops sent against them, and have ample supplies of ammunition. Since 1872, it has been well known to army officers stationed along the Upper Missouri that the traders at Fort Peck secured and maintained almost a monopoly of the Sioux trade by furnishing the redskins with Winchester rifles in exchange for buffalo-skins and furs. The rifles the traders have sold at enormous rates, receiving as high as 300 robes, or about $2,400 each, for the rifles, and the enormous cargoes sent down the river by them were known to have been obtained in exchange for Winchester rifles and ammunition. In view of these facts, before the Government sends any more expeditions against the Sioux, it would be in order to send out a company or two to capture those traders and cut off the savage base of supplies.

## Article 8 -- No Title

*Chicago Daily Tribune (1872-1922);* Apr 15, 1878; ProQuest Historical Newspapers: Chicago Tribune
pg. 4

The recent donation by the Canadian Government of forty Winchester rifles and 20,000 cartridges to the chiefs and head-men of the Blackfeet appears to have met with very decided manifestations of disapproval among the people of the Dominion. It is complained that the gift of so deadly and effective an arm as the Winchester would place at a disadvantage the Mounted Police, who are not so well provided, and who, in the event of an encounter, would be in danger of repeating the history of CUSTER and his men, whose speedy massacre was owing to the fact that their weapons were inferior to the Winchester rifles with which SITTING BULL's warriors were supplied. The arms and ammunition are given to the Blackfeet for the purposes of hunting, and the danger of their being traded or sold to the Sioux, to be used against the soldiers of the United States, seems not to have been taken into account by the Canadian authorities.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

THE REDS.: Extraordinary Turn-Out at the Exposition Building. It Is ...
*Chicago Daily Tribune (1872-1922);* Mar 23, 1879; ProQuest Historical Newspapers: Chicago Tribune
pg. 7

# THE REDS.

### Extraordinary Turn-Out at the Exposition Building.

### It Is Scanned by the Hardest Elements of This City.

### A Crowd So Great that the Programme Cannot Be Executed.

### Turn-Out of the Military Companies—Their Strength and Appearance.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

*Georgia Weekly Telegraph and Georgia Journal and Messenger*, April 5, 1870

Page 1



Page 4

### "I Tell You the Winchester Rifle is the Best Law You Can Have."

Such was the declaration of South Carolina carpet-bag Governor Scott, at the Washington Radical meeting, and it drew rounds of applause from the motley crowd to whom it was addressed. Rifles and gunpowder, bayonets and blood was the cry of that meeting from the call to order to adjournment, and all the outgivings of the letter-writers, gossips and quidnuncs in Washington go to show that this talk is not without serious meaning.

Beard, the blood-thirsty nigger from Augusta, said they did not want these Winchester Rifles in the hands of United States soldiers. Oh no! that would not begin to do, because the soldiers would be likely to deal even-handed justice and put down violence and lawlessness wherever found. Oh, no, says Beard, "we want the power to raise a militia and we want the guns put in our hands." Yes! Beard and his crowd don't want peace. But they want to kick up a row. They are "*spiling for a fight*," and we have no doubt would be willing to take a little preliminary whipping, so they could be thrown into a quasi defensive attitude and invoke the power of the United States Government to put down "another rebellion," by fire, sword, confiscation and political disabilities. Give them their melish and guns, and they could get up a fight as the boys make the little tortoise bite—by heaping live coals on his back.

And this desperate programme to force all the Southern States into an attitude in which the universal disfranchisement of the whites would be justified as a measure of "national safety," they tell us is the last card of the Butler, Drake and Thayer Radicals, to avert the possibility that the Southern States should ever vote the Democratic ticket. It is the initiatory step in the grand military *coup d'etat*, which, beginning in the Southern States, shall spread at last to every Democratic State, and destroy every ballot not cast for the Radical party. That is the Winchester Rifle Law as expounded by the advocates of the Butler bill, and no wonder they say to each other, "I tell you the Winchester Rifle is the best law *we* can have."

Page 8

### Beard and Bullock Call for Rifles.

Simeon Beard, the Augusta mulatto, wound up his speech at the Washington Bullock meeting with these words:

In conclusion, give us what we ask; strike out the Bingham amendment, which ties us hand and foot. We don't want soldiers; we want the power to raise a militia; we want guns put in our hands, and we will see whether we cannot protect ourselves. Give us this, and we will give you the State of Georgia evermore. [Applause.]

Bullock's speech was as follows. We quote from Forney's Chronicle:

Mr. Chairman. It was not my purpose to have said a word on this occasion, but I should certainly be insensible to the magnificent reception which has been given to the loyal representatives of Georgia to-night, should I refuse to make a few remarks, at least; and while here, I desire to refer to that matter which has been alluded to by the eloquent speakers who have preceded me, in regard to striking out a certain amendment to the Georgia bill, now before Congress. That amendment, my friends, seeks to determine in advance, a question which the loyal Legislature of Georgia asks to decide for itself. We are not here asking that the Congress of the United States, as some newspapers allege, shall perpetuate the term of that Legislature. We simply ask that its terms shall not be cut off, and shortened to the interest of the rebels.

If Congress will give a decision in regard to this Georgia matter, which, in the opinion of many of the ablest lawyers, in the true one, and which is entertained by every loyal man in our State, we will not ask protection at the hands of the general government; we will be able to put a rifle in the hand of every loyal man in the State of Georgia. But we would do this in the interest of peace, and not for the purpose of oppressing any man. All we ask, as the rebels of old asked, is to be let alone. We desire simply to be allowed to carry out the constitution which the loyal people of Georgia adopted, and when I say the people of Georgia, I mean all the people, black and white.

It will be seen that Beard, as the representative of the Georgia Radical negroes, calls for arms with which to commence war upon the white people of the State, and that Bullock, the head of the party here, echoes the demand. The sham about defending themselves deceives nobody. Georgia is at peace now, and we know of no one who proposes to disturb it but these Radicals, white and black. There are thousands of white people in this State who have no arms at all, not even a pistol, while there is not one negro in three who does not own some sort of firearm. They are armed now—fully armed. It is the white people who need arms, not the negroes.

Now, we want to tell these gallant gentry,

Now, we want to tell these gallant gentry, who are clamoring so lustily for arms, that the white people don't care how many Winchester rifles they own. They are welcome to make walking arsenals of themselves if so minded, but they must not presume upon that fact to bully and insult white people too far. They must not forget that "rebels" still have, or think they have, some rights that even "loyal" men must respect. There are conditions and circumstances, the submitting to which is far worse, far more ruinous, in every respect, than even civil war. We would be glad to have these war men recollect that. It is neither wise nor brave to threaten, so our people don't do it. They simply ask these devils to remember that there are limits beyond which even they must not pass.

There is no earthly use for a "loyal," or any other sort of militia in Georgia, but if one is organized it must have something to do to justify its organization. If there are no disorders to put down, they will make them, just as they did in Tennessee, and then the fiend of a race war will be let loose. Have Beard and his friend, Bullock, thought of these things? Are they ready to face the horrid music that will surely resound through Georgia if they succeed in their plans?

We write in the interests of peace. We want peace. We will make almost any sacrifice to preserve it, but we will never advise the people to make every sacrifice for it. If they choose to do it, well and good. It is their affair, and as they make their bed so must they lie. All we ask is that those who are trying to break the peace think the matter over seriously, and restrain themselves, if possible. We speak in their interest as well as our own. Their lives are worth as much to them as are anybody else's. When they start on this campaign against the peace and order of Georgia, they must put them to the hazard as other people do theirs. Will any result they can achieve compensate them for a fatal issue? Let them ask and answer that question. It may improve their state of mind. We especially commend it to Generals Beard and Bullock, who are snuffing the battle from afar, and who, of course, will lead the "loyal" columns on their first campaign.

*Fayette County Herald* [Washington Court House, Ohio]

December 21, 1871

Page 2

Column 1:



LETTER FROM AFRICA.

GABOON, WEST AFRICA,
Oct. 26th, 1871.

EDITORS HERALD:—It is always cheering to see the countenance of an old friend, especially if he has been long absent and this absence has created some apprehension as to his safety. Such was my happiness on seeing several copies of the HERALD in our last monthly mail. When the English line of steamers took the mail contract for the coast, the French neglected to hand over a large mail that had collected at Fernanda P. O. until the last mail steamer brought it down. There is nothing here which makes us feel so much out of the world as this slow mail facility. In this age of Ocean Cables and daily newspapers, to be a whole month away from the nearest of them, seems at first like being condemned constantly to read stale news. But instead of complaining, we are reminded by those who have been here many years, that when they first came out, it was sometimes a whole year before the slow-sailing coasting vessels would bring the mail; and that then it was as irregular and uncertain as the wind. Our latest dates from home close with an account of the Fair, the crowds of people and the

Column 2

large success of the exhibition. But what has transpired since that time is still, as to us, in the future, and since it is a common, although a wrong desire, to seek to lift the veil which a peep into the future, we must be content, while we call to mind Pope's distich:

"O! blindness to the future kindly given,
That each may fill the circle macked by Heaven."

It is now the rainy season and our Spring time; flowers bloom on every hand; birds sing more sweetly and joyfully, and all nature seems revived. The first rain, not more than a sprinkle, which often occurs in the dry season, fell on 14th inst. This was the first shower since our arrival on the 10th of June, and there had been no rain for a month then. Your farmers would think this a terrible dry spell; but here, from the heavy dews and moist atmosphere, vegetation, although greatly stunted, does not appear so burnt up as it would from two weeks of drouth with you. This is not near so hot and sultry as your summers. The highest I have noticed the thermometer for some time was 86 deg. The nights are quite cool, but it must be caused by the dampness of the atmosphere taking away the heat of air bodies, for the thermometer rarely falls as much as ten degrees, generally six or seven. Almost every morning it is 78 deg., and in the hottest part of the day 84 deg. And this is now our hot season. The dry season is our winter. Then the sun is north of us; now it is right over our heads, and the days and nights are equal.

There is plenty of game now—three or four kinds of deer, from the little beautiful gazelle to the big horned antler, frisk and run across the grass fields. They have come down from the brush to feed upon the fresh grass. Some very fine ones have been shot close by our house. Last week I was down, or rather up the coast—for it is north—to Benita, perhaps a hundred miles from this. I spent two days hunting. There are wide prairies there where plenty of wild cattle, deer and elephants feed. Judging from the tracks, or rather paths, the elephants are the most numerous; but they sleep in the forest in the day time, and only come out to feed at night, so that

Column 2 continued

is now our hot season. The dry season is our winter. Then the sun is north of us; now it is right over our heads, and the days and nights are equal.

There is plenty of game now—three or four kinds of deer, from the little beautiful gazzelle to the big horned antler, frisk and run across the grass fields. They have come down from the brush to feed upon the fresh grass. Some very fine ones have been shot close by our house. Last week I was down, or rather up the coast—for it is north—to Benita, perhaps a hundred miles from this. I spent two days hunting. There are wide prairies there where plenty of wild cattle, deer and elephants feed. Judging from the tracks, or rather paths, the elephants are the most numerous; but they sleep in the forest in the day time, and only come out to feed at night, so that we did not get to see many. The deer also were very wary, and we only shot one. But the cattle were to be seen on every hand, of all ages and sizes. We fired almost all our ammunition away at them; but for the want of skill we only killed two, and these ran away with the rest, and were found dead by the natives. Our guns were not heavy enough caliber to kill them at once unless we hit them fair in the head. They much resemble buffaloes, but I think they are not so tall or so heavy, but larger bodied, with drooping horns, and the bulls with shaggy manes like a lion; and when they charge, as they did once at Mr. Murphy, they must look very frightful; for although he escaped by being over the brush, he would not go near them again. There were two large bulls charged at him as soon as he fired, and but for the thick under brush close at hand, he could hardly have escaped. He forgot to shoot again his repeating rifle, and was so frightened that he left for home straightway. But we had not much to boast of, for soon afterwards when we were stalking a herd, an old elephant started up from a muddy hollow where he had been wallowing, and gave such an angry snort that the whole party ran for the trees and left the huge beast and the cattle alone in their glory. The natives said he was angry and it would not do to disturb him; and our guns would have effected him about as much as goosequill pop-guns.

Column 2 continued

...ful; for although he escaped by being near the brush, he would not go near them again. There were two large bulls charged at him as soon as he fired, and but for the thick under brush close at hand, he could hardly have escaped. He forgot to shoot again his repeating rifles, and was so frightened that he left for home straightway. But we had not much to boast of, for soon afterwards when we were stalking a herd, an old elephant started up from a muddy hollow where he had been wallowing, and gave such an angry snort that the whole party ran for the trees and left the huge beast and the cattle alone in their glory. The natives said he was angry and it would not do to disturb him; and our guns would have affected him about as much as gooseqaill pop-guns, so that it was not difficult to persuade us to let him alone. Afterwards we saw two others, or rather the bushes shaking and heard them cracking, for we could only get glimpses of the animals as they crashed down through the underbrush into the forest. We saw plenty of monkeys—little gray ones jumping about on the trees, and large black ones, whose bark was like that of a coarse bull dog's, but they would all hide away in the thick vine-covered branches so that we could not shoot them. These prairies are very the hunting grounds, and will be for many years to come, as the natives are very cowardly, and their guns are not capable of killing the large game. A skilful hunter might make a fortune here killing elephants, if they did not kill him.

Mr. Thompson, of Glasgow, who is visiting us, and making some observations and collections, has assisted me in making several journeys inland. The most extensive one was up the Benita River. We were supplied with everything for our journey by Dr. Wasson, whose long experience and judgment gave us such aid as we could not get elsewhere. We traveled one whole week straight back from the coast; and all this time we did not find, after we left the coast, a single place where we could see a hundred yards, except at some native town where they had cleared a small place. We traveled by a little winding foot path through dense forests, the trees two hundred feet high, and covered with innumerable vines. We came to...

Column 2 continued

an angry snort that the whole party ran for the trees and left the huge beast and the cattle alone in their glory. The natives said he was angry and it would not do to disturb him; and our guns would have affected him about as much as goosequill pop-guns, so that it was not difficult to persuade us to let him alone. Afterwards we saw two others, or rather the bushes shaking and heard them cracking, for we could only get glimpses of the animals as they crashed down through the underbrush into the forest. We saw plenty of monkeys—little gray ones jumping about on the trees, and large black ones, whose bark was like that of a coarse bull dog's, but they would all hide away in the thick vine-covered branches so that we could not shoot them. These prairies are very fine hunting grounds, and will be for many years to come, as the natives are very cowardly, and their guns are not capable of killing the large game. A skillful hunter might make a fortune here killing elephants, if they did not kill him.

Mr. Thompson, of Glasgow, who is visiting us, and making some observations and collections, has assisted me in making several journeys inland. The most extensive one was up the Benita River. We were supplied with everything for our journey by Dr. Wasson, whose long experience and judgment gave us such aid as we could not get elsewhere. We traveled one whole week straight back from the coast; and all this time we did not find, after we left the coast, a single place where we could see a hundred yards, except at some native town where they had cleared a small place. We traveled by a little winding foot path through dense forests, the trees two hundred feet high, and covered with innumerable vines. We came to the river again on Friday, and glad we were to see a little open space. Two men with a canoe ferried us over, but would not take any pay. We thought this was strange, for these people are notorious beggars, and rarely refuse what is offered them. The next week

Column 3

as we returned we sent our baggage on before while we staid to visit the falls at the river. In the evening when we went down to the ferry, we found they had hid the canoe, and refused to let us cross until we paid them. When they found we would pay they made an exorbitant demand; and when Mr. Thompson, in his kindness and unwillingness to quarrel, was disposed to give them their price, they began to gather up their guns, and said that it was not enough, they must have half of our goods. I saw that the next demand would be all, and then if we were too cowardly to fight, they would strip and perhaps kill us. I told Mr. T. to get out of the way and I would settle the palaver. I had a Winchester rifle with eighteen balls in it, which it would discharge before they could reload, besides a brace of pistols, and three muskets in the hands of our men. I took the pistols, which our men had named "streams of fire," from their rapidity of discharging, being self cocking revolvers; and my gun they had named "Ekonke," which means the "death dealer." As I buckled on my belt our men mentioned these names. I demanded: Who hid that canoe. The man had concealed himself in his house, and when he came out I got him before me toward the river, and then made him understand, by our interpreter, that he must go at once and get the canoe, or I would let go these spirits, at the same time whirling the cylinder of my revolver making it click. All the women and most of the men scampered at once, and the fellow did not wait for a second order, but was very spry to find it. We gave them some presents when we were sore of the canoe. But I have no doubt a little cowardice just at that juncture would have perhaps cost us our lives. But another palaver awaited us. Our guide, whose home was on this side of the river, and who had gone on with our baggage in the morning, was now missing. The supposition at once was that he had swam the river and gone on home. But when we came to his town he was not there. It was then dark; but four men immediately

Column 3 continued

which means the "death dealer." As I buckled on my belt our men mentioned these names. I demanded: Who hid that canoe. The man had concealed himself in his house, and when he came out I got him before me toward the river, and then made him understand, by our interpreter, that he must go at once and get the canoe, or I would let go these spirits, at the same time whirling the cylinder of my revolver making it click. All the women and most of the men scampered at once, and the fellow did not wait for a second order, but was very spry to find it. We gave them some presents when we were sure of the canoe. But I have no doubt a little cowardice just at that juncture would have perhaps cost us our lives. But another palaver awaited us. Our guide, whose home was on this side of the river, and who had gone on with our baggage in the morning, was now missing. The supposition at once was that he had swam the river and gone on home. But when we came to his town he was not there. It was then dark; but four men immediately started back to hunt for him, fearing he would be injured by the people who had hid the canoe, or had attempted to swim the river and had been picked up by alligators. Our men were very much concerned. If the young man could not be found, or there was any evidence of his death, the natives would demand one of our men for him, to be cruelly murdered, if possible, in the same way the young man had died. And all our men accepted it as the law, and never thought of making any resistance, but were only thinking who would have to die. I told them that we would make every exertion to find the young man, and then we would kill all the men and burn up their town if they made any such foolish demand of us; that we would all die rather than give up one to be so cruelly and wickedly murdered. Fortunately the young man came in safe the next morning. He had attempted to swim the river, but was swept down by the current and lodged on an island; and seeing alligators in the water he was afraid to venture in the river again, and had staid all night on the island. Seeing the canoe crossing in the morning he had called to it, and was landed safely on shore.

We returned by a more southern

Column 3 continued

lodged on an island; and seeing alligators in the water he was afraid to ... ture in the river again, and had ... 'd all night on the island. Seeing the canoe crossing in the morning he had called to it, and was landed safely on shore.

We returned by a more southern route and found it far less hilly and a better path. The elephant paths thro' the forests, especially near the river, were worn down like old roads. There are elephants enough here to supply the world with ivory for ages. The natives rarely kill one, and then only some old and helpless fellow which has been deserted by its comrades.

We arrived home after many incidents and adventures late on the eve of the 22d, having been out eleven days, sleeping on the ground and in native's huts, wading many streams through the day, or sometimes crossing the streams by sitting perched on the shoulders of a native. And then our canned provisions spoiled as soon as we opened them, so that the last two days we had nothing but native food. Still we were quite well, and although weary, enjoyed our journey and gained some useful knowledge of the country and people.

Tuesday, Oct. 31st. Last night Tom Core died. He was the richest native man on the river. He owned several plantations and many slaves, and was the head clerk in the Hamburg Co.'s factory. (We call stores factories). I have just been to see the wailing. About a hundred women are sitting on the floor around the coffin making a most hideous noise, more like a lot of hungry hogs squeal ing than the noise of human voices,— A small cannon is fired every few minutes, and then a loud wail follows. A large number of slaves are wailowing in the dirt around the door, and pouring the dust on their heads. A number of police from the plateau are guarding his store room. The relatives, as soon as it was certain he would die, began appropriating whatever they could lay hands on. He had much gold and goods in chests in his house. Some of them were carried away and others found to be empty. A new Colonel's uniform, which he had just received and had worn but once, was not to be found to bury him in. He has five children here in the Mission School. It was his last request to be buried in a Christian manner in the Mission Church yard. There will be a service in the church

Column 3 continued

We arrived home after many incidents and adventures late on the eve of the 22d, having been out eleven days, sleeping on the ground and in native's huts, wading many streams through the day, or sometimes crossing the streams by sitting perched on the shoulders of a native. And then our canned provisions spoiled as soon as we opened them, so that the last two days we had nothing but native food. Still we were quite well, and although weary, enjoyed our journey and gained some useful knowledge of the country and people.

Tuesday, Oct. 31st. Last night Tom Care died. He was the richest native man on the river. He owned several plantations and many slaves, and was the head clerk in the Hamburg Co.'s factory. (We call stores factories). I have just been to see the wailing. About a hundred women are sitting on the floor around the coffin making a most hideous noise, more like a lot of hungry hogs squealing than the noise of human voices.— A small cannon is fired every few minutes, and then a loud wail follows. A large number of slaves are wallowing in the dirt around the door, and pouring the dust on their heads. A number of police from the plateau are guarding his store room. The relatives, as soon as it was certain he would die, began appropriating whatever they could lay hands on. He had much gold and goods in chests in his house. Some of them were carried away and others found to be empty. A new Colonel's uniform, which he had just received and had worn but once, was not to be found to bury him in. He has five children here in the Mission School. It was his last request to be buried in a Christian manner in the Mission Church yard. There will be a service in the church. Some heathen friends have caught persons whom they say killed him by witchcraft; but the day is past for such cruel superstitions here.

LOVEJOY.

David Kopel, "The History of Magazines holding 11 or more rounds: Amicus brief in 9th Circuit, May 29, 2014," *Washington Post*, May 29, 2014

… "The commercial breakthrough for guns holding more than 10 rounds began in the late 1850s, with a collaboration between Daniel Wesson and Oliver Winchester, producing the Volcanic Rifle. This rifle used two innovations: the metallic cartridge (holding the primer, gunpowder, and bullet in a metallic case, just like modern ammunition) and the lever action mechanism for ejecting an empty case and loading a fresh cartridge. The Volcanic Rifle was improved to become the 16-shot Henry Rifle during the Civil War. The Henry was in turn refined into the Winchester Model 1866, which became a huge commercial success. So by the time the Fourteenth Amendment was ratified in 1868, rifles holding more than 10 rounds were common in America. The latter 19th century saw the proliferation of 11+ magazine rifles from companies such as Winchester, Colt's, and other manufacturers." …

NOTE: Michael Vorenberg declaration, footnote 54, has a typographical error. *New Orleans Republican*, June 1, 1873, p. 1, should read as *New Orleans Republican*, June 13, 1873, p. 1.

The relevant article is reproduced here.

*New Orleans Republican*, June 13, 1873, p. 1



## A BOHEMIAN IN NEW ORLEANS.

**His Visit to Governor Kellogg, and What Came of It—The Governor has an Office—He has a House—Both Described—Bohemian Surprised to Find the Governor can Talk in the English Language—Samples Given of What He Heard.**

Turning from this branch of the subject, I next asked Mr. Kellogg about the condition of affairs in the parishes. I had heard that he had been unable to install his representatives in some of the Red river parishes, and that he intended to send his Metropolitans up there for that purpose. He said: "there are in the State about sixty parishes; in all but about a dozen of them there is perfect quiet and order, and I have the representatives of the legal State government in office. In some of the parishes near the Arkansas and Texas boundaries, where Fusion candidates were chosen and returned by our board, as well as the other, they took commissions from McEnery, but refused to take them from me. We were obliged to have men in office holding commissions from the legal State government, and so, when those who were elected refused to take my commissions, I had to appoint others. In some cases I took the defeated candidate, and in some, other persons. Some of these appointments have not been good ones—I couldn't always tell what kind of an officer a man would make when he lived 400 miles away. At any rate, I would prefer to have the man who was elected in. Whenever, therefore, those who have held McEnery's commissions have concluded to take mine I have got the officers who were acting to resign, or in some other way caused a vacancy for them. Since the President's proclamation, a number of these men have come in and signified their willingness to submit. They say that they carried the matter far enough to show that they protested. If the Texas and Arkansas people will stay at home and not stir our people up, there will be no more trouble."

*New Orleans Republican*, March 13, 1877, page 2

# NEW ORLEANS REPUBLICAN.

SINGLE COPIES: FIVE CENTS.    OFFICIAL JOURNAL OF THE STATE OF LOUISIANA.    TERMS: $12 PER ANNUM.

VOLUME X.—NO. 265.    NEW ORLEANS, TUESDAY, MARCH 13, 1877.    WHOLE NUMBER 3044

## LAW AND REASON WILL RULE.

The telegrams now pouring into the city, addressed to prominent Democrats and assuring them of the positive success of the Nicholls government, are but the effusions of men who do not stop to reason—men who regard the fulfillment of their hopes as necessarily consequent to the expression of their desires. No credence should be given the dispatches, but the facts looked into briefly.

A Returning Board, legal and constitutional, rendered its verdict. Louisiana's electoral vote was conceded to have been the pivot upon which turned the national election.

To avoid all possibility of civil war Congress created a commission of fifteen men to inquire into facts, to listen to arguments, and to decide finally concerning the votes of all disputed States. That tribunal, after a complete reviewal of all the main points, after hearing the greatest lawyers on either side, and after a careful scrutiny of evidence and due deliberation, declared the action of the Louisiana Louisiana Returning Board as final and decisive, and announced as their irrevocable decision that the eight Republican electors were the duly chosen ones in Louisiana, and must be counted as such. Accordingly, Governor Hayes was given the vote of the State, and chiefly through its means was made President of the United States. He has been peacefully inaugurated, and is now performing the functions of his office. His Cabinet has been confirmed, and meets for the first time to-day.

Upon the very threshold of the new administration rests the difficulty of the Louisiana case. For two months now a *status quo* has existed, injurious to all men, irrespective of party, prostrating all interests, and destructive to the welfare of the entire State.

Immediate action must be taken, and

Immediate action must be taken, and will, we hope. The question for President Hayes to decide is, can he, consistently with honor and justice to himself and his party, pursue any other course than to recognize Governor Packard, and sustain him with all available and legal means? Take a hypothetical parallel case to ours. Suppose the Democrats of Ohio to have risen in arms, and by formidable array and strategy to have captured the court buildings and offices of the capital of the State. Suppose that the offices thus seized were guarded by armed men night and day; that the Republicans, though in a majority, were powerless, and the ousted and legal authorities unable to act; that this state of affairs was to continue, and that armed men paraded and patroled parts of the city; and that for two months an undisturbed condition had lasted, and the usurpers had had full sway and control. Precisely similar is the aspect in this State. The organization known as the White League, fully armed and equipped, numbering over fifteen hundred, demanded and took the Supreme and other court buildings, drove out the judges and seated their candidates. The proper officers are excluded from their places, and a body of pretending officials maintained, surrounded by Winchester rifles and muskets.

An examination of the returns shows that Governor Packard ran ahead of Hayes; that the same four men who decided the electoral vote to have been Republican, declared S. B. Packard Governor; that Hayes obtained his position by the promulgations of the Returning Board, and under the same claims Packard believes he is lawfully Governor.

Hayes has without molestation quietly assumed all responsibilities of his office. Packard is powerless to start his government, because of opposition from armed men, and the lack of Federal aid to disperse them. Nationally no violent demonstrations of resistance to Hayes; in one State secret pledges of even bloodshed before submission to a government legal, but displeasing to the wealth and intelligence.

The further we carry our inquiries the

The further we carry our inquiries the stronger and more inseparable is the bond between the two— Hayes and Packard.

The failure to recognize the latter will be the equivalent to invalidate the title of the former and be fraught with infinite danger.

We hear much talk of compromise. Compromise for what? Because a few men falter, and as they think to insure peace, desire an agreement, are we to regard their treaties? Bargains are for Europe not for America—for monarchies not republics!

For the reason that a conflict may ensue if Packard is acknowledged; because he needs support and aid to maintain himself as executive, is he to be abandoned under the name of compromise? Will President Hayes sacrifice right because the upholding of it is accompanied with a possibility of turbulence; will he deprive of strength his own position by listening to the appeals of timid men who for *promised* harmony lay aside the rightful dictations of their minds? It can not be. Reflecting men know and feel the pressing necessity for a settlement and the recognition of Packard, maintaining him physically and morally. The consequences must not be considered. Right and good faith must be predominant and in the end will triumph, and disprove the maxim of "might is right."

Patiently, not anxiously, we await a vindication of justice and an affirmation of law.

"Breech-Loading Arms," *New York Herald*, Oct. 12, 1866, p. 4



THE HENRY AND WINCHESTER RIFLES.

Almost every reader of this paper has heard of the Henry repeating rifle and the fact that it contains a magazine under the barrel, into which sixteen cartridges are stored at one time. It is merely the Spencer rifle reversed, and as a repeater has the same objections. The magazine is composed of a tube running under the barrel from the breech to within five inches of the muzzle, and is partially open along its entire length, at the bottom. At the top of this magazine and up to the muzzle is a tube which moves on hinges to one side, exposing the chamber of the magazine, so as to admit the cartridges. This tube contains a follower, which is pressed forward by a spiral spring, thus forcing a cartridge into the breech as fast as the lever is pulled down. On entering the breech the cartridge is forced into the barrel by an upward movement of the main spring. The shell is ejected by a spring catch, which seizes it by the rim and ejects it, room being left in the barrel for it to rise over the rim. An improvement on this rifle has been recently made, and the new weapon is called the "Winchester." Instead of the magazine being partially open, it is entirely closed up, and instead of loading from the top the cartridges are inserted into the magazine from the breech, thus enabling the gun to be used either as a single loader or as a repeater. By this manner of loading the cartridge last inserted is the first one fired. The cartridges are inserted in the magazine through an opening in the side of the frame, back of the lower block. A spring lid, grooved on the top, and of a length to correspond with the size of the cartridge, opens inward by a slight pressure of the cartridge, which is then pushed forward, and as it drops in its place is held there by a shoulder; the lid then rises to its place and closes the aperture. If the Henry rifle was condemned for its complications, the "Winchester" has certainly not improved the defects. However terrible both weapons would be in the hands of experts, they are totally unfit for military service. The charm of being able to fire sixteen rounds of ammunition without cessation would be quickly dispelled by the slightest injury to any one part of the delicate and complicated machinery contained in the Henry and Winchester rifles.

"A Tough Customer," St. Louis Globe-Democrat, Oct. 1, 1877

Page 4

4      St. Louis Daily Globe-Democrat, Monday Morning, October 1, 1877.

Column 4:

## A TOUGH CUSTOMER,

### The Officer Whom the Kansas Strikers Defied.

### Their Leader, a Noted Texas Desperado, Killed.

### The Federal Authorities Appealed to For Aid.

### A Mid-day Duel in Front of a Memphis Hotel.

### Several Brutal Murders—Curiosities of Crime.

Special Dispatch to the Globe-Democrat.

LEAVENWORTH, KAS., September 30.—The trouble in connection with the laborers' strike on the new extension of the Narrow-gauge Kansas Central Road on the little town of Clarksville, sixty-two miles west of this city, culminated yesterday morning in the shooting and killing of the ringleader of the rioters, Bill Hartman, a notorious Texas desperado. Saturday morning, shortly after midnight, a party of fifteen or twenty, consisting of various officers of the road and citizens, left this city on a special train for the scene of the row, many of them being armed, as trouble was anticipated.

ON ARRIVING AT HOLTON,

fifty-six miles from here, the beginning of the extension, the Leavenworth party was joined by the Sheriff of Jackson County, with a posse of fifteen men, and the entire party, after being sworn in as special deputies of the Sheriff, were armed with Winchester rifles. No trouble was met with until the train reached the end of the extension, six miles west of Clarksville, where the rioters, about sixty-five in number, were found in full force, headed by Bill Hartman, a Texas desperado and a hard case generally. The rioters surrounded the train and

DARED THE SHERIFF'S POSSE

to get out of the cars. Capt. W. S. Tough, ex-United States Marshal for the State of Kansas, who had been selected as the leader of the party, stepped out upon the platform of the car with a cocked rifle in his hand, and, ordering his men our placed them in his by the side of the track. The rioters then broke up into small squads and rode around Tough's party, yelling like fiends, and cussing him mad. Capt. Tough, with F. W. Wilford, a reporter of the Times, of this city, went down a ravine near by and met Hartman, the

LEADER OF THE RIOTERS,

with about thirty of his men. Hartman fired at Tough, and then at Wilford, his fire being returned by both. Another exchange of shots then took place, when Hartman fell, shot through and through. Mr. Tough and Wilford both fired at the same time. It is not known which of the two hit Hartman. Tough was subsequently arrested on a warrant sworn out by one of Hartman's men, and gave $10,000 bail for his appearance before the District Court of Jackson County. Intense excitement reigned among the rioters at

THE DEATH OF HARTMAN,

and threats were made of lynching Tough, but when they approached the train where Tough and his men were, they fell back before their rifles. This occurred about 9 o'clock Saturday morning, and at 10 o'clock the strikers were at work again. Capt. Tough's party then proceeded down the track to Holton where they found the rioters in full force, having torn up the switch and in possession of the railroad. The rioters made two or three demonstrations against Tough's party here, and for some time it looked as though bloodshed would be the natural consequence.

THE DETERMINED ATTITUDE

of Tough's party, however, disarmed them, and at 3 o'clock this p. m. they returned to this city. The mob, however, is in full possession of the town of Holton, and trouble is feared there, as the absence of armed men will give them confidence and make them bolder. The workmen, who returned work yesterday will probably not be allowed to go to work again. A call has been made upon Gen. Pope for troops to protect the trackmen in their work. The real cause of the trouble seems to be that Hartman,

Page 4, column 4 continued

WHO WAS KILLED,

and another man, brother to one of the contractor, had made arrangements between themselves to horse the rust so that they could buy up the workmen's pay certificates at seventy cents on the dollar. Twelve hundred dollars was found upon Hartman's person, which is proof of this. The lack of telegraphic communications between this city and Holton makes information from the scene of the trouble very difficult to obtain. A man named Renaell is now the leader of the rioters since the death of Hartman.

## The Correspondent's Story.

LEAVENWORTH, KAS., September 30.—A correspondent of the *Times* returned from Centerville, this afternoon, about o'clock, having been an eye-witness to the shooting of Hartman, the ringleader of the rioters. The full details of the fight would have been given in this morning's *Times* had there been any means of communication between Holton and this city, but owing to the lack of telegraphic connection between the two points this was impossible, and, therefore, we were forced to wait until the arrival of our reporter from the scene of hostilities.

TROUBLE ON THE ROAD.

The trouble on the narrow-gauge railroad at Circleville culminated yesterday morning about 8 o'clock in the killing by the sheriff's posse of Bill Hartman, the leader of the strikers. Saturday morning, shortly after midnight, a party from the city, consisting of Capt. Tough, Len Smith, Levi Wilson, H. W. Gillett, Ed Gilbert, Fred W. Willard, representing the *Times*, Harry Haley, Wm. Bickers, Harry Duffy, Wm. Bitcock, Gid Armstrong, and several others, altogether twenty in number, took a special train on the Kansas Central for the scene of the trouble at Circleville. It was anticipated that trouble would occur at the end of the road, as it was reported that the strikers were desperate and determined. When the train reached Holton the party from Leavenworth was joined by Sheriff Williams, of Jackson County, with a posse of fifteen deputies, and the Leavenworth party was sworn in on occasion, and furnished with Springfield rifles belonging to the Holton militia company. As the request of the entire party, Capt. Tough was selected as the leader of the posse, each man having confidence in his bravery and ability as a leader. Subsequent events proved the wisdom of the selection. The train arrived at Circleville about half-past 7, and from that time on the approach of the train was signalled all along the line by pickets, who were stationed on the bluffs along the track. When about half a mile this side of the place where the strikers were congregated, they came upon the man Hartman, who

DREW HIS REVOLVER,

and in the most abusive terms addressed the posse in the cars. Capt. Tough had given orders not to fire upon any one, no matter who they were, unless commanded by the sheriff. When the train stopped at the end of the track the men were told to remain in the car until ordered out. Capt. Tough then left the car, and going towards Hartman, who had arrived at that point, said, "I would like to speak to you."

Hartman replied, "You d—d d—n of a b—h, you come this away another step, and I will shoot your heart out." Capt. Tough thus returned to the car and ordered his men out, and drawing them up in a line told them to load, and also again instructed them in regard to their duties. The command then moved forward and, crossing a ravine, took their position on the top of a hill overlooking the entire ground occupied by the strikers. Here, again, the men were greeted with hoots and yells by the mounted strikers, but no attention was paid to them. Three of the command were then ordered on top of the hill and the rest moved down the railroad track to clear it. Three prisoners were taken at this point, and the command marched out on the open prairie towards the mounted strikers, who were making all kinds of hostile demonstrations. Capt. Tough said to Sheriff Williams: "Do you want that man?" meaning Hartman. Williams said, "Yes, and bring him in."

TOUGH THEN STEPPED FORWARD

and ordered Hartman to halt. Hartman replied by shooting once at Tough, and upon that he gave the order to fire over his head, which was promptly replied to by his men. Hartman galloped away, and turning, fired two more shots, and the command then fired their second volley, this time with fatal effect. Hartman was seen to reel in his saddle, but he did not fall off. He kept his position until he reached his party, who had ridden about a mile away after the first volley. His horse was also hit in the right fore leg and his tail was cut in two by a bullet. He was taken from his horse and brought into camp in an express wagon, and upon his arrival there a large crowd gathered around, and were ordered away by the deputies. This they did not readily do, and a man on horseback began to address them and excite to other deeds of violence. They then commenced to cry "Hang him! Hang him!" meaning Captain Tough, and he, with great coolness, drew his revolver and marched into the crowd and said, "The next man that repeats those words I will make him eat them." This settled the cowards, and they slunk away. Hartman was placed on the train and taken back to Holton, where he died last night about 7 o'clock. He was shot through and through below the ribs. The posse kept their position on the ground until 5 o'clock, when they went back to Circleville for dinner. Here

Page 4, column 4 continued

ANOTHER CROWD HAD ASSEMBLED, and a warrant had been sworn out for Capt. Tough. He was arrested by Sheriff Williams,

Page 4, column 5

and, upon consultation with the Justice at that point, he was released upon his recognizance. The command then returned to the end of the track, and remained there until evening, when they returned to Holton. Serious trouble was again encountered there, as the friends of Harriman had ridden into town and told the most improbable stories concerning the shooting. They had assembled at the depot to the number of about 300, most of them armed with rifles and shotguns. They had taken possession of the switch, and refused to let the train pass until the body of Capt. Tough was turned over to them, they having a warrant. The crowd also commenced yelling, "Hang the s—n of a b—h," but the boys stuck together like old veterans, and refused to let their leader or themselves go to what would have been their certain deaths. Seeing the mob was determined not to let the train pass, it was run back to Circleville and remained there for a short time, and then run down within about two miles of Holton. The posse then left the train and marched into town. They soon reached the hotel, which was surrounded by a large mob, but as Tough's company was well intrenched in the house they did not attempt an assault, and they soon afterwards dispersed.

CAPT. TOUGH WAS ARRESTED last night and released this morning, for his examination on the 31st. His bond was fixed at $10,000. There are other facts in the case that will show the cause of the strike, that will be published in our next daily issue.

*Wilkes' Spirit of the Times*, March 24, 1866, p. 59

A Chronicle of the Turf, Field Sports, the Army and the Stage.

OFFICE, { 201 William Street, Corner Frankfort. } NEW YORK, SATURDAY, MARCH 24, 1866. VOL. XIV.—NO. 4.

UNITED STATES

## PRIZE CONCERT

TO BE DRAWN AT

Crosby's Opera House, Chicago, Illinois,

MAY 28th, 1866.

125,000 *Valuable Prizes, valued at* $492,575 25, *will be presented to Ticket Holders, including* $100,000 *in Greenbacks.*

NUMBER OF TICKETS ISSUED 500,000. PRICE $1.00 EACH.

This is the greatest inducement ever offered to the public, one ticket out of every four drawing a prize.
The following Prizes are a few among the many to be drawn (for full list see Circulars).

| | |
|---|---|
| 1 Gift, in Greenbacks | $50,000 |
| 1 do do | 10,000 |
| 1 do do | 5,000 |
| 1 do do | 4,000 |

## BREECH LOADING ARMS,

BREECH LOADING RIFLES,

SPENCER'S MILITARY AND SPORTING RIFLES, 7 SHOT MAGAZINE.
HENRY'S SPORTING RIFLE, 16 SHOT MAGAZINE.
WESSON'S, SHARP'S,
BALLARD'S, MAYNARD'S,

*BREECH LOADING PISTOLS.*

SMITH & WESSON'S, STARR'S, SHARP'S, SLOCUM'S, NATIONAL,
ELLIOT'S & LEFAUCHEUX REVOLVERS.
ALLEN'S and FRANK WESSON'S Single Shot Pistols.

*COLT'S PATENT*

Revolving Breech

PISTOLS, RIFLES, CARBINES AND SHOT GUNS.

All with Ammunition to correspond.

SCHUYLER, HARTLEY, GRAHAM & CO.,
19 Maiden Lane and 22 John St., New York.

240

INSURANCE AGAINST ACCIDENTS!

THE ORIGINAL



*Ouachita Telegraph*, October 24, 1873, p. 1

# The Ouachita Telegraph.

E IX.                MONROE, LOUISIANA, FRIDAY, OCTOBER 24, 1873.

## THE METROPOLITAN POLICE FOR RED RIVER.

The Picayune last evening received information that the steamboat Osark, which was last year purchased by the Kellogg Government, would Sunday morning leave the city fully armed and provisioned for six weeks, for some portion of the State, supposed to be Grant parish and Rapides in the Red River. The expedition, it is stated, would land at the mouth of Red River, say Pointe Coupee parish, and being all mounted, would push forward, accompanied by the steamboat, to Rapides and Grant, where all the gentlemen charged with being concerned in the battle of Colfax, in April last, and in supporting the McEnery Government in these parishes ever since, would be arrested and brought to this city.

Orders have been issued from headquarters commanding Capts. Snow and Taylor, of the mounted police, with thirty men well mounted, and Capt. Grey, with fifteen officers of the Third Precinct, and a cannon, also mounted, to hold themselves in readiness for marching orders. Fifty patrolmen, armed with Winchester rifles, and one cannon, will be kept on board the steamboat, ready to co-operate with those on land. These will be probably under the command of Capts. Lawler and Joseph. The boat is to be under the command of W. P. Loan, by the grace of Kellogg Harbor Master and Commodore. W. J. DeKlyne, a Deputy United States Marshal, will also be present as Colonel of Louisiana State Militia, and all will be under command of A. S. Badger, Chief of Police.

*The Opelousas Journal*, August 29, 1873, p. 3









*The Forest Republican* (Tionesta, Pennsylvania), October 3, 1877, p. 4



Page 4

—Winchester rifles are becoming quite fashionable in this section, and are rapidly displacing the old double-barreled rifles. During this fall Messrs. Eli Holeman, W. A. Hilands and Jas. Swales, have each invested in a Winchester, and perhaps others of whom we have not heard. The Remington rifle is highly spoken of by those who have used it, but it is not a repeater, or "stem-winder," and so the Winchester is ahead.

*Weekly Democratic Statesman* (Austin, Texas), August 24, 1871, page 2



Page 2:



**The Meeting of Tax-Payers in Austin.**

On Saturday last, the 19th instant, the tax-payers and solid men of Travis county, met en masse, without regard to party, to consult together and devise some plan of action to relieve the people from the ruinous taxes now being levied upon their property.

The meeting took place in the open air, on the corner of Congress avenue and Pecan street, numbering about one thousand persons.

Hon. George Hancock was called to the chair, and Mr. Joseph Spence appointed Secretary. August Ziller, Alfred Smith, J. W. Hannig, M. C. Hamilton, and W. M. Walton, were appointed a committee to draft resolutions suitable to the occasion.

The meeting was addressed by the Hon. George Hancock and Senator Hamilton, with telling effect, upon the oppression, distress and ruin about to be imposed upon the people by the forced collection of the enormous taxes now levied to support the standing army of State police, State guards, for school purposes and public printing.

After showing up the monstrosities of the party in power and the inability of the people to pay the exhorbitant taxes demanded, Senator Hamilton spoke of Gov. Davis's post-dating the school bill, as an act of inadvertence! He could not think he would do such a thing intentionally, but he had no doubt that section five of the school bill was repealed by the general tax law.

In concluding his speech to the applauding multitude, he declared that he would not pay the taxes now attempted to be collected of him.

The following preamble and resolutions were presented and unanimously adopted:

Whereas, In consequence of the want of accurate information as to the value of the taxable property in the State, inadvertence on the part of the Executive in defeating the repeal of the fifth section of the "act to organize and maintain, a system of public free schools in the State of Texas," by post-dating its approval, the burdens imposed for the support of the Government is ten times the ordinary rate of taxation in this State; and

Whereas, [T]he im overished condition in

... money; save us taxation in this state; and

Whereas, ¶The [ill] overtaxed condition in which the disasters of the last ten years have left the people, with the certainty now of a blighted harvest, renders it impossible to meet the demands of the tax gatherers; and

Whereas, Delay and great difficulty is apprehended in the collection of the taxes, even if they can be collected at all; therefore be it

Resolved, That we, the tax-payers of Travis county, in mass-meeting assembled, without distinction of party or creed, recommend that a convention of tax-payers of the State assemble at the city of Austin, on the 22d day of September next, to consider the condition of the people, as well as the legitimate wants of the Government, and to memorialize the Legislature for an abatement of the taxes to the necessities of the State, and thereby avert threatened trouble in the attempt to collect the full amount of the levies.

Resolved, That the Legislature be further memorialized to repeal the act of the 15th of August, 1870, regulating elections, it being manifestly repugnant to section four, article three, of the Constitution, and by the enforcement whereof the integrity of the Government is threatened by leaving it without a Legislative department, and that a general election be ordered, in October or November next, as is plainly required by the Constitution.

Resolved, That the tax-payers of the several counties in the State, who concur in the foregoing resolutions, are earnestly urged to co-operate in this effort to modify the burdens under which we suffer, in common, and to avert, if possible, the pending menace against the most important branch of the State Government.

Resolved, That each and every county in the State send up a delegation to the Convention.

Resolved, That all papers in the State of Texas, friendly to this movement, be and are hereby requested to publish the foregoing resolutions; and to urge the people to meet and select delegates to the Convention.

After the adoption of these resolutions, the following gentlemen were elected as delegates to the convention to be held on the 22d of September, 1871: Morgan C. Hamilton, Alfred Smith, Louis Horst, August Ziller, Giles Burdett, Aaron Burleson, C. S. West, E. M. Pease, Felix E. Smith, J. W. Brown, A. J. Hamilton, Herman Green, W. M. Walton, M. H. Bowers, H. W. Sutor, Ed Zimmerman, and George Hancock; when the meeting adjourned in an orderly manner without the slightest disturbance whatever, to meet again Saturday, August 26th, to take into consideration the Governor's election order and other matters of importance.

There was displayed by the actors

There was displayed by the actors in the meeting a fixed determination by the people no longer to aid, uphold and support the standing army of Governor Davis and thereby perpetuate the rule of the odious and corrupt party now in power. The people are aroused, and know full well that money purchases the sinews of war. No money, no martial law! No money, no drunken policemen! No money, no secret detectives and spies! No money, no Winchester rifles and ammunition! Texans are not yet prepared to yield an abject slaves to such masters as Davis, Davidson, Tracy, Quick & Co.

The people are now, as they ever have been, willing to pay every legitimate expense of the State Government.

Washington *The Evening Star*, August 16, 1869, page 1



ANOTHER VISIT FROM THE SAVANNAH BASE BALL CLUB TO CHARLESTON—*Police and Military Escort.*—The Savannah Base Ball Club, whose recent visit to Charleston, S.C., was the occasion of a negro riot, reached there Saturday evening on another visit, at the special invitation of the citizens. The scene at the wharf upon the arrival of the Savannah steamer was one of great excitement. About two thousand citizens had assembled to escort the visiting club, and great indignation was caused by Mayor Pillsbury insisting upon sending a body of police armed with Winchester rifles and bayonets to the scene. The colored people generally kept within doors, and very few were to be seen on the streets. The march to the hotel was attended with much confusion and excitement, the procession being accompanied by the armed police and two companies of United States troops. No outbreak occurred. The feeling yesterday was feverish, as the colored people threatened to break up the match game which is to take place to-day.

DETECTIVES FOILED.—Several

*Wyoming Leader*, March 16, April 21, May 8, 1868, always p. 4. [NOTE: Footnote 27 has typographical error: "March 17" in that footnote should read as "March 16"]



# OTHER SOURCES



*James Bown and Son's Illustrated Catalogue and Price List* (Pittsburgh Pa., 1877)

Generated at Brown University on 2022-10-18 14:42 GMT  /  https://hdl.handle.net/2027/udel.31741112787850
Public Domain  /  http://www.hathitrust.org/access_use#pd

Digitized by
UNIVERSITY OF DELAWARE

Original from
UNIVERSITY OF DELAWARE



Page 33



136 & 138 WOOD STREET, PITTSBURGH, PA.        33

# WINCHESTER REPEATING FIRE ARMS.

## Sporting Rifle, Octagon Barrel, Set Trigger.

Price............$50 00

| | |
|---|---|
| Length of Barrel | 24 in. |
| Calibre | 44-100 |
| Number of Shots | 15 |
| Weight | 9 lbs. |

## Sporting Rifle, Octagon Barrel, Plain Trigger.

| | |
|---|---|
| Price | $45 00 |
| Length of Barrel | 24 in. |
| Calibre | 44-100 |
| Number of Shots | 15 |



| | |
|---|---|
| Length of Barrel | |
| Calibre | |
| Number of Shots | 15 |
| Weight | 9 lbs. |

## Sporting Rifle, Round Barrel, Set Trigger.

Price............$40 00

| | |
|---|---|
| Length of Barrel | 24 in. |
| Calibre | 44-100 |
| Number of Shots | 15 |
| Weight | 8½ lbs. |

## Sporting Rifle, Round Barrel, Plain Trigger.

| | |
|---|---|
| Price | $35 00 |
| Length of Barrel | 24 in. |
| Calibre | 44-100 |
| Number of Shots | 15 |
| Weight | 8½ lbs. |

All deviations from standard styles and sizes involve a large proportional outlay for hand labor, and when ordered will be subject to the following charges:

For additional length of barrel and magazine add to price $1 00 per inch over the regular lengths.

Extra heavy barrels, round or octagon, increasing the weight of the gun from one to two pounds, can be furnished at an additional cost of from $5 00 upward.

The prices above given include our regular sights.

Swivel and Sling Straps, $1 50.   Varnished Stocks, extra, $1 50.

# 14-15408

IN THE

# United States Court of Appeals

## FOR THE NINTH CIRCUIT



LEONARD FYOCK; SCOTT HOCHSTETLER; WILLIAM DOUGLAS;
DAVID PEARSON; BRAD SEIFERS; ROD SWANSON,

*Plaintiffs-Appellants,*

*v.*

CITY OF SUNNYVALE; THE MAYOR OF SUNNYVALE; ANTHONY SPITALERI,
in his official capacity; THE CHIEF OF THE SUNNYVALE DEPARTMENT
OF PUBLIC SAFETY; FRANK GRGURINA, in his official capacity,

*Defendants-Appellees.*

*Appeal From the United States District Court
for the Northern District of California, San Jose
Case No. 5:13-cv-05807-RMW, Ronald M. Whyte, Senior District Judge*

## *AMICI CURIAE* BRIEF FOR THE CENTER FOR CONSTITUTIONAL JURISPRUDENCE AND GUN OWNERS OF CALIFORNIA IN SUPPORT OF PLAINTIFFS-APPELLANTS AND SUPPORTING REVERSAL

David B. Kopel
INDEPENDENCE INSTITUTE
727 East 16th Avenue
Denver, Colorado 80203
Telephone:   303-279-6536
Facsimile:   303-279-4176

John Parker Sweeney
T. Sky Woodward
BRADLEY ARANT BOULT CUMMINGS, LLP
1615 L Street NW, Suite 1350
Washington, D.C. 20036
Telephone:   202-393-7150
Facsimile:   202-347-1684

*Attorneys for Amici Curiae
The Center for Constitutional Jurisprudence and Gun Owners of California*

*Columbia v. Heller*, 554 U.S. 570, 595 (2008) (using "text and history" to interpret Second Amendment); *id.* at 588-89 (same); *id.* at 623-24 (*United States v. Miller* was flawed by its "scant discussion of the history of the Second Amendment"); *id.* at 629 ("Few laws in the history of our Nation have come close to the severe restriction of the District's handgun ban."); *see also Peruta v. County of San Diego*, 742 F.3d 1144, 1150 (9th Cir. 2014) ("[W]e must consult 'both text and history.'"); *Kerr v. Hickenlooper*, 744 F.3d 1156, 1178 (10th Cir. 2014) (Second Amendment analysis includes history, and "the rarity of state enactments in determining whether they are constitutionally permissible").

The District Court erred when it asserted that "magazines didn't even exist when the Second Amendment was ratified." *Id.* The District Court appears to have erroneously assumed that magazines themselves (as well as magazines of more than ten rounds) are a relatively recent technological advancement; that assumption was plain error. Like many consumer products, magazines today are better-made and even more common than ever, but they are hardly novelties of recent vintage.

Magazines of more than ten rounds are older than the United States. Box magazines pre-date the Civil War. In terms of large-scale commercial success, rifle magazines of more than ten rounds had become popular by the time the Fourteenth Amendment was being ratified. Handgun magazines of more than ten rounds would become popular in the 1930s.

Compendium_Vorenberg
Page 702

http://npshistory.com/publications/spar/serial-nos.pdf

# SERIAL NUMBER RANGES FOR SPRINGFIELD ARMORY-MANUFACTURED MILITARY FIREARMS

**(Including the "Trapdoor" Springfield, the Springfield "Krag," the Springfield M1903, the M1 Garand [by all makers], and the M14, as well as the M1911 automatic pistol. Included, also, are the US "Enfield" M1917 rifles, the M1911A1 automatic pistol, and Luger pistol M1900 American Eagle Second Issue.)**

*note: before 1865, serial numbers were not given to National Armory weapons. Production at Springfield Armory shoulder arms began with the Model 1795 flintlock musket. Springfield Armory was closed by the U.S. government in 1968 as a cost-cutting measure.

## U.S. SPRINGFIELD "TRAPDOOR" PRODUCTION
[dated by calendar year: January – December]

MODEL 1865 "TRAPDOOR" RIFLE
1866-5005 CONVERTED MUSKETS

MODEL 1866 "TRAPDOOR" RIFLE(none were serial numbered)
1867
49257 RIFLES
320 CADET RIFLES

1868
1796 RIFLES
104 CADET RIFLES

1869
1296 RIFLES

1871
1 RIFLE

MODEL 1868 "TRAPDOOR" RIFLES
1869
15482 RIFLES

3 CARBINES


1870
34651 RIFLES
1 CARBINE

1871
2016 RIFLES (4 SPORTING RIFLES)

MODEL 1869 "TRAPDOOR" CADET & SPORTING RIFLES
1869 2
1870 310
1871 3091 (1 SPORTING RIFLE)

1872 (3 SPORTING RIFLES)
1873 (2 SPORTING RIFLES)
1876 20

MODEL 1870 "TRAPDOOR" RIFLES
1870
550 RIFLES

1871
2372 RIFLES
341 CARBINES
20 UNDETERMINED

1872
8110 RIFLES
1 SPORTING RIFLE

1873
501 RIFLES (INCLUDING 100 METCALFE ALTERATIONS)
1 SPORTING RIFLE
1 CARBINE

**\* PRODUCTION FIGURES: SERIAL NUMBER TO END QUARTER**
**1873**

JULY-SEPT 4
OCT-DEC 1946

1874
JAN-MAR 10592
APR-JUNE 28032
JULY-SEPT 29718
OCT-DEC 35218

1875
JAN-MAR 45039
APR-JUNE 54779
JULY-SEPT 57407
OCT-DEC 60325

1876
JAN-MAR 64164
APR-JUNE 69815
JULY-SEPT 71673
OCT-DEC 74213

1877
JAN-MAR 74231
APR-JUNE 76725

1878
JAN-MAR 81226
APR-JUNE 89729
JULY-SEPT 94467
OCT-DEC-100395

1879
JAN-MAR 104919
APR-JUNE 109753

JULY-SEPT 113920
OCT-DEC 119273

1880
JAN-MAR 125953
APR-JUNE 130140
JULY-SEPT 136545
OCT-DEC 144519

1881
JAN-MAR 151222
APR-JUNE 156700
JULY-SEPT 160722
OCT-DEC 164896

1882
JAN-MAR 170487
APR-JUNE 179736
JULY-SEPT 185569
OCT-DEC 193815

1883
JAN-MAR 203087
APR-JUNE 212809
JULY-SEPT 219411
OCT-DEC 228571

1884
JAN-MAR 228571
APR-JUNE 237708
JULY-SEPT 247189
OCT-DEC 263876

1885
JAN-MAR 275266
APR-JUNE 287246
JULY-SEPT 296367
OCT-DEC 306054

1886
JAN-MAR 315857
APR-JUNE 326773
JULY-SEPT 335915
OCT-DEC 346775

1887
JAN-MAR 356677
APR-JUNE 367879
JULY-SEPT 376839
OCT-DEC 387645

1888
JAN-MAR 398207
APR-JUNE 408909
JULY-SEPT 417929
OCT-DEC 428769

1889
JAN-MAR 439436
APR-JUNE 450281
JULY-SEPT 459533
OCT-DEC 470294

1890
JAN-MAR 480259
APR-JUNE 490019
JULY-SEPT 495420
OCT-DEC 502540

1891
JAN-MAR 510181
APR-JUNE 519421
JULY-SEPT 525941
OCT-DEC 533681

1892
JAN-MAR 541221
APR-JUNE 547121
JULY-SEPT 552042

OCT-DEC 558122

1893
JAN-MAR 563562
APR-JUNE 567882

MODEL 1881 SHOTGUN
1880-(2 UNMARKED EXPERIMENTALS)
1881-1-251
1882-252-626
1883-627-876
1884-877-1376

M1868 RIFLE 1-52000
M1869 CADET 1-3500
M1873 RIFLE 1-96000
M1873 CARBINE 1-75000
M1877 CARBINE 175001-280000
M1873/79 RIFLE 96000-280000
LONG RANGE RIFLE 110000, 132000-136000, 1622000
M1880 ROD-BAYONET RIFLE 154000-158000
M1882 28" INFANTRY & CAVALRY RIFLE 197000-197500
M1884 RIFLE AND CARBINE 280001-503500
M1884 CADET RIFLE 280001-568000
M1884 ROD-BAYONET RIFLE 305000-320000
M1886 24" CARBINE 330000-350000
M1888 "POSITIVE CAM" RIFLE -      415000
M1888 ROD-BAYONET RIFLE 503501-568000
M1881 SHOTGUN 1-1400

https://www.nps.gov/spar/learn/historyculture/u-s-springfield-trapdoor-production-serial-numbers.htm

**National Park Service**

# Springfield Armory
National Historic Site
Massachusetts

# U.S. Springfield Trapdoor Production

Compendium_Vorenberg
Page 710

Below is a list of serial numbers for Trapdoor Rifles noting the year and sometimes month(s) it was produced. Serial numbers begin with the 1873 Trapdoor Rifle. All given serial numbers are approximate. These serial numbers are credited to Albert Frasca, PH.D. and Robert Hill in their book *The .45-70 Springfield.*

- **Model 1865 Trapdoor Rifle**
    - 1866: 5,005 Converted Muskets

- **Model 1866 Trapdoor Rifle (None were given serial numbers)**
    - 1867: 49,257 Rifles and 320 Cadet Rifles
    - 1868: 1,796 Rifles and 104 Cadet Rifles
    - 1869: 1,296 Rifles
    - 1871: 1 Rifle

- **Model 1868 Trapdoor Rifle**
    - 1869: 15,482 Rifles and 3 carbines
    - 1870: 34,651 Rifles and 1 Carbine
    - 1871: 2,016 Rifles, four of which were sporting rifles

- **Model 1869 Trapdoor Rifle**
    - 1869: 2 Cadet Rifles
    - 1870: 310 Cadet Rifles
    - 1871: 3,090 Cadet Rifles and 1 Sporting Rifle
    - 1872: 3 Sporting Rifles
    - 1873: 2 Sporting Rifles
    - 1876: 20 Cadet Rifles

- **Model 1870 Trapdoors**
    - 1870: 550 Rifles
    - 1871: 2,372 Rifles, 341 Carbines, and 20 Undetermined
    - 1872: 8,110 Rifles and 1 Sporting Rifle
    - 1873: 501 Rifles (Including 100 Metcalfe Alterations), 1 Sporting Rifle and 1 Carbine

- **Model 1873 Trapdoors**
    - The serial number listed is the last one made in the given month(s).
    - 1873
        - July-September: 4
        - October-December: 1,946
    - 1874
        - January-March: 10,592

- April-June: 28,032
- July-September: 29,718
- October-December: 35,218

- 1875
  - January-March: 45,039
  - April-June: 54,779
  - July-September: 57,407
  - October-December: 60,325

- 1876
  - January-March: 64,164
  - April-June: 69,815
  - July-September: 71,673
  - October-December: 74,213

- 1877
  - January-March:74,231
  - April-June: 76,725

- 1878
  - January-March: 81,226
  - April-June: 89,729
  - July-September: 94,467
  - October-December: 100,395

- 1879
  - January-March: 104,919
  - April-June: 109,753
  - July-September: 113,920
  - October-December: 119,273

- 1880
  - January-March: 125,953
  - April-June: 130,140
  - July-September: 136,545
  - October-December: 144,519

- 1881
  - January-March: 151,222
  - April-June: 156,700
  - July-September: 160,722
  - October-December: 164,896

- 1882
  - January-March: 170,487
  - April-June: 179,736
  - July-September: 185,569

Compendium_Vorenberg
Page 712

- October-December: 193,815
- 1883
  - January-March: 203,087
  - April-June: 212,809
  - July-September: 219,411
  - October-December: 228,571
- 1884
  - January-March: 228,571
  - April-June: 237,708
  - July-September: 247,189
  - October-December: 263,876
- 1885
  - January-March: 275,266
  - April-June: 287,246
  - July-September: 296,367
  - October-December: 306054
- 1886
  - January-March: 315,857
  - April-June: 326,773
  - July-September: 335,915
  - October-December: 346,775
- 1887
  - January-March: 356,677
  - April-June: 367,879
  - July-September: 376,839
  - October-December: 387,645
- 1888
  - January-March: 398,207
  - April-June: 408,909
  - July-September: 417,929
  - October-December: 428,769
- 1889
  - January-March: 439,436
  - April-June: 450,281
  - July-September: 459,533
  - October-December: 470,294
- 1890
  - January-March: 480,259
  - April-June:490,019
  - July-September:495,420

Compendium_Vorenberg
Page 713

- October-December: 502,540

- 1891
  - January-March: 510,181
  - April-June: 519,421
  - July-September: 525,941
  - October-December: 533,681

- 1892
  - January-March: 541,221
  - April-June: 547,121
  - July-September: 552,042
  - October-December: 558,122

- 1893
  - January-March: 563,562
  - April-June: 567,882

Last updated: March 14, 2022

## Was this page helpful?

Yes

No

An official form of the United States government. Provided by **Touchpoints**

**CONTACT INFO**

**Mailing Address:**
Springfield Armory National Historic Site
One Armory Square
Suite 2
Springfield , MA 01105

## Phone:

413 734-8551

The phone is answered during museum operating hours. All other times callers will be prompted to leave a voice message that will be received and responded to during museum operating hours.

STAY CONNECTED

Compendium_Vorenberg
Page 715

https://guncite.com/court/state/

# Second Amendment

## State Decisions

State court opinions on federal and state right to arms.

*Last updated*: February 24, 2013

Rameriz, In re, *193 Cal. 633, 226 P. 914, 34 A.L.R. 51 (1924)*. [PDF] *55k*

State v. White, *299 Mo. 599, 253 S.W. 724 (1923)*. [HTML] *29k*

State v. Gentry, *(Mo. Sup. Ct.) 242 S.W. 398 (1922)*. [HTML] *14k*

Hayes v. State, *28 Ga. App. 67, 110 S.E. 320 (1922)*. [HTML] *2k*

People v. Zerillo, *219 Mich. 635, 189 N.W. 927 (1922)*. [HTML] *14k*

State v. Kerner, *181 N.C. 574, 107 S.E. 222 (1921)*. [HTML] *22k*

State v. Jackson, *283 Mo. 18, 222 S.W. 746 (1920)*. [HTML] *27k*

State v. Nieto, *101 Ohio 409, 130 N.E. 663 (1920)*. [HTML] *49k*

State v. Conley, *280 Mo. 21, 217 S.W. 29 (1919)*. [HTML] *11k*

Town of Lester ex rel. Richardson v. Trail, *85 W. Va. 386, 389, 101 S.E. 732, 733 (1919)*. [HTML] *12k*

State v. Reagan, *280 Mo. 57, 217 S.W. 83 (1919)*. [HTML] *12k*

In Re Reilly, *31 Ohio Dec. 364 (C.P. 1919)*. [HTML] *9k*

Danal v. State, *14 Ala. App. 97, 71 So. 976 (1916)*. [HTML] *7k*

State v. Keet, *269 Mo. 206, 190 S.W. 573, L.R.A. 1917C, 60 (1916)*. [HTML] *18k*

State v. Carter, *259 Mo. 349, 168 S.W. 679 (1914)*. [HTML] *16k*

Heaton v. State, *130 Tenn. 163, 169 S.W. 750 (1914)*. [HTML] *17k*

Johnson v. State, *11 Ala. App. 301, 66 South. 875 (1914)*. [HTML] *4k*

Darling v. Warden, *154 App. Div. 413, 139 N.Y.S. 277 (1913)*. [HTML] *41k*

Thomas v. State, *9 Ala. App. 67, 64 So. 192 (1913)*. [HTML] *6k*

Carlton v. State, *63 Fla. 1, __, 58 So. 486, 488 (1912)*. [HTML] *23k*

Ellias v. State, *65 Tex. App. 479, 144 S.W. 139 (1912)*. [HTML] *4k*

Kellum v. State, *66 Tex. Cr. R. 505, 147 S.W. 870 (1912)*. [HTML] *4k*

Nichols v. State, *4 Ala. App. 115, 58 So. 681 (1912)*. [HTML] *7k*

People v. Persce, *204 N.Y. 397, 97 N.E. 877 (1912)*. [HTML] *11k*

Isaiah v. State, *176 Ala. 27, 58 So. 53 (1911)*. [HTML] *24k*

Commonwealth v. Patsone, *231 Pa. 46, 79 A. 928 (1911)*. [HTML] *25k*

Strickland v. State, *137 Ga. 1, 72 S.E. 260 (1911)*. [HTML] *53k*

State v. Athanas, *150 Mo. App. 588, 131 S.W. 373 (1910)*. [HTML] *8k*

Eads v. State, *17 Wyo. 490, ___, 101 P. 946, 950-951 (1909)*. [HTML] *23k*

State v. Hovis, *135 Mo. App. 544, 116 S.W. 6 (1909)*. [HTML] *9k*

Salter v. State, *2 Okla. Crim. 464, 479, 102 P. 719, 725 (1909)*. [HTML] *36k*

People v. Boa, *143 Ill. App. 356 (1908)*. [HTML] *11k*

People v. Demorio, *123 App. Div. 665, 108 N.Y. Supp. 24 (1908)*. [HTML] *5k*

Ex parte Thomas, *21 Okla. 770, 1 Okla. Cr. 210, 97 P. 260, 20 L.R.A. (N.S.) 1007, 17 Am. & Eng. Ann. Cas. 566 (1908)*. [HTML] *29k*

Fitzgerald v. State, *52 Tex. App. 265, 106 S.W. 365 (1907)*. [HTML] *5k*

Kendall v. State, *118 Tenn. 156, 101 S.W. 189, 121 Am. St. Rep. 994, 11 Ann. Cas. 1104 (1907)*. [HTML] *6k*

State v. Roan, *128 Mo. App. 212, 106 S.W. 581 (1907)*. [HTML] *4k*

Ex Parte Luening, *3 Cal. App. 76; 84 P. 445 (1906)*. [HTML] *7k*

Osborne v. State, *115 Tenn. 720, 92 S.W. 853 (1906)*. [HTML] *4k*

Mangum v. State, *(Tex. App.) 90 S.W. 31 (1905)*. [HTML] *2k*

Salina v. Blaksley, *72 Kan. 230, 83 P. 619, 3 L.R.A. (N.S.) 168, 115 Am. St. Rep. 196, 7 Am. & Eng. Ann. Cas. 925 (1905)*. [HTML] *9k*

State v. Boone, *132 N.C. 1108, 44 S.E. 595 (1903)*. [HTML] *8k*

State v. Rosenthal, *75 Vt. 295, 55 A. 610 (1903)*. [HTML] *8k*

Wilson v. State, *81 Miss. 404, 33 So. 171 (1903)*. [HTML] *5k*

In re Brickey, *8 Idaho 597, 70 P. 609, 101 Am. St. Rep. 215, 1 Ann. Cas. 55 (1902)*. [HTML] *5k*

Judy v. Lashley, *50 W.Va. 628, 41 S.E. 197 (1902)*. [HTML] *22k*

Brown v. State, *114 Ga. 60, 39 S.E. 873 (1901)*. [HTML] *5k*

Dunston v. State, *124 Ala. 89, 27 So. 333, 82 Am. St. Rep. 152 (1900)*. [HTML] *5k*

State v. Hogan, *63 Ohio 202, 58 N.E. 572, 52 L.R.A. 863, 81 Am. St. 626 (1900)*. [HTML] *24k*

State v. Brown, *125 N.C. 704, 34 S.E. 549 (1899)*. [HTML] *5k*

State v. Griffin, *125 N.C. 692, 34 S.E. 513 (1899)*. [HTML] *4k*

Walburn v. State, *9 Okla. 23, 59 P. 972 (1899)*. [HTML] *14k*

Bain v. State, *38 Tex. Crim. App. 635, 44 S.W. 518 (1898)*. [HTML] *6k*

Hardy v. State, *37 Tex. Crim. App. 511, 40 S.W. 299 (1897)*. [HTML] *3k*

Eubanks v. State, *(Tex. App.) 40 S.W. 973 (1897)*. [HTML] *3k*

State v. Reams, *121 N.C. 556, 27 S.E. 1004 (1897)*. [HTML] *6k*

Stayton v. State, *(Tex. App.) 40 S.W. 299 (1897)*. [HTML] *5k*

State v. Foutch, *96 Tenn. (12 Pick.) 242, 34 S.W. 1 (1896)*. [HTML] *11k*

Commonwealth v. Murphy, *166 Mass. 171, 44 N.E. 138 (1896)*. [HTML] *9k*

Stanfield v. State, *(Tex. App.) 34 S.W. 116 (1896)*. [HTML] *2k*

Brownlee v. State, *35 Tex. Crim. App. 213, 32 S.W. 1044 (1895)*. [HTML] *5k*

Lawson v. State, *(Tex. App.) 31 S.W. 645 (1895)*. [HTML] *6k*

State v. Lilly, *116 N.C. 1049, 21 S.E. 563 (1895)*. [HTML] *5k*

State v. Pigford, *117 N.C. 748, 23 S.E. 182 (1895)*. [HTML] *3k*

Price v. State, *34 Tex. Crim. App. 102, 29 S.W. 473 (1895)*. [HTML] *3k*

Crawford v. State, *94 Ga. 772 (1894)*. [HTML] *6k*

State v. Dixon, *114 N.C. 850, 19 S.E. 364 (1894)*. [HTML] *10k*

McDaniel v. State, *(Tex. App.) 26 S.W. 724 (1894)*. [HTML] *3k*

Ratigan v. State, *33 Tex. Crim. App. 301 (1894)*. [HTML] *17k*

Gorge v. State, *(Tex. App.) 22 S.W. 43 (1893)*. [HTML] *3k*

Love v. State, *32 Tex. App. 85, 22 S.W. 140 (1893)*. [HTML] *4k*

Impson v. State, *(Tex. App.) 19 S.W. 677 (1892)*. [HTML] *4k*

Lemmons v State, *Lemmons v. State, 56 Ark. 559; 20 S.W. 404 (1892)*. [HTML] *10k*

Sanders v. State, *(Tex. App.) 20 S.W. 556 (1892)*. [HTML] *5k*

Valdez v. State, *(Tex. Crim. App.) 18 S.W. 414 (1892)*. [HTML] *4k*

Ex Parte Cheney, *90 Cal. 617, 27 P. 436 (1891)*. [HTML] *12k*

Hathcote v. State, *55 Ark. 181, 17 S.W. 721 (1891)*. [HTML] *12k*

Jones v. State, *Jones v. State, 55 Ark. 186 (1891)*. [HTML] *7k*

State v. Workman, *35 W.Va. 367, 14 S.E. 9, 14 L.R.A. 600 (1891)*. [HTML] *22k*

State v. Barnett, *34 W.Va. 74, 11 S.E. 735 (1890)*. [HTML] *12k*

Boles v. State, *86 Ga. 255 (1890)*. [HTML] *5k*

Ladd v. State, *92 Ala. 58, 9 So. 401 (1890)*. [HTML] *12k*

Maupin v. State, *89 Tenn. 367, 17 S.W. 1038 (1890)*. [HTML] *5k*

State v. Murray, *39 Mo. App. 127 (1890)*. [HTML] *10k*

State v. Roberts, *39 Mo. App. 47 (1890)*. [HTML] *5k*

Strahan v. State, *68 Miss. 347, 8 So. 844 (1890)*. [HTML] *3k*

Baker v. State, *28 Tex. App. 5, 11 S.W. 676 (1889)*. [HTML] *14k*

Campbell v. State, *28 Tex. Crim. App. 44 (1889)*. [HTML] *4k*

Coleman v. State, *28 Tex. Crim. App. 173, 12 S.W. 590 (1889)*. [HTML] *5k*

Stilly v. State, *27 Tex. App. 445, 11 S.W. 458 (1889)*. [HTML] *8k*

Diffey v. State, *86 Ala. 66, 5 So. 576 (1888)*. [HTML] *4k*

Lann v. State, *25 Tex. App. 495 (1888)*. [HTML] *7k*

State v. Livesay, *30 Mo. App. 633 (1888)*. [HTML] *12k*

Cathey v. State, *23 Tex. App. 492 (1887)*. [HTML] *3k*

Clark v. State, *49 Ark. 174 (1887)*. [HTML] *5k*

Darby v. State, *23 Tex. Crim. App. 407, 5 S.W. 90 (1887)*. [HTML] *5k*

State v. Julian, *25 Mo. App. 133 (1887)*. [HTML] *24k*

State v. Larkin, *24 Mo. App. 410 (1887)*. [HTML] *6k*

Sanderson v. State, *23 Tex. App. 520 (1887)*. [HTML] *2k*

State v. Smith, *24 Mo. App. 413 (1887)*. [HTML] *4k*

Brinson v. State, *75 Ga. 882 (1886)*. [HTML] *2k*

State v. Hall, *20 Mo. App. 401 (1886)*. [HTML] *18k*

State v. Hedrick, *20 Mo. App. 629 (1886)*. [HTML] *4k*

Lyle v. State, *21 Tex. App. 153 (1886)*. [HTML] *6k*

Redus v. State, *82 Ala. 53; 2 So. 713 (1886)*. [HTML] *5k*

State v. Shelby, *90 Mo. 302, 2 S.W. 468 (1886)*. [HTML] *11k*

State v. Bias, *37 La. Ann. 259 (1885)*. [HTML] *5k*

Davis v. State, *45 Ark. 359 (1885)*. [HTML] *5k*

State v. Harrison, *93 N.C. 605 (1885)*. [HTML] *7k*

Hunter v. State, *62 Miss. 540 (1885)*. [HTML] *6k*

Irvine v. State, *18 Tex. App. 51 (1885)*. [HTML] *8k*

Kinkead v. State, *45 Ark. 536 (1885)*. [HTML] *7k*

Smith v. State, *79 Ala. 257 (1885)*. [HTML] *6k*

State v. Terry, *93 N.C. 585, 53 Am. Rep. 472 (1885)*. [HTML] *5k*

Pressler v. State, *19 Tex. App. 52, 53 Am. Rep. 383 (1885)*. [HTML] *5k*

Commonwealth v. Walker, *7 Ky. L. Rptr. 218 (1885)*. [HTML] *2k*

State v. Broadnax, *91 N.C. 543 (1884)*. [HTML] *5k*

Cunningham v. State, *76 Ala. 88 (1884)*. [HTML] *3k*

State v. Erwin, *91 N.C. 545 (1884)*. [HTML] *10k*

Mangum v. State, *15 Tex. App. 362 (1884)*. [HTML] *3k*

Parrish v. Commonwealth, *81 Va. 1 (1884).* [HTML] *34k*

Burst v. State, *89 Ind. 133 (1883).* [HTML] *7k*

State v. Hayne, *88 N.C. 625 (1883).* [HTML] *5k*

State v. McManus, *89 N.C. (14 Ken.) 555 (1883).* [HTML] *9k*

State v. Peacock, *40 Ohio 333 (1883).* [HTML] *2k*

Zallner v. State, *15 Tex. App., 23 (1883).* [HTML] *6k*

Dabbs v. State, *39 Ark. 353 (1882).* [HTML] *10k*

Farley v. State, *72 Ala. 170 (1882).* [HTML] *8k*

State v. Gilbert, *87 N.C. (12 Ken.) 527 (1882).* [HTML] *5k*

Haile v. State, *38 Ark. 564, 42 Am. Rep. 3 (1882).* [HTML] *7k*

State v. Roten, *86 N.C. (11 Ken.) 701 (1882).* [HTML] *8k*

State v. Speller, *86 N.C. (11 Ken.) 697 (1882).* [HTML] *10k*

State v. Woodfin, *87 N.C. (12 Ken.) 526 (1882).* [HTML] *3k*

State v. Burgoyne, *75 Tenn. 173 (1881).* [HTML] *12k*

Collier v. State, *68 Ala. 499 (1881).* [HTML] *8k*

Harman v. State, *69 Ala. 248 (1881).* [HTML] *3k*

State v. Johnson, *16 S.C. 187 (1881).* [HTML] *12k*

Rice v. State, *10 Tex. App. 288 (1881).* [HTML] *3k*

State v. Wilforth, *74 Mo. 528, 41 Am. Rep. 330 (1881).* [HTML] *9k*

Wilson v. State, *68 Ala. 41 (1881).* [HTML] *8k*

Coffee v. State, *72 Tenn. (4 Lea) 246 (1880).* [HTML] *4k*

Dycus v. State, *74 Tenn. (6 Lea) 584 (1880).* [HTML] *3k*

Lewis v. State, *7 Tex. App. 567 (1880)*. [HTML] *5k*

Moorefield v. State, *73 Tenn. (5 Lea) 348 (1880)*. [HTML] *2k*

Carr v. State, *34 Ark 448, 36 Am. Rep. 15 (1879)*. [HTML] *6k*

Coker v. State, *63 Ala. 95 (1879)*. [HTML] *6k*

Dunne v. Illinois, *94 Ill. 120 (1879)*. [HTML] *52k*

Leatherwood v. State, *6 Tex. App. 244 (1879)*. [HTML] *9k*

Preston v. State, *63 Ala. 127 (1879)*. [HTML] *5k*

Robinson v. State, *3 Tenn.Cas 59, 3 Shannon 59, 3 Leg.Rep., 114 (1879)*. [HTML] *3k*

Shorter v. State, *63 Ala. 129 (1879)*. [HTML] *14k*

State v. Callicut, *69 Tenn. (1 Lea) 714 (1878)*. [HTML] *6k*

Holland v. State, *33 Ark. 560 (1878)*. [HTML] *3k*

Hutchinson v. State, *62 Ala. 3, 34 Am. Rep. 1 (1878)*. [HTML] *4k*

Wilson v. State, *33 Ark. 557, 34 Am. Rep. 52 (1878)*. [HTML] *8k*

Jennings v. State, *5 Tex. App. 298 (1878)*. [HTML] *8k*

Owens v. State, *3 Tex. App. 404 (1878)*. [HTML] *10k*

Summerlin v. State, *3 Tex. App. 444 (1878)*. [HTML] *7k*

Williams v. State, *61 Ga. 417 (1878)*. [HTML] *5k*

Lewis v. State, *2 Tex. App. 26 (1877)*. [HTML] *10k*

State v. Carlton, *48 Vt. 636 (1876)*. [HTML] *26k*

Fife v. State, *31 Ark. 455, 25 Am. Rep. 556 (1876)*. [HTML] *16k*

Stroud v. State, *55 Ala. 77 (1876)*. [HTML] *8k*

Atwood v. State, *53 Ala. 508 (1875)*. [HTML] *6k*

Gholson v. State, *53 Ala. 519, 25 Am. Rep. 652 (1875)*. [HTML] *8k*

State v. Clayton, *43 Tex. 410 (1875)*. [HTML] *9k*

State v. Duke, *42 Tex. 455 (1875)*. [HTML] *17k*

Smith v. State, *42 Tex. 464 (1875)*. [HTML] *4k*

Titus v. State, *42 Tex. 578 (1875)*. [HTML] *3k*

Wright v. Commonwealth, *77 Pa. 470 (1875)*. [HTML] *4k*

Barton v. State, *66 Tenn. (7 Baxt.) 105 (1874)*. [HTML] *2k*

Hill v. State, *53 Ga. 472 (1874)*. [HTML] *25k*

Jones v. State, *51 Ala. 16 (1874)*. [HTML] *5k*

Porter v. State, *66 Tenn. (7 Baxt.) 106 (1874)*. [HTML] *6k*

Stoneman v. Commonwealth, *66 Va. (25 Gratt.) 887 (1874)*. [HTML] *40k*

Baird v. State, *38 Tex. 599 (1873)*. [HTML] *8k*

Baker v. State, *49 Ala. 350 (1873)*. [HTML] *9k*

Christian v. State, *37 Tex. 475 (1873)*. [HTML] *3k*

Eslava v. State, *49 Ala. 355 (1873)*. [HTML] *7k*

Maxwell v. State, *38 Tex. 170 (1873)*. [HTML] *4k*

Carroll v. State, *28 Ark. 99, 18 Am. Rep. 538 (1872)*. [HTML] *6k*

English v. State, *35 Tex. 473, 14 Am. Rep. 374 (1872)*. [HTML] *17k*

Hilliard v. State, *37 Tex. 358 (1872)*. [HTML] *4k*

Lockett v. State, *47 Ala. 42 (1872)*. [HTML] *12k*

Morton v. State, *46 Ga. 292 (1872)*. [HTML] *6k*

Waddell v. State, *37 Tex. 354 (1872)*. [HTML] *5k*

State v. Wilburn, *66 Tenn. (7 Bax.) 57, 32 Am. Rep. 551 (1872)*. [HTML] *12k*

Andrews v. State, *50 Tenn. (3 Heisk.) 165, 8 Am. Rep. 8 (1871)*. [HTML] *61k*

Commonwealth v. Branham, *71 Ky. (18 Bush) 387 (1871)*. [HTML] *4k*

Evins v. State, *46 Ala. 88 (1871)*. [HTML] *3k*

Commonwealth v. McNulty, *28 Leg. Intel., 389, 8 Phila. 610 (Penn. 1871)*. [HTML] *2k*

Page v. State, *50 Tenn. (3 Heisk.) 198 (1871)*. [HTML] *8k*

Smith v. State, *50 Tenn. (3 Heisk.) 511 (1871)*. [HTML] *6k*

Carico v. Commonwealth, *70 Ky. (7 Bush) 124 (1870)*. [HTML] *15k*

Cutsinger v. Commonwealth, *70 Ky. (7 Bush) 392 (1870)*. [HTML] *4k*

Galvin v. State, *46 Tenn. (6 Cold.) 283 (1869)*. [HTML] *26k*

Hopkins v. Commonwealth, *66 Ky. (3 Bush) 480 (1868)*. [HTML] *7k*

Sutton v. State, *12 Fla. 135 (1867)*. [HTML] *7k*

Smith v. Ishenhour, *43 Tenn. (3 Cold.) 214 (1866)*. [HTML] *9k*

Philips v. Commonwealth, *63 Ky. (2 Duv.) 328 (1865)*. [HTML] *12k*

Cobb v. Stallings, *34 Ga. 73 (1864)*. [HTML] *13k*

Ex parte McCants, *39 Ala. 107 (1863)*. [HTML] *16k*

State v. Moore, *31 Conn. 479 (1863)*. [HTML] *22k*

Ex parte Coupland, *26 Tex. 387 (1862)*. [HTML] *124k*

Jeffers v. Fair, *33 Ga. 347 (1862)*. [HTML] *58k*

Stockdale v. State, *32 Ga. 225 (1861)*. [HTML] *8k*

Isaacs v. State, *25 Tex. 174 (1860)*. [HTML] *12k*

McManus v. State, *36 Ala. 285 (1860)*. [HTML] *23k*

Pond v. People, *8 Mich. 150 (1860).* [HTML] *74k*

Cockrum v. State, *24 Tex. 394, 401 (1859).* [HTML] *26k*

State v. Hannibal, *51 N.C. (6 Jones) 57 (1859).* [HTML] *8k*

Opinion of the Justices, *80 Mass. (14 Gray) 614 (1859).* [HTML] *16k*

Sears v. State, *33 Ala. 347 (1859).* [HTML] *6k*

Owen v. State, *31 Ala. 387 (1858).* [HTML] *6k*

State v. Jumel, *13 La. Ann. 399 (1858).* [HTML] *6k*

State v. Chavers, *50 N.C. (5 Jones) 11 (1857).* [HTML] *11k*

Day v. State, *37 Tenn. (5 Sneed) 495 (1857).* [HTML] *11k*

Flournoy v. State, *16 Tex. 31 (1856).* [HTML] *6k*

State v. Smith, *11 La. Ann. 633, 66 Am. Dec. 208 (1856).* [HTML] *6k*

Campbell v. People, *16 Ill. 17 (1854).* [HTML] *12k*

State v. Chandler, *5 La. Ann. 489, 52 Am. Dec. 599 (1850).* [HTML] *11k*

Cooper and Warsham v. Savannah, *4 Ga. 68, 72 (1848).* [HTML] *12k*

Nunn v. State, *1 Ga. (1 Kel.) 243 (1846).* [HTML] *34k*

Walls v. State, *7 Blackf. 572 (Ind. 1845).* [HTML] *3k*

Haynes v. State, *24 Tenn. (5 Hum.) 120 (1844).* [HTML] *11k*

State v. Newsom, *27 N.C. (5 Ired.) 250 (1844).* [HTML] *13k*

State v. Huntley, *25 N.C. (3 Ired.) 418, 40 Am. Dec. 416 (1843).* [HTML] *12k*

State v. Buzzard, *4 Ark. (2 Pike) 18 (1842).* [HTML] *64k*

State v. Morgan, *25 N.C. (3 Ired.) 186 (1842).* [HTML] *21k*

State v. Duzan, *6 Blackf. 31 (Ind. 1841).* [HTML] *2k*

Aymette v. State, *21 Tenn. (2 Hump.) 154 (1840)*. [HTML] *21k*

State v. Reid, *1 Ala. 612, 35 Am. Dec. 44 (1840)*. [HTML] *23k*

Commonwealth v. Riley, *Thacher's Crim. Cas. 471 (Mass. 1837)*. [HTML] *15k*

State v. Mitchell, *3 Blackf. 229 (Ind. 1833)*. [HTML] *1k*

Simpson v. State, *13 Tenn. (5 Yer.) 356 (1833)*. [HTML] *15k*

Gray v. Combs, *30 Ky. (7 J.J. Mar.) 478 (1832)*. [HTML] *23k*

Grainger v. State, *13 Tenn. (5 Yerg.) 459 (1830)*. [HTML] *11k*

Commonwealth v. Blanding, *3 Pick. 304 Mass. (1825)*. [HTML]

Bliss v. Commonwealth, *12 Ky. (2 Litt.) 90, 13 Am. Dec. 251 (1822)*. [HTML] *11k*

# BOOKS

# Weapons

OF THE

# Lewis & Clark Expedition

By Jim Garry



THE ARTHUR H. CLARK COMPANY

An imprint of the University of Oklahoma Press

Norman, Oklahoma

2012

Lewis's air rifle enters the Expedition journals on the day Lewis began recording the journey.

> went on shore and being invited on by some of the gentlemen present to try my *airgun* which I purchased brought it on shore charged it and fired myself seven times fifty five yards with pretty good success; after which a Mr. Blaze Cenas being unacquainted with the management of the gun suffered her to discharge herself accidently the ball passed through the hat of a woman about 40 yards distanc cuting her temple about the fourth of the diameter of the ball; shee feel instantly and the blood gusing from her temple we were all in the greatest consternation supposed she was dead by [but] in a minute she revived to our enespressable satisfaction, and by examination we found the wound by no means mortal or even dangerous.
>
> *Lewis, August 30, 1803*[6]



GIRANDONI AIR RIFLE (RIGHT SIDE VIEW)

Notice that there is no frizzen and pan in front of the hammer. The hammer sets the air charge for the trigger to release; there is no need for spark of fire. Also note that the butt stock is metal; it is the air cylinder for the weapon, holding air compressed to about 750 psi. *Courtesy Michael F. Carrick.*



GIRANDONI AIR RIFLE (RIGHT SIDE CLOSE-UP)

This view shows the metal butt stock and the tubal magazine in front of the hammer more clearly. *Courtesy Michael F. Carrick.*



GIRANDONI AIR RIFLE (TOP VIEW)

In this view one can see the magazine tube on the right, in front of the hammer. The breech block sticks out on the left. *Courtesy Michael F. Carrick.*

There is an obvious question. How did Lewis find a man west of Pittsburgh who was "unacquainted with the management of the gun?" In 1803, guns were a part of life that far west. One possible answer is that Lewis's air gun was somehow different from the guns to which men along the Ohio River were accustomed. The Corps of Discovery's journals aren't much help. The next time the air gun is mentioned is almost a year later, when, on August 3, 1804, an entry makes a typical allusion to the air gun, saying



# THE
# GUNNING
# OF AMERICA

Business and the
Making of American Gun Culture

## PAMELA HAAG

BASIC BOOKS
A Member of the Perseus Books Group
New York



Copyright © 2016 by Pamela Haag.

Published by Basic Books,
A Member of the Perseus Books Group

All rights reserved. Printed in the United States of America. No part of this book may be reproduced in any manner whatsoever without written permission except in the case of brief quotations embodied in critical articles and reviews. For information, contact Basic Books, 250 West 57th Street, New York, NY 10107.

Books published by Basic Books are available at special discounts for bulk purchases in the United States by corporations, institutions, and other organizations. For more information, please contact the Special Markets Department at the Perseus Books Group, 2300 Chestnut Street, Suite 200, Philadelphia, PA 19103, or call (800) 810-4145, ext. 5000, or e-mail special .markets@perseusbooks.com.

Designed by Trish Wilkinson
Set in 11.5-point Goudy Oldstyle Std

Library of Congress Cataloging-in-Publication Data
Names: Haag, Pamela.
Title: The gunning of America : business and the making of American gun culture / Pamela Haag.
Description: New York : Basic Books, a member of the Perseus Books Group, 2016. | Includes bibliographical references and index.
Identifiers: LCCN 2015036679 | ISBN 9780465048953 (hardcover) | ISBN 9780465098569 (electronic)
Subjects: LCSH: Firearms—Social aspects—United States—History. | Firearms industry and trade—United States—History. | Capitalism—United States—History. | United States—Social conditions. | United States—Economic conditions. | BISAC: HISTORY / United States / 19th Century. | HISTORY / United States / General. | HISTORY / Military / Weapons. | BIOGRAPHY & AUTOBIOGRAPHY / Women.
Classification: LCC TS533.2 .H33 2016 | DDC 338.4/768340973—dc23
LC record available at http://lccn.loc.gov/2015036679

10 9 8 7 6 5 4 3 2 1

CHAPTER 6

# "GUN MEN" AND
# THE "ORIENTAL LECTURER"

GOOD AND BAD FORTUNE TENDED TO WORK INVERSELY FOR gun capitalists. The Spencer's good fortune in war turned to bad fortune in peace. Despite the Ordnance Department's endorsement (indirectly, because of it), and despite encomiums such as one from a soldier who said, "I have got Spencer on the brain," the Spencer firm failed in 1868. The post–Civil War glut of Spencer rifles sent prices plummeting and the company went bankrupt. Spencer reminisced that "when the war was ended, motives of patriotism were no longer an incentive to continue making the weapons of warfare, and the return to the peaceful industry of silk was hailed with delight." Guns did not enthuse him commercially as they did Winchester (although eventually he did devise new gun designs).[1]

On April 1, 1867, Winchester's corporate war was over, and he opened the Books of Account for the Winchester Repeating Arms Company with the subscription to stock. The WRAC assumed the liabilities of the New Haven Arms Company, which amounted to precisely $188,493.59. The new company took over the accounts receivable, which amounted to precisely $183,608.85. Winchester had no glut of rifles or a contraction of government orders to contend with. Still, he faced the same existential dilemma that had ruined Spencer.[2]

109

Compendium_Vorenberg
Page 733



Experts agree that the American gun market for years after the Civil War was "abysmal." Demand had "fallen off drastically" for Smith & Wesson, which made only 15 guns a month in 1867, and for others. The American gun business was "fighting to stay afloat." Colt's leased out some of its factory space. Winchester sold just 308 Henrys in the first six months of 1866, and employment at the factory declined from 72 men during the war to about 25 afterward. What followed was a "great struggle to survive," a Remington family member and executive recalled in the early 1900s, as the company had "more than a million dollars' worth of products on hand and no adequate market for them. . . . Nearly every additional production added to the financial burden." The Remington brothers huddled anxiously around their roll-top desk when the government's abrupt cancellation of wartime contracts silenced the gargantuan furnaces of the Ilion factory. In the early 1870s, they would handle the all-but-dead gun market by diversifying, as they had in the 1850s, to make "sewing machines, horse cars, cotton gins, bridges, plows, mowers and reapers or anything else that strikes their fancy," *Scientific American* reported. The gun legacy of the Civil War contributed to the stagnation for the commercial gun industry, as the Ordnance Department sold unsuitable arms "uninterruptedly" from March 1865 through June 1871, with net proceeds into the US Treasury of $17 million. Half a million men went home from the war with guns, which obviously dampened demand, but helped make America one of the most heavily armed nations in the world. This happened not through gun sales, per se, or exclusively, or even principally, but through the informal gun inheritance of a civil war. A lethal peculiarity of this civil war was that men on opposing sides returned to the same homes they had left, in the same reconstructed country, but now with guns in their hands.[3]

Productive capacity was "far greater than necessary to satisfy demand," particularly in a "gun weary nation," a Connecticut historian wrote. Without strong sales volume, overhead costs in the gun industry were crushingly heavy after the war.[4]

Gun dealer Marcellus Hartley reasoned that the problem with the gun business was the erratic nature of demand, contingent as it was on



Winchester cartridge board. The Winchester Repeating Arms Company, like other gun titans, would make much of its profit in the late 1800s off of the ammunition to feed the modern repeater rifles. *Courtesy of the Buffalo Bill Center of the West.*

the tripwire of war. Hartley figured that a hunter might buy two guns in his entire lifetime, if that, and they would rarely wear out. But that same hunter would buy ammunition every year. With gun demand inherently constrained by need, desire, and durability, he reasoned, then perhaps the future for the arms industrialist lay with bullets instead, which might at least stabilize the boom-and-bust gun cycle so incompatible with industrial production. Great demand and profit would come from ammunition. This was a lesson that all of the gun industry would embrace by century's end, as a larger share of profits would come from the sale of ammunition to feed rapid-firing guns, rather than the guns themselves. Hartley bought two small New England cartridge companies, moved the entire ammunition works to Bridgeport, Connecticut, in 1867, and formed the United Metallic Cartridge (UMC) Company. He hired as his superintendent a versatile mechanical genius

112   THE GUNNING OF AMERICA

named A. C. Hobbs, a wood carver and carriage and lock maker who had won a $1,000 prize offered to anyone who could pick the lock of the Bank of England. He accomplished the task, with picks, after fifty-one hours of work.[5]

Other gun industrialists found themselves seeking new markets for their wares. It is not that they abandoned the quest for US contracts. Alexander Gorlov, a Russian artillery expert, visited the United States in 1867 and noted the "desire of successful inventors to make a big profit all at once," which had stimulated what he took to be a characteristically American fervor and excitement. "Many people from all walks of life, who frequently have little understanding of firearms, and even a few personages of the female sex," he wrote, "have applied their effort to create a firearm for the Army," and to slurp around Washington, DC, hotels for contracts. Nor were gun capitalists overlooking the thus far challenging US civilian market. Winchester intended to exploit "whatever American civilian market existed," the company archives recall. He cultivated his first seventeen dealers, from New York to San Francisco and New Orleans, sometimes in a disastrously casual fashion. The mysterious General Lafayette Baker, from the war, became a dealer in the Northwest. Baker worked up a debt to the company, offered mortgages on a hotel as collateral, and then defaulted on payments. Winchester sued him, to no avail—Baker's mortgages proved worthless—and the company lost thousands. Winchester faced similar difficulties with his Brownsville, Texas, dealer.[6]

Primarily, however, gun industrialists from the mid-1860s to the early and mid-1870s relied on foreign, international markets and consumers to stay alive. An 1880 US Census Bureau review of the firearms industry noted succinctly that the "civil war gave tremendous impetus to arms manufacture, . . . and after its close, the capital invested sought a foreign market, and millions of arms were exported." The number of gun capitalists who failed after the war because of their lack of international contracts and markets attests indirectly to their vital importance in the creation of an American gun culture. Robbins & Lawrence, whose founders were pioneers of interchangeable production; the Spencer Company; and the Sharps Company all failed owing to lack of



adequate foreign contracts. Christian Sharps had first sent a representative to the southern states to see if he could "drum up" demand, which he found, instead, to be "dismal." Next, a representative sailed to Europe, but failed, and nothing could stave off the Sharps debts and creditors.[7]

The arms industrialists who survived, and those who became synonymous with the American West, thrived first in, and because of, non-US markets. The post–Civil War phase of the American gun business is characterized most dramatically by market difficulties at home and with the government, and the consequent widespread and intense cultivation of foreign markets for survival, by all of the gun titans. The gun industry was on the leading edge of the first wave of economic globalization, and from the perspective of guns as a business, it is clear that the development of an "American" gun culture was bound up inextricably—and quite necessarily—with non-US, international markets and commerce in firearms.

Colt's company trailblazed the path abroad: throughout the late 1860s, it simply continued its focus on international markets that founder Samuel Colt had pursued in the 1850s. Its 1869 Russian contract, for example, made "business lively" for many years at Hartford, according to a historian of Russia.[8]

Horace Smith and Daniel Wesson joined the parade of American gun capitalists traveling to Europe, Arabia, and Asia to present gift guns to despots, tsars, officers, revolutionaries, and other individuals, and to sell guns wherever they could. Smith & Wesson made its foreign debut at the 1867 Paris Exhibition. It meant everything to the company to have a postbellum Russian contract, and the latter was the only thing that got Smith & Wesson out of financial duress. Foreign sales saved the company up until 1874. The Russian contract came about after the Grand Duke Alexei Alexandrovich went on a buffalo hunting expedition with "Buffalo Bill" Cody in the summer of 1869. Colonel William Cody had ridden the pony express in 1860, had been a civilian scout in the Civil War, and was involved in sixteen battles with Native Americans afterward. He became famous as a hunter for the Union Pacific, killing buffalo to supply meat to railroad workers,



114   THE GUNNING OF AMERICA

and in Wyoming he once killed sixty-nine buffaloes in a single day. He always used a Winchester for these tasks. But the grand duke went straight from the hunting trip to Springfield, where he contracted for a modified revolver that would take a special cartridge requested by the Russian Army. Before long, Springfield was swarming with zealous Russian technicians, whom Daniel Wesson eventually sent home in exasperation.[9]

Smith & Wesson delivered over 250,000 of its Model 3 Army Russian gun, which kept the factory occupied for almost five years. It also sold a Model 3 Turkish model, and a model in 1878 to the Japanese navy, Australia, Cuba, and Spain. Smaller lots sold to England, Europe, and Asia—all told, 40 percent of the model sold to non-US customers.[10]

Remington, the legend holds, was at a disadvantage because the founder, Eliphalet Remington, and his sons did not believe in bribes. Alas, "it may be said with absolute confidence that no big arms contract has ever been given in Eastern Europe without some sort of graft attached," a disarmament activist recollected in 1934. As the 1870s progressed, and it became impossible—if it had not always been so—to make foreign arms deals without bribery, the Remington company fell on even greater difficulty. In 1866, however, the Remington brothers had dispatched to the European courts Samuel Remington, whom they deemed to be the most amiable, polished, and charming salesman among them. A Remington descendent recollected that Samuel was an "ambitious man," with a "greater desire to make money for personal ends than either of his brothers."[11]

Samuel established his headquarters in Paris, where he lived opulently. He regularly graced the best royal palaces of Europe, including attending the soirées of Napoleon III's wife at the Tuileries, and socialized at the finest clubs of London. He demonstrated the very successful Remington "rolling block" (an action design) single-shot rifle before royalty, armies, and dignitaries, arriving in Potsdam on a beautiful charger, wearing a Prince Albert coat and silk hat. The king of Prussia wanted to try the rolling block personally, but the gun had a dud cartridge, and the enraged king threw the gun to the ground.[12]

Although it did not win the Prussian market, E. Remington & Sons survived after the war on sales of its rifle to non-US markets. Sales to foreign governments brought the company to unimagined prosperity and spurred massive expansion of the Remington factory. Remington sold 145,000 of the rolling block to France in 1870 and 1871 in what was believed to have been the largest scale of production ever realized in any public or private arms factory. It also sold to Puerto Rico (10,000), Cuba (89,000), Spain (130,000), Egypt (55,000), Mexico (50,000), and Chile (12,000), and a quantity unknown to the Chinese Army, via Marcellus Hartley's gun business in New York. It sold a breech-loading rifle to Denmark, Sweden, Norway, Luxembourg (5,000), Cuba and Spain (8,000), Japan (3,000), Greece (16,000), Peru (5,000), and Argentina. It even sold to the Papal States. The acting war minister for the papacy, Ermanno Kanzler, ordered 5,000 Remington rolling-block rifles, underwritten by a French Catholic organization, for the Zouaves Pontificaux armed forces.[13]

In Egypt, Isma'il Pasha, the great khedive of Egypt, wanted to equip his army with the latest guns. Samuel Remington set sail for Cairo, and a deep friendship developed between the two. The khedive was so impressed by the timely delivery of the rifles that he gave Samuel a plot of land in one of Cairo's poshest neighborhoods. Samuel gratefully accepted the gift, not realizing that it would have been an unspeakable discourtesy if he did not build a house on the lot. So he built a beautiful marble palace, and then left it empty and silent, as he never had any occasion to live in it. As for the Remington order, it proved disastrous. The company manufactured a good number of the 10,000 Model 1875 revolvers, but did not ship them because Egypt was still behind on its payments for its first rifle order. Samuel Remington's fabulous mansion in Cairo sat like a marble mausoleum to a gun infatuation gone bad.[14]

"The sun of happiness has beamed upon the town," the *Ilion Citizen* effused when Remington secured another international contract for 15,000 Spanish model rifles for the Argentine Republic. Tiny, improbable Ilion, a town whose fate was thoroughly inseparable from the Remingtons', was a vector for international arms commerce. It hosted a

Case 3:17-cv-01017-BEN-JLB   Document 123-10   Filed 11/10/22   PageID.11760   Page 91 of 192

delegation of "several prominent Mexicans" in May 1874, including the son of the ex-emperor Augustin de Iturbide, in town to purchase cartridge-making machinery; it got to know well a "Colonel Minnie" who lived in town for several years as the inspector of Egyptian arms; it prepared "in lavish profusion" an elegant supper in appreciation of visiting members of the Spanish Ordnance Commission, replete with music, "gaslight, tapers, flags, evergreen trimmings," and fancy carriages for use by the visiting Spaniards; in the other direction, highly skilled Remington workers set sail for Cuba in 1881, as guests of the government, to help construct a new armory there.[15]

Marcellus Hartley likewise brought the world to his Bridgeport ammunition factory in the early 1870s. Alexander Gorlov, the Russian artillery expert, encamped at the factory as a representative to oversee Russia's substantial order for metallic cartridges. He demanded an almost "impossible standard of perfection." The Grand Duke Alexei Alexandrovich visited the Bridgeport factory in 1871, and the young women of the town were deliriously excited over a royal visit. The imperial standard of the black eagle of the house of Romanov flew over the factory. Gorlov took the duke on a tour of the factory—which was impressive in itself—but even more impressive to the duke were the young women working the machines, who were wearing beautiful silk dresses for the occasion. They had decorated the "grasshopper machines" (so named because they had long rods) with flowers and ribbons. The duke apparently was shocked by the matter of how working girls could afford silk dresses.[16]

The archive of surviving sales records from Hartley's giant gun business, Schuyler, Hartley & Graham (SHG), although most likely only a partial record, nevertheless attests to the firm's brisk international business from 1868 to 1880; more specifically, to its arming of regimes, governments, or individuals in South and Central America and the Caribbean. In each of these cases, SHG's—and the gun industry's—commercial transactions may or may not have overlaid with the US government's diplomacy and its desire to prevent European regional involvement under the Monroe Doctrine, but, whatever the case, international arms commerce proceeded independently of US diplo-





matic or political considerations. Although their sales certainly inflected and influenced international affairs, the gun titans could choose themselves whom to arm, why, and at what price.[17]

The majority of SHG's international shipments in these twelve years went to Havana. Cuba was engaged from 1868 to 1878 in a Ten Years' War for independence against Spain, a development that the United States studiously ignored, but not so US gun dealers and makers. SHG made thirty-six shipments to Cuba from 1869 to 1874, including 140 Spanish-design Remingtons to a Sir Don Gabriel de Amenabar, of the 2nd company of the 5th Battalion of volunteers; numerous shipments to Colonel Enrique Barbaza, who was fighting for the Spanish; and a shipment of 130 .43-caliber Remington rifles to a mysterious "E.M." in Havana in June 1871. SHG might have shipped only to the Spanish or to both sides during these years.[18]

SHG sold and shipped arms frequently to Mexico as well, with twenty-three recorded shipments in the 1870s, one composed of 1,000 Enfield rifles sent "in the cheapest kind of boxes" possible to Mexico's minister of war, as well as a large number to an A. Hoffman, presumably an arms dealer, in Veracruz, and others to murkier recipients in Mexico such as "E.G." and "C.M." The company made eighteen shipments to the Dominican Republic, and sixteen to Panama. It also made seven shipments to the Dutch Caribbean island of Curacao, five each to Guatemala and Costa Rica, three to Haiti, and three to El Salvador. From 1868 to 1880 the SHG account records also show one shipment each to the Latin American and Caribbean countries of Honduras, Bahamas, Brazil, Ecuador, and Chile. In other regions of the world, SHG shipped liberally to Liberia (ten times), made at least two shipments to a dealer in Japan, and one each to "Gaboon" (Gabon, perhaps), Hong Kong, and Paris.[19]

OLIVER WINCHESTER SURVIVED ON NON-US MARKETS, TOO. HE didn't invent the gun that bore his name, or the machines that made the guns, or the parts that made the machines that made the guns. But he did invent (or find) their market. He reached many of the foreign markets through ads in *Army and Navy Journal*. The influential journal,

118   THE GUNNING OF AMERICA

founded in 1863, was mostly read by American and foreign military officers. Winchester, Remington, Sharps, Whitney Arms, and Gatling placed a flurry of ads in the *Journal*, often on the same page. They included detailed technical drawings, usually of specific gun parts, data on sales to governments, and results from shooting matches. They did not require any seductive appeal to the mystique of the gun, or narrative. Revealing gun capitalists' deep dependency on foreign markets, some ads offered pamphlets in French, German, or Spanish. In the same spirit, Winchester promptly translated his older catalogs into German and French in the late 1860s.[20]

To his advantage, Winchester and the other gun capitalists faced no restrictions on gun sales. The gun was treated as another commodity whose manufacturers, in the words of two experts in the field, "took advantage of laissez-faire economics and sold weapons to interested customers, no matter who or where they might have been." The president acquired a first, limited right to embargo arms exports only in 1898. So gun titans were in the peculiar position of making and selling a commodity far and wide that exceptionally inflicted wars, expeditions, conquests, and other matters of great public and political interest, but operating unexceptionally in this phase of the gun industry as autonomous commercial agents, independent of public oversight. Episodically—but rarely—this peculiarity did come into worried congressional view. In 1870, the US government offered guns deemed obsolete or unsuitable for sale to arms dealers at public auction, as had been the custom since 1865. Gun dealers and capitalists Schuyler, Hartley & Graham and E. Remington & Sons bought roughly $9 million of these arms on a 20 percent margin, with the intention of selling them for much more. "It is a speculative trade," testified Colonel Silas Crispin. "We even had women make applications for arms." At this time, France was on the cusp of war with Germany, and this provided an obvious market.[21]

The trouble began on October 13, 1870, when Secretary of War W. W. Belknap discovered a telegram that Watson Squires, the E. Remington & Sons salesman and secretary, had sent from Washington back to headquarters in Ilion. "If you have not yet bought for the [French]





government," the telegram read, "you will now be able to do so on better terms." This language strongly suggested to Belknap that the company was an "agent" of the French government. It is important to note here that had E. Remington & Sons simply been selling arms made at Ilion, through private contracts, they would not have attracted attention, but, in this case, they were selling arms purchased from one government, the United States, to another, France, in plausible violation of the United States' status as neutral in the Franco-Prussian conflict.[22]

Secretary Belknap got in his carriage and rushed over to the Ordnance Department, where he insisted "over and over and over" again that no sales of consigned US arms be made to France or Germany via Remington. Two years later, Congress held hearings on this incident to ascertain, among other questions, whether these sales truly comported with neutrality; who, specifically, had actually purchased the guns; and for whom. What became clear in the testimony from US military and ordnance officials and E. Remington & Sons is that the situation defied any tidy definitions and revealed the awkward quasi-public consequences of the private, commercial gun business. True, all of New York knew that the arms purchased from the US government by Remington's sales representative were being loaded almost instantly onto steamers at Pier 50, known as the French pier, and marked "R.F.," for "Republic of France"; and, in any case, even without such evidence and gossip from the port, it was a truism of the gun industry that guns sold abroad, naturally, at places in conflict or war. "Nobody buys from a government on a large scale except for the purpose of being in war somewhere," Secretary of the Navy George Robeson explained.[23]

The abridged chain of possession, from the US government, via E. Remington & Sons, to the French government, was quite obvious, but elicited no curiosity, interest, or opprobrium from the Ordnance Department or military officials or E. Remington & Sons. This despite the efforts of suddenly incredulous congressmen concerned about "national honor," who prodded their witnesses to transliterate commercial transactions into political ones and see them as violations of neutrality.[24]

When asked if he knew that the Remingtons were "French agents," the shipping merchant responded, characteristically, "No. My idea was

simply that Mr. Remington, as an arms-dealer, was purchasing arms here and selling them there." S. V. Benet, a major of ordnance, echoed this view: "I supposed that these dealers were purchasing on specula-tion, to sell again wherever they could get a market." Nor did Robeson evince concern when asked if he had any knowledge of "what became of the arms" after the government sale. "Not the slightest," he an-swered. "I never thought of it before until this question was brought up." The commodore of the US Navy, Augustus Case, stationed in the navy's Ordnance Department, answered with the same spare, unyield-ing elegance: When Representative Ephraim Acker asked Case, "It was the business of the government to sell arms, and it was not its business to inquire where they were going?," he answered, "I think not. We sell arms to arms-dealers, . . . and they dispose of them to their own advan-tage." Case was further questioned about whether he thought it the "duty of the government" to know such things, and he responded, "not at all." Still, Acker continued, did he not draw a "reasonable inference" that "they calculated to sell these arms to one or the other belliger-ents?" Case answered, "The inference was that they wanted to sell them to somebody who would pay for them, and give them a profit."[25]

Despite strenuous efforts to construe E. Remington & Sons as a co-vert agent of the French government, and a minority report that de-cried the obvious "*pretext*" of the company's impolitic role as an agent, the majority of the committee members concluded that even if the arms were quite obviously going to France, this was a commercial transaction, and they saw no grounds "in international law, or morals" to "repudiat[e] its contract" with one of its own citizens—the Reming-ton company—when they had sold them guns at auction, any more than a private citizen could break an agreement. A contract was a con-tract. If, in an earlier, germinal phase of the gun industry, the gunmaker was very much at the mercy of the US government and patronage, the shoe was now decisively on the other foot of laissez-faire commercial enterprise, and the sanctity of contract won over murkier consider-ations of "national honor."[26]

A momentous thing—the arming of America's civilian population—in one respect began indirectly, in far distant, international locales, and



haphazardly. For as entrenched as the armed world is today, it couldn't have started in a more improvisational fashion. It is imprinted strongly and perhaps indelibly by the character, ambition, and will of gun capitalists rather than of diplomats, politicians, generals, rifle-carrying pioneers, or statesmen.

Oliver Winchester needed salesmen to find customers and redeem the "incredible folly" of his gun manufactory, to recall New Haven's earlier assessment that Winchester was deranged to think he could sell as many guns as he could make in a factory. A keen judge and exploiter of other people's talents, Winchester plucked his first regular arms salesman out of the primer shop of his manufactory. There, Thomas Emmett Addis worked at a bench and delighted his coworkers with Irish jigs. Winchester must have sensed that this man possessed the "nerve" required, above all else, to sell repeater rifles.[27]

Addis had had an unhappy childhood. He ran away from home at the age of thirteen and never returned, and he harbored a lifelong, intense bitterness toward the Roman Catholic Church for reasons unknown. His family name was O'Connor, but it was easy to change names in the mid-1800s, so he renamed himself after an Irish patriot (a transcription mistake must have occurred, as the patriot's name was Addis Emmett). "He was truly a self-made man," a company memoir said, and in the age of self-made men, one's name and identity constituted another kind of frontier to be cultivated and manipulated.[28]

Addis was remembered by Winchester employees as a very peculiar man. He chose to invent himself as a scrupulously mannered, fastidious gentleman whose style "bordered on affectation." He dressed meticulously, with a black cutaway jacket, a dark tie, shoes neatly polished, and a high-crowned derby hat. Addis sported a flamboyant, thick handlebar mustache, and he never left home without a gold-headed cane, not because he needed one, but because he felt it conferred dignity. He might have felt the same about his fabricated military title. By the late 1860s he'd acquired the title "Colonel," but no one had any idea where it came from.[29]

Winchester sent Addis on his first of many missions in 1866. It was a life-or-death one for both of them. The WRAC was tottering on



122   THE GUNNING OF AMERICA

bankruptcy, and a sale to Mexico would keep it going. Don Benito Juárez was waging a revolutionary battle in Mexico against Napoleon III's appointed regime of Ferdinand Maximilian, the archduke of Austria. Juárez had heard rumors of these wondrous, unstoppable Model 66s, and he sent Winchester an order for 1,000 repeaters and 500,000 rounds of ammunition, to be delivered to a border town.[30]

Deliver the cargo in Brownsville, Winchester instructed Addis, but under no circumstances whatsoever relinquish it before you've received payment. Although Winchester had an order from Juárez, he would sell to "either warring party" (and, indeed, already had: the first Model 66 order had been shipped to France for Maximilian).[31]

Addis dutifully went to Brownsville, Texas, and waited a month with no sign of the Juárez forces. Then he received word that he would be paid if he brought the guns to Monterrey, in Mexico. Making the trip violated Winchester's literal instructions, but Addis took matters into his own hands, following the advice of an ex-Confederate officer he'd met in Brownsville. He kept a few Winchesters close by, loaded the rest onto oxcarts, traveled 240 miles, and crossed the Rio Grande toward Monterrey, where he hoped to close the deal with Juárez.[32]

When he arrived, Addis rented a ramshackle one-room store, draped American flags over the guns, the door, and himself, and announced that he would only relinquish the goods when he had the silver coin in hand. "I am an American citizen in charge of that property," he declared unwaveringly to Juárez's representatives, "and you will not get those munitions until they are paid for and I will remain in this store until they are paid for, and anyone who attempts to take them away will be shot."[33]

Clear enough. The Juárez forces connived for four months to secure the guns without paying for them anyway. When Addis finally gave notice that the rifles could be had by whichever side would pay (US government sympathies be damned), and that he would gladly sell them to Maximilian's forces, Juárez settled up.

Now there was only the matter of transporting the profits through the bandit-infested Mexican countryside when everyone for miles around knew that the Colonel had a fortune in silver on him. Honorably unpersuaded by advice that he stay in Mexico and live like a gran-

dee off of Winchester's pilfered profit, Addis hired a Diligence stagecoach with a driver, armed guards, and a team of four horses, packed his coin in the boot of the coach, and left Monterrey at 2:00 A.M. for the 240-mile trek back to the border.

In addition to run-of-the-mill bandits, Addis realized that the Juárez forces had no intention of paying for weapons that they could get for free, simply by robbing him on his treacherous journey out of the country. Addis trusted no one, not even his driver. After traveling dusty back roads for several hours, Addis suddenly stopped the coach, took out his pistol and a rope, and put a slip noose around the driver's neck. He bound him hand and foot and stuffed him in the back of the coach. Then he rigged the rope to his own leg, so that if the driver became "rebellious" he could jerk his leg to tighten the noose around his neck and choke him.

Addis drove the coach to Brownsville, stabbing himself in the thigh with a large scarf pin to keep himself awake and vigilant. When they arrived at the Rio Grande, he removed the driver's noose and released him with heartfelt apologies for his rude but prudently cautious treatment of him. He told him that he could trust no man in Mexico, especially as no one in Mexico seemed willing to trust him.

Addis was through the most dangerous part of the journey, across the mountains, and would go it alone from there. He dismissed his guards, paying them double what they'd agreed upon, and dropped their money in a bag from the rear seat of the coach. He told them to remain standing until the coach was out of sight, and that he'd shoot them if they moved before then.

When Addis finally arrived at the other side of the river in Brownsville, he took the coin to the Wells Fargo office for immediate shipment to the WRAC representative in New Orleans. Then he made contact with Oliver Winchester by telegram for the first time in nine months. Winchester's friends had long given up on Addis and counseled Winchester that he'd probably never hear from him again. He would skip the country with the $57,000.

The Addis affair was of great—indeed, mortal—importance to the company in 1867, when its accounts receivable amounted to $183,608,

124    THE GUNNING OF AMERICA

of which $57,000 came from the Mexico sale and $58,000 from a sale to the Chilean-Peruvian government (one government at the time), and just $1,374 in cash. Meanwhile, the 1,000 guns that Addis delivered had killed a share of the 50,000 war dead from the conflict and helped Juárez and his people vanquish Prince Max, who was executed in July 1867. (The city named after Juárez had the highest homicide rate per capita in the world in 2010. Mexico has strict gun-control regulations, but that has not deterred homicide and gun violence related to drug cartels. As in 1866, guns come across the border from the United States, among other sources of supply.)[34]

Addis had found his calling. A peculiar one, but a calling. He sought war and tinderboxes the way others sought gold. He was part of the fraternity of first-generation "gun men." That is what Oliver Winchester's son-in-law and future company president, T. G. (or "TG") Bennett, called them. They were the men who indirectly built the American gun culture by operating internationally in a milieu of intrigue, bribery, dissemblance, cutthroat competition, self-invention, and makeshift interpretations of honor in regions of the world that most Americans knew nothing about, but whose purchase of Winchester guns would begin an arms diaspora radiating from Connecticut outward.[35]

Bennett had been born in New Haven and attended the Russell school until he was sixteen, when he enlisted with the 28th Connecticut Volunteer Infantry for the Civil War. After the war he attended the Sheffield Scientific School at Yale, so he had much more scientific education and mechanical training than Oliver Winchester. He joined the WRAC in 1870, right after Yale, and surveyed the land for the New Haven plant construction. He solidified his position the old-fashioned, continental way, by marrying Winchester's daughter Hannah Jane, who went by Jane, in 1872. Bennett was a big man with a handlebar mustache and an austere, patient, quiet demeanor. He had piercing grey eyes but otherwise conveyed no aura of power. Like Winchester, he was almost single-minded about business.[36]

Throughout the 1870s, without restrictions on the gun market, and planted firmly in the saddle of commercial agnosticism, Winchester representatives jockeyed to sell everywhere. Bennett and Addis crossed

paths and rendezvoused at Winchester's orchestration to make sales to foreign dealers, despots, monarchs, revolutionaries, and governments; to secure non-US patents; and to track down counterfeit Winchester producers ("These parties have learned better than to pay for what can be stolen," Bennett wrote home). "I have a letter from your father by which I am to see Mr. Addis somewhere, perhaps at Turin. I am also to go to Constantinople. It will turn out however that neither of these trips are necessary . . . of course you won't mention my having said so," wrote TG Bennett to Jane. From Hungary, he bemoaned, "I shall take the first passage possible home . . . staying only until I can find out where Mr. Addis is."[37]

A Colt's agent decades later rued that "the whole process of selling arms abroad has brought into play the most despicable side of human nature: lies, deceit, hypocrisy, greed, and graft occupying a most prominent part." Bennett's descriptions of the gun business, however, were more tedious than ominous, more *Death of a Salesman* than *Day of the Jackal.* Typically he vacillated between ennui and bemusement, tinged always with homesickness. Often he sounded more like a world-weary, droll Continental tourist than a trailblazing arms dealer. He wrote to Jane from Bucharest: "The encyclopedia lied." He found no "plague" or "bazaars" there. A "Roumanian dresses like ordinary people except that he leaves his shirt outside of his trowsers. . . . This to an American is quite picturesque. But aside from this one thing there seems to be nothing characteristic or peculiar or interesting. In such a land one looks for something new and exciting in dress or life—broiled missionary on the bill of fare, or something like that. But you don't find it here."[38]

To summarize the European-American gun world, he wrote: "Everything is just the same without variation." And yet he did not mean that it was boring: "We excite ourselves with supposed intrigues against us dropped by one friend or another, discuss counter plots of fearful vengeance and sure ruin to our foes." The American gun men in Europe were intimately cutthroat. Bennett continued, "all . . . have each recounted the private swindles of the others. . . . A miserable business is it not. It amuses me, however, not a little."[39]

126    THE GUNNING OF AMERICA

Typical of the milieu was a man named Broadwell, known as "the General." Bennett encountered him in Bucharest and described him as "the first, so far as I know, of that class of gun men Americans who came out to skim these ignorant European nations" in the 1860s. Broadwell had paid $6,000 for the rights to a very flawed gun, but he grossly overestimated its appeal to foreign governments. Even worse was the wretched gun itself. It blew up in his hands and occasionally "blackened his face beyond all possibility of blushing, to say nothing of explanation."[40]

Chagrined but not vanquished, Broadwell went to St. Petersburg, hoping to secure an order from the tsar, but had no luck, and not even enough money to get home. But the gun's notoriety preceded it. "You will guess from what I write," TG lamented to Jane, "that I am not very pleasantly surrounded."[41]

Like Benjamin Tyler Henry, gun men were a tenacious breed; many of them became "wealthy many times," and theirs was often a rags-to-riches-to-rags story. "It is to be remarked of these men that they . . . burn their hands in the same fire again and again. They might end up depleted in purse but never ruined. This is to such men impossible," Bennett wrote, adding that he and Broadwell "talked guns" and "ideas for cities and oceans of money," over dinners in Bucharest, Paris, or wherever political turmoil and intrigue lured them.[42]

Bennett found his work occasionally tedious, but overall these were "stirring days" for the globe-trotting gun men who served the rifle kings. One of SHG's international agents, W. W. Reynolds, having negotiated an arms deal with the French in the early 1870s, managed to escape in a balloon over the German lines, although he was shot at repeatedly and his balloon's gas bag was pierced. Another Remington agent burrowed into Chinese culture, thoroughly "adopted the native costume" and customs, and gained the trust of the general and diplomat Li Hung Chang, who embraced the Remington breech-loader over the old muzzle-loaders still in use at the time. Watson C. Squires was a poor Ilion schoolteacher when he fell in love and married into the Remington family and business. He promptly went abroad to sell guns to the Russians, Turks, Austrians, and Egyptians. On his way



home, he traveled through Mexico and South America, and sold there as well. When the gun trade "stagnated," and the company was left with a large, unsellable stock, Philo Remington offered to give Squires a tract of land in what would become Seattle. Although Squires was gloomy about leaving the gun business, he made millions off of the land and became the governor of the Washington Territory and then a US senator—all before the age of forty.[43]

Inventors were also part of the American gun expatriate community. They hoped to secure patents in Europe, or felt that their genius was undervalued in the United States. Benjamin Berkeley Hotchkiss was born in Watertown, Connecticut, and worked in his family's hardware manufactory, which produced everything from buckles to oxbow pins. His brother Andrew, an inventive genius, was crippled and couldn't walk, so he devised a cart for himself to get about the office and trained a large dog to drive it. Benjamin and Andrew thrived during the Civil War on government orders for rifle shells. As with the Spencer, however, peace curdled Hotchkiss's good fortune to bad. Seeking new markets and fortune in Europe, he set sail in 1867 and established an office in Paris and a manufactory in St. Denis.[44]

Another brother, Charles, recalled Benjamin's early travails abroad. He had "not money enough to buy anything more than a crust of bread," but felt that if he could only "hold out," his gun inventions would make him rich. He was in such dire straits that even his wardrobe of clothing was claimed by creditors. To get his clothes, he had to climb into the wardrobe from the back, so as not to break the creditors' seal. One day Hotchkiss was traveling from Vienna to Bucharest with his wife. On the train he started talking to a Romanian army officer who wanted a magazine rifle. Hotchkiss's imagination started churning. The train stopped at a station for the passengers to dine, and Hotchkiss requested that the officer escort his wife to dinner. Having gotten rid of his distracting companions, he frantically sketched a detailed gun in the margin of the Paris Figaro. Underneath, he wrote "This is a magazine rifle. Make it at once. BBH," and mailed it back to his St. Denis shop. After its random conception on a European train, the rifle emigrated back to the United States and was shown at the

128   THE GUNNING OF AMERICA

Philadelphia Exposition of 1876. Winchester bought the patent, after a furious competition, and promoted the "Hotchkiss Repeater" as "the most promising gun yet made for army use." At the Exposition, he wrote, "it . . . was at once recognized by all gun makers as most probably the 'coming' gun," using one of his favorite phrases.[45]

It was coming, perhaps, but it never arrived. The gun, after improvements, was called the Winchester Model 1883, but it wasn't a commercial success. Theirs was a tricky business of accurately gauging—or creating—new fashions in death.

ON HIS OWN GUN-SELLING EXPEDITIONS THROUGHOUT THE 1870s and 1880s, Thomas Addis would mysteriously "depart without ceremony, disappear for a time, but return with his object successfully completed," recalls the company archive. He prided himself on being ready to start for the most remote corner of the earth on a moment's notice. Addis kept his luggage ready and a full supply of linen and clothes to pack, including twelve laundered shirts. TG Bennett once asked Addis how fast he could prepare for a European trip. The Colonel picked up a New York paper, turned to the shipping news, and said that he'd be ready to board a steamer scheduled to sail that evening.[46]

In his gun dealing, Addis followed scrupulously what George Bernard Shaw's character Undershaft described as the arms credo: "to give arms to all men who offer an honest price without respect for persons or principles: to aristocrats and republicans, to Nihilist and Czar, to Capitalist and Socialist . . . to burglar and policeman, to black man, white man, and yellow man, to all . . . nationalities, all faiths, all follies, all causes and all crimes." The gun men took the 1870s "amorality of business," as historian John Blum termed it, to an extreme, selling their lethal commodity with the commercial equivalent of agnosticism.[47]

Reputedly, Addis would visit every part of the "civilized world" in his lifetime. He asked that his gravestone identify him only as "Thomas Emmett Addis—Traveler." Over the decades he sent concise and candid dispatches back to the company on his expeditions to find markets, written in barely legible hand on his knee, from a moving pony carriage or train.[48]



The United States treated the gun as an unexceptional commodity, but some other countries did not, which complicated Addis's sales efforts. In Saurebaya, Java, he lamented, "dealing in arms is attended with some difficulties, [since] authorities will not permit more than ten guns . . . to enter the city in a month." Bangkok, Siam, too, would "be a grand market for our goods, were free importation permitted," but, as it was, "the regulations are practically prohibitive, as a permit must be obtained from the King himself who will only grant a permit where he is satisfied the arms will not be used against him." Nevertheless," Addis admitted, "arms were arriving from time to time without permits, but it is extremely risky business and the profit is not large enough to warrant any risks," although he implied that if it were otherwise he might assume the risks.[49]

Singapore, the Straits Settlement, tantalized, and would be a "grand market for arms were it not for the fact that their exportation is absolutely prohibited to all those countries whose inhabitants desire to purchase them," he wrote. "The natives of Java, Borneo and Sumatra desire arms, but no arms of any sort" were allowed to go there from Singapore. Smuggling was always an option. Singapore was a "'free port,' [and] considerable smuggling is done; the penalty in cases of detection is a fine of $5,000 and imprisonment." The benefits would have to outweigh the penalties.[50]

Addis dismissed Western Australia as not worth the trouble—"no town of 5,000 inhabitants, and would require months' time to make the trip." In New South Wales, there was one dealer—only one—with whom Addis had "no success": "Will have nothing to do with us," he reported, as he "feels very sore on account of our making no allowance for the rifles which were stolen [en route] and replaced by New York papers and bricks" (pilfering was always a problem). In other places, such as Japan, there was, quite simply, "very little demand."[51]

Addis traveled hundreds of miles across the desert to the city of Fez, with assistance from the US vice consul at Casablanca, to negotiate a contract with the sultan of Morocco for 1,000 muskets and 1 million cartridges. As part of the deal, several Moroccan gunsmiths visited New Haven. The city had never seen such an exotic entourage. A

130    THE GUNNING OF AMERICA

Winchester storekeeper housed them near the factory, and company workers recalled that they "created great consternation . . . by the practice of their daily religious rites . . . —ablutions, chicken killing, and so forth." They were sent immediately to a clothing store to replace their native garments from Fez with American clothing, but whenever they could, in the evenings, they would put on their flowing robes and go downtown, where they elicited great curiosity. Their costumes "flit[ted] about like bats" in the semidarkness, as they insisted on walking down the middle of the street.[52]

Addis sold 300,000 carbines and 100,000 cartridges to the government of "Hayti" for $25,000 ($610,000 worth of arms today). He enjoyed unlimited territory and power, and he was allowed to accept lumber, crops, or other commodities in exchange for guns. For Haiti, Addis sailed down with the guns and returned with negotiable bills of lading for coffee, which the WRAC sold in a makeshift arms-for-coffee deal.[53]

Addis haphazardly and serendipitously picked up business on his way to business. The London agent for Winchesters first handled the guns because of a chance meeting in 1875 between Addis and the president of the agent's company. They were both traveling to Turkey on business, and they became friendly on the journey. Addis persuaded the president to try out a case of Winchester repeaters on the English market.[54]

Addis and Bennett traveled far and wide, but their biggest, most momentous deals in the early 1870s were the ones that led them to Constantinople. Addis, who picked up foreign languages easily, went there so often that eventually he could understand Turkish. In 1870, the fate of the "gun that won the West"—and America—hinged precariously, halfway around the world, in Turkey, on the whims of an egomaniacal, deranged sultan known as the Madman of Dolmabache.[55]

---

IN THE LATE 1860s, CONSTANTINOPLE WAS CALLED THE "THRESHOLD of happiness." Americans' knowledge of Turkey usually extended no

further than *Arabian Nights* and tales of white slavery, abductions, and, in the words of British journalist Noel Barber, "harem maidens, ravishings, eunuchs, and slaves with their tongues slit guarding abominable secrets." Reality was somewhat different. Abdul Aziz was the sultan of the Ottoman Empire from 1861 to 1876. He decided to visit Europe, to showcase his Western sensibility. No prospective visitor had inflamed the French imagination more. Newspapers tantalized readers with the prospect of the sultan traveling in a "solid gold coach, with a retinue of concubines and a trail of elephants led by negro slaves chained in gold." In reality, Aziz arrived a "portly gentleman in a plain frock coat." It must have been quite a disappointment.[56]

Christopher Oscanyan was an Armenian Turk by birth and a naturalized US citizen. He had been educated in the United States and was the consul general of the Ottoman government in New York City during the 1860s and 1870s. This was an honorary position. Oscanyan made his living by charging brokerage fees for shipments from the United States to Turkey. He "cut quite a dash" in New York, a Winchester company memoir said.[57]

For many of the self-fashioned identities of the day, duties were largely unspecified. As later court testimony revealed, this was true of Oscanyan's position as consul general. "No one knows precisely what he [did]," according to court documents, although he was definitely "some sort of representative of the Turkish government."[58]

Oscanyan was, however, an informal cultural ambassador of the Ottoman Empire. Billed as "the Oriental Lecturer," he had an illustrious reputation as a speaker and author on Turkish life. He lamented "the difficulty of finding *authentic* sources of information" about "the affairs of the orient," as there were so few American travelers, beyond the small number of traders and missionaries. He informally tasked himself with disabusing Americans of their silly, fabulous legends of the Turks.[59]

His task must have been complicated by the inconvenient fact that Sultan Abdul Aziz was a silly, fabulous figure. Aziz was a "vast hulk of a man," wrote Noel Barber. He looked "every inch a Sultan, with a full face and large staring eyes and a beard streaked with grey." Aside from



132   THE GUNNING OF AMERICA

his physical grandeur, Aziz was a vacuous, extravagant, and increasingly deranged ruler. He had 900 concubines guarded by 3,000 black eunuchs, and a staff of 5,000 servants, each with a precise task. One was to put the royal backgammon board in its proper place; another was to trim Aziz's toenails. His megalomania only added to the empire's notoriety of being both morally and financially bankrupt. The Madman of Dolmabache either committed suicide or was murdered in 1876, having dragged the empire into great debt with his bouts of maniacal extravagance.[60]

Whatever the sultan's madness, at least the Ottomans didn't have taxes or excessive regulations. European businessmen who felt burdened by both in their own countries were flocking to Constantinople, a dynamic, cosmopolitan city with vast untapped potential to make money. And this was the point that the Oriental Lecturer needed to emphasize to secure US-Turkish business—and his brokerage commissions. Far from being a place of "perpetual stagnation," Oscanyan reassured businessmen, there were no obstacles to commerce in Turkish waters, and the port would gladly remove any commercial hindrances. True, at the time, Turkey was "notorious throughout the world for its corruption," as a 1930s disarmament activist wrote. Bribes were the unavoidable lifeblood of business. But here, gun industrialists could capitalize on Ottoman-European conflict.[61]

Rustem Bey, a Turkish army officer, was sent to the United States in May 1869 by the sultan's war department to recommend and purchase arms and ammunition. Bey spoke little English, so he relied on his old friend Christopher Oscanyan to be his guide and interpreter. Oscanyan thought of the Winchester rifle, and his commission opportunities. At the time, Oliver Winchester was working in a small office on New Haven's Chapel Street, with a handful of men under his direct guidance who were beginning to build a rifle empire. His office staff consisted of his son Will, the vice president; a bookkeeper; and a porter named Al Harris. The shop superintendent, Nelson King, employed three clerks. In 1869, the factory, headed by Winchester's seven-person staff, sold about 10,930 guns. Oscanyan met with Winchester, who urged him to call Bey's attention to the wonders of the

repeater rifle. Oscanyan promised to do so—for a commission on any sales that were "affected through his instrumentality."[62]

This was neither a transaction between governments nor an illicit, covert, black-ops enterprise. It was simply business, on a frontier, like any other business with any other commodity, and it is how modern firearms reshaped the world: ad hoc and fortuitously, in a brief laissez-faire heyday, with deals hanging on idiosyncrasies of character and circumstance along with bribery, occasional swindling and dissemblance, and the gun men's mettle. The private interests of the gun capitalists and the gun salesmen shaped matters of public interest.

Assured of a piece of the profits, Oscanyan displayed the Model 1866 to Bey, who didn't like it at all. He thought it was too complicated for the Turkish soldier. In January 1870, the sultan seemed to be leaning toward the Spencer. He'd heard of the post–Civil War glut of Spencers that the US government would gladly sell to other governments. Thinking of his commission, however, Oscanyan exerted his influence with Bey to have the Spencer derided and the Winchester extolled. Bey obtained an order for 1,000 guns, to please Oscanyan. He also dissuaded the Ottoman Empire from dealing through the US government.[63]

Meanwhile, Winchester worked every angle. Early in 1870, the WRAC made an agreement with Azarian, Pere et Fils, a Constantinople company, to act as the WRAC's official representative in all transactions with the Ottoman Empire. TG Bennett described the Azarian firm as "a very curious one." It was composed of Aristakes Azarian; his two sons, Pier and Joseph; and his brother Joseph. Azarian himself, around sixty years old, was very short, very fat, and so frenetic that he barely seemed to ever eat, drink, or sleep. Owing to its confidential business, Azarian kept no clerks in the office, and every decision, including the wording of telegrams, was arrived at collectively. Bennett said, "They shout, stamp, gesticulate, *solo, uno, trio, quarto*, and just as you expect to see them punch each other . . . the noises cease and the point is settled," and "with the most astonishing judgment and cunning." The Turkish government ministers deferred to Aristakes, who was even allowed to walk into the War Department in muddy boots, when all others had to take off their shoes and wear special slippers.



The government hung on his every word. Azarian had visited Marcellus Hartley's United Metallic Cartridge factory in Bridgeport in 1872. He took a courtesy tour without identifying himself and was thought to be simply a "strange Armenian man." After the tour, he revealed himself to be a representative of the Turkish government and ordered 10 million rounds of ammunition on the spot.[64]

In the spring of 1870, Winchester sent sixteen guns, including one that was gold-plated and five silver-plated ones, to Azarian for Turkish officials. Then the Winchester underwent trials before the sultan, with Addis as a representative. The Winchester and other rifles passed all the tests, until the dreaded sand test. Rifles were placed in a blanket and shaken in sand until the rifle's action was clogged. Using only tools carried by an ordinary soldier, the rifle salesman then had to put the rifle into action.[65]

Rifles from other companies failed all around him, but Addis was undaunted. He asked for water, and was told that a canteen wasn't part of the soldier's equipment. Because Addis had been drinking heavily, as was his custom, he was equipped to solve the problem: he urinated on the rifle to clear sand out of its action. Competitors fumed, but every soldier had a bladder; hence, Addis argued, he had complied with the test's requirements.[66]

Evidently, Addis' ingenuity impressed the sultan's representatives. With an order imminent from the Ottoman Empire, Winchester now realized that he might have to pay a double commission, one to Azarian and one to Oscanyan, so in mid-July he began talking exclusively with Azarian.

Oscanyan was furious. He wanted to claim a commission for his services in persuading Bey to pursue the Winchester. As Oscanyan petitioned for a share of the gun-trade bounty, Azarian wrote that he, too, wanted to be promised a commission on any sale to the sultan, regardless of whether it came through him. Winchester rejected both proposals. If he promised to pay a commission to all of the agents who had slyly peddled their influence on his behalf, "it would break us," Winchester concluded with his usual candor. It was out of the question.[67]

(Around the same time, E. Remington & Sons was dealing with the same dreaded prospect of paying a "double commission" on sales to Cuba. Remington had contracted with Samuel Norris in 1868 to sell arms for a 10 percent commission on orders with "any European countries, or any associations . . . contracting for European powers." Norris did quite well in his international sales, earning roughly half a million dollars in his first years. The company's protracted conflict with its gun man ultimately had to do with the vagaries of colonialism and the difference, if any, between a European "country" and a "power." Norris contended that he should have a commission on sales to Havana, Cuba, because Cuba was a colony of the European country of Spain, and hence loosely part of his territory. For the purposes of not having to pay the double commission, Remington's lawyer had to argue that Cuba was its own "country" even if it was not recognized as a "power" or government, whose purchase of the Remington rifle was not at all dependent on the "parent country" of Spain doing the same. For the gun industrialist, an entity's independence was tacitly determined by its capacity to buy its own guns. Foreign sales in the 1870s presented all sorts of dilemmas of nomenclature, since gun industrialists, although private commercial agents, operated on a global, imperial stage. "Suppose a European country [was] at war with an Asiatic power, say, France with China," the Remington lawyer hypothesized, and "arms had been sold to parties in New York with the intent that these arms should be furnished to France for use . . . in China." If the arms had been shipped by way of San Francisco, directly to China, but for use by French troops in China, then by the strict construction of sales to "European countries," Norris would not be entitled to his commission. For that reason, Remington had used two terms, country and government—and by that distinction, Cuba was certainly a "country" even if not recognized as a "government," and not a European one, at that. Hence, Norris was not entitled to his 10 percent commission.)[68]

In late September, negotiations between Winchester and the Turks lurched along. Winchester complained to Azarian that "there is much want of clearness and much confusion of ideas." Ahead of his time, in tone and entrepreneurial style, Winchester prized clarity to the point of



136   THE GUNNING OF AMERICA

brutality. "I now write for the purpose of trying to state clearly what I am willing to do," he said. "I should be pleased to sell the Turkish government five, or fifty thousand of our guns, if I can make anything on them." He had already offered the lowest price, and the sultan's bargaining left him unimpressed. "The offer made us by the Government was simply ridiculous," Winchester stated with unsparing candor. "Your Government does not seem to understand the method of doing business in this country. We are not in the habit of asking twice as much for our goods as we expect to get. We ask only a moderate profit."

Winchester was also contending in his negotiations with counterfeiters who would stamp a **W** on a rifle and claim that it was an authentic Winchester. (Likewise, Colt's ads routinely warned the customer against "counterfeits and patent infringements.") "The party who made the proposition to furnish our arms [at less than price] is a swindler," Winchester wrote decisively to Azarian. Even if European armorers could ensure the "great exactitude and perfect workmanship" of a Winchester, they could never get up to speed with New Haven's humming machinery, which could "make and deliver [20,000] guns before anyone in Europe" could finish one. Belying none of his precarious footing in the gun business, Winchester warned Azarian, "We are now turning them out every day, increasing the quantity"—with more business than they could handle.

Winchester delivered a bravura P.S.: "You have only to telegraph to us, when you shall have arranged a contract, thus: 'Yes, for fifteen thousand' (more or less, as the case may be); or 'No.' This I shall understand, and will reply, 'All right,' or 'Too late,' as the case may be."

On November 9, 1870, Winchester and the sultan's minister of war sealed their momentous contract. Winchester would sell 15,000 muskets and 5,000 repeating carbines for $28 and $20 each, respectively, with a discount of 5 percent, "payable ready money in gold," deliverable to the wharf at New York no later than January 1, 1871, and shipping at a rate of at least 1,000 arms a week.[71]

The Turkish order was marvelously audacious and ambitious when Winchester had relatively few years of experience. An employee recollected that in the winter of 1870, the "shop was running on the



Turkish contract" almost nonstop, with two ten-hour shifts a day. In the midst of the contract, Winchester was also moving the factory from Bridgeport to New Haven. The Turkish inspectors insisted that production not be affected. Winchester operated the most important machines up until the very last minute, and then their belts were cut and they were loaded onto flatcars for the short journey to New Haven. This happened around noon, and production would start promptly again at 7 A.M. the next morning in the new factory. When the cargo was ready, five steamers and seven sailing ships, including the *Daisy*, the *Henry Knight*, the *Americus*, and the *Mindota*, transported it to Turkey. This was how international gun commerce typically worked. Mortimer MacKenzie ran a shipping business in New York and regularly shipped arms, which he treated "just as any other merchandise." He shipped often for Smith & Wesson, E. Remington & Sons, and Schuyler, Hartley & Graham (Austin Baldwin & Company, another gun wholesaler, actually had its own steamer). The gun industrialist would come to his office and tell him how many hundreds or thousands of cases it needed to ship and make a "regular freight engagement for so many cases. . . . The whole thing was managed much the same as our ordinary business," Mortimer concluded.[72]

Including ammunition, the Turkish contracts brought the company a gross income of over $1,360,000 for the 1870 contract and a similar 1871 agreement for additional arms. It could not have arrived too soon, as Oliver Winchester was hanging by a thread. As he awaited final payments on a subsequent Turkish contract, he wrote to the Malleable Iron Fittings firm of Branford, Connecticut, to beg its forbearance. "We are very short," he wrote, "but we may be relieved at any moment by remittance from abroad, [and] ask your patient indulgence."[73]

Oscanyan wanted his share, the promised 10 percent commission, for his labors of persuasion. Winchester flatly refused. Oscanyan sued in 1875 in New York to enforce the agreement. The service in question, which the plaintiff had stated "so baldly and clearly," the court ruling summarized, was to buy and sell "official influence" over the sultan on Winchester's behalf, and "personal influence over Rustem Bey." The court concluded that "the benefit which would accrue to the



government of which [Oscanyan] was the commercial representative . . . does not seem to have entered into his mind" at all. It had, too, any other gun sales, even those to another government. Oscanyan was thinking of his commission and private agreement with Winchester.

The "public good," as the court recognized, had little to do with

Obviously, the Oscanyan ruling declared, the courts do not exist to enforce or recognize a contract that is "tainted with . . . vices," "corrupt in itself," and "repugnant" to the idea of public service. The accounting worked entirely in Winchester's favor. He had secured for free all of Oscanyan's influence, which was all Oscanyan had to sell.[75]

Everyone had an angle. In February 1877, as Oscanyan's case wended its way through appeals, the *New York Times* reported on "The Adventures of a Turkish 'Nobleman' in New-York," and how a "social fraud [had] imposed" himself on the city, a "dashing naval gentleman . . . known to his friends as 'Edinboro' Bey, captain in the naval service of his imperial majesty the Sultan." Presumably, since he told New York society that he was on a vital mission connected to the pending war between Russia and Turkey, authorized to charter shipments of guns to Constantinople, and an important witness in the contentious Oscanyan suit, "Edinboro" Bey was pretending to be Rustem Bey. Or was Rustem himself, reinvented. Prominent New Yorkers introduced him into society, where he dazzled the elite with his "audacity, wit and consequential bearing."[76]

The *Times* couldn't know precisely what happened when "Bey" and Winchester met in New Haven, except that Bey had left New York broke, without paying his hotel bill, but returned flush with money. A Winchester agent in New York cashed for Bey a draft for $600 in gold on the Bank of New York. Then Bey left the city, and was not heard from again. The *Times* reported rumors that Winchester was willing to "bleed liberally" by way of cash to secure Bey's loyalty, silence, or disappearance in the Oscanyan lawsuit.

Even though they were duped, New York's elite had to admire the show. Dissemblance was part of doing business, and a business in its own right. "He has proven himself one of the most adroit and accomplished *adventurers* that the metropolis has ever entertained," wrote

the *Times*. "Even the gentlemen who have suffered most by him cannot help expressing their admiration of the fellow's insinuating address, . . . and *Arabian Nights*–like imagination."

WINCHESTER CONTINUED TO DO BUSINESS WITH THE TURKS throughout the 1870s. In the first weeks of December 1877, TG Bennett was in Constantinople to seal another contract, with another sultan. This sultan, Abdul Hamid II, was thin, sallow, and, according to Bennett, "stupid in appearance." The Ottoman Empire's last despotic ruler, Hamid turned the empire into a parody of its former grandeur, squandering the empire's wealth in random extravagance.[77]

By the time of Bennett's visit in December, the Turks were mired in one of their thirteen wars with the Russians, who aspired to conquer Constantinople. As early as June, the *New York Times* reported that a "body of Christian volunteers armed with Winchester rifles" was leaving to join the fray. Bennett reported home to Jane, "we have no news of the war here, as it is not considered best to give it. . . . The people of Constantinople will know when the Russians come but nothing before."[78]

Bennett intermingled arms negotiations with tourism and expeditions to find decorative goods for Jane. After inspecting a cartridge factory (Winchester had sold cartridge-making machinery to Spain and Turkey) and finding it thoroughly wasteful, with good brass getting thrown out and no good bullets being produced, he set out with an English-speaking tourist to find the howling dervishes in a dark, small mosque on the outskirts of Pera.[79]

Through it all, as he often did, Bennett pined for home. "You don't know how I long to see our house," he told Jane. Still, he mused, "It is curious to think that while this is going on here, the Russians are surely grinding upon [the Turkish] armys [*sic*] beyond the Balkans."[80]

It was curious, and more so because the Winchester was in that conflict changing European warfare. The Winchesters were actually devastating the Russians, in one of the most tactically brilliant maneuvers of the nineteenth century, by which the Turkish field marshal Osman Pasha managed to hold up a massive, 40,000-strong Russian force in a five-month siege. Osman's army at Plevna, now part of Bulgaria, was a small



140   THE GUNNING OF AMERICA

one of 10,000 at the beginning of the siege. But it was equipped with a strange new firepower—at least 8,000 and perhaps as many as 12,000 of the Winchester 66s that had been sold in 1870 and 1871. Through long periods of constant firing, the repeater rifles would dispatch a total of 40 million to 60 million rounds of ammunition on the Russians.[81]

The Russians, led by the Grand Duke Nicholas, Nikolai Nikolaievich, had walked surely into town on July 30—and into a trap. They expected to face a smaller army, and not the Peabody-Martinis and Winchesters—both models of repeater rifles—which unleashed a constant, infantry-decimating "wall of hot lead," as a gun expert wrote. In this first assault, the Turks lost only 12 killed and 30 wounded; the Russians lost 74 officers and 2,771 men in a firefight that lasted no more than 20 minutes. "What the Russians didn't know," the *New Haven Register* recollected in 1971, "was that the Turks were firing a repeater rifle that cut the enemy soldiers to ribbons as they reloaded their single-shot weapons." The *Register* called it a "hero rifle"—"part of 100 years of U.S.-Turk military 'aid' as the term is used today." But the US government's aid had had nothing to do with Osman's guns: Winchester had armed the Turks, for his own profit, in improvised collusion with the mysterious Bey and Oscanyan.[82]

Subsequent attacks were just as horrific. A fully loaded Winchester lay next to many of the Turkish soldiers at trenchlines hidden in the undulating terrain. Death with the Winchester was loud, fast, and relentless. What the US government saw as a liability—the potential waste of ammunition with a repeater, and profligate shooting—Osman saw as tactically effective. He issued soldiers with repeaters 500 cartridges, and instructed them to shoot as much and as fast as possible. They unleashed an unheard of 20,000 shots per minute in one battle. Russia's coalition lost 14,000 men and 356 officers. Reporters wrote of the Second Battle of Plevna that it would be difficult to recall "another instance of a corps being so rapidly destroyed" as this "frightful slaughter."[83]

Disease and dwindling supplies were more effective against the Turks than the Russians' small arms, rendered impotent by the Win-

chesters. When Osman finally surrendered, the grand duke took him prisoner at a huge breakfast gathering, congratulated him on his brilliant defense of Plevna, and returned his sword as a tribute. It was a ritual of more intimate warfare, on the cusp of the new.[84]

Word of the horrendous casualties by this fearsome new repeater spread through Europe, which had been following the "Plevna Delay" incredulously. How could such a small Turkish force be thwarting the Russian juggernaut? Journalists didn't recognize the significance of the rapid-firing Winchesters at the time, but war rooms around the world did. A lieutenant colonel in London urged the adaptation of the Winchester repeater, based on its "deadly effect" at Plevna. A vice admiral concurred, saying, "I have been for a long time a consistent advocate of the magazine gun known as the Winchester, or the Winchester-Henry as it is also called: for there is a gentleman of the name of Henry who has been connected with it." Henry might have been pleased to be remembered, as few did remember him anymore.[85]

Winchester's foreign sales thrived. Nations and tribes raced to acquire this new weapon of mystery and near supernatural power. Eventually, Fiji replaced its boomerangs with repeater rifles. From Bangkok, King Rama V of Thailand bought Winchesters in the 1880s to combat French aggression in Laos and Cambodia. People who had never met an American had met the American gun. "Eskimos and South Sea Islanders" bought the rifle, and it was known on "the African veldt and the Australian bush," according to a company retrospective. Isolated Arab tribes scattered in African deserts began to demand Winchesters from secondhand dealers.[86]

As part of the ongoing gun evolution to faster shooting, practically every European nation replaced outdated and single-shot rifles with rapid-fire ones. Gun innovation moved almost invariably in the direction of greater speed, lethality, and power in the commercial arms race. The Plevna Winchesters had inaugurated irreversibly the age of the semiautomatic rifle.[87]

BACK IN NEW HAVEN, THE IRONCLAD ACCOUNTING OF THE GUN business held true: death and commercial fecundity were linked. Because of the sultan's business, Oliver Winchester was turning the corner to profit and expansion. The Turkish contracts (international, not domestic, sales) "put the Company on Easy Street," the company archive recalls.[88]

In April 1871, a once timid, now giddy board presented Oliver Winchester with a letter of appreciation, praising his "most untiring perseverance . . . under every discouraging circumstance imaginable," and his "consummate financial skill and inventive genius" that allowed stockholders to enjoy "very handsome financial returns."[89]

Since April 1, 1867, the net worth of the company had increased by $727,105, to $1,177,105 (the economic status equivalent of $324 million today). A letter from Winchester to the stockholders on March 6, 1872, described the liabilities and assets with which the Account Books were opened for the year beginning in February 1872. The company now had a surplus of "reliable assets" of $510,797.76, which did not include the assets of the Patent Right account—the most important but intangible asset. Its profits in the year 1872, Winchester reported, had increased by $60,659.94. Sales for 1872 were $1,015,652.20, an increase of $206,258.56 over the year before. The Imperial Ottoman government had contributed $333,172.12 to those sales. The 1870s were a decade, the company archive recalls, "when the rewards to our Company were rich, and the money poured in."[90]

TG Bennett felt flush in good fortune, too, despite his complaints about the European arms-trading life of travel, all the swindles, and the insufficiently dazzling natives in the company of gun men. "The [new summer] leads me to consider how short our lives really are," he wrote to Jane from Romania in 1879, "and to feel rebellious that two months of mine should be spent here so far away from you. And yet, who have had as much to be thankful for as we. I cannot think of any one with whom we could advantageously change. Can you?"[91]



# THE BELTON SYSTEMS
## 1758 AND 1784-86
### AMERICA'S FIRST REPEATING FIREARMS

BY ROBERT HELD

PHOTOGRAPHS BY MARCELLO BERTONI

ANDREW MOWBRAY INCORPORATED PUBLISHERS          LINCOLN, R.I.          M.CM.LXXX.VI



PUBLISHED by Andrew Mowbray Inc., Lincoln, Rhode Island, U.S.A.
COPYRIGHT © 1986 by Robert Held. All rights reserved, in the U.S. and abroad.
BOOK DESIGN AND LAYOUT by Tabatha Catte, Washington, D.C.
PHOTOGRAPHS, except where otherwise indicated, by Marcello Bertoni, Florence, Zürich and London.
PHOTOCOMPOSITION, to p. 7 in Garth, thereafter in 10 on 12 Korinna, by A. Mugnai, Florence, Italy.
PHOTOENGRAVING by Fotolito R.A.F., Florence.
LITHO MONTAGE AND PLATES by Bluprint, Florence.
PRINTING AND BINDING by La Nuova Cartografica, Brescia, Italy.
LIBRARY OF CONGRESS CATALOG CARD NUMBER 86-62143
INTERNATIONAL STANDARD BOOK NUMBER 0-917218-25-6
PRINTED IN ITALY IN OCTOBER 1986



37
38

or a British thing? And since the answer rests on endless cyclical reviews of school-boyish commonplaces about fundamental historical circumstances and events, let us leave it to take what turn it will — one is as good as the other.

All this of course as though the fusil were, like many antiques, an object isolated in its own time and space. But if we see it as the germinal entity of a hundred-and-eight-year sequence of descendant inventions and events, all of them set in the purest American ambiences, it acquires a downright festively American nature by virtue of irradiation from this colorful and strongly nationalistic aura. Moreover, Belton's brief strut on the stage casts him as a would-be purveyor of weapons to the American revolutionary government in a time of war *against* Great Britain (even though his motives were solely and stridently venal). The sequence that leads from the fusil to the Chambers pieces of 1813 and after — and, if one reasons inventively, to the Hunt/Jennings rifles of 1849 and ultimately to the Henry and the Winchester — is utterly American. See Paragraph XXXVII.



39

## XVI. BUT WAS IT A PRACTICAL, WORKING THING?

a. In theory, a regiment or even just a platoon armed with Beltons and twenty magazine tubes per man would have constituted a formidable force, especially in defensive positions behind cover. Belton's intransigent faith, wheedlingly pleaded, not only in the military efficacy but in the hard cash value of his invention was the sort that moved mountains, or should have. In the end it did not move Congress. Thus he to the Congress on May 7th, 1777:

May it please your Honours,
I have received your Resolve of the first of May, wherein I am authorized to superintend, & direct, the altering of one hundred Muskets, & that I receive a reasonable compensation for my trouble (for so

33

## THE VALUE OF BELTON'S DEMANDS

Establishing modern equivalents of old-time moneys is fraught with fudgery because concepts of what is/was a necessity and what a luxury, and the availability of either or both in terms of labor time, are not only not easily compared but often not comparable at all. In the Philadelphia or London of 1777, a family of five could live frugally but without want on a hundred pounds a year. Recent studies tend to equate one pound of Belton's time to about a hundred of 1986, and hence to around a hundred and forty or a hundred and fifty dollars. Thus "a thousand pounds from each state" becomes something like £1,300,000 pounds or $1,800,000 in 1986 terms, while the "five hundreds a year" for life requested on July 10th (p.38) translates to an annuity of seventy-five thousand dollars (tax-free).

superintending & directing) &c. But I see no prospect of having my reward for my Invention, and for the cost and trouble I have already been at, which has ever been customary through all Nations, to reward usefull inventions, or discoveries, as I have set forth in a paper, which I had wrote before I had seen the Resolve, which I had desir'd the Board of War to lay before your Honours, and to what length I would carry the invention and what service it might render to the States, and provided I should fail in compleating the armes as I had therein set fourth, I would have no reward as I desire not my Countries money without rendering services adiquate thereto. And still to remove all possible Objections, & to put things on as equitable, & reasonable a futten [footing] as any one I think can desire, I will engage to direct the arming of one hundred men, so as to be equal to two hundred in the field of Battle, or any number equal to double the same number as they are armed at present, which shall be left to the Judgment of the Commander, or three first Commanding officers of our Army. And if they Judge they are not I will be satisfied, & desire, and receive no reward & be intitled to none. But provided they should Judge they were equal I then should be intiteled to a thousand pound from each State according to resolve of Congress, for then where one hundred was thus equipt it would be the same, to the strength of the army, as if there was another hundred raisd & equipt, & what state can raise, Cloth & equipt one hundred men for a thousand pound, or even three thousand then allowing one hundred men to be equipt for each State, their final strength would be the same, as if they had been to the expence of three thousand pounds more, in raising men besides the cost of maintaining them which may be saiv'd to the State. What then would be the saveing in arming three or four thousand for each State, in short the many & innumerable advantages, which it may render, are almost beyond discription, which makes my proposal vastly reasonable, & untill it is agreed to, or something similar, I shall beg to be excused from superintending & directing the altering of any Muskets. But when it is, it will be undertaken with Alacrity by

Your Most Obedient Humbl Sert.
Joseph Belton

N.B. As for the Enemies obtaining & making any of the invention against us, as some perhaps may imagine, I am no ways apprehensive of at present, for it will be my own folt if they doe, at least untill we had what number you please armed, and if they doe then it might be by a deserter from our armey, after he had become acquainted with the use of the armes, for were our enemy to take some of the armes after they were completed they could not very suddenly use them, untill they had discovered the true & safe method of Charging, which might puzzle the best of them, for Months, as it has done me, & perhaps split one or two about their ears, as I have done. Which you may think, Gentlemen, as you have seen me discharge, to be very easy. But if any Gentlemen in this place will tel me in a week with what, & how I charge I will give him the invention. And him that alterd me the gun knows not, and I am confident there is but one upon the Continent beside myself that does know. But from this you may think it will always be difficult, & dangerous, for men to use them. But so far from that, that I would tust any friend that was usd to a gun, after giving him the materials, & three or four words of direction, to go by himself & Charge, for me to dischare, and who had never seen the gun thus Charg'd before. Many things appear vastly dangerous & difficult, & are till they are found out, then as vastly easy & simple as experientia docet omnia, and has taught the foregoing.

Your Hbl. Sert.
Jos. Belton

Philadelphia May 7th 1777

In spite of this clarion prognosis of breathtaking benefits to come, no force was ever thus armed in America — nor anywhere else in numbers

Compendium_Vorenberg
Page 770



sufficient to leave a trace in history. True, the roman-candle system was periodically exhumed here and there for still another round of experimentation . . . and then always relegated back into the cellar. What rendered it unsatisfactory is easy to imagine.

b. We have already seen the critical necessity of perfect timing between shots (Paragraph X), since too rapid a sequence would make the gun explode, while a stoppage would demand immediate and dangerous unloading.

c. Heat dissipation must have posed problems beyond the ability of eighteenth-century technology to resolve. Even after just one eight-shot burst the barrel must have been uncomfortable to hold. Successive rapid discharges of entire eight-shot magazine tubes would no doubt have compromised the metallurgical structure of any brass or bronze of the time to the point of peril. Cooling by wet cloth wraps or by dousing must have been essential. Hence the take-down fore-end (Figs. 21-22).

d. Even with the conventional touchhole plugged or closed by a sliding valve, the danger of ignition of the lowermost charge in the breech could never have been *entirely* obviated if the load consisted of loose charges. The longitudinal seam and the cap on the breech end of the magazine tubes had necessarily to be sealed by silver-soldering — not by lead — to ensure continued flash-proof closure, but in recycled tubes insidious leaks might develop.

e. The recoil of an eight-shot burst had to subject any gun to brutal strain at the wrist — and in fact, the wrist of the fusil is broken through in a line running approximately from the trigger to the escutcheon (visible in Figs. 33 to 35) and has been repaired with glue and a stout iron screw.

f. Finally and probably most telling, the usefulness of an uninterruptible burst of eight or more shots must have been queried by sober commanders in all times and places. What if a soldier who had started the reaction by pulling the trigger fell dead or wounded? — if someone tripped and set off a burst? — if a burst went off accidentally for any reason? Or, from the loftier perspective of finance and supply ministries: what about the time, labor, materials, machinery, physical plant and vehicles needed not only for the conversion of tens of thousands of muskets but for the manufacture, loading, packing and storing of millions of magazine tubes and the leather carriers for individual soldiers? And what about the mastodontic logistics required to supply to the field eight and even sixteen times the normal quantities of ammunition, with a proportionate rate of consumption? And the re-training of thousands of men trained in standard musket drill?

g. Belton's letter of April 11th blathers blithely that "in two or three Months we might have an armey thus equipt". This was pure smoke, for he must have known better than anyone that alone the conversion of ten thousand muskets in three months of six working days a week meant consigning one hundred thirty finished products a day, for which were needed over two thousand loaded and packaged magazine tubes *every day*, plus carrier bags and other accoutrements — a feat within the power of industrial Birmingham working on a full war footing, but as attainable by the thirteen more or less united and wholly agricultural states as the transmutation of lead into gold. When in 1812, before the disastrous Russian campaign, Samuel Johannes Pauly, a Swiss, offered Napoleon an excellent and simple breech-loading system using metallic center-fire per-

35



cussion cartridges, a revolution in small-arms of earthquake proportions that in theory would have led to incalculable French superiority over everyone, the emperor turned thumbs down because, he said, such radical innovations can only be made in peacetime, for they summon and pledge all the resources of the entire small-arms industry for years to come, and also because the re-training of hundreds of thousands of men habituated to flintlock muzzleloaders would probably have to be abandoned in favor of awaiting a new generation of recruits.

## XVII. BELTON'S DEBACLE

Within hours of having penned his letter of May 7th, Belton felt the need to follow it up with a less rambling, less patently avaricious, more conciliatory one. Possibly word had reached him that his case had run into opposition, or he may have intuited that his tone of the day before was less than an invitation to sympathetic confidence. Thus he wrote in haste specifically to the president, John Hancock:

> Philadelphia May 8th 1777
>
> Mr. Hancock
> Sir,
> Perhaps the Congress will sooner comply with this than what I have heretofore laid before them, (Viz.) I will engage to arm any number which shall prove equal to double the same number in Battle, if so then I should be intitled to five hundred pounds from each State, & if equal to three times their number I should be intitled to a thousand pound from each State, and if to four times their number I should be intitled to fifteen hundred from each State, so on rising five hundred for every greater number, which should be left to four experienced Officers two of which I should have the privelage of Chosing. And as they brought in so I should receive. And if they Judged they were not equal to double their number I would be [illegible] intitled to no reward, which will be hartily complid with by
>
> Your Most Obedient Humbl. Sert.
> Joseph Belton

There can be little doubt that the system he had been proposing up to this point was that of the 1758 fusil, and indeed it seems all but certain, on a basis of reasoning we shall examine shortly, that this very weapon was used at the trials, probably together with one or two altered muskets — for it was after all the method of alteration and adaptation that he was trying to sell. Inspection of the 1758 fusil (and of the photographs shown here) quickly leads the experienced arms student to visualize any number of ways in which this might have been done. The button-operated sliding valve over the rear touchhole could be substituted by a small vertical slide moving up and down in a dove-tail groove filed out across the touchhole; or an enlarged touchhole might be bushed with a new core containing a touchhole adapted to closure by a specially contoured stud; and so on. The priming conduit from pan to the new and foremost touchhole could be of iron, brass or copper, in many shapes, brazed or screwed or silver-soldered to the barrel, or held to the stock by pins; instead of having a long hinged flip-up lid it might be totally tubular, the rear end leading into the pan of a conventional flintlock whose pan cover has been adapted accordingly while the front end is left open; it could be primed by pouring powder down through the open front end and sealing this with a daub of wax or grease or a paper pellet which would be blown out on firing. But there is no need to dwell on all this — the

36

system is a simple one, susceptible to many small variations that would satisfy military requirements. Essentially they would all function like the 1758 fusil.

When still no contract had materialized five weeks later, Belton deemed it opportune to tack into the wind and push his cause with more diplomacy:

> Please to inform the Honourable Congress, that as I have herefore asserted to them, that I would discharge sixteen or twenty balls from one piece, once charging, by once puling tricker, or at two or three different times, by little more than cocking & priming the same lock two or three different times. And as I mean ever to fulfill all & every of my Assertions, I propose next monday about ten O.Clock A.M. (if it be agreeable to your Honours) in the State House Yard to make the following exhibition (viz.) to make five distinct discharges from once puling tricker, then again by little more than cocking & priming to make five more distinct discharges, then by little more than cocking & priming again to make six, all which I will warrant to do execution one hundred yards and I think I might warrant it would two hundred, after which I can charge & fire with cartrage as usual.
>
> From Your Most Obedient Humbl. Sert.
> Joseph Belton
>
> Phila.da
> Saturday June 14th 1777

Once again the experienced arms student will have no difficulty envisioning Belton's innovations. Evidently he had displaced the first touchhole far forward (sixteen charges would have filled a barrel almost halfway to the muzzle) and added two new ones inbetween. The tube was now loaded in three separate groups of charges, two of five and the rearmost of six. The first and second ended on unpierced, solid balls so that the burst stopped after the fifth shot. After the first burst had gone off, the new second touchhole was opened, the pan and conduit reprimed and the next burst of five fired, ending again with a solid ball. Then, upon the third vent being opened and the conduit reprimed, the last burst of six went on its way. Now the fourth or rearmost vent was opened and the musket fired with a single-shot service cartridge — or a new magazine tube could be inserted and the groups repeated. No doubt three short bursts were potentially more efficacious than a single long one, but the adaptation of old muskets to this more complex system, the manufacture of corresponding tubes and the longer training needed for proper use also multiplied exponentially the drawbacks, dangers and costs.

Yet the proposal did not fail to draw cautious approval from some highly respectable quarters. Sometime in early July a congressional commission composed of conspicuous, influential personages reported to Congress in an undated brief that

> Having carefully examined Mr. Belton's new Constructed Musket from which the discharg'd sixteen balls loaded at one time, we are fully of the Opinion that Muskets of this Construction, with some small alteration, & improvement, might be Rendered of great service in the Defense of Lines, Redoubts, Ships, &c., & even in the Field, and that for his Ingenuity & improvement he is Intituled to a handsome reward from the Publick.
>
> David Rittenhouse
> Charles W. Seale
>
> B. Arnold
> Horatio Gates
> F. Nash
> Thf. Proctor
> F. W. Stronburgh

37

One wonders why the gentlemen turned in so sanguine a report — qualified, cautious, but favorable. Horatio Gates, victor-to-be (six months later) over Burgoyne at Saratoga, soon-to-be president of the Board of War and a man seriously proposed by many fellow officers to replace Washington; Benedict Arnold, able general, right-hand-man to Gates at Saratoga, his good military sense already proven in Connecticut; David Rittenhouse, philosopher, scientist, maker of scientific instruments, discoverer of the atmosphere of Venus; Seale, Nash, Stronburgh, Proctor, men of the world, no doubt familiar with firearms for sport and defense: Proctor a surveyor and cartographer, Stronburgh a prosperous ship-owner and one-time captain of Boston packets. Shouldn't one expect them to have reflected in greater length and depth? Were it not for the known stature of at least four of the seven one might be tempted to sniff odor of corruption — but not only does the presence of Gates, Arnold, Rittenhouse and Proctor rule this out, but the mise-en-scene, if it had been one, would have been too superficial, too linear and puerile to hold up as a fraud against the state. Probably it was a hasty verdict of men hard-pressed for time; the demonstrations must have been spectacular, Belton's monologues smooth and persuasive; and on the spur of what was thus made to seem potentially revolutionary a swift nod was given, at least for proceeding to the next step of trials in greater quantities.

Belton attached a copy of this report to his next letter, dated July 10th; it is the last one known:

To the Honourable Continental Congress
May it Please your Honours,

you may see from a paper herewith inclosed signed by the Generals, & other Officers, & Gentlemen, their Oppinions upon my new Constructed Musket, and how extensively usefully they judge it may be, and that I ought to be handsomely rewarded by the Publick for my invention. And it is responsible to think that all Publick reward ought to be in proportion to the service that any invention, or improvement, may render to the Publick. And to remove Objections (if any there be) against the usefulness of my Invention, I will engage to direct the making of Muskets upon such a construction, that any body of men shall be safe in useing them in discharging sixteen rounds in less space than a minute, that shall do execution two hundred yards, and then shall be able to load and fire with cartradge as usual, or to load the whole sixteen rounds again, and if I in the least faile herein I would be entitled to no reward. The service that such arms may render to the Publick at this day, & to posterity, I will leave your Honours to judge, at the same time, I think that Great Britain has granted many five hundred a year for less services rendered to their Country, than what this will render to mine, and I look upon this extensive Continent to be able to grant five hundreds as well as the Island of Briton, and as money is still'd the sinews of war, so it may be stild the sinews of invention, for doubtless many experiments which might have discovered something usefull to the Publick, has for the want of it died in oblivion. And as the present Invention opens a door into a wide extended field of improvement in every existing department, where may usefull things present themselves to view, which lies as yet [three words illegible], I am rewarded as the Invention merits. I shall speedily step forth in my Countries cause, and exert every ingenious effort to arm my Country to the best possible advantage, for which purpose I beg leave to dedicate these papers to your Honours serious consideration, and your wise determination may, I hope, be crown'd with salutory consequences, which is the desire of
your Most Obedient
Most Humble Servant
Joseph Belton

Philadelphia July 10th 1777

38



Alas for Belton, someone somewhere along the paths through the jungles of government purchase and procurement must have stopped to take a long, expert and jaundiced view of matters. We have no documents about this, but we know that not one of the hundred muskets ordered by Congress has ever come to light, which inexorably forces the conclusion that none was ever made. In so small a universe as that of the nascent United States so large a public property as a consignment of a hundred valuable and specialized weapons could not have disappeared without leaving a trace in the form of at least one surviving specimen in some arsenal, state house or county museum, or, perhaps most likely of all, in some veteran's kitchen corner; or a trail in some archive, direct or oblique, federal or local, public or private. Only the 1758 fusil is left of what came close to being America's first official military repeating firearm.

Here the American archival sources run dry, save an odd post-script from Paris. On February 13th, 1779, Benjamin Franklin, American minister to the court of Louis XVI, listed in his expense and disbursement accounts the payment of nine hundred and sixty English pounds — say, $120/150,000 of today — to one "I. Belton" ("I" and "J" were interchangeable). No reason is given, and nothing links this beneficiary unequivocally with our Philadelphian. Yet in view of the latter's operations in Britain between 1784 and 1786 (as we shall see in Part Three), his presence in Paris and his sometime dealing with, through or for the ministry in wartime conjurs up shadowy visions of espionage, intrigue and secret arms negotiations. We shall probably never know more about this because the American national revolutionary archives have been ploughed to exhaustion; conceivably, hitherto unknown information may lie dormant in some private family archive or in the records of a county courthouse — and perhaps the publication of these notes may coax something into the light.

## XVIII. JOSEPH BELTON: IDENTITY, LONGEVITY, HIDDEN TRACES

Let us now reason about the inventor as reflected in his inventions.

The 1758 fusil was made nineteen years before Belton's offer to the Congress and must have been in the planning stage a year or more before that. We know that in 1758 he styled himself «captain» and gave vigor to the claim by ornamenting his piece with salty motifs: an anchor in a sea shell, sails on distant horizons, and, cunningly or subconsciously, the long straight legend of the barrel's genesis and of his own personal identity literally linked to the anchor by a ring through its buckle (Fig. 14). Now, the title of «captain» in the eighteenth century was rather amorphous and often generously self-bestowed (a later "Colonel" Colt comes to mind). Bona-fide commanders of merchantmen and naval vessels, army officers and stalwart leaders of county militias were captains; so were successful highwaymen and pirates, and history no less than literature abounds with conspicuous personages whose claims to captaincies lay shrouded in nebulous obscurity. It is immaterial for our purposes whether Belton was a real or a self-styled captain; what matters is that in order to sustain publically a plausible image consonant with this claim he had to be, by law, at least twenty-five years old, even if to be, or to seem to be, the captain of a mere coastal packet (as well he may have been). Thus the upper limit of his birth is 1733. We also know that in 1784 he was busy promoting the 1784 Board of Ordnance musket (Paragraph XXXII) to the

39

# Arms and Armor
# in Colonial America
## 1526-1783

by
Harold L. Peterson



BRAMHALL HOUSE: NEW YORK

Plate 1. The French colonists from Fort Caroline find the Indians worshiping a column erected during their first voyage. Jacque Le Moyne, an eye-witness, painted the scene about 1564. It was engraved by Theodore De Bry and published in 1591.

1-SIZE
U818
P48x
1956

L. PETERSON

States of America

r: 56-11273

House,
Inc. by
company



*THE COMPANY OF MILITARY COLLECTORS
& HISTORIANS*

Through its Reviewing Board, takes pride in sponsoring this book
and in recommending it as a standard work of reference in the field of
American military history.

COLONEL HARRY C. LARTER, USA, Ret.
*President*

REVIEWING BOARD

COLONEL ARCADI GLUCKMAN, USA, Ret.
MR. C. O. v. KIENBUSCH
LIEUTENANT COLONEL HERMANN W. WILLIAMS, JR., USAR
COLONEL FREDERICK P. TODD, USAR, *Editor-in-Chief*

WASHINGTON, D. C.

AMERICA

Collection, Courtesy Robert Abels
ry.

uit cap or none at all.
ete on contemporary
nor ramrod thimble.
rged, differing only in

ther the "Kentucky"
tle of both. However,
ade either during the
e originally made pri-

er types of pistol were

# THE FRENCH WARS AND THE REVOLUTION

introduced to the American scene, the Dutch and the German. Just as the colonists purchased muskets from the Dutch so they also acquired pistols, although in much smaller quantities.

The German pistols used in this country were extremely few in number. The officers of the German troops brought their own personal weapons just as did their French and British counterparts, and they differed just as widely. There were only a few mounted units, and some of these relied principally on the carbine. And there were no German sailors. The service pistols that were used were acquired in the same way as the muskets and thus varied just as greatly. There were, however, certain general similarities. They were brass mounted, the barrels were round, pin-fastened, and of large caliber, often about .75. Cocks were frequently convex and reinforced. Ramrods were iron and occasionally attached to the barrel by a swivel. And almost always there was the typical elliptical brass front sight.

In addition to these standard muzzle-loading firearms of the period, there were also some breech-loaders and even some repeating arms. The desire for breech-loading and repeating weapons is almost as old as the history of firearms, and there were numerous attempts to achieve this goal, beginning at least as early as the opening years of the 16th century.

The first mention of a repeating weapon in America was made by Samuel Niles, who recorded that in September 1722 certain Indians

> ... were also entertained with the sight of a curious gun, made by Mr.
> [John] Pim of Boston,—a curious piece of workmanship,—which though
> loaded but once, yet was discharged eleven times following, with bullets,
> in the space of two minutes each of which went through a double door
> at fifty yards' distance.[11]

The principle on which Pim's gun operated is not known, but it could well have been that patented in London by Abraham Hill in 1664. Hill's mechanism was copied by several other English gunsmiths of his own time, notably John Cookson and John Shaw and by a host of others throughout the 18th century. Another John Cookson (1701-1762), probably a lineal descendant of Hill's contemporary, was a gunsmith in Massachusetts, active after about 1720, and he advertised in the *Boston Gazette* of April 12 and April 26, 1756 that he could make a repeating arm similar to those made by Hill and his forebear. Thus this type of repeating flintlock, popular in England from the third quarter of the 17th century, was known and manufactured in Massachusetts early in the 18th century and is therefore a likely candidate for the type made and used by Pim.[13]

The interrelationship of Hill and the Cooksons is worthy of some slight elaboration because of the misconceptions that have been prevalent in America

[215]

# ARMS AND ARMOR IN COLONIAL AMERICA

for the past quarter of a century. Because the first example of a gun built on the Hill system which achieved widespread notice in America had been made by John Cookson of London, his name was applied to all such guns by the majority of American collectors. Thus the Hill became known as the "Cookson type" repeating flintlock in this country. The picture was further complicated because the first specimen described here had had its date of manufacture altered so that it appeared to have been made a century before it actually was. Since the date it bore was obviously wrong, and since a John Cookson who advertised that he could make such guns lived in Massachusetts, there has been a tendency to accept the American maker as the one and only Cookson. Some have even listed him as the inventor of the type. John Cookson of London, however, has long been known to students in England, and several of these repeating guns made by him and bearing late 17th century dates are preserved in Great Britain. Thus there were definitely two John Cooksons, probably directly related, who made the Hill type of repeating flintlock, one working in England and one in America.[14]

The mechanism of the Hill repeating flintlock was ingenious. The butt contained two tubular cavities, one above the other, which could be filled from the outside through openings with hinged or pivoted covers on the left side. The uppermost of these cavities was filled with balls, the lower with powder. Between these cavities and the barrel was a cylindrical breech block which pivoted on an axis perpendicular to that of the bore. This cylinder could be revolved by means of a lever attached to its left end. Bored in the side of this cylinder were two cavities which could be aligned either with the cavities in the butt or with the bore by moving the lever. Cut into the side of the breech block near the right end of the cylinder was a shallow depression which served as the bottom of the priming pan.

The method of loading was swift and simple. The tubular cavities in the butt were filled separately with powder and balls, and a small magazine in front of the cock was filled with priming powder. Then the muzzle of the piece was pointed up, and the lever was pulled backward revolving the breech cylinder one half turn. This aligned simultaneously the two cavities in the cylinder with those in the butt. The muzzle was then depressed, allowing a ball to fall into one cavity and enough powder for a charge into the other. At the same time the action cocked the piece and moved the hollow serving as the bottom of the pan under the priming magazine where it also was filled. As soon as these actions had been accomplished the lever was returned to its original position. As it revolved the cylinder back again it aligned first one and then the other of its cavities with the bore. The first to align with the bore was the one containing the ball. As it did so the ball rolled forward to the anterior end of the chamber

[ 216 ]

# THE FRENCH WARS AND THE REVOLUTION



Plate 215. Officer's model Ferguson rifle and bayonet presented by Ferguson to Frederick De Peyster. *U. S. National Museum*

where a slight decrease in the diameter of the bore prevented it from going further. Next to align itself was the cavity containing the powder, and this also deposited its contents in the chamber. The same action returned the pan filled with powder to its proper place and pushed the frizzen into operating position. Thus with a simple forward and back movement of the lever the gun was loaded, cocked and primed.

The Hill was an efficient, fast-acting gun. Its great drawback was that it required many hours of work by a highly skilled gunsmith to produce one. Alignments had to be perfect, and the seal against the explosion in the chamber had to be secure or the powder in the magazine would also ignite. In the United States National Museum are preserved the remnants of one of these guns in which the seal was not adequate. Because of these factors the Hill was made by fine craftsmen in many countries for well over 100 years, but the expense of manufacture confined its use primarily to wealthy sportsmen.

Another type of repeating flintlock used in America was that invented by Joseph Belton of Philadelphia. Belton offered his gun to Congress, April 11, 1777, and his letter of that date is the only known surviving evidence of the operation of the piece.

> To the Honorable Continental Congress
> May it Please your Honors,
>
> I would just informe this Honorable Assembly, that I have discovered an improvement, in the use of Small Armes, wherein a common small arm, may be maid to discharge eight balls one after another, in eight, five or three seconds of time, & each one to do execution five & twenty, or thirty yards, and after so discharg'd to be loaded and fir'd with cartrage as [useal?], which I am ready to prove by experimental proof, and can with eaquel ease fix them so as to discharge sixteen or twenty, in sixteen, ten or five seconds of time, which I have kept as yet a secret, thinking that in two or three Months we might have an armey thus equipt, which our enemy should know nothing of, till they should be maid to know it in the field, to their immortal sorrow—

[ 217 ]

Compendium_Vorenberg
Page 780

3 / 6

# GAS, AIR and SPRING GUNS
## OF THE WORLD

♦

## W. H. B. SMITH

**Author of Small Arms of the World, National Rifle Assn. Book
of Small Arms, Walther Pistols, Mauser Rifles and
Pistols, Mannlicher Rifles and Pistols, etc.**



*MSPC Books*

**MILITARY SERVICE PUBLISHING COMPANY**

**Harrisburg, Pennsylvania**

Generated on 2022-11-11 01:22 GMT  /  https://hdl.handle.net/2027/uiug.30112068359691
Public Domain in the United States, Google-digitized  /  http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

Copyright 1957
By W. H. B. Smith

ALL RIGHTS RESERVED

Library of Congress Catalog Card Number: 57-8696

Printed and bound in the United States of America
by THE TELEGRAPH PRESS, established 1831,
Harrisburg, Pennsylvania

Generated on 2022-11-11 01:22 GMT  / https://hdl.handle.net/2027/uiug.30112066359691
Public Domain in the United States, Google-digitized  / http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

UNIVERSITY OF ILLINOIS AT
URBANA-CHAMPAIGN

corps. It consisted of 1300 men and was trained by the Freiherr von Mack, a captain on the quartermaster general's staff.

Each rifleman carried 2 to 4 air flasks into battle with him, while carts carrying additional flasks and two heavy duty air pumps were carried in support carts for each company.

Depending upon pressures and types of shooting required, the rifles are said to have been used at distances from 150 to 400 paces. As to their effectiveness, there are few records but many traditions. (Contemporary tests with two reconditioned rifles of this type, a Girardoni and a Contriner, gave very good accuracy at 100 yards; but proved hopelessly inaccurate at 200.)

Says Captain Halla: "The fact that this remarkable weapon nevertheless did not remain in use and was removed as expendable supply to the fortress of Olmutz in 1815 was due not only to the changed tactical principles, but chiefly to the circumstance that there were no adequately trained riflesmiths available to take care of the delicate component parts of the locks and valves, and therefore the percentage of unusable air rifles shown in the reports was frighteningly high."

It is interesting to note, however, that in 1848 and 1849, during the Czech and Hungarian revolt, the serviceable air rifles at Olmutz Armory were withdrawn by order of Emperor Franz Josef, then 18 years old, and issued for temporary service. (Note: In this connection it might be pointed out that even today there are very few general gunsmiths who are capable of servicing the common American varieties of compressed air guns. Most of the factory repair men with whom this author has discussed the subject, all stressed the fact that most of their troubles stemmed from owners misusing the arms or from average gunsmiths butchering them! "Keep screwdrivers out of the hands of owners and we'd have very little trouble with returns," is the way one manufacturing expert succinctly expressed it. We can well understand, therefore, the troubles the Austrians encountered 150 years ago!)

The designer, C. G. Girardoni, was a most efficient and prolific maker of all types of firearms and air arms

for both military and civilian use. He made various types of air pistols, including some with bellows in the grips, used for short-range target work. He made some shotguns about 1814, and sporting air rifles in 1815. Among his other designs are the 1776 model Flintlock Repeating Rifle, also of 12-shot capacity.

While experimenting with a special repeating mechanism on a 15-mm. hunting rifle, the priming flash ignited the powder magazine. (This remember was before the days of metallic cartridges, and each propelling charge had to be set off by an individual flash which the inventors of the time tried to confine to the individual chamber charge—always with eventual powder magazine blowups.)

The explosion shredded his left hand, but this did not deter the inventor. With the aid of an artificial iron hand he had attached to the arm stump, Girardoni went back to work on the magazine principle; but applied it now to use with compressed air. Girardoni's great-great-grandson wrote to Dollcezek: "This was the origin of the air rifle which, with its smokeless and almost soundless shot, was used by the Austrian army for more than 35 years."

The Austrians treated the development as a real "secret weapon." A special shop was set up for Girardoni and workers were specially selected and sworn to a secrecy about equivalent to that required for an H-Bomb "Q" clearance today.

It should be mentioned in passing that the Girardoni pattern was produced by other makers on contract. Then even as now, Austria was a hotbed of *small* gunmakers who were good at duplication. In 1956 the giant Steyr works has two factories operating with an employment roll of some 20,000 men—and that plant, to the average American shooter who knows the fine quality of their Mannlicher-Schoenauer rifles, is the epitome of firearms quality. However, Steyr today is basically a roller bearing and farm equipment maker, and this author is constantly amazed at finding so many American gunmakers so ill-informed that they are frightened at the size of the Steyr payroll.

As a matter of record, fewer than 200 men are employed in manufacturing firearms there! At the same time,



**Austrian Model 1799 by Contriner. Pin in line with trigger is the feed and breechblock release catch.**

Generated on 2022-11-11 01:23 GMT / https://hdl.handle.net/2027/uiug.30112066359691
Public Domain in the United States, Google-digitized / http://www.hathitrust.org/access_use#pd-us-google

Digitized by Google

# LAW REVIEWS AND JOURNALS

# "THIS RIGHT IS NOT ALLOWED BY GOVERNMENTS THAT ARE AFRAID OF THE PEOPLE": THE PUBLIC MEANING OF THE SECOND AMENDMENT WHEN THE FOURTEENTH AMENDMENT WAS RATIFIED

*Clayton E. Cramer,[*] Nicholas J. Johnson,[**] and George A. Mocsary[***]*

INTRODUCTION

The lingering question following the U.S. Supreme Court's decision in *District of Columbia v. Heller*[1] is whether the Court will employ the Fourteenth Amendment to incorporate the newly confirmed right to keep and bear arms as a limitation on states.[2] The answer will hinge substantially on the Court's assessment of the intent and purpose of the Fourteenth Amendment with regard to the right to keep and bear arms. Discerning such intent requires detailed evaluation of the context within which the amendment emerged and the understanding of the right to keep and bear arms at the time.

This is a historical assessment that poses a threshold methodological question. Whose views on these matters should we credit? Should we privilege the drafters, the signers, opinions expressed in newspaper accounts?

---

[*] Adjunct History Faculty, College of Western Idaho. Sonoma State University, M.A. History, 1998; Sonoma State University, B.A. History, *cum laude*, with distinction, 1994. Cramer is the author of *For the Defense of Themselves and the State* (1994), *Concealed Weapon Laws of the Early Republic: Dueling, Southern Violence, and Moral Reform* (1999), *Armed America: The Remarkable Story of How and Why Guns Became as American as Apple Pie* (2006), as well as co-author of Clayton E. Cramer & Joseph Edward Olson, *What Did "Bear Arms" Mean in the Second Amendment?*, 6 GEO. J.L. & PUB. POL'Y 511 (2008), cited by Justice Antonin Scalia in *District of Columbia v. Heller*, 128 S. Ct. 2783, 2795 (2008).

[**] Professor, Fordham University School of Law. West Virginia University, B.S., B.A., *magna cum laude*, 1981; Harvard Law School, J.D. 1984.

[***] Law Clerk to the Honorable Harris L Hartz, U.S. Court of Appeals for the Tenth Circuit; Fordham University School of Law, J.D., *summa cum laude*, 2009; University of Rochester Simon School of Business, M.B.A., 1997. Thanks to Gregory Townsend, Reference Librarian, for his research assistance.

[1] 128 S. Ct. 2783 (2008).

[2] Immediately on the heels of *Heller*, plaintiffs filed claims challenging state and local laws that plausibly infringed on the right to keep and bear arms. *See, e.g.*, Brief for Appellant at 25-27, Nat'l Rifle Ass'n of Am., Inc. v. Vill. of Oak Park, 567 F.3d 856 (7th Cir. 2009), *cert. granted sub nom.* McDonald v. Chicago, 130 S. Ct. 48 (2009) (mem.) (No. 08-1521). These claims raise a variety of issues and implicate a range of interpretative methodologies and perspectives. Michael Kent Curtis offers a rich summary of the multiple perspectives from which we might draw answers in *The Bill of Rights and the States Revisited After* Heller, 60 HASTINGS L.J. 1445, 1448-50 (2009).

Electronic copy available at: http://ssrn.com/abstract=1585451

The predominant originalist theory today is original public meaning.[3] "Theories of original public meaning, in contrast to original intent, interpret the Constitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment."[4] This Essay adopts that methodology.

Assessing the constitutional right to arms in the context of the Fourteenth Amendment is different from assessing it purely as a matter of Second Amendment originalism. Things change. Cultures evolve. When those changes lead to modifications of governing political documents, our understanding of those documents must reflect the changed context. This is *not* living constitutionalism wherein social change drives continuously evolving conceptions of constitutional boundaries. Instead it is an acknowledgment that the public understanding in 1866 of the right to arms protected by the Fourteenth Amendment might be different from the public understanding in 1791 of that same right. The public meaning of 1866 is a fixed point of reference that generates the interesting possibility that originalism may give the Second Amendment one meaning when applied to the federal government, and a different meaning when applied to the states, through the Fourteenth Amendment.[5] Professor Akhil Reed Amar, for example, argues that the right to keep and bear arms in 1791 was focused substantially on the dangers of a strong standing army. By 1866, when the authors of the Fourteenth Amendment were proposing to extend the Bill of Rights to apply to the states, Amar argues, they "were hardly in the mood to rail against a federal standing army; these men, after all, wanted to use precisely such an army to reconstruct recalcitrant southern states."[6]

> [The] words "the right . . . to keep and bear arms" take on a different coloration and nuance when they are relabeled "privileges or immunities of citizens" rather than "the right of the people," and when they are severed from their association with a well-regulated militia. To recast the textual point as a historical one, the core applications and central meanings of the right to keep and bear arms and other key rights were very different in 1866 than in 1789. . . .

---

[3]   John O. McGinnis & Michael B. Rappaport, *Original Methods Originalism: A New Theory of Interpretation and the Case Against Construction*, 103 NW. U. L. REV. 751, 761 (2009).

[4]   *Id.*

[5]   *See also* Josh Blackman & Ilya Shapiro, *Keeping Pandora's Box Sealed: Privileges or Immunities, the Constitution in 2020, and Properly Extending the Right to Keep and Bear Arms to the States*, 8 GEO. J.L. & PUB. POL'Y (forthcoming 2010) (contending that originalism at the right time "demands that the interpreter select the proper temporal location in which to seek the text's original public meaning. . . . Federal protection against state encroachments on individual liberty began with the ratification of the Fourteenth Amendment. 1868 is thus the proper temporal location for applying a whole host of rights to the states, including the right that had earlier been codified as the Second Amendment as applied against the federal government. Interpreting the right to keep and bear arms as instantiated by the Fourteenth Amendment—based on the original public meaning in 1791—thus yields an inaccurate analysis.").

[6]   AKHIL REED AMAR, THE BILL OF RIGHTS: CREATION AND RECONSTRUCTION 216 (1998).

Electronic copy available at: http://ssrn.com/abstract=1585481

> [W]e must first and foremost reflect on the meaning and the spirit of the amendment of 1866, not the Bill of 1789.[7]

This Essay pursues in detail the public meaning of the "right to keep and bear arms" during the period leading up to enactment of the Fourteenth Amendment. It elaborates five broad categories of original public meaning. Part I examines nineteenth century scholarly commentary and case law. Part II examines popular understandings of the Second Amendment as the militia declined in importance and the struggle over abolition of slavery took center stage. Part III examines Civil War era claims about the meaning of the Second Amendment. Part IV details how Reconstruction and the Black Codes energized debate about the right to keep and bear arms. Part V reviews the debate and enactment of the Fourteenth Amendment, as it relates to the constitutional right to arms.

I.   BETWEEN THE RATIFICATIONS: ORIGINAL PUBLIC MEANING OF THE
     SECOND AMENDMENT—COMMENTARY AND CASE LAW IN THE
     NINETEENTH CENTURY

There is abundant evidence about the public understanding of the Second Amendment between 1791 and the Civil War. Nearly all scholarly commentary and most case law viewed the "right of the people" in the Second Amendment to be an individual liberty,[8] like other constitutional rights enjoyed by the people. There was something of a divide as to the *purpose* of the right. Some articulated its purpose as resistance to tyranny—a conception of the right that protected the option of political violence. Even with this public purpose, the right was individual.[9] Others acknowl-

---

[7]   *Id.* at 223.

[8]   Justice Scalia noted in *Heller* that "[w]e have found only one early 19th-century commentator who clearly conditioned the right to keep and bear arms upon service in the militia—and he recognized that the prevailing view was to the contrary." District of Columbia v. Heller, 128 S. Ct. 2783, 2807 (2008) (quoting BENJAMIN L. OLIVER, THE RIGHTS OF AN AMERICAN CITIZEN 177 (Boston, Marsh, Capen & Lyon 1832)). *See also infra* note 10.

[9]   The Supreme Court, in adopting the individual rights view of the Second Amendment while acknowledging its tyranny-control purpose, effectively confirmed what scholars have been saying for some time: that the Second Amendment's tyranny-control purpose was consistent with, and perhaps even required, the individual ownership of arms. *Heller*, 128 S. Ct. at 2798-99, 2801-02, 2805-07 (discussing how the tyranny-control aspects of the Second Amendment were served by individual rights adopted by the Court); *see also* Stephen P. Halbrook, *The Right of the People or the Power of the State: Bearing Arms, Arming Militias, and the Second Amendment*, 26 VAL. U. L. REV. 131, 134-35 (1991) (describing the adoption of the Second Amendment as a distinctly individual right, as opposed to a state power, which often intersected with the Founders' concerns about tyranny); David B. Kopel, *The Second Amendment in the Nineteenth Century*, 1998 BYU L. REV. 1359, 1362-70 (discussing a plethora of nineteenth century commentaries and caselaw); George A. Mocsary, Note, *Explaining Away the Obvious: The Infeasibility of Characterizing the Second Amendment as a Nonindividual Right*, 76

Electronic copy available at: https://ssrn.com/abstract=1585461

edged the purpose of resisting tyranny, but explicitly recognized that the right also included individual self-defense. With a few remarkable exceptions, none of the case law or commentary explicitly rejects the idea of a right to arms for individual self-defense.

Most early constitutional commentaries articulate an individual right to keep and bear arms. St. George Tucker's 1803 gloss on Blackstone's *Commentaries on the Laws of England*, William Rawle's 1829 *A View of the Constitution*, and Justice Joseph Story's *Commentaries on the Constitution of the United States* present an individual right explicitly intended to enable resistance to tyranny.[10] This view reflects the expectation that the people from whom the militia is drawn would appear bearing their own private arms.[11]

Tucker's edition of Blackstone's *Commentaries* lists the Second Amendment, and contrasts the right it protects with the more limited guarantee of the English Bill of Rights of 1689: "[A]nd this without any qualification as to their condition or degree, as is the case in the British government."[12]

William Rawle's analysis is more detailed:

> The corollary from the first position is, that *the right of the people to keep and bear arms shall not be infringed.*

> . . . .

> The prohibition is general. No clause in the constitution could by any rule of construction be conceived to give to congress a power to disarm the people. Such a flagitious attempt could only be made under some general pretense by a state legislature. But if in any blind pursuit of inordinate power, either should attempt it, this amendment may be appealed to as a restraint on both.

---

FORDHAM L. REV. 2113, 2154-75 (2008) (analyzing the Second Amendment from a primarily founding-era viewpoint assuming the tyranny-control model as its primary purpose, and concluding that "[p]roperly understanding 'well regulated Militia' to refer to the armed and ready body of the people, and considering the Founders' concern with tyranny, the Second Amendment can be translated into modern parlance: 'Armed and ready citizens being necessary to prevent tyranny, the right of the people to keep and bear arms shall not be infringed.'").

[10]   Justice Stevens, dissenting in *Heller*, argued that "[t]here is not so much as a whisper in the passage above that Story believed that the right secured by the Amendment bore any relation to private use or possession of weapons for activities like hunting or personal self-defense." *Id.* at 2840 (Stevens, J., dissenting). The majority rejects this argument because Story equated the Second Amendment with the "right to bear arms" in the English Bill of Rights, which in turn had nothing to do with militia service and was clearly an individual right. *Id.* at 2806-07 (majority opinion).

[11]   Pursuing the question in the modern era, the U.S. Supreme Court in *United States v. Miller*, 307 U.S. 174 (1939), and recently in *Heller*, acknowledged this aspect of the individual right. *Heller*, 128 S. Ct. at 2799-2800 (citing *Miller*, 307 U.S. at 179).

[12]   2 WILLIAM BLACKSTONE, COMMENTARIES *143-44 n.40.

Electronic copy available at: https://ssrn.com/abstract=1585461

. . . .

> This right ought not, however, in any government, to be abused to the disturbance of the public peace.[13]

Justice Story emphasizes that while the purpose is to allow the people to rise up against a tyrannical government, this is a "right of the citizens," not a right of the states, or of the militia:

> The right of the citizens to keep and bear arms has justly been considered, as the palladium of the liberties of a republic; since it offers a strong moral check against the usurpation and arbitrary power of rulers; and will generally, even if these are successful in the first instance, enable the people to resist and triumph over them.[14]

Rawle's commentary also adds a significant new dimension to this general theme. He viewed the Second Amendment as a limitation not only on the federal government, but also on the states. This amplifies the point that he does not conceive of it as a state right. As discussed below, this aspect of Rawle's view may have been a minority view, but it was hardly unique.

The one commentator of the period who argues against an individual right for self-defense, Benjamin L. Oliver, still acknowledges that this is the dominant understanding:

> The provision of the constitution, declaring the right of the people to keep and bear arms, &c. was *probably* intended to apply to the right of the people to bear arms for such purposes only, and not to prevent congress or the legislatures of the different states from enacting laws to prevent the citizens from always going armed. *A different construction however has been given to it.*[15]

Oliver's objection to the individual right construction is evidently a point of policy. He amplifies the primary point with a lengthy and passionate criticism of the "common practice in some parts of the United States" of carrying concealed deadly weapons.[16] "This cowardly and disgraceful practice, *if it is really unconstitutional to restrain it by law*, ought to be discountenanced by all persons who are actuated by proper feelings of humanity or a just regard for the dictates of religion."[17]

---

[13]   WILLIAM RAWLE, A VIEW OF THE CONSTITUTION OF THE UNITED STATES OF AMERICA 122-23 (Phila., H. C. Carey & I. Lea 1825) (emphasis added).

[14]   3 JOSEPH STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1890, at 746-47 (Boston, Hilliard, Gray & Co. 1833) (citing RAWLE, *supra* note 13, at 122-23). Story's understanding of the Second Amendment must have been pretty close to that of Tucker's and Rawle's because his citation for that sentence are the pages cited in the previous footnote.

[15]   BENJAMIN L. OLIVER, THE RIGHTS OF AN AMERICAN CITIZEN 177 (Boston, Marsh, Capen & Lyon 1832) (emphasis added).

[16]   *Id.* at 177-79.

[17]   *Id.* at 177 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=1585461

A textbook on the U.S. Constitution published during this period articulates the tyranny-control model (as well as the benefits of rapid response to external attack). While not as explicit as other statements of the time, its use of the term "citizens" suggests an individual right rather than a collective or state right to maintain a militia:

> "ARTICLE II A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."
>
> . . . .
>
> § 622. If citizens are allowed to keep and bear arms, it will be likely to operate as a check upon their rulers, and restrain them from acts of tyranny and usurpation. The necessity of maintaining a large standing army is also diminished by arming and disciplining the citizens generally, so that they may be ready and qualified at any time, to defend the country in a sudden emergency.[18]

From our modern perspective, the search for case law concerning the right to arms during this period is curious. There is a dearth of federal gun control laws in the antebellum period. Except for the Militia Acts of 1792 and 1803, which *required* every "free white male citizen" between the ages of eighteen and forty-five to own a gun, there were not many gun control questions to litigate.[19] Consequently, there are very few federal court decisions in this period that address the Second Amendment. In a few cases the individual right to arms is referenced by comparison. For example, *United States v. Sheldon*[20] analogizes the right to arms to the First Amendment. Sheldon was prosecuted for falsely reporting a court case, and fined for contempt of court. Sheldon argued that the First Amendment protected his freedom of expression. The Michigan Territorial Supreme Court ruled that "[t]he constitution of the United States also grants to the citizen the right to keep and bear arms. But the grant of this privilege cannot be construed into the *right in him who keeps a gun to destroy his neighbor*."[21] In *Johnson v. Tompkins*,[22] Justice Henry Baldwin operating as a circuit judge acknowledged that the plaintiff Johnson had a right to recapture a runaway slave in Pennsylvania. In determining whether Johnson's tactics for reclaiming his slave had broken Pennsylvania law, Baldwin listed several rights that John-

---

18  FURMAN SHEPPARD, THE CONSTITUTIONAL TEXT-BOOK 245 (Phila., Childs & Peterson 1855).

19  Militia Act of 1803, ch. 15, 2 Stat. 207 (current version at 10 U.S.C. §§ 331-35 (2006)); Militia Act of 1792, ch. 33, 1 Stat. 271 (current version at 10 U.S.C. §§ 331-35).

20  5 Blume Sup. Ct. Trans. 337 (Mich. 1829).

21  *Id.* at *12 (emphasis added).

22  13 F. Cas. 840 (C.C.D. Pa. 1833) (No. 7416).

Electronic copy available at: https://ssrn.com/abstract=1585461

son enjoyed under both the U.S. and Pennsylvania constitutions—including a personal right to keep and bear arms.[23]

Legislation and litigation in the states is both more abundant and more complex. In the period 1813 to 1840 there was a burst of state laws, primarily in the Old Southwest, that either restricted concealed carry of deadly weapons, or banned sale of certain knives and concealable handguns.[24] One result of these laws is a series of state high court decisions that attempted to define the limits of the right to keep and bear arms. While most of these decisions are limited to right to arms provisions in state constitutions,[25] a number of them comment on the Second Amendment.

In 1842, the Arkansas Supreme Court decided a case that took a very narrow view of the right to arms under both the Second Amendment and the more restrictively-worded arms provision in the Arkansas Constitution. Chief Justice Ringo and Associate Justice Dickinson issued separate opinions that came to the same conclusion: the state's authority to prohibit concealed carrying of deadly weapons did not violate the Second Amendment. Ringo's opinion urged that the Second Amendment protected only a right of the "free white men of this State" to be armed "for the preservation and defense of the State and her republican institutions."[26] While Ringo appears to have assumed a right of individuals to *keep* arms appropriate for militia duty, he was evidently hostile to the right to *bear* arms for self-defense.[27]

It is difficult to determine which of Ringo's arguments apply only to the Second Amendment, which apply to the Arkansas Constitution's more narrow "for their common defence" arms guarantee, and how much to credit his advocacy of the collective rights theme. He moves from a nearly sourceless claim of a collective right with respect to the Second Amendment to an acknowledgement that "the militia, without arms, however well disposed, might be unable to resist, successfully, the efforts of those who should conspire to overthrow the established institutions of the country, or subjugate their common liberties . . . ."[28] This second statement seems to acknowledge that the right to keep and bear arms limited the power of the government to disarm the population. The right was limited: it "surely was

---

[23]   *Id.* at 850 (holding that both the Pennsylvania Constitution and Second Amendment's "right to keep and bear arms" were personal rights enjoyed by Johnson).

[24]   *See* CLAYTON E. CRAMER, CONCEALED WEAPON LAWS OF THE EARLY REPUBLIC: DUELING, SOUTHERN VIOLENCE, AND MORAL REFORM 2-3, 17-46 (1999) (discussing the cultural factors involved in restricting deadly weapons).

[25]   *See* CLAYTON E. CRAMER, FOR THE DEFENSE OF THEMSELVES AND THE STATE: THE ORIGINAL INTENT AND JUDICIAL INTERPRETATION OF THE RIGHT TO KEEP AND BEAR ARMS 71-87 (1994) (summarizing most of these state supreme court decisions, as well as raising questions of causation that are answered in CRAMER, *supra* note 24).

[26]   State v. Buzzard, 4 Ark. 18, 26-27 (1842).

[27]   *See id.* at 25.

[28]   *Id.* at 24-25.

Electronic copy available at: https://ssrn.com/abstract=1585461

not designed to operate as an immunity to those who should so keep or bear their arms as to injure or endanger the private rights of others, or in any manner prejudice the common interests of society."[29] Even if we ignore the federalism context and glibly conclude that the Second Amendment protects a right to arms only for common defense (as the Arkansas Constitution's more narrow guarantee provided), we still come back to the definition of militia as constituting the people bearing their own private arms.

Associate Justice Dickinson's concurrence came to the same conclusion, arguing that "[t]he militia constitutes the shield and defense for the security of a free State; and to maintain that freedom unimpaired, arms and the right to use them for that purpose are solely guaranteed."[30] Dickinson also appears to argue that there was no personal right of self-defense: "The personal rights of the citizen are secured to him through the instrumentality and agency of the constitution and laws of the country; and to them he must appeal for the protection of his private rights and the redress of private injuries."[31] This is a remarkable claim—an assertion that the government could, if it so chooses, criminalize self-defense even if such self-defense was necessary to prevent death. It is a fully Hobbesian view of the authority of the state over individuals—in a nation predominately grounded on Lockean principles.

Associate Justice Lacy dissented and urged an individual self-defense right construction:

> I cannot separate the political freedom of the State from the personal rights of its citizens. They are indissolubly bound up together in the same great bond of union, and, to my mind, they are incapable of division. . . . Among these rights, I hold, is the privilege of the people to keep and bear their private arms for the necessary defense of their person, habitation and property, or for any useful or innocent purpose whatever. We derive this right from our Anglo-Saxon ancestors, and under the form of that government it has ever been regarded as sacred and inviolable.[32]

None of these three opinions referenced any contemporaneous scholarly commentary. The opinions reasoned instead from case law and the text of arms provisions in other state constitutions (provisions that generally were textually very different from the Second Amendment) and the Arkansas Constitution's arms guarantee.

---

29   *Id.* at 25.
30   *Id.* at 32. (Dickinson, J., concurring).
31   *Id.*
32   *Buzzard*, 4 Ark. at 42-43 (Lacy, J., dissenting). U.S. Supreme Court Associate Justice James Wilson discussed the somewhat similar statement of the Anglo-Saxon origin of the right of bearing arms with respect to self-defense and the arms guarantee in the 1790 Pennsylvania Constitution. 3 JAMES WILSON, THE WORKS OF THE HONOURABLE JAMES WILSON, L.L.D. 84 (Bird Wilson, ed., Phila., Bronson & Chauncey 1804).

Electronic copy available at: https://ssrn.com/abstract=1585461

*State v. Buzzard*[33] is widely cited after the Civil War by courts attempting to uphold weapons restrictions. This is not because *Buzzard* was the mainstream view. Rather, it is because *Buzzard* is one of the few precedents available to justify the postbellum laws aimed primarily at disarming freedmen.[34]

The vast majority of the antebellum decisions recognize an individual right to bear arms at least in part for self-defense, and fall into one of three categories: (1) the Second Amendment applies only to the federal government—although these decisions either explicitly or implicitly treat it as an individual right, (2) the state constitutional guarantee in question limits (although does not completely block) the authority of the state to regulate the bearing of arms, and (3) the Second Amendment or the state constitutional guarantee in question does not apply to blacks.

*State v. Newsom*[35] illustrates the first and third themes. Elijah Newsom challenged his conviction under a state law requiring free blacks to have a license to possess deadly weapons. Newsom's appeal argued that such a law violated the Second Amendment and the North Carolina Constitution's similar guarantee of an individual right. Newsom, a free black man, had been convicted of carrying a shotgun without a license. The North Carolina Supreme Court had already recognized that the state constitution protected an individual right to keep and bear arms.[36]

The court disposed of the Second Amendment question by asserting that "[t]he limitations of power, contained in it and expressed in general terms, are necessarily confined to the General Government."[37] Citing *Barron v. Baltimore*,[38] the court explained that "[i]n Article II of the amended Constitution the States are neither mentioned nor referred to. It is, therefore, only restrictive of the powers of the Federal Government."[39] The court dismissed Newsom's parallel claim with respect to the North Carolina Constitutional arms guarantee. The court did not dispute that the North Carolina provision protected an individual right. It simply argued that this right belonged only to white people.[40]

---

33   4 Ark. 18 (1842).

34   See CRAMER, *supra* note 25, at 97-164, for an overview of postbellum arms decisions in state and federal courts.

35   27 N.C. 250 (1844).

36   State v. Huntley, 25 N.C. 418, 422-23 (1843) (upholding a conviction for the common law crime of "riding or going armed with unusual and dangerous weapons, to the terror of the people" in a case that might today be prosecuted for brandishing a firearm or assault with a deadly weapon).

37   *Newsom*, 27 N.C. at *251.

38   32 U.S. 243 (1833).

39   *Newsom*, 27 N.C. at *251.

40   *Id.* at *253-54. "The defendant is not indicted for carrying arms in defence of the State, nor does the act of 1840 prohibit him from so doing. Its only object is to preserve the peace and safety of the community from being disturbed by an indiscriminate use, on ordinary occasions, by free men of color,

Electronic copy available at: https://ssrn.com/abstract=1585461

The second general theme of the state cases embraces Rawle's view of the Second Amendment as a limit on state power. For example, in *Nunn v. State*,[41] Georgia's Supreme Court upheld a ban on concealed carry of deadly weapons, but struck down a ban on sales of concealable handguns. The court ruled that the Second Amendment protected open carry against both federal and state restrictions.[42]

Chief Justice Lumpkin's decision was part of a broader objection to *Barron v. Baltimore*'s decision that the first eight amendments limited only the federal government. It was a position that was contrary to Supreme Court precedent, but it was based on disagreement with the Court, not ignorance.[43] As we will see shortly, other state high courts believed that the Second Amendment protected an individual right against state encroachment.

Another aspect of Lumpkin's decision in *Nunn* helps illustrate the range of opinions about the nature of the right protected by the Second Amendment. At one point, he articulates a right that extends broadly to "the people."

> The right of the whole people, old and young, men, women and boys, and not militia only, to keep and bear *arms* of every description, and not *such* merely as are used by the *militia*, shall not be *infringed*, curtailed, or broken in upon, in the smallest degree . . . .[44]

But within a few paragraphs, he shifts to a focus on citizens and how legislation may not "deprive the citizen of his *natural* right of self-defence, or of his constitutional right to keep and bear arms."[45]

The implications of the distinction between a right of the people and a right of citizens are evident. Two years after *Nunn*, in *Cooper v. Savannah*,[46] the Supreme Court of Georgia confronted the question of what rights blacks enjoyed under the Georgia Constitution. The court ruled that "[f]ree persons of color have never been recognized here as citizens; they are not entitled to bear arms, vote for members of the legislature, or to hold any civil office."[47] The court recognized a right to arms rooted in the Georgia

---

of fire arms or other arms of an offensive character. Self preservation is the first law of nations, as it is of individuals." *Id.*

41   1 Ga. 243 (1846).

42   *Id.* at 251.

43   AMAR, *supra* note 6, at 153-56 (showing that a contrarian argument that the Bill of Rights represented a common law tradition appears not only in *Nunn*, and Lumpkin's *Campbell v. State*, 11 Ga. 353 (1852), but also in the plaintiff's arguments in *Holmes v. Jennison*, 39 U.S. 540 (1840), arguing that *Barron* was wrongly decided).

44   *Nunn*, 1 Ga. at 250-51.

45   *Id.* at 251.

46   4 Ga. 68 (1848).

47   *Id.* at 72. Either this ordinance, or a very similar predecessor, was the basis for *A Fact*, LIBERATOR, Mar. 26, 1831, at 51, to suggest that a Massachusetts free black citizen can move to Savan-

Electronic copy available at: https://ssrn.com/abstract=1585461

Constitution and the Second Amendment that extended to "old and young, men, women and boys."[48] The right was decidedly individual said the court. But it did not extend to blacks.

The view of the Second Amendment as an individual right restricting state law is amplified by three decisions from the Louisiana Supreme Court handed down in the 1850s. In *State v. Chandler*[49] the court ruled that the Second Amendment was a limitation on state legislation.[50] At that time there was no right to arms provision in the Louisiana Constitution.[51] The statute ultimately survived the challenge because it only prohibited *concealed* carry:

> It interfered with no man's right to carry arms (to use its own words) "in full open view," which places men upon an equality. This is the right guaranteed by the Constitution of the United States, and which is calculated to incite men to a manly and noble defence of themselves, if necessary, and of their country, without any tendency to secret advantages and unmanly assassination.[52]

Louisiana Supreme Court decisions in 1856 and 1858 took similar positions. The first, *Smith v. State*,[53] involved a challenge to Louisiana's ban on concealed weapons based on the claim that a pistol in the pocket was only partially concealed, and was therefore protected by the Second Amendment.[54] The court held that the concealed weapon statute applied to any weapon that was not fully exposed:

> The statute against carrying concealed weapons does not contravene the second article of the amendments of the Constitution of the United States. The arms there spoken of are such as are borne by a people in war, or at least carried openly. The article explains itself. It is in these words: "A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed." This was never intended to prevent the individual States from adopting such measures of police as might be necessary, in order to protect the orderly and well disposed citizens from the treacherous use of weapons not even designed for any purpose of public defence, and used most frequently by evil-

---

nah and challenge the statute as violating the "privileges and immunities" clause of Article IV of the U.S. Constitution, implying that certain rights were fundamental, and not simply a guarantee of equal treatment for both residents and non-residents.

48   *Nunn*, 1 Ga. at 251.
49   5 La. Ann. 489-91 (1850).
50   *Id.* at 490.
51   Louisiana adopted its first arms-bearing constitutional provision in 1879. Nicholas J. Johnson, *A Second Amendment Moment: The Constitutional Politics of Gun Control*, 71 BROOK. L. REV. 715, 742 & n.143 (2005). By 2003, a total of forty-four state constitutions had arms-bearing provisions. *Id.* at 724.
52   *Chandler*, 5 La. Ann. at 489-90.
53   11 La. Ann. 633 (1856).
54   *Id.* at 633.

Electronic copy available at: https://ssrn.com/abstract=1585461

disposed men who seek an advantage over their antagonists, in the disturbances and breaches of the peace which they are prone to provoke.[55]

The message of *Smith* is moderately contestable because of the reference to arms borne in war.[56] But that ambiguity is resolved by its position in sequence between *Chandler* (which is unequivocal on the individual nature of the right) and *State v. Jumel*.[57] In *Jumel*, the defendant challenged his conviction for carrying a concealed weapon both based on the statute of limitations (more than six months had elapsed between the offense and being charged), and that the Second Amendment protected his carrying of a weapon.[58] The primary question was not the nature of the Second Amendment right but its boundaries. Recognizing that some regulation of the individual right was necessary to public safety, the court held "[t]he statute in question does not infringe the right of the people to keep or bear arms. It is a measure of police [regulation]*, prohibiting only a *particular* mode of bearing arms which is found dangerous to the peace of society."[59]

The right articulated in these cases is not unlimited. Legislatures might restrict individuals from carrying concealed weapons, but laws that prohibited open carry faced a much more stringent burden. The type of weapons protected trends more toward weapons used in warfare, as contrasted with the treacherous tools of "unmanly assignation." But the focus on arms privately held shows that the right was conceived as individual in nature.

The last of the antebellum decisions to express an opinion concerning the Second Amendment is the 1859 decision by the Supreme Court of Texas in *Cockrum v. State*.[60] There, the court upheld a sentence enhancement of life in solitary for manslaughter committed with a Bowie knife.[61] Because the sentence enhancement keyed on a cheap and common class of weapon, counsel argued it was a form of class discrimination,[62] and that the "right of bearing arms" (though not the right to use them for manslaughter) was protected by both the Second Amendment and the Texas Constitution's arms

---

55   *Id.*

56   In arguments about the original meaning of the Second Amendment, Justice Stevens' dissent in *Heller* argued that bearing arms has a particularly military connotation that supports a purely collective or state right interpretation of the Second Amendment. District of Columbia v. Heller, 128 S. Ct. 2783, 2827-28 (2008) (Stevens, J., dissenting). However, the Louisiana Supreme Court's addition "or at least carried openly" undercuts that view. *Smith*, 11 La. Ann. at 634; *see also* Cramer & Olson, supra note *, at 517-19 (destroying the claim that "bear arms" has a particularly military connotation).

57   13 La. Ann. 399 (1858).

58   *Id.* at 399-400.

59   *Id.* (emphasis added).

60   24 Tex. 394 (1859).

61   *Id.* at 395-96.

62   *Id.* ("A common butcher-knife, which costs not more than half a dollar, comes within the description given of a bowie-knife or dagger, being very frequently worn on the person. To prohibit such a weapon, is substantially to take away the right of bearing arms, from him who has not money enough to buy a gun or a pistol.").

Electronic copy available at: https://ssrn.com/abstract=1585461

guarantee.[63] The court's discussion of the Second Amendment claim appears to recognize both an individual right for the purposes of tyranny control, and arguably, a collective view of the right:

> The object of the clause first cited, has reference to the perpetuation of free government, and is based on the idea, that the people cannot be effectually oppressed and enslaved, who are not first disarmed. The clause cited in our bill of rights, has the same broad object in relation to the government, and in addition thereto, secures a personal right to the citizen. The right of a citizen to bear arms, in the lawful defense of himself or the State, is absolute.[64]

The court was clearly uncomfortable with the nature of the weapon—ascribing capabilities to Bowie knives that bear a striking similarity to current concerns about scary-looking semiautomatic weapons. And yet, they acknowledged the right to carry such weapons:

> *The right to carry a bowie-knife for lawful defense is secured, and must be admitted.* It is an exceeding destructive weapon. It is difficult to defend against it, by any degree of bravery, or any amount of skill. The gun or pistol may miss its aim, and when discharged, its dangerous character is lost, or diminished at least. The sword may be parried. With these weapons men fight for the sake of the combat, to satisfy the laws of honor, not necessarily with the intention to kill, or with a certainty of killing, when the intention exists. *The bowie-knife differs from these in its device and design; it is the instrument of almost certain death.*[65]

On the question of the Second Amendment, *Cockrum* poses the perpetual question that plagues militia-centered conceptions of the Second Amendment: do references to collective defense, tyranny control, or political violence, necessarily mean that the guns borne for these political aims are to be "kept" only by the state? Note that their claim would be that this is about state governments resisting the national government's tyranny. Also this point launches us down the slope of how many citizens are needed to stage legitimate political violence. Or shall the arms be kept by individuals, who when called for militia service shall appear bearing arms provided by themselves in common use at the time?[66]

If the Second Amendment protected a purely collective right, or an individual right subject to governmental control over the militia[67] the Supreme Court of Texas should have flatly dismissed Cockrum's Second Amendment claim: he was not armed with a butcher knife, nor did he kill another person, as part of militia duty. The court's failure to dismiss the argument suggests several aspects of how the court understood the Second Amendment. The Second Amendment limited state authority to regulate the

---

[63] *Id.* at 396.

[64] *Id.* at 401.

[65] *Id.* at 402 (emphasis added).

[66] *See* District of Columbia v. Heller, 128 S. Ct. 2783, 2815 (2008); *see also* United States v. Miller, 307 U.S. 174, 179 (1939).

[67] *See Heller*, 128 S. Ct. at 2822-47 (Stevens, J., dissenting).

Electronic copy available at: https://ssrn.com/abstract=1585461

bearing of arms—and not limited to bearing arms as part of a militia. The precise nature of that right is left open.

Once it is decided that the Second Amendment applies to the state, the pure collective rights view seems untenable. The reason is structural: the collective rights argument is essentially a claim about the federalist bargain at the core of our Constitution. It asserts that the Second Amendment simply prevents the federal government from disarming state militias. That view (rejected by *Heller*) only makes sense in the context of a dispute about federal power. When applied to the states, the collective rights theory devolves into nonsense—a view that the Second Amendment prohibits the *state* from infringing on the *state's own right* to arm the *state's own militia*.

The scholarly commentary and judicial decisions of the antebellum period demonstrate that Americans recognized at least two different, not necessarily exclusive, purposes for the Second Amendment. One objective was to protect an individual right to preserve the potential for collective political violence, so that "being armed, they may as a body rise up to defend their just rights, and compel their rulers to respect the laws."[68] The other purpose was private self-defense—protection within the boundaries of what the Louisiana Supreme Court called "a manly and noble defence of themselves."[69]

II.  POPULAR UNDERSTANDINGS OF THE SECOND AMENDMENT: ABOLITIONISM, THE FUGITIVE SLAVE ACT, AND BLEEDING KANSAS

Judges are not the only, and perhaps not even the primary, sources of information about the public understanding of the right to bear arms at the time of the Fourteenth Amendment. In a variety of contexts, public officials and private citizens in the nineteenth century discuss and describe the constitutional right to arms in predominately individual terms. Both the political violence/tyranny-control and private self-defense purposes continued to be advanced. However, consistent with Akil Amar's surmise, articulation of the political violence purpose diminishes around the Civil War while private self-defense rationales become dominant.

---

[68]  This is the Tennessee Supreme Court's explanation of the Tennessee Constitution's somewhat more narrowly written arms guarantee in *Aymette v. State*, 21 Tenn. (2 Hum.) 154, 157 (1840). While *Aymette* denied that the right to keep and bear arms protected an individual right to self-defense, this decision was based on the more restrictive "for their common defence" language. TENN. CONST. of 1834, art. I, § 26.

[69]  *State v. Chandler*, 5 La. Ann. 489, 490 (1850). The Georgia and Louisiana Supreme Courts found that the right was not unlimited; concealed carry could be regulated or prohibited—a position that in the latter half of the nineteenth century became increasingly the norm. *Nunn v. State*, 1 Ga. 243, 250-51 (1846); *Smith v. State*, 11 La. Ann. 633, 633 (1856); *see also* CRAMER, *supra* note 25, 141-64 (providing a detailed examination of the development of case law and constitutional provisions that usually recognized that concealed carry could be regulated or even banned as long as open carry was allowed).

Electronic copy available at: https://ssrn.com/abstract=1585461

Some articulated understandings of the Second Amendment in the first part of the nineteenth century focus on the Amendment's public violence purpose, because of the militia context in which they appear. Recall that this purpose can be pursued either through an individual right (under the traditional conception of militia as the people bearing their own private arms) or arguably through a variety of collective rights theories where government has full control of all the arms. An 1832 report from the New York adjutant-general, unsurprisingly, focuses on the tyranny control model.[70] It describes how unusual the U.S. militia system was compared to other countries:

> In most other countries it is a practical rule of government to limit as much as possible the influence of all, who live under it, over its measures and movements, and to arm and discipline such only as are in its pay and under its control. The spirit of our political organization, on the other hand, is, by extending as far as possible the right of suffrage, to subject the measures and operations of government to the influence of the greatest possible number, and, by arming and disciplining every citizen, to be prepared to sustain in all emergencies, by the united force of the whole community, a system instituted for the benefit of the whole.[71]

As a consequence, the system required "that every citizen shall be armed, and that he shall be instructed also in the use of arms."[72] The report also argued "it is doubted by the most sagacious observers whether our civil liberties could be maintained for a length of time without the influence and protection of a militia."[73] What made the militia "dangerous to the existence of an arbitrary government, render it indispensable to the existence of ours."[74] Finally, the report draws the connection to the Second Amendment:

> That this was the opinion of the original parties to the constitution of the United States, is apparent from the second article of the amendments of that instrument, which assumes that "a well-regulated militia" is "necessary to the security of a free state," and declares that "the right of the people to keep and bear arms shall not be infringed;" showing that the militia was designed by those who had the largest share in its institution, not merely as a support to the public authority, but, in the last resort, as a protection to the people against the government itself.[75]

Like Tucker, Rawle, Story, and Oliver, the adjutant-general saw the militia system as a fundamental part of our government—something that could not be excised without serious damage: "So intimately, indeed, are they all in-

---

[70]  SENATE OF THE STATE OF N.Y., REPORT OF THE ADJUTANT-GENERAL, Vol. 1, Issue 4, at 2 (1832) [hereinafter ADJUTANT-GENERAL REPORT].

[71]  Id.

[72]  Id.

[73]  Id.

[74]  Id.

[75]  Id.

Electronic copy available at: https://ssrn.com/abstract=1585461

terwoven with each other, that the connexion which exists between them could not be dissolved without impairing the strength of the whole fabric."[76]

As the century progressed, enthusiasm for and attention to the militia system declined.[77] At the same time, the declining legal status of free blacks, and the growing abolition movement, prompts a robust articulation of the Second Amendment as a guarantee of arms for private self-defense. The struggle over the rights of free blacks, which grew along with the abolition movement,[78] led to this 1838 complaint from black Ohioans about laws that sought to prevent free blacks from entering the state:

> Nor were the projectors of this measure satisfied with casting them out beyond the protection of law, and depriving them of the means of obtaining a lawful subsistence; but they made it the duty of the officers of townships to remove them by force out of the state, for disobedience to these laws. By the same process of legislation, every right secured by the constitution may be taken from the citizens of the state. The right of suffrage, *the right to bear arms*, the right of the people to assemble together and consult for the common good; the right to speak, write, and print upon any subject, might be trameled with such conditions, as to preclude their free exercise by a large portion of the citizens to whom they are secured. There is no greater security given for the right of suffrage, to those who now enjoy it, by the constitution, than is given to all men of acquiring and protecting property, pursuing happiness and safety, and of enjoying personal liberty. The constitution was formed with a full knowledge that our population was comprised of white and colored persons.[79]

To this point, the complaint gives no basis for determining whether "the constitution" was that of Ohio, or of the United States. But the following sentences clarify that they are appealing to the U.S. Constitution—and making an argument that resonates with views decades later that the aim of the Fourteenth Amendment was to overturn *Dred Scott v. Sandford*:[80]

> The rights and privileges of the one class were as clearly defined and settled, and as sacredly secured, as the other, by that instrument. The discrimination was distinctly made and expressed in unequivocal terms, whenever it was intended to confer any political privileges upon the one, from whi[...] ... to the general government; the constitution of this state, and to the principles of our free institutions, are also in direct contravention of the constitution of the United States. That document declares, that 'the citizens of each shall be entitled to all the privileges and immunities of citizens in the several states. . . .' Was it not intended to secure to all the citizens, in each state, the right of ingress and egress to and from them, and the privileges of trade, commerce, and employment in

---

76   ADJUTANT-GENERAL REPORT, *supra* note 70, at 2.

77   Militia Act of 1862, ch. 201, 12 Stat. 597 (current version at 10 U.S.C. §§ 331-35 (2006)). *See generally* RICHARD H. KOHN, EAGLE AND SWORD: THE FEDERALISTS AND THE CREATION OF THE MILITARY ESTABLISHMENT IN AMERICA, 1783-1802, at 1-13 (1975) (examining in detail the decline of the militia system).

78   *See* CLAYTON E. CRAMER, BLACK DEMOGRAPHIC DATA, 1790-1860: A SOURCEBOOK 32-34, 43-49, (1997) (discussing Old Northwest immigration restrictions and "slave-dumping"); STEPHEN MIDDLETON, THE BLACK LAWS IN THE OLD NORTHWEST: A DOCUMENTARY HISTORY 15-18 (1993).

79   *Unconstitutional Laws of Ohio*, LIBERATOR, Apr. 6, 1838, at 53 (emphasis added).

80   60 U.S. (19 How.) 393 (1857).

Electronic copy available at: https://ssrn.com/abstract=1585461

> them, of acquiring and holding property, and sustaining and *defending life and liberty* in any state in the Union? Does it not form one of the conditions of our national compact?[81]

Later that year, *The Liberator* advances again the view that the Bill of Rights is a limitation on state laws, and explicitly ties these rights to the "privileges and immunities" clause:

> However, you must leave him by virtue of others, a few other incidentals, such as compulsory process for calling in all witnesses for him, of whatever color,— the inviolate right to be secure in person, house, papers and effects, against unreasonable searches and seizures; right of trial by jury in all cases over $20 value; the free exercise of religion, of speech, of the press, of peaceable assembly and of petition; the civil rights of republican government, which is guarantied to him in every State in this Union; the *privileges and immunities of citizens in every State* . . . . [82]

The reference to "right of trial by jury in all cases over $20 value" and "civil rights of republican government" suggests that the editorial writer is invoking the U.S. Constitution, not a state constitution. The quotation of the U.S. Constitution's Article IV, Section 2 "privileges and immunities in every State" leaves no doubt.[83] He continues with a claim to habeas corpus and then invokes the right to bear arms this way. "We will mention one more—that is the uninfringeable right to keep and bear arms."[84] A purely linguistic assessment of this statement might claim that the reference to the right to arms is still consistent with the political violence purpose of the Second Amendment and thus is contestably collective in nature. In context, as we will see, these are profoundly individual rights and individual self-defense conceptions of the Second Amendment.

   The Fugitive Slave Act of 1850 created a firestorm of popular upset. Many Northerners had regarded slavery as a regional issue of little concern to them. The new legal requirement to assist U.S. marshals in the capture of runaway slaves, and the extraordinary fines for those assisting runaways,[85] injected the slavery question more directly into the lives and politics of Northerners. As an idea and in application, the Fugitive Slave Act led to the growth and increasing militancy of the abolition movement. Advocates of nonviolent protest had long dominated *The Liberator*. Now, voices such as Lysander Spooner's appeared, promoting more aggressive solutions.[86] Some of this advocacy explicitly invokes the Second Amendment in a style that is hard to reconcile with a states' rights view:

---

81   *Id.* (emphasis added).

82   *The Claim of Property in Man*, LIBERATOR, Sept. 21, 1838, at 149 (emphasis added) [hereinafter *Claim of Property in Man*]; *see also* Curtis, *supra* note 2, at 1449-50.

83   *Claim of Property in Man*, *supra* note 82, at 149.

84   *Id.*

85   Fugitive Slave Act of 1850, ch. 60, § 7, 9 Stat. 462 (repealed 1864).

86   *E.g.*, Lysander Spooner, *The Fugitive Slave Bill*, LIBERATOR, Jan. 3, 1851, at 1.

Electronic copy available at: https://ssrn.com/abstract=1585461

> The constitution contemplates no such submission, on the part of the people, to the usurpations of the government, or to the lawless violence of its officers. On the contrary, it provides that '*The right of the people to keep and bear arms shall not be infringed.*' This constitutional security for '*the right to keep and bear arms,*' implies the right to use them—as much as a constitutional security for the right to buy and keep food, would have implied the right to eat it. The constitution, therefore, takes it for granted that, as the people have the right, they will also have the sense to use arms, whenever the necessity of the case justifies it.[87]

The New England Anti-Slavery Convention of 1853 articulated a similar view about the individual protections of the Bill of Rights, including the Second Amendment:

> Then there were other provisions in the Constitution. They had *personal guarantees of the most express and liberal kind*. Gentlemen had claimed, and he granted that the word 'persons' was sometimes intended to cover slaves. But the same interpretation of words must go all through any instrument which is subject to criticism; and so, if the word 'persons' was intended to mean slaves, in the representation clause, then all the guaranties of personal liberty given to 'persons' belong to slaves also. *The people were guarantied the right to bear arms, and, of course, by implication, to use them*; they were guarantied the right to assemble peaceably; the right of free discussion; the right to hold property.[88]

The struggle in the South against abolitionism led to trials alleging treason. As part of the political battle, in 1851, abolitionists reprinted St. George Tucker's discussion of the differences between English and American standards for judging treason. It advances the Second Amendment as a personal right:

> The same author observes elsewhere: "The very use of weapons by such an assembly, without the King's licence, unless in some lawful and special cases, carries a terror with it, and a *presumption* of warlike force," &c. The bare circumstance of having arms, therefore, of itself, creates a *presumption* of warlike force in England, and may be given in evidence there to prove *quo animo* the people are assembled. But ought that circumstance of itself to create any such presumption in America, *where the right to bear arms is recognised and secured in the Constitution itself? In many parts of the United States, a man no more thinks of going out of his house, on any occasion, without his rifle or musket in his hand, than an European fine gentleman without his sword by his side.*[89]

The fight for control over Kansas Territory by proslavery and abolitionist factions soon led to barbarous attacks and deprivations of civil liberties. As the crisis in Kansas Territory grew, speeches by politicians and statements by ordinary citizens demonstrate that the Second Amendment was widely understood to protect an individual right to not only possess arms for self-defense but to carry them, and not dependent in any way on

---

87　*Id.* (emphasis added).

88　*The New England Anti-Slavery Convention*, LIBERATOR, June 3, 1853, at 23 (emphasis added).

89　5 WILLIAM BLACKSTONE, COMMENTARIES *19, *reprinted in Judge Tucker on the Law of Treason*, NAT'L ERA, Oct. 30, 1851, at 173 (fourth emphasis added).

Electronic copy available at: https://ssrn.com/abstract=1585461

militia duty. Senator Charles Sumner's speech of May 19-20, 1856, claims the Second Amendment as a decidedly individual right to be armed:

> The rifle has ever been the companion of the pioneer, and, under God, his tutelary protector against the red man and the beast of the forest. Never was this efficient weapon more needed in just self-defence, than now in Kansas, and *at least one article in our National Constitution must be blotted out, before the complete right to it can in any way be impeached.* And yet, such is the madness of the hour, that, in defiance of the solemn guaranty, embodied in the Amendments of the Constitution, that *"the right of the people to keep and bear arms shall not be infringed"* the people of Kansas have been arraigned for keeping and bearing them, and the Senator from South Carolina has had the face to say openly, on this floor, that they should be disarmed—of course, that the fanatics of Slavery, his allies and constituents, may meet no impediment. Sir, the Senator is venerable with years . . . but neither his years, nor his position, past or present, can give respectability to the demand he has made, or save him from indignant condemnation, when, to compass the wretched purposes of a wretched cause, he thus proposes to trample on one of the plainest provisions of constitutional liberty.[90]

Bills proposed in Congress in June and July of 1856 reacting to the turmoil of "Bleeding Kansas" included a guarantee that the Bill of Rights would be respected in Kansas Territory. The list of rights in these bills corroborates later claims about what rights the Fourteenth Amendment was intended to impose on the states. These lists also show that the "right to keep and bear arms" along with other provisions of the Bill of Rights was understood as an individual right:

> And the people of said Territory shall be entitled to *the right to keep and bear arms*, to the liberty of speech and of the press, as defined in the constitution of the United States, and all other rights of person or property thereby declared and as thereby defined.[91]

> The bill provides that no law shall be of force or enforced in the Territory infringing the liberty of speech, or the liberty of the press, or *the right of the people to bear arms*, &c.[92]

> That inasmuch as the Constitution of the United States and the organic act of said Territory has secured to the inhabitants thereof certain inalienable rights, of which they cannot be deprived by any legislative enactment, therefore no religious test shall ever be required as a qualification to any office or public trust; no law shall be in force or enforced in said Territory respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble and petition for the redress of grievances; the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures shall not be violated; and no warrant shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized; nor shall *the rights of the people to keep and bear arms be infringed*.[93]

---

90   Charles Sumner, United States Senator, Speech at the United States Senate (May 19-20, 1856), *in* THE CRIME AGAINST KANSAS: THE APOLOGIES FOR THE CRIME 22-23 (1856) (emphasis added).

91   H.R. JOURNAL, 34th Cong. at 1126 (1st Sess. June 28, 1856) (emphasis added).

92   *Thirty-Fourth Congress: First Session*, NAT'L ERA, July 3, 1856, at 107 (emphasis added).

93   S. JOURNAL, 34th Cong. at 428-29 (1st Sess. July 8, 1856) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=1585461

In July 1856, *The Liberator* reprinted an article from the Alton, Illinois *Courier* that invokes a constitutional right to bear arms without specific reference to the Second Amendment. However, because the "great constitutional right" is invoked in Kansas Territory which had no constitution the reference is evidently to the Second Amendment:

> The right to bear arms is a great *constitutional right*; in Kansas it is also a great *necessity*. These thieves and murderers who pour over in armed bonds to molest us, say we must be disarmed, and that Free-State settlers must not enter the Territory.[94]

Similarly, an August 1, 1856, letter from abolitionist settlers who had been arrested when entering Kansas includes a list of violations by the Territorial government that seems drawn from the U.S. Bill of Rights. While they do not explicitly reference the U.S. Constitution, because the letter refers to "quartering of soldiers in time of peace," and there was as yet no state constitution in Kansas, the most plausible inference is that the claim invokes the Federal Constitution:

> As for the acts of a body elected by the people of Missouri, calling themselves a Territorial Legislature of Kansas, which authorize 'abridging the freedom of speech or the press,' or the right of the people 'peaceably to assemble, and to petition the Government for a redress of grievances;' which authorize the destruction of printing presses, hotels, and private dwellings; the plundering of the people of their horses, cattle, and other property; the sacking and robbing of towns and their citizens; the murder of political opponents with impunity; the 'quartering of soldiers in time of peace in homes without the consent of the owner's; the infringement of the '*right of the people to keep and bear arms*;' the violation of their right to be 'secure in their persons, houses, papers, and effects against unreasonable searches and seizures;' the issuing of warrants without 'probable cause, supported by oath or affirmation;' the requiring of excessive bail, the indictment of persons for high crimes, for the sole purpose of prosecution, or of depriving them of their liberty and lives; these, and such as these, who can dignify by the name of 'laws adopted in pursuance thereof.'[95]

The following day, August 2, Free Soil Party Representative Edward Wade of Ohio made the same argument in a speech in the U.S. House of Representatives. He complained that "[t]he whole military force of the government, is put in requisition by the slave democracy" and listed the Second Amendment as one of the rights being infringed:

> *Second amendment.*—"The right of the people to keep and bear arms shall not be infringed."

> In this amendment the same spirit of liberty is developed, as was so apparent in the preceding. The right to "keep and bear arms," is thus guarantied, in order that if the liberties of the people should be assailed, the means for their defence should be in their own hands.

---

[94]   John B. Baldwin, *Kansas Closed Against Free-State Immigrants*, LIBERATOR, Aug. 15, 1856, at 33.

[95]   C. Robinson, *Letter from the State Prisoners*, LIBERATOR, Aug. 1, 1856, at 122.

Electronic copy available at: https://ssrn.com/abstract=1585461

> But this right of the people of the United States, of which the free-state settlers of Kansas are a part, has been torn from them by the treasonable violence of this ill-starred administration, which is used as the mere pack-mule of the slave democracy.[96]

Wade's articulation of the infringement and the importance of protecting the constitutional right to arms is incompatible with a states' rights view of the Second Amendment.

A speech by Representative Giddings in the U.S. House on August 17, 1856, reprinted in *The National Era*, also describes violations of the Second Amendment in Kansas Territory. Giddings describes a robustly individual right with a focus on self-defense:

> By the use and power of the army, *[the President] has taken from the people of that Territory their arms; and when the citizens were thus left without the means of defence,* they have been set upon by ruffians, by Missouri Democrats, friends of the President, and robbed of their property, their persons insulted, their dwellings burned, and in some instances individuals were murdered.
>
>         . . . .
>
> The second article in the amendments of our Federal Constitution declares that "the right of the people to keep and bear arms shall not be infringed." But in that Western Territory the Constitution is trampled upon by our army, acting under the President's orders; and we are called on to give the President money to support the army, while thus engaged in overthrowing the Constitution . . . .[97]

Iowa Governor (and later, U.S. Senator) James W. Grimes's letter to President Pierce, August 28, 1856, concerning the antislavery citizens of Kansas, echoes the private self-defense theme:

> Citizenship has been virtually denied them. Their right to defend themselves and "to keep and bear arms" has been infringed by the act of the Territorial officers, who have wrested from them the means of defense, while putting weapons of offense into the hands of their enemies.[98]

This is an illuminating equation: by denying these immigrants the right to arms for self-defense, territorial officials had virtually stripped them of citizenship.

The Republican National Platform of 1856 makes a similar charge, explicitly including the right to keep and bear arms in a list of individual

---

[96] *Slavery Question: Speech of Hon. Edward Wade, of Ohio: In the House of Representatives, August 2, 1856*, NAT'L ERA, Sept. 11, 1856, at 148 (emphasis omitted).

[97] *The Right of the People to Control the National Treasure: Speech of Mr. Giddings, on His Motion, that the House of Representatives Adhere to Its Position on the Bill Making Appropriations for the Support of the Army*, NAT'L ERA, Aug. 28, 1856, at 140 (emphasis added).

[98] WILLIAM SALTER, THE LIFE OF JAMES W. GRIMES 85 (N.Y., D. Appleton & Co. 1876).

Electronic copy available at: https://ssrn.com/abstract=1585461

liberties guaranteed by the Bill of Rights that were being violated by terri-torial officers:

> [T]he dearest Constitutional rights of the people of Kansas have been fraudulently and vio-lently taken away from them; their territory been invaded by an armed force; spurious and pretended legislative, judicial and executive officers have been set over them, by whose usurped authority, sustained by the military power of the Government, *tyrannical and un-constitutional laws have been enacted and enforced; the right of the people to keep and bear arms has been infringed*, test oaths of an extraordinary and entangling nature have been im-posed as a condition of exercising the right of suffrage and holding office; the right of an ac-cused person to a speedy and public trial by an impartial jury has been denied; the right of the people to be secure in their persons, houses, papers and effects against unreasonable search and seizure has been violated, and they have been deprived of life, liberty, and proper-ty without due process of law; the press has been abridged . . . .[99]

Some called for impeachment of President Pierce, on the grounds that he had violated multiple provisions of the Bill of Rights, including the right of "peaceable citizens" to "keep and bear arms." The petition of impeachment from citizens of Earlville, Illinois, is a good example. Importantly, this is a collective enterprise where objections about the details and contestable mi-nor claims (e.g., controversial claims of individual rights) might be filtered out by the need for consensus on the primary message. So it is significant that the Earlville citizens' petition reflects a distinctly individual rights un-derstanding of the Second Amendment:

> We, the undersigned, citizens of Earlville, and vicinity, La Salle County, State of Illinois, be-lieving FRANKLIN PIERCE, President of the United States, to be guilty of high crimes and misdemeanors: That he has, in the exercise of the functions of his office, trampled the Con-stitution of the United States, which he has sworn to support, under his feet, in many of its most vital and essential provisions—to wit—That he, as commander-in-chief, has used the military of the nation to destroy 'freedom of speech and of the press in Kansas'; *to take from peaceable citizens of that Territory the 'right to keep and bear arms';* to prevent the people from 'peaceably assembling to petition the government for redress of grievances: That he has 'quartered soldiers, in time of peace, in houses, without consent of the owners:' That he has caused the arrest of peaceable citizens for a political object, and without 'probable cause, supported by oath or affirmation': That he has violated the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures:' . . . .[100]

Senator William H. Seward of New York sought the Republican nomi-nation for President in 1856, and later served as Secretary of State under Presidents Abraham Lincoln and Andrew Johnson. In an October 2, 1856, speech in Detroit, he argued that the Constitution was not in fact a "pact with the devil" as William Lloyd Garrison had claimed. Rather, Seward argued, the Constitution actually had sought to abolish slavery:

---

    99  B.F. MORRIS, THE LIFE OF THOMAS MORRIS 314-15 (Cincinnati, Moore, Wilstach, Keys & Overend 1856) (emphasis added).

    100  *Impeachment of Franklin Pierce*, LIBERATOR, Aug. 22, 1856, at 140 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=1585461

> While they aimed at an ultimate extinction of that caste, and the class built upon it, by autho-rizing Congress to prohibit the importation of "persons" who were slaves after 1808, and to tax it severely in the mean time, and while they necessarily left to the individual States the management of the domestic relations of all classes and castes existing therein, they especial-ly declared what should be the rights and relations of all "persons," so far as they were to be affected by the action of the Federal Government which they were establishing.[101]

Among the individual rights Seward claims were protected by the Constitu-tion are the writ of habeas corpus, the prohibition on bills of attainder and ex post facto laws, and the individual right to arms:

> "The privilege of the writ of *habeas corpus* shall not be suspended, unless when, in case of rebellion or invasion, the public security shall require it." "No bill of attainder or *ex post fac-to* law shall be passed." . . . *"The right of the people to keep and bear arms shall not be in-fringed."* "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." They ordained "trial by jury," prohibited "excessive bail and excessive fines, and cruel and unusual punishments," and "reserved to the States and to the people all the powers of Government not expressly de-legated to the United States."[102]

In November of 1856, a report concerning the arrest of a group of immi-grants to Kansas Territory, and the seizure of their arms, included a letter to the territorial governor asserting a right to bear arms:

> All that we have to say is, that our mission to this Territory is entirely peaceful. We have no organization, save a police organization for our own regulation and defence on the way; and, coming in that spirit to this Territory, we claim *the right of American citizens to bear arms* and to be exempt from unlawful search or seizure.[103]

This is another case where the reference is not tied explicitly to the Second Amendment. However, the claim is staked as a right of "American citi-zens." Such a national claim seems less likely to be in reference to a state constitutional guarantee and more likely to be the invocation of the Second Amendment.

III.    DISPARATE CLAIMS TO CIVIL LIBERTIES: THE RUN UP TO WAR AND WARTIME

It was not just Republicans and abolitionists who invoked the Second Amendment. In 1857, as the crisis over slavery grew, Mississippi Governor McWillie sent a message to the legislature that called for vigilance and a

---

101    *The Slaveholding Class Dominant in the Republic: Speech of William H. Seward at Detroit, October 2, 1856,* NAT'L ERA, Feb. 5, 1857, at 24.

102    *Id.* (emphasis added).

103    *Official Dispatches Concerning the Arrest of Col. Eldridge's Party,* NAT'L ERA, Nov. 6, 1856, at 178 (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=1585461

willingness to fight to preserve the peculiar institution. Excerpted in *The Liberator*, McWillie's address declares:

> The North already has a large majority in the House of Representatives, a majority of two in the Senate, and the power to elect the President; for that power they cannot want but for purposes of aggression. In this view of the question, it is our duty to be prepared for any contingency, never losing sight of *that article of the Constitution of the United States which declares the axiomated truth that a 'well-regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed.'* Our fathers well understood, when they adopted this provision of the Constitution; the dangers to which our institutions might be exposed, and thereby secured the means of safety. This, however, to be available, must be accompanied by the courage and the will to use those arms when necessary against all enemies, either foreign or domestic. Our institutions are already protected by the Constitution and by the decisions of the Supreme Court of the United States, but as Constitutions or decrees of courts have no self-executing power, it may yet be that the duty will be forced upon us of standing to our arms in the maintenance of our just rights.[104]

It is possible to read this as a states' rights claim. But the authority of the states to train the militia under Article I, Section 8 of the U.S. Constitution was not in dispute. Later in his address, McWillie employs language that suggests an individual right with a political violence purpose—namely, the armed people as a bulwark against tyranny:

> Eternal vigilance and sacrifice is the price of liberty. No people ever have been great and free, no people ever can be free, who are not military in their habits, and ever ready to defend their institutions and their laws. We, as a people, enjoy the peculiar privilege of bearing arms, and being the defenders of our own rights and liberties. If we should ever be deprived of the one or lose the other, it will be because we are unworthy of them, and had not the courage to defend them.[105]

If McWillie understood the Second Amendment purely as protecting the right of states to organize militias to fight against federal tyranny, his contention that the privilege of bearing arms extends to the people seems odd. Indeed, given the State's claim of authority over the militia under Article 1, Section 8, it seems misplaced. Moreover, since it is common for governments at various levels to have military capabilities, his reference to the "peculiar privilege of bearing arms" that "[w]e, as a people, enjoy" argues that he is invoking an individual right conception of the Second Amendment with a focus on its political violence purpose.

On the other side of the race question, Representative Wells of the Massachusetts House of Representatives, in his criticism of *Dred Scott*, employs Chief Justice Taney's articulation of the rights of citizens to illustrate the fundamental rights of Americans and highlight the fundamental injustice of the decision:

---

104   *Impertinence of the Abolitionists: Slavery Forever!*, LIBERATOR, Dec. 11, 1857, at 197 (emphasis added).

105   *Id.*

Electronic copy available at: https://ssrn.com/abstract=1585461

> Thank heaven! there are higher privileges embraced in this term, 'Citizen of the United States,' than all that comes to; and it is of these privileges and rights that the colored man is deprived, and it is of that deprivation he complains. I could find, sir, in that very Dred Scott decision, an enumeration, by the Supreme Court itself, of the rights guaranteed by the Constitution of the United States, but I will not occupy the time of the House in searching for it now. *Those rights are to bear arms*, to meet in public assemblies, and various other rights therein enumerated, entirely distinct from that class of simply political rights of which the gentlemen speaks. Of all these, in the express terms of the decision, the colored man is deprived, as well as of those other rights to which I have already alluded.[106]

Wells' view is consistent with Republican sentiment at the time. In December of 1859, *The National Era* quoted the Republican platform as follows: "Spurious and pretended Legislative, Judicial, and Executive officers have been set over them by whose usurped authority, sustained by the military power of the Government, tyrannical and unconstitutional laws have been enacted and enforced; *The rights of the people to keep and* bear arms *have been infringed*."[107]

Representative Orris S. Ferry, Republican of Connecticut, speaking about the problem of slavery and the Constitution a few months later, argued that the Constitution was fundamentally a document "that breathed the very spirit of freedom" and proceeded to list the Second Amendment right to arms alongside a list of other individual rights as exemplars of that freedom such as freedoms of religion, press, assembly, petition, security from unreasonable searches, from deprivation of life, liberty, or property, without due process.[108]

Not all the evidence of the period suggests that the Second Amendment protected an individual right. In Massachusetts, the struggle over what rights blacks enjoyed led to legislative attempts to include black men in the state militia. The primary conflict concerned the respective powers of the state over its militia and the broad authority over the militia granted to the federal government under Article 1, Section 8. The Federal Militia Act of 1792 declared that only white males were members of the militia.[109] One response to this was F.W. Bird's pamphlet urging that blacks be allowed into the state militia. In one place, Bird's tract employs an explicitly collective rights view of the Second Amendment:

> "To keep and bear arms,"—not for self-defence, nor for "military instruction," not for "special service in keeping guard;" but as members of a "well regulated" [State] militia. This

---

106. *Who Are American Citizens?*, LIBERATOR, Jan. 21, 1859, at 10 (emphasis added).

107. *The Republican Platform*, NAT'L ERA, Dec. 22, 1859, at 203 (emphasis added).

108. *Speech of Orris S. Ferry, of Connecticut, in the House of Representatives, February 10, 1860*, NAT'L ERA, Feb. 23, 1860, at 32 (emphasis added).

109. Militia Act of 1792, ch. 33, 1 Stat. 271 (current version at 10 U.S.C. §§ 331-35 (2006)).

Electronic copy available at: https://ssrn.com/abstract=1585461

> was the very purpose of adopting this second amendment to the federal constitution—to put this matter of the independence of the State militia beyond the domain of controversy . . . .[110]

In the next paragraph, Bird confounds this view with the suggestion there was some *other* right that the Second Amendment *ought* to protect. First, he argues that the Massachusetts Constitution's guarantee of "the right of the people to keep and bear arms for the common defence" means essentially the same thing as the Second Amendment's guarantee.[111] Then he seems to complain that neither right goes far enough in guaranteeing to citizens a natural right of armed self-defense: "[T]his right is as sacred to colored citizens as to white citizens; and it is a miserable evasion to tell them that they have the natural right of self-defence against lawless violence. So have savages and dogs."[112] This suggests that Bird viewed the Second Amendment and the state constitution both as protecting only a state right to arms, but viewed that result as unfortunate and unjust. The minor puzzle here is how to make sense of his view of the state constitutional provision. What is the utility of a state constitutional provision protecting the state militia from interference by the state?

In the months preceding the outbreak of hostilities, it was evident that civil war was coming. In New York City, police seized weapons and ammunition bound for Georgia. An editorial in the February 15, 1861, Democratic *New York Herald* invokes the Second Amendment as an individual right:

> But, whatever is coming, we are not yet under martial law and a military dictatorship; and the right of the citizens of Georgia to have and to hold as many arms as they please is clear and undoubted. The second amendment to the constitution was expressly adopted to guarantee this right. It is in the following words:—"A well regulated militia being necessary to the security of a free State, the right of the people to keep and bear arms shall not be infringed."[113]

On the same question, Representative Burnett of Kentucky complains in a July 16, 1861, speech on the floor of the House that President Lincoln had "violated the first, second, third, fourth, fifth, and sixth amendments to the Constitution," stating with reference to the Second Amendment that "[this] right has been infringed. Arms, the private property of citizens, have, upon mere suspicion, been taken at the order of military commanders, and are now withheld from the citizens, whose property they are, and whose rights

---

110   F.W. BIRD, REVIEW OF GOV. BANKS' VETO OF THE REVISED CODE 30 (Boston, John P. Jewett & Co. 1860).
111   *Id.* (emphasis omitted).
112   *Id.* at 30-31.
113   *More Unconstitutional Violence of the New York Police*, N.Y. HERALD, Feb. 15, 1861, at 4 (emphasis omitted).

Electronic copy available at: https://ssrn.com/abstract=1585461

have thus been violated."[114] While another member of the House challenged Burnett as to where this seizure of arms took place,[115] no one contested that the Second Amendment protected an individual right to possess arms.

Once the war began, Northern Democrats continued to invoke the Second Amendment's protection of an individual right. Clement Vallandigham was a prominent Ohio Democrat before the Civil War. When hostilities commenced, he continued to express Confederate sympathies. He was tried in 1863 by a military commission,[116] and eventually exiled from the United States. In an August 2, 1862, speech at Dayton, he decried the loss of the individual rights protected by the Bill of Rights:

> These guarantees were not in the original Constitution, but demanded by the States and the people, and added afterwards. They were added for fear some President might be elected who would claim to have the power, if not expressly withheld by the Constitution. What are they! Freedom of speech, of the press, peaceable assemblages, *the right to keep and bear arms*, freedom from illegal arrest. Yet you have been told that we shall not be allowed to enjoy these rights—that "executive orders" shall be issued against us—that men who represent the voice of the people shall not be heard—that the press shall be muzzled, and men's mouths gagged, and no censure or criticism of the acts of the President, or of the officials under him, shall be permitted, under penalty of arrest and imprisonment; and, thus, that our personal and political liberties shall be disregarded, and the Constitution trampled under foot.[117]

At a mass meeting in Hamilton, Ohio, in March of 1863, Vallandigham delivered a speech that decried the infringements of the individual right to arms.[118] Quoting Col. Henry B. Carrington's General Order No. 15 (that no one was to carry arms), Vallandigham railed:

> "At this time—" at a time when Democrats are threatened with violence everywhere; when mobs are happening every day, and Democratic presses destroyed; when secret societies are being formed all over the country to stimulate to violence; when, at hotels and in depots, and in railroad cars and on the street corners, Democrats are scowled at and menaced, a military order coolly announces that it is unnecessary, impolitic, and dangerous to carry arms! And who signs this order! "Henry B. Carrington, Colonel 18th U.S. Infantry, Commanding"—

---

114  CONG. GLOBE, 37th Cong., 1st Sess. 150-51 (1861).

115  *Id.* at 151.

116  THE TRIAL OF HON. CLEMENT L. VALLANDIGHAM, BY A MILITARY COMMISSION 10-12 (Cincinnati, Rickey & Carroll 1863).

117  SPEECHES, ARGUMENTS, ADDRESSES, AND LETTERS OF CLEMENT L. VALLANDIGHAM 403 (N.Y., J. Walter & Co. 1864) (emphasis added). He reiterated the loss of individual rights in a later speech. *See id.* at 473. Vallandigham, as early as July 17, 1861, indicated his intent to introduce bills to enforce "the writ of habeas corpus" as well as protections of the First, Second, Third, and Fourth Amendments. H.R. JOURNAL, 37th Cong., at 102 (1st Sess. 1861). It is not clear whether this was a genuine desire to add enforcing legislation for the Bill of Rights, or a satirical criticism of the Lincoln administration's wartime measures. It does not appear from the House Journal's index that such bills were ever introduced. *Id.* at 311.

118  SPEECHES, ARGUMENTS, ADDRESSES, AND LETTERS OF CLEMENT L. VALLANDIGHAM, *supra* note 117, at 502-05.

Electronic copy available at: https://ssrn.com/abstract=1585461

Commanding what! The 18th U.S. Infantry, or at most the United States forces of Indiana—but not the people, the free white American citizens of American descent, not in the military service. That is the extent of his authority, and no more. And now, sir, I hold in my hand a general order also—an order binding on all military men and all civilians alike—on colonels and generals and commanders-in-chief—State and Federal. (Applause.) Hear it:

"The right of the people to keep and bear arms shall not be infringed." By order of the States and people of the United States. George Washington, commanding. (Great cheering.)

That, sir, is General Order No. 1—the Constitution of the United States. (Loud cheers.) Who now is to be obeyed—Carrington or Washington![119]

General Order No. 15 also prohibited sales of "arms, powder, lead, and percussion caps."[120] Vallandigham continued:

Sir, the Constitutional right to keep and bear arms, carries with it the right to buy and sell arms; and fire-arms are useless without powder, lead, and percussion caps. It is our right to have them, and we mean to obey General Orders Nos. 1 [referring to the Second Amendment] and 2 [referring to the Ohio Constitution's guarantee of a right to keep and bear arms], instead of No. 15.[121]

Vallandigham's views were shared by many Northern Democrats, as well as others who were sympathetic to slave owners. In January of 1864, Senator Garrett Davis of Kentucky introduced a resolution attacking the Lincoln administration for subverting "in large portions of the loyal States, the freedom of speech, the freedom of the press, and free suffrage, the constitutions and laws of the States and of the United States" and causing citizens "to be tried and punished without law, *in violation of the constitutional guarantee to the citizen of his right to keep and bear arms*, and of his rights of property; it has forcibly deprived as well the loyal as the disloyal of both."[122] The Democratic National Platform adopted in August, 1864, also complained about the Lincoln administration's use of military authority in the north:

[T]he subversion of the civil by military law in States not in insurrection; the arbitrary military arrest, imprisonment, trial and sentence of American citizens in States where civil law exists in full force; the suppression of freedom of speech and of the press; the denial of the right of asylum; the open and avowed disregard of State rights; the employment of unusual test-oaths, and *the interference with and denial of the right of the people to bear arms in their defence* . . . .[123]

---

119   *Id.* at 503 (emphasis omitted).
120   *Id.* at 504.
121   *Id.*
122   S. JOURNAL, 38th Cong., at 53 (1st Sess. 1864) (emphasis added).
123   EDWARD MCPHERSON, THE POLITICAL HISTORY OF THE UNITED STATES OF AMERICA DURING THE PERIOD OF RECONSTRUCTION 118 (Wash., Solomons & Chapman 2d ed. 1875) (1871) (emphasis added).

Electronic copy available at: https://ssrn.com/abstract=1585461

Similarly, S.S. Nicholas, a conservative Democrat, described the rights protected by the Constitution in a collection of essays published in 1865. He listed the individual rights protected by the Constitution and the Bill of Rights.[124] Significantly, when he listed the Constitution's guarantee of a "Republican form of government," he distinguished from the other rights by explaining that it was guaranteed "to each State."[125] This suggests that Nicholas' inclusion of the Second Amendment in the list of individual rights was not careless.

Republicans regarded the Democratic concerns about civil liberties with considerable suspicion. An 1866 history of the overthrow of slavery describes the concern:

> Mr. Lincoln soon discovered "the enemy's programme," as he termed it; yet thoroughly imbued with a reverence for the guaranteed rights of individuals, he was slow to adopt the strong measures indispensable to public safety.

> The rights guaranteed by the Constitution to loyal citizens, such as freedom of the press, freedom of speech, the right of trial by jury, *the right to bear arms*, were all claimed by traitors in the North, even when used only to protect the notorious enemies of the Union in the execution of their treasonable plans.[126]

Rights in the context of civil war are tenuous as, for example, the passage of the Test Act in Pennsylvania and Virginia's law requiring loyalty oaths during the Revolution showed.[127] Also, some rights claims might be less than principled, since the stage of civil discourse and debate had long passed. On this basis, one might discount the complaints of Democrats and Southern sympathizers about infringements of the individual right to arms. However, the complaints about infringements of the individual right ranged across the political spectrum. Democrats and Republicans, abolitionists and slaveholders, in slave states and in free states, all invoked the Second Amendment as an individual right. In the context of the time, this view is entirely understandable. So it is fair to believe that their claims were genuine, that their understanding of the right was plausible, and that by the time the Fourteenth Amendment was finally adopted, the individual rights vision of the Second Amendment was broadly shared.

---

124  S.S. NICHOLAS, CONSERVATIVE ESSAYS: LEGAL AND POLITICAL 19-20 (Phila., J.B. Lippincott & Co. 1865) (emphasis added).

125  *Id.* at 20.

126  ISAAC N. ARNOLD, THE HISTORY OF ABRAHAM LINCOLN, AND THE OVERTHROW OF SLAVERY 702 (Chi., Clarke & Co., Publishers 1866) (emphasis added).

127  *See* CLAYTON E. CRAMER, ARMED AMERICA: THE REMARKABLE STORY OF HOW AND WHY GUNS BECAME AS AMERICAN AS APPLE PIE 44 (2006).

Electronic copy available at: https://ssrn.com/abstract=1585461

IV.  RECONSTRUCTION AND THE BLACK CODES

With the shooting war over and four million slaves now freed, it is no surprise that support by Democrats for the right to keep and bear arms became more selective. Representative Thaddeus Stevens got to the heart of things: "When it was first proposed to free the slaves, and arm the blacks, did not half the nation tremble? The prim conservatives, the snobs, and the male waiting-maids in Congress, were in hysterics."[128] This was not simply objection to an abstract principle of legal equality for blacks; it was strongly tied to fear of blacks with guns (a situation that has been recurrent throughout American history, and the origin of many of America's first gun control laws).[129] Senator Willard Saulsbury, a Delaware Democrat, expressed his opposition to the presence of black soldiers in the post-war Regular Army: "'What would be the effect,' he asked his fellow senators, 'if you were to send negro regiments into the community in which I live to brandish their swords and exhibit their pistols and their guns?'"[130]

In the South particularly, white unease with the new situation led to widespread fear. Myrta Lockett Avary's *Dixie After the War* contains a chapter on "Secret Societies," which articulates white fears of bloodthirsty freedmen, out to murder white men, in order to rape the white women.[131] Many of the hearsay accounts involve armed blacks, engaging in wanton murders, and negligent discharges of firearms.[132]

Fear of black retribution for slavery provoked tremendous stress among white Georgians in the summer of 1865: "Everywhere there were vivid secondhand accounts of armed blacks drilling in nightly conclaves, waiting only for the signal that would trigger a coordinated massacre sometime during the Christmas holidays."[133] Similar fears soon appeared in the Carolinas.[134] While no evidence was found that such uprisings were actually planned, by November, the panic had spread to more than sixty counties throughout the former Confederacy—largely in the states with the largest

---

[128]  KENNETH M. STAMPP, THE ERA OF RECONSTRUCTION, 1865-1877, at 103-04 (1965).

[129]  *See generally* Clayton E. Cramer, *The Racist Roots of Gun Control*, 4 KAN. J.L. & PUB. POL'Y 17 (1995).

[130]  BERNARD C. NALTY, STRENGTH FOR THE FIGHT: A HISTORY OF BLACK AMERICANS IN THE MILITARY 47-51 (1986) (quoting *Further Senate Debate on the Wilson Bill*, *in* 3 BLACKS IN THE UNITED STATES ARMED FORCES: BASIC DOCUMENTS 19-20 (Morris J. MacGregor & Bernard C. Nalty eds., 1977)).

[131]  MYRTA LOCKETT AVARY, DIXIE AFTER THE WAR: AN EXPOSITION OF SOCIAL CONDITIONS EXISTING IN THE SOUTH, DURING THE TWELVE YEARS SUCCEEDING THE FALL OF RICHMOND 263-78 (1906).

[132]  *Id.*

[133]  DAN T. CARTER, WHEN THE WAR WAS OVER: THE FAILURE OF SELF-RECONSTRUCTION IN THE SOUTH, 1865-1867, at 192 (1985).

[134]  *Id.* at 193.

Electronic copy available at: https://ssrn.com/abstract=1585442

black populations.[135] These fears increasingly centered on organized black rifle companies,[136] and not surprisingly, many whites began to see disarming the freedmen as necessary for their safety, or at least used this as a cover for other motivations. An example is "[i]n the late summer of 1865 a Summerton, South Carolina, vigilance committee agreed to disarm the freedmen of the area because of the danger of insurrection."[137] A conservative planter, Warren Manning raised an unusual objection given the context, but one that seems significant in terms of the quest for the public understanding of the Second Amendment. Manning argued that "some of his slaves carried weapons for the protection of the plantation before the war, and now these men had been 'made free and therefore had a right to carry arms.'"[138] Manning's objection seems courageous as a general matter. That he advanced it at all and in such basic and concise terms suggests that he and his audience understood it to be part of the basic rights of men, at least white men.[139]

White-dominated state governments that formed immediately after the war rapidly began to form militias; their concern was that the federal troops which occupied the region would be insufficient, or perhaps unwilling, to protect whites from the feared insurrection of the freedmen.[140] In many cases, militias formed without formal state recognition and began searching black homes, confiscating the freedmen's firearms.[141] In Eufaula, Alabama, a militia company was joined by federal troops in confiscating arms from free blacks.[142]

With the close of 1865, Union generals and Southern legislatures advanced conflicting statutes and orders attempting to govern freedmen's access to arms. In November of 1865, Mississippi required all blacks "not in the military service of the United States Government" to obtain a license from the county's board of police to "keep or carry fire-arms of any kind, or any ammunition, dirk, or bowie-knife."[143] The same measure made it unlawful for "any white person" to "sell, lend, or give to any freedman, free negro, or mulatto, any fire-arms, dirk, or bowie-knife, or ammunition."[144] In December of 1865, Alabama enacted an even more severe penalty—and without any provision for the granting of a license.[145] In January of 1866,

---

[135]   *Id.* at 193-94.
[136]   *Id.* at 197-98.
[137]   *Id.* at 199.
[138]   *Id.*
[139]   *See* CARTER, *supra* note 133, at 199.
[140]   *Id.* at 219-20.
[141]   *Id.* at 220.
[142]   *Id.* at 219-20.
[143]   MCPHERSON, *supra* note 123, at 32.
[144]   *Id.*
[145]   *Id.* at 33.

Electronic copy available at: https://ssrn.com/abstract=1585461

Florida passed a law that tracked the Mississippi restriction.[146] It required all blacks to obtain a license "to own, use, or keep in his possession or under his control any bowie-knife, dirk, sword, fire-arms, or ammunition of any kind."[147]

The federal government responded with military orders countermanding this discriminatory arms legislation. Commander of federal troops in occupation, General Dan Sickles, issued an order on January 17, 1866, declaring that "[t]he constitutional rights of all loyal and well-disposed inhabitants to bear arms will not be infringed; nevertheless this shall not be construed to sanction the unlawful practice of carrying concealed weapons, nor to authorize any person to enter with arms on the premises of another against his consent."[148]

Federal treatment of the right to arms also was not color-coded, but it was not blind to the reality of policing the peace. One order commanded: "No one shall bear arms who has borne arms against the United States, unless he shall have taken the amnesty oath . . . within the time prescribed therein. And no disorderly person, vagrant, or disturber of the peace, shall be allowed to bear arms."[149] This was a "constitutional right," which citizens could lose because of bad behavior.

While hostilities had formally ceased, the importance of the individual right to arms was plain to black people. One month after "General Order Confirming the Freedmen's Right to Arms," *The Christian Recorder* (published by the African Methodist Episcopal Church) editorialized:

> The Charleston (S.C.) Leader says: "We have several times alluded to the fact that *the Constitution of the United States, guaranties to every citizen the right to keep and bear arms*. Gen. Tilson, Assistant Commissioner, for Georgia, has issued a circular, in which he clearly defines the right as follows: "IV. *Article II. of the amendment to the Constitution of the United States, gives the people the right to bear arms, and states that this right, 'shall not be infringed.'* Any person, white or black, may be disarmed, if convicted of making an improper and dangerous use of weapons; but no military or civil officer has the right or authority to disarm any class of people, thereby placing them at the mercy of others. All men, without the distinction of color, have the right to keep arms to defend their homes, families or themselves." We are glad to learn that Gen. Scott, Commissioner for this State, has given freedmen to understand that they have as good a right to keep fire arms as any other citizens. The Constitution of the United States is the supreme law of the land, and we will be governed by that at present.[150]

---

146   *See id.* at 40.
147   *Id.*
148   *Id.* at 36-37.
149   MCPHERSON, *supra* note 123, at 37.
150   *Right to Bear Arms*, CHRISTIAN RECORDER (Phila.), Feb. 24, 1866, at 1-2.

Electronic copy available at: https://ssrn.com/abstract=1585461

## V.   THE MEANING OF THE SECOND AMENDMENT SURROUNDING DEBATE AND ENACTMENT OF THE FOURTEENTH AMENDMENT

Given the complex interrelationships between the factions involved, some scholars suggest that there may not be a single meaning discernable from the statements of the legislators who produced the Fourteenth Amendment.[151] Contemporary views about the nature of the constitutional right to arms seem less complicated.[152] A variety of scholars have mined the legislative history of the Fourteenth Amendment for signals about contemporary views of the right to keep and bear arms.[153] Some of the strongest statements of support for an individual rights interpretation come out of this period. There is solid evidence that both supporters *and* opponents of the Fourteenth Amendment viewed the Second Amendment as an individual right—and in some cases, the opposition to the Fourteenth Amendment was driven by fear that it would preclude the Black Code provisions from disarming the freedmen.

The post-war Congress was well aware of the racially discriminatory black codes that the Southern states were passing to maintain the status quo. Senate debate of the Civil Rights Act of 1866 and the Freedman's Bureau Legislation shows that a central aim was to combat racially discriminatory legislation in the Southern states, including laws and practices that disarmed freedmen. There are numerous indications in the period from the end of the war to the adoption of the Fourteenth Amendment suggesting that people who disagreed about many other things viewed the right to keep and bear arms in the Federal Constitution as an individual right.

In 1865, The Thirty-Ninth Congress convened a joint House and Senate Committee of Fifteen that would evaluate the plight of freedmen in the

---

[151]   *See* RICHARD B. BERNSTEIN & JEROME AGEL, AMENDING AMERICA: IF WE LOVE THE CONSTITUTION SO MUCH, WHY DO WE KEEP TRYING TO CHANGE IT? 105-06 (1993). Michael Kent Curtis explains that our understanding of the Fourteenth Amendment is beset by dueling theories that he summarizes this way:

First, one can read Section I (and particularly the Privileges or Immunities Clause) as protecting both equality and basic liberties for Americans throughout the nation against state denial or abridgement. Second, one can read Section I of the Privileges or Immunities Clause as simply, and only, prohibiting racial and similar caste discrimination in rights provided by—and revocable under—state law. By the first reading, all persons would have rights, for example, to free speech and to bear arms (assuming, as I do, that the right was considered an individual constitutional right of all citizens by 1868) and these rights or privileges would be protected at least against state denial. By the second reading, a state could not take free speech or the right to keep and bear arms away from African Americans if it granted the right to whites. But it could abridge the right for both.

Curtis, *supra* note 2, at 1448-49 (footnote omitted).

[152]   *See* STEPHEN P. HALBROOK, FREEDMEN, THE FOURTEENTH AMENDMENT, AND THE RIGHT TO BEAR ARMS, 1866-1876, at 68-69 (1998).

[153]   *See, e.g.*, Stephen P. Halbrook, *Personal Security, Personal Liberty, and "The Constitutional Right to Bear Arms": Visions of the Framers of the Fourteenth Amendment*, 5 SETON HALL CONST. L.J. 341, 341-408 (1995); Kopel, *supra* note 9, at 1451-54, 1461-1506.

Electronic copy available at: https://ssrn.com/abstract=1585441

South and eventually would draft the Fourteenth Amendment.[154] The Committee of Fifteen, the Congress, and the nation would come to understand that while the war was over, subjugation of black Americans was not. Through enactment of Black Codes and private terror, southerners attempted to continue slavery in a different form. These depredations included peonage contracts, denial of the right to assembly, denial of access to the courts, and the taking of private firearms through discriminatory legislation or government sanctioned robbery. The denial of arms to freedmen received substantial attention in the debates and conversation of the times. Given the context, it should be no surprise that these conversations reflect an individual rights view of the Second Amendment.[155] The country had just emerged from a tragic and horribly bloody episode of political violence of the type that the states' rights view of the Second Amendment enables. Abuses by southern state militias were one of the problems Republicans were attempting to combat. A report in *Harper's Weekly* illustrates the situation, noting that the militia seized all of the firearms from the freedmen and that the militia "commenced seizing arms in town and now the plantations are ransacked . . . . The civil laws of this State do not and will not protect, but insist upon infringing their liberties."[156]

The reaction of freedmen is not surprising. One petition to the Congress in response to such deprivations invokes the Federal Constitution and an understanding of the right to arms that cannot plausibly be construed as a states' rights understanding:

> We ask that, inasmuch as the Constitution of the United States explicitly declares that the right to keep and bear arms shall not be infringed—and the Constitution is the Supreme law of the land—that the late efforts of the Legislature of this state to pass and act to deprive us or [sic] arms are forbidden, as a plain violation of the Constitution . . . .[157]

Debates over the Freedman's Bureau Bill show that even Southerners who opposed extending full rights of citizenship to freedmen might agree that the individual rights of Americans included "*every man bearing his arms about him and keeping them in this house, his castle, for his own defense.*"[158] Similarly, the attack by Senator Saulsbury on the Civil Rights Bill reflected an individual rights understanding of the federal protection:

---

[154]   CONG. GLOBE, 39th Cong., 1st Sess. 30 (1865).

[155]   *See* AMAR, *supra* note 6, at 215-18. Fresh out of the Civil War, there was little advocacy for any sort of states' rights conception of the Second Amendment—or any other states' right. *Id.*

[156]   *The Labor Question at the South*, HARPER'S WEEKLY, Jan. 13, 1866, at 19.

[157]   2 PROCEEDINGS OF THE BLACK STATE CONVENTIONS, 1840-1865, at 302 (Philip Sheldon Foner & George E. Walker eds., 1980).

[158]   CONG. GLOBE, 39th Cong., 1st Sess. 371 (1866) (statement of Sen. Davis in opposition to the Freedman's Bill).

Electronic copy available at: https://ssrn.com/abstract=1585461

> [T]here has existed a law of the State based upon and founded in its police power, which declares that free negroes shall not have the possession of fire-arms or ammunition. This bill proposes to take away from the States this police power, so that if in any State of this Union at anytime hereafter there shall be such a numerous body of dangerous persons belonging to any distinct race as to endanger the peace of the State, and to cause the lives of its citizens to be subject to their violence, the State shall not have the power to disarm them without disarming the whole population.[159]

Debate over the Civil Rights Bill reveals another aspect of the racial dynamic of the time that confirms the individual rights understanding. As the debate progressed in the Senate, Senator George H. Williams from Oregon worried that if the act extended the rights of citizens to Indians, it would invalidate state laws prohibiting whites from selling guns to Indians.[160] This was a period where the U.S. was still engaged in the conquest of Indian tribes so it is no surprise that the Senate voted to exclude Indians "not taxed" from the definition of citizens.[161]

Consideration of the Civil Rights Bill reflected a concern at many levels about who was armed and under what authority. Northern congressmen worried about disarmament of freedmen and noted that the right to arms currently required protection through military orders of occupying federal forces. One of those orders, issued by General D.E. Sickels, claimed to protect the "constitutional rights of all loyal and well disposed inhabitants to bear arms."[162] It is not a reference to states, and under the circumstances seems decidedly individual in character.

A report of the commissioner of the Kentucky Freedman's Bureau elaborates the context and the individual right understanding in unequivocal terms: "The civil law prohibits the colored man from bearing arms . . . . Their arms are taken from them by the civil authorities . . . . Thus the right of the people to keep and bear arms as provided in the constitution is infringed."[163]

Congress reflected this concern explicitly in the Freedman's Bureau Bill by providing military protection to those whose rights were violated and left defenseless due to the interruptions of civil process caused by the rebellion. Among those explicitly protected rights was "the constitutional right of bearing arms."[164]

The black press widely circulated General Order No. 1, General Sickles' declaration that freedman, now citizens, enjoyed an individual right to arms. The order was reprinted in the *Loyal Georgian*, accompanied by a robust editorial on individual rights:

---

159   *Id.* at 478 (statement of Sen. Saulsbury against the Civil Rights Act).
160   *Id.* at 572-73 (statements of Sen. Williams).
161   *Id.* at 574-75.
162   *Id.* at 908-09 (statement of Sen. Wilson citing Sickles' order).
163   *Id.* at 657, 2774.
164   CONG. GLOBE, 39th Cong., 1st Sess. 1292 (1866).

Electronic copy available at: https://ssrn.com/abstract=1585461

> Editor Loyal Georgian: Have colored persons a right to own and carry fire arms? A Colored Citizen.

> [Editor:] Almost every day we are asked questions similar to the above. We answer *certainly* you have the *same* right to own and carry arms that *other* citizens have. You are not only free but citizens of the United States and, as such, entitled to the same privileges granted to other citizens by the Constitution of the United States. . . .

> Article II of the amendments to the Constitution of the United States, gives the people the right to bear arms and states that this right shall not be infringed. Any person, white or black may be disarmed if convicted of making an improper or dangerous use of weapons, but no military or civil officer has the right or authority to disarm any class of people, thereby placing them at the mercy of others. All men, without distinction of color have the right to keep and bear arms to defend their homes, families or themselves.[165]

Concern about infringement of the basic liberties of freedmen also prompted arguments for disbanding the militias of the rebel states.[166] Significantly, this occurred consistent with arguments that the right to keep and bear arms should be respected. The right in this context was an individual not a state right. In February of 1866, Senator Wilson introduced a resolution to disband militia forces in most southern states where militias had disarmed freedmen. In the debate both supporters and opponents agreed that peaceful citizens maintained a right to keep and bear arms.[167] Wilson's bill ultimately passed in a form that disbanded militias but maintained the right of individuals to their private firearms.[168]

The threats and violence of the southern militias were palpable, but other deprivations were subtler. In February of 1866 General Rufus Saxon, former assistant commissioner of the Freedmen's Bureau in South Carolina, testified before the Joint Committee about the use of peonage contracts that deprived freedmen of basic rights including a right to arms. Saxon explained to the committee that white southerners "desired me to sanction a form of contract which would deprive the colored men of their arms, which I refused to do. The subject was so important, as I thought, to the welfare of the freedmen that I issued a circular on this subject."[169] Saxon's circular frames the right to arms in decidedly individual terms.

> It is reported that in some parts of this State, armed parties are, without proper authority, engaged in seizing all fire-arms found in the hands of the freedmen. Such conduct is in plain and direct violation of their *personal rights* as guaranteed by the Constitution of the United States, which declares that "the right of the people to keep and bear arms shall not be in-

---

165  *Letter to the Editor*, LOYAL GEORGIAN (Augusta), Feb. 3, 1866, at 3.
166  CONG. GLOBE, 39th Cong., 1st Sess. 914 (1866).
167  CONG. GLOBE, 39th Cong., 1st Sess. 40 (1865).
168  STEPHEN P. HALBROOK, THAT EVERY MAN BE ARMED 135-42 (1984).
169  JOINT COMMITTEE ON RECONSTRUCTION, 39TH CONG., REPORT OF THE JOINT COMMITTEE ON RECONSTRUCTION AT THE FIRST SESSION THIRTY-NINTH CONGRESS 219 (1866) [hereinafter RECONSTRUCTION REPORT].

Electronic copy available at: https://ssrn.com/abstract=1585461

fringed." The freedmen of South Carolina have show by their peaceful and orderly conduct that they can safely be trusted with fire-arms, and they need them to kill game and for subsistence, and to protect their crops for destruction by birds and animals.[170]

At the end of February 1866, the House began debating the proposed Fourteenth Amendment.[171] Some objected that the amendment was unnecessary. Senator Nye, for example, argued that the Bill of Rights already was "established by the fundamental law . . . [and] that [no] state has the power to subvert or impair the natural and personal rights of the citizen."[172] On the question of a right to arms he argued, that blacks "[a]s citizens of the United States . . . [h]ave equal right to protection, and to keep and bear arms for self-defense."[173]

Debate over provisions of the Civil Rights Bill in March 1866 referenced language that parallels what we would come to know as the citizenship clause of the Fourteenth Amendment. Explaining this proposal, Representative Henry Raymond of New York declared:

Make the colored man a citizen of the United States and he has every right which you and I have as citizens of the United States under the laws and Constitution . . . . He has a defined *status*; he has a country and a home; a right to defend himself and his wife and children; a right to bear arms . . . .[174]

True, Raymond separates the right of personal defense and the right to arms with a semicolon. But this is far from endorsement of a states' rights argument. Raymond makes no mention of states or militias and in this context the very prospect that Raymond was arguing for a collective right is implausible.

Testimony before the Joint Committee of Fifteen in March of 1866 reminds us that the state militias were the source of infringement of a right to arms that was understood as vested in individual freedmen. Major General Wager Sayne, assistant commissioner of the Freedman's Bureau in Alabama, testified that militias "were ordered to disarm the freedmen" and that when he learned of one order in particular, "[he] made public [his] determination to maintain the right of the Negro to keep and to bear arms and [his] disposition to send an armed force into any neighborhood in which that right should be systematically interfered with."[175]

The statements of commanders such as Major General Sayne are important because they reflect broadly dispersed public announcements. Some of the Congressional debates during this time are arguably more obscure

---

170 *Id.* at 229 (emphasis added).
171 CONG. GLOBE, 39th Cong., 1st Sess. 1033-34 (1866).
172 *Id.* at 1072.
173 *Id.* at 1073.
174 *Id.* at 1266.
175 RECONSTRUCTION REPORT, *supra* note 169, at 140.

Electronic copy available at: https://ssrn.com/abstract=1585461

(i.e., exchanges in the House or Senate). However, the thrust of those debates is reflected strongly in the newspapers of the time. This is particularly so for the vote to override Andrew Johnson's veto of the Civil Rights Bill. An April 1866 *New York Evening Post* editorial about the override vote described the "mischiefs for which the Civil Rights Bill seeks to provide a remedy."[176] Listed among their rights to public assembly and the right to own property was "keeping fire-arms."[177]

By the end of April 1866, the Joint Committee of Fifteen reported its proposal for the Fourteenth Amendment out to the congress and the debate became public.[178] Introducing the proposed amendment to the Senate, Senator Howard explained the view of the Joint Committee that the "[g]reat object of the first section of this amendment is therefore to restrain the power of the States and compel them at all times to respect these great fundamental guarantees."[179] These guarantees he urged were the "personal rights guaranteed and secured by the first eight amendments of the Constitution" including "the right to keep and bear arms."[180] Howard's explanation was widely reported in the press.[181]

In the summer of 1866, Congress voted to override Andrew Johnson's veto of the second Freedman's Bureau Bill and to approve for ratification the Fourteenth Amendment. Stephen Halbrook highlights that "[e]very Senator who voted for the Fourteenth Amendment also voted for the Freedmen's Bureau Bills."[182] The Freedman's Bureau Act explicitly declared that "the constitutional right to bear arms, shall be secured to and enjoyed by all the citizens of such State or district without respect to race or color or previous condition of slavery."[183] The act extended military protection to and gave the military jurisdiction over questions concerning "the free enjoyment of such immunities and rights."[184]

The right to arms discussed in the act, argues Halbrook, is squarely within the privileges and immunities the Fourteenth Amendment was designed to protect.[185] And that right, as the context shows, was anchored to individuals. Not only is there no reference to militias or states' rights in the Freedmen's Bureau Act, but it was states and militias who were the principal violators of the rights the Act aimed to protect. As further evidence, as the controversy over ratification of the Fourteenth Amendment swirled,

---

176   *The Civil Rights Bill in the Senate*, N.Y. EVENING POST, Apr. 7, 1866, at 2.
177   *Id.*
178   BENJAMIN B. KENDRICK, THE JOURNAL OF THE JOINT COMMITTEE OF FIFTEEN ON RECONSTRUCTION 114-20 (1914).
179   CONG. GLOBE, 39th Cong., 1st Sess. 2766 (1866).
180   *Id.* at 2765.
181   HALBROOK, *supra* note 152, at 36.
182   *Id.* at 41.
183   *Id.*
184   *Id.*
185   *Id.* at 40-44.

Electronic copy available at: https://ssrn.com/abstract=1585461

Congress passed legislation to abolish Southern state militias—the ultimate repudiation of a states' rights view of the Second Amendment.[186] Senator Wilson explained that the legislation was necessary because the state militias had been used "to disarm portions of the people," namely freedmen.[187]

On first pass, the Fourteenth Amendment was unanimously rejected by the Southern states. But chafing under federal military rule and the stipulation that they could not reenter the Union unless they approved the Amendment, the Southern states ultimately capitulated.[188] By 1868 the Fourteenth Amendment was the law of the land. The evils it addressed, the aims it pursued, and the context in which it arose show that the right to arms that flowed with it was decidedly individual.

CONCLUSION

The nature and boundaries of the rights of citizens and the rights of men were burning questions in the nineteenth century. They culminated in war, reconstruction, and constitutional change that aimed to extend the rights and privileges of American citizenship to those previously held in bondage. The discussion and discord over the right to arms in this context reveals that people all along the political spectrum held a decidedly individual rights understanding. Those who supported the Fourteenth Amendment frequently articulated that the freedmen, now citizens, enjoyed the same right to keep and bear arms as others. Freedmen themselves claimed and embraced the individual right. Even those who were committed to stripping blacks of their new status considered the individual right to arms an attribute of citizenship.

The description of the right from an 1872 school textbook elaborates the point:

> 15. What are the rights which are secured to every individual by the Constitutions and laws of the United States?
>
>     . . . .
>
> K. The right to keep and bear arms.[189]
>
>     . . . .

---

[186]  *Id.* at 68-69.

[187]  CONG. GLOBE, 39th Cong., 2d Sess. 1848 (1867).

[188]  *See* Proclamation of Ratification, 15 Stat. 708, 709-11 (1868).

[189]  CASPAR T. HOPKINS, A MANUAL OF AMERICAN IDEAS 49 (San Francisco, Bacon & Company 1872).

Electronic copy available at: https://ssrn.com/abstract=1585461

Every individual throughout the nation has the Constitutional right to keep and bear arms. This accustoms the people to their use. (*This right is not allowed by governments that are afraid of the people.*)[190]

---

[190]   *Id.* at 177-78.

Electronic copy available at: https://ssrn.com/abstract=1585461

# The Firearms of the Lewis and Clark Expedition

## S. K. Wier

Many skills and many tools contributed to the success of the Lewis and Clark Expedition. Firearms were absolutely essential, not for warfare and conquest, but for daily hunting for food, to provide a strong defense if needed, and for natural history collections.

If we want to have a full understanding of the experiences and achievements of the men of the "voyage of discovery," an appreciation of their guns and the guns' limitations is necessary. Firearms technology improved tremendously in the century after the expedition; their guns were not like modern guns.

The journals and records prepared by the expedition members show that they carried rifles from the arsenal at Harpers Ferry, Virginia, and army service muskets brought by soldiers posted from other units. Personal firearms were brought by Captains Clark and  Lewis, and some of the hunters enlisted for the journey may have used their own rifles. The French-speaking boatmen probably carried "trade guns."  Lewis brought an air-powered rifle, a case of matched pistols, and a fowling piece, and Clark brought an "elegant fusil." A swivel gun, a small cannon, was mounted on the keelboat, and the two pirogues each had a blunderbuss.  All the firearms of the Lewis and Clark expedition were single-shot, muzzle loading, black powder guns with flintlock ignition, the notable exception being Lewis's air gun, which on several occasions astonished native Indians, presumably because of its rapid, smokeless, and somewhat quiet firing

The expedition journalists nowhere describe guns in detail. Guns were common properties of life everywhere on the frontier, not worthy of note compared to the daily discoveries of the expedition. The only surviving guns that might possibly be relics of the expedition are a rifle that once belonged to Clark and an air rifle, and it is only a faint possibility.  To achieve a complete picture of the guns of the expedition, a kind of detective process is required, piecing together brief journal entries, other expedition records, and documents of the time, as well as recent firearms scholarship and examination of surviving firearms. Sometimes the clues are only a few words, and the meaning is ambiguous.  Some conclusions are tentative, linking brief statements written many miles and many years apart. Questions remain, but much has been learned, and firearms research allows more positive statements than were possible even  a few years ago.

### Expedition Rifles

On March 16, 1803, a year and two months before the expedition headed up the Missouri River, Captain Meriwether Lewis arrived at the federal Armory at Harpers Ferry, then in Virginia, to arrange for military supplies needed by the expedition.  President Thomas Jefferson and Lewis originally planned an expedition of fifteen men,[1] and  Lewis's list of requirements included "15 Rifles, 15 Powder Horns & pouches complete, 15 Pairs of Bullet Moulds, 15. do. of Wipers or Gun worms, 15 Ball screws, 24 Pipe Tomahawks, 24 large knives, Extra parts of Locks & tools for repairing arms, 15 Gun Slings, 500 best Flints ... 200 lbs Best rifle powder, 400 lbs Lead."[2]

---

1   Donald Jackson , ed., *Letters of the Lewis and Clark Expedition and Related Documents*, 1783-1854, 2 volumes (Urbana: University of Illinois Press, 1968), Vol. 1,  pp. 69-99; 102; 103.

2   Ibid., p. 70.

Before 1999, when Frank Tait published his study of the 1792 contract rifles, it was widely believed that the rifle supplied for the Lewis and Clark Expedition was the "U.S. Model 1803" rifle made at Harpers Ferry.[3]  However, Tait's careful examination of letters and records of the times makes clear that  this rifle was not actually manufactured until 1804 and so could not have been obtained by Lewis during his visit early in 1803.[4]  What kind of rifles did Lewis select at Harpers Ferry, and what was done to prepare them?  An inventory at Harpers Ferry Armory taken April 6, 1801, showed 382 rifles in storage there, most of which were the "1792-1794 Contract" rifle.

In 1791, following Major General Arthur St. Clair's disastrous defeat near the Wabash River, Secretary of War Henry Knox arranged for purchase by contract of nearly 1500 rifles from gunsmiths in Pennsylvania; 2000 more were ordered in 1794. For this  contract Knox approved a pattern flintlock rifle with a 42-inch octagonal barrel, 40 balls to the pound or caliber 0.49,[5] a full-length plain maple stock, and a plain patch box with a  release button on top of the butt plate.  In early 1801 some of  these "1792 contract rifles" were shipped to the Harpers Ferry Armory, which had just opened.[6]  No more than six or seven specimens of the  1792 contract rifle are known to survive, but they show the kind of gun that Lewis had to choose from at Harper's Ferry.[7]

Lewis directed that fifteen of these existing rifles be prepared to suit the needs of the expedition. The modifications included swivels for slings and new flintlocks. Gunsmiths at Harpers Ferry fitted the new locks, apparently the same flintlock design used later on the Model 1803 rifle. Surviving "1792 contract" rifles indicate the original patch boxes were like those on the Model 1803 rifle. The rifling in the barrels may have been "freshened" or recut, and it appears that the bore was enlarged, as described below.  It also appears that the barrels were shortened from the original length of 42 inches, but the reduced length is not known.

On April 18 Lewis departed Harpers Ferry for Lancaster, Pennsylvania, and  Philadelphia, for special training and to purchase supplies.  Two days later he wrote a long letter to Jefferson reporting his progress and plans, mentioning firearms only in one sentence: "My Rifles, Tomahawks, & knives are preparing at Harpers Ferry, and are already in a state of forwardness that leaves me little doubt of their being in readiness in due time."[8]

On July 8, 1803, Lewis, back at  Harpers Ferry, again wrote to Jefferson. He had just completed arranging wagon transport of all his supplies to Pittsburgh. "Yesterday, I shot my guns and examined the several articles which had been manufactured for me at this place; they appear to be

---

3  Carl P. Russell, *Firearms, Traps, & Tools of the Mountain Men,* (Albuquerque: University of New Mexico Press, 1967), p. 37.

4  Frank A. Tait, "The U.S. Contract Rifle Pattern of 1792," *Man at Arms* 21, no. 3, (May/June 1999) pp. 33-45. Frank A Tait, "Response to the letter of  Michael H. Maggelet," *Man at Arms* 21, no. 6, (November/December 1999) pp. 7-8.

5  Gun caliber of size of the barrel's bore is now indicated by diameter in inches. A 0.49 caliber barrel has a bore 0.49 inches across. At the time of the expedition barrel size was given by how many round  lead balls could be made to fit a gun  from one pound of lead. A 0.49 caliber barrel takes 40 round lead balls to the pound. Modern shotguns preserve the old system: a 12 gage shotgun could fire leads balls of 12 to the pound.

6  Tait 1999a, pp. 34, 36, 37.

7  Ibid., pp. 35-36; George D. Moller, *American Military Shoulder Arms*, (Niwot: University Press of Colorado, 1993), Vol. 2. pp. 19-30.

8  Jackson, Vol. 1, p. 40.

well executed."[9] At Pittsburgh the rifles and other equipment were loaded on the keelboat for the voyage down the Ohio River.

**The Mystery of the "Short Rifles," Rifle Length, and Caliber**

There are several references to "short rifles" in the expedition journals: by Lewis on April 12, 1806 ("we caused all the men who had short rifles to carry them, in order to be prepared for the natives should they make any attempts to robe or injure them."); by Ordway, June 18, 1806; and by Lewis, August 11, 1806, after he was accidentally shot by Cruzatte: "... the ball had lodged in my breeches which I knew to be the ball of the short rifles such as that he had."[10] Lewis must have recognized the round lead bullet simply from its size, even under trying circumstances..

What were these "short rifles?" "Short rifle" appears to be a term for the rifles prepared at Harpers Ferry, with barrel lengths reduced from the original length of the 1792 contract rifle, 42 inches. American rifles of the time typically had barrels 40 to 48 inches long, or more.[11] A rifle with a barrel much shorter than 40 inches would have been a short rifle. Hunters know that there is a difference handling guns with short barrels, and a short gun is handy when traveling in small boats or in rough terrain, as on the expedition. Lewis may have desired a handier rifle than one with a 42 inch barrel, and had his selected 1792 contract rifles' barrels shortened at Harpers Ferry.

During the expedition some rifle barrels were shortened again. On July 1, 1806, on the return journey, the party's blacksmith John Shields shortened Windsor's rifle that had "busted ... near the muzzle."[12] Clark reported "two of the rifles have unfortunately bursted near the muscle [muzzle], Shields Cut them off and they Shute tolerable well   one which is very Short we exchanged with the Indian whoe we had given a longer gun to induc them to pilot us across the Mountains."[13] The Indian was the Nez Perce chief   Speaking Eagle, and he asked to exchange his gun for the short rifle.[14]

So there were two meanings for "short rifles:" the fifteen 1792 contract rifles, apparently shortened at Harpers Ferry, and two or three of those same rifles which were further shortened to remove a split barrel muzzle. All the journalists' references with the words "short rifles" appear to refer to the original unaltered guns. When Lewis directed that short rifles be used on April 12, 1806, in case of "attempts to robe or injure them," before shortening barrels for repairs, he surely was indicating the best guns of the party, the rifles from Harpers Ferry. No commander would choose damaged guns for the weapon of choice.

Lewis's quick  recognition of the ball fired by Cruzatte appears to show that the "short rifles," the Harpers Ferry rifles,  fired a bullet that was clearly different in size from other guns on the expedition. If others on the expedition had personal rifles (typically with calibers close to 0.49, the same caliber as the unmodified 1792 contract rifles), and personal smoothbores (muskets with caliber of 0.69; fusils with caliber of 0.625 or more), then the "short rifles" must have had a noticeably different caliber, larger than 0.49 and less than 0.625.  Lewis's remark is the only

---

9  Jackson, Vol. 1, p. 107.

10  Moulton, Vol. 7, p. 111; Vol. 9, p. 324; Vol. 8, p. 155.

11  Short barrels were known: German Jaeger rifles had barrels as short as 28 inches and were widely used in the American Revolution by the Hessian Jaeger Corps and other German units. Many Americans in 1803 were familiar with the short Jaeger rifle.  Moller, Vol. 1, p. 449.

12  Moulton, Vol. 8, pp. 27; 75.

13  Ibid., p. 80.

14  Zoa L. Swayne, *Do Them No Harm! Lewis and Clark among the Nez Perce,* (Caldwell Id.: Caxton Press,  1990), p. 303.

evidence I know that the expedition rifles had a caliber larger than 0.49. As a matter of personal experience it is hard to distinguish a .50 caliber ball from a 0.49 ball, but a 0.54 ball, for example, is plainly larger than a .49 ball.

It appears that Lewis selected the fifteen expedition rifles as the best of some three hundred 1792 contract rifles in storage at Harpers Ferry in March 1803. New flintlocks were fitted, the same locks used on the later Model 1803 rifle, and swivels and slings were added.  I expect that the barrels were shortened to a length less than 42 inches long, and that they had full stocks.  There is some reason to think the barrels were re-bored,  increasing the caliber from 0.49 to a noticeably larger bore.


### Other Rifles

Civilian hunters enlisted for the expedition, including the "nine young men from Kentucky," may have used their own firearms, and those guns mostly would have been American long rifles or "Pennsylvania rifles,"  the common rifle of hunters on the frontier. These famous American guns were  made by individual gunsmiths in eastern Pennsylvania and adjacent states. They were typically 57 to 60 inches long; sometimes more than 65 inches. Barrels were generally 40 inches long, or more, and the caliber usually was about 0.45 to 0.50. Ornamentation was common, with ornate patch boxes, trigger guards, and side plates, and carving on the wooden stock. Many fine examples of this handsome and famous American rifle survive, and are the subject of intense study.[15] A song "The Hunters of Kentucky," written  by S. Woodworth and W. Blondell in 1815 after the Battle of New Orleans, became very popular and may have originated the term "Kentucky rifle," but there is no record of the name "Kentucky rifle" being in use at the time of the expedition.[16]


### Muskets

A musket is a smoothbore: the interior of the barrel is smooth, unlike a rifle barrel which has spiral grooves to impart spin to the ball. Muskets are easier and faster to load than rifles, an advantage in battle, but are less accurate. Muskets can fire single round bullets, or small shot for hunting, like a modern shotgun.  Flintlock muskets were the regular firearm for soldiers in the American army of 1803. We know Lewis intended from the beginning that muskets would be used on the journey.  The "Invoice of Articles received from the Arsenal for the use of Capt. Lewis May 18th. 1803"  includes 125 musket flints and "15 Cartouch Box Belts,"[17] standard infantry equipment for holding musket cartridges – paper tubes containing a bullet and enough powder for one shot.

Lewis did not have to obtain muskets from the arsenal since enlisted men and sergeants coming from other army units brought their service muskets to the expedition. This was the "Charleville pattern musket," as it was known then, now called the Model 1795 musket. It was manufactured in Springfield, Massachusetts at the Springfield Armory from 1795 to 1814, and at Harpers Ferry beginning in 1801. The total production was 80,000 to 85,000 guns. This gun was the first official

---

15 Henry J. Kauffman, *The Pennsylvania-Kentucky Rifle*, (New York: Bonanza Books, 1960). Joe Kindig, Jr., *Thoughts on the Kentucky Rifle in Its Golden Age,* (York, PA: George Shumway, 1960). Merrill Lindsay, *The Kentucky Rifle,*  (New York: Arma Press, 1972).

16 Lindsay, p. 1.

17 Jackson, Vol. 1, p. 98.

model musket made for the U.S. government. It is a very close copy of the French Model 1763 Charleville musket.  The overall length is 60 inches and the weight is near 10 pounds.   The barrel is 44 ¾ inches in length, 0.69 caliber, tapered, and round.[18]  In his early planning, Meriwether Lewis provided accoutrement's for fifteen rifles and fifteen muskets for his intended party of fifteen men.   On the actual expedition there must have been about as many Charleville pattern muskets as Harpers Ferry rifles.  Although we tend to envision the men of the Lewis and Clark Expedition hunting with flintlock rifles, muskets were often used.

Some of the French *engages,* the boat men, surely brought their own guns, rifles or trade muskets. The trade musket, often called the trade gun or the North West gun, was a basic, plain musket about 0.60 inches caliber and 50 inches overall. Various forms of the North West gun were traded to native Indians in large numbers on the frontier for nearly 200 years. Distinctive trade gun features include a brass butt plate, a side plate in the form of a curling serpent, and an oversized trigger guard that allowed the trigger to be pulled when wearing mittens.[19] The journalists of the expedition encountered trade muskets among the native Indians and called them "fusees."

Since rate of fire of muzzle-loading guns is a matter of some importance, for example when dealing with grizzly bears, note that properly loading a patched ball in either a  flintlock rifle or a musket requires a minute or slightly less. Loading times of half a minute are difficult to achieve. A bear can run more than 600 feet in half a minute.  That is one reason the members of the expedition preferred to go out in groups when hunting grizzly bears, that, plus the fact that no gun on the expedition could be certain of killing large game in one shot.


### Clark's "Small Rifle"

Eighteenth and early-nineteenth century military officers on campaign often took considerable personal property with them. Clark several times refers to his own "small rifle .. the Size of the ball which was 100 to the pound."[20]  He even noted early in the journey "Little rifle for all my hunting." That was before he fired four times at an elk without bringing it down.  Small indeed: 100 lead bullets to the pound are 0.36 inch diameter balls, not much larger than a pea. These bullets are one eighth the weight of a bullet for a Charleville pattern musket. Such a small-caliber flintlock rifle is light and easy to carry which may explain Clark's preference for it over the heavy muskets and expedition rifles weighing nearly ten pounds.  A 0.36 caliber rifle that belonged to Clark is now owned by the Missouri Historical Society. It has a silver patch box and is highly ornamented, typical of Pennsylvania-style rifles made after 1790, with a mixture of features from early (Revolutionary War symbols in the ornamentation) and late (percussion lock, after 1810) periods of rifle building. The barrel is 37 ¾ inches long and the gun is 53 ¾ inches overall.[21] It was made by John Small of Vincennes, Indiana. Both the caliber and the maker's name raise the possibility that this surviving gun was the  "small" rifle Clark carried on the expedition. Stylistically this gun could have been made before 1803 (with an original flintlock replaced later with a percussion lock), or  it could have been made after 1806. Clark clearly liked "Small rifles." He may have purchased this one after the expedition. This rifle shows comparatively little wear. There is a chance that this rifle is Clark's "little rifle" of the expedition, but at the moment there is no definitive reason to be sure.

---

18  Robert M. Reilly, *United States Martial Flintlocks,*  (Lincoln, RI: Andrew Mowbray, 1987), pp. 51-54.

19  Charles E. Hanson, *The Northwest Gun.* (Lincoln: Nebraska State Historical Society, 1955).

20  Moulton, Vol. 6, pp. 121. Michael F. Carrick, "William Clark's `Small' Rifle, " Muzzle Blasts, 64, no. 11, (November 2003), p. 37.

21  Carolyn Gilman, *Lewis and Clark Across the Divide*, (Washington: Smithsonian Books, 2003), p. 356.

**Clark's "Elegant Fusil" and Lewis's Fowling Piece**

Clark also took an "elegant fusil" on the journey, a gentleman's sporting gun. "Fusil" is simply a French word for a smoothbore, and the expedition journalists call the natives' plain trade muskets "fusees." Fusils of an altogether different sort were comparatively small, high-quality, light-weight, ornamented smoothbores used by gentlemen for hunting birds and small game. Usually these gentleman's guns have a brightly polished barrel, ornamentation in the form of engraved brass or silver fittings and inlays, and finer workmanship than military and trade muskets. They deserve the adjective elegant.

Generally the fine fusils of the time are English guns with round tapering barrels, or octagonal barrels at the breech, becoming round about 10 inches ahead of the breech, with a caliber of 20 gage (20 balls to the pound, or 0.625 inches) to 0.69. Overall lengths fall in the range 48 inches to 58 inches, 52 to 55 inches being most common; the weight is 6 to 8 pounds. Fittings often include a butt plate and side plate engraved with hunting or martial scenes or symbols, a trigger guard with acorn finial, an engraved thumb piece or escutcheon plate, and sometimes checkering on the wrists.

On June 29, 1805, Clark, Charbonneau, Sacagawea, and her baby were in a ravine during a downpour, just upstream of the highest waterfall on the Missouri River, and were nearly swept away in a torrent that grew to 15 feet deep. In his journal that evening Clark described the flash flood and his loss of an "eligant fusee" [elegant fusil] and other equipment. Lewis, however, wrote that *Charbonneau* "lost his gun" and "my wiping rod" in the flood, and makes no mention of any fusil. However, Lewis did not learn of the flash flood adventure until two days later, when Clark and his party reached the upper portage camp. Whitehouse, who was also at the upper camp with Lewis, wrote in his journal "Capt. Clark lost the large Compass a fusiee pouch & horn." Sergeant Ordway was with Clark the evening after the flood. His journal entry is largely a copy of parts of Clark's journal, stating Clark lost "an elegant fusee."[22] Whose gun was lost remains a mystery, although Clark was present, and saw what happened. On the other hand Charbonneau was prone to poor judgment and mistakes. Clark also wrote, when the flood began, "I took my gun & Shot pouch in my left hand" and does not say he later dropped the gun. Another bit of evidence about a Clark fusil is a later entry in his journal, on August 30, 1805: "finding that we Could purchase no more horse than we had for our goods &c. ... I gave my Fusee to one of the men & sold his musket for a horse . . . ."[23] This might have been a simple trade gun "fusee," but a trade gun is an unlikely exchange for the better quality Charleville pattern musket -- if that is what the man had. So perhaps Charbonneau did lose a gun, or fusil, in the flash flood and Clark gave a personal fusil to one of the men on August 30. Odd to think of one of the men of the expedition using a gentleman's elegant sporting gun. In any case, Clark appears to have had at least one "eligant fusee" on the expedition. This is another case where scanty evidence leaves us in doubt.

After the return of the expedition Lewis submitted several requests for reimbursement of personal expenses. One listed items of personal property he traded for supplies: "One Uniform Laced Coat, one silver Epaulet, ... one pistol, one fowling piece, all private property, given in exchange for canoe, horses, &c."[24] A fowling piece is a civilian smoothbore long gun, not so elegant as a gentleman's fusil, and with an unusually long barrel -- some fowlers were over six feet long -- used primarily with small shot for hunting birds. "Fowlers" in the parlance of the time mean

---

22 Moulton, Vol. 4, p. 341; Vol. 9, p 177; Vol. 11, p. 215.
23 Moulton, Vol. 5, p. 178.
24 Jackson, Vol. 2, p. 428.

hunters using small shot in a fowling piece or in any suitable smoothbore gun, going out for birds, small game, or even deer.

## Lewis's Air Gun

The most remarkable gun of the expedition was Lewis's personal air rifle. Many expedition journal entries mention the "air gun,"[25] usually for a demonstration in council with the Indians, a display that usually "astonished the nativs."[26]   The air gun is a legendary property of the adventure, in no way lessened by being something of a mystery. The air gun proved useful, impressing Indians with apparently magical powers -- it was almost silent, it made no smoke, and it appears to have been a repeater.

Lewis wrote that he purchased the air gun in 1804, but did not say where.  There is no known expedition record  of what it looked like or how it worked.  Our knowledge of the air gun is based on brief expedition journal entries, and on three nineteenth-century documents: a personal journal, a memoir written some years after the event but possibly based on a journal, and a auctioneer's pamphlet, all of which may have errors. Two candidate air guns have been discussed at considerable length. One air gun is a single-shot gun made in America, the other is a repeater designed in Austria and made in Europe.

Until recently the conclusion of researchers was that the air gun was made by Isaiah Lukens of Philadelphia or possibly by his father Seneca Lukens.[27]  Key support for this view is an 1846 auctioneer's pamphlet of items in the sale of Isaiah Lukens' estate, written forty years after the expedition's return.  The list includes several air guns and air canes, and  "1 large Air Gun made for, and used by Messrs Lewis & Clark in their exploring expeditions. *A great curiosity*."  Note that it does not say the gun was made by Lukens, although another item in the list is described as "of his own construction."  One concern is the reliability of the claim, made forty years after the expedition's return, that the air gun in the estate sale was the air gun of the expedition. That air gun was withdrawn from the sale and lost to view, at least for a time.

Isaiah Lukens was born in 1779, lived in Horsham Pennsylvania, apprenticed there with his father Seneca Lukens, and moved to Philadelphia about 1811.  He was a notable craftsman and machinist, making clocks, watches, scientific instruments, and air guns. He was a founder of the Franklin Institute and a member of the American Philosophical Society (both in Philadelphia). He made the clock in Independence Hall.[28]  Dates are lacking for the surviving Lukens air guns,

25  Journal entries of Aug. 30, 1803; Aug. 3, 1804, Aug. 20, 1804, Oct. 10, 1804, Oct. 27, 1804, Oct. 29, 1804, Jan. 16, 1805, Jun. 9 1805, Jun. 10, 1805, Aug. 7, 1805, Aug. 17, 1805, Jan. 24, 1806, Apr. 3, 1806, May 11, 1806, and Aug. 11, 1806.

26  Moulton, Vol. 3, p. 209.

27  Charter Harrison Jr., "The Lewis and Clark Air Gun," *The Gun Report*, (May 1956), pp. 6, 34-35; Charter Harrison Jr., "More on the Lewis and Clark Air Gun," *The Gun Report*, (June 1956), p. 28; Henry Stewart Jr., "The American Air Gun School of 1800-1830," *Monthly Bugle* (Pennsylvania Antique Gun Collectors Association), 89, (1977), pp. 2-7; Roy M. Chatters, "The Not So Enigmatic Lewis and Clark Air Gun," *We Proceeded On*, 3, no. 2, (May 1977), p. 4-7; Ashley Halsey Jr., "The Air Gun of Lewis and Clark," *American Rifleman*, (August 1984), pp. 36-37, 81-82; Robert D. Beeman, "Proceeding On to the Lewis & Clark Airgun*,"* in Robert D. Beeman and John B. Allen, *Blue Book of Airguns*, (Minneapolis: Blue Book Publication, 2002) 2nd ed., pp. 50-77;  Website Robert D. Beeman, "Proceeding On" To The Lewis and Clark Airgun II," http://www.beemans.net/Lewis%20&%20Clark %20Airgun.htm, 2004, Website Robert D. Beeman, "Did Meriwether Lewis Carry and Assault Rifle?" http://www.beemans.net/Lewis%20Assault%20Rifle.htm, 2004;

28   Brooks Palmer, *The Book of American Clocks*, (New York: MacMillan, 1950), p. 235; George H.

but available evidence suggests that they were made after the expedition.[29]

Six Lukens air guns survive, four signed and two unmarked.  One particular gun,  now in the museum of the Virginia Military Institute, is claimed to be the air gun of the expedition. Repairs to its main spring, front sight, hammer, and a lock screw are consistent with brief mention of repairs made to the air gun during the expedition.  This air gun is 49 inches long, with a 32 inch brass or bronze barrel, .31 caliber, and rifled.  It fires one shot at a time, each bullet being loaded from the muzzle with a ramrod, like a conventional rifle of the period. Among the surviving air guns made by Lukens, this one is the smallest.

But the historical consensus now is that Lewis took a Girandoni air rifle on the expedition.[30] Bartolemeo Girandoni of Vienna  designed and manufactured an innovative and powerful air rifle which was adopted by the Austrian Army in 1780 as a silent – and secret – weapon. By 1800 about 1500 Girandoni air rifles were in use by the Austrian Army.[31]  Other gunsmiths in Europe made single copies of this design for private individuals, before and after 1800. An Austrian government report of January 20, 1801 states that 399 Girandoni air guns had been lost in battle,[32] so there were many more potential expedition air guns circulating in Europe before 1803 than Lukens guns, if any, available in America.  The Girandoni-style air gun is a large caliber rifle, near 0.50 caliber, 48 inches overall, with a magazine holding about 20 round lead bullets. The magazine is a short tube lying next to the barrel on the right side, looking something like a second and shorter barrel. The entire butt is a welded steel tube that serves as the air reservoir.  Loading a shot involves working a short horizontal bar or breech block that passes through the breech and magazine from left to right against a long external spring on the right side. A bullet moves from the magazine into an opening in the bar, and then into the breech when the bar is released and moves back to the left. Cocking the hammer prepares the air release. This takes a few seconds at most. Nothing is loaded from the muzzle. The gun is not an automatic, but it is a true repeater: twenty shots can be fired with one charge of air by simply working the breech block and hammer.

Although no expedition member described the air gun, there are accounts from two other observers. Colonel Thomas Rodney, a judge traveling to Mississippi Territory, visited with Lewis on September 7, 1083, in Wheeling, Virginia, and recorded the day in his journal. Lewis showed the air gun to Rodney and others with Rodney, and fired the gun several times. Rodney wrote "... when in perfect order she fires 22 times in a minute. All the balls are put at once into a short side

Eckhardt, *Pennsylvania Clocks and Clockmakers*, (New York: Devin-Adair, 1955), pp. 183-184; James B. Whisker, *Pennsylvania Clockmakers and Watchmakers* (Lampeter, Wales: Edwin Mellen Press, 1996), p. 164.

29  "Lukens moved to Philadelphia (from working in his father's shop in Horsham, PA) in 1811. The first listing I could find in the Philadelphia business directories was in 1813 as a `turner'  (of lathes). ... Lukens is in the business directories until 1830.... I have looked at all I could find in Philadelphia libraries. A companion of Lukens wrote in 1822 that `Lukens was chiefly engaged in making town clocks, but found time, with never more than the assistance of one or two men, to finish two or three small lathes and an air gun or two in the course of a year, for which there were always ready purchasers.' Lukens was primarily a clockmaker, a maker of small lathes (of a style he invented), and a machinist." Michael F. Carrick, personal communication.

30 Michael F. Carrick, "Meriwether Lewis's Air Gun," *We Proceeded On*, 29, no. 4, (November 2002), pp. 13-19;  Michael F. Carrick,  "Meriwether Lewis' Repeating Air Gun," *The Gun Report*,   (January 2003), pp. 28-36; Michael F. Carrick, "More on Lewis's Air Gun," *We Proceeded On*, 30, no. 2,  (May 2004), pp. 2-3.; Website Joseph Mussulman, *Capt. Lewis' s Medicine Gun,* http://www.lewis-clark.org/content/content-channel.asp?ChannelID=249, 2004.

31 Carrick 2003, p. 32.
32 Ibid., p. 35.

barrel and are then dropped into the chamber of the gun one at a time by moving a spring; and when the trigger is pulled just so much air escapes out of the air bag which forms the britch of the gun as serves for one ball. It is a curious piece of workmanship not easily described...."[33]  This description closely matches the Girandoni gun.  The "side barrel" magazine is particularly distinctive, and a Lukens gun never could fire 22 shots in a minute. Some fanciful material is present elsewhere in Rodney's journals,[34]  but Rodney's editors state he was "closely observant and unquenchably curious."[35]  Rodney's visit is corroborated by Lewis's journal entry for September 8, 1803.[36] To question Rodney's account is to ask why did Rodney correctly describe the unusual Girandoni air gun, with a mechanism found on no other gun, if Lewis showed him something else?

One other account  indicates that the expedition air gun was a repeater.  Charles McKenzie was a young clerk for the North West Company, on a trading expedition to the Hidatsa villages in the winter of 1804-1805, at the same time the Lewis and Clark Expedition wintered over there.  He later wrote "The Indians admired the air gun as it could discharge forty shots out of one load – but they dreaded the magic of the owners."[37]  This might mean it could fire many times on one charge of air, each bullet being separately loaded, but it sounds like it was a repeater. The discrepancy between McKenzie's statement of forty shots in one load and the Girandoni-style twenty shot magazine is puzzling, but an error may have crept into the only surviving copy of his journal, while the description preserves the essential attribute of many "shots out of one load."[38] The Rodney and McKenzie accounts are both consistent with a Girandoni-style gun, and not consistent with the surviving air guns made by Lukens or his associates.

There is a way to make all the records agree.  Perhaps Lukens obtained the expedition air gun after Lewis's death  -- he clearly had an interest in air guns -- and it was a Girandoni-style air rifle. Forty years later it appeared in his estate.  Incidentally, a Girandoni-style air gun could have a forty shot magazine, simply by a longer magazine tube.


## Pistols

Captain Lewis requisitioned "1 P[air] Horsemans Pistols" from the  Schuylkill Arsenal in Philadelphia in May 1803.[39]     Although details of these pistols are not recorded, two kinds of horseman's pistol were on hand in large numbers in the Schuylkill Arsenal at that time: the "North and Cheney 1799" pistol and the "McCormick style" pistol.

Simeon North of Berlin, Connecticut, a noted gunmaker with a 53 year career supplying pistols and rifles for the U.S. military, and an early innovative New England industrialist, accepted his first contract with the government on March 9, 1799, for five hundred pistols of what is now

---

33 Dwight L. Smith, and Ray Swick, eds., *A Journey through the West Thomas Rodney's 1803 Journal from Delaware to the Mississippi Territory,* (Athens: Ohio University Press, 1997), p. 50.

34 Beeman, 2004a.

35 Carrick, 2004, p. 3.

36 Moulton, Vol. 2, p.  .

37  W. Raymond Wood and Thomas D. Thiessen, *Early Fur Trade on the Northern Plains: Canadian Traders Among the Mandan and Hidatsa Indians, 1738-1818* (Norman: University of Oklahoma Press, 1985), p. 232.

38 McKenzie's "accounts were apparently written about 1809-1810...." The surviving manuscript is "Narrative C, which is an unknown hand, and probably does not represent Charles McKenzie's original composition on these subjects, which are lost." Wood and Thiessen, pp. 223; 227.

39 Jackson, Vol. 1, p. 97.

called the U.S. Model 1799 pistol, or the "North and Cheney 1799" pistol. North's partner was his brother in law, Elisha Cheney. All five hundred pistols were received by January 24, 1801 at the Schuylkill Arsenal in Philadelphia. A later contract for fifteen hundred pistols of the same model was completed and the guns received in September 1802 at the New Haven, Connecticut storeroom.[40] The pistols made for the second contract probably were not available to Lewis in Philadelphia in 1803.

The North and Cheney 1799 pistol closely follows the French Model 1777 pistol, also called the Charleville or St. Etienne pistol, an unusual design with a brass frame, using wood only for grips. The American version is 14 ½ inches overall, with an 8 ½ inch barrel, one inch longer than the French pistol. The caliber is 0.69, using the same bullet as the Charleville pattern musket, and the gun weighs about 3 pounds. The first 500 contract pistols were stamped S. NORTH & E. CHENEY BERLIN in a curve on the underside of the brass frame near the trigger, and US was stamped on top of the barrel at the breech. Serial numbers are marked internally.[41] Fewer than ten pistols of this contract are known to survive.

In 1797 or 1798 the storekeepers at the Schuylkill "military storeroom" in Philadelphia issued gun parts to several local gunsmiths for assembly into pistols.[42] Delivery of horseman's pistols were noted from gunsmith John Miles in October and December 1798 (200 pistols total) and from Robert McCormick in August 1799 (98 pistols). Of fewer than 10 guns remaining of this lot, two are marked McCormick and the others are unmarked. The few surviving guns of these "1799 Contract" or "McCormick style" horseman's pistols are near 16 ¼ inches overall, with round barrels 9 ¾ to 10 ¼ inches long in calibers 0.65 to 0.67, and weigh near 2 ½ pounds. Brass mountings include a butt cap with short side extensions, a single ramrod thimble, the trigger guard, and a brass band at the muzzle; the full stock is walnut. The locks were purchased from Ketland & Company of London and Birmingham by the federal government.[43] The Schuylkill Arsenal also may have had on hand other kinds of horseman's pistols; for example, the original French Charleville pistol was used by U.S. officers at that time.

On the expedition each of the captains carried one of the horseman's pistols. Among the Shoshones, Clark wrote on August 29, 1805 "I purchased a horse for which I gave my Pistol 100 Balls Powder & a Knife."[44] For Lewis the critical moment with a pistol was the fight with the Piegan Blackfeet early on July 27, 1806: "I jumped up and asked what was the matter which I quickly learned when I saw drewyer in a scuffle with the indian for his gun. I reached to seize my gun but found her gone, I then drew a pistol from my holster...."[45] After a pursuit on foot of some 300 yards, he fired at a Blackfeet warrior who was driving off the horses. The warrior was hit but was able to return fire and nearly hit Lewis. Blackfeet accounts say the injured man died.[46] These are the only shots fired at other humans during the expedition.

Lewis also purchased "1 Pair Pocket Pistols, Secret Triggers" for ten dollars from Robert

---

40  Samuel E. Smith and Edwin W. Bitter, *Historic Pistols The American Martial Flintlock 1760-1845,* (New York: Scalamandre, 1985), p. 123; Reilly, p. 168.
41  Smith and Bitter, pp. 126-128.
42  Reilly, pp. 164-166.
43  Smith and Bitter, pp. 126-128; Reilly, pp. 164-168.
44  Moulton, Vol. 5, p. 178.
45  Moulton, Vol. 8, p. 134.
46  James P. Ronda, *Lewis and Clark Among the Indians*, (Lincoln: University of Nebraska, 1984), p. 242.

Barnhill at 63 North Second Street in Philadelphia on May 21st, 1803.[47]  Pocket pistols, also called screw-barrel pistols and box lock pistols, were small in caliber and small in size, small enough to fit in a pocket, often only four to five inches long. The gun was loaded by unscrewing the barrel from the lock, loading powder and ball into a chamber in the box-shaped lock, and screwing the barrel back on. There was no ramrod, but there was a small wrench to tighten the barrel. Some pocket pistols had a "secret" trigger which folded out of sight, into the handle. The trigger swung into place when the hammer was cocked. There is no further mention of the pocket pistols in other records of the expedition.

The same request by Lewis mentioned previously for reimbursement of a fowling piece given in trade also indicates that he traded a personal pistol for supplies.  On the return journey, and very short of trade items, on April 29, 1806, Lewis wrote "we gave small medals to two inferior cheifs of this nation and they each presented us a fine horse  in return we gave them sundry articles and among others one of my case pistols and several hundred rounds of ammunition."[48]   Case pistols are a matched pair of high-quality pistols, kept in a lined case or box, such as gentlemen used for dueling.

Early in his Army career, Lewis, then an Ensign, challenged a superior officer to a duel, contrary to regulations. The duel did not occur.[49]  The outcome was that Lewis was transferred from the post where the incident occurred, to another fort, where he met Willima Clark, lived in Clark's quarters.  Perhaps the case pistols of the expedition were the same pistols which led to a key event in Lewis's life.

### Swivel Gun and Blunderbuss

The expedition had one swivel gun and two blunderbusses. A swivel gun is a small version of the 18th century naval cannon, about 30 inches long and with a bore near 2 inches, usually cast in iron but occasionally cast in bronze. It swivels on a U-shaped yoke, standing on a vertical pin in the rail of a ship or in the wall of a fortification, and is easily and quickly pointed in any direction. Swivel guns could also be mounted on a miniature naval gun carriage. Swivel guns can fire a single solid ball but usually were loaded with a handful of shot – or even musket balls - and used as a kind of extra-large shotgun to repel attackers.  Blunderbusses are short, heavy, smooth-bore flintlock shoulder arms used for defense, usually mounted on a pivot in the rail of ship or boat, or on the top of a wall. The muzzle is flared to assist rapid loading. Going upriver in 1804 the swivel gun was mounted in the bow of the keelboat and the blunderbusses were on the pirogues. During the winter  of 1804-1805, the swivel gun and blunderbusses apparently were mounted on the walls of Fort Mandan. The time they were most important for defense was during confrontations with the Teton Sioux, September 25 and 28, 1804. On the first occasion Sergeant Ordway wrote "Capt. Lewis who was on board ordered every man to his arms.  the large swivel loaded immediately with 16 Musquet balls in it   the two other Swivels loaded well with Buck Shot, Each of them manned."[50]   On the 28th a group of braves seized the keelboat's cable to prevent departure and demanded more gifts. Clark wrote that he spoke firmly, gave a carrot of tobacco to a chief, and prepared to fire the swivel gun.[51]  The chief jerked the cable from the

---

47 Jackson, Vol 1. p. 91.
48 Moulton, Vol. 7, p. 183.
49 E. G. Chuinard, "The Court-Martial of Ensign Meriwether Lewis," *We Proceeded On*, 8, no. 4,
    (November 1982), pp. 12-15.
50 Moulton, Vol. 9, p. 68.
51 Moulton, Vol. 3, p 124.

braves and the expedition departed.


Returning to the Hidatsa villages on the Missouri River on 14 August 1806, Clark wrote "we directed the blunderbusses be fired several times...." as a peaceful salute.[52]  The swivel gun was presented to the Hidatsa chief One Eye, with an admonition by Clark to heed the words of the captains and to remember those words whenever the gun was fired.[53]  The blunderbusses sounded for the last time at the return to St. Charles, Missouri,    September 21, 1806. Clark wrote: "at 4 P M we arived in Sight of St. Charles, the party rejoiced at the sight of this Hospital [hospitable] village plyed thear ores with great dextreity and we Soon arived opposit the Town, ... we saluted the Village by three rounds from our blunderbuts and the Small arms of the party, and landed near the lower part of the town. we were met by great numbers of the inhabitants."[54]   The expedition was over.

Traveling across an unmapped and unknown wilderness, remote from familiar sources of aid and supply, guns were indispensable to the explorers.   The Harpers Ferry rifles, the Charleville pattern muskets, the air gun, Clark's "little rifle," the plain trade muskets and Clark's elegant fusil, Lewis's fowling piece and his case pistols, the pocket pistols with secret triggers, the horseman's pistols, the small cannon, and the blunderbusses made a kind of traveling exhibition of firearms technology of the day. Many of these guns were little used on the expedition, and others, especially the rifles and muskets, were essential to survival in the wilderness and for the successful return of the expedition.


Copyright © 2005, 2010 S. K. Wier.  Reproduction, reuse, or retransmission prohibited without prior written permission from the author.

August 11, 2010

Boulder, Colorado

---

52  Moulton, Vol. 8, p. 298.
53  Ibid., p. 304.
54  Ibid., p. 369.

# OTHER SOURCES



(/)

**Collection** (/collections)

Subjects (/collections/subjects)

Object Groups (/collections/object-groups)

About the Online Collection (/collections/about-online-collection)

FAQ (/museum/faqs/museum-collection)

Rights and Reproductions (/collections/rights-and-reproductions)

# Belton Repeating Flintlock Fusil



(https://ids.si.edu/ids/deliveryService?id=NMAH-2008-19692-000002)

 
**DESCRIPTION (BRIEF)**

Eight-shot or single-shot flintlock fusil made by Joseph Belton in Philadelphia, 1758

**LOCATION**

Currently not on view

**OBJECT NAME**

Fusil

fusil

**OTHER TERMS**

Fusil; Firearms; Flintlock;.72 In; Smooth Bore; Muzzle Load; Sa

**ASSOCIATED DATE**

1758 05 05

**LICENSEE**

Belton

**PLACE MADE**

United Kingdom: Grand Bretagne

United States

**MEASUREMENTS**

overall: 6 1/2 in x 53 1/2 in x 2 1/4 in; 16.51 cm x 135.89 cm x 5.715 cm

**ID NUMBER**

1982.0151.01

**ACCESSION NUMBER**

1982.0151

**CATALOG NUMBER**

1982.0151.01

**CREDIT LINE**

Charles Bremner Hogg Jackson

**SEE MORE ITEMS IN**

Political and Military History: Armed Forces History, Military (/collections/search?
edan_q=&edan_fq[]=set_name:%22Political+and+Military+History%3A+Armed+Forces+Hist
search)

**DATA SOURCE**

National Museum of American History

Our collection database is a work in progress. We may update this record based on further research and review. Learn more about our approach to sharing our collection online (/collections/about-online-collection).

If you would like to know how you can use content on this page, see the Smithsonian's Terms of Use (https://www.si.edu/termsofuse/). If you need to request an image for publication or other use, please visit Rights and Reproductions (/collections/rights-and-reproductions).

Note: Comment submission is temporarily unavailable while we make improvements to the site. We apologize for the interruption. If you have a question relating to the museum's collections, please first check our Collections FAQ (https://americanhistory.si.edu/museum/faqs/museum-collection). If you require a personal response, please use our Contact page (https://americanhistory.si.edu/about/contact).

## ▍Collections Search



(/)

Constitution Avenue, NW
Between 12th and 14th Streets
Washington, D.C.

Giving (/giving)

Contact (/about/contact)

Press (/press)

Smithsonian Institution (https://www.si.edu/)

Terms of Use (https://www.si.edu/termsofuse/)

Privacy (https://www.si.edu/privacy/)

## Sign up for Monthly E-newsletter

**Email Address \***

| | |
|---|---|
| | **Submit** |

Email powered by MailChimp (Privacy Policy & Terms of Use (https://mailchimp.com/legal/))

**f** (https://www.facebook.com/americanhist

🐦 (https://twitter.com/#!/amhistorymuseum

▶ (https://www.youtube.com/SmithsonianA

📌 (https://www.pinterest.com/amhistorymu

📷 (https://instagram.com/amhistorymuseum